# 11-0126-cv

## United States Court of Appeals
### *for the*
## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

— v. —

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SPECIAL APPENDIX

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

**Page**

Summary Judgment Order, dated
    September 15, 2010 ................................................ SPA-1

Order Excluding Expert Testimony, dated
    October 27, 2010 .................................................. SPA-3

Order Excluding Evidence of Citi's Liability,
    dated October 28, 2010........................................... SPA-19

Order Excluding Evidence of Citi's Liability,
    dated November 1, 2010......................................... SPA-34

Order Granting Directed Verdict and Issuing Jury
    Instructions, dated November 1, 2010 .................. SPA-59

Order Dismissing Juror, dated
    November 2, 2010 ................................................ SPA-133

Order Issuing Jury Instructions, dated
    November 2, 2010 ................................................ SPA-144

Summary Judgment Opinion, dated
    November 3, 2010 ................................................ SPA-150

Court's Jury Instructions, dated
    November 3, 2010 ................................................ SPA-166

The Court's Instructions to the Jury........................... SPA-182

Order Entering Judgment, dated
    December 9, 2010, Appealed From ....................... SPA-198

SPA-1

Case 1:09-cv-10459-JSR    Document 98    Filed 09/15/10    Page 1 of 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TERRA FIRMA INVESTMENTS (GP) 2      :
LIMITED (for and on behalf of the six :
limited partnerships constituting the :
Terra Firma Capital Partners II      :        09 Civ. 10459 (JSR)
Fund), and TERRA FIRMA INVESTMENTS   :
(GP) 3 LIMITED (for and on behalf of :        ORDER
Terra Firma Capital Partners III,    :
L.P.),                               :

                Plaintiffs,          :

                -v-                  :

CITIGROUP INC., CITIBANK N.A.,       :
CITIGROUP GLOBAL MARKETS LIMITED, and :
CITIGROUP GLOBAL MARKETS, INC.,      :

                Defendants.          :
------------------------------------ x



JED S. RAKOFF, U.S.D.J.

        Plaintiffs Terra Firma Investments (GP) 2 Limited and Terra

Firma Investments (GP) 3 Limited (collectively, "Terra Firma") have

brought suit against defendants Citigroup Inc., Citibank N.A.,

Citigroup Global Markets Limited, and Citigroup Global Markets, Inc.

(collectively, "Citi"), alleging that Citi engaged in fraudulent

misrepresentation, negligent misrepresentation, fraudulent

concealment, and tortious interference with prospective economic

advantage, all in connection with Terra Firma's acquisition of and

interest in the well-known music company, EMI Group.  Following

extensive discovery, defendants filed for summary judgment on August

13, 2010, seeking dismissal of all claims.  After receiving full

briefing from the parties, the Court heard oral argument on September

10, 2010.

SPA-2

Upon careful consideration, the Court partially grants the motion to the extent of dismissing the negligent misrepresentation and tortious interference claims, but denies the motion as to the claims for fraudulent misrepresentation and fraudulent concealment. Accordingly, the latter two claims will proceed to trial on October 18, 2010.

An Opinion setting forth the reasons for these rulings will issue in due course.  Meanwhile, the Clerk of the Court is directed to close document number 57 on the docket of the case.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       September 14, 2010

2

**SPA-3**

0AR3TER1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    TERRA FIRMA INVESTMENTS (GP) 2
      LIMITED (for and on behalf of
 4    the six limited partnerships
      constituting the Terra Firma
 5    Capital Partners II Fund), and
      TERRA FIRMA INVESTMENTS (GP) 3
 6    LIMITED (for and on behalf of
      Terra Firma Capital Partners
 7    III, L.P.),

 8                  Plaintiffs,

 9          v.                          09 CV 10459 (JSR)

10    CITIGROUP INC., CITIBANK,
      N.A., CITIGROUP GLOBAL MARKETS
11    LIMITED, AND CITIGROUP GLOBAL
      MARKETS, INC.,
12
                  Defendants.           Jury Trial
13
      ------------------------------x
14                                      New York, N.Y.
                                        October 27, 2010
15                                      9:40 a.m.

16    Before:

17                    HON. JED S. RAKOFF,

18                                      District Judge

19

20

21

22

23

24

25
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

1394

0ar1ter8

1              THE COURT:  All right.

2              MR. COHEN:  Your Honor, can I just follow up on that?

3              THE COURT:  Yes.

4              MR. COHEN:  There are -- there are many analyst

5    reports, with all sorts of target prices, that come out on

6    different days, and this chart refers to the, plural, broker

7    research published following the profit warnings.  So, you

8    know, I understand 211, 222, and I understand Mr. Boies wants

9    the number to be as low as possible and I want the number to be

10   as high as possible, so with that caveat, I don't, you know --

11   I don't think there's any magic to the Citi date.  I mean, I

12   think we could have a discussion, you know, around trying to

13   figure out a fair date to achieve what you want to achieve.  I

14   don't think that plaintiff's expert has anything to say about

15   this.  It's not a question she's looked at.

16             THE COURT:  No, I understand.

17             All right.  Let's go to the next -- I'm, for the

18   moment, reserving on all this.  Let's go to the next thing, the

19   next alternative measure of damages that you --

20             MR. BOIES:  Right.  And the next alternative

21   measure -- the next measure of damages, the lost profits, is

22   not an alternative measure.

23             THE COURT:  It's an additional.

24             MR. BOIES:  It's an additional measure, although you

25   could make it into an alternative measure simply by --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-5

1395

0ar1ter8

1           MR. COHEN:  I'm sorry.  I can give you two numbers,
2    then I can discuss it with Mr. Boies.  The announcement by EMI
3    that there were private equity bidders was on May 4th.  The
4    stock closed that day -- we'll check this all -- at 246 pence.
5    There it is.  The day before the announcement was 227 pence.
6    So that was the 4th, and we can provide the answer -- the 4th
7    was the official announcement by EMI of that.  So, I mean, if
8    we're looking for a day where there was significant movement
9    because of the private equity news, it would have been on
10   May 4th.
11           (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0AR3TER9

1          THE COURT:  All right.

2          MR. COHEN:  Sorry to interrupt you.

3          MR. BOIES:  No, that's fine.

4          THE COURT:  I agree.  It could be made an alternative

5    if I rejected the first approach, but right now it is an

6    addition.

7          MR. BOIES:  No.  What I meant was, I don't think it

8    would work as an alternative.

9          THE COURT:  Okay.

10          MR. BOIES:  Because if you rejected our approach, we'd

11    still have to apply that rejection to the lost profits.  The

12    way the lost profits works is that you get the money that you

13    would have earned on the differential.  The first step is

14    calculating differential and the second step is how much you

15    would have earned on --

16          THE COURT:  You are absolutely right.

17          MR. BOIES:  If the differential is down because of

18    what the Court rules is the right way to calculate the

19    differential, that has to flow into the calculation of lost

20    profits.

21          THE COURT:  I agree with that.  But on the issue of

22    lost profits, I had a lot of problem, which you may recall,

23    with her using this historical rate of return from a boom

24    period that involved Terra Firma 1 and the combination of that

25    was this 43.66 rate of return projected then into a period of

**SPA-7**

0AR3TER9

1  recession.  This seemed like to blink the realities of the

2  situation.

3       MR. BOIES:  I think it is not.  Indeed, I think it

4  goes, if I understand the economics, your Honor, the opposite

5  way than the Court may be thinking of it.  Because what you

6  always want to do is buy low and sell high.  In boom times, the

7  prices are higher.  What the issue is, is if this deal had not

8  been done, that is, if they had not done this deal, or if they

9  had done the deal at the lower price, what would they have then

10 done with that money.  And that money would have been invested

11 in the bust times.  That money would have been invested -- in

12 2007 --

13      THE COURT:  I hear what you are saying but I don't buy

14 it at all.  Because if for reasons that have nothing to do with

15 anything about market psychology, you have a straight upward

16 line, so that even though you're overpaying for your house

17 because the same house a year ago was half the price, you know

18 that it's highly likely the way real estate is going that the

19 house is going to be worth twice as much a year from now

20 because this is for lack of a better word a bubble, then you

21 are going to realize on paper at least these phenomenal profits

22 even though you are buying high because everything is going off

23 the charts.  And then suddenly the bubble bursts and things get

24 worse and worse and worse, and you are saying in that market,

25 you can still realize a 43 percent return.  That's -- if that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1398

0AR3TER9

1    were so, there would be a lot fewer people complaining out

2    there today than there are.

3           MR. BOIES:  But that's why you take the actual IRR

4    through that -- through both the ups and the downs.  In other

5    words --

6           THE COURT:  There were no downs.

7           MR. BOIES:  There were downs in 2007, 2008 and 2009.

8    Could I have just one moment just to check something?

9           THE COURT:  Yes.

10          MR. BOIES:  As I understand the calculation, is this

11   is from 1995 through 2010.  In other words, it's whatever they

12   have earned over that entire period, and the 43 is an average

13   IRR.  Now, what the right --

14          THE COURT:  I guess what I am really saying is this:

15   Hidden behind that approach is a notion that over the long run,

16   market fluctuations, other factors, extraneous factors will

17   sort of factor out, and you'll get a fair and reasonable

18   evaluation of how this kind of company or this kind of investor

19   would do investing over the long term.  But when you have

20   instead a extraordinary period of incredible boom, followed by

21   very serious bust, but the boom is seven of your years and the

22   bust is two, you are going to have a very artificial valuation.

23          MR. BOIES:  I think there are ways to correct that.

24   If you look at the case the Court gave us, the English case.

25          THE COURT:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**SPA-9**

0AR3TER9

1             MR. BOIES:  You recall that's a case where the

2     plaintiff had this investing business and had earned 50 percent

3     returns.  And the court holds that because he had earned those

4     over a period of six years, that it is appropriate to use that

5     return.

6             THE COURT:  Yes.  I came across that case because it

7     was the most recent case I could find.  But, there is no doubt

8     if I were to apply the English rules of evidence, you wouldn't

9     have to be as methodologically rigorous as perhaps you would

10    have to be on your U.S. law.  So there is no doubt that case is

11    helpful too, I understand that, and therefore I take full

12    account of it.  But I think that's part of the reason, though,

13    I made the distinction upfront between English substantive law

14    and American admissibility law.

15            MR. BOIES:  One thing I'd ask the Court to consider is

16    sort of where that line falls.  I think that if you are talking

17    about the American law of evidence, it has to do certainly with

18    certain criteria for expert testimony, what's appropriate for

19    expert testimony, what's appropriate for lay testimony.  Things

20    like that.  But when you are talking about the measure of

21    damages, that is, whether the measure is under -- as under the

22    English rule a hypothetical business run by the plaintiff, or

23    whether the measure is something else, then I think that may --

24    may be a matter of English law, not evidence.

25            THE COURT:  As the English would say, it's a nice

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-10

1400

0AR3TER9

1    distinction.  I'll think about that.

2              MR. BOIES:  The other thing I would say to the Court,

3    I believe that ultimately the choice of what the right internal

4    rate of return is, is a question for either the jury, or the

5    Court, depending on the standard the Court applies.  That's one

6    of the reasons why Ms. DeMario provides sensitivity analysis

7    that show what the different lost profits are depending on what

8    internal rate of return you choose.  For example, one of the

9    points the Court made was that we have fund 1 and 2, and fund 1

10   didn't invest.  Now, the justification for doing that --

11             THE COURT:  You mean it's really -- maybe I'm getting

12   it mixed up.  I thought it was 2 and 3, and 3 didn't invest.

13             MR. BOIES:  No.  Funds 1, 2 and 3.  2 and 3 invested.

14             THE COURT:  I'm sorry.  I see.  We are saying the same

15   thing, just different.  The 2 and 3 invested in EMI.

16             MR. BOIES:  Yes.

17             THE COURT:  1 did not.

18             MR. BOIES:  Yes.

19             THE COURT:  3 has no track record.

20             MR. BOIES:  Yes.

21             THE COURT:  So, one approach that might seem more

22   appropriate under all those set of circumstances would be just

23   to look at 2, and that's where she said if we look at 2, it's

24   20 percent rather than 43 percent.

25             MR. BOIES:  The other advantage of looking at 2 is

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**SPA-11**

1401

0AR3TER9

1   because 2 is a more recent fund, it only starts I think in

2   2002.

3          THE COURT:  Yes.  So let me -- that's a good point.

4   Forgive me for interrupting.  Let me ask Mr. Cohen.

5          MR. COHEN:  Two points, your Honor.

6          THE COURT:  Let's assume for the sake of argument that

7   we went with just fund 2.

8          MR. COHEN:  Right.

9          THE COURT:  Why isn't that a reasonable way of

10  estimating lost profits?

11         MR. COHEN:  Putting to one side, if I could just make

12  two prefatory points.  Under Parabola, in that case which I've

13  been slogging through, there was a track record before and a

14  track record after.  The fraud was for a little period in the

15  middle.  So even under English law, if we apply it to this

16  damage, you don't get to speculate, you know, endlessly about

17  what the lost profits might be.

18         Second, this sensitivity analysis of Ms. DeMario which

19  of course did not appear until after the Daubert hearing, we

20  got a piece of paper yesterday.  It's wrong.  So if I could put

21  up, and I am going to hand to the Court and I'll show you why,

22  your Honor, exhibit ALL, which is a Terra Firma document.  If

23  we could put up the next to last page, I think it's 29 of 31.

24  We put this into evidence, your Honor, as an admission on our

25  case sort of through Ms. DeMario on cross.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0AR3TER9

1           Here is 29 of 31 is what's actually happened.  Here is
2     the problem.  Ms. DeMario's 20 percent says for investments
3     that we made at any time in the history of the fund, we'll look
4     at those how those investments did from 2007 to 2010.  The
5     question under English law is not how preexisting investments
6     would have done.  But what would you have done in the
7     marketplace if you hadn't spent your money in EMI, starting in
8     2007.
9           Let's look at fund 2.  There are two investments.
10     This is their document.  One has a negative 12 percent IRR
11     that's AWAS, and one has a negative 68 percent IRR, that's EMI.
12     Let's look at the next page.  These are the investments they've
13     made since '07.  Not surprisingly -- they are unrealized
14     losses -- but not surprisingly, like everyone else in this
15     market, they are not earning 40 percent.  They are not earning
16     20 percent.
17           THE COURT:  That's a very interesting point.  Do we
18     know how, even though they weren't an investor in EMI, but just
19     to complete the picture how did fund 1 do since 2006?
20           MR. COHEN:  Go back -- I think it closed out, that's
21     the problem, your Honor.  If you go to fund 1.
22           THE COURT:  Okay.  That will answer the question,
23     anyway.
24           MR. COHEN:  I think fund 1, I think if you go to page
25     28 of 31, your Honor, investments prior to fund 2 so I think

SPA-13

1403

0AR3TER9

1    this has to be both fund 1 and -- they did very well

2    historically, but we don't know when this fund closed out.  We

3    can tell from these boxes on the left they've all been

4    divested.

5            THE COURT:  Let me go back to Mr. Boies.  Isn't that

6    point really well taken?  The theory of lost profits is that

7    you would have taken this money that but for the fraud you

8    would not have invested in EMI, and you would have invested at

9    that time in something else using the same kind of expertise

10   that you had historically used, and that you've used in the

11   years to come, and look what you did in your other investments

12   during that period, 2007, 8, 9, 10, you lost money.

13           Why isn't that the right way to look at this?

14           MR. BOIES:  I think there are two things, your Honor.

15   First, no one would ever calculate the final results based on

16   what happened over one or two years, particularly when you buy

17   it at the beginning of the greatest financial crisis since the

18   Great Depression.  That's why you take --

19           THE COURT:  A good time you just told me to buy cheap

20   and make a killing.

21           MR. BOIES:  It is.  If you notice, your Honor, the one

22   that was done in April of '09, you know, remember the bottom

23   was March of '09.  And remember what Mr. Hands testified to, is

24   that the right thing to do would have been to start investing

25   when the market turned in '09.  And that 1, while it doesn't

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-14

0AR3TER9

1   have a profit yet, it doesn't have a loss either.  And if you

2   look at EMI here, of course EMI --

3           THE COURT:  Forget about EMI.  I agree we exclude EMI.

4   But everything else lost, or you are telling me 1 stayed even

5   so to speak.

6           MR. BOIES:  The one from '09, from '09 forward.

7           THE COURT:  You presumably don't want to go to the

8   jury with your lost profits as zero.

9           MR. BOIES:  No.  And I don't think it is appropriate

10  to take something that has -- this is published six months

11  after the investment is made.  And if you look at Project

12  Hammer, Project Hammer is 174 million.  It is 1 or 2 percent of

13  large investments that you are looking at here.  The AWAS

14  preceded EMI.

15          What Mr. Hands testified to, and I really think that

16  this is something that is entirely consistent with everything

17  that the literature shows, is that what happened is that

18  starting -- and Citibank people said this as well.  That

19  starting in the summer of 2007, the credit markets froze up.

20  You weren't going to do a deal like this.  By '08, things were

21  in free fall.  You wouldn't begin to do any of these deals

22  until 2009.  That's when if they hadn't made this investment,

23  those funds would have been invested.  That is the kind of long

24  term private equity work that the company has done for 13

25  years.

SPA-15

0AR3TER9

1          THE COURT:  All right.  Let's turn again.

2          MR. COHEN:  Could I just briefly make one point?

3          THE COURT:  Yes.

4          MR. COHEN:  Look, I want to make one -- one point from

5     the document and one point from the cases.  If we could go back

6     to page five.  This is part of the problem because I think what

7     Mr. Boies is demonstrating and I think the case law supports

8     it, is this is incredibly speculative.  If we go to page five

9     of ALL.  Five of 31.  And we go to the box in the right corner.

10    We see fund 3.  Right bottom corner.  It closed in May 2007

11    just before EMI with 5.4 billion and half of it is uncalled on.

12    No one is investing in this period.  52 percent of fund

13    commitments have been invested to date.  That means the rest of

14    the fund is sitting in cash.  This is not a time where you

15    invest and make 30 and 40 percent returns.  And in fact there

16    was one modest investment in that period.

17         The second point I would make under the case law it

18    does go to what Mr. Boies is saying, is in Parabola, the trader

19    had a long history before, a modest period of fraud in the

20    middle, and then a comparable history afterwards.  If what we

21    were facing here was a long period before EMI, the EMI fraud

22    being in the middle, and then a long period after from which we

23    could draw some inference about how they would have done, we

24    would be facing a different case.  This shows they are not

25    going to make any money.  But there is certainly no basis for

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1406

0AR3TER9

1    today assuming that because from 1995 to 2006, Terra Firma was

2    able to earn returns of 30 or 40 percent or even 20 percent,

3    that they'll be able to do that going forward.  That's our

4    fundamental problem which is any way you do it, it's

5    speculative.

6         THE COURT:  All right.  Let me go now to the next

7    basic assertion Ms. DeMario is making, which is what, the

8    locked in assumption or any one you want to put before me.

9         MR. BOIES:  I think that the locked in assumption that

10   she has does not affect the ultimate numbers.  I think that's

11   an alternative calculation depending on what the Court and the

12   jury were to find is the right date.  She does not depend on

13   that.

14        THE COURT:  I guess my question is why should she be

15   permitted to testify to anything in that regard because what's

16   the evidence that would support a theory that they were locked

17   in?

18        MR. BOIES:  I would have to look at Mr. Hands'

19   testimony to see whether he testified about the extent to which

20   he could have -- been able -- maybe even Mr. Wormsley's

21   testimony.  About the extent to which they would be able to do

22   a transaction in the period of 2008 and 2009.  But --

23        THE COURT:  I don't read the case law on this as

24   really dealing with that kind of situation.  I think it's a far

25   more onerous kind of locking that the case law relates to.  But

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1407

0AR3TER9

1    at any rate, we'll put that aside for a moment.

2            MR. COHEN:  Could I just respond to that one point.

3    There isn't any evidence.  Mr. Hands might have used the word

4    locked in.  But here's the only evidence there is, and here's

5    what's missing.  The only evidence there is is that in January

6    of 2008, they sold to co-investors at the original valuation

7    price.  That's in Ms. DeMario's report at paragraph 35.  They

8    sold off 14 percent of the investment at the same price that

9    they invested.  They invested a billion five, they sold

10   14 percent at 259 million pounds.  It is the same -- it grosses

11   it up to 1.795 billion.  That's the same price.  That's the

12   only price.

13           What's missing from the record, and there is no

14   witness who is going to come forward in Terra Firma's case that

15   they've put on their witness list, is they didn't try to sell

16   the company.  They didn't hire a banker, they didn't conduct an

17   auction.  I mean, he made a decision to hold the investment.

18   That can't be what is locked in under English law to take

19   the -- with due respect to Mr. Boies, it does make a

20   difference.  Because the fair market value today may well be

21   different than the fair market value in 2007.  And we shouldn't

22   be dealing with the fair market value in --

23           THE COURT:  That's where it comes up.

24           MR. BOIES:  I think we're prepared to deal with the

25   fair market value in 2007.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1408

0AR3TER9

1       MR. COHEN:  Okay.

2       THE COURT:  All right.  Anything else that you would

3   be proffering from Ms. DeMario other than lost profits and fair

4   market value damages?

5       MR. BOIES:  Nothing that we probably need an expert

6   for.  The third category of damages are the additional amounts

7   that had to be put in for so-called equity cures.

8       THE COURT:  That's not a question for her.

9       MR. COHEN:  I agree.  I don't think they are entitled

10  to it, but that's just math.  Just math.

11      THE COURT:  We'll argue, my definition of locked in is

12  everyone having to be here at 7:35.  So, anyway.

13      MR. COHEN:  Mostly you, your Honor.  We apologize.

14      THE COURT:  Anyway, I will not allow her to testify

15  about lost profits.  I really think that it is speculative and

16  I also think the methodology is really flawed.

17      The gist of the appropriate methodology in this

18  context would be to measure how Terra Firma 2 and 3 had done

19  since the time of the alleged fraud.  She hasn't calculated it,

20  and in any event, if she had, it wouldn't be offered because

21  it's going to be a negative number or zero.

22      With respect to fair market value, I'm considering two

23  alternatives and I will let you know tomorrow morning.  One is

24  letting her testify as her report now reads.  There are many

25  serious questions about that approach, all of which would be

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1415

0as1ter1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TERRA FIRMA INVESTMENTS (GP) 2
    LIMITED (for and on behalf of
4   the six limited partnerships
    constituting the Terra Firma
5   Capital Partners II Fund), and
    TERRA FIRMA INVESTMENTS (GP) 3
6   LIMITED (for and on behalf of
    Terra Firma Capital Partners
7   III, L.P.),

8              Plaintiffs,

9       v.                          09 CV 10459 (JSR)

10  CITIGROUP INC., CITIBANK,
    N.A., CITIGROUP GLOBAL MARKETS
11  LIMITED, AND CITIGROUP GLOBAL
    MARKETS, INC.,
12
             Defendants.            Jury Trial
13
    ------------------------------x
14                                  New York, N.Y.
                                    October 28, 2010
15                                  10:01 a.m.

16  Before:

17              HON. JED S. RAKOFF,

18                             District Judge

18

19

20

21

22

23

24

25

              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

SPA-20

0as1ter5                    Slattery - direct

1    Q.  Let me ask you to look at a page of handwritten notes that

2    have been marked as Plaintiff's Exhibit 6.  Do you recognize

3    these notes, sir?

4    A.  Yes, I do.  These are a page from my notebook that I kept

5    during the EMI transaction.

6    Q.  And can you tell me what period these notes represent.

7    A.  These notes I believe were taken -- were taken down by me

8    on Wednesday, the 16th of May, 2007.

9           MR. BOIES:  Your Honor, I would offer Plaintiff's

10   Exhibit 6.

11          MR. COHEN:  Objection, your Honor.  May we approach?

12          THE COURT:  All right.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-21

1543

0as1ter5                          Slattery - direct

1              (At the sidebar)

2              MR. COHEN:  Your Honor, I assume they're being offered

3      as a business record.  This document (indicating), which was

4      marked as Exhibit DAC for identification, is the full notebook.

5      It's a series of notes and doodles and various notes.  I don't

6      think it qualifies as a business record.  Just because he took

7      notes in a notebook doesn't make it a business record.  There's

8      no testimony that he was under any business duty, there's no

9      testimony that --

10             THE COURT:  All right.  So let me hear from --

11             MR. BOIES:  Your Honor, I'm not sure whether this

12     could qualify as a business record or not, but for my purposes,

13     I think I am -- I intend to offer it not for the truth of the

14     matters asserted but for a prior consistent statement.

15             THE COURT:  Well, first of all, what is the statement

16     you're going to elicit from him that this would be consistent

17     with?

18             MR. BOIES:  Can you get the page, my page.

19             THE COURT:  Well, tell me generally, because --

20             MR. BOIES:  He talked -- he's going to talk about --

21     he's going to talk about being told that on May 16th that

22     Mr. Wormsley was providing intelligence on the bid, that

23     Cerberus was bidding by next Wednesday, which would have been

24     the 23rd.

25             THE COURT:  Told by whom?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0as1ter5                         Slattery - direct

1           MR. BOIES:  His testimony will be he was told that by

2    Mr. Pryce.

3           THE COURT:  So Mr. Pryce, and Mr. Pryce told him this

4    when?

5           MR. BOIES:  On May 16th.

6           THE COURT:  Okay.  And do we know when on May 16th?

7           MR. BOIES:  I don't know what his testimony will be on

8    that, your Honor.

9           THE COURT:  All right.  So that statement, before we

10   get to the notes, that statement is offered as circumstantial

11   corroboration to Mr. Hands' testimony.

12          MR. COHEN:  Your Honor, may I be heard on that for one

13   moment?

14          THE COURT:  Yes.  It wouldn't be offered for its

15   truth, it would be offered for the fact that it was said,

16   because the jury, if you wish, can draw the inference that it

17   would have been said if Mr. Hands hadn't previously made the

18   statements he allegedly made to Mr. Pryce.

19          So let me hear you, Mr. Cohen, just on that, before we

20   get to the notes.

21          MR. COHEN:  Right.  Of course it's multiple layers of

22   hearsay because it's what Mr. Hands was told by Mr. Wormsley,

23   and what Mr. Hands told -- I don't understand why it's

24   appropriate if it's not being offered for the truth.  It's

25   obviously being offered to show Mr. Wormsley said those things,

0as1ter5                    Slattery - direct

1    so I don't understand quite how --

2              THE COURT:  If a witness says, "I was told on day one

3    that the grass was green," and the other side says, "We contest

4    that he ever made that statement," or, let's put it this way,

5    "that he ever heard that statement --" let me rephrase the

6    hypothetical.  We'll put it in terms of this case.

7              So Mr. Hands testifies that he was told by

8    Mr. Wormsley on such-and-such a date certain statements.  Okay.

9    And the defense is, in part, that no such statements were ever

10   made.  So one proof that such statements were made would be

11   that, you know, within five minutes of the time that

12   Mr. Wormsley allegedly made the statement to Mr. Hands,

13   Mr. Hands reported the statement to someone else.  Because why

14   would he do that unless the statement had been made?  Or at

15   least that's a possible inference.  So the second statement

16   would not be offered for its truth but for the fact that the

17   mere fact that it was said is corroboration.  Now we get to one

18   further step removed.  I think it makes it more attenuated, but

19   it's still the same basic theory.  If Mr. Hands said it to

20   Mr. Pryce, Mr. Pryce said it to this witness, the fact that it

21   was said at the time that it was said could still be

22   corroborative of it.  However, you are right, there is a -- I'm

23   gliding over the double hearsay aspect of it.

24             MR. WELLS:  But also, also, the dates.  The battle in

25   the courtroom is about what was said on the 18th.  This is

1546

0as1ter5                    Slattery - direct

1   made two days later, and this is --

2           MR. BAUGHMAN:  No, before.

3           MR. WELLS:  Two days earlier, so this is a 403 issue

4   too.  So you see, your Honor, kind of --

5           THE COURT:  Okay.  I wasn't focused on that.

6           MR. WELLS:  That's two days that nobody's been

7   fighting about.

8           THE COURT:  Anyway, we only get to the notes if we get

9   to this statement, because Mr. Boies says he wants to offer it

10  as a prior consistent statement on the theory that if this

11  witness' credibility is attacked as to his statement that that

12  statement was made, then you could offer a statement made at a

13  prior time in this case in the form of handwritten notes that

14  was made before the motive to fabricate arose.  So --

15          MR. COHEN:  I'm not attacking his credibility, your

16  Honor.  I think Mr. Wells' point is that this statement has

17  nothing to do with the alleged fraud.  There's nothing in this

18  statement -- there's nothing in this statement that says

19  Mr. Wormsley mentioned Cerberus or 262.  So I think that's what

20  Mr. Wells' point is.

21          THE COURT:  Okay.  All right.  So that's a relevance

22  objection.

23          MR. WELLS:  It's relevance, it's 403, 'cause it's

24  confusing just up here among us lawyers.  And I'd like to also

25  add to the mix that they called Mr. Pryce and they didn't ask

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1547

0as1ter5                    Slattery - direct

1    Mr. Pryce anything about this.

2         MR. COHEN:  No, they did, and the Court sustained the

3    objection with respect to this discussion, actually.

4         MR. BOIES:  I think we did ask him.

5         I think, your Honor, two things.  First, the testimony

6    has been that not only on the 18th but prior to the 18th

7    Mr. Hands has testified that from the beginning, Mr. Wormsley

8    told him about Cerberus -- about Cerberus bidding and promised

9    to keep him informed.  Mr. Wormsley denied that that happened.

10   That's an important part of the case.  It's not just what

11   happened on the 18th and the 20th.  And what counsel has

12   argued at this --

13        THE COURT:  I'm going to have to give the jury their

14   break, because this is going to take some more time.

15        (In open court)

16        THE COURT:  How clever of you, ladies and gentlemen,

17   to arrange for a long sidebar so we could give you your

18   midafternoon break.  So we'll see you in 15 minutes.

19        (Jury excused)

20        (In open court; jury not present)

21        THE COURT:  Please put to the witness, outside the

22   presence of the jury, the question that we were debating about

23   at the sidebar.  So let's see what his answer is.

24   BY MR. BOIES:

25   Q.  Mr. Slattery, do you recall a conversation with Mr. Pryce

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1548

0as1ter5                        Slattery - direct

1   on May 16th, 2007?

2   A.  Yes, I do.

3   Q.  And what did Mr. Pryce tell you in that conversation?

4   A.  I recall speaking to Tim Pryce, I think it was on the

5   evening of May 16th, and Tim -- Tim and I spoke about the

6   fact that in terms of EMI, in terms of the possible offer for

7   EMI, Citigroup as an institution were fully supportive of Terra

8   Firma's offer, that David Wormsley had been providing

9   information about the bidding process to Guy Hands.  Tim's

10  message to me was that I was to continue to work hard on the

11  transaction, to stay focused, and he also said that he didn't

12  want me to repeat the contents of -- of that conversation to

13  anyone.

14          THE COURT:  All right.  I don't see how that is

15  admissible.  There's a double hearsay problem if it's offered

16  for its truth.  We were debating at the sidebar theories on

17  which it conceivably could be offered not for its truth, but I

18  agree with Mr. Wells that that probative value is so attenuated

19  that it would be impossible for the jury to make a distinction

20  that we were spinning so fine at the sidebar and that they

21  would inevitably take this conversation for its truth, and

22  that's what the hearsay rule forbids.  So it is both a hearsay

23  problem and a 403 problem, and that testimony will not be

24  permitted.

25          MR. BOIES:  Your Honor, could I ask a couple of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

0as1ter5                    Slattery - direct

1    additional questions --

2            THE COURT:  Go ahead.

3            MR. BOIES:  -- outside the presence of the jury?

4    BY MR. BOIES:

5    Q.  Did Mr. Pryce tell you anything about any particular

6    bidder?

7    A.  I don't -- I don't recall in that conversation Mr. Pryce

8    telling me about any particular bidder, no.

9    Q.  Did Mr. Pryce tell you what he meant by Mr. Wormsley

10   providing Guy Hands with -- I think you said intelligence about

11   the bidding process?

12   A.  Mr. -- I recall that the -- that Tim told me that

13   Mr. Wormsley was providing information or intelligence about

14   the bidding process, and by bidding process, he meant

15   information about the timing of bids and bidding strategy.

16           MR. BOIES:  Your Honor, anytime we have -- can I

17   address this for a moment?

18           THE COURT:  Sure.

19           MR. BOIES:  Anytime you have a prior consistent

20   statement offered, there's always a risk of somebody taking it

21   for the truth, but the Court gives instructions that it's not

22   coming in for the truth.  I don't think that whether it's

23   double or triple hearsay in this context makes any difference,

24   because the issue with double and triple hearsay is that it's

25   being offered for the truth and you can't cross-examine

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-28

0as1ter5                    Slattery - direct

1   somebody who's in between.

2          Here, it's being offered to show that it was said.

3   The argument here is that they say we just made all this up

4   about Wormsley providing this information on the bidding

5   process, Terra Firma, we made it all up after EMI was in

6   trouble.  If it's being said and, indeed, if it's being written

7   down back in May, we cannot have made it up back then.

8          THE COURT:  Well, I enunciated that theory at the

9   sidebar as your likely theory, and I understand it.  Remind me

10  precisely what Mr. Pryce said in this regard.

11         MR. BOIES:  Mr. Cohen has it.

12         MR. COHEN:  Your Honor, Mr. Boies tried to introduce

13  this through Mr. Pryce at page 92 of the trial transcript, and

14  you sustained an objection on the same theory that is being

15  offered now with respect to fabrication.  So the double hearsay

16  has particular problems for us.  Mr. Pryce is gone, the person

17  who supposedly got the information from Mr. Hands.  We can no

18  longer cross-examine him.  So, I mean, I would think for this

19  purpose we should reach the same result.

20         THE COURT:  Consistency is desirable.  Getting it

21  right is even more desirable.  But I think I got it right both

22  times.  So --

23         MR. BOIES:  The only thing I'd ask your Honor is that

24  at page 92, what you say is -- you think I'm offering it for

25  the truth in that context.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-29

0as1ter5                    Slattery - direct

1        THE COURT:  I don't have --

2        MR. COHEN:  May I, your Honor?

3        THE COURT:  -- the transcript in front of me.  Yes.

4        MR. COHEN:  Can I approach, your Honor.

5        THE COURT:  Yes.

6        MR. COHEN:  I don't have the context around it.  If

7    you need that, I can get that for you.

8        (Pause)

9        THE COURT:  Well, the original question in Mr. Pryce's

10   testimony which brought this all to a head was at page 91,

11   line 3:

12       "Q.  How did you come to the understanding that

13   Cerberus was Terra Firma's main competitor for EMI?

14       "A.  Through a conversation which I had with my boss.

15       "A.  Guy Hands.

16       "Q.  What did Mr. Hands tell you?"

17       So at that point, of course, it was all related to how

18   Mr. Pryce came to an understanding that Cerberus was Terra

19   Firma's main competitor.  And so I sustained the question that

20   was put -- "Q.  What did Mr. Hands tell you?" -- on both

21   hearsay and relevance grounds.

22       Then at the sidebar, it was only then that it was

23   raised by Mr. Boies that what Mr. Pryce would say was that

24   Mr. Hands had told him what Mr. Wormsley had said, and that was

25   offered there as a prior consistent statement.  I didn't rule

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0as1ter5                    Slattery - direct

1    finally on that.  I said there was an insufficient foundation

2    to invoke that exception on the present state of the record.  I

3    offered to reconsider if a greater foundation were laid.  "So

4    if something comes up on cross that makes you think you can

5    renew that proffer, of course I'll hear you then."

6        In fact there was no such renewal, at least not on

7    anything you just handed up to me.

8        So now we're getting at it in this witness' testimony

9    about what Mr. Pryce told him that Mr. Hands had told Mr. Pryce

10   about what Mr. Wormsley had told Mr. Hands.  So I was wrong to

11   call it double hearsay; it's triple hearsay.  And the proffer

12   is that from the fact that Wormsley told Hands, who told

13   contemporaneously Pryce, who told contemporaneously

14   Mr. Slattery that he was getting inside information, for lack

15   of a better word, from Mr. Wormsley, the jury could infer that

16   that was actually going on because those series of

17   conversations would not have occurred but for the chain being

18   based on an original conversation from Mr. Wormsley to

19   Mr. Hands.  At least there would be corroboration of that

20   assertion.  I think that is too slim a reed in this context of

21   hearsay upon hearsay.

22       MR. BOIES:  Could I reply in proffer?

23       THE COURT:  Yes.

24       MR. BOIES:  The proffer is to show that the claim that

25   Mr. Wormsley was providing this information is not a claim that

SPA-31

1553

0as1ter5                    Slattery - direct

1   arose after EMI began to be in trouble but was something that

2   occurred in May of 2007.

3           THE COURT:  All right.  That's a different argument.

4   The argument now is, if I understand it, you're saying the

5   defense has said that this is all being made up after the fact,

6   and these conversations, even though they're in double, triple

7   hearsay form, would not have occurred at the time, or at least

8   the jury could infer from that this is not something that's

9   just being made up after the fact.

10          MR. BOIES:  You see, your Honor, if we were offering

11  it simply to prove this happened at a particular -- this

12  happened, then the hearsay, double and triple hearsay would be

13  important, because you would not be able to test the accuracy

14  or lack of bias of the person who was repeating it.  But here,

15  what we're saying is that this was not made up after the fact,

16  and the fact that it exists here is good evidence that it was

17  not made up after the fact.

18          THE COURT:  Well, I want to hear from defense counsel

19  in a minute, but my initial reaction is, I don't disagree that

20  that adds a little bit more probative value, but it still seems

21  to me it's outweighed.  What you have here is a situation like

22  the classic telephone gossip you all remember, when there used

23  to be telephones.  So, you know, someone breathlessly describes

24  to someone else, "Did you hear about the affair that Joe was

25  having with Mary?"  And, you know, it goes down the whole line.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0as1ter5                    Slattery - direct

1   And now under your theory, Mr. Boies, you're saying, in effect,

2   the jury could infer that, because that rumor was going around,

3   even though you can't cross-examine each of the links about

4   what exactly they heard in the conversations and so forth, that

5   that's proof that there really was an affair or at least proof,

6   in your theory, that the accusation of the affair wasn't made

7   up just for purposes for some family law lawsuit.  I think that

8   that very limited probative value continues to be substantially

9   outweighed by the high likelihood that the jury would not make

10  those refined distinctions but would take this for its truth,

11  and I really don't think in this context any instruction from

12  the Court could overcome that problem.  So --

13          MR. BOIES:  If I could, I'll do one more thing.

14          THE COURT:  Yes, please.

15          MR. BOIES:  I would just remind the Court that every

16  link in this chain has been subject to cross-examination and --

17          THE COURT:  True, but, as it turned out, not on this

18  specific aspect.  But not for lack of your attempting to put it

19  into play.  So I think that's a fair point, and I will factor

20  that in as well, but I still think the balance comes out

21  against you.

22          But Mr. Cohen, do you want to talk me out of my ruling

23  in your favor?  This is your opportunity.

24          MR. COHEN:  Your Honor, I think you have it exactly

25  right as always.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**SPA-33**

0as1ter5                    Slattery - direct

1       THE COURT:  All right.  So in light of that, the notes

2    won't come in either because that's just one more level down

3    the chain.

4            So let's take a five-more-minute break.  The witness

5    is excused as well, for five minutes, and we'll reconvene.

6            (Recess)

7            (In open court; jury not present )

8            MR. BOIES:  Your Honor, before we bring in the jury --

9            THE COURT:  Yes.

10            MR. BOIES:  -- Mr. Cohen and I thought it would be

11    prudent that we resolve a couple of issues that may come up so

12    we don't have to have another sidebar.

13            THE COURT:  Okay.

14            MR. BOIES:  I really -- I think I can put it in the

15    form of two questions.  One is -- I'm quite sure I know the

16    answer to, and I just need to be sure; and the other I'm afraid

17    I know the answer to, but I'd like to get it.

18            The one I'm pretty sure I know the answer to is, with

19    respect to Terra Firma 6, the notes that I offered, if I were

20    to try to lay a predicate with this of past recollection with

21    respect to the assertion Cerberus was bidding by next

22    Wednesday, I take it you would --

23            THE COURT:  Yes.  It still has all the same problems.

24    I was actually surprised that you didn't raise that at the

25    sidebar.  I was waiting for you to raise it.  And my faith in

SPA-34

1723

0B13TER1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TERRA FIRMA INVESTMENTS (GP) 2
    LIMITED (for and on behalf of
4   the six limited partnerships
    constituting the Terra Firma
5   Capital Partners II Fund), and
    TERRA FIRMA INVESTMENTS (GP) 3
6   LIMITED (for and on behalf of
    Terra Firma Capital Partners
7   III, L.P.),

8                  Plaintiffs,

9          v.                        09 CV 10459 (JSR)

10  CITIGROUP INC., CITIBANK,
    N.A., CITIGROUP GLOBAL MARKETS
11  LIMITED, AND CITIGROUP GLOBAL
    MARKETS, INC.,
12
                 Defendants.         Jury Trial
13
    ------------------------------x
14                                   New York, N.Y.
                                     November 1, 2010
15                                   9:45 a.m.

16  Before:

17                 HON. JED S. RAKOFF,

18                                   District Judge

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1802

0b11ter4

```
 1          (At the sidebar)

 2          THE COURT:  All right.  Now the only remaining part of

 3     the plaintiff's case is to offer some exhibits.  Are those in

 4     dispute?

 5          MR. BOIES:  Well, many are not, a few are.  We have

 6     one other witness, which is a custodian of records.  We'll be

 7     very brief.  And we are putting him on only because we had

 8     believed that we were going to be able to stipulate as to the

 9     admissibility of Mr. Nicoli's phone records.  Counsel for Citi

10     has declined to stipulate, so we're going to put on a

11     custodian.

12          THE COURT:  And there's --

13          MR. BAUGHMAN:  I'd like to be heard on the issue, but

14     I didn't mean to interrupt.

15          THE COURT:  Yes, go ahead.  Well, no one can force you

16     to stipulate.  If you want to impose on the jury's time, that's

17     totally up to you.

18          MR. BAUGHMAN:  I have the following points, your

19     Honor.  First of all, there was no custodian of records on the

20     witness list; second of all, we have a substantive objection.

21     They want to call the witness to attempt to introduce

22     Mr. Nicoli's telephone records.  The problem is, Mr. Nicoli

23     testified on July 5th pursuant to Hague Convention.  That was

24     his trial testimony.  They had in their possession his

25     telephone records and did not produce them to us until
```

**SPA-36**

0b11ter4

```
1    August 6th.  So we were denied the opportunity to question

2    Mr. Nicoli about those phone records.  In their summary

3    judgment papers they made arguments to the effect that

4    Mr. Nicoli had lied --

5            THE COURT:  I'm going to give the jury another short

6    break.

7            (In open court)

8            Ladies and gentlemen, since we're not going to break

9    for lunch until 1:00 but you've had a long time without a

10   break, why don't we give you a ten-minute break at this time.

11           (Jury excused)

12           THE COURT:  And we'll continue this in open court.

13           (In open court; jury not present)

14           THE COURT:  Please be seated.

15           Before we get back to the question of Mr. Nicoli's

16   phone records, what are the exhibits that plaintiff is

17   introducing to which there are no objections?

18           MR. BOIES:  To which there are no objections?

19           THE COURT:  Yes.

20           MR. DUFFY:  Your Honor, I'll read these into the

21   record, if that's okay.

22           THE COURT:  Yes.

23           MR. DUFFY:  These are all Terra Firma trial exhibits.

24   They are numbers 2, 5, 14, 16, 17, 19, 22, 23, 26 through 28,

25   33 through 35, 61, 125, 194, 195, 214, 215, 220 to 230, 242,
```

1804

0b11ter4

```
 1    243, 248, 274, 280.

 2              THE COURT:  Hold on just one second.

 3              Go ahead.  274, 280.  Go ahead.

 4              MR. DUFFY:  283, 314, 318, 329, 346, 366, 387, 429,

 5    439, 449, 464, 468, 469, 479, 480, 481, 492, 496, 501, 532,

 6    537.

 7              THE COURT:  Hold on.

 8              Go ahead.

 9              MR. DUFFY:  539, 541, 543, 544, 548, 552, 553 through

10    555, 564, 570, 594, 597 through 600, 619 through 621, 623, 631,

11    632, 729, 744, 746, 750, 756, 757, 758, 765, 766 in a form that

12    is redacted and agreed by the parties, 767, 787, 788, 791, 795,

13    796, 802, 806, 819 through 820, 872, 874, 882, 887, 971, 987,

14    1019, 1040, 1111, 1109, 1114, 1147, 1225, 1241, 1251, 1369,

15    1370.

16              And then the next three dozen or so will be out of

17    sequence.  424, in a redacted version agreed by the parties,

18    918, 992, 1100.

19              MR. BAUGHMAN:  Mr. Duffy, can I interrupt.

20              (Counsel conferring)

21              MR. BAUGHMAN:  I apologize.

22              MR. DUFFY:  1365, 1400, 38, 53, 201, 221, 232, 238,

23    241, 244, 250, 348, 416, 465, 508, 516, 579, 593, 604, 608,

24    636, 674, 749, 752, 763, 783, 824, 827, 831, 833, 883, 903,

25    923, 993, 994, 1004, 1006, 1026, 1313, 1367, 1371, and 1372.
```

1805

0b11ter4

```
 1        THE COURT:  All right.  So first of all, does defense
 2   counsel agree those are all received?
 3        MR. BAUGHMAN:  Yes, your Honor.
 4        (Plaintiff's Exhibits 2, 5, 14, 16, 17, 19, 22, 23, 26
 5   through 28, 33 through 35, 61, 125, 194, 195, 214, 215, 220 to
 6   230, 242, 243, 248, 274, 280 received in evidence)
 7        (Plaintiff's Exhibits 283, 314, 318, 329, 346, 366,
 8   387, 429, 439, 449, 464, 468, 469, 479, 480, 481, 492, 496,
 9   501, 532, 537 received in evidence)
10        (Plaintiff's Exhibits 539, 541, 543, 544, 548, 552,
11   553 through 555, 564, 570, 594, 597 through 600, 619 through
12   621, 623, 631, 632, 729, 744, 746, 750, 756, 757, 758, 765, 766
13   (redacted), 767, 787, 788, 791, 795, 796, 802, 806, 819, 820,
14   872, 874, 882, 887, 971, 987, 1019, 1040, 1111, 1109, 1114,
15   1147, 1225, 1241, 1251, 1369, 1370 received in evidence)
16        (Plaintiff's Exhibits 424 (redacted), 918, 992, 1100
17   received in evidence)
18        (Plaintiff's Exhibits 1365, 1400, 38, 53, 201, 221,
19   232, 238, 241, 244, 250, 348, 416, 465, 508, 516, 579, 593,
20   604, 608, 636, 674, 749, 752, 763, 783, 824, 827, 831, 833,
21   883, 903, 923, 993, 994, 1004, 1006, 1026, 1313, 1367, 1371,
22   and 1372 received in evidence)
23        THE COURT:  All right.  Well, that is certainly a
24   relief, because I was wondering what Mr. Boies was going to
25   spend his two and a half hours of summation on.  Now I know
```

**SPA-39**

1806

0b11ter4

1   that he will be spending it describing to the jury these

2   exhibits that they've never seen that were so inconsequential

3   that no witness was shown them but that undoubtedly contribute

4   to universal knowledge, which is a good thing.

5           Now you have some exhibits that are in dispute.  How

6   many of those are there?

7           MR. BOIES:  There are --

8           MR. DUFFY:  Your Honor, may I hand up a binder that --

9           THE COURT:  No.  Just tell me how many there are,

10  roughly.

11          MR. BOIES:  I would say roughly 25, 30.

12          THE COURT:  All right.  So you thought you were going

13  to lunch, but instead at 1:00 we will take up those.

14          Now what I will tell the jury is that a number of

15  exhibits have been received that may be referred to later on in

16  the trial or on summation and will be available to them along

17  with the index that they're going to receive, but I don't see

18  any point, now that I see the number, in reciting that endless

19  list of numbers to them, and my instruction will include, in

20  effect, the exhibits that are admitted during the lunch break,

21  if there are any such exhibits.

22          So the next thing we have is the question of the phone

23  records, so let me hear further on those.  There were two

24  objections to the phone records being raised at the sidebar.

25  One was to -- oh, let me go back a step before I get to that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-40**

0b11ter4

1    Were these listed on the plaintiff's exhibit list?

2         MR. BAUGHMAN:  Yes, your Honor.

3         THE COURT:  And what were the objections raised by the

4    defense in the pretrial order?

5         MR. BAUGHMAN:  Foundation and hearsay, your Honor,

6    and --

7         THE COURT:  All right.  So the custodian would be

8    necessary to overcome the first of the objections, or I should

9    say to overcome the hearsay objection.

10        And the objection at the sidebar, the first of the two

11   objections was the custodian was not listed on the list of

12   witnesses.  That objection is overruled.  I think it is a

13   reasonable assumption of counsel for both sides that when

14   you're dealing with a business record that it is likely that

15   the parties will agree that they are business records and that

16   if not, the opportunity to call a custodian will be permitted.

17   And indeed, I just want to make sure that you are maintaining

18   your objection to these as business records as opposed to the

19   other objection you're about to tell me.  You're saying these

20   are not ordinary business records.

21        MR. BAUGHMAN:  Yes, your Honor.

22        THE COURT:  And why is that?

23        MR. BAUGHMAN:  Well, I do not believe this witness

24   could authenticate them as business records.  As I understand

25   it --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1808

0b11ter4

1          THE COURT:  All right.  That's not my question.  Do

2     you have a good faith belief for believing they are not

3     ordinary business records?

4          MR. BAUGHMAN:  Your Honor, I believe the analysis of

5     phone records --

6          THE COURT:  Do you have a good faith belief for

7     believing they are not business records; yes or no?

8          MR. BAUGHMAN:  Not of EMI, your Honor.

9          THE COURT:  Excuse me?

10          MR. BAUGHMAN:  I do not believe they are EMI's

11     business records.

12          THE COURT:  Whose business records do you believe they

13     are?

14          MR. BAUGHMAN:  The phone company's.

15          THE COURT:  And do you have a good faith belief for

16     believing that they are not business records of a telephone

17     identified with Mr. Nicoli?

18          MR. BAUGHMAN:  I don't know, your Honor.  I don't have

19     a basis to challenge it.

20          THE COURT:  I never expected, with two firms whose

21     lawyers have this Court's very highest respect, that I would be

22     hearing an objection to what purports to be a business record

23     on the ground that they are not business records or that the

24     phone to which they relate, the phone number to which they

25     relate is not the phone number of one of the witnesses,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-42

0b11ter4

1    something that could be ascertained even from the phone company

2    without much difficulty.  But you have your objection.  I can't

3    force, of course, anyone to stipulate.

4            So now what's your other objection?

5            MR. BAUGHMAN:  Your Honor, I want to focus on the

6    important objection, which I think is really a 403 --

7            THE COURT:  I'm just focusing on the first objection

8    you made.  But now we'll hear your more important objection.

9    Go ahead.

10           MR. BAUGHMAN:  Yes, the issue under 403 and 615, your

11   Honor.  Mr. Nicoli was called by them as a witness to give his

12   trial testimony pursuant to the Hague Convention.  He testified

13   on July 5.  They had custody of the telephone records, and they

14   did not produce them until August 6th.  So we had no

15   opportunity to question Mr. Nicoli about the contents of his

16   phone records and what may or may not have been said.

17           THE COURT:  All right.  So that's a more substantive

18   objection.  So was the question about telephone conversations

19   simply without reference to the telephone records or was he not

20   questioned about that?

21           MR. BAUGHMAN:  He -- it goes beyond that, your Honor,

22   and I want to -- there's a context.  They asked him what he

23   recalled of speaking to Mr. Wormsley.  He said he recalled

24   speaking to Mr. Wormsley once on the 20th of May.  He was --

25   said he spoke to Mr. Wormsley once about one subject, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-43

1810

0b11ter4

1    Warner Music press report that had been in the newspaper.  On

2    their summary judgment -- and he also, I should add, at the

3    deposition testified that his recollection had been refreshed

4    as to other matters on which he was shown documents by

5    plaintiff's counsel.  He was not shown the phone records.  He

6    was asked what he recalled.  He only remembered speaking to

7    Mr. Wormsley once.

8              THE COURT:  All right.  So what do the phone records

9    purportedly show?

10             MR. BAUGHMAN:  They purportedly show that there were

11   two calls.

12             THE COURT:  When is the other one?

13             MR. BAUGHMAN:  There's one call in Mr. Wormsley's

14   records to Mr. Nicoli about 3 -- 11:30 in the morning, then one

15   to Mr. -- from Mr. Nicoli to Mr. Wormsley at about 2:45 in the

16   afternoon.

17             THE COURT:  Both on the 20th?

18             MR. BAUGHMAN:  Correct, your Honor.

19             THE COURT:  So what is the significance of -- are you

20   disputing that he had a telephone conversation?

21             MR. BAUGHMAN:  I'm not disputing that the records are

22   in the calls, your Honor, but I'm very -- I want to dispute

23   what they want to do with it based on the summary judgment

24   argument, which we objected to.  In their summary -- if I could

25   explain --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

SPA-44

1811

0b11ter4

1           THE COURT:  Well, summary judgment is at this point
2     totally irrelevant.  What we want to know is what they want to
3     do with it now.  So let me find out what they propose to do
4     with it.
5           MR. BOIES:  We simply want to demonstrate, your Honor,
6     that Mr. Nicoli, 30 minutes after getting a -- getting off a
7     call where he was told that Cerberus is not bidding, has a call
8     with Mr. Wormsley.
9           THE COURT:  Well, that's --
10          MR. BOIES:  That's the morning phone call.
11          THE COURT:  And one of these calls is before that time
12    and one of these calls is after that time?
13          MR. BOIES:  No.  They're both after that time.  But
14    the first call is in the morning.  Mr. Nicoli has a call, a
15    conference call in which he is told that Cerberus is not
16    bidding; 30 minutes later, he has a call with Mr. Wormsley.
17    That's the morning call.  Then in the afternoon there is an
18    e-mail exchange that's in evidence in which Mr. Nicoli writes
19    about a subject and Mr. Wormsley replies and says, in effect,
20    "If people are falling away, I might do something, but if
21    people are not falling away, I wouldn't."  But essentially I
22    think he only has one half of that, but I think the second half
23    is implied.  I think he says, "If people are falling away,
24    maybe we need to do something."  Mr. -- and he testified,
25    Mr. Wormsley testified about that that "falling away" meant

1812

0b11ter4

1   people not bidding.

2           THE COURT:  So let me interrupt you.  What did

3   Mr. Nicoli say on the subject at his testimony pursuant to the

4   Hague Convention?

5           MR. BAUGHMAN:  Are you asking me, your Honor?

6           THE COURT:  Yes, I am.

7           MR. BAUGHMAN:  Yes.  He was asked whether he recalled

8   speaking to Mr. Wormsley.  He said he recalled speaking to him

9   once at about 2:30 in the afternoon and that he believed the

10  subject matter was the speculation about Warner in the press.

11  He was asked if he recalled speaking to him at another time in

12  the day, and he said no, he did not remember that.  And the

13  reason I think this is important is because counsel has

14  previously argued at length that the phone records prove

15  Mr. Nicoli gave untruthful testimony in his trial testimony at

16  the -- on the 5th of July, and we objected in footnote 7 of our

17  reply brief on summary judgment raising precisely this issue

18  and citing cases to your Honor that it was improper for them to

19  argue about what would have been in that telephone call based

20  on pure speculation.  I think the issue has been teed up for

21  some time, and it's improper for them to try and put in the

22  records and make arguments to the jury about what Mr. Nicoli's

23  testimony means or doesn't mean when they had the records, they

24  were in their possession, and they did not show the witness to

25  them -- show them to the witness during his trial testimony.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-46

0b11ter4

1      think it's prejudicial, your Honor.

2            MR. BOIES:  First, your Honor, they did not preserve

3      this objection to the document in the pretrial order.  The only

4      objection in the pretrial order was foundation and hearsay.

5            Second, there are a great many documents --

6            THE COURT:  Well, I think this arguably could fall

7      within a broad definition of foundation.  Go ahead.

8            MR. BOIES:  Second, a great many documents were

9      produced after the deposition, by both sides.  If the failure

10     to produce documents prior to the depositions were a ground for

11     excluding documents, that is something that would have excluded

12     many of the documents both sides offered in this case.  This

13     is --

14            THE COURT:  I hear you.

15            Tell me with some specificity what you intend to argue

16     on summation based on these phone records that you would not

17     otherwise be arguing or not arguing with the same corroboration

18     without these phone records.

19            MR. BOIES:  I was thinking of exactly that -- that

20     question, your Honor.  And I do not believe that we would be

21     arguing from these phone records that Mr. Nicoli lied.  That's

22     not what we would be arguing.  There is an aspect that we will

23     argue that Mr. Nicoli lied, but that has to do with his

24     deposition testimony where he said that certain people were on

25     the call he was on and he told them about Cerberus not

**SPA-47**

0b11ter4

1    bidding -- he didn't know that Cerberus was not bidding.  So we

2    have his deposition testimony saying one thing and

3    uncontradicted evidence showing something else.  And it is from

4    that that I think we will argue that Mr. Nicoli was not giving

5    truthful testimony.  But --

6              THE COURT:  Well, let me do this.  Here's what I

7    propose to both counsel.  I propose that defendant withdraw

8    your first objection, which I've overruled anyway --

9              MR. BAUGHMAN:  Done, your Honor.

10             THE COURT:  -- and agree that these are business

11   records of Mr. Nicoli's telephone calls.  And then we don't

12   have to call the custodian.  But we can determine whether this

13   will be admitted or not based on the issue that we're now

14   debating.  And that issue, it seems to me, will turn, at least

15   in part, on Mr. Boies' formulation of precisely what he's going

16   to say on summation with respect to these records, and I think

17   in fairness, he should be given over the lunch break to think

18   about that.  It doesn't affect anything that's going to occur

19   before this jury right now.  So is that agreeable to defense

20   counsel?

21             MR. BAUGHMAN:  Very satisfactory, your Honor.

22             MR. BOIES:  Yes, your Honor.

23             THE COURT:  Very good.  So let's bring in the jury.

24             Yes, sir.

25             MR. WELLS:  Is Mr. Boies going to rest now?

1834

0B13TER5

```
 1                      AFTERNOON SESSION

 2                         2:00 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Before we bring in the jury, we didn't

 5     take up all those disputed documents, we'll take them up on the

 6     next break.  But I do want to hear argument, on the question on

 7     the phone cases what it is you intend to stay, Mr. Boies, in

 8     summation.

 9          MR. BOIES:  Your Honor, in summation, I would argue

10     that the phone calls represent opportunity and already motive

11     and expectation for the communication of the information that

12     Cerberus was not bidding.  I am not going to argue that the

13     distance of the phone calls is a question of Nicoli lying.

14     That is, I'm not going to argue that he told you that there was

15     only one call, there are two calls.  I'm not going to argue

16     that.

17          THE COURT:  All right.

18          MR. BAUGHMAN:  Your Honor, I think that's inviting

19     inappropriate speculation from the jury.  We cited to your

20     Honor two cases previously where the court has held that you

21     can't argue what the contents of a conversation on a phone call

22     were merely from the fact that the conversation occurred.

23          THE COURT:  That's a different point.  That may be a

24     ground and you may convince me to preclude them from making

25     that argument on summation.  The question now is I take it what
```

1835

0B13TER5

1   you are saying is you think that for that purpose, the calls

2   are not relevant because you don't think they can make that

3   argument.

4          MR. BAUGHMAN:  Correct, your Honor.

5          THE COURT:  So it wouldn't be relevant to any issue in

6   the case.

7          MR. BAUGHMAN:  Correct.

8          THE COURT:  What cases are you relying on?

9          MR. BAUGHMAN:  We cited in footnote eight in our reply

10  brief in our summary judgment.

11         THE COURT:  I know it like the back of my hand.

12         MR. BAUGHMAN:  I have them right here, your Honor.

13  It's Goldhirsh Group, Inc. v. Alpert, which is Second Circuit

14  107 F.3d 105.

15         THE COURT:  Give me that again, just the cite.

16         MR. BAUGHMAN:  107 F.3d 105.  And I think it's on

17  point, your Honor, the issue is --

18         THE COURT:  And what is the other case?

19         MR. BAUGHMAN:  Sure.  Grancio v. De Vecchio, 572 F.

20  Supp. 2d 299.

21         THE COURT:  I will take a look at this and we'll take

22  this up when we take up the disputed documents at the next

23  break.

24         MR. BOIES:  The only other thing that I think is

25  relevant from the phone records is the extent of the

1836

0B13TER5

1  conversations between Mr. Wormsley and Mr. Nicoli that again

2  show they were in constant communication.

3          THE COURT:  Okay.  Let's bring in the jury.

4          MR. BAUGHMAN:  I have the cases, they do have the

5  relevant parts highlighted.

6          THE COURT:  That's even better.  Let's bring in the

7  jury.

8          (Jury present)

9          THE COURT:  The defense will call their next witness.

10          MR. BAUGHMAN:  Your Honor, we are going to begin by

11  playing a three minute and 45 second clip of some excerpts from

12  Mr. Hands' deposition as admissions.

13          THE COURT:  All right.

14          MR. BOIES:  Your Honor, can we approach?

15          THE COURT:  Yes.

16          (At the side bar)

17          MR. BOIES:  I thought the rule was they couldn't do

18  this for a witness that they had testify.

19          THE COURT:  Both of you preserved your positions and I

20  wish I had known with all the things that you guys were raising

21  before we resumed.  No one raised this.  My recollection is we

22  agreed to have a discussion about it before they did it, so I

23  think we will have that discussion.  But we are not going to

24  have that discussion right now.  We'll have it at the break.

25  So go on to your next clip and we'll take this up later.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-51

0b11ter8

1     THE COURT:  And I'm glad the tender ears of our jury

2  are not being burdened with a profanity.

3     All right.  So let's go back and talk about the

4  telephone records.  We now have what it is that Mr. Boies is

5  going to say about them on summation.  So let me hear anything

6  further that defense counsel wants to say about it and then

7  we'll come back to plaintiff's counsel.

8     MR. BAUGHMAN:  Well, I just would rely on the cases

9  that I handed up, your Honor.

10     THE COURT:  So let's talk about those cases, and I

11  think they are helpful to your position.  What those cases say,

12  in effect, is that in isolation, the fact that there's been a

13  phone call without more can't be a rational basis on which a

14  jury can infer what the subject matter of the phone call was.

15  But I'm not quite sure whether that applies to this situation.

16     If, for example, you take an easy case, much easier

17  than this, supposing there was in evidence that the accused

18  murderer said to someone, "Oh, my gosh, I can't believe I

19  murdered that guy.  I'd better call my mother."  A very

20  unlikely scenario, to say the least.  And then it's shown that

21  ten minutes later there was a phone call from the accused to

22  his mother.  One could infer that that call was done to confess

23  the murder and that the whole situation was corroboration of

24  the alleged conversation that he had with the first person that

25  he was going to call his mother because he was so ashamed of

1950

0b11ter8

1   having murdered someone.  And, you know, I'm sure that his

2   mother would have chastised him for it.  So why isn't that more

3   like what's involved here than what's involved in your cases

4   where, essentially, for example, in the Second Circuit case

5   that you cited to me, Goldhirsh v. Alpert, 107 F.3d 105 (2d

6   Cir. 1997), the plaintiff attempted to avoid summary judgment

7   because he speculated that phone calls that had been made to

8   potential advertising agencies, that in those calls the

9   defendant "must have" told the advertising agencies that

10  Alpert, the plaintiff, was a crook, that criminal charges were

11  going to be brought against him, and etc., etc.  And the only

12  evidence of that, even indirectly, was the counsel's

13  speculation that that's what must have occurred in the calls.

14  And the Second Circuit says that won't do it.  But that seems

15  to me a much different case from what's presented here.

16          MR. BAUGHMAN:  Respectfully, your Honor, I think that

17  actually is a much closer case than the hypothetical that you

18  just offered.  In the hypothetical you offered, the accused

19  said that he had committed a homicide and was going to call his

20  mother and then, in your hypothetical, he went on and did that

21  thing that he said he had done, and therefore the act of doing

22  it is probative that when he said it, he meant what he said.

23          Here, we have a situation where there's an absence of

24  any testimony related to the phone call.  What we have is, you

25  have testimony from Mr. Nicoli that he recalls speaking to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1951

0b11ter8

1    Mr. Wormsley once in the afternoon.  They want to introduce

2    evidence that the gentlemen actually spoke twice, once in the

3    morning, once in the afternoon.  And they want to argue, based

4    on other information elsewhere, that they must have -- I'm sure

5    Mr. Boies will refrain from using the word "must," but he will

6    strongly suggest to the jury that they should infer that in one

7    or the other of the telephone calls they discussed information

8    that Cerberus had withdrawn.  And there simply is no evidence

9    of that.  It's speculation.

10           THE COURT:  Okay.  I think that's a fair point.  Let

11   me go back to your adversary and see what he says in that

12   regard.

13           MR. DUFFY:  Well, your Honor, this is not an instance

14   of pyramided inferences -- an inference on an inference on an

15   inference.  There is significant record evidence that, number

16   one, Mr. Wormsley was an advisor, an M&A advisor of EMI on this

17   particular transaction; number two, that he offered his help to

18   EMI in bringing in a bid from Guy Hands; number three, that

19   Mr. Nicoli and Mr. Gildersleeve took him up on that offer and

20   spoke to him on multiple occasions in the days leading up to

21   the bid; number four, there was an e-mail, which is Exhibit 46,

22   which Mr. Boies referred to earlier -- Jason, if you can pull

23   it up on the screen.  This is that day.  This is May 20th.

24   This is Mr. Nicoli writing to Mr. Wormsley, "Can I call you at

25   2:30 p.m.," and Mr. Wormsley responding, "Perfect."  The phone

**SPA-54**

0b11ter8

1     records show -- and we can put those up as Exhibit 47, Jason,

2     at page 3 -- I'm sorry.  It's the wrong one.  Exhibit F is

3     Mr. Nicoli's phone records.  And I would note, in passing --

4     I'm not sure if this is consequence, but this is an exhibit

5     that Citi listed on its exhibit list, and that's the version

6     that's up here on the screen now.  So this is Citi's Trial

7     Exhibit F.  And on page 3 of this particular exhibit, at the

8     very bottom -- at the very -- I'm sorry.  I have the pages

9     wrong.  Go down another page, please, Jason.

10          THE COURT:  But before you continue, Mr. Nicoli's

11    deposition was taken at your instance; yes?

12          MR. DUFFY:  That is correct, but he was sort of a

13    split with us, yes, both sides.

14          THE COURT:  I understand that.  But anyway, I mean, my

15    recollection in fact is that originally he wasn't -- is he the

16    one who wasn't originally going to be available and then made

17    himself available after a telephone conference with the Court?

18          MR. DUFFY:  No, your Honor.  That was Mr. Alexander

19    from Maltby.

20          THE COURT:  Okay.  All right.  So anyway, so

21    Mr. Nicoli is deposed by you, you have the phone records, he

22    says there's one conversation, you don't ask him about the

23    second conversation, and now you want to draw some inference

24    from the second conversation.

25          MR. DUFFY:  This is the second conversation.  This is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-55

1953

0b11ter8

1    the one he testified about.

2         THE COURT:  All right.  So you didn't ask him about

3    the first conversation.

4         MR. DUFFY:  We did not ask -- well, we asked him if

5    he's --

6         THE COURT:  It's the combination of those two that you

7    want to now make an argument about, according to what Mr. Boies

8    told me earlier today.

9         MR. DUFFY:  Well, I don't think that's what he said.

10   I thought that what he said was that we're not going to say

11   that Mr. Nicoli provided false testimony.

12        THE COURT:  Yes.  But what you're going to say is,

13   from the fact of two conversations and the timing of the two

14   conversations, they can infer that certain things were said in

15   the conversations and Mr. Nicoli doesn't remember.  That's the

16   argument that's being made; yes?

17        MR. DUFFY:  It's a circumstantial -- piece of

18   circumstantial evidence.

19        THE COURT:  Right.  And so there you have the

20   opportunity, with the records right in your hands, so to speak,

21   to put that question to him, show him the records, ask him to

22   refresh his recollection, and you did none of that.  And now

23   you want to put in, and just make an argument to the jury,

24   those records.  I think the more I think about this stage of

25   the case, I think it becomes increasingly prejudicial because

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**SPA-56**

0b11ter8

```
 1    no one's going to have a chance to respond through testimony or
 2    calling any other witness or anything like that to put in
 3    matters, first of all, for impeachment only.  That clearly I
 4    got.  But the argument that Mr. Boies is making, you're making
 5    now, is in fact a form of impeachment because you're saying the
 6    jury can infer that what he failed to remember was X, even
 7    though he never confronted him with it when his memory failed.
 8    And it has the same vise as putting it in for impeachment now,
 9    because he's never had the chance to respond.  He's never had a
10    chance, as the one and only person who would have firsthand
11    information, one of two people who would have firsthand
12    information, never was presented with the opportunity to
13    comment on it.  That seems to me to be unfair.
14         Yes.
15         MR. DUFFY:  Well, he actually was.  If we can, with
16    your permission, put up part of his transcript.
17         THE COURT:  Yes, go ahead.
18         MR. DUFFY:  It's at page 123, line 16 through
19    page 124, line 8.  He was asked about the 2:30 phone call,
20    which is what is covered in the records that are not yet in
21    evidence but which we propose to admit, and the question is:
22         "Were you informed at any point in time on Sunday,
23    May 20th of whether Cerberus would put in a bid for EMI by
24    the appointed deadline of 9:00 a.m. on Monday, May 21st?"
25         THE COURT:  "I was informed," etc.
```

1955

0b11ter8

1          MR. DUFFY:  "I was informed," etc.  Well, as I'm

2     looking at this, it's actually not the right piece of

3     testimony.  I apologize.

4          THE COURT:  Yes.

5          MR. DUFFY:  Hmm.  There is a Q and A with Mr. Nicoli,

6     and maybe Jason can look for it.  It's around that part of the

7     transcript where the document about the 2:30 phone call --

8     where Mr. Wormsley responds, "Perfect," or maybe it was the

9     other way around, is put to him and -- or it was at least

10    referenced.  He received that as part of the packet he got in

11    preparation for his deposition under English law.  And he said,

12    "Yes, I believe I did speak with Mr. Wormsley that afternoon,

13    and I believe what we spoke about was the Warner Music leak to

14    the press."

15         THE COURT:  What is it you think now you'll be able to

16    argue from having both calls in?  You're going to be arguing

17    that the conversation was different; right?

18         MR. DUFFY:  We'll be arguing that the notion that

19    EMI's CEO and its top, highly-paid advisor from Citi spoke

20    twice, at least -- because some of these phone calls we propose

21    to admit last 20 or 30 seconds and there are actually five --

22    four or five of them on this Citi Exhibit F -- the notion that

23    they spoke twice that day as this entire process was reaching

24    its culmination and didn't discuss the status of the bidders,

25    which is the key to the entire process on the day before the

0b11ter8

1    bids were due, indeed less than 24 hours before the bids were

2    due, the notion that that wasn't discussed, we think we should

3    have the ability to argue to the jury that it is not credible

4    and, at a minimum, is not -- not worth being credited.  It

5    might not be --

6            THE COURT:  Last time I checked, that sounds like

7    impeachment.

8            MR. DUFFY:  Well, it might --

9            THE COURT:  You're saying that the testimony he gave

10   could not have been the whole story because he had two calls,

11   they both went on for 20 minutes, and given the time, place,

12   circumstances, and their positions, they must have discussed

13   something else, mainly, what you think they discussed.  I do

14   think I have to agree with defense counsel, that's exactly what

15   the Goldhirsh case cautions against.  But I don't even have to

16   reach that because it seems to me grossly unfair, if you had

17   the records at the time, not to have confronted him and said,

18   in effect, "Isn't it a fact you had two conversations, and are

19   you telling us that in both those conversations,

20   notwithstanding this close relationship, blah, blah, blah, you

21   never discussed X?"  And that would have given him a chance to

22   say whatever he would have said, which might have proven

23   credible or might have proven noncredible, but that would have

24   been his opportunity.  So I'm going to sustain the objection.

25           All right.  Now let's talk, because I think it may

1723

0B13TER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    TERRA FIRMA INVESTMENTS (GP) 2
     LIMITED (for and on behalf of
4    the six limited partnerships
     constituting the Terra Firma
5    Capital Partners II Fund), and
     TERRA FIRMA INVESTMENTS (GP) 3
6    LIMITED (for and on behalf of
     Terra Firma Capital Partners
7    III, L.P.),

8                  Plaintiffs,

9           v.                          09 CV 10459 (JSR)

10   CITIGROUP INC., CITIBANK,
     N.A., CITIGROUP GLOBAL MARKETS
11   LIMITED, AND CITIGROUP GLOBAL
     MARKETS, INC.,
12
                   Defendants.          Jury Trial
13
     ------------------------------x
14                                      New York, N.Y.
                                        November 1, 2010
15                                      9:45 a.m.

16   Before:

17                  HON. JED S. RAKOFF,

18                                      District Judge

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

SPA-60

1818

0b11ter4

```
 1          (Jury not present)

 2          THE COURT:  All right.  Please be seated.

 3          So are any of the disputed documents -- well, let me

 4     put it this way.  I'm going to hear now any motions.  If any of

 5     the disputed documents somehow relate to these motions, we'll

 6     decide that then; otherwise, we'll decide them after I've heard

 7     the motions.

 8          So, motions from the defense.

 9          MR. COHEN:  Your Honor, we would make a Rule 50 motion

10     at this time.  I don't want to argue things that your Honor has

11     clearly indicated --

12          THE COURT:  Well, I'll tell you the only two things

13     that I thought were perhaps open, though of course, for the

14     record, you've objected, you've moved to dismiss both claims as

15     a matter of law.  But what seemed to me to be at least open to

16     reasonable argument was: number one, the second claim, the

17     fraudulent concealment claim; and second, if anyone cares about

18     it -- and I'm not sure anyone does -- whether some of the

19     defendants should be dismissed, since I'm not sure that all the

20     defendants -- I'm not sure, for example, if we heard one word

21     about Citibank as opposed to Citigroup or Citigroup Global

22     Markets, etc.  So -- but you're welcome, of course, to argue

23     anything else.

24          MR. COHEN:  Let me add two things, your Honor, to your

25     list.  The two things I would add are punitive damages --
```

SPA-61

1974
0B13TER9                    Charge Conference

1      THE COURT:  Now when a judge is not actually paying
2  attention, he can look at the screen and still make rational
3  rulings.  I won't mention what was the case in the old days.
4      MS. DYER:  That's multitasking, isn't it?
5      MR. BAUGHMAN:  I guess it's frozen forever, then, your
6  Honor.  I don't want to take up an inordinate amount of time.
7      THE COURT:  Give it one more try.
8      MR. BAUGHMAN:  I don't want to waste the Court's time
9  at 6:30, your Honor.
10      THE COURT:  Let's turn to the proposed instructions of
11  the law.  And first, an issue comes right up with the caption.
12  I've now removed Citigroup Global Markets Inc.  I'm certainly
13  going to keep Citigroup Inc. and Citigroup Global Markets
14  Limited.  And the only question is Citibank.  But my
15  recollection is Mr. Boies at least was representing Citibank
16  was the name under which the loans, the financing was done.  So
17  that they were intimately involved in the whole situation.
18      Is that plaintiff's position?
19      MR. DUFFY:  That is, your Honor.
20      THE COURT:  So, anything defense wants to say about
21  that?
22      MR. COHEN:  Your Honor, they are the lender, but I am
23  not sure that has anything to do with the fraud.  I think
24  that's the point Mr. Baughman outlined our position before.
25      THE COURT:  I think the plaintiffs have made out a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1975

0B13TER9                        Charge Conference

1    case on which a reasonable jury could conclude that the lines

2    between lender and advisor were not very well thought.  I don't

3    think it is a jury question as to whether Citigroup and

4    Citigroup Global Markets Limited should be viewed as one for

5    purposes of this charge.  Arguably it is a jury question as to

6    Citibank.  Do you really care about?

7            MR. COHEN:  I mean, yes, we do, your Honor, for --

8            THE COURT:  Why would it matter to Citibank as opposed

9    to Citigroup?

10           MR. COHEN:  Capital related, your Honor.

11           THE COURT:  Capital?

12           MR. COHEN:  It is a regulatory issue.  It has

13   regulatory implications.

14           THE COURT:  Citigroup wouldn't have that regulatory

15   issues?

16           MR. COHEN:  The answer is no for Citigroup, but yes

17   for Citibank NA.

18           THE COURT:  Let me ask plaintiff's counsel, do you

19   really want to have a charge on this issue or are you content

20   with Citigroup, which presumably is good for any award you

21   would have, and Citigroup Global Markets Limited.

22           MR. DUFFY:  Well, we do think it is important to have

23   Citibank NA in exhibit 1074 which we were looking at earlier

24   when we were going through the exhibits that there were

25   challenges to, mentions what the bank did.  The rule 2.5

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1976

0B13TER9                    Charge Conference

1   announcement which was marked as exhibit 53, this is the
2   document that was sent out to the world to let the world know
3   that EMI's board had approved the loans, or I'm sorry, the bid
4   by Terra Firma.  Has a list of parties to which people can make
5   inquiries and it says simply Citi.  It doesn't distinguish
6   between the various entities.
7           The financing fees, which were one of the main
8   financial motivations of getting this deal done, Citi, to the
9   tune of 150 to 180 million dollars, those went to Citibank NA.
10  Therefore we think Citibank NA is on the hook to the extent
11  there is liability here.  So we would ask that they remain --
12          THE COURT:  Let me ask this because I really think
13  it's just going to be endlessly confusing to the jury to have
14  to make a factual determination as to whether Citibank is
15  sufficiently involved to hold them liable for the fraud which
16  was committed by someone who was a agent of Citigroup Global
17  Markets Limited but who reported to and invoked the overall
18  umbrella of Citigroup Inc.
19          But let me throw out this possibility.  If there is an
20  award in this case, would the parties be prepared to let the
21  Court decide whether the verdict would be against just
22  Citigroup Inc. and Citigroup Global Markets Limited or also
23  would include Citibank NA so that we don't have to bother the
24  jury with this issue?
25          MR. DUFFY:  Plaintiffs would be agreeable, your Honor.

0B13TER9                    Charge Conference

1       THE COURT:  Defense counsel?

2       MR. COHEN:  Could I confer with the client for one

3   moment?

4       THE COURT:  Yes.

5       MR. COHEN:  Thank you.  Yes, your Honor.  That would

6   be agreeable.

7       THE COURT:  Very good.  So, we'll put all three before

8   the jury but with that understanding that it's not binding.

9   Okay.

10      Now, turning to the general instructions.  One, two,

11  three, four I'll fix so there are three Citis rather than four.

12  Five, six, seven, that's it.

13      Any objections or additions?  Let's take objections

14  and edits first and then any additions.  So any objections or

15  additions from plaintiff's counsel one through seven?

16      MR. DUFFY:  Your Honor, on number four there is a

17  reference to the fraud claim.  Which I think is --

18      THE COURT:  Right.  The whole thing will have to be

19  revised if I add your fraudulent concealment claim, and then I

20  will make those adjustments and you'll all have a copy of this

21  before it goes to the jury so you can double check those

22  things.  Anything else?

23      MR. DUFFY:  No, your Honor.

24      THE COURT:  Anything from defense counsel?

25      MR. BAUGHMAN:  Yes, your Honor.  I would like to be

1978

0B13TER9                    Charge Conference

1    heard on item four, the burden of proof.

2         THE COURT:  Okay.

3         MR. BAUGHMAN:  I have a primary argument and then

4    depending on how your Honor views it, there is a second point

5    I'd like to make.

6         As your Honor is aware, under traditional choice of

7    law rules, the forum court would apply its own procedural rules

8    but not procedural rules of another forum.  I think it is

9    pretty clear that the burden of proof is ordinarily reviewed as

10   a procedural matter.  The Supreme Court has commented on that,

11   I would cite to your Honor Sun Oil v. Wortman in which the

12   United States Supreme Court held or noted that the burden of

13   proof is generally treated as procedural under conflicts law

14   and has generally regarded as within the forum state's

15   legislative jurisdiction.

16        That's consistent with New York law, your Honor, and I

17   would cite to your Honor the Second Circuit case of Woodling v.

18   Garrett in which the Second Circuit has held the question of

19   burden of proof is regulated by New York law as a question of

20   procedure, to which the law of the forum applies.

21        I've looked very hard, your Honor, to find a case

22   where a court, any court, considered the issue of whether or

23   not any fraud claim, the burden of proof or anything relating

24   to the burden of persuasion sufficiency of the evidence would

25   be split.  I would cite to your Honor, it's a slightly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1979

0B13TER9                    Charge Conference

1    different case, but I think it is instructive.  It is a Sixth

2    Circuit case called Bayless.  There was a case that was held in

3    Tennessee.  The fraud there was a fraud claim advanced the

4    substantive law of the fraud claim was being determined by

5    California law.  The court observed in its ruling that under

6    California law, the burden of proof on a fraud claim was

7    preponderance.  Under Tennessee law, it was clear and

8    convincing evidence, your Honor.  And the court held in the

9    footnote that it was -- in viewing the sufficiency of the

10   evidence, that would be governed by Tennessee law, because the

11   forum was in the Tennessee court.

12          I think in this case, as your Honor has held and many

13   of your colleagues in the courthouse has held, fraud must be

14   proven by the plaintiff by clear and convincing evidence.  So

15   for these reasons, we would submit that the burden of proof in

16   this case should be clear and convincing evidence.  Because

17   that's a procedural matter governed by New York law.

18          THE COURT:  Well, certainly it is a close question and

19   I have struggled with this and I'm not sure until I hear all

20   arguments where I'm coming out.  But, do you have any case

21   involving two nations as opposed to two states?

22          MR. BAUGHMAN:  I don't, your Honor.

23          THE COURT:  It seemed to me different for several

24   reasons, but I can be convinced otherwise.  In doing away with

25   clear and convincing, which was of course ultimately the law

SPA-67

1980

0B13TER9                    Charge Conference

1   that American jurisdictions drew from common law precedents in

2   England, the English court seemed to be expressing a

3   substantive policy rationale.  And I don't want to read too

4   much into their decision, but the purpose at common law of the

5   clear and convincing rule was that the fear that making fraud

6   cases too easy would constitute a clog on commerce was always

7   really a substantive kind of rationalization.  It is totally

8   different, for example, from say, rules about hearsay or

9   admissibility or classic procedural rules, all of which relate

10  to how is the best way to ascertain the truth.  Under our

11  particular system, whichever state or sovereign is involved.

12  Even in its origins, the rule for clear and convincing evidence

13  had a substantive aspect.  We don't want to in a free market

14  economy make it too easy for people to bring fraud claims

15  because every time someone is disappointed in the goods they

16  received or the failure to deliver on time or anything like

17  that, they are going to be yelling "fraud" because they can add

18  to their damages thereby.  So it seems to me in its origins

19  different.

20        And I would be surprised, I don't think there is such

21  a case like this, but I would be surprised, for example, if

22  there were a state that said we have decided that we will have

23  preponderance as our burden in proof in criminal cases.  That

24  someone who was subject to criminal liability -- this is almost

25  impossible to come up, but, you know, that the courts would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1981

0B13TER9                    Charge Conference

1   have said, well, you shouldn't apply, even though you are

2   applying the law of some other state in determining criminal

3   liability, you shouldn't use the other state's proof beyond a

4   reasonable doubt standard because it is just procedural.  I

5   think that everyone would agree that in that situation, proof

6   beyond a reasonable doubt is a policy determination.

7   Substantive policy determination.  It is a determination that

8   we would rather see, as the saying goes, 12 guilty men

9   acquitted than one innocent man convicted.  That's the classic

10   formulation of why we have proof beyond a reasonable doubt.

11           So, here we have a sovereign nation, England, which,

12   having originated for substantive reasons the clear and

13   convincing evidence standard in fraud cases, has made a

14   seemingly substantive determination that that policy no longer

15   is applicable in the modern world where corporations can

16   protect themselves, etc., etc.

17           So it was that line of reasoning, I'm not articulating

18   it perhaps as well as I should, but it was that line of

19   reasoning that made me think this was not procedure in the

20   sense that those cases you are citing are all about.

21           MR. BAUGHMAN:  Yes, your Honor.  All of the cases that

22   I've been able to find that deal with the issue of burden of

23   proof and things that relate to burden of proof, the amount of

24   sufficiency of the evidence, operation of presumption, so on

25   and so forth, the United States Supreme Court and the cases

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-69**

1    that follow it, clearly say that those are devices relating to

2    the management of the trial.  And they have to do with --

3         THE COURT:  They may say that.  That's obviously

4    baloney.  But if they say it and they're my bosses, I guess I

5    have to follow it.  But it doesn't seem to me to be true in the

6    case of this particular presumption.

7         MR. BAUGHMAN:  Yes, your Honor.  I think that I can --

8    I don't believe that there is any -- I think if what you are

9    proposing to do is to instruct on a preponderance theory

10   because it is an English law claim, I think that would be

11   unprecedented -- I only mean that in the sense that it hasn't

12   happened before, not --

13        THE COURT:  Of course you're just enticing me.

14        MR. BAUGHMAN:  I understand, your Honor.  But I would

15   like to make a related point though, which I think is very

16   important.  Your Honor's charge, the one you have written, the

17   preponderance charge, is basically an American preponderance

18   charge.  And what the English cases hold is that while it may

19   well be that they talk about a balance of the probabilities

20   being the standard, it is more than that.  It is something of a

21   sliding scale.  And I think your Honor has to take into account

22   the fraud claims in England are tried to the court.  They are

23   never -- they are not tried to a jury.  What the courts talk

24   about is the improbability of the accusation is a factor that

25   needs to be weighed.

1983

0B13TER9                          Charge Conference

1    THE COURT:  I think that's a very good point.  Because

2    of course I use that same arguments in some of the rulings I

3    was making earlier on other issues.  The change from clear and

4    convincing to probabilities was made after, it was made by the

5    House of Lords after they abandoned jury trials in fraud cases.

6    So you may well argue that that -- it was in that sense

7    procedural because what they thought was, well, the dangers

8    that exist in these claims will not be a danger for a judge,

9    because judges are crusty old guys who are never swayed by

10   irrational factors.  Another instance of baloney.

11   So, let me go to your adversary for a minute.  I'll

12   come right back to you.  Can you cite me a case where an

13   American court has applied the burden of proof of a foreign

14   sovereign in a fraud case as opposed to the American burden?

15   MR. DUFFY:  Your Honor, I can't at this moment.  But

16   what I can do is if I may explain why I think Mr. Baughman has

17   it backwards in terms of the substance of procedure and the

18   directives from the Supreme Court.

19   THE COURT:  Okay.

20   MR. DUFFY:  In Raleigh v. Illinois Department of

21   Revenue, 530 U.S. 15 from the year 2000, the court wrote "Do

22   the state's right and the taxpayer's obligation include the

23   burden of proof?  Our cases point to an affirmative answer

24   given its important to the outcome of cases, we have long held

25   the burden of proof to be a substantive, quote unquote,

1984

0B13TER9                    Charge Conference

1   substantive aspect of the claim."

2           And there are other cases to the same in the same

3   vein.  In American Dredging v. Miller, 510 U.S. 443, the court

4   wrote that "the right of the plaintiff to be free of the burden

5   of proof inherent in his cause of action was a part of the very

6   substance of his claim and cannot be considered a mere incident

7   of a form of procedure."  There are other cases along the same

8   lines.

9           THE COURT:  So, if it comes down and of course the

10  truth is that the line between substance and procedure is not

11  always a clear cut line.  But what you are saying is, frankly,

12  what seems to me instinctively to be more likely in this kind

13  of situation, which is that the burden of proof here is

14  reflecting a substantive policy.  But, what about all the cases

15  that your adversary says go the other way?

16          MR. DUFFY:  I think he forgets we are here on federal

17  subject jurisdiction.  Notwithstanding this is a fraud claim,

18  this is an Edge Act case.  In an Edge Act case, which is the

19  only reason we are in this courthouse instead of next door, we

20  must apply federal choice of law law.  And under the federal

21  choice of law law, it is a substance question.  Burden of proof

22  is a substance question, not a procedure question.  So the

23  cases from the New York state courts or from Tennessee, they

24  may say some different things, but they are not relevant here.

25  What is relevant here are these Supreme Court cases.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1985

0B13TER9                         Charge Conference

1      THE COURT:  Yes, so you think it makes a difference as

2  to whether we are applying the law that would apply in

3  diversity situations versus the law that would apply in another

4  kind of situation where what are you saying you think this is a

5  federal common law type issue?

6      MR. DUFFY:  The federal choice of law rules point you

7  to the restatement, which point you to the most significant

8  relationship.  The parties agree that as to the underlying

9  claim, that's what matters, and the burden of proof is tied up

10  with that.  Under the restatement analysis that we are bound by

11  here.  I would also note that the defendants in their summary

12  judgment papers seem to agree that it was English law that

13  governed burden of proof.

14      THE COURT:  I'm not going to hold them to that.  They

15  really had no reason then to take the higher standard because

16  what they were trying to argue in effect was take everything

17  possible the plaintiff's way and we the defendants still win.

18  So it wasn't the same kind of situation they are confronted

19  with now.

20      But I guess, okay, I think what I want to do because I

21  don't think I can decide this right now.  But I will decide it

22  tonight and have you a new draft tomorrow.  And we'll have oral

23  argument tonight.  But what I do want to do is if you each had

24  to pick out say your top three cases on each side, what would

25  they be?  Starting with the plaintiff.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    MR. DUFFY:  Number one would be American Dredging v.

2    Miller, 510 U.S. 443 from 1994.  Number two would be Raleigh v.

3    Illinois Department of Revenue, 530 U.S. 15 from the year 2000.

4    And number three, your Honor, would be a case that is cited

5    inside the Raleigh case, it is the Director of the Office of

6    Workers' Compensation Programs v. Greenwich Collieries, 512

7    U.S. 267 from 1994.

8        THE COURT:  All right.  And how about on the defense

9    side?

10       MR. BAUGHMAN:  Your Honor, I'd start with Sun Oil v.

11   Wortman, 486 U.S. 717.

12       THE COURT:  486 U.S?

13       MR. BAUGHMAN:  717.

14       THE COURT:  Go ahead.

15       MR. BAUGHMAN:  Bailey v. Chattem, that was the Sixth

16   Circuit case I referred to.  684 F.2d 386.  And the Second

17   Circuit case I referred to is Woodling v. Garrett, and I will

18   can I get the citation for you at the break.

19       THE COURT:  At the break.

20       MR. BAUGHMAN:  I have the name, I just didn't write

21   down the --

22       THE COURT:  Okay.

23       MR. BAUGHMAN:  813 F.2d 543.

24       THE COURT:  813 F.2d 543.

25       MR. BAUGHMAN:  Yes, your Honor.

1987

0B13TER9                    Charge Conference

1       THE COURT:  Very good.

2       MR. BAUGHMAN:  Before you leave the issue, if your

3  Honor does -- I hope your Honor will conclude that it should be

4  clear and convincing, but in the event that it doesn't, I would

5  like to return to the issue of whether this sliding scale

6  burden of persuasion thing should be included in an English law

7  burden of proof charge.

8       THE COURT:  I will give you an opportunity.

9       MR. BAUGHMAN:  Thank you, your Honor.

10      THE COURT:  Now let's turn to -- are there any other

11 objections or now I'll take additions to the general

12 instructions?  Anyone want to add anything to the general

13 instructions anything from the plaintiffs?

14      MR. DUFFY:  Not from plaintiffs, your Honor.

15      THE COURT:  Anything from defendants?

16      MR. BAUGHMAN:  No, your Honor.

17      THE COURT:  Now turning to the instructions on

18 liability.  We'll turn in a minute to whether this should be

19 the claim for fraudulent concealment.  But other than that,

20 objections to instructions 8 or 9?  Any objections from

21 plaintiff's counsel?

22      MR. DUFFY:  Yes, your Honor.  To number nine if I can

23 start there.

24      THE COURT:  Yes.

25      MR. DUFFY:  Our objection relates to the paragraph

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0B13TER9                    Charge Conference

1   that begins with the word "second."

2           THE COURT:  Yes.  You don't like my definition of

3   reckless.

4           MR. DUFFY:  Well, that's right.

5           THE COURT:  Before we turn --

6           MR. DUFFY:  I would have put it in a more elegant way.

7           THE COURT:  I do want to hear you right now on

8   reckless.  Just to make sure you don't forget is there anything

9   else on instruction number nine?

10          MR. DUFFY:  The only other thing is in the paragraph

11  that starts "third," we think the words "his statements" should

12  be after the words "would rely on."  Rather than

13  "misrepresentations."

14          THE COURT:  No.  I'm missing your point there.  I

15  define it first.  I say there could be one or more false

16  misrepresentations.  That's under first.  And all the other

17  ones talk to as to any given misrepresentation you're

18  considering.  Can be one or more.  But, so the second is then

19  as to any such misrepresentation that you are considering.

20  Third is that Mr. Wormsley intended that Terra Firma rely on --

21  you want me to put on the misrepresentation you are

22  considering?  I'll do that.

23          MR. DUFFY:  That's agreeable.

24          THE COURT:  All right.  Tell me your view of what you

25  think I should say on reckless.

0B13TER9                    Charge Conference

1        MR. DUFFY:  What we would think that it should say to

2   be more true to English law would be that Mr. Wormsley either

3   knew when he made it that it was untrue, or had no honest

4   belief in that statement when he made it.  Or alternatively,

5   was reckless when he made that statement.

6        THE COURT:  Reckless is a term that will have to be

7   defined if we use reckless.  I was trying to short circuit

8   that.

9        MR. DUFFY:  I think honest belief is a much more plain

10  English way of saying it.  If Mr. Wormsley or to use a

11  hypothetical, if anyone said to me that the empty plot of land

12  next door to the courthouse is going to be -- there is a

13  goldmine underneath it and you should invest in it, and that

14  person is just making that up out of thin air, even though

15  there is a possibility, a theoretical metaphysical possibility

16  that what the person is saying might happen to be true, that

17  statement is still made without any honest belief in its truth

18  or indeed without caring one way or the other whether it's

19  true.  That's the standard under English law.  Someone cannot

20  get out of a fraud charge by saying that they thought it might

21  be true or they didn't definitively know.

22       THE COURT:  I agree with you that is much closer to

23  the language of some of the English cases.  I had some

24  difficulty unpacking what was really meant there.  But let me

25  now hear from your adversary and we'll come back to you in a

1990

0B13TER9                      Charge Conference

1    minute.

2          MR. BAUGHMAN:  Are you asking just on that one point

3    or I have a series of comment.

4          THE COURT:  Why don't you take your other comments

5    first and we'll get to that point.

6          MR. BAUGHMAN:  Just to flag them.  In item one, on the

7    first section, made one or more representations, I think it

8    would need to be much more specific.  There is no ambiguity as

9    to what the alleged false statement is.  The alleged false

10   statement is that Mr. Wormsley said Cerberus was bidding 262,

11   that if they wanted to win they had to bid 265.  And I think

12   leaving it at just one or more false representations would --

13         THE COURT:  Remember Mr. Boies pointed out in his

14   opening that there were like three or four different ways in

15   which those representations were false.  So, and any one of

16   which he argued could support liability.  So it wasn't the

17   gestalt of those representations that he said was the false

18   representation.  Although it could be.  But he argued that it

19   was false in this respect, it was false in that respect, it was

20   false in other respects, pointing to different words of what

21   was allegedly said.  If you look at his opening you'll see this

22   quite clearly.  And I think for a charge for me to go through

23   all that would not be appropriate.  He is going to go through

24   it and you are going to go through it, but why should I go

25   through it on the charge.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1       MR. WELLS:  Your Honor, the problem is there is no

2   question that Mr. Boies at various times has suggested all

3   sorts of false things were being said.  For example, you can

4   trust me, I'm doing this for you, I'm only looking out for you.

5   None of these things go to the heart.

6       THE COURT:  No, I agree with that.  And I'm sorry I

7   don't have his opening in front of me.

8       MR. WELLS:  I think --

9       THE COURT:  I'm talking about the statements, the

10  operative statements are the ones made in three phone calls.

11      MR. WELLS:  Yes.

12      THE COURT:  I'm certainly willing to say that in the

13  first element, but my recollection is that he pointed out

14  different things that were said that were allegedly false in

15  each of those phone calls.

16      MR. COHEN:  I have it if it's helpful to the Court.

17  If the Court would like to see it, I think it reinforces

18  Mr. Wells' point.

19      MR. WELLS:  The only other thing he said was false

20  that Mr. Baughman did not discuss is that in the first phone

21  call Mr. Boies said in his opening, they also say this in their

22  complaint, so it was consistent, that Mr. Wormsley said that

23  the bid date is going to be moved up at the request or because

24  of another bidder.  That's the only -- there is a consistency.

25  There is a 262, there is the 265 and then I think in that first

**SPA-79**

0B13TER9                          Charge Conference

1   call --

2           THE COURT:  Go back to that.

3           MR. COHEN:  54 is I think the paragraph you were

4   referring to.

5           THE COURT:  Well, that page seemed to me to be partly

6   relevant.

7           MR. COHEN:  This is what I think you are referring to

8   in the middle of the page.

9           THE COURT:  "Told him first that it had been advanced.

10  And Cerberus was bidding 262 per share.  That too was false."

11  So "too" relates back to something else.  Right.  "Cerberus had

12  not yet decided whether or not to bid and if so at what price.

13  That was the second lie on the 18th.  Now let's go to the 19th.

14  What happens on the 19th.  Well, on the 19th they find out that

15  Cerberus tells EMI that will not will not participate.  They've

16  got a busted auction.  Let's go to chart 28 if we can."

17          Let me see the next page.  Just from what I've seen so

18  far, one alleged misrepresentation is that Cerberus would put

19  in a bid when in fact Cerberus was dropping out.  Second

20  misrep -- alleged misrepresentation is that Cerberus would put

21  in a bid of 262.  When, even if he believes Cerberus was

22  putting in a bid, he had no basis to say they were putting in a

23  binding bid for 262 or that's the second point.  Third one is

24  that you would have to bid 265 in order to win.  Whereas they

25  had no basis for saying that.  No honest belief.  So those are

0B13TER9                    Charge Conference

1   the three that I remember from his opening.  Those are three

2   separate misrepresentations, any one of which if found by the

3   jury could support liability.

4       MR. WELLS:  I don't quarrel with that.  What I am very

5   concerned about is Mr. Boies goes all over the place with this

6   was a lie, that was a lie, this was a lie, and I would like --

7   I've tried this case from day one on the basis of those three

8   representations.

9       THE COURT:  Okay.  So I have no problem, let's see if

10  we can work it out in a way that is concise.  Now as I'm

11  writing it, have -- I have -- I'm glad you raised this,

12  Mr. Wells, because I think it raises an interesting question.

13  Here's what I have and then I have a question about it.

14      First, that David Wormsley as an agent of Citi made

15  one or more false representations to Guy Hands of Terra Firma

16  in the three alleged phone calls of May 18 and 19.

17  Specifically, plaintiffs allege that Mr. Wormsley falsely

18  represented that Cerberus was going to bid -- was going to

19  submit a final bud on Monday, that Cerberus' bid would be 262,

20  and that if Terra Firma bid 265, it would win the bidding.

21      Now, I wonder if the third is really on any theory a

22  false representation.  Because that part was true.  If they bid

23  265, they were going to win.

24      MR. DUFFY:  Your Honor, I think the lie is something

25  slightly different.  It is not that if they bid 265 they would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1994

0B13TER9                    Charge Conference

1   win.  It is that they had to bid 265 in order to win.  That's

2   the misrepresentation there.

3          THE COURT:  You're right.  Thank you, that's exactly

4   right.

5          MR. DUFFY:  There is one other misrepresentation

6   packed into it and I'll wait to be heard.

7          THE COURT:  Go ahead.

8          MR. DUFFY:  That is the notion that the bid deadline

9   was being accelerated from May 23 to May 21 at the request of

10  Cerberus.  That too was false.  That too is one of the lies or

11  misrepresentations that Mr. Boies alluded to.  I disagree with

12  Mr. Wells that Mr. Boies was throwing lies around everywhere.

13  There are four lies.

14         THE COURT:  You are certainly right that he asserted

15  that in his opening argument.  I remember that.  How is that

16  material?

17         MR. DUFFY:  It is material in the sense that it is

18  supportive of -- it props up the other misrepresentations.

19         THE COURT:  Yes.  How could it be by itself a

20  misrepresentation on which liability could be --

21         MR. DUFFY:  It creates the impression of competition

22  when in fact there was none.  And Mr. Wormsley had no honest

23  belief that there was any competition at that point in time

24  when he said it was accelerated due to Cerberus.  We know from

25  Mr. Borrow's testimony that --

1995

0B13TER9                    Charge Conference

1    THE COURT:  Is there any testimony from Mr. Hands or

2    anyone else that if all they had heard was that it had been

3    moved up at the request of Cerberus as opposed to at the

4    request of the company or anyone else, that that would have

5    changed their behavior?

6    MR. DUFFY:  Yes, I think Mr. Hands did testify to

7    that.

8    THE COURT:  If he testified to that, I will consider

9    including that as a fourth.  Because it was certainly, I do

10   agree with you that was said on opening statement.  But I'd

11   like to know, you'll have to find that testimony.

12   MR. DUFFY:  We will try to find that for you, your

13   Honor.

14   THE COURT:  Let me go back to you, Mr. Wells.  Either

15   three or four but that's what you want, right?

16   MR. WELLS:  Yeah.  Look, I think your Honor raises a

17   couple issues.  First, the 265 may not -- that may not be a

18   false statement at all.

19   THE COURT:  We'll get to that.  I just want to make

20   sure I'm doing now what you requested in form.  It may be two,

21   it may be three, it may be four.  What you want me to do is

22   spell out what they are.

23   MR. WELLS:  I think I do, your Honor.  I want to hear,

24   look, here are the options.  You either tie it to the phone

25   call and just leave it kind of loosey goosey.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1996

0B13TER9                    Charge Conference

1     THE COURT:  I want to know what you want me to do.  I

2  don't do anything until some party requests it or usually.

3     MR. WELLS:  What I am trying to understand is as this

4  being is being fleshed out what it looks like.

5     THE COURT:  Here's what it looks likes at the moment.

6  And then I'll give you what it might look like.  First, that

7  David Wormsley as an agent of Citi made one or more false

8  representations to Guy Hands as an agent of Terra Firma in the

9  three alleged phone calls of May 18 and 19.

10     Let me just stop there.  So far so good?

11     MR. COHEN:  20th, your Honor.

12     THE COURT:  Thank you very much.  Any problem with

13  that on the part of defense counsel?

14     MR. WELLS:  I have no problem.

15     THE COURT:  Any problem with that on the part of

16  plaintiff's counsel?

17     MR. DUFFY:  No, your Honor.

18     THE COURT:  Let's go to the next sentence.  Mr. Cohen.

19     MR. COHEN:  Sorry, your Honor.

20     THE COURT:  So the next sentence would be:

21  Specifically, plaintiffs allege that Mr. Wormsley falsely

22  represented that -- and there would follow after that either

23  two, three or four possibilities depending on this

24  conversation.  But, do you want it -- do you want that

25  specification or do you not want that specification?

1997

0B13TER9                    Charge Conference

1    MR. WELLS:  I will be candid.  There is a difference

2    of agreement.

3        THE COURT:  Difference of opinion, yeah.

4        MR. WELLS:  Of opinion.  At a minimum, I want it tied

5    to the phone calls so there is no question about that.

6        THE COURT:  We've got that both sides are agreeing on

7    that.

8        MR. WELLS:  It is hard for me to evaluate should I

9    just stop there when I don't know how it's going to be fleshed

10   out.  That's what --

11       THE COURT:  You are saying if it's two, it's fine, and

12   if it's four it's not fine.  But I can't be bothered with

13   tactical considerations like that.  I have to figure out

14   whether the jury will be helped or hindered by knowing more of

15   the specifics.  Frankly, you have convinced me on the whole --

16   I want to hear from plaintiff's counsel -- but on a whole you

17   were convincing me that they would be helped.

18       MR. WELLS:  Well, let me give you an example.  We know

19   already that there is an argument that if he had said you'll

20   win at 265.  That may not be a false statement at all.  We are

21   going to come to that in a minute.  Let's go back to this one

22   about moving up the bid date.  I'd like to see the testimony

23   first.  I do not recall it.  But I just don't recall it.

24       THE COURT:  But I don't see in principle why it

25   matters.  Whether it's two, three or four, the jury will be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1998

0B13TER9                    Charge Conference

1   enhanced in their understanding of what they need to do by

2   specifying beyond the phone calls the particulars of what can

3   be a misrepresentation on which liability can be premised or

4   not.  And you know, for instance, on the first one, I won't see

5   until we see the testimony which way I come out.  But in

6   principle it seems to me that they either will be enhanced or

7   they will not be enhanced by knowing what the specifics are.

8   And frankly, you had done a pretty good job of convincing me

9   that they would be enhanced because you made clear to them that

10  anything else that Mr. Boies or anyone in this courtroom was

11  claiming was false that wasn't in one of those specifics is not

12  something that could support liability.  So, but it may turn

13  out that they have four.  That would be the maximum.

14       So, I think we have to decide this as a general

15  matter, not on whether it is going to be two, three or four.

16       MR. COHEN:  Your Honor.

17       THE COURT:  Mr. Cohen, you want to argue against

18  Mr. Wells.

19       MR. COHEN:  I hate to, but let me raise what I think

20  might be misleading.  As I understand it the next piece of this

21  charge you'll instruct that any one of those representations

22  was relied upon.  Let's take the 262.  If the jury were to find

23  simply that he said 262, I don't think that's the theory of the

24  plaintiff's case.  Cerberus at 262.  Because it doesn't cause

25  them to bid Monday.  It doesn't cause them to bid 265.  So one

**SPA-86**

0B13TER9                    Charge Conference

1    of the problems I think with unpacking all four and say if any

2    one is false, I don't think that's the theory of the

3    plaintiff's case, as opposed to three phone calls where we are

4    all in agreement because it does cabin the misrepresentations

5    to the relevant conversations.

6          THE COURT:  I am not sure I agree with you about

7    whether it could support.  But anyway, eventually the jury is

8    going to have to focus on a particular misrepresentation.

9    Other representations which may or may not have been false, may

10   give color or context to the misrepresentation that is

11   supporting liability, but there is still going to have to be at

12   least one misrepresentation that will support liability.  And

13   the question is whether you want to analyze it, or rather the

14   question for me is whether the jury should analyze it in terms

15   of specific misrepresentations that we flag for them in

16   advance, or whether they should leave that to argument of

17   counsel, just focus on the fact that it has to be in those

18   three phone calls.

19         Let me hear plaintiff's counsel.

20         MR. DUFFY:  I think that actually if I could start off

21   by citing the testimony that your Honor asked before.

22         THE COURT:  Yes.

23         MR. DUFFY:  Regarding the acceleration of the bid

24   deadline, I think it comes in twice.  Firstly at page 264,

25   lines six through 19 of the trial transcript.

SPA-87

0B13TER9                    Charge Conference

1    "Q.  After the board meeting that we just looked at at

2    8 o'clock in the morning at Guernsey on May 18, did you have

3    any conversations with Mr. Wormsley about the competitive

4    situation?

5    "A.  Yes, we had a conversation sometime later that day after

6    the board meeting where he told me that the auction was being

7    accelerated at the request of one other bidders, the only

8    bidder Cerberus, and that it was being accelerated to the

9    Monday morning.  And that we needed to be in a position to put

10   a bid in Monday morning."

11        Then it goes on to talk about the price terms and

12   necessity of bidding 265.  Then again about nine pages later,

13   at page 273, Mr. Hands testified around line 12 "You know,

14   David telling us the reason for why the -- telling me the

15   reason for why the auction was being accelerated gave me the

16   false assumption that it was being done because of another

17   bidder and that, therefore, we either had to be there or we

18   couldn't.  If he hadn't told me that, then we wouldn't have had

19   any belief in that.  I wouldn't have had any belief in that."

20        So that is one of the four lies and I think the

21   arguments that Mr. Wells and Mr. Cohen and Mr. Baughman are all

22   making here about the way this particular part of the charge

23   should look is really an issue of reliance.  If they want to

24   say that Mr. Hands did not in fact rely on the mere fact of the

25   acceleration, then they can run that argument.  If they want to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-88**

0B13TER9                    Charge Conference

1    say he didn't rely on the notion that there had to be a bid of

2    265 in order to win, then they can make that argument.  But

3    this all goes to the reliance aspect.  We are not quite there

4    yet.  I think in terms of the misrepresentation aspect,

5    Mr. Boies was very clear that there are these four separate and

6    distinct misrepresentations, all of which propped each other up

7    and were all part and parcel of the claim

8            THE COURT:  The time has come, gentlemen, for you to

9    tell me definitively what your position is on the following

10   question.  Should I stop the sentence after the phone calls of

11   May 18 and 20th or should I specify the specific

12   misrepresentations that can properly be argued which could be

13   as few as two and could be as many as four, something I'm not

14   going to decide until I know what your positions are on the

15   general question.  So the question is simply do you want the

16   further specification, yes or no?  So let's start with defense

17   counsel.

18           MR. WELLS:  We will accept the change that just stops

19   it and ties it to the phone calls with no elaboration.

20           THE COURT:  What about plaintiff's counsel?

21           MR. DUFFY:  Can I confer just very briefly?

22           THE COURT:  Yes.  By the way, I notice that there is a

23   gentleman in the court who is doing what all of us really want

24   to do, which is falling asleep.  He's been actually falling

25   asleep for the last four or five hours, and I admire his

2002

0B13TER9                    Charge Conference

1    ability to do so, but I won't identify him further.  He just

2    woke up sort of.

3            Yes, go ahead.

4            MR. DUFFY:  Your Honor, we're satisfied to stop.

5            THE COURT:  Great.  We have an agreement.  So there we

6    go.  All right.  Makes my life easier.  Okay.  Now, going back

7    to Mr. Baughman, you had again putting off recklessly for a

8    moment, you had some other things.

9            MR. BAUGHMAN:  Yes, your Honor.  If I could go to the

10   second, the paragraph that begins "second."

11           THE COURT:  Yes.

12           MR. BAUGHMAN:  I think that there is a concept that is

13   central to English law on this subject that is missing from the

14   charge here, which is the concept of dishonesty.  All of the

15   cases dating back to Derry v. Peek and carrying on through say,

16   Angus v. Clifford which speaks of moral obliquity, all of them

17   speak about the need for the defendant's state of mind to be

18   subjectively dishonest.

19           THE COURT:  Why isn't that covered by the combination

20   of two and three?  He knew it was false and he intended then to

21   rely on it.  That is in English law the classic formulation for

22   what deceitful or dishonest intent.

23           MR. BAUGHMAN:  What AIC for instance talks about is

24   the vital importance of stressing the issue of the defendant's

25   dishonesty.  If we just talk about whether he knew --

2003

0B13TER9                    Charge Conference

1           THE COURT:  You show me back in the days that England

2    had jury charges, you show me a jury charge that says what you

3    say.

4           MR. BAUGHMAN:  I don't have a jury charge.

5           THE COURT:  What you are talking about is when a judge

6    is talking about this, he basically puts on his moral hat and

7    says, oh, these scoundrels, how they were reeking with

8    dishonesty and all of that.  But that's a word that has very

9    little meaning to the jury until you unpack it and that's what

10   I tried to do in this case.

11          MR. BAUGHMAN:  But your Honor, I think that's what the

12   cases and why the speeches of the House of Lords go on for so

13   long, is they are struggling to define what exactly dishonesty

14   means.  It is --

15          THE COURT:  If they can't do it, why should I try?

16          MR. BAUGHMAN:  Because we do have guidance from them.

17   Moral obliquity, wickedness, guilty mind.  These are the

18   statements by the Law of Lords precisely on this point.  Saying

19   that's what is required is a guilty mind.  A wicked state of

20   mind.  Acting with moral obliquitude.

21          THE COURT:  I think that which used to be called mens

22   rea before they dropped their Latinisms is much more in the

23   context of criminal cases than civil cases.  But there are

24   civil cases where a judge here and there says that.  But I'm

25   not, I think that by the way most commonly comes up in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-91

0B13TER9                    Charge Conference

1   precisely the situation where your adversary is arguing, namely

2   when you are defining recklessness as not having an honest

3   belief in the truth of the statement.  But give me an example

4   of a case or two that you think supports your point of view as

5   showing that this is an essential element.

6          MR. BAUGHMAN:  Yes, your Honor.  I would cite to your

7   Honor the AIC case where the elements of the --

8          THE COURT:  Give me the citation.

9          MR. BAUGHMAN:  Sure.  2006 EWCA civ 1601.  I believe

10  we submitted it.  But the quote is listed, dishonesty is listed

11  as one of the elements of the tort, is item three.  In essence

12  they require, one, a representation --

13         THE COURT:  But, dishonesty means so many different

14  things.  If I say something that is knowingly false, I am being

15  dishonest, am I not?  What is added?

16         MR. BAUGHMAN:  It is a state of mind of wickedness, an

17  intent to do evil.  That is what the cases are attempting to

18  capture.

19         THE COURT:  No.  I don't see that.

20         MR. BAUGHMAN:  I could cite then Bradford Third

21  Equitable Building Society which stated fraud involves

22  deliberate intent which is called mens rea, nothing short of

23  the wicked or guilty mind will serve.  A civil case, your

24  Honor.  The Angus v. Clifford case which the plaintiffs had

25  cited a case from 1892, the court of appeals on appeal from the

2005

0B13TER9                    Charge Conference

1    house of chancery made quite clear that moral obliquitude

2    amounting to dishonesty was what was required.

3         THE COURT:  Moral obliquitude?

4         MR. BAUGHMAN:  I probably wouldn't advocate those

5    words in the charge, your Honor.

6         THE COURT:  And so tell me to my simple minded way of

7    thinking, if one intentionally tells a lie, for the purpose of

8    cheating someone else, how can one do that without being guilty

9    of moral obliquitude, dishonesty, or any of the other

10   adjectives you've used?  Nouns, actually.

11        MR. BAUGHMAN:  I think it focuses the jury on the

12   subjective state of mind of the defendant.  It is undisputed

13   that between the experts for the parties that this is a

14   subjective inquiry into Mr. Wormsley's mind.  Perhaps I could

15   offer an edit.

16        THE COURT:  Tell me also, how can you square that with

17   what the cases certainly permit, and we are working on the

18   formulation, but certainly permit, which is some form of

19   recklessness.

20        MR. BAUGHMAN:  I don't think that they do.  What Lord

21   Herschell wrote in Derry v. Peek, the case from which all of

22   this holds, he set out three things.  He said number one is

23   knowing that it was false.  Number two was no honest belief.

24   Then he said number three, recklessness.  Then he went on very

25   clearly to say that recklessness is just a subcategory of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2006
0B13TER9                    Charge Conference

1    number two.  Here is where I would refer your Honor directly to

2    Angus v. Clifford.  Angus v. Clifford is a case from the court

3    of appeals approximately 25 years later which wrestles

4    precisely with the question of what is required for

5    recklessness.  And that case clearly holds that recklessness is

6    a dishonest state of mind.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SPA-94

2007

0b11ter10

```
 1        MR. BAUGHMAN:  And it says recklessness to truth in
 2   this context amounts to dishonesty, and a statement is not
 3   fraudulent if the speaker honestly believes it, quote, however
 4   inappropriate, however stupid, however grossly careless.  That
 5   is what Angus v. Clifford set forth in 1891, your Honor, and
 6   that principle has carried through in the cases.
 7        And then I would refer yourself -- refer your Honor to
 8   AIC, where the AIC -- the Lord is -- AIC case, summarizes a
 9   lengthy set of precedents and concludes that the leading
10   cases -- I'm quoting from AIC.  "The leading cases are replete
11   with statements of the vital importance and of watering down
12   this ingredient -- this ingredient into something akin to
13   negligence, however gross."
14        So I think it is clear that to pick up something -- up
15   on something your Honor said a few minutes ago, the -- the
16   House of Lords may at times get caught up in semantics of
17   things, but in this context there really is not, in the English
18   law of deceit, the tort we're dealing with, a concept of
19   recklessness that bears any resemblance to something that a US
20   court would consider recklessness.  Recklessness under the
21   English system is really a statement about the dishonest mind
22   of the defendant.  And in order to be reckless, there almost
23   has to be --
24        THE COURT:  So let me ask you this:  Under your
25   theory, to take the classic conscious disregard of American
```

2008

0b11ter10

1       law, Mr. Jones has every reason to believe, before he offers to

2       sell you the Brooklyn Bridge, that the deed that he got from

3       his confederate that purported to put ownership of the Brooklyn

4       Bridge in his hands was a false and phony document, but he

5       chooses purposely not to make the inquiries that would expose

6       the phoniness of the deed, and you're saying he could not be

7       prosecuted under English law, he would not be civilly liable

8       under English law?

9              MR. BAUGHMAN:  Absolutely not, your Honor, and I'll

10      cite to Derry v. Peek.  Derry v. Peek is exactly on point.

11      What Derry v. Peek dealt with, your Honor, was a share

12      prospectus.  It was a share prospectus for a company that

13      operated trams, and the issue was, in the share prospectus,

14      they represented that they actually had a license from the

15      government to operate a particular type of tram.  I think it

16      was that they could operate motorized trams.  In fact, they

17      didn't have that license, and the guys who made the prospectus

18      knew they didn't have that license.  Nevertheless, the House of

19      Lords held that the -- they could not be held liable for fraud

20      because there was no proof that, by not checking, by making the

21      statement, they actually intended to cause harm to the people

22      who purchased the shares, your Honor.

23             THE COURT:  All right.  Well, I will take a look at

24      all that, because one never knows how bizarre the law of

25      another sovereign may be.  But let me hear from your adversary.

SPA-96

0b11ter10

```
 1        MR. DUFFY:  Your Honor, the one thing I agree on is
 2   this all goes back to the Derry v. Peek case and the
 3   reformulation of what dishonesty is, which is what deceit is,
 4   which is as follows, and this is cited in the report of
 5   Mr. McQuater, who was the barrister who put in an opinion in
 6   support of Citi's summary judgment brief.  It says, "Fraud is
 7   proved when it is shown that false representation has been made
 8   (1) knowingly (2) without belief in its truth, or (3)
 9   recklessly -- carelessly, whether it be true or false."
10        Those are three separate formulations.  As
11   Mr. Baughman mentioned, the opinion goes on to say, "Although I
12   have treated the second and third as distinct cases, I think
13   the third is but an instance of the second, for one who makes a
14   statement under such circumstances can have no real belief in
15   the truth of what he states."
16        I don't think there's very much daylight between
17   Mr. Baughman and I on the notion that recklessness is really
18   but a species of lack of honest belief.  I think the plain
19   English here way to get this across to the jury is,
20   Mr. Wormsley made this statement, dishonestly or without --
21   without any honest belief in its truth, or without any honest
22   belief in its truth.  Forget the word "dishonestly," because
23   that's sort of tacked in there.
24        And going back to the notion that there has to be this
25   wickedness or moral ubiquity, it's just not the case.  In
```

2010
0b11ter10

```
 1    Halsbury's, I'll read the Court what the -- what the real
 2    standard is, as set forth in Halsbury's Section 757.  "Not only
 3    is a misrepresentation fraudulent if it was known or believed
 4    by the representation -- representor to be false when made, but
 5    mere nonbelief in the truth is also indicative of fraud.  Thus,
 6    whenever a person makes a false statement which he does not
 7    actually and honestly believe to be true, for purposes of civil
 8    liability, that statement is as fraudulent as if he had stated
 9    that which he did not know to be true or knew or believed to be
10    false.  Proof of absence of actual and honest belief is all
11    that is necessary to satisfy the requirements of the law."
12         This goes back again to the lack of honest belief in
13    the truth.  That goes back to Derry v. Peek.  It does not
14    impose any sort of burden on plaintiff to show moral ubiquity.
15    It simply imposes a burden of showing that there was no honest
16    belief, and I think we've now gone through this at length and
17    we can --
18         THE COURT:  All this seems to me, on both sides --
19    forgive me -- word play.  Maybe I misunderstood the Bible when,
20    in the Ten Commandments, it says, "Thou shalt not lie."  I
21    thought that meant that if you do lie, you're doing something
22    immoral and dishonest.
23         And here, putting aside for just a moment the question
24    of recklessness, you have to have shown that you lied,
25    intending that the other person do something that was helpful
```

SPA-98

2011

0b11ter10

1    to you and, as it turned out, harmful for them, which is what

2    we commonly mean by cheating.

3         If you look up "fraud" in the Oxford Dictionary, you

4    will see that the first synonym is "cheat," to defraud is to

5    cheat.  A good English word.  And last I knew -- maybe Moses

6    had it wrong, maybe my parents had it wrong, but -- cheating is

7    dishonest, and immoral, and all those other bad things that you

8    want me to throw in here.

9         So I think it really comes down to the question of

10   whether recklessness is embraced by English law.  And the rest

11   just seems to me to be word play.  So I will go look one more

12   time at this whole issue, all the aspects of it, but

13   particularly the recklessness part of it, and you'll see my

14   final formulation tomorrow.

15        MR. BAUGHMAN:  May I give you one additional, your

16   Honor?

17        THE COURT:  Yes.

18        MR. BAUGHMAN:  I direct your Honor to page 375 of

19   Derry v. Peek in Lord Herschel's speech, where Lord Herschel

20   said that in order for there to be dishonesty, the defendant

21   would have had to have purposefully abstained from inquiring

22   into the fact, purposely abstained, which is I think just

23   saying no honest belief doesn't quite capture it.  He has to

24   not have a belief and knowing it and decide not to do it.  This

25   Nelsonian blindness concept of, "I'm going to put the spyglass

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**SPA-99**

0b11ter10

```
 1    to the glass eye, I'm going to deliberately not look."

 2         THE COURT:  No.  One thing we all have to remember is

 3    that because in the English system there are often multiple

 4    opinions, it's not like you have one opinion that is

 5    definitive.  When Lord Toulson was here the other day -- and I

 6    did not discuss this case with him, but I said to him, "What do

 7    you find the biggest difference as an appellate judge between

 8    appeals here and appeals in the United Kingdom?"  And he said,

 9    "You have to vote."  There's a majority opinion, there's a

10    dissenting opinion, and you know for sure which opinion sets

11    the law, whereas in the English system, there are multiple

12    opinions.  Not always.  Sometimes there's the single opinion,

13    increasingly there's the single opinion, but in the olden days

14    there were multiple opinions, and if they all come to the same

15    bottom line, you have the decision of the court, but it's not

16    so clear which is the precedent.

17         And so these cases have to be read with some instinct

18    for the British system of proceeding, and not every single word

19    is entitled to the kind of weight that we would give it.

20         It's also worth remembering that these opinions are

21    delivered orally, and while it is amazing to watch and see a

22    British judge deliver orally, without notes and often without

23    preparation, an opinion that reads better, not only

24    substantively but grammatically, than any American written

25    decision, nevertheless, words are not always chosen with the
```

2013

0b11ter10

1   precision that we expect after 14 law clerks have pored over

2   the opinion before it's issued.

3            And, for example, what plaintiff's counsel just read

4   to me, the third formulation included the word "careless," but

5   it is crystal clear from other decisions that he did not mean

6   "negligence," even though the word "carelessness" is often

7   given as a synonym for "negligence."  So this has to be read

8   with some sophistication, for lack of a better word.

9            But I'll take a look at all of this.

10            MR. DUFFY:  Your Honor?

11            THE COURT:  Yes.

12            MR. DUFFY:  We would just like to refer the Court to

13   paragraphs 33 through 45 of the report entered on summary

14   judgment by our barrister, Nicholas Strauss, Q.C.

15            THE COURT:  Yes, I will go back and look at all that

16   stuff --

17            MR. DUFFY:  Thank you, your Honor.

18            THE COURT:  -- in the few hours that we'll have

19   remaining after we finish this conference.

20            All right.  Anything else on instruction number 9?

21            MR. BAUGHMAN:  Yes, your Honor, if I may.

22            THE COURT:  Yes.

23            MR. BAUGHMAN:  This is picked up in both

24   paragraph 3rd and paragraph 4th, where the draft reads, "In

25   deciding whether to make a binding bid for EMI," and then later

SPA-101

2014

0b11ter10

1    on down there it says, "and whether to make a binding bid for
2    EMI," I think the reliance point, your Honor, should be in
3    going through with the transaction, in entering into the
4    transaction.  What the English base -- cases talk about is that
5    you rely on something to your detriment.  The detriment that
6    they are claiming occurred on August 17th.  Ms. DeMario
7    testified for two days about how they suffered the harm on
8    August 17th.  So I think it should be entering into the
9    transaction.
10            THE COURT:  Well, first of all, I agree with you about
11    the word "detriment," which I thought I should add anyway, so I
12    will add that.  I'm unclear what you mean by whether -- in
13    other words, certainly part of their claim is, they say, "If we
14    hadn't been told this, maybe we wouldn't have bid at all, or
15    maybe we would have bid a lot lower."  And both of those are
16    independent possibilities and arguably supported by the
17    evidence in this case, so why shouldn't they be able to ride
18    both those horses?
19            MR. BAUGHMAN:  Your Honor, I have two issues.
20            THE COURT:  Yes.
21            MR. BAUGHMAN:  One, the word "binding" I think is a
22    very dangerous word, because it is very much an issue in
23    dispute in this case as to whether or not it was a binding bid.
24    We've offered --
25            THE COURT:  I don't care about that.  If you want to

2015

0b11ter10

1    make that "whether to make a bid for EMI on May 21," if you

2    prefer that --

3              MR. BAUGHMAN:  Well, I certainly do, but I'm not

4    giving up yet.

5              THE COURT:  Okay.

6              MR. BAUGHMAN:  I mean, going back to my point, which

7    is, by defining the fraud only in terms of what happened on

8    May 21, you're, in effect, cutting off a very significant part

9    of our defense, which is that they could have gotten out of the

10   deal.  They learned on May 22nd -- or they were put on notice

11   on May 22nd that Cerberus didn't bid.  Mr. Hands testified

12   that he knew for certain as of July 19th that there was no

13   competition because he had learned that Warner had withdrawn

14   its bid, that no other bids had come in.  And we've emphasized

15   that they had five opportunities to get out.  Mr. Hands in his

16   e-mail testified that, "It should not be assumed that we would

17   just proceed," so the issue, from our point of view, is the

18   reliance.  What matters is the date of the alleged harm, which

19   is August 17th, when Ms. DeMario claims they suffered the

20   $2 billion harm.  It's the whole entering into the transaction,

21   your Honor.  And if -- by cutting it off here, you're -- the

22   charge would discount a significant part of our defense, and it

23   allows them to not have to prove reliance throughout the period

24   leading up to the time that they allege harm.

25              So I would say --

SPA-103

2016

0b11ter10

```
1         THE COURT:  Well, if I understand your argument, you
2    want, "In deciding whether --" this would be in both
3    paragraphs.  "In deciding whether to purchase EMI at the time
4    and at the price for which they did," or something like that.
5         MR. BAUGHMAN:  That would be fine, your Honor, or what
6    I had written down was, "to enter into the transaction."
7         THE COURT:  That gives the jury no guidance
8    whatsoever.
9         MR. BAUGHMAN:  Then your Honor's is infinitely better
10   than mine.
11        THE COURT:  Well, I doubt that, but let me hear from
12   plaintiff's counsel.
13        MR. DUFFY:  Your Honor, we think that the action that
14   was triggered by the misrepresentations here is the bid.  The
15   bid then triggered additional -- it was sort of a set of
16   dominoes that then followed from that.  As Mr. Borrows
17   testified and as he wrote in contemporaneous documents, there
18   was no real practical way for Terra Firma to extricate itself
19   once it had placed this bid without destroying its own
20   business.  If that bid had not been put in, then none of us
21   would be here right now arguing about this.  It was the bid
22   that was what Mr. Wormsley's misrepresentations intended to
23   cause and did cause, under our theory.
24        THE COURT:  Yes.  I think it's -- while there arguably
25   is a duty, we'll say, under American law to mitigate damages,
```

0b11ter10

1    once you've been enticed into a deal, it doesn't become your
2    burden to show that, well, you could have gone out but you
3    chose not to.  If your reliance was reasonable -- or under
4    British law, it doesn't even have to be reasonable -- if you
5    had actual reliance, the fact that theoretically you could have
6    still gone out of it is neither here nor there, and at most it
7    goes to the issue of damages.
8              MR. DUFFY:  Exactly.  That's what we think.
9              THE COURT:  That's my understanding of the law too.
10              All right.  I'll play with all that.
11              Let's move to the question of whether there should be
12    a claim for fraudulent concealment.  As I understand
13    plaintiff's counsel, really, Mr. Boies introduced two
14    alternative theories for fraudulent concealment, one of which
15    was vaguely that Citigroup, in one form or another, should have
16    done something to apprise Mr. Hands that there was no Cerberus
17    bid.  I don't think that can support, on this set of facts, a
18    claim.  It's much too ambiguous and convoluted in its
19    presentation, even as Mr. Boies presented it earlier today.
20              The clean, straightforward theory, which, if I had
21    allowed any, is the one I would allow -- and that's in
22    question -- is that when Mr. Wormsley found out there was no
23    other bid, which he admitted was on May 21st, that if he had,
24    as alleged, told Mr. Hands that Cerberus was, you know, bidding
25    its 262 on Monday, etc., that he had a duty at that point to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-105

0b11ter10

1   correct it because then Mr. Hands could have taken action to

2   get out of it.

3          So let me hear first from defense counsel as to why

4   that theory should not go forward.

5          MR. BAUGHMAN:  Your Honor, I go back to what I said

6   when we had this -- the conversation on the mini charge.  It's

7   just not their theory.  Their theory has always been that this

8   is a case of intentional fraud.  Counsel's opening talked about

9   how they made a decision on the 18th to lie.  It said that

10  they made statements that they knew they were false, and that

11  they made affirmative misstatements on the 20th, and then

12  they had a coverup of the lie.  That's what they said.  That's

13  the theory that they've been --

14         THE COURT:  Yes, but your defense is, A, that no such

15  statements were ever made, or, B, if they were, they were not

16  intentionally false.  And all the things you've just been

17  telling me about, you know, the need for dishonest intent and

18  so forth, is part of your defense.

19         You're saying, you know, ladies and gentlemen, we

20  think, first and foremost, he never said those things, but even

21  if you were to find that he did say those things, you haven't

22  heard anything that suggests that he didn't have a good honest

23  belief in that, and then you have your reliance defense and

24  your damages defense.  So given that that was your defense,

25  part of your defense from the get-go, why aren't they fairly

0b11ter10

1    entitled to say to the jury, that's no defense, because even if

2    he honestly believed those statements at the time he made them,

3    he had to recognize, once he heard that no Cerberus bid had

4    been made, that we had been misled and he should have corrected

5    it at that time and he purposely didn't?  Why isn't that a fair

6    argument in terms of your own theory?

7         MR. BAUGHMAN:  It goes back to the part of the charge

8    we were just looking at, your Honor, which is, what is the

9    action?  If it's the putting in of the bid, if -- as it was

10   defined in the charge there, you would have to find that

11   Mr. Wormsley somehow learned, between midnight and 9 a.m. on

12   Monday, that what he had allegedly said in the midnight call --

13        THE COURT:  No, I'm not going to let it go to the jury

14   on that, but they're saying their theory is, it ain't over till

15   it's over, and if he had learned on May 21st after he had

16   submitted the bid that he had submitted a bid on that basis, he

17   could still get out of it, and he would have, is their claim.

18        MR. COHEN:  Your Honor, one thing he said this

19   morning, or afternoon, during the Rule 50 conference, was to go

20   back and look at Mr. Boies' opening.

21        THE COURT:  Yes.

22        MR. COHEN:  And I would urge you to do that, because

23   it's not that long, and I'll try to characterize it fairly,

24   because -- he's not here, but I will characterize it fairly.

25   Because all through the low 50s of the transcript, he lays out

SPA-107

2020

0b11ter10

1    an intentional fraud case.  There's not a word in that opening

2    about fraudulent concealment.  We have been trying an

3    intentional fraud case.  As Mr. Baughman said, it was a fraud

4    case, and then in anticipation of our arguments with respect to

5    what happened when they learned later, the Alexander e-mail and

6    so on, they've constructed a defense that there was some

7    elaborate coverup by Citi.

8         THE COURT:  I think the opening is important, and if

9    it is as you say, I think that cuts strongly against charging

10   this claim.

11        The other question I would ask is:  Did Mr. Boies put

12   to Mr. Hands the question, "What would you have done if, on

13   May 21st, after you had submitted the bid, Mr. Wormsley had

14   called you up and said, 'Sorry about that, there was no

15   Cerberus bid'?"  And my recollection was that, A, that question

16   wasn't asked, and, B, that the kinds of questions that were

17   asked all cut in the other direction.  They were all of the

18   form, "We were locked in.  No matter what, we were stuck.  We

19   couldn't pull out because it would be a terrible reputational

20   harm.  Everyone would have said, 'Don't do a deal with Guy

21   Hands.'"  So the thrust was entirely in the opposite direction

22   from what would be the sine qua non of a fraudulent concealment

23   claim.

24        Yes, sir.

25        MR. DUFFY:  Your Honor, I think Mr. Cohen's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-108

0b11ter10

1    formulation makes it sound like a fraudulent concealment is not

2    intentional fraud.  It is intentional fraud.  To the extent we

3    argued in our opening that this is intentional fraud, to the

4    extent Mr. Cohen is accusing us of arguing an intentional fraud

5    case, your Honor, I agree.

6         THE COURT:  He's saying there was never in your

7    opening -- he's saying -- I don't know -- something along the

8    lines of, "Ladies and gentlemen, even if you find that at the

9    time Mr. Wormsley made these statements, he didn't know they

10   were false, there came a time very shortly thereafter when he

11   knew they were false, and it was his duty at that point to tell

12   us and he didn't," and I don't recall anything remotely like

13   that.

14        MR. DUFFY:  Well, on page 54, around line 18, after

15   Mr. Boies explained the phone call on May 18th, he moved on

16   to May 19th, and he said, "What happens on the 19th?  Well,

17   on the 19th they find out that Cerberus tells EMI that it

18   will not participate.  They've got a busted auction.  They

19   don't have any bidders anymore.  The auction is over with.

20   Unless this information can be concealed from Terra Firma, the

21   auction for EMI is busted, and Citibank will lose hundreds of

22   millions of pounds in fees and interest."

23        THE COURT:  That's still a third.  That's different

24   from either theory he enunciated just this afternoon.

25        MR. DUFFY:  Well --

SPA-109

2022

0b11ter10

1      THE COURT:  That's theory number three, which is I

2  think an irrelevancy, because under the chart that we just went

3  over, no matter how I work it out, if the jury finds that any

4  time in those conversations there was a fraudulent

5  misrepresentation and that he intended to have it relied on,

6  there's liability.

7      MR. DUFFY:  Well, it may well be that this is

8  superseded within the fraudulent misrepresentation claim, but I

9  do think there is one piece of the concealment case that does

10  become important based on the part that I just read there, and

11  I apologize if it wasn't articulated earlier, but there is

12  evidence in the record that will go back to the jury room that

13  Mr. Wormsley had in his head at some point the knowledge that

14  Cerberus had put in an indicative bid, 262, in late April.  It

15  is conceivable that the jury could conclude -- because only

16  they can find the facts here -- that Mr. Wormsley had some sort

17  of honest belief that Cerberus still intended to ride its horse

18  of 262 all the way to the end, all the way to May 21st.  They

19  didn't -- Cerberus didn't fully communicate to everyone on the

20  EMI end until May 19th that they were gone, that they were

21  out, in terms of the May 21st auction.  So --

22      THE COURT:  But then he goes ahead.  It's not

23  fraudulent concealment because he repeats his

24  misrepresentations on the 20th.

25      MR. DUFFY:  Well, if they find those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-110

2023

0b11ter10

1    misrepresentations didn't happen but the one on the 18th did,

2    that's the fraudulent concealment.

3          THE COURT:  That is truly impossible.  I mean, I think

4    we are all lucky to have this fantastic jury.  I'm certainly

5    not going to assume that they're going to find something that

6    would be almost impossible.  They could conceivably find that

7    the initial misrepresentation was, you know, less than

8    intentional but then the later ones were, but there's no way

9    that they can find that the second ones didn't occur and the

10   first one did.  I mean, theoretically can they find it?  Yes.

11   As a practical matter, impossible.

12          MR. DUFFY:  But I think they could, your Honor, for a

13   couple reasons.

14          THE COURT:  Because they would think that Mr. Hands

15   lied partly and told the truth partly in his testimony?

16          MR. DUFFY:  Well --

17          THE COURT:  I mean, get real.  The question in this

18   case, after all you lawyers have worked it over, is going to be

19   whether they believe Guy Hands or they believe David Wormsley.

20          MR. DUFFY:  Well, I think the fact finder can believe

21   one person part of the time and another person part of the

22   time.

23          THE COURT:  Fact finder can, but not in this case.

24          MR. DUFFY:  Okay.  I hear you, your Honor.

25          THE COURT:  All right.  I'm not going to charge the

SPA-111

2024

0b11ter10

1    recklessness, because I think this whole discussion has

2    illustrated this is a theory never truly articulated until

3    today, and searching wildly for facts to try to support it in a

4    manner that was not in any practical way put before the jury

5    and I think really does not in the end have a sufficiently

6    articulable basis in the evidence as presented thus far on

7    theories presented to the jury to go to the jury as a separate

8    claim.  And I think it is telling in that respect that, as I

9    say, even if he had not articulated it in his opening

10   statement, Mr. Boies had the opportunity, if not the

11   obligation, to establish one part of the essence of his theory

12   by putting the question to Mr. Hands, and the questions he put

13   to Mr. Hands all went the other direction, which was that they

14   were locked in.  So --

15            MR. DUFFY:  Your Honor?

16            THE COURT:  -- I will not charge fraudulent

17   concealment.

18            Obviously, it goes without saying, after I charge the

19   jury, I will say to counsel here in open court that all

20   objections previously made to my charge at any time during the

21   charging conference or at any time thereafter through the time

22   we finish discussing this tomorrow are preserved for appeal and

23   don't have to be renewed.  So you will have your appeal on

24   that.

25            MR. DUFFY:  Can I ask one clarification?

SPA-112

2025

0b11ter10

 1          THE COURT:  Yes.

 2          MR. DUFFY:  You said you were not going to charge

 3     recklessness.  I think --

 4          THE COURT:  I'm sorry, yes.  I meant I'm not going to

 5     charge fraudulent concealment.  Thank you so much.

 6     Recklessness is what I'm deciding, among other things, deciding

 7     tonight.

 8          Okay.  Thank you for catching that.

 9          With respect to instructions 11 and 12 --

10          MR. BAUGHMAN:  Your Honor, may I raise something on

11     10?

12          THE COURT:  Pardon?

13          MR. BAUGHMAN:  May I raise something on 10?

14          THE COURT:  Something on 10.  Oh, I'm sorry.  Yes.

15     Oh, forgive me.  Yes, on damages.  Yes.  Let me find out first

16     from your adversary whether he has anything.

17          MR. DUFFY:  Your Honor, on 10, we would -- I

18     apologize.  I want to compare something.

19          On the paragraph that begins, "The plaintiffs," it's

20     the third paragraph --

21          THE COURT:  Yes.

22          MR. DUFFY:  -- we would propose to conclude that

23     sentence, starting with the words, "you must," with, "you must

24     find that buying EMI in 2007 caused the plaintiffs to make

25     these investments."  In other words, that's a consequential --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-113

2026

0b11ter10

1    when we were claiming consequential damages, these equity cures

2    were the result of the --

3            THE COURT:  I'm sorry.  Let me have that again.  "You

4    must find that"?

5            MR. DUFFY:  "You must find that buying EMI in 2007

6    caused the plaintiffs to make these," and we would like to add

7    the word "additional," "these additional investments."  And

8    that is the consequential damages.

9            THE COURT:  I'm not sure I'll use that wording, but I

10   get the idea.

11           MR. DUFFY:  Yes.

12           THE COURT:  Now let me hear from defense counsel.

13           MR. BAUGHMAN:  Well, let me address the point that

14   plaintiff's counsel just raised first, and then I want to loop

15   back, because I have a different point on the previous

16   paragraph.

17           Your Honor, this is the instruction on consequential

18   damages, and I think that under the evidence in the case, no

19   consequential damages instruction is appropriate, and the one

20   plaintiff's counsel has just suggested is particularly

21   inappropriate.  The only real evidence on the subject comes

22   from the testimony of Mr. Slattery, and you will recall,

23   plaintiff's counsel -- well, you got right to the point.  You

24   asked Mr. Slattery, "Isn't it that that was the deal?"  And he

25   said yes.  That they put in this additional money.  And I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-114

0b11ter10

1    understand, your Honor, how a payment made pursuant to a

2    voluntarily made contractual commitment, when they had an

3    option, absolute option not to make that payment, his testimony

4    was clear, they didn't have to make it, it was something they

5    chose to do, it was -- and if they chose it, it was pursuant to

6    a deal they had entered into, I don't understand how that could

7    be fraud damages.  So I don't think that a consequential

8    damages instruction is appropriate at all, but in the event

9    that your Honor disagrees, I strongly disagree with the edit

10    that has been proposed by plaintiff's counsel because what it

11    is doing is, it is eliding the point that the consequential

12    damages must flow from the fraud, and he presupposes --

13        THE COURT:  Well, I think you're right about the

14    latter point.  Consequential damages are not simply any money

15    you might lose if, you know, you're fraudulently induced to buy

16    a company and then you decide, you know, "Gee, I'd like to turn

17    this into a megaconglomerate and pour a billion dollars more

18    into this company," that would not be consequential damages

19    under any definition that I'm familiar with.  So they have to

20    flow proximately from the fraud itself.

21        Now the point you're making is, you don't believe it

22    flows from the fraud, that all that flowed from the fraud was

23    the bid for EMI at 265, not the promise to make additional

24    equity investment under certain circumstances.

25        MR. BAUGHMAN:  To preserve my position, I think what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-115

2028

0b11ter10

1    flowed from the fraud would be the purchase on August the

2    17th, not the bid.

3          THE COURT:  Yes, right.

4          MR. BAUGHMAN:  But going after that, your Honor, their

5    choice to make an additional equity investment, we heard

6    testimony today that perhaps their equity investment was zero

7    at the time.  If they made a conscious choice to invest

8    additional equity, that was up to them.  That was something

9    they chose to do.  They wouldn't --

10         THE COURT:  Okay.  I understand the point.  Let me

11   hear from your adversary.

12         MR. DUFFY:  What Terra Firma bought was a cancer

13   patient with a terminal disease, as we saw in the notes today,

14   and when the fraud --

15         THE COURT:  I'm still amazed there wasn't a hearsay

16   objection to that, but --

17         MR. DUFFY:  Well, I think that statement was made by a

18   Citi employee.

19         MR. BAUGHMAN:  That's why I didn't object, your Honor,

20   but --

21         THE COURT:  It was still hearsay in the context of

22   that particular presentation.  Moreover, I'm not sure what it

23   shows.  It's meaningless.

24         MR. DUFFY:  Well --

25         THE COURT:  Anyway, that's neither here nor there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-116

2029

0b11ter10

1    It's part of the evidence now, so --

2        MR. DUFFY:  Right.  And the broader point, without

3    jumping to the inflammatory language as I just did, was this

4    was a very troubled company when Terra Firma purchased it, and

5    the Smith New Court v. Scrimgeour Vickers case, which is a

6    House of Lords opinion, I think deals with this most directly,

7    and says that at page 280, Sections -- excuse me -- page 281, I

8    believe, and the point that is made there by the opinion is

9    that there's a real difference between negligence liability and

10   fraud liability, and the law will not provide any quarter to --

11       THE COURT:  When is it that you claim that you learned

12   that Cerberus had not made a bid?

13       MR. DUFFY:  In mid 2008, I believe is what the record

14   shows.

15       THE COURT:  And what was this equity contribution?

16       MR. DUFFY:  The equity cures?  One was made in 2010.

17   They're both in 2010.

18       THE COURT:  Yes.  So I don't really see the argument.

19   At that point you knew you were defrauded.  If anything, you

20   had a duty to mitigate damages, but we haven't really discussed

21   whether that's part of British law or not.  But at that point

22   you could have brought suit.  Instead, you chose not to bring

23   suit but elected the alternative of trying to pour more money

24   into this company.  So I don't see how you can say that flows

25   from the fraud.  You knew you were defrauded at that point, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2030

0b11ter10

1    you made an independent decision.

2            MR. DUFFY:  Well, absent the equity cures, the asset

3    that Terra Firma is still trying to cultivate would have been

4    turned over to Citi, they would have received the keys in the

5    mail and would have started enforcement proceedings.

6            THE COURT:  Well, you would have brought your lawsuit.

7            MR. DUFFY:  We would, but I don't see the distinction

8    between the sequencing of the equity cure and the lawsuit.  If

9    we had brought the lawsuit ten days before that first equity

10   cure payment was due, I think the equity cure still would have

11   been made and still would have been damages -- that still would

12   have constituted damages.

13           And I've located the part of the Smith New Court case,

14   which I think is really on point here, and --

15           THE COURT:  All right.  Go ahead.

16           MR. DUFFY:  It's at page 281, and it is a block

17   quotation from another case, Doyle v. Olby (Ironmongers).  It

18   said that, "In fraud, damages are not so limited as they are in

19   contract," which is discussed just before.  "The defendant is

20   bound to make reparations for all the actual damages directly

21   flowing from the fraudulent inducement.  The person who's been

22   defrauded is entitled to say, 'I would not have entered into

23   this bargain at all but for your representation.  Owing to your

24   fraud, I have not only lost all the money I paid you, but what

25   is more, I've been put to a large amount of extra expense as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-118

2031

0b11ter10

1    well and suffered this or that extra damages.'  All such

2    damages can be recovered, and it does not lie in the mouth of

3    the fraudulent person to say that they could not reasonably

4    have been foreseen."

5            THE COURT:  Yes, but I think the difference is -- and

6    this is why I'm focusing on when you knew what -- once you knew

7    you were defrauded, it breaks that chain.  I totally agree that

8    English law and, frankly, American law says that if you don't

9    know you've been defrauded and you're just, you know, trying to

10   manage this business as best you can and prop it up and do all

11   the things that you should do, that flows from the fraud,

12   that's a consequence of the fraud, but once you know you've

13   been defrauded and you have a remedy in law, mainly to sue for

14   fraud, to elect instead to continue to pour money in, it seems

15   to me a totally different situation from what you've just read.

16           MR. DUFFY:  But I think that not putting the money in

17   at that point in time would have led to an enforcement

18   proceeding and likely bankruptcy and solvency proceedings,

19   which would have triggered the release of artists from their

20   contracts, there would have been change in control or clauses

21   along those lines --

22           THE COURT:  I don't recall any of that being in

23   evidence.

24           MR. DUFFY:  It's not.

25           THE COURT:  Well, anything further you want to say?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-119

2032

0b11ter10

1           MR. BAUGHMAN:  Actually, there's some relevant

2     evidence from today, your Honor.  Mr. Cockerill testified that

3     enforcement proceedings could only be initiated when there was

4     a default and when, by definition, their equity was worth zero.

5     So if their equity was worth zero, they've already maxed out on

6     their damages, and their subsequent -- their decision to throw

7     good money after bad was their decision, not anything that

8     flows from the alleged fraud.  And I would -- let me stop

9     there, because I want to make a related point, but let me stop

10    there.

11          THE COURT:  All right.  Well, out of the back of the

12    courtroom has come a whispered idea to counsel for plaintiffs.

13    I don't know if you want to share it with the Court or not.

14          MR. DUFFY:  I haven't decided yet myself, but --

15          THE COURT:  Okay.  All right.  Well, let me hear your

16    subsidiary argument.

17          MR. BAUGHMAN:  It has to do with paragraph 2, your

18    Honor.  And it is related in this sense.  So I think the

19    English cases on this point are absolutely clear that

20    damages -- they are only entitled to the damages that are,

21    quote, a direct consequence of the fraudulent inducement.  The

22    case as counsel cited, Smith New Court, says that Doyle v.

23    (Ironmonger) says that Clark and --

24          THE COURT:  That was, in effect, my point.  There's

25    some break in the causal chain.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2033

0b11ter10

1          MR. BAUGHMAN:  I agree, and what I wanted to propose,

2     your Honor, was, in addition to the charge, I had drafted a

3     clause that would go at the end of the first sentence in the

4     second paragraph, if I might, that would make that point.  May

5     I offer the suggested edit?

6          THE COURT:  Yes, but I mean, let me just say this.

7     I'm convinced that you're right, that they don't have a claim

8     for consequential damages.  So I'm going to strike that portion

9     of the charge.  So I don't see the need for anything else.

10          MR. BAUGHMAN:  Okay.  That's fine, your Honor.

11          THE COURT:  All right.

12          MR. DUFFY:  Your Honor?

13          THE COURT:  Yes.

14          MR. DUFFY:  May I go back to the note that was passed

15     up?

16          THE COURT:  Yes.  Now that you know where I'm going,

17     you'll take your last shot.  Okay.

18          MR. DUFFY:  Yes.  And there's actually two shots.

19          Number one, the equity cures, I just want to make sure

20     that everything is clear.  The equity cures were put in after

21     we sued, so we did sue, we did file the lawsuit, we elected

22     that remedy, to be sure, but we then were not, I don't think,

23     bound to let the asset go to waste and just say, "Well, we

24     filed our fraud suit and we'll wait for our verdict and our

25     damages down the line."  I think that putting the equity cures

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2034

0b11ter10

1    in during 2010 is a mitigation of damages that if we did not

2    do, we'd be hearing arguments about why we should be --

3          THE COURT:  I think the last part is a conceivable

4    notion if you put in evidence to that effect -- but I don't

5    think you did -- that this was a form of mitigating damages.

6    I'm not at all sure that English law has that doctrine, in any

7    event, but I'll tell you what.  I will look at this one more

8    time tonight, and if I change my mind, then I'll hear tomorrow

9    your additional sentence that you want to --

10         MR. BAUGHMAN:  I will submit it, your Honor.

11         THE COURT:  All right.  So instructions number 11 and

12   12, anything from the plaintiff?

13         MR. DUFFY:  Nothing from plaintiffs.

14         THE COURT:  Anything from the defense?

15         MR. BAUGHMAN:  No, your Honor.

16         THE COURT:  Okay.  The verdict form, which I'll get

17   you tomorrow, is going to be a very simple form.  "On the claim

18   of fraudulent misrepresentation, do you find the defendants

19   blank liable, blank not liable?"  "If you find liable, go ahead

20   and answer the next question."  Next question is, "What do you

21   find in damages?"  Of course in the two claims we'll have

22   double that.  But so it's going to be a general verdict is my

23   point, no special interrogatories.

24         Yes.

25         MR. COHEN:  Your Honor, one question on damages, if I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-122

0b11ter10

1    may, because I think there might be some inconsistency between

2    instruction 9 and instruction 10.

3            THE COURT:  Yes.

4            MR. COHEN:  If you look at the fourth paragraph of

5    instruction 9, one of the things that you plan to do is you say

6    that it was an essential factor in causing Terra Firma to make

7    a binding bid for EMI and in causing them to make a higher bid

8    than they would otherwise have made.  With respect to damages,

9    all that's left is fair market value.  So what if the jurors

10   were to conclude that they would have bid 260 but the fair

11   market value is 1 -- you know, 123, 200, or anything else?

12   They're being overcompensated.

13           THE COURT:  No.  I think that is, you know, if you

14   will, the fraud version of the tort principle that you take the

15   victim as you find them.  I may be changing the fourth

16   paragraph anyway in light of the comments made by your

17   colleague, but either way, I think the damages are still the

18   same.

19           MR. COHEN:  Very good, your Honor.

20           MR. DUFFY:  Your Honor, we did have two -- a couple of

21   instructions that we had proposed which were not received,

22   which we'd like to cover.

23           THE COURT:  Yes.

24           MR. DUFFY:  The first is the instruction we proposed

25   on the presumption of reliance, which, under the definition for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-123

2036

0b11ter10

1   fraud in English law, we believe there is a rebuttable

2   presumption of reliance, so while actual reliance is required,

3   there's a presumption that when someone says something that is

4   a misrepresentation, it wasn't done just for sport, it was done

5   to cause the representee to --

6           THE COURT:  I think that's a doctrine, like most

7   presumptions, a legal doctrine that doesn't drop out in English

8   law because they're bench trials but would drop out under

9   normal procedure in American law if the other side has come

10   forward with sufficient evidence to negate the presumption, and

11   then all these presumptions drop out and it becomes a civil

12   jury question.  I would give this -- a not very good analogy,

13   perhaps, but the presumptions that exist in the employment

14   discrimination context under McDonnell Douglas.  These

15   presumptions operate at the pretrial stage but they drop out at

16   the trial stage in part because it can only confuse the jury to

17   have these kinds of what are essentially directions as to who

18   should go forward with the next bit of evidence.  And that's

19   effectively what happens with this presumption as well.  So I

20   hear you, but I will not charge it.

21           MR. DUFFY:  Okay.  We viewed it as more of a burden

22   shifting --

23           THE COURT:  Yeah, no, I think it is procedural in

24   nature.  I think it, in effect, is a form of a presumption on

25   who has to come forward with the next bit of evidence, all of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-124

2037

0b11ter10

1    which drops out at this stage.

2         But anyway, gives you one more point to raise on

3    appeal, if there is an appeal.  If there is a verdict.  If we

4    ever finish tonight.

5         So go ahead.

6         MR. DUFFY:  Sorry, your Honor.

7         MS. DYER:  Your Honor, we had an additional jury

8    instruction which was I think our jury instruction number 8,

9    which was the definition of substantial factors, or that it was

10   a substantial factor.

11        THE COURT:  Yes.  How do you define it?

12        MS. DYER:  Well, I don't think English law actually

13   defines "substantial factors," but I think if you were to ask

14   the English barristers and solicitors, they would say, "not de

15   minimis."  What we would like to do is at least make --

16        THE COURT:  Well, that would surely be good.  Ladies

17   and gentlemen, by "substantial," a word you use every day of

18   your life, let me instruct you that that means "not de

19   minimis," a term you've never ever heard in your entire life.

20        MS. DYER:  Understood.  What we would like to do is

21   have the flexibility to argue to the jury what that means.  So

22   that the Court would instruct on -- that it's a real and

23   substantial factor, but we could tell the jury what we believe

24   that means here, not necessarily as a matter of law but just

25   what we think it means and what they should look at to

SPA-125

2038

0b11ter10

1    determine that.

2           THE COURT:  Well, I agree with you it's not defined in

3    English law that I can see.  And let's just see what Webster's

4    has.

5           You may recall when I gave the very preliminary

6    instruction to the jury, I used the word "important," and of

7    course I made clear that none of my instructions then were

8    binding.

9           So passing over "substantialism," "substantialist,"

10   and other words of no consequence, "substantial" is defined by

11   Webster's as: 1, having substance; 2, considerable, large, in a

12   different sense, responsible or wealthy, nourishing.

13          I think it appears to me the relevant adjective here

14   is "considerable."  I'll bet if we turn to "considerable," the

15   relevant adjective would be "substantial."  But I think it's a

16   word that is of common use and everyone pretty much understands

17   it.

18          MS. DYER:  Well, I think, your Honor, perhaps de

19   minimis they wouldn't understand, but I think it is clear under

20   English law that it doesn't have to be the primary factor, it

21   has to be a factor but not the primary, even to be real and

22   substantial, I think --

23          THE COURT:  All right.  That's a different point.

24   That's why I used "a substantial factor" in my charge.  That

25   Terra Firma relied on that misrepresentation and that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-126

2039

0b11ter10

1    misrepresentation was a substantial factor in causing Terra

2    Firma to make a bid.

3         MS. DYER:  And what we would propose is what we put in

4    instruction number 8, which it's not necessary that the Court

5    find that Citi's statement was the only or primary reason Terra

6    Firma submitted its bid on the day or at the price it did.

7    Rather, it's enough to satisfy this element if you find that

8    Citi's statement was a cause, even if one of several causes.

9    And I'm certainly happy to hand this up to you, your Honor.

10         THE COURT:  No, but I mean, one of the reasons I

11   didn't, I looked at the time, I thought, "Oh, my god, you want

12   to introduce 'cause,' a much more complicated word than

13   'factor' or, in this case, 'substantial factor.'"  Once you

14   insert "cause," then we get into the difficulties of American

15   law on, you know, loss causation and transactional causation

16   and how many English can dance on the head of a pin.

17         (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0B13TER11                    Charge Conference

1          MS. DYER:  Certainly.  And I think you could replace

2    cause with something like reason or factors.  Not necessary

3    that it be cause in the sense that you're now perhaps confusing

4    the jury with something that they believe connotes causation.

5          THE COURT:  If you can argue on summation that as the

6    Court will instruct you, it has to be a substantial factor and

7    then you can say and the plain meaning of that is that it

8    doesn't have to be the sole factor or the only substantial

9    factor, it just has to be a substantial factor.  Certainly you

10   can make that argument.  If the jury sends us a note wanting

11   further explanation, we can give it to them.  But I think

12   simpler is better here.  And I think a substantial factor tells

13   them common sense wise what they need to know.

14         MR. DUFFY:  To make it even simpler we could drop out

15   the word "substantial" and a factor.

16         THE COURT:  I don't think that's English law.

17         MR. DUFFY:  I think it is.  In the authority section

18   of our proposed instruction number eight, we quote the

19   Cartwright treatise which says "Even if the evidence shows that

20   the plaintiff would still have entered into the contract if the

21   misrepresentations had not been made, it is possible to hold

22   that he did in fact rely upon it as long as it was present to

23   his mind and acted as one of the factors he took into account."

24         THE COURT:  But the trouble with that, all that shows

25   is which is clear it doesn't have to be a but for cause.  And

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2041

0B13TER11                    Charge Conference

1    no one is suggesting that.  But, under what you just read, if

2    taken truly literally, and I read that language would mean that

3    something that is truly de minimus would still qualify under

4    English law.  That can't be English law.

5            MR. DUFFY:  Well.

6            THE COURT:  English law may be idiosyncratic.  It is

7    not irrational.  There is absolutely no way that can be English

8    law.  So I am going to stick with a substantial factor.

9            MR. DUFFY:  Okay.

10            THE COURT:  Anything else from plaintiffs?

11            MS. DYER:  Your Honor, since I'm batting a thousand,

12    at the risk of raising this, punitive damages was the other

13    request that we had.

14            THE COURT:  Yes.  Thank you.  That is an important

15    issue.  So show me a case like this under English law in which

16    punitive damages was awarded.

17            MS. DYER:  My colleague seems to be searching

18    furiously for a case.  But I think the question that we had

19    first and foremost was whether English law applied to the

20    punitive damages or whether there was a possibility to apply

21    New York law to the punitive damages even though English law

22    otherwise --

23            THE COURT:  Right.  That is an open question in a

24    theoretical sense.  That surely is a substantive issue, not a

25    procedural issue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0B13TER11                    Charge Conference

1        MS. DYER:  And I think there are cases and we cited

2   them in our statement of claim under English law that certainly

3   while they didn't use the word punitives, they certainly used

4   the word exemplary damages, and they indicated that they were

5   not necessarily limited but we wanted to --

6        THE COURT:  Even under New York law, I would have

7   grave doubts that you had made out a claim for punitive damages

8   here.  Punitive damages have to have some broader application.

9   It can't be just that what you did was bad or as your adversary

10   would say full of moral obliquity.  It has to in effect

11   threaten in at least some sense the public good.  That's not

12   true here at all.  This is a cat fight between two rich

13   companies.

14        MS. DYER:  Let me ask for further clarification.  Lost

15   profits, I know you struck the testimony of Ms. DeMario and the

16   question was are you precluding the plaintiffs all together

17   from arguing lost profits?

18        THE COURT:  Absolutely.  Absolutely.  That's why I cut

19   her off today when she wanted to bring that back in.

20        MR. DUFFY:  Your Honor, part of the reason for carving

21   that off as we heard your Honor was that in English courts it

22   is almost 100 percent of the time an issue for the judge, and

23   to throw these issues for the jury may give them more than they

24   could deal with, without causing significant confusion.

25   Conversely, in England, punitive damages are typically not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-130

2043

0B13TER11                    Charge Conference

1    awarded, although it does happen.  I have one case here I can

2    cite to the Court.  But we think that it is sort of the other

3    side of that coin.  Whereas in England there is a much greater

4    likelihood and greater ability to argue for lost profit damages

5    to a court and to a judge, in this country there is not that

6    ability, but there is an ability to argue for punitive damages.

7    The policy underpinnings of the two really go hand in hand, and

8    I think that comes across again in the Smith New Court v.

9    Scrimgeour Vickers case.

10         THE COURT:  The only argument that I've heard that

11   would support punitive damages in this case is the argument

12   made by Mr. Baughman that fraud must involve such a high degree

13   of mens rea, of deceitful, immoral, evil conduct, that the

14   court should be able to punish the person for ever engaging in

15   such conduct.  But quite aside from the fact that you have

16   convinced me that his statement of what is required under

17   English law is not required, even then punitive damages in most

18   jurisdictions, and I believe this is true as a practical matter

19   in England as well, involves some threat to the public,

20   something that in the normal course would cause a prosecutor to

21   bring a case, but prosecutors can't bring every case.  So, in

22   this case, a court confronted with what is the functional

23   equivalent of such a case steps in and punishes.

24         This case has none of the trappings of on your theory

25   of what I should charge.  It could be indeed simply a reckless

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2044

0B13TER11                    Charge Conference

1    mistake on the part of Mr. Wormsley.  But even if, as I'm sure

2    you would suggest I would have to say to the jury, but before

3    you have punitive damage you have to find the additional this,

4    this, this and this, none of which is very well set out in

5    English law.  I don't see how they can rationally find it under

6    the facts of this case.

7         MS. DYER:  We think from the English law perspective

8    if we were talking about exemplary damages, it wouldn't be

9    punishing.  It is not the conduct of the defendant or the

10   deterrent conduct like it is under U.S. law.  That's the

11   purpose of punitives.  But here the policy argument

12   underpinning those damages would be really make whole.  That's

13   what the English courts look at, making the plaintiff whole and

14   not really necessarily the lost profit.

15        THE COURT:  Making him whole twice?

16        MS. DYER:  That's the underpinnings of lost profits.

17   And unjust enrichment, a windfall to the defendants as much as

18   a conduct deterrent.

19        THE COURT:  I admire your ingenuity, but I adhere to

20   my determination.  Anything additional from defense counsel?

21        MR. BAUGHMAN:  No, your Honor.

22        THE COURT:  All right.  Now let's see is there

23   anything we haven't touched on?

24        MR. COHEN:  I hesitate to get up.  Just to remind you,

25   if in the morning sometime by midmorning you could give us back

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SPA-132

0B13TER11                    Charge Conference

1    Hayward-Cole, we can make the cut so we can get that video

2    played.

3              THE COURT:  I read that a long time ago.  Let me just

4    find it somewhere on this desk.  That was --

5              MR. BAUGHMAN:  The fellow from Deutsche Bank, your

6    Honor.

7              THE COURT:  Here it is.

8              MR. COHEN:  Thank you, your Honor.

9              THE COURT:  All right.  9 o'clock sharp.  See you

10   tomorrow.

11             (Adjourned until November 2, 2010, at 9 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2049

0b21ter1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    TERRA FIRMA INVESTMENTS (GP) 2
     LIMITED (for and on behalf of
4    the six limited partnerships
     constituting the Terra Firma
5    Capital Partners II Fund), and
     TERRA FIRMA INVESTMENTS (GP) 3
6    LIMITED (for and on behalf of
     Terra Firma Capital Partners
7    III, L.P.),

8                    Plaintiffs,

9              v.                        09 CV 10459 (JSR)

10   CITIGROUP INC., CITIBANK,
     N.A., CITIGROUP GLOBAL MARKETS
11   LIMITED, AND CITIGROUP GLOBAL
     MARKETS, INC.,
12
                  Defendants.           Jury Trial
13
     ------------------------------x
14                                      New York, N.Y.
                                        November 2, 2010
15                                      9:14 a.m.

16   Before:

17                    HON. JED S. RAKOFF,

18                                      District Judge

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2263

0b21ter7

1           (Jury excused)

2           (In open court; jury not present)

3           THE COURT:  All right.  Please be seated.

4           Counsel, I'll see you in the robing room, along with

5     the court reporter.

6           Mr. Fischel, we'll see you at 9:00 tomorrow morning.

7           THE WITNESS:  Thank you, your Honor.

8           (Continued on next page)

9           (In open court; jury not present)

10           THE COURT:  Please be seated.  Counsel, I'll see you

11     in the robing room along with the court reporter.  Mr. Fischel,

12     we'll see you at 9 o'clock.

13           MR. BOIES:  Your Honor, the question I had is whether

14     the Court thinks it is better for counsel to join you or

15     whether it would be --

16           THE COURT:  I'm happy not to have you join me if you

17     so consent.  I would only do it -- I think it is always better

18     to have fewer people in this kind of situation than more.  But

19     only if both of you consent.  And otherwise, if either of you

20     wants to be there, then both of you need to be there.

21           MR. BOIES:  I would consent if they would.

22           MR. WELLS:  No.  I'm not concerned about the first

23     set.  I'm concerned about --

24           THE COURT:  Pardon?

25           MR. WELLS:  I'm not concerned about -- I would consent

2264

0B23TER5

1    not to be there on the elevator.

2              THE COURT:  But if I get to the other issue then you

3    want to be there.

4              MR. WELLS:  Yes.

5              THE COURT:  I think it's better if you are there.

6    Then I don't have to -- I don't know whether I am going to get

7    to that other issue or not, I really don't.  But why take the

8    risk.

9              So come on in.  So we'll go on in and await.

10             (In the robing room)

11             THE COURT:  I guess my inclination is not to get into

12   the Michael Moore stuff unless her answers to the other stuff

13   makes me concerned.  And when we finish, you can make whatever

14   record you want about that.

15             MR. WELLS:  Judge, I've got, I think I just wish you

16   can look at it from my client's perspective.

17             THE COURT:  It is a close call and I'm not shy about

18   saying that.  But it is not your client's perspective that

19   counts.  It is not irrelevant, but what counts is in the end is

20   making sure that we have a fair and impartial jury.  And the

21   inquiry itself affect that.

22             MR. WELLS:  Your Honor, it is going to be in every

23   newspaper tomorrow.  She may be on the front of the Post.  This

24   thing is out there.  Okay, let's start there.  So it's out

25   there.  Secondly, your Honor --

                    SOUTHERN DISTRICT REPORTERS, P.C.

                             (212) 805-0300

SPA-136

0B23TER5

1          THE COURT:  That's why I gave that instruction.

2          MR. WELLS:  I understand.  But it's out there, your

3     Honor.  I don't think it's realistic to think that way.  It's

4     out there.  It is not going to be that she's not going to know

5     about it.  She is going to know that Citi made a motion and

6     so --

7          THE COURT:  You're presupposing.  On that ground, I

8     would have to excuse her right now.

9          MR. WELLS:  Look, your Honor, when you say thanks

10    means little things, none of us have a clue.  That is nothing

11    but a hopeful assumption that a thanks is for the little

12    people.  We don't know, your Honor, until you ask, you are not

13    going to know and we've got a right to know.  It's real.  You

14    can't tell or make any judgments.

15         MR. BOIES:  We know it's not "special thanks."  That

16    we know.

17         MR. WELLS:  I accept that.

18         THE COURT:  If the question is do people come into the

19    jury room with attitudes towards banks, of course people come

20    in.  You know, in my experience, jurors put that kind of thing

21    aside very quickly.  What you are suggesting, the only reason

22    this is a close call is you're suggesting a more deep seated

23    attitude that goes beyond peripheral responses.  And I

24    understand that, but I'm not convinced as to what we should do.

25              I am not sure what's holding things up, so go check on

                    SOUTHERN DISTRICT REPORTERS, P.C.

                          (212) 805-0300

SPA-137

2266

0B23TER5

1    this.

2          MR. WELLS:  I guess all I'm saying is the truth is

3    none of us know what "thanks" means.  None us know what her

4    role was.  And I just --

5          THE COURT:  We'll see.  We'll see.  I'm going to have

6    to assess this in part on her answers to my earlier questions.

7    So let's see how it goes.

8          THE LAW CLERK:  There are still a couple people in the

9    jury room and Linda wanted to do it as naturally as possible.

10   She is going to bring the juror in soon.

11         (Juror present)

12         THE DEPUTY CLERK:  Juror number 6.

13         THE COURT:  Sorry.  Grab a seat.

14         JUROR NO. 6:  Thank you.  Do I put these here?

15         THE COURT:  Wherever you like.  Forgive us for keeping

16   you.  I know you need to be on your way too.

17         We had a report that when you were going down the

18   elevator for lunch, you said to three of the other jurors

19   something to the effect of "What could possibly go on this

20   afternoon.  When they give us so much information, it is hard

21   to know what to focus on."  Words to that effect.  And

22   unfortunately, I'm obligated under the law to inquire about

23   that.  Because as you know, we really don't want anyone talking

24   about the case even in that sort of way to their fellow jurors.

25   So maybe, why don't you just tell me what happened..

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-138

0B23TER5

1          JUROR NO. 6:  Number one is I don't say those kinds of

2     words.  That's not the way I speak.  If that happened today, I

3     went by myself.  I was one of the first ones out because I just

4     needed to get out and be by myself.  So I was not on an

5     elevator with any of the jurors.

6          THE COURT:  Okay.

7          JUROR NO. 6:  So it wasn't me.

8          THE COURT:  Okay.  So you think it was --

9          JUROR NO. 6:  I don't know who it was.  That's --

10    that's not -- that's not the way I speak.  And that's not how I

11    think of things.  I -- I generate a lot of things, and I let it

12    gel.  I'm using the wrong kind of words.  What kind of words

13    can I say.  But the thing is that I know I needed to get out,

14    get some fresh air, and get out there, and I was not even on

15    the elevator with any other juror.

16          THE COURT:  Thank you very much.

17          JUROR NO. 6:  You're welcome.  I hope that you find

18    out who it was but --

19          THE COURT:  Okay.

20          (Juror not present)

21          THE COURT:  Thank you.  Well, assuming, and if we want

22    to, if anyone wants to, we'll call in the court reporter.

23    Assuming the court reporter accurately reported what happened,

24    and I think there is every reason to credit the court

25    reporter's account, I will have to excuse this juror because

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-139

2268

0B23TER5

1    she just lied to the Court.

2            But, Mr. Boies, do you want to us bring in the court

3    reporter?

4            MR. BOIES:  I think we better.  Just to be sure.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-140

2269

0b21ter9

1              (In the robing room)

2              THE COURT:  I want to say for the record that when the

3    court broke this afternoon, which was a few minutes before 2:00

4    because we had that extended colloquy after the jury had left

5    at 1:00, court reporter Rebecca Forman came to me and said,

6    although she was very reluctant, she felt, in light of the

7    colloquy we had had about this juror, that she needed to report

8    something that she had observed.

9              And Ms. Forman, do you want to reiterate what you told

10   me you observed.

11             MS. FORMAN:  I got in the elevator with four jurors,

12   and the juror in question said, "What could they possibly have

13   this afternoon?  It seems they're just carrying on.  The

14   problem with too much information is you don't know what to

15   focus on."

16             THE COURT:  And the other jurors did not respond; is

17   that correct?

18             MS. FORMAN:  Correct.

19             THE COURT:  All right.  So Ms. Forman, do you have any

20   doubt that the juror who was speaking -- or maybe I'll phrase

21   this question affirmatively.  Is it your recollection that the

22   juror who was speaking was juror number 6?

23             MS. FORMAN:  It is.

24             THE COURT:  All right.  And do you have any doubt

25   about that?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-141

2270

0b21ter9

1          MS. FORMAN:  I don't think so.

2          THE COURT:  All right.  Okay.  Thank you so much.  You

3      may step down.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2271

0b21ter9

1          (In the robing room)

2          THE COURT:  I have to say, independently, that my

3    impression of Juror Number 6's demeanor when she gave the

4    answer she gave in the robing room a few minutes ago was of

5    someone who was lying.  Who wanted to make sure that she stayed

6    on this jury rather than admit to anything in the way that

7    might possibly subject her to being excused.  I've considered

8    the possibility that she was just nervous, but I didn't sense

9    that at all.  I sentenced the evasiveness and a rigidness that

10   in the Court's experience is much more consistent with

11   prevarication.

12          And therefore, it seems to me, that given that we have

13   a juror who has lied to the Court about an important matter,

14   that we need to excuse her.  So I will excuse her.

15          I assume, Mr. Boies, you want to register an

16   objection?

17          MR. BOIES:  I guess I should.

18          THE COURT:  All right.  And Mr. Wells, I assume you

19   agree with the Court's ruling.

20          MR. WELLS:  I agree.

21          THE COURT:  And I will direct my courtroom deputy to

22   call the juror.  Try to speak to the juror in person, but in

23   worst case you will leave a message.  But preferably in person.

24   And tell her for reasons she should not speculate about, we've

25   excused her from the jury.  That she nevertheless is still

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-143

2272

0b21ter9

1    under a court order to have no communication with anyone about

2    the case until the jury has reached its verdict.  That we will

3    inform her when the jury reaches a verdict.  And that in the

4    meantime, she should not be in contact with any juror or with

5    anyone else about the case.  And that we thank her for her

6    service and that she should not come in tomorrow.

7              THE DEPUTY CLERK:  Okay.  Shall I tell her that it

8    might be a generally good idea not to contact any of the jurors

9    until after the verdict is in at all?

10             THE COURT:  Yes.

11             MR. BOIES:  Yes.

12             MR. WELLS:  Yes.

13             THE COURT:  All right.

14             MR. WELLS:  A direction.

15             THE COURT:  Very good.  Thanks very much.

16             (Adjourned until November 3, 2010, at 9 a.m.)

17

18

19

20

21

22

23

24

25

SPA-144

2049

0b21ter1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TERRA FIRMA INVESTMENTS (GP) 2
    LIMITED (for and on behalf of
4   the six limited partnerships
    constituting the Terra Firma
5   Capital Partners II Fund), and
    TERRA FIRMA INVESTMENTS (GP) 3
6   LIMITED (for and on behalf of
    Terra Firma Capital Partners
7   III, L.P.),

8                   Plaintiffs,

9           v.                        09 CV 10459 (JSR)

10  CITIGROUP INC., CITIBANK,
    N.A., CITIGROUP GLOBAL MARKETS
11  LIMITED, AND CITIGROUP GLOBAL
    MARKETS, INC.,
12
                Defendants.          Jury Trial
13
    ------------------------------x
14                                   New York, N.Y.
                                     November 2, 2010
15                                   9:14 a.m.

16  Before:

17                  HON. JED S. RAKOFF,

18                                   District Judge

19

20

21

22

23

24

25

0B23TER4

1          THE COURT:  We'll take up the juror matter last after

2     we take up some other matters that we need to cover.

3          I will note while it's fresh in my mind that during

4     the last videotape, the juror in question appeared to have some

5     difficulty staying awake, which, given that videotape, seems to

6     me to be eminently reasonable.  But in any event, I add that to

7     the mix.

8          So the first thing I want to take up is the charge.

9     You now have my final instructions to the jury, all objections

10    are preserved.  With respect to the question that came up last

11    night about whether more needed to be said or something

12    different needed to be said about the balance of probabilities,

13    I note that in the English case of In re: H and Others (minors)

14    [1996] AC 563, HL, at 586, Lord Nicholls states, "The balance

15    of probabilities standard means that a court is satisfied an

16    event occurred if the court considers that on the evidence the

17    occurrence of the event was more likely than not." Which is

18    essentially the words I've used in the charge.  So there will

19    be no change in that charge.

20         I am going to take comments at the end.

21         On the more meaty question of whether the standard

22    should be clear and convincing evidence, as defendants argue,

23    or preponderance of the evidence as the Court concluded, I

24    asked counsel last night to give me their three best cases for

25    their respective positions.

                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

0b21ter5

1    THE COURT:  And it was very illuminating.  The

2    question turns on whether the burden of proof is substantive or

3    procedural.  If it's substantive, then English law governs and

4    it is preponderance of the evidence.  If it is procedural, then

5    arguably New York law might govern or some other law might

6    govern and it might be very convincing.

7        The first case cited by the plaintiffs was Raleigh v.

8    Illinois Department of Revenue, Supreme Court of the United

9    States opinion dated May 30th, 2000, which states, "Given its

10    importance to the outcome of cases, we have long held the

11    burden of proof to be a substantive aspect of a claim."  And

12    there follows citations to numerous cases going back to 1942.

13        The second case cited by the plaintiffs was American

14    Dredging Co. v. Miller, a 1994 decision of the Supreme Court of

15    the United States, which states, "In earlier times burden of

16    proof was regarded as procedural for choice of law purposes,

17    such as the one before us here," citing a 1919 case and citing

18    to the restatement of conflict of laws.  The quote continues

19    "For many years, however, it has been viewed as a matter of

20    substance."  And they then quote to many of the same cases

21    cited by the Supreme Court in the other decision I just read.

22        And finally, the plaintiffs cited to Director, Office

23    of Workers' Compensation Programs v. Greenwich Collieries, and

24    that case says, "The assignment of the burden of proof is a

25    rule of substantive law."  That was in also the 1994 decision.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0b21ter5

1          So we have three Supreme Court cases and really more

2     than three because they cite to numerous others, directly on

3     point, flatly and unequivocally stating that this is a rule of

4     substantive law.  And I might say, when I saw that, I was

5     somewhat taken aback at the representations that defense

6     counsel had made to me yesterday in which he suggested that the

7     law was clear and overwhelming that this was procedural.

8          So I looked at the defendant's cases, and the first of

9     the three that defendant had cited was Bailey v. Chattem, a

10    Sixth Circuit case, which defense counsel had emphasized at

11    some length in oral argument yesterday.  As near as I can tell,

12    that case says not one word about whether burden of proof is

13    substantive or procedural.  Counsel apparently inferred that

14    was an implicit holding of the court because of the way they

15    decided that case.  I'm not so sure.  But certainly there's

16    nothing express about the issue in that case.

17         Then I looked at the one Supreme Court case that

18    defense counsel had put among his three cases, which is Sun Oil

19    Co. v. Wortman, 486 U.S. 717, a 1988 decision, therefore

20    earlier than decisions that I just quoted from the plaintiff.

21    It is a split decision with no opinion commanding a majority of

22    the court, but doesn't address this question either.  The

23    question there, which was largely about statute of limitations,

24    but to the extent it was relevant to the question of burden of

25    proof, the question was whether a state violates the full faith

SPA-148

0b21ter5

1    and credit clause by applying the forum's burden of proof to

2    out-of-state claims.  This presents all sorts of different

3    issues than the issue before the Court.

4            And finally, the third case presented by defense

5    counsel, which was a Second Circuit case, is Woodling v.

6    Garrett Corporation, 813 F.2d 543, a 1987 decision, therefore,

7    again, earlier than the three Supreme Court cases that

8    plaintiff presented.  And the case was 99.9 percent concerned

9    with other issues, but to the extent it addressed this issue,

10   it turned on whether, under New York law, New York courts

11   regard burden of proof as a matter of procedure.  That seems to

12   me, in a case that's before this court by virtue of the Edge

13   Act, completely irrelevant.

14           So to be frank, I think that defense counsel very

15   substantially overstated what the law and the caselaw shows,

16   but in any event, such zealous advocacy aside, it seems to me

17   crystal clear that plaintiff's counsel is correct, and

18   therefore this case will go to the jury on a preponderance

19   standard.

20           Now I was persuaded by defense counsel to rephrase the

21   third and fourth elements of the fraudulent misrepresentation

22   claim to emphasize the need for a dishonest intention and to

23   not spell out -- although, of course, plaintiff's counsel is

24   welcome to spell it out -- the varying respects in which they

25   allege misrepresentations might have caused Terra Firma to make

SPA-149

2169

0b21ter5

1    the bid but simply to collapse that into a single phrase.  I

2    agree with plaintiff's counsel, however, that the English

3    definition of "reckless" is "no honest belief in its truth,"

4    and I adopted that in the second element there.

5            And finally, I adhere to my ruling yesterday that with

6    respect to consequential damages, that there's no way that any

7    rational juror could find that the consequential damages were

8    directly caused by the fraud, which is the requirement of

9    English law.

10           Now since all previously stated objections are

11   preserved, if anyone now wishes to say one word that is simply

12   repetitive of what they had said last night, they will be held

13   in contempt, but if there's anything new you want to say, now

14   would be your opportunity.

15           Anything from plaintiffs?

16           MR. BOIES:  I don't think we have anything that would

17   be fair to say would be anything new, your Honor.

18           THE COURT:  Thank you.

19           Defense?

20           MR. BAUGHMAN:  No, your Honor.

21           THE COURT:  All right.  Very good.

22           Now with respect to the verdict form, you have that in

23   front of you now.  Any objections to the verdict form?

24           MR. BOIES:  No, your Honor.

25           MR. BAUGHMAN:  No, your Honor.

SPA-150

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
TERRA FIRMA INVESTMENTS (GP) 2       :
LIMITED, and TERRA FIRMA INVESTMENTS :
(GP) 3 LIMITED,                      :        09 Civ. 10459 (JSR)
                                     :
          Plaintiffs,                :        MEMORANDUM
                                     :
          -v-                        :
                                     :
CITIGROUP INC., CITIBANK, N.A.,      :
CITIGROUP GLOBAL MARKETS LIMITED, and :
CITIGROUP GLOBAL MARKETS INC.,       :
                                     :
          Defendants.                :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.
```



     In this action, plaintiffs Terra Firma Investments (GP) 2

Limited and Terra Firma Investments (GP) 3 Limited (collectively,

"Terra Firma") have brought suit against defendants Citigroup Inc.,

Citibank N.A., Citigroup Global Markets Limited, and Citigroup Global

Markets, Inc. (collectively, "Citi"), alleging that Citi engaged in

fraudulent misrepresentation (Count 1), negligent misrepresentation

(Count 2), fraudulent concealment (Count 3), and tortious

interference with prospective economic advantage (Count 4), all in

connection with Terra Firma's acquisition of the well-known music

company, EMI Group.  See Compl. ¶¶ 168-196.  Following extensive

discovery, defendants filed for summary judgment on August 13, 2010,

seeking dismissal of all claims.  After receiving full briefing from

the parties, the Court heard oral argument on September 10, 2010.  On

September 14, 2010, the Court issued a "bottom-line" Order granting

SPA-151

Citi's motion with respect to the negligent misrepresentation and tortious interference claims and denying Citi's motion with respect to the fraudulent misrepresentation and fraudulent concealment claims, with opinion to follow.  Although the trial of the remaining claims is now ongoing, it is still relevant for the parties to have the Court's reasoning with respect to the dismissal of two claims on summary judgment, so this is that opinion.

The pertinent facts presented at the time of summary judgment, either undisputed, or, where disputed, taken most favorably to plaintiffs, are as follows.  The plaintiffs are part of a broader group of Terra Firma entities and are the general partners, respectively, of the six limited partnerships that constitute the Terra Firma Capital Partners II Fund and the Terra Firma Capital Partners III Limited Partnership.  <u>See</u> Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("Def. 56.1") ¶ 1; Response of Plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. To Defendants' Statements of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 1.[1]  In making investment decisions, the plaintiffs receive advice from Terra Firma Capital Partners, Ltd. ("TFCPL"), which typically presents recommendations through its

_____

[1] All citations to a party's statement of undisputed facts made pursuant to Local Rule 56.1 incorporate the corresponding paragraphs of the opposing party's response.

2

Case 1:09-cv-10459-JSR   Document 148   Filed 11/03/10   Page 3 of 16

Investment Advisory Committee ("IAC").  <u>See</u> Loveridge Dep. at 54-55;
Stokes Dep. at 59-60.  However, final investment decisions are made
by the plaintiffs' boards of directors.  Stokes Dep. at 59-60.  In
May of 2007, the board of directors of the two plaintiffs consisted
of John Loveridge, Iain Stokes, Fraser Duncan, Nigel Carey, and Guy
Hands, and the CEO of TFCPL was Guy Hands.

Between 2006 and 2007, EMI endured financial difficulties and
sought to merge, unsuccessfully, with Warner Music Group ("Warner"),
or to put the company up for auction.  <u>Compl.</u> ¶¶ 6, 8.  On April 20,
2007, EMI's board met to discuss the potential sale of the company.
Def. 56.1 ¶ 23.  By the time of this meeting, two private equity
firms, Cerberus and Fortress, had put in so-called indicative bids
for EMI -- <u>i.e.</u>, non-binding bids subject to due diligence.  <u>See</u> Def.
Exs. 12-13.  On April 23, 2007, a third private equity firm, One
Equity, submitted an indicative bid in the same range as Fortress.
Def. 56.1 ¶ 26.  Terra Firma continued to evaluate whether it should
submit a potential bid and sought advice from financial and industry
experts·to assist in this evaluation.  <u>See</u> Pl. 56.1 ¶ 29; Def. Ex.
19; MacInnes Dep. at 64.

On May 6, 2007, Hands met with Eric Nicoli, the CEO of EMI, to
ask questions regarding Terra Firma's business plan assumptions for
EMI.  Pl. 56.1 ¶ 31-32.  After the meeting, Hands instructed Riaz
Punja, a managing director of TFCPL, to prepare a memorandum for the
IAC recommending an indicative bid of £2.65 per share.  <u>See</u> Def. Ex.

3

SPA-153

24.  On May 7, 2007, Hands wrote an email to Punja as well as the members of the IAC outlining nine reasons he believed "it [was] worth spending time to focus on [the EMI acquisition]."  Def. Ex. 25.  On May 8, 2007, the plaintiffs submitted an indicative bid for EMI.  Pl. Ex. 118.

On May 9, 2007, plaintiffs and EMI executed the Project Mulberry Agreement (the "PMA") which, among other things, provides that information supplied to plaintiffs by EMI "does not purport to be all-inclusive and that no representation or warranty is made by any person as to the accuracy, reliability or completeness of any of the Information."  See Def. Ex. 29 at 5.  Information is defined as "information supplied by each of us or by any of our respective Connected persons orally, in writing or in any other form to the other or its Authorized Recipients whether before, on or after the date of this letter in connection with the Proposal..."  Id. at 1. It further provides that neither party nor any of their "Connected Persons"[2] shall be liable to the other or any other person resulting from the use of "Information" provided by one party or the other and neither party "nor any of [their] respective Connected Persons shall owe a duty of care to the other, to the other's Connected Persons or to any other Person."  Id. at 5.  The PMA seemingly negates any

_____

[2] "Connected Persons means, in relation to each of us, to the extent that they are involved in or have knowledge of the Proposal ... (b) officers, employees and partners of our advisors, agents and representatives or of their respective group undertakings" ...  Id. at 1-2.

4

liability for negligence.  The PMA does not, however, limit liability
for fraud, for it provides that "[n]othing in this letter excludes
any liability for, or remedy in respect of, fraudulent
misrepresentation." Id. at 5.

     While, in connection with the auction for EMI, binding offers
were initially due on May 23, 2007, on May 18, 2007, EMI decided to
require that bids be submitted by 9:00 A.M. on May 21, 2007.  Borrows
Dep. at 84-89, 252; Nicoli Dep. at 109-110; Def. Exs. 54-55.  On May
19, Cerberus's investment bankers informed Simon Borrows, the lead
banker at Greenhill & Co. (the company serving as EMI's primary
financial advisor), that Cerberus had decided not to place a bid.
Borrows Dep. at 112-114.  Greenhill advised EMI's senior management
about this decision in a conference call on the morning of May 20.
Def. 56.1 ¶ 70.  There is no evidence that David Wormsley, a senior
Citi investment banker and the head of the M&A Team of Citigroup
Global Markets Limited, participated in this conference call.  Two of
the conference call participants -- Simon Borrows and Peter Bell --
testified that they did not convey information about the conference
call to Wormsley or anyone at Citi and three of the conference call
participants -- Nimrod Barak, Eric Nicoli, and Martin Stewart --
testified that they do not recall conveying any information to
Wormsley or anyone at Citi.  See Borrows Dep. at 128; Bell Dep. at
324; Nicoli Dep. at 158, 192-93; Stewart Dep. at 141-42; Barak Dep.
at 59-61.  Wormsley testified that he does not recall being told at

SPA-155

or prior to this time that Cerberus was not planning to bid.  See
Wormsley Dep. at 274.

Between May 18 and May 20, Hands allegedly had three
conversations with Wormsley in which Wormsley told Hands that
Cerberus intended to bid £2.62 per share for EMI on May 21 and that
Terra Firma needed to bid £2.65 to win the auction for EMI.  Def.
56.1 ¶ 75.  Hands allegedly revealed the gist of the information he
obtained from Wormsley to the directors present at a Terra Firma
board meeting held on May 20.  Id. ¶ 77.  According to Hands,
Wormsley's statements regarding the Cerberus bid were the "sole"
reason Terra Firma bid at £2.65.  Hands Dep. at 241, 250-251.  Two
other directors who ultimately voted in favor of the bid similarly
allege that the information Hands received from Wormsley played a
substantial role in Terra Firma's decision to bid on EMI: Loveridge
testified that the information was the "main reason for the bid" and
Stokes testified that the information served as the "catalyst" for
the bid.  Loveridge Dep. at 226; Stokes Dep. at 55, 90, 92.  While
the official minutes of the May 20 Terra Firma board meetings make no
reference to the Cerberus bid, see Def. Exs. 72-73, handwritten notes
of the May 20 IAC meeting taken by the minute-taker, Kirsten Randell,
reflect that a question had been asked about other bidders and the
answer "one at 262" was given.  See Decl. of Kirsten Randell, Aug.
2010, Ex. A.  Moreover, draft minutes of a May 21 Terra Firma meeting
state that "the consortium of Cerberus and Fortress had made an offer

of £2.63 per [] share," although this information is not reflected in the final version of these minutes.  See Pl. Ex. 143; Def. Ex. 74.

On May 18, the plaintiffs' directors approved a plan to acquire EMI with investment of "up to 2.65 or such lesser sum as may be negotiated," Def. Ex. 68 at 4, and thereafter, on May 21, approved making at bid at £2.65.  At 9 A.M. on May 21, 2007, Terra Firma, on behalf of the English acquisition vehicle they had created, Maltby Limited, submitted to EMI a formal letter offering to purchase EMI at £2.65.  See Def. Exs. 74-75; Def. 56.1 ¶ 101.  Neither Cerberus nor any other entity submitted a bid for EMI.  Def. 56.1 ¶¶ 106, 118.

Terra Firma's offer was subject to the condition that 90% of EMI's shareholder accept it.  Compl. ¶ 145.  On June 27, 2007, only 4% of EMI's shareholders had accepted Terra Firma's offer, leading Terra Firma to extend the deadline for shareholder approval five times until, on August 1, 2007, 90% of EMI shareholders had approved the deal.  See Compl. ¶ 145; Def. Exs. 79, 81-84.  The closing took place on August 17, 2007..  Def. Ex. 86 at 3.  Plaintiffs spent approximately £1.502 billion in equity to acquire EMI and borrowed the remaining £2.74 billion from Citi through financing agreements entered into on August 13, 2007.  Def. 56.1 ¶ 116.  Upon the closing of the transaction, Maltby Limited (now known as Maltby Acquisitions Limited), a vehicle created by Terra Firma to undertake the EMI transaction, became the sole shareholder.  Id. ¶¶ 130-131.  The plaintiffs indirectly own EMI through intermediate holding companies

7

and are not parties to any financing agreements with Citi since the
EMI debt is currently owned by Maltby Acquisitions Limited
("Maltby"). Id. ¶¶ 132, 134.

At some point subsequent to the closing, Terra Firma discovered
that Cerberus had in fact never bid on EMI. On September 24, 2007,
Terra Firma managing director Stephen Alexander (who is now the
Chairman of the holding company that controls EMI) emailed Hands that
he understood that Cerberus had done due diligence but never actually
submitted a formal offer for EMI. See Def. Ex. 93. In the second
quarter of 2008, Terra Firma's general counsel Tim Pryce definitively
told Hands that Cerberus had not bid on EMI. Def. 56.1 ¶ 123. Even
after learning that Cerberus had not bid, Hands did not immediately
confront Wormsley or anyone at Citi and Terra Firma continued to work
with Citi.

Because of concerns that Maltby would be unable to meet its debt
obligations, Terra Firma made various proposals to Citi to
restructure the Maltby debt throughout 2009, but the parties never
reached agreement. Id. ¶ 139. On September 15, 2009, Citigroup's
research division issued an analyst report on Warner (the "Analyst
Report") authored by media analyst Jason Bazinet. Def. 56.1 ¶ 143.
In this report, Bazinet opined that EMI's financial difficulties
could lead to a possible merger of EMI and Warner. Id. ¶ 144. The
Analyst Report commented upon EMI's financial prospects, EMI's
relationship with Terra Firma, and the prospect of the lender

enforcing its rights under the loan agreements, "push[ing] EMI into insolvency." Def. Ex. 119 at 7-8.

According to Bazinet, his calculations of "synergies" of an EMI/Warner merger and all factual statements about EMI were based on public sources. See Bazinet Dep. at 87, 184-185. Bazinet also testified that Citi has procedures in place that prohibit research professionals from communicating with Citi bankers and that he and his group comply with these procedures. Id. at 184, 199 (stating that the research department has a "totally separate function" from the banking department and "operate[s] in [an] isolated silo"). Bazinet contends that, at the time he wrote the report, he did not know Citigroup was the sole lender for the EMI acquisition. Id. at 72. The report itself, however, contains a citation to an article which said "Citi was left holding the entire debt package," see Def. Ex. 119 at 7, Pl. Ex. 112, and, on October 14, 2009, Bazinet wrote an email to Scott Cohen, another Citi analyst, that said "citi is the holder of the emi debt, and we are playing hard ball." See Pl. Ex. 113. Terra Firma alleges that Citi's actions, including its publication of the Analyst Report, forced Terra Firma to invest an additional £66.6 million in equity to retain its relationship with EMI. See Memorandum of Law of Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. In Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 34.

Based on these facts, Terra Firma brought four causes of action:

three in connection with the purchase of EMI (fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment) and a fourth cause of action for tortious interference with prospective economic advantage based on allegations that Citi interfered with Terra Firma's relationship with EMI by publishing misleading statements in the September 2009 Analyst Report. Compl. ¶¶ 168-196. After careful consideration of the parties' submissions on summary judgment, the Court reached the following conclusions:

First, Terra Firma is barred from bringing the negligent misrepresentation claim by the plain language of the PMA -- the letter agreement entered into between EMI and Terra Firma on May 9, 2007. The PMA clearly states that neither party nor any of their "Connected Persons" shall be liable to the other or any other person resulting from the use of "Information"[3] negligently provided by one party or the other. Def. Ex. 29 at 5. Terra Firma concedes that the PMA is an enforceable agreement that contains a waiver of liability for any negligence claim based on information supplied by EMI and/or any of EMI's Connected Persons to Terra Firma and/or any of Terra Firma's Connected Persons. Terra Firma nonetheless argues that the terms of the PMA do not apply to its negligent misrepresentation claim against Citi because the PMA does not cover communications

---
[3] "Information" is defined broadly to include any information "supplied by each of us or by any of our respective Connected persons orally, in writing or in any other form to the other or its Authorized Recipients whether before, on or after the date of this letter in connection with the Proposal." Def. Ex. 29 at 1.

10

between Terra Firma and its own Connected Persons.  It contends that

while Wormsley was one of EMI's Connected Persons, he was acting as a

Connected Person for Terra Firma at the moment he provided false

information to Hands.  See Pl. Mem. at 31-32.  Even assuming arguendo

that Wormsley was acting as a Connected Person for both Citi and

Terra Firma -- something that is not clear from the summary judgment

record -- Terra Firma's argument is too clever by half.  Given that

it is undisputed that Wormsley was a Connected Person of EMI, the PMA

plainly applies to any information Wormsley passed on to Hands that

was relevant to the potential EMI acquisition.  The suggestion that

the liability waiver is contingent upon a determination that Wormsley

was acting as a Connected Person of EMI "at the moment" the

information was transferred is a nicety almost certainly not

considered by the drafters of the PMA or relevant to its

interpretation.  Thus, the Court affirms its previous ruling finding

that Terra Firma's negligent misrepresentation claim must fall.

    Second, Terra Firma has failed to come forward with sufficient

evidence to establish a prima facie case of tortious interference.

This is true regardless of whether New York law or English law

governs this claim.  While the parties agree that English law governs

the other three claims, there is a disagreement about which law

governs the tortious interference claim.  Citi contends that English

law applies, while Terra Firma contends that New York law applies.

11

Since this case is in federal court pursuant to the Edge Act,[4] 12 U.S.C. § 632, federal choice of law principles apply.  See Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980).  Generally speaking, federal courts will apply the law of the jurisdiction with "the most significant relationship to the occurrence and the parties."  See Restatement (Second) of Conflict of Laws § 145(1).  Terra Firma contends that New York law governs because the location of defendant's conduct is generally the most significant factor for competition-related torts and, here, the Analyst Report was published in New York.  See Pl. Mem. at 24 (citing Restatement (Second) of Conflict of Laws § 145, cmt. (f); Grupo Televisa, S.A. v. Telemundo Commc'ns Group, Inc., 485 F.3d 1233, 1240-41 (11th Cir. 2007)).  Citi counters that choice of law determinations cannot be based on a single factor and that English law should govern all of the claims since England has "the

_____

[4] The Edge Act provides:
   Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking,... or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for removal of causes otherwise provided by law.
12 U.S.C. § 632.

most significant relationship to the occurrence and the parties."
Memorandum of Law in Support of Defendants' Motion for Summary
Judgment ("Def. Mem.") at 20 (quoting Restatement (Second) of
Conflict of Laws §§ 148(2), 145).

Given that most of the conduct relating to the tortious
interference claim occurred in New York, the Court finds that New
York law governs the tortious interference claim.  However, this
determination is immaterial given that under English law, Terra
Firma's claim would also fail as it is more difficult to prevail on
this claim under English law than it is under New York law.[5]  To
establish a claim for tortious interference under New York law, the
plaintiffs must establish the following elements: "(1) business
relations with a third party; (2) the defendant's interference with
those business relations; (3) the defendant acted with the sole
purpose of harming the plaintiff or used dishonest, unfair, or
improper means; and (4) injury to the business relationship."  See
Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d

---

[5] Indeed, the elements required to establish tortious
interference are less demanding than the elements of the English-
law equivalent, the tort of causing loss by unlawful means.  In
order to prevail under English law, the plaintiff would have to
show that the defendant used independently unlawful means against
a third party, affecting the third party's freedom of action to
deal with the plaintiff.  See Future Investments SA v. FIFA,
[2010] EWHC (Ch) 1019, [19]-[21] (Eng.).  Additionally, the
English doctrine of "reflective loss" precludes a shareholder
from bringing an action for diminution in the value of the
shareholder's investment where that diminution merely reflects
the loss suffered by the company.  See Prudential Assurance Co.
Ltd. v. Newman Industries Ltd. (No. 2), [1982] Ch. 204 at 210
(Eng.).

13

SPA-163

Cir. 2000); Harger v. Price, 204 F. Supp. 2d 699, 709 (S.D.N.Y. 2002). Terra Firma's claim fails because the facts do not establish the third element -- that Citi acted solely to harm Terra Firma or committed the sort of "egregious wrongdoing" that would support a tortious interference claim. See Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1108 (2004). While Terra Firma claims that Citi prepared the Analyst Report in order to harm Terra Firma and suggests that Bazinet used non-public information in preparing the report, there is no competent evidence of this.

Bazinet has testified that he only relied on public information in preparing his report and that, as a member of Citi's research group, he was not privy to any private information regarding the relationship between Citi and Terra Firma. Bazinet also testified that, at the time he prepared the report, he did not know that Citi was the sole holder of the EMI debt. In order to counter his testimony and suggest that Bazinet did in fact have access to non-public information, Terra Firma points to two pieces of evidence: the citation in the Analyst Report to an article which states "Citi was left holding the entire debt package" and the email that Bazinet sent to another analyst which said "citi is the holder of the emi debt, and we are playing hard ball." See Pl. Mem. at 34 (quoting Ex. 113). This evidence alone is insufficient to demonstrate that Citi acted improperly. The mere fact that Bazinet cited to an article that stated that Citi was the sole lender does not demonstrate that

Bazinet was being untruthful in his deposition -- since citing to an article does not necessarily imply knowledge of every statement in th article -- and, more importantly, does not demonstrate that Bazinet had non-public knowledge since the article itself is a public source. Also, the email that Terra Firma references was sent after the report was issued, so this evidence similarly fails to contradict Bazinet's testimony that, at the time the report was issued, he did not know Citi was the sole holder of the debt.  While Bazinet's statement in the email that Citi is "playing hardball" is more suggestive of impropriety than any other evidence in the record, it is still not sufficient for a reasonable jury to infer that Bazinet possessed non-public information or that Citi acted dishonestly, unfairly, or improperly in issuing the Analyst Report.  Thus, the Court hereby affirms its decision granting Citi's summary judgment motion on the tortious interference claim.

Finally, turning to the fraud claims -- fraudulent misrepresentation and fraudulent concealment -- the Court on summary judgment concluded that Terra Firma had proffered sufficient evidence to survive summary judgment on these claims, and since these claims subsequently went to trial, no purpose would be served by reviewing here the bases for that conclusion.  The Court notes, however, that at trial the plaintiffs were unable to sustain their fraudulent concealment claim as against a motion to dismiss that claim made at the conclusion of plaintiffs' case.  See Trial Transcript, 11/01/10.

For the foregoing reasons, the Court affirms its previous ruling granting Citi's summary judgment motion with respect to negligent misrepresentation (Count 2)and tortious interference (Count 4) and denying Citi's summary judgment motion with respect to fraudulent misrepresentation and fraudulent concealment (Counts 1 and 3).

_____
JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          November 2, 2010

16

2274

0B33TER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TERRA FIRMA INVESTMENTS (GP) 2
LIMITED (for and on behalf of
the six limited partnerships
constituting the Terra Firma
Capital Partners II Fund), and
TERRA FIRMA INVESTMENTS (GP) 3
LIMITED (for and on behalf of
Terra Firma Capital Partners
III, L.P.),

                    Plaintiffs,

          v.                          09 CV 10459 (JSR)

CITIGROUP INC., CITIBANK,
N.A., CITIGROUP GLOBAL MARKETS
LIMITED, AND CITIGROUP GLOBAL
MARKETS, INC.,

                    Defendants.       Jury Trial

------------------------------x
                                      New York, N.Y.
                                      November 3, 2010
                                      9:15 a.m.

Before:

                    HON. JED S. RAKOFF,

                                      District Judge

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

SPA-167

0B33TER7

1           THE COURT:  Anything that counsel needs?

2           MR. BOIES:  Not from us, your Honor.

3           MR. WELLS:  No.

4           THE COURT:  Very good.  I want to say now, because

5     once the jury returns a verdict in this case, one side will be

6     happy and one side will be disappointed.  I had thought that

7     the best trial I had ever seen was the one Starr v. AIG last

8     year in my courtroom.  But this was its equal in terms of the

9     level of advocacy.

10          I think there's probably not a person in this

11    courtroom who shouldn't be impressed and learn from the

12    brilliant job that all the lawyers, and especially of course

13    the lead lawyers have done in this case.  And because in the

14    end it is only through effective and fair and good advocacy

15    that the truth comes out, I think the public and this court

16    should be very grateful to counsel for both sides.

17          We'll see you in 10 minutes.

18          (Recess)

19          (In open court; jury present)

20          THE COURT:  Ladies and gentlemen, you have a copy of

21    my charge.  You are going to be able to take that with you into

22    the jury room, keep it there for your use.  But let's read it

23    together now.

24          If you look at the table of contents, you'll see it is

25    divided into four parts.  First there are general instructions,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

SPA-168

0B33TER7                    Charge

1    these are just how you go about finding the facts.  These are

2    basic principles of law that apply to all cases.  Then there is

3    a section called liability.  That's where you determine whether

4    or not the plaintiff has established the essential elements of

5    its claim.  If you find that liability has been established,

6    then we have a section on damages, which deals with the amount

7    of money you would then have to award if you found liability.

8    And finally, we have some concluding instructions about how you

9    fill out your verdict form and things like that.  So let's

10   start on page one with the first instructions.

11           We are now approaching the most important part of this

12   case, your deliberations.  You have heard all of the evidence

13   in the case, as well as the final arguments of the lawyers for

14   the parties.  Before you retire to deliberate, it is my duty to

15   instruct you as to the law that will govern your deliberations.

16   As I told you at the start of this case, and as you agreed, it

17   is your duty to accept my instructions of law and apply them to

18   the facts as you determine them.

19           Regardless of any opinion you may have as to what the

20   law may be or ought to be, it is your sworn duty to follow the

21   law as I give it to you.  Also, if any attorney or other person

22   has stated a legal principle different from any that I state to

23   you in my instructions, it is my instructions that you must

24   follow.

25           Because my instructions cover many points, I have

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2448

0B33TER7                    Charge

1    provided each of you with a copy of them.  Not only so that you

2    can follow them as I read them to you now, but also so that you

3    can have them with you for reference throughout your

4    deliberations.  In listening to them now and in reviewing them

5    later, you should not single out any particular instruction as

6    alone stating the law, but you should instead consider my

7    instructions as a whole.

8              Your duty is to decide the fact issues in the case and

9    arrive, if you can, at a verdict.  You, the members of the

10   jury, are the sole and exclusive judges of the facts.  You pass

11   upon the weight of the evidence; you determine the credibility

12   of the witnesses; you resolve such conflicts as there may be in

13   the testimony; and you draw whatever reasonable inferences you

14   decide to draw from the facts as you determine them.

15             In determining the facts, you must rely upon your own

16   recollection of the evidence.  To aid your recollection, we

17   will send you all the exhibits at the start of your

18   deliberations, and if you need to review particular items of

19   testimony, we can also arrange to provide them to you in

20   transcript, videotape, or readback form.  But please remember

21   that none of what the lawyers have said in their opening

22   statements, in their closing arguments, in their objections or

23   in their questions is evidence, nor is anything I may have said

24   evidence.

25             The evidence before you consists of just three things:

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2449

0B33TER7                    Charge

1   The testimony given by witnesses that was received in evidence,

2   the exhibits that were received in evidence, and the

3   stipulations of the parties that were received in evidence.

4         Testimony consists of the answers that were given by

5   the witnesses to the questions that were permitted either here

6   in court or in the depositions that were read into evidence.

7   Please remember that questions, although they may provide the

8   context for answers, are not themselves evidence.  Only answers

9   are evidence, and you should therefore disregard any question

10  to which I sustained an objection.  Also, you may not consider

11  any answer that I directed you to disregard or that I directed

12  to be stricken from the record.  Likewise, you may not consider

13  anything you heard about the contents of any exhibit that was

14  not received in evidence.

15        It is the duty of the attorney for each side of a case

16  to object when the other side offers testimony or other

17  evidence that the attorney believes is not properly admissible.

18  Counsel also have the right and duty to ask the Court to make

19  rules of law and to request conferences at the side bar out of

20  the hearing of the jury.  All such questions of law must be

21  decided by me.  You should not show any prejudice against any

22  attorney or party because the attorney objected to any

23  admissibility of evidence or asked for a conference out of the

24  hearing of the jury or asked me for a ruling on the law.

25        I also ask you to draw no inference from my rulings or

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2450

0B33TER7                    Charge

1    from the fact that upon occasion I asked questions of certain

2    witnesses.  My ruling were no more than applications of the

3    law, and my questions were only intended for clarification or

4    to expedite matters.  You are expressly to understand that I

5    have no opinion as to the verdict you should render in this

6    case.

7              You are to perform your duty of finding the facts

8    without bias or prejudice or sympathy as to any party, for all

9    parties are equal under the law.  You are to perform your final

10   duty in an attitude of complete fairness and impartiality.  You

11   are not to be swayed by rhetoric or emotional appeals.

12             It must be clear to you that if you were to let

13   prejudice or bias or sympathy interfere with your thinking,

14   there would be a risk that you would not arrive at a true and

15   just verdict, so do not be guided by anything except clear

16   thinking and calm analysis of the evidence.

17             The plaintiffs in this case are two private equity

18   funds that invested in EMI, namely Terra Firma Investments (GP)

19   2 Limited and Terra Firma Investments (GP) 3 Limited.  But for

20   your purposes, you can treat them as one entity, which I will

21   refer to as Terra Firma.  Similarly, the defendants are three

22   affiliated entries named Citigroup Inc., Citibank NA, and

23   Citigroup Global Markets Limited.  But for your purposes, you

24   can treat them as one entity which I will refer to as Citi.

25   The Terra Firma plaintiffs are suing the Citi defendants on a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2451

0B33TER7                    Charge

1    fraud claim, specifically a claim for fraudulent

2    misrepresentation.  I will instruct you shortly on the elements

3    of this claim.  For now, I simply want to note that the Terra

4    Firma plaintiffs have what is called the burden of proof, which

5    is the burden of proving each of the essential elements of the

6    of this claim by a preponderance of the credible evidence.

7    Credible evidence means evidence you find worthy of belief.  To

8    establish an element of a claim by a preponderance of the

9    credible evidence means to prove that that element is more

10   likely true than not true.  It is not a question of which party

11   called the greater number of witnesses or how much time one

12   party or another spent on a given claim.  The focus must always

13   be on the quality of the evidence, its persuasiveness in

14   convincing you of its truth.

15        In deciding whether a party meets its burden of proof,

16   you may consider both direct evidence and circumstantial

17   evidence.  Direct evidence is evidence that proves a disputed

18   fact directly.  For example, where a witness testifies to what

19   he or she saw, heard or observed, that is called direct

20   evidence.

21        Circumstantial evidence is evidence that tends to

22   prove a disputed fact by proof of other facts.  To give a

23   simple example, suppose that when you came into the courthouse

24   today the sun was shining and it was a nice day, but the

25   courtroom blinds were drawn and you could not look outside.

2452

0B33TER7                    Charge

1    Then later as you were sitting here, someone walked in with a

2    dripping wet umbrella and soon somebody else walked in with a

3    dripping wet raincoat.  Now, on our assumed facts you cannot

4    look outside the courtroom and you cannot see whether or not it

5    is raining, so you have no direct evidence of that fact.  But

6    on the combination of the facts about the umbrella and

7    raincoat, it would be reasonable for you to infer that it had

8    begun raining.

9            That is all there is to circumstantial evidence.

10   Using your reason and experience, you infer from established

11   facts the existence or the non-existence of some other fact.

12   Please note, however, it is not a matter of speculation or

13   guess; it is a matter of logical inference.

14           The law makes no distinction between direct and

15   circumstantial evidence.  Circumstantial evidence is of no less

16   value than direct evidence.  You may consider either or both

17   and may give them such weight as you conclude is warranted.

18           It must be clear to you by now that counsel for

19   opposing parties are asking you to draw very different

20   conclusions about various factual issues in the case.  An

21   important part of that decision will involve making judgments

22   about the testimony of the witnesses you have listened to and

23   observed.  In making these judgments, you should carefully

24   scrutinize all of the testimony of each witness, the

25   circumstances under which each witness testified, and any other

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2453

0B33TER7                    Charge

1    matter in evidence that may help you to decide the truth and

2    the importance of each witness's testimony.

3        Your decision whether or not to believe a witness may

4    depend on how that witness impressed you.  How did the witness

5    appear to you?  Was the witness candid, frank and forthright;

6    or did the witness seem to be evasive or suspect in some way?

7    How did the way the witness testified on direct examination

8    compare with how the witness testified on cross-examination?

9    Was the witness consistent or contradictory?  Did the witness

10   appear to know what he or she was talking about?  Did the

11   witness strike you as someone who was trying to report his or

12   her knowledge accurately?  These are examples of the kinds of

13   common sense questions you should ask yourselves in deciding

14   whether a witness is or is not truthful.

15       How much you choose to believe a witness may also be

16   influenced by the witness's bias.  Does the witness have a

17   relationship with any of the parties that may affect how he or

18   she testified?  Does the witness have some interest, incentive,

19   loyalty or motive that might cause him or her to shade the

20   truth?  Does the witness have some bias, prejudice or hostility

21   that may cause the witness to give you something other than a

22   completely accurate account of the facts he or she testified

23   to?

24       You should also consider whether the witness had an

25   opportunity to observe the facts he or she testified about and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2454

0B33TER7                    Charge

1    whether the witness's recollection of the facts stands up in

2    light of the other evidence in the case.  In other words, what

3    you must try to do in deciding credibility is to size up a

4    person just as you would in any important matter where you are

5    trying to decide if a person is truthful, straightforward and

6    accurate in his or her recollection.

7         The law permits parties to offer testimony from

8    witnesses who by education or experience profess expertise in a

9    specialized area of knowledge.  In this case, Marianne DeMario

10   and Daniel Fischel have been offered as expert witnesses on the

11   issue of damages.  Expert testimony is presented to you on

12   theory that someone who is learned in the field may be able to

13   assist you in understanding specialized aspects of the

14   evidence.

15        However, your role in judging credibility and

16   assessing weight applies just as much to experts as to other

17   witnesses.  When you consider the expert opinions that were

18   received in evidence in this case, you may give them as much or

19   as little weight as you think they deserve.  For example, an

20   expert witness necessarily bases his or her opinions, in part

21   or in whole, on what the expert learned from others, and you

22   may conclude that the weight to be given the expert's opinions

23   may be affected by how accurate or inaccurate the underlying

24   information is.  More generally, if you find that the opinions

25   of an expert were not based on sufficient data, education, or

2455

0B33TER7                    Charge

1    experience, or if you should conclude that the trustworthiness

2    or credibility of an expert is questionable, or if the opinion

3    of the expert was outweighed in your judgment by other evidence

4    in the case, then you may, if you wish, disregard the opinions

5    of the expert either entirely or in part.  On the other hand,

6    if you find that an expert is credible, and that the expert's

7    opinions are based on sufficient data, education and

8    experience, and if the other evidence does not give you reason

9    to doubt the expert's conclusions, you may, if you wish, rely

10   on that expert's opinions and give them whatever weight you

11   deem appropriate.

12          Turning to the only remaining claim in this case, a

13   claim for fraudulent misrepresentation, you must first

14   determine, in accordance with my instructions, whether the

15   plaintiffs have met their burden of proof as to each of the

16   essential elements of this claim.  This is known as

17   establishing liability.  If, and only if, you determine that

18   there is liability on a given claim against the defendants do

19   you then determine the sum of money, called damages, to be paid

20   on that claim by defendants.

21          One other point about liability in general.  The Terra

22   Firma plaintiffs and the Citi defendants are all companies.

23   Like any company, each of these companies acts through its

24   officers, managers, employees, and other agents, and is

25   therefore responsible for the acts of its agents taken in

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2456

0B33TER7                    Charge

1   furtherance of the company's business.

2          Terra Firma's claim against Citi is for a kind of

3   fraud called fraudulent misrepresentation.  To establish Citi's

4   liability for fraudulent misrepresentation, Terra Firma must

5   prove, by a preponderance of the credible evidence, each of the

6   four essential elements:

7          First, that David Wormsley, as an agent of Citi, made

8   one or more false representations to Guy Hands, as an agent of

9   Terra Firma, in the three alleged telephone calls between them

10  on May 18 and May 20, 2007.

11         Second, that as to any such misrepresentation that you

12  are considering, Mr. Wormsley either knew when he made it that

13  it was untrue, or had no honest belief in its truth at the time

14  he made it.

15         Third, that Mr. Wormsley, in making one or more such

16  misrepresentations, acted with dishonest intentions, in that he

17  intended that the Terra Firma plaintiffs would rely on the

18  misrepresentations to Citi's benefit and Terra Firma's

19  detriment.

20         Fourth, that Terra Firma did in fact rely on one or

21  more such misrepresentations and that the misrepresentations

22  were a substantial factor in causing Terra Firma to make the

23  bid it made for EMI on May 21, 2007.

24         If, and only if, you find that the Citi defendants are

25  liable on Terra Firma's claim for fraudulent misrepresentation,

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

0B33TER7                    Charge

1     then you must determine the sum of money that must be paid by

2     the defendants to the plaintiffs as a result of such liability.

3     This is called damages.  Generally speaking, damages seek to

4     make the injured party whole, that is, to put the injured party

5     in the same position the party would have been if the party had

6     not been defrauded.  Damages must be based on evidence, not on

7     speculation or sympathy, and the plaintiffs bear the burden of

8     proving damages by a preponderance of the credible evidence.

9         Here, if you find that the plaintiffs have proved

10    liability, the plaintiffs are entitled to recover from

11    defendants the difference between the price they paid for the

12    shares and the fair market value of the shares at the time of

13    the transaction.  The fair market value means the price at

14    which a hypothetical willing buyer and a hypothetical willing

15    seller would conduct a purchase and sale of EMI, assuming that

16    both sides have reasonable knowledge of the relevant facts.

17        You should calculate your fair market damages in

18    English pounds as of the time of the fraud.  The Court will

19    make any calculations that need to be made to adjust to present

20    value or to reflect changes in currency.  Also, bear in mind

21    that, while you should make every effort to calculate damages

22    with reasonably certainty, absolute certainty as to amount is

23    not required.

24        You will shortly retire to the jury room to begin your

25    deliberations.  As soon as you get to the jury room, please

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

0B33TER7                    Charge

1   select one of your number as the foreperson to preside over

2   your deliberations and to serve as your spokesperson if you

3   need to communicate with the Court.

4           You will be bringing with you into the jury room a

5   copy of my instructions of law and a verdict form on which to

6   record your verdict.  Let me just pause there, ladies and

7   gentlemen, to show you the verdict form.  It is a very simple

8   one-page document.  It first asks you whether you find that

9   liability has been established.  So you either check liable or

10  not liable.  If you check not liable, that's the end.  If you

11  check liable, then you go on to the second question, which is

12  to determine damages, and put in an amount.  And I see that we

13  made one mistake on this.  We put a dollar sign.  I am going to

14  correct that in hand to a pound sign.  Because you have to, if

15  you do determine damages, they have to be expressed in pounds.

16          And then once you've reached your verdict, your

17  foreperson will sign this, date it, and fold it up and seal it

18  in this envelope very cleverly marked "verdict," and that will

19  be brought to me here in open court, and I will not open it

20  until all of you are back here in court.  Then I'll open it, it

21  will be read out to you, and each of you will be asked to

22  affirm that that is in fact your verdict.  The reason we go

23  through all those technicalities to be absolutely sure we have

24  your verdict as you have decided.

25          Going back to the instructions.  In addition, we will

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

2459

0B33TER7                    Charge

1    send into the jury room all of the exhibits that were admitted

2    into evidence.  I'll pause there to say also an index, as I

3    mentioned, each side will have an index to their exhibits.

4         If you want any of the testimony, that can also be

5    provided either in transcript, videotape or readback form.

6    But, please remember that it is not always easy to locate what

7    you might want.  So be as specific as you possibly can be in

8    requesting portions of testimony.

9         Any of your requests, in fact any communication with

10   the Court, should be made to me in writing signed by your

11   foreperson, and given to the marshal, who will be available

12   outside the jury room throughout your deliberations.  After

13   consulting with counsel, I will respond to any question or

14   request you have as promptly as possible, either in writing or

15   by having you return to the courtroom so that I can speak with

16   you in person.  You should not, however, tell me or anyone else

17   how the jury stands on any issue until you have reached your

18   verdict and recorded it on your verdict form.

19        Each of you must decide the case for yourself after

20   consideration with your fellow jurors of the evidence in the

21   case and your verdict must be unanimous.  In deliberating, bear

22   in mind that while each juror is entitled to his or her

23   opinion, each should exchange views with his or her fellow

24   jurors.  That is the very purpose of jury deliberation, to

25   discuss and consider the evidence, to listen to the arguments

2460

0B33TER7                    Charge

1    of fellow jurors, to present your individual views, to consult

2    with one another, and to reach a verdict based solely and

3    wholly on the evidence.

4            If, after carefully considering all the evidence and

5    the arguments of your fellow jurors, you entertain a

6    conscientious view that differs from the others, you are not to

7    yield your view simply because you are outnumbered.  On the

8    other hand, you should not hesitate to change or modify an

9    earlier opinion which, after discussion with your fellow

10    jurors, now appears to you erroneous.

11            In short, your verdict must reflect your individual

12    views and it must also be unanimous.

13            This completes my instructions of law.

14            Now, ladies and gentlemen, a couple of housekeeping

15    matters.  We will in a moment swear the marshal in, have you go

16    into the jury room, you should select your foreperson, and if

17    you want to start your deliberations.  But at 5 o'clock of

18    course you should go home.  Come back tomorrow at 9 o'clock.

19    Whoever is your foreperson should make sure that you don't

20    resume the deliberations until all eight of you are in the jury

21    room.  And you should start your deliberations.  You can take

22    as little or as long as you need.  It is totally up to you.  If

23    you need anything at all, just send us a note and we will

24    respond.

25            As I mention, we are going to send in the exhibits and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

TERRA FIRMA INVESTMENTS (GP) 2
LIMITED, and TERRA FIRMA INVESTMENTS
(GP) 3 LIMITED,

        Plaintiffs,

        -v-

CITIGROUP INC., CITIBANK, N.A., and
CITIGROUP GLOBAL MARKETS LIMITED,

        Defendants.

------------------------------------------------- x

09 Civ. 10459 (JSR)



## THE COURT'S INSTRUCTIONS OF LAW TO THE JURY

TABLE OF CONTENTS

I.  GENERAL INSTRUCTIONS

1.    Duty of the Court

2.    Duty of the Jury

3.    Duty of Impartiality

4.    Burden of Proof

5.    Direct and Circumstantial Evidence

6.    Witness Credibility

7.    Expert Testimony

II.  LIABILITY

8.    Liability in General

9.    Plaintiffs' Claim for Fraudulent Misrepresentation

III.  DAMAGES

10.    Damages

IV.  CONCLUDING INSTRUCTIONS

11.    Selection of Foreperson; Right to See Exhibits and Hear Testimony; Communications with the Court

12.    Verdict; Need for Unanimity; Duty to Consult

i

I.  GENERAL INSTRUCTIONS

INSTRUCTION NO. 1

Duty of the Court

We are now approaching the most important part of this case, your deliberations.  You have heard all of the evidence in the case, as well as the final arguments of the lawyers for the parties.  Before you retire to deliberate, it is my duty to instruct you as to the law that will govern your deliberations.  As I told you at the start of this case, and as you agreed, it is your duty to accept my instructions of law and apply them to the facts as you determine them.

Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you.  Also, if any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

Because my instructions cover many points, I have provided each of you with a copy of them not only so that you can follow them as I read them to you now but also so that you can have them with you for reference throughout your deliberations.  In listening to them now and reviewing them later, you should not single out any particular instruction as alone stating the law, but you should instead consider my instructions as a whole.

1

SPA-185

INSTRUCTION NO. 2

Duty of the Jury

Your duty is to decide the fact issues in the case and arrive, if you can, at a verdict.  You, the members of the jury, are the sole and exclusive judges of the facts.  You pass upon the weight of the evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own recollection of the evidence.  To aid your recollection, we will send you all the exhibits at the start of your deliberations, and if you need to review particular items of testimony, we can also arrange to provide them to you in transcript, videotape, or read-back form.  But please remember that none of what the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions, is evidence.  Nor is anything I may have said evidence.

The evidence before you consists of just three things: the testimony given by witnesses that was received in evidence, the exhibits that were received in evidence, and the stipulations of the parties that were received in evidence.

Testimony consists of the answers that were given by the witnesses to the questions that were permitted either here in court or in the depositions that were read into evidence.   Please remember that questions, although they may provide the context for answers, are not themselves evidence; only answers are evidence, and you should therefore disregard any question to which I sustained an objection.  Also, you may not consider any answer that I directed you to disregard or that I directed be stricken from the record.  Likewise, you may not consider anything you heard about the contents of any exhibit that was not received in evidence.

It is the duty of the attorney for each side of a case to object when the other side offers

2

testimony or other evidence that the attorney believes is not properly admissible. Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences at the side bar out of the hearing of the jury. All such questions of law must be decided by me. You should not show any prejudice against any attorney or party because the attorney objected to the admissibility of evidence, or asked for a conference out of the hearing of the jury, or asked me for a ruling on the law.

I also ask you to draw no inference from my rulings or from the fact that upon occasion I asked questions of certain witnesses. My rulings were no more than applications of the law and my questions were only intended for clarification or to expedite matters. You are expressly to understand that I have no opinion as to the verdict you should render in this case.

3

SPA-187

INSTRUCTION NO. 3

Duty of Impartiality

You are to perform your duty of finding the facts without bias or prejudice or sympathy as to any party, for all parties are equal under the law.  You are to perform your final duty in an attitude of complete fairness and impartiality.  You are not to be swayed by rhetoric or emotional appeals.

It must be clear to you that if you were to let prejudice or bias or sympathy interfere with your thinking, there would be a risk that you would not arrive at a true and just verdict.  So do not be guided by anything except clear thinking and calm analysis of the evidence.

4

SPA-188

INSTRUCTION NO. 4

Burden of Proof

The plaintiffs in this case are the two private equity funds that invested in EMI, namely, Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited; but for your purposes you can treat them as one entity, which I will refer to as "Terra Firma." Similarly, the defendants are three affiliated entities named Citigroup, Inc., Citibank, N.A., and Citigroup Global Markets Limited; but for your purposes you can treat them as one entity, which I will refer to as "Citi." The Terra Firma plaintiffs are suing the Citi defendants on a fraud claim, specifically, a claim for fraudulent misrepresentation. I will instruct you shortly on the elements of this claim. For now, I simply want to note that the Terra Firma plaintiffs have what is called the "burden of proof," which is the burden of proving each of the essential elements of this claim by a preponderance of the credible evidence. "Credible" evidence means evidence you find worthy of belief. To establish an element of a claim by a "preponderance" of the credible evidence means to prove that that element is more likely true than not true. It is not a question of which party called the greater number of witnesses or how much time one party or another spent on a given claim. The focus must always be on the quality of the evidence: its persuasiveness in convincing you of its truth.

SPA-189

INSTRUCTION NO. 5

Direct and Circumstantial Evidence

In deciding whether a party meets its burden of proof, you may consider both direct evidence and circumstantial evidence.

Direct evidence is evidence that proves a disputed fact directly. For example, where a witness testifies to what he or she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts. To give a simple example, suppose that when you came into the courthouse today the sun was shining and it was a nice day, but the courtroom blinds were drawn and you could not look outside. Then later, as you were sitting here, someone walked in with a dripping wet umbrella and, soon after, somebody else walked in with a dripping wet raincoat. Now, on our assumed facts, you cannot look outside of the courtroom and you cannot see whether or not it is raining. So you have no direct evidence of that fact. But, on the combination of the facts about the umbrella and the raincoat, it would be reasonable for you to infer that it had begun raining.

That is all there is to circumstantial evidence. Using your reason and experience, you infer from established facts the existence or the nonexistence of some other fact. Please note, however, it is not a matter of speculation or guess; it is a matter of logical inference.

The law makes no distinction between direct and circumstantial evidence. Circumstantial evidence is of no less value than direct evidence, and you may consider either or both, and may give them such weight as you conclude is warranted.

6

INSTRUCTION NO. 6

Witness Credibility

It must be clear to you by now that counsel for the opposing parties are asking you to draw very different conclusions about various factual issues in the case. An important part of that decision will involve making judgments about the testimony of the witnesses you have listened to and observed. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you to decide the truth and the importance of each witness's testimony.

Your decision whether or not to believe a witness may depend on how that witness impressed you. How did the witness appear to you? Was the witness candid, frank and forthright; or, did the witness seem to be evasive or suspect in some way? How did the way the witness testified on direct examination compare with how the witness testified on cross-examination? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? These are examples of the kinds of common sense questions you should ask yourselves in deciding whether a witness is or is not truthful.

How much you choose to believe a witness may also be influenced by the witness's bias. Does the witness have a relationship with any of the parties that may affect how he or she testified? Does the witness have some interest, incentive, loyalty, or motive that might cause him or her to shade the truth? Does the witness have some bias, prejudice, or hostility that may cause the witness to give you something other than a completely accurate account of the facts he or she testified to?

You should also consider whether the witness had an opportunity to observe the facts he

7

or she testified about, and whether the witness's recollection of the facts stands up in light of the other evidence in the case.

In other words, what you must try to do in deciding credibility is to size up a person just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

8

SPA-192

INSTRUCTION NO. 7

Expert Testimony

The law permits parties to offer testimony from witnesses who by education or experience profess expertise in a specialized area of knowledge. In this case, Marianne DeMario and Daniel Fischel have been offered as expert witnesses on the issue of damages. Expert testimony is presented to you on the theory that someone who is learned in the field may be able to assist you in understanding specialized aspects of the evidence.

However, your role in judging credibility and assessing weight applies just as much to experts as to other witnesses. When you consider the expert opinions that were received in evidence in this case, you may give them as much or as little weight as you think they deserve. For example, an expert witness necessarily bases his or her opinions, in part or in whole, on what the expert learned from others, and you may conclude that the weight to be given the expert's opinions may be affected by how accurate or inaccurate that underlying information is. More generally, if you find that the opinions of an expert were not based on sufficient data, education, or experience, or if you should conclude that the trustworthiness or credibility of an expert is questionable, or if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you may, if you wish, disregard the opinions of the expert, either entirely or in part. On the other hand, if you find that an expert is credible, and that the expert's opinions are based on sufficient data, education, and experience, and that the other evidence does not give you reason to doubt the expert's conclusions, you may, if you wish, rely on that expert's opinions and give them whatever weight you deem appropriate.

9

SPA-193

II. LIABILITY

INSTRUCTION NO. 8

Liability in General

Turning to the only remaining claim in this case – a claim for fraudulent misrepresentation  – you must first determine, in accordance with my instructions, whether the plaintiffs have met their burden of proof as to each of the essential elements of this claim.  This is known as establishing "liability."  If, and only if, you determine that there is liability on a given claim against the defendants do you then determine the sum of money, called "damages," to be paid on that claim by defendants.

One other point about liability in general: the Terra Firma plaintiffs and the Citi defendants are all companies.  Like any company, each of these companies acts through its officers, managers, employees, and other agents, and is therefore responsible for the acts of its agents taken in furtherance of the company's business.

10

SPA-194

INSTRUCTION NO. 9

Plaintiffs' Claim Fraudulent Misrepresentation

Terra Firma's claim against Citi is for a kind of fraud called fraudulent misrepresentation. To establish Citi's liability for fraudulent misrepresentation, Terra Firma must prove, by a preponderance of the credible evidence, each of four essential elements:

First, that David Wormsley, as an agent of Citi, made one or more false representations to Guy Hands, as an agent of Terra Firma, in the three alleged telephone calls between them on May 18 and May 20, 2007.

Second, that, as to any such misrepresentation that you are considering, Mr. Wormsley either knew when he made it that it was untrue or had no honest belief in its truth at the time he made it.

Third, that Mr. Wormsley, in making one or more such misrepresentations, acted with dishonest intentions, in that he intended that the Terra Firma plaintiffs would rely on the misrepresentation(s) to Citi's benefit and Terra Firma's detriment.

Fourth, that Terra Firma did in fact rely on one or more such misrepresentations and that the misrepresentation(s) were a substantial factor in causing Terra Firma to make the bid it made for EMI on May 21, 2007.

11

## lll.  DAMAGES

### INSTRUCTION NO. 10

#### Damages

If, and only if, you find that the Citi defendants are liable on Terra Firma's claim for fraudulent misrepresentation, then you must determine the sum of money that must be paid by the defendants to the plaintiffs as a result of such liability.  This is called "damages."  Generally speaking, damages seek to make the injured party whole -- that is, to put the injured party in the same position the party would have been if the party had not been defrauded.  Damages must be based on evidence, not on speculation or sympathy, and the plaintiffs bear the burden of proving damages by a preponderance of the credible evidence.

Here, if you find that the plaintiffs have proved liability, the plaintiffs are entitled to recover from defendants the difference between the price they paid for the shares and the fair market value of the shares at the time of the transaction.  The fair market value means the price at which a hypothetical willing buyer and a hypothetical willing seller would conduct a purchase and sale of EMI, assuming that both sides have reasonable knowledge of the relevant facts.

You should calculate your fair market damages in English pounds as of the time of the fraud.  The Court will make any calculations that need to be made to adjust to present value or to reflect changes in currency.  Also, bear in mind that, while you should make every effort to calculate damages with reasonable certainty, absolute certainty as to amount is not required.

SPA-196

IV.  CONCLUDING INSTRUCTIONS

INSTRUCTION NO. 11

Selection of Foreperson; Right to See Exhibits and Hear Testimony;

Communications with the Court

You will shortly retire to the jury room to begin your deliberations.  As soon as you get to the jury room, please select one of your number as the foreperson, to preside over your deliberations and to serve as your spokesperson if you need to communicate with the Court.

You will be bringing with you into the jury room a copy of my instructions of law, and a verdict form on which to record your verdict.  In addition, we will send into the jury room all of the exhibits that were admitted into evidence.  If you want any of the testimony, that can also be provided, either in transcript, videotape, or readback form.  But, please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of testimony.

Any of your requests, in fact any communication with the Court, should be made to me in writing, signed by your foreperson, and given to the marshal, who will be available outside the jury room throughout your deliberations.  After consulting with counsel, I will respond to any question or request you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person.

13

SPA-197

INSTRUCTION NO. 12

Verdict; Need for Unanimity; Duty to Consult

You should not, however, tell me or anyone else how the jury stands on any issue until you have reached your verdict and recorded it on your verdict form.

Each of you must decide the case for yourself, after consideration, with your fellow jurors, of the evidence in the case; and your verdict must be unanimous. In deliberating, bear in mind that while each juror is entitled to his or her opinion, each should exchange views with his or her fellow jurors. That is the very purpose of jury deliberation -- to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another; and to reach a verdict based solely and wholly on the evidence.

If, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others, you are not to yield your view simply because you are outnumbered. On the other hand, you should not hesitate to change or modify an earlier opinion which, after discussion with your fellow jurors, now appears to you erroneous.

In short, your verdict must reflect your individual views and it must also be unanimous.

This completes my instructions of law.

14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**TERRA FIRMA**

                                 Plaintiff,                          09 CIVIL 10459 (JSR)

                -against-                                            **JUDGMENT**

**CITIGROUP**
                                 Defendant.
-------------------------------------------------------------X

         The issues in the above-entitled action having been brought on for trial before the Honorable

Jed S. Rakoff, United States District Judge, and a jury on October 18, 2010,  and at the conclusion

of the trial on November 4, 2010, the jury having returned a verdict in favor of the defendant, it is,

         **ORDERED, ADJUDGED AND DECREED:**  That the Complaint be and it is

hereby dismissed.

**DATED:**  New York, New York
             December     , 2010

**SO ORDERED**

_____
         **USDJ**

              **RUBY J. KRAJICK**
              _____
              **Clerk of Court**

         BY:  _____
              **Deputy Clerk**

                                        **THIS DOCUMENT WAS ENTERED**
                                        **ON THE DOCKET ON** _____

SPA-199

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

**Terra Firma**

                         Plaintiff(s)

        -against-

**Citigroup**

                         Defendant(s)

-------------------------------------------------------X

**Before: Jed S. Rakoff, U.S.D.J.**
**Date: 11-4-2010**
**Case #: 09cv10459 (JSR)**
**Courtroom Deputy: R. Landers**
**Court Reporters:**

## A N   E X T R A C T   O F   T H E   M I N U T E S

**Plaintiff(s) by:**      **David Boies, Esq.**
                         **Boies, Schiller & Flexner**
                         **575 Lexington Ave**
                         **New York, NY 10022**
                         **212-446-2300**

**Defendant(s) by:**    **Theodore Wells, Jr., Esq.**
                         **Paul, Weiss, Rifkind**
                         **1285 Ave of the Americas**
                         **New York, NY 10022**
                         **212-373-3000**

A jury trial began on, October 18, 2010, and continued on the following dates:
10-19,20,21,22,25,26,27,28,29,November 1,2,3,4.

The jury returned with the following verdict:
Defendants found not liable.

7

STATE OF NEW YORK     )

                              )      ss.:        **AFFIDAVIT OF**

COUNTY OF NEW YORK    )                      **CM/ECF SERVICE**


       I, Kersuze Morancy, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.


       **On April 25, 2011**

deponent served the within: **Special Appendix**

       **upon:**

**PAUL, WEISS, RIFKIND, WHARTON**
   **& GARRISON LLP**
*Attorneys for Defendants-Appellees*
**1285 Avenue of the Americas**
**New York, New York 10019**
**(212) 373-3000**


via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.


**Sworn to before me on April 25, 2011**


_____

     *Maryna Sapyelkina*
    Notary Public State of New York
       No. 01SA6177490
     Qualified in Kings County
Commission Expires Nov. 13, 2011

                                 **Job # 234698**