# 11-0126-cv

# United States Court of Appeals
### *for the*
## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

— v. —

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to F.R.A.P. 26.1, plaintiff-appellants Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd., by their undersigned counsel, hereby state as follows:

1.     TFCP Holdings Limited is the corporate parent of each of Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd.

2.     No publicly held corporation owns 10% or more of the stock of Terra Firma Investments (GP) 2 Ltd. or Terra Firma Investments (GP) 3 Ltd.

C

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ C

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT OF JURISDICTION................................................................... 1

STATEMENT OF ISSUES FOR REVIEW ..................................................... 2

STATEMENT OF THE CASE ......................................................................... 3

STATEMENT OF FACTS ............................................................................... 7

SUMMARY OF ARGUMENT ...................................................................... 20

ARGUMENT ................................................................................................. 23

I.     THE COURT'S INSTRUCTIONS TO THE JURY
       MISSTATED ENGLISH LAW ON THE RELIANCE ELEMENT
       OF THE FRAUDULENT MISREPRESENTATION CLAIM. .................. 23

II.    THE DISTRICT COURT ERRED IN
       GRANTING SUMMARY JUDGMENT ON
       THE NEGLIGENT MISREPRESENTATION CLAIM............................. 36

III.   THE DISTRICT COURT ERRED IN GRANTING
       JUDGMENT AS A MATTER OF LAW DURING TRIAL
       ON TERRA FIRMA'S FRAUDULENT CONCEALMENT CLAIM. ........ 44

IV.    THE DISTRICT COURT ERRED BY EXCLUDING ADMISSIBLE
       EVIDENCE OFFERED BY TERRA FIRMA AT TRIAL........................... 52

       A.     The Slattery Notes Were Not
              Inadmissible Hearsay, Because Terra Firma
              Offered Them to Rebut a Charge of Recent Fabrication. ................. 52

       B.     The Nicoli Phone Records, Which Showed
              the Extent and Length of Conversations Between
              Wormsley and Nicoli on May 20, 2007, Were Admissible. .............. 56

C.    The District Court Erred in Excluding Portions of
Terra Firma's Proffered Expert Testimony on Damages....................59

CONCLUSION .....................................................................................................62

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B) ...........................64

# TABLE OF AUTHORITIES

## CASES

*American Dredging Co. v. Miller*,
   510 U.S. 443 (1994)............................................................................27

*Anderson v. Branen*,
   17 F.3d 552 (2d Cir. 1994) ...............................................................30

*Bank of China v. NBM LLC*,
   359 F.3d 171 (2d Cir. 2004) .............................................................31

*Barton v. Cnty. NatWest Ltd.*,
   [1999] Lloyd's Reports (Banking) 408.........................................23, 27

*Black v. Finantra Capital, Inc.*,
   418 F.3d 203 (2d Cir. 2005) ..........................................................28, 29

*Boyle v. Revici*,
   961 F.2d 1060 (2d Cir. 1992) ...........................................................30

*Bradford Third Equitable Benefit Bldg. Soc'y v. Borders*,
   [1941] 2 All ER 205...........................................................................29

*Brown v. Pagan*,
   2010 WL 1430702  (S.D.N.Y. Apr. 8, 2010) ...................................53

*Brownlie v. Campbell*,
   (1880) 5 Appeal Cases 925 ...............................................................44

*Cobb v. Pozzi*,
   363 F.3d 89 (2d Cir. 2004) ...............................................................31

*Conlon v. Simms*,
   [2006] EWHC 401 (Ch)......................................................................44

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
   629 F.2d 786 (2d Cir. 1980) .............................................................27

*Cweklinsky v. Mobil Chemical Co.*,
   364 F.3d 68 (2d Cir. 2004) ..........................................................30, 31

iii

*Dadourian Grp. v Simms*,
　[2006] EWHC 2973 (Ch)................................................................24

*Derry v. Peek*,
　[1889] 14 App. Cas. 337..............................................................29

*Dick v. N.Y. Life Ins. Co.*,
　359 U.S. 437 (1959)....................................................................28

*Downs v. Chappell*,
　[1997] 1 W.L.R. 426....................................................................25

*East v. Maurer*,
　[1991] I WLF 461..................................................................59, 60

*George v. Celotex Corp.*,
　914 F.2d 26 (2d Cir. 1990) .........................................................58

*Girden v. Sandals Intern.*,
　262 F.3d 195 (2d Cir. 2001) .......................................................48

*Gordon v. New York City Bd. of Educ.*,
　232 F.3d 111 (2d Cir. 2000) ...................................................31, 32

*Intercity Maint. Co. v. Local 254, Serv. Emp. Int'l Union AFL-CIO*,
　241 F.3d 82 (1st Cir. 2001)..........................................................50

*Investors Compensation Scheme v. W. Bromwich Bldg. Society*,
　[1998] 1 W.L.R. 896....................................................................39

*JEB Fasteners v. Marks Bloom & Co.*,
　[1983] 1 All E.R. 583.............................................................24, 25

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
　173 F.3d 454 (2d Cir. 1999) ...................................................31, 32

*Livingstone v. Rawyards Coal Co.*,
　[1880] 5 Appeal Cases 25............................................................59

*Mannai Investment Co., Ltd. v. Eagle Star*,
　[1997] A.C. 749 ..........................................................................39

*Milano by Milano v. Freed*,
   64 F.3d 91 (2d Cir. 1995) ...................................................................48

*Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More or*
   *Less Parcel of Land*,
   766 F.2d 685 (2d Cir. 1985) ...............................................................31

*Parabola Investments Ltd. v Browallia Cal Ltd.*,
   [2010] Bus. L.R. 1446 .....................................................................60, 61

*Perry v. Ethan Allen, Inc.*,
   115 F.3d 143 (2d Cir. 1997) ...............................................................58

*Peters v. Baldwin Union Free Sch. Dist*,
   320 F.3d 164 (2d Cir. 2003) ...........................................................45, 51

*Phoenix Assoc. III v. Stone*,
   60 F.3d 95 (2d Cir. 1995) ...............................................................53, 55

*Raleigh v. Illinois Dept. of Revenue*,
   530 U.S. 15 (2000)..............................................................................27

*Slough Estates plc v. Welwyn Hatsfield District Council*,
   [1996] 2 E.G.L.R. 219 .........................................................................44

*Smith New Court Sec. Ltd. v Scrimgeour Vickers (Asset Mgmt.) Ltd.*,
   [1997] AC 254 .....................................................................................59

*Stevison by Collins v. Enid Health Sys., Inc.*,
   920 F.2d 710 (10th Cir. 1990) ............................................................32

*Torch Offshore LLC v Cable Shipping Inc.*,
   [2004] EWHC 787 (Comm) ................................................................25

*United States v. Iaconetti*,
   406 F. Supp. 554 (E.D.N.Y. 1976) .....................................................53

*United States v. Jackson*,
   335 F.3d 170 (2d Cir. 2003) ...............................................................55

*United States v. McCombs*,
   30 F.3d 310 (2d Cir. 1994) ............................................................27, 28

*Zubulake v. UBS Warburg LLC*,
    382 F. Supp. 2d 536 (S.D.N.Y. 2005) ...............................................................53


## RULES AND STATUTES

F.R.E. 403 ...............................................................................10, 15, 57, 62

F.R.E. 801 ...............................................................................................52, 53

F.R.E. 805 ...........................................................................................................53

12 U.S.C. § 632 ...............................................................................................1, 27

28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. § 1441 ...................................................................................................1


## OTHER AUTHORITIES

*Cartwright on Misrepresentation, Mistake and Non-disclosure* (2d ed.), § 3.54 ...25

*Clerk and Lindsell on Torts* (19th ed.), § 18-22 ......................................................44

*McGregor on Damages*, § 41-023 ...........................................................................59

## <u>STATEMENT OF JURISDICTION</u>

This case was removed from state court to federal court under 28 U.S.C. § 1441.  The District Court had jurisdiction under the Edge Act, 12 U.S.C. § 632.

The District Court entered judgment on December 9, 2010.  Appellants filed a timely notice of appeal on January 10, 2011.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1.  Whether the District Court's instructions to the jury on the reliance element of a fraudulent misrepresentation claim were erroneous.  The standard of review is *de novo*.

2.  Whether the District Court, in granting summary judgment on the negligent misrepresentation claim, erred by extending a contractual liability waiver to apply to information provided by Citi to Terra Firma in Citi's role as an advisor to Terra Firma, which a reasonable jury could have concluded was Citi's role when Citi made the misrepresentations.  The standard of review is *de novo*.

3.  Whether the District Court erred in granting judgment as a matter of law on fraudulent concealment, despite evidence sufficient to permit the submission of that claim to the jury.  The standard of review is *de novo*.

4.  Whether the District Court erred in precluding the introduction of evidence by Terra Firma during trial, including fact evidence and expert testimony on lost profits and consequential damages.  The standard of review is abuse of discretion.

## <u>STATEMENT OF THE CASE</u>

Terra Firma brought this action to redress a fraud perpetrated by Citi during the auction of EMI Group ("EMI") in May 2007.[1]  That auction resulted in Terra Firma, a private equity firm, purchasing EMI on the basis of false representations by David Wormsley, one of Citi's top bankers, about a purported bid from another private equity firm (Cerberus).

Citi wore many hats in the EMI auction, placing its employees in a conflict-ridden environment that created the motive and opportunity for the fraudulent (or at a minimum, negligent) acts that occurred.  As Citi described in an internal document, it "acted as both sell-side and buy-side advisor in Terra Firma's take over of EMI," JA-16529, providing advice via Wormsley and others to both EMI (the sell side) and Terra Firma (the buy side).

Citi was also a pre-auction unsecured creditor of EMI, and the lead arranger of a multi-billion dollar secured debt package that permitted Terra Firma to finance its bid.  JA-13535-36 (701:8-720:17); JA-18630.  Citi intended to syndicate the debt if Terra Firma was the winning bidder, but the credit crunch of 2007 resulted in Citi holding all the debt and becoming EMI's sole secured creditor.  JA-18630.

---

[1] As used herein, "Terra Firma" means appellants Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd.; and "Citi" means appellees Citigroup Inc., Citibank, N.A., Citigroup Global Markets Ltd., and Citigroup Global Markets Inc.

Irrespective of debt syndication issues, Citi's loan to Terra Firma generated more than $170 million in fees to Citi. JA-18630.

At the time of the auction, Citi internally described EMI as "a terminally ill cancer patient on chemotherapy." JA-14734-35 (1906:20-1907:1). While expressing such views internally, Citi helped EMI to package itself as a saleable company by, among other things, designing an auction intended to create maximum competitive tension while providing potential buyers with minimal information. When EMI's new chairman pushed Wormsley and Citi into a peripheral role, Wormsley brought his longtime client Terra Firma into the auction to prove his value to EMI. JA-14086-87 (1252:15-1253:8); JA-15316. He encouraged his colleagues in Citi's credit group to structure a debt package for Terra Firma quickly, so that Terra Firma would have to use Citi to finance any offer by the auction deadline. JA-14088-90 (1254:20-1256:1). Any such offer, if accepted by EMI, would ensure a contingency fee of more than $10 million to Citi from EMI, along with the loan underwriting fees from Terra Firma of more than $170 million. JA-15436; JA-18630. Immediately upon issuance, Citi classified its loan to Terra Firma as "Classified II", which meant "future default still probable" – something that Citi's own witness testified he had never previously seen upon issuance of a billion dollar loan. JA-14728 (1901:4-18); JA-16117.

4

Terra Firma's claims center on misrepresentations by Wormsley between May 18 and May 21, 2007 to Guy Hands, who served as a director of Terra Firma and was the chief executive officer of Terra Firma Capital Partners Limited ("TFCP"), the financial advisor to Terra Firma.  Wormsley wanted to ensure that Terra Firma placed a bid by the auction deadline of May 21 at 9:00 a.m.  Evidence at trial showed that he told Hands three times that if Terra Firma did not bid 265p per share by the deadline, Terra Firma would lose the opportunity to purchase EMI to Cerberus, which was purportedly making a pre-deadline bid of 262p.  Wormsley made this statement to Hands once during the morning of May 18, once during the afternoon of May 20, and once during the late evening of May 20.

In reliance on Wormsley's misrepresentations, which Wormsley knew to be false, Terra Firma placed a bid to purchase EMI at a share price of 265p.  In reality, there was no competing bid, and Wormsley had no honest belief that one existed.  Had Citi told the truth or stayed silent on the matter, then Terra Firma would not have placed a bid when it did (May 21) at the price it did (265p).

Terra Firma tried its fraudulent misrepresentation claim to a jury in the Southern District of New York (the Honorable Jed. S. Rakoff, presiding).  This appeal arises from the District Court's pre-trial order granting summary judgment on Terra Firma's negligent misrepresentation claim, its order during trial granting judgment as a matter of law on the fraudulent concealment claim, several

evidentiary rulings made during the trial, and the jury instructions that led to the

verdict of "not liable" on the fraudulent misrepresentation claim.

## STATEMENT OF FACTS

### 1.    Factual Background of Terra Firma's Claims

When the auction for EMI took place in May 2007, Citi and Terra Firma had a close and longstanding relationship, with the main two points of contact being Wormsley and Hands.  Wormsley viewed Citi's relationship with Terra Firma as an "advisory relationship," JA-6524, and acknowledged that he made "an effort to convince Mr. Hands that [he] was a person who he could trust."  JA-13835 (1001:7-9).  Hands testified that he trusted Wormsley "completely."  JA-13094 (260:1-2).  In addition to its deep advisory relationship with Terra Firma, Citi was a partner in the private equity funds managed by Terra Firma, which were the economic interest-holders in EMI after Terra Firma's acquisition.

Citi also had a strong relationship with EMI.  In September 2006, EMI and Citi agreed in writing that Citi would provide advisory and banking services to EMI, including in connection with a potential acquisition of EMI by a third-party buyer.  JA-6593; JA-15433.  Wormsley led the Citi team advising EMI on the potential transaction, and was Citi's primary point of contact with Eric Nicoli, EMI's CEO.  CA-420-21 (70:24-71:12); CA-429-30 (109:18-110:11); JA-8091 (81:12-22);  JA-7774-75  (219:2-220:9);  JA-7614-15  (61:9-62:7);  JA-13880 (1046:12-17); JA-14006 (1172:13-21); JA-15421.   The engagement entitled Citi to a contingency fee of £6 million (about $11.8 million in 2007) on completion of

such a transaction, but nothing in the absence of a transaction.  JA-15436.

Wormsley arranged for Hands to meet Nicoli on May 6, 2007 "to discuss the possibility of Terra Firma entering the process."  JA-8002-03 (162:24-163:21).  By the date of his meeting with Nicoli, Hands had learned the identity of each of the three other private equity firms that had entered the EMI auction process – Cerberus, Fortress and One Equity.  JA-6694; JA-16898.  Also by that time, Nicoli had apprised Wormsley about indicative proposals from Cerberus and Fortress to buy EMI.  JA-6655; JA-6628; JA-6640; JA-15421; JA-15669; JA-15681.

On May 8, 2007, Terra Firma sent a letter to EMI officially entering the auction process, and identifying an indicative proposal price of 265p per share.  JA-6697; JA-6699; JA-18495.  The next day, Wormsley wrote to EMI to boast that he was "absolutely certain that I can deliver very serious added value in any discussions with Guy."  JA-6703; JA-15316.

Hands understood Wormsley to be working on behalf of Terra Firma during the EMI auction, on a non-exclusive basis.  In connection with his efforts to facilitate a Terra Firma offer for EMI, Wormsley acknowledged that he sought to "███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████."  CA-420 (70:12-23.)

Other Citi investment bankers were also working on the "Terra Firma deal team,

acting for Terra Firma and providing it with "investment banking advice" in connection with its possible bid for EMI. JA-8094-95 (139:25-140:4); JA-8096 (141:13-15); JA-8097 (142:8-9).

On the evening of May 17, Wormsley participated in an internal Citi credit committee teleconference to discuss the financing of a possible Terra Firma bid to purchase EMI. JA-6721; JA-6690; JA-15341; JA-16011. On Friday May 18, Wormsley told Hands by phone that EMI, at the request of another bidder, was accelerating the bidding deadline to May 21; and that in advance of that deadline, Cerberus was bidding 262p, which Terra Firma would have to exceed to win the auction. JA-7876 (159:10-21); JA-7879; JA-7880 (162:13-163:20); CA-322-23; JA-12945-46 (111:17-112:3); JA-13098-99 (264:6-265:17).

These statements were false. Wormsley admitted that prior to May 21, he had no basis to tell anyone whether Cerberus would make a formal offer. CA-426 (106:17-22). Wormsley testified that he had been "pushed out" by EMI and played a "junior role" in the transaction, and thus was not kept informed on the status of other bidders. JA-14087 (1253:1-8). Wormsley testified that he does not recall trying to find out any information about Cerberus after he learned about the indicative Cerberus bid. JA-14187 (1353:15-18).

By May 19, Cerberus, previously seen as a front-runner, told EMI that it would not participate in the May 21 auction. JA-15360. EMI's top executives,

including Nicoli, discussed that fact in a teleconference on the morning of May 20. JA-13784-85 (950:23-951:18); JA-15114 (2286:10-15).  Starting at 11:45 a.m. on May 20, just 29 minutes after the conclusion of the 10:30 a.m. teleconference, Nicoli spoke to Wormsley for about three minutes.  JA-6738; CA-267; JA-15369. Phone records that the District Court excluded from evidence under F.R.E. 403 show that at 2:47 p.m. on May 20, Nicoli called Wormsley on his mobile phone, and they spoke again for about eight minutes.  CA-61; CA-267; CA-832. Throughout the auction process, Nicoli had provided Wormsley with updates on the status of potential bidders.  JA-6746; JA-15358.

On the morning of May 20, 2007, the Investment Advisory Committee (the "IAC") of TFCP (the adviser to Terra Firma) met to discuss a bid for EMI.  JA-6747; JA-16608.  During the meeting, Hands reported on the status of other bidders, including the existence of a competing bid at 262p described to him by Wormsley two days earlier.  Handwritten notes from the IAC meeting included the notation "Other bidders – one at 262."  JA-16683.  Later on May 20, Terra Firma convened a board meeting to decide whether to proceed with a possible bid for EMI.  JA-6512; JA-6515; JA-17290; JA-17334.

During the board meeting, Wormsley called Hands and told him again that Cerberus was bidding at 262p per share, and that Terra Firma would need to bid 265p to win the auction.  JA-7883-85 (166:17-168:18); JA-13553; JA-13101-02

(267:23-268:5). Wormsley had no honest belief in the truth of this false statement to Hands, who immediately relayed the information to the other attendees at the board meeting, John Loveridge and Iain Stokes. JA-7950-53 (143:6-146:14); JA-8137-38 (54:2-55:23); JA-14273 (1439:1-14).

Terra Firma decided to bid by EMI's deadline, subject to there being no change in status, including with the expected Cerberus bid, and appointed a committee to meet on May 21 at 7:30 a.m. for "final consideration and approval" of the potential bid. JA-7956-57, JA-7960-61; JA-6512; JA-6515; JA-17290; JA-17334. Terra Firma also put forth evidence that it delayed final approval of the bid until Monday morning just in case the situation changed. JA-12950; JA-12958; JA-13104-06; JA-13109-10; JA-13711-12. The draft minutes of the May 21 meeting show that the directors discussed whether Cerberus was still bidding. JA-15311. Consistent with this evidence, Loveridge and Stokes, the two directors that attended the committee meeting on the morning of May 21 to approve the bid, testified that they recalled that, as of the time of the meeting, nothing had changed overnight regarding Cerberus. JA-14370; JA-14308.

Close to midnight on May 20, 2007, Wormsley repeated to Hands by phone that Cerberus was bidding 262p, and that Terra Firma would have to bid 265p in order to win the auction. JA-7885-86; JA-7-73 (¶ 129); JA-13102-03; JA-13553. The midnight call – which Wormsley has testified that he could recall (CA-452,

CA-462-63); JA-13951) – is memorialized by an e-mail from Wormsley to Nicoli immediately afterward, which stated: "Just had a call from GH. He is going to credit at 6am and hopes to get something to you by 9. I reinforced the point that he should not play games on price. He said 'I hear you.'" JA-6755; JA-15300. About a minute later, Wormsley sent an e-mail to a Citi colleague that stated: "Just spoke to GH. Complained of nickle and diming but pretty clear he will go for it." JA-6756; JA-15301. Wormsley testified that, between the time that he learned of Cerberus's indicative proposal in early May and the May 21 EMI board meeting, he didn't know anything about whether or not Cerberus was going to bid on May 21. JA-14186-87 (1352:3-1353:18); JA-14185 (1351:15-20); JA-14189 (1355:7-14). Thus, he could not have had an honest belief in the truth of his statements to Hands that Cerberus was going to bid.

The next morning, Terra Firma sent a letter to EMI making a firm offer to purchase the company for 265p per share. JA-6771-72; JA-17001. No other bidder submitted a firm offer by that deadline, or at any other time. JA-7764 (184:10-16); JA-7972-73 (44:25-45:7); JA-7995 (133:14-23); JA-13793 (959:8-10). As with any auction, the competitive landscape was a significant consideration for Terra Firma in determining whether to bid, when to bid, and what to bid. JA-13108 (267:2-10); JA-13107 (273:5-18). Wormsley's false representations about competition were the catalyst for Terra Firma bidding 265p

by the May 21 deadline.  JA-13341-42 (507:23-508:13)

EMI's board convened a meeting at 1:00 p.m. on May 21, during which it resolved to recommend Terra Firma's offer to EMI's shareholders.  JA-6786-87; JA-15384-85.  Wormsley attended the EMI board meeting on behalf of Citi.  JA-6782; JA-15380.  At approximately 4:25 p.m. that day, EMI made a public announcement of Terra Firma's offer, and of its recommendation that EMI's shareholders accept it.  JA-6791; JA-15389.

EMI's public written announcement of the offer did not list Wormsley among the key Citi contacts on the deal, an omission that further demonstrates Citi's consciousness that Wormsley's participation on both sides of the deal was a perilous exercise.  JA-6793; JA-15391.  Citi then took steps to hide Wormsley's deceit regarding the phantom Cerberus bid.  On May 21, Wormsley's closest colleague on the EMI deal team wrote in an e-mail that "We got 2 bids this morning with TF highest so we announced it."  JA-6837; JA-15309.  This was undisputedly false, and stands as further evidence of the circulation of false information about a non-existent Cerberus bid.  Months later, in an e-mail message to Hands on September 17, 2007, Paul Simpkin of Citi mischaracterized Cerberus as "a bidder for EMI in May."  JA-6839; JA-15304.  Simpkin forwarded the message to Wormsley and Simon Lindsay.  JA-6838; JA-15304.  Lindsay wrote: "The reference to Cerberus at the end is particularly masterful."  JA-6839.

Wormsley replied: "Lovely isnt it." ███████████████

███████████████████████████████████████████████

███████ CA-70-71. These documents indicate a cover-up within Citi.

## 2.    The Proceedings in the District Court

### a.    *The Negligent Misrepresentation Claim*

Before trial, the District Court granted summary judgment for Citi on Terra Firma's negligent misrepresentation claim. It adopted Citi's argument that the claim was barred by a liability waiver in the Project Mulberry Agreement ("PMA"), which was a confidentiality agreement signed by Terra Firma and EMI during Terra Firma's pre-auction due diligence. JA-963. The District Court rejected Terra Firma's argument that the application of the waiver depended upon whether Wormsley held himself out to be advising and working on behalf of Terra Firma when he made his misrepresentations. The jury should have decided this disputed issue of fact.

### b.    *Evidentiary Rulings During Trial*

At trial, Citi argued to the jury at length that the absence of corroborating documents strongly supported Citi's position that Wormsley never told Hands anything about Cerberus. In this regard, Terra Firma offered into evidence the May 16, 2007 handwritten notes of Michael Slattery, legal counsel at TFCP, in order to rebut Citi's charges that Terra Firma fabricated Wormsley's statements

about Cerberus.  JA-12898 (64:7-18); JA-12906 (72:1-17); JA-12913 (79:14-25); JA-15192-96 (2364:8-2368:5); JA-15199-201 (2371:8-2373:3); JA-15223 (2395:16-25); JA-15231 (2403:1-24); JA-15238-39 (2410:1-2411:20).  Slattery's notes read in part: "EMI….not to be repeated.  Worm…huge desire…intelligence[.]  Wednesday…submit Friday, Mon/Tues make announcement."  JA-19126.  The Court excluded this evidence on hearsay grounds, despite its plainly falling within a hearsay exception as a rebuttal to charges of recent fabrication.

The Court also excluded a second piece of evidence that supported Terra Firma's claims – the phone records of EMI's CEO Eric Nicoli (the "Nicoli Phone Records").  Wormsley's e-mail and his own phone records show that he and Nicoli spoke on May 20 shortly after Nicoli learned that Cerberus would not bid on May 21.  The Nicoli Phone Records show the frequency and breadth of their communications that day, including several additional calls that Nicoli made to Wormsley, one lasting eight minutes.  CA-832.  The Nicoli Phone Records go directly to the credibility of Wormsley's testimony that he did not know that Cerberus had dropped out.  However, the Court excluded them under F.R.E. 403, even though both Terra Firma *and* Citi listed them as trial exhibits on their respective pre-trial exhibit lists.

Because Terra Firma bid for EMI in reliance on Wormsley's lies, Terra Firma contended that it was damaged because Terra Firma would not have bid for EMI had it known that there was no other bidder. JA-13101 (267:2-10); JA-13105-06 (271:20-272:4); JA-13107 (273:5-18); JA-14309 (1474:17-1475:5).   Terra Firma sought, among other damages, lost profits that are undisputedly available under English law.   JA-12799 (¶ 20); JA-12802 (¶ 30); JA-12808 (¶ 43).   The District Court improperly excluded a portion of testimony that Terra Firma intended to present from its valuation expert on lost profits and consequential damages, and thus also refused to charge the jury on those issues.   JA-14242 (1408:14-21); JA-14870 (2042:14-19); JA-14861 (2033:6-9); JA-14997 (2169:5-9).

In open court on the second-to-last day of trial, Citi moved to strike a juror because (1) her name appeared after the credits of a movie that Citi called "antibank," and (2) she did not take as many notes during one Citi employee's testimony as she had during other witnesses.   JA-14879-82.   Citi told the District Court that it discovered via internet searches during trial that the juror was listed among more than 100 names under the heading "Thanks" after the closing credits of the Michael Moore movie "Capitalism: A Love Story."   Citi admitted that "none of us have a clue" about the meaning of the "Thanks" list, or about whether the juror had "antibank" tendencies.   JA-15093.   Nevertheless, Citi argued to the

16

District Court that her acknowledgement – and the fact that, according to Citi, she was at times taking notes "like a person possessed," JA-15007, but purportedly "turned and she folded her arms" with "pure anger on her face" during the testimony of a Citi witness, JA-14881 – meant that she was "part of the other side." JA-15018.   Citi's attacks on the juror were based solely on supposition and innuendo.

Still, Citi made the motion with its emotive commentary knowing, as it told the District Court, that Citi's discussion of its fear of the juror in open court (without the jury present) meant that "it is going to be in every newspaper tomorrow. She may be on the front of the Post.  This thing is out there."  JA-15092.  Citi told the District Court that, notwithstanding the standard admonition to avoid media coverage, "She is going to know that Citi made a motion" to remove her based on "antibank" bias.  JA-15093.  (Citi presumably believed that the other jurors would learn the same.)  As Citi predicted, news stories appeared within hours of Citi raising the matter, identifying the juror by name and quoting Citi's stinging public comments.

The same day, a court stenographer advised the judge that she heard the same juror commenting to other jurors in an elevator words to the effect of, "What could possibly go on this afternoon.  When they give us so much information, it is hard to know what to focus on."  JA-15023; JA-15094.  The stenographer said she

raised the issue only because of Citi's motion to strike that juror earlier that day. JA-15097. The District Court asked the juror privately, with counsel present, whether she had made the statement, which she denied. JA-15094. The District Court concluded that she had "lied to the Court on an important matter," and excused her. JA-15099.

Citi's heated, distasteful and public speculation about the juror's political views achieved Citi's improper purpose – making it impossible as a practical matter for the District Court to allow the trial to proceed with her as a juror. While Terra Firma has withdrawn this issue as an independent basis for appeal (having identified it on a prior filing with this Court), the underlying events further demonstrate the prejudice to which Terra Firma was subject during trial.

### c.    *The Fraudulent Concealment Claim*

During trial, the District Court granted Citi's motion for judgment as a matter of law on fraudulent concealment. Terra Firma argued that a dismissal was inappropriate because the evidence showed that after Wormsley learned that Cerberus was not bidding (which took place at some point between May 19 and May 21), he did not correct his prior misrepresentations. Terra Firma submitted evidence that, had Wormsley corrected his prior misrepresentations, Terra Firma would not have moved forward with its bid on the same terms. JA-13101 (267:2-4). However, the District Court granted Citi's motion on the basis that the Terra

Firma did not sufficiently discuss its concealment claim during its opening statement, and did not offer witness testimony in support of this theory. JA-14847-48 (2019:22-2020:23).

### d. *The Jury Instructions on the Fraudulent Misrepresentation Claim*

The District Court's closing instructions to the jury included a charge that, in order to find Citi liable for fraudulent misrepresentation, the jury would have to find that that Wormsley "intended that the Terra Firma plaintiffs would rely on the misrepresentation(s) to Citi's benefit and Terra Firma's detriment." JA-15284 (2456:17-19). The District Court's instructions on this point were erroneous, because (1) they refused to give Terra Firma the benefit of the presumption of reliance that English law requires in fraud claims, and (2) the benefit/detriment notions entailed in the instruction had no basis under English law, which does not consider it relevant whether a fraud defendant intended to harm the fraud plaintiff or to benefit itself. Following these improper instructions, the jury found Citi not liable on the fraudulent misrepresentation claim. JA-19179.

## SUMMARY OF ARGUMENT

As relevant to this appeal, Terra Firma's complaint against Citi stated claims for fraudulent misrepresentation, negligent misrepresentation and fraudulent concealment in connection with Citi's misrepresentations and omissions relating to the auction of EMI.

The fraudulent concealment claim was the only one on which the District Court permitted a jury to render a verdict. English law, which all parties agreed governed the substantive claims at trial, entitles a plaintiff in a fraudulent misrepresentation case to a rebuttable presumption that it relied on the alleged misrepresentation. The District Court refused to instruct the jury on this presumption, and compounded its error by instructing the jury that it could find liability only if it concluded that Citi intended Terra Firma to rely on the alleged misrepresentations "to Citi's benefit and Terra Firma's detriment." Under English law, however, all that is required is that the defendant intended the plaintiff to rely, irrespective of whether the defendant wanted to benefit itself or injure the plaintiff. The erroneous instruction was prejudicial, and is grounds for vacating the verdict. *See* Point I.

The District Court dismissed the negligent misrepresentation at the summary judgment stage, ruling that it was foreclosed by a liability waiver in a written agreement between Terra Firma and EMI. It held that the liability waiver, which

covered non-fraud claims related to Terra Firma's use of information received from EMI or its advisors, barred its negligent misrepresentation claim because Citi was an agent of EMI. The District Court ignored that a disputed issue of fact existed as to whether Citi was acting in its role as advisor to Terra Firma when it made the misrepresentations. A reasonable jury could have found that Citi was acting in that capacity when Wormsley made misstatements to Hands, which would take the statements outside the purview of the liability waiver. This Court should vacate the summary judgment order and remand this claim for trial. *See* Point II.

The District Court also erred by granting judgment as a matter of law on Terra Firma's fraudulent concealment claim. The record contained sufficient evidence to permit a reasonable jury to find that, between Terra Firma's submission of its bid and the closing several months later, Citi fraudulently concealed the fact that its prior statements about Cerberus's participation in the auction – which were the catalyst for Terra Firma bidding what it did when it did – were false. Instead of charging the jury on this claim, the District Court granted Citi's Rule 50 motion on the basis that Terra Firma did not sufficiently articulate the claim in its opening statement, and did not ask a particular hypothetical question of Hands during trial regarding what he would have done if Citi came clean prior to the deal closing. *See* Point III.

The District Court also erred in refusing to admit into evidence (1) handwritten notes offered by Terra Firma to rebut Citi's charges of recent fabrication, (2) phone records offered by Terra Firma to show Wormsley's opportunity and motive for the misconduct that occurred, and (3) expert testimony offered by Terra Firma on the issues of lost profits and consequential damages. *See* Point IV.

## ARGUMENT

## I.   THE COURT'S INSTRUCTIONS TO THE JURY MISSTATED ENGLISH LAW ON THE RELIANCE ELEMENT OF THE FRAUDULENT MISREPRESENTATION CLAIM.

There was no dispute between the parties that, to prove fraudulent misrepresentation under English law, a plaintiff must show:  (1) a representation, which is (2) false, (3) dishonestly made, (4) intended to be relied on, (5) is in fact relied on, and (6) thereby causes damage.   JA-3319-20 (¶ 8).   When the misrepresentation is one on which a reasonable person would rely under the circumstances, a rebuttable presumption of reliance exists.  A-8214 (¶ 61); A-3323 (¶ 21(2)).   Both parties acknowledged the presumption in their submissions on foreign law in the District Court.  JA-3323 (¶ 21(2)); JA-8214 (¶ 61).[2]

The "effect of the presumption is to alter the burden of proof" during the fact-finding stage so that, instead of the plaintiff having to prove reliance, the defendant has the burden of proving that the plaintiff did *not* rely on the misrepresentation.  *Barton v. Cnty. NatWest Ltd.* [1999] Lloyd's Reports (Banking) 408, ¶ 58 (appeal from judgment after trial).   JA-8924-25.   Unless a defendant carries that burden, then reliance by the plaintiff is presumed.  *Id.*; *see also*, *e.g.*,

---

[2] Both parties provided the District Court with submissions on English law from English barristers that include additional discussion of the elements of fraudulent misrepresentation under English law, as well as other claims and damage issues.  *See* JA-2950-73 and JA-10977-11010 (Citi's submissions); JA-7743-92 and JA-11397-421 (Terra Firma's submissions).

*Dadourian Grp. v Simms* [2006] EWHC 2973 (Ch), ¶ 543 ("At this stage, another rebuttable presumption come into play: if the misrepresentation is of such a nature that it would be likely to play a part in the decision of a reasonable person it will be presumed that it did so unless the representor satisfies the court to the contrary") (judgment after trial) (JA-4325), *aff'd*, [2009] EWCA Civ 169.   The District Court's instructions to the jury, however, improperly deprived Terra Firma of this rebuttable presumption.  Had the District Court properly instructed the jury on this presumption, the jury would have presumed that, provided that it found that Wormsley's misrepresentations were of the kind on which a reasonable person would rely, Terra Firma did rely on Wormsley's misrepresentations.  JA-8214-15 (¶¶ 61-66).[3]   The jury would have been required to maintain this presumption unless it believed that Citi came forward with evidence proving that Wormsley's statements did not play any substantial role in Terra Firma's actions.  *Id.*

This presumption is difficult to overcome because English law does not require proof that the misrepresentation is the only cause, or even the main cause, of the representee's decision to enter into the transaction.  It is enough that the misrepresentation is ___a___ cause of the decision.  JA-8213 (¶ 57).  As stated in *JEB*

---

[3]   The record clearly contained evidence from which the jury could have found that Wormsley's misrepresentations were the kind on which a reasonable person could rely.  For example, as Citi itself acknowledged, "Citi has historically been the advisor closest to Terra Firma."  JA-6518; JA-15333.

*Fasteners v. Marks Bloom & Co.* [1983] 1 All E.R. 583 at 589, "as long as a misrepresentation plays a real and substantial part, though not by itself a decisive part, in inducing a plaintiff to act, it is a cause of his loss, and he relies on it, no matter how strong or how many other matters which play their part in inducing him to act." JA-9643.[4] As stated in a leading treatise, the "decision to enter into a contract is generally based on a range of motives and as long as any one of those motives is vitiated by the misinformation given by the other party, it is enough to undermine the whole transaction." *Cartwright on Misrepresentation, Mistake and Non-disclosure* § 3.54 (JA-11109); *see also*, *e.g.*, *Downs v. Chappell*, [1997] 1 W.L.R. 426, at 433 (providing that once it is shown that the decision to enter into the contract was influenced by the representation, it is irrelevant to consider how the plaintiffs would have acted if they had been told the truth) (JA-4284).

Even though there was no dispute that English law recognizes such a presumption, the Court refused to instruct the jury on it. JA-14864-65 (2036:6-2037:4). Instead, the Court instructed the jury that Terra Firma had the burden of proving "by a preponderance of the credible evidence . . . that Terra Firma did in fact rely on one or more such misrepresentations and that the misrepresentations

---

[4] A "real and substantial" cause does not equate to being the dominant or sole cause, as is particularly clear from the statement in *JEB Fasteners* that the representation need not play a "decisive part" in the representee's decision in order to be actionable. A "real and substantial" cause is to be distinguished from a merely minor, trivial or peripheral cause. *E.g.*, *Torch Offshore LLC v Cable Shipping Inc.*, [2004] EWHC 787 (Comm), 2004 WL 741893, ¶ 34.

were a substantial factor in causing Terra Firma to make the bid it made for EMI on May 21, 2007." SPA-194. By failing to instruct the jury on the presumption, the Court reversed the applicable burden of proof in a manner contrary to English law.

Over Terra Firma's objection, the District Court stated that it did not instruct the jury about the reliance presumption based on its erroneous view that the presumption was solely a pre-trial procedural device that had no role in a jury trial because of possible confusion that the District Court thought it could cause:

> THE COURT: I think that's a doctrine, like most presumptions, a legal doctrine that *doesn't drop out in English law because they're bench trials but would drop out under normal procedure in American law* if the other side has come forward with sufficient evidence to negate the presumption, and then all these presumptions drop out and it becomes a civil jury question. I would give this – a not very good analogy perhaps, but the presumptions that exist in the employment discrimination context under McDonnell Douglas. *These presumptions operate at the pretrial stage but they drop out at the trial stage in part because it can only confuse the jury* to have these kinds of what are essentially directions as to who should go forward with the next bit of evidence. *And that's effectively what happens with this presumption as well.* So hear you, but I will not charge it.
>
> MR. DUFFY: Okay. We viewed it as more of a burden shifting –
>
> THE COURT: Yeah, no, *I think it is procedural in nature*. I think it, in effect, is a form of a presumption on who has to come forward with the next bit of evidence, all of which drops out at this stage. But anyway, gives you one more point to raise on appeal, if there is an appeal.

JA-14864-65 (2036:6-2037:3) (emphasis added).

The District Court erred in refusing to instruct the jury on the presumption of reliance.  As this Court explained in *United States v. McCombs*, 30 F.3d 310 (2d Cir. 1994), "Presumptions and other matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue."  *Id.* at 323-24; *see also Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20-21 (2000); *American Dredging Co. v. Miller*, 510 U.S. 443, 454 (1994).[5]  Because English law governs the application of the presumption, the Court should have applied the presumption exactly as it is applied under English law.

As demonstrated in *Barton v. Cnty. NatWest Ltd.* [1999] Lloyd's Reports (Banking), 408, the presumption applies beyond just the pre-trial stage.  In *Barton*, England's Court of Appeals reviewed a lower court's findings of fact on a fraudulent misrepresentation claim.  JA-8911-12 (¶ 5).  On appeal, the *Barton* court made clear that the presumption is part of the fact-finding process, and found that the lower court had erred by failing to include in its findings of fact a "reference to the presumption or to the alteration in the burden of proving inducement to which it gives rise."  JA-8925 (¶ 58).

---

[5]  Federal choice of law rules apply here because this case is in federal court under federal question jurisdiction pursuant to the Edge Act, 12 U.S.C. § 632.  *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980).

The District Court's refusal to apply the presumption of reliance contradicted its own holding during trial that English law determined the applicable burden of proof on the fraudulent misrepresentation claim. JA-14805-13 (1977:25-1985:25). The District Court reached a different conclusion regarding the presumption of reliance by characterizing it as procedural rather than substantive, because the fact-finder here was a jury rather than a judge. JA-14864-65 (2036:6-2037:4). This was error. The classification of an issue as substantive or procedural does not vary with the identity of the fact-finder. Circuit law is clear that the presumption is a substantive issue that must be applied as it would be applied under English law, regardless of whether the fact-finder is a judge or jury. *McCombs*, 30 F.3d at 323-24.

No basis exists for the District Court's stated concern that the concept of a presumption would confuse the jury. Courts regularly instruct juries on presumptions without any indication of confusion. *E.g.*, *Dick v. N.Y. Life Ins. Co.*, 359 U.S. 437, 443, 446 (1959) ("Under the Erie rule, presumptions (and their effects) and burden of proof are 'substantive' and hence respondent was required to shoulder the burden during the instant trial" and holding that "plaintiff is entitled to affirmative instructions to the jury concerning [the] existence and weight" of a presumption.). Indeed, the District Court has instructed a jury on the presumption of reliance in at least one other case. *Black v. Finantra Capital, Inc.*, 418 F.3d 203,

28

209 (2d Cir. 2005) (stating that Judge Rakoff correctly instructed jury that "[If] you find that the market price was secretly and artificially inflated then a presumption arises that plaintiff relied on the market price to his detriment. The defendants, however, can overcome this presumption if they prove by a preponderance of the evidence that plaintiff did not in fact rely on the market price.").

The District Court compounded its error by incorrectly instructing the jury that, to find for Terra Firma on the fraudulent misrepresentation claim, it needed to find that "Mr. Wormsley, in making one or more such misrepresentations, acted with dishonest intentions, in that he intended that the Terra Firma plaintiffs would rely on the misrepresentation(s) *to Citi's benefit and Terra Firma's detriment*." SPA-194 (emphasis added). To show dishonest intentions, however, a plaintiff must show only that the representor had no "honest belief" in the false statement. *Derry v. Peek* [1889] 14 App. Cas. 337, 374. JA-4200. English law did not require Terra Firma to show that Wormsley intended for Terra Firma to rely on his misrepresentations *to Citi's benefit and Terra Firma's detriment*. *E.g.*, *Bradford Third Equitable Benefit Bldg. Soc'y v. Borders*, [1941] 2 All ER 205 at 211 ("If fraud be established, it is immaterial that there was no intention to . . . injure the person to whom the false statement was made.") (JA-4263); *see also Derry* at 374 (same) (JA-4200).

29

Even Citi did not argue for the inclusion of the benefit/detriment formulation of reliance in its submission on foreign law, its proposed jury instructions, or during the charging conference. JA-3321 (¶ 15). By instructing the jury that Terra Firma had to prove that Wormsley intended that Terra Firma would rely on his statement to its detriment, the District Court required Terra Firma to prove that Wormsley *intended to injure* Terra Firma. No such proof is required under English law, and Terra Firma did not seek to offer any such proof at trial (a reasonable approach in light of Citi not arguing the point in its own proposed jury instructions submitted before trial). Similarly, English law does not require Terra Firma to prove that Wormsley intended to benefit Citi.

A jury instruction is considered erroneous if "it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir. 1994). Erroneous instructions merit reversal only where they were prejudicial. *Boyle v. Revici*, 961 F.2d 1060, 1063 (2d Cir. 1992) ("We will grant a new trial because of an error in jury instructions if our review of the record convinces us that the error was prejudicial."); *see also*, *e.g.*, *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994) ("An erroneous instruction, unless harmless, requires a new trial."). When an appellate court is "unable to determine with certainty that the district court's erroneous instruction did not affect the jury's verdict, [it] cannot deem that error harmless." *Cweklinsky*

*v. Mobil Chemical Co.*, 364 F.3d 68, 77 (2d Cir. 2004).  Similarly, if the erroneous instructions that were given might have "left the jury 'highly confused,'" the error is not harmless.  *Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land*, 766 F.2d 685, 688 (2d Cir. 1985).  Thus, in order to conclude that reversal is necessary here, this Court need not find with absolute certainty that the erroneous instructions influenced the jury's verdict.  Rather, it need find only that the instructions might have affected the verdict.  *E.g.*, *Cobb v. Pozzi*, 363 F.3d 89, 116 (2d Cir. 2004) (error not harmless if "jury might well have reached a different result had appropriate instructions been given.") (citation omitted).

Courts have found to be prejudicial, and thus reversible, jury instructions that "improperly direct[] the jury on whether the plaintiff has satisfied her burden of proof. " *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (citations and quotation marks omitted).  Thus, prejudicial error exists where, as here, jury instructions improperly reverse the burden of proof.  *E.g.*, *Bank of China v. NBM LLC*, 359 F.3d 171, 176-80 (2d Cir. 2004) (finding reversible error when Court misstated law and relieved plaintiff of burden of proving reliance under RICO, thus preventing defendant from relying on defense that plaintiffs knew and approved of alleged fraud); *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 463 (2d Cir. 1999) (finding that court's ruling "had the effect of misplacing the burden of proving these affirmative defenses" by placing

31

burden on plaintiff, rather than defendant); *see also*, *e.g.*, *Stevison by Collins v. Enid Health Sys., Inc.,* 920 F.2d 710, 713-14 (10th Cir. 1990) (finding reversible error when court improperly placed on plaintiff burden of showing she had withdrawn request for treatment, when burden belonged on defendant). Similarly, prejudicial error exists where the Court incorrectly instructs the jury as to the facts a party must prove to satisfy its burden of proof. *E.g.*, *Gordon*, 232 F.3d at 118 (finding reversible error when the jury was incorrectly charged that plaintiff had to prove "*both* that defendant's non-retaliatory reason was pretextual *and* that a retaliatory reason motivated the Board's adverse employment actions" when it was sufficient for plaintiff to prove only one); *LNC Invs.*, 173 F.3d at 454 (finding reversible error when jury was charged that it had to find reliance to establish causation, but where governing law required no such proof).

By failing to instruct the jury on the presumption of reliance, the District Court committed prejudicial error by effectively reversing the applicable burden of proof on that element of Terra Firma's fraudulent misrepresentation claim. At trial, the parties put forth competing theories on reliance. Citi argued extensively that Terra Firma did not rely on Wormsley's misstatements. For example, Citi argued that Terra Firma relied on factors other than Wormsley's misrepresentations in deciding to bid on May 21, such as Terra Firma's due diligence and its anticipation that it would earn a profit on the EMI transaction.

*E.g.*, JA-15192-93 (2364:8-2365:25); JA-15211 (2383:9-17); JA-15252-65 (2424:9-2437:10). In contrast, Terra Firma put forth evidence that it did rely on the misrepresentation. Hands, Loveridge, Pryce and Punja all testified that Terra Firma would not have had any reason to bid, and would not have bid, if it had not been misinformed about the purported Cerberus bid. JA-12937 (103:9-21); JA-13086 (252:3-6); JA-13093 (259:7-15); JA-13096-97 (262:22-263:7); JA-13101 (267:2-9); JA-13105-06 (271:20-272:4); JA-13399 (565:6-23); JA-13568 (734:9-19); JA-14308-09 (1474:17-1475:5). Draft minutes of Terra Firma's May 21 board committee meeting show that the directors discussed whether Cerberus was still bidding. JA-15311.[6] The jury might have found that, because Terra Firma had the burden of proof on the element of reliance, Terra Firma's evidence of reliance did not outweigh Citi's evidence of non-reliance. Because the District Court's jury instructions on this point were in error, there is a substantial likelihood that they prejudiced Terra Firma and affected the outcome.

The Court's instruction on benefit and detriment likely confused the jury, because it required proof that contradicted the theories underlying Terra Firma's fraudulent misrepresentation claim. By requiring Terra Firma to prove that Wormsley intended for Terra Firma to rely on his misstatement to Terra Firma's

---

[6] As Hands testified "If I hadn't got confirmation there was going to be a bidder 9:00 on the Monday morning, then . . . we would have just sat on the sidelines." JA-13706-07 (872:21-873:1).

"detriment," the Court required Terra Firma to prove that Wormsley wanted to hurt Terra Firma in connection with its purchase of EMI. Terra Firma presented substantial evidence, however, that Citi's relationship with Terra Firma was close and highly profitable to Citi. JA-6518; JA-15333; JA-15346; JA-15347; JA-15348; JA-15349; JA-15350. A jury could have concluded (and rightfully so) that it would be illogical for Wormsley to try to destroy one of his best clients, with whom he had a lucrative relationship. The District Court severely prejudiced Terra Firma's ability to prove its case when, at the end of trial, it instructed the jury that English law required Terra Firma to have presented such proof.

Properly stated, English law does not require Terra Firma to prove that Wormsley wanted Terra Firma to lose money in order to demonstrate liability for fraudulent misrepresentation. English law provides that even if "there was no intention to cheat or injure the person to whom the statement was made," a defendant can still be liable for fraud if the statement is made without any honest belief. JA-8211-12 (¶ 52). Thus, even if Wormsley wanted Terra Firma to profit from the fraudulently induced transaction, Citi would still be liable for fraud if Wormsley made the misstatements without an honest belief in their truth, and if damage resulted.

Likewise, by requiring the jury to find that Wormsley wanted to "benefit" Citi, the Court effectively required Terra Firma to prove that Citi *profited* from the

EMI transaction.  This erroneous instruction was unfairly prejudicial because Citi repeatedly emphasized throughout the trial that Citi lost money on the EMI sale. Citi's counsel argued in his opening statement to the jury when he said that "one of the biggest victims of the fact that Guy Hands put a lot of people's money into a bad investment was Citibank, because Citibank loaned him the money to buy the company."   JA-12899 (65:1-9).   Citi's counsel repeated this theme to the jury during his summation, when he stated: "We already lost 2 billion dollars thinking he could turn the company around."  JA-15273 (2445:12-17).  Citi's counsel also elicited testimony from Ian Cockerill, a Citi executive, that Citi took a "huge loss" on the EMI transaction. JA-14763-64 (1935:22-1936:10); *see also* JA-12901 (67:3-10); JA-14691 (1863:14-15); JA-14700-03 (1872:18-1875:8); JA-15272 (2444:11-20); JA-16438.   Thus, based on the flawed jury instruction, the jury could have concluded that, because Citi purportedly suffered a loss rather than a "benefit" on the EMI transaction, it could not be liable for fraudulent misrepresentation.

## II.     THE DISTRICT COURT ERRED IN
##          GRANTING SUMMARY JUDGMENT ON
##          THE NEGLIGENT MISREPRESENTATION CLAIM.

The PMA governed the sharing of information between EMI, as seller, and

Terra Firma, as bidder, during the EMI auction process.  JA-963.  Paragraph 10 of

the PMA, which was signed by EMI and Terra Firma, contained a liability waiver

providing that, except for fraud claims, "neither of us [*i.e.*, EMI and Terra Firma]

**nor any of our respective Connected Persons**: (a) shall have any liability to the

other or any other person resulting from the use of Information by us or them; and

(b) shall be under any obligation to provide further Information, to update

Information or to correct any inaccuracies."  JA-967 (emphasis added).

The PMA defined "Connected Person" as:

> in relation to each of us [*i.e.*, EMI and Terra Firma], to the extent that
> they are involved in or have knowledge of the Proposal,[7] (a) our
> respective group undertakings and each of our and their respective
> officers, employees, advisers, agents and representatives; (b) officers,
> employees and partners of our advisors, agents, and representatives
> or of their respective group undertakings and (c) your Agreed
> Financiers and their advisers.

JA-963-64.

The District Court granted summary judgment by concluding that the PMA

bars non-fraud claims by Terra Firma against EMI or its "Connected Persons,"

---

[7]  The PMA defined "Proposal" to mean "a possible offer by you [*i.e.*, Terra
Firma or an affiliate of you (***Potential Offeror***) to acquire the issued share capital
of EMI."  JA-963.

including Citi, related to Terra Firma's "use of Information" as defined in the PMA. SPA-160. The District Court's ruling failed to consider the significance of the fact that Citi was a Connected Person not only of EMI, but also of Terra Firma due to Citi's roles as (1) an adviser to Terra Firma, (2) a pre-existing investor in, and agreed debt provider to, Terra Firma, and (3) a partner of Terra Firma (through holding direct limited partnership interests in the Terra Firma Funds).

In granting summary judgment on the basis of the PMA, the District Court effectively found that when an entity is a Connected Person of both sides (*i.e.*, Terra Firma and EMI), the liability waiver applies to any information provided by that Connected Person to either signatory, without the need for a factual determination of which signatory the Connected Person was working for when the alleged misconduct took place. *See* SPA-160 ("Given that it is undisputed that Wormsley was a Connected Person of EMI, the PMA plainly applies to any information Wormsley passed on to Hands that was relevant to the potential EMI acquisition.").

This interpretation leads to irrational results. For example, if an accountant provided advice to EMI on auction-related issues, and simultaneously provided such services to Terra Firma in relation to the same transaction (with the knowledge of both sides), the District Court's interpretation would bar EMI from bringing a malpractice action against the accountant for work performed for EMI,

even though the terms of EMI's relationship with the accountant are not set forth in the PMA, but rather by any governing agreement between EMI and the accountant and/or relevant common law principles.  It would make no sense to interpret the PMA as governing the relationship between EMI and the accountant, just because the accountant also worked for Terra Firma.  But this is precisely what the Court's ruling does.

The District Court's conclusions were inappropriate at the summary judgment stage, because they ignored the fact that there were disputed issues of fact about the role in which Citi was acting when Wormsley made false statements to Hands.  The PMA's liability waiver covers non-fraud claims relating to the "use of information," JA-967, and defines "Information" as:

> information supplied by each of us or by any of our respective Connected Persons orally, in writing, or in any form ***to the other*** or its Authorised Recipients whether before, on or after the date of this letter in connection with the Proposal as well as all documents and other information which contain or reflect or are generated or derived from the information we each supply ***to the other***.

A-963 (emphasis added).

The phrase "to the other" makes clear that the liability waiver applies only to the communication of information by EMI and/or any of its Connected Persons on the one hand, to Terra Firma and/or any of its Connected Persons on the other hand (or vice versa).  That is, it relates only to information provided by one party "to the other."  By contrast, it does not apply to the transmission of information by Terra

Firma's Connected Person to Terra Firma (or by EMI's Connected Person to EMI). It would not, for instance, bar claims by Terra Firma against its own accountant, or its own legal advisors.  In short, it covers inter-group communications, not intra-group ones.

Paragraph 11 of the PMA supports this interpretation.  It states that "neither of us nor any of our respective Connected Persons shall owe any duty of care ***to the other, to the other's Connected Persons*** or to any other person."  JA-967 (emphasis added).  Importantly, it is silent about whether a Connected Person owes a duty of care *to the party on whose behalf it is acting* (that is, the person to whom it is "connected").  Thus, while the PMA precludes Terra Firma from bringing a negligent misrepresentation claim against a Connected Person acting on behalf of EMI, it has no impact on Terra Firma's right to bring such a claim against one of Terra Firma's own Connected Persons acting on Terra Firma's behalf – including Citi, which Citi's own document acknowledge was acting as a "buy-side advisor in Terra Firma's take over of EMI."  JA-15339.

English law, which undisputedly governs interpretation of the PMA, requires contracts to be interpreted so as to achieve a "commercially sensible construction." *Mannai Investment Co., Ltd. v. Eagle Star* [1997] A.C. 749 at 771 (JA-10017); *see also Investors Compensation Scheme v. W. Bromwich Bldg. Society* [1998] 1 W.L.R. 896 at 912-3 ("if detailed semantic and syntactical analysis of words in a

commercial contract is going to lead to a conclusion that flouts business common-sense, it must be made to yield to business common-sense.") (citation omitted) (JA-9606).   In a world where large financial institutions such as Citi often play multiple roles in a particular transaction, the District Court's interpretation lacked the requisite "business common-sense."  Here, that approach requires that, where a "Connected Person" has been engaged by two sides of a transaction, the applicability of the liability waiver to claims against that Connected Person requires an inquiry into the facts to determine the role that the Connected Person was playing when the alleged misconduct occurred.

The record on summary judgment (and at trial) showed that Citi was a Connected Person not only of EMI, but also of Terra Firma because Citi was an advisor to Terra Firma, an investor and limited partner in the Terra Firma Funds, and, with EMI's prior approval, a provider of financing for Terra Firma's bid. Hands viewed Citi, and Wormsley in particular, as advising Terra Firma on its bid for EMI.  Hands testified that he viewed Wormsley as "my advisor, my . . . person who was advising me what to do.  I viewed Citigroup as advising us on the financing."   JA-13134 (300:1-8).   Indeed, Wormsley testified that most of his conversations with Hands over the May 18 weekend related to Citi's financing of a Terra Firma bid.  JA-13899 (1065:10-16).

40

Hands testified that he understood Citi to be working on behalf of Terra Firma during the EMI auction process, albeit on a non-exclusive basis. JA-7862 (47:16-20); JA-7865 (50:4-11). Moreover, Citi acknowledged that it had "historically been the advisor closest to Terra Firma," and that it historically has "had an outsize share of Terra Firma's wallet." JA-6517-18. Another senior Citi executive testified that, within Citi, Wormsley and Citi were each considered to be "a trusted adviser of Terra Firma." JA-8111-12 (266:7-267:6); JA-8114-15 (305:9-306:9). Citi acknowledged in internal memoranda more than two years after the auction that it "acted as both sell-side and buy-side advisor in Terra Firma's take over of EMI." JA-15339. Citi acknowledged in an e-mail about the EMI auction, five days before its conclusion, that "Wormsley is Guy Hands banker." JA-15336. Citi's clear role as an advisor to Terra Firma during the EMI auction makes clear that it was at times *Terra Firma's* Connected Person under the PMA, contrary to the District Court's comment that Citi's status in this regard was "not clear from the summary judgment record." SPA-160.

Beyond its role as an advisor, Citi also qualifies as a Terra Firma Connected Person as one of Terra Firma's "Agreed Financiers." The PMA defined "Agreed Financiers" to mean "existing investors in funds advised by Terra Firma Capital Partners Limited together with any additional actual or potential providers of debt, equity and/or other finance of which EMI is notified in writing after the date of this

41

letter [May 9, 2007]." JA-963. There is no dispute that Citi (1) was an investor in limited partnership interests in the Terra Firma Funds, and (2) notified EMI in writing after the PMA was signed that it was seeking to provide debt financing for Terra Firma's acquisition of EMI. JA-7414; JA-6534, JA-6535, JA-6536, JA-6537; JA-15326; JA-13530 (696:7-15).

Because Citi was a "Connected Person" of both EMI and Terra Firma, the applicability of the PMA's liability waiver to negligent misrepresentation claims against Citi must entail a factual inquiry into whether Citi acted on behalf of Terra Firma or EMI when Citi made the statements at issue – here, Wormsley's statements about Cerberus to Hands. The question of whether Wormsley was acting on behalf of EMI or Terra Firma is a disputed issue. Terra Firma's position is that Wormsley was acting in his role as a Terra Firma advisor when he made the misrepresentations about Cerberus. Wormsley, however, testified that he had only one advisory client at a time, that being EMI. A-13905 (1071:15-19); A-13929 (1095:4-11); CA-418 (54:3-9). Because of the dispute between the parties regarding the capacity in which Wormsley was acting, a jury should have determined that issue, which in turn would determine whether the liability waiver applies to Terra Firma's negligent misrepresentation claim.

If the Court had permitted Terra Firma to go forward with its negligent misrepresentation claim, the jury could have found Citi liable for negligent

42

misrepresentation.    Under English law, a claim for negligent misrepresentation requires proof that (1) the representor assumed a duty of care to the representee; (2) a representation was made; (3) the representation was false; (4) the maker of the representation breached his duty to exercise reasonable care and skill in making the representation; (5) the claimant reasonably relied on the representation; and (6) the claimant suffered reasonably foreseeable loss as a result. JA-3324 (¶ 24). Unlike a fraudulent misrepresentation claim, a negligent misrepresentation claim does not require a plaintiff to show that the defendant intended for the plaintiff to rely on the false statement.    All that a plaintiff must show is that defendant was careless in making a false statement.    A jury could have believed that Wormsley was careless, which is different from being deliberately dishonest, when he told Hands about the competing Cerberus bid.[8]    This Court should vacate summary judgment and remand for a trial on this claim.

---

[8]    Because the jury delivered its verdict on a general verdict sheet, the jury did not indicate the reasons why it found Citi not liable for fraudulent misrepresentation.

43

### III. THE DISTRICT COURT ERRED IN GRANTING JUDGMENT AS A MATTER OF LAW DURING TRIAL ON TERRA FIRMA'S FRAUDULENT CONCEALMENT CLAIM.

To prove fraudulent concealment under English law, a plaintiff must show that (1) the defendant made one or more statements to the plaintiff, which were true, or which defendant believed to be true, when the statements were made; (2) the defendant learned that its prior statement had been untrue, or was no longer true, but did not inform the plaintiff that its prior statement had become untrue; (3) the defendant intended for the plaintiff to rely on the original statement; (4) the plaintiff in fact relied on the statement; and (5) the plaintiff suffered damages as a result. JA-8237-40 (¶¶ 134-44); *Conlon v. Simms* [2006] EWHC 401 (Ch) (JA-9213); *Slough Estates plc v. Welwyn Hatsfield District Council* [1996] 2 E.G.L.R. 219, 236-37 (JA-10302); *Brownlie v. Campbell* (1880) 5 Appeal Cases 925 (JA-9119); *Clerk and Lindsell*, § 18-22 (JA-11118).

At trial, Terra Firma offered extensive evidence in support of this claim. While the parties offered competing interpretations of the evidence regarding whether Wormsley learned that Cerberus would not bid prior to the May 21 deadline, even Wormsley admits that he learned of that fact by no later than the morning of May 21, when EMI's board met after the bid deadline. JA-14185 (1351:15-20); JA-14189 (1355:7-14). A juror could credit that Wormsley learned this for the first time on May 21, while simultaneously crediting Hands' testimony

that Wormsley told him prior to the deadline that Cerberus was bidding 262p.  A juror could have concluded that after the bid deadline, Wormsley had the ability to correct his prior false statements, but deliberately failed to do so to ensure that Terra Firma did not alter its plans based on the corrected information.

By "drawing all reasonable inferences in favor of  [Terra Firma] and making all credibility assessments in [Terra Firma's] favor, there was sufficient evidence to permit a rational juror" to find for Terra Firma on all elements of its fraudulent concealment claim.  *Peters v. Baldwin Union Free Sch. Dist*, 320 F.3d 164, 167-68 (2d Cir. 2003 (internal quotations and citations omitted).  Terra Firma proved that Wormsley and Hands spoke on the morning of May 18.  JA-15367.  Hands testified that, during this call, Wormsley told him that Cerberus was bidding 262p on May 21 and that Terra Firma needed to bid 265p.  JA-13098-100 (264:6-22; 265:13-266:3).  Consistent with Hands' testimony, Pryce testified that he recalls speaking to Hands on May 18 and learning of a competing Cerberus bid at 262. JA-12945-46 (111:17-112:8).  Handwritten notes from the TFCP IAC meeting that took place on May 20 – after the May 18 phone call and before any other conversation between Hands and Wormsley – show that the attendees discussed Cerberus' purported bid.  JA-16683-84; JA-13357 (523:6-15).  Loveridge and Morton, who were present at the May 20 afternoon Terra Firma board meetings,

testified that those present discussed a competing bidder.  JA-13748 (914:5-16);
JA-14273 (1439:20-24).

The jury's evaluation of the evidence could have led it to conclude that
Wormsley made an incorrect statement to Hands on May 18 about Cerberus
bidding (as Hands testified), but did not make such statements on May 20 (as
Wormsley testified).  A reasonable jury could also have concluded that up until the
morning of May 21, Wormsley thought Cerberus was bidding.  Wormsley testified
that he did not recall trying to find out any information about Cerberus between
(a) the time that he learned about its 262p indicative proposal, and (b) May 21.
JA-14187 (1353:15-18).  Wormsley testified that he had been "pushed out" of a
senior advisory role by EMI and thus played only a "junior role" in the EMI sale
transaction.    JA-14087 (1253:1-8).    Thus, the jury could have concluded that
Wormsley honestly believed that Cerberus was bidding for EMI at 262p per share
– the price associated with its earlier "indicative" proposal – until learning the
contrary at the May 21 EMI board meeting.

Having learned by no later than that board meeting that he had supplied
incorrect information to Hands, Wormsley failed to correct his misstatements,
resulting in Terra Firma publically announcing its 265p bid to the markets a few
hours later based on Wormsley's misstatements, and closing on the purchase a few

months later based upon them. This qualifies as fraudulent concealment under English law.

The District Court, however, entered judgment as a matter of law by making an express determination that the jury would either believe everything that Hands said, or everything that Wormsley said, but could not conclude that parts of a witness's testimony were accurate while other parts were not. JA-14851 (2023:3-23). Because a court must not make credibility determinations in evaluating a motion for judgment as a matter of law, the grant of Citi's motion was error. The District Court improperly usurped the fact-finding duties from the jury when it ruled that it was "impossible" for a rational juror to find that Wormsley told Hands about the competing Cerberus bid in the first conversation on May 18, but not in the last two conversations on May 20.

> THE COURT: That is truly impossible. I mean, I think we are all lucky to have this fantastic jury. I'm certainly not going to assume that they're going to find something that would be almost impossible. They could conceivably find that the initial misrepresentation was, you know, less than intentional but then the later ones were, but there's no way that they can find that the second ones didn't occur and the first one did. I mean, theoretically can they find it? Yes. As a practical matter, impossible:
>
> MR. DUFFY: But I think they could, your Honor, for a couple reasons.
>
> THE COURT: Because they would think that Mr. Hands lied partly and told the truth partly in his testimony?
>
> MR. DUFFY: Well –

THE COURT:  I mean, get real.  The question in this case, after all you lawyers have worked it over, is going to be whether they believe Guy Hands or they believe David Wormsley.

MR. DUFFY:  Well, I think the fact finder can believe one person part of the time and another person part of the time.

THE COURT:  Fact finder can, but not in this case.

JA-14851 (2023:2-23).

The jury thus could not, according to the District Court, "believe one person part of the time and another person part of the time."  In so ruling, the Court made a credibility determination as to whether all of Hands' testimony, or all of Wormsley's testimony, could be believed.  A credibility determination should only be made by the jury, not by a judge on a motion for directed verdict.  *E.g.*, *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995).  Moreover, as this Court recognized in *Girden v. Sandals Intern.*, 262 F.3d 195 (2d Cir. 2001), a jury does *not* have to "accept in its entirety the story of one or another of two sets of witnesses."  *Id.* at 204.  Rather, a jury can "accept part of it and . . . reject part of it."  *Id.* (citation omitted).  This is precisely what the District Court prevented the jury from doing by refusing to allow the jury to render a verdict on fraudulent concealment.

Wormsley admitted that he never informed Terra Firma that Cerberus had not participated in the auction, having testified that "following the announcement of the Terra Firma bid," he did not "have any conversations with Mr. Hands or

48

anyone from Terra Firma that Cerberus had not bid." JA-14022-23 (1188:25-1189:3). Beyond Wormsley's admission, the record contained corroborative evidence that Citi intentionally concealed the fact that Cerberus had not bid. First, on May 21, 2007, Matthew Smith, a top Citi banker who worked closely with Wormsley on the EMI deal, e-mailed another Citi employee that "We got 2 bids this morning with TF highest so we announced it." JA-15309. This statement was undisputedly false. Furthermore, there was evidence that Citi continued this concealment through September 2007, when Paul Simpkin of Citi stated in an e-mail to Hands that "Cerberus" had been "a bidder for EMI." JA-15305. Simon Lindsay, another Citi employee, emailed Wormsley stating that "the reference to Cerberus [in Simpkin's email] is particularly masterful!" and Wormsley responded "Lovely isnt it." JA-15304. There was no reason for Citi to tell Terra Firma that Cerberus *had* bid (which it had not) unless Citi was trying to conceal the truth about Cerberus from Terra Firma.

The EMI acquisition closed in August 2007. JA-16446. A jury could have concluded that if Terra Firma learned after bidding that Cerberus had not bid, and that its own bid was based upon false information, it would not have closed the transaction, or would not have closed it on the terms that it did. Citi itself argued to the jury that Terra Firma could have withdrawn from the bid if it wanted to. JA-17298; JA-13339-40 (505:12-506:23); JA-16931; JA-17717. A jury could have

49

concluded from this evidence that, if Terra Firma learned that its own bid was based upon misinformation about a purported competing bid, Terra Firma would have withdrawn from the deal.

The District Court, however, dismissed the claim before jury deliberations based largely on the content of Terra Firma's opening statement, and the fact that a certain hypothetical question was not asked of Hands. JA-14847-48 (2019:22-2020:23) ("I think the opening is important, and if it is as you say, I think that cuts strongly against charging this claim. The other question I would ask is: Did Mr. Boies put to Mr. Hands the question, 'What would you have done if, on May 21st, after you had submitted the bid, Mr. Wormsley had called you up and said, "Sorry about that, there was no Cerberus bid"?'"). Neither ground was proper. First, the District Court should not have focused on the degree to which the fraudulent concealment claim was discussed in the one-hour opening statement, which, of course, is not evidence. *E.g.*, *Intercity Maint. Co. v. Local 254, Serv. Emp. Int'l Union AFL-CIO*, 241 F.3d 82, 88 n.4 (1st Cir. 2001) ("Because counsel's statement was not evidence, we, like a jury, may not consider it."); JA-12850 ("Assuming we get the jury picked promptly, each side can have up to an hour for opening statements."). Instead, the District Court should have looked only at whether the trial record contained sufficient evidence for the claim to go the jury. Moreover, Terra Firma did address its fraudulent concealment theory in its

opening.  It expressly argued that it would show the jury that, after the auction, Citi intentionally concealed from Terra Firma that Cerberus never bid for EMI.  JA-12895 (61:1-17); JA-12896 (62:19-23) ("You saw the e-mails, where they continued to say there were two bids when they weren't two bids.  There were never two bids.  Why would they say there were two bids when there weren't, unless they were covering up?").

Second, in granting Citi's motion, the District Court found it significant that a specific hypothetical question had not been asked of Hands during his testimony.  This was error.  As noted above, there was evidence from which the jury could have inferred that, if Terra Firma had found out prior to closing that it was the only bidder, it would have withdrawn its bid.  That is all that is necessary where the relevant standard is whether the record contains sufficient evidence from which a rational juror could find for the plaintiff.  *Peters v. Baldwin Union Free Sch. Dist*, 320 F.3d 164, 167-68 (2d Cir. 2003).  As shown above, the record contained substantial evidence in that regard.  The District Court should have evaluated the evidence, rather than granting Citi's motion based on the content of opening statements and the possible absence of particular hypothetical testimony.

## IV. THE DISTRICT COURT ERRED BY EXCLUDING ADMISSIBLE EVIDENCE OFFERED BY TERRA FIRMA AT TRIAL.

### A. The Slattery Notes Were Not Inadmissible Hearsay, Because Terra Firma Offered Them to Rebut a Charge of Recent Fabrication.

The District Court erred by sustaining Citi's hearsay objection to the admission of certain handwritten notes of Terra Firma legal counsel Michael Slattery. The hearsay rule did not bar the admission of this document, because it reflects a prior consistent statement that Terra Firma offered to rebut a charge of recent fabrication, and thus falls within the scope of F.R.E. 801(d)(1)(B).

The relevant portion of the disputed notes read: "EMI….not to be repeated. Worm…huge desire…intelligence[.] Wednesday…submit Friday, Mon/Tues make announcement." JA-19126. It is a contemporaneous writing that reflects that Pryce informed Slattery on May 16 that Wormsley was providing Hands with intelligence about the EMI auction. JA-14383 (1549:12-15). Terra Firma proffered the handwritten note to establish that the statement was made at the time that the note was written, not to prove the substance of Mr. Hands' conversation with Mr. Pryce. JA-14386-87 (1552:24-1553:2). Specifically, the note was offered to (1) rebut Citi's accusations at trial that improper motives compelled Terra Firma to fabricate the claim that Wormsley was providing intelligence to Hands about the auction (JA-12898 (64:7-18); JA-12906 (72:1-17); JA-12913 (79:14-25); JA-15192-96 (2364:8-2368:5); JA-15199-201 (2371:8-2373:3); JA-

15223 (2395:16-25); JA-15231 (2403:1-24); JA-15238-39 (2410:1-2411:20)), and (2) establish that the claim was made at least as early as May 16, before the end of the auction and before any improper motive could have arisen.

The prior consistent statement exception of F.R.E. 801(d)(1)(B) extends to "hearsay within hearsay," which "is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." F.R.E. 805. Courts in this Circuit have consistently admitted such "hearsay within hearsay" under F.R.E. 801(d)(1)(B), even for substantive purposes. *E.g. Brown v. Pagan*, 2010 WL 1430702, at *1 (S.D.N.Y. Apr. 8, 2010); *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 544 and n.3 (S.D.N.Y. 2005); *United States v. Iaconetti*, 406 F. Supp. 554, 557-58 (E.D.N.Y. 1976). Because Terra Firma intended to offer the notes (and the statement from Pryce that they recorded) as a prior consistent statement, its admission would not violate the hearsay rule.

Importantly, Pryce's prior statement in the notes is wholly consistent with his and Slattery's testimony. *See Phoenix Assoc. III v. Stone*, 60 F.3d 95, 103 (2d Cir. 1995) (setting forth three elements that proponent must establish in order for evidence to fall within Rule 801(d)(1)(B), including consistency with prior statements). Pryce testified that on May 15 or 16, he came to understand that Cerberus was Terra Firma's main competitor for EMI via "a conversation which I

had with my boss [*i.e.*, Hands]." JA-12924-25 (90:16-91:7). The District Court erroneously sustained Citi's objection to Pryce testifying as to what Hands told him during that conversation, JA-12925, but Pryce testified at his deposition that

███████████████████████████████████████████████

███████████. CA-318-19 (40:12-41:8). Likewise, outside the presence of the jury, Slattery testified that Pryce "told me that Mr. Wormsley was providing information or intelligence about the bidding process, and by bidding process, he meant information about the timing of bids and bidding strategy." JA-14383 (1549:12-15).

Pryce's prior consistent statement also satisfied the second prong of the Rule 801(d)(1)(B) analysis because it rebuts Citi's charges (1) that Pryce was subject to improper influence or motive and that his trial testimony was fabricated; and (2) that Hands fabricated his testimony. At trial, Citi asserted that Pryce's testimony about Wormsley could not be trusted because Pryce was subject to improper motives due to his relationship with Hands JA-12906 (72:1-17); JA-15231 (2403:1-24). On summation, Citi suggested that his trial testimony was fabricated as a result of improper motives. JA-15238-39 (2410:1-2411:20). Citi also argued to the jury that Hands lied about Wormsley. JA-12898 (64:7-18); JA-12913 (79:14-25); JA-15192-96 (2364:8-2368:5); JA-15199-201 (2371:8-2373:3);

JA-15223 (2395:16-25).    Under Rule 801(d)(1)(B), Pryce's prior consistent statement was admissible to rebut these charges.

Evidentiary rulings are reviewed for abuse of discretion.  *United States v. Jackson,* 335 F.3d 170, 176 (2d Cir. 2003).  The Second Circuit applies a harmless error analysis and will reverse "only where the improper admission or exclusion of evidence affects 'a substantial right' of one of the parties."  *Phoenix Assoc.*, 60 F.3d at 104-05.   Making this determination involves an "assessment of the likelihood that the error affected the outcome of the case."  *Id*.  If an appellate court "cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."  *Id*.  This Court has held that where a party argues at trial that a particular claim must be corroborated with documentation, "it is substantially likely that the complete absence of such documentation [would] affect[] the outcome of the case," and that an erroneous exclusion of such documentation is not harmless.  *Id.* at 104-06 (holding that district court's erroneous exclusion of proffered evidence was not harmless because defendant "placed particular emphasis on the need to corroborate the alleged oral agreement with written documentation.").

Here, Citi repeatedly argued at trial that Terra Firma's claim could not stand without written corroboration.  During its opening statement, Citi argued that "if

[Terra Firma] bought that company based on something David Wormsley had said, it would be in a document somewhere." JA-12903 (69:6-9). Citi further argued on summation that, "If it's not written down someplace, it probably didn't happen." JA-15212 (2384:5-13). Citi repeatedly urged the jury to use their "common sense" to conclude that the lack of corroborating documentation meant that Terra Firma's claim was fabricated. JA-15192-93 (2364:18-2365:2) ("He never said it, and if he said it, it would be written down someplace."). Citi made similar arguments during its opening statement and summation on at least seven other occasions. JA-12902 (68:1-7); JA-15214-16 (2386:22-2388:6); JA-15223 (2395:16-25); JA-15228-29 (2400:3-2401:9); JA-15231 (2403:1-24); JA-15238-39 (2410:1-2411:20); JA-15273 (2445:6-11).

Because Citi so strongly emphasized the need for Terra Firma to corroborate its claim with written documentation, the erroneous evidentiary ruling regarding Slattery's notes is likely to have affected the outcome, and independently warrants vacating the verdict.

### B. The Nicoli Phone Records, Which Showed the Extent and Length of Conversations Between Wormsley and Nicoli on May 20, 2007, Were Admissible.

The mobile phone records of EMI CEO Nicoli show that, on May 20, shortly after the teleconference where Greenhill told Nicoli that Cerberus would not place a bid the following day, Nicoli called Wormsley five times, including one call that

lasted almost eight minutes.  Nicoli's phone records are additional evidence of Wormsley's opportunity to learn from Nicoli that Cerberus had dropped out of the May 21 auction prior to his final telephone calls with Hands.  If the jury credited Hands' testimony that Wormsley told him that Cerberus was bidding, then Nicoli's phone records, which show the frequency and length of Wormsley's communications with Nicoli during the final hours of the auction, constitute powerful evidence that Wormsley either knew that Cerberus was out, or deliberately turned a blind eye to learning about its status in the interest of justifying his prior lies to Hands.

The District Court sustained Citi's objection to this document under F.R.E. 403, because Terra Firma had not yet produced the phone records to Citi when Nicoli gave his testimony in England pursuant to the Hague Convention a few months before trial.  The District Court ruled that "it seems to me grossly unfair, if you had the records at the time, not to have confronted [Nicoli] and . . . given him a chance to say whatever he would have said, which might have proven credible or might have  proven noncredible, but that would have been his opportunity.  So I'm going to sustain the objection."  JA-14784 (1956:16-24).  The District Court's ruling, however, overlooked the critical fact that Nicoli *did testify* about his eight-minute conversation with Wormsley on May 20 at 2:47 p.m., the record of which is

57

the primary reason that Terra Firma offered the Nicoli phone records.  JA-14912 (2084:18-23).

Since Rule 403 applies to the exclusion of evidence that is relevant and probative, it "is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.,* 914 F.2d 26, 31 (2d Cir. 1990) (citation omitted).  It is difficult to understand how the Nicoli phone records – which reflect the length of a conversation about which the jury heard testimony from Nicoli – could have prejudiced Citi, let alone how the prejudice could have outweighed its probative value.  *E.g.*, *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir. 1997) (for exclusion under Rule 403, imbalance must be substantial).  It is true that Nicoli did not recall a conversation with Wormsley in the *morning* of May 20 that *Wormsley's* phone records reflect, but Citi (who had Wormsley's phone records) chose not to ask Nicoli about that conversation.  Terra Firma questioned Nicoli about it without showing him the document, but he said he did not think he spoke to Wormsley that morning.  JA-14912 (2084:15-17).

The District Court should have permitted the jury to see all the available evidence of the phone communications between Nicoli and Wormsley on May 20, including the Nicoli phone records, so that it could then decide what inferences to draw from this highly relevant evidence from the final hours of the EMI auction. With the benefit of all such evidence, there is a substantial likelihood that, had the

58

Nicoli phone records been admitted, the jury would have reached a different conclusion with respect to Terra Firma's fraud claims.  This erroneous evidentiary ruling was not harmless and merits vacating the jury's verdict.

### C.    The District Court Erred in Excluding Portions of Terra Firma's Proffered Expert Testimony on Damages.

The District Court excluded Terra Firma's proffered expert testimony on lost profit damages, which are undisputedly recoverable under English law.  *Livingstone v. Rawyards Coal Co.*, [1880] 5 Appeal Cases 25 at 39-43 (JA-5722-26).  Where as here, a plaintiff would have purchased another alternative business in the absence of the fraudulently induced activity, the plaintiff is not required to identify a specific alternative investment, and is entitled to recover the profit that the hypothetical investment would have delivered.  *East*, [1991] I W.L.R. 461, at *468; *see also McGregor on Damages* at § 41-023 (stating that in *East*, the court in determining lost profits to be awarded "had in mind only a hypothetical business to be purchased." *Id.* (emphasis added).  In *Smith New Court Sec. Ltd. v Scrimgeour Vickers (Asset Mgmt.) Ltd.*, [1997] AC 254, at *282, Lord Steyn approvingly cited *East* and stated that "an award based on the hypothetical profitable business in which the plaintiff would have engaged but for deceit is permissible: it is a classic consequential loss."  JA-5755.

The District Court held that the only proper methodology for determining lost profits would be to base them on the performance of Terra Firma's "Fund III,"

which was an impossible requirement to satisfy because Fund III had not existed long enough to build and sell any of its investments.  JA-18576.  Moreover, English law does not require that a plaintiff have a history of profits to recover lost profits.  In *East v. Maurer*, the court arrived at an award of lost profits that accounted for the defrauded plaintiff's "lack of experience."  [1991] I WLF 461, at *467.  Because Fund III lacked a full investment history, Terra Firma's expert, Marianne DeMario, measured "the ability and the success of the TF management to earn a profit on their investments." JA-13598-99 (764:24-765:3).  Fund III was managed by Hands, and thus Ms. DeMario found the historical rate of return of prior funds that they managed to be relevant to determining a range of probable returns for Fund III.   As *Maurer* demonstrates, this approach complies with English law in determining the proper measure of lost profits.

English law is also clear that precise calculation of a consequential loss is not required for the plaintiff to be entitled to recover those damages.  Where, as here, the quantification of lost profits "involves a hypothetical exercise," the Court "estimates the loss by making the best attempt it can to evaluate the chances, great or small (unless those chances amount to no more than remote speculation), taking all significant factors into account."  *Parabola Investments Ltd. v Browallia Cal Ltd.*, [2010] Bus. L.R. 1446, *1454 (Toulson, J.).  In *Parabola*, the Court permitted the use of an average profit number (omitting one year as an outlier) to establish

60

the amount of profits that the plaintiff would have made but for the fraud. *Parabola*, [2010] Bus. L.R. at 1451.  Ms. DeMario's calculation of a historical rate of return and preparation of a sensitivity analysis taking into account various scenarios would have presented precisely the type of evidence that English courts envision being used to establish lost profits for a hypothetical alternate investment. It was error for the District Court to exclude it.

## <u>CONCLUSION</u>

For the reasons discussed above, this Court should (1) vacate the judgment, (2) remand for a new trial on the fraudulent misrepresentation, fraudulent concealment and negligent misrepresentation claims, (3) require a jury instruction on the evidentiary presumption of reliance that applies to fraud claims under English law, without regard to whether Wormsley intended for Hands to rely on the alleged misrepresentations to Terra Firma's detriment or for Citi's benefit, and (4) instruct that the Slattery notes are admissible to rebut a charge of recent fabrication, the Nicoli phone records are admissible notwithstanding F.R.E. 403, and Terra Firma's expert testimony on consequential damages and lost profits is admissible at trial and is the proper subject of a damages instruction to the jury.

Dated:  April 25, 2011

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

  /s/ Christopher E. Duffy
Christopher E. Duffy
CDUFFY@BSFLLP.COM
575 Lexington Avenue
New York, New York 10022
Tel.: 212-446-2300
Fax: 212-446-2350

David Boies
DBOIES@BSFLLP.COM
333 Main Street
Armonk, New York 10504
Tel.: 914-749-8200
Fax: 914-749-8300

62

Jonathan H. Sherman
JSHERMAN@BSFLLP.COM
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Tel: 202-237-2727
Fax:  202-237-6131

*Attorneys for Plaintiffs-Appellants Terra
Firma Investments (GP) 2 Ltd. and Terra
Firma Investments (GP) 3 Ltd.*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)</u>

I HEREBY CERTIFY, pursuant to Fed.R.App.P. 32(a)(7)(C)(i), that:

1.    This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 13,821 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 point Times New Roman type style.

By:    /s/ Christopher E. Duffy
Christopher E. Duffy

*Attorney for Plaintiffs-Appellants*

Dated:  April 25, 2011

STATE OF NEW YORK    )                      **AFFIDAVIT OF SERVICE**
                           )    ss.:      **BY OVERNIGHT EXPRESS**
COUNTY OF NEW YORK   )                      **MAIL**

       I,                , being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

      **On April 25, 2011**

deponent served the within**: Brief for Plaintiffs-Appellants**

      **upon:**

**PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP**
*Attorneys for Defendants-Appellees*
**1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000**

the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

This document was also submitted via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.

**Sworn to before me on April 25, 2011**

_____

*Maryna Sapyelkina*
Notary Public State of New York
No. 01SA6177490
Qualified in Kings County
Commission Expires Nov. 13, 2011

                      **Job # 234698**