# 11-0126-cv

## United States Court of Appeals
### for the
## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 65 (Pages A-301 to A-600)

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Summons and Complaint, dated December 11, 2009    A-39

Declaration of Adrian Briggs, for Defendants, in
Support of Motion to Dismiss, dated January 20,
2010, with attached *Curriculum Vitae* ................... A-89

Declaration of Strauss, for Plaintiffs, in Opposition
to Defendants' Motion, dated February 2010,
with attached *Curriculum Vitae* ............................ A-106

Second Declaration of Adrian Briggs, for
Defendants, in Support of Motion to Dismiss,
dated February 11, 2010 ........................................ A-137

Defendants' Answer to Plaintiff's Complaint, dated
April 7, 2010 .......................................................... A-149

Notice of Motion for Summary Judgment, by
Defendants, dated August 13, 2010 ...................... A-171

Defendants' Local Rule 56.1 Statement of
Undisputed Facts in Support of Motion for
Summary Judgment, dated August 13, 2010 ........ A-173

Declaration of Gary R. Carney, in Support of
Defendants' Motion for Summary Judgment,
dated August 13, 2010 ........................................... A-199

Exhibit 1 to Carney Declaration -
Terra Firma Private Placement Memorandum,
dated April 2006 .................................................... A-217

Exhibit 2 to Carney Declaration -
Terra Firma Capital Partners II Q3 2007 report,
dated November 2007 ............................................ A-318

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006.................................................... A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006.................................................... A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006.................................................... A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007.......................................................... A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings............................... A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007.......................................................... A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010.... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007.......................................................... A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ........................... A-404

iii

**Page**

Exhibit 13 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachments........................... A-415

Exhibit 14 to Carney Declaration -
E-mail from Ashcroft to Wormsley *et al.*, dated
April 23, 2007, with attachment ........................... A-427

Exhibit 15 to Carney Declaration -
EMI News Release, dated May 4, 2007 ............... A-437

Exhibit 16 to Carney Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.................................................... A-439

Exhibit 17 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
February 5, 2007................................................ A-441

Exhibit 18 to Carney Declaration -
Memorandum from Seymour to Punja, dated
March 2, 2007................................................... A-457

Exhibit 19 to Carney Declaration -
E-mail from Reid to Seymour, dated
May 16, 2007.................................................... A-462

Exhibit 20 to Carney Declaration -
Music Industry Key Market Outlook Summary of
Findings prepared by L.E.K. Consulting, dated
May 15, 2007.................................................... A-656

Exhibit 21 to Carney Declaration -
Project Dice Limited Scope Financial Due
Diligence Report, dated May 17, 2007.................. A-783

Exhibit 22 to Carney Declaration -
Project Mulberry Limited Scope Financial Due
Diligence Report, Volume I, dated May 4, 2007 ... A-887

iv

**Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments ............................. A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007 ......................................................... A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 ........................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007 ................... A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 .................... A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments .................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment .............................................................. A-995

v

**Page**

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007    A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007 ........................................................    A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007 ...........................................................    A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007 .........................................................    A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007 ...........................................................    A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007 .........................................................    A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007 ...........................................................    A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 ...........................................................    A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 .............................    A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ....................................    A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 . A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments .................................... A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007 ........................................................ A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 ............................... A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007 ........................................................ A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ........................................................ A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ........................................................ A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007 ........................................................ A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 .................................... A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007 ........................................................ A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007......................................................... A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007......................................................... A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007......................................................... A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007......................................................... A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ............................................... A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007......................................................... A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007......................................................... A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007......................................................... A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment..................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007.....   A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007........................................................   A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007........................................................   A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007........................................................   A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007........................................................   A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007........................................................   A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007........................................................   A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007........................................................   A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007........................................................   A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007 .................................. A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007 ........................................................ A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007 ........................................................ A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007 ...................... A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007 ...................... A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007 ........................................................ A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc ...................................................... A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007 ............................................... A-1554

**x**

**Page**

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ...................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................. A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................. A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 ...................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ..................................... A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................... A-1590

xi

**Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma .................................................................. A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ............... A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007 ................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ............... A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ....................................................... A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ....................................................... A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ........................ A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 .............................................. A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008 .................................................. A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008.................................................... A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008...................................................... A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009.................................................... A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009.................................................... A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008......................................................... A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008......................................................... A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart............................ A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update........................ A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 ...................................... A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008......................................................... A-2301

xiii

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ......   A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ...............   A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009 .............................   A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 ....................................................   A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 ..............................................   A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 ..................................................   A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ..................................................   A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 .............................................   A-2479

xiv

 Page

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009............................ A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ............................................ A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 ......................... A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 ......................................... A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009 .................. A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 .............................................. A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes .................. A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007 .................... A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 ....................................................... A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 ................................................. A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 .................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................ A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 ................................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code ............................ A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010 ............... A-2602

Mark Nimrod Barak, dated July 15, 2010 ................. A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 ................... A-2631

Simon A. Borrows, dated June 25, 2010.................... A-2702

Andre Bourbonnais, dated July 13, 2010................... A-2779

Andrew Chadd, dated July 23, 2010
   (Reproduced herein at pp. CA-1-CA-53)

xvi

**Page**

Ricardo Hacelas Coats, dated June 23, 2010 ............. A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010 .................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010 ................... A-2959

Elio Leoni-Sceti, dated June 25, 2010 ...................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010 ........................ A-3027

Eric Nicoli, dated July 5, 2010 ................................. A-3039

Timothy Pryce, dated July 22, 2010 ........................ A-3087

Riaz Punja, dated July 28, 2010 ............................... A-3130

Michael Slattery, dated August 6, 2010 ................... A-3169

Martin David Stewart, dated July 7 and 8, 2010 ........ A-3177

Iain Stokes, dated August 6, 2010 ........................... A-3183

Kamal Fouad Tabet, dated July 29, 2010 ................. A-3238

Francois Van der Spuy, dated July 7, 2010 ............... A-3242

Julie Williamson, dated July 28, 2010 ..................... A-3267

Alexander Wolf, dated July 14, 2010 ....................... A-3280

David Wormsley, dated July 20, 2010 ...................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated
    July 30, 2010 ..................................................... A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ................ A-3340

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006]
EWCA Civ 1601 .................................................... A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007]
EWHC 1151 (Comm) ............................................ A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal
Bank of Scotland Plc* [2010] EWHC 1392
(Comm) ................................................................ A-3493

*BSkyB Ltd v Sky Subscribers Services Limited*
[2010] EWHC 86 ................................................. A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus
Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006]
EWHC 2887 (QB) (Comm), [2007] EWCA Civ
811 ....................................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................ A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ...................... A-4240

*Bradford Building Society v Borders* [1941] 2 All
ER 205 ................................................................. A-4258

*Downs v Chappell* [1997] 1 WLR 426 ...................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009]
EWCA Civ 169 .................................................... A-4325

xviii

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All
ER 583 ........................................................... A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER
(Comm) 573 ................................................... A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd*
[2007] EWHC 2541 (QB) ................................. A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd*
[1964] AC 465 ................................................ A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC
145 ................................................................. A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson &
Co* [1991] 2 QB 113........................................ A-4671

*Bankers Trust International v Dharmala Sakti
Sejahtera* [1996] CLC 518............................... A-4688

*Valse Holdings SA v Merrill Lynch International
Bank Ltd* [2004] EWHC 2471 ......................... A-4741

*Peekay Intermark v Australia and New Zealand
Banking Group* [2006] EWCA Civ 386.............. A-4779

*JP Morgan Chase Bank v Springwell Navigation
Corp* [2008] EWHC 1186 (Comm) ................... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland
Plc* [2010] EWHC 211 (Comm) ....................... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight
Couriers Ltd* [2008] EWHC 1686 (Comm),
[2009] 1 All ER (Comm) 16, [2009] EWCA Civ
290 ................................................................. A-5126

xix

**Page**

*IFE Fund SA v Goldman Sachs International* 1
[2007] Lloyd's Rep 264 .......................... A-5184

*William Sindall plc v Cambridgeshire County
Council* [1994] 1 WLR 1016 ................. A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 .......................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co*
[1892] AC 25 ...................................... A-5325

*Allen v Flood* [1898] AC 1 ........................ A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019
(Ch) ................................................... A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries
Ltd* (No. 2) [1982] Ch 204 .................... A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ............... A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas
25 ...................................................... A-5708

*Smith New Court Securities v Citibank NA* [1997]
AC 254 ............................................... A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142
and 6-158 ............................................ A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs
8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

**Page**

*McGregor on Damages*, 17th Edition, paragraph 1-
021 ........................................................................ A-5774

*Halsbury's Laws of England*, 4th Edition, Vol 33,
paragraph 614 ...................................................... A-5777

*Cartwright on Misrepresentation, Mistake and Non-
Disclosure*, 2nd Edition, paragraph 6.12 .............. A-5780

*The Unfair Contract Terms Act 1977* ........................ A-5783

Response of Plaintiffs to Defendants' Statement of
Undisputed Facts Pursuant to Local Rule 56.1,
dated August 27, 2010 ........................................ A-5807

Declaration of Kirsten Randell, in Support of
Plaintiffs' Opposition to Defendants' Motion for
Summary Judgment, dated August 26, 2010 ......... A-5883

Exhibit A to Randell Declaration -
Handwritten Notes ................................................ A-5887

Declaration of John Loveridge, in Support of
Plaintiffs' Opposition to Motion for Summary
Judgment, dated August 27, 2010 ........................ A-5891

Exhibit A to Loveridge Declaration -
Senior Facilities Agreement, dated
August 13, 2007 .................................................... A-5894

Exhibit B to Loveridge Declaration -
Securitisation Bridge Facility Agreement, dated
August 13, 2007 .................................................... A-6101

Exhibit C to Loveridge Declaration -
Mezzanine Facility Agreement, dated
August 13, 2007 .................................................... A-6280

xxi

**Page**

Declaration of Christopher E. Duffy in Opposition
to Defendants' Motion for Summary Judgment,
dated September 2, 2010 ......................................    A-6447

Exhibit 1 to Duffy Declaration -
Amended and Restated Advisory Agreement
relating to Terra Firma Investments (GP) 2
Limited and Terra Firma Capital Partners
Limited, dated October 9, 2003 ............................    A-6471

Exhibit 2 to Duffy Declaration -
Advisory Agreement relating to Terra Firma
Capital Partners III, L.P., dated February 8, 2006 .    A-6493

Exhibit 3 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 20, 2007 ..    A-6512

Exhibit 4 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Directors' meeting, dated May 20, 2007 ..    A-6515

Exhibit 5 to Duffy Declaration -
E-mail from Rowland to Laskowski and Crocker,
dated September 18, 2008, with attachment ..........    A-6517

Exhibit 6 to Duffy Declaration -
E-mail from Smith to Small, dated May 21, 2007 .    A-6521

Exhibit 7 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 7, 2006 .................................................    A-6523

Exhibit 8 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
September 19, 2007 ................................................    A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 .................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ................................................ A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006 ................................................ A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007 .......................................................... A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 .................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et
al.*, dated November 16, 2007 .............................. A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 ............... A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007 ....................................................... A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007 ................................. A-6571

xxiii

**Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...   A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006.......................................   A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 ................................................   A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment............................................   A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 ................................................   A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 ......................................   A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 ........................................................   A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 ..............................................   A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6640

**xxiv**

                                                                                              **Page**

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 ............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007 ...................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007 ...................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................... A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ............................ A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 ............................... A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 .......................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ........................................................... A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ........................................................... A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 .......................................................... A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 ........................................................ A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 ........................................................ A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 ........................................................ A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 ............................................... A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ............................................... A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 ........................................................ A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 ........................................................ A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 ........................................................ A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ............................ A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 ................................... A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 ....................................................... A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 .............................................. A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment ........................................... A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 ........................................................ A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 ........................................................ A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 .............................................. A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 ....................................................... A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ............................... A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ........................................................ A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ........................................................ A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007........................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 ............................................... A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 ................................................ A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment.............................................. A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007   A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007   A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ........................................................ A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ........................................................ A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment.............................................. A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007...................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" .................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ........................................................ A-6835

xxx

**Page**

Exhibit 87 to Duffy Declaration -
E-mail from Simonian to Smith, dated
May 21, 2007 .......................................................    A-6837

Exhibit 88 to Duffy Declaration -
E-mail from Wormsley to Lindsay, dated
September 17, 2007 ................................................    A-6838

Exhibit 89 to Duffy Declaration -
Memorandum from Simpkin *et al.* to Klein *et al.*,
dated November 16, 2007
(Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration -
E-mail from Borrows to Nicoli, Gildersleeve and
Parker, dated July 31, 2007....................................    A-6843

Exhibit 91 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................    A-6844

Exhibit 92 to Duffy Declaration -
E-mail from Grigorova to Cockerill, *et al.*, dated
September 5, 2007 ..................................................    A-6846

Exhibit 93 to Duffy Declaration -
E-mail from Sckerl to Cockerill, dated June 9,
2009 with Attachment
(Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration -
E-mail from Grigorova to Sckerl, dated
February 16, 2009 ..................................................    A-6850

Exhibit 95 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 23, 2007 ................................................    A-6855

xxxi

**Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment............... A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009...................................................... A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment.................... A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ................................................ A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 ..................................................... A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009................................................. A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010...................................................... A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007 ........................................................ A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ....................................................... A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................. A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ......................................... A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ....................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 ............................... A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 ............................... A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007 .... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ......................................................... A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 ................................................... A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006 ................................................ A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006 ................................................ A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006 ................................................... A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ......................................................... A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ................................................. A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 ........................................................... A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007 ....................................................... A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 .................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ........................................................ A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 ...................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 .................................................... A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ........................................................ A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ....................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 ...................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 .................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007 ........................................................... A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 ................................................ A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007 ......... A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ....................................................... A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 ......................................................... A-7410

xxxvi

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 ................... A-7473

xxxvii

**Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 ................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 ................................................ A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ....................................................... A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ........................................... A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 .............................................. A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

**Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009.................................... A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007.. A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 . A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 ....................................................... A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-7553

Mark Nimrod Barak, dated July 15, 2010 ................ A-7557

Jason Bazinet, dated June 30, 2010 .......................... A-7564

Peter Edward Bell, dated June 22, 2010 ................... A-7601

Simon A. Borrows, dated June 25, 2010................... A-7705

Andre Bourbonnais, dated July 13, 2010.................. A-7827

Andrew Chadd, dated July 23, 2010
(Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
(Reproduced at pp. CA-295-CA-315)

xxxix

Page

John Gildersleeve, dated June 30, 2010.................... A-7832

Guy Hands, dated July 15, 2010 ............................ A-7848

Guy Hayward-Cole, dated July 27, 2010.................. A-7901

David Robert Paul Hill, dated August 4, 2010 .......... A-7918

Michael Klein, dated July 19, 2010 ......................... A-7923

Chad Leat, dated June 18, 2010............................... A-7935

John Loveridge, dated July 30, 2010 ....................... A-7941

Bruce MacInnes, dated July 8, 2010........................ A-7966

Eric Nicoli, dated July 5, 2010 ............................... A-7970

Riaz Punja, dated July 28, 2010.............................. A-8039

Timothy Pryce, dated July 22, 2010
   (Reproduced at pp. CA-316-CA-335)

Elio Leoni-Sceti, dated June 25, 2010
   (Reproduced at pp. CA-336-CA-385)

Paul Simpkin, dated July 5, 2010 ............................ A-8056

Michael Slattery, dated August 6, 2010 ................... A-8073

Matthew Canning Smith, dated August 3, 2010
   (Day 1)................................................................ A-8077

Matthew Canning Smith, dated August 9, 2010
   (Day 2)................................................................ A-8116

Iain Stokes, dated August 6, 2010........................... A-8127

Kamal Fouad Tabet, dated July 29, 2010.................. A-8157

Francois Van der Spuy, dated July 7, 2010 ............... A-8171

xl

**Page**

Julie Williamson, dated July 28, 2010
  (Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010 ........................ A-8175

David Wormsley, dated July 20, 2010
  (Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
  Defendants' Motion for Summary Judgment,
    dated August 27, 2010 ............................................. A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
  44.1, dated August 27, 2010 ................................... A-8195

Appendices to the Report of Nicholas S. Strauss
  Q.C. Pursuant to Rule 44.1 .................................... A-8245

Exhibit 1 to Strauss Report -
*AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
CLC 265 ............................................................... A-8249

Exhibit 2 to Strauss Report -
*AIC Limited v. ITS Testing Services (UK) Ltd,*
[2006] EWCA Civ 1601 ........................................ A-8262

Exhibit 3 to Strauss Report -
*Angus v. Clifford,* [1891] 2 Ch 449 ...................... A-8371

Exhibit 4 to Strauss Report -
*Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

Exhibit 5 to Strauss Report -
*Assicurazione Generali v. Arab Insurance Group,*
[2003] I.R.L.R. 131 ............................................... A-8422

Exhibit 6 to Strauss Report -
*Attorney General of Belize v. Belize Telecom
Limited,* [2009] 1 W.L.R. 1988 ............................ A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 ...................   A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International
(Overseas) Ltd (In Liquidation) v. Price
Waterhouse (No.2),* [1998] PNLR 564 ...............   A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan
Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ...............................................................   A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ....................................................   A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 ........................................................................   A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 ..............................................   A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ..........................................   A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ................   A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................   A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ............................................................   A-9042

**xlii**

**Page**

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................................   A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton
(London) Ltd,* [1957] 2 QB 621 CA .....................   A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925 ......   A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ..................................................................   A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484 ..................   A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 ........................................................................   A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 ........................................................................   A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337 .................   A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ...............   A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777 ...............   A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ ...............................................   A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne* & *Co Ltd. v. Heller* & *Partners Ltd.,* [1964] AC 465 ............................... A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),* [1995] 2 AC 145 HL ............................ A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247 CA ................................................ A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De Productos Agricolas SA De CV,* [2003] EWCA Civ 1104 ............................................ A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,* [2006] EWHCA 2887 (QB) (Comm) ................. A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West Bromwich Building Society,* [1998] 1 W.L.R. 896 A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,* [2004] EWCA Civ 1244 ....................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom* & *Co.,* [1983] 1 All E.R. 583 ......................................... A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation Corp.,* [2008] EWHC 2286 (Comm) ................... A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)*
*Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 .................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 ........................................... A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson*
*& Co.,* [1991] 2 QB 113 ........................ A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand*
*Banking Group,* [2006] EWCA Civ 386 .............. A-10148

Exhibit 45 to Strauss Report -
*Raiffseisen Zentralbank Osterreich AG v. The*
*Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) ............................................ A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ............... A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District*
*Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

xlv

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL .............................................. A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour
Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 .................................................................... A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour
Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 .......................................................... A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National
Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ...................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ..................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and
Company of the Bank of England (No.3),* [2001]
UKHL 16 ............................................................. A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 ........................................ A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................. A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016.............................. A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 ........................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 ................... A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) .............................................................. A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) .............................................................. A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) ........................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

**Page**

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) .............................  A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). .........................  A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ......................  A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss ...........................  A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss ................................................  A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement ...............................  A-11178

Affidavit of Service, sworn to September 2, 2010.....  A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 ....................  A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010....................................  A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration -
Responses and Objections of Plaintiffs Terra
Firma Investments (GP) 2 Ltd. and Terra Firma
Investments (GP) 3 Ltd. To Defendants' First
Request for Production of Documents, dated
March 9, 2010......................................................... A-11216

Exhibit 131 to Carney Reply Declaration -
Journey Log Book for Guy Hands's flight to
London, dated May 20, 2007 ................................ A-11244

Exhibit 132 to Carney Reply Declaration -
Reservation for Guy Hands's flight to London,
dated May 20, 2007 ................................................ A-11247

Exhibit 133 to Carney Reply Declaration -
Report for Guy Hands's flight from the Airport
Landing Dues Information System of Guernsey
Airport, dated May 20, 2007.................................. A-11248

Exhibit 134 to Carney Reply Declaration -
Daily Confirmed Handling report of Blue Islands
at Guernsey Airport, dated May 20, 2007.............. A-11249

Exhibit 135 to Carney Reply Declaration -
Phone records of Guy Hands for the months of
April and May 2007................................................ A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010................ A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 ........................... A-11363

John Gildersleeve, dated June 30, 2010..................... A-11376

Guy Hands, dated July 15, 2010 ................................ A-11380

xlix

                                                                        **Page**

John Loveridge, dated July 30, 2010 ........................ A-11395

Eric Nicoli, dated July 5, 2010 .................................. A-11410

Timothy Pryce, dated July 22, 2010 ......................... A-11419

Riaz Punja, dated July 28, 2010 ................................ A-11439

Michael Slattery, dated August 6, 2010 .................... A-11457

Martin David Stewart, dated July 7 and 8, 2010 ........ A-11473

Iain Stokes, dated August 6, 2010 ............................. A-11477

Francois Van der Spuy, dated July 7, 2010 ............... A-11501

Alec Werner, dated August 19, 2010 ........................ A-11513

David Wormsley, dated July 20, 2010 ...................... A-11520

Second Report of Ewan McQuater, Pursuant to Rule
   44.1, dated September 3, 2010, with Exhibit 1 ...... A-11532

Affidavit of Service, sworn to September 23, 2010... A-11566

Summary Judgment Hearing Transcript, dated
   September 10, 2010 ............................................... A-11568

Letter from Christopher E. Duffy to the Honorable
   Jed S. Rakoff, dated September 13, 2010, with
   attachments ............................................................ A-11620

Letter from Jay Cohen to the Honorable Jed S.
   Rakoff, dated September 13, 2010, with
   attachments ............................................................ A-11646

Order of the Honorable Jed S. Rakoff, dated
   September 14, 2010, filed September 15, 2010 ..... A-11664

Notice of Motion *in Limine* No. 2 to exclude the
   Testimony of Marianne Demario, by Defendants,
   dated October 4, 2010 ........................................... A-11666

l

**Page**

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 .. A-11668

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 .. A-11677

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* Nos. 1 through 5,
   dated October 4, 2010........................................... A-11686

   Exhibit 1 to Levi Declaration -
   Expert Report of David J. Teece, dated
   June 14, 2010
   (Reproduced at pp. CA-481-CA-544)

   Exhibit 4 to Levi Declaration -
   Complaint in the above-captioned matter, dated
   December 11, 2009................................................. A-11695

   Exhibit 16 to Levi Declaration -
   Expert Report of Daniel R. Fischel, dated
   July 7, 2010
   (Reproduced at pp. CA-545-CA-586)

   Exhibit 17 to Levi Declaration -
   Microsoft Excel Spreadsheet printed from the
   native file produced by Plaintiffs and bearing
   bates number TF0000635801
   (Reproduced at pp. CA-587-CA-592)

   Exhibit 18 to Levi Declaration -
   Expert Report of Marianne DeMario, dated
   June 14, 2007
   (Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) .............. A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers*
*(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 ....... A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ...................................................... A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ..................................................... A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 ......................... A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007 .......................... A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

**Page**

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
    (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
    (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010.................... A-12146

Eric Nicoli, dated July 5, 2010 ................................. A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

**liii**

**Page**

Declaration of Karen C. Dyer in Support of
Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
and Terra Firma Investments (GP) 3 Ltd's
Memoranda in Oppositions to Defendants'
Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration -
Wise Men Committee meeting minutes, dated
July 27, 2007 ......................................................... A-12186

Exhibit 14 to Dyer Declaration -
"Project Record Valuation Considerations"
prepared by Merrill Lynch for Cerberus, dated
May 17, 2007 ......................................................... A-12188

Exhibit 15 to Dyer Declaration -
Citi's Project Dice Credit Approval
Memorandum, dated May 17, 2007 ....................... A-12209

Exhibit 16 to Dyer Declaration -
Citi's "Fairness Committee Materials," dated
May 21, 2007 ......................................................... A-12303

Exhibit 17 to Dyer Declaration -
Excerpts from American Society of Appraisers,
*ASA Business Valuation Standards* (2009) ............. A-12309

Exhibit 18 to Dyer Declaration -
"Project Mulberry Valuation Materials," dated
May 21, 2007 ......................................................... A-12315

Exhibit 19 to Dyer Declaration -
E-mail from Barak to Reid *et al.*, dated
March 2, 2007 ....................................................... A-12324

Exhibit 20 to Dyer Declaration -
Letter from Borrows to Nicoli, dated
July 19, 2007 ......................................................... A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ....................................................... A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 .............................................. A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ........................................................ A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ...................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ...................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 .................................................. A-12462

lv

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 ................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................. A-14551

Trial Transcript, dated November 2, 2010 ................. A-14877

Trial Transcript, dated November 3, 2010 ................. A-15102

Trial Transcript, dated November 4, 2010 ................. A-15292

**lvi**

**Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
  E-mail from Wormsley to Nicoli re call from
  GH, dated May 21, 2007.................................... A-15300

Terra Firma Exhibit 2 -
  E-mail from Tabet to Wormsley re
  Conversation with Guy Hands, dated
  May 21, 2007 ...................................................... A-15301

Terra Firma Exhibit 3 -
  E-mail from Wormsley to Lindsay re
  financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
  E-mail from Simonian to Smith re Bids, dated
  May 21, 2007  ................................................... A-15309

Terra Firma Exhibit 9 -
  E-mail from Randell to Terra Firma re May
  21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
  Draft Minutes of a meeting of a committee of
  the board of directors of Terra Firma (GP) 2
  Limited, dated May 21, 2007 ............................ A-15311

Terra Firma Exhibit 11 -
  E-mail from Wormsley to Gildersleeve re Dice,
  dated May 9, 2007 ............................................ A-15316

Terra Firma Exhibit 12 -
  E-mail from Smith to Kirshenbaum re EMI
  deal, dated May 21, 2007 .................................. A-15319

Terra Firma Exhibit 13 -
  E-mail from Smith to Mehta re EMI, dated
  May 21, 2007  ................................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
   E-mail from Smith to Badhe re EMI, dated
   May 21, 2007 .................................... A-15322

Terra Firma Exhibit 15 -
   E-mail from Wormsley to Tague re Congrats
   on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
   E-mail from Poyser to Vakilian re Terra Firma
   Recommended Cash Offer, dated
   May 21, 2007 .................................... A-15324

Terra Firma Exhibit 17 -
   E-mail from Grigorova to Cockerill re
   EMI/Maltby CCR July, dated
   September 5, 2007 ............................. A-15326

Terra Firma Exhibit 19 -
   E-mail from Smith to Small re CITI M&A
   wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
   E-mail from Rowland to Laskowski and
   Crocker re Terra Firma, dated
   September 18, 2008 ........................... A-15332

Terra Firma Exhibit 22 -
   E-mail from Miller to Zogheb re EMI, dated
   May 16, 2007 .................................... A-15336

Terra Firma Exhibit 23 -
   E-mail from Gildersleeve to Wormsley re
   Roles, dated April 20, 2007 ............................. A-15338

**lviii**

**Page**

Terra Firma Exhibit 24 -
   Citi Franchise Risk Assessment Template for
   Maltby Investments Limited, Appendix 6B,
   dated June 1, 2009 ............................................ A-15339

Terra Firma Exhibit 25 -
   E-mail from Smith to Poyser re Chaka
   Feedback, dated May 17, 2007 ......................... A-15340

Terra Firma Exhibit 26 -
   E-mail from Wormsley to Poyser, *et al.*, re
   EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
   E-mail from Wormsley to Smith re FW: E-mail
   from Wormsley to McBride, dated
   May 21, 2007 .................................................... A-15342

Terra Firma Exhibit 28 -
   E-mail from Wormsley to Leat and Klein re
   marginal deal for Terra Firma, dated
   July 14, 2007 .................................................... A-15345

Terra Firma Exhibit 29 -
   E-mail from Wormsley to Hands re DAIG fees,
   dated November 7, 2006 ................................... A-15346

Terra Firma Exhibit 30 -
   E-mail from Wormsley to Hands re DAIG,
   dated October 23, 2006 .................................... A-15347

Terra Firma Exhibit 31 -
   E-mail from Wormsley to Hands re proposal,
   dated November 15, 2006 ................................. A-15348

Terra Firma Exhibit 32 -
   E-mail from Wormsley to Klein re Citi/Terra
   Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
E-mail from Klein to Hands re Business
Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
E-mail from Tague to Lindsay re NBM #159
Europe, dated March 9, 2007 .......................... A-15351

Terra Firma Exhibit 35 -
E-mail from Tabet to Blagdon, Klein and
Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
E-mail from Wormsley to Miller re call from
Guy Hands, dated May 8, 2007 ...................... A-15357

Terra Firma Exhibit 40 -
E-mail from Smith to Wormsley re talk with
JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
E-mail from Wormsley to Nicoli, Gildersleeve,
Stewart re FW: Terra Firma, dated
May 18, 2007 .................................................. A-15359

Terra Firma Exhibit 42 -
E-mail from Shott to Bell re auction process
and Antitrust Confirmation, dated
May 20, 2007 .................................................. A-15360

Terra Firma Exhibit 43 -
E-mail from Ashcroft to Stewart re Conference
call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
E-mail from Wormsley to Nicoli re EMI media
Review, dated May 20, 2007 ........................... A-15366

lx

Page

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records ........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 ........................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 .............................. A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 .................................................... A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007.................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ........................................ A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ........................................ A-15420

**lxi**

**Page**

Terra Firma Exhibit 61 -
E-mail from Wormsley to Klein and Smith re
proposals from Cerberus and Fortress, dated
April 19, 2007 .................................................. A-15421

Terra Firma Exhibit 62 -
E-mail from Barclay re EMI Media Review - 13
May 2007, dated May 13, 2007 ........................ A-15422

Terra Firma Exhibit 63 -
E-mail from Klein to Nicoli re General, dated
May 18, 2007 .................................................. A-15424

Terra Firma Exhibit 64 -
E-mail from Smith to Wormsley re EMI, dated
May 18, 2007 .................................................. A-15425

Terra Firma Exhibit 125 -
Interoffice memorandum from Lindsay to
Drayton, *et al.* re East Surrey Holdings, dated
February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
Letter from Smith to Stewart re Engagement
Letter, dated September 4, 2006 ...................... A-15433

Terra Firma Exhibit 195 -
E-mail from Wormsley to Hands, dated
September 8, 2006 ........................................... A-15440

Terra Firma Exhibit 197 -
Terra Firma - Perspectives on Threshers, dated
September 25, 2006 ......................................... A-15441

Terra Firma Exhibit 201 -
Project Prince Working Party List, dated
November 1, 2006 ............................................ A-15461

**lxii**

**Page**

Terra Firma Exhibit 209 -
    E-mail from Wormsley to Mylchreest, dated
    November 23, 2006 ........................................... A-15490

Terra Firma Exhibit 214 -
    EMI Group plc - Statement re preliminary
    approach from Permira, dated
    November 28, 2006 ........................................... A-15493

Terra Firma Exhibit 215 -
    E-mail from Miller to Simpkin re EMI, dated
    November 28, 2006 ........................................... A-15494

Terra Firma Exhibit 220 -
    E-mail from Badhe to Hill re Fairness Opinion
    Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
    Minutes from EMI Meeting of Directors, dated
    November 29, 2006 ........................................... A-15498

Terra Firma Exhibit 224 -
    E-mail from Smith to Wormsley, dated
    November 30, 2006 ........................................... A-15504

Terra Firma Exhibit 230 -
    E-mail from Ashcroft to Smith re Prince, dated
    December 6, 2006 ............................................. A-15505

Terra Firma Exhibit 232 -
    Minutes from EMI Meeting of Directors, dated
    December 7, 2006 ............................................. A-15506

Terra Firma Exhibit 237 -
    E-mail from Bell to Smith, dated
    December 14, 2006 ........................................... A-15519

**lxiii**

Page

Terra Firma Exhibit 238 -
E-mail from Smith to Wormsley, dated
December 14, 2006 ......................................... A-15520

Terra Firma Exhibit 239 -
E-mail from Smith to Wormsley re FW: Draft
announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
E-mail from Wormsley to Robertson re
Agenda, dated December 14, 2006 .................... A-15524

Terra Firma Exhibit 241 -
E-mail from Nicoli to Gildersleeve re Project
Prince, dated December 14, 2006 ...................... A-15525

Terra Firma Exhibit 242 -
E-mail from McBride to Citi re EMI cessation
announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
E-mail from Wormsley to Smith and EMI re
TF For Urgent Reply Please, dated
December 14, 2006 ........................................... A-15528

Terra Firma Exhibit 244 -
Letter from Kelly to EMI Group plc, dated
December 14, 2006 ........................................... A-15530

Terra Firma Exhibit 248 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
December 14, 2006 ........................................... A-15532

Terra Firma Exhibit 250 -
Letter from Nicoli to Kelly, dated
December 15, 2006 ........................................... A-15533

**lxiv**

**Page**

Terra Firma Exhibit 274 -
E-mail from Simpkin to Miller re EMI, dated
January 4, 2007 ................................................ A-15534

Terra Firma Exhibit 280 -
Minutes from EMI Meeting of Directors, dated
January 10, 2007 .............................................. A-15536

Terra Firma Exhibit 281 -
E-mail from Jones to Cockerill re Pepe - terms,
dated January 11, 2007...................................... A-15539

Terra Firma Exhibit 283 -
EMI Press Release announcing restructuring,
dated January 12, 2007 .................................... A-15545

Terra Firma Exhibit 285 -
E-mail from Smith to Wormsley, dated
January 12, 2007 ............................................... A-15548

Terra Firma Exhibit 314 -
EMI Press Release, dated February 14, 2007  ...  A-15550

Terra Firma Exhibit 315 -
E-mail from Smith to Wormsley re EMI
Announcement, dated February 14, 2007.......... A-15551

Terra Firma Exhibit 317 -
E-mail from Smith to Swannell and Wormsley
re 6am Cut, dated February 15, 2007................. A-15552

Terra Firma Exhibit 318 -
Citigroup Analyst Report "EMI Group plc
Another Month, Another Warning," dated
February 15, 2007 ............................................. A-15557

Terra Firma Exhibit 329 -
EMI group confirms approach from Warner
Music group, dated February 20, 2007  ............. A-15569

**lxv**

**Page**

Terra Firma Exhibit 346 -
Minutes of a Meeting of the Board of Directors
of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
Valuation Update, dated March 1, 2007 ........... A-15582

Terra Firma Exhibit 348 -
EMI Board Meeting Minutes, dated
March 1, 2007 .................................................. A-15597

Terra Firma Exhibit 366 -
"EMI GROUP plc - Statement re Possible
Offer," PR Newswire UK Disclose, dated
March 12, 2007 ................................................ A-15608

Terra Firma Exhibit 368 -
E-mail from Wormsley to Hands, dated
March 3, 2008 .................................................. A-15610

Terra Firma Exhibit 377 -
E-mail from Steffno to Cockerill re EMI
Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
E-mail from Nicoli to Faxon re Full year
target, dated March 12, 2007 ........................... A-15624

Terra Firma Exhibit 387 -
E-mail from Smith to CIB-CBKG re Viacom's
music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
E-mail from Smith to Wormsley re EMI, dated
March 26, 2007 ................................................ A-15629

**lxvi**

                                                                    **Page**

Terra Firma Exhibit 392 -
    E-mail from Hill to Simpkin re (EUR) Wolters
    Kluwer Education falls to Bridgepoint, dated
    March 26, 2007 .................................................. A-15630

Terra Firma Exhibit 410 -
    E-mail from Simpkin to Smith re EMI - staple,
    dated April 3, 2007 .......................................... A-15633

Terra Firma Exhibit 412 -
    E-mail from Llewelyn-Jones to CIB-GFI re
    EMI, dated April 13, 2007 ................................ A-15635

Terra Firma Exhibit 416 -
    Letter from EMI board of Directors to
    Gildersleeve re the proposal, dated
    April 16, 2007 .................................................. A-15636

Terra Firma Exhibit 424 -
    E-mail from Seaton to Smith re FW: Trading
    statement, dated April 17, 2007 ....................... A-15646

Terra Firma Exhibit 427 -
    E-mail from Wormsley to Hands re new idea,
    dated April 18, 2007 ......................................... A-15651

Terra Firma Exhibit 429 -
    E-mail from EMI Investor Relations re EMI
    Group plc - trading statement, dated
    April 18, 2007 .................................................. A-15652

Terra Firma Exhibit 436 -
    E-mail from Smith to Estacio and Hill re Fee,
    dated April 19, 2007 ......................................... A-15654

Terra Firma Exhibit 438 -
    E-mail from Klein to Hands cc Wormsley,
    Burns, dated April 19, 2007 ............................. A-15655

lxvii

Page

Terra Firma Exhibit 439 -
   E-mail from Wormsley to Hands, Klein, cc
   Burns, dated April 19, 2007 ............................  A-15657

Terra Firma Exhibit 443 -
   Minutes of a Meeting of the Board of Directors
   of EMI, dated April 20, 2007  ...........................  A-15659

Terra Firma Exhibit 444 -
   E-mail from Klein to Wormsley re Roles, etc.,
   dated April 20, 2007 .........................................  A-15667

Terra Firma Exhibit 445 -
   E-mail from Barak to Citi financing re Strictly
   Private & Confidential, dated April 20, 2007  ...  A-15669

Terra Firma Exhibit 446 -
   E-mail from Barak to Citi financing re
   Cerberus Indication, dated April 20, 2007  ........  A-15681

Terra Firma Exhibit 447 -
   E-mail from Gildersleeve to Nicoli and
   Borrows re FW: E-mail from Wormsley to
   Gildersleeve, dated April 20, 2007 ....................  A-15692

Terra Firma Exhibit 448 -
   E-mail from Smith to Seaton re Roles, dated
   April 20, 2007 ...................................................  A-15694

Terra Firma Exhibit 449 -
   E-mail from Smith to Wormsley re Roles,
   dated April 20, 2007............................................  A-15696

Terra Firma Exhibit 454 -
   E-mail from Smith to Wormsley re Roles,
   dated April 22, 2007............................................  A-15698

**lxviii**

**Page**

Terra Firma Exhibit 455 -
    E-mail from Ashcroft to Wormsley re OEP
    Letter, dated April 23, 2007 ............................. A-15700

Terra Firma Exhibit 462 -
    E-mail from Ashcroft to Citi financing re
    Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
    Letter from Smith to Baxter (Takeover Panel),
    dated April 24, 2007........................................... A-15714

Terra Firma Exhibit 464 -
    E-mail from Tabet to Swannell, Klein and
    Wormsley re Hands, dated April 25, 2007 ......... A-15716

Terra Firma Exhibit 465 -
    E-mail from Gildersleeve to Ashcroft re Citi
    and Deutsche, dated April 26, 2007 .................. A-15717

Terra Firma Exhibit 468 -
    Letter from Smith to Stewart re provisions of
    advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
    E-mail from Coleman to Wolf re EMI, dated
    April 27, 2007 .................................................... A-15721

Terra Firma Exhibit 470 -
    E-mail from Smith to Wormsley re A3 page
    valuation summary, dated April 27, 2007 .......... A-15723

Terra Firma Exhibit 479 -
    E-mail from Smith to Bell re EMI consent
    letter, Side letter re financing bidders, dated
    April 28, 2007 .................................................... A-15726

**lxix**

**Page**

Terra Firma Exhibit 480 -
E-mail from Smith to Stewart re Project
Mulberry, dated April 30, 2007......................... A-15729

Terra Firma Exhibit 481 -
E-mail from Smith to Ashcroft re Project
Mulberry, dated April 30, 2007......................... A-15732

Terra Firma Exhibit 484 -
Global FEG Working List Client Account List,
dated May 1, 2007............................................. A-15735

Terra Firma Exhibit 492 -
E-mail from Wormsley to Hands, dated
May 3, 2007 ...................................................... A-15754

Terra Firma Exhibit 496 -
EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
E-mail from Cole to Ashcroft re Panel, dated
May 4, 2007 ...................................................... A-15757

Terra Firma Exhibit 498 -
E-mail from Cole to Bell re DB financing
trees, dated May 4, 2007 ................................... A-15761

Terra Firma Exhibit 501 -
EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
May 4, 2007 ...................................................... A-15764

Terra Firma Exhibit 516 -
E-mail from McCluskey to Yang re FW:, dated
May 6, 2007 ...................................................... A-15765

**lxx**

**Page**

Terra Firma Exhibit 532 -
E-mail from Smith to Wormsley re Terra
Firma/EMI, dated May 8, 2007......................... A-15766

Terra Firma Exhibit 537 -
E-mail from Hands to Wormsley re EMI, dated
May 9, 2007 ..................................................... A-15767

Terra Firma Exhibit 538 -
E-mail from Borrows to Gildersleeve re Dice,
dated May 9, 2007............................................ A-15768

Terra Firma Exhibit 539 -
E-mail from Smith to Hill & Estacio fw OEP,
dated May 9, 2007............................................ A-15772

Terra Firma Exhibit 540 -
E-mail from Wormsley to Gildersleeve re Dice,
dated May 9, 2007............................................ A-15773

Terra Firma Exhibit 541 -
E-mail from Bell to Wormsley re Terra Firma
Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
E-mail from Simpkin to Wormley and Smith re
Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
E-mail from Smith to Poyser re Project
Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
E-mail from Ashcroft to Gildersleeve fw
TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
Project Mulberry Bidders Contact Details,
dated May 11, 2007.......................................... A-15789

**lxxi**

**Page**

Terra Firma Exhibit 552 -
　E-mail from Wormsley to Bell re Mulberry,
　dated May 11, 2007............................................ A-15814

Terra Firma Exhibit 553 -
　E-mail from Bell to Smith and Wormsley re
　Mondays meeting, dated May 11, 2007............. A-15816

Terra Firma Exhibit 554 -
　E-mail from Smith to McCluskey re Just left
　you a voicemail, dated May 11, 2007 ................ A-15820

Terra Firma Exhibit 555 -
　E-mail from Simpkin to Edwards re Hope you
　are well. re EMI, dated May 11, 2007 ............... A-15821

Terra Firma Exhibit 558 -
　E-mail from Gildersleeve to EMI re Mulberry -
　Data Room - IMPALA, dated May 13, 2007..... A-15822

Terra Firma Exhibit 564 -
　E-mail from Barak to Smith re Citi Financing,
　dated May 14, 2007............................................ A-15826

Terra Firma Exhibit 570 -
　E-mail from Estacio to Klein fw Full DDT
　procedures - Project Mulberry, dated
　May 15, 2007 ..................................................... A-15828

Terra Firma Exhibit 578 -
　E-mail from Bell to Citi Financing re Project
　Mulberry Update, dated May 16, 2007.............. A-15834

Terra Firma Exhibit 579 -
　E-mail from Zogheb to Miller re EMI, dated
　May 16, 2007 ..................................................... A-15835

lxxii

**Page**

Terra Firma Exhibit 582 -
  E-mail from Wormsley to Gildersleeve and
  Nicoli re call from Guy Hands, dated
  May 16, 2007 ...................................................... A-15837

Terra Firma Exhibit 593 -
  Project Mulberry Working Party List, dated
  May 17, 2007 ...................................................... A-15838

Terra Firma Exhibit 594 -
  E-mail from Brumpton to Klein re LF/SEC
  call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
  E-mail from Klein to Wormsley re EMI Credit
  call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
  E-mail from Leat to Klein re Call, dated
  May 17, 2007 ...................................................... A-15866

Terra Firma Exhibit 599 -
  E-mail from Wormsley to Klein re Call Guy
  Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
  E-mail from Curtis to Klein re David
  Wormsley called, VERY URGENT, dated
  May 17, 2007 ...................................................... A-15868

Terra Firma Exhibit 604 -
  E-mail from Bell to Gildersleeve re Update
  from C, dated May 17, 2007 ............................... A-15869

Terra Firma Exhibit 607 -
  E-mail from Wormsley to Klein, dated
  May 17, 2007 ...................................................... A-15870

**lxxiii**

Page

Terra Firma Exhibit 608 -
E-mail from Klein to Hands re Call, dated
May 17, 2007 ...................................................... A-15871

Terra Firma Exhibit 619 -
E-mail from Wormsley to Poyser re Issue on
covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
E-mail from Wormsley to Tabet re Covenants,
dated May 18, 2007............................................ A-15873

Terra Firma Exhibit 621 -
E-mail from Poyser to Wormsley re interest
coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
E-mail from Smith to Poyser re Debt approval,
dated May 18, 2007............................................ A-15875

Terra Firma Exhibit 630 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 2 Ltd 8:00am,
dated May 18, 2007............................................ A-15877

Terra Firma Exhibit 631 -
E-mail from Stewart to Wormsley re call, dated
May 18, 2007 ...................................................... A-15889

Terra Firma Exhibit 632 -
E-mail from Stewart to Wormsley re returning
call, dated May 18, 2007.................................... A-15890

Terra Firma Exhibit 636 -
E-mail from Nicoli to Stewart re Draft process
E-mail to be sent to bidders tomorrow, dated
May 18, 2007 ...................................................... A-15891

lxxiv

Page

Terra Firma Exhibit 640 -
E-mail from Watson to Cole & Citi re
Mulberry Mark-ups of Crimson Documents,
dated May 18, 2007............................................ A-15894

Terra Firma Exhibit 643 -
Greenhill: Fairness Opinion/Advice Review
Form, dated May 18, 2007.................................. A-15896

Terra Firma Exhibit 644 -
E-mail from Barak to Bell *et al.* re Update on
calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
E-mail from Borrows to Gildersleeve re
Hands, dated May 18, 2007 .............................. A-15902

Terra Firma Exhibit 648 -
E-mail from Borrows to Bell re draft process,
dated May 18, 2007............................................ A-15903

Terra Firma Exhibit 649 -
E-mail from O'Brien to Citi and EMI re EMI-
NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 3 Ltd 8:30am,
dated May 18, 2007............................................ A-15911

Terra Firma Exhibit 661 -
E-mail from Pryce to Burrows cc Wormsley re
Terra Firma, dated May 18, 2007 ...................... A-15923

Terra Firma Exhibit 674 -
E-mail from Bell to Gildersleeve re EMI
conference call, dated May 19, 2007  ............... A-15924

lxxv

**Page**

Terra Firma Exhibit 694 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 3 Ltd 4:00pm,
    dated May 20, 2007........................................... A-15925

Terra Firma Exhibit 702 -
    E-mail from Watson to Ashcroft, cc Smith,
    Cole, *et al.*, re Mulberry - Key Issues Table and
    Turquoise Position, dated May 20, 2007 ........... A-15928

Terra Firma Exhibit 715 -
    E-mail from Quigley to O'Haire, Van der Spuy
    re FW: Update on Dice financing for
    discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
    E-mail from Smith to Wormsley re Mulberry
    Key issues table and Turquoise position, dated
    May 20, 2007 ..................................................... A-15940

Terra Firma Exhibit 726 -
    E-mail from Bell to Borrows re Trustee
    meeting notes, dated May 20, 2007 .................. A-15943

Terra Firma Exhibit 729 -
    E-mail from Wormsley to Hands, dated
    May 20, 2007 .................................................... A-15944

Terra Firma Exhibit 736 -
    Minutes of a Meeting of a Committee of the
    Board of Directors of Terra Firma (GP) 3 Ltd
    at 8:00am, dated May 21, 2007.......................... A-15947

Terra Firma Exhibit 744 -
    E-mail from Hill to Shah re Citi M&A Wins:
    EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

**lxxvi**

Page

Terra Firma Exhibit 746 -
Project Mulberry Fairness Committee
Materials, dated May 21, 2007 ........................ A-15952

Terra Firma Exhibit 749 -
E-mail from Smith to Llewelyn-Jones re
Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
E-mail from Wormsley to Smith re Greenhill
Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
E-mail from Hill to Smith re EMI, dated
May 21, 2007 ................................................... A-15963

Terra Firma Exhibit 756 -
E-mail from Smith to Bichara, Estacio, Hill,
Abbasi, Golebiewski re Citi M&A Wins: EMI
Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
E-mail from Smith to Swannell re EMI, dated
May 21, 2007 ................................................... A-15966

Terra Firma Exhibit 758 -
E-mail from Smith to Suen and Mcbride re
EMI M&A Wins, dated May 21, 2007 ............. A-15967

Terra Firma Exhibit 760 -
Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
E-mail from Vakilian to Poyser re (RNS) Terra
Firma Invest Recommended Cash Offer, dated
May 21, 2007 ................................................... A-15973

lxxvii

**Page**

Terra Firma Exhibit 765 -
    E-mail from Poyser to Lee re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15975

Terra Firma Exhibit 766 -
    E-mail from Poyser to Abbasi re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15977

Terra Firma Exhibit 767 -
    E-mail from Poyser to Vakilian re (RNS) Terra
    Firma Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15979

Terra Firma Exhibit 768 -
    E-mail from Wormsley to Smith re update on
    call with GH, dated May 21, 2007 ................... A-15981

Terra Firma Exhibit 783 -
    Project Mulberry Valuation Materials,
    Greenhill & Co., dated May 21, 2007 .............. A-15982

Terra Firma Exhibit 787 -
    E-mail from Simpkin to Treco re Call, dated
    May 22, 2007 ................................................... A-15991

Terra Firma Exhibit 788 -
    E-mail from Smith to Skarbek re Citi M&A
    wins, dated May 22, 2007 ................................ A-15992

Terra Firma Exhibit 791 -
    E-mail from Temming to Poyser re Example
    for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
    E-mail from Poyser to Smith re Example for us
    all, dated May 22, 2007 .................................... A-15995

**lxxviii**

Page

Terra Firma Exhibit 796 -
　　E-mail from Poyser to Smith re Dice, dated
　　May 22, 2007 ................................................... A-15996

Terra Firma Exhibit 802 -
　　E-mail from Poyser to Smith re financing
　　process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
　　E-mail from Poyser to Smith re financing
　　process, dated May 24, 2007............................. A-16001

Terra Firma Exhibit 815 -
　　David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
　　E-mail from Wormsley to Hands re Thistle
　　Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
　　E-mail from Gildersleeve to Wormsley, dated
　　May 29, 2007 ................................................... A-16015

Terra Firma Exhibit 824 -
　　E-mail from Nesbit to Grigorova re Project
　　Dice, dated May 30, 2007................................. A-16016

Terra Firma Exhibit 827 -
　　E-mail from Smith to Blackburn re MDs
　　meeting Monday, June 4 at 8:15 UK time,
　　dated May 31, 2007.......................................... A-16020

Terra Firma Exhibit 831 -
　　Citi Markets & Banking Credit Risk
　　Principles, Policies and Procedures, dated
　　June 1, 2007 .................................................... A-16022

**lxxix**

                                                                    **Page**

Terra Firma Exhibit 833 -
    Recommended Cash Offer by Maltby-a
    company formed at the direction of Terra
    Firma-for EMI Group plc, dated June 7............. A-16246

Terra Firma Exhibit 846 -
    E-mail from Aldred (on behalf of Hands) to
    Van der Spuy re Message from Guy Hands -
    Project Dice, dated June 27, 2007...................... A-16410

Terra Firma Exhibit 872 -
    E-mail from Wormsley to Gildersleeve and
    Nicoli re Terra Firma, dated July 4, 2007 .......... A-16411

Terra Firma Exhibit 874 -
    E-mail from Poyser to Smith re Your revenue
    list as at 4th July 2007, dated July 4, 2007 ........ A-16412

Terra Firma Exhibit 882 -
    E-mail from King to Klein re Riverdeep, dated
    July 9, 2007........................................................ A-16414

Terra Firma Exhibit 883 -
    E-mail from Hill to Lee re your revenue list as
    at 4th July 2007, dated July 9, 2007................... A-16415

Terra Firma Exhibit 887 -
    E-mail between Wormsley and Leat regarding
    advice, dated July 9, 2007.................................. A-16416

Terra Firma Exhibit 903 -
    E-mail from Simpkin to Lavelle re EMI Equity
    Bridge, dated July 16, 2007 .............................. A-16417

Terra Firma Exhibit 917 -
    E-mail from Borrows to Gildersleeve, Nicoli,
    *et al.*, re Board Presentation, dated
    July 18, 2007................................................... A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
E-mail from King to Klein re Terra Firma
(High Importance), dated July 18, 2007 ............  A-16432

Terra Firma Exhibit 923 -
E-mail from Smith to Stewart re Invoice to
Stewart, dated July 19, 2007 ..............................  A-16434

Terra Firma Exhibit 971 -
E-mail from Cockerill to Grigorova and Jones
re EMI CCR, dated July 31, 2007......................  A-16438

Terra Firma Exhibit 987 -
E-mail from Hill to Smith, dated
August 6, 2007..................................................  A-16439

Terra Firma Exhibit 992 -
E-mail from Klein to Prince re EMI-DO NOT
FORWARD, dated August 8, 2007 ....................  A-16440

Terra Firma Exhibit 993 -
E-mail from Klein to Mehta re Warner-
confidential, dated August 8, 2007 ....................  A-16442

Terra Firma Exhibit 994 -
E-mail from Wirdnam to Leat re Terra Firma
Project Update, dated August 9, 2007 ...............  A-16443

Terra Firma Exhibit 1004 -
E-mail from Klein to Volk *et al.* re W, "Guy
Spoke to Edgar and offered 3B," dated
August 11, 2007 ................................................  A-16444

Terra Firma Exhibit 1006 -
E-mail from Klein to Volk *et al.* re FW: edgar,
"4B value of EMI," dated August 12, 2007 .......  A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
E-mail from Smith to Watson re Mulberry Citi
Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
E-mail from Barker to Leat fw EMI, dated
August 24, 2007................................................ A-16447

Terra Firma Exhibit 1040 -
E-mail from Smith to CMB-GBKG re Quote
of the Day, dated September 10, 2007 .............. A-16448

Terra Firma Exhibit 1074 -
Memorandum from Simpkin *et al.* to Klein *et al.* re Project Dice (Public to Private of EMI),
dated November 16, 2007 .................................. A-16449

Terra Firma Exhibit 1080 -
E-mail from Wormsley to Klein re Guy Hands,
dated November 23, 2007 .................................. A-16459

Terra Firma Exhibit 1100 -
E-mail from Wormsley to Lynn re meeting
with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
E-mail from Smith to Poyser re trusted adviser,
dated January 30, 2008 ...................................... A-16461

Terra Firma Exhibit 1111 -
E-mail from Wormsley to Hands cc Burns,
dated February 1, 2008 ...................................... A-16463

Terra Firma Exhibit 1114 -
E-mail from Wormsley to Hands, dated
February 19, 2008 .............................................. A-16466

**lxxxii**

Page

Terra Firma Exhibit 1141 -
    Franchise Rise Assessment Template, dated
    July 2008....................................................... A-16470

Terra Firma Exhibit 1144 -
    Handwritten Notes of Cockerill, dated
    September 1, 2008 ........................................... A-16471

Terra Firma Exhibit 1147 -
    E-mail from Smith to Wormsley re FW:
    Morgan Stanley CDs now officially higher than
    EMI!!! Hurrah, dated September 18, 2008........... A-16472

Terra Firma Exhibit 1158 -
    Handwritten Notes of Cockerill, dated
    November 16, 2008........................................... A-16473

Terra Firma Exhibit 1176 -
    E-mail from Cox to Smith re City Speaker
    Series - 12th February, Wormsley Presentation,
    dated February 11, 2009.................................... A-16476

Terra Firma Exhibit 1196 -
    Franchise Risk Assessment Template, Maltby
    Investments Limited, dated June 2009............... A-16529

Terra Firma Exhibit 1225 -
    E-mail from Smith to Vakilian re Citigroup
    accused of fraud over EMI sale, dated
    December 13, 2009 .......................................... A-16530

Terra Firma Exhibit 1241 -
    Compliance "Tree" for EMI group, dated
    January 14, 2010 ............................................. A-16532

**lxxxiii**

**Page**

Terra Firma Exhibit 1251 -
  Baughman to Duffy re supplement to Citi's
  response to Terra Firma's Interrogatory No. 5,
  dated March 25, 2010 ....................................... A-16536

Terra Firma Exhibit 1313 -
  EMI Trading Update ....................................... A-16539

Terra Firma Exhibit 1346 -
  EMI Stock Price.xls ....................................... A-16541

Terra Firma Exhibit 1365 -
  E-mail from Wormsley to Hands re DAIG-
  subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
  E-mail from Wormsley to Smith, dated
  November 28, 2006........................................... A-16592

Terra Firma Exhibit 1369 -
  E-mail from Smith to Wormsley re EMI, dated
  December 20, 2006 ........................................... A-16593

Terra Firma Exhibit 1370 -
  E-mail from Wormsley to Klein re Call, dated
  May 17, 2007 ................................................... A-16594

Terra Firma Exhibit 1371 -
  E-mail from Coats to Dolenec re Project Dice,
  dated May 21, 2007........................................... A-16595

Terra Firma Exhibit 1372 -
  E-mail from Wormsley to Klein re EMI, dated
  August 2, 2007 ................................................. A-16596

Terra Firma Exhibit 1377 -
  E-mail from Seymour to Van der Spuy re
  Project Dice memo, dated May 15, 2007........... A-16597

lxxxiv

**Page**

Terra Firma Exhibit 1380 -
    Minutes of the May 20, 2007 Meeting of the
    IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
    Kirsten Randell notebook ................................. A-16610

Terra Firma Exhibit 1395 -
    Amended and Restated Fee Letter, dated
    August 13, 2007 ................................................. A-16751

Terra Firma Exhibit 1400 -
    E-mail from Rawlings to Silva, Reeves cc
    Govinida, Dubin re Maltby - fees, dated
    August 31, 2007 ................................................. A-16761

Terra Firma Exhibit 1407 -
    E-mail from Wormsley to Klein, dated
    November 21, 2007 ............................................ A-16763

Terra Firma Exhibit 1409 -
    E-mail from Wormsley to Hands re BUPA
    hospitals, dated June 18, 2007 ......................... A-16764

Terra Firma Exhibit 1415 -
    E-mail from Seth to Simpkin, *et al.,* re EMI
    staple plan, attaching EMI Recd Financing.xls
    and EMI Group Financing.xls, dated
    April 1, 2007 ...................................................... A-16765

Terra Firma Exhibit 1434 -
    David Wormsley deposition excerpts (pp. 159-
    170:18), dated July 20, 2010 ............................. A-16872

Terra Firma Exhibit 1436 -
    Stipulation re Eric Nicoli ................................. A-16885

lxxxv

                                                                  **Page**

Citi Exhibit A-1 -
    Page 27, Paragraph 109 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
    Page 28, Paragraph 110 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
    Pages 31-32, Paragraph 126 of Complaint in
    *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16890

Citi Exhibit A-8 -
    Page 32, Paragraph 128 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
    Page 32-33, paragraphs 127-129 of Complaint
    in *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16895

Citi Exhibit C -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re URGENT & IMPORTANT-
    EMI, dated May 6, 2007 .................................... A-16898

Citi Exhibit D -
    Minutes of May 7, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma, dated May 7, 2007 ................................. A-16900

Citi Exhibit E -
    E-mail from Seymour to Becker, *et al.*, with
    attached Project Dice Memo to the GP, dated
    May 7, 2007 ..................................................... A-16902

**lxxxvi**

**Page**

Citi Exhibit H -
Minutes of May 15, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma, dated May 15, 2007 ............................. A-16914

Citi Exhibit I -
Memo from Punja, *et al.*, to the IAC re Project
Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
E-mail thread ending with E-mail from Slattery
to Randell, *et al.*, re IAC Distribution List
DICE, dated May 19, 2007 ............................. A-16923

Citi Exhibit K -
Minutes of May 18, 2007, Terra Firma
Investment Advisory Committee Meeting,
dated May 18, 2007 .......................................... A-16927

Citi Exhibit L -
Minutes of May 20, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners Limited, dated
May 20, 2007 ................................................... A-16929

Citi Exhibit P -
Project Dice Update to the IAC, dated
June 28, 2007 ................................................... A-16931

Citi Exhibit W -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice: 2008 Forecast vs.
Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
Project Mulberry Limited Scope Vendor Due
Diligence Report, dated May 4, 2007 .............. A-16959

**lxxxvii**

**Page**

Citi Exhibit BL -
    Letter from Stokes to Gildersleeve re Terra
    Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
    Project Mulberry Valuation Materials, dated
    May 21, 2007 ................................................... A-17011

Citi Exhibit BP -
    E-mail from Night BA to Amstutz, *et al.*, re
    EMI Co-Investment Opportunity, with attached
    EMI Presentation to Co-Investors, dated
    August 20, 2007 .............................................. A-17020

Citi Exhibit BR -
    E-mail thread ending with E-mail from Night
    BA to Tequila Bone, with attached co-investor
    presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
    E-mail from Vallance to TF Team Dice re EMI
    Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
    E-mail thread ending with E-mail from Punja
    to Hands re Revised financing E-mail, dated
    May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
    Guernsey Airport Landing Dues Information
    System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
    Memo from Punja, *et al.*, to IAC, *et al.*, re
    Project Dice Phase One Due Diligence, dated
    February 5, 2007 ............................................. A-17071

**lxxxviii**

Page

Citi Exhibit DT -
E-mail from Vallance on behalf of Hands to
Wormsley re Hands' desire to speak with
Wormsley ASAP, dated May 6, 2007 ............... A-17087

Citi Exhibit DW -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice, dated
May 7, 2007 .................................... A-17088

Citi Exhibit DX -
E-mail thread ending with E-mail from Hands
to Hedegaard, *et al.*, re Project Dice, dated
May 6, 2007 .................................... A-17090

Citi Exhibit DY -
Minutes of May 8, 2007, Meeting of the Board
of Directors at 10:00 a.m. (GP3), dated
May 8, 2007 .................................... A-17092

Citi Exhibit EA-1 -
Terra Firma's telephone records from British
Telecom, dated August 2, 2007.......................... A-17101

Citi Exhibit EA-2 -
Airtime Billing Reporting Team Itemisation
Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
E-mail thread ending with E-mail from
Vallance on behalf of Hands to Klein re request
for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
E-mail thread ending with E-mail from
Vallance on behalf of Hands to Wormsley re
request for Wormsley to call Hands, dated
May 18, 2007 .................................... A-17205

lxxxix

**Page**

Citi Exhibit ED -
  E-mail thread ending with E-mail from Tabet
  to Hands re EMI, dated May 18, 2007 .............  A-17206

Citi Exhibit EE -
  E-mail thread ending with E-mail from Aldred
  to Hands, *et al.*, re Relationship between Roger
  Ames and Cerberus Capital Management,
  dated September 24, 2007 ................................  A-17208

Citi Exhibit EH -
  Project Dice Presentation by Terra Firma, with
  E-mail thread ending with E-mail from Punja
  to Hands re Process, dated May 20, 2007 .........  A-17209

Citi Exhibit EI -
  E-mail thread ending with E-mail from Punja
  to Hands re Process, dated May 20, 2007 .........  A-17286

Citi Exhibit EJ -
  Minutes of May 20, 2007, Meeting of the Terra
  Firma (GP) 2 Board of Directors, dated
  May 20, 2007 ....................................................  A-17290

Citi Exhibit EL -
  E-mail thread ending with E-mail from Hands
  to Wormsley re outstanding issues between Citi
  and Terra Firma, dated May 20, 2007 ...............  A-17293

Citi Exhibit EO -
  Minutes of May 23, 2007, Meeting of the
  Investment Advisory Committee of Terra
  Firma Capital Partners, Limited, dated
  May 23, 2007 ....................................................  A-17296

xc

**Page**

Citi Exhibit EQ -
E-mail from Vallance to Terra Firma Team
Dice, *et al.*, re Weekly Dice Updates for IAC,
dated June 14, 2007 .......................................... A-17298

Citi Exhibit ET -
Press release re Recommended Cash Offer for
EMI Group plc by Maltby Limited, dated
July 20, 2007 .................................................... A-17299

Citi Exhibit FB-1 -
Declaration of John Loveridge, dated
February 3, 2010 .............................................. A-17302

Citi Exhibit FD -
Terra Firma Investments (GP) 3 Limited
Advisory Agreement Relating to Terra Firma
Capital Partners III, L.P., dated
February 8, 2006 ............................................... A-17311

Citi Exhibit FG -
Draft Memo from Punja, *et al.* to the IAC re
Project Dice: Presentation and Success Fee,
dated May 18, 2007 .......................................... A-17331

Citi Exhibit FI -
Minutes of May 15, 2007, Meeting of Terra
Firma (GP) 3 Board of Directors, dated
May 15, 2007 ................................................... A-17332

Citi Exhibit FN -
Minutes of May 20, 2007, Meeting of the
Board of Directors at 4:00 p.m. (GP3), dated
May 20, 2007 ................................................... A-17334

xci

**Page**

Citi Exhibit FO -
    Minutes of May 21, 2007, Meeting of the
    Board of Directors at 7:30 a.m. (GP2), dated
    May 21, 2007 ..................................................... A-17337

Citi Exhibit FP -
    Terra Firma Presentation to GP re Project Dice,
    dated May 21, 2007............................................ A-17340

Citi Exhibit FR -
    Memo Recommending Cash Offer by Maltby
    Limited for EMI Group plc, dated
    May 30, 2007 .................................................... A-17350

Citi Exhibit FV -
    Letter from Kelly to EMI Group plc re Terra
    Firma's interest as a potential offeror for EMI,
    dated December 14, 2006 .................................. A-17512

Citi Exhibit FX -
    E-mail from Van der Spuy to Bell, *et al.*, with
    attached Project Dice: Management Meeting
    questions and attendees, dated
    May 11, 2007 .................................................... A-17514

Citi Exhibit GF -
    Letter from Kelly to Gildersleeve re Summary
    Proposal for Terra Firma potential offer, dated
    May 8, 2007 ..................................................... A-17533

Citi Exhibit GG -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 8:45 a.m. (GP2), dated
    May 8, 2007 ..................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
E-mail thread ending with E-mail from Nicoli
to Stewart, *et al.*, re E-mail to be sent to
bidders tomorrow, dated May 18, 2007 ............. A-17548

Citi Exhibit GN -
E-mail thread ending with E-mail from
Wormsley to Simpkin, *et al.*, re Terra
Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
Terra Firma Presentation to Investment
Advisory Committee re Project Dice, dated
May 18, 2007 .................................................... A-17552

Citi Exhibit GQ -
E-mail from Pryce to Burrows, *et al.*, re Terra
Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
E-mail from Melvin to Hands, *et al.*, re Urgent-
EMI/Terra, dated May 22, 2007 ........................ A-17713

Citi Exhibit HH -
E-mail from Shaw to Nicoli re Trading
statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
Project Dice Presentation: Update to the IAC,
dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
E-mail thread ending with E-mail from Van der
Spuy to O'Haire, *et al.*, re Update on Dice
Financing for Discussion Tomorrow, dated
May 20, 2007 .................................................... A-17738

xciii

**Page**

Citi Exhibit IC -
    E-mail from Vallance to Hudson, *et al.*, re
    Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
    Court Order in the High Court of Justice,
    Queen's Bench Division, dated
    August 16, 2010 ................................................ A-17749

Citi Exhibit IE -
    Journey Log Book for aircraft Cs-DXJ
    registered with the Portuguese Registry
    entitled, "Diário de Navegaçao," dated
    May 24, 2007 .................................................... A-17758

Citi Exhibit IF -
    Screen Shot: Build Reservation for Terra
    Firma, dated May 20, 2007 ............................... A-17761

Citi Exhibit IW -
    Terra Firma Capital Partners II Q3 2007, dated
    November 1, 2007 ............................................. A-17762

Citi Exhibit JC -
    E-mail from Reid to Seymour re Final Version
    of McK docs, dated, with attachment
    May 16, 2007 .................................................... A-17807

Citi Exhibit JD -
    Terra Firma Music Industry Key Market
    Outlook, dated May 15, 2007 ........................... A-18001

Citi Exhibit JE -
    KPMG Report - Project Dice - Limited Scope
    due financial diligence report, dated
    May 17, 2007 ................................................... A-18128

xciv

**Page**

Citi Exhibit JI -
E-mail from Vallance on behalf of Hands to TF
Team Dice re Dice and RBS, dated
May 8, 2007 ...................................................... A-18232

Citi Exhibit JN -
Minutes of the May 18, 2007, EMI Group plc
meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated June 28, 2007 ................. A-18240

Citi Exhibit JQ -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 13, 2007 ................. A-18246

Citi Exhibit JS -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 20, 2007 ................. A-18249

Citi Exhibit JT -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 28, 2007 ................. A-18252

Citi Exhibit KA -
E-mail from Dowler to Hands re Dice, dated
May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
E-mail from Robert-Tissot to Hands re
Gatwick, dated February 6, 2009 ....................... A-18257

xcv

**Page**

Citi Exhibit KH -
E-mail from Wormsley to Cabrey re Hands -
Invitation to Terra Firma Annual Clay Pigeon
Shoot, dated July 1, 2008 .................................. A-18259

Citi Exhibit KJ -
Terra Firma Annual Review 2007, dated
June 29, 2005 .................................................. A-18262

Citi Exhibit KY -
Terra Firma Private Placement Memorandum,
dated April 1, 2006 ........................................... A-18382

Citi Exhibit LI -
Memo from Punja, *et al.*, to Hands, *et al.*, re
EMI Preliminary Discussion, dated
December 1, 2006 ............................................. A-18482

Citi Exhibit MB -
Signed Minutes of the February 5, 2007,
Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
Letter from Smith to Stewart re Provision of
Advisory and Corporate Broking Services by
Citigroup, dated April 27, 2007 ........................ A-18493

Citi Exhibit OF -
Letter from Kelly to Gildersleeve re possible
offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
E-mail thread ending with E-mail from Miller
to Wormsley, dated May 8, 2007 ...................... A-18499

Citi Exhibit OJ -
E-mail from Wormsley to Hands re EMI, dated
May 8, 2007 .................................................... A-18500

xcvi

Page

Citi Exhibit OM -
   Project Mulberry Bidders Contact Detail, dated
   May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
   E-mail thread ending with E-mail from Van der
   Spuy to Simpkin, *et al.*, re Project Dice:
   Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
   Minutes of May 15, 2007, Meeting of the
   Board of Directors at 7:30 p.m. (GP2), dated
   May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
   E-mail thread ending with E-mail from Klein
   to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
   E-mail from Wilkins to Nicoli, *et al.*, re
   Wormsley call, dated May 18, 2007 ................. A-18533

Citi Exhibit RU -
   E-mail thread ending with E-mail from Nicoli
   to Wormsley re EMI media review, dated
   May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
   E-mail thread ending with E-mail from
   Simpkin to Dolenec, *et al.*, re securitisation
   colleagues, dated May 20, 2007 ....................... A-18537

Citi Exhibit UF -
   E-mail thread ending with E-mail from Tabet
   to Wormsley re just spoke to GH, dated
   May 21, 2007 .................................................. A-18540

xcvii

**Page**

Citi Exhibit VP -
  Minutes of May 23, 2007, Meeting of the
  Board of Directors at 2:00 p.m. (GP2), dated
  May 23, 2007 .................................................. A-18543

Citi Exhibit VQ -
  Minutes of May 23, 2007, Meeting of the
  Board of Directors at 2:15 p.m. (GP3), dated
  May 23, 2007 .................................................. A-18545

Citi Exhibit WI -
  Memo from Punja, *et al.*, to the IAC, *et al.*, re
  Project Dice Update and Budget, with attached
  Presentation re IAC update: Project Dice,
  dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
  E-mail from Cabrey to Wormsley, *et al.*, re
  Villa Saletta Shoot, with attached Fax Reply
  Form, dated August 15, 2007 ............................ A-18555

Citi Exhibit AAO -
  E-mail from MacInnes to Punja, *et al.*, with
  attached Dresdner invoice to Maltby, dated
  August 17, 2007 ............................................... A-18560

Citi Exhibit ABL -
  Memo from Pryce to TFCP Personnel re Public
  to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
  Letter from Terra Firma Investments (GP) 3
  Limited to Citi re the amendment letter, dated
  December 21, 2007, dated January 11, 2008 .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
　　E-mail from Dicks to Wormsley, *et al.*, re DW
　　Menu selection Die Sauberflote, attached
　　menu, dated June 23, 2008 ................................ A-18571

Citi Exhibit AGF -
　　Terra Firma Capital Partners II, Q1 2008, dated
　　March 31, 2009 .................................................. A-18574

Citi Exhibit AHA -
　　Presentations re EMI and the Terra Firma/Citi
　　Relationship, dated August 1, 2009 .................. A-18623

Citi Exhibit AJJ -
　　Cell phone Records for David Wormsley, dated
　　April 26, 2007 ................................................... A-18643

Citi Exhibit AJT -
　　Guy Hands' Calendar for May 18, 2007, dated
　　May 18, 2007 .................................................... A-18671

Citi Exhibit AKL -
　　EMI Recorded Music Presentation, dated
　　April 1, 2009 ..................................................... A-18672

Citi Exhibit AKT -
　　Stipulated Phone Numbers.................................. A-18698

Citi Exhibit AKY -
　　TFCP III Co-Investment 2 L.P. Project Dice
　　Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
　　Citigroup Structure Chart................................... A-19064

Citi Exhibit ALK -
　　E-mail thread ending with E-mail from
　　Wormsley to Dicks re shotgun certificate form,
　　dated October 4, 2007 ....................................... A-19065

xcix

**Page**

Citi Exhibit ALU -
    E-mail thread ending with E-mail from
    Grigorova to Lynn, *et al.*, re EMI Summary
    Exposure, dated November 21, 2009 ................... A-19067

Citi Exhibit ALY -
    Paragraph 22, Page 5 of Joint Statement
    Pursuant to Individual Practices 4(a) of the
    Facts and Other Matters on Which the Parties
    Agree ................................................................ A-19072

Citi Exhibit EEB-3 -
    Table 1B of Expert Report of Marianne
    DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
    Appendix 1 of Expert Report of Marianne
    DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
    Corrected Expert Report of Marianne DeMario
    in *Andrews v. Raphaelson*, *et al.*, dated
    October 19, 2006 .............................................. A-19078

Citi Exhibit EEJ -
    *Caiola v. Citibank*, Expert Report of Marianne
    DeMario ........................................................... A-19095

Citi Exhibit EEY -
    Client List for Spectrum Consulting Partners .... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
    Handwritten Notes ............................................ A-19126

Terra Firma Exhibit 48 -
    Nicoli Mobile Phone Records
    (Reproduced at pp. CA-826-CA-837)

c

**Page**

Letter Brief of Terra Firma to the Honorable Jed S.
 Rakoff, dated October 25, 2010............................ A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed
 S. Rakoff, dated October 25, 2010........................ A-19137

The Court's Proposed Jury Instructions, dated
 November 1, 2010 ................................................ A-19147

Memorandum of the Honorable Jed S. Rakoff,
 dated November 2, 2010........................................ A-19163

Verdict Sheet, dated November 4, 2010 ................... A-19179

Judgment, So-Ordered on December 9, 2010,
 Appealed From ...................................................... A-19180

Notice of Appeal, dated January 10, 2011 ................ A-19187

terra firma

**DENMARK**

THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN FILED WITH OR APPROVED BY THE DANISH FINANCIAL SUPERVISORY AUTHORITY OR ANY OTHER REGULATORY AUTHORITY IN THE KINGDOM OF DENMARK.

THE INTERESTS HAVE NOT BEEN OFFERED OR SOLD AND MAY NOT BE OFFERED, SOLD OR DELIVERED DIRECTLY OR INDIRECTLY IN DENMARK, UNLESS IN COMPLIANCE WITH CHAPTER 12 OF THE DANISH ACT ON TRADING IN SECURITIES AND THE DANISH EXECUTIVE ORDER NO. 166 OF 13 MARCH, 2003 ON THE FIRST PUBLIC OFFER OF CERTAIN SECURITIES ISSUED PURSUANT HERETO AS AMENDED FROM TIME TO TIME. *NO SINGLE INVESTOR MAY INVEST AN AMOUNT LESS THAN € 50,000.*

**FINLAND**

THE INTERESTS WILL NOT BE PUBLICLY OFFERED OR BROUGHT INTO GENERAL CIRCULATION IN THE REPUBLIC OF FINLAND OTHER THAN IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE LAWS OF THE REPUBLIC OF FINLAND AND ESPECIALLY IN COMPLIANCE WITH THE FINNISH SECURITIES MARKETS ACT (1989/495, AS AMENDED) AND ANY REGULATION MADE THERE UNDER, AS SUPPLEMENTED AND AMENDED FROM TIME TO TIME. ONLY PROFESSIONAL INVESTORS AS SET FORTH IN THE FINNISH SECURITIES MARKETS ACT MAY INVEST IN THE INTERESTS DESCRIBED IN THIS MEMORANDUM AND, ACCORDINGLY, ONLY PERSONS FALLING INTO THIS CLASS OF INVESTORS MAY RECEIVE THIS MEMORANDUM. THIS MEMORANDUM HAS BEEN PREPARED FOR PRIVATE INFORMATION PURPOSES OF INTERESTED INVESTORS ONLY. THE FINANCIAL SUPERVISION AUTHORITY (FI. RAHOITUSTARKASTUS) HAS NOT AUTHORIZED ANY OFFERING OF THE SUBSCRIPTION OF THE INTERESTS. THIS MEMORANDUM IS STRICTLY FOR PRIVATE USE BY ITS HOLDER AND MAY NOT BE PASSED ON TO THIRD PARTIES.

**FRANCE**

THE INTERESTS MAY NOT BE OFFERED, DIRECTLY OR INDIRECTLY, TO PERSONS IN FRANCE. THIS MEMORANDUM AND RELATED MATERIAL HAVE NOT BEEN AND WILL NOT BE THE SUBJECT OF ANY ADVERTISING OR ACTIVE MARKETING IN FRANCE. THIS MEMORANDUM AND ANY RELATED MATERIAL ARE MADE AVAILABLE ONLY TO SELECTED CLIENTS WHICH ARE LOCATED IN FRANCE UPON EXPRESS REQUEST FROM SUCH CLIENTS AND IS NOT BEING DISTRIBUTED IN THE CONTEXT OF A PUBLIC OFFER IN FRANCE WITHIN THE MEANING OF FRENCH MONETARY AND FINANCIAL CODE AND THE REGULATIONS OF THE AUTORITÉS DES MARCHÉS FINANCIERS (THE AMF). THE DISTRIBUTION OF THIS MEMORANDUM AND RELATED MATERIAL, AND ANY OFFERING OF THE INTERESTS DESCRIBED THEREIN, IS NOT SUBJECT TO ANY AUTHORISATION FROM THE AMF IN FRANCE AND NEITHER THE MEMORANDUM NOR ANY RELATED MATERIALS HAVE BEEN SUBMITTED TO THE AMF FOR REVIEW OR APPROVAL. THIS MEMORANDUM AND ANY RELATED MATERIAL IS NOT TO BE FURTHER DISTRIBUTED OR REPRODUCED (IN WHOLE OR IN PART) BY THE ADDRESSEE AND HAS BEEN DISTRIBUTED ON THE BASIS OF AN UNDERTAKING THAT THE ADDRESSEE INVESTS FOR ITS OWN ACCOUNT AND UNDERTAKES NOT TO TRANSFER, DIRECTLY OR INDIRECTLY, THE INTERESTS TO THE PUBLIC IN FRANCE, OTHER THAN IN COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS. THE INTERESTS SHOULD ONLY BE PURCHASED BY INVESTORS HAVING SPECIFIC KNOWLEDGE IN RELATION TO THIS TYPE OF INVESTMENT AND WHO HAVE SUFFICIENT KNOWLEDGE, EXPERIENCE AND PROFESSIONAL ADVICE TO MAKE THEIR OWN EVALUATION OF THE MERITS AND THE RISKS OF AN INVESTMENT OF THIS TYPE.

NOTICE AUX RESIDENTS FRANCAIS: CETTE NOTE D'INFORMATION N'A PAS SOUMISE AU VISA DE L'AUTORITE DES MARCHES FINANCIERS (AMF). PAR CONSEQUENT, NI CETTE NOTE D'INFORMATION, NI TOUT AUTRE DOCUMENT PROMOTIONNEL SE RAPPORTANT AUX TITRES EMIS PAR LE FONDS NE POURRONT ETRE COMMUNIQUES AU PUBLIC OU UTILISES DANS LE CADRE DE TOUTE

CITI-TF 00586378

terra firma

OFFRE DE SOUSCRIPTION OU DE VENTE DES TITRES EN FRANCE ET LES TITRES NE PEUVENT ETRE EMIS, OFFERTS OU CEDES EN FRANCE.

GERMANY

THIS MEMORANDUM IS ADDRESSED TO THE NAMED RECIPIENT ONLY AND DOES NOT CONSTITUTE AN OFFER OR ADVERTISEMENT TO THE PUBLIC.   THE INTERESTS, THIS MEMORANDUM AND ANY RELATED MATERIAL SHALL NOT BE DISTRIBUTED IN GERMANY BY WAY OF PUBLIC OFFER, PUBLIC ADVERTISING OR IN ANY SIMILAR MANNER AND THE NAMED RECIPIENT MUST NOT PASS IT ON TO ANY OTHER PERSON.   IT CANNOT BE EXCLUDED THAT THE GERMAN INVESTMENT ACT AND THE GERMAN INVESTMENT TAX ACT ARE APPLICABLE AND IT SHOULD BE NOTED THAT THE INTERESTS HAVE NOT BEEN AND WILL NOT BE NOTIFIED FOR PUBLIC DISTRIBUTION UNDER THE GERMAN INVESTMENT ACT. THE TAX COMPLIANCE REQUIREMENTS OF § 5 OF THE GERMAN INVESTMENT TAX ACT WILL NOT BE FULFILLED.   INVESTORS TAXABLE IN GERMANY ARE URGED TO CONSULT THEIR OWN PROFESSIONAL TAX ADVISOR.

HONG KONG

WARNING

IMPORTANT: IF YOU ARE IN ANY DOUBT ABOUT THE CONTENTS OF THIS MEMORANDUM, YOU SHOULD CONSULT YOUR BROKER, BANK MANAGER, SOLICITOR, PROFESSIONAL ACCOUNTANT, FINANCIAL ADVISOR, OR OTHER PROFESSIONAL ADVISOR.

THE FUND IS NOT AUTHORIZED BY THE SECURITIES AND FUTURES COMMISSION IN HONG KONG PURSUANT TO SECTION 104 OF THE SECURITIES AND FUTURES ORDINANCE (CAP. 571 OF THE LAWS OF HONG KONG) (THE "SFO") AND A COPY OF THIS MEMORANDUM HAS NOT BEEN APPROVED BY THE SECURITIES AND FUTURES COMMISSION.   NO PERSON MAY ISSUE OR HAVE IN THEIR POSSESSION FOR THE PURPOSES OF ISSUE, WHETHER IN HONG KONG OR ELSEWHERE, ANY ADVERTISEMENT, INVITATION OR DOCUMENT RELATING TO THE INTERESTS, WHICH IS DIRECTED AT, OR THE CONTENTS OF WHICH ARE LIKELY TO BE ACCESSED OR READ BY, THE PUBLIC IN HONG KONG (EXCEPT IF PERMITTED TO DO SO UNDER THE SECURITIES LAWS OF HONG KONG) OTHER THAN WITH RESPECT TO INTERESTS WHICH ARE OR ARE INTENDED TO BE DISPOSED OF ONLY TO PERSONS OUTSIDE HONG KONG OR ONLY TO "PROFESSIONAL INVESTORS" AS DEFINED IN THE SFO AND ANY RULES MADE THEREUNDER.

THIS MEMORANDUM IS INTENDED SOLELY FOR THE USE OF THE PERSON TO WHOM IT HAS BEEN DELIVERED FOR THE PURPOSE OF EVALUATING A POSSIBLE INVESTMENT IN THE interests DESCRIBED HEREIN, AND IS NOT TO BE REPRODUCED OR DISTRIBUTED TO ANY OTHER PERSONS (OTHER THAN PROFESSIONAL ADVISORS OF THE PROSPECTIVE INVESTOR RECEIVING THIS MEMORANDUM).

IRELAND

THIS MEMORANDUM HAS NOT BEEN APPROVED BY THE IRISH FINANCIAL SERVICES REGULATORY AUTHORITY.   THE FUND HAS NOT BEEN AUTHORISED AND IS NOT SUPERVISED BY THE IRISH FINANCIAL SERVICES REGULATORY AUTHORITY.   THIS MEMORANDUM DOES NOT AND SHALL NOT CONSTITUTE AN INVITATION TO THE PUBLIC IN IRELAND TO PURCHASE THE INTERESTS AND THE FUND DOES NOT PROVIDE FACILITIES FOR OPEN PARTICIPATION BY THE PUBLIC IN IRELAND TO PURCHASE THE INTERESTS.   THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER OF THE INTERESTS IS RESTRICTED TO THE INDIVIDUALS TO WHOM IT IS ADDRESSED.   INTERESTS IN THE LIMITED PARTNERSHIP MAY NOT BE OFFERED OR SOLD BY ANY PERSON (A) OTHERWISE THAN IN A MANNER THAT DOES NOT CONSTITUTE AN OFFER FOR SALE TO THE PUBLIC WITHIN THE MEANING OF

– 77 –

CITI-TF 00586379

terra firma

SECTION 9 OF THE UNIT TRUST ACT, 1990; OR (B) IN ANY COUNTRY OR JURISDICTION INCLUDING IRELAND EXCEPT IN ALL CIRCUMSTANCES THAT WILL RESULT IN COMPLIANCE WITH ALL APPLICABLE LAWS AND REGULATIONS IN SUCH COUNTRY OR JURISDICTION.

NO OTHER PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM IS ADDRESSED MAY TREAT IT AS CONSTITUTING AN INVITATION TO THEM TO SUBSCRIBE FOR THE INTERESTS.  THE INFORMATION CONTAINED HEREIN IS DIRECTED TO A SMALL NUMBER OF SELECT PERSONS WHOSE ORDINARY BUSINESS IS TO BUY OR SELL SECURITIES AND TO WHOM THE INTERESTS ARE BEING OFFERED IN THE CONTEXT OF THEIR TRADE, OCCUPATION OR PROFESSION.

ITALY

SHARES MAY NOT BE OFFERED OR SOLD AND THE MEMORANDUM, OR ANY CIRCULAR, ADVERTISEMENT OR OTHER DOCUMENT OR OFFERING MATERIAL RELATING TO THE INTERESTS, MAY NOT BE PUBLISHED, DISTRIBUTED OR MADE AVAILABLE IN THE REPUBLIC OF ITALY OR TO ANY ITALIAN RESIDENT INVESTOR IN CIRCUMSTANCES WHICH WOULD BE IN BREACH OF RELEVANT ITALIAN LAW AND REGULATIONS.  THIS MEMORANDUM HAS ONLY BEEN DELIVERED TO RECIPIENTS IN ITALY IN RESPONSE TO THAT PERSON'S EXPRESS REQUEST AND ON THE BASIS THAT IT IS FOR THEIR OWN INVESTMENT PURPOSES WITH NO INTENT TO DISTRIBUTE THE MEMORANDUM OR THE INTERESTS, DIRECTLY OR INDIRECTLY, TO ANY OTHER PERSON.

JAPAN

A TRANSFER OF THE LIMITED PARTNERSHIP INTERESTS SOLICITED FOR SUBSCRIPTION IN JAPAN, SHALL BE SUBJECTED TO THE FOLLOWING RESTRICTIONS:

(a)  THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE TRANSFERRED EXCEPT FOR THE TRANSFER OF THE WHOLE LIMITED PARTNERSHIP INTERESTS ACQUIRED BY A PARTNER;

(b)  IF A PARTNER TRANSFERS THE LIMITED PARTNERSHIP INTERESTS SUBJECT TO ITEM (a), IT SHALL NOTICE THE FOLLOWING ITEMS AND DELIVER A WRITTEN NOTIFICATION STATING THE FOLLOWING ITEMS TO THE COUNTERPARTY BEFORE OR AT THE TIME OF TRANSFER THEREOF:

(i)  NO REGISTRATION HAS BEEN MADE IN RESPECT OF SOLICITATION FOR SUBSCRIPTION OF THE LIMITED PARTNERSHIP INTERESTS SUBJECT TO ARTICLE 4, ITEM 1 OF THE SECURITIES AND EXCHANGE LAW OF JAPAN (THE "SEL LAW") AND ACCORDINGLY THE SOLICITATION FOR SUBSCRIPTION OF THE LIMITED PARTNERSHIP INTERESTS FALLS UNDER ARTICLE 2, PARAGRAPH 3, ITEM 2(B) THEREOF; AND

(ii)  THE LIMITED PARTNERSHIP INTERESTS ARE NOT TRANSFERABLE EXCEPT FOR THE TRANSFER OF THE WHOLE LIMITED PARTNERSHIP INTERESTS ACQUIRED BY THE COUNTERPARTY;

(c)  NOTWITHSTANDING ITEM (a) AND (b), THE LIMITED PARTNERSHIP INTERESTS ACQUIRED BY A PARTNER WHO IS A QUALIFIED INSTITUTIONAL INVESTOR (DEFINED IN ARTICLE 2, PARAGRAPH 3, ITEM (1) OF THE SEL LAW; THE SAME SHALL APPLY HEREINAFTER) WHO HAS BEEN EXCLUDED FROM THE CALCULATION OF THE NUMBER OF PERSONS SOLICITED FOR SUBSCRIPTION OF THE LIMITED PARTNERSHIP INTERESTS PURSUANT TO ARTICLE 1-4, PARAGRAPH 2 OF THE CABINET ORDER FOR THE SEL LAW (THE "CABINET ORDER") MAY NOT BE TRANSFERRED EXCEPT FOR THE TRANSFER TO ANOTHER QUALIFIED INSTITUTIONAL INVESTOR; AND

(d)  IF A PARTNER WHO IS A QUALIFIED INSTITUTIONAL INVESTOR TRANSFERS THE LIMITED PARTNERSHIP INTERESTS TO ANOTHER QUALIFIED INSTITUTIONAL INVESTOR, A WRITTEN

CITI-TF 00586380

terra firma

NOTIFICATION STATING THE FOLLOWING ITEMS SHALL BE DELIVERED TO SUCH OTHER QUALIFIED INSTITUTIONAL INVESTOR BEFORE OR AT THE TIME OF TRANSFER THEREOF;

(i)· THE RESTRICTIONS OF TRANSFER THAT THE LIMITED PARTNERSHIP INTERESTS ACQUIRED BY THE QUALIFIED INSTITUTIONAL INVESTOR MAY NOT BE TRANSFERRED EXCEPT FOR THE TRANSFER TO ANOTHER QUALIFIED INSTITUTIONAL INVESTOR SHALL BE PLACED THEREON;

(ii) NO REGISTRATION HAS BEEN MADE IN RESPECT TO SOLICITATION FOR SUBSCRIPTION OF THE LIMITED PARTNERSHIP INTERESTS SUBJECT TO ARTICLE 4, ITEM 1 OF THE SEL LAW IN ACCORDANCE THAT THE SOLICITATION FOR SUBSCRIPTION RELATED TO THE ISSUE OF THE LIMITED PARTNERSHIP INTERESTS FALLS UNDER ARTICLE 2, PARAGRAPH 3, ITEM 2(B) THEREOF PURSUANT TO ARTICLE 1-4, PARAGRAPH 2 OF THE CABINET ORDER; AND

(iii) IF THE LIMITED PARTNERSHIP INTERESTS ARE TO BE TRANSFERRED TO ANOTHER QUALIFIED INSTITUTIONAL INVESTOR IN ADDITION, A WRITTEN NOTIFICATION STATING THE FOLLOWING ITEMS SHALL BE DELIVERED TO SUCH ADDITIONAL QUALIFIED INSTITUTIONAL INVESTOR BEFORE OR AT THE TIME OF TRANSFER THEREOF:

a) THE RESTRICTIONS OF TRANSFER THAT THE LIMITED PARTNERSHIP INTERESTS ACQUIRED BY THE QUALIFIED INSTITUTIONAL INVESTOR MAY NOT BE TRANSFERRED EXCEPT FOR THE TRANSFER TO ANOTHER QUALIFIED INSTITUTIONAL INVESTOR SHALL BE PLACED ON SUCH LIMITED PARTNERSHIP INTERESTS;

b) NO REGISTRATION HAS BEEN MADE IN RESPECT TO SOLICITATION FOR SUBSCRIPTION OF THE LIMITED PARTNERSHIP INTERESTS SUBJECT TO ARTICLE 4, ITEM 1 OF THE SEL LAW IN ACCORDANCE THAT THE SOLICITATION FOR SUBSCRIPTION RELATED TO THE ISSUE OF THE LIMITED PARTNERSHIP INTERESTS FALLS UNDER ARTICLE 2, PARAGRAPH 3, ITEM 2(B) THEREOF PURSUANT TO ARTICLE 1-4, PARAGRAPH 2 OF THE CABINET ORDER; AND

IF SUCH OTHER QUALIFIED INSTITUTIONAL INVESTOR TRANSFERS THE LIMITED PARTNERSHIP INTERESTS TO ANOTHER QUALIFIED INSTITUTIONAL INVESTOR IN ADDITION, A WRITTEN NOTIFICATION STATING THE ITEMS PROVIDED IN ITEM (i), (ii) AND (iii) ABOVE SHALL BE DELIVERED TO SUCH ADDITIONAL QUALIFIED INSTITUTIONAL INVESTOR BEFORE OR AT THE TIME OF TRANSFER THEREOF. IF A PARTNER WHO IS A QUALIFIED INSTITUTIONAL INVESTOR TRANSFERS THE LIMITED PARTNERSHIP INTERESTS TO THE OTHER QUALIFIED INSTITUTIONAL INVESTOR, A CERTIFICATE REPRESENTING THE LIMITED PARTNERSHIP INTERESTS SHOULD BEAR A NOTE CONCERNING THE RESTRICTIONS OF TRANSFER AS INDICATED IN THE ABOVE (c).

KOREA

NEITHER THE FUND, THE GENERAL PARTNER, NOR THE MANAGER IS MAKING ANY REPRESENTATION WITH RESPECT TO THE ELIGIBILITY OF ANY RECIPIENTS OF THIS MEMORANDUM TO ACQUIRE THE INTERESTS THEREIN UNDER THE LAWS OF KOREA, INCLUDING BUT WITHOUT LIMITATION THE FOREIGN EXCHANGE TRANSACTION ACT AND REGULATIONS THEREUNDER. THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES AND EXCHANGE ACT OF KOREA OR THE INDIRECT INVESTMENT ASSET MANAGEMENT BUSINESS ACT OF KOREA, AND NONE OF THE INTERESTS MAY BE OFFERED, SOLD OR DELIVERED, OR OFFERED OR SOLD TO ANY PERSON FOR RE-OFFERING OR RESALE, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA EXCEPT PURSUANT TO APPLICABLE LAWS AND REGULATIONS OF KOREA.

KUWAIT

THIS OFFERING IS NOT INTENDED TO BE MARKETED IN KUWAIT IN ACCORDANCE WITH THE SECURITIES TRADING AND MUTUAL FUNDS ACT 31/1990, THEREFORE THIS OFFERING HAS NOT BEEN APPROVED BY THE KUWAIT CENTRAL BANK OR THE KUWAIT MINISTRY OF COMMERCE AND INDUSTRY,

CITI-TF 00586381

terra firma

NOR HAS THE FUND RECEIVED AUTHORIZATION OR LICENSING FROM THE KUWAIT CENTRAL BANK OR THE KUWAIT MINISTRY OF COMMERCE AND INDUSTRY TO MARKET OR SELL THE INTERESTS WITHIN KUWAIT.

## LUXEMBOURG

THIS MEMORANDUM SHOULD NOT BE CONSIDERED A PUBLIC OFFERING IN THE GRAND DUCHY OF LUXEMBOURG AND THE FUND IS NOT REGISTERED AS A FOREIGN FUND WITH THE LUXEMBOURG REGULATORY AUTHORITIES.  THIS MEMORANDUM IS STRICTLY PRIVATE AND CONFIDENTIAL, IS BEING ISSUED TO A LIMITED NUMBER OF SOPHISTICATED INVESTORS, AND MAY NOT BE REPRODUCED OR USED FOR ANY PURPOSE OTHER THAN THIS PRIVATE PLACEMENT, NOR PROVIDED TO ANY PERSON OTHER THAN THE PERSON TO WHOM IT IS DISTRIBUTED BY, OR ON BEHALF OF, THE FUND.  THE SHARES OF THE FUND MAY NOT BE OFFERED TO THE PUBLIC IN OR FROM LUXEMBOURG.

## MONACO

INTERESTS IN THE FUND MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, TO THE PUBLIC IN MONACO OTHER THAN BY AN AUTHORIZED INTERMEDIARY.  NEITHER THIS MEMORANDUM, WHICH HAS NOT BEEN SUBMITTED TO THE CLEARANCE PROCEDURE OF THE MONEGASQUE AUTHORITIES, INCLUDING THE COMMISSION DE CONTROLE, NOR ANY OFFERING MATERIAL RELATING TO THE OFFER OF INTERESTS, MAY BE RELEASED OR ISSUED TO THE PUBLIC IN MONACO IN ACCORDANCE WITH ANY SUCH OFFER.  THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL SECURITIES UNDER THE SECURITIES LAWS OF MONACO.

## THE NETHERLANDS

THE INTERESTS MAY NOT BE OFFERED, SOLD, TRANSFERRED OR DELIVERED IN OR FROM THE NETHERLANDS AS PART OF THEIR INITIAL DISTRIBUTION OR AT ANY TIME THEREAFTER, DIRECTLY OR INDIRECTLY, OTHER THAN TO INDIVIDUALS OR LEGAL ENTITIES WHO OR WHICH BOTH (A) IN THE PURSUIT OF THEIR OCCUPATION OR BUSINESS, DEAL OR INVEST IN INVESTMENT OBJECTS WITHIN THE MEANING OF SECTION 1 OF THE REGULATION IN IMPLEMENTATION OF SECTION 14 OF THE INVESTMENT INSTITUTIONS SUPERVISION ACT ("UITVOERINGSREGELING EX ARTIKEL 14 WET TOEZICHT BELEGGINGSINSTELLINGEN") AND (B) QUALIFY AS PROFESSIONAL MARKET PARTIES (PROFESSIONELE MARKTPARTIJEN) AS DEFINED IN ARTICLE 1A, SUBSECTION 3 OF THE EXEMPTION REGULATION ON THE ACT ON THE SUPERVISION OF THE SECURITEIS TRADE 1995 (VRIJSTELLINGSREGELING WET TOEZICHT EFFECTENVERKEER 1995).

## NORWAY

THE OFFERING OF INTERESTS IN THE FUND IS NOT SUBJECT TO THE INVESTMENT FUND ACT OF 1981 OR THE SECURITIES TRADING ACT OF 1997.  NO ACTION HAS OR WILL BE TAKEN FOR THE OFFERING OF INTERESTS IN THE FUND TO BE REGISTERED UNDER THE PUBLIC OFFERING RULES OF THE SECURITIES TRADING ACT 1997.  THE FUND HAS NOT BEEN, NOR WILL BE, REGISTERED OR APPROVED BY THE FINANCIAL SUPERVISORY AUTHORITY OF NORWAY (KREDITTILSYNET) AND IS THUS NOT UNDER PUBLIC SUPERVISION IN NORWAY.  EACH INVESTOR SHOULD CAREFULLY CONSIDER INDIVIDUAL TAX ISSUES BEFORE INVESTING IN THE FUND.  THIS MEMORANDUM MUST NOT BE COPIED OR OTHERWISE DISTRIBUTED BY THE RECIPIENT.

## SAUDI ARABIA

THIS MEMORANDUM IS BEING PROVIDED SOLELY FOR INFORMATIONAL PURPOSES.  NEITHER IT NOR THE FUND HAVE BEEN APPROVED BY THE CAPITAL MARKETS AUTHORITY OF SAUDI ARABIA.

- 80 -

CITI-TF 00586382

terra firma

ACCORDINGLY INTERESTS IN THE FUND MAY NOT BE OFFERED SOLD OR OTHERWISE MARKETED IN SAUDI ARABIA.

SINGAPORE

THIS DOCUMENT IS AN INFORMATION MEMORANDUM AS DEFINED IN SECTION 275 OF THE SINGAPORE ACT ("INFORMATION MEMORANDUM") AND HAS BEEN PREPARED SOLELY FOR THE DELIVERY TO AND REVIEW BY SOPHISTICATED INVESTORS AND CERTAIN INSTITUTIONAL INVESTORS SO AS TO ASSIST THEM IN MAKING AN INVESTMENT DECISION IN RESPECT OF THE SHARES IN THE COMPANY.

THIS INFORMATION MEMORANDUM HAS NOT BEEN LODGED WITH THE MONETARY AUTHORITY OF SINGAPORE AND IS NOT A PROSPECTUS (AS DEFINED IN THE ACT). ACCORDINGLY, STATUTORY LIABILITY UNDER THE SINGAPORE ACT IN RELATION TO THE CONTENTS OF PROSPECTUSES WOULD NOT APPLY. THE MONETARY AUTHORITY OF SINGAPORE TAKES NO RESPONSIBILITY FOR THE CONTENTS OF THIS DOCUMENT. YOU SHOULD CONSIDER CAREFULLY WHETHER THIS INVESTMENT IS SUITABLE FOR YOU.

IF YOU ARE IN ANY DOUBT ABOUT THE CONTENTS OF THIS INFORMATION MEMORANDUM, YOU SHOULD CONSULT YOUR LEGAL ADVISOR OR OBTAIN OTHER INDEPENDENT PROFESSIONAL FINANCIAL ADVICE. YOU SHOULD ALSO SEEK INDEPENDENT PROFESSIONAL ADVICE AS TO THE SAFETY OF THE CAPITAL YOU INTEND TO INVEST IN THE COMPANY.

INVESTORS SHOULD NOTE THAT THE SALE OF SHARES IN THE COMPANY (IF SUBSCRIBED FOR OR PURCHASED IN SINGAPORE) WITHIN 6 MONTHS FROM THE DATE THE SHARES WERE INITIALLY ACQUIRED PURSUANT TO SECTION 274 OR 275 OF THE SINGAPORE ACT WILL BE TREATED AS AN OFFER TO THE PUBLIC UNLESS THEY ARE SOLD TO SPECIFIED CATEGORIES OF PERSONS.

SPAIN

NEITHER THIS DOCUMENT NOR THE LIMITED PARTNERSHIP HAVE BEEN REGISTERED WITH THE SPANISH COMISIÓN NACIONAL DEL MERCADO DE VALORES. IT IS, THEREFORE, NOT ALLOWED TO SELL, OR OFFER THE INTERESTS IN THE FUND EXCEPT IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE A PUBLIC OFFER OR MARKETING PURSUANT TO THE SPANISH LEGISLATION.

THIS DOCUMENT WILL ONLY BE PROVIDED TO SELECTED SOPHISTICATED INVESTORS WHO: (I) HAVE PREVIOUSLY APPROACHED EITHER THE LIMITED PARTNERSHIP OR A THIRD PARTY TO GATHER INFORMATION ABOUT THIS LIMITED PARTNERSHIP AND (II) ARE CAPABLE OF ASSUMING THE FINANCIAL RISK ASSOCIATED WITH SUCH AN INVESTMENT. COPYING THIS DOCUMENT OR PASSING IT ON TO ANYONE ELSE IS UNAUTHORISED AND MAY CONTRAVENE THE LAW. ANY PERSON RECEIVING THIS DOCUMENT SHOULD NOT ONLY RELY ON THE INFORMATION CONTAINED HEREIN BUT ALSO ON SPECIFIC INVESTMENT ADVICE SOUGHT IN THE LIGHT OF HIS/HER PERSONAL CIRCUMSTANCES.

SWEDEN

THIS MEMORANDUM HAS NOT AND WILL NOT BE REGISTERED WITH OR APPROVED BY FINANSINSPEKTIONEN (THE SWEDISH FINANCIAL SUPERVISORY AUTHORITY). ACCORDINGLY, THIS MEMORANDUM MAY NOT BE MADE AVAILABLE, NOR MAY THE INTERESTS OFFERED HEREUNDER BE MARKETED AND OFFERED FOR SALE IN SWEDEN, OTHER THAN UNDER CIRCUMSTANCES WHICH ARE DEEMED NOT TO BE AN OFFER TO THE PUBLIC IN SWEDEN UNDER THE SWEDISH FINANCIAL INSTRUMENTS TRADING ACT (1991:980) OR THE INVESTMENT FUNDS ACT (2004: 46). THIS OFFERING WILL ONLY BE MADE TO A LIMITED NUMBER OF IDENTIFIED PERSONS OR ENTITIES IN SWEDEN.

– 81 –

CITI-TF 00586383

terra firma

HISTORICAL PERFORMANCE IS NOT A GUARANTEE FOR FUTURE PERFORMANCE. INVESTMENTS MADE IN THE PARTNERSHIP MAY DECREASE AS WELL AS INCREASE IN VALUE, AND IT CANNOT BE GUARANTEED THAT YOUR INITIAL INVESTMENT WILL BE RETURNED IN ITS ENTIRETY.

SWITZERLAND

THE LIMITED PARTNERSHIP MAY QUALIFY AS A FOREIGN INVESTMENT FUND UNDER THE LAWS OF SWITZERLAND. ACCORDINGLY, THIS MATERIAL IS NOT ADDRESSED TO THE GENERAL PUBLIC IN SWITZERLAND AND NO ADVERTISING TO THE GENERAL PUBLIC WILL TAKE PLACE. MARKETING OF THE LIMITED PARTNERSHIP IN SWITZERLAND IS RESTRICTED TO A LIMITED CIRCLE OF POTENTIAL INVESTORS WHO DO NOT SUBSCRIBE THE SHARES WITH A VIEW TO DISTRIBUTION. THESE INVESTORS WILL INDIVIDUALLY BE APPROACHED FROM TIME TO TIME. THIS MATERIAL MAY ONLY BE USED BY THOSE INVESTORS FOR EVALUATING A POTENTIAL INVESTMENT IN THE LIMITED PARTNERSHIP AND MAY NOT BE DISTRIBUTED OR MADE AVAILABLE TO OTHER PERSONS WITHOUT EXPRESS CONSENT OF THE ISSUER.

TAIWAN

THIS DOCUMENT IS PROVIDED FOR INFORMATION ONLY. IT IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY LIMITED PARTNER INTERESTS IN THE FUND. ANY SUCH SALE OR SOLICITATION MAY ONLY BE MADE PURSUANT TO FINAL OFFERING DOCUMENTS. THE OFFER OF INTERESTS IN THE FUND HAS NOT BEEN REGISTERED WITH THE SECURITIES AND FUTURES BUREAU, FINANCIAL SUPERVISORY COMMISSION OF THE REPUBLIC OF CHINA PURSUANT TO RELEVANT SECURITIES LAWS AND REGULATIONS AND MAY NOT BE OFFERED OR SOLD WITHIN THE REPUBLIC OF CHINA THROUGH AN OFFERING OR IN CIRCUMSTANCES WHICH CONSTITUTE AN OFFER WITHIN THE MEANING OF THE SECURITIES AND EXCHANGE LAW OF THE REPUBLIC OF CHINA THAT REQUIRES A REGISTRATION OR APPROVAL OF THE SECURITIES AND FUTURES BUREAU, FINANCIAL SUPERVISORY COMMISSION OF THE REPUBLIC OF CHINA.

UNITED ARAB EMIRATES

THIS DOCUMENT DOES NOT CONSTITUTE A PUBLIC OFFER. ONLY A RESTRICTED NUMBER OF INVESTORS IN THE UAE HAVE BEEN INVITED TO PARTICIPATE. BY RECEIVING THIS MEMORANDUM, THE PERSON OR ENTITY TO WHOM IT HAS BEEN ISSUED UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THIS MEMORANDUM HAS NOT BEEN APPROVED BY THE U.A.E. CENTRAL BANK, THE U.A.E. MINISTRY OF ECONOMY AND PLANNING OR ANY OTHER AUTHORITIES IN THE U.A.E., NOR HAS THE PLACEMENT AGENT RECEIVED AUTHORIZATION OR LICENSING FROM THE U.A.E. CENTRAL BANK, THE U.A.E. MINISTRY OF ECONOMY AND PLANNING OR ANY OTHER AUTHORITIES IN THE UNITED ARAB EMIRATES TO MARKET OR SELL INTERESTS WITHIN THE UNITED ARAB EMIRATES.

NO MARKETING OF ANY FINANCIAL PRODUCTS OR SERVICES HAS BEEN OR WILL BE MADE FROM WITHIN THE UNITED ARAB EMIRATES AND NO SUBSCRIPTION TO ANY SECURITIES, PRODUCTS OR FINANCIAL SERVICES MAY OR WILL BE CONSUMMATED WITHIN THE UNITED ARAB EMIRATES. IT SHOULD NOT BE ASSUMED THAT THE PLACEMENT AGENT IS A LICENSED BROKER, DEALER OR INVESTMENT ADVISOR UNDER THE LAWS APPLICABLE IN THE UNITED ARAB EMIRATES OR THAT IT ADVISES INDIVIDUALS RESIDENT IN THE UNITED ARAB EMIRATES AS TO THE APPROPRIATENESS OF INVESTING IN OR PURCHASING OR SELLING SECURITIES OR OTHER FINANCIAL PRODUCTS. NOTHING CONTAINED IN THIS MEMORANDUM IS INTENDED TO CONSTITUTE INVESTMENT, LEGAL, TAX, ACCOUNTING OR OTHER PROFESSIONAL ADVICE. THIS MEMORANDUM IS FOR YOUR INFORMATION ONLY AND NOTHING IN THIS MEMORANDUM IS INTENDED TO ENDORSE OR RECOMMEND A PARTICULAR COURSE OF ACTION. YOU SHOULD CONSULT WITH AN APPROPRIATE PROFESSIONAL FOR SPECIFIC ADVICE RENDERED ON THE BASIS OF YOUR SITUATION.

– 82 –

CITI-TF 00586384

A-308

terra firma

IT IS POSSIBLE THAT SOME OF THE INVESTMENTS THAT WILL BE MADE BY THE FUND COULD BE DESCRIBED AS "RELATIVELY HIGH RISK" OR EVEN "HIGH RISK." OFTEN THE DECREASE IN VALUE OF CERTAIN INVESTMENTS HELD BY THE FUND WILL BE BALANCED BY THE INCREASE IN VALUE OF OTHER INVESTMENTS IN THE FUND'S PORTFOLIO. HOWEVER, THIS WILL NOT ALWAYS BE THE CASE. IF THERE IS AN OVERALL DECREASE IN THE VALUE OF THE FUND'S PORTFOLIO OF INVESTMENTS, THIS COULD SUBSTANTIALLY AFFECT THE VALUE OF YOUR INTERESTS.

UNITED STATES OF AMERICA

NOTWITHSTANDING ANYTHING IN THE MEMORANDUM, THE PARTNERSHIP AGREEMENT OR THE SUBSCRIPTION AGREEMENT TO THE CONTRARY, TO COMPLY WITH U.S. TREAS. REG. SECTION 1.6011-4(B)(3)(I), EACH INVESTOR (AND ANY EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT THEREOF) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE UNITED STATES FEDERAL INCOME TAX TREATMENT AND TAX STRUCTURE OF THE INVESTMENT, IT BEING UNDERSTOOD AND AGREED, FOR THIS PURPOSE, (I) THE NAME OF, OR ANY OTHER IDENTIFYING INFORMATION REGARDING, THE PARTNERSHIP OR ANY EXISTING OR FUTURE INVESTOR (OR ANY AFFILIATE THEREOF) IN THE PARTNERSHIP, OR ANY INVESTMENT OR TRANSACTION ENTERED INTO BY THE PARTNERSHIP, (II) ANY PERFORMANCE INFORMATION RELATING TO THE PARTNERSHIP OR ITS INVESTMENTS, OR (III) ANY PERFORMANCE OR OTHER INFORMATION RELATING TO PREVIOUS FUNDS OR INVESTMENTS MANAGED AND/OR ADVISED BY TERRA FIRMA OR ITS AFFILIATES DO NOT CONSTITUTE SUCH TAX TREATMENT OR TAX STRUCTURE INFORMATION.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE INTERESTS HAVE NOT BEEN RECOMMENDED BY ANY U.S. FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THERE CAN BE NO ASSURANCE THAT AN INVESTOR WILL RECEIVE A RETURN OF ITS CAPITAL INVESTED IN THE PARTNERSHIP.

THE PARTNERSHIP IS A LIMITED PARTNERSHIP ESTABLISHED UNDER THE LAWS OF ENGLAND. THE GENERAL PARTNER AND THE MANAGER ARE NON-RESIDENTS OF THE UNITED STATES AND ALL OR A SUBSTANTIAL PORTION OF THE ASSETS OF THE PARTNERSHIP AND SUCH PERSONS ARE LOCATED OUTSIDE THE UNITED STATES. AS A RESULT, IT MAY NOT BE POSSIBLE FOR INVESTORS TO EFFECT SERVICE OF PROCESS WITHIN THE UNITED STATES UPON THE PARTNERSHIP OR SUCH PERSONS OR TO ENFORCE AGAINST ANY OF THEM IN THE U.S. COURTS JUDGMENTS OBTAINED IN U.S. COURTS, INCLUDING JUDGMENTS PREDICATED UPON THE CIVIL LIABILITY PROVISIONS OF THE SECURITIES LAWS OF THE UNITED STATES OR ANY STATE OR TERRITORY WITHIN THE UNITED STATES.

FOR FLORIDA RESIDENTS ONLY

THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.

IF SALES ARE MADE TO FIVE (5) OR MORE INVESTORS IN FLORIDA, ANY FLORIDA INVESTOR MAY, AT HIS OPTION, VOID ANY PURCHASE HEREUNDER WITHIN A PERIOD OF THREE (3) DAYS AFTER HE (A) FIRST TENDERS OR PAYS TO THE PARTNERSHIP, AN AGENT OF THE PARTNERSHIP OR AN ESCROW AGENT THE

– 83 –

CITI-TF 00586385

terra firma

CONSIDERATION REQUIRED HEREUNDER OR (B) DELIVERS HIS EXECUTED SUBSCRIPTION AGREEMENT, WHICHEVER OCCURS LATER.   TO ACCOMPLISH THIS, IT IS SUFFICIENT FOR A FLORIDA INVESTOR TO SEND A LETTER OR TELEGRAM TO THE PARTNERSHIP WITHIN SUCH THREE (3) DAY PERIOD, STATING THAT HE IS VOIDING AND RESCINDING THE PURCHASE.   IF AN INVESTOR SENDS A LETTER, IT IS PRUDENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT THE LETTER IS RECEIVED AND TO EVIDENCE THE TIME OF MAILING.

FOR GEORGIA RESIDENTS ONLY

THESE INTERESTS HAVE BEEN ISSUED OR SOLD IN RELIANCE ON THE EXEMPTION FROM SECURITIES REGULATION CONTAINED IN PARAGRAPH 13 OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

~ B4 ~

CITI-TF 00586386

terra firma

## 11    Track Record Calculation Methodology

### Methodology for Calculating Gross IRR

Gross IRRs have been calculated for each investment from the month when the first material cashflow of each investment occurs before deduction of management fees and carried interest.

Gross IRRs for the "Realised or Partially Realised Investments", the "Unrealised Investments", and "All Investments" have been calculated using aggregated cashflows and by reference to the months in which cashflows actually arise, treating all cash inflows and outflows as if they pertained to a single investment for each category, so that the Gross IRR is the IRR for that hypothetical single investment, before deduction of management fees, transaction costs of deals not consummated and carried interest. This method is sometimes called the actual time weighted method or time line method.

Unless otherwise indicated, all internal rates of return are presented on a "gross" basis (i.e. they do not reflect the management fees, carried interest, taxes, transaction costs and other expenses to be borne by investors in the Partnership, which in the aggregate are expected to be substantial); for a description of such management fees and carried interest, see Section 7; "Key Terms." Actual realised returns on Terra Firma's unrealised investments will depend on, among other factors, future operating results, the value of the assets and market conditions at the time of disposition, any related transaction costs and the timing and manner of sale, all of which may differ from the assumptions on which the valuations used in the prior performance data contained herein are based. Accordingly, the actual realised returns on these unrealised investments may differ materially from the returns indicated herein.

### Methodology for Valuing Unrealised Investments

**☒  Transaction Size**

Transaction Size represents the total entity value that was acquired via the equity investment. Transaction Size includes the equity investment to fund the purchase (initial and deferred), term debt assumed at purchase and/or put in place to finance the acquisition (excluding working capital lines) and transaction costs incurred directly by Terra Firma.

**☒  Equity Invested**

Equity Invested equals the aggregated cash payments made by Terra Firma over the duration of the investment comprising the sum of the initial investment (purchase payments plus transaction costs and Terra Firma fees at completion date) plus any other further payments made by Terra Firma prior to exit (for example, deferred purchase payments, capital expenditure or other payments). Equity invested is reduced to the extent any equity investment has been funded by bridge finance and is subsequently repaid from additional debt in the portfolio business or from proceeds of a past disposal.

**☒  Co-Investment Selldown**

Co-Investment Selldown represents the total equity value that was sold by the fund to co-investment partners post-acquisition. This does not represent equity provided by external minority investors on acquisition.

CITI-TF 00586387

terra firma

■ **Realised Value**

Realised Value equals the aggregated cash received by the Terra Firma over the duration of the investment comprising the monthly cashflows received by Terra Firma including all investment income (for example sale proceeds net of costs, interest, capital repayments, dividends, warrant exercise receipts) and fees. It excludes proceeds of co-investment sales received by the fund, proceeds of portfolio business refinancings that are used to repay equity bridge finance and proceeds of exits that are used to repay equity bridge finance.

■ **Transaction Cashflow Aggregation Dates**

Cashflows included in Equity Invested and Realised Value for each transaction have been aggregated on the basis that all payments and receipts occur at the beginning of each month.

■ **Taxation**

The IRRs are stated gross of any corporate taxation.

■ **Foreign Currency Cashflows**

TFCP II cashflows are presented in Euros, the currency of TFCP II. Foreign currency cashflows have been converted to Euro at the closing exchange rates applicable on the day of each receipt or payment.

TFCP I cashflows are presented in Euros. The currency of TFCP I is Sterling. Dollar cashflows have been converted to Sterling at the closing exchange rates applicable on the day of each receipt or payment by Terra Firma. All cashflows have then been translated from Sterling, the currency of TFCP I, to Euros at an exchange rate of 1.5 Euro to 1 GBP. Deutsche Annington cashflows are shown in the natural currency of Euros.

■ **Unrealised Value**

Valuations of unrealised investments are stated at amounts considered to be a fair assessment of their value. In valuing unlisted investments a number of principles which are based upon the European Private Equity and Venture Capital Association guidelines for valuing unquoted investments, have been followed.

■ **Valuation Date**

TFCP I unrealised investments are valued as at 1 April, 2006.

TFCP II unrealised investments are valued as at 1 January, 2006. The 1 January, 2006 Valuation has been adjusted for subsequent investments and divestments to 31 March, 2006 as set out in the cashflows.

■ **Valuation Approach for Recent Unrealised Investments**

Unrealised investments acquired within the last 12 months are valued at cost.

■ **Valuation Approach for Other Unrealised Investments**

Unrealised Investments held for more than 12 months are valued at Fair Market Value including a liquidity discount.

– 86 –

CITI-TF 00586388

terra firma

The valuation is determined by using earnings multiple, net assets, or discounted cashflow approaches. Generally the earnings multiple basis of valuation will be used unless this is inappropriate, as in the case of certain asset-based businesses or cash negative businesses. Valuations are then reduced by liquidity discounts of between 10 per cent. to 20 per cent. to reflect the unlisted nature of the investments. In cases where recent offers/indications from potential purchasers have been received, these have been considered relevant in assessing the valuation.

Provisions against cost are made if there has been a material and permanent diminution of the value of the investment below cost.

**Deductions for Other Interests**

In arriving at the Unrealised Value of an investment, any expected dilution from outstanding warrants, options or performance related management incentive mechanisms is taken into account.

**Total Value**

Total Value is defined as the sum of Realised Value and Unrealised Value.

**Gross IRR (for Investments)**

Gross IRRs have been calculated for each investment from the month when the first material cashflow of each investment occurs before deduction of management fees and carried interest.

**Gross IRR (Aggregate)**

Gross IRRs for the "Realised or Partially Realised Investments", the "Unrealised Investments", and "All Investments" have been calculated using aggregated cashflows and by reference to the months in which cashflows actually arise, treating all cash inflows and outflows as if they pertained to a single investment for each category, so that the Gross IRR is the IRR for that hypothetical single investment, before deduction of management fees, transaction costs of deals not consummated and carried interest. This method is sometimes called the actual time weighted method or time line method.

**Gross Cash Multiple**

Gross Cash Multiples have been calculated as the ratio of Total Value to Equity Invested after deducting proceeds of Co-investment Selldowns.

**Gross Cash Multiple After Recycling**

Gross Cash Multiples After Recycling have been calculated as the ratio of Adjusted Total Value to Adjusted Equity Invested. Adjusted Equity Invested means Equity Invested minus cash returned during the first 18 months from the date of acquisition (for example from refinancing). Adjusted Total Value means Total Value minus cashflow received during the first 18 months from the date of acquisition.

**Excluded Investments**

The investments listed in the Track Record at Section 3: "Summary of Investment Performance" comprise all investments made by Terra Firma up until 1 April, 2006, with the exception of six small investments made in the

CITI-TF 00586389

terra firma

1990s that have been aggregated or excluded because they are of a size and type which are not consistent with the target transactions for the Fund, and are also immaterial to the total track record performance.

Overall, the excluded transactions have been profitable but insignificant.   Unilease, Macmillian (Norland) and Gleneagles have been categorised as "Securitisation/bonds/debt-repackaging" and are not private equity investments.   Other deals are excluded/aggregated because of their size of equity.

– 88 –

CITI-TF 00586390

THIS PAGE INTENTIONALLY LEFT BLANK

CITI-TF 00586391

THIS PAGE INTENTIONALLY LEFT BLANK

CITI-TF 00586392

THIS PAGE INTENTIONALLY LEFT BLANK

CITI-TF 00586393

A10662  06/06

CITI-TF 00586394



ntents        Letter from the CEO        An Alternative Perspective        General Partner's Report

Portfolio Companies        Management Accounts        Contacts and Advisory Board

# terra firma

## Terra Firma Capital Partners II
## Q3 2007

Confidential

TF0000633303

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | Management Accounts | Contacts and Advisory Board |

# terra firma

November 2007

Dear Partners,

As we are all well aware, the environment that private equity faces has changed dramatically in the last few months. Some weeks ago, I attended a conference for senior LPs and GPs and what I found amazing was how incredibly positive the GPs were on the prospects for private equity over the next few years. However, in my view, it is going to take some time for the debt markets to return to any kind of normality and for there to be the normal positive spread between risk-adjusted equity yields and debt. Hence, while I don't want to be a doom-sayer, I felt I should share with you some of the issues facing the world markets that I shared with the conference attendees and which are keeping me up at night, in contrast to the sound sleep of my other GP colleagues.

First, there is the obvious one, the credit crunch. Many people seem to be viewing this as some kind of "blip" which will pass quickly. I simply do not believe this will be the case. My last July guestimate was that something like $3 trillion of liquidity would be taken out of the global financial system over the following 18 months as the banks face something like $300 billion of losses. Mark to market accounting will take its toll, many more people will get fired and some, most likely in the US, will go to jail for "fiddling" the books. These losses may largely be in the sub-prime market in the US, but will extend over time to other areas such as LBOs and CLOs. Not only is much less debt going to be available, but the price of it will be much higher, and while the investment banks digest the loans that are already on their balance sheets, lending to large buyout investors will continue to be difficult for them.

Second, there is the very real question of how much this financial crisis will spill into the broader economies of the world and, in particular, to the US and UK. Dieter Helm discusses this in his subsequent article, but my view is that these economies have been driven by the consumer, who is now up against a brick wall, over-leveraged and with no room for manoeuvre. The ensuing reduction in consumer expenditure will mean recessions are inevitable, but will probably be delayed until after the US elections by the lowering of interest rates.

Third, there is the fact that the world political climate is increasingly unhelpful. Localisation, not globalisation, is becoming the driver as people worry about issues closer to home which will need funding. Business taxes are likely to go up to fund these problems and these taxes will not just be on GPs, but on LPs and portfolio companies themselves.

On the global front, the world is becoming increasingly unstable, with fundamentalism continuing to rise. The division between the "haves" and the "have nots" is becoming larger which is further fuelling political tensions. On top of all this, the world is still failing to reckon with global warming and the unpredictable effects and consequences that this will have on all areas of life.

With all of these concerns, one would expect the world stock markets to be down, and down heavily, but this simply has not been the case. With a movement away from alternatives, and with interest rates being relatively low, investors are unsure where to put their money. The listed equity markets have therefore been seen by many as a long-term safe harbour. Indeed, by mid-October, the listed equity markets had basically returned to their pre-credit crunch peaks.

From a private equity perspective, this means that sellers' price expectations have remained high, as those areas of the world that are still awash with liquidity continue to make purchases. This might help protect exit valuations, but, with the availability of finance having decreased, doing large buyout deals in the first half of 2008 will be far more difficult than in the first half of 2007. This is already evidenced by the decline in the value of transactions that have been completed since June. Furthermore, on the exit front, those countries with liquidity, such as Russia, China and the Middle East, are all subject to the political uncertainty I mention above. I believe all of this will lead to either a sharply lower equity market within the next year or alternatively, and I think more likely, a stagnant equity market for some time with consumer brand-based businesses tending to underperform and asset-rich businesses overperforming the general market.

ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report

Portfolio Companies | Management Accounts | Contacts and Advisory Board

# terra firma

Now, I could be wrong, and, while I think all of the above concerns are very real, I don't believe they will all occur – or certainly not at the same time with the same force. However, I am a believer that the things that are most dangerous are those risks that one is not thinking about. Or, as someone once put it, it's not what you know that you don't know that gets you into trouble, it's what you don't know you don't know that does!

So, in such a challenging environment, what should an LP look for from private equity general partners? I think that there are basically four types of GP:

- Transformers – GPs who have been in the business for years and have the proven ability and size to adjust to different environments or find attractive new opportunities;

- Focusers – GPs who have stayed focused on one particular strategy, developing both expertise and a reputation in that area;

- Traditionalists – GPs who do not have the resources or the desire to adjust to new environments and who are not particularly focused; and

- Newbies – GPs who are new and have yet to be proven (typically founded during favourable markets).

In the pre-summer 2007 era, all of these groups should have made money as leverage was plentiful, there was a positive spread between debt and equity and prices continued to rise. However, in the new environment, the "Transformers" and "Focusers" are where, I believe, one wants to be. These are the groups that perform in difficult markets, although I do believe there is a danger that, once a group is of such a size as to be a "Transformer", it can start to lose its alignment with its investors. Such groups can start to think more about fee income than capital gain and can also plan on going public – which has its own challenges.

So, how does Terra Firma fit into these GP categories? The origins of Terra Firma go back to 1990 when I established the Global Asset Structuring Group ("GAS") at Goldman Sachs in response to the 1989–1994 market correction. In 1994, I moved to Nomura and established the Principal Finance Group to focus on the same types of businesses as GAS, but as a principal investor. In 2002, we spun out to form Terra Firma. We have been centred on the same type of business for 17 years and are definitely a "focuser" and a "focuser" that was born out of recession when "necessity became the mother of invention".

As you know, Terra Firma invests in large buyouts of businesses that most other private equity firms tend to avoid: companies in unfashionable sectors that are supported by assets; complex businesses with structural and regulatory issues; and businesses that are in need of change – operational, strategic and managerial.

In fact, we are not actually in the business of management buy-outs, but of Terra Firma buy-ins – using the approximately 100 people we have with financial, operational and strategic experience to effect change. Basically, Terra Firma invests in high added-value transactions focusing on assets, and it is a strategy that has done well and will continue to do well in the new environment. It will not be without its challenges as finding debt financing for deals will not be easy over the next year at least. However, by staying very close to our relationship banks and being realistic with regard to terms, timing and quantity, Terra Firma should be able to continue to obtain financing for the deals we want to do.

Our latest acquisition, that of EMI, is a great example of a quintessentially Terra Firma deal. EMI draws on Terra Firma's full experience in strategically transforming businesses, repositioning assets, driving operational change, and growing and stabilising cash flows in an industry that is out of favour. It has all the attributes of a Terra Firma transaction:

- Asset-rich business – Publishing and Recorded Music catalogues;

- Industry in transformation – Impact of market change on consumer and artist behavior;

- Potential for consolidation – Acquisition of assets from other market participants;

- Potential for greater efficiency – Ability to use technology to reduce the cost base; and

ii

**terra firma**

- Opportunity for strong financing—An attractive initial financing package that took advantage of the pricing and terms that were available at the time and which provides the flexibility needed for Terra Firma's planned changes.

Terra Firma plans to add value in many ways, including:

- Bringing focus – Making the people in the business understand what it is they are supposed to be doing, that is, that they are there to serve the customer and the artist and not to try and be or act like artists themselves;

- Driving operational change – Forcing the business to simplify its operations, reduce costs and start making decisions based on sound financial judgements;

- Repositioning Recorded Music – Helping Recorded Music tackle the B2B and consumer digital opportunity/challenge;

- Exploiting assets – Moving the prioritisation of the exploitation of the catalogue from the bottom of the pile to the top; and

- Intervening – Changing the culture and displaying leadership where previously there was little and, what little there was, was confused.

These changes will not be easy and will require both extensive effort and resources. We are driving these value-added changes by putting approximately 45 people, both from Terra Firma and outside our firm, into the business. This total includes three seconded MDs, and I have taken on the role of non-executive Chairman. There is no doubt that EMI is a tremendous challenge, but it is also a huge opportunity and our success or failure will not be correlated to the markets, but to our ability to effect change, quickly and decisively. It is this type of deal that Terra Firma focuses on and from which it makes money.

But, EMI is a done deal, so going forward, what type of deal should Terra Firma do? You won't be surprised to hear me say, more of the same. Our contrarian interventionist strategy focuses on assets that need transformation in how they are managed and is well suited to making money in more challenging environments such as that which we now face. As I mentioned in my last letter, we intend to focus on puzzle deals, where bringing all the pieces together takes time, and on deals which need significant amounts of equity. There is also a third strategy and those are "fallen-over" deals or deals that were over-leveraged in the recent heady environment and are in need of capital restructuring as well as strategic change which I believe will come into their own in about 18 months.

In sum, the private equity market has entered a new and far more challenging phase after the recent era of excessive leverage, but there are still money-making opportunities available; it is just that they will be more difficult to find and finance. GPs who have the experience to either adapt – the "Transformers" – or who have a disciplined strategy that works in such an era – the "Focusers" – will deliver the best returns.

Terra Firma intends to focus on the same type of deals that we have always done. Having been formed in recession, we are not frightened or dismayed about the times ahead and feel that we are well-positioned to take advantage of the opportunities that will be presented in this changed environment. It will not be easy, but I believe it will be profitable for all of us.

Best wishes

*S H*

Guy Hands – CEO, Terra Firma

iii

# Contents

**An Alternative Perspective – Guest Articles**   2

It's not over yet: the implications of the   3
credit crunch
*Prof. Dieter Helm, University of Oxford*

Growing risk in Turkey   7
*Ian Bremmer, President, Eurasia Group*

**General Partner's Report**   11
Quarterly Review   12
Fund Summary   14

**Portfolio Companies**   18
Infinis(WRG)   20
Odeon/UCI   21
Tank & Rast   23
Phoenix Natural Gas (ESH)   25
AWAS   27
EMI   29
Analysis of Investments and Asset Values   30
Investment Cash Flows   31

**Management Accounts**   34
Fund Financial Statements   35
Notes to the Accounts   37

**Contacts and Advisory Board**   41

1

Contents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

# An Alternative Perspective

Guest Articles: Prof. Dieter Helm, University of Oxford

Ian Bremmer, President, Eurasia Group



Confidential

ntents     Letter from the CEO     An Alternative Perspective     General Partner's Report

Portfolio Companies     Management Accounts     Contacts and Advisory Board

# It's not over yet: the implications of the credit crunch

PROF. diEtER hELM, uniVERsity OF OXFORd

2007 will go down in economic history as a rollercoaster – it's not often that we see a global credit crunch which requires over $0.5 trillion to stabilise, and a run on a major London bank. The former occurs roughly every quarter of a century, the latter on a century scale – though there were no major UK bank runs in the entire twentieth century.

What is at least as surprising is that many in the financial markets appear to believe that these are events that can happen without wider economic consequences. A prevalent belief – backed up by the remarkable resilience of equity markets – is that the losses are confined to those exposed in the sub-prime market, who have borrowed and lent imprudently.

## OPtiMists And suPER-OPtiMists

This belief has two versions: the optimists and the super-optimists. The optimists hold that the actions of central banks (notably in the US and Europe) have staved off disaster by easing monetary policy. Interest rates, which had been on the rise since 2006 (back to normal long-run levels), have been eased back and money pumped into the market to restore confidence. The optimists see no reason to think that this will not be repeated – that the Fed, in particular, will continue to lower rates as and when necessary to underpin markets, and as a result equities have rebounded.

The super-optimists go one step further: they think that monetary policy has now become so sophisticated that the business cycle itself has been abolished. Whereas the economic history of capitalism has been punctuated by booms and recessions, on this view, policy-makers have now mastered the tools of macro-economic management and, having started in the early 1990s, the long boom will go on indefinitely, unless these same policy-makers make serious mistakes. Here, the trick was to free central bankers to set interest rates with inflation targets in mind, so that, as a result, low inflation expectations have become embedded in markets.

## Busin Ess CyCLEs in thE PAst

The super-optimists are right about one thing – inflation has played a central role in downturns in the past. But it is not the only component: exchange rates and government borrowing have been familiar components too. The 'stop – go' cycles in the post-Second World War UK economy were initially caused by the use of Keynesian demand-management expansions of domestic demand, leading to an increased demand for imports. Balance-of-payments and currency crises followed and the brakes were then slammed on domestically to restore the current account to equilibrium. This cycle eventually became fine-tuned to the electoral cycle: politicians would expand domestic demand up to elections and,

3

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | | Management Accounts | Contacts and Advisory Board |

once in power, administer sterner medicine, in the hope that another boom would come along just in time for them to face the electorate again. It was not, of course, entirely successful – and devaluations and external help were needed from time to time. Harold Wilson had to face this music in 1967, and Callaghan and Healey needed the IMF to bail them out in 1976.

But whereas the UK is a relatively small open economy, the US could weather such balance-of-payments storms more easily. The dollar acted as the world's reserve currency, and with around 25 per cent of world GDP, others had to live with the US's growing appetite for consumption and imports. Yet even the US could not live with inflation, and its own business cycles were in large measure driven by its desire to hold the inflationary line. And its war expenditure in first North Korea and then Vietnam eventually broke the Breton Woods currency system.

### WhAt ChAnGEd in thE 1980s And 1990s?

In the last decades of the twentieth century, the world economy changed a lot – probably more than in any previous peacetime period of comparative length. There was an extraordinary explosion of technical progress, with information technology and the Internet the main driving forces. For many now, it is hard to imagine what life was like without mobile phones, laptops and the web.

In itself, this was transformational. But there was more good news: the Berlin Wall collapsed and, with it, the Soviet Union. China turned to capitalism (with an authoritarian face). These new markets provided an opening that bears comparison with the opening up of the US in the nineteenth century.

And then there was the collapse of oil prices – after the trauma of the 1970s' OPEC years. Instead of marching up to $100/barrel and then on to $200, as many predicted at the end of the 1970s, oil prices fell back to $10 from the mid-1980s for more than a decade, punctuated only briefly by the first Gulf War.

Lower prices eased the US costs of importing oil. In the UK, the oil effect was rather different: North Sea oil had on its own 'solved' the balance-of-payments constraint: in the Thatcher years the trade deficit simply no longer mattered, while the revenues could be used to lower taxes and further boost the economy.

These were indeed the lucky decades – technical progress boosted growth and productivity, the opening of China injected cheap labour, and commodity prices fell. All three factors suppressed inflation – it was dead for the period. And with the death of inflation came the ability to soften monetary policy and to use it to smooth out markets – and to head off the business cycle.

4

ntents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

## tOO GOOd tO LAst

Faced with such extraordinary benign conditions and for so long, it was not surprising that what was 'special' began to be assumed as 'normal'. Irrational exuberance inevitably followed, and indeed the surprise was that it played out for so long. Eventually, the day of reckoning came in 2000 as equity markets fell back sharply – indeed, so sharply that in real terms they remain well below their peaks nearly a decade later.

The irrational exuberance masked other trends too, which signalled a return to more normal times. Oil prices started their gradual and continuous rise towards the $100 mark. The US trade deficit began to edge towards the diff which would trigger a dollar sell-off. For the UK, the oil was running out and the old balance-of-payments problems began to return.

But for all the warning signs, the new conventional wisdom about the ability of central banks to keep the business cycle at bay held sway. And they acted in 2000 with an extraordinary zeal – cutting real interest rates to zero. As a result, the real economy kept going and economic growth did not seriously falter. It appeared to work.

But this time, the growth was much less sustainable. It was built on cheap debt and consumer and government spending financed by that cheap debt. GDP kept going up – but more as an accounting illusion than a reality. GDP comprises the credit of spending and investment, but takes no account of the debit of the debt. And when interest rates started to return to normal in real terms in 2006, the day of reckoning could not be postponed for much longer.

## thE suB-PRiME CRisis And thE CREdit CRunCh

And so, in 2007, the irrational exuberance came to a shuddering halt in the housing markets in the US (but also eventually in the UK, Spain and Ireland too). The sub-prime market had been built into a sophisticated pyramid of debt, and both lenders and borrowers were in serious trouble. Put simply, the real economy could no longer support the financial economy.

The credit crunch itself was in many ways merely a symptom of an underlying real economy problem. The credit crunch came about because of a loss of confidence – but that loss of confidence was caused by the weaknesses in the property markets. Those have not gone away.

Throughout 2007, it was like a slow fuse burning. First there was the sub-prime crisis, then calm returned: this was, the optimists argued, a painful problem in a box, with losers who would have to pay. But otherwise, the world economy (and the US) was in good shape. Next came the credit crunch itself, with the unprecedented injections of cash by central banks. But otherwise, the world economy was in good shape, the optimists replied. And, in any case, it showed that central banks would always bail out the markets, so equities were a one-way bet. Next came Northern Rock. Again, the optimists pointed out that this was the result of the strategy of a particular bank, exposed to the property market, and the UK government stepped in – showing that it would always bail out the banks.

## Once the immediate froth of events is wiped away, the real economy looks a lot more vulnerable

5

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | Management Accounts | Contacts and Advisory Board |

## nOt Out OF thE WOOds yEt

The optimists have had a good run so far. Yet it would be extraordinary, if it were to continue in such a benign way. For, once the immediate froth of events is wiped away, the real economy looks a lot more vulnerable. Back in the golden years of the 1980s and 1990s, the underlying conditions were those of the technical revolution that had direct applications to the core drivers of the economy. IT did what railways, cars and electricity had done in the past. Although technical progress is marching on, this sort of surge is unlikely to be sustained for the real economy. Low oil prices appear to have gone too, and the ability of the US to sustain its external deficit looks very exposed. Finally, China's inflation is rising, and it will find it hard to continue to play the role of cheap labour to the world sufficient to head off the oil price effects.

For the optimists, the worry must be the dollar, and the consequences of its fall. If the Fed bails out the US economy to keep its growth afloat, then the rest of the world will need to brace itself for the consequences for the other currencies – for the euro predominantly, as it emerges as the competing reserve currency to the dollar; for the UK now without its North Sea cushion; for Japan still struggling with its own stock market implosion in 1989; and, perhaps most significantly, for China and its low-currency protection.

These factors all point to at least a return to normal after the golden decades at the end of the last century. They point to the possibility that history – and particularly the business cycle – has not yet been abolished. The super-optimists are therefore likely to be proved wrong. The challenge for policy-makers is to manage this transition back to normal without a major recession. The jury is out on whether they might pull it off – whether the optimists are right. Perhaps it is time for a bit of realism – and the return of economic realists. History, rather than having been abolished, might just have been postponed.

**dieter helm, Professor of Energy Policy, university of Oxford & Fellow in Economics, new College, Oxford**

**dieter helm is an economist, specialising in utilities, infrastructure, regulation and the environment, and concentrates on the energy, water and transport sectors in Britain and Europe.**

© D.R. Helm, 2007.

6

Confidential

TF0000633312



ntents     Letter from the CEO     An Alternative Perspective     General Partner's Report

Portfolio Companies     Management Accounts     Contacts and Advisory Board

# Growing risk in Turkey

iAn BREMMER, PREsidEnt, EuRAsiA GROuP

Just as Turkey seemed to be emerging from a winter of political discontent, a pair of international provocations has drawn its government into new conflicts. Ankara accuses Iraqi Kurds of harbouring militant Turkish Kurds who have carried out repeated attacks on Turkish soldiers and now threaten cross-border military operations into northern Iraq. In addition, in the US Congress, a House resolution formally recognising the Armenian genocide has threatened to generate yet higher tensions between Turkey and the US.

However, I was surprised to discover during a recent visit to Istanbul that the real emerging risks in Turkey have more to do with domestic politics than with all this foreign-policy turmoil. These risks are not going away.

Over the past three months, Prime Minister Erdogan's Justice and Development Party secured a solid parliamentary majority, got its man (former Foreign Minister Abdullah Gul) elected president, and developed a good working relationship with at least one of the major opposition parties. It also now appears to enjoy a temporary truce with Turkey's military, still a key player in the country's politics. In fact, the foreign-policy conflicts appear to have drawn Erdogan's government and the military a bit closer together.

7

TF0000633313

Contents    Letter from the CEO    **An Alternative Perspective**    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

# The real risks to Turkey's delicate political balance come not from Washington or Iraq, but from within

## POsitiVE MARkEt REACtiOn, But is thERE LOOMinG dOMEstiC tROuBLE?

Markets responded to Erdogan's resounding July victory with jubilation. Prices on the country's largest stock exchange quickly spiked. The value of Turkey's currency rose to its highest level against the dollar in more than two years. So why the looming domestic trouble? Erdogan looks set to overplay his hand in ways that upset Turkey's still delicate political balance.

Since his party, known by its Turkish acronym AKP, first rose to power following elections in 2002, Erdogan has helped deliver 7.4 per cent annual growth, lower inflation and unprecedented levels of foreign investment. A series of liberalising reforms keeps Turkey's bid to join the European Union limping forward. The party's new parliamentary majority, 341 of 550 seats, frees Erdogan to pursue his agenda without having to compromise with rivals.

## tOO FAR, tOO FAst?

Therein lies the danger. The prime minister still faces a range of domestic critics who fear that his moderate Islamic party will erode the country's secularist traditions – and that his new strength threatens their political and economic interests. An uneasy co-existence has taken hold, but if Erdogan moves too far too fast, interpreting his new mandate as a green light for some of his more controversial policy ideas, trouble won't be far behind.

## COnstituti OnAL ChAnGEs WiLL uPsEt VARiOus FACtiOns

First, Erdogan says he plans to rewrite the country's constitution. The scale of the AKP's electoral triumph speaks for itself, but efforts to use the constitution to promote greater religious freedom – by striking down a ban on the Islamic headscarf in universities, for example – risk a strong backlash from those who see it as a symbol of resistance to Turkey's official secularism.

Erdogan's political clumsiness has made matters worse. Party officials say he alone will make the decision on headscarves, confirming the fears of those who warn that his party has amassed too much power. The prime minister didn't help matters during a press conference in September when he invited critics within the universities to "mind their own business".

However, disgruntled scholars are the least of Erdogan's problems. There is no more resolute guardian of the country's secularist tradition than its military brass, which has pushed four civilian governments from power since 1960. The current constitution, the one Erdogan wants to rewrite, was drafted by the generals in 1982. The new draft may well undermine key aspects of the military's authority.

But if there's an even better way to rile nationalists within the army, it's by using constitutional changes to win friends among Turkey's minority Kurds, particularly as Kurdish separatists become more aggressive in their attacks on Turkish soldiers. One of the AKP's biggest electoral boosts came from a surge in support from southeast Anatolia, home to much of the country's restive Kurdish minority. The party won 53 per cent of the vote there this summer, up from just 27.7 per cent in 2002.

An early version of Erdogan's proposed constitutional changes, leaked to the media, includes a proposal to amend the clause which establishes Turkish as the country's official language, a move that nationalist critics insist will encourage demands for education in Kurdish and other minority languages. Given the new tensions over Kurdish militants hiding out in northern Iraq, these proposed constitutional changes have become the country's dominant political issue.

8

Confidential

ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report

Portfolio Companies | Management Accounts | Contacts and Advisory Board

**If Prime Minister Erdogan interprets his new mandate as a green light for some of his more controversial policy ideas, trouble won't be far behind**

### PROPOSeD REFORMs WiLL distRACt FROM Eu Bid

But they also pose a more mundane problem for Turkey's reform process: they're a distraction and a drain on time and political capital that might better be spent on other issues. An AKP official spoke with told me the constitutional reform process could take up to 18 months. That would force Erdogan to shelve other reforms, many of them crucial for Turkey's bid to join the European Union.

Ironically, though the EU has pressed Erdogan's government to follow through on constitutional changes meant to harmonise Turkish law with EU norms, the current controversy leaves Turkish officials with little time to implement many of the changes EU officials hope to see before the European Commission releases its annual progress report on Turkish accession in November.

In particular, the measure the EU most forcefully insists must be scrapped – Article 301 of the penal code, which criminalises public insults to "Turkishness" – may not be addressed at all before Erdogan's government puts the new constitution to a parliamentary vote. The proposed genocide resolution in Washington makes this all the more likely, because it pushes Erdogan to defend his nationalist ground.

As Turkey debates these controversies, its economy shows early signs of a slowdown, just as the developing credit squeeze in global markets threatens inflows of foreign capital. Investors, foreign and domestic, anxiously await details and budget targets of the government's economic programme.

Foreign governments and investors like predictability and when elections provide a familiar and market-friendly political party with a solid majority, most outsiders cheer the result. But when the winner presses his advantage too far, particularly in a political environment as turbulent as Turkey's, storm clouds can quickly gather just beyond the horizon.

9

Confidential

Contents    Letter from the CEO    **An Alternative Perspective**    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

## Any MiLitARy ACtiOn is LikELy tO BE LiMitEd

We cannot completely ignore Turkey's threat to take military action in northern Iraq. Ankara accuses Iraqi Kurds of harboring more than 3,000 of Turkey's most active Kurdish militants, separatists they blame for the deaths of nearly 100 Turkish soldiers so far this year. The trouble reached boiling point on October 7, when Kurdish fighters killed 13 Turkish soldiers near the country's border with Iraq.

The Turkish public has demanded action and its government has responded. On October 17, Turkish lawmakers voted 507-19 to authorise Erdogan to order military strikes inside Iraq at any time over the next year. Despite pleas for patience and restraint from Baghdad and Washington, Erdogan has sent Iraqi Kurds a forceful message. Any concentration of military power within a conflict zone carries risks of unintended escalation. But for the moment, the Turkish military is likely to limit its operations to small-scale cross-border incursions, more shelling of carefully selected targets, and pinprick air strikes rather than to launch a full-on invasion. There are several reasons.

First, Erdogan has no interest in exposing the Turkish military to the risks that come with involvement in Iraq's sectarian strife. Second, he hopes to keep the country's bid to join the European Union moving forward. An invasion of Iraq would bring that process to a grinding halt. Third, Ankara is well aware that an all-out attack inside Iraq is exactly what Turkey's Kurdish separatists want. What better way to damage Turkey than to pull its military into conflict with Iraq, the United States and the European Union at one fell swoop? Erdogan has no intention of being drawn into that trap.

With all that in mind, this latest move by Turkey's parliament should be seen more as an ultimatum to Iraq's Kurdish Regional Government to expel the Turkish Kurds and an attempt to persuade Washington to finalise its considerable influence there. That's hardball politics, not a declaration of war.

Further, common sense may yet prevail within the US Congress, as House Speaker Nancy Pelosi postpones the genocide resolution for another day. A number of House Democrats quickly backed away from the resolution following the firestorm of criticism that erupted when Pelosi's plans made headlines. She will not call for a vote she knows she cannot win.

## REAL dOMEstiC POLitiCAL Risks REMAin

Yet, when today's foreign-policy crises have dissipated, Turkey's domestic political problems will return to the surface. In fact, the opportunities to burnish his nationalist credentials that these conflicts have provided may help persuade Erdogan to continue to press his advantage at home. That's why the real risks to Turkey's delicate political balance come not from Washington or Iraq, but from within. Those are the longer-term risks we should all keep an eye on.

ian Bremmer, President, Eurasia Group

ian Bremmer is president of Eurasia Group, the world's largest political risk consultancy. he is also a columnist for late, a contributing editor at thenationinterest, and a political commentator on Bn, Fox news and CnBC.

10

Contents    Letter from the CEO    An Alternative Perspective    General Partner's Report
Portfolio Companies    Management Accounts    Contacts and Advisory Board



# General Partner's Report

11

Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report

Portfolio Companies | Management Accounts | Contacts and Advisory Board

## Quarterly Review

We are pleased to present
our third quarter report for
Terra Firma Capital Partners II
("TFCP II")



12



Contents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

# Rental Business
## Operating Results by Region

**tank & Rast**

In August, we completed the partial sale and refinancing of Tank & Rast and distributed proceeds of €1,145m to investors, including €701m to TFCP II LPs. This transaction provided the Fund with an IRR of 130 per cent and a 5.3x realised cash-on-cash multiple on the deal, while retaining the ability to participate in the substantial upside remaining in the business.

**AWAs**

At AWAS, the business's senior management team is now complete with the appointment of John Nozell as Chief Investment Officer. John is responsible for managing AWAS's portfolio strategy and investment decisions and, alongside AWAS's CEO Franklin Pray and CFO Michael Howard, will implement Terra Firma's detailed operational plan for the combined AWAS and Pegasus business.

Following the acquisition of Pegasus Aviation Finance in June, Terra Firma will complete a co-investment opportunity in the combined aircraft leasing business. The General Partner will call on TFCP II investors and co-investors to repay the outstanding Pegasus equity bridge, with funds due in early December.

**Long-term financing arrangements**

In this challenging credit market, Terra Firma is pleased to report that our portfolio is in a strong position, with long-term financing arrangements in place for our businesses. Despite the changes in the credit markets following the signing of the Pegasus acquisition, the team has successfully refinanced pre-existing Pegasus facilities, maintaining the parameters of the original underwriting. In addition, permanent debt facilities for EMI were signed in October and long-term financing is in place to support the business. We continue to work with our lender groups to maintain or improve flexibility in our financing and also aid our banks in their syndication process.

While the wider credit market remains difficult, specialist aviation finance providers continue to actively lend against smaller portfolios of aircraft. We anticipate that the combined AWAS business will be able to successfully finance the acquisition of aircraft on reasonable terms as the business continues its plans for growth.

13

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | Management Accounts | Contacts and Advisory Board |

# Fund summary

### Fund hiGhLiGhts

TFCP II has invested total equity of €2.9 billion, including €0.6 billion of co-investment.

To date, €2.1 billion of proceeds have been realised, which represents 109 per cent of the total Fund size.

Against a book value of €1.3 billion, our conservative valuation of the portfolio is €2.4 billion, which represents a 2.1x gross cash-on-cash return and a 53 per cent gross IRR. Excluding the recent acquisition of EMI, the gross cash-on-cash return is 2.5x.



Fund Commitments €1,939m | Gross Cash Invested €2,915m | Net Cash Invested €2,148m | Market Level Investments

| | 100% | 150% | 111% | 233% |
| Gross Cash Multiple: | | 1x | | 2.1x |

| | Book Value | Market Value | Gross Cash Multiple | Gross IRR | Realised Value |
|---|---|---|---|---|---|
| Inflins (WRG) | €54m | €668m | 2.5x | 57% | €845m |
| Odeon/UCI | €244m | €363m | 2.5x | 15% | €115m |
| Tank & Rast | €3m | €107m | 5.9x | 138% | €954m |
| PNG (ESH) | €106m | €207m | 4x | 42% | €209m |
| AWAS | €338m | €458m | 1.3x | 36% | |
| EMI | €586m | €586m | 1.0x | | |
| | €1,852m | €2,388m | | | €2,147m |

14

Confidential

TF0000633320



Contents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

## AnALysis OF inVEstMEnt ACtiVity



15

Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report
Portfolio Companies | Management Accounts | Contacts and Advisory Board

# Fund summary

### nEt Fund inVEstMEnts

Gross equity of €2,915m has been invested and represents 150 per cent of the Fund's total commitments of €1,939m. This has been reduced to **net investment of €2,148m** representing 111 per cent of Fund commitments, by:

- €598m of proceeds from sales to co-investors;

- €84m of proceeds from divestments; and

- €85m of proceeds from refinancing.

### COMMitMEnts

Gross of reserves, undrawn commitments at 30 September 2007 are €389m.

**Gross Fund Investments**
Total €2,915m

Tank & Rast €276m
Infinis (WRG) €669m
PNG (ESH) €396m
Odeon €448m
EMI €586m
AWAS €540m

**Net Fund Investments**
Total €2,148m

Tank & Rast €181m
PNG (ESH) €292m
EMI €586m
Odeon/UCI €322m
Infinis (WRG) €427m
AWAS €339m

### PORtFOLiO MARkEt VALuE

The six portfolio businesses are conservatively valued at €2,388m which represents a premium of €1,056m over the net book value of €1,332m.



Valuation Uplift €1,056m
EMI €586m
AWAS €339m
PNG (ESH) €106m
Tank & Rast €3m
Odeon/UCI €244m
Infinis (WRG) €54m

PNG (ESH) €100m
AWAS €117m
Odeon/UCI €119m
Infinis (WRG) €615m
Tank & Rast €104m

16

Confidential

TF0000633322

Case: 11-126    Document: 46    Page: 139    04/25/2011    272857    401

A-338

## tOtAL PORtFOLiO PROFit

Since Q1 2006, the value of the TFCP II portfolio has substantially increased. Profits of €1,308m have been realised and the unrealised profit in the five businesses has increased to €1,056m.



17

Confidential                                                          TF0000633323

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|----------|--------------------|-----------------------------|--------------------------|
| | Portfolio Companies | Management Accounts | Contacts and Advisory Board |

# Portfolio Companies



18

Contents Letter from the CEO An Alternative Perspective General Partner's Report
Portfolio Companies Management Accounts Contacts and Advisory Board

# Infinis(WRG)



## BusinEss dEsCRiPtiOn

Infinis accounts for 10 per cent of the UK's renewable electricity sector and is the largest pure-play company in the sector both in terms of number of sites and output.

Infinis has 217 MW of installed baseload generating capacity, with a further 80 MW of capacity managed on a royalty basis. Infinis was de-merged from WRG, the waste disposal business, in May 2006.

WRG's landfill and incineration business was sold by Terra Firma in September 2006. WRG's principal business involved the sale of landfill void space to municipal and private sector customers. It operated 30 waste "transfer stations" and 71 "civic amenity" sites as well as a renewable energy business.

## inVEstMEnt RAtiOnALE

Terra Firma identified that while European harmonisation would gradually move disposal away from landfill, it would never fully remove the importance of landfill as a disposal option. Demand/supply imbalances created over the life of this market shift would allow substantial price and margin growth. Terra Firma also recognised the potential of the Waste-to-Energy operations as a significant margin driver for the business. WRG was outsourcing some capacity at significantly lower returns than those available from building its own power division and had not developed generation capacity to its potential. WRG's platform would also allow it to engage in large capital projects such as the Allington incinerator which could diversify the business and create value.

## CAPitAL stRuCtuRE

The initial investment in WRG of €422m was funded by a call on LPs, along with a co-investment sale of €114m in December 2003.

The initial Shanks investment in June 2004 was funded by the equity bridge facility which was partly repaid in August 2004 by a €44m sale to co-investors and a call on LPs for €119m. The outstanding bridge of €85m was repaid following the merger and refinancing of WRG and Shanks in December 2004. In addition, a distribution of €214m was made to LPs.

| source of Capital | initial Equity inc. Co-invest | distribution Proceeds | sale Proceeds | net Equity invested | Book Value | Market Value | Equity interest |
|---|---|---|---|---|---|---|---|
| Terra Firma Capital Partners II | €427.5m | €(214.2m) | €(520.9m) | | €54.0m | €668.5m | 73.2% |
| TFCP II Co-Investment 1 LP | €143.7m | €(72.1m) | €(210.9m) | | €18.7m | €223.9m | 24.5% |
| TFCP II LP-II Co-Invest | €13.7m | €(6.9m) | €(20.0m) | | €1.9m | €21.4m | 2.3% |
| Bridge Finance – Shanks | €84.5m | €(84.5m) | | | | | |
| Net Debt | €523.6m | | | | | €35.5m | |
| Liquidity discount, LTIP | | | | | | €143.8m | |
| | | | | | | €123.6m | |

**Basis of Current unrealised Value: 1.3x budgeted 2007 EBITDA, less debt, management incentive and a 10% liquidity discount.**

Confidential

TF0000633325

Case: 11-126    Document: 46    Page: 142    04/25/2011    272857    401

A-341


infinis

Following the sale of WRG's landfill business, €629m was distributed to TFCP II investors in September 2006 and all outstanding debt against the remaining business, Infinis, was repaid.

The acquisition of ReGen and a biomass and wind power generation development business in 2007 were funded from free cash and new debt at the company level.

### tERRA FIRMA dEVELOPMEnt PLAn
Following the separation of WRG into a waste disposal division and Infinis Terra Firma sold the waste disposal business for an enterprise value of £1,400m, while retaining the renewable energy business.

Infinis completed a strategic review at the end of February. The business has a clear plan to move itself from a UK-focused landfill gas business to a broad-based renewable energy business, moving into onshore and offshore wind, as well as biomass over the next five years.

Infinis' 2007 development schedule has been agreed, setting out major landfill gas developments of 10.6 MW. The business is also considering a further 67 MW of development opportunities in wind and biomass. In line with this strategy, a 42 MW UK landfill gas acquisition (ReGen) was completed in January 2007.

In September 2007, Infinis completed a 125 MW biomass power generation acquisition, along with 125 MW of wind development opportunities. The biomass developments include combustion, gasification and anaerobic digestion.

Further acquisitions covering a number of renewable technologies are under review.

### CuRREnt FinAnCiALs
Infinis's year-to-date EBITDA was £39.4m, which was £1.7m behind budget. The business also recorded an electricity generation budget shortfall, which was driven by budgeted new developments that have not occurred. Sites affected by incidents such as flooding across the North East and Hempsted also contributed to the shortfall, along with gas and engine-related issues which caused disruption to some sites.

Year-to-date costs were higher than expected, due to increases in engine mechanical costs, landfill gas costs and manpower.

Infinis has reviewed electricity pricing on a site-by-site basis and does not expect forecast prices for the remainder of 2007 to deviate significantly from budget.

| £'000 year End: 31 december | ytd 2006 Actual | ytd 2007 Actual | ytd 2007 Budget | Variance to Budget | 2007 Budget |
|---|---|---|---|---|---|
| Average Megawatt hours | 160,644 | 182,019 | 186,889 | (4,870) | 191,323 |
| Revenue | 50,582 | 67,319 | 67,453 | (134) | 95,616 |
| Costs | (22,612) | (32,622) | (26,398) | (1,826) | (35,600) |
| EBITDA | 38,971 | 39,397 | 41,055 | (1,661) | 60,015 |
| EBIT | 13,253 | 16,555 | 15,379 | 1,176 | 25,228 |

\* Actuals include exceptional costs relating to the separation of WRG's landfill business and Infinis

Confidential

TF0000633326

ntents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

# Odeon/UCI



## BusinEss dEsCRiPtiOn

The combined Odeon and UCI business operates in the UK, Ireland, Spain, Portugal, Italy, Germany and Austria, and is the market leader in the UK cinema industry, with an approximate 28 per cent market share by box office value. The group has a total of 1,579 screens on 181 cinema sites, a substantial portion of which are freehold/long leasehold. The business operates under the name of Odeon in the UK, but retains the UCI, Cinestar and Warner national brand identities outside the UK.

## inVEstMEnt RAtiOnALE

Odeon has a stable cash flowstream due to its low ticket price in a basic leisure sector. The team identified areas for significant earnings improvements and opportunities to selectively unlock value from the freehold estate. Following the completion of the Odeon/UCI merger, significant benefits were expected to be realised from synergies. Terra Firma intends to take advantage of further industry consolidation that is expected to occur in the UK and the broader European cinema market.

## CAPitAL stRuCtuRE

The Odeon acquisition was funded by the equity bridge facility in September 2004 and repaid by a call on LPs in October 2004. The UCI deal was bridge funded and repaid by a call in December 2004. Co-investment of €58m was completed in December 2004. Odeon co-investment funds were not returned to LPs, but used to reduce the call for the Fund's investment in UCI. In 2005, WLS was acquired (€17m of equity) and a second round of co-investment raised €68m. As a result, €51m was returned to LPs. The purchase of the Iberian assets of AMC in May 2006 was completed using the equity bridge, which was repaid with part of the proceeds from the sale of three Irish cinemas. The purchase of Cinestar in June 2007 for €39m has been funded by existing cash within Odeon/UCI and new debt.

| source of Capital | Initial Equity inc. Co-Invest | distribution | Refinancing | net Equity Invested | Book Value | Market Value | Equity Interest |
|---|---|---|---|---|---|---|---|
| Terra Firma Capital Partners II | €373.5m | (€61.2m) | (€6.0m) | €207.3m | €643.7m | €363.0m | 71.9% |
| TFCP II Co-Investment 21 LP | €44.7m | | (€15.8m) | €28.9m | €53.5m | €50.0m | 9.9% |
| TFCP II LP H Co-Invest | €15.5m | | (€5.8m) | €9.9m | €11.7m | €17.5m | 3.5% |
| TFCP II Co-Investment 2a LP | €54.7m | | (€20.1m) | €34.6m | €39.8m | €61.6m | 12.2% |
| TFCP II Co-Investment GMI | €11.5m | | (€4.2m) | €7.3m | €8.7m | €12.9m | 2.6% |
| Net Debt | | | | | | €533.5m | |
| Liquidity Discount | €498.4m | | | | | €56.1m | |

**Basis of Current unrealised Value** Aggregate sale and leaseback value of UK cinemas reflecting a blended net initial yield of 5.33% (propco), plus approximately 9x forecast 2008 post-propco rent EBITDA (opco), less debt and a 10% liquidity discount. The propco is valued at €263m and the opco at €838m.

21

Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report
Portfolio Companies | Management Accounts | Contacts and Advisory Board




Odeon/UCI was refinanced in May 2007. €44m was retained by the business and €161m was returned to investors, including €115m to TFCP II LPs.

## tERRA FiRMA dEVELOPMEnt PLAn

Following the merger of Odeon and UCI, the new management team initially focused on exploiting synergies between the businesses. Attention was also given to selective price increases on a site-by-site basis and achieving increases in retail spend per head through retail area refurbishments, range extension and improved selling strategies. Other actions that were taken include increasing film hire margin, improving marketing effectiveness and enhancing procurement. The team continues to develop additional revenue streams, such as advertising and gaming machine revenues.

Odeon/UCI plans the rollout of new ticketing machines and systems in the UK in 2008. This initiative will enable both some cost savings as well as the improvement of customer relationships, helping to further drive admissions.

Acquisitions of individual cinemas and cinema chains continues to be part of the strategic development of the business. Odeon/UCI has successfully integrated the acquisition of Warner Lusomundo Sogecable with its existing Spanish businesses. In Q2 2006, UCI acquired the Iberian assets of AMC for €34m, strengthening market leadership in the region and offering the opportunity to eliminate overheads. In Q3 2006, Odeon/UCI completed the sale of three Irish UCI sites for proceeds of £62m or 14.5x 2005 EBITDA, while continuing to manage the cinemas for a fee.

Following the acquisitions of three Europlex sites in Q4 2006 and Cinestar assets in Q2 2007, Odeon/UCI has become the market leader in Italy. The business will continue to review further opportunities for growth in existing markets, both organically via new sites, and via acquisitions.

## CuRREnt FinAnCiALs

Odeon/UCI recorded year-to-date EBITDA of £47.1m, which was £2.3m ahead of budget and £8.1m better than year-to-date 2006.

Cumulative admissions were 1.1m less than expected, but gross revenue was broadly in line with expectations. Good KPI performance was seen, with both average ticket prices and retail spend per head ahead of budget and significantly better than prior year.

The cost of sales was higher than expected, due to film hire charges which reflected higher terms on "The Bourne Ultimatum" and the over-performance of "Atonement". This was outweighed by below budget spending on other expenses, particularly property costs.

| £'000 year End: 31 december | ytd 2006 Actual | ytd 2007 Actual | ytd 2007 Budget | Variance to Budget | 2007 Budget |
|---|---|---|---|---|---|
| Admissions ('000) | 52,002 | 54,227 | 55,367 | (1,140) | 76,036 |
| Gross revenue | 344,553 | 375,571 | 372,778 | 2,059 | 591,199 |
| Cost of sales | (212,619) | (199,390) | (225,685) | (2,707) | (383,442) |
| Operating expenses | (85,847) | (90,037) | (90,316) | (719) | (127,735) |
| Other expenses | (96,520) | (96,009) | (103,675) | 3,666 | (131,050) |
| EBITDA | 39,079 | 47,134 | 44,802 | 2,284 | 72,886 |

| key Performance indicator | ytd 2006 Actual | ytd 2007 Actual | ytd 2007 Budget |
|---|---|---|---|
| Admissions '000 | 52,002 | 54,227 | 55,367 |
| Average Ticket Price | £4.96 | £4.80 | £4.25 |
| Retail per head | £1.65 | £1.65 | £1.62 |

22

ntents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

# Tank & Rast



## BusinEss dEsCRiPtiOn

Autobahn Tank & Rast holds 90 per cent of German motorway concessions for petrol stations, shops, restaurants and motels. Key revenue streams are lease income from tenants, fuel supply commissions from the oil companies and income from self-operated sites.

## inVEstMEnt RAtiOnALE

Tank & Rast has a strong position on the German Autobahn, underpinned by long-term government concessions and low possibility of sizeable new entry. Stable cash-flows are supported by a significant fixed lease component of income and the large number of independent sites offer a low risk portfolio. These high quality assets also came with the benefit of a major investment programme. The complex operational and contractual structure offers significant opportunities for improved cash generation, operational improvement and potential

change of business model. All of these factors play to Terra Firma's strengths and experience.

## CAPitAL stRuCtuRE

The initial investment of €275m was funded by the equity bridge facility, €225m of which was repaid from a call on LPs in February 2005. Co-investment sell-downs of €94m in March repaid the Fund's remaining €50m equity bridge and a €44m distribution was made to LPs in May 2005.

A refinancing in June 2006 raised €1,200m of hybrid infrastructure finance and the business returned €410m to investors, including €253m to the Fund.

In June 2007, Terra Firma agreed the sale of approximately 50 per cent of Tank & Rast, along with a refinancing. In August, proceeds of €1,145m were distributed to investors, including €701m to TFCP II LPs.

| source of Capital | initial Equity inc. Co-invest | Refinancing | sale Proceeds | net Equity invested | Book Value | Market Value | Equity interest |
|---|---|---|---|---|---|---|---|
| Terra Firma Capital Partners | €187.7m | €252.6m | €701.3m | | €83.0m | €107.2m | 26.3% |
| TFCP I Co-Investment 1 LP | €44.4m | €103.7m | €287.9m | | €12m | €44.1m | 10.9% |
| TFCP II LES Co-invest | €19.9m | €27.6m | €67.1m | | €0.3m | €1C.7m | 2.9% |
| Annington | €28.7m | €26.3m | €67.65m | | €0.6m | €2.7m | 17.6% |
| Rreef | | | | | | €163.0m | 140.0% |
| Management | | | | | | €2.0m | 2.3% |
| | | | | | | | |
| Net Debt | €799.8m | | | | | €2,200.0m | |
| Liquidity Discount and other | | | | | | €45.3m | |

Basis of Current unrealised Value Based on the purchase price paid by Rreef for its interest in Tank & Rast, less debt and a 10% liquidity discount.

23

Contents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board


**TANK & RAST**

## tERRA FIRMA dEVELOPME nt PLAn

The Terra Firma plan focuses on topline growth opportunities and on increasing Tank & Rast's share of overall system profits. Potential efficiency gains include reorganising the tenant base to maximise operating efficiency and leasing more sites to the most professional tenants, with a corresponding increase in Tank & Rast's system profits. A number of growth initiatives are in place including improved retail strategies, professional fast food catering and hotel operations plus a disciplined capex policy reflecting the implementation of a value/return-based capital expenditure approach.

Having evaluated potential growth projects and pilot data, a number of projects that meet our risk-return requirements have been initiated. These include a signage project (278 sites now have motorway signage, 340 construction permits have been approved by planning authorities; the development of more Burger King outlets under a new Development Agreement (21 restaurants have been completed with 78 feasibility studies completed); a branding project (81 sites now have had the Serways brand implemented); the roll out of Sanifair pay-per-visit toilets, with a revised fee model and lower up-front implementation cost (309 sites now have Sanifair facilities); and Bund/Land-projects, i.e. the construction of new sites, building extensions and new buildings construction on existing sites. We believe that these projects, together with a number of other initiatives (e.g. network optimisation, gambling machines, advertising and commission, a new EPOS initiative), will allow the company to continue to achieve significant EBITDA growth.

## CuRREnt FinAnCiALs

Tank & Rast achieved year-to-date EBITDA of €137.7m, which was €9.3m ahead of budget and €16.2m better than last year.

Year-to-date revenue was 3.0 per cent ahead of budget and 10.3 per cent ahead of prior year, largely due to the strong performance of Tank & Rast's fuel and lease business. Tank & Rast continues to benefit from the positive economic trend in Germany, leading to increased travel on the autobahn network. In particular, petrol sales were 19.0 per cent ahead of budget due to the high volume of private travel. Diesel sales were also 1.5 per cent ahead of budget and 2.8 per cent ahead of prior year, due to increased business travel and logistics traffic.

Capex continues to be below budget but ahead of prior year. The year-to-date variance of €16.8m relates mainly to Sanifair, Serways and strategic capex.

| €'000 year End: 31 december | ytd 2006 Actual | ytd 2007 Actual | ytd 2007 Budget | Variance to Budget | 2007 Budget |
|---|---|---|---|---|---|
| Revenue | 185,133 | 234,406 | 198,292 | 8,194 | 262,300 |
| Costs | (63,878) | (96,752) | (67,633) | 1,081 | (89,300) |
| EBITDA | 121,555 | 137,734 | 128,559 | 9,275 | 173,000 |
| EBIT | 70,364 | 80,455 | 75,180 | 5,275 | 101,200 |
| Capex | 28,494 | 37,685 | 54,518 | 16,832 | 77,400 |

24

# Phoenix Natural Gas (ESH)



### BusinEss dEsCRiPtiOn

East Surrey Holdings (ESH) operated and developed regulated infrastructure businesses and originally included three operations: Sutton and East Surrey Water (SESW), Phoenix Natural Gas (PNG) and East Surrey Pipelines (ESP). SESW was sold by Terra Firma in January 2006 and ESP, along with BGCL, was sold in June 2006.

PNG was established in 1996 to introduce natural gas to the industrial, commercial and domestic markets of the Greater Belfast area and holds a licence for the transmission, distribution and supply of gas. SESW was a regulated water supplier providing services to domestic and commercial properties in South London and Surrey. ESP was a natural gas transportation business, bringing gas to industrial, commercial and domestic properties in Great Britain. BGCL was acquired from Centrica in May 2005 and operated a similar gas transportation business to ESP.

### inVEstMEnt RAtiOnALE

ESH presented a unique opportunity for Terra Firma to acquire a portfolio of regulated utility businesses, with the gas businesses demonstrating strong growth prospects and the mature water business, SESW, representing a near-term disposal opportunity. Following its merger with BGCL, ESP represented a sizeable position within the independent gas transportation market, with trades in the sector evidencing significant appetite for consolidation.

Although regulated, PNG has a more attractive regulatory framework than, for example, UK water companies, in order to help the gas business achieve the development of its network. The comparative instability of the regulatory framework combined with the relative penetration immaturity of the network reduced competition when bidding for the business.

| source of Capital | initial Equity inc. Co-invest | distribution | sale Proceeds | net Equity invested | Book Value | Market Value | Equity interest |
|---|---|---|---|---|---|---|---|
| Terra Firma Capital Partners I/III | €292.0m | | €208.9m | €83.1m | €106.3m | €206.9m | 95.0% |
| TFCP II LP/II Co-invest | €20.0m | €4.5m | €11.1m | €4.4m | €5.6m | €11.0m | 5.0% |
| Bridge Finance | €83.9m | €83.9m | | | | | |
| | | | | | | | |
| Net Debt | €709.1m | | | | | €468.2m | |
| Liquidity Discount/LTIP | | | | | | €31.6m | |
| | | | | | | | |
| Basis of Current unrealised Value: 1.25x Regulated Asset Value, less debt, management incentive and a 10% liquidity discount. | | | | | | | |

Confidential

TF0000633331

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| Portfolio Companies | Management Accounts | Contacts and Advisory Board | |

# PHOENIX
### NATURAL GAS

## CAPitAL stRuCtuRE

In May 2005, TFCP II acquired a 75 per cent interest in BGCL, funded via a drawdown on the equity bridge facility, with the remaining 25 per cent being acquired by ESH. The bridge was repaid in November 2005 following a call on LPs. After the Fund acquired ESH in October 2005, BGCL was combined with the ESP division of ESH. In December 2005, co-investors invested €20m in the combined deal and the sale of SESW was agreed. Also in December, a call was made for €196m which was used to part repay the bridge. The SESW sale was completed in January 2006 generating total cash proceeds of £60m after re-payment of acquisition debt. These proceeds, along with a call on LPs for €60m in March 2006, were used to part repay the outstanding bridge loan. In July 2006, €209m was returned to TFCP II investors following the sale of ESP and BGCL for 26x earnings.

## tERRA FiRMA dEVELOPMEnt PLAn

SESW, the ESH water utility, was sold in January 2006 to an infrastructure fund for £88m or £60m equity value. In June 2006, ESP, including BGCL, was sold for £225m equity value or 26x 2006 earnings. Following the sale, TFCP II holds 95 per cent of PNG for a net cash investment of only £83m.

At PNG, the immediate objective is to secure agreement with the Regulator on a new licence. Licence principles have been agreed and discussions are ongoing with regard to agreeing the terms for the next five-year price control period.

In Q4 2006, PNG split its supply and distribution divisions to comply with the EU Gas Directive. It is continuing with plans to mutualise its transmission business in the coming months.

PNG continues to develop its distribution infrastructure and increase the number of users connected to its network. Recent increases in the price of heating oil have meant that natural gas prices are now comparable, which is a positive development for signing up new connections.

## CuRREnt FinAnCiALs

PNG's year-to-date EBITDA was £20.5m or 41.4 per cent better than budget, driven mainly by the gross gas margin, which was £4.5m higher than expected. Contributing to the favourable gross gas margin was the gross supply margin, which was £1.6m better than budget as a result of supplied throughput being 4.8m therms higher than expected. The supply variance includes an increase of 3.6m therms due to a lower loss of customers to competition than anticipated.

Also contributing to the favourable gross supply margin was the significantly lower commodity cost of gas, which resulted in a £16.4m positive variance to margin. This was offset by £12.0m from lower selling prices, mainly due to the prices in PNG's contract sector, which have fallen directly in line with the commodity cost of gas.

| £'000 year End: 31 december | ytd 2006 Actual | ytd 2007 Actual | ytd 2007 Budget | Variance to Budget | 2007 Budget |
|---|---|---|---|---|---|
| Gas Turnover | 68,205 | 65,439 | 77,178 | (7,839) | (101,540) |
| Gas purchases | (35,197) | (43,591) | (55,807) | 12,316 | (69,670) |
| Gas margin | 33,009 | 25,848 | 21,371 | 4,477 | 31,970 |
| Other income | 5,124 | | | | (104,265) |
| Operating costs | (4,891) | (5,916) | (7,571) | 1,654 | (19,121) |
| EBITDA | 8,640 | 20,541 | 14,532 | 6,009 | 23,254 |
| EBIT | 5,350 | 16,064 | (10,118) | 5,966 | (17,346) |

| network development | ytd 2007 Actual | 2007 Budget | %of Budget Complete |
|---|---|---|---|
| Mains (km) | 55 | 89 | 62% |
| Connections | 7,927 | 10,008 | 79% |

Confidential

TF0000633332

# AWAS



## BusinEss dEsCRiPtiOn
The combined AWAS and Pegasus business is the world's third-largest aircraft lessor by assets under management, with more than 230 owned aircraft, and approximately 100 further aircraft under management.

The weighted average age of the combined fleet is 9.2 years, with average lease terms of 5.6 years. Rental yields are strong and the business's embedded acquisition pipeline provides attractive future growth prospects.

## inVEstMEnt RAtiOnALE
The short-term outlook for the aircraft leasing market remains strong and Terra Firma expects continued excess demand for aircraft over the next three years, supporting high lease rates and asset valuations.

The combined AWAS business will continue to pursue a differentiated strategy within the aircraft leasing market, focusing on maximising returns and controlling risk through a combination of aircraft leasing and trading. It will maximise the running yield on equity by leasing a diversified portfolio of assets to weaker airline credits, and generate incremental profit and reduce residual asset risk through pro-active aircraft trading.

The merger of the two businesses will release substantial synergies and the integration will be managed to ensure that the "best of both" businesses is retained within the combined entity.

## CAPitAL stRuCtuRE
Terra Firma initially committed €520m (approximately 26 per cent of the Fund) to the

| source of Capital | AWAs Equity inc. Co-invest | initial Equity % | Pegasus Equity inc. Co-invest | net Equity invested | Market Value | Equity interest % |
|---|---|---|---|---|---|---|
| Terra Firma Capital Partners II | €327.4m | 62.7% | €11.1m | €338.5m | €456.2m | 31.4% |
| Terra Firma Capital Partners II | | | €456.2m | €456.2m | €456.2m | 31.4% |
| TFCP II Co-investment 1 LP | | | €270.8m | €270.8m | €270.8m | 18.6% |
| TFCP II Co-investment 4 LP | €178.4m | 34.2% | | €178.4m | €242.6m | 16.7% |
| AWAS Co-inv. LLC | €12.0m | 2.3% | | €12.0m | €16.3m | 1.1% |
| TFCP II Co-investment 4A LP | | | €6.6m | €6.6m | €8.6m | 0.5% |
| AWAS 2006, LLC | €2.1m | 0.4% | | €2.1m | €2.8m | 0.2% |
| AWAS V, LLC | €1.9m | 0.4% | | €1.9m | €2.6m | 0.2% |
| Net Debt | €1,085.7m | | | €1,085.7m | | |
| Liquidity Discount, LTIP | | | | | €91.4m | |

Basis of Current unrealised Value AWAS equity is valued at 1.1x Aircraft Maintenance Adjusted Current Market Value, less debt, management incentive and a 10% liquidity discount. The value of Pegasus equity is based on the acquisition price paid.

27

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | | Management Accounts | Contacts and Advisory Board |



AWAS transaction. In March 2006, TFCP II used its equity bridge facility to finance the acquisition. The bridge was repaid in September 2006 by a call on investors for €327m and co-investment of €194m.

While the AWAS acquisition was wholly funded out of TFCP II, Pegasus will be funded jointly by TFCP II and TFCP III. The two Funds will have an equal equity interest in the combined AWAS business. The acquisition of Pegasus is currently funded by TFCP II's and TFCP III's bridge facilities and will be repaid in December by a call on LPs and the proceeds of a second co-investment sell-down.

## tERRA FiRMA dEVELOPMEnt PLAn
Global air travel is anticipated to grow at between 5 per cent and 6 per cent p.a. over the next two decades, leading to long-term increased demand for aircraft. Demand for aircraft continues to exceed supply, a situation which is anticipated to persist for two to three years. This imbalance will continue to support robust lease rates and asset valuations.

The combined AWAS business will increase its focus on earning high risk-adjusted rental yields on both newer and mid-life aircraft and by positioning the combined business as the market leader among weaker credit customers. Risk will be controlled through appropriate contract structuring as well as asset and lessee diversification.

AWAS will generate incremental profit and reduce residual asset risk through pro-active aircraft trading. It will take advantage of the spread between acquisition and disposal prices across a variety of channels and by exploiting cyclical markets, buying when asset values decline and selling when they recover. Residual risk will be controlled by trading out of positions with high levels of asset obsolescence risk.

Following the acquisition of Pegasus, progress is being made on the merger with AWAS and we presently anticipate generating synergy savings

ahead of plan. A reduction in the tax rate of Pegasus is expected to be realised by locating the combined business in Ireland.

The business is exploring several opportunities to acquire portfolios of new aircraft assets.

## CuRREnt FinAnCiALs
The AWAS results presented currently do not include Pegasus figures, which will be consolidated for the start of AWAS's new financial year.

AWAS recognised year-to-date EBITDA of $269.3m, which was slightly ahead of budget. Revenue was behind budget mainly due to a change of accounting policy on maintenance revenue recognition. AWAS's budget recognises the previous policy of taking maintenance income to profit and loss, however, the current policy is to recognise actual maintenance net cash flows a liability until the lease has ended.

Costs were below budget, again mainly due a change of policy. AWAS previously accrued for estimated repossession costs when a repossession was probable. Under the current policy, the business only accrues for repossession when it has occurred, leading to a positive variance on cost. Maintenance net cash flow and EBIT variances were also affected by the changes in accounting policies.

In September, AWAS made its first aircraft acquisitions since 2003 with the completion of the purchase and leaseback of a new Airbus aircraft and the purchase of a used Airbus. A further purchase and leaseback of two Boeing aircraft was also completed later in the month.

AWAS has continued to keep the number of its aircraft off-lease to a minimum. Two aircraft were off-lease at the end of September; one is committed for sale and the other is being actively marketed by AWAS's sales force.

| $'000 (AWAs) year End: 30 november | ytd 2006 Actual | ytd 2007 Actual | ytd 2007 Budget | Variance to Budget | 2007 Budget |
|---|---|---|---|---|---|
| Revenue | 355,511 | 320,692 | 323,954 | (3,322) | 388,171 |
| Costs | (43,508) | (53,320) | (55,309) | 4,989 | (66,235) |
| EBITDA | 312,002 | 269,312 | 267,645 | 1,667 | 321,938 |
| EBIT | 177,433 | 200,296 | 208,106 | (7,810) | 269,208 |
| Maintenance net cash flow | (7,435) | (26,685) | (43,790) | 16,155 | (37,300) |

28

| ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| | Portfolio Companies | Management Accounts | Contacts and Advisory Board |

# EMI



## BusinEss dEsCRiPtiOn

EMI is one of the world's largest music companies. It operates directly in 50 countries, with licensees in a further 20 countries, and it employs around 5,500 people. The business comprises two divisions: EMI Recorded Music and EMI Music Publishing, one of the world's leading music publishers.

EMI Recorded Music represents recording artists spanning all musical genres and owns a recorded music catalogue of over three million tracks. The company's roster and catalogue includes artists such as Lily Allen, The Beach Boys, The Beatles, Coldplay, Norah Jones, Kylie and The Rolling Stones.

EMI Music Publishing owns one of the largest catalogues of songs in the world, containing more than a million contemporary and classic titles.

## inVEstMEnt RAtiOnALE

EMI draws on Terra Firma's experience in strategically transforming businesses, repositioning assets, driving operational change and enhancing cash flows.

EMI's revenue has declined over the past five years due to the structural shift in the consumer music market and a slow response, both by the industry and the company, to the shift towards digital consumption. This shift has been detrimental to the consumer-oriented recorded music business, while the publishing business (accounting for two-thirds of group profits) has been more protected through its diversified revenue base.

Terra Firma intends to exploit the opportunity to develop the publishing catalogue while streamlining the recorded music business and repositioning it to capitalise on the digital opportunity.

## CAPitAL stRuCtuRE

Terra Firma has committed £1,503m of initial equity to the EMI deal, provided 26.5 per cent by TFCP II and 73.5 per cent by TFCP III.

TFCP II's share was part-funded by a call on investors in August 2007. The remainder is currently funded by the two Funds' equity bridge facilities, which will be repaid in December by a further call on LPs.

| source of Capital | initial Equity | initial Equity % |
|---|---|---|
| Terra Firma Capital Partners II | €384.1m | 26.5% |
| Terra Firma Capital Partners III | €1,066.4m | 73.5% |
| Bridge Finance - TFCP II | €201.6m | |
| Bridge Finance - TFCP III | €560.9m | |
| Net Debt | €3,857.6m | |
| Other | (€52.9m) | |

Basis of Current unrealised Value EMI equity is valued at acquisition price.

Confidential

TF0000633335

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| | Portfolio Companies | Management Accounts | Contacts and Advisory Board |



## tERRA FiRMA dEVELOPME nt PLAn

The Terra Firma plan focuses both on EMI's music publishing and recorded music businesses. We have a well-defined growth strategy for the publishing business with a focus on several key principles. Terra Firma will continue EMI's excellence in Artists & Repertoire ("A&R"), which has created the world's highest quality music catalogue by developing a customer-focused sales organisation, proactively building new revenue streams and providing operational leverage. The business will target expansion through catalogue acquisition and the development of new services. Internal capabilities will be strengthened through rebuilding systems and processes, lowering costs and broadening the staff skill set. Terra Firma will also encourage the further growth of music publishing by pursuing a comprehensive programme of industry infrastructure reform.

EMI's recorded music business will be repositioned to exploit the digital opportunity. Digital presence will be put at the heart of EMI's revenue growth, capitalising on the business's existing presence and developing new routes to digital consumers.

Opportunities to substantially reduce the recorded music business's fixed costs have been identified, including back office savings and centralised procurement. Terra Firma will also seek to re-channel A&R and marketing costs by the increased use of social networking and user-generated websites to source new acts and gauge audience reactions. EMI will provide more customer-focused marketing and targeted promotional support for its recorded music artists.

The recorded music business will target growth through a model which partners EMI with its artists and enables a closer relationship with consumers. Terra Firma has identified further opportunities for growth through a number of potential bolt-on acquisitions.

## CuRREnt FinAnCiALs

### Recorded Music

EMI Recorded Music recognised year-to-date revenue of £476.1m, down on the prior year. The negative sales variance was driven by the continued, and expected, decline in the physical market which was down roughly 13 per cent globally in the six months to September. Global digital revenues in the first half were up 23 per cent versus prior year with strong growth being experienced in the US market. Unfortunately, the level of cost savings and efficiency enhancement initiatives that had been put in place under the previous management were insufficient to offset the overall sales shortfall with year-to-date EBITDA of £3.5m being down £27.4m on the previous year.

The top sellers for the year so far have been "The Songs of Christmas", a compilation release in North America; Korn, "Untitled"; and KT Tunstall, "Drastic Fantastic".

### Music Publishing

Year-to-date, EMI Music Publishing generated revenue of £207.0m, which was 4.2 per cent better than 2006. This includes a £9.5m settlement as the result of litigation with YouTube. The UK business is showing strong performance with growth in all revenue categories bar physical sales. In the United States, revenue was £6.5m above prior year.

EMI Music Publishing's EBITDA for the year was £59.5m, which was ahead of 2006. Contributing to the EBITDA variance, overheads were down by £1.6m following cost reduction initiatives. However, gross margin was slightly down reflecting a change in sales mix towards writers with higher royalties.

| £'000 year End: 31 March | ytd 2006 Actual | ytd 2007 Actual |
|---|---|---|
| RECORDed MusiC* | | |
| Revenue | 660,200 | 478,100 |
| Direct costs | (431,400) | (322,000) |
| Overheads | (197,900) | (150,600) |
| EBITDA | 30,900 | 3,500 |
| MusiC PubLishinG* | | |
| Revenue | 198,800 | 207,000 |
| Royalties costs and overheads | (143,700) | (147,500) |
| EBITDA | 54,900 | 59,500 |

\* Excludes corporate overhead

30

Confidential

TF0000633336

| ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| Portfolio Companies | | Management Accounts | Contacts and Advisory Board |

# Analysis of investments and Asset Values

| investment Company | date of investment | initial Cash invested €'000 | Re-financing Proceeds' €'000 | sale Proceeds' €'000 | net Cash invested €'000 |
|---|---|---|---|---|---|
| WRG | Jul-03 | 421,722 | | | 421,722 |
| Shanks | Jun-04 | 247,445 | (84,945) | | 162,500 |
| FX-loss on refinancing of Shanks | | | | | |
| | | 675,412 | | | 675,412 |
| Odeon | Dec-04 | 228,225 | | | 228,225 |
| UCI | Oct-04 | 220,248 | | | 220,248 |
| | | | | | |
| Lapp & Rest | Dec-04 | 275,523 | | | 275,523 |
| | | | | | |
| BGC | May-05 | 96,867 | | | 96,867 |
| East Surrey Holding | Oct-05 | 358,970 | | (83,899) | 275,071 |
| | | | | | |
| AWAS | Mar-06 | 539,742 | | | 539,742 |
| EMI | Aug-07 | 586,041 | | | 586,041 |
| Carmel Capital II | Mar-06 | 72 | | | 72 |
| | | | | | |

31

Confidential

TF0000633337

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| **Portfolio Companies** | Management Accounts | Contacts and Advisory Board |

| | sold down to Co-investors €'000 | Re-financing Proceeds[1] €'000 | sale Proceeds[3] €'000 | Realised Profit €'000 | net Book Value €'000 | Market Value €'000 |
|---|---|---|---|---|---|---|
| | (2,979) | 214,154 | (26,801) | (722,802) | | |
| | (43,916) | | 12,859 | | | |
| | | | | | | |
| | (9,728) | (45,006) | | (8,403) | | |
| | (29,427) | | | | | |
| | (9,319) | 252,586 | (701,976) | (775,646) | 4,984 | 107,213 |
| | (31,050) | | (350,007) | | | |
| | (8,050) | | 173,875 | 23,200 | | |
| | | | | | | |
| | (200,960) | | | 336,782 | 456,197 | |
| | | | | 136,041 | 586,041 | |
| | | | | | | |

[1] WRG/Shanks refinancing proceeds used to part-finance the Fund's investment in Shanks.

[2] Disposal proceeds on the sale of the SESW water division of ESH used to part-finance the Fund's investment in ESH.

[3] Proceeds distributed to Limited Partners.

[4] Expenditure in advance of a proposed acquisition.

Confidential

TF0000633338

| ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| **Portfolio Companies** | Management Accounts | Contacts and Advisory Board | |

# investment Cash Flows

| | infinis(WRG) €'000 | Odeon/uCf €'000 | tank & Rast €'000 | PnG (Esh) €'000 | AWAs €'000 | EMi €'000 | total €'000 |
|---|---|---|---|---|---|---|---|
| **SUMMARY** | | | | | | | |
| Initial investment | (41,138) | 448,464 | (276,523) | 395,857 | 5,397,767 | (586,041) | 2,795,768 |
| total received | (652,674) | (241,755) | (1,046,152) | (912,755) | (194,400) | | (2,155,126) |
| | | | | | | | |
| **MOnthly Cash FLOWS since fund inception** | | | | | | | |
| November 2002 | | 169 | | | | | 169 |
| June 2003 | | 4,512 | | | | | 4,512 |
| July 2003 | | 171,500 | | | | | 171,500 |
| August 2003 | | 252,328 | | | | | 252,328 |
| September 2003 | | (5,178) | | | | | (5,178) |
| December 2003 | | (113,635) | | | | | (113,635) |
| March 2004 | | 19 | | | | | 19 |
| April 2004 | | | 40 | | | | 40 |
| May 2004 | | | | | | | 75,143 |
| June 2004 | | | | | | | 12,637 |
| July 2004 | | (2,962) | | | | | (2,962) |
| August 2004 | | 47,022 | | | | | 47,022 |
| October 2004 | | 211,233 | | | | | 211,233 |
| November 2004 | | | 15,000 | | | | 15,000 |
| December 2004 | | (215,432) | 162,305 | | 200 | | (52,927) |
| February 2005 | | | 280,453 | | | | 280,453 |
| March 2005 | | | (94,318) | | 18 | | (94,300) |
| May 2005 | | | | | (200) | | (200) |
| June 2005 | | (51,213) | | 9,006 | | | (42,209) |
| September 2005 | | | | 121 | | | 121 |
| November 2005 | | | | 27,729 | | | 27,729 |
| December 2005 | | | | 196,000 | | | 196,000 |
| January 2006 | | | | (11,737) | | | (11,737) |
| March 2006 | | | | 70,857 | 146,109 | | 216,965 |
| June 2006 | | | (252,580) | | | | (252,580) |
| July 2006 | | | (208,864) | | | | (208,864) |
| September 2006 | (208,884) | | | | 181,296 | | (27,587) |
| May 2007 | | | (115,905) | | | | (115,905) |
| June 2007 | | | | | 17,911 | | 17,911 |
| August 2007 | | | (701,276) | | | | (701,276) |
| September 2007 | | | | | | 586,041 | 586,041 |

[1] Includes €214m distribution from the combined WRG/Shanks refinancing. The book value has also been reduced by a forex loss of €2.7m on refinancing. A further €85m of re-financing proceeds were used to partly fund the Shanks acquisition. In January 2005, the cash flows associated with Shanks were transferred to WRG on merger of the two companies.

[2] Late interest charges of €152k received from co-investors on sell-down of Odeon were used to reduce the UCI call on LPs. In June 2005, the acquisition of Warner Lusomundo Sogecable Cinemas (€17m equity) was funded from part of the co-investment sale proceeds.

33



Contents  Letter from the CEO  An Alternative Perspective  General Partner's Report
Portfolio Companies  **Management Accounts**  Contacts and Advisory Board

# Management Accounts

Confidential

TF0000633340

| ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| | Portfolio Companies | Management Accounts | Contacts and Advisory Board |

# Fund Financial statements

| Profit and Loss statement | Quarter to 30-sep-07 € | yar to date 30-sep-07 € |
|---|---|---|
| **INCOME** | | |
| Capital gain on investments | 780,737 | 685,826,221 |
| Interest on investments | | 30,561,622 |
| Interest on bank accounts | 1,000,390 | 1,213,860 |
| **EXPENDITURE** | | |
| Partnership expenses | (4,503,202) | (7,255,119) |
| Foreign exchange gain | 24,801 | (2542) |
| Bank charges | (2,000) | (22,555) |
| Auditors' remuneration | | (10,500) |
| **NET INCOME AND GAINS** | | |
| **ALLOCATED TO** | | |
| Limited Partners | 1,000,384 | 970,930,069 |
| Special Limited Partner | 226,041 | 426,458,262 |
| Nominal Special Limited Partner | 24,000 | 14,273,250 |

| Cash Flow statement | Quarter to 30-sep-07 € | yar to date 30-sep-07 € |
|---|---|---|
| **RECONCILIATION OF NET PROFIT TO NET CASH** | | |
| **INFLOW FROM OPERATING ACTIVITIES** | | |
| Net profit for the period | 1,250,229 | 733,662,512 |
| Decrease in receivables | 698,299,318 | 1,053,978 |
| Decrease in payables | (100,290) | (6,725,380) |
| Add back income on investments | | (35,403,259) |
| Add back re-investment proceeds not yet received | 8,564,193 | 8,564,193 |
| **NET CASH INFLOW FROM Operating Activities** | | |
| **CAPITAL EXPENDITURE AND FINANCIAL INVESTMENT** | | |
| Proceeds from sale and redemption of investments | 43,407 | 132,674,214 |
| Purchase of fixed asset investments | (585,283,639) | (603,955,742) |
| **FINANCING** | | |
| Drawdowns on partners' commitments | 384,135,150 | 408,982,722 |
| Increase in loans and advances | 202,115,681 | 219,276,464 |
| Distributions and return of contributions | (701,275,961) | (816,260,909) |
| Advance of General Partner's share | (13,847,573) | (27,695,146) |
| **NET DECREASE IN CASH** | | |

35

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | | Management Accounts | Contacts and Advisory Board |

| Balance sheet | notes | As at 30-sep-07 €|
|---|---|---|
| **FIXEd AssEts** | | |
| Investments | 25,106 | 337,887,897 |
| **CURRENt AssEts** | | |
| Cash at bank | | 6,518,859 |
| Accounts receivable | | 6,864,419 |
| **CURREnt LIABILItIEs** | | |
| Loans and advances | | (219,275,464) |
| Accounts Payable | | (3,656,200) |
| **nEt AssEts** | | |
| | | |
| **REPRESEntEd By PARtnERs' ACCOunts** | | |
| Capital accounts | | 24,340 |
| Loan Accounts | | 89,275,563 |
| Shortfall in net Income due to General Partner | | |
| Profit allocated to Limited partner | | 887,623,060 |
| Profit allocated to Special Limited Partner | | 99,765,882 |
| Profit allocated to Non-participating Limited Partner | | 22,190,675 |
| SLP escrow | | (8,769,449) |
| **CAPITAL ACCOunts** | | |
| Revaluation surplus not included in Net Assets and Capital Accounts | | (741,055,703,180) |
| **Market Value of net Assets** | | |

36

| ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
|---|---|---|---|
| Portfolio Companies | | Management Accounts | Contacts and Advisory Board |

# notes to the Accounts

## 1. GEnERAL PARtnER's shARE OF nEt inCOME

| GP's share paid semi-annually in advance | Life to date no. of days | total Commitment | year to date 30-sep-07 | Life to date 30-sep-07 |
|---|---|---|---|---|
| 28 June 2002 to 31 DECEMBER 2007: | | | | |
| Limited Partner compliments | 2,014 | 1,652,400,097 | 12,399,000 | 136,662,534 |
| Nomura European Investment plc [1] | 2,014 | 193,249,000 | 1,354,575 | 16,040,150 |
| Terra Firma Capital Investment [2] | n/a | 19,354,000 | 0 | 0 |
| Terra Firma Investments LP II [2] | n/a | 9,366 | 0 | 0 |
| Inland Sky Investments 10 [2] | n/a | 6,700,000 | 0 | 0 |
| TFCI Holdings Ltd [2] | n/a | 85,000,000 | 0 | 0 |
| Nomura European Investment plc (SLP) [3] | n/a | 486 | 0 | 0 |
| | | | | |
| | | | | |
| ALLOCATED TO: | | | | |
| General Partner | | | | 136,662,534 |
| Nomura European Investment plc | | | | 16,040,150 |

[1] Nomura European Investment plc receives a proportion of the General Partner's share based on the level of its own commitment.

[2] Terra Firma entities do not pay General Partner's share to the General Partner.

[3] Nomura European Investment plc (SLP) in its capacity as a Special Limited Partner does not pay General Partner's share to the General Partner.

## 2. inVEstMEnts

| deal | Company | head Office | Book Value as at 30-sep-07 | Market Value as at 30-sep-07 |
|---|---|---|---|---|
| Infinis | Monterey Capital I Sarl | Northampton | 153,961,929 | 568,468,316 |
| Odeon/UCI | Monterey Capital I Sarl | Manchester | 243,705,979 | 363,003,955 |
| Tank & Rast | Monterey Capital IV Sarl | Bonn | 2,994,068 | 107,292,586 |
| PNG (ESH) | Carmel Capital I Sarl | Belfast | 106,301,496 | 206,562,506 |
| AWAS | Carmel Capital Sarl | Dublin | 336,762,365 | 456,193,559 |
| EMI | Maltby Capital Ltd | London | 586,040,740 | 586,040,740 |
| Carmel Capital III Sarl | Carmel Capital III Sarl | Luxembourg | 71,868 | 71,868 |
| | | | | |

37

Confidential

TF0000633343

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| | Portfolio Companies | Management Accounts | Contacts and Advisory Board |

### 3. AnALysis OF CAsh At BAnk

| | 30-sep-07 |
|---|---|
| Amount retained for expenses | 5,609,308 |
| Limited Partner distribution | 655,208 |
| Partner capital accounts | 24,340 |

### 4. ACCOunts RECEiVABLE

| | 30-sep-07 |
|---|---|
| Co-investment sell-down | 6,564,193 |
| Rebillable costs | 19,955 |

### 5. LOAns And AdVAnCEs

| | 30-sep-07 |
|---|---|
| EMI equity bridge loan and interest | (20,872,732) |
| Pegasus equity bridge loan and interest | (17,403,840) |

### 6. ACCOunts PAyABLE

| | 30-sep-07 |
|---|---|
| Limited Partner distribution | (655,208) |

### 7. EuRO EXChAnGE RAtEs

| | 31-dec-06 | 31-Mar-06 | 30-June-07 | 30-sep-07 |
|---|---|---|---|---|
| Sterling | 0.67372 | 0.67848 | 0.67434 | 0.69820 |
| US Dollar | 1.31975 | 1.33545 | 1.35415 | 1.42241 |
| Yen | 157.12928 | 157.50292 | 166.79060 | 163.40707 |
| Canadian Dollar | 1.53830 | 1.54185 | 1.44183 | 1.41693 |
| Australian Dollar | 1.67252 | 1.64748 | 1.59431 | 1.60767 |

38

ntents    Letter from the CEO    An Alternative Perspective    General Partner's Report

Portfolio Companies    Management Accounts    Contacts and Advisory Board

# notes to the Accounts

### 8. suMMARy AnALysis OF PARtnERs' ACCOunts – inCEPtiOn tO dAtE

| inception to 30-sep-07 | terra Firma Partners | Limited Partners | otal Partners' Account |
|---|---|---|---|
| Original Commitments | (93,098,461) | 1,846,343,485 | 1,539,941,946 |
| Capital Contribution Account | 3,992 | (10,948) | (24,340) |
| Undrawn Commitments | (6,074,443) | 373,367,033 | 389,441,175 |
| cALLs | | | |
| General Partner's Share | | (152,702,984) | (152,702,684) |
| Partnership Expenses | 2,332,140 | 46,253,578 | 48,585,718 |
| Investment | (102,968,323) | 2,042,161,475 | 2,145,129,798 |
| distRibutiOns | | | |
| Recyclable | (35,980,309) | (768,100,230) | (804,101,170) |
| Permanent | (63,244,046) | (1,389,757,019) | (1,453,001,065) |
| Repaid & Not Eligible for Recycle | (63,244,046) | 1,389,757,019 | 1,453,001,065 |
| Share of Net Asset at Book Value | 169,854,326 | 525,264,855 | 725,119,179 |
| AnALysis OF cALLs FOR invEstmEnt | | | |
| WRG Shares Investment | 26,087,151 | 516,397,522 | 542,434,673 |
| Odeon/UCI Investment | 17,906,401 | 355,139,518 | 373,045,919 |
| Tank & Rast Investment | 10,811,255 | 214,420,752 | 225,232,007 |
| BGCL/ESH Investment | 14,057,756 | 278,608,976 | 292,666,734 |
| AWAS Investment | 15,217,068 | 311,718,247 | 327,435,315 |
| LEM Investment | 18,438,890 | 365,696,860 | 384,135,750 |
| AnALysis OF distRibutiOns | | | |
| WRG Shares Distribution – Recyclable | (14,924,513) | (312,864,722) | (327,789,235) |
| WRG Distribution – Permanent | (28,301,603) | (600,499,691) | (628,801,294) |
| Tank & Rast Distributions – Recyclable | (9,699,008) | (205,667,562) | (215,366,570) |
| Tank & Rast Distributions – Permanent | (29,928,489) | (679,266,338) | (709,194,827) |
| Odeon/UCI Distribution – Recyclable | (2,203,529) | (49,009,323) | (51,212,852) |
| Odeon/UCI Distribution – Permanent | (5,013,954) | (109,990,990) | (115,004,944) |
| ESH Distributions – Recyclable | (9,153,890) | (200,338,626) | (209,792,516) |

39

| Contents | Letter from the CEO | An Alternative Perspective | General Partner's Report |
| Portfolio Companies | | Management Accounts | Contacts and Advisory Board |

### 9. thE Fund

The Fund comprises a series of English Limited Partnerships acting in concert, which are subject to the Limited Partnership Act 1907. The first Partnership in the Fund was registered on 21 June 2002. The Fund's principal place of business is Guernsey. Its day-to-day activities are carried out by the General Partner on behalf of the Partners.

The Limited Partnership Agreements, dated 20 June 2002, created the following classes of Partners:

a) Limited Partners; b) General Partner; c) Nomura Special Limited Partner; d) Special Limited Partner; and e) Executive Limited Partners.

The purpose of the Partnerships is to provide the Partners with a return by means of long-term capital appreciation through the acquisition of significant equity and equity-related interests, predominantly in unquoted companies in Western Europe and by making other selective equity and equity-related investments.

The Fund acquired its first investment, WRG, in July 2003.

### 10. ACCOuntinG POLiCiEs

The following accounting policies have been used consistently in dealing with items which are considered material in relation to the Fund's financial statements:

#### a) BAsis OF ACCOuntinG

The financial statements have been prepared in Euros (€) since this is the functional currency of the Fund, under the historical cost convention as modified by the revaluation of investments and in accordance with the Limited Partnership Agreements. The financial statements of the Fund are the aggregated financial statements of the Partnerships.

#### b) inVEstMEnts

Those investments that are associated or are subsidiary undertakings are carried at the lower of cost or the General Partner's valuation, in accordance with the Fund's normal policy, and are neither equity accounted nor consolidated.

Investments in associates will be accounted for in accordance with FRS 9 (Associates and Joint Ventures). The General Partner considers that investments in subsidiaries are held as part of an investment portfolio with a view to the ultimate realisation of capital gains and hence, in accordance with the Limited Partnership Agreements, fully consolidated financial statements as required by FRS 2 (Subsidiary Undertakings) are not prepared.

#### c) VALuAtiOn OF inVEstMEnts

Investments are valued at the lower of cost or General Partner's valuation at the balance sheet date. Provisions for diminution in value are recognised where the General Partner considers there has been a permanent impairment in value.

Revaluation adjustments are dealt with in the revaluation reserve.

#### d) inCOME

Bank interest is accounted for on an accruals basis. Due to the nature of investments in the Fund, whereby they are deemed to be equity or equity-related, investment income receivable is accounted for when the receipt of income is reasonably certain.

#### e) tAXAtiOn

The Partnership is not subject to taxation and no provision for taxation has been made in the financial statements. Any tax on income or capital is the responsibility of each individual Partner. Where any taxes on income or gains received by the Partnership have been deducted at source, these have been allocated to individual Partners in accordance with the Partnership Agreement.

#### f) FOREIGn EXChAnGE

Transactions in foreign currencies are recorded at the rate of exchange at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies at the balance sheet date are reported at the rates of exchange prevailing at that date. All amounts for reporting purposes are shown in Euros (€) unless otherwise stated.

Investment transactions and income and expenditure items are translated at the rate of exchange ruling at the date of the transaction. Differences on foreign exchange which are of an income nature are included in the income and expenditure account. Realised profit and losses on the sale of investments are included in the income and expenditure account.

40

ntents | Letter from the CEO | An Alternative Perspective | General Partner's Report
Portfolio Companies | Management Accounts | Contacts and Advisory Boa

# Contacts & Advisory Board

**inVEstOR RELAtIOns**

Peter Cornell
Managing Director, Stakeholder Relationships
Tel: +44 20 7015 9683

Michael Hewett
Head of Investor Relations
IR Director – Europe, Middle East and Australasia
Tel: +44 20 7015 9684

Bill Miles
IR Managing Director – North America
Tel: +44 20 7015 9680

Manabu Kurata
IR Director – Asia
Tel: +44 20 7015 9682

**FinAnCE**

Cormac O'Haire
Finance Director
Tel: +44 20 7015 9580

Anne Sheedy
Fund Reporting Manager
Tel: +44 20 7015 9567

**GEnERAL PARtnER**

Terra Firma Investments (GP) 2 Ltd
PO Box 543
First Floor, Dorey Court
Admiral Park, St Peter Port
Guernsey GY1 6HJ

**AdMinistRAtORs**

Iain Stokes
Mourant International Finance Administration
PO Box 543
First Floor, Dorey Court
Admiral Park, St Peter Port
Guernsey GY1 6HJ
Tel: +44 14 8171 5601
Fax: +44 14 8171 5602

**AdVisORs**

Terra Firma Capital Partners
4th Floor, 2 More London Riverside
London SE1 2AP
Tel: +44 20 7015 9500
Fax: +44 20 7015 9501

**inVEstMEnt AdVisORy COMMittEE**

| | |
|---|---|
| Guy Hands | Chief Executive Officer |
| Fraser Duncan | Managing Director, Portfolio Businesses |
| Cormac O'Haire | Finance Director |
| Tim Pryce | General Counsel |

**sEniOR MAnAGEMEnt tEAM**

| | |
|---|---|
| Stephen Alexander | Operational Managing Director |
| Phillip Burns | Financial Managing Director |
| Peter Cornell | Managing Director, Stakeholder Relationships |
| Mayamiko Kachingwe | Financial Managing Director |
| Mike Kinski | Operational Managing Director |
| David Pascall | Operational Managing Director |
| Riaz Punja | Financial Managing Director |
| Chris Roling | Managing Director, Portfolio Businesses |
| Quentin Stewart | Financial Managing Director |
| Ashley Unwin | Managing Director of Talent |
| Julie Williamson | Financial Managing Director |

**AuditORs**

KPMG
PO Box 235
St Peter Port
Guernsey GY1 4LD

**AdVisORy BOARd**

The Investor Relations team holds contact details for the individuals serving on the Advisory Board and will be happy to furnish you with contact information for any Advisory Board member upon request (please see left for contact details).

**REPORtinG**

If you have any questions on the content of this report or the reporting process, please contact Anne Sheedy, Fund Reporting Manager.

Electronic copies of this report and prior quarters' reports are available on the Investor Reports area of our website (www.terrafirma.com), which provides a link through to www.intralinks.com. Your username and password for the reporting workspace have been notified to you separately.

For other matters, please contact a member of the Investor Relations team.

41

A-363

From: Smith, Matthew [CIB-GBKG] [ms97314@imceu.eu.ssmb.com]
Sent: Thursday, December 14, 2006 12:01 PM
To: Wormsley, David [CIB-GBKG]
Subject: Fw: Draft announcement

This will be going out fairly shortly.

——Original Message——
From: Bell, Susie <BellS@emigroup.com>
To: Paynter, John G <john.paynter@jpmorgancazenove.com>; Reid, Tom [CIB-ECM]; Seaton, Andrew [CIB-ECM]; Charlie Foreman <charlie.foreman@db.com>; toby.clark@db.com <toby.clark@db.com>; andrew.hodgkin@jpmorgancazenove.com <andrew.hodgkin@jpmorgancazenove.com>; Smith, Matthew [CIB-GBKG]; guy.hayward-cole@db.com <guy.hayward-cole@db.com>; mark.rawlinson@freshfields.com <mark.rawlinson@freshfields.com>; martin.nelson-jones@freshfields.com <martin.nelson-jones@freshfields.com>
CC: Barak, Mark <mark.barak@emimusic.com>; Stewart, Martin <StewartM@emigroup.com>; Ashcroft, Charles <AshcroftC@emigroup.com>; Nicoli, Eric <NicoliE@emigroup.com>; Strong, Pippa <pippa.strong@emimusic.com>
Sent: Thu Dec 14 10:18:47 2006
Subject: RE: Draft announcement

Please see revised draft below

Further to the announcement on 28 November 2006 that EMI Group plc ('EMI' or the 'Company') had received a preliminary approach which might or might not lead to an offer being made for the Company, EMI today announces that discussions with the potential offeror have now ceased. The EMI Board has not received an offer that fully reflects the prospects for and value of the company and which it could recommend to shareholders.

From: Paynter, John G [mailto:john.paynter@jpmorgancazenove.com]
Sent: 14 December 2006 09:48
To: Bell, Susie; tom.reid@citigroup.com; andrew.seaton@citigroup.com; Charlie Foreman; toby.clark@db.com; andrew.hodgkin@jpmorgancazenove.com.; matthew.smith@citigroup.com; guy.hayward-cole@db.com; mark.rawlinson@freshfields.com; martin.nelson-jones@freshfields.com
Cc: Barak, Mark; Stewart, Martin; Ashcroft, Charles; Nicoli, Eric; Strong, Pippa
Subject: RE: Draft announcement

Two "mights" instead of two "mays" and, at the end, "reflects the prosects for, and value of, the company".

Otherwise looks fine. What is the current sate of play?

From: Bell, Susie [mailto:BellS@emigroup.com]
Sent: 14 December 2006 09:45
To: tom.reid@citigroup.com; andrew.seaton@citigroup.com; Charlie Foreman; toby.clark@db.com; Paynter, John G; andrew.hodgkin@jpmorgancazenove.com.; matthew.smith@citigroup.com; guy.hayward-cole@db.com; mark.rawlinson@freshfields.com; martin.nelson-jones@freshfields.com
Cc: Barak, Mark; Stewart, Martin; Ashcroft, Charles; Nicoli, Eric; Strong, Pippa
Subject: Draft announcement

Please find below and attached a draft announcement saying that discussions have now ceased. As discussed in the meeting yesterday, management are very keen to keep this breif and factual. Please can you let me have comments.



EXHIBIT TB
WORMSLEY 24
07/20/10

CITI-TF 00816883

Thanks

Susie

Further to the announcement on 28 November 2006 that EMI Group plc ('EMI' or the 'Company') had received a preliminary approach which may or may not lead to an offer being made for the Company, EMI today announces that discussions with the potential offeror have now ceased.  The EMI Board has not received an offer that it can recommend to shareholders and that fully reflects the prospects and value in the company.

-  _____

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

-  _____

This e-mail is confidential and is for the addressee only. Please refer to www.jpmorgancazenove.com/disclaimers/jpmorgancazenove.htm for important disclaimers and the firm's regulatory position.

-  _____

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

-  _____

CITI-TF 00816884

CITI-TF 00816885

terra firma

Terra Firma Investments (GP) 2 Limited
PO Box 543, First Floor,
Dorey Court,
Admiral Park,
St Peter Port,
Guernsey,
GY1 6HJ
Telephone +44 (0)1481 715 601
Facsimile   +44 (0)1481 715 602

EMI Group plc

27 Wrights Lane

London W8 5SW

For the attention of: Mr. Eric Nicoli

14 December 2006


Dear Sir

Terra Firma Investments (GP) 2 Limited ("Terra Firma") confirms its interest as a potential offeror for the entire issued and to be issued share capital of EMI Group plc ("EMI").

## 1. Identity of Terra Firma

Terra Firma manages a number of investment partnerships, including the six which together constitute the Terra Firma Capital Partners II Fund on whose behalf we are acting in connection with this expression of interest. Terra Firma has made eight principal investments since 2003, namely Waste Recycling Group, Shanks' UK landfill business, UCI Cinemas, Odeon Cinemas, Tank & Rast, British Gas Connections Limited, East Surrey Holdings and AWAS. The group of which we are part has funds under management of over €8 billion.

The Terra Firma group was created in 2002 as the independent successor to Nomura International plc's Principal Finance Group ("PFG") which was established by Guy Hands in 1994. Since 1994, the Terra Firma group has invested over €8 billion of equity and has completed transactions with an aggregate transaction value of over €33 billion. During this period, significant acquisitions were made in the UK, Europe and North America.

We are regulated by the Guernsey Financial Services Commission and are advised by Terra Firma Capital Partners Limited which is authorised and regulated by the Financial Services Authority of the United Kingdom.

## 2. Background to our interest

We have followed the progress of EMI closely over the past four years and we believe that the company presents many of the characteristics of the investment opportunities that Terra Firma is seeking. In our view, the combination of the stable and growing cashflows of the Music

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

Publishing Division together with the potential for industrial change in respect of the Recorded Music division represents a highly attractive investment proposition.

We have appointed Dresdner Kleinwort to advise us in relation to a possible offer for EMI. In addition, we have their support in connection with the financing of an offer. Our due diligence advisory team is in place and in a position to commence due diligence immediately.

### 3. Request for information under the Code

We note that EMI is in an offer period under the City Code on Takeovers and Mergers (the **"Code"**). In light of our interest as a potential offeror, we should be grateful if you would provide to us copies of any information which has been given to any other potential offeror pursuant to Rule 20.2 of the Code so that we may further evaluate the possibility of an offer by us for the entire issued and to be issued share capital of EMI.

We note the provisions of Note 1 to Rule 20.2. We are happy to provide you with a detailed list of questions and requests for specific information if you consider it necessary. We will also, of course, be prepared to sign a reasonable confidentiality agreement as contemplated by Note 2 on Rule 20.2.

### 4. Confidentiality and the Code

For the avoidance of doubt, this letter should not be construed in any regard as constituting an offer or evincing an intention to make an offer for EMI or any of its securities or otherwise giving rise to legal relations (save for the provisions relating to confidentiality) and, in particular, does not constitute a firm intention to make an offer within the meaning of Rule 2.2 of the Code.

This letter is sent to you on a strictly private and confidential basis. Neither our interest in EMI nor the contents of this letter may be disclosed to any person other than your professional advisers without our prior written consent, save as required by the Panel on Takeovers and Mergers (in which case you will use your reasonable endeavours to consult with us in advance). In particular, we reserve the right to terminate discussions immediately and without any obligation in the event that such confidentiality is breached or any public disclosure made.

Yours faithfully,

*Lorna Kelly*

Lorna Kelly as
Alternate to Iain Stokes
Director

For and on behalf of            14/12/2006

**Terra Firma Investments (GP) 2 Limited**
**(for and on behalf of the six limited partnerships constituting the Terra Firma Capital Partners II Fund)**

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

2

Confidential



Eric Nicoli
Chairman

Tel  020 7795 7777
Fax 020 7795 7755
nicolie@emigroup.com

15 December, 2006

Ms Lorna Kelly
Terra Firma Investments (GP) 2 Ltd
PO Box 543, First Floor
Dorey Court
Admiral Park
St Peter Port
Guernsey
GY1 6HJ

Dear Ms Kelly

I acknowledge receipt of your letter dated yesterday in which you request access to due diligence information about EMI under Rule 20.2 of the City Code.

As you may be aware, EMI announced yesterday morning that discussions with the party whose approach EMI disclosed on 28 November 2006 have ceased. As a result, as the Takeover Panel has confirmed, EMI is no longer in an offer period under the Code. We have therefore been advised that we are under no obligation to accede to your request for access to due diligence information under Rule 20.2.

It is, of course, open to the funds you represent to put forward a specific proposal. The Board would give due consideration to any such proposal. In the absence, however, of a specific proposal which the Board considers to be attractive, well founded and capable of implementation, we are not willing to permit the funds you represent to have the requested access to due diligence information. This is consistent with the approach the Board took with the previous party.

If there is any speculation or rumour concerning your interest we reserve the right to clarify its nature and extent.

Yours sincerely

Eric L. Nicoli

REENHILL_0024434                                                                                          Confidential

20 February 2007

## EMI GROUP plc

Further to recent press speculation, EMI Group plc ("EMI" or the "Company") confirms that it has received an approach from Warner Music Group. There is, however, no proposal currently for the EMI Board to consider. There can be no certainty that this approach will lead to any proposal or offer being made for the Company. If a proposal is made, it will be considered with a particular focus on conditionality, the regulatory and operational risk profile, and on value in relation to the Company's stand alone value and the value creation available from a combination.

Further announcements will be made if and when required.

### Enquiries

**EMI Group plc**
| | | |
|---|---|---|
| Amanda Conroy | Corporate Communications | +44 20 7795 7529 |
| Susie Bell | Investor Relations | +44 20 7795 7971 |
| Pippa Strong | Investor Relations | +44 20 7795 7681 |

Brunswick Group LLP
Patrick Handley                                    +44 20 7404 5959

*Dealing Disclosure Requirements*

*Under the provisions of Rule 8.3 of the Takeover Code (the "Code"), if any person is, or becomes, "interested" (directly or indirectly) in 1% or more of any class of "relevant securities" of Warner Music Group Corp. ("Warner Music Group") or of the Company, all "dealings" in any "relevant securities" of that company (including by means of an option in respect of, or a derivative referenced to, any such "relevant securities") must be publicly disclosed by no later than 3.30 pm (London time) on the London business day following the date of the relevant transaction. This requirement will continue until the date on which the offer becomes, or is declared, unconditional as to acceptances, lapses or is otherwise withdrawn or on which the "offer period" otherwise ends. If two or more persons act together pursuant to an agreement or understanding, whether formal or informal, to acquire an "interest" in "relevant securities" of Warner Music Group or the Company, they will be deemed to be a single person for the purpose of Rule 8.3.*

*Under the provisions of Rule 8.1 of the Code, all "dealings" in "relevant securities" of Warner Music Group or of the Company by Warner Music Group or the Company, or by any of their respective "associates", must be disclosed by no later than 12.00 noon (London time) on the London business day following the date of the relevant transaction.*

*A disclosure table, giving details of the companies in whose "relevant securities" "dealings" should be disclosed, and the number of such securities in issue, can be found on the Takeover Panel's website at www.thetakeoverpanel.org.uk.*

*"Interests in securities" arise, in summary, when a person has long economic exposure, whether conditional or absolute, to changes in the price of securities. In particular, a person will be treated as having an "interest" by virtue of the ownership*

or control of securities, or by virtue of any option in respect of, or derivative referenced to, securities.

*Terms in quotation marks are defined in the Code, which can also be found on the Panel's website. If you are in any doubt as to whether or not you are required to disclose a "dealing" under Rule 8, you should consult the Panel.*

Confidential

TF0001463552



2 March, 2007

John Gildersleeve
Chairman

Tel 020 7795 7765
Fax 020 7795 7766
gildersj@emigroup.com

Edgar Bronfman Jr.
Chairman & Chief Executive Officer
Warner Music Group
75 Rockefeller Plaza
30th Floor
New York
NY 10019

Dear Edgar,

Your proposal of 1st March 2007 was considered by the Board today and we specifically focused on those elements which I referred to in my letter of 21st February, namely regulatory uncertainty, operational risk and price.

In light of this background, it was again concluded by the Board that it would not be in the best interests of EMI shareholders to entertain any pre-conditional offer given the prolonged uncertainty that a regulatory review of the proposed transaction would entail and the associated operational risk.

I reiterate that, if you were willing to assume the regulatory risk as set out in my letter of 21 February 2006, the board might be more disposed to discussing an appropriate offer with you.

However, the board regards your proposal of 260p as inadequate, having regard to the stand-alone value of EMI, the synergies available from a combination with WMG and the risks referred to above.

I attach a copy of an announcement which we have released to the stockmarket this afternoon.

Yours sincerely,

John Gildersleeve

Enc.

ENHILL_0010892

Confidential

strictly private and confidential

**EMI Group plc**

**Meeting of the Directors held on
Thursday 1st March 2007 at 8.00pm (Part 1)
and Friday 2nd March 2007 at 9.20am (Part 2)
at 27 Wrights Lane, London W.8.**

| | |
|---|---|
| **Present:** | Mr J. Gildersleeve *(Chairman)* |
| | Mr E. L. Nicoli |
| | Mrs S. Bailey – for Part 2 only |
| | Mr K. K. Carton |
| | Mr R. C. Faxon |
| | Mr P. A. Georgescu |
| | Mr D. J. Londoner |
| | Mr M. D. Stewart |

| | | |
|---|---|---|
| **In Attendance:** | Mr C. P. Ashcroft *(Secretary)* | |
| | Mr M. Barak | ) |
| | Mr S. Borrows (Greenhill & Co.) | ) – For part of |
| | Mr A. Burgess (Deutsche Bank) | )    Minute 9 |
| | Mr G. Hayward-Cole (Deutsche Bank) | ) |
| | Mr D. Wormsley (Citigroup) | ) |

| | |
|---|---|
| **Apology for Absence:** | Mrs S Bailey – for Part 1 |

PART 1

1.    PREVIOUS MINUTES, MATTERS ARISING AND COMMITTEE REPORTS

(a)    Previous Minutes and Matters Arising

The Minutes of the Board meetings held on 14th and 29th November 2006, 7th December 2006, 10th January 2007 and 5th and 20th February 2007, the Board Committee meetings held on 14th November 2006 and 11th January 2007, and the Written Resolutions as of 11th January 2007 were approved. There were no matters arising.

(b)    Committee Minutes

The Board noted the Minutes of the:

- Executive Committee meetings held on 13th November and 18th December 2007;
- Finance Committee meeting held on 11th January 2007;
- Audit Committee meeting held on 13th November 2006;
- Nomination Committee meeting held on 5th February 2007;
- Offer Committee meetings held on 28th November and 14th December 2006; and,
- Share Schemes Committee meeting held on 29th January 2007.

Confidential

EXHIBIT
GILDERSLEEVE
5

TF0000992804

- 2 -

(c) **Committee Reports**

**Nomination Committee: 1st March 2007**
John Gildersleeve reported on the NC held earlier in the evening, when the Committee had confirmed the independence of the Non-executive Directors for the purposes of the Code on Corporate Governance, and agreed to recommend the reappointment of Sly Bailey as a Director.

**Executive Committee: 1st March 2007**
Eric Nicoli reported on the EC held the previous day, which John Gildersleeve had attended. He noted, in particular, the discussion regarding the possible move to unprotected MP3 formats. John Gildersleeve said that this would be discussed in more detail later in the meeting.

2. **REVISED 2007 BOARD AND COMMITTEE PROGRAMME**

The Board approved the revised Board and Committee Programme for 2007, which had been circulated, with the variation that there should be two reports on the Global IT change programme, rather than only one.

3. **DELEGATED AUTHORITIES AND BOARD COMMITTEE STRUCTURE**

Following the management restructuring announced on 12th January 2007, a revised Summary Schedule of Delegated Authorities and the related Explanatory Notes, as well as the document setting out the Board Committee Structure (including the Schedule of matters specifically reserved to the Board for decision), had been circulated. It was noted that the current Board Committee Structure had been approved by the Board at its meeting on the 25th February 2005, with subsequent amendments being made to it since that date.

The Board reviewed the proposed amendments and after discussion it was Resolved that:

(i) the revised Summary Schedule of Delegated Authorities and the related Explanatory Notes (attached as Appendix A to the official copy of these Minutes) be approved in substitution for that currently in force;

(ii) all previous Resolutions of this Board relating to the establishment and/or formation and/or administration of Board Committees be and they are hereby revoked;

(iii) the Committees indicated in the document (attached as Appendix B to the official copy of these Minutes) be established, with the membership, secretary, quorum requirement, attendance particulars and delegated authorities/terms of reference indicated under each of their respective names;

- 3 -

(iv) the delegated authority of each Committee shall include the power to approve all Minutes of meetings of such Committee and that from the date of such approval the Minutes shall be deemed to be a true record and form part of the Minutes of the proceedings of the Board;

(v) the Minutes of all Committee meetings, other than those of the Remuneration Committee, shall be circulated to all Board members with the Agenda and papers for the subsequent normal Board meeting;

(vii) the Schedule of matters specifically reserved to the Board for decision, together with the procedure endorsed on that Schedule to be followed when, exceptionally, decisions are required between Board meetings, be approved; and,

(viii) so as to avoid such matters being referred on every occasion to a meeting of the Board or one of its committees, any one of the Group Company Secretary, the Group General Counsel and the Deputy Secretary from time to time be and is hereby authorised to approve on behalf of the Board such allotments of the Company's Ordinary Shares of 14p each as may be validly required:

(A) on the exercise of options granted under the Company's Executive Share Option Scheme, Executive Share Incentive Plan and Savings-Related Share Option Scheme or otherwise granted in like circumstances to any of the Group's employees or directors;

(B) in respect of awards made to the Group's employees under the Company's Share Incentive Plan;

(C) on the conversion of the Guaranteed Convertible Bonds due 2010 issued by EMI Group Finance (Jersey) Limited; and,

(D) under any Scrip Dividend Scheme as the Company shall provide for its shareholders from time to time.

4.  **FORMAL MATTERS**

(a) **Toshiba EMI:**
    <u>Acquisition of Minority Shareholding – Ratification of Decision Note</u>

    The Board noted and ratified Charles Ashcroft's 13th December 2006 Decision Note approving a proposal for the Company to acquire, on an unconditional basis, Toshiba Corporation's 45% interest in Toshiba EMI (TOEMI) on the basis of the Company's 'fair valuation' analysis of Yen 202,421m, with receipt of the consideration being delayed until after TOEMI's audited accounts for the period to 31st March 2007 had been prepared.

- 4 -

(b) **Reappointment of a Non-executive Director**

The Board was advised that 2nd April 2007 would be the third anniversary of the appointment, as a Non-executive Director, of Sly Bailey, who had expressed her willingness to continue as a Director of the Company for a further period.

After noting the recommendation of the Nomination Committee, it was Resolved that Sly Bailey be and is hereby reappointed as a Non-executive Director for a further three-year term commencing with effect on and from 2nd April 2007.

(c) **Representation of the Company at Meetings of Other Companies**

It was Resolved that:

(i) the following be and each one of them is authorised pursuant to Section 375 of the Companies Act 1985 to act as representative of EMI Group plc at any Meeting of any other company of which EMI Group plc is or may hereafter become interested as a Member or a Creditor or a holder of Debentures:

Eric Luciano Nicoli
Roger Conant Faxon
Martin David Stewart
Charles Patrick Ashcroft
Christopher Lindsay Christian
Christopher John Ancliff; and,

(ii) any previous authority given in this respect be and is hereby revoked.

5. **GOVERNANCE**

(a) **Board and Committees' Effectiveness Reviews**

The Board noted Charles Ashcroft's summary of responses to the questionnaire regarding the Board and Committees' effectiveness review.

(b) **Regulatory Updates**

A paper from Charles Ashcroft, highlighting key changes arising from the implementation of the Companies Act 2006 and of the European Transparency Directive, had been circulated.    This was intended as an introduction to the key issues, and it was agreed that a more detailed paper would be brought to the April Board regarding financial reporting, together with Directors' responsibilities and liabilities in respect of financial reporting. The fact that the music industry was a 'fashion' business meant there was an unavoidable element of volatility in the business's forecasts.    Quarterly reporting would, therefore, need to be put into an appropriate context as part of an investor relations programme.

Confidential

- 5 -

The Board noted that the first quarterly report would be due in respect of the three months ended 30th June 2007, and agreed that the Group should aim to follow general practice, rather than undertaking greater disclosure than others.

6.   **SECRETARY'S REPORTS**

   (a)   **Share Register**

   The report on the Share Register, together with a memorandum summarising the main changes since the last meeting, was noted.

   (b)   **Use of Company Seal**

   The Board noted that the use of the Company Seal, Ref. 06/03.

   (c)   **Directors' Interests**

   It was reported that:

   (a)   Eric Nicoli was appointed as a Non-executive Director and Chairman of Vue Entertainment Investment Ltd on 21st December 2006;  and,

   (b)   David Londoner ceased to be a Director of Wintergreen Fund on 15th February 2007.

7.   **ANY OTHER BUSINESS**

   (a)   **Digital Rights Management**

   Eric Nicoli referred to the paper by Barney Wragg (Global Head of Digital, EMI Music) on Digital Rights Management (DRM) which had been previously circulated to the Board.   The case in favour of moving to unprotected MP3 format was that the Group's content was, in any event, effectively unprotected so long as product was offered in physical CD format.  Apple did not wish to licence its Fairplay platform and consumers were increasingly irritated that they were paying for content that they did not truly own.   A decision now to move to unprotected MP3 format would not prevent the Group subsequently moving to a successful and wholly interoperable DRM technology, if such emerged.   The recommendation of management was, therefore, to move to unprotected MP3 format.

   In discussion, John Gildersleeve noted that there was significant value in being seen to align with Apple and to support the consumer.   In response to concerns that the move would encourage increased piracy, Eric Nicoli said that it would be a vital part of the proposal that education and enforcement efforts be continued and even enhanced.

   After discussion, the Board approved management's recommendation that the Group should move to unprotected MP3 format for the delivery of downloaded music.

Confidential                                                                        TF0000992808

A-377

- 6 -

**(b)  Group CEO's Overview**

Reporting on events since the 12th January 2007 restructuring announcement, Eric Nicoli noted that the profit warnings, the proposals made by Warner Music Group (WMG) and the departure of Martin Bandier from Music Publishing had been significant distractions. Despite that, however, excellent progress had been made with the restructuring, with the key combination of the Capitol and Virgin labels in North America into Capitol Music Group having been implemented within a week of the restructuring announcement and the change of management. Eric Nicoli described the cultural issues arising out of the previous management style, as well as a number of unsatisfactory artist relationships, which included The Beatles. Despite the weak markets, Music was currently enjoying a good chart performance, including in the USA, where it had added 1.5 percentage points of market share. The relative performance in Continental Europe was also strong, but the UK business had performed weakly.

Eric Nicoli then summarised the various management changes and commented on key senior managers.

The Board noted Eric Nicoli's report.

-o-O-o-

The meeting adjourned and reconvened
at 9.25am on Friday 2nd March 2007

-o-O-o-

PART 2

**8.  JANUARY REPORTS**

**(a)  Group**

Supplementing his report, which appeared in the Blue Book, Martin Stewart noted that weekly reviews were being held with the regional CFOs. He reviewed the results of Music Publishing and Music.; the former was on track to deliver its Blue Book forecast, while the latter's March sales bridge was relatively low, compared to prior years.

Martin Stewart then reviewed market expectations, the likely year-end outturn for debt and changes within the Finance Department. The latter included the imminent removal of the regional CFO for Latin America. He also noted the possible further centralisation of finance functions and, in due course, the potential outsourcing of IT and back-office operations, although the Board noted the risk inherent in such outsourcing until the systems were working effectively and robustly. Financial reporting was moving to quarterly rolling forecasts and the aim was to remove any unnecessary reporting.

Confidential

TF0000992809

- 7 -

**Financing**

Martin Stewart noted that both credit rating agencies had placed the Group on negative watch, although there was no immediate impact on finance charges.

A paper was circulated regarding a proposed refinancing.   Following the paper circulated to the Board for its 10th January 2007 discussion, the Group continued to investigate securitisation of Music Publishing and Music cashflows as an efficient means to finance the Company going forward, albeit there would also need to be other forms of debt to complete the Group's financing plans.   It was likely that, in order to complete the refinancing, the Group would need to commit to an ultimate securitisation which was expected to result in reduced finance charges.

The Board noted Martin Stewart's paper regarding refinancing and Resolved that a Committee of the Board be appointed, the quorum for which should be any two Directors, of whom one should, where possible, be John Gildersleeve, together with one or both of Eric Nicoli and Martin Stewart, with full authority to approve detailed terms of the refinancing within the general parameters indicated by Martin Stewart's paper to the Board, and that such Committee should, up to 30th June 2007, have full authority to arrange for, authorise and approve, on such terms as it may think fit, the completion of the said refinancing, generally to act on behalf of the Board in all matters relating to such refinancing and any part of it and in connection therewith to have the like powers and discretions as the Board, including (but without limitation) authority to approve the giving and terms of a guarantee or guarantees by the Company in respect of the obligations of any of its subsidiaries, and to authorise its appropriate officers to execute and deliver any relevant documentation, and to give all notices and take all other action as may be required by the Company under such documentation.

Martin Stewart then completed his report, referring to:

- the poor Internal Audit report that had delivered in respect of Toshiba-EMI, which reflected difficulties arising from the SAP implementation and restructuring, coupled with a change in CFO.   Three IT auditors were in Japan helping to resolve issues and, at this stage, there were no indications of significant financial issues;

- ongoing tax analysis projects; and,

- JPMorgan Cazenove having stood down as a joint broker to the Company.

(b)  **Music**

Reporting on Music's performance, Eric Nicoli noted the difficulties caused by the bid approach from WMG, particularly as regards attracting executive and artist talent.   He also noted that the current market problems were affecting all the major record companies (although Universal Music Group appeared to be outperforming).   The September 2006 consensus of a flat market for the year had been replaced with a forecast 7%-10% overall decline.   In the USA,

Confidential                                                                TF0000992810

- 8 -

there had been a 22% physical market decline. Despite this, the business was achieving good chart share and, indeed, global market share was up on the basis of over-the-counter scanned sales. The returns issue which Music had experienced in North America had been, in part, a result of retail's reaction to the decline in the market as well as the level of shipments prior to the half year. US returns had now returned to a much lower level.

Music was experiencing great creative success in France and Germany, and the Japanese business was holding up. Latin America remained a problem and the UK was weak with an overall expected market decline of 5%. However, it was expected that the UK business would hit its forecast.

(c) Music Publishing

Reviewing the performance of Music Publishing, Roger Faxon noted that, whilst there had been some disappointing distributions in Italy and Japan, as well as in respect of Continental European mechanical revenues, performance and synchronisation revenues were both growing well and, overall, the business expected to meet its full-year forecast with broadly flat sales and NPS. That was an excellent performance in current market conditions. The business had very strong market share in the UK and its worldwide share appeared to be larger than that of Universal Music Publishing and BMG Music Publishing combined. He noticed, however, that there appeared to be a lag in the digital market, with mobile revenues declining in the UK. Overall, the business would continue to focus on being less dependent on the sale of records.

9.   PROJECT MULBERRY AND STRATEGIC OPTIONS

Mark Barak (SVP, Corporate Finance & Strategy) joined the meeting, together with Simon Borrows (Greenhill & Co. International), Tony Burgess and Guy Hayward-Cole (Deutsche Bank) and David Wormsley (Citigroup).

Project Mulberry
A letter which had been received the previous evening from the Chairman and Chief Executive of Warner Music Group (WMG) was circulated, together with an updated valuation sheet. Mark Barak took the Board through the schedule of summary valuation parameters, noting that it comprised two sections:

- valuation on a stand-alone basis; and,
- the potential value effect of certain strategic options.

Eric Nicoli noted that, as yet, the valuation schedule did not factor in any potential improvement in operational performance.

Mark Barak then took the Board through the stand-alone valuation basis (DCF, brokers' consensus, sum of the parts, sale to WMG, and LBO with IPO exit). It was noted that the valuation basis did not include the potential benefit from a securitisation, and Music Publishing might well achieve a higher value on sale.

- 9 -

The analysis regarding the possible value enhancement from strategic alternatives was at an early stage of assessment and was intended to be indicative only at this stage. John Gildersleeve stressed the importance of understanding the taxation impact as it varied between the different scenarios considered.

The Board then considered the letter from the Chairman and CEO of WMG which set out a revised indicative proposal to acquire the share capital of the Company. John Gildersleeve referred to the areas in which this proposal differed from the earlier proposal noting, in particular, the various assumptions to which the indicative proposal was made subject, the pre-condition for satisfactory regulatory clearance, and the requirement for irrevocable undertakings from shareholders to accept any bid made. The financial advisers tabled a suggested response to the proposal and recommended that a simultaneous formal announcement should be made. Key issues for the Board remained value and undeliverability. The advisers' joint recommendation was that the proposal should be rejected, with particular reference to the threshold issue of anti-trust risk and the fact that the true value of the proposal, having regard to the assumptions to which it was subject, was significantly below both the indicated 260p per share and the Company's current share price.

After discussion, the Board agreed the general principles of the proposed response, which would be redrafted to reflect the discussion. The Board similarly agreed that a formal announcement should be made later in the day which, following the discussion, the financial advisers were requested to redraft.

The financial advisers then left the meeting. They subsequently produced revised drafts of the letter of response and the formal announcement, both of which were approved by the Board.

**Strategic Options**
A book entitled *Strategic Options Review* was put round the table.

Martin Stewart first took the Board through the updated base plan contained in the book, which he believed indicated that it was necessary to look for improvement actions. The book benchmarked the updated plan to previous plans, reflecting changes in market forecasts. Eric Nicoli stressed that the plan was illustrative only at this stage and required further detailed discussion and analysis by management. Sly Bailey stressed the importance of assessing the Group's fundamental beliefs as to the consumption of music.

The main section of the book provided the detailed work behind the Strategic Alternatives section in the summary valuation parameters schedule that had been discussed earlier with the Group's financial advisers.

Mark Barak took the Board through the details of the strategic options that had been assessed, comprising:

- as regards Music Publishing, possible alternatives of a demerger or sale; and,

- as regards Music:
  o the base case;
  o continuing as a stand-alone business;

Confidential                                                   TF0000992812

- 10 -

o  the potential for outsourcing to provide a step change in overhead costs within back-office services;

o  a possible portfolio restructuring.    It was noted that these remained illustrative only;   when the necessary analysis was complete, the Board would need to consider the recommended options in detail and agree potential priorities;

o  a catalogue-only business model, in relation to which the Board again noted that it was essential to understand what was happening to the consumption of music, as well as the sensitivity of value created to the assessed decline rate of the catalogue;

o  a regional sale strategy;   and,

o  a full sale strategy.

In discussion, the Board noted the various opportunities that were not included in the base plan, which required further consideration.    The Board expressed its appreciation of the book, which was a very useful data reference point.

## 10.  RESTRUCTURING

Martin Stewart took the Board through his paper, which had been circulated, updating the cost savings to be achieved from the restructuring announced on 12th January 2007.    He reviewed progress to date against the programme described in the 12th January announcement noting that, of the forecast £110m of savings, £96m would come from Music and £14m from Music Publishing. These would involve a fixed-cost reduction of £90m, and variable-cost reduction of £20m.

A process had been established to itemise initiatives and collect and track data; weekly reports were submitted to a Restructuring Committee, which was chaired by Martin Stewart and comprised functional, as well as business, executives from both Music and Music Publishing.

Martin Stewart the took the Board through an update of the fixed-cost savings, which presently totalled £82m, as compared to the £90m planned fixed-cost reductions.    The cash cost of achieving base savings was estimated at £85m, as compared to the original £106.7m.    He provided a breakdown of the fixed-cost savings between headcount, roster reduction and other initiatives, and reviewed regional initiatives underlying the plan, as well as initiatives at the Group centre, in IT and Music Publishing;   he also reviewed the current status of variable-cost savings and other projects under consideration.

Completing his report, Martin Stewart circulated a schedule outlining current thinking as regards possible balance sheet adjustments at the year end.

The Board noted Martin Stewart's report.

## 11.  DATES OF NEXT MEETING

The next meetings would be held, as follows:

A-382

- 11 -

(a) by telephone conference on Tuesday 17th April 2007 at 5.00pm (UK time); and,

(b) Friday 20th April 2007, at 43 Brook Green, London W.6., following conclusion of the Remuneration and Nomination Committee meetings.

Confidential

TF0000992814

From: Klein, Michael [CIB-CORP] [0000034877@citigroup.com]
Sent: Friday, April 20, 2007 11:18 AM
To: Wormsley, David [CIB-GBKG]; Smith, Matthew [CIB-GBKG]
Subject: Re: Roles, etc.

Ridiculous

——Original Message——
From: Wormsley, David [CIB-GBKG]
To: Klein, Michael [CIB-CORP]; Smith, Matthew [CIB-GBKG]
Sent: Fri Apr 20 11:01:43 2007
Subject: FW: Roles, etc.

JG has as predicted marginalised us I am afraid. There are many points that I disagree with in this e-mail but I suspect that to respond would be damaging. I will draft something and circulate but suspect silence is the wisest course

From: Gildersleeve, John [mailto:gilders]@emigroup.com]
Sent: 20 April 2007 15:54
To: Wormsley, David [CIB-GBKG]
Cc: John Gildersleeve; Gildersleeve, John; Ashcroft, Charles
Subject: Roles, etc.

David,

Thanks for your earlier note. I have given much thought to the issues EMI faces and the process we should pursue in respect of a transaction over the last few months.

As I agreed with the Board at the time I stepped up to Chairman, any process would have to be arranged in such a way that it was transparent and demonstrably in the best interests of the general body of shareholders and no one interested party would be favoured over another. I also insisted on the full involvement of Greenhill as trusted adviser to the board.

I know that both Citigroup and Deutsche Bank have significant business relationships with the private equity world and as a result are not qualified to give the Board the sort of independent advice we are looking for. Also, given the private equity interest, I want all negotiations with any potential bidders to be led by me and for Greenhill to co-ordinate these discussions in order to simplify logistics and ensure there are no miscommunications.

We will, of course, be looking to update you on a regular basis as well as seek your counsel and that of your broking colleagues. I will ask Charles to prepare a note on process for the advisers which will set this out more clearly.

John

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW



EXHIBIT
GILDERSLEEVE
9

CITI-TF 00316652

Registered in England No 229231.

CITI-TF 00316653

As a Third Party
Eric Luciano Nicoli
First
Exhibit ELN-1
5 July 2010

**IN THE HIGH COURT OF JUSTICE**                    CR 2010-240
**QUEENS BENCH DIVISION**
**THE SENIOR MASTER**

**BETWEEN:**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS)
ACT 1975**

**AND IN THE MATTER OF THE HAGUE CONVENTION OF 18TH MARCH 1970 ON THE
TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

**AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
ENTITLED AS FOLLOWS:**

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED (for and on behalf of the
six limited partnerships constituting the Terra Firma Capital Partners II
Fund)

TERRA FIRMA INVESTMENTS (GP) 3 LIMITED (for and on behalf of
Terra Firma Capital Partners III, L.P.)

                                                              Plaintiffs

- and -

CITIGROUP INC., CITIBANK, N.A.,
CITIGLOBAL MARKETS LIMITED and
CITIGROUP GLOBAL MARKETS INC.

                                                              Defendants

---

### WITNESS STATEMENT OF ERIC LUCIANO NICOLI

I, Eric Luciano Nicoli of Woodstock House, London Road, Sunningdale, Berkshire, SL5 0JN

**WILL SAY** as follows:

1.     I make this statement pursuant to an order of the Senior Master of the High Court in this
       action, dated 3 June 2010 ("**the Order**"), and to assist the United States District Court

**EXHIBIT**
Nicoli
(
PMS 7.5.10

Southern District of New York in resolving the issues between the parties in complaint number 603737/2009 ("the Claim").

2.     I joined Thorn EMI plc in July 1993 as a non-executive director. In 1997, EMI Group plc ("EMI") was formed following the demerger of Thorn EMI. I became an executive director of EMI on 1 May 1999 and was appointed Executive Chairman in July 1999, holding the roles of both Chief Executive Officer ("CEO") and Chairman until 2007. On 12 January 2007, I ceased to be the chairman of EMI (John Gildersleeve was appointed non-executive chairman in my place) but I continued as CEO until August 2007, when I left EMI. I was also the non-executive Chairman of HMV Group plc from March 2001 until February 2004 and the non-executive chairman of Tussauds Group Limited from March 2001 to May 2007. I currently hold a number of directorships, including as non-executive chairman of Vue Entertainment Limited, chairman of Nick Stewart & Associates Limited and chairman of R&R Music Limited. I am also the Senior Partner of Sunningdale Capital LLP.

3.     Save as where indicated to the contrary, the facts and matters contained in this statement are made from my own knowledge and I believe them to be true. Where they are not from my own knowledge, they are matters of information or belief, and I give the source of this information or the basis for the belief.

4.     In preparing this statement, I have reviewed the complaint of the plaintiffs in the Claim ("the Complaint") and I have refreshed my memory on some of the matters in issue by reviewing the bundle of documents provided by Clyde & Co., instructed by the plaintiffs in the Claim, to Herbert Smith LLP (instructed by me to assist with the compliance of the Order) on 30 June 2010. I make specific reference to some of these documents below and exhibit any such document in the bundle exhibited to this witness statement and marked "ELN-1".

**Citigroup's role in the sale of EMI in spring 2007**

5.      Having reviewed the Complaint, the plaintiff in this action appears to have misinterpreted the role that Citigroup ("**Citi**") played in the sale of EMI in Spring 2007.  I feel that it would be beneficial to all parties and would clarify the role that Citi played if I, in my position of CEO of EMI, offer my understanding of Citi's role.

6.      In late 2006, the board of EMI considered the possibility of entertaining bids for the company from private equity firms.  At the time, Citi was (along with Deutsche Bank AG ("**Deutsche**")) a retained advisor to EMI and acted as EMI's broker.  However, as both Citi and Deutsche had extensive connections with a significant portion of the private equity community, the EMI board considered that it would not be suitable for either Citi or Deutsche to be the lead advisor in relation to the sale of EMI.  The EMI board considered that neither Citi nor Deutsche would be sufficiently independent of any potential private equity purchaser in order to satisfy Rule 3 of the City Code on Takeovers and Mergers.

7.      Accordingly, Greenhill & Co. International LLP ("**Greenhill**"), who (to my knowledge and the knowledge of the board of EMI at the time) had no connections with the private equity community, was appointed as the principal advisor to the board of EMI in relation to the potential sale of EMI in the Spring of 2007.  This is as stated by paragraph 62 of the Complaint.

8.      The Complaint describes Citi as EMI's "*lead investment advisor*" (at paragraph 138).  This is not correct.  Citi did not lead, nor manage the auction process; Greenhill was EMI's lead advisor and Greenhill managed the process by which bids were received and negotiated with prospective purchasers.  Citi and Deutsche were asked by EMI to ascertain the level of interest within the private equity community and they were participators from time to time in discussions regarding the likely bidders for EMI, the valuation of EMI and the likely reaction of EMI shareholders to any potential propositions.  Any interest thereby

A-388

identified was managed by Greenhill on behalf of EMI.  Citi also helped arrange the debt-based acquisition funding for Terra Firma.

9.   Citi's role is further explained by paragraphs 100 and 101 of the Complaint.  Following the EMI board meeting of 20 April 2007, I was mandated by the board of EMI to establish whether any parties, who had previously expressed an interest in buying EMI, retained its interest (see paragraph 100(d)).  David Wormsley of Citi had previously informed EMI that Terra Firma was interested in purchasing EMI around the time of the Permira offer in late 2006.  Citi was therefore instructed to establish whether Terra Firma retained an interest in purchasing EMI.

**Weekend of 19 and 20 May 2007**

10.   Paragraph 138 of the Complaint states that "...*Mr Wormsley was in regular contact with EMI on May 19 and 20 and the early morning hours of May 21, 2007.  EMI, through Mr Nicoli, kept Mr Wormsley, as EMI's lead investment advisor and one of the people who ran the auction, informed of the true facts of the discussions between EMI and Cerberus, including Cerberus' withdrawal from the bidding process...*".  As to the mistaken belief that Mr Wormsley was "...*one of the people who ran the auction...*", I refer to my explanation at 5 to 9 (above).  For my part, I can recall only one email exchange and one telephone conversation that I had with Mr Wormsley over the weekend of 19 and 20 May 2010.  I am only able to recall these exchanges because I have been prompted by the documents provided by Clyde & Co.  Indeed, the documents disclosed by Clyde & Co. show that I emailed Mr Wormsley on 20 May 2007 at 13:41, responding to Mr Wormlsey's earlier email and requesting a call with him (see ELN-1 at page 1).  To the best of my recollection, the conversation that followed was in relation to the article that had been published that day by the Sunday Times in relation to Warner's interest in EMI and the

merits or otherwise of making a complaint to the Takeover Panel in relation to this and similar stories which had appeared in the press.

11.  I also note from the emails produced by Clyde & Co. that Mr Wormsley emailed me at 20:59 on 20 May 2007 (see ELN-1 at page 2). I have no recollection of when I read this email. I note though that Mr Wormsley's email to me, informing me that Guy Hands had told him that Terra Firma hoped to make a bid for EMI the following morning was sent prior to the telephone conversation between Mr Wormsley and Mr Hands that is referred to in paragraph 129 of the Complaint and which I discuss at 26 and 27 (below).

12.  John Gildersleeve emailed various personnel from EMI and Greenhill who were leading the sale process at 15:52 on 20 May 2007 (see ELN-1 at page 3 to 4). In this email, Mr Gildersleeve explained that Cerberus would not be submitting a bid the following day, but it did retain an ambition to join with another party in order to make an offer in due course. To my recollection, I had no conversations with Mr Gildersleeve on this subject following receipt of this email until the following morning.

13.  I recall that at about 7 p.m. on 20 May 2007, I had a telephone conversation with Mr Hands which I believe that Mr Hands initiated. During this conversation, I recall that Mr Hands told me that Terra Firma intended to submit a bid the following day and that the bid would be at the level of 265p per share. My impression was that Mr Hands hoped to elicit a reaction or a response from me, so that he could assess whether 265p was a suitable price at which to bid. I believe I gave Mr Hands a simple answer along the lines of 'I look forward to receiving your bid'.

**Status of the bidders as at 9 a.m. 21 May 2007**

14.  The Complaint states that "...*all of the other private equity bidders... withdrew from the auction...*" (paragraph 9) and that "... *during the afternoon of May 20, 2007, Cerberus*

*formally informed EMI that it had exited the auction and would not be submitting a bid...*".

In so far as it is suggested that, as at 9 a.m. on 21 May 2007, Terra Firma was the only potential purchaser of EMI, this does not accord with my understanding.

15.   At the time that Terra Firma submitted its bid for EMI, representatives of Warner Music Group ("**Warner**") were in the offices of Greenhills conducting management due diligence, with the potential that Warner might submit a bid in due course. I had in mind therefore the presence of Warner as a potential purchaser when EMI received the bid from Terra Firma. Indeed, it is my belief that the EMI board generally considered it more likely than not that Warner would come to EMI with a bid at some stage, although this did not actually in the end happen.

16.   As mentioned at 12 (above), Cerberus had expressed its keenness to combine with Fortress or another in order to submit a bid in the future. I also had this potential bid in mind when the EMI board considered the Terra Firma bid. Indeed, I understood that Mr Gildersleeve had postponed giving Cerberus a definitive answer on its proposition until after the bid-deadline had passed (see ELN-1 at page 3 to 4).

17.   In addition to those bidders that had actively been involved during May 2007, I was also aware of several other private equity firms that had expressed an interest in purchasing EMI in the 6-12 months previously. I also considered the possibility of one or more of these bidders re-emerging as an interested party.

18.   The views that I have expressed in paragraphs 14 to 17 were also shared by the remainder of the EMI board

**EMI's ability to "withstand a failed bid"**

19.   The Complaint states that "...*a busted auction... would likely have resulted in EMI being unable to meet its banking covenants...*" (paragraph 9) and that "...*EMI could not*

*withstand a failed bid...*" (paragraph 129).  As CEO of EMI at the time, I do not believe that either of these statements is correct.  I was certainly not "*aware*" of such a situation at the time.

20.    Throughout the entire process, the potential impact that may or may not occur to my reputation should EMI not receive a recommendable bid on 21 May 2007 was not an important consideration for me.

### Mr Wormsley's communications with Guy Hands

21.    The Complaint states on more than one occasion (see e.g. paragraphs 129 and 142) that Mr Wormsley made communications with Mr Hands with my knowledge.  The Complaint specifically refers to the telephone conversation between Mr Wormsley and Mr Hands "*at approximately midnight at the start of Monday, May 21, 2007*" (paragraph 129).  For the avoidance of doubt, I have no recollection that I knew in advance of this conversation that it was going to happen and I do not believe that I did so know. I have no recollection of Mr Wormsley telling me that he was going to have such a conversation or what its contents, in general or specific terms, may be.

### Paragraph 128 of the Complaint

22.    In paragraph 128, the Plaintiff alleges that Mr Wormsley made the following representations to Mr Hands in a conversation during the evening of May 18 2007:

    a.    That EMI had Cerberus bidding at £2.62, which Terra Firma had to exceed if it was to win the auction;

    b.    That if Terra Firma did not submit its bid by 9 a.m. on Monday, May 21, 2007, the EMI board would recommend accepting the Cerberus bid; and

c.  That Citi would make sure that Terra Firma had the financing in place to make a bid.

23.  I was not party to any such alleged conversation between Mr Wormsley and Mr Hands.

24.  At no time did Mr Wormsley inform me that he had made representations to Mr Hands on 18 May 2007 to the effect of those set out in paragraph 128 of the Complaint (as summarised in paragraph 22 above).

**Paragraph 129 of the Complaint**

25.  The Plaintiff alleges that over the weekend through May 21, 2007, Mr Wormsley repeated the alleged representations set out in paragraph 22 (above) to Mr Hands several times during the course of several conversations. If Mr Wormsley did so then he did not tell me that he had done so and I was not aware that he had done so.

26.  The Plaintiff further alleges that around midnight at the start of Monday 21 May 2007, Mr Wormsly repeated that:

a.  there was another bidder in the auction for EMI;

b.  the other bidder would bid on Monday morning at £2.62 per share;

c.  a bid of £2.65 per share by Terra Firma would ensure that EMIs Board recommended Terra Firmas offer to EMIs shareholders; and

d.  a failure by Terra Firma to provide a bid by Monday, 21 May 2007 at 9 a.m. at or above £2.62 would ensure that Terra Firma would lose the EMI auction to the other bidder;

AND that these representations were made with my knowledge.

27. I do not know whether Mr Wormsly made the representations to Mr Hands as alleged in paragraph 129 of the Complaint and set out in paragraph 26 (above). If he did so he did not tell me at the time or subsequently that he had done so. It follows that if such representations were made I had no knowledge of this fact. I find it hurtful and improper that the Plaintiff chooses to assert the contrary.

28. In paragraph 129 the Plaintiff further asserts that I was aware that my reputation would be critically injured by a failed bid. This was not my view at the time. Nor is it my view now. Indeed had Terra Firma not proceeded to bid I considered that Warner and Cerberus would continue to pursue their stated interest. As explained at 20 (above), the question of possible critical damage to my reputation as a result of any failed auction was not something that influenced my actions at any stage. Again, I find it surprising that the Plaintiff can make such an unfounded assertion.

**Statement of Truth**

I believe the facts stated in this witness statement to be true.

Eric Luciano Nicoli

**5 July 2010**

As a Third Party
Eric Luciano Nicoli
First
Exhibit ELN-1
5 July 2010

CR 2010-24

IN THE HIGH COURT OF JUSTICE
QUEENS BENCH DIVISION
THE SENIOR MASTER

BETWEEN:

IN THE MATTER OF THE EVIDENCE
(PROCEEDINGS IN OTHER JURISDICTIONS)
ACT 1975

AND IN THE MATTER OF THE HAGUE
CONVENTION OF 18TH MARCH 1970 ON THE
TAKING OF EVIDENCE ABROAD IN CIVIL
OR COMMERCIAL MATTERS

AND IN THE MATTER OF A CIVIL
PROCEEDING NOW PENDING BEFORE THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ENTITLED AS FOLLOWS:

TERRA FIRMA INVESTMENTS (GP) 2
LIMITED & Another

Plaintiffs

- and -

CITIGROUP INC., & Others

Defendants

---

WITNESS STATEMENT OF ERIC LUCIANO
NICOLI

---

Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS
Solicitors for the Third Party

As a Third Party
Eric Luciano Nicoli
First
Exhibit ELN-1
5 July 2010

CR 2010-240

IN THE HIGH COURT OF JUSTICE
QUEENS BENCH DIVISION
THE SENIOR MASTER

BETWEEN:

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS)
ACT 1975

AND IN THE MATTER OF THE HAGUE CONVENTION OF 18TH MARCH 1970 ON THE
TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

AND IN THE MATTER OF A CIVIL PROCEEDING NOW PENDING BEFORE THE
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
ENTITLED AS FOLLOWS:

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED (for and on behalf of the
six limited partnerships constituting the Terra Firma Capital Partners II
Fund)

TERRA FIRMA INVESTMENTS (GP) 3 LIMITED (for and on behalf of
Terra Firma Capital Partners III, L.P.)

Plaintiffs

- and -

CITIGROUP INC., CITIBANK, N.A.,
CITIGLOBAL MARKETS LIMITED and
CITIGROUP GLOBAL MARKETS INC.

Defendants

EXHIBIT ELN-1

This is the exhibit marked "ELN-1 referred to in the First Witness Statement of Eric Luciano Nicoli
dated 23 June 2010.

Signed: .......................................................
Eric Nicoli

Date: 5 July 2010

10/29008092_3

11

strictly private and confidential

<u>EMI Group plc</u>

**Meeting of the Directors held on Friday 20th April 2007 at 9.35am
at 27 Wrights Lane, London W.8.**

**Present:**                    Mr J. Gildersleeve *(Chairman)*
                               Mr E. L. Nicoli
                               Mrs S. Bailey
                               Mr K. K. Carton
                               Mr R. C. Faxon
                               Mr P. A. Georgescu – For Minutes 1-5 (part)
                               Mr D. J. Londoner
                               Mr M. D. Stewart

**In Attendance:**              Mr C. P. Ashcroft *(Secretary)*
                               Mr I. W. Smellie – For Minute 4
                               Mr M. Barak                     ) – For Minute 5
                               Mr S. Borrows (Greenhill & Co.) )

---

1.  <u>**PREVIOUS MINUTES, MATTERS ARISING AND COMMITTEE REPORTS**</u>

    (a) <u>Previous Minutes and Matters Arising</u>

    The Minutes of the Board meetings held on 1st/2nd, 22nd and 27th March
    2007, and the Board Committee meeting held on 27th March 2007 were
    approved.   The following matters arose:

    - **Digital Rights Management** *(1st/2nd March 2007 – Minute 9)* – Eric
      Nicoli briefed the Board on reaction to the Company's announcement of
      the removal of Digital Rights Management (DRM) from its products on the
      Apple iTunes service.

    - **April Trading Statement** *(17th April 2007)* – The Board noted that
      reaction to the trading statement on 18th April had been more positive
      than initially expected.   Generally, shareholders appeared to understand
      the reasons for the suspension of dividends.

    - **Beatles/Bertelsmann Settlements** – The Board noted the settlement of
      the audit claim and related proceedings brought by The Beatles against
      EMI Records.      The settlement of the Company's claim against
      Bertelsmann regarding the original Napster service, which had resulted in
      the highest copyright infringement payment to a single company in US
      legal history, was also noted.

    (b) <u>Committee Minutes</u>

    The Board noted the Minutes of the:

    - Audit Committee meeting held on 5th March 2007;  and,
    - Nomination Committee meeting held on 1st March 2007.

EXHIBIT

BORROWS 47

Confidential

TF0000992819

- 2 -

**(c) Committee Reports**

**Nomination Committee: 20th April 2007**
Reporting on the NC meeting held earlier in the day, John Gildersleeve noted that the Committee had reviewed the structure, size and composition of the Board; approved a formal process for the making of Board appointments; approved the process to be followed for the performance reviews of the Board, its principal Committees and individual Directors in 2007/08; and confirmed the appropriateness of the time commitments for NEDs.

**Remuneration Committees: 2nd March and 20th April 2007**
Sly Bailey reported on the RC's meetings of:

- *2nd March 2007:* when revised employment terms had been approved for JF Cecillion, Jason Flom, Lee Trink and Jeff Kempler; and,

- *20th April 2007:* when the Committee had approved the revised design of the EIP for 2007/08, as well as of the ESIP. In the case of the EIP, the changes concerned Music and aimed to achieve a greater alignment between the objectives of senior staff and the business and to provide the Company with a better means of driving business performance. The focus had been on simplification of the plan and increased effectiveness. As regards the ESIP, the use of options would be discontinued, with the aim of reducing downside cost whilst maximising the incentive value to executives. Additionally, the Committee had noted certain contractual salary increases and approved the acceleration of the salary increase provided in Roger Faxon's contract, reflecting the fact that he had become sole Chairman and CEO of Music Publishing a year earlier than originally envisaged.

**Audit Committee: 5th March 2007**
Reporting on the AC meeting held on 5th March 2007, Kevin Carton noted that corrected Minutes of the meeting had been circulated and drew attention to two particular points:

- the Risk Matrix would be updated for the Committee's May meeting; good progress was being made, which should be continued notwithstanding the other major projects on which the Company was engaged; and,

- Internal Audit's Work Plan for the current financial year, where coverage would decrease by approximately one third, reflecting a reduction in staff numbers. He noted that the Department had played an important role in risk mitigation over the previous year, and for the current year would be asked to focus efforts on the most important risks. Whilst this would provide less assurance to the Board, it was essential to prioritise given the reduced resources available. Martin Stewart noted that it might become necessary to consider re-staffing of the Department if the Group's territorial portfolio was not reduced.

Confidential

- 3 -

2. **MARCH REPORTS**

    (a) **Group**

        Commenting on the March Blue Book, which had been put round the table, Martin Stewart noted that the pre-audit year-end result showed EBITDA of £174.1m.   The Group had moved to EBITDA as its key financial metric. This result compared with the median of market expectations of £159m. The variations between the Group EBITDA outcome and the prior forecast of £189m was largely explained by the different accounting treatment of the Bertelsmann settlement, net of provisions in respect of the Janet Jackson contract and settlement of The Beatles' audit claim.

        The Board noted the commentary on the pre-audit full-year results in Martin Stewart's CFO Report.

        Martin Stewart then reported on the refinancing of the Group's banking facilities which had been completed, at a cost in fees of approximately £14m. The facility had been increased from £450m to £700m to finance the purchase of the minority interest in Toshiba-EMI (TOEMI) and the cost of the restructuring announced on 12th January 2007.   The increased interest cost of the new facilities, coupled with the increase in debt in respect of the TOEMI acquisition and the restructuring, meant that finance charges in the current year were expected to be approximately £130m.   Whilst the Group had passed its financial covenants at 31st March 2007, there remained work to do to ensure compliance at the half year, which would be dealt with in more detail during the Budget discussion later in the meeting.

        Martin Stewart also noted progress on the audit, where no material issues had, as yet, been raised.

    (b) **Music**

        Eric Nicoli noted that Music had faced a difficult year, particularly in the last three months.   The physical market had declined by 13%, with a total market decrease of 7% after allowing for a 68% increase in the digital market. Music's sales had declined twice as much as the market on the basis of shipments, but had done much better in over-the-counter market share, reflecting the fact that the business had excess stock in the market.   The business's US share over the counter had been pleasingly up in the fourth quarter.

        Eric Nicoli also commented on the steps being taken to improve relationships with key artists.

    (c) **Music Publishing**

        Roger Faxon reported that Music Publishing had also had a difficult year. However, normalised mechanical revenues had fallen only 3.6% in the context of a market that had fallen 13%.   The business had achieved its highest market share in the UK as well as an excellent chart share in the US. Performance revenues were up approximately 10% (including an additional BMI distribution), whilst synchronisation revenues showed 6% growth. Overall, the results were a good performance.

Confidential

- 4 -

Roger Faxon then reviewed changes in personnel, including the departure of Marty Bandier. Ensuring the full collection of digital revenues remained a critical issue.

**3.    RESTRUCTURING**

Reviewing the report appended to his CFO report, Martin Stewart noted that the plans to achieve the announced cost savings were substantially complete and approved. A full run-rate reduction of overheads of £82.3m had been identified, together with £20m of variable cost reductions. The one-off cost of these savings had been £113.7m in 2006/07, with a further £22.7m forecast in 2007/08. Of these costs, the cash element in the prior year had been £29.6m, with an anticipated £69m in the current year, so the cash cost at present was well below the indicated level of £125m. The detailed schedules provided to the Board showed the savings, accounting cost and cash cost each phased by month.

John Gildersleeve said that the Board approved the level of diligence being shown by management. He requested that, at the next meeting, the outstanding £6m of announced savings should be identified, together with possible next steps.

**4.    2007/08 BUDGET**

Ian Smellie (SVP, Group Financial Controller) joined the meeting.

Commenting on the 2007/08 Group Annual Operating Plan and Forecast, which had been circulated, Martin Stewart noted that the Plan envisaged a total market decline of 6% for the plan year, representing a 14% decline in the physical market offset by a 45% increase in the digital market. This assumption compared with a 7.4% decline in the total market for the financial year just ended.

The introduction to the Plan reviewed the Group's business aims and current industry issues, including the economic environment and market overview, the relaxation of DRM and legal and regulatory matters.

The Group forecast for the plan year remained 'work in progress', in particular as regards phasing and the H1 and H2 split. The forecast was for revenues of £1.71bn, down approximately 2.1%, within which digital revenues were forecast to increase by 56.1%. The forecast EBITDA for the year was £272.4m.

Martin Stewart then reviewed the performance required in the first half to ensure the Group's banking covenants would be met at 30th September 2007, together with possible actions which included a sale of the Group's Japanese (and, perhaps, South-East Asian) businesses to Universal, an accelerated securitisation, and the banks accepting that the Bertelsmann settlement should be treated as underlying for the purposes of the financial covenant tests. It would also be possible significantly to constrain expenditure.

- 5 -

John Gildersleeve stressed the importance of a confirmed plan being available to provide the necessary degree of reassurance to the Board. Martin Stewart said that the Budget would be amended to ensure that the necessary actions were taken, but other actions outside of the Budget would be pursued in parallel. It was also noted that the Plan did not assume release of the digitally remastered Beatles' albums, nor any sales pick-up as a result of the Group's records being offered free of DRM on the Apple iTunes service.

In discussion, the Board noted the mechanical relationship of forecast M&P spend to the volume of sales, as well as the trend of falling volumes of sales from chart position in the US. John Gildersleeve also noted that, whilst in the recent past the Group had reduced costs in line with falling sales, operating efficiencies had not improved, i.e. there had been no reduction in cost ratios. This remained an issue to be addressed.

The Board noted the 2007/08 Group Annual Operating Plan and Forecast as presented.

5. **PROJECT MULBERRY**

Mark Barak (SVP, Corporate Finance & Strategy) and Simon Borrows of Greenhill & Co., the Company's independent financial adviser, joined the meeting.

**Background and Process**
Reviewing the background to the current situation, John Gildersleeve reminded the Board that it had been decided not to engage with any potentially interested parties until the refinancing had been completed, plans to achieve the announced cost savings had been put in place, the year-end had been completed, a budget had been established for 2007/08, and preparation of due diligence data had been commenced.

As to the process for engagement, all potential parties had been told that initial contact must be through John Gildersleeve, as Chairman, with an indication to be given in writing of a confirmed cash price and description of material assumptions and pre-conditions, as well as the financing and timetable for the proposal. The point of contact amongst the advisers was Simon Borrows of Greenhill & Co., which was the Company's Rule 3 adviser for the purposes of the Takeover Code.

The process was likely to involve a number of parties and the outcome was not guaranteed. In the case of approaches from private equity, no discussions as to potential participation by management would take place until the relevant offer had been announced. Day-to-day management of the process and any emerging negotiations would be through the Board's Offer Committee, but the Board would be kept regularly informed and consulted as to key decisions, with final approval of any transaction being reserved to the Board.

As to potentially interested parties, a log of all contacts since the 12th January 2007 restructuring announcement had been kept. John Gildersleeve summarised those contacts for the Board. Proposal letters had now been received from the parties code-named 'Guardian' and 'Rook', and these had been circulated to the Board.

- 6 -

**Market Analysis and Valuation Update**
There was put round the table:

- a book entitled *Market Analysis*;  and,
- a valuation update.

Mark Barak drew the Board's attention to the Executive Summary in the Market Analysis book, which summarised the market performance analysis (total market trends, physical market and digital market), as well as key performance drivers (the continuing impact of piracy, the transition from physical to digital product, and consumer demand and retail), and the outlook.   Significant conclusions were that digital uptake was slowing and appeared to be failing to compensate for accelerating physical decline;  trend growth had fallen since mid-2004, with a dramatic decline in the second half of the financial year just ended.   Average over-the-counter sales of chart albums had fallen, with the rate of decline strongest amongst the top ten sellers.   New releases were accounting for a greater proportion of total sales as catalogue sales slowed.   Consumer demand and retail dynamics were leading to reduced average net effective prices.   Digital growth was robust, but slowing, and cannibalisation might become more of an issue as the transition from physical to digital intensified.   Market trends were, therefore, expected to continue to be challenging in the short to medium term, with physical sales continuing to decline as digital sales matured.   It was unclear when physical sales would reach their base level.   Eric Nicoli noted that the emergence of big box retailers carrying fewer SKUs, at the expense of traditional specialist retailers which were being driven out of the market, was exacerbating the dynamics in the short to medium term.

While in the US the decline in the market had been principally a volume issue, Mark Barak noted that in the rest of the world it was mainly a value issue.

Mark Barak then took the Board through the valuation update.   First, he drew the Board's attention to the updated financial base case, as compared to market consensus forecasts.   The P&L account within the consolidated base five-year plan showed a low level of reduction in finance charges over the plan period to 2012, with a reduction of total debt to £775m despite the continued suspension of the dividend.   Digital sales were expected to represent approximately 40% of total sales by the end of the plan period, with that increase driving some margin expansion.

Mark Barak then reviewed the likely level of cost savings required to be generated by a private equity bidder in order to support the indicated prices and, as an alternative, possible assumptions as to increases in revenue.   He thought that the focus was likely to be on cost savings.   The analysis suggested that an assumption of cost savings of £75m was credible.   The Board noted the historic review of the Group's cost base, which suggested that there had been a real decline in overheads but that the decline was not commensurate with the reduction in sales.

**Peter Georgescu left the meeting.**

- 7 -

The Board then considered the schedule of summary valuation parameters which had been updated from the versions previously presented to the Board. These assessed the Company's stand-alone value on a DCF, brokers' consensus and sum-of-the-parts basis, as well as potential incremental value emerging from the implementation of strategic alternatives. Mark Barak drew the Board's attention to the valuation's sensitivity to the perpetual growth rate.

In discussion, the Board noted that any offer at or above 260p per share would be one the Board would have to consider seriously. Only 'Jack', with its potential for significant synergies, was likely to be able to achieve a price materially in excess of that level. In relation to any potential interest by Jack, it was noted that there remained meaningful anti-trust uncertainty and, in that connection, it was now unlikely that the European Commission would determine its reassessment of the Sony-BMG merger until September 2007 at the earliest.

**Indications of Interest Received**

Simon Borrows then took the Board through the proposals received from Guardian and Rook. In the case of each of these parties, the Board agreed that they should be notified of the correct assumptions as to fully diluted share capital and average debt, and invited to reconfirm their indicated prices.

Overall, Simon Borrows thought that the key assumption of no reduction in dividends meant that either the Group's business model had to change dramatically, or there should be a transaction. He therefore considered that the present was a good time to explore possible transactions, in relation to which it was important that there should be a multi-party process. The aim should be to get interested parties through due diligence on a rapid timetable.

The Board agreed, but noted the importance of its stance as responding to unsolicited offers, as opposed to putting the Company up for sale.

**Summary**

Summarising the position agreed by the Board, John Gildersleeve noted that:

- each of Rook and Guardian would be invited to reconfirm their indicated prices based on corrected assumptions;

- Eric Nicoli was authorised to contact two parties who had previously indicated interest, with the suggestion that they contact Simon Borrows; and,

- the provision of due diligence information to the potential interested parties was approved.

6. **SECRETARY'S REPORTS**

   (a) **Share Register**

   The report on the Share Register, together with a memorandum summarising the main changes since the last meeting, was noted.

Confidential                                                                    TF0000992825

A-403

- 8 -

(b)  **Use of Company Seal**

The Board noted that the use of the Company Seal, Ref. 07/01.

(c)  **Directors' Interests**

It was reported that:

- Eric Nicoli had ceased to be a Director of the PerCent Club on 3rd March 2007; and,

- John Gildersleeve had ceased to be a Director of Gallaher Group plc on 18th April 2007.

(d)  **Changes to Financial Reporting,
Responsibility, etc. under the Transparency Directive**

The Board noted Charles Ashcroft's paper regarding the new liability regime for financial statements (which would come into effect for the half-year results, but not for the results for the year just ended).

(e)  **UK Pension Fund Valuation:  Update**

The Board noted Charles Ashcroft's paper summarising the valuation bases for the triennial valuation as at 31st March 2006 proposed, respectively, by the Trustee and the Company and the current status of those negotiations.

(f)  **Roles and Responsibilities for Chairman and Group CEO**

The Board approved the description of the respective roles of the Chairman and Group Chief Executive Officer that had been circulated, subject to a minor change suggested by Kevin Carton.

7.  **DATE OF NEXT MEETING**

The next meeting would be held on Friday 18th May 2007, following conclusion of the Remuneration Committee meeting, at 27 Wrights Lane, London W.8.

Confidential

A-404

**From:** Barak, Mark [mark.barak@emimusic.com]
**Sent:** Friday, April 20, 2007 9:24 AM
**To:** Barak, Mark; Wormsley, David ; Smith, Matthew ; Guy Hayward-Cole; tony.burgess@db.com
**Cc:** Stewart, Martin; Ashcroft, Charles
**Subject:** RE: Strictly Private & Confidential

**Attachments:** Cerberus Indication.pdf

Mark Barak
Senior Vice President
Corporate Finance & Strategy
EMI Group plc
27 Wrights Lane
London
W8 5SW

T: 0207 795 7143
F: 0207 795 7144
M: 07771 763 929

---

**From:** Barak, Mark
**Sent:** 20 April 2007 08:15
**To:** Wormsley, David [CIB-GBKG]; Smith, Matthew ; Guy Hayward-Cole; tony.burgess@db.com
**Cc:** Stewart, Martin; Ashcroft, Charles
**Subject:** Strictly Private & Confidential

Guys,
Attached are the two letters we have received.
Mark

---

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

---

EXHIBIT TS
WORMSLEY 42
07/20/10

CITI-TF 00312646

Cerberus European Investments, L.L.C
299 Park Avenue
New York, NY 10171
United States

**Strictly Private and Confidential**

The Board of Directors
EMI Group plc
27 Wrights Lane
London, England
W8 5SW

**For the attention of Mr. John Gildersleeve**

April 16, 2007

Dear Sirs,

We are writing to confirm our interest in working with you towards a recommended offer to be made by Cerberus European Investments, L.L.C ("**Cerberus**") on behalf of a new company ("**Newco**") to be formed by its affiliated funds or managed accounts to be designated (collectively, the "**Cerberus Affiliates**") for the entire issued and to be issued share capital of EMI Group plc (the "**Company**") and to set out the terms of such proposed offer (the "**Proposal**").

**The Proposal**

On the basis of the significant work already undertaken by Cerberus and its advisers, Newco would be prepared to make a recommended cash offer of 262p per share ("**Offer Price**"). This Offer Price represents a premium of 19 per cent to the closing share price on Monday April 16, 2007 and values the fully diluted share capital of approximately 912.4 million at approximately £2.4 billion (prior to the receipt of any option proceeds). Based on our current analysis, in connection with a recommended offer, Cerberus, on behalf of the Cerberus Affiliates, is prepared to commit up to £1.2 billion of the aggregate Offer Price as equity financing.

Our proposed price per share is based upon several important suppositions, which are subject to confirmation:

- Total fully diluted ordinary shares outstanding of approximately 912.4 million which we have assumed includes the expected conversion of the 5.25% Guaranteed Convertible Bond Securities due 2010 issued by EMI Group Finance (Jersey) Limited and the exercise of all options or other equity rights (with an exercise/conversion price below the Offer Price) outstanding on shares;

- Refinancing of outstanding Company debt and borrowings, including related redemption premiums. Our proposal incorporates the expectation of the buy-out of interests in the Company's Japanese venture and, inclusive of such event, total net debt (excluding the convertible, which as stated above is assumed to be converted into share capital) shall be no greater than £1.0 billion;

- No further cash dividends will be declared or paid, other than the interim dividend paid on or around 2 April 2007; and

- Working capital accounts shall be consistent with the ordinary course operations of the Company and the industry in general.

10395522.12                                            1

CITI-TF 00312647

**Background and Rationale**

Cerberus, together with its advisers, has carried out a significant amount of research and analysis on the Company's business, spending the last several weeks reviewing publicly available information and analysing trends and prospects in each of the Company's product markets, including analysis of the opportunities and potential threats from the digital downloading of music.

Cerberus is interested in the Company because of its experienced operational management, strong cash flow characteristics, geographic diversification and competitive positioning. We believe that the leading brand reputation of the Company provides an attractive platform to continue to build a strong recorded music and music publishing business globally.

We believe that it would benefit the Company, its employees, customers and suppliers if the next stage of its development took place under private ownership given the current competitive pressures within the sector and the increasing impact of digital downloading to the economics of the conventional music industry. Private ownership would allow the strategic development of the business to be carried out away from the pressures and short term results focus of the public markets.

Our Proposal, as outlined above, would allow the Company's shareholders to realise their investment at an attractive premium.

**Cerberus Background**

Founded in 1992 in New York, the Cerberus group today forms one of the largest private investment fund organizations in the world. Currently, the Cerberus group has approximately US$23.5 billion of equity funds under management. The Cerberus group differs from many investment funds in that its funds are generally raised on a long-term basis. This provides stability and allows the Cerberus group to act as a supportive, long-term investor that is renowned for contributing to the development of its portfolio company businesses.

Each of the funds of the Cerberus group is managed by Cerberus Capital Management, L.P. ("CCM") or one of its affiliates. Cerberus European Investments, LLC was formed in 2003 with offices in New York and Amsterdam to act as an advisor to CCM and the other affiliated fund managers to provide investment advice with respect to investment opportunities located in Europe.

**Confirmatory Due Diligence**

As a result of our extensive work completed to date, we believe we have a strong understanding of the Company and its operations. Therefore, we, together with our advisors, are well placed to conduct our due diligence review expeditiously and are able to commence work immediately. Key to our due diligence effort will be access to management and relevant information in order to discuss and verify commercial assumptions in our business plan. We would anticipate reviewing the information related to the financial, commercial, legal, tax and other due diligence categories set out at Appendix 1. Given Cerberus' understanding of the Company and the sector, the due diligence required (described above) before an offer can be announced under Rule 2.5 of the City Code should be capable of being conducted quickly.

**Financing and Approvals**

Such offer by Newco would be financed from funds of the designated Cerberus Affiliates and debt financing from external providers of financing. Cerberus has obtained final approval of CCM for the offer, subject to satisfactory completion of its due diligence, and has indications of support from providers of debt financing to support such an offer. Letters of support from each of Merrill Lynch and Madeleine L.L.C. are attached in Appendix 2.

The conditions to any formal offer by Cerberus would be those customary for a recommended offer for a UK public company and we would expect the Company to agree to pay a break fee on normal terms should an offer be announced but not complete. We do not expect that there will be any regulatory issues that would prevent any transaction from closing within the normal City Code timetable.

10395522.12                                           2

CITI-TF 00312648

A-407

**Role of Management and Employees**

Cerberus attaches great importance to the skills and experience of the existing management and employees of the Company and believes they are integral to the future success of the business. Cerberus confirms that it is expected that Newco will give the usual assurances to the board of the Company regarding the safeguarding of existing employment rights, including pension rights, of all management and employees of the Company and will create incentive arrangements to share the rewards of success with management following completion of the Proposal.

**Other Matters**

This letter is intended only to convey Cerberus's interest in the possible Proposal. This letter is not intended to constitute, and is not an offer or a firm intention to make such an offer pursuant to Rule 2.5 of the City Code, nor does it impose any obligation on any of Cerberus, any Cerberus Affiliate or Newco to make an offer at any value (the value mentioned above being an indication of value only). For the avoidance of doubt, this letter is not intended to give rise to any obligation to make an announcement under Rule 2.2 of the City Code.

This letter and any subsequent discussions or contact with you and your fellow advisers should be kept strictly confidential. No announcement referring to the existence or terms of this letter shall be made without the prior written consent of Cerberus. For the avoidance of doubt, either Cerberus or the Company may make an announcement if required by law or applicable stock exchange regulation or the City Code, provided that in the case of the Company, it will consult with Cerberus to the extent practicable prior to such an announcement being made as to its terms, and the Company shall not name Cerberus or indicate the detailed terms (including price) of the Proposal in any such announcement.

This letter shall be governed by and interpreted in accordance with English law, and the courts of England shall have exclusive jurisdiction in respect of any disputes relating to it.

We have retained both Lazard and Merrill Lynch as our financial advisors as well as Ashurst and Schulte Roth as our legal advisors. We believe that the Company constitutes an attractive investment opportunity and that this Proposal presents a compelling proposition for the shareholders of the Company and we do not expect any regulatory issues that would prevent us from closing. We would be pleased to discuss the contents of this letter with you in person and to address any questions you may have. Set out below are our contact details and those of our financial advisers:

Cerberus

Lenard Tessler

*Senior Managing Director*

**Tel:** +1 212 909 1464

Lazard

Nicholas Shott

*Managing Director*

**Tel:** +44 20 7187 2466

Merrill Lynch

Philip Noblet

*Managing Director*

**Tel:** +44 20 995 2551

10395522.12                                      3

CITI-TF 00312649

We trust that the Proposal makes clear our level of seriousness and enthusiasm for pursuing this opportunity. We are prepared to move forward immediately to the next stage of this process. We believe that it is in all parties' interests to progress this transaction as swiftly as possible in order to minimise disruption to the business and the time commitment of management. We would expect to be in a position to make the formal announcement of an offer within 3-4 weeks after being granted full and complete access and cooperation in connection with our focused due diligence review. We look forward to hearing from you shortly.

Yours faithfully,

**CERBERUS EUROPEAN INVESTMENTS, L.L.C**

Seth Plattus
Managing Director

10395522.12                    1

CITI-TF 00312650

**APPENDIX 1**

**Due Diligence**

**Key Due Diligence Categories**

1. Financial
   a. Management reports/results breakdown and analysis of financial information (including off-balance sheet items) on both on an historical and projected basis

2. Current trading and outlook for fiscal year ending March 2007
   a. Revenue and profitability breakdown by business segments, by front and back catalogue and by geography
   b. Impact of 2006/2007 release programme and top selling albums
   c. Comparison of performance to latest budget
   d. Non recurring impacts: restructuring costs, FX movements
   e. Estimated net debt position as at March 31, 2007

3. Commercial and business plan
   a. Medium and long term strategic planning documents and copies of customer studies
   b. Market trends analysis and impact
   c. Release schedule over next 18 months - 2 years and related forecast
   d. A&R strategy
   e. Review of performance and adequacy of IT systems

4. Cost savings programme
   a. Nature and phasing of programme, historically and projected, including any "negative synergies" due to the restructuring programme (e.g. delays in album releases etc.)
   b. Associated restructuring costs and source of funding
   c. Headcount split by geography and function
   d. Allocation of costs within the Company

5. Pensions/Employment
   a. Organisational chart with key management and employees; service contracts of directors and key management
   b. Details of all pension schemes including current/projected contributions and assumptions under FRS 17/IFRS
   c. Trust deeds, rules, trustees' report and accounts, valuation and other documents relating to the Group's pension schemes, including multi-period experience analysis
   d. Full actuarial extract, including full member data, that backs up scheme valuation

6. Share Capital
   a. Schedule of issued share capital and all options outstanding, together with exercise prices, and terms of employee share trusts and the funding thereof

7. Legal and regulatory
   a. Material claims/disputes/prosecutions/proceedings/infringements (outstanding and potential)
   b. Material contracts including artists'/writers' contracts
   c. Regulatory issues

8. Tax
   a. Review of underlying tax charge and potential tax exposures, including tax basis by business/geographic unit

**Management Access**

Meetings with a limited number of members of the Company's senior management team.

CITI-TF 00312651

**APPENDIX 2**

**Financing Support Letters**

10395522.12                                                    3

CITI-TF 00312652

 **Merrill Lynch**

Global Markets & Investment Banking Group

Merrill Lynch International
2 King Edward Street
London EC1A 1HQ

Cerberus European Investments, L.L.C
299 Park Avenue
New York, NY 10171
United States

For the attention of:
Lenard Tessler
Alex Wolf

13 April, 2007

Dear Sirs,

We write with regard to the offer to be made by Cerberus European Investments, L.L.C on behalf of a new company ("Newco") to be formed by its affiliated funds or managed accounts to be designated for the entire issued and to be issued share capital of EMI Group plc ("EMI" or the "Company"; the "Acquisition" or "Transaction"). Merrill Lynch International ("Merrill Lynch" or "we") understands that the Newco would expect to fund the Transaction in part through debt financing of potentially up to £2.25 billion (the "Debt Financing") (including the payment of transaction fees, any pension deficit and minority interest).

Based upon, amongst other things, the information reviewed to date upon which we are relying, we are highly confident in our ability, as of the date hereof, to arrange and underwrite the Debt Financing at prevailing market conditions, subject to the conditions set out below.

We believe we benefit from a strong base of knowledge in the media and music industry. As you are aware, Merrill Lynch acted as financial advisor to Vivendi's Universal Music in its €1,630 million acquisition of BMG Music Publishing, and financial advisor to Bertelsmann AG in the merger of its music recording operations with Sony Corporation to create the Sony BMG joint venture.

We believe your partnership with EMI plc should create an extremely attractive financing opportunity and one that should support a financing of up to £2.25 billion given the quality of the Company, its credit profile, the credibility of the management team and your deep understanding of the business.

We are pleased to inform you that we have had preliminary discussions with our Debt Markets Commitment Committee in relation to the Transaction and it is supportive of our proceeding towards completion of our due diligence with a view towards lead arranging and underwriting 100% of the Debt Financing.

Merrill Lynch International            Merrill Lynch Financial Centre        Tel   020 7628 1000
                                       2 King Edward Street
                                       London EC1A 1HQ

CITI-TF 00312653

**Merrill Lynch**

Global Markets & Investment Banking Group

Please note that Merrill Lynch's expression of confidence hereunder and any commitment in respect of the Debt Financing would be subject to customary conditions including (i) our satisfaction with the terms and conditions of the proposed Acquisition and the Debt Financing and its final capital structure; (ii) approval by the relevant internal Merrill Lynch Debt Markets Commitment Committees and any required additional approvals from Merrill Lynch senior management; (iii) satisfactory completion of due diligence; (iv) satisfactory final documentation; and (v) prevailing market conditions.

Please note this letter is not intended to be, and shall not constitute, a commitment or undertaking by Merrill Lynch or any of its affiliates to place, underwrite or provide the Debt Financing or any financing. Merrill Lynch shall not be responsible or liable to you or any other person for any damages which may be alleged as a result of the letter. This letter has been delivered to you for your information only, and is not to be relied upon by any person or entity. Except as otherwise required by law or unless Merrill Lynch has otherwise consented in writing, you are not authorized to show or circulate this letter to any person or entity (other than your advisors or the board of EMI plc and its advisors in connection with the Transaction on a confidential basis, but they shall not be entitled to rely on its terms). You agree to indemnify and hold harmless Merrill Lynch for any losses, claims, damages and liabilities which Merrill Lynch may incur as a result of the delivery of this letter. The terms of this letter shall be governed by and construed in accordance with English law.

We look forward to working with you on this exciting opportunity.

Yours sincerely,

Merrill Lynch International

By:

Hoby Buvat
Director, European Leveraged Finance

A-413

Madeleine L.L.C.
299 Park Avenue
New York, NY 10171
United States

Cerberus European Investments, L.L.C
299 Park Avenue
New York, NY 10171
United States

For the attention of:
Lenard Tessler
Alex Wolf

16 April, 2007

Dear Sirs,

You have discussed with us a possible offer to be made by Cerberus European Investments, L.L.C ("Cerberus") on behalf of a new company ("Newco") to be formed by certain of its affiliated funds or managed accounts, for the entire issued and to be issued share capital of EMI Group plc ("EMI" or the "Company"; the "Transaction"). We confirm that we have seen a copy of your letter to the Company which is attached hereto and which sets out the proposed terms of your offer.

Based on the public information reviewed to date and our discussions with you, Madeleine L.L.C., an affiliate of Cerberus ("Madeleine" or "we") is pleased to inform you that, subject to the conditions set forth below, we are prepared to work with you with a view to acting as arranger and lender for up to £200 million in debt facilities necessary for the Transaction and ongoing corporate requirements of the Company as are required, after taking into account the equity portion of the Transaction's purchase price committed by you and the provision of any other debt facilities committed by other third party financing sources in connection therewith.

We are fully aware of the requirements of Rule 24.7 and other provisions of the Takeover Code as regards the need for a cash confirmation and committed financing at the time of announcement of any formal offer.

I0396423.5

CITI-TF 00312655

Any such financing would be subject to various customary conditions, including satisfactory market conditions, satisfactory completion of business and legal due diligence, approvals of our credit committee, and execution of definitive documentation in satisfactory form.

This letter is not intended to be, and shall not constitute, a commitment or undertaking by Madeleine or any of its affiliates to underwrite or provide any debt or other financing. Madeleine shall not have any liability to you on any basis whatsoever as a result of this letter or your use of it. This letter has been delivered to you for your information only, and is not to be relied upon by any person or entity. Except as otherwise required by law or unless Madeleine has otherwise consented in writing, you shall not disclose this letter to any person or entity (other than your advisors or the board of the Company and its advisors in connection with the Transaction on a confidential and non-reliance basis). You shall indemnify and hold harmless Madeleine for any losses, claims, damages and liabilities which Madeleine may incur as a result of the disclosure of this letter.

We are excited about working with you on this promising opportunity.

Very truly yours,

Madeleine L.L.C.

By:

Name: Kevin Genda
Title: Vice President

10396423.5

CITI-TF 00312656

**From:** Barak, Mark [mark.barak@emimusic.com]
**Sent:** Friday, April 20, 2007 8:15 AM
**To:** Wormsley, David ; Smith, Matthew ; Guy Hayward-Cole; tony.burgess@db.com
**Cc:** Stewart, Martin; Ashcroft, Charles
**Subject:** Strictly Private & Confidential

**Attachments:** bd0704-rook-offer.pdf; SDOC5017.pdf
Guys,
Attached are the two letters we have received.
Mark

------------------------------------------------

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

------------------------------------------------

EXHIBIT TR
WORMSLEY 41
07/20/10

CITI-TF 00312630



**FORTRESS**
INVESTMENT GROUP LLC

1345 AVENUE OF THE AMERICA
46TH FLOOR
NEW YORK, NY 10105
TEL 212 798-6100

April 17, 2007

Mr. John Gildersleeve
Chairman

Mr. Eric Nicoli
Chief Executive Officer

EMI Group plc
27 Wrights Lane
London, W8 5SW
UK

Dear Messrs Gildersleeve and Nicoli:

Fortress Investment Group LLC on behalf of certain of its private equity funds ("Fortress") is pleased to express its interest in pursuing a go-private transaction (the "Proposed Transaction") with EMI Group plc ("EMI" or the "Company"). As one of the most successful and highly creative music groups in the world, we believe there are exciting and terrific growth opportunities for the business. As a private enterprise, EMI will have the needed flexibility to be progressive and at the forefront of adopting new business practices under challenging market conditions.

Fortress has deep knowledge of the music industry and has spent significant resources in the last three months diligencing the Company's assets and operating businesses using publicly available information. Given our extensive experience in financing music publishing assets, particularly with the recent financing of Michael Jackson's loans, we believe that Fortress can help management create substantial value with EMI's best-in-class music publishing and recorded music catalog assets.

Fortress has a highly successful track record of working with management teams and businesses to grow operations and build long-term value. By combining the Company's creative and operational excellence with Fortress's access to capital, structured finance and restructuring experience, we believe we will create an invaluable partnership with existing management as the Company repositions itself in a new and dynamic digital consumer driven environment.

Fortress, a New York Stock Exchange listed public company with a $13 billion market capitalization, is a global multi-strategy alternative investment and asset management firm founded in 1998 with over $35 billion in assets under management. Headquartered in New York, Fortress's affiliates also have offices in London, Rome, Frankfurt, Geneva, Sydney, Toronto and San Diego and employ over 550 people. Fortress manages approximately $18 billion of private equity capital, through which we primarily make long-term, control-oriented investments in cash-flowing assets and asset-based businesses. Fortress has a distinguished investment track record and in total has made 85 private equity investments involving $63 billion of assets. Fortress has a proven capability to put significant amount of capital to work quickly and in the last year alone invested and/or committed to $6 billion of equity and raised $10 billion in debt financing for 10 transactions.

We are fully prepared, following EMI's acceptance of this letter and the terms contained herein, to move expeditiously towards completion of our due diligence and the simultaneous negotiation and agreement of definitive documentation for the Proposed Transaction. The relevant terms of our indicative offer are as follows:

1

CITI-TF 00312631

I.   **Price.** We propose to acquire 100% of the fully diluted issued share capital of EMI for a minimum of £2.50 a share, and our offer may reach as high as £2.60 share pending the outcome of our due diligence. In addition, we are familiar with the obligation to make an appropriate offer or proposal to the holders of EMI's guaranteed convertible bonds. The consideration will be all cash.

II.  **Financing:** Our offer is fully financed. We expect Fortress-managed funds to provide 100% of the equity required to close the transaction. We expect the equity component of the transaction to be approximately 30-35% of the total transaction consideration and the balance to be financed with debt provided by Bear Stearns and Banc of America and their affiliates ("Lenders"). Our Lenders have indicated to us that they are highly confident that they can provide acquisition financing for the Proposed Transaction and we are familiar with the requirement for "certain funds" to be in place by the time the transaction is announced.

III. **Diligence:** As mentioned above, Fortress has conducted a significant amount of diligence using publicly available information. In addition to customary confirmatory diligence on tax, legal and accounting matters, our financial diligence for the most part will be confirmatory in nature and will be focused on the cash flow and operating characteristics of the Recorded Music business, specifically EMI's catalog assets. We believe that we will be able to complete our remaining confirmatory due diligence in 14 days with finalization of the definitive documentation and public announcement of the transaction to occur as soon thereafter as practicable. We are very mindful of the Company's current restructuring efforts and believe that our diligence efforts will cause minimal business disruption for EMI. *Please see Annex I for our Diligence Information Request.*

IV.  **Management:** We understand that EMI's management is currently implementing a significant restructuring program and we believe that impressive progress has been made to date. Retaining key senior management is an important element of the future growth of the Company, and we would expect to enter into mutually acceptable long term employment contracts with key members of senior management as part of the Proposed Transaction.

V.   **Regulatory Approvals, Other Conditions, Consents Required:** Other than standard regulatory approvals, we do not anticipate requiring any additional approvals, and based on the information available to us, we do not foresee any difficulty or delay in obtaining such approvals. As a financial buyer with no existing investments in the music industry, we believe that we will face a materially shorter regulatory approval time and a materially less complicated process for completion of the Proposed Transaction than a strategic buyer would. With respect to other consents, the Proposed Transaction has been reviewed and approved by the investment committee of Fortress and no further internal approvals are required.

We understand that certainty of execution is almost as important a consideration as price, and we strongly believe that with our access to capital and our expertise as a leading global investor, we will give EMI's shareholders the highest likelihood of closing rapidly with the least amount of disruption to the business. A recent example of our focus and commitment to move quickly was with Intrawest Corporation, North America's largest ski operator and real estate development company with over 25,000 employees globally, where Fortress completed diligence and signed definitive documents within a two week time frame in a highly complex go-private transaction valued at $3.1 billion.

2

CITI-TF 00312632

The making of any definitive binding offer would be subject to satisfaction of the following pre-conditions, among others:

1.  the unanimous recommendation of our proposed acquisition of the Company by the Company's board of directors to its shareholders, having been advised by the Company's independent financial adviser, and such recommendation not being withdrawn or modified;

2.  irrevocable undertakings or other commitments in acceptable form being received from the Company's directors; we would also like to discuss the possibility of obtaining similar commitments from certain other key shareholders;

3.  the entry into an agreement, on mutually acceptable terms, providing for customary non-solicitation undertakings and the payment of an inducement fee (in the maximum amount permitted under the City Code on Takeovers and Mergers (the "City Code")) to Fortress in appropriate circumstances;

4.  satisfactory completion of our confirmatory due diligence, as described above;

5.  agreement on satisfactory transaction documentation;

6.  the final credit committee approval of the Lenders and associated documentation; and

7.  no further dividends being declared or paid.

We anticipate that the conditions of any offer, if made, would be customary for transactions governed by the City Code and consistent with established UK market practice.

We must emphasize that this letter does not constitute an offer (or impose any obligation to make an offer) nor does it evidence a firm intention to make an offer, the making of which is not subject to any pre-condition, within the meaning of the City Code, nor is it legally binding save for the following two paragraphs. We would not, therefore, regard it as forming the basis for any announcement pursuant to Rule 2.2 of the City Code or otherwise.

It is a condition of this proposal that (without our prior written consent or in accordance with a requirement of the Panel on Takeovers and Mergers (the "Panel")) the Company will not disclose or announce the contents or existence of this letter, the interest of Fortress in acquiring the Company or Fortress's name in connection with a contemplated offer for the Company to anyone other than those within the Company and its professional advisers who need to know. The Company will ensure that each person to whom this interest in it is disclosed is made aware of this condition and shall take all steps to ensure that this condition is not breached.

In the event that an announcement is required by the Panel, the announcement shall only be made by the Company after consultation with Fortress and after taking into account the desire of Fortress not to be named and Fortress's requirements as to timing, content and the manner of making such announcement.

This letter is to be governed by and construed in accordance with English law.

3

CITI-TF 00312633

A-419

We believe that our proposed price offers compelling value for the shareholders and we are very excited about the opportunity to become partners with EMI management and to help your team grow this extraordinary business even further.

Very truly yours,

By: _____

Name:  Wesley R. Edens
Title:    Chairman & Chief Executive Officer
FORTRESS INVESTMENT GROUP LLC

4

## Annex 1:  Diligence Information Request

| | | |
|---|---|---|
| **I.** | **Catalog (Recorded Music)** | ▫ Detailed budget / projections |
| | | ▫ Historical catalog revenue by tracks, artists, albums, vintage |
| | | ▫ Schedule marketing, distribution, manufacturing and SGA costs associated to Catalog |
| | | ▫ Capex |
| **II.** | **New Release (Recorded Music)** | ▫ Detailed budget / projections |
| | | ▫ FY 06 & 07 P&L by label & by region |
| | | ▫ Schedule marketing, distribution, manufacturing and SGA costs associated to New Release |
| | | ▫ Capex |
| **III.** | **Music Publishing** | ▫ Detailed budget / projections |
| | | ▫ Historical revenue by source (mechanical, sync, performance) |
| | | ▫ Detailed marketing and SGA costs |
| | | ▫ Capex |
| **IV.** | **Cost Savings** | ▫ Detailed restructuring plan |
| **V.** | **Capital Structure** | ▫ Current balance sheet & write offs |
| | | ▫ Work done on securitization of music publishing library |
| | | ▫ Details & terms of material indebtedness & guarantees (incl. intra-group) |
| | | ▫ Detailed schedule of shares, restricted stock, options and warrants outstanding (incl. securities with rights to subscribe for shares, i.e. converts) |
| **VI.** | **Legal & Tax** | ▫ Corporate & tax structure chart (for all entities and business units, % ownership, assets owned & jurisdiction and tax residence) |
| | | ▫ Tax positions, returns, audits & rulings for each entity |
| | | ▫ Schedules of defined benefit pension schemes (actuarial valuations, material correspondence b/t the Company and scheme trustees & regulators) |
| | | ▫ Schedule of litigation & major & contingent liabilities |
| | | ▫ Schedule of material licenses, consents & authorizations (identify material violations) |
| | | ▫ Schedule of assets, material contracts (incl. intra-group arrangements, recent acquisitions & dispositions), IP (identify assets pledged against liabilities) |
| | | ▫ Identify all employee unions & size |
| | | ▫ Last 3 years minutes |
| **VII.** | **Accounting & Systems** | ▫ Accounting work papers |
| | | ▫ Summary of IT systems & assets |

5

CITI-TF 00312635

04/17/2007 06:35 FAX                    FORTRESS INVESTMENTS                    ☒001

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Eric Nicoli | Wesley Edens |
| **COMPANY:** | **DATE:** |
| EMI Group plc | 4/17/2007 |
| **FAX NUMBER:** | **TOTAL NO. OF PAGES INCLUDING COVER:** |
| 011-44-20-7795-7755 | 6 |
| **PHONE NUMBER:** | **SENDER'S REFERENCE NUMBER:** |
| 011-44-20-7795-7777 | |
| **RE:** | **YOUR REFERENCE NUMBER:** |

X URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

## HIGHLY CONFIDENTIAL

CITI-TF 00312636



**FORTRESS**
INVESTMENT GROUP LLC

1345 AVENUE OF THE AMERICAS
46TH FLOOR
NEW YORK, NY 10105
TEL 212 798-6100

April 17, 2007

Mr. John Gildersleeve
Chairman

Mr. Eric Nicoli
Chief Executive Officer

EMI Group plc
27 Wrights Lane
London, W8 5SW
UK

Dear Messrs Gildersleeve and Nicoli:

Fortress Investment Group LLC on behalf of certain of its private equity funds ("Fortress") is pleased to express its interest in pursuing a go-private transaction (the "Proposed Transaction") with EMI Group plc ("EMI" or the "Company"). As one of the most successful and highly creative music groups in the world, we believe there are exciting and terrific growth opportunities for the business. As a private enterprise, EMI will have the needed flexibility to be progressive and at the forefront of adopting new business practices under challenging market conditions.

Fortress has deep knowledge of the music industry and has spent significant resources in the last three months diligencing the Company's assets and operating businesses using publicly available information. Given our extensive experience in financing music publishing assets, particularly with the recent financing of Michael Jackson's loans, we believe that Fortress can help management create substantial value with EMI's best-in-class music publishing and recorded music catalog assets.

Fortress has a highly successful track record of working with management teams and businesses to grow operations and build long-term value. By combining the Company's creative and operational excellence with Fortress's access to capital, structured finance and restructuring experience, we believe we will create an invaluable partnership with existing management as the Company repositions itself in a new and dynamic digital consumer driven environment.

Fortress, a New York Stock Exchange listed public company with a $13 billion market capitalization, is a global multi-strategy alternative investment and asset management firm founded in 1998 with over $35 billion in assets under management. Headquartered in New York, Fortress's affiliates also have offices in London, Rome, Frankfurt, Geneva, Sydney, Toronto and San Diego and employ over 550 people. Fortress manages approximately $18 billion of private equity capital, through which we primarily make long-term, control-oriented investments in cash-flowing assets and asset-based businesses. Fortress has a distinguished investment track record and in total has made 85 private equity investments involving $63 billion of assets. Fortress has a proven capability to put significant amount of capital to work quickly and in the last year alone invested and/or committed to $6 billion of equity and raised $10 billion in debt financing for 10 transactions.

We are fully prepared, following EMI's acceptance of this letter and the terms contained herein, to move expeditiously towards completion of our due diligence and the simultaneous negotiation and agreement of definitive documentation for the Proposed Transaction. The relevant terms of our indicative offer are as follows:

I

CITI-TF 00312637

I.   **Price.** We propose to acquire 100% of the fully diluted issued share capital of EMI for a minimum of £2.50 a share, and our offer may reach as high as £2.60 share pending the outcome of our due diligence. In addition, we are familiar with the obligation to make an appropriate offer or proposal to the holders of EMI's guaranteed convertible bonds. The consideration will be all cash.

II.  **Financing:** Our offer is fully financed. We expect Fortress-managed funds to provide 100% of the equity required to close the transaction. We expect the equity component of the transaction to be approximately 30-35% of the total transaction consideration and the balance to be financed with debt provided by Bear Stearns and Banc of America and their affiliates ("Lenders"). Our Lenders have indicated to us that they are highly confident that they can provide acquisition financing for the Proposed Transaction and we are familiar with the requirement for "certain funds" to be in place by the time the transaction is announced.

III. **Diligence:** As mentioned above, Fortress has conducted a significant amount of diligence using publicly available information. In addition to customary confirmatory diligence on tax, legal and accounting matters, our financial diligence for the most part will be confirmatory in nature and will be focused on the cash flow and operating characteristics of the Recorded Music business, specifically EMI's catalog assets. We believe that we will be able to complete our remaining confirmatory due diligence in 14 days with finalization of the definitive documentation and public announcement of the transaction to occur as soon thereafter as practicable. We are very mindful of the Company's current restructuring efforts and believe that our diligence efforts will cause minimal business disruption for EMI. *Please see Annex I for our Diligence Information Request.*

IV.  **Management:** We understand that EMI's management is currently implementing a significant restructuring program and we believe that impressive progress has been made to date. Retaining key senior management is an important element of the future growth of the Company, and we would expect to enter into mutually acceptable long term employment contracts with key members of senior management as part of the Proposed Transaction.

V.   **Regulatory Approvals, Other Conditions, Consents Required:** Other than standard regulatory approvals, we do not anticipate requiring any additional approvals, and based on the information available to us, we do not foresee any difficulty or delay in obtaining such approvals. As a financial buyer with no existing investments in the music industry, we believe that we will face a materially shorter regulatory approval time and a materially less complicated process for completion of the Proposed Transaction than a strategic buyer would. With respect to other consents, the Proposed Transaction has been reviewed and approved by the investment committee of Fortress and no further internal approvals are required.

We understand that certainty of execution is almost as important a consideration as price, and we strongly believe that with our access to capital and our expertise as a leading global investor, we will give EMI's shareholders the highest likelihood of closing rapidly with the least amount of disruption to the business. A recent example of our focus and commitment to move quickly was with Intrawest Corporation, North America's largest ski operator and real estate development company with over 25,000 employees globally, where Fortress completed diligence and signed definitive documents within a two week time frame in a highly complex go-private transaction valued at $3.1 billion.

2

CITI-TF 00312638

The making of any definitive binding offer would be subject to satisfaction of the following pre-conditions, among others:

1.  the unanimous recommendation of our proposed acquisition of the Company by the Company's board of directors to its shareholders, having been advised by the Company's independent financial adviser, and such recommendation not being withdrawn or modified;

2.  irrevocable undertakings or other commitments in acceptable form being received from the Company's directors; we would also like to discuss the possibility of obtaining similar commitments from certain other key shareholders;

3.  the entry into an agreement, on mutually acceptable terms, providing for customary non-solicitation undertakings and the payment of an inducement fee (in the maximum amount permitted under the City Code on Takeovers and Mergers (the "City Code")) to Fortress in appropriate circumstances;

4.  satisfactory completion of our confirmatory due diligence, as described above;

5.  agreement on satisfactory transaction documentation;

6.  the final credit committee approval of the Lenders and associated documentation; and

7.  no further dividends being declared or paid.

We anticipate that the conditions of any offer, if made, would be customary for transactions governed by the City Code and consistent with established UK market practice.

We must emphasize that this letter does not constitute an offer (or impose any obligation to make an offer) nor does it evidence a firm intention to make an offer, the making of which is not subject to any pre-condition, within the meaning of the City Code, nor is it legally binding save for the following two paragraphs. We would not, therefore, regard it as forming the basis for any announcement pursuant to Rule 2.2 of the City Code or otherwise.

It is a condition of this proposal that (without our prior written consent or in accordance with a requirement of the Panel on Takeovers and Mergers (the "Panel")) the Company will not disclose or announce the contents or existence of this letter, the interest of Fortress in acquiring the Company or Fortress's name in connection with a contemplated offer for the Company to anyone other than those within the Company and its professional advisers who need to know. The Company will ensure that each person to whom this interest in it is disclosed is made aware of this condition and shall take all steps to ensure that this condition is not breached.

In the event that an announcement is required by the Panel, the announcement shall only be made by the Company after consultation with Fortress and after taking into account the desire of Fortress not to be named and Fortress's requirements as to timing, content and the manner of making such announcement.

This letter is to be governed by and construed in accordance with English law.

3

CITI-TF 00312639

04/17/2007 06:37 FAX                    FORTRESS INVESTMENTS                        ☑005

We believe that our proposed price offers compelling value for the shareholders and we are very
excited about the opportunity to become partners with EMI management and to help your team grow
this extraordinary business even further.

Very truly yours,

By: _____
    Name:   Wesley R. Edens
    Title:    Chairman & Chief Executive Officer
    FORTRESS INVESTMENT GROUP LLC

4

CITI-TF 00312640

### Annex 1: Diligence Information Request

| I. Catalog (Recorded Music) | <ul><li>Detailed budget / projections</li><li>Historical catalog revenue by tracks, artists, albums, vintage</li><li>Schedule marketing, distribution, manufacturing and SGA costs associated to Catalog</li><li>Capex</li></ul> |
|---|---|
| II. New Release (Recorded Music) | <ul><li>Detailed budget / projections</li><li>FY 06 & 07 P&L by label & by region</li><li>Schedule marketing, distribution, manufacturing and SGA costs associated to New Release</li><li>Capex</li></ul> |
| III. Music Publishing | <ul><li>Detailed budget / projections</li><li>Historical revenue by source (mechanical, sync, performance)</li><li>Detailed marketing and SGA costs</li><li>Capex</li></ul> |
| IV. Cost Savings | <ul><li>Detailed restructuring plan</li></ul> |
| V. Capital Structure | <ul><li>Current balance sheet & write offs</li><li>Work done on securitization of music publishing library</li><li>Details & terms of material indebtedness & guarantees (incl. intra-group)</li><li>Detailed schedule of shares, restricted stock, options and warrants outstanding (incl. securities with rights to subscribe for shares, i.e. converts)</li></ul> |
| VI. Legal & Tax | <ul><li>Corporate & tax structure chart (for all entities and business units, % ownership, assets owned & jurisdiction and tax residence)</li><li>Tax positions, returns, audits & rulings for each entity</li><li>Schedule of defined benefit pension schemes (actuarial valuations, material correspondence b/t the Company and scheme trustees & regulators)</li><li>Schedule of litigation & major & contingent liabilities</li><li>Schedule of material licenses, consents & authorizations (identify material violations)</li><li>Schedule of assets, material contracts (incl. intra-group arrangements, recent acquisitions & dispositions), IP (identify assets pledged against liabilities)</li><li>Identify all employee unions & size</li><li>Last 3 years minutes</li></ul> |
| VII. Accounting & Systems | <ul><li>Accounting work papers</li><li>Summary of IT systems & assets</li></ul> |

5

CITI-TF 00312641

**To:**     david.wormsley@citigroup.com[david.wormsley@citigroup.com];
matthew.smith@citigroup.com[matthew.smith@citigroup.com];
anthony.burgess@db.com[anthony.burgess@db.com];
mark.rawlinson@freshfields.com[mark.rawlinson@freshfields.com]; guy.hayward-
cole@db.com[guy.hayward-cole@db.com]

**From:**     Ashcroft, Charles
**Sent:**     Mon 4/23/2007 7:35:12 PM
**Importance:**     Normal
**Sensitivity:**     None
**Subject:**     FW: OEP Letter

**Globe offer letter 23APR2007.doc**

Dear All

Here is a letter received this evening from One Equity.

Regards
Charles

-----Original Message-----
From: Nicoli, Eric
Sent: 23 April 2007 20:24
To: Ashcroft, Charles
Cc: Stewart, Martin; Barak, Mark; 'gilderj@cpwplc.com'; 'sborrows@greenhill.com'
Subject: Fw: OEP Letter

Charles,

One Equity asked to see JG and me at 6.30pm this evening. In a one hour meeting they handed us the
attached letter and made a brief presentation of their investment thesis and their proposals for the
business.

Their current price range is 250p to·260p and they say that they can move to formal offer in one week
from the start of confirmatory due diligence.

Can you circulate the letter to the board and attendees of tomorrow morning's meeting please?

See you in the morning.

E

----- Original Message -----
From: henry.h.briance@oneequity.com <henry.h.briance@oneequity.com>
To: sborrows@greenhill.com <sborrows@greenhill.com>
Cc: m.gregory.ohara@oneequity.com <m.gregory.ohara@oneequity.com>; Chris Ahrens
<chris.ahrens@oneequity.com>
Sent: Mon Apr 23 20:02:02 2007
Subject: OEP Letter

Eric and Simon -

Please find attached OEP's letter.

Regards,

Confidential                                   TF0000240188

Henry

—— Original Message ——
From: "Henry Briance" [henrybriance@hotmail.com]
Sent: 04/23/2007 01:56 PM
To: henry.h.briance@oneequity.com

Txt a lot? Get Messenger FREE on your mobile.
https://livemessenger.mobile.uk.msn.com/

This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt
from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that
any disclosure, copying, distribution, or use of the information contained herein (including any reliance
thereon) is STRICTLY PROHIBITED.  Although this transmission and any attachments are believed to be
free of any virus or other defect that might affect any computer system into which it is received and
opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is
accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage
arising in any way from its use.
If you received this transmission in error, please immediately contact the sender and destroy the material
in its entirety, whether in electronic or hard copy format. Thank you.

Confidential

A-429

**One Equity Partners**   M Gregory O'Hara   320 Park Avenue, 18th Floor   Tel: 212 277 1588
Managing Director   New York, NY, 10022   Fax: 212 277 1533
m.gregory.ohara@oneequity.com

**STRICTLY PRIVATE AND CONFIDENTIAL**
**SUBJECT TO CONTRACT**

EMI Group plc,
27 Wrights Lane,
London,
W8 5SW

For the attention of John Gildersleeve, Chairman

April 23, 2007

Dear Sirs,

**EMI Group plc**

On behalf of funds managed by One Equity Partners II, L.P. ("OEP"), we are pleased to confirm our strong interest in making an offer (the "Offer") for 100% of the fully diluted share capital of EMI Group plc ("EMI" or the "Company").

We are fully committed to this transaction and our preparations are very well advanced. We have conducted an extensive review of EMI over several months and have the necessary financing commitments for the Offer. Subject to the completion of limited confirmatory due diligence, we are ready and able to announce a formal offer for the Company. We would like to discuss the EMI's ability to provide us with the necessary information and materials and would be prepared to make our formal offer within one week of receiving all requested information.

**Offer**

Based on 926.3 million fully diluted shares outstanding (consisting of 800 million outstanding listed ordinary shares, 19.3 million outstanding share options and 107 million shares from the exercise of the convertible bond (including change of control premium)) and assuming a net debt of £1,175 million, debt make-wholes of £65 million and a deficit globally on the EMI group's pension schemes of £60 million (including an IAS19 deficit of £22.8 million on EMI's UK defined benefit scheme), OEP places an enterprise value of £3,616 million - £3,708 million on EMI, equating to a full cash offer of 250p-260p per share.

The Offer is capable of speedy delivery to EMI shareholders. Based on our detailed analysis the Offer is not envisaged to have any regulatory risk.

Appropriate proposals would be made to participants in the EMI share option schemes. Subject to confirmation that the terms of EMI share option scheme and the trust deed constituting the employee benefit trust would permit this, OEP proposes to put in place arrangements to facilitate a cashless exercise.

## OEP

OEP was formed in 2001 as Bank One's private equity arm and joined JPMorgan Chase after the acquisition of Bank One in 2004; since 2006, OEP has been the exclusive private equity arm of JPMorgan Chase, one of the world's largest financial services groups with assets of $1.4 trillion and offices in 50 countries. JPMorgan Chase is the sole investor in OEP thereby allowing the fund to have an extremely streamlined internal approval process. OEP manages in excess of $8bn for JPMorgan Chase, has invested $4bn since 2001, and has a current portfolio value of $10bn. OEP seeks to make investments driven by compelling industrial logic, driving value creation through operational improvements and strategic change, rather than by financial engineering. The firm is comprised of a differentiated combination of senior investment professionals and highly experienced industry executives with a unique depth and breadth of commercial experience. The private nature of OEP's ownership allows the firm to take a long-term view, with the backing and patience to support portfolio companies through economic cycles and transformative company and sector change. Unlike private equity firms that rely on limited partners to commit capital with a fixed expectation of its return, OEP is able to commit long-term to its portfolio companies without regard for an arbitrary investment horizon.

## Transaction rationale

OEP has long admired EMI with its strong and established recorded music roster combined with the world's best music publishing business. The company is founded on a valuable catalogue of recorded and publishing rights and driven by a highly talented pool of executives and artists. At the same time, OEP has noted the seven-year decline in music industry revenues in a period when demand and uses for music have proliferated. OEP believes a growth strategy can be combined with EMI's unique position in the industry to exploit the enormous latent opportunity presented by this divergent dynamic.

OEP is highly focused on a long-term strategy to restore growth and leadership to EMI and in doing so accelerate the transformation of the industry to align revenues and value creation with the continued growth in music usage. However, to execute this strategy, OEP believes that EMI will need to navigate a series of changes, risks and short-term impacts that would be poorly understood and received by the public equity markets. In making this proposal, OEP is looking to give EMI the long-term stability of vision, appetite for change and access to capital that would not be afforded by its current interim-focused public investor base.

2

Confidential

In order for OEP's investment to succeed at the proposed premium valuation, it would be absolutely critical to restore and drive top line revenue growth. Aggressive and destructive cost rationalisation for short-term cash flow gain is not an economically viable or sustainable proposition for OEP. Specifically, we have identified a number of key areas of investment for growth:

- Re-invent EMI as a multi-faceted Music Company, beyond its current Record Company focus;

- Re-assess the digital music growth opportunity - pricing sophistication, DRM strategies, balance of power with iTunes, music bundling, deeper catalogue exploitation, new digital distribution channels;

- Expand revenue streams to fully exploit the artist and brand value created by the core record business across a spectrum of merchandising, online, transactional, interactive, concert and other revenues;

- Continued investment in recorded and publishing A&R;

- Optimise capital allocation by label and geography driven by long term, rigorous, ROIC targets;

- Strengthen EMI to lead and exploit industry consolidation, rather than be beholden to it.

We look forward to a constructive partnership to restore EMI to its rightful position at the forefront of industry change and musical talent.

### Financing

The Offer would be made by a new company established by OEP ("BIDCO"). BIDCO would be a wholly-owned subsidiary of OEP. BIDCO would be financed by a mixture of equity from OEP and debt from JPMorgan.

The equity financing is being provided by OEP. OEP contemplates bringing equity partners into this transaction at the appropriate time. The transaction has been reviewed in detail by OEP's Investment Committee, following which the Committee has approved the making of this approach.

The debt financing is being provided in full by JPMorgan. JPMorgan may allow other financial services firms to assist in this transaction. JPMorgan, which has considerable expertise in financing transactions of this sort, has reviewed the transaction in its Credit and Underwriting Committees and has committed to arrange and underwrite the necessary debt finance for the Offer. Moreover, the debt financing has been constructed with minimal/no covenants in order to maximise operational flexibility of the business. OEP is able to provide term sheets for such financing at EMI's request.

For the avoidance of doubt, our funding considerations take into account the existing debt securities issued by EMI and its subsidiaries.

3

A-432

**Pre-Conditions**

The making of an Offer will be subject to the following pre-conditions:

(i)     The unanimous recommendation of the Offer by the board of EMI;

(ii)    Completion of limited confirmatory due diligence (see attached appendix I);

(iii)   Final approval of the Investment Committee of OEP and completion of the necessary financing documentation.


The Offer itself would be subject to normal terms and conditions for UK public offers. We would expect the Offer to be implemented by way of a Scheme of Arrangement.

**Anti-trust**

OEP has conducted a competition review in conjunction with its legal advisers, Linklaters. On the basis of this review, we do not expect the Offer to raise any competition concerns. We believe that all necessary clearances can be obtained within the normal transaction timetable. We would, of course, be prepared to share our regulatory analysis with you and would expect to work with you to finalise the necessary filings.

**Due diligence**

We have made a significant investment in an "outside in" due diligence process, including:

- Market analysis by various external consultants as well as a number of senior industry executives;

- A review of publicly-available financial, commercial and legal information on the Company by JPMorgan, KPMG and Linklaters respectively;

- A financial and tax due diligence analysis by KPMG; and

- A review of the publicly available information in respect of the pension obligations of the Company and the EMI group by KPMG and Linklaters.

Given the amount of work that we and our advisers have done on analysing the Company, our remaining due diligence is limited, highly specific and confirmatory in nature. OEP recognises the commercially-sensitive nature of EMI's business and can finalise its due diligence within these constraints. The details of our limited confirmatory due diligence requirements are set out in Appendix I. Subject to the availability of the relevant people and information at EMI, we would expect to be able to complete our due diligence in no more than one week from receipt of the requested information.

**Management and employees**

4

TF0000240193

OEP attaches great importance to the skills and experience of the Management and existing employees of EMI. It is our intention that the business would continue to be run by the key members of the existing operational team and could be supplemented by well-known media and entertainment industry executives. None of these are former EMI employees.

OEP is also willing to give the Board of EMI the assurances that are customary in an offer for a UK public company regarding the safeguarding of the existing employment and pension rights of the employees of EMI.

**Other arrangements**
In order for OEP to make a formal offer, as is customary, we would require certain deal protections, such as a 1% break fee, non-solicitation agreement and right to match. As is also customary, we will expect to receive irrevocable undertakings to accept the Offer from the directors of EMI relating to their respective shareholdings in the Company.

**Pension**
We have reviewed the publicly available information regarding the EMI group's pension arrangements and have some limited follow up requests for information. These are set out in Appendix I. Following receipt and review of such information, we will be in a position to present a definitive proposal in respect of pension arrangements in the context of the Offer.

**Offer documentation**
We are well advanced in the preparation of the necessary documentation. Subject to your agreement to move forward on an acceptable basis we have available drafts of the formal press release announcing the Offer and a draft Implementation Agreement documenting the deal protections referred to above.

**Timetable to announcement**
We believe it is in both parties' interest to move forward expeditiously. With your full co-operation, we would expect to have completed our due diligence, documentation and internal processes within one week of being provided due diligence materials and be able to announce the Offer the next day under Rule 2.5. We would seek to collectively work with EMI to post the scheme document as quickly as possible thereafter.

**Confidentiality**
This letter and its contents are strictly confidential to EMI, its directors and its professional advisers and must not be disclosed to any other persons.

This letter is non-binding and nothing contained herein or arising from any discussions that may occur between the parties relating hereto shall be construed as a legally-binding obligation by or on behalf of OEP to make an offer for EMI. Nothing in this letter should be interpreted as constituting a firm intention to make an offer under the Takeover Code.

5

A-434

We sincerely hope we will be able to work together towards a successful agreement. We are very enthusiastic about the EMI opportunity and have the ability to move quickly and discreetly to a formal offer.

We look forward to hearing from you. In the meantime, if you have any questions please do not hesitate to contact Greg O'Hara (direct office line +1 212 277 1588; mobile: +1 917 825 8494) at OEP, or Harry Hampson (direct office line +44 207 325 5536; mobile: +44 (0) 7768 793 422) at JPMorgan who are acting as OEP's financial adviser in this matter.

Yours faithfully

M Gregory O'Hara
Managing Director

For and on behalf of
One Equity Partners II, L.P.

6

Confidential

## Appendix I

### Diligence Items

**Market**
- Management's view on the copyright tribunal in the US regarding mechanical royalties for Music Publishing? How will this impact EMI's business?
- Various legal disputes are outstanding. Please provide updated list.

**Cost base**
- Detailed overview of current cost savings (confirmatory)
- Announced cost savings of 110mm, with 85mm of these costs flowing through the income statement in the first year: what is the timeframe of the remaining expected cost savings?
- What is the timeline for the proposed "North America" cost savings from merging VRA and Capitol, and how long will it take in order to realize the benefits of the restructuring? Will this have any impact on lost key artists? How does EMI manage this risk?
- Manufacturing, distribution and marketing efficiencies could result in savings. What are the implications of these cost savings on operations within the respective groups and what is the quantum?
- Details of plans for further fixed cost savings
- Details on components of marketing spend; how much marketing spend is fixed cost vs. discretionary; what is the time frame for marketing spending commitments?
- Details on components of A&R spend; size of current spend compared to historical spend and competitors'; how much A&R spend is committed vs. discretionary; how is the A&R budget allocated?

**Current Trading**
- How effective are EMI's previous and current reporting systems at forecasting sales and earnings?
- When will draft FY2007 audits be available?
- Please provide artist release schedule and estimates.

**Projections**
- 3-5 Year business plan projection
- Detailed Revenue Bridge for 06/07, 07/08 and 08/09 broken by RM and MP
- Detailed EBITDA Bridge for 06/07, 07/08 and 08/09 (Detail on fixed and variable costs) by RM and MP
- Details of normalizations assumed in 174mm 2007 EBITDA
- Specific details on year on year revenue upside/downside for 06/07 and 07/08
- Assumed unit evolution of recorded physical and digital
- Gross Margin details for physical and digital sales in Recorded Music; Gross Margin details for Mechanical, Performance and Synchronization revenues in Music Publishing
- Details on artist pipeline, release schedule, artist concentration, slippage and delay risk
- Overview of planned million plus sellers from 2007-2009, timing, slippage risk
- Split between recorded catalogue versus new releases historically and next three years.
- Key artists due for contract extension/ renewal.
- Change of control or other contract risks (confirmatory)
- Music Publishing asset splits by owned, versus managed, average contract length, concentration of key titles and artists.
- Valuation of music publishing- recent offers received by management, if any (confirmatory)
- Expected peak to trough working capital needs of the business; general working capital needs of the business

7

**Other**
- Confirmation of issued share capital/options (Breakdown including convertible and options)
- Details regarding recent accounting fraud in Brazil
- Tax structure paper with details on cash flows by jurisdiction and ability to push down debt where appropriate
- Tax basis of Recorded Music and Music Publishing Assets
- How much work has been completed around the securitization of the Music Publishing asset?
- What would be the likely timing of execution of a securitization? What would be the expected debt quantum raised?
- Pension Trustee Agreement

**Normal and Customary**
- Description of legal issues facing company
- Information technology description
- Description of real estate leases and other long-term liabilities
- Description of any environmental issues facing company

8

Confidential



# News Release
for immediate release

ER 07/75

4 May 2007

### EMI GROUP plc

Further to recent speculation, EMI Group plc (the "Company") confirms that it has received a number of preliminary indications of interest to acquire the Company. There can be no certainty that any offer will ultimately be made.

Further announcements will be made if and when required.

**Enquiries**

**EMI Group plc**
| | | |
|---|---|---|
| Amanda Conroy | Corporate Communications | +44 20 7795 7529 |
| Pippa Strong | Investor Relations | +44 20 7795 7681 |

**Brunswick Group LLP**
| | |
|---|---|
| Patrick Handley | +44 20 7404 5959 |

*The Directors of EMI Group plc accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.*

*Dealing Disclosure Requirements*

*Under the provisions of Rule 8.3 of the Takeover Code (the "Code"), if any person is, or becomes, "interested" (directly or indirectly) in 1% or more of any class of "relevant securities" of the Company, all "dealings" in any "relevant securities" of the Company (including by means of an option in respect of, or a derivative referenced to, any such "relevant securities") must be publicly disclosed by no later than 3.30 pm (London time) on the London business day following the date of the relevant transaction. This requirement will continue until the date on which the offer becomes, or is declared, unconditional as to acceptances, lapses or is otherwise withdrawn or on which the "offer period" otherwise ends. If two or more persons act together pursuant to an agreement or understanding, whether formal or informal, to acquire an "interest" in "relevant securities" of the Company, they will be deemed to be a single person for the purpose of Rule 8.3.*

*Under the provisions of Rule 8.1 of the Code, all "dealings" in "relevant securities" of the Company by the potential offerors or the Company, or by any of their respective "associates", must be disclosed by no later than 12.00 noon (London time) on the London business day following the date of the relevant transaction.*

EMI Group plc  27 Wrights Lane  London W8 5SW  UK  Tel  +44 (0)20 7795 7000  Fax +44 (0)20 7795 7001
Registered Office: Address as above. Registered in England No. 229231

TF0000249119

A-438

- 2 -

*A disclosure table, giving details of the companies in whose "relevant securities" "dealings" should be disclosed, and the number of such securities in issue, can be found on the Takeover Panel's website at www.thetakeoverpanel.org.uk.*

*"Interests in securities" arise, in summary, when a person has long economic exposure, whether conditional or absolute, to changes in the price of securities. In particular, a person will be treated as having an "interest" by virtue of the ownership or control of securities, or by virtue of any option in respect of, or derivative referenced to, securities.*

*Terms in quotation marks are defined in the Code, which can also be found on the Panel's website. If you are in any doubt as to whether or not you are required to disclose a "dealing" under Rule 8, you should consult the Panel.*

TF0000249120



warner | music | group

Chairman
Chief Executive Officer

May 10, 2007

**STRICTLY PRIVATE AND CONFIDENTIAL**

Mr. John Gildersleeve
Chairman
EMI Group plc
27 Wrights Lane
London W8 5SW

Dear John,

Thank you for your letter of May 8.

We look forward to participating in the process being conducted by your board.

As requested, we can reconfirm the price in our proposal of March 1 of 260 pence per share based upon the corrected assumptions set out in the appendix to your letter of May 8.

Given our confidence in the regulatory approach outlined in our proposal of March 1, we are prepared to offer a $100 million reverse break-up fee, paid in cash, under circumstances where the transaction fails due to regulatory impediments. We believe that both EMI and WMG already share in regulatory risk, but we recognize the greater operational exposure for EMI: this very substantial payment is intended materially to re-apportion risk towards WMG in this regard. The fee, which is equal to approximately 2.5% of your equity value, is significantly larger than normal for fees of this type, would provide substantial value to your shareholders and would give you the wherewithal to subsidize employee incentives designed to reduce your operational risk. It also adds significantly to the already very high motivation we have to obtain all relevant clearances. In addition to this, and as mentioned in our letter of May 7, we will agree steps to achieve all antitrust clearances required, including a direct commitment to EMI to offer up to the regulators the divestitures and behavioral and other relevant undertakings that we have committed to in our Heads of Agreement with IMPALA, a copy of which has been provided to EMI. The precise detail of the covenants is a matter for discussion between us and our respective counsel in due course.

Debt financing for our proposal will be provided by Goldman Sachs and Lehman Brothers (our financial advisors) as discussed in our proposal of March 1.

75 Rockefeller Plaza  I  New York, NY 10019  I  p 212.275.4400  I  f 212.275-4422  I  ebj@wmg.com

Confidential

Herbert Smith and Freshfields have finalized the non-disclosure agreement submitted with your letter of May 8 and Goldman Sachs and/or Lehman Brothers will be reaching out to Greenhill on process.

Many thanks.

Sincerely yours,

Edgar Bronfman, Jr.

TF0000994594

terra firma

# Memo

| | |
|---|---|
| **To** | IAC |
| **cc:** | Stephen Alexander, Patrick Sader, Michael Slattery |
| **From** | Riaz Punja, Francois van der Spuy, Michael Hedegaard, Stephen Seymour, Don Hoang |
| **Date** | 5 February 2007 |
| **Subject** | Project Dice: Phase I Due Diligence |

### Background

Project Dice is the potential public-to-private acquisition of Dice Group plc ("Dice"), the world's third-largest recorded music company ("Recorded Music") and the second-largest music publishing company ("Publishing") (please see Appendix 1 for a description of Dice). This memo summarizes the opportunity and discusses the preliminary investment strategies and key issues that the team has identified.

The team seeks IAC approval of a budget for up to £800,000 to conduct Phase I diligence to determine whether the team should return to the IAC to recommend submitting a conditional non-binding offer letter to the Dice Board, which could then permit the team to conduct confirmatory due diligence and agree a recommended offer to the shareholders.

### Key Investment considerations

#### Offer to Dice Board

The team believes that an offer price in the 300p – 320p/share range has a reasonable chance of eliciting a recommendation by the Dice Board to Dice's shareholders. The 320p share price implies an EV of £3,897m (17.7x FY 2007E EBITDA / 11.1x FY 2008E EBITDA[1]) and is a 28% premium to the 250p closing price on 1 February.[2]

At 320p/share, TF Base Case operating assumptions (see Appendix 3) and financing assumptions (see Appendix 4), an exit in five years would generate CoCM of 2.05x and a 15.4% IRR. Sensitivities and upside / downside scenarios are detailed in Appendix 5.

The team proposes to work with Dresdner Klienwort during Phase I due diligence to refine the appropriate initial offer price.

#### Bank Financing

It is recommended that, at a minimum, TF's offer to Dice contains supporting letters from at least two banks. Dresdner Kleinwort has indicated that it could provide £1,475m of acquisition financing, in addition to a revolver facility to fund the cost of Dice's restructuring programme. Assuming Phase I IAC approval, the team will solicit further interest from the market to solidify support from a second bank and to determine whether there is scope for increased debt quantum.

#### Equity commitment

Based on the 320p share price and bank financing of £1,475m, the total equity required for the transaction is c.£2,508m. An offer letter to Dice must therefore include supporting letters from co-investors of up to c.£1,300m (post-sell down: c.£1,700m) based on the following chart below.

---

1 Based on TF Base Case assumptions.
2 Please see Appendix 2 for a summary of recent events of Dice, including details of its restructuring program.

Confidential



EXHIBIT 3
WIT: Handa
DATE: 2/15/10
T.M. PASTOR, RPR, CLR



TF0000107924

terra firma



**Composition of Equity Funding**

|  | £1,298m | €1,976m | £1,701m | €2,390m |
|---|---|---|---|---|
|  | £828m | €1,260m | £552m | €840m |
|  | At Offer (£2,508m) | At Offer (€3,818m) | Post-Sell Down (£2,508m) | Post-Sell Down (€3,818m) |

☐ TFCP II * ☐ TFCP III ** ☐ Co-Investment

\* Cross-fund investment requires approval from the advisory board of TFCP III.

\** Based on €4.2bn TFCP III close. At €5.2b TFCP III close, £1,101m (€1,676m) co-investment commitment required in offer letter, and £1,570m (€2,390m) required following sell-down.

### Investment strategies:

#### Back-to-Back Sale of Recorded Music

The primary investment strategy is (i) to dispose of the Recorded Music business – characterized by volatile earnings, high fixed costs and an uncertain market environment given the decline of core physical recorded music revenue – and (ii) retain the Publishing business – characterized by stable cash flows, strong growth prospects, scalable cost structure and a market-leading position.

The natural buyer for Recorded Music is Whist, the fourth-largest recorded music company, which has a complementary geography and market position to Dice. Analysts estimate that there could be up to £200m synergies available in a merger of Whist and Dice, in addition to the savings from Dice's restructuring plan.[3] The sale of Recorded Music in 2009, at 8.5x LTM EBITDA,[4] and giving credit to seller for 50% of £200m synergies, would increase returns to 24.2% IRR. Appendix 5 illustrates the impact to returns of a 2009 sale of Recorded Music across exit multiples and synergies.

#### Regulatory Considerations

A Dice-Whist merger would be subject to regulatory approval. In June 2006, the European Court of First Instance ("CFI") annulled a two-year old European Commission ("EC") decision to approve the merger of the recorded music businesses of Sony and BMG. Sony BMG, which has operated a combined entity for since the EC's decision, has appealed this decision to the European Court of Justice, from which a ruling may not be forthcoming for up to two years.

In parallel, Sony BMG has re-submitted its case to the EC, which is likely to issue its decision of the Sony BMG merger under the CFI's more searching standard of review within the next 6-9 months. It is expected that the EC will re-approve the Sony BMG merger given the continued market decline of recorded music, the increased market presence of independent labels, and the concentrated strength of digital retail channels offer support for industry consolidation. It is possible, however, that the EC's re-affirmation could be subject to further appeal.

---

3 Please see, e.g., UBS research dated 15 January 2007.
4 UBS research valued Dice Recorded Music at 6.5x FY 2007E EBITDA, reflecting current declining top-line trends, low margins and threatening structural trends. 8.5x LTM EBITDA reflects Base Case operational improvements and stabilization / low growth of top-line revenue. Whist currently trades at 8.9x CY 2007E EBITDA (EBITDA comprised of 28% publishing / 72% recorded music).

Page 2 of 15



terra·firma

As a result, the EC and ECJ may each approve the Sony BMG merger, but there is likely to be continued regulatory uncertainty surrounding a potential merger of Dice and Whist. Additionally, there is the possibility – believed to be remote – that the EC and ECJ could re-affirm the Sony BMG merger, but, independently, the EC could reject the combination of Dice and Whist.

<u>Source of due diligence:</u> The team proposes during Phase I to direct Weil Gotshal to assess the regulatory / antitrust implications of a sale to Whist. In parallel, the team proposes during Phase I to contact a political consultant who would be in position to advise on the European antitrust regulatory environment in this sector.

<u>Core Investment Themes</u>

In light of the uncertain regulatory environment, the TF Base Case assumes no disposal of Recorded Music, and the team has developed the following core investment themes to explore further in Phase I diligence.

<u>Recorded Music</u>

1.  **Base Case: £170m of annualized cost savings at Recorded Music:** On 12 January, Dice announced a plan to reduce costs by £110m on an annual basis by FY ending March 2009. These savings are to come from:

    a.  Delayering of management (senior management of RM has been replaced);
    b.  Closing of smaller country offices (e.g., in Latin America);
    c.  Combination of labels (e.g., Virgin-Capital in the US); and
    d.  Targeted headcount reduction (1,000 of 6,300 total employees).

    In addition, the team believes that there is potential for an additional £60m of annualized savings from:

    a.  Elimination of PLC and head office costs (£20m);
    b.  Continued reduced overhead and consolidation of labels;
    c.  Focus on purchasing excellence; and
    d.  Extension of off-shoring in manufacturing and distribution.

    The team has incorporated £170m of run rate cost savings and £200m restructuring charge into the TF Base Case.

    <u>Source of further due diligence:</u> It is proposed that McKinsey & Co. examine Dice's cost structure against the announced restructurings and industry benchmarks. In parallel, the team will continue discussions with identified industry consultants to better understand the scope of these savings.

The following investment themes are not included in the TF Base Case and are considered potential areas of value creation.

2.  **Marketing efficiency improvements:** The team believes that the recorded music industry generally, and Dice in particular, has demonstrated a long history of undisciplined marketing spending to promote new releases. Significant variable cost savings may be attainable through the introduction of a rigorous "return on investment" approach to marketing expenditures.

    A 15% improvement in marketing RoI would result in c.£38m savings and increase Base Case CoCM and IRR to 2.23x and 17.4%.

    <u>Source of further due diligence:</u> It is proposed that, together with McKinsey and independent consultants, the team will determine (i) the extent to which marketing efficiency improvements are not included in the announced restructuring plan and (ii) the likelihood of implementation that may warrant inclusion in the TF Base Case.

3.  **Proposed sale of US Recorded Music operations:** TF could pursue a sale of Dice's US Recorded Music operations. Dice has struggled for decades to sustain – either via acquisitions or organic growth – a US market share above 10% and has had little success at breaking UK acts into the US market. The team proposes to explore the potential for sale of Dice's US Recorded Music business, which represents c.30% of total RM revenue (£480m) (though believed to operate a substantially lower margins than RM overall). A sale of the US operations to Whist



Page 3 of 19

terra firma

would not be subject to EU regulatory approval, although the US regulatory position will have to be confirmed.

<u>Source of further due diligence</u>: The team proposes to work with McKinsey and industry consultants to quantify the operating performance of the US recorded music division and to work with Weil Gotshal to investigate the regulatory implications of a sale of the US operations to Whist.

4.  **Recorded Music distribution JV**: Dice has a strong distribution presence, particularly in Europe, but is weak in Asia. Dice could partner with another major label to form a global distribution JV that would result in further cost savings.

    The team will also explore the sale or JV of Dice's US distribution operations, possibly to Whist. In effect, Dice's US Recorded Music operations could become a standalone stable of labels within Whist's US operations, which could improve distribution of Dice product while reducing Dice's US cost base.

    <u>Source of further due diligence</u>: The team proposes to discuss with identified industry consultants the economic rationale for the disposal or sharing of Dice's US and / or Asian distribution. Weil Gotshal will assess whether there are any regulatory barriers (e.g., the US Dep't of Trade requirement for separate distribution channels) to the sale or JV of Dice's US distribution operations.

5.  **Reconfigure A&R strategy**: While Dice has strong presence in the US market in the Country, Christian and Classical genres, it has had little success in building its presence in the more mainstream Rock, Hip-Hop and Rap genres, where Dice has occasionally opted to sign over-the-hill artists (e.g., Janet Jackson) with disappointing results. Dice's A&R struggle in these key genres is now compounded by the emergence of online communities that have revolutionized the manner in which new artists are identified. The team has identified three potential strategies for a revised A&R strategy.

    a.  **Online trolling**: The marketing and promotion strength of major labels will continue to be a competitive advantage for building a stable of leading artists in the digital world. Dice can adapt its A&R strategy to the digital world – and conserve A&R costs – by sourcing talent from online community sites such as YouTube and Myspace, where A&R employees can identify artists that have already developed grassroots support, and a technique spearheaded by labels such as Atlantic Records.

    b.  **The "VC model"**: The success of a few albums has long driven profitability. Dice could adapt a portfolio approach with an exclusive focus on new artists, who are generally the least expensive to sign to new contracts. The corollary is to reconsider the strategy of re-signing established artists to contracts with large upfront payments that are recouped only through multi-million sales volumes (e.g. Robbie Williams).

    c.  **Growth in popular genres**: Dice's longstanding weakness in mainstream Rock, Hip-Hop and Rap genres is also an opportunity. A new management team could refocus Dice's efforts to develop new talent, rather than overpay for over-the-hill.

    <u>Source of further due diligence</u>: The team proposes to work with McKinsey and identified industry consultants to test these hypotheses and evaluate the risk of a repositioning of the A&R strategy. This would be a key focus of Phase I diligence.

6.  **Focus US Recorded Music on core strengths**: Alternatively, the team will consider the strategy to run the US operations based largely on its strength in the Country, Christian and Classical genres and its strong Recorded Music back catalogue and avoid the considerable marketing costs of promoting new mainstream acts and investing in less-profitable genres.

    <u>Source of further due diligence</u>: In Phase I, the team proposes to speak with industry consultants to determine the relative profitability of labels with similar characteristics and to assess the run-from-strength strategy. It is likely not possible until Phase II



Page 4 of 15

terra firma

diligence to examine in full detail the composition of Dice's US recorded music division by genre / label.

7. **Run Recorded Music from catalogue:** Dice has large catalogues in Recorded Music (i.e., recording masters older than one year) and Publishing (i.e., copyrights of songs older than one year) that can be re-mastered and re-released at lower cost (A&R and marketing) than new material. Further analysis is required to determine the split of Dice's revenue between current and catalogue sales and to determine the potential for artists' greatest hits and compilation albums.

   <u>Source of further due diligence:</u> It is likely not possible until Phase II diligence to examine in detail the composition of Dice's Recorded Music or Publishing catalogues. The team proposes to spend time in Phase I diligence with identified industry consultants to develop an estimate of Recorded Music catalogue sales and to quantify the potential to re-release material from the Publishing catalogue.

<u>Music Publishing</u>

1. **Consolidation:** Music Publishing (26% EBITDA margin) is a strong platform from which to acquire additional song catalogues and independent music publishers (collectively 32% market share). There is opportunity to achieve synergies in this highly scalable business by exploiting the songs across Dice's existing infrastructure. The acquisition of publishing catalogues totalling £20m net publishing revenue ("NPS") at 11x NPS (c.18x EBITDA) increases Base Case IRR and CoCM to 16.7% and 2.2x.

   Appendix 5 details upside scenarios incorporating acquisitions of publishing catalogues. Several publishing catalogues (described in Appendix 6) are owned by private equity firms and are likely to be candidates for sale in the near- to medium-term.

   <u>Source of further due diligence:</u> The team proposes to identify further potential targets among the independent music publishers.

2. **Monetizing the "star attraction":** The team proposes to explore the potential to retain the management of the copyrights (keeping benefits of scale) and associated costs of the big name acts / songs by selling a portion of the net publishing share. The acquirer would receive these revenues, as well as the "bragging rights" to "owning" the catalogues such as the Rolling Stones. With the right marketing it may be possible to sell such a product at a significantly higher multiple than that achievable through sale of the entire catalogue.

   <u>Source of further of due diligence:</u> The team views this opportunity as upside only, and proposes to investigate whether the market exists for individual buyers of for investment trusts potentially attracted to the low-yield dividend-like characteristics.

3. **Potential acquisition of collection society:** Collection societies serve as agents for music publishers and collect royalty revenue that result from the performance of songs. Some synergies may be achievable through ownership of the collection societies by Publisher due to increased leverage in direct bargaining with radio stations and other broadcasters and economies of scale. On the other hand, there are concerns about regulatory barriers to vertical consolidation and the limited number of privately-owned collection societies.

   <u>Source of further of due diligence:</u> The team proposes to work with industry consultants to identify potential targets for vertical consolidation and with McKinsey to examine the potential synergies.

4. **Securitization of publishing back catalogue:** Publishing's back catalogue contains the rights to a large number of songs with a long track record of stable sales that are attractive candidates for securitization.

   <u>Source of further due diligence:</u> Initial feedback from Barclays indicated concern about the depth of the market, considering complications from multi-jurisdictional revenue collection and the duration of individual copyrights and administrative



Page 5 of 16

TF0000107928



terra firma

agreements. The team will explore this avenue further with banks in Phase I. To the extent possible, Phase I and Phase II diligence will identify the average duration of Dice's copyrights and administrative agreements.

## Exit considerations

The team believes that exit can be achieved through sale of the combined entity or its separate divisions.

### Recorded Music or Dice Combined:

1. **Sale to Music Major:** Universal Music Group, Sony BMG and Whist each would be interested in acquiring Dice.

   - Whist is the most likely given portfolio complementarities. Due to leading market positions, UMG and Sony BMG would face regulatory uncertainty.

2. **Sale to Media conglomerates:** The team will work with Dresdner to identify media companies (e.g., Disney, NewsCorp) with diversified interests who may have interest in acquiring Recorded Music or the entire company.

3. An **IPO** may be possible a possible exit strategy for Dice, although the team does not view it as likely for Recorded Music standalone. None of the major recorded music companies are publicly-traded on a standalone basis.

4. A partial exit through **refinancing** is an unlikely exit option for Recorded Music, given the lower leverage available on the more volatile cash flow streams.

### Publishing

1. **Sale to financial player:** Private equity and infrastructure funds will likely have strong interest given the low-growth, stable and scalable cash flows.

2. **Refinancing** of cash flows provides opportunity given high levels of cash generation.

3. **Trade Sale:** The team will work with Dresdner to identify the set of potential trade buyers for the Publishing business.

## Key risks

**Recorded music industry revenue is in decline:** The recorded music market is projected to continue its decline from $40 billion in 2001 to $32 billion in 2009, with minimal growth thereafter due to:

- <u>Piracy</u>: Piracy is the most significant concern for all digital entertainment forms. Piracy of physical and digital music which costs the music industry $6 billion annually, an amount that is expected to increase as young music consumers become accustomed to acquiring their music without paying.

- <u>Decline in core physical recordings</u>: Revenue from core physical recordings is expected to continue a 8-10% annual decline through 2012, at which point revenue from digital is expected to surpass core CD sales. This decline keeps pace with demographic trends, as music consumers currently under the age of 25 are far more likely to acquire their music in digital format. The continued reduction in physical retail space for music sales perpetuates the vicious cycle.

- <u>Disintermediation</u>: The decline in CD sales corresponds to a reduction in the number of "album equivalents" sold as digital distribution permits consumers to cherry-pick 2-3 tracks of an album for c.$0.99 each rather than paying $15.99 for the entire physical album.

  o The team has modelled a "Market Collapse" scenario in which revenue from physical recording declines 14% a year and digital revenue fails to grow as expected. Please see Appendix 5.

Against this backdrop, there is growth for recorded music in synchronization (i.e., revenue from use of music in video games, advertisements and TV/movies), and advertising-based

Page 6 of 14

TF0000107929

terra firma

revenue and downloads to mobile phones. It is recommended that the following will be a core focus of Phase I market due diligence driven by McKinsey and Enders:

Synchronization is an opportunity for recorded music companies. Thus far, synchronization revenue has accrued to publishers, but there is opportunity for recorded music companies to generate revenue from licensing music to YouTube, Myspace, Bebo and other sites.

Advertising: Dice has recently signed deals with websites such as Spiral Frog and Baidu (in China), which are developing an advertising-based revenue model for free music downloads. This model is in its infancy, but could provide revenue opportunity from otherwise "pirated" music downloads. One area of concern is that the advertising-based revenue model further devalues music by continuing the perception that music is available for without the customer's need to pay.

Mobile downloads: The introduction of full-track downloads is expected to drive revenue from music downloads – previously from ringtones / ringtunes / ringbacks – over the next five years.

**Litigation may reduce Publishing revenue:** The statutory rate that recorded music companies pay to music publishers for sales of a each track sold individually or as part of an album (whether physical or digital) is US$0.091 per track sold. For mobile downloads, however, publishers for legacy reasons receive a percent of the retail price for mobile downloads that is considerably higher than the statutory rate for mechanical sales. To correct this anomaly, US recorded music companies have initiated legal action to renegotiate the royalties paid to music publishers from revenue from mobile downloads. An outcome in favour of the recorded music companies (which is anticipated) will result in a loss of Publishing revenue offset by an increase in Recorded Music revenue from downloads in the US.

The team believes that the downside scenario is a loss of $100m annually (c.50% of Publishing's royalty revenue from US sales from mobile downloads), or c.$45m of net publishing share. From discussion with market analysts, the team believes that the more likely outcome, factored into the TF Base Case, is a settlement that results in a loss of $20m revenue ($9.0m / £4.9m NPS based on 45.2% Dice NPS) for Publishing annually commencing in 2008, with an uplift in revenue for Recorded Music (quantum to be determined and not included in the Base Case).

Source of further of due diligence: The team proposes in Phase I to direct Weil Gotshal to analyze the range of potential outcomes of this litigation, and with McKinsey and industry consultants to understand the net impact to Publishing and Recorded Music.

**Budget**
Please see Appendix 7 (attached in a separate document) for detail of the proposed budget for up to £800,000 for Phase I diligence.



Page 7 of 18

Confidential

terra firma

Recommendation

The team recommends to the IAC that it recommends to the GP to approve the budget of £800,000 for Phase I diligence in order to engage McKinsey & Co., Enders Analysis, Weil Gotshal, KPMG and a political consultant.

| Recommendation | IAC Approval/ Rejection | Conditions/Comments |
|---|---|---|
| To approve the budget of up to £800,000 for Phase I diligence in order to commission McKinsey & Co., Enders Analysis, Weil Gotshal, KPMG and political consultant. | | |

Confirmed:

..............................................

Member of the Investment Advisory Committee

| |
|---|
| Approved By:...............................................<br><br>..............................................................<br>For and on behalf of<br>Terra Firma Investments (GP) 2 Limited |

Page 8 of 18

Confidential

TF0000107931

terra firma

## Appendix 1: Description of Dice

Dice is the world's third-largest recorded music company (12.8% market share in 1H 06) and, pro forma for Vivendi's acquisition of BMG Music Publishing, the world's second-largest music publisher (20% market share in 2005).

### Recorded Music

Dice's recorded music division ("Recorded Music") records, manufactures and markets recorded music from more than 1,500 artists including Coldplay, Gorillaz, KT Tunstall and Robbie Williams. Recorded Music creates and develops new artists and promotes and markets the music recordings that the artists produce. Recorded Music generated revenue of £1,660m and EBITDA of £167m (10.1% margin) for FY 2006. The low margin reflects in part the "R&D" characteristics of the business as well as Dice's high SG&A costs compared with industry peers. The core value of Recorded Music is driven by the ability of its A&R division to discover, sign and promote new artists and market new albums from established artists or the company's back catalogue. The division is characterized by volatile, unpredictable earnings and significant working capital outlays (e.g., artist advances).

### Publishing

Dice's music publishing division ("Publishing") owns the copyright and administers the rights to more than one million compositions, including 2006 hits by the Arctic Monkeys, James Blunt, Black Eyed Peas, and Pink, as well as an extensive back catalogue that includes the Beatles, the Rolling Stones, Queen, Pink Floyd, the Beach Boys and Frank Sinatra.

Publishing's back catalogue – those songs older than one year – is widely regarded to be one of the most important catalogues of sound recordings and music copyrights in the world. Publishing generated revenue of £420m and EBITDA of £109m (25.9% margin) for FY 2006. Dice does not disclose the mix between current and back catalogue.

Publishing revenue is comprised of the following:

- **Mechanical** (e.g., royalties paid on recorded music, derived from physical sales and digital downloads), comprising 45% of revenue in 2006;
- **Performance** (e.g., chart success, radio commercialization, webcasts, sporting events), 27% of 2006 revenue;
- **Synchronization** (e.g., advertising revenue, TV producers, computer games makers), 17% of 2006 revenue and the fastest growing segment of the business; and
- **Other** (e.g., stage productions, sheet music, ring tones / ring tunes / ring backs), 11% of 2006 revenue.



Page 9 of 16

A-450

terra firma

### Appendix 2: Transaction Background

Dice has been the target of two unsuccessful formal approaches during the last twelve months, one last summer by Whist Music Corp., a publicly-traded US-based recorded music and music publishing company, and more recently in November by a private equity consortium of Permira and Apollo Management.

In early December, the TF team appointed Dresdner Kleinwort ("DK") as an advisor in relation to a possible offer and began to explore leverage financing options. On 14 December, TF submitted a letter to Eric Nicoli, the Chairman and CEO of Dice, confirming its interest as a potential bidder. Pursuant to Rule 20.2 of the City Code on Takeovers and Mergers, TF requested any information that had been provided to any other potential offeror.

Dice declined to provide the information requested and announced on 14 December that it had ceased discussions with Permira. While no reason was given for the end of discussions, it is rumoured that Permira was unable to get comfortable with the volatility of the Dice's recorded music business.

In recent weeks, the TF team has continued to develop its investment rationale together with informal discussions with external consultants, including Tom McGrath, a music industry veteran who agreed to assist TF in developing a business plan and investment theses.

Most recently, on 12 January Dice announced a 2007 profits warning and restructuring programme, the highlights of which are:

- FY 2007 revenue from Recorded Music expected to be down 6-10%, due to continued drop-off in physical revenue and disappointing December sales;
- £110m of run rate cost savings to be achieved by FY 2009 (85% RM / 15% Publishing);
- Restructuring costs 60% US / 40% Europe driven largely by increased shared services at labels and front office reduction, including:
  - o Some smaller country offices may be closed;
  - o Labels combined in smaller countries and US; and
  - o Targeted headcount reduction (1,000 of 6,300 total employees);
- Eric Nicoli to take control of the Dice Recorded Music division; Alain Levy (CEO of Recorded Music) and David Munns (Vice-Chairman of Recorded Music) depart; and
- Dice to explore separate financing of the Recorded Music and Publishing divisions.

Dice's share price had fallen 12% following the end of discussions with Permira to close at Thursday, January 11 at 264.75p per share. Since the 12 January announcement, the share price has fallen a further 6% to close on Thursday, 1 February at 249.50p. Below is the two-year Dice share price graph.



Page 10 of 18

TF0000107933

terra firma

### Appendix 3: Base Case Operational Assumptions

The table below outlines the key assumptions underlying the TF Base Case.

| Business Unit | Driver | Assumption | Rationale |
|---|---|---|---|
| Recorded Music | | | Overall market declines 19% to US$32b by 2009, with modest growth thereafter. |
| Physical recordings | Market growth | 8.2% CAGR decline through 2012 | Enders Analysis. Not precipitous decline due to continued CD gift-giving and library building. |
| | Dice Revenue decline | • 3.3% decline in FY 2008<br><br>• 7.6% CAGR decline ('08-'12) | • 3.3% decline in FY2008 (compared with 6.6% market decline), reflecting album release shift from FY07 to FY08 and excessive returns charges believed to be incorporated in 12 January revenue warning.<br>• Revenue decline in 2008-2012 is 0.6% stronger than broader market, reflecting that Dice is more insulated from decline in physical sales because Recorded Music is geared toward older, more European demographic. |
| | Market share | 2007: 10.0%<br>2012:<br>• 10.8% on constant currency basis<br>• 9.8% on forecast currency basis | • Market share increase due to more resilient sales than general market. |
| Digital recordings | Market growth | 24% CAGR through 2012 | • Enders Analysis.<br>• Based on 34% CAGR in digital downloads and 8% CAGR in mobile downloads.<br>• Digital surpasses physical revenue in 2012. |
| | Dice Revenue growth | 39% CAGR through 2012 | • 45% CAGR in digital downloads; 26% CAGR in mobile downloads.<br>• Growth above market reflects current low digital revenue base due to:<br>   o delayed take up of digital among core Dice customers, and<br>   o Dice's historically poor digital platform. |
| | Dice Market share | 3.9% in 2007 growing to 7% in 2012 | • 7% digital market share below 10% historical market share on physical. |
| Costs | Variable costs | 64.5% of rev - 2007<br>64.7% of rev - 2012 | • Margin improvement from shift to digital revenue is mitigated by "fixed-like" variable cost of album production and no reduction in forecast number of albums produced. |
| | Fixed costs | 30% of rev - 2007;<br>26% of rev – 2012 | • Reflects costs savings program. |
| Publishing | Revenue growth | 6% CAGR through 2012 | Enders Analysis. Higher growth seen from synchronization and performance.<br>• Adjusted for loss of $20m revenue ($9m NPS) pursuant to US litigation. |
| | EBITDA margin | 26.1% in 2007<br>30.8% in 2012 | • Increase from scalability and cost savings, offset by loss in NPS through litigation. |
| Cost savings | | £115m in 2008;<br>£55m in 2009;<br>£170m runrate | • £110m identified by Dice management;<br>• £20 in PLC and head office savings;<br>• £40m savings identified by consultants<br>• Total restructuring charge of £200m. |
| Tax | Effective tax rate | 25% | Based on analyst projections.<br>Further diligence required. |

Confidential

TF0000107934

terra firma

### Appendix 4: Transaction Financing Assumptions

The LBO analysis incorporates the following transaction assumptions.

| Assumption | Amount | Comment |
|---|---|---|
| Per share price | 320p | Dice's rumoured asking price. |
| Fully Diluted Shares | 938m | £28.5m in executive compensation (33m shares at £1.98 per share exercise price), per DK estimates. |
| | • 799.8m basic shares | |
| | • 101.2m shares from conversion of £152.5m convertible bond | |
| | • 33m "in the money" options exercised | |
| Equity Financing | £2,508m | Requires c.£1,701m co-investment |
| Debt Financing | £1,475m (6.7x 2007F EBITDA) | Based on indicative leverage from Dresdner Kleinwort. |
| | • Senior: £1,250 million (5.68x 2007F EBITDA) | • A mezz structure could produce leverage up to £1,700m (7.7x leverage) |
| |   • £350m A, amortising | |
| |   • £450m B, bullet in year 8 | |
| |   • £450m C, bullet in year 9 | |
| | • Junior: £225m (1.02x 2007E EBITDA) | |
| | £150m revolving facility for restructuring cash charge | |
| | • 39.3% leverage | |
| Cash - Financing | £264m | £191m on balance sheet 2007E £73m from exercise of options |
| Cash in business | £100m | |
| Fees & Expenses | £47m | Deal & Advisory fees (0.25% of EV) Financing fees (2.25% of debt) |
| Minority Interests | £61m | Per JPMorgan analyst research; includes c.£10m minority interest in Tooth & Nail (to be confirmed). |
| Pension Liability | £31m | Per JPMorgan analyst research; 50% (£15m) funded day one, with balanced funded over five years. |
| Refinancing cost | £68m | Retirement of existing bonds at take-out premium and (1%) tender fee. |
| Equity bridge | £6m | Interest assumed EURIBOR + 1.25% between transaction close and financing (assumed one month). Equity bridge capped at £1,249m. |



Page 12 of 15

Confidential

terra firma

### Appendix 5: Returns Analysis

**Base Case**

Our base case includes a five-year investment horizon for TF, with the following exit assumptions:

- 8.5x Recorded Music LTM EBITDA[5];
- 18x Publishing LTM EBITDA[6];
- 12.0x blended LTM EBITDA exit multiple;
- Exit FY 2012 (FY ends in March).

At 320p per share offer price, TF Base Case IRR is 15.4%, generating a 2.05x CoCM. The table below illustrates the IRR and CoCM at various per share equity purchase prices.

| IRR and CoCM at various share prices* | | | | | |
|---|---|---|---|---|---|
| | Dice equity share price (p) | | | | |
| | 300p | 305p | 310p | 315p | 320p |
| IRR | 17.2% | 16.7% | 16.3% | 15.8% | 15.4% |
| CoCM | 2.21x | 2.17x | 2.13x | 2.09x | 2.05x |

* A 273p per share offer price results in a 20% IRR and 2.5x CoCM.
Note: Dice expected ask price in bold.

The team has also identified that additional cost savings may be achievable from improved return on investment from marketing spend. The table below illustrates the IRR and CoCM at various levels of run-rate cost savings achieved, assuming a 320p per share price.

| IRR and CoCM at incremental Savings @ 320p/share | | | | | |
|---|---|---|---|---|---|
| | Run-rate incremental Savings in 2009 (£m) | | | | |
| | | | | £170m+ improved Marketing ROI | |
| | £110m | £140m | £170m | £170m + 15.0% | £170m + 30.0% |
| IRR | 11.6% | 13.6% | 15.4% | 17.4% | 19.3% |
| CoCM | 1.73x | 1.89x | 2.05x | 2.23x | 2.42x |

Note: Base case in bold.

**Downside Sensitivities**

**Adverse Litigation Outcome**

For a downside scenario, the team has assumed that the music publishers lose the litigation in the US surrounding renegotiation of royalty rates for sales of digital recordings. The lower rates would result in a $100m (£52m) reduction of Dice's Publishing revenue, with a partially offsetting positive impact on Dice's Recorded Music revenue (to be determined). The table below reflects the impact on returns of loss in Publishing revenue.

| IRR and CoCM at Impact of Litigation Outcome @ 320p/share | | | | | | |
|---|---|---|---|---|---|---|
| | Loss in Publishing Revenue ($m) | | | | | |
| | $0m | $20m | $40m | $60m | $80m | $100m |
| Loss in NPS (£m) | £0 | £5 | £10 | £15 | £19 | £24 |
| IRR | 16.0% | 15.4% | 14.8% | 14.1% | 13.5% | 12.8% |



5 UBS research valued Dice Recorded Music at 6.5x FY 2007E EBITDA, reflecting current declining top-line trends, low margins and threatening structural trends. 8.5x LTM EBITDA reflects Base Case operational improvements and stabilization / low growth of top-line revenue. Whist currently trades at 9x CY 2007E EBITDA (EBITDA comprised of 28% publishing / 72% recorded music).
6 Vivendi's acquired BMG Publishing in 2006 at purchase price implying 20x EBITDA multiple, pre-synergies.

Page 13 of 16

DRAFT                                                    terra firma

| CoCM | 2.10x | 2.05x | 1.99x | 1.94x | 1.88x | 1.83x |
|------|-------|-------|-------|-------|-------|-------|

Note: Base case in bold.

Rapid Decline in Recorded Music

The team has modelled the returns in the event that decline in recorded music continues at a rapid rate due to piracy and underperformance of the digital revenue. The table below illustrates the returns at this scenario.

| CoCM assuming rapid Recorded Music Decline @ 320p/share | | | | | |
|---|---|---|---|---|---|
| | | RM Physical Revenue: '07-'12 CAGR | | | |
| | | (6.8%) | (8.8%) | (10.8% | (12.8% | (14.8% ) |
| RM Digital | 9% | 1.00x | 0.78x | 0.58x | 0.38x | |
| '07-'12 | 19% | 1.24x | 1.03x | 0.83x | 0.64x | 0.46x |
| CAGR | 29% | 1.58x | 1.37x | 1.17x | 0.98x | 0.81x |
| | 39% | 2.05x | 1.82x | 1.62x | 1.44x | 1.27x |
| | 49% | 2.64x | 2.42x | 2.22x | 2.04x | 1.87x |

Note: Base Case in bold. Market Collapse scenario is shaded.

In the Market Collapse scenario (i.e., 14.8% CAGR decline in physical revenue and 9% CAGR growth in digital revenue), Dice would be able to meet debt service requirements (assuming Dresdner's leverage) in 2008, but not beyond 2009.

In the event of a dramatic and accelerated decline in physical revenue without corresponding growth in digital revenue, the Recorded Music business would likely be run from back catalogue with minimal fixed costs, A&R and marketing spend, or closed down entirely. The team will attempt to determine the revenue split between current and catalogue Recorded Music revenue in Phase II to conduct this analysis.

- Assuming that Publishing is held for sale in 2012 and Market Collapse Case of Recorded Music, a "fire-sale" of Recorded Music in 2009 at 4.5x LTM EBITDA would result in overall returns of 0.63x CoCM and (8.7%) IRR.

Upside Sensitivity

Sale of Recorded Music in 2009

The team has modelled the scenario of a separate sale of Recorded Music in 2009, giving benefit for various levels of the synergies available (e.g., up to £200m in the event of a merger with Whist). This scenario assumes that Publishing is sold in 2012 at Base Case assumptions, with 25% of run-rate savings retained after sale of Recorded Music. The table below should be compared with Base Case CoCM of 2.05x and IRR of 15.4% assuming sale in 2012:

| CoCM assuming separate sale of Recorded Music @ 320p/share | | | | | | |
|---|---|---|---|---|---|---|
| | | Value of synergies received by Dice | | | | |
| | | £0m | £50m | £100m | £150m | £200m |
| EBITDA | 6.5x | 1.50x | 1.63x | 1.76x | 1.89x | 2.02x |
| Exit | 7.5x | 1.61x | 1.76x | 1.91x | | |
| Multiple** | 8.5x | 1.71x | 1.88x | | | |
| | 9.5x | 1.82x | 2.01x | | | |
| | 10.5x | 1.92x | | | | |

Note: CoCM above Base Case CoCM are shaded.

| IRR assuming separate sale of Recorded Music @ 320p/share | | | | | | |
|---|---|---|---|---|---|---|
| | | Value of synergies received by Dice | | | | |
| | | £0m | £50m | £100m | £150m | £200m |
| EBITDA | 6.5x | 10.6% | 13.6% | | | |
| Exit | 7.5x | 13.1% | | | | |
| | 8.5x | | | | | |

Confidential

TF0000107937

DRAFT                                                    terra firma

| Multiple** | 9.5x | |
| | 10.5x | |



Note: Returns above Base Case returns are shaded.

## Acquisition of publishing catalogues

In addition, an Upside Case scenario comes from the acquisition of independent publishing catalogues. The table below shows the IRR variance from Base Case resulting from the acquisition of publishing NPS in 2009 at various average acquisition multiples of net publishing share.

| IRR impact from Publishing catalogue add-ons @ 320p/share | | | | | | |
|---|---|---|---|---|---|---|
| | | \multicolumn{5}{c}{Run-rate NPS acquired (£m)} |
| | | £0m | £10m | £20m | £30m | £40m |
| | 8x | 15.4% | 16.2% | 17.0% | 17.7% | 18.4% |
| NPS | 9x | 15.4% | 16.2% | 16.9% | 17.5% | 18.2% |
| Acquisition | 10x | 15.4% | 16.1% | 16.8% | 17.4% | 18.0% |
| Multiple | 11x | 15.4% | 16.1% | 16.7% | 17.2% | 17.7% |
| | 12x | 15.4% | 16.0% | 16.5% | 17.0% | 17.5% |

Note: Base case in bold.

## Award from Napster litigation

There is an opportunity that Dice could be awarded up to $100m from the outcome of litigation with Bertelsmann for investing in Napster and promoting music piracy. Assuming these proceeds were used to pay down debt, the impact is +0.2% to IRR and +0.02x to CoCM.

Page 15 of 16

Confidential



TF0000107938

DRAFT                                        terra firma

**Appendix 6: Potential Publishing Targets**

| Target | Description |
|---|---|
| Parts of BMG/UMG Publishing | • BMG/UMG may be required to divest some businesses to satisfy the competition commission |
| Chrysalis Music | • 2005 NPS: £10.7m (Bowie, Blondie, Outkast) |
| Blue Mountain Music | • Administration of the Bob Marley catalogue<br>• £6.2m turnover in 2005 |
| Stage Three Music | • Aerosmith, Gerry Rafferty and ZZ Top<br>• £4.3m revenue, £1.8m operating loss<br>• Owned by Apex/Ingenious Ventures |
| Bug Music | • Manages 120,000 copyrights<br>• Backed by Spectrum Equity Partners |
| Really Useful Music | • Andrew Lloyd Webber's private company<br>• Publishing division potentially underperforming |
| Windswept Pacific | • Trio & Quartet catalogues of 60s-70s songs<br>• Owned by FujiPacific Music<br>• Management looking for MBO opportunity |
| Cherry Lane Music | • Partner in the television, motion picture, theatrical and music industries<br>• Songwriters include John Legend and Black Eyed Peas<br>• Founded by Milton Okun |
| TVT Records | • Leading US independent label and music publisher – Scott Storch (premier songwriter for Snoop Dogg, Beyonce, Justin Timberlake)<br>• Strong position in digital distribution |
| Other | • Production / background music catalogues |



Confidential                                TF0000107939

terra firma

# Memo

| | |
|---|---|
| **To** | Riaz Punja |
| **cc:** | Francois van der Spuy, Don Hoang, Patrick Sader, Michael Hedegaard |
| **From** | Stephen Seymour |
| **Date** | 2 March 2007 |
| **Subject** | Project Dice: Model Update |

<u>Market diligence highlights</u>

Publishing

- Overall market growth driven by Synchronization, Ringtones, and Performance, offset by decline at mechanical revenue.
  - McKinsey is slightly more bullish (2-3% CAGR '06-'12) than Enders (1.7% CAGR '06-'12).
- Core phonomechanical revenue (~33% of industry) forecast to decline at 3% CAGR through FY 2012, due to declining track sales and increased pricing pressure.
  - Additional risk from renegotiation of statutory phonomechanical rates in US, which comprises 33% of phonomechanical revenue (11% of total publishing industry revenue).
    - Based on McKinsey and Enders forecast, TF Base Case assumes 26% loss in US phonomechanical revenue (3% industry-wide losss).
    - Recorded Music companies expected to seek a rate reduction that could reduce revenue by 56% in the US (6% industry-wide).
- Applying midpoint McKinsey market growth forecast (2.5% CAGR through CY 2012), TF Base Case forecasts total Dice Publishing revenue ('06-'12) CAGR of 1.4%.
  - Dice is below market growth rate as declining mechanical is 45% of publishing revenue (compared with 33% overall).

Recorded Music

- Overall market will continue decline, as digital not only fails to compensate for physical, but also accelerates its decline. In 2012, digital revenue is 25% of total market.
  - Disaggregation and reduction in retail space reduce total track sales (4.2% CAGR decline '06-'12).
  - Pricing declines forecast for digital (4.4% CAGR '06-'12) and physical (~2%).
  - Unit purchasing limited by "fair use" conversion of CD → digital, and limited "format replacement" that has driven growth in the past.
    - Internet-based file sharing piracy is not regarded as a primary driver of revenue decline going forward.
- Upside on mobile downloads minimized by "sideloading" of music tracks from computer to handset.
- Applying McKinsey market growth rates, Base Case forecasts Dice Recorded Music revenue declines at an average annual rate of 3.7%.
  - Market share improves slightly to reflect releases delayed until 2008.
    - Physical: 9.9% in FY 2007 → 10.5% in 2008, constant thereafter.
    - Digital: 9.2% in FY 2007 → 9.7% in 2008, constant thereafter.



Page 1 of 5

Confidential

TF0000107945

A-458

terra firma

**Dice Purchase Price & Valuation**

The table below illustrates Dice's enterprise value and funding required at 270p/share, the rumoured range of Whist's most recent approach.

| Dice Enterprise Value @ 270p/share | |
|---|---:|
| (£m, unless noted) | |
| Per share price (p) | 270 |
| FD shares outstanding* | 938 |
| Equity valuation | £2,532 |
| Net debt** | 836 |
| Minority interests | 61 |
| Enterprise valuation | £3,428 |
| New Cash in Co | 100 |
| Transaction Expenses | 118 |
| Total Funding Required | £3,646 |
| EV / 2007E EBITDA | 20.5x |
| EV / 2008E EBITDA | 12.6x |

**Impact of Market Diligence on Returns**

If TFCP were to purchase Dice and execute a back-to-back sale of Recorded Music to Whist, assuming the regulatory risk, TFCP could extract value by assuming the regulatory risk and offering synergies to Whist, thereby reducing the entry price of Publishing.

| Valuation of Publishing, post-RM sale to Whist | |
|---|---:|
| (£m, unless noted) | |
| Total Funding Required | £3,646 |
| Recorded Music 2008E EBITDA | £174 |
| Value of Synergies (50% of total) | 100 |
| 2008E EBITDA Multiple | 6.5x |
| Back-to-Back Sale Value of RM | £1,781 |
| 2007E EBITDA + synergies Multiple | 10.7x |
| Net Purchase price – Publishing | £1,865 |
| Publishing 2007E EBITDA | 111 |
| Publishing 2007E EBITDA Multiple | 16.8x |
| Total Debt | £913 |
| Debt / 2007E EBITDA | 8.2x |
| TFCP Equity required | £952 |

Recorded music industry decline may drag EBITDA multiples below 6.5x, and the level of synergies paid for by Whist need to be quantified. The table below illustrates the range of implied Publishing entry multiples based on synergy and EBITDA multiples paid by Whist.

| Implied 2007E EBITDA Multiple for Publishing | | | | | | |
|---|---|---:|---:|---:|---:|---:|
| | | | Multiple paid (2008 EBITDA + Synergies) | | | |
| | % of (£200m) | | 5.5x | 6.5x | 7.5x | 8.5x |
| Synergies Paid by Whist | 0% | £0 | 24.2x | 22.7x | 21.1x | 19.5x |
| | 25% | £50 | 21.7x | 19.7x | 17.7x | 15.7x |
| | 50% | £100 | 19.3x | 16.8x | 14.3x | 11.9x |

The revised market growth assumptions for Publishing reduce IRR and CoCM to Publishing. Base Case assumes a 16x EBITDA exit multiple, which may be aggressive in light of the

Page 2 of 5

terra firma

likelihood that exit is achieved via an IPO or sale to PE funds, rather than to a strategic that could pay for synergies.

| IRR - Publishing held; exit in 2012 @ 16x EBITDA | | | | | |
|---|---|---|---|---|---|
| | | RM 2008E EBITDA Multiple | | | |
| | | 5.5x | 6.5x | 7.5x | 8.5x |
| Synergies | £0 | (4.8%) | (2.8%) | (0.6%) | 2.1% |
| Paid by | £50 | (1.5%) | 1.7% | 5.7% | 10.9% |
| Whist | £100 | 2.5% | 7.8% | 15.4% | 28.0% |

- The table below illustrates the returns at 14x EBITDA exit multiple:

| IRR - Publishing held; exit in 2012 @ 14x EBITDA | | | | | |
|---|---|---|---|---|---|
| | | RM 2008E EBITDA Multiple | | | |
| | | 5.5x | 6.5x | 7.5x | 8.5x |
| Synergies | £0 | (8.4%) | (6.5%) | (4.4%) | (1.8%) |
| Paid by | £50 | (5.3%) | (2.2%) | 1.6% | 6.6% |
| Whist | £100 | (1.4%) | 3.7% | 11.0% | 23.1% |

- At 14x EBITDA exit and adverse outcome in the renegotiations of US phonomechanical rates paid to publishers (resulting in 56% loss of US phonomechanical revenue v. 26% in TF Base Case), the IRR scenarios are:

| IRR - Publishing held; exit in 2012 @ 14x EBITDA | | | | | |
|---|---|---|---|---|---|
| | | RM 2008E EBITDA Multiple | | | |
| | | 5.5x | 6.5x | 7.5x | 8.5x |
| Synergies | £0 | (10.2%) | (8.4%) | (6.2%) | (3.8%) |
| Paid by | £50 | (7.2%) | (4.1%) | (0.4%) | 4.5% |
| Whist | £100 | (3.3%) | 1.7% | 8.8% | 20.7% |

### Publishing Acquisition Strategy

Based on (1) Back-to-back sale of Recorded Music at 6.5x 2008 EBITDA and £100m of synergies; (2) Base Case operating assumptions, and (3) exit of Publishing in FY 2012 at 14x EBITDA, in order to generate a 20% IRR:

- Dice must acquire £167m / US$322m of NPS at 10x NPS, (87% of current NPS).
  - For reference, Famous Music (which Viacom is currently selling) has $40m of NPS.

### Assuming no RM sale to Whist

If RM is held for exit in 2012 at 7x EBITDA (together with Publishing at 14x EBITDA) at Base Case operating assumptions, the total deal returns are negative given the declining revenue profile:

- IRR: -11%
- CoCM: 0.6x.

Page 3 of 5

terra firma

### Impact of Dice RM acquisition to Whist

If Whist were to pay 6.5x multiple for 2008 EBITDA + £100m synergies, the acquisition is $0.60 (67%) accretive by year two, provided that Whist is able to achieve £200m (US $390m) of synergies in a combined company.

The pro forma EPS calculation for years 1-2 are summarized in the table belows:

| (US$m) | FY ending June 2008 | | | |
| --- | --- | --- | --- | --- |
| | Dice Adjusted* | Whist | Synergies** & Trans. Exp. | Pro forma |
| Revenue | 2,633 | 3,671 | 0 | 6,304 |
| EBITDA | 359 | 549 | 195 | 1,103 |
| EBIT | 308 | 310 | 195 | 813 |
| Restructuring costs | (52) | | (273) | (325) |
| Interest | | (159) | (328) | (487) |
| PBT | | | | 1 |
| Tax | | | | (0) |
| Net Income | | | | 0 |
| Shares outstanding | | | | 153 |
| EPS | | 0.61 | | $0.00 |

| (US$m) | FY ending June 2009 | | | |
| --- | --- | --- | --- | --- |
| | Dice* adjusted | Whist | Synergies** & Trans. Exp. | Pro forma |
| Revenue | 2,515 | 3,813 | 0 | 6,328 |
| EBITDA | 404 | 593 | 390 | 1,387 |
| EBIT | 351 | 353 | 390 | 1,094 |
| Restructuring costs | (15) | 0 | (273) | (288) |
| Interest | | (145) | (328) | (473) |
| PBT | | | | 332 |
| Tax | | | | (100) |
| Net Income | | | | 233 |
| Shares outstanding | | | | 155 |
| EPS | | 0.90 | | $1.50 |

\* Dice projections adjusted to FY ending June and converted at US$1.95/£.
\*\* Assumes synergies realized 50% in year one and 100% by year two.

- If Whist were to pay 7.5x multiple for 2008 EBITDA + £100m synergies, the acquisition is still accretive by year two.
  - o Interest expense increases to $379m.
  - o Pro forma 2009E EPS $1.23 ($0.33 accretive).



Confidential

TF0000107948

A-461

terra firma

**Summary changes to TF Base Case Operational Assumptions**

| Business / Driver | Old Assumption | New Assumption | Rationale |
|---|---|---|---|
| Total RM Industry | 0.5% CAGR growth ('06-'12) | 3.4% CAGR decline (CY'06-CY'12) | McKinsey analysis<br>Enders (4.0%)<br>Digital accelerating, not compensating for decline in physical |
| **Physical** | | | |
| Market Growth (FY'07-FY'13) | 8.5% CAGR decline | 8.1% CAGR decline | McKinsey (8.1%) forecast; Enders (9.3%) |
| Dice Revenue decline | FY 2007: 13%<br>FY 2008: 3.3%<br>FY '08-'13: 7.6% CAGR | FY 2007: 18%<br>FY2008: 9.3%<br>FY '08-'13: 7.7% CAGR | Adjusted for second revenue warning |
| Dice Market Share | 2007: 10.0%<br>2012: 10.8% on constant currency | FY2007: 9.9%<br>FY2008: 10.5% on constant currency | Slight uplift in FY2008, no change thereafter |
| **Digital** | | | |
| Market Growth (FY'07-'13) | Digital: 34% CAGR<br>Mobile: 8% CAGR | Digital: 21.7% CAGR<br>Mobile: 9.3% CAGR | Digital revenue 25% of market in CY 2012 (v. >50% in old assumptions) |
| Dice Revenue Growth ('07-'13) | 39% CAGR | 20% CAGR | Growth consistent with market; difference is CY → FY adjustment |
| Dice Market Share | 2007: 3.9%<br>2012: 7% | FY'07: 9.2%<br>FY'12: 9.8% | Correction for Dice digital '07 revenue composition |
| **Recorded Music EBITDA Margins** | | 2007: 4.7%<br>2009: 16.5%<br>2013: 10.0% | Poor trading in 2007<br>Publisher royalty costs savings<br>Declining revenue |
| **Music Publishing** | | | |
| Market | 6% CAGR through 2012 | 2.5% CAGR<br>• Mechanical: – 4.1%<br>• Synchronization: +6.8%<br>• Performance +5.1%<br>• Other: +1.9% | Midpoint of McKinsey projections<br>Enders forecasts 1.7% CAGR<br>• Possible further downside on phonomechanical rates |
| Revenue growth through FY2013 | 6% CAGR | 1.4% CAGR<br>• Mechanical: – 4.7%<br>• Synchronization: + 6.3%<br>• Performance + 5.0%<br>• Other: + 1.9% | • Dice growth is below market due to overweight in declining phonomechanical revenue (45% of revenue v. 33% of market) |

Page 5 of 5



onfidential

TF0000107949

**To:**    Stephen Seymour[Stephen.Seymour@terrafirma.com]
**Cc:**    Antoon_Schneider@mckinsey.com[Antoon_Schneider@mckinsey.com];
Philipp_Nattermann@mckinsey.com[Philipp_Nattermann@mckinsey.com];
Miles_Graham@mckinsey.com[Miles_Graham@mckinsey.com];
Helen_Puddefoot@mckinsey.com[Helen_Puddefoot@mckinsey.com]; Michael
Hedegaard[Michael.Hedegaard@terrafirma.com]
**From:**    Peter_Reid@mckinsey.com
**Sent:**    Wed 5/16/2007 8:19:34 AM
**Importance:**    High
**Sensitivity:**    None
**Subject:**    Final Version of McK Docs

<u>MarketAttractivenessDiceV3.zip</u>
<u>Cost side 15 May 2007 vm2.ppt</u>
<u>Growth and business transformation 15 May 2007 v6.zip</u>

Stephen,

I have attached below a consolidated set of the three documents that we owe you for banks.
Unfortunately, there was an issue with the Disclaimer included within the previous versions, so I would
ask if you could resend them to the banks if they have already gone out (other than that they have not
changed from last night).

Will give you a brief call to follow-up.

Apologies,

Peter


...........................................
Peter Reid

Tel:  +44 (0) 207 961 5468
Fax:  +44 (0) 207 339 5468
Mob: +44 (0) 788 7575175


```
+=========================================================+
This message may contain confidential and/or privileged
information.  If you are not the addressee or authorized to
receive this for the addressee, you must not use, copy,
disclose or take any action based on this message or any
information herein.  If you have received this message in
error, please advise the sender immediately by reply e-mail
and delete this message.  Thank you for your cooperation.
+=========================================================+
```

Confidential                                                        TF0000092476

This email has been scanned by the MessageLabs Email Security System.

For more information please visit http://www.messagelabs.com/email

---

Confidential

TF0000092477

| Name | Size | Modified |
|------|------|----------|
| letAttractivenessDiceV3.ppt | 4,408,832 | 5/16/2007 9:09 AM |

Confidential

TF0000092478

Comment

Confidential

TF0000092479

CONFIDENTIAL

# Terra Firma Project Dice
# Cost improvement potential

A-466

01 March 2007, updated for cost information in VDD

This report is solely for the use of client personnel.  No part of it may be
circulated, quoted, or reproduced for distribution outside the client
organisation without prior written approval from McKinsey & Company.
This material was used by McKinsey & Company during an oral
presentation; it is not a complete record of the discussion.

# DISCLAIMER

This document and the analyses and conclusions set forth herein are based on information that has mainly not been generated by McKinsey & Company and has not, therefore, been subject to our independent verification

The analyses and conclusions contained in this document were conducted on an accelerated basis, reflect our perspectives concerning Dice's business plan and do not purport to contain or incorporate all the information that would be required for Terra Firma to properly evaluate an acquisition of Dice. Accordingly, the Terra Firma must conduct more detailed analyses for the purposes of their review of the transaction

The analyses and conclusions contained in this document are based on various assumptions that we have developed with the Terra Firma and their respective advisors in this project, which partly may or may not be correct, being based upon factors and events subject to uncertainty. Such assumptions were developed solely as a means of illustrating the principal considerations that may be taken into account and independently evaluated. Future results or values could be materially different from any forecast or estimate contained in these analyses

McKinsey makes no representation or warranty, express or implied, as to the accuracy or completeness of the underlying assumptions, estimates, analyses, or other information contained in this document, and nothing contained herein is or shall be relied upon as a promise or a representation, whether as to the past, the present, or the future

This document is solely for the use of the Terra Firma. No part of it may be circulated, quoted, or reproduced for distribution outside the client organizations without prior written approval from McKinsey & Company. It is not intended to, and may not, be relied upon by any person or entity and, therefore, any person or entity who receives this document or the information contained herein, with McKinsey & Company's permission or otherwise, is hereby put on notice that (i) they are responsible for their own analyses and may not rely on any information contained herein, and (ii) McKinsey & Company makes no representations or warranties, including with respect to the accuracy or completeness of the information contained herein or any other written or oral communication transmitted or made available to the 3rd party, and expressly disclaims any and all liabilities based on such information or on omissions there from

A-467

1

Confidential

TF0000092481

# EXTERNAL INTERVIEWS AND DATA SOURCES

| Interviewee | Status |
|---|---|
| **External sources** | |
| Ex Universal country CEO | Completed |
| Ex Dice recorded music executive | Completed |
| Music Executive for Digital strategy | Cancelled |
| Ex Dice marketing and strategy executive | Completed |
| Ex BMG Media analyst | Completed |
| CEO independent label | Completed |
| US Music Lawyer | Completed |
| UK Media analyst | Completed |
| EU Anti-trust and performance rights lawyer | Completed |
| Ex Dice Marketing | Completed |
| Founder of digital music web site | Completed |
| Media analyst | Completed |
| Former Major strategy director | Completed |
| Former executive at Sony and Microsoft | Completed |
| Clare Enders and team | Completed |
| Former analyst on digital licensing details | Completed |
| Former Sony media analyst | Completed |
| Former MTV analyst/independent publisher | Completed |
| Former Music industry strategy analyst | Completed |
| CEO US collection agency | Completed |
| Executive UK publishing association | Completed |
| Executive of UK Independent publisher | Completed |
| Executive US Digital Music Distributor | Completed |

**Data sources**

- IFPI
- RIAA
- Enders
- PWC
- Credit Suisse

A-468

Source: Team analysis

2

Confidential

TF0000092482

# AGENDA

- **Recorded Music**
  - **Efficiency improvements**
    - **Current cost base and RE4 initiative**
    - McKinsey estimate of cost savings through efficiency

  - Additional procurement savings

  - Impact assessment

- Music publishing

A-469

3

Confidential

TF0000092483

# DICE HAS BEEN RESTRUCTURING SINCE 2002 BUT SOME COSTS HAVE CREPT BACK INTO THE BUSINESS

| Previous announcements | Estimated impact, £m |
|---|---|
| **March 2002 – 2-year restructuring plan**<br>• Cuts 1,900 people from Recorded Music<br>• Drops 25% of artist roster - 400 acts | 100 |
| **March 2004**<br>• 20% reduction in Dice headcount -1,500 people including outsourcing manu-facturing and distribution (900 people)<br>• Reduced artist roster by 20%, merged marketing departments in some smaller companies and some niche labels into larger labels - 600 people | 50 |
| • 3-year Technology change programme to cut cost by £20m<br>• Expected one-off cash costs of £75 million and all savings delivered by March 2006 | 20 |
| **May 2006**<br>• Identifies an additional £30 million of costs savings from<br>  – New organisational structure for Japan<br>  – Sale and leaseback agreements for Japanese and US properties<br>• Expected cost of restructuring of £60 million<br>• Expect to deliver £10 million by March 2007 and the remainder by March 2008 | 30 |

A-470

\* In 2002 Dice had 8,664 employees by March 2006 reduced to 5,672
\*\* Estimated at £90 million for recorded Music
Source: Company press releases, analysts commentary

4

Confidential

TF0000092484

# DESPITE THE RESTRUCTURING DICE IS STILL SIGNIFICANTLY BELOW WARNER'S LEVELS OF PRODUCTIVITY



**Dice Recorded Music headcount evolution**
Units

**Dice Recorded Music revenue per employee,**
£k per employee

In comparison, Warner Recorded Music generates approximately £400-450k per employee*

Headcount values: 8,664 | 7,439 | 7,343 | 6,043 | 5,672
Years: * | 2003 | 2004 | 2005 | *

Revenue per employee: 234 | 238 | 235 | 265 | 293
Years: * | 2003 | 2004 | * | *

A-471

* WMG reported 4,000 employees in FY2006 split between Publishing and Recorded Music, but does not provide detailed information on the evolution of employee numbers

Source: Annual reports; interviews

5

Confidential

TF0000092485

# WARNER HAS USED MANY OF THE SAME LEVERS AS DICE, BUT USED THEM EARLIER AND MORE AGGRESSIVELY

| | Key actions | Reported use of this lever by Dice to date |
|---|---|---|
| **Rationalise local offices** | • Strategic decision to redesign existing global network to reduce presence in minor, unprofitable countries |  |
| **Reduced the complexities in label structure** | • While Elektra and Atlantic Records still continue to operate as two separate labels, their legal and business affairs, finance and label sales functions were merged, resulting in a 20% reduction in headcount |  |
| **Improved marketing ROI** | • Marketing expenditures reallocated to a smaller number of "higher potential" acts, in order to create greater returns for the invested capital<br>• "The Investor Group cut marketing spend by $140m from $750m"<br>   —*Morgan Stanley equity research* |  |
| **Rationalised number of artists** | • IRR analysis applied to all major artists' signings and rosters leading to a 30% reduction in WMG's artist roster |  |
| **Renegotiated retailer arrangements** | • "In 2004 approximately 20-30% of the marketing spend was going on ineffective retailer discounts" – *Industry analyst* | ? |

- In 2004, WMG forecast recurring costs savings of $250m (approximately 10% of its cost base) from its restructuring with one off restructuring costs of $310m, leading to a 5.1% increase in EBITDA margin to 15.3% in 2005*
- Reduced fixed costs to move the company to a more flexible cost structure with only 25% of costs classified as fixed
- Sold CD and DVD manufacturing, packaging and distribution assets for $1.1 billion
- Investor Group able to take out over 100% of their initial investment within 18 months and still retain a stake

*15.3% for Warner Music Group's operating income before Depreciation and Amortisation and non-recurring items, revenue improved 2% to $2.9 billion

Source:  Press clippings; WMG annual reports; broker reports

6

A-472

Confidential

TF0000092486

# MOST RECENT COST REDUCTION PROGRAMME, RE4, IS DRIVEN PRIMARILY BY STAFF CUTS AND PROPERTY COST SAVINGS



|  | RE4 savings |
|---|---|
| **Head count reductions** | 61 |
| **Property savings** | 28.6 |
| **Marketing spend** | 0.9 |
| **Other overheads** | ~2.3 |
| (Publishing) | (11) |
| TOTAL SAVINGS FROM 2007 | 105.8 |
| SAVINGS ACHIEVED ALREADY IN 2007 | 5 |
| **TOTAL** | **110.8** |

**January 2007, management announced RE4 cost cutting initiative**

Almost all of RE4 savings driven by two levers
• Staff reduction
• Property savings

A-473

Deloitte due diligence report

7

Confidential

TF0000092487

# AGENDA

- **Recorded Music**
  - Efficiency improvements
    - Current cost base and RE4 initiative
     – **McKinsey estimate of cost savings through efficiency**
  - Additional procurement savings
  - Impact assessment
- Music publishing

A-474

8

TF0000092488

# SUMMARY OF COST STRUCTURE OF DICE'S RECORDED MUSIC DIVISION
### £m, 2007A

ESTIMATES
☒ Fixed
■ Variable



Primary areas for costs cutting ~£800 million



| 1,414 | 206 | 356 | 78 | 52 | 253 | 83 | 303 | 78 |

| Reve-nues | Manufact uring & distribut-ion | Royalties | A&R variable | A&R fixed | Market-ing variable | Market-ing fixed | Over-head/ Other* | EBITDA |
|---|---|---|---|---|---|---|---|---|

| % of reven-ues | 100 | 15 | 25 | 6 | 4 | 18 | 6 | 21 | 6 |
|---|---|---|---|---|---|---|---|---|---|

**Observations**

- Dice has outsourced manufacturing and distribution, and announced cuts in both headcount and artist roster

- "Going forward our flexible cost structure with about 25% fixed and 75% variable costs enables us to be nimble and take advantage of the migration to digital"
  *Warner Annual report 2006*

**Assumptions**
- Marketing and A&R costs split between fixed and variable as per broker estimates
- Marketing and A&R fixed costs include costs explicitly promised in artists contracts e.g. level of marketing support and recording costs
- Manufacturing and distribution outsourced (company states costs are 100% variable) assumed to only apply to physical format
- Overheads assumed fixed in the short term and exclude depreciation

\* Includes all provisions except advances; advances are included in A&R costs

Source: Company data; industry interviews, ML estimates, Team analysis

A-475

9

Confidential

# RECORDED MUSIC COST IMPROVEMENT:  FOCUS ON THREE LARGEST AREAS



**Observations**

- "Retail spend needs to be cut or fundamentally changed.  We are increasing spend as sales drop" – *Marketing VP, Major Label*
- "We need to learn how to fail faster" – *Marketing GM, Major Label*
- "There is very little analytical work in marketing" – *Ex-Dice Executive*
- "In the 1990s this was a very easy place to cut, we cut 12% of marketing costs without any trouble – now my guess is it would be harder" – *ex-Sony executive*
- "Warner made significant cuts in this areas – close to 20% of marketing costs" – *Morgan Stanley analyst\**

- "Outside of Warner, there has been very little performance measurement in A&R" – *McKinsey Media expert 2*
- "Traditionally the sacred cow of the music company, but significant opportunities to make savings by measuring individual performance and cutting poor performers" – *McKinsey Media expert 1*
- "A&R get paid a lot and I cannot believe the corporate people would under pay themselves" - *Ex-BMG  Executive*

- "Business discipline in this industry is ridiculously poor" – *Independent label executive*
- "There is a tail of unprofitable countries that can be closed and covered from elsewhere – look at Belgium for example" – *Independent label executive 2*
- "There is a huge amount of musical overlap between labels [implying labels can be merged reducing both A&R and back office costs]" – *ex-Dice employee 1*
- "Label heads are often the "blockers" to any cost reduction – you need to kill some sacred cows to get results.  Warner removed the head of Elektra, which sent a big signal to the rest of the company" – *McKinsey Media expert 1*

\*Reported as $140 million reduction in marketing costs

Source: Industry interviews

10

Confidential

TF0000092490

A-476

# ① MARKETING SPEND IS FOCUSED ON DRIVING PHYSICAL SALES

EXAMPLE MUSIC COMPANY  ▨ Major cost categories

| | Types of activity | Share of spend | Includes . . . |
|---|---|---|---|
| **Promo** | Radio promo | **20-30%** | • Staff & consultant costs to drive radio play<br>• Cost of radio events; artist visits |
| | Video production | 1-5% | |
| | Tour support | 1-5% | |
| | Public relations | 1-5% | |
| **Marketing** | Consumer marketing | } **30-40%** | • TV ads, media promotions<br>• Album artwork, lining & casing<br>• Ads in Trade publications |
| | Trade (e.g., Billboard) | | |
| | Album packaging | | |
| **Retail/ channel spend** | Retail Co-Op & other | **20-30%** | • In-store placement, in-store promotions<br>• End-cap displays, special displays<br>• Payments to 3rd parties for merchandising stores, filling racks & managing returns |
| **Digital** | BASICs (non-media spend) | } **~0-5%** | • On-line relationship development/promo (e.g., blogs, communities, fan clubs)<br>• Search terms<br>• Display/rich media ads |
| | Online advertising | | |
| | Online retail | | |
| **Strategic Marketing** | Consumer brand alliance | } **1-10%** | • Staff & consultant costs to drive tie-in with 3rd party brands<br>• Staff & consultant costs to feature music in 3rd party media creations |
| | TV/Game/Mobile music inclusion | | |



**Observations**

• Three largest areas of marketing spend are focused on physical sales
  – Direct consumer marketing
  – Retail discounts
  – Radio promotions

• "There is a significant opportunity in marketing budgets to reallocate spend to more effective channels to drive digital sales rather than spending more to drive declining physical sales"
  *Independent label executive 1*

A-477

Confidential

TF0000092491

# ① IMPROVED MARKETING ROI: MEASURING AND PRIORITISING MARKETING BUDGETS COULD LEAD TO COST SAVINGS

**Dice Marketing spend is comparable to the top end of Warner's performance**

**Marketing expenditure, % of sales**

| | 20–23 | 22 |
|---|---|---|
| Warner Music Group* | | Dice |

| Actions | Observations |
|---|---|
| **Focus on priority acts** | • "The concept of spending less on marketing and accepting a lower chart position, but making more money is totally foreign to the industry" – *ex-Sony analyst*<br>• "Warner increased the spend on its high potential acts" – *Warner* |
| **Measure performance and spend effectiveness** | • "There is very little analytical work in marketing" – *ex-Dice employee 2*<br>• "Companies are still spending 20-30% of their marketing budget on radio promotions, which are much less effective" – *McKinsey media expert 3*<br>• "Companies are spending only 1% of their budget on the fastest growing channel – the web" – *ex-Sony Executive* |
| **Subscriptions** | • "We spend GBP 13 – 14 million per year on industry bodies which we could cut by perhaps a third    - *EMI management* |
| **Reduce long-tail of expenses** | • "There is long tail of expenses which can be cut – e.g., marketing people courier by DHL a free new album to a list of thousands of people" – *McKinsey media expert 3* |

**Potential impact**

• "Typically a 5-15% cost saving is achievable by refocusing on the high potential acts and more cost effective forms of marketing" – *McKinsey media expert 1*
• Saving 10-15% of costs brings savings of £33–51m
  – Removing £8-13 million of fixed costs
  – Reducing variable costs by 1.8-2.7% of sales

**Potential risks**

• Potential savings may need to be reinvested in promising acts to drive revenue
• Difficult to quantify how much of the cost savings in Marketing have already been captured

**A-478**

* Warner recorded music marketing cost as a percent of sales from 2004–2006
Source: Team analysis, Company data and Industry interviews, Deloitte due diligence report

12

Confidential

TF0000092492

# ② RATIONALISE A&R:  DICE'S A&R SPEND IS ALMOST DOUBLE THE AMOUNT SPENT BY WARNER



**Dice's A&R spend is almost 2x higher than Warner's**

A&R, % of sales

Warner Music  Dice**
Group*

Impact of greater use of internet in A&R model calculated separately in business model assessment

## Observations

- "A&R has always been sacred -- there is rarely any real performance management or monitoring of the bottom line" – *Independent label executive 2*

- "Our A&R people work with very simple metrics" – *EMI management*

- "One of the first actions of the new owners of Warner was to remove the head of Electra" – *Independent label executive 2*

- "The investor group took a hatchet to Warner – including the A&R group" – *ex-Universal executive*

- "To manage A&R costs you can do three things:

  ① Bring in a performance management mindset and simple KPI's – e.g., the number of artists selling over 1m albums per A&R person

  ② Remove excess back office A&R functions – typically can take out 10%

  ③ Innovate to become more efficient: You need to use the internet much more - use Myspace!" – *McKinsey Media expert 1*

- "The A&R team are still more likely to contact a person after reading NME than spot them on Myspace" – *Independent label executive 1*

## Potential impact

- "Warner are believed to have taken out 10-20% within 18 months" – *ex-Sony BMG analyst*

- Cutting A&R spend by 10-20% reduces the costs to 10-11% of sales (still above Warner's costs) saving £14-27 million

  – Removes £6-11 million of fixed costs

  – Reduces variable cost by 0.6-1.2% of sales

## Potential risks

- Warner's model is more focused on the US and large global acts, which may make it harder to cut Dice's A&R costs

A-479

* Warner Recorded music A&R costs as a percent of sales for 2004–2006
** Dice A&R costs for 2007

Source: Company data, Industry interviews, team analysis, Deloitte due diligence report

13

Confidential

TF0000092493

# ③ REDUCE OVERHEAD SPENDING

**Actions**   **Observations**

**Ⓐ**
**Rationalise "tail" geographies**

- "Dice has a local presence in 50 different countries – some smaller ones will be barely profitable"
  – *Independent Label Executive 2*
- "We need to move out of more markets [and consolidate] like we are doing in the Nordics"
  – *EMI Marketing*

*Dice's overhead spend is 4-6% of sales higher than Warner's*

**Overhead/Other, % of sales**

16–18     22–26

Warner Music   Dice**
Group*

**Ⓑ**
**Consolidate shared functions and back office**

- "The music companies are the classic matrices" – functions are present in both labels and countries and then also at the group level"
  – *Independent Label Executive  2*
- "Aside from manufacturing, there is almost no outsourcing of back office functions, e.g., royalty collection "
  – *ex-Dice employee 2*

**Ⓒ**
**Consolidate labels**

- "Every A&R 'star' wants his own label and then every label wants their own marketing team and support functions"
  – *ex-Vivendi executive*
- We consolidated most of the back office but we haven't touched the front office yet" – *EMI management*

**Potential impact**

- "Unless a PE firm has run this company expect cost savings of easily 10–20% – but you will need to be aggressive" – *McKinsey Media expert 2*
- Rent saving of £20m plus saving of 10–20% on rest of cost give cost savings of £48–75m

**Potential risks**

- Dice has announced they are trying to attack central overhead, so some of these savings may be planned

A-480

* Warner Recorded music overhead costs as a percent of sales for 2004–2006
** Dice overhead costs for 2006 – estimated at 26% of sales by a broker and 22% by an ex-Dice employee (based on a marketing cost of £360 million)

Source: Company data, Industry interviews, team analysis

14

# ③A RATIONALISE THE NUMBER OF LOCAL OFFICES

## Regional headcount split

100% = 6,312*



Latin America Other
U.K. 19
North America 32
Asia Pacific 20
Rest of Europe 22
5  2

## Estimated revenue per employee**
£ k per FTE



| Region | Value |
|---|---|
| Rest of Europe | 402 |
| North America | 283 |
| U.K. | 257 |
| Asia Pacific | 243 |
| Latin America | 241 |
| Other | 198 |

£293k

## Observations

- "We are a global business with a presence in more than 50 countries"
  – *Dice annual report*
- Limited opportunity for the sale-and-leaseback on properties, with Japan and US offices already leased
- Potential to consolidate small offices in Europe – e.g., Dice has separate offices in countries Scandinavian and Baltic countries
  – Sweden
  – Norway
  – Denmark
  – Latvia
- "Real savings can come from rationalising the back office functions"
  – *Ex-Dice employee 1*

**A-481**

\* Split is not broken down between recorded music and music publishing
\*\* Revenue per employee is for both publishing and recorded music
Source: Company data, Industry interview

15

Confidential

TF0000092495

# 3A RATIONALISE SMALL AND UNPROFITABLE COUNTRY OFFICES

<u>ESTIMATES</u>

**Typical small country office**

**Observations**



Typical office size:  15–30
Office and staff costs:  £2–3m*

- "There are some territories where local presence is crucial, but there are others like Belgium which could be consolidated"
  - *Independent Label Executive*

- Dice has offices in ~50 countries including

  - Belgium, Norway, Denmark, Sweden, Latvia, Greece, Slovenia, Czech Republic, Slovakia

  - Consolidating or closing 5 small offices could save £5–10m

  - Dice estimates they saved £4m by closing Hong Kong and Miami

\* Estimate includes staff cost, office overhead and maintenance costs
Source: Industry interviews, Company

16

Confidential

TF0000092496

A-482

# 3B CONSOLIDATE SHARED FUNCTIONS ACROSS LABELS AND ACROSS GEOGRAPHIES

**Dice geographical presence**

**Dice Music local organization**

**Observations**



**Typical structure**

**Key features**

Large country (e.g., U.K.)

- Multiple labels with a mix of shared/un-shared functions
- Several levels of hierarchy
- Warner revenue per employee is £400-450k per person versus Dice at ~£300k

Smaller country (e.g., Sweden)

- Fewer/one "umbrella" label
- Some people can occupy multiple places on hierarchy
- Some functions (e.g., IT) can be shared across a region (e.g., Scandinavia)

- "Some functions like finance are already centralized, but this can often be taken further" – *McKinsey media expert 3*
- "Dice has yet to consolidate some functions like IT across countries" – *Ex-Dice employee*
- "Salaries and contracts in this industry can be incredibly generous – even a client two levels down in the finance function had a contract written by an entertainment lawyer" – *McKinsey media expert 1*

A-483

Source: Dice annual reports; interviews; McKinsey analysis

17

Confidential

TF0000092497

# 30 LABEL STRUCTURE IS COMPLEX WITH MULTIPLE OVERLAPS IN MANY COUNTRIES

A-484

*Since January 2007 Virgin Records and Capitol Music have merged in the U.S. to create the Capitol Music Group*


Dice also operates through umbrella label EMI Music in multiple key countries (e.g., France, Italy)


Despite some attempts by former CEO Alain Levy to restructure labels' organisation (especially in the U.S.A), the structure remains intricate (e.g., more than 10 labels are active in the U.S.A.)

| Label | Main genres | Major artists | Geographical focus |
|---|---|---|---|
| Capitol | • Pop, dance, rock, R&B, jazz, oldies, country | • Tim Turner, Al Green, Frank Sinatra, Beach Boys, Beastie Boys | • **Global**, but centering on the U.S.A |
| Virgin | • R&B, pop, rock, alternative, soul, hip-hop | • Robbie Williams, Ben Harper, Gorrilaz, Lennie Kravitz, Massive Attack, Janet Jackson | • **Global**, but centring on the U.S.A |
| blue note | • Jazz | • Norah Jones, Stan Getz, Herbie Hancock, Madredevs | • **Global** |
| EMI CMG | • Christian music | • Switchfoot, Stacie Orrico | • U.S.A. |
| Mute | • Alternative, rock, dance | • Depeche Mode, Goldfrapp, Moby | • Mainly U.K./Ireland and Continental Europe |
| Astralwerks | • Alternative, rock, dance, hip-hop | • Air, Badly Drawn Boy, Chemical Brothers, Fatboy Slim, Phoenix | • Mainly U.K./Ireland and Continental Europe |
| PRIORITY RECORDS | • Hip-hop | • N.W.A. | • U.S.A. |

Source: Dice annual reports; interviews; McKinsey analysis

18

Confidential

TF0000092498

# SUMMARY OF COST SAVINGS AND OVERLAP WITH 2007 RESTRUCTURING (EXCLUDING PROCUREMENT)



ESTIMATES
- Fixed
- Variable



Total efficiency improvement drives cost savings of £110-152m

Recorded Music from 2007A cost base
£ million

(1) Improve marketing RoI: £33-51m
(2) Rationalise A&R: £14-27m
(3) Reduce overhead: £48-75m
Total: £110-152m

25-38
8-13
8-16
6-11
48-75
1,180-1,226

2007 costs *     *     *     *     2007 Pro forma

Savings as % of 2007A cost base    10-15%    10-20%    10-20%**

**Assumptions**
- Marketing and A&R costs split between fixed and variable by broker estimates
- Overheads assumed fixed and exclude depreciation

---

Incremental savings above proposed 2007 restructuring can capture from ~£16-60m

96
8-35
6-20
2-5    1,180-1,226

2007A    2007 announced cost savings    Marketing    A&R    Overhead    2006 Pro forma

% of 2007A cost base    7%    1-3%    88-92

**Assumptions**
- Announced fixed cost savings have been allocated to overhead, except savings from merger of Virgin and EMI in US, where we have assumed 50% is from the removing the overlap in A&R personnel and budgets

*Announced restructurings include £10 million of distribution costs and do not include the Music Publishing or further potential savings

** Including £ 20 million in real estate

Source: Company data; industry interviews, ML estimates, Team analysis

19

A-485

Confidential

TF0000092499

# AGENDA

- **Recorded Music**
  - Efficiency improvements

 - **Additional procurement savings**

  - Impact assessment

- Music publishing

A-486

20

Confidential

TF0000092500

# EVEN AFTER EFFECTIVENESS IMPROVEMENTS, THE PURCHASING BASE IS £250-280M

<u>ESTIMATES</u>
Procurement base

£m

**Breakdown of cost base, 2007 figures adjusted for effectiveness savings**



A-487

Source: Deloitte vendor due diligence; Review of EMI Group global procurement

Confidential

21

TF0000092501

# IMPROVED PROCUREMENT COULD ACHIEVE SIGNIFICANTLY MORE THAN THE INITIAL INTERNAL ESTIMATE

ESTIMATES

£m

| Spend (size) category* | Examples of spend (size)* | EMI/Ussher estimated savings, % | McKinsey benchmarks | Sizings Ussher | McKinsey low estimate (10%) |
|---|---|---|---|---|---|
| • A&R (50) | • Video production<br>• Recording studios<br>• Concert tickets<br>• Limos | 2.5<br>2.5<br>10<br>4 | • 10—15% average savings in specialist | ~2 | ~5 |
| • Marketing (120) | • Media advertising<br>• Print<br>• Design start work | 5<br>2.5<br>5 | >15%<br>>15%<br>>15% | ~5 | ~12 |
| • Overheads (80) | • Security<br>• Catering<br>• Office copiers and printing | 0<br>4<br>4 | 20–30%<br>15–20%<br>>20% | ~2 | ~8 |
| | Average | 2.5-5% | 10-15% | Total ~9 | ~25 |

Even on reduced purchasing base, procurement process could improve cost base by £25m

This would be in addition to the saving of £110-152m from efficiency

A-488

* Figures from review EMI group global procurement adjusted for efficiency improvements altering base

22

Confidential

TF0000092502

# AGENDA

- **Recorded Music**
  - Efficiency improvements

  - Additional procurement savings

 - **Impact assessment**

- Music publishing

A-489

23

Confidential

TF0000092503

# SUMMARY IMPACT ON P&L – INCLUDING JANUARY 2007 ANNOUNCEMENT

ESTIMATES

**Recorded Music from 2007A cost base**
£ million



Based on original 2007-10 revenue forecasts

|  | Cost base 2007A | * 2007-2010 | * change 2007-2010 | ** 2007-2010 Cost base 2010E | * restructuring savings 2008-2010 | * in 2010E** | 2010E Pro forma costs |
|---|---|---|---|---|---|---|---|
| **EBITDA** | 78 | | | 74 | | | 212-258 |
| **EBITDA margin, %** | 5.5 | | | 5.9 | | | 16.9-20.6 |

**Assumptions**
• Marketing and A&R costs split between fixed and variable by broker estimates
• Overheads assumed fixed and exclude depreciation

*Assumes variable costs reduce with the decline in sales
**Impact of the cost savings in 2010 after the natural decline in variable costs due to the market decline

Source:    Company data; Team analysis

24

A-490

Confidential                                                                TF0000092504

# SANITY CHECK

| | Revenue per employee £k per FTE | EBITDA margin per employee £k per FTE | Number of employees |
|---|---|---|---|
| Dice (2007) | 248 | 14 | 5,700 |
| Dice (2010 with restructuring) | 250 | 15 | 5,000 |
| Dice (2010 with all cost savings included) | 250-277 | 47-52 | 4,500-5,000 |
| Warner Music Group Estimate (2006) | 400-450 | 100-130 | 4,000 |

**Assumptions**
• Assumes 50% of cost savings from staff cuts

\* Warner reports 4,000 employees for both divisions so a range is shown for revenue and EBITDA per employee

Source: Team analysis

25

A-491

Confidential

TF0000092505

## AGENDA

- Recorded Music
  - Efficiency improvements

  - Additional procurement savings

  - Impact assessment

 • **Music publishing**

A-492

26

Confidential

TF0000092506

# TYPICAL BREAKDOWN OF COSTS FOR MUSIC PUBLISHING

INDICATIVE



"With fixed overheads accounting for a significant percentage of the cost – growth through acquisition can generate significant cost savings" – *McKinsey Media Practice Expert*

| Revenues | Royalties | Marketing | SGA | EBITDA |
|---|---|---|---|---|
| 100 | 50–60 | 1–2 | 15–20 | 20–30 |

A-493

Source: Industry interviews

27

Confidential

TF0000092507

# EMPLOYEE BREAKDOWN – MUSIC PUBLISHING

<u>INDICATIVE</u>





A-494

\* Includes HR, synchronization licensing; reception

28

Confidential

TF0000092508

# MUSIC PUBLISHING: SUMMARY EVOLUTION OF EBITDA TO 2010

**Music Publishing from 2006A to 2010**
£ million

ESTIMATES

A-495



| | | | | | | | Cost savings* | **2010E EBITDA** |

**% of 2006 revenues**: 100  55  45  9  19  26

**EBITDA margin, %**: 25.9    31.3

**Assumptions**
- Music publishing market forecast to grow at 2.5% per year until 2010
- Net publishers share reported by analysts at ~45% of revenues
- Staff costs estimated from the total Dice staff cots and the number of employees in publishing division
- Market growth includes estimated improvement in revenue from the collection agency, based on 2% reduction in collection fees
- Staff and other costs assumed to be fixed from 2006-2010

*CAGR for EBITDA 2006-2012

Source: Company data; Team analysis

29

Confidential

TF0000092509

Name                                              Size  Modified
Growth and business transformation 15 March 2007 v5.ppt 6/18/2007 9:11 AM

Confidential                                              TF0000092510

**Comment**

Confidential

TF0000092511

CONFIDENTIAL

# Terra Firma Project Dice

A-498

Market attractiveness assessment
01 March 2007

This report is solely for the use of client personnel.  No part of it may be circulated, quoted, or reproduced for distribution outside the client organisation without prior written approval from McKinsey & Company. This material was used by McKinsey & Company during an oral presentation; it is not a complete record of the discussion.

TF0000092512

# DISCLAIMER

This document and the analyses and conclusions set forth herein are based on information that has mainly not been generated by McKinsey & Company and has not, therefore, been subject to our independent verification

The analyses and conclusions contained in this document were conducted on an accelerated basis, reflect our perspectives concerning Dice's business plan and do not purport to contain or incorporate all the information that would be required for Terra Firma to properly evaluate an acquisition of Dice. Accordingly, the Terra Firma must conduct more detailed analyses for the purposes of their review of the transaction

The analyses and conclusions contained in this document are based on various assumptions that we have developed with the Terra Firma and their respective advisors in this project, which partly may or may not be correct, being based upon factors and events subject to uncertainty. Such assumptions were developed solely as a means of illustrating the principal considerations that may be taken into account and independently evaluated. Future results or values could be materially different from any forecast or estimate contained in these analyses

McKinsey makes no representation or warranty, express or implied, as to the accuracy or completeness of the underlying assumptions, estimates, analyses, or other information contained in this document, and nothing contained herein is or shall be relied upon as a promise or a representation, whether as to the past, the present, or the future

This document is solely for the use of the Terra Firma. No part of it may be circulated, quoted, or reproduced for distribution outside the client organizations without prior written approval from McKinsey & Company. It is not intended to, and may not, be relied upon by any person or entity and, therefore, any person or entity who receives this document or the information contained herein, with McKinsey & Company's permission or otherwise, is hereby put on notice that (i) they are responsible for their own analyses and may not rely on any information contained herein, and (ii) McKinsey & Company makes no representations or warranties, including with respect to the accuracy or completeness of the information contained herein or any other written or oral communication transmitted or made available to the 3rd party, and expressly disclaims any and all liabilities based on such information or on omissions there from

A-499

1

# EXTERNAL INTERVIEWS AND DATA SOURCES

| Interviewee | Status | | Data sources |
|---|---|---|---|
| **External sources** | | | • IFPI |
| Ex Universal country CEO | Completed | | |
| Ex Dice recorded music executive | Completed | | • RIAA |
| Music Executive for Digital strategy | Cancelled | | |
| Ex Dice marketing and strategy executive | Completed | | • Enders |
| Ex BMG Media analyst | Completed | | |
| CEO independent label | Completed | | • PWC |
| US Music Lawyer | Completed | | |
| UK Media analyst | Completed | | • Credit Suisse |
| EU Anti-trust and performance rights lawyer | Completed | | |
| Ex Dice Marketing | Completed | | |
| Founder of digital music web site | Completed | | |
| Media analyst | Completed | | |
| Former Major strategy director | Completed | | |
| Former executive at Sony and Microsoft | Completed | | |
| Clare Enders and team | Completed | | |
| Former analyst on digital licensing details | Completed | | |
| Former Sony media analyst | Completed | | |
| Former MTV analyst/independent publisher | Completed | | |
| Former Music industry strategy analyst | Completed | | |
| CEO US collection agency | Completed | | |
| Executive UK publishing association | Completed | | |
| Executive of UK Independent publisher | Completed | | |
| Executive US Digital Music Distributor | Completed | | |

A-500

Source: Team analysis

2

Confidential

# AGENDA

**Overall music industry overview**

**A** Recorded music
- Market outlook
- Dice baseline

**B** Music publishing
- Market outlook
- Dice baseline

**C** Splitting the businesses

Appendix

A-501

Confidential

TF0000092515

# THE MUSIC BUSINESS – CASH AND PRODUCT FLOWS

→ Product flow
→ Cash flow



* With some contracts, artists can receive a share of the publishing revenues – i.e., when they provide creative input
** Product includes CDs, digital downloads and "real" tones (those that play the actual recording as opposed to the tune)

Source: Team analysis

4

A-502

Confidential

TF0000092516

# OUTSIDE OF PHYSICAL SALES THE MUSIC INDUSTRY FREQUENTLY FAILS TO CAPTURE A SIGNIFICANT SHARE OF THE VALUE

Industry value 2005, $b

<u>ESTIMATES</u>

A-503



* Total wholesale revenues, includes payments to publishers
** Includes rental and public lending

Source: PWC, IFPI, Credit Suisse, Yankee, Enders

5

Confidential

TF0000092517

# RECORDED MUSIC RECEIVES BETWEEN ~40-65% OF THE RETAIL PRICE FOR CDs AND DOWNLOADS AFTER ROYALTIES



A-504

* Equivalent to a retail price of ~$15 per album in the U.S. and a download price of $0.99
** ~70 cents for most tracks but $1.20 for some tracks

Source: Industry interviews

6

Confidential

TF0000092518

# SINGLE DIGITAL DOWNLOADS PROVIDE 3-31 CENTS MORE REVENUE PER TRACK TO RECORDED MUSIC COMPANIES THAN CD ALBUM SALES
2006

**Physical format revenue per track**
US cents



**Digital format revenue per track**
US cents



A-505

Digital track provides 6-107% more equivalent revenue per track than a physical track

Source: Industry interviews; CSFB; Enders 2006

7

Confidential

TF0000092519

# AGENDA

Overall music industry overview

**Ⓐ Recorded music**
  **• Market outlook**
  • Dice baseline

**Ⓑ** Music publishing
  • Market outlook
  • Dice baseline

**Ⓒ** Splitting the businesses

Appendix

A-506

8

TF0000092520

# INDUSTRY SALES PEAKED IN 1995, MOSTLY DUE TO THE CD PLATFORM CYCLE



A-507

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1969 | 1973 | 1977 | 1981 | 1985 | 1989 | 1993 | 1997 | 2001 | 2005 |
| US % of global | - | 44 | 43 | 32 | 36 | 30 | 32 | 32 | 40 | 37 |
| Global % of world Nominal GDP | 0.08 | 0.12 | 0.13 | 0.11 | 0.11 | 0.11 | 0.12 | 0.13 | 0.11 | 0.07 |
| Global % of disposable income | - | - | - | 0.23 | 0.20 | 0.21 | 0.20 | 0.20 | 0.17 | 0.12 |

* Global numbers are for product shipped (which tends to be 10-15% higher than actual retail sales reported by Soundscan)
** U.S. numbers are retail values at suggested list price

Source  IFPI; RIAA

9

Confidential

TF0000092521

# THE GLOBAL MARKET TENDS TO BE VOLATILE

| Annual growth range (nominal) | Number of instances | | |
|---|---|---|---|
| | 1969–1982 | 1983–1996 | 1997–2006 |
| -10 to -5 | 1 | 0 | 3 |
| -5 to -3 | 0 | 0 | 1 |
| -3 to -1 | 0 | 0 | 0 |
| -1 to 1 | 0 | 2 | 3 |
| 1 to 3 | 0 | 1 | 1 |
| 3 to 5 | 0 | 0 | 1 |
| 5 to 10 | 3 | 5 | 0 |
| 10 to 15 | 3 | 3 | 0 |
| 15 to 20 | 3 | 2 | 0 |
| >20 | 3 | 1 | 0 |
| Average | 14.6 | 9.7 | (1.9) |
| Standard deviation | 11 | 7 | 3 |
| Maximum | 36 | 21 | 4 |
| Minimum | (9) | 0 | (6) |

A-508

Source: IFPI; McKinsey analysis

10

Confidential

TF0000092522

# SUMMARY OF RECENT HISTORY IN RECORDED MUSIC, 2001–06

- Track volumes are down 20% from 2001–06, consistently across markets

- Total market revenue is down nearly 23% as prices have declined rapidly in non-U.S. markets

A-509

11

Confidential

TF0000092523

# SINCE 2001, THE OVERALL GLOBAL MARKET HAS BEEN DECLINING DUE TO SIGNIFICANT DROPS IN VOLUME

Global digital and physical retail sales*

**Comments**



- After stabilising in 2003–05, global volumes have started to continue their descent

- 2004 strength is likely the result of a particularly good year for new releases

- Price levels (in US$) have stabilised

A-510

\* Ring tones add $1.0 B in 2005 and $1.5 B in 2006

Note: Local currency to USD exchange rates held constant at 2005 rates

Source: Enders Analysis, 2007

12

Confidential

TF0000092524

# RECORDED MUSIC – BREAKDOWN BY REGION
Retail sales, $b



| | CAGR % |
|---|---|
| | 4.0 |
| | (0.1) |
| | 5.5 |
| | 2.0 |
| | 6.6 |

**A-511**

| Observations |
|---|
| • Since 2000, US has become less important where Europe has grown in importance |

Note: Annual exchange rates used to convert to USD, hence 2001 to 2005 CAGR is lower than that of previous page

Source: IFPI; PWC

13

Confidential

# THE DECLINE IN THE US MARKET SINCE 2000 HAS BEEN DRIVEN BY VOLUME, NOT PRICE

Retail sales, U.S.

**Comments**



Volume*
Tracks billion
13.0 13.1 12.1 13.1 13.9 13.8 12.1 11.1 9.9 10.6 10.0

- No clear trend in the last few years; after a year of stabilisation in 2004, decline has continued
- Explanation for stabilisation include particularly strong releases in that year



Market size
$b
12.1 12.3 11.9 13.2 14.3 14.0 13.4 12.6 11.8 12.5 12.3

00

x



Average price per track
$
0.93 0.94 0.99 1.01 1.03 1.02 1.11 1.14 1.19 1.18 1.22

- Price increases driven by mix shift from tapes to CDs
- U.S. price growth likely overstated by 1–2% as prices reported by RIAA are based on RRP; interviews suggest actual prices have been declining relative to RRP

A-512

\* Assumes 13 tracks per album

Source: IFPI; industry interviews

14

Confidential

TF0000092526

# U.K. MARKET HAS DECLINED DUE TO PRICE DECLINE

Retail sales, U.K.



**Comments**

- Sharp decline from 1999–2000 likely due to data gathering technique inconsistency

- Sharp increase from 1999–2000 due to volume decline likely caused by data gathering technique inconsistency

A-513

\* Assumes 13 tracks per album

Source: IFPI

15

Confidential

TF0000092527

# FRENCH MARKET HAS SEEN VOLUME AND PRICE DECLINES

Retail sales, France



**Volume***
Tracks billion

**Market size**
€ b

**Average price per track**
€

A-514

\* Assumes 13 tracks per album

Source: IFPI

16

Confidential

TF0000092528

# IN THE GERMAN MARKET VOLUME DECLINE HAS BEEN OFFSET BY PRICE INCREASES

Retail sales, Germany



**Market size**
€ billion

2.7  2.6  2.4  2.2  1.8  1.8  1.8

**Volume***
Tracks billion

3.1  3.0  2.8  2.7  2.1  1.8  1.8

**Average price per track**
€

0.86  0.87  0.87  0.83  0.88  0.96  1.00

\* Assumes 13 tracks per album

Source: IFPI

A-515

Confidential

17

TF0000092529

# JAPANESE MARKET HAS HAD STABLE VOLUME IN LAST FEW YEARS
Retail sales, Japan



Market size
JPY billion

733.2  694.6  691.3  627.1  569.2  590.8  600.5



Volume*
Tracks billion

3.8  3.9  3.6  3.3  3.1  3.0  3.1



Average price per track
JPY

194.64  178.25  189.41  189.36  184.62  198.81  196.14

* Assumes 13 tracks per album

Source: IFPI

18

A-516

Confidential

TF0000092530

# ENDERS PREDICTS THAT THE DECLINE IN THE MARKET WILL RE-ACCELERATE AFTER A RELATIVELY GOOD 2004–05
$b



| | Mobile |
| | Digital |
| | Physical |

| | CAGR, % | | |
|---|---|---|---|
| | **2001–06** | **06–09** | **2009–12** |
| Total | -3.9 | -5.2 | -3.4 |
| Total without mobile | -5.0 | -6.8 | -4.1 |
| | NA | 16.5 | 2.5 |
| | NA | 33.2 | 11.2 |
| | -6.2 | -10.7 | -8 |

Note: Total market size differs from previous pages as Enders base is lower than IFPI
Source: Enders Analysis, 2007

Confidential

A-517

19

TF0000092531

# YOY GROWTH RATES
%

| | 2002 | 2003 | 2004 | 2005 | 2006 | Projections | | | | | |
| | | | | | | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mobile** | | | NA | NA | 57.2 | 22.5 | 18.9 | 8.6 | 4.7 | 1.6 | 1.2 |
| **Digital** | | | NA | 327.9 | 70.0 | 45.8 | 32.1 | 22.7 | 16.5 | 11.2 | 6.3 |
| **Physical** | -8.9 | -6.7 | -2.7 | -5.6 | -6.9 | -10.9 | -10.6 | -10.5 | -8.7 | -7.7 | -7.7 |
| **Total** | **-8.9** | **-6.7** | **-2.0** | **0.4** | **-2.2** | **-5.9** | **-4.8** | **-4.8** | **-3.4** | **-3.1** | **-3.6** |

A-518

Source: Enders Analysis, 2007

20

Confidential

TF0000092532

# PHYSICAL MARKET – ENDERS FORECAST
## Global retail physical sales

Forecast



**Enders rationale**

- Physical decline driven by several factors
  - Download substitution
  - Piracy
  - Decline in retail space

- Price declines will continue mainly due to increased importance of mass retailers and pricing pressure from lower download pricing

**McKinsey view**

- Baseline growth, not including digital substitution, is likely flat, due to piracy, retail space

- Increasing digital penetration will negatively impact physical volumes due to substitution

- Enders forecast increases in price declines likely, especially if there is a slower depreciation of dollar relative to 2001–06

A-519

Source: Enders Analysis, 2007

Confidential

21

TF0000092533

# DIGITAL MARKET – ENDERS FORECAST

▨ Forecast

## Global retail digital sales

**Digital market size**
$ million



216  925  1,572  2,291  3,026  3,712  4,323  4,806  5,108

**X**

**Volume**
tracks million



277  813

**Average price per track**
$




0.78  1.14  1.04  0.96  0.90  0.86  0.83  0.81  0.79

Likely incorrect due to small size of market



**Enders rationale**

- Fast volume growth 2006–09 driven by MP3 player penetration

- Slowing of penetration will result in lower growth 2009–12

- Price decline driven by increase in album vs. track sales (from ~5% of tracks to ~11% of tracks)

- Per track prices for albums are $0.77 vs. $0.99 for single tracks (constant over period)

**McKinsey view**

- Digital download growth will be driven by MP3 and broadband penetration

- No evidence to date of move to album purchases

- Given low profitability of downloads for iTunes, less likely average pricing will decline even if album sales grow

- Base case assumption is digital prices are flat 2006–12

Source: Enders Analysis, 2007

22

A-520

Confidential

TF0000092534

# MOBILE GROWTH HAS BEEN HIGH AND IS PROJECTED TO FLATTEN

Global retail mobile sales

 Forecast

**Mobile market size**
$ million



**Enders rationale**

- US mobile market will continue to grow

- Mobile growth has peaked in Western Europe

- In other European markets, lack of collection limits growth, despite high sales

- In Japan, 90% digital consumption through mobile will shift with 2005 iTunes introduction

**McKinsey view**

- Growth is likely to slow, although Enders forecast may underestimate total market size as well as growth (reflected below)

- Impact of additional mobile growth is minimal, given small market size and low wholesale revenue captured by recorded music companies

Conclusion:
Enders projection appear appropriate until 2010, although perhaps slightly low between 2010–2012

23

Source: Enders Analysis, 2007

Confidential

TF0000092535

A-521

# SEVERAL KEY FORCES HAVE SHAPED THE RECORDED MUSIC SECTOR IN THE LAST YEARS AND ARE BOUND TO TRANSFORM IT IN THE YEARS TO COME

Focus of document



| Key force | Description | Estimated impact on sales | |
|---|---|---|---|
| | | 2001–06 | 2006–12 |
| ① Shift from physical to digital | Although margins may be higher, strong growth of digital may not substitute for loss of CD sales due to disaggregation | | |
| ② Physical distribution/channel rationalisation | • Shift to mass retailers has put pressure on prices and margins and increased reliance on blockbusters<br>• Lower prices have not resulted in higher volumes | | |
| ③ Competing media | • Music faces tough competition from other media for share of consumer's wallet | | |
| ④ Mobile phone distribution | • Mobile phone downloads contribute a lot to digital sales | | |
| ⑤ Platform change to CDs | • Declining rate of installed-base cassette replacement likely to have stabilized by 2006<br>• Shift to digital will not result in catalog replacement | | |
| ⑥ Piracy | • Initial impact leveled out | | |
| **CAGR** | | **-3.9%** | **-2.9%** |

Evolution of the recorded music sector

A-522

Source: Enders; McKinsey analysis

24

Confidential

TF0000092536

# DYNAMICS OF DIGITAL SUBSTITUTION



A-523

Confidential

TF0000092537

# (A) MP3 PLAYER ADOPTION DIFFERS FROM CD ADOPTION IN 6 KEY ASPECTS

| | CD | MP3 | Implication on MP3 adoption | Impact on MP3 player adoption relative to CD player adoption |
|---|---|---|---|---|
| **Hardware pricing** | • Standalone<br>• Automobile<br>• Portable | • Computer<br>• Broadband<br>• Portable player | • The relative cost of entry is lower for digital vs. CDs<br>  – Significant installed base of broadband users<br>  – MP3 player relatively less than CD player in the 1980s | ⊕ |
| **Backward compatibility** | • CDs uncompatible with previous format (cassettes) | • Digital players compatible with CDs | • CD content and digital content can be combined in one electronic library limiting substitution and enabling faster digital adoption | ⊜ |
| **Product pricing** | • CDs more expensive than cassettes | • Downloads cheaper, particularly for singles | • Ability to make smaller purchases (per track) enables digital consumption | ⊕ |
| **Quality** | • Significant improvement to cassettes | • No improvement (same quality as CDs) | • No product quality improvement from CD to digital | ⊖ |
| **Convenience/ portability** | • Less portable than cassettes<br>• Better access to tracks | • Enables portability of entire collection<br>• Creation of play lists | • Likely to be a big factor in MP3 adoption | ⊕ |

• Digital adoption may be faster than CD adoption although likely bounded by population with access to broadband computer

Source: McKinsey analysis

26

Confidential

A-524

TF0000092538

# Ⓐ THE SPEED OF MP3 PLAYER ADOPTION HAS OVERTAKEN CD PLAYER ADOPTION

**Household penetration MP3 players vs. CD players, U.S.**
**% penetration of**



- Initial analysis would suggest that MP3 player adoption is likely to increase fast, potentially even faster than CD player adoption
- Limiting factor likely to be broadband penetration in forecast period (until 2012)
- Assumed annual growth slows down from 129% over last 2 years to 16% until 2012

A-525

Source: eBrain Market Research (Consumer Electronics Association); McKinsey analysis

27

Confidential

TF0000092539

**A) MP3 ADAPTION IS LIKELY TO BE LIMITED BY BROADBAND PENETRATION ALTHOUGH THIS IS UNLIKELY TO BE A FACTOR IN THE FORECAST PERIOD IN US AND EUROPE**

**Penetration of technology, % of households**



- In forecast period, broadband penetration will not likely limit MP3 penetration

- A potential downside may exist, as some broadband users may not acquire MP3 players; however some non-broadband users may acquire MP3 players

A-526

Source: eBrain Market Research (Consumer Electronics Association); Screen Digest; McKinsey analysis

28

Confidential

TF0000092540

## (B) DOWNLOADS PER ACTIVE IPOD HAS REMAINED FAIRLY STABLE AND AT A RELATIVELY LOW BASE

Quarterly number of songs downloaded per active iPod user*



A-527

* Calendar quarters adjusted from Apple's system
Source: Enders Analysis

29

Confidential

TF0000092541

## Ⓑ INFORMAL SURVEY DATA SUGGESTS MP3 OWNERS STILL PURCHASE A SIGNIFICANT AMOUNT OF CDs FOR A VARIETY OF REASONS



Average reported number of tracks purchased per year per person by MP3 owners

N = 79

100% = 122

39 Downloads

CD 61



"Since you have had an MP3 player, why have you bought CDs instead of downloading?"
N = 74, %

| | |
|---|---|
| Convenience/impulse purchase | 39 |
| Like to stop in record stores | 19 |
| Want to listen to music in a place where I have a CD player (e.g., automobile) | 34 |
| More freedom to play/copy the song unlike downloads which are harder to store or play on multiple devices | 20 |
| Like to have physical product | 49 |
| Less expensive | 7 |
| Music wasn't available to download | 18 |
| Other | 26 |

Note: Survey of friends/family unscientific in the selection of respondees
Source: Friends and family survey

30

A-528

**(B) MP3 USAGE IS LIKELY TO LEAD TO INCREASED PIRACY**
N = 82, %

**"Since you have owned an MP3 player, would you say that the number of songs you acquire without paying (including CD burning, file storing, transfers, etc.) has increased, decreased or stayed the same?**

| | |
|---|---|
| Increased | 45 |
| Decreased | 16 |
| Stayed the same | 39 |

A-529

Source: Friends and family survey

31

Confidential

TF0000092543

# B EXTRAPOLATING EXPECTED PENETRATION AND TRACK PURCHASE GROWTH RATES SUGGEST DOWNLOADS WILL GROW BY ~20% PER YEAR

**Projected downloads volume, US**
Millions of tracks



| | CAGR | | | |
|---|---|---|---|---|
| | 06–09 | 09–12 | 06–12 | Methodology |
| McKinsey upside | 34 | 8 | 20.5 | • +10% from base case |
| Enders | 31 | 10 | 20.1 | • Extrapolation of historical/ industry judgement |
| McKinsey base case | 30 | 8 | 18.6 | • Assumes constant download tracks per MP3 household of 35 |
| McKinsey downside | 25 | 8 | 16.5 | • -10% from base case |

A-530

Source: Enders Analysis, 2007; IFPI; McKinsey analysis

32

Confidential

TF0000092544

# C DISAGGREGATION MADE POSSIBLE THROUGH CHEAP DOWNLOADS MAY HAVE A SIGNIFICANT EFFECT ON TOTAL VOLUMES



**Consumers prefer buying single tracks to albums online**

US track volume, 2005, %

☐ Singles
▨ Albums

100   CDs

33
67   Downloads

**Consumers on average buy ~3 tracks per album when downloading singles**

"On average, when buying single tracks on iTunes (or other downloads sites) how many tracks would you say you buy from the same album?"
N = 58

| | |
|---|---|
| 1 | * |
| 2 | * |
| 3 | 7 |
| 4 | 2 |
| 5 | 0 |
| 6 | 2 |
| 7 | 0 |
| 8 | 2 |
| 9 | 0 |
| 10 | 0 |
| Whole album | * |

Average= ~3

**Total impact**

- Net impact is driven by 2 countervailing forces
  - Less tracks purchased from each album
  - More tracks purchased by download where full CD would not have been purchased

- We have attempted to measure net effect in 2 ways
  a  Top-down analysis of digital vs. physical sales
  b  Bottom-up, consumer survey of buying habits

A-531

Source: Friends and family survey; RIAA 2006

33

Confidential

TF0000092545

# Ⓒ TOP-DOWN PERSPECTIVE IN THE U.S. SUGGESTS THE SUBSTITUTION RATIO IS 50–70%



**Absolute track volume delta, U.S. 2005–06,** tracks million

**Theoretical substitution ratio (download gain/ physical loss), %**

Physical actual

'Theoretical' demand growth scenarios

+3% growth — 53

+1.5% growth — 61

0% growth — 0 — 72

Download actual

- Substitution ratio implies that while purchasing less tracks per album via download, consumers make up for some of the disaggregation loss by downloading things they would not have otherwise purchased as an album

A-532

Source: Enders Analysis, 2007; McKinsey analysis

34

Confidential

TF0000092546

# ⓒ SURVEY DATA SUGGESTS THE SUBSTITUTION RATE IS AT THE HIGH END OF THIS RANGE



**Tracks per person**
N = 52

Single tracks download purchased in last year — 16

Tracks downloaded as part of albums in last year — 31

Total downloads in last year — 47

Net decrease in reported album purchases (equivalent tracks) — 68

Net decline in tracks — 21

- Theoretical substitution ratio (download gain/physical loss) is 70%

A-533

Source: Friends and family survey

Confidential

TF0000092547

# C THE CUMULATIVE SUBSTITUTION RATIO IMPLIED IN ENDERS ANALYSIS IS 54 – 79 FROM 2007 THROUGH 2012

Impact of digital substitution on physical volume decline

**Physical track volume, U.S.**
Tracks millions



| Estimated market growth without substitution | Cumulative net decline in tracks relative to base case 2006 | Cumulative substitution ratio (download gain/ physical loss) Percent |
|---|---|---|
| +3% | 6,862 | 54 |
| +1.5% | 4,433 | 65 |
| 0% | 2,122 | 79 |

A-534

Source: Enders Analysis, 2007; McKinsey analysis

36

Confidential

TF0000092548

# THE MIDPOINT SCENARIO IMPLIES A PROJECTED U.S. MARKET VOLUME GROWTH RATE OF -1.6%, 2006–12 CAGR

Physical growth rate, 2006–12 CAGR

Total growth rate, 2006–12 CAGR

| Substitution ratio,% | Digital download tracks growth rate % | | |
|---|---|---|---|
| | Downside 16.5% | Base 18.5% | Upside 20.5% |
| 53 | -8.2 / -3.0 | -10.1 / -3.6 | -12.4 / -4.2 |
| 70 | -5.8 / -1.4 | -7.1 / -1.6 | -8.5 / -1.9 |
| 79 | -5.1 / -0.8 | -6.2 / -1.0 | -7.3 / -1.2 |

**Assumptions**
• Theoretical volume demand growth rate of 0%

Source: Enders Analysis, 2007; McKinsey analysis

37

Confidential

TF0000092549

A-535

# OUR U.S. FORECAST IS IN LINE WITH ENDERS
U.S. recorded music market forecast, $ billion

Legend:
- Mobile
- Download
- Physical



**McKinsey base case**

| CAGR | | |
|---|---|---|
| **2006–09** | **2009–12** | **2006–12** |
| -3.6 | -2.2 | -2.9 |
| 18.8 | 1.6 | 9.9 |
| 29.8 | 8.3 | 18.6 |
| -10.5 | -7.4 | -9.0 |

**Enders base case**

| 2006–09 | 2009–12 | 2006–12 |
|---|---|---|
| -3.5 | -1.6 | -2.6 |
| 18.8 | 1.6 | 9.9 |
| 27.5 | 9.5 | 18.2 |
| -10.7 | -7.2 | -8.7 |

**Key assumptions in McKinsey base case**

- Slower decline in digital prices
- Slower growth in downloads
- Lower digital/physical substitution ratio (70 vs. 79)
- Mobile is assumed to be the same

A-536

Source: Enders Analysis, 2007; McKinsey analysis

38

Confidential

TF0000092550

# WE BELIEVE THE GLOBAL MARKET WILL DECLINE BY 4-5% PER YEAR FROM 2006-12

% in local currency

PRELIMINARY ESTIMATES

☒ Focus of work

| | Size, 2006 $b | CAGR* 01-05 | Enders CAGR** 06-12 | McK CAGR** 06-12 | Rationale |
|---|---|---|---|---|---|
| **US** | 8.2 | | | | • See previous section |
| • Value | | (2.2) | (2.6) | (2.9) | |
| • Volume | | (4.6) | (0.9) | (1.6) | |
| • Price | | 2.5 | (1.6) | (1.3) | |
| **Europe3 (UK, GE, FR)** | 6.3 | | | | • Volume decline likely to steady as piracy flattens |
| • Value | | (5.4) | (6.3) | (6) – (4) | |
| • Volume | | (4.8) | (3.8) | | |
| • Price | | (0.7) | (2.6) | | |
| **Japan** | 4.3 | | | | • Prices unlikely to decline so fast |
| • Value | | (3.5) | (8.7) | (5) – (3) | |
| • Volume | | (4.3) | (1.3) | | |
| • Price | | 0.9 | (7.5) | | |
| **RoW** | 7.6 | | | | • Strong piracy concerns in non-European countries (~75% of RoW) |
| • Value | | (2.1) | (6.5) | (6.5) | |
| • Volume | | (7.8) | (3.3) | | |
| • Price | | 6.2 | (3.3) | | |
| **Global** | 26.4 | | | | • On balance, slightly more optimistic than Enders as we believe Japan and Europe declines may be overstated while we are broadly in line with US projections |
| • Value | | (1.0) | (5.4) | (5) – (4) | |
| • Volume | | (5.9) | (2.3) | | |
| • Price | | 5.3 | (3.2) | | |

** Does not include mobile
* IFPI data used as it has local currency figures

Source: Enders 2007; McKinsey analysis

39

Confidential

TF0000092551

A-537

## ② PHYSICAL DISTRIBUTION HAS GONE THROUGH SIGNIFICANT RATIONALISATION; THE RECENT IMPACT IN THE US IS MORE ON VOLUMES THAN PRICE

U.S. market total sales
%, $m



CAGR %

-2.2
-4.6
0.4
5.9
18.5
-7.8
8.4

**Observations**

- Retail space is becoming more concentrated on top sellers, reducing available product

- Music shelf-space is declining as specialist retailers go out of business
  – "We are likely to see 20% of shelf-space disappear in the near term" - *Enders*

Average album price $
14.32   14.68   14.88   14.85   14.89

\* Other includes TV newspaper mag 800 number
Source:   Hart Research and Taylor Research, IFPI

40

A-538

Confidential

TF0000092552

## ② IN THE UK, MASS RETAILERS APPEAR TO BE HAVING A LARGER IMPACT ON AVERAGE PRICES

Market, U.K. – total sales, £m



A-539

# ③ MUSIC IS LOSING SHARE OF WALLET TO OTHER MEDIA AND THE TREND IS EXPECTED TO CONTINUE

**Percent share of consumer entertainment dollar**
U.S.
Spend per head per year, $

| | CAGR | | |
|---|---|---|---|
| | 2000-2003 | 2003-2006E | 2006-2009E |



| | 2000-2003 | 2003-2006E | 2006-2009E |
|---|---|---|---|
| | 5 | 3 | 3 |
| | 5 | 3 | 7 |
| Movie box office & home video | 12 | 6 | 5 |
| Cable & satellite TV | 8 | 6 | 4 |
| Newspaper, books, & magazines | 1 | 0 | 0 |

Bar values (Movie box office & home video): 20, 21, 23, 24, 24, 25, 26, 26, 27, 27
Cable & satellite TV: 33, 34, 35, 36, 37, 38, 38, 38, 39, 39
Newspaper, books, & magazines: 32, 30, 29, 28, 27, 26, 25, 25, 24, 23

"Pressure from video games and mobile phones is a big factor in the industry decline and is likely to continue" – ex-music industry executive

Source: Veronis Schuler; McKinsey analysis

42

A-540

Confidential

TF0000092554

### ③ THE PERCENTAGE OF TIME SPENT LISTENING TO RECORDED MUSIC HAS ALMOST HALVED OVER THE LAST 7 YEARS

USA time spent with Media %



Projections

Source: Veronis Schuler; McKinsey analysis

43

Confidential

TF0000092555

A-541

# ④ MOBILE PHONE DISTRIBUTION HAS BEEN PICKING UP, DRIVEN BY NETWORK AND HANDSET UPGRADES – STILL, OVERALL VOLUMES ARE SMALL

$ Billion

**Mobile digital music retail sales**



**Mobile digital music wholesale sales**



A-542

Source: Enders Analysis, 2007; Interviews

44

Confidential

TF0000092556

## ⑤ THE LONG 'GROWTH WAVE OF CDs HAS STARTED TO RETREAT SINCE THE BEGINNING OF 2000 AND DIGITAL SALES HAVE NOT COMPENSATED THIS DOWNTURN YET

**Evolution of sales by format, Global**
M units (13 tracks equivalent to 1 unit)



**Key observations**

• As the CD format has reached maturity, music sales have decreased due to the end of CD catalog replacement

• While the digital format is growing rapidly, sales volumes are still down 35% from their 1996 peak

A-543

Source: IFPI; McKinsey analysis

Confidential

45

TF0000092557



# ⑤ CATALOG SALES HAVE BEEN STEADY SINCE 2000 SUGGESTING THAT FORMAT REPLACEMENT CYCLE IS OVER

**Music sales**, %
$ Million

U.K. only



Source: BPI/TNS Audio Visual Trak Survey

Confidential

46

TF0000092558

A-544

# ⑥ PHYSICAL PIRACY IS BELIEVED TO HAVE THE MOST SIGNIFICANT IMPACT ON SALES

| | Description | Impact |
|---|---|---|
| **Ⓐ Physical piracy** | • Burning CDs beyond "fair use" allowances, e.g., friends' albums | • Difficult to assess accurately the impact of this type of piracy given it occurs at a local/individual level<br>• Interviews suggest this is biggest challenge for the industry |
| **Ⓑ Online file-sharing** | • Swapping MP3 files on online file-sharing sites, e.g., KazaA<br>• Focused action by RIAA and other industry bodies have helped to shut down a number of illegal sites | • Appears to be flattening phenomenon in developed markets given the efforts of the Music Industry and the rise in legal download sites |

A-545

Source: Interviews

Confidential

47

TF0000092559

# 6a. CD-R SALES PROJECTIONS SUGGEST PHYSICAL PIRACY MAY ABATE

**Shipments to retailers**
Millions of units

☐ CD-RW
▦ CD-R audio
▓ CD-R data



**CAGR, 05-10**
**%**

(3.2)

(8.4)

(15.3)

(0.1)

Source: CEA Blank Computer Media 2005-10

Confidential

48

A-546

TF0000092560

# 6b P2P PIRACY APPEARS TO BE LEVELLING OFF DESPITE INCREASING BROADBAND PENETRATION

<u>U.S. FIGURES</u>



Illegal file sharing dynamics
European Market

**Billion units** — Broadband penetration — Unlicensed downloads



Share of Americans (aged 12 or above) who paid to download music or engaged in file sharing
%

File sharing
Paid to download

Source: Jupiter Research Sept. 2006; Enders

49

Confidential

TF0000092561

A-547

## 6  PIRACY'S FUTURE IMPACT IS UNCLEAR GIVEN THE COMPLEX FORCES AT WORK AND UNCERTAIN IMPACT OF FILE SHARING ON BUYING HABITS

<u>U.S. FIGURES</u>

### Forces influencing

| Pros | Cons |
|---|---|
| • Growth of service providers, (e.g., Napster, KaZaA)<br>• Ease of download<br> – Broadband penetration<br> – New compression formats (MP3, MP4)<br>• Device proliferation<br> – PCs, CD-Rs<br> – Portable MP3 players | • Personal legal liability, ethical concerns<br>• Security and quality issues (e.g., viruses, incomplete/corrupted tracks)<br>• Service provider liability<br>• Technology defenses (e.g., CDs that do not play in computers, DRM in digital devices)<br>• Attractiveness of legitimate alternatives:<br> – Completeness ("any song I want")<br> – Portability and ownership<br> – User experience (no-hassle buy/use)<br> – Price<br> – Value-added content and services<br>• Potential pricing of bandwidth by usage |

### Impact of file sharing on buying habits

#### Piracy consumer survey

"Since you initially began down-loading music or MP3 files off the internet, you would say that your CD purchases have . . ."



". . . decreased"  19
". . . Stayed the time"  57
". . . increased"  24

A-548

Source: McKinsey analysis; IPSOS Tempo 2002; n = 834.

50

Confidential

TF0000092562

## ⑥ RECORDED MUSIC SALES HAVE DECREASED MOST IN THE YOUTH POPULATION, POTENTIALLY DUE TO PIRACY

%, $b

U.S.

CAGR
%



Note: Revenue based on RRP (recommended retailer price) and shipments volume and is therefore higher than Enders
Source: RIAA

51

Confidential

TF0000092563

A-549

# AGENDA

Overall music industry overview

**A** Recorded music
- Market outlook
- **Dice baseline**

**B** Music publishing
- Market outlook
- Dice baseline

**C** Splitting the businesses

Appendix

A-550

52

Confidential

TF0000092564

# GIVEN THE VOLATILITY OF INDIVIDUAL HITS, MARKET SHARE REMAINS SURPRISINGLY STABLE OVER TIME

2005 ESTIMATES

**Global market share trends by value**



| Observations |
| --- |
| • Large portfolio of artists and interests in a range of genres enables majors to maintain a reasonably constant market share |
| • High cost cutting at Warner Music Group has so far not led to a noticeable decrease in market share |
| • "Sony BMG is facing management challenges driven by its JV structure" – *music industry executive* |

A-551

Source: IFPI; CS estimates

53

Confidential

TF0000092565

# DICE RECORDED MUSIC MARKET POSITION – EARLY HYPOTHESES

☐ Focus    PRELIMINARY

**Estimated impact on market share**

| Market share factors | Early hypotheses | 2000–05 | 2006–11 |
|---|---|---|---|

 **A&R pipeline**

- EMI has recently had mixed results from its releases
- Norah Jones sales disappointed

 (=)

 **Geographic factors**

- EMI has had poor presence in the U.S., which was growing as a share of revenue
- US artists are taking an increasing share of the global market, and EMI underperforms in US A&R
- Other majors have decreased local European A&R, possibly contributing to increased share in these markets for EMI

 (=)

**Catalog strength**

- EMI has historically had a relatively strong catalog

(+)



**Dice RM market share**

 **Digital distribution strategy**

- EMI perceived as late in the game on digital distribution

 (=)

 **Pricing strategy**

- Universal tried to capture share by lowering prices, but backed away as customer demand was inelastic

 (=)

 **Execution**

- EMI organisation has been distracted by merger/sale discussions and numerous restructurings
- Other firms, notably Sony BMG, have faced similar issues

  (=)

Source: Interviews; McKinsey analysis

54

A-552

Confidential

TF0000092566

# ① EMI BEST SELLING ACTS ARE CONCENTRATED IN POP-ROCK, WITH VERY LIMITED PRESENCE IN THE 'URBAN' SEGMENT WHICH IS KEY IN THE U.S. MARKET

RECORDED MUSIC

☐ Artist with main focus on the U.S.A.

Artists with 1m+ sales, 2005–2006

| Artist | Genre | Main geographical market | Cumulative album sales 2005–06, M units | |
|---|---|---|---|---|
| Coldplay | Pop | Global | | 11.1 |
| Robbie Williams | Pop | U.K./Ireland, continental Europe | | 7.3 |
| Gorillaz | Alternative//dance | U.K./Ireland, continental Europe | | 5.9 |
| RBD | Pop | Latin America | | 2.6 |
| KT Tunstall | Pop/rock | U.K./Ireland, continental Europe | | 2.6 |
| Keith Urban | Country | North America, Australia | | 2.5 |
| The Rolling Stones | Rock | Global | | 2.4 |
| Korn | Hard Rock | North America | | 1.8 |
| Depeche Mode | Alternative | Global | | 1.6 |
| Trace Adkins | Country | North America | | 1.5 |
| Paul McCartney | Pop | Global | | 1.3 |
| Dierks Bentley | Country | North America | | 1.3 |
| Radja | Pop | Asia | | 1.2 |
| Raphael | Pop | France | | 1.1 |
| Kate Bush | Pop | U.K./Ireland | | 1.1 |
| Corinne Bailey Rae | Soul | U.K./Ireland | | 1.0 |
| Dem Franchize Boyz | Hip-hop | North America | | 1.0 |



"EMI is basically an indie label in the U.S.A." — former EMI senior executive

A-553

Source: EMI AGM presentation 2006; interviews; McKinsey analysis

Confidential

TF0000092567

 # RECORDED MUSIC – GENRE % OF RETAIL MUSIC MARKETS





A-554

Source: Hart Research / Taylor Research, The Official Chart Company

56

Confidential

TF0000092568

**② EMI MARKET PENETRATION IS CHARACTERISED BY SUBSTANTIAL GEOGRAPHIC HETEROGENEITY WITH UNDER-PAR RESULTS IN THE U.S. AND JAPAN**

RECORDED MUSIC

- ▦ 2003
- ▨ 2004
- ▩ 2005
- ■ 2006

**EMI market share, 2003–2006, %**



*    **North America**    *    *    **Australasia**

Global EMI penetration oscillated between a minimum of 12.7% (2003) and a maximum of 13.2% (2004) in the period

A-555

Source: EMI annual reports; interviews

Confidential

57

TF0000092569

 **2** **REPEATED ATTEMPTS TO TURNAROUND NORTH AMERICAN OPERATIONS HAVEN'T BEEN SUCCESSFUL**

<u>RECORDED MUSIC</u>

| 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |

**Key corporate event**

**2001**
- EMI Records its 4th consecutive year of losses in North American unit
- Andrew Slater* (former talent manager) named Capitol Music President

**2002**
- Matt Serletic (producer of Match box20, Santana) is appointed Virgin records CEO
- David Munns* nominated CEO of EMI Music North America

**2003**
- North American unit turns a profit after 5 years; investment in artist roster expansion resumes

**2004**
- Rationalisation of label structure – Higher Octane and Narada are merged, CMG is founded (combining Sparrow and Forefront)
- Manufacturing facility in Jacksonville is closed; company claims to reinvest savings in U.S. market

**2005**
- Jermaine Dupri** (producer of Usher, founder of SoSoDef) brought in to be President of Virgin Records Urban Music
- Jason Flow (Atlantic Records CEO, A&R executive who signed James Blunt and Tori Amos) is made CEO of Virgin Records U.S. replacing Serletic

**2006**
- EMI has no albums among the 10 best sellers of the year in the U.S.

**Market share %**

9.3

* N.A. * N.A. * N.A. * N.A. * N.A. * N.A.

* Fired in 2007
** Resigned in 2006
Source: EMI annual reports; Websites; analyst reports

58

A-556

Confidential

TF0000092570

# AGENDA

Overall music industry overview

**A** Recorded music
- Market outlook
- Dice baseline

**B** **Music publishing**
- **Market outlook**
- Dice baseline

**C** Splitting the businesses

Appendix

A-557

Confidential

TF0000092571

# TYPES OF PUBLISHING AGREEMENTS

| | Full publishing | Co-publishing | Administration |
|---|---|---|---|
| Terms: | • Music publisher becomes the owner of the song's copyright<br><br>• Royalty income generated from songs is then split, usually on a 50/50 basis with the Songwriter | • Main terms of a co-publishing agreement similar to a full publishing agreement, except:<br>  – Music publisher co-owns a percentage of the copyright along with the songwriter<br>• Common for both parties to each own 50% of the copyright, though percentages can vary from deal to deal<br>• Songwriter or contract partner also receives a percentage of the publisher's share | • Music publisher collects royalties and also helps promote the songwriter's catalogue, but does not own the copyright<br>• Publisher deducts an administration fee (typically 5-20% of revenues)<br>• Administrator distributes the entire remaining proceeds to the songwriter or original publisher<br>• Administration deal lasts for a specific period of time |

A-558

| | Revenue | NPS* | Revenue | NPS* | Revenue | NPS* |
|---|---|---|---|---|---|---|
| Mechanical | 50 | 25 | 50 | 12.5 | 50 | 5 |
| Performance (publisher's share) | 30 | 30 | 30 | 15 | 30 | 3 |
| Other | 20 | 10 | 20 | 5 | 20 | 2 |
| **Total,%** | 100 | **65** | 100 | **32.5** | 100 | **10** |
| Gross margin (NPS margin), % | | 65 | | 32.5 | | 10 |

*Publishers share
Source: Industry analysis

60

Confidential

TF0000092572

# ROYALTY COLLECTION MECHANISMS

| Type of royalty | Description of mechanism |
|---|---|
| **Mechanical** | • Mechanical rights collection societies issue mechanical licenses on behalf of the publisher<br>• Collection societies charge a percentage of royalties collected, between 10–30%<br>• In the U.S.<br>  – Royalties are set at not more than 9.1 cents per song per unit through legislation<br>  – Royalties collected either by the music publisher or the HFA*<br>• Outside the U.S.,<br>  – Royalties set through lawful price fixing and stated as a percentage of the price (typically 7–10%)<br>  – Collected by third party not-for-profit agencies |
| **Performance** | • Royalties determined at National level<br>• Collected by performance rights organisations and collection societies (some societies can collect both mechanical and performance rights, e.g., Italy and Spain)<br>• In the U.S., three third-party performance rights organisations collect and distribute only public performance income |
| **Synchronisation** | • Synchronisation licenses generally granted directly to the user by the publisher<br>• Outside the U.S., synchronisation royalties sometimes have to go through collection societies |

**Trends**

• In 2006, EMI reduced its use of collection societies from 26 to 2 in Europe

• Use of the Internet has enabled more efficient remote monitoring, enabling staff to audit other media and increase collection rates

A-559

\* Harry Fox Agency
Source: Industry interviews

Confidential

61

TF0000092573

# MARKET SIZE – HISTORICAL
## Total global publishing revenue, $m

These figures are total publishers revenues after collection agencies have taken their payment.

| Royalty type | 2002 | 2003 | 2004 | 2005 | 2006 | CAGR 02–06 |
|---|---|---|---|---|---|---|
| **Performance** | 1,489 | 1,679 | 1,890 | 2,014 | 2,113 | 9% |
| • Radio | 232 | 254 | 282 | 317 | 352 | 11% |
| • TV | 777 | 858 | 958 | 1,025 | 1,053 | 8% |
| • General | 472 | 560 | 635 | 649 | 674 | 9% |
| • Streaming | 8 | 8 | 14 | 23 | 35 | 44% |
| **Reproduction** | 2,709 | 2,985 | 3,270 | 3,522 | 3,522 | 8% |
| • Phonomechanical | 1,811 | 1,962 | 1,978 | 1,989 | 1,954 | 2% |
| • Synchronisation | 568 | 643 | 791 | 873 | 950 | 14% |
| • Private copy | 114 | 153 | 235 | 248 | 256 | 22% |
| • Ring tones | 124 | 114 | 139 | 280 | 337 | 28% |
| • Other | 92 | 114 | 128 | 132 | 126 | 8% |
| **Distribution** | 825 | 915 | 1,003 | 1,044 | 1,081 | 7% |
| • Sale of printed music | 787 | 870 | 955 | 1,001 | 1,039 | 7% |
| • Rental/Lending | 38 | 44 | 48 | 44 | 41 | 2% |
| **Other** | 134 | 148 | 131 | 129 | 130 | -1% |
| **Total** | 5,156 | 5,727 | 6,294 | 6,710 | 6,947 | 8% |

A-560

"MP industry is simply not radical. Income lines are very disparate and they wax and wane at different times. There are very few phenomena that explode; ring tones are the rarity, even digital growth has not caused huge changes in MP revenues." – Interview, Claire Enders.

Source: Enders 2007

62

Confidential

TF0000092574

# ENDERS FORECAST – BASE CASE

Total publishing revenue, $m



Figures are after collection society commissions

|  | CAGR 02-06, % | CAGR 06-12, % |
|---|---|---|
|  | 9.1 | 4.4 |
|  | 7.5 | -0.1 |
|  | 7.0 | 2.1 |
|  | -0.7 | 0.5 |

Forecast

Source: Enders 2007

A-561

Confidential

TF0000092575

# EXCLUDING CURRENCY CHANGES MUSIC PUBLISHING WOULD HAVE GROWN BY 4-4.5% from 2002 - 06

**Music publishing by geography 2003, %**



- In Dollar terms market CAGR for 02-06 partly driven by currency
  - Appreciation in the £ adds ~0.5% to overall CAGR ($/£ up 5.2% CAGR)
  - Rest of Europe adds ~2% to CAGR ($/Euro up 7.3%)
  - Japanese Yen up 1.8%, this adds another ~0.2% to CAGR

- Discounting major currency fluctuations, 02-06 growth is 4.0 – 4.5%

A-562

Source: Enders analysis 2004; currency rates from Oanda

64

Confidential

TF0000092576

# MARKET SIZE – ANALYSIS OF ENDERS PROJECTION

| | Size, $m 2006 | Enders CAGR 2002–06 | 2006–12 | Volume | Pricing | Capture | Assumptions | McKinsey View | 2006–12, % |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Rationale for change in growth | | |
| **Performance** | 2,113 | 9 | 4 | | | | | | 5 |
| ① Radio | 352 | 11 | 3 | – | ↓ | – | • Built up from advertising spend trends in each country<br>• Pricing assumed constant, except US, where assuming steady growth until 2009, then more modest growth after new agreement in 2009<br>• Assumed constant prices from satellite of $1 per subscriber | • Conservative – with no upside factored in from the growth in satellite | 3 |
| ② TV | 1,053 | 8 | 4 | – | | – | • Built up from trends in countries with no pricing changes or saturation point assumptions | • Potential upside from growth in TV | 4-5 |
| • General | 674 | 9 | 4 | – | | – | • Assumed 3.8% growth from 2006-08 driven by growth in no. of licensed premises and live performances (less important), then assumed levelling off in long term | • Conservative with potential upside from better capture | 4-5 |
| • Streaming | 35 | 44 | 25 | ↓ | | – | • Assumed levelling off of market growth as market matures, but assumes future regulations will still cause increased revenue, i.e., $100 million added by 2010 | • Not examined | 25 |
| **Reproduction** | 3,623 | 8 | 0 | | | | | | 1 |
| ③ Phono-mechanical | 1,954 | 2 | -5 | ↓ | ↓ | | • Follows broad trend of recorded music model with no changes to pricing for ROW and price declines in US | • Decline in recorded music may not be as fast. Price declines are reasonable | -4 |
| ④ Synchroni-sation | 950 | 14 | 5 | ↓ | | | • Assumes continued strong growth 2006-08, but assumes market maturity beyond 2008 | • Conservative with potential upside from volume increases | 6-8 |
| • Private copy | 256 | 22 | 2 | ↓ | | | • Assumes slower 'straight line' growth driven by no further levies introduced | • Agreed | 2 |
| ⑤ Ring tones | 337 | 28 | 5 | ↓ | ↓ | ↑ | • Matches growth rates from Recorded Music Model, assuming 15% payments to publishers until 2008, then a decrease to 10% in 2010 | • Conservative on maturity, tbd on retail price | 5-7 |
| • Other | 126 | 8 | 2 | – | – | – | • No comment | • Not examined | 2 |
| **Distribution** | 1,080 | 7 | 2 | | | | | | 2 |
| • Sale of printed music | 1,039 | 7 | 2 | ↓ | | – | • Assumes slower growth due to increased piracy | • Not examined but stable market | 2 |
| • Rental/ Lending | 41 | 2 | -1 | ↓ | | – | | • Not examined | -1 |
| Other | 130 | -1 | 1 | | | | | • Not examined | 1 |
| **Total** | 6,947 | 8 | 1.7 | | | | | | 2-3 |

Source: Enders 2007, McKinsey

65

A-563

Confidential

TF0000092577

# OVERALL ASSUMPTION ON COLLECTION AGENCIES' COSTS

| Enders assumption | Observations from interviews | McKinsey view |
|---|---|---|

**Enders assumption**

- 2006 collection agency commission rates based on actual data
- Adds 2% to overall market by 2012, assuming collection agencies will cut commission with the reduction in collection costs
  - 1% cut in commission rates for all revenue streams in 2007
  - Further 1% cut in commission applied in the same way in 2009

**Observations from interviews**

**A Better use of technology to reduce costs**
- "The big problem is data exchange. DDex [project to create data uniformity across collection territories] will lower the costs of collection societies. But it is two years from completion" -- *Executive, US digital music distributor*

**B Consolidation of collection agencies across Europe**
- "EMI have licensed two collection agencies to manage collection across Europe – this consolidation should lead to cuts in collection fees" – *EU Lawyer on Collection Agencies*
- "The changes in European collection will reduce deductions by collection agencies and dramatically shorten payment time to publishers" – *Music Publishing Association, UK*

**C Simplified registration techniques**
- "The US SIRA Bill simplifies licensing transactions between music publishers and online distributors so that it is easier to register songs, and for distributors and collection societies to allocate royalty payments" – *Executive, US digital music distributor*

**D Pressure to pass savings on to publishers**
- "This is obviously something we constantly reassess. We are trying new models, such as commission-free contracts, which charge the licensee fee for our costs" – *Executive, Harry Fox Agency*

**McKinsey view**

- Expect collection fees to fall across Europe and to a lesser extent globally due to
  - Moves by EMI to consolidate the collection of royalty payments across Europe
  - Improvement in technology reducing collection costs

- Moves by The Harry Fox Agency suggest commission rates in the US may fall

- Enders assumption appears reasonable, may be some potential upside

A-564

Source: Team analysis, Enders, Industry interviews

66

Confidential

TF0000092578

# ① 3% GROWTH RATE FOR RADIO IS REASONABLE, GIVEN ADVERTISING TRENDS AND SATELLITE RADIO PENETRATION

## Volume

Global radio industry revenues $b



CAGR 06-10

23.4 %

2.8 %

"In 2004, 2% of US households had a satellite radio, it is predicted that 10% of households will have one by 2009" – *Zenith Optimedia*

## Pricing

**Pricing environment is expected to remain stable in Europe and remain stable in the US until 2009**
- Globally, excluding the US and BBC, revenues from radio are through blanket agreements linked to the station revenues*
- "There is stability in the global percent of advertising revenue paid to publishers" - *Enders*
- In the US, pricing will be stable until the ASCAP agreement expires in 2009, the outcome of the subsequent negotiations is unclear
- Satellite radio is a US market, where payment to publishers is settled at $1 per subscriber

**Royalty rates from radio not expected to fall**
- "Tribunals that are currently in progress could lead to pricing increases that are not factored into our forecasts. These tribunals are not expected to reduce prices." – *Enders*

**Conclusion:** Enders growth rate of 3% is reasonable given advertising revenue growth of ~3% until 2010 and increasing satellite penetration is increasing in the US

*Typically ~15% of station revenues go to music publishers in Europe
Source: Global value of radio advertising, ZenithOptimedia (until 2009, then 06-09 CAGR assumed to continue for 2010); Satellite radio value, PWC; US satellite radio, Verizon analysis

67

A-565

TF0000092579

## ② POTENTIAL FOR 4-5% ROYALTY GROWTH FROM TELEVISION GIVEN THE INCREASE IN ADVERTISING SPEND AND "PAY" TV

| Volume | Pricing |
|---|---|

**Volume**

Global television advertising spend, $ billion



129  125  128  133  145  151  160  167  177  185

**Volume is likely to remain stable, following 2001 dip**
• "Steady growth expected" – *Enders*
**But local concerns about the future of industry are not reflected in overall global growth**
• "The problems at ITV may indicate the movement towards the 'new frontiers' of advertising spend – away from TV towards online" – *Music Publishers Association, UK*

**Pricing**

**Current pricing structure is not expected to change**
• Blanket licences usually negotiated by channels, dependent on advertising revenue and, occasionally, audience share, e.g.,
  – UK stations are banded according to revenue, BBC pays a flat annual fee
• Payment can be on a per programme basis

**Current pricing levels not expected to decrease**
• Publisher receives 50% of fee
• In US and UK, collection takes 15% cut, in EU is nearer 20%
• "No major changes expected" – *Enders*

**Conclusion:** Enders forecast of 4% growth is conservative given the expected 5% CAGR in advertising spend and the increase in non-advertising revenues by channels, e.g., TV on demand and subscription, making them less vulnerable to advertising trends

Source: Global television advertising spend, ZenithOptimedia

68

Confidential

TF0000092580

A-566

## ③ PHONOMECHANICAL RIGHTS COMPRISE 30% OF GLOBAL MUSIC PUBLISHING REVENUES, OUR ANALYSIS OF FUTURE TRENDS ONLY SLIGHTLY DIFFERS FROM ENDERS

**Global phonomechanical publisher revenues, 2002-2012 ($m)**



McKinsey
Enders

Forecast

CAGR
06-12, %

-3.9%
-4.5%

"The mechanical down turn is a fact of life, but it has bolstered other revenue streams that may grow even further in the future. As an example, live performance is very strong as online activity creates buzz around seeing artists. We will survive." – *Music Publishers Association, UK*

\* Applying McKinsey recorded music growth rates to phonomechanical historical data, maintaining Enders assumption of proportion of total market revenue going to publishers

Source: Enders, McKinsey analysis

69

A-567

Confidential

TF0000092581

# ③ US MUSIC PUBLISHING RATE IS UNDER REVIEW, OUTSIDE OF THE US RATES ARE EXPECTED TO REMAIN STABLE

## U.S. music publishing market

| Historical pricing | Current situation | Possible outcomes |
|---|---|---|
| • Digital downloads and CDs provide 9.1 cents revenue for publisher per track<br>• Prices last reviewed in 1981<br>• Ring tones and synchronisation rights tend to be negotiated on a case-by-case basis | • Phonomechanical pricing is being reviewed and will go to tribunal in 2007<br>• 3 major players with different positions<br><br>1. RIAA – propose publisher payments of 7-8% of wholesale, ~ 4 cents per track<br>2. DiMA – propose 75% reduction to ~2.5 cents per track<br>3. Music publishers – propose no change to payment rates on CDs, 12% of retail price for digital (~10 cents per track), and 15% of retail price for ring tones | 1. Tribunal will rubber stamp current process<br>2. DiMA and RIAA proposals will be implemented and U.S. music publishing revenues will drop<br>3. U.S. music publishers will be successful and other revenues will increase<br><br>**Outcome is "not at all clear", a ruling that is too weighted in any party's favour would be likely to lead to an appeal** |

## U.K. music publishing market

• Recent ruling on digital download payments resulted in a settlement of 8% of retail price
• For Physical: 8.5% of PPD is stable. "The difference between 8.5% of PPD and 8.5% of RRP is negligible to the industry, the problem is far more pandemic than negotiations with publishers" – *Music Publishers Association, UK*

## Rest of world

• Europe is predicted to be stable at around 10-15% of retail price, but Germany - currently at 15% - may decrease as it is at the high end of the range
• Rest of World expected to be stable  (e.g., Japan payments are linked to retail price at 7.7%)

Source: Interviews

70

Confidential

TF0000092582

A-568

## ③ POTENTIAL CHANGES IN THE US COULD LEAD TO UPSIDE OR DOWNSIDE ON THE MCKINSEY BASE CASE FORECAST FOR THE US

**US Mechanical net revenue, 2001- 2012\***
**($m)**



CAGR
06-12, %

4    **NMPA scenario** – 29% increase in music publisher mechanical revenues between 2007 and 2010

-2    **Current** – publisher revenues follow total physical and digital track volumes

-7    **Compromise scenario (base case)** – 24% drop in music publisher mechanical revenues between 2007 and 2010

-14    **RIAA scenario** – 56% drop in music publisher mechanical revenues between 2007 and 2010

\*Pre-2006 data from Enders, with McKinsey growth rates from total recorded industry revenues applied from 2006, then Enders assumptions on price scenarios used

Source: Enders 2007

71

Confidential

A-569

TF0000092583

## ④ SYNCHRONISATION IS SHOWING HEALTHY MARKET GROWTH

**Volume**

**Market buoyancy is expected to continue**

- "The sync business is growing at a huge rate, and it looks like continuing" - *Harry Fox Agency*

- "The year I left Warner Chappell, sync was in 20% growth, in my current, far smaller company, we're looking at about 10% annual growth" – *UK sync executive*

**Shift to online transactions is opening up a larger number of revenue streams**

- "The online world is allowing access to catalogues - there is tremendous growth in synchronisation with a lot of margin to be captured" – *Music Publishers Association, UK*

**New sources of revenue are increasing volume demand**

- "The number of synchronisation agreements is growing hugely from new sources – online advertising etc." – *Music Publishers Association, UK*

**Confidence is evident that sync spend will continue to rise, transferring to different formats, at different volumes as the market changes**

- "There has been a reduction in spending on TV advertising which looks set to continue, but revenue loss from these traditional large contracts is being offset by the high volume of small spend contracts from new sources" – *US digital music distributor*

**Estimated sync revenue sources, UK 2006**



"These are ball park proportions, and very dependent on if there's a big film that year etc. Major streams won't change much in future, though advertising may give to other sources"
– *UK indie publisher*

A-570

Source: Interviews; McKinsey analysis

Confidential

TF0000092584

## ④ IT IS BENEFITING FROM TRENDS IN ENTERTAINMENT SPEND DESPITE DECLINING SPEND ON RECORDED MUSIC



A-571

Source: Veronis Schuler; McKinsey analysis

73

Confidential

TF0000092585



# ④ …AND EXECUTIVES ARE CONFIDENT IN THE STRENGTH OF A FLEXIBLE PRICING STRUCTURE

---

### Pricing

**Pricing is currently negotiated on a deal-by-deal basis**

- One-off negotiations that vary hugely according to type of usage / means of purchaser, often go straight to publisher
- TV channels can negotiate blanket rates, or deal by programme. "It varies hugely across world – in the UK, Channel 4 generally pays ~85p for 30-second background usage, US TV producers can pay $10k for 30 seconds" – *Sync exec, UK indie publisher*
- "The film industry isn't about to stop wanting music. They might pay less for an unknown artist, but chances are that once that artist is played on a major film, their track will become more desirable for further contracts – the proliferation of media means there is a great market horizon for music publishers" – *Sync exec, UK indie publisher*

**Future outlook is good, as publishers see strength in negotiating ad hoc deals**

- "Sync benefits from not having rate ceilings like mechanical, one off negotiations have flexibility required in the industry" – *Harry Fox Agency*
- "We're flexible on pricing, in the past 2-3 years we've negotiated more than enough low price deals to compensate for less 'big money' contracts" – *Sync exec, UK indie publisher*
- "Contracts aren't up for negotiation: the music companies choose their fights, and phonomechanical is far more critical for them" – *Enders*

---

**Conclusion:**
- Enders growth rate of 5% seems conservative given the historical growth and the optimism of executives in capturing rising media spend across formats
- Demand is increasing as new channels develop, but existing revenue sources such as television remain stable
- Growth rate of 6-8% seems more realistic

Source: Interviews; McKinsey analysis

74

Confidential

TF0000092586

A-572

## ⑤ OPINIONS DIFFER ON THE MATURITY OF THE RING TONE MARKET



**Volume and collection**

Total global ring tone market
$b

Forecast

558    980    1,231    1,510    1,667    1,763    1,784    1,796

280    397    382    409    416    417    432    447

Publishers revenue
from ring tones

Publisher revenue
CAGR

| 05-06 | 06-12 |
|-------|-------|
| 20%   | 5%    |

**The European market is generally thought to be mature**
- "The golden period is over" – *Music Publishers Association, UK*

**Opinions differ over potential growth in the US**
- "Still room for growth in the US" – *Enders*
- "The US ring tone market is not as exciting as it has been" – *Harry Fox Agency*
- "We have seen explosive growth in 2006 Q4 due to the success of mastertones and realtones" – *Executive, US digital music distributor*

**New markets are emerging, but collection is challenging in new and old markets**
- "There has been a phenomenal explosion in India and China, which isn't yet reflected in publisher revenues – working out collection on these things takes time" – *Music Publishers Association, UK*
- "Out of 120 licensees for ring tones registered with The Alliance last year, only 10 paid royalties" – *Enders*

A-573

Source: PWC; Enders 2007

75

TF0000092587

## ⑤ … WE FORECAST STABILITY WITH POTENTIAL UPSIDE

**Pricing**

**There are several different pricing structures across the world, all relatively stable**
- US: publishers receive up to 20% of retail price: "on average, it's about 10% of retail, with a 10 cent floor" – *US digital music distributor*
- UK: publisher receives ~15% of retail
- Rest of Europe: publisher receives 12-15% retail
- Japan: publisher receives 7.2% retail

**The pricing structure in the US is currently under review, but average price is likely to remain similar**
- Ruling will probably bring US ring tone payments in line with RoW. "In practice, payments are already around this level" – *US digital music distributor*

**New distribution techniques will increase collection efficiency, but may also lower prices in mature markets**
- "Shift towards mobile operators controlling ring tone market has improved collection but also likely to reduce overall market growth as prices stabilise" – *Enders*

**Ring tone prices are likely to remain stable or possibly decline**

A-574

**Conclusion:** Given the potential to increase the proportion of royalties collected from existing market - by selling through mobile operators and increased policing of those territories - and the expected growth in the market size, a 5-7% growth rate seems realistic

Source: Enders 2007, Interviews

76

Confidential

TF0000092588

# MARKET OUTLOOK SUMMARY

| | Size '06, $m | CAGRs 2006-12 | |
|---|---|---|---|
| | | Enders | McKinsey |
| **Performance** | **2,113** | **4** | **5** |
| ① Radio | 352 | 3 | 3 |
| ② TV | 1,053 | 4 | 4-5 |
| • General | 674 | 4 | 4-5 |
| • Streaming | 35 | 25 | 25 |
| **Reproduction** | **3,623** | **0** | **1** |
| ③ Phonomechanical | 1,954 | -5 | -4 |
| ④ Synchronisation | 950 | 5 | 6-8 |
| • Private copy | 256 | 2 | 2 |
| ⑤ Ring tones | 337 | 5 | 5-7 |
| • Other | 126 | 2 | 2 |
| **Distribution** | **1,080** | **2** | **2** |
| • Sale of printed music | 1,039 | 2 | 2 |
| • Rental/ Lending | 41 | -1 | -1 |
| **Other** | **130** | **1** | **1** |
| **Total** | **6,947** | **1.7** | **2-3** |

- Overall, we believe that new revenue streams will compensate for decline in recorded music

- Collection improvements add additional source of revenue

- Traditional markets are stable

- Some potential for regulatory risk in the US

- "This is a fantastic time to be a music publisher. The online movement is creating a great environment for entrepreneurial publishers who are imaginative about new revenue sources" – *Music Publishers Association, UK*

A-575

Source: Enders Analysis, 2007; McKinsey analysis; Interviews

77

Confidential

TF0000092589

# AGENDA

Overall music industry overview

**(A)** Recorded music
- Market outlook
- Dice baseline

**(B)** Music publishing
- Market outlook
- **Dice baseline**

**(C)** Splitting the businesses

Appendix

A-576

78

TF0000092590

# MARKET SHARES IN THE PUBLISHING INDUSTRY ARE GENERALLY STABLE AND SHARE GAINS ARE MORE DRIVEN THROUGH ACQUISITION

**Market share by revenue**
%



- UMG – Known for its catalogue of film scores and TV themes; now includes BMG
- EMI – Reduced to the second largest publishing business in 2006
- SATV – Holds a strong pop catalogue including the Beatles and Bob Dylan
- Remaining 35% of the market comprised of independent companies

A-577

\* UMG includes acquisition of BMG

Source: Enders analysis; music copyright company

79

Confidential

TF0000092591

# PUBLISHED MUSIC – MAJOR PLAYERS REVENUE BREAKDOWN
%, 2005

| | No.of copyrights* | Global market share | Royalties | | | | Key observations |
| | | | Mechanical | Perfor-mance | Synchro-nisation | Other | |
|---|---|---|---|---|---|---|---|
| **Universal Music Group**** | >2.0m | 25 | 48 | 29 | 15 | 8 | • Acquisition of BMG by UMG has created a clear No. 1<br>• Up until 2006, EMI was the No. 1 publishing house<br>• Growth of Sony's publishing business has been hindered by a restrictive agreement with Michael Jackson<br>• Press releases indicate ~30% of copyrights generate revenue in a given year |
| **EMI** | >1.0m | 17 | 45 | 27 | 17 | 11 | |
| **Warner Music Group** | >1.0m | 16 | 44 | 34 | 17 | 5 | |
| **Sony ATV** | ~0.5m | 7 | – | – | – | – | |

\* Includes the acquisition of BMG

A-578

80

Confidential

# AGENDA

Overall music industry overview

**A** Recorded music
- Market outlook
- Dice baseline
- Cost savings potential
- Revenue generation opportunities
- Business model changes

**B** Music publishing
- Market outlook
- Dice baseline
- Cost savings opportunities

**C** **Splitting the businesses**

Appendix

A-579

81

Confidential

TF0000092593

# POTENTIAL TO SPLIT PUBLISHING AND RECORDING BUSINESSES

## Observations from interviews

- Separated revenue streams:
  - Published Music receives 70% of revenues from a long tail of small contracts
  - Recorded Music focused on new hits
- Potential regulatory issues from combining Recorded Music business with Warner
  - With changing business models, defining market power is complex and a regulatory ruling could be a "No" given the uncertainty
- Music publishing and Recorded Music expected to have some synergies, especially:
  - Overlap between A&R areas
  - Contract negotiations
  - Fighting piracy

A-580

Source: Team analysis; Interviews

Confidential

82

TF0000092594

# DIVERSITY OF BUSINESS REVENUES

DISGUISED EXAMPLE

**Publisher revenues distribution by contracts, 2005**
%



|  | Number of contracts |
|---|---|
| Greater than $1m | 5 |
| $0.5-1.0m | 7 |
| $0.25-0.5m | 13 |
| $0.1-0.25m | 99 |
| $0.05-0.1m | 157 |
| $0.025-0.05m | 301 |
| Less than $0.025m | ~20,000 |

30%



**Key Observations**

- 70% of revenues are driven by contracts which generate less than $25,000 per year

Source: Industry analysis

Confidential

83

A-581

TF0000092595

# AGENDA

Overall music industry overview

**(A)** Recorded music
– Market outlook
– Dice baseline
– Cost savings potential

**(B)** Music publishing
– Market outlook
– Dice baseline
– Growth opportunities

**(C)** Splitting the businesses

- **Appendix**

A-582

84

TF0000092596

# APPENDIX

- Recorded music
  - Market outlook
  - Dice baseline
- Music publishing
  - Market outlook
  - Dice baseline

85

TF000092597

Confidential

## ON AVERAGE RECORD COMPANY REVENUE SHARE OF RETAIL PRICE IS JUST LESS THAN 60%

Global recorded music sales, 2006
$b

**Wholesale share of retail, %**



|  | Wholesale share of retail, % |
|---|---|
| * | 57 |
| Physical | ~60 |
| Digital downloads | 70–80 |
| Mobile | 20* |

Retail   Wholesale

\* Assumes 50% leakage and 40–50% share of collected revenue

Source: Enders Analysis, Interviews

86

Confidential

TF0000092598

A-584

# iTUNES AND ITS PAY PER SONG MODEL LEAD THE MARKET BY A WIDE MARGIN

| Outlet | Description of services | US market share Percent, Q3 2006 |
|---|---|---|
| iTunes | • Provides various types of digital media content (e.g., music, video, webcast) at a flat price per song<br>• Integrated devise and download service for ease of use | 72 |
| eMusic | • Only service beside iTunes that sells tracks that can be played on an iPod | 10 |
| napster | • Offers both subscription and pay per purchase access to digital media content, with free trials | 4 |
| MSN music | • Ceased music sales in Nov 2006, redirecting users to Rhapsody | 3 |
| Yahoo music | • In 2005 became the first major online service to provide $5 monthly unlimited download service | 3 |
| Rhapsody | • Subscription based music service offering unlimited access to digital content | – |
| CONNECT | • Sony music download service | – |
| Artist websites | • Less than 1% of downloads are done direct from artist websites | – |
| SPIRALFROG | • Subscriber based service in which consumers are not charged for songs; advertising covers price of song | – |

Source: McKinsey analysis

Confidential

87

A-585

TF0000092599

# IT WILL BE HARD TO IMPROVE PER TRACK ECONOMICS DUE TO THE POWER OF iTUNES

 Share of dominant retailer



| Mass retail CD purchase | Online CD purchase | Digital download |

2000                              2003                              2006

- The dominance of players in key channels has grown as each new channel is introduced

- Recording company commented that "In negotiations with iTunes the only thing we successfully changed about the contract was the date"

A-586

Source: Fortune, Feb 2007                                   88

Confidential                                   TF0000092600

# THE MUSIC INDUSTRY IS GENERALLY SCEPTICAL OF ANTI-DRM EFFORTS, ALTHOUGH OPINIONS ARE NOT UNIFORM

## Perspectives of key stakeholders

**iTunes**
- Steve Jobs, Chairman of Apple, is in favor predicts no increase in piracy with DRM removal, claiming that 97% of digital music libraries are from copied CDs

**Record companies**
- General pro-DRM as an anti-piracy measure
- See more benefit in sharing DRM standards

**Mobile phone companies**
- DRM critical to maintaining high price point of ring tones

## Different interviewee perspectives

### Rationale

**Pro-DRM (80% of interviewees)**
- Piracy will increase massively as a result
  - "Getting rid of DRM will result in explosion of piracy" - *Music industry executive*
- Shift CD to digital (which has DRM) will help stop piracy
  - "As consumers shift to digital, less unprotected content will be out there" - *Enders*
- Problem is lack of common DRM, not DRM in itself

**Anti-DRM (20% of interviewees)**
- DRM encourages piracy as the pirated products are more user-friendly than DRM downloads
  - "Why would I buy on iTunes when I get a better product when I download or copy from a CD?" *Ex-major label executive*
- Discourages shift to digital and ultimately limits digital business models
  - "Majors have underleveraged digital distribution. There is an opportunity to innovate on products -- imagine downloading Eminem's new song right as it comes out of the studio" - *Ex-music industry exec*

A-587

Source: Interviews

Confidential

89

TF0000092601

# OVERVIEW OF THE MAJORS – RECORDED MUSIC
FY 2006, $m

| | EMI Recorded Music | Warner Music Group | Sony BMG | Universal Music Group |
|---|---|---|---|---|
| Revenue | 2,954 | 2,924 | - | 5,646 |
| EBITDA | 268 | 355 | - | 836 |
| *% margin* | *9.1* | *12.1* | *11.8* | *14.8* |
| ***Revenue split by geography, %*** | | | | |
| • *North America* | *27* | *46* | *43* | *47* |
| • *Europe* | *45* | *38* | *43* | *38* |
| • *Asia* | *17* | *8* | *5* | *8* |
| Global market share (2006) | 13 | 12 | 20 | 26 |

**Observations**

- Industry profitability benefits from economies of scale

- However, EMI's EBITDA is 25% lower than WMG despite comparable revenues

- EMI is noticeably weaker in the U.S. market

A-588

Source: Company data; CS estimates; team analysis

90

Confidential

TF0000092602

# RECORDED MUSIC – SALES BY FORMAT



**Global music sales by format**
Volume billions



**U.S. music sales by format**
Percent of revenue

A-589

Source: Global: IFPI – 'Other' accounts for less than 0.5% in 2005. US: IRAA 2005 consumer profile

91

Confidential

TF0000092603

# RECORDED MUSIC – BY POPULARITY



Global market, most popular albums % total units sold
CD albums, million

| | CAGR % |
|---|---|
| | -3.1 |
| | 0.2 |
| | -0.1 |

5 * 92
6 90
6 * 91
* 91
5 * 91

U.K. market sales of best selling albums as % of total album sales
CD albums, million

| CAGR % | TBC |
|---|---|
| | -4.9 |
| | -5.9 |
| | -1.6 |
| | -2.9 |
| | -1.1 |
| | -1.5 |

8 13 8 * 65
9 15 7 * 65
6 12 8 * 68
6 12 8 * 70
6 12 7 * 70

92

TF000092604

Source: IFPI; BPI

Confidential

# RECORDED MUSIC – GENRE % OF RETAIL MUSIC MARKETS

<u>BACKUP</u>





Source: Hart Research / Taylor Research, The Official Chart Company

93

Confidential

TF0000092605

A-591

# THE DECLINE OF THE US CD MARKET IS DRIVEN MORE BY VOLUME THAN BY PRICE

APPENDIX

## US retail CD sales

**Comments**



- Significant decline in CD sales likely result of end of cassette replacement, piracy, retail space growth slow down/reverse and rise of digital players





- Prices stable, although likely overstated as data is reported as RRP
- Enders/interviews suggest actual prices were likely slightly down (-1 to -2% CAGR)

A-592

Source: RIAA; Team analysis

94

Confidential

TF0000092606

# IN MOBILE, FASTER MOBILE MUSIC GROWTH IS PARTIALLY OFFSET BY SLOWING RINGTONE GROWTH

Global revenues* (US$ m)



* Average of Ovum and Yankee
** Ring tone market includes ringtones, ringtunes and ringback tones
Source: Ovum, Yankee

95

Confidential

TF0000092607

A-593

# APPENDIX

- Recorded music
  - Market outlook
  - Dice baseline
- Music publishing
  - Market outlook
  - Dice baseline and growth opportunities

A-594

96

Confidential

TF0000092608

# RECORDED MUSIC – MAJOR PLAYERS MARKET SHARE BY GEOGRAPHY

2005 market share data, %

| | Global market share | Market share by major geography | | |
|---|---|---|---|---|
| | | North America | Europe | Asia |
| **Universal Music Group** | 25.5 | 32.5 | 26.8 | 12.4 |
| **Sony – BMG** | 21.5 | 24.9 | 25.5 | 6.2 |
| **EMI** | 13.4 | 9.9 | 16.7 | 12.2 |
| **Warner Music Group** | 11.3 | 14.2 | 11.7 | 4.9 |
| **Market size** | 33.5 | 12.3* | 12.2 | 6.2 |

\* U.S. only
Source: IFPI

**Key Observations**

- EMI has tried and failed to address its weakness in the U.S. market
  - *"Low market share in the U.S. has led to EMI being a second or third choice for artists, leading to it signing more mature acts – e.g., Lenny Kravitz or Courtney Love"* – ex-Dice employee

A-595

97

Confidential

TF0000092609

# OVER 70% OF EMI'S RECENT HITS COME FROM ACTS LAUNCHED IN THE 90'S AND 2000'S

<u>RECORDED MUSIC</u>

**Breakdown of HITs for the period***
%



Decade of band/ singer launch

60's · 70's · 80's · 90's · 2000's

(4 · 9 · 16 · 39 · 32)

- skewed distribution of hit makers in favour of more recent acts reflects the managerial approach of former CEO Alain Levy – Focused on Developing long term career artists

A-596

\* 1M+ sales
Source: EMI presentations, McKinsey analysis

98

Confidential

TF0000092610

# APPENDIX

- Recorded music
  - Market outlook
  - Dice baseline
- Music publishing
  - Market outlook
  - Dice baseline

99

TF000092611

Confidential

# OVERVIEW OF THE MAJORS – MUSIC PUBLISHERS

2005 $ million

| | Warner Chappell | EMI Music Publishing | Universal Music Publishing |
|---|---|---|---|
| Revenue* | 607 | 738 | 853 |
| NPS | - | 334 | 392 |
| • *% Margin* | - | *45.2* | *46.0* |
| EBITDA | 111 | 192 | 236 |
| • *% Margin* | *18.3* | *26.0* | *27.7* |
| **Revenue by geography, %** | | | |
| North America | – | 39 | – |
| U.K. | – | 17 | – |
| Rest of Europe | – | 29 | – |
| Other | – | 15 | – |
| **Global market share (2005)** | **16%** | **17%** | **25%** |

\* Revenue information for each company based on latest reporting period and respective reporting format and might not match historical market share information based on Enders analysis

Source: Industry interviews

100

Confidential

TF0000092612

A-598

# RIGHTS PRICING OVERVIEW (1/2)

| Mechanical | US | UK | Germany | France | Japan |
|---|---|---|---|---|---|
| Physical | 9.1 cents per track sold, currently under negotiation | 8.5% of PPD | 13.75% PPD | 11% PPD | 6% rsp |
| Digital | 9.1 cents per track sold, currently under negotiation | 8% of retail recently settled in UK ruling | 15% ex vat | 12% ex vat | 7.7% rsp |
| Ring tone | Publishers get up to 20% of retail price, and mechanical/performance split is not set. Currently under negotiation, % will probably decrease in line with RoW, and be solely mechanical | Publisher receives ~15% of retails: 75% mechanical, 25% performance | 15% of retail price, 2/3 mech | 12% of retail, about 2/3 mech | 7.2% retail (Accounts for 1.2 billion of ring tone sales) |
| Blank media | N/A (but v lucrative in Canada) | N/A | Currently about 30m euro per year | Currently about 50 m euro per year | ~750 million YEN a year paid to music publishers |

A-599

Source: Team analysis

101

Confidential

TF0000092613

# RIGHTS PRICING OVERVIEW (2/2)

| Synchronisation | US | UK | Germany | France | Japan |
|---|---|---|---|---|---|
| Film | One off negotiations that vary hugely according to type of usage / means of purchaser. Deals are often straight to publisher. | | | | |
| TV | As film | | | | |
| Advertising | As film | | | | |
| Video game | As film | | | | |

| Performance | US | UK | Germany | France | Japan |
|---|---|---|---|---|---|
| TV | Blanket licence, dependent of ad revenue or audience share.  Or on per programme basis - dependent on individual station. Usually about 50% of fee goes to publisher.  In US and UK, collection takes 15% cut, in EU is nearer 20% | | | | |
| | | UK – bands based on station income.  BBC negotiates set fee for each year. | | | |
| Radio | US payments are settled until 2009 | % of station advertising revenue, in EU is typically around 15%.  Collection agency (PRS) then divides up between artists according to frequency of play. | | | |
| | Satellite: recent agreement ~$1 per subscriber per year | UK - like TV, bands according to size of radio station as well as advertising revenue | | | |
| Streaming | Yahoo, and AOL pay maybe $50 million each annually for streaming rights to music.  "Not much bang for buck on streaming music" - Enders interview | | | | |
| Live | Usually negotiated one off fee – per concert or per tour basis. | | | | |

A-600

Source: Team analysis

102

Confidential

TF0000092614