# 11-0126-cv

## United States Court of Appeals

*for the*

## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

―――――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 3 of 65 (Pages A-601 to A-900)

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Summons and Complaint, dated December 11, 2009    A-39

Declaration of Adrian Briggs, for Defendants, in
     Support of Motion to Dismiss, dated January 20,
     2010, with attached *Curriculum Vitae* ................... A-89

Declaration of Strauss, for Plaintiffs, in Opposition
     to Defendants' Motion, dated February 2010,
     with attached *Curriculum Vitae* ............................. A-106

Second Declaration of Adrian Briggs, for
     Defendants, in Support of Motion to Dismiss,
     dated February 11, 2010 ........................................ A-137

Defendants' Answer to Plaintiff's Complaint, dated
     April 7, 2010 .......................................................... A-149

Notice of Motion for Summary Judgment, by
     Defendants, dated August 13, 2010 ...................... A-171

Defendants' Local Rule 56.1 Statement of
     Undisputed Facts in Support of Motion for
     Summary Judgment, dated August 13, 2010 ........ A-173

Declaration of Gary R. Carney, in Support of
     Defendants' Motion for Summary Judgment,
     dated August 13, 2010 .......................................... A-199

Exhibit 1 to Carney Declaration -
     Terra Firma Private Placement Memorandum,
     dated April 2006 .................................................... A-217

Exhibit 2 to Carney Declaration -
     Terra Firma Capital Partners II Q3 2007 report,
     dated November 2007 ............................................ A-318

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006................................................. A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006................................................. A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006................................................. A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007....................................................... A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings............................... A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007....................................................... A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010.... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007....................................................... A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ........................... A-404

iii

**Page**

Exhibit 13 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachments...........................  A-415

Exhibit 14 to Carney Declaration -
E-mail from Ashcroft to Wormsley *et al.*, dated
April 23, 2007, with attachment ...........................  A-427

Exhibit 15 to Carney Declaration -
EMI News Release, dated May 4, 2007 ................  A-437

Exhibit 16 to Carney Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.........................................................  A-439

Exhibit 17 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
February 5, 2007....................................................  A-441

Exhibit 18 to Carney Declaration -
Memorandum from Seymour to Punja, dated
March 2, 2007........................................................  A-457

Exhibit 19 to Carney Declaration -
E-mail from Reid to Seymour, dated
May 16, 2007.........................................................  A-462

Exhibit 20 to Carney Declaration -
Music Industry Key Market Outlook Summary of
Findings prepared by L.E.K. Consulting, dated
May 15, 2007.........................................................  A-656

Exhibit 21 to Carney Declaration -
Project Dice Limited Scope Financial Due
Diligence Report, dated May 17, 2007.................  A-783

Exhibit 22 to Carney Declaration -
Project Mulberry Limited Scope Financial Due
Diligence Report, Volume I, dated May 4, 2007 ...  A-887

iv

**Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments............................. A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007.......................................................... A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 ........................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007................... A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 ................... A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments ................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment.............................................................. A-995

v

Page

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007     A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007.................................................... A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007....................................................... A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007..................................................... A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007....................................................... A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007..................................................... A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007....................................................... A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007....................................................... A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 .............................. A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ................................... A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 . A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments .................................. A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007 ........................................................ A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 .............................. A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007 ........................................................ A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ........................................................ A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ........................................................ A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007 ........................................................ A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 .................................... A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007 ........................................................ A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007 ........................................................ A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007 ........................................................ A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007 ........................................................ A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007 ........................................................ A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ............................................... A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007 ........................................................ A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007 ........................................................ A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007 ........................................................ A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment ..................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007..... A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007........................................................ A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007........................................................ A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007........................................................ A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007........................................................ A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007........................................................ A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007........................................................ A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007........................................................ A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007........................................................ A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007................................. A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007......................................................... A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007......................................................... A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007.................... A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007.................... A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007......................................................... A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc....................................................... A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007............................................... A-1554

x

**Page**

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ....................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................................. A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................................. A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 .......................................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ........................................................ A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................................ A-1590

**xi**

**Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma.................................................................... A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ................ A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007.................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ................ A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ........................................................ A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ........................................................ A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ......................... A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 ............................................... A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008................................................... A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008 ................................................... A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008 ..................................................... A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009 ................................................. A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009 ................................................. A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008 ........................................................ A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008 ........................................................ A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart .......................... A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update ........................ A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 ..................................... A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008 ........................................................ A-2301

xiii

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ......   A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ...............   A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009 .............................   A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 ....................................................   A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 .............................................   A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 ..................................................   A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ...................................................   A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 .............................................   A-2479

xiv

**Page**

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009............................ A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ............................................ A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 .......................... A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 .......................................... A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009 ................... A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 .............................................. A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes ................... A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007 .................... A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 ....................................................... A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 .................................................. A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 ...................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................. A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 .................................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code ............................ A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010 ............... A-2602

Mark Nimrod Barak, dated July 15, 2010 ................. A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 ................... A-2631

Simon A. Borrows, dated June 25, 2010 ................... A-2702

Andre Bourbonnais, dated July 13, 2010 .................. A-2779

Andrew Chadd, dated July 23, 2010
    (Reproduced herein at pp. CA-1-CA-53)

xvi

**Page**

Ricardo Hacelas Coats, dated June 23, 2010 ............ A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010 ................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010 ................. A-2959

Elio Leoni-Sceti, dated June 25, 2010 ..................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010 ........................ A-3027

Eric Nicoli, dated July 5, 2010 ................................. A-3039

Timothy Pryce, dated July 22, 2010 ........................ A-3087

Riaz Punja, dated July 28, 2010 ............................... A-3130

Michael Slattery, dated August 6, 2010 ................... A-3169

Martin David Stewart, dated July 7 and 8, 2010 ....... A-3177

Iain Stokes, dated August 6, 2010 ............................ A-3183

Kamal Fouad Tabet, dated July 29, 2010 ................. A-3238

Francois Van der Spuy, dated July 7, 2010 .............. A-3242

Julie Williamson, dated July 28, 2010 ..................... A-3267

Alexander Wolf, dated July 14, 2010 ....................... A-3280

David Wormsley, dated July 20, 2010 ...................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated
    July 30, 2010 ....................................................... A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ............... A-3340

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006]
    EWCA Civ 1601 ...................................................... A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007]
    EWHC 1151 (Comm) ............................................ A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal
    Bank of Scotland Plc* [2010] EWHC 1392
    (Comm)..................................................................... A-3493

*BSkyB Ltd v Sky Subscribers Services Limited*
    [2010] EWHC 86 ................................................... A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus
    Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006]
    EWHC 2887 (QB) (Comm), [2007] EWCA Civ
    811 ........................................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................. A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ...................... A-4240

*Bradford Building Society v Borders* [1941] 2 All
    ER 205 .................................................................... A-4258

*Downs v Chappell* [1997] 1 WLR 426 ...................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009]
    EWCA Civ 169 ..................................................... A-4325

## xviii

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All ER 583 ........................................................ A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER (Comm) 573 ............................................. A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd* [2007] EWHC 2541 (QB)................................... A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465 .......................................... A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 ................................................... A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson & Co* [1991] 2 QB 113................................... A-4671

*Bankers Trust International v Dharmala Sakti Sejahtera* [1996] CLC 518..................................... A-4688

*Valse Holdings SA v Merrill Lynch International Bank Ltd* [2004] EWHC 2471 ............................. A-4741

*Peekay Intermark v Australia and New Zealand Banking Group* [2006] EWCA Civ 386................. A-4779

*JP Morgan Chase Bank v Springwell Navigation Corp* [2008] EWHC 1186 (Comm) ...................... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland Plc* [2010] EWHC 211 (Comm) ........................... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* [2008] EWHC 1686 (Comm), [2009] 1 All ER (Comm) 16, [2009] EWCA Civ 290 ........................................................ A-5126

xix

**Page**

*IFE Fund SA v Goldman Sachs International* 1 [2007] Lloyd's Rep 264 ......................................... A-5184

*William Sindall plc v Cambridgeshire County Council* [1994] 1 WLR 1016 ................................ A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 .......................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co* [1892] AC 25 .................................................. A-5325

*Allen v Flood* [1898] AC 1 ....................................... A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019 (Ch) ................................................................ A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ...................... A-5591

*Prudential Assurance Co Ltd v Newman Industries Ltd* (No. 2) [1982] Ch 204 .................................... A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ............... A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25 ................................................................... A-5708

*Smith New Court Securities v Citibank NA* [1997] AC 254 ............................................................ A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142 and 6-158 ............................................. A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs 8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

**Page**

*McGregor on Damages*, 17th Edition, paragraph 1-021 ................................................................ A-5774

*Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 ....................................................... A-5777

*Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 .............. A-5780

*The Unfair Contract Terms Act 1977* ........................ A-5783

Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 ............................................ A-5807

Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 ......... A-5883

Exhibit A to Randell Declaration - Handwritten Notes ................................................ A-5887

Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 ........................ A-5891

Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 .................................................... A-5894

Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 .................................................... A-6101

Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 .................................................... A-6280

xxi

**Page**

Declaration of Christopher E. Duffy in Opposition
   to Defendants' Motion for Summary Judgment,
   dated September 2, 2010 ....................................... A-6447

Exhibit 1 to Duffy Declaration -
Amended and Restated Advisory Agreement
relating to Terra Firma Investments (GP) 2
Limited and Terra Firma Capital Partners
Limited, dated October 9, 2003 ............................ A-6471

Exhibit 2 to Duffy Declaration -
Advisory Agreement relating to Terra Firma
Capital Partners III, L.P., dated February 8, 2006 . A-6493

Exhibit 3 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 20, 2007 .. A-6512

Exhibit 4 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Directors' meeting, dated May 20, 2007 .. A-6515

Exhibit 5 to Duffy Declaration -
E-mail from Rowland to Laskowski and Crocker,
dated September 18, 2008, with attachment .......... A-6517

Exhibit 6 to Duffy Declaration -
E-mail from Smith to Small, dated May 21, 2007 . A-6521

Exhibit 7 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 7, 2006 ................................................ A-6523

Exhibit 8 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
September 19, 2007 .............................................. A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 ................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ............................................... A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006................................................ A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007.......................................................... A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 ................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et
al.*, dated November 16, 2007.............................. A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 .............. A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007....................................................... A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007................................. A-6571

**xxiii**

                                                                              **Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...   A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006........................................   A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 ................................................   A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment............................................   A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 ................................................   A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 ......................................   A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 ........................................................   A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 ..............................................   A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6640

**xxiv**

                                                                  **Page**

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 ............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007 .................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007 .................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................... A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ............................ A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 .............................. A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 .......................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ............................................................. A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ............................................................. A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 ........................................................... A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 ......................................................... A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 ......................................................... A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 ......................................................... A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 ................................................ A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................ A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 ......................................................... A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 ......................................................... A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 ......................................................... A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ............................. A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 ................................... A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 ........................................................ A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 ............................................... A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment........................................... A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 ........................................................ A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 ........................................................ A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 .............................................. A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 ........................................................ A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ................................ A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ........................................................ A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ........................................................ A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007 .......................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 .............................. A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 .............................. A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 ............................................. A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 .............................................. A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment............................................. A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007  A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007  A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ...................................................... A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ...................................................... A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment............................................. A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" ..................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ...................................................... A-6835

**xxx**

**Page**

Exhibit 87 to Duffy Declaration -
E-mail from Simonian to Smith, dated
May 21, 2007 ........................................................ A-6837

Exhibit 88 to Duffy Declaration -
E-mail from Wormsley to Lindsay, dated
September 17, 2007 ............................................... A-6838

Exhibit 89 to Duffy Declaration -
Memorandum from Simpkin *et al.* to Klein *et al.*,
dated November 16, 2007
(Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration -
E-mail from Borrows to Nicoli, Gildersleeve and
Parker, dated July 31, 2007 ................................... A-6843

Exhibit 91 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ............................................... A-6844

Exhibit 92 to Duffy Declaration -
E-mail from Grigorova to Cockerill, *et al.*, dated
September 5, 2007 ................................................. A-6846

Exhibit 93 to Duffy Declaration -
E-mail from Sckerl to Cockerill, dated June 9,
2009 with Attachment
(Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration -
E-mail from Grigorova to Sckerl, dated
February 16, 2009 ................................................. A-6850

Exhibit 95 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 23, 2007 ............................................... A-6855

**xxxi**

                                                    **Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment...............  A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009....................................................  A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment...................  A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ...............................................  A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 .....................................................  A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009.................................................  A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010......................................................  A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007.........................................................  A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................ A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ........................................ A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 ............................... A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 ............................... A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007 .... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ....................................................... A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 .................................................. A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006.................................................. A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006.................................................. A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006.................................................. A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ........................................................ A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ................................................ A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 ........................................................ A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007 ...................................................... A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ....................................................... A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 ..................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ....................................................... A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ...................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 ..................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 ................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007 ........................................................  A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 ..............................................  A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007 .........  A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ....................................................  A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 ......................................................  A-7410

xxxvi

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 ................... A-7473

xxxvii

**Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 ................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 ................................................ A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ........................................................ A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ........................................... A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 ............................................... A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

**Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009.................................... A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007.. A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 . A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 ....................................................... A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-7553

Mark Nimrod Barak, dated July 15, 2010 ................ A-7557

Jason Bazinet, dated June 30, 2010 .......................... A-7564

Peter Edward Bell, dated June 22, 2010 ................... A-7601

Simon A. Borrows, dated June 25, 2010................... A-7705

Andre Bourbonnais, dated July 13, 2010.................. A-7827

Andrew Chadd, dated July 23, 2010
   (Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
   (Reproduced at pp. CA-295-CA-315)

xxxix

| | Page |
|---|---|
| John Gildersleeve, dated June 30, 2010 | A-7832 |
| Guy Hands, dated July 15, 2010 | A-7848 |
| Guy Hayward-Cole, dated July 27, 2010 | A-7901 |
| David Robert Paul Hill, dated August 4, 2010 | A-7918 |
| Michael Klein, dated July 19, 2010 | A-7923 |
| Chad Leat, dated June 18, 2010 | A-7935 |
| John Loveridge, dated July 30, 2010 | A-7941 |
| Bruce MacInnes, dated July 8, 2010 | A-7966 |
| Eric Nicoli, dated July 5, 2010 | A-7970 |
| Riaz Punja, dated July 28, 2010 | A-8039 |
| Timothy Pryce, dated July 22, 2010 (Reproduced at pp. CA-316-CA-335) | |
| Elio Leoni-Sceti, dated June 25, 2010 (Reproduced at pp. CA-336-CA-385) | |
| Paul Simpkin, dated July 5, 2010 | A-8056 |
| Michael Slattery, dated August 6, 2010 | A-8073 |
| Matthew Canning Smith, dated August 3, 2010 (Day 1) | A-8077 |
| Matthew Canning Smith, dated August 9, 2010 (Day 2) | A-8116 |
| Iain Stokes, dated August 6, 2010 | A-8127 |
| Kamal Fouad Tabet, dated July 29, 2010 | A-8157 |
| Francois Van der Spuy, dated July 7, 2010 | A-8171 |

xl

**Page**

Julie Williamson, dated July 28, 2010
(Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010........................  A-8175

David Wormsley, dated July 20, 2010
(Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
Defendants' Motion for Summary Judgment,
dated August 27, 2010 ............................................  A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated August 27, 2010 ..................................  A-8195

Appendices to the Report of Nicholas S. Strauss
Q.C. Pursuant to Rule 44.1 ....................................  A-8245

Exhibit 1 to Strauss Report -
*AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
CLC 265 ................................................................  A-8249

Exhibit 2 to Strauss Report -
*AIC Limited v. ITS Testing Services (UK) Ltd,*
[2006] EWCA Civ 1601 ........................................  A-8262

Exhibit 3 to Strauss Report -
*Angus v. Clifford,* [1891] 2 Ch 449 ......................  A-8371

Exhibit 4 to Strauss Report -
*Armstrong v. Strain,* [1951] 1 TLR 856 ................  A-8404

Exhibit 5 to Strauss Report -
*Assicurazione Generali v. Arab Insurance Group,*
[2003] I.R.L.R. 131 ..............................................  A-8422

Exhibit 6 to Strauss Report -
*Attorney General of Belize v. Belize Telecom
Limited,* [2009] 1 W.L.R. 1988 ............................  A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 ................... A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International
(Overseas) Ltd (In Liquidation) v. Price
Waterhouse (No.2),* [1998] PNLR 564 ............... A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan
Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ................................................. A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ...................................... A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 ...................................................... A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 ................................. A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ............................. A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ................ A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................ A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ............................................ A-9042

**xlii**

**Page**

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................................ A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton*
*(London) Ltd,* [1957] 2 QB 621 CA ..................... A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925 ...... A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ................................................................ A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484 .................. A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 .................................................................... A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 .................................................................... A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337 ................. A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ............... A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777 ............... A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ .............................................. A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne & Co Ltd. v. Heller & Partners
Ltd.,* [1964] AC 465 .............................................. A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),*
[1995] 2 AC 145 HL ............................................. A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247
CA ....................................................................... A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De
Productos Agricolas SA De CV,* [2003] EWCA
Civ 1104 .............................................................. A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,*
[2006] EWHCA 2887 (QB) (Comm) .................. A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West
Bromwich Building Society,* [1998] 1 W.L.R. 896 A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,*
[2004] EWCA Civ 1244 ....................................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom & Co.,* [1983] 1
All E.R. 583 ......................................................... A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation
Corp.,* [2008] EWHC 2286 (Comm) .................... A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)
Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 .................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 ............................................ A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson
& Co.,* [1991] 2 QB 113 ........................ A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand
Banking Group,* [2006] EWCA Civ 386 .............. A-10148

Exhibit 45 to Strauss Report -
*Raiffseisen Zentralbank Osterreich AG v. The
Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) .............................................. A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ................ A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District
Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

xlv

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL ............................................. A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 .................................................................... A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 .......................................................... A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National*
*Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ....................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ...................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and*
*Company of the Bank of England (No.3),* [2001]
UKHL 16 .............................................................. A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 .......................................... A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................. A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016............................. A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 .......................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 ................... A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) ............................................................. A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) ............................................................. A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) .......................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

**Page**

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) .............................  A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). .........................  A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ......................  A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss  ...........................  A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss  .................................................................  A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement  ...............................  A-11178

Affidavit of Service, sworn to September 2, 2010.....  A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 .....................  A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010 ..................................................  A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration - Responses and Objections of Plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. To Defendants' First Request for Production of Documents, dated March 9, 2010......................................................... A-11216

Exhibit 131 to Carney Reply Declaration - Journey Log Book for Guy Hands's flight to London, dated May 20, 2007 ................................. A-11244

Exhibit 132 to Carney Reply Declaration - Reservation for Guy Hands's flight to London, dated May 20, 2007 ................................................ A-11247

Exhibit 133 to Carney Reply Declaration - Report for Guy Hands's flight from the Airport Landing Dues Information System of Guernsey Airport, dated May 20, 2007................................... A-11248

Exhibit 134 to Carney Reply Declaration - Daily Confirmed Handling report of Blue Islands at Guernsey Airport, dated May 20, 2007.............. A-11249

Exhibit 135 to Carney Reply Declaration - Phone records of Guy Hands for the months of April and May 2007................................................ A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010................ A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 ........................... A-11363

John Gildersleeve, dated June 30, 2010...................... A-11376

Guy Hands, dated July 15, 2010 ................................ A-11380

xlix

                                                                    **Page**

John Loveridge, dated July 30, 2010 ........................ A-11395

Eric Nicoli, dated July 5, 2010 ................................. A-11410

Timothy Pryce, dated July 22, 2010 ........................ A-11419

Riaz Punja, dated July 28, 2010................................ A-11439

Michael Slattery, dated August 6, 2010 .................... A-11457

Martin David Stewart, dated July 7 and 8, 2010........ A-11473

Iain Stokes, dated August 6, 2010............................. A-11477

Francois Van der Spuy, dated July 7, 2010 ............... A-11501

Alec Werner, dated August 19, 2010 ........................ A-11513

David Wormsley, dated July 20, 2010 ...................... A-11520

Second Report of Ewan McQuater, Pursuant to Rule
    44.1, dated September 3, 2010, with Exhibit 1 ...... A-11532

Affidavit of Service, sworn to September 23, 2010... A-11566

Summary Judgment Hearing Transcript, dated
    September 10, 2010 ............................................... A-11568

Letter from Christopher E. Duffy to the Honorable
    Jed S. Rakoff, dated September 13, 2010, with
    attachments ......................................................... A-11620

Letter from Jay Cohen to the Honorable Jed S.
    Rakoff, dated September 13, 2010, with
    attachments ......................................................... A-11646

Order of the Honorable Jed S. Rakoff, dated
    September 14, 2010, filed September 15, 2010..... A-11664

Notice of Motion *in Limine* No. 2 to exclude the
    Testimony of Marianne Demario, by Defendants,
    dated October 4, 2010........................................... A-11666

**l**

                                                                    **Page**

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* to exclude certain
    Testimony and Evidence, dated October 4, 2010 ..  A-11668

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* to exclude certain
    Testimony and Evidence, dated October 4, 2010 ..  A-11677

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* Nos. 1 through 5,
    dated October 4, 2010 ..........................................  A-11686

    Exhibit 1 to Levi Declaration -
    Expert Report of David J. Teece, dated
    June 14, 2010
    (Reproduced at pp. CA-481-CA-544)

    Exhibit 4 to Levi Declaration -
    Complaint in the above-captioned matter, dated
    December 11, 2009 ..............................................  A-11695

    Exhibit 16 to Levi Declaration -
    Expert Report of Daniel R. Fischel, dated
    July 7, 2010
    (Reproduced at pp. CA-545-CA-586)

    Exhibit 17 to Levi Declaration -
    Microsoft Excel Spreadsheet printed from the
    native file produced by Plaintiffs and bearing
    bates number TF0000635801
    (Reproduced at pp. CA-587-CA-592)

    Exhibit 18 to Levi Declaration -
    Expert Report of Marianne DeMario, dated
    June 14, 2007
    (Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) .............. A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers*
*(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 ....... A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ...................................................... A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ..................................................... A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 ......................... A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007.......................... A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

Page

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010.................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
  (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
  (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010.................... A-12146

Eric Nicoli, dated July 5, 2010 ................................. A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

**liii**

**Page**

Declaration of Karen C. Dyer in Support of
    Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
    and Terra Firma Investments (GP) 3 Ltd's
    Memoranda in Oppositions to Defendants'
    Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration -
    Wise Men Committee meeting minutes, dated
    July 27, 2007.......................................................... A-12186

Exhibit 14 to Dyer Declaration -
    "Project Record Valuation Considerations"
    prepared by Merrill Lynch for Cerberus, dated
    May 17, 2007.......................................................... A-12188

Exhibit 15 to Dyer Declaration -
    Citi's Project Dice Credit Approval
    Memorandum, dated May 17, 2007....................... A-12209

Exhibit 16 to Dyer Declaration -
    Citi's "Fairness Committee Materials," dated
    May 21, 2007.......................................................... A-12303

Exhibit 17 to Dyer Declaration -
    Excerpts from American Society of Appraisers,
    *ASA Business Valuation Standards* (2009)............. A-12309

Exhibit 18 to Dyer Declaration -
    "Project Mulberry Valuation Materials," dated
    May 21, 2007.......................................................... A-12315

Exhibit 19 to Dyer Declaration -
    E-mail from Barak to Reid *et al.*, dated
    March 2, 2007........................................................ A-12324

Exhibit 20 to Dyer Declaration -
    Letter from Borrows to Nicoli, dated
    July 19, 2007......................................................... A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ....................................................... A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 .............................................. A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ........................................................ A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ...................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ...................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 ................................................... A-12462

**lv**

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 ................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 ................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 ................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................. A-14551

Trial Transcript, dated November 2, 2010 ................. A-14877

Trial Transcript, dated November 3, 2010 ................. A-15102

Trial Transcript, dated November 4, 2010 ................. A-15292

**lvi**

Page

Trial Exhibits:

Terra Firma Exhibit 1 -
    E-mail from Wormsley to Nicoli re call from
    GH, dated May 21, 2007.................................... A-15300

Terra Firma Exhibit 2 -
    E-mail from Tabet to Wormsley re
    Conversation with Guy Hands, dated
    May 21, 2007 ..................................................... A-15301

Terra Firma Exhibit 3 -
    E-mail from Wormsley to Lindsay re
    financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
    E-mail from Simonian to Smith re Bids, dated
    May 21, 2007 .................................................... A-15309

Terra Firma Exhibit 9 -
    E-mail from Randell to Terra Firma re May
    21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
    Draft Minutes of a meeting of a committee of
    the board of directors of Terra Firma (GP) 2
    Limited, dated May 21, 2007 ............................ A-15311

Terra Firma Exhibit 11 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007 ............................................. A-15316

Terra Firma Exhibit 12 -
    E-mail from Smith to Kirshenbaum re EMI
    deal, dated May 21, 2007 .................................... A-15319

Terra Firma Exhibit 13 -
    E-mail from Smith to Mehta re EMI, dated
    May 21, 2007 .................................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
E-mail from Smith to Badhe re EMI, dated
May 21, 2007 .................................................. A-15322

Terra Firma Exhibit 15 -
E-mail from Wormsley to Tague re Congrats
on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
E-mail from Poyser to Vakilian re Terra Firma
Recommended Cash Offer, dated
May 21, 2007 .................................................. A-15324

Terra Firma Exhibit 17 -
E-mail from Grigorova to Cockerill re
EMI/Maltby CCR July, dated
September 5, 2007 ........................................... A-15326

Terra Firma Exhibit 19 -
E-mail from Smith to Small re CITI M&A
wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
E-mail from Rowland to Laskowski and
Crocker re Terra Firma, dated
September 18, 2008 .......................................... A-15332

Terra Firma Exhibit 22 -
E-mail from Miller to Zogheb re EMI, dated
May 16, 2007 .................................................. A-15336

Terra Firma Exhibit 23 -
E-mail from Gildersleeve to Wormsley re
Roles, dated April 20, 2007 ............................. A-15338

lviii

**Page**

Terra Firma Exhibit 24 -
Citi Franchise Risk Assessment Template for
Maltby Investments Limited, Appendix 6B,
dated June 1, 2009 ............................................. A-15339

Terra Firma Exhibit 25 -
E-mail from Smith to Poyser re Chaka
Feedback, dated May 17, 2007 ......................... A-15340

Terra Firma Exhibit 26 -
E-mail from Wormsley to Poyser, *et al.*, re
EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
E-mail from Wormsley to Smith re FW: E-mail
from Wormsley to McBride, dated
May 21, 2007 ..................................................... A-15342

Terra Firma Exhibit 28 -
E-mail from Wormsley to Leat and Klein re
marginal deal for Terra Firma, dated
July 14, 2007 ...................................................... A-15345

Terra Firma Exhibit 29 -
E-mail from Wormsley to Hands re DAIG fees,
dated November 7, 2006 ................................... A-15346

Terra Firma Exhibit 30 -
E-mail from Wormsley to Hands re DAIG,
dated October 23, 2006 ..................................... A-15347

Terra Firma Exhibit 31 -
E-mail from Wormsley to Hands re proposal,
dated November 15, 2006 ................................. A-15348

Terra Firma Exhibit 32 -
E-mail from Wormsley to Klein re Citi/Terra
Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
   E-mail from Klein to Hands re Business
   Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
   E-mail from Tague to Lindsay re NBM #159
   Europe, dated March 9, 2007 .......................... A-15351

Terra Firma Exhibit 35 -
   E-mail from Tabet to Blagdon, Klein and
   Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
   E-mail from Wormsley to Miller re call from
   Guy Hands, dated May 8, 2007 ....................... A-15357

Terra Firma Exhibit 40 -
   E-mail from Smith to Wormsley re talk with
   JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
   E-mail from Wormsley to Nicoli, Gildersleeve,
   Stewart re FW: Terra Firma, dated
   May 18, 2007 .................................................. A-15359

Terra Firma Exhibit 42 -
   E-mail from Shott to Bell re auction process
   and Antitrust Confirmation, dated
   May 20, 2007 .................................................. A-15360

Terra Firma Exhibit 43 -
   E-mail from Ashcroft to Stewart re Conference
   call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
   E-mail from Wormsley to Nicoli re EMI media
   Review, dated May 20, 2007 ........................... A-15366

lx

**Page**

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records ........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 .......................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 ............................. A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 .................................................. A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007 .................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ......................................... A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ......................................... A-15420

**lxi**

**Page**

Terra Firma Exhibit 61 -
E-mail from Wormsley to Klein and Smith re
proposals from Cerberus and Fortress, dated
April 19, 2007 .................................................. A-15421

Terra Firma Exhibit 62 -
E-mail from Barclay re EMI Media Review - 13
May 2007, dated May 13, 2007 ....................... A-15422

Terra Firma Exhibit 63 -
E-mail from Klein to Nicoli re General, dated
May 18, 2007 .................................................. A-15424

Terra Firma Exhibit 64 -
E-mail from Smith to Wormsley re EMI, dated
May 18, 2007 .................................................. A-15425

Terra Firma Exhibit 125 -
Interoffice memorandum from Lindsay to
Drayton, *et al.* re East Surrey Holdings, dated
February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
Letter from Smith to Stewart re Engagement
Letter, dated September 4, 2006 ....................... A-15433

Terra Firma Exhibit 195 -
E-mail from Wormsley to Hands, dated
September 8, 2006 ........................................... A-15440

Terra Firma Exhibit 197 -
Terra Firma - Perspectives on Threshers, dated
September 25, 2006 ......................................... A-15441

Terra Firma Exhibit 201 -
Project Prince Working Party List, dated
November 1, 2006 ........................................... A-15461

lxii

**Page**

Terra Firma Exhibit 209 -
    E-mail from Wormsley to Mylchreest, dated
    November 23, 2006 ........................................... A-15490

Terra Firma Exhibit 214 -
    EMI Group plc - Statement re preliminary
    approach from Permira, dated
    November 28, 2006 ........................................... A-15493

Terra Firma Exhibit 215 -
    E-mail from Miller to Simpkin re EMI, dated
    November 28, 2006 ........................................... A-15494

Terra Firma Exhibit 220 -
    E-mail from Badhe to Hill re Fairness Opinion
    Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
    Minutes from EMI Meeting of Directors, dated
    November 29, 2006 ........................................... A-15498

Terra Firma Exhibit 224 -
    E-mail from Smith to Wormsley, dated
    November 30, 2006 ........................................... A-15504

Terra Firma Exhibit 230 -
    E-mail from Ashcroft to Smith re Prince, dated
    December 6, 2006 ............................................. A-15505

Terra Firma Exhibit 232 -
    Minutes from EMI Meeting of Directors, dated
    December 7, 2006 ............................................. A-15506

Terra Firma Exhibit 237 -
    E-mail from Bell to Smith, dated
    December 14, 2006 ........................................... A-15519

**lxiii**

                                                                    **Page**

Terra Firma Exhibit 238 -
    E-mail from Smith to Wormsley, dated
    December 14, 2006 ........................................... A-15520

Terra Firma Exhibit 239 -
    E-mail from Smith to Wormsley re FW: Draft
    announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
    E-mail from Wormsley to Robertson re
    Agenda, dated December 14, 2006 .................... A-15524

Terra Firma Exhibit 241 -
    E-mail from Nicoli to Gildersleeve re Project
    Prince, dated December 14, 2006 ...................... A-15525

Terra Firma Exhibit 242 -
    E-mail from McBride to Citi re EMI cessation
    announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
    E-mail from Wormsley to Smith and EMI re
    TF For Urgent Reply Please, dated
    December 14, 2006 ........................................... A-15528

Terra Firma Exhibit 244 -
    Letter from Kelly to EMI Group plc, dated
    December 14, 2006 ........................................... A-15530

Terra Firma Exhibit 248 -
    "EMI Group plc - Statement re preliminary
    approach," EMI Press Release, dated
    December 14, 2006 ........................................... A-15532

Terra Firma Exhibit 250 -
    Letter from Nicoli to Kelly, dated
    December 15, 2006 ........................................... A-15533

lxiv

Page

Terra Firma Exhibit 274 -
E-mail from Simpkin to Miller re EMI, dated
January 4, 2007 ................................................ A-15534

Terra Firma Exhibit 280 -
Minutes from EMI Meeting of Directors, dated
January 10, 2007 .............................................. A-15536

Terra Firma Exhibit 281 -
E-mail from Jones to Cockerill re Pepe - terms,
dated January 11, 2007...................................... A-15539

Terra Firma Exhibit 283 -
EMI Press Release announcing restructuring,
dated January 12, 2007 .................................... A-15545

Terra Firma Exhibit 285 -
E-mail from Smith to Wormsley, dated
January 12, 2007 ............................................... A-15548

Terra Firma Exhibit 314 -
EMI Press Release, dated February 14, 2007 ... A-15550

Terra Firma Exhibit 315 -
E-mail from Smith to Wormsley re EMI
Announcement, dated February 14, 2007.......... A-15551

Terra Firma Exhibit 317 -
E-mail from Smith to Swannell and Wormsley
re 6am Cut, dated February 15, 2007................. A-15552

Terra Firma Exhibit 318 -
Citigroup Analyst Report "EMI Group plc
Another Month, Another Warning," dated
February 15, 2007 ............................................. A-15557

Terra Firma Exhibit 329 -
EMI group confirms approach from Warner
Music group, dated February 20, 2007 ............. A-15569

lxv

Page

Terra Firma Exhibit 346 -
 Minutes of a Meeting of the Board of Directors
 of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
 Valuation Update, dated March 1, 2007 ............ A-15582

Terra Firma Exhibit 348 -
 EMI Board Meeting Minutes, dated
 March 1, 2007 ................................................... A-15597

Terra Firma Exhibit 366 -
 "EMI GROUP plc - Statement re Possible
 Offer," PR Newswire UK Disclose, dated
 March 12, 2007 ................................................. A-15608

Terra Firma Exhibit 368 -
 E-mail from Wormsley to Hands, dated
 March 3, 2008 ................................................... A-15610

Terra Firma Exhibit 377 -
 E-mail from Steffno to Cockerill re EMI
 Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
 E-mail from Nicoli to Faxon re Full year
 target, dated March 12, 2007 ............................ A-15624

Terra Firma Exhibit 387 -
 E-mail from Smith to CIB-CBKG re Viacom's
 music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
 E-mail from Smith to Wormsley re EMI, dated
 March 26, 2007 ................................................. A-15629

**lxvi**

**Page**

Terra Firma Exhibit 392 -
E-mail from Hill to Simpkin re (EUR) Wolters
Kluwer Education falls to Bridgepoint, dated
March 26, 2007 ................................................. A-15630

Terra Firma Exhibit 410 -
E-mail from Simpkin to Smith re EMI - staple,
dated April 3, 2007 .......................................... A-15633

Terra Firma Exhibit 412 -
E-mail from Llewelyn-Jones to CIB-GFI re
EMI, dated April 13, 2007 ............................... A-15635

Terra Firma Exhibit 416 -
Letter from EMI board of Directors to
Gildersleeve re the proposal, dated
April 16, 2007 .................................................. A-15636

Terra Firma Exhibit 424 -
E-mail from Seaton to Smith re FW: Trading
statement, dated April 17, 2007 ....................... A-15646

Terra Firma Exhibit 427 -
E-mail from Wormsley to Hands re new idea,
dated April 18, 2007 ......................................... A-15651

Terra Firma Exhibit 429 -
E-mail from EMI Investor Relations re EMI
Group plc - trading statement, dated
April 18, 2007 ................................................... A-15652

Terra Firma Exhibit 436 -
E-mail from Smith to Estacio and Hill re Fee,
dated April 19, 2007 ......................................... A-15654

Terra Firma Exhibit 438 -
E-mail from Klein to Hands cc Wormsley,
Burns, dated April 19, 2007 ............................. A-15655

**lxvii**

Page

Terra Firma Exhibit 439 -
    E-mail from Wormsley to Hands, Klein, cc
    Burns, dated April 19, 2007 ............................ A-15657

Terra Firma Exhibit 443 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated April 20, 2007 ........................... A-15659

Terra Firma Exhibit 444 -
    E-mail from Klein to Wormsley re Roles, etc.,
    dated April 20, 2007 ......................................... A-15667

Terra Firma Exhibit 445 -
    E-mail from Barak to Citi financing re Strictly
    Private & Confidential, dated April 20, 2007 ... A-15669

Terra Firma Exhibit 446 -
    E-mail from Barak to Citi financing re
    Cerberus Indication, dated April 20, 2007 ........ A-15681

Terra Firma Exhibit 447 -
    E-mail from Gildersleeve to Nicoli and
    Borrows re FW: E-mail from Wormsley to
    Gildersleeve, dated April 20, 2007 ................... A-15692

Terra Firma Exhibit 448 -
    E-mail from Smith to Seaton re Roles, dated
    April 20, 2007 ................................................... A-15694

Terra Firma Exhibit 449 -
    E-mail from Smith to Wormsley re Roles,
    dated April 20, 2007........................................... A-15696

Terra Firma Exhibit 454 -
    E-mail from Smith to Wormsley re Roles,
    dated April 22, 2007.......................................... A-15698

**lxviii**

Page

Terra Firma Exhibit 455 -
    E-mail from Ashcroft to Wormsley re OEP
    Letter, dated April 23, 2007 ............................. A-15700

Terra Firma Exhibit 462 -
    E-mail from Ashcroft to Citi financing re
    Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
    Letter from Smith to Baxter (Takeover Panel),
    dated April 24, 2007.......................................... A-15714

Terra Firma Exhibit 464 -
    E-mail from Tabet to Swannell, Klein and
    Wormsley re Hands, dated April 25, 2007 ......... A-15716

Terra Firma Exhibit 465 -
    E-mail from Gildersleeve to Ashcroft re Citi
    and Deutsche, dated April 26, 2007 .................. A-15717

Terra Firma Exhibit 468 -
    Letter from Smith to Stewart re provisions of
    advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
    E-mail from Coleman to Wolf re EMI, dated
    April 27, 2007 .................................................. A-15721

Terra Firma Exhibit 470 -
    E-mail from Smith to Wormsley re A3 page
    valuation summary, dated April 27, 2007 .......... A-15723

Terra Firma Exhibit 479 -
    E-mail from Smith to Bell re EMI consent
    letter, Side letter re financing bidders, dated
    April 28, 2007 .................................................. A-15726

lxix

**Page**

Terra Firma Exhibit 480 -
   E-mail from Smith to Stewart re Project
   Mulberry, dated April 30, 2007......................... A-15729

Terra Firma Exhibit 481 -
   E-mail from Smith to Ashcroft re Project
   Mulberry, dated April 30, 2007......................... A-15732

Terra Firma Exhibit 484 -
   Global FEG Working List Client Account List,
   dated May 1, 2007............................................. A-15735

Terra Firma Exhibit 492 -
   E-mail from Wormsley to Hands, dated
   May 3, 2007 ..................................................... A-15754

Terra Firma Exhibit 496 -
   EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
   E-mail from Cole to Ashcroft re Panel, dated
   May 4, 2007 ..................................................... A-15757

Terra Firma Exhibit 498 -
   E-mail from Cole to Bell re DB financing
   trees, dated May 4, 2007 ................................... A-15761

Terra Firma Exhibit 501 -
   EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
   "EMI Group plc - Statement re preliminary
   approach," EMI Press Release, dated
   May 4, 2007 ..................................................... A-15764

Terra Firma Exhibit 516 -
   E-mail from McCluskey to Yang re FW:, dated
   May 6, 2007 ..................................................... A-15765

lxx

Page

Terra Firma Exhibit 532 -
    E-mail from Smith to Wormsley re Terra
    Firma/EMI, dated May 8, 2007......................... A-15766

Terra Firma Exhibit 537 -
    E-mail from Hands to Wormsley re EMI, dated
    May 9, 2007 ..................................................... A-15767

Terra Firma Exhibit 538 -
    E-mail from Borrows to Gildersleeve re Dice,
    dated May 9, 2007............................................. A-15768

Terra Firma Exhibit 539 -
    E-mail from Smith to Hill & Estacio fw OEP,
    dated May 9, 2007............................................. A-15772

Terra Firma Exhibit 540 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007............................................. A-15773

Terra Firma Exhibit 541 -
    E-mail from Bell to Wormsley re Terra Firma
    Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
    E-mail from Simpkin to Wormley and Smith re
    Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
    E-mail from Smith to Poyser re Project
    Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
    E-mail from Ashcroft to Gildersleeve fw
    TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
    Project Mulberry Bidders Contact Details,
    dated May 11, 2007............................................ A-15789

**lxxi**

**Page**

Terra Firma Exhibit 552 -
E-mail from Wormsley to Bell re Mulberry,
dated May 11, 2007............................................ A-15814

Terra Firma Exhibit 553 -
E-mail from Bell to Smith and Wormsley re
Mondays meeting, dated May 11, 2007............. A-15816

Terra Firma Exhibit 554 -
E-mail from Smith to McCluskey re Just left
you a voicemail, dated May 11, 2007 ................ A-15820

Terra Firma Exhibit 555 -
E-mail from Simpkin to Edwards re Hope you
are well. re EMI, dated May 11, 2007 ............... A-15821

Terra Firma Exhibit 558 -
E-mail from Gildersleeve to EMI re Mulberry -
Data Room - IMPALA, dated May 13, 2007..... A-15822

Terra Firma Exhibit 564 -
E-mail from Barak to Smith re Citi Financing,
dated May 14, 2007............................................ A-15826

Terra Firma Exhibit 570 -
E-mail from Estacio to Klein fw Full DDT
procedures - Project Mulberry, dated
May 15, 2007 ..................................................... A-15828

Terra Firma Exhibit 578 -
E-mail from Bell to Citi Financing re Project
Mulberry Update, dated May 16, 2007.............. A-15834

Terra Firma Exhibit 579 -
E-mail from Zogheb to Miller re EMI, dated
May 16, 2007 ..................................................... A-15835

**lxxii**

**Page**

Terra Firma Exhibit 582 -
E-mail from Wormsley to Gildersleeve and
Nicoli re call from Guy Hands, dated
May 16, 2007 ...................................................... A-15837

Terra Firma Exhibit 593 -
Project Mulberry Working Party List, dated
May 17, 2007 ...................................................... A-15838

Terra Firma Exhibit 594 -
E-mail from Brumpton to Klein re LF/SEC
call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
E-mail from Klein to Wormsley re EMI Credit
call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
E-mail from Leat to Klein re Call, dated
May 17, 2007 ...................................................... A-15866

Terra Firma Exhibit 599 -
E-mail from Wormsley to Klein re Call Guy
Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
E-mail from Curtis to Klein re David
Wormsley called, VERY URGENT, dated
May 17, 2007 ...................................................... A-15868

Terra Firma Exhibit 604 -
E-mail from Bell to Gildersleeve re Update
from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
E-mail from Wormsley to Klein, dated
May 17, 2007 ...................................................... A-15870

**lxxiii**

**Page**

Terra Firma Exhibit 608 -
E-mail from Klein to Hands re Call, dated
May 17, 2007 ..................................................... A-15871

Terra Firma Exhibit 619 -
E-mail from Wormsley to Poyser re Issue on
covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
E-mail from Wormsley to Tabet re Covenants,
dated May 18, 2007............................................ A-15873

Terra Firma Exhibit 621 -
E-mail from Poyser to Wormsley re interest
coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
E-mail from Smith to Poyser re Debt approval,
dated May 18, 2007............................................ A-15875

Terra Firma Exhibit 630 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 2 Ltd 8:00am,
dated May 18, 2007............................................ A-15877

Terra Firma Exhibit 631 -
E-mail from Stewart to Wormsley re call, dated
May 18, 2007 ..................................................... A-15889

Terra Firma Exhibit 632 -
E-mail from Stewart to Wormsley re returning
call, dated May 18, 2007.................................... A-15890

Terra Firma Exhibit 636 -
E-mail from Nicoli to Stewart re Draft process
E-mail to be sent to bidders tomorrow, dated
May 18, 2007 ..................................................... A-15891

**lxxiv**

Page

Terra Firma Exhibit 640 -
    E-mail from Watson to Cole & Citi re
    Mulberry Mark-ups of Crimson Documents,
    dated May 18, 2007............................................ A-15894

Terra Firma Exhibit 643 -
    Greenhill: Fairness Opinion/Advice Review
    Form, dated May 18, 2007.................................. A-15896

Terra Firma Exhibit 644 -
    E-mail from Barak to Bell *et al.* re Update on
    calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
    E-mail from Borrows to Gildersleeve re
    Hands, dated May 18, 2007 ............................... A-15902

Terra Firma Exhibit 648 -
    E-mail from Borrows to Bell re draft process,
    dated May 18, 2007............................................ A-15903

Terra Firma Exhibit 649 -
    E-mail from O'Brien to Citi and EMI re EMI-
    NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 3 Ltd 8:30am,
    dated May 18, 2007............................................ A-15911

Terra Firma Exhibit 661 -
    E-mail from Pryce to Burrows cc Wormsley re
    Terra Firma, dated May 18, 2007 ..................... A-15923

Terra Firma Exhibit 674 -
    E-mail from Bell to Gildersleeve re EMI
    conference call, dated May 19, 2007 ................ A-15924

**lxxv**

                                                                                      **Page**

Terra Firma Exhibit 694 -
        Minutes of the Meeting of the Board of
        Directors of Terra Firma (GP) 3 Ltd 4:00pm,
        dated May 20, 2007........................................... A-15925

Terra Firma Exhibit 702 -
        E-mail from Watson to Ashcroft, cc Smith,
        Cole, *et al.*, re Mulberry - Key Issues Table and
        Turquoise Position, dated May 20, 2007 ........... A-15928

Terra Firma Exhibit 715 -
        E-mail from Quigley to O'Haire, Van der Spuy
        re FW: Update on Dice financing for
        discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
        E-mail from Smith to Wormsley re Mulberry
        Key issues table and Turquoise position, dated
        May 20, 2007 ..................................................... A-15940

Terra Firma Exhibit 726 -
        E-mail from Bell to Borrows re Trustee
        meeting notes, dated May 20, 2007 .................. A-15943

Terra Firma Exhibit 729 -
        E-mail from Wormsley to Hands, dated
        May 20, 2007 ..................................................... A-15944

Terra Firma Exhibit 736 -
        Minutes of a Meeting of a Committee of the
        Board of Directors of Terra Firma (GP) 3 Ltd
        at 8:00am, dated May 21, 2007.......................... A-15947

Terra Firma Exhibit 744 -
        E-mail from Hill to Shah re Citi M&A Wins:
        EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

lxxvi

Page

Terra Firma Exhibit 746 -
   Project Mulberry Fairness Committee
   Materials, dated May 21, 2007 ........................ A-15952

Terra Firma Exhibit 749 -
   E-mail from Smith to Llewelyn-Jones re
   Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
   E-mail from Wormsley to Smith re Greenhill
   Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
   E-mail from Hill to Smith re EMI, dated
   May 21, 2007 ................................................... A-15963

Terra Firma Exhibit 756 -
   E-mail from Smith to Bichara, Estacio, Hill,
   Abbasi, Golebiewski re Citi M&A Wins: EMI
   Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
   E-mail from Smith to Swannell re EMI, dated
   May 21, 2007 ................................................... A-15966

Terra Firma Exhibit 758 -
   E-mail from Smith to Suen and Mcbride re
   EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
   Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
   E-mail from Vakilian to Poyser re (RNS) Terra
   Firma Invest Recommended Cash Offer, dated
   May 21, 2007 ................................................... A-15973

lxxvii

**Page**

Terra Firma Exhibit 765 -
E-mail from Poyser to Lee re (RNS) Terra
Firma Invest Recommended Cash Offer, dated
May 21, 2007 ..................................................... A-15975

Terra Firma Exhibit 766 -
E-mail from Poyser to Abbasi re (RNS) Terra
Firma Invest Recommended Cash Offer, dated
May 21, 2007 ..................................................... A-15977

Terra Firma Exhibit 767 -
E-mail from Poyser to Vakilian re (RNS) Terra
Firma Recommended Cash Offer, dated
May 21, 2007 ..................................................... A-15979

Terra Firma Exhibit 768 -
E-mail from Wormsley to Smith re update on
call with GH, dated May 21, 2007 ................... A-15981

Terra Firma Exhibit 783 -
Project Mulberry Valuation Materials,
Greenhill & Co., dated May 21, 2007 .............. A-15982

Terra Firma Exhibit 787 -
E-mail from Simpkin to Treco re Call, dated
May 22, 2007 .................................................... A-15991

Terra Firma Exhibit 788 -
E-mail from Smith to Skarbek re Citi M&A
wins, dated May 22, 2007 ................................ A-15992

Terra Firma Exhibit 791 -
E-mail from Temming to Poyser re Example
for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
E-mail from Poyser to Smith re Example for us
all, dated May 22, 2007 .................................... A-15995

lxxviii

**Page**

Terra Firma Exhibit 796 -
    E-mail from Poyser to Smith re Dice, dated
    May 22, 2007  ................................................... A-15996

Terra Firma Exhibit 802 -
    E-mail from Poyser to Smith re financing
    process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
    E-mail from Poyser to Smith re financing
    process, dated May 24, 2007............................. A-16001

Terra Firma Exhibit 815 -
    David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
    E-mail from Wormsley to Hands re Thistle
    Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
    E-mail from Gildersleeve to Wormsley, dated
    May 29, 2007 .................................................... A-16015

Terra Firma Exhibit 824 -
    E-mail from Nesbit to Grigorova re Project
    Dice, dated May 30, 2007.................................. A-16016

Terra Firma Exhibit 827 -
    E-mail from Smith to Blackburn re MDs
    meeting Monday, June 4 at 8:15 UK time,
    dated May 31, 2007........................................... A-16020

Terra Firma Exhibit 831 -
    Citi Markets & Banking Credit Risk
    Principles, Policies and Procedures, dated
    June 1, 2007 ..................................................... A-16022

**lxxix**

Page

Terra Firma Exhibit 833 -
Recommended Cash Offer by Maltby-a
company formed at the direction of Terra
Firma-for EMI Group plc, dated June 7............  A-16246

Terra Firma Exhibit 846 -
E-mail from Aldred (on behalf of Hands) to
Van der Spuy re Message from Guy Hands -
Project Dice, dated June 27, 2007.....................  A-16410

Terra Firma Exhibit 872 -
E-mail from Wormsley to Gildersleeve and
Nicoli re Terra Firma, dated July 4, 2007 ..........  A-16411

Terra Firma Exhibit 874 -
E-mail from Poyser to Smith re Your revenue
list as at 4th July 2007, dated July 4, 2007 ........  A-16412

Terra Firma Exhibit 882 -
E-mail from King to Klein re Riverdeep, dated
July 9, 2007.........................................................  A-16414

Terra Firma Exhibit 883 -
E-mail from Hill to Lee re your revenue list as
at 4th July 2007, dated July 9, 2007...................  A-16415

Terra Firma Exhibit 887 -
E-mail between Wormsley and Leat regarding
advice, dated July 9, 2007..................................  A-16416

Terra Firma Exhibit 903 -
E-mail from Simpkin to Lavelle re EMI Equity
Bridge, dated July 16, 2007 ..............................  A-16417

Terra Firma Exhibit 917 -
E-mail from Borrows to Gildersleeve, Nicoli,
*et al.*, re Board Presentation, dated
July 18, 2007....................................................  A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
    E-mail from King to Klein re Terra Firma
    (High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
    E-mail from Smith to Stewart re Invoice to
    Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
    E-mail from Cockerill to Grigorova and Jones
    re EMI CCR, dated July 31, 2007 ...................... A-16438

Terra Firma Exhibit 987 -
    E-mail from Hill to Smith, dated
    August 6, 2007 .................................................. A-16439

Terra Firma Exhibit 992 -
    E-mail from Klein to Prince re EMI-DO NOT
    FORWARD, dated August 8, 2007 .................... A-16440

Terra Firma Exhibit 993 -
    E-mail from Klein to Mehta re Warner-
    confidential, dated August 8, 2007 ................... A-16442

Terra Firma Exhibit 994 -
    E-mail from Wirdnam to Leat re Terra Firma
    Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
    E-mail from Klein to Volk *et al.* re W, "Guy
    Spoke to Edgar and offered 3B," dated
    August 11, 2007 ................................................ A-16444

Terra Firma Exhibit 1006 -
    E-mail from Klein to Volk *et al.* re FW: edgar,
    "4B value of EMI," dated August 12, 2007 ....... A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
E-mail from Smith to Watson re Mulberry Citi
Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
E-mail from Barker to Leat fw EMI, dated
August 24, 2007................................................ A-16447

Terra Firma Exhibit 1040 -
E-mail from Smith to CMB-GBKG re Quote
of the Day, dated September 10, 2007 .............. A-16448

Terra Firma Exhibit 1074 -
Memorandum from Simpkin *et al.* to Klein *et al.* re Project Dice (Public to Private of EMI), dated November 16, 2007 ................................. A-16449

Terra Firma Exhibit 1080 -
E-mail from Wormsley to Klein re Guy Hands, dated November 23, 2007................................. A-16459

Terra Firma Exhibit 1100 -
E-mail from Wormsley to Lynn re meeting
with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
E-mail from Smith to Poyser re trusted adviser, dated January 30, 2008 ..................................... A-16461

Terra Firma Exhibit 1111 -
E-mail from Wormsley to Hands cc Burns,
dated February 1, 2008 ..................................... A-16463

Terra Firma Exhibit 1114 -
E-mail from Wormsley to Hands, dated
February 19, 2008 ............................................. A-16466

**lxxxii**

Page

Terra Firma Exhibit 1141 -
    Franchise Rise Assessment Template, dated
    July 2008........................................................... A-16470

Terra Firma Exhibit 1144 -
    Handwritten Notes of Cockerill, dated
    September 1, 2008 ............................................. A-16471

Terra Firma Exhibit 1147 -
    E-mail from Smith to Wormsley re FW:
    Morgan Stanley CDs now officially higher than
    EMI!!! Hurrah, dated September 18, 2008........... A-16472

Terra Firma Exhibit 1158 -
    Handwritten Notes of Cockerill, dated
    November 16, 2008............................................ A-16473

Terra Firma Exhibit 1176 -
    E-mail from Cox to Smith re City Speaker
    Series - 12th February, Wormsley Presentation,
    dated February 11, 2009.................................... A-16476

Terra Firma Exhibit 1196 -
    Franchise Risk Assessment Template, Maltby
    Investments Limited, dated June 2009............... A-16529

Terra Firma Exhibit 1225 -
    E-mail from Smith to Vakilian re Citigroup
    accused of fraud over EMI sale, dated
    December 13, 2009 ........................................... A-16530

Terra Firma Exhibit 1241 -
    Compliance "Tree" for EMI group, dated
    January 14, 2010 .............................................. A-16532

**lxxxiii**

**Page**

Terra Firma Exhibit 1251 -
  Baughman to Duffy re supplement to Citi's
  response to Terra Firma's Interrogatory No. 5,
  dated March 25, 2010 ....................................... A-16536

Terra Firma Exhibit 1313 -
  EMI Trading Update ........................................ A-16539

Terra Firma Exhibit 1346 -
  EMI Stock Price.xls ........................................ A-16541

Terra Firma Exhibit 1365 -
  E-mail from Wormsley to Hands re DAIG-
  subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
  E-mail from Wormsley to Smith, dated
  November 28, 2006............................................ A-16592

Terra Firma Exhibit 1369 -
  E-mail from Smith to Wormsley re EMI, dated
  December 20, 2006 ........................................... A-16593

Terra Firma Exhibit 1370 -
  E-mail from Wormsley to Klein re Call, dated
  May 17, 2007 ................................................... A-16594

Terra Firma Exhibit 1371 -
  E-mail from Coats to Dolenec re Project Dice,
  dated May 21, 2007........................................... A-16595

Terra Firma Exhibit 1372 -
  E-mail from Wormsley to Klein re EMI, dated
  August 2, 2007................................................. A-16596

Terra Firma Exhibit 1377 -
  E-mail from Seymour to Van der Spuy re
  Project Dice memo, dated May 15, 2007........... A-16597

**lxxxiv**

**Page**

Terra Firma Exhibit 1380 -
    Minutes of the May 20, 2007 Meeting of the
    IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
    Kirsten Randell notebook ................................ A-16610

Terra Firma Exhibit 1395 -
    Amended and Restated Fee Letter, dated
    August 13, 2007 ................................................ A-16751

Terra Firma Exhibit 1400 -
    E-mail from Rawlings to Silva, Reeves cc
    Govinida, Dubin re Maltby - fees, dated
    August 31, 2007 ................................................ A-16761

Terra Firma Exhibit 1407 -
    E-mail from Wormsley to Klein, dated
    November 21, 2007 ............................................ A-16763

Terra Firma Exhibit 1409 -
    E-mail from Wormsley to Hands re BUPA
    hospitals, dated June 18, 2007 ......................... A-16764

Terra Firma Exhibit 1415 -
    E-mail from Seth to Simpkin, *et al.*, re EMI
    staple plan, attaching EMI Recd Financing.xls
    and EMI Group Financing.xls, dated
    April 1, 2007 .................................................... A-16765

Terra Firma Exhibit 1434 -
    David Wormsley deposition excerpts (pp. 159-
    170:18), dated July 20, 2010 ............................. A-16872

Terra Firma Exhibit 1436 -
    Stipulation re Eric Nicoli .................................. A-16885

**lxxxv**

Page

Citi Exhibit A-1 -
 Page 27, Paragraph 109 of Complaint in *Terra
 Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
 Page 28, Paragraph 110 of Complaint in *Terra
 Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
 Pages 31-32, Paragraph 126 of Complaint in
 *Terra Firma v. Citigroup*, dated
 December 11, 2009 ........................................... A-16890

Citi Exhibit A-8 -
 Page 32, Paragraph 128 of Complaint in *Terra
 Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
 Page 32-33, paragraphs 127-129 of Complaint
 in *Terra Firma v. Citigroup*, dated
 December 11, 2009 ........................................... A-16895

Citi Exhibit C -
 E-mail from Vallance on behalf of Hands to
 Punja, *et al.*, re URGENT & IMPORTANT-
 EMI, dated May 6, 2007 ................................... A-16898

Citi Exhibit D -
 Minutes of May 7, 2007, Meeting of the
 Investment Advisory Committee of Terra
 Firma, dated May 7, 2007 ................................ A-16900

Citi Exhibit E -
 E-mail from Seymour to Becker, *et al.*, with
 attached Project Dice Memo to the GP, dated
 May 7, 2007 ..................................................... A-16902

**lxxxvi**

**Page**

Citi Exhibit H -
Minutes of May 15, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma, dated May 15, 2007 ............................. A-16914

Citi Exhibit I -
Memo from Punja, *et al.*, to the IAC re Project
Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
E-mail thread ending with E-mail from Slattery
to Randell, *et al.*, re IAC Distribution List
DICE, dated May 19, 2007 ............................. A-16923

Citi Exhibit K -
Minutes of May 18, 2007, Terra Firma
Investment Advisory Committee Meeting,
dated May 18, 2007 .......................................... A-16927

Citi Exhibit L -
Minutes of May 20, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners Limited, dated
May 20, 2007 .................................................... A-16929

Citi Exhibit P -
Project Dice Update to the IAC, dated
June 28, 2007 .................................................... A-16931

Citi Exhibit W -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice: 2008 Forecast vs.
Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
Project Mulberry Limited Scope Vendor Due
Diligence Report, dated May 4, 2007 .............. A-16959

**lxxxvii**

Page

Citi Exhibit BL -
    Letter from Stokes to Gildersleeve re Terra
    Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
    Project Mulberry Valuation Materials, dated
    May 21, 2007 ................................................... A-17011

Citi Exhibit BP -
    E-mail from Night BA to Amstutz, *et al.*, re
    EMI Co-Investment Opportunity, with attached
    EMI Presentation to Co-Investors, dated
    August 20, 2007 ............................................... A-17020

Citi Exhibit BR -
    E-mail thread ending with E-mail from Night
    BA to Tequila Bone, with attached co-investor
    presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
    E-mail from Vallance to TF Team Dice re EMI
    Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
    E-mail thread ending with E-mail from Punja
    to Hands re Revised financing E-mail, dated
    May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
    Guernsey Airport Landing Dues Information
    System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
    Memo from Punja, *et al.*, to IAC, *et al.*, re
    Project Dice Phase One Due Diligence, dated
    February 5, 2007 .............................................. A-17071

**lxxxviii**

Page

Citi Exhibit DT -
    E-mail from Vallance on behalf of Hands to
    Wormsley re Hands' desire to speak with
    Wormsley ASAP, dated May 6, 2007 ................ A-17087

Citi Exhibit DW -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re Project Dice, dated
    May 7, 2007 ..................................................... A-17088

Citi Exhibit DX -
    E-mail thread ending with E-mail from Hands
    to Hedegaard, *et al.*, re Project Dice, dated
    May 6, 2007 ..................................................... A-17090

Citi Exhibit DY -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 10:00 a.m. (GP3), dated
    May 8, 2007 ..................................................... A-17092

Citi Exhibit EA-1 -
    Terra Firma's telephone records from British
    Telecom, dated August 2, 2007......................... A-17101

Citi Exhibit EA-2 -
    Airtime Billing Reporting Team Itemisation
    Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
    E-mail thread ending with E-mail from
    Vallance on behalf of Hands to Klein re request
    for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
    E-mail thread ending with E-mail from
    Vallance on behalf of Hands to Wormsley re
    request for Wormsley to call Hands, dated
    May 18, 2007 ................................................... A-17205

lxxxix

**Page**

Citi Exhibit ED -
E-mail thread ending with E-mail from Tabet
to Hands re EMI, dated May 18, 2007 .............. A-17206

Citi Exhibit EE -
E-mail thread ending with E-mail from Aldred
to Hands, *et al.*, re Relationship between Roger
Ames and Cerberus Capital Management,
dated September 24, 2007 ................................ A-17208

Citi Exhibit EH -
Project Dice Presentation by Terra Firma, with
E-mail thread ending with E-mail from Punja
to Hands re Process, dated May 20, 2007 ......... A-17209

Citi Exhibit EI -
E-mail thread ending with E-mail from Punja
to Hands re Process, dated May 20, 2007 ......... A-17286

Citi Exhibit EJ -
Minutes of May 20, 2007, Meeting of the Terra
Firma (GP) 2 Board of Directors, dated
May 20, 2007 ................................................... A-17290

Citi Exhibit EL -
E-mail thread ending with E-mail from Hands
to Wormsley re outstanding issues between Citi
and Terra Firma, dated May 20, 2007 ............... A-17293

Citi Exhibit EO -
Minutes of May 23, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners, Limited, dated
May 23, 2007 ................................................... A-17296

xc

**Page**

Citi Exhibit EQ -
    E-mail from Vallance to Terra Firma Team
    Dice, *et al.*, re Weekly Dice Updates for IAC,
    dated June 14, 2007 ........................................... A-17298

Citi Exhibit ET -
    Press release re Recommended Cash Offer for
    EMI Group plc by Maltby Limited, dated
    July 20, 2007 .................................................... A-17299

Citi Exhibit FB-1 -
    Declaration of John Loveridge, dated
    February 3, 2010 ............................................... A-17302

Citi Exhibit FD -
    Terra Firma Investments (GP) 3 Limited
    Advisory Agreement Relating to Terra Firma
    Capital Partners III, L.P., dated
    February 8, 2006 ............................................... A-17311

Citi Exhibit FG -
    Draft Memo from Punja, *et al.* to the IAC re
    Project Dice: Presentation and Success Fee,
    dated May 18, 2007 ........................................... A-17331

Citi Exhibit FI -
    Minutes of May 15, 2007, Meeting of Terra
    Firma (GP) 3 Board of Directors, dated
    May 15, 2007 .................................................... A-17332

Citi Exhibit FN -
    Minutes of May 20, 2007, Meeting of the
    Board of Directors at 4:00 p.m. (GP3), dated
    May 20, 2007 .................................................... A-17334

xci

**Page**

Citi Exhibit FO -
    Minutes of May 21, 2007, Meeting of the
    Board of Directors at 7:30 a.m. (GP2), dated
    May 21, 2007 ...................................................... A-17337

Citi Exhibit FP -
    Terra Firma Presentation to GP re Project Dice,
    dated May 21, 2007............................................ A-17340

Citi Exhibit FR -
    Memo Recommending Cash Offer by Maltby
    Limited for EMI Group plc, dated
    May 30, 2007 .................................................... A-17350

Citi Exhibit FV -
    Letter from Kelly to EMI Group plc re Terra
    Firma's interest as a potential offeror for EMI,
    dated December 14, 2006 .................................. A-17512

Citi Exhibit FX -
    E-mail from Van der Spuy to Bell, *et al.*, with
    attached Project Dice: Management Meeting
    questions and attendees, dated
    May 11, 2007 .................................................... A-17514

Citi Exhibit GF -
    Letter from Kelly to Gildersleeve re Summary
    Proposal for Terra Firma potential offer, dated
    May 8, 2007 .................................................... A-17533

Citi Exhibit GG -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 8:45 a.m. (GP2), dated
    May 8, 2007 .................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
E-mail thread ending with E-mail from Nicoli
to Stewart, *et al.*, re E-mail to be sent to
bidders tomorrow, dated May 18, 2007 ............ A-17548

Citi Exhibit GN -
E-mail thread ending with E-mail from
Wormsley to Simpkin, *et al.*, re Terra
Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
Terra Firma Presentation to Investment
Advisory Committee re Project Dice, dated
May 18, 2007 .................................................... A-17552

Citi Exhibit GQ -
E-mail from Pryce to Burrows, *et al.*, re Terra
Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
E-mail from Melvin to Hands, *et al.*, re Urgent-
EMI/Terra, dated May 22, 2007 ........................ A-17713

Citi Exhibit HH -
E-mail from Shaw to Nicoli re Trading
statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
Project Dice Presentation: Update to the IAC,
dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
E-mail thread ending with E-mail from Van der
Spuy to O'Haire, *et al.*, re Update on Dice
Financing for Discussion Tomorrow, dated
May 20, 2007 .................................................... A-17738

xciii

**Page**

Citi Exhibit IC -
　　E-mail from Vallance to Hudson, *et al.*, re
　　Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
　　Court Order in the High Court of Justice,
　　Queen's Bench Division, dated
　　August 16, 2010 ................................. A-17749

Citi Exhibit IE -
　　Journey Log Book for aircraft Cs-DXJ
　　registered with the Portuguese Registry
　　entitled, "Diário de Navegaçao," dated
　　May 24, 2007 ................................... A-17758

Citi Exhibit IF -
　　Screen Shot: Build Reservation for Terra
　　Firma, dated May 20, 2007 .................... A-17761

Citi Exhibit IW -
　　Terra Firma Capital Partners II Q3 2007, dated
　　November 1, 2007 ............................. A-17762

Citi Exhibit JC -
　　E-mail from Reid to Seymour re Final Version
　　of McK docs, dated, with attachment
　　May 16, 2007 ................................... A-17807

Citi Exhibit JD -
　　Terra Firma Music Industry Key Market
　　Outlook, dated May 15, 2007 ................... A-18001

Citi Exhibit JE -
　　KPMG Report - Project Dice - Limited Scope
　　due financial diligence report, dated
　　May 17, 2007 .................................. A-18128

xciv

**Page**

Citi Exhibit JI -
E-mail from Vallance on behalf of Hands to TF
Team Dice re Dice and RBS, dated
May 8, 2007 ...................................................... A-18232

Citi Exhibit JN -
Minutes of the May 18, 2007, EMI Group plc
meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated June 28, 2007 ................. A-18240

Citi Exhibit JQ -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 13, 2007 ................ A-18246

Citi Exhibit JS -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 20, 2007 ................ A-18249

Citi Exhibit JT -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 28, 2007 ................ A-18252

Citi Exhibit KA -
E-mail from Dowler to Hands re Dice, dated
May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
E-mail from Robert-Tissot to Hands re
Gatwick, dated February 6, 2009....................... A-18257

xcv

**Page**

Citi Exhibit KH -
   E-mail from Wormsley to Cabrey re Hands -
   Invitation to Terra Firma Annual Clay Pigeon
   Shoot, dated July 1, 2008 .................................. A-18259

Citi Exhibit KJ -
   Terra Firma Annual Review 2007, dated
   June 29, 2005 ................................................... A-18262

Citi Exhibit KY -
   Terra Firma Private Placement Memorandum,
   dated April 1, 2006 ............................................ A-18382

Citi Exhibit LI -
   Memo from Punja, *et al.*, to Hands, *et al.*, re
   EMI Preliminary Discussion, dated
   December 1, 2006 .............................................. A-18482

Citi Exhibit MB -
   Signed Minutes of the February 5, 2007,
   Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
   Letter from Smith to Stewart re Provision of
   Advisory and Corporate Broking Services by
   Citigroup, dated April 27, 2007 ....................... A-18493

Citi Exhibit OF -
   Letter from Kelly to Gildersleeve re possible
   offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
   E-mail thread ending with E-mail from Miller
   to Wormsley, dated May 8, 2007 ..................... A-18499

Citi Exhibit OJ -
   E-mail from Wormsley to Hands re EMI, dated
   May 8, 2007 ................................................... A-18500

xcvi

**Page**

Citi Exhibit OM -
    Project Mulberry Bidders Contact Detail, dated
    May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
    E-mail thread ending with E-mail from Van der
    Spuy to Simpkin, *et al.*, re Project Dice:
    Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
    Minutes of May 15, 2007, Meeting of the
    Board of Directors at 7:30 p.m. (GP2), dated
    May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
    E-mail thread ending with E-mail from Klein
    to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
    E-mail from Wilkins to Nicoli, *et al.*, re
    Wormsley call, dated May 18, 2007 ................ A-18533

Citi Exhibit RU -
    E-mail thread ending with E-mail from Nicoli
    to Wormsley re EMI media review, dated
    May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
    E-mail thread ending with E-mail from
    Simpkin to Dolenec, *et al.*, re securitisation
    colleagues, dated May 20, 2007 ...................... A-18537

Citi Exhibit UF -
    E-mail thread ending with E-mail from Tabet
    to Wormsley re just spoke to GH, dated
    May 21, 2007 .................................................. A-18540

xcvii

**Page**

Citi Exhibit VP -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:00 p.m. (GP2), dated
    May 23, 2007 ................................................... A-18543

Citi Exhibit VQ -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:15 p.m. (GP3), dated
    May 23, 2007 ................................................... A-18545

Citi Exhibit WI -
    Memo from Punja, *et al.*, to the IAC, *et al.*, re
    Project Dice Update and Budget, with attached
    Presentation re IAC update: Project Dice,
    dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
    E-mail from Cabrey to Wormsley, *et al.*, re
    Villa Saletta Shoot, with attached Fax Reply
    Form, dated August 15, 2007 ........................... A-18555

Citi Exhibit AAO -
    E-mail from MacInnes to Punja, *et al.*, with
    attached Dresdner invoice to Maltby, dated
    August 17, 2007 ............................................... A-18560

Citi Exhibit ABL -
    Memo from Pryce to TFCP Personnel re Public
    to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
    Letter from Terra Firma Investments (GP) 3
    Limited to Citi re the amendment letter, dated
    December 21, 2007, dated January 11, 2008 .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
E-mail from Dicks to Wormsley, *et al.*, re DW
Menu selection Die Sauberflote, attached
menu, dated June 23, 2008 ............................... A-18571

Citi Exhibit AGF -
Terra Firma Capital Partners II, Q1 2008, dated
March 31, 2009 ................................................ A-18574

Citi Exhibit AHA -
Presentations re EMI and the Terra Firma/Citi
Relationship, dated August 1, 2009 ................. A-18623

Citi Exhibit AJJ -
Cell phone Records for David Wormsley, dated
April 26, 2007 ................................................. A-18643

Citi Exhibit AJT -
Guy Hands' Calendar for May 18, 2007, dated
May 18, 2007 .................................................. A-18671

Citi Exhibit AKL -
EMI Recorded Music Presentation, dated
April 1, 2009 ................................................... A-18672

Citi Exhibit AKT -
Stipulated Phone Numbers ............................... A-18698

Citi Exhibit AKY -
TFCP III Co-Investment 2 L.P. Project Dice
Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
Citigroup Structure Chart .................................. A-19064

Citi Exhibit ALK -
E-mail thread ending with E-mail from
Wormsley to Dicks re shotgun certificate form,
dated October 4, 2007 ....................................... A-19065

xcix

**Page**

Citi Exhibit ALU -
 E-mail thread ending with E-mail from
 Grigorova to Lynn, *et al.*, re EMI Summary
 Exposure, dated November 21, 2009 .................. A-19067

Citi Exhibit ALY -
 Paragraph 22, Page 5 of Joint Statement
 Pursuant to Individual Practices 4(a) of the
 Facts and Other Matters on Which the Parties
 Agree ................................................................. A-19072

Citi Exhibit EEB-3 -
 Table 1B of Expert Report of Marianne
 DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
 Appendix 1 of Expert Report of Marianne
 DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
 Corrected Expert Report of Marianne DeMario
 in *Andrews v. Raphaelson*, *et al.*, dated
 October 19, 2006 ............................................. A-19078

Citi Exhibit EEJ -
 *Caiola v. Citibank*, Expert Report of Marianne
 DeMario ........................................................... A-19095

Citi Exhibit EEY -
 Client List for Spectrum Consulting Partners.... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
 Handwritten Notes ............................................ A-19126

Terra Firma Exhibit 48 -
 Nicoli Mobile Phone Records
 (Reproduced at pp. CA-826-CA-837)

c

|  | **Page** |
|---|---|
| Letter Brief of Terra Firma to the Honorable Jed S. Rakoff, dated October 25, 2010 | A-19127 |
| Letter Brief of Citigroup Inc. to the Honorable Jed S. Rakoff, dated October 25, 2010 | A-19137 |
| The Court's Proposed Jury Instructions, dated November 1, 2010 | A-19147 |
| Memorandum of the Honorable Jed S. Rakoff, dated November 2, 2010 | A-19163 |
| Verdict Sheet, dated November 4, 2010 | A-19179 |
| Judgment, So-Ordered on December 9, 2010, Appealed From | A-19180 |
| Notice of Appeal, dated January 10, 2011 | A-19187 |

WORKING DRAFT

CONFIDENTIAL

# Terra Firma Project Dice

A-601

Assessment of potential sources of major upside

14 May 2007

This report is solely for the use of client personnel. No part of it may be circulated, quoted, or reproduced for distribution outside the client organization without prior written approval from McKinsey & Company. This material was used by McKinsey & Company during an oral presentation; it is not a complete record of the discussion.

# DISCLAIMER

This document and the analyses and conclusions set forth herein are based on information that has mainly not been generated by McKinsey & Company and has not, therefore, been subject to our independent verification

The analyses and conclusions contained in this document were conducted on an accelerated basis, reflect our perspectives concerning Dice's business plan and do not purport to contain or incorporate all the information that would be required for Terra Firma to properly evaluate an acquisition of Dice. Accordingly, the Terra Firma must conduct more detailed analyses for the purposes of their review of the transaction

The analyses and conclusions contained in this document are based on various assumptions that we have developed with the Terra Firma and their respective advisors in this project, which partly may or may not be correct, being based upon factors and events subject to uncertainty. Such assumptions were developed solely as a means of illustrating the principal considerations that may be taken into account and independently evaluated. Future results or values could be materially different from any forecast or estimate contained in these analyses

McKinsey makes no representation or warranty, express or implied, as to the accuracy or completeness of the underlying assumptions, estimates, analyses, or other information contained in this document, and nothing contained herein is or shall be relied upon as a promise or a representation, whether as to the past, the present, or the future

This document is solely for the use of the Terra Firma. No part of it may be circulated, quoted, or reproduced for distribution outside the client organizations without prior written approval from McKinsey & Company. It is not intended to, and may not, be relied upon by any person or entity and, therefore, any person or entity who receives this document or the information contained herein, with McKinsey & Company's permission or otherwise, is hereby put on notice that (i) they are responsible for their own analyses and may not rely on any information contained herein, and (ii) McKinsey & Company makes no representations or warranties, including with respect to the accuracy or completeness of the information contained herein or any other written or oral communication transmitted or made available to the 3rd party, and expressly disclaims any and all liabilities based on such information or on omissions there from

A-602

1

Confidential

TF0000092616

# CONTENTS

- **Summary**

- Geographic expansion

- Business model transformation

- Other adjacent sources of revenue

A-603

2

Confidential

TF0000092617

# WE HAVE IDENTIFIED A POTENTIAL UPLIFT OF UP TO £55MM IN EBITDA BY 2012, IN PART REQUIRING A SIGNIFICANT SHIFT IN THE BUSINESS MODEL

**PRELIMINARY**



■ More easily implemented initiatives   ○ Low   ● High

| Potential lever | Potential initiative evaluated | Incremental 2012 EBITDA above base case* £MM | Feasibility of imple-mentation | Comments |
|---|---|---|---|---|
| Geographic expansion (£10–16m) | ① MP3 (non-mobile) recorded music in emerging markets | 0 | n/a | • Little prospect of sizeable legal (non-mobile) market emerging<br>• Advertising model potential to be determined |
| | ② Mobile recorded music in emerging markets | 4-6 | ◐ | • Small additional upside of DICE expanded roster of local market |
| | ③ Music publishing in emerging markets | 6-10 | ◐ | • Limited upside in performance and synchronisation revenues |
| Business model transformation (£57m) | ④ Enhanced product and yield management | ■ | ● | • Easiest opportunity to capture, but requires iTunes cooperation or development of an alternative channel |
| | ⑤ Radical change to business model (A&R and marketing costs) enabled by digital | 33 | ◔ | • Large potential opportunity but would require massive cultural change and upgrade of digital skills |
| | ⑥ Exploitation of long-tail in recorded music | ~ | n/a | • Long-tail represented limited value and already served by P2P |
| Expansion into adjacent revenue streams (£~0m) | ⑦ Exploitation of broader set of rights (e.g., merchandise) | ~0 | ◔ | • Value realised depends on nature of deals<br>• Some opportunity, but primarily in complementing additional strategies (e.g., yield management) |
| | ⑧ New web-enabled sources of music publishing revenue (e.g., YouTube copyright revenues) | Tbd | ◔ | • Preliminary view is that overall opportunity is limited |
| **Total** | | 22    33    55 | | |

\* Excluding investment; implementation costs

3

TF0000092618

Confidential

A-604

# CONTENTS

- Summary

- **Geographic expansion**

- Business model transformation

- Other adjacent sources of revenue

A-605

Confidential

4

TF0000092619

# ALTHOUGH MATERIAL GROWTH OPPORTUNITIES APPEAR TO EXIST IN EMERGING MARKET MOBILE MUSIC AND MUSIC PUBLISHING, DICE IS CURRENTLY NOT WELL POSITIONED TO BENEFIT



● High
◐ Medium
○ Low

**Opportunity assessment**

| Levers evaluated | Description | Size (approx. 2012 EBIT impact* (£m)) | Feasibility | Rationale |
|---|---|---|---|---|
| **①** Digital (non-mobile) recorded music in emerging markets | • Significant increase in the legal digital download market | ~0 | ○ | • Endemic culture of piracy in all key emerging market countries is expected to remain, if not worsen, in digital world<br>• Strong agreement from experts that little prospect exists of a material legal download market emerging in countries such as China or Russia |
| **②** Mobile recorded music market in emerging markets | • Ability to generate revenue from direct-to-mobile downloads | 4-6 | ◐ | • China is the one BRIC market with an established mobile music market and future growth is expected to be strong<br>• However, even with significant growth, total market size will remain small, given share to content provider |
| **③** Music publishing in emerging markets | • Significant increase in synchronisation and performance income in BRIC markets | 6-10 | ◐ | • Relatively attractive fundamentals with strong growth expected in underlying content which uses music and possibility of some limited improvement in collection rates |

\* Excludes implementation costs

5

Confidential

TF0000092620

A-606

**① OUTLOOK FOR RECORDED MUSIC IN EMERGING MARKETS APPEARS BLEAK, WITH ENDEMIC PIRACY EXPECTED TO ENDURE AMID ONLY MODEST BROADBAND PENETRATION**

**Current situation**

Non-mobile downloads in BRIC countries characterised by mass piracy, drastically limiting potential of legal mobile market in physical and digital world

**What you would need to believe to forecast higher revenue**

**ⓐ** Piracy rates will be significantly lower in non-mobile digital than they are in physical sales (current pricing levels running at >95% in major markets)

**ⓑ** Significantly more people will have access to downloads (broadband penetration will increase dramatically)

**Initial findings**

- Piracy will undermine sales even more in digital unless there is a dramatically new model

- Broadband penetration will increase steadily, but remain low

A-607

Source: Team analysis

6

Confidential

TF0000092621

 **TO DATE, IT APPEARS THAT THE PIRACY CULTURE, MUCH MORE THAN LOW BROADBAND PENETRATION HAS INFLUENCED DIGITAL DOWNLOADS SALES**
%

Broadband penetration is strongest in China

**Percentage of population with broadband access**



However, only Brazil has >1% of music sales from digital...

**Digital sales as percentage of total music sales**



...which reflects the prevalence of piracy in physical music sales

**Piracy levels as percentage of physical music sales**



"Piracy is rampant across all segments particularly for entertainment – e.g. MP3 and DVD"
  – Result of Chinese focus group August 2006

"The possibility of a legal download market emerging has gone"
  – McKinsey Asia media expert

"You are dreaming if you expect Russians to start paying at legal sites"
  – McKinsey Russian media expert

"iTunes has got nowhere in China; everyone is so used to not paying, they are not going to start now"
  – McKinsey Asia media expert

A-608

Source: Ovum; IFPI; expert interviews

7

Confidential

TF0000092622

# 1A LOOKING FORWARD, THERE APPEARS LITTLE PROSPECT THAT PIRACY RATES WILL REDUCE IN THE NEAR FUTURE

| | Rationale | Quotes |
|---|---|---|
| **Technology** | • Future technology will make piracy even easier<br>  – Digital formats can be copied by vastly greater number of people than physical/CDs<br>  – P2Ps networks allow faster dissemination of pirated material than physical/CDs<br>  – Convergence of devices/storage media allows easier copying between 'families and friends' ( "soft pirating") | "Access to the internet is getting easier and less expensive with great advances in technology which, at the same time, makes online piracy much more rampant"<br><br>*– Wang Zigiany,*<br>*National Copyright Administration,*<br>*China* |
| **Enforcement** | • Even developed markets have not succeeded in reducing piracy rates, only in reducing the rate of growth<br>• Governments in key markets in China and Russia have shown no determination in making a concerted push against piracy | "Physical piracy shows no sign of abating . . . (in China) digital piracy is progressively worsening"<br>*– IFPI*<br><br>"Despite the protestations, Chinese record on even trying to enforce copyright through the courts has at best been patchy ."<br><br>*– McKinsey* |
| **Culture** | • In most markets, culture of piracy is deeply engrained with little/ no social stigma associated with piracy<br>• It would appear impossible to change such an ingrained culture in short-term | "Piracy is a way of life in both Russia and China"<br>*– Universal film executive responsible*<br>*for China and Russia operation* |

A-609

Source: Internet research; IFPI; team analysis

8

Confidential

TF0000092623



# **1A** MOREOVER, DICE'S RECENT SETTLEMENT WITH BAIDU APPEARS TO BE A TACIT ADMISSION THAT THE BATTLE HAS BEEN LOST IN CHINA

Size of advertising opportunity under development

## Background

- Significant piracy, primarily through "deep links" on baidu.com hit sales at all majors

- September 2005 – majors launched claim for damages from baidu.com

- November 2006 – court dismissed claim against baidu.com

- January 2007 –all majors lodged appeal with court, except DICE

- Instead, DICE chooses to strike deal with BAIDU and announces launch of new partnership with baidu.com

## Resulting agreement between BAIDU and DICE



- DICE/baidu.com agreed to split revenue from advertising on site, in return for allowing new music streaming service

- Seen by commentators as "DICE trying to turn defeat into victory"

Further question which may be worthy of consideration is whether advertising business model represents a material revenue opportunity

Source: Press search

9

Confidential

TF0000092624

A-610

# 1B AT THE SAME TIME, BROADBAND PENETRATION IS EXPECTED TO REMAIN RELATIVELY LOW

**Forecast broadband penetration rates (households), %**



%  CAGR

- BRIC markets will add ~60m new households to broadband network
- Penetration rates still expected to significantly lag U.K. (70%) or U.S. (60%)

|  | 2006 | *E |
|---|---|---|
| | | +30% |
| | | +73% |
| | | +15% |

| | Brazil | Russia | India | China |
|---|---|---|---|---|
| **No. of new households, (m)** | ~4 | ~4 | 15 | 15 |
| **Total broadband households (m, 2011E)** | ~6 | ~6 | ~16 | ~30 |



No. of households with broadband also increases the number of P2P networks/piracy

Source: Ovum; CIA Brazilian national census; team analysis

10

A-611

Confidential

TF0000092625

ESTIMATE

# 1 EVEN IN THE MOST OPTIMISTIC SCENARIO, IMPROVEMENT IN PIRACY WOULD ONLY DRIVE A POTENTIAL EBITDA UPLIFT OF £<3m FOR DIGITAL MUSIC

Reference point for EBITDA sizing

**Expected Case**

60m X 20 X 10p X 5% X 20% X 20% = £240k

- 60m: Estimated number of BRIC households with broadband in 2011
- 20: Potential number of downloads per household per year (Global average (downloads/year))
- 10p: Estimated cost per track in BRIC markets (Current typical spend in BRIC)
- 5%: Potential non-piracy rate (Typical non-piracy rate)
- 20%: DICE market share (Approximate market share in Asia)
- 20%: Potential EBITDA margin with predominantly digital business model

**Best Case**

60m X 20 X 25p X 25% X 20% X 20% = £3.0m

- 60m: Estimated number of BRIC households with broadband in 2011
- 20: Potential number of downloads per household per year (Assumes global average can be maintained despite ?)
- 25p: Estimated cost per track in BRIC markets (Perceived maximum given lower disposable income relative to developed markets)
- 25%: Potential non-piracy rate (Would require a step change in piracy levels)
- 20%: DICE market share
- 20%: Potential EBITDA margin with predominantly digital business model

Source: IFPI; Deloitte due diligence report; team analysis

Confidential

TF0000092626

A-612

## 2 MOBILE RECORDED MUSIC APPEARS TO OFFER A GREATER OPPORTUNITY IN CHINA

PRELIMINARY

Projected growth of total mobile music download market, £m



A-613

- China offers the most significant opportunity for mobile music revenue, with an established base of mobile users and 3G enabled handsets
- Strong growth in India and Brazil do not offset minimal overall revenue potential
- Note, however, that music label receives only small portion of available revenue (66% retained by mobile operator)

Source: Yankee Group Dec. 2006

12

Confidential

TF0000092627

**②** **THIS GREATER POTENTIAL REFLECTS CHINESE CONSUMERS STRONG AFFINITY TO MOBILE (RELATIVE TO THE INTERNET), WHICH ALSO PROVIDES PROTECTION VS. SIDE-LOADING**

 Mobile phone user
Internet user

### Mobile phone and Internet user base in China
m



**Key Points**

- Moreover, the relatively low broadband penetration in China limits the potential of side-loading or 'cache and carry', since only a relatively limited proportion of the population will have internet access even in 2011

**Supporting quotes**

- *"Buying mobile phones is a much more 'aspirational' purchase than in other markets; hence people have a strong attachment to mobiles"*
    — McKinsey Telecoms Partner
- *"Side-loading will happen but it won't be anything like in W. Europe"*
    — McKinsey Asia Mobile Phone Expert

A-614

Source: CSFB; CNNIC; eMarketer 2006; interviews; China Consumer Centre; JD Power; Yankee; Tempo; team analysis     13

Confidential

TF0000092628

**2** **EVEN IF DICE WERE ABLE TO INCREASE ITS EXPOSURE TO LOCAL TALENT, THE OVERALL OPPORTUNITY WOULD REMAIN RELATIVELY MODEST**

**Key assumptions**

- China total mobile music market reaches £288m in 2011
- Mobile phone operators retain 60-70% of consumer spend (maximum of 30-40% for music publisher)
- DICE maintains 19.7% share in Asia/Australia of major label sales
- Contribution Margin based on Publishing margin: 35%



**Potential 2012 EBITDA opportunity**
£m

Reflects the fact that at least 33% of revenues is likely to be attributable to China JV (49% owned)

17–23

5.9–*

4.1-5.6

REVENUE    TOTAL EBITDA    DICE EBITDA

A-615

14

Confidential

TF0000092629

 **EMERGING MARKETS PUBLISHING COULD OFFER A SMALL UPSIDE CASE**

DISCUSSION DRAFT

**What you would need to believe?**

**a**

BRIC markets will have significantly higher growth in content which uses music

**Current situation**

Small current publishing base could be increased significantly (~£25m for Dice in BRIC countries)

**and/or**

**b**

Current low collection rates will grow significantly

**Initial findings**

- Strong growth expected in synchronisation and performance revenues

- Low existing collection rates. Very limited prospects for step-change in collection in near-term

A-616

Source: Interviews, team analysis

15

Confidential

TF0000092630



# **3  CURRENT PUBLISHING INCOME FROM EMERGING MARKETS IS MODEST**

<u>ESTIMATES</u>



Geographic Breakdown of publishing revenues, 2007

Breakdown of publishing revenues for BRIC Countries 2006
£MM

BRIC markets estimated to contribute less than 6% of revenue

Estimates*

* Assumes revenues contained in Eastern Europe, SEA and Hong Kong office revenues

Source: Merrill Lynch data room; Deloitte vendor due diligence report; team analysis

16

A-617

Confidential

TF0000092631

 **3A**

# LOOKING FORWARD, BRIC MARKETS WILL LIKELY BENEFIT FROM STRONG SYNCHRONISATION AND PERFORMANCE GROWTH

**ESTIMATES**

Example covered in detail

 High

 Medium

 Low

| Drivers | Approx current size of market across BRIC countries, £ (% share) | Outlook for underlying drivers | Rationale |
|---|---|---|---|
| **Phono-mechanical**<br>• CD sales<br>• Digital downloads<br>• Cassette sales<br>• Vinyl sales<br>• Ring tunes | ~2.5 (10) |  | • Global decline in recorded music sales ~7%<br>• Very high piracy rates suggest only small core of legal buyers currently paying fees in BRIC<br>• Decline of CD sales may have proportionally less impact on revenues than in emerging markets |
| **Synchronisation**<br>• Advertisements<br>• TV and film productions<br>• Toys, novelty items and merchandise<br>• Computer games<br>• Ring tones/tunes | ~9 (35) |  | • Strong underlying growth in content containing music<br>• Easier to enforce collection from national content users than controlling consumer piracy |
| **Performance**<br>• TV and radio broadcasts<br>• Live performances<br>• Music in nightclubs, bars<br>• Sporting events, shops | ~13.5 (55) |  | • Continued growth in globalisation of artists (e.g., increased Asia MTV penetration, western artists with more Asian dates in tours – e.g., Rolling Stones in China 2006)<br>• Performance of broadcast fees highly collectable; retail fees not |

**Total publishing revenue**

 No data available for in-depth performance forecast

Source: Interviews; vendor due diligence report; May 2007; interviews

17

Confidential

TF0000092632

A-618

# 3A KEY DRIVERS OF SYNDICATION REVENUES ARE EXPECTED TO EXPERIENCE ROBUST GROWTH

$m, %


2006
2009
% CAGR


TV Advertising expected to grow by 5-32% CAGR




Radio advertising will grow by 5–18% CAGR



Ring tone content sales are likely to grow by 17–71% CAGR



**Key Points**

- Like syndication, performance revenue, which shares similar underpinning drivers, is likely to enjoy strong growth
- Underlying content growth suggests more robust revenue potential than in Enders forecast
  - Performance 4.3% CAGR
  - Synchronisation 4.7% CAGR

A-619

Source: ZenithOptimedia; Yankee

18

Confidential

TF0000092633

# 3B LITTLE PROSPECT EXISTS OF MORE THAN A MODEST IMPROVEMENT IN COLLECTION RATES

**Pros**

- Chinese government needs to improve piracy situation as part of international trade discussions and may take action
  - April 2007 US launched complaint at WTO for IPR infringements
- Likely initial focus will be on companies who would pay synchronization fees, rather than individual piracy
  - Court in April 2007 awarded damages to Warner, Sony and Dice for copyright infringement by Yahoo China

**Situation unlikely to worsen; optimistic outcome would be a modest improvement in collection rates**

**Cons**

- Recent attempts at better collection have barely had an impact, considering the size of the Chinese market
  - China Audio and Video association (CAVA) and Music Copy right Society of China (MCSC), only able to enforce licensing for Karaoke at 40 bars across whole country
  - New Performing Rights Society contract only resulted in MCSC paying £8,100 in 2005 for China, vs. £335,000 from Hong Kong collections in the same year
- No prioritisation by governments of Brazil, India, Russia on countering counterfeit goods

*"America's action ignores the great progress China has made"*
— Vice-Premier, Win-Yi, April 2007

*"[Enforcement of copyright] was only possible due to the new laws [introduced recently by the government]"*    — IFPI

*"Although there has been the Yahoo case, there have been other cases where the majors lost . . . there will be no step change [in collections]"*
— McKinsey media expert

A-620

Source: Internet search; press search; British Music Rights; interviews

19

Confidential

TF0000092634

## 3B CURRENT COLLECTION RATES ARE 35–50% OF THE POTENTIAL ADDRESSABLE MARKET

<u>ESTIMATES</u>

BRIC market shares



**BRIC countries represent 9–14% spend of key proxy markets**

Percentage share of global TV advertising

100% = $160b

Percentage share of global ring-tone revenues

100% = $14b



**Only 35–50% of the potential revenue is currently being collected**

Total estimated publishing revenues in 2006
$

600–*

300–*

35–50%

Based on US publishing revenue of US $2.5b, BRIC markets should generate US $600–950m revenue

Collection rates remain low in BRIC markets

A-621

Source: Enders; Yankee; Zenith Optimedia; team analysis

20

Confidential

TF0000092635

## **3** HOWEVER, SMALL EXISTING BASE AND LIMITED LOCAL TALENT MEAN THAT OVERALL OPPORTUNITY IS LIMITED

£m

Impact from collection
Impact from content growth



**Potential incremental revenue, EBITDA contribution**

BRIC Countries estimate

**Scenario**
• Strong underlying growth in content
• Collection rates assumed to increase marginally

**Assumptions**
• Publishing base
  – Phonomechanical 2.5
  – Synchronisation 8.8
  – Performance 13.8

• Growth (variance to analyst* forecast)
  – Phonomechanical +5pp
  – Synchronisation 10–15pp
  – Performance 10–15pp

• EBITDA margin on publishing division 35%
• Collection rate increase of 10–15%

Would likely be a further haircut to this figure since at a proportion of rights are likely to remain within JV, at least in China

\* Enders forecasts for global publishing revenues
Source: Enders; Deloitte due diligence report; team analysis

Confidential

TF0000092636

# CONTENTS

- Summary

- Geographic expansion

- **Business model transformation**

- Other adjacent sources of revenue

A-623

22

Confidential

TF0000092637

# OVERALL, WE BELIEVE OPPORTUNITY EXISTS AROUND BUSINESS MODEL TRANSFORMATION, ALTHOUGH IT IS NOT WITHOUT EXECUTIONAL RISK



FOR DISCUSSION

- ◌ Low
- ◑ Medium
- ● High

| Levers evaluated | Description | Opportunity assessment | | Rationale |
|---|---|---|---|---|
| | | Size (approx. 2012 EBIT impact* (£m)) | Feasibility | |
|  Revenue focused ❹ Yield management | • Driving significant incremental revenue through increased use of differential offerings and pricing across different distribution channels and release dates | ~£9m | ◕ | • Preliminary (conservative) assessment of demand dynamics suggest a material opportunity exists to adopt more aggressive yield management tactics<br>• However, detailed consumer research would be required to fully validate and size opportunity |
|  Cost focused ❺ Digital trans-formation | • Leverage web 2.0 dynamics (communities, crowd sourcing) to drive step-change reductions in cost base for non-established acts | ~£33m | ◔ | • Potential to use digital dynamics to drive a step change in cost base for non-established acts across multiple cost areas (e.g., A&R, marketing)<br>• However, considerable executional risk since relies upon DICE building a leading music website and significant culture change |
| Revenue focused ❻ Long tail | • Drive significant incremental sales through focus on long-tail and currently underserved segments to drive increased niche and back catalogue sales | Limited | ◌ | • Appears to be a long tail but majority of sales in the top 200 so little opportunity<br>• Peer-to-peer market dominates back catalogue sales<br>• Dice securitisation of back catalogue compounds limitations of opportunity |

*Excludes implementation costs

23

A-624

Confidential

TF0000092638

# ④ TO DATE, MUSIC HAS NOT EXPLOITED YIELD MANAGEMENT, UNLIKE MANY OTHER MEDIA



PRELIMINARY

High premium    Small premium
Premium         Standard price
                Not applicable

**Limited yield management to date**



**Potential Yield management initiatives**



Source: Team analysis

24

Confidential

TF0000092639

A-625

# 4  MOREOVER, ANALYSIS OF TYPICAL DEMAND CURVES SUGGESTS A SIGNIFICANT OPPORTUNITY FOR TOP ACTS IN MUSIC   <u>PRELIMINARY</u>

Typical profile of sales for top 5 album (Scissor Sisters – Ta Dah)



CD album sales

Digital bundle album sales

- Strategy likely to be focused on extracting a premium from most committed fans who appear to place significant value on obtaining album as early as possible
- Value relative to current baseline may take the form of extracting a premium or encouraging more fans to buy an entire album (rather than ~3 tracks only on iTunes)
- Focus likely to be on large established acts (at least in short term)

Source: The Official chart company, team analysis

25

Confidential

A-626

TF0000092640

**4** **ARGUABLY THE NEW DIGITAL ENVIRONMENT CREATES FURTHER OPPORTUNITIES**    <u>PRELIMINARY</u>



**Arctic monkeys digital album sales 2006**

Number of sales per week

Single release

600

0

Week from release    57

**Arctic monkeys digital singles sales 2006**

Number of sales per week

1200

0

Week from release    38



**Characteristics of digital environment**

- Greater focus on singles provides more release windows as well as greater peaks in album demand

- Easier to shape release window/ pricing dynamics than in physical word where less channels exist and patterns are more well established

- Bands/ labels are focusing on building fan communities around their website, linked into broader fan communities on sites such as MySpace and Bebo (and have increasing opportunities to do so)

- Coldplay fan base exceeds 300,000 members

A-627

Source: The Official chart company, team analysis, band websites

26

Confidential

TF0000092641

**4** **THIS OPPORTUNITY COULD BE EXPLOITED BY OFFERING CORE FANS A PREMIUM PRODUCT IN ADVANCE OF GENERAL RELEASE**

PRELIMINARY

A-628

| Week 2 | Week 0/general release |
|---|---|
| "Premium offer to web-registered fans" | "Basic offer available to all" |



 
amazon.com
HMV
TESCO

| | Week 2 | Week 0/general release |
|---|---|---|
| **Offering** | • Advanced release of DRM album *(Conservative assumption given demand and ability to build fan base over time)* | • General release of album |
| **Target population*** | • 300,000<br>• Fan base of top acts | • 1.4m<br>• Remainder of sales |
| **Price** | • £10 (25% uplift on current UK album price) | • Album: £8 [or £0.79 per track on i-tunes] |

Source: The official chart company, team analysis, band websites

27

Confidential

TF0000092642

**4** **EVEN BASIC DISCRIMINATION ON TOP ACTS COULD HAVE AN IMPACT OF UP TO £10M A YEAR EBIT** <u>ILLUSTRATIVE</u>



**A** Customers buying album in 2012 at premium price (both physical and digital)

1.7m albums are sold on average for the top Dice acts
Coldplay fan base comprises 13% of their total sales assuming one album per person

25% uplift on current retail price

| 221,000 | X | 22 | X | 20 | = | £8.8m |

Number of albums for top Dice acts sold to core fans

Uplift per album sold at premium price

Number of albums released per year by top established Dice acts



0.6% of total revenue from Music

Source: Fan club members lists; the official chart company; team analysis

28

Confidential

A-629

TF0000092643

## **4** THIS MODEL CAN BE FURTHER DEVELOPED, ESPECIALLY WITH MULTIPLE RIGHTS AND INNOVATIVE BUNDLES/PRODUCTS









**Die Hard Fan Bundle**
- Advanced release of album
- VIP tickets
- Tickets to performance
- Merchandise

Price for bundle $100

**Multiple varieties of one album/single**

E.g.,
www.playitnow.co.uk
- £1.89 per track standard version
- £3.99 per track with guitar chords/tutorial

**Mobile pre-release sales**
- Option to download tracks to mobile in advance of general release for a premium price

Price for album $5

Source: http://www.playitnow.co.uk; http://www.iTunes.com; team analysis

29

A-630

**5** **THE PREMISE FOR DIGITAL TRANSFORMATION IS THAT WEB 2.0 DYNAMICS CAN RADICALLY SHIFT THE COST BASE FOR CURRENTLY UNPROFITABLE RELEASES**

ILLUSTRATIVE



The profits of the labels are concentrated in few successful releases, which represent 20 to 30% of total new releases

70-80% produce no profit*

**Key points**

- Such a strategy could have a dramatic impact on bottom-line by turning the long-tail of loss-makers into positive contribution

- Dice currently has approximately ~70%** of sales in the 'tail'

| Potential model | Established acts | New, uncertain acts |
|---|---|---|
| **Distribution** | • Physical and digital distribution | • Digital only distribution |
| **A&R** | • High search/ development investment | • Use existing music communities/ social sites to identify popular acts |
| **Marketing** | • Large-scale multi-media promotion campaigns | • Focus on viral/on-line marketing (use of MySpace; YouTube) |
| **Formats** | • Focus on traditional formats (especially albums) | • Experiment with different formats and prioritise singles until artist proven |

\* They do however contribute to overhead costs
\*\* 70% represents share of 'Other' artists not included in sales categories 'Top 10' or 'Top sales' according to Red Book
Source: Next Magazine; Interviews; McKinsey analysis

30

Confidential

TF0000092645

A-631

**5** ## LOW COST DIGITAL MODEL IS ALREADY STARTING TO EMERGE AND MAJOR LABELS ARE PAYING ATTENTION

PRELIMINARY

Case study on MusicNation.com

### Background

- Online platform to develop emerging artists, via online video competition
- Launched Jan. 2007 (running for 15 weeks)
- Promotion of site and bands via Clear Channel radio partnership
- Close partnership with Sony in US:
  - Sony provides winners with recording contract
  - Jointly set up independent record label (JV) to test release 'low-cost' singles for most clicked on bands (on exclusive basis)
- Plans to offer artists share of ad revenue in future to encourage stickiness



### Impact

- Site captures 350,000 monthly unique users (vs. ~24m for MySpace.com)
- 6m monthly page impressions
- Deals with Sony BMG in Asia and Europe and Typhoon in Asia
- Built portfolio of 3,000 bands (and expect to yield 30 successful acts)

A-632

Source: Website; team analysis

31

**5** THIS APPROACH CAN DRIVE A STEP CHANGE IN THE MAJORITY OF COST AREAS FOR THOSE CURRENTLY 'UNPROFITABLE' ACTS

| Cost area | Approach | Evidence | Supporting quotes |
|---|---|---|---|
| **A&R** | • Successful artists emerge via 'crowd-sourcing'; bands are selected to have singles made based on level of community appeal (click thrus, reviews, ratings) | • Music Nation built profile of 3,000 bands for $300,000 (30 of which are likely to get at least a test deal)<br>• Spend may come down over time as MusicNation becomes better known | *"We estimate that we save at least 80% of A&R costs spent by majors on non-established acts"*<br>– *Founder MusicNation* |
| **Marketing** | • Artists are marketed primarily through their communities and viral marketing,<br>• Save on upfront marketing costs to develop new talent as marketing spend focused on only promising new acts | • Typical marketing budget per new act has been $10K vs. typical spend of ~$1m for major seeking to establish major new act<br>• *Original Signal* new MusicNation signing already has 37,000 MySpace friends and 27,000 Bebo friends before a single is released | *"The majors just don't get the power of digital and how digital communities work"*<br>– *Ex-Sony UK Head of Marketing; now MD of UK indie label* |
| **Production** | • Initially produce singles rather than full CD bunch<br>• Create lower-cost videos<br>• Focus on low budget production for early singles | • Popular band *Original Signal* produced a video for $94; bands on Sony/ MusicNation indie label spend ~ $5,000 on a video (vs. ~$500,000 for typical MTV music video<br>• Total production costs for an iTunes release are ~$10,000 | *"They made the video for $94 – and that was because they spent $60 on the Xmas lights"*<br>– *Founder MusicNation*<br><br>*"New digital technology means anyone can make a cheap video now"*<br>– *Indie label exec* |
| **Distribution** | • Distribute digitally only for non-established bands and produce physical copies only for successful acts | • Typically costs of physical distribution ~13% of CD wholesale price (~$1.35 per CD) | *"Digital distribution costs us virtually nothing "*<br>– *Founder MusicNation* |

Source: Merrill Lynch 2005 report, team analysis; interviews

32

A-633

Confidential

TF0000092647

**⑤ FOR DICE, THIS COULD RESULT IN COST BASE SAVINGS OF UP TO £33MM IN EBITDA**

Potential savings

PRELIMINARY
ESTIMATES
*



**Recorded music cost base***
£, MM

**Assumptions**

- Cost base*
  - Sales of music genres likely to fare well on digital platform, including pop, rock, R&B/ urban, and rap/ hip hop (76% of sales)
  - Assumes 67% of artists within key music genres can migrate to a digital platform
- **A&R**
  - Non-established bands represent 40% of costs
  - Potential saving of 50% via digital model
- **Marketing**
  - Non-established bands represent 35% of costs
  - 50% savings via digital model
- **Production and distribution****
  - Non-established bands represent 70% of costs
  - Savings of 20% via digital model

Reduction from initial estimate reflects change in cost baseline and ensures no double counting with previously announced cost initiatives

17    *    66    *    19    *    160    103    Total potential savings of £33 MM (4% total cost base)

| Established artists | Non-establish-ed artists | Established artists | Non-establish-ed artists | Established artists | Non-establish-ed artists | Royalties | Others/ overhead | Total €m costs |

A&R spend    Marketing costs    Production and distribution**

* Cost base based on 2010 low case baseline forecast included in McKinsey 01 March 2007 Terra Firma Project Dice presentation
** Assumes category includes recording costs, lifting the expected savings from production; if recording costs are included in A&R, estimated production savings will decrease, while A&R savings will increase
Source: Team analysis

33

A-634

Confidential

TF0000092648

# ⑤ HOWEVER, THERE ARE A NUMBER OF POTENTIAL RISKS TO BETTING ON THIS STRATEGY

**Details**

**Would require a major cultural transformation to successfully implement**

- Represents a significant shift from long established operating practices

- Likely to be significant cultural resistance from A&R and marketing functions

- Artists have attachment to current status quo and would have to be considered within any transformation strategy

**Currently, DICE lacks required digital capabilities**

- Key to success would be rapidly acquiring digital and web 2.0 dynamics

- Need to move quickly before de facto standard music website is established in each country

- DICE's current digital skills perceived to be limited, especially around web 2.0 dynamics

## Key points

- Successfully driving through this level of change would require a much greater level of Terra Firma management time than a typical deal

- Although DICE could reach the full potential benefit of this strategy it is unlikely this effect would be seen within the next 3-5 years

- Given current level of digital capabilities, DICE would almost certainly have to acquire required web 2.0 skills

A-635

34

Confidential

TF0000092649

# 6  THE LONG TAIL DOES NOT APPEAR TO PRESENT AN SIGNIFICANT OPPORTUNITY



**There appears to be a long tail in music but it is dominated by P2P.....**

Number of tracks available (000s)    ESTIMATES

140
**
5,000
*
*
***



**...and this represents little opportunity as majority of sales are in top 200**

Distribution of music sales in the US, %

*

14

86 *

- In addition, websites would need to dislodge peer to peer market which currently dominates the long-tail
- Dice's securitisation of its back catalogue also provides little opportunity for increased revenue

\* Based on store visit, 14,000 albums, 10 tracks per album,
\*\* Based on unique music tracks comprising 2% of total files shared on Kazaa (1bn per month)
Source: Soundscan; The Guardian; i-tunes.com; interviews; store visits; team analysis

35

A-636

Confidential

TF0000092650



# 6  THE LONG TAIL DOES NOT APPEAR TO PRESENT AN OPPORTUNITY IN THE ALBUM MARKET



**Physical album sales as for October 2006** (units)

Sales distribution for singles under development

420,285
146,745
86,217
47,418
23,659
11,548
3,530
2,250
1,167
198
78
16
4
1



**Digital album sales as for October 2006** (units)

16,668
4% of physical sales

Low proportion of digital sales at end of chart indicates there is no substantial tail in the album market

3% of physical sales

4,292
2,471
1,091
526
287
105
64
31
4
1
0
0
0

**Chart marker position**

Source: The Official Charts Company

36

Confidential

TF0000092651

A-637

# CONTENTS

- Summary

- Geographic expansion

- Business model transformation

- **Other adjacent sources of revenue**

A-638

37

# WIDER SET OF RIGHTS APPEARS SENSIBLE, BUT UNCLEAR WHETHER WILL DRIVE SIGNIFICANT UPSIDE



● High
◐ Medium
○ Low

**Assessment of opportunity**

| Levers evaluated | Description | Size (£m) | Feasibility | Rationale |
|---|---|---|---|---|
| **7** **Wider sets of rights** | • Diversify into related revenue streams (e.g., merchandise, touring) by negotiating a broader set of rights with artists | ~0 | ◔ | • Sensible to diversify and compliments other strategies (e.g., yield management) <br> • Unclear whether can achieve rights at 'price' to enable significant upside <br> • Will likely take time to renegotiate given long term contracts (3-5 albums) |
| **8** **New web-based music publishing revenue stream** <br><br> Only very preliminary assessment | • Additional sources of music publishing revenue created through growth of new web services (primarily synchronisation) e.g., <br> – Royalties paid for music used on YouTube clips <br> – Share of advertising received for lyric searches | TBD (currently assumed to be relatively small) | ◔ | • Likely that websites will resist <br> • Size of advertising pools are relatively small |

A-639

38

Confidential

TF0000092653

**7** **WITH PHYSICAL MUSIC SALES IN DECLINE, GROWING ANCILLARY MARKETS BEGIN TO LOOK MORE ATTRACTIVE**

ILLUSTRATIVE

Music industry ancillary markets, 2006

U.K.
£m

USA
$b



Moreover, in many cases not systematically exploited

A-640

2002 – 2006
CAGR, %


-2.6

-3.3

+2.0

+10.0

180

2,200





Merchandise sales*

\* Licensed retail music merchandise (e.g. posters, T-shirts)

Source: BPI, Mintel, RIAA, Licensing Letter

39

Confidential

TF0000092654

### 7 FOR THE SMALL NUMBER OF ARTISTS WHO HAVE DONE IT, MONETIZING A BROADER RANGE OF RIGHTS CAN GENERATE ATTRACTIVE STREAMS

PRELIMINARY



**Jay Z**

**Fashion brand: Rocawear**
- Designed premium clothing and accessory collection for men and women under new label Rocawear using his brand name
- Rocawear label can be licensed to 3rd party manufacturers

**Music**
- Traditional music records on CD, digital downloads
- Licenses songs for ringtones, MP3s and mobile phone wallpapers

**3rd party merchandise**
- Licenses name and image for apparel, gifts and other merchandise
- Merchandise available on his personal website and via 3rd party retailers

**Complementary media**
- Licenses rights for video games, books and photo collections

**Jennifer Lopez**

**Fragrance**
- Developed fragrance collections under the J Lo and Jennifer Lopez brand name

**Movies**
- Movie actress, developing and licensing song titles for movie soundtrack

**Music**
- Traditional music records on CD, digital downloads
- Licenses songs for ringtones, MP3s and mobile phone wallpapers

**Toys**
- Licenses image for dolls and toys in her likeness

**Fashion brand: J Lo**
- Designed premium clothing and accessory collection for women using brand name

Shakira makes 80% of her revenue from non-music products

Source: Websites, team analysis

40

Confidential

TF0000092655

A-641

# BACKUP

41

TF000092656

Confidential

# THERE ARE JUST UNDER 70 MILLION iPOD'S IN USE

Number of iPods in use, millions*



A-643

* Calendar quarters adjusted from Apple's data

Source: Enders Analysis

42

Confidential

TF0000092657

# APPLE HAVE SOLD 2.5bn SONGS ON iTUNES

Cumulative iTunes songs sold, millions*



A-644

* Calendar quarters adjusted from Apple's system

Source: Enders, Apple Investor Relations

43

Confidential

TF0000092658

# AFTER PEAKING NEAR ITS LAUNCH THE AVERAGE NUMBER OF iTUNE SONGS PER IPOD OWNER HAS INCREASED TO 7.4

Quarterly number of songs downloaded per active iPod user*



A-645

* Calendar quarters adjusted from Apple's system

Source: Enders Analysis

44

Confidential

TF0000092659

## ALTHOUGH APPLES PERFORMANCE IS IMPRESSIVE IT IS DWARFED BY THE NUMBER OF MUSIC ENABLED PHONES

Cumulative music enabled mobile phone sales, millions*



A-646

\* Capable of playing  AAC, MP3

\*\* Calendar quarters adjusted from Apple's system

Source: iSuppli

45

Confidential

TF0000092660

**2** MUSIC SUBSCRIBERS IN MOBILE MUSIC MARKET ON THE RISE, WHILE SPEND PER CUSTOMER LIKELY TO DECLINE

BACK-UP



* Assumes average price per download in 2010 is $0.65
** Based on total number of music connections

Source: Yankee Mobile Report 12/2006, Jonathan Arber and Aleksandra Bosnjak, November 2006, team analysis

46

Confidential

TF0000092661

# ENHANCED AND SMART PHONES ARE EXPECTED TO GROW RAPIDLY AND DOMINATE CHINA HANDSET MARKET BY 2010



**China mobile handset shipment by type\***
Millions

CAGR, %

PDA phone
Smart phone

Enhanced
Phone\*

Basic
Phone\*

18
18
59

23

8

\* Basic phone: voice/sms only; enhanced phone: voice/SMS + camera, MP3, video, Java, etc.; Smartphone: operating
system + browser and e-mail, or even PIM synchronization, >64MB of storage; PDA phone: data-centric mobile terminal

Source: Gartner

47

A-648

Confidential

TF0000092662

**③ EMERGING MARKET GROWTH WOULD NEED TO COME FROM PERFORMANCE OR SYNCHRONISATION FEES**

<u>BACKUP</u>



**Breakdown of music publishing revenues by category, 2006**

100% = £416m

Synchro-nisation

9

Phono-mechanical

Performance

- BRIC is a small percentage of overall publishing revenue
- Principle drivers of revenue in emerging markets must be performance and synchronisation

A-649

**Note**

- Synchronisation revenue is 60% from U.S., driven by strong film industry contributions
- Phonomechanical revenue is likely to be small due to endemic piracy
- Performance must be primary contributor

\* Excluding eliminations due to intra-group transactions

Source: Deloitte vendor Due Diligence report, May 2007

48

Confidential

TF0000092663

**④ MAJORS CAN HELP PROPEL INDIE DISCOVERED TALENT**

<u>PRELIMINARY</u>



**HardFI album sales before and after to deal with major**

Number of sales per week

Source: The Official chart company, team analysis, Wikipedia



**Implications of support of major label**

- HardFI released a self-financed mini-album in the summer of 2004, released on minor indie label, Necessary records

- Album was supported by Dermot O'Leary on his Radio 2 show and built a following (~300 sales)

- Atlantic signed a Licencing deal with Necessary Records and re-released the album in the summer of 2005

- HardFI sales increased following a Brit Award nomination, helping to contribute to the album selling over 700,000 in the UK from launch

A-650

49

Confidential

TF0000092664

**4** ## THERE IS STILL A LARGE PROPORTION OF CUSTOMERS WHO HAVE NOT SWITCHED TO DIGITAL

PRELIMINARY

**Physical still dominates, suggesting there is opportunity to maximise potential from those yet to switch to digital**

Average number of albums sold in each format for top 5 albums 2006



97.4% *

2.5% *

**Initial research suggests different purchasing behavior dependent on individual's relative attraction to artist**

...I wouldn't pay more to get an album early for an artist I don't really like. I would just download a couple of singles or rip it... *interviews*

If I love the band, I have to have the album, you just don't buy singles if you are a fan *interviews*

...I have paid a couple of pounds extra to get an album on the first day of release, but only for artists I really like... *interviews*

Source: The Official Chart Company, Interviews

50

Confidential

TF0000092665

A-651

**⑤ ASSUMPTIONS FOR COST BASE SAVINGS OF UP TO OF UP TO £48 IN EBIT**



Potential savings

<u>PRELIMINARY</u>
<u>ESTIMATES</u>

**Cost base\* assumptions**

**① Music genres**
- Includes sales of genres likely to fare well on digital platform (78% of total sales)
  - Younger listener demographic and marketing approach/ tools enable genres pop, R&B/ urban, rap/ hip hop and rock to successfully migrate to digital
- Assumes 67% of artists within key genres can convert to digital business model

**② Distribution of costs**
- **A&R**
  - Non-established bands represent 40% of costs
  - Potential savings of 50% via digital model
- **Marketing**
  - Non-established bands represent 35% of costs
  - 50% savings via digital model
- **Production and distribution\*\***
  - Non-established bands represent 70% of costs
  - Savings of 20% via digital model

**Breakdown of sales by genre**
Percent

▨ Genres included in cost base





A-652

\* Cost base based on 2010 low case baseline forecast included in McKinsey 01 March 2007 Terra Firma Project Dice presentation

Source: Team analysis

51

Confidential

TF0000092666

**⑤ ASSUMPTIONS FOR DIGITAL BUSINESS MODEL SAVINGS ESTIMATE** <u>BACK-UP</u>

| Cost area | Artist category | Share of total costs | Savings captured in digital transformation | Rationale |
|---|---|---|---|---|
| A&R | • Established<br><br>• Non-established | • 60%<br><br>• 40% | • 0% of total costs<br><br><br>• 50% of total costs | • A&R costs (signing new artists and providing advances) are heavily weighted in advances for established acts<br>• Limited savings for non-established acts, as existing music communities identify popular acts and increase signing costs |
| Marketing | • Established<br><br>• Non-established | • 65%<br><br>• 35% | • 0%<br><br>• 50% | • Marketing costs are heavily concentrated in promoting established acts<br>• Non-established acts achieve significant savings due to viral and peer networking campaigns |
| Production | • Established<br><br>• Non-established | • 30%<br><br>• 70% | • 0%<br><br>• 20% | • Majority of production costs (recording and manufacture of discs) are driven by non-established acts (70% of total sales), though savings potential is limited by 2011 due to existing digital conversion |
| Distribution | • Established<br><br>• Non-established | • 30%<br><br>• 70% | • 0%<br><br>• 20% | • Similar to production, majority of distribution costs lie in physical discs of non-established acts (70% of total sales) |

Source: Merrill Lynch 2005 report, team analysis; interviews

52

A-653

Confidential

TF0000092667

**⑤ MUSIC NATION USES WEB AS VEHICLE TO CREATE TALENT AND BUILD BUZZ**

**Description of key features**

- Independent artists upload their own video
- Band generate buzz via links to other leading web community sites (MySpace, Bebo); allows anyone to create or join group
- Banners ads from other artists, radio stations and record labels help support the site
- Videos are ranked by users and sorted by popularity
- Viewers can click on artist links to learn more information artists
- Focus on releasing low budget singles and videos for most highly ranked bands
- Successful bands transitioned onto EPIC label once proven success in multiple singles



Band generate buzz via supportive fan clubs; allows anyone to create or join group

Banners ads from other artists, radio stations and record labels help support the site

Easy uploading facilitates participation

Popular videos are highlighted on home screen

Links to other community sites build grand-up marketing and Help establish bands more quickly

Source: Websites, team analysis

53

Confidential

TF0000092668

A-654

**7** **AN ENHANCED DIGITAL POSITION IS FURTHER ENABLED BY OWNERSHIP OF A BROADER SETS OF RIGHTS**

## Last FM

Crowd-searching approach; adjust playlists to user requests

Widget section enables users to incorporate MySpace profile

Call out to discover new artists and listen to free tracks

Viewers create personal profiles to connect with other users and share new music



## 'Everything But the Music'

Search by band, name or label

Offers wide range of merchandise

Call outs for popular items



'Everything But the Music' is an online music inspired retailer of clothing, footwear, jewelry and accessories. Launched in 2005 and acquired by P-Retailer in 2006. Revenue of £0.4MM (£0.2 MM). A rapidly growing site with 233,000 unique visitors in April 2007 (from revenue of £1.7MM for year ending April 2007)

Other music websites are capitalizing on merchandising opportunities which can offer artists significant incremental revenue

Source: Websites, team analysis

Confidential

54

A-655

TF0000092669

Confidential

TF0000037986

A-656

# L.E.K.

AUCKLAND
BANGKOK
BEIJING
BOSTON
CHICAGO
LONDON
LOS ANGELES
MELBOURNE
MILAN
MUNICH
NEW YORK
PARIS
SAN FRANCISCO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO

*Terra Firma*
*Music Industry - Key Market Outlook*

Summary of Findings

May 15, 2007

L.E.K. CONSULTING LLC
1100 GLENDON AVENUE
21ST FLOOR
LOS ANGELES, CA 90024
USA

T: 310.209.9800
F: 310.209.9125
WWW.LEK.COM

L.E.K. CONSULTING
40 GROSVENOR PLACE
LONDON SW1X 7JL
UNITED KINGDOM

T: 44.20.7389.7200
F: 44.20.7389.7440
LEK.COM

The materials contained in this document are intended to supplement a discussion between Terra Firma and L.E.K. Consulting on May 15, 2007.
These perspectives are confidential and will only be meaningful to those in attendance.

Confidential

# *Disclaimer*

This draft report has been produced by L.E.K. Consulting (International) Limited ("L.E.K.") for Terra Firma Capital ("the Users") who are considering investing in EMI ("the Company"). This report is confidential to and for the sole benefit of the Users. In its final form this report may be relied upon by the Users only in connection with the proposed transaction ("the Project") and on the terms set out in L.E.K.'s letters of engagement dated May 10th and January 19, 2007. Other parties may also be able to rely on this report subject to signing an agreed reliance letter.

Neither the whole nor any part of this report may be distributed, reproduced, disclosed to, used or relied upon by any other person or used for any other purpose without the prior written consent of L.E.K.. It is agreed that the Users may show this report to their professional advisors involved with the Project, although these parties may not place any reliance on this information.

The report has been prepared for the Users with reasonable skill and care. The report is based on information obtained or received from the Users, the Company or publicly available sources. This information has not been assessed for completeness or accuracy and L.E.K. makes no representation and gives no warranty, in either case express or implied, as to the accuracy or completeness of such information. The report has been prepared expressly for use in relation to the stated project and is based on certain assumptions and information available at the time the report was prepared. L.E.K. gives no representation, warranty or other assurance that any of the projections or estimates contained in the report will be realised, and nothing contained within the report is or should be relied upon as a promise or representation as to the future. L.E.K. will not be responsible or liable if the Users rely on this report at a date later than envisaged by the report without requesting L.E.K. to review advice given previously

L.E.K.'s principal task has been to collect, analyse and present data on the Company, its markets and its competitors. L.E.K. has not been asked to verify the accuracy of the information it has received from the Users, Company or their advisors, or any third party in this transaction. The report contains the results of L.E.K's market and business review. The report is intended to identify certain business and market issues relating to the Project and to assist in understanding and evaluating them. The report is not intended to act as a recommendation to proceed (or not to proceed) with the Project, which is a commercial decision for each party to make entirely at their own risk. In any event, L.E.K.'s total liability in aggregate to all parties relying on this report, howsoever caused, including without limitation, in breach of contract, tort (including negligence), breach of statutory duty, misstatement or otherwise, is limited to £1m in respect of producing this report.

In this notice the terms "L.E.K." and "L.E.K. Consulting (International) Limited" include its directors, employees and agents.

A-657

TF00003798 7



Confidential

## *L.E.K. Consulting activities were as follows:*

| What L.E.K. Did | What L.E.K. Did Not Do* |
|---|---|
| ⊛ Developed music market forecasts for U.S., UK, Germany, and France with particular focus on:<br>  – Digital growth<br>    – On-line and Mobile Users<br>    – Spend per user<br>    – Changes in business models<br>    – Cannibalization<br>  – Piracy (P2P and Ripping)<br>  – Cannibalization from other media (games)<br>⊛ Purchased proprietary research on consumer behavior and key trends in music buying<br>⊛ Interviewed a wide selection of industry executives and experts to inform likely future scenarios and trends<br>⊛ Assisted in limited management interviews<br>⊛ Provided qualitative counsel to Terra Firma on industry dynamics | ⊛ Forecast rest-of-world markets<br>⊛ Perform commercial due diligence on EMI<br>⊛ Conduct primary research re: current and future music consumption<br>⊛ Evaluate the implications of shifting product mix on margins<br>⊛ Assess the ability of the CD distribution infrastructure to endure the rapid decline<br>⊛ Forecast EMI financials<br>⊛ Develop post-acquisition strategy<br>⊛ Evaluate deal economics for investors |

A-658

* Note: Time and role constraints prevented L.E.K. review.  Other due diligence must cover these and other items.



TF-0000037988

Confidential

TF0000037989

A-659

## *In developing this outlook L.E.K. has leveraged prior work, 3ʳᵈ party research reports, interviews with well-placed industry executives and triangulation of sources*

### Interviews

- Paul Leakas, General Manager, Nielsen Mobile
- Scott Hochesgang, former VP Business Development UMG eLabs
- Senior Music Executive, UMG
- Barry Massarsky, Music Industry Economic Consultant
- Michelle Graf, VP Label relations, Apple
- Former Sr. Executive, EMI North America
- Mike Bebel, CEO, Ruckus Networks former CEO Pressplay
- Laura Goldberg, COO, Napster
- Jim Caparro, CEO, EDC (leading CD replicator)
- Ken Tysell, Director 3-screen marketing, ATT
- Ted Cohen, TAG Strategic, Former Head EMI Digital
- John Burbank, Chief New Products, Cingular
- Mike Thelander, Signals Ahead, Leading Telecom Newsletter Author
- Ruper Perry, Former Sr. Executive, EMI Europe
- Gabriel Levy, Head of Label Relations, RealNetworks
- Ralph Simon, Chairman, Mobile Entertainment Forum
- Mark Mooradian, SVP Business Development, MusicNet
- Howie Singer, CTO, WMG
- Adrian McAloon, VP Bizdev WiderThan/Real Networks
- Gabriela Lopes, Head of Marketing, IFPI

### Secondary Research

- Informa Telecoms and Media Strategic Reports
- AFTRA
- BPI Statistical Handbook 2006
- Credit Suisse
- CTIA
- Eurostat
- Future of Music Coalition
- IFPI
- Ipsos TEMPO
- Jupiter Research
- Kagan
- Merrill Lynch Cable Satellite Report
- Morgan Stanley
- Nielsen Ratings
- OECD
- RIAA
- Pali Research
- Pew Research
- Pillsbury Law
- PWC
- Screen Digest
- SG Cowen
- SoundExchange.com
- Soundscan
- ThinkEquity
- Veronis Suhler Stevenson



Confidential

## *Agenda*

> ⊛ **Background and Context**

⊛ **Market Forecast**
  - **US**
  - **Europe (EU 3)**

⊛ **Upside Scenarios**

⊛ **Appendix**
  - **LEK Analysis of 1999-2002 decline**
  - **Music industry mechanics reference**

A-660

LEK

TF0000037990

Confidential

*Format changes lead to a dynamic industry with varying growth rates, but the long-term story is incomplete without adjusting for inflation and population...*



US Consumer Spending on Recorded Music
by Format

(1974 - 2002E)

Source :  **CAGR = Compound Annual Growth Rate
1973-80 data from Schroeders International Media and Entertainment Report 2000, 1980-90 data from Veronis Suhler Communications, 1991-2001 data from Recording Industry Association of America, 2002E data from RIAA and L.E.K. Analysis

5

L.E.K.

A-661

TF000037991

Confidential

TF0000037992

KEY MARKET TRENDS

*...And, after adjusting for inflation and population growth, we see that (1) 40-45% declines are nothing new in this industry and (2) we are near a cyclical low of spending on an inflation-adjusted per capita basis*



Spending Per Capita for US 10+ Consumers
Adjusted for Inflation (2006 Dollars)
(1974 - 2002E)

Source: 1973-80 data from Schroeders International Media and Entertainment Report 2000, 1980-90 data from Veronis Suhler Communications, 1991-2001 data from Recording Industry Association of America, 2002E data from RIAA and L.E.K. Analysis

A-662

| CAGR | | |
|---|---|---|
| 1974-78 | | 1978-82 |
| 7.8 | | (12.2) |
| 1982-00 | | 2000-06 |
| 3.3 | | (8.4) |

6

L.E.K.

Confidential

*Physical media represented 94% of the total recorded music market in the U.S. and Europe in 2005 – with more digital penetration in the U.S.*



U.S. and European Music Market
2005 Retail Sales[1]

$B

| $12.3B | $3.4B | $2.2B | $2.0B | $3.5B |

Mobile
Online
Physical

Media Share %

U.S.     U.K.     Germany     France     Other Europe[2]

Note:      [1] Euros converted to US dollars
           [2] "Other Europe" includes Italy, Spain, Netherlands, Switzerland, Russia, Belgium, Sweden, Austria, Norway, Denmark
Source:    L.E.K. Music Market Model, RIAA, IFPI

L.E.K.

A-663

TF0000037993

Confidential

*The average broadband user spends ~2 hours a day and $23 a month on music; there is a core of ~20% avid and ~10% superavid individuals who spend significantly more*



Hours Listening to Music per Day
(N = 711)

% of BB
Users

7hr+ (5%)
5-7hr (5%)
3-5hr (10%)
1-3hr (30%)
30-60min (22%)
<30min (24%)
None (4%)

Average =
1.9 Hours / Day



Spend in Music per Month
(N = 670)

% of BB
Users

$50-59 (11%)
$40-49 (7%)
$30-39 (12%)
$20-29 (10%)
$10-19 (20%)
$0-9 (40%)

Average =
$23 / month

A-664

Source :    L.E.K. Consumer Research

L.E.K.

TF0000037994

Confidential

TF0000037995

A-665

KEY MARKET TRENDS

## *Spend correlates to listening*



**Hours Spent Listening to Music Daily By Average
Amount Spent On Music Per Month
(N = 711)**

Legend:
- Less than 30 min.
- 30 min. to 1 hour
- 1 to 3 hours
- 3 to 5 hours
- 5 to 7 hours
- More than 7 hours

Source :   L.E.K. Consumer Research

9

L.E.K.

Confidential

## *Online sales have been growing rapidly, particularly in the US*



US Online Sales
Subscription and Download

CAGR%
(02-06)

202.1%

Western European[1] Online Sales
Subscription and Download

CAGR%
(02-06)

NA

A-666

Note :    [1] Western Europe represented by UK, France, Germany, Italy, Belgium, Spain and Austria
Source :    PwC, RIAA

LEK

TF0000037996

Confidential

*On average, people who consume digital music also spend on physical music*



Internet User Per Capita Music Spending
by Consumer Type
(Last 12 Months)

| | Paid DL | Digital Subscriber | P2P User | Burn from Other | Ripped from Other | No Digital Activity |
|---|---|---|---|---|---|---|
| CD | $88 | $89 | $71 | $72 | $80 | $45 |
| Digital | $64 | $98 | $19 | $15 | $26 | $0 |

Source :    NPD, Ages 13 and Up

11



A-667

TF0000037997

Confidential

KEY MARKET TRENDS

## *The emergence of new platforms will create the opportunity for music revenue growth*



Music Platform Penetration
(2000 – 2010F)

| Year Average (M) | 2000 | 01 | 02 | 03 | 04 | 05 | 06F | 07F | 08F | 09F | 10F |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Satellite Radio Subs | - | - | - | 2 | 4 | 8 | 14 | 19 | 25 | 30 | 35 |
| Digital Cable HHs | 8 | 14 | 17 | 21 | 24 | 26 | 29 | 31 | 34 | 37 | 40 |
| Broadband HHs | 6 | 11 | 20 | 26 | 36 | 43 | 50 | 57 | 63 | 67 | 72 |
| MP3 Player HHs | - | - | 5 | 9 | 18 | 33 | 48 | 59 | 68 | 75 | 81 |
| Media-Enabled Mobile Phones | - | - | - | 1 | 4 | 10 | 22 | 42 | 61 | 78 |
| Home Network HHs | - | - | - | - | - | 1 | 3 | 6 | 9 | 13 | 17 |

Source :    L.E.K. Forecast

TF00000037998

12



A-668

Confidential

KEY MARKET TRENDS

*In early 2006, few consumers currently use music services on their mobile phones though a significant portion expressed interest for ringtones, songs uploads and radio listening*



Music on Mobile Phones

Note:    Sample size for respondents who currently use music on their mobile phones is 16
Source :    L.E.K. Analysis

13

L.E.K.

A-669

TF0000037999

Confidential

KEY MARKET TRENDS

***Despite the many music services and offerings from competitors, there is a large opportunity to better service the customer***



Overall Satisfaction with Current Digital Music Service

A-670

TF0000038000

14

L.E.K.

Confidential

## Cross-platform applications stand out as a key unmet interest area among customers, and music-enabled phones will help carriers meet these needs

### Importance of and Dissatisfaction with
### Broadband Subscription Music Service Features

**High**

| Importance | | |
|---|---|---|
| | **Personalized playlists** | **Listen to music from PC, MP3 player, stereo, TV, or mobile phone** |
| | **Comprehensive selection of major artists** | **Ability to use the subscription service with a portable MP3 player** |
| | **Flexibility to purchase individual songs or albums** | **Comprehensive selection of lesser-Known and independent artists** |
| | **Interactive radio stations** | **Extensive music video library** |
| | **Brand reputation** | |
| | **Price** | |
| | **Share music with friends** | **Compatible with an iPod** |
| | **Music recommendations** | **Local information and services** |
| | **Music reviews** | |
| | **Popularity** | |

**Low**

Low ← **Dissatisfaction** → High

Source : L.E.K. Interviews

15

LEK

A-671

TF0000038001

Confidential

## KEY MARKET TRENDS

*The forces which have driven the decline in music are being offset by new opportunities, the question is when and to what extent*

Future of Music

Piracy (P2P, Ripping)
Entertainment Competition
Retail Challenges
A/R Harder to Break
Attention Deficits / Shorter Franchises

Mobile
Legitimate Digital Delivery
Audience Reach
Advertising Models
New Marketing Avenues

?

Today

A-672

16

L.E.K.

Confidential

**KEY MARKET TRENDS**

*From past work, we were able to separate the main drivers of changing revenue*



Sources of Change, 1999 to 2002 Consumer Spending in Recorded Music, US

A-673

Source:    L.E.K. Analysis



TF0000038003

Confidential

**KEY MARKET TRENDS**

*In 2003 we said, "Despite labels' actions and growth in paid digital services, CD price declines, continued cannibalization and piracy will cause a further decline in consumer spending from $12.6B to about $10.6B"*

### Sources of Change, 2002 to 2008 Consumer Spending in Recorded Music, US



A-674

Source:    L.E.K. Analysis

18



TF000038004

Confidential

TF-0000038005

UPSIDE SCENARIOS

### *While L.E.K.'s main task was to forecast base case industry revenues, Terra Firma also asked L.E.K. Consulting to discuss some upside scenarios for Mulberry*

- These are discussed in our last section of the main pack, but not included in model unless noted (see later)

- The upsides we discuss are:

  1) Major labels have begun exploring ad-supported models that have high potential

  2) Increase label participation in other artist / music revenue streams (touring, marketing deals, merchandise, co-own the master)

  3) Uptick in music revenue via mobile platforms and new subscription model (Subscription 2.0)

  4) Broaden use base beyond traditional music buyers base on ubiquity and ease of use (in model)

  5) Substantial $ revenue per music enabled phones (in model for 8 countries)

  6) Pricing model changes to allow higher pricing of top tracks

  7) A label goes out of business and revenue is redistributed among remaining majors.

  8) Physical model holds as store shrinkage stabilizes and older users continue buying

  9) Cooperation with ISPs on anti-piracy reduces piracy loss by 50% piracy impact

  10) Increased licensing rates for SoundExchange digital performance income unless congress intervenes

  11) Inter-operability boosts market from moving to open formats

A-675

19



Confidential

## *Agenda*

- ◎ **Background and Context**

- ◎ **Market Forecast**
  - – **US**
    - – **Drivers**
    - – **Summary**
    - – **Comparisons**
  - – **Europe (EU 3)**

- ◎ **Upside Scenarios**

- ◎ **Appendix**
  - – **LEK Analysis of 1999-2002 decline**
  - – **Music industry mechanics reference**

A-676

LEK

TF000038006

A-677

## Driver Support

### Music Market Drivers

Physical

Mobile

Digital

21

UBK

Confidential

MARKET ASSUMPTIONS : DIGITAL

## *Industry experts believe piracy will remain a challenge but that P2P in the US has reached or neared peak*

- Effects of piracy will continue to be detrimental to the industry going forward

   "... Bottom line is that a whole generation of music buying consumers has now been trained to buy music as singles (or steal it). We will not ever get these consumers back with the old packaged CD model. Only hope is new products and services ..."
   Senior Executive, UMG

   "... In analyzing this biz, the answer is simple. Without consumer piracy (CD burning and downloads), a new Beyonce single hit release would be selling 100M copies on a global basis. At an avg. price of $1 each, that would be $100M to the artist and label. We are probably doing 5M in combining full track download and mastertone sales. So the digital market should be 20 times bigger than it is. Just look at radio play numbers for these big hit songs. All you have to do is put a small conversion on that to sales and the numbers are just enormous..."
   Senior Executive, UMG

- However, piracy is near peak and converting pirates to paid consumers could lead to an uplift in music

   "... The effect of peer-to-peer pirating in the US has likely peaked, or is near peak ..."
   Senior Executive, UMG

   "... There could be an uplift in music if you could convert 2-3% of pirates to start buying music ..."
   Former Vice President, UMG GLOBAL (digital download business unit)

Source:    L.E.K. Interviews, L.E.K. Research

L.E.K.

A-678

TF-0000038008

Confidential

*Paid music downloading is penetrating into the file-sharing user base*

Fee-Based vs. Total Downloaders



Millions of Downloaders



TF0000038009

A-679

Confidential

MARKET ASSUMPTIONS : DIGITAL

### *Across age cohort, people are buying more digital music downloads today than in 2004*



Share of Fee-based Digital Music Users by
Age Cohort as a Percentage of Digital
Music Users
(Q2/Q4 Averages 2004 – 2006)

Share of Age Group

Q2/Q4 Average 2004        Q2/Q4 Average 2006

| | CAGR% (2004-06) |
|---|---|
| All Ages | 40% |
| 12-17 | 42% |
| 18-24 | 65% |
| 25-34 | 68% |
| 35-54 | 25% |

A-680

**Higher share of 12-17 indicates possibility that subsequent generations may pirate less**

Note :    Based on answers to the survey question, "Have you ever paid a fee for the digital music or MP3 files
that you have downloaded off the Internet, and have you done so in the last 30 days?"
Source :   Ipsos TEMPO

L.E.K.

TF0000038010

Confidential

*Digital services will likely take 10 years from "take off" year to achieve 80% penetration (the most analogous service, premium cable, took ~8 years)*

### New Service Penetration

Percent of Total Potential Users



Internet *
Paid Digital Services ***
DVD **
Premium Cable ****

Take Off Year (2005 for paid digital services)

Years After Take Off

**Digital music service penetration faces more friction than analogous services**

| Sources of Friction | |
|---|---|
| Paid Digital Service (est. 10 years) | • Multiple devices / networking |
| | • Content DRM |
| | • Infrastructure penetration |
| Premium Cable Subscription (est. 8 years) | • New concept |
| | • Awareness |
| Internet (est. 8 years) | • New concept |
| | • Awareness |
| DVD (est. 7 years) | • Content availability |

A-681

Note:    * % of PC HH; ** % of TV HH; *** % of active music consuming broadband users; **** % of basic cable subscribers
Source:  Veronis Suhler, Consumer Electronics Association, Kagan, L.E.K. Analysis

25

TF0000038011

LEK

Confidential

## *Broadband penetration, Legitimate digital music user penetration and Number of digital downloaders*

| | 2003A | 2004A | 2005A | 2006A | 2007F | 2008F | 2009 | 2010F | 2011F | 2012F | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Broadband Users (% of U.S. Population)** | | | | | | | | | | | |
| Age 10-14 | 27.7% | 39.3% | 49.2% | 57.6% | 63.2% | 66.5% | 68.4% | 69.6% | 70.2% | 70.6% | 70.8% |
| Age 15-19 | 27.7% | 39.3% | 49.2% | 57.6% | 63.2% | 66.5% | 68.4% | 69.6% | 70.2% | 70.6% | 70.8% |
| Age 20-24 | 27.7% | 39.3% | 49.2% | 57.6% | 63.2% | 66.5% | 68.4% | 69.6% | 70.2% | 70.6% | 70.8% |
| Age 25-29 | 27.7% | 39.3% | 49.2% | 57.6% | 63.2% | 66.5% | 68.4% | 69.6% | 70.2% | 70.6% | 70.8% |
| Age 30-34 | 25.2% | 35.7% | 44.7% | 52.4% | 58.3% | 62.4% | 65.2% | 67.1% | 68.4% | 69.3% | 69.9% |
| Age 35-39 | 25.2% | 35.7% | 44.7% | 52.4% | 58.3% | 62.4% | 65.2% | 67.1% | 68.4% | 69.3% | 69.9% |
| Age 40-100 | 13.9% | 19.7% | 24.7% | 28.9% | 33.4% | 37.6% | 41.5% | 45.2% | 48.6% | 51.8% | 54.8% |
| Total | | | | | | | | | | | |
| | | | | | | | | | | | |
| **% Active & legit downloaders (%of broadband)** | | | | | | | | | | | |
| Age 10-14 | 0.0% | 7.9% | 10.2% | 18.3% | 26.4% | 36.7% | 48.1% | 60.5% | 73.1% | 84.9% | 94.4% |
| Age 15-19 | 0.0% | 10.4% | 11.4% | 21.3% | 30.3% | 41.8% | 54.1% | 67.0% | 79.1% | 88.9% | 94.3% |
| Age 20-24 | 0.0% | 11.3% | 9.0% | 21.0% | 30.3% | 43.2% | 56.7% | 71.0% | 84.3% | 94.8% | 99.9% |
| Age 25-29 | 0.0% | 7.4% | 25.1% | 18.7% | 21.6% | 21.8% | 24.0% | 26.8% | 31.3% | 37.8% | 47.2% |
| Age 30-34 | 0.0% | 7.7% | 27.5% | 21.5% | 25.4% | 26.3% | 29.1% | 32.4% | 37.1% | 43.4% | 52.1% |
| Age 35-39 | 0.0% | 10.3% | 10.3% | 13.9% | 16.7% | 20.5% | 24.7% | 29.5% | 34.9% | 40.8% | 47.3% |
| Age 40-100 | 0.0% | 10.0% | 9.7% | 13.6% | 16.6% | 20.6% | 24.9% | 29.8% | 35.0% | 40.6% | 46.2% |
| Total | 0.0% | 9.5% | 13.3% | 17.2% | 22.0% | 27.5% | 33.7% | 40.4% | 47.2% | 53.9% | 60.1% |
| | | | | | | | | | | | |
| **Digital downloaders (Non-Subscribers)** | | | | | | | | | | | |
| Age 10-14 | - | 0.6 | 0.9 | 2.0 | 3.0 | 4.2 | 5.5 | 6.9 | 8.4 | 9.8 | 10.9 |
| Age 15-19 | - | 0.8 | 1.1 | 2.4 | 3.7 | 5.3 | 6.8 | 8.3 | 9.6 | 10.5 | 10.9 |
| Age 20-24 | - | 0.8 | 0.8 | 2.3 | 3.6 | 5.3 | 7.1 | 8.9 | 10.7 | 12.0 | 12.6 |
| Age 25-29 | - | 0.5 | 2.2 | 2.0 | 2.6 | 2.7 | 3.0 | 3.3 | 3.9 | 4.6 | 5.8 |
| Age 30-34 | - | 0.5 | 2.2 | 2.0 | 2.6 | 2.8 | 3.2 | 3.7 | 4.3 | 5.2 | 6.3 |
| Age 35-39 | - | 0.7 | 0.9 | 1.4 | 1.8 | 2.3 | 2.8 | 3.3 | 3.9 | 4.5 | 5.2 |
| Age 40-100 | - | 2.3 | 2.9 | 4.8 | 6.8 | 9.3 | 12.3 | 15.9 | 20.1 | 24.9 | 30.0 |
| Total | - | 6.2 | 10.9 | 16.9 | 24.1 | 31.8 | 40.7 | 50.2 | 60.8 | 71.5 | 81.7 |

A-682

LEK

TF0000038012

Confidential

## *Other qualitative factors will lead to increased growth in digital*

- ⚙ As indicated by recent reorgs at the major labels, they are finally learning to embrace digital rather than trying to constrain it

  - Rio Caraeff (mobile guy Sony) taking over eLabs at Universal, Amanda Marks (senior digital person) now moved into Universal distribution, Adam Mirabella (senior digital person at Warner) now senior person in sales at SonyBMG, and many more…

- ⚙ Increased pricing flexibility (arguably the EMI $1.29 initiative is first and only example to date) is anticipated to start to occur resulting in more revenue per digital subscriber

  "... There is opportunity to increase revenue per digital user because there is elasticity on downside. Being able to differentially price will expand revenue per digital music consumer. Unless labels are too greedy and send the message of monopoly prices ..."
  Former Vice President, UMG GLOBALe (digital download business unit)

- ⚙ Major labels will likely go DRM-free in the near future

  - There are varying views, but most expect this within 2 years and maybe one other besides EMI by end of 2007

  "... There is a high probability that by year end most of the major labels will go DRM-free. In a year or two all of the major labels will be DRM-free ..."
  Former Vice President, UMG GLOBALe (digital download business unit)

> With improved pricing flexibility and improved interoperability, some estimate that the $ per digital user could increase ~20-25%

A-683



TF000003013

Confidential

**However, $1.00 of digital spending cannibalizes only about $0.70 of physical spending since (1) only 20% of buyers are non-pirates and (2) for pirates, 50% of the effect is incremental buys of music that would have been pirated**



Note:     * Percentages vary over time; split based on Abated versus Unabated Pirate (50-50 split based on percent of downloaders who consume fee-based downloads)
Source:   Odyssey, L.E.K. Research and Analysis

A-684

TF000003014

L.E.K.

A-685

*Driver Support*

**Music Market Drivers**

Digital

Mobile

Physical

L.E.K.

29

Confidential

TF0000038015

Confidential

**DIGITAL UPSIDES**

## *A successful November 2006 release shows the potential of digital and, in particular, mobile*

| | Total UMG Revenue |
|---|---|
| CD | $16.2M  (59%) * |
| Digital Sources | $11.2M (41%) |
|    Digital Singles | $2.8M (10%) |
|    Digital Albums | $350K (1%) |
|    Mastertones/MP3 Ringtones | $7.0M (26%) |
|    Ringback Tones | $330K (1%) |
|    Digital Music Video Downloads | $140K (1%) |
|    Other the Air/Mobile Downloads | $625K (2%) |

\* Approximate physical CD sales is 1.5M

- *41% of the $27.445M in wholesale revenue from album was from digital sources*

- *Artist / Album: Akon /Konvicted*
  - R&B with an Urban and African/Carribean feel
  - One of the more "mobile-friendly" artists



A-686



Confidential

## *Mobile phone based music has the potential to be a major upside for the labels*

- ❋ There is potential for labels to push on mobile going forward

  "... I see an overall 5% growth rate in the market after 2008 primarily driven by growth in mobile phones as the physical market continues to decline ..."
  >     TAG Strategic, Former Head of EMI Digital

- ❋ The number of users of music enabled phones is anticipated to increase rapidly, driven by:

  - Increased user friendliness

  "... We see a trend in the player market moving away from single purpose devices towards multipurpose ... This trend will enable hundreds of millions of people to have their music collections with them, as well as to download and enjoy digital music on their mobile device ..."
  >     Managing Director, Nokia Music

  - Increased availability of music enabled mobile devices

  "... Currently about 15% of music enabled phone subscribers use phones as MP3 players ..."
  >     TAG Strategic, Former Head of EMI Digital

  "... We expect to have 30M of our 50+M subscribers with music enabled phones by the end of the year ..."
  >     Senior Executive, Cingular

  Increased availability of music services for wireless devices

  "... For mobile, if the short term the economics look good and the carriers are really ready to push it, labels will start to overlook the issue of preserving the opportunity of a $5-$10 sell through and open up to mobile downloads more. Labels view it as their way to compete against Apple who have locked down the singles download market ..."
  >     Senior Executive, UMG



A-687

TF000038017

Confidential

## *Mobile phones will become the largest platform for mobile music, driven by increased user friendliness as well as increased availability of devices and services*



MP3 Player Users v. Installed Base
of MP3 Mobile Phones
(2006-11F)

CAGR%
(2006-11F)

MP3 / Video
Capable
Mobile
Phones     64

MP3 Player
Users     22

Millions
of
Units

● The number of users of music enabled phones is anticipated to increase rapidly, driven by

- Increased user friendliness

"… We see a trend in the player market moving away from single purpose devices towards multipurpose … This trend will enable hundreds of millions of people to have their music collections with them, as well as to download and enjoy digital music on their mobile device …"
Managing Director, Nokia Music

- Increased availability of music enabled mobile devices

"… Penetration of phones with MP3 capabilities is rising fast. By 2008, around half of all cellular phones will be able to play music …"
Yunata Research Center, Feb 2007

- Increased availability of music services for wireless devices

Source : Jupiter Research; L.E.K. Interviews & Analysis

32



A-688

TF0000038018

Confidential

*Mobile music has a much greater potential to expand on mobile phones; even youngsters only carry MP3 player with them 30% of time, and the rest only 10%*



When you leave home, how often do you take the following items with you?

Source: Ericsson Consumer Lab Global 10, 2005

A-689

TF-000003019

33

L.E.K.

Confidential

MARKET ASSUMPTIONS : MOBILE

*Asia, the bellwether for new mobile phone applications, is on the cusp of seeing a rapid expansion in the mobile music market*

A-690



Source :    In-stat 2006

34

TF000038020



Confidential

MARKET ASSUMPTIONS : MOBILE

*Our forecast of mobile music downloading penetration at 30% triangulates with other penetration levels*



A-691

Source :     L.E.K. Interviews and Analysis, In-Stat 2006, Veronis Suhler Stevenson 2006, IDC

35

LEK

TF0000038021

Confidential

## *Mobile music users spending in Asia and forecasted spending by mobile subscribers support an ~$80 per year mobile music spend per user*



Average Music User Spend in Asia*
Per Year
(July 2006)



Mobile Music Subscriber
Spend in US Per Year
(2010F)

A-692

Note :     * Includes full track downloads, ringback and ringtone
Source :    In-Stat 2006, IDC 2006

36

LEK

TF0000038022

Confidential

## *The Apple iPhone's effect on the OTA market is not likely to be dramatic*

- ❀ Apple iPhone has been projected to capture a small share of the market by 2010

  "... Users can already access and sideload iTunes on other MP3 capable phones, so the Apple iPhone will likely only be adopted by Apple's most loyal consumers ..."
  >    Analyst, CSFB

  "... The iPod customer base, though fiercely loyal, is only 50 million strong and concentrated in the U.S., contrasting with the 2.3 Billion global mobile phone subscriber base. Even if 1 in 3 U.S. iPod users were to shift their MP3 use to mobile, there would still be less than 20 million iPhone subscribers...."
  >    Bernstein Research

  "... Apple's goal is for shipments of iPhones to make up 1% of the global handset market at the end of 2008 ...."
  >    IDC

- ❀ Apple iPhone will most likely not be OTA capable, which is potentially harmful to the OTA download market

  "... Such a move could actually have a negative impact on the OTA market in general. Besides casting a significant vote of no confidence in the OTA model, it would provide an attractive alternative to music enthusiasts who might have otherwise been tempted to give OTA services a try..."
  >    CIBC

- ❀ However it may bring more visibility to using a mobile phone as a primary MP3 device

  "... Apple's iPhone will get consumers to view the mobile phone as a primary MP3 device. However, ...."
  >    Telephia

A-693

37

LEK

TF0000038023

*Driver Support*

## Music Market Drivers

Digital

Mobile

Physical

L.E.K.

38

Confidential

## *The industry gives various reasons for 20% decline in physical units in Q1 2007*

"... Tower closing is a big one.  Other retailers are just cutting back on CD stocking.  It's not due to consumers buying a lot more games and videos..."
    **Senior Executive, Major Music Company**

"... Before the digital market a guy in his 20s would be buying 12 CDs, but now he is just buying iTunes which has been a big hit for the music industry.  This is positive cannibalization  ..."
    **General Manager, Industry Analysis Firm**

"... My kids rip the CDs and then sneaker net the files around with USB drives ..."
    **Industry Expert**

"... We told the PWC guys there would be big step function decreases in CD sales over time when they came in but they still projected a gradual decrease in CD sales which was of course wrong..."
    **Senior Executive, Major Music Company**

A-695

TF000038025

L.E.K.

Confidential

MARKET ASSUMPTIONS : PHYSICAL

*Piracy has resulted in less major hits, which has knock-on effects due to lack of pull through to other music purchases*



### Titles Reaching Multi-Platinum (over 2M units) Within 12 Months of Release Date

- Top two scanning albums in 2005 were 50 Cent and Eminem

- Experts believe that this year will be better in terms of overall strong artist / genre releases

"... The industry has gotten really screwed up lately in terms of new releases... sometimes you get a year where not everyone like a Sheryl Crow, 50 Cent, Eminem is releasing a hit album... last year, we didn't have any of those ..."
President, UMG Distribution

Source:    RIAA, L.E.K. Analysis

A-696

L.E.K.

TF0000038026

Confidential

MARKET ASSUMPTIONS : PHYSICAL

## *As file sharing has decreased, paid downloads have gained share*



Prevalence of Fee-Based Downloading
(Q4 2002 – Q2 2006)



% of Population 12+ Who Have Ever Paid to Download Music

⊗ There is a natural asymptote to piracy

"... The effect of peer-to-peer pirating in the US has likely peaked, or is near peak ..."
Senior Executive, UMG

| Top Reasons People in the US Choose Not to Download Pirated Movies | |
|---|---|
| Takes Too Long | 12% |
| Poor Sound / Picture Quality | 12% |
| Cheap Enough to Get Movies Legally | 9% |
| It is Illegal | 8% |
| No Interest in Watching Movies on My Computer | 7% |
| Prefer Going to the Theater | 5% |
| It is Immoral | 4% |

A-697

Source :    Ipsos TEMPO, Prior L.E.K. Research

41



TF0000038027

Confidential

MARKET ASSUMPTIONS : PHYSICAL

## *Over the last several years CD-Rs have become wide spread, further enabling physical copy piracy*



CD-R Owners
(1999-2006)

Consumers (M)

Source :   IDC 2004, L.E.K. Analysis

A-698



TF0000038028

Confidential

MARKET ASSUMPTIONS : PHYSICAL

*As a share, consumers paid for a lower percentage of the music they acquired in 2006 compared to 2005*



US Music Acquisition: Volume Share
(Internet Population Age 13+)

If we assume that paid files have twice as much user value then piracy accounted for a 3.5%/49% = 7% reduction in paid content in 2006

Source :    NPD MusicWatchDigital

A-699

43

L.E.K.

TF0000038029

Confidential

MARKET ASSUMPTIONS : PHYSICAL

### *Time spent consuming music is falling as individuals increasingly spend time on other media*



Note:      *Online use of traditional media, such as downloaded music, newspaper websites, e-books, cable modems, online video of television programs and Internet radio, was included in the traditional media segment, not in consumer Internet;
** Pure-play Internet services includes, telecommunications access, such as DSL and dial-up, but not cable modems, advertising at pure-play websites like Google and GameSpy, pure-play content, such as eHarmony and GameSpy, and mobile e-mail alerts.

Source :    Veronis Suhler Stevenson, ThinkEquity, L.E.K. Analysis

44

A-700

TF000038030

L.E.K.

Case: 11-126    Document: 47    Page: 202    04/25/2011    272862    401

Confidential

## *In 2003, L.E.K. calculated a cannibalization rate from spending on competitive media of .33*

| | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|
| Music Actual Consumer Spending | 14,585 | 14,324 | 13,741 | 12,614 |
| Music Pro Forma - w/Population, Enablement, and Price Increase | 14,585 | 15,451 | 16,206 | 16,777 |
| Music Actual | 14,585 | 14,324 | 13,741 | 12,614 |
| Add-Backs: | | | | |
| Piracy | | | | |
| Add back: Decline from Download Piracy | - | 466 | 866 | 954 |
| Add back: Decline from CD-R Borrow/Copy Piracy | - | 230 | 436 | 646 |
| Decline Estimated from Piracy | - | 696 | 1,302 | 1,600 |
| Music Pro Forma Inclusive of Piracy | 14,585 | 15,020 | 15,043 | 14,214 |
| Other Impacts | | | | |
| Elimination of CD Singles | - | 88 | 154 | 216 |
| Friction Loss of Cassettes/Other Formats | - | 41 | 56 | 70 |
| Economic Cycles | - | (155) | 332 | 413 |
| Creative Cycles | - | - | 100 | 294 |
| Total Music Pro Forma Inclusive Piracy and Other Impacts | 14,585 | 14,993 | 15,684 | 15,207 |
| Variance - Music Pro Forma w/Growth and Net Music Inclusive of Piracy, Cycles | - | (458) | (522) | (1,569) |
| Physical Media Spend | | | | |
| Home Video | 16,843 | 17,976 | 18,779 | 20,108 |
| Video Games | 5,498 | 5,090 | 5,321 | 6,765 |
| Total | 22,340 | 23,067 | 24,099 | 26,873 |
| Incremental to 1999 | | 726 | 1,759 | 4,532 |
| Cannibalization Rate, Gap vs. Incremental Physical Media Spend | | (0.63) | (0.30) | (0.35) |

**Growth in Other Physical Media versus Music "Gap"**

Music Gap ($M) vs Growth in Other Media ($M)

> Given further dilution of the music industry we use a lower cannibalization factor = 20%



A-701

TF000038031

45

L.E.K.

Confidential

## Game Forecast



US Games Market
(2001-2013F)

|  | CAGR% | |
| --- | --- | --- |
|  | 01-06E | 07-13F |
| Total | 8 | 9 |
| Wireless | N/A | 23 |
| Online | 52 | 17 |
| PC | (12) | (4) |
| Console & Handheld | 7 | 4 |

A-702

Source :    PricewaterhouseCooopers, Wilkofsky Gruen Associates, L.E.K. Analysis

46



TF0000038032

Confidential

MARKET ASSUMPTIONS : PHYSICAL

### *Based on the VHS to DVD experience, it takes about 10 years for a superior replacement format to replace its predecessor*



VHS vs. DVD Consumer Spend (1997-2007)

CAGR%
(06F-10F)

DVD*    25.4

VHS    57.6

| VHS YoY % Change | (3.8%) | (14.9%) | (3.0%) | (6.0%) | (22.3%) | (45.4%) | (46.2%) | (66.0%) | (82.3%) | (100.0%) |

Note :     *Includes Standard and High Def DVD
Source :     L.E.K analysis

47

LEK

A-703

TF0000038033

Confidential

*As in other industries, new formats can sustain the market when other formats become obsolete*



Total Consumer Home Video
Sell-Through Spend

| | CAGR 03-06 | CAGR 06-12 |
|---|---|---|
| Total New Sell-Through | 6% | 2% |
| EST | N/A | 57% |
| High Definition DVD S-T | N/A | 163% |
| DVD S-T | 12% | (12%) |
| VHS S-T | (68%) | (100%) |

A-704

Note :    Format war assumed to last until 2008

48

LEK

TF-000038034

Confidential

## *Agenda*

- ❀ **Background and Context**

- ❀ **Market Forecast**
  - – **US**
    - – **Drivers**
    - – **Summary**
    - – **Comparisons**
  - – **Europe (EU 3)**

- ❀ **Upside Scenarios**

- ❀ **Appendix**
  - – **LEK Analysis of 1999-2002 decline**
  - – **Music industry mechanics reference**

A-705

49



TF0000038035

Confidential

*L.E.K.'s U.S. forecast of the music market is built "bottom-up" by examining the key drivers affecting each segment*

## Mobile

| | |
|---|---|
| Music-enabled Phones | ◉ Music-enabled phone penetration – approached ~200M phones by 2013 |
| Active Mobile Music Downloaders | ◉ Ramps up to paid transactional VOD levels – currently at 30% |
| Spend / Active User | ◉ Increases to levels approaching digital music subscriber as buying convenience offsets need to learn the usability by dual mode<br>◉ $80 per active user (approximately the same as current spend in Asia) |

## Online

| | |
|---|---|
| Broadband-enabled households | ◉ Enabled households for active music downloading<br>◉ S-curve penetration |
| Digital Music User Prevalence | ◉ Projected to reach 60% by 2013, slightly larger than the active rate for physical music (57%) |
| Spend / Digital Household | ◉ Downloaders vs. subscribers mix<br>◉ Laggard effect from less avid buyers offset by increased usability and tiered pricing |
| Cannibalization from Mobile | ◉ $1 mobile cannibalizes $0.40 digital music |
| Download Piracy | ◉ Incremental 3% digital piracy |

## Physical

| | |
|---|---|
| Baseline Increase | ◉ Based on 2006 with constant price and population growth |
| Cannibalization from Digital | ◉ $1 digital music cannibalizes $0.70 on physical as digital music converts some pirates to legal downloading |
| Cannibalization from other Media | ◉ $1 spent on games leads to a $0.25 loss on music<br>◉ Based on media cannibalization study and expert views |
| Incremental Physical Piracy | ◉ Updated view on prior L.E.K. research, incorporating that P2P activity has remained stable, but that ripping is still a problem |

A-706

TF0000038036

LEK

Case: 11-126    Document: 47    Page: 208    04/25/2011    272862    401

Confidential

## *Basic Assumptions Physical Music Market US*

| Driver Physical Music US | 06A | 07E | 10F | 13F | Rationale / Source |
|---|---|---|---|---|---|
| ⊛ Baseline Increase | 1% | 1% | 1% | 1% | ⊛ Based on 2006 with constant price and growth in U.S. eligible population growth |
| ⊛ Cannibalization from digital | | 70% | 70% | 70% | ⊛ $ 1 digital music cannibalized $ 0.70 physical music - cannibalization factor < 1 as digital music coverts some pirates to legal downloading |
| ⊛ Cannibalization from mobile | | 20% | 20% | 20% | ⊛ $ 1 mobile music cannibalizes $ 0.20 physical music. To note: mobile music also canniblizes on digital |
| ⊛ Cannibalization from other media | | 25% | 18% | 10% | ⊛ $ 1 spent on games leads to $ 0.25 loss in music sales. Cannibalization rate based on L.E.K. analysis of other media cannibalization in 2003 and expert views, and scaled back in line with smaller size music business |
| • Incremental growth in piracy | | 10% | 4% | 4% | ⊛ Piracy baseline from L.E.K. prior work and grown based on expert views and 3rd party data which indicate that P2P is in check but ripping is still a problem |

> **IDC forecasts 54.3 million mobile music subs in 2010 versus L.E.K. forecast of 46.5 million**

A-707



TF000038037

Confidential

## *Basic Assumptions Digital Music Market US*

| Driver Digital Music US | 06A | 07E | 10F | 13F | Rationale / Source |
|---|---|---|---|---|---|
| • Digital Music Users (% of BB Households) | 17% | 22% | 40% | 60% | Projected to reach 60% by 2013 slightly in excess of the active rate for physical music (57%) |
| ⊛ Average Spend per Active Digital Music User ($ per year) | | | | | |
|    - Downloader | 52 | 56 | 68 | 75 | ⊛ Current digital download spend (NPD and Odyssey) - laggard effect from less avid buyers digital more than offset by increased usability and increased purchasing from tiered pricing |
|    - Subscriber | | 120 | 120 | 120 | ⊛ Current realized subscription price |
|    - Share Downloader vs. Subscriber | 9% | 10% | 17% | 20% | ⊛ Over time subscription share is expected to increase from 10% to 20% |
| ⊛ Cannibalization from Mobile | | 40% | 40% | 40% | ⊛ $ 1 game cannibalizes $ 0.40 digital music |

A-708

TF-000003803B



Confidential

TF0000038039

<div align="right">US MARKET SUMMARY</div>

## *Basic Assumptions Mobile Music Market US*

| Driver Mobile Music US | 06A | 07E | 10F | 13F | Rationale / Source |
|---|---|---|---|---|---|
| ⊛ Enabled phones (M) | 27 | 50 | 135 | 175 | ⊛ Driven by the replacement cycle - majority of new phones will be MP3 enabled |
| ⊛ Active music downloader users (% enabled phones) [1] | | 30% | 30% | 30% | ⊛ Ramps up to paid transactional VOD levels |
| ⊛ Spend per active ($ per year) [1] | | 70 | 60 | 60 | ⊛ increases quickly to levels approaching on-line digital music subscriber as buying convenience offsets need to learn the usability by dual mode |
| ⊛ Cannibalization of mobile on physical music | | 20% | 20% | 20% | ⊛ $1 mobile sales cannibalizes on $ 0.20 physical music |
| ⊛ Cannibalization of mobile on digital music | | 40% | 40% | 40% | ⊛ $1 mobile sales cannibalizes on $ 0.40 digital music |

(1) excluding ringtones and ring backs

**A-709**



Confidential

US MARKET SUMMARY

## *Sources of Change – US*



Sources of Change
US Music Market (2006-2013)

Note that the primary driver of the "Physical Decline" is
cannibalization or substitution from other channels

A-710

TF000038040

L.E.K.

Confidential

## Summary of US Market – Revenue and YoY Growth

| | Units | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | CAGR '11-'15 | '11-'15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | |
| **US** | | | | | | | | | | | | | | | |
| Physical | $M | 11,549 | 11,063 | 11,423 | 10,477 | 9,062 | 8,122 | 7,287 | 6,494 | 5,547 | 4,592 | 3,659 | 2,738 | (11%) | (16%) |
| Digital | $M | 0 | 0 | 183 | 653 | 1,084 | 1,487 | 1,993 | 2,668 | 3,486 | 4,416 | 5,387 | 6,356 | 143% | 29% |
| Mobile | $M | 16 | 100 | 275 | 422 | 776 | 965 | 1,357 | 1,797 | 2,251 | 2,639 | 2,869 | 3,099 | 68% | 22% |
| Total | $M | 11,565 | 11,163 | 11,881 | 11,552 | 10,911 | 10,574 | 10,638 | 10,969 | 11,283 | 11,647 | 11,914 | 12,191 | (4%) | 2% |
| YoY Growth | % | | (4%) | 7% | (3%) | (6%) | (3%) | 1% | 3% | 3% | 3% | 2% | 2% | | |
| | | | | | | | | | | | | | | | |
| Cannibalization from Digital | $M | 0 | 0 | 0 | 0 | 0 | (318) | (730) | (1,283) | (1,967) | (2,742) | (3,585) | (4,454) | | |
| Loss to Piracy | $M | 0 | 0 | 0 | 0 | 0 | (279) | (487) | (606) | (628) | (609) | (556) | (470) | | |
| | | | | | | | | | | | | | | | |
| **YoY Growth** | | | | | | | | | | | | | | | |
| **US** | | | | | | | | | | | | | | | |
| Physical | $M | | (4.3%) | 3.3% | (8.3%) | (13.6%) | (10.3%) | (10.3%) | (10.9%) | (14.6%) | (17.2%) | (20.3%) | (25.2%) | | 9% |
| Digital | $M | | | | 255.9% | 66.1% | 37.1% | 34.1% | 33.9% | 30.6% | 26.7% | 22.0% | 18.0% | | (17%) |
| Mobile | $M | | 526.0% | 176.0% | 53.5% | 83.5% | 24.6% | 40.7% | 32.4% | 26.3% | 17.2% | 8.7% | 8.0% | | (28%) |
| Total | $M | | (3.6%) | 6.5% | (2.8%) | (5.6%) | (3.1%) | 0.6% | 3.0% | 3.0% | 3.2% | 2.3% | 2.3% | | (188%) |

A-711

TF00000038041



Confidential

## Summary - Physical Music Market US

| US Physical Music | Units | 2002A | 2003A | 2004A | 2006A | 2009A | 2007F | 2008F | 2009F | 2010F | 2011F | 2012F | 2013F | CAGR '07-10 | CAGR '10-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Spend before Cannibalization | $M | 11,549 | 11,053 | 11,423 | 10,477 | 9,052 | 9,132 | 9,209 | 9,286 | 9,363 | 9,444 | 9,525 | 9,616 | 1% | 1% |
| Cannibalization from Digital (since 2006) | $M | - | - | - | - | - | (318) | (730) | (1,283) | (1,957) | (2,742) | (3,585) | (4,454) | 83% | 32% |
| Cannibalization from Mobile (since 2006) | $M | - | - | - | - | - | (38) | (117) | (204) | (295) | (373) | (419) | (465) | 98% | 16% |
| Cannibalization from Games (since 2006) | $M | - | - | - | - | - | (376) | (589) | (698) | (936) | (1,128) | (1,307) | (1,492) | 36% | 17% |
| Total Spend after Cannibalization | $M | 11,549 | 11,053 | 11,423 | 10,477 | 9,052 | 8,401 | 7,774 | 7,100 | 6,174 | 5,201 | 4,215 | 3,205 | -10% | -20% |
| Additional Loss from Piracy (since 2006) | $M | - | - | - | - | - | (279) | (487) | (606) | (628) | (609) | (556) | (470) | 31% | -9% |
| Total Spend after Cannibalization and Piracy | $M | 11,549 | 11,053 | 11,423 | 10,477 | 9,052 | 8,122 | 7,287 | 6,494 | 5,547 | 4,592 | 3,659 | 2,735 | -12% | -21% |
| | | | | | | | | | | | | | | | |
| Split year-over-year decline | | | | | | | | | | | | | | | |
| From Base | | | | | | | -9% | -9% | -10% | -8% | -9% | -9% | -10% | | |
| Cannibalization from Digital (since 2006) | | | | | | | 34% | 49% | 70% | 71% | 82% | 90% | 94% | | |
| Cannibalization from Mobile (since 2006) | | | | | | | 4% | 9% | 11% | 10% | 8% | 5% | 5% | | |
| Cannibalization from Games (since 2006) | | | | | | | 40% | 26% | 25% | 25% | 20% | 19% | 20% | | |
| Additional Loss from Piracy (since 2006) | | | | | | | 30% | 25% | 15% | 2% | -2% | -6% | -9% | | |
| Total | | | | | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | | |
| | | | | | | | | | | | | | | | |
| Total Spend after Cannibalization and Piracy | % | (6.8%) | (4.3%) | 3.3% | (8.3%) | (13.6%) | (10.3%) | (10.3%) | (10.9%) | (14.6%) | (17.2%) | (20.3%) | (25.2%) | | |

Note that the primary driver of the "Physical Decline" is cannibalization or substitution from other channels

L.E.K.

A-712

TF-0000038042

Confidential

## Digital Music Market US

| US Digital Music | Units | 2002A | 2003A | 2004A | 2005A | 2006A | 2007F | 2008F | 2009F | 2010F | 2011F | 2012F | 2013F | CAGR '07-10 | CAGR '10-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Consumer Spend** | | | | | | | | | | | | | | | |
| Subscription Spend | $M | | | | 149 | 206 | 261 | 446 | 716 | 1,048 | 1,418 | 1,807 | 2,231 | 59% | 29% |
| Download Spend | | | | 183 | 504 | 878 | 1,353 | 1,914 | 2,610 | 3,423 | 4,330 | 5,236 | 6,146 | 36% | 22% |
|    Consumer Spend before Cannibalization from Mobile | $M | | | 183 | 653 | 1,084 | 1,614 | 2,360 | 3,327 | 4,470 | 5,747 | 7,043 | 8,377 | 40% | 23% |
| Cannibalization from Mobile | | - | - | - | (76) | (233) | (409) | (591) | (746) | (838) | (930) | | | 98% | 16% |
|    Consumer Spend after Cannibalization from Mobile | $M | | | 183 | 653 | 1,084 | 1,538 | 2,127 | 2,918 | 3,880 | 5,002 | 6,205 | 7,448 | 36% | 24% |
| Piracy | | | | | | | (51) | (133) | (249) | (394) | (586) | (819) | (1,092) | 98% | 40% |
| **Total Spend After Cannibalization and Piracy** | | | | 183 | 653 | 1,084 | 1,487 | 1,993 | 2,668 | 3,486 | 4,416 | 5,387 | 6,356 | 33% | 22% |
| *Growth Rate* | | | | | | | | | | | | | | | |
| *Total Spend after Cannibalization and Piracy* | | - | - | - | 255.9% | 66.1% | 37.1% | 34.1% | 33.9% | 30.6% | 26.7% | 22.0% | 18.0% | | |

A-713

57

L.E.K.

TF00003043

Confidential

## Mobile Music Market US

| US Mobile Music | Units | 2002A | 2003A | 2004A | 2005A | 2006A | 2007F | 2008F | 2009F | 2010F | 2011F | 2012F | 2013F | CAGR '07-'10 | CAGR '10-'13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Consumer Spend (Ring Tunes) | $M | | | | 225 | 375 | 804 | 1,224 | 1,685 | 2,150 | 2,548 | 2,786 | 3,024 | 39% | 12% |
| Ring Tones, Ring Back | $M | 16 | 100 | 275 | 197 | 400 | 161 | 133 | 112 | 101 | 92 | 83 | 75 | -14% | -10% |
| **Total Mobile Music Spend** | $M | 16 | 100 | 276 | 422 | 776 | 965 | 1,367 | 1,797 | 2,251 | 2,639 | 2,869 | 3,099 | 33% | 11% |

*Growth Rate*
Total Mobile Music Spend

| | | - | 525.0% | 175.0% | 53.5% | 83.5% | 24.6% | 40.7% | 32.4% | 25.3% | 17.2% | 8.7% | 8.0% | | |

A-714

LEK

Confidential

*Agenda*

- ⊛ **Background and Context**

- ⊛ **Market Forecast**
  - – **US**
    - – **Summary**
    - – **Drivers**
    - – **Comparisons**
    - – **Europe (EU 3)**

- ⊛ **Upside Scenarios**

- ⊛ **Appendix**
  - – **LEK Analysis of 1999-2002 decline**
  - – **Music industry mechanics reference**

A-715

L.E.K.

TF0000038045

Confidential

## Expert views – mobile



**U.S. Mobile Revenues [1]**
**(2003-2010F)**

Billions of Dollars

| | CAGR% (2006F-10F) |
|---|---|
| Credit Suisse | 32.7 |
| Veronis 2006 | 16.9 |
| CIBC | 34.4 |
| LEK | 30.6 |
| PWC 2006 | 26.3 |
| Expert IV | 33.4 |

A-716

Note :      [1] Includes master ringtones, ringbacks, music videos, full length downloads, other mobile and subscriptions
Source :    Veronis Suhler Stevenson, Credit Suisse, L.E.K. Music Market Model

TF00000038046

60

LEK

Confidential

# *Expert views – digital download and subscription*



US Digital Download & Subscription
(2004-2013F)

| | CAGR% (2006F-10F) |
|---|---|
| Credit Suisse | 32.7 |
| Veronis 2006 | 16.9 |
| LEK | 26.3 |
| PWC 2006 | 26.3 |
| Expert IV | 23.0 |
| CIBC | 34.3 |

Source :    PWC 2006, Veronis Suhler, 2006 Jupiter, Credit Suisse 2006, U&S 2006, L.E.K. Music Market Model

A-717

LEK

TF000038047

Confidential

**US MARKET FORECAST**

## Expert views – US physical



US Physical Market
(2000-2013F)

CAGR%
(2006F-10F)

Billions of Dollars

PWC 2005       (0.7)*
Veronis 2005   (1.7)*

Expert IV      (4.1)
PWC 2006       (5.6)

Veronis 2006   (10.6)**
LEK            (11.7)**

Note :    * CAGR% calculated for 06-09F
          ** L.E.K. figures based on retail value, whereas other Veronis forecast based on total value of product shipped
Source :   PWC 2005 & 2006, Veronis Suhler 2005 & 2006, Jupiter 2006, Credit Suisse 2006, U&S 2006, L.E.K. Music Market Model

LEK

A-718

TF-000003804B

Confidential

***The educated guesses of senior VPs at large music companies are varied but not dissimilar to the L.E.K. outlook***

| | 07 | 08 | 09 | 10-13 | | Rationale |
|---|---|---|---|---|---|---|
| Expert 1 | (10%) | (5%) | 1% | 5%+ | ● | Uplift due to digital pricing |
| Expert 2 | N/A | (10%) | (4%) | 3-5% | ● | Rebound due to mobile |
| Expert 3 | (20%) | (5%) | (5%) | 2-10% | ● | New formats and business models will provide uplift 4-5 years into the future; if there is another steep decline in '08, industry will continue downward |



**Insiders generally agree that recorded music will get worse before it gets better**

A-719

TF000003B049



Confidential

## *Agenda*

⚙ **Background and Context**

⚙ **Market Forecast**

    – US

    – Europe (EU 3)

⚙ **Upside Scenarios**

⚙ **Appendix**

    – LEK Analysis of 1999-2002 decline

    – Music industry mechanics reference

A-720

TF-0000038050



EUROPE MARKET DRIVERS

## *Europe drivers*

- ◉ Broadband penetration

- ◉ 3G wireless adoption and other new technology

- ◉ Piracy



65

Confidential

**EUROPE MARKET DRIVERS**

*Broadband adoption in Europe follows that in the U.S., with the U.K. having a steeper penetration curve*



U.S. Broadband Penetration by Age Band (2000-10F)



Western European Broadband Penetration by Country (1999-10F)

Source :    L.E.K. European Music Model; OECD; Eurostat; Pew Internet Research



A-722

TF0000038052

Confidential

**EUROPE MARKET DRIVERS**

### *3G penetration into mobile subscribers*



US Mobile Phone Subscribers



Europe Mobile Phone Subscribers

A-723

Source :    L.E.K. Music Market Model, Morgan Stanley, Jupiter, CTIA

LEK

TF0000038053

Confidential

**EUROPE MARKET DRIVERS**

*Pricing on physical varies greatly among countries*

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006E | 2007E | 2008E | 2009E | 2010E | CAGR 2001-05 | CAGR 2005-10E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US | 14.32 | 14.68 | 14.88 | 14.85 | 14.89 | 14.90 | 14.90 | 14.90 | 14.90 | 14.90 | 1.0% | - |
| UK | 12.77 | 12.57 | 12.73 | 12.16 | 12.18 | 12.27 | 12.36 | 12.45 | 12.55 | 12.72 | (1.2%) | 0.9% |
| Germany | 11.95 | 12.28 | 12.32 | 12.15 | 12.19 | 12.12 | 12.12 | 12.12 | 12.12 | 12.13 | 0.5% | 0.0% |
| France | 15.31 | 15.17 | 14.70 | 13.81 | 13.01 | 12.74 | 12.43 | 12.12 | 11.81 | 11.50 | (4.0%) | (2.5%) |
| Italy | 15.15 | 14.08 | 17.10 | 18.08 | 18.29 | 18.65 | 18.93 | 19.30 | 19.61 | 19.88 | 4.8% | 1.6% |
| Spain | 10.70 | 10.88 | 10.95 | 11.56 | 11.92 | 12.12 | 12.42 | 12.75 | 13.06 | 13.38 | 2.7% | 2.5% |
| Belgium | 12.43 | 12.62 | 12.59 | 12.04 | 11.93 | 11.81 | 11.67 | 11.56 | 11.45 | 11.23 | (1.0%) | (1.3%) |
| Austria | 18.59 | 19.42 | 18.03 | 18.54 | 18.72 | 18.64 | 18.52 | 18.38 | 18.32 | 18.17 | 0.2% | (0.6%) |

A-724

Source : PwC



TF000038054

Confidential

EUROPE MARKET DRIVERS

*P2P activity has slowed down since 2003, mainly due to stepped-up enforcement efforts; market experts expect Western Europe to continue to abate piracy*



Illegal P2P files on networks
Western Europe
(2003-05)



Illegal P2P music downloaders of online users
Western Europe
(2002-06)

- In Western Europe law enforcements and lawsuits led to a decrease in P2P activity and piracy

  "... Piracy is a big issue in Europe. However, in the last year Western European countries, like Germany and the UK effectively reduced illegal P2P music downloads ..."
  Director Marketing, IFPI

- Going forward, experts believe that Western Europe will continue to abate music piracy

  "... Due to new laws and the uptake of paid digital services in Western Europe, especially in Spain and Italy, we expect music piracy decrease going forward ..."
  Director Marketing, IFPI

A-725

Source :    Jupiter, PwC, RIAA

L.E.K.

TF0000038055

Confidential

EU 3 MUSIC MARKET

## *US vs. EU 3 Music Market size, split by repertoire*



US vs. EU 3 by Market Share and Repertoire (2005)

TF0000038056

Source:    IFPI

70

L.E.K.

A-726

Confidential

**EU 3 MUSIC MARKET**

*Genre share by country*



Genre Share by Country *

Note:    * Genre data unavailable for Spain, Russia, India, and China
         ** In France, Other includes French songs (33%), International songs (26%), Compilations (22%) and Other (6%)
         *** In Brazil, Pop and Rock combined represent 42% portion of total genre
Source:  IFPI, CRA Nielsen Research



TF0000038057

A-727

Confidential

## Basic Assumptions Physical Music Market EU-3

| Driver Physical Music EU 3 | 06A | 07E | 10F | 13F | Rationale / Source |
|---|---|---|---|---|---|
| • Baseline Increase | 0% | 0% | 0% | 0% | • Based on 2006 with constant prices, constant exchange rates, and EU-3 eligible population growth |
| • Cannibalization from digital | | 70% | 70% | 70% | • $ 1 digital music cannibalizes $ 0.70 physical music - cannibalization factor < 1 as digital music coverts some pirates to legal downloading |
| • Cannibalization from mobile | | 40% | 40% | 40% | • $ 1 mobile music cannibalizes $ 0.20 physical music. To note: mobile music also canniblizes on digital music |
| • Cannibalization from other media | | 25% | 18% | 10% | • $ 1 spent on games leads to $ 0.25 loss in music sales. Cannibalization rate based on L.E.K. analysis of other media cannibalization in 2003 and expert views, and scaled back in line with smaller size music business |
| • Incremental growth in piracy | | 15% | 6% | 4% | • Piracy baseline from L.E.K. prior work and grown based on expert views and 3rd party data which indicate that P2P is in check but ripping is still a problem |

A-728

TF0000038058

L.E.K.

Case: 11-126    Document: 47    Page: 230    04/25/2011    272862    401

Confidential

## *Basic Assumptions Digital Music Market – EU3*

| Driver Digital Music EU 3 | 06A | 07E | 10F | 13F | Rationale / Source |
|---|---|---|---|---|---|
| • Digital Music Users (% of BB Households) | 9% | 17% | 36% | 57% | Projected to reach 60-70% by 2013 slightly in excess of the active rate for physical music |
| • Average Spend per Digital MusicHousehold ($ per year) | | | | | |
|    - Downloader | | 76 | 142 | 183 | • Current digital download spend (NPD and Odyssey) - laggard effect from less avid buyers digital more than offset by increased usability and increased purchasing from tiered pricing |
|    - Subscriber | | 216 | 216 | 216 | • Current realized subscription price |
|    - Share Downloader vs. Subscriber | 15% | 12% | 12% | 22% | • Over time subscription share is expected to increase from 15% to 22% |
| • Cannibalization from Mobile | | 40% | 40% | 40% | • $ 1 game cannibalizes $ 0.20 digital music |

A-729

TF0000038059

73



Confidential

## Basic Assumptions Mobile Music Market – EU3

| Driver Mobile Music Europe | 06A | 07E | 10F | 13F | Rationale / Source |
|---|---|---|---|---|---|
| • Enabled phones (M) | 29 | 41 | 92 | 121 | • Driven by the replacement cycle - majority of new phones will be MP3 enabled |
| • Active music downloader users (% | | 36% | 36% | 36% | • Ramps up to paid transactional VOD levels |
| • Spend per active ($ per year) | | $ 100 | $ 93 | $ 85 | • Increases quickly to levels approaching on-line digital music subscriber as buying convenience offsets need to learn the usability by dual mode |
| • Cannibalization of mobile on physical music | | 40% | 40% | 40% | • $1 mobile sales cannibalizes on $ 0.20 physical music |
| • Cannibalization of mobile on digital music | | 40% | 40% | 40% | • $1 mobile sales cannibalizes on $ 0.20 digital music |

A-730

TF0000038060

74

LEK

Confidential

TF000038061

A-731

## *Primary global driver assumptions*



**Mobile Activity Rate**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% |
| France | 36.0% | 35.0% | 34.0% | 33.0% | 32.0% | 31.0% | 30.0% |
| Germany | 36.0% | 35.0% | 34.0% | 33.0% | 32.0% | 31.0% | 30.0% |
| UK | 36.0% | 35.0% | 34.0% | 33.0% | 32.0% | 31.0% | 30.0% |

**Music Enabled Mobile Phone Owners**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | 50 | 76 | 104 | 135 | 148 | 161 | 175 |
| France | 12 | 16 | 21 | 27 | 31 | 33 | 34 |
| Germany | 17 | 23 | 30 | 38 | 42 | 45 | 46 |
| UK | 12 | 16 | 21 | 27 | 31 | 33 | 34 |

**ARPU**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | 75 | 73 | 70 | 68 | 65 | 63 | 60 |
| France | 40 | 35 | 30 | 30 | 30 | 30 | 30 |
| Germany | 90 | 75 | 65 | 60 | 60 | 60 | 60 |
| UK | 150 | 125 | 100 | 100 | 100 | 100 | 100 |

**Similar to 2006 levels**

L.E.K.

Confidential

MUSIC MARKET FORECAST

## Primary global driver assumptions


Digital

**Active Digital Downloaders (Millions)**

| US | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Age 10-14 | 3.0 | 4.2 | 5.5 | 6.9 | 8.4 | 9.8 | 10.9 |
| Age 15-19 | 3.7 | 5.3 | 6.8 | 8.3 | 9.6 | 10.6 | 10.9 |
| Age 20-24 | 3.6 | 5.3 | 7.1 | 8.9 | 10.7 | 12.0 | 12.6 |
| Age 25-29 | 2.6 | 2.7 | 3.0 | 3.3 | 3.9 | 4.6 | 5.8 |
| Age 30-34 | 2.6 | 2.8 | 3.2 | 3.7 | 4.3 | 5.2 | 6.3 |
| Age 35-39 | 1.8 | 2.3 | 2.8 | 3.3 | 3.9 | 4.5 | 5.2 |
| Age 40-100 | 6.8 | 9.3 | 12.3 | 16.9 | 20.1 | 24.9 | 30.0 |
| Total | 24.1 | 31.8 | 40.7 | 50.2 | 60.8 | 71.6 | 81.7 |
| | | | | | | | |
| France | 1.6 | 2.8 | 4.1 | 5.4 | 6.7 | 7.8 | 7.8 |
| Germany | 2.1 | 3.6 | 5.6 | 7.9 | 10.4 | 12.8 | 13.3 |
| UK | 3.1 | 4.5 | 6.0 | 7.4 | 8.9 | 10.2 | 10.2 |

**Digital Buy Rate (Units)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | 55.5 | 59.5 | 63.5 | 67.5 | 70.5 | 72.5 | 74.5 |
| France | 40.0 | 42.6 | 46.2 | 47.7 | 50.2 | 52.6 | 55.0 |
| Germany | 46.0 | 48.2 | 50.5 | 52.8 | 55.2 | 57.6 | 60.0 |
| UK | 58.0 | 60.8 | 63.2 | 65.3 | 67.1 | 68.6 | 70.0 |

**Download Price per Song ($)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | $1.01 | $1.01 | $1.01 | $1.01 | $1.01 | $1.01 | $1.01 |
| France | $1.41 | $1.41 | $1.41 | $1.41 | $1.41 | $1.41 | $1.41 |
| Germany | $2.48 | $2.48 | $2.48 | $2.48 | $2.48 | $2.48 | $2.48 |
| UK | $0.80 | $0.90 | $1.00 | $1.00 | $1.00 | $1.00 | $1.00 |

**Similar to 2006 levels**

76

A-732

TF0000038062

LEK

Confidential

## *Primary global driver assumptions*

Digital
Subscription

**% Subscribers (% of Total Legit Buyers)**

|        | 2007  | 2008  | 2009  | 2010  | 2011  | 2012  | 2013  |
|--------|-------|-------|-------|-------|-------|-------|-------|
| US     | 10.0% | 13.0% | 15.0% | 17.0% | 18.0% | 19.0% | 20.0% |
| France | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 20.0% |
| Germany| 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 20.0% |
| UK     | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 25.0% |

**Monthly Subscription Fee**

|        | 2007   | 2008   | 2009   | 2010   | 2011   | 2012   | 2013   |
|--------|--------|--------|--------|--------|--------|--------|--------|
| US     | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 |
| France | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 |
| Germany| $18.00 | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 |
| UK     | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 | $18.00 |

**Similar to 2006 levels**

A-733

TF0000038063

77

L.E.K.

Confidential

**MUSIC MARKET FORECAST**

## *Primary global driver assumptions*



See page 28 for explanation

### Digital Cannibalization of Physical

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| France | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| Germany | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |
| UK | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 | $0.70 |

### Physical Buy Rate Decline

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | - | - | - | - | - | - | - |
| France | - | - | - | - | - | - | - |
| Germany | - | - | - | - | - | - | - |
| UK | - | - | - | - | - | - | - |

### Physical Price

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| US | | | | | | | |
| CD Singles | $6.79 | $6.79 | $6.79 | $6.79 | $6.79 | $6.79 | $6.79 |
| CD | $16.24 | $16.24 | $16.24 | $16.24 | $16.24 | $16.24 | $16.24 |
| DVD | $21.27 | $21.27 | $21.27 | $21.27 | $21.27 | $21.27 | $21.27 |
| France | $12.74 | $12.74 | $12.74 | $12.74 | $12.74 | $12.74 | $12.74 |
| Germany | $12.12 | $12.12 | $12.12 | $12.12 | $12.12 | $12.12 | $12.12 |
| UK | $12.27 | $12.27 | $12.27 | $12.27 | $12.27 | $12.27 | $12.27 |

Similar to 2006 levels

A-734

TF000038064

LEK

Confidential

EU 3 MUSIC MARKET

## Source of Change – EU 3 Music Market



Sources of Change
EU 3 Music Market (2006-2013)



A-735

TF0000038065

## Summary of US + EU 3 Markets – Revenue

| | Units | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | CAGR 04-06 | CAGR 06-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | |
| **US** | | | | | | | | | | | | | | | |
| Physical | $M | 11,549 | 11,053 | 11,423 | 10,477 | 9,052 | 8,122 | 7,287 | 6,494 | 5,547 | 4,592 | 3,659 | 2,735 | (11%) | (16%) |
| Digital | $M | 0 | 0 | 183 | 653 | 1,084 | 1,487 | 1,993 | 2,668 | 3,486 | 4,416 | 6,387 | 6,366 | 143% | 29% |
| Mobile | $M | 16 | 100 | 275 | 422 | 775 | 965 | 1,357 | 1,797 | 2,251 | 2,639 | 2,869 | 3,099 | 68% | 22% |
| Total | $M | 11,565 | 11,153 | 11,881 | 11,552 | 10,911 | 10,574 | 10,638 | 10,959 | 11,283 | 11,647 | 11,914 | 12,191 | (4%) | 2% |
| YoY Growth | % | | (4%) | 7% | (3%) | (6%) | (3%) | 1% | 3% | 3% | 3% | 2% | 2% | | |
| | | | | | | | | | | | | | | | |
| Cannibalization from Digital | $M | 0 | 0 | 0 | 0 | 0 | (318) | (730) | (1,283) | (1,957) | (2,742) | (3,585) | (4,454) | | |
| Loss to Piracy | $M | 0 | 0 | 0 | 0 | 0 | (279) | (487) | (606) | (628) | (609) | (556) | (470) | | |
| | | | | | | | | | | | | | | | |
| **France** | | | | | | | | | | | | | | | |
| Physical | $M | 2,750 | 2,353 | 2,042 | 1,990 | 1,598 | 1,409 | 1,219 | 1,003 | 743 | 505 | 291 | 142 | (12%) | (29%) |
| Digital | $M | 0 | 0 | 4 | 13 | 37 | 103 | 200 | 351 | 564 | 785 | 998 | 1,124 | 203% | 63% |
| Mobile | $M | 5 | 20 | 50 | 80 | 115 | 273 | 389 | 531 | 704 | 888 | 988 | 1,080 | 52% | 38% |
| Total | $M | 2,755 | 2,373 | 2,096 | 2,083 | 1,750 | 1,785 | 1,807 | 1,884 | 2,011 | 2,168 | 2,277 | 2,347 | (9%) | 4% |
| YoY Growth | % | | (14%) | (12%) | (1%) | (16%) | 2% | 1% | 4% | 7% | 7% | 6% | 3% | | |
| | | | | | | | | | | | | | | | |
| **Germany** | | | | | | | | | | | | | | | |
| Physical | $M | | | 2,201 | 2,211 | 1,986 | 1,836 | 1,585 | 1,300 | 960 | 650 | 373 | 182 | (5%) | (29%) |
| Digital | $M | | | 12 | 38 | 103 | 149 | 276 | 500 | 854 | 1,264 | 1,694 | 1,986 | 192% | 53% |
| Mobile | $M | | | 186 | 290 | 380 | 518 | 695 | 894 | 1,120 | 1,309 | 1,416 | 1,470 | 43% | 21% |
| Total | $M | | | 2,399 | 2,538 | 2,469 | 2,503 | 2,555 | 2,694 | 2,935 | 3,223 | 3,483 | 3,638 | 1% | 6% |
| YoY Growth | % | | | | 6% | (3%) | 1% | 2% | 5% | 9% | 10% | 8% | 4% | | |
| | | | | | | | | | | | | | | | |
| **UK** | | | | | | | | | | | | | | | |
| Physical | $M | | | 3,540 | 3,446 | 3,057 | 2,802 | 2,429 | 2,000 | 1,484 | 1,008 | 581 | 284 | (7%) | (29%) |
| Digital | $M | | | 3 | 22 | 69 | 240 | 383 | 583 | 905 | 1,213 | 1,505 | 1,672 | 378% | 58% |
| Mobile | $M | | | 250 | 380 | 500 | 557 | 710 | 867 | 1,024 | 1,120 | 1,124 | 1,069 | 41% | 11% |
| Total | $M | | | 3,793 | 3,848 | 3,626 | 3,599 | 3,522 | 3,450 | 3,413 | 3,341 | 3,210 | 3,025 | (2%) | (3%) |
| YoY Growth | % | | | | 1% | (6%) | (1%) | (2%) | (2%) | (1%) | (2%) | (4%) | (6%) | | |
| | | | | | | | | | | | | | | | |
| **Total EU3** | | | | | | | | | | | | | | | |
| Physical | $M | | | 7,783 | 7,647 | 6,641 | 6,047 | 5,232 | 4,302 | 3,188 | 2,162 | 1,245 | 609 | (8%) | (29%) |
| Digital | $M | | | 19 | 72 | 208 | 493 | 859 | 1,434 | 2,324 | 3,263 | 4,196 | 4,782 | 231% | 57% |
| Mobile | $M | | | 486 | 750 | 995 | 1,348 | 1,794 | 2,292 | 2,848 | 3,297 | 3,528 | 3,619 | 43% | 20% |
| Total | $M | | | 8,288 | 8,469 | 7,844 | 7,888 | 7,885 | 8,028 | 8,359 | 8,722 | 8,969 | 9,009 | (3%) | 2% |
| YoY Growth | % | | | | 2% | (7%) | 1% | (0%) | 2% | 4% | 4% | 3% | 0% | | |



Confidential

**EU 3 MUSIC MARKET**

## *Summary of EU 3 Markets – YoY Growth*

A-737

| | Units | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **YoY Growth** | | | | | | | | | | | | | |
| **France** | | | | | | | | | | | | | |
| Physical | $M | (14.4%) | (13.2%) | (2.6%) | (19.7%) | (11.9%) | (13.6%) | (17.7%) | (26.9%) | (32.1%) | (42.4%) | (51.1%) | 15% |
| Digital | $M | | | 216.4% | 190.4% | 180.9% | 93.6% | 76.8% | 60.8% | 39.3% | 27.1% | 12.7% | (32%) |
| Mobile | $M | 300.0% | 160.0% | 60.0% | 43.8% | 137.6% | 42.4% | 36.6% | 32.6% | 23.3% | 13.9% | 9.3% | (20%) |
| Total | $M | (13.9%) | (11.7%) | (0.6%) | (16.0%) | 2.0% | 1.3% | 4.2% | 6.7% | 7.3% | 5.6% | 3.1% | (179%) |
| **Germany** | | | | | | | | | | | | | |
| Physical | $M | | | 0.4% | (10.1%) | (7.6%) | (13.7%) | (18.0%) | (26.1%) | (32.3%) | (42.6%) | (51.2%) | 26% |
| Digital | $M | | | 213.9% | 172.3% | 45.6% | 84.7% | 81.2% | 70.8% | 47.9% | 34.0% | 17.3% | (28%) |
| Mobile | $M | | | 66.9% | 31.0% | 36.4% | 34.0% | 28.7% | 25.3% | 16.9% | 8.2% | 3.8% | (26%) |
| Total | $M | | | 5.8% | (2.7%) | 1.4% | 2.1% | 5.4% | 8.9% | 9.8% | 8.1% | 4.4% | (207%) |
| **UK** | | | | | | | | | | | | | |
| Physical | $M | | | (2.7%) | (11.3%) | (8.3%) | (13.3%) | (17.6%) | (26.8%) | (32.1%) | (42.4%) | (51.0%) | 24% |
| Digital | $M | | | 638.6% | 209.2% | 261.0% | 59.3% | 52.1% | 55.3% | 34.0% | 24.0% | 11.1% | (34%) |
| Mobile | $M | | | 52.0% | 31.6% | 11.3% | 27.6% | 22.1% | 18.1% | 9.4% | 0.3% | (4.9%) | (177%) |
| Total | $M | | | 1.6% | (5.8%) | (0.7%) | (2.1%) | (2.0%) | (1.1%) | (2.1%) | (3.9%) | (5.8%) | (0%) |
| **Total EU3** | | | | | | | | | | | | | |
| Physical | $M | | | (1.8%) | (13.1%) | (9.0%) | (13.5%) | (17.8%) | (26.9%) | (32.2%) | (42.4%) | (51.1%) | 21% |
| Digital | $M | | | 281.6% | 188.7% | 137.2% | 74.2% | 66.9% | 62.1% | 40.4% | 28.6% | 13.9% | (31%) |
| Mobile | $M | | | 54.3% | 32.7% | 36.6% | 33.1% | 27.8% | 24.2% | 16.8% | 7.0% | 2.6% | (30%) |
| Total | $M | | | 2.2% | (7.4%) | 0.6% | (0.0%) | 1.8% | 4.1% | 4.3% | 2.8% | 0.4% | (167%) |

TF000038067

L.E.K.

Confidential

## *Physical Music Market EU-3*

| Europe Physical Music | Units | 2002A | 2003A | 2004A | 2005A | 2006A | 2007F | 2008F | 2009F | 2010F | 2011F | 2012F | 2013F | CAGR '07-10 | CAGR '10-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Spend before Cannibalization | $M | 9,076 | 8,189 | 7,783 | 7,647 | 6,641 | 6,879 | 6,899 | 6,916 | 6,931 | 6,948 | 6,964 | 6,981 | 0% | 0% |
| Cannibalization from Digital (since 2006) | $M | - | - | - | - | - | (218) | (515) | (1,003) | (1,780) | (2,620) | (3,483) | (4,085) | 102% | 32% |
| Cannibalization from Mobile (since 2006) | $M | - | - | - | - | - | (141) | (319) | (519) | (741) | (921) | (1,013) | (1,050) | 74% | 12% |
| Cannibalization from Games (since 2006) | $M | - | - | - | - | - | (161) | (318) | (471) | (637) | (789) | (930) | (1,077) | 58% | 19% |
| **Total Spend after Cannibalization** | $M | 9,076 | 8,189 | 7,783 | 7,647 | 6,641 | 6,360 | 5,747 | 4,923 | 3,773 | 2,618 | 1,537 | 769 | -16% | -41% |
| Additional Loss from Piracy (since 2006) | $M | - | - | - | - | - | (313) | (515) | (621) | (586) | (456) | (293) | (161) | 23% | -35% |
| **Total Spend after Cannibalization and Piracy** | $M | 9,076 | 8,189 | 7,783 | 7,647 | 6,641 | 6,047 | 5,232 | 4,302 | 3,188 | 2,162 | 1,246 | 609 | -19% | -42% |

| Split year-over-year decline | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From Base | | | | | | -40% | -2% | -2% | -1% | -2% | -2% | -3% |
| Cannibalization from Digital (since 2006) | | | | | | 37% | 37% | 52% | 70% | 82% | 94% | 95% |
| Cannibalization from Mobile (since 2006) | | | | | | 24% | 22% | 21% | 20% | 18% | 10% | 6% |
| Cannibalization from Games (since 2006) | | | | | | 27% | 19% | 16% | 15% | 15% | 15% | 23% |
| Additional Loss from Piracy (since 2006) | | | | | | 53% | 25% | 11% | -3% | -13% | -18% | -21% |
| Total | | | | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Total Spend after Cannibalization and Piracy* | % | (2.3%) | (9.8%) | (5.0%) | (1.8%) | (13.1%) | (9.0%) | (13.5%) | (17.8%) | (25.9%) | (32.2%) | (42.4%) | (51.1%) |

A-738



TF0000038068

Confidential

A-739

EU 3 MUSIC MARKET

## *Digital Music Market EU-3*

| Europe Digital Music | Units | 2002A | 2003A | 2004A | 2005A | 2006A | 2007F | 2008F | 2009F | 2010F | 2011F | 2012F | 2013F | CAGR 07-'10 | CAGR 10-'13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Consumer Spend** | | | | | | | | | | | | | | | |
| Subscription Spend | $M | | | | 14 | 37 | 139 | 267 | 393 | 532 | 676 | 817 | 1,378 | 56% | 37% |
| Download Spend | $M | | | 19 | 58 | 171 | 521 | 996 | 1,767 | 2,960 | 4,195 | 5,380 | 5,714 | 78% | 25% |
| Consumer Spend before Cannibalization from Mobile | $M | - | - | 19 | 72 | 208 | 660 | 1,263 | 2,159 | 3,492 | 4,872 | 6,197 | 7,093 | 74% | 27% |
| Cannibalization from Mobile | | | | | | | (141) | (319) | (519) | (741) | (921) | (1,013) | (1,050) | 74% | 12% |
| Consumer Spend after Cannibalization from Mobile | $M | | | 19 | 72 | 208 | 519 | 943 | 1,641 | 2,751 | 3,951 | 5,184 | 6,043 | 74% | 30% |
| Piracy | | | | | | | (26) | (84) | (207) | (427) | (688) | (987) | (1,261) | 156% | 43% |
| **Total Spend After Cannibalization and Piracy** | | | | 19 | 72 | 208 | 493 | 859 | 1,434 | 2,324 | 3,263 | 4,196 | 4,782 | 68% | 27% |
| **Growth Rate** | | | | | | | | | | | | | | | |
| *Total Spend after Cannibalization and Piracy* | % | | | | 281% | 187% | 137% | 74% | 67% | 62% | 40% | 29% | 14% | | |

LEK

TF0000038069

Confidential

## Mobile Music Market EU-3

| Europe Mobile Music | Units | 2002A | 2003A | 2004A | 2005A | 2006A | 2007F | 2008F | 2009F | 2010F | 2011F | 2012F | 2013F | CAGR 07-10 | CAGR 10-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Consumer Spend (Ring Tunes) | $M | 47 | 244 | 486 | 750 | 995 | 1,348 | 1,794 | 2,292 | 2,848 | 3,297 | 3,528 | 3,619 | 28% | 8% |
| Ring Tones, Ring Back | $M | . | . | . | . | . | . | . | . | . | . | . | . | | |
| Total Mobile Music Spend | $M | 47 | 244 | 486 | 750 | 995 | 1,348 | 1,794 | 2,292 | 2,848 | 3,297 | 3,528 | 3,619 | 28% | 8% |
| *Growth Rate* Total mobile music spend | % | | 419.1% | 99.2% | 54.3% | 32.7% | 35.5% | 33.1% | 27.8% | 24.2% | 15.8% | 7.0% | 2.6% | | |

A-740

TF0000038070

L.E.K.

Confidential

US + EU 3 SUMMARY MUSIC MARKET

## *Sources of Changes – US and EU 3*



Sources of Change
US + EU 3 Music Market (2006-2013)

A-741

LEK

TF000003071

Confidential

## *Agenda*

- Background and Context

- Market Forecast
  - US
  - Europe (EU 3)

- Upside Scenarios

- Appendix
  - LEK Analysis of 1999-2002 decline
  - Music industry mechanics reference

A-742

TF000038072

86

LEK

Confidential

*While L.E.K.'s main task was to forecast base case industry revenues, Terra Firma also asked L.E.K. Consulting to suggest some upside scenarios for Mulberry*

- Unless where noted, L.E.K. Consulting did not provide detailed modeling on these upsides given time constraints, project scope, and work of other advisors

- The upsides we discuss are:

    1) Major labels have begun exploring ad-supported models that have high potential

    2) Increase label participation in other artist / music revenue streams (touring, marketing deals, merchandise, co-own the master)

    3) Uptick in music revenue via mobile platforms and new subscription model (Subscription 2.0)

    4) Broaden use base beyond traditional music buyers base on ubiquity and ease of use (in model)

    5) Substantial $ revenue per music enabled phones (in model for 8 countries)

    6) Pricing model changes to allow higher pricing of top tracks

    7) A label goes out of business and revenue is redistributed among remaining majors.

    8) Physical model holds as store shrinkage stabilizes and older users continue buying

    9) Cooperation with ISPs on anti-piracy reduces piracy loss by 50% piracy impact

    10) Increased licensing rates for SoundExchange digital performance income unless congress intervenes

    11) Inter-operperability boosts market from moving to open formats



A-743

TF0000038073

Confidential

**UPSIDE SCENARIOS**

## 1) Major labels have begun exploring ad-supported models that have high potential (page 1 of 2)

- Music fans enjoy free, add-supported music on terrestrial over-the-air radio

- Warner Music Group (WMG), SonyBMG, Universal (UMG) licensed music videos to YouTube in exchange for share of advertising revenues.
  - EMI has licensed videos to Gotuit; may adopt litigation strategy with YouTube if content filtering is insufficient.

- WMG and SonyBMG using Brightcove to syndicate free-to-the-user, ad-supported music videos on MySpace, blogs and other social networks.
  - MySpace – SnoCap model (pay to download non-DRM'd MP3's) little traction to date

- Ad-supported streaming of copyrighted content may be analogous to network television online:
  - Downloaded episodes of prime time programming priced at $1.99 on iTunes
  - Ad-supported streaming free to consumer on ABC.com
  - Working assumption is that ratio of user base size for the two models is 5:1 Free On-Demand Streamed (FODS) to Pay-Per-Download (PPD)
  - Given the CPMs and avails, revenue per user is 1:5

A-744



TF0000038074

Confidential

## *Long-Form Content Example:*   *ABC Network*

### Description

- ⊛ Offers FODS on ABC.com for all major shows
  - Streams contain 3-4 30-second spots per show regularly scheduled for 1 hour on TV
  - Streams are shorter in length than on TV due to fewer ads
- ⊛ Offers PPD through iTunes
  - Downloads are ad-free
  - User can purchase individual shows or "Season Pass" bundles

### Key Metrics

| Online | | Offline | |
|---|---|---|---|
| Pricing | | Pricing | |
| PPD: | $1.99 | Broadcast: | free |
| Season Pass: | $34.99 | | |
| FODS: | free | | |
| | | | |
| Audience | | | |
| Unique Visitors (monthly): | 9M | | |
| Streamers: | 2.5M | | |

### Observations

- ⊛ ABC was the first major network to offer FODS on its website in May 2006
  - ABC has been the most successful among its peers in terms of driving traffic, generating the most unique visitors and streams
- ⊛ ABC's FODS model offers a compelling value proposition to both advertisers and users
  - Many shows offer advertisers exclusive sponsorship, translating to differentiated branding opportunities and higher consumer recall than broadcast TV
  - Users may consume content on-demand while sitting through fewer ads than broadcast TV
- ⊛ ABC captures an additional revenue stream from users willing to pay for ad-free shows sold via iTunes

Source :   Nielson NetRatings, Company Website and Press Releases



A-745

TF000038075

Confidential

*Broadcast Network TV Advertising gets better revenue than FODS at current rates, although highly popular content is reaching traditional rates*

| | Traditional Network Television | Sponsorship of Popular Free On-Demand Stream (FODS) | Free On-Demand Stream (FODS) | ESPN Motion (FODS) |
|---|---|---|---|---|
| CPM | $25[1] | $130 | $37.50 | $13.70 |
| | ÷ | ÷ | ÷ | ÷ |
| | 1000 | 1000 | 1000 | 1000 |
| | = | = | = | = |
| $ / Ad View | $0.02 | $0.13 | $0.0375 | $0.0137 |
| | X | X | X | X |
| Avails per Hour | 30 | 4 | 8 | 1 avail per 2-min video |
| | = | = | = | = |
| $ / Viewer Hour | $0.75 | $0.52 | $0.30 | $0.41 |

Note :      [1] Primetime 30 second spot (2006)
Source :    Media Dynamics, iTunes, AccuStream

A-746



TF00000038076

Confidential

**UPSIDE SCENARIOS**

## 1) Major labels have begun exploring ad-supported models that have high potential (page 2 of 2)

- SpiralFrog, ad-supported download environment, announced with much fanfare and deals with UMG and EMI Music Pub never launched, presently dormant or out of business

  - Bad implementation, terrible management

  - Model widely expected to have great traction implemented by others

  - Qtracks still looks promising; has licensed WMG, SonyBMG, EMI; UMG forthcoming.

- Ruckus offers ad-supported on demand music streaming service targeting college students

  - Licensed by all four major labels

- Net net, while some analogs (chiefly over-the-air music radio and videos online) show that there may be huge market expansion from "ad-supported" downloads of music, there is no clear sign that the large market is very imminent

A-747



TF000038077

Confidential

## 2) Music companies are acquiring stakes in artist revenue streams outside recorded music (touring, merchandising, licensing, etc.): and more efficient deals are occurring with developing artists

- ◉ With physical CD sales and mechanical royalties in decline, music labels are acquiring non-traditional revenue streams
  - However, these deals can be risky and expensive, especially with established artists:

- ◉ EMI-Robbie Williams deal (2002) gave company stake in touring, merchandising and TV
  - 80 million GBP for 4 albums and partnership in touring, merchandising, television. Viewed as late in artist's career
    - Early w/r/t EMI's organizational ability to exploit all revenue streams, optimistic w/r/t EMI's ability to break artist outside Europe

- ◉ EMI-Korn deal (2005)
  - $15 million advance viewed as more efficient than Williams deal
  - EMI received to a percentage of Korn's earnings from touring, music publishing, merchandise and sponsorships; film, TV, books and videogames. EMI will give the band $15 million (U.S.) up front.
  - In exchange, EMI will collect about one quarter of the group's earnings.
  - The term of the contract is about five years

- ◉ Proforma Example: Fall Out Boy (Island Def Jam/UMG)
  - Label retained actual profits of approx $1 per unit on 3.25 million sales first 2 albums.
  - Under partnership model, same level of investment and sales outcome would have yielded $8.25 to $11.25 in label retained earnings under partnership model

Source : Billboard, The Hollywood Reporter, L.E.K. interviews

A-748

LEK

TF00000038078

Confidential

TF00000038079

**UPSIDE SCENARIOS**

*Labels currently have a relatively small participation in the overall music revenues, and there is an opportunity to participate in other streams (e.g., terrestrial radio rate renegotiation)*



US Music and Related Revenues 2002

Note: Other includes licensing and proceeds from motion pictures, TV, etc
Source: L.E.K. Analysis

93

A-749

LEK

Confidential

UPSIDE SCENARIOS

## *Market Attractiveness for emerging businesses*

2004 Data

| Assessment Criteria | Artist Branding | | | VIP Ticketing | Merchandising / Memorabilia |
|---|---|---|---|---|---|
| | Licensing | Commercial / Endorsement | Sponsorship | | |
| Current Market Size | $115-125M** | <$1B*** | $1.2B* | $30-50M | $2B |
| Annual Growth | 4-6% | 3-5% | 8-10% | 25% | 5-10% |
| Key Market Trends | ❀ New artist-related products (e.g. artist branded perfume, fashion) | ❀ Increase in media distribution outlets leads to more opportunity for endorsements | ❀ Corporate sponsorship of VIP experiences ❀ Naming rights | ❀ Traditional Ticketing cos. entering market, especially in auction and presale | ❀ Growth in new products, distribution channels, and Urban music genre |
| Nature of Competition | ❀ Several intermediaries that source deals non-exclusively to artists | ❀ Few agencies with critical mass of artists & accompanying ad agency and brand relationships | ❀ Several intermediaries in sponsorship that source deals opportunistically | ❀ Few dedicated music event VIP Ticketing companies | ❀ Few key leaders in tour merchandising; music memorabilia underserved |
| Barriers to Entry | ❀ Low - Medium to license likeness, brand, or music | ❀ High barriers to entry ❀ Need access to ad agencies, media buyers, brands and critical mass of artists | ❀ Low barriers to entry to source sponsorship deals | ❀ High for "5-star" packages | ❀ High to secure artist contract for tour & retail |

Note: *Includes Entertainment, Tour, and Attractions sponsorship
** License royalties paid for music licensing; an additional 15% of royalties is paid in licensing service fees
*** Based on 1998 value of $800m and estimated growth till 2005. Includes sporting and other endorsements
Source: Licensing Letter, Credit Suisse 2004 Sanctuary Analyst Report, IEG, LEK Interviews

94

A-750



Confidential

UPSIDE SCENARIOS

## *Risk profile for emerging businesses*

| Assessment Criteria | Artist Branding | | Sponsorship | VIP Ticketing | Merchandising / Memorabilia |
| --- | --- | --- | --- | --- | --- |
| | Licensing | Commercial / Endorsement | | | |
| Repeatable, Predictable Revenue Streams | ⊛ Provides revenue opportunity on off-touring cycles<br><br>⊛ Benefits from portfolio effect | ⊛ Exposed to the popularity of the artist<br><br>⊛ Provides revenue opportunity on off-touring cycles<br><br>⊛ Benefits from portfolio effect | ⊛ Dependant upon touring<br><br>⊛ Benefits from portfolio effect | ⊛ Largely dependant upon touring schedule<br><br>⊛ Benefits from portfolio effect of large artist roster | ⊛ Live event merchandise dependant upon touring schedule<br><br>⊛ Retail & Internet opportunities less exposed to touring cycle |
| Diversity of Revenue Streams | ⊛ Medium as it provides off-touring cycle revenues<br><br>⊛ External and internal artists (?) | ⊛ Medium as it provides off-touring cycle revenues | ⊛ Low as it relies on touring schedule | ⊛ High with external artist roster and non-music related VIP events<br><br>⊛ External and internal artists | ⊛ High with memorabilia opportunities that do not depend on touring schedule<br><br>⊛ External and internal artists |
| Asset Intensity | ⊛ Low capital investment | ⊛ Low capital investment | ⊛ Low capital investment | ⊛ Low capital investment<br><br>⊛ No inventory risk | ⊛ Requires working capital investment |



A-751

TF0000038081

Confidential

## *Artist Branding includes Licensing, Commercials / Endorsements and Sponsorship opportunities*

### Artist Branding

| | Licensing | Commercials / Endorsements | Sponsorships |
|---|---|---|---|
| **Description (service offered):** | ❀ Likeness, name, voice, performance, logo license in order to create new product or services for sale in the retail or wholesale market | ❀ Consumer brand payment to endorse product or service; commercial appearance (likeness, name, voice, logo) on behalf of brand | ❀ Brand tour sponsorship (naming rights, signage, print and ticket advertising, on-site promotions, samples) |
| **Market Size and Growth:** | ❀ $115-125M; 4-6% | ❀ <$1B*; 3-5% | ❀ $1.1B; 8 - 10% |
| **Typical Sales Touchpoint:** | ❀ Licensing (in) divisions at major brands; licensing agencies | ❀ Ad agencies; media buyers; CMO/EVP/SVP marketing | ❀ Promotion divisions of major brands; pr agencies; boutique intermediaries; (often rider to media buys, personal appearances, launches, and other events) |
| **Deal Procurement:** | ❀ Push and Pull | ❀ Mostly Pull | ❀ Mostly Push |

A-752

Note:      * Based on 1998 value of $800m and estimated growth till 2005. Includes sporting endorsements
Source:    Licensing Letter, Credit Suisse 2004 Sanctuary Analyst Report, IEG, LEK Interviews
                 Press Articles

96

LEK

TF-0000038082

Confidential

## *Merchandising is an attractive fit offering scalable EBITDA growth*

- The music merchandising market, benefiting from an increasing consumer base and expanded retail outlets, is expected to reach $4.2B in 2010

  - Increasing purchasing power of teenagers and high visibility of music personalities on popular MTV networks have contributed to a rise in demand for music/pop culture-licensed apparel and accessories

  - Increasingly involved in distribution, big box (e.g., Kmart) and particularly specialty retail (e.g., Hot Topic) monitor music trends on TV, radio, and in nightclubs to guide their purchasing decisions

  - New distribution channels such as Internet and retail sales are providing higher returns than traditional touring

A-753

Source:    L.E.K. Interviews & Analysis, The Licensing Letter,
          CSFB Analyst Report

97



TF0000038083

Confidential

**UPSIDE SCENARIOS**

*New licensed products like fragrances and the new Urban music genre are driving Music Merchandising*



### Music Merchandise in U.S. and Canada

CAGR% (2004-2009)

10.0%

### Key Findings

- Music Merchandising is expected reach $3.2B in 2009 based on growth rates discussed in the press

- Although licensed products from music artists represented only 3% of the overall licensed product market, it was the only segment with positive growth from 2003 to 2004

- Music merchandising is a highly fragmented market with many local and regional players of disparate businesses (e.g., T-shirts, memorabilia)

- Major players are Signature Networks and Sanctuary Group's Bravado Int'l, and FEA

A-754

Source:    L.E.K. Analysis, The Licensing Letter, CSFB Analyst Report

L.E.K.

TF0000038084

Confidential

*A merchandising enterprise allows one to capture a greater share of overall revenue*

| | Live Events | Internet | Retail |
|---|---|---|---|
| Gross Sales | $100 | $100 | $100 |
| Retailer | | | $50 |
| Merchandising Co. | $32 | $75 | $43 |
| Promoter | | | |
| Venue | $35 | | |
| Artist | $28 | $21 | $6 |
| Management Company | $5 | $4 | $7 |

Source:    L.E.K. Interviews



TF0000038085

Confidential

### *Ancillary revenues framework:  Bottoms up,  mid-level band*

- ⊛ Touring:
  - 750,000 tickets at $25 per head; tour gross = $18,750,000
  - Less:  Touring costs (agency, business management, production, tour staffing, travel) = $10 to $12 million
  - Net:  Tour earns $8 to $10 million
  - Label partner receives 25% of net (Korn example)

- ⊛ Merchandising:
  - $8/head gross merchandising = $6,000,000
  - Less:  COGS (manufacturing,  shipping, hall fees generally 20%)
  - Net:  $3 million
  - Label partner receives 50%, $1.5 million

A-756

TF-0000038086

L.E.K.

Confidential

## 3) Music revenue grows via mobile platforms and new subscription model (Subscription 2.0)

- Current download business is comprised of Apple and mobile

- Subscription services (Real, Napster @ $15/month) are losing traction (plateauing at 2M subs or $30M gross revenue per month, $15M to labels) and Microsoft WMA/DRM ("Plays for Sure") are dying
    - MS-Zune is so far irrelevant; fewer than 1 million units expected to be sold from introduction in holiday 06 through June 07.

- Subscription 2.0 model (now being pushed by Universal and SonyBMG bundles full music subscription service with mobile phone operator at say a cost $2-3 per month (Cingular/AT&T alone with 60 million subs would have $120M to $180M per month all to the label).

- Subscription is difficult sell in cable and broadband ISPs
    - They do not want to pay $1/month for bundled music product
    - No examples come to mind.

- Download market via
    - Proprietary service (e.g. Vcast)
    - Or ITunes-enabled

A-757



TF0000038087

Confidential

### 4) Broaden use base beyond traditional music buyers base on ubiquity and ease of use (in model)

- Internet already did this with Amazon in mail order CD's; gave everyone access to a music store in their town

- Mobile music has a much greater potential to expand on mobile phones; even youngsters only carry MP3 player with them 30% of time, and the rest only 10%



When you leave home, how often do you take the following items with you?

Source. Ericsson Consumer Lab Global 10, 2005

A-758

TF0000038088

L.E.K.

Confidential

**UPSIDE SCENARIOS**

## 5) Substantial $ revenue per music enabled phones (in model for 8 countries)

- Leading phone company has 10% penetration of satellite radio on enabled phones
    - Dangerous to project mass market on this; early adopters off small base.
    - Mastertone growth has leveled off, hurt by high pricing, e.g. $6/tone in AUS

- Real Networks/Rhapsody example
    - Handset form factor doesn't lend itself to searching 3 million song Rhapsody database (This will be resolved next 2 years)
    - Radio streaming offered to date (genre and artist channels)
    - US licensing from rights holders still formative or too costly for full fledged download on demand
    - Real Networks Tone Pass in Europe quietly profitable
        - Order from PC, download to handset with no rev share to network operator
        - Not possible in US due to different architecture of network gateways

A-759

TF000038089

L.E.K.

Confidential

**UPSIDE SCENARIOS**

## 6) *Pricing model changes to allow higher pricing of top tracks*

- Labels would like to charge $1.50 to $1.99 for hit tracks from current albums
  - If implemented, Could provide digital profit boost over next 2-3 yrs
  - Then might see cheaper secondary tracks and lower priced albums ($5-8) especially from catalog.

- Re-bundling of hit track, video, wallpaper could price at a few dollars

- However, side-loaded MP3s will likely make phones iPod-like and restrict premium pricing of tracks by themselves

- Upside is not included in the model

A-760

L.E.K.

TF0000038090

Confidential

## 7) *A major music company goes out of business and revenue is redistributed among remaining majors*

* This may be very unlikely since music company can run profitably as catalog operation without artist development cost (like a music publisher)

* If there are fewer major label competitors, some may assume either side of the following arguments:
  - Cut better artist deals
  - Increase their digital licensing fees
  - Otherwise improve terms

A-761

TF0000038091

L.E.K.

Confidential

**UPSIDE SCENARIOS**

## 8) Physical model holds as store shrinkage stabilizes and older users continue buying

- This will only slow decline in CD sales

- Price declines might help in some markets (in AUS CD's cost as much as $25-29)

- Unlikely that price declines they will bring paying digital downloaders and pirates back to buying CD's

A-762

TF0000038092

LEK

Confidential

UPSIDE SCENARIOS

## 9) Cooperation with ISPs on anti-piracy reduces piracy loss by 50% piracy

- Could increase per market by 10% as average user gets 20% of music from P2P

- But ISP's have little to gain here

- Industry moving toward suing colleges for non compliance

- Legislation requiring mandatory filtering could help

A-763

LEK

TF000038093

Confidential

## 10) Increased licensing rates for SoundExchange digital performance income unless congress intervenes

- Labels could target ancillary markets for music licensing, put screws to MTV, music vid jukeboxes in bars

- A possibility that digital performance income will grow, possibly dramatically, difficult to quantify

- We don't think chasing MTV and video jukeboxes will move the needle

A-764



TF-0000038094

Confidential

## 11) Inter-operperability boosts revenue from moving to open formats

⚬ Increased and renewed marketing of music services and new entrants

⚬ Amazon likely entrant

⚬ A large potential negative:

- Piracy could grow as downloaded files are open MP3
- Currently in DRM world users must burn to CD and re-rip and upload to P2P
- DRM thus provides a speedbump which may limit casual piracy by less technically savvy users

⚬ However, most would argue all tracks are already on illegal P2P

- "The toothpaste is already out of the tube"

⚬ Interoperability across devices and platforms is a critical driver and could boost market substantially starting in 2 years

A-765

TF0000038095

LEK

Confidential

## *Agenda*

- ⚙ **Background and Context**

- ⚙ **Market Forecast**
  - **US**
  - **Europe (Big Three)**

- ⚙ **Upside Scenarios**

- ⚙ **Appendix**
  - **LEK Analysis of 1999-2002 decline**
  - **Music industry mechanics reference**

A-766

TF0000038096

L.E.K.

Confidential

1999-2002 MUSIC DECLINE ANALYSIS

## *L.E.K. Industry Analysis from 2003*

- In 2003, L.E.K. evaluated the industry for a private equity firm contemplating a transaction with a major music label

- The 2008 forecast generated at that time has proven largely accurate — although gains from piracy abatement are to date unrealized

A-767

L.E.K.

TF0000038097

Confidential

## Cannibalization from other media and piracy (download and borrowing/copying) represent more than 75% of the recent industry decline

### Sources of Change, 1999 to 2002 Consumer Spending in Recorded Music, US



**Source:** L.E.K. Analysis

A-768

TF0000038098

112

L.E.K.

Confidential

**1999-2002 MUSIC DECLINE ANALYSIS**

*Despite labels' actions and growth in paid digital services, CD price declines, continued cannibalization and piracy will cause a further decline in consumer spending from $12.6B to about $10.6B*



Sources of Change, 2002 to 2008 Consumer Spending in Recorded Music, US

A-769

Source:    L.E.K. Analysis



1F000038099

Confidential

## *Agenda*

- ⊛ **Background and Context**

- ⊛ **Market Forecast**
  - – **US**
  - – **Europe (E7)**
  - – **BRIC**
  - – **Roll-up**
  - – **Upsides**

- ⊛ **Appendix**
  - – **LEK Analysis of 1999-2002 decline**
  - – **Music industry mechanics reference**

A-770

TF000038100

L.E.K.

Confidential

*There are two basic formats for digital music services, programmed and on-demand, employing three business models: purchase, subscription and advertising*

| | Programmed Services | | On-Demand Services | |
|---|---|---|---|---|
| | **Non-Interactive** | **Interactive** | **Streaming** | **Download** |
| **Definition** | ⊛ DCMA-compliant programmed streams | ⊛ Personalized programming which "learns" from user feedback | ⊛ Allows the user to select a play list song-by-song | ⊛ Download to own or rent (tethered) |
| **Examples** | ⊛ Live365 | ⊛ Rhapsody | ⊛ Musicmatch On Demand | ⊛ iTunes Music Store |
| | ⊛ Musicmatch Radio | ⊛ LAUNCHcast Plus | ⊛ Rhapsody | ⊛ Real Music Store |
| | ⊛ MSpot Radio | | | |
| | ⊛ Music Choice | | | |
| **Primary Revenue Model(s)** | ⊛ Advertising | ⊛ Advertising | ⊛ Subscription | ⊛ Purchase |
| | ⊛ Subscription | ⊛ Subscription | | ⊛ Subscription |
| | ⊛ Affiliate fees (cable / satellite)* | | | |
| **Delivery Platforms** | ⊛ Internet | | | |
| | ⊛ Proprietary Wireless | | ⊛ Internet | |
| | ⊛ Cable / satellite* | | ⊛ Proprietary wireless | |
| **DMCA-Compliant** | ⊛ Yes | | ⊛ No | |

Note :    * Not addressed in this section

115

A-771

TF0000038101

L.E.K.

Confidential

## The market is highly competitive across all formats

|  | **Programmed** | | **On-Demand** | |
|---|---|---|---|---|
|  | __Non-Interactive__ | __Interactive__ | __Streaming__ | __Download__ |
| Yahoo! | ⊗ LAUNCHcast radio (Basic and Plus) | ⊗ LAUNCHcast Plus (Basic and Plus) | ⊗ Y! Music Unlimited | ⊗ Y! Music Unlimited and Y! Music Engine |
|  | ⊗ Musicmatch Radio | ⊗ Musicmatch Radio | ⊗ Musicmatch On Demand | ⊗ Musicmatch Music Store |
| AOL | ⊗ Radio@AOL | | ⊗ MusicNet @ AOL | ⊗ MusicNet @ AOL |
|  | ⊗ SHOUTcast | | | |
| MSN | ⊗ MSN Radio (Basic and Plus) | | | ⊗ MSN Music |
| Real | ⊗ Rhapsody Real Radio (Basic and Radio PLUS) | ⊗ Rhapsody Real Radio PLUS | ⊗ Rhapsody Unlimited | ⊗ Real Music Store |
|  | | | ⊗ Rhapsody To Go | ⊗ Rhapsody Unlimited |
| Apple | | | | ⊗ iTunes Music Store |
| Napster | ⊗ Napster | ⊗ Napster | ⊗ Napster | ⊗ Napster Light |
|  | ⊗ Napster To Go | ⊗ Napster To Go | ⊗ Napster To Go | ⊗ Napster To Go |
| Live365 | ⊗ Live365 | | | |
| MSpot | ⊗ MSpot Radio | | | |

A-772

LEK

TF000003810Z

Confidential

*There are three key music rights which are relevant to digital music services --
digital performance rights are not required for analog radio*

Public Performance:

⊛ The *right of public performance* only applies to compositions, not to sound recordings: the three U.S. performance rights societies (ASCAP, BMI and SESAC) manage this right for most composition copyright owners

Reproduction (Mechanicals):

⊛ The exclusive *right to reproduce copyrighted works* applies to both *musical compositions and sound recordings. The right to reproduce compositions* is managed by the Harry Fox Agency. The *right to reproduce sound recordings* is (typically) managed by the record companies

Digital Performance:

⊛ The *right to publicly perform by means of a digital audio transmission*, created by the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA") belongs to the copyright owner of the sound recording only and is typically managed by the record companies

A-773

TF0000038103



Confidential

**DIGITAL MUSIC SERVICES**

## *DMCA-compliancy minimizes the complexity of licensing digital performance rights*

- In 1998, Congress passed the Digital Millenium Copyright Act (DMCA) that created a statutory license for the digital transmission of sound recordings

- Several conditions must be met to qualify for statutory licenses, i.e., to become "DCMA-compliant"

  - A transmitter cannot provide an "interactive service", or specially created transmission where the listener can dictate or influence the songs being played

  - A transmitting service must identify information about the songs being played

  - The programming cannot exceed the "sound recording performance complement" which restricts the number of songs from a specific album to 3 and the number of songs by a specific artist to 4 in a 3-hour period

  - No advance program schedules can be published

- The statutory license allows digital transmitters to perform all of the sound recordings it wishes without obtaining separate licenses from each copyright owner

- Programmed non-interactive programmed services are DMCA-compliant, while programmed interactive and on-demand services are inherently non-DMCA compliant

A-774

TF0000038104



Confidential

DIGITAL MUSIC SERVICES

## Non-DMCA compliant services must negotiate with each of the labels individually to secure digital performance rights

| Music Right: | Public Performance | Reproduction (Mechanicals) | Digital Performance |
|---|---|---|---|
| Collected by: | Collection Society/ Agency | | Direct Payment |
| Payment Structure: | Stat Rate | | Negotiated |

| DMCA Compliant? | Service: | | | |
|---|---|---|---|---|
| NA | Analog broadcast radio stations: | ASCAP/BMI/SESAC | | |
| Yes | Programmed non-interactive services: | ASCAP/BMI/SESAC | | SoundExchange |
| No | Programmed interactive, on-demand streaming and tethered download services: | ASCAP/BMI/SESAC | Harry Fox (For on-demand streaming and tethered download services only) | Labels/SRCOs* |
| No | Permanent download services: | | Harry Fox | Labels/SRCOs* |
| | Distributed to: | Publisher and Songwriter | Publisher and Songwriter | Labels/SRCOs* Performers AFTRA/AFM | Performers AFTRA/AFM |

Notes :    * Sound Recording Copyright Owners
Source :   Future of Music Coalition, Harry Fox Agency

119

L.E.K.

A-775

TF00000038105

Confidential

DIGITAL MUSIC SERVICES

## *Programmed non-interactive services are DMCA-compliant and make payments at statutory rates*



**Public Performance Royalty (Statutory)**

- ✿ Terrestrial radio has negotiated a fixed payment schedule for BMI (through 2006) and ASCAP (through 2009) that includes internet simulcasts
- ✿ Non-simulcast services pay 1-2% of revenues

**Digital Performance Royalty (Statutory)**

- ✿ Monthly royalty payments can be made with three options for payment structure:
    - Per performance option: 0.0762¢ per performance (except that 4% of performances shall bear no royalty), OR
    - Aggregate Tuning Hour option (music programming): 0.88¢ per ATH for broadcast simulcast programming, 1.17¢ per ATH for non-broadcast simulcast programming, OR
    - Percentage of Revenues option (applies to New Subscription Services only): greater of 10.9% of subscription service revenues, or 27¢ per month per subscriber
- ✿ An additional 8.8% of digital performance royalties are paid for the right to make "ephemeral" recordings to facilitate transmission
- ✿ The royalties are a minimum of $500 per channel per year but no more than $2,500 for a non-subscription channel and no more than $5,000 for a subscription channel

Note:      * Separate rates exist for Small Commercial Webcasters/Broadcast Simulcasters, Noncommercial Webcasters/Broadcast Simulcasters, Noncommercial Educational Entities, NPR/CPB Member Stations, and Preexisting Subscription Services
Source :   SoundExchange.com, Pillsbury Law, AFTRA



A-776

TF000038106

Confidential

TF0000038107

DIGITAL MUSIC SERVICES

## *Programmed interactive services must negotiate digital performance royalty agreements with each label*



A-777

### Public Performance Royalty (Statutory)

❀ **Non-simulcast services pay 1-2% of revenues**

### Digital Performance Royalty (Negotiated)

❀ Interactive services must contact and obtain a direct license from each and every sound recording copyright owner whose sound recordings the service wishes to use

❀ After RIAA filed suit on several interactive services for copyright infringement, companies who wished to maintain some consumer influence features settled by negotiating higher royalties with each label

Source :    AFTRA, Business Week

121



Confidential

## *On-demand streaming and tethered download services must also negotiate separate agreements with each label*



### Public Performance Royalty (Statutory)

- Non-simulcast services pay 1-2% of revenues

### Mechanical Royalty (TBD)

- Currently structured as cash advances, with exact royalty rates to be determined and/or confirmed by U.S. Copyright Office

- Required for streaming-on-demand and tethered download services to copy and retain musical works in database

### Digital Performance Royalty (Negotiated)

- Interactive services must contact and obtain a direct license from each and every sound recording copyright owner whose sound recordings the service wishes to use

Source :    AFTRA, Business Week

LEK

A-778

Confidential

## *Permanent download services pay mechanicals at the statutory rate and must negotiate digital performance royalties with each label*



### Mechanical Royalty (Statutory)

- The current rate for the period Jan. 1 – Dec. 31, 2005 is $0.085 per unit or $0.0165 per min.  Fees are adjusted annually

- The license may be obtained either directly from the copyright owner or from the Harry Fox Agency, which acts as licensing agent for ~28,000 music publishers, at the same rate

### Digital Performance Royalty (Negotiated)

- Interactive services must contact and obtain a direct license from each and every sound recording copyright owner whose sound recordings the service wishes to use

Source :    AFTRA, Business Week



A-779

TF0000038109

Confidential

## *Physical music value chain*



Physical Value Chain
(Average $ per Unit)

- There is a potential opportunity to restructure the value chain
  - Consolidate CD replication and becoming the "last man standing"
  - Consolidate distribution and increase efficiencies along the supply chain
- Manufacturing and distribution margins may be increased through operational synergies
  - Reduction in overlap from activities
  - Closure of overlapping facilities



☐ Operating Profit
▨ Operating Costs

Source :   Credit Suisse 2006, L.E.K. Analysis, L.E.K. Music Model

L.E.K.

A-780

Confidential

MUSIC VALUE CHAIN

## *Digital Album Value Chain*



Digital Album Value Chain
General Example
(Average $ per Unit) [1]

Digital Album Value Chain
Independent Content Example [2]
(Average $ per Unit) [1]

Note :    [1] Average price of a digital album download is $9.98
           [2] Based on The Orchard/ CI independent content management and distribution
Source :   L.E.K. Interviews, Credit Suisse 2006, ThinkEquity Partners 2006, L.E.K. Analysis

125

A-781

TF00000038111

Case: 11-126    Document: 47    Page: 283    04/25/2011    272862    401

MUSIC VALUE CHAIN

### The dual download (OTA & PC) prices will gradually decrease, compressing the value chain

#### Cost Structure of Full-track Music Download



Source :    CIBC Sept 2006

\* Price may likely go lower than $1.20

L.E.K.

A-782

TF0000038112

TF0000113196

TRANSACTION SERVICES

# Project Dice

Limited scope due financial diligence report

17 May 2007

ADVISORY

**KPMG**

AUDIT · TAX · ADVISORY

Confidential

A-784

TF0000113197

Confidential

A-785

**KPMG**

KPMG LLP
Transaction Services
1 Puddle Dock
London
EC4V 3PD
United Kingdom

Tel +44 (0) 20 7311 1000
Fax +44 (0) 20 7311 2080

The Directors
Terra Firma Investments (GP) 2 Limited (for and on behalf of the six limited
partners constituting the Terra Firma Capital Partners II Fund)

The Directors
Terra Firma Investments (GP) 3 Limited (for and on behalf of the Terra Firma
Capital Partners III Fund)

The Directors
Maltby Limited

For the attention of Riaz Punja and Francois Van Der Spuy

17 May 2007

Dear Sirs

**Project Dice**

In accordance with our engagement letter and its attachments dated 15 May 2007
("our Engagement Letter"), we enclose our report on Dice Group plc. As stated
in our Engagement Letter, you have agreed that this final written report
supersedes all previous oral, draft or interim advice, reports and presentations, and
that no reliance will be placed by you on any such oral, draft, or interim advice,
reports or presentations other than at your own risk. The Engagement Letter
attached as Appendix 1 to the report sets out the agreed scope of our enquiries,
directed at those issues which you determined to be critical to your investment.
You should note that our findings do not constitute recommendations to you as to
whether or not you should proceed with the proposed transaction. The Important
Notice on page 3 should be read in conjunction with this letter.

Our report is for the benefit and information of the addressees only and should not
be copied, referred to or disclosed, in whole or in part, without our prior written
consent, except as specifically permitted in our Engagement Letter. The scope of
work for this report included as Appendix 1 has been agreed by the addressees
and to the fullest extent permitted by law we will not accept responsibility or
liability to any other party (including the addressees' legal and other professional
advisers) in respect of our work or the report.

Yours faithfully

KPMG LLP

KPMG LLP, a UK limited liability partnership, is a member of KPMG
International, a Swiss cooperative

Registered in England No 0G30649
Registered office 8 Salisbury Square, London EC4Y 8BB

Confidential

TF0000113198

# Important notice

Our work on the financial due diligence commenced on 11 May 2007 and our fieldwork was completed on 15 May 2007. We have not undertaken to update our report for events or circumstances arising after that date.

Our work on the operational cost savings commenced on 17 July 2007 and was completed on 25 July 2007. We have not undertaken to update our report for events or circumstances arising after that date.

We stress that the scope of our work has been limited, in particular, we have not assessed the historical revenue trends and the potential savings from the RE4 restructuring programme. We understand Terra Firma have asked LEK to assess the revenue and commercial issues facing the business, in particular the Music division.

In preparing our report, our primary source has been the limited scope vendor due diligence report dated 4 May 2007 prepared by Deloitte and Touche LLP, information available in the public domain and information provided in the data room. We do not accept responsibility for such information which remains the responsibility of management. We have not sought to establish the reliability of the sources by reference to other evidence.

We draw your attention to the significant limitations in the information available to us. We have had no access to the premises of Dice. We have had no access to the management and personnel of Dice other than meetings on 14 May 2007. Access to the audit files has not been granted. Management information available was restricted to specified documents in a dataroom.

This engagement is not an assurance engagement conducted in accordance with any generally accepted assurance standards and consequently no assurance opinion is expressed.

Our report makes reference to 'KPMG Analysis'; this indicates only that we have (where specified) undertaken certain analytical activities on the underlying data to arrive at the information presented; we do not accept responsibility for the underlying data.

The analysis of "underlying" earnings is for indicative purposes only. We have sought to illustrate the effect on EBITDA of adjusting for those items identified in the course of our work that may be considered to be "non-recurring" or "exceptional" or otherwise unrepresentative of the trend in EBITDA. However the selection and quantification of such adjustments is necessarily judgmental. Because there is no authoritative literature or common standard with respect to the calculation of "underlying" earnings and working capital, there is no basis to state whether all appropriate and comparable adjustments have been made. In addition, while the adjustments may indeed relate to items which are "non-recurring" or "exceptional" or otherwise unrepresentative of the trend, it is possible that earnings and working capital for future periods may be affected by such items, which may be different from the historical items.

There is no authoritative literature or common standard with respect to the calculation of "proforma" EBITDA, and therefore there is no basis on which to state whether, in the illustrative analysis of "proforma" EBITDA, all appropriate and comparable adjustments have been made. We have set out in our report the basis on which items have been included in or excluded from the calculation. It is for you to satisfy yourselves as to whether the items included or excluded are appropriate for your purposes. The decision as to what items should be included in or excluded from the calculation of "proforma" EBITDA is highly judgemental; you may choose to interpret the information presented differently.

The directors of Dice have not confirmed the factual accuracy of this report.

We accept no responsibility or liability for the findings or reports of legal and other professional advisers even though we have referred to their findings and/or reports in our report.

The US tax analysis provided herein is informal and preliminary in nature and is not intended to be relied upon for any purpose without further development of the relevant facts and applicable law. Any tax advice in this communication is not intended or written by KPMG to be used, and cannot be used, by a client or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to another party any matters addressed herein.

A-786



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

3

Confidential

TF0000113199

# Glossary of terms

| | |
|---|---|
| Dice Group | Dice Group plc and its subsidiaries |
| EBIT | Earnings before interest and tax |
| EBITDA | Earnings before interest, tax, depreciation and amortisation |
| FX | Foreign exchange rate |
| FY05 | Financial year ended 31 March 2005 |
| FY06 | Financial year ended 31 March 2006 |
| FY07 | Financial year ended 31 March 2007 |
| GM | Gross margin |
| HMRC | HM Revenue & Customs |
| NIC | National insurance contributions |
| NPS | Net publisher's share |
| PAYE | Pay As You Earn |
| Q4 | Quarter ended 31 March |
| RE | Restructuring exercise |
| Terra Firma | Terra Firma Investments (GP) 2 Limited (for and on behalf of the six limited partners constituting the Terra Firma Capital Partners II Fund) and Terra Firma Investments (GP) 3 Limited (for and on behalf of the Terra Firma Capital Partners III Fund) |
| Toshiba Dice Limited | Joint venture between Dice Group and Toshiba Corporation |
| USD | United States dollar |
| VAT | Value Added Tax |
| VDD report | Limited scope vendor due diligence report dated 4 May 2007 prepared by Deloitte & Touche LLP |

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.



4

Confidential

TF0000113200

A-787

# Contents

The contacts at KPMG in connection with this report are:

**Sandip Shah**
Transaction Services
*Partner, KPMG LLP*

Tel: + 44 (0)20 7311 2014
Fax: + 44 (0)20 7311 2080
sandip.shah@kpmg.co.uk

**Paul Snape**
Transaction Services
*Associate Director,*
*KPMG LLP*

Tel: + 44 (0)20 7311 3014
Fax: + 44 (0)20 7311 2080
paul.snape@kpmg.co.uk

**Anneli Collins**
Transaction Services
*Partner, M&A Tax, KPMG*
*LLP*

Tel: + 44 (0)20 7694 3403
Fax: + 44 (0)20 7694 8474
anneli.collins@kpmg.co.uk

**Jeff Hunt**
Transaction Services
*Partner, Pensions, KPMG*
*LLP*

Tel: + 44 (0)20 7311 3141
Fax: + 44 (0)20 7311 3223
jeff.hunt@kpmg.co.uk

|                          | Page |
| ------------------------ | ---- |
| Trading performance      | 5    |
| Balance sheet            | 14   |
| Pensions                 | 24   |
| Taxation                 | 28   |
| Share based payments     | 43   |
| Operations cost savings  | 46   |
| Appendices               | 64   |

A-788



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113201

Trading performance
# Introduction

**A-789**

**The reported results of Dice's Music division are in decline**

**Results of the Music division are subject to a degree of volatility**

**The Music Publishing business appears more stable**

**Earnings volatility**

- The reported results of Dice's Music division are subject to a degree of volatility caused by a number of factors particular to the industry

- A small number of key artists have a significant impact on performance (typically top ten new releases account for 20-25% of total new release units). Changes in the popularity of individual artists and the timing of new releases can have a material impact on results in each year. The volatility is compounded by the structural decline of the physical market

- In addition, the accounting policies, in particular accounting for advances to artists, and to a lesser extent for returns, involve a significant degree of estimation and management judgement regarding future events. As a result, any attempt to present "normalised" or "underlying EBITDA" is very difficult and great care is required in interpreting the results. Changes in accounting estimates - either to the policies used or to the interpretation of those policies - can have a significant impact on earnings

- These two factors can act together, with poor performance of an artist leading both to lower sales in the period and a write off of advances paid in anticipation of lower future sales. In FY07 advances to two artists of £21 million and £16 million (Janet Jackson) were written off. Whilst management have classified these write offs as exceptional, and the period to which the costs relate is debatable, they clearly relate to normal business risks and are linked to the trading performance of the group

- In contrast the Music Publishing business has much less dependence on key artists and there is little overlap between the Music and Music Publishing divisions' rosters (management estimate 10% overlap)

- The two divisions recognise revenue (and associated costs) on different bases. Music sales are recognised on delivery to retailers, whilst publishing sales are recognised on receipt of royalty statements from collection agencies, which typically occur many months after physical sales/performance. Market wide trends should therefore affect the reported results of the two divisions at different times, as well as to a different extent

- The underlying earnings analysis presented here should therefore be considered in the context of the volatility of the group's earnings. We have presented an underlying EBITDA measure which includes advances on a cash basis, and thus removes the element of accounting judgement relating to them. However, we have made no attempt to normalise the inherent volatility of the trading results



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

6

Confidential

TF0000113202

Trading performance
# Underlying earnings

Underlying earnings are shown after excluding large exceptional items, mainly in the Music division (£304 million in FY07)

Underlying earnings show the same strong directional trends as reported earnings from FY06 to FY07, with performance affected by quality and timing of releases and the structural changes in the physical market

Although significant write-offs of artist advances were made in FY07 (£74 million exceptional cost) the level of cash advances paid at £276 million was in line with earlier years

The net impact of underlying earnings adjustments in FY07 was a reduction of £6.2 million but this is net of a broad estimate of the impact of excess returns of £15 million

### Underlying earnings

| £m | FY05 | FY06 | FY07 |
|---|---|---|---|
| Reported EBITDA | 249.9 | 275.9 | 174.1 |
| Underlying earnings adjustments per VDD report | (14.7) | 11.9 | (6.9) |
| Underlying EBITDA per VDD report | 235.2 | 287.8 | 167.2 |
| Additional underlying earnings adjustments | | | |
| Excess returns | - | - | 15.0 |
| Tower records bad debt | - | - | (4.2) |
| MGM copyright NPS | (0.6) | (0.6) | (1.3) |
| | (0.6) | (0.6) | 9.5 |
| Underlying EBITDA - revised | 234.6 | 287.2 | 176.7 |
| Cash basis advances adjustments | | | |
| Recoupments (add back) | 229.5 | 231.9 | 221.3 |
| Provisions (add back) | 39.6 | 37.6 | 45.3 |
| Cash payments | (278.5) | (250.7) | (275.4) |
| | (9.4) | 18.8 | (8.8) |
| Underlying EBITDA - cash basis advances | 226.2 | 306.0 | 167.9 |

Source: VDD report, data room information, KPMG analysis

### Reconciliation to cash flows

| £m | FY07 |
|---|---|
| Underlying EBITDA - cash basis advances | 167.9 |
| Working capital movement | (95.0) |
| Unreconciled difference | (0.6) |
| Cash flow from operations | 72.3 |

Source: VDD report, data room information, KPMG analysis

### Underlying earnings

z   The underlying EBITDA analysis here is based on that presented in the VDD report, with a number of additional adjustments where we have taken a different view on items. The underlying earnings adjustments made in the VDD report are set out in Appendix 2

### Cash basis advances

z   We have adjusted underlying EBITDA so as to recognise artists advances when paid, rather than as they are recouped or written off (ie on a cash basis rather than the accruals basis used in the reported results). This is not the normal accounting treatment but has a number of benefits here:

  - eliminating the impact of accounting judgements/policy changes

  - allocation of the £74 million advances write-off in FY07 to the periods to which it relates is no longer an issue (an unquantified normalisation adjustment in the VDD report)

  - underlying earnings more closely match operating cash flows

z   The level of cash advances paid in FY07, £275 million, was broadly in line with the average for the preceding four years (£272 million)

### Excess returns

z   Management have estimated that the one-off impact from excess returns in Q4 FY07, due to retailer de-stocking and the September 2006 catalogue campaign, was in the region of £10-20 million. We have included the mid-point of this range as an adjustment. We have not been provided with details of management's estimation methodology

### Tower records bad debt

z   The £4.2 million bad debt cost incurred due to the insolvency of Tower Records in FY07 was added back to underlying earnings in the VDD report. We consider that whilst it is an individually significant item, it does relate to underlying trading, and have therefore reversed the VDD report adjustment here

z   Management acknowledge that, given the structural decline in the physical market, further significant retailer failures are likely to occur, although they monitor retailers closely for early signs of trading difficulty and are not aware of any currently in this position

### MGM copyright NPS

z   The Music Publishing business sold certain MGM copyrights in FY06 and FY07, the profits from which have been excluded from underlying earnings in the VDD report

z   We have made an additional adjustment to remove an estimate of the lost NPS from these copyrights (assuming an x10 earnings multiple from the sale and nil carrying value for the rights before sale)



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

7

A-790

Confidential

TF0000113203

Trading performance
# Proforma earnings

Proforma earnings must be treated with caution in a declining business

Proforma EBITDA is around £310 million after adjustments for restructuring programmes (£116 million) and reduction in marketing expenditure (£30 million). No account has been taken of the continued structural decline in the physical market, or the expected growth in digital

Management are confident that the restructuring savings will be delivered and are in the early stages of identifying further savings in addition to those reflected here

The marketing cost savings may not be realised if the group does not become more responsive to changing sales patterns

| Proforma earnings | |
|---|---|
| £m | FY07 |
| Underlying EBITDA - cash basis advances | 167.9 |
| Proforma earnings adjustments | |
| Marketing spend | 30.0 |
| RE3 - full year impact | 10.0 |
| RE4 - FY08 incremental benefit | 75.0 |
| RE4 - FY09 incremental benefit | 30.0 |
| FX difference | (3.5) |
| | 141.5 |
| Proforma earnings | 309.4 |

Source: VDD report, data room information, KPMG analysis

## Proforma earnings

z The illustrative pro-forma EBITDA analysis presented here is intended to show the run rate impact of cost saving measures which have already started to be implemented on FY07 underlying earnings

z Proforma earnings must be used with caution as the benefits of current reorganisation initiatives are reflected. However, any further decline in the physical market will require management to continue to remove cost from the business to offset loss of revenues for earnings to be preserved

## Marketing

z Marketing costs as a proportion of revenues increased from 16.6% in FY05 and FY06 to 18.9% in FY07, attributed to spending being held at budget levels in spite of the decline in sales. These costs are typically committed some months in advance and the group could not respond quickly enough to the rapid decline in the market in Q4

z Management intend to take a more responsive approach to marketing expenditure going forward, including increasing the proportion of spend on internet marketing, supported by a rolling monthly reforecast process. This should be a positive step although it is currently unproven, and there is a risk that reducing absolute marketing spend will have a sales impact

z The adjustment made illustrates the impact of reducing FY07 marketing spend to approximately 17% of revenues without adversely affecting revenues

## Restructuring – RE3

z The RE3 restructuring programme was completed during the course of FY07. Of the total annualised benefits expected of £30 million, £20 million were delivered in FY07, and we have thus adjusted for the difference here

## Restructuring – RE4

z The RE4 restructuring programme was announced in January 2007. The £110 million planned cost savings are expected to be delivered as follows:

- FY07 £5 million (included in FY07 results)

- FY08 £80 million (incremental £75 million)

- FY09 and thereafter £110 million pa (incremental £30 million)

z Actions have already been taken to deliver £50 million of these savings, predominantly through headcount reduction, in which cases the individuals concerned have been notified. This amount is net of £17 million of anticipated new hire staff costs, although not all of these staff have yet been recruited

z Management have stated that the £60 million balance of savings have now all been identified, including identifying named individuals in the case of further headcount reductions. The VDD report indicated that £23 million of benefits had yet to be identified, but was produced before the detailed implementation planning process had been completed

z Management do not consider that there is a significant risk of loss of margin as a result of RE4, as its primary focuses are in removing surplus layers of management and addressing loss making businesses

z In FY07 properties in Japan, US and South Africa were sold for some £87 million. The lease costs to be incurred in FY08 are said to have been offset in arriving at the RE4 incremental benefit but this will need validation

z Previous restructuring initiatives RE1 and RE2 have delivered benefits but these have been eroded through new recruitment and support for digital delivery. Management intend to enforce a net hiring freeze following RE4 and see this as the key measure to ensure that the benefits of the programme are not eroded

z The one-off cash cost of RE4 is £107 million, of which £26 million was incurred in FY07

A-791



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

8

Confidential

TF0000113204

## Trading performance
# Proforma earnings (continued)

The group's earnings have significant sensitivity to exchange rates, with around 80% of earnings in currencies other than sterling in FY07

z  Whilst management remain confident about the cost savings the total savings represent some 7% of the FY07 cost base or some 15% of the cost base excluding marketing and promotion and royalty costs

| £m | FY06 | FY07 |
|---|---|---|
| Royalty | 654.5 | 586.5 |
| Payroll | 369.0 | 331.5 |
| Marketing and promotion | 275.9 | 267.9 |
| Manufacturing | 164.0 | 133.6 |
| Distribution | 75.0 | 73.6 |
| Origination | 63.3 | 60.4 |
| Property | 44.7 | 44.1 |
| Other | 166.0 | 79.1 |
| | 1,812.4 | 1,576.7 |
| Less: provision | (72.6) | (70.8) |
| Net advance cash | (18.8) | 8.8 |
| Capital expenditure | 30.0 | 30.0 |
| "Cash" cost | 1,751.0 | 1,544.7 |
| Savings (a) | | 105.0 |

Note    (a)  Run-rate savings assuming full benefit of RE4 is achieved
Source:    VDD report, KPMG analysis

**FX difference**

z  The group generates a large proportion of its earnings in Euros and US dollars, and has also has significant Yen earnings (see chart below).  There are also royalty payments between territories.  Reported earnings are therefore sensitive to FX rates

z  The adjustment made to proforma earnings retranslates FY07 earnings from historical FY07 average rates to spot rates on 14 May 2007

**EBIT before exceptionals by currency FY07**



Source:    VDD report

**Toshiba minority interest**

z  The proforma figures include a full contribution from the Toshiba Dice Limited business where Toshiba has a minority interest.  This interest is to be acquired by Dice for £93 million

**Change of ownership clauses**

z  There may well be change of ownership clauses in various business contracts which could affect future revenues of the business

A-792



This document is CONFIDENTIAL  and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF000113205

Trading performance
# Group EBITDA bridge

We have presented EBITDA bridges here and on the following pages which illustrate the main drivers of the £102 million/ 37% fall in reported EBITDA before exceptional items in FY07

### Group EBITDA bridge
### FY05-FY07



Source:    VDD report

z    Detailed bridges showing the cause of change of FY07 EBITDA for the Music and Music Publishing divisions are shown on the following pages

z    In preparing these bridges we have had to make a number of simplifying assumptions where we do not have complete data, however the trends illustrated should be directionally correct

z    The divisional bridges use data prepared using constant currency FY06 exchange rates; this eliminates the impact of changes in FX rates from them. The overall exchange rate impact is shown separately

**Corporate costs FY07**

z    Of the £8.6 million increase in corporate costs in FY07, £8.1 million relates to professional fees. In FY07 costs were reduced by the reimbursement of £7.6 million of legal costs relating to the Bertlesmann settlement. This credit has been excluded from underlying earnings both in the VDD report and this report



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

A-793

Confidential

TF0000113206

Trading performance
# Music EBITDA bridge

Music division reported EBITDA fell by 55% in FY07, driven by an 18% fall in physical units sold. This fell reflected both market factors, weakness in Dice's release schedule and a strategic decision to reduce discounted catalogue sales campaigns.

This failure to reduce marketing costs in line with sales also had a significant impact on earnings.

Digital sales increased by 59% but given the current size of the market this had a relatively small impact on divisional earnings.



Music division EBITDA bridge
FY06-FY07

| Volume decreases: | |
| --- | --- |
| New releases | (17)% |
| Catalogue | (21)% |
| Compilations | (13)% |

Note.   Impact of changes in sales price/volume is shown at gross profit level, assuming that the same gross margins apply to all categories
Source.   VDD report, KPMG analysis

- Physical unit volumes declined by nearly 18% in FY07, driven by a number of factors:
  - global decline in the physical music market (12.7% quoted in VDD report)
  - poor new release schedule/underperformance by key artists' new releases (top 10 releases sold 32% less units, although only 3% behind budget)
  - reduced catalogue campaign in March 2007 compared to previous years (catalogue units down 21%)
  - de-stocking by specialist retailers (eg HMV) which have moved away from carrying a large back catalogue and a move to just in time stock holding by some retailers. This factor, together with oversupply for the September 2006 catalogue campaign, contributed to a marked increase in the level of returns during the year
- Physical prices declined by 2.0% in FY07, following a 3.9% decline in FY06. This reflects the continued bargaining power of supermarkets and shift of sales mix from specialists to supermarkets and on-line stores
- Digital sales increased by 59% in FY07, compared to an industry average of 67% (per VDD report). Management attribute the below market increase to the US market having growth above the global average and the group having a smaller market share in the US than elsewhere
- Marketing costs declined in FY07 in absolute terms, but as a percentage of revenues increased from 16.6% to 18.9%. Marketing expenditure is planned and to some extent committed a number of months ahead of releases. Management attribute the increase in percentage cost experienced to a lack of flexibility in spending patterns and a 'spend to budget' approach
- Payroll costs fell by 11% in FY07, primarily due to reduced headcount following the RE3 restructuring programme and a reduction in bonuses



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

A-794

Confidential

TF0000113207

Trading performance
# Music EBITDA bridge (continued)

The fall in Music division EBITDA has occurred across all territories except for Japan

Management indicated that the decline in physical sales has been led from the US, but the FY07 results show significant falls in Europe, also

Music division EBITDA bridge by territory
FY06-FY07



Source:  VDD report, KPMG analysis

⌐  The payment of royalties between group companies in different territories means that a fall in the US market will impact earnings both in the US and other territories which have artists with significant US sales

⌐  The fall in EBITDA in Latin America is due in part to the fraud in Brazil and the resultant disruption.  The impact of the direct losses has been adjusted for in underlying earnings



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

A-795

Confidential

TF0000113208

Trading performance
# Music Publishing EBITDA bridge

Music Publishing division reported EBITDA was broadly stable from FY06 to FY07 (3.6% increase)

Although revenues from recorded music ('mechanical') have fallen, reflecting the decline in that market, this has been more than offset by increased sales of music for use in TV programmes and films ('performance' and 'synchronisation')

**Music Publishing EBITDA bridge**
**FY06-FY07**



Note:     Impact of change in revenue shown at gross profit level
Source:   VDD report, KPMG analysis

- z   Mechanical income is derived from reproduction of recorded songs, either physically or digitally, and accounted for 43% of total FY07 publishing revenue. Mechanical revenues fell by 6.7% in FY07, reflecting the industry decline in physical sales which has not been fully offset by digital growth.  There is limited overlap between the Music and Publishing division rosters, so that Publishing has been affected by the general market decline but not that specific to Music's roster

- z   Performance income relates to TV and radio performance of music and represented 30% of FY07 revenue.  Revenues grew by 10.1% in FY07, attributed to the successful marketing of the division's music rights to TV productions

- z   Synchronisation income is derived from the use of music in advertisements and films.  Revenues increased by 5.9% in FY07, again attributed to pro-active marketing of repertoire to commercial consumers of music

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.



A-796

Confidential

TF0000113209

# Contents

|                          | Page |
|--------------------------|------|
| Trading performance      | 5    |
| Balance sheet            | 14   |
| Pensions                 | 24   |
| Taxation                 | 28   |
| Share based payments     | 43   |
| Operations cost savings  | 46   |
| Appendices               | 64   |

A-797



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

14

Confidential

TF0000113210

# Balance sheet
## Overview

At 31 March 2007 the group had net liabilities of £1,184 million. Key contributors are negative working capital (£449 million) and net debt (£910 million)

The impact of negative liabilities on future distribution options will need to be examined

### Group balance sheet

| £m | 31 March 2006 | 31 March 2007 |
|---|---|---|
| Non-current assets | 651.9 | 483.1 |
| Net working capital | (285.0) | (449.4) |
| Provisions | (64.5) | (185.7) |
| Net debt | (879.5) | (909.6) |
| Interest | (40.7) | (40.4) |
| Taxation | (108.7) | (82.3) |
| Group net liabilities | (726.5) | (1,184.3) |
| KPIs | | |
| Group - advance provision as a % of group revenue | 28.2% | 37.2% |
| Music - inventories as a % of music manufacturing and distribution costs | 9.2% | 13.8% |
| Music - bad debt provision as a % of revenue | 1.4% | 1.6% |
| Music - returns provision as a % of revenue | 3.0% | 3.7% |
| Music - discounts provision as a % of revenue | 0.9% | 1.1% |
| Music - royalty audit claim as a % of royalty and copyright costs | 2.6% | 4.9% |

Note:      We have reclassified £16.4 million of advance provisions in relation to Janet Jackson from
           provisions into net advances within working capital
Source:    VDD report, management accounts

### Provision as a percentage of net liabilities

| | |
|---|---|
| Advances | 60.5% |
| Returns [a] | 4.4% |
| Debtors [a] | 1.9% |
| Inventory [a] | 2.4% |
| Discounts [a] | 1.3% |
| Royalty audit claims [a] | 1.5% |

Note:      (a)    Relates to Music only
Source:    VDD report, management accounts

### Overview

- The group operates with negative working capital, primarily due to high levels of provisions (£852 million), creditors and accruals (£516 million) and royalty creditors (£516 million), offset by advances and other receivables

- Key provisions as a percentage of net liabilities are as listed in the bottom table

### Accounting policies

- As a result of the significant level of provisions included in working capital and their inherently uncertain nature, working capital and therefore net liabilities are susceptible to a significant degree of judgement

- The accounting policy section of the VDD report sets out the criteria applied for provisions against key working capital balances which highlights their judgemental nature

  - advances – provisions against recoupable advances are set so that net advances are recouped over a period of between one and three years, but in determining the level of provisioning, an assessment of future expected sales needs to be made;

  - inventory – requires assessment of anticipate future demand;

  - returns – takes into account anticipated returns rate, time lag between sale and return, expected margin loss and percentage of returns likely to be damaged or obsolete

A-798



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113211

Balance sheet
## Overview (continued)

Provisions against advances are judgmental and a change in the provisioning methodology/estimates can have a significant EBITDA impact

**Impact of a 1% movement in provision on reported EBITDA**

| £m | FY06 | FY07 |
|---|---|---|
| Reported EBITDA | 276.9 | 174.1 |
| EBITDA impact of a 1% movement in provision | | |
| Group advances provision as % of gross advances | 9.2 | 9.1 |
| Music inventories provision as % of gross inventories | 0.6 | 0.6 |
| Music bad debt/ returns/ discount provision as % of gross receivables [a] | 4.9 | 3.9 |
| Music royalty audit claim provision as % of royalty and copyright costs | 4.3 | 3.6 |

*Note:     (a)   Gross receivables comprises trade and other debtors*
*Source:    VDD report, management accounts*

### Impact on EBITDA

z  The adjacent table shows the illustrative impact on EBITDA of a one percent change in the provision of certain working capital balances. The impact on advances is most pronounced. Determining the appropriate level of provisioning is complex and judgemental and can have a significant impact on reported EBITDA, which may not reflect the underlying performance of the business

z  We have therefore excluded net advances from our analysis of working capital later in this report

z  We note that the Music Publishing balance sheet is less judgemental, as NPS is largely accounted for on receipt of royalty statements

### Capital expenditure

z  The group has historically incurred capex of some £30 million per annum. This is largely within the plant equipment and IT. Within this spend a significant amount (approximately £7 million to £10 million) have recently been spent on implementing SAP in the UK and Japan

A-799



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113212

## Balance sheet
# Working capital

We have excluded net advances from reported working capital, as it does not represent part of the underlying working capital requirement of this business

Annual cash advance payments of approximately £272 million (based on a five year historical average) will have to be funded in addition to the working capital presented here

**Working capital summary**

| £m | 31 March 2006 | 31 March 2007 |
|---|---|---|
| Music | (146.1) | (152.0) |
| Music Publishing | (77.7) | (116.2) |
| Corporate | (57.3) | (199.6) |
| Difference | (3.9) | 18.4 |
| Group working capital | (285.0) | (449.4) |
| Adjustments | | |
| Corporate | 57.3 | 199.6 |
| Adjusted group working capital | (227.7) | (249.8) |
| Less advances (net of provisions) | | |
| Music | (182.4) | (103.5) |
| Music Publishing | (142.1) | (119.4) |
| Difference | (5.0) | 10.1 |
| Total advances (net of provisions) | (329.5) | (212.8) |
| Adjusted group working capital excluding advances (net) | (557.2) | (462.6) |

Source: VDD report, management accounts

**Working capital by category**

| £m | 31 March 2006 | 31 March 2007 |
|---|---|---|
| Current asset investment | 0.8 | 0.2 |
| Inventories | 37.2 | 32.8 |
| Receivables (net) | 445.1 | 335.9 |
| Creditors and accruals | (422.7) | (337.6) |
| Net music royalties | (599.7) | (545.6) |
| Intercompany | (9.0) | 23.2 |
| Difference | (8.9) | 28.5 |
| Adjusted group working capital excluding advances (net) | (557.2) | (462.6) |
| Advances (net) | 329.5 | 212.8 |
| Adjusted group working capital | (227.7) | (249.8) |

Source   VDD report, management accounts

**Basis of preparation**

z  The group working capital that is presented in this report has been derived from the information presented in the VDD report and has been adjusted to exclude the element relating to the Corporate division.  Management have advised us that this balance primarily relates to non-working capital type items.  We understand that, amongst others, it includes a £93 million liability in respect of Toshiba Dice Limited, which would need to be considered separately when considering the funding requirements of this business, but we have not been provided with a breakdown of this balance

z  We have also excluded from working capital advances and related provisions.  In our view, the characteristics of advances are more akin to an intangible asset, where the benefit of the cash payment is recouped in the medium- to long term future through CD sales, as is the case in the Music division

**Overview**

z  The most significant balances in working capital relate to receivables, creditors and accruals and net music royalties (as presented in the adjacent table)

z  The increase in adjusted group working capital (excluding advances) of £95 million in FY07 is partly reflective the structural change in the business, which has resulted in lower individual working capital balances, such as receivables of £109 million, offset by lower levels of creditors and accruals and music and royalty creditors

z  Whilst management believe that the level of working capital at the end of FY07 is representative of the ongoing working capital requirements of the business, in our view it is distorted by year end working capital management initiatives and we have made an adjustment for this on the next page

A-800


This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113213

Balance sheet
# Working capital (continued)

Underlying working capital requirements are £112 million higher than on an adjusted reported basis, primarily due to tighter working capital management at year end

Management estimate a facility requirement for working capital of between £250 million and £300 million

Effective working capital management during the year, in particular for key balances in respect of royalties, copyright, marketing and promotion will provide management with additional flexibility

**Underlying working capital – FY07**

| £m | Music | Publishing | Other | Group |
|---|---|---|---|---|
| Adjusted group working capital excluding advances (net) | (255.5) | (235.6) | 28.5 | (462.6) |
| Underlying working capital adjustment | | | | |
| Actual working capital | (255.5) | (235.6) | 28.5 | (462.6) |
| Average working capital | (185.7) | (193.7) | 28.5 | (350.9) |
| Adjustment | 69.8 | 41.9 | – | 111.7 |

Source: VDD report, KPMG analysis

**Working capital facility requirement**

| £m | FY06 | FY07 |
|---|---|---|
| High | | |
| Music | (113.6) | (119.8) |
| Music Publishing | (164.8) | (159.8) |
| Corporate (March balance) | (57.3) | (199.6) |
| Group | (335.9) | (479.2) |
| Low | | |
| Music | (328.5) | (255.5) |
| Music Publishing | (219.8) | (235.6) |
| Corporate (March balance) | (57.3) | (199.6) |
| Group | (605.6) | (690.7) |
| Estimated RCF requirement | 269.7 | 211.5 |

Note: High and low points have been based on working capital excluding advances and related provisions
Source: VDD report, management accounts

**Underlying working capital**

≋ Net working capital (excluding advances) at 31 March 2007 at negative £462.6 million is some £111.7 million worse than a simple average over 24 months. Prima facie, this suggests that the working capital at March 2007 is not normal and in order to assume a normalised position an adjustment of some £112 million can be made. However, this does not take account of the structural decline of physical and in reality the adjustment would be less than £112 million. We do not have detailed information to assess the quantum of an adjustment. Deloitte have suggested an adjustment of some £137.5 million, which includes advances. Management have indicated that the proposed adjustment by Deloitte would bring the 31 March 2007 balance towards 'normal' working capital

**Working capital facility requirement**

≋ Management have estimated the facility requirements for working capital at between £250 million and £300 million. Based on the highest and lowest monthly working capital balances in FY07, we estimate a facility requirement for working capital alone, excluding the funding requirements for advance payments, of slightly below this range

≋ However, we have not taken into account any additional intra-month funding requirements, as we have not been provided with sufficient information to assess this. Therefore, managements' view above may be a more conservative estimate of the working capital requirement of this business

≋ We would note, that royalty, copyright, marketing and promotion costs together account for over 50% of the group's cost base. Effective working capital management in respect of related creditor and accrual balances may provide management with additional flexibility

A-801



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

18

Confidential

TF0000113214

# Balance sheet
## Advances and provisions

We estimate a funding requirement of approximately £46 million for net advances, although care is needed in interpreting this as we do not have the historical phasing of cash payments during the year.

This masks the fact that annual cash advance payments of approximately £272 million (based on a five year historical average) will have to be funded each year.

However, the structural decline due to physical Music sales may reduce this level in the short term.

### Advances and provisions

| £m | 31 March 2006 | 31 March 2007 |
|---|---|---|
| Gross advances | | |
| Music | 648.0 | 701.9 |
| Music Publishing | 253.9 | 254.4 |
| Difference | 14.5 | (47.3) |
| Group gross advances | 916.4 | 909.0 |
| Provisions | | |
| Music | (465.6) | (598.4) |
| Music Publishing | (111.8) | (135.0) |
| Difference | (9.5) | 37.2 |
| Group advances provision | (586.9) | (696.2) |
| Net advances | | |
| Music | 182.4 | 103.5 |
| Music Publishing | 142.1 | 119.4 |
| Difference | 5.0 | (10.1) |
| Group net advances | 329.5 | 212.8 |

Source: VDD report, management accounts

### Underlying advances and provisions - FY07

| £m | Music | Publishing | Other | Group |
|---|---|---|---|---|
| Group net advances | 103.5 | 119.4 | (10.1) | 212.8 |
| Underlying advances adjustment | | | | |
| Actual advances (net) | 103.5 | 119.4 | (10.1) | 212.8 |
| Average advances (net) | 115.8 | 140.9 | (10.1) | 246.6 |
| Adjustment | 12.3 | 21.5 | | 33.8 |

Source: VDD report, management accounts

### Advances facility requirements

| £m | FY06 | FY07 |
|---|---|---|
| High | | |
| Music | 120.4 | 133.4 |
| Music Publishing | 162.4 | 144.1 |
| Group | 282.8 | 277.5 |
| Low | | |
| Music | 104.1 | 112.7 |
| Music Publishing | 125.1 | 119.4 |
| Group | 229.2 | 232.1 |
| Estimated facility requirement | 53.6 | 45.4 |

Note:    Advances during FY06 and FY07 have been adjusted for the impact of the accounting estimate of
£94.3 million that was booked in March 2007
Source:    VDD report, management accounts

### Overview

z Advances at the end of FY07 include £94.3 million of additional provisions in respect of the FRESH balance sheet review. It is managements' view that this reflects a step change in the ongoing levels of net advances of this business

z We have estimated an additional adjustment to the FY07 balance to reflect the variability of net advances during the year based on the monthly averages in the year (adjusted for the impact of the additional provision at year end). We estimate underlying net advances at £247 million

z In addition, to the working capital facility discussed earlier in this report, we estimate a net funding requirement for advances of approximately £50 million. However, we note that average payments for artists' advances over the last five years have been in the region of £272 million per annum which represents an annual cash outflow to this business. We have not been provided with a monthly phasing of this cost to assess any peak funding requirements during the year

### Commitments

z We have not yet been provided with the level of advance commitments as at 31 March 2007

A-802



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113215

## Balance sheet
# Provisions

We estimate that more than half of the provisions at 31 March 2007 will result in a cash cost in FY08

| £m | Balance sheet 31 March 2007 | Cash flow impact FY08 |
|---|---|---|
| Royalty audit claim provision | 17.4 | (8.7) |
| Other claims provision | 3.1 | (3.1) |
| Restructuring provision | 113.1 | (74.7) |
| Beatles audit settlement | 16.0 | (16.0) |
| Other provision | 1.3 | (1.3) |
| Difference | (6.2) | - |
| Provisions (excluding pensions) | 144.7 | (103.8) |
| Pension provision | 41.0 | (11.0) |
| Total provision | 185.7 | (114.8) |

Note:      (a)  Per the pension the net provision should be £43 million – awaiting explanation
Source:    VDD report, KPMG analysis

### Overview

z   At 31 March 2007 the group had recognised £185.7 million of provisions, more than half of which we estimate will impact cash flow in FY08, although we have not been provided with sufficient information to assess the cash impact of all of these items

z   Royalty audit claim provisions are based on specific royalty and licensor claims

z   The restructuring provision relates primarily to RE3 and RE4. Based on the cash cost phasing presented in the VDD report, approximately £75 million of this will represent cash outflow in FY08, and this relates only to RE4. No information has been made available in respect of the cash impact of the remaining RE3 provision

z   On the basis that the Beatles audit claim has now been settled we have included a cash outflow in FY08

z   The pension scheme deficit for material plans at 31 March 2007 was approximately £34 million and this liability is recognised in Music. Additionally, £7 million of deficits are recognised in corporate, for which we have not been provided with further information. The projected cash flow funding requirement for the three major plans in the UK, Germany and Japan amounts to approximately £11 million in FY08. Funding details for other plans have not been made available

z   Neither the buy-out cost in respect of Project Typhoon nor the consideration for the acquisition of the remaining 45% share of Toshiba Dice Limited has been recognised as a liability on the balance sheet as at 31 March 2007

A-803



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113216

Balance sheet
# Net debt

The debt has significant break costs and will need input from your banking advisors

| Adjusted net debt | |
|---|---|
| £m | 31 March 2007 |
| Total net debt per VDD | (1,277.2) |
| Cash traps | |
| South Africa | (4.1) |
| South Korea | (5.0) |
| | (9.1) |
| Break costs on borrowings | |
| Euro 425 million 8.625% senior notes | |
| Accrued interest | (5.3) |
| Other break costs | (26.2) |
| £325 million 8.25% sterling bonds | |
| Accrued interest | (3.6) |
| Other break costs | (9.7) |
| US $500 million 8.375% guaranteed notes | |
| Accrued interest | (7.9) |
| Other break costs | (15.7) |
| US $243.3 million 5.25% guaranteed convertible bonds | n/a |
| Long term committed facilities | n/a |
| | (68.4) |
| Taxation | |
| Music | (21.2) |
| Music Publishing | 2.3 |
| Other | (63.4) |
| | (82.3) |
| Other non working capital provisions | |
| Royalty audit provision | (17.4) |
| Other pension plan deficits | (8.3) |
| Beatles audit settlement | (16.0) |
| | (41.7) |
| Unquantified items in the VDD | |
| Actual to normal working capital requirements for Corporate | n/a |
| Project Typhoon option | (51.4) |
| | (51.4) |
| | (1,530.0) |

Note:   n/a not available
Source:   VDD report report, 2.6.2 page 9, 2.6.1.5 Break cost analysis

## Overview
z Further adjustments to net debt which have been identified are presented in the table. These include items of a debt like nature

## Cash traps
z Management have reported that there is no trapped cash in the group, however they have also indicated that there may be tax costs associated with repatriating cash from South Africa and South Korea. These cash balances have been excluded on the basis that they are not wholly accessible

## Break costs on borrowings
z The VDD identified significant break costs in relation to refinancing the current funding structure on change of control. The data room break cost analysis has been used to quantify three of the borrowings
z No calculation was available for the USD 243.3 million guaranteed convertible bonds break fees as Deloitte was unable to quantify the redemption options available to the group
z The long term committed facilities would only incur break fees if the repayment were between agreed settlement dates

## Taxation
z The non working capital corporation tax liability and assets are included here within net debt

## Other non working capital provisions
z The balance sheet provision for royalty audit claims has been calculated on the basis of claims that are considered to have substance and are likely to be accepted by Music
z The pension deficit adjustment included in the VDD net debt excludes the deficits in respect of the other defined benefit plans. The total deficit in respect of these was £8.3 million at 31 March 2007
z The £16 million Beatles' audit settlement is a cash payment due and has therefore been included in net debt

## Unquantified items in the VDD
z N Cheng, the partner in the long term joint venture (Project Typhoon) can require Dice to purchase the remaining interest in the joint venture for a purchase price based on a multiple of average EBIT in the previous three years up to a cap of USD100 million. Based on historical data and current projections the price calculation would exceed the cap. The cap payment has therefore been included in net debt

A-804



This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

21

Confidential

TF0000113217

# Balance sheet
# Commitments and contingencies

Commitments to pay artists' advance were £497 million at 31 March 2006

We have not been provided with details of this commitment at 31 March 2007

## Quantified the contingent liabilities

| £m | 31 March 2006 | 31 March 2007 |
|---|---|---|
| Guarantees | | |
| Performance related commitment | 496.7 | n/a |
| Typhoon | 57.7 | 51.4 |
| Parent company performance guarantees | | |
| Barclays | 0.1 | 0.1 |
| Standard Chartered | 0.1 | 0.1 |
| HMV | 18.6 | 15.8 |
| Thorn | 9.6 | 9.6 |
| Contingent liabilities | | |
| Contingent liabilities included in loan covenant within the Articles of Association | 6.9 | 4.1 |
| **Total guarantees and other contingent liabilities** | **589.7** | **81.1** |
| Operating lease commitments | | |
| Land and buildings | | |
| Within first year | 24.3 | n/a |
| In two to five years | 74.7 | n/a |
| After five years | 108.8 | n/a |
| Total land and buildings | 207.8 | n/a |
| Plant, equipment and vehicles | | |
| Within first year | 3.3 | n/a |
| In two to five years | 3.2 | n/a |
| After five years | | n/a |
| Total plant, equipment and vehicles | 6.5 | n/a |
| **Total operating lease commitments** | **214.3** | **n/a** |

Note:   n/a not available
Source:   2006 Dice Group annual report, VDD report

### Performance related commitments

z   Performance related commitments to pay advances to artists, repertoire owners and song writers amount to £497 million as at 31 March 2006. We have not yet been provided with this information as at 31 March 2007

### Project Typhoon

z   Pursuant to a joint venture agreement with Mr Norman Cheng ('Project Typhoon' ) the group has agreed to establish and fund new businesses in People's Republic of China, Hong Kong and South Korea

z   The group has an option to buy and Mr Cheng has an option to sell his equity interests in the joint venture in 2009 at a price determined by reference to earnings over a three- year period, capped at USD 100 million

### Contingent liabilities on loan covenant

z   Letters of credit and third party guarantees totalling £4.1 million in 2007 include:

-   letters of credit issued to US insurance companies for workers compensation insurance, general liability insurance and similar costs (£2.0 million)

-   letters of credit issued onto courts in Spain for potential litigation costs and towards bill payments (£1.9 million)

### Thorn

z   The group has guaranteed certain leases on properties previously occupied by the Thorn group (£9.6 million) following the de-merger of the Thorn rental business in 1996

### HMV

z   Annual rental payments under guaranteed property leases were approximately £15.8 million in FY07. These are a result of the 1998 asset sale to HMV Group

### Operating leases

z   The group has annual operating lease commitments with respect to land and buildings and plant, equipment and vehicles. Information regarding the position at the end of FY07 has not been made available, but the sale and leaseback transactions in Japan and the US during the year will add additional commitments at the end of FY07

### Contingent liabilities disclosed with potential effect not quantified

z   As disclosed in FY06 Dice annual report, the group has, along with other companies in the music industry, received a complaint from the New York State Attorney General and the United States Department of Justice regarding conditions and pricing of the online sale of music. Dice confirmed that no claim has been received to date and are awaiting an indication as to whether the investigation will continue or be closed

A-805



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113218

# Contents

|  | Page |
|---|---|
| Trading performance | 5 |
| Balance sheet | 14 |
| Pensions | 24 |
| Taxation | 28 |
| Share based payments | 43 |
| Operations cost savings | 46 |
| Appendices | 64 |

A-806



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

23

Confidential

TF0000113219

Pensions
# Key findings

| Issue | Summary observations |
|---|---|
| Dice operates significant defined benefit pension schemes | ≥ Dice operates a number of defined benefit arrangements in the UK, Germany and Japan, as well as a number of other small overseas arrangements<br>≥ By far the largest of the arrangements is the Dice Pension Fund ("the Fund") in the UK, which had assets of around £1 billion as at 31 March 2007 |
| Approach to business valuation | ≥ In our experience, the typical approach adopted by purchasers when allowing for pensions in valuing a business is to:<br>— treat any deficits or unfunded liabilities in respect of past service as debt; and<br>— allow for the cost of future benefit accrual (or "service cost") when assessing EBITDA<br>≥ In assessing both the deficit (to be treated as debt) and the value of future benefit accrual (to be allowed for as a charge to EBITDA), our experience is that IAS19 methodology is typically used for business valuation purposes. However, to the extent that the Trustees of the Fund seek to target a more prudent basis for cash funding purposes, this should be reflected when assessing business value. |
| Past service deficits - overview | ≥ The aggregate IAS19 deficit in Dice's pension arrangements as at 31 March 2007 was £43 million (excluding deferred tax), made up of a deficit in the Fund of £7 million and net deficits/unfunded liabilities for non-UK arrangements of £36 million, as set out in the table below |

| Summary of IAS19 funding position at 31 March 2007 | | | | |
|---|---|---|---|---|---|
| £m | Dice pension fund | German DB arrangement | Japanese DB arrangements | Other non-UK arrangements | Total |
| Surplus/(deficit) | (7.0) | (30.7) | 3.0 | (8.3)(a) | (43.0) |

*Note: (a) As at 31 March 2006 - VDD report states that figure at 31 March 2007 should be broadly similar*
*Source: VDD report*

| Past service deficits - UK | ≥ For the latest cash funding valuation (as at 31 March 2006), the Trustees of the Fund initially proposed a target that was more prudent than the IAS 19 basis at the time (which would have resulted in a deficit of £49 million at 31 March 2006). However, we understand that Dice has proposed, and is expecting the Trustees to agree to, a revised funding target with a zero deficit. In reaching agreement on the funding target, the Trustees have taken account of the strength of Dice's covenant towards the Fund<br>≥ As a result of a likely weakening of Dice's covenant towards the Fund as a result of the transaction, there is a risk that the Trustees could seek to adopt a more prudent assessment of the liabilities. In recent leveraged buy outs, pension fund trustees have begun to focus on ways of making their funds self sufficient, which has been supported by the UK Pensions Regulator in its recent statements<br>≥ The Trustees could aim to achieve self sufficiency by removing investment risk through moving the current investment strategy into gilts (as they hold the unilateral power to invest the assets of the Fund). We estimate that the deficit on a gilts basis would be around £190 million<br>≥ Ultimately, if the Trustees react adversely to the transaction, their opening negotiating position would be the cost of securing all benefits with an insurance company. We estimate that the aggregate deficit on this basis would be around £370 million using typical industry buy-out cost assumptions. However, due to a number of new providers of pension buy-out solutions and the emergence of more innovative products, the market may become more competitive resulting in a lower ultimate cost. Detailed mortality analysis could also potentially reduce buy-out costs. Clearly a negotiated solution would be between the current position and the full buyout cost |



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

24

A-807

Pensions
# Key findings (continued)

| Issue | Summary observations |
|---|---|
| Past service deficits overseas | ■ The aggregate IAS19 deficit in the overseas pension arrangements at 31 March 2007 of £36 million includes a surplus in one of the Japanese arrangements of £3 million. As it is unlikely that economic benefit can be derived from the surplus, we recommend this is ignored for pricing purposes (i.e. a net deficit of £39 million should be allowed for the non-UK benefit arrangements) |
| The Trustees' position | ■ The Fund ranks as an unsecured creditor of Dido. A deterioration in the position of the Fund, for example through the introduction of significant amounts of additional secured debt as a result of the transaction, is likely to be viewed by the Trustees as adversely impacting the strength of Dido's covenant towards the Fund. As a result, the Trustees are likely to consider what actions they could take in response to the transaction and the associated benefits |
| | ■ The powers set out in the Fund's Trust Deed & Rules are crucial in understanding the options the Trustees could take in response to the transaction. Whilst the Trustees unilaterally control the investment strategy, our understanding is that the Trustees do not have the sole power to wind-up the Fund or to determine Dido's contribution rate. However, we recommend that legal advice is sought in this area |
| Approaching the Trustees | ■ Consideration will need to be given as to when to approach the Trustees of the Fund to agree a funding/security strategy, including the level of cash contributions to be paid following completion. Reaching agreement with the Trustees can take a period of several weeks. There are a number of issues where pension scheme Trustees have reacted aggressively where they have not been properly consulted and a positive relationship has not been developed so it will be important to monitor the situation and ensure the Trustees of the Fund are engaged at the appropriate time |
| | ■ In situations where large amounts of secured debt are brought into a business, it is likely that the Trustees could seek to increase cash funding and/or non-cash security to compensate for the reduction in employer covenant |
| | ■ We understand that Dido previously discussed a potential securitisation of the Music Publishing business with the Trustees. As this would not have involved a deterioration in covenant towards the Fund, it could serve as an indication of the Trustees reaction to a leveraged buy-out. Our understanding is that the Trustees view the future cash flows of the Music Publishing business as a key element of their security and that, whilst no formal agreement was reached, the Trustees positively considered the provision of a defined amount of security behind the primary Dido holding as potential security |
| | ■ It is therefore possible that the Trustees would react favourably to a proposal involving a combination of cash and increased security as an alternative to just cash only, offer in our experience of recent leveraged buy-outs, as a result of the higher compliance, and markets it is becoming more common for implying structures to accommodate additional security for pension schemes |
| | ■ Management also indicated that the Trustees were likely to favour the approach to funding in conservative. As a result, whilst they would expect the Trustees to seek security to counter any reduction in covenant, they consider that the Trustees might be persuaded against a large up-front cash lump sum |
| | ■ The Purchaser will need to consider whether clearance for the transaction from the UK Pensions Regulator is desirable. We understand that legal advice is being sought in this area |

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

25



Confidential

TF000113221

Pensions
# Key findings (continued)

| Issue | Summary observations |
|---|---|
| Future service costs | z  Dice recognised an FY07 pension operating charge to the income statement of £12.0 million, made up of a recurring IAS19 service cost of £13.4 million and a one-off credit of £1.4 million in respect of Japanese redundancies (which would normally be excluded for business valuation purposes). |
| | z  Information provided in the data room shows that a forward looking IAS19 service cost based on market conditions at 31 March 2007 would be £11.4 million, made up of £10.7 million in respect of the Fund and £0.7 million in respect of the non-UK pension arrangements. |
| | z  We understand that Dice has proposed a number of alterations to the pension benefits to be provided for future service, which will be discussed with the Trustees this week. Management expects the alterations to result in a net saving to the IAS19 service cost of £5.5 million a year. In the context of a transaction, these changes may be viewed unfavourably by the UK employees. However, to the extent that the purchaser considers the benefit alterations to be deliverable it may wish to make allowance for the savings in projected earnings. |
| | z  In addition to the above, Dice contributes to a number of defined contribution arrangements. Contributions to these arrangements in FY06 were £10.8 million. |
| Benchmark accounting figures | z  Overall, the IAS19 deficit as at 31 March 2007 has been calculated broadly in line with typical market practice. However, in the UK the individual assumptions were different to those typically used as follows: |
| | – the inflation assumption of 3.0% was around 0.2% lower than that typically used. If a more typical assumption was chosen, the IAS19 liabilities would be around £30 million higher; and |
| | – the mortality assumption chosen by Dice for the Fund is in line with the 2006 valuation assumption, which was chosen to be consistent with current experience. However, the allowance for future improvements in mortality is more conservative than that typically used by companies for accounting purposes in the UK. If a more typical assumption was chosen, the IAS19 liabilities would reduce by around £20 million. |
| Updated position at 30 April 2007 | z  The financial position of the defined benefit pension schemes will be volatile with respect to changes in market conditions. For example, the Fund invests a significant portion of its assets in equities, whilst the IAS19, gilt funding and buyout liability measures are calculated by reference to the yields on bonds. |
| | z  We have summarised the position of the Fund on the bases discussed above as at 30 April 2007 in the table below. |

Summary of IAS19 funding position of the Fund at 30 April 2007

| £m | IAS19 | Gilts basis | Buyout |
|---|---|---|---|
| Surplus /(deficit) | 10 | (170) | (350) |

Source: KPMG analysis

z  Bond yields in Germany and Japan have not moved significantly between 31 March 2007 and 30 April 2007, and therefore the financial positions of the plans in these territories are unlikely to be materially different.

z  We estimate that a forward looking IAS19 service cost, based on market conditions, at 30 April 2007 would be £11.1 million, made up of £10.4 million in respect of the Fund and £0.7 million in respect of the non-UK pension arrangements.

A-809



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113222

# Contents

|  | Page |
|---|---|
| Trading performance | 5 |
| Balance sheet | 14 |
| Pensions | 24 |
| Taxation | 28 |
| Share based payments | 43 |
| Operations cost savings | 46 |
| Appendices | 64 |

A-810



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113223

Taxation
# Group overview



### Background

z The Dice Group has a worldwide presence with operations in over 50 countries. Our report has focused on the group's main operating jurisdictions and as such we have reviewed the information available for those entities located in the UK, US, the Netherlands, Japan, France, Germany and Italy. Together these jurisdictions account for 89% of EBITA in FY07

z We understand that the proposed transaction structure is to acquire 100% of the shares of Dice Group plc

z Our work has been limited to a consideration of the tax affairs in the key Dice locations based only on the information in the VDD report, the data room and discussions with management on 14 May 2007. Only very limited tax data is in the data room with no tax returns, tax authority correspondence, tax provision calculations or any details to support the tax accounting figures. Further, the tax VDD runs to only 10 pages and was based entirely on discussions with management and no document review. As a result, our due diligence findings are based primarily on information provided by management on 14 May and we have not yet been able to verify the facts provided

z This report should also be read in conjunction with the VDD report as the intention of this report is to build on the issues discussed there and cover additional information provided by management or in the data room

z No significant information has currently been provided regarding VAT or employee tax issues (they were not part of the VDD and few documents are in the data room). It has been agreed that follow up calls will be arranged to cover these issues but, in the meantime, the tax director of the target advised that he was not aware of any material issues and the group is not subject to any special VAT regimes

### Summary findings

z Based on the limited information to date, the group does not appear to have any significant unprovided corporate tax exposures. Indeed, the group is probably overprovided with circa £20 million of the current tax provision of £76.3 million being 'general' in nature. Indeed, the auditors believe the group is overprovided and requested that the tax provision be reduced by approximately £30 million over a three year period starting in FY06

z In addition, no significant tax planning has been undertaken by the group and they are considered low risk for HMRC audit purposes in the UK which is unusual for a multinational group of this size (and supports the view that no significant planning or unreasonable filing positions have been taken)

### Tax profile

z Within the identified material jurisdictions, the Dice Group continues to incur tax losses in the UK and the US while there has been limited tax payable in France and Spain due to losses brought forward. The key tax paying jurisdictions are Italy, Netherlands, Japan and Australia

z Overall on a consolidated basis, the Dice Group has an effective tax rate of 37.7% for FY07 based on draft financial information made available in the data room in respect of this period. This rate has been diluted to some extent by the release of prior year provisions. Provisions of £11.8 million and £27.1 million were released in FY06 and FY07 respectively. The tax rate is also slightly depressed by losses brought forward in France, Spain and Germany as set out below

z However, the group continues to make significant losses in the US and UK for which no tax asset has been recognised. As a result, it is likely, overall, that the tax rate is overstated. Given that the bulk of the profits are in Europe and the US continues to make losses due to its Recorded Music business, it seem likely that the cash tax rate is closer to 30%

### Tax compliance

z Tax compliance by the Dice group entities seems to be up to date and tax payments are generally made within the relevant deadlines

z Most of the key countries (other than the UK and US) are currently undergoing some level of audit and the tax exposures are discussed in the subsequent paragraphs. The US has not been subject to audit since 2001 but this may in part be due to its loss position. The last US audit resulted in a tax repayment of USD12 million



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113224

A-811

Taxation
# Group overview (continued)



**Tax provision**

- Dice management informed us that they adopt a policy of making full provision for any key exposures identified during tax audits. From discussions, it would appear that this is done regardless of whether the tax authorities are expected to succeed and even where advise is that the group's filing position is strong. The one exception to this seems to be in respect of the Brazilian litigation exposures as discussed below

- Dice Group has provided for potential liabilities arising from ongoing audits in the material jurisdictions (total £33.3 million as at 31 March 2007), as summarised on the following page. In addition, a specific tax provision of £19 million has been made in respect of a potential Japanese transfer pricing challenge. Further provisions amounting to £24 million have also been made to cover any other 'general' risks, primarily as a buffer in respect of potential transfer pricing adjustments

- There is pending tax litigation in Brazil which relates to two cases for amortisation of goodwill and a VAT exposure on artist royalties. Management indicated that both Brazilian cases relate to very old exposures and no significant exposure is expected. However, the data room comments state that the cases were last decided (against the target) in 2005/6 and the exposures amount to £21 million. A detailed review of the facts of the case will be necessary to assess the likelihood of the risk, but it would be prudent to assume that some provision is required. However, the general provision above should be sufficient to cover the exposure. It seems that there is also probably some "buffer" within the transfer pricing provisions noted below

- The auditors believe the group is overprovided and requested that the tax provision be reduced by approximately £30 million over a three year period starting in FY06. However, should a liability arise, this will need to be cash funded

| Tax credits as at 31 March 2007 | £m |
|---|---|
| Current tax receivable | (16) |
| Current tax creditor | 112 |
| Deferred tax asset | (12) |
| Deferred tax liability | 4 |
| **Total** | **87.8** |

Source:  Information provided in the VDD report dated 2 May 2007

**Ongoing audits**

- Details of on-going audits and litigation and the level of risk have been provided in the individual country findings on the following pages. A summary of the exposures are provided below:

  - A Dutch tax challenge in respect of dividend withholding tax and the tax gain on the sale of the manufacturing site: £15.3 million

  - A German tax challenge in respect of transfer pricing (management charges) and artist advances provisions : £15 million

  - An Italian tax challenge in respect transfer pricing (management charges and royalties) : £3.3 million

- The Dice Group has fully provided for these exposures in these challenges within the provisions mentioned above

- It is likely that the risk of a liability arising from some of the key challenges is low and may not arise in the immediate future. The Dutch tax challenge on the dividend withholding tax issue (£5.3 million) is similar to a case which has been decided in favour of the taxpayer by the European Court of Justice. Further, the German challenge on the management charges has been considered by the tax authorities in earlier audits and held in favour of the Dice Group. In addition, management has made a full provision in respect of the potential transfer pricing adjustments but if the tax authorities are successful in making a disallowance, it is likely that only a portion of the expense will be disallowed

- The group has undergone a several significant restructurings in the last few years to reduce headcount and other overhead costs. Management have indicated that they have, generally, treated the related costs as fully deductible. This issue should therefore be looked at further as it is likely that some of the costs would be non deductible as capital. However, the level of general provision and the view taken by the auditors suggests that, overall, any exposures may be covered

**Transfer pricing**

- The main intra group charges are in respect of royalties, interest and management charges. As noted above, a number of tax challenges in respect of transfer pricing are currently pending relating to management charges and royalties



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113225

A-812

Taxation
# Group overview (continued)



**Transfer pricing (continued)**

z   We have not reviewed the arm's length nature of the pricing arrangements of the various intra-group transactions as part of this review. However, management have indicated that in their view the transfer pricing position is robust. Further, we understand that regular transfer pricing reviews are undertaken by their advisers in the US and the Netherlands

z   Further, although a detailed study has not been undertaken, the management charge position has been subject to a high level review by the target's UK advisers (KPMG). This has indicated that the amount of recharges are actually on the low side (more costs could possibly be recharged from the UK and a mark up could be applied)

**Withholding tax**

z   There are substantial intra-group royalty transactions especially to Dice UK and Dice US (see comments under 'Transfer pricing' on page 42)

z   Management has indicated that the withholding tax position adopted by the various Dice group entities have not been challenged to date in any jurisdiction. However, a claim for a beneficial rate of tax withholding under a tax treaty, especially the US treaties are often subject to satisfaction of onerous conditions

z   On a high-level basis, we expect that these conditions are likely to be satisfied, given that the UK parent is a publicly listed entity and on the basis that Dice UK has an active business related to the royalties. This point should however be looked at further post deal and it is likely that, in particular, some additional substance may need to be put into the UK parent of the Dice German group in order to avoid future withholding tax issue on any German dividends (we understand that no dividends have been paid in the past from Germany)

**Tax losses**

z   The group has losses carried forward in several countries. The table below summarises the tax losses being carried forward as at 31 March 2007 in each of the material jurisdictions

| Summary of tax losses carried forward as at 31 March 2007 | |
| --- | --- |
| | Tax losses (£m) |
| UK | 323.8 |
| US | 93.3 |
| France | 16.0 |
| Germany | 128.5 |

Source:   Information provided in the VDD report dated 2 May 2007

z   In Germany, both corporate tax and trade tax is payable and the above losses relate only to corporate tax. Further, they are subject to a general restriction so that they can only be offset against 60% of corporate tax profits in any year

z   Following the change of control, the annual deduction for the US tax losses will also be limited to, in general terms, 4.18% of the US purchase price

z   The UK tax losses primarily comprise excess interest (£240.3 million). These losses cannot be offset against future trading profits. Further, the UK change of control rules for excess interest losses are such that there is a strong risk the losses will be forfeited post-deal. In view of the above-mentioned restrictions, we recommend that no value should be given to the tax losses in the model

z   The UK also has capital losses of £83.5 million in Dice plc

z   We understand that the French losses have mainly been incurred in the last two years and so are not subject to any time restriction in their utilisation

z   In addition, the group has significant brought forward losses in Hong Kong, Spain and Sweden and details of these and the other group losses are given on page 7 of the Tax VDD report



This document is CONFIDENTIAL and its circulation and use are RESTRICTED  © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

A-813

Confidential

TF0000113226

Taxation
# United Kingdom

Tax compliance of UK entities is up to date

The group has carried forward tax losses of £323.8 million as at 31 March 2007

## Effective tax rate

- The Dice UK entities are loss-making, due to the availability of significant non-trade deficits (excess interest) which is group relieved to the profitable UK entities. As such, no UK tax has been paid over the past two years for which we have information

## Tax compliance

- The filing deadline for submission of the corporation tax return is twelve months after the end of the relevant accounting period. Assuming the returns are filed within the deadline (as management have indicated is the case), HMRC have 12 months to open an enquiry into the return (the "enquiry window"). If no enquiry is opened within that time the return can be regarded as closed to enquiry. However, the enquiry window can be extended to six years where a discovery is made or up to 20 years where there has been fraudulent or negligent conduct

### Years up to FY05

- The UK tax returns for the years up to and including FY05 are closed to enquiry and there are no open audits for prior periods

### FY06

- The FY06 tax returns were submitted before the statutory deadline of 31 March 2007

- HMRC have until 31 March 2008 to initiate an enquiry into these returns

### FY07

- The tax returns for FY07 have not yet been prepared. The Group has until the statutory deadline of 31 March 2008 to submit the returns

### Tax losses

- The UK group has the following tax losses carried forward as at 31 March 2007 per the VDD report:

| Tax losses | 31 March | 31 March |
|---|---|---|
| £m | 2006 | 2007 |
| Non-trade tax losses | 185.4 | 240.3 |
| Capital losses | 83.5 | 83.5 |
| UK tax losses carried forward | 268.9 | 323.8 |

*Source: Information provided in the VDD report*

- Based on FY07 unaudited calculations, the UK companies have £240.3 million in non-trade loan relationship debits

- Non-trading deficits may be carried forward indefinitely but can only be utilised against future non-trading income of that company. We understand that these losses mainly in Dice Worldwide and Dice Group Holdings

- Anti-avoidance legislation exists which can lead to the forfeiture of non-trading financial losses carried forward in an investment company where there is a change in ownership and:
  - there is a significant increase in the company's capital following the change in ownership; or
  - within a period of six years, beginning three years before the change in ownership, there is a major change in the nature of the investments; or
  - the change in ownership occurs after the scale of the activities in the business have become small or negligible and before any considerable revival of the business

- The acquisition of the group will constitute a change in ownership for the above purposes and therefore this should be monitored going forward

- Management has indicated that they are not aware of any circumstances that have occurred to date that would restrict the carry forward of the tax losses.

- However, a significant increase in capital is broadly the lower of the amount of capital prior to the change in ownership and £1 million. Given how small this amount is, there must be a significant risk that these losses will be forfeited post deal and so their benefit should not be modelled

### Residence status of Dutch incorporated entities

- Dice was acquired by Thorn in 1980 and at the end of the 1980s, the majority of the overseas subsidiaries were restructured so that the local subsidiaries were held by a local parent company which was in turn held by a two tier Dutch holding structure. This was done to bring together the various local subsidiaries, to benefit from improved local gearing ratios and to obtain the benefits of the Dutch participation exemption. This latter point became less relevant in the 1990s due to UK law changes to double tax relief and in 2004, the tax residence of the Dutch holding companies were migrated to the UK and the Dutch offices were closed



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

A-814

Confidential

TF0000113227

Taxation
# United Kingdom (continued)

**Residence status of Dutch incorporated entities (continued)**

- Management has indicated that the tax residential status of the Dutch holding companies have not been challenged by the tax authorities, either in the UK or the Netherlands. This point should be confirmed post deal but on the basis that the directors have been changed to UK residents and management is in the UK, it seems likely that these companies would be regarded as solely UK resident for UK tax purposes and not as dual residents

**Transfer pricing**

- z  For our comments about the Dice Group's transfer pricing position, please refer to page 42



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

32

A-815

TF0000113228

Taxation
# United States



### Overview

- Dice has a large US consolidated tax group headed by Dice Group North America Holdings Inc

- In addition as a result of a number of acquisitions in the US, there are a few foreign subsidiaries below the US group. These subsidiaries have not been transferred out of the US to the main country groups because of the US tax that would be payable on exit

### Effective tax rate

- Dice US has a nil effective tax rate for the FY07 as it has been incurring tax losses (£93.3 million carried forward as at 31 March 2007), in respect of which a deferred tax asset has not been recognised

### Tax compliance

Years up to FY06

- Management indicated that the tax returns of Dice US for the years up to and including FY06 have been submitted by the statutory deadline

Corporation tax payments

- All corporation tax payments have been made within the applicable deadline

### Tax audits

- Tax audits into the tax affairs of Dice US entities were last undertaken in respect of FY01. No adjustments were proposed and no issues are outstanding in relation to these audits and these audits are now closed. Indeed, management have indicated that the last audit resulted in a USD12 million refund of tax

- There are no other tax audits currently underway for any of the entities in US

### Transfer pricing

- For our comments about the Dice Group's transfer pricing position, please refer to comments on page 42

- We understand that the group's tax advisers (E&Y) have been undertaking regular reviews of the transfer pricing policy in the US. The US tax authorities have not challenged the transfer pricing policy of Dice US to date

### Tax losses

- Dice US has carried forward tax losses of £93.3 million as at 31 March 2007

- Following the change of control, the annual deduction for the US tax losses will be limited annually to the product of the fair value of the corporation (market value immediately before ownership change) and the applicable federal rate (4.18% for April 2007)

- If the annual limitation is not utilised in any year, it can be carried forward to increase the limitation for the subsequent year

- State tax losses are only available for carry forward against future income arising in that state. The limitation rules in respect of loss offset differ from state to state

A-816



This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113229

Taxation
# Germany

**A-817**

**Tax compliance is up to date**

**The current tax audit has challenged the goodwill amortisation and management charges. These issues have not yet been resolved**

**There is query regarding the tax deductibility of a provision regarding artist advances in the current tax audit**

## Overview

- The Dice Group has one main German group with the key trading subsidiaries in it. The Recorded Music and Music Publishing businesses are kept in separate subsidiaries. Except for the holding company which is a GmbH, all German entities are in the form of partnership companies (KG+Cos)

## Tax compliance

z Tax returns for the German entities have been submitted up to FY05 within the relevant filing deadlines

## Tax audits

z We understand that the tax returns of Dice Germany:

- have been audited up to FY97

- are currently being audited by the tax authorities for the period from FY98 to FY01

- have not been audited for the FY02 and later years

z The tax authorities are challenging the cross charge of management expenses and the claim of a deduction in respect of artist's advances in the course of the current on-going audit. Management believes that the chances of successfully defeating such challenges are high, but a provision of £15 million has been made to fully cover any potential liability in this respect

## Effective tax rate

z Dice Germany has a 30% effective tax rate for the FY07 which is lower than the statutory tax rate, as it has carry forward tax losses and claims a deduction in respect of goodwill amortisation

## Goodwill amortisation

z As mentioned above, Dice Germany amortises goodwill for corporate income tax but not for trade income tax purposes. We understand that the goodwill amortisation has been subject to an audit by the German tax authorities and no challenge has been made. Whether this is a final determination by the tax authorities is not clear

## Transfer pricing

z For our comments about the Dice Group's transfer pricing position, please refer to comments on page 42

z The transfer pricing policy in respect of the management charges has been questioned by the German tax authorities in the course of audits. Dice Germany has been successful in defending the transfer pricing in respect of these charges during prior audits (relating to years up to FY97) and is therefore hoping to be successful in the current audits (FY98 to FY01)

z If any of the above transactions is considered excessive, it would be treated as a constructive dividend and would be added to taxable income. In addition, WHT at a rate of 21.1% (26.375% if borne by the German entity), would be applied if no treaty clearance is in place

## Tax losses carried forward

z According to management there are only tax losses carried forward for corporate income tax purposes and there are no losses carried forward for trade income tax purposes. This makes sense since the losses arise on the goodwill amortisation which is only available for corporate tax purposes

z As per the VDD, Dice Germany has carry forward tax losses of £128.5 million as at 31 March 2007

z Where there is a change of control of a company with carried forward tax losses, the future availability of the tax losses following the change in ownership depends on there being a common business identity between the corporation incurring the losses and the corporation claiming the relief

z For tax purposes a loss of common business identity occurs where:

- more than 50% of the shares of the corporation have been <u>directly</u> (an indirect transfer as indicated in the VDD report does not trigger the provisions according to the tax authorities) transferred within a period of five years after the first change of shareholder was effective (shareholders test), and

- within a period of five years (the watch period) after the share transfer, additional business/assets are injected which, after the transfer, result in the market value of the total assets exceeding the total assets prior to the share transfer (asset test)



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

34

Confidential

TF0000113230

Taxation
## Germany (continued)

**Losses carried forward (continued)**

The VDD report shows £128.6 million of tax losses carried forward as at 31 March 2007.

Under current law, an indirect change of ownership of the German group should not trigger the change of control rules.

According to proposed law changes, a direct or indirect ownership change in 2008 or later may result in the loss of the tax losses carried forward.

Thus, careful tax planning is strongly recommended around this area.

z  Based on the proposed changes in German tax legislation ("German Business Tax Reform 2008") which is currently before parliament, the future use of losses carried forward would be restricted if more than 25% of a corporation's shares or voting rights are directly or indirectly transferred to a purchaser or a person related to the purchaser within a period of five years ("tainted transfer")

z  On the occurrence of a tainted transfer:

- of more than 25% and of up to 50%, losses carried forward would be forfeited in proportion to the tainted transfer.

- of more than 50%, the entire losses carried forwards would be forfeited entirely.

According to this bill, the current change of control rules would continue to apply to share transfers made prior to 31 December 2007 but the watch period above is to be reduced to two years ending at the end of 2009. The new draft rules would apply from 1 January 2008

z  Please note that these draft rules themselves as well the date of their first application may change significantly in the legislative review process

A-818



This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113231

Taxation
# The Netherlands

Tax compliance for the
Dutch fiscal entity is up to
date

A tax audit is currently
underway. Key focus is
on the loss on sale of the
manufacturing operations

Tax litigation is currently
pending before the courts
with respect to the
correct application of the
withholding tax
provisions

**Tax compliance**

Fiscal unity

z All Dutch entities are part of the corporate income tax fiscal unity Dice Group Netherlands B.V. Therefore, only one tax return has to be filed by Dice Group Netherlands B.V. as parent fiscal unity

z All entities within the fiscal unity can be held jointly and severally liable for the corporate income tax due by the fiscal unity

Years up to FY05

z We have not received any information in respect of these periods. In general, we would expect tax returns for years up to at least FY05 to have been filed by this stage as companies can be granted an extension for filing a tax return for one year and three months after the end of the financial year

Corporation tax payments

z The Dutch fiscal unity is in a tax paying position and has no tax losses carry forward. We have no further information on whether the payments on the assessments are made in time except that management indicated that this was usually the case in all countries

**Tax audits**

z We understand that currently a tax audit is pending and the main discussion points is whether the sale price received on disposal of the manufacturing operations was at arm's length since a loss has been realised on this transaction and deducted from the taxable profit. We have been advised that the group has made a provision of £10 million in this respect

z A litigation is pending regarding whether Dutch dividend withholding tax should have been withheld on dividend distributions by Dice Group Holding BV in the period 1989-1992 (when a branch structure existed which has since been unwound). We have been advised that the total amount involved (£5.3 million) is fully provided for. We have no information to verify whether this amount is indeed sufficient to cover the dividend withholding tax due, including possible interest and penalties

**Withholding tax on royalties**

z No royalty withholding tax exists in the Netherlands under domestic law

**Transfer pricing**

z For our comments about the Dice Group's transfer pricing position, please refer to our comments on page 42

z We understand from management that transfer pricing studies are done regularly in the Netherlands and management believes the applied transfer pricing for intra-group transactions (e.g. management charges and interest) is reasonable

**A-819**



This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113232

## Taxation
# France



**Overview**

- z The key (material) entities in the French tax group are Dice Music France SA ("EMFSA") and Dice Music Publishing France SA ("EMPF")

- z The Dice group has one main French group with the key trading subsidiaries in it. The Recorded Music and Music Publishing businesses are kept in separate French subsidiaries but they are members of the same fiscal unity

- z Separately, the Dice Group has made a number of acquisitions in the US which have resulted in it owning a few French subsidiaries below the US group. These subsidiaries have not been transferred out of the US to the main French group as we understand that this cannot be done without a US tax cost. As a result, there is some French tax paid in the group, since the losses of the main French group cannot offset the profits in the subsidiaries held through the US

**Effective tax rate**

- z The French entities had an effective tax rate of 16.4% for FY07 based on the information in the due diligence report. As mentioned above, although the main French fiscal unity has tax losses, tax was payable by the subsidiaries that do not form part of the French fiscal unity

**Tax compliance**

- z Tax returns of all the French entities have been submitted up to FY06 (within relevant deadlines) except for Dice Group Services France SAS which has been filed up to FY05

**Tax audits**

- z EMFSA last underwent a tax audit for FY05 which resulted in some minor adjustments and we understand that there are no outstanding issues. This audit is now closed

- z EMPF last underwent a tax audit for FY03 and there are no outstanding issues from this audit, which is now closed

- z Dice Group Services France SAS last underwent a tax audit for FY01 and we understand that there are no outstanding issues resulting from this audit, which is now closed

- z Based on the French statute of limitations, the following tax returns are still open to enquiry by the tax authorities:

  - EMFSA: FY06

  - All other French entities: FY04 to FY06

- z Additionally, the French tax code provides that financial years in which carried forward tax losses were incurred are also open to tax audit

- z We have not been provided with a historical breakdown of the financial years in which the tax losses were incurred so we are unable to identify which years would be still be open to an audit based on these provisions

**Tax losses**

- z The French tax group has carried forward tax losses of £16 million as at 31 March 2007, based on the information provided in the VDD report. These tax losses may be carried forward indefinitely without any time limit

**Transfer pricing**

- z For our comments about the Dice Group's transfer pricing position, please refer to comments on page 42

A-820



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113233

## Taxation
# Italy

Tax returns for the companies have been submitted on time

A tax audit is currently underway on Dice Publishing Italia SRL

### Overview

- The Italian Dice Group consists of Dice Music Italy SPA (which runs the recording division) and Dice Music Publishing Italia SRL (which runs the publishing division) and each of their respective subsidiaries (collectively these companies are referred to as Dice Italy)

### Tax compliance

- Management has represented that all tax returns for the fiscal years up to FY06 have been submitted by the statutory deadline

### Tax audits

- Based on management's representations, Dice Music Italy SPA (the recording company) underwent a tax audit in FY03. No adjustments were required as a result of this audit

- The publishing companies (Dice Music Publishing Italia SRL and its subsidiaries) are currently undergoing a tax audit of the tax affairs for FY04. We understand that the tax authorities are looking at transfer pricing in respect of management charges and royalties. A provision has been made in the accounts of the Italian companies for £3.3 million in respect of these exposures although management were of the view that an adjustment was unlikely to be required

### Effective tax rate

- The Italian tax charge is made up of IRES (formerly IRPEG) and IRAP

- IRES is a tax on profits and is levied at 33%. IRAP is a tax on production activities and essentially levies a further 4.25% on the following:
  - Profit before tax; plus
  - Employment costs; plus
  - Interest costs

- Certain other extraordinary items and adjustments are included and/or excluded from the calculation of IRAP

- The effective tax rates for Dice Music Italy SPA and Dice Music Publishing Italia SRL are shown in the opposite tables

### Dice Music Italy SPA

- Dice Music Italy SPA effective tax rate in fiscal year 2007 is affected by a negative adjustment amounting to £0.8 million

- We have no information regarding the nature of this adjustment

### Dice Music Publishing Italia SRL

- The effective tax rate of Dice Music Publishing Italia SRL appears to be equal to the theoretical IRES and IRAP tax rates. However, this is unusual since the number of disallowable items for IRAP increases its tax rate such that the effective tax rate is usually higher

**Dice Music Italy SPA**

| £m | FY07 |
|---|---|
| Profit/(loss) before tax | 5.2 |
| Net positive/(negative) adjustments | (0.8) |
| IRES taxable base | 4.5 |
| Total taxes (IRES and IRAP) | 1.7 |
| Effective tax rate | 31.68% |
| Theoretical tax rate | 37.25% |
| Difference | 5.57% |

Source:  Virtual data room

**Dice Music Publishing Italia SRL**

| £m | FY07 |
|---|---|
| Profit/(loss) before tax | 7.0 |
| Positive adjustments | |
| Negative adjustments | |
| IRES/IRPEG taxable base | 7.0 |
| Total taxes | 2.6 |
| Effective tax rate | 37.25% |
| Theoretical tax rate | 37.25% |
| Difference | |

Source:  Virtual data room

 This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

38

A-821

TF0000113234

Taxation
# Japan

Corporation tax compliance is up to date.

No tax audits are currently underway in Japan

A management services fee is being charged to Japanese entities. Management considers the quantum of this fee to be reasonable. However this position is open to challenge by the Revenue Authorities

## Overview

ℤ There are two Japanese subsidiaries (together referred to as "Dice Japan") within the Dice Group, Toshiba-Dice Music Publishing Co Limited ("MP Japan") and Toshiba-Dice Limited ("MR Japan")

ℤ MR Japan is joint venture with Toshiba Corporation holding 45% of the ordinary share capital. The Dice Group is currently in the process of converting it into a 100% subsidiary of the Dice Group by a process of redemption of the shares held by Toshiba Corporation

## Tax compliance

Years up to FY06

ℤ The tax returns of Dice Japan for the years up to and including FY06 have been submitted by the statutory deadline

Corporation tax payments

ℤ All corporation tax payments have been made within the applicable deadline

## Tax audits

ℤ The Japanese Revenue Authorities have a window of three years from the end of the financial year to enquire into corporate tax returns (unless there are losses or fraud is suspected in which case the enquiry window is extended to five and seven years respectively). The statutory period to enquire into transfer pricing matters is six years from the end of the financial year

ℤ Tax audits into the tax affairs of MR Japan and MP Japan were last undertaken in respect of FY01 and FY04 respectively. No adjustments were proposed and no issues are outstanding in relation to these audits and these audits are now closed

ℤ There are no other tax audits currently underway for any of the entities in Japan

## Effective tax rate

ℤ The effective tax rate of Dice Japan for FY07 is 30% which is lower than the statutory tax rate of 42%, primarily on account of prior year adjustments of which we have no details

ℤ The current tax charge of Dice Japan in the accounts in respect of the FY07 was £17.6 million and Dice Japan has recognised a deferred tax asset at 31 March 2007, details of which have been requested but not yet obtained

## Transfer pricing

ℤ For our general comments about the Dice Group's transfer pricing position, please refer to comments on page 42

ℤ The Dice Group historically did not cross-charge management expenses to MR Japan. However, following a transfer pricing review undertaken in the US in 2002, it was decided to commence charging for management services provided to MR Japan at the rate of 1.5% of turnover and a back payment was then made for prior years

ℤ It is not uncommon for the Japanese tax authorities to challenge the deductibility of management fees during tax audits. In this case, the basis for the fee is likely to increase the risk of a challenge as it is more common for management fees to be calculated on a cost plus basis. However, the existence of a third party shareholder is likely to support the position that the fee is arm's length since the joint venture partner would not have accepted it otherwise

ℤ Management has advised that there is appropriate documentation to support the basis of the charge and are of the opinion that the charge is unlikely to be considered excessive under Japanese transfer pricing guidelines (especially given that any charges were subject to restrictions under the joint venture agreement with Toshiba)

ℤ This point has not yet been challenged by the Japanese tax authorities. However, in view of the introduction of the charges in 2002 in variance with the historical position and given that the tax return for FY02 is still open to a TP audit, Management has made a provision of £19 million towards the tax exposure. Management has indicated that the amount provided represents a full provision with no discount applied

ℤ Turning to MP Japan's royalty payments, at a very high level, we consider that the 10% commission on Music Publishing activities does not appear to be unreasonable. However, a transfer pricing study will need to be performed in order to confirm the arm's length nature of the charges

## Withholding tax on royalties

ℤ Historically, withholding tax at the rate of 10% has been imposed on all royalties payable to US and UK entities by Dice Japan

ℤ However, under the new US-Japan tax treaty in force since 2004, this rate has decreased to 0% subject to satisfaction of conditions in the treaty. Similarly, under a new UK-Japan tax treaty which has recently come into force, withholding tax on royalties paid has reduced to 0%

A-822



This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113235

Taxation
## Japan (continued)



z  A claim for a beneficial rate of tax withholding under a tax treaty,
   especially the UK and US treaties are often subject to satisfaction of
   onerous conditions

z  On a high-level basis, we expect that these conditions are likely to be
   satisfied, given that the UK parent is a publicly listed entity and on the
   basis that Dice US has an active business related to the royalties. We
   however recommend that appropriate indemnities be sought in respect of
   any failures to comply with withholding tax obligations

A-823

This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

40

Confidential

TF0000113236

Taxation
# Transfer pricing



**Transfer pricing**

z Transfer pricing is relevant in respect of three cross border payments within the group: royalties, management charges and interest

z Transfer pricing rules vary across the world but at a high level they all requires arm's length pricing to be used, as well as requiring companies to keep documentation supporting the rate charged being a third party rate. There are penalties for non compliance with the rules

z Based on discussions with Management, we understand that the Group's intra-group transactions comprise the following:

– Exploitation of IP/ brands:

Music recording business

z Under a 'Matrix Exchange Agreement', Dice Music International Services Limited (Dice MIS), a UK company, acts as the intermediary for all music licenses. For example, if Italy wants to use a US copyright, the US licenses to Dice MIS and it in turn sub-licenses it to Italy. This has been standard corporate practice for many years

Music Publishing

z The rights for publishing materials are primarily owned by the US and UK entities. These entities act as the publishers and the other overseas entities act as the 'sub-publishers' exploiting the rights in various territories. These sub-publishers generally charge a commission of approximately 10%. In Management's opinion, this margin is reasonable considering the risks assumed, assets used and functions performed by the sub-publishers

z The royalties are primarily paid to the UK and US and we understand that a bi-annual transfer pricing review is carried out by US advisers (E&Y) to support the US filing position

– Management charges

z Currently, central overheads are cross-charged on a cost basis. Of the total head office costs, we understand that only £35 million (approximately 50%) are recharged. Although a detailed study has not been undertaken, the management charge position has been subject to a high level review by the target's UK advisers (KPMG) who have indicated that the amount of recharges are actually on the low side (more costs could possibly be recharged from the UK and a mark up could be applied)

– Interest on intra-group loans and balances:

z Management has advised us that all interest charged on intra-group loans and balances are charged on an arm's length basis. We have not considered any information on the exact rates, but management has confirmed that the rates used are set based on market rates

z Overall, Management is of the opinion that the Group's transfer pricing policy is robust. Further, as mentioned above, the Group's tax advisers (E&Y) have been undertaking regular reviews of the transfer pricing policy in the US and have also regularly conducted a transfer pricing study in the Netherlands

z As noted in the individual country summaries, tax authorities in Germany and Italy are querying the transfer pricing policy of the group in respect of management expenses. Although Management believes that they should be successful in the challenge, we understand that full provisions have been made to cover any potential liabilities. In addition, at an overall group level, the tax provision made includes a buffer in respect of potential exposures that could arise as a result of transfer pricing adjustments (analysis of tax provision summarised on page 30)

A-824



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113237

# Contents

|                        | Page |
| ---------------------- | ---- |
| Trading performance    | 5    |
| Balance sheet          | 14   |
| Pensions               | 24   |
| Taxation               | 28   |
| Share based payments   | 43   |
| Operations cost savings| 46   |
| Appendices             | 64   |

A-825



This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113238

# Share based payments
## Overview



### Background

z   The Dice Group operates the following share based payments ('SBP'):

-   1995 Executive Share Option Scheme ('ESOS')

-   2004 Savings Related Share Option Scheme (revision of 1994 scheme) ('SRSOS')

-   Group Senior Executive Incentive Plan ('SEIP') replaced with 2003 Executive Share Incentive Plan ('ESIP')

z   We understand that an all employee Share Incentive Plan ('SIP') was approved at the 2004 AGM but at 31 March 2006 no awards had been made under this plan

z   Awards under the ESOS and ESIP may be subscription options or transfer options (performance shares) and are subject to the satisfaction of performance conditions and various exercise prices

z   The Dice Group has a worldwide presence with operations in over 50 countries. We have not received a breakdown of share incentive awards by country and have been unable to comment on tax and accounting issues arising in local jurisdictions in relation to SBP

z   Our work has been limited to a consideration of the scheme rules contained in the data room, the VDD report and the FY06 group accounts

z   Dice operates an Employee Benefits Trust ('EBT'). The EBT was established to hedge future obligations under the SEIP

### Change of control provisions

z   At a change of control, awards made under the SAYE may vest (in proportion to the savings period elapsed) and be exercised within six months of a change of control. Vested ESOS options may be exercised 12 months post a change of control and unvested may vest early (depending on the meeting of performance targets at the discretion of the committee) and be exercised 12 months after a change of control

z   Under the ESIP awards (subscription and transfer options) may vest early depending on the satisfaction of performance targets at committee discretion. Some awards may be satisfied in cash rather than equity

### Key issues identified

#### Underlying earnings

z   The FY06 group accounts include a charge for share incentives calculated in accordance with IFRS 2 of £4.9 million. We recommend that this amount is removed from the calculation of EBITDA. The purchaser may consider replacing this charge with a charge to reflect replacement plans. The future accounting charge will depend on the plans introduced post transaction

z   We understand that Dice has a loan outstanding to the EBT of £14.6 million in respect of shares purchased to satisfy awards under the SEIP. Arrangements for the repayment of this loan are not clear. We recommend further investigation into the status of the loan

#### Price

z   It is not clear how awards under the SAYE, ESIP and ESOS are to be satisfied. We assume that they will be satisfied by issue of new shares when the options are exercised or awards vest at a change of control. The table below summarises the number of shares under award which may need to be issued at a change of control. However a number of awards appear to be underwater which will significantly reduce the number to be delivered at a change of control

z   We recommend that accurate data is obtained in order to assess the awards which may vest at a change of control and the number which would be in the money to ascertain the number of shares that will actually need to be delivered on a change of control

| Share incentive awards outstanding as at 31 March 2006 | Number of awards outstanding |
|---|---|
| ESOS | 37,567,450 |
| SAYE | 3,349,558 |
| Transfer options | 21,092,474 |
| Total | 58,617,660 |
| Shares held by EBT to satisfy SEIP awards | 3,391,922 |

Note.    A number of these awards appear to be under water. Accurate date not available
Source:    2006 annual accounts



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113239

A-826

Share based payments
## Overview (continued)

Net debt

☑ An employer's social security (NIC) liability and PAYE will arise at a change
of control. There is no evidence that the liability has been transferred.
The employer's NIC liability will be dependent on local tax rules, the
number of awards vesting and the purchase price. We estimate, that the
liability would be £1.5 million at a purchase price of £2.45 and £2.0 million
at a price of £2.65. These amounts take account of potential underwater
awards which we assume would not vest/be exercised

Tax

☑ A corporation tax deduction estimated at £7.5 million may arise on a
change of control (estimated using data from FY06 accounts and share
price at 15 May 2007). However, as the purchaser will be unlisted,
arrangements should be made to ensure crystallisation of the deduction
prior to a change of control otherwise the deduction may be lost. The
amount of the deduction may be reduced by any previous deductions
taken in respect of contributions to the EBT

☑ We recommend that further investigation is undertaken to ascertain
whether claims in relation to EBT contributions have been made pre
January 2003 which would reduce the CT deduction available

Retention/replacement

☑ Cash and equity awards for key employees could deliver windfall
payments. We recommend consideration is given to associated retention
issues prior to deal close. Replacement plans should also be considered
particularly the value to all employees of the SAYE plan

A-827



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent
member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113240

# Contents

|                          | Page |
|--------------------------|------|
| Trading performance      | 5    |
| Balance sheet            | 14   |
| Pensions                 | 24   |
| Taxation                 | 28   |
| Share based payments     | 43   |
| Operations cost savings  | 46   |
| Appendices               | 64   |

A-828



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113241

TRANSACTION SERVICES

# Project Dice – Operations cost savings

7 September, 2007

ADVISORY

KPMG

AUDIT · TAX · ADVISORY

TF0000113242

Confidential

# Contents

The contacts at KPMG
in connection with this
report are:

**Martin Scott**
*Partner*
*Operations Practice*
*London*
*KPMG LLP [UK]*

Tel: +44 (0) 20 7311 1000
Fax: +44 (0) 20 7694 8474
martin.scott@kpmg.co.uk

**Mona Bitar**
*Director*
*Operations Practice*
*Transaction Services*
*London, KPMG LLP*

Tel: +44 (0) 797 027 1638
Mona.Bitar@kpmg.co.uk

**Simon Harden**
*Transaction Services*
*Operations Practice*
*KPMG London*

Tel: +44 (0) 771 753 8390
simon.harden@kpmg.co.uk

z  Executive summary

z  Methodology

z  Potential opportunity analysis

**A-830**

![KPMG logo]

This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113243

Executive summary
# Overview

| Dice background | Approach / key areas |
|---|---|

**Dice background**

produce recordings of their work, markets the finished recordings to consumers and media, and sells the releases into the retail trade in a variety of formats

z Dice Publishing, employing approximately 600 staff, acquires, protects, administers and exploits the rights in musical compositions, while at the same time servicing both songwriters and licensors of music

z The remaining 100 staff form part of the corporate group head office and are located in both the UK and US

z In January 2007 Dice announced a restructuring programme (RE4) with the plan to deliver £110 million of incremental annual cost savings by FY09

  – the RE4 restructuring programme is the fourth cost reduction initiative since 2003

**Approach / key areas**

business:

  – **procurement savings** : the creation of an optimised procurement function leveraging scale, sharing best practice and deploying common strategies. Reduction of spend on services and outsourced contracts through rationalising activity and better supplier/contractor management

  – **IT optimisation** : standardising/streamlining systems and infrastructure and outsourcing specific support activities

  – **finance function restructuring** : outsourcing transactional activities, implementing lean principles and removing non value add and business support activities

  – **small country consolidation** : consolidation of small country offices into larger regionally focused hubs

  – **North America restructuring** : consolidation of all front office personnel costs across labels and further consolidation of back office overheads. Additionally return the US Virgin/ Capitol label to profitability

  – **other FTE rationalisation** : optimisation of large office organisational structures and processes through application of lean principles, streamlining of processes and removal of non value add activities

A-831



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113244

Executive summary

# Hypotheses analysed

**Upside potential**

| | | |
|---|---|---|
| H1 | Procurement savings | Procurement savings can be achieved through the implementation of an optimised function that effectively leverages scale, shares best practices and deploys common strategies |
| H2 | IT optimisation | IT costs can be reduced through centralising IT support activities, standardising/streamlining IT infrastructure and outsourcing specific activities such as help desk and first line maintenance/support |
| H3 | Finance function restructuring | Savings in the existing finance function can be achieved through outsourcing transactional activities, implementing lean principles and the removal of non-value add activities |
| H4 | Small country operations | Office overhead costs can be reduced by consolidating small offices into larger regionally focused offices |
| H6 | Other FTE rationalisation | Savings can be achieved across the overhead structures in all large countries/offices through the implementation of lean principles and the removal of non value add activities |
| H7 | Further savings | Agreed additional savings included within management and TF plans |

Identified total savings

A-832

KPMG

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113245

Executive summary
# EBITDA improvement bridge

EBITDA improvement bridge





**Benefits methodology**

- For each hypothesis, benefits have been derived by applying identified savings opportunities to the assumed impactable cost base
  - base and stretch savings opportunities have been identified for each hypothesis
- Hypothesis have been applied in numerical order, i.e.:
  - H1: Procurement savings
  - H2: IT optimisation
  - H3: Finance function restructuring
  - H4: Small country operations
  - H5: North America restructuring
  - H6: Other FTE rationalisation
  - H7: Further savings
- In order to ensure that savings are not double counted each cost area or subset of cost area has been impacted by one hypothesis
  - hypotheses 4,5 and 6 impact different subsets of Music-Payroll costs

Source:    KPMG analysis



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

50

A-833

Confidential

TF0000113246

# Contents

z  Executive summary

z  Methodology

z  Potential opportunity analysis

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Methodology
## Operations diagnostic methodology and approach

*Preparation*



**Key inputs**



Annual reports
Publicly available information
VDD documentation
TF business plan



**Approach**

*STAGE 1*

Cost and organisational model

- Re-construction of the cost base

*STAGE 2*

Diagnostic of potential organisational improvement

- Outside-in evaluation of benefits potential

Company dataroom
Sector and comparable
company experience

KPMG comparable
case experience
Proprietary information
KPMG benchmark data

*Next steps*



Detailed improvement substantiation and full implementation cost analysis

Extended cost and
organisation breakdown
Baseline operational
performance

A-835



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113248

Methodology
## Assumed cost baseline



Group P&L
VDD



Corporate cost and FTE breakdown
VDD

Music P&L costs and FTE breakdown
VDD



Publishing P&L cost and FTE breakdown
VDD





| Dice cost structure | Current baseline | |
|---|---|---|
| | Cost base (£m) | #FTE |
| **Corporate Centre** | | |
| Payroll | 12.4 | 90 |
| Other Operating / Overhead costs | 0.9 | |
| subtotal | 13.3 | 90 |
| **Music** | | |
| Payroll | 282.8 | 4,513 |
| Royalty and copywright costs | 358.5 | |
| Manufacturing costs | 133.6 | |
| Distribution costs | 73.2 | |
| Orgination costs | 60.4 | |
| Marketing and Promotion costs | 267.9 | |
| Provisions | 70.8 | |
| Property | 44.1 | |
| IT (Infrastructure) | 19.2 | |
| Communications | 7.7 | |
| Other | 59.3 | |
| Function overheads | (41.8) | |
| subtotal | 1,335.7 | 4,513 |
| **Publishing (Music)** | | |
| Payroll | 48.7 | 628 |
| Royalty payments | 228.0 | |
| Occupancy | 6.7 | |
| Legal and professional | 3.1 | |
| Travel and entertainment | 2.8 | |
| Other publishing | 6.2 | |
| Advance Provisions | 6.5 | |
| Miscellaneous & One-off items | (5.8) | |
| subtotal | 298.2 | 628 |
| **Other** | | |
| Miscellaneous & One-off items | 0.8 | |
| Foreign exchange difference | (69.9) | |
| subtotal | (69.1) | |
| **TOTAL** | 1,578.1 | 5,231 |

A detailed cost breakdown has been drawn together using data from the VDD

z  The table shown disaggregates the total cost base in the Group P&L

- it has been created by combining divisional P&L and cost data from the VDD

z  Hypotheses savings have been applied to the detailed cost bases shown

z  Further breakdown of the FTE categories and associated costs has been achieved with additional information from the data room; this is included on the following page

Further breakdown of FTE costs and roles on the following page

A-836

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

53

Confidential

TF0000113249

Methodology
# Detailed FTE and payroll baseline









| Dice FTE and Payroll breakdown | Current baseline | |
|---|---|---|
| | Cost base (£m) | #FTE |
| **Corporate centre** | | |
| Management | 2.8 | 20 |
| Finance | 7.6 | 55 |
| Facilites management | 0.8 | 6 |
| Other | 1.2 | 9 |
| Total | 12.4 | 90 |
| **Music** | | |
| A&R | 16.2 | 259 |
| Facilities Management | 7.5 | 119 |
| Finance | 51.3 | 819 |
| IT | 20.7 | 331 |
| Business Affairs | 6.3 | 100 |
| Management | 13.1 | 208 |
| Manufacturing | 0.6 | 9 |
| Marketing | 79.5 | 1,268 |
| HR | 4.6 | 74 |
| Sales | 36.5 | 582 |
| Distribution | 27.3 | 436 |
| Others | 19.3 | 309 |
| Total | 282.8 | 4,613 |
| **Music publishing** | | |
| Professional and creative | 8.6 | 123 |
| Finance & Admin | 8.2 | 113 |
| IT | 2.1 | 31 |
| Legal & Business Affairs | 8.4 | 187 |
| Management | 14.8 | 52 |
| Marketing | 5.0 | 83 |
| Other | 1.6 | 39 |
| Total | 48.7 | 628 |
| **TOTAL** | 343.9 | 5,231 |

**Further information available in the Data room has enabled the creation of a detailed FTE base**

z  In order to create a detailed cost base different methodologies have been applied according to the granularity of the data available

  – corporate centre

    z  FTE numbers and total cost base provided in VDD; a fixed average cost per FTE has been assumed

  – music

    z  detailed FTE breakdown by office/label and role was included in the Data room. A fixed average cost per FTE has been assumed by using the total payroll cost in the VDD

  – music publishing

    z  detailed costs by function were available in the Data room totalling £46.9 million; this was scaled to consolidate with the P&L total of £48.7 million

    z  Legal & Business affairs includes copyright and royalty FTE

A-837

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

54

TF0000113250

# Contents

z   Executive summary

z   Methodology

z   Potential opportunity analysis

Hypothesis savings

-   Additional upside

-   Suggested further analysis

A-838


Confidential

TF0000113251

Potential opportunity analysis
## Summary of hypothesis savings

| Savings summary £ million | Current Baseline | | H1: Procurement | | H2:IT | | H3 Finance | | H4: Small countries | | H5:NA restructure | | H6:Other FTE | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost base | #FTE | base | stretch | Base | Stretch | Base | Stretch | Base | Stretch | Base | Stretch | Base | Stretch | Base | Stretch |
| **Central funded** | | | | | | | | | | | | | | | | |
| Corporate Centre | 12.4 | 90 | | | | | 0.8 | 1.5 | | | | | | | 0.8 | 1.6 |
| Music | 282.8 | 4,513 | | | 4.1 | 6.2 | 10.1 | 16.3 | 11.6 | 14.5 | 20.1 | 25.1 | 8.1 | 16.2 | 54.1 | 78.3 |
| Music publishing | 48.7 | 628 | | | 0.4 | 0.6 | 0.8 | 1.6 | | | | | 1.9 | 3.8 | 3.2 | 6.1 |
| subtotal | 343.9 | 5,231 | | | 4.8 | 6.8 | 11.7 | 19.4 | 11.6 | 14.5 | 20.1 | 25.1 | 10.0 | 20.0 | 58.0 | 85.9 |
| **Other entities** | | | | | | | | | | | | | | | | |
| Corporate Centre | 0.9 | | | | | | | | | | | | | | | |
| Music | 1,052.9 | | 52.7 | 95.2 | 2.9 | 5.8 | | | 2.3 | 2.9 | 4.0 | 5.0 | | | 61.9 | 108.8 |
| Music publishing | 249.5 | | 0.6 | 1.7 | | | | | | | | | | | 0.6 | 1.7 |
| Other | (69.1) | | | | | | | | | | | | | | | |
| subtotal | 1,234.2 | | 53.3 | 96.8 | 2.9 | 5.8 | | | 2.3 | 2.9 | 4.0 | 5.0 | | | 62.4 | 110.4 |
| **Total KPMG savings** | | | 53.3 | 96.8 | 7.4 | 12.6 | 11.7 | 19.4 | 13.9 | 17.4 | 24.1 | 30.1 | 10.0 | 20.0 | 120.4 | 196.3 |
| EMI further savings | | | | | | | | | | | | | | | 49.1 | 49.1 |
| Total financial HT | | | | | | | | | | | | | | | 169.5 | 245.4 |

A-839

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

56

Confidential

TF0000113252

Potential opportunity analysis
# H1: Procurement savings

**Hypothesis**

■ Does a existing purchasing function is underdeveloped and there are significant opportunities to reduce total procurement spend through:
- leveraging advantages offered through economies of scale
- implementing tight internal and external cost controls across the business
- sharing best practice and developing a culture of continuous improvement
- improving supplier management and contract negotiation, principally on outsourced activities
- reducing the overall level of activity and ensuring all spend is in-line with business needs

### Key assumptions

### Evidence

### Savings analysis

| Firm | Cost Base | Buyer / Stretch | |
|---|---|---|---|
| Music | | | |
| Manufacturing costs | 133.6 | | 10.0 |
| Distribution costs | 73.2 | | 7.3 |
| Origination, Marketing and Promotion - Material | 131.3 | | 39.4 |
| Origination, Marketing and Promotion - Outsourced | 197.0 | | 29.5 |
| Other | 59.3 | | 8.9 |
| subtotal: Music | 594.4 | | 95.2 |
| Publishing | | | |
| Travel and entertainment | 2.8 | | 0.4 |
| Other publishing | 8.2 | | 1.2 |
| subtotal: Publishing | 11.0 | | 1.7 |
| **Total** | **605.4** | | **96.8** |

*Sources:    KPMG analysis*



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

57

TF0000113253

Confidential

Potential opportunity analysis
# H2: IT optimisation

| | |
|---|---|
| **Hypothesis** | x  The current IT organisational structure is not optimised, and there is potential benefit through:<br>  –  removing duplicated activities and centralising support functions<br>  –  outsourcing and offshoring of processes, for example 1st line maintenance and support<br>  –  implementing a standardised/streamlined IT infrastructure with more centralised systems<br>  –  the benefit will be both headcount and infrastructure spend |

## Key assumptions

- IT support is currently performed by in house IT personnel with significant presence at a local office level
- The majority of local IT functions have bespoke IT packages with limited standardisation across the geographies
- A level of centralisation of systems will be possible
- Opportunities exist to manage demand within the business to ensure that support and infrastructure is fit for purpose and to remove 'gold-plating' and unnecessary investments

## Savings approach

- IT savings are believed to exist in both IT personnel as well as current IT infrastructure costs
  - The application of median performance benchmarks of 1:25 for IT personnel to total base FTE, results in savings of approximately 42% in IT personnel
  - however, in order that savings identified are prudent, a range of 20-30% in IT FTEs will be assumed
- For businesses such as these savings opportunities in IT personnel are typically created through:
  - streamlining front end processes, for example, the use of online help desk functions
  - outsourcing elements of IT helpdesk such as 1st line maintenance and support
  - the removal of non value adding systems requiring support
  - reduction in the overall maintenance spend through simplified systems
- IT infrastructure cost:
  - KPMG experience suggests that savings of between 15-30% are achievable in IT infrastructure costs through rationalising software used across the business combined with shifting from operating multiple bespoke IT systems to standardised off the self packages

## Evidence

- The detailed breakdown of the IT function across the Music division identifies local IT personnel within the majority of country and label offices
- Available information suggests that historically there has been limited focus in this region of saving opportunities within the IT function
  - the MOD report shows that whilst IT capital expenditure has seen a slight decrease since FY06, operating expenditure has remained stable
- Management's IRBR restructuring programme identifies a savings opportunity, labelled as Global Technology restructuring, which is understood to consist of an element of IT support
  - however, the extent to which this is impacting local IT support in each office is unclear
- KPMG's experience of similar businesses suggests that it is typical to develop and implement expensive bespoke IT systems
- Median performance industry benchmarks suggest that a ratio of IT FTEs to total FTEs of 1:25 should be achievable in this type of business
  - currently, Clive appears to operate a ratio of 1 IT FTE:14 FTEs, below industry benchmarks

### H2: IT optimisation

| £m | Cost Base | Base | Stretch |
|---|---|---|---|
| Music IT - Payroll | 20.7 | 4.1 | 6.2 |
| Music IT - Infrastructure | 19.2 | 2.9 | 5.8 |
| Publishing IT - Payroll | 2.1 | 0.4 | 0.6 |
| Total | 42.0 | 7.4 | 12.6 |

Source:    KPMG analysis


This document is CONFIDENTIAL and its circulation and use are RESTRICTED © 2007 KPMG LLP a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

58

A-841

Confidential

TF0000113254

Case: 11-126    Document: 47    Page: 343    04/25/2011    272862    401

Potential opportunity analysis
# H3: Finance function restructuring

H3: Finance restructuring

| **Hypothesis** | ≈ There is an opportunity to optimise the finance structure and achieve cost savings through: |
| --- | --- |
| | – the optimisation of internal structures and processes |
| | – removal of non value add and business support activities |
| | – centralisation and outsourcing of certain finance functions |

## Key assumptions

- All finance functions are currently being carried out by in-house finance personnel
- The majority of Finance support is performed at a local office level with limited shared services
- There has been limited consolidation of the finance function in the back of continued acquisitive growth
- It is typical of this industry to maintain finance and support structures following acquisitions

## Savings approach

Music division
- It is assumed that copyright and royalty activities are business critical and therefore FTE classified as performing these roles will be considered as non-impactable at this stage although further savings may be achievable
  - literature understood to be approximately 168 FTEs performing these roles within Music
- The remaining FTEs within the Music finance function have been classified as either performing transactional, non-transactional or business support activities. KPMG's experience suggests that:
  - transactional FTE savings of between 15-30% are typically achievable through outsourcing/offshoring of these finance activities
  - non-transactional FTE savings of between 20-30% are achievable through the application of lean principles, the removal of NVA activities such as legacy reporting as well as the appropriate centralisation in regionally housed shared centres and further automation
  - business support FTE savings of between 40-60% are achievable through the appropriate deployment of responsibility to line managers, the removal of NVA activities and the streamlining of the finance processes
    - our experience suggests that it is typical for business support functions to grow and the application of a cascaded performance management system will drive accountability out of the finance function and have added benefit of further control within the business

Music Publishing and Corporate Centre
- Since the structure of the finance functions within the Music Publishing and Corporate Centre are currently not understood, although many of the opportunities observed in the Music division are likely to exist, a flat saving of between 10-20% has been assumed

## Evidence

- Detailed FTE structures of finance within the Music division indicate significant levels of representation at each of the individual geographies (i.e. layers) suggesting that finance is performed at a local level
- The 2007 annual report illustrates that shared services is a viable option. Certain geographies in continental Europe such as France and Spain, have already commenced streamlining their finance processing
- There is indication that limited investment in systems has been made and there is room to replace/enhance systems and increase the level of automation
- Median performance, industry benchmarks indicate, for a wide variety of sectors including FMCG, luxury brands and the service industry, that a ratio of finance FTEs to total revenue of 1 FTE to £10 million revenue is achievable considering the complexity within the music business, and with limited understanding of detailed country activity we have only applied this benchmark as a triangulation point
  - Currently, Dice operates at a ratio of 1 Finance FTE: £1.8 million revenue, well below industry benchmark

| £m | Cost Base | Base | Stretch |
| --- | --- | --- | --- |
| **Music - Payroll** | | | |
| Transactional FTE | 14.4 | 2.2 | 4.3 |
| Non-transactional FTE | 12.9 | 2.6 | 3.9 |
| Business support | 13.5 | 5.4 | 8.1 |
| subtotal: Music | 51.3 | 10.1 | 16.3 |
| **Corporate Centre - Payroll** | | | |
| Finance | 7.6 | 0.8 | 1.5 |
| **Publishing - Payroll** | | | |
| Finance & Admin | 8.2 | 0.8 | 1.6 |
| Total | 67.1 | 11.7 | 19.4 |

Source:    KPMG analysis



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

A-842

59

Confidential

TF0000113255



## Potential opportunity analysis
## H4: Small country operations

**Hypothesis**

- There is an opportunity to optimise the organisational structure in the smaller offices, whilst maintaining local presence, and achieve savings by:
  - consolidating the smaller Dice offices and labels into larger regional offices
  - optimising the organisational structure of the larger regional offices created
  - increasing the level of shared services

### Key assumptions

- Existing service performance can be maintained in small countries through the provision of overhead support from regionally focused hubs
  - It is assumed that limited representation of A&R, sales and marketing is maintained in each current geography

### Evidence

- Review of the detailed FTE breakdown shows that there are a significant number of countries that would be expected to have low local music content, but have fully developed overhead structures
- Available information suggests that whilst there has been some effort historically to restructure record labels and close those that are loss making, there is no evidence that savings identified have been sustained or that small offices have been rationalised
  - key initiative of the RE1 (2003) programme included the restructuring of the Music and Publishing divisions and the closure of loss making record labels
  - key element of the RE2 (2004) programme included the restructuring of record labels in Continental Europe
  - key initiative of the RE3 (2006) programme included the reorganisation of the continental Europe business
  - "redeveloped its organisation and business approach" (2007 annual report)
- KPMG's experience of similar businesses suggests that there is typically limited focus on the consolidation of overhead structures following acquisition of smaller office structures

### Savings approach

- Music division
  - Savings are based on the assumption that a number of smaller countries can be consolidated into regionally focused hubs
    - a high-level review of what these opportunities exist forms the basis of the savings calculation; key criteria considered included the number of FTEs, geographic location and the likely local music content
    - for example, there appears to be the opportunity to consolidate the various Northern European offices such as Denmark, Sweden, Finland and Norway to form a single Scandinavian office hub
    - consolidation of labels in North America have not been assumed within this hypothesis
  - Savings are assumed to be driven primarily from synergies in overhead functions as well as reductions in office related non-personnel overhead costs
    - as well as savings arising from the enhanced control/de-dependency of a particular overhead function on the physical number of offices staffed – strength of correlation assumption
    - for example there is a strong correlation between the number of facilities management FTEs to the number offices maintained
    - this was then used to identify potential savings

| £m | Cost Base | Base | Stretch |
|---|---|---|---|
| **Music - Payroll** | | | |
| A&R | 16.2 | 0.5 | 0.7 |
| Facilities Management | 7.5 | 0.7 | 0.9 |
| Finance | 51.3 | | |
| IT | 20.7 | | |
| Business Affairs | 6.3 | 0.3 | 0.4 |
| Management | 13.1 | 2.3 | 2.9 |
| Manufacturing | 0.6 | 5.5 | 6.9 |
| Marketing | 79.5 | | |
| HR | 4.6 | | 0.2 |
| Sales | 36.5 | 1.3 | 1.6 |
| Distribution | 27.3 | 0.3 | 0.3 |
| Others | 19.3 | 0.6 | 0.7 |
| **subtotal - Payroll** | 282.8 | 11.6 | 14.5 |
| **Music - Other costs** | | | |
| Property | 44.1 | 1.8 | 2.3 |
| Other | 59.3 | 0.5 | 0.6 |
| **Total** | 386.2 | 13.9 | 17.4 |

Source:    KPMG analysis

A-843

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113256

Potential opportunity analysis
# H5: North America restructuring

H1: Digital/on-line opportunities
H2: Product/release optimisation
H3: Reduction of returns
H4: Rest of country operations
**H5: NA restructuring**
H6: Shared IT infrastructure
H7: IT operating model review

| **Hypothesis** | x   There is an opportunity to optimise the organisational structure in the US labels and offices and achieve savings through: |
| --- | --- |
| | –   consolidating existing label front office personnel and further consolidating the back office support functions |
| | –   optimisation of the organisational structure of the larger national offices created |

### Key assumptions

- Existing operational performance can be maintained in the US whilst consolidating of multiple offices and label overheads into target profiles
  - it is assumed that the number label brands will not be reduced and that limited representation for each in the areas of A&R, sales and marketing will be maintained
- There has been limited historical focus on consolidating smaller office offices and labour into larger national offices

### Evidence

- Detailed FTE data indicates there are currently approximately 18 different labels and offices across the North American region, each with their own organisation structures and contained an element of overhead support
- There is clear evidence that a significant level of restructuring of the North American organisation has been undertaken recently, with the impact in reducing the number of labels, suggesting that further consolidation is a viable and cost effective opportunity
  - the 2007 annual report states that Sice has recently merged their two main pop labels in the region, Capitol and Virgin to form Capitol Music Group. The restructuring programme also involved additional overhead reduction across the region
- Savings opportunities driven through the consolidation of label overhead structures have been pursued and achieved within the UK
  - "We have pulled back in areas and changed some functions of our four UK labels while maintaining the four imprints ... we anticipate that we will take significant cost out from the business" (2007 annual report)

### Savings approach

- **North American Music division**
  - Saving calculations detailed below are similar in methodology to that for smaller countries detailed in hypothesis H4
  - Savings are based on the assumption that existing offices and labels front and back office personnel can be consolidated into a fewer number of larger offices
  - Savings are assumed to be driven primarily from synergies in overhead functions too well as reductions in office front and non personnel overhead costs
    - as well as savings arising from the enhanced opportunity to streamline processes, remove NVA activity and increased shared services
  - On a cost by cost basis an assumption has been made of the dependency of a particular overhead function on the physical number of offices staffed by labels individually supported strength of correlation assumption
    - for example there is a strong correlation between the number of facilities management FTEs to the number offices maintained
    - this will then used to identify potential savings

| **H5 North America restructuring** | | | |
| --- | --- | --- | --- |
| £m | Cost Base | Base | Stretch |
| **Music - Payroll** | | | |
| A&R | 16.2 | | |
| Facilities Management | 7.5 | | |
| Finance | 51.3 | | |
| IT | 20.7 | | |
| Business Affairs | 6.3 | | 0.8 |
| Management | 13.1 | | |
| Manufacturing | 0.6 | | |
| Marketing | 79.5 | | 8.4 |
| HR | 4.6 | | 0.5 |
| Sales | 36.5 | | |
| Distribution | 27.3 | | |
| Others | 19.3 | | |
| subtotal: Payroll | 262.8 | | |
| **Music - Other costs** | | | |
| Property | 44.1 | | |
| Other | 59.3 | | |
| **Total** | 386.2 | | 30.1 |

Source:    KPMG analysis



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

A-844

TF0000113257

Potential opportunity analysis
# H6: Other FTE rationalisation

**Hypothesis**
z  There is an opportunity to optimise the organisational structures of the large offices and achieve savings through:
- streamlining internal processes
- removing all NVA activity
- sharing best practice and applying lean principles

### Key assumption
- Whilst the restructuring programmes have identified some savings potential through restructuring initiatives, these savings have not been sustained
- There is further opportunity to increase use of shared service centres for overhead functions

### Evidence
- The VDD document states that whilst management's national restructuring programmes have identified significant levels of overhead savings these have not been sustained
  - 'historically previous REI and RE2 have failed to deliver sustainable overhead reductions, with underlying benefits outweighed by other increases in overheads' (Mulberry VDD)
  - Management have identified approximately £60 million of headcount savings as part of the recently initiated RE4 it is not currently clear what is driving these savings
    - however, this suggests that further opportunity exists across the business
- It is our understanding that there has been no focus on the optimisation of UK organisational structures during previous restructuring programmes RE3 and RE4

### Savings approach
- Savings opportunities have been calculated based only on those costs/entities/offices not impacted in previous hypothesis, in order that benefits are not double counted
  - in addition no further savings have been taken from the IT or finance functions in any country for similar reasons
- A flat saving of 5-10% has been applied to all FTE across all functions in countries/offices that have been deemed impactable
  - KPMG's experience suggests that these savings will be driven from the application of lean principles, streamlining of process, removal of non value add and legacy activities and the sharing of best practice across the group as well as enhanced shared services
- Savings have been increased to 15-30% for the UK business since it is understood that this country has not been subjected to the RE1-RE4 restructuring programmes
  Publishing division:
- A flat saving of 5-10% has been applied to all publishing functions with the exception of IT and finance impacted in previous hypothesis
  - KPMG's experience suggests that these savings will be driven from the application of lean principles, streamlining of process, removal of non value add and legacy activities and the sharing of best practice across the group as well as enhanced shared services

### H6 Other FTE rationalisation

| £m | Cost Base | Base | Stretch |
|---|---|---|---|
| **Music - Payroll** | | | |
| A&R | 16.2 | 0.9 | 1.9 |
| Facilities Management | 7.5 | 0.4 | 0.8 |
| Finance | 51.3 | | |
| IT | 20.7 | | |
| Business Affairs | 6.3 | 0.2 | 0.4 |
| Management | 13.1 | 0.4 | 0.8 |
| Manufacturing | 0.6 | | 0.1 |
| Marketing | 79.5 | 2.9 | 5.8 |
| HR | 4.6 | 0.2 | 0.5 |
| Sales | 36.5 | 1.2 | 2.4 |
| Distribution | 27.3 | 1.1 | 2.2 |
| Others | 19.3 | 0.7 | 1.5 |
| subtotal: Music | 282.8 | 8.1 | 16.2 |
| **Publishing - Payroll** | | | |
| Professional and creative | 8.6 | 0.4 | 0.9 |
| Finance & Administration | 8.2 | | |
| IT | 2.1 | | |
| Legal and business affairs | 8.4 | 0.4 | 0.8 |
| Management | 14.8 | 0.7 | 1.5 |
| Marketing | 5.0 | 0.2 | 0.5 |
| Other | 1.6 | 0.1 | 0.2 |
| subtotal: Publishing | 48.7 | 1.9 | 3.8 |
| **Total** | 331.5 | 10.0 | 20.0 |

*Source:    KPMG analysis*

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved



A-845

Confidential

TF0000113258

Potential opportunity analysis

## H7: Management/TF non headcount savings accounted for in the VDD

| Area | Description | KPMG view | Base | Stretch |
|------|-------------|-----------|------|---------|
| Property | z Cost savings from a combination of sale of properties, reduction in annual rent charges and other property costs<br>z Includes exit of London Charing Cross property, property portfolio consolidation in North America, sale of property in Mexico and exit of leasehold in Brazil and Chile, and minor property lease savings in Korea and Thailand<br>z Savings primarily from Music business | z In line with the restructuring and the reduction of headcount, there is no reason to believe that these reductions cannot be achieved<br>z In our view, there will be further potential saving that we have not quantified through a full review of the property portfolio once implementation of the headcount reductions and office rationalisation is complete | 6.6 | 6.6 |
| Other Consulting, Travel and entertainment | z Reduction in consulting costs from corporate centre<br>z Cost savings from reducing Travel & Entertainment allowances in proportion to reduction in FTE headcount<br>z Savings primarily from Music business | z There is some potential overlap with the overall spend savings applied in the previous hypothesis, however we maintain that these savings are achievable and account for a small proportion of the total spend | 8.0 | 8.0 |
| Pensions | z Management have identified a cost saving through a re-design of the UK pension scheme<br>z Following a 60 day employee consultation period in June/July the revised scheme would be in place from September 2007 | z Whilst we have had no real insight into the analysis, we have accepted these savings based on our experience of other businesses | 5.5 | 5.5 |
| Industry memberships | z Termination of non-essential corporate memberships to industry bodies by approximately 1/3 of total membership cost base | z A rationalisation of membership in line with focus on absolute spend and increased cost control seems achievable and in line with similar initiatives in comparable businesses | 5.0 | 5.0 |
| US Virgin Capitol | z The label currently runs at a loss (negative 12% gross profit). If the label does not return to profitability the office will be closed and an overhead saving of £25 million can be cashed | z This saving will be dependant on the new management team delivering a return to profitability, but a decision to cease the operation will result in the necessary overhead reduction should this margin improvement initiative stall.<br>z It should be noted that there is potential for overlap with some of the savings identified in hypothesis H5 | 25.0 | 25.0 |
| Total savings | | | 49.1 | 49.1 |

A-846



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

63

Confidential

TF0000113259

# Contents

**Appendices** 64

1. Engagement letter

2. Underlying earnings per VDD report

3. Exceptional items

4. Group cost analysis

5. Monthly working capital

6. Monthly advances (net)

7. Net debt per VDD report

8. Net debt by territory

9. Pensions background information

A-847



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113260

Appendix 1
# Engagement letter

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

65

TF0000113261

Confidential



KPMG LLP
**Transaction Services**
1 Puddle Dock
London EC4V 3PD
United Kingdom

Tel +44 (0) 20 7311 1000
Fax +44 (0) 20 7311 2080
DX 38050 Blackfriars

**Private & confidential**
The Directors
Terra Firma Investments (GP) 2 Limited (for
and on behalf of the six limited partners
constituting the Terra Firma Capital Partners II
Fund)

Our ref  ps/650

Contact  Paul Snape
Tel 020 7311 3014

The Directors
Terra Firma Investments (GP) 3 Limited (for
and on behalf of the Terra Firma Capital
Partners III Fund)

Trafalgar Court
Admiral Park
St Peter Port
Guernsey
GY1 GHJ      (together "Terra Firms")

The Directors
Maltby Limited
1 South Place
London
EC2M 2WG    ("Newco")

15 May 2007

Dear Sirs

**Project Dice – engagement letter**

1.  We are writing to confirm the terms of the engagement of KPMG LLP to carry out work in
    connection with the potential acquisition of Dice Group plc ('Dice') by Maltby Limited,
    financed by third party funding ('Project Dice').

2.  The obligations of Terra Firma Investments (GP) 2 Limited ("TFI(GP)2") and Terra Firma
    Investments (GP) 3 Limited ("TFI(GP)3") shall be several only.  The liability of each of
    TFI(GP)2 and TFI(GP)3" under the Agreement shall be proportionate to the respective
    equity commitments in the ultimate parent company of Newco.

*Arrangements for circulation of our report*

3.  We are aware that you may wish to circulate our report to prospective lending banks.
    Where we consider it appropriate we will consent to distribution of our report to such
    parties, prior to the date of completion of initial or primary syndication, and, should they
    become actual lenders in connection with Project Dice ("Lending Banks"), accept

KPMG LLP, a UK limited liability partnership, is a member of
KPMG International, a Swiss cooperative

Registered in England No OC301540
Registered office: 8 Salisbury Square, London EC4Y 8BB

A-850

**KPMG**

KPMG LLP
*Project Dice – engagement letter*
*15 May 2007*

responsibility and liability to them in connection with our work under this letter subject to receipt by us from the relevant prospective Lending Bank of a countersigned copy of the letter in the form set out in Appendix 5.

*Scope of the work*

4. We have discussed and agreed with you the scope of our work which is set out in full in Appendix 1. Attention is drawn to the limitations in the scope of our work set out therein. Any requests for changes in the scope of our work as the engagement progresses are to be made and agreed solely between Terra Firma Investments (GP) 2 Limited, Terra Firma Investments (GP) 3 Limited and us and will be recorded in writing and will be subject to the terms set out in this letter.

5. Any work performed in connection with the engagement before the date of this letter will also be governed by the terms and conditions of this letter.

6. The procedures we will use to perform the work set out in this engagement letter will not constitute an audit or review made in accordance with any generally accepted auditing standards.

7. We must emphasise that the realisation of the forecasts/projections prepared by Dice management is dependent on the continuing validity of the assumptions on which they are based. The assumptions will need to be reviewed and revised to reflect any changes in trading patterns, cost structures or the direction of the business as they emerge. We accept no responsibility for the realisation of the projections.

8. Since the forecasts/projections relate to the future, actual results are likely to be different from the projected results because events and circumstances frequently do not occur as expected, and the differences may be material.

9. In respect of "underlying" earnings, our work will be restricted to assisting you in the identification and documentation of items which may be "non-recurring" or "exceptional" or otherwise unrepresentative of the trend in earnings using criteria established by you. Because there is no authoritative literature or common standard with respect to the calculation of "underlying" earnings there is no basis to state whether all appropriate and comparable adjustments have been made. In addition, while the adjustments may indeed relate to items which are "non-recurring" or "exceptional" or otherwise unrepresentative of the trend, it is possible that earnings for future periods may be affected by such items, which may be different from the historical items.

*Reporting*

10. Following completion of our work we shall report formally in writing to the directors of Terra Firma Investments (GP) 2 Limited, Terra Firma Investments (GP) 3 Limited and Maltby Limited. During the course of the engagement we shall also give regular

Confidential

KPMG LLP
*Project Dice – engagement letter*
*15 May 2007*

presentations of our interim findings to the directors of Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited. We may also be prepared to allow parties who have entered into an agreement with us as outlined in paragraph 2 above to participate in such presentations in accordance with such agreement.

11. Our report will present the findings of our work for the purpose of assisting you with your enquiries in connection with the proposed transaction. You should note that our findings shall not constitute recommendations to you as to whether or not you should proceed with the proposed transaction.

12. We will indicate within our report the sources of the information presented and will satisfy ourselves, so far as possible, that the information presented is consistent with other information which is made available to us in the course of our work in accordance with the terms of this engagement letter. We will not, however, seek to establish the reliability of the sources by reference to other evidence, except as may be specifically agreed in writing between us.

13. We will not be under any obligation to (and will not) perform any work, take account of or comment on any intervening events (including any audit report which might be issued) occurring after the issue of our report in final form to Terra Firma Investments (GP) 2 Limited, Terra Firma Investments (GP) 3 Limited and Maltby Limited. It will be for prospective Lending Banks to determine to what extent our report meets their interests and needs, having regard, inter alia, to the passage of time between the date on which our report is issued and the subsequent date on which it is delivered to them, and the fact that our report will not have been updated for any events that may have occurred during that time.

*Timetable*

14. A provisional timetable for the delivery of our services, together with the assumptions on which it is based, is as follows:

| | | |
|---|---|---|
| Commence work | - | 11 May 2007 |
| Report on initial findings | - | 15 May 2007 |
| Issue draft report | - | 16 May 2007 |
| Issue final report | - | 18 May 2007 |

We shall use all reasonable endeavours to meet this timetable.

15. Our work will be dependent upon receiving without undue delay full co-operation from all relevant officials of Dice and their timely disclosure to us of all information as we may need for the purposes of our work.

ps/650

3

Confidential

A-852



*KPMG LLP*
*Project Dice – engagement letter*
*15 May 2007*

*KPMG resources*

16. Senior members of the engagement team are set out below:

| | |
|---|---|
| Overall engagement partner | Sandip Shah |
| Financial due diligence associate director | Paul Snape |
| Tax due diligence and structuring partner | Anneli Collins |
| Pensions partner | Jeff Hunt |

You should be aware that KPMG International member firms deliver tax services to Dice group companies in the UK and the US, specifically:

- KPMG LLP, the UK member firm of KPMG International, delivers tax advisory services to Dice group companies in the UK

- KPMG LLP, the US member firm of KPMG International, delivers tax advisory services to Dice group companies in the US

We shall put in place information barriers in accordance with paragraph 19 of our General Terms of Business designed to prevent the flow of confidential information in respect of the Proposed Transaction outside the engagement team assigned to deliver services to you under this engagement letter ("your engagement team"). Your engagement team will not include any members of the Dice tax advisory teams in the UK or the US. Information barriers designed to prevent the flow of confidential information regarding Dice from Dice's tax advisory teams to your engagement team may prevent the disclosure by Dice's tax advisory teams of information regarding Dice or may result in any such disclosure being conditional. If Dice authorises its tax advisors to make information available to you and your engagement team or your other advisers, it would be standard practice for the tax advisors in these circumstances to require a release letter to be signed by parties requiring access to the information.

*Our charges*

17. Our normal hourly rates in operation when the work is performed will apply to this engagement. We will write to you separately regarding our estimated charges for this engagement.

18. We will also: (a) invoice for expenses properly incurred in providing the Services (specific expenses, for example travel, subsistence, accommodation and couriers, being reimbursed at cost; general expenses, for example copying, telephone, fax and project stationery being

ps/650

4

Confidential

TF0000113265



reimbursed at the rate of 3.5% of our time costs incurred); and (b) include all applicable VAT in connection with our invoices.

19. We will provide you with weekly summaries of our costs to date.

20. In the event that we incur additional costs due to any change in the scope of our work, delays in the provision of information or delays in the timetable, we will notify you of this immediately and discuss with you the implication for our fee.

21. In the event that you do not proceed with the transaction, our fees will be for the account of Terra Firma. In the event that you do proceed, our fees will be for the account of Newco.

*General Terms of Business*

22. We accept this engagement on the basis that our General Terms of Business, as set out in Appendix 2, will apply to this work and govern our relationship with you, together with the Additional Terms referable to Transaction Services in Appendix 3, together with the Additional Terms referable to Tax Advisory Services in Appendix 4. This letter is the 'Engagement Letter' mentioned in our General Terms of Business. Please read these Terms carefully. KPMG LLP, Terra Firma and Newco each agree that at the time that the acquisition of Dice is completed Terra Firma shall be unconditionally released from all of its obligations under this engagement letter (and its attachments) and from this time Newco shall be liable for these obligations in place of Terra Firma. We draw your attention in particular to the following clauses:

Clause 5: We set out here the status of oral, draft or interim advice or reports which we may supply to you.

Clauses 18 to 24: These set out our position where your interests may conflict with our other clients' interests and clarify our responsibilities in relation to Confidential Information (as defined in clause 4) in the circumstances identified.

Clauses 31 to 35: We set out here the principal exclusions and limitations on our liability to you. Our liability in connection with our work under this engagement letter for losses to all parties to whom we accept responsibility for such work shall be limited, on the basis set out in our General Terms, to a maximum aggregate amount of £25 million.

Clause 35.2: If you wish to bring a claim against us, you must do so within six years. All references to "four years" in clause 35.2 will be replaced with "six years".

Confidential

KPMG

KPMG LLP
Project Dice – engagement letter
15 May 2007

*Special Terms of Business*

23. If our work on this engagement involves supplying advice to you on tax planning which might result in a reduction or deferral of any US tax by a US or non-US person or entity (whether or not associated with you):

- Notwithstanding Clause 7 of the General Terms of Business clause 3 of the Additional Terms: Tax Advisory Services, no provision in this Engagement Contract is or is intended to be construed as a condition of confidentiality within the meaning to the US Internal Revenue Code or similar provisions under the laws of a US state. Accordingly, Terra Firma Investments (GP) 2 Limited, Terra Firma Investments (GP) 3 Limited and Maltby Limited (together 'the Addressees') (and each employee, representative, or other agent of the Addressees) is expressly authorised to disclose the structure and tax aspects of the transaction or matter in respect of which we have advised with any and all persons, without limitation of any kind on such disclosure. We will accept no responsibility or liability to any person to whom you make such disclosure (and we may make this clear in any report or other product released to you) unless we have expressly agreed to such responsibility or liability in writing, signed by us and that person, clearly setting out the terms of that responsibility or liability. Clause 36 of the General Terms of Business shall not apply and shall be replaced with:

  "36. You shall indemnify any KPMG Persons and hold us and them harmless against any loss, damage, expense or liability incurred by us or them as a result of, arising from or in connection with the following circumstances:

  36.1 any breach by you of your obligations under the Services Contract and any claim made or threatened by a third party or any Other Beneficiaries which results from or arises from or is connected with any such breach, or

  36.2 except with respect to any disclosure permitted pursuant to the amendment to Clause 7 of the General Terms of Business and Clause 3 of the Additional Terms: Tax Advisory Services above, any disclosure, in whole or in part, by you of the product of the Services to a third party, unless we have agreed with such a third party to accept responsibility and liability to that third party in respect of the Services and the product disclosed to them by you."

24. Please be advised that US federal and certain state tax regulations require taxpayers to disclose to the Internal Revenue Service (IRS) and applicable state tax authorities, respectively, their participation in reportable transactions. You agree to advise us if you determine any matter covered by this engagement is required to be disclosed to the IRS or state authorities as a reportable transaction. The regulations also provide that KPMG must disclose information on the transactions to the IRS and applicable state authority by a prescribed date, and retain lists of persons and other information with respect to the transactions if it is a material adviser with respect to the transactions. KPMG will use its

Confidential

A-855

**KPMG LLP**
*Project Dice – engagement letter*
*15 May 2007*

best efforts to promptly advise the Addressees if KPMG provides the Addressees' information to the IRS or state tax authority.

25. In compliance with US standards of tax practice prescribed by the US Treasury that apply to all US tax advisers, we do not anticipate that the written tax advice provided under this engagement letter will rise to the level of a Covered Opinion as defined in §10.35 of Circular 230 ("Covered Opinion"). Therefore, all the written tax advice provided under this engagement letter will contain the following legend:

> "Any US tax advice in this engagement is not intended or written by KPMG to be used, and cannot be used, by a client or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any taxpayer, or (ii) promoting, marketing or recommending to another party any matters addressed herein."

*Other arrangements*

26. We would normally ask the management of Dice to confirm in writing the factual accuracy of the contents of our draft report. In the circumstances of this assignment we will be unable to seek confirmation of factual accuracy of our report or representations regarding the accuracy of financial information provided in the data room.

27. If the proposed transaction proceeds to completion, we will discuss with you the basis on which our role will be included in any publicity you issue in connection with the transaction.

*Debriefing*

28. On completion of the engagement, as part of our commitment to the quality of our service, we would welcome the opportunity to receive your views on the work carried out by ourselves and the service delivered.

*Agreement*

Please confirm your agreement to and acceptance of the terms of this letter and the attachments by signing and returning to us the enclosed copy. If there are any aspects that you wish to discuss, please let us know

Yours faithfully

*KPMG LLP*

KPMG LLP

ps/650

7

TF0000113268

20/05 2007 15:58 FAX                                                    ☑001/001



KPMG LLP
Project Dica – engagement letter
13 May 2007

I have read and understood the terms and conditions of this letter and attachments and I agree to and accept them for and on behalf of Terra Firma Investments (GP) 2 Limited by whom I am duly authorised, for itself and as agent duly authorised for and on behalf of the six limited partners constituting the Terra Firma Capital Partners II Fund:

Signature    _Iarsn_

Name    _Iain Stokes_

Position    _Director_

Date    _21 May 2007_

I have read and understood the terms and conditions of this letter and attachments and I agree to and accept them for and on behalf of Terra Firma Investments (GP) 3 Limited by whom I am duly authorised, for itself and as agent duly authorised for and on behalf of the Terra Firma Capital Partners III Fund:

Signature    _Iarsn_

Name    _Iain Stokes_

Position    _Director_

Date    _21 May 2007_

I have read and understood the terms and conditions of this letter and attachments, and I agree to and accept them for and on behalf of Maltby Limited by whom I am duly authorised:

Signature    _Johnny_

Name    _Francois Van Der Spuy_

Position    _Director_

Date    _22 August 2007_

ps/6541                                                                    8

Confidential                                                    TF0000113269

A-857

ABCD

KPMG LLP
*Project Dice – engagement letter*
*15 May 2007*

ps/650

9

Confidential

TF0000113270

ABCD                                                      Appendix 1

## Scope of work

### Restriction of scope

The financial and tax due diligence work will be focused on a consideration of certain specific items detailed below. Our scope does not comprise a full financial or tax due diligence scope.

Our principal sources of information will be the limited scope vendor due diligence report dated 4 May 2007 prepared by Deloitte & Touche LLP ('the VDD report'), the Project Dice electronic data room ('the data room'), and limited discussions with certain members of Dice management.

Our restricted scope of work will be subject in all cases to relevant information being available from the limited sources of information and documentation provided to us. We draw your attention to the significant limitations in the scope of our work:

- we will have no access to the premises of Dice;

- we will have no access to the management and personnel of Dice or their advisers, except during pre-organised telephone conferences and meetings;

- management information available is restricted to specified documents in a data room and supporting work papers will not be available in all instances (we will read relevant documents from the financial section of the data room only);

- we will have no access to the audit files.

These restrictions will have a corresponding impact on the nature of comments we are able to make on the financial information available.

### Financial due diligence

*FY05   Financial year ended 31 March 2005*
*FY06   Financial year ended 31 March 2006*
*FY07   Financial year ended 31 March 2007*

Read the VDD report and the financial information made available in the data room and comment on the following:

- Summarise and comment on underlying earnings for the three years FY05 to FY07

- Summarise and comment on pro-forma earnings for FY07

- Present EBITDA bridges between FY06 and FY07 at a group and divisional level

- Summarise and comment on the group balance sheet as at 31 March 2006 and 2007

- Comment on key accounting policies

- Summarise working capital at 31 March 2006 and 2007 and present a summary of underlying working capital

Page 10

A-859

ABCD                                                                Appendix 1

- Summarise net debt as at 31 March 2007. Present a summary of other debt like items that may be considered as part the indebtedness of the group

- Summarise commitments and contingencies at 31 March 2007

**Pensions**

- Review the pensions information provided in the VDD report and the data room

- Summarise the main pension arrangements for employees in all material territories

- Seek to identify key business valuation issues and comment on typical approaches to allowing for pensions in business value

- Consider areas of key uncertainty and suggest areas for further analysis

**Tax due diligence**

Based on a review of the VDD report, we will consider the key tax issues and highlight any material unprovided tax exposures and the level of risk we would attach to the identified exposures in respect of the tax affairs of the target group in the key jurisdictions. Our report will be based on the information provided in the VDD report, information made available in the data room and discussions with Dice's management and tax advisers, as applicable.

Based on the above, we will comment on the adequacy of the tax provision in respect of the exposures identified.

We will confirm what, if any, share schemes or similar are in place for directors/employees and if possible quantify any cost for the target group in triggering an early vesting of those shares as a result of the proposed transaction

**Tax structuring and model**

We will work with you and your other advisors to develop a tax efficient acquisition structure within the commercial and other constraints of the transaction as advised to us. We will present this structure in a steps paper. For the avoidance of doubt, we will only provide tax advice in relation to the UK and material subsidiary countries (namely US, France, The Netherlands, Italy, Germany) and not provide tax advice to management nor provide any fund tax advice in connection with the transaction.

We will, if requested, comment on the reasonableness of the tax assumptions underlying your financial model.

ps/650                                                                        11

Confidential

ABCD                                                                                    Appendix 2

## General Terms of Business

These General Terms of Business apply to the delivery of services by KPMG to a client pursuant to a letter enclosing these General Terms of Business and recording the engagement ("the **Engagement Letter**").

### Definitions

The meanings of the following words and phrases which are widely used in these General Terms of Business shall be as set out below:

**Services** — the services to be delivered by us under the Engagement Letter.

**KPMG** or **we** (or derivatives) — the KPMG contracting party as identified by the Engagement Letter.

**You** (and derivatives) — the addressee (or addressees) of the Engagement Letter.

**Services Contract** — these General Terms of Business and the Engagement Letter, together with any documents or other terms applicable to the Services ("**Additional Terms**") to which specific contractual reference is made in the Engagement Letter.

**KPMG Persons** — the KPMG contracting party, each and all of our partners, members, directors, employees and agents, as the case may be, together with any other body or entity controlled by us or owned by us or associated with us and each and all of its partners, members, directors, employees and agents and "**KPMG Person**" shall mean any one of them.

**Partners** – Any KPMG Person having the title "partner" (whatever that KPMG Person's legal status) or being a member of us where we are a limited liability partnership.

**Other Beneficiaries** — any and each person or organisation identified in the Engagement Letter (other than you) as a beneficiary of the Services or any product thereof.

These definitions shall apply wherever these words and phrases are used in the Services Contract.

### Our services and responsibilities

1.  The Engagement Letter shall set out the Services to be delivered by us and associated matters. These General Terms of Business shall be subject to variation if required in the Engagement Letter.

2.  The Services shall be delivered with reasonable skill and care.

3.  Where individuals to be involved in delivering the Services are named in the Engagement Letter, we shall use reasonable endeavours to ensure that they are so involved. We may substitute those identified for others of equal or similar skills but we shall consult you before doing so.

4.  We may acquire sensitive information concerning your business or affairs in the course of delivering the Services ("**Confidential Information**"). In relation to Confidential Information we shall comply with the confidentiality standards of our regulatory body,

the Institute of Chartered Accountants in England & Wales and we shall adhere to the confidentiality restrictions imposed on us by any other authority in the United Kingdom with whose requirements we are bound to comply, as well as any obligations imposed on us by English law. We shall be entitled to comply with any requirement of English law, of our regulatory body or any other authority in the United Kingdom with whose requirements we are bound to comply to disclose Confidential Information. This clause shall not apply where Confidential Information properly enters the public domain. This clause shall not prohibit our disclosure of Confidential Information where we wish to disclose it to our professional indemnity insurers or advisers, in which event we may do so in confidence only.

For the purposes of marketing or publicising or selling our service we may wish to disclose that we have performed work (including the Services) for you, in which event we may identify you by your name and we may indicate only the general nature or category of such work (or of the Services) and any details which have properly entered the public domain.

5.  We may supply written advice or confirm oral advice in writing or deliver a final written report or make an oral presentation on completion of the Services. Prior to completion of the Services we may supply oral, draft or interim advice or reports or presentations but in such circumstances our written advice or our final written report shall take precedence. No reliance shall be placed by you on any draft or interim advice or report or any draft or interim presentation. Where you wish to rely on oral advice or on an oral presentation made on completion of the Services, you shall inform us and we shall supply documentary confirmation of the advice concerned.

6.  We shall not be under any obligation in any circumstances to update any advice, report or any product of the Services, oral or written, for events occurring after the advice, report or product concerned has been issued in final form.

7.  Any product of the Services released to you in any form or medium shall be supplied by us on the basis that it is for your benefit and information only and that, save as may be required by law or by a competent regulatory authority (in which case you shall inform us in advance), it shall not be copied, referred to or disclosed, in whole (save for your own internal purposes) or in part, without our prior written consent. The Services shall be delivered on the basis that you shall not quote our name or reproduce our logo in any form or medium without our prior written consent. You may disclose in whole any product of the Services to your legal and other professional advisers for the purposes of your seeking advice in relation to the Services, provided that when doing so you inform them that

    •  disclosure by them (save for their own internal purposes) is not permitted without our prior written consent, and

General Terms - v4.4 – 09.06

TF0000113273

ABCD                                                                                          Appendix 2

- to the fullest extent permitted by law we accept no responsibility or liability to them in connection with the Services.

8.  Any advice, opinion, statement of expectation, forecast or recommendation supplied by us as part of the Services shall not amount to any form of guarantee that we have determined or predicted future events or circumstances.

**Ownership**

9.  We shall retain ownership of the copyright and all other intellectual property rights in the product of the Services, whether oral or tangible, and ownership of our working papers. You shall acquire ownership of any product of the Services in its tangible form on payment of our Charges for any such product. For the purposes of delivering services to you or other clients, we and other KPMG Persons shall be entitled to use, develop or share with each other knowledge, experience and skills of general application gained through performing the Services.

**Our charges**

10.  We shall render invoices in respect of the Services comprising fees, outlays and VAT thereon (where appropriate), plus any overseas taxes that might be payable thereon or deductible therefrom ("our Charges"). Details of our Charges and any special payment terms shall be set out in the Engagement Letter. Our fees shall be based on the degree of responsibility of our partners, members, directors, employees or agents, as the case may be, involved in delivering the Services, their skill and time spent by them in performing them and the nature and complexity of them. Outlays will include both directly incurred costs and an amount, equal to 3.5% of the value of time, to cover incidental expenses which are not charged directly to the engagement. Our Charges may differ from estimates or quotations that may have been supplied, which shall be provisional only.

11.  In return for the delivery of the Services by us, you shall pay our Charges (without any right of set-off), on presentation of our invoice or at such other time as may be specified in the Engagement Letter.

11.1  We may charge interest on any outstanding balances at the statutory rate from time to time in force (this rate applying after as well as before any court award or judgement in our favour in respect of outstanding balances).

11.2  If the Services Contract is terminated or suspended, we shall be entitled to payment for outlays incurred to that time and to payment of fees for work done, plus VAT thereon (where appropriate). Our fees for work done shall in this event be calculated by reference to our hourly rates at the time of performance of our work on the basis set out in clause 10.

11.3  Where there is more than one addressee of the Engagement Letter, unless provision is made in the Engagement Letter for payment of our Charges by one of you or by a third party, all of you shall each be fully liable separately to pay our Charges as well as being so liable together as a group and we shall be entitled to call upon any of you and all of you for payment in full.

**Your responsibilities**

12.  Notwithstanding our duties and responsibilities in relation to the Services, you shall retain responsibility and accountability for:

12.1  the management, conduct and operation of your business and your affairs

12.2  deciding on your use of, choosing to what extent you wish to rely on, or implementing advice or recommendations or other product of the Services supplied by us

12.3  making any decision affecting the Services, any product of the Services, your interests or your affairs

12.4  the delivery, achievement or realisation of any benefits directly or indirectly related to the Services which require implementation by you.

13.  Where you require us or the nature of the Services is such that it is likely to be more efficient for us to perform work at your premises or using your computer systems or telephone networks, you shall ensure that all arrangements are made for access, security procedures, virus checks, facilities, licences or consents as may be required (without cost to us).

14.  You shall not, directly or indirectly, solicit the employment of any of our partners, members, directors or employees, as the case may be, involved in performing the Services while the Services are being performed or for a period of 3 months following their completion or following termination of the Services Contract, without our prior written consent. This prohibition shall not prevent you at any time from running recruitment advertising campaigns nor from offering employment to any of our partners, members, directors or employees, as the case may be, who may respond to any such campaign.

**Information**

15.  To enable us to perform the Services, you shall supply promptly all information and assistance and all access to documentation in your possession, custody or under your control and to personnel under your control where required by us. You shall use your best endeavours to procure these supplies where not in your possession or custody or under your control. You shall inform us of any information or developments which may come to your notice and which might have a bearing on the Services. You shall supply information in response to our enquiries (if any) to enable us to comply with our statutory responsibilities to make disclosures to relevant authorities in respect of money laundering and any other criminal activity that we may encounter during performance of the Services and any such disclosures may include Confidential Information.

16.  We may rely on any instructions or requests made or notices given or information supplied, whether orally or in writing, by any person whom we know to be or reasonably believe to be authorised by you to communicate with us for such purposes. We may communicate with you by electronic mail where any such person wishes us to do so, on the basis that in consenting to this method of communication you accept the inherent risks (including the security risks of interception of or unauthorised

General Terms - v4.4 – 09.06

Confidential                                                          TF0000113274

ABCD

access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and that you shall perform virus checks.

17. We may receive information from you or from other sources in the course of delivering the Services.

To the fullest extent permitted by law, we shall not be liable to you for any loss or damage suffered by you arising from fraud, misrepresentation, withholding of information material to the Services or other default relating to such material information, whether on your part or that of the other information sources, unless such fraud, misrepresentation, withholding or such other default is evident to us without further enquiry.

**Knowledge and conflicts**

18. In clauses 18 to 24 the following definitions shall apply:

   * "the **Engagement Team**" shall mean, collectively or individually, KPMG Persons (excluding corporate bodies, entities or firms) who is or are involved in delivering the Services,

   * "**Other KPMG Person(s)**" shall mean, collectively or individually, KPMG Persons who are not members of the Engagement Team,

   * "**Barriers**" shall mean safeguards designed to facilitate the protection of each client's interests and may include (for example): separate teams, their geographical and operational separation and/or access controls over data, computer servers and electronic mail systems.

19. The Engagement Team shall not be required, expected or deemed to have knowledge of any information known to Other KPMG Persons which is not known to the Engagement Team.

20. The Engagement Team shall not be required to make use of or to disclose to you any information, whether known to them personally or known to Other KPMG Persons, which is confidential to another client.

21. KPMG Persons may be delivering services to, or be approached to deliver services to, another party or parties who has or have interests which compete or conflict with yours (a "**Conflicting Party**" or "**Conflicting Parties**").

22. KPMG Persons are and shall remain free to deliver services to Conflicting Parties, except that where the interests of the Conflicting Party conflict with yours specifically and directly in relation to the subject matter of the Services:

   * the Engagement Team shall not deliver services to the Conflicting Party; and

   * Other KPMG Persons may only deliver services to the Conflicting Party where appropriate Barriers are put in place. The effective operation of such Barriers shall constitute sufficient steps to avoid any real risk of a breach of our duty of confidence to you.

We seek to identify Conflicting Parties in the circumstances set out in this clause 22. If you know or become aware that a KPMG

Person is advising or proposing to advise such a Conflicting Party, you shall inform us promptly.

23. Without limiting the general applicability of clause 22, the following are examples of specific circumstances in which Other KPMG Persons may deliver services to a Conflicting Party or Conflicting Parties:

   * where at any time during performance of the Services, you are an employee (including a director) and a KPMG Person is delivering services to your employer, in which case Other KPMG Persons shall be entitled to deliver services to your employer, or

   * where an Other KPMG Person is appointed to hold an office in his capacity as an insolvency practitioner (licensed under insolvency legislation or otherwise) in respect of a person or at an organisation who or which is or subsequently becomes in conflict with you, in which case such Other KPMG Person shall be entitled to act at any time in that capacity, or

   * where Other KPMG Persons are asked to deliver services (the "Other Services") to a Conflicting Party (whose existence may or may not be known to you) who is actually or potentially interested in acquiring the same or a similar interest in the subject matter of a transaction to which both the Other Services and the Services relate (for example, where you and the Conflicting Party are both interested in acquiring a company, asset or operation which has been put up for sale by auction), in which case Other KPMG Persons shall be entitled to deliver the Other Services to the Conflicting Party.

24. Where a party has engaged us to deliver services before you have done so and subsequently circumstances change, we may consider that, even with Barriers operating, your interests are likely to be prejudiced and we may not be satisfied that the situation can be managed. In that event we may have to terminate the Services Contract and we shall be entitled to do so on notice taking effect immediately on delivery but we shall consult you before we take that step.

**The Services Contract**

25. The Services Contract sets out the entire agreement and understanding between us in connection with the Services and supersedes any prior agreements, understandings, arrangements, statements or representations (unless made fraudulently) relating to the Services. Any modifications or variations to the Services Contract must be in writing and signed by an authorised representative of each of us. In the event of any inconsistency between the Engagement Letter and any other elements of the Services Contract, the Engagement Letter shall prevail. In the event of any inconsistency between these General Terms of Business and Additional Terms that may apply, the Additional Terms shall prevail. Nothing in the Services Contract shall operate to exclude any liability which we would otherwise have to you in respect of any statements made by us fraudulently prior to the date of the Services Contract.

Confidential

ABCD                                                                                    Appendix 2

**Third party rights**

In the particular circumstances of the Services set out in the Engagement Letter and subject to clause 33 and clause 34 below,

26.  The Services Contract shall not create or give rise to, nor shall it be intended to create or give rise to, any third party rights. No third party shall have any right to enforce or rely on any provision of the Services Contract which does or may confer any right or benefit on any third party, directly or indirectly, expressly or impliedly. The application of any legislation giving to or conferring on third parties contractual or other rights in connection with the Services Contract shall be excluded. No KPMG Person shall be deemed to be a third party for the purposes of this clause.

* the aggregate liability to you and to Other Beneficiaries of each and all KPMG Persons,

* in contract or tort or under statute or otherwise,

* for any loss or damage suffered by you (or by any such other party) arising from or in connection with the Services,

* however the loss or damage is caused, including our negligence but not our fraud or other deliberate breach of duty,

shall be limited to the amount specified in the Engagement Letter, or if no amount is specified there, to £1million.

**Circumstances beyond your or our control**

27.  Neither of us shall be in breach of our contractual obligations nor shall either of us incur any liability to the other if we or you are unable to comply with the Services Contract as a result of any such occurrence affecting one of us, that one shall be obliged as soon as reasonably practicable to notify the other, who shall have the option of suspending or terminating the operation of the Services Contract on notice taking effect immediately on delivery.

32.  Where there is more than one beneficiary of the Services ("Beneficiary") the limitation on our liability agreed under clause 31 to each Beneficiary shall be apportioned by them amongst them. No Beneficiary shall dispute or challenge the validity, enforceability or operation of clause 31 on the ground that no such apportionment has been so agreed or on the ground that the agreed share of the limitation amount apportioned to any Beneficiary is unreasonably low. In this clause, "Beneficiary" shall include you and Other Beneficiaries.

**Waiver, assignment and sub-contractors**

28.  Failure by any one of us to exercise or enforce any rights available to us shall not amount to a waiver of any rights available to either of us.

33.  Subject always to the aggregate limitation on our liability in clause 31 above, the following provisions shall govern the extent of our liability to you and to any Other Beneficiaries for any loss or damage suffered by you (or by any such other party) arising from or in connection with the Services:

29.  Neither of us shall have the right to assign the benefit (or transfer the burden) of the Services Contract to another party without the written consent of the other of us.

33.1  The liability of KPMG Persons shall be limited to that proportion of the total loss or damage, after taking into account your contributory negligence (if any) or the contributory negligence (if any) of any Other Beneficiaries, which is just and equitable having regard to the extent of the responsibility of KPMG Persons for the loss or damage concerned ("the KPMG Proportion") and the extent of responsibility of any other party also responsible or potentially responsible ("Another Liable Party").

30.  Subject to clause 39, we shall have the right to appoint sub-contractors to assist us in delivering the Services but where any such sub-contractors are not KPMG Persons we shall consult you before doing so. Where we appoint sub-contractors under this clause, we may share Confidential Information with them and for all purposes in connection with the Services Contract we shall accept responsibility for their work which shall be deemed to be part of the Services.

33.2  For the purposes of determining the KPMG Proportion,

**Limitations on our liability**

* no account shall be taken of Another Liable Party having ceased to exist, having ceased to be liable, having had imposed an agreed limit on its liability or being impecunious or for other reasons unable to pay

31.  Our liability in connection with the Services shall be limited in accordance with this clause.

* in any relevant court proceedings brought against us by you or Other Beneficiaries ("the Claimant"), on request by us, the Claimant shall join Another Liable Party to any such proceedings against us, unless doing so is prohibited by law and on the basis that, provided that the court determines that the conduct of the Claimant has been reasonable both before the proceedings and during them, we shall not resist an application to the court by the Claimant that we (rather than the Claimant) should bear the reasonable costs awarded (if any) against the Claimant in respect of any such joinder of Another Liable Party to proceedings.

Confidential
                                                                              TF0000113276

ABCD

33.3   Where despite the provisions of this clause 33 the extent of the KPMG Proportion is not determined, the question shall be referred on request to an expert, to be appointed by agreement or by the President of The Law Society of England and Wales, who shall act as an expert and not as an arbitrator and whose decision on the KPMG Proportion shall be final and enforceable in satisfaction of any prior judgment.

34.   We accept the benefit of the limitations in clauses 31, 32 and 33 above on our own behalf and as agent and trustee for each and all other KPMG Persons who may be or might have been involved in delivering the Services.

Any clauses in these General Terms of Business operating or which may operate to exclude or limit our liability in any respects shall not operate to exclude or limit any liability which cannot lawfully be excluded or limited.

35.   This clause shall apply to claims arising from or under the Services Contract.

35.1   You and Other Beneficiaries shall not bring any claim against any KPMG Person other than the KPMG contracting party in respect of loss or damage suffered by you or by Other Beneficiaries arising out of or in connection with the Services. This restriction shall not operate to limit or exclude the liability of the KPMG contracting party as a firm or company for the acts or omissions of any other KPMG Person.

35.2   Any claim from you or Other Beneficiaries in respect of loss or damage suffered as a result of, arising from or in connection with the Services Contract, whether in contract or tort or under statute or otherwise, must be made

- where Services have been delivered, within four years of the date on which the work giving rise to the claim was performed

- if the Services Contract has been terminated, within four years of the date of termination (subject to the bullet point above)

- if the loss or damage is suffered as a result of, arising from or in connection with our unauthorised disclosure of Confidential Information, within four years of the date on which the unauthorised disclosure took place

and in any of these cases that shall be the date when the earliest cause of action (in contract or tort or under statute or otherwise) shall be deemed to have accrued in respect of the relevant claim. For the purposes of this clause a claim shall be made when court or other dispute resolution proceedings are commenced.

**Third parties**

36.   If you breach any of your obligations under the Services Contract and there is any claim made or threatened against us by a third party, you shall compensate us and reimburse us for and protect us against any loss, damage, expense or liability incurred by us which results from or arises from or is connected with any such breach and any such claim. If any payment is made by you under this clause you shall not seek recovery of that payment from us at

any time. In this clause "us" shall include all KPMG Persons and "you" shall include Other Beneficiaries.

**Termination**

37.   Each of us can terminate the Services Contract or suspend its operation by giving 30 days' prior notice in writing to the other at any time. Termination or suspension under this clause shall be without prejudice to any rights that may have accrued for either of us before termination or suspension and all sums due to us shall become payable in full when termination or suspension takes effect.

38.   The following clauses of these General Terms of Business shall survive expiry or termination of the Services Contract: clauses 4, 5, 6, 7, 8, 9, 12, 14, 17, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 31, 32, 33, 34, 35, 36, 39, 40, 41, 42, 43, 44, 45.

**Data protection**

39.   The definitions and interpretations in the Data Protection Act 1998 (and any subsequent amendment or re-enactment that does not substantively change the original enactment) ("the Act") shall apply to this clause. Where necessary to enable us to deliver the Services, for such purposes we shall have your authority to process personal data on your behalf in accordance with this clause. When we do so, we shall take appropriate technical and organisational measures designed to protect against unauthorised or unlawful processing of personal data and against accidental loss or destruction of, or damage to, personal data. In particular, we shall act only on your instructions and we shall comply at all times with the seventh principle in Part 1 of Schedule 1 to the Act as if applicable to us directly. We shall answer your reasonable enquiries to enable you to monitor our compliance with this clause and we shall not sub-contract our processing of personal data (unless to KPMG Persons) without your prior written consent.

**Notices**

40.   Any notice to you or us delivered under the Services Contract shall be in writing and delivered by pre-paid first class post (or pre-paid overseas equivalent) to or left at our respective addresses appearing in the Engagement Letter (or such other address as may be notified in writing). Notices delivered by post shall be deemed to have arrived

- where posted from and to addresses in the UK, on the second working day and

- where posted from or to addresses overseas, on the tenth working day

following the date of posting.

**Severability**

41.   Each clause or term of the Services Contract constitutes a separate and independent provision. If any of the provisions of the Services Contract are judged by any court or authority of competent jurisdiction to be void or unenforceable, the remaining provisions shall continue in full force and effect.

Confidential

TF0000113277

A-865

ABCD                                                                                      Appendix 2

**Capacity**

42.  You agree to and accept the provisions of the Services Contract on your own behalf and as agent for Other Beneficiaries. You shall procure in such circumstances that any Other Beneficiaries shall act on the basis that they are a party to the Services Contract, as if they had each signed a copy of the Engagement Letter and agreed to be bound by it. However, you alone shall be responsible for payment of our Charges.

43.  We accept your agreement to and acceptance of the terms of the Services Contract (save for clauses 31, 32 and 33 above) on our own behalf and as agent and trustee for each and all other KPMG Persons.

**Regulated activities**

44.  Where the Services (or part of the Services) amount to "regulated activities" under the Financial Services and Markets Act 2000, we shall inform you and set out the implications in the Engagement Letter or elsewhere in writing and Additional Terms including provisions referable to "regulated activities" shall apply.

**Law and jurisdiction**

45.  The Services Contract shall be subject to and governed by English law and all disputes arising from or under the Services Contract shall be subject to the exclusive jurisdiction of the English courts.

**Complaints**

46.  If at any time you would like to discuss with us how the Services can be improved or if you have a complaint about them, you are invited to telephone a partner or director, as the case may be, identified in the Engagement Letter. If your problem is not resolved, you should contact Mike Ashley, our UK Head of Risk Management, either by writing to him at 8 Salisbury Square, London EC4Y 8BB or through our client care website at http://www.kpmg.co.uk/clientcare where you will find details of our complaints handling procedures and what arrangements we have for compensation and when they apply. If you prefer, details of these procedures and arrangements will be made available to you outside of our client care website on request. We will investigate any complaint promptly and do what we can to resolve the difficulties. If you are still not satisfied, you can refer the matter to the Institute of Chartered Accountants in England & Wales and (in respect of "regulated activities" and ancillary services) to the Financial Ombudsman Service.

General Terms - v4.4 – 09.06

Confidential                                                                        TF0000113278

ABCD

**Additional Terms: Transaction Services**

These Additional Terms supplement our General Terms of Business and apply where expressly incorporated in the Engagement Letter.

Where the Services relate to transactional activity, the terms and conditions set out below shall apply.

**City Code**

1.  If the Services relate to a transaction within the scope of the City Code on Takeovers and Mergers (the "City Code"), it shall be a term of the engagement that we shall comply with the provisions of the City Code and shall observe the terms of the guidance note issued by the Institute of Chartered Accountants in England and Wales dealing with compliance with the City Code and with all rulings made and guidance issued under them by the Panel on Takeovers and Mergers (the "Panel").

2.  Under the terms of the guidance note we may be required to supply to the Panel information, books, documents or other records concerning the transaction which the Panel may properly require and otherwise render all such assistance as we are reasonably able to give to the Panel. Your agreement to the Services Contract shall be confirmation of our authority to comply with any such Panel request.

3.  If the Panel makes a statement that it considers that the facilities of the securities markets in the United Kingdom should be withheld from you, or should you fail to comply with the City Code, your agreement to the Services Contract shall be confirmation of our right to withdraw from the engagement immediately.

**Survival on termination**

4.  Clause 1 and clause 2 of these Additional Terms shall survive expiry or termination of the Services Contract.

TS – v1.1 – 05.06

Confidential

TF0000113279

ABCD                                                                                        Appendix 4

## Additional Terms: Tax Advisory Services

These Additional Terms supplement our General Terms of Business and apply where expressly incorporated in the Engagement Letter.

Where the Services comprise our assisting you with tax matters, direct or indirect, the terms and conditions set out below shall apply.

### Trusts and Trustees

1.  Where the Services are delivered to the Trustees of a Trust in connection with tax matters concerning the Trust or concerning the Trustees in their capacity as such

    1.1  We may treat any one of the Trustees as a person authorised to communicate with us under clause 16 of our General Terms of Business;

    1.2  Save where you inform us that we may not rely on communications from such a person without evidence of the written approval of all the Trustees to do so, we may assume that any such person deals with us with the authority of all the Trustees.

### Advisory work

2.  We shall not undertake research into Hansard.

3.  You shall not disclose, in general or specific terms, in whole or in part, any advice that we may supply on planning opportunities to any third party without our prior written consent.

### Retention of working papers

4.  You shall inform us if you require our working papers referable to the Services to be retained for any period longer than 7 years following completion of the Services or termination of the Services Contract.

### Commissions

5.  Where commissions or other benefits ("Commissions") become payable to us in respect of the Services, we shall inform you of the amount and terms of payment. We shall be entitled to retain Commissions and reduce our Charges proportionately.

### Professional Guidance

6.  We shall comply with the Professional Conduct in Relation to Taxation guidelines prepared by the Institute of Chartered Accountants in England & Wales in conjunction with the Chartered Institute of Taxation ("Professional Guidance"). In

doing so we shall be entitled without reference to you to disclose to HM Revenue & Customs any error made by HM Revenue & Customs in your favour.

### Separate invoicing

7.  Our Charges for advisory work shall be invoiced separately from any other work we may do for you under the terms of a separate engagement.

### Termination

8.  In the event of termination of the Services Contract, we shall endeavour to agree with you arrangements for completion of work in progress at that time, unless termination takes place for reasons of compliance with Professional Guidance. In that event, we shall not be required to carry out any further work following termination and we shall not be responsible or liable for any consequences arising from such termination.

### Disclosure of tax avoidance schemes and contributions avoidance arrangements

9.  Where the Services include the delivery of advice on arrangements which might be expected to enable any person to obtain an advantage in relation to tax or National Insurance contributions or both, we may be required by law to disclose to HM Revenue & Customs details of such arrangements. We shall determine whether and to what extent any such disclosure, which shall include Confidential Information, shall be made. To the fullest extent permitted by law, we shall not incur any responsibility or liability to you for any loss or damage or any other adverse consequences that may result from, arise from or be connected with any such disclosure.

### US Securities and Exchange Commission rules on provision of tax services to certain individuals

10.  Where you are an individual, you shall notify us of all employments and directorships held by you, your spouse, your spousal equivalent and any dependants, including a general description of the role performed. You shall also notify us as a priority of any changes to this information, promptly as and when the changes occur.

### Survival on termination

11.  The following clauses of these Additional Terms shall survive expiry or termination of the Services Contract: clauses 3, 8, 9.

Confidential                                                          TF0000113280

ABCD

**Assumption of responsibility letter**

[Lead Bank [and Other Banks as set out below]]

[date]

Dear Sirs

**Project Dice**

You have requested sight of our confidential report dated [ ] in respect of Dice Group plc.

Our work in preparing that report was undertaken and our report produced solely in accordance with the terms of an engagement letter dated [ ] 2007, a copy of which is attached ('the engagement letter'). As stated in the engagement letter, our work does not constitute an audit or review made in accordance with any generally accepted auditing standards. The terms of the engagement letter record the specific requirements for the report as determined by Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited which will not necessarily address your specific circumstances.

You should be aware that the report is designed to be part only of the due diligence process which any prospective lender may wish to undertake, and to which he must bring his own expertise and knowledge. There may be other interests, needs or issues which are of importance to you in the context of your own procedures in relation to the proposed acquisition. It will be for you to determine the extent to which the work undertaken and the report provided by us under the terms of the engagement letter may be suitable for your purposes.

Our report has not been updated for any events that may have occurred between the date on which our report was issued and the date on which it is delivered to you. Further, unless agreed otherwise, no additional work will be performed at any date subsequent to the date of the report.

We are prepared to make available to you a copy of our report as a prospective Lending Bank (as defined in the engagement letter) on condition that you accept that we have no responsibility or liability whatsoever to you in connection with our report.

Should you become an Lending Bank we are prepared to accept responsibility and liability to you in connection with our work under the engagement letter on the terms that:

- you will be bound by and will accept all the provisions of the engagement letter as though you had been an addressee and signatory of the engagement letter. We draw your attention to the limitations on our liability as set out in the engagement letter and to the confidential nature of the report;

Page 20

ABCD                                                    Appendix 5

you alone will determine whether or to what extent the work which we were called upon to undertake and the scope of our report, as defined in the engagement letter, are likely to satisfy your interests and needs, having regard, inter alia, to the passage of time between the date on which our report was issued and the date on which it is delivered to you, and the fact that our report has not been updated for any events that may have occurred during that time.

*For use where this letter is being sent to a prospective Lead Bank who intends to syndicate to other banks:* **[We understand that [name of lead bank] ('Lead Bank') is [proposing] to enter into a facility agreement ('the Facility Agreement') with other syndicate members ('Other Banks') in connection with Project Dice. We will accept responsibility and liability in connection with our work under the engagement letter to Lead Bank and to each of the Other Banks who, at the date of counter-signature of this letter by Lead Bank, have agreed (i) to participate in the Facility Agreement and (ii) to accept the terms and conditions of this letter (and its attachments). We will also accept such responsibility and liability to any Other Banks who will have, up to the date of completion of initial or primary syndication, made the same agreement in respect of participation and the terms and conditions. By counter-signing this letter and accepting the terms and conditions of this letter (and its attachments), Lead Bank confirms that it has obtained or, unless any Other Banks separately accept the terms and conditions of this letter (and its attachments) directly with us, will obtain written confirmation from all Other Banks wishing to acquire rights against us under this letter than they have made such agreement in respect of participation in the Facility Agreement and acceptance of the terms and conditions. The separate acceptance from Other Banks or the obtaining of that written confirmation, as the case may be, will be a condition precedent to Lead Bank providing our report to and our accepting responsibility and liability to any such Other Banks under this letter.

*Insert the following if we are asked to permit the Lead Bank to distribute the report amongst prospective syndicate members* [We understand that in connection with the initial or primary syndication the Lead Bank wishes to make available copies of our report to other potential members of the lending syndicate. Notwithstanding the foregoing paragraph, we agree to the Lead Bank providing the report to such parties on condition that the Lead Bank will procure the acceptance of any such party, prior to their having access to the report, that:

(a)    to the fullest extent permitted by law, KPMG LLP owes no duty to such party ("Party"), whether in contract or in tort or under statute or otherwise, with respect to or in connection with the report or any part thereof;

(b)    to the fullest extent permitted by law, KPMG LLP has no responsibility or liability on any basis whatsoever to Party in respect of the report or any part thereof;

(c)    if, notwithstanding the conditions under which access to the report is granted, Party wishes to rely upon the report for any purpose, Party will do so entirely at its own risk;

(d)    the report is made available to Party on the basis that it is for information purposes only and shall not be copied, referred to or disclosed, in whole (save for their own internal purposes) or in part, without the prior written consent of KPMG LLP, and;

Confidential                                    TF0000113282

ABCD                                                                    Appendix 5

(e)      KPMG LLP has no responsibility or liability whatsoever to Party in connection with its
         audit or any information or explanations sought by KPMG LLP (as preparer of the
         report) in the course of the review of the audit working papers [and the tax papers]. The
         attention of Party is drawn to the Notice included on page [ ] of the report].]

We will not accept any responsibility or liabilit y in connection with our work under the
engagement letter to any of the Other Banks who have not agreed to accept the terms and
conditions of this letter (and its attachments) nor to any person who acquires debt from the
Other Banks subsequent to the date of completion of initial or primary syndication.

With reference to clause 35.2 General Terms of Business: If you wish to bring a claim against
us, you must do so within four years. Any action against us on behalf of participants in the
Facility Agreement shall be taken only by Lead Bank (and, only to the extent necessary to give
effect to the action, other members of the co-lending syndicate at the date of completion of
initial or primary syndication) and then only on the instructions of the Majority or Instructing
Group (as defined in the Facility Agreement). If any such action is brought, we will be entitled
to exercise against any such claimant in its capacity as agent all rights and remedies available to
us at law or in equity (including under the Civil Procedure Rules) in relation to the claim as if
the claim had been made directly against us by Other Banks.

*Insert the following if we are asked to address this letter to the Lead Bank in different
capacities, for example in its capacity as Facility Agent and Security Trustee:* [Notwithstanding
that Lead Bank is an addressee of this letter in its capacities as [Facility Agent and Security
Trustee], this shall not, at any time, (a) extend or alter our duties and responsibilities under this
letter, or (b) oblige us to (and we shall not) assume or accept any additional obligations to Lead
Bank, beyond those that would arise under this letter if Lead Bank were not addressed in those
capacities.]]**

*For use if this letter is being sent to a prospective Other Bank which is proposing to enter into
a facility agreement with a Lead Bank:* **[We understand that you are proposing to enter into
a facility agreement ('the Facility Agreement') with [name of lead bank] ('Lead Bank') and
other syndicate members ('Other Banks') in conn ection with Project Dice. With reference to
clause 35.2 General Terms of Business: If you wish to bring a claim against us, you must do so
within four years. Any action against us on behalf of participants in the Facility Agreement
shall be taken only by Lead Bank (and, only to the extent necessary to give effect to the action,
other members of the co-lending syndicate at the date of completion of initial or primary
syndication) and then only on the instructions of the Majority or Instructing Group (as defined
in the Facility Agreement). If any such action is brought, we will be entitled to exercise against
any such claimant in its capacity as agent all rights and remedies available to us at law or in
equity (including under the Civil Procedure Rules) in relation to the claim as if the claim had
been made directly against us by Other Banks.]**

Any reports which we provide to you under this agreement will be provided for your
information only and are not to be disclosed, quoted or referred to, in whole or in part, without

Page 22

ABCD                                                              Appendix 5

our prior written consent except that you may provide a copy of our reports to your legal and other professional advisers for the purposes of your seeking advice in relation to the transaction, provided that in such case such advisers each agree not to disclose such reports and agree that we accept no responsibility or liability to them.

In the event that you do not become an Lending Bank we would be grateful if you would arrange for any copies of our report provided to you together with any further copies which have been made by you or on your behalf to be returned to us or destroyed.

Please sign the accompanying copy of this letter and return it to us as an acknowledgement and acceptance of its terms whereupon we will send a copy of the report to you.

Yours faithfully

KPMG LLP

*Either:*

[We acknowledge receipt of a letter of which this is a copy and accept its terms [on behalf of [ ].]

....................................     ...........................     .................................. ...
Signature                 Position                 Date                           ]

*Or:*

[I have read and understood the terms and conditions of this letter and attachments and I agree to and accept them for and on behalf of [Lead Bank], by whom I am duly authorised, for itself and as agent duly authorised for and on behalf of other syndicate members participating in the [Facility Agreement] from whom [Lead Bank] has obtained or will obtain written confirmation that they have agreed (i) to participate in the [Facility Agreement] and (ii) to accept the terms and conditions of this letter (and its attachments)]:

....................................     ...........................     .................................. ...
Signature                 Position                 Date                 ]

Page 23

Confidential                                                    TF0000113284



KPMG LLP
Transaction Services
1 Puddle Dock
London EC4V 3PD
United Kingdom

Tel +44 (0) 20 7311 1000
Fax +44 (0) 20 7311 2060
DX 38050 Blackfriars

Private & confidential
The Directors
Terra Firma Investments (GP) 2 Limited (for
and on behalf of the six limited partners
constituting the Terra Firma Capital Partners II
Fund)

Our ref    ps/650 elvl v3

Contact    Paul Snape
Tel 020 7311 3014

The Directors
Terra Firma Investments (GP) 3 Limited (for
and on behalf of the Terra Firma Capital
Partners III Fund)

Trafalgar Court
Admiral Park
St Peter Port
Guernsey
GY1 GHJ  (together 'Terra Firma')

The Directors
Maltby Limited
1 South Place
London
EC2M 2WG  ('Newco')

28 August 2007

Dear Sirs

**Project Dice – variation to engagement letter**

We refer to our letter dated 15 May 2007, acknowledged and signed on behalf of Terra Firma on
31 May and on behalf of Newco on 22 August 2007 ("the Engagement Letter"), a copy of which
is attached for ease of reference.  We are writing to confirm the revisions to be made to the
Engagement Letter.

This letter forms a variation to the Engagement Letter and except as expressly provided herein
all the terms of that letter shall continue to apply.

The Engagement Letter is to be amended as follows:

Delete paragraph 3 and replace with the following:

"3. We are aware that you may wish to circulate our report amongst prospective other
investors and to prospective lending banks.  Where we consider it appropriate we will

KPMG LLP
*Project Dice – variation to engagement letter*
*28 August 2007*

consent to distribution of our report to such parties, prior to the date of completion of initial or primary syndication for equity or debt as applicable, and, should they become other investors or actual lenders in connection with Project Dice ("Lending Banks"), accept responsibility and liability to them in connection with our work under this letter subject to receipt by us from the relevant prospective other investor or Lending Bank of a countersigned copy of the letter in the form set out in Appendix 5 (amended to refer to other investors rather than lending banks if applicable)."

Include the following text as an addendum to Appendix 1 (scope of work):

"Operations scope of work

( limited )

"The operations scope of work is a desk-top diagnostic of the potential upside opportunities based on sources of information limited to the vendor due diligence report dated 4 May 2007 prepared by Deloitte & Touche LLP ('the VDD report'), the Project Dice electronic data room ('the data room') and other, publicly available, information. We draw your attention to the nature of this exercise as an outside-in analysis and we will have no access to the management and personnel of Dice or their advisers. You will appreciate that our analysis is necessarily limited in scope by the extent and quality of information on which it will be based. To the extent that the information is incomplete or unclear, the operations team will make some stated assumptions which would have to be tested and clarified further downstream in the deal process.

"This is a rapid analysis to consider the potential cost reduction opportunities and the impact of applying a lean organisation that could be achieved by Dice through operational improvements arising from indirect labour cost reduction, reduction in procurement spend and the impact of applying different operating models for the business. This will be conducted adopting a top down approach to modelling the organisation structure of the business (and the implied cost), and modelling the potential impact of applying the suggested hypotheses on how the business might operate going forward.

"The output of the work will be a range of quantified benefits with the rationale for the cost reduction and reference to comparators that are our proprietary intelligence. It is important to note the following caveats:

- KPMG can take no responsibility for the implementation and delivery of these benefits;

- Our work cannot be relied on to identify all potential issues or necessarily to identify errors, omissions or misstatements should such exist in the information investigated by us;

- The implementation of the savings will require full buy-in of either incumbent management or new management to ensure focused delivery within the timeframe;

- An assessment of management capability to deliver the savings will be required;

Confidential



- The savings are based on current understanding of performance, any significant changes may impact the benefit;

- A bottom-up diagnostic, to include detailed performance analysis will be required to further assess and narrow the savings potential."

Delete the following sentence in paragraph 22:

"KPMG LLP, Terra Firma and Newco each agree that at the time that the acquisition of Dice is completed Terra Firma shall be unconditionally released from all of its obligations under this engagement letter (and its attachments) and from this time Newco shall be liable for these obligations in place of Terra Firma."

and replace with:

"With effect from the date on which the acquisition of Dice by NewCo takes place: (a) KPMG LLP shall recognise NewCo as the sole party to the Services Contract in place of Terra Firma and shall treat the Services Contract agreed with Terra Firma as terminated in accordance with its terms; (b) subject to such termination, KPMG LLP shall release and discharge Terra Firma from its past, current and future obligations under the Services Contract and from all claims and demands whatsoever in respect thereof; (c) KPMG LLP shall accept responsibility and liability to NewCo in place of Terra Firma in respect of the services provided and to be provided under the Engagement Letter; (d) Terra Firma shall assign to NewCo all Terra Firma's rights and benefits and shall transfer all its duties and burdens under the Services Contract and NewCo shall assume responsibility for discharging those duties and burdens absolutely in place of Terra Firma and KPMG LLP confirms now that it consents to and accepts such assignment and transfer and (e) NewCo shall perform the Services Contract and be bound by its terms and conditions in place of Terra Firma in every way as if NewCo had been the sole addressee and signatory of it when it was originally issued."

Please confirm your agreement with the amendments set out in this letter by signing and returning to me the enclosed duplicate.

Yours faithfully

*KPMG LLP*

KPMG LLP

A-875

KPMG LLP

*Project Dice – variation to engagement letter*
*28 August 2007*

I have read and understood the terms and conditions of this letter and the attachments and I agree to and accept them as a variation to your engagement letter dated 15 May 2007 acknowledged and signed on our behalf on 21 May 2007:

Signed:

Name: *Thomas Fyshe*

Position: **Authorised Signatory**

Date: *14-9-07*

Duly authorised, for and on behalf of Terra Firma Investments (GP) 2 Limited (for and on behalf of the six limited partners constituting the Terra Firma Capital Partners II Fund).

I have read and understood the terms and conditions of this letter and the attachments and I agree to and accept them as a variation to your engagement letter dated 15 May 2007 acknowledged and signed on our behalf on 21 May 2007:

Signed:

Name: *Thomas Barton*

Position: **Authorised Signatory**

Date: *14-9-07*

Duly authorised, for and on behalf of Terra Firma Investments (GP) 3 Limited (for and on behalf of the Terra Firma Capital Partners III Fund).

Confidential

TF0000113288



KPMG LLP
*Project Dice – variation to engagement letter*
*28 August 2007*

I have read and understood the terms and conditions of this letter and the attachments and I agree to and accept them as a variation to your engagement letter dated 15 May 2007 acknowledged and signed on our behalf on 22 August 2007:

Signed:     *W Quigley*

Name:     TOM QUIGLEY

Position:     DIRECTOR

Date:     13 Sep. 2007

Duly authorised, for and on behalf of Maltby Limited.

5

Confidential

## Appendix 2
# Underlying earnings per VDD report

| £m | FY05 | FY06 | FY07 |
|---|---|---|---|
| **Underlying earning per VDD report** | | | |
| Reported EBITDA | 249.9 | 275.9 | 174.1 |
| Underlying earnings adjustments | | | |
| Bertelsmann case legal costs | - | 3.0 | 4.6 |
| Recovery of Bertelsmann costs | - | - | (7.6) |
| Pensions credit in Japan | - | (5.0) | (1.4) |
| Beatles royalties | (0.9) | (0.9) | (0.9) |
| Tower Records debtor write-off | - | - | 4.2 |
| Kazaa settlement | - | - | (8.0) |
| Abnormal stock write-off | - | 2.8 | - |
| Garth Brooks settlement income | - | (6.1) | - |
| VRA restructuring costs | - | 3.9 | - |
| Musicland bad debt write off | - | 2.5 | - |
| Spitzer provision for settlement | - | 1.6 | - |
| Steiner settlement | (5.1) | - | - |
| Brazil fraud impact | - | - | 9.0 |
| Changes in accounting policy/estimate | (9.8) | (7.6) | - |
| Termination/succession costs | - | 2.4 | - |
| Audit settlement (ScreenGems/ FujiPacific) | - | (1.8) | - |
| Sale of MGM copyrights | - | (6.7) | (6.8) |
| Constant FX adjustment | 1.1 | - | - |
| | (14.7) | (11.9) | (6.9) |
| Underlying EBITDA per VDD report [a] | 235.2 | 264.0 | 167.2 |
| Unquantified adjustments | | | |
| Advances write off allocation | ? | ? | ? |
| Impact of excess returns | ? | ? | ? |
| MGM copyright NPS | ? | ? | ? |

*Note (a) Before unquantified adjustments*
*Source: VDD report*

<div style="text-align: right">A-877</div>

 This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113290

Appendix 3
# Exceptional items

| £m | FY05 | FY06 | FY07 |
|---|---|---|---|
| **Restructuring and reorganisation** | | | |
| Transaction costs - Warner Music Group | . | . | (6.4) |
| Transaction costs - bid approach Nov/Dec 2006 | . | . | (1.2) |
| Janet Jackson advance provision | . | . | (16.4) |
| Beatles audit settlement costs | . | . | (16.0) |
| Bertelsmann settlement (net proceeds) | . | . | 37.8 |
| RE3 | . | (0.1) | (59.5) |
| RE4 | . | . | (114.0) |
| Fresh balance sheet review | . | . | (41.3) |
| Advance provisions write down | . | . | (94.3) |
| FX adjustment | . | 0.1 | 7.2 |
| | . | . | (304.1) |
| **Property disposals** | | | |
| Japanese properties | . | . | 36.5 |
| Capital Tower | . | . | 18.7 |
| South Africa | . | . | 1.0 |
| Tenterden Street (UK) | . | . | (1.7) |
| Other | 0.9 | 1.4 | . |
| FX adjustment | . | . | (6.0) |
| | 0.9 | 1.4 | 48.5 |
| **Amortisation and impairment** | | | |
| Amortisation and impairment | (47.9) | (49.8) | (69.2) |
| FX adjustment | (0.1) | (0.1) | (0.9) |
| | (48.0) | (49.9) | (70.1) |
| Investment remeasurement | 0.5 | 2.6 | (0.2) |
| | (46.6) | (45.9) | (325.9) |

Source: VDO report

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.



Confidential

TF0000113291

A-878

Appendix 4
# Group cost analysis

| Cost analysis - Group | | | |
|---|---|---|---|
| £m | FY06 | FY07 | Percentage of total cost base (FY07) |
| Operating cost | | | |
| Royalty and copyright cost | 654.5 | 586.5 | 37.2% |
| Manufacturing costs | 164.0 | 133.6 | 8.5% |
| Distribution cost | 75.0 | 73.2 | 4.6% |
| Origination costs | 63.3 | 60.4 | 3.8% |
| Marketing and promotion costs | 275.9 | 267.9 | 17.0% |
| Provisions | 72.6 | 70.8 | 4.5% |
| Difference | - | (52.9) | (3.4)% |
| Total operating costs | 1,305.3 | 1,139.5 | |
| Overheads | | | |
| Payroll | 369.0 | 331.5 | 21.0% |
| Property | 44.7 | 44.1 | 2.8% |
| IT (Infrastructure) | 21.0 | 19.2 | 1.2% |
| Communications | 7.9 | 7.7 | 0.5% |
| Other | 86.8 | 80.9 | 5.1% |
| Functional overheads | (50.3) | (41.8) | (2.7)% |
| Difference | 28.0 | (4.4) | (0.3)% |
| Total overheads | 507.1 | 437.2 | |
| Total cost base | 1,812.4 | 1,576.7 | 100.0% |

Source:   VDD report, management accounts

 This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113292

A-879

## Appendix 5
# Monthly working capital

**Music - monthly working capital**

| £m | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Current asset investments | 0.5 | 0.8 | 1.8 | 1.7 | 1.7 | 3.5 | 3.4 | 2.8 | 2.0 | 2.1 | 0.9 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Inventories | 29.5 | 30.4 | 31.9 | 30.0 | 30.2 | 31.5 | 30.5 | 34.7 | 35.3 | 31.4 | 30.3 | 32.4 | 37.0 | n/a | 38.2 | 38.4 | 38.2 | 40.0 | 36.9 | 36.0 | 36.0 | 36.0 | 39.4 | 38.3 | 32.6 |
| Receivables (net of provisions) | 344.5 | 366.1 | 304.8 | 358.6 | 338.1 | 344.1 | 375.2 | 437.3 | 468.0 | 494.1 | 378.4 | 353.8 | 397.2 | n/a | 329.9 | 323.6 | 357.2 | 341.9 | 444.5 | 442.4 | 489.5 | 433.4 | 307.5 | 344.0 | 299.9 |
| Advances (net of provisions) | 176.8 | 197.7 | 185.0 | 186.7 | 190.3 | 198.6 | 188.6 | 192.1 | 181.4 | 182.5 | 185.4 | 187.4 | 182.4 | n/a | 192.4 | 194.5 | 197.4 | 204.5 | 190.8 | 194.7 | 190.0 | 198.5 | 210.7 | 209.8 | 119.9 |
| Creditors and accruals | (350.0) | (261.7) | (278.4) | (262.1) | (254.0) | (277.2) | (319.1) | (304.6) | (323.0) | (309.6) | (285.7) | (283.7) | (395.2) | n/a | (294.0) | (264.3) | (265.5) | (254.8) | (315.3) | (316.1) | (328.5) | (314.7) | (263.5) | (273.1) | (307.7) |
| Net Music Royalties | (336.8) | (347.1) | (274.5) | (282.9) | (282.4) | (278.9) | (319.2) | (312.2) | (320.4) | (325.6) | (318.5) | (314.2) | (356.3) | n/a | (287.5) | (270.8) | (289.1) | (270.7) | (324.3) | (299.3) | (308.5) | (321.8) | (307.6) | (294.3) | (303.3) |
| Inter-company | (4.6) | (1.7) | 4.4 | 0.6 | (1.1) | (3.3) | (9.2) | (5.8) | (9.0) | (5.9) | (9.0) | (1.1) | (11.0) | n/a | (8.7) | (4.7) | (5.5) | (4.2) | (8.4) | (7.8) | (8.1) | (8.4) | (2.0) | (1.9) | 19.8 |
| Net working capital | (180.3) | (33.7) | (25.2) | 12.8 | 22.8 | 16.3 | (49.6) | 44.1 | 52.3 | 68.7 | (18.2) | (25.4) | (146.1) | (30.0) | (29.9) | 12.5 | 29.5 | 57.5 | 31.0 | 50.7 | 70.2 | 21.8 | 43.3 | 23.1 | (16.6) |
| Add back advances (net of provisions) | (176.8) | (197.7) | (185.0) | (186.7) | (190.3) | (198.6) | (188.6) | (192.1) | (181.4) | (182.5) | (185.4) | (187.4) | (182.4) | n/a | (192.4) | (194.5) | (197.4) | (204.5) | (190.8) | (194.7) | (190.0) | (198.5) | (210.7) | (209.8) | (119.9) |
| Adjusted net working capital | (357.1) | (231.4) | (210.2) | (173.9) | (167.5) | (180.3) | (238.4) | (148.0) | (129.1) | (113.8) | (203.6) | (212.8) | (328.5) | n/a | (222.3) | (182.0) | (168.9) | (147.0) | (165.8) | (144.0) | (119.8) | (174.7) | (168.8) | (180.7) | (255.5) |
| Advances - impact of accounting estimate | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | (77.3) | |
| Adjusted advances (net of provision) | 99.5 | 120.4 | 107.7 | 109.4 | 113.0 | 118.3 | 111.5 | 114.6 | 104.1 | 105.2 | 108.1 | 110.1 | 105.1 | | | | | | | | | | | | |
| 12-month rolling average | | | | | | | | | | | (9.6) | 115.1 | 117.2 | (6.5) | 120.1 | 127.2 | 119.5 | 117.4 | 112.7 | 119.2 | 133.4 | 132.5 | 119.9 | | |
| | | | | | | | | | | | | (9.6) | (6.8) | (8.5) | (6.9) | (8.4) | (3.0) | 3.7 | 4.3 | 5.8 | 1.9 | 7.1 | 11.1 | 12.0 | |

Source:  VDD report, KPMG analysis

**Music Publishing - monthly working capital**

| £m | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 | Feb-07 | Mar-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Current asset investments | | | | | | | | | | | | | | | | | | | | | | | | | |
| Inventories | 0.2 | | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | n/a | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Receivables (net of provisions) | 29.4 | | 42.6 | 35.2 | 38.0 | 42.9 | 36.7 | 40.7 | 47.3 | 42.7 | 44.3 | 55.3 | 47.9 | n/a | 59.6 | 53.7 | 57.6 | 64.5 | 29.8 | 35.3 | 42.8 | 42.7 | 38.0 | 50.2 | 38.0 |
| Advances (net of provisions) | 161.0 | | 179.4 | 166.4 | 175.7 | 175.6 | 159.2 | 161.9 | 158.8 | 154.8 | 159.4 | 152.5 | 142.1 | n/a | 159.7 | 159.6 | 160.5 | 161.1 | 143.3 | 152.2 | 151.9 | 152.7 | 159.5 | 153.8 | 119.4 |
| Creditors and accruals | (27.4) | | (17.4) | (17.1) | (15.4) | (17.2) | (16.8) | (13.2) | (12.7) | (15.0) | (12.7) | (12.9) | (26.5) | n/a | (15.0) | (17.8) | (15.8) | (15.0) | (17.7) | (16.1) | (15.4) | (17.2) | (14.3) | (13.3) | (28.9) |
| Net Music Royalties | (225.9) | | (198.0) | (219.3) | (231.7) | (226.4) | (235.9) | (198.0) | (208.4) | (226.7) | (231.6) | (225.1) | (243.4) | n/a | (205.5) | (240.0) | (246.8) | (244.8) | (221.4) | (191.0) | (206.5) | (229.0) | (231.4) | (232.2) | (245.3) |
| Intercompany | 7.8 | | 7.6 | 2.2 | — | 1.4 | 2.0 | 1.8 | 1.8 | 1.7 | 1.4 | 1.7 | 2.0 | n/a | 0.9 | 2.1 | 1.8 | 2.1 | 3.1 | 2.9 | 2.8 | 2.0 | 1.5 | 2.5 | 3.4 |
| Net working capital (including advances) | (54.9) | n/a | 14.8 | (32.4) | (33.2) | (23.5) | (52.6) | (4.8) | (11.0) | (44.3) | (39.3) | (28.3) | (77.7) | n/a | (0.1) | (45.2) | (42.0) | (31.9) | (62.7) | (16.3) | (24.1) | (47.8) | (46.5) | (38.6) | (116.2) |
| Addback (advances net of provisions) | (161.0) | | (179.4) | (166.4) | (175.7) | (175.6) | (159.2) | (181.9) | (158.8) | (154.8) | (159.4) | (152.5) | (142.1) | n/a | (159.7) | (159.6) | (160.5) | (161.1) | (143.3) | (152.2) | (151.9) | (152.7) | (159.5) | (153.8) | (119.4) |
| Adjusted net working capital | (215.9) | n/a | (164.6) | (198.8) | (208.9) | (199.1) | (211.8) | (166.5) | (169.8) | (199.1) | (198.7) | (180.8) | (219.8) | n/a | (159.8) | (201.6) | (202.5) | (193.0) | (206.0) | (168.7) | (176.0) | (200.5) | (208.0) | (192.6) | (235.8) |
| Advances - impact of accounting estimate | (17.0) | | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | (17.0) | |
| Adjusted advances (net of provision) | 144.0 | | 162.4 | 149.4 | 158.7 | 158.6 | 142.2 | 144.8 | 141.8 | 137.8 | 142.4 | 135.5 | 125.1 | | 142.7 | 139.6 | 143.5 | 144.1 | 126.3 | 135.2 | 134.9 | 135.7 | 142.5 | 136.8 | 119.4 |
| 12-month rolling average | | | | | | | | | | | | (28.1) | (30.2) | (30.2) | (31.5) | (32.7) | (33.5) | (34.3) | (35.2) | (36.3) | (37.5) | (37.8) | (38.4) | (38.4) | (42.9) |
| 12-month rolling average (adjusted) | | | | | | | | | | | | (192.2) | (192.6) | (192.6) | (192.1) | (192.4) | (191.8) | (191.2) | (190.7) | (190.9) | (191.5) | (191.6) | (192.3) | (193.3) | (194.9) |

Source:  VDD report, KPMG analysis

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

A-880

TF0000113293

Appendix 5
# Monthly working capital (continued)

Music working capital



Source:   VDO report, KPMG analysis

Music Publishing working capital



Source    VDO report, KPMG analysis



A-881

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved

Confidential

TF0000113294

Appendix 6
## Monthly advances (net)

Advances (net of provisions)



Source: VODD report, KPMG analysis



Confidential

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

71

TF0000113295

Appendix 7
# Net debt per VDD report

| Net debt per VDD £m | 31 March 2006 | 31 March 2007 |
|---|---|---|
| US $500 million 8.375% guaranteed notes | (287.7) | (252.0) |
| £325 million 8.25% sterling bonds | (323.1) | (324.0) |
| US $243.3 million 5.25% guaranteed convertible bonds | (123.1) | (109.4) |
| Euro 425 million 8.625% senior notes | (300.0) | (285.5) |
| Long term committed facilities | 1.5 | (245.3) |
| Term loan | (3.2) | - |
| Finance lease obligations | (18.8) | (17.1) |
| Overdrafts | (19.6) | (9.5) |
| Gross borrowings | (1,074.0) | (1,242.8) |
| Gross cash | 194.5 | 333.2 |
| Reported net debt | (879.5) | (909.6) |
| Cash equivalents | 17.4 | 10.4 |
| Interest payable | (40.7) | (40.4) |
| | (902.8) | (939.6) |
| Accounting adjustments | | |
| Debt issuance costs | | (25.4) |
| Fair value of interest rate swaps | | (2.2) |
| IAS 39/32 treatment of convertible bonds | | (11.0) |
| US $550 million notes adjustment | | (1.1) |
| €425 million notes adjustment | | 2.3 |
| | | (37.4) |
| Working capital adjustment | | (137.5) |
| Restructuring costs | | (81.1) |
| Consideration for acquisition of Toshiba Dice Limited | | (93.3) |
| Adjusted financial net debt | | (1,288.9) |
| Pension deficit | | (37.7) |
| Net cash on issue of share options | | 49.4 |
| Total net debt per VDD | | (1,277.2) |

Source: VDD report

**Basis of preparation**

≥ Net debt presented here is as reported in the Group Net Debt and Treasury sections of the VDD report

A-883



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113296

## Appendix 8
# Net debt by territory

**Net borrowing by territory**

| £m | Cash | Borrowings | Net |
|---|---|---|---|
| UK | 220.9 | (965.4) | (744.5) |
| North America | | | |
| Canada | 8.2 | (0.3) | 8.0 |
| USA | 16.9 | (254.8) | (237.9) |
| | 25.2 | (255.1) | (229.8) |
| Euro Bloc | | | |
| Austria | 0.4 | - | 0.4 |
| Belgium | 1.7 | - | 1.7 |
| Finland | 0.9 | - | 0.9 |
| France | 12.7 | (17.0) | (4.3) |
| Germany | 8.5 | - | 8.5 |
| Greece | 3.2 | - | 3.2 |
| Ireland | 1.2 | - | 1.2 |
| Italy | 2.8 | - | 2.8 |
| Netherlands | 3.1 | - | 3.1 |
| Portugal | 0.2 | (0.1) | 0.0 |
| Spain | 3.4 | - | 3.4 |
| | 38.0 | (17.2) | 20.8 |
| Europe | | | |
| Czech Republic | 0.8 | - | 0.8 |
| Denmark | 0.7 | - | 0.7 |
| Hungary | 0.7 | - | 0.7 |
| Norway | 2.2 | - | 2.2 |
| Poland | 1.8 | - | 1.8 |
| Sweden | 2.1 | - | 2.1 |
| Switzerland | 0.7 | - | 0.7 |
| Turkey | 0.6 | - | 0.6 |
| | 9.4 | - | 9.4 |

**Net borrowing by territory (continued)**

| £m | Cash | Borrowings | Net |
|---|---|---|---|
| Asia | | | |
| China | 0.8 | - | 0.8 |
| Hong Kong | 0.2 | - | 0.2 |
| India | - | (0.2) | (0.2) |
| Indonesia | 1.0 | - | 1.0 |
| Japan | 8.8 | - | 8.8 |
| Malaysia | 1.1 | - | 1.1 |
| Philippines | 0.5 | - | 0.5 |
| Singapore | 0.5 | - | 0.5 |
| South Korea | 5.0 | - | 5.0 |
| Taiwan | 2.3 | (0.6) | 1.7 |
| Thailand | 0.1 | - | 0.1 |
| | 20.3 | (0.8) | 19.6 |
| Rest of World | | | |
| Argentina | 2.5 | - | 2.5 |
| Australia | 4.9 | - | 4.9 |
| Brazil | 3.5 | (4.7) | (1.2) |
| Chile | 1.0 | - | 1.0 |
| Colombia | - | (0.1) | (0.1) |
| Mexico | 2.1 | - | 2.1 |
| New Zealand | 0.8 | - | 0.8 |
| South Africa | 4.1 | - | 4.1 |
| UAE | 1.3 | - | 1.3 |
| | 20.2 | (4.9) | 15.3 |
| Total | 333.9 | (1,243.3) | (909.4) |
| Difference | (0.7) | 0.5 | (0.2) |
| Total per VDD | 333.2 | (1,242.8) | (909.6) |

Source:   Data room information, VDD report

A-884



This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113297

# Appendix 9
# Pensions background information

**Introduction**

z  This appendix sets out certain background information in relation to the Dice Pension Fund. Please note that the figures exclude any information in relation to other (non-UK) defined benefit arrangements operated by Dice

**Background Information**

z  The table below shows a summary of the membership data at the last formal funding valuation date, 31 March 2006:

**Membership data at 31 March 2006**

| | Number | Total salary/ pension (£m) | Liability-weighted average age |
|---|---|---|---|
| Actives | 864 | 38.1 | 47 |
| Deferreds | 11,388 | 16.1 | 52 |
| Pensioners | 10,069 | 43.6 | 71 |

Source:  Data room information

z  The following table shows the split of the assets by class at 31 March 2006:

**Split of assets at 31 March 2006**

| | Proportion | Amount £m |
|---|---|---|
| UK equities | 19% | 184 |
| Overseas equities | 18% | 174 |
| UK public sector bonds | 17% | 164 |
| Other bonds | 7% | 68 |
| Managed funds – bonds | 17% | 164 |
| Managed funds – equities | 21% | 203 |
| Cash and net current assets | 1% | 10 |
| Total | 100% | 967 |

Source:  Data room information

z  Dice has subsequently proposed that the bond component of the investment strategy is increased to 55%

**Summary of actuarial valuation as at 31 March 2006**

z  The table below shows a summary of the initial results of the funding valuation as at 31 March 2006. We understand that Dice has proposed a revised funding target with a deficit of zero; however, we do not have specific details of the basis used to derive the revised results

**Summary of initial results for the 31 March 2006 funding valuation**

| | £m |
|---|---|
| Liabilities | |
| Actives | 81 |
| Deferreds | 288 |
| Pensioners | 642 |
| Money purchase AVCs | 5 |
| Total | 1,016 |
| Assets | |
| Total | 967 |
| Surplus/(deficit) | (49) |
| Company cost of future service benefits (including expenses) | 29% of pensionable salaries |

Source:  Data room information

**Key assumptions as at 31 March 2006**

| | % |
|---|---|
| Discount rate | |
| Pre-retirement | 6.8% |
| Post-retirement (non-pensioners) | 4.1% |
| Post-retirement (pensioners) | 4.4% |
| Inflation | 3.0% |
| Salary increases (contribution rate only) | 5.0% |
| Pension increases | 3.0% |
| Life expectancy from 65 | |
| Male aged 45 | 22.0% |
| Male aged 65 | 20.7% |
| Female aged 45 | 22.5% |
| Female aged 65 | 21.3% |

Source   Data room information

A-885


This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

Confidential

TF0000113298

# Appendix 9
# Pensions background information (continued)

**IAS 19 draft results as at 31 March 2007**

z  The table below shows the IAS 19 results as at 31 March 2007:

**Accounting IAS 19 draft results at 31 March 2007**

|  | UK | Germany | Japan | Other[a] | Total |
|---|---|---|---|---|---|
| Assets | 955 | 4 | 16 | - | 975 |
| Liabilities | (962) | (35) | (13) | 8 | (1,018) |
| Surplus/(deficit) | (7) | (31) | 3 | (8) | (43) |

Note:    (a)   As at 31 March 2006 – VDD report states that figure at 31 March 2007 should be broadly similar

Source:   Data room information

**Accounting assumptions at 31 March 2007**

|  | UK | Germany | Japan |
|---|---|---|---|
| Discount rate | 5.4% | 4.8% | 2.2% |
| Inflation | 3.0% | 2.0% | - |
| Salary increases | 5.0% | 3.0% | 2.2% |
| Pension increases | 3.0% | 2.0% | - |

Source:   Data room information

This document is CONFIDENTIAL and its circulation and use are RESTRICTED. © 2007 KPMG LLP, a UK limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative. All rights reserved.

A-886

Confidential

TF0000113299

Confidential

CITI-TF 00322469

A-887

# Deloitte.

**STRICTLY PRIVATE**

**AND CONFIDENTIAL**

Project Mulberry

Limited Scope Vendor Due Diligence Report

Dated 4 May 2007



DEPOSITION EXHIBIT
Barak 11
7 15 /10
ERIC J. FINZ

This Report has been prepared on the basis of the limitations set out in the Scope and Bases of Review on page 3 and the matters noted in the transmittal letter over the page.   For your convenience, this document may have been made available to you in electronic as well as hard copy format.  Multiple copies and versions of this document may, therefore, exist in different media.  Only the final signed copy should be regarded as definitive.

Audit . Tax . Consulting . Corporate Finance .

Deloitte & Touche LLP is authorised and regulated by the Financial Services Authority.

©2007 Deloitte & Touche LLP

Confidential

CITI-TF 00322470

A-888

# Deloitte.

The Directors
EMI Group plc
27 Wrights Lane
London
W8 5SW

Deloitte & Touche LLP
Athene Place
66 Shoe Lane
London EC4A 3BQ

Tel: +44 (0) 207 936 3000

www.deloitte.co.uk

4 May 2007

Dear Sirs

**Project Mulberry**

We enclose our report ("the Final Report") prepared in connection with the proposed transaction involving the possible offer to acquire the issued share capital of EMI Group plc ("the Transaction") in accordance with the terms of the contract dated 2 May 2007 (the "Contract"), which is attached as an Appendix.

The Final Report is confidential and is intended for the use of the Addressees and the use and solely for the benefit of the Agreed Purchasers and Agreed Lenders, if any, based on the definitions in the Contract, Terms of Business, in accordance with the terms of the Contract. No other party is entitled to rely on the Final Report for any purpose whatsoever and we accept no responsibility or liability to any party other than the Agreed Purchasers and Agreed Lenders in respect of the Final Report.

We draw your attention to the section titled "Scope and Bases of Review" included in the Final Report in which we refer to the scope of our work, sources of information and the limitations of the work undertaken. Our field work was completed on 3 May 2007 (the "Cut-Off Date" for the purposes of Clause 5.8 of the Contract, Terms of Business) and we have not updated our work since that date, except in respect of the Management representations.

The Final Report comprises five volumes.

Volume 1: Group overview

Volume 2: Music review

Volume 3: Music Publishing review

Volume 4: Central activities and specialist reviews

Volume 5: Appendices

Audit . Tax . Consulting . Corporate Finance .

Member of
Deloitte Touche Tohmatsu

Deloitte & Touche LLP is a limited liability partnership registered in England and Wales with registered number OC303675. A list of members' names is available for inspection at Stonecutter Court, 1 Stonecutter Street, London EC4A 4TR, United Kingdom, the firm's principal place of business and registered office. Deloitte & Touche LLP is authorised and regulated by the Financial Services Authority.

Confidential

# Deloitte.

The limitations on the depth and breadth of our Final Report should be viewed in the context of a Public Company transaction environment, albeit the Final Report contains information considerably in excess of that currently available in the public domain.

Our work has been limited by the time and information made available and by the restricted numbers of the Target Group employees who are aware of the scope and nature of our work and were therefore able to respond to our questions ("Target Group Management"). In addition, the scope of work has been restricted to specific key areas (identified by you) to be covered by the Final Report and is significantly less than a typical full scope exercise. In accordance with your instructions, we have not had access to the Target Group's auditors and tax advisers, nor have we reviewed their workpapers.

In particular, we have had no access to divisional and regional management which precluded us from making enquiries of them regarding certain key operational and financial matters.

Consequently our work was more limited than is usual and did not permit more than brief reviews and summaries, such as comparative analytical scheduling, of the information in certain areas. Whilst we have used reasonable endeavours in the circumstances to address the specific areas of enquiry included in our scope in Appendix 2 to the Contract, such information was not all available from the data provided to us by Target Group Management, or at all. In the circumstances, it is unlikely that we will have identified all matters which may be of potential interest to Beneficiaries (as defined in the Contract). The information made available to us included unaudited information.

In the circumstances, our work and our Final Report should not be relied upon as being comprehensive as it will not cover all areas that might be of relevance to Beneficiaries and even in those areas within our scope of work we may not have become aware of all facts or information that Beneficiaries may regard as relevant. Furthermore we have not corroborated the information received and, to that extent, the information may not be entirely reliable. We accept no responsibility for matters not covered by the scope of our work or omitted due to the limited nature of our review. Our work will not be an adequate substitute for a detailed investigation on which reliance could properly be placed as part of the process in making an investment decision.

We provided a draft of this report dated 3 May 2007 to Target Group Management and asked them to confirm to the best of their knowledge and belief that the facts, as stated, are accurate in all material respects, that any opinions attributable to them are fair and reasonable, that they have made available to us all significant information relevant to the Final Report of which they have knowledge and that they are not aware of any material matters relevant to our terms of reference which have been excluded.

Target Management provided the confirmation we requested.

Yours faithfully

Deloitte & Touche LLP

A-889

CITI-TF 00322471

Confidential

Project Mulberry

Final Report

Dated 4 May 2007

# Scope and Bases of Review

The scope of our work is set out in Appendix 2 of our Contract dated 2 May 2007 (the "Contract").  Our work, which is summarised in this Final Report, has been specifically limited to matters on which you have instructed us to report.

Our work has not been carried out in accordance with auditing or other standards and practices generally accepted in the United Kingdom or other jurisdictions ("Audit Procedures") and accordingly should not be relied upon as if it has been carried out in accordance with those standards and practices.

**Limited Access to Management and Information**

Our initial access to management was restricted to a limited number of meetings and other communications with senior and central Group Management up until 27 April 2007 at the Target Group's premises at 27 Wright's Lane, London W8 5SW.  This senior Group management team consisted of:

**Senior Management**

| | |
|---|---|
| Martin Stewart | - Chief Financial Officer |
| Mark Barak | - Senior Vice President, Corporate Finance and Strategy |
| Ian Smellie | - Senior Vice President, Group Financial Controller |
| Duncan Bratchell | - Senior Vice President (Treasury and taxation) |
| Chris Ancliff | - General Counsel |

**Other Management**

| | |
|---|---|
| Melanie Hudson | - Manager, Financial Analysis |

The majority of our fieldwork was undertaken offsite.  Access was available via pre-arranged meetings, e-mail and telephone calls with further limited access to the following additional personnel from 25 April 2007:

| | |
|---|---|
| Chris Holmes | - Manager, Corporate Finance and Strategy |
| Graham Collins | - Manager, Financial Analysis |

Together we refer to the individuals listed above as "Target Management".

We have not been granted access to any of the regional offices or personnel of EMI Group and this has limited our ability to obtain a detailed understanding of business trends within local territories and therefore for the Target Group overall.  The amount of financial information and analysis in the Group management accounts relating to Music Publishing is considerably less than that relating to Music.  In addition, the central finance function now performs that role for Music (as well as Group) and consequently their knowledge of that business is greater than of Music Publishing.  The lack of access to regional management has significantly impacted the depth of our review and analysis of Music Publishing and, to a lesser degree, Music.

In undertaking a typical review of this nature we would expect to obtain corroborative evidence and information in support of the comments and interpretations provided by Target Management.  Due to the limited time available and restrictions over access to people and underlying information sources we have been unable to undertake these usual procedures.  We cannot say to what extent these limitations have affected the accuracy of this Final Report.

A-890

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322472

Confidential

*Project Mulberry*                          *Final Report*                          *Dated 4 May 2007*

# Scope and Bases of Review

**Normalised EBITDA**

Our involvement in the calculation of normalised EBITDA consisted solely of assisting you in the identification, documentation and accumulation of items using criteria discussed and agreed between ourselves. Because there is no authoritative literature or common standard with respect to the calculation of normalised EBITDA, there is no basis to state whether all appropriate and comparable adjustments have been made. In addition, while the identified adjustments may indeed be unusual or infrequently occurring, it is possible that there may have been other items not included in the calculation, and it is possible that future periods may also include such items, although they would be different from the historical items.

Our assessment of items to be considered for normalisations was limited to reviews undertaken of the monthly management accounts and discussions with Management.

As a result of the normalisation adjustments that have been presented you should note that normalised EBITDA within our report does not represent EBITDA that will be or has been reported in any of the periods presented.

**Other Matters**

This Report has been prepared using numeric tables prepared on Excel spreadsheets. As figures have been rounded (typically to £0.1 million), as such apparent summing errors of similar magnitude may appear in certain of the tables herein.

A-891

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322473

Confidential

*Project Mulberry*                          *Final Report*                                    *Dated 4 May 2007*

# Contents

**Strapline Summary**

**Volume 1 – Group Overview**

**Volume 2 - Music**

**Volume 3 – Music Publishing**

**Volume 4 – Central activities and specialist reports**

   i. Pensions

   ii. Treasury

   iii. Restructuring

   iv. Taxation

   v. Central activities

**Volume 5 - Appendices**

A-892

CITI-TF 00322474

© 2007 Deloitte & Touche LLP. Private and confidential

Dated 4 May 2007

© 2007 Deloitte & Touche LLP. Private and confidential

# Strapline Summary

Final Report

Project Mulberry

Confidential

CITI-TF 00322475

Dated 4 May 2007

© 2007 Deloitte & Touche LLP. Private and confidential

Final Report

**Group**

7

Project Mulberry

Confidential

CITI-TF 00322476

Confidential

*Project Mulberry*                     *Final Report*                                   *Dated 4 May 2007*

# Group

**Overview of Status of Our Work**

- Given the limited access to information and Management, it is likely that there are further matters which we would typically include in our report which are currently omitted

- Our analysis has principally been focused on a divisional (Music and Music Publishing) level

- This summary of straplines should be read in conjunction with the rest of the report

**Group Trading Performance**

- In comparison to Music, Music Publishing was significantly more profitable in FY07 and more stable throughout the Historical Period.  The poor performance in FY07 reflects the challenges facing Music's business and there are significant levels of exceptional costs excluded from reported EBITDA

- On a statutory basis, revenue has declined by £328.9 million (15.8 per cent) in FY07 compared to FY06. On a constant currency basis, revenue has declined by £252.1 million (12.1 per cent)

- FY07 results include exceptional items totalling £304 million (net, pre-tax) which relate to reorganisations and restructurings and other items separately identified because of their quantum

- Within the £304 million, Management has identified £135 million of write-offs and provisions relating to the FRESH programme

- During FY07, Mulberry disposed of properties in the US, Japan and South Africa.  The profits from sale of these properties have been excluded from normalised EBITDA

- Whilst we have identified a number of normalising adjustments, of the normalisation adjustments that we have been able to quantify, they are insignificant in comparison to the items identified as exceptional by Management and shown separately in the management accounts

- In response to the declining market and the commensurate operating challenges facing the business, Management have instigated a restructuring plan to reduce the cost base of the business

A-895

CITI-TF 00322477

8

© 2007 Deloitte & Touche LLP. Private and confidential

Confidential

*Project Mulberry*                    *Final Report*                    *Dated 4 May 2007*

# Group

**Group Balance Sheet**

- As at 31 March 2007 the net liability position of the Group was £1,184 million

- Gross advances to artists, composers and songwriters are a significant feature of the business and the Group revised its basis of estimating advances provisions in FY07 resulting in a one-off provision increase of £94 million.  As at 31 March 2007, gross advances were £955.9 million offset by a provision of £717 million

**Net debt**

- Prior to the inclusion of pension deficit, cash inflow from the exercise of share options and break costs, adjusted financial net debt was £1,288.9 million at 31 March 2007.  There are also a number of other factors that also need to be considered

- There are potentially significant break costs associated with the US guaranteed notes, UK sterling bonds, the Euro senior notes and the US convertible bonds

**Group Cash Flow**

- Operational cash flows have reduced from £223.5 million in FY06 to £72.3 million in FY07 reflecting a challenging trading environment and lower levels of period end cash management at 31 March 2007

- As is the nature of Mulberry's business, there is a significant time lag between receipt of royalties and payment on to artists, composers and songwriters, which typically gives rise to negative working capital in Music Publishing.  Music's working capital level is typically positive due to the high level of advances made

- Historically there has been a significant focus on semi-annual catalogue campaigns by the Group at the mid-year and year-end.  The decline in creditor days when comparing 31 March 2007 level to 2006 levels would indicate that the period end cash management policy has been less aggressively pursued (Music 178 days and 200 days respectively, Music Publishing 612 days and 737 days)

- Cash spend on restructuring costs for restructuring initiatives in FY07 totalled £85.5 million (split between RE3 spend of £59.7 million and RE4 spend of £25.8 million respectively). This was partially funded by property sales made during FY07 and cash received from the Bertelsmann settlement

CITI-TF 00322478

A-896

© 2007 Deloitte & Touche LLP. Private and confidential

Dated 4 May 2007

Final Report

Project Mulberry

# Music

© 2007 Deloitte & Touche LLP. Private and confidential

10

CITI-TF 00322479

Confidential

*Project Mulberry*                          *Final Report*                                        *Dated 4 May 2007*

# Music

**Revenue**

- The decline in physical sales accelerated in FY07 due to: a general decline in the physical market; de-stocking by retailers resulting in higher volumes of returns; and the under-performance of major new releases
- On-going structural changes to physical sales in a highly competitive market environment have resulted in a decline in both revenues and margins in FY07
- Unit prices have been under pressure from distributors and sales outlets.  Notwithstanding this, unit prices have not declined to the same extent as volumes
- Catalogue unit sales have declined due to a change in the retail mix.  Compilation unit sales have reduced as end users increasingly compile their own playlists
- Digital sales, which accounted for c.10.4 per cent of overall sales in FY07, have more than trebled during the Historical Period.  However, Mulberry's digital sales growth of 59.0 per cent in FY07 was less than market growth of 67.2 per cent.
- Revenue is driven to a significant extent by the success of international acts, the largest and most successful of which have historically been UK-signed
- High margin revenue streams, including Neighbouring Rights and Licence income, continues to perform
- The £41.8 million increase in the September FY07 catalogue campaign versus FY06 led to significantly higher than normal level of returns in the following months.  As a result, EBITDA in the second half of FY07 was substantially below prior years

**The impact of the semi annual catalogue campaigns**

- The incidence of physical unit returns increased in FY07 as North American and German distributors returned higher volumes than previously experienced.  This is due to the impact on returns of a more significant catalogue campaign in September 2006 and the general market decline
- In March 2007 the semi-annual catalogue campaign was less pronounced, being £63 million (31 per cent) lower than in March 2006
- The high level of returns has also caused an increase in the level of stock required to be provided against

A-898

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322480

Confidential

*Project Mulberry*                    *Final Report*                    *Dated 4 May 2007*

# Music

Costs

- Music is in the process of changing its cost structure in response to the changing nature and demographics of the music industry which has been compounded by the poor performance of key Music artists in FY07

- Revenue declines of 14.8 per cent in FY07 have only been partly offset by a 9.6 per cent decline in total costs

- The reduction in royalty and copyright costs in absolute terms reflects their fully variable nature

- Despite a 14.8 per cent decline in revenue, marketing and promotion costs reduced by only £6.0 million (2.9 per cent) on FY06 levels, driven by lower levels of spending in UK and Ireland, offset by committed spend in North America on several prominent artists

- The time difference between incurring marketing expenditure and receiving the associated revenue stream can range from two to eight weeks

- Declining manufacturing cost percentage reflects outsourcing of manufacturing and an increase in sales through the digital channel. In FY07 increase in distribution cost ratios reflects the cost of returns. The increase in origination cost ratios is due to the semi variable nature of the cost

- Decreases in overhead costs are driven by decreases in payroll costs, which reflect the implementation of the restructuring programmes. There are further headcount savings to come

- Excluding the advance provision adjustments treated as exceptional, provisions expense on an absolute basis has remained static

- Headcount reductions have been achieved across all functions with a net reduction of 16.5 per cent in year end staff numbers from FY06 to FY07

- IT expenditure has averaged 4.3 per cent of revenue over the Historical Period

A-899

CITI-TF 00322481

© 2007 Deloitte & Touche LLP. Private and confidential

Confidential

*Project Mulberry*                              *Final Report*                              *Dated 4 May 2007*

# Music

**Balance Sheet and Working Capital**

- Recoupable cash advances remained consistent between FY06 and FY07, whilst the provision increased significantly due to the change in accounting estimate, reducing the net advances balance by c.£74 million at Management exchange rates (£77 million at statutory rates)

- In addition, there was a specific £16 million write-down in respect of one major artist.

- Management employs a broad definition in respect of the working capital of the business. The inclusion of provisions in respect of advances has a significant impact on the level of net working capital as does September and March working capital management

- Adjusting for the impact of the change in advance provisioning estimate and the Bertelsmann creditor, FY07 year-end working capital is (£61.6) million compared to a simple FY07 month-end average of £18.1 million, a difference of £(79.7) million

- For material working capital balances, the year end position is significantly lower than during the other times of the year

- Provisions represent a significant item on Music's balance sheet aggregating £864.4 million as at 31 March 2007 of which advance provisions represent over half

- Advance payments in Q4 FY07 were 21.8 per cent below the December 2006 forecast

- £75.4 million has been provided against the future costs of implementing RE4

**Cash Flows**

- The decrease in FY07 operating cash flow reflects the decline in FY07 trading profitability.  The operating cash outflow was partially offset by several one-off property disposals

- Advances represent the largest discretionary cash outflow of the division

- The semi annual catalogue campaigns in September and March combined with high rates of debtor collection and deferring creditor payments results in operating cash flow peaks in those months, with low-points in October and April as the position reverses.  The month on month profiles for FY06 and FY07 track each other closely

A-900

CITI-TF 00322482

© 2007 Deloitte & Touche LLP. Private and confidential