# 11-0126-cv

## United States Court of Appeals

*for the*

## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX**
**Volume 4 of 65 (Pages A-901 to A-1200)**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

| | **Page** |
|---|---|
| District Court Docket Entries | A-1 |
| Summons and Complaint, dated December 11, 2009 | A-39 |
| Declaration of Adrian Briggs, for Defendants, in Support of Motion to Dismiss, dated January 20, 2010, with attached *Curriculum Vitae* | A-89 |
| Declaration of Strauss, for Plaintiffs, in Opposition to Defendants' Motion, dated February 2010, with attached *Curriculum Vitae* | A-106 |
| Second Declaration of Adrian Briggs, for Defendants, in Support of Motion to Dismiss, dated February 11, 2010 | A-137 |
| Defendants' Answer to Plaintiff's Complaint, dated April 7, 2010 | A-149 |
| Notice of Motion for Summary Judgment, by Defendants, dated August 13, 2010 | A-171 |
| Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment, dated August 13, 2010 | A-173 |
| Declaration of Gary R. Carney, in Support of Defendants' Motion for Summary Judgment, dated August 13, 2010 | A-199 |
| Exhibit 1 to Carney Declaration - Terra Firma Private Placement Memorandum, dated April 2006 | A-217 |
| Exhibit 2 to Carney Declaration - Terra Firma Capital Partners II Q3 2007 report, dated November 2007 | A-318 |

Page

Exhibit 3 to Carney Declaration - E-mail from Smith to Wormsley, dated December 14, 2006 ............................................. A-363

Exhibit 4 to Carney Declaration - Letter from Kelly to EMI Group plc, dated December 14, 2006 ............................................. A-366

Exhibit 5 to Carney Declaration - Letter from Nicoli to Kelly, dated December 15, 2006 ............................................. A-368

Exhibit 6 to Carney Declaration - EMI Press Release, dated February 20, 2007 ........ A-369

Exhibit 7 to Carney Declaration - Letter from Gildersleeve to Bronfman, dated March 2, 2007 ...................................................... A-371

Exhibit 8 to Carney Declaration - Minutes of March 1 and March 2, 2007 EMI Group plc Directors meetings .............................. A-372

Exhibit 9 to Carney Declaration - E-mail from Klein to Wormsley and Smith, dated April 20, 2007 ...................................................... A-383

Exhibit 10 to Carney Declaration - Witness statement of Nicoli, dated July 5, 2010.... A-385

Exhibit 11 to Carney Declaration - EMI Group plc Directors meeting, dated April 20, 2007 ...................................................... A-396

Exhibit 12 to Carney Declaration - E-mail from Barak to Wormsley *et al.*, dated April 20, 2007, with attachment .......................... A-404

Page

Exhibit 13 to Carney Declaration - E-mail from Barak to Wormsley *et al.*, dated April 20, 2007, with attachments .......................... A-415

Exhibit 14 to Carney Declaration - E-mail from Ashcroft to Wormsley *et al.*, dated April 23, 2007, with attachment .......................... A-427

Exhibit 15 to Carney Declaration - EMI News Release, dated May 4, 2007 ............... A-437

Exhibit 16 to Carney Declaration - Letter from Bronfman to Gildersleeve, dated May 10, 2007 ....................................................... A-439

Exhibit 17 to Carney Declaration - Memorandum from Punja *et al.* to the IAC, dated February 5, 2007 ................................................... A-441

Exhibit 18 to Carney Declaration - Memorandum from Seymour to Punja, dated March 2, 2007 ....................................................... A-457

Exhibit 19 to Carney Declaration - E-mail from Reid to Seymour, dated May 16, 2007 ....................................................... A-462

Exhibit 20 to Carney Declaration - Music Industry Key Market Outlook Summary of Findings prepared by L.E.K. Consulting, dated May 15, 2007 ....................................................... A-656

Exhibit 21 to Carney Declaration - Project Dice Limited Scope Financial Due Diligence Report, dated May 17, 2007 ................. A-783

Exhibit 22 to Carney Declaration - Project Mulberry Limited Scope Financial Due Diligence Report, Volume I, dated May 4, 2007 ... A-887

**Page**

Exhibit 23 to Carney Declaration - E-mail from Bell to Wormsley and Smith, dated May 9, 2007, with attachments .............................. A-929

Exhibit 24 to Carney Declaration - E-mail from Vallance on behalf of Hands to Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration - E-mail from Vallance on behalf of Hands to Punja, dated May 7, 2007 ..................................... A-939

Exhibit 26 to Carney Declaration - E-mail from Randell to Slattery, dated May 19, 2007 ........................................................ A-940

Exhibit 27 to Carney Declaration - Memorandum from Punja *et al.* to the IAC, dated May 7, 2007 .......................................................... A-944

Exhibit 28 to Carney Declaration - Terra Firma Investments (GP) 3 Limited Board of Directors meeting, dated May 8, 2007.................. A-954

Exhibit 29 to Carney Declaration - Agreement between Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited and EMI Group plc regarding Project Mulberry, dated May 9, 2007 .................... A-963

Exhibit 30 to Carney Declaration - E-mail from Van der Spuy to Bell and Punja, dated May 11, 2007, with attachments .................. A-976

Exhibit 31 to Carney Declaration - E-mail from Van der Spuy to TFCP Managing Directors and Ford, dated May 15, 2007, with attachment........................................................... A-995

**Page**

Exhibit 32 to Carney Declaration - E-mail from Punja to Hands, dated May 17, 2007 A-1003

Exhibit 33 to Carney Declaration - E-mail from Borrows to Bell, dated April 26, 2007 ........ A-1005

Exhibit 34 to Carney Declaration - E-mail from Lee to Scelfo *et al.*, dated May 2, 2007 ........ A-1006

Exhibit 35 to Carney Declaration - E-mail from Fong to Vakilian, dated May 15, 2007 ........ A-1007

Exhibit 36 to Carney Declaration - E-mail from Hayward-Cole to Bell, dated May 4, 2007 ........ A-1008

Exhibit 37 to Carney Declaration - E-mail from Ashcroft to Gildersleeve, dated May 10, 2007 ........ A-1009

Exhibit 38 to Carney Declaration - E-mail from Wormsley to Smith, dated May 6, 2007 ........ A-1011

Exhibit 39 to Carney Declaration - E-mail from Wormsley to Miller, dated May 8, 2007 ........ A-1012

Exhibit 40 to Carney Declaration - E-mail from Vallance on behalf of Hands to TF Team Dice, dated May 8, 2007 ........ A-1013

Exhibit 41 to Carney Declaration - E-mail from Vallance on behalf of Hands to Klein, dated May 17, 2007 ........ A-1014

| | Page |
|---|---|
| Exhibit 42 to Carney Declaration - E-mail from Curtis to Klein, dated May 17, 2007 . | A-1015 |
| Exhibit 43 to Carney Declaration - E-mail from Van der Spuy to Hoang, dated May 18, 2007, with attachments .................................. | A-1016 |
| Exhibit 44 to Carney Declaration - E-mail from Ginsburg to Billington, dated May 20, 2007 ....................................................... | A-1020 |
| Exhibit 45 to Carney Declaration - E-mail from Govindia to Rawlings, Lorkin, and Dolenec, dated May 20, 2007 ............................... | A-1022 |
| Exhibit 46 to Carney Declaration - E-mail from Rawlings to Dolenec, dated May 20, 2007 ....................................................... | A-1024 |
| Exhibit 47 to Carney Declaration - E-mail from Dolenec to Simpkin, dated May 20, 2007 ....................................................... | A-1026 |
| Exhibit 48 to Carney Declaration - E-mail from Dolenec to Simpkin, dated May 20, 2007 ....................................................... | A-1029 |
| Exhibit 49 to Carney Declaration - E-mail from Ginsburg to Dolenec, dated May 21, 2007 ....................................................... | A-1033 |
| Exhibit 50 to Carney Declaration - E-mail from Quigley to O'Haire and Van der Spuy, dated May 20, 2007 .................................... | A-1036 |
| Exhibit 51 to Carney Declaration - Project Dice Presentation to the IAC, dated May 18, 2007 ....................................................... | A-1041 |

Page

Exhibit 52 to Carney Declaration - E-mail from Khan to Dolenec *et al.*, dated May 19, 2007 ........................................................ A-1202

Exhibit 53 to Carney Declaration - E-mail from Dolenec to Hands, dated May 20, 2007 ........................................................ A-1203

Exhibit 54 to Carney Declaration - E-mail from Bell to Wormsley *et al.*, dated May 16, 2007 ........................................................ A-1207

Exhibit 55 to Carney Declaration - E-mail from Barak to Bell *et al.*, dated May 18, 2007 ........................................................ A-1208

Exhibit 56 to Carney Declaration - Minutes of EMI Group plc Directors meeting, dated May 18, 2007 .............................................. A-1212

Exhibit 57 to Carney Declaration - E-mail from Bell to Borrows, dated May 17, 2007 ........................................................ A-1220

Exhibit 58 to Carney Declaration - E-mail from Bell to Stewart and Barak, dated May 18, 2007 ........................................................ A-1221

Exhibit 59 to Carney Declaration - E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration - E-mail from Stewart to Barak, dated May 20, 2007 ........................................................ A-1226

Exhibit 61 to Carney Declaration - E-mail from Shott to Bell, dated May 20, 2007, with attachment.................................................... A-1231

Page

Exhibit 62 to Carney Declaration - E-mail from Wolf to Holt, dated May 20, 2007..... A-1235

Exhibit 63 to Carney Declaration - E-mail from Gildersleeve to Ashcroft *et al.*, dated May 20, 2007 ........................................................ A-1237

Exhibit 64 to Carney Declaration - E-mail from Ashcroft to Stewart *et al.*, dated May 20, 2007 ........................................................ A-1239

Exhibit 65 to Carney Declaration - E-mail from Hands to Wormsley, dated May 20, 2007 ........................................................ A-1241

Exhibit 66 to Carney Declaration - E-mail from Punja to Van der Spuy *et al.*, dated May 22, 2007 ........................................................ A-1245

Exhibit 67 to Carney Declaration - Memorandum from Punja *et al.* to the IAC, dated May 18, 2007 ........................................................ A-1246

Exhibit 68 to Carney Declaration - Draft Minutes of a Terra Firma Investments (GP) 2 Limited Board of Directors meeting, dated May 18, 2007 ........................................................ A-1247

Exhibit 69 to Carney Declaration - Minutes of a Terra Firma Investments (GP) 3 Limited Board of Directors meeting, dated May 18, 2007 ........................................................ A-1259

Exhibit 70 to Carney Declaration - Project Dice Presentation to the IAC, dated May 20, 2007 ........................................................ A-1271

Page

Exhibit 71 to Carney Declaration - Minutes of a meeting of the Investment Advisory Committee of Terra Firma Capital Partners Limited, dated May 20, 2007 ................................ A-1348

Exhibit 72 to Carney Declaration - Minutes of a Terra Firma Investments (GP) 2 Limited Board of Directors meeting, dated May 20, 2007 ........................................................ A-1350

Exhibit 73 to Carney Declaration - Minutes of a Terra Firma Investments (GP) 3 Limited Board of Directors meeting, dated May 20, 2007 ........................................................ A-1354

Exhibit 74 to Carney Declaration - Minutes of a meeting of a Committee of the Board of Directors of Terra Firma Investments (GP) 2 Limited, dated May 21, 2007 ..................... A-1356

Exhibit 75 to Carney Declaration - Minutes of a meeting of a Committee of the Board of Directors of Terra Firma Investments (GP) 3 Limited, dated May 21, 2007 ..................... A-1359

Exhibit 76 to Carney Declaration - Letter from Stokes to EMI Group plc, dated May 21, 2007 ........................................................ A-1362

Exhibit 77 to Carney Declaration - Recommended Cash Offer by Maltby Limited for EMI Group plc ..................................................... A-1372

Exhibit 78 to Carney Declaration - Minutes of a EMI Group plc Directors meeting, dated May 21, 2007 .............................................. A-1554

Page

Exhibit 79 to Carney Declaration - Offer Update and Extension of the Recommended Cash Offer by Maltby Limited for EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration - E-mail from Vallance on behalf of Hands to TF Team Dice *et al.*, dated June 14, 2007 .................. A-1567

Exhibit 81 to Carney Declaration - Offer Update and Extension of the Recommended Cash Offer by Maltby Limited for EMI Group plc, dated July 5, 2007....................... A-1568

Exhibit 82 to Carney Declaration - Update and Extension of the Recommended Cash Offer by Maltby Limited for EMI Group plc, dated July 13, 2007 .............................................. A-1571

Exhibit 83 to Carney Declaration - Update and Extension of the Recommended Cash Offer by Maltby Limited for EMI Group plc, dated July 20, 2007 .............................................. A-1574

Exhibit 84 to Carney Declaration - Extension of the Recommended Cash Offer by Maltby Limited for EMI Group plc, dated July 28, 2007........................................................ A-1577

Exhibit 85 to Carney Declaration - E-mail from Seaton to Foreman *et al.*, dated August 1, 2007..................................................... A-1580

Exhibit 86 to Carney Declaration - Maltby Capital Ltd. Annual Review for the Year Ended 31 March 2008.......................................... A-1590

Page

Exhibit 87 to Carney Declaration - EMI Business Description prepared by Terra Firma ........ A-1691

Exhibit 88 to Carney Declaration - £1,175,000,000 Senior Facilities Agreement for Maltby Limited, dated August 13, 2007 ........ A-1693

Exhibit 89 to Carney Declaration - £1,410,000,000 Securitisation Bridge Facility Agreement for Maltby Limited, dated August 13, 2007 ........ A-1900

Exhibit 90 to Carney Declaration - £155,000,000 Mezzanine Facility Agreement for Maltby Limited, dated August 13, 2007 ........ A-2079

Exhibit 91 to Carney Declaration - E-mail from Dowler to Hands, dated May 21, 2007 ........ A-2246

Exhibit 92 to Carney Declaration - E-mail from Melvin to Hands *et al.*, dated May 22, 2007 ........ A-2248

Exhibit 93 to Carney Declaration - E-mail from Aldred on behalf of Alexander to Hands, dated September 24, 2007 ........ A-2249

Exhibit 94 to Carney Declaration - E-mail from Vallance to TF Team Dice, dated September 25, 2007 ........ A-2250

Exhibit 95 to Carney Declaration - E-mail from Draffan to Simpkin and Smith, dated January 14, 2008 ........ A-2253

Page

Exhibit 96 to Carney Declaration - E-mail from Wormsley to Hands, dated February 1, 2008 .................................................. A-2254

Exhibit 97 to Carney Declaration - E-mail from Womsley to Miles, dated April 30, 2008 ....................................................... A-2256

Exhibit 98 to Carney Declaration - E-mail from Wormsley to Hands, dated February 6, 2009 .................................................. A-2258

Exhibit 99 to Carney Declaration - E-mail from Robert-Tissot to Hands, dated February 6, 2009 .................................................. A-2261

Exhibit 100 to Carney Declaration - E-mail from Hands to Wormsley, dated July 8, 2008 .......................................................... A-2263

Exhibit 101 to Carney Declaration - E-mail from Wormsley to Cabrey, dated July 1, 2008 .......................................................... A-2266

Exhibit 102 to Carney Declaration - EMI Investment Structure Chart ........................... A-2269

Exhibit 103 to Carney Declaration - November 2007 IAC EMI Update ......................... A-2270

Exhibit 104 to Carney Declaration - Memorandum from Simpkin *et al.* to Leat *et al.*, dated December 21, 2007 ..................................... A-2296

Exhibit 105 to Carney Declaration - E-mail from Burns to Prior *et al.*, dated July 4, 2008 .......................................................... A-2301

**Page**

Exhibit 106 to Carney Declaration - Minutes of a meeting of the Board of Directors of Maltby Capital Limited, dated March 6, 2009 ...... A-2307

Exhibit 107 to Carney Declaration - Letter from Maltby Acquisitions Limited and Maltby Investments Limited to Citibank International plc, dated March 10, 2008 ............... A-2312

Exhibit 108 to Carney Declaration - Letter from Citibank International plc to Maltby Acquisitions Limited and Maltby Investments Limited, dated March 17, 2009............................ A-2314

Exhibit 109 to Carney Declaration - Compliance Certificate from Maltby Acquisitions Limited to Citibank International plc, dated May 14, 2009 ....................................................... A-2317

Exhibit 110 to Carney Declaration - Letter from Sckerl to Chadd, dated September 24, 2009 ............................................ A-2327

Exhibit 111 to Carney Declaration - Letter from Maltby Investments Limited to Citibank N.A., London Branch, dated October 7, 2009 .................................................. A-2329

Exhibit 112 to Carney Declaration - Maltby Investments Limited Director's Report and Consolidated Financial Statements, dated March 31, 2009 .................................................... A-2334

Exhibit 113 to Carney Declaration - E-mail from Lo to Bazinet, Kulp, and Harlalka, dated July 15, 2009 .............................................. A-2479

Case: 11-126 Document: 48 Page: 15 04/25/2011 272867 401

**Page**

Exhibit 114 to Carney Declaration - E-mail from Leat to Lynn, Cockerill, and Simpkin, dated March 26, 2009 ............................ A-2480

Exhibit 115 to Carney Declaration - E-mail from Simpkin to Cockerill and Lynn, dated April 18, 2009 ............................................ A-2481

Exhibit 116 to Carney Declaration - E-mail from Smith on behalf of Hands to Lynn and Leat, dated August 19, 2009 .......................... A-2482

Exhibit 117 to Carney Declaration - E-mail from Lo to Bazinet, Kulp, and Harlalka, dated August 15, 2009 .......................................... A-2484

Exhibit 118 to Carney Declaration - Article titled, "Terra Firma in EMI Restructuring Talks With Citi," dated July 13, 2009 ................... A-2487

Exhibit 119 to Carney Declaration - Citi Investment Research & Analysis Report regarding Warner Music Group, dated September 15, 2009 .............................................. A-2489

Exhibit 120 to Carney Declaration - Michael Slattery's Project Dice notes .................... A-2510

Exhibit 121 to Carney Declaration - Draft Minutes of a meeting of a Committee of the Board of Directors of Terra Firma Investments (GP) 2 Limited, dated May 23, 2007 ..................... A-2558

Exhibit 122 to Carney Declaration - Update to the IAC regarding Project Dice, dated June 21, 2007 ....................................................... A-2560

Page

Exhibit 123 to Carney Declaration - Letter from Leat to Hands, dated November 10, 2009 .............................................. A-2581

Exhibit 124 to Carney Declaration - E-mail from Vallance on behalf of Hands to Klein, dated May 18, 2007 .................................. A-2583

Exhibit 125 to Carney Declaration - E-mail from Vallance on behalf of Hands to Wormsley, dated May 18, 2007 ............................ A-2584

Exhibit 126 to Carney Declaration - E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration - Declaration of John Loveridge in Opposition to Defendants' Motion to Dismiss executed on February 3, 2010 and filed in this action on February 4, 2010 .................................................. A-2588

Exhibit 128 to Carney Declaration - Excerpts of The Takeover Code............................ A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-2602

Mark Nimrod Barak, dated July 15, 2010 ................ A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 .................... A-2631

Simon A. Borrows, dated June 25, 2010................... A-2702

Andre Bourbonnais, dated July 13, 2010.................. A-2779

Andrew Chadd, dated July 23, 2010 (Reproduced herein at pp. CA-1-CA-53)

Page

Ricardo Hacelas Coats, dated June 23, 2010 ............ A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010.................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010.................. A-2959

Elio Leoni-Sceti, dated June 25, 2010 ...................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010......................... A-3027

Eric Nicoli, dated July 5, 2010 ................................ A-3039

Timothy Pryce, dated July 22, 2010 ......................... A-3087

Riaz Punja, dated July 28, 2010............................... A-3130

Michael Slattery, dated August 6, 2010 .................... A-3169

Martin David Stewart, dated July 7 and 8, 2010........ A-3177

Iain Stokes, dated August 6, 2010............................ A-3183

Kamal Fouad Tabet, dated July 29, 2010.................. A-3238

Francois Van der Spuy, dated July 7, 2010 ............... A-3242

Julie Williamson, dated July 28, 2010 ...................... A-3267

Alexander Wolf, dated July 14, 2010........................ A-3280

David Wormsley, dated July 20, 2010 ...................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated July 30, 2010....................................................... A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ................ A-3340

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006] EWCA Civ 1601 .................................................. A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007] EWHC 1151 (Comm) .......................................... A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal Bank of Scotland Plc* [2010] EWHC 1392 (Comm)............................................................... A-3493

*BSkyB Ltd v Sky Subscribers Services Limited* [2010] EWHC 86 ................................................. A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006] EWHC 2887 (QB) (Comm), [2007] EWCA Civ 811 ......................................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................. A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ...................... A-4240

*Bradford Building Society v Borders* [1941] 2 All ER 205 ............................................................... A-4258

*Downs v Chappell* [1997] 1 WLR 426 ...................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009] EWCA Civ 169 .................................................... A-4325

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All ER 583 .......... A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER (Comm) 573 .......... A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd* [2007] EWHC 2541 (QB) .......... A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465 .......... A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 .......... A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson & Co* [1991] 2 QB 113 .......... A-4671

*Bankers Trust International v Dharmala Sakti Sejahtera* [1996] CLC 518 .......... A-4688

*Valse Holdings SA v Merrill Lynch International Bank Ltd* [2004] EWHC 2471 .......... A-4741

*Peekay Intermark v Australia and New Zealand Banking Group* [2006] EWCA Civ 386 .......... A-4779

*JP Morgan Chase Bank v Springwell Navigation Corp* [2008] EWHC 1186 (Comm) .......... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland Plc* [2010] EWHC 211 (Comm) .......... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* [2008] EWHC 1686 (Comm), [2009] 1 All ER (Comm) 16, [2009] EWCA Civ 290 .......... A-5126

Case: 11-126 Document: 48 Page: 20 04/25/2011 272867 401

**Page**

*IFE Fund SA v Goldman Sachs International* 1 [2007] Lloyd's Rep 264 .......................................... A-5184

*William Sindall plc v Cambridgeshire County Council* [1994] 1 WLR 1016 ................................ A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 ........................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co* [1892] AC 25 ........................................................ A-5325

*Allen v Flood* [1898] AC 1........................................ A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019 (Ch) ......................................................................... A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries Ltd* (No. 2) [1982] Ch 204 .................................... A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ................ A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25 ............................................................................ A-5708

*Smith New Court Securities v Citibank NA* [1997] AC 254.............................................................. A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142 and 6-158 .............................................................. A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs 8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

Page

*McGregor on Damages*, 17th Edition, paragraph 1-021 .......... A-5774

*Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 .......... A-5777

*Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 .......... A-5780

*The Unfair Contract Terms Act 1977* .......... A-5783

Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 .......... A-5807

Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 .......... A-5883

Exhibit A to Randell Declaration - Handwritten Notes .......... A-5887

Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 .......... A-5891

Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 .......... A-5894

Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 .......... A-6101

Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 .......... A-6280

**Page**

Declaration of Christopher E. Duffy in Opposition to Defendants' Motion for Summary Judgment, dated September 2, 2010 ........................................ A-6447

Exhibit 1 to Duffy Declaration - Amended and Restated Advisory Agreement relating to Terra Firma Investments (GP) 2 Limited and Terra Firma Capital Partners Limited, dated October 9, 2003 ............................ A-6471

Exhibit 2 to Duffy Declaration - Advisory Agreement relating to Terra Firma Capital Partners III, L.P., dated February 8, 2006 . A-6493

Exhibit 3 to Duffy Declaration - Minutes of a Terra Firma Investments (GP) 2 Limited Directors' meeting, dated May 20, 2007 .. A-6512

Exhibit 4 to Duffy Declaration - Minutes of a Terra Firma Investments (GP) 3 Limited Directors' meeting, dated May 20, 2007 .. A-6515

Exhibit 5 to Duffy Declaration - E-mail from Rowland to Laskowski and Crocker, dated September 18, 2008, with attachment .......... A-6517

Exhibit 6 to Duffy Declaration - E-mail from Smith to Small, dated May 21, 2007. A-6521

Exhibit 7 to Duffy Declaration - E-mail from Wormsley to Hands, dated November 7, 2006 ................................................ A-6523

Exhibit 8 to Duffy Declaration - E-mail from Wormsley to Hands, dated September 19, 2007 .............................................. A-6524

Page

Exhibit 9 to Duffy Declaration - E-mail from Wormsley to Hands, dated October 23, 2006 .................................................. A-6529

Exhibit 10 to Duffy Declaration - E-mail from Wormsley to Hands, dated November 15, 2006 .............................................. A-6530

Exhibit 11 to Duffy Declaration - E-mail from Klein to Hands, dated December 13, 2006 ............................................... A-6531

Exhibit 12 to Duffy Declaration - E-mail from Smith to Del Rio, dated July 20, 2007 ......................................................... A-6532

Exhibit 13 to Duffy Declaration - Answer and Affirmative Defenses of Defendant Citigroup Inc. to Plaintiffs' Amended Complaint in *Sungate Securities LLLP v. Citigroup, Inc.* (Case No. 09-040664 CA 43) in the Circuit Court of the Ninth Judicial District of the State of Florida, dated July 22, 2010 ................................. A-6533

Exhibit 14 to Duffy Declaration - Memorandum from Simpkin, *et al.* to Klein, *et al.*, dated November 16, 2007............................... A-6549

Exhibit 15 to Duffy Declaration - Interoffice memorandum from Lindsay to Drayton, *et al.*, dated February 17, 2005 .............. A-6559

Exhibit 16 to Duffy Declaration - E-mail from Tague to Lindsay, *et al.*, dated March 9, 2007 ....................................................... A-6566

Exhibit 17 to Duffy Declaration - E-mail from Bayazid to Favaro, Richards and Pavlus, dated April 19, 2007 ................................. A-6571

**Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"... A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of Citigroup Global Markets Limited to Stewart, dated September 4, 2006....................................... A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated November 28, 2006 ............................................. A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22, 2007, with attachment.......................................... A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated November 21, 2006 ............................................. A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli, dated December 11, 2006 .................................... A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated May 21, 2007 ....................................................... A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting, dated April 20, 2007 ............................................ A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated April 20, 2007, with attachments.......................... A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated April 20, 2007, with attachments.......................... A-6640

Case: 11-126 Document: 48 Page: 25 04/25/2011 272867 401

Page

Exhibit 28 to Duffy Declaration - EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration - EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration - E-mail from Wormsley to Klein and Smith, dated April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration - E-mail from Gildersleeve to Nicoli and Borrows, dated April 20, 2007 ............................................. A-6656

Exhibit 32 to Duffy Declaration - E-mail from Gildersleeve to Wormsley, dated April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration - E-mail from Klein to Wormsley and Smith, dated April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration - E-mail from Smith to Wormsley, dated April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration - E-mail from Smith to Wormsley, dated April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration - E-mail from Smith to Stewart and Barak, dated April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration - EMI Press Release, dated May 4, 2007 ................ A-6667

Exhibit 38 to Duffy Declaration - E-mail from Ashcroft to Wormsley, *et al.*, dated April 23, 2007, with attachment ........................... A-6669

Page

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007 .................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007 .................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ........................................... A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ........................... A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 ................................ A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 ........................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ....................................................... A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ....................................................... A-6703

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 .......... A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 .......... A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 .......... A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 .......... A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 .......... A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 .......... A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 .......... A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 .......... A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 .......... A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 .......... A-6721

**Page**

Exhibit 58 to Duffy Declaration - E-mail from Wormsley to Gildersleeve and Nicoli, dated May 16, 2007 .................................. A-6722

Exhibit 59 to Duffy Declaration - E-mail from Smith to Poyser, dated May 17, 2007 ........................................................ A-6723

Exhibit 60 to Duffy Declaration - E-mail from Tessler to Teitelbaum and Wolf, dated May 18, 2007 .............................................. A-6724

Exhibit 61 to Duffy Declaration - E-mail from Shott to Bell, *et al.*, dated May 20, 2007, with attachment........................................... A-6726

Exhibit 62 to Duffy Declaration - E-mail from Ashcroft to Stewart, *et al.*, dated May 20, 2007........................................................ A-6730

Exhibit 63 to Duffy Declaration - Teleconference Information from May 20, 2007 (Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration - E-mail from Watson to Rawlinson, *et al.*, dated May 20, 2007........................................................ A-6732

Exhibit 65 to Duffy Declaration - Mobile telephone records of David Wormsley, dated June 27, 2007 .............................................. A-6736

Exhibit 66 to Duffy Declaration - May 2007 mobile telephone records of Nicoli (Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration - E-mail from Smith to Wormsley, dated May 17, 2007 ........................................................ A-6746

**Page**

Exhibit 68 to Duffy Declaration - Minutes of a Terra Firma Capital Partners Limited Investment Advisory Committee meeting, dated May 20, 2007 ............................... A-6747

Exhibit 69 to Duffy Declaration - Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration - E-mail from Wormsley to Nicoli, dated May 21, 2007 ........................................................ A-6755

Exhibit 71 to Duffy Declaration - E-mail from Tabet to Wormsley, dated May 21, 2007 ........................................................ A-6756

Exhibit 72 to Duffy Declaration - E-mail from Nicoli to Ashcroft, *et al.*, dated May 2, 2007 .......................................................... A-6759

Exhibit 73 to Duffy Declaration - Minutes of a Terra Firma Investments (GP) 2 Limited Committee of the Board of Directors' meeting, dated May 21, 2007 ............................... A-6765

Exhibit 74 to Duffy Declaration - Minutes of a Terra Firma Investments (GP) 3 Limited Committee of the Board of Directors' meeting, dated May 21, 2007 ............................... A-6768

Exhibit 75 to Duffy Declaration - E-mail from Thornton on behalf of Hands to Bell, dated May 21, 2007 .............................................. A-6771

Exhibit 76 to Duffy Declaration - Letter from Terra Firma Investments (GP) 3 Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

**Page**

Exhibit 77 to Duffy Declaration - Minutes of an EMI Group plc Directors' meeting, dated May 21, 2007 ............................................. A-6782

Exhibit 78 to Duffy Declaration - E-mail from Watson to Dowler, dated May 21, 2007, with attachment.......................................... A-6791

Exhibit 79 to Duffy Declaration - E-mail from Smith to Badhe, dated May 21, 2007 A-6818

Exhibit 80 to Duffy Declaration - E-mail from Smith to Mehta, dated May 21, 2007 A-6819

Exhibit 81 to Duffy Declaration - E-mail from Smith to Kirshenbaum, dated May 21, 2007 ....................................................... A-6821

Exhibit 82 to Duffy Declaration - E-mail from Wormsley to Tague, dated May 22, 2007 ....................................................... A-6822

Exhibit 83 to Duffy Declaration - Letter from Smith to Stewart, dated July 19, 2007, with attachment.......................................... A-6823

Exhibit 84 to Duffy Declaration - E-mail from Smith to Watson, dated August 17, 2007.................................................... A-6827

Exhibit 85 to Duffy Declaration - November 2009 presentation titled, "EMI Debt Interest Expense Analysis" .................................. A-6828

Exhibit 86 to Duffy Declaration - E-mail from Poyser to Vakilian, dated May 21, 2007 ....................................................... A-6835

Page

Exhibit 87 to Duffy Declaration - E-mail from Simonian to Smith, dated May 21, 2007 ........ A-6837

Exhibit 88 to Duffy Declaration - E-mail from Wormsley to Lindsay, dated September 17, 2007 ........ A-6838

Exhibit 89 to Duffy Declaration - Memorandum from Simpkin *et al.* to Klein *et al.*, dated November 16, 2007 (Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration - E-mail from Borrows to Nicoli, Gildersleeve and Parker, dated July 31, 2007 ........ A-6843

Exhibit 91 to Duffy Declaration - Minutes of a Wise Men Committee meeting, dated July 23, 2007 ........ A-6844

Exhibit 92 to Duffy Declaration - E-mail from Grigorova to Cockerill, *et al.*, dated September 5, 2007 ........ A-6846

Exhibit 93 to Duffy Declaration - E-mail from Sckerl to Cockerill, dated June 9, 2009 with Attachment (Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration - E-mail from Grigorova to Sckerl, dated February 16, 2009 ........ A-6850

Exhibit 95 to Duffy Declaration - E-mail from Wormsley to Klein, dated November 23, 2007 ........ A-6855

Case: 11-126 Document: 48 Page: 32 04/25/2011 272867 401

**Page**

Exhibit 96 to Duffy Declaration - E-mail from Grigorova to Cockerill and Sckerl, dated February 2, 2009, with attachment ............... A-6856

Exhibit 97 to Duffy Declaration - E-mail from Rochford to Trask and Zogheb, dated June 25, 2009 (Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration - E-mail from Romero-Apsilos to Hurst, dated March 17, 2009 ....................................................... A-6859

Exhibit 99 to Duffy Declaration - E-mail from Bazinet to Salamander, dated September 28, 2009, with attachment.................... A-6860

Exhibit 100 to Duffy Declaration - E-mail from Bronfman to Rosen, dated September 29, 2009 .............................................. A-6882

Exhibit 101 to Duffy Declaration - E-mail from Bronfman to Fleisher, dated October 7, 2009 ..................................................... A-6883

Exhibit 102 to Duffy Declaration - E-mail from Cotton to Pastor, dated December 21, 2009 ................................................ A-6885

Exhibit 103 to Duffy Declaration - E-mail from Smith to Ponti and Hands, dated March 22, 2010 ....................................................... A-6886

Exhibit 104 to Duffy Declaration - E-mail from Nicoli to Wormsley, dated May 20, 2007 ......................................................... A-6889

Page

Exhibit 105 to Duffy Declaration - E-mail from Wormsley to Klein and Smith, dated April 19, 2007 ........ A-6893

Exhibit 106 to Duffy Declaration - Memorandum from Punja, *et al.* to the IAC, dated May 7, 2007 ........ A-6894

Exhibit 107 to Duffy Declaration - Revised memorandum from Punja, *et al.* to the IAC, dated May 7, 2007 ........ A-6904

Exhibit 108 to Duffy Declaration - E-mail from Vallance on behalf of Hands to Punja, dated May 7, 2007 ........ A-6914

Exhibit 109 to Duffy Declaration - Presentation titled, "Project Dice: Presentation to the IAC," dated May 18, 2007 ........ A-6916

Exhibit 110 to Duffy Declaration - Presentation titled, "Project Dice: Presentation to the IAC," dated May 20, 2007 ........ A-7076

Exhibit 111 to Duffy Declaration - Agreement (the "PMA") between Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited and EMI Group plc regarding Project Mulberry, dated May 9, 2007 ........ A-7153

Exhibit 112 to Duffy Declaration - Article from Billboard.biz titled, "Terra Firma In EMI Restructuring Talks With Citi," dated July 13, 2009 ........ A-7166

Exhibit 113 to Duffy Declaration - E-mail from Bazinet to Cohen, dated October 14, 2009 ........ A-7168

Case: 11-126 Document: 48 Page: 34 04/25/2011 272867 401

**Page**

Exhibit 114 to Duffy Declaration - Letter from Nicoli to Kelly, dated December 15, 2006 .......... A-7169

Exhibit 115 to Duffy Declaration - E-mail from Smith to Wormsley, dated December 14, 2006 .......... A-7170

Exhibit 116 to Duffy Declaration - E-mail from Frederick to Nicoli, *et al.*, dated December 5, 2006 .......... A-7171

Exhibit 117 to Duffy Declaration - E-mail from Randell to Becker, dated May 10, 2007 .......... A-7178

Exhibit 118 to Duffy Declaration - Letter from Terra Firma Investments (GP) 2 and Terra Firma Investments (GP) 3 to Gildersleeve, dated May 8, 2007 .......... A-7190

Exhibit 119 to Duffy Declaration - E-mail from Van der Spuy to Punja, dated May 9, 2007 .......... A-7194

Exhibit 120 to Duffy Declaration - Letter from Smith to Stewart, dated April 27, 2007 .......... A-7197

Exhibit 121 to Duffy Declaration - E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration - E-mail from Plotnik to Miller, *et al.*, dated May 19, 2007
(Reproduced at pp. CA-84-CA-87)

Case: 11-126 Document: 48 Page: 35 04/25/2011 272867 401

Page

Exhibit 123 to Duffy Declaration - Compliance "tree" for Citigroup, dated January 14, 2010 .................................................. A-7324

Exhibit 124 to Duffy Declaration - E-mail from Zogheb to Miller, dated May 16, 2007 ....................................................... A-7326

Exhibit 125 to Duffy Declaration - E-mail from Wirdnam to Leat, dated August 9, 2007 ..................................................... A-7328

Exhibit 126 to Duffy Declaration - Compliance "tree" for Citigroup, dated January 14, 2010 .................................................. A-7329

Exhibit 127 to Duffy Declaration - E-mail from Smith to Poyser, dated May 18, 2007 ....................................................... A-7333

Exhibit 128 to Duffy Declaration - E-mail from Heh to Llewelyn-Jones, dated June 13, 2007 ....................................................... A-7335

Exhibit 129 to Duffy Declaration - E-mail from Fong to Llewelyn-Jones, dated August 1, 2007 ..................................................... A-7337

Exhibit 130 to Duffy Declaration - Leveraged Finance Memorandum, dated May 18, 2007 (Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration - E-mail from Masiello to Nelson, dated August 16, 2007 ................................................... A-7338

Case: 11-126 Document: 48 Page: 36 04/25/2011 272867 401

Page

Exhibit 132 to Duffy Declaration - E-mail from Dolenec to Hands *et al.*, dated May 18, 2007 ........ A-7340

Exhibit 133 to Duffy Declaration - E-mail from Pryce to Burrows and Wormsley, dated May 18, 2007 ........ A-7342

Exhibit 134 to Duffy Declaration - Article from Music Week titled, "Cheques in the City: EMI Joins Hands," dated June 2, 2007 ........ A-7343

Exhibit 135 to Duffy Declaration - August 2009 Classified Credit Report (CCR) belonging to Maltby Limited/EMI Group (Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration - Maltby Investments Limited – Director's Report and Consolidated Financial Statements, dated March 31, 2009 ........ A-7345

Exhibit 137 to Duffy Declaration - E-mail from Leoni-Sceti to Williamson, dated November 21, 2009 (Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration - October 2009 Citi presentation titled, "ICG Top 10 Risks" (Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration - E-mail from Cockerill to Bates and Dean, dated June 11, 2009 ........ A-7410

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated May 13, 2007 .......... A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2 Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated May 11, 2007 .......... A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated May 17, 2007 .......... A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone records that are available in their original form as Exhibits 41, 63, 65, 66, 144 and 145 to this declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated May 20, 2007 .......... A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by Maltby Limited, dated May 21, 2007 .......... A-7473

**Page**

Exhibit 149 to Duffy Declaration - Presentation titled, "Project Poker," dated January 14, 2008 .................................................. A-7499

Exhibit 150 to Duffy Declaration - E-mail and attachment from Simpkin to Cockerill and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration - E-mail and attachments from Grigorova to Sckerl, dated June 29, 2009 (Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration - E-mail from Sckerl to Slattery and Prior, dated February 16, 2009 ................................................ A-7510

Exhibit 153 to Duffy Declaration - Article from Billboard.biz titled, "Terra Firma In EMI Restructuring Talks With Citi," dated July 13, 2009....................................................... A-7511

Exhibit 154 to Duffy Declaration - E-mail from Smith to CazzyDog and Hands, dated March 22, 2010 .......................................... A-7513

Exhibit 155 to Duffy Declaration - E-mail from Leoni-Sceti to Williamson, dated November 21, 2009 .............................................. A-7516

Exhibit 156 to Duffy Declaration - E-mail from Leoni-Sceti to Hands, dated October 2, 2009 (Reproduced at pp. CA-275-CA-276)

Page

Exhibit 157 to Duffy Declaration - Memorandum from Faxon titled, "External Pressure on Business Performance," dated November 23, 2009 (Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration - Citi analyst report on Warner Music Group Corp, dated September 15, 2009 .................................... A-7523

Exhibit 159 to Duffy Declaration - Minutes of a Terra Firma Investments (GP) 2 Limited Directors' meeting, dated May 25, 2007 .. A-7544

Exhibit 160 to Duffy Declaration - E-mail from Barak to Reid, dated March 2, 2007 . A-7549

Exhibit 161 to Duffy Declaration - Michael Slattery's handwritten notes from May 16, 2007 ........................................................ A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010................ A-7553

Mark Nimrod Barak, dated July 15, 2010 ................. A-7557

Jason Bazinet, dated June 30, 2010 ........................... A-7564

Peter Edward Bell, dated June 22, 2010 .................... A-7601

Simon A. Borrows, dated June 25, 2010.................... A-7705

Andre Bourbonnais, dated July 13, 2010................... A-7827

Andrew Chadd, dated July 23, 2010 (Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010 (Reproduced at pp. CA-295-CA-315)

Page

John Gildersleeve, dated June 30, 2010 .................... A-7832

Guy Hands, dated July 15, 2010 .............................. A-7848

Guy Hayward-Cole, dated July 27, 2010 .................. A-7901

David Robert Paul Hill, dated August 4, 2010 .......... A-7918

Michael Klein, dated July 19, 2010 .......................... A-7923

Chad Leat, dated June 18, 2010 ............................... A-7935

John Loveridge, dated July 30, 2010 ........................ A-7941

Bruce MacInnes, dated July 8, 2010 .......................... A-7966

Eric Nicoli, dated July 5, 2010 ................................ A-7970

Riaz Punja, dated July 28, 2010 ............................... A-8039

Timothy Pryce, dated July 22, 2010
(Reproduced at pp. CA-316-CA-335)

Elio Leoni-Sceti, dated June 25, 2010
(Reproduced at pp. CA-336-CA-385)

Paul Simpkin, dated July 5, 2010 ............................ A-8056

Michael Slattery, dated August 6, 2010 .................... A-8073

Matthew Canning Smith, dated August 3, 2010
(Day 1) ............................................................ A-8077

Matthew Canning Smith, dated August 9, 2010
(Day 2) ............................................................ A-8116

Iain Stokes, dated August 6, 2010 ............................ A-8127

Kamal Fouad Tabet, dated July 29, 2010 .................. A-8157

Francois Van der Spuy, dated July 7, 2010 ............... A-8171

**Page**

Julie Williamson, dated July 28, 2010
(Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010 ........................ A-8175

David Wormsley, dated July 20, 2010
(Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to Defendants' Motion for Summary Judgment, dated August 27, 2010 .......................................... A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule 44.1, dated August 27, 2010 ................................. A-8195

Appendices to the Report of Nicholas S. Strauss Q.C. Pursuant to Rule 44.1 ................................... A-8245

Exhibit 1 to Strauss Report - *AEG (UK) Ltd. v. Logic Resource Ltd,* [1996] CLC 265 .............................................................. A-8249

Exhibit 2 to Strauss Report - *AIC Limited v. ITS Testing Services (UK) Ltd,* [2006] EWCA Civ 1601 ...................................... A-8262

Exhibit 3 to Strauss Report - *Angus v. Clifford,* [1891] 2 Ch 449 ....................... A-8371

Exhibit 4 to Strauss Report - *Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

Exhibit 5 to Strauss Report - *Assicurazione Generali v. Arab Insurance Group,* [2003] I.R.L.R. 131 ............................................. A-8422

Exhibit 6 to Strauss Report - *Attorney General of Belize v. Belize Telecom Limited,* [2009] 1 W.L.R. 1988 ............................ A-8472

**Page**

Exhibit 7 to Strauss Report - *In re B (Children),* [2008] UKHL 35 .................... A-8483

Exhibit 8 to Strauss Report - *Bank of Credit and Commerce International (Overseas) Ltd (In Liquidation) v. Price Waterhouse (No.2),* [1998] PNLR 564 ................ A-8511

Exhibit 9 to Strauss Report - *Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC 1276 Ch ................................................................ A-8539

Exhibit 10 to Strauss Report - *Bankers Trust Int'l v. Dharmala Sakti Sejahtera,* [1996] CLC 518 .................................................... A-8811

Exhibit 11 to Strauss Report - *Barings v. Coopers & Lybrand,* [2002] B.C.L.C. 410 ............................................................................ A-8864

Exhibit 12 to Strauss Report - *Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,* [2006] 1 WLR 1476 ............................................. A-8902

Exhibit 13 to Strauss Report - *Barton v. County NatWest Ltd.,* [1999] Lloyd's Reports (Banking) 408 ......................................... A-8911

Exhibit 14 to Strauss Report - *Bell v. Lever Bros Ltd.,* [1932] AC 161 ................ A-8930

Exhibit 15 to Strauss Report - *BCCI v. Ali,* [2001] 1 A.C. 251 ............................ A-9008

Exhibit 16 to Strauss Report - *Bradford Building Society v. Borders,* [1941] 2 All ER 205 .......................................................... A-9042

**Page**

Exhibit 17 to Strauss Report - *Bristol & West Building Society v. Mothew,* [1998] Ch. 1 CA Civ ............................................ A-9061

Exhibit 18 to Strauss Report - *Brown Jenkinson & Co Ltd v. Percy Dalton (London) Ltd,* [1957] 2 QB 621 CA ...................... A-9089

Exhibit 19 to Strauss Report - *Brownlie v. Campbell,* [1880] 5 App Cas 925 ...... A-9119

Exhibit 20 to Strauss Report - *Caparo Industries Plc v. Dickman,* [1990] 2 A.C. 605 HL ............................................................... A-9154

Exhibit 21 to Strauss Report - *Conlon v. Simms,* [2008] 1 WLR 484 .................. A-9213

Exhibit 22 to Strauss Report - *Cream Holdings Ltd v. Davenport,* [2009] B.C.C. 183 ......................................................................... A-9254

Exhibit 23 to Strauss Report - *Cremdean Properties Ltd v. Nash,* [1977] 244 EG 547 ......................................................................... A-9261

Exhibit 24 to Strauss Report - *Derry v. Peek,* [1889] 14 App Cas 337 ................. A-9265

Exhibit 25 to Strauss Report - *Downs v. Chappell,* [1997] 1 WLR 426 ................ A-9309

Exhibit 26 to Strauss Report - *Evans v. Edmonds,* [1853] 13 C.B. 777 ................ A-9330

Exhibit 27 to Strauss Report - *Galoo Ltd v. Bright Grahame Murray,* [1994] 1 WLR 1360 CA Civ ............................................... A-9335

**Page**

Exhibit 28 to Strauss Report - *In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report - *Hedley Byrne & Co Ltd. v. Heller & Partners Ltd.,* [1964] AC 465 ............................................ A-9396

Exhibit 30 to Strauss Report - *Henderson v. Merrett Syndicates Ltd (No.1),* [1995] 2 AC 145 HL ........................................... A-9472

Exhibit 31 to Strauss Report - *Hornal v. Neuberger Products,* [1957] 1 QB 247 CA .............................................................. A-9535

Exhibit 32 to Strauss Report - *Huyton SA v. Distribuidora Internacional De Productos Agricolas SA De CV,* [2003] EWCA Civ 1104 ............................................................ A-9556

Exhibit 33 to Strauss Report - *IFE Fund SA v. Goldman Sachs International,* [2006] EWHCA 2887 (QB) (Comm) .................. A-9573

Exhibit 34 to Strauss Report - *Investors Compensation Scheme v. West Bromwich Building Society,* [1998) 1 W.L.R. 896 A-9589

Exhibit 35 to Strauss Report - *Item Software (UK) Ltd v. Kouroush Fassihi,* [2004] EWCA Civ 1244 ..................................... A-9612

Exhibit 36 to Strauss Report - *JEB Fasteners v. Marks Bloom & Co.,* [1983] 1 All E.R. 583 ....................................................... A-9637

Exhibit 37 to Strauss Report - *JP Morgan Chase Bank v. Springwell Navigation Corp.,* [2008] EWHC 2286 (Comm) .................... A-9645

**Page**

Exhibit 38 to Strauss Report - *John D Wood & Co (Residential & Agricultural) Ltd v Knatchbull,* [2003] PNLR 17 ....................... A-9927

Exhibit 39 to Strauss Report - *Kuddus v. Chief Constable of Leicestershire,* [2002] 2 AC 122 .................................................. A-9943

Exhibit 40 to Strauss Report - *Longstaff v. Birtles,* [2002] 1 WLR 470 ................ A-9986

Exhibit 41 to Strauss Report - *Mannai Investment Co. Ltd. v. Eagle Star,* [1997] A.C. 749 ............................................................. A-9995

Exhibit 42 to Strauss Report - *McNaughton Paper Group Ltd v. Hicks Anderson & Co.,* [1991] 2 QB 113 ...................................... A-10030

Exhibit 43 to Strauss Report - *Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report - *Peekay Intermark v. Australia and New Zealand Banking Group,* [2006] EWCA Civ 386 ............... A-10148

Exhibit 45 to Strauss Report - *Raiffseisen Zentralbank Osterreich AG v. The Royal Bank of Scotland Plc,* [2010] EWHC 1392 (Comm) ............................................................... A-10171

Exhibit 46 to Strauss Report - *In re S-B (Children),* [2009] UKSC 17 ................. A-10284

Exhibit 47 to Strauss Report - *Slough Estates v. Welwyn Hatfield District Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,* [1997] A.C. 254 HL ............................................ A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour Vickers (Asset Management) Ltd.,* [1992] BCLC 1104 ........................................................................ A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour Vickers (Asset Management) Ltd.,* [1994] 1 W.L.R.1271 ......................................................... A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA Civ ........................................................................ A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ...................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and Company of the Bank of England (No.3),* [2001] UKHL 16 ........................................................... A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,* [2002] EWCA Civ 555 ........................................ A-10886

**Page**

Exhibit 58 to Strauss Report - *Uzinterimpex JSC v. Standard Bank Plc,* [2007] EWHC 1151 (Comm) .......................................... A-10910

Exhibit 59 to Strauss Report - *White v. Jones,* [1995] 2 A.C. 207 HL .................. A-10948

Exhibit 60 to Strauss Report - *William Sindall plc v. Cambridgeshire County Council,* [1994] 1 W.L.R. 1016............................. A-11037

Exhibit 61 to Strauss Report - The Misrepresentation Act 1967 ........................... A-11068

Exhibit 62 to Strauss Report - The Unfair Contract Terms Act 1977 .................. A-11070

Exhibit 63 to Strauss Report - Mark Blackett-Ord, *Partnership Law* § 11-16 (3d ed. 2007) ........................................................... A-11094

Exhibit 64 to Strauss Report - George Spencer Bower & Alexander Turner, *The Law of Actionable Misrepresentation* § 115 (3d ed. 1974) ........................................................... A-11098

Exhibit 65 to Strauss Report - George Spencer Bower & Alexander Turner, *The Law Relating to Actionable Non-Disclosure* § 14.02 (2d ed. 1990) .......................................... A-11100

Exhibit 66 to Strauss Report - Jolm Cartwright, *Misrepresentation, Mistake and Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report - *Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

| | Page |
|---|---|
| Exhibit 68 to Strauss Report - *Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18, 18-20, 18-22, 18-28 (19th ed.) | A-11118 |
| Exhibit 69 to Strauss Report - 31 Lord Mackay of Clashfern, *Halsbury's Laws of England* § 757 (4th ed. 2003). | A-11127 |
| Exhibit 70 to Strauss Report - Harvey McGregor, *McGregor on Damages* §§ 41-038, 41-040 (17th Ed. 2003) | A-11130 |
| Exhibit 71 to Strauss Report - Declaration of Adrian Briggs in Support of Defendants' Motion to Dismiss | A-11133 |
| Exhibit 72 to Strauss Report - Declaration of Nicholas Strauss in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss | A-11150 |
| Exhibit 73 to Strauss Report - Project Mulberry Agreement | A-11178 |
| Affidavit of Service, sworn to September 2, 2010 | A-11191 |
| Reply Declaration of Gary R. Carney in Further Support of Defendants' Motion for Summary Judgment, dated September 3, 2010 | A-11193 |
| Exhibit 129 to Carney Reply Declaration - Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated February 3, 2010 | A-11198 |

Page

Exhibit 130 to Carney Reply Declaration - Responses and Objections of Plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. To Defendants' First Request for Production of Documents, dated March 9, 2010 ........ A-11216

Exhibit 131 to Carney Reply Declaration - Journey Log Book for Guy Hands's flight to London, dated May 20, 2007 ........ A-11244

Exhibit 132 to Carney Reply Declaration - Reservation for Guy Hands's flight to London, dated May 20, 2007 ........ A-11247

Exhibit 133 to Carney Reply Declaration - Report for Guy Hands's flight from the Airport Landing Dues Information System of Guernsey Airport, dated May 20, 2007 ........ A-11248

Exhibit 134 to Carney Reply Declaration - Daily Confirmed Handling report of Blue Islands at Guernsey Airport, dated May 20, 2007 ........ A-11249

Exhibit 135 to Carney Reply Declaration - Phone records of Guy Hands for the months of April and May 2007 ........ A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010 ........ A-11353

Mark Nimrod Barak, dated July 15, 2010 ........ A-11358

Jason Bazinet, dated June 30, 2010 ........ A-11363

John Gildersleeve, dated June 30, 2010 ........ A-11376

Guy Hands, dated July 15, 2010 ........ A-11380

Page

John Loveridge, dated July 30, 2010 ........................ A-11395

Eric Nicoli, dated July 5, 2010 ................................ A-11410

Timothy Pryce, dated July 22, 2010 ......................... A-11419

Riaz Punja, dated July 28, 2010................................ A-11439

Michael Slattery, dated August 6, 2010 .................... A-11457

Martin David Stewart, dated July 7 and 8, 2010........ A-11473

Iain Stokes, dated August 6, 2010............................. A-11477

Francois Van der Spuy, dated July 7, 2010 ............... A-11501

Alec Werner, dated August 19, 2010 ........................ A-11513

David Wormsley, dated July 20, 2010 ...................... A-11520

Second Report of Ewan McQuater, Pursuant to Rule 44.1, dated September 3, 2010, with Exhibit 1...... A-11532

Affidavit of Service, sworn to September 23, 2010... A-11566

Summary Judgment Hearing Transcript, dated September 10, 2010 ............................................. A-11568

Letter from Christopher E. Duffy to the Honorable Jed S. Rakoff, dated September 13, 2010, with attachments ......................................................... A-11620

Letter from Jay Cohen to the Honorable Jed S. Rakoff, dated September 13, 2010, with attachments ......................................................... A-11646

Order of the Honorable Jed S. Rakoff, dated September 14, 2010, filed September 15, 2010..... A-11664

Notice of Motion *in Limine* No. 2 to exclude the Testimony of Marianne Demario, by Defendants, dated October 4, 2010........................................... A-11666

**Page**

Declaration of Daniel H. Levi in Support of Defendants' Motions *in Limine* to exclude certain Testimony and Evidence, dated October 4, 2010 .. A-11668

Declaration of Daniel H. Levi in Support of Defendants' Motions *in Limine* to exclude certain Testimony and Evidence, dated October 4, 2010 .. A-11677

Declaration of Daniel H. Levi in Support of Defendants' Motions *in Limine* Nos. 1 through 5, dated October 4, 2010 .......................................... A-11686

Exhibit 1 to Levi Declaration - Expert Report of David J. Teece, dated June 14, 2010 (Reproduced at pp. CA-481-CA-544)

Exhibit 4 to Levi Declaration - Complaint in the above-captioned matter, dated December 11, 2009 ............................................. A-11695

Exhibit 16 to Levi Declaration - Expert Report of Daniel R. Fischel, dated July 7, 2010 (Reproduced at pp. CA-545-CA-586)

Exhibit 17 to Levi Declaration - Microsoft Excel Spreadsheet printed from the native file produced by Plaintiffs and bearing bates number TF0000635801 (Reproduced at pp. CA-587-CA-592)

Exhibit 18 to Levi Declaration - Expert Report of Marianne DeMario, dated June 14, 2007 (Reproduced at pp. CA-593-CA-702)

Case: 11-126 Document: 48 Page: 52 04/25/2011 272867 401

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) ............. A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers (Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 ....... A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ........................................................ A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ....................................................... A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 ......................... A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007.......................... A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

**Page**

Exhibit 42 to Levi Declaration - Response of Plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 .................................................... A-11878

Exhibit 43 to Levi Declaration - Project Record Valuation Considerations, dated May 17, 2007 (Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration - E-mail from Moore to Pryce, dated March 14, 2007, with attachment (Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010 (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010 (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ......................... A-12120

John Gildersleeve, dated June 30, 2010..................... A-12146

Eric Nicoli, dated July 5, 2010 ................................. A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

**Page**

Declaration of Karen C. Dyer in Support of Plaintiffs' Terra Firma Investments (GP) 2 Ltd's. and Terra Firma Investments (GP) 3 Ltd's Memoranda in Oppositions to Defendants' Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration - Wise Men Committee meeting minutes, dated July 27, 2007 .......... A-12186

Exhibit 14 to Dyer Declaration - "Project Record Valuation Considerations" prepared by Merrill Lynch for Cerberus, dated May 17, 2007 .......... A-12188

Exhibit 15 to Dyer Declaration - Citi's Project Dice Credit Approval Memorandum, dated May 17, 2007 .......... A-12209

Exhibit 16 to Dyer Declaration - Citi's "Fairness Committee Materials," dated May 21, 2007 .......... A-12303

Exhibit 17 to Dyer Declaration - Excerpts from American Society of Appraisers, *ASA Business Valuation Standards* (2009) .......... A-12309

Exhibit 18 to Dyer Declaration - "Project Mulberry Valuation Materials," dated May 21, 2007 .......... A-12315

Exhibit 19 to Dyer Declaration - E-mail from Barak to Reid *et al.*, dated March 2, 2007 .......... A-12324

Exhibit 20 to Dyer Declaration - Letter from Borrows to Nicoli, dated July 19, 2007 .......... A-12327

Case: 11-126 Document: 48 Page: 55 04/25/2011 272867 401

Page

Exhibit 21 to Dyer Declaration - Financial Dynamics Business Communications press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration - Excerpts of the deposition of Peter Bell, dated June 22, 2010 ....................................................... A-12329

Exhibit 23 to Dyer Declaration - Excerpts from the deposition of Simon Borrows, dated June 25, 2010 ............................................. A-12345

Exhibit 24 to Dyer Declaration - Excerpts of the deposition of Marianne DeMario, dated July 19, 2010 .............................................. A-12378

Exhibit 25 to Dyer Declaration - Excerpts of the deposition of Daniel Fischel, dated July 28, 2010 .............................................. A-12406

Exhibit 26 to Dyer Declaration - Excerpts of the deposition of Guy Hands, dated July 15, 2010....................................................... A-12413

Exhibit 27 to Dyer Declaration - Excerpts from the deposition of Guy Hayward-Cole, dated July 27, 2010 .................................... A-12422

Exhibit 28 to Dyer Declaration - Excerpts of the deposition of John Loveridge, dated July 30, 2010 .............................................. A-12438

Exhibit 30 to Dyer Declaration - Excerpts of the deposition of Iain Stokes, dated August 6, 2010.................................................... A-12452

Exhibit 33 to Dyer Declaration - *Livingstone v. Rawyards Coal Co.* [1880] 5 Appeal Cases 25 .................................................. A-12462

Page

Exhibit 34 to Dyer Declaration - *Smith New Court Sec. Ltd. v. Citibank M.A.* [1997] A.C. 254 .................................................... A-12471

Proposed Pre-Trial Consent Order, dated October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated October 12, 2010 ................................................. A-12684

Defendants' Proposed Jury Instructions, dated October 12, 2010 ................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule 44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................ A-14551

Trial Transcript, dated November 2, 2010 ................ A-14877

Trial Transcript, dated November 3, 2010 ................ A-15102

Trial Transcript, dated November 4, 2010 ................ A-15292

**Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
E-mail from Wormsley to Nicoli re call from GH, dated May 21, 2007 .................................. A-15300

Terra Firma Exhibit 2 -
E-mail from Tabet to Wormsley re Conversation with Guy Hands, dated May 21, 2007 .................................................. A-15301

Terra Firma Exhibit 3 -
E-mail from Wormsley to Lindsay re financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
E-mail from Simonian to Smith re Bids, dated May 21, 2007 .................................................. A-15309

Terra Firma Exhibit 9 -
E-mail from Randell to Terra Firma re May 21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
Draft Minutes of a meeting of a committee of the board of directors of Terra Firma (GP) 2 Limited, dated May 21, 2007 ........................... A-15311

Terra Firma Exhibit 11 -
E-mail from Wormsley to Gildersleeve re Dice, dated May 9, 2007 ........................................... A-15316

Terra Firma Exhibit 12 -
E-mail from Smith to Kirshenbaum re EMI deal, dated May 21, 2007 .................................. A-15319

Terra Firma Exhibit 13 -
E-mail from Smith to Mehta re EMI, dated May 21, 2007 .................................................. A-15320

**Page**

Terra Firma Exhibit 14 -
E-mail from Smith to Badhe re EMI, dated May 21, 2007 .................................................. A-15322

Terra Firma Exhibit 15 -
E-mail from Wormsley to Tague re Congrats on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
E-mail from Poyser to Vakilian re Terra Firma Recommended Cash Offer, dated May 21, 2007 .................................................. A-15324

Terra Firma Exhibit 17 -
E-mail from Grigorova to Cockerill re EMI/Maltby CCR July, dated September 5, 2007 .......................................... A-15326

Terra Firma Exhibit 19 -
E-mail from Smith to Small re CITI M&A wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
E-mail from Rowland to Laskowski and Crocker re Terra Firma, dated September 18, 2008 ........................................ A-15332

Terra Firma Exhibit 22 -
E-mail from Miller to Zogheb re EMI, dated May 16, 2007 .................................................. A-15336

Terra Firma Exhibit 23 -
E-mail from Gildersleeve to Wormsley re Roles, dated April 20, 2007 ............................. A-15338

Page

Terra Firma Exhibit 24 -
Citi Franchise Risk Assessment Template for Maltby Investments Limited, Appendix 6B, dated June 1, 2009 .......... A-15339

Terra Firma Exhibit 25 -
E-mail from Smith to Poyser re Chaka Feedback, dated May 17, 2007 .......... A-15340

Terra Firma Exhibit 26 -
E-mail from Wormsley to Poyser, *et al.*, re EMI credit call 5pm, dated May 17, 2007 .......... A-15341

Terra Firma Exhibit 27 -
E-mail from Wormsley to Smith re FW: E-mail from Wormsley to McBride, dated May 21, 2007 .......... A-15342

Terra Firma Exhibit 28 -
E-mail from Wormsley to Leat and Klein re marginal deal for Terra Firma, dated July 14, 2007 .......... A-15345

Terra Firma Exhibit 29 -
E-mail from Wormsley to Hands re DAIG fees, dated November 7, 2006 .......... A-15346

Terra Firma Exhibit 30 -
E-mail from Wormsley to Hands re DAIG, dated October 23, 2006 .......... A-15347

Terra Firma Exhibit 31 -
E-mail from Wormsley to Hands re proposal, dated November 15, 2006 .......... A-15348

Terra Firma Exhibit 32 -
E-mail from Wormsley to Klein re Citi/Terra Firma party, dated November 21, 2006 .......... A-15349

Page

Terra Firma Exhibit 33 -
E-mail from Klein to Hands re Business Relationship, dated December 13, 2006 ........... A-15350

Terra Firma Exhibit 34 -
E-mail from Tague to Lindsay re NBM #159 Europe, dated March 9, 2007 ........................... A-15351

Terra Firma Exhibit 35 -
E-mail from Tabet to Blagdon, Klein and Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
E-mail from Wormsley to Miller re call from Guy Hands, dated May 8, 2007 ........................ A-15357

Terra Firma Exhibit 40 -
E-mail from Smith to Wormsley re talk with JG and EN, dated May 17, 2007 ....................... A-15358

Terra Firma Exhibit 41 -
E-mail from Wormsley to Nicoli, Gildersleeve, Stewart re FW: Terra Firma, dated May 18, 2007 .................................................. A-15359

Terra Firma Exhibit 42 -
E-mail from Shott to Bell re auction process and Antitrust Confirmation, dated May 20, 2007 .................................................. A-15360

Terra Firma Exhibit 43 -
E-mail from Ashcroft to Stewart re Conference call at 10.30 am, dated May 20, 2007 ................ A-15364

Terra Firma Exhibit 46 -
E-mail from Wormsley to Nicoli re EMI media Review, dated May 20, 2007 ............................ A-15366

**Page**

Terra Firma Exhibit 47 -
David Wormsley Mobile Phone Records........... A-15367

Terra Firma Exhibit 50 -
E-mail from Wormsley to Klein re Markets and Banking, dated May 21, 2007 ........................... A-15377

Terra Firma Exhibit 51 -
E-mail from Wormsley to Borrows fw Terra Firma, dated May 21, 2007 .............................. A-15378

Terra Firma Exhibit 52 -
Minutes of a Meeting of the Board of Directors of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
E-mail from Watson to Dowler re Mulberry Final Press Announcement, dated May 21, 2007 .................................................... A-15389

Terra Firma Exhibit 55 -
Minutes of a Telephone Meeting of the Wise Men Committee, dated July 23, 2007 ............... A-15416

Terra Firma Exhibit 56 -
E-mail from Borrows to Nicoli *et al.* re EMI-Possible Script, dated July 31, 2007..................... A-15418

Terra Firma Exhibit 59 -
E-mail from Wormsley to Klein re I spoke, dated April 17, 2007 ........................................ A-15419

Terra Firma Exhibit 60 -
E-mail from Smith to Wormsley re FW: EMI, dated April 13, 2007 ........................................ A-15420

Page

Terra Firma Exhibit 61 -
E-mail from Wormsley to Klein and Smith re proposals from Cerberus and Fortress, dated April 19, 2007 .................................................. A-15421

Terra Firma Exhibit 62 -
E-mail from Barclay re EMI Media Review - 13 May 2007, dated May 13, 2007 ....................... A-15422

Terra Firma Exhibit 63 -
E-mail from Klein to Nicoli re General, dated May 18, 2007 .................................................. A-15424

Terra Firma Exhibit 64 -
E-mail from Smith to Wormsley re EMI, dated May 18, 2007 .................................................. A-15425

Terra Firma Exhibit 125 -
Interoffice memorandum from Lindsay to Drayton, *et al.* re East Surrey Holdings, dated February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
Letter from Smith to Stewart re Engagement Letter, dated September 4, 2006 ...................... A-15433

Terra Firma Exhibit 195 -
E-mail from Wormsley to Hands, dated September 8, 2006 ........................................... A-15440

Terra Firma Exhibit 197 -
Terra Firma - Perspectives on Threshers, dated September 25, 2006 ........................................ A-15441

Terra Firma Exhibit 201 -
Project Prince Working Party List, dated November 1, 2006 ........................................... A-15461

**Page**

Terra Firma Exhibit 209 -
E-mail from Wormsley to Mylchreest, dated
November 23, 2006 .......................................... A-15490

Terra Firma Exhibit 214 -
EMI Group plc - Statement re preliminary
approach from Permira, dated
November 28, 2006 .......................................... A-15493

Terra Firma Exhibit 215 -
E-mail from Miller to Simpkin re EMI, dated
November 28, 2006 .......................................... A-15494

Terra Firma Exhibit 220 -
E-mail from Badhe to Hill re Fairness Opinion
Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
Minutes from EMI Meeting of Directors, dated
November 29, 2006 .......................................... A-15498

Terra Firma Exhibit 224 -
E-mail from Smith to Wormsley, dated
November 30, 2006 .......................................... A-15504

Terra Firma Exhibit 230 -
E-mail from Ashcroft to Smith re Prince, dated
December 6, 2006 ............................................ A-15505

Terra Firma Exhibit 232 -
Minutes from EMI Meeting of Directors, dated
December 7, 2006 ............................................ A-15506

Terra Firma Exhibit 237 -
E-mail from Bell to Smith, dated
December 14, 2006 .......................................... A-15519

Case: 11-126 Document: 48 Page: 64 04/25/2011 272867 401

**Page**

Terra Firma Exhibit 238 -
E-mail from Smith to Wormsley, dated
December 14, 2006 .......................................... A-15520

Terra Firma Exhibit 239 -
E-mail from Smith to Wormsley re FW: Draft
announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
E-mail from Wormsley to Robertson re
Agenda, dated December 14, 2006.................... A-15524

Terra Firma Exhibit 241 -
E-mail from Nicoli to Gildersleeve re Project
Prince, dated December 14, 2006 ...................... A-15525

Terra Firma Exhibit 242 -
E-mail from McBride to Citi re EMI cessation
announcement, dated December 14, 2006......... A-15527

Terra Firma Exhibit 243 -
E-mail from Wormsley to Smith and EMI re
TF For Urgent Reply Please, dated
December 14, 2006........................................... A-15528

Terra Firma Exhibit 244 -
Letter from Kelly to EMI Group plc, dated
December 14, 2006........................................... A-15530

Terra Firma Exhibit 248 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
December 14, 2006........................................... A-15532

Terra Firma Exhibit 250 -
Letter from Nicoli to Kelly, dated
December 15, 2006........................................... A-15533

**Page**

Terra Firma Exhibit 274 -
E-mail from Simpkin to Miller re EMI, dated January 4, 2007 ............................................... A-15534

Terra Firma Exhibit 280 -
Minutes from EMI Meeting of Directors, dated January 10, 2007 ............................................ A-15536

Terra Firma Exhibit 281 -
E-mail from Jones to Cockerill re Pepe - terms, dated January 11, 2007..................................... A-15539

Terra Firma Exhibit 283 -
EMI Press Release announcing restructuring, dated January 12, 2007 ................................... A-15545

Terra Firma Exhibit 285 -
E-mail from Smith to Wormsley, dated January 12, 2007 .............................................. A-15548

Terra Firma Exhibit 314 -
EMI Press Release, dated February 14, 2007 ... A-15550

Terra Firma Exhibit 315 -
E-mail from Smith to Wormsley re EMI Announcement, dated February 14, 2007.......... A-15551

Terra Firma Exhibit 317 -
E-mail from Smith to Swannell and Wormsley re 6am Cut, dated February 15, 2007................ A-15552

Terra Firma Exhibit 318 -
Citigroup Analyst Report "EMI Group plc Another Month, Another Warning," dated February 15, 2007 ............................................ A-15557

Terra Firma Exhibit 329 -
EMI group confirms approach from Warner Music group, dated February 20, 2007 ............. A-15569

Page

Terra Firma Exhibit 346 -
Minutes of a Meeting of the Board of Directors of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
Valuation Update, dated March 1, 2007 ............ A-15582

Terra Firma Exhibit 348 -
EMI Board Meeting Minutes, dated March 1, 2007 .................................................. A-15597

Terra Firma Exhibit 366 -
"EMI GROUP plc - Statement re Possible Offer," PR Newswire UK Disclose, dated March 12, 2007 ................................................ A-15608

Terra Firma Exhibit 368 -
E-mail from Wormsley to Hands, dated March 3, 2008 .................................................. A-15610

Terra Firma Exhibit 377 -
E-mail from Steffno to Cockerill re EMI Greenlight Memo, dated March 9, 2007 ........... A-15615

Terra Firma Exhibit 380 -
E-mail from Nicoli to Faxon re Full year target, dated March 12, 2007 ............................ A-15624

Terra Firma Exhibit 387 -
E-mail from Smith to CIB-CBKG re Viacom's music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
E-mail from Smith to Wormsley re EMI, dated March 26, 2007 ................................................ A-15629

Case: 11-126 Document: 48 Page: 67 04/25/2011 272867 401

**Page**

Terra Firma Exhibit 392 -
E-mail from Hill to Simpkin re (EUR) Wolters Kluwer Education falls to Bridgepoint, dated March 26, 2007 .......... A-15630

Terra Firma Exhibit 410 -
E-mail from Simpkin to Smith re EMI - staple, dated April 3, 2007 .......... A-15633

Terra Firma Exhibit 412 -
E-mail from Llewelyn-Jones to CIB-GFI re EMI, dated April 13, 2007 .......... A-15635

Terra Firma Exhibit 416 -
Letter from EMI board of Directors to Gildersleeve re the proposal, dated April 16, 2007 .......... A-15636

Terra Firma Exhibit 424 -
E-mail from Seaton to Smith re FW: Trading statement, dated April 17, 2007 .......... A-15646

Terra Firma Exhibit 427 -
E-mail from Wormsley to Hands re new idea, dated April 18, 2007 .......... A-15651

Terra Firma Exhibit 429 -
E-mail from EMI Investor Relations re EMI Group plc - trading statement, dated April 18, 2007 .......... A-15652

Terra Firma Exhibit 436 -
E-mail from Smith to Estacio and Hill re Fee, dated April 19, 2007 .......... A-15654

Terra Firma Exhibit 438 -
E-mail from Klein to Hands cc Wormsley, Burns, dated April 19, 2007 .......... A-15655

**Page**

Terra Firma Exhibit 439 -
E-mail from Wormsley to Hands, Klein, cc Burns, dated April 19, 2007 .............................. A-15657

Terra Firma Exhibit 443 -
Minutes of a Meeting of the Board of Directors of EMI, dated April 20, 2007 ............................ A-15659

Terra Firma Exhibit 444 -
E-mail from Klein to Wormsley re Roles, etc., dated April 20, 2007 ......................................... A-15667

Terra Firma Exhibit 445 -
E-mail from Barak to Citi financing re Strictly Private & Confidential, dated April 20, 2007 ... A-15669

Terra Firma Exhibit 446 -
E-mail from Barak to Citi financing re Cerberus Indication, dated April 20, 2007 ........ A-15681

Terra Firma Exhibit 447 -
E-mail from Gildersleeve to Nicoli and Borrows re FW: E-mail from Wormsley to Gildersleeve, dated April 20, 2007 .................... A-15692

Terra Firma Exhibit 448 -
E-mail from Smith to Seaton re Roles, dated April 20, 2007 .................................................... A-15694

Terra Firma Exhibit 449 -
E-mail from Smith to Wormsley re Roles, dated April 20, 2007.......................................... A-15696

Terra Firma Exhibit 454 -
E-mail from Smith to Wormsley re Roles, dated April 22, 2007.......................................... A-15698

Case: 11-126 Document: 48 Page: 69 04/25/2011 272867 401

Page

Terra Firma Exhibit 455 -
E-mail from Ashcroft to Wormsley re OEP Letter, dated April 23, 2007 .............................. A-15700

Terra Firma Exhibit 462 -
E-mail from Ashcroft to Citi financing re Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
Letter from Smith to Baxter (Takeover Panel), dated April 24, 2007.......................................... A-15714

Terra Firma Exhibit 464 -
E-mail from Tabet to Swannell, Klein and Wormsley re Hands, dated April 25, 2007......... A-15716

Terra Firma Exhibit 465 -
E-mail from Gildersleeve to Ashcroft re Citi and Deutsche, dated April 26, 2007.................. A-15717

Terra Firma Exhibit 468 -
Letter from Smith to Stewart re provisions of advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
E-mail from Coleman to Wolf re EMI, dated April 27, 2007 .................................................. A-15721

Terra Firma Exhibit 470 -
E-mail from Smith to Wormsley re A3 page valuation summary, dated April 27, 2007.......... A-15723

Terra Firma Exhibit 479 -
E-mail from Smith to Bell re EMI consent letter, Side letter re financing bidders, dated April 28, 2007 .................................................. A-15726

**Page**

Terra Firma Exhibit 480 -
E-mail from Smith to Stewart re Project Mulberry, dated April 30, 2007 .......................... A-15729

Terra Firma Exhibit 481 -
E-mail from Smith to Ashcroft re Project Mulberry, dated April 30, 2007 .......................... A-15732

Terra Firma Exhibit 484 -
Global FEG Working List Client Account List, dated May 1, 2007 ............................................ A-15735

Terra Firma Exhibit 492 -
E-mail from Wormsley to Hands, dated May 3, 2007 ...................................................... A-15754

Terra Firma Exhibit 496 -
EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
E-mail from Cole to Ashcroft re Panel, dated May 4, 2007 ...................................................... A-15757

Terra Firma Exhibit 498 -
E-mail from Cole to Bell re DB financing trees, dated May 4, 2007 .................................. A-15761

Terra Firma Exhibit 501 -
EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
"EMI Group plc - Statement re preliminary approach," EMI Press Release, dated May 4, 2007 ...................................................... A-15764

Terra Firma Exhibit 516 -
E-mail from McCluskey to Yang re FW:, dated May 6, 2007 ...................................................... A-15765

**Page**

Terra Firma Exhibit 532 -
E-mail from Smith to Wormsley re Terra Firma/EMI, dated May 8, 2007.......................... A-15766

Terra Firma Exhibit 537 -
E-mail from Hands to Wormsley re EMI, dated May 9, 2007 ...................................................... A-15767

Terra Firma Exhibit 538 -
E-mail from Borrows to Gildersleeve re Dice, dated May 9, 2007............................................. A-15768

Terra Firma Exhibit 539 -
E-mail from Smith to Hill & Estacio fw OEP, dated May 9, 2007............................................. A-15772

Terra Firma Exhibit 540 -
E-mail from Wormsley to Gildersleeve re Dice, dated May 9, 2007............................................. A-15773

Terra Firma Exhibit 541 -
E-mail from Bell to Wormsley re Terra Firma Support Letter, dated May 9, 2007 .................... A-15777

Terra Firma Exhibit 543 -
E-mail from Simpkin to Wormley and Smith re Project Dice/TF, dated May 10, 2007 ................ A-15784

Terra Firma Exhibit 544 -
E-mail from Smith to Poyser re Project Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
E-mail from Ashcroft to Gildersleeve fw TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
Project Mulberry Bidders Contact Details, dated May 11, 2007........................................... A-15789

Page

Terra Firma Exhibit 552 -
E-mail from Wormsley to Bell re Mulberry, dated May 11, 2007 .......... A-15814

Terra Firma Exhibit 553 -
E-mail from Bell to Smith and Wormsley re Mondays meeting, dated May 11, 2007 .......... A-15816

Terra Firma Exhibit 554 -
E-mail from Smith to McCluskey re Just left you a voicemail, dated May 11, 2007 .......... A-15820

Terra Firma Exhibit 555 -
E-mail from Simpkin to Edwards re Hope you are well. re EMI, dated May 11, 2007 .......... A-15821

Terra Firma Exhibit 558 -
E-mail from Gildersleeve to EMI re Mulberry - Data Room - IMPALA, dated May 13, 2007 .......... A-15822

Terra Firma Exhibit 564 -
E-mail from Barak to Smith re Citi Financing, dated May 14, 2007 .......... A-15826

Terra Firma Exhibit 570 -
E-mail from Estacio to Klein fw Full DDT procedures - Project Mulberry, dated May 15, 2007 .......... A-15828

Terra Firma Exhibit 578 -
E-mail from Bell to Citi Financing re Project Mulberry Update, dated May 16, 2007 .......... A-15834

Terra Firma Exhibit 579 -
E-mail from Zogheb to Miller re EMI, dated May 16, 2007 .......... A-15835

Page

Terra Firma Exhibit 582 -
E-mail from Wormsley to Gildersleeve and Nicoli re call from Guy Hands, dated May 16, 2007 .................................................... A-15837

Terra Firma Exhibit 593 -
Project Mulberry Working Party List, dated May 17, 2007 .................................................... A-15838

Terra Firma Exhibit 594 -
E-mail from Brumpton to Klein re LF/SEC call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
E-mail from Klein to Wormsley re EMI Credit call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
E-mail from Leat to Klein re Call, dated May 17, 2007 .................................................... A-15866

Terra Firma Exhibit 599 -
E-mail from Wormsley to Klein re Call Guy Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
E-mail from Curtis to Klein re David Wormsley called, VERY URGENT, dated May 17, 2007 .................................................... A-15868

Terra Firma Exhibit 604 -
E-mail from Bell to Gildersleeve re Update from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
E-mail from Wormsley to Klein, dated May 17, 2007 .................................................... A-15870

Page

Terra Firma Exhibit 608 -
E-mail from Klein to Hands re Call, dated May 17, 2007 .................................................. A-15871

Terra Firma Exhibit 619 -
E-mail from Wormsley to Poyser re Issue on covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
E-mail from Wormsley to Tabet re Covenants, dated May 18, 2007.......................................... A-15873

Terra Firma Exhibit 621 -
E-mail from Poyser to Wormsley re interest coverage covenant, dated May 18, 2007........... A-15874

Terra Firma Exhibit 623 -
E-mail from Smith to Poyser re Debt approval, dated May 18, 2007.......................................... A-15875

Terra Firma Exhibit 630 -
Minutes of the Meeting of the Board of Directors of Terra Firma (GP) 2 Ltd 8:00am, dated May 18, 2007.......................................... A-15877

Terra Firma Exhibit 631 -
E-mail from Stewart to Wormsley re call, dated May 18, 2007 .................................................. A-15889

Terra Firma Exhibit 632 -
E-mail from Stewart to Wormsley re returning call, dated May 18, 2007.................................. A-15890

Terra Firma Exhibit 636 -
E-mail from Nicoli to Stewart re Draft process E-mail to be sent to bidders tomorrow, dated May 18, 2007 .................................................. A-15891

**Page**

Terra Firma Exhibit 640 -
E-mail from Watson to Cole & Citi re Mulberry Mark-ups of Crimson Documents, dated May 18, 2007........................................... A-15894

Terra Firma Exhibit 643 -
Greenhill: Fairness Opinion/Advice Review Form, dated May 18, 2007................................ A-15896

Terra Firma Exhibit 644 -
E-mail from Barak to Bell *et al.* re Update on calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
E-mail from Borrows to Gildersleeve re Hands, dated May 18, 2007 .............................. A-15902

Terra Firma Exhibit 648 -
E-mail from Borrows to Bell re draft process, dated May 18, 2007........................................... A-15903

Terra Firma Exhibit 649 -
E-mail from O'Brien to Citi and EMI re EMI-NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
Minutes of the Meeting of the Board of Directors of Terra Firma (GP) 3 Ltd 8:30am, dated May 18, 2007........................................... A-15911

Terra Firma Exhibit 661 -
E-mail from Pryce to Burrows cc Wormsley re Terra Firma, dated May 18, 2007 ...................... A-15923

Terra Firma Exhibit 674 -
E-mail from Bell to Gildersleeve re EMI conference call, dated May 19, 2007 ................ A-15924

Page

Terra Firma Exhibit 694 -
Minutes of the Meeting of the Board of Directors of Terra Firma (GP) 3 Ltd 4:00pm, dated May 20, 2007 .......... A-15925

Terra Firma Exhibit 702 -
E-mail from Watson to Ashcroft, cc Smith, Cole, *et al.*, re Mulberry - Key Issues Table and Turquoise Position, dated May 20, 2007 .......... A-15928

Terra Firma Exhibit 715 -
E-mail from Quigley to O'Haire, Van der Spuy re FW: Update on Dice financing for discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
E-mail from Smith to Wormsley re Mulberry Key issues table and Turquoise position, dated May 20, 2007 .......... A-15940

Terra Firma Exhibit 726 -
E-mail from Bell to Borrows re Trustee meeting notes, dated May 20, 2007 .......... A-15943

Terra Firma Exhibit 729 -
E-mail from Wormsley to Hands, dated May 20, 2007 .......... A-15944

Terra Firma Exhibit 736 -
Minutes of a Meeting of a Committee of the Board of Directors of Terra Firma (GP) 3 Ltd at 8:00am, dated May 21, 2007 .......... A-15947

Terra Firma Exhibit 744 -
E-mail from Hill to Shah re Citi M&A Wins: EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

Case: 11-126 Document: 48 Page: 77 04/25/2011 272867 401

Page

Terra Firma Exhibit 746 -
Project Mulberry Fairness Committee Materials, dated May 21, 2007 ......................... A-15952

Terra Firma Exhibit 749 -
E-mail from Smith to Llewelyn-Jones re Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
E-mail from Wormsley to Smith re Greenhill Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
E-mail from Hill to Smith re EMI, dated May 21, 2007 .................................................... A-15963

Terra Firma Exhibit 756 -
E-mail from Smith to Bichara, Estacio, Hill, Abbasi, Golebiewski re Citi M&A Wins: EMI Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
E-mail from Smith to Swannell re EMI, dated May 21, 2007 .................................................... A-15966

Terra Firma Exhibit 758 -
E-mail from Smith to Suen and Mcbride re EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
E-mail from Vakilian to Poyser re (RNS) Terra Firma Invest Recommended Cash Offer, dated May 21, 2007 .................................................... A-15973

Case: 11-126 Document: 48 Page: 78 04/25/2011 272867 401

**Page**

Terra Firma Exhibit 765 -
E-mail from Poyser to Lee re (RNS) Terra Firma Invest Recommended Cash Offer, dated May 21, 2007 .................................................... A-15975

Terra Firma Exhibit 766 -
E-mail from Poyser to Abbasi re (RNS) Terra Firma Invest Recommended Cash Offer, dated May 21, 2007 .................................................... A-15977

Terra Firma Exhibit 767 -
E-mail from Poyser to Vakilian re (RNS) Terra Firma Recommended Cash Offer, dated May 21, 2007 .................................................... A-15979

Terra Firma Exhibit 768 -
E-mail from Wormsley to Smith re update on call with GH, dated May 21, 2007 .................... A-15981

Terra Firma Exhibit 783 -
Project Mulberry Valuation Materials, Greenhill & Co., dated May 21, 2007 ............... A-15982

Terra Firma Exhibit 787 -
E-mail from Simpkin to Treco re Call, dated May 22, 2007 .................................................. A-15991

Terra Firma Exhibit 788 -
E-mail from Smith to Skarbek re Citi M&A wins, dated May 22, 2007 ................................ A-15992

Terra Firma Exhibit 791 -
E-mail from Temming to Poyser re Example for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
E-mail from Poyser to Smith re Example for us all, dated May 22, 2007 .................................... A-15995

**Page**

Terra Firma Exhibit 796 -
E-mail from Poyser to Smith re Dice, dated May 22, 2007 .................................................... A-15996

Terra Firma Exhibit 802 -
E-mail from Poyser to Smith re financing process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
E-mail from Poyser to Smith re financing process, dated May 24, 2007............................. A-16001

Terra Firma Exhibit 815 -
David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
E-mail from Wormsley to Hands re Thistle Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
E-mail from Gildersleeve to Wormsley, dated May 29, 2007 ..................................................... A-16015

Terra Firma Exhibit 824 -
E-mail from Nesbit to Grigorova re Project Dice, dated May 30, 2007 ................................. A-16016

Terra Firma Exhibit 827 -
E-mail from Smith to Blackburn re MDs meeting Monday, June 4 at 8:15 UK time, dated May 31, 2007............................................ A-16020

Terra Firma Exhibit 831 -
Citi Markets & Banking Credit Risk Principles, Policies and Procedures, dated June 1, 2007 ...................................................... A-16022

Page

Terra Firma Exhibit 833 - Recommended Cash Offer by Maltby-a company formed at the direction of Terra Firma-for EMI Group plc, dated June 7............ A-16246

Terra Firma Exhibit 846 - E-mail from Aldred (on behalf of Hands) to Van der Spuy re Message from Guy Hands - Project Dice, dated June 27, 2007...................... A-16410

Terra Firma Exhibit 872 - E-mail from Wormsley to Gildersleeve and Nicoli re Terra Firma, dated July 4, 2007 .......... A-16411

Terra Firma Exhibit 874 - E-mail from Poyser to Smith re Your revenue list as at 4th July 2007, dated July 4, 2007 ........ A-16412

Terra Firma Exhibit 882 - E-mail from King to Klein re Riverdeep, dated July 9, 2007...................................................... A-16414

Terra Firma Exhibit 883 - E-mail from Hill to Lee re your revenue list as at 4th July 2007, dated July 9, 2007.................. A-16415

Terra Firma Exhibit 887 - E-mail between Wormsley and Leat regarding advice, dated July 9, 2007................................. A-16416

Terra Firma Exhibit 903 - E-mail from Simpkin to Lavelle re EMI Equity Bridge, dated July 16, 2007 ............................... A-16417

Terra Firma Exhibit 917 - E-mail from Borrows to Gildersleeve, Nicoli, *et al.*, re Board Presentation, dated July 18, 2007.................................................... A-16418

**Page**

Terra Firma Exhibit 918 -
E-mail from King to Klein re Terra Firma (High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
E-mail from Smith to Stewart re Invoice to Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
E-mail from Cockerill to Grigorova and Jones re EMI CCR, dated July 31, 2007...................... A-16438

Terra Firma Exhibit 987 -
E-mail from Hill to Smith, dated August 6, 2007 .................................................. A-16439

Terra Firma Exhibit 992 -
E-mail from Klein to Prince re EMI-DO NOT FORWARD, dated August 8, 2007.................... A-16440

Terra Firma Exhibit 993 -
E-mail from Klein to Mehta re Warner-confidential, dated August 8, 2007 .................... A-16442

Terra Firma Exhibit 994 -
E-mail from Wirdnam to Leat re Terra Firma Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
E-mail from Klein to Volk *et al.* re W, "Guy Spoke to Edgar and offered 3B," dated August 11, 2007 ................................................ A-16444

Terra Firma Exhibit 1006 -
E-mail from Klein to Volk *et al.* re FW: edgar, "4B value of EMI," dated August 12, 2007....... A-16445

**Page**

Terra Firma Exhibit 1019 -
E-mail from Smith to Watson re Mulberry Citi Payment, dated August 17, 2007 ....................... A-16446

Terra Firma Exhibit 1026 -
E-mail from Barker to Leat fw EMI, dated August 24, 2007 ................................................ A-16447

Terra Firma Exhibit 1040 -
E-mail from Smith to CMB-GBKG re Quote of the Day, dated September 10, 2007 ............... A-16448

Terra Firma Exhibit 1074 -
Memorandum from Simpkin *et al.* to Klein *et al.* re Project Dice (Public to Private of EMI), dated November 16, 2007 ................................. A-16449

Terra Firma Exhibit 1080 -
E-mail from Wormsley to Klein re Guy Hands, dated November 23, 2007 ................................. A-16459

Terra Firma Exhibit 1100 -
E-mail from Wormsley to Lynn re meeting with EMI, dated January 4, 2008 ....................... A-16460

Terra Firma Exhibit 1109 -
E-mail from Smith to Poyser re trusted adviser, dated January 30, 2008 ..................................... A-16461

Terra Firma Exhibit 1111 -
E-mail from Wormsley to Hands cc Burns, dated February 1, 2008 ..................................... A-16463

Terra Firma Exhibit 1114 -
E-mail from Wormsley to Hands, dated February 19, 2008 ............................................. A-16466

Page

Terra Firma Exhibit 1141 -
Franchise Rise Assessment Template, dated
July 2008 .......... A-16470

Terra Firma Exhibit 1144 -
Handwritten Notes of Cockerill, dated
September 1, 2008 .......... A-16471

Terra Firma Exhibit 1147 -
E-mail from Smith to Wormsley re FW:
Morgan Stanley CDs now officially higher than
EMI!!! Hurrah, dated September 18, 2008 .......... A-16472

Terra Firma Exhibit 1158 -
Handwritten Notes of Cockerill, dated
November 16, 2008 .......... A-16473

Terra Firma Exhibit 1176 -
E-mail from Cox to Smith re City Speaker
Series - 12th February, Wormsley Presentation,
dated February 11, 2009 .......... A-16476

Terra Firma Exhibit 1196 -
Franchise Risk Assessment Template, Maltby
Investments Limited, dated June 2009 .......... A-16529

Terra Firma Exhibit 1225 -
E-mail from Smith to Vakilian re Citigroup
accused of fraud over EMI sale, dated
December 13, 2009 .......... A-16530

Terra Firma Exhibit 1241 -
Compliance "Tree" for EMI group, dated
January 14, 2010 .......... A-16532

**Page**

Terra Firma Exhibit 1251 -
Baughman to Duffy re supplement to Citi's response to Terra Firma's Interrogatory No. 5, dated March 25, 2010 ........................................ A-16536

Terra Firma Exhibit 1313 -
EMI Trading Update ........................................ A-16539

Terra Firma Exhibit 1346 -
EMI Stock Price.xls ........................................ A-16541

Terra Firma Exhibit 1365 -
E-mail from Wormsley to Hands re DAIG-subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
E-mail from Wormsley to Smith, dated November 28, 2006........................................... A-16592

Terra Firma Exhibit 1369 -
E-mail from Smith to Wormsley re EMI, dated December 20, 2006 ........................................... A-16593

Terra Firma Exhibit 1370 -
E-mail from Wormsley to Klein re Call, dated May 17, 2007 .................................................... A-16594

Terra Firma Exhibit 1371 -
E-mail from Coats to Dolenec re Project Dice, dated May 21, 2007........................................... A-16595

Terra Firma Exhibit 1372 -
E-mail from Wormsley to Klein re EMI, dated August 2, 2007 ................................................. A-16596

Terra Firma Exhibit 1377 -
E-mail from Seymour to Van der Spuy re Project Dice memo, dated May 15, 2007........... A-16597

**Page**

Terra Firma Exhibit 1380 -
Minutes of the May 20, 2007 Meeting of the IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
Kirsten Randell notebook ................................ A-16610

Terra Firma Exhibit 1395 -
Amended and Restated Fee Letter, dated August 13, 2007 ................................................ A-16751

Terra Firma Exhibit 1400 -
E-mail from Rawlings to Silva, Reeves cc Govinida, Dubin re Maltby - fees, dated August 31, 2007 ................................................ A-16761

Terra Firma Exhibit 1407 -
E-mail from Wormsley to Klein, dated November 21, 2007.......................................... A-16763

Terra Firma Exhibit 1409 -
E-mail from Wormsley to Hands re BUPA hospitals, dated June 18, 2007 .......................... A-16764

Terra Firma Exhibit 1415 -
E-mail from Seth to Simpkin, *et al.*, re EMI staple plan, attaching EMI Recd Financing.xls and EMI Group Financing.xls, dated April 1, 2007 ..................................................... A-16765

Terra Firma Exhibit 1434 -
David Wormsley deposition excerpts (pp. 159-170:18), dated July 20, 2010............................. A-16872

Terra Firma Exhibit 1436 -
Stipulation re Eric Nicoli ................................. A-16885

**Page**

Citi Exhibit A-1 -
Page 27, Paragraph 109 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
Page 28, Paragraph 110 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
Pages 31-32, Paragraph 126 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .......................................... A-16890

Citi Exhibit A-8 -
Page 32, Paragraph 128 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
Page 32-33, paragraphs 127-129 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .......................................... A-16895

Citi Exhibit C -
E-mail from Vallance on behalf of Hands to Punja, *et al.*, re URGENT & IMPORTANT-EMI, dated May 6, 2007 .................................. A-16898

Citi Exhibit D -
Minutes of May 7, 2007, Meeting of the Investment Advisory Committee of Terra Firma, dated May 7, 2007 ................................ A-16900

Citi Exhibit E -
E-mail from Seymour to Becker, *et al.*, with attached Project Dice Memo to the GP, dated May 7, 2007 ..................................................... A-16902

**Page**

Citi Exhibit H -
Minutes of May 15, 2007, Meeting of the Investment Advisory Committee of Terra Firma, dated May 15, 2007 .............................. A-16914

Citi Exhibit I -
Memo from Punja, *et al.*, to the IAC re Project Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
E-mail thread ending with E-mail from Slattery to Randell, *et al.*, re IAC Distribution List DICE, dated May 19, 2007 .............................. A-16923

Citi Exhibit K -
Minutes of May 18, 2007, Terra Firma Investment Advisory Committee Meeting, dated May 18, 2007 ......................................... A-16927

Citi Exhibit L -
Minutes of May 20, 2007, Meeting of the Investment Advisory Committee of Terra Firma Capital Partners Limited, dated May 20, 2007 .................................................. A-16929

Citi Exhibit P -
Project Dice Update to the IAC, dated June 28, 2007 .................................................. A-16931

Citi Exhibit W -
E-mail from Vallance on behalf of Hands to Punja, *et al.*, re Project Dice: 2008 Forecast vs. Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
Project Mulberry Limited Scope Vendor Due Diligence Report, dated May 4, 2007 ............... A-16959

Page

Citi Exhibit BL -
Letter from Stokes to Gildersleeve re Terra Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
Project Mulberry Valuation Materials, dated May 21, 2007 .................................................. A-17011

Citi Exhibit BP -
E-mail from Night BA to Amstutz, *et al.*, re EMI Co-Investment Opportunity, with attached EMI Presentation to Co-Investors, dated August 20, 2007 .............................................. A-17020

Citi Exhibit BR -
E-mail thread ending with E-mail from Night BA to Tequila Bone, with attached co-investor presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
E-mail from Vallance to TF Team Dice re EMI Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
E-mail thread ending with E-mail from Punja to Hands re Revised financing E-mail, dated May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
Guernsey Airport Landing Dues Information System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
Memo from Punja, *et al.*, to IAC, *et al.*, re Project Dice Phase One Due Diligence, dated February 5, 2007 .............................................. A-17071

Page

Citi Exhibit DT -
E-mail from Vallance on behalf of Hands to Wormsley re Hands' desire to speak with Wormsley ASAP, dated May 6, 2007 ................ A-17087

Citi Exhibit DW -
E-mail from Vallance on behalf of Hands to Punja, *et al.*, re Project Dice, dated May 7, 2007 ..................................................... A-17088

Citi Exhibit DX -
E-mail thread ending with E-mail from Hands to Hedegaard, *et al.*, re Project Dice, dated May 6, 2007 ...................................................... A-17090

Citi Exhibit DY -
Minutes of May 8, 2007, Meeting of the Board of Directors at 10:00 a.m. (GP3), dated May 8, 2007 ..................................................... A-17092

Citi Exhibit EA-1 -
Terra Firma's telephone records from British Telecom, dated August 2, 2007.......................... A-17101

Citi Exhibit EA-2 -
Airtime Billing Reporting Team Itemisation Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
E-mail thread ending with E-mail from Vallance on behalf of Hands to Klein re request for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
E-mail thread ending with E-mail from Vallance on behalf of Hands to Wormsley re request for Wormsley to call Hands, dated May 18, 2007 .................................................. A-17205

**Page**

Citi Exhibit ED -
E-mail thread ending with E-mail from Tabet to Hands re EMI, dated May 18, 2007 .............. A-17206

Citi Exhibit EE -
E-mail thread ending with E-mail from Aldred to Hands, *et al.*, re Relationship between Roger Ames and Cerberus Capital Management, dated September 24, 2007 ................................ A-17208

Citi Exhibit EH -
Project Dice Presentation by Terra Firma, with E-mail thread ending with E-mail from Punja to Hands re Process, dated May 20, 2007 ......... A-17209

Citi Exhibit EI -
E-mail thread ending with E-mail from Punja to Hands re Process, dated May 20, 2007 ......... A-17286

Citi Exhibit EJ -
Minutes of May 20, 2007, Meeting of the Terra Firma (GP) 2 Board of Directors, dated May 20, 2007 .................................................... A-17290

Citi Exhibit EL -
E-mail thread ending with E-mail from Hands to Wormsley re outstanding issues between Citi and Terra Firma, dated May 20, 2007 ............... A-17293

Citi Exhibit EO -
Minutes of May 23, 2007, Meeting of the Investment Advisory Committee of Terra Firma Capital Partners, Limited, dated May 23, 2007 .................................................... A-17296

Page

Citi Exhibit EQ -
E-mail from Vallance to Terra Firma Team Dice, *et al.*, re Weekly Dice Updates for IAC, dated June 14, 2007 .......................................... A-17298

Citi Exhibit ET -
Press release re Recommended Cash Offer for EMI Group plc by Maltby Limited, dated July 20, 2007 ..................................................... A-17299

Citi Exhibit FB-1 -
Declaration of John Loveridge, dated February 3, 2010 .............................................. A-17302

Citi Exhibit FD -
Terra Firma Investments (GP) 3 Limited Advisory Agreement Relating to Terra Firma Capital Partners III, L.P., dated February 8, 2006 ................................................ A-17311

Citi Exhibit FG -
Draft Memo from Punja, *et al.* to the IAC re Project Dice: Presentation and Success Fee, dated May 18, 2007 .......................................... A-17331

Citi Exhibit FI -
Minutes of May 15, 2007, Meeting of Terra Firma (GP) 3 Board of Directors, dated May 15, 2007 .................................................... A-17332

Citi Exhibit FN -
Minutes of May 20, 2007, Meeting of the Board of Directors at 4:00 p.m. (GP3), dated May 20, 2007 .................................................... A-17334

**Page**

Citi Exhibit FO -
Minutes of May 21, 2007, Meeting of the Board of Directors at 7:30 a.m. (GP2), dated May 21, 2007 .................................................... A-17337

Citi Exhibit FP -
Terra Firma Presentation to GP re Project Dice, dated May 21, 2007........................................... A-17340

Citi Exhibit FR -
Memo Recommending Cash Offer by Maltby Limited for EMI Group plc, dated May 30, 2007 .................................................. A-17350

Citi Exhibit FV -
Letter from Kelly to EMI Group plc re Terra Firma's interest as a potential offeror for EMI, dated December 14, 2006 ................................. A-17512

Citi Exhibit FX -
E-mail from Van der Spuy to Bell, *et al.*, with attached Project Dice: Management Meeting questions and attendees, dated May 11, 2007 .................................................... A-17514

Citi Exhibit GF -
Letter from Kelly to Gildersleeve re Summary Proposal for Terra Firma potential offer, dated May 8, 2007 ..................................................... A-17533

Citi Exhibit GG -
Minutes of May 8, 2007, Meeting of the Board of Directors at 8:45 a.m. (GP2), dated May 8, 2007 ..................................................... A-17537

**Page**

Citi Exhibit GM -
E-mail thread ending with E-mail from Nicoli to Stewart, *et al.*, re E-mail to be sent to bidders tomorrow, dated May 18, 2007 ............ A-17548

Citi Exhibit GN -
E-mail thread ending with E-mail from Wormsley to Simpkin, *et al.*, re Terra Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
Terra Firma Presentation to Investment Advisory Committee re Project Dice, dated May 18, 2007 .................................................. A-17552

Citi Exhibit GQ -
E-mail from Pryce to Burrows, *et al.*, re Terra Firma, dated May 18, 2007 ............................... A-17712

Citi Exhibit GY -
E-mail from Melvin to Hands, *et al.*, re Urgent-EMI/Terra, dated May 22, 2007 ....................... A-17713

Citi Exhibit HH -
E-mail from Shaw to Nicoli re Trading statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
Project Dice Presentation: Update to the IAC, dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
E-mail thread ending with E-mail from Van der Spuy to O'Haire, *et al.*, re Update on Dice Financing for Discussion Tomorrow, dated May 20, 2007 .................................................. A-17738

**Page**

Citi Exhibit IC -
E-mail from Vallance to Hudson, *et al.*, re Cerberus/TF call, dated June 1, 2007 ................ A-17744

Citi Exhibit ID -
Court Order in the High Court of Justice, Queen's Bench Division, dated August 16, 2010 ................ A-17749

Citi Exhibit IE -
Journey Log Book for aircraft Cs-DXJ registered with the Portuguese Registry entitled, "Diário de Navegaçao," dated May 24, 2007 ................ A-17758

Citi Exhibit IF -
Screen Shot: Build Reservation for Terra Firma, dated May 20, 2007 ................ A-17761

Citi Exhibit IW -
Terra Firma Capital Partners II Q3 2007, dated November 1, 2007 ................ A-17762

Citi Exhibit JC -
E-mail from Reid to Seymour re Final Version of McK docs, dated, with attachment May 16, 2007 ................ A-17807

Citi Exhibit JD -
Terra Firma Music Industry Key Market Outlook, dated May 15, 2007 ................ A-18001

Citi Exhibit JE -
KPMG Report - Project Dice - Limited Scope due financial diligence report, dated May 17, 2007 ................ A-18128

**Page**

Citi Exhibit JI -
E-mail from Vallance on behalf of Hands to TF Team Dice re Dice and RBS, dated May 8, 2007 .................................................... A-18232

Citi Exhibit JN -
Minutes of the May 18, 2007, EMI Group plc meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
Recommended Cash Offer by Maltby Limited for EMI Group, dated June 28, 2007 ................ A-18240

Citi Exhibit JQ -
Recommended Cash Offer by Maltby Limited for EMI Group, dated July 5, 2007 .................. A-18243

Citi Exhibit JR -
Recommended Cash Offer by Maltby Limited for EMI Group, dated July 13, 2007 ................ A-18246

Citi Exhibit JS -
Recommended Cash Offer by Maltby Limited for EMI Group, dated July 20, 2007 ................ A-18249

Citi Exhibit JT -
Recommended Cash Offer by Maltby Limited for EMI Group, dated July 28, 2007 ................ A-18252

Citi Exhibit KA -
E-mail from Dowler to Hands re Dice, dated May 21, 2007 .................................................. A-18255

Citi Exhibit KF -
E-mail from Robert-Tissot to Hands re Gatwick, dated February 6, 2009...................... A-18257

**Page**

Citi Exhibit KH -
E-mail from Wormsley to Cabrey re Hands - Invitation to Terra Firma Annual Clay Pigeon Shoot, dated July 1, 2008 .................................. A-18259

Citi Exhibit KJ -
Terra Firma Annual Review 2007, dated June 29, 2005 .................................................. A-18262

Citi Exhibit KY -
Terra Firma Private Placement Memorandum, dated April 1, 2006 ........................................... A-18382

Citi Exhibit LI -
Memo from Punja, *et al.*, to Hands, *et al.*, re EMI Preliminary Discussion, dated December 1, 2006 ............................................ A-18482

Citi Exhibit MB -
Signed Minutes of the February 5, 2007, Meeting of the IAC, dated February 5, 2007..... A-18491

Citi Exhibit NE -
Letter from Smith to Stewart re Provision of Advisory and Corporate Broking Services by Citigroup, dated April 27, 2007 ........................ A-18493

Citi Exhibit OF -
Letter from Kelly to Gildersleeve re possible offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
E-mail thread ending with E-mail from Miller to Wormsley, dated May 8, 2007 ...................... A-18499

Citi Exhibit OJ -
E-mail from Wormsley to Hands re EMI, dated May 8, 2007 .................................................... A-18500

**Page**

Citi Exhibit OM -
Project Mulberry Bidders Contact Detail, dated May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
E-mail thread ending with E-mail from Van der Spuy to Simpkin, *et al.*, re Project Dice: Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
Minutes of May 15, 2007, Meeting of the Board of Directors at 7:30 p.m. (GP2), dated May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
E-mail thread ending with E-mail from Klein to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
E-mail from Wilkins to Nicoli, *et al.*, re Wormsley call, dated May 18, 2007 ................ A-18533

Citi Exhibit RU -
E-mail thread ending with E-mail from Nicoli to Wormsley re EMI media review, dated May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
E-mail thread ending with E-mail from Simpkin to Dolenec, *et al.*, re securitisation colleagues, dated May 20, 2007 ....................... A-18537

Citi Exhibit UF -
E-mail thread ending with E-mail from Tabet to Wormsley re just spoke to GH, dated May 21, 2007 .................................................. A-18540

**Page**

Citi Exhibit VP -
Minutes of May 23, 2007, Meeting of the Board of Directors at 2:00 p.m. (GP2), dated May 23, 2007 .................................................. A-18543

Citi Exhibit VQ -
Minutes of May 23, 2007, Meeting of the Board of Directors at 2:15 p.m. (GP3), dated May 23, 2007 .................................................. A-18545

Citi Exhibit WI -
Memo from Punja, *et al.*, to the IAC, *et al.*, re Project Dice Update and Budget, with attached Presentation re IAC update: Project Dice, dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
E-mail from Cabrey to Wormsley, *et al.*, re Villa Saletta Shoot, with attached Fax Reply Form, dated August 15, 2007 ........................... A-18555

Citi Exhibit AAO -
E-mail from MacInnes to Punja, *et al.*, with attached Dresdner invoice to Maltby, dated August 17, 2007 ............................................... A-18560

Citi Exhibit ABL -
Memo from Pryce to TFCP Personnel re Public to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
Letter from Terra Firma Investments (GP) 3 Limited to Citi re the amendment letter, dated December 21, 2007, dated January 11, 2008 .... A-18569

Page

Citi Exhibit AEI -
E-mail from Dicks to Wormsley, *et al.*, re DW Menu selection Die Sauberflote, attached menu, dated June 23, 2008 ................................ A-18571

Citi Exhibit AGF -
Terra Firma Capital Partners II, Q1 2008, dated March 31, 2009 ................................................ A-18574

Citi Exhibit AHA -
Presentations re EMI and the Terra Firma/Citi Relationship, dated August 1, 2009 .................. A-18623

Citi Exhibit AJJ -
Cell phone Records for David Wormsley, dated April 26, 2007 .................................................. A-18643

Citi Exhibit AJT -
Guy Hands' Calendar for May 18, 2007, dated May 18, 2007 .................................................. A-18671

Citi Exhibit AKL -
EMI Recorded Music Presentation, dated April 1, 2009 .................................................... A-18672

Citi Exhibit AKT -
Stipulated Phone Numbers................................ A-18698

Citi Exhibit AKY -
TFCP III Co-Investment 2 L.P. Project Dice Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
Citigroup Structure Chart.................................. A-19064

Citi Exhibit ALK -
E-mail thread ending with E-mail from Wormsley to Dicks re shotgun certificate form, dated October 4, 2007 ....................................... A-19065

**Page**

Citi Exhibit ALU -
E-mail thread ending with E-mail from Grigorova to Lynn, *et al.*, re EMI Summary Exposure, dated November 21, 2009 .................. A-19067

Citi Exhibit ALY -
Paragraph 22, Page 5 of Joint Statement Pursuant to Individual Practices 4(a) of the Facts and Other Matters on Which the Parties Agree ............................................................ A-19072

Citi Exhibit EEB-3 -
Table 1B of Expert Report of Marianne DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
Appendix 1 of Expert Report of Marianne DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
Corrected Expert Report of Marianne DeMario in *Andrews v. Raphaelson*, *et al.*, dated October 19, 2006 ............................................. A-19078

Citi Exhibit EEJ -
*Caiola v. Citibank*, Expert Report of Marianne DeMario .......................................................... A-19095

Citi Exhibit EEY -
Client List for Spectrum Consulting Partners.... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
Handwritten Notes ........................................... A-19126

Terra Firma Exhibit 48 -
Nicoli Mobile Phone Records
(Reproduced at pp. CA-826-CA-837)

Page

Letter Brief of Terra Firma to the Honorable Jed S. Rakoff, dated October 25, 2010 .......................... A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed S. Rakoff, dated October 25, 2010 ...................... A-19137

The Court's Proposed Jury Instructions, dated November 1, 2010 ............................................. A-19147

Memorandum of the Honorable Jed S. Rakoff, dated November 2, 2010 ..................................... A-19163

Verdict Sheet, dated November 4, 2010 .................. A-19179

Judgment, So-Ordered on December 9, 2010, Appealed From ................................................ A-19180

Notice of Appeal, dated January 10, 2011 ............... A-19187

Case: 11-126 Document: 48 Page: 102 04/25/2011 272867 401
A-901

*Project Mulberry* *Final Report* *Dated 4 May 2007*

# Music Publishing

14

© 2007 Deloitte & Touche LLP. Private and confidential

Confidential

CITI-TF 00322483

Confidential

# Music Publishing

**Overview**

- Our review of Music Publishing has been limited by the lack of information held centrally and the lack of access to the Music Publishing Management team
- Music Publishing's trading performance is based upon millions of small individual transactions across a number of revenue streams, using different revenue generating models and rates across a large number of Regions

**Trading performance**

- Music Publishing's overall NPS margin has remained broadly consistent across the three years to FY07, at 45 per cent, although there have been minor variations in the NPS margins of individual revenue streams
- Over the Historical Period declines in revenue earned from Mechanical have been largely off-set by increases in Performance and Synchronisation
- In FY07 the £6.9 million increase in Digital Revenues partly off-set the £10.7 million decline in Physical Revenues, although challenges surrounding the monetisation of digital delivery mechanisms remain
- Music Publishing's revenue and operating profit displays a strong quarterly profile, as a result of revenue recognition at statement receipt, which results in at least 50 per cent of revenue each quarter earned in the last month of that quarter
- The acceleration of a cash receipt from a collection agency in the form of an advance will be recorded in sales (and royalties payable) on receipt. Consequently Management have some control over the recording of sales (and the related payable) between one accounting period and the next.
- Music Publishing is highly dependent on the key markets of the US and UK, which together contributed 59 per cent of Group revenue in FY07, with UK compositions the most widely sold outside of the region of origin

A-902

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322484

Confidential

# Music Publishing

- Music Publishing has shown a consistent, high level of EBITDA to cash conversion
- Operating costs declined by £7.0 million in FY07 due to the reduced performance bonus charges, reduced advance provision charges and overhead benefit from RE3
- Advances represent the largest discretionary cash outflow of the division
- Working capital is subject to large swings predominantly due to the timing of statements or cash receipts from Collection Societies and the timing of internal royalty runs
- The business operates with a negative working capital balance reflecting the significant delays common between receipt of royalties and the payment of the songwriter's share of those royalties
- Consistent annual phasing of cash flows has been seen throughout the Historical Period
- Adjusting for the impact of the change in advance provisioning estimate, FY07 year end working capital is £(99.2) million compared to a FY07 month-end average of £(41.4) million, a difference of £(57.8) million
- From the end of FY07 provisions against advances have been determined in a mechanistic manner to reduce the variability in judgements

A-903

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322485

Case: 11-126 Document: 48 Page: 105 04/25/2011 272867 401

A-904

Project Mulberry Final Report Dated 4 May 2007

# Specialist reports

17

© 2007 Deloitte & Touche LLP. Private and confidential

Confidential

CITI-TF 00322486

Confidential

**Treasury**

- At 31 March 2007, reported net debt was £909.6 million and adjusted net debt, including accounting adjustments to debt, debt issuance costs and accrued interest was £977.0 million
- The Group uses interest rate swaps to manage interest rate risk; the only other derivatives held by the Group are the embedded derivatives in the US $243.0 million and €425.0 million notes and forward contracts to buy ¥21.0 billion for the acquisition of Toshiba's stake in a subsidiary
- There are significant potential break costs on refinancing
- As at 31 March 2007, the Group has 16.8% of EBITDA in GBP with the remainder of EBITDA being earned in other currencies, therefore the Group is exposed to substantial translation risk
- The Group is exposed to currency transaction risk from royalty payments being made between countries, however this exposure has not been quantified and is not hedged by the Group
- As of 31 March 2007, the Group has a total of £29.7 million in commitments and contingent liabilities excluding future advances to artists/songwriters/composers, operating lease commitments and Project Typhoon

**Restructuring**

- Targeted annualised savings through RE4 are £110.8 million, with a one-off cost of £136.2 million (of which £106.9 million is cash related). To date, Management has identified specific initiatives to support the delivery of £88.3 million of the £90.0 million fixed cost reduction targeted, with actions now taken to effect the delivery of £50.7 million of the £88.3 million
- Management has identified a cost reduction target of £110.8 million for RE4 and expects to achieve the full run rate in FY09.
- RE4 targets cost reduction across both core geographies and head office functions. As at the end of March 2007, benefits of £5.0 million have been delivered, with incremental benefits of £76.8 million anticipated in FY08 and annualised benefits of £110.8 million thereafter
- Management has formed a Programme Management team to support the co-ordination of benefit targeting through a bottom-up assessment exercise undertaken by Regional and functional Management heads
- RE4 targeted cost reduction predominantly relates to headcount reduction, net of planned new hires. 20 per cent of the annualised cost reduction target remains to be specifically supported by detailed implementation plans

A-905

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322487

Confidential

**Restructuring (continued)**

- Total one-off (cash and non-cash) costs of £136.2 million are anticipated by Management. The income statement charges were predominantly incurred in FY07 and the majority of cash costs are expected to be incurred in FY08
- Cash costs of £106.9 million have been assessed (which principally relate to severance costs of £86.0 million) against Management's initial estimate of £150.0 million
- Actions (including notification of redundancies) have been taken to support the delivery of £50.7 million of the £88.3 identified fixed cost reduction target. This mainly constitutes targeted headcount savings, net of new hire costs, of £47.6 million
- Prior to RE4, three major cost reduction programmes have been implemented by Mulberry Management, with a total announced benefit target of £180 million. This included a major £100 million restructuring programme of Music, launched in 2003
- Cost reductions from RE1 and RE2 have been absorbed by other increases in overhead costs. RE3 and RE4 have both delivered savings in FY07, without overhead increases occurring in other areas

**Pensions**

- Mulberry operates material defined benefit plans in the UK, Germany and Japan
- Mulberry estimate a deficit of £37.7 million as at 31 March 2007 for material plans already booked, excluding the surplus in the Japanese funded plan
- Future UK employer cash contributions will depend on outcome of negotiations with Trustees – management expect significant savings
- The FY07 service cost (cost of benefits accruing) is £13.4 million
- Mulberry's actuary estimates a projected funded status deficit of £24.3 million in the material defined benefit plans at 31 March 2008. Management expect that changes to benefits in the UK will reduce expense by £5.5 million p.a.

**Tax**

- Tax provisions have fallen by £11.8 million in FY06, £27.1 million in FY07 and are forecast to decrease in FY08
- The release of tax provisions covering historical exposures has reduced the effective tax rate in FY06 and FY07
- Significant tax losses are available to shelter future taxable profits although these may be subject to change of control restrictions

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322488

A-906

Case: 11-126 Document: 48 Page: 108 04/25/2011 272867 401
A-907

Project Mulberry Final Report – Volume 1 Dated 4 May 2007

# Volume 1: Group Overview

© 2007 Deloitte & Touche LLP, Private and confidential

Confidential CITI-TF 00322489

Case: 11-126 Document: 48 Page: 109 04/25/2011 272867 401

Confidential

*Project Mulberry* *Final Report – Volume 1* *Dated 4 May 2007*

# Contents

| | Page |
|---|---|
| **Group** | |
| Glossary | 2 |
| Group Trading Performance | 5 |
| Reported EBITDA, Exceptional Items and Normalisations | 7 |
| Group FY07 Pro-forma Adjusted Cost Base | 14 |
| Group Balance Sheet | 15 |
| Group Net Debt | 16 |
| Group Cash Flow Statement | 20 |
| Data Reconciliation and Integrity | 21 |

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322490

A-908

Confidential

# Glossary

| | |
|---|---|
| £ | Pounds sterling |
| A&R | Artists and repertoire. Those responsible for: finding and signing talent; finding songs; matching producers and songwriters; and generally overseeing Music projects |
| Advances provision | Mechanical provision against advance royalty payments made to artists or songwriters which Management do not expect to recoup |
| ARP | Average Realised Price – the average wholesale price achieved including discounts |
| Artist | An individual performer or group contracted to Mulberry plc |
| Artist advances | Contractual cash flow advance of royalty to artists and songwriters |
| Artist management | Services provided by Music to artists |
| Blue Book | Monthly management accounts at a Statutory Group, Music and Music Publishing level, including comparative information restated at current management rates |
| Catalogue sale | Sales of an album which was released earlier than the previous financial year (i.e. album sold in FY07, initial release date in FY05) |
| Compilation | An album which includes musical content from a number of Mulberry Artists or artists signed to other record companies |
| Collecting Agencies | The societies who are responsible for tracking and collecting royalties on behalf of authors/songwriters in each territory |
| Core record labels | Rock and pop labels |
| Corporate | The central Group Head Office function, including executive management and central finance. This is distinct from the divisional head office functions, which have been included within the Music and Music Publishing results. |
| Digital | Sales of units through digital medium – fixed line, mobile and subscriptions (primarily recognised on a cash receipt basis (i.e. royalty statement basis), but increasingly made on an accruals basis) |
| DRM | Digital Rights Management |
| EBITDA | Earnings Before Interest, Taxes, Depreciation and Amortisation |
| Enders | Independent market analysts |
| EUR/€ | Euros |
| External Licence Income | Income generated through the use of Music recordings on other compilation albums and synchronisation (i.e. use of Music in advertisements, films and on TV) |
| Financial period | A calendar month used by the Company for Management's account reporting purposes |
| Fixed line | Music sales via internet download |

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322491

A-909

Confidential

# Glossary (continued)

| | |
|---|---|
| Green Book | Detailed half yearly financial management information prepared in accordance with IFRS to support the external Statutory Accounts |
| Group | The consolidated results of the operations of Music and Publishing businesses and the Central Head Office |
| Historical Period | The 3 financial years under review: FY05, FY06 and FY07 |
| H1, H2 | The first and second half of the financial year respectively |
| IFPI | International Federation of the Phonographic Industry |
| FY05, FY06, FY07 | The years ended 31 March 2005, 2006 and 2007 respectively |
| International artist | An artist who is signed by another Mulberry region |
| Management | The directors and senior management of Mulberry plc as set out in the Scope and Bases of Review |
| Master tone | An MP3 format ringtone, which allows actual excerpts of music to be used on mobile phones, rather than the synthesiser format used by 'mono' and 'poly' phonic ringtones |
| Matrix Exchange Agreement ('MEA') | The licensing agreement between territories governing the exploitation of the product of locally signed artists in other Mulberry regions |
| MCPS | Mechanical-Copyright Protection Society |
| Mobile | Includes the sale of ring tones, videos, etc for use on mobile phones |
| Mulberry | Mulberry Group plc |
| Music | The recorded music division of Mulberry Group plc |
| Music Publishing | The music publishing division of Mulberry Group plc |
| n/a | Information not available |
| Neighbouring Rights Income | Income from the performance of Music recordings on the radio, television, at live concerts and in bars and clubs |
| New release | Sales of units whose earliest release date falls within the previous financial year (i.e. album sold in FY07 and original release was in FY06 or FY07) |
| Net realised unit price | Net domestic sales revenue after returns and discounts divided by net domestic audio and video sales units |
| Non record marketing 3rd party sales | Manufacturing and distribution of sales/units where Music are not responsible for the marketing |
| NPS | Net Publishers Share (equivalent to Gross Margin in Music Publishing) |
| Permanent fixed line | Fixed line audio downloads (e.g. via internet, kiosk, cable) |
| Permanent mobile | Permanent mobile products (e.g. full audio downloads, clip downloads, ringtones, ring tunes) |

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322492

A-910

Confidential

# Glossary (continued)

| | |
|---|---|
| Physical | Income from physical unit sales (i.e. CDs). Recognised on shipment date, and gross of returns in the management accounts |
| PPD | Published Price to Dealer (the maximum wholesale price that retailers pay to the record label or distributor) |
| Provisions | Includes four main types – artist advances, returns, stock and debtors |
| PRS | Performing Rights Society |
| Purple Book | Rolling twelve month management forecast (annual 'budget') |
| Sound Carriers | Third party users of copyrighted music, such as TV and film companies, radio stations, recorded music companies |
| Region | North America, Latin America, UK and Ireland, Continental Europe, Japan, South East Asia, Australasia and Other |
| Red Book | Music financial information prepared on a monthly basis containing supplemental information to the Blue Book. Includes detailed information on volume of sales. Management have discontinued the preparation of the Red Book from 31 December 2006 |
| Returns | Physical units of original shipment which are returned to Mulberry by customers |
| Ringtone | A music download to a mobile phone |
| Roster | Full list of artists signed at any one time |
| Royalty | Represents the sum of money paid to an artist for the use/exploitation of intellectual property |
| Royalty and Copyright costs | Contractual payments to artists in Music and songwriters in Music Publishing |
| Royalty rate | The per cent of a unit base price paid to an artist or songwriter. Royalty rates are negotiated individually and are typically a function of track record/status of artist or songwriter, total investment expected to be incurred, level of advance and artist requirement for cash, and nature of the relationship between Mulberry and the artist/songwriter |
| Sales | Represents income generated from physical units and digital |
| Songwriter | The writer and/or composer of the songs |
| Specialist labels | For example Christian labels |
| Subscriptions | To services which allows access by fixed line and mobile, but revenue is not generated on a per unit basis |
| Temporary fixed | Income from subscription services from all fixed line channels. Anything reported as part of a subscription model, whether free to customer or not |
| USD/$ | United States dollar |
| VRA | Virgin Records America |

A-911

CITI-TF 00322493

© 2007 Deloitte & Touche LLP. Private and confidential

Confidential

# Group Trading Performance

**In comparison to Music, Music Publishing was significantly more profitable in FY07 and more stable throughout the Historical Period. The poor performance in FY07 reflects the challenges facing Music's business and there are significant levels of exceptional costs excluded from reported EBITDA**

**Consolidated Group profit and loss account**

| £ million | FY06 | FY07 | % Variance |
|---|---|---|---|
| **Revenue** | 2,079.9 | 1,751.8 | (15.8)% |
| Music | 1660.5 | 1,412.8 | (14.8)% |
| Music Publishing | 419.8 | 415.8 | (0.8)% |
| Other | - | (76.0) | |
| Gross Margin | 774.6 | 612.1 | (21.0)% |
| Overheads | (507.1) | (437.2) | (13.8)% |
| Miscellaneous & One-off Items | 8.4 | (0.8) | (109.5)% |
| **EBITDA** | 275.9 | 174.1 | (36.9)% |
| Music | 186.1 | 78.2 | (58.0)% |
| Music Publishing | 113.4 | 117.6 | 3.6% |
| Central function | (23.6) | (15.2) | (36.1)% |
| Other | - | (6.3) | |
| Depreciation | (25.4) | (23.6) | (7.1)% |
| Share of Associates | 1.0 | 1.8 | 84.0% |
| Finance charges | (92.3) | (89.4) | (3.1)% |
| **Underlying PBT** | 159.2 | 63.1 | (60.4)% |
| Restructuring and reorganisation costs | - | (328.8) | - |
| Finance exceptional items | 4.7 | (16.2) | (444.7)% |
| Listed investments - remeasurements | 2.6 | (0.2) | (107.7)% |
| Gain (loss) on property and business disposals | 1.4 | 46.5 | 3364.3% |
| Amortisation | (49.9) | (45.4) | (9.0)% |
| **Profit before tax** | 118.0 | (279.0) | (336.4)% |
| Tax | (28.1) | (19.0) | (32.4)% |
| **Profit after tax** | 89.9 | (298.0) | (431.4)% |

Source: Management information

**FY07 revenue and EBITDA for Music and Music Publishing**

Note: These charts are based on the aggregated results of the two divisions, and the EBITDA analysis excludes central overheads

Source: Management information

- This Group section is intended to set the context for the divisional reports and does not attempt to provide commentary on Group performance on anything more than a very high level.
- The results shown opposite are for the consolidated Group. They were complied using the statutory reporting exchange rates (i.e. the prevailing average exchange rates for each region during FY06 and FY07 respectively) to translate the local currency results of non-sterling regions. The divisional analysis of revenue and EBITDA is shown at FY06 foreign exchange rates, being the basis on which the Blue Books were prepared and which forms the basis of our divisional analysis in Volumes 2 and 3.
- A reconciliation for FY06 of the management accounts to the statutory accounts is included in Appendix 2 of the Group section of Volume 5. The FY07 statutory accounts were not available at the time of our review.
- As can be seen from the charts opposite, the Music division generates the majority (77 per cent in FY07) of the Group's revenue. However, it contributed only 40 per cent to Group EBITDA in that year.
- A more detailed analysis of the key findings and trading performance of the two divisions is contained in the divisional reports (Volume 2: Music and Volume 3: Music Publishing). The fall in underlying EBITDA in FY07 is almost entirely due to the competitive challenges facing Music.
- Management's exceptional items of £328.8 million in FY07 comprise restructuring and reorganisation costs of £173.5 million (in respect of RE3 and RE4 initiatives), changes in accounting estimates applied to advance provisions (£94.3 million), a specific artist advance provision write-off of £16.4 million, the balance sheet impairment write-offs of £41.3 million, goodwill impairment of £24.7 million, a favourable Bertelsmann settlement of £37.8 million, an artist's audit settlement cost of £16.0 million and other miscellaneous charges of £0.4 million. The financial exceptional items relate to credits and charges on swaps, hedging positions and foreign exchange contracts traded by the business.
- Foreign exchange movements account for £76.2 million of the £76.0 million other revenue line, and £6.3 million of EBITDA.

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322494

A-912

Case: 11-126 Document: 48 Page: 114 04/25/2011 272867 401

Confidential

# Group Trading Performance

**On a statutory basis, revenue has declined by £328.9 million (15.8 per cent) in FY07 compared to FY06. On a constant currency basis, revenue has declined by £252.1 million, (12.1 per cent)**

## Split of the FY07 Group results between divisions

| £ million | Music Mgmt | MP Mgmt | Corporate Mgmt | Group Mgmt | Foreign Exchange difference | Group Stat |
|---|---|---|---|---|---|---|
| Total net Revenue | 1,413.8 | 415.8 | (1.8) | 1,827.8 | (76.2) | 1,751.6 |
| Gross Margin | 449.4 | 187.8 | (1.8) | 635.4 | (23.3) | 612.1 |
| *Gross Margin %* | *31.8%* | *45.2%* | | *34.8%* | | *34.9%* |
| Overheads | (371.4) | (69.5) | (13.3) | (454.2) | 17.0 | (437.2) |
| Miscellaneous & One-off items | 0.2 | (0.8) | (0.1) | (0.8) | - | (0.8) |
| EBITDA | 78.2 | 117.4 | (15.2) | 180.4 | (6.3) | 174.1 |
| *EBITDA margin* | *5.5%* | *28.2%* | | *9.9%* | | *9.9%* |
| Depreciation | (19.9) | (3.1) | (1.8) | (24.2) | 0.8 | (23.6) |
| EBITA | 58.3 | 114.3 | (16.8) | 156.2 | (5.7) | 150.5 |
| Share of Associates | 1.2 | 0.9 | - | 2.0 | (0.1) | 1.9 |
| Profit from operations | 59.7 | 115.2 | (16.8) | 158.2 | (5.8) | 152.4 |
| Amortisation | (23.8) | (45.3) | (0.9) | (70.1) | | (70.1) |
| Restructuring and reorganisation | (284.4) | (19.3) | (7.6) | (311.3) | 7.2 | (304.1) |
| Gain/(loss) on property sale | 56.2 | - | (7.7) | 48.5 | | 48.5 |
| Investment remeasurement | (0.2) | - | 0.0 | (0.2) | - | (0.2) |
| EBIT | (192.6) | 50.6 | (23.0) | (174.9) | 1.4 | (173.5) |

Note: The 'Restructuring and Reorganisation' and 'Gain/Loss on property sale' balances above reflect Management's push-down of these costs to the two divisions, as detailed in Appendix 4 of the Group Appendices in Volume 6. These push-downs have not been reflected in the divisional numbers in Volumes 2 and 3.

In addition, Appendix 4 also includes a reallocation of impairment costs from Amortisation to Restructuring and Reorganisation costs, which has been included in the table above, but has not been reflected in the Management Account numbers presented on the previous page.

Source: Blue Book

## Split of the FY06 Group results between divisions

| £ million | Music Mgmt | MP Mgmt | Corporate Mgmt | Group Mgmt | Foreign Exchange difference | Group Stat |
|---|---|---|---|---|---|---|
| Total Net Revenue | 1,660.3 | 419.6 | - | 2,079.8 | - | 2,079.8 |
| Gross Margin | 583.9 | 190.7 | - | 774.6 | - | 774.6 |
| *Gross Margin %* | *35.2%* | *45.4%* | | *37.2%* | | *37.2%* |
| Overheads | (401.8) | (81.5) | (23.8) | (507.1) | - | (507.1) |
| Miscellaneous & One-off items | 4.2 | 4.2 | - | 8.4 | - | 8.4 |
| EBITDA | 186.3 | 113.4 | (23.8) | 275.9 | - | 275.9 |
| *EBITDA margin* | *11.2%* | *27.0%* | | *13.3%* | | *13.3%* |
| Depreciation | (20.8) | (2.9) | (1.7) | (25.4) | - | (25.4) |
| EBITA | 165.5 | 110.5 | (25.5) | 250.5 | - | 250.5 |
| Share of Associates | (0.1) | 1.1 | - | 1.0 | | 1.0 |
| Profit from operations | 165.4 | 111.6 | (25.5) | 251.5 | - | 251.5 |
| Amortisation | (3.5) | (40.3) | (0.1) | (49.9) | - | (49.9) |
| Restructuring and reorganisation | 0.1 | - | (0.1) | - | | - |
| Gain/(loss) on property sale | - | - | 1.4 | 1.4 | - | 1.4 |
| Investment remeasurement | 2.3 | - | 0.3 | 2.6 | - | 2.6 |
| EBIT | 164.3 | 65.5 | (24.0) | 205.8 | - | 205.8 |

Source: Blue Book

- The tables opposite show how the consolidated Group results split into the divisions for FY06 and FY07. These divisional numbers form the basis of our divisional analysis.
- The divisional results used for FY06 and FY07 reflect the trading figures reported in the Group's Management accounts (Blue Book) which uses the FY06 statutory exchange rates for both years. Consequently there is an exchange difference in FY07 between the Management accounts (at FY06 average exchange rates) and the FY07 statutory rate numbers (at FY07 average exchange rates) presented on the previous page. No such exchange difference exists for FY06.
- We have not been provided with the FY07 divisional results using FY07 average rates. Therefore, for the purpose of comparability both years have been presented using FY06 average rates.
- Although not presented opposite, the divisional reports contain the trading results for FY05. However, these have only been made available at a detailed level using FY05 average exchange rates (sourced from the FY06 Blue Book comparative) and, given the changes to the business in respect of the trading environment and cost structure, they have not been a critical area of significant focus for our work.
- A review of the Central Group Head Office costs has been included within Volume 4.
- As at 31 March 2007, Music and Music Publishing changed their basis of accounting estimates for provisions on artist advances, resulting in a one-off amortisation expense of £77.3 million and £17.0 million respectively in that year.
- In FY07 the Group initiated a cost reduction programme (internally called "RE4"), which is forecast to make £110 million of annualised overhead saving.
- The gain on property sale of £48.5 million in FY07 related to three property sales, (Tokyo, Los Angeles and South Africa).

© 2007 Deloitte & Touche LLP. Private and confidential

A-913

CITI-TF 00322495

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

**Whilst we have identified a number of normalising adjustments, of the normalisation adjustments that we have been able to quantify, they are insignificant in comparison to the items identified as exceptional by Management and shown separately in the management accounts**

**Reported EBITDA, exceptional items and normalisations**

| FY07 £ million | | Corporate Mgmt | Music Mgmt | MP Mgmt | Group Mgmt | Exchange | Group Stat |
|---|---|---|---|---|---|---|---|
| | Reported EBITDA | (15.7) | [illegible] | 111.4 | [illegible] | [illegible] | [illegible] |
| | Exceptionals (as reported by management) | | | | | | |
| A | Restructuring and Reorganisation | (7.9) | (284.6) | (19.3) | (311.1) | 2.2 | [illegible] |
| A | [illegible] | (7.1) | 58.2 | [illegible] | [illegible] | | |
| A | Amortisation and impairment | (9.8) | (21.0) | [illegible] | [illegible] | | |
| A | [illegible] | 0.0 | (0.3) | - | (0.3) | | |
| | Normalisations (quantified) | B | C | D | | | |
| | [illegible] | (5.3) | 5.2 | (4.9) | (5.0) | | |

| FY06 £ million | | Corporate Mgmt | Music Mgmt | MP Mgmt | Group Mgmt | Exchange | Group Stat |
|---|---|---|---|---|---|---|---|
| | Reported EBITDA | [illegible] | [illegible] | [illegible] | [illegible] | 0.0 | [illegible] |
| | Exceptionals (as reported by management) | | | | | | |
| A | Restructuring and Reorganisation | (0.1) | 0.1 | | [illegible] | | |
| A | [illegible] | 1.4 | 0.0 | | 1.4 | | |
| A | Amortisation and impairment | (0.1) | (3.5) | (45.5) | (49.1) | | |
| A | [illegible] | 0.3 | 3.3 | - | 3.6 | | |
| | Normalisations (quantified) | B | C | D | | | |
| | [illegible] | (2.7) | [illegible] | [illegible] | [illegible] | | |

| FY05 £ million | | Corporate Mgmt | Music Mgmt | MP Mgmt | Group Mgmt | Exchange | Group Stat |
|---|---|---|---|---|---|---|---|
| | Reported EBITDA | [illegible] | [illegible] | 107.7 | [illegible] | [illegible] | [illegible] |
| | Exceptionals (as reported by management) | | | | | | |
| A | [illegible] | [illegible] | - | | [illegible] | | |
| A | Amortisation and impairment | (0.1) | [illegible] | [illegible] | [illegible] | | |
| A | [illegible] | [illegible] | 0.2 | | [illegible] | | |
| | Normalisations (quantified) | B | C | D | | | |
| | [illegible] | (0.4) | [illegible] | [illegible] | [illegible] | | |

Source: Blue Books and Deloitte analysis

- This section presents the Reported EBITDA of the Mulberry Group (including the split between Music, Music Publishing and Group Head Office ("Corporate")), together with the exceptional items which have been identified by Management and excluded from the reported underlying EBITDA figure. (Reported in Part A, below)
- In addition, presented opposite are normalising adjustments (split between Music, Music Publishing and Corporate) which we have identified during the course of our work. (Reported in Parts B, C and D, below)
- Not all costs incurred in relation to Restructuring and Reorganisation in FY07 have been allocated to the Music and Music Publishing divisions. As such the split between Music, Music Publishing and Corporate divisions is subject to change.
- In FY07, the Restructuring and Reorganisation exceptional charge reported in the Group management accounts (Blue Book) included c. £24.7 million of intangible impairment expenses which Management advise should be classified within the Amortisation and Impairment expense line. This adjustment has been reflected in the adjacent table.
- Refer to Appendix 4 in the Corporate Appendices for a reconciliation between the Blue Books and the management information presented in this section.
- It is expected that items shown in A will be classified as "Operating exceptionals" in the statutory accounts currently being prepared.

Items A and B – refer below

Item C – Refer to Music report (Volume 2)

Item D – Refer to Music Publishing report (Volume 3)

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322496

A-914

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

**Prior to FY07 exceptional items below the line principally related to amortisation and impairment amounts; in FY07 restructuring and reorganisation costs of net £304 million were charged to the P&L**

## Exceptional items identified by Management

A

*Restructuring and Reorganisation costs*

| £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| **Corporate** | | | |
| A Transaction costs – Warner Music Group | - | - | (6.4) |
| B Transaction costs – bid approach Nov/Dec 2006 | - | - | (1.2) |
| **Music** | | | |
| C Janet Jackson advance provision | - | - | (16.4) |
| D Beatles audit settlement costs | - | - | (10.0) |
| E Berteismann settlement (net proceeds) | - | - | 23.7 |
| Restructuring & Reorganisation costs | | | |
| F RE3 | - | (0.1) | (49.8) |
| G RE4 | - | - | (107.3) |
| H FRESH (balance sheet review) | - | - | (41.3) |
| I Adjustment for advance provisions | - | - | (77.3) |
| **Music Publishing** | | | |
| E Bertelsmann settlement (net proceeds) | - | - | 4.1 |
| Restructuring & Reorganisation costs | | | |
| F RE3 | - | - | (9.7) |
| G RE4 | - | - | (8.7) |
| I Adjustment for advance provisions | - | - | (17.0) |
| J Currency adjustment (management to statutory rates) | - | 0.1 | 7.2 |
| Total | 0.0 | 0.0 | (304.1) |

*Gain/loss on property disposals*

| £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| **Music** | | | |
| K Property Disposals (other) | 0.9 | 1.4 | - |
| Two Japanese properties – profit on sale and leaseback | - | - | 38.5 |
| Capital Tower – profit on sale and leaseback (US) | - | - | 16.7 |
| Sale of property in South Africa | - | - | 1.0 |
| Costs of exiting Tenterden Street property (UK) | - | - | (3.7) |
| Currency adjustment (management to statutory rates) | - | - | (8.0) |
| Total | 0.9 | 1.4 | 45.5 |

*Amortisation and impairment*

| | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| L Music | (5.2) | (3.6) | (23.9) |
| Music Publishing | (42.7) | (46.3) | (45.3) |
| Currency adjustment (management to statutory rates) | (0.1) | (0.1) | (0.9) |
| | (48.0) | (48.9) | (70.1) |

Source: Blue Books and management information

**Exceptional items reflected in the statutory accounts and trading statement**

- Reported EBITDA within the management accounts excludes a number of items identified by Management as exceptional (as identified opposite).

A On 1 May 2006, Mulberry approached Warner Music Group in respect of a possible acquisition. All costs associated with the potential transaction amounted to £6.4 million, and are treated as exceptional.

B In November 2006, the Group received a bid approach from another interested party. Although this transaction did not proceed, Mulberry incurred legal and professional costs of c.£1.2 million during the process, treated as exceptional.

C Following disappointing sales performance in FY07, a provision of £16.4 million was raised in respect of advance royalty payments made to Janet Jackson in respect of her latest album release '20 Years Old'. Whilst underlying in nature, this provision is deemed to be exceptional by size.

The Janet Jackson provision booked is in addition to the 'one-off' provision (c. £94.3 million) booked as a result of the change in accounting estimate/treatment in advance provisions (refer to item I below).

D In December 2006, the surviving members of the Beatles filed a lawsuit (claiming £34 million) against Mulberry alleging that the Group underpaid record royalties on sales of Beatles' records between 1994 and 1999. A settlement was made in respect of this claim in March 2007, at a cost of £10 million (£8 million settlement plus £2 million in legal costs).

In addition to this amount, the Group has also accrued £6 million, to cover the estimated settlement cost for the period between 2000 and 2007.

© 2007 Deloitte & Touche LLP. Private and confidential

A-915

CITI-TF 00322497

Case: 11-126 Document: 48 Page: 117 04/25/2011 272867 401

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

**The restructuring and reorganisation cost category also includes other items which, in some cases, relate to the ongoing business but are shown separately due to their size**

## Exceptional items identified by Management

A

*Restructuring and Reorganisation costs*

| £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| **Corporate** | | | |
| A Transaction costs - Warner Music Group | - | - | (6.4) |
| B Transaction costs - bid approach Nov/Dec 2006 | - | - | (1.2) |
| **Music** | | | |
| C Janet Jackson advance provision | - | - | (16.4) |
| D Beatles audit settlement costs | - | - | (10.0) |
| E Bertelsmann settlement (net proceeds) | - | - | 23.7 |
| Restructuring & Reorganisation costs | | | |
| F RE3 | - | (0.1) | (49.8) |
| G RE4 | - | - | (107.3) |
| H FRESH (balance sheet review) | - | - | (45.3) |
| I Adjustment for advance provisions | - | - | (77.3) |
| **Music Publishing** | | | |
| E Bertelsmann settlement (net proceeds) | - | - | 14.1 |
| Restructuring & Reorganisation costs | | | |
| F RE3 | - | - | (9.7) |
| G RE4 | - | - | (8.7) |
| I Adjustment for advance provisions | - | - | (17.0) |
| J Currency adjustment (management to statutory rates) | - | 0.1 | 7.2 |
| **Total** | 0.0 | 0.0 | (304.1) |

*Gain/(loss) on property disposals*

| £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| **Music** | | | |
| K Property Disposals (other) | 0.9 | 1.4 | - |
| Two Japanese properties - profit on sale and leaseback | - | - | 39.5 |
| Capitol Tower - profit on sale and leaseback (US) | - | - | 18.1 |
| Sale of property in South Africa | - | - | 1.0 |
| Costs of exiting Tenterden Street property (UK) | - | - | (1.7) |
| Currency adjustment (management to statutory rates) | - | - | (8.0) |
| **Total** | 0.9 | 1.4 | 48.8 |

*Amortisation and impairment*

| | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| L Music | (5.2) | (3.6) | (23.0) |
| Music Publishing | (42.7) | (46.3) | (46.3) |
| Currency adjustment (management to statutory rates) | (0.1) | (0.1) | (0.9) |
| | (48.0) | (49.9) | (70.1) |

Source: Blue Books and management information

E The Bertelsmann litigation settlement relates to compensation for loss of sales and royalties deemed to have arisen as a result of music shared through the Napster website. The settlement amount of c.US$109 million (net of legal costs) is to be shared between Mulberry and its artists.

Whilst underlying in nature, this settlement was deemed by Management to be exceptional in size. The net settlement amounts retained by Music and Music Publishing are shown opposite.

After legal costs of US$21 million (US$15 million in Corporate and US$6 million in Music Publishing), the net settlement amount of US$109 million is split between Music and Music Publishing at US$55 million (£28.8 million) and US$54 million (£28.3 million) respectively.

In the case of Music Publishing approx 50 per cent of this amount is paid on to song writers and the remaining 50 per cent retained by Music Publishing.

The Music business is expected to pay c.18 per cent of the balance to artists and retain 82 per cent of the net settlement amount.

The net amount retained by Music Publishing and Music (i.e. amount after payment of artists/song writers) is included in the table opposite.

The applicable amounts (rates) of the total settlement paid on to artists/song writers was based on Management's judgement of the extent to which each artist/song writer was affected (if at all) by loss of royalties through Napster. Management have advised that the amounts paid on to artists/song writers were set on the high side of estimates to retain goodwill.

- During the reported period, Management has initiated a number of restructuring and reorganisation programmes.

F The RE3 programme is focused heavily on overhead cost reductions in the Japanese Music business, and modest savings in Music Publishing.

The total implementation cost of RE3 in FY07 was £59.5 million, incurred separately in Music and Music Publishing as shown opposite. Management have indicated that this programme was complete at the end of FY07.

© 2007 Deloitte & Touche LLP. Private and confidential

A-916

CITI-TF 00322498

Case: 11-126 Document: 48 Page: 118 04/25/2011 272867 401

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

## Within the £304 million of total exceptionals, Management has identified c.£135 million of write offs and provisions following a review of the carrying value of items on the balance sheet

**Exceptional Items identified by Management** A

*Restructuring and Reorganisation costs*

| | £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|---|
| | Corporate | | | |
| A | Transaction costs - Warner Music Group | - | - | (8.4) |
| B | Transaction costs - bid approach Nov/Dec 2006 | - | - | (1.2) |
| | Music | | | |
| C | Janet Jackson advance provision | - | - | (16.4) |
| D | Beatles audit settlement costs | - | - | (18.0) |
| E | Bertelsmann settlement (net proceeds) | - | - | 22.7 |
| | Restructuring & Reorganisation costs | | | |
| F | RE3 | - | (0.1) | (49.8) |
| G | RE4 | - | - | (107.3) |
| H | FRESH (balance sheet review) | - | - | (41.3) |
| I | Adjustment for advance provisions | - | - | (77.3) |
| | Music Publishing | | | |
| E | Bertelsmann settlement (net proceeds) | - | - | (4.1) |
| | Restructuring & Reorganisation costs | | | |
| F | RE3 | - | - | (9.7) |
| G | RE4 | - | - | (6.7) |
| I | Adjustment for advance provisions | - | - | (17.0) |
| J | Currency adjustment (management to statutory rates) | - | 0.1 | 7.2 |
| | Total | 0.0 | 0.0 | (304.1) |

*Gain/(loss) on property disposals*

| | £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|---|
| | Music | | | |
| K | Property Disposals (other) | 0.8 | 1.4 | - |
| | Two Japanese properties - profit on sale and leaseback | - | - | 36.5 |
| | Capital Tower - profit on sale and leaseback (UK) | - | - | 16.7 |
| | Sale of property in South Africa | - | - | 1.0 |
| | Costs of exiting Tenterden Street property (UK) | - | - | (2.7) |
| | Currency adjustment (management to statutory rates) | - | - | (8.0) |
| | Total | 0.8 | 1.4 | 48.5 |

*Amortisation and impairment*

| | | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|---|
| L | Music | (5.2) | (3.5) | (23.9) |
| | Music Publishing | (42.7) | (46.3) | (49.3) |
| | Currency adjustment (management to statutory rates) | (0.1) | (0.1) | (0.9) |
| | | (48.0) | (49.9) | (70.1) |

Source: Blue Books and management information

G Targeted cost reduction through the RE4 programme predominantly relates to headcount reduction, net of planned new hires, reduction of the music roster, property reorganisation and 'other opportunities'.

H During FY07, Management undertook a review of items on the balance sheet (FRESH programme) including the Group's valuation of assets. As a result of this balance sheet review, Management has identified and written off £41.3 million of assets in Music.

The key elements of the write down are:

- An increase in the provision for audit exposure on digital exploitation (£10 million);
- Accelerated write down of global technology assets (£16 million); and
- Costs associated with the discontinuation of a line of stock with copy protection features, write-off of c.£17 million.

I Also as part of the FRESH programme, a review of the provisions made against advances has been performed and a change in the provisioning methodology was made. More stringent application of performance thresholds for advance provisioning has resulted in a one-off £94 million additional provision in FY07 (predominantly relating to Music as shown opposite).

J This item represents a currency adjustment for the RE4 and FRESH exceptional items which are quoted at management exchange rates. Translating to statutory exchange rates results in a gain of c.£7.2 million (excluding currency adjustment in relation to impairment losses on intangible assets which have been reclassified in amortisation and impairment).

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322499

A-917

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

**During FY07, Mulberry disposed of properties in the US, Japan and South Africa. The profits from sale of these properties have been excluded from underlying EBITDA**

Exceptional items identified by Management A

*Restructuring and Reorganisation costs*

| £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| Corporate | | | |
| A Transaction costs - Warner Music Group | - | - | (5.4) |
| B Transaction costs - bid approach Nov/Dec 2006 | - | - | (1.2) |
| Music | | | |
| C Janet Jackson advance provision | - | - | (10.4) |
| D Beatles audit settlement costs | - | - | (18.0) |
| E Bertelsmann settlement (net proceeds) | - | - | 33.7 |
| Restructuring & Reorganisation costs | | | |
| F RE3 | - | (0.1) | (49.8) |
| G RE4 | - | - | (107.3) |
| H FRESH (balance sheet review) | - | - | (41.5) |
| I Adjustment for advance provisions | - | - | (77.3) |
| Music Publishing | | | |
| E Bertelsmann settlement (net proceeds) | - | - | 14.1 |
| Restructuring & Reorganisation costs | | | |
| F RE3 | - | - | (9.7) |
| G RE4 | - | - | (8.7) |
| I Adjustment for advance provisions | - | - | (17.0) |
| J Currency adjustment (management to statutory rates) | - | 0.1 | 7.2 |
| Total | 0.0 | 0.0 | (304.1) |

*Gain/(loss) on property disposals*

| £ million | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|
| Music | | | |
| K Property Disposals (other) | 0.9 | 1.4 | - |
| Two Japanese properties - profit on sale and leaseback | - | - | 36.5 |
| Capitol Tower - profit on sale and leaseback (US) | - | - | 18.7 |
| Sale of property in South Africa | - | - | 1.0 |
| Costs of exiting Tenterden Street property (UK) | - | - | (1.7) |
| Currency adjustment (management to statutory rates) | - | - | (6.0) |
| Total | 0.9 | 1.4 | 48.5 |

*Amortisation and Impairment*

| | FY05 | FY06 | FY07 |
|---|---|---|---|
| L Music | (5.2) | (3.5) | (23.9) |
| Music Publishing | (42.7) | (46.3) | (45.3) |
| Currency adjustment (management to statutory rates) | (0.1) | (0.1) | (0.9) |
| | (48.0) | (49.9) | (70.1) |

Source: Blue Books and management information

**Gain on property disposals**

K During the reported period, the business made a number of property disposals as outlined below:

- FY05 – £0.9 million profit on disposal of land and buildings in Spain and the UK.
- FY06 – £1.4 million profit on disposal of a property in Spain.
- FY07
  - In August 2006, Music recognised a £36.5 million profit on sale and leaseback of two properties in Japan. Proceeds from the sale were £67.3 million.
  - During September 2006, Music completed a sale and leaseback for Capitol Tower in the US, recording a net profit of £18.7 million (proceeds were £27.1 million).
  - Also in September 2006, Mulberry South Africa sold its office, warehouse and former manufacturing plant at Steeledale. The net proceeds from the sale of £1 million were settled in the same month.

All property disposals have been treated as exceptional items and excluded from underlying EBITDA.

**Amortisation and Impairment**

L Amortisation and impairment charges were also excluded from reported underlying EBITDA for the purposes of the trading statement/financial statements.

The charge, split between Music and Music Publishing in the adjacent table is generally constant over the period shown, with the exception of FY07, where an additional charge of c.£20 million was made in Music, representing impairment of Music goodwill.

A-918

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322500

Case: 11-126 Document: 48 Page: 120 04/25/2011 272867 401

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

## We have identified a number of other normalising adjustments during the course of our work

**Normalised EBITDA** B

| £ million | Note | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|---|
| Reported EBITDA- Group[1] | | 249.9 | 275.9 | 174.1 |
| Normalisation adjustments | | | | |
| Corporate | | | | |
| Legal costs incurred in Bertelsmann case | 1 | - | 3.0 | 4.6 |
| Recovery of Bertelsmann costs | 2 | - | - | (7.6) |
| Pensions credit in Japan | 3 | - | (5.0) | (1.4) |
| Royalties to The Beatles | 4 | (0.9) | (0.9) | (0.9) |
| Total Corporate B | | (0.9) | (2.9) | (5.3) |
| Music (from divisional report) C | | (8.4) | (2.9) | 5.2 |
| Music Publishing (from divisional report) D | | (6.4) | (6.1) | (6.8) |
| Total Adjustments | | (14.7) | (11.9) | (6.9) |
| Normalised EBITDA before unquantified amounts | | 235.2 | 264.0 | 167.2 |
| Unquantified normalisation adjustments | | | | |
| Change in accounting estimate - Advances | 5 | ? | ? | ? |
| Impact of excess returns | 6 | ? | ? | ? |
| NPS from MGM copyrights | 7 | ? | ? | ? |
| Normalised EBITDA | | | | |

[1] Note: Reported EBITDA excludes a number of items identified by Management as exceptional

Source: Blue Books and management information

**Normalisation adjustments**

- In addition to the items identified by Management as exceptional, there are a number of normalising adjustments which we have identified during the course of our work.

1&2 In relation to the Bertelsmann litigation settlement (discussed above), legal costs of c.US$15 million (c.£7.6 million) were incurred within Corporate in both FY06 and FY07. Upon finalisation of settlement, these costs were recovered against the settlement proceeds, booked in FY07.

These adjustments reallocate the recovery of the legal costs to the period in which they were incurred.

3. Pension plan credits were recorded in the Japanese business in both FY06 and FY07. An adjustment has been made to remove the positive impact of this exceptional item on normalised EBITDA.

4. Following the settlement of the claim by The Beatles relating to unpaid music royalties, the provision made for 2000 to 2007, has been charged back evenly over the period.

**Unquantified normalisation adjustments**

5. As identified above, the impact of the change in accounting estimate in respect of advance provisions was a one-off additional charge of c.£94 million in FY07. For the purposes of arriving at normalised EBITDA for FY05 to FY07, an adjustment should be made to reflect the provision expense under the new policy. However, advance balances and associated provisions are reviewed at the individual territory level and due to constraints in information available at this level, we are unable to calculate the impact of the one-off adjustment (reallocation) to each year.

© 2007 Deloitte & Touche LLP. Private and confidential

A-919

CITI-TF 00322501

Case: 11-126 Document: 48 Page: 121 04/25/2011 272867 401

Confidential

# Reported EBITDA, Exceptional Items and Normalisations

**In addition to the normalisation adjustments specifically quantified, a number of additional normalisation items have been identified which are unable to be quantified**

**Normalised EBITDA** B

| £ million | | Note | FY05 Actual | FY06 Actual | FY07 Actual |
|---|---|---|---|---|---|
| Reported EBITDA - Group[1] | | | 249.9 | 275.9 | 174.1 |
| Normalisation adjustments | | | | | |
| Corporate | | | | | |
| Legal costs incurred in Bertelsmann case | | 1 | - | 3.0 | 4.6 |
| Recovery of Bertelsmann costs | | 2 | - | - | (7.6) |
| Pensions credit in Japan | | 3 | - | (5.0) | (1.4) |
| Royalties to The Beatles | | 4 | (0.9) | (0.9) | (0.9) |
| Total Corporate | B | | (0.9) | (2.9) | (5.3) |
| Music (from divisional report) | C | | (8.4) | (2.9) | 5.2 |
| Music Publishing (from divisional report) | D | | (5.4) | (6.1) | (6.8) |
| Total Adjustments | | | (14.7) | (11.9) | (6.9) |
| Normalised EBITDA before unquantified amounts | | | 235.2 | 264.0 | 167.2 |
| Unquantified normalisation adjustments | | | | | |
| Change in accounting estimate - Advances | | 5 | ? | ? | ? |
| Impact of excess returns | | 6 | ? | ? | ? |
| NPS from MGM copyrights | | 7 | ? | ? | ? |
| Normalised EBITDA | | | | | |

[1] Note: Reported EBITDA excludes a number of items identified by Management as exceptional.

Source: Blue Books and management information

6. Music suffered materially higher product returns in H2 FY07 than in previous years, partly reflecting a change in stock holding practices by customers in all markets but particularly the US and Germany and partly reflecting returns of overshipments by Music, both of which are against a backdrop of declining market demand for physical product.

   The impact of the reduction of physical product held within Music's distribution channel represents a step change in the market and manifested itself in an exceptional period of higher returns during H2 FY07 as customers re-based their stock levels.

   Due to constraints in information available at an individual territory level, we are unable to isolate the financial impact (cost) of this re-basing of customer stock levels on FY07.

   It is not possible to disaggregate the financial impact of each of these individual factors on the underlying EBITDA of the business, nor the period impacted by this reassessment.

   Management have performed some high level analysis to estimate the potential cost savings which may be generated by reducing the level of returns resulting from over shipping of product. The calculation compares absolute returns to prior period levels and extrapolates a savings figure based on a proportion of gross margin percentages. Management estimated that the one off cost associated with the returns was between £10 million to £20 million.

   A more accurate estimate of potential savings from reducing returns would be to calculate the non-recoverable costs incurred on returned items (e.g. manufacturing and shipping costs), extrapolated over the expected level of reduced returns in the future.

7. During FY06 and FY07, Music Publishing disposed of a number of MGM copyrights to third parties. The NPS generated from these copyrights is no longer available to Music Publishing and should therefore be removed from prior years as a normalising adjustment. We have been unable to quantify the impact of this adjustment.

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322502

A-920

Confidential

# Group FY07 Pro forma adjusted cost base

**In response to the declining market and the commensurate operating challenges facing the business, Management have instigated a restructuring plan to reduce the cost base of the business**

**FY07 pro forma adjusted cost base**

| £ million | Operating costs excluding overheads | Overheads | Total |
|---|---|---|---|
| FY07 costs | (1,139.5) | (437.2) | (1,576.7) |
| Adjustments | | | |
| RE3 (annualisation of cost savings) | - | 10.0 | 10.0 |
| RE4 Adjustments | 22.5 | 88.3 | 110.8 |
| Adjustment for RE4 costs already recognised in FY07 | - | (5.0) | (5.0) |
| Marketing and promotion overspend in FY07 | 33.2 | - | 33.2 |
| Total FY07 pro forma adjusted cost base | (1,083.8) | (343.9) | (1,427.7) |
| Unquantified adjustments | | | |
| Change in accounting estimate – Advances | ? | ? | ? |
| Change in industry stockholding practices of customers | ? | ? | ? |

Note: The costs above do not reflect the Normalisation adjustments

Source: Blue Books, RE4 schedules

- Set out in the table opposite is a pro forma adjusted cost base calculation which adjusts the FY07 total costs to take account of RE3 and RE4, together with certain other identified quantifiable adjustments.

**Potential pro forma adjustments**

- The RE3 programme is complete and has achieved the cost savings objectives with £20 million of the annualised cost savings of £30 million, recorded in FY07 results.
- RE4 is a further restructuring programme with planned annualised cost savings of £110 million, which we have reduced by £5.0 million representing the cost savings already realised in FY07 reported costs.
- In FY07, marketing and promotion costs accounted for 18.9 per cent of net revenue, 2.3 per cent higher than the level noted in FY05 and FY06. This increase was due to expenditure being based on budgeted revenue levels that were significantly higher than those actually realised.

  Management have indicated that the level of spend was not tracked against the reduced revenue levels and should have been held at 16.6 per cent of net revenue. If this spend was at historical levels of 16.6 per cent of FY07 net revenue, marketing and promotional costs would have been lower by £32.2 million (calculated as the difference between actual FY07 M&P expenditure and pro forma FY07 M&P expenditure of 16.6 per cent of actual net revenue).

  This has been identified as a potential pro forma adjustment, albeit the impact of this lower level of spend on sales going forward is difficult to assess.

**Unquantified adjustments**

- These have been discussed earlier in this section.

A-921

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322503

Case: 11-126 Document: 48 Page: 123 04/25/2011 272867 401

Confidential

# Group Balance Sheet

**As at 31 March 2007 the net liability position of the Group was £1,184 million**

**FY07 Balance Sheet**

| £ million | Music | Music Publishing | Other | Group |
|---|---|---|---|---|
| Non-current assets | 163.9 | 353.7 | (24.5) | 493.1 |
| Investment in group companies | 2,726.4 | 345.8 | (3,072.2) | - |
| Net working capital | (135.6) | (116.3) | (181.1) | (433.0) |
| Provisions | (164.1) | (16.2) | (21.8) | (202.1) |
| Net debt | (653.8) | 876.2 | (1,032.0) | (909.6) |
| Interest | (6.1) | 5.9 | (38.2) | (40.4) |
| Taxation | (21.2) | 2.3 | (63.4) | (82.3) |
| Dividends | - | - | - | - |
| Net intragroup items | (1.2) | - | 1.2 | - |
| Net assets/(liabilities) | 1,886.3 | 1,261.4 | (4,432.0) | (1,184.3) |

Source: Management information

**FY06 Balance Sheet**

| £ million | Music | Music Publishing | Other | Group |
|---|---|---|---|---|
| Non-current assets | 233.9 | 391.0 | 27.0 | 651.9 |
| Investment in group companies | 2,732.9 | 345.8 | (3,078.7) | - |
| Net working capital | (146.1) | (77.7) | (61.2) | (285.0) |
| Provisions | (61.6) | (6.7) | 3.8 | (64.5) |
| Net debt | (619.1) | 662.0 | (922.4) | (879.5) |
| Interest | (8.0) | 6.0 | (38.7) | (40.7) |
| Taxation | (9.5) | (2.9) | (96.3) | (108.7) |
| Dividends | (9.3) | 0.0 | 9.3 | - |
| Net intragroup items | 3.9 | 0.0 | (3.9) | - |
| Net assets/(liabilities) | 2,217.1 | 1,217.8 | (4,161.1) | (726.5) |

Note: These tables are based on the aggregated results of the Music and Music Publishing divisions

Source: Management information

- The tables presented opposite show the Group's consolidated balance sheets at the end of FY06 and FY07. These have both been compiled at statutory foreign exchange rates for their respective years (i.e. the prevailing year end exchange rates for each region during FY06 and FY07 respectively). However, as with the profit and loss account, the divisional balance sheets shown opposite and used in Volumes 2 and 3 have been constructed using Management exchange rates.
- No information has been made available regarding either the balance sheet of the Corporate function (other than that contained in Appendix 14 of the Specialists reports appendices in Volume 5, which are at statutory, rather than management exchange rates), the consolidation elimination adjustments or the exchange differences, and consequently the columns labelled 'Other' on the tables opposite are the net of these three items (a balancing figure).
- The divisional balance sheets are reviewed separately within the Music and Music Publishing volumes (Volumes 2 and 3 respectively).
- "Other" primarily comprises the elimination of Group investments and intercompany adjustments and to reflect the external debt position.

A-922

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322504

Confidential

# Group Net Debt

**Prior to the inclusion of pension deficit, cash inflow from the exercise of share options and break costs, adjusted financial net debt was £1,288.9 million at 31 March 2007. There are also a number of other factors that also need to be considered**

**Group net debt**

| £ million | | FY07 |
|---|---|---|
| As at 31 March | | |
| Reported net debt | | (903.5) |
| Cash equivalents | | 10.4 |
| Interest payable | | (47.8) |
| Accounting adjustments to debt | | |
| - Debt issuance Costs | (26.4) | |
| - Fair value of interest rate swaps | (2.3) | |
| - IAS 39/32 treatment of convertible bond* | (11.0) | |
| - US $600m notes adjustments* | (1.1) | |
| - €425m notes adjustments* | 2.3 | |
| | | (37.9) |
| | | (977.0) |
| Working capital | | |
| *Music Publishing* | | |
| Actual 31 March 2007 | (29.2) | |
| Average (1) | (41.4) | |
| | | (67.6) |
| *Music* | | |
| Actual 31 March 2007 | (81.6) | |
| Average (1) | 18.1 | |
| | | (73.7) |
| Restructuring costs (2) | | (81.1) |
| Consideration for acquisition of Toshiba Mulberry Limited (3) | | (93.3) |
| **Adjusted financial net debt** | | (1,288.9) |
| Pension deficit | | (37.7) |
| Net cash on issue of share options | | 49.4 |
| Other items for consideration | | |
| Corporate – adjust to normal working capital adjustment | | ? |
| Corporation tax liability | | ? |
| Project Typhoon option | | ? |

Note* These adjustments simply adjust the book value of these instruments in the Group accounts to their par value translated at 31 March 2007 foreign exchange rates.

(1) Adjusted to include advance provisions calculated on a basis consistent with that used at the other month ends used in calculating the average.

(2) The restructuring cost reflects total cash implementation costs of £106.9 million less £25.8 million of spend in FY07.

(3) The consideration is fixed and is covered by a Yen 21 billion forward rate contract.

Source: Blue Books and Deloitte analysis

- In its April trading statement, the Group announced net debt of £910 million as at 31 March 2007. As outlined in our Treasury Report (contained in Volume 4) we have identified a number of additional net debt type items (including cash equivalents, interest payable, the accounting impact of grossing up for previous debt issuance costs, adjusting swaps to their fair value and setting the existing bonds and notes to their par value at 31 March 2007 exchange rates).
- In addition, in the course of our review, we have identified a number of items which may be viewed as debt type items:
  - working capital adjustment, which reflects the differential between working capital balances at 31 March 2007 for Music and Music Publishing relative to an average level of working capital. The monthly profile of working capital balances for the Corporate operations (payroll, premises and professional fees) was not available at the time of our review.
  - restructuring costs reflect the outstanding cash implementation costs of the RE4 cost saving initiative excluding cash spent in FY07; and
  - Mulberry has entered into an unconditional agreement to acquire the remaining 45 per cent share of Toshiba Mulberry Limited for £93.3 million (Yen 21billion). Historically the Group has been required to make a dividend payment to the Toshiba Mulberry Limited minority interest holder. Following the share purchase, Mulberry will not have to pay a dividend in FY08 and thereafter relating to the minority. Mulberry has a Yen forward rate contract in respect of the £93.3 million which fixes the unpaid consideration at this amount.

A-923

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322505

Confidential

# Group Net Debt

**Prior to the inclusion of pension deficit, cash inflow from the exercise of share options and break costs, adjusted financial net debt was £1,288.9 million at 31 March 2007. There are also a number of other factors that also need to be considered**

**Group net debt**

| £ million | | FY07 |
|---|---|---|
| As at 31 March | | |
| Reported net debt | | (909.0) |
| Cash equivalents | | [illegible] |
| Interest payable | | (47.4) |
| Accounting adjustments to debt | | |
| – Debt issuance costs | (25.4) | |
| – Fair value of interest rate swaps | (2.2) | |
| – IAS 39/32 treatment of convertible bond | (11.0) | |
| – US $500m notes adjustments* | (1.1) | |
| – €425m notes adjustments* | 2.3 | |
| | | (37.4) |
| | | (977.0) |
| Working capital | | |
| *Music Publishing* | | |
| Actual 31 March 2007 | (89.2) | |
| Average [1] | [illegible] | |
| | | (57.5) |
| *Music* | | |
| Actual 31 March 2007 | (81.6) | |
| Average [1] | 38.1 | |
| | | (73.7) |
| Restructuring costs [2] | | [illegible] |
| Consideration for acquisition of Toshiba Mulberry Limited [3] | | (93.2) |
| Adjusted financial net debt | | (1,288.9) |
| Pension deficit | | (52.7) |
| Net cash on issue of share options | | 49.4 |
| Other items for consideration | | |
| Corporate – actual to normal working capital adjustment | | ? |
| Corporation tax liability | | ? |
| Project Typhoon option | | ? |

Note* These adjustments simply adjust the book value of these instruments in the Group accounts to their par value translated at 31 March 2007 foreign exchange rates.

(1) Adjusted to include advance provisions calculated on a basis consistent with that used at the other month ends used in calculating the average.

(2) The restructuring cost reflects total cash implementation costs of £[illegible] million less £28.8 million of spend in FY07.

(3) The consideration is fixed and is covered by a Yen 21 billion forward rate contract.

Source: Blue Books and Deloitte analysis

- **Other Items for consideration**

  There are also a number of additional items that should be considered:

  – the pension deficit reflects the estimated IFRS deficit at 31 March 2007 in respect of the UK and German defined benefit schemes and excludes the Japanese defined benefit scheme surplus. This figure also excludes any deficit in respect of other defined benefit plans as no information is available. At 31 March 2006, the deficit in respect of these other plans was disclosed as £8.3 million. An allowance for these plans should be included in the measurement of liabilities;

  – By way of illustration, at an assumed offer price of 275p Management estimate that 25.6 million share options would vest. Of this 25.6 million, 24.1 million represents options that would be satisfied by the issue of new shares. The remaining 1.5 million would be satisfied from the existing 2.3 million of shares currently held in trust, with the balance of c. 794,000 used to either settle part of the 24.1 million new issue of shares or to be issued for cash. The total cash inflow from the exercise of 25.6 million options would be £49.4 million;

  – corporation tax liability; and

  – the put option held by Mr Norman Cheng with the Group in respect of Project Typhoon.

© 2007 Deloitte & Touche LLP. Private and confidential

A-924

CITI-TF 00322506

Confidential

# Group Net Debt

## There are significant potential break costs on refinancing

**Change of control and early redemption of debt**

- Our comments below are based on discussions with management and our reading of certain documents. We are not, however, lawyers or bankers and therefore recommend appropriate legal and banking advice is sought by any acquirer of the Group.
- **US $500 million 8.375% guaranteed notes:**
  - upon a change of control the Group is required to offer to repurchase the notes at 101 per cent of par plus accrued interest, however it is unlikely that investors would accept this offer as the market price of the notes is greater than 101 per cent of par (at 31 March 2007 the market price was 103.3 per cent of par);
  - in the event of a change of control and investors declining to redeem at 101 per cent of par the Group can repurchase the notes in the open market, however this may be a time consuming process and may not result in redemption of all of the notes;
  - if the notes cannot be fully redeemed through a repurchase offer or open market purchases, the Group can fully redeem the notes at any time at a price set by reference to a US government bond of similar maturity. This is binding on the bondholders and is likely to be at a substantial premium to the normal market value of the bonds. At 31 March 2007 the price for a similar maturity US government bond was 107.8 per cent of par.
- **£325 million 8.25% Sterling bonds:**
  - if there is a change of control and a further downgrade in credit rating then the Group is required to offer to repurchase the bonds at par, however it is unlikely that the investors would accept this offer as the market price of the notes is above par (at 31 March 2007 the market price was 103.7 per cent of par);
  - in the event of a change of control, decline in credit rating and investors declining to redeem at par, the Group can repurchase the notes in the open market. However, this may be a time consuming process and may not result in redemption of all of the notes;
  - if the notes cannot be fully redeemed through a repurchase offer or open market purchases, the Group can fully redeem the notes at any time based on a price set by reference to a UK government bond of similar maturity. This is binding on the bondholders and is likely to be at a substantial premium to the normal market value of the bonds. At 31 March 2007 the price for a similar maturity UK government bond was 104.6 per cent of par.
- **US $243.3 million 5.25% guaranteed convertible notes:**
  - upon change of control the note holders are entitled to exercise their conversion rights within 60 days;
  - the exchange price is adjusted upon change of control, based on a formula that takes into account the Group's share price and the market price of the notes over a 30-day period prior to the change of control offer;

Sources: Management information and FY06 financial statements

© 2007 Deloitte & Touche LLP. Private and confidential

A-925

CITI-TF 00322507

# Group Net Debt

## There are significant potential break costs on refinancing

- the exchange price is directly proportional to the market price of the notes and inversely proportional to the Group's share price, i.e.:
  - increases in the Group's share price will decrease the number of shares to be issued upon conversion;
  - increase in market price of the notes will increase the number of shares to be issued upon conversion;
- this exchange price is used to calculate the number of shares that will be issued to bondholders exercising their rights of conversion;
- if an acquirer wished to control 100 per cent of the outstanding share capital, it would need to purchase these additional shares;
- the conversion offer is not binding upon the bondholders and if certain bondholders do not exercise their conversion rights, the principal value of those notes may continue to remain outstanding. We have been unable to determine the redemption options available to the Group (or any acquirer) in this scenario and recommend a legal review of the debt documents to determine the best course of action; and
- therefore refinancing the convertible notes on a change of control will require purchasing additional shares at any potential offer price.

- **€425 million 8.625% senior notes:**
  - the redemption schedule for the notes has not been considered since it only starts in October 2008;
  - upon a change of control, the Group is required to offer to repurchase the notes at 101 per cent of par plus accrued interest. However it is unlikely that investors would accept this offer as the market price of the notes is greater than 101 per cent of par (at 31 March 2007 the market price was 108.7 per cent of par);
  - in the event of a change of control and investors declining to redeem at 101 per cent of par, the Group can repurchase the notes in the open market. However, this may be a time consuming process and may not result in redemption of all of the notes;
  - if the notes cannot be fully redeemed through the above mentioned repurchase offer or open market purchases, the Group can offer to purchase the notes by paying a premium over the market price. However, this offer would not be binding upon the bondholders and therefore cannot guarantee complete redemption.
- **Long term committed facilities:**
  - upon change of control, the facilities are expected to be cancelled by the lenders and any outstanding borrowings repaid. We understand that no break costs would be incurred if repayments occurred on an interest settlement date. If repaid at a date between interest settlement dates, a cost equivalent to the difference between deposit and borrowing rates would be incurred in respect of the unexpired part of the particular interest period.

Sources: Management Information and FY06 financial statements

© 2007 Deloitte & Touche LLP. Private and confidential

Confidential

CITI-TF 00322508

Case: 11-126 Document: 48 Page: 128 04/25/2011 272867 401

Confidential

# Group Cash Flow

**Operational cash flows have reduced from £223.5 million in FY06 to £72.3 million in FY07 reflecting a challenging trading environment and lower levels of period end cash management at 31 March 2007**

**FY07 cash flows by division**

| £ million | Music Mgmt | MP Mgmt | Corporate | Group Mgmt | Variance | Group Stat |
|---|---|---|---|---|---|---|
| Operating receipts | 2,172.1 | 531.0 | 35.6 | 2,838.7 | (94.6) | 2,744.1 |
| Operating payments | (2,258.9) | (498.6) | 1.7 | (2,755.7) | 84.8 | (2,670.9) |
| Intercompany transfers | 16.8 | (1.0) | (18.3) | (2.5) | 1.6 | (0.9) |
| Operating cash flows | (70.0) | 131.5 | 19.0 | 80.5 | (8.2) | 72.3 |
| Cash conversion | (89.6%) | 112.0% | | 44.6% | | 41.6% |
| Spend on projects reported as exceptional | (52.0) | 8.1 | (8.3) | (52.2) | 2.0 | (50.2) |
| Acquisition/(Disposal) of business | 88.9 | - | 4.3 | 93.2 | (7.9) | 85.3 |
| Copyright/catalogue acquisition costs | (1.2) | (3.9) | - | (5.1) | 0.1 | (5.0) |
| Other investment cash flows | 6.2 | 0.4 | (10.1) | (3.5) | 0.2 | (3.3) |
| Investing cash flows | 41.9 | 4.6 | (14.1) | 32.4 | (5.6) | 26.8 |
| Net cash flows before financing | (28.1) | 136.1 | 4.9 | 112.9 | (13.8) | 99.1 |
| Management charges | - | - | 8.8 | 8.8 | (0.1) | 8.7 |
| Interest paid | - | - | (103.8) | (103.8) | 2.3 | (101.5) |
| Tax paid | - | - | (41.7) | (41.7) | 1.5 | (40.2) |
| Dividends paid | - | - | (54.2) | (54.2) | 0.3 | (53.9) |
| Exchange and other | (6.5) | (21.9) | 105.6 | 77.2 | (0.2) | 68.0 |
| Net cash flows | (34.6) | 114.2 | (82.8) | (3.0) | (19.0) | (22.0) |
| Opening net borrowings | (519.2) | 662.0 | (979.2) | (936.4) | 56.9 | (879.5) |
| Movement in the period | (34.6) | 114.2 | (82.8) | (3.0) | (19.0) | (22.0) |
| Foreign exchange adjustments | - | - | - | - | - | (7.9) |
| Closing net borrowings | (553.8) | 576.2 | (1,061.8) | (939.4) | 37.9 | (909.4) |

Source: Management information

**FY06 cash flows by division**

| £ million | Music Mgmt | MP Mgmt | Other | Group Mgmt | Variance | Group Stat |
|---|---|---|---|---|---|---|
| Operating receipts | 2,312.4 | 604.5 | (36.9) | 2,880.0 | n/a | n/a |
| Operating payments | (2,213.6) | (474.3) | 30.9 | (2,656.0) | n/a | n/a |
| Intercompany transfers | 23.1 | 0.3 | (23.4) | - | n/a | n/a |
| Operating cash flows | 122.1 | 130.5 | (29.4) | 223.2 | 0.3 | 223.5 |
| Cash conversion | 65.6% | 115.1% | | 81.4% | | 81.0% |
| Spend on projects reported as exceptional | (18.3) | - | - | (18.1) | (0.2) | (18.3) |
| Acquisition/(Disposal) of business | 15.2 | - | (6.5) | 8.7 | (0.3) | 8.4 |
| Copyright/catalogue acquisition costs | - | (3.0) | - | (3.0) | - | (3.0) |
| Other investment cash flows | 7.3 | (0.1) | (1.4) | 0.8 | - | 0.8 |
| Investing cash flows | 4.2 | (3.1) | (7.8) | (9.6) | (0.6) | (10.1) |
| Net cash flows before financing | 123.3 | 127.4 | (37.0) | 213.7 | (0.3) | 213.4 |
| Management charges | - | - | (2.4) | (2.4) | (0.2) | (2.6) |
| Interest paid | - | - | (97.2) | (97.2) | (1.6) | (98.8) |
| Tax paid | - | - | (39.4) | (39.4) | (0.4) | (39.8) |
| Dividends paid | - | - | (63.7) | (63.7) | 0.1 | (63.6) |
| Exchange and other | (32.8) | (9.3) | 41.8 | (0.3) | (45.0) | (45.4) |
| Net cash flows | 90.5 | 118.1 | (197.9) | 10.7 | (47.5) | (36.8) |
| Opening net borrowings | (609.7) | 443.9 | (781.3) | (947.1) | 104.4 | (842.7) |
| Movement in the period | 90.5 | 118.1 | (197.9) | 10.7 | (47.5) | (36.8) |
| Closing net borrowings | (519.2) | 562.0 | (979.2) | (936.4) | 56.9 | (879.5) |

Source: Management information

- The tables opposite show the Group's cash flows for FY06 and FY07, split between the divisions as disclosed in the management accounts.
- For FY06 no Corporate cash flow statement has been made available. Consequently, the 'Other' column in FY06 contains both Corporate cash flows and the effect of exchange differences.
- As with the rest of the report, FY06 average exchange rates have been used in the preparation of the cash flows at the divisional level for both FY06 and FY07.
- Music Publishing recognises revenues (and royalty payments) on a statement basis, which is broadly comparable to cash accounting for revenues.

  The Group also has the ability to manage its advance payments, allowing it to match its cash position to ongoing cash requirements.

  Both of these factors, allow the Group to maintain a high level of operating cash conversion.
- Management have indicated that lower levels of period end cash management (accelerated debtor collection and delays to creditor payments) occurred at 31 March 2007 relative to the 31 March 2006 year end, thus reducing operating cash flow levels although it has not been possible to identify the absolute financial impact.
- Operating cash flow in FY07 has also been impacted by a deterioration in the trading environment of the Music business. Management have actioned a new cost restructuring initiative in order to address the deterioration in profitability and cash flow levels, although its full benefits are yet to be realised.

© 2007 Deloitte & Touche LLP. Private and confidential

A-927

CITI-TF 00322509

Confidential

# Data Reconciliation and Integrity

## The Group's business units are autonomous in nature and much of the detailed information is held locally

| Source | Content |
|---|---|
| Blue Book | Monthly management accounts at a Group, Music and Music Publishing level, including comparative information restated at current management exchange rates. |
| Red Book | Prepared for Music only and includes further detailed Management information underlying the Music Blue Book. The last Red Book was prepared for the quarter ended 31 December 2006. The restructuring programme has resulted in a reduction in resource at a Group level. As a result, Management have discontinued the generation of this report. |
| Green Book | This provides further detail underlying the September and March financial information prepared in accordance with IFRS. The March figures form the basis of the year end statutory accounts. |
| Purple Book | Rolling twelve month management forecast. |

- Throughout this report, we have drawn financial information from a number of management-prepared sources in the preparation of our analysis. The contents thereof are summarised in the table opposite.
- Key income statement line items from the Blue Books have been reconciled to the Green Book and the audited annual financial statements for FY05 and FY06 in the Group section of the Appendices in Volume 5.
- At the date of this report, FY07 audited financial statements were not available, consequently no reconciliation of FY07 has been presented.
- A reconciliation of the Group net assets from the Blue Books to the statutory accounts for FY05 and FY06 has been undertaken and is presented in the Group section of the appendices in Volume 5.
- Management of the Group and its trading divisions is focussed primarily on earnings and overall net debt levels, as such there is less emphasis placed on a detailed review of the monthly balance sheets. As a result, the management commentary and level of financial detail available to us on the remaining parts of the balance sheet has been more limited.
- The Group's business units are autonomous in nature and we understand that much of the detailed explanation of trading performance is held at local level .

A-928

© 2007 Deloitte & Touche LLP. Private and confidential

CITI-TF 00322510

A-929

**From:** Peter Bell
**Sent:** Wednesday, May 09, 2007 11:45 AM
**To:** Wormsley, David ; Smith, Matthew
**Subject:** RE:

**Attachments:** Terra Firma Support Letter EMI.PDF; Project Dice indicative offer 8May07.pdf

See attached

[illegible]

NOTE NEW ADDRESS & TELEPHONE NUMBERS

[illegible]

---

**From:** Wormsley, David [mailto:david.wormsley@citi.com]
**Sent:** 09 May 2007 11:40
**To:** Peter Bell; Smith, Matthew
**Subject:** RE:

Can we see the Terra Firma letter please

---

**From:** Peter Bell [mailto:pbell@greenhill.com]
**Sent:** 09 May 2007 09:14
**To:** Wormsley, David [CMB-GBKG]; Smith, Matthew [CMB-GBKG]
**Subject:**

Per your request to John, I attach the letter sent to 'Jack'.
Peter

[illegible]

NOTE NEW ADDRESS & TELEPHONE NUMBERS

[illegible]

Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne
This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this

EXHIBIT
BELL 19

GREENHILL_0013384

Confidential

Case: 11-126 Document: 48 Page: 131 04/25/2011 272867 401
A-930

 Dresdner Kleinwort Limited
PO Box 52715
30 Gresham Street
EC2P 2XY

Telephone: +44 (0)20 7623 8000
Telex: General 885540 DRES BK G

www.dresdnerkleinwort.com

Terra Firma Investments (GP) 2 Limited
PO Box 543
First Floor, Dorey Court, Admiral Park
Peter Port
Guernsey
GY1 6HJ

Terra Firma Investments (GP) 3 Limited
PO Box 543
First Floor, Dorey Court, Admiral Park
Peter Port
Guernsey
GY1 6HJ

8th May 2007

STRICTLY PRIVATE & CONFIDENTIAL

**Dresdner Kleinwort supports the proposed acquisition of EMI plc by Terra Firma**

Dear Sirs,

Thank you for approaching Dresdner Kleinwort regarding the debt financing in connection with the potential acquisition of EMI plc and its subsidiaries (together "EMI" or the "Company") by Terra Firma Investments (GP) 2 Limited (for and on behalf of funds managed by it) and Terra Firma Investments (GP) 3 Limited (for and on behalf of funds managed by it) (together "Terra Firma").

We are pleased to inform you that following our preliminary review of the asset, based on publicly available information, our own knowledge of the industry in general, and subject but not limited to the conditions set forth below, we are supportive of your bid to acquire the Company and are interested in arranging and underwriting on your behalf the debt financing for this acquisition (the "Financing").

We understand that the Financing and an equity investment by Terra Firma will be used to acquire up to 100% of the share capital of the Company. We recognise that Terra Firma has a proven track record in European private equity investments. We believe that Terra Firma's sponsorship and reputation will ensure a strong reception from the debt markets for the acquisition financing.

**Dresdner Kleinwort's Leverage Finance Track Record:**

Dresdner Kleinwort has a leading position in European leverage finance market. We have the ability to underwrite both senior and subordinated debt products on behalf of Terra Firma and hold significant portions of it.

Authorised by the German Federal Financial Supervisory Authority and by the Financial Services Authority; regulated by Financial Services Authority for the conduct of designated investment business in the UK

Incorporated in Germany with limited liability. Registered in England and Wales No. FC007638

Investment Banking Division
Of Dresdner Bank AG

A member of Allianz

Dresdner Kleinwort is consistently ranked as one of the top leverage finance houses in Europe. Selected Dresdner Kleinwort transactions include: the £4.0 billion financing in support of the acquisition of Thames Water by Macquarie (Bookrunner & MLA, in market), the £1.9 billion financing in support of Arcapita's acquisition of Viridian, the €960 million financing in support of Advent International and the Carlyle Group's acquisition of HC Starck, the €715 million recapitalisation of Sportfive for Advent International (Global Co-ordinator & MLA, September 2006), the €4.0 billion financing for Babcock & Brown's acquisition of Eircom (Bookrunner & MLA, July 2006), £1.025 million financing for the acquisition of Select Service Partner by EQT (Bookrunner & MLA, June 2006), the €7.45 billion facilities for the acquisition of Autoroutes Paris Rhin Rhone by Eiffage and Macquarie (Bookrunner & MLA, April 2006), the £492.5 million facilities for the acquisition of Fitness First by BC Partners (MLA, January 2006) and the €385 million financing supporting Barclays Private Equity's acquisition of Neumayer Tekfor (Bookrunner & MLA, October 2005).

Our views expressed above are subject to certain conditions, including, without limitation (i) our agreement and satisfaction with the acquisition agreements and related debt documents, (ii) our satisfaction with the proposed capital structure of the Company following the acquisition, (iii) satisfactory due diligence, and (iv) credit and underwriting approvals.

We consent to the release of this letter to the vendor and their advisers.

Very truly yours,

For and on behalf of
Dresdner Kleinwort Limited

For and on behalf of
Dresdner Kleinwort Limited

terra firma

Terra Firma Investments (GP) 2 Limited
PO Box 543, First Floor,
Dorey Court,
Admiral Park,
St Peter Port,
Guernsey.
GY1 6HJ
Telephone +44 (0)1481 715 601
Facsimile +44 (0)1481 715 602

Terra Firma Investments (GP) 3 Limited
PO Box 543, First Floor,
Dorey Court,
Admiral Park,
St Peter Port,
Guernsey.
GY1 6HJ
Telephone +44 (0)1481 715 601
Facsimile +44 (0)1481 715 602

**Strictly private and confidential**

**Subject to contract**

EMI Group Plc
27 Wrights Lane
London W8 5SW

**For the attention of J. Gildersleeve Esq**

8 May 2007

Dear John,

Further to the telephone conversation today between you and our adviser, Terra Firma Capital Partners Limited, we are writing to express our interest in making a possible offer (the "**Proposal**") for the entire issued and to be issued share capital of EMI Group plc (the "**Company**"). We would expect to structure the offer as a scheme of arrangement and that the acquiring entity would be a special purpose vehicle formed by us ("**Bidco**").

**Summary Proposal**

- Indicative offer price of 265 pence per share in cash
- Substantial amount of work undertaken based on publicly available information
- Limited confirmatory due diligence required
- Limited pre-conditions (as listed below)
- Financing support from Dresdner Kleinwort
- In position to make a firm announcement (under rule 2.5 of the Takeover Code) within two to three weeks.

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

**Background and rationale**

We are a leading European private equity firm that, since 1994, has invested over €7 billion of equity and has completed transactions with an aggregate transaction value of over €30 billion. We have a strong track record of investing in the UK, and have made a number of investments in the media and consumer sectors including UCI Cinemas, Odeon Cinemas and Thorn.

As one of the world's largest independent music companies, we believe that the Company represents a high quality and attractive business that can, with continued investment and focus, consolidate its leadership positions in the recorded music and music publishing segments. We strongly believe in the long-term growth prospects of digital music and that EMI is extremely well positioned to capitalise on this growth opportunity, and that as a global leader in music publishing the Company will continue to benefit from the positive dynamics in this sector. We plan to build on the Company's strong current foundation, and continue to optimise its operations and participate in profitable growth opportunities.

**The Proposal**

Subject to the satisfaction of the pre-conditions set-out below, we are prepared to make an offer of 265 pence per ordinary share in cash for the entire issued and to be issued ordinary share capital of the Company. The Proposal values the equity of the Company at £2.455 billion.

This Proposal is based on the following assumptions:

- The fully diluted share capital at the indicated offer price is 926.3m shares (comprising 800m shares in issue, 107m arising from conversion of the convertible indenture and 19.3m vested options).

- The net debt figure for EMI is £1,135.5m, consisting of £1,175m fully diluted pro forma average net debt adjusted down for £39.5m of proceeds from the exercise of options, and excluding the convertible bonds.

- Debt redemption premia and related costs are £65m.

**Pre-conditions and Conditions**

The announcement by Bidco of a firm intention to make an offer would be subject to, *inter-alia*, the following limited pre-conditions:

a.  Completion of limited confirmatory due diligence, including management meetings;

b.  The Independent Directors of the Company, as advised by the Company's financial advisers, confirming that they will recommend acceptance of an offer to the Company's shareholders on the terms proposed;

c.  Receipt of hard irrevocable undertakings to accept the potential offer or vote in favour of a scheme of arrangement from the Directors of the Company and any related parties in respect of their shareholdings.

Any offer would be subject to standard terms and conditions usually attaching to a recommended cash offer or scheme of arrangement for a UK public company.

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

**Financing arrangements**

Bidco's offer would be financed by a combination of debt and equity. The equity to fund the transaction would be subscribed to by Terra Firma.

We have undertaken a considerable amount of work with our finance providers, including Dresdner Kleinwort who have expressed their strong support for our proposal. A support letter from Dresdner Kleinwort is attached.

Each of our boards has approved the submission of this letter. Final approvals will be required from our respective boards and Dresdner Kleinwort's Credit Committee. We are confident that these approvals can be obtained swiftly following the completion of due diligence. We are also confident that definitive debt documents can be completed quickly.

**Process and timetable**

We have committed considerable resources to this potential transaction, with a view to proceeding to the announcement of an offer as soon as possible. Our proposal is subject to the satisfactory completion of limited confirmatory due diligence normal for a transaction of this nature. We recognise the need in a transaction such as this to move quickly and we anticipate that we will be able to complete our diligence within two to three weeks, subject to timely receipt of additional information and sufficient access to your management team.

**Management and employees**

We attach considerable importance to retaining the skills and expertise of management and employees of the Company, and will provide the customary commitments to safeguarding existing employment rights, including pensions rights, of management and employees.

**Pensions**

We propose to work closely with the trustees of the Company pension schemes in order to address any potential concerns which they may have.

**Confidentiality and the City Code**

We emphasise that this Proposal does not constitute an offer or impose an obligation on Terra Firma to make an offer, nor does it evidence an intention to make an offer, the making of which is not subject to any pre-condition, within the meaning of the City Code. The information set out in this proposal is for your information only and is provided on a non-reliance basis. This proposal is not intended to be legally binding, save for the following paragraph. We would not, therefore, regard it as forming the basis of any announcement obligation pursuant to Rule 2.2 of the City Code.

It is a condition of this proposal that, without our prior written consent and in the absence of a requirement to do so by the Panel or by the Listing Rules or the Disclosure Rules (in each case issued by the Financial Services Authority ("FSA")), the Company will not disclose or announce the contents or existence of this proposal or our interest in making an offer for the Company to anyone other than those within the Company who need to know and its professional advisers. We request that you ensure that each person to whom our interest in the Company is disclosed is made aware of this condition and takes all reasonable steps to ensure that this condition is not breached. In the event that you think it appropriate or the Panel or the FSA requires that any announcement be made

by the Company which relates in any way to this proposal, such announcement should be made by the Company after consultation with our advisers, Dresdner Kleinwort.

**Capacity**

Terra Firma Investments (GP) 3 Limited is acting on behalf of the private equity fund, Terra Firma Capital Partners III L.P. and Terra Firma Investments (GP) 2 Limited (which is acting on behalf of the six limited partnerships which together constitute the Terra Firma Capital Partners II Fund). Terra Firma Investments (GP) 3 Limited and Terra Firma Investments (GP) 2 Limited are being advised by Terra Firma Capital Partners Limited in connection with this potential acquisition.

**Conclusion**

We are very enthusiastic about this opportunity and have the experience and track record to ensure a smooth and timely completion of this transaction. We look forward to hearing from you once you have had chance to consider our Proposal. Please feel free to contact Riaz Punja, Financial Managing Director, on +44 (0) 207 015 9620 at our adviser, Terra Firma Capital Partners Limited, if you would like to discuss any of the matters raised in this proposal.

With kind regards

Yours sincerely

[signature] Lorna Kelly as Alternate to Iain Stokes Director

for and on behalf of
**Terra Firma Investments (GP) 2 Limited**
**(for and on behalf of the six limited partnerships constituting the Terra Firma Capital Partners II Fund)**

[signature] Lorna Kelly as Alternate to Iain Stokes Director

**Terra Firma Investments (GP) 3 Limited**
**(for and on behalf of Terra Firma Capital Partners III, L.P.)**

**To:** Riaz Punja[Riaz.Punja@terrafirma.com]; Stephen Alexander[Stephen.Alexander@terrafirma.com]; David Kassler[David.Kassler@terrafirma.com]; Stephen Seymour[Stephen.Seymour@terrafirma.com]; Michael Slattery[Michael.Slattery@terrafirma.com]; Michael Hedegaard[Michael.Hedegaard@terrafirma.com]
**Cc:** TFCP Investment Advisory Committee[TFCPInvestmentAdvisoryCommittee@terrafirma.com]
**From:** Christine Vallance
**Sent:** Sun 5/6/2007 12:32:47 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** URGENT & IMPORTNAT - EMI

Dear Riaz
I had a meeting today with Eric Nicoli of EMI to discuss our business plan assumptions. He had his plan and I was not given it, however I could ask questions about our assumptions. The following changes need to be made to our plan:

1. Bank financing - Citigroup and Deustsche Bank are offering £2.5bn of acquisition debt and I will have a conversation with David Wormsley to firm this up.

2. There are 926 million shares outstanding.

3. Net debt is £1,175m.

4. There are no minority interests.

5. You should allow £40m for the pension deficit.

6. Assume that the music publishing base numbers have mechanical declinig by 3.5% per annum, synchronisation increasing by 7.2% per annum, performance increasing by 3.5% per annum and other increasing by 10% per annum. Additionally assume overheads after group allocation reduced to £68m by 2012.

7. Assume that Japan is sold to Universal for £425m.

8. Re recorded music, assume on physical recordings 10% decline between 2007 and 2012. Assume on digital recordings a 34% increase through to 2012. Assume variable costs coming down to 56% by 2012. Assume the cost savings you have plus a further £25m in 2010, once digital has become a larger percentage of total recorded music.

If you could please make these changes to the business plan as soon as possible.

Next, can you please put together an IAC memo for tomorrow's IAC recommending that the GP sends a note to the Chairman of EMI requesting access and providing an indicative bid of 265pence. The person to clear this note with is Simon Borrells (at Greenhills) on 07775 657595. The GP meeting is on Tuesday morning and we need to clear this as soon as possible.

I am trying to set up management meetings for this Friday. Currently, One Equity working with JP Morgan, Cerberus working with Merrill Lynch, Bank of America and Roger Ames, and Fortress (think they are working with Levi's son and possibly Levi himself) have booked Tuesday, Wednesday and Thursday. Therefore I am trying to get us Friday. Eric Nicoli knows Stephen Alexander well and would like him to be the OMD with regard to the company and I would like Stephen and David Kassler to be brought up to speed as quickly as possible.

EXHIBIT 6
WIT: Hand
DATE: 9/15/08
T.M. PASTOR, RPR, CLR

What I discussed with Eric was the management base case, there are a number of substantial upsides in addition to the base case which we can discuss later this week. In the meantime the important thing is for Stephen and David Kassler to get up to speed as quickly as possible and for us to get the letter in, speak to financing banks and prepare for the management meetings on Friday. If you have any questions, please phone me.

With best wishes
Guy

*Dictated not seen*

**To:** Riaz Punja[Riaz.Punja@terrafirma.com]
**Cc:** TFCP Investment Advisory Committee[TFCPInvestmentAdvisoryCommittee@terrafirma.com]; TF Team Dice[TFTeamDice@terrafirma.com]; Stephen Alexander[Stephen.Alexander@terrafirma.com]; Julie Williamson[Julie.Williamson@terrafirma.com]; Phillip Burns[Phillip.Burns@terrafirma.com]; David Kassler[David.Kassler@terrafirma.com]
**From:** Christine Vallance
**Sent:** Mon 5/7/2007 11:07:56 AM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Dice

Dear all
Re project Dice, there is a full electronic data room available once we have put our letter in and signed the appropriate confidentiality. All bidders are signing the same confidentiality agreement, which includes a full standstill re purchasing shares. In other words, this is a straight auction. Management meetings are on Friday, the morning will be commercial and the afternoon will be legal and tax. I would like us to be in a position to put a full bid in by 14 May, ie a week today. Clearly to achieve this we are going to have to work extremely hard together. Let me tell you why I feel it is worth spending time to focus on this deal.

1. We are dealing with a distressed seller.

2. We are focusing on a business which is going through enormous changes.

3. To operate this business going forward we will need a different operating model.

4. The bidding process is clear and a level playing field.

5. Based on my conversation with Eric Nicoli, I think the new management team is pretty much spot on with regard to our views and I would intend to keep the majority of them, including, at least in the short term, Eric Nicoli.

6. This business has substantial regulatory issues, which plays to our strengths.

7. This is a contrarian play.

8. There is substantial asset backing through the library.

9. The deal is 100% the right size for us. We will keep control, get the majority of economics but still have sufficient to sell down to our investors to keep them happy.

I could go on, but most importantly, unlike the other P2Ps we are looking at, this company is most definitely in play. Therefore, let's see if we can win it.

Riaz Punja, Phil Burns and Julie Williamson - please could you talk to each other re approaching financing partners. Most firms are putting in trees and I am trying to get Citigroup and RBS to work with us, so there is no need for you to call them. Fortress currently has Bearstones, Bank of America and Deutsche Bank; Cerberus has Merrill Lynch, Citi, Barcap, Bank of America, Deutsch Bank and BNP; One Equity has JP Morgan; and RBS is with Permira. That gives us an awful lot of firms that we can phone. We need bridge equity for £500m, against TFCP III underwriting £1bn. Additionally, we need debt of approx £2.5bn. These are approx numbers. I would strongly suggest we go to the group that we used on Boots as they were first class and got there very quickly.

**To:** Michael Slattery[Michael.Slattery@terrafirma.com]
**Cc:** Francois Van Der Spuy[Francois.Van.Der.Spuy@terrafirma.com]; Riaz Punja[Riaz.Punja@terrafirma.com]; Tim Pryce[Tim.Pryce@terrafirma.com]; Tom Becker[Tom.Becker@mourant.com]; Jacqueline Jones[Jacqueline.Jones@terrafirma.com]
**From:** Kirsten Randell
**Sent:** Sat 5/19/2007 1:14:00 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** IAC Distribution List DICE

Hi Michael

IAC 10am and GP 3.45pm all arranged - its in everyones diaries.

Can I ask that you distribute papers to:

TFCP Managing Directors, Henry, Guys support team, Jayne, Claire, Kirsten and Tom Becker and of course all concerned on Dice;

Please call me or Tom when this has been done. This will give Tom the time to forward to the Guernsey directors, print etc.

FYI - Q, Phill, Mayamiko and Julie may dial in tomorrow as interested in attending. The above distribution list includes them.

FYI - GP meeting being held at the airport hanger so anything for the GP meeting should be emailed no later than 2.30pm if possible (otherwise I will get a fax number but we had trouble with this last time)

FYI - I think I will come in for this tomorrow Michael.

Thanks

k

---

**From:** Christine Vallance **On Behalf Of** Guy Hands
**Sent:** 19 May 2007 12:06
**To:** Karen Dolenec; Riaz Punja; Trudy Cooke; Tim Pryce; Francois Van Der Spuy; TFCP Investment Advisory Committee; Stephen Alexander; Kirsten Randell; Chris Barnes; Tom Quigley
**Subject:** RE: Update on Dice financing for discussion tomorrow

Dear all

Firstly, thank you all of you for supporting this deal at such short notice and, in the case of some of you, even shorter notice! I realise that there is an enormous amount going on and it is extremely difficult not at times to feel that some things are slipping through the cracks. However, I think the team work on this deal is ensuring that we are catching things. The main thing we need to do over the next 48 hours is ensure that we systematically work through the issues and keep ourselves as physically attuned as possible. We definitely have the management on our side and I believe there are many upsides to this business which we have not yet had time to focus on.

Turning to some of the things which will need to be done in the next 24 hours and to Karen's excellent memo, what follows is a list of some of the things we clearly need to do:

1. Get ourselves there re the financing. It looks like we will have sorted out the Citi facility sometime today, subject to agreeing the commercial terms. I think probably the best person to negotiate on those terms is myself and what I suggest is that Karen finalises the terms of the facility and, once that is done,

EXHIBIT PUNJA 7 07-28-10 CM

gives me a list of Citi's asks vs. Deutsche's asks re the commercial terms, which I can then compare and go back to the appropriate people at Citi. Could Karen please also give me a list of who these people are. Re Deutsche Bank, clearly we need to get them there as soon as possible as it will increase our leverage re negotiating with Citi. Finally, re Barclays, we just need to keep them working to get there as soon as they can, though clearly it is likely to be Monday rather than Sunday. Clearly here, re Barclays, we need to have the commercial documents finalised on Sunday. I hope this strategy re the financing is clear. I will continue to ask HBOS if they are willing to come in, but I think it is highly unlikely in this timeframe.

2. Turning to the share purchase facility, my understanding is that Dresdner won't have that ready until Friday and we clearly need to look at alternatives to Dresdner. However, at this stage we will use the equity facility from HBOS and I need to understand from Cormac how that facility is currently being used and how much space we have.

3. Clearly the pricing we are talking now is getting challenging and we might well need an equity bridge. I have mentioned this to HBOS and they are seeing what they can do. In the meantime, please could Cormac and Riaz determine just what the maximum share price is that we can pay (excluding an equity bridge) based on the debt facility and what level of equity bridge we need at a share price of £2.70; £2.75; £2.80; £2.85.

4. A couple of technical questions, please could Tim confirm that we do not at this point need to have a meeting of the Advisory Boards of II and III to discuss how we will reduce our exposure from 30% down to a maximum of 20%. To the extent we do need to have that meeting, when do we need to have it and can Tim and Riaz determine who is going to prepare the presentation for it.

5. A further technical point, please can Tim and Cormac discuss what happens with regard to currency exposure as we are clearly going to be at the Fund's limit in Sterling but there could be an exchange rate change between Sterling and Euro, which would push us over the Euro 30% limit?!

6. I have got Christine to arrange for me to fly out to Guernsey tomorrow at 3pm and would suggest that we do the GP meeting at the aircraft hanger at 3.45pm. I am allowing 1.5 hours for it, please Tim can you confirm that this is fine?

7. Re the IAC meeting, clearly the updated presentation books will need to be couriered to the IAC members. Please could Riaz indicate when those books are going to be ready and when the IAC should take place. I am available to do it tomorrow at any time from 10am through to 1pm.

8. My understanding is that Tim Pryce, Tom Quigley and Paternoster will be attending the pension presentation. Obviously it would be useful to have an update as soon as possible, however all indications are that our current pension plan position is very conservative, relative to what we are likely to achieve through negotiation. Clearly, if there are any changes dramatically up or down, these will need to be communicated to the GP and the IAC, and if Tim and Tom can determine the best way and when to update us all on their meeting, that would be most useful.

9. I am presuming that no one else is travelling out with me on the jet from Biggin Hill, which will leave at 3pm, however please to the extent anyone does want to travel with me, could they let Christine know ASAP (her mobile is 07958 396145).

If any of the above is not clear or you need to get hold of me urgently, please text me, as I will be with HBOS and Wellcome at the FA Cup Final from approx 12 noon through to 5.30pm and clearly will not have access to email. I will check my email when I get home, but would not expect that to be before 7pm at the very earliest.

Congratulations to all on moving us from a also ran to a finalist on this deal. As I said on the Boots deal, that in itself is an extraordinary achievement. I am convinced one of these days we will win one of these deals and hopefully this will be it.

With very best wishes
Guy

*Dictated not seen*

| | |
|---|---|
| **From:** | Karen Dolenec |
| **Sent:** | 18 May 2007 22:52 |
| **To:** | Guy Hands |
| **Cc:** | Riaz Punja; Trudy Cooke; Tim Pryce; Francois Van Der Spuy |
| **Subject:** | Update on Dice financing for discussion tomorrow |

Guy,

We called Dresdner tonight but they said that they cannot get there.

There is an overall point regarding covenants which every bank has. The rationale behind it is that we have a large undrawn facility relative to the term bank facility (£450m of revolver and acq facility vs. £725m of term loan). Citi and Deutsche are at slightly different positions on this while Barclays has just flagged for the moment that this is an issue.
- Deutsche are proposing a leverage covenant on just the undrawn facilities with c. 30% headroom and no maintenance covenants on the drawn facilities. However, they would like to be able to flex this into the same leverage covenant as the undrawn facilities if needed.
- Citi are asking for a leverage covenant on all facilities but an unlimited right to cure. This right would flex into a right to cure in 3 quarters only in a year if needed. I have asked them to consider having the covenant on just the revolver.
The bottom line is that there is not a lot of difference in having the leverage covenant against just the revolver vs. the other tranches. My main concern here is that if these are set off of the base case and the base case includes a reasonable cash sweep (which banks are requiring especially on the bridge to securitisation) then any deviation from this case could bust through the covenant relatively quickly because the cash flow is pretty strong in the base case. Obviously if we have generous cure provisions, this will help.

Below is where the various banks are on other points:

1. Citi - They are approved for 100%. Aside from the covenant point above, there are no more substantive outstanding points on the term sheet. Below are their asks in the other documents, the first of which was in their feedback from the credit committee yesterday. The others were dropped on us today.

- No rebate on the funding fee for the bridge to securitisation but also no extension fee for the terming out the bridge.

- A break fee of 2.5% on the bridge to securitisation and the bridge to high yield if we acquire more than 30% of the shares of the target and if we either 1) do a different take out than a securitisation and a high yield issuance respectively or 2) we do any take out away from Citi. This appears to include a take out with equity.

- Securities demand on the securitisation and on the high yield. On the securitisation, they are asking for the right to make us go to market at any time after closing as long as the margin is below 3.0% (vs. the estimated 1.4% on the securitisation take out). They have asked for something similar on the high yield but on a more reasonable time line and a more reasonable cap.

- They are asking to be mandated now for the high yield and securitisation take outs, however, they are not committed to actually do these take outs.

- They are asking for the right to match on all additional services such as hedging and liability management.

- No other arranger can have a bigger share of the deal or a bigger fee.

2. Deutsche Bank - they are approved for 1/3. We will begin going through the detailed documents tomorrow, but this should not be too laborious since the documents were drafted on the back of their package anyway. Don't know if they will come up with the same last-minute asks as Citi.

3. Barclays - David Shaw has been unable so far to move the combined credit committee earlier than 1:00 on Monday. He will continue trying but it will not be possible to do it at any time before earlier on Monday. I have obviously asked him to do it as soon as possible. We will push through on helping them with the commercial understanding of the deal and the structure tomorrow and move to finalising docs on Sunday. They are not comfortable with this structure and will likely go with it but with a flex to their preferred structure which they still need to come back to me on. This path makes it easier for us to put them with the others if needed. They are being really cooperative considering that they were originally way off the terms we are now discussing.

All of the banks have issues from syndication because of the track record of the company in the banking market, although it seems that Citi is the most scarred from this.

Look forward to getting your thoughts tomorrow.

Regards,

Karen

terra firma

# Memo

To The IAC
cc: Francois van der Spuy
From Riaz Punja, Stephen Seymour, Michael Hedegaard, Don Hoang
Date 7 May 2007
Subject Project Dice: Update

*This memo contains confidential information that must be kept confidential.*

*It also contains information that may be unpublished price sensitive or inside information because securities of the target are listed on the London Stock Exchange. Your attention is drawn to your obligations relating to such information under Part V of the Criminal Justice Act 1993 (the "Act"), the City Code on Takeovers and Mergers and the Listing Rules of the UK Listing Authority in England and Wales. Accordingly, you must not disclose such information or deal in, or encourage others to deal in, the securities of the target or otherwise engage in any activity prohibited by the Act.*

Background to the Opportunity

The team has revisited the opportunity to acquire Dice plc in a public-to-private acquisition ("Project Dice").[1] The team conducted limited due diligence on Dice in Q1 2007, contracting McKinsey to assist in market diligence and Weil Gotshal to assist in assessing the regulatory environment.

The primary findings from that diligence period were:

- **Recorded Music:** The deteriorating conditions for recorded music could continue for some time given the decline in physical recorded music and the slower take up of digital music.
- **Music Publishing:** The music publishing revenue – attractive for its stable cash flows – might be subject to pricing pressure from recorded music companies eager to reduce the royalty cost per track, although other revenue streams (synchronization, performance and ring tones demonstrated strong growth potential).
- **Regulatory:** There was continued regulatory uncertainty about the potential combination of Whist Music Group and Dice, the third and fourth largest recorded music companies in the industry, in light of the EU ongoing review of the Sony BMG combination.

In sum, the team believed that while the opportunity had attraction on the condition that TF could sell the Recorded Music division to Whist Music Group, the price expectations of the Dice board (rumoured to be >300p/share) and regulatory uncertainty resulted in an unattractive risk profile if TF was left holding the declining Recorded Music business.

This past week, Dice was approached by private equity groups. It is believed that One Equity, Cerberus, Bank of America and Fortress are interested.

Offer to Dice Board

Based on the operating and financing assumptions that have emerged through conversation between Eric Nicoli, CEO of Dice, and Guy Hands, the team proposes that the IAC recommends to the GP to submit an indicative bid of 265p to the Dice Board.

The team notes, however, that this bid price is conditioned on further diligence into the assumptions detailed below, **which deviate materially from the results of the team's diligence in March.**

Key Investment considerations

Offer to Dice Board

1 Please see Appendix 1 for a description of the business.

EXHIBIT
WIT:
DATE:
T.M. PASTOR, RPR, CLR

terra firma

The team believes that an offer price of 265p/share range has a reasonable chance of eliciting a recommendation by the Dice Board to Dice's shareholders. The 265p share price implies an EV of £3,454m (19.7x FY 2007E EBITDA / 10.1x FY 2008E EBITDA[2]) and is a 7.8% premium to the 246p closing price on 4 May.

At 265p/share, TF Revised Case operating assumptions (see below) and financing assumptions, an exit in five years would generate CoCM of 2.7x and a 21.9% IRR.

The team worked with Dresdner Klienwort during Phase I due diligence, and the [team proposes to continue to work with them in the approach and preparation for the management meetings, potentially as early as Friday.]

## Bank Financing

It is recommended that, at a minimum, TF's offer to Dice contains supporting letters from at least two banks. It is understood that Citigroup and Deutsche Bank may be offering up to £2.5bn of acquisition debt.

- The team did not progress beyond preliminary discussions with Dresdner Kleinwort and Barclays in Q1, although DK did indicated that it could provide £1,475m of acquisition financing, in addition to a revolver facility to fund the cost of Dice's restructuring programme.

Assuming IAC approval at this stage, the team will immediately solicit further interest from the market.

## Equity commitment

Based on the 265p share price and bank financing of £2.5b, the total equity required for the transaction is c.£1.3bn. An offer letter to Dice must therefore need not include supporting letters from co-investors provided there is £392m capital available from TFCP II, although cross-fund investment would investment would require approval from the TFCP III Advisory Board.

## Dice Purchase Price & Valuation

The table below illustrates Dice's enterprise value and funding required at 265p/share, the rumoured range of Whist's most recent approach.

| Dice Enterprise Value @ 265p/share | |
|---|---|
| (£m, unless noted) | |
| Per share price (p) | 265 |
| FD shares outstanding* | 926 |
| Equity valuation | £2,454 |
| Net debt** | 1,000 |
| Minority interests | 0 |
| Enterprise valuation | £3,454 |
| New Cash in Co | 100 |
| Transaction Expenses | 176 |
| Total Funding Required | £3,752 |
| EV / 2007E EBITDA | 19.7x |
| EV / 2008E EBITDA | 10.1x |

| IRR and CoCM at various share prices* |
|---|
| Dice equity share price (p) |

2 Based on Revised TF Base Case assumptions.

Confidential

terra firma

| | 260p | 265p | 270p | 275p | 280p |
|---|---|---|---|---|---|
| IRR | 23.6% | **21.9%** | 20.3% | 18.9% | 17.5% |
| CoCM | 2.9x | **2.7x** | 2.5x | 2.4x | 2.2x |

This return profile is considerably more robust than the returns based on the team's operating assumptions following initial diligence and financing structure ("TF March Case").

The pages that follow detail first the differences in financing and capital structure assumptions and then the operating assumptions that generate the significantly higher returns.

**TF March v. TF Revised Case Reconciliation**

**Financing & Capital Structure Assumptions**

In addition to the different operating assumptions of the TF March Case detailed below, there are several key financing assumptions that have changed, including:

- Shares outstanding: 926m total (938m in TF March)
  - Exercisable options reduced to 19.3m (33m in TF March)
    - Options proceeds £39.5m (£73m in TF March)
  - 107m shares issued from convertible debt (101m in TF March)
- Net debt: £1,175m, excluding convertible debt outstanding and including the cost of the TOEMI acquisition (£93m).
- Pension deficit: £40m (£31m in TF March)
- Japan's operations sold in 2008 for £425m (to Universal).
  - **Note:** Dice acquired the remaining 50% of TOEMI (expected to complete in Q207) for £93m. Dice reported that TOEMI generated profits before tax of £11.6m.[3]

**Operating Assumptions**

At this stage, support for the operating assumptions underlying TF Revised Case comes from a preliminary conversation between Guy Hands and Eric Nicoli, CEO of Dice.

Given the extent to which these assumptions are materially different from the results of TF's initial diligence,[4] further assessment of these assumptions, as well as potential other upsides yet to be identified **will need to be diligenced thoroughly** in the next phase.

For illustrative purposes, a table comparing the TF March and TF Revised Case assumptions are laid out below.

| **IRR and CoCM at respective cases at TF Revised financing / capital structure** | | |
|---|---|---|
| | March 2007 Case | Revised Case |
| IRR | 8.8% | 21.9% |
| CoCM | 1.5x | 2.7x |

[3] Based on Dice press release dated 13 December 2006.
[4] See Appendix 2 for greater detail on the team's findings during initial diligence.

terra firma

**Comparison of TF March and TF Revised Operating Assumptions**

| Business Driver | TF March Assumption | Rationale | TF Revised Assumption | Rationale |
|---|---|---|---|---|
| **Total RM Industry** | 3.4% CAGR decline (CY'06-CY'12) | McKinsey analysis<br>Enders (4.0%)<br>Digital accelerating, not compensating for decline in physical | NA | |
| **Physical** | | | | |
| Market Growth (FY'07-FY'13) | 8.1% CAGR decline | McKinsey (8.1%) forecast; Enders (9.3%) | NA | |
| Dice Revenue decline | FY 2007: 18%<br>FY2008: 9.3%<br>FY '08-'13: 7.7% CAGR | Adjusted for second revenue warning | FY 2007: 15% (actual)<br>FY 2008: 2% decline<br>FY '08-'13: 2.0% CAGR | |
| Dice Market Share | FY2007: 9.9%<br>FY2008: 10.5% on constant currency | Slight uplift in FY2008, no change thereafter | 2007: 10.0%<br>2012: NA | |
| **Digital** | | | | |
| Market Growth (FY'07-'13) | Digital: 21.7% CAGR<br>Mobile: 9.3% CAGR | Digital revenue 25% of market in CY 2012 (v. >50% in old assumptions) | NA | |
| Dice Revenue Growth ('07-'13) | 20% CAGR | Growth consistent with market; difference is CY → FY adjustment | 35% CAGR | |
| Dice Market Share | FY'07: 9.2%<br>FY'12: 9.8% | Correction for Dice digital '07 revenue composition | 2007: 3.9%<br>2012: NA | |
| **Recorded Music EBITDA Margins** | 2007: 4.7%<br>2009: 16.5%<br>2013: 10.0% | Poor trading in 2007<br>Publisher royalty costs savings<br>Declining revenue | 2007: 4.2%<br>2009: 19.9%<br>2013: 26.0% | Variable costs decline to 56%; additional £25m cost savings in 2010 following shift to digital. |

terra firma

| Music Publishing | | | | |
|---|---|---|---|---|
| Market | 2.5% CAGR<br>• Mechanical: – 4.1%<br>• Synchronization: +6.8%<br>• Performance +5.1%<br>• Other: +1.9% | Midpoint of McKinsey projections<br>Enders forecasts 1.7% CAGR<br>• Possible further downside on phonomechanical rates | NA | |
| Revenue growth through FY2013 | 1.4% CAGR<br>• Mechanical: – 4.7%<br>• Synchronization: + 6.3%<br>• Performance + 5.0%<br>• Other: + 1.9% | • Dice growth is below market due to overweight in declining phonomechanical revenue (45% of revenue v. 33% of market) | 1.4% CAGR<br>• Mechanical: – 3.5%<br>• Synchronization: + 7.2%<br>• Performance + 3.3%<br>• Other: + 10% | |

**Key risks identified in initial diligence**

- Terminal decline in core physical recordings: Revenue from core physical recordings is expected to continue a 8-10% annual decline through 2012, at which point revenue from digital is expected to surpass core CD sales. This decline keeps pace with demographic trends, as music consumers currently under the age of 25 are far more likely to acquire their music in digital format. The continued reduction in physical retail space for music sales perpetuates the vicious cycle.
- Slow digital growth due to disaggregation of the album: The decline in CD sales corresponds to a reduction in the number of "album equivalents" sold as digital distribution permits consumers to cherry-pick 2-3 tracks of an album for c.$0.99 each rather than paying $15.99 for the entire physical album.
    - Both McKinsey and Enders believed that this was a primary driver for the continued decline in album equivalent
- Decline in core phonomechanical rates at publishing: Pressured by declining album sales, the recorded music companies are expected to seek lower royalty rates on phonomechanical publishing, which could result in a significant decline in mechanical revenue for Dice.
    - From discussion with market analysts, the team believes that the more likely outcome, factored into the TF Base Case, is a settlement that results in a loss of $20m revenue ($9.0m / £4.9m NPS based on 45.2% Dice NPS) for Publishing annually commencing in 2008, with an uplift in revenue for Recorded Music (quantum to be determined and not included in the Base Case).

**Key opportunities confirmed in diligence**

Synchronization is an opportunity for recorded music companies. Thus far, synchronization revenue has accrued to publishers, but there is opportunity for recorded music companies to generate revenue from licensing music to YouTube, Myspace, Bebo and other sites.

Consolidation of Publishing is a primary driver of value given the inherent scalability of the operations. The team has heard that Dice could double its one million copyrights under management with additional headcount of 20.

- Several publishing catalogues (described in Appendix 3) are owned by private equity firms and are likely to be candidates for sale in the near- to medium-term.

Potential to flip Recorded Music to Whist: while there continues to be regulatory uncertainty surrounding the EU review of the Sony BMG merger (which was completed in 2004), there is increasing support for the combination of Whist and Dice in the industry.

- Whist again approached Dice on March 2 with an offer of 260p, having secured the support of IMPALA, the consortium of independent labels in Europe that challenged the SonyBMG merger.

**Potential opportunities to be explored further**

Advertising: Dice has recently signed deals with websites such as Spiral Frog and Baidu (in China), which are developing an advertising-based revenue model for free music downloads. This model is in its infancy, but could provide revenue opportunity from otherwise "pirated" music downloads. One area of concern is that the advertising-based revenue model further devalues music by continuing the perception that music is available for without the customer's need to pay.

Mobile downloads: The introduction of full-track downloads is expected to drive revenue from music downloads – previously from ringtones / ringtunes / ringbacks – over the next five years.

- Initial diligence did not support strong sustained growth in mobile downloads.

**Exit considerations**

The team believes that exit can be achieved through sale of the combined entity or its separate divisions.

Recorded Music or Dice Combined:

1. **Sale to Music Major:** Universal Music Group, Sony BMG and Whist each would be interested in acquiring Dice.
   - Whist is the most likely given portfolio complementarities. Due to leading market positions, UMG and Sony BMG would face regulatory uncertainty.
2. **Sale to Media conglomerates:** The team will work with Dresdner to identify media companies (e.g., Disney, NewsCorp) with diversified interests who may have interest in acquiring Recorded Music or the entire company.
3. An **IPO** may be possible a possible exit strategy for Dice, although the team does not view it as likely for Recorded Music standalone. None of the major recorded music companies are publicly-traded on a standalone basis.
4. A partial exit through **refinancing** is an unlikely exit option for Recorded Music, given the lower leverage available on the more volatile cash flow streams.

Publishing

1. **Sale to financial player:** Private equity and infrastructure funds will likely have strong interest given the low-growth, stable and scalable cash flows.
2. **Refinancing** of cash flows provides opportunity given high levels of cash generation.
3. **Trade Sale:** The team will work with Dresdner to identify the set of potential trade buyers for the Publishing business.

**Recommendation**



terra firma

The team recommends to the IAC that it recommends to the GP to approve the submission of an indicative bid at 265p/share.

| Recommendation | IAC Approval/ Rejection | Conditions/Comments |
|---|---|---|
| To recommend to the GP to approve the submission of an indicative bid to the Dice Board to acquire Dice at 265p/share. | | |

Confirmed:

.............................................

Member of the Investment Advisory Committee

Approved By:......................................

..........................................................

For and on behalf of
Terra Firma Investments (GP) 2 Limited

## Appendix 1: Description of Dice

Dice is the world's third-largest recorded music company (12.8% market share in 1H 06) and, pro forma for Vivendi's acquisition of BMG Music Publishing, the world's second-largest music publisher (20% market share in 2005).

### Recorded Music

Dice's recorded music division ("**Recorded Music**") records, manufactures and markets recorded music from more than 1,500 artists including Coldplay, Gorillaz, KT Tunstall and Robbie Williams. Recorded Music creates and develops new artists and promotes and markets the music recordings that the artists produce. Recorded Music generated revenue of £1,660m and EBITDA of £167m (10.1% margin) for FY 2006, although revenue declined 15% in FY ending March 2007.

The low margin reflects in part the "R&D" characteristics of the business as well as Dice's high SG&A costs compared with industry peers. The core value of Recorded Music is driven by the ability of its A&R division to discover, sign and promote new artists and market new albums from established artists or the company's back catalogue. The division is characterized by volatile, unpredictable earnings and significant working capital outlays (e.g., artist advances).

### Publishing

Dice's music publishing division ("**Publishing**") owns the copyright and administers the rights to more than one million compositions, including 2006 hits by the Arctic Monkeys, James Blunt, Black Eyed Peas, and Pink, as well as an extensive back catalogue that includes the Beatles, the Rolling Stones, Queen, Pink Floyd, the Beach Boys and Frank Sinatra.

Publishing's back catalogue – those songs older than one year – is widely regarded to be one of the most important catalogues of sound recordings and music copyrights in the world. Publishing generated revenue of £420m and EBITDA of £109m (25.9% margin) for FY 2006, and the Company reported that revenue was flat in 2007. Dice does not disclose the mix between current and back catalogue.

Publishing revenue is comprised of the following:

- **Mechanical** (e.g., royalties paid on recorded music, derived from physical sales and digital downloads), comprising 45% of revenue in 2006;
- **Performance** (e.g., chart success, radio commercialization, webcasts, sporting events), 27% of 2006 revenue;
- **Synchronization** (e.g., advertising revenue, TV producers, computer games makers), 17% of 2006 revenue and the fastest growing segment of the business; and
- **Other** (e.g., stage productions, sheet music, ring tones / ring tunes / ring backs), 11% of 2006 revenue.

terra firma

## Appendix 2: Highlights of market diligence from 1Q 2007

**Publishing**

- Overall market growth driven by Synchronization, Ringtones, and Performance, offset by decline at mechanical revenue.
  - McKinsey is slightly more bullish (2-3% CAGR '06-'12) than Enders (1.7% CAGR '06-'12).
- Core phonomechanical revenue (~33% of industry) forecast to decline at 3% CAGR through FY 2012, due to declining track sales and increased pricing pressure.
  - Additional risk from renegotiation of statutory phonomechanical rates in US, which comprises 33% of phonomechanical revenue (11% of total publishing industry revenue).
    - Based on McKinsey and Enders forecast, TF Base Case assumes 26% loss in US phonomechanical revenue (3% industry-wide losss).
    - Recorded Music companies expected to seek a rate reduction that could reduce revenue by 56% in the US (6% industry-wide).
- Applying midpoint McKinsey market growth forecast (2.5% CAGR through CY 2012), TF Base Case forecasts total Dice Publishing revenue ('06-'12) CAGR of 1.4%.
  - Dice is below market growth rate as declining mechanical is 45% of publishing revenue (compared with 33% overall).

**Recorded Music**

- Overall market will continue decline, as digital not only fails to compensate for physical, but also accelerates its decline. In 2012, digital revenue is 25% of total market.
  - Disaggregation and reduction in retail space reduce total track sales (4.2% CAGR decline '06-'12).
  - Pricing declines forecast for digital (4.4% CAGR '06-'12) and physical (~2%).
  - Unit purchasing limited by "fair use" conversion of CD → digital, and limited "format replacement" that has driven growth in the past.
    - Internet-based file sharing piracy is not regarded as a primary driver of revenue decline going forward.
- Upside on mobile downloads minimized by "sideloading" of music tracks from computer to handset.
- Appying McKinsey market growth rates, Base Case forecasts Dice Recorded Music revenue declines at an average annual rate of 3.7%.
  - Market share improves slightly to reflect releases delayed until 2008.
    - Physical: 9.9% in FY 2007 → 10.5% in 2008, constant thereafter.
    - Digital: 9.2% in FY 2007 → 9.7% in 2008, constant thereafter.

Confidential

terra firma

Appendix 3: Potential Publishing Targets

| Target | Description |
|---|---|
| Parts of BMG/UMG Publishing | • BMG/UMG may be required to divest some businesses to satisfy the competition commission |
| Chrysalis Music | • 2005 NPS: £10.7m (Bowie, Blondie, Outkast) |
| Blue Mountain Music | • Administration of the Bob Marley catalogue<br>• £6.2m turnover in 2005 |
| Stage Three Music | • Aerosmith, Gerry Rafferty and ZZ Top<br>• £4.3m revenue, £1.8m operating loss<br>• Owned by Apax/Ingenious Ventures |
| Bug Music | • Manages 120,000 copyrights<br>• Backed by Spectrum Equity Partners |
| Really Useful Music | • Andrew Lloyd Webber's private company<br>• Publishing division potentially underperforming |
| Windswept Pacific | • Trio & Quartet catalogues of 60s-70s songs<br>• Owned by FujiPacific Music;<br>• Management looking for MBO opportunity |
| Cherry Lane Music | • Partner in the television, motion picture, theatrical and music industries<br>• Songwriters include John Legend and Black Eyed Peas<br>• Founded by Milton Okun |
| TVT Records | • Leading US independent label and music publisher – Scott Storch (premier songwriter for Snoop Dogg, Beyonce, Justin Timberlake)<br>• Strong position in digital distribution |
| Other | • Production / background music catalogues |

**Terra Firma Investments (GP) 3 Limited**

(registered in Guernsey with registration number 43846) (the "Company")

Minutes of a meeting of the Board of Directors of the Company held at Aigle Flight Support, Guernsey Airport, Forest. Guernsey on Tuesday 8 May 2007 at 10:00 a.m.

| | | |
|---|---|---|
| Present: | Nigel Carey | |
| | Fraser Duncan | |
| | Guy Hands | |
| | John Loveridge | |
| | Iain Stokes | by telephone from France |
| In attendance: | Tom Becker | representing Mourant Guernsey Limited |
| | William Burnand | representing Terra Firma Capital Partners Limited by telephone for Project Phantom |
| | Trudy Cooke | representing Terra Firma Capital Partners Limited by telephone for Project Daisy |
| | David Kassler | representing Terra Firma Capital Partners Limited by telephone for Project Dice |
| | Lorna Kelly | representing Mourant Guernsey Limited |
| | Riaz Punja | representing Terra Firma Capital Partners Limited by telephone for Project Dice and Project Hammer |
| | Tom Quigley | representing Terra Firma Capital Partners Limited by telephone for Project Hammer |
| | Quentin Stewart | representing Terra Firma Capital Partners Limited by telephone for Project Daisy |
| | Francois van der Spuy | representing Terra Firma Capital Partners Limited by telephone for Project Dice and Project Hammer |

**Chairman, Directors and Quorum**

**IT WAS RESOLVED** that Mr Loveridge be appointed Chairman of the meeting.

The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, In accordance with the Articles of Association. It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

**Declaration of Interests**

Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Company's Articles of Association, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

**Capacity**

EXHIBIT 12
WIT: Hands
DATE: 7/15/10
T.M. PASTOR, RPR, CLR

It was noted that in transacting any business at this meeting, the Company was acting in its own capacity and in its capacity as general partner of Terra Firma Capital Partners III, L.P. (the "Partnership").

**Project Phantom**

The Chairman reminded the Board that the Project Phantom Committee of the Board had previously approved (in accordance with the powers previously delegated to it by the Board):

(a) an increase to the budget of £750,000 in connection with the submission by AWAS (an aircraft leasing business currently owned by funds managed by Terra Firma Investments (GP) 2 Limited ("TFCPII")) on 28 March 2007 of a final bid for 100% of the common stock of Pegasus Aviation Finance Company ("Pegasus") (a US-based aircraft leasing portfolio of 80 owned aircraft, with committed forward orders of 34 aircraft) and each of its subsidiaries (the "Group") for an equity value of up to $966m ("Project Phantom");

(b) the acquisition of Pegasus by AWAS for an equity value of up to $966m; and

(c) the subscription by the Company for equity and subordinated debt instruments in Carmel Capital, a wholly owned subsidiary of TFCP II, for an amount up to $1,003.4m such that the Company will have a 50% joint interest in and 50% control of Carmel Capital.

conditional in the case of (b) and (c) upon the Company being notified by AWAS that the bid for Pegasus has been successful at a price of up to $966m and that all conditions to completion of the SPA (other than payment of the purchase price for Pegasus) have been satisfied in full.

The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, approve, a budget in respect of Project Phantom of £3.5m.

**Documents Produced to the Meeting**

The following documents (the "Project Phantom Documents") were produced to the meeting:

(a) an Update dated 2 May 2007 to the Investment Advisory Committee Presentation dated 16 April 2007 prepared by Terra Firma Capital Partners Limited as investment adviser to the Company ("TFCPL") (the "Project Phantom Update"); and

(b) the recommendation of the Investment Advisory Committee of TFCPL dated 2 May 2007 (the "Project Phantom Investment Committee Recommendation").

**Investment Approval**

The Directors reviewed the Project Phantom Update and the Project Phantom Investment Committee Recommendation. The Directors discussed the information reported to the meeting and after due consideration, **IT WAS RESOLVED** that a budget in respect of Project Phantom of £3.5m be and is hereby approved.

**Project Hammer**

The chairman reported that the purpose of this section of the meeting was to consider and, if thought fit, to approve:

(a) the making, by a wholly owned subsidiary, of market purchases of shares in the company code named Hammer plc ("Hammer"), at the prevailing bid price, of up to 2.99% of the issued share capital of Hammer prior to approaching the Board of Hammer with a non-binding indicative offer proposal ("Project Hammer"); and

(b) an additional budget in respect of Project Hammer of £200k to cover commercial due diligence to be undertaken by Deloittes (at an agreed abort fee rate of £130,000) plus the costs of other specialist industry consultants.

**Documents Produced to the Meeting**

The following documents (the "Project Hammer Documents") were produced to the meeting:

(a) the recommendation of the Investment Advisory Committee of TFCPL dated 4 May 2007 (the "Project Hammer Investment Committee Recommendation") and

(b) the Presentation to the Investment Advisory Committee of TFCPL dated 7 May 2007 prepared by TFCPL as investment adviser to the Company (the "Project Hammer Presentation").

**Investment Approval**

The Directors reviewed the Project Hammer Investment Committee Recommendation and Project Hammer Presentation. The Chairman noted that the Project Hammer Presentation outlined the risks, issues and financial projections for Project Hammer and, together with the Project Hammer Investment Committee Recommendation, recommended the approval of the making, by a wholly owned subsidiary, of market purchases of shares in Hammer, at the prevailing bid price, of up to 2.99% of the issued share capital of Hammer prior to approaching the Board of Hammer with a non-binding indicative offer proposal as well as the approval of a budget in respect of Project Hammer of £200k.

Mr Punja presented the Project Hammer Presentation in great detail, noting in particular the advantages to buying shares in the market prior to making a bid and the potential risk the Company would be exposed to should it purchase more than 2.99% of Hammer shares (being the RNS announcement threshold). However, there also existed the possibility that Hammer would serve a s.793 notice on the bid vehicle holding less than 2.99%, forcing the Company to reveal its interest.

Mr Punja further advised that the analysis conducted for TFCPL suggested that an offer of £16-17 per Hammer share should secure Hammer board recommendation of an offer made by the Company or its subsidiary. If the Company were able to agree the presale of the Hammer branded hotel business at a price in excess of 23x EDITDA an offer of £16-17 per Hammer share would be an attractive proposition for the Company.

TFCPL's tactics would be to negotiate the presale of the Hammer branded hotel business at an agreeable price on behalf of the Company, and having purchased a minority shareholding in Hammer, present the board of Hammer with an offer it had a duty to consider seriously.

Each Director confirmed that he was satisfied with the contents of the Project Hammer Documents tabled at the meeting and after due and careful consideration, IT WAS RESOLVED that:

(a) the making, by a wholly owned subsidiary, of market purchases of shares in Hammer, at the prevailing bid price, of up to 2.99% of the issued share capital of Hammer prior to approaching the Board of Hammer with a non-binding indicative offer proposal be and is hereby approved

(b) a budget in respect of Project Hammer of £200k be and is hereby approved.

**Any Other Business**

**Project Daisy**

The Chairman noted that the board of Terra Firma Investments (GP) 2 Limited ("TFI(GP)2L") had requested that TFCPL present their recommendations in connection with Project Daisy (as defined

below) to the Company for its consideration, and specifically that the Company consider a joint investment between the Company and TFI(GP)2L with an investment of equity pro rated between the Company and TFI(GP)2L in Project Daisy, it was noted that the level of equity investment should be pro rated between the Company and TFI(GP)2L, based on the total commitments of the TFCPIII and TFCPII Funds respectively.

The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, to approve:

(a) an additional budget of £3.3 million, including an M&A advisory success fee of up to US$6 million;

(b) the submission of a final offer for the 2.3GW portfolio of power generation assets owned by Globeleq ("Project Daisy") of up to US$830 million as of 31 December 2006 (the "Equity Purchase Price" and the "Final Offer" respectively); and

(c) the investment of equity in connection with Project Daisy, pro rated between the Company and TFI(GP)2L, based on the total the commitments available to TFCP II and the Partnership respectively.

The Directors noted that the Equity Purchase Price would accrue on a LIBOR +5.0% until closing.

**Documents Produced to the Meeting**

The following documents (the "Project Daisy Documents") were produced to the meeting;

(a) the recommendation of the Investment Advisory Committee of TFCPL dated 2 May 2007 and including an appended detailed budget (the "Project Daisy Investment Advisory Committee Recommendation"); and

(b) the presentation to the Investment Advisory Committee of TFCPL dated 3 May 2007 relating to Project Daisy (the "Project Daisy Presentation").

**Investment Approval**

The Directors reviewed the Project Daisy Investment Advisory Committee Recommendation and Project Daisy Presentation. The Chairman noted that the Project Daisy Presentation outlined the background, issues and risks relating to Project Daisy.

The Directors noted that the Final Offer was subject to completion of confirmatory due diligence, agreement to a satisfactory share purchase agreement with the seller and full financing documentation.

The Directors further noted that based on acquisition financing of US$550 million and a closing in September 2007, the Final Offer would require an aggregate equity commitment of up to US$370 million.

Ms Cooke reported in detail to the meeting in relation to the Project Daisy Presentation. The Directors considered the Project Daisy Presentation, noting in particular that the potential of this acquisition lay in the building of a business of a significantly greater scale, diversification and value through acquisition.

Ms Cooke noted that should the Company approve Project Daisy as a joint investment between the Company and TFI(GP)2L, acting in their capacities as general partners of the Partnership and TFCP II respectively, then the consent of the Advisory Boards of the Partnershop and TFCP II would be required.

Each Director confirmed that he was satisfied with the contents of the Project Daisy Documents tabled at the meeting and after due and careful consideration, IT WAS RESOLVED that:

(a) the Project Daisy Investment Advisory Committee Recommendation be and is hereby approved;

(b) an additional budget of £3.3 million, including an M&A advisory success fee of up to US$6 million be and is hereby approved;

(c) the submission of the Final Offer be and is hereby approved; and

(d) the negotiation and final approval of the split of the equity investment between the Company and TFI(GP)2L in connection with Project Daisy be delegated to the Project Daisy Committee (as defined below).

**Establishment of a Committee**

After due and careful consideration IT WAS RESOLVED that:

(a) for the purposes of negotiating the final split of equity investment in Project Daisy between the Company and TFI(GP)2L that a committee of the Board made up of two Guernsey-resident Directors be created (the "Project Daisy Committee") and that the Board's powers and discretions be delegated to the Project Daisy Committee to negotiate and approve any documents and to execute, sign and deliver any agreements on behalf of the Company and to do every other act or thing in the name of the Company which the Project Daisy Committee or any such member or his respective duly appointed alternate or representative may deem to be desirable, necessary or appropriate in connection with the negotiation of the final split of equity investment in Project Daisy between the Company and TFI(GP)2L; and

(b) any member of the Project Daisy Committee or his respective duly appointed alternate or representative (or in the case of any deed, any two of them) be and are hereby authorised to do all things, sign or execute and deliver any act, thing, deed or document on behalf of and in the name of the Company as general partner of the Partnerships which they consider to be necessary or expedient for the Company as general partner of the Partnerships to perform its obligations in connection with the negotiation of the final split of equity investment in Project Daisy between the Company and TFI(GP)2L.

**Project Dice**

The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, approve:

(a) the submission of an indicative bid to the Board of the company code-named Dice plc ("Dice") at 265p per Dice share ("Indicative Offer"); and

(b) a Phase II budget of £250,000 in respect of Project Dice.

**Documents Produced to the Meeting**

The recommendation of the Investment Advisory Committee of Terra Firma Capital Partners Limited ("TFCPL") dated 7 May 2007 and including an appended detailed budget (the "Project Dice Investment Advisory Committee Recommendation") was produced to the meeting.

**Investment Approval**

The Directors reviewed the Project Dice Investment Advisory Committee Recommendation and noted it outlined the background, issues and risks relating to Project Dice.

Mr Punja reported in detail to the meeting in relation to the Project Dice Investment Advisory Committee Recommendation.

Each Director confirmed that he was satisfied with the contents of the Project Dice Investment Advisory Committee Recommendation tabled at the meeting. The Chairman noted that TFI(GP)2L, acting in its capacity as general partner to TFCP II had considered this recommendation and had proposed that an investment of equity pro rated between the Company and TFI(GP)3L by the commitments made to TFCP II and the Partnership respectively be made in Project Dice

After due and careful consideration, IT WAS RESOLVED that:

(a)     the budget of £230,000, be and is hereby approved;

(b)     the submission of the Indicative Offer be and is hereby approved; and

(c)     that the proposal that the Company's investment in Dice (and any costs attributable thereto) be pro rated between the Company and TFI(GP)2L by the commitments made to TFCP II and the Partnership respectively be and is hereby approved.

**Partnership revolving credit investment bridge facility**

The Chairman reported that the purpose of this section of the meeting was to explain to the Board that:

(a)     the Company (acting in its own capacity and as general partner of the Partnership) had, on 9 June 2006, entered into a facility agreement relating to a revolving credit investment bridge facility of up to €1,200,000,000 between the Partnership (as Original Borrower), the Company (as General Partner) and The Governor and Company of the Bank of Scotland (the "Bank") (the "Facility Agreement") for the purpose of making investments;

(b)     it is intended that the Company (acting in its own capacity and in its capacity as general partner of the Partnership) enter into a first amendment and restatement agreement pursuant to which a subsidiary of the Partnership, Cabrillo Capital I S.à.r.l. ("Cabrillo"), would accede to the Facility Agreement as an Additional Borrower and the facility available under the Facility Agreement would be increased from €1,200,000,000 to €1,615,228,373 (the "First Amendment and Restatement Agreement");

(c)     the Company (acting in its own capacity and in its capacity as general partner of the Partnership) intends to enter into a put option deed between the Company, the Partnership, Cabrillo and the Bank in relation to the First Amendment and Restatement Agreement (the "Investment Bridge Put Option Deed"); and

(d)     the Board is to consider, and if deemed appropriate, approve the terms of, and the transactions contemplated by the Finance Documents and the Ancillary Documents (as defined below).

Capitalised terms used but not defined in these minutes have their meanings as defined in the First Amendment and Restatement Agreement.

**Documents to be Approved**

There was produced to the meeting a copy of the following documents:

(a)     the First Amendment and Restatement Agreement;

(b)     the Investment Bridge Put Option Deed;

(c)     a formalities certificate from the Company (acting in its capacity as general partner of the Partnership) to the Bank confirming, inter alia, (i) that the constitutional documents of the

Partnership are true, correct and complete, (ii) that no borrowing limits have been breached, (iii) the current investments of the Partnership, (iv) that the certified copy of the private placement memorandum relating to the Partnership is true, correct and complete and (v) confirming the current LP commitments;

(d) a formalities certificate from the Company (acting in its own capacity) confirming (i) that its constitutional documents are true, correct and complete, and (ii) that the board resolutions and specimen signatures are true, correct and complete; and

(e) the LP Commitment Certificate;

each of the documents at (a) and (b) being a "Finance Document" and documents (c), (d) and (e) each being "Ancillary Documents".

The Chairman explained that although substantial negotiations have already been undertaken on the terms of the Finance Documents and Ancillary Documents, the parties may still require some amendments to the document before execution as approved in accordance with the authorities given below.

**Benefit**

After due and careful consideration the Board has determined that:

(a) it is in the best interests of the Partnership and the Company that the Company (in its own capacity and in its capacity as general partner of the Partnership) enters into the Finance Documents and the Ancillary Documents and the transactions contemplated therein;

(b) there are reasonable grounds for believing that entering into the Finance Documents and the Ancillary Documents would benefit the Partnership and the Company; and

(c) the Company would enter into the Finance Documents and the Ancillary Documents in its own capacity and in its capacity as general partner of the Partnership.

After due and careful consideration and believing such to be in the best interests of the Partnership and the Company (in its own capacity and in its capacity as general partner of the Partnership), the Board was of the opinion that the Company would not be in breach of:

(a) any law or regulation applicable to it;

(b) its Memorandum and Articles of Association;

(c) the Partnership Agreement; or

(d) any agreement or instrument binding on it or on its assets,

by executing and delivering the Finance Documents and the Ancillary Documents, and that the exercise and performance by it of any of its rights and obligations thereunder are in accordance with its Memorandum and Articles of Association.

**Approval of Transaction and Documents**

After due and careful consideration:

IT WAS RESOLVED that the terms of the Finance Documents and the Ancillary Documents (with such amendments authorised by a director or signatory authorised by the board of the Company), be approved.

IT WAS RESOLVED that:

(a) each director or the secretary (each such person being an "authorised signatory") be severally authorised to execute, on behalf of the Company (in its own capacity and in its capacity as general partner of the Partnership), the Finance Documents and Ancillary Documents (or in the case of a deed, to act with any other authorised signatory on behalf of the Company (in its own capacity and in its capacity as general partner of the Partnership) to execute and deliver such deed and affix the seal of the Company thereto) in the form produced to the meeting, with any amendments he/she may approve;

(b) each one of the persons as listed in the Schedule to these minutes be and is hereby authorised to sign or execute on behalf of the Company (in its own capacity and in its capacity as general partner of the Partnership) the Finance Documents, Ancillary Documents or any other documents delivered by the Company (in its own capacity and in its capacity as general partner of the Partnership) under or in connection with the Finance Documents and to take any other action on behalf of the Company (in its own capacity and in its capacity as general partner of the Partnership) in connection with the Finance Documents or the transactions contemplated thereunder;

IT WAS RESOLVED that execution of the Finance Documents and Ancillary Documents by the authorised signatories in accordance with authorities given above be conclusive evidence of his/her approval of the amendments made to it.

IT WAS RESOLVED that each authorised signatory shall be severally authorised:

(a) to execute and deliver any deed, agreement, certificate, notice, form or any other document required to be executed and delivered under or in connection with the Finance Documents (or in the case of a deed, to act with any other authorised signatory on behalf of the Company (in its own capacity and in its capacity as general partner of the Partnership) to execute and deliver such deed and affix the seal of the Company thereto);

(b) to sign and despatch on behalf of the Company (in its own capacity and in its capacity as general partner of the Partnership) all documents and notices required to be signed or despatched; and to do all other acts and things,

as he/she may consider necessary or desirable in connection with the Finance Documents or any of the transactions contemplated therein.

**Filing of Documents**

IT WAS RESOLVED that each director and the secretary of the Company (in its own capacity and in its capacity as general partner of the Partnership) is severally authorised:

(a) to despatch to the Bank a copy of the resolutions passed at this meeting, and/or extract resolutions passed at this meeting, and/or a copy of the Minutes of this meeting signed by the Chairman;

(b) to sign and despatch to the Bank or any other person as required by the Finance Documents and to authorise any other officer or employee of the Company to sign and despatch to the Bank or any other person or authority as required by the Finance Documents any other document, notice, request (including any utilisation requests under the Facility Agreement) or form required in connection with the Finance Documents; and

(c) to sign and despatch to the Bank or any other person as required by the Finance Documents and to authorise any two directors or a director and secretary of the Company to sign, seal and despatch to the Bank or any other person or authority as required by the Finance Documents any other documentation in connection with them as are deeds.

Case: 11-126 Document: 48 Page: 163 04/25/2011 272867 401

A-962

There being no further business, the Chairman declared the meeting closed.

Chairman

Terra Firma Investments (GP) 3 Limited 8 May 2007

9

To: Terra Firma Investments (GP) 2 Limited
PO Box 543, First Floor
Dorey Court, Admiral Park
St Peter Port
Guernsey GY1 6HJ

Terra Firma Investments (GP) 3 Limited
PO Box 543, First Floor
Dorey Court, Admiral Park
St Peter Port
Guernsey GY1 6HJ

9 May 2007

Dear Sirs

**Project Mulberry**

In connection with our mutual consideration of a possible offer by you or an affiliate of you (***Potential Offeror***) to acquire the issued share capital of EMI Group plc (***EMI***) (the ***Proposal***), we will be providing each other with certain confidential information. This letter relates to information supplied by each of us or by any of our respective Connected Persons orally, in writing or in any other form to the other or its Authorised Recipients whether before, on or after the date of this letter in connection with the Proposal as well as all documents and other information which contain or reflect or are generated or derived from the information we each supply to the other (the ***Information***).

In this letter:

(a) ***Agents*** means directors, officers, employees, agents, partners, contractors and advisers;

(b) ***Agreed Financiers*** means those existing investors in funds advised by Terra Firma Capital Partners Limited together with any additional actual or potential providers of debt, equity and/or other finance of which EMI is notified in writing after the date of this letter, which are to be treated as Agreed Financiers under this agreement;

(c) ***City Code*** means the City Code on Takeovers and Mergers;

(d) ***Competitive Services*** means goods or services competitive with those which during the Relevant Period any EMI Group Company was or is supplying or negotiating or actively and directly seeking to supply to a Restricted Person or a Customer for the purpose of Restricted Business;

(e) ***Connected Persons*** means, in relation to each of us, to the extent that they are involved in or have knowledge of the Proposal, (a) our respective group undertakings and each of our and their respective officers, employees, advisers, agents and representatives; (b) officers, employees and partners of

our advisers, agents and representatives or of their respective group undertakings and (c) your Agreed Financiers and their advisers;

(f) ***Customer*** means a person who is or was during the Relevant Period a customer of any EMI Group Company (whether or not goods or services are or were actually provided during such period) or to whom at the expiry of the Relevant Period any EMI Group Company is actively and directly seeking to supply goods or services, in either case for the purpose of a Restricted Business;

(g) ***EMI Group*** means EMI and its group undertakings from time to time and ***EMI Group Company*** shall be construed accordingly;

(h) ***EMI Group Employee*** means a person who, during the Relevant Period, is or was employed by or who renders or rendered services to any EMI Group Company in:

(i) a senior management role;

(ii) a senior A&R (Artist & Repertoire) role; or

(iii) a senior sales or marketing role,

and who has or had responsibility for or material dealings with one or more Restricted Person or Customer or influence over them or who is or was in possession of confidential information relating to the EMI Group and who has or had a basic fixed annual cash salary (excluding bonus and incentive arrangements) of US$500,000 (or the equivalent in any other currency) or more;

(i) ***group undertaking*** shall be construed in accordance with section 259 of the Companies Act 1985;

(j) ***interest in securities*** has the meaning given in the City Code;

(k) ***recording artist*** or ***songwriter*** means a recording artist, session musician, side man, songwriter, lyricist or composer;

(l) ***Relevant Period*** means the period commencing on 31 March 2006 and ending on the earlier of (i) the date falling 12 months after the date of this letter and (ii) the date that the Proposal is completed;

(m) ***Restricted Business*** means any part of the business of any EMI Group Company including EMI Music and EMI Music Publishing (including the production, distribution, marketing or sale of records on any form or carrier or by any means including via electronic media); and

(n) ***Restricted Person*** means a person who is or was during the Relevant Period under a contract with any EMI Group Company as a recording artist,

songwriter, distributor or supplier of records on any form or by any means, including via electronic media; and

(o) ***Surviving Provisions*** means this paragraph setting out defined terms and paragraphs 14, 16, 17, and 21 to 32 inclusive (but excluding paragraph 25).

In consideration of the mutual disclosure of the Information, we each agree and undertake to the other, including in relation to Information received from the other and its Connected Persons, as follows. The undertakings in this letter are given to each of us in our own favour and in favour of our respective Connected Persons.

**Duty of confidentiality**

1. Save as otherwise expressly provided in this letter, we will each hold the Information in strict confidence and will not disclose, copy, reproduce or distribute any of it to any person other than: (i) as permitted in writing by the other or (ii) to those of our respective Connected Persons (excluding, in the case of Potential Offeror, potential providers of debt, equity and/or other finance in respect of the Proposal, other than Agreed Financiers) who strictly need access to it for the purposes of the Proposal (our ***Authorised Recipients***). The Information may only be disclosed to such persons on the terms of this letter and on the basis that they will not disclose, copy, reproduce or distribute it to any person who is not an Authorised Recipient.

2. Save as otherwise expressly provided in this letter, neither of us nor any of our Connected Persons will, without the other's prior written consent:

(a) reveal to any person other than an Authorised Recipient:

(i) that EMI may be acquired by Potential Offeror;

(ii) that negotiations or discussions are or have been taking place between us and/or our Connected Persons; or

(iii) the status or progress of such negotiations or discussions between us and/or our Connected Persons; or

(b) use the Information for any purpose other than to evaluate, negotiate, advise on and/or implement a recommended Proposal.

**Exceptions**

3. The undertakings in paragraph 1 and paragraph 2 will not apply to Information which:

(a) at the time of supply is in the public domain;

(b) subsequently comes into the public domain, except through breach of the undertakings set out in this letter;

(c) is already in the lawful possession of one of us (as evidenced by written records);

(d) subsequently comes lawfully into the possession of one of us from a third party who does not owe the other party or any of its Connected Persons an obligation of confidence in relation to it; or

(e) is required to be disclosed by law, regulation or any governmental or competent regulatory authority, as long as the disclosing party (to the extent permitted by applicable law and regulations) consults the other party first on the proposed form, timing, nature and purpose of the disclosure.

4. We and you agree that, notwithstanding any other provision of this letter:

(a) we shall at any time be entitled to make, at our sole discretion, any announcement that we are in discussions in respect of a potential offer for our securities or another similar transaction, with any such announcement including details of potential terms (including, without limitation, any potential price under discussion) being discussed between us, provided that any such announcement does not, without your prior written consent and subject to the provisions of paragraph 3, identify you as a counterparty;

(b) if either you or we indicate to the other that you or we are unwilling to proceed with the Proposal, we shall be entitled to announce publicly that we and you are no longer in discussions; and

(c) we and our Authorised Recipients shall, subject to applicable law and regulations, be entitled to disclose on a strictly confidential basis Information to no more than six of EMI's institutional shareholders to assist EMI's board of directors in evaluating the merits of the Proposal, provided that the identity of Potential Offeror and its equity investors shall not be disclosed.

**Obligations to procure compliance**

5. Each of us will procure so far as we are legally able that each of our Authorised Recipients who receives any Information is aware of and adheres to the terms of this letter. The undertakings given by each of us in this letter are given on our own behalf and as agent for each of our Authorised Recipients, except where any of each of our Authorised Recipients enters directly into a written confidentiality agreement with you on substantially the same terms as this letter.

6. You will procure that each of your Authorised Recipients is provided with a copy of this letter and, where the Authorised Recipient is not a financial adviser or professional adviser to you, agree with you (for you and as trustee for us) to be bound by the terms of this letter.

7. You will keep a list of your Authorised Recipients to whom any Information is given which you will make available to us on demand.

8. Each of us agrees promptly to notify the other on becoming aware that Information has been disclosed to or obtained by a third party otherwise than as permitted by this letter.

**Return/destruction of confidential information**

9. Subject as provided below in this paragraph 9, we and our respective Authorised Recipients will destroy or return to the other on demand any document containing Information (including any note, analysis or memorandum that any of us may have prepared and any copy any of us may have made) and take all reasonable steps to expunge all Information from any computer, word processor or other device containing Information. If requested by the other party, any destruction of Information will be certified in writing to the other party by an authorised officer supervising it. The provisions of this paragraph 9 will not apply:

(a) to the minutes of any meeting of a board of directors or investment committee (or a duly appointed committee or sub-committee thereof) of an Authorised Recipient which contain or reflect any Information;

(b) to the extent that the Authorised Recipient is required to retain any such Information by any applicable law, rule or regulation, professional record-keeping obligation or by any competent judicial, governmental, supervisory or regulatory body; or

(c) to the extent that Information is stored electronically subject to an existing routine data back-up exercise on servers or back-up sources so long as it is deleted from local hard drives and no attempt is made to recover it from such servers or back-up sources.

**Representations and warranties**

10. We each understand that the Information does not purport to be all-inclusive and that no representation or warranty is made by any person as to the accuracy, reliability or completeness of any of the Information. Accordingly we agree with each other on the other's own behalf and as agent for each of its respective Connected Persons that neither of us nor any of our respective Connected Persons:

(a) shall have any liability to the other or any other person resulting from the use of Information by us or them; and

(b) shall be under any obligation to provide further Information, to update Information or to correct any inaccuracies.

The terms of this disclaimer may not be varied or terminated without the prior written consent of our respective Connected Persons. Nothing in this letter excludes any liability for, or remedy in respect of, fraudulent misrepresentation.

11. Save as expressly set out in this letter, neither of us nor any of our respective Connected Persons shall owe any duty of care to the other, to the other's Connected Persons or to any other person.

12. You acknowledge, confirm, undertake, represent and warrant to us (for our benefit and the benefit of each of the EMI Group Companies) that:

(a) in connection with the Proposal or any element of it, you are not acting as an agent or broker for any other person or in conjunction with any director, officer or employee of any EMI Group Company and that we shall not, except to the extent agreed otherwise in writing between us and you, be responsible for any costs incurred by you or on your behalf;

(b) neither you nor any of your Authorised Recipients is presently in, and none of such persons will without our prior written consent enter into, discussions or negotiations with any third party concerning any offer for or acquisition of any of EMI's securities and/or any Restricted Business by that third party; and

(c) there is no agreement, arrangement or undertaking, formal or informal, in relation to any sale, transfer or other disposal, whether for cash or otherwise, of any interest in securities (as defined in the City Code) of EMI or any asset of any EMI Group Company by you nor, so far as you are aware, by any of your Agents or any of the Agreed Financiers.

13. Each of the acknowledgements, confirmations, undertakings, representations and warranties in clause 12 shall be deemed to be repeated by you at the time of receipt by us of any written notice to us informing us of the identity of an additional Agreed Financier, with each reference to Agreed Financiers and Authorised Recipients deemed to include each additional Agreed Financier notified by you in such notice.

**Restrictions on dealings**

14. You recognise and accept, and will advise your Authorised Recipients, that the Proposal and some or all of the Information may be inside information for the purposes of the Criminal Justice Act 1993 (the ***CJA***) and/or the Financial Services and Markets Act 2000 (the ***FSMA***) and neither you nor any of your Authorised Recipients should:

(a) deal in securities that are price-affected securities (as defined in the CJA) in relation to the inside information, encourage another person to deal in price-affected securities or disclose the information except as permitted by the CJA before the inside information is made public;

(b) deal or attempt to deal in a qualifying investment or related investment (as defined in the FSMA) on the basis of the inside information;

(c) disclose the inside information to another person other than in the proper course of the exercise of employment, profession or duties; or

(d) engage in behaviour based on any inside information which would amount to market abuse for the purposes of the FSMA until the inside information has been made generally available.

**Non-solicitation obligations**

15. You undertake to us (for our benefit and the benefit of each EMI Group Company) that you will not (and that you will use all reasonable endeavours to procure that your Connected Persons and Agents will not), directly or indirectly, without our prior written consent:

(a) disclose any Information to, or have any contact whatsoever for the purpose of preparing for and making the Proposal with, any of our Agents, any person or entity known by the discloser or person making contact to be a holder of 5.25% guaranteed convertible bonds issued by EMI Group Finance (Jersey) Limited in respect of its holding of such bonds or any EMI Group Company's Agents or shareholders, except for such of those persons as EMI may nominate from time to time and in such case only for the purposes of implementing the Proposal;

(b) disclose any Information to, or have any contact whatsoever for the purpose of preparing for and making the Proposal with, any person who has a business relationship with any EMI Group Company (including, without limitation, Customers, suppliers, distributors, recording artists, recording artists' managers and agents, songwriters, songwriters' managers and agents, sub-contractors, licensors, licensees and sub-publishers) save to the extent that such approach relates to matters conducted in the ordinary course of your business unconnected with your consideration of the Proposal and save that you shall not be prevented from disclosing Information (subject always to the terms of this letter) to those of your Authorised Recipients who are advising you or prospectively providing you with finance in connection with the Proposal, notwithstanding that they have a business relationship with a EMI Group Company;

(c) visit or inspect any property owned, used or occupied by any EMI Group Company for the purpose of preparing for and making the Proposal and other than in the ordinary course of your business; and

(d) during the period from the date of this letter until the date falling 12 months after the date of this letter:

(i) solicit, endeavour to entice away, employ or offer to employ any recording artist or songwriter who is at the expiry of the Relevant Period or was at any time during the Relevant Period under contract to any EMI Group Company;

(ii) entice, induce or encourage a Restricted Person:

(A) to end his, her or its contract with any EMI Group Company;

(B) not to extend or renew any such contract; and/or

(C) to enter into any contract with a competitor of any EMI Group Company;

(iii) entice, induce or encourage a Customer to remove custom from any EMI Group Company;

(iv) solicit, endeavour to entice away, employ or offer to employ any EMI Group Employee who is then under a current contract of employment with a EMI Group Company for the purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with a Restricted Business or which plans to compete with a Restricted Business, whether or not that EMI Group Employee would act in breach of his or her contract of employment in leaving his or her employment, provided that the restrictions in this paragraph (iv) shall not apply in the case of any such person who responds to a bona fide general advertisement for recruitment or approaches you or your Connected Persons or Agents in each case without any other direct or indirect solicitation by or encouragement from you or your Connected Persons or Agents.

16. Each sub-paragraph and part of such sub-paragraph of paragraph 15 constitutes an entirely separate and independent restriction and does not operate to limit any other obligation owed by you, your Connected Persons and/or your Agents, whether that obligation is express or implied by law. For the avoidance of doubt, paragraph 26 shall apply to paragraph 15.

17. Without prejudice to any other provision of this letter, you expressly acknowledge (for our benefit and the benefit of each EMI Group Company) that each of the restrictions in paragraph 15 goes no further than is necessary for the protection of each EMI Group Company's legitimate business interests.

**Standstill obligations**

18. Except for the purposes of implementing the Proposal neither you nor any of your Connected Persons will before the date which is 12 months following the date of this letter, either alone or acting in concert with others, without our prior written consent:

(a) acquire or offer to acquire, or cause another person to acquire or to offer to acquire, an interest in securities of EMI or enter into an agreement or arrangement (whether or not legally binding) or do or omit to do any act as a result of which you, it or any other person may acquire an interest in securities of EMI;

(b) announce or make, or cause another person to announce or make, any offer for or proposal in connection with all or any of EMI's shares or other securities; or

(c) enter into any agreement or arrangement (whether or not legally binding) or do or omit to do any act as a result of which you, it or any other person may become obliged (under the City Code or otherwise) to announce or to make any offer for or proposal in connection with all or any of EMI's shares or other securities.

19. The restrictions in paragraph 18 shall cease to apply if:

(a) the EMI board of directors agrees to recommend an offer for EMI by you or any of your group undertakings; or

(b) a third party (not acting in concert (as such term is defined in the City Code) with you) announces a firm intention to make an offer for EMI.

20. The restrictions in paragraph 18 shall not apply:

(a) to dealing by any exempt market maker in the same group as your financial advisers provided the dealings are for the purposes of their market making business; or

(b) to any person who acquires or disposes of any interest in securities of EMI in the ordinary course of business of that person and it is understood and agreed that certain of your Agents are investment banking and/or full service security firms and as such, may, from time to time:

(i) provide full service investment banking and advisory services, including, without limitation, underwriting and private placement services, and mergers and acquisitions related advice and services; and/or

(ii) effect transactions for their accounts or the accounts of their respective customers and hold positions in EMI in the ordinary course of their business as fund managers, broker-dealers, investment advisers, block positioners, investment bankers or the provider of trustee or nominee services where the decision to acquire or dispose is taken by an individual who is not in possession of Information,

provided in each case that such activities are not on your behalf (or on behalf of any person acting in concert with you) and that no Information provided by or on behalf of EMI pursuant to the terms of this agreement to you and/or its Authorised Recipients shall be used in connection with such activities, and nothing in this agreement will prohibit, limit or restrict the foregoing activities;

**Authorised contacts**

21. Potential Offeror shall direct any communications relating to this letter and/or the Proposal, including any applications for consent from or notifications to EMI, in writing to:

Name: Charles Ashcroft
Address: EMI Group Plc, 27 Wrights Lane, London W8 5SW
Telephone number: +44 20 7795 7749
Fax number: +44 20 7795 7766
E-mail: ashcroftc@emigroup.com

or such other person(s) as EMI may nominate in writing.

22. EMI shall direct any communications relating to this letter and/or the Proposal, including any applications for consent from or notifications to Potential Offeror, in writing to:

| | |
|---|---|
| Name: | William Burnand |
| Address: | Terra Firma Capital Partners Limited, 4th Floor<br>2 More London Riverside, London SE1 2AP |
| Telephone number: | +44 20 7015 9500 |
| Fax number: | +44 20 7015 9501 |
| E-mail: | william.burnand@terrafirma.com |

or such other person(s) as Potential Offeror may nominate in writing.

**General**

23. Without affecting any other rights or remedies that we may each have, we each acknowledge that a person with rights under this letter may be irreparably harmed by any breach of its terms and that damages alone may not necessarily be an adequate remedy. Accordingly, a person bringing a claim under this letter will be entitled to seek the remedies of injunction, specific performance and other equitable relief, or any combination of these remedies, for any threatened or actual breach of its terms, and no proof of special damages will be necessary to enforce this letter.

24. Nothing in this letter will prevent EMI or its group undertakings from disclosing information in relation to the Proposal to its or their employees or to representatives of such employees in accordance with any applicable procedure for informing and consulting employees.

25. You acknowledge and agree that the undertakings set out in this letter will survive completion of our negotiations, whether or not the Proposal is implemented.

26. If any provision of this letter is held to be invalid or unenforceable, that provision shall (so far as it is invalid or unenforceable) be given no effect and shall be deemed not to be included in this letter, but without invalidating any of the remaining provisions.

27. Each of our respective Connected Persons shall have the right under the Contracts (Rights of Third Parties) Act 1999 to enforce the terms of this letter (as it may be amended from time to time), subject to and in accordance with:

(a) the terms of paragraph 30 (Governing Law and Jurisdiction); and

(b) save as provided in paragraph 10, the term that the parties to this letter may by agreement terminate or rescind or vary it in any way without the consent of any of our Connected Persons.

28. Save as provided in paragraph 27, a person who is not a party to this letter shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

29. Neither of us shall be entitled to assign the benefit or burden of this agreement without the prior written consent of the other.

30. This letter and the relationship between the parties shall be governed by, and construed in accordance with, English law, and we each irrevocably submit to the exclusive jurisdiction of the English courts.

31. You shall at all times maintain an agent for service of process and any other documents in proceedings in England or any other proceedings in connection with this letter. Such agent shall be Terra Firma Capital Partners Limited, currently of registered address 4th Floor, 2 More London Riverside, London SE1 2AP, and any claim form, judgment or other notice of legal process shall be sufficiently served on you if delivered to such agent at its address registered at Companies House for the time being. You hereby irrevocably undertake not to revoke the authority of the above agent.

32. This agreement shall automatically terminate (other than the Surviving Provisions) on the earlier of (i) the date falling 24 months after the date of this letter and (ii) the date that the Proposal is completed. In such event, neither you nor we (nor any of our Connected Persons) shall have any claim under this agreement of any nature whatsoever against the other party (or any of its Connected Persons) except in respect of any rights and liabilities which have accrued before termination or under any of the Surviving Provisions.

Please confirm your agreement by signing and returning to us a copy of this letter.

Yours faithfully

**By**.......................................
for and on behalf of
**EMI Group plc**

**AGREED AND ACCEPTED**

**By**.......................................
for and on behalf of
**Terra Firma Investments (GP) 2 Limited**
(for and on behalf of the six limited partnerships constituting the **Terra Firma Capital Partners II fund**)
**Dated** 9 May 2007

**By**.......................................
for and on behalf of
**Terra Firma Investments (GP) 3 Limited**
(for and on behalf of **Terra Firma Capital Partners III, L.P.**)
**Dated** 9 May 2007

Please confirm your agreement by signing and returning to us a copy of this letter.

Yours faithfully

**By**......................................
for and on behalf of
**EMI Group plc**

**AGREED AND ACCEPTED**

**By**...
for and on behalf of
**Terra Firma Investments (GP) 2 Limited**
(for and on behalf of the six limited partnerships constituting the **Terra Firma Capital Partners II fund)**
**Dated** 9 May 2007

**By**...
for and on behalf of
**Terra Firma Investments (GP) 3 Limited**
(for and on behalf of **Terra Firma Capital Partners III, L.P.**)
**Dated** 9 May 2007

**To:** 'Peter Bell'[pbell@greenhill.com]; Riaz Punja[Riaz_Punja@terrafirma.com]
**Cc:** Ross McCluskey[rmccluskey@greenhill.com]
**Bcc:** Stephen Alexander[Stephen.Alexander@terrafirma.com]; Michael Hedegaard[Michael.Hedegaard@terrafirma.com]; Dominic Spiri[Dominic.Spiri@terrafirma.com]; Chris Barnes[Chris.Barnes@terrafirma.com]; William Burnand[William.Burnand@terrafirma.com]; Michael Slattery[Michael.Slattery@terrafirma.com]; 'Marco.Compagnoni@weil.com'[Marco.Compagnoni@weil.com]; James.Harvey@weil.com[James.Harvey@weil.com]; MacInnes, Bruce[Bruce.MacInnes@dkib.com]; 'Watherston, Sean'[Sean.Watherston@dkib.com]; Anneli.Collins@KPMG.co.uk[Anneli.Collins@KPMG.co.uk]; 'Shah, Sandip (TSG)'[sandip.shah@kpmg.co.uk]; Snape, Paul[paul.snape@kpmg.co.uk]; 'Antoon_Schneider@mckinsey.com'[Antoon_Schneider@mckinsey.com]; 'WALKER, Adrian, GBM'[Adrian.Walker@rbos.com]; Sunil.Bhilotra@barclayscapital.com[Sunil.Bhilotra@barclayscapital.com]; 'Julian.Hester@barclayscapital.com'[Julian.Hester@barclayscapital.com]; 'david.bugge@db.com'[david.bugge@db.com]; 'etienne.hairy@db.com'[etienne.hairy@db.com]; 'Markus.Ehrler@ubs.com'[Markus.Ehrler@ubs.com]; 'paul.simpkin@citigroup.com'[paul.simpkin@citigroup.com]; 'Poyser, Stuart '[stuart.poyser@citi.com]; 'Coats, Ricardo '[ricardo.coats@citi.com]
**From:** Francois Van Der Spuy
**Sent:** Fri 5/11/2007 7:42:31 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Project Dice: Management meeting questions and attendees

Project Dice - Mgmt Meeting Attendees.xls
Mulberry Questions to management (Composite) (2).doc

Peter,

Please find attached the list of TF questions for management as well as attendees for Monday's management meeting.

Regards,

Francois

-----Original Message-----
From: Peter Bell [mailto:pbell@greenhill.com]
Sent: 11 May 2007 12:51
To: Riaz Punja; Francois Van Der Spuy
Cc: Ross McCluskey; MacInnes, Bruce
Subject: RE:

The programme for Monday 14th is as follows:

Commercial 8am-11am: Eric Nicoli (CEO), Martin Stewart (CFO), Mark Barak (Head of Corporate Finance) Legal/Pensions/HR 8am - 1.30pm: (with 30 min break for lunch): Charles Ashcroft (Company Secretary), Chris Ancliff (General Counsel), Paul Cuff (KPMG, pensions adviser), Carol Separovich (HR) Financial/Tax 11.30 - 5.00pm (with 30 min lunch break): Martin Stewart (CFO), Mark Barak (Head of Corporate Finance), Ian Smellie (Grp Financial Controller), Duncan Bratchell (head of tax) Meetings at Freshfields, 65 Fleet Street, London. Please ask for Christopher Yu.
Ross and I look forward to receiving your question list/agenda and list of attendees shortly.
Regards
Peter

Confidential

EXHIBIT
MacInnes 10

TF0000323472

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 7521
Mob: +44 7788 442 576
Email: pbell@greenhill.com
Website: www.greenhill.com

-----Original Message-----
From: Riaz Punja [mailto:Riaz.Punja@terrafirma.com]
Sent: 11 May 2007 12:08
To: Peter Bell; Francois Van Der Spuy
Cc: Ross McCluskey
Subject: RE:

Morning Peter,

Could you please confirm timetable for Monday please

Riaz Punja
Financial Managing Director

Terra Firma Capital Partners
2 More London Riverside
London
SE1 2AP

Tel: +44 (0) 20 7015 9620
Fax: +44 (0) 20 7015 9505

-----Original Message-----
From: Peter Bell [mailto:pbell@greenhill.com]
Sent: 09 May 2007 19:26
To: Riaz Punja; Francois Van Der Spuy
Cc: Ross McCluskey
Subject: RE:

Riaz and Francois
Slight change of timings I'm afraid which are unavoidable. We need to move the legal/pensions meeting so that it runs from 8am to 2pm on Friday concurrently with commercial and the start of financial/ta.
Apologies for this change of plan.
Peter

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 7521
Mob: +44 7788 442 576
Email: pbell@greenhill.com
Website: www.greenhill.com

-----Original Message-----
From: Peter Bell
Sent: 09 May 2007 15:37
To: 'Riaz.Punja@terrafirma.com'; 'Francois.Van.Der.Spuy@terrafirma.com'
Cc: Ross McCluskey
Subject:

Riaz and Francois,
To confirm our earlier conversation re the planned DD meetings with EMI management, the details are as follows:

Friday May 11 - Terra Firma
8am-11am: Commercial Meeting: Eric Nicoli (CEO), Martin Stewart (CFO), Mark Barak (Head of Corporate Finance)
11.30am-5.30pm: three concurrent meetings (with 1 hour break for lunch): Financial: Martin Stewart (CFO), Mark Barak (Head of Corporate Finance), Ian Smellie (Grp Financial Controller); Legal and Pensions: Charles Ashcroft (Company Secretary), Chris Ancliff (Grp General Counsel), Paul Cuff (KPMG adviser on pensions); and Tax: Duncan Bratchell (Head of tax & treasury).
Location: Freshfields, 65 Fleet Street, London, EC4Y 1HS. Please ask for Helen Archbold.

As per our conversation, this is your only major opportunity for meetings with management due to the financial year end and the multi-party process bein operated. Requests for follow-up meetings will be considered but cannot be committed to. Our client requires your list of questions or agenda items in advance, preferably by tomorrow lunchtime or at the latest by tomorrow night. A list of attendees is also required by those times. We recommend that one person on your team leads each session to facilitate productive discussion. No forecast data will be disclosed and, given the Takeover Code, commercially sensitive information will not be disclosed.

Peter

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 5721
Mob: +44 7788 442 576
Email: pbell@greenhill-co.com

Website: www.greenhill-co.com
Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 57 Berkeley Square, London W1J 6ER.Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7500.
This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any damage suffered as a consequence of software viruses that this email and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachments.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

PLEASE READ: The information contained in this email is confidential and

intended for the named recipient(s) only. If you are not an intended recipient
of this email you must not copy, distribute or take any further action in
reliance on it and you should delete it and notify the sender immediately. Email
is not a secure method of communication and Terra Firma Capital Partners Ltd
cannot accept responsibility for the accuracy or completeness of this message or
any attachment(s). Please examine this email for virus infection, for which
Terra Firma Capital Partners Ltd accepts no responsibility. If verification of
this email is sought then please request a hard copy. Unless otherwise stated
any views or opinions presented are solely those of the author and do not
represent those of Terra Firma Capital Partners Ltd. This email is intended for
informational purposes only and is not a solicitation or offer to buy or sell
securities or related financial instruments. Terra Firma Capital Partners
Limited Registered in England no. 04219556. Registered Office: 2 More London
Riverside, London SE1 2AP. Authorised and regulated by the Financial Services
Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 57 Berkeley Square, London W1J 6ER.Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7500. This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any damage suffered as a consequence of software viruses that this email and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachments.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

**Project Dice**

*Management Meeting Attendees*

*The meetings will be held at Freshfields, 65 Fleet Street, London. Please ask for Christopher Yu*

| Company | Name | Commercial | Financial | Tax | Legal/Pensions/IT |
|---|---|---|---|---|---|
| | | | 1130-1700 | 1130-1700 | |
| | | | Martin Stewart (CFO), Mark Beraz (Head of Corp. Finance), Ian Smalle (Grp Financial Controller), Duncan Bratchell (Head of Tax) | | |
| Terra Firma | Alaz Punja | | Y | | |
| Terra Firma | Francois Van Der Spuy | | T | | |
| Terra Firma | Stephen Seymour | | Y | | |
| Terra Firma | Stephen Alexander | | | | |
| Terra Firma | Michael Hedegaard | | Y | | |
| Terra Firma | Dominic Spiel | | | Y | |
| Terra Firma | William Burnard | | | | |
| Terra Firma | Michael Saffery | | | | |
| Weil, Gotshal & Manges | Marco Compagnoni | | | | |
| Weil, Gotshal & Manges | Joanne Etherton | | | | |
| Weil, Gotshal & Manges | James Harvey | | | | |
| DKW | Bruce MacInnes | | Y | | |
| DKW | Sean Wetherston | | Y | | |
| KMPG | Anneli Collins | | | Y | |
| KMPG | Shevoni Rongenathan | | | Y | |
| KMPG | Sandip Shah | | Y | | |
| KMPG | Paul Snape | | Y | | |
| KMPG | Jeff Hurd | | | | |
| KMPG | Johnathan Green | | | | |
| LEK | Dan Schechter | | | | |
| LEK | Larry Miller | | | | |
| McKinsey | Allison Schneider | | | | |
| RBS | Adrian Walker | | | | |
| RBS | Stephen Llewellyn | | | | |
| RBS | Lucy Standing | | Y | | |
| RBS | Alex Tripes | | Y | | |
| Barclays Capital | Sunil Bhiore | | Y | | |
| Barclays Capital | Julian Hester | | Y | | |
| DB | David Buggs | | Y | | |
| DB | Etienne Kahy | | Y | | |
| UBS | Marcus Ehner | | Y | | |
| UBS | Scott Vreiben | | Y | | |
| Citigroup | Paul Simpkin | | | | |
| Citigroup | Stuart Poynor | | Y | | |
| Citigroup | Ricardo Costa | | Y | | |

Terra Firma Capital Partners Confidential

Page 1

Meetings with Mulberry Management
May 14 2007, Terra Firma

## QUESTIONS GROUPINGS

Commercial.....................................2
Financial.....................................5
Tax.....................................7
Legal / Pensions.....................................8

Confidential

Meetings with Mulberry Management
May 14 2007, Terra Firma

## COMMERCIAL

**Industry overview**

1. How does management see the music market evolving over the next five years?
    a. Content v. music
    b. Physical v. digital
    c. Album v. single track
    d. Current / backlist / long tail
    e. Digital / physical formats
    f. Retail trends (Physical & digital)
    g. Online pricing models
    h. Subscription / download / advertising models
    i. Music-enabled devices
    j. Evolution of musical genres
    k. Piracy (incidence, substitution by country)
    l. Other new revenue (e.g. live events)
2. What initiatives has management undertaken/intends to undertake in order to adapt Mulberry to the new market dynamics?
3. How does Mulberry view evolution of pricing by distribution method?
4. How does management view evolution of royalty payments & artist contracts?
5. How does management view mobile market evolving? (what services with what ARPU)

**MUSIC OVERVIEW**

1. Please describe the strategy vis-à-vis core geographies, including genre:
    i. UK
    ii. Europe
    iii. United States
    iv. Japan
    a. Where does management see relative strength / growth opportunity over the next five years?
    b. Where are the risk areas?
2. What does management see as its normalised market share (physical and digital)? What support can be given for management's views?
3. What does management see as its natural market share (physical and digital)?
4. What labels/genres are particularly profitable?
5. What is management's strategy in smaller operations in other markets?
6. Drivers of Mulberry revenue:
    a. Wholesale price per physical CD
    b. Wholesale price per digital track
    c. Royalty per song
        i. How does management view evolution of royalty payments & artist contracts over the next five years?
    d. Royalty per ring tune
    e. How does this vary across US / UK / Europe?

**Meetings with Mulberry Management**
**May 14 2007, Terra Firma**

7. What are the key new releases / re-releases scheduled for FY 2008 / 2009? What were the sales figures of the previous releases of the same artists?
8. How does Dice assess ROI on marketing spend for each brand?
9. What is the process for agreeing A&R spend and the signing of artists?

**Physical**

1. Neighbouring rights & royalty / licensing income
   a. Please discuss the characteristics / drivers.
      i. New media
   b. What is the split between new release & catalogue?
   c. What is split between traditional (physical & digital) and non-traditional distribution (e.g., synchronization / mobile) streams?
   d. What costs are associated?
      i. Marketing? Collection costs?
2. Returns:
   a. Under what conditions does the company contribute to the shipping cost of returns?
3. March / September catalogue campaign
   a. Please describe the dynamics. To what extent has this been driven by public company reporting requirements?
   b. How do you foresee this as a component of the annual sales?
   c. What percentage of sales represented?
   d. What percentage of catalogue sales (as opposed to new releases)?
4. Market share:
   Discuss the drop in sales and market share in Q1 2007

**Digital**

1. Please describe the key strategies that management has for monetizing consumption of music in the digital media world?
   a. Please discuss the arrangement with Apple. What are the early results?
   b. Please discuss online pricing models more generally
2. Please discuss the A&R strategy in the transition to digital.
3. Please discuss the production / origination strategy in the transition to digital
4. What is EMI's strategy vis-à-vis mobile consumption of music?
   a. Growth in music enabled devices, as well as increased opportunity for sideloading.

**Costs**

1. What are EBITDA margins in digital v. physical for recorded music?
2. Please provide a breakdown of main sources of savings in RE3 and RE4 as well as future potential in terms of:
   a. Reducing management layers
   b. Closing smaller country offices
   c. Combining labels
   d. Close duplicate head office(s)
   e. Consolidating back-office functions across labels
   f. General overhead reductions

**Meetings with Mulberry Management**
**May 14 2007, Terra Firma**

   g. PLC costs that could be eliminated
3. What further cost reductions has management identified
   a. Fixed
   b. Variable
   c. Manufacturing / distribution
4. Marketing cost strategy
5. Production / origination costs

**PUBLISHING**
**Revenues**

1. Please describe split of publishing revenue between new release / catalogue; copyrights v. administration rights.
   a. Across physical and digital.
2. How is Mulberry positioned to take advantage of the forecast growth in synchronization and performance revenue streams
3. What impact do you expect new media initiatives to have?
4. What potential do you see for digital radio / subscription services?
5. What has Mulberry's strategy been historically vis-à-vis catalogue acquisition and disposal?
   a. What were the drivers behind the sale of MGM Catalogue in FY 2007?
6. Please discuss the negotiations between recorded music companies and music publishers before the US Copyright Royalty Board. What is management's expectation of settlement?
7. Is there strategic rationale in acquiring collection societies?

**Costs**

1. Where has the management found savings in the recent restructuring programs?
2. Where does management see potential cost savings / efficiencies, both separate from and combined with Music.

Confidential

Meetings with Mulberry Management
May 14 2007, Terra Firma

## FINANCIAL

1. Restructuring programme (RE4).
    a. Please detail the identified cost savings as described in management statements and the Deloitte report.
    b. What is potential impact to revenue as a result of the cost savings?
    c. What markets (geographic & genre) does management expect to be affected adversely?
    d. Please discuss the cost reduction items that fall within the "medium / lower" confidence level (as per vol.4iii, p.11 in the VDD).
    e. What is the delivery to date v. the plan?
2. What further areas of cost saving have been identified? Where do you see opportunity?
    a. Manufacturing
    b. Distribution
    c. A&R budget
    d. Marketing: shift to trade marketing
    e. Production
    f. PLC costs
    g. Procurement initiatives
    h. Consolidating back-office functions across labels
    i. Other overhead
3. What is the revenue performance of digital & mobile thus far in FY 08?
4. What are the margins for digital & mobile revenues?
5. What are the revenue opportunities and margins from touring & merchandising?
    a. What opportunity do you see for other alternative revenue streams (and margins)?
6. What opportunity do you see to improve revenue & margin performance in the various markets?
    a. By geography
    b. By genre
7. Please provide the split of revenue & margin across the following categories of performers (for each of Music and Publishing):
    a. stars;
    b. emerging acts;
    c. seed artists;
    d. back catalogue.
8. What opportunities do you see for exploiting the value of the back catalogue?
    a. Music
    b. Publishing
9. What are the margins for catalogue sales v. new release?
    a. Music
    b. Publishing
10. What are the margins for revenue from compilation sales?
11. What is the historic performance of the key releases projected for FY 2008 and FY 2009?
12. What has management considered to reduce the impact of currency movements?

**Meetings with Mulberry Management**
**May 14 2007, Terra Firma**

13. What approach does management have to manage the working capital movements amidst decline in physical and growth in digital growth?
14. What capex does management envision for Music and Publishing?
15. How does management view the cash conversion of EBITDA going forward?
16. Discuss the unquantified normalisation adjustments identified by Deloitte (charge for advance provisions, returns, MGM etc).
17. How confident is management of adding back £8-9m to EBITDA for Brazil for 2007/8 against background of underperformance in 2006/7?
18. Clarify differences in items for computing Enterprise Value as provided by Greenhill compared to Deloitte/VDD report
19. What is Project Typhoon and the potential cost of the put option?

Meetings with Mulberry Management
May 14 2007, Terra Firma

## TAX

1) A walkthrough of the group structure chart to better understand:
   a) which are the key companies in terms of profits, tax and assets (such as brand ownership)
   b) how the structure has evolved (through acquisitions, local mergers, expansion etc)
   c) what tax groupings exist
   d) the purpose of any low tax companies (such as intra group finance companies)
   e) details of any dividend blocks
   f) details of any check the box elections made
   g) details of any companies not subject to tax locally or not tax resident where incorporated
2) A summary of the tax filing position of the key group companies, including the extent to which tax returns and tax payments are made within the required deadlines and confirmation of the periods agreed by the tax authorities.
3) Details of any significant tax planning undertaken in the past or planned for the future (such as debt push downs, IP planning, sale and leasebacks, transfer tax planning, VAT/sales tax planning, double dips structures etc), discussions with tax authorities thereon and details of any provisions made
4) Details of any significant tax exposures, the status of any related discussions with tax authorities; the status of any ongoing tax audits and the approach taken for providing for potential exposures.
5) Details of the effective tax rate in each of the key countries and an explanation of why this differs from the statutory rate
6) Details of the group's most significant tax assets (such as tax losses) including any restrictions on future uses and implications of change of control for tax purposes;
7) Details of any tax deferrals or latent gains (attaching to shares, debt or other assets) and circumstances in which these may be clawed back / reversed.
8) Details of the existing internal and external group financing structure (e.g. details of cash balances within the group, borrowers of third party debt and intra group loan relationships)
9) Details of the current securitisation plans

Confidential

Meetings with Mulberry Management
May 14 2007, Terra Firma

## LEGAL AND PENSIONS

**Corporate**

1 What is the status of the restructuring of the group announced in April 2006 (particularly in Japan) and what further costs of this restructuring are anticipated?

2 If an offer is made to acquire Mulberry Group plc ("Mulberry ") by way of a scheme of arrangement or offer will all share options that are not exercised lapse?

3 What impact does a change of control of Mulberry have on the following joint ventures of the group:

(i) Lamp Caps Ltd (with Osram Limited);

(ii) British Lion Music Limited (with J Craig and M Edwards);

(iii) Kennedy Street Music (with Kennedy Street Enterprises Limited);

(iv) Hermusic Limited (with Frimp Limited, Herman's Hermits and Kennedy Street Enterprises Limited);

(v) Mulberry Paradise Music Limited (with Terence Nelhams);

(vi) Moss Rose Music Limited (with John Beinstock);

(vii) DGI Library Limited (with GL Scargill and PN Oldroyd);

(viii) The Ded Good Music Library Limited (with GL Scargill and PN Oldroyd);

(ix) Brille Records Limited (with LA Silverman); and

(x) Relentless 2006 Limited (P Franklyn and S Jobanputra),

4 Are there any other joint ventures and, if so, will a change of control of Mulberry have an impact on them?

5 Are there any joint ventures where the rights or obligations of the Mulberry group party are not commensurate with its shareholdings and, if so, what are they?

6 Have any disposals been made by the group in the last three years from which there are outstanding obligations on or outstanding consideration owed to any group company (including the former manufacturing plant in Gotemba, Japan)?

7 Has the group made any acquisitions in the last three years where there is any outstanding consideration still due?

Meetings with Mulberry Management
May 14 2007, Terra Firma

**Commercial**

8 Who are the group's top 20 artists (by sales of their singles/albums) and what percentage of revenue of the group does their work command?

9 Do any of your contracts with your top 20 artists, (by sales of their singles/albums) have change of control clauses or expire prior to 31 December 2010? What is: (a) the typical notice period allowing Mulberry to terminate for convenience; and (b) the minimum term for each such arrangement?

10 What is the current level of contingent liabilities in the group? Describe their nature. How does this compare to historical levels? Do you expect an increase in contingent liabilities in the near future? Are there any commitments and contingencies not disclosed in the public documentation?

11 If the sole manufacturer/supplier/distributor in a jurisdiction was unable to fulfil its obligations under its contract, how long would it take to source and bring a replacement on-line?

12 Are any material contracts in Mulberry 's manufacturing/supply/distribution network (e.g. with collection societies) affected by a change of control?

**Finance**

13 Overview of breakdown of current net debt into its components including gross debt, inter-company loans, third party debt both at a group and individual company level etc (e.g. breakdown by each element of debt, hedge gain/loss and cash etc).

14 Derivatives financial instruments; overview of policy, practice, fair values (as at 30 April 2007) and whether on ISDA standard terms.

15 Overview of existing financial arrangements and any break costs in refinancing (or triggered on a change of control).

16 What stage is the proposed securitisation of the group's publishing royalties at?

**Competition/Regulatory**

17 Identify any genres of music where Mulberry has a particularly strong presence compared to its competitors.

18 Explain the function of the Iranian company in the group.

**Litigation**

19 *Mulberry v. Infospace, et al*


**Meetings with Mulberry Management**
**May 14 2007, Terra Firma**

What is the status of this claim where Mulberry is alleging that Infospace violated the terms of various licences, under which Mulberry provided copyrighted materials to Infospace, who in turn sold ringtones based on those copyrighted materials? What is the expectation of a successful outcome for Mulberry?

20 What is the position of Mulberry on the opinion of the Register of Copyrights in the US, on 16 October 2006, that the compulsory licensing scheme provided for under section 115 of the U.S. Copyright Act applies to the use of copyrighted works in ringtones? What effect will this decision have on the business of Mulberry going forward?

21. Are there any ongoing disputes over ownership of the back catalogue of the group?

**Pensions**

22 Brief overview of the pension arrangements operated by the group?

23 What is the status of the discussions with the trustees on the March 2006 valuation of the Defined Benefit scheme? Has the schedule of contributions and deficit repayment plan been finalised and submitted to the Regulator?

24 What is the relationship between Mulberry and the trustees?

25 How are the pensions assets invested?

26 Outline current finance arrangements. In particular what is current level of bank debt and are all company assets currently subject to a charge in favour of the Banks?

27 Is the plan open to new entrants? Are there any proposals to change benefits?

28 Are there any disputes re pension membership/benefits?

29 Are there any separate top-up, supplemental or unfunded arrangements?

30 Details of any contingent financial support provided to the pension arrangements (e.g. guarantees and charges) or any proposals to enter into such arrangements.

31 Are any members of the UK defined benefit arrangements domiciled in non-UK EU states?

**Employment**

32 Are there any proposed redundancies from the reorganisation announced in April 2006 and if so, what are the anticipated costs?

33 Do any senior employees have notice periods of greater than 6 months?

34 Are there any bonuses currently outstanding to employees of the group?

35 What is the turnover of employees in the last 6 months? Have any of these been senior employees?

36 Are there bonus schemes in operation and if so to whom do they apply (i.e. grade of employee), what is the nature of payment (are they purely discretionary or linked to performance criteria) and what are the levels of payment?

37 Is there any union representation and/or are there any agreements regarding consultation with employees (such as an agreement under the ICE Regulations)?

**Intellectual Property**

38 Identify the most important licences/agreements with on-line/digital/mobile providers and identify any change of control issues which would be triggered by this transaction. Specify the typical notice period allowing Mulberry to terminate for convenience under each such arrangement.

39 The 2006 annual report refers to a Heads of Agreement signed by Mulberry Music Publishing in relation to licensing of on-line rights. Clarify whether a full form agreement has been signed and again identify whether or not such agreement or any similar agreements have any change of control clauses which would be triggered by this transaction.

40 Identify the 5 most important contracts or agreements in relation to the group's IT/systems infrastructure and manufacturing operations and identify any change of control issues.

41 Piracy – what specific measures are the group implementing in terms of lobbying and collective legal action?

42 Imminent loss of copyright over significant back catalogue titles – what specific measures are the group implementing to address this?

43 Is any group company involved in a material dispute with any licensor or licensee under any licences?

44 Do any particular procedures exist to ensure that the group does not infringe copyright, database rights, trade marks, design rights or confidential information proprietary to third parties?

45 Are there any significant artists that own rights in their works contrary to Mulberry's preferred model?

46 Provide details of any monitoring and/or enforcement policy in relation to any trade marks and domain names. Are internal or external trade mark agents used?

Meetings with Mulberry Management
May 14 2007, Terra Firma

47 Does Mulberry effectively control the ownership of IP created for it by employees and third party consultants/contractors?

48 What arrangements does the group have in place against the disclosure of confidential information by a group company?

**Information Technology**

49 What investments in IT are being made to develop global marketing tools and royalty payment systems? How much are these investments and what stage has the development reached?

50 To what extent does the group rely on third party software and hardware? Does it develop software in-house? Does the group own the copyright in all of the software it uses?

51 Does the group own the copyright in its website design?

52 Please detail any material recurring technical problems with each group company's computer systems and details of any material system failures or data loss which have occurred in the past 12 months.

53 Does the group have access to the source codes of its computer programs?

**Property/Assets**

54 Does the group own or use any unique real estate facilities which cannot be replicated e.g. recording studios?

55 The 2006 accounts refer to £67m freehold property assets of the group; what do these consist of beyond offices and recording studios and where are they located?

56 Does the group own or lease all assets necessary to carry on the business?

57 Where are CDs/DVDs and other products stored prior to shipping? How is the distribution network of the group set up?

58 What are the levels of obsolescence of stock in the business?

**Environmental**

59 Have there been any environmental claims made against any group company or environmental clean up costs for which a group company is responsible in the last 3 years and are any anticipated in the future?

Case: 11-126 Document: 48 Page: 195 04/25/2011 272867 401
A-994

Meetings with Mulberry Management
May 14 2007, Terra Firma

13 of 13

Confidential

TF0000323490

| | |
|---|---|
| **From:** | Francois Van Der Spuy |
| **Sent:** | Tuesday, May 15, 2007 2:54 PM |
| **To:** | TFCP Managing Directors; Henry Ford |
| **Cc:** | Guys Support Team; TF Team Dice; Kirsten Randell; Claire Cassar; Jayne Mockford; Michael Hedegaard |
| **Subject:** | IAC memo: Dice |

See attached.

IAC Dice update memo 15 May 07...

Francois van der Spuy
Director
Terra Firma Capital Partners

2 More London Riverside
London
SE1 2AP

Tel: +44 (0)20 7015 9623
Fax: +44 (0)20 7015 9501

EXHIBIT
van der Spuy
7
MS 7·7·10

1

Case: 11-126 Document: 48 Page: 197 04/25/2011 272867 401

A-996

terra firma

# Memo

**To** The IAC
**cc:** Andrew Chadd
**From** Riaz Punja, Francois van der Spuy, Stephen Seymour, Stephen Alexander, Michael Hedegaard, Don Hoang, Matthew Hodgkinson
**Date** 15 May 2007
**Subject** Project Dice: Update

*This memo contains confidential information that must be kept confidential.*

*It also contains information that may be unpublished price sensitive or inside information because securities of the target are listed on the London Stock Exchange. Your attention is drawn to your obligations relating to such information under Part V of the Criminal Justice Act 1993 (the "Act"), the City Code on Takeovers and Mergers and the Listing Rules of the UK Listing Authority in England and Wales. Accordingly, you must not disclose such information or deal in, or encourage others to deal in, the securities of the target or otherwise engage in any activity prohibited by the Act.*

## Background

The team has revisited the opportunity to acquire Dice plc, the third-largest recorded music company and largest music publisher, in a public-to-private acquisition ("Project Dice").

The purpose of this memo is to update the IAC on the team's current views on valuation for Dice.

## Current status of the bid

The current status of the bid is as follows:

**Due diligence:** Since the last IAC recommended to the GP and the GP approved an offer price of 265p, the team has conducted detailed due diligence with KPMG (financial, tax and structuring), McKinsey and LEK (commercial) and legal (Weil). The team has also had access to a VDD report prepared by Deloitte & Touche, a data room and a full day of management meetings on Monday, May 14.

**Financing:** The team has signed NDAs with 6 banks of which 5 are still interested in providing financing. Indicative financing packages have been received from Deutsche bank, Citi (to be confirmed later today) and RBC. Barclays and RBS have not provided packages yet. It is likely that DB and Citi will be the two banks with the highest probably of obtaining credit committee approval before or on Friday.

**Process:** The team has been working with its advisers and financing providers to enable the GP to be in a position to submit a fully financed offer on Friday, May 18. Advisory Board presentations have been scheduled for May 17 to approve the cross fund transaction with an IAC and a GP meeting scheduled for Thursday evening and Friday morning, respectively.

## Equity commitment

Based on the 265p share price and bank financing of £2.1b, the total equity required for the transaction is c.£1.8bn. An offer to Dice will therefore require either an equity bridge provided by the finance providers or use of the bridge to high yield tranche as offered by Deutsche Bank.

Confidential

**Valuation assumptions**

**Financing & Capital Structure Assumptions**

The key financing related assumptions are as follows:

- **Debt:** Separate financing of the Music and Music Publishing business with the Music business financed at a Senior Term Loan B of £725m at a margin of 250bps and the Publishing business financed through a senior securitisation bridge of £1,410m at a margin of 200bps, increasing by 25bps each 6 months with a cap of 300bps. This is based on Deutsche Bank's offer which also has the option of an additional £365m of sub bridge to high yield at a margin of 450bps.
- **Pension deficit:** Upfront payment of £50m followed by an additional £150m upon exit in year 5. The downside case assumes an upfront payment of £100m followed by annual contributions of £20m for 5 years (a total cash contribution in both cases of £200m). After a meeting of the Trustees today, changes in the funding calculations are expected to be ratified resulting in an elimination of the FRS 17 deficit. Based on the input from KPMG and Weil as well as Andrew Chadd, the above scenarios were agreed.
- **Japan:** Japan's operations assumed to be sold (in 2008) for £425m
  - Dice acquired the remaining 50% of TOEMI (expected to complete in Q207) for £93m. Dice reported that TOEMI generated EBITDA of c.£30m in FY07.

Confidential

terra firma

Key operational assumptions

| Business / Driver | TF Base Case Assumption | Rationale |
|---|---|---|
| **Strategic** | Assumes sale of Japan in 2008 for £425m | £30m EBITDA + 50% x £30m overhead<br>9-10x multiple |
| **Physical** | | |
| Dice Revenue decline<br>FY ending March | CAGR FY ('06-'10) (11%) | Market Forecasts:<br>LEK: 11% CAGR decline (TBC)<br>Enders 9% CAGR decline |
| **Digital** | | |
| Dice<br>FY ending March | CAGR FY ('06-'10) 34%<br>Dice not assumed to increase market share | Market forecasts<br>LEK<br>• Digital 22%<br>• Mobile: 66%<br>Enders<br>• Digital 36%<br>• Mobile: 21% |
| **Recorded Music EBITDA Margin** | 2007: 6%<br>2009: 22%<br>2012: 23% | Due to cost savings and reduction in marketing cost from 16.6% in 2006 to 15% by 2010.<br>Margin improvement also due to increased contribution by digital, which has higher contribution margins |
| **Costs** | £110m restructuring costs already announced achieved by FY2009<br>• Incremental £50m, plus £10m plc costs achieved in 2009-09 | |
| **PUBLISHING** | 2.1% revenue CAGR '06-'11,<br>£30m of NPS acquisitions in 2008<br>Margins increase from 28% in 2007 to 32% in 2012 | McKinsey: 2.5% CAGR<br>Enders: 1.9% CAGR |

Confidential

terra firma

**Profit improvement plan**

The team has identified c.£45-65m of potential cost savings not including PLC costs of c.£10-15m. The Base Case model incorporates £50m of cost savings and £10m of PLC cost savings. The key areas identified are below.

| Key driver / EBITDA impact | Assumption | Summary rationale |
|---|---|---|
| Procurement £10-15m | £360m addressable spending; 3-7% saving on most categories | Currently no procurement function on Group level – only 3 procurement staff in entire group; no culture of cost control |
| Outsourcing £15-20m | Outsource back office functions | Current costs very high; systems not integrated; currently based in very expensive office locations |
| US New Releases £10-15m | Further savings according to management | Return NR business to break-even; alternative is to merge this operation with other major in 25/75 JV |
| Cont. Europe £5-10m | Close offices in some smaller countries | Austria, for example, has £3m overhead and 2% local content... Switzerland, Sweden etc. |
| LatAm / SE Asia £5m | Licensing model | Allows to reduce overhead but loses half of gross margin |

**Key opportunities confirmed in diligence**

Synchronization is an opportunity for recorded music companies. Thus far, synchronization revenue has accrued to publishers, but there is opportunity for recorded music companies to generate revenue from licensing music to YouTube, Myspace, Bebo and other sites.

Consolidation of Publishing is a primary driver of value given the inherent scalability of the operations. The team has heard that Dice could double its one million copyrights under management with additional headcount of 20.

- Several publishing catalogues are owned by private equity firms and are likely to be candidates for sale in the near- to medium-term.

Potential to sell Recorded Music to Whist: while there continues to be regulatory uncertainty surrounding the EU review of the Sony BMG merger (which was completed in 2004), there is increasing support for the combination of Whist and Dice in the industry.

- Whist again approached Dice on March 2 with an offer of 260p, having secured the support of IMPALA, the consortium of independent labels in Europe that challenged the SonyBMG merger.

**Potential opportunities to be explored further**

Advertising: Dice has recently signed deals with websites such as Spiral Frog and Baidu (in China), which are developing an advertising-based revenue model for free music downloads. This model is in its infancy, but could provide revenue opportunity from otherwise "pirated" music downloads. One area of concern is that the advertising-based revenue model further devalues music by continuing the perception that music is available for without the customer's need to pay.

**Valuation**

The table below illustrates Dice's enterprise value and funding required at 265p/share, the potential offer price for Dice.

| Dice Enterprise Value @ 265p/share | |
|---|---|
| (£m, unless noted) | |
| Per share price (p) | 265 |
| FD shares outstanding* | 926 |
| Equity valuation | £2,455 |
| Net debt** | 1,136 |
| Minority interests | 0 |
| Enterprise valuation | £3,590 |
| New Cash in Co | 100 |
| Transaction Expenses*** | 176 |
| Total Funding Required | £3,906 |
| EV / 2007E EBITDA**** | **20.6x** |
| EV / 2008E EBITDA | 13.1x |

* Based on basic shares of 800m, converted options of 19.3m and 107m shares from convertible debt.

** Assumes average net debt of £1,175m, less £39.5m of proceeds from options conversion.

*** Includes £40m pension funding, £65m of debt redemption premia and related costs, and £72m of transaction costs.

**** EV/EBITDA multiple shown is pre-transaction costs. Post-transaction costs, EV/EBITDA multiple is 23.0x 2007 EBITDA; 14.0x 2008E EBITDA.

The team has modelled three valuation scenarios:

**Base case:** This case assumes that the Music and Music Publishing business are both operated in its current form in terms of genre and geographic focus, with the exception of a sale of the Japan business. In addition, it assumes full implementation of the RE4 restructuring plan (largely implemented) as well as an additional £50m of cost savings and £10m of PLC cost savings

**Business model repositioning case:** The case assumes a repositioning of the Music business to concentrate on its core UK/European operations and will involve repositioning its US. The scenario assumes the closure / disposal of Capitol Virgin (frontline US rock& pop) and focus on catalogue and more profitable niche genres. Further analysis is required to develop this scenario further for reduction in Latin American and South East Asian operations to licensing agreements.

**Run off case:** The case assumes that Music experiences a greater decline in overall revenues (4% greater CAGR decline) resulting in closure of New Release operations across all territories, focusing purely on the catalogue, compilation and Classic &Jazz business, with a head office cost operation of c.£60m p.a.

The returns from Dice under the various scenarios are as follows:

| | Base case | Business model repositioning | Run off |
|---|---|---|---|
| IRR | 14.4% | 18.2% | 11.3% |
| Cash multiple (x) | 1.9x | 2.3x | 1.7x |
| Equity (incl.day one costs) | 1,733 | 1,733 | 1,783 |
| Leverage (%) | 55.2% | 55.2% | 54.5% |
| Total EV (debt free, cash free) (£m) | 3,590 | 3,590 | 3,590 |
| EV / EBITDA 07 (x) | 20.6x | 20.6x | 20.6x |
| EV / EBITDA 08 (x) | 13.1x | 13.1x | 13.1x |

terra firma

The table below show the returns to the base case at a share price range of 230p and 265p.

| IRR and CoCM at various share prices | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dice equity share price (p) | | | | | | | |
| | 230p | 235p | 240p | 245p | 250p | 255p | 260p | 265p |
| IRR | 19.1% | 18.3% | 17.6% | 16.9% | 16.3% | 15.6% | 15.0% | 14.4% |
| CoCM | 2.4x | 2.3x | 2.2x | 2.2x | 2.1x | 2.1x | 2.0x | 1.9x |

**Recommendation**

To recommend to GP 2 and GP 3 to approve continuing evaluating and refining the opportunity with a view to submitting a fully-financed binding offer for Dice on Friday, May 18.

| Recommendation | IAC Approval/ Rejection | Conditions/Comments |
|---|---|---|
| To recommend to GP 2 and GP 3 to approve continuing evaluating and refining the opportunity with a view to submitting a fully-financed binding offer for Dice on Friday, May 18. | | |

Confirmed:

.........................................

Member of the Investment Advisory Committee

Approved By:.....................................

.....................................................

For and on behalf of
Terra Firma Investments (GP) 2 Limited

Approved By:.....................................

.....................................................

For and on behalf of
Terra Firma Investments (GP) 3 Limited

EXHIBIT
DOLENEC
8
06·18·10 CM

**From:** Riaz Punja
**Sent:** Thursday, May 17, 2007 6:30 AM
**To:** Guy Hands
**Cc:** Karen Dolenec; Francois Van Der Spuy; Tom Quigley
**Subject:** FW: Revised financing e-mail

Guy below is Karen's update. We can all have a longer conversation with you.

Telephone info:

1. Barclays: Main contact is David Shaw 0207 773 7099 mobile 07900 406 177
Top guy is Diamond as you know

2. Deutche Main contact is Nick Gaynor 0207 547 4662 mobile 0711037312

Top guy – could you please ask Q? I don't know

3. Cit Main contact is Paul Simpkin 0207 986

Top guy is Michael Klein as you know

Facility for share purchase. Tom is checking Cormac but may have to be non recourse given TF's imits on recourse.

I have left a message for David Wormsley to call me asap so that he can give us the name of the best person to talk on this. Not sure Paul Simpkins will be helpful there. Maybe you can ask him if you speak to him first

**Terra Firma Capital Partners**
2 More London Riverside
London
SE1 2AP

Tel: +44 (0) 20 7015 9620
Fax: +44 (0) 20 7015 9505

---

**From:** Karen Dolenec
**Sent:** 17 May 2007 11:07
**To:** Riaz Punja
**Subject:** Revised financing e-mail

The structure we are targeting is still the DB proposal:

- £1,410m of bridge to a securitisation on the publishing business. It is a 12 month bridge with a 7/8 year term out at a margin of 200 bps, stepping up 25 bps every 6 mos and capped at 300 bps. DB has not been able to give us a very clear steer on the ultimate take-out citing their internal conflict with the company. What I have gleaned is that out of the 12x total quantum, 10.5x will be a senior tranche priced at 90-95 bps including the costs of wrapping. The remainder will be a subordinated tranche at 450-500 bps. The blended margin will be in the 140s.

- £725m of term loan B on the recording business. This is an 8-yr bullet at 250 bps.

- £365m bridge to high-yield or equity on the recording business. It is a 12 month bridge with a 9 year term out at a margin of 450 bps, stepping up 50 bps every 3 mos and capped at 10.5% cash/11.5% total. The high yield take out has a 10-yr term and a margin of 525 bps. It is proposed to be NC1, 102, 101, par.

- We have also asked for a revolver of £350m (mainly against the recording business) and an acquisition facility, £100m committed and £200m uncommitted (mainly against the publishing business).

- Total drawn debt is £2.5bn.

Status for each bank is as follows:

- DB - After pitching that they would underwrite 100%, they are now saying that they are only willing to do 50% and that would require full board approval which can't happen until Tuesday. For Friday afternoon, they will be able to target 1/3 of the package (vs. £1bn which they told us earlier in the day). They cannot go to the committee on Friday with both the 1/3 option and the 50% option. Nick Gaynor feels that a fully financed bid is not required on Friday and doesn't think other bidders will be there but cautioned against using his advice for an decision-making purpose. I sense there is something else going on here but don't know what.

- Citi - They are going to committee tonight on the above structure but are stuggling with some structuring points. The ultimate concern is on the securitisation take-out because they have not been involved in the rating agency discussions. I was on a call with them and DB yesterday on which DB shared some of the feedback from the agencies with them. The concern on the take-out is translating into issues with the bridge structure because the various pieces of debt are not actually segragated on day 1. We think that they still believe that DB are ahead of them, and we need to keep this pressure on. **Issues here are whether they will end up going for and getting approval for 100% of the package and that they may change the proposed structure to deal with some of their concerns.** We don't think the quantum will change.

- Barclays - I went back to them with the above structure yesterday. They were some way off and originally thought they were too far away to get there. We subsequently had a call with them during which we asked them to get as close to £2.5bn as possible with an equity bridge portion if required. We also asked if they could get there by Monday as opposed to their original proposal of Tuesday. We are waiting to hear back.

K

**From:** Simon Borrows
**Sent:** Thursday, April 26, 2007 8:53 PM
**To:** Peter Bell
**Subject:** Re:

I will call jg tomorrow am
--------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Peter Bell
To: Simon Borrows
Sent: Thu Apr 26 19:19:01 2007
Subject:

I have left you a voicemail message re the Citi leverage request. Martin has already had that request from Citi and also DB. He and Mark are in favour of giving clearance for them to work with any of the three bidders, particularly given the perceived weakness of debt funding to PE houses for this deal. However, they are mindful of the financial adviser conflict perception but think the benefits to shareholders outweigh that particularly given Greenhill's role (I agree with their reasoning). In light of the conflict issue, Martin asked me to get you to confirm with JG that he is happy to release Citi and DB's leverage finance teams (who would be ring-fenced; to talk to the bidders. Let me know if you'd like me to call JG directly on this one. Martin is expecting confirmation back from you or me once you've confirmed with JG so he can go back to Citi and DB.

Peter

Peter Bell

Principal

Greenhill & Co. International LLP

Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421

Fax: +44 20 7198 7521

Mob: +44 7788 442 576

Email: pbell@greenhill.com <mailto:pbell@greenhill.com>

Website: www.greenhill.com <http://www.greenhill.com>

EXHIBIT
BELL 9

**Fong, Jade [EMA-LEGAL]**

**From:** Lee, Wayne Z [CIB-GCO]
**Sent:** 02 May 2007 18:55
**To:** Scelfo, Brian [CIB-GBKG]; Coleman, Brad [ICG-GBKG]; Plotnik, Michael F [ICG-GBKG]; Adler, Irina [CIB-GBKG]; Wirdnam, David J [CIB-GFI]; Rasmussen, Klaus [CIB-GFI]; Anderson, Christian [ICG-CMO]; Mandel, David E [CIB-GFI]; Beemer, Zachary [ICG-CMO]
**Cc:** Connell III, Philip G [ICG-GTS]; *GCO NY NOTIFICATION; *GCIB Conflict Check Europe
**Subject:** Control Group Notification - Project Earl

This e-mail is to notify you that your deal team has been ring-fenced by the Control Group with respect to your assignment on Project Earl. As a result, you are hereby advised that your team is considered walled-off from discussing this transaction with any others without the prior approval from Legal or the Control Group. To that end, please forward to us any communication that you may receive that is not in direct relation to this assignment.

Listed below are the names of employees that are currently registered with the Control Group for this assignment. Please contact us immediately if the below list is inaccurate or incomplete.

**SCELFO, BRIAN**
**COLEMAN, BRAD**
**PLOTNIK, MICHAEL**
**ADLER, IRINA**
**WIRDNAM, DAVID**
**RASMUSSEN, KLAUS**
**ANDERSON, CHRISTIAN**
**MANDEL, DAVID ELIAS**
**BEEMER, ZACHARY**

In addition, attached please find the DDT memo that explains in detail our Legal and Control Group procedures in these situations. You are reminded to keep this notification e-mail for your records.

DDT Memo - Final.doc

Wayne Lee
Citigroup
Global Control Group
212-723-3702 Office
212-723-2980 fax

**Fong, Jade [EMA-LEGAL]**

| | |
|---|---|
| **From:** | Fong, Jade [EMA-LEGAL] |
| **Sent:** | 15 May 2007 11:23 |
| **To:** | Vakilian, Sajjad [ICG-GBKG] |
| **Cc:** | *GCIB Conflict Check Europe |
| **Subject:** | Full DDT procedures - project Dice |

Sajjad,

**Acquisition Finance for TERRA FIRMA CAPITAL PARTNERS LTD, submitted for review on 05/14/07 by Sajjad Vakilian**

Due to other activity in the firm you are required to maintain a segregated team for this transaction. As such, I am sending you the attached procedures for your team to adhere to. I would be grateful if you could forward the procedures to the current team members.

I have the following persons registered as being on the deal team:

BAYAZID, TAREK WAEL
BLANCO GARCIA, MANUEL
COATS, RICARDO
DUBIN, DAVID HENRY
GOVINDIA, KUNAL
LORKIN, MARK EDWIN
PARRY, OWAIN DAVID
POYSER, STUART
SIMPKIN, PAUL A
VAKILIAN, SAJJAD

**Could you please:**

1) **Confirm you have forwarded the procedures to the above deal team members. It is your responsibility to ensure that any new team members on this project receive these procedures.**
2) **Confirm that the above deal team list is complete and there have been no changes or additions to the team. You are required to contact the Control Group prior to making any additions to the deal team.**
3) **Confirm that no confidential information provided by the client in respect of this transaction has been distributed or made available outside of the deal team.**
4) **In order to ensure that this team is segregated from any conflicting transaction, please indicate which business groups are working on this deal (eg IBD only or IBD and Securitisation). Please also indicate the floor location floor number) for these units.**

Please keep us informed of any other significant developments.

Regards

Jade

**Jade Fong**
**EMEA Control Group**
**General Counsel's Office**
**Citigroup Corporate and Investment Bank**
**Tel: +44 (0)20 7508 7611**
**Fax: +44 (0)20 7508 9110**
**Web: http://www.emea.citigroup.net/compliance/control_group/index.shtml**

*DDT Full*
Procedures.doc

**From:** Guy Hayward-Cole [guy.hayward-cole@db.com]
**Sent:** Friday, May 04, 2007 6:43 PM
**To:** Peter Bell
**Cc:** Charlie.foreman@db.com; Anthony Burgess
**Subject:** DB financing trees

Peter
Ahead of the management presentations next week , I wanted to let you know where we currently stand on my colleagues ' financing discussions with buyers :
- we have set up 3 separate financing trees , 2 out of New York for Cerberus and OEP and 1 out of London for Fortress
- these are being operated under the terms of our agreement with EMI in terms of ringfencing and team segragation .

Perhaps you could pass on to relevant people within EMI and do call if you need further clarity . If not before , I will see you next week at the meetings as agreed .
Kind regards

Guy

---

This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

EXHIBIT
HAYWARD-COLE
53
27-7-10

Confidential

To: 'John Gildersleeve'[GilderJ@cpwplc.com]
Cc: Nicoli, Eric[NicoliE@emigroup.com]
From: ASHCROFC
Sent: Thur 5/10/2007 8:08:16 PM
Importance: Normal
Sensitivity: None
Subject: FW: TF / DB financing tree

John

I assume this is OK - we need to maintain the competition. We already have a letter agreement with DB assuring us of ring fencing etc.

Thanks
Charles

-----Original Message-----
From: Guy Hayward-Cole [mailto:guy.hayward-cole@db.com]
Sent: 10 May 2007 21:05
To: Ashcroft, Charles
Subject: Fw: TF / DB financing tree

Charles
Please see below our request to set up a separate financing tree for Terra Firma . I trust this is OK .
Many thanks
Guy

----- Original Message -----
From: "Peter Bell" [pbell@greenhill.com]
Sent: 05/10/2007 10:13 AM
To: Guy Hayward-Cole/DMGIB/DMG UK/DeuBa@DBEMEA
Subject: Re: TF / DB financing tree

Ok, please inform Charles A and JG.

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 5721
Mob: +44 7788 442 576
Email: pbell@greenhill-co.com
Website: www.greenhill-co.com

----- Original Message -----
From: Guy Hayward-Cole <guy.hayward-cole@db.com>
To: Graham Watson <graham.watson@freshfields.com>; Peter Bell

EXHIBIT
HAYWARD-COLE
54
27-7-10

Cc: Charlie.foreman@db.com <Charlie.foreman@db.com>
Sent: Thu May 10 14:36:44 2007
Subject: TF / DB financing tree

Peter , Graham
I have been informed that Terra Firma have approached Deutsche Bank asking us to be one of their potential sources of financing .

We therefore intend to set up a financing tree within the guidelines agreed with EMI . I trust this is OK .
Kind regards

Guy

---

This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 57 Berkeley Square, London W1J 6ER.Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7500. This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any damage suffered as a consequence of software viruses that this email and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachments.

---

This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

From: Wormsley, David [CMB-GBKG] [97274@citigroup.com]
Sent: Sunday, May 06, 2007 9:57 PM
To: Smith, Matthew [CMB-GBKG]
Subject: EMI

Had a call from Guy Hands. They would like to see our debt package and want some bridge equity/co-investment. Can you call me asap

From: Wormsley, David [CMB-GBKG] [dw97274@imceu.eu.ssmb.com]
Sent: Tuesday, May 08, 2007 9:33 AM
To: Miller, Scott [CMB-GFICC]

I had a call from Guy Hands at Terra Firma who had spoken to Eric Nicoli at EMI. Eric had volunteered that we were potentially providing finance to some of the potential bidders. Guy would very much like us to provide terms to him as well. What is the best way to help him?

I am tied up for an hour but could call you then if that helped

**To:** TF Team Dice[TFTeamDice@terrafirma.com]
**Cc:** Phillip Burns[Phillip.Burns@terrafirma.com]; Julie Williamson[Julie.Williamson@terrafirma.com]
**From:** Christine Vallance
**Sent:** Tue 5/8/2007 12:25:14 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Dice & RBS

Dear all
Leith has given clearance for RBS to work with us on the debt side of Project Dice. The person to speak to is John Hurricane (020 7085 8286). Please could someone phone him as soon as possible to get RBS involved in the process. Permira has not released them to work with us on equity, however, only on debt.

Best wishes
Guy

PS Citigroup is clearing their conflict and hopefully will be able to work with us on debt soon. As soon as I have a name, I will come back to you.

*Dictated not seen*

**From:** Christine Vallance [Christine.Vallance@terrafirma.com] on behalf of Guy Hands [Guy.Hands@terrafirma.com]
**Sent:** Thursday, May 17, 2007 9:19 AM
**To:** Michael Klein (michael.klein@ssmb.com)
**Subject:** Please call me ASAP - on mobile in Guernsey +44 7785 255463

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

From: Curtis, Chris [CMB-CORP] [CC15087@imcnam.ssmb.com]
Sent: Thursday, May 17, 2007 9:42 AM
To: Klein, Michael [CMB-CORP]
Subject: Calling Guy in an hour is fine.

They also asked that I tell you that Guy is trying to track down Kamal Tabet.

-----Original Message-----
From: Klein, Michael [CMB-CORP]
Sent: Thursday, May 17, 2007 9:28 AM
To: Curtis, Chris [CMB-CORP]
Subject: Re: Wormsley holding here,, Guy Hands office just called

Can I call in an hour

-----Original Message-----
From: Curtis, Chris [CMB-CORP]
To: Klein, Michael [CMB-CORP]
Sent: Thu May 17 09:24:33 2007
Subject: Wormsley holding here,, Guy Hands office just called

Do you want to talk to Wormsley now??

**To:** Don Hoang[Don.Hoang@terrafirma.com]
**From:** Francois Van Der Spuy
**Sent:** Fri 5/18/2007 1:20:35 AM
**Importance:** High
**Sensitivity:** None
**Subject:** FW: Project Dice

TF Terms.doc

-----Original Message-----
From: Coats, Ricardo [mailto:ricardo.coats@citi.com]
Sent: 18 May 2007 00:08
To: Francois Van Der Spuy; Karen Dolenec
Cc: Simpkin, Paul ; Dubin, David ; Lorkin, Mark ; Poyser, Stuart
Subject: Project Dice
Importance: High

Francois and Karen -

With apologies for delay, please find attached our terms which have been approved by our credit committee.

Kind regards,

Ricardo.

Ricardo Coats
Citigroup Global Markets
Office: +44 (0)20 7986 7407
Mobile: +44 (0)7956 318 761

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

**Terms Accepted By Our Credit Committee**

Interim Facility

No major commercial comments. We would like the opportunity to discuss the transaction timing and the requirement of a certain funds period ending 212 days after posting of the scheme document.

Term Sheets

- Term Loan B at a margin of 250bps with 50bps of flex. Margin ratchet on Term Loan B to be limited to two ratchets. Revolver and facility shall have a margin of 200bps. Fee shall be 2%.

- High Yield Bridge at a margin of 450bps with 50bps step-ups each quarter after drawdown and an interest rate cap at 10.5% cash, and 11.5% total, with securities demand from 6-months after funding. The margin and interest rate caps shall be 50bps higher if the bond is rated CCC+ or worse. Commitment fee of 0.75% (non-rebateable), funding fee of 1.25% (to be rebateable against the takeout fee), takeout fee of 2.50%. To be par call for the first year and then to have standard high yield bond call protection.

- Dividends of excess proceeds/Business separation - We support your approach of treating the target as two separate businesses, (ie music publishing and recorded music) and your desire to extract excess proceeds if you sell or leverage either line of business at a higher multiple than the day one leverage. However, in order to achieve dividend extraction and cheaper pricing on the securitisation bridge, we consider the market will require (i) a covenant to use all reasonable efforts to achieve the legal/contractual separation of the two business lines as soon as practicable and (ii) a maximum pro forma leverage level for the parts of the business not sold or relevered as a cap on the ability to extract excess proceeds as a dividend.

- Financial covenant testing – we don't think the market will accept that the leverage covenant will only be tested when the revolver is drawn. On the equity cures, we can seek to get you consecutive cures and the ability to carry forward the benefit of each cure for the next three quarters if each cure when made is not in an amount in excess of the amount of required to cure the most recent default and there must be one quarter in each calendar year in which no cure is made.

- Change of Control - We would be happy to discuss with you the expected level of sell down of the equity in the initial six month period and to agree a minimum level of equity to be retained by the initial sponsors that are committed to the equity at the time we commit our debt funding.

- We would not recommend including the ability to redenominate debt tranches over time.

- We would like to better understand the request to provide second priority encumbrances in order to secure the pension liabilities.

General

Our counsel at Cleary have discussed a number of points with Weil and don't consider there will be any difficulty in resolving the legal and drafting points they have. We look forward to seeing the clear market, exclusivity and flex language we understand will be included in the next turn of the documents.

Securitisation

- Pricing increases by an additional 50 bps after six months if indicative ratings for the take-out have not been obtained, 100bps if at 12 months such indicative ratings have not been obtained.

- An additional flex of 50 bps which can be used at any time by a JLA to sell down its risk;

- A "go to market" clause and a requirement that BidCo use its best endeavours to achieve a separation of the music publishing and music recording business within 6 months of the Closing Date. This would be accompanied by the usual covenant requiring debt push down;

- Citi has at least a Joint Arranger / Joint Bookrunner title for the securitisation take-out;

- Citi has right of first or last refusal for pro-rata hedging and liability management;

- Mandatory prepayment of the Securitisation Bridge Facility from asset sales or disposals prior to securitisation;

- A full cash sweep until refinancing is achieved;

- Condition precedent: A securitisation structure paper prepared by Borrowers counsel (and agreed in principal by Citi's counsel) detailing the securitisation steps and debt pushdown including detailing the subsidiary companies to where debt is to be pushed down;

- Conditions subsequent: Within 6 months of the Closing Date: (i) (with a 2 month extension upon agreement) debt push down completed; and (ii) written feedback from at least 2 agencies allocating an IG rating to in respect of at least 65% of the EV of the Music Publishing Business;

- Hedging - 90-100% hedged for a minimum duration of 7 years;

- The Securitisation Bridge Facility tenor of 1 year with term-out to an additional 7 years and the pricing indicated (200 bps, 25 bps every quarter thereafter up to a cap of 300 bps) are acceptable subject to the above.

Securitization Bridge Facility Fees
- Upfront fees on securitization bridge facility of 1.5%

£100m Acquisition Facility
- Upfront fee on acquisition facility - 1.5%
- Commitment fee on acquisition facility - 0.80%

Securitisation Take Out
- Structuring Fee - 55bp on the aggregate securities issued to take out the bridge
- Distribution Fees (a) Investment grade - 65bps irrespective of market (b) Non Investment Grade - 2%
- No rebate against upfront financing costs
- Right to be Lead Arranger and Bookrunner (or Joint as applicable)for the Securitisation.

Other
- Right to match on derivatives business on market terms based upon our pro-rata loan amount for the initial acquisition facilities and separately for the securitisation as applicable
- Right to match on Liability Management on market terms to the extent it is required based upon our pro-rata loan amount

All third party fees in relation to the transaction to be at the client's expense (Bridge and Securitisation phase)

We believe the above terms deliver certainty to the participants in the Securitisation Bridge Facility that the facility will be pushed down and refinanced as quickly as possible, enabling securitisation bridge financing to be achieved in respect of a significant portion of the transaction debt from day 1.

EXHIBIT
DOLENEC
15
06-18-10 CM

**From:** richard.ginsburg@weil.com
**Sent:** Sunday, May 20, 2007 8:16 AM
**To:** DBillington@cgsh.com
**Cc:** arussell@cgsh.com; ashutter@cgsh.com; billington@ntlworld.com; bpetrovic@cgsh.com; david.dubin@citigroup.com; karen.dolenec@terrafirma.com; kunal.govindia@citigroup.com; mark.lorkin@citigroup.com; paul.simpkin@citigroup.com; peter.rawlings@citigroup.com; ricardo.coats@citigroup.com; trudy.cooke@terrafirma.com; faisal.ramzan@weil.com; peter.schwartz@weil.com
**Subject:** Re: Term sheet and commitment letter

**Importance:** High

**Attachments:** Project Dice -- Fee Letter (Citi)_#644531.DOC; Project Dice – Term Sheet (Citi)_#644792.DOC; Project Dice -- Commitment Letter (Citi)_#644520.DOC; Citi Comparisons.zip

Dear All:

Attached are revised drafts of the Commitment Letter, Fee Letter and Term Sheet, reflecting our discussions overnight and our review of the comments received earlier today. I have endeavoured to incorporate as many of your comments as possible and have put some of the requested changes in square brackets pending review by Terra Firma.

To facilitate your review I have attached a clean version of each of the documents (the WORD versions), along with comparisons to our last draft and to your markup (the .PDF versions in the zip-file) – other than the Fee Letter where I have only included a comparison to your last markup. In the interest of time these revised drafts are being circulated to all parties simultaneously, including to Terra Firma, and accordingly the remain subject to further review and comment.

Kind regards.

**Richard A. Ginsburg**

Weil, Gotshal & Manges

One South Place, London EC2M 2WG
(0)20 7903-1311 (Direct)
(0)20 7903-0990 (Fax)
(0)7787 564 049 (Mobile)
richard.ginsburg@weil.com

"David Billington" <DBillington@cgsh.com>

05/20/2007 03:50 AM

To richard.ginsburg@weil.com, faisal.ramzan@weil.com, karen.dolenec@terrafirma.com, trudy.cooke@terrafirma.com, peter.schwartz@weil.com

cc "Home" <billington@ntlworld.com>, "Andrew Shutter" <ashutter@cgsh.com>, "Alistair Russell" <arussell@cgsh.com>, bpetrovic@cgsh.com, david.dubin@citi.com, kunal.govindia@citi.com, mark.lorkin@citi.com, paul.simpkin@citi.com, peter.rawlings@citi.com, ricardo.coats@citi.com

Subject Term sheet and commitment letter

Dear all,

Please find attached our comments on the revised versions of the term sheet and commitment letter. These documents remain subject to further review and comment by Citi pending receipt of a revised fee letter.

We look forward to finalising the outstanding points later today.

Kind regards

David

David Billington
Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

Direct line: +44 20 7614 2263
Mobile: +44 7725 447 529
Email: dbillington@cgsh.com
www.cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy. [attachment "Dice Term Sheet.DOC" deleted by Richard Ginsburg/LO/WGM/US] [attachment "Dice Commitment Letter.DOC" deleted by Richard Ginsburg/LO/WGM/US]

< END >

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

**To:** Rawlings, Peter [peter.rawlings@citi.com]; Lorkin, Mark [mark.lorkin@citi.com]; Karen Dolenec[karen.dolenec@terrafirma.com]
**Cc:** Dubin, David [david.dubin@citi.com]; Trudy Cooke[Trudy.Cooke@terrafirma.com]; Coats, Ricardo [ricardo.coats@citi.com]; Simpkin, Paul [paul.simpkin@citi.com]
**From:** Govindia, Kunal
**Sent:** Sun 5/20/2007 2:24:32 AM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Re: Project Dice 9am dial-in

Karen,

Please find below dial-in details for the 9am call later today:

Dial-in: 01452 586 935
Passcode: 42 52 82 97 77#

Best Regards,
Kunal

-----Original Message-----
From: Rawlings, Peter [CMB-GFICC]
To: Lorkin, Mark [CMB-GFICC]; 'karen.dolenec@terrafirma.com' <karen.dolenec@terrafirma.com>
CC: Dubin, David [CMB-GFICC]; Govindia, Kunal [CMB-GFICC]; 'Trudy.Cooke@terrafirma.com' <Trudy.Cooke@terrafirma.com>
Sent: Sat May 19 21:48:03 2007
Subject: Re: Project Dice

Karen- we may have indicated that we were ok with a single figure for successful syndication at the c412 level. After consultation with our colleagues this remains a concern for Citi with the request being for separate sub limits. We look forward to closing out all points tomorrow and helping you progress your bid.
Best regards
-----------------------------

Peter Rawlings
Citigroup Global Markets Limited
Tel: +44 20 7986 4969
Fax: +44 20 7986 4704
Mobile: +447702 778 740
E-mail: peter.rawlings@citigroup.com

Registered in England with number 1763297. Registered office: Citigroup Centre, Canada Square, London E14 5LB. Authorised and regulated by the Financial Services Authority.

The information contained in this electronic message and any attachments (the "Message") is intended for one or more specific individuals or entities, and may be confidential, proprietary, privileged or otherwise protected by law. If you are not the intended recipient, please notify the sender immediately, delete this Message and do not disclose, distribute, or copy it to any third party or otherwise use this Message. Electronic messages are not secure or error free and can contain viruses or may be delayed, and the sender is not liable for any of these occurrences. The sender reserves the right to monitor, record and retain electronic messages.

-----Original Message-----

From: Lorkin, Mark [CMB-GFICC]
To: 'karen.dolenec@terrafirma.com' <karen.dolenec@terrafirma.com>
CC: Dubin, David [CMB-GFICC]; Rawlings, Peter [CMB-GFICC]; Govindia, Kunal [CMB-GFICC]; 'Trudy.Cooke@terrafirma.com' <Trudy.Cooke@terrafirma.com>
Sent: Sat May 19 21:34:28 2007
Subject: Project Dice

Karen,

Thank you for your time earlier to run thru our points

As agreed our lawyers are reflecting our pts in the TS and commitment letter and we will send that over later this evening

In the meantime it would be useful to receive the Fee Letter u mentioned was going to be circulated at your earliest convenience

Best regards

--------------------------
Sent from my BlackBerry

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

EXHIBIT
DOLENEC
19
06-18-10 CM

From: Rawlings, Peter [CMB-GFICC] [peter.rawlings@citigroup.com]
Sent: Sunday, May 20, 2007 3:38 PM
To: karen.dolenec@terrafirma.com
Cc: Dubin, David [CMB-GFICC]; Lorkin, Mark [CMB-GFICC]; Trudy.Cooke@terrafirma.com; Coats, Ricardo [CMB-GFICC]; Simpkin, Paul [CMB-GFICC]; Govindia, Kunal [CMB-GFICC]; ashutter@cgsh.com
Subject: Re: Dice

Thanks Karen - Let's dial in at 6.15pm on:
Dial-in: 01452 586 935
P/word : 42 52 82 97 77
Regards

---

Peter Rawlings
Citigroup Global Markets Limited
Tel: +44 20 7986 4969
Fax: +44 20 7986 4704
Mobile: +447702 778 740
E-mail: peter.rawlings@citigroup.com

Registered in England with number 1763297. Registered office: Citigroup Centre, Canada Square, London E14 5LB. Authorised and regulated by the Financial Services Authority.

The information contained in this electronic message and any attachments (the "Message") is intended for one or more specific individuals or entities, and may be confidential, proprietary, privileged or otherwise protected by law. If you are not the intended recipient, please notify the sender immediately, delete this Message and do not disclose, distribute, or copy it to any third party or otherwise use this Message. Electronic messages are not secure or error free and can contain viruses or may be delayed, and the sender is not liable for any of these occurrences. The sender reserves the right to monitor, record and retain electronic messages.

-----Original Message-----
From: Karen Dolenec <karen.dolenec@terrafirma.com>
To: Rawlings, Peter [CMB-GFICC]
CC: Dubin, David [CMB-GFICC]; Lorkin, Mark [CMB-GFICC]; Trudy Cooke <Trudy.Cooke@terrafirma.com>
Sent: Sun May 20 15:14:19 2007
Subject: RE: Dice

As mentioned this morning, we are ready whenver you are. We are on a call right now so I suppose we will have to take the after 6 slot.

Regards,

Karen

-----Original Message-----
From: Rawlings, Peter [mailto:peter.rawlings@citi.com]
Sent: 20 May 2007 14:54
To: Karen Dolenec
Cc: Dubin, David ; Lorkin, Mark
Subject: Dice

Karen
Just in terms of planning the next 18 hours - do you have a feel for when you will be able to revert on the points we discussed this morning?
Any time before 4 and again after 6 works for us to discuss the few remaining points. Please let us know. Regards

---

Peter Rawlings
Citigroup Global Markets Limited
Tel: +44 20 7986 4969
Fax: +44 20 7986 4704
Mobile: +447702 778 740

E-mail: peter.rawlings@citigroup.com

Registered in England with number 1763297. Registered office: Citigroup Centre, Canada Square, London E14 5LB. Authorised and regulated by the Financial Services Authority.

The information contained in this electronic message and any attachments (the "Message") is intended for one or more specific individuals or entities, and may be confidential, proprietary, privileged or otherwise protected by law. If you are not the intended recipient, please notify the sender immediately, delete this Message and do not disclose, distribute, or copy it to any third party or otherwise use this Message.
Electronic messages are not secure or error free and can contain viruses or may be delayed, and the sender is not liable for any of these occurrences. The sender reserves the right to monitor, record and retain electronic messages.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

A-1026

EXHIBIT
DOLENEC
22
06-18-10 CM

From: Karen Dolenec [karen.dolenec@terrafirma.com]
Sent: Sunday, May 20, 2007 10:26 PM
To: Simpkin, Paul
Subject: RE:

Back at my desk now 0207 015 9614. Can't seem to find your mobile.

-----Original Message-----
From: Simpkin, Paul [mailto:paul.simpkin@citi.com]
Sent: 20 May 2007 22:18
To: Karen Dolenec
Subject: Re:

Just called. Can we clarify 1. On funding fees and I can respond to your final point. The 75bp upfront is non-rebateable but the 125bp funding is rebateable. Are you suggesting we get 125bp without paying any rebates back to you plus a further 100bp ? P

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Karen Dolenec <karen.dolenec@terrafirma.com>
To: Tabet, Kamal [CMB-GBKG]; Simpkin, Paul [CMB-GFICC]; Wormsley, David [CMB-GBKG]
CC: Guy Hands <Guy.Hands@terrafirma.com>
Sent: Sun May 20 22:01:01 2007
Subject: RE:

Dear all,

I have now discussed your overall package with Guy, and the points are as follows:

1. Break fees - on the high yield bridge and on the securitisation bridge, we are willing to pay 1% if we do not take up such facilities. We would point out that this is something you raised with us only Friday night. We had assumed that there would be no break fees as we are paying you 2% in funding fees on the high yield bridge and 1.5% in funding fees on the securitisation bridge.

2. You have asked for joint appointment on the securitisation which we are happy to give you. However, once appointed, if the securitisation is not done satisfactorily within 12 months we would require the right to terminate you without the payment of any break fee. With regards to the high yield we would go with sole or joint appointment on a 12 month term and the ability to appoint up to two others as you suggested.

3. On hedging, you have a right to match for up to 50% of your pro rata share.

4. On the go-to-market clause for the securitisation, we can agree your proposal of the 2.5% cap on margin.

5. We understand that a refund of 25 bps from the funding fee would be available if the securitisation is done within 270 days.

6. We are also assuming that there will be no interest coverage covenant consistent with all of our previous discussions.

One final point, which is a new one we are raising with you, is we would like you to consider taking out the whole high yield bridge and ask you to come back to us with regard to what your fees would be on the overall transaction if this tranche were taken out tomorrow by equity. In other words, if we can get equity signed up by tomorrow morning and no longer need the high yield bridge because we would be replacing it with equity, does this reduce the overall fees on this transaction? Our belief is that based on conversations this evening that we can raise £365m of additional equity and therefore quite probably do not need the high yield bridge.

Please could you come back on this note as quickly as possible.

Regards,

Karen

-----Original Message-----
From: Guy Hands
Sent: 20 May 2007 21:27
To: 'Tabet, Kamal '
Cc: 'Wormsley, David '; Karen Dolenec
Subject: RE:

Dear Kamel,

This is not what Karen said. We have now gone round in circles on the same economic points for two days and I have tied up our lawyers working with you. At this point I have instructed our lawyers to work with alternative providers and will reply by e mail with our final position once I have discussed in detail the still outstanding points. Most of which were only raised after we originally decided to go with you.

Best Wishes Guy

-----Original Message-----
From: Tabet, Kamal [mailto:kamal.tabet@citi.com]
Sent: 20 May 2007 21:19
To: Guy Hands
Subject:

Dear Guy,

I just left you a vm.

I have circled the team and it sounds like they believe there are no outstanding issues, or if there is 1 or 2, they are relatively insignificant and both positions are very close.

Paul Simpkin also told me that Karen told him she did not think there were any real issues left and it is now in your hands (no pun intended).

I can only hope you are hearing similar feedback from your team.

Either way, I am at your disposal to discuss further.

Regards, K

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.

For more information please visit http://www.messagelabs.com/email

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

**To:** 'Simpkin, Paul '[paul.simpkin@citi.com]
**Cc:** Coats, Ricardo [ricardo.coats@citi.com]; ashutter@cgsh.com[ashutter@cgsh.com]; Tabet, Kamal [kamal.tabet@citi.com]; 'richard.ginsburg@weil.com'[richard.ginsburg@weil.com]
**From:** Karen Dolenec
**Sent:** Sun 5/20/2007 11:59:27 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** RE:

OK, understood.

-----Original Message-----
From: Simpkin, Paul [mailto:paul.simpkin@citi.com]
Sent: 21 May 2007 00:52
To: Karen Dolenec
Cc: Coats, Ricardo ; ashutter@cgsh.com; Tabet, Kamal
Subject: Re:

The discounted fee is solely for a TF private equity takeout of the bridge.
If any other bank takes out our bridge then it would be the full 2.50 that applies plus commitment and funding fees. We really don't want you to use our balance sheet and have someone else do our takeout.
P
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Karen Dolenec <karen.dolenec@terrafirma.com>
To: Simpkin, Paul [CMB-GFICC]
Sent: Mon May 21 00:16:54 2007
Subject: RE:

Paul, when you say 1 works for you, do you mean that you are OK with a 1% alternative transaction fee if the high yield is taken out within 12 months but away from Citi?

-----Original Message-----
From: Simpkin, Paul [mailto:paul.simpkin@citi.com]
Sent: 20 May 2007 23:49
To: Karen Dolenec; Tabet, Kamal ; Wormsley, David ; Dubin, David
Cc: Guy Hands; Basra, David
Subject: Re:

Apologies - with my securitisation colleagues copied. P
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Simpkin, Paul [CMB-GFICC]
To: 'karen.dolenec@terrafirma.com' <karen.dolenec@terrafirma.com>; Tabet, Kamal [CMB-GBKG]; Wormsley, David [CMB-GBKG]
CC: 'Guy.Hands@terrafirma.com' <Guy.Hands@terrafirma.com>
Sent: Sun May 20 23:46:39 2007
Subject: Re:

EXHIBIT
Dolenec
24
06-18-10 CM

Thanks Karen.
Re 1 that works for us ........ But as you and I discussed we are happy with your proposal or our proposal as you choose. I think the breakeven is around 150 days ie my proposal is lower cost for TF before this point and your proposal is lower cost for TF after this point. Let us know which you prefer - we are happy either way.
Re 2 my sec colleagues are ok with your termination right if it is 12 months following the commencement of actively engaging the rating agencies Re 3 that works for us if we can change 50 per cent to 66.7 per cent Re 4 thank you Re 5 yes - that is right Re 6 yes - that is right On your final point, there would be no change to the Securitisation as Publishing will be ring-fenced but we would propose the following on recorded music. We would reduce the fees on the term loan B by 25bp as the company is a better credit with no sub debt but increase the fees on the revolver by 25bp as without the ability to be able to give away high yield bond co-manager slots/fees the revolver will be harder and more expensive to syndicate.. Effectively you therefore make a saving of 25bp on a little more then half the term loan. Best, Paul
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Karen Dolenec <karen.dolenec@terrafirma.com>
To: Tabet, Kamal [CMB-GBKG]; Simpkin, Paul [CMB-GFICC]; Wormsley, David [CMB-GBKG]
CC: Guy Hands <Guy.Hands@terrafirma.com>
Sent: Sun May 20 22:01:01 2007
Subject: RE:

Dear all,

I have now discussed your overall package with Guy, and the points are as follows:

1. Break fees - on the high yield bridge and on the securitisation bridge, we are willing to pay 1% if we do not take up such facilities. We would point out that this is something you raised with us only Friday night. We had assumed that there would be no break fees as we are paying you 2% in funding fees on the high yield bridge and 1.5% in funding fees on the securitisation bridge.

2. You have asked for joint appointment on the securitisation which we are happy to give you. However, once appointed, if the securitisation is not done satisfactorily within 12 months we would require the right to terminate you without the payment of any break fee. With regards to the high yield we would go with sole or joint appointment on a 12 month term and the ability to appoint up to two others as you suggested.

3. On hedging, you have a right to match for up to 50% of your pro rata share.

4. On the go-to-market clause for the securitisation, we can agree your proposal of the 2.5% cap on margin.

5. We understand that a refund of 25 bps from the funding fee would be available if the securitisation is done within 270 days.

6. We are also assuming that there will be no interest coverage covenant consistent with all of our previous discussions.

One final point, which is a new one we are raising with you, is we would like you to consider taking out the whole high yield bridge and ask you to come back to us with regard to what your fees would be on the overall transaction if this tranche were taken out tomorrow by equity. In other words, if we can get equity signed up by tomorrow morning and no longer need the high yield bridge because we would be replacing it with equity, does this reduce the overall fees on this transaction? Our belief is that based on conversations this evening that we can raise £365m of additional equity and therefore quite probably do not need the high yield bridge.

Please could you come back on this note as quickly as possible.

Regards,

Karen

-----Original Message-----
From: Guy Hands
Sent: 20 May 2007 21:27
To: 'Tabet, Kamal '
Cc: 'Wormsley, David '; Karen Dolenec
Subject: RE:

Dear Kamel,

This is not what Karen said. We have now gone round in circles on the same economic points for two days and I have tied up our lawyers working with you. At this point I have instructed our lawyers to work with alternative providers and will reply by e mail with our final position once I have discussed in detail the still outstanding points. Most of which were only raised after we originally decided to go with you.

Best Wishes Guy

-----Original Message-----
From: Tabet, Kamal [mailto:kamal.tabet@citi.com]
Sent: 20 May 2007 21:19
To: Guy Hands
Subject:

Dear Guy,

I just left you a vm.

I have circled the team and it sounds like they believe there are no outstanding issues, or if there is 1 or 2, they are relatively insignificant and both positions are very close.

Paul Simpkin also told me that Karen told him she did not think there were any real issues left and it is now in your hands (no pun intended).

I can only hope you are hearing similar feedback from your team.

Either way, I am at your disposal to discuss further.

Regards, K

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus

infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

EXHIBIT
DOLENEC
25
06-18-10 CM

**From:** richard.ginsburg@weil.com
**Sent:** Monday, May 21, 2007 6:24 AM
**To:** karen.dolenec@terrafirma.com
**Cc:** david.basra@citigroup.com; david.dubin@citigroup.com; kamal.tabet@citigroup.com; paul.simpkin@citigroup.com; ricardo.coats@citigroup.com; karen.dolenec@terrafirma.com; Michael.Slattery@terrafirma.com; Trudy.Cooke@terrafirma.com; Faisal.ramzan@weil.com; marco.compagnoni@weil.com; ian.hamilton@weil.com
**Subject:** RE: Project Dice

**Importance:** High

**Attachments:** Execution Copy -- Project Dice Fee Letter (Citi)_#645100.DOC; Execution Copy -- Project Dice Term Sheet (Citi)_#645103.DOC; Execution Copy -- Project Dice Commitment Letter (Citi)_#645101.DOC; Final Comparison -- Commitment Letter.pdf

Thanks for the confirmation that all documents are in agreed form.

I attach execution copies of the Commitment Letter and Fee Letter, along with the final Term Sheet. Other than removing "draft" language and adding Citi's address, there are no changes to the Term Sheet or Fee Letter. I attach a comparison of the Commitment Letter showing the last 2 changes.

Can Cleary please circulate the final Engagement Letter as this is on their system.

The final Interim Facility Agreement should be out shortly.

Kind regards.

**Richard A. Ginsburg**

**Weil, Gotshal & Manges**

One South Place, London EC2M 2WG
(0)20 7903-1311 (Direct)
(0)20 7903-0990 (Fax)
(0)7787 564 049 (Mobile)
richard.ginsburg@weil.com

"Karen Dolenec" <karen.dolenec@terrafirma.com>

05/21/2007 06:15 AM

To "Coats, Ricardo " <ricardo.coats@citi.com>
cc "Tabet, Kamal " <kamal.tabet@citi.com>, "Simpkin, Paul " <paul.simpkin@citi.com>, "Basra, David " <david.basra@citi.com>, "Dubin, David " <david.dubin@citi.com>, "Trudy Cooke" <Trudy.Cooke@terrafirma.com>, <richard.ginsburg@weil.com>
Subject RE: Project Dice

Many thanks, Ricardo. Does that also include confirmation that all of

the CPs have been satisfied?

-----Original Message-----
From: Coats, Ricardo [mailto:ricardo.coats@citi.com]
Sent: 21 May 2007 06:14
To: Karen Dolenec
Cc: Tabet, Kamal ; Simpkin, Paul ; Basra, David ; Dubin, David
Subject: Project Dice
Importance: High

Karen - -

Per my conversation with you a few minutes ago, I am pleased to confirm to you that we have resolved all business issues and that we are ready to proceed to the execution stages of documentation.

Kind regards,

Ricardo.

Ricardo Coats
Citigroup Global Markets
Office: +44 (0)20 7986 7407
Mobile: +44 (0)7956 318 761

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

< END >

The information contained in this email message is intended only for use of the individual or entity named

above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

**From:** Tom Quigley
**Sent:** Sunday, May 20, 2007 4:17 AM
**To:** Cormac OHaire; Francois Van Der Spuy
**Subject:** RE: Update on Dice financing for discussion tomorrow

Cormac / Francois
On the number of shares, have we correctly calculated the numbers including the increse in consideration for options and the convertible?
I'm just posing the query as I am aware that these are material, although I do not have the numbers to hand.
Tom

**From:** Cormac OHaire
**Sent:** 20 May 2007 08:46
**To:** Francois Van Der Spuy; Tim Pryce; Guy Hands; Karen Dolenec; Riaz Punja; Trudy Cooke; TFCP Investment Advisory Committee; Stephen Alexander; Kirsten Randell; Chris Barnes; Tom Quigley
**Cc:** Stephen Seymour; Don Hoang
**Subject:** RE: Update on Dice financing for discussion tomorrow

Francois, thanks
Your equity reqd seems to increase our of proportion to the increase in price rather than £ for £
Is there a reason for this?
cormac

**From:** Francois Van Der Spuy
**Sent:** 20 May 2007 03:19
**To:** Cormac OHaire; Tim Pryce; Guy Hands; Karen Dolenec; Riaz Punja; Trudy Cooke; TFCP Investment Advisory Committee; Stephen Alexander; Kirsten Randell; Chris Barnes; Tom Quigley
**Cc:** Stephen Seymour; Don Hoang
**Subject:** RE: Update on Dice financing for discussion tomorrow

Cormac,

Thanks for the attached.

The current status (as is reflected in the model and presentation we are about to send out) is different from your calculation for two reasons:

- We have used the Bloomberg exchange rate as of May 19th (Saturday) of 1.4618 vs. your assumed 1.47 (though you do note that today's rate is less than 1.47 - I presume you are allowing for the bid/ask spread). This results in c.£10 less of equity being available in your calculations.
- This is offset by movements up and down in terms of financing fees and net debt forecasted as at acquisition (based on further discussions/information from management and KPMG analyses).

As a result, the numbers according to the team's calculations are as follows:

- At 265p: £29m equity headroom
- At 268p: break even, i.e. maximum price without requiring equity bridge
- At 285p: £158m equity bridge required.

You have assumed the correct number of shares.

We can discuss and iron out any differences in our calculations tomorrow morning.

Regards,

Francois

**From:** Cormac OHaire
**Sent:** 20 May 2007 02:30
**To:** Tim Pryce; Guy Hands; Karen Dolenec; Riaz Punja; Trudy Cooke; Francois Van Der Spuy; TFCP Investment Advisory Committee; Stephen Alexander; Kirsten Randell; Chris Barnes; Tom Quigley

Confidential

EXHIBIT
DOLENEC
13
06.18.10 CM

TF0000007289

**Subject:** RE: Update on Dice financing for discussion tomorrow

See the following re equity available.

I have assumed Daisy is dead & Dice will use FII commitments in priority to Hammer.
Equity reqd is based on yesterdays IAC pack sources & uses. We usually find that these can change by €20-€30m by the time we fund a deal.
I have assumed the price changes are a £ for £ change to the equity reqd.

**TF Fund Equity available**
Based on the current S&U and todays fx rates at max concentration TFCPII and III have

- Equity Available £1.495m
- Can bid £2.74 per share

**Additional Equity/Bridging reqd at higher bid prices**

| | |
|---|---|
| @ £2.75 | £6m reqd |
| @ £2.80 | £52m reqd |
| @ £2.85 | £98m reqd |

**Equity Bridge Available for Market Purchases**

| | |
|---|---|
| TFCP III facility | €1,615m |
| Less Phantom | €745m |
| Less Hammer | €165m |
| Available | €705m or £482m and can purchase 18% -19% depending on price |
| | |
| TFCP II facility | €580m |
| Less phanton | €94m |
| Available for Dice | €485m or £330m and can purchase 12% -13% depending on price |
| | |
| Total | €1,190m or £812m and can purchase 30% -33% depending on price |

I attach the detailed workings. Tom, can you please check the no of shares in issue.
cormac << File: CapAvailHamDice.xls >>

---

**From:** Tim Pryce
**Sent:** 19 May 2007 12:58
**To:** Guy Hands; Karen Dolenec; Riaz Punja; Trudy Cooke; Francois Van Der Spuy; TFCP Investment Advisory Committee; Stephen Alexander; Kirsten Randell; Chris Barnes; Tom Quigley
**Subject:** RE: Update on Dice financing for discussion tomorrow

Re question 4 - we held the TFCPII and TFCPIII Fund Advisory boards last Thursday and covered not just the cross fund points but also the sell down from 30% to 20% points - so there is nothing further to do.
Re question 5 - the point in time when you apply the exchange rate to determine the amount of commitments that will be dedicated to the deal is at the time that the board meeting of the GP takes the decision to make an offer (ie tomorrow - Sunday) - if there is a subsequent change which results in the Fund exceeding the 30% limit the GP is not in breach of the provisions of the LPA - the GP would just have to try to sell down a larger amount to get down to 20% - so there should be no issue here.
Re question 6 - this is fine.
Re question 7 - I have suggested that the team prepare an update which will supplement the existing presentation rather than a completely revised existing presentation as time constraints will not permit otherwise and it will be much easier for the IAC to read a supplement rather than a revised 150 page presentation which repeats a lot of what the IAC has already read.
Re question 8 - Greenhills finally agreed last night to our request that the meeting be at 1.00 pm Sunday so that Q can attend. Tom, Q and Paternoster will attend and can then update the GP directly thereafter.

Regards

---

**From:** Christine Vallance **On Behalf Of** Guy Hands
**Sent:** 19 May 2007 12:06
**To:** Karen Dolenec; Riaz Punja; Trudy Cooke; Tim Pryce; Francois Van Der Spuy; TFCP Investment Advisory Committee; Stephen Alexander; Kirsten Randell; Chris Barnes; Tom Quigley
**Subject:** RE: Update on Dice financing for discussion tomorrow

Dear all

Firstly, thank you all of you for supporting this deal at such short notice and, in the case of some of you, even shorter notice! I realise that there is an enormous amount going on and it is extremely difficult not at times to feel that some things are slipping through the cracks. However, I think the team work on this deal is ensuring that we are catching things. The main thing we need to do over the next 48 hours is ensure that we systematically work through the issues and keep ourselves as physically attuned as possible. We definitely have the management on our side and I believe there are many upsides to this business which we have not yet had time to focus on.

Turning to some of the things which will need to be done in the next 24 hours and to Karen's excellent memo, what follows is a list of some of the things we clearly need to do:

1. Get ourselves there re the financing. It looks like we will have sorted out the Citi facility sometime today, subject to agreeing the commercial terms. I think probably the best person to negotiate on those terms is myself and what I suggest is that Karen finalises the terms of the facility and, once that is done, gives me a list of Citi's asks vs. Deutsche's asks re the commercial terms, which I can then compare and go back to the appropriate people at Citi. Could Karen please also give me a list of who these people are. Re Deutsche Bank, clearly we need to get them there as soon as possible as it will increase our leverage re negotiating with Citi. Finally, re Barclays, we just need to keep them working to get there as soon as they can, though clearly it is likely to be Monday rather than Sunday. Clearly here, re Barclays, we need to have the commercial documents finalised on Sunday. I hope this strategy re the financing is clear. I will continue to ask HBOS if they are willing to come in, but I think it is highly unlikely in this timeframe.

2. Turning to the share purchase facility, my understanding is that Dresdner won't have that ready until Friday and we clearly need to look at alternatives to Dresdner. However, at this stage we will use the equity facility from HBOS and I need to understand from Cormac how that facility is currently being used and how much space we have.

3. Clearly the pricing we are talking now is getting challenging and we might well need an equity bridge. I have mentioned this to HBOS and they are seeing what they can do. In the meantime, please could Cormac and Riaz determine just what the maximum share price is that we can pay (excluding an equity bridge) based on the debt facility and what level of equity bridge we need at a share price of £2.70; £2.75; £2.80; £2.85.

4. A couple of technical questions, please could Tim confirm that we do not at this point need to have a meeting of the Advisory Boards of II and III to discuss how we will reduce our exposure from 30% down to a maximum of 20%. To the extent we do need to have that meeting, when do we need to have it and can Tim and Riaz determine who is going to prepare the presentation for it.

5. A further technical point, please can Tim and Cormac discuss what happens with regard to currency exposure as we are clearly going to be at the Fund's limit in Sterling but there could be an exchange rate change between Sterling and Euro, which would push us over the Euro 30% limit?!

6. I have got Christine to arrange for me to fly out to Guernsey tomorrow at 3pm and would suggest that we do the GP meeting at the aircraft hanger at 3.45pm. I am allowing 1.5 hours for it, please Tim can you confirm that this is fine?

7. Re the IAC meeting, clearly the updated presentation books will need to be couriered to the IAC members. Please could Riaz indicate when those books are going to be ready and when the IAC should take place. I am available to do it tomorrow at any time from 10am through to 1pm.

8. My understanding is that Tim Pryce, Tom Quigley and Paternoster will be attending the pension presentation. Obviously it would be useful to have an update as soon as possible, however all indications are that our current pension plan position is very conservative, relative to what we are likely to achieve through negotiation. Clearly, if there are any changes dramatically up or down, these will need to be communicated to the GP and the IAC, and if Tim and Tom can determine the best way and when to update us all on their meeting, that would be most useful.

9. I am presuming that no one else is travelling out with me on the jet from Biggin Hill, which will leave at 3pm, however please to the extent anyone does want to travel with me, could they let Christine know ASAP (her mobile is 07958 396145).

If any of the above is not clear or you need to get hold of me urgently, please text me, as I will be with HBOS and Wellcome at the FA Cup Final from approx 12 noon through to 5.30pm and clearly will not have access to email. I will check my email when I get home, but would not expect that to be before 7pm at the very earliest.

Congratulations to all on moving us from a also ran to a finalist on this deal. As I said on the Boots deal, that in itself is an extraordinary achievement. I am convinced one of these days we will win one of these deals and hopefully this will be it.

With very best wishes
Guy

*Dictated not seen*

**From:** Karen Dolenec
**Sent:** 18 May 2007 22:52
**To:** Guy Hands
**Cc:** Riaz Punja; Trudy Cooke; Tim Pryce; Francois Van Der Spuy
**Subject:** Update on Dice financing for discussion tomorrow

Guy,

We called Dresdner tonight but they said that they cannot get there.

There is an overall point regarding covenants which every bank has. The rationale behind it is that we have a large undrawn facility relative to the term bank facility (£450m of revolver and acq facility vs. £725m of term loan). Citi and Deutsche are at slightly different positions on this while Barclays has just flagged for the moment that this is an issue.
- Deutsche are proposing a leverage covenant on just the undrawn facilities with c. 30% headroom and no maintenance covenants on the drawn facilities. However, they would like to be able to flex this into the same leverage covenant as the undrawn facilities if needed.
- Citi are asking for a leverage covenant on all facilities but an unlimited right to cure. This right would flex into a right to cure in 3 quarters only in a year if needed. I have asked them to consider having the covenant on just the revolver.
The bottom line is that there is not a lot of difference in having the leverage covenant against just the revolver vs. the other tranches. My main concern here is that if these are set off of the base case and the base case includes a reasonable cash sweep (which banks are requiring especially on the bridge to securitisation) then any deviation from this case could bust through the covenant relatively quickly because the cash flow is pretty strong in the base case. Obviously if we have generous cure provisions, this will help.

Below is where the various banks are on other points:

1. Citi - They are approved for 100%. Aside from the covenant point above, there are no more substantive outstanding points on the term sheet. Below are their asks in the other documents, the first of which was in their feedback from the credit committee yesterday. The others were dropped on us today.

- No rebate on the funding fee for the bridge to securitisation but also no extension fee for the terming out the bridge.

- A break fee of 2.5% on the bridge to securitisation and the bridge to high yield if we acquire more than 30% of the shares of the target and if we either 1) do a different take out than a securitisation and a high yield issuance respectively or 2) we do any take out away from Citi. This appears to include a take out with equity.

- Securities demand on the securitisation and on the high yield. On the securitisation, they are asking for the right to make us go to market at any time after closing as long as the margin is below 3.0% (vs. the estimated 1.4% on the securitisation take out). They have asked for something similar on the high yield but on a more reasonable time line and a more reasonable cap.

- They are asking to be mandated now for the high yield and securitisation take outs, however, they are not committed to actually do these take outs.

- They are asking for the right to match on all additional services such as hedging and liability management.

- No other arranger can have a bigger share of the deal or a bigger fee.

2. Deutsche Bank - they are approved for 1/3. We will begin going through the detailed documents tomorrow, but this should not be too laborious since the documents were drafted on the back of their package anyway. Don't know if they will come up with the same last-minute asks as Citi.

3. Barclays - David Shaw has been unable so far to move the combined credit committee earlier than 1:00 on Monday. He will continue trying but it will not be possible to do it at any time before earlier on Monday. I have obviously asked him to do it as soon as possible. We will push through on helping them with the commercial understanding of the deal and the structure tomorrow and move to finalising docs on Sunday. They are not comfortable with this structure and will likely go with it but with a flex to their preferred structure which they still need to come back to me on. This path makes it easier for us to put them with the others if needed. They are being really cooperative considering that they were originally way off the terms we are now discussing

All of the banks have issues from syndication because of the track record of the company in the banking market, although it seems that Citi is the most scarred from this.

Look forward to getting your thoughts tomorrow.

Regards,

Karen

Case: 11-126 Document: 48 Page: 242 04/25/2011 272867 401

A-1041

terra firma

# Project Dice

## Presentation to the IAC

18 May 2007

EXHIBIT 18
WIT: Hands
DATE: 7/15/10
T.M. PASTOR, RPR, CLR

Confidential

TF0000081373

# Disclaimer

terra firma

- This presentation has been prepared by Terra Firma Capital Partners Limited ("TFCP") solely on behalf of Terra Firma Investments (GP) 2 Limited (for and on behalf of funds managed by it) ("TFIGP2") and Terra Firma Investments (GP) 3 Limited (for and on behalf of funds managed by it) ("TFIGP3").

- It is being circulated on a confidential basis. This presentation must not be distributed, published or reproduced, in whole or in part, nor may its contents be disclosed by you to any other person. Receipt of this presentation by you constitutes an agreement to be bound by such confidentiality.

- This presentation may also contain information that may be unpublished price sensitive or inside information and you are reminded of your obligations relating to such information under Part V of the Criminal Justice Act 1993 (the "Act"), the City Code on Takeovers, the Financial Services and Markets Act 2000 and the Listing Rules of the UK Listing Authority in England and Wales. Accordingly you must not, either alone or together or in concert with any other person, disclose such information or deal in or, encourage others to deal in, the securities of the target or otherwise engage in any activity prohibited by the Act.

- This presentation, to the extent that it relates to the target business, is based on historical information taken from public sources which has not been independently verified by TFCP. Neither TFCP nor of its officers, employees, agents or affiliates makes any express or implied representation, warranty or undertaking with respect to the historical information contained in this presentation, and none of them accept any responsibility or liability as to its accuracy or completeness. This presentation includes statements, estimates, opinions and projections with respect to anticipated future performance of the target which reflect various assumptions concerning anticipated results and which may or may not prove to be correct. It is up to you to make your own assessment of the validity of such assumptions and no liability is accepted by TFCP in respect of the achievement of such assumptions.

- The delivery of this presentation does not imply that the information herein is correct as at any time subsequent to the date hereof and neither TFCP nor any of its associates has any obligation whatsoever to update any of the information or the conclusions contained herein or to correct any inaccuracies which may become apparent subsequent to the date hereof.

- TFCP, which is authorised and regulated by the Financial Services Authority, is acting solely as adviser to TFIGP2 and TFIGP3 and no one else in relation to this proposed transaction and will not be responsible to anyone other than TFIGP2 and TFIGP3 for providing the protections afforded to clients of TFCP nor for providing advice in connection with the proposed transaction or any other matters referred to herein.

Confidential

TF0000081374

terra firma

## Contents

- Market Overview
- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations
- Due Diligence Conclusions
- Appendices

Confidential

TF0000081375

A-1043

# Executive Summary
## Transaction Overview

terra firma

- Project Dice is the proposed public-to-private acquisition of Dice plc ("Dice" or the "Company"), a leading recorded music and music publishing company with FY 2007 revenue of £1,414 million and EBITDA of £174m.
  - Recorded Music ("Music"): FY 2007 Revenue of £1,414m and EBITDA of £78m (5.5% margin)
  - Music Publishing ("Publishing"): FY 2007 Revenue of £416m and EBITDA of £117m (28.1% margin)
- The music industry is undergoing a period of fundamental transformation as the distribution of music shifts from physical to digital.
  - Digital sales continue to grow at strong pace, although not at levels sufficient to offset the significant decline in physical sales.
  - Dice's Music revenue fell 19.3% year-on-year in FY 2007 compared to a market decline of 13% globally.
  - TF Base Case forecasts physical revenue to continue to decline by 11% CAGR through FY 2012.
- There is a wide divergence of opinion regarding the ability of large music companies to monetize consumer consumption of music in the digital age.
  - LEK forecasts c.35% CAGR growth in digital through CY 2011.
  - Enders Analysis forecasts 20% CAGR growth in digital through CY 2011.
  - Management indicated a CAGR through 2012 in the mid-30% range following growth in FY06 – 07 of 59%.
  - TF has assumed in its base case (the "Indie Case") a 32% CAGR growth in digital through FY 2012.
- At the same time, consumption of music is increasing and new revenue opportunities are emerging, e.g., increased consumption of music in films, TV, video games, and advertisement campaigns.
  - Dice's Publishing business derives an increasing share of revenues from these higher-margin B2B revenue streams, offsetting decline in core mechanical revenue from CD/digital sales.
- Against the backdrop of this transition, there is substantial opportunity for cost-savings and restructuring of the business to adapt to the challenges facing the music industry.

Confidential

TF0000081376

A-1044

# Executive Summary

## Transaction Overview: Process

terra firma

- Dice is currently undergoing an effective auction process, and the team understands that the Board expects to announce on 23 May (the Company's earnings announcement date) either that (i) the Board has recommended an offer to acquire, or (ii) the Company will pursue a securitization of its publishing business.
- Following several aborted approaches by Permira and Warner Music Group in the last six months (backed by Thomas Lee and Bain Capital), the team believes **there is pressure on the Board and management to conclude a private sale.**
- TF conducted limited market diligence with respect to Dice in Feb-Mar 07, although decided not to proceed at the price level (c.320p/share) the Board expected at that time, in particular given the Company's two successive revenue warnings related to continued decline in physical music revenue.
  - Permira had approached Dice interest in December 2006, rumoured to be at the 320p / share price level, but ultimately withdrew its interest.
- TF submitted an indicative bid of 265p on May 8, after which TF was invited to management meetings and to review the data room.
- The team understands that the Dice board is to meet on Friday May 18, and the team believes that another bidder – the consortium of Cerberus and Fortress – may be in position to submit a binding bid on that date.
- The team believes that while the Board may announce a recommended offer on May 23, it is critical to be in position to submit a fully-financed binding offer (together with a draft Rule 2.5 announcement) to the Board on Friday.

# Executive Summary
## Transaction Overview (cont'd)

terra firma

A-1046

### Recommendation

- The team recommends that the IAC consider recommending a binding bid of 265p/share.
  - TF Indie Case, assuming exit in FY 2012 of both Music and Publishing separately, generates IRR of 22.1% and CoCM of 2.7x.
- The **Indie Case** (effectively the TF Base Case) envisions a repositioning of Dice from the smallest of the majors with a money-losing US Rock&Pop label into the largest of the independent labels, with strong UK-Europe labels and profitable niche (e.g., country/Christian) labels in the US
- **Equity Case**: The team believes that there is further upside from higher-than expected growth in digital and mobile (and which management does not include within their projections), driven by
  1. Music
     - Beatles online: the Beatles catalogue is expected to become digitally available;
     - Improved pricing on iTunes and other digital retailers (Amazon) on DRM-free premium tracks and introduction of variable pricing models;
     - Underlying digital growth above market reflecting catch up to Dice's more natural market share
     - Developing alternative revenue streams (e.g. touring / merchandising) to complement core album sales-driven revenue;
  2. Publishing
     - Consolidation of smaller music publishing catalogues to take advantage of the business's scalability
- The **Wind-Down Scenario**: The risk of a continued decline of the physical music continues to decline and failure of the digital market to grow as projected **is mitigated by** the Wind-Down Scenario, in which the team would shrink the business and run from catalogue and niche markets in the US, savings substantial fixed costs and the money-losing US Rock & Pop operations.
  - The Wind-Down Scenario generates IRR of 3.6% and CoCM of 1.43x, assuming no exit.

Confidential

TF0000081378

# Executive Summary
## Tactics: Other Potential Bidders

terra firma

- It is believed that the Board will be receptive to an offer of 260p.
- The team believes that the primary competition is from a consortium of Cerberus & Fortress, while the presence of Warner Music, who has made a series of approaches to Dice over the past twelve months, cannot be discounted.
  - Warner could bid significantly higher than 260p on the basis of the synergies achievable through combination of the 3rd and 4th largest recorded music companies.
  - However, a bid from Warner would most likely have regulatory conditions – as have all previous approaches, which the Board would resist unless the premium was considered sufficient enough to take account of the time involved in obtaining regulatory clearance and the risk of clearance not being given
  - In addition, in the absence of a significant premium (e.g. 300+ p/share), the Board may not be willing to entertain the business disruption risk that a potential combination with Warner would entail.
- It has been reported that Cerberus & Fortress may attempt to submit an offer below this the 260p sought by the Board.
- There may be other bidders as well.
  - **One Equity (JPMorgan's venture capital arm)** has been rumoured in the press to be interested in Dice.
  - **Permira** is not believed to be in the process at this stage, but made an approach to the Board in December 2006 at 320p.
  - **Apollo / KKR** – Rumoured to have been interested in December, though not believed to be involved in the current process.

- As a result, the team believes that a bid of 265p could be compelling to the Board and position TF to agree the terms of a recommended offer.

A-1047

# Executive Summary

## Investment Considerations - Publishing

terra firma

Diversified
Cash flows

- Publishing cash flows derive from four revenue streams:
  - **Mechanical:** royalties paid on recorded music, derived from physical sales and digital downloads
  - **Performance:** chart success, radio commercialization, webcasts, sporting events
  - **Synchronization:** advertising revenue, TV producers, computer games makers
  - **Other:** stage productions, sheet music, mobile ring tones
- Of the top 50 songs in NPS in 220-2007 (contributing c. £30m NPS/year). All are older than five years.

Highly-scalable
consolidation
opportunity

- Publishing's high fixed cost base comprised of individuals marketing and promoting the catalogue of copyrights, is highly scalable.
- The team has heard that Dice could manage an additional one million copyrights – doubling its existing catalogue – with an additional 20 headcount.
- The team has identified several potential targets, many of which are held by financial backers and could be available for sale

Emerging
Revenue
opportunities

- Publishing's revenues have historically been derived from royalties received from sales of music in physical (and now digital) form as well as other media, e.g. sheet music and stage performances.
- Increasingly, there is potential for growth opportunity in B2B revenue from use of music under copyright in films, TV and advertising campaigns, from synchronization and performance
  - These revenue streams generate higher net publishing share (NPS) for Dice than mechanical revenue, leading to higher margins over time.

Asset-backed

- Publishing receives royalty payments for performance of over one million copyrights under administration, composed of new releases and standards.
  - Dice is publisher for 51.1% of its copyrights, and co-publisher for 40.5% of its copyrights
    - 8.4% of copyrights are under administration, which have less favourable economics
- 85% of copyright agreements have duration more than ten years; only 8.5% have duration less than five years.

Confidential

TF0000081380

A-1048

# Executive Summary
## Investment Considerations - Music

terra firma

- The recorded music industry finds itself in a period of transformation following the advent of digital distribution.
  - Consumers are listening to music in new and varied ways, and the major record labels have thus far struggled to develop a model that monetizes increased music consumption.
  - The industry has struggled to develop a model that monetizes this increased music consumption, and Dice in particular has continued to try to grow its market share in the US market, with little success and with heavy losses.
- The team believes that there is a viable strategy to reposition Dice from the smallest of the four major labels into the largest of the independent labels and leverage its strong position in the UK and European markets, while maintaining limited presence in the US through its profitable niche labels (e.g., Christian/country/blues).

- Music has substantial overhead costs, partly driven by Dice's historic desire to have geographic presence, and partly driven by characteristics particular to the music industry.
- The team has identified substantial cost savings potential to reduce the fixed cost base, in addition to the £110m that current management has targeted in its current restructuring.
  - The team has identified £80m of savings in the Indie Case, which the team believes can be delivered with a high degree of confidence.

- The team fully recognizes the risk that the recent decline in the music market – a combination of rapid decline in the physical market without sufficient digital growth to compensate – remains a potential scenario, at least in the mid-term.
- In the context of a downside market scenario, the team has developed a Wind-Down Case, in which the music business would be run from catalogue sales and limited presence in genres with more resilient demographics (i.e., Country/Christian/Jazz/Blues), at substantially reduced overhead.
  - The Wind-Down Case generates IRR of 3.6% and CoCM of 1.4x.

- Absent regulatory review, Dice and Warner remain a natural combination given their complementary geographic strengths and size as the third and fourth-largest majors in the market.
  - Analysts estimate up to £200m of cost savings could be achieved in a combination.
- TF would continue to monitor the regulatory landscape and explore the potential for a sale of Music to Warner.

Confidential

# Executive Summary
## Fit with TF Investment Criteria

terra firma

The acquisition of Dice fits with several of TF's stated investment criteria.

| TF Investment Criteria | Comment |
|---|---|
| Severable cash flows | Publishing generates revenue from over one million copyrights, and through four distinct revenue streams, including B2B and B2C. |
| Asset-backed | Of the over one million copyrights held by Publishing, 84.6% have length of agreement longer than ten years.<br>Music owns the recording copyrights of thousands of albums, including the Beatles library, that generate substantial recurring cash flows. |
| Cost structure rationalisation | Music has c.£400m of fixed overheads, off a revenue base of £1.4 billion. The team has identified substantial opportunity for fixed cost savings. |
| Business repositioning | There is opportunity to reposition Music from a laggard music label business to a provider of music content across multiple distribution formats. |
| Strong position with potential for acquisition-led growth in the Publishing market | Publishing is the second-largest owner of music copyrights. The four largest comprise c.60% of the market, and there are dozens of independent music publishers that may be available for acquisition. |

Confidential

A-1050

# Executive Summary

## Risks and Mitigants – Recorded Music

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Physical decline continues to be rapid | Physical sales, which comprised 90% of Dice Music revenue in FY 2007, declined by 15% year-on-year. There continues to be a step-change in the physical recorded music market, which could result in continued decline in industry revenue from physical sales. | • The decline in physical is in part driven by cannibalization from increased digital consumption of music.<br>• The team has assumed a 11% decline in physical revenue during the hold period in the Base Case (the "Indie" case).<br>– In line with analysts estimates.<br>• Dice's strong music catalogue and strength in music genres with "friendly" demographics (i.e., Christian/country/jazz) provides support for a floor on physical revenue with low cost base. |
| Digital growth is lower than expected | The music industry has thus far struggled to develop revenue models for monetizing the consumer patterns for consumption of digital music.<br>As a result, it is possible that the overall industry will continue decline to a smaller size. | • The base case assumes digital growth that is within the range of market forecasts.<br>• Slower than expected pickup in digital would at least partly be offset by less dramatic declines in physical.<br>• There are several value propositions that the team has identified that are not included in the Indie Case:<br>- The release of the Beatles catalogue in digital format;<br>- Positive impact from higher-priced premium digital tracks (i.e., higher quality and free from digital rights management). |
| Mobile growth is lower than expected | The opportunity presented by the emergence of music-enabled handsets is offset by sideloading of content that undermines the revenue capture opportunity for music labels. | • Leading industry-led initiative focus on music-enabled handsets (as well as the iPhone) as a driver of growth.<br>• The Indie Case does not factor in an industry initiative ( "Subscription 2.0") to transform delivery of music content to consumers on a subscription-based model similar to the cable subscription models. |

A-1051

# Executive Summary

## Risks and Mitigants – Recorded Music (cont'd)

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Achievability of cost savings | The Indie Case assumes a substantial degree of cost savings, which carries a degree of execution risk. | ▪ Even after four rounds of restructuring, there remains considerable fixed cost in the business required to support presence in smaller unprofitable markets<br>▪ The team has discussed in detail with management and identified with a high degree of confidence the costs that could be eliminated in the Indie and RunDown scenarios. |
| Disaggregation of the album | The decline in CD sales corresponds to a reduction in the number of "album equivalents" sold as digital distribution permits consumers to cherry-pick 2-3 tracks of an album for c.$0.99 each rather than paying $15.99 for the entire physical album. | ▪ The industry has developed pricing initiatives such as the "complete my album" that incentivize album purchases.<br>– As a result, the team understands that digital album sales are currently growing faster than digital singles sales.<br>▪ The team has modelled a market downside scenario reflective of a market in continued decline.<br>-This RunDown scenario overall music industry decline of 5.1% CAGR through 2017. |
| Piracy | Piracy of physical and digital music which costs the music industry $6 billion annually, an amount that is expected to increase as young music consumers become accustomed to acquiring their music without paying. | ▪ Piracy was most compelling as a consumer proposition when there was no legal alternative for digital download.<br>▪ The team believes that the impact of piracy, while significant, is unlikely to cut further into existing revenues as those who would commit piracy likely already do.<br>-Those markets where piracy is yet to develop do not account for significant revenues for Dice. |

Confidential

TF0000081384

A-1052

# Executive Summary
## Risks and Mitigants – Publishing

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Decline in the statutory royalty rate | The Copyright Regulatory Board is to determine the revised royalty rate that recorded music companies must pay to publishers.<br>In light of the deteriorating market conditions, it is likely that this rate will be set below the current rate, resulting in decline in mechanical revenue in the US. | ▪ TF RunDown Case assumes that the statutory rate is set at $0.065/track in 2008, 2.7% below the current $0.091 statutory rate.<br>▪ On a cash flow basis, there is an offset to Music as royalty costs paid to publishers in the US reduce by the same percentage.<br>▪ On a value basis, there would be additional leakage to the extent that Publishing is expected to attract a higher multiple on exit than Music. |
| Indie Case may reduce opportunity to cross-sell US artists to publishing catalogue | The Indie Case scenario assumes retraction from the US Rock&Pop market, which will result in lost opportunity for Dice to offer both Music and Publishing services to artists. As a result, there is risk that over time Dice will be unable to add to its catalogue to the extent forecast. | ▪ Historically, the publishing and record label industries have performed distinctly different functions for artists, and there is minimal overlap between the two as artists seek to split management of their rights to safeguard their interests.<br>▪ Publishing has many of the topselling songwriters who are not on the Music label, including Eminem, Kanye West and the Arctic Monkeys.<br>▪ Dice's Publishing has strong demonstrated ability to exploit its existing catalogue, and is likely to continue to be attractive to new artists who will profit from exploitation of their copyrights.<br>▪ While the team believes that any impact from separation of the two businesses will be negligible, the Indie Case assumes a slight decline of 0.5% top-line growth resulting from fewer new acts signed. |

## Executive Summary
### Risks and Mitigants – Financial

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Execution of Securitization | The securitization of Publishing's cash flows is complicated by the multi-jurisdictional nature of collections and the existing Dice corporate structure. | ▪ The team has had discussions on securitization structure with its banks, including Deutsche Bank which Dice had announced mandated to explore the securitization of the Publishing business. |
| Working capital swings intra-year | The company has historically operated with a £350m peak-to-trough swing in working capital, reflecting the advance payments to artists on the front-end and the ability to control royalty payments to artists on the back-end. | ▪ The team has had discussions with banks for a £350m revolving facility to provide sufficient flexibility.<br>▪ While the company operates at significant net working capital, overall net change in working capital year-on-year has been minimal. |

A-1054

# Executive Summary

## Risks and Mitigants – Legal

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Information Flow | The level of due diligence information in the data room and the time available to review was less extensive than on a typical transaction. | This is common on P2Ps. Dice had a particular concern that Whist could have accessed sensitive Information under Rule 20.2 of the Takeover Code. Management were also open and helpful in management meetings. |
| Financing | Dice has issued listed bonds (including those convertible into ordinary shares) which need to be taken out to implement our financing. | DKW has included the bond take out cost in the model. Our finance documents allow a sufficient grace period for us to take out the bonds before full financing is inserted. |
| Litigation | Dice operates in a very litigious environment. Proceedings are often taken against Dice and Dice robustly protects its rights. Dice does not take out insurance against claims but relies on internal legal resource to manage this risk. The view of management is that litigation is a "cost of doing business" this industry. | Over the past 3 years Dice has received more than it has paid out in litigation. Nonetheless, we have included amounts in the model to reflect estimated payout under material current litigation. |
| Defined Benefit Pensions Scheme | The trustees of the UKL Defined Benefit plan have confirmed that agreement has been reached in principle on the funding basis and schedule of contributions arising and from the 31 March 2006 valuation on the new Scheme specific funding basis on the basis of the Target's current covenant. As expected, the trustees have reserved their position to reassess the employer covenant if there is a change of control . The funding basis should show the UK Plan to be broadly 100% funded as at 31 March 2006 and so no defined repayment schedule is required. | ▪ On or following the Transaction, the trustees are likely to want to reassess the employer covenant and if they consider that the covenant has been weakened as a result of the Transaction they may seek additional funding or other security. Therefore, dialogue should be entered into with the trustees after announcing the offer. We understand from Management that Target and the trustees currently have a positive constructive relationship. |

A-1055

## Executive Summary
## Operational Plan – £130m Fixed Cost Savings beyond RE4

terra firma

| Cost area / EBITDA impact | Assumption | Summary rationale |
|---|---|---|
| Procurement £15-20m | £360m addressable spend; 5-10% saving on most categories | Currently no procurement function on Group level – only 3 procurement staff in entire group; no culture of cost control |
| Back Office £5-10m | Outsource back office functions | Current costs very high; systems not integrated; currently based in very expensive office locations |
| IT £10-15m | Outsource and use third party systems | Total Opex £46m Capex £12m: off-shoring, demand/vendor management, process streamlining |
| UK Overhead £10-15m | Apply same savings as rest of group | UK has £50m overhead v. £11m A&R spend: "should be reverse"; mostly escaped previous restructuring rounds |
| US New Releases £25-30m | Further savings according to management | Return NR business to break-even; alternative would be distribution contract with other major |
| Smaller countries £5-10m | Close offices in some smaller countries | Switzerland, for example, has £2m overhead and 2% local content… Austria, Sweden, Belgium etc. |
| LatAm / SE Asia £5m | Licensing model | Allows to reduce overhead but loses half of gross margin |
| Label costs £5m | Consolidate back office and some front office | Several labels based in close locations have complete and duplicated structures: press, PR etc. |

A-1056

# Executive Summary
# Debt Financing

terra firma

Summary of day 1 debt package

- Bridge to securitiation - 12 month bridge with a 7/8 year term out at a margin of 200 bps, stepping up 25 bps every 6 mos and capped at 300 bps
- Term loan B (on recorded music business) – 8-yr buller at 250 bps.
- Bridge to high yield or equity - 12 month bridge with a 9 year term out at a margin of 450 bps, stepping up 50 bps every 3 mos and capped at 10.5% cash/11.5% total
- Revolver - £350m mostly against recorded music business
- Acquisition facility - £100m committed and £200m uncommitted mostly against the publishing business

Summary of take-outs

- Securitisation against the publishing business - Out of the 12x total quantum, 10.5x will be a senior tranche priced at 90-95 bps including the costs of wrapping. The remainder will be a subordinated tranche at 450-500 bps. The blended margin will be in the 140s.
- High yield - Has a 10-yr term and a margin of 525 bps. It is proposed to be NC1, 102, 101, par.
- Including the high yield take-out, the permanent financing will total £2.5bn of drawn facilities with a weighted average margin of c. 228 bps.

- We are also negotiating an incurrence based covenant package only although we may end up with a very loose leverage covenant on the undrawn facilities.
- The proposal to the left is our requested structure and is based on Deustche Bank's original proposal. None of the banks has credit committee approval yet. The current status with each bank is below:
  - Deustche Bank – can only get approval for 1/3 of the package by Friday afternoon are only willing to go for 50% of the package by next Tuesday with their board.
  - Citi – the credit committee meets this evening. They are concerned about the securitisation take-out because they have not been involved in the rating agency discussions. This concern is translating into issues with the bridge structure because the various pieces of debt are not actually segregated on day 1. They may tweak the structure, but we don't think the quantum will change.
  - Barclays - They were some way off originally but are working to get as close to the £2.5bn quantum as possible – including an equity bridge if necessary. The structure is likely to be different. They are also checking whether they can get there by Monday as opposed to their original proposal of Tuesday.

A-1057

# Executive Summary
## Sources & Uses

terra firma

| Sources | | Uses | |
|---|---|---|---|
| New Equity | £1,407 | Shareholders | £2,465 |
| | | Debt retirement | 1,250 |
| Senior Term Loan | 725 | Pension Deficit | 40 |
| Senior Sceuritisation | 1,410 | Additional Pension Buyout | 25 |
| | | Financing Fees | 56 |
| Sub bridge to HY / Equity | 365 | Deal Fees | 11 |
| | | Refinancing Costs | 72 |
| | | Other Day One | - |
| Cash | 38 | Min cash | 25 |
| **Total** | **£3,945** | **Total** | **£3,945** |

A-1058

Confidential

TF0000081390

## Equity Case

terra firma

- Growth Assumptions:
  - Physical: 10% CAGR decline
  - Digital: 35% CAGR growth
- £40m of NPS acquisition at 12x NPS
- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close
- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m
- CRB arbitration outcome: $0.091/track
- Exit multiples:
  - 10x Music
  - 16x Publishing

- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

Upside Scenarios:

- Sale of DRM free tracks add 5% to digital growth each of first 3 years
- Subscription 2.0 in Europe adds £24m EBITDA in 2011 and £48m from 2012 onwards
- Share in touring and merchandising revenues grow to £18m revenues, £12m EBITDA in 2012

A-1059

Confidential

## Rundown Scenario

terra firma

- Growth Assumptions:
  - Physical: 15% CAGR decline
  - Digital: 23% CAGR growth
- Operate Indie (base case) model in 2009, switch to rundown in 2010
- In 2009 stop all new releases, keeping Country, Christian, Jazz and Blues
- Consolidate regional offices and run from catalogue
- Rundown decline: 3% CAGR below market (digital less growth, physical more decline)
- CRB arbitration outcome: $0.065/track
- Exit multiples:
  - 6.5x Music
  - 14x Publishing

- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

Scenarios:

- Scenario A:
  - Hold Publishing
  - Reduce catalogue sales by 0.5% CAGR decline
  - Exit Music in 2012
  - Run for cash, no exit

Confidential

A-1060

# Executive Summary
## TF Base Case: Summary Transaction Economics

terra firma

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | Actual | | Forecast | | | | |
| Total Recorded Music Net Revenue | 1,660 | 1,414 | 1,131 | 1,096 | 1,095 | 1,102 | 1,117 |
| Total Publishing Net Revenue | 420 | 338 | 427 | 463 | 499 | 513 | 529 |
| Total Consolidated Net Revenue | 2,080 | 1,752 | 1,558 | 1,559 | 1,593 | 1,615 | 1,646 |
| Recorded Music EBITDA | 186 | 78 | 155 | 268 | 274 | 273 | 269 |
| Publishing EBITDA | 113 | 118 | 129 | 153 | 168 | 173 | 179 |
| Central and Other EBITDA | (24) | (22) | (16) | (16) | (17) | (17) | (18) |
| Total EBITDA pre-PIP | 276 | 174 | 269 | 404 | 425 | 430 | 431 |
| add: Incremental Central and Other Restructuring | - | - | 10 | 45 | 47 | 48 | 50 |
| Total EBITDA | 276 | 174 | 279 | 450 | 472 | 478 | 480 |
| Net income | | | (28) | 132 | 174 | 192 | 204 |
| Plus: Depreciation | | | 15 | 15 | 15 | 15 | 15 |
| Plus: Amortization | | | 40 | 43 | 45 | 47 | 48 |
| Less: Change in WC | | | 15 | 2 | (0) | 0 | (1) |
| Less: Pension deficit funding | | | - | - | - | - | - |
| Cash flow from operations | | | 41 | 191 | 234 | 253 | 267 |
| Recorded Music Capex | | | (21) | (19) | (17) | (15) | (14) |
| Purchase of music copyrights | | | (6) | (7) | (7) | (7) | (7) |
| Disposals of music copyrights | | | - | - | - | - | - |
| Publishing Acquisitions | | | - | (120) | (120) | - | - |
| Other purchases | | | - | - | - | - | - |
| Disposals of other | | | - | - | - | - | - |
| Net cash used in investing | | | (28) | (145) | (144) | (22) | (21) |
| Cash flow before financing | | | 13 | 46 | 91 | 231 | 245 |

Confidential

TF0000081394

A-1061

## Base Case (Indie Scenario)

terra firma

- Growth Assumptions:
  - Physical: 11% CAGR decline
  - Digital: 32% CAGR growth
- £20m of NPS acquisition at 12x NPS
- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close
- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m
- CRB arbitration outcome: $0.091/track
- Exit multiples:
  - 8.5x Music
  - 16x Publishing

- Total fixed cost savings: £80m + £10m post RE4
  - Procurement: £15m
  - Back office: £10m
  - IT: £10m
  - US New releases: £22+£5m
  - Smaller countries: £5m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

A-1062

Confidential

Case: 11-126 Document: 48 Page: 264 04/25/2011 272867 401

# Project Dice
## Recorded Music EBITDA bridge: 2007-2009

terra firma

Market dynamics
Variable cost reduction
Fixed cost reduction
£m
300
225
150
75
0
-75
-150
2007 Recorded Music EBITDA
*
Increase in digital gross margin
Decline in physical gross margin
Reduction in variable costs
Reduction in fixed costs
2009 Recorded Music EBITDA

* Excludes Japan

Page 22

A-1063

Confidential

TF0000081395

# Executive Summary
## Diligence Conducted

terra firma

| Advisors | | |
|---|---|---|
| **Focus** | **Parties** | **Status** |
| Commercial | LEK | Developed a bottom-up model of each of the US and UK/France/Germany to project market digital growth and physical decline. Participated in management meetings; reports submitted to banks. |
| Commercial | McKinsey | Examined potential upside opportunities and the cost reduction plan. Participated in management meetings; reports submitted to banks. |
| Tax | KPMG | Reports submitted to banks. |
| Pensions | KPMG | Reports submitted to banks. |
| Accounting | KPMG | Reviewed data room and Vendor Due Diligence prepared by Deloitte. Reports submitted to banks. |
| Legal | Weil Gotshal | Reviewed data room; participated in management meetings. |
| Advisory | Dresdner Kleinwort | Reviewed the data room; participated in management meetings. |

A-1064

Confidential

# Executive Summary
## Exit Considerations

terra firma

### Recorded Music

- Sale to Whist:
  - "perfect" geographical fit to the businesses (Whist strong in US, weak in Europe; Dice vice versa)
  - £200m of cost savings from combination (value to Dice of £1bn at 10x multiple on 50%)
  - only remaining consolidation play for the majors (UMG or Sony BMG would have regulatory issues)
  - regulatory risk generally considered relatively modest given pricing trends in the industry
- Sale to media conglomerate, distribution player or new media major:
  - distribution companies have perennial fascination with pure content plays (Sony/Columbia, JVC/Victor Music, AOL/Time Warner, Telefonica/Endemol, Vivendi/Universal, Mediaset/Endemol, Virgin Media/ITV): Dice represents the perfect digital content engine for the broadband pipes of the future (eg Comcast, Virgin Media, Liberty Global)
  - digital content engine for new media majors (Google, Yahoo!, Microsoft)
  - good fit with film majors not currently in the music industry (News Corp, Disney)
- IPO:
  - perfectly feasible as a pure play, attracting premium multiple as market enthusiasm for digital growth developspublishing income not a prerequisite, though a re-IPO of the combined group also makes sense
- Recapitalisation:
  - increased leverage potential post restructuring and as visibility on industry revenue growth improves

### Publishing

- Sale to financial player:
  - private equity and infrastructure funds will have strong interest based on highly stable but growing and scaleable cash flow profile
- Sale to major media conglomerate, distribution player or new media major:
  - standalone logic may be less compelling but feasible at attractive valuation as part of integrated play with Recorded Music
- IPO:
  - music publishing assets highly valued in the equity market today even at much smaller scale (implied value of Chrysalis music publishing c. £150m based on £10m NPS, £5m EBITDA
- Recapitalisation:
  - good opportunity to recap the business in conjunction with bolt on acquisitions
  - upscale the financing on similar multiples based on higher cashflows as growth comes through

A-1065

## Executive Summary
## Optimum Timetable to Offer Announcement

terra firma

| | |
|---|---|
| May 17 | TFCP II & TFCP III Advisory Board approval received |
| May 18 | IAC approval<br>Credit Committee approval<br>Interim finance docs prepared for signature<br>Submit Draft 2.5 announcement and irrevocable break fee letters |
| May 18 - 20 | Negotiate with Board |
| May 21 | Announce Recommended Offer |

A-1066

terra firma

# Contents

- Executive Summary

[redacted]

- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations
- Due Diligence Work Streams
- Appendices

A-1067

# L.E.K.'s U.S. forecast of the music market is built "bottom-up" by examining the key drivers affecting each segment

terra firma

## Mobile

**Music-enabled Phones**
- Music-enabled phone penetration – approached ~200M phones by 2013

**Active Mobile Music Downloaders**
- Ramps up to paid transactional VOD levels – currently at 30%

**Spend/Active User**
- Increases to levels approaching digital music subscriber as buying convenience offsets need to learn the usability by dual mode
- $80 per active user (approximately the same as current spend in Asia)

## Online

**Broadband-enabled households**
- Enabled households for active music downloading
- S-curve penetration

**Digital Music User Prevalence**
- Projected to reach 60% by 2013, slightly larger than the active rate for physical music (57%)

**Spend/Digital Household**
- Downloaders vs. subscribers mix
- Laggard effect from less avid buyers offset by increased usability and tiered pricing

**Cannibalization from Mobile**
- $1 mobile cannibalizes $0.40 digital music

**Download Piracy**
- Incremental 3% digital piracy

## Physical

**Baseline Increase**
- Based on 2006 with constant price and population growth

**Cannibalization from Digital**
- $1 digital music cannibalizes $0.70 on physical as digital music converts some pirates to legal downloading

**Cannibalization from other Media**
- $1 spent on games leads to a $0.25 loss o[n] music
- Based on media cannibalization study and expert views

**Incremental Physical Piracy**
- Updated view on prior L.E.K. research, incorporating that P2P activity has remained stable, but that ripping is still a problem

A-1068

Confidential

Case: 11-126 Document: 48 Page: 270 04/25/2011 272867 401

US MARKET FORECAST
terra firma

# Expert views – US physical

US Physical Market
(2000-2013F)
Billions of Dollars
16
14
12
10
8
6
4
2
0
2000
02
04
06F
08F
10F
12F
CAGR%
(2006F-10F)
PWC 2005 (0.7)*
Veronis 2005 (1.7)*
Expert IV (4.1)
PWC 2006 (5.6)
Veronis 2006 (10.6)**
LEK (11.7)**

Note : * CAGR% calculated for 06-09F
** L.E.K. figures based on retail value, whereas other Veronis forecast based on total value of product shipped

Source : PWC 2005 & 2006, Veronis Suhler 2005 & 2006, Jupiter 2006, Credit Suisse 2006, U&S 2006, L.E.K. Music Market Model

Page 28

Confidential

TF0000081401

A-1069

US MARKET FORECAST
terra firma

# Expert views – digital download and subscription

US Digital Download & Subscription
(2004-2013F)
Billions of Dollars
6
5
4
3
2
1
0
2004
05
06F
07F
08F
09F
10F
11F
12F
13F
Credit Suisse
Veronis 2006
LEK
PWC 2006
Expert IV
CIBC
CAGR% (2006F-10F)
32.7
16.9
26.3
26.3
23.0
34.3

Source : PWC 2006, Veronis Suhler, 2006 Jupiter, Credit Suisse 2006, U&S 2006, L.E.K. Music Market Model

Page 29

A-1070

Case: 11-126 Document: 48 Page: 272 04/25/2011 272867 401

# Expert views – mobile

US MARKET FORECAST
terra firma

U.S. Mobile Revenues 1
(2003-2010F)
Billions of Dollars
6.0
5.0
4.0
3.0
2.0
1.0
0
2003 2004 2005 2006F 2007F 2008F 2009F 2010F 2011F 2012F 2013F
CAGR% (2006F-10F)
Credit Suisse 32.7
Veronis 2006 16.9
CIBC 34.4
LEK 30.6
PWC 2006 26.3
Expert IV 33.4

Note : [1] Includes master ringtones, ringbacks, music videos, full length downloads, other mobile and subscriptions

Source : Veronis Suhler Stevenson, Credit Suisse, L.E.K. Music Market Model

Page 30

Confidential TF0000081403

A-1071

Case: 11-126 Document: 48 Page: 273 04/25/2011 272867 401

US MARKET SUMMARY
terra firma

# Sources of Change – US

Sources of Change
US Music Market (2006-2013)
$B
14
12
10
8
6
4
2
0
10.9
0.6
(4.5)
(0.5)
(1.5)
(0.5)
7.3
(0.9)
(1.1)
2.3
12.2
2006 Sales
Change Physical Sales
Cannibalization from Digital
Cannibalization from Mobile
Cannibalization from Games
Piracy Impact
Incremental Digital Sales
Cannibalization from Mobile
Piracy Impact
Incremental Mobile Sales
2013 Sales
Physical
Digital
Mobile
Note that the primary driver of the Physical Decline is cannibalization or substitution from other channels

Source: LEK

Page 31

Confidential

TF0000081404

A-1072

EU 3 MUSIC MARKET
terra firma

# Source of Change – EU 3 Music Market

Sources of Change
EU 3 Music Market (2006-2013)
$B
10
9
8
7
6
5
4
3
2
1
0
7.8
0.3
(4.1)
(1.0)
(1.1)
(0.2)
6.9
(1.0)
(1.3)
2.6
9.0
2006 Sales
Cannibalization from Digital
Cannibalization from Games
Incremental Digital Sales
Piracy Impact
2013 Sales
Physical
Digital
Mobile

Confidential

TF0000081405

A-1073

Case: 11-126 Document: 48 Page: 275 04/25/2011 272867 401

MARKET ASSUMPTIONS : DIGITAL

# Paid music downloading is penetrating into the file-sharing user base

terra firma

Fee-Based vs. Total Downloaders
Millions of Downloaders
70
60
50
40
30
20
10
0
56.5M
48.9M
54.8M
47.9M
60.3M
Total
Fee-based
2002
2003
2004
2005
2006

Source : Ipsos Tempo : In-Depth Downloader Survey, Q4 2006

Page 33

Confidential

TF0000081406

A-1074

Case: 11-126 Document: 48 Page: 276 04/25/2011 272867 401

EUROPE MARKET DRIVERS
terra firma

# P2P activity has slowed down since 2003, mainly due to stepped-up enforcement efforts; market experts expect Western Europe to continue to abate piracy

Illegal P2P files on networks
Western Europe
(2003-05)
Files
1,200
1,000
800
600
400
200
0
1,000
800
760
2003
04
05

Illegal P2P music downloaders of online users
Western Europe
(2002-06)
Percentage
20
15
10
5
0
2002
03
04
05
06

- In Western Europe law enforcements and lawsuits led to a decrease in P2P activity and piracy
  "... Piracy is a big issue in Europe. However, in the last year Western European countries, like Germany and the UK effectively reduced illegal P2P music downloads ..."
  Director Marketing, IFPI
- Going forward, experts believe that Western Europe will continue to abate music piracy
  "... Due to new laws and the uptake of paid digital services in Western Europe, especially in Spain and Italy, we expect music piracy decrease going forward ..."
  Director Marketing, IFPI

Source : Jupiter, PwC, RIAA

Page 34

A-1075

Confidential TF0000081407

# Music Industry Overview – Cash and Product Flows

terra firma

* With some contracts, artists can receive a share of the publishing revenues – i.e., when they provide creative input

** Product includes CDs, digital downloads and "real" tones (those that play the actual recording as opposed to the tune)

Source: McKinsey

Confidential

A-1076

terra firma

## Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Transaction Economics
- Structure & Financing
- Exit Considerations
- Due Diligence Work Streams
- Appendix

A-1077

terra firma

## BASE CASE:
## "From smallest Major to largest Indie in 5 profitable steps"

1. Focus geographical coverage on areas of strength
   - Sell Japan
   - Cover smaller countries through regional hubs or licensing
   - De-risk US
   - Focus on UK and Europe
2. Reduce fixed cost base
   - Procurement
   - Overhead
3. Take creative not financial risk
   - Improve Marketing ROI
   - Rationalise A&R function
4. Work closer with artists to share in ancillary revenues
   - Touring
   - Merchandising
   - etc.
5. Aggressively pursue new opportunities:
   - Subscription 2.0
   - Advertising based models
   - Differentiated pricing
   - ...

A-1078

Confidential

## 1. FOCUS GEOGRAPHICAL COVERAGE ON AREAS OF STRENGTH

terra firma

| Sell Japan | Consolidate smaller countries in regional platforms | De-risk US by scaling down New Releases | Focus resources on UK & Europe |
|---|---|---|---|
| ▪ Growing and profitable<br>▪ Very dependent on local content (J-pop)<br>▪ Fragmented market, need for consolidation<br>▪ Expected to fetch £400-450m | ▪ Overhead per country at least £2-3m<br>▪ Many smaller countries with little local content; hence do not require local operation<br>▪ Licensing agreements or small distribution co's<br>▪ Estimated savings £5-10m | ▪ Catalogue Country and Christian stable and profitable<br>▪ Pop/Rock new releases lost $300m in 3 years; sub-scale<br>▪ Maintain presence to attract UK talent with opportunity to break into US market<br>▪ Estimated savings £25-30m fixed cost and £13m gross margin | ▪ As only UK based major, Dice has strategic advantage<br>▪ ½ to 2/3 of international roster UK based<br>▪ In total nearly twice as big as US operation and profitable |

A-1079

Confidential

## 2. REDUCE FIXED COST BASE
## £80-100m Savings beyond RE4 in Recorded Music

terra firma

| Cost area / EBITDA impact | Assumption | Summary rationale |
|---|---|---|
| **Procurement** £15-20m | £360m addressable spend; 5-10% saving on most categories | Currently no procurement function on Group level – only 3 procurement staff in entire group; no culture of cost control |
| **Back Office** £5-10m | Outsource back office functions | Current costs very high; systems not integrated; currently based in very expensive office locations |
| **IT** £10-15m | Outsource and use third party systems | Total Opex £46m Capex £12m: off-shoring, demand/vendor management, process streamlining |
| **UK Overhead** £10-15m | Apply same savings as rest of group | UK has £50m overhead v. £11m A&R spend: "should be reverse"; mostly escaped previous restructuring rounds |
| **US New Releases** £25-30m | Further savings according to management | Return NR business to break-even; alternative would be distribution contract with other major |
| **Smaller countries** £5-10m | Close offices in some smaller countries | Switzerland, for example, has £2m overhead and 2% local content... Austria, Sweden, Belgium etc. |
| **LatAm / SE Asia** £5m | Licensing model | Allows to reduce overhead but loses half of gross margin |
| **Label costs** £5m | Consolidate back office and some front office | Several labels based in close locations have complete and duplicated structures: press, PR etc. |

terra firma

# Improved procurement could save significantly more than the initial internal estimate

| Spend (size) category (£m) | Examples of spend | EMI/Ussher estimated savings, % | McKinsey benchmarks | Sizing (£m) Ussher | McKinsey low estimate (10%) |
|---|---|---|---|---|---|
| A&R (50) | Video production | 2.5 | 10—15% average savings in specialist | ~2 | ~5 |
| | Recording studios | 2.5 | | | |
| | Concert tickets | 10 | | | |
| | Limos | 4 | | | |
| Marketing (120) | Media advertising | 5 | >15% | ~5 | ~12 |
| | Print | 2.5 | >15% | | |
| | Design start work | 5 | >15% | | |
| Overheads (80) | Security | 0 | 20–30% | ~2 | ~8 |
| | Catering | 4 | 15–20% | | |
| | Office copiers and printing | 4 | >20% | | |
| | **Average** | **2.5-5%** | **10-15%** | **Total ~9** | **~25** |

A-1081

## Potential savings from off-shoring / outsourcing

terra firma

| Cost Area | Cost Base (£m) | Typical Saving (%) | Potential EBITDA increase (£m) | Levers | Typical Areas |
|---|---|---|---|---|---|
| Finance | 29 | 7.5-12.5% | 2-4 | ▪ Off-shoring<br>▪ Process harmonisation<br>▪ Systems replacement / automation | ▪ Routine processing and reconciliation<br>▪ Financial reporting and monitoring |
| HR | 20 | 10-17.5% | 2-4 | ▪ Off-shoring<br>▪ Process harmonisation<br>▪ Systems replacement / automation | ▪ Benefits administration<br>▪ Training |
| IT Opex | 46 | 15-30 | 7-14 | ▪ Off-shoring<br>▪ Vendor management<br>▪ Process streamlining<br>▪ Demand management | ▪ Support desk<br>▪ Infrastructure operations<br>▪ Application maintenance |
| IT Capex | 12 | 10-25 | 1-3 | ▪ Off-shoring<br>▪ Process streamlining<br>▪ Procurement<br>▪ Contract renegotiation | ▪ Application development<br>▪ Hardware<br>▪ Licensing |

A-1082

Confidential

terra firma

## 3. TAKE CREATIVE, NOT FINANCIAL RISK
## The Indie approach can drive a step change in the majority of cost areas for most unproven acts

| Cost Area | Approach | Evidence | Quotes |
|---|---|---|---|
| A&R | Successful artists emerge via 'crowd-sourcing'; bands are selected to have singles made based on level of community appeal (click thrus, reviews, ratings) | Music Nation built profile of 3,000 bands for $300,000 (30 of which are likely to get at least a test deal)<br>Spend may come down over time as MusicNation becomes better known | "We estimate that we save at least 80% of A&R costs spent by majors on non-established acts"<br>*Founder MusicNation* |
| Marketing | Artists are marketed primarily through their communities and viral marketing,<br>Save on upfront marketing costs to develop new talent as marketing spend focused on only promising new acts | Typical Indie marketing budget per new act is $10K vs. typical spend of ~$1m for major seeking to establish major new act<br>Original Signal new MusicNation signing already has 37,000 MySpace friends and 27,000 BeBo friends before a single is released | "The majors just don't get the power of digital and how digital communities work"<br>*Ex-Sony UK Head of Marketing; now MD of UK indie label* |
| Production | Initially produce singles rather than full CD bunch<br>Create lower-cost videos<br>Focus on low budget production for early singles | Popular band Original Signal produced a video for $94; bands on indie label spend ~ $5,000 on a video (vs. ~$500,000 for typical MTV music video)<br>Total production costs for an iTunes release are ~$10,000 | "New digital technology means anyone can make a cheap video now"<br>*Indie label exec* |
| Distribution | Distribute digitally only for non-established bands and produce physical copies only for successful acts | Typical costs of physical distribution ~13% of CD wholesale price (~$1.35 per CD) | "Digital distribution costs us virtually nothing "<br>*Founder MusicNation* |

A-1083

terra firma

# 4. WORK CLOSER WITH ARTISTS TO SHARE IN ANCILLARY REVENUES

**Labels currently have a relatively small participation in the overall music revenues, and there is an opportunity to participate in other streams**

Note: Other includes licensing and proceeds from motion pictures, TV, etc
Source : L.E.K. Analysis

Confidential

# A small number of artists have succeeded in generating considerable revenue streams from a broader range of rights

terra firma

A-1085

## Ancillary revenues framework: Bottoms up, mid-level band

terra firma

- Touring:
  - 750,000 tickets at $25 per head; tour gross = $18,750,000
  - Less: Touring costs (agency, business management, production, tour staffing, travel) = $10 to $12 million
  - Net: Tour earns $8 to $10 million
  - Label partner receives 25% of net (Korn example)
- Merchandising:
  - $8/head gross merchandising = $6,000,000
  - Less: COGS (manufacturing, shipping, hall fees generally 20%)
  - Net: $3 million
  - Label partner receives 50%, $1.5 million

A-1086

terra firma

# 5. AGGRESSIVELY PUIRSUE NEW OPPRTUNITIES - EXAMPLE

## A successful Nov-06 release illustrates the potential of digital and – in particular – mobile

| Unit Sales | Physical CD | Digital Single | Digital Album | Ringtune | Video | OTA Download | TOTAL |
|---|---|---|---|---|---|---|---|
| | 1.5m | 3.9m | | 5.9m | | 0.6m | |

Confidential

A-1087

terra firma

# Subscription 2.0 is currently being negotiated between record labels and a mobile operator in the US (numbers based on L.E.K. bottom-up model)

All mobile enabled subscribers pay $3/month for an unlimited subscription music service; a further upside could come from Europe being priced at €3/month.

100% of the $3 goes directly to record labels

Cingular and Vodafone are assumed to start the service in 2008, with all other carriers converting to the service over the 2010-11 period

Cingular and Vodafone are assumed to have 30% market share in their respective markets. 100% of users with music enabled mobile phones receive the service when their carriers convert

In our Equity Case we have assumed £48m contribution from Europe staring in 2012; this corresponds to signing up one operator – Vodafone – with 30% market share. Dice receives 20% of overall label revenue, based on their market share

We have not factored in a share in US proceeds due to strategy of scaling down; this is conservative, as catalogue business will generate a share in revenues

A-1088

Case: 11-126 Document: 48 Page: 290 04/25/2011 272867 401

terra firma

# The extra label revenue from Subscription 2.0 would come from extra spending in the US and different sharing in European mobile operators

US Consumer Spend (2005-2013)
Billion US$
15
14
13
12
11
10
Subscription 2.0
Base Case
2005 2006 2007 2008 2009 2010 2011 2012 2013

EU3* Consumer Spend (2005-2013)
Billion US$
9.5
9.0
8.5
8.0
7.5
7.0
Subscription 2.0
Base Case
2005 2006 2007 2008 2009 2010 2011 2012 2013

* UK, France, Germany
Source: L.E.K.

Page 48

A-1089

Confidential

TF0000081421

# Operational Business Plan - Dice Management

terra firma

- TF expects to continue with the current management team, at least in the short term
- TF has met with management in meetings

## Analyst Commentary on Management

- *"By having a second profits warning so rapidly after the first one the new regime at Recorded Music (effectively CEO Eric Nicoli) can implicitly put the blame for what might appear to be systematic over-shipment of product at the feet of the previous management, Alain Levy and David Munns. To have left the profit warning longer would have meant that the Nicoli management might have had to 'own' the problem itself. In this respect the market is likely, grudgingly, to continue to run with the existing Dice management for the moment." –* ***Morgan Stanley 16 February 2007***
- *"Dice has two fundamental problems: an industry with negative growth and a management team which, in our opinion, lacks the credibility to solve the issues facing the company. In particular the management team has been slow to adapt to the new industry structure and we doubt it can find the right answers to the company's future challenges.... We are left wondering whether Mr Nicoli is co-responsible for these disappointments, or instead acted swiftly to get rid of the management that caused the problems. We are sceptical, however, that the existing management team has the depth, the experience and the talent to cope successfully with the issues facing Dice and the music industry in general." –* ***Pali International 11 April 2007***

Confidential

TF0000081422

A-1090

## Base Case (Indie Scenario)

terra firma

- Growth Assumptions:
  - Physical: 11% CAGR decline
  - Digital: 32% CAGR growth
- £20m of NPS acquisition at 12x NPS
- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close
- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m
- CRB arbitration outcome: $0.091/track
- Exit multiples:
  - 8.5x Music
  - 16x Publishing

- Total fixed cost savings: £80m + £10m post RE4
  - Procurement: £15m
  - Back office: £10m
  - IT: £10m
  - US New releases: £22+£5m
  - Smaller countries: £5m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

A-1091

# Equity Case

terra firma

- Growth Assumptions:
  - Physical: 10% CAGR decline
  - Digital: 35% CAGR growth
- £40m of NPS acquisition at 12x NPS
- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close
- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m
- CRB arbitration outcome: $0.091/track
- Exit multiples:
  - 10x Music
  - 16x Publishing
- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

Upside Scenarios:

- Sale of DRM free tracks add 5% to digital growth each of first 3 years
- Subscription 2.0 in Europe adds £24m EBITDA in 2011 and £48m from 2012 onwards
- Share in touring and merchandising revenues grow to £18m revenues, £12m EBITDA in 2012

A-1092

## Rundown Scenario

terra firma

- Growth Assumptions:
  - Physical: 15% CAGR decline
  - Digital: 23% CAGR growth
- Operate Indie (base case) model in 2009, switch to rundown in 2010
- In 2009 stop all new releases, keeping Country, Christian, Jazz and Blues
- Consolidate regional offices and run from catalogue
- Rundown decline: 3% CAGR below market (digital less growth, physical more decline)
- CRB arbitration outcome: $0.065/track
- Exit multiples:
  - 6.5x Music
  - 14x Publishing

- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

Scenarios:

- Scenario A:
  - Hold Publishing
  - Reduce catalogue sales by 0.5% CAGR decline
  - Exit Music in 2012
  - Run for cash, no exit – when is debt repaid?
- Scenario B:
  - Sell Publishing in 2008 for 14x EBITDA
  - Reduce catalogue sales by 0.5% CAGR decline
  - Exit Music in 2012
  - Run for cash, no exit – when is debt repaid?

A-1093

Confidential TF0000081425

## Base Case (Indie Scenario)

terra firma

- Growth Assumptions:
  - Physical: 11% CAGR decline
  - Digital: 32% CAGR growth
- £20m of NPS acquisition at 12x NPS
- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close
- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m
- CRB arbitration outcome: $0.091/track
- Exit multiples:
  - 8.5x Music
  - 16x Publishing

- Total fixed cost savings: £80m + £10m post RE4
  - Procurement: £15m
  - Back office: £10m
  - IT: £10m
  - US New releases: £22+£5m
  - Smaller countries: £5m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

A-1094

# Opportunities Analysis

terra firma

Dice Marketing spend looks comparable to Warner's

Marketing expenditure, % of sales

| | Warner Music Group* | Dice** |
|---|---|---|
| Marketing expenditure, % of sales | 20–23 | 17–22 |

| Actions | Observations |
|---|---|
| Focus on priority acts | - "The concept of spending less on marketing and accepting a lower chart position, but making more money is totally foreign to the industry" – *ex-Sony analyst*<br>- "Warner increased the spend on its high potential acts" – *Warner* |
| Measure performance and spend effectiveness | - "There is very little analytical work in marketing" – *ex-Dice employee 2*<br>- "Companies are still spending 20-30% of their marketing budget on radio promotions, which are much less effective" – *McKinsey media expert 3*<br>- "Companies are spending only 1% of their budget on the fastest growing channel – the web" – *ex-Sony Executive* |
| Consolidate purchasing | - "Each label has their own marketing team so there are no economies of scale" – *Ex-Dice employee 2*<br>- "Each month, the company added 6 new creative agencies to its list of suppliers and never cut any of the old one's" – *McKinsey media expert 3* |
| Reduce long-tail of expenses | - "There is long tail of expenses which can be cut – e.g., marketing people courier by DHL a free new album to a list of thousands of people" – *McKinsey media expert 3* |

**Potential impact**

- "Typically a 5-15% cost saving is achievable by refocusing on the high potential acts and more cost effective forms of marketing" – *McKinsey media expert 1*
- Saving 5-15% of costs brings savings of £15–55m
  - Removing £5-15 million of fixed costs
  - Reducing variable costs by 1-2.5% of sales

- Potential savings may need to be reinvested in promising acts to drive revenue
- Difficult to quantify how much of the cost savings in Marketing have already been captured

* Warner recorded music marketing cost as a percent of sales from 2004–2006
** Brokers report Dice marketing (variable and fixed) as 17% of sales for 2006 compared to an estimate of 22% by a former Dice executive

Source: Team analysis, Company data and Industry interviews

A-1095

# RATIONALISE THE NUMBER OF LOCAL OFFICES

terra firma

Regional headcount split
100% = 6,312*
Latin America
Other
North America
U.K.
Asia Pacific
Rest of Europe
Estimated revenue per employee**
£ k per FTE
Rest of Europe
402
North America
283
U.K.
257
Asia Pacific
243
Latin America
241
Other
198
£293k

**Observations**

- "We are a global business with a presence in more than 50 countries"
  - *– Dice annual report*
- Limited opportunity for the sale-and-leaseback on properties, with Japan and US offices already leased
- Potential to consolidate small offices in Europe – e.g., Dice has separate offices in countries Scandinavian and Baltic countries
  - Sweden
  - Norway
  - Denmark
  - Latvia
- "Real savings can come from rationalising the back office functions"
  - *– Ex-Dice employee 1*

* Split is not broken down between recorded music and music publishing
** Revenue per employee is for both publishing and recorded music
Source: Company data, Industry interview

Confidential

A-1096

terra firma

# Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Operational Business Plan
- Structure & Financing
- Exit Considerations
- Due Diligence Work Streams
- Appendix

A-1097

# Transaction Economics and Valuation

## TF Indie Case: Financial Projections

terra firma

Operating Performance - Recorded Music

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | Actual | | Forecast | | | | |
| **Recorded Music Revenue** | | | | | | | |
| Digital | 61 | 97 | 110 | 156 | 204 | 247 | 289 |
| Mobile | 31 | 49 | 56 | 79 | 104 | 125 | 147 |
| Total Digital Revenue | 93 | 147 | 165 | 236 | 308 | 372 | 436 |
| *Growth (%)* | | *58.7%* | *12.7%* | *42.4%* | *30.6%* | *20.9%* | *17.1%* |
| Physical | 1,403 | 1,114 | 822 | 717 | 644 | 587 | 538 |
| Growth (%) | | *(20.6%)* | *(26.2%)* | *(12.8%)* | *(10.2%)* | *(9.0%)* | *(8.3%)* |
| Royalty and licensing | 102 | 85 | 76 | 72 | 69 | 65 | 62 |
| Neighbouring rights | 63 | 69 | 67 | 70 | 74 | 78 | 82 |
| Total Recorded Music Net Revenue | 1,660 | 1,414 | 1,131 | 1,096 | 1,095 | 1,102 | 1,117 |
| *Growth (%)* | | *(14.8%)* | *(20.0%)* | *(3.1%)* | *(0.1%)* | *0.6%* | *1.4%* |
| Recorded Music EBITDA | 186 | 78 | 155 | 268 | 274 | 273 | 269 |
| *Margin (%)* | *11.2%* | *5.5%* | *13.7%* | *24.4%* | *25.0%* | *24.8%* | *24.1%* |
| Depreciation | (4) | (24) | (2) | (2) | (2) | (2) | (2) |
| EBITA | 182 | 54 | 153 | 266 | 271 | 271 | 267 |
| *Margin (%)* | *43.5%* | *13.1%* | *35.6%* | *57.2%* | *54.2%* | *52.6%* | *50.2%* |

Operating Performance - Publishing

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | Actual | | Forecast | | | | |
| **Publishing Revenue** | | | | | | | |
| Total Publishing Revenue | 547 | 543 | 559 | 577 | 595 | 613 | 632 |
| less: Publishing eliminations | (128) | (127) | (131) | (135) | (139) | (143) | (148) |
| add: Publishing Acquisition | - | - | - | 22 | 45 | 45 | 47 |
| Total Publishing Net Revenue | 420 | 416 | 429 | 465 | 501 | 515 | 531 |
| Net Publisher Share | 191 | 188 | 194 | 202 | 208 | 216 | 223 |
| add: Publishing Acquisition | - | - | - | 10 | 20 | 21 | 21 |
| Total Net Publishing Share | 191 | 188 | 194 | 212 | 229 | 236 | 244 |
| *% Total Publishing Revenue* | *45.4%* | *45.2%* | *45.4%* | *45.5%* | *45.7%* | *45.8%* | *46.0%* |
| Publishing EBITDA | 113 | 118 | 129 | 143 | 148 | 153 | 158 |
| add: Publishing Acquisition | - | - | - | 10 | 20 | 21 | 21 |
| Total Publishing EBITDA | 113 | 118 | 129 | 153 | 168 | 173 | 179 |
| *Margin (%)* | *27.0%* | *28.3%* | *30.2%* | *32.8%* | *33.5%* | *33.6%* | *33.7%* |
| Depreciation | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| EBITA | 111 | 115 | 127 | 150 | 165 | 170 | 176 |
| *Margin (%)* | *26.4%* | *27.6%* | *29.6%* | *32.2%* | *32.9%* | *33.1%* | *33.2%* |

Confidential

TF0000081430

# Transaction Economics and Valuation
## TF Indie: Cash Flow Statement

terra firma

| (£m) | 2006 Actual | 2007 | 2008 Forecast | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Total Recorded Music Net Revenue | 1,660 | 1,414 | 1,131 | 1,096 | 1,095 | 1,102 | 1,117 |
| Total Publishing Net Revenue | 420 | 338 | 427 | 463 | 499 | 513 | 529 |
| Total Consolidated Net Revenue | 2,080 | 1,752 | 1,558 | 1,559 | 1,593 | 1,615 | 1,646 |
| Recorded Music EBITDA | 186 | 78 | 155 | 268 | 274 | 273 | 269 |
| Publishing EBITDA | 113 | 118 | 129 | 153 | 168 | 173 | 179 |
| Central and Other EBITDA | (24) | (22) | (16) | (16) | (17) | (17) | (18) |
| Total EBITDA pre-PIP | 276 | 174 | 269 | 404 | 425 | 430 | 431 |
| add: Incremental Central and Other Restructuring | - | - | 10 | 45 | 47 | 48 | 50 |
| Total EBITDA | 276 | 174 | 279 | 450 | 472 | 478 | 480 |
| Net income | | | (28) | 132 | 174 | 192 | 204 |
| Plus: Depreciation | | | 15 | 15 | 15 | 15 | 15 |
| Plus: Amortization | | | 40 | 43 | 45 | 47 | 48 |
| Less: Change in WC | | | 15 | 2 | (0) | 0 | (1) |
| Less: Pension deficit funding | | | - | - | - | - | - |
| Cash flow from operations | | | 41 | 191 | 234 | 253 | 267 |
| Recorded Music Capex | | | (21) | (19) | (17) | (15) | (14) |
| Purchase of music copyrights | | | (6) | (7) | (7) | (7) | (7) |
| Publishing Acquisitions | | | - | (120) | (120) | - | - |
| Net cash used in investing | | | (28) | (145) | (144) | (22) | (21) |
| Cash flow before financing | | | 13 | 46 | 91 | 231 | 245 |

**Preliminary IRR**

| | | Recorded Music Exit (x) | | |
|---|---|---|---|---|
| | | 7.5x | 8.5x | 9.5x |
| Share Price Paid (p) | 230 | 26.6% | 28.6% | 30.6% |
| | 235 | 25.5% | 27.6% | 29.5% |
| | 240 | 24.5% | 26.6% | 28.5% |
| | 245 | 23.6% | 25.6% | 27.5% |
| | 250 | 22.7% | 24.7% | 26.5% |
| | 255 | 21.8% | 23.8% | 25.7% |
| | 260 | 21.0% | 22.9% | 24.8% |
| | 265 | 20.2% | 22.1% | 24.0% |
| | 270 | 19.4% | 21.3% | 23.2% |
| | 275 | 18.7% | 20.6% | 22.4% |

**Preliminary COCM**

| | | Recorded Music Exit (x) | | |
|---|---|---|---|---|
| | | 7.5x | 8.5x | 9.5x |
| Share Price Paid (p) | 230 | 3.2x | 3.4x | 3.7x |
| | 235 | 3.0x | 3.3x | 3.5x |
| | 240 | 2.9x | 3.2x | 3.4x |
| | 245 | 2.8x | 3.0x | 3.3x |
| | 250 | 2.7x | 2.9x | 3.2x |
| | 255 | 2.6x | 2.8x | 3.1x |
| | 260 | 2.5x | 2.8x | 3.0x |
| | 265 | 2.5x | 2.7x | 2.9x |
| | 270 | 2.4x | 2.6x | 2.8x |
| | 275 | 2.3x | 2.5x | 2.7x |

A-1099

Confidential

Case: 11-126 Document: 48 Page: 301 04/25/2011 272867 401

A-1100

# Transaction Economics and Valuation
## Base Case: EBITDA Bridge

terra firma

£m
600
500
400
300
200
100
0
Recorded Music EBITDA
Publishing EBITDA
Central and Other EBITDA
2007 EBITDA
Increase in digital gross margin
Decline in physical gross margin
Reduction in variable costs
Reduction in fixed costs
Reduction in Central Costs
Other Restructuring
Catalogue Acquisition
2012E EBITDA
4

Page 59

Confidential

TF0000081432

# Transaction Economics and Valuation
## Base Case: Sources and Uses

terra firma

| Sources | | Uses | |
|---|---|---|---|
| New Equity | £1,407 | Shareholders | £2,465 |
| | | Debt retirement | 1,250 |
| Senior Term Loan | 725 | Pension Deficit | 40 |
| Senior Sceuritisation | 1,410 | Additional Pension Buyout | 25 |
| | | Financing Fees | 56 |
| Sub bridge to HY / Equity | 365 | Deal Fees | 11 |
| | | Refinancing Costs | 72 |
| | | Other Day One | - |
| Cash | 38 | Min cash | 25 |
| **Total** | **£3,945** | **Total** | **£3,945** |

A-1101

Confidential

# Transaction Economics and Valuation
## Indie Case: Sensitivity Analysis

terra firma

The sensitivities are shown based on movement from Base Case returns.

- Current Base Case assumes Physical decline CAGR of 11% through 2012.
- Upside: +3% CAGR
- Downside: 3% below Base Case in each year

IRR +2% and CoC +0.2x

IRR –2% and CoC -0.2x

- Base Case assumes Digital growth CAGR of 32% through 2012
- Upside: +10% CAGR
- Downside: 10% CAGR below Base Case in each year

IRR +6% and CoC +0.7x

IRR –6% and CoC -0.6x

- Base Case assumes £80m of run-rate savings, achieved by 2009
- Upside: £100m run-rate
- Downside: £40m

IRR +1.5% and CoC +0.1x

IRR –3% and CoC -0.4x

Confidential

TF0000081434

A-1102

# Transaction Economics and Valuation
## Indie Case: Sensitivity Analysis

terra firma

The sensitivities are shown based on movement from Base Case returns.

- The US Royalty rate is due to be set by CRB in 2008
- Current Base Case assumes that the current rate of 0.91c is continued
- Downside: $0.065

IRR –1% and CoC -0.1x

- We consider a sale of Recorded Music in 2010 to Whist, assuming £175m of synergies
  - Warner would be the obvious purchaser
- Upside: 2010 Sale at 10x plus synergies

IRR +10% and CoC +1.9x

- The acquisition and 'bolt-on' of publishing catalogues could bolster revenue growth
  - TF Indie Case assume £20m
    - Upside: £30m
    - Downside £0m

IRR +0.3% and CoC +0.0x

IRR –0.9% and CoC -0.1x

A-1103

Confidential

# Equity Case

terra firma

- Growth Assumptions:
  - Physical: 10% CAGR decline
  - Digital: 35% CAGR growth
- £40m of NPS acquisition at 12x NPS
- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close
- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m
- CRB arbitration outcome: $0.091/track
- Exit multiples:
  - 10x Music (Assuming sale to Warner in 2010 with incremental synergies)
  - 16x Publishing

- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

Upside Scenarios:

- Sale of DRM free tracks add 5% to digital growth each of first 3 years
- Subscription 2.0 in Europe adds £24m EBITDA in 2011 and £48m from 2012 onwards
- Share in touring and merchandising revenues grow to £18m revenues, £12m EBITDA in 2012

A-1104

Confidential

# TF Equity Case
# P&L

terra firma

Operating Performance - Recorded Music

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | Actual | | Forecast | | | | |
| **Recorded Music Revenue** | | | | | | | |
| Digital | 61 | 97 | 116 | 174 | 241 | 298 | 358 |
| Mobile | 31 | 49 | 59 | 88 | 122 | 152 | 182 |
| Total Digital Revenue | 93 | 147 | 174 | 262 | 363 | 450 | 541 |
| *Growth (%)* | | *58.7%* | *18.7%* | *50.5%* | *38.6%* | *23.9%* | *20.1%* |
| Physical | 1,403 | 1,114 | 832 | 734 | 667 | 614 | 569 |
| Growth (%) | | (20.6%) | (25.3%) | (11.8%) | (9.2%) | (8.0%) | (7.3%) |
| Royalty and licensing | 102 | 85 | 78 | 76 | 74 | 72 | 71 |
| Neighbouring rights | 63 | 69 | 67 | 70 | 74 | 78 | 82 |
| Total Recorded Music Net Revenue | 1,660 | 1,414 | 1,152 | 1,143 | 1,178 | 1,214 | 1,261 |
| *Growth (%)* | | *(14.8%)* | *(18.5%)* | *(0.7%)* | *3.1%* | *3.0%* | *3.9%* |
| Recorded Music EBITDA | 186 | 78 | 164 | 294 | 322 | 350 | 374 |
| *Margin (%)* | *11.2%* | *5.5%* | *14.3%* | *25.7%* | *27.3%* | *28.8%* | *29.7%* |
| Depreciation | (4) | (24) | (2) | (2) | (3) | (3) | (3) |
| EBITA | 182 | 54 | 162 | 291 | 319 | 347 | 371 |
| *Margin (%)* | *43.5%* | *13.1%* | *37.7%* | *62.5%* | *63.3%* | *64.1%* | *63.9%* |

**Preliminary IRR**

| Share Price Paid (p) | Recorded Music Exit (x) 7.5x | 8.5x | 9.5x |
|---|---|---|---|
| 230 | 51.0% | 56.4% | 61.7% |
| 235 | 49.4% | 54.7% | 59.9% |
| 240 | 47.9% | 53.1% | 58.1% |
| 245 | 46.5% | 51.6% | 56.5% |
| 250 | 45.1% | 50.1% | 54.9% |
| 255 | 43.8% | 48.7% | 53.5% |
| 260 | 42.6% | 47.4% | 52.0% |
| 265 | 41.4% | 46.1% | 50.7% |
| 270 | 40.3% | 44.9% | 49.4% |
| 275 | 39.2% | 43.7% | 48.1% |

**Preliminary COCM**

| Share Price Paid (p) | Recorded Music Exit (x) 7.5x | 8.5x | 9.5x |
|---|---|---|---|
| 230 | 5.3x | 5.8x | 6.3x |
| 235 | 5.1x | 5.6x | 6.0x |
| 240 | 4.9x | 5.4x | 5.8x |
| 245 | 4.7x | 5.2x | 5.6x |
| 250 | 4.6x | 5.0x | 5.4x |
| 255 | 4.4x | 4.8x | 5.2x |
| 260 | 4.3x | 4.7x | 5.0x |
| 265 | 4.1x | 4.5x | 4.9x |
| 270 | 4.0x | 4.4x | 4.7x |
| 275 | 3.9x | 4.2x | 4.6x |

Confidential

# TF Equity Case
# P&L

terra firma

Operating Performance - Publishing

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | Actual | | Forecast | | | | |
| **Publishing Revenue** | | | | | | | |
| Total Publishing Revenue | 547 | 543 | 560 | 580 | 599 | 619 | 639 |
| less: Publishing eliminations | (128) | (127) | (131) | (136) | (140) | (145) | (149) |
| add: Publishing Acquisition | - | - | - | 22 | 45 | 68 | 91 |
| **Total Publishing Net Revenue** | **420** | **416** | **429** | **467** | **504** | **542** | **581** |
| Net Publisher Share | 191 | 188 | 195 | 202 | 210 | 217 | 225 |
| add: Publishing Acquisition | - | - | - | 10 | 20 | 31 | 41 |
| **Total Net Publishing Share** | **191** | **188** | **195** | **212** | **230** | **248** | **266** |
| *% Total Publishing Revenue* | *45.4%* | *45.2%* | *45.3%* | *45.5%* | *45.6%* | *45.7%* | *45.8%* |
| Publishing EBITDA | 113 | 118 | 130 | 143 | 149 | 154 | 160 |
| add: Publishing Acquisition | - | - | - | 10 | 20 | 31 | 41 |
| **Total Publishing EBITDA** | **113** | **118** | **130** | **153** | **169** | **185** | **201** |
| *Margin (%)* | *27.0%* | *28.3%* | *30.2%* | *32.8%* | *33.5%* | *34.1%* | *34.6%* |
| Depreciation | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| EBITA | 111 | 115 | 127 | 150 | 166 | 182 | 198 |
| *Margin (%)* | *26.4%* | *27.6%* | *29.6%* | *32.2%* | *32.9%* | *33.5%* | *34.1%* |

Confidential

TF0000081438

A-1106

# Transaction Economics and Valuation

## TF Equity Case: Exit multiples analysis

terra firma

Successful repositioning of Dice as a music content provider in a high growth market is likely to result in exit multiples more approximating content production companies.

### Dice Historic Multiples Since Thorn De-merger

| Historic Enterprise Value / EBITDA | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1997[1] | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| 13.9x | 11.8x | 12.6x | 17.6x | 11.5x | 16.8x | 5.9x | 9.6x | 10.9x | 10.6x |

| | |
|---|---|
| Mean | 12.1x |
| Median | 11.6x |
| Low | 5.9x |
| High | 17.6x |

(1) Pro forma to exclude Thorn

### Content Production EBITDA Trading Multiples

| | Historical | Current Year |
|---|---|---|
| Lions Gate | nm | 31.8x |
| Chrysalis Music (SGTP)(2) | 43.7x | 37.9x |
| Entertainment Rights | 16.0x | 12.5x |
| Median | 29.9x | 31.8x |
| Median | 29.9x | 31.8x |
| Low | 16.0x | 12.5x |
| High | 43.7x | 37.9x |

(2) Based on a blended EBITA and NPS multiple

### Content Production EBITDA Transaction Multiples

| | Date | Historical | Current Year |
|---|---|---|---|
| Endemol | May 07 | 19.5x | 14.0x |
| MME Moviement | Feb 07 | 10.6x | [illegible] |
| Classic | Dec 06 | 17.9x | 18.5x |
| ALL3Media | Jul 06 | 19.1x | |
| Chorion | Feb 06 | 18.4x | 13.4x |
| Rixal | Jan 06 | 29.1x | |
| HIT Entertainment | Mar 05 | 14.7x | 16.6x |
| Median | | 18.4x | 13.8x |
| Median | | 18.4x | 13.8x |
| Low | | 10.6x | 13.4x |
| High | | 29.1x | 16.6x |

Confidential

TF0000081439

A-1107

## Rundown Scenario

terra firma

- Growth Assumptions:
  - Physical: 15% CAGR decline
  - Digital: 23% CAGR growth
- Operate Indie (base case) model in 2009, switch to rundown in 2010
- In 2009 stop all new releases, keeping Country, Christian, Jazz and Blues
- Consolidate regional offices and run from catalogue
- Rundown decline: 3% CAGR below market (digital less growth, physical more decline)
- CRB arbitration outcome: $0.065/track
- Exit multiples:
  - 6.5x Music
  - 14x Publishing

- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m
- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years

Scenarios:

- Scenario A:
  - Hold Publishing
  - Reduce catalogue sales by 0.5% CAGR decline
  - Exit Music in 2012
  - Run for cash, no exit – when is debt repaid?
- Scenario B:
  - Sell Publishing in 2008 for 14x EBITDA
  - Reduce catalogue sales by 0.5% CAGR decline
  - Exit Music in 2012
  - Run for cash, no exit – when is debt repaid?

A-1108

Confidential

# Transaction Economics and Valuation

## Down Side Case: Financial Projections and Returns

terra firma

A-1109

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | | Forecast | | | | | | | | | |
| **Recorded Music Revenue** | | | | | | | | | | | | |
| Digital | 61 | 97 | 101 | 132 | 156 | 170 | 179 | 197 | 215 | 234 | 255 | 276 |
| Mobile | 31 | 49 | 51 | 67 | 79 | 86 | 91 | 100 | 109 | 119 | 129 | 140 |
| Total Digital Revenue | 93 | 147 | 152 | 199 | 236 | 257 | 270 | 297 | 324 | 353 | 384 | 416 |
| *Growth (%)* | | *58.7%* | *3.7%* | *30.4%* | *18.6%* | *9.0%* | *5.2%* | *10.0%* | *9.2%* | *8.9%* | *8.9%* | *8.4%* |
| Physical | 1,403 | 1,114 | 764 | 621 | 520 | 442 | 379 | 360 | 343 | 327 | 312 | 299 |
| Growth (%) | | *(20.6%)* | *(31.4%)* | *(18.7%)* | *(16.2%)* | *(15.0%)* | *(14.3%)* | *(5.0%)* | *(4.8%)* | *(4.7%)* | *(4.5%)* | *(4.3%)* |
| Royalty and licensing | 102 | 85 | 70 | 61 | 54 | 47 | 41 | 36 | 32 | 28 | 24 | 21 |
| Neighbouring rights | 63 | 69 | 67 | 70 | 74 | 78 | 82 | 86 | 90 | 94 | 99 | 104 |
| **Total Recorded Music Net Revenue** | **1,660** | **1,414** | **1,053** | **951** | **884** | **824** | **772** | **779** | **788** | **802** | **820** | **840** |
| *Growth (%)* | | *(14.8%)* | *(25.5%)* | *(9.7%)* | *(7.1%)* | *(6.8%)* | *(6.3%)* | *0.9%* | *1.2%* | *1.7%* | *2.2%* | *2.5%* |
| Recorded Music EBITDA | 186 | 78 | 141 | 206 | 167 | 148 | 126 | 125 | 125 | 126 | 128 | 131 |
| *Margin (%)* | *11.2%* | *5.5%* | *13.3%* | *21.7%* | *18.9%* | *17.9%* | *16.4%* | *16.0%* | *15.8%* | *15.7%* | *15.6%* | *15.6%* |
| Depreciation | (4) | (24) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) |
| EBITA | 182 | 54 | 138 | 204 | 165 | 146 | 125 | 123 | 123 | 124 | 126 | 130 |
| *Margin (%)* | *43.5%* | *13.1%* | *34.4%* | *50.3%* | *40.0%* | *35.0%* | *29.4%* | *28.6%* | *28.0%* | *27.7%* | *27.6%* | *27.7%* |

Confidential

# Transaction Economics and Valuation
## Downside Case: Cash Flow Statement

terra firma

| (£m) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | | | | | | | | | | | |
| Total Recorded Music Net Revenue | 1,660 | 1,414 | 1,053 | 951 | 884 | 824 | 772 | 779 | 786 | 802 | 820 | 840 |
| Total Publishing Net Revenue | 420 | 338 | 400 | 405 | 410 | 415 | 422 | 429 | 437 | 445 | 455 | 466 |
| Total Consolidated Net Revenue | 2,080 | 1,762 | 1,453 | 1,356 | 1,293 | 1,239 | 1,193 | 1,208 | 1,225 | 1,247 | 1,275 | 1,307 |
| | | | | | | | | | | | | |
| Recorded Music EBITDA | 186 | 78 | 141 | 206 | 167 | 148 | 126 | 125 | 125 | 126 | 128 | 131 |
| Publishing EBITDA | 113 | 118 | 120 | 125 | 127 | 129 | 131 | 134 | 137 | 140 | 144 | 148 |
| Central and Other EBITDA | (24) | (22) | (16) | (16) | (17) | (17) | (18) | (18) | (19) | (19) | (20) | (20) |
| Total EBITDA pre-PIP | 276 | 174 | 245 | 315 | 277 | 260 | 240 | 241 | 243 | 246 | 252 | 259 |
| add: Incremental Central and Other Restructuring | - | - | 10 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
| Total EBITDA | 276 | 174 | 255 | 343 | 305 | 289 | 270 | 272 | 274 | 279 | 286 | 293 |
| | | | | | | | | | | | | |
| Net income | | | (48) | 83 | 62 | 56 | 47 | 123 | 131 | 141 | 153 | 166 |
| Plus: Depreciation | | | 14 | 13 | 13 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| Plus: Amortization | | | 36 | 37 | 37 | 38 | 38 | 39 | 40 | 41 | 42 | 43 |
| Less: Change in WC | | | 21 | 7 | 5 | 4 | 3 | (0) | (1) | (1) | (1) | (1) |
| Less: Pension deficit funding | | | (20) | (20) | (20) | (20) | (20) | - | - | - | - | - |
| Cash flow from operations | | | 4 | 121 | 97 | 90 | 80 | 173 | 183 | 193 | 206 | 221 |
| | | | | | | | | | | | | |
| Recorded Music Capex | | | (20) | (16) | (14) | (12) | (10) | (9) | (9) | (9) | (8) | (8) |
| Purchase of music copyrights | | | (6) | (6) | (6) | (6) | (6) | (7) | (7) | (7) | (7) | (7) |
| Publishing Acquisitions | | | - | - | - | - | - | - | - | - | - | - |
| Net cash used in investing | | | (26) | (22) | (20) | (18) | (16) | (16) | (16) | (15) | (15) | (15) |
| Cash flow before financing | | | (22) | 98 | 77 | 72 | 63 | 157 | 167 | 178 | 191 | 206 |

**Preliminary IRR**

| | | Recorded Music Exit (x) | | |
|---|---|---|---|---|
| | | 5.5x | 6.5x | 7.5x |
| Share Price Paid (p) | 230 | 5.4% | 6.4% | 7.4% |
| | 235 | 5.0% | 6.0% | 7.0% |
| | 240 | 4.5% | 5.6% | 6.6% |
| | 245 | 4.1% | 5.2% | 6.2% |
| | 250 | 3.8% | 4.8% | 5.8% |
| | 255 | 3.4% | 4.4% | 5.4% |
| | 260 | 3.1% | 4.1% | 5.0% |
| | 265 | 2.7% | 3.8% | 4.7% |
| | 270 | 2.4% | 3.4% | 4.4% |
| | 275 | 2.1% | 3.1% | 4.0% |

**Preliminary COCM**

| | | Recorded Music Exit (x) | | |
|---|---|---|---|---|
| | | 5.5x | 6.5x | 7.5x |
| Share Price Paid (p) | 230 | 1.7x | 1.9x | 2.0x |
| | 235 | 1.6x | 1.8x | 2.0x |
| | 240 | 1.6x | 1.7x | 1.9x |
| | 245 | 1.5x | 1.7x | 1.8x |
| | 250 | 1.4x | 1.6x | 1.8x |
| | 255 | 1.4x | 1.5x | 1.7x |
| | 260 | 1.4x | 1.5x | 1.6x |
| | 265 | 1.3x | 1.4x | 1.6x |
| | 270 | 1.3x | 1.4x | 1.5x |
| | 275 | 1.2x | 1.4x | 1.5x |

Confidential

TF0000081442

A-1110

terra firma

# Transaction Economics and Valuation
Summary

Need to check

Methodology
Dice value per share (1)
Comments
Share price at 11 May: 245p
Recent Share Price Performance
314
Last 12 months high / low trading range
Analyst Price Targets
Range of analyst price targets post 2nd profit warning
Comparable Trading Multiples
173
Range based on 2008E Sales and EBITDA multiple for Whist with 30% takeover premium
SOTP valuation
Applying a 19x EBITDA multiple for music publishing and a 12.6x multiple for recorded music. Range derived by applying -/+ 10%
0
50
100
150
200
250
300
350
400
£ value per share

Note: (1) Based on fully diluted number of shares, adjusted net debt of £1288.9m, pension deficit of £37.7m and minorities of £48.8m

A-1111

terra firma

# Transaction Economics and Valuation
## Overview Trading Multiples

| | | | Dice Offer price per share | | | | | | | | | Whist current valuation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Share price(p) | 245p | 250p | 255p | 260p | 265p | 270p | 275p | 280p | Share price($) | 17 |
| | | Market cap (£m) | 2,269.4 | 2,315.8 | 2,362.1 | 2,408.4 | 2,454.7 | 2,501.0 | 2,547.3 | 2,593.6 | Market cap ($m) | 2,541.6 |
| | | Enterprise value (£m) [1] | 3,644.8 | 3,691.2 | 3,737.5 | 3,783.8 | 3,830.1 | 3,876.4 | 3,922.7 | 3,969.0 | Enterprise value ($m) | 4,552.6 |
| | | Brokers' consensus | | | | | | | | | Brokers' forecasts [2] | |
| Revenues | 3/07 | £1,751.6m | 2.1 x | 2.1 x | 2.1 x | 2.2 x | 2.2 x | 2.2 x | 2.2 x | 2.3 x | $3,505.0m | 1.3 x |
| | 3/08 | £1,747.9m | 2.1 x | 2.1 x | 2.1 x | 2.2 x | 2.2 x | 2.2 x | 2.2 x | 2.3 x | $3,568.5m | 1.3 x |
| | 3/09 | £1,774.3m | 2.1 x | 2.1 x | 2.1 x | 2.1 x | 2.2 x | 2.2 x | 2.2 x | 2.2 x | $3,679.5m | 1.2 x |
| EBITDA | 3/07 | £174.1m | 20.9 x | 21.2 x | 21.5 x | 21.7 x | 22.0 x | 22.3 x | 22.5 x | 22.8 x | $510.5m | 8.9 x |
| | 3/08 | £230.6m | 15.8 x | 16.0 x | 16.2 x | 16.4 x | 16.6 x | 16.8 x | 17.0 x | 17.2 x | $525.5m | 8.7 x |
| | 3/09 | £271.7m | 13.4 x | 13.6 x | 13.8 x | 13.9 x | 14.1 x | 14.3 x | 14.4 x | 14.6 x | $556.5m | 8.2 x |
| EBITA | 3/07 | £150.6m | 24.2 x | 24.5 x | 24.8 x | 25.1 x | 25.4 x | 25.7 x | 26.0 x | 26.4 x | $464.0m | 9.8 x |
| | 3/08 | £204.0m | 17.9 x | 18.1 x | 18.3 x | 18.6 x | 18.8 x | 19.0 x | 19.2 x | 19.5 x | $476.0m | 9.6 x |
| | 3/09 | £244.5m | 14.9 x | 15.1 x | 15.3 x | 15.5 x | 15.7 x | 15.9 x | 16.0 x | 16.2 x | $510.5m | 8.9 x |
| FCF Yield (%) | 3/07 | £74.4m | 3.3% | 3.2% | 3.1% | 3.1% | 3.0% | 3.0% | 2.9% | 2.9% | $217.0m | 8.5% |
| | 3/08 | £62.6m | 2.8% | 2.7% | 2.6% | 2.6% | 2.5% | 2.5% | 2.5% | 2.4% | $251.0m | 9.9% |
| | 3/09 | £150.6m | 6.6% | 6.5% | 6.4% | 6.3% | 6.1% | 6.0% | 5.9% | 5.8% | $286.0m | 11.3% |

Source: Broker research, Datastream

Notes: (1) Enterprise value including net debt of £1288.9m, pension deficit of £37.7m as per Deloitte vendor due diligence report and minorities of £48.8m

(2) Profits and multiples are calendarised to March year end

(3) Whist valuation is including value of options at current share price

Confidential

TF0000081444

A-1112

terra firma

# Transaction Economics and Valuation

## Transaction comparables

| Date | Target | Buyer | Currency | Enterprise value (m) | EV/NPS | EV/Sales | EV/EBITDA | |
|---|---|---|---|---|---|---|---|---|
| *Music Publishing:* | | | | | | | | |
| 6 Sep 2006 | BMG Music Publishing | Vivendi Universal | EUR | 1,630 | 9.5x | 4.4x | 19.0x | LFY |
| | | | | | 9.2x | 4.4x | 18.8x | CFY |
| | | | | | 8.9x | 4.2x | 17.2x | CFY +1 |
| 30 Aug 2006 | Rondor | Vivendi Universal | USD | 400 | 18.0x | n/a | n/a | |
| 10 Apr 2003 | Jobete | EMI | USD | 364 | 20.0x | n/a | n/a | |
| 2 Jul 2002 | Acuff Rose | Sony | USD | 157 | 16.0x | n/a | n/a | |
| 1 Mar 2001 | Securitisation of Chrysalis catalogue | - | GBP | 150 | 18.5x | n/a | n/a | |
| **Average (excl. BMG current year and forecast year)** | | | | | **18.4x** | | | |
| *Recorded Music:* | | | | | | | | |
| 24 Nov 2003 | Warner Music Group | Bain Capital, Providence Equity Partners, Thomas H Lee, Lexa Partners | USD | 2,600 | n/a | 0.8x | 12.6x | |

# Transaction Economics and Valuation
## Indicative SOTP Analysis

terra firma

Sum of the Parts Valuation
Recorded music valuation range:
Based on 12.6x EV/EBITDA transaction multiple of the Whist buyout by a sponsor consortium in 2003, applied to 2008E Dice numbers
Music publishing valuation:
19x EV/EBITDA multiple applied to Dice 2008E music publishing EBITDA
Numbers based on 2008 forecasts given that full cost savings are expected to be achieved from the current restructuring
4,000
3,500
3,000
2,500
2,000
1,500
1,000
500
0
£m
(1,288.9)
(34.7 )
Recorded music
Music publishing
Net Debt
Pensions
Equity value
Note: Sum of the parts valuation based on consensus 2008E numbers

A-1114

terra firma

# Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Exit Considerations
- Due Diligence Work Streams
- Appendix

A-1115

Confidential

Case: 11-126 Document: 48 Page: 317 04/25/2011 272867 401

# Project Dice
## Acquisition Structure – current established structure

terra firma

A-1116

Page 75

Confidential TF0000081448

# Project Dice
## Acquisition Structure – proposed final structure

The acquisition of Dice would be structured as a cross-fund transaction, and approval of the Advisory Boards of both TFCP II and TFCP III has been received.

Note: Terra Firma Capital Partners II represents six limited partnerships with a common general partner investing in parallel

Confidential

# Debt financing

terra firma

Summary of day 1 debt package

- Bridge to securitiation - 12 month bridge with a 7/8 year term out at a margin of 200 bps, stepping up 25 bps every 6 mos and capped at 300 bps
- Term loan B (on recorded music business) – 8-yr buller at 250 bps.
- Bridge to high yield or equity - 12 month bridge with a 9 year term out at a margin of 450 bps, stepping up 50 bps every 3 mos and capped at 10.5% cash/11.5% total
- Revolver - £350m mostly against recorded music business
- Acquisition facility - £100m committed and £200m uncommitted mostly against the publishing business

Summary of take-outs

- Securitisation against the publishing business - Out of the 12x total quantum, 10.5x will be a senior tranche priced at 90-95 bps including the costs of wrapping. The remainder will be a subordinated tranche at 450-500 bps. The blended margin will be in the 140s.
- High yield - Has a 10-yr term and a margin of 525 bps. It is proposed to be NC1, 102, 101, par.
- Including the high yield take-out, the permanent financing will total £2.5bn of drawn facilities with a weighted average margin of c. 228 bps.

| Sources | | Uses | |
|---|---|---|---|
| New Equity | £1,407 | Shareholders | £2,465 |
| | | Debt retirement | 1,250 |
| Senior Term Loan | 725 | Pension Deficit | 40 |
| Senior Securitisation | 1,410 | Additional Pension Buyout | 25 |
| | | Financing Fees | 56 |
| Sub bridge to HY / Equity | 365 | Deal Fees | 11 |
| | | Refinancing Costs | 72 |
| | | Other Day One | - |
| Cash | 38 | Min cash | 25 |
| Total | £3,945 | Total | £3,945 |

- We are also negotiating an incurrence based covenant package only although we may end up with a very loose leverage covenant on the undrawn facilities.
- The proposal to the left is our requested structure and is based on Deustche Bank's original proposal. None of the banks has credit committee approval yet. The current status with each bank is below:
  - Deustche Bank – can only get approval for 1/3 of the package by Friday afternoon are only willing to go for 50% of the package by next Tuesday with their board.
  - Citi – the credit committee meets this evening. They are concerned about the securitisation take-out because they have not been involved in the rating agency discussions. This concern is translating into issues with the bridge structure because the various pieces of debt are not actually segregated on day 1. They may tweak the structure, but we don't think the quantum will change.
  - Barclays - They were some way off originally but are working to get as close to the £2.5bn quantum as possible – including an equity bridge if necessary. The structure is likely to be different. They are also checking whether they can get there by Monday as opposed to their original proposal of Tuesday.

A-1118

Confidential

## Structure & Financing
### Offer vs. Scheme – Key Considerations

terra firma

| | Scheme | Offer |
|---|---|---|
| **Control** | ▪ Scheme is the target's process – i.e. only suitable for a recommended deal<br>▪ Involves a number of Court hearings (though City Code still applies) | ▪ Process (and documentation) under bidder control<br>▪ Governed by City Code |
| **Stamp Duty** | ▪ Stamp duty exempt (equivalent to 0.5% of consideration) except in relation to shareholders issued with loan | ▪ Stamp duty payable |
| **Acceptances** | ▪ 75% by value plus majority in number of shareholders voting enough to gain 100% control | ▪ 90% acceptances required for squeeze out of minority |
| **US registration** | ▪ Structure exempt from SEC registration and tender offer rules | ▪ SEC registration and review may be required where target has significant US shareholder base or either party SEC registered |
| **Share Purchases** | ▪ Bidder stake will not count towards acceptance level (but can act as blocking stake for a rival scheme) | ▪ Pre-offer document purchases do not count towards 90% required for squeeze out, post offer document purchases do |
| **Timing** | ▪ Often slightly slower to closing (av. 3 month process) but no compulsory acquisition procedure required | ▪ Can be faster to obtain control but slower to get to 100% (squeeze out can take several months) |
| **Flexibility** | ▪ Recent examples have shown schemes to be effectively as flexible as offers for recommended bids, save where 75% acceptance condition not achievable | ▪ Very flexible, subject to compliance with Code timetable |

A-1119

Structure & Financing
Scheme Timetable
terra firma
The scheme timetable is less rigid than an offer
Announcement
Day P-5 Initial Court hearing*
Day 0 (P) Posting of scheme document
Day 23 Shareholder meetings (court meeting & EGM)
Day 42 sanction hearing*
Day 57 Deadline for posting of consideration
Maximum 28 days (unless pre-conditional)
Minimum 23 days
14 days
Day P-7 File court documents
Day 24 File Court documents
Day 33 Court directions hearing*
Day 43 Effective date and shares delisted
Bidder
Target
These dates are subject to Court availability which is likely to be restricted in Court vacation periods (Christmas, Easter and summer)
May have two hearings a few days apart for technical reasons in relation to share options
Page 79

A-1120

terra firma

## Structure & Financing – Key Documents for Announcement

**Scheme Announcement**

- Target and bidder agree the form of the announcement of a firm intention to make an offer by way of a scheme under Rule 2.5 of The City Code
- Announcement can only be made when bidder is able to proceed with offer, including having committed financing to pay for 100% of the shares

**Implementation Agreement**

- Agreement by bidder and target to implement the scheme of arrangement
- Obligations on both parties to proceed with the scheme, subject to target directors' fiduciary duties
- Option to switch to a takeover offer (with Takeover Panel consent)
- Business of target to be conducted in ordinary course prior to effective date
- Break fee of 1% of the value of the offer payable if target board recommendation is withdrawn or in the event of a successful competing offer
- Provisions preventing target from soliciting other offers and (subject to target directors' fiduciary duties) providing information to, or having discussions with, a third party potential bidder
- Treatment of options/convertible bonds

Confidential

terra firma

## Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Due Diligence Work Streams
- Appendix

A-1122

# Exit Considerations
# Preliminary Thoughts

terra firma

## Music Publishing

- Dice Music Publishing is the global leader in music publishing and will make a suitable platform for buying additional publishers
  - At present, Dice is capital constrained from bidding for assets
  - Significant costs can be taken out in an acquisition
  - Smaller businesses change hands at between 15x and 20x NPS to reflect this. Classical Music focused portfolios are valued at 10x-12x NPS
- A number of potential candidates are set out below. However, there is a long list of small and medium sized music publishers and administrators that could become available. 38% of the sub-sector's revenues are generated by companies outside of the Majors. It is much less concentrated then Recorded Music

| Target | NPS | Description |
|---|---|---|
| Blue Mountain Music | Turnover £6.2m but has unusually high level of costs | • Administration of the Bob Marley catalogue<br>• £6.2m turnover in 2005 |
| Parts of BMG/UMG Publishing | | • BMG/UMG may be required to divest some businesses to satisfy the competition commission |
| Boosey & Hawkes | £12.8m (12/05) | • Focussed on classical music.<br>• Taken private by HgCapital in 2004, when NPS was £11.4m and has made some small acquisitions since then.<br>• Reportedly for sale in 2005 for £130m. Lower NPS because of focus on Classical Music |
| Bug Music | | • Manages 120,000 copyrights<br>• Backed by Spectrum Equity Partners |
| Cherry Lane | | • One of the largest independent music publishers in the US<br>• Artists include The Black Eyed Peas and Quincy Jones |
| Chrysalis Music | £11.4m (y/e 8/06) | • Bowie, Blondie, Outkast, Dixie Chicks and Gnarls Barkley form part of catalogue.<br>• Nominated for 41 Grammy's in 2006 and won in 14 categories |
| Music Copyright Solutions | £1.5m (12/05) | • Quoted company with a market cap. of £16m<br>• Suffered a loss in y/e 12/06 as a major customer defaulted on a loan |
| Really Useful Music | Circa £12.7m (y/e 6/06) | • Andrew Lloyd Webber's private company<br>• Publishing division potentially underperforming<br>• NPS is estimate and includes revenues earned from share of production of Lloyd Webber's shows (although Really Useful Group is not active in the running of the show) |
| Stage Three Music | £2.1m | • Apax backed vehicle which has been slow to grow.<br>• Made three acquisitions in y/e 12/05 as it tried to accelerate growth.<br>• Artists include Aerosmith, Gerry Rafferty, Macy Gray and ZZ Top |
| TVT Records | | • Leading US independent label and music publisher – Scott Storch (premier songwriter for Snoop Dogg, Beyonce, Justin Timberlake)<br>• Strong position in digital distribution |
| Music brokers | Various | • There are music brokers that specialise in selling rights on behalf of current musicians or the estate of deceased writers.<br>• An example is IPBC which sells catalogues and portions of rights for values of £10m and less. |

- An eventual exit by way of a sale to a financial sponsor is highly possible. In 2006 Bertelsmann sold its music publishing arm to Universal, another major, for 19x LFY EBITDA. In the auction process there were Financial Sponsor bidders close enough behind this price level to force Universal to buy the business unconditionally and assume all the competition risk.

A-1123

terra firma

## Exit Considerations – Publishing

**Sell to financial player**

- Private equity and infrastructure funds will have strong interest based on highly stable but growing and scaleable cash flow profile

**Sell to media conglomerate, distribution player or new media major**

- Standalone logic may be less compelling but feasible at attractive valuation as part of integrated play with Recorded Music

**IPO**

- Music publishing assets highly valued in the equity market today even at much smaller scale (implied value of Chrysalis music publishing c. £150m based on £[10]m NPS, £[5]m EBITDA

**Recapitalisation**

- Good opportunity to recap the business in conjunction with bolt on acquisitions
- Upscale the financing on similar multiples based on higher cashflows as growth comes through

Confidential

TF0000081456

A-1124

terra firma

## Exit Considerations – Recorded Music Division

- "Perfect" geographical fit to the businesses (Whist strong in US, weak in Europe; Dice vice versa)
- £200m of cost savings from combination (value to Dice of £1bn at 10x multiple on 50%)
- Only remaining consolidation play for the majors (UMG or Sony BMG would have regulatory issues)
- Regulatory risk generally considered relatively modest given pricing trends in the industry

- Distribution companies have perennial fascination with pure content plays (Sony/Columbia, JVC/Victor Music, AOL/Time Warner, Telefonica/Endemol, Vivendi/Universal, Mediaset/Endemol, Virgin Media/ITV): Dice represents the perfect digital content engine for the broadband pipes of the future (eg Comcast, Virgin Media, Liberty Global)
- Digital content engine for new media majors (Google, Yahoo!, Microsoft)
- Good fit with film majors not currently in the music industry (News Corp, Disney)

- Perfectly feasible as a pure play, attracting premium multiple as market enthusiasm for digital growth develops
- Publishing income not a prerequisite, though a re-IPO of the combined group also makes sense

- Increased leverage potential post restructuring and as visibility on industry revenue growth improves

terra firma

## Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations
- [redacted]
- Appendix

A-1126

Confidential

TF0000081458

## Due Diligence: Legal

terra firma

| Area | Risk | Mitigation/Recommendation |
|---|---|---|
| Financing: listed debt securities ( "Bonds") | Dice has four separate bonds in issue which will need to be taken out in order to implement the transaction financing structure. All of the bonds are redeemable at the option of the holder following a change of control. All of the bonds are redeemable by the issuer at any time other than [ ] 425m 8.625% senior notes due 2013 | DKW has calculate d the take-out cost of all of the Bonds (including the Convertible Bonds as set our below) at £76m which has been included in the model. The 2013 notes will need to be dealt with by way of tender offer followed by, if not successful, a process of "satisfaction and discharge" whereby all amounts due under the sebonds up until the first redemption date (15 October 2008) are deposited with the trustees.<br>A [ ] month grace period has been included in the finance documents to allow the Bonds to be taken out. |
| Financing: convertible bonds ( "Convertibles") | The Convertibles allow the noteholders to convert their notes into ordinary shares of Dice. As the Convertibles are "in the money" and appropriate offer will need to be made to noteholders under the terms of the Takeover Code. | The take-out cost of the Convertibles is included in the DKW calculation above. In the event that the tender offer for the Convertibles was not successful (which is unlikely) the articles of Dice will be amended so that on any future exercise any new ordinary shares issued would be automatically acquired for cash. In any event Convertibles may be redeemed by Dice after 16 October 2007. |
| Financing: facility | Dice has entered into a £700m credit facility agreement. At 11 May 2007 the total drawn amount was £260m. On a change of control of Dice any lender may require repayment of principal, interest and break costs. Dice has a right to prepay the facility subject to payment of break costs. | |

A-1127

## Due Diligence: Legal

terra firma

| Area | Risk | Mitigant/Recommendation |
|---|---|---|
| Financing: securitisation | Target has started process to securitise music publishing assets. Termination fees will be payable to arranging banks (a) of between £500k and £2.5m if securitisation terminated by Target and (b) a further amount of between £3.75m and £7.5m if engage other bookrunners or arrangers within 24 months of termination. | As our proposed syndicate of banks will contain some of the same banks we have assumed a termination payment of £5m in the model. |
| Change of Control | We have been informed that the following agreements have change of control clauses that will be triggered by the transaction:<br>Dice has entered into an agreement with Fujipacific Music, Inc.. Project Dice will allow Fujipacific to terminate the agreement and claim a termination payment of $7,000,000.<br>The agreement between Dice and the Rolling Stones under the terms of which it has the right to release and sell Rolling Stones products contains a change of control provision which is triggered by Project Dice | Rolling Stones contract expires April 2008. Any unrecouped advances made by Dice to the Rolling Stones would become immediately repayable. Management confirmed that sales of Rolling Stones are not material. |
| Toshiba Joint Venture | Target has agreed to buy out Toshiba's share in JV with Target for approximately £93m. Parties to crystallise distributable profits to pay part of consideration, remainder (£15m) to be paid in cash | Cash payment has been included in Target Group's accounts. Target has entered into futures contracts to hedge currency exposure |
| Lease Surrender | Target proposing to surrender leases for property on Charing Cross Road London. The landlord proposed a payment of £2.5m and negotiations with landlord concerning surrender payment by Target Group ongoing | Amount included in the model. |
| No non-compete obligations | Senior executives do not have non-compete provisions in service agreements. | Management confirmed that these are not common in the music industry. Consider tying in key executives as part of incentive arrangements. |

A-1128

# Due Diligence

terra firma

| Area | Risk | Mitigation/Recommendation |
| --- | --- | --- |
| Litigation | Dice operates in a very litigious environment. Proceedings are often taken against Dice and Dice robustly protects its rights. Dice does not take out insurance against claims but relies on internal legal resource to manage this risk. The view of management is that litigation is a "cost of doing business". Current material claims against Dice include:<br>1. royalty payment audit claims totalling £50m (typical payout rate is 2.7%);<br>2. tax claims (€7.7m in Netherlands and £22.5m in Brazil);<br>3. dispute with Philips concerning CD manufacturing royalties; and<br>4. dispute in Brazil concerning acquisition accounting (£4.5m);<br>5. general litigation of around £30m | Over the past 3 years Dice has received more than it has paid out in litigation. Nonetheless, we have included amounts in the model to reflect estimated payout under material litigation. |

A-1129

Confidential

# Due Diligence: Accounting (KPMG)
## Working Capital

terra firma

We have excluded net advances from reported working capital, as it does not represent the underlying working capital requirement of this business

Annual cash advance payments of approximately £272 million (based on a five year historical average) will have to be funded in addition to the working capital presented here

**Working capital summary**

| £m | FY06 | FY07 |
|---|---|---|
| Music | (146.1) | (152.0) |
| Music Publishing | (77.7) | (116.2) |
| Corporate | (57.3) | (199.6) |
| Difference | (3.9) | 18.4 |
| Group working capital | (285.0) | (449.4) |
| Adjustments | | |
| Corporate | 57.3 | 199.6 |
| Adjusted group working capital | (227.7) | (249.8) |
| Less advances (net of provisions) | | |
| Music | (182.4) | (103.5) |
| Music Publishing | (142.1) | (119.4) |
| Difference | (5.0) | 10.1 |
| Total advances (net of provisions) | (329.5) | (212.8) |
| Adjusted group working capital excluding advances (net) | (557.2) | (462.6) |

*Source: VDD report, management accounts*

**Working capital by category**

| £m | FY06 | FY07 |
|---|---|---|
| Current asset investment | 0.8 | 0.2 |
| Inventories | 37.2 | 32.8 |
| Receivables (net) | 445.1 | 335.9 |
| Creditors and accruals | (422.7) | (337.6) |
| Net music royalties | (599.7) | (545.6) |
| Intercompany | (9.0) | 23.2 |
| Difference | (3.9) | 18.4 |
| Adjusted group working capital excluding advances (net) | (552.2) | (472.7) |
| Advances (net) | 324.5 | 222.9 |
| Adjusted group working capital | (227.7) | (249.8) |

*Source: VDD report, management accounts*

- Basis of preparation
  - The group working capital has been derived from the information presented in the Deloitte VDD and has been adjusted to exclude the element relating to Corporate. Management have advised us that this balance primarily relates to non-working capital type items. We understand that, amongst others, it includes a £93 million liability in respect of Project Typhoon, which would need to be considered separately when considering the funding requirements of this business
  - We have also excluded from working capital advances and related provisions. In our view, the characteristics of advances are more akin to an intangible asset, where the benefit of the cash payment is recouped in the medium to long term future through CD sales, as is the case in the Music division
- Overview
  - The most significant balances in working capital relate to receivables, creditors and accruals and net music royalties (as presented in the adjacent table)
  - The increase in adjusted group working capital (excluding advances) of £94.6 million in FY07 is partly reflective the structural change in the business, which has resulted in lower individual working capital balances, such as receivables of £109 million, offset by lower levels of creditors and accruals and music and royalty creditors
  - Whilst management believe the level of working capital at the end of FY07 is representative of the ongoing working capital requirements of the business, in our view it is distorted by year end working capital management initiatives and we have made an adjustment for this on the next page

A-1130

Confidential

TF0000081462

# Due Diligence: Accounting (KPMG)

## Working Capital (Cont'd)

terra firma

Underlying working capital requirements are £112 million higher than on an adjusted reported basis, primarily due to tighter working capital management at year end

Management estimate a facility requirement for working capital of between £250 million and £300 million Effective working capital management during the year, in particular for key balances in respect of royalties, copyright, marketing and promotion will provide management with additional flexibility

**Underlying working capital - FY07**

| £m | Music | Publishing | Other | Group |
|---|---|---|---|---|
| Adjusted group working capital excluding advances (net) | (255.5) | (235.6) | 28.5 | (462.6) |
| Underlying working capital adjustment | | | | - |
| Actual working capital | (255.5) | (235.6) | 28.5 | (462.6) |
| Average working capital | (185.7) | (193.7) | 28.5 | (350.9) |
| Adjustment | 69.8 | 41.9 | - | 111.7 |

*Source: VDD report, KPMG analysis*

**Working capital facility requirements**

| £m | FY06 | FY07 |
|---|---|---|
| High | | |
| Music | (113.8) | (119.8) |
| Music Publishing | (164.8) | (159.8) |
| Corporate (March balance) | (57.3) | (199.6) |
| Group | (335.9) | (479.2) |
| Low | | |
| Music | (328.5) | (255.5) |
| Music Publishing | (219.8) | (235.6) |
| Corporate (March balance) | (57.3) | (199.6) |
| Group | (605.6) | (690.7) |
| Estimated RCF requirement | 269.7 | 211.5 |

*Note: High and low points have been based on working capital excluding advances and related provisions*

*Source: VDD report, management accounts*

- Underlying working capital
  - The working capital (excluding advances) at 31 March 2007 at negative £462.6 million is some £111.7 million worse than a simple average over 24 months. Prima facie, this suggests that the working capital at March 2007 is not normal and in order to assume a normalised position an adjustment of some £112 million can be made. However, this does not take account of the structural decline of physical and in reality the adjustment would be less than £112 million. We do not have detailed information to assess the quantum of an adjustment. Deloitte have suggested an adjustment of some £137.5 million, which includes advances. Management have indicated that the proposed adjustment by Deloitte would bring the 31 March 2007 balance towards 'normal' working capital
- Working capital facility requirement
  - Management have estimated the facility requirements for working capital at between £250 million and £300 million. Based on the highest and lowest monthly working capital balances in FY07, we estimate a facility requirement for working capital alone, excluding the funding requirements for advance payments, of slightly below this range
  - However, we have not taken into account any additional intra-month funding requirements, as we have not been provided with sufficient information to assess this. Therefore, managements' view above may be a more conservative estimate of the working capital requirement of this business
  - We would note, that royalty, copyright, marketing and promotion costs together account for over 50% of the group's cost base. Effective working capital management in respect of related creditor and accrual balances may provide management with additional flexibility

A-1131

Confidential

# Due Diligence: Tax (KPMG)

## Key Findings - summary

terra firma

- There is very little tax data in the data room and the tax information in the VDD covered only a very high level review (10 pages) based on only a few discussions with management. Our due diligence findings are therefore based primarily on information provided in the management meetings on 14 May and we have not yet been able to verify the facts provided
- However, based on information to date, the group does not appear to have any significant unprovided corporate tax exposures. Indeed, the group is probably overprovided with circa £20m of the current tax provision of £76.3m being 'general' in nature. Indeed, the auditors believe the group is overprovided and requested that the tax provision be reduced by approximately £30m over a 3 year period starting in FY06
- In addition, no significant tax planning has been undertaken by the group and they are considered low risk for HMRC audit purposes in the UK which is unusual for a multinational group of this size (and supports the view that no significant planning or unreasonable filing positions have been taken)
- However, no significant information has currently been provided regarding VAT or employee tax issues (it was not part of the VDD and few documents are in the data room). As the target's tax director was also not able to cover these areas at the meetings on 14 May, it was agreed that follow up calls would be arranged and we have submitted lists of information to discuss on these calls. The calls have yet to been set up
- The key jurisdictions for the target are UK, US, France, Japan, Italy, Germany, Netherlands, Australia and Spain which represent 85% of EBITA. Of these countries, the UK and US continue to make tax losses while there has been no (or limited) tax payable in France and Spain due to losses brought forward. The key tax paying jurisdictions are Italy, Netherlands, Japan and Australia

Confidential

TF0000081464

A-1132

# Due Diligence: Tax (KPMG)

## Key Findings – historic exposures

terra firma

- Tax is provided for on a conservative basis with tax provisions of £76.3m as at 31 March 2007. This is split as follows:
  - Dutch tax challenge in respect of dividend withholding tax and the tax gain on the sale of the manufacturing site: £15.3m
  - German tax challenge in respect of transfer pricing (management charges) and artist advances provisions : £15m
  - Japanese tax challenge in respect of transfer pricing (management charges) : £19m
  - Italian tax challenge in respect transfer pricing (management charges and royalties) : £3m
  - General: £24m
- Management have indicated that for each of the exposures identified above, the amount provided represents a full provision, with no discount applied
- The bulk of the provisions relate to transfer pricing and although no formal studies have been done in the local countries, the management charge position has been subject to a high level review by the target's UK advisers (KPMG) who have indicated that the amount of recharges are actually on the low side (more costs could possibly be recharged from the UK and a mark up could be applied). Further, the German tax position has been challenged in past audits by the tax authorities with no ultimate adjustment being required. The Japanese provision recognises that recharges were only introduced in 2002 and a back payment was then made for prior years. Regarding the royalty position, these are primarily paid to the UK and US and a bi-annual transfer pricing review is carried out by US advisers (E&Y) to support the US filing position.
- The Dutch provision includes £5.3m in respect of withholding tax which is currently the subject of litigation. A decision by the court has been outstanding for 2 years and adviser apparently view the changes of success as strong. The only other tax litigation notified is in Brazil which relates to two cases for amortisation of goodwill and a VAT exposure on artist royalties. Management indicated that both Brazilian cases relate to very old exposures and no significant exposure is expected. However, the data room comments state that the cases were last decided (against the target) in 2005/6 and the exposures amount to £21m. We have asked our local office to look at this issue further but it seems likely that some provision is required. However, the general provision above should be sufficient to cover the exposure. It seems that there is also probably some "buffer" within the transfer pricing provisions as noted above. Indeed, we understand that the auditors are of the view that the group is overprovided.

A-1133

# Due Diligence: Tax (KPMG)

## Key Findings – compliance & effective tax rate

terra firma

- Tax compliance is generally up to date and tax returns have been submitted up to FY2006 in respect of most entities.
- Most of the key countries (other than the UK and US) are currently undergoing some level of audit and the tax exposures are discussed above. The US has not been subject to audit since 2001 but this may in part be due to its loss position. The last US audit resulted in a tax repayment of $12m
- Group effective tax rate for FY2007: 37.7%
- The table below summarises the effective tax rate and the tax losses being carried forward as at 31 March 2006 as at 31 March 2006 in each of the material jurisdictions

| Summary of tax position in FY2007 (£m) | | |
|---|---|---|
| Country | Effective tax rate | Tax losses |
| UK | Nil | 323.8 |
| US | Nil | 93.3 |
| Japan | 30% | 0 |
| The Netherlands | 21% | 0 |
| France | 7% | 16.4 |
| Italy | 37% | 0 |
| Germany | 30% | 128.5 |

*Information in the VDD report and data room

- In Germany, both corporate tax and trade tax is payable and the above losses relate only to corporate tax. Further, they are subject to a general restriction so that they can only be offset against 60% of corporate tax profits in any year. Following the change of control, the annual deduction for the US tax losses will also be limited to, in general terms, 4.18% of the US purchase price. The UK tax losses primarily comprise excess interest which cannot be offset against future trading profits. Further, the UK change of control rules for excess interest losses are such that there is a strong risk the losses will be forfeited post-deal. So no value should be given to them in the model.

A-1134

terra firma

# Due Diligence: Legal (Weil Gotshal)

## Regulatory Overview: Recorded Music

- The EC is making an in-depth review of *Sony/BMG*, after the CFI annulled its 2004 clearance decision (on appeal by Impala).
  - A final decision is due from the EC on 2 July 2007.
  - If the parties lose (unlikely), the JV may have to be disbanded.
- Key Question: Whether the JV creates "collective dominance" (i.e. an ability to raise prices above competitive levels) in recorded music.
  - The JV has a roughly 25% share, and is the largest competitor, in a "5-to-4" consolidation of majors.
  - The EC initially found that discounts make the market "non-transparent" and that the past shows that retaliation against price-cutters is unlikely. The CFI rejected both views for lack of solid evidence and analysis.
  - The EC must evaluate discounts and market transparency under a more rigorous standard (with current data), and must determine whether profit sacrifice or reduced scope for compilations, etc will deter industry retaliation against price cutters. Buyer power provides a possible third line of defence.
- The parties have appealed the CFI's decision to the ECJ, providing an additional opportunity for the courts to reconsider and, possibly, develop a less restrictive assessment.

Confidential

A-1135

# Due Diligence: Legal (Weil Gotshal)
## Regulatory Overview: Publishing

terra firma

- The EC is making an in-depth review of Universal's proposed acquisition of BMG's music publishing (licensing) business.
  - A decision is reportedly imminent (the official deadline was 27 April).
- The deal may presage a stricter regulatory attitude toward this sector.
  - The deal would create the world's largest music publishing business, but with a share of roughly 27% – well short of the 40% "benchmark" that often signals some regulatory concern is likely.
  - The EC traditionally has found (in *Sony/BMG* and other smaller deals) that music publishing is unlikely to raise concerns, because collecting societies limit the scope for coordination.
  - Nonetheless, Universal reportedly has agreed, as a condition to clearance, to divest the British portions of the 19, BBC, Rondor and Zomba catalogues for licensing in the EEA.
- Impala opposed the deal and reportedly sought, but did not obtain, behavioural commitments.

A-1136

terra firma

## Due Diligence: Legal (Weil Gotshal)

**Regulatory Overview: Implications for a Whist – Dice combination**

- Key Question: Whether the deal creates "collective dominance" (i.e. an ability to raise prices above competitive levels) in recorded music and/or music publishing.
  - In recorded music, the parties would be the largest competitor, with roughly 30%.
  - In music publishing, the parties would be the largest competitor, with roughly 32%.
  - In both segments, the deal represents a "4-to-3" concentration of majors, raising more issues than the "5-to-4" deals now being reviewed by the EC.
  - However, numerous considerations might well resolve any regulatory concerns here (e.g. market instability, growth of online trading, economics of pricing deviation, significance of independents, Dice's long-term decline, and creation of an effective 3rd competitor to Universal and Sony/BMG).
- The transaction almost certainly would receive close scrutiny in the EC and the US.
  - Closing is likely to be suspended for roughly six months after notification, pending review.
  - Clearance may be facilitated by Whist's reported agreement with Impala, which neutralizes a key source of opposition in the industry. However, this does not limit what the EU might do (since the regulators may question Impala's change of view, and may reject any behavioural commitments).
  - If the parties must make commitments in order to obtain clearance, these may well have to be structural (i.e. divestment) rather than behavioural remedies, which the regulators generally disfavour.

Confidential

# Due Diligence: Pensions
## Key Findings

terra firma

Dice operates significant defined benefit pension schemes

- Dice operates a number of defined benefit arrangements in the UK, Germany and Japan, as well as a number of other small overseas arrangements
- By far the largest of the arrangements is the Dice Pension Fund ("the Fund") in the UK, which had assets of around £1 billion as at 31 March 2007

Past service deficits – overview

- The aggregate IAS19 deficit in Dice's pension arrangements as at 31 March 2007 was £43 million (excluding deferred tax), made up of a deficit in the Fund of £7 million and net deficits/unfunded liabilities for non-UK arrangements of £36 million, as set out in the table below:

Summary of IAS19 funding position at 31 March 2007

| £m | Dice Pension Fund | German DB arrangement | Japanese DB arrangements | Other non-UK arrangements | Total |
|---|---|---|---|---|---|
| Surplus / (Deficit) | (7.0) | (30.7) | 3.0 | (8.3)* | (43.0) |

Notes: * As at 31 March 2006 – D&T VDD states that figure at 31 March 2007 should be broadly similar

Source: D&T VDD

Past service deficits – overview

- For the latest cash funding valuation (as at 31 March 2006), the Trustees of the Fund initially proposed a target that was more prudent than the IAS 19 basis at the time (which would have resulted in a deficit of £49 million at 31 March 2006). However, we understand that Dice has proposed, and is expecting the Trustees to agree to, a revised funding target with a zero deficit. In reaching agreement on the funding target, the Trustees have taken account of the strength of Dice's covenant towards the Fund

# Due Diligence: Pensions (continued)

## Key Findings

terra firma

### Past service deficits – overview (continued)

- As a result of a likely weakening of Dice's covenant towards the Fund as a result of the transaction, there is a risk that the Trustees could seek to adopt a more prudent assessment of the liabilities. In recent leveraged buy outs, pension fund trustees have begun to focus on ways of making their funds self sufficient, which has been supported by the UK Pensions Regulator in its recent statements
- The Trustees could aim to achieve self sufficiency by removing investment risk through moving the current investment strategy into gilts (as they hold the unilateral power to invest the assets of the Fund). KPMG estimate that the deficit on a gilts basis would be around £190 million
- Ultimately, if the Trustees react adversely to the transaction, their opening negotiating position would be the cost of securing all benefits with an insurance company. KPMG estimate that the aggregate deficit on this basis would be around £370 million using typical industry buy-out cost assumptions. However, due to a number of new providers of pension buy-out solutions and the emergence of more innovative products, the market may become more competitive resulting in a lower ultimate cost. Detailed mortality analysis could also potentially reduce buy-out costs. Clearly a negotiated solution would be between the current position and the full buyout cost

### Approaching the Trustees

- Consideration will need to be given as to when to approach the Trustees of the Fund to agree a funding/security strategy, including the level of cash contributions to be paid following Completion. Reaching agreement with the Trustees can take a period of several weeks. There are a number of cases where pension scheme trustees have reacted aggressively where they have not been properly consulted and a positive relationship has not been developed so it will be important to monitor the situation and ensure the Trustees of the Fund are engaged at the appropriate time

### Future service costs

- Dice recognised an FY07 pension operating charge to the income statement of £12.0 million, made up of a recurring IAS19 Service Cost of £13.4 million and a one-off credit of £1.4 million in respect of Japanese redundancies (which would normally be excluded for business valuation purposes)
- Information provided in the data room shows that a forward looking IAS19 Service Cost based on market conditions at 31 March 2007 would be £11.4 million, made up of £10.7 million in respect of the Fund and £0.7 million in respect of the non-UK pension arrangements
- We understand that Dice has proposed a number of alterations to the pension benefits to be provided for future service, which will be discussed with the Trustees this week. Management expects the alterations to result in a net saving to the IAS19 Service Cost of £5.5 million a year. In the context of a transaction, these changes may be viewed unfavourably by the UK employees.
- In addition to the above, Dice contributes to a number of defined contribution arrangements. Contributions to these arrangements in FY06 were £10.8 million
- The model assumes a charge for UK pension schemes of £50m upfront cash contribution and £120m upon exit for the German pension scheme funding £15m of the £30m deficit. In the run down case, the UK pension scheme is funded with £70m upfront and £20m p.a. for 5 years for a £170m total cash contribution

A-1139

# Due Diligence: Pensions (continued)

## Key Findings

terra firma

### Benchmark accounting figures

- Overall, the IAS19 deficit as at 31 March 2007 has been calculated broadly in line with typical market practice. However, in the UK, the individual assumptions were different to those typically used as follows:
  - the inflation assumption of 3.0% was around 0.2% lower than that typically used. If a more typical assumption was chosen, the IAS19 liabilities would be around £30 million higher; and
  - the mortality assumption chosen by Dice for the Fund is in line with the 2006 valuation assumption, which was chosen to be consistent with current experience. However, the allowance for future improvements in mortality is more conservative than that typically used by companies for accounting purposes in the UK. If a more typical assumption was chosen, the IAS19 liabilities would reduce by around £20 million

### Updated position at 30 April 2007

- The financial position of the defined benefit pension schemes will be volatile with respect to changes in market conditions. For example, the Fund invests a significant portion of its assets in equities, whilst the IAS19, gilt funding and buyout liability measures are calculated by reference to the yields on bonds
- KPMG have summarised the position of the Fund on the bases discussed above as at 30 April 2007 in the table below:

Summary of IAS 19 funding position of the Fund at 30 April 2007

| £m | IAS19 | Gilts basis | Buyout |
|---|---|---|---|
| Surplus / (Deficit) | 10 | (170) | (350) |

Source: KPMG analysis

- Bond yields in Germany and Japan have not moved significantly between 31 March 2007 and 30 April 2007 and therefore the financial positions of the plans in these territories are unlikely to be materially different
- KPMG estimate that a forward looking IAS19 Service Cost, based on market conditions at 30 April 2007, would be £11.1 million, made up of £10.4 million in respect of the Fund and £0.7 million in respect of the non-UK pension arrangements

A-1140



terra firma

## Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations
- Due Diligence Work Streams

A-1141

terra firma

# Dice – 2007 forecast vs. expected actuals

## Music Revenue

Source: Deloitte VDD, broker research

## Publishing Revenue

Source: Deloitte VDD, broker research

## Music EBITA

Source: Deloitte VDD, broker research

## Publishing EBITA

Source: Deloitte VDD, broker research

**If reported actuals on 23 May exceed consensus expectations, share price increase is likely to follow**

# Appendix
## RE4 Cost Reduction Programme

terra firma

- Targets cost reduction across both core geographies and head office functions. Cost reductions of £5.0m as at the end of March 2007, with incremental benefits of £76.8m in 2008 and annualised benefits of £110.8m thereafter.

**RE4 – Cost Reduction Programme**

| Region | Description | Net Headcount Reduction* | Cost Reduction (£000s) 2007 | 2008 | Annualised |
|---|---|---|---|---|---|
| *North America* | Capitol Music Group and the closure of the Jacksonville facility. Property portfolio consolidation generate £0.9m savings. Travel & Entertainment, Legal and Consulting cost reductions. | (28.0%) | 2,061 | 24,503 | 25,352 |
| *UK & Ireland* | Planned headcount reduction of 88. Trave & Entertainment and legal costs. | (16.0%) | 230 | 3,735 | 7,179 |
| *Europe* | 258 planned redundancies (77 in France). £1.8m reduction from exiting leaseholds. | (14.0%) | 94 | 6,944 | 11,886 |
| *Latin America* | Targeted headcount reduction of 135 employees, sale of freehold property in Mexico and exit from leasehold properties.in Brazil and Chile. | (42.0%) | 245 | 2,127 | 3,130 |
| *South East Asia* | Targeted headcount reduction of 71 , minor property lease savings in Korea and Thailand. | (21.0%) | (3) | 2,409 | 2,964 |
| *Australasia* | Planned headcount redution of 34 employees. | (14.0%) | 50 | 583 | 533 |
| *Central* | Planned headcount reductions of 83 and substantial reduction in associated Travel & Entertainment cost. £0.9m reduction in the marketing budget. | (46.0%) | 2,262 | 15,469 | 15,285 |
| *Global Technology* | Targeted headcount reduction of 70 and £2.3m savings in Other IT costs, including £0.9m in server monitoring costs. | (23.0%) | 72 | 3,483 | 5,446 |
| *Music Publishing* | Planned headcount reduction of 57 and exit from Charing Cross property, generating £1.8m cost savings. | (6.0%) | 10 | 7,567 | 11,058 |
| *Pensions* | | - | - | - | 5,500 |
| *Less Supported Opportunities* | Variable cost savings and extension of shared services. | - | - | 10,000 | 22,500 |
| Total | | | 5,021 | 76,820 | 110,833 |

*Calculated as targeted headcount reduction (net of new hires) compared to RE4 submission 8 schedules opening headcount.
Source: VDD – Volume 4iii – p5

Confidential

A-1143

terra firma

## Contents

- Executive Summary
- Market Overview
- Dice Company Profile
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations
- Due Diligence Work Streams

A-1144

# Recorded Music Industry Participants

## The key participants are set out below

terra firma

- The global Recorded Music Industry is relatively concentrated with 72% of share in the hands of the four majors. Music Publishing is less concentrated

| | Company | Global market share 2005 | Parent | Parent market cap | Comment |
|---|---|---|---|---|---|
| Majors | Universal Music Group | 26% | vivendi | [illegible] | [illegible] |
| | SONY BMG Music Entertainment | 22% | SONY | [illegible] | [illegible] |
| | EMI | [illegible] | EMI | [illegible] | [illegible] |
| | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| | | 72% | | | |
| Independents | edel, V2 | 28% | N/A | N/A | [illegible] |
| | | 100% | | | |

Source: Broker research, Bloomberg

A-1145

Confidential

TF0000081477

# 'Big Box' and Specialist Music Retailers

terra firma

- Physical sales are becoming increasingly concentrated with a number of key 'big box' retailers. These primarily are:
  - Wal-Mart
  - Tesco
- The effect of the increasing purchasing power of these customers is primarily two-fold
  - The large retailers have the ability to command favourable prices and terms (i.e. sale on return conditions)
  - The tendency to stock only albums on the charts hurts the catalogue business of all the Recorded Music businesses in the industry
- One of the knock-on effects is the increasing pressure on the music specialist retailers
- Low prices from the above 'big box' retailers forces the specialist to lower prices as well
- The failure of one of these businesses (i.e. Musicland or Sam Goody in the US) would damage physical sales, especially catalogue sales
- While closely monitored, these failures are largely unpredictable and will contribute to the likely step-change declines in future physical music sales
- There is likely to be some offsetting benefit from transferred sales at competing retailers. This benefit is most likely to be in New Releases and not Catalogue for reasons mentioned above

A-1146

Case: 11-126 Document: 48 Page: 348 04/25/2011 272867 401

terra firma

# Recorded Music Industry
## Market Outlook

- To consider page when LEK analysis available

% share of consumer entertainment dollar
Movie box office & home video
Cable & satellite TV
Newspaper, books, & magazines
11
10
8
7
7
7
6
6
5
5
32
30
29
28
27
26
25
25
24
23
*E
*E
*E
*E

A-1147

Page 106

Confidential

TF0000081479

terra firma

# Recorded Music Industry Market Outlook

USA time spent with Media
Projections
Interactive TV & Wireless Content

A-1148

# US Catalogue

terra firma

## Top US Album Sales

## US Album Average Age

- In the US sales are becoming increasingly concentrated in the Top Albums
- The average age of the US Catalogue has been increasing

A-1149

# Publishing Contracts by NPS

terra firma

| £m Song writer | 2006 Geography: | UK | US | Germany | France | Italy |
|---|---|---|---|---|---|---|
| 1 | | 0.8 | 1.3 | 0.5 | 0.1 | 2.3 |
| 2 | | 0.5 | 1.2 | 0.1 | 0.1 | 0.3 |
| 3 | | 0.4 | 1.0 | 0.1 | 0.1 | 0.2 |
| 4 | | 0.3 | 1.0 | 0.1 | 0.1 | 0.2 |
| 5 | | 0.3 | 0.7 | 0.1 | 0.0 | 0.1 |
| 6 | | 0.3 | 0.6 | 0.1 | 0.0 | 0.1 |
| 7 | | 0.3 | 0.6 | 0.6 | 0.0 | 0.1 |
| 8 | | 0.3 | 0.5 | 0.1 | 0.0 | 0.1 |
| 9 | | 0.2 | 0.5 | 0.1 | 0.0 | 0.1 |
| 10 | | 0.2 | 0.5 | 0.0 | 0.0 | 0.1 |
| **Top 10** | | **3.6** | **7.9** | **1.6** | **0.5** | **3.7** |
| | *Percentage of total revenue* | *11.6%* | *12.3%* | *7.4%* | *13.2%* | *57.0%* |
| **Next highest 11 to 20** | | **1.9** | **4.6** | **0.3** | **0.3** | **0.7** |
| | *Percentage of total revenue* | *6.3%* | *7.1%* | *7.1%* | *6.4%* | *10.3%* |
| | *Cumulative percentage* | *17.9%* | *19.4%* | *14.5%* | *19.6%* | *67.3%* |
| **Next highest 21 to 50** | | **3.3** | **8.3** | **0.5** | **0.5** | **0.8** |
| | *Percentage of total revenue* | *10.7%* | *12.9%* | *3.4%* | *13.0%* | *12.8%* |
| | *Cumulative percentage* | *28.6%* | *32.3%* | *17.9%* | *32.6%* | *80.1%* |

Over the last 3 years the cumulative sales Top 50 artists have included **c.5.7% revision units** (revision units being an album which will revert to the artist in within the next 5 years). Thus c.1% a year will be up for renewal / renegotiation

Source: VDD – Vol 5

A-1150

# Catalogues for Potential Acquisition

terra firma

| Target | NPS | Description |
| --- | --- | --- |
| Blue Mountain Music | Turnover £6.2m but has unusually high level of costs | • Administration of the Bob Marley catalogue<br>• £6.2m turnover in 2005 |
| Parts of BMG/UMG Publishing | | • BMG/UMG may be required to divest some businesses to satisfy the competition commission |
| Boosey & Hawkes | £12.8m (12/05) | • Focussed on classical music.<br>• Taken private by HgCapital in 2004, when NPS was £11.4m and has made some small acquisitions since then.<br>• Reportedly for sale in 2005 for £130m. Lower NPS because of focus on Classical Music |
| Bug Music | | • Manages 120,000 copyrights<br>• Backed by Spectrum Equity Partners |
| Cherry Lane | | • One of the largest independent music publishers in the US<br>• Artists include The Black Eyed Peas and Quincy Jones |
| Chrysalis Music | £11.4m (y/e 8/06) | • Bowie, Blondie, Outkast, Dixie Chicks and Gnarls Barkley form part of catalogue.<br>• Nominated for 41 Grammy's in 2006 and won in 14 categories |
| Music Copyright Solutions | £1.5m (12/05) | • Quoted company with a market cap. of £18m<br>• Suffered a loss in y/e 12/06 as a major customer defaulted on a loan |
| Really Useful Music | Circa £12.7m (y/e 6/06) | • Andrew Lloyd Webber's private company<br>• Publishing division potentially underperforming<br>• NPS is estimate and includes revenues earned from share of production of Lloyd Webber's shows (although Really Useful Group is not active in the running of the show) |
| Stage Three Music | £2.1m | • Apax backed vehicle which has been slow to grow.<br>• Made three acquisitions in y/e 12/05 as it tried to accelerate growth.<br>• Artists include Aerosmith, Gerry Rafferty, Macy Gray and ZZ Top |
| TVT Records | | • Leading US independent label and music publisher – Scott Storch (premier songwriter for Snoop Dogg, Beyonce, Justin Timberlake)<br>• Strong position in digital distribution |
| Music brokers | Various | • There are music brokers that specialise in selling rights on behalf of current musicians or the estate of deceased writers.<br>• An example is IPBC which sells catalogues and portions of rights for values of £10m and less. |

A-1151

## Publishing Copyrights

terra firma

The majority of publishing copyrights (c.85%) have an agreement length of longer than 10 yrs

Source: Data Room – 2.9.1.2

A-1152

# Artist Lifespan (Top 500 Albums Analysis)

terra firma

- Sales per album tend to trend downwards with a reduction in annual units sold of est. 3%
  - This figure is distorted by "classic" / "evergreen" albums which have continually strong unit sales. This leads to the rise in Sales per Album for 1970s – 1980s catalogue relative to more recent 1990s - 2000

Source: Data Room -

Confidential

TF0000081485

A-1153

Case: 11-126 Document: 48 Page: 355 04/25/2011 272867 401

# Artist Lifespan (Top 500 Albums Analysis) Cont'd

terra firma

- The older 'evergreen' albums form a larger proportion of the Top 10 and Top 20 albums – exhibited by the higher average age in these categories

Group Sales / Album
Sales
400000
350000
300000
250000
200000
150000
100000
50000
0
2003
2004
2005
2006
2007
1960 - 1965
1965 - 1970
1970 - 1975
1975 - 1980
1980 - 1985
1985 - 1990
1990 - 1995
1995 - 2000
2000 - 2005
2005 - 2010
Date
2007 Catalogue Average Age
Years
14
12
10
8
6
4
2
0
Top 10
Top 20
Top 50
Top 100
Top 200
Top 500
Top 20 Albums – Average age from release of 12.3 years
Remaining 480 Albums in Top 500 – Average age from release of 10.6 years

Source: Data Room - Page 113

A-1154

Confidential TF0000081486

terra firma

# Music Industry Overview – Industry Size

- The Music Industry is a $22.4bn business globally (2005 estimate[1]) earning revenues from sales of music, broadcasting of songs, licensing of music and the sale of printed music
- Recorded Music is the largest of the two sub-sectors of the industry. Estimated 2005 revenues were $16.4bn Recorded Music involves the development of artists, production of music and its associated marketing and distribution. Its revenues are earned from the sale of CDs and the digital downloading of music
- Music Publishing involves the management of portfolios of music on behalf of songwriters, collecting revenues from end-users and marketing music to end-users. Estimated 2005 revenues were $6bn. Music Publishers earn revenues from the sale of CDs/downloads. They also earn revenues from live performances, broadcasting, licensing and the sale of sheet music
- An analysis of the cash and product flows in the Music Industry is set out on the next page

Split of Industry Value Between Recorded Music and Music Publishing (2005)

Music publishing revenues, $6bn, 27%
Recorded music revenues, $16.4bn, 73%

Split of Industry Value (2005) between major sources

Physical, $16.3bn, 73%
Digital, $1.3bn, 6%
Other, $3.8bn, 17%
Printed Music, $1bn, 4%

1. Excluding retailers margin in Recorded Music

Source: PWC, IFPI, Credit Suisse, Yankee, Enders

Confidential

TF0000081487

terra firma

# Recorded Music Industry Overview

- Industry sales peaked in 1995, mostly due to the CD platform cycle
- The introduction of iTunes and a stronger global economy had stalled this decline

| CAGR % | |
|---|---|
| 1981-1996 | 1996-2005 |
| 8% | (2%) |
| 8% | 0% |

| | 1969 | 1973 | 1977 | 1981 | 1985 | 1989 | 1993 | 1997 | 2001 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|
| US% of global | - | 44 | 43 | 32 | 36 | 30 | 32 | 32 | 40 | 37 |
| Global % of World Nominal GDP | 0.08 | 0.12 | 0.13 | 0.11 | 0.11 | 0.11 | 0.12 | 0.13 | 0.11 | 0.07 |
| Global % of disposable income | - | - | - | 0.23 | 0.20 | 0.21 | 0.20 | 0.20 | 0.17 | 0.12 |

* Global numbers are for product shipped (which tends to be 10-15% higher than actual retail sales reported by Soundscan
** U.S. numbers are retail values at suggested list price

Source: IFPI; RIAA

Confidential

TF0000081488

A-1156

Case: 11-126 Document: 48 Page: 358 04/25/2011 272867 401

terra firma

# Music Industry Overview
## Economics of Physical and Digital Sales

- Recorded Music companies receive between 40-65% of the retail price for CDs and Downloads after royalties
- The retailer's margin in Physical sales is up to 80% higher than Digital
- Royalties represent circa 14-15% of the retail price, split between the Music Publisher and the Artist
- Manufacturing and Distribution costs in Physical are more than double those for Digital
- As a result, Digital revenues, after royalties and M&D costs, can be double those of a sale of a physical track
- However, digital music buyers can disaggregate an album and, potentially, only buy a few tracks
- This means that overall revenue and therefore profits can be lower from Digital

Physical format revenue per track (%)
100
38-47
53-64
6-8
7-8
38-51
8-11
26-42
Suggested retail price
Retailer margin and VAT
Recorded music revenue
Publisher royalties
Artist royalty
Revenue after royalties
Manufacturing and Distribution costs
Revenue after royalty, M&D
Digital format revenue per track (%)
100
20-30
70-80
8-9
7-8
55-65
< 5
50-60
Retail price
Retailer margin and VAT
Recorded music revenue
Publisher royalties
Artist royalty
Revenue after royalties
Manufacturing and Distribution costs
Revenue after royalty, M&D
Music publishing
Recorded Music

Source: McKinsey

Page 116

Confidential

TF0000081489

A-1157

Case: 11-126 Document: 48 Page: 359 04/25/2011 272867 401

# P2P piracy appears to be levelling off despite increasing broadband penetration

terra firma

Illegal file sharing dynamics
European Market
Billion units
50
40
30
20
10
0
2002
2003
2004
2005
2006
Broadband penetration
Unlicensed downloads

Share of Americans (aged 12 or above) who paid to download music or engaged in file sharing
%
File sharing
Paid to download
2500%
2000%
1500%
1000%
500%
0%
Q4 2002
Q1 2003
Q2 2003
Q3 2003
Q4 2003
Q1 2004
Q2 2004
Q3 2004
Q4 2004
Q1 2005
Q2 2005
Q3 2005
Q4 2005
Q1 2006
Q2 2006
Q3 2006

Source: Jupiter Research Sept. 2006; Enders
Page 117

Confidential

TF0000081490

A-1158

terra firma

A-1159

# Recorded Music Industry Overview

- Since the peak of the Recorded Music industry size in 1995 the market size (by value) has declined by a CAGR of 1.6%. Asia has declined at the fastest rate
- The key forces impacting Recorded Music are set out below:
  - Shift of sales from physical to digital: margins for digital sales are much higher but the ability of buyers to unbundle albums may lead to lower aggregate profits as users buy fewer songs
  - Change in the nature of music retailers: the shift to mass retailers at the expense of specialist stores has put pressure on prices and margins. Also, mass retailers typically dedicate less floor space and only focus on chart music. This reduces catalogue sales
  - Competing media: music faces increasing challenges for consumers' time and money from activities such as computer games, the Internet and proliferation of TV channels
  - No new platform on the horizon: The advent of the CD drove a cycle of replacement sales. The shift to digital will not result in a similar cycle
  - Piracy: Jupiter Research suggest that piracy appears to be levelling off despite increasing broadband penetration

Source: IFPI; PWC

(1) Annual exchange rates used to convert to USD

### Impact of changes in units vs price in the major markets (physical and digital)

| Region | 2005 size ($bn) | 2001-2005 value CAGR | 2001-2005 CAGR impact price | 2001-2005 CAGR impact volume |
|---|---|---|---|---|
| Global | [illegible] | 5.2% | 2.0% | 3.5% |
| US | 12.[illegible] | 2.1% | 2.4% | 1.7% |
| UK | 3.5 | 1.9% | 1.5% | 1.1% |
| France | 2.0 | 6.6% | 2.4% | 2.5% |
| Germany | 2.2 | 6.9% | 3.6% | 0.5% |
| Japan | 6.6 | 3.5% | 0.9% | 3.7% |

Source: IFPI; Enders Analysis, 2007

Confidential

TF0000081491

# Music on Mobile Phones

terra firma

- There is considerable evidence that mobile phones will become ubiquitous music devices – converging with MP3 players
  - Therefore allowing Dice to access a much larger pool of digital music users




* Capable of playing AAC, MP3
** Calendar quarters adjusted from Apple's system
*** Source: McKinsey
****Source: LEK
***** Sample size 16
****** Source: Ericsson Consumer Lab

# Model Assumptions relative to Market Forecasts

terra firma

Our modelled market forecasts remain in-line with consultants and broker estimates

A-1161

terra firma

# Decrease in the Statutory Copyright Cost per Track in the US

- A decrease from the currently level of 9.1c to 6.5c would generate incremental savings of £10m to recorded music in 2008 and similarly a decrease in publishing gross margin of £7m

**Calculating Impact of a Decrease in Statutory Copyright Payments**

| Music | 2007 | 2008 |
|---|---|---|
| *(£m)* | | |
| Royalty to Artist | 66 | 62 |
| Copyright Cost | 39 | 37 |
| Total | 105 | 99 |
| | | |
| Current Stat Track Cost | 9.1 | 9.1 |
| Implied Tracks | 4 | 4 |
| Revised Stat Track Cost | 6.5 | 6.5 |
| Revised Copyright Cost | 28 | 26 |
| ***Recorded Music Cost Savings*** | ***11*** | ***10*** |

| Publishing | 2007 | 2007 |
|---|---|---|
| Mechanical Income | 95 | 93 |
| Mechanical Royalties | (68) | (67) |
| Gross Margin | 26 | 26 |
| *Margin (%)* | *27.7%* | *27.7%* |
| | | |
| *Ratio of Revised Copyright to Old Copyright* | *71%* | *71%* |
| | | |
| Revised Mechanical Income | 68 | 67 |
| Mechanical Royalties | (49) | (48) |
| Gross Margin | 19 | 18 |
| *Margin (%)* | *27.7%* | *27.7%* |
| | | |
| ***Decrease in Publishing Gross Margin*** | ***(7)*** | ***(7)*** |

Source: Data Room, Red Book p14

A-1162

terra firma

# Overview of the Music Publishing value-chain

**Music publishers assist songwriters/authors in managing copyrights and collect royalties through a combination of collective licensing and contractual agreements with sound carriers/partners**

Source: Deloitte analysis

- Music publishers manage the highly fragmented end-usage of music catalogues with the help of collective bodies called Collection Societies
- Royalties for the sale of physical media like CDs, DVDs, etc. are generally collected through Collection Societies with the exception of c.25% in the US which is collected directly
- Digital media royalty collection varies by market:
  - European digital royalties for downloads/mobile music are collected directly from the retailer (e.g. iTunes) by mechanical Collection Societies; and
  - US digital royalties are initially collected from the retailer by the record labels and subsequently passed through to the Collection Society
- Performance royalties are collected through Collection Societies; 'Grand Rights' are negotiated and collected directly by the copyright holder
- Synchronisation and print licenses are directly negotiated and usually collected directly by music publishers

A-1163

Confidential

terra firma

# Net Publisher Share: Key drivers

NPS is determined by overall trends in mix between music delivery channels and the proportion of royalties retained by publishers

- Music publisher NS, a key top line metric in the music industry, is determined by:
  - the size, shape and growth of overall music consumption;
  - publishing royalties as a percentage of music industry revenues;
  - the ability of music publishers to maintain their share of royalties ;
  - competition between music publishers for new talent
- The value and volume of the music industry end markets influence Music Publishing revenues. Key trends need to be assessed in terms of geography, genre an platforms
- Music publishing royalties are determined by tariffs, the application of those tariffs and the level of commission retained by the societies
- The division of royalties between publisher and songwriter varies by geography, platform and genre. In addition, as a general feature, older catalogues deliver greater NPS margins than more recent catalogues
- Competition between music publishers also affects the NPS share at which new talent is signed up
- Whilst the performance of superstar acts can be important, they are likely to have less material impact than in the music business. The size and type of back catalogue will significantly impact longer term performance

Source: Deloitte analysis

Confidential

A-1164

terra firma

# Types of publishing agreements

| | Full publishing | Co-publishing | Administration |
|---|---|---|---|
| Terms: | ▪ Music publisher becomes the owner of the song's copyright<br>▪ Royalty income generated from songs is then split, usually on a 50/50 basis with the Songwriter | ▪ Main terms of a co-publishing agreement similar to a full publishing agreement, except:<br>– Music publisher co-owns a percentage of the copyright along with the songwriter<br>▪ Common for both parties to each own 50% of the copyright, though percentages can vary from deal to deal<br>▪ Songwriter or contract partner also receives a percentage of the publisher's share | ▪ Music publisher collects royalties and also helps promote the songwriter's catalogue, but does not own the copyright<br>▪ Publisher deducts an administration fee (typically 5-20% of revenues)<br>▪ Administrator distributes the entire remaining proceeds to the songwriter or original publisher<br>▪ Administration deal lasts for a specific period of time |

| | Revenue | NPS* | Revenue | NPS* | Revenue | NPS* |
|---|---|---|---|---|---|---|
| Mechanical | 50 | 25 | 50 | 12.5 | 50 | 5 |
| Performance (publishers share) | 30 | 30 | 30 | 15 | 30 | 3 |
| Others | 20 | 10 | 20 | 5 | 20 | 2 |
| **Total %** | 100 | 65 | 100 | 32.5 | 100 | 10 |
| Gross margin (NPS margin) % | | 65 | | 32.5 | | 10 |

Source: Industry analysis

*Publishers share

A-1165

TF0000081497

Confidential

terra firma

# Music Publishing Overview

- Music publishers assist songwriters in managing copyrights and collecting royalties through a combination of collective licensing and contractual agreements with users of music. The industry was estimated to be worth $6.9bn in 2006

## Performance

- End users of music for Performance are highly fragmented. Music publishers generally manage revenue collection with assistance from Collection Societies in each country (such as the Performing Rights Society in the UK)
- The sector has performed well as Music Publishers have forced Collection Societies to become more thorough/efficient and the internet has enabled remote monitoring and auditing of users
- Radio has performed strongly in the period from 2002-2006 as the number of channels proliferates through satellite and digital
- General has also performed well as artists seek to increase revenues by touring and performing more frequently

## Synchronisation

- Synchronisation is the use of music in films, advertisements and on video/computer games. Music Publishers have focussed on actively marketing their portfolios to increase revenues in this area

## Phonomechanical

- Phonomechanical revenue is related to the sale of CDs. It performed poorly as physical sales declined. However it performed less badly as royalties are earned on the equivalent of the RRP, not the actual unit price

**Publishing Royalties by Type**

| Royalty type | 2002 | 2006 | CAGR 02-06 |
|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |

Source: Deloitte's VDD

Confidential

terra firma

# Music Publishing Industry Participants

## The key participants are set out below

- 61% of global market share is in the hands of the four majors

| | Company | Global market share | Parent | Market cap | Comment |
|---|---|---|---|---|---|
| Majors | Universal Music Publishing Group | [illegible] | vivendi | [illegible] | [illegible] |
| | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| | Warner Chappell Music | [illegible] | [illegible] | [illegible] | [illegible] |
| | [illegible] | [illegible] | SONY / Michael Jackson | [illegible] | [illegible] |
| | | 61% | | | |
| Independent | Chrysalis; [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| | | 100% | | | |

Source: Broker research, Bloomberg
(1) BMG is now part of Vivendi Universal

Confidential

terra firma

# Music Publishing Forecasts

- In the period 2002-2006, revenues from music publishing grew at a CAGR of 8%, helped by strong growth from performance revenues (9.1% CAGR). This reflected increased live entertainment and also improved capturing of broadcast royalties through internet monitoring and better performance by the Collecting Societies
- In the forecast period, revenue CAGR is expected to be circa 2%. Growth is held back by:
  - Slower growth in Performance (only 4.4% CAGR). The easy gains from improved performance have now been made. However, there could be further upside in this area
  - Negative growth in Reproduction as it suffers from the anticipated performance of physical sales (from which Music Publishers derive mechanical revenues)

## Music publishing by geography 2003

Rest of Europe 32%
UK 9%
North America 37%
Rest of World 22%

Enders analysis 2004

## Forecasts by sector

2002 - 2006
8%
CAGR
2%
CAGR 02-06, %
CAGR 06-12, %
9.1
4.4
7.5
-0.1
7.0
2.1
-0.7
0.5
129
130
131
131
132
133
134
135
2005
2006
2007
2008
2009
2010
2011
2012
Other
Distribution
Reproduction
Performance

Source: Enders 2007

Confidential

A-1168

terra firma

# Music
## Dice Market Share

- Low market share in the largest music market in the world (US)
- However, Dice has the #2 market share in Japan, a more fragmented market and the #2 market in the world
- Global EMI penetration oscillated between a minimum of 12.7% (2003) and a maximum of 13.2% (2004) in the period

Source: EMI annual reports; Interviews

A-1169

TF0000081501

Confidential

# Publishing

## Review of Copyright rates in the US

terra firma

### U.S. music publishing market

**Historical pricing**

- Digital downloads and CDs provide 9.1 cents revenue for publisher per track
- Prices last reviewed in 1981
- Ring tones and synchronisation rights tend to be negotiated on a case-by-case basis

**Current situation**

- Phonomechanical pricing is being reviewed and will go to tribunal in 2007
- 3 major players with different positions

1. RIAA – propose publisher payments of 7.8% of wholesale, ~ 4 cents per track
2. DiMA – propose 75% reduction to ~2.5 cents per track
3. Music publishers – propose no change to payment rates on CDs, 12% of retail price for digital (~10 cents per track), and 15% of retail price for ring tones

**Possible outcomes**

1. Tribunal will rubber stamp current process
2. DiMA and RIAA proposals will be implemented and U.S. music publishing revenues will drop
3. U.S. music publishers will be successful and other revenues will increase

**Outcome is "not at all clear", a ruling that is too weighted in any party's favour would be likely to lead to an appeal**

- **U.K. music publishing market**
  - Recent ruling on digital download payments resulted in a settlement of 8% of retail price
  - For Physical: 8.5% of PPD is stable. "The difference between 8.5% of PPD and 8.5% of RRP is negligible to the industry, the problem is far more pandemic than negotiations with publishers" – *Music Publishers Association, UK*

  **Rest of world**
  - Europe is predicted to be stable at around 10-15% of retail price, but Germany - currently at 15% - may decrease as it is at the high end of the range
  - Rest of World expected to be stable (e.g., Japan payments are linked to retail price at 7.7%)

Source: Interviews

Confidential

A-1170

terra firma

# Overview of Dice

Capitol

Virgin

Parlophone

Angel

BLUE NOTE

- Dice is composed of two divisions, Recorded Music and Music Publishing with headquarters in London and New York
- Top selling artists for FY07 include The Beatles (5m copies), Norah Jones (4m), Corinne Bailey Rae (2.5m), Robbie Williams (2.4m) and Keith Urban (1.9m)
- Dice's Recorded Music catalogue is made up of over 3 million tracks by artists such as The Beatles, the Rolling Stones, Pink Floyd, Frank Sinatra, Robbie Williams and Kylie Minogue. Record labels include Angel, Astralwerks, Blue Note, Capitol, Capitol Nashville, Dice, Dice Televisa, Narada, Parlophone and Virgin
- Music Publishing is the world's largest music publisher in terms of revenue. Dice's publishing catalogues include SBK (CBS Songs, MGM, United Artists), Filmtrax (Columbia Pictures and TV) and Screen Gems
- The company completed the outsourcing of almost all its CD manufacturing capacity in December 2005

## Revenue and EBITDA (2007)

Revenue
Publishing, 23%
Music, 77%

EBITDA
Music, 40%
Publishing, 60%

Source: Deloitte's VDD

Revenue by Geography and Digital/Physical (2007)

Other
22%
US
30%
UK & Eire
20%
Europe
28%
Digital
11%
Physical
89%

Source: Deloitte's VDD

A-1171

TF0000081503

Confidential

# Dice Overview (£m)
## Historical Financials

terra firma

### Recorded Music

- 2001 – Revenue growth driven by increase in global market share of 1.6% to 14.1% in part due to new media and successful releases from Geri Halliwell, Paul McCartney, Janet Jackson and Emma Bunton
- 2002 - Underperformance of major releases including artists such as Mariah Carey, a release schedule slippage in Japan and a poor economic environment in Latin America. Significant management issues in North America which ended in appointing David Munns as CEO and Chairman of Dice Recorded Music North America and moving the Virgin office to New York
- 2003 - Partly due to decline in the overall market with significant increase in both digital and physical piracy. Disruption to day-to-day business due to restructuring measures, particularly in continental Europe and at Virgin America
- 2005 - Challenging year due to delays in the release schedule, in particular X&Y from Coldplay and Demon Days from Gorillaz. Further decline in revenues due to weaker reorders than expected in the 4th quarter
- 2006/07 - Another challenging year as the global music market declined by 12.8% and the physical music market in the US declined by 20%. Alain Levy and David Munns were fired and replaced by Eric Nicoll. EMI decides to sell its content DRM free on Apple's iTunes website, the first major label to do so

### Music Publishing

- 2000 - High growth underpinned by first time contributions from catalogue acquisitions such as Windswept and Hit & Run with additional growth coming from artists such as TLC, Blink 182, matchbox twenty, and the Goo Goo Dolls
- 2001 - Significant growth in the US market share (around 20%) due to hit releases from artists such as Sting, matchbox twenty, blink-182, and Jay-Z which fed through to mechanical and synchronization royalties
- 2002 -Despite difficult conditions in the recorded music industry, revenues increased driven by market share and increased UK chart share to 28.4% e.g. hit release of Alicia Keys debut album "Songs in A Minor"
- 2003 - Negative impact on mechanical royalties (53% of music publishing revenues) due to overall decline in the recorded music industry
- 2006/07 - Strong results from artists such as Black Eyed Peas, Natasha Bedingfield, James Blunt, Kelly Clarkson and Eminem fuelled overall division performance in 2006. Growth in digital revenues was large contributor to overall division revenue growth amounting to 5% of total divisional revenue (growth of 52%) in 2006. Winner of the ASCAP 2007 Publisher of the Year award

Source: Company reports / presentations

### Dice historical P&L analysis (pre-exceptionals)

| Dice Y/E March £m | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Recorded Music | 2,033 | 2,282 | 2,029 | 1,774 | 1,723 | 1,601 | 1,660 | 1,414 |
| *growth* | (1.2)% | 12.3% | (11.1)% | (12.6)% | (2.9)% | (7.0)% | 3.7% | (14.8)% |
| Music Publishing | 354 | 391 | 416 | 401 | 398 | 401 | 420 | 416 |
| *growth* | 11.8% | 10.4% | 6.6% | (3.7)% | (0.8)% | 0.7% | 4.7% | (0.9)% |
| Corporate eliminations | 0 | 0 | 0 | 0 | 0 | -1 | 0 | -78 |
| Sales | 2,387 | 2,673 | 2,446 | 2,175 | 2,121 | 2,002 | 2,080 | 1,752 |
| *growth* | 0.6% | 12.0% | (8.6)% | (11.1)% | (2.5)% | (5.8)% | 3.9% | |
| | | | | | | | | |
| Recorded Music | n/a | n/a | n/a | n/a | n/a | 148 | 167 | 78 |
| *margin* | n/a | n/a | n/a | n/a | n/a | 9.2% | 10.1% | 5.5% |
| *growth* | n/a | n/a | n/a | n/a | n/a | n/a | 13.4% | (53.2)% |
| Music Publishing | n/a | n/a | n/a | n/a | n/a | 103 | 109 | 118 |
| *margin* | n/a | n/a | n/a | n/a | n/a | 25.6% | 25.9% | 28.3% |
| *growth* | n/a | n/a | n/a | n/a | n/a | n/a | 5.7% | 8.2% |
| Corporate eliminations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -22 |
| EBITDA | 349 | 390 | 241 | 298 | 284 | 250 | 276 | 174 |
| *margin* | 14.6% | 14.6% | 9.9% | 13.7% | 13.4% | 12.5% | 13.3% | 9.9% |
| *growth* | 7.0% | 11.8% | (38.1)% | 23.5% | (4.6)% | (12.0)% | 10.2% | (36.8)% |
| | | | | | | | | |
| Recorded Music | n/a | n/a | n/a | n/a | n/a | 22 | 22 | 20 |
| *% of sales* | n/a | n/a | n/a | n/a | n/a | 1.4% | 1.3% | 1.4% |
| Music Publishing | n/a | n/a | n/a | n/a | n/a | 3 | 3 | 3 |
| *% of sales* | n/a | n/a | n/a | n/a | n/a | 0.8% | 0.8% | 0.7% |
| Corporate eliminations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Depreciation | 58 | 57 | 51 | 43 | 35 | 25 | 25 | 24 |
| *% of sales* | 2.4% | 2.1% | 2.1% | 2.0% | 1.7% | 1.3% | 1.2% | 1.4% |
| | | | | | | | | |
| Recorded Music | 195 | 228 | 83 | 151 | 147 | 126 | 145 | 58 |
| *margin* | 9.6% | 10.0% | 4.1% | 8.5% | 8.6% | 7.8% | 8.7% | 4.2% |
| *growth* | 7.1% | 16.6% | (63.5)% | 81.1% | (2.1)% | (14.9)% | 15.6% | (59.5)% |
| Music Publishing | 96 | 105 | 108 | 104 | 102 | 100 | 105 | 114 |
| *margin* | 27.0% | 26.9% | 25.9% | 25.8% | 25.6% | 24.9% | 25.1% | 27.6% |
| *growth* | 9.1% | 9.9% | 2.7% | (4.0)% | (1.5)% | (2.3)% | 5.8% | 8.4% |
| Corporate eliminations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -23 |
| EBITA[1] | 291 | 333 | 190 | 256 | 249 | 228 | 251 | 151 |
| *margin* | 12.2% | 12.5% | 7.8% | 11.7% | 11.8% | 11.2% | 12.0% | 8.6% |
| *growth* | 7.9% | 14.4% | (42.8)% | 33.9% | (2.2)% | (8.7)% | 11.3% | (39.8)% |

Source: Dice Annual Report, Deloitte's VDD

A-1172

Confidential

TF0000081504



A-1173

terra firma

# Dice Overview
## Company History

| Year | Event |
| --- | --- |
| 1931 | Gramophone Company (listed in 1904) merges with Columbia Gramophone to form Electric and Musical Industries (Dice) |
| 1955 | Dice acquires Capitol Records in Los Angeles, one of the largest record labels in the US |
| 1961 | Dice establishes a joint venture record company with Toshiba in Japan |
| 1962 | Dice signs The Beatles |
| 1967 | Dice signs Pink Floyd |
| 1672 | Dice signs Queen |
| 1974 | Dice Music Publishing formed, based on [illegible] acquisition of Keith Prowse Music Publishing and Central Songs |
| 1979 | Dice purchases the Liberty United Artists record company which includes the Blue Note label |
| 1979 | Dice merges with Thorn Industries to create Thorn Dice |
| 1992 | Acquisition of the Virgin Music Group which includes record labels and publishing catalogues |
| 1996 | Thorn Dice shareholders vote in favour of demerger proposal. Demerger completed |
| 1996 | Dice acquires 50% of leading US independent Priority Records, acquiring the remaining 50% in 1998 |
| 1998 | Dice sells HMV to HMV Media Group joint venture |
| 2000 | Dice Music Publishing signs ground breaking ringtone deal with Nokia |
| 2002 | Dice becomes the first major music company to make new music available digitally at the same time as it is released to radio |
| 2004 | Dice completes acquisition of [illegible] |
| 2006 | Dice wins [illegible] |
| 2007 | Dice Music launches DRM-free superior quality downloads across its entire digital repertoire |

TF0000081505

Confidential

# Dice Overview
## Shareholder Composition

terra firma

### Top 25 Shareholders

| | Holder | Sheet name | Style | Total change since 7/12/06 (%) | Current holding (%) | Current holding Cumulative |
|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 2. | Credit Suisse | CreditSuisse | UK active | (0.12%) | 1.92 | 7.97 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 4. | Capital Group | Capital | US active | 1.57% | 4.31 | 16.96 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 6. | Wellington | Wellington | US value | (4.38%) | 4.11 | 25.28 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 8. | Aberdeen AM | Aberdeen | UK active | 2.00% | 3.74 | 32.88 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 10. | GAM London | GAMLondon | UK active | 1.99% | 3.35 | 39.83 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 12. | Morley FM | Morley | UK active | 1.29% | 2.95 | 46.05 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 14. | CIC | CIC | Other broker | 2.09% | 1.99 | 49.74 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 16. | Eminence Capital | Eminence | Hedge fund | (0.93%) | 1.81 | 53.44 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 18. | Schroders Investment | Schroder | UK active | (0.21%) | 1.74 | 56.95 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 20. | ING GAM | ING | Long only | - | 1.56 | 60.14 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 22. | SMG Global | SMG | Hedge fund | 0.37% | 1.36 | 62.93 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 24. | Henderson GI | Henderson | UK active | (1.25%) | 1.05 | 65.07 |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| | Total | | | | 65.03 | |

### Shareholders by Type / Geography

2.6%
0.6%
0.0%
3.3%
2.9%
1.4%
4.8%
12.1%
51.0%
3.3%
8.0%
4.1%
6.2%
UK active
Hedge fund
Trading A/c
US active
European
Custodian account
US value
RoW
Unidentified
Index fund
Private client broker
Long only
Other broker

*Source: Citywatch and RNS.*

# Dice Overview
## Senior Leadership

terra firma

**Senior Leadership (Executive Directors)**

| Name | Position | Comments |
| --- | --- | --- |
| Eric Nicoli | CEO, Dice Group & Music | • Eric Nicoli was appointed to the Board in 1993 as a Non-executive Director, becoming executive Chairman in July 1999 and CEO in January 2007<br>• Until April 1999, he was Group Chief Executive of United Biscuits (Holdings) plc (UB), which he joined from Rowntree Mackintosh in 1980. He was appointed to the UB Board in 1989 and became Chief Executive of UB in 1991<br>• He is co-Chairman of BASCAP, an international initiative to stop counterfeiting and piracy, and he also sits on the UK government's Creative Industries Forum on Intellectual Property |
| Martin Stewart | CFO | • Appointed CFO and became a member of the Board in February 2005<br>• Before joining Dice, Mr. Stewart was CFO of British Sky Broadcasting Group plc<br>• He entered the process to become CEO of Sky following the retirement of Tony Ball but was beaten to the role by James Murdoch. He left shortly after |
| Roger Faxon | Chairman and CEO, Dice Music Publishing | • Roger Faxon became joint CEO of Dice Music Publishing and rejoined the Board on 1 April 2006.<br>• He became sole CEO of Dice Music Publishing in March 2007 following the departure of Martin Bandier<br>• Mr Faxon joined Dice in 1994, initially as Senior Vice President, Business Development & Strategy, Dice Music and, in April 1999, became Executive Vice President and Chief Financial Officer, Dice Music Publishing<br>• On 1 February 2005, after three years as the Chief Financial Officer and an Executive Director of Dice, Roger Faxon returned to Dice Music Publishing as President and co-CEO |

Confidential

TF0000081507

A-1175

# Dice Overview
## Senior Leadership

terra firma

**Senior Leadership (Non-Executive Directors)**

| Name | Position | Comments |
| --- | --- | --- |
| John Gildersleeve | Non-Executive Chairman of Dice Group | • Became Chairman of Dice Group in January 2007 when Eric Nicoll became CEO<br>• John Gildersleeve joined the Board in 2004 when he also became Deputy Chairman and Senior Independent Non-executive Director<br>• Until 2004, Mr Gildersleeve was the Commercial and Trading Director of Tesco plc. He joined Tesco in 1965 and became an executive director in 1984<br>• Mr Gildersleeve is also Non-executive Chairman of Gallaher Group plc and of The Carphone Warehouse Group PLC |
| Sly Bailey | Senior Independent Director | • Sly Bailey joined the Board in 2004. She became Senior Independent Director in February 2007<br>• Mrs Bailey is Chief Executive of Trinity Mirror plc, the UK's largest newspaper publisher |
| Kevin Carton | Non-Executive Director | • Kevin Carton joined the Board on 1 February 2006 and is the Chairman of Dice's Audit Committee, succeeding Kathleen O'Donovan (who left the board in November 2006)<br>• Mr Carton retired as a senior partner of PricewaterhouseCoopers LLP in June 2004 after 38 years. He was the Global Leader of the Entertainment & Media practice based in New York |
| Peter Georgescu | Non-Executive Director | • Peter Georgescu joined the Board in 2002<br>• Mr Georgescu is Chairman Emeritus of Young & Rubicam Inc., a network of commercial communications companies, having served as that company's Chairman and CEO from 1994 until 2000 |
| David Londoner | Non-Executive Director | • David Londoner joined the Board in 2003<br>• Mr Londoner is the General Partner of The North River Company, L.P., a family investment partnership<br>• He spent most of his career at Schroder & Co. Inc., joining a predecessor firm,Wertheim & Co., in 1972 and leaving when it was sold in 2000<br>• Additionally, Mr Londoner is a director of Meredith Corporation and Wintergreen Fund. He is also a trustee emeritus of the Museum of the Moving Image in the US |

A-1176

Confidential

TF0000081508

# Dice Overview
## Group Executives

terra firma

| Name | Position | Comments |
|---|---|---|
| Jean-Francois Cecillon | Chairman and CEO, Dice Music International | • Appointed to Chairman and CEO of Dice Music International in January 2007<br>• Has regional responsibility for all of Dice Music's operations outside North America and the UK<br>• Prior to this role, he was Chairman and CEO of Dice Music Continental Europe<br>• Has over 20 years' experience in the entertainment industry including positions at Dice, Polydor/A&M, Sega Europe and Media Advisor at Accenture |
| Tony Wadsworth | Chairman and CEO, Dice Music UK & Ireland | • Appointed to Chairman and CEO of Dice Music UK & Ireland in January 2002<br>• Joined Dice in 1982. He moved to Parlophone in 1987 and was promoted Managing Director in 1993<br>• Was appointed President of Dice Records UK & Ireland in 1998<br>• Prior to joining Dice, he worked as production manager at Warwick, Logo and RCA Records |
| Bob Flax | Vice Chairman, Dice Music Publishing | • Worldwide Vice Chairman of Dice Music Publishing since August 2006<br>• Joined Dice Music Publishing in 1992 as Executive Vice President of the worldwide company and was appointed President of Dice Music Publishing US in 2002 |
| Peter Ende | President and CEO, Dice Music Publishing Continental Europe | • Has been President and CEO of Dice Music Publishing Continental Europe since May 2004<br>• Is currently President and CEO of Germany/Switzerland/Austria in addition to his broader responsibilities across Europe |
| Guy Moot | Managing Director, Dice Music Publishing UK | • Became Managing Director of Dice Music Publishing UK in June 2005<br>• Joined SBK Music Publishing in 1987 which merged with Dice in 1989 |
| Susanne Ng | Regional Managing Director, Dice Music Publishing Asia | • Appointed Regional Managing Director of Dice Music Publishing Asia in 1995<br>• Joined Dice Music Publishing as Regional Head of Asia in 1995 |

A-1177

Confidential

# Dice Overview
## Insider Director / Officer Share & Option Holdings

terra firma

### Insider Option / Share Ownership Overview

| Name | Position | 2006 Remuneration Base Salary | Benefits | Incentive remuneration | Total Remuneration | Shareholding | No. of Options | Total value of shares and options (£000) at: 255p | 260p | 265p | 270p |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive Directors | | | | | | | | | | | |
| E L Nicoll | CEO of Dice Group & Music | 750.4 | 67.4 | 725.4 | 1,543.2 | 1,920,938 | 2,105 | 5,202.3 | 5,394.0 | 5,592.3 | 5,790.6 |
| M D Stewart | CFO | 525.0 | 214.2 | 507.5 | 1,246.7 | 602,266 | 519,116 | 1,546.7 | 1,602.7 | 1,658.8 | 1,714.9 |
| R C Faxon | Chairman and CEO of Dice Publishing | 1,500.0 | na | na | 1,500.0 | 1,210,034 | 0 | 3,085.6 | 3,146.1 | 3,206.6 | 3,267.1 |
| | | 2,775.4 | 281.6 | 1,232.9 | 4,289.9 | | | | | | |
| Non-executive Directors | | | | | | | | | | | |
| J Gildersleeve | Chairman of Dice Group | 300.0 | 0.0 | 0.0 | 300.0 | 1,377 | 0 | 3.5 | 3.6 | 3.6 | 3.7 |

Notes: Assumes all options and performance share grants vest upon change of control. Option and share totals as of 4 April 2007

Source: Annual Reports and RNS announcements

Confidential

TF0000081510

A-1178

terra firma

# Dice Overview
## 5-year Share Price Performance

A-1179

Confidential

TF0000081511

Case: 11-126 Document: 48 Page: 381 04/25/2011 272867 401

terra firma

# Dice Overview

## 1- Year Share Price Performance

GBp
400
380
360
340
320
300
280
260
240
220
200
180
160
140
120
100
80
60
13 July 06: EU challenges Sony/BMG merger
12 Jan 07: Dice fires Alain Levy and David Munns along with profit warning of 6-10 % decline in sales
3 May 07: Takeover approach by One Equity rumoured
28 Nov 06: KKR and Goldman Sachs rumoured takeover approach
28 June 06: Dice rejects 320p Warner Music offer
20 Feb 07: Dice confirms approach from Warner Music
14 Feb 07: Dice issues 2nd profit warning in a month, expecting a 15% decline in recorded music sales
2 April 07: Dice reaches agreement with ITunes to sell its music catalogue without DRM
18 April 07: Dice suspends dividend and appoints DB and RBS to advise on securitisation of music publishing assets
May-06
Jun-06
Jul-06
Aug-06
Sep-06
Oct-06
Nov-06
Dec-06
Jan-07
Feb-07
Mar-07
Apr-07
May-07
Key Events
Dice
Whist (re-based)
FTSE250 (re-based)

Page 139

A-1180

Confidential

TF0000081512

terra firma

# Dice Overview

## Dice Broker Estimates

| Broker | Standalone Target Price | Rec. | Change in TP | Takeout price | Valuation |
|---|---|---|---|---|---|
| Merrill Lynch (19 April 2007) | 206 | Neutral | No | 280 | • DCF target price with separate valuation for the recorded music and publishing divisions (implying a 14x 2008E EBITA for record music and 11.3x 2008E EBITA for music publishing)<br>• 56% probability of Whist bid |
| Morgan Stanley (19 April 2007) | 240 | Neutral | Yes | 280 - 300 | • Sum of the parts valuation based on 2007E Dice financials<br>• EBITA multiple of 12x for recorded music and 14x EBITDA for music publishing |
| Cazenove (16 April 2006) | n/a | Outperform | No | 224 | • Sum of the parts valuation<br>• Multiple of 15x EBITDA for music publishing but not stated metric for recorded music |
| Pali Research (11 April 2007) | 205 | Neutral | n/a | 280 - 300 | • Sum of the parts based on 2008F Dice financials<br>• EBITA multiple of 10.6x for recorded music and 18.5x for music publishing |
| Deutsche Bank (15 February 2007) | 235 | Buy | Yes | 280 | • Sum of the parts on 2009F Dice financials with 7x EBITDA for recorded music and 15x EBITDA for music publishing |
| ABN Amro (16 February 2007) | n/a | Buy | Yes | 245 | • 3 scenario based valuation: 1) Whist merger talks at 260p, 2) Private equity take over at 235p and 3) break up value at 260 |
| UBS (15 February 2007) | 190 | Neutral | Yes | 225 | • DCF target price of 190p with potential upside from takeover speculation giving a takeout price of 225 |
| Citigroup (15 February 2007) | 208 | Buy | Yes | 260 | • Sum of the parts, 6x EBITDA multiple for recorded music and 14x for music publishing<br>• 50% of the capitalized £160m synergies and 100% of tax assets forecast to arise from a Whist deal |
| Average | 214 | | | 262 | |

House broker/adviser
Non-connected

Note: All price targets are post 2nd profit warning in February 2007

TF0000081513

Confidential

A-1181

# Dice Music - Overview

- Similar to the rest of the recorded music industry, Dice Music has struggled in recent years due to structural changes in the music industry, most notably digital music, piracy and increasing availability of alternatives (i.e. games, online)
- Financial performance is largely dependent on new releases. In FY07, new releases made up 6.2% of the total units sold. Generally, Dice's major new releases fell short of expectations in 2007
- There has been a change in the customer base away from the traditional, specialised music companies to general retailers and supermarkets. Primarily, this has affected Catalogue sales as the retailers generally only stock current releases that are on the charts. Catalogue unit sales fell by 20.7% in FY07
  - The purchasing (increasingly demanding sale on return agreements) and stockholding (just-in-time inventory) characteristics of these major customers has led to higher than expected levels of product returns. According to management this was the primary reason for the February 2007 profits warning
- Much like the rest of the industry, Dice has seen music prices fall, but not to the same degree as unit sales. Unit prices have fallen by 5.8% since FY05, while unit sales have fallen by 19.2% in that same period
- A number of restructuring initiatives have been undertaken in the recent past. However, the decline in the total cost base (including overheads) of 9.6% in FY07 have not been enough to offset the 14.8% decline in revenue. Although there have been absolute declines in costs, on a relative basis, most have risen. As a per cent of revenue:

| Operational metrics | FY05 | FY06 | FY07 |
|---|---|---|---|
| Headcount | 5,754 | 5,406 | 4,513 |
| Payroll cost per employee (inc. bonus) (£) | na | 58,821 | 62,653 |
| Payroll cost as a % of revenue | na | 19.2% | 20.0% |
| Revenue per employee (£000) | 278 | 307 | 313 |

Source: Deloitte's VDD

Source: Deloitte's VDD

Source: Deloitte's VDD

A-1182

Confidential

TF0000081514

Case: 11-126 Document: 48 Page: 384 04/25/2011 272867 401

# Dice Music
## Overview

terra firma

### Revenue

CAGR: (5.8)%

| | 2002A | 2003A | 2004A | 2005A | 2006A | 2007A | 2008E | 2009E |
|---|---|---|---|---|---|---|---|---|
| Dice | 2,029.4 | 1,774.2 | 1,722.8 | 1,601.4 | 1,6[illegible] | 1,413.8 | 1,322.6 | 1,334.9 |

Dice — % growth

Source: Dice annual reports, Deloitte VDD & broker research

### EBITA

CAGR: 5.9%
200
150
100
50
0
10%
9%
8%
7%
6%
5%
4%
3%
2%
1%
0%
83.1
8.5%
8.6%
147.4
7.8%
125.5
8.7%
145.1
4.2%
58.8
6.8%
90.1
9.3%
124.4
2002A
2003A
2004A
2005A
2006A
2007A
2008E
2009E
Dice
% margin

Source: Dice annual reports, Deloitte VDD & broker research

### Split of revenues 2007

Digital
10%
Neighbouring rights(1)
5%
Royalty and licencing
5%
Physical
80%

Source: Deloitte VDD

(1) From performance of music recordings on radio, tv, live concerts, and in bars and clubs

### Split of cost structure 2007

Provisions
7%
Royalty and Copyright costs
37%
Marketing and promotion costs
28%
Manufacturing costs
14%
Origination costs
6%
Distribution costs
8%

Source: Deloitte VDD

A-1183

Page 142

Confidential

TF0000081515

# Dice Music – Market Share

## Overview

- Despite significant investment in the US over the last few years, EMI has not been able to gain change its position as the smallest of the four major labels in the US
- Major Dice artists, with some exceptions, have consistently underperformed in the US market
- Some characterise EMI as a very large independent label in the US, while being a major label in the rest of the world
- In the UK, traditionally the stronghold of Dice, has seen a decline in market share. This may be the result of underinvestment in the UK market in recent years
- Lagging position in Digital is closely tied to the lagging position in the US which is the largest digital market. Ex-US, Dice Digital market share is roughly in line with its competitors

## UK market share Q1 2007

Source: Industry Estimates

## UK market share by company

35%
30%
25%
20%
15%
10%
2002 2003 2004 2005 2006

EMI UMG Sony/BMG WMG Others

Source: Nielsen Soundscan

## US market share by company

A-1184

# Dice Music
## Digital

terra firma

### Digital

- Digital sales have grown more than 3x since FY05, now making up 10.4% of recorded music sales
- Digital sales are driven by both the quantity of music available online and the development of technology enabling its purchase, distribution and use
- Management initiatives to further drive digital growth have been in bundling and windowing of album releases (i.e. Coldplay X&Y)
- Dice holds the rights to the digital exploitation of the rights of a majority of its artists. [The Beatles are a notable exception], although recent press has indicated a deal to sell Beatles songs online is getting close
- Although growth in digital sales has been substantial, it has not been enough to offset the decline in physical music sales
- Sales of digital albums have been growing faster than individual digital tracks
- Reaction to the removal of DRM software has been almost universally positive

### Digital sales by format (2007)

Source: Deloitte's VDD

### Dice digital growth vs. market

Source: Company data, McKinsey

### Digital sales by region (2007)

Source: Deloitte's VDD

A-1185

Confidential

TF0000081517

# Dice Music - Physical

## Physical

- Dice experienced a 17.7% decline in physical music sales from FY06 to FY07. This compares to a market decline of 12.7%. In North America, the decline has been 20%
- Physical music is heavily reliant on new releases. Weak performance of new releases in 2007 led to a steep decline in new release sales of 17.1%. This represented 50.1% of the total unit sales decline
  - -FY06: 3 albums with sales >5m units and 5 in the UK top 10
  - -FY07: 0 albums with sales >5m units and 1 in the UK top 10
- There has been a shift in the retail base of physical music sellers away from the specialist music stores to general retailers (i.e. Wal-Mart) and supermarkets (i.e. Tesco).
  - -Retailers and supermarkets devote less space to music and thus focus on albums at the top of the charts. This has a negative impact on Catalogue titles, whose unit sales have declined 24.7%
  - -Large retailers have strong bargaining positions and can demand favourable prices, cutting into margins. This has the secondary effect of forcing the specialist music retailers to bring down prices as well
  - -The increased bargaining power of the retailers is also reflected in the increase in sales made on a "sales on return" basis. Returns increased by 39.9% in FY07
- The increasing preference of consumers to create their own playlists (greatly enabled by digital technology) has also led to a sharp decline in the Compilations segment, with unit sales declining by 26.5% since FY05

## Sales by type

Source: Deloitte's VDD

## Sales by region

Source: Deloitte's VDD



terra firma

# Dice Music
## Historical EBITA development

- This page sets out the historical Music EBITA development back to 2001.

Source: Dice annul reports, press releases, Deloitte VDD

A-1187

# Dice Music Overview

terra firma

## Artists with 1m+ sales, 2005–2006

| Artist | Genre | Main geographical market | Cumulative album sales 2005–06, M units |
|---|---|---|---|
| Coldplay | Pop | Global | 11.1 |
| Robbie Williams | Pop | U.K./Ireland, continental Europe | 7.3 |
| Gorillaz | Alternative//dance | U.K./Ireland, continental Europe | 5.9 |
| RBD | Pop | Latin America | 2.6 |
| KT Tunstall | Pop/rock | U.K./Ireland, continental Europe | 2.6 |
| Keith Urban | Country | North America, Australia | 2.5 |
| The Rolling Stones | Rock | Global | 2.4 |
| Korn | Hard Rock | North America | 1.8 |
| Depeche Mode | Alternative | Global | 1.6 |
| Trace Adkins | Country | North America | 1.5 |
| Paul McCartney | Pop | Global | 1.3 |
| Dierks Bentley | Country | North America | 1.3 |
| Radja | Pop | Asia | 1.2 |
| Raphael | Pop | France | 1.1 |
| Kate Bush | Pop | U.K./Ireland | 1.1 |
| Corinne Bailey Rae | Soul | U.K./Ireland | 1.0 |
| Dem Franchize Boyz | Hip-hop | North America | 1.0 |

☐ Artist with main focus on the U.S.A.

Source: EMI AGM presentation 2006; interviews; McKinsey analysis

terra firma

# Catalogue Margins

- Catalogue has the highest gross margin of any segment in Music
- Volumes have been under pressure as the preferred retail channel shifts from the specialist retailer who sells catalogue titles, to supermarkets and general retailers who primarily stock new releases

**Revenue and NPS Margin by Catalogue 2006**

**Revenue and NPS Margin by Catalogue 2007**

Source: Data Room – 11.1.5

A-1189

Confidential

TF0000081521

# Recorded Music – Top 20 Releases Actual vs. Budgeted

terra firma

Management reported that a variance to budget in any individual case of +/- 50% was not unusual

**2006 / 07 Actual vs. Budgeted Top 20**

| Rank | Title | Units (000s) | Budget (000s) | Variance (000s) | Variance (%) |
|---|---|---|---|---|---|
| 1 | The Beatles - Love | 4,999 | | NA | NA |
| 2 | Nora Jones - Not Too Late | 4,022 | 4,699 | (677) | (14.4%) |
| 3 | Corinne Bailey Rae | 2,457 | 1,855 | 602 | 32.5% |
| 4 | Robbie Williams - Rudebox | 2,444 | 2,940 | (496) | (16.9%) |
| 5 | High School Musical | 1,895 | | NA | NA |
| 6 | Keith Urban - The Whole Crazy Thing | 1,892 | 2,281 | (389) | (17.1%) |
| 7 | Lily Allen - Alright Still | 1,583 | | NA | NA |
| 8 | The Kooks - Inside In / Inside Out | 1,508 | | NA | NA |
| 9 | RBD - Celestrial | 1,306 | 880 | 426 | 48.4% |
| 10 | Joss Stone - Introducing | 1,247 | 2,916 | (1,669) | (57.2%) |
| 11 | Depeche Mode - Best of Vol 1 | 1,162 | 1,165 | (3) | (0.3%) |
| 12 | Janet Jackson - 20 Years Old | 1,130 | 2,728 | (1,598) | (58.6%) |
| 13 | Kikaru Utada - Ultra Blue | 1,094 | 1,567 | (473) | (30.2%) |
| 14 | Herbert Groenemeyer - 12 | 1,091 | | NA | NA |
| 15 | Sarah Brightman - Diva | 1,013 | 948 | 65 | 6.9% |
| 16 | 30 Seconds to Mars - A Beautiful Lie | 1,001 | | NA | NA |
| 17 | Bob Seger - Face The Promise | 976 | | NA | NA |
| 18 | Iron Malden - A Matter of Life and Deat | 844 | | NA | NA |
| 19 | Diam's - Dans Ma Bulle | 801 | | NA | NA |
| 20 | Renaud - Rouge Sang | 783 | 1,096 | (313) | (28.6%) |
| | Other Budgeted Top 20 | | 11,167 | | |
| | **Total** | **33,248** | **34,242** | **(994)** | **(2.9%)** |

The Beatles – Love Album was not forecast and had a considerable impact on returning the Top 20 performance closer to budget

Source: Data Room – 11.1.5 / Conversations with management

Confidential

TF0000081522

A-1190

terra firma

# Dice Company Profile
## Publishing

- Dice Music Publishing's catalogue consists of over one million songs including older and contemporary titles. Best-sellers include Bohemian Rhapsody, I Heard It Through The Grapevine and New York, New York
- The division is the largest music publishing house in the world and has increased its market share in each of the last 4 years
- Decline in sales of physical product has impacted the Mechanical division (43% of sales), but has largely been offset by increases in Performance and Synchronisation
- Successfully marketing its music rights to an increasing number of video games, advertisers, and TV shows (Synchronisation), however synchronisation margins have declined as a result of demand for new artists (higher royalty rates) rather than back catalogue songs (higher margins)
- Recently implemented a new programme for tracking the use of digital rights called 'Digits' which will allow faster and more efficient licensing of its content through a pan-European, one-stop shop for on-line rights. It has reduced the number of Collection Societies it uses in Europe from 26 to 2
- Awards include:
  - Billboard Pop Publisher of the Year – 16 of the last 17 years
  - Music Week UK Publisher of the Year – 11th consecutive year
  - BMI Publisher of the Year – for the 11th year

| Operational metrics | FY05 | FY06 | FY07 |
|---|---|---|---|
| Headcount | na | 622 | 628 |
| Payroll cost per employee (inc. bonus) (£) | na | 81,937 | 77,567 |
| Payroll cost as a % of revenue | 9.6% | 10.2% | 10.1% |
| Revenue per employee (£000) | na | 674.6 | 662.1 |

Source: Deloitte's VDD

A-1191

Confidential

TF0000081523

terra firma

# Dice Overview
## Historical Financials: Publishing

### Revenue

Source: Dice annual reports, Deloitte VDD & broker research

### EBITA

Source: Dice annual reports, Deloitte VDD & broker research

### Revenue by source

Source: Dice annual reports, Deloitte VDD

### NPS

▪ NPS is a key metric in Music Publishing. It represents the earnings of the Music Publisher after paying royalties to the songwriter

Source: Dice annual reports, Deloitte VDD

Confidential

terra firma

# Dice Music Publishing – historical EBITA development

This page sets out the historical Music Publishing EBITA development back to 2001

Source: Dice annul reports, press releases, Deloitte VDD

Confidential

# Publishing
## Digital revenue

terra firma

- To date, Music Publishing's digital revenue has been earned principally from the following sources:
  - Ringtones (mono- and poly-phonic), which are tunes downloaded for reproduction via a synthesiser chip within mobile phones;
  - Master tones: these are actual recordings of songs (usually MP3 format) which are downloaded for use as mobile phone ringtones. This differs from Ringtones in that the actual recording is purchased, rather than just the rights to reproduce the tune
  - Digital download: which relates to royalty income earned when songs are downloaded over the internet (for example from iTunes), together with a share of subscription paid to subscription-based music websites
  - Other digital income: principally relates to levies earned on the sale of writable CDs
- In the Music Publishing business, the growth in digital revenues in 2007 has partially offset the decline in physical revenues.
- Management consider the monetisation of digital delivery channels as an area that can be improved significantly and are seeking to enhance digital tracking processes to capture these revenues more completely going forward
- Overall Ringtone income (both ringtones and master tones) make up over half of digital revenues, although sales from digital downloads have increased significantly (160%) in 2007
- However, revenues from ringtones alone fell in FY07, suggesting that Ringtone sales may have reached maturity in the most developed markets and highlighting the need for constant innovation to drive digital growth

**Digital vs. Physical**

| £m | FY05 | FY06 | FY07 | FY06 % growth | FY07 % growth |
|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

Source: Deloitte's VDD

**Digital revenue by source**

Source: Deloitte's VDD

Confidential

TF0000081526

A-1194

terra firma

# Composition of Digital Revenue - 2007

Composition of Digital Revenue 2007
2.0%
-1.2%
8.8%
0.9%
6.4%
43.4%
39.7%
Audio - Permanent Fixed Line
Audio - Temporary Fixed Line
Visual
Other Income
Audio - Permanent Mobile
Audio - Temporary Mobile
Royalty and Licensing including intercompany

Music Publishing: Composition of Digital Revenue 2007
34%
43%
1%
22%
Ringtone
Master Tone
Ringback
Sales from Digital dow nload

**Comments**

- Currently, permanent downloads, both mobile and fixed (home computer) dominate the market
- May reflect consume preference to purchase and own the music or reflect the early stage of development (and current limitations) of the subscription business model
  - Subscription is mainly a home computer / streaming product
  - Few portable products are enabled
  - General lack of infrastructure to allow wireless subscription

## Normalised Earnings

terra firma

Underlying earnings show the same strong directional trends as reported earnings from FY05 to FY07, with performance affected by quality and timing of releases and the structural changes in the physical market

Although significant write-offs of artist advances were made in FY07 (£74 million exceptional cost), the level of cash advances paid at £275 million was in line with earlier years

The net impact of underlying earnings adjustments in FY07 was a reduction of £6.2 million, but this is net of a broad estimate of the impact of excess returns of £15 million

**Underlying earnings**

| £m | FY05 | FY06 | FY07 |
|---|---|---|---|
| Reported EBITDA | 249.9 | 275.9 | 174.1 |
| Underlying earnings adjustments per VDD report | (14.7) | 11.9 | (6.9) |
| Underlying EBITDA per VDD report | 235.2 | 287.8 | 167.2 |
| Additional underlying earnings adjustments | | | |
| Excess returns | - | - | 15.0 |
| Tower records bad debt | - | - | (4.2) |
| MGM copyright NPS | (0.6) | (0.6) | (1.3) |
| | (0.6) | (0.6) | 9.5 |
| Underlying EBITDA - revised | 234.6 | 287.2 | 176.7 |
| Cash basis advances adjustments | | | |
| Recoupments (add back) | 229.5 | 231.9 | 221.3 |
| Provisions (add back) | 39.6 | 37.6 | 45.3 |
| Cash payments | (278.5) | (250.7) | (275.4) |
| | (9.4) | 18.8 | (8.8) |
| Underlying EBITDA - cash basis advances | 225.2 | 306.0 | 167.9 |

*Source: VDD report, data room information, KPMG analysis*

**Reconciliation to cash flows**

| £m | FY07 |
|---|---|
| Underlying EBITDA - cash basis advances | 167.9 |
| Working capital movement | (95.0) |
| Unreconciled difference | (0.6) |
| Cash flow from operations | 72.3 |

*Source: VDD report, data room information, KPMG analysis*

- Underlying earnings
  - The underlying EBITDA analysis here is based on that presented in the VDD report, with a number of additional adjustments where KPMG have taken a different view on items.

**Cash basis advances**

- We have adjusted underlying EBITDA so as to recognise artists advances when paid, rather than as they are recouped or written off (ie on a cash basis rather than the accruals basis used in the reported results). This is not the normal accounting treatment but has a number of benefits here:
  - eliminating the impact of accounting judgements/policy changes
  - allocation of the £74 million advances write-off in FY07 to the periods to which it relates is no longer an issue (an unquantified normalisation adjustment in the VDD report)
  - underlying earnings more closely matches operating cash flows
- The level of cash advances paid in FY07, £275 million, was broadly in line with the average for the preceding four years (£272 million)

**Excess returns**

- Management have estimated that the one-off impact from excess returns in Q4 FY07, due to retailer de-stocking and the September 2006 catalogue campaign, was in the region of £10-20 million. We have included the mid-point of this range as an adjustment. We have not been provided with details of management's estimation methodology

**Tower records bad debt**

- The £4.2 million bad debt cost incurred due to the insolvency of Tower Records in FY07 was added back to underlying earnings in the VDD report. We consider that whilst this is an individually significant item, it does relate to underlying trading, and have therefore reversed the VDD report adjustment here
- Management acknowledge that, given the structural decline in the physical market, further significant retailer failures are likely to occur, although they monitor retailers closely for early signs of trading difficulty and are not aware of any retailers currently in this position

**MGM copyright NPS**

- The Music Publishing business sold certain MGM copyrights in FY06 and FY07, the profits from which have been excluded from underlying earnings in the VDD report
- We have made an additional adjustment to remove an estimate of the lost NPS from these copyrights (assuming an x10 earnings multiple from the sale and nil carrying value for the rights before sale)

Confidential

TF0000081528

A-1196

terra firma

# 2007 Proforma Earnings

Proforma EBITDA is around £300 million after adjustments for restructuring programmes (£105 million) and reduction in marketing expenditure (£30 million)

No account has been taken of the continued structural decline in the physical market, or the expected growth in digital

Management are confident that the restructuring savings will be delivered and are in the early stages of identifying further savings in additional to those reflected here

The marketing cost savings may not be realised if the group does not become more responsive to changing sales patterns

**Proforma earnings**

| £m | FY07 |
|---|---|
| Underlying EBITDA - cash basis advances | 167.9 |
| Proforma earnings adjustments | |
| Marketing spend | 30.0 |
| RE3 - full year impact | 5.0 |
| RE4 - FY08 incremental benefit | 75.0 |
| RE4 - FY09 incremental benefit | 30.0 |
| FX difference | (2.0) |
| | 138.0 |
| Proforma earnings | 305.9 |

Source: *VDD report, data room information, KPMG analysis*

Proforma earnings

- The illustrative pro-forma EBITDA analysis presented here is intended to show the run rate impact of cost saving measures which have already started to be implemented on FY07 underlying earnings. It does not take account of the structural decline in physical sales or expected growth in digital sales

Marketing

- Marketing costs as a proportion of revenues increased from 16.6% in FY05 and FY06 to 18.9% in FY07, attributed to spending being held at budget levels in spite of the decline in sales. These costs are typically committed some months in advance and the group could not respond quickly enough to the rapid decline in the market in Q4
- Management intend to take a more responsive approach to marketing expenditure going forward, including increasing the proportion of spend on internet marketing, supported by a rolling monthly reforecast process. This should be a positive step although it is currently unproven, and there is a risk that reducing absolute marketing spend will have a sales impact
- The adjustment made illustrates the impact of reducing FY07 marketing spend to approximately 17% of revenues

Restructuring – RE3

- The RE3 restructuring programme was completed during the course of FY07. Of the total annualised benefits expected of £30 million, £20 million were delivered in FY07, and we have thus adjusted for the difference here

Restructuring – RE4

- The RE4 restructuring programme was announced in January 2007. The £110 million planned cost savings are expected to be delivered as follows:
  - FY07 £5 million (included in FY07 results)
  - FY08 £80 million (incremental £75 million)
  - FY09 and thereafter £110 million pa (incremental £30 million)
- Actions have already been taken to deliver £50 million of these savings, predominantly through headcount reduction, in which cases the individuals concerned have been notified. This amount is net of £17 million of anticipated new hire staff costs, although not all of these staff have yet been recruited
- Management have stated that the £60 million balance of savings have now all been identified, including identifying named individuals in the case of further headcount reductions. The VDD report indicated that £23 million of benefits had yet to be identified, but was produced before the detailed implementation planning process had been completed
- Management do not consider that there is a significant risk of loss of margin as a result of RE4, as its primary focuses are in removing surplus layers of management and addressing loss making businesses
- Previous restructuring initiatives RE1 and RE2 have delivered benefits but these have been eroded through new recruitment and support for digital delivery. Management intend to enforce a net hiring freeze following RE4 and see this as the key measure to ensure that the benefits of the programme are not eroded

TF0000081529

A-1197

Confidential



Case: 11-126 Document: 48 Page: 399 04/25/2011 272867 401
A-1198

# Indie Case

terra firma

Digital Market
Market Size (2006 = 100)
600
500
400
300
200
100
0
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dica
Average

Combined Market Digital & Physical
Market Size (2006 = 100)
120
100
80
60
40
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dica
Average

Physical Market
Market Size (2006 = 100)
120
100
80
60
40
20
0
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dica
Average

Page 157

Confidential

TF0000081530



Case: 11-126 Document: 48 Page: 400 04/25/2011 272867 401

A-1199

# Equity Case

terra firma

Digital Market
Market Size (2006 =100)
600
500
400
300
200
100
0
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dice
Average

Combined Market Digital & Physical
Market Size (2006 =100)
120
100
80
60
40
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pall
LEK
TF - Dice
Average

Physical Market

Market Size (2006 =100)

120 100 80 60 40 20 0

2006 2007 2008 2009 2010 2011 2012

PWC, Enders, Pall, LEK, TF - Dice, Average

Page 158

Confidential

TF0000081531

Case: 11-126 Document: 48 Page: 401 04/25/2011 272867 401

A-1200

# Downside

terra firma

Digital Market
Market Size (2006 =100)
600
500
400
300
200
100
0
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dice
Average

Physical Market
Market Size (2006 =100)
120
100
80
60
40
20
0
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dice
Average

Combined Market Digital & Physical
Market Size (2006 =100)
120
100
80
60
40
2006
2007
2008
2009
2010
2011
2012
PWC
Enders
Pali
LEK
TF - Dice
Average

Page 159

Confidential

TF0000081532