# 11-0126-cv

# United States Court of Appeals
*for the*
## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 5 of 65 (Pages A-1201 to A-1500)

PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

| | Page |
|---|---|
| District Court Docket Entries ..................................... | A-1 |
| Summons and Complaint, dated December 11, 2009 | A-39 |
| Declaration of Adrian Briggs, for Defendants, in Support of Motion to Dismiss, dated January 20, 2010, with attached *Curriculum Vitae* ................... | A-89 |
| Declaration of Strauss, for Plaintiffs, in Opposition to Defendants' Motion, dated February 2010, with attached *Curriculum Vitae* ............................ | A-106 |
| Second Declaration of Adrian Briggs, for Defendants, in Support of Motion to Dismiss, dated February 11, 2010 ........................................ | A-137 |
| Defendants' Answer to Plaintiff's Complaint, dated April 7, 2010 ........................................................ | A-149 |
| Notice of Motion for Summary Judgment, by Defendants, dated August 13, 2010 ...................... | A-171 |
| Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment, dated August 13, 2010 ......... | A-173 |
| Declaration of Gary R. Carney, in Support of Defendants' Motion for Summary Judgment, dated August 13, 2010 ....................................... | A-199 |
| Exhibit 1 to Carney Declaration - Terra Firma Private Placement Memorandum, dated April 2006 .................................... | A-217 |
| Exhibit 2 to Carney Declaration - Terra Firma Capital Partners II Q3 2007 report, dated November 2007........................................... | A-318 |

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006................................................ A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006................................................ A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006................................................ A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007..................................................... A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings.............................. A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007...................................................... A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010.... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007...................................................... A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ........................... A-404

iii

**Page**

Exhibit 13 to Carney Declaration -
E-mail from Barak to Wormsley *et al.,* dated
April 20, 2007, with attachments........................... A-415

Exhibit 14 to Carney Declaration -
E-mail from Ashcroft to Wormsley *et al.,* dated
April 23, 2007, with attachment ........................... A-427

Exhibit 15 to Carney Declaration -
EMI News Release, dated May 4, 2007 ............... A-437

Exhibit 16 to Carney Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.......................................................... A-439

Exhibit 17 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
February 5, 2007.................................................... A-441

Exhibit 18 to Carney Declaration -
Memorandum from Seymour to Punja, dated
March 2, 2007........................................................ A-457

Exhibit 19 to Carney Declaration -
E-mail from Reid to Seymour, dated
May 16, 2007.......................................................... A-462

Exhibit 20 to Carney Declaration -
Music Industry Key Market Outlook Summary of
Findings prepared by L.E.K. Consulting, dated
May 15, 2007.......................................................... A-656

Exhibit 21 to Carney Declaration -
Project Dice Limited Scope Financial Due
Diligence Report, dated May 17, 2007 ................. A-783

Exhibit 22 to Carney Declaration -
Project Mulberry Limited Scope Financial Due
Diligence Report, Volume I, dated May 4, 2007 ... A-887

iv

**Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments ............................ A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007 ........................................................ A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 .......................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007 .................. A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 ................... A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments ................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment ............................................................ A-995

v

**Page**

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007    A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007....................................................    A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007.......................................................    A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007.....................................................    A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007.......................................................    A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007.....................................................    A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007.......................................................    A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007.......................................................    A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 ...........................    A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ..................................    A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 .    A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments ...................................    A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007.......................................................    A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 ..............................    A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007.......................................................    A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007.......................................................    A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007.......................................................    A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007.......................................................    A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 ...................................    A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007.......................................................    A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007 ........................................................... A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007 ........................................................... A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007 ........................................................... A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007 ........................................................... A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ................................................. A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007 ........................................................... A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007 ........................................................... A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007 ........................................................... A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment....................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007.....    A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007.......................................................    A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007.......................................................    A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007.......................................................    A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007.......................................................    A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007.......................................................    A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007.......................................................    A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007.......................................................    A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007.......................................................    A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007................................. A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007......................................................... A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007......................................................... A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007..................... A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007..................... A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007......................................................... A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc ....................................................... A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007 ............................................... A-1554

x

**Page**

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ....................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................................ A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................................ A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 .......................................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ....................................................... A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................................ A-1590

xi

**Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma ................................................................... A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ............... A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007 ................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ............... A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ........................................................ A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ........................................................ A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ........................ A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 ............................................... A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008 ................................................... A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008...................................................... A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008........................................................ A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009..................................................... A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009..................................................... A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008.......................................................... A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008.......................................................... A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart........................... A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update....................... A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 .................................... A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008.......................................................... A-2301

**xiii**

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ...... A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ............... A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009............................. A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 ...................................................... A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 ............................................. A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 .................................................. A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009.................................................... A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 ............................................. A-2479

xiv

**Page**

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009............................  A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ...............................................  A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 ..........................  A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 ...........................................  A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009...................  A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 ................................................  A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes...................  A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007.....................  A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 .........................................................  A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 ................................................. A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 ..................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................. A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 .................................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code ............................. A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010................ A-2602

Mark Nimrod Barak, dated July 15, 2010 ................. A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 .................... A-2631

Simon A. Borrows, dated June 25, 2010.................... A-2702

Andre Bourbonnais, dated July 13, 2010................... A-2779

Andrew Chadd, dated July 23, 2010
   (Reproduced herein at pp. CA-1-CA-53)

xvi

|  | Page |
|---|---|
| Ricardo Hacelas Coats, dated June 23, 2010 | A-2795 |
| Karen Dolenec, dated June 18, 2010 | A-2799 |
| John Gildersleeve, dated June 30, 2010 | A-2803 |
| Guy Hands, dated July 15, 2010 | A-2813 |
| Guy Hayward-Cole, dated July 27, 2010 | A-2959 |
| Elio Leoni-Sceti, dated June 25, 2010 | A-2974 |
| John Loveridge, dated July 30, 2010 | A-2982 |
| Bruce MacInnes, dated July 8, 2010 | A-3027 |
| Eric Nicoli, dated July 5, 2010 | A-3039 |
| Timothy Pryce, dated July 22, 2010 | A-3087 |
| Riaz Punja, dated July 28, 2010 | A-3130 |
| Michael Slattery, dated August 6, 2010 | A-3169 |
| Martin David Stewart, dated July 7 and 8, 2010 | A-3177 |
| Iain Stokes, dated August 6, 2010 | A-3183 |
| Kamal Fouad Tabet, dated July 29, 2010 | A-3238 |
| Francois Van der Spuy, dated July 7, 2010 | A-3242 |
| Julie Williamson, dated July 28, 2010 | A-3267 |
| Alexander Wolf, dated July 14, 2010 | A-3280 |
| David Wormsley, dated July 20, 2010 | A-3305 |
| Report Pursuant to Rule 44.1 of McQuater, dated July 30, 2010 | A-3316 |
| Appendix 1 — |  |
| *Curriculum Vitae* of Ewan McQuater QC | A-3340 |

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006] EWCA Civ 1601 .................... A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007] EWHC 1151 (Comm) ............................ A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal Bank of Scotland Plc* [2010] EWHC 1392 (Comm) .................................................... A-3493

*BSkyB Ltd v Sky Subscribers Services Limited* [2010] EWHC 86 ................................ A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006] EWHC 2887 (QB) (Comm), [2007] EWCA Civ 811 ................................................................. A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................. A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ..................... A-4240

*Bradford Building Society v Borders* [1941] 2 All ER 205 .................................................... A-4258

*Downs v Chappell* [1997] 1 WLR 426 ..................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009] EWCA Civ 169 .................................... A-4325

xviii

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All
    ER 583 ........................................................... A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER
    (Comm) 573 ........................................................... A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd*
    [2007] EWHC 2541 (QB) .................................... A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd*
    [1964] AC 465 ...................................................... A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC
    145 ........................................................................ A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson &*
    *Co* [1991] 2 QB 113........................................... A-4671

*Bankers Trust International v Dharmala Sakti*
    *Sejahtera* [1996] CLC 518.................................... A-4688

*Valse Holdings SA v Merrill Lynch International*
    *Bank Ltd* [2004] EWHC 2471 ............................. A-4741

*Peekay Intermark v Australia and New Zealand*
    *Banking Group* [2006] EWCA Civ 386................. A-4779

*JP Morgan Chase Bank v Springwell Navigation*
    *Corp* [2008] EWHC 1186 (Comm) ...................... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland*
    *Plc* [2010] EWHC 211 (Comm) ........................... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight*
    *Couriers Ltd* [2008] EWHC 1686 (Comm),
    [2009] 1 All ER (Comm) 16, [2009] EWCA Civ
    290 ........................................................................ A-5126

xix

**Page**

*IFE Fund SA v Goldman Sachs International* 1
[2007] Lloyd's Rep 264 .......................... A-5184

*William Sindall plc v Cambridgeshire County
Council* [1994] 1 WLR 1016 ................ A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 .......................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co*
[1892] AC 25 ...................................... A-5325

*Allen v Flood* [1898] AC 1 ........................ A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019
(Ch) ................................................ A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries
Ltd* (No. 2) [1982] Ch 204 .................................. A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ................ A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas
25 ........................................................ A-5708

*Smith New Court Securities v Citibank NA* [1997]
AC 254 .................................................... A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142
and 6-158 ................................................ A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs
8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

|  | **Page** |
|---|---|
| *McGregor on Damages*, 17th Edition, paragraph 1-021 | A-5774 |
| *Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 | A-5777 |
| *Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 | A-5780 |
| *The Unfair Contract Terms Act 1977* | A-5783 |
| Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 | A-5807 |
| Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 | A-5883 |
| Exhibit A to Randell Declaration - Handwritten Notes | A-5887 |
| Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 | A-5891 |
| Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 | A-5894 |
| Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 | A-6101 |
| Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 | A-6280 |

**xxi**

                                                            **Page**

Declaration of Christopher E. Duffy in Opposition
   to Defendants' Motion for Summary Judgment,
   dated September 2, 2010 ........................................ A-6447

Exhibit 1 to Duffy Declaration -
Amended and Restated Advisory Agreement
relating to Terra Firma Investments (GP) 2
Limited and Terra Firma Capital Partners
Limited, dated October 9, 2003 ............................ A-6471

Exhibit 2 to Duffy Declaration -
Advisory Agreement relating to Terra Firma
Capital Partners III, L.P., dated February 8, 2006 . A-6493

Exhibit 3 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 20, 2007 .. A-6512

Exhibit 4 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Directors' meeting, dated May 20, 2007 .. A-6515

Exhibit 5 to Duffy Declaration -
E-mail from Rowland to Laskowski and Crocker,
dated September 18, 2008, with attachment .......... A-6517

Exhibit 6 to Duffy Declaration -
E-mail from Smith to Small, dated May 21, 2007 . A-6521

Exhibit 7 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 7, 2006 ................................................ A-6523

Exhibit 8 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
September 19, 2007 ................................................ A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 ................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ................................................ A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006................................................. A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007......................................................... A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 .................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et
al.*, dated November 16, 2007............................... A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 ............... A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007....................................................... A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007................................. A-6571

xxiii

**Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...   A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006.......................................   A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 ................................................   A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment............................................   A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 ................................................   A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 .......................................   A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 .........................................................   A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 ..............................................   A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6640

**xxiv**

Page

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 ............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007 ..................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007 ..................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................. A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ........................... A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 .............................. A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 ........................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ........................................................ A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ........................................................ A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 .......................................................... A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 ........................................................ A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 ........................................................ A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 ........................................................ A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 ................................................ A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................ A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 ........................................................ A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 ........................................................ A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 ........................................................ A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ............................. A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 ................................... A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 ....................................................... A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 ............................................. A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment.......................................... A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 ....................................................... A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 ....................................................... A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 ............................................. A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 ....................................................... A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ................................ A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ........................................................ A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ........................................................ A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007 .......................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 .............................. A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 .............................. A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 .............................................. A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 ................................................ A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment............................................ A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007    A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007    A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ........................................................ A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ........................................................ A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment............................................ A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007..................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" .................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ........................................................ A-6835

**xxx**

**Page**

Exhibit 87 to Duffy Declaration -
E-mail from Simonian to Smith, dated
May 21, 2007 .......................................................... A-6837

Exhibit 88 to Duffy Declaration -
E-mail from Wormsley to Lindsay, dated
September 17, 2007 ................................................. A-6838

Exhibit 89 to Duffy Declaration -
Memorandum from Simpkin *et al.* to Klein *et al.*,
dated November 16, 2007
(Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration -
E-mail from Borrows to Nicoli, Gildersleeve and
Parker, dated July 31, 2007.................................... A-6843

Exhibit 91 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................ A-6844

Exhibit 92 to Duffy Declaration -
E-mail from Grigorova to Cockerill, *et al.,* dated
September 5, 2007 ................................................... A-6846

Exhibit 93 to Duffy Declaration -
E-mail from Sckerl to Cockerill, dated June 9,
2009 with Attachment
(Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration -
E-mail from Grigorova to Sckerl, dated
February 16, 2009.................................................. A-6850

Exhibit 95 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 23, 2007 ................................................ A-6855

**xxxi**

**Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment.............. A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009...................................................... A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment.................... A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ............................................... A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 .................................................... A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009................................................ A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010..................................................... A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007 ........................................................ A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................. A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ........................................ A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 ............................... A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 ............................... A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007 .... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ........................................................ A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 .................................................. A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006.................................................. A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006.................................................. A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006.................................................. A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ........................................................ A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ................................................ A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 ........................................................ A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007...................................................... A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ....................................................... A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 ..................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ....................................................... A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ...................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 ..................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 .................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007 .........................................................    A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 .................................................    A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007 .........    A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ......................................................    A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 ........................................................    A-7410

xxxvi

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 .................... A-7473

**xxxvii**

                                                                    **Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 .................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 .................................................. A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 .......................................................... A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ............................................ A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 ................................................ A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

**Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009.....................................  A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007..  A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 .  A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 .......................................................  A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010...............  A-7553

Mark Nimrod Barak, dated July 15, 2010 ................  A-7557

Jason Bazinet, dated June 30, 2010 ...........................  A-7564

Peter Edward Bell, dated June 22, 2010 ....................  A-7601

Simon A. Borrows, dated June 25, 2010....................  A-7705

Andre Bourbonnais, dated July 13, 2010...................  A-7827

Andrew Chadd, dated July 23, 2010
(Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
(Reproduced at pp. CA-295-CA-315)

xxxix

|  | **Page** |
|---|---|
| John Gildersleeve, dated June 30, 2010 | A-7832 |
| Guy Hands, dated July 15, 2010 | A-7848 |
| Guy Hayward-Cole, dated July 27, 2010 | A-7901 |
| David Robert Paul Hill, dated August 4, 2010 | A-7918 |
| Michael Klein, dated July 19, 2010 | A-7923 |
| Chad Leat, dated June 18, 2010 | A-7935 |
| John Loveridge, dated July 30, 2010 | A-7941 |
| Bruce MacInnes, dated July 8, 2010 | A-7966 |
| Eric Nicoli, dated July 5, 2010 | A-7970 |
| Riaz Punja, dated July 28, 2010 | A-8039 |
| Timothy Pryce, dated July 22, 2010 (Reproduced at pp. CA-316-CA-335) | |
| Elio Leoni-Sceti, dated June 25, 2010 (Reproduced at pp. CA-336-CA-385) | |
| Paul Simpkin, dated July 5, 2010 | A-8056 |
| Michael Slattery, dated August 6, 2010 | A-8073 |
| Matthew Canning Smith, dated August 3, 2010 (Day 1) | A-8077 |
| Matthew Canning Smith, dated August 9, 2010 (Day 2) | A-8116 |
| Iain Stokes, dated August 6, 2010 | A-8127 |
| Kamal Fouad Tabet, dated July 29, 2010 | A-8157 |
| Francois Van der Spuy, dated July 7, 2010 | A-8171 |

xl

**Page**

Julie Williamson, dated July 28, 2010
  (Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010 ........................ A-8175

David Wormsley, dated July 20, 2010
  (Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
  Defendants' Motion for Summary Judgment,
    dated August 27, 2010 ........................................... A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
  44.1, dated August 27, 2010 .................................. A-8195

Appendices to the Report of Nicholas S. Strauss
  Q.C. Pursuant to Rule 44.1 .................................... A-8245

Exhibit 1 to Strauss Report -
*AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
CLC 265 ................................................................ A-8249

Exhibit 2 to Strauss Report -
*AIC Limited v. ITS Testing Services (UK) Ltd,*
[2006] EWCA Civ 1601 ........................................ A-8262

Exhibit 3 to Strauss Report -
*Angus v. Clifford,* [1891] 2 Ch 449 ...................... A-8371

Exhibit 4 to Strauss Report -
*Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

Exhibit 5 to Strauss Report -
*Assicurazione Generali v. Arab Insurance Group,*
[2003] I.R.L.R. 131 ............................................... A-8422

Exhibit 6 to Strauss Report -
*Attorney General of Belize v. Belize Telecom
Limited,* [2009] 1 W.L.R. 1988 ............................. A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 ..................    A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International
(Overseas) Ltd (In Liquidation) v. Price
Waterhouse (No.2),* [1998] PNLR 564 ...............    A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan
Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ................................................................    A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ....................................................    A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 ........................................................................    A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 ..............................................    A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ..........................................    A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ...............    A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................    A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ............................................................    A-9042

**xlii**

Page

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................................. A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton*
*(London) Ltd,* [1957] 2 QB 621 CA ...................... A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925  ...... A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ................................................................. A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484 ................... A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 ....................................................................... A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 ....................................................................... A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337 ................. A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ................ A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777 ................ A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ ............................................... A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne & Co Ltd. v. Heller & Partners
Ltd.,* [1964] AC 465 .............................................. A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),*
[1995] 2 AC 145 HL .............................................. A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247
CA ........................................................................... A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De
Productos Agricolas SA De CV,* [2003] EWCA
Civ 1104 ................................................................ A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,*
[2006] EWHCA 2887 (QB) (Comm) ................... A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West
Bromwich Building Society,* [1998] 1 W.L.R. 896 A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,*
[2004] EWCA Civ 1244 ....................................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom & Co.,* [1983] 1
All E.R. 583 .......................................................... A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation
Corp.,* [2008] EWHC 2286 (Comm) ................... A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)
Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 ................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 ............................................. A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson
& Co.,* [1991] 2 QB 113 ........................ A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand
Banking Group,* [2006] EWCA Civ 386 ............... A-10148

Exhibit 45 to Strauss Report -
*Raiffeisen Zentralbank Osterreich AG v. The
Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) ............................................. A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ................ A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District
Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

xlv

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL ............................................ A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 .................................................................. A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 ........................................................ A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National*
*Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ..................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ...................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and*
*Company of the Bank of England (No.3),* [2001]
UKHL 16 ............................................................ A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 ........................................ A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................. A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016............................. A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 ........................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 ................... A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) ................................................................ A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) ................................................................ A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) ........................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

Page

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) ............................. A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). ......................... A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ...................... A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss ........................... A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss ................................................. A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement ............................... A-11178

Affidavit of Service, sworn to September 2, 2010..... A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 .................... A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010.................................... A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration -
Responses and Objections of Plaintiffs Terra
Firma Investments (GP) 2 Ltd. and Terra Firma
Investments (GP) 3 Ltd. To Defendants' First
Request for Production of Documents, dated
March 9, 2010.......................................................... A-11216

Exhibit 131 to Carney Reply Declaration -
Journey Log Book for Guy Hands's flight to
London, dated May 20, 2007 ................................. A-11244

Exhibit 132 to Carney Reply Declaration -
Reservation for Guy Hands's flight to London,
dated May 20, 2007 ................................................. A-11247

Exhibit 133 to Carney Reply Declaration -
Report for Guy Hands's flight from the Airport
Landing Dues Information System of Guernsey
Airport, dated May 20, 2007................................... A-11248

Exhibit 134 to Carney Reply Declaration -
Daily Confirmed Handling report of Blue Islands
at Guernsey Airport, dated May 20, 2007.............. A-11249

Exhibit 135 to Carney Reply Declaration -
Phone records of Guy Hands for the months of
April and May 2007................................................. A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010................ A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 ........................... A-11363

John Gildersleeve, dated June 30, 2010..................... A-11376

Guy Hands, dated July 15, 2010 ................................ A-11380

xlix

                                                                    **Page**

John Loveridge, dated July 30, 2010 ........................ A-11395

Eric Nicoli, dated July 5, 2010 ................................. A-11410

Timothy Pryce, dated July 22, 2010 ......................... A-11419

Riaz Punja, dated July 28, 2010................................. A-11439

Michael Slattery, dated August 6, 2010 .................... A-11457

Martin David Stewart, dated July 7 and 8, 2010........ A-11473

Iain Stokes, dated August 6, 2010............................. A-11477

Francois Van der Spuy, dated July 7, 2010 ............... A-11501

Alec Werner, dated August 19, 2010 ........................ A-11513

David Wormsley, dated July 20, 2010 ...................... A-11520

Second Report of Ewan McQuater, Pursuant to Rule
    44.1, dated September 3, 2010, with Exhibit 1...... A-11532

Affidavit of Service, sworn to September 23, 2010... A-11566

Summary Judgment Hearing Transcript, dated
    September 10, 2010 .............................................. A-11568

Letter from Christopher E. Duffy to the Honorable
    Jed S. Rakoff, dated September 13, 2010, with
    attachments ............................................................ A-11620

Letter from Jay Cohen to the Honorable Jed S.
    Rakoff, dated September 13, 2010, with
    attachments ............................................................ A-11646

Order of the Honorable Jed S. Rakoff, dated
    September 14, 2010, filed September 15, 2010..... A-11664

Notice of Motion *in Limine* No. 2 to exclude the
    Testimony of Marianne Demario, by Defendants,
    dated October 4, 2010............................................ A-11666

**l**

                                                                    **Page**

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 ..  A-11668

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 ..  A-11677

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* Nos. 1 through 5,
   dated October 4, 2010...........................................  A-11686

   Exhibit 1 to Levi Declaration -
   Expert Report of David J. Teece, dated
   June 14, 2010
   (Reproduced at pp. CA-481-CA-544)

   Exhibit 4 to Levi Declaration -
   Complaint in the above-captioned matter, dated
   December 11, 2009...............................................  A-11695

   Exhibit 16 to Levi Declaration -
   Expert Report of Daniel R. Fischel, dated
   July 7, 2010
   (Reproduced at pp. CA-545-CA-586)

   Exhibit 17 to Levi Declaration -
   Microsoft Excel Spreadsheet printed from the
   native file produced by Plaintiffs and bearing
   bates number TF0000635801
   (Reproduced at pp. CA-587-CA-592)

   Exhibit 18 to Levi Declaration -
   Expert Report of Marianne DeMario, dated
   June 14, 2007
   (Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) .............. A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers
(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 ....... A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ...................................................... A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ..................................................... A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 ........................ A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007.......................... A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

**Page**

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010.................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
    (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
    (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010.................... A-12146

Eric Nicoli, dated July 5, 2010 ................................ A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

liii

**Page**

Declaration of Karen C. Dyer in Support of
Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
and Terra Firma Investments (GP) 3 Ltd's
Memoranda in Oppositions to Defendants'
Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration -
Wise Men Committee meeting minutes, dated
July 27, 2007 ......................................................... A-12186

Exhibit 14 to Dyer Declaration -
"Project Record Valuation Considerations"
prepared by Merrill Lynch for Cerberus, dated
May 17, 2007 ......................................................... A-12188

Exhibit 15 to Dyer Declaration -
Citi's Project Dice Credit Approval
Memorandum, dated May 17, 2007 ...................... A-12209

Exhibit 16 to Dyer Declaration -
Citi's "Fairness Committee Materials," dated
May 21, 2007 ......................................................... A-12303

Exhibit 17 to Dyer Declaration -
Excerpts from American Society of Appraisers,
*ASA Business Valuation Standards* (2009) ............. A-12309

Exhibit 18 to Dyer Declaration -
"Project Mulberry Valuation Materials," dated
May 21, 2007 ......................................................... A-12315

Exhibit 19 to Dyer Declaration -
E-mail from Barak to Reid *et al.*, dated
March 2, 2007 ......................................................... A-12324

Exhibit 20 to Dyer Declaration -
Letter from Borrows to Nicoli, dated
July 19, 2007 ......................................................... A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ........................................................ A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 ............................................... A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ........................................................ A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ...................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ...................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 ................................................... A-12462

lv

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 .................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................ A-14551

Trial Transcript, dated November 2, 2010 ................ A-14877

Trial Transcript, dated November 3, 2010 ................ A-15102

Trial Transcript, dated November 4, 2010 ................ A-15292

**lvi**

                                                                        **Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
    E-mail from Wormsley to Nicoli re call from
    GH, dated May 21, 2007.................................... A-15300

Terra Firma Exhibit 2 -
    E-mail from Tabet to Wormsley re
    Conversation with Guy Hands, dated
    May 21, 2007 ...................................................... A-15301

Terra Firma Exhibit 3 -
    E-mail from Wormsley to Lindsay re
    financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
    E-mail from Simonian to Smith re Bids, dated
    May 21, 2007 .................................................... A-15309

Terra Firma Exhibit 9 -
    E-mail from Randell to Terra Firma re May
    21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
    Draft Minutes of a meeting of a committee of
    the board of directors of Terra Firma (GP) 2
    Limited, dated May 21, 2007 ............................ A-15311

Terra Firma Exhibit 11 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007 ............................................ A-15316

Terra Firma Exhibit 12 -
    E-mail from Smith to Kirshenbaum re EMI
    deal, dated May 21, 2007 .................................... A-15319

Terra Firma Exhibit 13 -
    E-mail from Smith to Mehta re EMI, dated
    May 21, 2007 .................................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
    E-mail from Smith to Badhe re EMI, dated
    May 21, 2007 .................................................. A-15322

Terra Firma Exhibit 15 -
    E-mail from Wormsley to Tague re Congrats
    on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
    E-mail from Poyser to Vakilian re Terra Firma
    Recommended Cash Offer, dated
    May 21, 2007 .................................................. A-15324

Terra Firma Exhibit 17 -
    E-mail from Grigorova to Cockerill re
    EMI/Maltby CCR July, dated
    September 5, 2007 ............................................ A-15326

Terra Firma Exhibit 19 -
    E-mail from Smith to Small re CITI M&A
    wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
    E-mail from Rowland to Laskowski and
    Crocker re Terra Firma, dated
    September 18, 2008 .......................................... A-15332

Terra Firma Exhibit 22 -
    E-mail from Miller to Zogheb re EMI, dated
    May 16, 2007 .................................................. A-15336

Terra Firma Exhibit 23 -
    E-mail from Gildersleeve to Wormsley re
    Roles, dated April 20, 2007 ............................. A-15338

**lviii**

**Page**

Terra Firma Exhibit 24 -
Citi Franchise Risk Assessment Template for
Maltby Investments Limited, Appendix 6B,
dated June 1, 2009 ............................................. A-15339

Terra Firma Exhibit 25 -
E-mail from Smith to Poyser re Chaka
Feedback, dated May 17, 2007 ......................... A-15340

Terra Firma Exhibit 26 -
E-mail from Wormsley to Poyser, *et al.*, re
EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
E-mail from Wormsley to Smith re FW: E-mail
from Wormsley to McBride, dated
May 21, 2007 .................................................... A-15342

Terra Firma Exhibit 28 -
E-mail from Wormsley to Leat and Klein re
marginal deal for Terra Firma, dated
July 14, 2007 .................................................... A-15345

Terra Firma Exhibit 29 -
E-mail from Wormsley to Hands re DAIG fees,
dated November 7, 2006 ................................... A-15346

Terra Firma Exhibit 30 -
E-mail from Wormsley to Hands re DAIG,
dated October 23, 2006 .................................... A-15347

Terra Firma Exhibit 31 -
E-mail from Wormsley to Hands re proposal,
dated November 15, 2006 ................................. A-15348

Terra Firma Exhibit 32 -
E-mail from Wormsley to Klein re Citi/Terra
Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
    E-mail from Klein to Hands re Business
    Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
    E-mail from Tague to Lindsay re NBM #159
    Europe, dated March 9, 2007 ........................... A-15351

Terra Firma Exhibit 35 -
    E-mail from Tabet to Blagdon, Klein and
    Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
    E-mail from Wormsley to Miller re call from
    Guy Hands, dated May 8, 2007 ........................ A-15357

Terra Firma Exhibit 40 -
    E-mail from Smith to Wormsley re talk with
    JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
    E-mail from Wormsley to Nicoli, Gildersleeve,
    Stewart re FW: Terra Firma, dated
    May 18, 2007 ................................................... A-15359

Terra Firma Exhibit 42 -
    E-mail from Shott to Bell re auction process
    and Antitrust Confirmation, dated
    May 20, 2007 ................................................... A-15360

Terra Firma Exhibit 43 -
    E-mail from Ashcroft to Stewart re Conference
    call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
    E-mail from Wormsley to Nicoli re EMI media
    Review, dated May 20, 2007 ........................... A-15366

lx

Page

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 ........................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 ............................... A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................. A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 .................................................... A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007.................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ......................................... A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ......................................... A-15420

lxi

**Page**

Terra Firma Exhibit 61 -
E-mail from Wormsley to Klein and Smith re
proposals from Cerberus and Fortress, dated
April 19, 2007 .................................................... A-15421

Terra Firma Exhibit 62 -
E-mail from Barclay re EMI Media Review - 13
May 2007, dated May 13, 2007 ....................... A-15422

Terra Firma Exhibit 63 -
E-mail from Klein to Nicoli re General, dated
May 18, 2007 ................................................... A-15424

Terra Firma Exhibit 64 -
E-mail from Smith to Wormsley re EMI, dated
May 18, 2007 ................................................... A-15425

Terra Firma Exhibit 125 -
Interoffice memorandum from Lindsay to
Drayton, *et al.* re East Surrey Holdings, dated
February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
Letter from Smith to Stewart re Engagement
Letter, dated September 4, 2006 ..................... A-15433

Terra Firma Exhibit 195 -
E-mail from Wormsley to Hands, dated
September 8, 2006 ........................................... A-15440

Terra Firma Exhibit 197 -
Terra Firma - Perspectives on Threshers, dated
September 25, 2006 ......................................... A-15441

Terra Firma Exhibit 201 -
Project Prince Working Party List, dated
November 1, 2006 ............................................ A-15461

lxii

**Page**

Terra Firma Exhibit 209 -
  E-mail from Wormsley to Mylchreest, dated
  November 23, 2006 .......................................... A-15490

Terra Firma Exhibit 214 -
  EMI Group plc - Statement re preliminary
  approach from Permira, dated
  November 28, 2006 .......................................... A-15493

Terra Firma Exhibit 215 -
  E-mail from Miller to Simpkin re EMI, dated
  November 28, 2006 .......................................... A-15494

Terra Firma Exhibit 220 -
  E-mail from Badhe to Hill re Fairness Opinion
  Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
  Minutes from EMI Meeting of Directors, dated
  November 29, 2006 .......................................... A-15498

Terra Firma Exhibit 224 -
  E-mail from Smith to Wormsley, dated
  November 30, 2006 .......................................... A-15504

Terra Firma Exhibit 230 -
  E-mail from Ashcroft to Smith re Prince, dated
  December 6, 2006 ............................................ A-15505

Terra Firma Exhibit 232 -
  Minutes from EMI Meeting of Directors, dated
  December 7, 2006 ............................................ A-15506

Terra Firma Exhibit 237 -
  E-mail from Bell to Smith, dated
  December 14, 2006 .......................................... A-15519

**lxiii**

**Page**

Terra Firma Exhibit 238 -
E-mail from Smith to Wormsley, dated
December 14, 2006 .......................................... A-15520

Terra Firma Exhibit 239 -
E-mail from Smith to Wormsley re FW: Draft
announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
E-mail from Wormsley to Robertson re
Agenda, dated December 14, 2006 .................... A-15524

Terra Firma Exhibit 241 -
E-mail from Nicoli to Gildersleeve re Project
Prince, dated December 14, 2006 ...................... A-15525

Terra Firma Exhibit 242 -
E-mail from McBride to Citi re EMI cessation
announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
E-mail from Wormsley to Smith and EMI re
TF For Urgent Reply Please, dated
December 14, 2006 ........................................... A-15528

Terra Firma Exhibit 244 -
Letter from Kelly to EMI Group plc, dated
December 14, 2006 ........................................... A-15530

Terra Firma Exhibit 248 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
December 14, 2006 ........................................... A-15532

Terra Firma Exhibit 250 -
Letter from Nicoli to Kelly, dated
December 15, 2006 ........................................... A-15533

**lxiv**

                                                                    **Page**

Terra Firma Exhibit 274 -
      E-mail from Simpkin to Miller re EMI, dated
      January 4, 2007  ................................................. A-15534

Terra Firma Exhibit 280 -
      Minutes from EMI Meeting of Directors, dated
      January 10, 2007  ............................................... A-15536

Terra Firma Exhibit 281 -
      E-mail from Jones to Cockerill re Pepe - terms,
      dated January 11, 2007...................................... A-15539

Terra Firma Exhibit 283 -
      EMI Press Release announcing restructuring,
      dated January 12, 2007  .................................... A-15545

Terra Firma Exhibit 285 -
      E-mail from Smith to Wormsley, dated
      January 12, 2007................................................ A-15548

Terra Firma Exhibit 314 -
      EMI Press Release, dated February 14, 2007  ... A-15550

Terra Firma Exhibit 315 -
      E-mail from Smith to Wormsley re EMI
      Announcement, dated February 14, 2007.......... A-15551

Terra Firma Exhibit 317 -
      E-mail from Smith to Swannell and Wormsley
      re 6am Cut, dated February 15, 2007................. A-15552

Terra Firma Exhibit 318 -
      Citigroup Analyst Report "EMI Group plc
      Another Month, Another Warning," dated
      February 15, 2007.............................................. A-15557

Terra Firma Exhibit 329 -
      EMI group confirms approach from Warner
      Music group, dated February 20, 2007  ............. A-15569

lxv

Page

Terra Firma Exhibit 346 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
    Valuation Update, dated March 1, 2007 ........... A-15582

Terra Firma Exhibit 348 -
    EMI Board Meeting Minutes, dated
    March 1, 2007 ................................................. A-15597

Terra Firma Exhibit 366 -
    "EMI GROUP plc - Statement re Possible
    Offer," PR Newswire UK Disclose, dated
    March 12, 2007 ............................................... A-15608

Terra Firma Exhibit 368 -
    E-mail from Wormsley to Hands, dated
    March 3, 2008 ................................................. A-15610

Terra Firma Exhibit 377 -
    E-mail from Steffno to Cockerill re EMI
    Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
    E-mail from Nicoli to Faxon re Full year
    target, dated March 12, 2007 ............................ A-15624

Terra Firma Exhibit 387 -
    E-mail from Smith to CIB-CBKG re Viacom's
    music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
    E-mail from Smith to Wormsley re EMI, dated
    March 26, 2007 ............................................... A-15629

**lxvi**

**Page**

Terra Firma Exhibit 392 -
    E-mail from Hill to Simpkin re (EUR) Wolters
    Kluwer Education falls to Bridgepoint, dated
    March 26, 2007 ................................................. A-15630

Terra Firma Exhibit 410 -
    E-mail from Simpkin to Smith re EMI - staple,
    dated April 3, 2007 .......................................... A-15633

Terra Firma Exhibit 412 -
    E-mail from Llewelyn-Jones to CIB-GFI re
    EMI, dated April 13, 2007 ................................ A-15635

Terra Firma Exhibit 416 -
    Letter from EMI board of Directors to
    Gildersleeve re the proposal, dated
    April 16, 2007 ................................................... A-15636

Terra Firma Exhibit 424 -
    E-mail from Seaton to Smith re FW: Trading
    statement, dated April 17, 2007 ........................ A-15646

Terra Firma Exhibit 427 -
    E-mail from Wormsley to Hands re new idea,
    dated April 18, 2007 ......................................... A-15651

Terra Firma Exhibit 429 -
    E-mail from EMI Investor Relations re EMI
    Group plc - trading statement, dated
    April 18, 2007 ................................................... A-15652

Terra Firma Exhibit 436 -
    E-mail from Smith to Estacio and Hill re Fee,
    dated April 19, 2007 ......................................... A-15654

Terra Firma Exhibit 438 -
    E-mail from Klein to Hands cc Wormsley,
    Burns, dated April 19, 2007 ............................. A-15655

lxvii

**Page**

Terra Firma Exhibit 439 -
    E-mail from Wormsley to Hands, Klein, cc
    Burns, dated April 19, 2007 ............................  A-15657

Terra Firma Exhibit 443 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated April 20, 2007 ...........................  A-15659

Terra Firma Exhibit 444 -
    E-mail from Klein to Wormsley re Roles, etc.,
    dated April 20, 2007 .........................................  A-15667

Terra Firma Exhibit 445 -
    E-mail from Barak to Citi financing re Strictly
    Private & Confidential, dated April 20, 2007  ...  A-15669

Terra Firma Exhibit 446 -
    E-mail from Barak to Citi financing re
    Cerberus Indication, dated April 20, 2007  ........  A-15681

Terra Firma Exhibit 447 -
    E-mail from Gildersleeve to Nicoli and
    Borrows re FW: E-mail from Wormsley to
    Gildersleeve, dated April 20, 2007 ...................  A-15692

Terra Firma Exhibit 448 -
    E-mail from Smith to Seaton re Roles, dated
    April 20, 2007 ...................................................  A-15694

Terra Firma Exhibit 449 -
    E-mail from Smith to Wormsley re Roles,
    dated April 20, 2007...........................................  A-15696

Terra Firma Exhibit 454 -
    E-mail from Smith to Wormsley re Roles,
    dated April 22, 2007...........................................  A-15698

**lxviii**

                                                                Page

Terra Firma Exhibit 455 -
    E-mail from Ashcroft to Wormsley re OEP
    Letter, dated April 23, 2007 ............................. A-15700

Terra Firma Exhibit 462 -
    E-mail from Ashcroft to Citi financing re
    Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
    Letter from Smith to Baxter (Takeover Panel),
    dated April 24, 2007.......................................... A-15714

Terra Firma Exhibit 464 -
    E-mail from Tabet to Swannell, Klein and
    Wormsley re Hands, dated April 25, 2007 ......... A-15716

Terra Firma Exhibit 465 -
    E-mail from Gildersleeve to Ashcroft re Citi
    and Deutsche, dated April 26, 2007 .................. A-15717

Terra Firma Exhibit 468 -
    Letter from Smith to Stewart re provisions of
    advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
    E-mail from Coleman to Wolf re EMI, dated
    April 27, 2007 .................................................... A-15721

Terra Firma Exhibit 470 -
    E-mail from Smith to Wormsley re A3 page
    valuation summary, dated April 27, 2007 ......... A-15723

Terra Firma Exhibit 479 -
    E-mail from Smith to Bell re EMI consent
    letter, Side letter re financing bidders, dated
    April 28, 2007 .................................................... A-15726

**lxix**

**Page**

Terra Firma Exhibit 480 -
  E-mail from Smith to Stewart re Project
  Mulberry, dated April 30, 2007......................... A-15729

Terra Firma Exhibit 481 -
  E-mail from Smith to Ashcroft re Project
  Mulberry, dated April 30, 2007......................... A-15732

Terra Firma Exhibit 484 -
  Global FEG Working List Client Account List,
  dated May 1, 2007............................................. A-15735

Terra Firma Exhibit 492 -
  E-mail from Wormsley to Hands, dated
  May 3, 2007 ...................................................... A-15754

Terra Firma Exhibit 496 -
  EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
  E-mail from Cole to Ashcroft re Panel, dated
  May 4, 2007 ...................................................... A-15757

Terra Firma Exhibit 498 -
  E-mail from Cole to Bell re DB financing
  trees, dated May 4, 2007 ................................... A-15761

Terra Firma Exhibit 501 -
  EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
  "EMI Group plc - Statement re preliminary
  approach," EMI Press Release, dated
  May 4, 2007 ...................................................... A-15764

Terra Firma Exhibit 516 -
  E-mail from McCluskey to Yang re FW:, dated
  May 6, 2007 ...................................................... A-15765

**lxx**

**Page**

Terra Firma Exhibit 532 -
  E-mail from Smith to Wormsley re Terra
  Firma/EMI, dated May 8, 2007......................... A-15766

Terra Firma Exhibit 537 -
  E-mail from Hands to Wormsley re EMI, dated
  May 9, 2007 ...................................................... A-15767

Terra Firma Exhibit 538 -
  E-mail from Borrows to Gildersleeve re Dice,
  dated May 9, 2007............................................. A-15768

Terra Firma Exhibit 539 -
  E-mail from Smith to Hill & Estacio fw OEP,
  dated May 9, 2007............................................. A-15772

Terra Firma Exhibit 540 -
  E-mail from Wormsley to Gildersleeve re Dice,
  dated May 9, 2007............................................. A-15773

Terra Firma Exhibit 541 -
  E-mail from Bell to Wormsley re Terra Firma
  Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
  E-mail from Simpkin to Wormley and Smith re
  Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
  E-mail from Smith to Poyser re Project
  Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
  E-mail from Ashcroft to Gildersleeve fw
  TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
  Project Mulberry Bidders Contact Details,
  dated May 11, 2007........................................... A-15789

**lxxi**

**Page**

Terra Firma Exhibit 552 -
E-mail from Wormsley to Bell re Mulberry,
dated May 11, 2007............................................ A-15814

Terra Firma Exhibit 553 -
E-mail from Bell to Smith and Wormsley re
Mondays meeting, dated May 11, 2007............. A-15816

Terra Firma Exhibit 554 -
E-mail from Smith to McCluskey re Just left
you a voicemail, dated May 11, 2007 ................ A-15820

Terra Firma Exhibit 555 -
E-mail from Simpkin to Edwards re Hope you
are well. re EMI, dated May 11, 2007 ............... A-15821

Terra Firma Exhibit 558 -
E-mail from Gildersleeve to EMI re Mulberry -
Data Room - IMPALA, dated May 13, 2007..... A-15822

Terra Firma Exhibit 564 -
E-mail from Barak to Smith re Citi Financing,
dated May 14, 2007............................................ A-15826

Terra Firma Exhibit 570 -
E-mail from Estacio to Klein fw Full DDT
procedures - Project Mulberry, dated
May 15, 2007 ..................................................... A-15828

Terra Firma Exhibit 578 -
E-mail from Bell to Citi Financing re Project
Mulberry Update, dated May 16, 2007.............. A-15834

Terra Firma Exhibit 579 -
E-mail from Zogheb to Miller re EMI, dated
May 16, 2007 ..................................................... A-15835

**lxxii**

Page

Terra Firma Exhibit 582 -
    E-mail from Wormsley to Gildersleeve and
    Nicoli re call from Guy Hands, dated
    May 16, 2007 ...................................................... A-15837

Terra Firma Exhibit 593 -
    Project Mulberry Working Party List, dated
    May 17, 2007 ...................................................... A-15838

Terra Firma Exhibit 594 -
    E-mail from Brumpton to Klein re LF/SEC
    call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
    E-mail from Klein to Wormsley re EMI Credit
    call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
    E-mail from Leat to Klein re Call, dated
    May 17, 2007 ...................................................... A-15866

Terra Firma Exhibit 599 -
    E-mail from Wormsley to Klein re Call Guy
    Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
    E-mail from Curtis to Klein re David
    Wormsley called, VERY URGENT, dated
    May 17, 2007 ...................................................... A-15868

Terra Firma Exhibit 604 -
    E-mail from Bell to Gildersleeve re Update
    from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
    E-mail from Wormsley to Klein, dated
    May 17, 2007 ...................................................... A-15870

lxxiii

**Page**

Terra Firma Exhibit 608 -
   E-mail from Klein to Hands re Call, dated
   May 17, 2007 ..................................................... A-15871

Terra Firma Exhibit 619 -
   E-mail from Wormsley to Poyser re Issue on
   covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
   E-mail from Wormsley to Tabet re Covenants,
   dated May 18, 2007............................................ A-15873

Terra Firma Exhibit 621 -
   E-mail from Poyser to Wormsley re interest
   coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
   E-mail from Smith to Poyser re Debt approval,
   dated May 18, 2007............................................ A-15875

Terra Firma Exhibit 630 -
   Minutes of the Meeting of the Board of
   Directors of Terra Firma (GP) 2 Ltd 8:00am,
   dated May 18, 2007............................................ A-15877

Terra Firma Exhibit 631 -
   E-mail from Stewart to Wormsley re call, dated
   May 18, 2007 ..................................................... A-15889

Terra Firma Exhibit 632 -
   E-mail from Stewart to Wormsley re returning
   call, dated May 18, 2007.................................... A-15890

Terra Firma Exhibit 636 -
   E-mail from Nicoli to Stewart re Draft process
   E-mail to be sent to bidders tomorrow, dated
   May 18, 2007 ..................................................... A-15891

**lxxiv**

**Page**

Terra Firma Exhibit 640 -
 E-mail from Watson to Cole & Citi re
 Mulberry Mark-ups of Crimson Documents,
 dated May 18, 2007............................................ A-15894

Terra Firma Exhibit 643 -
 Greenhill: Fairness Opinion/Advice Review
 Form, dated May 18, 2007.................................. A-15896

Terra Firma Exhibit 644 -
 E-mail from Barak to Bell *et al.* re Update on
 calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
 E-mail from Borrows to Gildersleeve re
 Hands, dated May 18, 2007 .............................. A-15902

Terra Firma Exhibit 648 -
 E-mail from Borrows to Bell re draft process,
 dated May 18, 2007............................................ A-15903

Terra Firma Exhibit 649 -
 E-mail from O'Brien to Citi and EMI re EMI-
 NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
 Minutes of the Meeting of the Board of
 Directors of Terra Firma (GP) 3 Ltd 8:30am,
 dated May 18, 2007............................................ A-15911

Terra Firma Exhibit 661 -
 E-mail from Pryce to Burrows cc Wormsley re
 Terra Firma, dated May 18, 2007 ...................... A-15923

Terra Firma Exhibit 674 -
 E-mail from Bell to Gildersleeve re EMI
 conference call, dated May 19, 2007 ................ A-15924

lxxv

Page

Terra Firma Exhibit 694 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 3 Ltd 4:00pm,
dated May 20, 2007............................................ A-15925

Terra Firma Exhibit 702 -
E-mail from Watson to Ashcroft, cc Smith,
Cole, *et al.*, re Mulberry - Key Issues Table and
Turquoise Position, dated May 20, 2007 ........... A-15928

Terra Firma Exhibit 715 -
E-mail from Quigley to O'Haire, Van der Spuy
re FW: Update on Dice financing for
discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
E-mail from Smith to Wormsley re Mulberry
Key issues table and Turquoise position, dated
May 20, 2007 ..................................................... A-15940

Terra Firma Exhibit 726 -
E-mail from Bell to Borrows re Trustee
meeting notes, dated May 20, 2007 .................. A-15943

Terra Firma Exhibit 729 -
E-mail from Wormsley to Hands, dated
May 20, 2007 ..................................................... A-15944

Terra Firma Exhibit 736 -
Minutes of a Meeting of a Committee of the
Board of Directors of Terra Firma (GP) 3 Ltd
at 8:00am, dated May 21, 2007.......................... A-15947

Terra Firma Exhibit 744 -
E-mail from Hill to Shah re Citi M&A Wins:
EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

lxxvi

Page

Terra Firma Exhibit 746 -
Project Mulberry Fairness Committee
Materials, dated May 21, 2007 ........................ A-15952

Terra Firma Exhibit 749 -
E-mail from Smith to Llewelyn-Jones re
Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
E-mail from Wormsley to Smith re Greenhill
Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
E-mail from Hill to Smith re EMI, dated
May 21, 2007 .................................................... A-15963

Terra Firma Exhibit 756 -
E-mail from Smith to Bichara, Estacio, Hill,
Abbasi, Golebiewski re Citi M&A Wins: EMI
Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
E-mail from Smith to Swannell re EMI, dated
May 21, 2007 .................................................... A-15966

Terra Firma Exhibit 758 -
E-mail from Smith to Suen and Mcbride re
EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
E-mail from Vakilian to Poyser re (RNS) Terra
Firma Invest Recommended Cash Offer, dated
May 21, 2007 .................................................... A-15973

lxxvii

**Page**

Terra Firma Exhibit 765 -
 E-mail from Poyser to Lee re (RNS) Terra
 Firma Invest Recommended Cash Offer, dated
 May 21, 2007 ..................................................... A-15975

Terra Firma Exhibit 766 -
 E-mail from Poyser to Abbasi re (RNS) Terra
 Firma Invest Recommended Cash Offer, dated
 May 21, 2007 ..................................................... A-15977

Terra Firma Exhibit 767 -
 E-mail from Poyser to Vakilian re (RNS) Terra
 Firma Recommended Cash Offer, dated
 May 21, 2007 ..................................................... A-15979

Terra Firma Exhibit 768 -
 E-mail from Wormsley to Smith re update on
 call with GH, dated May 21, 2007 ................... A-15981

Terra Firma Exhibit 783 -
 Project Mulberry Valuation Materials,
 Greenhill & Co., dated May 21, 2007 .............. A-15982

Terra Firma Exhibit 787 -
 E-mail from Simpkin to Treco re Call, dated
 May 22, 2007 .................................................... A-15991

Terra Firma Exhibit 788 -
 E-mail from Smith to Skarbek re Citi M&A
 wins, dated May 22, 2007 ................................. A-15992

Terra Firma Exhibit 791 -
 E-mail from Temming to Poyser re Example
 for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
 E-mail from Poyser to Smith re Example for us
 all, dated May 22, 2007 .................................... A-15995

lxxviii

**Page**

Terra Firma Exhibit 796 -
   E-mail from Poyser to Smith re Dice, dated
   May 22, 2007  ................................................... A-15996

Terra Firma Exhibit 802 -
   E-mail from Poyser to Smith re financing
   process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
   E-mail from Poyser to Smith re financing
   process, dated May 24, 2007............................. A-16001

Terra Firma Exhibit 815 -
   David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
   E-mail from Wormsley to Hands re Thistle
   Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
   E-mail from Gildersleeve to Wormsley, dated
   May 29, 2007 ..................................................... A-16015

Terra Firma Exhibit 824 -
   E-mail from Nesbit to Grigorova re Project
   Dice, dated May 30, 2007.................................. A-16016

Terra Firma Exhibit 827 -
   E-mail from Smith to Blackburn re MDs
   meeting Monday, June 4 at 8:15 UK time,
   dated May 31, 2007............................................ A-16020

Terra Firma Exhibit 831 -
   Citi Markets & Banking Credit Risk
   Principles, Policies and Procedures, dated
   June 1, 2007 ...................................................... A-16022

**lxxix**

                                                                    **Page**

Terra Firma Exhibit 833 -
    Recommended Cash Offer by Maltby-a
    company formed at the direction of Terra
    Firma-for EMI Group plc, dated June 7............  A-16246

Terra Firma Exhibit 846 -
    E-mail from Aldred (on behalf of Hands) to
    Van der Spuy re Message from Guy Hands -
    Project Dice, dated June 27, 2007.....................  A-16410

Terra Firma Exhibit 872 -
    E-mail from Wormsley to Gildersleeve and
    Nicoli re Terra Firma, dated July 4, 2007 ..........  A-16411

Terra Firma Exhibit 874 -
    E-mail from Poyser to Smith re Your revenue
    list as at 4th July 2007, dated July 4, 2007 ........  A-16412

Terra Firma Exhibit 882 -
    E-mail from King to Klein re Riverdeep, dated
    July 9, 2007........................................................  A-16414

Terra Firma Exhibit 883 -
    E-mail from Hill to Lee re your revenue list as
    at 4th July 2007, dated July 9, 2007..................  A-16415

Terra Firma Exhibit 887 -
    E-mail between Wormsley and Leat regarding
    advice, dated July 9, 2007..................................  A-16416

Terra Firma Exhibit 903 -
    E-mail from Simpkin to Lavelle re EMI Equity
    Bridge, dated July 16, 2007 ..............................  A-16417

Terra Firma Exhibit 917 -
    E-mail from Borrows to Gildersleeve, Nicoli,
    *et al.*, re Board Presentation, dated
    July 18, 2007....................................................  A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
E-mail from King to Klein re Terra Firma
(High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
E-mail from Smith to Stewart re Invoice to
Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
E-mail from Cockerill to Grigorova and Jones
re EMI CCR, dated July 31, 2007 ...................... A-16438

Terra Firma Exhibit 987 -
E-mail from Hill to Smith, dated
August 6, 2007 .................................................. A-16439

Terra Firma Exhibit 992 -
E-mail from Klein to Prince re EMI-DO NOT
FORWARD, dated August 8, 2007 .................... A-16440

Terra Firma Exhibit 993 -
E-mail from Klein to Mehta re Warner-
confidential, dated August 8, 2007 ................... A-16442

Terra Firma Exhibit 994 -
E-mail from Wirdnam to Leat re Terra Firma
Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
E-mail from Klein to Volk *et al.* re W, "Guy
Spoke to Edgar and offered 3B," dated
August 11, 2007 ................................................ A-16444

Terra Firma Exhibit 1006 -
E-mail from Klein to Volk *et al.* re FW: edgar,
"4B value of EMI," dated August 12, 2007 ....... A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
E-mail from Smith to Watson re Mulberry Citi
Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
E-mail from Barker to Leat fw EMI, dated
August 24, 2007 ................................................ A-16447

Terra Firma Exhibit 1040 -
E-mail from Smith to CMB-GBKG re Quote
of the Day, dated September 10, 2007 ............... A-16448

Terra Firma Exhibit 1074 -
Memorandum from Simpkin *et al.* to Klein *et
al.* re Project Dice (Public to Private of EMI),
dated November 16, 2007 .................................. A-16449

Terra Firma Exhibit 1080 -
E-mail from Wormsley to Klein re Guy Hands,
dated November 23, 2007 .................................. A-16459

Terra Firma Exhibit 1100 -
E-mail from Wormsley to Lynn re meeting
with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
E-mail from Smith to Poyser re trusted adviser,
dated January 30, 2008 ..................................... A-16461

Terra Firma Exhibit 1111 -
E-mail from Wormsley to Hands cc Burns,
dated February 1, 2008 ..................................... A-16463

Terra Firma Exhibit 1114 -
E-mail from Wormsley to Hands, dated
February 19, 2008 ............................................. A-16466

**lxxxii**

                                                                      **Page**

Terra Firma Exhibit 1141 -
    Franchise Rise Assessment Template, dated
    July 2008.............................................................. A-16470

Terra Firma Exhibit 1144 -
    Handwritten Notes of Cockerill, dated
    September 1, 2008 ............................................. A-16471

Terra Firma Exhibit 1147 -
    E-mail from Smith to Wormsley re FW:
    Morgan Stanley CDs now officially higher than
    EMI!!! Hurrah, dated September 18, 2008........... A-16472

Terra Firma Exhibit 1158 -
    Handwritten Notes of Cockerill, dated
    November 16, 2008............................................. A-16473

Terra Firma Exhibit 1176 -
    E-mail from Cox to Smith re City Speaker
    Series - 12th February, Wormsley Presentation,
    dated February 11, 2009..................................... A-16476

Terra Firma Exhibit 1196 -
    Franchise Risk Assessment Template, Maltby
    Investments Limited, dated June 2009............... A-16529

Terra Firma Exhibit 1225 -
    E-mail from Smith to Vakilian re Citigroup
    accused of fraud over EMI sale, dated
    December 13, 2009 ............................................ A-16530

Terra Firma Exhibit 1241 -
    Compliance "Tree" for EMI group, dated
    January 14, 2010 ................................................ A-16532

**lxxxiii**

**Page**

Terra Firma Exhibit 1251 -
 Baughman to Duffy re supplement to Citi's
 response to Terra Firma's Interrogatory No. 5,
 dated March 25, 2010 ....................................... A-16536

Terra Firma Exhibit 1313 -
 EMI Trading Update ........................................ A-16539

Terra Firma Exhibit 1346 -
 EMI Stock Price.xls ........................................ A-16541

Terra Firma Exhibit 1365 -
 E-mail from Wormsley to Hands re DAIG-
 subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
 E-mail from Wormsley to Smith, dated
 November 28, 2006............................................ A-16592

Terra Firma Exhibit 1369 -
 E-mail from Smith to Wormsley re EMI, dated
 December 20, 2006 ........................................... A-16593

Terra Firma Exhibit 1370 -
 E-mail from Wormsley to Klein re Call, dated
 May 17, 2007 .................................................... A-16594

Terra Firma Exhibit 1371 -
 E-mail from Coats to Dolenec re Project Dice,
 dated May 21, 2007............................................ A-16595

Terra Firma Exhibit 1372 -
 E-mail from Wormsley to Klein re EMI, dated
 August 2, 2007 .................................................. A-16596

Terra Firma Exhibit 1377 -
 E-mail from Seymour to Van der Spuy re
 Project Dice memo, dated May 15, 2007........... A-16597

lxxxiv

Page

Terra Firma Exhibit 1380 -
    Minutes of the May 20, 2007 Meeting of the
    IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
    Kirsten Randell notebook .................................. A-16610

Terra Firma Exhibit 1395 -
    Amended and Restated Fee Letter, dated
    August 13, 2007 ................................................. A-16751

Terra Firma Exhibit 1400 -
    E-mail from Rawlings to Silva, Reeves cc
    Govinida, Dubin re Maltby - fees, dated
    August 31, 2007 ................................................. A-16761

Terra Firma Exhibit 1407 -
    E-mail from Wormsley to Klein, dated
    November 21, 2007 ............................................ A-16763

Terra Firma Exhibit 1409 -
    E-mail from Wormsley to Hands re BUPA
    hospitals, dated June 18, 2007 .......................... A-16764

Terra Firma Exhibit 1415 -
    E-mail from Seth to Simpkin, *et al.*, re EMI
    staple plan, attaching EMI Recd Financing.xls
    and EMI Group Financing.xls, dated
    April 1, 2007 ..................................................... A-16765

Terra Firma Exhibit 1434 -
    David Wormsley deposition excerpts (pp. 159-
    170:18), dated July 20, 2010 ............................. A-16872

Terra Firma Exhibit 1436 -
    Stipulation re Eric Nicoli .................................. A-16885

**lxxxv**

Page

Citi Exhibit A-1 -
Page 27, Paragraph 109 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
Page 28, Paragraph 110 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
Pages 31-32, Paragraph 126 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 ........................................... A-16890

Citi Exhibit A-8 -
Page 32, Paragraph 128 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
Page 32-33, paragraphs 127-129 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 ........................................... A-16895

Citi Exhibit C -
E-mail from Vallance on behalf of Hands to Punja, *et al.*, re URGENT & IMPORTANT-EMI, dated May 6, 2007 ................................... A-16898

Citi Exhibit D -
Minutes of May 7, 2007, Meeting of the Investment Advisory Committee of Terra Firma, dated May 7, 2007 ................................. A-16900

Citi Exhibit E -
E-mail from Seymour to Becker, *et al.*, with attached Project Dice Memo to the GP, dated May 7, 2007 ........................................ A-16902

lxxxvi

**Page**

Citi Exhibit H -
    Minutes of May 15, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma, dated May 15, 2007 ............................. A-16914

Citi Exhibit I -
    Memo from Punja, *et al.*, to the IAC re Project
    Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
    E-mail thread ending with E-mail from Slattery
    to Randell, *et al.*, re IAC Distribution List
    DICE, dated May 19, 2007 ............................. A-16923

Citi Exhibit K -
    Minutes of May 18, 2007, Terra Firma
    Investment Advisory Committee Meeting,
    dated May 18, 2007 .......................................... A-16927

Citi Exhibit L -
    Minutes of May 20, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma Capital Partners Limited, dated
    May 20, 2007 ................................................... A-16929

Citi Exhibit P -
    Project Dice Update to the IAC, dated
    June 28, 2007 ................................................... A-16931

Citi Exhibit W -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re Project Dice: 2008 Forecast vs.
    Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
    Project Mulberry Limited Scope Vendor Due
    Diligence Report, dated May 4, 2007 .............. A-16959

**lxxxvii**

**Page**

Citi Exhibit BL -
  Letter from Stokes to Gildersleeve re Terra
  Firma, dated May 21, 2007 ............................. A-17001

Citi Exhibit BM -
  Project Mulberry Valuation Materials, dated
  May 21, 2007 ................................... A-17011

Citi Exhibit BP -
  E-mail from Night BA to Amstutz, *et al.*, re
  EMI Co-Investment Opportunity, with attached
  EMI Presentation to Co-Investors, dated
  August 20, 2007 ................................ A-17020

Citi Exhibit BR -
  E-mail thread ending with E-mail from Night
  BA to Tequila Bone, with attached co-investor
  presentation, dated September 7, 2007 ............ A-17032

Citi Exhibit CA -
  E-mail from Vallance to TF Team Dice re EMI
  Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
  E-mail thread ending with E-mail from Punja
  to Hands re Revised financing E-mail, dated
  May 17, 2007 ................................... A-17068

Citi Exhibit DP -
  Guernsey Airport Landing Dues Information
  System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
  Memo from Punja, *et al.*, to IAC, *et al.*, re
  Project Dice Phase One Due Diligence, dated
  February 5, 2007 .............................. A-17071

**lxxxviii**

**Page**

Citi Exhibit DT -
    E-mail from Vallance on behalf of Hands to
    Wormsley re Hands' desire to speak with
    Wormsley ASAP, dated May 6, 2007 ................ A-17087

Citi Exhibit DW -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re Project Dice, dated
    May 7, 2007 ..................................................... A-17088

Citi Exhibit DX -
    E-mail thread ending with E-mail from Hands
    to Hedegaard, *et al.*, re Project Dice, dated
    May 6, 2007 ..................................................... A-17090

Citi Exhibit DY -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 10:00 a.m. (GP3), dated
    May 8, 2007 ..................................................... A-17092

Citi Exhibit EA-1 -
    Terra Firma's telephone records from British
    Telecom, dated August 2, 2007......................... A-17101

Citi Exhibit EA-2 -
    Airtime Billing Reporting Team Itemisation
    Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
    E-mail thread ending with E-mail from
    Vallance on behalf of Hands to Klein re request
    for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
    E-mail thread ending with E-mail from
    Vallance on behalf of Hands to Wormsley re
    request for Wormsley to call Hands, dated
    May 18, 2007 ................................................... A-17205

**lxxxix**

**Page**

Citi Exhibit ED -
E-mail thread ending with E-mail from Tabet
to Hands re EMI, dated May 18, 2007 .............. A-17206

Citi Exhibit EE -
E-mail thread ending with E-mail from Aldred
to Hands, *et al.*, re Relationship between Roger
Ames and Cerberus Capital Management,
dated September 24, 2007 ................................ A-17208

Citi Exhibit EH -
Project Dice Presentation by Terra Firma, with
E-mail thread ending with E-mail from Punja
to Hands re Process, dated May 20, 2007 ......... A-17209

Citi Exhibit EI -
E-mail thread ending with E-mail from Punja
to Hands re Process, dated May 20, 2007 ......... A-17286

Citi Exhibit EJ -
Minutes of May 20, 2007, Meeting of the Terra
Firma (GP) 2 Board of Directors, dated
May 20, 2007 ................................................... A-17290

Citi Exhibit EL -
E-mail thread ending with E-mail from Hands
to Wormsley re outstanding issues between Citi
and Terra Firma, dated May 20, 2007 ............... A-17293

Citi Exhibit EO -
Minutes of May 23, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners, Limited, dated
May 23, 2007 ................................................... A-17296

xc

**Page**

Citi Exhibit EQ -
  E-mail from Vallance to Terra Firma Team
  Dice, *et al.*, re Weekly Dice Updates for IAC,
  dated June 14, 2007 .......................................... A-17298

Citi Exhibit ET -
  Press release re Recommended Cash Offer for
  EMI Group plc by Maltby Limited, dated
  July 20, 2007 ................................................... A-17299

Citi Exhibit FB-1 -
  Declaration of John Loveridge, dated
  February 3, 2010 ............................................... A-17302

Citi Exhibit FD -
  Terra Firma Investments (GP) 3 Limited
  Advisory Agreement Relating to Terra Firma
  Capital Partners III, L.P., dated
  February 8, 2006 ............................................... A-17311

Citi Exhibit FG -
  Draft Memo from Punja, *et al.* to the IAC re
  Project Dice: Presentation and Success Fee,
  dated May 18, 2007 .......................................... A-17331

Citi Exhibit FI -
  Minutes of May 15, 2007, Meeting of Terra
  Firma (GP) 3 Board of Directors, dated
  May 15, 2007 ................................................... A-17332

Citi Exhibit FN -
  Minutes of May 20, 2007, Meeting of the
  Board of Directors at 4:00 p.m. (GP3), dated
  May 20, 2007 ................................................... A-17334

xci

**Page**

Citi Exhibit FO -
Minutes of May 21, 2007, Meeting of the
Board of Directors at 7:30 a.m. (GP2), dated
May 21, 2007 ..................................................... A-17337

Citi Exhibit FP -
Terra Firma Presentation to GP re Project Dice,
dated May 21, 2007............................................ A-17340

Citi Exhibit FR -
Memo Recommending Cash Offer by Maltby
Limited for EMI Group plc, dated
May 30, 2007 .................................................... A-17350

Citi Exhibit FV -
Letter from Kelly to EMI Group plc re Terra
Firma's interest as a potential offeror for EMI,
dated December 14, 2006 ................................... A-17512

Citi Exhibit FX -
E-mail from Van der Spuy to Bell, *et al.*, with
attached Project Dice: Management Meeting
questions and attendees, dated
May 11, 2007 .................................................... A-17514

Citi Exhibit GF -
Letter from Kelly to Gildersleeve re Summary
Proposal for Terra Firma potential offer, dated
May 8, 2007 ..................................................... A-17533

Citi Exhibit GG -
Minutes of May 8, 2007, Meeting of the Board
of Directors at 8:45 a.m. (GP2), dated
May 8, 2007 ..................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
E-mail thread ending with E-mail from Nicoli
to Stewart, *et al.*, re E-mail to be sent to
bidders tomorrow, dated May 18, 2007 ............. A-17548

Citi Exhibit GN -
E-mail thread ending with E-mail from
Wormsley to Simpkin, *et al.*, re Terra
Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
Terra Firma Presentation to Investment
Advisory Committee re Project Dice, dated
May 18, 2007 ................................................. A-17552

Citi Exhibit GQ -
E-mail from Pryce to Burrows, *et al.*, re Terra
Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
E-mail from Melvin to Hands, *et al.*, re Urgent-
EMI/Terra, dated May 22, 2007 ........................ A-17713

Citi Exhibit HH -
E-mail from Shaw to Nicoli re Trading
statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
Project Dice Presentation: Update to the IAC,
dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
E-mail thread ending with E-mail from Van der
Spuy to O'Haire, *et al.*, re Update on Dice
Financing for Discussion Tomorrow, dated
May 20, 2007 ................................................. A-17738

xciii

**Page**

Citi Exhibit IC -
E-mail from Vallance to Hudson, *et al.*, re
Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
Court Order in the High Court of Justice,
Queen's Bench Division, dated
August 16, 2010 ................................. A-17749

Citi Exhibit IE -
Journey Log Book for aircraft Cs-DXJ
registered with the Portuguese Registry
entitled, "Diário de Navegaçao," dated
May 24, 2007 ................................... A-17758

Citi Exhibit IF -
Screen Shot: Build Reservation for Terra
Firma, dated May 20, 2007 ................................ A-17761

Citi Exhibit IW -
Terra Firma Capital Partners II Q3 2007, dated
November 1, 2007 ............................. A-17762

Citi Exhibit JC -
E-mail from Reid to Seymour re Final Version
of McK docs, dated, with attachment
May 16, 2007 ................................... A-17807

Citi Exhibit JD -
Terra Firma Music Industry Key Market
Outlook, dated May 15, 2007 ........................... A-18001

Citi Exhibit JE -
KPMG Report - Project Dice - Limited Scope
due financial diligence report, dated
May 17, 2007 ................................... A-18128

xciv

Page

Citi Exhibit JI -
   E-mail from Vallance on behalf of Hands to TF
   Team Dice re Dice and RBS, dated
   May 8, 2007 ...................................................... A-18232

Citi Exhibit JN -
   Minutes of the May 18, 2007, EMI Group plc
   meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated June 28, 2007 ................. A-18240

Citi Exhibit JQ -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 13, 2007 ................ A-18246

Citi Exhibit JS -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 20, 2007 ................. A-18249

Citi Exhibit JT -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 28, 2007 ................ A-18252

Citi Exhibit KA -
   E-mail from Dowler to Hands re Dice, dated
   May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
   E-mail from Robert-Tissot to Hands re
   Gatwick, dated February 6, 2009....................... A-18257

xcv

**Page**

Citi Exhibit KH -
E-mail from Wormsley to Cabrey re Hands -
Invitation to Terra Firma Annual Clay Pigeon
Shoot, dated July 1, 2008 .................................. A-18259

Citi Exhibit KJ -
Terra Firma Annual Review 2007, dated
June 29, 2005 .................................... A-18262

Citi Exhibit KY -
Terra Firma Private Placement Memorandum,
dated April 1, 2006 ............................ A-18382

Citi Exhibit LI -
Memo from Punja, *et al.*, to Hands, *et al.*, re
EMI Preliminary Discussion, dated
December 1, 2006 ............................. A-18482

Citi Exhibit MB -
Signed Minutes of the February 5, 2007,
Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
Letter from Smith to Stewart re Provision of
Advisory and Corporate Broking Services by
Citigroup, dated April 27, 2007 ........................ A-18493

Citi Exhibit OF -
Letter from Kelly to Gildersleeve re possible
offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
E-mail thread ending with E-mail from Miller
to Wormsley, dated May 8, 2007 ..................... A-18499

Citi Exhibit OJ -
E-mail from Wormsley to Hands re EMI, dated
May 8, 2007 .................................... A-18500

xcvi

**Page**

Citi Exhibit OM -
  Project Mulberry Bidders Contact Detail, dated
  May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
  E-mail thread ending with E-mail from Van der
  Spuy to Simpkin, *et al.*, re Project Dice:
  Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
  Minutes of May 15, 2007, Meeting of the
  Board of Directors at 7:30 p.m. (GP2), dated
  May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
  E-mail thread ending with E-mail from Klein
  to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
  E-mail from Wilkins to Nicoli, *et al.*, re
  Wormsley call, dated May 18, 2007 ................. A-18533

Citi Exhibit RU -
  E-mail thread ending with E-mail from Nicoli
  to Wormsley re EMI media review, dated
  May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
  E-mail thread ending with E-mail from
  Simpkin to Dolenec, *et al.*, re securitisation
  colleagues, dated May 20, 2007 ....................... A-18537

Citi Exhibit UF -
  E-mail thread ending with E-mail from Tabet
  to Wormsley re just spoke to GH, dated
  May 21, 2007 .................................................. A-18540

xcvii

**Page**

Citi Exhibit VP -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:00 p.m. (GP2), dated
    May 23, 2007 .................................................. A-18543

Citi Exhibit VQ -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:15 p.m. (GP3), dated
    May 23, 2007 .................................................. A-18545

Citi Exhibit WI -
    Memo from Punja, *et al.*, to the IAC, *et al.*, re
    Project Dice Update and Budget, with attached
    Presentation re IAC update: Project Dice,
    dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
    E-mail from Cabrey to Wormsley, *et al.*, re
    Villa Saletta Shoot, with attached Fax Reply
    Form, dated August 15, 2007 ............................ A-18555

Citi Exhibit AAO -
    E-mail from MacInnes to Punja, *et al.*, with
    attached Dresdner invoice to Maltby, dated
    August 17, 2007 ............................................... A-18560

Citi Exhibit ABL -
    Memo from Pryce to TFCP Personnel re Public
    to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
    Letter from Terra Firma Investments (GP) 3
    Limited to Citi re the amendment letter, dated
    December 21, 2007, dated January 11, 2008 .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
    E-mail from Dicks to Wormsley, *et al.*, re DW
    Menu selection Die Sauberflote, attached
    menu, dated June 23, 2008 ............................... A-18571

Citi Exhibit AGF -
    Terra Firma Capital Partners II, Q1 2008, dated
    March 31, 2009 ................................................ A-18574

Citi Exhibit AHA -
    Presentations re EMI and the Terra Firma/Citi
    Relationship, dated August 1, 2009 ................. A-18623

Citi Exhibit AJJ -
    Cell phone Records for David Wormsley, dated
    April 26, 2007 ................................................. A-18643

Citi Exhibit AJT -
    Guy Hands' Calendar for May 18, 2007, dated
    May 18, 2007 .................................................. A-18671

Citi Exhibit AKL -
    EMI Recorded Music Presentation, dated
    April 1, 2009 ................................................... A-18672

Citi Exhibit AKT -
    Stipulated Phone Numbers................................. A-18698

Citi Exhibit AKY -
    TFCP III Co-Investment 2 L.P. Project Dice
    Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
    Citigroup Structure Chart.................................. A-19064

Citi Exhibit ALK -
    E-mail thread ending with E-mail from
    Wormsley to Dicks re shotgun certificate form,
    dated October 4, 2007 ....................................... A-19065

xcix

**Page**

Citi Exhibit ALU -
E-mail thread ending with E-mail from
Grigorova to Lynn, *et al.*, re EMI Summary
Exposure, dated November 21, 2009 .................. A-19067

Citi Exhibit ALY -
Paragraph 22, Page 5 of Joint Statement
Pursuant to Individual Practices 4(a) of the
Facts and Other Matters on Which the Parties
Agree .................................................................. A-19072

Citi Exhibit EEB-3 -
Table 1B of Expert Report of Marianne
DeMario, dated June 14, 2010 ........................ A-19073

Citi Exhibit EEB-9 -
Appendix 1 of Expert Report of Marianne
DeMario, dated June 14, 2010 ........................ A-19077

Citi Exhibit EEG -
Corrected Expert Report of Marianne DeMario
in *Andrews v. Raphaelson*, *et al.*, dated
October 19, 2006 .............................................. A-19078

Citi Exhibit EEJ -
*Caiola v. Citibank*, Expert Report of Marianne
DeMario ............................................................ A-19095

Citi Exhibit EEY -
Client List for Spectrum Consulting Partners .... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
Handwritten Notes ............................................ A-19126

Terra Firma Exhibit 48 -
Nicoli Mobile Phone Records
(Reproduced at pp. CA-826-CA-837)

c

**Page**

Letter Brief of Terra Firma to the Honorable Jed S.
  Rakoff, dated October 25, 2010 ............................  A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed
  S. Rakoff, dated October 25, 2010 ........................  A-19137

The Court's Proposed Jury Instructions, dated
  November 1, 2010 ................................................  A-19147

Memorandum of the Honorable Jed S. Rakoff,
  dated November 2, 2010 ........................................  A-19163

Verdict Sheet, dated November 4, 2010 ...................  A-19179

Judgment, So-Ordered on December 9, 2010,
  Appealed From ....................................................  A-19180

Notice of Appeal, dated January 10, 2011 ................  A-19187

To:    Karen Dolenec[karen.dolenec@terrafirma.com];
faisal.ramzan@weil.com[faisal.ramzan@weil.com]; Francois Van Der
Spuy[Francois.Van.Der.Spuy@terrafirma.com]; Michael Slattery[Michael.Slattery@terrafirma.com];
richard.ginsburg@weil.com[richard.ginsburg@weil.com]; Stephen
Seymour[Stephen.Seymour@terrafirma.com]; Trudy Cooke[Trudy.Cooke@terrafirma.com]
Cc:    Altaf Bux[altaf.bux@db.com]; Dana Nason[dana.nason@db.com]; David
Bugge[david.bugge@db.com]; David Ross[david.ross@db.com]; Etienne Hairy[etienne.hairy@db.com];
Nicholas Gaynor[nicholas.gaynor@db.com]; Paramvir Sethi[paramvir.sethi@db.com]; Kandel,
Christopher[CKandel@london.whitecase.com]; Mathews, Rob[RMathews2@london.whitecase.com];
Rockwell, Alan[arockwell@london.whitecase.com]
From:    Khan, Imtiaz
Sent:    Sat 5/19/2007 5:16:26 AM
Importance:    High
Sensitivity:    None
Subject:    Project Dice - Revised Commitment Documents

**Redline.doc**
**Redline.doc**
**Redline.doc**
**Redline.doc**
**EXTERNAL DOCUMENT - Interim Facilities Agreement.DOC**
**AR-2K-Dice Term Sheet  (not stripped).DOC**
**Project Dice -- Commitment Letter.DOC**
**Project Dice -- Fee Letter.DOC**

Faisal, Richard,

Further to your email of this morning, attaching revised bid documents, please find attached mark-ups on
behalf of Deutsche (clean and redlined).

We are sending these mark-ups to all parties at the same time (in view of the time constraints) so they
remain subject to Deutsche's comments.

Please note that with respect to the Interim Facilities Agreement, Deutsche will require the delivery of a
legal opinion to be prepared by WGM as a condition precedent to availability of funds under the Interim
Facilities Agreement (covering capacity and authority of the newcos and validity and enforceability of the
IFA).  Please can you let us have a draft of that legal opinion for review as soon as possible.

Please can you also advise when you will be circulating draft Security Documents and draft Interim
Subordination Agreement for review.

With respect to the amount of the Interim Facilities, these should not include the Acquisition Facility.

Please can you provide an update first thing tomorrow morning regarding expected timing for delivery of
final drafts of the reports.  Please can you also explain what is proposed with respect to reliance.  Have
there been any discussions with any of the report providers regarding the reliance which will be required
by the Arrangers and the syndicate banks?  This is something that will need to be addressed over the
course of the weekend.

We understand that further discussions are taking place regarding the structure of the subordinated
facilities.  For the time being, we have reverted with Deutsche's original proposal consisting of a high yield
bridge to a high yield takeout (which is now incorporated in the main term sheet).  In the event that the
subordinated facilities are to be structured as a mezzanine bridge which terms out as a traditional

Confidential

A-1202

mezzanine facility, amendments and modifications will be required. We will need to discuss this further during the course of tomorrow.

We look forward to discussing the revised mark-ups with you.

Kind regards,

White & Case (on behalf of DB Team)

===============================================================
===========
This message, including any attachments, is confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and please delete this message and any attachments from your system. If you are not the intended recipient you should not copy this message or its attachments or disclose their contents to any other person.
White & Case LLP is a limited liability partnership registered in England & Wales under number OC324340. The registered office address is 5 Old Broad Street, London EC2N 1DW. White & Case LLP is regulated by the Law Society.
The term partner is used to refer to a member of White & Case LLP, a list of whom is available at the registered office.
For further information about White & Case please see our website at http://www.whitecase.com or refer to any White & Case office.
We believe, but do not warrant, that this e-mail, including any attachments, is virus free. You should take full responsibility for virus checking.
White & Case reserves the right to monitor all email communications (whether related to the business of White & Case or not) through its internal or external networks.

===============================================================
===========


This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

Confidential

TF0000083929

A-1203

| To: | Guy Hands[Guy.Hand |
| Cc: | Riaz Punja[Riaz.Punj Trudy Cooke[Trudy.Cooke@terrafirma.com]; Francois |
| Van Der Spuy[Francois.Van.I com] |
| From: | Karer |
| Sent: | Sun M |
| Importance: | Norm |
| Sensitivity: | None |
| Subject: | Updat |

**terms.doc**
**debt comp for GH.xls**

Dear Guy,

Please find attached two docu our current positions on the terms and other commercial points.  There are l issues outstanding:

1.  DB need to see if they can a securitisation bridge.
2.  Citi have been saying since from their commitee that the funding fees on the securitisation bridge cannot be take out.  I don't think this is a reasonable position but they have stuck by it.  In re n will probably take towards the longer end of things and the rebate we have from max.
3.  Leverage covenant - we are om both banks on our ask.

There are a few other economo which we are pretty close but we are trying to squeeze out the best terms.  d very quickly.

Also there are some other poin have asked for which we need to take a view on such as break fees.

I believe that Francois will sen parisons shortly.

Regards,

Karen

EXHIBIT
20
06·18·10   CM

Confidential

TF0000359538

A-1204

Project Dice
Comparison of other bank terms and asks

|  | Citi | DB |
|---|---|---|
| Leverage covenant | Awaiting their position | -Only on drawn revolver facilities<br>-Flex into other facilities<br>-Trying to push for unlim |
| Flex on sec bridge margin | They ask for 50 bps on top of all of the other step ups, we have said no | Have not asked for this |
| Pricing flex | 25 bps | 25 bps |
| Break fees | Asked for full fees on both high yield and securitisation take outs, we have said no | Asked for full fees, and o back appears to have acce |
| Engagement | Have asked for it on high yield and securitisation with no obligation on their part to do it, we have resisted so far | Have added engagement not provided any yet, we CP |
| Hedging | Asked to be appointed on market terms, we have said no | Asked for a right to matc |
| Liability mgmt on refi | Asked to be appointed on fees to be agreed | Have not asked for this |
| Successful syndication | They have asked for sell-down to £412m on senior to be broken into each tranche, we have said £500m coming down to £350m each if more than 1 arranger | They have asked for sell-d have said £500m coming each if more than 1 arrang |

**Project Dice**
**Comparison of Debt Packages**

| | Citi | DB | Current position |
|---|---|---|---|
| **Securitisation Bridge** | £1,410m | £1,410m | |
| Term | 12 mos | 12 mos | |
| Term out | 7 yrs | 7/8 years | This is the major outstanding point with DB. They are trying to get there. |
| Margin | 200 | 200 | |
| Step-up | 25 bps every 3 mos | 25 bps every 6 mos | Citi - additional step-up of 50 bps after 9 mos, 25 bps after 12 mos and |
| | Plus ratings step-up | | 25 bps after 18 mos if indicative ratings have not been obtained |
| | | | DB - they are asking for a 50 bps step up between mos 12 and 18 |
| Cap | 400 incl ratings step-up | 300 | |
| Commitment fee | 0.50% | 0.50% | |
| Funding fee | 1.50% | 2.00% | DB - they are asking for 2.25% |
| Rollover fee | None | 1.50% | DB have not yet agreed to the rollover |
| Take-out fee | 120 bps on inv grade | Not raised yet | |
| | 255 bps on non inv grade | | |
| Rebates | None | 100% 60 days | Citi came back from their credit committee saying that the deal was no |
| | | 75% 90 days | on the fees for the securitisation bridge, we continue to resist this |
| | | 50% 120 days | |
| | | 25% 150 days | |
| **Term Loan B** | £725m | £725m | |
| Term | 8 yr bullet | 8 yr bullet | |
| Margin | 250 | 250 | |
| Arr fees | 2.00% | 2.00% | |
| Commitment fee | 0.50% | 0.50% | |
| **Revolver** | £350m | £350m | |
| Margin | 200 | 225 | |
| Commitment fee | 0.50% | 0.50% | DB is asking for .625% |
| Arr fee | 2.00% | 2.00% | |
| **Acq facility** | | | |
| Committed | £100m | £100m | |
| Uncommitted | £200m | £200m | |
| Margin | 200 | 225 | DB is asking for 250 |
| Commitment fee | 0.50% | 0.50% | Citi asking for .75%, DB asking for .625% |
| Arr fees | 2.00% | 2.00% | |
| **Bridge to HY/equity** | 365 | None | |
| Term | 12 mos | | |
| Term out | 9 yrs | | |
| Margin | 450 | | |
| Step-up | 50 bps every 3 mos | | |
| Cap | L + 875 bps | | Citi asking for L + 925 bps |
| Commitment fee | 0.50% | | |
| Funding fee | 2.00% | | |
| Rollover fee | 2.50% | | |
| Rebates | 100% 90 days | | |
| | 75% 150 days | | |
| | 50% 210 days | | |
| | 25% 270 days | | |

A-1206

From: Peter Bell
Sent: Wednesday, May 16, 2007 6:48 PM
To: david.wormsley@citigroup.com; matthew.smith@citigroup.com; anthony.hurgess@db.com; guy.hayward-cole@db.com
Cc: GilderJ@cpwplc.com; nicolie@emigroup.com; stewartm@emigroup.com; ashcroftc@emigroup.com; mark.barak@emimusic.com; Simon
Borrows; Ross McCluskey
Subject: Project Mulberry update
I set our below a further brief update on the progress of Project Mulberry:
· All the one-day management meetings with the four PE bidders have now been held
· Follow-up meetings, calls and information requests with PE bidders have largely been completed
· 'Jack' has been given access to diligence information and their meeting with management  is now likely to be on Monday (having been postponed from
   tomorrow by Jack)
· All bidders are aware that we are still targeting an announcement on Weds 23 May with the prelims
Regards
Peter


Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax:  44 20 7198 7521
Mob: +44 7788 442 376
Email: pbell@greenhill.com
Website: www.greenhill.com



GREENHILL_0013622

Confidential

A-1207

**From:** Barak, Mark [mark.barak@emimusic.com]
**Sent:** Friday, May 18, 2007 8:33 PM
**To:** Peter Bell; gilderj@cpwplc.com; Nicoli, Eric; Stewart, Martin; Ashcroft, Charles
**Cc:** Simon Borrows; mark.rawlinson@freshfields.com; graham.watson@freshfields.com; Ross McCluskey
**Subject:** Re: Update on calls with bidders

Being ready to announce wednesday would have meant a final bid tuesday. if they could have gotten there for tuesday they can get there for monday, its one day acceleration

----- Original Message -----
**From:** Peter Bell <pbell@greenhill.com>
**To:** GilderJ@cpwplc.com <GilderJ@cpwplc.com>; Nicoli, Eric; Stewart, Martin; Ashcroft, Charles; Barak, Mark
**Cc:** Simon Borrows <sborrows@greenhill.com>; mark.rawlinson@freshfields.com <mark.rawlinson@freshfields.com>; graham.watson@freshfields.com
<graham.watson@freshfields.com>; Ross McCluskey <mccluskey@greenhill.com>
**Sent:** Fri May 18 20:28:18 2007
**Subject:** RE: Update on calls with bidders

Simon has spoken to Brian Magnus of MS advising Fortress (having tried to get Wes). He delivered the agreed message. Feedback was as follows:

· Are increasingly keen to participate having analysed all the recent disclosures

· Not sure that they can meet this new timetable, were expecting to be able to hit Wednesday timetable

· Do not understand why the timetable has been accelerated

· Simon confirmed that the board has made up its mind

· He expressed disappointment that this may disadvantage them

Note that Fortress may call you Eric on this.

Peter


Peter Bell

Principal

Greenhill & Co. International LLP

Lansdowne House, 57 Berkeley Square, London W1J 6ER


NOTE NEW ADDRESS & TELEPHONE NUMBERS

GREENHILL_0002194

Confidential

EXHIBIT
BELL 31

A-1208

Tel: +44 20 7198 7421

Fax: +44 20 7198 7521

Mob: +44 7788 442 576

Email: pbell@greenhill.com <mailto:pbell@greenhill.com>

Website: www.greenhill.com <http://www.greenhill.com>

_____

From: Peter Bell
Sent: 18 May 2007 17:54
To: 'John Gildersleeve (GilderJ@cpwplc.com)'; 'Eric Nicoli (nicolie@emigroup.com)'; 'Martin Stewart (stewartm@emigroup.com)'; 'Charles Ashcroft (ashcroftc@emigroup.com)'; 'Mark Barak (mark.barak@emimusic.com)'
Cc: Simon Borrows; 'Mark Rawlinson (mark.rawlinson@freshfields.com)'; 'Graham Watson (graham.watson@freshfields.com)'; Ross McCluskey
Subject: Update on calls with bidders

As discussed, Simon has contacted the four PE bidders and delivered the agreed messages.  Feedback was as follows:

Guy Hands at TF

- Fine with the process, subject to seeing the two pension letters

- Expects that they will get comfortable on pensions

- Expects to be in a position to bid on Monday morning at 9am

Nicholas Short at Lazards on behalf of C

- Had been planning to send an offer letter over the weekend or Monday and will now do so Monday at 9am

- Expect that a meeting with chairman of trustees will be required

Harry Hampson at JP Morgan on behalf of OEP

- Still have not concluded on value

- Surprised by an acceleration of the timetable, didn't think they would be ready to bid by Monday morning

GREENHILL_0002195

Confidential

A-1209

Simon has left a message for Brian Magnus at Morgan Stanley advising Fortress.

Regards

Peter



Peter Bell

Principal

Greenhill & Co. International LLP

Lansdowne House, 57 Berkeley Square, London W1J 6ER


NOTE NEW ADDRESS & TELEPHONE NUMBERS


Tel: +44 20 7198 7421

Fax: +44 20 7198 7521

Mob: +44 7788 442 576

Email: pbell@greenhill.com <mailto:pbell@greenhill.com>

Website: www.greenhill.com <http://www.greenhill.com>


Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 57 Berkeley Square, London W1J 6ER.Tel: +44 (0)20 7198 7400, Fax: +44 (0)20 7198 7500. This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any damage suffered as a consequence of software viruses that this email and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachments.

GREENHILL_0002196

Confidential

A-1210

---------------------------------------------------------

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

---------------------------------------------------------

A-1211

GREENSILL_0002197

Confidential

**strictly private and confidential**

### EMI Group plc

**Meeting of the Directors held on Friday 18th May 2007 at 9.35am
at 27 Wrights Lane, London W.8.**

| | |
|---|---|
| **Present:** | Mr J. Gildersleeve *(Chairman)* |
| | Mr E. L. Nicoli |
| | Mrs S. Bailey |
| | Mr K. K. Carton |
| | Mr R. C. Faxon |
| | Mr D. J. Londoner |
| | Mr M. D. Stewart |
| **In Attendance:** | Mr C. P. Ashcroft *(Secretary)* |
| | Mr M. Barak                    ) – For Minute 3 |
| | Mr S. Borrows (Greenhill & Co.) ) |
| **Apology for Absence:** | Mr P. A. Georgescu |

1. **PREVIOUS MINUTES, MATTERS ARISING AND COMMITTEE REPORTS**

   (a) **Previous Minutes and Matters Arising**

   The Minutes of the Board meetings held on 17th and 20th April 2007 were approved and there were no matters arising.

   (b) **Committee Minutes**

   The Board noted the Minutes of the:

   - Nomination Committee meeting held on 20th April 2007; and,
   - Share Schemes Committee meeting held on 17th April 2007.

   (c) **Committee Reports**

   **Audit Committee: 17th May 2007**
   Reporting on the AC meeting held the previous day, Kevin Carton noted that the Committee had reviewed the year-end accounts which it had agreed to recommend to the Board for acceptance. The Committee had also approved those parts of the Corporate Governance section of the Annual Report that related to the Committee's activities and Internal Control.

   **Remuneration Committee: 18th May 2007**
   Sly Bailey reported that the RC had:
   - received a summary of the proposed changes to future benefits under the UK Pension Fund, the detail of which would be brought to the Committee for approval later in the year;
   - approved bonus payouts under the 2006/07 EIP;
   - reviewed progress against performance targets for ESIP awards; and,
   - approved the draft Remuneration Report for consideration by the Board.

- 2 -

## 2.  APRIL REPORTS

### (a)  Group

Eric Nicoli reported that sales for the month had been slow but the loss was lower than the prior year, and consistent with the trading pattern over the last four years.   He also noted that the Group's banks had agreed to treat the Bertelsmann/Napster litigation settlement as part of the underlying result for the purposes of the September 2007 financial covenant tests under the Group's facilities agreements.   This was a very good result.

Eric Nicoli then commented on the performance of the various senior executives, noting that Roger Ames had now taken up his position as Head of Music North America.   JF Cecillon was doing an exceptional job at the International division.   The biggest source of concern, however, was the UK where Tony Wadsworth needed to get the business moving again.

Eric Nicoli also reported on the first meeting with the new commercial head of Apple Corp., where there were key negotiations as regards the release of the remastered albums and digital exploitation of The Beatles' catalogue.

### (b)  Music Publishing

Commenting on Music Publishing's performance for April, Roger Faxon noted that, consistent with prior years, April was an insignificant month.   He noted, however, the YouTube settlement and, overall, felt good about the year.   The business aimed to refocus its A&R efforts, with a view to increasing market share again by a full percentage point:  the key strategy was to drive increased uses where the business held direct control over pricing.

### (c)  Music

Eric Nicoli reported that, whilst local repertoire was holding up relatively well, the market in the US was currently weak.   Digital now represented some 25% of the US market.

## 3.  PROJECT MULBERRY

Mark Barak (SVP, Corporate Finance & Strategy) and Simon Borrows of Greenhill & Co., the Company's independent financial adviser, joined the meeting.

Simon Borrows circulated a paper updating the Board on the process currently under way.   He reviewed the indicative proposals that had been received from private equity sponsors shortly after the issue of the trading statement on 18th April 2007.   All these proposals had been made, or reconfirmed, on the basis of corrected and consistent assumptions.    Non-disclosure agreements, which included standstill arrangements, had been executed and the due diligence process commenced.   Due diligence comprised a virtual data room, a vendor due diligence report by Deloittes, and management presentations to each of the interested parties.

Confidential

- 3 -

Warner Music Group (WMG) had also reconfirmed its interest on 7th May; a non-disclosure agreement with standstill arrangements had now been signed and it had been agreed that WMG would have access to due diligence.

Considering the outline timeline of potential events, the Board discussed whether it might be possible, if appropriate, to accelerate the release of the Preliminary Announcement.

Key issues surrounding potential bids included current trading and the position with the Trustee of the UK Pension Fund. As regards the latter, a letter from the Chairman of the Trustee Board was circulated. Charles Ashcroft took the Board through the background to the letter, including the prior negotiations with the Trustee as regards the triennial valuation as at 31st March 2006 (which was the first 'scheme-specific' valuation under the new Pensions regime) which had led to an 'in principle' agreement on the valuation on the assumption that the Company remained independent. He took the Board through the application of the new regime to a takeover offer noting that, whilst the parties could seek clearance from the Pensions Regulator, they were not required to do so, nor could the Pension Fund Trustee unilaterally require such an application to the Pensions Regulator. The issue, therefore, was whether a bidder would stipulate either agreement with the Trustee or clearance by the Regulator as conditions precedent to the making of a bid.

In discussion, the Board agreed that it would be appropriate for the Chairman to meet with the Chairman of the Pension Trustee. Whilst the Board would encourage potential bidders to deal appropriately with the Pension Fund, it was not thought appropriate that the Company should press either for pre-clearance or pre-agreement as pre-conditions to an offer. That was likely to lead to the process being substantially elongated, which was not in the Company's interests. Furthermore, it was considered that the Fund was in a sound funding position, quite possibly in the top decile of UK pension funds. The issue, therefore, was one of potential weakening of the Company's covenant in the context of a leveraged acquisition and that was primarily a matter for the Offeror to resolve with the Trustee.

After discussion, the Board agreed the following steps:

- John Gildersleeve would meet Robin Charlton, the Chairman of the Trustee Board, later in the afternoon;
- Simon Borrows would contact all bidders, disclose to them the letter that had been received from the Trustee and offer them meetings with the Trustee over the weekend if they so wished;
- documents would be advanced with each of potential bidders over the weekend with a view to best offers being submitted on Monday morning; and,
- a further Board meeting to consider any offers received would be held at 1.00pm on Monday 21st May 2007.

Simon Borrows then reviewed outstanding deal issues, including the inducement fee that would be required from the Company (its size and triggers for its payment); Irrevocable Undertakings to be given by the Directors to accept the

- 4 -

offer;  Irrevocable Undertakings from key shareholders (which were unlikely to be obtained);  and how to handle potential continuing discussions with other parties following announcement of a recommended offer.

The Board noted the position.

4.    **RESTRUCTURING**

The Board noted progress on the restructuring, as set out in Martin Stewart's CFO Report.

5.    **FULL-YEAR RESULTS**

The component parts of the Annual Report, including the draft financial statements, had been circulated with the Board papers.   There were further circulated at the meeting a typeset version of the Annual Report and revised versions of the CEO's Statement and Preliminary Announcement.   With regard to:

**Analysts' Presentations**
The Board noted that, in view of the continuing 'offer period' under the Takeover Code and the possibility of an imminent bid announcement, the usual analysts' presentations would not take place.    Instead, analysts would be invited to a conference call and only a financial presentation of the results would be given.

**Preliminary Announcement**
The Board reviewed the draft Preliminary Announcement and noted that the final version would be approved by the Results Committee referred to below.

(a)  **Year-end Documentation**

The Board considered the following documents in connection with the year-end results:

- **Ernst & Young Board Report**
  The Board noted the recommendations of the Audit Committee in connection with the Auditor's Board Report.

- **Letter of Representation to the Auditor**
  The Board noted the recommendation of the Audit Committee and approved the Letter of Representation to the Auditor, authorising Eric Nicoli and Martin Stewart to sign the same on behalf of the Board.

- **Final Dividend:  Policy**
  The Board noted that it had already been announced that the Company would pay no final dividend and would suspend payment of future dividends pending realisation of the cost reductions announced on 12th January 2007.

Confidential

- 5 -

- **Annual Report**
  The Board then considered the component parts of the Annual Report, including:

  *Chairman's Statement, CEO's Statement*
  *and Operating & Financial Review*
  These were recommended for approval by the Results Committee, subject to any amendments made and approved by that Committee.

  *Directors' Report*
  The Board noted the draft Directors' Report, the final version of which would be approved by the Results Committee.

  *Corporate Governance (including Internal Control)*
  The Board approved the Corporate Governance statement for inclusion in the Annual Report, in compliance with the Combined Code.

  *Combined Code Compliance Statement*
  The Board noted and approved the Combined Code Compliance Statement, as approved by Ernst & Young LLP, for inclusion in the Annual Report.

  *Remuneration Report*
  The Board considered the Remuneration Report and authorised Sly Bailey to sign the same on behalf of the Board, subject to final approval being delegated to the Results Committee.

  *Financial Statements*
  The Financial Statements were recommended for approval by the Results Committee, subject to any amendments made and approved by that Committee.

- **Company's Profit & Loss Account**
  The draft Profit & Loss Account for the Company for the year ended 31st March 2007 was noted.

**(b)  Notice of AGM Circular**

The Board reviewed the Notice of AGM circular containing a letter from the Chairman, the Notice of AGM and explanatory notes concerning the items of Special Business, which would be sent to shareholders with the Annual Report.

The Board agreed to recommend the Notice of AGM circular for approval by the Results Committee, referred to below, subject to any amendments approved by that Committee.

**(c)  Disclosure of Relevant Audit Information**

Charles Ashcroft reminded the Board of the requirement that the Annual Report should include the following statement:

Confidential

- 6 -

*"So far as each Director is aware, there is no relevant audit information (as defined in the UK Companies Act) of which the Company's auditors are unaware, and that each Director has taken all steps that he or she ought to have taken as a Director in order to make himself or herself aware of, and to establish that the auditors are aware of, any relevant audit information."*

As envisaged by his memorandum to the Board, Charles Ashcroft confirmed that letters of representation and certificates of disclosure of relevant audit information had been provided by the business unit CEOs and CFOs, together with the functional heads of Global Marketing, IT, Strategy, Finance, Legal and Tax.   In addition, at the Audit Committee the previous day, Ernst & Young had confirmed that, so far as they were aware, the Directors and the Group had provided all information in relation to the audit which Ernst & Young had requested.

Each Executive Director was then asked to confirm that the required statement was true in relation to himself and, so far as he was aware, his business or function.   Each Executive Director so confirmed.

With the benefit of these representations, certificates and confirmations, each Non-executive Director then confirmed that the statement was true in relation to himself or herself.

**(d)   Appointment of Annual Results Committee**

It was Resolved that John Gildersleeve, Eric Nicoli, Roger Faxon, Martin Stewart and Charles Ashcroft be and they are hereby appointed a Committee of the Board, the quorum of such Committee to be two, with authority to act for the Board in all matters relating to the finalisation of the Annual Report for the year to 31st March 2007 including, but without limitation, authority to approve:

(i)  the Company's Profit and Loss Account for the year ended 31st March 2007;

(ii)  the Report of the Directors for the year ended 31st March 2007 and authorise the Company Secretary to sign it on behalf of the Board;

(iii)  the Annual Report for publication and authorise the signing of the Group and Company Balance Sheets as at 31st March 2007;

(iv)  the Preliminary Announcement for publication;

(v)  the Notice convening the Annual General Meeting for 2007, contained in a separate document to be sent to Shareholders with the 2007 Annual Report, and detailing the special business to be dealt with at that meeting, namely:

- Authority to allot shares
- Disapplication of pre-emption rights
- Purchase of own shares by the Company

Confidential

- 7 -

- Donations to EU political organisations and EU political expenditure
- Communications with shareholders by electronic means
- Changes to the Articles of Association;

(vi) the presentation to analysts;  and,

(vii) all such other documents and do or cause to be done all such other acts and things as may be necessary to give effect thereto.

## 6.    FAMOUS MUSIC

Roger Faxon updated the Board on this potential acquisition opportunity.    Music Publishing had decided not to pursue a bid, as the deal was too expensive.

## 7.    IRISH SUBSIDIARY COMPANIES:  GUARANTEE

It was reported that the exemption from filing annual accounts would again be available to the Company's Irish subsidiaries if, in respect of their accounts for the year ended 31st March 2007, the Company irrevocably guaranteed the due payment of all their liabilities.   It was noted that the non-filing of accounts had the advantage of protecting results and performance from current and potential competitors.

It was Resolved that a Guarantee, in the form presented to the meeting, be given under the Common Seal of the Company pursuant to Section 17(1)(b) of the Republic of Ireland's Companies (Amendment) Act 1986 in respect of the Irish companies listed in the schedule to the Guarantee.

## 8.    SECRETARY'S REPORTS

(a)    Share Register

The report on the Share Register, together with a memorandum summarising the main changes since the last meeting, was noted.

(b)    Use of Company Seal

The Board noted that the Company Seal had not been used since the last meeting.

## 9.    DATE OF NEXT MEETING

The next meeting would be held by telephone at approximately 2.00pm on Thursday 21st June 2007, following conclusion of the Remuneration Committee meeting, at 27 Wrights Lane, London W.8.

Confidential

**From:** Peter Bell
**Sent:** Thursday, May 17, 2007 6:19 PM
**To:** Simon Borrows

Bruce MacInnes of Dresdner Kleinwort called back as he said he would.   He said TF's investment committee meeting is being held in the morning tomorrow and then they would get sign-off from the banks which will be their gating item for delivery of their firm proposal for the board to consider.  He was concerned as to the timing of the board meeting tomorrow morning (which he already knew about) and when it would end.  I said to him that I was sure that their proposal would receive the requisite attention even if the board had finished by the time it came through.   He asked about timing of an announcement and said they were targeting an announcement on Monday.  I said that Wednesday remains a target for us but we could consider announcing earlier, depending on events, although there could be some technical difficulties in doing so.

I made the point to him re TF/Citi conversations and the chairman's requirement that all such conversations in the future come via Greenhill.

Peter

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 7521
Mob: +44 7788 442 576
Email: pbell@greenhill.com
Website: www.greenhill.com

EXHIBIT
BELL 29

GREENHILL_0027066                                                                                                                Confidential

A-1221

EXHIBIT

Confidential

From: Peter Bell
Sent: Friday, May 18, 2007 4:59 PM
To: stevens@thesagroup.com; mark.burls@renaimatic.com
Cc: Ross McCluskey
Subject: FW:

Dial in details below for the 5.30pm call...

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel +44 20 7198 7425
Fax +44 198 7301
Mob +44 798 442 9??
Email peter.bell@greenhill.com
Website www.greenhill.com

---

From: Moore, Eoin [mailto:Eoin.Moore@dds.com]
Sent: 18 May 2007 16:36
To: Peter Bell; Hucknen, Bruce
Cc: Ross McCluskey
Subject: RE:

Thanks Peter.

Dial-in details below:
Number: 0207 475 6400
Pin: 7265448

Eoin

---

From: Peter Bell [mailto:pbell@greenhill.com]
Sent: 18 May 2007 16:07
To: Hucknen, Bruce
Cc: Moore, Eoin; Ross McCluskey
Subject: RE:

5.30pm works for Martin Stewart and Mark Barah to discuss your two topics. Please forward dial-in details to me and Ross.
Peter

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel +44 20 7198 7425
Fax +44 198 7301
Mob +44 798 442 9??
Email peter.bell@greenhill.com
Website www.greenhill.com

---

From: Peter Bell
Sent: 18 May 2007 15:50
To: 'Hucknen, Bruce'
Cc: Moore, Eoin
Subject: RE:

Tried calling Eoin. The call needs to be at 6pm ie in 10 mins. Please circulate dial-in details and confirm.
Peter

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel +44 20 7198 7425
Fax +44 198 7301
Mob +44 798 442 9??
Email peter.bell@greenhill.com
Website www.greenhill.com

GREENHILL_0013486

**From:** MacInnes, Bruce [mailto:Bruce.MacInnes@cicb.com]
**Sent:** 18 May 2007 14:55
**To:** Peter Bell
**Cc:** Moore, Eoin
**Subject:** Re:

Pete...

I will be out of pocket between 3pm and 5pm. Could you liaise with Eoin when you have a time for a call

Many thanks

Bruce

-----Original Message-----
**From:** Peter Bell <pbell@grenfell.com>
**To:** MacInnes, Bruce
**Sent:** Fri May 18 14:29:00 2007
**Subject:** RE:

I expect to see Aucthedingr re Inurge...

Peter Bell

Principal

Grenfell & Co. International LLP

Lansdowne House. 57 Berkeley Square. London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel +44 20 7495 1211

Fax +44 20 7495 7231

Mob +44 7768 442576

Email  pbell@grenfell.com <mailto:rbell@grenfell.com>

Website: www.grenfell.com <http://www.grenfell.com>

-----
**From:** MacInnes, Bruce [mailto:Bruce.MacInnes@cicb.com]
**Sent:** 18 May 2007 14:21
**To:** Peter Bell
**Subject:** Re:

Many thanks.

Will a call with him be possible? I can give you a slide on the slide move slow on that if you will first it would be extremely helpful over nite.

Regards

Bruce

-----Original Message-----
**From:** Peter Bell <pbell@grenfell.com>
**To:** MacInnes, Bruce
**Cc:** Wohraiten, Ston
**Sent:** Fri May 18 14:10:39 2007
**Subject:** Re:

I confirm that is correct

Pete

Peter Bell

GRFRNHIJJ. 0013697

Confidential

Principal
Greenhill & Co. International LLP
Lansdowne House, 5th Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 5731
Mob: +44 7730 422 555
Email: pbell@greenhill-co.com
Website: www.greenhill-co.com

-----Original Message-----
From: Madsen, Bruce <Bruce.Madsen@dkib.com>
To: Pete Bell
Cc: Valderrama, Sonya <Sonya.Valderrama@dkib.com>
Sent: Fri May 18 12:13:31 2007
Subject

Pete,

Could I ask you to confirm the below at this point as a matter of good order on our side.

Many thanks,

Bruce

-----Original Message-----
From: Madsen, Bruce
To: Pete Bell <pbell@greenhill-co.com>
Sent: Fri May 11 21:08:18 2007
Subject

Pete,

Following our conversation this morning I thought I would drop a line to confirm your consent that Tara Room has now received all information funds available to other bidders, and that therefore there is no further information on which it might in future be made available under Rule 20.2 request.

Look forward to seeing you on Monday.

Best wishes,

Bruce

This e-mail is confidential and the information contained in it may be privileged. If it should not be sent, copied or used by anyone other than the intended recipient. If you have received it in error, please contact the sender immediately by telephoning +44 (0)20 7623 8000 or by return mail, and delete the e-mail and do not disclose its contents to any person. We believe, but do not warrant, that this e-mail and any attachments are virus free, but you must take full responsibility for virus checking. Please refer to http://www.dresdnerkleinwort.com/disclaimer and/or our e-mail disclaimer entered and awaking policy.

Dresdner Kleinwort is the trading name of the investment banking division of Dresdner Bank AG, and operates through Dresdner Bank AG, Dresdner Kleinwort Securities Limited, Dresdner Kleinwort Limited and other affiliated or associated companies. Dresdner Bank AG is a company incorporated in Germany with limited liability and registered in England (registered no. FC007638, place of business no. BR000772) whose principal place of business in the UK is at 30 Gresham Street, London EC2V 7PG, and is authorised by the German Federal Financial Supervisory Authority and by the Financial Services Authority (FSA) and is regulated by the FSA, for the conduct of investment business in the UK. Dresdner Kleinwort Limited is a company incorporated in England (registered no. 551334, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA.

Greenhill & Co. International LLP (Registered in the UK, no. OC302011) (Incorporated Kingdom) is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 5th Berkeley Square, London W1J 6ER Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7400
This e-mail may contain confidential and/or privileged information. If you are the intended recipient or have received this e-mail in error please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any change suffered as a consequence of software viruses that this e-mail and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachment.

This e-mail is confidential and the information contained in it may be privileged. It should not be sent, copied or used by anyone other than the intended recipient. If you have received it in error, please contact the sender immediately by telephoning +44 (0)20 7623 8000 or by return mail, and delete the e-mail and do not disclose its contents to any person. We believe, but do not warrant, that this e-mail and any attachments are virus free, but you must take full responsibility for virus checking. Please refer to http://www.dresdnerkleinwort.com/disclaimer and/or our e-mail disclaimer entered and awaking policy.

Dresdner Kleinwort is the trading name of the investment banking division of Dresdner Bank AG, and operates through Dresdner Bank AG, Dresdner Kleinwort Limited, Dresdner Kleinwort Securities Limited and other affiliated or associated companies. Dresdner Bank AG is a company incorporated in Germany with limited liability and registered in England (registered no. FC007638, place of business no. BR000772) whose principal place of business in the UK is at 30 Gresham Street, London EC2V 7PG, and is authorised by the German Federal Financial Supervisory Authority and by the Financial Services Authority (FSA) and is regulated by the FSA, for the conduct of investment business in the UK. Dresdner Kleinwort Limited is a company incorporated in England (registered no. 551334, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA. Dresdner Kleinwort Securities Limited is a company incorporated in England (registered no. 1767105, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA.

Greenhill & Co. International LLP (Registered in the UK, no. OC302011) (Incorporated Kingdom) is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 5th Berkeley Square, London W1J 6ER Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7400

GREENHILL_0013668

Confidential

This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any damage suffered as a consequence of software viruses that this email and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachments.

--

This e-mail is confidential and the information contained in it may be privileged. It should not be read, copied or used by anyone other than the intended recipient. If you have received it in error, please contact the sender immediately by telephoning +44 (0)20 7623 8000 or by return email, and delete the e-mail and do not disclose its contents to any person. We believe, but do not warrant, that this e-mail and any attachments are virus free, but you must take full responsibility for virus checking. Please refer to http://www.dresdnerkleinwort.com/disc/email/ and read our e-mail disclaimer statement and monitoring policy.

Dresdner Kleinwort is the trading name of the investment banking division of Dresdner Bank AG, and operates through Dresdner Bank AG, Dresdner Kleinwort Limited, Dresdner Kleinwort Securities Limited and their affiliated or associated companies. Dresdner Bank AG is a company incorporated in Germany with limited liability and registered in England (registered no. FC007638, place of business 30 Gresham Street, London EC2V 7PG), and is authorised by the German Federal Financial Supervisory Authority and by the Financial Services Authority ('FSA') and regulated by the FSA for the conduct of designated business in the UK. Dresdner Kleinwort Limited is a company incorporated in England (registered no. 551334, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA. Dresdner Kleinwort Securities Limited is a company incorporated in England (registered no. 1767419, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA.

Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne This e-mail may contain confidential and/or privileges information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this (

--

This e-mail is confidential and the information contained in it may be privileged. It should not be read, copied or used by anyone other than the intended recipient. If you have received it in error, please contact the sender immediately by telephoning +44 (0)20 7623 8000 or by return email, and delete the e-mail and do not disclose its contents to any person. We believe, but do not warrant, that this e-mail and any attachments are virus free, but you must take full responsibility for virus checking. Please refer to http://www.dresdnerkleinwort.com/disc/email/ and read our e-mail disclaimer statement and monitoring policy.

Dresdner Kleinwort is the trading name of the investment banking division of Dresdner Bank AG, and operates through Dresdner Bank AG, Dresdner Kleinwort Limited, Dresdner Kleinwort Securities Limited and their affiliated or associated companies. Dresdner Bank AG is a company incorporated in Germany with limited liability and registered in England (registered no. FC007638, place of business 30 Gresham Street, London EC2V 7PG), and is authorised by the German Federal Financial Supervisory Authority and by the Financial Services Authority ('FSA') and regulated by the FSA for the conduct of designated business in the UK. Dresdner Kleinwort Limited is a company incorporated in England (registered no. 551334, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA. Dresdner Kleinwort Securities Limited is a company incorporated in England (registered no. 1767419, registered office 30 Gresham Street, London EC2V 7PG), and is authorised and regulated by the FSA.

A-1224

GREENHILL 0013689                                                                                                                           Confidential

**To:** Guy Hands[Guy.Hands@terrafirma.com]
**From:** Tim Pryce
**Sent:** Fri 5/18/2007 5:14:05 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** FW: Terra Firma

Tim Pryce
General Counsel
Terra Firma Capital Partners
2 More London Riverside, London SE1 2AP
Tel: 0207 015 9690
Fax: 0207 015 9504

---

**From:** Tim Pryce
**Sent:** 18 May 2007 17:31
**To:** 'sburrows@greenhill.com'
**Cc:** Wormsley, David [IBD]
**Subject:** Terra Firma

**Strictly private and confidential**

Dear Simon,

I understand that Terra Firma should be expecting a communication this afternoon regarding the process going forwards.

I have also spoken with Guy and it would appear that there might have been a misunderstanding during your call with him this morning which we would like to clarify. In any conversation that Guy might have had with David Wormsley, it has never been suggested that were your clients to receive a possible offer in the region of £2.40 per share that this might receive their recommendation. As was reiterated this morning, a favourable consideration of any possible offer in the region of £2.65 would clearly be subject to the competitive landscape at the time that any such offer was forthcoming.

We hope that this clears up any misunderstanding.

Tim Pryce
General Counsel
Terra Firma Capital Partners
2 More London Riverside, London SE1 2AP
Tel: 0207 015 9690
Fax: 0207 015 9504



EXHIBIT: 22
WIT: Hands
DATE: 4/15/10
T.M. PASTOR, RPR, CLR

Confidential

TF000956930

**To:**      Barak, Mark[mark.barak@emimusic.com]
**From:**      MARTINS
**Sent:**      Sun 5/20/2007 8:41:23 PM
**Importance:**      Normal
**Sensitivity:**      None
**Subject:**      Re: Full press release

More than 262 i hope not sure where.

----- Original Message -----
From: Barak, Mark
To: Stewart, Martin
Sent: Sun May 20 21:38:20 2007
Subject: Re: Full press release

Phew. 265?

----- Original Message -----
From: Stewart, Martin
To: Barak, Mark
Sent: Sun May 20 21:37:40 2007
Subject: Re: Full press release

Yep.

----- Original Message -----
From: Barak, Mark
To: Stewart, Martin
Sent: Sun May 20 21:27:52 2007
Subject: Re: Full press release

You spokin to b? They gonna go?

----- Original Message -----
From: Stewart, Martin
To: Barak, Mark; Ashcroft, Charles; Smellie, Ian; 'rmccluskey@greenhill.com'
<rmccluskey@greenhill.com>
Sent: Sun May 20 21:19:36 2007
Subject: Re: Full press release

Yes

----- Original Message -----
From: Barak, Mark
To: Ashcroft, Charles; Smellie, Ian; 'rmccluskey@greenhill.com' <rmccluskey@greenhill.com>
Cc: Stewart, Martin
Sent: Sun May 20 20:26:56 2007
Subject: Re: Full press release

Yes

----- Original Message -----
From: Ashcroft, Charles
To: Smellie, Ian; Barak, Mark; 'rmccluskey@greenhill.com' <rmccluskey@greenhill.com>
Cc: Stewart, Martin

Confidential



EXHIBIT

MacInnes 19

TF0000957229

Sent: Sun May 20 20:23:41 2007
Subject: RE: Full press release

Ian - understood that we can't guarantee it wont change.  I wonder if it would not be ok to put it in the
Data Room now for what it is - ie latest draft which remains subject to final audit sign off (at present
planned for early evening Monday 21st); therefore remains subject to possible change, but the audit is
very well advanced and we are not aware of any reason for believing that it is likely to be subject to
anything other than immaterial change.

Would a cover note to that effect satisfy everyone?

-----Original Message-----
From: Smellie, Ian
Sent: 20 May 2007 19:45
To: Barak, Mark; 'rmccluskey@greenhill.com'
Cc: Ashcroft, Charles; Stewart, Martin
Subject: RE: Full press release

Mark

Sorry but I am not in a position to change that it won't change. It has changed today (not much and
arguably, not materially, but it has changed nonetheless) and the Audit Partner may wish (and we may
agree to make) further change at any time until the moment of signing.

Regards

Ian

-----Original Message-----
From: Barak, Mark
Sent: 20 May 2007 19:42
To: Smellie, Ian; 'rmccluskey@greenhill.com'
Cc: Ashcroft, Charles; Stewart, Martin
Subject: Re: Full press release


Ian,
We decided to put it in draft form as it won't change and they need to see it as a final check, so its okay.
Thanks Mark

----- Original Message -----
From: Smellie, Ian
To: 'Ross McCluskey' <rmccluskey@greenhill.com>
Cc: Barak, Mark; Ashcroft, Charles
Sent: Sun May 20 19:39:05 2007
Subject: RE: Full press release

Ross

The prelim announcement is a subset of the Report and Accounts. The Report and Accounts are only
finalised when the Directors and Auditors have signed them. They will either sign tomorrow evening or
Tuesday evening depending on when the Company is planning to announce.

I can't imagine that we would contemplate placing a "draft" document of this nature in the dataroom.

Charles - please let me know if you think that any of the above is incorrect or misplaced

Confidential

TF0000957230

A-1228

Regards

Ian

——Original Message——
From: Ross McCluskey [mailto:rmccluskey@greenhill.com]
Sent: 20 May 2007 13:38
To: Smellie, Ian
Cc: Hazel Schofield
Subject: FW: Full press release

Ian,

Mark has asked us to place the "second half" of the prelims release on the datasite – can you please send me a copy of just the back end and the notes (P&L, balance sheet, cash flow, notes etc). We are not intending to put any textual commentary on the site at this stage

Thanks

Ross

Ross McCluskey

Associate

Greenhill & Co. International LLP

Lansdowne House

57 Berkeley Square

London

W1J 6ER

Tel:    +44 207 198 7445

Mobile: +44 7971 066 062

Email:  rmccluskey@greenhill-co.com

Confidential

TF0000957231

A-1229

From: Peter Bell
Sent: 18 May 2007 19:19
To: Ross McCluskey
Subject: FW: Full press release


Peter Bell

Principal

Greenhill & Co. International LLP

Lansdowne House, 57 Berkeley Square, London W1J 6ER


NOTE NEW ADDRESS & TELEPHONE NUMBERS


Tel: +44 20 7198 7421

Fax: +44 20 7198 7521

Mob: +44 7788 442 576

Email: pbell@greenhill.com <mailto:pbell@greenhill.com>

Website: www.greenhill.com <http://www.greenhill.com>


From: Strong, Pippa [mailto:pippa.strong@emimusic.com]
Sent: 18 May 2007 18:04
To: Nicoli, Eric; Stewart, Martin; Faxon, Roger; Ashcroft, Charles; Ancliff, Chris; Barak, Mark; Conroy, Amanda; Charlie Foreman; Toby Clark; tom.reid@citigroup.com; Seaton, Andrew ; Peter Bell; graham.watson@freshfields.com; Guy Hayward-Cole; Smith, Matthew ; mark.rawlinson@freshfields.com; Jones, Dylan
Cc: Ramroop, Shreya
Subject: Full press release


Please find attached the full press release. If you could give me comments by 12pm on Monday that would be fantastic.  Please can I draw your particular attention to the future outlook section as we need to make sure messaging is consistent.


Confidential                                    TF0000957232

With many thanks

Pippa


Pippa Strong

EMI Investor Relations

27 Wrights Lane

London

W8 5SW


Tel:  +44 207 795 7681

Fax  +44 207 795 7626

---------------------------------------------------------------


Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact us on +44 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

---------------------------------------------------------------

Confidential

TF0000957233

A-1231

| From: | nicholas.shott@lazard.com |
|---|---|
| Sent: | Sunday, May 20, 2007 8:10 AM |
| To: | pbell@greenhill.com |
| Cc: | Alex Wolf <awolf@cerberuscapital.com>; carsten.seiler@lazard.com; graham.watson@freshfields.com; Lenard Tessler <LTessler@cerberuscapital.com>; mark.rawlinson@freshfields.com; martin.nelson-jones@freshfields.com; Simon Borrows <sborrows@greenhill.com>; John.Chachas@lazard.com |
| Subject: | Re: Process |
| Attach: | MULBERRY - Antitrust Confirmation.doc |

Peter,

I called Simon yesterday evening to explain that Cerberus will not be submitting an offer proposal in this timeframe. I have asked for your client's approval for Cerberus to join forces with one of your bidders. I recognise that the instinctive reaction to this might be negative, but it merits consideration in these particular circumstances - ie, as you are holding a 'sudden death' sealed bids auction, it is not as if our request would deny you the opportunity to play one bidder off against another. Rather, we think this may result in a better proposal from our preferred partner (they presumably wouldn't agree otherwise). In any event, we won't be putting in a proposal by 9.00 tomorrow.

We're still awaiting a response to this.

Nicholas Shott

50 Stratton Street
London W1J 8LL

Switchboard: +44 (0)20 7187 2000
Direct no.: +44 (0)20 7187 2466
Direct fax no.: +44 (0)20 7072 6466

"Peter Bell"       To:   ltessler@cerberuscapital.com, awolf@cerberuspartners.com, Nicholas
LONDON              Shott/CFD/Lazard@LAZARD LONDON, Carsten Seiler/CFD/Lazard@LAZARD
        <pbell@greenhill.com>     cc:   "Simon Borrows" <sborrows@greenhill.com>, mark.rawlinson@freshfields.com,
        20 May 2007 12:59         martin.nelson-jones@freshfields.com, graham.watson@freshfields.com
                    Subject: Process

I set out below the details of the process that the board of EMI will conduct regarding potential offers for the company. Bidders are required to provide their final offer letter, including the confirmations set out below, by Monday 21 May 2007 at 9.00am UK time.

The final offer letter should give the following confirmations, and should include the related documents, set out below:
  ?    The price in cash per share that you are willing to offer for the share capital of EMI Group plc.
  ?    Details of your proposed offer for the convertible bonds pursuant to rule 15 of the Takeover Code



**CONFIDENTIAL**

CERB48983

?      Confirmation that your due diligence is completed
?      Confirmation that you have agreed with Freshfields the terms of the offer announcement related documentation (terms and conditions of the offer, inducement fee, director irrevocables etc.)
?      Confirmation that you are willing to proceed to announce your offer in light of the letters exchanged between the company and the pension trustees on 18 May and, if relevant, your meeting with the chairman of the trustees
?      Confirmation of your anti-trust position by supplying with your final offer letter the attached form duly completed
?      Confirmation that the financing required by you to make the offer is in agreed form and that it is subject only to signature
?      Details of the conditions to draw-down of your financing under the certain funds clauses of your financing documentation
?      A letter from your financial adviser stating that it will provide the requisite cash confirmation under rule 24.7 of the Takeover Code
?      Confirmation that no further approvals are required by your organisation to make the rule 2.5 offer announcement
?      Confirmation that the only pre-conditions to the making of the rule 2.5 offer announcement are the signature of your financing documentation and the recommendation of the board of EMI
?      A copy of your proposed rule 2.5 announcement (including the agreed terms and conditions), the agreed form inducement fee and the agreed form director irrevocable undertaking should be appended to the final confirmation letter

The final offer letter (with attachments) should be addressed to the chairman of EMI, John Gildersleeve, and should be either (i) emailed as a signed, letterhead document in pdf form to Simon Borrows, me and copying those cc?d on this email; or (ii) faxed for the attention of Simon Borrows and Peter Bell on 0207 198 7521 and Mark Rawlinson at Freshfields on 0207 108 7105. The letter must be received by 9.00am UK time on Monday 21 May 2007.
The board of EMI will then consider the bids received and, assuming that one or more of the offers received is at a price and on terms which are capable of recommendation by the board, it will select the best offer and proceed to announcement with that party on Tuesday morning.
If you have any queries on this procedure, please call Simon Borrows (07775657595) or me (07788442576).
Regards
Peter Bell


Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 7521
Mob: +44 7788 442 576
Email: pbell@greenhill.com
Website: www.greenhill.com


Greenhill & Co. International LLP (Registered in the UK, no. 300796) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 57 Berkeley Square, London W1J 6ER. Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7500. This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying,


**CONFIDENTIAL**                                **CERB48984**

disclosure or distribution of the material in this e-mail is strictly forbidden.
Greenhill cannot accept liability for any damage suffered as a consequence of
software viruses that this email and/or its attachment(s) may contain and we
advise that you carry out your own virus checks before opening any attachments.

(See attached file: MULBERRY - Antitrust Confirmation.doc)

The information in this e-mail and any attachments is confidential and may be
legally privileged. It is intended solely for the addressee or addressees. If
you are not an intended recipient, please delete the message and any attachments
and notify the sender of misdelivery: any use or disclosure of the contents of
either is unauthorised and may be unlawful. All liability for viruses is
excluded to the fullest extent permitted by law. Any views expressed in this
message are those of the individual sender, except where the sender states them,
with requisite authority, to be those of a specific LAZARD company or
partnership

Lazard & Co., Limited, 50 Stratton Street, London W1J 8LL. Registration Number:
162175  Place of Registration: England

CONFIDENTIAL

CERB48985

A-1234

PRIVILEGED AND CONFIDENTIAL

## PROJECT MULBERRY

### BIDDERS STATEMENT ON MERGER CONTROL APPROVALS

1.1    We confirm that neither [●] nor any of the funds or companies it controls are currently active in either the same businesses as, or any upstream/downstream/related businesses to, those of EMI Group plc (*EMI*). [*If that is not the case, please specify relevant overlaps and/or upstream/downstream/related businesses.*]

For the purposes of this document, "control" has the meaning within the relevant merger control or other legislation and "the businesses of the EMI Group" means any or all of the following: music recording and distribution; music publishing; the granting of licences for online music by the record companies to the providers of online services at the wholesale level; the distribution of online music via the internet to end-consumers at the retail level.

1.2    We, therefore, confirm that the acquisition of EMI by [●] will not give rise to any overlaps or vertical or other issues in relation to any of the businesses of the EMI Group.

1.3    We confirm that the acquisition of EMI by [●] will be subject to mandatory approvals in the following jurisdictions under either the relevant merger control rules and/or foreign direct investment rules and/or other (eg media) relevant rules, as specified below:

    (i)    [●];

    (ii)    [●]; and

    (iii)    [●].

Please specify both the jurisdictions and the relevant rules.

1.4    We expect all of the clearances in the jurisdictions referred to in 1.3 above to be granted in Phase I (or the equivalent).

1.5    More specifically, we expect all the clearances to have been granted within [●] calendar days [from announcement – *discuss: assumption on filing dates*].

1.6    We confirm that neither we, nor any of the funds or companies we control or act in concert with, are (or will be prior to completion of any offer for EMI by us or any person acting in concert with us (an *Offer*)) acting in concert with Warner Music Group Corp. (*Warner*) and that there are (and will be prior to completion of any Offer) no agreements or arrangements regarding any onsale of all or part of EMI to Warner or any of its group (or any other combination of EMI and Warner or any of their businesses) or the management or operation of all or part of EMI by Warner or any of its group.

_____

for and on behalf of [BIDDER]

[●] May 2007

BRU262659/4

CONFIDENTIAL

CERB48986

A-1235

| | |
|---|---|
| **From:** | Alex Wolf <awolf@cerberuscapital.com> |
| **Sent:** | Sunday, May 20, 2007 10:23 AM |
| **To:** | Christopher Holt <cholt@cerberusoperations.com> |
| **Subject:** | Re: EMI status |

Yes - that's fine.  Roger and Helen are up to speed.  We were working yesterday to try and figure out the partnering aspect, which was really the only basis Feinberg left for us to move forward on.

Thanks.

----- Original Message -----
From: Christopher Holt
To: Alex Wolf
Sent: Sun May 20 10:21:33 2007
Subject: Re: EMI status

I should probabaly send a note to the core working group on the Cerberus ops team letting them know that we are on hold for the moment and advising that they should complete any work necessary to position us for fast action, but to pause on anything else.   Also would recommend telling them that you will coordinate directly with roger and helen. Thoughts?

---- Original Message -----
From: Alex Wolf
To: David E. Rosewater (david.rosewater@srz.com) <david.rosewater@srz.com>; Christopher Holt; Ron Risdon (ronald.risdon@srz.com) <ronald.risdon@srz.com>; Nicholas Shott (nicholas.shott@lazard.com) <nicholas.shott@lazard.com>; John Chachas (John.Chachas@lazard.com) <John.Chachas@lazard.com>

Sent: Sun May 20 10:08:08 2007
Subject: FW: EMI status

From: Alex Wolf
Sent: Sun 5/20/2007 10:07 AM
To: Lenard Tessler; Steven Mayer; David Teitelbaum - UK; Frank Bruno
Cc: Kevin Genda; Kevin McLeod; Keith Read
Subject: EMI status

I just spoke with John Gildersleeve (Chairman of the Board of EMI), who had asked that someone from Cerberus to clarify our request to speak with another bidder in the process at this juncture and explain how our status had changed from his discussion with Lenard on Friday.  I explained where we were and why I thought we could be helpful to the process in supporting another party's bid.  After our discussion, he indicated that our position was now quite clear and to be equally clear, the board would not waver from the schedule/timetable they were currently on and that the board does not wish us to speak with anyone until after tomorrow but that at the very least, they would call us tomorrow morning after receiving bids to

CONFIDENTIAL



CERB48999

A-1236

indicate to us which party they thought it would be most productive for us to contact. He was fairly cordial (especially given the circumstances) and thanked us for our participation in the process.

Barring an 11th-hour solution today on an equity co-investment/bridge from one of the banks (as has been discussed with Merrill and DB yesterday), I think we are shut down for now and will await further instruction from Greenhill tomorrow AM. I will relay to the attorneys/advisors.

AW

CONFIDENTIAL

CERB49000

From: John Gildersleeve [GilderJ@cpwplc.com]
Sent: Sunday, May 20, 2007 3:52 PM
To: ashcroftc@emigroup.com; nicolie@emigroup.com; StewartM@emigroup.com; mark.barak@emimusic.com; Simon Borrows; Peter Bell
Subject: Re: TF - Pensions

I have heard from C and they will not participate on Monday and if they do so at a later date it will not be on their own
I told them we will consider there request with regard to F and indeed offers if we thought fit and let them know our views tomorrow. See you in the morning!!!
John

----- Original Message -----
From: Ashcroft, Charles <AshcroftC@emigroup.com>
To: John Gildersleeve; Nicoli, Eric <NicoliE@emigroup.com>; Stewart, Martin <StewartM@emigroup.com>; Barak, Mark <mark.barak@emimusic.com>; sborrows@greenhill.com <sborrows@greenhill.com>; pbell@greenhill.com <pbell@greenhill.com>
Sent: Sun May 20 15:09:05 2007
Subject: TF - Pensions

A much more positive meeting with TF today - its still ongoing, but the atmosphere is altogether more professional and constructive. TF presented very well, and the discussion rapidly focussed on security for the Trustee in the financing structure ("low levered", debt in "low 50s per cent of EV"), not cash funding.

Trustee pressed me in a private session to say the Board would give them "48 - 72 hours window to reach agreement", I said Board would consider any request they put forward, but left them in no doubt that the Board was very unlikely to allow them to delay the process or become the arbiter of the outcome.

Trustee seems to hope that it can reach a "comfort" agreement with TF today.

TF showing no signs of discomfort with the situation, and should be reassured by the focus on security rather than cash funding.

Regards
Charles

---------------------------------------------------------

Music from EMI

This e-mail including any attachments is confidential and may be legally privileged. If you have received it in error please advise the sender immediately by return email and then delete it from your system. The unauthorised use, distribution copying or alteration of this email is strictly forbidden. If you need assistance please contact us on 0 20 7795 7000.

This email is from a unit or subsidiary of EMI Group plc.

Registered Office: 27 Wrights Lane, London W8 5SW

Registered in England No 229231.

GREENHILL_0002209

EXHIBIT
GILDERSLEEVE
17

Confidential

A-1237

This communication together with any attachments transmitted with it ("this E-Mail") is intended only for the use of the addressee and may contain information which is privileged and confidential. If the reader of this E-Mail is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient you are hereby notified that any use, dissemination, forwarding, printing or copying of this E-Mail is strictly prohibited. Addressees should check this E-mail for viruses. The Company makes no representations as regards the absence of viruses in this E-Mail. If you have received this E-Mail in error please notify our IT Service Desk immediately by e-mail at postmaster@cpw.co.uk Please then immediately delete, erase or otherwise destroy this E-Mail and any copies of it.

Any opinions expressed in this E-Mail are those of the author and do not necessarily constitute the views of the Company. Nothing in this E-Mail shall bind the Company in any contract or obligation.

For the purposes of this E-Mail "the Company" means The Carphone Warehouse Group Plc and/or any of its subsidiaries.

Please feel free to visit our website: http:// www.carphonewarehouse.com or http://www.phonehouse.com

The Carphone Warehouse Group Plc (Registered in England No. 3253714) 1 Portal Way, London W3 6RS

A-1238

GREENHILL_0002210

Confidential

To:     Stewart, Martin[StewartM@emigroup.com]; 'pbell@greenhill.com'[pbell@greenhill.com];
'GilderJ@cpwplc.com'[GilderJ@cpwplc.com]; Nicoli, Eric[NicoliE@emigroup.com]; Barak,
Mark[mark.barak@emimusic.com]
Cc:     'sborrows@greenhill.com'[sborrows@greenhill.com]
From:   Ashcroft, Charles
Sent:   Sun 5/20/2007 7:25:10 AM
Importance:   Normal
Sensitivity:  None
Subject:   Re: Conference call at 10.30am

I will be on also.

Peter, I have cancelled the 11am Trustee meeting with C, no doubt you will explain when we speak!

—— Original Message ——
From: Stewart, Martin
To: 'pbell@greenhill.com' <pbell@greenhill.com>; 'GilderJ@cpwplc.com' <GilderJ@cpwplc.com>; Nicoli,
Eric; Stewart, Martin; Barak, Mark; Ashcroft, Charles
Cc: 'sborrows@greenhill.com' <sborrows@greenhill.com>
Sent: Sun May 20 07:51:58 2007
Subject: Re: Conference call at 10.30am

Ok. Eric mark and i will be on.

We can also discuss the process revision for monday.

We have not been able to send mails since lunchtime yesterday so not been able to respond til now.

M

—— Original Message ——
From: Peter Bell <pbell@greenhill.com>
To: GilderJ@cpwplc.com <GilderJ@cpwplc.com>; Nicoli, Eric; Stewart, Martin; Barak, Mark; Ashcroft,
Charles
Cc: Simon Borrows <sborrows@greenhill.com>
Sent: Sat May 19 21:18:34 2007
Subject: Conference call at 10.30am

Due to an important development, we would like to convene a conference call tomorrow at 10.30am.
Dial-in details are set out below
Conf call no.: 020 8 609 0794 or 0800 358 2181
Attendee PIN: 926221#
Peter

Peter Bell
Principal
Greenhill & Co. International LLP
Lansdowne House, 57 Berkeley Square, London W1J 6ER

NOTE NEW ADDRESS & TELEPHONE NUMBERS

Tel: +44 20 7198 7421
Fax: +44 20 7198 5721
Mob: +44 7788 442 576
Email: pbell@greenhill-co.com

EXHIBIT

BORROWS 20

Confidential

TF0000116494

A-1240

Website: www.greenhill-co.com

Greenhill & Co. International LLP (Registered in the UK, no. 300798) ("Greenhill") is regulated by the Financial Services Authority for the conduct of investment business. Registered Office: Lansdowne House, 57 Berkeley Square, London W1J 6ER.Tel: +44 (0)20 7198 7400. Fax: +44 (0)20 7198 7500.

This e-mail may contain confidential and/or privileged information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorised copying, disclosure or distribution of the material in this e-mail is strictly forbidden. Greenhill cannot accept liability for any damage suffered as a consequence of software viruses that this email and/or its attachment(s) may contain and we advise that you carry out your own virus checks before opening any attachments.

Confidential

TF000116495

From: Guy Hands [Guy.Hands@terrafirma.com]
Sent: Sunday, May 20, 2007 11:28 PM
To: Wormsley, David
Subject: RE:

So do I. I need some sleep prior to tomorrow

——Original Message——
From: Wormsley, David [mailto:david.wormsley@citi.com]
Sent: 20 May 2007 22:50
To: Guy Hands
Subject: Re:

A call is going on now. Hope it won't be too long


——Original Message——
From: Guy Hands <Guy.Hands@terrafirma.com>
To: Tabet, Kamal [CMB-GBKG]
CC: Wormsley, David [CMB-GBKG]; Karen Dolenec <karen.dolenec@terrafirma.com>
Sent: Sun May 20 21:53:16 2007
Subject: RE:

Dear Kamal,

We certainly have managed to keep the lawyers tied up all weekend. Karen will be replying on my behalf ASAP.

Best wishes Guy

——Original Message——
From: Tabet, Kamal [mailto:kamal.tabet@citi.com]
Sent: 20 May 2007 21:44
To: Guy Hands
Cc: Wormsley, David ; Karen Dolenec
Subject: Re:

Dear Guy,

I am sorry to hear 2 different renditions but I thought you and I agreed earlier this evening we would try to knock off any outstanding remaining points.

I will call you to discuss further but I believe that both teams have worked very hard through the week-end in good faith so while I share your frustration I believe we should stick to our plan.

Best wishes, Kamal

——Original Message——
From: Guy Hands <Guy.Hands@terrafirma.com>
To: Tabet, Kamal [CMB-GBKG]
CC: Wormsley, David [CMB-GBKG]; Karen Dolenec <karen.dolenec@terrafirma.com>
Sent: Sun May 20 21:27:14 2007
Subject: RE:

Dear Kamel,

This is not what Karen said. We have now gone round in circles on the same economic points for two days and I have tied up our lawyers working with you. At this point I have instructed our lawyers to work with alternative providers and will reply by e mail with our final position once I have discussed in detail the still outstanding points. Most of which were only raised after we originally decided to go with you.

Best Wishes Guy

CITI-TF 00313135

A-1242

——Original Message——
From: Tabet, Kamal [mailto:kamal.tabet@citi.com]
Sent: 20 May 2007 21:19
To: Guy Hands
Subject:

Dear Guy,

I just left you a vm.

I have circled the team and it sounds like they believe there are no outstanding issues, or if there is 1 or 2, they are relatively insignificant and both positions are very close.

Paul Simpkin also told me that Karen told him she did not think there were any real issues left and it is now in your hands (no pun intended).

I can only hope you are hearing similar feedback from your team.

Either way, I am at your disposal to discuss further.

Regards, K

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556.
Registered Office: 2 More London Riverside, London SE1 2AP.. Authorised and regulated by the Financial Services Authority.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556.

CITI-TF 00313136

Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

PLEASE READ: The information contained in this email is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this email you must not copy, distribute or take any further action in reliance on it and you should delete it and notify the sender immediately. Email is not a secure method of communication and Terra Firma Capital Partners Ltd cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). Please examine this email for virus infection, for which Terra Firma Capital Partners Ltd accepts no responsibility. If verification of this email is sought then please request a hard copy. Unless otherwise stated any views or opinions presented are solely those of the author and do not represent those of Terra Firma Capital Partners Ltd. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments. Terra Firma Capital Partners Limited Registered in England no. 04219556. Registered Office: 2 More London Riverside, London SE1 2AP. Authorised and regulated by the Financial Services Authority.

---

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

---

CITI-TF 00313137

A-1245

**To:**     Francois Van Der Spuy[Francois.Van.Der.Spuy@terrafirma.com]; Stephen
Seymour[Stephen.Seymour@terrafirma.com]; Don Hoang[Don.Hoang@terrafirma.com]; Matthew
Hodgkinson[Matthew.Hodgkinson@terrafirma.com]; Trudy Cooke[Trudy.Cooke@terrafirma.com]; Chris
Barnes[Chris.Barnes@terrafirma.com]; Karen Dolenec[karen.dolenec@terrafirma.com]; Tom
Quigley[Tom.Quigley@terrafirma.com]; Michael Slattery[Michael.Slattery@terrafirma.com]; Michael
Hedegaard[Michael.Hedegaard@terrafirma.com]
**Cc:**     TF All Staff & Contractors[TFStaff@terrafirma.com]
**From:**     Riaz Punja
**Sent:**     Tue 5/22/2007 9:37:36 AM
**Importance:**     Normal
**Sensitivity:**     None
**Subject:**     Dice

I would like to personally thank all of you on the achievement on getting a recommended offer on Dice.
When you consider that we got access to the data room and Management on the 10th of May (i.e only 11
days ago) and, given the complexity of this deal, it is an astonishing achievement. It is yet another reason
to be proud of Terra Firma. Special thanks to the core team who I know hardly slept over those 11 days.

Riaz

Confidential

TF0000081360

DRAFT

terra firma

# Memo

| | |
|---|---|
| **To** | The IAC |
| **cc:** | Andrew Chadd |
| **From** | Riaz Punja, Francois van der Spuy, Stephen Seymour, Stephen Alexander, Michael Hedegaard, Don Hoang, Matthew Hodgkinson |
| **Date** | 18 May 2007 |
| **Subject** | Project Dice: Presentation and success fee |

*This memo contains confidential information that must be kept confidential.*

*It also contains information that may be unpublished price sensitive or inside information because securities of the target are listed on the London Stock Exchange. Your attention is drawn to your obligations relating to such information under Part V of the Criminal Justice Act 1993 (the "Act"), the City Code on Takeovers and Mergers and the Listing Rules of the UK Listing Authority in England and Wales. Accordingly, you must not disclose such information or deal in, or encourage others to deal in, the securities of the target or otherwise engage in any activity prohibited by the Act.*

The team recommends proceeding with an offer for Dice plc on the terms set out in the attached presentation.

In addition, the team has negotiated the engagement letter with our financial advisers, Dresdner Kleinwort ("DK"), which contains a success fee arrangement which will entitle DK to receive an amount equal to 0.2% of Dice Enterprise Value or 30% of any break fee paid by Dice to GP2 and GP3.

| Recommendation | IAC Approval/ Rejection | Conditions/Comments |
|---|---|---|
| To recommend to GP 2 and GP 3 to approve (1) proceeding with the offer for Dice plc on the terms set out in the attached presentation and (2) the success fee arrangement with DK outlined above. | Approved | |

Confirmed:

*[signature]*

Member of the Investment Advisory Committee

| | |
|---|---|
| Approved By: *Lorna Kelly* | Approved By: *Lorna Kelly* |
| For and on behalf of Terra Firma Investments (GP) 2 Limited | For and on behalf of Terra Firma Investments (GP) 3 Limited |

Lorna Kelly as
Alternate to Iain Stokes
Director

Lorna Kelly as
Alternate to Iain Stokes
Director

Page 1 of 1

EXHIBIT
CHADD
12
07-23-10  CM

Confidential

TF0000754201

Draft [18 May 2007]

**Terra Firma Investments (GP) 2 Limited**

(registered in Guernsey with registration number 39257) (the "Company")

Minutes of a meeting of the Board of Directors of the Company held at The Old Government House Hotel, St Peter Port, Guernsey on Friday 18 May 2007 at 8:00 a.m.

| Present: | Guy Hands |
| | John Loveridge |
| | Lorna Kelly | as alternate Director to Iain Stokes |
| In attendance: | Tom Becker | representing Mourant Guernsey Limited |
| | William Burnand | representing Terra Firma Capital Partners Limited |
| | Henry Ford | representing Terra Firma Capital Partners Limited |
| | Riaz Punja | representing Terra Firma Capital Partners Limited by telephone |
| | Tim Pryce | representing Terra Firma Capital Partners Limited |
| | Kirsten Randell | representing Terra Firma Capital Partners Limited |
| | Michael Slattery | representing Terra Firma Capital Partners Limited by telephone |
| Apologies: | Nigel Carey |
| | Fraser Duncan |

**1    Chairman, Directors and Quorum**

1.1    IT WAS RESOLVED that Mr Loveridge be appointed Chairman of the meeting.

1.2    The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, in accordance with the Company's Articles of Association. It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

**2    Declaration of Interests**

2.1    Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Company's Articles of Association, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

**3    Capacity**

3.1    It was noted that in transacting business at this meeting in connection with Project Dice, Project Wellington and Project Kildare (as defined below), the Company was acting in its capacity as general partner of each of Terra Firma Capital Partners II, L.P.-A; Terra Firma Capital Partners II, L.P.-B; Terra Firma Capital Partners II, L.P.-C; Terra Firma Capital Partners II, L.P.-D; Terra Firma Capital Partners II, L.P.-E; and Terra Firma Capital Partners II, L.P.-F (the "Partnerships") and that accordingly any resolutions of the Board in connection with Project Dice, Project Wellington and Project Kildare were being taken on behalf of each of the Partnerships and that any reference in connection with Project Dice,

Terra Firma Investments (GP) 2 Limited 18 May 2007                                                     1

Confidential

TF0001666819



EXHIBIT
PRYCE
9
072210JW

Project Wellington and Project Kildare to the Fund or the TFCP II Fund shall mean all of these partnerships acting together.

3.2    It was further noted that in transacting any business at this meeting in connection with Project Phantom (as defined below), the Company was acting in its capacity as (a) general partner of each of the Partnerships and TFCPII Co-Investment 4, L.P. (the "Co-Investment Partnership") and (b) nominee on behalf of certain Adam Street entities (the "AS Entities") and that accordingly any resolutions of the Board in relation to Project Phantom were being taken on behalf of each of the Partnerships, the Co-Investment Partnership and the AS Entities and that any reference in connection with Project Phantom to the Fund or the TFCPII Fund shall mean all of these Partnerships acting together.

4    Project Dice

4.1    The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, approve:

(a)    the terms of the proposed acquisition by Maltby Limited ("BidCo") of all of the issued and to be issued share capital of the company codenamed Dice Group plc (the "Target" or "Dice") by way of a scheme of arrangement in accordance with section 425 of the Companies Act 1985 (the "Scheme") or a takeover offer under section 974 of the Companies Act 2006 (if for any reason it is decided that the Scheme would be an inappropriate way of effecting the proposed acquisition) (Project Dice). Pursuant to the Scheme, there would be a cancellation of all of the issued ordinary shares of 14 pence each in the capital of the Target (the "Target Ordinary Shares") and the subsequent issue of new ordinary shares in the Target to BidCo as contemplated by the Press Announcement (as defined below). It was reported that Dresdner Kleinwort (the "Financial Adviser") would act as financial adviser to BidCo. It was further reported that the Scheme may offer Target shareholders the opportunity to accept a loan note alternative ("Loan Note Alternative") in BidCo;

(b)    the investment structure for Project Dice; and

(c)    the terms of the interim debt financing arrangements for Project Dice including the interim facility agreement between BidCo and the institutions providing interim debt facilities to BidCo for Project Dice.

5    Documents produced to the meeting

5.1    The following documents were produced to the meeting:

Investment documents

(a)    the Project Dice Investment Advisory Committee Meeting presentations dated 18 May 2007 prepared by the investment advisory committee of Terra Firma Capital Partners Limited ("TFCPL") (the "Investment Committee Presentation"); and

(b)    the recommendation of the Investment Advisory Committee of TFCPL dated 18 May 2007 (the "Investment Committee Recommendation");

Investment structure

(c)    a draft paper dated 16 May 2007 setting out the proposed steps for the implementation of Project Dice as prepared by KPMG (the Steps Paper);

Scheme documents

Terra Firma Investments (GP) 2 Limited 18 May 2007                                                    2

Confidential

(d)     the most recent draft of the press announcement containing, inter alia, details of the Scheme and setting out the principal terms and conditions of the proposed offer (the "Press Announcement");

(e)     the most recent draft of the letter from the Company and Terra Firma Investments (GP) 3 Limited to the Target setting out the terms of a potential offer for the entire issued and to be issued share capital of the Target, to be made subject to the conditions contained therein ("Offer Letter");

(f)     a form of responsibility letter to be signed by each of the Directors authorising, inter alia, the issue by or on behalf of BidCo, in connection with the Scheme, of any document or advertisement approved by the Board or any duly authorised committee thereof with the inclusion in such document or advertisement of a responsibility statement, either in the form set out in the letter ("Directors' Responsibility Letters");

(g)     the most recent draft of an implementation agreement, including provision of an inducement fee, whereby the Target would agree to pay the Company an inducement fee of up to £24 million, in the event that BidCo's offer fails due to the successful completion of a competing offer to that proposed by BidCo and otherwise relating to the parties' various obligations in connection with the implementation of the Scheme ("Implementation Agreement")

(h)     a draft letter of undertaking from the Company acting for itself and as general partner of the TFCPII Fund to the Financial Adviser in relation to the provision of finance to BidCo for the purpose of Project Dice ("Cash Confirmation Letter 1");

(i)     a draft letter of undertaking from the Company acting for itself and for and on behalf of the TFCPII Fund to BidCo in relation to the provision of finance to BidCo for the purpose of Project Dice ("Cash Confirmation Letter 2"), Cash Confirmation Letter 1 and Cash Confirmation Letter 2 together being the "Cash Confirmation Letters";

(j)     a draft form of opinion to be issued by Linklaters to the Financial Adviser in connection with Project Dice (the "Linklaters Opinion");

(k)     a draft form of an opinion to be issued by Carey Olsen to the Financial Adviser in connection with Project Dice (the "Guernsey Opinion");

(l)     a draft form of the certificates to be issued to Linklaters and Carey Olsen respectively (the "Certificates");

**Debt documents**

(m)     the most recent draft of the Interim Facilities Agreement, whereby the banks ("Banks") would provide facilities in the aggregate sum of up to £2,500,000,000 ("Interim Facilities Agreement");

(n)     various side letters including the Fees Letter and Commitment Letter; and

(o)     the most recent draft of the term sheet for the Senior, Securitisation Bridge, High Yield Bridge and the Loan Note Term Sheet ("Term Sheet").

6       **Investment Approval**

6.1     The Directors reviewed the Investment Committee Presentations and the Investment Committee Recommendation.   The Chairman noted that the Investment Committee Presentations outlined the risks, issues, financial projections and the proposed structure of

Terra Firma Investments (GP) 2 Limited 18 May 2007                                        3

Confidential                                                              TF0001666821

A-1250

Project Dice and sought Investment Committee approval for a price of up to £2.65 per Target Ordinary Share.

6.2     Mr Punja then reported in detail to the meeting in relation to the documents tabled at the meeting and referred to in paragraph 6.1 above, noting in particular the timing issues involved with the Scheme, and especially the need for Dice to announce its preliminary results for the financial year ended 31 March 2007 (the "Dice Announcement") ahead of being able to make any representations to potential purchasers.

6.3     The Directors discussed extensively the timing of the Dice Announcement in relation to the proposed Scheme and noted that Dice could bring forward the release of the Dice Announcement from Wednesday 23 May 2007 to Monday 21 May 2007 to be in a position to support a potential purchaser immediately thereafter.

6.4     The Directors further discussed access to the Dice pension scheme, and specifically whether Dice would be giving potential purchasers access, or whether potential purchasers would be expected to take a view on the value of this item without access.

6.5     The Directors noted that TFCPL would be well placed to advise them on the pension scheme should no access be given and the Directors agreed that should other purchasers be given access that TFCPL should also request access, however should no access be given to any potential purchaser then TFCPL should take a view on the value of this item and make a recommendation to the Directors, rather than press Dice for access.

6.6     It was noted that the Investment Committee Initial Recommendation had resolved to recommend a price of up to £2.65 per Target Ordinary Share.

6.7     The Directors discussed the information reported to the meeting and noted that all of the required investment criteria had been met. Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 6.1.

6.8     The Directors discussed whether after the release of the Press Announcement, BidCo should contemplate any market purchases of Target Shares. It was noted that BidCo was currently negotiating with Dresdner to provide a market purchase facility for this purpose And failing satisfactory agreement with them on terms then the Company would propose using its equity bridge with HBOS for this purpose. It was further noted that the Company would not in any event be a party to any market purchase facility agreement. These proposals were considered by the meeting and it was unanimously resolved that market purchases of Target Shares by BidCo may be made.

6.9     It was reported to the meeting that the Company had instructed a number of due diligence providers to review the Target and that the findings of their reports had been summarised in the Investment Committee Presentation. It was noted that final copies of each of the reports set out in the Investment Committee Presentation were being addressed and sent to the Company. It was noted that each of the Reports would also be addressed to the Banks and that reliance letters would be given by each of the Report providers to the Partnerships in accordance with the terms of the Interim Facilities Agreement.

6.10    After due consideration, IT WAS UNANIMOUSLY RESOLVED that Project Dice be and is hereby approved and the investment in relation to Project Dice be and is hereby approved at a price of up to £2.65 per Target Ordinary Share or such lesser sum as may be negotiated.

7       Structure

Terra Firma Investments (GP) 2 Limited 18 May 2007                                                    4

Confidential                                                                                    TF0001666822

7.1 The Directors discussed the proposed structure to effect Project Dice as set out in the Steps Paper.

7.2 It was noted that the structure was very similar to that adopted on the Clover transaction. The recommended structure utilised LuxCo as the top holding company. The acquisition of shares in the Target would be made by BidCo, which was in turn wholly-owned by Maltby Investments Limited, which was in turn wholly-owned by Maltby Holdings Limited, which was in turn wholly-owned by LuxCo. The structure would be capitalised using a combination of ordinary shares, preference shares and PIK notes, and CPECs and PECs for the Luxco. It was further noted that this was a cross-fund transaction ie to be made in conjunction with Terra Firma Capital Partners III, L.P. ("TFCP III"), and that TFCP III would invest in Maltby Holdings Limited via its wholly owned Luxco, or alternatively invest in the same top Luxco as TFCP II.

7.3 It was further noted that the acquisition structure had already been established under Carmel Capital V Sarl ("CCV"), which was currently wholly owned by the Company. It was proposed that all 12,500 of the issued €1 shares of CCV be sold at par value to Terra Firma Investments (GP) 3 Limited as general partner of TFCP III with effect as of today.

7.4 Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 7.1.

7.5 After due consideration, it was unanimously resolved that the structure set out in the Steps Paper be and is hereby approved, and that the sale of the shares of CCV be approved. It was further resolved that any Director of the Company be and is hereby authorised to do, sign or execute and deliver any act, thing, deed or document which they may consider necessary in connection with the sale.

8    Scheme

8.1 The Directors discussed the way in which Project Dice would be implemented and carefully considered the Offer Letter, the Press Announcement and the Implementation Agreement. It was reported that the intention was to sign the Implementation Agreement shortly prior to releasing the Press Announcement. The Scheme documents would then be finalised and posted to Dice shareholders not more than 28 days thereafter.

8.2 The terms of the Offer Letter were then considered in detail. It was noted that the potential offer would be conditional upon:

(a) no material new information having been disclosed to TFCPL or its professional advisers since noon on Friday 18 May 2007; and

(b) unanimous recommendation from the board of Directors of the Target;

(c) entry into irrevocable undertakings by each of the board of Directors of the Target; and

(d) the Target entering into the Implementation Agreement.

8.3 In relation to the Press Announcement, the attention of the Directors was drawn to the provisions of the City Code on Takeovers and Mergers (the "Code") and in particular it was noted that:

(a) Rule 2.5(a) of the Code provides that its publication should only be made if the company has every reasons to believe that it can and will continue to be able to implement the offer;

Terra Firma Investments (GP) 2 Limited 18 May 2007

5

TF0001666823

(b)     Rule 2.7 of the Code provides that following publication of the Press Announcement the company must, save in exceptional circumstances approved by the Takeover Panel (the "Panel"), proceed with the offer; and

(c)     Rule 19.1 that states that "Each document or advertisement issued or statement made during the course of an offer must, as is the case with a prospectus, satisfy the highest standards of accuracy and the information given must be adequately and fairly presented."

8.4     It was also noted that the Press Announcement contained all of the information required by Rule 2.5(b) of the Code, save only for information regarding:

(a)     the interests (if any) in Target shares of any member of BidCo's group or any of their Directors deemed to be acting in concert with it for the purpose of the Code; and

(b)     arrangements (if any) in respect of Target Shares entered into by any member of BidCo's group deemed to be an associate of the Company for the purposes of the Code,

where, in each case, it was considered impracticable, for security reasons, to make appropriate enquiries prior to release of the Press Announcement.

8.5     The Press Announcement was considered carefully and particular attention was directed to the following matters:

(a)     the section entitled "Summary";

(b)     that the Company has given assurances to the Board of Dice that the existing rights of employees of Dice will be fully safeguarded;

(c)     that the Company has agreed that appropriate proposals will be made to holders of options under the Dice share schemes and convertible bonds in due course; and

(d)     the terms and conditions set out in Appendix I to the Press Announcement.

Unless otherwise defined in theses minutes, capitalised terms used in this section 8.5 have the meaning given to them in the Press Announcement.

8.6     With regard to the Responsibility Letters, it was explained that the Code required all documents and advertisements issued in connection with the offer to contain a responsibility statement by the Directors of BidCo and those Directors who were the decision makers for the proposed transaction. Each of the Directors of the Company would be required to take responsibility, in the prescribed form, for the Press Announcement and, once finalised, the Scheme documents.

8.7     By reference to the Memorandum on Directors' Responsibilities which was produced to the meeting each of the Directors were reminded of their responsibilities and obligations in relation to the Offer.

8.8     It was noted that the purpose of the Scheme was to enable BidCo to acquire the whole of the issued and to be issued share capital of the Target. Under the terms of the Scheme (and upon the Scheme becoming effective), there would be a cancellation of all of the Target Ordinary Shares and the subsequent issue of new ordinary shares in the Target to BidCo (with the Target thereby becoming a wholly-owned subsidiary of BidCo), and within 14 days of the Scheme becoming effective, existing holders of Target Ordinary Shares will receive (from BidCo) the prices per share approved in paragraph 6.7 above ("Closing").

8.9     It was reported to the meeting that the Dice Board had expressed their concern that many of the individual UK shareholders of Dice may desire a loan note alternative. It was noted that in accordance with market practice, any such loan note alternative would be backed by

Confidential

a guarantee to be issued as part of the Interim Facilities Agreement. It was reported that the terms of documents were still being negotiated but that drafts (in agreed form) would be agreed before posting of the Scheme documents. It was also noted that, for tax reasons, Dice Shares in respect of which any loan note alternative had been elected would be transferred to BidCo) rather than cancelled and reissued) and that stamp duty at 0.5 per cent. would accordingly be payable on such transfers.

8.10 It was noted that to become effective, the Scheme required, amongst other things:

(a) approval by a simple majority in number of the existing holders of Target Ordinary Shares, and three-fourths in value of the shares held by the existing holders of Target Ordinary Shares, present and voting in person or by proxy at the meeting(s) ordered by the Court at which the Target shareholders will be given an opportunity to consider, and if deemed fit, approve the Scheme;

(b) the passing of a special resolution of the Target to approve the Scheme, cancel the existing shares of the Target, increase the authorised share capital of the Target (if necessary), allot and issue new shares in the Target to BidCo, and amend the articles of association of the Target;

(c) satisfaction or waiver of the conditions set out in the Scheme documents (these conditions will need to be satisfied or waived before the Scheme becomes effective); and

(d) sanction of the Court.

8.11 It was noted that the Scheme is expected to become effective by the end August 2007, and unless the Scheme becomes effective by a long stop date to be agreed with the Dice Board or such later date as the Target and BidCo may agree and the Court may allow, the Scheme will not become effective and the Scheme will not proceed.

8.12 After due consideration, IT WAS UNANIMOUSLY RESOLVED that:

(a) the implementation of Project Dice by way of the Scheme be and is hereby approved;

(b) each of the documents tabled and referred to in paragraph 8.1 be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (c) below; and

(c) any two Directors of the Company or their duly appointed alternates or representatives be and are hereby authorised to agree any changes which they consider may be necessary or expedient to the documents referred to in paragraph (b) above.

9 Concert Party Analysis

9.1 It was reported to the meeting that the Panel had been consulted on the Clover transaction on which entities in the TFCP II Fund structure would be considered concert parties or associates of BidCo.

9.2 It was noted that BidCo would be required, following its Press Announcement, to notify such parties that they were not permitted to acquire shares in Target, and that steps were being taken to ensure those notifications were sent.

10 Cash Confirmation and Equity Subordinated Finance

10.1 The Directors carefully considered the Cash Confirmation Letters, the Linklaters Certificate, the Linklaters Opinion, the Guernsey Certificate and the Guernsey Opinion. It was reported that documentation was substantially in the same form as the Cash Confirmation pack issued on the Clover transaction.

Terra Firma Investments (GP) 2 Limited 18 May 2007

7

Confidential

TF0001666825

10.2    Since Project Dice is to be effected by means of the Scheme (which is subject to the Code), it is a requirement that the Financial Adviser provide letters to the Panel confirming that BidCo will have sufficient cash available to it to satisfy the consideration due under the Scheme (the Cash Confirmation Letters).

10.3    The Directors carefully considered the terms of the Cash Confirmation Letters.

10.4    Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraphs 10.1 – 10.3 above.

10.5    After due consideration, it was unanimously resolved that the drawdown of up to [ ] under the Interim Facilities Agreement by Maltby Limited in accordance with the Steps Paper be and are hereby approved.

**Cash confirmations**

10.6    It was noted that Linklaters and Carey Olsen, as English and Guernsey legal advisers, respectively, to the Partnerships and the Company, would provide respectively the Linklaters Opinion and the Guernsey Opinion to the Financial Adviser in relation to the capacity and powers of the Partnerships and the Company to enter into and perform the documents referred to in paragraph 10.1 above, and the power of the Company to call for cash from the limited partners of the Partnerships in connection with Project Dice. In order to enable Linklaters and Carey Olsen to provide respectively the Linklaters Opinion and the Guernsey Opinion, and to provide comfort to the Financial Adviser as to certain factual matters relevant to such opinions and the Cash Confirmation Statement, the Company would sign the Certificates and the Cash Confirmation Letters to confirm some factual matters, including the identity and commitments of limited partners in the Partnerships and that Project Dice is within the investment objectives of the Partnerships and does not fall within any of the 'excuse' provisions negotiated with certain limited partners.

10.7    In connection with the Cash Confirmation Letters, the Directors considered the Private Placement Memorandum in relation to the Partnerships dated October 2001 (as since updated) and in particular Section 3 ("Investment Strategy"). The Directors (noting the advice received from TFCPL) confirmed that they were of the belief that Project Dice is consistent with the investment strategy and conditions set out therein. The Directors considered the investment limitations set out in clause 4.7 of each of the Partnership Agreements. The Directors confirmed that they were of the belief that these limitations will not be infringed in relation to Project Dice.

10.8    It was noted that the total investment of the Partnerships in Project Dice would be approximately £[*]. As at today's date, Total Partnership Commitments amounted to €1,936 million and the amount available for drawdown as €799 million. The Directors noted that Project Dice would not exceed 30% of Total Partnership Commitments which can be invested in a single Portfolio Company or group of Portfolio Companies. The Directors confirmed that Project Dice was therefore within the investment limitations set out in clause 4.7 of the Partnership Agreements. It was further noted that it was intended to sell down to co-investors post transaction in order to reduce the concentration level to below 20%.

10.9    It was further noted that, although Project Dice involves the acquisition of publicly quoted securities, this acquisition was with a view to obtaining control of the target company, and is therefore permitted under clause 4.7.3 of the Partnership Agreements. It was also noted that the principal place of business of the target group is in the UK, and therefore the restriction in clause 4.7.5 of the Partnerships Agreement will not apply.

Confidential                                                                TF0001666826

10.10 The contents of the various side letters entered into with limited partners were noted, insofar as they contained restrictions on the types of investment in relation to which limited partners may be required to advance funds to the Partnerships. The Directors confirmed that to the best of their knowledge, and based on advice received from TFCPL, none of such restrictions applied to Project Dice, and that neither TFCPL nor the Company had been advised by any limited partner that by reason of a change of law they would be entitled to rely on the 'excuse' provisions in clause 3.9 of the Partnership Agreements.

10.11 It was noted that the Company would be undertaking to provide Bidco with £24 million of equity funding, and it was envisaged this would be provided to Bidco via the intermediate holding entities consistent with the Steps Paper.

10.12 It was noted that BidCo would enter into a letter agreement with the Financial Adviser in order to give the Financial Adviser the confirmation that they required to give the Cash Confirmation Letters.

10.13 Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 10.1.

10.14 After due consideration, IT WAS UNANIMOUSLY RESOLVED that:

(a) the Certificates and the Cash Confirmation Letters be and are hereby approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (b) below;

(b) any two Directors of the Company or their respective duly appointed alternates or representatives be and are hereby authorised to agree any changes which they consider may be necessary or expedient to the documents referred to in paragraph (a) above;

(c) any two Directors of the Company or their respective duly appointed alternates or representatives or any one of them and the Company Secretary be and are hereby authorised to execute the Certificates and the Cash Confirmation Letters as the Company's deed in their personal capacity and in their capacity as, and in the name of, the Company as general partner of the TFCPII Fund, in each case in the form produced to the meeting or with such amendments as may be agreed pursuant to paragraph (b) above; and

(d) any Director of the Company be and is hereby authorised to do, sign or execute and deliver any act, thing, deed or document which they may consider necessary in connection with such documents.

11 Bank/Financing

11.1 It was reported to the meeting that discussions were underway with Citigroup, Barclays and Deutsche Bank (Banks) regarding the provision of finance for the propose offer. The Directors noted that currently Citigroup had 100% credit committee approval to finance 100% of the transaction and that it was waiting to hear back from the other two banks. The senior debt facilities proposed were up to £2,500,000,000 under the Interim Facilities Agreement which would be entered into with BidCo. The terms of the Interim Facilities Agreement were considered by the meeting. It was reported that the terms of those facilities were still being negotiated but that prior to release of the Press Announcement, the Interim Facilities Agreement and the various side letters would all be executed by BidCo and its holding company. It was reported that the Company was not party to any of those banking agreements.

11.2 It was reported to the meeting that the Interim Facilities Agreement was in a form sufficient to satisfy the "certain funds" requirements of a Code offer.

Terra Firma Investments (GP) 2 Limited 18 May 2007                                    9

11.3 It was noted that BidCo would be looking to execute a permanent re-financing of these interim debt facilities prior to the expiry of the Interim Facilities Agreement and that the Term Sheet relating to the proposed terms of those permanent re-financings was currently being negotiated with the Banks.

**12    General**

12.1    It was resolved that:

(a)    a committee of the Board of the Company should be formed to consider any further matters required to be considered by the Board in connection with Project Dice and that this committee should consist of any two Guernsey based Directors;

(b)    any Director of the Company or his respective duly appointed alternate or representative (or in the case of any deed, any two of them or any one of them and the Company Secretary) be and is hereby authorised to enter into such further documents as may be necessary or expedient in connection with Project Dice and/or the matters set out in the tabled documents;

(c)    any Director of the Company or his respective duly appointed alternate or representative (or in the case of any deed, any two of them or any one of them and the Company Secretary) be and is hereby authorised to do all things, sign or execute and deliver any act, thing, deed or document on behalf of and in the name of the Company as general partner of the TFCPII Fund which they consider to be necessary or expedient for the Company as general partner of the TFCPII Fund to perform its obligations in connection with Project Dice and/or under any of the tabled documents and all the documents contained or referred to therein including without limitation:

(i)    to submit or authorise the submission on behalf of the Company as general partner of the TFCPII Fund any and all applications, filings, notifications or other submissions for anti trust, merger control, trade, regulatory and foreign investment clearances and consents;

(ii)    to seek all other third party consents and licences which may be necessary or expedient in connection with such matters; and

(iii)    to execute any power of attorney or other authority permitting the attorney or agent to act with full power and authority in the Company's name to do all or any of those acts.

**13    Project Wellington**

13.1    The Chairman reminded the Board that it had previously approved a budget of £5m in connection with Project Wellington, being the acquisition of the entire issued and to be issued share capital of the company code named Wellington plc ("Project Wellington"), subject to the receipt of a detailed analysis and recommendation from the Investment Advisory Committee of TFCPL.

13.2    The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, approve the detailed analysis and recommendation from the Investment Advisory Committee of TFCPL in connection with the Project Wellington budget.

**14    Documents Produced to the Meeting**

14.1    The following documents (the "Project Wellington Documents") were produced to the meeting:

Terra Firma Investments (GP) 2 Limited 18 May 2007                                              10

(a)     the recommendation of the Investment Advisory Committee of TFCPL dated 19 April 2007 (the "Project Wellington Budget Request"); and

(b)     the recommendation of the Investment Advisory Committee of TFCPL dated 10 May 2007 (the "Project Wellington Expenses Incurred").

**15      Investment Approval**

15.1    The Directors noted the content of the Project Wellington Documents and noted that expenses incurred were considerably less than the £5m budget previously approved by the Board and after due consideration, IT WAS RESOLVED that the Project Wellington Budget Request and Project Wellington Expenses Incurred be and are hereby approved.

**16      Project Kildare**

16.1    The Chairman reported that the purpose of this section of the meeting was to receive an update on progress from the Company's investment adviser, TFCPL in connection with the acquisition of twenty six UK hospitals from BUPA ("Project Kildare").

16.2    The Chairman further noted that the submission of an indication of interest, subject to due diligence, at a level of £1.55bln and a budget of £100k had previously been approved in connection with Project Kildare.

**17      Documents Produced to the Meeting**

17.1    The following documents (the "Project Kildare Documents") were produced to the meeting:

(a)     the recommendation of the Investment Advisory Committee of TFCPL dated 30 April 2007 (the "Project Kildare Investment Committee Recommendation"); and

(b)     the presentation to the Investment Advisory Committee of TFCPL dated 2 May 2007 (the "Project Kildare Presentation").

**18      Investment Update**

18.1    The Directors reviewed the Project Kildare Investment Committee Recommendation and Project Kildare Presentation. The Chairman noted that the Project Kildare Presentation outlined the risks, issues and financial projections for Project Kildare and, together with the Project Kildare Investment Committee Recommendation recommended the submission of an indication of interest, subject to due diligence, at a level of £1.55bln and a budget of £100k, as previously approved.

18.2    Mr Pryce advised that Mr Burns, who was due to present the Project Kildare Presentation to the Board, was currently flying back to the UK and would be unable to attend the meeting. Mr Pryce therefore suggested that the Directors consider the Project Kildare Presentation at their leisure and provide any comments to Mr Burns in due course.

**19      HSR Filings in relation to Project Phantom**

19.1    Mr Burnand advised that the Company was required to file HSR Notifications and Report Forms in connection with the acquisition by AWAS Aviation Capital Limited of Pegasus Aviation Finance Company ("Project Phantom") as well as for the buy-in to Carmel Capital by TFCP III (the "HSR Notifications and Report Forms"). Mr Burnand further advised that the Company was also required to make payments totalling US$280,000 in connection with these filings (the "Filing Fees").

19.2    The HSR Notifications and Report Forms were produced to the meeting and the Directors noted that these were still in draft form, to be reviewed by TFCPL on their behalf.

Terra Firma Investments (GP) 2 Limited 18 May 2007

11

Confidential

TF0001666829

19.3    The Directors considered the HSR Notifications and Report Forms and after due consideration IT WAS RESOLVED that:

(a)    the HSR Notifications and Report Forms be approved in the form produced to the meeting or with such amendments as may be recommended by TFCPL and approved pursuant to paragraph (b) below;

(b)    any Director of the Company or his duly appointed alternate or representative be and is hereby authorised to agree any amendments to the HSR Notifications and Report Forms which they consider may be necessary or expedient following review by TFCPL; and

(c)    the payment of the Filing Fees be and is hereby approved.

20    Any Other Business

21    Previous Minutes

21.1    The Chairman tabled the minutes of a meeting held on 3 May 2007, relating to Project Phantom and which would be required to support the HSR Notifications and Report Forms.

21.2    After due consideration IT WAS RESOLVED that those minutes be and are hereby approved, subject to minor typographical amendments, that the Chairman sign those minutes and that the Company Secretary enter them into the minute book of the Company.

20.1    There being no further business, the Chairman declared the meeting closed

.............................

Chairman

Terra Firma Investments (GP) 2 Limited 18 May 2007                                          12

Confidential                                                                      TF0001666830

**Terra Firma Investments (GP) 3 Limited**

(registered in Guernsey with registration number 43846) (the "Company")

Minutes of a meeting of the Board of Directors of the Company held at The Old Government House Hotel, St Peter Port, Guernsey on Friday 18 May 2007 at 8:30 a.m.

| Present: | Guy Hands | |
| | John Loveridge | |
| | Lorna Kelly | as alternate Director to Iain Stokes |
| | | |
| In attendance: | Tom Becker | representing Mourant Guernsey Limited |
| | William Burnand | representing Terra Firma Capital Partners Limited |
| | Henry Ford | representing Terra Firma Capital Partners Limited |
| | Riaz Punja | representing Terra Firma Capital Partners Limited by telephone |
| | | |
| | Tim Pryce | representing Terra Firma Capital Partners Limited |
| | Kirsten Randell | representing Terra Firma Capital Partners Limited |
| | Michael Slattery | representing Terra Firma Capital Partners Limited by telephone |
| | | |
| Apologies: | Nigel Carey | |
| | Fraser Duncan | |

**1    Chairman, Directors and Quorum**

1.1    IT WAS RESOLVED that Mr Loveridge be appointed Chairman of the meeting.

1.2    The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, in accordance with the Articles of Association of the Company (the "Articles"). It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

**2    Declaration of Interests**

2.1    Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Articles, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

**3    Capacity**

3.1    It was noted that unless otherwise stated, in transacting any business at this meeting, the Company was acting as general partner on behalf of Terra Firma Capital Partners III, L.P. (the "Partnership") and that accordingly any resolutions of the Board were being taken on behalf of the Partnership and that any reference herein to the "Fund" or the "TFCP III Fund" shall mean the Partnership

**4    Purpose of the meeting**

4.1    The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, approve:

Terra Firma Investments (GP) 3 Limited 18 May 2007



EXHIBIT
PRYCE
10
0722107JW

(a) the terms of the proposed acquisition by Maltby Limited ("BidCo") of all of the issued and to be issued share capital of the company codenamed Dice Group plc (the "Target" or "Dice") by way of a scheme of arrangement in accordance with section 425 of the Companies Act 1985 (the "Scheme") or a takeover offer under section 974 of the Companies Act 2006 (if for any reason it is decided that the Scheme would be an inappropriate way of effecting the proposed acquisition) (Project Dice).    Pursuant to the Scheme, there would be a cancellation of all of the issued ordinary shares of 14 pence each in the capital of the Target (the "Target Ordinary Shares") and the subsequent issue of new ordinary shares in the Target to BidCo as contemplated by the Press Announcement (as defined below).    It was reported that Dresdner Kleinwort (the "Financial Adviser") would act as financial adviser to BidCo.  It was further reported that the Scheme may offer Target shareholders the opportunity to accept a loan note alternative ("Loan Note Alternative") in BidCo;

(b) the investment structure for Project Dice; and

(c) the terms of the interim debt financing arrangements for Project Dice including the interim facility agreement between BidCo and the institutions providing interim debt facilities to BidCo for Project Dice.

5    Documents produced to the meeting

5.1    The following documents were produced to the meeting:

**Investment Documents**

(a) the Project Dice Investment Advisory Committee Meeting presentations dated 18 May 2007 prepared by the investment advisory committee of Terra Firma Capital Partners Limited ("TFCPL") (the "Investment Committee Presentation"); and

(b) the recommendation of the Investment Advisory Committee of TFCPL dated 18 May 2007 (the "Investment Committee Recommendation");

**Investment structure**

(c) a draft paper dated 16 May 2007 setting out the proposed steps for the implementation of Project Dice as prepared by KPMG (the Steps Paper);

**Scheme documents**

(d) the most recent draft of the press announcement containing, inter alia, details of the Scheme and setting out the principal terms and conditions of the proposed offer (the "Press Announcement");

(e) the most recent draft of the letter from the Company and Terra Firma Investments (GP) 2 Limited to the Target setting out the terms of a potential offer for the entire issued and to be issued share capital of the Target, to be made subject to the conditions contained therein ("Offer Letter");

(f) a form of responsibility letter to be signed by each of the Directors authorising, inter alia, the issue by or on behalf of BidCo, in connection with the Scheme, of any document or advertisement approved by the Board or any duly authorised committee thereof with the inclusion in such document or advertisement of a responsibility statement, either in the form set out in the letter ("Directors' Responsibility Letters");

(g) the most recent draft of an implementation agreement, including provision of an inducement fee, whereby the Target would agree to pay the Company an inducement fee of up to £24 million, in the event that BidCo's offer fails due to the successful completion of

a competing offer to that proposed by BidCo and otherwise relating to the parties' various obligations in connection with the implementation of the Scheme ("Implementation Agreement")

(h)    a draft letter of undertaking from the Company acting for itself and as general partner of the TFCPIII Fund to the Financial Adviser in relation to the provision of finance to BidCo for the purpose of Project Dice ("Cash Confirmation Letter 1");

(i)    a draft letter of undertaking from the Company acting for itself and for and on behalf of the TFCPIII Fund to BidCo in relation to the provision of finance to BidCo for the purpose of Project Dice ("Cash Confirmation Letter 2", Cash Confirmation Letter 1 and Cash Confirmation Letter 2 together being the "Cash Confirmation Letters");

(j)    a draft form of an opinion to be issued by Carey Olsen to the Financial Adviser in connection with Project Dice (the "Guernsey Opinion");

(k)    a draft form of the certificate to be issued to Carey Olsen (the "Certificate");

**Debt documents**

(l)    the most recent draft of the Interim Facilities Agreement, whereby the banks ("Banks") would provide facilities in the aggregate sum of up to £2,600,000,000 ("Interim Facilities Agreement");

(m)    various side letters including the Fees Letter and Commitment Letter; and

(n)    the most recent draft of the term sheet for the Senior, Securitisation Bridge, High Yield Bridge and the Loan Note Term Sheet ("Term Sheet").

6    **Investment Approval**

6.1    The Directors reviewed the Investment Committee Presentations and the Investment Committee Recommendation. The Chairman noted that the Investment Committee Presentations outlined the risks, issues, financial projections and the proposed structure of Project Dice and sought Investment Committee approval for a price of up to £2.65 per Target Ordinary Share.

6.2    Mr Punja then reported in detail to the meeting in relation to the documents tabled at the meeting and referred to in paragraph 6.1 above, noting in particular the timing issues involved with the Scheme, and especially the need for Dice to announce its preliminary results for the financial year ended 31 March 2007 (the "Dice Announcement") ahead of being able to make any representations to potential purchasers.

6.3    The Directors discussed extensively the timing of the Dice Announcement in relation to the proposed Scheme and noted that Dice could bring forward the release of the Dice Announcement from Wednesday 23 May 2007 to Monday 21 May 2007 to be in a position to support a potential purchaser immediately thereafter.

6.4    The Directors further discussed access to the Dice pension scheme, and specifically whether Dice would be giving potential purchasers access, or whether potential purchasers would be expected to take a view on the value of this item without access.

6.5    It was noted that the Investment Committee Initial Recommendation had resolved to recommend a price of up to £2.65 per Target Ordinary Share.

6.6    The Directors discussed the information reported to the meeting and noted that all of the required investment criteria had been met. Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 6.1.

6.7 The Directors discussed whether after the release of the Press Announcement, BidCo should contemplate any market purchases of Target Shares. It was noted that BidCo was currently negotiating with Dresdner to provide a market purchase facility for this purpose and failing satisfactory agreement with them on terms then the Company would propose using its equity bridge with HBOS for this purpose. It was further noted that should a market purchase facility be agreed then in any event the Company would not be a party to such an agreement. These proposals were considered by the meeting and it was unanimously resolved that market purchases of Target Shares by BidCo may be made.

6.8 It was reported to the meeting that the Company had instructed a number of due diligence providers to review the Target and that the findings of their reports had been summarised in the Investment Committee Presentation. It was noted that final copies of each of the reports set out in the Investments Committee Presentation were being addressed and sent to the Company. It was noted that each of the Reports would also be addressed to the Banks and that reliance letters would be given by each of the Report providers to the Partnership in accordance with the terms of the Interim Facilities Agreement.

6.9 After due consideration, it was unanimously resolved that Project Dice be and is hereby approved and the Investment in relation to Project Dice be and is hereby approved at a price of up to £2.65 per Target Ordinary Share or such lesser sum as may be negotiated.

7 **Structure**

7.1 The Directors discussed the proposed structure to effect Project Dice as set out in the Steps Paper.

7.2 It was noted that the structure was very similar to that adopted on the Clover transaction. The recommended structure utilised LuxCo as the top holding company. The acquisition of shares in the Target would be made by BidCo, which was in turn wholly-owned by Maltby Investments Limited, which was in turn wholly-owned by Maltby Holdings Limited, which was in turn wholly-owned by LuxCo. The structure would be capitalised using a combination of ordinary shares, preference shares and PIK notes, and CPECs and PECs for the Luxco. It was further noted that this was a cross-fund transaction ie to be made in conjunction with TFCP II, and that TFCP II would invest in Maltby Holdings Limited via its wholly owned Luxco, or alternatively invest in the same top Luxco as TFCP II.

7.3 It was further noted that the acquisition structure had already been established under Carmel Capital V Sarl ("CCV"), which was currently wholly owned Terra Firma Investments (GP) 2 Limited. It was proposed that all 12,500 of the issued €1 shares of CCV be acquired at par value by the company from Terra Firma Investments (GP) 2 Limited as general partner of TFCP II with effect as of today.

7.4 Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 7.1.

7.5 After due consideration, it was unanimously resolved that the structure set out in the Steps Paper be and is hereby approved, and that the purchase of the shares of CCV be approved. It was further resolved that any Director of the Company be and is hereby authorised to do, sign or execute and deliver any act, thing, deed or document which they may consider necessary in connection with the purchase.

8 **Scheme**

8.1 The Directors discussed the way in which Project Dice would be implemented and carefully considered the Offer Letter, the Press Announcement and the Implementation Agreement.

Terra Firma Investments (GP) 3 Limited 18 May 2007                                                    4

It was reported that the intention was to sign the Implementation Agreement shortly prior to releasing the Press Announcement. The Scheme documents would then be finalised and posted to Dice shareholders not more than 28 days thereafter.

8.2   The terms of the Offer Letter were then considered in detail. It was noted that the potential offer would be conditional upon:

(a)   no material new information having been disclosed to TFCPL or its professional advisers since noon on Friday 18 May 2007; and

(b)   unanimous recommendation from the board of Directors of the Target;

(c)   entry into irrevocable undertakings by each of the board of Directors of the Target; and

(d)   the Target entering into the Implementation Agreement.

8.3   In relation to the Press Announcement, the attention of the Directors was drawn to the provisions of the City Code on Takeovers and Mergers (the "Code") and in particular it was noted that:

(a)   Rule 2.5(a) of the Code provides that its publication should only be made if the company has every reasons to believe that it can and will continue to be able to implement the offer;

(b)   Rule 2.7 of the Code provides that following publication of the Press Announcement the company must, save in exceptional circumstances approved by the Takeover Panel (the "Panel"), proceed with the offer; and

(c)   Rule 19.1 that states that "Each document or advertisement issued or statement made during the course of an offer must, as is the case with a prospectus, satisfy the highest standards of accuracy and the information given must be adequately and fairly presented."

8.4   It was also noted that the Press Announcement contained all of the information required by Rule 2.5(b) of the Code, save only for information regarding:

(a)   the interests (if any) in Target shares of any member of BidCo's group or any of their Directors deemed to be acting in concert with it for the purpose of the Code; and

(b)   arrangements (if any) in respect of Target Shares entered into by any member of BidCo's group deemed to be an associate of the Company for the purposes of the Code,

where, in each case, it was considered impracticable, for security reasons, to make appropriate enquiries prior to release of the Press Announcement.

8.5   The Press Announcement was considered carefully and particular attention was directed to the following matters:

(a)   the section entitled "Summary";

(b)   that the Company has given assurances to the Board of Dice that the existing rights of employees of Dice will be fully safeguarded;

(c)   that the Company has agreed that appropriate proposals will be made to holders of options under the Dice share schemes and convertible bonds in due course; and

(d)   the terms and conditions set out in Appendix I to the Press Announcement.

Unless otherwise defined in theses minutes, capitalised terms used in this section 8.4 have the meaning given to them in the Press Announcement.

A-1264

8.6    With regard to the Responsibility Letters, it was explained that the Code required all documents and advertisements issued in connection with the offer to contain a responsibility statement by the Directors of BidCo and those Directors who were the decision makers for the proposed transaction. Each of the Directors of the Company would be required to take responsibility, in the prescribed form, for the Press Announcement and, once finalised, the Scheme documents.

8.7    By reference to the Memorandum on Directors' Responsibilities which was produced to the meeting each of the Directors were reminded of their responsibilities and obligations in relation to the Offer.

8.8    It was noted that the purpose of the Scheme was to enable BidCo to acquire the whole of the issued and to be issued share capital of the Target. Under the terms of the Scheme (and upon the Scheme becoming effective), there would be a cancellation of all of the Target Ordinary Shares and the subsequent issue of new ordinary shares in the Target to BidCo (with the Target thereby becoming a wholly-owned subsidiary of BidCo), and within 14 days of the Scheme becoming effective, existing holders of Target Ordinary Shares will receive (from BidCo) the prices per share approved in paragraph 6.7 above ("Closing").

8.9    It was reported to the meeting that the Dice Board had expressed their concern that many of the individual UK shareholders of Dice may desire a loan note alternative. It was noted that in accordance with market practice, any such loan note alternative would be backed by a guarantee to be issued as part of the Interim Facilities Agreement. It was reported that the terms of documents were still being negotiated but that drafts (in agreed form) would be agreed before posting of the Scheme documents. It was also noted that, for tax reasons, Dice Shares in respect of which any loan note alternative had been elected would be transferred to BidCo) rather than cancelled and reissued) and that stamp duty at 0.5 per cent. would accordingly be payable on such transfers.

8.10    It was noted that to become effective, the Scheme required, amongst other things:

(a)    approval by a simple majority in number of the existing holders of Target Ordinary Shares, and three-fourths in value of the shares held by the existing holders of Target Ordinary Shares, present and voting in person or by proxy at the meeting(s) ordered by the Court at which the Target shareholders will be given an opportunity to consider, and if deemed fit, approve the Scheme;

(b)    the passing of a special resolution of the Target to approve the Scheme, cancel the existing shares of the Target, increase the authorised share capital of the Target (if necessary), allot and issue new shares in the Target to BidCo, and amend the articles of association of the Target;

(c)    satisfaction or waiver of the conditions set out in the Scheme documents (these conditions will need to be satisfied or waived before the Scheme becomes effective); and

(d)    sanction of the Court.

8.11    It was noted that the Scheme is expected to become effective by the end August 2007, and unless the Scheme becomes effective by a long stop date to be agreed with the Dice Board or such later date as the Target and BidCo may agree and the Court may allow, the Scheme will not become effective and the Scheme will not proceed.

8.12    After due consideration, it was unanimously resolved that:

(a)    the implementation of Project Dice by way of the Scheme be and is hereby approved;

(b)     each of the documents tabled and referred to in paragraph 8.1 be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (c) below; and

(c)     any two Directors of the Company or their duly appointed alternates or representatives be and are hereby authorised to agree any changes which they consider may be necessary or expedient to the documents referred to in paragraph (b) above.

**9        Concert Party Analysis**

9.1     It was reported to the meeting that the Panel had been consulted on the Clover transaction on which entities in the TFCP II Fund structure would be considered concert parties or associates of BidCo.

9.2     It was noted that BidCo would be required, following its Press Announcement, to notify such parties that they were not permitted to acquire shares in Target, and that steps were being taken to ensure those notifications were sent.

**10       Cash Confirmation and Equity Subordinated Finance**

10.1    The Directors carefully considered the Cash Confirmation Letters, the Guernsey Certificate and the Guernsey Opinion.  It was reported that documentation was substantially in the same form as the Cash Confirmation pack issued on the Clover transaction.

10.2    Since Project Dice is to be effected by means of the Scheme (which is subject to the Code), it is a requirement that the Financial Adviser provide letters to the Panel confirming that BidCo will have sufficient cash available to it to satisfy the consideration due under the Scheme (the Cash Confirmation Letters).

10.3    The Directors carefully considered the terms of the Cash Confirmation Letters.

10.4    Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraphs 10.1 – 10.3 above.

10.5    After due consideration, it was unanimously resolved that the drawdown of up to £[ ] under the Interim Facilities Agreement by Maltby Limited in accordance with the Steps Paper be and are hereby approved.

**Cash confirmations**

10.6    It was noted that Carey Olsen, as Guernsey legal advisers to the Partnership and the Company, would provide the Guernsey Opinion to the Financial Adviser in relation to the capacity and powers of the Partnership and the Company to enter into and perform the documents referred to in paragraph 10.1 above, and the power of the Company to call for cash from the limited partners of the Partnership in connection with Project Dice.  In order to enable Carey Olsen to provide the Guernsey Opinion, and to provide comfort to the Financial Adviser as to certain factual matters relevant to such opinions and the Cash Confirmation Statement, the Company would sign the Certificate and the Cash Confirmation Letters to confirm some factual matters, including the identity and commitments of limited partners in the Partnership and that Project Dice is within the investment objectives of the Partnership and does not fall within any of the 'excuse' provisions negotiated with certain limited partners.

10.7    In connection with the Cash Confirmation Letters, the Directors considered the Private Placement Memorandum in relation to the Partnership dated April 2006 (as since updated) and in particular Section 3 ("Investment Strategy").  The Directors (noting the advice received from TFCPL) confirmed that they were of the belief that Project Dice is consistent

with the investment strategy and conditions set out therein. The Directors considered the investment limitations set out in clause 4.7 of each of the Partnership Agreement. The Directors confirmed that they were of the belief that these limitations will not be infringed in relation to Project Dice.

10.8   It was noted that the total investment of the Partnership in Project Dice would be approximately £[ ]. As at today's date, Total Partnership Commitments amounted to €5,384 million. The Directors noted that Project Dice would not initially exceed 30% of Total Partnership Commitments which can be invested in a single Portfolio Company or group of Portfolio Companies. The Directors confirmed that Project Dice was therefore within the investment limitations set out in clause 4.7 of the Partnership Agreement. It was further noted that it was intended to sell down to co-investors post transaction to below the 20% threshold.

10.9   It was further noted that, although Project Dice involves the acquisition of publicly quoted securities, this acquisition was with a view to obtaining control of the target company, and is therefore permitted under clause 4.7.3 of the Partnership Agreement. It was also noted that the principal place of business of the target group is in the UK, and therefore the restriction in clause 4.7.5 of the Partnership Agreement will not apply.

10.10   The contents of the various side letters entered into with limited partners were noted, insofar as they contained restrictions on the types of investment in relation to which limited partners may be required to advance funds to the Partnership. The Directors confirmed that to the best of their knowledge, and based on advice received from TFCPL, none of such restrictions applied to Project Dice, and that neither TFCPL nor the Company had been advised by any limited partner that by reason of a change of law they would be entitled to rely on the 'excuse' provisions in clause 3.9 of the Partnership Agreement.

10.11   It was noted that the Company would be undertaking to provide Bidco with £24 million of equity funding, and it was envisaged this would be provided to Bidco via the intermediate holding entities consistent with the Steps Paper.

10.12   It was noted that BidCo would enter into a letter agreement with the Financial Adviser in order to give the Financial Adviser the confirmation that they required to give the Cash Confirmation Letters.

10.13   Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 10.1.

10.14   After due consideration, it was unanimously resolved that:

(a)   the Certificate and the Cash Confirmation Letters be and are hereby approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (b) below;

(b)   any two Directors of the Company or their respective duly appointed alternates or representatives be and are hereby authorised to agree any changes which they consider may be necessary or expedient to the documents referred to in paragraph (a) above;

(c)   any two Directors of the Company or their respective duly appointed alternates or representatives or any one of them and the Company Secretary be and are hereby authorised to execute the Certificate and the Cash Confirmation Letters as the Company's deed in their personal capacity and in their capacity as, and in the name of, the Company as general partner of the TFCPIII Fund, in each case in the form produced to the meeting or with such amendments as may be agreed pursuant to paragraph (b) above; and

(d)    any Director of the Company be and is hereby authorised to do, sign or execute and deliver any act, thing, deed or document which they may consider necessary in connection with such documents.

**11**    **Bank/Financing**

11 1    It was reported to the meeting that discussions were underway with Citigroup, Barclays and Deutsche Bank (Banks) regarding the provision of finance for the proposed offer. The Directors noted that currently Citigroup had credit committee approval to finance 100% of the transaction and that it was waiting to hear back from the other two banks. The senior debt facilities proposed were up to £2,500,000,000 under the Interim Facilities Agreement which would be entered into with BidCo. The terms of the Interim Facilities Agreement were considered by the meeting. It was reported that the terms of those facilities were still being negotiated but that prior to release of the Press Announcement, the Interim Facilities Agreement and the various side letters would all be executed by BidCo and its holding companies. It was reported that the Company was not party to any of those banking agreements.

11.1    It was reported to the meeting that the Interim Facilities Agreement was in a form sufficient to satisfy the "certain funds" requirements of a Code offer.

11.3    It was noted that BidCo would be looking to execute a permanent re-financing of these interim debt facilities prior to the expiry of the Interim Facilities Agreement and that the Term Sheet relating to the proposed terms of those permanent re-financings was currently being negotiated with the Banks

**12**    **General**

12.1    IT WAS RESOLVED that:

(a)    a committee of the Board of the Company should be formed to consider any further matters required to be considered by the Board in connection with Project Dice and that this committee should consist of any two Guernsey based Directors;

(b)    any Director of the Company or his respective duly appointed alternate or representative (or in the case of any deed, any two of them or any one of them and the Company Secretary) be and is hereby authorised to enter into such further documents as may be necessary or expedient in connection with Project Dice and/or the matters set out in the tabled documents;

(c)    any Director of the Company or his respective duly appointed alternate or representative (or in the case of any deed, any two of them or any one of them and the Company Secretary) be and is hereby authorised to do all things, sign or execute and deliver any act, thing, deed or document on behalf of and in the name of the Company as general partner of the TFCPIII Fund which they consider to be necessary or expedient for the Company as general partner of the TFCPIII Fund to perform its obligations in connection with Project Dice and/or under any of the tabled documents and all the documents contained or referred to therein including without limitation:

(i)    to submit or authorise the submission on behalf of the Company as general partner of the TFCPIII Fund any and all applications, filings, notifications or other submissions for anti trust, merger control, trade, regulatory and foreign investment clearances and consents;

(ii)    to seek all other third party consents and licences which may be necessary or expedient in connection with such matters; and

(iii)  to execute any power of attorney or other authority permitting the attorney or agent to act with full power and authority in the Company's name to do all or any of those acts.

**13**    **Project Hammer**

13.1   The Directors were advised that TFCPL wished to remove this item from today's agenda.

**14**    **Project Wellington**

14.1   The Chairman reminded the Board that it had previously approved a budget of £5m in connection with Project Wellington, being the acquisition of the entire issued and to be issued share capital of the company code named Wellington plc ("Project Wellington"), subject to the receipt of a detailed analysis and recommendation from the Investment Advisory Committee of TFCPL.

14.2   The Chairman reported that the purpose of this section of the meeting was to consider, and if thought fit, approve the detailed analysis and recommendation from the Investment Advisory Committee of TFCPL in connection with the Project Wellington budget.

**15**    **Documents Produced to the Meeting**

15.1   The following documents (the "Project Wellington Documents") were produced to the meeting:

(a)    the recommendation of the Investment Advisory Committee of TFCPL dated 19 April 2007 (the "Project Wellington Budget Request"); and

(b)    the recommendation of the Investment Advisory Committee of TFCPL dated 10 May 2007 (the "Project Wellington Expenses Incurred").

**16**    **Investment Approval**

16.1   The Directors noted the content of the Project Wellington Documents and noted that expenses incurred were considerably less than the £5m budget previously approved by the Board and after due consideration, IT WAS RESOLVED that the Project Wellington Budget Request and Project Wellington Expenses Incurred be and are hereby approved.

**17**    **Release of ERISA funds from escrow**

17.1   The Chairman noted that following the final close of TFCP III less than 20% of commitments to TFCP III whad been made by benefit plan ERISA investors and as such it was proposed that the agents acting on behalf of the benefit plan ERISA investors be approached and asked to release the funds called to date to TFCP III.

17.2   The Chairman tabled an e-mail and spreadsheet from the Company's legal advisors, Kirkland & Ellis Intl LLP, noting that pursuant to the TFCPIII limited partnership agreement there was no requirement to hold funds in escrow if commitments in TFCPIII from benefit plan investors were less than 25%, and that such commitments to TFCPIII were 12%.

17.3   After due consideration IT WAS RESOLVED that the agents acting on behalf of the benefit plan ERISA investors be approached and asked to release the funds called to date to TFCP III.

**18**    **Extension of the Partnership Revolving Credit Investment Bridge Facility**

18.1   The Chairman noted that the review date in the facility agreement dated 9 June 2006 detailing an investment bridge facility of up to €1,200,000,000 between, *inter alios*, the Partnership (as an Original Borrower), the Company (as General Partner) and The

A-1269

Governor and Company of the Bank of Scotland (the "Bank") (the "Facility Agreement") was 8 June 2007.

18.2    The Chairman further noted that the Company (acting in its own capacity and in its capacity as general partner of the Partnership) had entered into a first amendment and restatement agreement pursuant to which a subsidiary of the Partnership, Cabrillo Capital I S.à.r.l. ("Cabrillo"), had acceded to the Facility Agreement as an Additional Borrower and the Facility (as such terms are defined therein) available under the Facility Agreement had been increased from €1,200,000,000 to €1,615,228,373 (the "First Amendment and Restatement Agreement").

18.3    The Chairman further noted that the purpose of this section of the meeting was for the Company to consider (acting in its own capacity and in its capacity as general partner of the Partnership) and, if thought fit, to approve the extension of the Facility for a further 364 days, in accordance with the terms of a draft renewal letter between, *inter alios*, the Bank, the Partnership and Cabrillo (the "Renewal Letter").

19      **Documents Produced to the Meeting**

19.1    The Chairman tabled a copy of the Facility Agreement, First Amendment and Restatement Agreement and Renewal Letter.

20      **Benefit**

20.1    After due and careful consideration the Board determined that:

(a)     it is in the best interests of the Partnership and the Company that the Company (in its own capacity and in its capacity as general partner of the Partnership) enters into the Renewal Letter and the transactions contemplated therein;

(b)     there are reasonable grounds for believing that entering into the Renewal Letter would benefit the Partnership and the Company; and

(c)     the Company would enter into the Renewal Letter in its own capacity and in its capacity as general partner of the Partnership.

20.2    After due and careful consideration and believing such to be in the best interests of the Partnership and the Company (in its own capacity and in its capacity as general partner of the Partnership), the Board was of the opinion that the Company would not be in breach of:

(a)     any law or regulation applicable to it;

(b)     its Memorandum and Articles of Association;

(c)     the Partnership Agreement; or

(d)     any agreement or instrument binding on it or on its assets,

        by executing and delivering the Renewal Letter, and that the exercise and performance by it of any of its rights and obligations thereunder are in accordance with its Memorandum and Articles of Association.

21      **Approval of Transaction and Documents**

21.1    After due consideration IT WAS RESOLVED that:

(a)     that the renewal of the Facility by a further 364 days be and is hereby approved;

(b)     that the terms of the Renewal Letter (with such amendments authorised by a Director (or his duly appointed alternate)), be and is hereby approved;

Terra Firma Investments (GP) 3 Limited 18 May 2007                                                11

A-1270

(c)     that any one Director of the Company (or his duly appointed alternate) be and is hereby authorised to execute the Renewal Letter in the form produced to the meeting, with any amendments he/she may approve.

**22    Any Other Business**

**23    Previous Minutes**

23.1    The Chairman tabled the minutes of a meeting held on 3 May 2007, relating to Project Phantom and which would be required to support the HSR Filings by Terra Firma Investments (GP) 2 Limited.

23.2    After due consideration IT WAS RESOLVED that those minutes be and are hereby approved, subject to minor typographical amendments, that the Chairman sign those minutes and that the Company Secretary enter them into the minute book of the Company.

/22.1    There being no further business, the Chairman declared the meeting closed.

Chairman

A-1271

terra firma

EXHIBIT
Van der Spuy
10
LP 7-7-10
PENGAD 800-631-6989

TF0000097070

# Project Dice

## Presentation to the IAC

20 May 2007




Confidential

## Disclaimer

terra firma

- This presentation has been prepared by Terra Firma Capital Partners Limited ("TFCP") solely on behalf of Terra Firma Investments (GP) 2 Limited (for and on behalf of funds managed by it) ("TFIGP2") and Terra Firma Investments (GP) 3 Limited (for and on behalf of funds managed by it) ("TFIGP3").

- It is being circulated on a confidential basis. This presentation must not be distributed, published or reproduced, in whole or in part, nor may its contents be disclosed by you to any other person. Receipt of this presentation by you constitutes an agreement to be bound by such confidentiality.

- This presentation may also contain information that may be unpublished price sensitive or inside information and you are reminded of your obligations relating to such information under Part V of the Criminal Justice Act 1993 (the "Act"), the City Code on Takeovers, the Financial Services and Markets Act 2000 and the Listing Rules of the UK Listing Authority in England and Wales. Accordingly you must not, either alone or together or in concert with any other person, disclose such information or deal in or, encourage others to deal in, the securities of the target or otherwise engage in any activity prohibited by the Act.

- This presentation, to the extent that it relates to the target business, is based on historical information taken from public sources which has not been independently verified by TFCP. Neither TFCP nor its officers, employees, agents or affiliates makes any express or implied representation, warranty or undertaking with respect to the historical information contained in this presentation, and none of them accept any responsibility or liability as to its accuracy or completeness. This presentation includes statements, estimates, opinions and projections with respect to anticipated future performance of the target which reflect various assumptions concerning anticipated results and which may or may not prove to be correct. It is up to you to make your own assessment of the validity of such assumptions and no liability is accepted by TFCP in respect of the achievement of such assumptions.

- The delivery of this presentation does not imply that the information herein is correct as at any time subsequent to the date hereof and neither TFCP nor any of its associates has any obligation whatsoever to update any of the information or the conclusions contained herein or to correct any inaccuracies which may become apparent subsequent to the date hereof.

- TFCP, which is authorised and regulated by the Financial Services Authority, is acting solely as adviser to TFIGP2 and TFIGP3 and no one else in relation to this proposed transaction and will not be responsible to anyone other than TFIGP2 and TFIGP3 for providing the protections afforded to clients of TFCP nor for providing advice in connection with the proposed transaction or any other matters referred to herein.

A-1272

Page 1

TF0000097071

## Contents

- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations
- Risks & Mitigants

terra firma

A-1273

Confidential

TF0000097072

# Executive Summary
## Transaction Overview

terra firma

- Project Dice is the proposed public-to-private acquisition of Dice plc ("Dice" or the "Company"), a leading recorded music and music publishing company with FY 2007 revenue of £1,414 m and EBITDA of £174m.
    - Recorded Music ("Music"): FY 2007 Revenue of £1,414m and EBITDA (excluding corporate ) of £78m (5.5% margin)
    - Music Publishing ("Publishing"): FY 2007 Revenue of £416m and EBITDA (excluding corporate) of £117m (28.1% margin)
- The music industry is undergoing a period of fundamental transformation as the distribution of music shifts from physical to digital.
    - Digital sales continue to grow at strong pace, although not at levels sufficient to offset the significant decline in physical sales.
    - Dice's Music revenue fell 19.3% year-on-year in FY 2007 compared to a market decline of 13% globally.
    - TF Base Case forecasts physical revenue to continue to decline by 11% CAGR through FY 2012.
- There is a wide divergence of opinion regarding the ability of large music companies to monetize consumer consumption of music in the digital age.
    - LEK forecasts c.35% CAGR growth in digital through CY 2011.
    - Enders Analysis forecasts 20% CAGR growth in digital through CY 2011.
    - Management indicated a CAGR through 2012 in the mid-30% range following growth in FY06 – 07 of 59%.
    - TF has assumed in its base case (the "Indie Case") a 32% CAGR growth in digital through FY 2012.
- At the same time, consumption of music is increasing and new revenue opportunities are emerging, e.g., increased consumption of music in films, TV, video games, and advertisement campaigns.
    - Dice's Publishing business derives an increasing share of revenues from these higher-margin Business-to-Business revenue streams, offsetting the decline in core mechanical revenue.
- Against the backdrop of this transition, there is substantial opportunity for cost-savings and restructuring of the business to adapt to the challenges facing the music industry.
- TF has met with management on several occasions to understand their strategy, financials, planned strategy as well as tax and legal issues.

Page 3

Confidential

A-1274

TF0000097073

# Executive Summary
## Process

terra firma

- Dice is currently undergoing an effective auction process, and the team understands that the Board expects to announce on 22 May (just after the Company's earnings announcement that the Board has recommended an offer.
- Following several aborted approaches by Permira and Warner Music Group in the last six months (backed by Thomas Lee and Bain Capital), the team believes that **there is pressure on the Board and management to conclude a private sale**.

- The team started analysing the opportunity in November 2006 and conducted limited market diligence with respect to Dice in February-March 07, although decided not to proceed at the price level (c.320p/share) the Board expected at that time, in particular given the Company's two successive revenue warnings related to continued decline in physical music revenue.
  - Permira had approached Dice interest in December 2006, rumoured to be at the 320p / share price level, but ultimately withdrew its interest.

- TF submitted an indicative bid of 265p on May 8, after which TF was invited to management meetings and to review the data room.

A-1275

Page 4

Confidential

TF0000097074

## Executive Summary
### Tactics: Other Potential Bidders

terra firma

- It is believed that the Board will be receptive to an offer of 260p or higher.
- The team believes that the primary competition is from Cerberus and Fortress, while the presence of Warner Music, who has made a series of approaches to Dice over the past twelve months, cannot be discounted.
  - Warner could bid significantly higher than 260p on the basis of the synergies achievable through combination of the 3rd and 4th largest recorded music companies.
  - However, a bid from Warner would most likely have regulatory conditions – as have all previous approaches, which the Board would resist unless the premium was considered sufficient enough to take account of the time involved in obtaining regulatory clearance and the risk of clearance not being given
- It has been reported that Cerberus and Fortress may attempt to submit an offer below the 260p sought by the Board.
- There may be other bidders as well.
  - One Equity (JPMorgan's venture capital arm) has been rumoured in the press to be interested in Dice.
  - Permira is not believed to be in the process at this stage, but made an approach to the Board in December 2006 at 320p.
  - Apollo / KKR – Rumoured to have been interested in December, though not believed to be involved in the current process.

- As a result, the team believes that a bid of 265p or above could be compelling to the Board and position TF to agree the terms of a recommended offer.

A-1276

Page 6

Confidential

TF0000097075

# Executive Summary
## Investment Considerations - Publishing

terra firma



**Diversified Cash flows**

- Publishing cash flows derive from four distinct and severable revenue streams:
  - **Mechanical:** royalties paid on recorded music, derived from physical sales and digital downloads
  - **Performance:** chart success, radio commercialization, webcasts, sporting events
  - **Synchronization:** advertising revenue, TV producers, computer games makers
  - **Other:** stage productions, sheet music, mobile ring tones
- Of the top 50 songs in NPS in 2002-2007 (contributing c. £30m NPS/year), all are older than five years.



**Highly-scalable consolidation opportunity**

- Publishing's high fixed cost base comprised of individuals marketing and promoting the catalogue of copyrights, is highly scalable.
- The team has heard that Dice could manage an additional one million copyrights – doubling its existing catalogue – with an additional 20 headcount.
- The team has identified several potential targets, many of which are held by financial backers and could be available for sale.



**Emerging Revenue opportunities**

- Publishing's revenues have historically been derived from royalties received from sales of music in physical (and now digital) form as well as other media, e.g. sheet music and stage performances.
- Increasingly, there is potential for growth opportunity in B2B revenue from use of music under copyright in films, TV and advertising campaigns. from synchronization and performance.
  - These revenue streams generate higher net publishing share (NPS) for Dice than mechanical revenue, leading to higher margins over time.



**Asset-backed**

- Publishing receives royalty payments for performance of over one million copyrights under administration, composed of new releases and standards.
  - Dice is publisher for 51.1% of its copyrights, and co-publisher for 40.5% of its copyrights.
  - 8.4% of copyrights are under administration, which have less favourable economics.
- 85% of copyright agreements have duration more than ten years; only 8.5% have duration less than five years.

Page 6

A-1277

Confidential

TF0000097076

# Executive Summary
## Investment Considerations - Music

terra firma



**Asset Repositioning Within an Industry in Transformation**

- The recorded music industry finds itself in a period of transformation following the advent of digital distribution.
  - Consumers are listening to music in new and varied ways, and the major record labels have thus far struggled to develop a model that monetizes increased music consumption.
  - The industry has struggled to develop a model that monetizes this increased music consumption, and Dice in particular has continued to try to grow its market share in the US market, with little success and with heavy losses.
- The team believes that there is a viable strategy to reposition Dice from the smallest of the four major labels into the largest of the independent labels and leverage its strong position in the UK and European markets, while maintaining limited presence in the US through its profitable niche labels (e.g. Christian/country/blues).



**Cost savings Opportunity**

- Music has substantial overhead costs, c.£400m off a revenue base of c.£1.4bn, partly driven by Dice's historic desire to have geographic presence and partly driven by characteristics particular to the music industry.
- The team has identified substantial cost savings potential to reduce the fixed cost base, in addition to the £110m that current management has targeted in its current restructuring.
  - The team has identified £80m of fixed cost savings in the Indie Case (in addition to the £10m of plc costs), which the team believes can be delivered with a high degree of confidence.

**Downside Protection**

- Music owns the recording copyrights of thousands of albums including the Beatles library, that generate substantial recurring cash flows.
- The team fully recognizes the risk that the recent decline in the music market – a combination of rapid decline in the physical market without sufficient digital growth to compensate – remains a potential scenario, at least in the mid-term.
- In the context of a downside market scenario, the team has developed a Downside Case, in which the music business would be run from catalogue sales and limited presence in genres with more resilient demographics (i.e., Country/Christian/Jazz/Blues), at substantially reduced overhead.
  - **The Downside Case generates IRR of 6.5% and CoCM of 1.9x.**



**Possibility of Quick exit**

- Absent regulatory review, Dice and Warner remain a natural combination given their complementary geographic strengths and size as the third and fourth-largest majors in the market.
  - Analysts estimate up to £200m of cost savings could be achieved in a combination.
- TF would continue to monitor the regulatory landscape and explore the potential for a sale of Music to Warner.

Page 7

Confidential

TF0000097077

A-1278

## TF Returns Under the Three Scenarios assuming the Citigroup debt package

terra firma

| IRR - % | Equity Case | | | Indie Case | | | Downside Case | | | Equity Add'l Equity Required* |
|---|---|---|---|---|---|---|---|---|---|---|
| Offer Price (p) | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | |
| 255 | 30.9% | 38.8% | 44.2% | 13.0% | 22.0% | 26.5% | (1.5%) | 6.5% | 10.4% | - |
| 260 | 30.0% | 37.8% | 43.1% | 12.3% | 21.2% | 25.7% | (1.8%) | 6.1% | 10.1% | - |
| 265 | 29.2% | 36.8% | 42.0% | 11.6% | 20.4% | 24.9% | (2.1%) | 5.8% | 9.7% | - |
| 270 | 28.3% | 35.8% | 41.0% | 10.9% | 19.7% | 24.1% | (2.4%) | 5.5% | 9.4% | 18 |
| 275 | 27.6% | 34.6% | 39.9% | 10.2% | 19.0% | 23.3% | (2.7%) | 5.2% | 9.1% | 65 |
| 280 | 26.8% | 33.9% | 39.0% | 9.5% | 18.3% | 22.6% | (3.0%) | 4.9% | 8.8% | 112 |
| 285 | 26.1% | 33.1% | 38.0% | 8.9% | 17.6% | 21.9% | (3.3%) | 4.6% | 8.5% | 158 |

| CoC | Equity Case | | | Indie Case | | | Downside Case | | | Equity Additional Equity Required |
|---|---|---|---|---|---|---|---|---|---|---|
| Offer Price (p) | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | |
| 255 | 3.84x | 4.37x | 4.96x | 1.85x | 2.71x | 3.24x | 0.86x | 1.84x | 2.64x | - |
| 260 | 3.71x | 4.23x | 4.79x | 1.78x | 2.62x | 3.14x | 0.83x | 1.79x | 2.56x | - |
| 265 | 3.59x | 4.09x | 4.64x | 1.73x | 2.53x | 3.04x | 0.81x | 1.74x | 2.49x | - |
| 270 | 3.48x | 3.97x | 4.50x | 1.67x | 2.46x | 2.94x | 0.78x | 1.69x | 2.41x | 18 |
| 275 | 3.38x | 3.85x | 4.36x | 1.62x | 2.38x | 2.85x | 0.76x | 1.64x | 2.35x | 65 |
| 280 | 3.28x | 3.74x | 4.24x | 1.58x | 2.31x | 2.77x | 0.74x | 1.60x | 2.28x | 112 |
| 285 | 3.19x | 3.63x | 4.12x | 1.53x | 2.25x | 2.69x | 0.72x | 1.55x | 2.22x | 158 |

* £20m of additional equity required due to additional pensions funding in downside case

A-1279

Confidential

TF0000097078

## TF Returns Under the Three Scenarios assuming the Deutsche Bank debt package

terra firma

| IRR - % | Equity | Indie | Downside |
|---|---|---|---|
| Offer Price (p) | Expected | Expected | Expected |
| 255 | 34.7% | 19.5% | 6.5% |
| 260 | 33.9% | 18.8% | 6.2% |
| 265 | 33.1% | 18.2% | 6.0% |
| 270 | 32.3% | 17.6% | 5.7% |
| 275 | 31.5% | 17.1% | 5.5% |
| 280 | 30.8% | 16.5% | 5.2% |
| 285 | 30.1% | 16.0% | 5.0% |

| CoC | Equity | Indie | Downside |
|---|---|---|---|
| Offer Price (p) | Expected | Expected | Expected |
| 255 | 3.69x | 2.43x | 1.85x |
| 260 | 3.60x | 2.37x | 1.81x |
| 265 | 3.50x | 2.31x | 1.77x |
| 270 | 3.42x | 2.25x | 1.72x |
| 275 | 3.33x | 2.20x | 1.69x |
| 280 | 3.26x | 2.15x | 1.65x |
| 285 | 3.18x | 2.10x | 1.61x |

A-1280

Page 9

Confidential

TF0000097079

# Executive Summary
## Valuation
### Recommendation

terra firma

- The team recommends to the IAC to recommended to the GP an offer of 285p, subject to the availability of an additional c.£170m equity bridge / equity co-investment. In the event that such an equity bridge is not available, a price of 265p is recommended.

- The **Indie Case** (effectively the TF Base Case) envisions a repositioning of Dice from the smallest of the majors with a money-losing US Rock & Pop label into the largest of the independent labels, with strong UK-Europe labels and profitable niche (e.g., country/Christian) labels in the US

  - **TF Indie Case**, assuming exit in FY 2012 of both Music and Publishing separately, generates **IRR of 20.4%** and **CoCM of 2.5x** at 265p and 17.6% IRR and 2.3x CoCM at 285p.

- The **Equity Case**: The team believes that there is further upside from higher-than expected growth in digital and mobile (and which management does not include within their projections), driven by

  1. Music
     - Beatles online: the Beatles catalogue is expected to become digitally available
     - Improved pricing on iTunes and other digital retailers (Amazon) on DRM-free premium tracks and introduction of variable pricing models
     - Underlying digital growth above market reflecting catch up to Dice's more natural market share
     - Developing alternative revenue streams (e.g. touring / merchandising) to complement core album sales-driven revenue

  2. Publishing
     - Consolidation of smaller music publishing catalogues to take advantage of the business's scalability
  - **The Equity Case**, assuming exit in FY 2012 of both Music and Publishing separately, generates **IRR of 36.8%** and **CoCM of 4.1x** at 265p and 33.1% IRR and 3.6x CoCM at 285p.

- The **Downside Case**: The risk of a continued decline of the physical music continues to decline and failure of the digital market to grow as projected **is mitigated by** the Downside Case, in which the team would shrink the business and run from catalogue and niche markets in the US, savings substantial fixed costs and the money-losing US Rock & Pop operations.

  - The **Downside Case** generates **IRR of 5.8% and CoCM of 1.7x**, assuming exit of Publishing in FY2017 and exit of Music in FY 2012 at 265p and 4.6% IRR and 1.6x CoCM at 285p.

Page 19

Confidential

A-1281

TF0000097080

# Executive Summary
# Debt Financing

terra firma

**Summary of day 1 debt package (Citigroup)**

- Bridge to securitisation - 12 month bridge with a 7 year term out at a margin of 200 bps, stepping up 25 bps every 3 months. There is also a step up of 50bps after 9 months, 25bps after 12 months and 25bps after 18 months if indicative ratings are not obtained.
- Term loan B (on recorded music business) -- 8-yr bullet at 250 bps.
- Bridge to high yield or equity - 12 month bridge with a 9 year term out at a margin of 450 bps, stepping up 50 bps every 3 months and capped at 925 bps.
- Revolver - £350m substantially against recorded music business
- Acquisition facility - £100m committed and £200m uncommitted mostly against the publishing business

**Summary of take-outs**

- Securitisation against Publishing - Out of the 12x total quantum, 10.5x will be a senior tranche priced at 90-95 bps including the costs of wrapping. The remainder will be a subordinated tranche at 450-500 bps. The blended margin will be in the 140s.
- High yield - Has a 10-yr term and a margin of 525 bps. It is proposed to be NC1, 102, 101, par.
- Including the high yield take-out, the permanent financing will total £2.5bn of drawn facilities with a weighted average margin of c.226 bps.

**Fees**

- Bridge to Securitisation:
  - Funding fee 1.50%
  - Commitment fee 0.50%
  - Takeout fee 120bps on investment grade, 255bps on non-investment grade
  - No rollover fee
- Term Loan B
  - Arrangement fees 2.00%
  - Commitment fee 0.50%
- Bridge to High Yield / Equity
  - Commitment fee 0.50%
  - Funding fee 2.00%
  - Rollover fee 2.50%
- Revolver
  - Arrangement fee 2.00%
  - Commitment fee 0.50%
- Acquisition Facility
  - Arrangement fee 2.00%
  - Commitment fee 0.50%

- We are likely to have one financial covenant -- net debt/EBITDA. Unlimited cure rights are being negotiated.
- We are working on an alternative debt package with Deutsche Bank which excludes the bridge to high yield or equity.
  - Deutsche Bank is approved for 1/3.
  - Barclays will probably be approved for 1/2 by lunchtime Monday.
  - HBOS -- Are intending to start working on the transaction on 20 May 2007, but timeline is extremely challenging and we have not heard back from them yet. Aim is to underwrite 100% of the debt.

Page 11

Confidential

A-1282

TF0000097081

# Executive Summary
Exit Considerations

terra firma

## Recorded Music

- Sale to Whist:
    - "perfect" geographical fit to the businesses (Whist strong in US, weak in Europe; Dice vice versa)
    - £200m of cost savings from combination (value to Dice of £1bn at 10x multiple on 50%)
    - only remaining consolidation play for the majors (UMG or Sony BMG would have regulatory issues)
    - regulatory risk generally considered relatively modest given pricing trends in the industry
- Sale to media conglomerate, distribution player or new media major:
    - distribution companies have perennial fascination with pure content plays (Sony/Columbia, JVC/Victor Music, AOL/Time Warner, Telefonica/Endemol, Vivendi/Universal, Mediaset/Endemol, Virgin Media/ITV): Dice represents the perfect digital content engine for the broadband pipes of the future (e.g. Comcast, Virgin Media, Liberty Global)
    - digital content engine for new media majors (Google, Yahoo!, Microsoft)
    - good fit with film majors not currently in the music industry (News Corp, Disney)
- IPO:
    - perfectly feasible as a pure play, attracting premium multiple as market enthusiasm for digital growth develops publishing income not a prerequisite, though a re-IPO of the combined group also makes sense
- Recapitalisation:
    - increased leverage potential post restructuring and as visibility on industry revenue growth improves

## Publishing

- Sale to financial player:
    - private equity and infrastructure funds will have strong interest based on highly stable but growing and scaleable cash flow profile
- Sale to major media conglomerate, distribution player or new media major:
    - standalone logic may be less compelling but feasible at attractive valuation as part of integrated play with Recorded Music
- IPO:
    - music publishing assets highly valued in the equity market today even at much smaller scale (implied value of Chrysalis music publishing c. £150m based on £10m NPS, £5m EBITDA
- Recapitalisation:
    - good opportunity to recap the business in conjunction with bolt on acquisitions
    - upscale the financing on similar multiples based on higher cash flows as growth comes through

A-1283

Page 12

TF0000097082

terra firma

## Contents

- Executive Summary

███████████████████████████

- Transaction Economics and Valuation

- Structure & Financing

- Exit Considerations

- Risks & Mitigants

Page 13

Confidential

A-1284

TF0000097083

# Operational Business Plan - Cases

terra firma

| Case | Description |
|------|-------------|
| **Indie** | **Base case business plan for TF**<br>• Sale of Japan in 2008<br>• Wind down and eventually close Rock and Pop in the US, focussing of the profitable Christian, Country, Jazz and Classical genres<br>• Rationalise LatAm/SE Asia<br>• Significantly reduce costs and acquire additional NPS for Publishing |
| **Equity** | **Upside Case to business plan**<br>• Sale of Japan in 2008<br>• Wind down US and eventually close<br>• Rationalise LatAm/SE Asia<br>• Significantly reduce costs and acquire additional NPS for Publishing<br>• Develop ancillary revenues (e.g. sale of DRM free tracks and Subscription 2.0)<br>• Higher exit multiple |
| **Downside** | **Attempt Indie Case until 2009 – from 2009 stop all new releases except Country, Christian, Jazz and Blues**<br>• Consolidate regional offices from 2009 and run from catalogue<br>• Either Exit Music in 2012 and run Publishing for Case or exit both Music and Publishing in 2010 |

Page 14

Confidential

A-1285

TF0000097084

# Base Case (Indie Case)

terra firma

- Growth Assumptions:
  - Physical: 11% CAGR decline
  - Digital: 32% CAGR growth

- £20m of NPS acquisition at 12x NPS

- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close

- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m

- CRB arbitration outcome: $0.091/track payable to publishers

- Exit multiples:
  - 8.5x Music EBITDA in 2012
  - 16x Publishing EBITDA in 2012

- Total fixed cost savings: £80m + £10m post RE4
  - Procurement: £15m
  - Back office: £10m
  - IT: £10m
  - US New releases: £30m
  - Smaller countries: £5m
  - SE Asia: £5m
  - Label costs: £5m

- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years
  - Gross margin savings of c.£13m from wind down of North American Pop / Rock

A-1286

Page 16

Confidential

TF0000097085

# Equity Case

terra firma

- Growth Assumptions:
  - Physical: 10% CAGR decline
  - Digital: 35% CAGR growth

- £40m of NPS acquisition at 12x NPS

- Sale of Japan in 2008
- Regionalize LatAm/SE Asia
- Wind down US Capitol/Virgin pop/rock New Releases and eventually close

- Beatles: $25m extra sales in 2009 on digital from Beatles sale (one-off), with limited knock-on; 2010 and 2011 each increased by $2.5m

- CRB arbitration outcome: $0.091/track payable to publishers

- Exit multiples:
  - 10x Music EBITDA in 2012
  - 18x Publishing EBITDA in 2012

- Total fixed cost savings: £100m + £10m post RE4
  - Procurement: £20m
  - Back office: £15m
  - IT: £15m
  - US New releases: £30m
  - Smaller countries: £10m
  - SE Asia: £5m
  - Label costs: £5m

- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years
  - Gross margin savings of c.£13m from wind down of North American Pop / Rock

Additional Upside:
- Sale of DRM free tracks add 5% to digital growth each of first 3 years
- Subscription 2.0 in Europe adds £24m EBITDA in 2011 and £48m from 2012 onwards
- Share in touring and merchandising revenues grow to £18m revenues, £12m EBITDA in 2012

A-1287

Confidential

TF0000097086

# Downside Scenario

terra firma

- Growth Assumptions:
  - Physical: 14% CAGR decline
  - Digital: 23% CAGR growth

- Operate Indie (base case) model in 2009, switch to rundown in 2010
- In 2009 stop all new releases, keeping Country, Christian, Jazz and Blues
- Consolidate regional offices and run from catalogue

- No acquisitions of publishing catalogues

- Rundown decline: 3% CAGR below market (digital less growth, physical more decline)

- CRB arbitration outcome: $0.0855/track payable to publishers

- Exit multiples:
  - 6.5x Music EBITDA in 2010
  - 14x Publishing EBITDA in 2017

- Reduce total fixed costs on Music to £93m by 2011 (representing total fixed cost reductions of £185m net of RE4)

- Variable cost savings:
  - Marketing costs: reduced from 16.6% to 15% over three years
  - Gross margin savings of c.£13m from wind down of North American Pop / Rock

A-1288

Page 17

Confidential

TF0000097087

## Indie and Equity Case:
## "From smallest Major to largest Indie in 5 profitable steps"

terra firma



| Step | Key Actions |
|------|-------------|

**Step 1: Focus geographic coverage on areas of strength**

1. Sell Japan
2. Cover smaller countries through regional hubs or licensing
3. De-risk US
4. Focus on UK and Europe

**Step 2: Reduce fixed cost base**

5. Procurement
6. Overhead

**Step 3: Take creative no financial risk**

7. Improve Marketing ROI
8. Rationalise A&R function

**Step 4: Work closer with artists to share in ancillary revenues**

10. Touring
11. Merchandising
12. etc.

**Step 5: Aggressively pursue new opportunities**

- Subscription 2.0
- Advertising based models
- Differentiated pricing
- Add on acquisitions to publishing platform

Page 18

Confidential

TF0000097088

A-1289

## Step 1. Focus geographical coverage on areas of strength

terra firma

| Sell Japan | Consolidate smaller countries in regional platforms | De-risk US by scaling down New Releases | Focus resources on UK & Europe |
|---|---|---|---|

- Growing and profitable
- Very dependent on local content (J-pop)
- Fragmented market, need for consolidation
- Expected to fetch £400-450m

- Overhead per country at least £2-3m
- Many smaller countries with little local content; hence do not require local operation
- Licensing agreements or small distribution co's
- Estimated savings £5-10m

- Catalogue Country and Christian stable and profitable
- Pop/Rock new releases lost $300m in 3 years; sub-scale
- Maintain presence to attract UK talent with opportunity to break into US market
- Estimated savings £25-30m fixed cost and £13m gross margin

- As only UK based major, Dice has strategic advantage
- ½ to 2/3 of international roster UK based
- In total nearly twice as big as US operation and profitable

A-1290

Page 19

Confidential

TF0000097089

## Step 2. Reduce fixed cost base
### £80-100m Savings beyond RE4 in Recorded Music

terra firma

| Cost area / EBITDA impact | Assumption | Summary rationale |
|---|---|---|
| Procurement £15-20m | £360m addressable spend; 5-10% saving on most categories | Currently no procurement function on Group level -- only 3 procurement staff in entire group; no culture of cost control |
| Back Office £5-10m | Outsource back office functions | Current costs very high; systems not integrated; currently based in very expensive office locations |
| IT £10-15m | Outsource and use third party systems | Total Opex £46m Capex £12m: off-shoring, demand/vendor management, process streamlining |
| UK Overhead £10-15m | Apply same savings as rest of group | UK has £50m overhead v. £11m A&R spend: "should be reverse"; mostly escaped previous restructuring rounds |
| Smaller countries £5-10m | Close offices in some smaller countries | Switzerland, for example, has £2m overhead and 2% local content... Austria, Sweden, Belgium etc. |
| LatAm / SE Asia £5m | Licensing model | Allows to reduce overhead but loses half of gross margin |
| US New Releases £25-30m | Further savings according to management | Return NR business to break-even; alternative would be distribution contract with other major |
| Label costs £5m | Consolidate back office and some front office | Several labels based in close locations have complete and duplicated structures: press, PR etc. |

Page 20

A-1291

Confidential

TF0000097090

terra firma

**Procurement Initiative**
Improved procurement could save significantly more than the initial internal estimate

| Spend (size) category (£m) | Examples of spend | EMI/Ussher estimated savings, % | McKinsey benchmarks | Sizing (£m) | |
|---|---|---|---|---|---|
| | | | | Ussher | McKinsey low estimate (10%) |
| A&R (50) | Video production | 2.5 | 10—15% average savings in specialist | ~2 | ~5 |
| | Recording studios | 2.5 | | | |
| | Concert tickets | 10 | | | |
| | Limos | 4 | | | |
| Marketing (120) | Media advertising | 5 | >15% | ~5 | ~12 |
| | Print | 2.5 | >15% | | |
| | Design start work | 5 | >15% | | |
| Overheads (80) | Security | 0 | 20–30% | ~2 | ~8 |
| | Catering | 4 | 15–20% | | |
| | Office copiers and printing | 4 | >20% | | |
| **Average** | | 2.5-5% | 10-15% | **Total** ~9 | ~25 |

Page 21

Confidential

TF0000097091

A-1292

## Additional Procurement Initiative
Marketing spend reduction

terra firma



Dice Marketing spend looks comparable to Warner's

Marketing expenditure, % of sales

20–23    17–22

Warner Music Group*    Dice**

**Actions**



Focus on priority acts

Measure performance and spend effectiveness

Consolidate purchasing

Reduce long-tail of expenses



**Observations**

– "The concept of spending less on marketing and accepting a lower chart position, but making more money is totally foreign to the industry" – ex-Sony analyst
– "Warner increased the spend on its high potential acts" – Warner

– "There is very little analytical work in marketing" – ex-Dice employee 2
– "Companies are still spending 20-30% of their marketing budget on radio promotions, which are much less effective" – McKinsey media expert 3
– "Companies are spending only 1% of their budget on the fastest growing channel – the web" – ex-Sony Executive

– "Each label has their own marketing team so there are no economies of scale" – Ex-Dice employee 2
– "Each month, the company added 6 new creative agencies to its list of suppliers and never cut any of the old one's" – McKinsey media expert 3

– "There is long tail of expenses which can be cut – e.g., marketing people courier by DHL a free new album to a list of thousands of people" – McKinsey media expert 3



**Potential impact**

"Typically a 5-15% cost saving is achievable by refocusing on the high potential acts and more cost effective forms of marketing" – McKinsey media expert 1
Saving 5-15% of costs brings savings of £15–55m
Reversing £5-15 m 'one off' and
costs
Reducing variable costs by 1-2.5% of sales

Potential savings may need to be reinvested in promising acts to drive revenue
Difficult to quantify how much of the cost savings in Marketing have already been captured

* Warner recorded music marketing cost as a percent of sales from 2004–2006
** Brokers report Dice marketing (variable and fixed) as 17% of sales for 2006 compared to an estimate of 22% by a former Dice executive

Source: Team analysis, Company data and Industry interviews

Confidential

A-1293

TF0000097092

**Back Office and IT Initiative**
Potential savings from off-shoring / outsourcing

terra firma

| Cost Area | Cost Base (£m) | Typical Saving (%) | Potential EBITDA increase (£m) | Levers | Typical Areas |
|---|---|---|---|---|---|
| Finance | 29 | 7.5-12.5% | 2-4 | ▪ Off-shoring<br>▪ Process harmonisation<br>▪ Systems replacement / automation | ▪ Routine processing and reconciliation<br>▪ Financial reporting and monitoring |
| HR | 20 | 10-17.5% | 2-4 | ▪ Off-shoring<br>▪ Process harmonisation<br>▪ Systems replacement / automation | ▪ Benefits administration<br>▪ Training |
| IT Opex | 46 | 15-30% | 7-14 | ▪ Off-shoring<br>▪ Vendor management<br>▪ Process streamlining<br>▪ Demand management | ▪ Support desk<br>▪ Infrastructure operations<br>▪ Application maintenance |
| IT Capex | 12 | 10-25% | 1-3 | ▪ Off-shoring<br>▪ Process streamlining<br>▪ Procurement<br>▪ Contract renegotiation | ▪ Application development<br>▪ Hardware<br>▪ Licensing |

A-1294

Page 23

Confidential

TF0000097093

## UK Overhead, and Smaller Country Initiatives
Savings opportunity by rationalising local offices

terra firma



**Regional headcount split**

100% = 6,312*

Latin America    Other

U.K.    North America

Asia Pacific

Rest of Europe

**Estimated revenue per employee****
£ k per FTE

| | |
|---|---|
| Rest of Europe | 402 |
| North America | 283 |
| U.K. | 257 |
| Asia Pacific | 243 |
| Latin America | 241 |
| Other | 198 |

▲ £293k

**Observations**

- "We are a global business with a presence in more than 50 countries"
  - — *Dice annual report*
- Limited opportunity for the sale-and-leaseback on properties, with Japan and US offices already leased
- Potential to consolidate small offices in Europe – e.g., Dice has separate offices in countries Scandinavian and Baltic countries
  - Sweden
  - Norway
  - Denmark
  - Latvia
- "Real savings can come from rationalising the back office functions"
  - — *Ex-Dice employee 1*

\* Split is not broken down between recorded music and music publishing
\*\* Revenue per employee is for both publishing and recorded music
Source: Company data, industry interview
Page 24

Confidential

A-1295

TF0000097094

terra firma

## Step 3. Take creative, not financial risk
**The Indie approach can drive a step change in the majority of cost areas for most unproven acts**

| Cost Area | Approach | Evidence | Quotes |
|---|---|---|---|
| A&R | Successful artists emerge via 'crowd-sourcing'; bands are selected to have singles made based on level of community appeal (click thrus, reviews, ratings) | Music Nation built profile of 3,000 bands for $300,000 (30 of which are likely to get at least a test deal) <br><br> Spend may come down over time as MusicNation becomes better known | "We estimate that we save at least 80% of A&R costs spent by majors on non-established acts" <br> *Founder MusicNation* |
| Marketing | Artists are marketed primarily through their communities and viral marketing <br><br> Save on upfront marketing costs to develop new talent as marketing spend focused on only promising new acts | Typical Indie marketing budget per new act is $10K vs. typical spend of ~$1m for major seeking to establish major new act <br><br> Original Signal new MusicNation signing already has 37,000 MySpace friends and 27,000 BeBo friends before a single is released | "The majors just don't get the power of digital and how digital communities work" <br> *Ex-Sony UK Head of Marketing; now MD of UK Indie label* |
| Production | Initially produce singles rather than full CD bunch <br> Create lower-cost videos <br> Focus on low budget production for early singles | Popular band Original Signal produced a video for $94; bands on Indie label spend ~$5,000 on a video (vs. ~$500,000 for typical MTV music video) <br><br> Total production costs for an iTunes release are ~$10,000 | "New digital technology means anyone can make a cheap video now" <br> *Indie label exec* |
| Distribution | Distribute digitally only for non-established bands and produce physical copies only for successful acts | Typical costs of physical distribution ~13% of CD wholesale price (~$1.35 per CD) | "Digital distribution costs us virtually nothing" <br> *Founder MusicNation* |

A-1296

Confidential

TF0000097095

### Step 4. Work closer with artists to share in ancillary revenues
Labels currently have a relatively small participation in the overall music revenues, and there is an opportunity to participate in other streams

terra firma



A-1297

Note:      Other includes licensing and proceeds from motion pictures, TV, etc
Source:     L.E.K. Analysis

Page 26

Confidential

TF0000097096

# Develop ancillary revenues
A small number of artists have succeeded in generating considerable revenue streams from a broader range of rights

terra firma



**Jay Z**

Fashion brand: Rocawear
- Designed premium clothing and accessory collection for men and women under new label Rocawear using his brand name
- Rocawear label can be licensed to 3rd party manufacturers

3rd party merchandise
- Licenses name and image for apparel, gifts and other merchandise
- Merchandise available on his personal website and via 3rd party retailers

Complementary media
- Licenses rights for video games, books and photo collections

**Jennifer Lopez**

Fragrance
- Developed fragrance collections under the J Lo and Jennifer Lopez brand name

Movies
- Movie actress, developing and licensing song titles for movie soundtrack

Toys
- Licenses image for dolls and toys in her likeness

Fashion brand: J.Lo
- Designed premium clothing and accessory collection for women using brand name

Page 27

Confidential

A-1298

TF0000097097

**Develop ancillary revenues**
Touring & Merchandising mid-level band

terra firma

- Touring:
  - 750,000 tickets at $25 per head; tour gross = $18,750,000
  - Less:  Touring costs (agency, business management, production, tour staffing, travel) = $10 to $12 million
  - Net:  Tour earns $8 to $10 million
  - Label partner receives 25% of net (Korn example)

- Merchandising:
  - $8/head gross merchandising = $6,000,000
  - Less:  COGS (manufacturing,  shipping, hall fees generally 20%)
  - Net:  $3 million
  - Label partner receives 50%, $1.5 million

Equity Case only – expectation is to sign up 5 'full size' bands and 10 'small size' bands.
Total annual expected initiative size from 2009:
Revenue: c.$35m/£18m
EBITDA c.$25m/£12m

Page 28

Confidential

TF0000097098

A-1299

terra firma

## Step 5. Aggressively pursue new opportunities
An example: A successful Nov-06 release illustrates the potential of digital and – in particular – mobile



**Label Revenues**
Million US$

0.4    0.1    0.6

R&B with urban African / Caribbean feel
Very mobile-friendly artist

Digital

Physical

| Physical CD | Digital Single | Digital Album | Ringtune | Video | OTA Download | TOTAL |

Unit Sales    1.5m    3.9m    5.9m    0.6m

Page 29

A-1300

Confidential

TF0000097099

**New Opportunities:**
Subscription 2.0 is currently being negotiated between record labels and a mobile operator in the US (numbers based on L.E.K. bottom-up model)

terra firma





All mobile enabled subscribers pay $3/month for an unlimited subscription music service; a further upside could come from Europe being priced at €3/month.

100% of the $3 goes directly to record labels

Cingular and Vodafone are assumed to start the service in 2008, with all other carriers converting to the service over the 2010-11 period

Cingular and Vodafone are assumed to have 30% market share in their respective markets.  100% of users with music enabled mobile phones receive the service when their carriers convert

In our Equity Case we have assumed £48m contribution from Europe staring in 2012; this corresponds to signing up one operator – Vodafone – with 30% market share. Dice receives 20% of overall label revenue, based on their market share

We have not factored in a share in US proceeds due to strategy of scaling down; this is conservative, as catalogue business will generate a share in revenues

A-1301

Page 30

Confidential

TF0000097100

terra firma

**New Opportunities:**
The extra label revenue from Subscription 2.0 would come from extra spending in the US and different sharing in European mobile operators



US Consumer Spend (2005-2013)
Billion US$



EU3* Consumer Spend (2005-2013)
Billion US$

\* UK, France, Germany
Source: L.E.K.

Page 31

A-1302

Confidential

TF0000097101

## New Opportunities:
Publishing - Adding NPS

terra firma

- Dice Music Publishing is the global leader in music publishing and will make a suitable platform for buying additional publishers
  - At present, Dice is capital constrained from bidding for assets
  - Significant costs can be taken out in an acquisition
  - Smaller businesses change hands at between 15x and 20x NPS to reflect this. Classical Music focused portfolios are valued at 10x-12x NPS
- A number of potential candidates are set out below.  However, there is a long list of small and medium sized music publishers and administrators that could become available. 38% of the sub-sector's revenues are generated by companies outside of the Majors.  It is much less concentrated then Recorded Music

| Target | NPS | Description |
|---|---|---|
| Blue Mountain Music | Turnover £6.2m but has unusually high level of costs | • Administration of the Bob Marley catalogue<br>• £6.2m turnover in 2005 |
| Parts of BMG/UMG Publishing | | • BMG/UMG may be required to divest some businesses to satisfy the competition commission |
| Boosey & Hawkes | £12.8m (12/05) | • Focussed on classical music.<br>• Taken private by HgCapital in 2004, when NPS was £11.4m and has made some small acquisitions since then.<br>• Reportedly for sale in 2005 for £130m.  Lower NPS because of focus on Classical Music |
| Bug Music | | • Manages 120,000 copyrights<br>• One of the largest independent music publishers in the US<br>• Backed by Spectrum Equity Partners |
| Cherry Lane | | • Artists include The Black Eyed Peas and Quincy Jones |
| Chrysalis Music | £11.4m (y/e 8/06) | • Bowie, Blondie, Outkast, Dixie Chicks and Gnarls Barkley form part of catalogue.<br>• Nominated for 41 Grammy's in 2006 and won in 14 categories |
| Music Copyright Solutions | £1.5m (12/05) | • Quoted company with a market cap. of £16m<br>• Suffered a loss in y/e 12/05 as a major customer defaulted on a loan |
| Really Useful Music | Circa £12.7m (y/e 6/06) | • Andrew Lloyd Webber's private company<br>• Publishing division potentially underperforming<br>• NPS is estimate and includes revenues earned from share of production of Lloyd Webber's shows (although Really Useful Group is not active in the running of the show) |
| Stage Three Music | £2.1m | • Apax backed vehicle which has been slow to grow.<br>• Made three acquisitions in y/e 12/05 as it tried to accelerate growth.<br>• Artists include  Aerosmith, Gerry Rafferty, Macy Gray and ZZ Top |
| TVT Records | | • Leading US independent label and music publisher – Scott Storch (premier songwriter for Snoop Dogg, Beyonce, Justin Timberlake)<br>• Strong position in digital distribution |
| Music brokers | Various | • There are music brokers that specialise in selling rights on behalf of current musicians or the estate of deceased writers.<br>• An example is IPBC which sells catalogues and portions of rights for values of £10m and less. |

A-1303

Confidential

TF0000097102

## Contents

terra firma

- Executive Summary
- Operational Business Plan

- Structure & Financing
- Exit Considerations
- Risks & Mitigants

A-1304

Page 33

Confidential

TF0000097103

# Transaction Economics and Valuation
## Indie Case, Recorded Music: Financial Projections (excludes Japan)

terra firma

| Recorded Music Revenue | 2006 Actual | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 Forecast | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Digital | 47 | 73 | 110 | 169 | 207 | 249 | 289 | 318 | 347 | 377 | 411 | 445 |
| Mobile | 24 | 37 | 58 | 79 | 104 | 125 | 147 | 161 | 178 | 192 | 209 | 226 |
| Total digital revenue | 70 | 110 | 165 | 248 | 310 | 375 | 438 | 479 | 523 | 569 | 620 | 671 |
| Growth (%) | | 57.0% | 49.9% | 50.0% | 25.0% | 20.7% | 16.3% | 9.9% | 9.1% | 8.9% | 8.9% | 8.4% |
| Physical | 1,256 | 982 | 829 | 723 | 648 | 591 | 542 | 514 | 489 | 467 | 445 | 426 |
| Growth (%) | | (21.8%) | (15.6%) | (12.8%) | (10.2%) | (9.0%) | (8.3%) | (5.1%) | (4.8%) | (4.7%) | (4.5%) | (4.3%) |
| Royalty and licensing | 89 | 72 | 71 | 69 | 68 | 66 | 65 | 63 | 62 | 61 | 59 | 58 |
| Neighbouring rights | 59 | 64 | 67 | 70 | 74 | 78 | 82 | 86 | 90 | 94 | 99 | 104 |
| Total Recorded Music net revenue | 1,474 | 1,228 | 1,132 | 1,111 | 1,101 | 1,110 | 1,124 | 1,142 | 1,164 | 1,191 | 1,224 | 1,260 |
| Growth (%) | | (16.6%) | (7.8%) | (1.9%) | (0.9%) | 0.8% | 1.3% | 1.6% | 1.9% | 2.3% | 2.7% | 3.0% |
| Virgin / Capitol closure | | | | (70) | (72) | (74) | (77) | (79) | (82) | (85) | (88) | (91) |
| Total PF Recorded Music net revenue | 1,474 | 1,228 | 1,132 | 1,041 | 1,029 | 1,035 | 1,047 | 1,063 | 1,082 | 1,106 | 1,136 | 1,169 |
| Total PF Gross Margin | 636 | 392 | 436 | 469 | 484 | 493 | 497 | 508 | 520 | 535 | 551 | 569 |
| Total net overheads | (363) | (337) | (282) | (180) | (185) | (191) | (196) | (202) | (208) | (215) | (221) | (228) |
| Recorded Music EBITDA | 173 | 55 | 153 | 290 | 299 | 302 | 301 | 306 | 312 | 320 | 330 | 341 |
| Margin (%) | 11.7% | 4.5% | 13.5% | 27.9% | 29.1% | 29.2% | 28.7% | 28.8% | 28.8% | 28.9% | 29.1% | 29.2% |
| Depreciation | (19) | (19) | (15) | (14) | (14) | (14) | (15) | (15) | (15) | (15) | (15) | (15) |
| EBITA | 154 | 36 | 139 | 275 | 285 | 288 | 286 | 291 | 297 | 305 | 315 | 326 |
| Margin (%) | 36.7% | 8.8% | 32.4% | 59.2% | 56.9% | 55.6% | 53.8% | 53.2% | 52.7% | 52.4% | 52.5% | 52.6% |

Note: All years exclude Japan, which is expected to be sold in 2008. Japan generated revenue of £165m and EBITDA of £23m in 2007.

Confidential

TF0000097104

A-1305

# Transaction Economics and Valuation
## Indie Case, Publishing: Financial Projections

terra firma

| Publishing Revenue | 2006 Actual | 2007 | 2008 | 2009 | 2010 | 2011 Forecast | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Publishing Revenue | 420 | 416 | 429 | 443 | 456 | 470 | 484 | 500 | 515 | 531 | 548 | 566 |
| add: Publishing Acquisitions | - | - | - | 22 | 45 | 45 | 47 | 48 | 49 | 51 | 52 | 54 |
| Total Publishing Net Revenue | 420 | 416 | 429 | 465 | 501 | 515 | 531 | 547 | 564 | 582 | 600 | 620 |
| | | | | | | | | | | | | |
| Net Publisher Share | 191 | 188 | 194 | 202 | 206 | 216 | 223 | 231 | 239 | 247 | 256 | 266 |
| add: Publishing Acquisitions | - | - | - | 10 | 20 | 21 | 21 | 22 | 22 | 23 | 24 | 24 |
| Total Net Publishing Share | 191 | 188 | 194 | 212 | 226 | 236 | 244 | 253 | 261 | 270 | 280 | 290 |
| % Total Publishing Revenue | 45.4% | 45.2% | 45.4% | 45.6% | 45.7% | 45.8% | 46.0% | 46.2% | 46.3% | 46.5% | 46.6% | 46.8% |
| | | | | | | | | | | | | |
| Total net overheads | (77) | (70) | (65) | (59) | (51) | (63) | (65) | (67) | (69) | (72) | (74) | (77) |
| Total Publishing EBITDA | 113 | 118 | 128 | 153 | 168 | 173 | 179 | 185 | 192 | 199 | 206 | 213 |
| Margin (%) | 27.0% | 28.3% | 30.2% | 32.6% | 33.5% | 33.6% | 33.7% | 33.9% | 34.0% | 34.1% | 34.3% | 34.4% |
| | | | | | | | | | | | | |
| Depreciation | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| EBITA | 111 | 115 | 127 | 150 | 165 | 170 | 176 | 182 | 189 | 196 | 202 | 210 |
| Margin (%) | 26.4% | 27.6% | 29.6% | 32.2% | 32.9% | 33.1% | 33.2% | 33.3% | 33.4% | 33.6% | 33.7% | 33.9% |

Page 36

Confidential

A-1306

TF0000097105

## Transaction Economics and Valuation
### Indie Case: Cash Flow Statement

terra firma

| | 2007 Actual | 2008 | 2009 | 2010 | 2011 | 2012 Forecast | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Recorded Music PF net revenue | 1,228 | 1,132 | 1,041 | 1,029 | 1,035 | 1,047 | 1,063 | 1,082 | 1,106 | 1,136 | 1,169 |
| Total Publishing PF net revenue | 416 | 429 | 465 | 501 | 515 | 531 | 547 | 564 | 582 | 600 | 620 |
| Total Consolidated Net Revenue | 1,644 | 1,561 | 1,506 | 1,530 | 1,551 | 1,578 | 1,610 | 1,646 | 1,688 | 1,736 | 1,789 |
| | | | | | | | | | | | |
| Recorded Music EBITDA | 55 | 153 | 290 | 299 | 302 | 301 | 306 | 312 | 320 | 330 | 341 |
| Publishing EBITDA | 118 | 129 | 153 | 168 | 173 | 179 | 185 | 192 | 199 | 206 | 213 |
| Central and Other EBITDA | (22) | (6) | (6) | (6) | (6) | (6) | (7) | (7) | (7) | (7) | (7) |
| Total EBITDA | 151 | 277 | 436 | 461 | 469 | 474 | 485 | 497 | 511 | 529 | 547 |
| | | | | | | | | | | | |
| Restructuring cash cost | | (97) | (54) | - | - | - | - | - | - | - | - |
| Litigation settlements | | (9) | (9) | (9) | | | | | | | |
| Working capital | | 4 | 2 | (0) | 0 | (1) | (1) | (2) | (2) | (2) | (3) |
| Central capex | | (24) | (21) | (19) | (17) | (16) | (15) | (14) | (14) | (13) | (13) |
| Music publishing capex | | (6) | (7) | (7) | (7) | (7) | (8) | (8) | (8) | (8) | (9) |
| Cash funding for acquisitions | | - | (36) | (36) | - | - | - | - | - | - | - |
| Tax | | - | (21) | (56) | (62) | (66) | (146) | (159) | (171) | (184) | (198) |
| Funding of pension deficit | | - | - | - | - | - | - | - | - | - | - |
| Total cashflow before debt financing | | 144 | 290 | 333 | 383 | 384 | 312 | 314 | 317 | 321 | 325 |

Note: All years exclude Japan, which is expected to be sold in 2008. Japan generated revenue of £185m and EBITDA of £23m in 2007.

Confidential

TF0000097106

A-1307

## Transaction Economics and Valuation
### Equity Case, Recorded Music: Financial Projections (excludes Japan)

terra firma

| Recorded Music Revenue | 2006 Actual | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Forecast | | | | | | |
| Digital | 47 | 73 | 116 | 186 | 243 | 301 | 358 | 394 | 430 | 468 | 509 | 552 |
| Mobile | 24 | 37 | 59 | 88 | 122 | 152 | 182 | 200 | 218 | 238 | 259 | 281 |
| Total digital revenue | 70 | 110 | 174 | 275 | 366 | 453 | 541 | 594 | 648 | 706 | 768 | 832 |
| Growth (%) | | 57.0% | 57.9% | 57.6% | 33.2% | 23.7% | 19.4% | 9.9% | 9.1% | 8.9% | 8.8% | 8.4% |
| Physical | 1,256 | 982 | 838 | 740 | 672 | 618 | 573 | 544 | 518 | 493 | 471 | 451 |
| Growth (%) | | (21.8%) | (14.6%) | (11.8%) | (9.2%) | (8.0%) | (7.3%) | (5.1%) | (4.8%) | (4.7%) | (4.5%) | (4.3%) |
| Royalty and licensing | 89 | 72 | 73 | 73 | 73 | 73 | 74 | 74 | 74 | 75 | 75 | 75 |
| Neighbouring rights | 59 | 64 | 67 | 70 | 74 | 78 | 82 | 86 | 90 | 94 | 99 | 104 |
| Total Recorded Music net revenue | 1,474 | 1,228 | 1,153 | 1,158 | 1,185 | 1,222 | 1,269 | 1,298 | 1,330 | 1,368 | 1,413 | 1,463 |
| Growth (%) | | (16.6%) | (6.2%) | 0.5% | 2.3% | 3.1% | 3.8% | 2.3% | 2.5% | 2.9% | 3.3% | 3.5% |
| Virgin / Capitol closure | | | | (74) | (80) | (85) | (91) | (94) | (97) | (101) | (105) | (109) |
| Total PF Recorded Music net revenue | 1,474 | 1,228 | 1,153 | 1,084 | 1,106 | 1,137 | 1,178 | 1,204 | 1,233 | 1,267 | 1,308 | 1,354 |
| Total PF Gross Margin | 536 | 392 | 445 | 493 | 526 | 549 | 568 | 585 | 604 | 626 | 650 | 676 |
| Total net overheads | (363) | (337) | (282) | (157) | (159) | (148) | (139) | (143) | (147) | (151) | (156) | (161) |
| Recorded Music EBITDA | 173 | 55 | 163 | 336 | 366 | 401 | 429 | 443 | 457 | 474 | 494 | 514 |
| Margin (%) | 11.7% | 4.5% | 14.1% | 31.0% | 33.3% | 35.2% | 36.4% | 36.8% | 37.1% | 37.4% | 37.7% | 38.0% |
| Depreciation | (19) | (19) | (15) | (15) | (16) | (16) | (17) | (17) | (17) | (18) | (18) | (19) |
| EBITA | 154 | 36 | 148 | 321 | 352 | 385 | 413 | 426 | 440 | 456 | 475 | 496 |
| Margin (%) | 38.7% | 8.8% | 34.4% | 65.6% | 64.3% | 68.1% | 70.8% | 70.8% | 70.9% | 71.2% | 71.8% | 72.4% |

Note: All years exclude Japan, which is expected to be sold in 2008. Japan generated revenue of £185m and EBITDA of £23m in 2007.

A-1308

Confidential

TF0000097107

# Transaction Economics and Valuation
## Equity Case, Publishing: Financial Projections

terra firma

| Publishing Revenue | 2006 Actual | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 Forecast | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Publishing Revenue | 420 | 416 | 429 | 444 | 459 | 474 | 490 | 506 | 522 | 540 | 558 | 577 |
| add: Publishing Acquisitions | - | - | - | 44 | 89 | 91 | 93 | 96 | 98 | 101 | 105 | 108 |
| Total Publishing Net Revenue | 420 | 416 | 429 | 489 | 548 | 565 | 583 | 602 | 621 | 641 | 662 | 685 |
| Net Publisher Share | 191 | 188 | 195 | 202 | 210 | 217 | 225 | 233 | 242 | 250 | 260 | 269 |
| add: Publishing Acquisitions | - | - | - | 20 | 40 | 41 | 42 | 43 | 45 | 46 | 47 | 49 |
| Total Net Publishing Share | 191 | 188 | 195 | 222 | 250 | 258 | 267 | 277 | 286 | 296 | 307 | 318 |
| % Total Publishing Revenue | 45.4% | 45.2% | 45.3% | 45.5% | 45.6% | 45.7% | 45.8% | 46.0% | 46.1% | 46.2% | 46.3% | 46.5% |
| Total net overheads | (77) | (70) | (65) | (59) | (61) | (63) | (65) | (67) | (70) | (72) | (74) | (77) |
| Total Publishing EBITDA | 113 | 118 | 130 | 163 | 189 | 195 | 202 | 209 | 216 | 224 | 233 | 241 |
| Margin (%) | 27.0% | 28.3% | 30.2% | 33.4% | 34.4% | 34.5% | 34.6% | 34.8% | 34.9% | 35.0% | 35.1% | 35.2% |
| Depreciation | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (4) |
| EBITA | 111 | 115 | 127 | 160 | 186 | 192 | 199 | 206 | 213 | 221 | 229 | 238 |
| Margin (%) | 26.4% | 27.6% | 29.6% | 32.8% | 33.9% | 34.0% | 34.1% | 34.2% | 34.4% | 34.5% | 34.6% | 34.7% |

A-1309

Confidential

TF0000097108

# Transaction Economics and Valuation
## Equity Case: Cash Flow Statement

terra firma

| | 2007 Actual | 2008 | 2009 | 2010 | 2011 | 2012 Forecast | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Recorded Music PF net revenue | 1,228 | 1,153 | 1,084 | 1,105 | 1,137 | 1,178 | 1,204 | 1,233 | 1,267 | 1,309 | 1,354 |
| Total Publishing PF net revenue | 416 | 429 | 489 | 548 | 565 | 583 | 602 | 621 | 641 | 662 | 685 |
| Total Consolidated Net Revenue | 1,644 | 1,582 | 1,573 | 1,653 | 1,703 | 1,761 | 1,806 | 1,854 | 1,909 | 1,971 | 2,038 |
| | | | | | | | | | | | |
| Recorded Music EBITDA | 55 | 163 | 336 | 368 | 401 | 429 | 443 | 457 | 474 | 494 | 514 |
| Publishing EBITDA | 118 | 130 | 163 | 189 | 195 | 202 | 209 | 216 | 224 | 233 | 241 |
| Central and Other EBITDA | (22) | (6) | (6) | (6) | (6) | (6) | (7) | (7) | (7) | (7) | (7) |
| Total EBITDA | 151 | 287 | 493 | 551 | 590 | 625 | 645 | 667 | 691 | 719 | 748 |
| | | | | | | | | | | | |
| Restructuring cash cost | | (97) | (72) | - | - | - | - | - | - | - | - |
| Litigation settlements | | (9) | (9) | (9) | | | | | | | |
| Working capital | | 3 | (0) | (3) | (2) | (2) | (2) | (2) | (3) | (3) | (3) |
| Central capex | | (25) | (22) | (20) | (18) | (17) | (16) | (15) | (15) | (14) | (13) |
| Music publishing capex | | (7) | (7) | (7) | (7) | (7) | (8) | (8) | (8) | (8) | (9) |
| Cash funding for acquisitions | | | (72) | (72) | | | | | | | |
| Tax | | | (35) | (60) | (186) | (205) | (211) | (228) | (246) | (266) | (287) |
| Funding of pension deficit | | | - | - | - | - | - | - | - | - | - |
| Total cashflow before debt financing | | 162 | 276 | 380 | 377 | 394 | 409 | 414 | 420 | 426 | 435 |

Note: All years exclude Japan, which is expected to be sold in 2008. Japan generated revenue of £165m and EBITDA of £23m in 2007.

A-1310

Confidential

TF0000097109

# Transaction Economics and Valuation
## Downside Case, Publishing: Financial Projections

terra firma

| Publishing Revenue | 2006 Actual | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 Forecast | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Publishing Revenue | 420 | 416 | 422 | 426 | 430 | 434 | 440 | 446 | 453 | 461 | 470 | 481 |
| add: Publishing Acquisitions | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Publishing Net Revenue | 420 | 416 | 422 | 426 | 430 | 434 | 440 | 446 | 453 | 461 | 470 | 481 |
| Net Publisher Share | 191 | 188 | 192 | 195 | 199 | 202 | 206 | 211 | 216 | 221 | 227 | 233 |
| add: Publishing Acquisitions | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Net Publishing Share | 191 | 188 | 192 | 195 | 199 | 202 | 206 | 211 | 216 | 221 | 227 | 233 |
| % Total Publishing Revenue | 45.4% | 45.2% | 45.5% | 45.9% | 46.2% | 46.6% | 46.9% | 47.3% | 47.6% | 47.9% | 48.2% | 48.4% |
| Total net overheads | | | | | | | | | | | | |
| Total Publishing EBITDA | (77) | (70) | (65) | (64) | (65) | (67) | (69) | (72) | (74) | (76) | (78) | (81) |
| | 113 | 118 | 127 | 132 | 133 | 135 | 137 | 139 | 142 | 145 | 148 | 152 |
| Margin (%) | 27.0% | 28.3% | 30.1% | 30.9% | 31.0% | 31.1% | 31.1% | 31.2% | 31.3% | 31.4% | 31.5% | 31.6% |
| Depreciation | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| EBITA | 111 | 115 | 125 | 129 | 131 | 132 | 134 | 137 | 139 | 142 | 145 | 149 |
| Margin (%) | 26.4% | 27.6% | 29.5% | 30.3% | 30.4% | 30.5% | 30.5% | 30.6% | 30.7% | 30.8% | 30.9% | 31.0% |

Note: All years exclude Japan, which is expected to be sold in 2008. Japan generated revenue of £185m and EBITDA of £23m in 2007.

Page 40

Confidential

TF0000097110

A-1311

# Transaction Economics and Valuation
## Downside Case : Cash Flow Statement

terra firma

| | 2007 Actual | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Forecast | | | | | |
| Total Recorded Music PF net revenue | 1,228 | 1,054 | 907 | 583 | 544 | 509 | 513 | 519 | 528 | 539 | 553 |
| Total Publishing PF net revenue | 416 | 422 | 426 | 430 | 434 | 440 | 446 | 453 | 461 | 470 | 481 |
| Total Consolidated Net Revenue | 1,644 | 1,476 | 1,332 | 1,013 | 979 | 949 | 960 | 972 | 989 | 1,010 | 1,033 |
| | | | | | | | | | | | |
| Recorded Music EBITDA | 55 | 123 | 228 | 162 | 146 | 126 | 125 | 125 | 126 | 129 | 132 |
| Publishing EBITDA | 118 | 127 | 132 | 133 | 135 | 137 | 139 | 142 | 145 | 148 | 152 |
| Central and Other EBITDA | (22) | (6) | (6) | 11 | 11 | 12 | 12 | 12 | 13 | 13 | 14 |
| Total EBITDA | 151 | 244 | 354 | 306 | 292 | 275 | 277 | 280 | 284 | 290 | 298 |
| | | | | | | | | | | | |
| Restructuring cash cost | | (97) | (55) | (64) | - | - | - | - | - | - | - |
| Litigation settlements | | (9) | (6) | (9) | - | - | - | - | - | - | - |
| Working capital | | 10 | 8 | 5 | 4 | 4 | (0) | (1) | (1) | (1) | (1) |
| Central capital | | (23) | (18) | (15) | (13) | (11) | (11) | (10) | (10) | (9) | (9) |
| Music publishing capex | | (6) | (6) | (7) | (7) | (7) | (7) | (7) | (7) | (7) | (7) |
| Cash funding for acquisitions | | - | - | - | - | - | - | - | - | - | - |
| Tax | | - | - | - | (38) | (40) | (44) | (48) | (52) | (57) | (62) |
| Funding of pension deficit | | - | - | - | - | - | - | - | - | - | - |
| Total cashflow before debt financing | | 119 | 273 | 197 | 238 | 220 | 215 | 214 | 215 | 216 | 218 |

Note: All years exclude Japan, which is expected to be sold in 2009. Japan generated revenue of £165m and EBITDA of £23m in 2007.

Page 41

Confidential

TF0000097111

A-1312

# Indie Case build-up at 265p per share

terra firma



**Indie Under-perform**

**Indie Case**

20.4%
2.5x

18.9%
2.4x    £60m

**Fixed Cost Savings**
£80m
by 2009    £90m    21.2%
2.6x

**Indie Outperform**

17.6%
2.2x    -13%

**Physical Decline**
-11% CAGR
(07-12)    -9%    22.8%
2.8x

12.6%
1.8x    +25%

**Digital Growth**
+32 CAGR
(07-12)    +35%    24.5%
3.0x

12.6%
1.8x    $0.065

**Statutory Royalty Fee**
$0.091    No change    24.5%
3.0x

11.6%
1.7x    +£0m

**Bolt on publishing catalogues**
+£20m (at 12x)    +£30m    24.9%
3.0x

NB. Reflects updated financing from the numbers presented at the IAC on 18 May 2007.

Page 42

Confidential

A-1313

TF0000097112



# Equity Case build-up at 265p per share

terra firma



A-1314

NB. Reflects updated financing from the numbers presented at the IAC on 18 May 2007.

Page 43

Confidential

TF0000097113

# Downside Case build-up at 265p per share

terra firma



**Downside Case**

**Downside
Under-perform**

| | |
|---|---|
| 5.8%<br>1.7x | |

**Downside
Outperform**

4.3%
1.5x    £120m

Overhead required
to run catalogue
£100m    £80m    7.2%
2.1x

3.9%
1.5x    -15%

Physical Decline
-14% CAGR
(07-12)    -11%    8.1%
2.1x

3.1%
1.3x    +20%

Digital Growth
+23% CAGR
(07-12)    +25%    8.5%
2.2x

3.2%
1.4x    $0.065

Statutory Royalty Fee
$0.0855    $0.091    8.5%
2.2x

3.2%
1.4x    £70m

UK Pension funding
£50m    £50m    9.2%
2.4x

3.2%
1.4x    +£0m

Bolt on publishing catalogues
None    +£10m    8.8%
2.3x

-2.1%
0.8x    Sale of Publishing
In 2017 at 14x

Sale of Recorded Music
In 2010 at 6.5x EBITDA
Sale of Publishing
In 2017 at 14x EBITDA    Sale of Publishing
In 2017 for 16.0x EBITDA    9.8%
2.5x

NB. Reflects updated financing from the numbers presented at the IAC on 18 May 2007.

Confidential

TF0000097114

A-1315

terra firma

## TF Returns Under the Three Scenarios assuming the Citigroup debt package

| IRR - % | Equity Case | | | Indie Case | | | Downside Case | | | Equity Add'l Equity Required* |
|---|---|---|---|---|---|---|---|---|---|---|
| Offer Price (p) | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | |
| 255 | 30.9% | 38.8% | 44.2% | 13.0% | 22.0% | 26.5% | (1.5%) | 6.5% | 10.4% | - |
| 260 | 30.0% | 37.8% | 43.1% | 12.3% | 21.2% | 25.7% | (1.8%) | 6.1% | 10.1% | - |
| 265 | 29.2% | 36.8% | 42.0% | 11.6% | 20.4% | 24.9% | (2.1%) | 5.8% | 9.7% | - |
| 270 | 28.3% | 35.8% | 41.0% | 10.9% | 19.7% | 24.1% | (2.4%) | 5.5% | 9.4% | 18 |
| 275 | 27.6% | 34.8% | 39.9% | 10.2% | 19.0% | 23.3% | (2.7%) | 5.2% | 9.1% | 65 |
| 280 | 26.8% | 33.9% | 39.0% | 9.5% | 18.3% | 22.6% | (3.0%) | 4.9% | 8.8% | 112 |
| 285 | 26.1% | 33.1% | 38.0% | 8.9% | 17.6% | 21.9% | (3.3%) | 4.6% | 8.5% | 158 |

| CoC | Equity Case | | | Indie Case | | | Downside Case | | | Equity Additional Equity Required |
|---|---|---|---|---|---|---|---|---|---|---|
| Offer Price (p) | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | Under-perform | Expected | Outperform | |
| 255 | 3.84x | 4.37x | 4.96x | 1.85x | 2.71x | 3.24x | 0.86x | 1.84x | 2.64x | - |
| 260 | 3.71x | 4.23x | 4.79x | 1.78x | 2.62x | 3.14x | 0.83x | 1.79x | 2.56x | - |
| 265 | 3.59x | 4.09x | 4.64x | 1.73x | 2.53x | 3.04x | 0.81x | 1.74x | 2.49x | - |
| 270 | 3.48x | 3.97x | 4.50x | 1.67x | 2.46x | 2.94x | 0.78x | 1.69x | 2.41x | 18 |
| 275 | 3.38x | 3.85x | 4.36x | 1.62x | 2.38x | 2.85x | 0.76x | 1.64x | 2.35x | 65 |
| 280 | 3.28x | 3.74x | 4.24x | 1.58x | 2.31x | 2.77x | 0.74x | 1.60x | 2.28x | 112 |
| 285 | 3.19x | 3.63x | 4.12x | 1.53x | 2.25x | 2.69x | 0.72x | 1.55x | 2.22x | 158 |

* £20m of additional equity required due to additional pensions funding in downside case

A-1316

Page 46

Confidential

TF0000097115

**TF Returns Under the Three Scenarios assuming the Deutsche Bank debt package**

terra firma

| IRR - % | Equity | Indie. | Downside |
|---|---|---|---|
| Offer Price (p) | Expected | Expected | Expected |
| 255 | 34.7% | 19.5% | 6.5% |
| 260 | 33.9% | 18.8% | 6.2% |
| 265 | 33.1% | 18.2% | 6.0% |
| 270 | 32.3% | 17.6% | 5.7% |
| 275 | 31.5% | 17.1% | 5.5% |
| 280 | 30.8% | 16.5% | 5.2% |
| 285 | 30.1% | 16.0% | 5.0% |

| CoC | Equity | Indie. | Downside |
|---|---|---|---|
| Offer Price (p) | Expected | Expected | Expected |
| 255 | 3.69x | 2.43x | 1.85x |
| 260 | 3.60x | 2.37x | 1.81x |
| 265 | 3.50x | 2.31x | 1.77x |
| 270 | 3.42x | 2.25x | 1.72x |
| 275 | 3.33x | 2.20x | 1.69x |
| 280 | 3.26x | 2.15x | 1.65x |
| 285 | 3.18x | 2.10x | 1.61x |

Page 46

Confidential

A-1317

TF0000097116

terra firma

## Transaction Economics and Valuation
### Equity / Indie Case: Sources and Uses

#### Citigroup Debt Package

| Sources | | Uses | |
|---|---|---|---|
| New Equity | £1,473 | Shareholders | £2,465 |
| | | Debt retirement | 1,338 |
| Bridge to Securistization | 1,410 | Pension Deficit | 40 |
| Securitization - Senior | - | Additional Pension Buyout | 10 |
| Securitization - Junior | - | Financing Fees | 37 |
| Term Loan B | 725 | Deal Fees | 11 |
| High Yield Bridge | 365 | Refinancing Costs | 72 |
| | | Stamp Duty | 12 |
| Cash | 38 | Min cash | 25 |
| Total | £4,011 | Total | £4,011 |

#### Deutsche Bank Debt Package

| Sources | | Uses | |
|---|---|---|---|
| New Equity | £1,841 | Shareholders | £2,465 |
| | | Debt retirement | 1,338 |
| Bridge to Securistization | 1,410 | Pension Deficit | 40 |
| Securitization - Senior | - | Additional Pension Buyout | 10 |
| Securitization - Junior | - | Financing Fees | 41 |
| Term Loan B | 725 | Deal Fees | 11 |
| High Yield Bridge | - | Refinancing Costs | 72 |
| | | Stamp Duty | 12 |
| Cash | 38 | Min cash | 25 |
| Total | £4,014 | Total | £4,014 |

A-1318

Confidential

TF0000097117

## Contents

- Executive Summary

- Operational Business Plan

- Transaction Economics and Valuation

- Exit Considerations

- Risks & Mitigants

terra firma

A-1319

Confidential

TF0000097118

## Acquisition Structure – proposed final structure

terra firma



The acquisition of Dice would be structured as a cross-fund transaction, and approval of the Advisory Boards of both TFCP II and TFCP III has been received.

Note: Terra Firma Capital Partners II represents six limited partnerships with a common general partner investing in parallel

Page 49

Confidential

TF0000097119

A-1320

# Debt Financing

terra firma

- **Summary of day 1 debt package (Citigroup)**
- Bridge to securitisation - 12 month bridge with a 7 year term out at a margin of 200 bps, stepping up 25 bps every 3 months. There is also a step up of 500bps after 9 months, 25bps after 12 months and 25bps after 18 months if indicative ratings are not obtained.
- Term loan B (on recorded music business) – 8-yr bullet at 250 bps.
- Bridge to high yield or equity - 12 month bridge with a 9 year term out at a margin of 450 bps, stepping up 50 bps every 3 months and capped at 925 bps.
- Revolver - £350m substantially against recorded music business
- Acquisition facility - £100m committed and £200m uncommitted mostly against the publishing business
- **Summary of take-outs**
- Securitisation against Publishing - Out of the 12x total quantum, 10.5x will be a senior tranche priced at 90-95 bps including the costs of wrapping. The remainder will be a subordinated tranche at 450-500 bps. The blended margin will be in the 140s.
- High yield - Has a 10-yr term and a margin of 525 bps. It is proposed to be NC1, 102, 101, par.
- Including the high yield take-out, the permanent financing will total £2.5bn of drawn facilities with a weighted average margin of c.228 bps.

- Fees
- Bridge to Securitisation:
    - Funding fee 1.50%
    - Commitment fee 0.50%
    - Takeout fee 120bps on investment grade, 255bps on non-investment grade
    - No rollover fee
- Term Loan B
    - Arrangement fees 2.00%
    - Commitment fee 0.50%
- Bridge to High Yield / Equity
    - Commitment fee 0.50%
    - Funding fee 2.00%
    - Rollover fee 2.50%
- Revolver
    - Arrangement fee 2.00%
    - Commitment fee 0.50%
- Acquisition Facility
    - Arrangement fee 2.00%
    - Commitment fee 0.50%

- We are likely to have one financial covenant – net debt/EBITDA. Unlimited cure rights are being negotiated.
- We are working on an alternative debt package with Deutsche Bank which excludes the bridge to high yield or equity.
    - Deutsche Bank is approved for 1/3.
    - Barclays will probably be approved for 1/2 by lunchtime Monday.
    - HBOS – Are intending to start working on the transaction on 20 May 2007, but timeline is extremely challenging and we have not heard back from them yet. Aim is to underwrite 100% of the debt.

Page 60

Confidential

A-1321

TF0000097120

terra firma

## Contents

- Executive Summary
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing

- Risks & Mitigants

Page 81

Confidential

A-1322

TF0000097121

## Exit Considerations – Publishing

terra firma

**Sell to financial player**

- Private equity and infrastructure funds will have strong interest based on highly stable but growing and scaleable cash flow profile
- An eventual exit by way of a sale to a financial sponsor is highly possible.  In 2006 Bertelsmann sold its music publishing arm to Universal, another major, for 19x LFY EBITDA.  In the auction process there were Financial Sponsor bidders close enough behind this price level to force Universal to buy the business unconditionally and assume all the competition risk.

**Sell to media conglomerate, distribution player or new media major**

- Standalone logic may be less compelling but feasible at attractive valuation as part of integrated play with Recorded Music

**IPO**

- Music publishing assets highly valued in the equity market today even at much smaller scale (implied value of Chrysalis music publishing c. £150m based on £10m NPS, £5m EBITDA

**Recapitalisation**

- Good opportunity to recap the business in conjunction with bolt on acquisitions
- Upscale the financing on similar multiples based on higher cash flows as growth comes through

Page 52

Confidential

A-1323

TF0000097122

terra firma

## Exit Considerations – Recorded Music Division

**Sell to Whist**

- "Perfect" geographical fit to the businesses (Whist strong in US, weak in Europe; Dice vice versa)
- £200m of cost savings from combination (value to Dice of £1bn at 10x multiple on 50%)
- Only remaining consolidation play for the majors (UMG or Sony BMG would have regulatory issues)
- Regulatory risk generally considered relatively modest given pricing trends in the industry

**Sell to media conglomerate, distribution player or new media major**

- Distribution companies have perennial fascination with pure content plays (Sony/Columbia, JVC/Victor Music, AOL/Time Warner, Telefonica/Endemol, Vivendi/Universal, Mediaset/Endemol, Virgin Media/ITV): Dice represents the perfect digital content engine for the broadband pipes of the future (e.g. Comcast, Virgin Media, Liberty Global)
- Digital content engine for new media majors (Google, Yahoo!, Microsoft)
- Good fit with film majors not currently in the music industry (News Corp, Disney)

**IPO**

- Perfectly feasible as a pure play, attracting premium multiple as market enthusiasm for digital growth develops
- Publishing income not a prerequisite, though a re-IPO of the combined group also makes sense

**Recapitalisation**

- Increased leverage potential post restructuring and as visibility on industry revenue growth improves

A-1324

Page 63

TF0000097123

# Exit Considerations
## Exit multiples analysis

Successful repositioning of Dice as a music content provider in a high growth market is likely to result in exit multiples more approximating content production companies.

terra firma

### Dice Historic Multiples Since Thorn De-merger

**Historic Enterprise Value / EBITDA**

| 1997[1] | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|

(1) Pro forma to exclude Thorn

### Content Production EBITDA Trading Multiples



(2) Based on a blended EBITA and NPS multiple

### Content Production EBITDA Transaction Multiples



A-1325

Confidential

TF0000097124

# Exit Considerations
## Summary

terra firma



| Methodology | Dice value per share [1] | Comments |
|---|---|---|
| ▪ Recent Share Price Performance | Share price as at 11 May: 245p — 314 | ▪ Last 12 months high / low trading range |
| ▪ Analyst Price Targets | | ▪ Range of analyst price targets post 2nd profit warning |
| ▪ Comparable Trading Multiples | 173 | ▪ Range based on 2008E Sales and EBITDA multiple for Whist with 30% takeover premium |
| ▪ SOTP valuation | | ▪ Applying a 19x EBITDA multiple for music publishing and a 12.6x multiple for recorded music. Range derived by applying -/+ 10% |

0   50   100   150   200   250   300   350   400   £ value per share

Note: (1) Based on fully diluted number of shares, adjusted net debt of £1288.9m, pension deficit of £37.7m and minorities of £48.8m

Page 66

Confidential

TF0000097125

A-1326

## Exit Considerations
### Overview trading multiples

terra firma

| | | | | | Dico Offer price per share | | | | | | | Whist current valuation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 245p | 250p | 255p | 260p | 265p | 270p | 275p | 280p | | Share price($) | 17 |
| | | Share price(p) Market cap (£m) | 2,269.4 | 2,315.8 | 2,362.1 | 2,408.4 | 2,454.7 | 2,501.0 | 2,547.3 | 2,593.6 | | Market cap ($m) | 2,541.6 |
| | | Enterprise value (£m) [1] | 3,644.8 | 3,691.2 | 3,737.5 | 3,783.9 | 3,830.1 | 3,876.4 | 3,922.7 | 3,969.0 | | Enterprise value ($m) | 4,592.6 |
| | | Brokers' consensus | | | | | | | | | | Brokers' forecasts [2] | |
| Revenues | 3/07 | £1,751.6m | 2.1 x | 2.1 x | 2.1 x | 2.2 x | 2.2 x | 2.2 x | 2.2 x | 2.3 x | | $3,505.0m | 1.3 x |
| | 3/08 | £1,747.9m | 2.1 x | 2.1 x | 2.1 x | 2.2 x | 2.2 x | 2.2 x | 2.2 x | 2.3 x | | $3,568.5m | 1.3 x |
| | 3/09 | £1,774.3m | 2.1 x | 2.1 x | 2.1 x | 2.1 x | 2.2 x | 2.2 x | 2.2 x | 2.2 x | | $3,679.5m | 1.2 x |
| EBITDA | 3/07 | £174.1m | 20.9 x | 21.2 x | 21.5 x | 21.7 x | 22.0 x | 22.3 x | 22.5 x | 22.8 x | | $510.5m | 8.9 x |
| | 3/08 | £230.6m | 15.8 x | 16.0 x | 16.2 x | 16.4 x | 16.6 x | 16.8 x | 17.0 x | 17.2 x | | $525.5m | 8.7 x |
| | 3/09 | £271.7m | 13.4 x | 13.6 x | 13.8 x | 13.9 x | 14.1 x | 14.3 x | 14.4 x | 14.6 x | | $556.5m | 8.2 x |
| EBITA | 3/07 | £150.6m | 24.2 x | 24.5 x | 24.8 x | 25.1 x | 25.4 x | 25.7 x | 26.0 x | 26.4 x | | $484.0m | 9.6 x |
| | 3/08 | £204.0m | 17.9 x | 18.1 x | 18.3 x | 18.6 x | 18.8 x | 19.0 x | 19.2 x | 19.5 x | | $476.0m | 9.6 x |
| | 3/09 | £244.5m | 14.9 x | 15.1 x | 15.3 x | 15.5 x | 15.7 x | 15.9 x | 16.0 x | 16.2 x | | $510.5m | 8.9 x |
| FCF Yield (%) | 3/07 | £74.4m | 3.3% | 3.2% | 3.1% | 3.1% | 3.0% | 3.0% | 2.9% | 2.9% | | $217.0m | 8.5% |
| | 3/08 | £62.6m | 2.8% | 2.7% | 2.6% | 2.6% | 2.5% | 2.5% | 2.5% | 2.4% | | $251.0m | 9.9% |
| | 3/09 | £160.6m | 6.6% | 6.5% | 6.4% | 6.3% | 6.1% | 6.0% | 5.9% | 5.8% | | $286.0m | 11.3% |

Source: Broker research, DataStream

Notes: (1) Enterprise value including net debt of £1288.9m, pension deficit of £37.7m as per Deloitte vendor due diligence report and minorities of £48.8m

(2) Profits and multiples are calendarised to March year end

(3) Whist valuation is including value of options at current share price

Confidential

TF0000097126

A-1327

# Exit Considerations
## Transaction comparables

terra firma

| Date | Target | Buyer | Currency | Enterprise value (m) | EV/NPS | EV/Sales | EV/EBITDA | |
|------|--------|-------|----------|---------------------|--------|----------|-----------|---|
| *Music Publishing:* | | | | | | | | |
| 6 Sep 2006 | BMG Music Publishing | Vivendi Universal | EUR | 1,630 | 9.5x | 4.4x | 19.0x | LFY |
| | | | | | 9.2x | 4.4x | 18.8x | CFY |
| | | | | | 8.9x | 4.2x | 17.2x | CFY +1 |
| 30 Aug 2006 | Rondor | Vivendi Universal | USD | 400 | 18.0x | n/a | n/a | |
| 10 Apr 2003 | Jobete | EMI | USD | 354 | 20.0x | n/a | n/a | |
| 2 Jul 2002 | Acuff Rose | Sony | USD | 157 | 16.0x | n/a | n/a | |
| 1 Mar 2001 | Securitisation of Chrysalis catalogue | - | GBP | 150 | 18.5x | n/a | n/a | |
| **Average (excl. BMG current year and forecast year)** | | | | | **16.4x** | | | |
| *Recorded Music:* | | | | | | | | |
| 24 Nov 2003 | Warner Music Group | Bain Capital, Providence Equity Partners, Thomas H Lee, Lexa Partners | USD | 2,600 | n/a | 0.8x | 12.6x | |

Page 67

Confidential

A-1328

TF0000097127

## Exit Considerations
Indicative SOTP analysis

terra firma



**Sum of the Parts Valuation**

- **Recorded music valuation range:**
  - Based on 12.6x EV/EBITDA transaction multiple of the Whist buyout by a sponsor consortium in 2003, applied to 2008E Dice numbers

- **Music publishing valuation:**
  - 19x EV/EBITDA multiple applied to Dice 2008E music publishing EBITDA

- Numbers based on 2008 forecasts given that full cost savings are expected to be achieved from the current restructuring

Note: Sum of the parts valuation based on consensus 2008E numbers

Page 68

Confidential

TF0000097128

A-1329

terra firma

# Contents

- Executive Summary
- Operational Business Plan
- Transaction Economics and Valuation
- Structure & Financing
- Exit Considerations

Page 69

Confidential

TF0000097129

A-1330

## Risks & Mitigants
### Diligence conducted

terra firma

| Focus | Parties | Status |
|---|---|---|
| Commercial | LEK | Developed a bottom-up model of each of the US and UK/France/Germany to project market digital growth and physical decline.<br>Participated in management meetings; reports submitted to banks. |
| Commercial | McKinsey | Examined potential upside opportunities and the cost reduction plan.<br>Participated in management meetings; reports submitted to banks. |
| Tax | KPMG | Reports submitted to banks. |
| Pensions | KPMG | Reports submitted to banks. |
| Accounting | KPMG | Reviewed data room and Vendor Due Diligence prepared by Deloitte. Reports submitted to banks. |
| Legal | Weil Gotshal | Reviewed data room; participated in management meetings. |
| Advisory | Dresdner Kleinwort | Reviewed the data room; participated in management meetings. |

**Advisors**

A-1331

Confidential

TF0000097130

# Risks & Mitigants
## Commercial Due Diligence: Recorded Music

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Physical decline continues to be rapid | Physical sales, which comprised 90% of Dice Music revenue in FY 2007, declined by 25% year-on-year. There continues to be a step-change in the physical recorded music market, which could result in continued decline in industry revenue from physical sales. | • The decline in physical is in part driven by cannibalization from increased digital consumption of music.<br>• The team has assumed a 11% (CAGR) decline in physical revenue during the hold period in the Base Case (the "indie" case).<br>   – In line with analysts estimates.<br>• Dice's strong music catalogue and strength in music genres with "friendly" demographics (i.e., Christian/country/jazz) provides support for a floor on physical revenue with low cost base. |
| Digital growth is lower than expected | The music industry has thus far struggled to develop revenue models for monetizing the consumer patterns for consumption of digital music.<br>As a result, it is possible that the overall industry will continue decline to a smaller size. | • The base case assumes digital growth that is within the range of market forecasts.<br>• Slower than expected pickup in digital would at least partly be offset by less dramatic declines in physical.<br>• There are several value propositions that the team has identified that are not included in the Indie Case:<br>   – The release of the Beatles catalogue in digital format;<br>   – Positive impact from higher-priced premium digital tracks (i.e., higher quality and free from digital rights management). |
| Mobile growth is lower than expected | The opportunity presented by the emergence of music-enabled handsets is offset by sideloading of content that undermines the revenue capture opportunity for music labels. | • Leading industry-led initiative focus on music-enabled handsets (as well as the iPhone) as a driver of growth.<br>• The Indie Case does not factor in an industry initiative ("Subscription 2.0") to transform delivery of music content to consumers on a subscription-based model similar to the cable subscription models. |

Page 61

Confidential

A-1332

TF0000097131

# Risks & Mitigants
## Commercial Due Diligence: Recorded Music (cont'd)

terra firma

| Item | Risk | Mitigant |
|---|---|---|
| Achievability of cost savings | The Indie Case assumes a substantial degree of cost savings, which carries a degree of execution risk. | • Even after four rounds of restructuring, there remains considerable fixed cost in the business required to support presence in smaller unprofitable markets<br>• The team has discussed in detail with management and identified with a high degree of confidence the costs that could be eliminated in the Indie and Downside scenarios. |
| Disaggregation of the album | The decline in CD sales corresponds to a reduction in the number of "album equivalents" sold as digital distribution permits consumers to cherry-pick 2-3 tracks of an album for c.$0.99 each rather than paying $15.99 for the entire physical album. | • The industry has developed pricing initiatives such as the "complete my album" that incentivise album purchases.<br>  – As a result, the team understands that digital album sales are currently growing faster than digital singles sales.<br>• The team has modelled a market downside scenario reflective of a market in continued decline.<br>  –This Downside scenario forecasts overall music industry decline of 5.1% CAGR through 2017. |
| Piracy | Piracy of physical and digital music which costs the music industry $6 billion annually, an amount that is expected to increase as young music consumers become accustomed to acquiring their music without paying. | • Piracy was most compelling as a consumer proposition when there was no legal alternative for digital download.<br>• The team believes that the impact of piracy, while significant, is unlikely to cut further into existing revenues as those who would commit piracy likely already do.<br>  –Those markets where piracy is yet to develop do not account for significant revenues for Dice. |

A-1333

Page 62

Confidential

TF0000097132

# Risks & Mitigants
**Commercial Due Diligence: Publishing**

terra firma

| Item | Risk | Mitigant |
|------|------|----------|
| Decline in the statutory royalty rate | The Copyright Regulatory Board is to determine the revised royalty rate that recorded music companies must pay to publishers.<br>In light of the deteriorating market conditions, it is likely that this rate will be set below the current rate, resulting in decline in mechanical revenue in the US. | • TF Downside Case assumes that the statutory rate is set at $0.065/track in 2008, 2.7% below the current $0.091 statutory rate.<br>• On a cash flow basis, there is an offset to Music as royalty costs paid to publishers in the US reduce by the same percentage.<br>• On a value basis, there would be additional leakage to the extent that Publishing is expected to attract a higher multiple on exit than Music. |
| Indie Case may reduce opportunity to cross-sell US artists to publishing catalogue | The Indie Case scenario assumes retraction from the US Rock & Pop market, which will result in lost opportunity for Dice to offer both Music and Publishing services to artists. As a result, there is risk that over time Dice will be unable to add to its catalogue to the extent forecast. | • Historically, the publishing and record label industries have performed distinctly different functions for artists, and there is minimal overlap between the two as artists seek to split management of their rights to safeguard their interests.<br>• Publishing has many of the top selling songwriters who are not on the Music label, including Eminem, Kanye West and the Arctic Monkeys.<br>• Dice's Publishing has strong demonstrated ability to exploit its existing catalogue, and is likely to continue to be attractive to new artists who will profit from exploitation of their copyrights.<br>• While the team believes that any impact from separation of the two businesses will be negligible, the Downside Case assumes a slight decline of 0.5% top-line growth resulting from fewer new acts signed. |

Page 63

A-1334

Confidential

TF0000097133

# Risks & Mitigants
## Commercial Due Diligence: Financial

terra firma

| Item | Risk | Mitigant |
|------|------|----------|
| Execution of Securitization | The securitization of Publishing's cash flows is complicated by the multi-jurisdictional nature of collections and the existing Dice corporate structure. | • The team has had discussions on securitization structure with its banks, including Deutsche Bank which Dice had announced mandated to explore the securitization of the Publishing business. |
| Working capital swings intra-year | The company has historically operated with a £350m peak-to-trough swing in working capital, reflecting the advance payments to artists on the front-end and the ability to control royalty payments to artists on the back-end. | • The team has had discussions with banks for a £350m revolving facility to provide sufficient flexibility.<br>• While the company operates at significant net working capital, overall net change in working capital year-on-year has been minimal. |

A-1335

Page 64

Confidential

TF0000097134

## Risks & Mitigants
### Tax Due Diligence - Summary

terra firma

- There is very little tax data in the data room and the tax information in the VDD covered only a very high level review (10 pages) based on only a few discussions with management. The due diligence findings are therefore based primarily on information provided in the management meetings on 14 May and the facts provided are yet to be verified

- However, based on information to date, the group does not appear to have any significant unprovided corporate tax exposures. Indeed, the group is probably overprovided with circa £20m of the current tax provision of £76.3m being 'general' in nature. Indeed, the auditors believe the group is overprovided and requested that the tax provision be reduced by approximately £30m over a 3 year period starting in FY06

- In addition, no significant tax planning has been undertaken by the group and they are considered low risk for HMRC audit purposes in the UK which is unusual for a multinational group of this size (and supports the view that no significant planning or unreasonable filing positions have been taken)

- However, no significant information has currently been provided regarding VAT or employee tax issues (it was not part of the VDD and few documents are in the data room).

- The key jurisdictions for the target are UK, US, France, Japan, Italy, Germany, Netherlands, Australia and Spain which represent 85% of EBITA. Of these countries, the UK and US continue to make tax losses while there has been no (or limited) tax payable in France and Spain due to losses brought forward. The key tax paying jurisdictions are Italy, Netherlands, Japan and Australia

A-1336

Page 65

Confidential

TF0000097135

# Risks & Mitigants
## Tax Due Diligence – Historic exposures

terra firma

- Tax is provided for on a conservative basis with tax provisions of £76.3m as at 31 March 2007. This is split as follows:
    - Dutch tax challenge in respect of dividend withholding tax and the tax gain on the sale of the manufacturing site: £15.3m
    - German tax challenge in respect of transfer pricing (management charges) and artist advances provisions : £15m
    - Japanese tax challenge in respect of transfer pricing (management charges) : £19m
    - Italian tax challenge in respect transfer pricing (management charges and royalties) : £3m
    - General: £24m
- Management have indicated that for each of the exposures identified above, the amount provided represents a full provision, with no discount applied
- The bulk of the provisions relate to transfer pricing and although no formal studies have been done in the local countries, the management charge position has been subject to a high level review by the target's UK advisers (KPMG) who have indicated that the amount of recharges are actually on the low side (more costs could possibly be recharged from the UK and a mark up could be applied). Further, the German tax position has been challenged in past audits by the tax authorities with no ultimate adjustment being required. The Japanese provision recognises that recharges were only introduced in 2002 and a back payment was then made for prior years. Regarding the royalty position, these are primarily paid to the UK and US and a bi-annual transfer pricing review is carried out by US advisers (E&Y) to support the US filing position.
- The Dutch provision includes £5.3m in respect of withholding tax which is currently the subject of litigation. A decision by the court has been outstanding for 2 years and adviser apparently view the changes of success as strong. The only other tax litigation notified is in Brazil which relates to two cases for amortisation of goodwill and a VAT exposure on artist royalties. Management indicated that both Brazilian cases relate to very old exposures and no significant exposure is expected. However, the data room comments state that the cases were last decided (against the target) in 2005/6 and the exposures amount to £21m. It seems likely that some provision is required. However, the general provision above should be sufficient to cover the exposure. It seems that there is also probably some "buffer" within the transfer pricing provisions as noted above. Indeed, we understand that the auditors are of the view that the group is overprovided.

Page 66

A-1337

TF0000097136

# Risks & Mitigants
## Pensions Due Diligence - Key Findings

terra firma

**Dice operates significant defined benefit pension schemes**

- Dice operates a number of defined benefit arrangements in the UK, Germany and Japan, as well as a number of other small overseas arrangements
- By far the largest of the arrangements is the Dice Pension Fund ("the Fund") in the UK, which had assets of around £1 billion as at 31 March 2007

**Past service deficits – overview**

- The aggregate IAS19 deficit in Dice's pension arrangements as at 31 March 2007 was £43 million (excluding deferred tax), made up of a deficit in the Fund of £7 million and net deficits/unfunded liabilities for non-UK arrangements of £36 million, as set out in the table below:

| Summary of IAS19 funding position at 31 March 2007 | | | | | |
|---|---|---|---|---|---|
| £m | Dice Pension Fund | German DB arrangement | Japanese DB arrangements | Other non-UK arrangements | Total |
| Surplus / (Deficit) | (7.0) | (30.7) | 3.0 | (8.3)* | (43.0) |

*Notes: * As at 31 March 2006 – D&T VDD states that figure at 31 March 2007 should be broadly similar*

**Past service deficits – overview**

- For the latest cash funding valuation (as at 31 March 2006), the Trustees of the Fund initially proposed a target that was more prudent than the IAS 19 basis at the time (which would have resulted in a deficit of £49 million at 31 March 2006). However, we understand that Dice has proposed, and is expecting the Trustees to agree to, a revised funding target with a zero deficit. In reaching agreement on the funding target, the Trustees have taken account of the strength of Dice's covenant towards the Fund

Page 67

Confidential

TF0000097137

A-1338

# Risks & Mitigants
### Pensions Due Diligence - Key Findings (cont'd)

terra firma

**Past service deficits – overview (continued)**

- As a result of a likely weakening of Dice's covenant towards the Fund as a result of the transaction, there is a risk that the Trustees could seek to adopt a more prudent assessment of the liabilities. In recent leveraged buy outs, pension fund trustees have begun to focus on ways of making their funds self sufficient, which has been supported by the UK Pensions Regulator in its recent statements
- The Trustees could aim to achieve self sufficiency by removing investment risk through moving the current investment strategy into gilts (as they hold the unilateral power to invest the assets of the Fund). KPMG estimate that the deficit on a gilts basis would be around £190 million
- Ultimately, if the Trustees react adversely to the transaction, their opening negotiating position would be the cost of securing all benefits with an insurance company. KPMG estimate that the aggregate deficit on this basis would be around £370 million using typical industry buy-out cost assumptions. However, due to a number of new providers of pension buy-out solutions and the emergence of more innovative products, the market may become more competitive resulting in a lower ultimate cost. Detailed mortality analysis could also potentially reduce buy-out costs. Clearly a negotiated solution would be between the current position and the full buyout cost

**Approaching the Trustees**

- Consideration will need to be given as to when to approach the Trustees of the Fund to agree a funding/security strategy, including the level of cash contributions to be paid following Completion. Reaching agreement with the Trustees can take a period of several weeks. There are a number of cases where pension scheme trustees have reacted aggressively where they have not been properly consulted and a positive relationship has not been developed so it will be important to monitor the situation and ensure the Trustees of the Fund are engaged at the appropriate time
- The TF team is due to meet with the chairman of the Trustees on 20 May 2007

**Future service costs**

- Dice recognised an FY07 pension operating charge to the income statement of £12.0 million, made up of a recurring IAS19 Service Cost of £13.4 million and a one-off credit of £1.4 million in respect of Japanese redundancies (which would normally be excluded for business valuation purposes)
- Information provided in the data room shows that a forward looking IAS19 Service Cost based on market conditions at 31 March 2007 would be £11.4 million, made up of £10.7 million in respect of the Fund and £0.7 million in respect of the non-UK pension arrangements
- We understand that Dice has proposed a number of alterations to the pension benefits to be provided for future service, which will be discussed with the Trustees this week. Management expects the alterations to result in a net saving to the IAS19 Service Cost of £5.5 million a year. In the context of a transaction, these changes may be viewed unfavourably by the UK employees
- In addition to the above, Dice contributes to a number of other contribution arrangements. Contributions to these arrangements in FY06 were £10.8 million
- The model assumes a charge for UK pension schemes of £50m upfront cash contribution and £120m upon exit for the German pension scheme funding £15m of the £30m deficit. In the run down case, the UK pension scheme is funded with £70m upfront and £20m p.a. for 5 years for a £170m total cash contribution

Page 68

Confidential

TF0000097138

A-1339

# Risks & Mitigants
## Pensions Due Diligence - Key Findings (cont'd)

terra firma

**Benchmark accounting figures**

- Overall, the IAS19 deficit as at 31 March 2007 has been calculated broadly in line with typical market practice. However, in the UK, the individual assumptions were different to those typically used as follows:
  - the inflation assumption of 3.0% was around 0.2% lower than that typically used. If a more typical assumption was chosen, the IAS19 liabilities would be around £30 million higher; and
  - the mortality assumption chosen by Dice for the Fund is in line with the 2006 valuation assumption, which was chosen to be consistent with current experience. However, the allowance for future improvements in mortality is more conservative than that typically used by companies for accounting purposes in the UK. If a more typical assumption was chosen, the IAS19 liabilities would reduce by around £20 million

**Updated position at 30 April 2007**

- The financial position of the defined benefit pension schemes will be volatile with respect to changes in market conditions. For example, the Fund invests a significant portion of its assets in equities, whilst the IAS19, gilt funding and buyout liability measures are calculated by reference to the yields on bonds
- KPMG have summarised the position of the Fund on the bases discussed above as at 30 April 2007 in the table below:

| Summary of IAS 19 funding position of the Fund at 30 April 2007 | | | |
|---|---|---|---|
| £m | IAS19 | Gilts basis | Buyout |
| Surplus / (Deficit) | 10 | (170) | (350) |

Source: KPMG analysis

- Bond yields in Germany and Japan have not moved significantly between 31 March 2007 and 30 April 2007 and therefore the financial positions of the plans in these territories are unlikely to be materially different
- KPMG estimate that a forward looking IAS19 Service Cost, based on market conditions at 30 April 2007, would be £11.1 million, made up of £10.4 million in respect of the Fund and £0.7 million in respect of the non-UK pension arrangements

Confidential

A-1340

TF0000097139

# Risks & Mitigants
## Legal Due Diligence

terra firma

| Item | Risk | Mitigant |
|------|------|----------|
| Information Flow | The level of due diligence information in the data room and the time available to review was less extensive than on a typical transaction. | • This is common on P2Ps. Dice had a particular concern that Whist could have accessed sensitive information under Rule 20.2 of the Takeover Code. Management were also open and helpful in management meetings. |
| Financing | Dice has issued listed bonds (including those convertible into ordinary shares) which need to be taken out to implement our financing. | • DKW has included the bond take out cost in the model. Our finance documents allow a sufficient grace period for us to take out the bonds before full financing is inserted. |
| Litigation | Dice operates in a very litigious environment. Proceedings are often taken against Dice and Dice robustly protects its rights.  Dice does not take out insurance against claims but relies on internal legal resource to manage this risk.  The view of management is that litigation is a "cost of doing business" this industry. | • Over the past 3 years Dice has received more than it has paid out in litigation.  Nonetheless, we have included amounts in the model to reflect estimated payout under material current litigation. |
| Defined Benefit Pensions Scheme | The trustees of the UKL Defined Benefit plan have confirmed that agreement has been reached in principle on the funding basis and schedule of contributions arising and from the 31 March 2006 valuation on the new Scheme specific funding basis on the basis of the Target's current covenant. As expected, the trustees have reserved their position to reassess the employer covenant if there is a change of control . The funding basis should show the UK Plan to be broadly 100% funded as at 31 March 2006 and so no defined repayment schedule is required. | • On or following the Transaction, the trustees are likely to want to reassess the employer covenant and if they consider that the covenant has been weakened as a result of the Transaction they may seek additional funding or other security. Therefore, dialogue should be entered into with the trustees after announcing the offer. We understand from Management that Target and the trustees currently have a positive constructive relationship. |

A-1341

Confidential

TF0000097140

# Risks & Mitigants
## Legal Due Diligence

terra firma

| Area | Risk | Mitigant/Recommendation |
|---|---|---|
| Financing: listed debt securities ("Bonds") | Dice has four separate bonds in issue which will need to be taken out in order to implement the transaction financing structure. All of the bonds are redeemable at the option of the holder following a change of control. All of the bonds are redeemable by the issuer at any time other than €425m 8.625% senior notes due 2013 | • DKW has calculate d the take-out cost of all of the Bonds (including the Convertible Bonds as set our below) at £76m which has been included in the model. The 2013 notes will need to be dealt with by way of tender offer followed by, if not successful, a process of "satisfaction and discharge" whereby all amounts due under the bonds up until the first redemption date (15 October 2008) are deposited with the trustees.<br>• A 120 day period has been given in the financing documents to put the security in place. This should be sufficient time for the bonds to be taken out. |
| Financing: convertible bonds ("Convertibles") | The Convertibles allow the noteholders to convert their notes into ordinary shares of Dice. As the Convertibles are "in the money" and appropriate offer will need to be made to noteholders under the terms of the Takeover Code. | • The take-out cost of the Convertibles is included in the DKW calculation above. In the event that the tender offer for the Convertibles was not successful (which is unlikely) the articles of Dice will be amended so that on any future exercise any new ordinary shares issued would be automatically acquired for cash. In any event Convertibles may be redeemed by Dice after 16 October 2007. |
| Financing: facility | Dice has entered into a £700m credit facility agreement. At 11 May 2007 the total drawn amount was £260m. On a change of control of Dice any lender may require repayment of principal, interest and break costs. Dice has a right to prepay the facility subject to payment of break costs. | |

Page 71

A-1342

TF0000097141

# Risks & Mitigants
## Legal Due Diligence

terra firma

| Area | Risk | Mitigant/Recommendation |
|---|---|---|
| Financing: securitisation | Target has started process to securitise music publishing assets. Termination fees will be payable to arranging banks (a) of between £500k and £2.5m if securitisation terminated by Target and (b) a further amount of between £3.75m and £7.5m if engage other book runners or arrangers within 24 months of termination. | • As our proposed syndicate of banks will contain some of the same banks we have assumed a termination payment of £5m in the model. |
| Change of Control | We have been informed that the following agreements have change of control clauses that will be triggered by the transaction: Dice has entered into an agreement with Fujipacific Music, Inc.. Project Dice will allow Fujipacific to terminate the agreement and claim a termination payment of $7,000,000. The agreement between Dice and the Rolling Stones under the terms of which it has the right to release and sell Rolling Stones products contains a change of control provision which is triggered by Project Dice | • Rolling Stones contract expires April 2008. Any unrecouped advances made by Dice to the Rolling Stones would become immediately repayable. Management confirmed that sales of Rolling Stones are not material. |
| Toshiba Joint Venture | Target has agreed to buy out Toshiba's share in JV with Target for approximately £93m. Parties to crystallise distributable profits to pay part of consideration, remainder (£15m) to be paid in cash | • Cash payment has been included in Target Group's accounts. Target has entered into futures contracts to hedge currency exposure |
| Lease Surrender | Target proposing to surrender leases for property on Charing Cross Road London. The landlord proposed a payment of £2.5m and negotiations with landlord concerning surrender payment by Target Group ongoing | • Amount included in the model. |

Page 72

A-1343

Confidential

TF0000097142

# Risks & Mitigants
## Legal Due Diligence

terra firma

| Area | Risk | Mitigant/Recommendation |
|------|------|-------------------------|
| No non-compete obligations | Senior executives do not have non-compete provisions in service agreements. | • Management confirmed that these are not common in the music industry. Consider tying in key executives as part of incentive arrangements. |
| Litigation | Dice operates in a very litigious environment. Proceedings are often taken against Dice and Dice robustly protects its rights. Dice does not take out insurance against claims but relies on internal legal resource to manage this risk. The view of management is that litigation is a "cost of doing business". Current material claims against Dice include:<br><br>1. royalty payment audit claims totalling £50m (typical payout rate is 2.7%);<br>2. tax claims (€7.7m in Netherlands and £22.5m in Brazil);<br>3. dispute with Philips concerning CD manufacturing royalties; and<br>4. dispute in Brazil concerning acquisition accounting (£4.5m);<br>5. general litigation of around £30m | • Over the past 3 years Dice has received more than it has paid out in litigation. Nonetheless, we have included amounts in the model to reflect estimated payout under material litigation. |

Page 73

Confidential

A-1344

TF0000097143

## Risks & Mitigants
### Legal Due Diligence - Regulatory Overview:  Recorded Music

terra firma

- The EC is making an in-depth review of *Sony/BMG*, after the CFI annulled its 2004 clearance decision (on appeal by Impala).

  - A final decision is due from the EC on 2 July 2007.

  - If the parties lose (unlikely), the JV may have to be disbanded.

- Key Question:  Whether the JV creates "collective dominance" (i.e. an ability to raise prices above competitive levels) in recorded music.

  - The JV has a roughly 25% share, and is the largest competitor, in a "5-to-4" consolidation of majors.

  - The EC initially found that discounts make the market "non-transparent" and that the past shows that retaliation against price-cutters is unlikely.  The CFI rejected both views for lack of solid evidence and analysis.

  - The EC must evaluate discounts and market transparency under a more rigorous standard (with current data), and must determine whether profit sacrifice or reduced scope for compilations, etc will deter industry retaliation against price cutters.  Buyer power provides a possible third line of defence.

- The parties have appealed the CFI's decision to the ECJ, providing an additional opportunity for the courts to reconsider and, possibly, develop a less restrictive assessment.

Page 74

Confidential

A-1345

TF0000097144

## Risks & Mitigants
### Legal Due Diligence - Regulatory Overview:  Publishing

terra firma

- The EC is making an in-depth review of Universal's proposed acquisition of BMG's music publishing (licensing) business.

  - A decision is reportedly imminent (the official deadline was 27 April).

- The deal may presage a stricter regulatory attitude toward this sector.

  - The deal would create the world's largest music publishing business, but with a share of roughly 27% – well short of the 40% "benchmark" that often signals some regulatory concern is likely.

  - The EC traditionally has found (in *Sony/BMG* and other smaller deals) that music publishing is unlikely to raise concerns, because collecting societies limit the scope for coordination.

  - Nonetheless, Universal reportedly has agreed, as a condition to clearance, to divest the British portions of the 19, BBC, Rondor and Zomba catalogues for licensing in the EEA.

- Impala opposed the deal and reportedly sought, but did not obtain, behavioural commitments.

A-1346

Page 75

Confidential

TF0000097145

## Risks & Mitigants
### Legal Due Diligence Regulatory: Implications for a Whist – Dice combination

terra firma

- Key Question:  Whether the deal creates "collective dominance" (i.e. an ability to raise prices above competitive levels) in recorded music and/or music publishing.

  - In recorded music, the parties would be the largest competitor, with roughly 30%.

  - In music publishing, the parties would be the largest competitor, with roughly 32%.

  - In both segments, the deal represents a "4-to-3" concentration of majors, raising more issues than the "5-to-4" deals now being reviewed by the EC.

  - However, numerous considerations might well resolve any regulatory concerns here (e.g. market instability, growth of online trading, economics of pricing deviation, significance of independents, Dice's long-term decline, and creation of an effective 3rd competitor to Universal and Sony/BMG).

- The transaction almost certainly would receive close scrutiny in the EC and the US.

  - Closing is likely to be suspended for roughly six months after notification, pending review.

  - Clearance may be facilitated by Whist's reported agreement with Impala, which neutralizes a key source of opposition in the industry.  However, this does not limit what the EU might do (since the regulators may question Impala's change of view, and may reject any behavioural commitments).

  - If the parties must make commitments in order to obtain clearance, these may well have to be structural (i.e. divestment) rather than behavioural remedies, which the regulators generally disfavour.

Page 76

Confidential

TF0000097146

A-1347

A-1348

TERRA FIRMA CAPITAL PARTNERS LIMITED

(the "Company")

Minutes of a meeting of the Investment Advisory Committee of the Company

Held at 2 More London Riverside, London SE1 2AP

On Sunday 20 May at 10:00 hours

| PRESENT: | Guy Hands | (via telephone) (Chairman) |
| | Fraser Duncan | (via telephone) |
| | Cormac O'Haire | (via telephone) |
| | Tim Pryce | (via telephone) |
| | Chris Roling | (via telephone) |
| IN ATTENDANCE: | Stephen Alexander | (via telephone) |
| | Chris Barnes | (via telephone) |
| | Trudy Cooke | (via telephone) |
| | Karen Dolenec | (via telephone) |
| | Henry Ford | (via telephone) |
| | Michael Hedegaard | (via telephone) |
| | Don Hoang | (via telephone) |
| | Mayamiko Kachingwe | (via telephone) |
| | Riaz Punja | (via telephone) |
| | Stephen Seymour | (via telephone) |
| | Francois van der Spuy | (via telephone) |
| | Quentin Stewart | (via telephone) |

**1   Chairman, Directors and Quorum**

It was reported that notice of the meeting had been given to all members of the Investment Advisory Committee of the Company to whom notice of the meeting was required to be given pursuant to the articles of association of the Company.

Guy Hands took the chair, noted that a quorum was present and declared the meeting open.

**2   Purpose of the Meeting**

The Chairman reported that the purpose of the meeting was to consider proposals in connection with:

   a)   Project Dice;

**3   Project Dice**

A memorandum and presentation dated 20 May 2007 was produced to the meeting, copies of which are attached to these minutes.

Confidential

EXHIBIT 25
WIT: _____
DATE: 7/15/10
T.M. PASTOR, RPR, CLR

TF0001669646

A-1349

Francois van der Spuy confirmed that the pension's model assumes a charge for UK pension schemes of £50m upfront cash contribution and £120m upon exit for the German pension scheme funding £15m of the £30m deficit. In the run down case, the UK pension scheme is funded with £70m upfront and £20m p.a. for 5 years for a £170m total cash contribution. The Committee agreed the financial position of the defined benefit pension schemes will be volatile with respect to changes in market conditions

The Committee discussed the three scenarios on each of the Citigroup and Deutche Bank debt packages and the fees associated with the packages together with the operational business plan. The Committee noted that the current financing packages would not support a price of 285p. If required, to increase price from 265p to 285p an equity bridge would need to be arranged.

After due and careful consideration it was resolved that a recommendation be made to TFI (GP) 2 and TFI (GP) 3 to approve proceeding with the offer for Dice at 265 pence per share with the ability to increase this offer to 285 pence per share subject to receipt of sufficient funding.

There being no further business, the meeting then terminated.

............................

Chairman

Confidential

A-1350

### Terra Firma Investments (GP) 2 Limited

(Registered in Guernsey with registration number 43846) (the "Company")

Minutes of a meeting of the Board of Directors of the Company held at Aigle Flight Support, Guernsey Airport, Forest, Guernsey on Sunday 20 May 2007 at 3:45pm

| Present: | Guy Hands |  |
|---|---|---|
|  | John Loveridge |  |
|  | Nigel Carey |  |
| In attendance: | Chris Barnes | representing Terra Firma Capital Partners Limited by telephone |
|  | Lorna Kelly | representing Mourant Guernsey Limited by telephone |
|  | Riaz Punja | representing Terra Firma Capital Partners Limited by telephone |
|  | Michael Slattery | representing Terra Firma Capital Partners Limited by telephone |
| Apologies: | Fraser Duncan |  |
|  | Iain Stokes |  |

**Chairman, Directors and Quorum**

IT WAS RESOLVED that Mr Loveridge be appointed Chairman of the meeting.

The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, in accordance with the Articles of Association. It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

**Declaration of Interests**

Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Company's Articles of Association, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

**Capacity**

It was noted that in transacting business at this the Company was acting in its capacity as general partner of each of Terra Firma Capital Partners II, L.P.-A; Terra Firma Capital Partners II, L.P.-B; Terra Firma Capital Partners II, L.P.-C; Terra Firma Capital Partners II, L.P.-D; Terra Firma Capital Partners II, L.P.-E; and Terra Firma Capital Partners II, L.P.-F (the "Partnerships") and that accordingly any resolutions of the Board were being taken on behalf of each of the Partnerships and that any reference to the Fund or the TFCP II Fund shall mean all of these Partnerships acting together.

Terra Firma Investments (GP) 2 Limited 20 May 2007



A-1351

**Project Dice**

The Chairman reminded the Board that it had previously approved:

(a)     the submission of an indicative bid to the Board of the company code named Dice plc ("Dice") at 265p per Dice share ("Project Dice"); and

(b)     a Phase II budget of £250,000 in respect of Project Dice.

The Chairman reported that the meeting was to consider, and if thought fit, approve the proceeding with the submission of an indicative bid to the board of Dice at 265p per Dice share with the ability to increase this offer to 285 per Dice share subject to receipt of sufficient funding.

**Documents Produced to the Meeting**

The following documents were produced to the meeting (the "Project Dice Documents")

(a)     the recommendation of the Investment Advisory Committee of Terra Firma Capital Partners Limited ("TFCPL") dated 20 May 2007 (the "Project Dice Investment Committee Recommendation"); and

(b)     the Project Dice Presentation prepared by TFCPL and dated 20 May 2007 (the "Project Dice Presentation").

**Investment Approval**

The Board requested an update on the pension due diligence. Mr Punja advised that although it was expected that the deficit would be a maximum of £100m it was possible that it could be as high as £250m although it would be likely to take a year to arrange a buyout of the scheme. The costs of funding a buyout would necessitate an additional £150m in equity for the company. The Board requested that more information in relation to the pensions be sought and that this be presented to a Committee of the Board (as defined below) scheduled to meet on 21 May at 7.30pm.

Attention was also drawn to the debt package and it was agreed that the presentation be updated and that it would be forwarded to the Committee.

**Establishment of a Committee**

After due and careful consideration IT WAS RESOLVED that:

(a)     for the purposes of considering the final consideration and approval of certain matters and any documents in connection with Project Dice that a committee of the Board made up of two Guernsey-resident Directors be created (the "Committee") and that the Board's powers and discretions be delegated to the Committee to negotiate and approve any documents and to execute, sign and deliver any agreements on behalf of the Company and to do every other act or thing in the name of the Company which the Committee or any such member or his respective duly appointed alternate or representative may deem to be desirable, necessary or appropriate in connection with the negotiation of the final consideration, and approval of certain matters and any documents in connection with Project Dice; and

(b)     any member of the Project Daisy Committee or his respective duly appointed alternate or representative (or in the case of any deed, any two of them) be and are hereby authorised to do all things, sign or execute and deliver any act, thing, deed or document on behalf of and in the name of the Company as general partner of the Partnerships which they consider to be necessary or expedient for the Company as general partner of the Partnerships to perform its obligations in respect of the consideration and approval of the final consideration, certain matters and any documents in connection with Project Dice.

**Any Other Business**

There being no further business, the Chairman declared the meeting closed.

....................................

Chairman

A-1353

3. JUL. 2009  8:57    MOURANT                                    NO. 516    P.. 14

## Terra Firma Investments (GP) 3 Limited

(Registered in Guernsey with registration number 43846) (the "Company")

Minutes of a meeting of the Board of Directors of the Company held at Aigile Flight Support, Guernsey Airport, Forest, Guernsey on Sunday 20 May 2007 at 4:00pm

| Present: | Guy Hands |
| | John Loveridge |
| | Nigel Carey |

| In attendance: | Chris Barnes | representing Terra Firma Capital Partners Limited by telephone |
| | Lorna Kelly | representing Mourant Guernsey Limited by telephone |
| | Riaz Punja | representing Terra Firma Capital Partners Limited by telephone |
| | Michael Slattery | representing Terra Firma Capital Partners Limited by telephone |

| Apologies: | Fraser Duncan |
| | Iain Stokes |

**Chairman, Directors and Quorum**

IT WAS RESOLVED that Mr Loveridge be appointed Chairman of the meeting.

The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, in accordance with the Articles of Association. It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

**Declaration of Interests**

Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Company's Articles of Association, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

**Capacity**

It was noted that unless otherwise stated, in transacting any business at this meeting, the Company was acting as general partner on behalf of Terra Firma Capital Partners III, L.P. (the "Partnership") and that accordingly any resolutions of the Board were being taken on behalf of the Partnership and that any reference herein to the "Fund" or the "TFCP III Fund" shall mean the Partnership

**Project Dice**

The Chairman reminded the Board that it had previously approved:

(a)    the submission of an indicative bid to the board of the company code named Dice plc ("Dice") at 265p per Dice share ("Project Dice"); and

Terra Firma Investments (GP) 3 Limited 20 May 2007                                    1

EXHIBIT: 28
WIT: Maulfo
DATE: 7/5/10
T.M. PASTOR, RPR, CLR

Confidential                                    TF0000754215

(b)      a Phase II budget of £250,000 in respect of Project Dice.

The Chairman reported that of the meeting was to consider, and if thought fit, approve the proceeding with the submission of an indicative bid to the board of Dice at 265p per Dice share with the ability to increase this offer to 285 per Dice share subject to receipt of sufficient funding.

**Documents Produced to the Meeting**

The following documents were produced to the meeting (the "Project Dice Documents")

(a)      the recommendation of the Investment Advisory Committee of Terra Firma Capital Partners Limited ("TFCPL") dated 20 May 2007 (the "Project Dice Investment Committee Recommendation"); and

(b)      the Project Dice Presentation prepared by TFCPL and dated 20 May 2007 ("the Project Dice Presentation").

**Investment Approval**

The Board requested an update on the pension due diligence.  Mr Punja advised that although it was expected that the deficit would be a maximum of £100m it was possible that it could be as high as £250m although it would be likely to take a year to arrange a buyout of the scheme.  The costs of funding a buyout would necessitate an additional £150m in equity for the company.  The Board requested that more information in relation to the pensions be sought and that this be presented to a Committee of the Board (as defined below) scheduled to meet on 21 May at 7.30am.

Attention was also drawn to the debt package and it was agreed that the presentation be updated and that it would be forwarded to the Committee.

**Establishment of a Committee**

After due and careful consideration IT WAS RESOLVED that

(a)      for the purposes of considering the final consideration and approval of certain matters and any documents in connection with Project Dice that a committee of the Board made up of two Guernsey-resident Directors be created (the "Committee") and that the Board's powers and discretions be delegated to the Committee to negotiate and approve any documents and to execute, sign and deliver any agreements on behalf of the Company and to do every other act or thing in the name of the Company which the Committee or any such member or his respective duly appointed alternate or representative may deem to be desirable, necessary or appropriate in connection with the negotiation of the final consideration and approval of certain matters and any documents in connection with Project Dice; and

(b)      any member of the Project Daisy Committee or his respective duly appointed alternate or representative (or in the case of any deed, any two of them) be and are hereby authorised to do all things, sign or execute and deliver any act, thing, deed or document on behalf of and in the name of the Company as general partner of the Fund which they consider to be necessary or expedient for the Company as general partner of the Fund to perform its obligations in respect of the consideration and approval of the final consideration, certain matters and any documents in connection with Project Dice.

**Any Other Business**

There being no further business, the Chairman declared the meeting closed

Terra Firma Investments (GP) 3 Limited 20 May 2007                                              2

Confidential

A-1356

**Terra Firma Investments (GP) 2 Limited**

(registered in Guernsey with registration number 39257) (the "Company")

Minutes of a meeting of a Committee of the Board of Directors of the Company held at First Floor, Dorey Court, Admiral Park, St Peter Port Guernsey on Monday 21 May 2007 at 7:30 a.m.

| Present: | John Loveridge |  |
| | Iain Stokes | |

| In attendance: | Chris Barnes | representing Terra Firma Capital Partners Limited by telephone |
| | Tom Becker | Mourant Guernsey Limited |
| | Tim Pryce | representing Terra Firma Capital Partners Limited by telephone |
| | Riaz Punja | representing Terra Firma Capital Partners Limited by telephone |
| | Michael Slattery | representing Terra Firma Capital Partners Limited by telephone |

Apologies:

**1.    Chairman, Directors and Quorum**

1.1    IT WAS RESOLVED that Mr Loveridge be appointed Chairman of the meeting.

1.2    The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, in accordance with the Company's Articles of Association. It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

**2    Declaration of Interests**

2.1    Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Company's Articles of Association, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

**3    Capacity**

3.1    It was noted that in transacting business at this meeting, the Company was acting in its own capacity and in its capacity as general partner of each of Terra Firma Capital Partners II, L.P.-A; Terra Firma Capital Partners II, L.P.-B; Terra Firma Capital Partners II, L.P.-C; Terra Firma Capital Partners II, L.P.-D; Terra Firma Capital Partners II, L.P.-E; and Terra Firma Capital Partners II, L.P.-F (the "Partnerships") and that accordingly any resolutions of the Board were being taken on behalf of each of the Partnerships and that any reference to the Fund or the TFCP II Fund shall mean all of these partnerships acting together.

**4    Project Dice**

4.1    The Chairman reminded those present that the Board had delegated its powers to a Committee of any two offshore Directors (the "Committee") in connection with the final consideration and approval of certain matters and documents relating to Project Dice (as

EXHIBIT

Loveridge  20
7/30/10         LS

defined below), as detailed in the minutes of the meeting of the Board held on 20 May 2007.

4.1  The Chairman reported that the purpose of the meeting was to consider, and if thought fit, approve the final terms of the proposed offer by Maltby Limited ("BidCo") of all of the issued and to be issued share capital of the company codenamed Dice Group plc (the "Target" or "Dice" "Project Dice" or the "Offer"). It was noted that, following developments since the Board meeting on 18 May 2007 it had been decided to proceed with Project Dice by way of a takeover offer rather than by way of a scheme of arrangement in accordance with section 425 of the Companies Act 1985 (the "Scheme").

5  **Documents produced to the meeting**

5.1  The following documents were produced to the meeting:

(a)  the Project Dice Investment Advisory Committee Meeting Presentation dated 21 May 2007 prepared by the investment advisory committee of Terra Firma Capital Partners Limited ("TFCPL") (the "Investment Committee Presentation");

(b)  the final draft of a letter from the Company and Terra Firma Investments (GP) 2 Limited to the Target (together with attachments) setting out the terms of a potential offer for the entire issued and to be issued share capital of the Target, to be made subject to the conditions contained therein ("Offer Letter");

(c)  the most recent draft of a press announcement containing, inter alia, details of the Scheme and setting out the principal terms and conditions of the proposed offer (the "Press Announcement");

(d)  an inducement fee agreement, whereby the Target would agree to pay the Company an inducement fee of up to £24 million, in the event that BidCo's offer fails due to the successful completion of a competing offer to that proposed by BidCo ("Inducement Fee Agreement"); and

(e)  a draft form of undertaking to accept the Offer to be entered into by the directors of Dice (the "Irrevocable Undertaking").

6  **Investment Approval**

6.1  The Directors reviewed the Investment Committee Presentation.

6.2  Mr Punja then reported in detail to the meeting in relation to the documents tabled at the meeting and referred to in paragraph 6.1 above.

6.3  The Directors enquired whether, following the discussions held overnight, TFCPL had made itself comfortable with the value of the Dice pension scheme and would be in a position to advise accordingly. Mr Pryce replied that TFCPL had not gained additional information as a result of overnight discussions and that the value of the Dice pension scheme remained, in TFCPL opinion, as previously advised by TFCPL.

6.4  The Directors enquired about rival offers, and specifically the consortium of Cerberus and Fortress and separately Warner Music Group. Mr Punja advised that Warner Music Group had to deal with regulatory issues, which were not, in his opinion, insurmountable, but would take time and introduce an element of risk for shareholders. Any offer by Warner Music Group would therefore need to compensate shareholders for both these items, and would therefore have to be substantially above £2.65 per Dice share.

A-1358

6.5    The Directors further discussed the information reported to the meeting and noted that all of the required investment criteria had been met. Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 6.1.

6.6    The Directors carefully considered the Offer Letter, the Press Announcement and the Inducement Fee Agreement. It was reported that the intention was to sign the Implementation Agreement shortly prior to releasing the Press Announcement. The Offer document would then be finalised and posted to Dice shareholders not more than 28 days thereafter.

6.7    The terms of the Offer Letter were then considered in detail. It was noted that the potential offer would be conditional upon:

(a)    no material new information having been disclosed to TFCPL or its professional advisers since noon on Friday 18 May 2007;

(b)    unanimous recommendation from the board of Directors of the Target;

(c)    entry into irrevocable undertakings by each of the board of Directors of the Target; and

(d)    the Target entering into the Inducement Fee Agreement.

6.8    After due consideration, IT WAS UNANIMOUSLY RESOLVED that:

(a)    the implementation of Project Dice by way of the offer be and is hereby approved;

(b)    the Offer Letter be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below;

(c)    the Press Announcement be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below;

(d)    the Inducement Fee Agreement be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below;

(e)    the Irrevocable Undertaking be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below; and

(f)    any Director of the Company or his duly appointed alternate or representative be and are hereby authorised to agree any changes which they consider may be necessary or expedient to the documents referred to in paragraphs (a) to (e) above.

**Any Other Business**

There being no further business, the Chairman declared the meeting closed.

Chairman

A-1359

**Terra Firma Investments (GP) 3 Limited**

(registered in Guernsey with registration number 43846) (the "Company")

Minutes of a meeting of a Committee of the Board of Directors of the Company held at First Floor, Dorey Court, Admiral Park, St Peter Port Guernsey on Monday 21 May 2007 at 8:00 a.m.

Present:        John Loveridge
                Iain Stokes

In attendance:  Chris Barnes          representing Terra Firma Capital Partners Limited
                                      by telephone
                Tom Becker            Mourant Guernsey Limited
                Tim Pryce             representing Terra Firma Capital Partners Limited
                                      by telephone
                Riaz Punja            representing Terra Firma Capital Partners Limited
                                      by telephone
                Michael Slattery      representing Terra Firma Capital Partners Limited
                                      by telephone

Apologies:

1       **Chairman, Directors and Quorum**

1.1     **IT WAS RESOLVED** that Mr Stokes be appointed Chairman of the meeting.

1.2     The Chairman noted that a Quorum of Directors was present and that all of the Directors had received due notice of the meeting, in accordance with the Company's Articles of Association. It was agreed that notice of the meeting be taken as read. Accordingly the Chairman declared the meeting duly convened and constituted.

2       **Declaration of Interests**

2.1     Each of the Directors declared any relevant interests to the extent each was to be regarded as interested in the agreements and other business that may be considered at the meeting. It was noted that, having declared his or her interest, under the Company's Articles of Association, each Director was able to vote on all resolutions put to the meeting and at subsequent meetings to consider these matters.

3       **Capacity**

3.1     It was noted that in transacting any business at this meeting, the Company was acting in its own capacity and in its capacity as general partner of Terra Firma Capital Partners III, L.P. (the "Partnership").

4       **Project Dice**

4.1     The Chairman reminded those present that the Board had delegated its powers to a Committee of any two offshore Directors (the "Committee") in connection with the final consideration and approval of certain matters and documents relating to Project Dice (as defined below), as detailed in the minutes of the meeting of the Board held on 20 May 2007.

4.1     The Chairman reported that the purpose of the meeting was to consider, and if thought fit, approve the final terms of the proposed offer by Maltby Limited ("BidCo") of all of the issued

Confidential

EXHIBIT
Loveridge 22
7/30/10    25

TF0001760827

and to be issued share capital of the company codenamed Dice Group plc (the "Target" or "Dice" "Project Dice" or the "Offer"). It was noted that, following developments since the Board meeting on 18 May 2007 it had been decided to proceed with Project Dice by way of a takeover offer rather than by way of a scheme of arrangement in accordance with section 425 of the Companies Act 1985 (the "Scheme").

5      Documents produced to the meeting

5.1    The following documents were produced to the meeting:

(a)    the Project Dice Investment Advisory Committee Meeting Presentation dated 21 May 2007 prepared by the investment advisory committee of Terra Firma Capital Partners Limited ("TFCPL") (the "Investment Committee Presentation");

(b)    the final draft of a letter from the Company and Terra Firma Investments (GP) 2 Limited to the Target (together with attachments) setting out the terms of a potential offer for the entire issued and to be issued share capital of the Target, to be made subject to the conditions contained therein ("Offer Letter");

(c)    the most recent draft of a press announcement containing, inter alia, details of the Scheme and setting out the principal terms and conditions of the proposed offer (the "Press Announcement");

(d)    an inducement fee agreement, whereby the Target would agree to pay the Company an inducement fee of up to £24 million, in the event that BidCo's offer fails due to the successful completion of a competing offer to that proposed by BidCo ("Inducement Fee Agreement"); and

(e)    a draft form of undertaking to accept the Offer to be entered into by the directors of Dice (the "Irrevocable Undertaking").

6      Investment Approval

6.1    The Directors reviewed the Investment Committee Presentation.

6.2    Mr Punja then reported in detail to the meeting in relation to the documents tabled at the meeting and referred to in paragraph 6.1 above.

6.3    The Directors enquired whether, following the discussions held overnight, TFCPL had made itself comfortable with the value of the Dice pension scheme and would be in a position to advise accordingly. Mr Pryce replied that TFCPL had not gained additional information as a result of overnight discussions and that the value of the Dice pension scheme remained, in TFCPL opinion, as previously advised by TFCPL.

6.4    The Directors enquired about rival offers, and specifically the consortium of Cerberus and Fortress and separately Warner Music Group. Mr Punja advised that Warner Music Group had to deal with regulatory issues, which were not, in his opinion, insurmountable, but would take time and introduce an element of risk for shareholders. Any offer by Warner Music Group would therefore need to compensate shareholders for both these items, and would therefore have to be substantially above £2.65 per Dice share.

6.5    The Directors further discussed the information reported to the meeting and noted that all of the required investment criteria had been met. Each Director confirmed that he was satisfied with the contents of the documents tabled at the meeting and referred to in paragraph 6.1.

onfidential

TF0001760828

A-1361

6.6     The Directors carefully considered the Offer Letter, the Press Announcement and the Inducement Fee Agreement. It was reported that the intention was to sign the Implementation Agreement shortly prior to releasing the Press Announcement. The Offer document would then be finalised and posted to Dice shareholders not more than 28 days thereafter.

6.7     The terms of the Offer Letter were then considered in detail. It was noted that the potential offer would be conditional upon:

(a)     no material new information having been disclosed to TFCPL or its professional advisers since noon on Friday 18 May 2007;

(b)     unanimous recommendation from the board of Directors of the Target;

(c)     entry into irrevocable undertakings by each of the board of Directors of the Target; and

(d)     the Target entering into the Inducement Fee Agreement.

6.8     After due consideration, IT WAS UNANIMOUSLY RESOLVED that:

(a)     the implementation of Project Dice by way of the offer be and is hereby approved;

(b)     the Offer Letter be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below;

(c)     the Press Announcement be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below;

(d)  .  the Inducement Fee Agreement be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below;

(e)     the Irrevocable Undertaking be approved in the form produced to the meeting or with such amendments as may be approved pursuant to paragraph (f) below; and

(f)     any Director of the Company or his duly appointed alternate or representative be and are hereby authorised to agree any changes which they consider may be necessary or expedient to the documents referred to in paragraphs (a) to (e) above.

**Any Other Business**

There being no further business, the Chairman declared the meeting closed.

Chairman

Confidential

A-1362

terra firma

Terra Firma Investments (GP) 3 Limited
PO Box 543, First Floor,
Dorey Court, Admiral Park,
St Peter Port,
Guernsey,
GY1 6HJ
Telephone +44 (0)1481 715 601
Facsimile +44 (0)1481 715 602

**Strictly private and confidential**

EMI Group plc
27 Wrights Lane
London W8 5SW

For the attention of Mr. John Gildersleeve Esq

21 May 2007

Dear John,

Further to our letter of 8th May, we are writing to set out the terms on which we are ready to make an offer for the entire issued and to be issued share capital of EMI Group plc ("EMI" or the "Company").

Since we wrote to you, we have completed our due diligence review with our advisers. This has confirmed our view that, as one of the world's largest music companies, the Company represents a high quality and attractive business that can, with continued investment and focus, consolidate its leadership positions in the recorded music and music publishing segments.

On the basis of our due diligence, we are currently prepared to make an offer of 265p per EMI share, subject to the terms and conditions set out in this letter (the "Offer"). We are clearly very focussed on securing the agreement of the board of the Company to recommend our offer for the Company on the terms of this letter. Accordingly, if the competitive nature of this process required us to increase our offer price we believe that we could be in a position to do this given limited additional time to finalise the necessary financing arrangements.

Our ability to announce the Offer is subject only to:

(1)      the Offer receiving the unanimous recommendation of the Company's directors;

(2)      execution of an Inducement Fee Agreement in the form attached at Appendix 1;

(3)      execution of an irrevocable commitment to accept the offer in the form attached at Appendix 2 by each of the Directors of the Company; and

(4)      execution of our financing documentation.

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

EXHIBIT
BORROWS 48

R. ...(HILL_0002253

Confidential

A-1363

The form of the Rule 2.5 Announcement (a copy of which is attached at Appendix 3), the Inducement Fee Agreement and the Irrevocable Undertaking (each referred to above) have been discussed and are largely settled between our respective legal advisers. The changes we wish to make to the latest versions returned to us yesterday evening are blacklined or otherwise marked on the attached versions of the documents. The price per EMI Share we have offered assumes that blacklined terms will form part of the Inducement Fee Agreement as signed by EMI.

Convertible Bonds

We intend to make a tender offer for the Convertible Bonds at an equivalent level to the Offer (by reference to the value at the offer price of the shares which a holder would be entitled to receive on conversion).

Financing

The acquiring entity will be a special purpose vehicle, Maltby Ltd ("Bidco"). Bidco will be funded with equity from Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited ("Terra Firma"). Debt for the Offer will be provided by a syndicate of banks led by Citigroup Global Markets Limited. All the terms of the financing are agreed and the relevant documentation only requires signature to become binding.

All necessary approvals have been received by Terra Firma to make the Offer. On final agreement of the Rule 2.5 Announcement and execution of the other documents listed above, we will instruct our financing banks to sign the financing agreements. At that point, we will be in a position immediately to announce our firm intention to make an offer for the Company by issuing the Rule 2.5 Announcement.

The conditions to draw-down of our financing under the certain funds clause of our financing documentation (which are entirely standard in nature) are set out in Appendix 4. Attached as Appendix 5 is a letter from our financial adviser, Dresdner Kleinwort, stating that it is ready to provide the requisite cash confirmation required under Rule 24.7 of the Takeover Code.

New information

The Offer is conditional on no material new information being disclosed to us by the Company or its advisers (whether in the online data room or otherwise) beyond that contained in the online data room at 6 am this morning. On that basis, we can confirm that we have concluded all our due diligence requirements, save in relation to the draft announcement of the Company's preliminary results for the year ended 31 March 2007.

Rationale

We have confidence in EMI's ability to capitalise on the significant growth opportunities in digital music, and that, as a global leader in music publishing, the Company will continue to benefit from the positive dynamics in this sector. We plan to build on the Company's strong current foundation, and work with management to optimise its operations and participate in profitable growth opportunities.

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

NHILL_0002254

Confidential

A-1364

**Competition**

Our legal advisers have advised us that our Offer will not give rise to any competition issues. No horizontal or vertical relationships exist between ourselves or any of our portfolio companies and the Company, so all competition filings are purely technical in nature. They have also discussed this with, and confirmed it to, your legal advisers. Your required form of statement on merger control approvals is attached at Appendix 6. For your ease of reference, we have also attached a blacklined version of the statement so you can see where we have made minor changes to the text supplied by your legal advisers.

**Pension Trustees**

We confirm that we are willing to proceed to announce the Offer having read the letters exchanged between the Company and the pension trustee on 18 May and our meeting with the Chairman of the pension trustee held yesterday.

**Confidentiality**

It is a condition to the making of the Offer described in this letter that, without our prior written consent and in the absence of a requirement to do so by the Panel or by the Listing Rules or the Disclosure Rules (in each case issued by the Financial Services Authority ("FSA")), the Company will not disclose or announce the contents or existence of this letter or our interest in the Company to anyone other than those within the Company who need to know and its professional advisers. We request that you ensure that each person to whom our interest in the Company is disclosed is made aware of this condition and takes all reasonable steps to ensure that this condition is not breached. In the event that you think it appropriate or the Panel or the FSA requires that any announcement be made by the Company which relates in any way to this proposal, such announcement should be made by the Company after consultation with our advisers, Dresdner Kleinwort.

**Capacity**

Terra Firma Investments (GP) 3 Limited is acting on behalf of Terra Firma Capital Partners III L.P. and is also issuing this letter with the consent of its affiliate Terra Firma Investments (GP) 2 Limited (for and on behalf of the six limited partnerships constituting the Terra Firma Capital Partners II Fund).

**Conclusion**

We are very enthusiastic about this opportunity and have the experience and track record to ensure a smooth and timely completion of this transaction. We look forward to hearing from you at the earliest opportunity and to receiving the recommendation of our Offer by the Company's Board of Directors. Please contact Riaz Punja, Financial Managing Director, on +44 (0) 20 7015 9620 at our adviser, Terra Firma Capital Partners Limited, if you would like to discuss any of the matters raised in this letter.

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

BROADHILL_0002255

Confidential

Yours sincerely,

Terra Firma Investments (GP) 3 Limited
(for and on behalf of Terra Firma Capital Partners III, L.P.)

AppenEMIs

1. Form of Directors' Irrevocable Undertaking
2. Inducement Fee Agreement
3. Rule 2.5 Announcement
4. Conditions to draw-down of financing
5. Dresdner Kleinwort letter re cash confirmation
6. Completed statement on merger control approvals (together with blacklined version to show changes made to version provided by the Company)

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

Confidential

APPENDIX 1

FORM OF DIRECTORS' IRREVOCABLE UNDERTAKING

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

HHILL_0002257

Confidential

A-1367

APPENDIX 2

INDUCEMENT FEE AGREEMENT

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

JI    NHILL_0002258

Confidential

APPENDIX 3

RULE 2.5 ANNOUNCEMENT

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

HILL_0002259

Confidential

A-1369

**APPENDIX 4**

**CONDITIONS TO DRAW-DOWN OF FINANCING**

1. The provision of constitutional documents, legal opinions, offer and financing documents and letters, all of which are already satisfied or are within the sole control of Maltby Limited.

2. Major representations being correct (concerning due incorporation, authority etc.)

3. No major default outstanding.

4. No illegality prohibiting Lenders from lending.

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

Confidential

A-1370

**APPENDIX 5**

**DRESDNER KLEINWORT LETTER RE CASH CONFIRMATION**

Regulated by The Guernsey Financial Services Commission Under The Protection of Investors (Bailiwick of Guernsey) Law, 1987

G..  _NHILL_0002261

Confidential

APPENDIX 6

COMPLETED STATEMENT ON MERGER CONTROL APPROVALS

Regulated by The Guernsey Financial Services Commission Under the Protection of Investors (Bailiwick of Guernsey) Law, 1987

R.   JHILL_0002262

Confidential

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. If you are in any doubt about the Offer or the action you should take, you are recommended immediately to seek your own personal financial advice from your stockbroker, bank manager, solicitor, accountant or other independent financial adviser duly authorised under the Financial Services and Markets Act 2000 if you are resident in the United Kingdom, or otherwise from another appropriately authorised independent financial adviser.**

If you have sold or otherwise transferred all your EMI Shares, please send this document, the accompanying Form of Acceptance and reply-paid envelope as soon as possible to the purchaser or transferee, or to the stockbroker, bank or other agent through whom the sale or transfer was effected, for transmission to the purchaser or transferee. However, these documents should not be mailed or otherwise sent in or into Canada or any other jurisdiction if to do so would constitute a violation of the laws of such jurisdiction. If you have sold or otherwise transferred part only of your holding of EMI Shares, you should retain these documents.

For holders of EMI Shares who hold their shares in certificated form (that is, not through CREST), this document should be read in conjunction with the accompanying Form of Acceptance, which forms part of this document.

Holders of EMI ADSs who wish to participate in the Offer must cancel their EMI ADSs and receive in return EMI Shares that may be tendered in the Offer as described in this document.

The procedure for acceptance of the Offer is set out on pages 19 to 23 of this document and, in respect of EMI Shares held in certificated form (that is, not through CREST) the Form of Acceptance. To accept the Offer in respect of EMI Shares held in certificated form you must complete and return the accompanying Form of Acceptance. The Form of Acceptance should be completed and returned as soon as possible and, in any event, so as to be received by Lloyds TSB Registrars by no later than 1.00 pm (London time) on 27 June 2007.

If you hold your EMI Shares in uncertificated form (that is, through CREST), you should follow the procedure set out on pages 20 and 21 of this document and ensure your TTE instruction settles no later than 1.00 pm (London time) on 27 June 2007. If you are a CREST sponsored member, you should refer to your CREST sponsor, as only your CREST sponsor will be able to send the necessary TTE instruction to CRESTCo.

Recommended Cash Offer

by

# Maltby Limited

a company formed at the direction of

## Terra Firma

for

## EMI Group plc



Your attention is drawn to the letter from the Chairman of EMI which contains the recommendation of the EMI Directors to accept the Offer and which is set out on pages 6 to 10 of this document.

Capitalised words and phrases used in this document shall have the meanings given to them in Appendix V.

Dresdner Kleinwort, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for Terra Firma and Maltby and no-one else in connection with the Offer and will not be responsible to anyone other than Terra Firma and Maltby for providing the protections afforded to clients of Dresdner Kleinwort or for providing advice in relation to the Offer.

Greenhill, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for EMI and for no-one else in connection with the Offer and will not be responsible to anyone other than EMI for providing the protections afforded to clients of Greenhill or for giving advice in relation to the Offer.

Citi, which is authorised and regulated in the United Kingdom by the Financial Services Authority, is acting exclusively for EMI and no one else in connection with the Offer and will not be responsible to anyone other than EMI for providing the protections afforded to clients of Citi or for providing advice in relation to the Offer.

Deutsche Bank is authorised under German Banking Law (Competent authority: BaFin – Federal Financial Supervising Authority) and with respect to UK commodity derivatives business by the Financial Services Authority; regulated by the Financial Services Authority for the conduct of UK business. Deutsche Bank is acting for EMI and no one else in connection with the Offer and will not be responsible to anyone other than EMI for providing the protections afforded to clients of Deutsche Bank nor for providing advice in connection with the Offer.



EXHIBIT

Loveridge 25
7/50/10    25

CITI-TF 00675782

A-1373

## Important Notices

The distribution of this document and/or the accompanying Form of Acceptance in jurisdictions other than the United Kingdom or the United States may be restricted by the laws and/or regulations of those jurisdictions and therefore persons into whose possession this document and/or the accompanying Form of Acceptance comes should inform themselves about and observe any such restrictions. Failure to comply with any such restrictions may constitute a violation of the laws and/or regulations of any such jurisdiction.

This document has been prepared for the purpose of complying with English law and the City Code and the information disclosed may not be the same as that which would have been disclosed if this document had been prepared in accordance with the laws and/or regulations of jurisdictions outside the UK.

Any person (including, without limitation, any custodian, nominee and trustee) who would, or otherwise intends to, or who may have a contractual or legal obligation to, forward this document and/or any other related document to any jurisdiction outside the UK should inform themselves of, and observe, any applicable legal or regulatory requirements of their jurisdiction.

To the extent permitted by applicable law, in accordance with the City Code and normal UK market practice and pursuant to class exemptive relief granted by the Staff of the Division of Market Regulation of the US Securities and Exchange Commission from Rule 14e-5 of the US Exchange Act, Maltby or its nominees or brokers (acting as agents) may from time to time during the period in which the Offer remains open for acceptance make certain purchases of, or arrangements to purchase, EMI Shares otherwise than under the Offer, such as in open market or privately negotiated purchases. In accordance with the requirements of Rule 14e-5 and exemptive relief granted by the SEC, such purchases, or arrangements to purchase, will comply with all applicable UK rules, including the City Code and the rules of the London Stock Exchange. In addition, in accordance with the City Code, normal UK market practice and Rule 14e-5(b) of the US Exchange Act, Citigroup Global Markets UK Equities Limited, Deutsche Bank AG London Branch and Dresdner Kleinwort Securities Limited will continue to act as exempt principal traders in EMI securities on the London Stock Exchange. Information regarding such activities which is required to be made public in the United Kingdom pursuant to the City Code will be reported to a Regulatory Information Service and will be available on the London Stock Exchange website at www.londonstockexchange.com. This information will also be publicly disclosed in the United States to the extent that such information is made public in the United Kingdom.

All times referred to in this document and the accompanying Form of Acceptance are London times, unless otherwise stated.

Neither the content of any EMI Group website, any TFCP website or any other website nor the content of any website accessible from hyperlinks on any of such websites is incorporated into, or forms part of, this document.

## Notice to US holders of EMI Shares

The Offer is being made for securities of a UK company and United States investors should be aware that this document and any other documents relating to the Offer have been or will be prepared in accordance with the City Code and UK disclosure requirements, format and style, all of which differ from those in the United States. EMI's financial statements, and all financial information that is included in this document or any other documents relating to the Offer, have been or will be prepared in accordance with United Kingdom generally accepted accounting principles or International Financial Reporting Standards and thus may not be comparable to financial statements of United States companies or companies whose financial statements are prepared in accordance with US generally accepted accounting principles.

The Offer is being made in the United States pursuant to Section 14(e) and Regulation 14E under the US Exchange Act and otherwise in accordance with the requirements of the City Code. Accordingly, the Offer is subject to disclosure and other procedural requirements, including with respect to withdrawal rights, offer timetable, settlement procedures and timing of payments that are different from those applicable under US domestic tender offer procedures and law.

EMI is incorporated under the laws of England and Wales. Four of the eight EMI Directors are not residents of the United States. As a result, it may not be possible for United States shareholders of EMI to effect service of process within the United States upon EMI or such EMI Directors or to enforce against any of them judgments of the United States predicated upon the civil liability provisions of the federal securities laws of the United States. It may not be possible to sue EMI or its officers or directors in a non-US court for violations of the US securities laws. Further it may be difficult to compel a non-US company and its affiliates to subject themselves to a US court's judgment.

While the Offer is being made available to holders of EMI Shares in the United States, the right to tender EMI Shares is not being made available in any jurisdiction within the United States in which the making of such offer or the right to tender such EMI Shares would not be in compliance with the laws of such jurisdiction.

The receipt of cash pursuant to the Offer by a United States holder of EMI Shares generally will be a taxable transaction for United States federal income tax purposes and under applicable US state and local, as well as non-US and other tax laws. Each holder of EMI Shares is urged to consult his independent professional adviser immediately regarding the tax consequences of acceptance of the Offer.

2

CITI-TF 00675783

A-1374

## Forward-looking statements

This document may contain "forward-looking statements" concerning the Offer, Maltby and EMI. Generally, the words "will", "may", "should", "continue", "believes", "expects", "intends", "anticipates" or similar expressions identify forward-looking statements. The forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond the companies' abilities to control or estimate precisely, such as future market conditions and the behaviours of other market participants, and therefore undue reliance should not be placed on such statements. Maltby and EMI assume no obligation and do not intend to update these forward-looking statements, except as required pursuant to applicable law and regulation.

## Dealing disclosure requirements

Under the provisions of Rule 8.3 of the City Code, if any person is or becomes "interested" (directly or indirectly) in 1 per cent. or more of any class of "relevant securities" of EMI, all "dealings" in any "relevant securities" of EMI (including by means of an option in respect of, or a derivative referenced to, any such "relevant securities") must be publicly disclosed by no later than 3:30 pm (London time) on the London business day following the date of the relevant transaction. This requirement will continue until the date on which the Offer becomes, or is declared, unconditional as to acceptances, lapses or is otherwise withdrawn or on which the "Offer Period" otherwise ends. If two or more persons act together pursuant to an agreement or understanding, whether formal or informal, to acquire an "interest" in "relevant securities" of EMI, they will be deemed to be a single person for the purpose of Rule 8.3.

Under the provisions of Rule 8.1 of the City Code, all "dealings" in "relevant securities" of EMI by Maltby or EMI, or by any of their respective "associates", must be disclosed by no later than 12.00 noon (London time) on the London business day following the date of the relevant transaction.

A disclosure table, giving details of the companies in whose "relevant securities" "dealings" should be disclosed, and the number of such securities in issue, can be found on the Panel's website at www.thetakeoverpanel.org.uk.

"Interests in securities" arise, in summary, when a person has long economic exposure, whether conditional or absolute, to changes in the price of "relevant securities". In particular, a person will be treated as having an "interest" by virtue of the ownership or control of securities, or by virtue of any option in respect of, or derivative referenced to, securities.

Terms in quotation marks are defined in the City Code, which can also be found on the Panel's website. If you are in any doubt as to whether or not you are required to disclose a "dealing" under Rule 8, you should consult the Panel.

3

CITI-TF 00675784

## TO ACCEPT THE OFFER

**EMI Shareholders**

1    If your EMI Shares are held in certificated form (that is, not through CREST), please complete the Form of Acceptance in accordance with the instructions printed thereon and on pages 19 and 20 of this document and return it (along with any appropriate documents of title) using the enclosed first class reply-paid envelope (for use only within the United Kingdom) as soon as possible and, in any event, so as to be received by 1.00 pm (London time) on 27 June 2007.

2    If your EMI Shares are held in uncertificated form (that is, through CREST), please follow the procedures set out on pages 20 and 21 of this document, so as to ensure that your TTE instruction(s) settle no later than 1.00 pm (London time) on 27 June 2007.

**EMI ADS Holders**

Although the Offer is not being specifically extended to EMI ADSs (which represent EMI Shares), EMI ADS Holders who wish to participate in the Offer may do so by taking the steps set out in paragraph 14.2 of Part 2 of this document, including procuring that the US Depositary cancels their EMI ADSs in return for receiving the EMI Shares to which those EMI ADSs relate. Such EMI Shares can then be tendered in the Offer in accordance with the instructions above.

**Settlement**

Subject to the Offer becoming or being declared unconditional in all respects, settlement for those EMI Shareholders who have validly accepted the Offer will be effected within 14 calendar days of the Offer becoming or being declared unconditional in all respects or, in relation to valid acceptances received after such date, within 14 days of receipt of that acceptance.

---

**YOU SHOULD ACCEPT THE OFFER BY NO LATER THAN**
1.00 pm (LONDON TIME) ON WEDNESDAY, 27 JUNE 2007

**If you require assistance, please call:**

Lloyds TSB Registrars: 0870 608 1822 (or +44 1903 276 342 from outside the United Kingdom) between 9.00 am and 5.00 pm (London time) Monday to Friday (excluding United Kingdom public holidays)

Please note that, for legal reasons, Lloyds TSB Registrars will only be able to provide you with the procedural information contained in this document and will be unable to give any further information, including any advice on the merits of the proposals contained in this document or any legal, financial or taxation advice on the contents of this document.

---

This page should be read in conjunction with the rest of this document and the Form of Acceptance. EMI Securityholders are recommended to seek financial advice from their stockbroker, bank manager, solicitor, accountant or other independent financial adviser duly authorised under the Financial Services and Markets Act 2000 if they are resident in the United Kingdom or otherwise from another appropriately authorised independent financial adviser.

4

CITI-TF 00675785

## TABLE OF CONTENTS

PART 1    LETTER FROM THE CHAIRMAN OF EMI ................................................... 6

PART 2    THE OFFER ........................................................................................................

1    Introduction ..................................................................................... 11
2    The Offer .......................................................................................... 11
3    Irrevocable undertakings ............................................................... 11
4    Background to and reasons for the Offer ...................................... 12
5    Information on Terra Firma and Maltby ........................................ 12
6    Information on EMI ......................................................................... 12
7    Intentions regarding EMI and its management, employees and EMI
     Pension Schemes ............................................................................ 13
8    EMI Share Schemes ........................................................................ 13
9    Convertible Bondholders ............................................................... 14
10   Financing the Offer ........................................................................ 14
11   Inducement Fee Agreement ........................................................... 14
12   Delisting, compulsory acquisition and re-registration ................. 15
13   Taxation ........................................................................................... 15
14   Procedure for acceptance .............................................................. 16
15   Overseas Holders ............................................................................ 19
16   Further information ......................................................................... 23
17   Action to be taken ........................................................................... 23

APPENDIX I – CONDITIONS AND FURTHER TERMS OF THE OFFER ...................... 24

APPENDIX II – INFORMATION RELATING TO THE MALTBY GROUP ..................... 46

APPENDIX III – FINANCIAL INFORMATION RELATING TO THE EMI GROUP ........ 48

APPENDIX IV – ADDITIONAL INFORMATION ........................................................ 140

APPENDIX V – DEFINITIONS ................................................................................... 155

CITI-TF 00675786

# PART 1

## LETTER FROM THE CHAIRMAN OF EMI



30 May 2007

To: EMI Shareholders and, for information only, to participants in the EMI Share Schemes and Convertible Bondholders

**1    Introduction**

On 21 May 2007, the Directors of EMI and the board of directors of Maltby announced the terms of a recommended offer for the entire issued and to be issued share capital of EMI at 265 pence in cash per EMI Share.

Maltby is a newly-incorporated company formed at the direction of Terra Firma for the purpose of making the Offer.

The Offer values EMI on an enterprise value basis at approximately £3.2 billion and the entire issued and to be issued share capital of EMI at approximately £2.4 billion.

Further details of the Offer are set out in Part 2 and Appendix I of this document.

This letter sets out a summary of the terms of the Offer, the background to the Offer and the reasons why the Directors, who have been so advised by Greenhill, consider the terms of the Offer to be fair and reasonable and are unanimously recommending that you accept the Offer. In providing advice to the EMI Directors, Greenhill have taken into account the commercial assessments of the EMI Directors.

**2    Terms of the Offer**

Details of the Offer are set out in Part 2 of this document. The Offer is subject to the Conditions and further terms set out in Appendix I to this document and in the Form of Acceptance.

The Offer is being made on the following basis:

For each EMI Share                265 pence in cash

**3    Background to and reasons for recommending the Offer**

The business fundamentals of the global music industry have changed significantly over the last few years. Revenues from physical product sales have been declining, while digital revenues have shown strong growth and new digital services, business models, devices and technologies have evolved rapidly. EMI has played a leading role in the development of the music industry during this period of change.

During the last twelve months, trading conditions in the industry have been very challenging, particularly in recorded music where the growth in digital product sales has been insufficient to offset the significant declines in physical sales. EMI's financial performance in the year to 31 March 2007 was below prior expectations due to the weak market conditions and lower than expected sales from EMI's portfolio of second half releases, especially over the Christmas period. EMI responded to this new market environment by announcing a restructuring programme on 12 January 2007 which is expected to generate £110 million of incremental annual cost savings. EMI remains confident in its ability to deliver on these restructuring plans. However, significant uncertainty continues to exist as to the timing and extent of future market development.

Over the last twelve months, the board of EMI has received a number of proposals from several different parties regarding possible offers for the Company. The board has always considered each

EMI Group plc   27 Wrights Lane   London W8 5SW   UK   Tel +44(0)20 7795 7000   Fax +44 (0)20 7795 7001
Registered Office: Address as above.   Registered in England No. 229231

6

CITI-TF 00675787

of the proposals it has received with regard to price, deliverability and minimising operational risk to the business, and by reference to the range of strategic options then available to EMI. On 20 February 2007, EMI announced it had received an approach from Warner Music Group and on 4 May 2007 EMI confirmed that it had received a number of indications of interest regarding possible offers for the Company. Discussions were held with, and information provided to, each of the parties that had expressed interest regarding a possible offer for the Company, and resulted in the announcement by Maltby of its intention to make the Offer.

In deciding to recommend the Offer, the board of EMI has taken into account a number of factors, including:

- that the Offer price of 265 pence per EMI Share represents:

  - a premium of approximately 19.4 per cent. to 222 pence, being the Closing Price per EMI Share on 19 February 2007, the Business Day prior to EMI's announcement that it had received an approach from Warner Music Group;

  - a premium of approximately 13.2 per cent. to 234 pence, being the average Closing Price per EMI Share from 14 February 2007, the day of the announcement of a further revision to EMI's expectations for the financial year ended 31 March 2007, to 18 May 2007, the Business Day prior to the date of announcement of the Offer; and

  - an enterprise value of approximately £3.2 billion which is a multiple of approximately 18.5x earnings before interest, tax, depreciation and amortisation and exceptional items for the twelve months ended 31 March 2007;

- that the terms of the Offer allow EMI Shareholders to realise certain cash now rather than face the continuing uncertainty of market developments;

- Maltby's and Terra Firma's strategic plans for EMI, which are set out in paragraph 7 of Part 2 of this document, and the information set out in paragraphs 5, 6 and 7 of this letter below; and

- that the combination of the value of the Offer, its deliverability and the minimisation of operational risk to the business make the Offer more attractive to EMI Shareholders than the other proposals received and the range of other strategic options available to the Company.

### 4    Irrevocable undertakings

All of the EMI Directors have given irrevocable undertakings to Maltby to accept or procure acceptance of the Offer. These irrevocable undertakings are given in respect of a total of 1,086,832 EMI Shares, representing, in aggregate, approximately 0.13 per cent. of EMI's existing issued ordinary share capital.

Further details of these irrevocable undertakings, including the circumstances in which they cease to be binding, are set out in paragraph 3 of Part 2 of this document.

### 5    Directors, management and employees

Maltby has confirmed to EMI that it attaches great importance to the skills and experience of the management and employees of EMI and that it believes they will be an important factor for the continuing success of the EMI Group. Accordingly, Maltby has given assurances to the board of Directors of EMI that the existing employment rights of the Directors, management and employees of EMI will be fully safeguarded following the completion of the Offer and that the EMI Group's pension obligations will be fully complied with. Maltby has also stated that it does not currently intend any changes in the conditions of employment of the Directors, management and employees of EMI beyond any existing plans of EMI management.

Maltby has also confirmed that it intends to enter into discussions with senior management of EMI, if and when the Offer completes, regarding their potential continuing involvement in the on-going business. There have been no discussions between Maltby, Terra Firma or TFCP and any of the senior management regarding any such involvement with the business after completion of the Offer and it is the EMI board's intention that no such discussions will take place prior to such completion. The Offer is not conditional on senior management participation.

### 6    EMI Pension Schemes

EMI operates a number of defined benefit pension schemes, the largest of which are in the UK, Japan and Germany. Maltby has confirmed that it recognises the importance of ensuring that the

7

CITI-TF 00675788

EMI Pension Schemes are prudently funded and that it is keen to reach agreement with the trustees on the appropriate levels of funding for these schemes.

**7    Effect of implementing the Offer and strategic plans for EMI**

Details of the Offer, Maltby's background to and reasons for the Offer, Maltby's and Terra Firma's plans for EMI and Maltby's financing of the Offer are set out in Part 2 of this document.

The EMI Directors note that Maltby has set out its and Terra Firma's intentions regarding EMI and its management, employees and EMI Pension Schemes in paragraph 7 of Part 2 of this document. It is stated that Terra Firma's objective is to build on EMI's current position as one of the world's leading music companies and accelerate the development of its digital and online strategy.

The EMI Directors welcome the assurances given to EMI that:

- Terra Firma is committed to assisting EMI in achieving EMI's long-term growth and development objectives;

- existing employment rights of the Directors, management and employees of EMI will be fully safeguarded following the completion of the Offer and that the EMI Group's pension obligations will be fully complied with;

- Maltby does not currently intend any changes in the conditions of employment of the Directors, management and employees of EMI beyond any existing plans of EMI management;

- Maltby recognises the importance of ensuring that the EMI Pension Schemes are prudently funded;

- appropriate proposals will be made pursuant to Rule 15 of the City Code to participants in the EMI Share Schemes and to Convertible Bondholders;

- Terra Firma plans to maintain the restructuring programme announced by EMI on 12 January 2007 and to continue the implementation of the cost savings plan developed by EMI management; and

- Terra Firma has no current intention to change the location of EMI's places of business beyond any existing plans of EMI management.

As first announced in the trading update issued by EMI on 18 April 2007, the board of EMI has decided to suspend dividend payments and no final dividend will be declared or paid in respect of the financial year ended 31 March 2007.

**8    EMI Share Schemes and Convertible Bonds**

The Offer extends to any EMI Shares which are unconditionally allotted or issued and fully paid (or credited as fully paid) while the Offer remains open for acceptance (or, subject to the City Code, by such earlier date as Maltby may decide), including EMI Shares issued pursuant to the exercise of options or release of awards granted under the EMI Share Schemes, pursuant to the exercise of rights under the Convertible Bonds or otherwise.

To the extent that such options or awards are not exercised or released, Maltby intends to make appropriate proposals to the holders of such options or awards under the EMI Share Schemes, subject to the Offer becoming or being declared unconditional in all respects. Such proposals will include a cashless exercise facility such that the exercise price of options exercised may be funded out of the consideration payable by Maltby for the shares acquired on the exercise of such options.

In addition, information regarding appropriate proposals to be made to Convertible Bondholders pursuant to Rule 15 of the City Code is set out in paragraph 9 of Part 2 of this document. Such proposals for the Convertible Bonds will be conditional upon the Offer becoming or being declared unconditional in all respects. The Offer is not conditional upon the success or otherwise of such proposals for the Convertible Bonds.

**9    Inducement fee arrangements**

As a pre-condition to Maltby agreeing to announce the Offer, EMI has agreed to pay a break fee to Maltby of £24 million (inclusive of VAT, if applicable, except to the extent that such VAT is recoverable by EMI) if:

8

A-1380

- a Competing Proposal is announced under Rule 2.5 of the City Code prior to the Offer lapsing or being withdrawn and is subsequently completed, or prior to the lapse or withdrawal of such Competing Proposal a subsequent Competing Proposal is announced under Rule 2.5 of the City Code and is subsequently completed; or

- the board of EMI withdraws, qualifies or adversely modifies its recommendation of the Offer,

and in either case the Offer lapses or is withdrawn.

EMI has agreed not to pay an inducement fee to, or to enter into any similar arrangement with, any other person prior to the time that the Offer lapses or is withdrawn.

Where an approach is made to EMI by a potential competing offeror, EMI has agreed (subject to confidentiality obligations entered into by EMI prior to the signature of the Inducement Fee Agreement on 21 May 2007 (the date of announcement of the Offer) and to the fiduciary duties of the Directors) to inform Maltby as soon as reasonably practicable of the identity of the potential competing offeror, the price and form of consideration offered and any subsequent changes in relation thereto.

## 10    Delisting, compulsory acquisition and re-registration

Your attention is drawn to paragraph 12 of Part 2 of this document with regard to delisting, cancellation of trading and compulsory acquisition of EMI Shares and re-registration of EMI as a private company and, in particular, the warning that delisting of EMI Shares would significantly reduce the liquidity and marketability of any EMI Shares not acquired under the Offer at that time.

## 11    Taxation

Your attention is drawn to paragraph 13 of Part 2 of this document. If you are in any doubt as to your own tax position, or if you are subject to taxation in a jurisdiction outside the United Kingdom or the United States, you should immediately consult an appropriately qualified independent professional adviser.

## 12    Overseas Holders

Your attention is drawn to paragraph 15 of Part 2 of this document with regard to EMI Shareholders who are not resident in the United Kingdom or the United States.

## 13    Actions to be taken

Your attention is drawn to paragraph 14 of Part 2 of this document, Appendix I to this document and, in respect of certificated EMI Shares, to the accompanying Form of Acceptance, which together contain the full terms and conditions of the Offer and, in particular, set out the procedure for acceptance of the Offer.

Your decision as to whether to accept the Offer will depend, amongst other things, upon your individual circumstances. If you are in any doubt as to the action you should take, you should seek your own independent financial advice immediately from your stockbroker, bank manager, solicitor, accountant or other independent financial adviser duly authorised under the Financial Services and Markets Act 2000, if you are resident in the United Kingdom, or, otherwise, from another appropriately authorised independent financial adviser.

If you have any questions as to how to complete the Form of Acceptance (or wish to request additional Forms of Acceptance) or as to how to make an Electronic Acceptance, please contact Lloyds TSB Registrars, the receiving agent to the Offer, on 0870 608 1822 or +44 1903 276 342 (if telephoning from outside the United Kingdom) between 9.00 am and 5.00 pm (London time) Monday to Friday (excluding United Kingdom public holidays).

## 14    Recommendation

Greenhill, Citi and Deutsche Bank are acting as joint financial advisers to EMI. Citi and Deutsche Bank have existing relationships with Terra Firma and therefore Greenhill is acting as the independent financial adviser to EMI for the purposes of providing independent advice to the board of Directors of EMI on the Offer under Rule 3 of the City Code.

**The board of Directors of EMI, which has been so advised by Greenhill, considers the terms of the Offer to be fair and reasonable. In providing advice to the board of Directors of EMI, Greenhill has taken into account the commercial assessments of the Directors of EMI.**

9

CITI-TF 00675790

Accordingly, the board of Directors of EMI recommends unanimously that EMI Shareholders accept the Offer, as the Directors have themselves irrevocably undertaken to do in respect of their own beneficial holdings of 1,086,832 EMI Shares, representing (as at the date of this document) approximately 0.13 per cent. of the existing issued ordinary share capital of EMI.

Yours sincerely

John Gildersleeve
Chairman

10

CITI-TF 00675791

## PART 2

## THE OFFER

### 1    Introduction

On 21 May 2007, the boards of Maltby and EMI announced the terms of a recommended cash offer for the entire issued and to be issued share capital of EMI. The Offer is being made by Maltby, a company formed at the direction of Terra Firma. This Part 2, Appendix I to this document and the Form of Acceptance contain the formal terms and conditions of the Offer for your EMI Shares.

**Your attention is drawn to the letter from John Gildersleeve, the Chairman of EMI, set out in Part 1 of this document, which states that the board of Directors of EMI, which has been so advised by Greenhill, considers the terms of the Offer to be fair and reasonable and that the board of Directors of EMI recommends unanimously that EMI Shareholders accept the Offer.**

### 2    The Offer

Maltby hereby offers to acquire, upon the terms and subject to the conditions set out or referred to in this document and in the Form of Acceptance, all issued and to be issued EMI Shares on the following basis:

| For each EMI share | 265 pence in cash |
|---|---|

The Offer price of 265 pence in cash for each EMI Share values EMI on an enterprise value basis at approximately £3.2 billion and values the entire issued and to be issued share capital at approximately £2.4 billion.

The Offer price of 265 pence for each EMI Share represents:

- a premium of approximately 19.4 per cent. to 222 pence, being the Closing Price per EMI Share on 19 February 2007, the Business Day prior to EMI's announcement that it had received an approach from Warner Music Group; and

- a premium of approximately 13.2 per cent. to 234 pence, being the average Closing Price per EMI Share from 14 February 2007, the day of the announcement of a further revision to EMI's expectations for the financial year ended 31 March 2007, to 18 May 2007, the Business Day prior to the date of announcement of the Offer.

The EMI Shares will be acquired under the Offer fully paid and free from all liens, equitable interests, charges, encumbrances, rights of pre-emption and any other third party rights or interests whatsoever and together with all rights existing at 21 May 2007 or thereafter attaching thereto, including the right to receive and retain in full all dividends and other distributions (if any) declared, made or paid or any other return of capital (whether by way of reduction of share capital or share premium account or otherwise) made on or after 21 May 2007.

As first announced in the trading update issued by EMI on 18 April 2007, the board of EMI has decided to suspend dividend payments and no final dividend will be declared or paid in respect of the financial year ended 31 March 2007.

As the Offer is not specifically extended to EMI ADSs (representing EMI Shares), EMI ADS Holders who wish to participate in the Offer should take appropriate steps to present, as soon as practicable, their EMI ADSs to the US Depositary for cancellation as discussed in paragraph 14.2 of this Part 2. Any underlying EMI Shares received by EMI ADS Holders upon such cancellation may then be tendered in the Offer.

The Offer is conditional, amongst other things, upon receiving certain regulatory clearances. Further information on the terms and conditions to which the Offer is subject are set out in Appendix I to this document and in the Form of Acceptance.

**If your EMI Shares are held in certificated form (that is, not in CREST) and you wish to accept the Offer, you should complete, sign and return the enclosed Form of Acceptance, together with all other required documents, as soon as possible and, in any event, so as to be received by post, or (during normal business hours only) by hand, by Lloyds TSB Registrars at Princess House, 1 Suffolk Lane, London EC4R 0AX no later than 1.00 pm (London time) on 27 June 2007. A reply-paid envelope (for use only within the United Kingdom) is enclosed for your convenience. No acknowledgment of receipt of documents**

11

CITI-TF 00675792

will be given. If your EMI Shares are held in uncertificated form (that is, in CREST) and you wish to accept the Offer, you should comply with the instructions set out in paragraph 14.1.2 of this Part 2 so that the relevant TTE instruction settles not later than 1.00 pm (London time) on 27 June 2007.

Your attention is drawn to paragraph 14 of this Part 2 and to the notes and instructions on the Form of Acceptance, which set out further details of the procedure for acceptance of the Offer.

### 3   Irrevocable undertakings

Maltby has received irrevocable undertakings to accept or procure the acceptance of the Offer from all of the Directors of EMI in respect of a total of 1,086,832 EMI Shares representing, in aggregate, approximately 0.13 per cent. of EMI's existing issued ordinary share capital.

These irrevocable undertakings will cease to be binding in the following circumstances:

(a)   the Offer is withdrawn or lapses;

(b)   the Offer has not become or been declared unconditional in all respects by 6.00 pm on 22 November 2007 (or such later time or date as agreed between Maltby and EMI, with the approval of the Panel if required);

(c)   the Directors of EMI have:

    (i)   withdrawn or modified their approval or recommendation of the Offer;

    (ii)   approved the announcement of or recommended any Competing Proposal; or

    (iii)   publicly announced an intention to take any of the foregoing actions; or

(d)   the Offer becomes or is declared unconditional in all respects.

Details of the number of EMI Shares subject to each irrevocable undertaking appear in paragraph 4 of Appendix IV to this document.

### 4   Background to and reasons for the Offer

As one of the world's largest music companies with leading market positions in both recorded music and music publishing, Terra Firma regards EMI as a highly attractive company, strategically placed to take advantage of significant changes currently taking place in the music recording and publishing industries.

Terra Firma believes the rapid migration from physical to digital and online formats represents a long-term growth opportunity for the music industry. In order to fully exploit this opportunity, Terra Firma believes EMI will be required to re-focus the business model of its recorded music division and accelerate the development of its digital business. Terra Firma also believes there is an opportunity for EMI to capture a larger portion of the music value chain over time in both recorded music and music publishing. Terra Firma believes these initiatives can be best executed under private ownership and is committed to assisting EMI in achieving EMI's long-term growth and development objectives.

Terra Firma's objective is to build on EMI's current position as one of the world's leading music companies and accelerate the development of its digital and online strategy to fully exploit this long-term growth opportunity. Through its experience of previous investments and its access to significant capital resources, Terra Firma believes it is well positioned to support EMI in the next phase of its development.

### 5   Information on Terra Firma and Maltby

#### 5.1   Terra Firma

Terra Firma Investments (GP) 2 Limited is the general partner of the six limited partnerships constituting the Terra Firma Capital Partners II Fund and a number of other limited partnership co-investment funds and makes private equity investments on their behalf. The Terra Firma Capital Partners II Fund has total fund commitments of approximately €2 billion.

Terra Firma Investments (GP) 3 Limited is the general partner of the Terra Firma Capital Partners III Fund and makes private equity investments on its behalf. The Terra Firma Capital Partners III Fund has total fund commitments of approximately €5.4 billion.

12

CITI-TF 00675793

TFCP is adviser to Terra Firma. TFCP is an independent private equity advisory firm set up in March 2002 by Guy Hands and other former employees of the Principal Finance Group of Nomura International plc through the spin-out of that division. TFCP has a team of approximately 100 professionals based in London and Germany. TFCP is authorised and regulated by the Financial Services Authority in the United Kingdom, and TFIGP2 and TFIGP3 are regulated by the Guernsey Financial Services Commission.

## 5.2  Maltby

Maltby, a company owned by Maltby Investments and whose indirect parent is Maltby Holdings, is a private company registered in England and Wales and was incorporated on 25 April 2007. Maltby is a company formed at the direction of Terra Firma for the purpose of making the Offer and has not, since its incorporation, traded or entered into any obligations other than in connection with the Offer. Further details on Maltby are contained in Appendix II to this document.

## 6  Information on EMI

EMI is one of the world's leading music companies, operating directly in 50 countries with licensees in a further 9 countries. The Company is comprised of EMI Music, one of the top global recorded music companies, and EMI Music Publishing, the world's largest publisher of popular music.

### 6.1  EMI Music

EMI Music is one of the largest recorded music businesses globally, with a roster of approximately 1,300 artists encompassing a wide range of musical genres. Record labels operated by EMI Music include Capitol, EMI, Parlophone and Virgin. EMI Music also has one of the world's most extensive catalogues of recordings, with over three million individual tracks. This catalogue continues to generate a significant volume of re-releases and compilations with strong consumer appeal.

EMI Music is at the forefront of the development of the digital music segment and is experiencing rapid growth in digital sales.

### 6.2  EMI Music Publishing

EMI Music Publishing is the world's largest publisher of popular music. It acquires and administers copyrights in musical compositions, and exploits the compositions by licensing them for inclusion on records, film, television and other media, seeking new uses for the compositions, and administering and collecting the proceeds generated. EMI Music Publishing receives a percentage of the royalty income earned in return for providing these services.

EMI Music Publishing's publishing catalogues include SBK (CBS Songs, MGM and United Artists), Filmtrax (Columbia Pictures and Television), Screen Gems, Virgin, Jobete (Motown) and a substantial part of the Windswept Pacific catalogue.

### 6.3  Preliminary results for the year ended 31 March 2007

For the financial year ended 31 March 2007, EMI, in its preliminary results statement released on 21 May 2007, reported underlying revenue of £1,751.5 million compared to underlying revenue of £2,079.9 million for the financial year ended 31 March 2006. EMI's underlying profit from operations before exceptional items and amortisation (EBITA) was £150.5 million for the year ended 31 March 2007, compared to underlying EBITA of £250.5 million for the financial year ended 31 March 2006.

Further financial information in relation to the EMI Group is set out in Appendix III to this document.

## 7  Intentions regarding EMI and its management, employees and EMI Pension Schemes

As stated above, Terra Firma's objective is to build on EMI's current position as one of the world's leading music companies and accelerate the development of its digital and online strategy to fully exploit this long-term growth opportunity. In order to realise this objective, Terra Firma intends to re-focus the business model of EMI's recorded music division on the digital segment and position EMI to capture a larger portion of the music value chain in both recorded music and music publishing.

13

CITI-TF 00675794

A-1385

Terra Firma plans to maintain the restructuring programme announced by EMI on 12 January 2007 to re-align its investment priorities and focus its resources in areas in which EMI is best positioned to maximise returns, and to continue the implementation of the cost savings plan developed by management to reduce the size of EMI's cost base, including any headcount reductions which may arise under that plan subject to any information and consultation obligations under relevant laws and regulations.

Terra Firma has no current intention to change the location of EMI's places of business beyond any existing plans of EMI management.

Maltby attaches great importance to the skills and experience of the management and employees of EMI and believes that they will be an important factor for the continuing success of the EMI Group. Accordingly, Maltby confirms, and it has given assurances to the board of directors of EMI, that the existing employment rights of the Directors, management and employees of EMI will be fully safeguarded following the completion of the Offer and that the EMI Group's pension obligations will be fully complied with. Maltby does not currently intend any changes in the conditions of employment of the Directors, management and employees of EMI beyond any existing plans of EMI management.

Maltby intends to enter into discussions with senior management of EMI, if and when the Offer completes, regarding their potential continuing involvement in the on-going business. There have been no discussions between Maltby, Terra Firma or TFCP and any of the senior management regarding any such involvement with the business after completion of the Offer and it is the EMI board's intention that no such discussions will take place prior to such completion. The Offer is not conditional on senior management participation.

EMI operates a number of defined benefit pension schemes, the largest of which are in the UK, Japan and Germany.  Maltby recognises the importance of ensuring that the EMI Pension Schemes are prudently funded and is keen to reach agreement with the trustees on the appropriate levels of funding for these schemes.

## 8    EMI Share Schemes

The Offer extends to any EMI Shares which are unconditionally allotted or issued and fully paid (or credited as fully paid) while the Offer remains open for acceptance (or, subject to the City Code, by such earlier date as Maltby may decide), including EMI Shares issued pursuant to the exercise of options or release of awards granted under the EMI Share Schemes, pursuant to the exercise of rights under the Convertible Bonds or otherwise.

To the extent that such options or awards are not exercised or released, Maltby intends to make appropriate proposals to the holders of such options or awards under the EMI Share Schemes, subject to the Offer becoming or being declared unconditional in all respects. Such proposals will include a cashless exercise facility such that the exercise price of options exercised may be funded out of the consideration payable by Maltby for the shares acquired on the exercise of such options.

Holders of options and awards under the EMI Share Schemes will in, due course, each be sent separate letters explaining the effect of the Offer on their options and awards, the action they may take and setting out the proposals to be made to them.

## 9    Convertible Bondholders

Convertible Bondholders will be contacted regarding the effect of the Offer on their rights under the Convertible Bonds and appropriate proposals pursuant to Rule 15 of the City Code will be made to Convertible Bondholders shortly. Such proposals will be made at least at the equivalent level as the Offer (by reference to the value at the Offer price of the EMI Shares to which a Convertible Bondholder would be entitled to receive on conversion). Such proposals for the Convertible Bonds will be conditional upon the Offer becoming or being declared unconditional in all respects. The Offer is not conditional upon the success or otherwise of such proposals for the Convertible Bonds.

## 10    Financing the Offer

The cash consideration payable under the Offer will be funded using a mixture of equity subscriptions from Terra Firma, and debt funding from a group of lenders including Citigroup Global Markets Limited and Citibank N.A. The equity subscriptions and debt funding will also be used to refinance expected indebtedness of the EMI Group at the time when the Offer becomes wholly unconditional, to finance the proposals referred to in paragraphs 8 and 9 of this Part 2, to pay

14

CITI-TF 00675795

fees, costs and expenses in connection with the Offer and to provide working capital for the EMI Group.

### 10.1 Equity Financing

Terra Firma entered into equity commitment letters addressed to Maltby on 21 May 2007, pursuant to which Terra Firma has irrevocably and unconditionally undertaken to procure that Maltby directly or indirectly receives, in aggregate, not less than £1,472 million in freely transferable funds within such time from the date on which the Offer is declared unconditional in all respects as is sufficient to enable Maltby to satisfy its obligations to settle the cash consideration for the Offer under Rule 31.8 of the City Code.

### 10.2 Debt Financing

Maltby also entered into an Interim Facilities Agreement on 21 May 2007 (as described in paragraph 2.2 of Appendix II) which provides for:

(a)  a committed term facility of up to £2,500 million; and

(b)  a committed working capital facility of up to £350 million.

It is intended that the Interim Facilities Agreement will be refinanced with facilities provided under permanent facilities agreements.

Further details of the funding available to Maltby are set out in Appendix II to this document.

## 11  Inducement Fee Agreement

As a pre-condition to Maltby agreeing to announce the Offer, EMI and Maltby entered into an inducement fee agreement dated 21 May 2007 (the "**Inducement Fee Agreement**") pursuant to which EMI has agreed to pay a break fee to Maltby of £24 million (inclusive of VAT, if applicable, except to the extent that such VAT is recoverable by EMI) if:

(a)  a Competing Proposal is announced under Rule 2.5 of the City Code prior to the Offer lapsing or being withdrawn and is subsequently completed, or prior to the lapse or withdrawal of such Competing Proposal a subsequent Competing Proposal is announced under Rule 2.5 of the City Code and is subsequently completed; or

(b)  the board of EMI withdraws, qualifies or adversely modifies its recommendation of the Offer,

and in either case the Offer lapses or is withdrawn.

EMI has agreed not to pay an inducement fee to, or to enter into any similar arrangement with, any other person prior to the time that the Offer lapses or is withdrawn.

Where an approach is made to EMI by a potential competing offeror, EMI has agreed (subject to confidentiality obligations entered into by EMI prior to the signature of the Inducement Fee Agreement on 21 May 2007 (the date of announcement of the Offer) and to the fiduciary duties of the Directors) to inform Maltby as soon as reasonably practicable of the identity of the potential competing offeror, the price and form of consideration offered and any subsequent changes in relation thereto.

Under the Inducement Fee Agreement EMI has also agreed, subject to the fiduciary duties of the Directors, to use reasonable endeavours to assist in making arrangements for the refinancing of the existing indebtedness of the EMI Group and related matters following completion of the Offer.

## 12  Delisting, compulsory acquisition and re-registration

If Maltby receives acceptances of the Offer in respect of, and/or otherwise acquires, 90 per cent. or more of the EMI Shares to which the Offer relates and assuming all other Conditions of the Offer have been satisfied or waived (if they are capable of being waived), Maltby intends to exercise its rights pursuant to the provisions of Part 28 of the 2006 Act to acquire compulsorily the remaining EMI Shares to which the Offer relates on the same terms as the Offer.

If the Offer becomes or is declared unconditional in all respects and Maltby has, by virtue of its shareholdings and/or acceptances of the Offer, acquired or agreed to acquire issued ordinary share capital carrying 75 per cent. of the voting rights attaching to the EMI Shares, Maltby intends, subject to the requirements of the FSA, to procure that EMI makes applications to cancel the listing of EMI Shares from the Official List and to cancel admission to trading in EMI Shares on the London Stock Exchange's market for listed securities. Maltby also intends to terminate the ADS

CITI-TF 00675796

facility with the US Depositary in connection with such delisting. **Delisting would significantly reduce the liquidity and marketability of any EMI Shares not acquired under the Offer at that time.**

It is anticipated that the cancellation of listing on the Official List and of admission to trading on the London Stock Exchange will take effect no earlier than the expiry of 20 Business Days after either (i) the date on which Maltby has, by virtue of its shareholdings and acceptances of the Offer, acquired or agreed to acquire issued ordinary share capital carrying 75 per cent. of the voting rights attaching to the EMI Shares, or (ii) the first date of issue of compulsory acquisition notices under section 979 of the 2006 Act.

Maltby will notify EMI Shareholders if and when the relevant event set out above has occurred and confirm that the notice period has commenced and the anticipated date of cancellation.

Following the Offer becoming or being declared unconditional in all respects and after the cancellation of listing on the Official List and of admission to trading on the London Stock Exchange, EMI may be re-registered as a private company under the relevant provisions of the 1985 Act.

## 13    Taxation

### 13.1 United Kingdom Taxation

The following paragraphs, which are intended as a general guide only and are based on current UK legislation and HM Revenue & Customs ("HMRC") published practice, summarise certain limited aspects of the UK taxation treatment of acceptance of the Offer. They relate only to the position of EMI Shareholders who are resident or, if individuals, ordinarily resident in the UK for taxation purposes (except insofar as express reference is made to the treatment of non-UK residents) and who hold their EMI Shares beneficially as an investment, otherwise than under a personal equity plan or an individual savings account and who have not (and are not deemed to have) acquired their shares by reason of an office or employment. In particular, the comments below may not apply to such persons as market makers, brokers, dealers, intermediaries and persons connected with depository arrangements or clearance services, to whom special rules may apply.

**If you are in any doubt as to your taxation position or if you may be subject to taxation in any jurisdiction other than the UK, you should consult an appropriate professional adviser immediately.**

#### 13.1.1 UK taxation of chargeable gains on disposal of EMI Shares

The sale by an EMI Shareholder of EMI Shares pursuant to the Offer will constitute a disposal for UK taxation of chargeable gains purposes. Such a disposal may give rise to a liability to UK taxation of chargeable gains, depending on that EMI Shareholder's individual circumstances (including the availability of exemptions, reliefs or allowable losses) and, in particular, the base cost of their holding of EMI Shares.

EMI Shareholders who are neither resident nor ordinarily resident in the UK for UK tax purposes should not generally be subject to UK taxation of chargeable gains, although there are specific rules which apply to individuals who are temporarily non-resident.

An EMI Shareholder within the charge to UK corporation tax on a disposal of their EMI Shares should be entitled to an indexation allowance (when calculating a chargeable gain but not an allowable loss) calculated by reference to the dates of acquisition and disposal of the EMI Shares. Where an individual (or other non-corporate entity) within the charge to UK capital gains tax disposes of their EMI Shares, taper relief may reduce the portion of the gain chargeable to tax on the disposal. The amount of taper relief available will depend on the number of complete years that the individual has held the EMI Shares and the status of the EMI Shares for taper relief purposes.

#### 13.1.2 EMI Share Schemes

Special tax provisions may apply to EMI Shareholders who have acquired or acquire their EMI Shares by exercising options or the vesting of awards under the EMI Share Schemes or in any other manner as a director or employee of EMI, including

16

CITI-TF 00675797

A-1388

provisions imposing a charge to income tax when such an option is exercised or award released. Such EMI Shareholders are advised to seek independent professional advice.

### 13.1.3 Stamp Duty and Stamp Duty Reserve Tax ("SDRT") on EMI Shares

No stamp duty or SDRT should be payable by EMI Shareholders as a result of accepting the Offer.

## 13.2 US Taxation

The following discussion is a summary of certain material US federal income tax considerations for holders of EMI Shares considering the Offer. This summary is based on present law, which is subject to change that could apply retroactively. No assurance can be given that the Internal Revenue Service ("IRS") will not assert, or that a court would not sustain, a position contrary to the conclusions expressed in this summary. This summary is not a comprehensive description of all the tax considerations that may be relevant to any particular holder. This summary does not address US state and local tax considerations. This summary does not address the tax treatment of holders whose EMI Shares were received in connection with the performance of services. It also does not address the tax considerations of partnerships or other entities classified as partnerships for US federal income tax purposes or of persons holding EMI Shares through any such entities. Each holder should consult its own tax adviser about the US federal, state and local income tax consequences of the Offer.

For purposes of this summary, a "US holder" is a beneficial owner that is (i) an individual citizen or resident of the United States, (ii) a corporation or other business entity treated as a corporation for US federal income tax purposes created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) an estate the income of which is subject to US federal income taxation regardless of its source or (iv) a trust subject to the control of a US person and the primary supervision of a US court or that has made a valid election to be treated as a US person.

For purposes of this summary, a "non-US holder" is a beneficial holder that is neither a US holder nor a partnership or entity classified as a partnership for US federal income tax purposes.

### Internal Revenue Service Circular 230 Notice

To ensure compliance with Treasury Department Circular 230, each holder of EMI Shares is hereby notified that: (a) any discussion of federal tax issues contained or referred to in the Offer to purchase such EMI Shares is not intended or written to be used, and cannot be used, by a holder for the purpose of avoiding penalties that may be imposed on such holder under the Internal Revenue Code; (b) such discussion is written to support the promotion or marketing (within the meaning of Circular 230) of the Offer by Maltby; and (c) a holder of EMI Shares should seek advice based on its particular circumstances from an independent tax adviser.

### 13.2.1 US Holders

This summary addresses only US holders who hold EMI Shares as capital assets and use the US dollar as their functional currency. It does not address the tax treatment of US holders subject to special rules, such as banks and other financial institutions, dealers, securities traders that elect mark-to-market accounting, insurance companies, tax-exempt entities, regulated investment companies, real estate investment trusts, US expatriates or persons treated as residents of more than one country, persons that at any time have held, directly, indirectly or by attribution, 10 per cent. or more (by vote) of the equity of EMI, persons holding EMI Shares as part of a hedging, straddle, conversion, integrated, constructive sale or constructive ownership transaction. This summary does not address US holders resident or ordinarily resident in the UK for UK tax purposes.

This discussion assumes that EMI is not, and never has been, a passive foreign investment company ("PFIC") for US federal income tax purposes. If it were determined that EMI is or has been a PFIC, the US federal income tax consequences of acceptance of the Offer would differ from those described below, and may be materially less favorable to US holders.

17

CITI-TF 00675798

(a) Sale of EMI Shares.

A US holder generally will recognise capital gain or loss on the disposition of EMI Shares equal to the difference between the US holder's adjusted tax basis and the amount realised. A US holder's adjusted tax basis in the EMI Shares generally will be the US dollar value of the amount paid to purchase the EMI Shares. The amount realised will be the US dollar value of the pounds sterling received in consideration for the US holder's EMI Shares. The date for determining that value depends on whether special rules for sales of securities traded on an established securities market apply. Although the EMI Shares currently are traded on such a market, it is unclear whether those rules apply here because a US holder accepting the Offer will not dispose of EMI Shares in a transaction on that market. If those rules apply and the US holder either uses the cash method of accounting or uses an accrual method of accounting and so elects, the dollar value of pounds sterling received will be determined on the settlement date. Otherwise, that value should be determined as of the date the US holder's tender of EMI Shares is unconditionally accepted.

Such gain or loss will generally be long-term capital gain or loss if, at the time of disposition, the US holder's holding period exceeds one year. Certain non-corporate US holders (including individuals) may be entitled to a preferential tax rate on long-term capital gains. Deductions for capital losses are subject to limitations. Any gain or loss realised on disposition of EMI Shares generally will be treated as from US sources.

A US holder will have a tax basis in the pounds sterling received on disposition of EMI Shares equal to the US dollar amount realised. Any gain or loss realised by a US holder on a subsequent conversion of those pounds sterling for a different amount of US dollars will be foreign currency gain or loss that will be ordinary and generally treated as from US sources.

(b) Information Reporting and Backup Withholding.

Proceeds from the disposition of EMI Shares generally will be subject to information reporting unless the holder is a corporation or otherwise establishes a basis for exemption. Any payment subject to information reporting may also be subject to backup withholding unless the US holder properly provides a valid US taxpayer identification number. The amount withheld will be refunded or allowed as a credit against the US holder's federal income tax liability.

*13.2.2 Non-US Holders Disposing of EMI Shares*

(a) Sale of EMI Shares.

A non-US holder generally will not be subject to US federal income tax upon the disposition of EMI Shares pursuant to the Offer unless (i) the non-US holder recognises gain thereon that is effectively connected with its conduct of a trade or business in the United States or (ii) the non-US holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met.

(b) Information Reporting and Backup Withholding.

Backup withholding tax generally will not apply to proceeds from the disposition of EMI Shares effected outside the United States. Information reporting and backup withholding may apply to proceeds from dispositions effected within the United States, and information reporting may apply to dispositions effected outside the United States if through financial intermediaries with certain connections to the United States, unless, in each case, the non-US holder (i) is a corporation, (ii) provides a properly completed Form W-8BEN or (iii) otherwise establishes a basis for exemption. Any amount withheld may be refundable.

**YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISERS TO DETERMINE THE TAX CONSIDERATIONS OF PARTICIPATING IN THE OFFER IN LIGHT OF YOUR PARTICULAR CIRCUMSTANCES, INCLUDING THE APPLICATION AND EFFECT OF ANY APPLICABLE GIFT, ESTATE, US FEDERAL, STATE, LOCAL OR OTHER FOREIGN TAX LAWS.**

18

CITI-TF 00675799

## 14    Procedure for acceptance

### 14.1    Procedure for acceptance of the Offer

EMI Shareholders who hold their EMI Shares in certificated form (that is, not through CREST) should read this section in conjunction with the Form of Acceptance and Part C of Appendix I to this document. EMI Shareholders who hold their EMI Shares in uncertificated form (that is, through CREST) should read this section in conjunction with Part D of Appendix I to this document.

#### 14.1.1    EMI Shares held in certificated form (that is, not through CREST)

(a)    Completion of the Form of Acceptance

To accept the Offer in respect of EMI Shares held in certificated form, you must complete the Form of Acceptance in accordance with the instructions set out below and in Part C of Appendix I and on the Form of Acceptance. The instructions printed on the Form of Acceptance are deemed to form part of the terms of the Offer. You should complete a separate Form of Acceptance for EMI Shares held in certificated form but under different designations.

Additional Forms of Acceptance are available from Lloyds TSB Registrars at Princess House, 1 Suffolk Lane, London EC4R 0AX. The instructions for completing a Form of Acceptance in this paragraph (a) and in paragraphs (b) and (c) below apply, where relevant, to each separate Form of Acceptance to be completed by you. If you have any queries as to how to complete the Form of Acceptance, please telephone Lloyds TSB Registrars on 0870 608 1822 (or from outside the United Kingdom on +44 1903 276 342).

To accept the Offer in respect of your EMI Shares, you must complete Box 3 with the total number of EMI Shares for which you wish to accept the Offer on the Form of Acceptance.

In all cases you must sign Box 4A or 4B (as appropriate) on the Form of Acceptance including, if you are an individual, in the presence of a witness, who should also sign in accordance with the instructions printed on it. Any EMI Shareholder that is a company should execute the Form of Acceptance in accordance with the instructions printed on it. If you do not insert a number in Box 3 your acceptance will be deemed to be in respect of all EMI Shares held by you.

(b)    Return of Form of Acceptance

To accept the Offer, the completed, signed and witnessed Form of Acceptance must be returned, together with your share certificate(s) and/or other document(s) of title for your EMI Shares, to Lloyds TSB Registrars at Princess House, 1 Suffolk Lane, London EC4R 0AX by post or (during normal business hours) by hand as soon as possible and in any event so as to be received by no later than 1.00 pm (London time) on 27 June 2007. A first class reply-paid envelope is enclosed for your convenience and may be used by EMI Shareholders for returning a Form of Acceptance from within the UK. No acknowledgement of receipt of documents will be given.

Any Form of Acceptance received in an envelope post-marked in Canada or otherwise appearing to Maltby or its agents to have been sent from Canada may be rejected as an invalid acceptance of the Offer. For further information on Overseas Holders, see paragraph 15 below.

(c)    Share certificates not readily available or lost

If your share certificate(s) and/or other document(s) of title is/are not readily available or is/are lost, the Form of Acceptance should still be completed, signed and returned as stated above so as to arrive by no later than 1.00 pm (London time) on 27 June 2007. You should send any share certificate(s) and/or other document(s) of title that you have available, accompanied by a letter stating that the balance will follow as soon as possible or that you have lost one or more of

19

your share certificate(s) and/or other document(s) of title. You should submit the relevant share certificate(s) and/or other document(s) of title as soon as possible. No acknowledgement of receipt of document(s) will be given.

In the case of loss, you should write as soon as possible to EMI's registrars, Lloyds TSB Registrars, Shareholder Services, The Causeway, Worthing, West Sussex, BN99 6DA, for a letter of indemnity for lost share certificate(s) and/or other document(s) of title which, when completed in accordance with the instructions given, should be returned to Lloyds TSB Registrars as set out in paragraph 14.1.1(b) above.

*14.1.2 EMI Shares held in uncertificated form (that is, through CREST)*

(a)  General

If your EMI Shares are held in uncertificated form (that is, if you do not have a paper certificate because your shares are held through CREST), to accept the Offer you must take (or procure the taking of) the action set out below to transfer the EMI Shares in respect of which you wish to accept the Offer to the appropriate escrow balance(s), specifying Lloyds TSB Registrars (in its capacity as a CREST participant under the Escrow Agent's Participant ID referred to below) as the Escrow Agent, as soon as possible and in any event so that the TTE instruction settles not later than 1.00 pm (London time) on 27 June 2007. Note that settlement cannot take place on weekends or bank holidays (or other times at which the CREST system is non-operational) and you should therefore ensure you time the input of any TTE instructions accordingly. The input and settlement of a TTE instruction in accordance with this paragraph (a) will (subject to satisfying the requirements set out in Parts B and D of Appendix I to this document) constitute an acceptance of the Offer in respect of the number of EMI Shares so transferred to escrow.

If you are a CREST sponsored member, you should refer to your CREST sponsor before taking any action. Only your CREST sponsor will be able to send the TTE instruction(s) to CRESTCo in relation to your EMI Shares.

After settlement of a TTE instruction, you will not be able to access the EMI Shares concerned in CREST for any transaction or charging purposes. If the Offer becomes or is declared unconditional in all respects, the Escrow Agent will transfer the EMI Shares concerned to itself in accordance with paragraph (d) of Part D of Appendix I to this document.

You are recommended to refer to the CREST manual published by CRESTCo for further information on the CREST procedures outlined below.

You should note that CRESTCo does not make available special procedures in CREST for any particular corporate action. Normal system timings and limitations will therefore apply in connection with a TTE instruction and its settlement. You should therefore ensure that all necessary action is taken by you (or by your CREST sponsor) to enable a TTE instruction relating to your EMI Shares to settle prior to 1.00 pm (London time) on 27 June 2007. In this connection you are referred in particular to those sections of the CREST manual concerning practical limitations of the CREST system and timings.

(b)  To accept the Offer

Send (or if you are a CREST sponsored member, procure that your CREST sponsor sends) to CRESTCo a Basic Offer TTE instruction in relation to such EMI Shares. A TTE instruction to CRESTCo must be properly authenticated in accordance with CRESTCo's specifications for transfers to escrow and must contain the following details:

(i)  the ISIN number for the EMI Shares, which is GB0000444736;

(ii)  the number of EMI Shares in respect of which you wish to accept the Offer (i.e. the number of EMI Shares to be transferred to escrow);

(iii)  your member account ID;

(iv)  your Participant ID;

20

(v)   the Participant ID of the Escrow Agent, which is 2RA11;

(vi)   the member account ID of the Escrow Agent for the Offer, which is TEREMI01;

(vii)   the intended settlement date, which should be as soon as possible and in any event not later than 1.00 pm (London time) on 27 June 2007;

(viii)   the corporate action number of the Offer. This is allocated by CRESTCo and will be available on screen from CRESTCo;

(ix)   input with a standard delivery instruction priority of 80; and

(x)   the contact name and telephone number in the shared note field.

(c)   Overseas Holders

The attention of EMI Shareholders holding EMI Shares in uncertificated form and who are residents of jurisdictions outside the UK and the US is drawn to paragraph 6 of Part B of Appendix I to this document.

### 14.1.3 Validity of acceptances

Without prejudice to Parts B, C and D of Appendix I and subject to the provisions of the City Code, Maltby and Lloyds TSB Registrars reserve the right to treat as valid, in whole or in part, any acceptance of the Offer (A) which is not entirely in order or (B) which is not accompanied (as applicable) by the relevant TTE instruction or (C) if confirmations as described in this document are not received by Lloyds TSB Registrars in respect of it or (D) if relevant share certificate(s) and/or other document(s) of title are not received by Lloyds TSB Registrars in respect of it or (E) if received by or on behalf of either of them at any place or places or in any manner determined by either of them or (F) which is otherwise than as set out in this document or in the Form of Acceptance. In any such event, no payment of cash under the Offer will be made until after (as applicable) the relevant TTE instruction has settled or the relevant share certificate(s) and/or other document(s) of title or indemnities satisfactory to Maltby have been received. **A Form of Acceptance that is received in respect of EMI Shares held in uncertificated form will not constitute a valid acceptance and will be disregarded.**

### 14.1.4 General

Maltby will make an appropriate announcement if any of the details contained in this paragraph 14.1 alter for any reason. Normal CREST procedures (including timings) apply in relation to any EMI Shares that are, or are to be, converted from uncertificated to certificated form, or from certificated to uncertificated form, during the course of the Offer (whether any such conversion arises as a result of a transfer of EMI Shares or otherwise). Holders of EMI Shares who are proposing so to convert any such shares are recommended to ensure that the conversion procedures are implemented in sufficient time to enable the person holding or acquiring the shares as a result of the conversion to take all necessary steps in connection with an acceptance of the Offer (in particular, as regards delivery of share certificate(s) or other document(s) of title or transfers to an escrow balance as described above) prior to 1.00 pm (London time) on 27 June 2007.

**If you are in any doubt as to the procedure for acceptance, please contact Lloyds TSB Registrars on 0870 608 1822 (or from outside the UK on +44 1903 276 342). You are reminded that, if you are a CREST sponsored member, you should contact your CREST sponsor before taking any action.**

### 14.2 EMI ADS Holders

The Offer is not being specifically extended to EMI ADSs (which represent EMI Shares). However, EMI ADS Holders who wish to participate in the Offer should take steps to present their EMI ADSs to the US Depositary for cancellation and (upon compliance with the terms of the Deposit Agreement, including payment of the US Depositary's fees and any applicable transfer fees, taxes and governmental charges) delivery of EMI Shares to them, so as to become:

CITI-TF 00675802

(a) a holder of certificated EMI Shares (that is, not through CREST) in time to complete and submit to Lloyds TSB Registrars the Form of Acceptance in accordance with the procedure set out in paragraph 14.1.1 above by no later than 1.00 pm (London time) on 27 June 2007; or

(b) a holder of uncertificated EMI Shares (that is, through CREST), in time to complete and submit to CRESTCo a TTE instruction in relation to such EMI Shares in accordance with the procedure set out in paragraph 14.1.2 above in time to settle prior to 1.00 pm (London time) on 27 June 2007.

The US Depositary is entitled to charge a fee of up to US$0.05 per EMI ADS for EMI Shares that are withdrawn from the EMI ADS programme, in addition to any applicable transfer fees, taxes and governmental charges provided under the Deposit Agreement.

### 14.3 Settlement

Subject to the Offer becoming or being declared unconditional in all respects, settlement of the acceptances from EMI Shareholders or other designated agents will be effected: (i) in the case of acceptances received, complete in all respects, by the date on which the Offer becomes or is declared unconditional in all respects, within 14 calendar days of such date; or (ii) in the case of acceptances of the Offer received, complete in all respects, after the date on which the Offer becomes or is declared unconditional in all respects but while the Offer remains open for acceptance, within 14 calendar days of such receipt, in the following manner:

14.3.1 where an acceptance relates to EMI Shares in certificated form, settlement of any cash due will be despatched by first class post (or by such other method as may be approved by the Panel) (but not into Canada) to accepting EMI Shareholders or their appointed agents. All such cash payments will be made in pounds sterling by cheque drawn on a branch of a United Kingdom clearing bank; and

14.3.2 where an acceptance relates to EMI Shares in uncertificated form, the cash consideration to which the accepting EMI Shareholder is entitled will be paid by means of a CREST payment in favour of the accepting EMI Shareholder's payment bank in respect of the cash consideration due, in accordance with CREST payment arrangements. Maltby reserves the right to settle all or any part of the consideration referred to in this paragraph 14.3.2 for all or any accepting EMI Shareholder(s), in the manner referred to in paragraph 14.3.1 above, if, for any reason, it wishes to do so.

### 14.4 Lapsing or withdrawal of the Offer

If the Offer does not become or is not declared unconditional in all respects (whether being implemented pursuant to the terms of the Offer set out in this document or the Form of Acceptance or otherwise) the Offer will lapse and:

(a) in respect of EMI Shares held in certificated form, any Form of Acceptance, share certificate(s) and/or other document(s) of title received will be returned by post (or by such other method as the Panel may approve) within 14 calendar days of the Offer lapsing, at the risk of the EMI Shareholder concerned, to the person or agent whose name and address is set out at the top of the Form of Acceptance, or as updated in Box 6 of the Form of Acceptance or, if no such name and address is set out, to the first-named holder at his registered address; and

(b) in respect of EMI Shares held in uncertificated form, Lloyds TSB Registrars will, immediately after the Offer lapses (or within such longer period as the Panel may permit), give TFE instructions to CRESTCo to transfer all EMI Shares held in escrow balances and in relation to which it is the Escrow Agent for the purposes of the Offer to the original available balances of the EMI Shareholders concerned.

### 14.5 General

All remittances, communications, notices, certificates and documents of title sent by, to or from holders of EMI Shares or their respective appointed agents will be sent at such EMI Shareholder's own risk.

22

CITI-TF 00675803

### 14.6 Further Information

The terms and conditions of the Offer are set out in full in Appendix I to this document and the Form of Acceptance. Your attention is also drawn to the further information set out in the other Appendices to this document, which form part of this document, and, in the case of EMI Shareholders holding their EMI Shares in certificated form, to the accompanying Form of Acceptance.

### 15    Overseas Holders

The attention of Overseas Holders is drawn to paragraph 6 of Part B of Appendix I to this document and to paragraph (b) of Part C of Appendix I to this document and to the relevant provisions of the Form of Acceptance (for holders of EMI Shares in certificated form) and to paragraph (b) of Part D of Appendix I to this document (for holders of EMI Shares in uncertificated form).

The receipt of cash pursuant to the Offer by a US holder of EMI Shares may be a taxable transaction for US federal income tax purposes and under applicable US state and local, as well as foreign and other tax laws. Each holder of EMI Shares is urged to consult his independent financial adviser immediately regarding the tax consequences of acceptance of the Offer. For a discussion of certain US federal income tax consequences see paragraph 13.2 of this Part 2.

The Offer is not being made, directly or indirectly, in or into Canada and the Offer is not capable of acceptance in or from Canada. Custodians, nominees and trustees should observe these restrictions and should not send or distribute documents in or into Canada. Any persons (including nominees, trustees and custodians) who may have a legal or contractual obligation to forward this document, the Form of Acceptance and/or any related documents to any jurisdiction outside the United Kingdom should seek appropriate advice and read paragraph 6 of Part B of Appendix I to this document before doing so.

While the Offer is being made available to holders of EMI Shares in the United States, the right to tender EMI Shares is not being made available in any jurisdiction within the United States in which the making of such offer or the right to tender such EMI Shares would not be in compliance with the laws of such jurisdiction.

### 16    Further Information

Your attention is drawn to the further information contained in the Appendices, which form part of this document, and to the accompanying Form of Acceptance.

### 17    Action to be taken

If your EMI Shares are held in certificated form (that is, not in CREST) and you wish to accept the Offer, you should complete, sign and return the enclosed Form of Acceptance, together with all other required documents, as soon as possible and, in any event, so as to be received either by post, or (during normal business hours only) by hand, by Lloyds TSB Registrars at Princess House, 1 Suffolk Lane, London EC4R 0AX, no later than 1.00 pm (London time) on 27 June 2007. A reply-paid envelope (for use only within the United Kingdom) is enclosed for your convenience. No acknowledgement of receipt of documents will be given. If your EMI Shares are held in uncertificated form (that is, in CREST) and you wish to accept the Offer, you should comply with the instructions set out in paragraph 14.1.2 of this Part 2 so that the relevant TTE Instruction settles no later than 1.00 pm (London time) on 27 June 2007.

CITI-TF 00675804

# APPENDIX I

## CONDITIONS AND FURTHER TERMS OF THE OFFER

**Part A – Conditions of the Offer**

1    The Offer is subject to the following conditions:

(a)    valid acceptances being received (and not, where permitted, withdrawn) by not later than 1.00 pm (London time) on 27 June 2007 (or such later time(s) and/or date(s) as Maltby may, subject to the rules of the City Code, decide) in respect of not less than 90 per cent. (or such lower percentage as Maltby may decide) (i) in nominal value of the EMI Shares to which the Offer relates; and (ii) of the voting rights attached to those shares, provided that this condition will not be satisfied unless Maltby (together with its wholly-owned subsidiaries) shall have acquired or agreed to acquire (whether pursuant to the Offer or otherwise) EMI Shares carrying in aggregate more than 50 per cent. of the voting rights normally exercisable at a general meeting of EMI. For these purposes:

   (i)    EMI Shares which have been unconditionally allotted but not issued before the Offer becomes or is declared unconditional as to acceptances, whether pursuant to the exercise of any outstanding subscription or conversion rights or otherwise, shall be deemed to carry the voting rights they will carry upon issue;

   (ii)    valid acceptances shall be deemed to have been received in respect of EMI Shares which are treated for the purposes of section 979 of the 2006 Act as having been acquired or contracted to be acquired by Maltby by virtue of acceptances of the Offer; and

   (iii)    the expression "EMI Shares to which the offer relates" shall be construed in accordance with Part 28 of the 2006 Act;

(b)    the European Commission making or being deemed to have made a decision that it will not initiate proceedings under Article 6(1)(c) of the Merger Regulation in relation to the Offer (or any matter arising therefrom);

(c)    no government or governmental, quasi governmental, supranational or statutory authority, court, regulatory or investigative body or any other body or person whatsoever in any jurisdiction (each a "**Third Party**", it being understood that, for the purpose of the Conditions, no authority, court, body or person applying merger control, competition law or regulation, foreign investment rules or media regulation shall be deemed to be a Third Party) having decided to take, institute, implement or threaten any action, proceeding, suit, investigation, enquiry or reference, or having required any action to be taken or otherwise having done anything or having enacted, made or proposed any statute, regulation, decision or order and there not continuing to be outstanding any statute, regulation, decision or order of any Third Party which (x) is or is likely to be material in the context of the Offer; and (y) which would or would reasonably be expected to:

   (i)    make the Offer, its implementation or the acquisition of any EMI Shares by any member of the Maltby Group void, illegal and/or unenforceable under the laws of any jurisdiction, or otherwise directly or indirectly prohibit, prevent, restrain, prevent, restrict, delay or otherwise interfere with the implementation of, or impose material additional conditions or obligations with respect to, or otherwise materially impede, challenge or require material amendment of the Offer;

   (ii)    require, prevent or materially delay the divestiture by any member of the Maltby Group or by any member of the Wider EMI Group of all or any part of its businesses, assets or property or impose any limitation on the ability of any of them to conduct their respective businesses (or any part thereof) or to own or control any of their assets or properties (or any part thereof) which in any such case is material in the context of the Wider Maltby Group or the Wider EMI Group, in either case taken as a whole;

   (iii)    impose any material limitation on, or result in a material delay in, the ability of any member of the Maltby Group directly or indirectly to acquire or hold or to exercise effectively all or any rights of ownership in respect of shares or other securities in EMI or on the ability of any member of the Wider EMI Group or any member of the Maltby

24

CITI-TF 00675805

Group directly or indirectly to hold or exercise effectively any rights of ownership in respect of shares or other securities (or the equivalent) in any member of the Wider EMI Group;

(iv) require any member of the Maltby Group or the Wider EMI Group to acquire or offer to acquire any shares, other securities (or the equivalent) or interest in any member of the Wider EMI Group or any asset owned by any third party (other than in the implementation of the Offer);

(v) require, prevent or materially delay a divestiture by any member of the Maltby Group of any shares or other securities (or the equivalent) in any member of the EMI Group which is material in the context of the EMI Group taken as a whole;

(vi) result in any member of the Wider EMI Group ceasing to be able to carry on business under any name under which it presently carries on business which in any such case is material in the context of the Wider EMI Group taken as a whole;

(vii) impose any material limitation on the ability of any member of the Wider EMI Group to integrate or co-ordinate all or any part of its business with all or any part of the business of any other member of the Wider EMI Group which is adverse to and material in the context of the EMI Group taken as a whole; or

(viii) otherwise adversely affect the business, assets, profits, financial position or trading position of any member of the Wider EMI Group or any member of the Maltby Group in a manner which is adverse to and material in the context of the EMI Group taken as a whole or of the obligations of any members of the Maltby Group taken as a whole in connection with the Offer,

and all applicable mandatory waiting and other time periods during which any such Third Party could decide to take, institute or implement any such action, proceeding, suit, investigation, enquiry or reference or otherwise intervene under the laws of any jurisdiction in respect of the Offer or the acquisition or proposed acquisition of any EMI Shares having expired, lapsed or been terminated;

(d) all mandatory filings under the HSR Act (as amended) and the regulations made thereunder having been made and all applicable waiting periods (including any extensions thereof) thereunder having expired or been terminated as appropriate, in each case in relation to the Offer (or any matter arising therefrom);

(e) since 31 March 2006 and except as disclosed in the Published EMI Information or as fairly disclosed by or on behalf of EMI to Maltby before 21 May 2007, there being no provision of any arrangement, agreement, licence, permit, lease or other instrument to which any member of the Wider EMI Group is a party or by or to which any such member or any of its assets is or may reasonably be expected to be bound or be subject, or any event or circumstance having occurred which would result in as a consequence of the Offer or the acquisition or the proposed acquisition by any member of the Wider Maltby Group of any EMI Shares or because of a change in the control or management of any member of the Wider EMI Group or otherwise, which would reasonably be expected to result in, in each case to an extent which is material in the context of the EMI Group taken as whole or the Offer:

(i) any monies borrowed by, or any other indebtedness (actual or contingent) of, or any grant or subsidy available to, any member of the Wider EMI Group being or becoming repayable, or capable of being declared repayable, immediately or prior to its or their stated maturity date or repayment date, or the ability of any such member to borrow monies or incur any indebtedness being withdrawn or inhibited or being capable of becoming or being withdrawn or inhibited;

(ii) the rights, liabilities, obligations, interests or business of any member of the Wider EMI Group under any such arrangement, agreement, licence, permit, lease or other instrument or the interests or business of any member of the Wider EMI Group in or with any other firm or company or body or person (or any agreement or arrangement relating to any such business or interests) being, or becoming capable of being, terminated or adversely modified or affected;

(iii) any member of the Wider EMI Group ceasing to be able to carry on business under any name under which it presently carries on business;

25

(iv)  any assets or interests of any member of the Wider EMI Group being or falling to be disposed of or charged or any right arising under which any such asset or interest could be required to be disposed of or charged or could cease to be available to any member of the Wider EMI Group otherwise than in the ordinary course of business;

(v)  the creation or enforcement of any mortgage, charge or other security interest over the whole or any part of the business, property or assets of any member of the Wider EMI Group, or any such mortgage, charge or other security interest becoming enforceable;

(vi)  the value of, or the financial or trading position or prospects of, any member of the Wider EMI Group being prejudiced or adversely affected;

(vii)  the creation of any material liability (actual or contingent) by any member of the Wider EMI Group otherwise than in the ordinary course of business; or

(viii)  any material liability of any member of the Wider EMI Group to make any severance, termination, bonus or other payment to any of its directors or other officers;

(f)  since 31 March 2006 and except as disclosed in the Published EMI Information or as fairly disclosed by or on behalf of EMI to Maltby before 21 May 2007, no member of the EMI Group having:

(i)  issued or agreed to issue or authorised or proposed the issue of additional shares of any class, or securities convertible into, or exchangeable for, or rights, warrants or options to subscribe for or acquire, any such shares or convertible capital or transferred or sold or agreed to transfer or sell or proposed the transfer or sale of EMI Shares out of treasury (save, in each case, where relevant, as between EMI and wholly-owned subsidiaries of EMI and save for the issue of EMI Shares or the transfer or sale of EMI Shares out of treasury (x) on the exercise of options or release of awards granted under the EMI Share Schemes or otherwise before 21 May 2007 in the ordinary course, (y) on the issue of EMI Shares pursuant to the terms of the Convertible Bonds or (z) as scrip dividends in relation to the final dividend for the year ended 31 March 2006 issued on 2 October 2006 or the interim dividend for the six months ended 30 September 2006 issued on 2 April 2007);

(ii)  save for the final dividend for the year ended 31 March 2006 of 6.0 pence (net) per EMI Share paid to EMI Shareholders on the register of members of EMI on 21 July 2006 and the interim dividend for the six months ended 30 September 2006 of 2.0 pence (net) per EMI Share paid to EMI Shareholders on the register of members of EMI on 12 January 2007, recommended, declared, paid or made or proposed to recommend, declare, pay or make any bonus, dividend or other distribution (whether payable in cash or otherwise) other than to EMI or one of its wholly-owned subsidiaries;

(iii)  merged with or demerged from or acquired any body corporate, partnership or business or acquired or disposed of, or transferred, mortgaged or charged or created any security interest over, any assets or any right, title or interest in any asset (including shares and trade investments) or authorised the same, other than in each case in the ordinary course of business and save in each case for transactions between EMI and its wholly-owned subsidiaries or between such wholly-owned subsidiaries;

(iv)  save as between EMI and its wholly-owned subsidiaries or between such wholly-owned subsidiaries made, authorised, proposed or announced an intention to propose any change in its loan capital save in respect of the Convertible Bonds;

(v)  issued, authorised or proposed the issue of any debentures, or made any change in or to, or (save in the ordinary course of business and save as between EMI and its wholly-owned subsidiaries or between such wholly-owned subsidiaries) incurred or increased any indebtedness or become subject to any contingent liability outside the ordinary course of business which is material in the context of the EMI Group taken as a whole;

(vi)  entered into or varied or announced its intention to enter into or vary any contract, transaction, arrangement or commitment (whether in respect of capital expenditure or otherwise), otherwise than in the ordinary course of business and which is (x) of a long term, unusual or onerous nature, or which involves or could involve an obligation of a nature or magnitude which is, in any such case, material in the context of the EMI

26

Group taken as a whole or (y) reasonably likely to be restrictive on the business of any member of the EMI Group or the Maltby Group where such restriction is material in the context of the EMI Group taken as a whole;

(vii) entered into or varied the terms of any service agreement, arrangement or contract with (x) any director of EMI or (y) any senior executive of the EMI Group whose basic fixed annual cash salary (excluding bonus and incentive arrangements) is equal to or greater than US$500,000;

(viii) proposed, agreed to provide or modified in any material respect the terms of any share option scheme, incentive scheme, or, other than in the ordinary course of business, materially altered any other benefit relating to the employment or termination of employment of any employee of the EMI Group;

(ix) nor the trustees of the relevant pension scheme since that date having, made or agreed or consented to any significant change to the terms of the trust deeds constituting the pension schemes established for its directors, employees or their dependants or the benefits which accrue, or to the pensions which are payable, thereunder, or to the basis on which qualification for, or accrual or entitlement to, such benefits or pensions are calculated or determined or to the basis on which the liabilities (including pensions) of such pension schemes are funded or valued, or agreed or consented to any change to the trustees or trustee directors;

(x) except as between EMI and its wholly-owned subsidiaries or between such wholly-owned subsidiaries and other than in relation to any Competing Proposal, implemented or effected or announced its intention to implement or effect, any reconstruction, amalgamation, scheme or other transaction or arrangement otherwise than in the ordinary course of business;

(xi) purchased, redeemed or repaid or announced any proposal to purchase, redeem or repay any of its own shares or other securities or reduced or, save in respect of the exceptions mentioned in sub paragraph (i) above, made any other change to any part of its share capital to an extent which is material in the context of the EMI Group taken as a whole;

(xii) waived or compromised any claim otherwise than in the ordinary course of business which is material in the context of the EMI Group taken as a whole;

(xiii) made any material alteration to its memorandum or articles of association or other incorporation documents which is material in the context of the EMI Group taken as a whole;

(xiv) other than in respect of a body corporate which is dormant and was solvent at the relevant time, taken or proposed any corporate action or had any legal proceedings instituted or threatened in writing against it for its winding up (voluntary or otherwise), dissolution, reorganisation or for the appointment of any administrator, receiver, administrative receiver, trustee or similar officer of all or any of its assets or revenues or any analogous proceedings in any jurisdiction or appointed any analogous person in any jurisdiction or had any such person appointed;

(xv) commenced negotiations with one or more of its creditors with a view to rescheduling or restructuring any of its indebtedness, or having stopped or suspended (or threatened to stop or suspend) payment of its debts generally or ceased or threatened to cease carrying on all or a substantial part of its business; or

(xvi) entered into any contract, commitment, agreement or arrangement otherwise than in the ordinary course of business or passed any resolution or made any offer (which remains open for acceptance) with respect to, or announced an intention to, or to propose to, effect any of the transactions, matters or events referred to in this condition;

(g) since 31 March 2006 and except as disclosed in the Published EMI Information or as fairly disclosed by or on behalf of EMI to Maltby before 21 May 2007, in each case before 21 May 2007:

(i) there having been no adverse change in the business, assets, financial or trading position or profits or operational performance of any member of the Wider EMI Group to an extent which is material to the EMI Group taken as a whole;

27

CITI-TF 00675808

(ii) no litigation, arbitration proceedings, prosecution or other legal proceedings having been threatened, announced or instituted by or against and remaining outstanding against any member of the EMI Group or to which any member of the EMI Group is or may become a party (whether as claimant or defendant or otherwise) and, other than as a result of the Offer, no enquiry or investigation by, or complaint or reference to, any Third Party against or in respect of any member of the EMI Group having been threatened, announced or instituted by and against, or remaining outstanding in respect of, any member of the EMI Group which, in any such case, might reasonably be expected to materially and adversely affect the EMI Group taken as a whole; and

(iii) no contingent or other liability having arisen or become known to Maltby which would be likely to adversely affect the business, assets, financial or trading position or profits of any member of the Wider EMI Group to an extent which is material to the EMI Group taken as a whole;

(h) since 31 March 2006 and except as disclosed in the Published EMI Information or as fairly disclosed by or on behalf of EMI to Maltby before 21 May 2007, Maltby not having discovered:

(i) that any financial, business or other information concerning the Wider EMI Group publicly disclosed or disclosed to any member of the Maltby Group at any time by or on behalf of any member of the Wider EMI Group which is material in the context of the Offer, and which was not subsequently corrected prior to 21 May 2007 by or on behalf of EMI, is misleading to a material extent, contains a material misrepresentation of fact or omits to state a fact necessary to make that information not misleading to a material extent;

(ii) that any member of the Wider EMI Group is subject to any liability, contingent or otherwise, which is material in the context of the EMI Group taken as a whole; or

(iii) any information which materially affects the import of any information disclosed to Maltby at any time before 21 May 2007 by or on behalf of any member of the Wider EMI Group which is material in the context of the EMI Group taken as a whole; and

(i) except as disclosed in the Published EMI Information or as fairly disclosed by or on behalf of EMI to Maltby before 21 May 2007, in relation to any release, emission, accumulation, discharge, spillage, leak, use, treatment, handling, storage, transport, disposal or other fact or circumstance which has impaired or is reasonably likely to impair the environment (including property) or harmed or is reasonably likely to harm human health or otherwise relating to environmental matters, no past or present member of the Wider EMI Group, in each case in a manner or to an extent which is material in the context of the EMI Group taken as a whole, (i) having committed any violation of any applicable laws, statutes, regulations, notices or other requirements of any Third Party and/or (ii) having incurred any liability (whether actual or contingent) to any Third Party, or being required, to make good, remediate, repair, re-instate or clean up the environment (including any property).

Maltby reserves the right to waive in whole, or in part, all or any of the Conditions except Condition (a).

Conditions (b) to (i) (inclusive) must be fulfilled, be determined by Maltby to be or remain satisfied or (if capable of waiver) be waived by midnight on the 21st day after the later of the First Closing Date of the Offer, 27 June 2007, and the date on which Condition (a) is fulfilled (or in each case such later date as Maltby may, with the consent of the Panel, decide), failing which the Offer will lapse. Maltby shall be under no obligation to waive (if capable of waiver), to determine to be or remain satisfied or to treat as fulfilled any of Conditions (b) to (i) (inclusive) by a date earlier than the latest date specified above for the fulfilment of that Condition, notwithstanding that the other Conditions of the Offer may at such earlier date have been waived or fulfilled and that there are, at such earlier date, no circumstances indicating that any Condition may not be capable of fulfilment.

CITI-TF 00675809

**Part B – Further Terms of the Offer**

Unless the context otherwise requires, any reference in Part B, Part C or Part D of this Appendix I and in the Form of Acceptance to:

(i)     the "**Offer**" includes any revision, variation, renewal or extension of the Offer;

(ii)    the "**acceptance condition**" means the Condition set out in paragraph 1(a) of Part A of this Appendix I;

(iii)   the "**Offer becoming unconditional**" means the acceptance condition becoming or being declared satisfied and remaining so in accordance with its terms whether or not any other condition of the Offer remains to be fulfilled and references to the Offer having become or not become unconditional shall be construed accordingly;

(iv)    "**acceptances of the Offer**" includes deemed acceptances of the Offer; and

(v)     the "**Offer Period**" means the period commencing on 20 February 2007, being the date on which EMI announced that it was in receipt of an approach from Warner Music Group, until the latest of:

(A)     1.00 pm (London time) on 27 June 2007 (or such later date as Maltby may determine in accordance with the City Code or otherwise with the Panel's consent) (the "**First Closing Date**");

(B)     the time and date when the Offer lapses; and

(C)     the time and date when the Offer becomes unconditional.

**1     Acceptance Period**

(a)     The Offer will initially be open for acceptance until 1.00 pm (London time) on the First Closing Date. If the Offer is revised, it will remain open for acceptance for a period of at least 14 calendar days (or such other period as the Panel may permit) from the date on which written notification of the revision is posted to holders of EMI Shares. Except with the Panel's consent, no revision of the Offer may be made or posted after 15 July 2007 or, if later, the date falling 14 calendar days before the last date upon which the Offer can become unconditional.

(b)     The Offer, whether revised or not, shall not (except with the Panel's consent) be capable of becoming unconditional after 12.00 midnight (London time) on 29 July 2007 (or any earlier time and/or date beyond which Maltby has stated that the Offer will not be extended unless Maltby has, where permitted, withdrawn that statement or extended the Offer beyond the stated earlier date), nor of being kept open for acceptance after that time and/or date unless it has previously become unconditional, provided that Maltby reserves the right, with the Panel's consent, to extend the Offer to a later time(s) and/or date(s). Except with the Panel's consent, Maltby may not, for the purpose of determining whether the acceptance condition has been satisfied, take into account acceptances received or purchases of EMI Shares made in respect of which relevant documents have been received by Lloyds TSB Registrars after 1.00 pm (London time) on 29 July 2007 (or any earlier time and/or date beyond which Maltby has stated that the Offer will not be extended unless, where permitted, it has withdrawn that statement or extended the Offer beyond the stated earlier date) or, if the Offer is so extended, any such later time(s) and/or date(s) as may be agreed with the Panel. If the latest time at which the Offer may become unconditional is extended beyond 12.00 midnight (London time) on 29 July 2007, acceptances received and purchases of EMI Shares made in respect of which relevant documents are received by Lloyds TSB Registrars after 1.00 pm (London time) on the relevant day may (except where the City Code permits otherwise) only be taken into account with the Panel's agreement.

(c)     If the Offer becomes unconditional, it will remain open for acceptance for not less than 14 calendar days from the date on which it would otherwise have expired. If the Offer has become unconditional and it is stated by or on behalf of Maltby that the Offer will remain open until further notice, then not less than 14 days' notice in writing will be given before closing the Offer to those EMI Shareholders who have not accepted the Offer.

(d)     If a competitive situation arises and is continuing on 29 July 2007, Maltby may, at its discretion and with the consent of the Panel, enable holders of EMI Shares in uncertificated form who have not already validly accepted the Offer but who have previously accepted the

29

competing offer to accept the Offer by special form of acceptance to take effect on 29 July 2007. It shall be a condition of such special form of acceptance being a valid acceptance of the Offer that (i) it is received by Lloyds TSB Registrars on or before 1.00 pm (London time) on 29 July 2007; (ii) the relevant EMI Shareholder shall have applied to withdraw his acceptance of the competing offer but that the EMI Shares to which such withdrawal relates shall not have been released from escrow before 29 July 2007 by the escrow agent to the competing offer; and (iii) the EMI Shares to which the special form of acceptance or special acceptance instruction relates are not transferred to escrow in accordance with the procedure for acceptance set out in Part 2 of this document on or before 29 July 2007, but an undertaking is given that they will be so transferred or so subject as soon as possible thereafter. EMI Shareholders wishing to use such special forms of acceptance should apply to Lloyds TSB Registrars on 0870 608 1822 (or +44 1903 276 342 from outside the United Kingdom) between 9.00 am and 5.00 pm (London time) on 26 July 2007 or 27 July 2007 in order that such forms can be despatched. Notwithstanding the right to use such special form of acceptance, holders of EMI Shares in uncertificated form may not use the Form of Acceptance (or any other purported acceptance form) for the purpose of accepting the Offer in respect of such EMI Shares.

(e)  If a competitive situation arises after Maltby has made a "no extension" statement and/or a "no increase" statement in relation to the Offer, Maltby may, if it specifically reserved the right to do so at the time such statement was made, or otherwise with the Panel's consent, choose not to be bound by and withdraw that statement and extend or revise the Offer (as appropriate) provided that it complies with the requirements of the City Code and, in particular, that:

(i)  it announces such withdrawal and that it is free to extend or revise the Offer (as appropriate) as soon as possible (and in any event within four Business Days of the firm announcement of the competing offer or other competitive situation) and EMI Shareholders are informed in writing at the earliest practicable opportunity or, in the case of: (A) EMI Shareholders with registered addresses outside the United Kingdom and the United States; or (B) EMI Shareholders whom Maltby or Dresdner Kleinwort know to be nominees, trustees or custodians for persons outside the United Kingdom and the United States, by announcement or paid advertisement in any daily newspaper(s) published and circulated in the United Kingdom and the United States, in which case such notice shall be deemed to have been sufficiently given notwithstanding any failure by any such shareholders to receive or see such notice; and

(ii)  any EMI Shareholders who accepted the Offer after the date of the "no extension" and/or "no increase" statement are given a right of withdrawal in accordance with paragraph 3(d) of this Part B of this Appendix I.

(f)  Maltby may, if it has reserved the right to do so, choose not to be bound by a "no increase" or a "no extension" statement if it would otherwise prevent the posting of an increased or improved offer (either as to the value or nature of the consideration offered or otherwise) which is recommended for acceptance by the board of Directors of EMI or in other circumstances permitted by the Panel.

(g)  Maltby may, if it has reserved the right to do so and EMI makes an announcement of the kind referred to in Rule 31.9 of the City Code after 8 July 2007, choose not to be bound by a "no increase" or a "no extension" statement and revise or extend the Offer with the consent of the Panel, provided that Maltby complies with the requirements of the City Code and in particular that notice to this effect is given as soon as possible (and in any event within four Business Days of the date of EMI's announcement) and EMI Shareholders are informed in writing at the earliest practicable opportunity or, in the case of: (A) EMI Shareholders with registered addresses outside the United Kingdom and the United States; or (B) EMI Shareholders whom Maltby or Dresdner Kleinwort know to be nominees, trustees or custodians for persons outside the United Kingdom and the United States, by announcement or paid advertisement in any daily newspaper(s) published and circulated in the United Kingdom and the United States, in which case such notice shall be deemed to have been sufficiently given notwithstanding any failure by any such shareholders to receive or see such notice.

30

(h)  For the purpose of determining at any particular time whether the acceptance condition has been satisfied, Maltby shall be entitled to take account only of those EMI Shares carrying voting rights which have been unconditionally allotted or issued before that time and written notice of allotment or issue of which, containing all the relevant details, has been received before that time by Lloyds TSB Registrars from EMI or its agents at the address specified in paragraph 3(b) of this Part B. Telex, e-mail or facsimile transmission will not constitute written notice for these purposes.

2    **Announcements**

(a)  Without prejudice to paragraph 3(b) of this Part B, by 8.00 am (London time) on the Business Day (the "relevant day") following the day on which the Offer is due to expire or becomes unconditional or is revised or extended, as the case may be (or such later time(s) or date(s) as the Panel may agree), Maltby will make an appropriate announcement and simultaneously inform a Regulatory Information Service of the status of the Offer. The announcement will also state (unless otherwise permitted by the Panel) the total number of EMI Shares and rights over EMI Shares (as nearly as practicable):

(i)   for which acceptances of the Offer have been received including from any person acting or deemed to be acting in concert (for the purposes of the City Code) with Maltby;

(ii)  held by or on behalf of Maltby or any person acting or deemed to be acting in concert (for the purposes of the City Code) with it before the Offer Period; and

(iii) acquired or agreed to be acquired by or on behalf of Maltby or any person acting or deemed to be acting in concert (for the purposes of the City Code) with it during the course of the Offer Period,

and the announcement will specify the percentage of the EMI Shares represented by each of these figures and state the next expiry date, unless the Offer is then unconditional, in which case a statement may instead be made that the Offer will remain open until further notice.

(b)  Any decision to extend the time and/or date by which the acceptance condition has to be fulfilled may be made at any time up to, and will be announced not later than, 8.00 am (London time) on the relevant day (as defined in paragraph 2(a) of this Part B) or such later time(s) and/or date(s) as the Panel may agree. In computing the number of EMI Shares represented by acceptances and/or purchases, there may be included or excluded for announcement purposes, acceptances and purchases which are not complete in all respects or which are subject to verification save that those EMI Shares which could not be counted towards fulfilment of the acceptance condition in respect of the Offer under Notes 4, 5 and 6 of Rule 10 of the City Code shall not (unless agreed by the Panel) be included.

(c)  In this Appendix I, references to the making of an announcement or the giving of notice by or on behalf of Maltby include the release of an announcement by public relations consultants or by any such person appointed by Maltby for this purpose to the press and the delivery by hand or telephone or telex or facsimile or other electronic transmission of an announcement to a Regulatory Information Service. An announcement made otherwise than to a Regulatory Information Service shall be notified simultaneously to a Regulatory Information Service (unless otherwise agreed by the Panel).

(d)  Without limiting the manner in which Maltby may choose to make any public announcement and, subject to Maltby's obligations under applicable law (including Rule 14e-1(d) under the US Exchange Act relating to Maltby's obligations to disseminate promptly public announcements concerning extensions of, or modifications to, the Offer), Maltby will have no obligation to publish, advertise or otherwise communicate any such public announcement other than by making a release to a Regulatory Information Service.

3    **Rights of withdrawal**

(a)  Except as provided by this paragraph 3 of this Part B, acceptances and elections under the Offer shall be irrevocable.

(b)  If Maltby, having announced the Offer to be unconditional, fails to comply by 3.30 pm (London time) on the relevant day (as defined in paragraph 2(a) of this Part B or such later time(s) and/or date(s) as the Panel may agree) with any of the requirements specified in paragraph 2(a) of this Part B, a person may (unless the Panel agrees otherwise) immediately

31

CITI-TF 00675812

thereafter withdraw his acceptance of the Offer by written notice received by post or, during normal business hours, by hand by Lloyds TSB Registrars at Princess House, 1 Suffolk Lane, London EC4R 0AX (or in the case of EMI Shares held in uncertificated form, in the manner referred to in paragraph 3(j) of this Part B). Subject to paragraph 1(b) of this Part B, this right of withdrawal may be terminated not less than eight calendar days after the relevant day (as defined in paragraph 2(a)) by Maltby confirming, if that be the case, that the Offer is still unconditional, and complying with the other requirements specified in paragraph 2(a) of this Part B. If any such confirmation is given, the first period of 14 calendar days referred to in paragraph 1(c) of this Part B will run from the date of such confirmation and compliance.

(c)     If by 1.00 pm (London time) on 18 July 2007 (or such later time(s) and/or date(s) as the Panel may agree) the Offer has not become unconditional, an accepting EMI Shareholder may withdraw his acceptance at any time thereafter in the manner referred to in paragraph 3(b) of this Part B before the earlier of:

(i)     the time when the Offer becomes unconditional; and

(ii)    the final time for lodgement of acceptances of the Offer which can be taken into account in accordance with paragraph 1(b) of this Part B.

(d)     If a "no extension" statement and/or a "no increase" statement has been withdrawn in accordance with paragraph 1(e) of this Part B, a person who accepts the Offer after the date of the statement may withdraw his acceptance in the manner referred to in paragraph 3(b) of this Part B not later than the eighth calendar day after the date on which written notice of withdrawal of the statement is notified to EMI Shareholders in the manner set out in paragraph 1(e) above.

(e)     In this paragraph 3, "written notice" (including any letter of appointment, direction or authority) means notice in writing bearing the original signature(s) of the relevant accepting person(s) or his/their agent(s) duly appointed in writing (evidence of whose appointment is produced with the notice in a form reasonably satisfactory to Maltby). Telex, e-mail or facsimile transmissions or copies will not be sufficient to constitute written notice.

(f)     To be effective, a written notice of withdrawal must be received on a timely basis by Lloyds TSB Registrars (or, in the case of EMI Shares in uncertificated form, CRESTCo) and must specify the name of the person who has tendered the EMI Shares to be withdrawn and (if share certificates or other document(s) of title have been tendered) the name of the holder of the relevant EMI Shares, if different from the name of the person who tendered EMI Shares or such other details as are required by CRESTCo.

(g)     Maltby may (in its absolute discretion) allow any acceptance of the Offer to be withdrawn (in whole or in part) without allowing withdrawal of any other acceptances in so far as necessary to enable the relevant EMI Shares to be purchased by it otherwise than pursuant to the Offer.

(h)     Withdrawals of tendered EMI Shares may not be rescinded (without Maltby's consent) and any EMI Shares properly withdrawn and not properly re-tendered will thereafter be deemed not validly tendered for the purposes of the Offer. Withdrawn EMI Shares may be subsequently re-tendered, by following the acceptance procedures described in this document, at any time whilst the Offer remains open.

(i)     Any question as to the validity (including time of receipt) of any notice of withdrawal will be determined by Maltby whose determination (save as the Panel otherwise determines) will be final and binding. None of Maltby, EMI, Lloyds TSB Registrars, or any other person will be under any duty to give notification of any defect in any notice of withdrawal or will incur any liability for failure to do so.

(j)     In the case of EMI Shares held in uncertificated form, if withdrawals are permitted pursuant to paragraphs 3(b), (c) or (d) of this Part B, an accepting EMI Shareholder may withdraw his acceptance through CREST by sending (or, if a CREST sponsored member, procuring that his CREST sponsor sends) an ESA instruction to settle in CREST in relation to each Electronic Acceptance to be withdrawn. Each ESA instruction must, in order for it to be valid and settle, include the following details:

(i)     the number of EMI Shares to be withdrawn, together with their ISIN number (this is GB0000444736);

(ii)    the member account ID of the accepting shareholder, together with his Participant ID;

32

CITI-TF 00675813

(iii) the Escrow Agent's Participant ID (this is 2RA11) and the member account ID of the Escrow Agent included in the relevant Electronic Acceptance (this is TEREMI01 for the Offer);

(iv) the CREST transaction ID of the Electronic Acceptance to be withdrawn, to be inserted at the beginning of the shared note field;

(v) the intended settlement date for the withdrawal;

(vi) the corporate action number for the Offer allocated by CRESTCo; and

(vii) input with a standard delivery instruction priority of 80.

(k) Any such withdrawal will be conditional upon Lloyds TSB Registrars verifying that the withdrawal request is validly made. Accordingly, Lloyds TSB Registrars will, on behalf of Maltby, either reject the withdrawal by transmitting in CREST a receiving agent reject (AEAD) message or accept the withdrawal by transmitting in CREST a receiving agent accept (AEAN) message.

## 4    Revisions of the Offer

(a) If the Offer is revised (either in its terms and conditions or in the value or nature of the consideration offered or otherwise) and such revision represents on the date on which it is announced (on such basis as Dresdner Kleinwort may consider appropriate) an improvement or no diminution in the value of that revised Offer compared with the consideration or terms previously offered or in the overall value received and/or retained by an EMI Shareholder (under the Offer or otherwise), the benefit of the revised Offer will, subject to paragraphs 4(c), 4(d) and 6 of this Part B, be made available to any EMI Shareholder as the case may be who has accepted the Offer in its original or any previously revised form(s) (a "**previous acceptor**"). The acceptance of the Offer by or on behalf of a previous acceptor in its original or any previously revised form(s) shall, subject as provided in paragraphs 4(c), 4(d) and 6 of this Part B, be treated as an acceptance of the Offer as so revised and shall also constitute the irrevocable and separate appointment of Maltby and Dresdner Kleinwort and each of their respective directors as his attorney and/or agent with authority: (i) to accept any such revised offer on behalf of such previous acceptor; (ii) if such revised offer includes alternative forms of consideration, to make on his behalf such elections for, and/or accept such alternative forms of consideration in the proportions such attorney and/or agent in his absolute discretion thinks fit; and (iii) to execute on behalf of, and in the name of, such previous acceptor all such further documents (if any) as may be required to give effect to such acceptances and/or elections. In making any such election and/or acceptance, such attorney and/or agent shall take into account the nature of any previous acceptances made by or on behalf of the previous acceptor and such other facts or matters as he may reasonably consider relevant.

(b) Subject to paragraphs 4(c) and 4(d) of this Part B, the powers of attorney and authorities conferred by this paragraph 4 and any acceptance of a revised Offer and/or any election pursuant thereto shall be irrevocable unless and until the previous acceptor becomes entitled to withdraw his acceptance under paragraph 3 of this Part B and duly and validly does so.

(c) The deemed acceptance referred to in paragraph 4(a) of this Part B shall not apply, and the authorities conferred by that paragraph shall not be exercised, to the extent that a previous acceptor:

(i) in respect of EMI Shares in certificated form, lodges with Lloyds TSB Registrars, within 14 calendar days of the posting of the document containing the revised Offer, a Form of Acceptance (or other form validly issued by or on behalf of Maltby) in which he validly elects to receive the consideration receivable by him under such revised Offer in some other manner than that set out in his original or any previous acceptance; or

(ii) in respect of EMI Shares in uncertificated form, sends (or, if a CREST sponsored member, procures that his CREST sponsor sends), within 14 calendar days of the posting of the document containing the relevant revised Offer, an ESA instruction to settle in CREST in relation to each Electronic Acceptance in respect of which an election is to be varied. Each ESA instruction must, in order for it to be valid and settle, include the following details:

(A) the number of EMI Shares in respect of which the changed election is made, together with their ISIN number (this is GB0000444736);

33

(B) the member account ID of the previous acceptor, together with his Participant ID;

(C) the Escrow Agent's Participant ID (this is 2RA11) and the member account ID of the Escrow Agent included in the relevant Electronic Acceptance (this is TEREMI01);

(D) the CREST transaction ID of the Electronic Acceptance in respect of which the election is to be changed to be inserted at the beginning of the shared note field;

(E) the intended settlement date for the changed election;

(F) the corporate action number for the Offer allocated by CRESTCo;

(G) and, in order that the desired change of election can be effected, must include:

(1) the member account ID of the Escrow Agent relevant to the new election; and

(2) input with a standard delivery instruction priority of 80.

Any such change of election will be conditional upon Lloyds TSB Registrars verifying that the request is validly made. Accordingly, Lloyds TSB Registrars will on behalf of Maltby reject or accept the requested change of election by, in relation to EMI Shares in uncertificated form, transmitting in CREST a receiving agent reject (AEAD) or receiving agent accept (AEAN) message as appropriate.

(d) The deemed acceptance referred to in paragraph 4(a) of this Part B shall not apply, and the authorities conferred by that paragraph shall not be exercised, if as a result thereof, the previous acceptor would (on such basis as Dresdner Kleinwort may consider appropriate) thereby receive less in aggregate in consideration under the revised Offer than he would have received in aggregate as a result of acceptance of the Offer in the form in which it was previously accepted by him or on his behalf unless the previous acceptor has previously agreed in writing. The authorities conferred by paragraph 4(a) of this Part B shall not be exercised in respect of any election available under the revised Offer save in accordance with this paragraph.

(e) Maltby reserves the right to treat an executed Form of Acceptance, or TTE instruction, or other instruction referred to above (in respect of the Offer in its original or any previously revised form(s)) which is received (or dated) on or after the announcement of any revision of the Offer as a valid acceptance of the revised Offer and/or, where applicable, a valid election for, or acceptance of, any of the alternative forms of consideration. Such acceptances shall constitute an authority in the terms of paragraph 4(a) of this Part B, *mutatis mutandis*, on behalf of the relevant EMI Shareholder.

## 5    Acceptances and Purchases

Except as otherwise agreed by the Panel:

(a) an acceptance of the Offer shall not be treated as valid for the purposes of the acceptance condition unless the requirements of Note 4 and, if applicable, Note 6 of Rule 10 of the City Code are satisfied in respect of it;

(b) a purchase of EMI Shares by Maltby or its nominee(s) or, in the case of a Rule 9 offer, any person acting or deemed to be acting in concert with Maltby or its nominees will only be treated as valid for the purposes of the acceptance condition if the requirements of Note 5 and, if applicable, Note 6 of Rule 10 of the City Code are satisfied in respect of it; and

(c) before the Offer may become unconditional, Lloyds TSB Registrars must have issued a certificate to Maltby which states the number of EMI Shares in respect of which acceptances have been received and which comply with paragraph 5(a) of this Part B, and the number of EMI Shares otherwise acquired, whether before or during the Offer Period, which comply with paragraph 5(b) of this Part B. Maltby (as the case may be) shall ensure that a copy of the certificate is sent to the Panel and/or the financial adviser of EMI as soon as possible after issue.

## 6    Overseas Holders

(a) The making of the Offer in, or to persons resident in, or to nationals of, jurisdictions outside the United Kingdom or the United States or to the nominees of, or custodians or trustees for such persons may be prohibited or affected by the laws of the relevant jurisdictions. EMI Shareholders who are residents or nationals of jurisdictions outside the United Kingdom and

34

CITI-TF 00675815

the United States should inform themselves about and observe any applicable legal requirements. No person receiving a copy of this document and/or the Form of Acceptance in any jurisdiction other than the United Kingdom or the United States may treat the same as constituting an invitation or offer to him, nor should he in any event use the Form of Acceptance if, in the relevant jurisdiction, such invitation or offer cannot lawfully be made to him or the Form of Acceptance cannot lawfully be used without contravention of any relevant or other legal requirements. In such circumstances, this document and/or the Form of Acceptance are sent for information only. It is the responsibility of such EMI Shareholder receiving a copy of this document and/or Form of Acceptance and wishing to accept the Offer to satisfy himself as to the full observance of the laws and regulatory requirements of the relevant jurisdiction in connection with the Offer, including obtaining any governmental, exchange control or other consents which may be required, or compliance with other necessary formalities needing to be observed and payment of any issue, transfer or other taxes or duties due in such jurisdiction. Any such EMI Shareholder will be responsible for any such issue, transfer or other taxes or other payments by whomsoever payable and Maltby EMI Shareholder for any such issue, transfer or other taxes or duties as Maltby (and any person acting on its behalf) shall be fully indemnified and held harmless by such person acting on its behalf) may be required to pay.

If you are an Overseas Holder and you are in doubt about your position, you should consult your independent professional adviser in the relevant jurisdiction.

(b)   In particular, the Offer is not being made, directly or indirectly, in or into Canada, and the Offer is not capable of acceptance in or from Canada. Accordingly, copies of this document and the Form of Acceptance are not being, and must not be, mailed or otherwise forwarded, distributed or sent in or into or from Canada.

Persons receiving any such documents (including without limitation, custodians, trustees and nominees) must not mail or otherwise forward, distribute or send them, directly or indirectly, in, into or from Canada, or use Canadian mails or any such means or instrumentality or facility for any purpose, directly or indirectly, in connection with the Offer. Doing so may invalidate any purported acceptance of the Offer. Persons wishing to accept the Offer must not use such mails or any such means or instrumentality or facility directly or indirectly for any purpose directly or indirectly related to acceptance of the Offer or such election.

Envelopes containing a Form of Acceptance, evidence of title or any other document relating to the Offer should not be postmarked in Canada or otherwise despatched from Canada and all accepting EMI Shareholders must provide details (including addresses) outside Canada for the remittance of cash or for the return of the Form of Acceptance, share certificate(s) and/or other document(s) of title.

(c)   An EMI Shareholder will be deemed not to have validly accepted the Offer if:

(i)    he puts "NO" in Box 5 of the Form of Acceptance and thereby does not give the representations and warranties set out in paragraph (b) of Part C of this Appendix I;

(ii)   Box 1 sets out an address in Canada and he does not insert in Box 6 of the Form of Acceptance the name and address of a person or agent outside Canada, to whom he wishes the consideration to which he is entitled under the Offer and/or any documents to be sent;

(iii)  in any case, the Form of Acceptance received from him is received in an envelope postmarked in, or which otherwise appears to Maltby, or its agent, to have been sent from Canada; or

(iv)   he inserts in Box 2 of the Form of Acceptance a telephone number in Canada.

Maltby reserves the right, in its sole discretion, to investigate, in relation to any acceptance, whether the representations and warranties set out in paragraph (b) of Part C of this Appendix I could have been truthfully given by the relevant EMI Shareholder and, if such investigation is made and, as a result, Maltby cannot satisfy itself that such representation and warranty was true and correct, the acceptance shall not be valid.

(d)   If, in connection with the making of the Offer, notwithstanding the restrictions described above, any person (including, without limitation, custodians, nominees and trustees), whether pursuant to a contractual or legal obligation or otherwise, forwards this document or the accompanying Form of Acceptance, in, into or from Canada, or uses the mails or any means

35

CITI-TF 00675816

or instrumentality (including without limitation, facsimile transmission, telephone or internet) of interstate or foreign commerce of, or any facility of a national securities exchange of Canada in connection with such forwarding, such person should:

(i)   inform the recipient of such fact;

(ii)   explain to the recipient that such action may invalidate any purported acceptance by the recipient; and

(iii)   draw the attention of the recipient to this paragraph 6.

(e)   If any written notice from an EMI Shareholder withdrawing his acceptance in accordance with paragraph 3 of Part B of this Appendix I is received in an envelope postmarked in, or which otherwise appears to Maltby or its agents to have been sent from, Canada, Maltby reserves the right in its absolute discretion to treat that notice as invalid.

**Any acceptance of the Offer by an EMI Shareholder who is unable to give the representations and warranties set out in paragraph (b) of Part C or paragraph (b) of Part D, as the case may be, of this Appendix I is liable to be disregarded.**

(f)   Maltby reserves the right, in its absolute discretion, to treat any acceptance as invalid if it believes that such acceptance may violate applicable legal and/or regulatory requirements.

(g)   If an EMI Shareholder holding EMI Shares in uncertificated form cannot give the representations and warranties set out in paragraph (b) of Part D of this Appendix I, but nevertheless can provide evidence satisfactory to Maltby that he can accept the Offer in compliance with all relevant legal and regulatory requirements, he may only purport to accept the Offer by sending (or if a CREST sponsored member, procuring that his CREST sponsor sends) a Transfer to Escrow instruction to a designated escrow balance detailed below (a "**Restricted Escrow Transfer**"). Such purported acceptance will not be treated as a valid acceptance unless the Restricted Escrow Transfer settles in CREST and Maltby decides, in its absolute discretion, to exercise its right described in paragraph 6(h) of Part B of this Appendix I to waive, vary or modify the terms of the Offer relating to Overseas Holders, to the extent required to permit such acceptance to be made, in each case during the acceptance period set out in paragraph 1(a) of Part B of this Appendix I. If Maltby accordingly decides to permit such acceptance to be made, Lloyds TSB Registrars will, on behalf of Maltby, accept the purported acceptance as an Electronic Acceptance on the terms of this document (as so waived, varied or modified) by transmitting in CREST a receiving agent accept (AEAN) message. Otherwise, Lloyds TSB Registrars will, on behalf of Maltby, reject the purported acceptance by transmitting in CREST a receiving agent reject (AEAD) message. Each Restricted Escrow Transfer must, in order for it to be valid and settle, include the following details:

(A)   the ISIN number for the EMI Shares. This is GB0000444736;

(B)   the number of EMI Shares in uncertificated form in respect of which the Offer is to be accepted;

(C)   the member account ID and Participant ID of the EMI Shareholder;

(D)   the Participant ID of the Escrow Agent (this is 2RA11) and its member account ID specific to a Restricted Escrow Transfer (this is RESTRICT);

(E)   the intended settlement date. This should be as soon as possible and in any event not later than 1.00 pm (London time) on 27 June 2007;

(F)   the corporate action number for the Offer allocated by CRESTCo;

(G)   input with a standard delivery instruction priority of 80; and

(H)   the contact name and telephone number inserted in the shared note field.

(h)   These provisions and any other terms of the Offer relating to Overseas Holders may be waived, varied or modified as regards specific EMI Shareholders or on a general basis by Maltby in its absolute discretion. Subject thereto, the provisions of this paragraph 6 supersede any terms of the Offer inconsistent with them. References in this paragraph 6 to an EMI Shareholder include references to the person or persons executing the Form of Acceptance and, if more than one person executes the applicable Form of Acceptance, the provisions of this paragraph 6 shall apply to them jointly and severally.

CITI-TF 00675817

7    **General**

(a)    Except with the Panel's consent, the Offer will lapse unless all of the conditions have been satisfied or (if capable of waiver) waived or, where appropriate, have been determined by Maltby in its reasonable opinion to be or remain satisfied by midnight on the date which is 21 calendar days after the date on which the Offer becomes unconditional or such later date(s) as Maltby may, with the Panel's consent, decide. If the Offer lapses it will cease to be capable of further acceptance. EMI Shareholders who have then accepted the Offer and Maltby shall then cease to be bound by acceptances delivered on or before the date on which the Offer lapses.

(b)    Save with the consent of the Panel, the Offer will lapse and the Offer will not proceed if the European Commission either initiates proceedings under Article 6(1)(c) of the Merger Regulation or makes a referral to a competent authority of the United Kingdom under Article 9(3)(b) of the Merger Regulation and there is a subsequent reference to the United Kingdom Competition Commission, in either case before 1.00 pm (London time) on 27 June 2007 or the date on which the Offer becomes unconditional, whichever is the later.

(c)    Except with the Panel's consent, settlement of the consideration to which any EMI Shareholder is entitled under the Offer will be implemented in full in accordance with the terms of the Offer without regard to any lien, right of set-off, counterclaim or other analogous right to which Maltby may otherwise be, or claim to be, entitled as against such EMI Shareholder and will be effected in the manner described in Part 2 of this document.

(d)    The Offer is made at midnight (London time) on 30 May 2007 and is capable of acceptance from that date and after that time. Copies of this document, the Form of Acceptance and any related documents are available from Lloyds TSB Registrars at the address set out in paragraph 3(b) of this Part B.

(e)    The terms, provisions, instructions and authorities contained in or deemed to be incorporated in the Form of Acceptance constitute part of the terms of the Offer. The provisions of this Appendix I shall be deemed to be incorporated in and form part of the Offer. Words and expressions defined in this document have the same meanings when used in the Form of Acceptance, unless the context otherwise requires.

(f)    The Offer, all acceptances of it and all elections pursuant to it, the Form of Acceptance and Electronic Acceptances, all contracts made pursuant to the Offer, all action taken or made or deemed to be taken or made pursuant to any of these terms and the relationship between an EMI Shareholder and Maltby or Lloyds TSB Registrars shall be governed by and interpreted in accordance with English law and:

   (i)    execution of a Form of Acceptance or the making of an Electronic Acceptance or any other valid acceptance of the Offer by or on behalf of an EMI Shareholder will constitute his agreement that the Courts of England are (subject to paragraph 7(f)(ii) of this Part B) to have exclusive jurisdiction to settle any dispute which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, the Offer and the Form of Acceptance or the Electronic Acceptance or otherwise arising in connection with the Offer and the Form of Acceptance or the Electronic Acceptance, and for such purposes that he irrevocably submits to the jurisdiction of the English Courts; and

   (ii)    execution of a Form of Acceptance or the making of an Electronic Acceptance by or on behalf of an EMI Shareholder will constitute his agreement that the agreement in paragraph 7(f)(i) of this Part B is included for the benefit of Maltby and Lloyds TSB Registrars and accordingly, notwithstanding the exclusive agreement in paragraph 7(f)(i) of this Part B, Maltby and Lloyds TSB Registrars shall each retain the right to, and may in its absolute discretion, bring proceedings in the courts of any other country which may have jurisdiction and that the accepting EMI Shareholder irrevocably submits to the jurisdiction of the courts of any such country.

(g)    If the expiry date of the Offer is extended, any reference in this document or the Form of Acceptance to 27 June 2007 or the First Closing Date shall, except in the last paragraph of Part A of this Appendix I and paragraphs 6 and 7(b) of this Part B and where the context otherwise requires, be deemed to refer to the expiry date of the Offer as so extended.

37

CITI-TF 00675818

(h) Any omission or failure to despatch this document or the Form of Acceptance or any other document relating to the Offer or any notice required to be despatched under the terms of the Offer to, or any failure to receive the same by, any person to whom the Offer is made, or should be made, shall not invalidate the Offer in any way or create any implication the Offer has not been made to any such person. Subject to paragraph 6 of this Part B, the Offer extends to any such person and to all EMI Shareholders to whom this document, the Form of Acceptance and any related documents may not be despatched and who may not receive such documents, and such persons may collect copies of those documents from Lloyds TSB Registrars at the address set out in paragraph 3(b) of this Part B.

(i) If the Offer lapses:

   (i) in respect of EMI Shares held in certificated form, the Form of Acceptance, share certificate(s) and/or other document(s) of title will be returned by post (or by such other method as the Panel may approve) within 14 calendar days of the Offer lapsing, at the risk of the EMI Shareholder concerned, to the person or agent whose name and address is set out in Box 1, or if completed, in Box 6 of the applicable Form of Acceptance or, if none is set out, to the first-named holder at his registered address; and

   (ii) in respect of EMI Shares held in uncertificated form, Lloyds TSB Registrars will, immediately after the Offer lapses (or within such longer period as the Panel may permit), give TFE instructions to CRESTCo to transfer all EMI Shares held in escrow balances and in relation to which it is the Escrow Agent for the purposes of the Offer to the original available balances of the EMI Shareholders concerned.

(j) All powers of attorney, appointments as agent and authorities on the terms conferred by or referred to in this Appendix I or in the Form of Acceptance are given by way of security for the performance of the obligations of the EMI Shareholder concerned and are irrevocable (in respect of powers of attorney in accordance with Section 4 of the Powers of Attorney Act 1971) except in the circumstances where the donor of such power of attorney, appointment or authority is entitled to withdraw his acceptance in accordance with paragraph 3 of this Part B and duly and validly does so.

(k) Without prejudice to any other provisions of this Part B, Maltby and Lloyds TSB Registrars reserve the right to treat as valid, in whole or in part, any acceptance of the Offer (A) which is not entirely in order or (B) which is not accompanied (as applicable) by the relevant TTE instruction or (C) if confirmations as described in this document are not received by Lloyds TSB Registrars in respect of it or (D) if relevant share certificate(s) and/or other document(s) of title are not received by Lloyds TSB Registrars in respect of it or (E) if received by or on behalf of either of them at any place or places or in any manner determined by either of them or (F) which is otherwise than as set out in this document in the Form of Acceptance. Any acceptances so treated as valid shall be deemed to be given on the basis of the terms and conditions of the Offer set out in this document and, in particular, Parts B, C and D of this Appendix I.

(l) All communications, notices, certificates, documents of title and remittances to be delivered by or sent to or from any EMI Shareholders will be delivered by or sent to or from them (or their designated agents) at their risk. No acknowledgement of receipt of any Form of Acceptance, transfer by means of CREST, communication, notice, share certificate(s) and/or other document(s) of title will be given by or on behalf of Maltby.

(m) Maltby reserves the right to notify any matter (including the making of the Offer) to EMI Shareholder(s) (i) with registered addresses outside the United Kingdom and the United States or (ii) whom Maltby knows to be nominees, trustees or custodians for persons outside the United Kingdom and the United States by announcement or paid advertisement in any daily newspaper(s) published and circulated in the United Kingdom and the United States in which case such notice shall be deemed to have been sufficiently given notwithstanding any failure by any such shareholders to receive or see such notice. All references in this document to "notice in writing" (other than in paragraph 3 of this Part B) shall be construed accordingly. No such document will be sent to an address in Canada.

38

CITI-TF 00675819

(n)  If all Conditions are satisfied, fulfilled or, where permitted, waived and if Maltby receives acceptances of the Offer in respect of, and/or otherwise acquires, 90 per cent. or more of the EMI Shares to which the Offer relates, Maltby intends to exercise its rights pursuant to the provisions of sections 979 to 982 of the 2006 Act to acquire the remaining EMI Shares to which the Offer relates.

(o)  If Maltby is required by the Panel to make an offer for EMI Shares under the provisions of Rule 9 of the City Code, Maltby may make such alterations to the terms and conditions of the Offer as are necessary to comply with the provisions of that Rule.

(p)  All references in this Appendix I to any statute or statutory provision shall include a statute or statutory provision which amends, consolidates or replaces the same (whether before or after the date of this document).

(q)  References in this Appendix I to an EMI Shareholder will include references to the person or persons executing a Form of Acceptance and in the event of more than one person executing a Form of Acceptance, such paragraphs will apply to them jointly and severally.

(r)  In relation to any acceptance (including any withdrawal, replacement, variation or settlement thereof) of the Offer in respect of a holding of EMI Shares which are in uncertificated form, Maltby reserves the right to make such alterations, additions or modifications to the terms and conditions set out herein as may be necessary or desirable to give effect to any purported acceptance of the Offer, whether in order to comply with the facilities or requirements of CREST or otherwise, provided such alterations, additions or modifications are not inconsistent with the requirements of the City Code or are otherwise made with the Panel's consent.

(s)  For the purposes of this document, the time of receipt of a TTE instruction, an ESA instruction or an Electronic Acceptance shall be the time at which the relevant instruction settles in CREST, as the case may be.

(t)  The EMI Shares will be acquired under the Offer fully paid and free from all liens, equitable interests, charges, encumbrances, rights of pre-emption and any other third party rights or interests whatsoever and together with all rights existing in full at 21 May 2007 or thereafter attaching thereto, including the right to receive and retain in full all dividends and other distributions (if any) declared, made or paid or any other return of capital (whether by way of reduction of share capital or share premium account or otherwise) made on or after 21 May 2007.

(u)  If an EMI Shareholder accepting the Offer is a non-corporate US holder, it may be subject to backup withholding tax unless the EMI Shareholder certifies that it is not subject to backup withholding tax by completing a US Internal Revenue Service Form W-9.

CITI-TF 00675820

**Part C – Form Of Acceptance**

Each EMI Shareholder (who holds his EMI Shares in certificated form) by whom, or on whose behalf, a Form of Acceptance is executed and delivered to Lloyds TSB Registrars irrevocably undertakes, represents, warrants and agrees to and with Maltby, Dresdner Kleinwort and Lloyds TSB Registrars (so as to bind him, his personal or legal representatives, heirs, successors and assigns) to the following effect:

(a) that the execution of the Form of Acceptance shall constitute:

    (i) an acceptance of the Offer in respect of the number of EMI Shares in certificated form inserted or deemed to be inserted in Box 3 of the Form of Acceptance;

    (ii) an undertaking to execute any further documents, take any further action and give any further assurances which may be required in connection with the foregoing and to enable Maltby to obtain the full benefit of this Part C and/or to perfect any of the authorities expressed to be given in this Part C; and

    (iii) if Box 3 of the Form of Acceptance is not completed or is completed incorrectly or the total number of EMI Shares inserted in Box 3 is greater than the number of EMI Shares comprised in the acceptance, but the Form of Acceptance is signed, an acceptance of the Offer in respect of all of the EMI Shares comprised in the acceptance,

in each case on and subject to the terms and conditions set out or referred to in this document and in the Form of Acceptance and that, subject only to the rights of withdrawal set out or referred to in paragraph 3 of Part B of this Appendix I, each such acceptance, election and undertaking shall be irrevocable.

For the purposes of this Appendix I and the Form of Acceptance, the phrase "EMI Shares comprised in the acceptance" shall mean the number of EMI Shares inserted in Box 3 of the Form of Acceptance or if no number (or a number greater than the relevant EMI Shareholder's registered holding of EMI Shares) is inserted, the greater of:

    (i) the relevant EMI Shareholder's entire holding of EMI Shares as disclosed by the register of members made available to Lloyds TSB Registrars prior to the time the Form of Acceptance is processed by them;

    (ii) the relevant EMI Shareholder's entire holding of EMI Shares as disclosed by the register of members made available to Lloyds TSB Registrars prior to the latest time for receipt of the Form of Acceptance which can be taken into account for determining whether the Offer is unconditional; or

    (iii) the number of EMI Shares in respect of which certificate(s) or document(s) of title or an indemnity in lieu thereof is received by Lloyds TSB Registrars;

(b) unless "NO" is put in Box 5 of the Form of Acceptance, that such EMI Shareholder:

    (i) has not, directly or indirectly, received or sent copies or originals of this document, the Form of Acceptance or any related offering documents in, into or from Canada, and has not utilised in connection with the Offer or the execution or delivery of the Form of Acceptance, directly or indirectly, the mails or any means or instrumentality (including, without limitation, facsimile transmission, email, telex, telephone or internet) of interstate or foreign commerce of, or any facilities of a national securities exchange of Canada;

    (ii) if an Overseas Holder, has observed the laws of the relevant jurisdiction, obtained all requisite governmental, exchange control and other required consents, complied with all necessary formalities and paid any issue, transfer or other taxes or other requisite payments due in any such jurisdiction in connection with such acceptance and has not taken or omitted to take any action that will or may result in Maltby or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the Offer or his acceptance thereof;

    (iii) is accepting the Offer from outside Canada and has not executed, mailed or sent the Form of Acceptance in or from Canada; and

    (iv) was outside Canada when the Form of Acceptance was delivered and at the time of accepting the Offer and, in respect of EMI Shares to which the Form of Acceptance relates, is not an agent or fiduciary acting on a non-discretionary basis for a principal, unless such agent or fiduciary is an authorised employee of such principal or such principal has given all instructions with respect to the Offer from outside Canada;

CITI-TF 00675821

(c) that the execution of the Form of Acceptance and its delivery to Lloyds TSB Registrars constitutes, subject to the Offer becoming unconditional in all respects in accordance with its terms and to an accepting EMI Shareholder not having validly withdrawn his/her acceptance, the irrevocable and separate appointment of each of Maltby and/or Dresdner Kleinwort and any director of, or any person authorised by them, as such shareholder's attorney and/or agent (the "attorney") and an irrevocable instruction and authorisation to the attorney:

(i) to complete and execute all or any form(s) of transfer and/or other document(s) at the discretion of the attorney in relation to the EMI Shares referred to in paragraph (a) of this Part C in favour of Maltby or such other person or persons as Maltby or its agents may direct in connection with acceptance of the Offer;

(ii) to deliver such form(s) of transfer and/or other document(s) in the attorney's discretion and/or the certificate(s) and/or other document(s) of title relating to such EMI Shares for registration (if applicable) within six months of the Offer becoming unconditional in all respects; and

(iii) to execute all such other documents and do all such other acts and things as may in the attorney's opinion be necessary or expedient for the purpose of, or in connection with, the acceptance or deemed acceptance of the Offer pursuant to the Form of Acceptance and to vest the EMI Shares referred to in paragraph (a) of this Part C in Maltby or its nominee;

(d) that the execution of the Form of Acceptance and its delivery to Lloyds TSB Registrars constitutes, subject to the Offer becoming unconditional in all respects in accordance with its terms and to an accepting EMI Shareholder not having validly withdrawn his acceptance, an irrevocable authority and request (subject to the provisions of paragraph 6 of Part B of this Appendix I):

(i) to EMI or its agents to procure the registration of the transfer of those EMI Shares referred to in paragraph (a) of this Part C pursuant to the Offer and the delivery of the share certificate(s) and/or other document(s) of title in respect of the EMI Shares to Maltby or as it may direct; and

(ii) to Maltby and Dresdner Kleinwort or their respective agents to procure the despatch by post (or by such other method as the Panel may approve) of the cheque for the cash consideration to which an accepting EMI Shareholder is entitled to the person or agent whose name and address outside Canada is set out in Box 6 of the Form of Acceptance, or if no name and address is set out in Box 6, to the first named holder at his registered address outside Canada, in each case at the risk of such EMI Shareholder;

(e) that the execution of the Form of Acceptance and its delivery to Lloyds TSB Registrars constitutes a separate authority to Maltby and/or Dresdner Kleinwort and/or their respective directors within the terms of paragraph 4 of Part B of this Appendix 1 in respect of the EMI Shares in certificated form comprised in the acceptance;

(f) that, subject to the Offer becoming or being declared unconditional in all respects (or if the Offer will become unconditional in all respects or lapse immediately upon the outcome of the resolution in question or if the Panel consents):

(i) Maltby or its agents shall be entitled to direct the exercise of any votes and any or all other rights and privileges (including the right to requisition the convening of a general meeting of EMI or of any class of its shareholders) attaching to any EMI Shares in respect of which the Offer has been accepted or is deemed to have been accepted and not validly withdrawn; and

(ii) the execution of a Form of Acceptance by an EMI Shareholder constitutes, in respect of the EMI Shares comprised in such acceptance and in respect of which such acceptance has not been validly withdrawn:

(A) an authority to EMI and/or its agents from such EMI Shareholder to send any notice, circular, warrant, document or other communication which may be required to be sent to him/her as a member of EMI (including any share certificate(s) or other document(s) of title issued as a result of a conversion of such EMI Shares into certificated form) to Maltby at its registered office;

41

CITI-TF 00675822

(B)  an authority to Maltby and/or its agents to sign any consent to short notice of a general or separate class meeting as his attorney and/or agent and on his behalf and/or to attend and/or execute a form of proxy in respect of such EMI Shares appointing any person nominated by Maltby to attend any general and separate class meetings of EMI or any other meetings of its members (and any adjournments thereof) and to exercise the votes attaching to such EMI Shares on his behalf, where relevant, such votes to be cast so far as possible to satisfy any outstanding condition of the Offer; and

(C)  the agreement of such EMI Shareholder not to exercise any of such rights without the consent of Maltby and the irrevocable undertaking of such EMI Shareholder not to appoint a proxy to attend any such general meeting or separate class meeting or other meetings of its members;

(g)  that he will deliver or procure the delivery to Lloyds TSB Registrars at the address referred to in paragraph 3(b) of Part B of this Appendix I of his share certificate(s) or other document(s) of title in respect of all EMI Shares in certificated form held by him in respect of which the Offer has been accepted or is deemed to have been accepted and not validly withdrawn, or an indemnity acceptable to Maltby in lieu thereof, as soon as possible and in any event within six months of the Offer becoming unconditional in all respects;

(h)  that he is the sole legal and beneficial owner of the EMI Shares in certificated form in respect of which the Offer is accepted or deemed to be accepted or he is the legal owner of such EMI Shares and he has the necessary capacity and authority to execute the Form of Acceptance;

(i)  that the EMI Shares in certificated form in respect of which the Offer is accepted or deemed to be accepted are sold fully paid up and free from all liens, equitable interests, charges, encumbrances, rights of pre-emption and other third party rights of any nature whatsoever and together with all rights existing at 21 May 2007 or thereafter attaching thereto, including the right to receive and retain in full all dividends, distributions and returns of capital (if any) declared, made or paid on or after 21 May 2007;

(j)  that the terms and conditions of the Offer contained in this document shall be deemed to be incorporated in, and form part of, the Form of Acceptance which shall be read and construed accordingly;

(k)  that, if he accepts the Offer, he will do all such acts and things as shall be necessary or expedient to vest the EMI Shares referred to in paragraph (a) of this Part C in Maltby or its nominee(s) or such other persons as it may direct;

(l)  that he agrees to ratify each and every act or thing which may be done or effected by Maltby, Dresdner Kleinwort or Lloyds TSB Registrars (or any director of any of them) or their respective agents or EMI or its agents, as the case may be, in the exercise of any of his powers and/or authorities under this document; and

(m)  that on execution the Form of Acceptance shall take effect as a deed.

References in this Part C to an EMI Shareholder shall include references to the person or persons executing a Form of Acceptance, and if more than one person executes a Form of Acceptance, the provisions of this Part C shall apply to them jointly and severally.

42

CITI-TF 00675823

**Part D – Electronic Acceptance for EMI Shareholders**

Each holder of EMI Shares in uncertificated form by whom, or on whose behalf, an Electronic Acceptance is made irrevocably undertakes, represents, warrants and agrees to and with Maltby, Dresdner Kleinwort and Lloyds TSB Registrars (so as to bind him, his personal representatives, heirs, successors and assigns) to the following effect:

(a)  that the Electronic Acceptance shall constitute an acceptance or deemed acceptance of the Offer in respect of the number of EMI Shares in uncertificated form to which the Electronic Acceptance relates on and subject to the terms and conditions set out or referred to in this document and that, subject only to the rights of withdrawal set out or referred to in paragraph 3 of Part B of this Appendix I, each such acceptance and election shall be irrevocable;

(b)  (i)  that such EMI Shareholder: (A) has not, directly or indirectly, received or sent copies or originals of this document, the Form of Acceptance or any related offering documents, in, into or from Canada, has not utilised in connection with the Offer, directly or indirectly, the mails or any means or instrumentality (including, without limitation, by means of facsimile transmission, email, telex, telephone or internet) of interstate or foreign commerce of, or any facilities of a national securities exchange of Canada; (B) is accepting the Offer from outside Canada; (C) was outside Canada at the time of the input, transmission and settlement of the relevant TTE instruction(s); and (D) in respect of the EMI Shares to which an Electronic Acceptance relates, is not an agent or fiduciary acting on a non-discretionary basis for a principal, unless such agent or fiduciary is an authorised employee of such principal or such principal has given all instructions with respect to the Offer from outside Canada; and

(ii)  that, if such EMI Shareholder is an Overseas Holder, he has observed the laws of the relevant jurisdiction, obtained all requisite governmental, exchange control and other required consents, complied with all necessary formalities and paid any issue, transfer or other taxes or other requisite payments due in any such jurisdiction in connection with such acceptance and has not taken or omitted to take any action that will or may result in Maltby, Dresdner Kleinwort or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the Offer (or his acceptance thereof);

(c)  that the Electronic Acceptance constitutes, subject to the Offer becoming unconditional in all respects in accordance with its terms and to an accepting EMI Shareholder not having validly withdrawn his acceptance, the irrevocable and separate appointment of each of Maltby and/or Dresdner Kleinwort and any director of, or any person authorised by, them as such shareholder's attorney and/or agent (the "attorney") and an irrevocable instruction and authorisation to the attorney to do all such acts and things as may in the attorney's opinion be necessary or expedient for the purpose of, or in connection with, the acceptance of the Offer and to vest the EMI Shares referred to in paragraph (a) of this Part D of this Appendix I in Maltby or its nominee;

(d)  that the Electronic Acceptance constitutes the irrevocable appointment of Lloyds TSB Registrars as such shareholder's attorney and an irrevocable instruction and authority to the attorney: (i) subject to the Offer becoming unconditional in all respects in accordance with its terms and to an accepting EMI Shareholder not having validly withdrawn his acceptance, to transfer to itself (or to such other person or persons as Maltby or its agents may direct) by means of CREST all or any of the EMI Shares in uncertificated form held by such EMI Shareholder (but not exceeding the number of EMI Shares in uncertificated form in respect of which the Offer is accepted or deemed to be accepted); and (ii) if the Offer does not become unconditional in all respects, to give instructions to CRESTCo, immediately after the lapsing of the Offer (or within such longer period as the Panel may permit, not exceeding 14 calendar days of the lapsing of the Offer), to transfer all such EMI Shares to the original available balance of the accepting EMI Shareholder;

(e)  that the Electronic Acceptance constitutes, subject to the Offer becoming unconditional in all respects and to an accepting EMI Shareholder not having validly withdrawn his acceptance, an irrevocable authority and request (subject to the provisions of paragraph 6 of Part B of this Appendix I):

43

CITI-TF 00675824

(i) to Maltby or its agents to procure the making of a CREST payment obligation in favour of the EMI Shareholder's payment bank in accordance with the CREST payment arrangements in respect of any cash consideration to which such shareholder is entitled, provided that:

   (A) Maltby may (if, for any reason, it wishes to do so) determine that all or any part of any such cash consideration shall be paid by cheque despatched by post (or by such other method as the Panel may approve); and

   (B) if the EMI Shareholder concerned is a CREST member whose registered address is in Canada, any cash consideration to which such EMI Shareholder is entitled may be paid by cheque despatched by post (or by such other method as the Panel may approve),

in any case, at the risk of such EMI Shareholder, and such cheque shall be despatched to the first named holder at his registered address outside Canada or as otherwise determined by Maltby;

(ii) to Maltby and Dresdner Kleinwort or their respective agents in their discretion to record and act upon (unless and until revoked) any instructions with regard to payments or notices which have been recorded in the records of EMI in respect of such EMI Shareholder's holding of EMI Shares.

(f) that the Electronic Acceptance constitutes a separate authority to Maltby and/or Dresdner Kleinwort and/or their respective directors within the terms of paragraph 4 of Part B of this Appendix I in respect of the EMI Shares in uncertificated form referred to in paragraph (a) of this Part D of this Appendix I;

(g) that, subject to the Offer becoming or being declared unconditional in all respects (or if the Offer will become unconditional in all respects or lapse immediately upon the outcome of the resolution in question or if the Panel consents) and pending registration:

(i) Maltby and/or its agents shall be entitled to direct the exercise of any votes and any or all other rights and privileges (including the right to requisition the convening of a general meeting of EMI or of any class of its shareholders) attaching to such EMI Shares in uncertificated form in respect of which the Offer has been accepted or is deemed to have been accepted and not validly withdrawn; and

(ii) an Electronic Acceptance in respect of the EMI Shares comprised in such acceptance and in respect of which such acceptance has not been validly withdrawn:

   (A) constitutes an authority to EMI and/or its agents from such EMI Shareholder to send any notice, circular, warrant, document or other communication which may be required to be sent to him/her as a member of EMI (including any share certificate(s) or other document(s) of title issued as a result of a conversion of such EMI Shares into certificated form) to Maltby at its registered office;

   (B) constitutes an authority to Maltby and/or its agents to sign any consent to short notice of a general or separate class meeting as his attorney and/or agent and on his behalf and/or to attend and/or execute a form of proxy in respect of such EMI Shares appointing any person nominated by Maltby to attend any general and separate class meetings of EMI or any other meetings of its members (and any adjournments thereof) and to exercise the votes attaching to such EMI Shares on his behalf, where relevant, such votes to be cast so far as possible to satisfy any outstanding condition of the Offer; and

   (C) will also constitute the agreement of such EMI Shareholder not to exercise any of such rights without the consent of Maltby and the irrevocable undertaking of such EMI Shareholder not to appoint a proxy to attend any such general meeting or separate class meeting or other meetings of its members;

(h) that he is the sole legal and beneficial owner of the EMI Shares in uncertificated form in respect of which the Offer is accepted or deemed to be accepted or he is the legal owner of such EMI Shares and he has the necessary capacity and authority to effect an Electronic Acceptance;

44

CITI-TF 00675825

(i) that the EMI Shares in uncertificated form in respect of which the Offer is accepted or deemed to be accepted are sold fully paid up and free from all liens, equitable interests, charges, encumbrances, rights of pre-emption and other third party rights of any nature whatsoever and together with all rights existing at 21 May 2007 or thereafter attaching thereto, including the right to receive and retain in full all dividends, distributions and returns of capital (if any) declared, made or paid on or after 21 May 2007;

(j) that he will do all such acts and things as shall be necessary or expedient to vest the EMI Shares referred to in paragraph (a) of this Part D in Maltby or its nominee(s) or such other persons as it may direct and all such acts and things as may be necessary or expedient to enable Lloyds TSB Registrars to perform its functions as Escrow Agent for the purposes of the Offer;

(k) that he agrees to ratify each and every act or thing which may be done or effected by Maltby, Dresdner Kleinwort or Lloyds TSB Registrars (or any director of any of them) or their respective agents or EMI or its agents, as the case may be, in the exercise of any of his powers and/or authorities under this document;

(l) that if, for any reason, any EMI Shares in respect of which a TTE Instruction has been effected in accordance with this document are converted to certificated form, he will (without prejudice to paragraph (g)(ii)(A) of this Part D) immediately deliver or procure the immediate delivery of the share certificate(s) or other document(s) of title in respect of all such EMI Shares as so converted to Lloyds TSB Registrars at the address referred to in paragraph 3(b) of Part B of this Appendix I or to Maltby at its registered office or as Maltby or its agents may direct; and he shall be deemed upon conversion to undertake, represent, warrant and agree in the terms set out in Part C of this Appendix I in relation to such EMI Shares without prejudice to the application of this Part D as far as Maltby deems appropriate;

(m) that the creation of a CREST payment obligation in favour of his payment bank in accordance with the CREST payment arrangements referred to in paragraph (e)(i) of this Part D shall, to the extent of the obligation so created, discharge in full any obligation of Maltby to pay him the cash consideration to which he is entitled pursuant to the Offer;

(n) that the making of an Electronic Acceptance constitutes his agreement to the terms of paragraphs 7(f)(i) and 7(f)(ii) of Part B of this Appendix I;

(o) that, by virtue of the CREST Regulations, the making of an Electronic Acceptance constitutes an irrevocable power of attorney by the relevant EMI Shareholder in the terms of all the powers and authorities expressed to be given by Part B and this Part D and (where applicable by virtue of paragraph (l) above) Part C of this Appendix I to Maltby, Lloyds TSB Registrars and any of their respective agents;

(p) that if any provision of Part B or Part D of this Appendix I shall be unenforceable or invalid or shall not operate so as to afford Maltby, Dresdner Kleinwort or Lloyds TSB Registrars (or any director of any of them) the benefit or authority expressed to be given therein, he shall with all practicable speed do all such acts and things and execute all such documents that may be required to enable Maltby and/or Dresdner Kleinwort and/or Lloyds TSB Registrars and/or any director of any of them to secure the full benefits of Part B and this Part D; and

(q) that he is not a customer (as defined by the rules of the FSA) of Dresdner Kleinwort in connection with the Offer.

References in this Part D to an EMI Shareholder shall include references to the person or persons making an Electronic Acceptance on his behalf and, if more than one makes an Electronic Acceptance, the provisions of this Part D shall apply to them jointly and severally.

CITI-TF 00675826

## APPENDIX II

## INFORMATION RELATING TO THE MALTBY GROUP

**1    Information on the Maltby Group**

An overview of the financing arrangements of the Maltby Group is set out at paragraph 2 below of this Appendix II and descriptions of the material contracts of the Maltby Group are set out in paragraph 6.2 of Appendix IV to this document.

**1.1    Names of directors**

The directors of each member of the Maltby Group (other than Carmel Capital) are:

Riaz Punja
Francois van der Spuy
Thomas Quigley

The company secretary of each member of the Maltby Group (other than Carmel Capital which has no company secretary) is WG&M Secretaries Limited.

**1.2    Incorporation and share capital**

**1.2.1    Carmel Capital**

Carmel Capital was incorporated as a société à responsabilité limitée in Luxembourg on 9 March 2007, and is registered with the Luxembourg trade and companies register under number B125.079. The share capital of Carmel Capital as at the date of this document is fixed at €12,500 divided into ordinary shares of €1 par value, all of which have been issued and are owned by TFIGP3.

**1.2.2    Maltby Holdings**

Maltby Holdings was incorporated as a private limited company in England and Wales on 25 April 2007 with registered number 6226830. The authorised share capital of Maltby Holdings as at the date of this document is £100 divided into 100 ordinary shares of £1 each of which one ordinary share has been issued and is owned by Carmel Capital.

**1.2.3    Maltby Investments**

Maltby Investments was incorporated as a private limited company in England and Wales on 25 April 2007 with registered number 6226775. The authorised share capital of Maltby Investments as at the date of this document is £100 divided into 100 ordinary shares of £1 each, of which one ordinary share has been issued and is owned by Maltby Holdings.

**1.2.4    Maltby**

Maltby was incorporated as a private limited company in England and Wales on 25 April 2007 with registered number 6226803. The authorised share capital of Maltby as at the date of this document is £100 divided into 100 ordinary shares of £1 each, of which one ordinary share has been issued and is owned by Maltby Investments.

**1.3    Registered offices**

The registered office of each of Maltby Holdings, Maltby Investments and Maltby is One South Place, London EC2M 2WG.

**1.4    Activities**

The members of the Maltby Group were each formed for the purpose of making the Offer and none of them has carried on business or entered into any obligation other than in connection with the Offer and financing of the Offer. None of the Maltby Group companies has prepared any accounts as at the date of this document.

**2    Financing Arrangements**

Maltby will initially be financed using a combination of equity and debt. Approximately £1,472 million will be provided by Terra Firma. A further £2,500 million will be provided under bank facilities arranged by Citigroup Global Markets Limited. This equity and debt financing will be used

46

CITI-TF 00675827

to pay the cash consideration under the Offer, to refinance expected indebtedness of the EMI Group at the time when the Offer becomes wholly unconditional, to finance the proposals referred to in paragraphs 8 and 9 of Part 2 of this document, to pay fees, costs and expenses in connection with the Offer and to provide working capital for the EMI Group.

### 2.1 Equity Financing

Terra Firma entered into equity commitment letters addressed to Maltby on 21 May 2007, pursuant to which Terra Firma has irrevocably and unconditionally undertaken to procure that Maltby directly or indirectly receives, in aggregate, not less than £1,472 million in freely transferable funds within such time from the date on which the Offer is declared unconditional in all respects as is sufficient to enable Maltby to satisfy its obligations to settle the cash consideration for the Offer under Rule 31.8 of the City Code.

### 2.2 Debt Financing

Maltby also entered into an interim facilities agreement on 21 May 2007 (the "**Interim Facilities Agreement**") with Citigroup Global Markets Limited as arranger, Citibank, N.A. as underwriter and Citibank International plc as interim facility agent and interim security agent.

The Interim Facilities Agreement provides for:

(a)   a committed term facility of up to £2,500 million (the "**Term Facility**") which will be available to finance, amongst other things, the Offer, repayment of existing indebtedness of the EMI Group and certain costs and expenses; and

(b)   a committed working capital facility of up to £350 million (the "**Working Capital Facility**") which will be available to finance the working capital requirements and/or the general corporate purposes of Maltby.

The Interim Facilities Agreement provides that only Maltby may borrow under the Term Facility and the Working Capital Facility.

Interest will be payable on any utilisation under the Interim Facilities Agreement at a rate per annum equal to the aggregate of (a) 2.50 per cent. (in the case of loans made under the Term Facility) or 2.50 per cent. (in the case of utilisations made under the Working Capital Facility), (b) LIBOR for the relevant interest period, and (c) any mandatory costs incurred by the lenders thereunder. Certain members of the Maltby Group have provided security over their material assets in support of the obligations of Maltby under the Interim Facilities Agreement. If still outstanding at such time, Maltby shall be required to repay all outstanding utilisations and other amounts due under the Interim Facilities Agreement on the date which is 60 days after the date of first utilisation under the Interim Facilities Agreement.

The Interim Facilities Agreement contains conditions precedent, representations and undertakings in favour of the lenders under the Interim Facilities Agreement which are usual for facilities of this type. The Interim Facilities Agreement also contains customary events of default upon the occurrence of which the lenders may terminate the interim facilities referred to above and demand repayment of all amounts outstanding under the Interim Facilities Agreement.

It is intended that the Interim Facilities Agreement will be refinanced with facilities to be provided under senior and subordinated facilities agreements.

In connection with those new facilities, after the Offer becomes wholly unconditionally Maltby expects that:

(i)   certain members of the EMI Group will become borrowers under the new facilities;

(ii)   certain members of the EMI Group will grant fixed and floating charges over certain of their assets in relation to the new facilities; and

(iii)   payment of interest on amounts borrowed under the new facilities will be funded from the business of the EMI Group.

CITI-TF 00675828

# APPENDIX III

## FINANCIAL INFORMATION RELATING TO THE EMI GROUP

**Basis of Information**

On 21 May 2007, EMI announced its preliminary results for the year ended 31 March 2007. The announcement is set out in Part A of this Appendix III. Part B of this Appendix III sets out financial information relating to the EMI Group for the financial years ended 31 March 2006 and 31 March 2005 respectively, prepared in accordance with International Financial Reporting Standards (IFRS). Part C of this Appendix III sets out financial information relating to the EMI Group for the financial year ended 31 March 2004, prepared in accordance with accounting standards generally accepted in the UK (UK GAAP).

The financial information contained in this Appendix III does not constitute statutory accounts within the meaning of section 240 of the 1985 Act. The financial information has been extracted without material adjustment from the audited statutory financial statements of EMI for each of the three financial years ended 31 March 2004, 31 March 2006 and 31 March 2007. The statutory financial statements for each of the three financial years ended 31 March 2004, 31 March 2005 and 31 March 2006 have been delivered to the Registrar of Companies in England & Wales. The statutory financial statements for the financial year ended 31 March 2007 have not yet been delivered to the Registrar of Companies in England & Wales. The auditors of EMI made reports under section 235 of the 1985 Act in respect of each such set of statutory financial statements and each such report was an unqualified report and did not contain a statement under section 237(2) or (3) of the 1985 Act.

48

CITI-TF 00675829

A-1420

## PART A – EMI's PRELIMINARY RESULTS FOR THE FINANCIAL YEAR ENDED 31 MARCH 2007

21 May 2007

**EMI GROUP PLC PRELIMINARY RESULTS FOR THE FINANCIAL YEAR ENDED 31 MARCH 2007**

- Underlying Group revenue fell by 15.8% on a reported basis and by 12.1% at constant currency

- As announced on 18 April 2007

  – EMI Music revenue fell by 15.0% at constant currency

  – EMI Music Publishing outperformed the recorded music market with revenue declining by only 0.9% at constant currency

- Group digital revenue increased by 46.5% from £112.1m to £164.2m on a reported basis representing 9.4% of total underlying Group revenue

- Continued success in finding and breaking long-term talent with top performing artists and songwriters in the financial year including:

  – EMI Music – Corinne Bailey Rae, Depeche Mode, Herbert Groenemeyer, Joss Stone, Keith Urban, Lily Allen, Norah Jones, RBD, Robbie Williams, The Beatles, The Kooks, 30 Seconds to Mars and Utada Hikaru

  – EMI Music Publishing – Amy Winehouse, Arctic Monkeys, Beyonce, Fergie, Gym Class Heroes, James Blunt, Jay-Z, Nelly Furtado, Norah Jones, Scissor Sisters and Vasco Rossi

- EMI Music operating margin reduced from 8.7% in the prior year to 3.3%, driven primarily by lower sales reflecting tough industry conditions and an unprecedented level of stock returns

- EMI Music Publishing operating margin improved from 25.1% to 26.3%, due to a reduction in the cost base and favourable revenue mix

- Underlying profit before tax decreased by 60.6% to £62.7m from £159.3m

- Underlying diluted earnings per share decreased to 5.8p from 15.7p

- As announced on 18 April, further dividend payments have been suspended until the benefits of the restructuring programme have been fully realised. The interim dividend of 2.0p per share has been paid

49

CITI-TF 00675830

**Financial Summary**

| | Year Ended 31 March 2007 £m | Year Ended 31 March 2006 £m |
|---|---|---|
| Underlying Group revenue | 1,751.5 | 2,079.9 |
| EBITDA[i] | 174.0 | 275.8 |
| Group profit from operations (EBITA)[ii] | 150.5 | 250.5 |
| Underlying PBT[iii] | 62.7 | 159.3 |
| Total (loss) profit before taxation | (263.6) | 118.1 |
| Underlying diluted earnings per share[iv] | 5.8p | 15.7p |
| Basic (loss) earnings per share | (36.3)p | 10.9p |
| Dividend per share | 8.0p | 8.0p |
| Return on sales[v] | 8.6% | 12.0% |
| Interest cover[vi] | 1.9x | 3.0x |

(i)  EBITDA is Group profit from operations before depreciation, operating exceptional items, amortisation, interest and tax.
(ii)  Group profit from operations (EBITA) is before operating exceptional items, amortisation, interest and tax.
(iii)  Underlying PBT is before exceptional items, amortisation and tax.
(iv)  Underlying diluted earnings per share is before exceptional items and amortisation.
(v)  Return on sales is defined as Group profit from operations before operating exceptional items and amortisation as a percentage of Group revenue.
(vi)  Interest cover is defined as the number of times EBITDA is greater than Group finance charges, excluding non-periodic interest and non-standard charges.

Exceptional items include operating exceptional items and financial exceptional items. Operating exceptional items include impairment of goodwill and intangible assets, gains/(losses) on disposal of property, plant and equipment and remeasurement of listed investments. Finance exceptional items include remeasurement of financial assets and liabilities to be included within finance charges and exceptional refinancing costs.

Eric Nicoli, CEO of EMI Group, said, "This has been a challenging year for EMI Group primarily as a result of the worsening market conditions which affected the entire recorded music industry with revenue declines in every major music market across the world.

"This led us to implement a restructuring plan which, as well as removing cost from the business, will fundamentally change the way we do business. Moving forward, we will realign our investment focus and direct our resources to areas where we will make higher and more sustainable returns.

"We believe that digital sales will continue to grow strongly and are excited about the possibilities offered by partnerships and new business models across both our divisions.

"During the past year, we have multiplied our digital distribution channels by entering into agreements with partners who will make our music available across their platforms in many different ways. Our digital activity is extensive and pro-active and we are open to experimenting with all emerging business models. In April 2007, we were the first music major to make available a new digital rights management (DRM)-free premium sound quality download product as part of our strategy to provide consumers with compelling music propositions.

"We remain confident about our long-term future: while current trading conditions are difficult, consumers' appetite for music has never been greater. Although fewer CDs are being purchased, people are consuming more music in more ways than ever before. We are positioning ourselves to capture these new and expanding revenue opportunities as we build a progressive music business which is truly consumer focused and well-equipped for the digital age."

50

CITI-TF 00675831

**EMI Group performance review**

**Recorded music industry**

EMI Music operates in a marketplace that continues to undergo significant change, primarily driven by the rapid development of the digital music industry. Global digital markets increased by 68.3% in value over the financial year to account for 13.2% of the total industry, with both mobile and fixed line platforms enjoying strong growth. Challenging market conditions saw global physical sales decline by 13.6% over the financial year, resulting in an overall industry decline of 7.6% for the period.

The digital environment continues to be dynamic with new entrants, new services and new devices. Consumers are now able to access up to 4m tracks in the legitimate digital environment enjoying access to 24 hour music stores with unlimited shelf space.

This year, more people were able to access the digital environment due to the wide availability of broadband lines and music enabled mobile phones. In the past year, mobile music in particular has developed strongly, fuelled by new services such as full audio and video over the air delivery. The last year has seen significant expansion of mobile entertainment market in the US. Music videos and user generated content are also gaining in importance bolstered by the popularity of services such as Yahoo! Music. This is creating new commercial and promotional opportunities for artist videos. Furthermore, the way people discover music is changing. The past year has also seen the increasing popularity of social networking sites. This gives EMI a new way in which to market artists and is also a valuable resource in gathering information about consumer preferences. EMI continues to actively explore commercial opportunities around social networking.

The industry has continued to make progress in combating both physical and digital piracy. We have had notable legal victories against illegal peer to peer sites and continued in our efforts to get Internet Service Providers to take greater responsibility for providing access to unauthorised content from their sites. Such successes include KaZaa (Australia), Kuro (Taiwan), and Zoekmp3 (The Netherlands). This has improved the business landscape for legitimate music sales. Today there are over 498 legitimate online music services in over 40 countries.

**EMI Music**

2006/07 has been a challenging year for EMI Music. Sales declined by 15.0% at constant currency. This is partly a function of the decline within the total music industry as well as the disappointing performance of EMI Music's portfolio compared to the prior year. We generated seventeen 1m+ selling albums in the year including successes from Norah Jones, The Beatles, Keith Urban, Corinne Bailey Rae, Bob Seger and Joss Stone. Strong performers digitally included MIMS, Utada Hikaru, KT Tunstall and OK Go. Total digital revenue represented 10.4% of total EMI Music revenue in the year.

Profit from operations before exceptional items and amortisation (EBITA) declined to £44.9m, resulting in an operating margin of 3.3%. This decline in profitability was driven by the flow through to profits from the reduction in revenues. In April 2006, we announced a cost savings initiative of £30m for the Group of which £25m was targeted for EMI Music to be achieved by the end of 2007/08. During 2006/07, the Group achieved £20m of this target which was well ahead of the planned £10m. In January 2007, we also initiated a far-reaching restructuring programme to remove £110m from the Group cost base which will be completed by 31 March 2009. The majority of these cost reductions will be generated from EMI Music.

Digital technology is multiplying the ways in which we can monetise our music assets and our key strategic priority is to continue to make our music content available on all economically attractive platforms, formats and services to ensure the widest consumer reach. In April 2007, we announced that we were launching a new premium download product which provides our music at a higher sound quality and without the restrictions of digital rights management to consumers. We are the first major recorded music company to do this and it is a fundamental step towards removing the boundaries for consumers by enabling the interoperability of digital music between services and devices. Our recent partnership with Amazon to provide our new premium product in their digital music store illustrates how the absence of DRM is promoting competition between digital retailers. By removing DRM, we are able to provide a seamless experience for the consumer, which we believe will grow the demand for digital music.

We continued to broaden our digital distribution channels globally by entering into agreements with partners who will make our music available on their platforms. During the year, we entered into

51

CITI-TF 00675832

partnerships including: a multi-territory deal with Apple; regional partnerships with MTV, Yahoo, Last.fm and Sony; and national agreements with Amazon in the US, Baidu in China, Napster in Germany and Playlouder and BT Vision in the UK. In addition to establishing the right relationships on the right terms, we are at the forefront of the industry in exploiting the new product, format and windowing possibilities that digital enables. For example, during the year we distributed the 30 Seconds to Mars video using the latest Web 2.0 technology. The flash technology allows users to embed videos within their own websites and social networking pages, with a click through function which allows viewers of the web page to purchase the tracks and also allows us to generate additional revenue by putting advertising around the video content. EMI Music repertoire is now available digitally in 70 countries, up from 56 countries in the prior year. We believe that we have made significant progress within the digital arena during the year and that this will enable us to enhance value for our shareholders through the growth of this market in the future.

**EMI Music geographic review**

*North America*

2006/07 has been a challenging year for the North American market, which declined by 7.7% overall. Digital sales grew strongly by 80.1%, which was driven, in particular, by the mobile market. This growth has not compensated for the decline experienced in the physical market. Digital represented 20.6% of the total market during 2006/07.

Against this difficult backdrop, our North American business experienced a decline in revenue. We had key successes from US artists, Norah Jones, Keith Urban, Janet Jackson, 30 Seconds to Mars and Trace Adkins in combination with the effective marketing and promotion of international releases from The Beatles, Corinne Bailey Rae and Joss Stone. MIMS is our latest urban breakthrough act in the region; his debut single has performed very strongly with 1.3m ring tunes sold and 0.7m tracks downloaded globally in the financial year.

EMI Music's digital revenue in North America increased by 84% over the year. Mobile products grew at the fastest rate but online downloads continued to represent the largest digital segment for the region. EMI Music has consistently been an innovator of new products and services. Most recently, we reached an agreement with Amazon, making us the first music major to be in Amazon's new online music store. We were also the first music major to make its catalogue of recordings available to Qtrax, which will be the first advertising supported, legal peer-to-peer music distribution service. During the year, we provided tracks which were used as pre-loaded content when the Microsoft's Zune player was launched in November 2006.

We believe it is important to participate across all genres and in North America we have specific labels dedicated to Country (Capitol Nashville), Christian (CMG) and Jazz Music (Bluenote). All of these labels are well known for their ability to attract high calibre talent such as Anita Baker, Amy Grant and Kenny Rogers. During the year, they generated strong sellers with releases from Norah Jones, Keith Urban and Chris Tomlin.

In September 2006, we completed the sale and leaseback of the Capitol Tower in Los Angeles which resulted in an inflow of cash for the Group.

As part of the restructuring we announced in January 2007, we have merged our two main pop labels in the region, Capitol and Virgin, to form the Capitol Music Group. The combined artist roster, talent and market share of this new label group establishes it as one of North America's leading labels. The restructuring also involves additional overhead reductions throughout our operations in the region and an increased focus on building our digital capability.

*UK & Ireland*

Consistent with the global recorded music market, the UK market experienced very tough conditions over the last 12 months, particularly in the physical market which showed significant decline in the fourth quarter. Total physical sales declined by an estimated 11.8% in the year, while digital sales increased by 79.7% to give a total market decline of 8.8% over the 2008/07 financial year. This reflected the weakness in industry sales in the key Christmas period and continuing price erosion as the specialist retailers began to compete on price with the supermarkets.

The strength and depth of our UK artist roster was again demonstrated this year despite the difficult market conditions. Album releases from Robbie Williams and Corinne Bailey Rae each sold in excess of 2m physical units worldwide and The Beatles *Love* album sold 5m worldwide during

52

CITI-TF 00675833

the year. A number of new UK artists also broke through to success during the year, most notably The Kooks, Lily Allen, The Good, The Bad and The Queen and Jamie T. EMI's British artists had tremendous success in the US with Corinne Bailey Rae and KT Tunstall breaking through in the year. 12 of the top 40 best-selling UK albums in the US during 2006 were EMI releases, including seven of the top 12 which is more than any of our competitors. EMI Music continued to demonstrate its strength in the compilation market and, in the final quarter of the financial year, it had three of the top-10 selling compilations.

Our digital revenue for 2006/07 in the UK grew by 31% over the prior year with fixed line downloads increasing by 16%, mobile downloads increasing by 41% and subscription by 38% over the period. Digital delivery brings many opportunities for capturing new revenue streams which we continue to explore. For example, EMI Music UK has entered into a deal with Playlouder MSP to make available its extensive catalogue via Playlouder's bundled subscription and ISP service.

As part of the restructuring we announced in January 2007, we have scaled back in all areas and merged some functions of our four UK labels while maintaining the four imprints. We anticipate that this will take significant costs out of the business while maintaining excellent specialist A&R skills in each label that will enable EMI to capitalise on the opportunities for marketing its recorded music around the world.

### Continental Europe

Market conditions in Continental Europe were challenging over the financial year, with total industry sales declining by 8.3%.

EMI Music delivered a very commendable market share in a tough market environment. EMI gained market share in Spain, The Netherlands, Switzerland, Austria and Poland while also delivering good results in Greece, Belgium and Italy. Good performances came from a broad range of established and new artists. Herbert Groenemeyer sold over 1m units worldwide of his album *12* and it remained number 1 in the German album charts for five weeks in a row which has not been accomplished by a local artist since he also achieved this in 2002. French rap artist Diam's achieved the best-selling album in France in 2006 with *Dans Ma Bulle*, reaching 1m units since its release. Diams also won Best French Act at the 2006 MTV Europe Music Awards.

We have sustained digital growth in the region during the financial year, with revenue increasing by 30%. However, our digital growth in Continental Europe is constrained by the lack of local fixed line retail stores in major markets such as Benelux and Scandinavia and a lack of marketing support for download stores. Mobile products represented a greater portion of digital sales in Europe than in the US or the UK, although fixed line sales still account for the majority of digital sales. The key issue remained the heavy level of piracy, particularly in Spain, Greece and Italy. However, EMI Music continues to explore all profitable digital models. For example, EMI Music has announced an advertising supported, pan-European agreement with Yahoo!Music, the biggest online video-on-demand service in the world together with AOL and MTV, to enable consumers of online services to watch videos from EMI's digital catalogue free of charge. EMI has also signed a pan-European agreement with online social community Last.fm, to make music from EMI available to its users and a deal with Sony to pre-load EMI Music onto the Sony memory stick as well as a number of pre-load handset deals including with Nokia.

During the year, as part of the cost reduction programme announced in April 2006, the region redeveloped its organisation and business approach to address changes in consumer trends and the consumption of music including the establishment of shared service centres for finance processing and advanced CRM capability and practices, in particular in France and Spain. This programme will continue with the further restructuring announced in January 2007.

### Japan

The Japanese market declined by 2.4% overall during the 2006/07 year with digital sales representing 12.4% of the overall industry.

Against this backdrop, our Japanese business performed strongly with its market share improving by 0.6 percentage points. This was driven by successful releases from Utada Hikaru selling over 1m physical units in the region along with local releases from DJ Ozma and Glay. International best sellers included Sarah Brightman and The Beatles. Utada Hikaru also performed phenomenally in digital format, with the *Flavor of Life* track selling 4.4m ring tunes in the financial year and continues to sell strongly. Overall, digital revenue showed an increase of 69% in the

53

CITI-TF 00675834

year, with mobile continuing to represent the majority of total digital sales. Digital revenues represented 19.6% of total revenue in Japan.

In April 2006, we announced a major restructuring of this business to improve the efficiency of our operations, to reinvest a proportion of these savings in the key areas of A&R and marketing, and to introduce a new multi-label organisational structure. During the year, we have implemented all the initiatives to ensure that we achieve the associated cost savings by the end of March 2008. In conjunction with this restructuring, we sold and leased back two freehold properties in Tokyo, with a substantial cash inflow generated from the transaction.

In December 2006, EMI announced the purchase from Toshiba of its 45% minority interest in Toshiba-EMI for £93m. We expect to complete the purchase in the first half of the 2007/8 financial year and EMI will then own 100% of our Japanese operations. Owning 100% of the business will provide us with full strategic flexibility in the region.

### South East Asia

The major markets in South East Asia suffered sales declines as physical and digital piracy continued to take their toll. Overall, our business suffered a slight decrease in share in the region, but continues to deliver acceptable profit levels.

EMI's digital growth in the region was robust, with download revenue growing by a factor of four times and subscription revenue growing by a factor of six times, as the region experienced a pick up in broadband penetration. We gained digital market share over the year and digital revenue accounted for nearly 15% of the region's revenue. Major local releases in the region included Jolin Tsai, S.H.E, David Tao and ADA Band. Top-selling international artists included The Beatles and Robbie Williams.

Music in China is an excellent opportunity for us, particularly within digital formats. During the year, we embraced the growing market in China by being the first music major to announce a pioneering strategic partnership with Baidu to launch an advertising-supported, online music streaming service in China, the first revenue-sharing arrangement between an internet search engine and an international music company in that country.

We are currently implementing cost reductions in the region as part of our restructuring programme.

### Australasia

Market conditions in Australasia worsened during the 2006/07 financial year. EMI Music's market share was modestly down. During the year, we generated releases from local superstars, The 12th Man and Silverchair, as well as selling international titles from The Beatles, Norah Jones and Robbie Williams. Our restructuring programme has already been implemented in the region. iTunes launched in New Zealand during December 2006 and this leaves the region well placed for growth in the digital market.

### Latin America

Our Latin American business had a disappointing 2006/07 year, largely because of problems experienced in Brazil. In October 2006, an accounting fraud was discovered in our recorded music operations in Brazil, which had a £9m negative profit impact. Following our investigation of the events and factors which led to and contributed to the fraud, we have conducted a thorough review of our policies and procedures both in Brazil and throughout our operations which we believe should mitigate the possibility of similar issues in the future. EMI Music Brazil has also been thoroughly restructured and new senior management has been appointed. The refocus of the company culture is now well underway.

Local superstars RBD had another good year, selling almost 3m units globally of their six currently released albums in the financial year. Releases from local artists Kumbia All Starz and Intocable were also successful, as were the new artists Fonseca, Shaila, Kudai and teen talent Belinda. The Latin music icon, Juan Luis Guerra, has recently been signed to EMI-Televisa.

As part of the restructuring plan announced in January 2007, the Latin American regional head office has been reorganised and each country within the region now reports directly to EMI Music International.

We believe that EMI's Latin music business, both in Latin America and in the US, will improve its creative and business performance due to our recent management changes and to the growing

54

CITI-TF 00675835

economic development of the Latin demographic. We are well positioned to develop and exploit this through our joint venture with Grupo Televisa S.A., the largest broadcaster in Mexico and the largest Spanish language conglomerate in the world.

Digital revenues for 2006/07 were almost four times larger than in the previous year and the rising penetration of mobile phones in most of Latin America provides a great opportunity for the legal distribution of music in the immediate future. EMI Latin America is focused on its mobile strategy and has completed a regional deal with Telefonica Movistar as well as most of the America Movil's carriers throughout the region. It has teamed up with Sony Ericsson and Nokia for the creation of preloaded content campaigns supporting the new albums of a number of local and international artists. For example, as part of the release campaign for Robbie William's *Rudebox*, his *Intensive Care* album was preloaded and sold in 850,000 units of Sony Ericsson handsets.

### EMI Classics

EMI and Virgin Classics had a good year during 2006/07 with particular success in France where they grew their market share by 7% and had a huge hit with *The Miracle of the Voice* from the critically acclaimed soprano, Natalie Dessay. Japan also performed well with the Sarah Brightman *Diva* collection and Simon Rattle's recording of *The Planets*.

The superstar pianist, Evgeny Kissin, has just been signed to EMI Classics joining other great names such as Nigel Kennedy, Leif Ove Andsnes and Angela Gheorghiu. Virgin Classics added the brilliant young pianist, David Fray, and the German soprano, Diana Damrau, to its expanding roster.

EMI Classics is one of the oldest record labels in the world. EMI Classics has started a drive to tap further into this incredible resource and share it with music lovers across the globe. In March 2007, EMI Classics and iTunes teamed up to celebrate the 80th birthday of the late Mstislav Rostropovich, who was one of the world's greatest cellists. EMI Classics is running an international campaign in conjunction with iTunes giving music lovers access to his entire EMI discography as cellist, conductor and pianist.

### EMI Music Publishing

EMI Music Publishing once again delivered a solid performance for the financial year ended 31 March 2007. Profit from operations before exceptional items and amortisation (EBITA), increased to £105.6m, an increase of 4.2% at constant currency with operating margin improving to 26.3%. Due to recorded music market conditions, as well as some phasing of income, revenue decreased by 0.9% at constant currency to £401.3m. Overall, this performance reflected both the underlying health and resilience of the business, as well as the early effects of efficiencies from our comprehensive restructuring programme which, in turn, is part of the evolution of the business. EMI Music Publishing has implemented a new strategy that will reshape the business for future growth and flexibility while, at the same time, building on and holding true to past successes. There are four key pillars to this strategy: continued excellence in A&R evidenced by the signing of today's top songwriters; helping to reform the industry's infrastructure through licensing and rate setting initiatives; further strengthening our internal capabilities including process and systems re-engineering; and deepening and expanding our client relationships.

Continued success in signing songwriters is essential for our future profitability. This year, a broad range of songs, songwriters and products underpinned our continued ability to sign the world's best songwriters, while reflecting the quality and depth of the catalogue. Notable successes during the period included songs by Beyonce, Fergie, Gym Class Heroes, Jay-Z, Norah Jones, Panic! At The Disco, The Fray, Nelly Furtado, Tool, Young Jeezy, Pink, Amy Winehouse, Arctic Monkeys, James Blunt, Jamiroquai, Kasabian, My Chemical Romance, Scissor Sisters, The Fratellis, The Feeling, Andreas Johnson, Estopa, Silbermond, La Roi Soleil, The Veronicas, and Vasco Rossi.

With the world's best collection of songs, we are working to drive industry reform in order to ensure that our songwriters are paid for their works. Nowhere is this more appropriate than in the world of digital revenues.

Digital revenues continued to grow strongly during 2006/07, increasing by 35.5% at constant currency on the prior year, to £25.3m. Revenues from digital music are currently classified amongst the various revenue categories – mechanical, performance, synchronisation and other uses – based on the varying status of income collection for these new uses in different countries.

CITI-TF 00675836

The use of songs in mobile phone products remains the most significant early digital revenue contributor for EMI Music Publishing and continues to enjoy very strong growth. For the revenue from mobile products, we have seen the percentage contribution from ring tunes increase significantly during the year whilst the contribution from ring tones has decreased. This trend is expected to continue as technology, handsets and networks continue to drive a product shift in the mobile space. Revenues from digital downloads (up 158.3% at constant currency in the year), and other newer products, such as video downloads, have also grown strongly and are starting to contribute more to the division's growth. EMI Music Publishing remains at the forefront of digital music by fostering relationships with new media-companies at all stages of development in order to maximise the exploitation of our songwriters' music.

However, growth in digital revenues in music publishing continues to lag the recorded music industry, reflecting an under-developed industry infrastructure for the tracking and collection of digital royalties and the lack of agreements on digital royalty rates for certain products in some regions. EMI Music Publishing is at the forefront of the industry's effort to ensure that the right structures and rates are in place to identify and collect fully all past and future digital revenues. We were pleased to join the 'Centralised European Licensing and Administration Services' initiative, which is based on an agreement between the UK's MCPS-PRS Alliance and Germany's GEMA collection societies to establish a pan-European licensing and collection mechanism for mobile and online digital rights. This pan-European one-stop shop for the licensing of online rights, which went live in January 2007, is a groundbreaking initiative in the publishing industry. EMI Music Publishing is involved in many of industry developments and rate-setting negotiations around the globe, all in the interest of making sure our songwriters are properly and fairly paid for their works.

### Mechanical revenue

Our mechanical revenues, which are derived from the sale of recorded music, declined by 6.7% at constant currency, reflecting the continued declines in the global recorded music market during the same period. Mechanical revenues now represent 42.6% of total divisional sales on a constant currency basis. On a regional basis, weaknesses in Eastern Europe and Scandinavia were partially offset by increases in Southeast Asia, while the US, the UK and Continental Europe were down marginally.

### Performance revenue

Performance revenues, earned when a song is performed live on stage, played in a bar or other public venue or broadcast on the radio or television, grew by 10.1% at constant currency for the year and now represent 30.0% of divisional revenues on a constant currency basis. Key drivers of growth in this business are the chart success of songs from our roster of active songwriters and the proliferation of new media channels, especially across Europe. On a regional basis, performance income was particularly strong in the US, reflecting timing differences and strong underlying growth.

### Synchronisation revenue

Synchronisation revenue, which is generated by the use of songs in audiovisual works such as advertisements, television programmes, films, computer games and in mobile phones, increased by 5.6% at constant currency, resulting in more than 12 years of consecutive growth. From the record level achieved in 2005/06, EMI Music Publishing was able to drive meaningful growth in synchronization by gaining greater penetration in multiple channels, particularly in the US and the UK. This growth is an early reflection of our strategy to deepen and broaden our customer relationships with licensors of music. Significant licences were issued worldwide for a number of major advertising campaigns, including Toyota, Kirin Beer, Pantene, General Electric, Maxwell House, Ford, Verizon, Proctor & Gamble, Starwood, Macy's, Pier 1 and $O_2$.

### Other revenue

Other revenue typically represents about 10% of revenues, although the absolute amount can vary significantly from year to year. An important driver of the change in other revenue in recent years has been revenue gained from stepped up efforts in enforcing proper use of our copyrights. By their nature, these revenues tend to be irregular and unpredictable, accounting for the overall decline on a constant currency basis in this revenue category.

56

CITI-TF 00675837

**EMI Group future outlook**

The recorded music market continues to undergo significant change as it becomes increasingly digitised. At this stage, uncertainty exists as to the timing and extent of future market development. We have seen physical sales declining at a significantly faster rate than the industry had anticipated but the Company remains positive on the long-term trends for the industry and, in particular, that there will be continued strong demand for digital music products of all types. We believe that the launch of our DRM-free, superior sound quality downloads, will boost sales of digital music and help unlock the many opportunities of the digital market. Our premium download product will be available with various retail partners including iTunes, Amazon, VirginMega and Telenor. We are currently in negotiations with many other retail services for the launch of this product.

In January 2007, we announced a restructuring programme and an update to our strategy to secure sustainable growth in underlying profits and cash flow. These initiatives will generate annualised cost savings of £110m and we expect £76m of these savings to be achieved by March 2008, with the full run rate being reflected in the financial results for the year to 31 March 2009.

We will continue to invest significantly in A&R to allow a continuing strong focus on artist and songwriter development. We are also investing to develop further our digital expertise so that we remain positioned at the forefront of the industry in capitalising on the opportunities arising from the market's evolution.

In the current financial year, EMI Music is planning releases from Kasey Chambers, Korn, Kylie Minogue, Lenny Kravitz, LeToya, M, Moby, Raphael, Thalia, The Chemical Brothers and Vasco Rossi. EMI Music Publishing expects to see releases from songwriters including Alicia Keys, Ashlee Simpson, Arctic Monkeys, Chris Cornell, Kanye West, Kelly Clarkson, Shiny Toy Guns, The Police, The Used and White Stripes. We have a world renowned catalogue in both EMI Music and EMI Music Publishing and we will continue to exploit them for the benefit of all stakeholders.

CITI-TF 00675838

## Financial review for the year ended 31 March 2007

### Revenue

Reported underlying Group revenue decreased by 15.8% or £328.4m to £1,751.5m. Excluding the effects of unfavourable currency movements the decrease was 12.1% or £252.2m. The unfavourable exchange movement was largely driven by an increase in the weighted average rate of the US Dollar against Sterling from $1.78 last year to $1.90 in 2006/07.

At constant currency, revenue in EMI Music declined by 15.0%, with notable decreases in North America, UK and Ireland and Latin America.

At constant currency, revenue in EMI Music Publishing was down 0.9% versus the prior year due mainly to declines in physical mechanical sales as well as minor phasing adjustments. The 6.7% decrease in mechanical revenue was largely offset by solid growth in performance and synchronisation revenues.

Group digital revenue increased to £164.2m from £112.1m in the prior year, an increase of 46.5%. Digital revenue represented 9.4% of total underlying Group revenue for the year.

### Costs

The underlying gross margin, after distribution costs, declined from 37.2% to 34.9%. This is the result of a gross margin decline in the Music division. Royalty, copyright manufacturing and distribution costs are all largely variable with revenue and have decreased in absolute terms in the year. Marketing and promotion costs, however, were lower in absolute terms but 2.6 percentage points higher as a percentage of total sales. Controlling marketing spend is a key area of focus for the Music business this year.

In April 2006, we announced a cost saving initiative to deliver £30m of annualised savings for the Group. During 2006/07, we achieved £20m of savings, well ahead of the £10m planned, and we remain on course for the full £30m in 2007/08.

In January 2007, we announced a comprehensive restructuring programme to realign our investment approach and streamline our operations. This programme will deliver £110m of annualised savings with £76m currently anticipated to be achieved in 2007/08.

### Profit from operations

Group profit from operations (EBITA)[i] decreased by £100.0m or 39.9% from £250.5m to £150.5m. Excluding exchange, the decrease in EBITA was £94.6m or 37.8%. Group operating margin decreased from 12.0% to 8.6% in the year.

EMI Music delivered EBITA of £44.9m, a decline of £100.2m or 68.2% at constant currency on the prior year. This decrease in EBITA was largely driven by the revenue declines particularly in North America, UK and Ireland and Latin America mentioned above. The operating margin reduced from 8.7% to 3.3%.

EMI Music Publishing generated EBITA of £105.6m, a growth of 4.2% at constant currency on the prior year. Operating margin improved from 25.1% to 26.3%, reflecting the partial effects of the restructuring programme and its efficiencies.

The Group's share of profit in its associated company investments increased from £1.0m in 2005/06 to £1.8m in 2006/07. Consequently, the total underlying profit from operations for the Group is £152.3m this year compared to £251.5m last year.

Group finance charges, excluding exceptional finance charges, reduced by £2.6m to £89.6m. This reflected a 3.2% decrease in average net borrowings, an increase in pension fund interest receivable offset by higher rates in three of our major funding territories (US, UK and Europe).

Underlying profit before tax declined by 60.6% from £159.3m to £62.7m, reflecting the reduction in revenue and underlying profit from operations discussed above.

The Group underlying tax rate, before amortisation and exceptional items, was 22% against 17.6% in the prior year. The increased rate reflected a movement in profitability towards countries where there were higher tax rates together with losses in territories where we cannot recognise the loss. This was offset by the settlement of prior liabilities.

Notes:
(i)  Group profit from operations (EBITA) is before exceptional items and amortisation and before share of profit in associates.

58

CITI-TF 00675839

As a result of the above, the Group's underlying profit after taxation decreased from £131.2m to £48.9m, a decrease of 62.7%.

Underlying basic earnings per share[(ii)] was 5.8p, a decrease of 10.4p from the prior year. Underlying diluted earnings per share, the calculation of which includes the impact of the potential conversion of convertible bonds (and related bond interest) together with the possible exercise of dilutive share options, decreased from 15.7p to 5.8p.

### Other items affecting earnings

Exceptional items and amortisation comprise operating exceptional costs, finance exceptional costs and amortisation of music copyrights and intangibles.

The Group is reporting operating exceptional costs of £256.3m compared with income of £4.0m in the prior year. Operating exceptional costs are net of a £50.2m gain on disposal of property (including the sale and leaseback transactions completed for our offices in Tokyo and the Capitol Tower in Los Angeles) and a gain following settlement of an infringement case with Bertelsmann AG in March. The exceptional costs include £191.5m for our restructuring programmes announced in April 2006 and January 2007 (largely headcount and roster reduction) and the results of our balance sheet review announced on 12 January 2007 and concluded as anticipated on 31 March 2007. The review resulted in a charge of £164.0m reported as exceptional this year. The final elements of this year's exceptional cost are a £0.2m loss on revaluation of investments and £7.6m for aborted corporate transactions.

The Group is reporting finance exceptional net costs relating to remeasurements and refinancing costs of £17.3m compared to net income of £4.7m last year. Finance exceptionals include the loss on revaluation to fair value of the convertible bond derivative of £5.7m (2005/06: £4.1m gain), the loss on revaluation of the Eurobond embedded call feature of £21.3m (2005/06 £8.2m gain) and the foreign exchange gain on Euro borrowings of £8.1m (2005/06: £4.1m loss). The finance exceptional net costs for 2006/07 include exceptional refinancing costs of £1.1m in connection with the refinancing programme carried out in March 2007 (2005/06: £5.2m refinancing programme carried out in July 2005).

Amortisation and impairment of music copyrights and other intangibles amounted to £52.7m in comparison with £49.9m last year.

The minority interest cost reduced from a charge of £3.9m in the previous year to a charge of £1.5m this year. This was the consequence of reduced profitability in the Music business in Japan in which there was a 45% minority share for eight and a half months of the year. In December 2006, we agreed to acquire the 45% minority share from Toshiba for approximately £93m. The cash cost is due to be paid in the first half of 2007/08.

The loss attributable to members of the Company was (£288.5m) in comparison with an attributable profit last year of £86.1m.

As announced in April 2007, the Board is suspending dividend payments until the benefits of the restructuring process have been fully realised. The interim dividend of 2p per share was paid on 2 April 2007.

### Reported results

Total Group loss from operations (including share of associates) was £(156.7)m in comparison with a profit of £205.6m last year. This decrease was entirely due to the decline in revenue compounded by exceptional costs of £309.0m this year compared to £45.9m last year.

Total loss before taxation was £(263.6)m compared to a profit of £118.1m in the prior year. This decrease reflected the reduction in Group profit from operations above and a change in the finance exceptional from net income to a net cost.

### Cash flow and net borrowings

Improvement in cash conversion and overall cash management remains a key area of focus for the Group. The net cash inflow from operating activities was £7.3m, a significant reduction from last year's inflow of £188.3m, reflecting a significant working capital outflow in the Music division as a

Notes:
(ii) Before exceptional items and amortisation.

59

A-1431

result of changes in trading patterns, the costs of our restructuring programme announced in January 2007 and the lower EBITA reported this year.

After the net cash inflow from operating activities, we had cash inflows of £65.8m for investment activity and cash inflows of £85.1m for financing activity including an outflow of £50.8m for dividends. Taking into account the gain on exchange of foreign currency denominated borrowings of £43.7m, year-end net debt increased by £24.7m from £879.5m to £904.2m.

The net cash inflow from operations after investing activities has approximated the operating result of both divisions in recent years.

CITI-TF 00675841

## FINANCIAL SUMMARY
for the year ended 31 March 2007

| | Year ended 31 March 2007 £m | Year ended 31 March 2006 £m |
|---|---|---|
| Underlying revenue.................................................. | | 2,079.9 |
| Underlying EBITDA[(i)] | 1,751.5 | 275.8 |
| Underlying Group profit from operations (EBITA)[(ii)] | 174.0 | 250.5 |
| Underlying PBT[(iii)] | 150.5 | 159.3 |
| Total (loss) profit before taxation.............................. | 62.7 | 118.1 |
| | (263.6) | |
| Underlying diluted earnings per share[(iv)] | | 15.7p |
| Basic (loss) earnings per share................................ | 5.8p | 10.9p |
| Dividends per share................................................ | (38.3)p | 8.0p |
| | 8.0p | |
| Return on sales[(v)].................................................. | | 12.0% |
| Interest cover[(vi)] | 8.6% | 3.0x |
| | 1.9x | |

(i)  *Underlying EBITDA is Group profit from operations before depreciation and exceptional items and amortisation.*

(ii)  *Underlying Group profit from operations (EBITA) is before exceptional items and amortisation.*

(iii)  *Underlying PBT is before exceptional items and amortisation.*

(iv)  *Underlying diluted earnings per share is before exceptional items and amortisation.*

(v)  *Return on sales is defined as Group profit from operations before exceptional items and amortisation as a percentage of Group revenue.*

(vi)  *Interest cover is defined as the number of times EBITDA is greater than Group net finance charges excluding finance exceptional items.*

*Exceptional items include operating exceptional items and finance exceptional items. Operating exceptional items include impairment of goodwill, gains (losses) on disposal of property, plant and equipment and remeasurement of listed investments. Finance exceptional items include remeasurement of financial assets and liabilities to be included within finance charges and exceptional refinancing costs.*

CITI-TF 00675842

## GROUP CONSOLIDATED INCOME STATEMENT
for the year ended 31 March 2007

|  | Year ended 31 March 2007 | | Year ended 31 March 2006 | |
|---|---|---|---|---|
|  | Total £m | Underlying £m | Underlying £m | Total £m |
| Revenue | 1,808.3 | 1,751.5 | 2,079.9 | 2,079.9 |
| Group profit from operations before exceptional items and amortisation | 207.3 | 150.5 | 250.5 | 250.5 |
| Exceptional charge and amortisation | (416.0) | — | — | (53.3) |
| Exceptional income | 50.2 | — | — | 7.4 |
| Share of profits from associates | 1.8 | 1.8 | 1.0 | 1.0 |
| Profit from operations* | (156.7) | 152.3 | 251.5 | 205.6 |
| Finance charges | 79.3 | 63.0 | 57.4 | 71.4 |
| Finance income | | | | |
| Finance costs | (186.2) | (152.6) | (149.6) | (158.9) |
| Total net finance charges | (106.9) | (89.6) | (92.2) | (87.5) |
| Profit (loss) before taxation | (263.6) | 62.7 | 159.3 | 118.1 |
| Overseas | (33.4) | (23.8) | (33.1) | (33.1) |
| UK | 10.0 | 10.0 | 5.0 | 5.0 |
| Total taxation | (23.4) | (13.8) | (28.1) | (28.1) |
| Profit (loss) from continuing operations after taxation | (287.0) | 48.9 | 131.2 | 90.0 |
| Attributable to: | | | | |
| Equity holders of the parent | (288.5) | | | 86.1 |
| Minority interest | 1.5 | | | 3.9 |

* The following items are included within Profit from operations

|  |  |  |  |  |
|---|---|---|---|---|
| Cost of sales | (1,270.9) | (1,069.9) | (1,230.4) | (1,280.3) |
| Distribution costs | (69.9) | (69.9) | (75.0) | (75.0) |
| Gross Profit | 467.5 | 611.8 | 774.5 | 724.6 |
| Administration expenses | (681.6) | (466.9) | (532.4) | (533.5) |
| Other operating income, net | 55.6 | 5.6 | 8.4 | 13.5 |

## Earnings per share (EPS)

|  | Year ended 31 March 2007 | Year ended 31 March 2006 |
|---|---|---|
| Basic (loss) earnings per Ordinary Share (note 6) | | 10.9p |
| Diluted (loss) earnings per Ordinary Share (note 6) | (36.3)p | 10.5p |
| Underlying basic earnings per Ordinary Share (note 6) | (36.3)p | 10.5p |
| Underlying diluted earnings per Ordinary Share (note 6) | 5.8p | 16.2p |
| | 5.8p | 15.7p |

*Underlying earnings are included as they provide a better understanding of the underlying trading performance of the Group on a normalised basis.*

## Average exchange rates for the year

|  | Year ended 31 March 2007 | Year ended 31 March 2006 |
|---|---|---|
| US Dollar to £1 | 1.90 | 1.78 |
| Euro to €1 | 1.48 | 1.47 |
| Yen to £1 | 223.20 | 203.69 |

*The results for the year have been translated into Sterling at the appropriate average exchange rates.*
*\*\* Exceptional items and amortisation include operating exceptional items, amortisation and finance exceptional items and tax on the exceptional items. See the Group accounting policies section of these financial statements for definitions of these terms and for examples of the types of transactions that may fall into each category.*

CITI-TF 00675843

**Part D – Electronic Acceptance for EMI Shareholders**

Each holder of EMI Shares in uncertificated form by whom, or on whose behalf, an Electronic Acceptance is made irrevocably undertakes, represents, warrants and agrees to and with Maltby, Dresdner Kleinwort and Lloyds TSB Registrars (so as to bind him, his personal representatives, heirs, successors and assigns) to the following effect:

(a)    that the Electronic Acceptance shall constitute an acceptance or deemed acceptance of the Offer in respect of the number of EMI Shares in uncertificated form to which the Electronic Acceptance relates on and subject to the terms and conditions set out or referred to in this document and that, subject only to the rights of withdrawal set out or referred to in paragraph 3 of Part B of this Appendix I, each such acceptance and election shall be irrevocable;

(b)    (i)    that such EMI Shareholder: (A) has not, directly or indirectly, received or sent copies or originals of this document, the Form of Acceptance or any related offering documents, in, into or from Canada, has not utilised in connection with the Offer, directly or indirectly, the mails or any means or instrumentality (including, without limitation, by means of facsimile transmission, email, telex, telephone or internet) of interstate or foreign commerce of, or any facilities of a national securities exchange of Canada; (B) is accepting the Offer from outside Canada; (C) was outside Canada at the time of the input, transmission and settlement of the relevant TTE instruction(s); and (D) in respect of the EMI Shares to which an Electronic Acceptance relates, is not an agent or fiduciary acting on a non-discretionary basis for a principal, unless such agent or fiduciary is an authorised employee of such principal or such principal has given all instructions with respect to the Offer from outside Canada; and

(ii)    that, if such EMI Shareholder is an Overseas Holder, he has observed the laws of the relevant jurisdiction, obtained all requisite governmental, exchange control and other required consents, complied with all necessary formalities and paid any issue, transfer or other taxes or other requisite payments due in any such jurisdiction in connection with such acceptance and has not taken or omitted to take any action that will or may result in Maltby, Dresdner Kleinwort or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the Offer (or his acceptance thereof);

(c)    that the Electronic Acceptance constitutes, subject to the Offer becoming unconditional in all respects in accordance with its terms and to an accepting EMI Shareholder not having validly withdrawn his acceptance, the irrevocable and separate appointment of each of Maltby and/or Dresdner Kleinwort and any director of, or any person authorised by, them as such shareholder's attorney and/or agent (the "attorney") and an irrevocable instruction and authorisation to the attorney to do all such acts and things as may in the attorney's opinion be necessary or expedient for the purpose of, or in connection with, the acceptance of the Offer and to vest the EMI Shares referred to in paragraph (a) of this Part D of this Appendix I in Maltby or its nominee;

(d)    that the Electronic Acceptance constitutes the irrevocable appointment of Lloyds TSB Registrars as such shareholder's attorney and an irrevocable instruction and authority to the attorney: (i) subject to the Offer becoming unconditional in all respects in accordance with its terms and to an accepting EMI Shareholder not having validly withdrawn his acceptance, to transfer to itself (or to such other person or persons as Maltby or its agents may direct) by means of CREST all or any of the EMI Shares in uncertificated form held by such EMI Shareholder (but not exceeding the number of EMI Shares in uncertificated form in respect of which the Offer is accepted or deemed to be accepted); and (ii) if the Offer does not become unconditional in all respects, to give instructions to CRESTCo, immediately after the lapsing of the Offer (or within such longer period as the Panel may permit, not exceeding 14 calendar days of the lapsing of the Offer), to transfer all such EMI Shares to the original available balance of the accepting EMI Shareholder;

(e)    that the Electronic Acceptance constitutes, subject to the Offer becoming unconditional in all respects and to an accepting EMI Shareholder not having validly withdrawn his acceptance, an irrevocable authority and request (subject to the provisions of paragraph 6 of Part B of this Appendix I):

43

CITI-TF 00675824

(i) to Maltby or its agents to procure the making of a CREST payment obligation in favour of the EMI Shareholder's payment bank in accordance with the CREST payment arrangements in respect of any cash consideration to which such shareholder is entitled, provided that:

    (A) Maltby may (if, for any reason, it wishes to do so) determine that all or any part of any such cash consideration shall be paid by cheque despatched by post (or by such other method as the Panel may approve); and

    (B) if the EMI Shareholder concerned is a CREST member whose registered address is in Canada, any cash consideration to which such EMI Shareholder is entitled may be paid by cheque despatched by post (or by such other method as the Panel may approve),

In any case, at the risk of such EMI Shareholder, and such cheque shall be despatched to the first named holder at his registered address outside Canada or as otherwise determined by Maltby;

(ii) to Maltby and Dresdner Kleinwort or their respective agents in their discretion to record and act upon (unless and until revoked) any instructions with regard to payments or notices which have been recorded in the records of EMI in respect of such EMI Shareholder's holding of EMI Shares.

(f) that the Electronic Acceptance constitutes a separate authority to Maltby and/or Dresdner Kleinwort and/or their respective directors within the terms of paragraph 4 of Part B of this Appendix I in respect of the EMI Shares in uncertificated form referred to in paragraph (a) of this Part D of this Appendix I;

(g) that, subject to the Offer becoming or being declared unconditional in all respects (or if the Offer will become unconditional in all respects or lapse immediately upon the outcome of the resolution in question or if the Panel consents) and pending registration:

(i) Maltby and/or its agents shall be entitled to direct the exercise of any votes and any or all other rights and privileges (including the right to requisition the convening of a general meeting of EMI or of any class of its shareholders) attaching to such EMI Shares in uncertificated form in respect of which the Offer has been accepted or is deemed to have been accepted and not validly withdrawn; and

(ii) an Electronic Acceptance in respect of the EMI Shares comprised in such acceptance and in respect of which such acceptance has not been validly withdrawn:

    (A) constitutes an authority to EMI and/or its agents from such EMI Shareholder to send any notice, circular, warrant, document or other communication which may be required to be sent to him/her as a member of EMI (including any share certificate(s) or other document(s) of title issued as a result of a conversion of such EMI Shares into certificated form) to Maltby at its registered office;

    (B) constitutes an authority to Maltby and/or its agents to sign any consent to short notice of a general or separate class meeting as his attorney and/or agent and on his behalf and/or to attend and/or execute a form of proxy in respect of such EMI Shares appointing any person nominated by Maltby to attend any general and separate class meetings of EMI or any other meetings of its members (and any adjournments thereof) and to exercise the votes attaching to such EMI Shares on his behalf, where relevant, such votes to be cast so far as possible to satisfy any outstanding condition of the Offer; and

    (C) will also constitute the agreement of such EMI Shareholder not to exercise any of such rights without the consent of Maltby and the irrevocable undertaking of such EMI Shareholder not to appoint a proxy to attend any such general meeting or separate class meeting or other meetings of its members;

(h) that he is the sole legal and beneficial owner of the EMI Shares in uncertificated form in respect of which the Offer is accepted or deemed to be accepted or he is the legal owner of such EMI Shares and he has the necessary capacity and authority to effect an Electronic Acceptance;

44

CITI-TF 00675825

(i)   that the EMI Shares in uncertificated form in respect of which the Offer is accepted or deemed to be accepted are sold fully paid up and free from all liens, equitable interests, charges, encumbrances, rights of pre-emption and other third party rights of any nature whatsoever and together with all rights existing at 21 May 2007 or thereafter attaching thereto, including the right to receive and retain in full all dividends, distributions and returns of capital (if any) declared, made or paid on or after 21 May 2007;

(j)   that he will do all such acts and things as shall be necessary or expedient to vest the EMI Shares referred to in paragraph (a) of this Part D in Maltby or its nominee(s) or such other persons as it may direct and all such acts and things as may be necessary or expedient to enable Lloyds TSB Registrars to perform its functions as Escrow Agent for the purposes of the Offer;

(k)   that he agrees to ratify each and every act or thing which may be done or effected by Maltby, Dresdner Kleinwort or Lloyds TSB Registrars (or any director of any of them) or their respective agents or EMI or its agents, as the case may be, in the exercise of any of his powers and/or authorities under this document;

(l)   that if, for any reason, any EMI Shares in respect of which a TTE instruction has been effected in accordance with this document are converted to certificated form, he will (without prejudice to paragraph (g)(ii)(A) of this Part D) immediately deliver or procure the immediate delivery of the share certificate(s) or other document(s) of title in respect of all such EMI Shares as so converted to Lloyds TSB Registrars at the address referred to in paragraph 3(b) of Part B of this Appendix I or to Maltby at its registered office or as Maltby or its agents may direct; and he shall be deemed upon conversion to undertake, represent, warrant and agree in the terms set out in Part C of this Appendix I in relation to such EMI Shares without prejudice to the application of this Part D as far as Maltby deems appropriate;

(m)  that the creation of a CREST payment obligation in favour of his payment bank in accordance with the CREST payment arrangements referred to in paragraph (e)(i) of this Part D shall, to the extent of the obligation so created, discharge in full any obligation of Maltby to pay him the cash consideration to which he is entitled pursuant to the Offer;

(n)   that the making of an Electronic Acceptance constitutes his agreement to the terms of paragraphs 7(f)(i) and 7(f)(ii) of Part B of this Appendix I;

(o)   that, by virtue of the CREST Regulations, the making of an Electronic Acceptance constitutes an irrevocable power of attorney by the relevant EMI Shareholder in the terms of all the powers and authorities expressed to be given by Part B and this Part D and (where applicable by virtue of paragraph (l) above) Part C of this Appendix I to Maltby, Lloyds TSB Registrars and any of their respective agents;

(p)   that if any provision of Part B or Part D of this Appendix I shall be unenforceable or invalid or shall not operate so as to afford Maltby, Dresdner Kleinwort or Lloyds TSB Registrars (or any director of any of them) the benefit or authority expressed to be given therein, he shall with all practicable speed do all such acts and things and execute all such documents that may be required to enable Maltby and/or Dresdner Kleinwort and/or Lloyds TSB Registrars and/or any director of any of them to secure the full benefits of Part B and this Part D; and

(q)   that he is not a customer (as defined by the rules of the FSA) of Dresdner Kleinwort in connection with the Offer.

References in this Part D to an EMI Shareholder shall include references to the person or persons making an Electronic Acceptance on his behalf and, if more than one makes an Electronic Acceptance, the provisions of this Part D shall apply to them jointly and severally.

45

CITI-TF 00675826

A-1437

## APPENDIX II

## INFORMATION RELATING TO THE MALTBY GROUP

**1    Information on the Maltby Group**

An overview of the financing arrangements of the Maltby Group is set out at paragraph 2 below of this Appendix II and descriptions of the material contracts of the Maltby Group are set out in paragraph 6.2 of Appendix IV to this document.

**1.1    Names of directors**

The directors of each member of the Maltby Group (other than Carmel Capital) are:

Riaz Punja
Francois van der Spuy
Thomas Quigley

The company secretary of each member of the Maltby Group (other than Carmel Capital which has no company secretary) is WG&M Secretaries Limited.

**1.2    Incorporation and share capital**

**1.2.1 Carmel Capital**

Carmel Capital was incorporated as a société à responsabilité limitée in Luxembourg on 9 March 2007, and is registered with the Luxembourg trade and companies register under number B125,079. The share capital of Carmel Capital as at the date of this document is fixed at €12,500 divided into ordinary shares of €1 par value, all of which have been issued and are owned by TFIGP3.

**1.2.2 Maltby Holdings**

Maltby Holdings was incorporated as a private limited company in England and Wales on 25 April 2007 with registered number 6226830. The authorised share capital of Maltby Holdings as at the date of this document is £100 divided into 100 ordinary shares of £1 each of which one ordinary share has been issued and is owned by Carmel Capital.

**1.2.3 Maltby Investments**

Maltby Investments was incorporated as a private limited company in England and Wales on 25 April 2007 with registered number 6226775. The authorised share capital of Maltby Investments as at the date of this document is £100 divided into 100 ordinary shares of £1 each, of which one ordinary share has been issued and is owned by Maltby Holdings.

**1.2.4 Maltby**

Maltby was incorporated as a private limited company in England and Wales on 25 April 2007 with registered number 6226803. The authorised share capital of Maltby as at the date of this document is £100 divided into 100 ordinary shares of £1 each, of which one ordinary share has been issued and is owned by Maltby Investments.

**1.3    Registered offices**

The registered office of each of Maltby Holdings, Maltby Investments and Maltby is One South Place, London EC2M 2WG.

**1.4    Activities**

The members of the Maltby Group were each formed for the purpose of making the Offer and none of them has carried on business or entered into any obligation other than in connection with the Offer and financing of the Offer. None of the Maltby Group companies has prepared any accounts as at the date of this document.

**2    Financing Arrangements**

Maltby will initially be financed using a combination of equity and debt. Approximately £1,472 million will be provided by Terra Firma. A further £2,500 million will be provided under bank facilities arranged by Citigroup Global Markets Limited. This equity and debt financing will be used

46

CITI-TF 00675827

to pay the cash consideration under the Offer, to refinance expected indebtedness of the EMI Group at the time when the Offer becomes wholly unconditional, to finance the proposals referred to in paragraphs 8 and 9 of Part 2 of this document, to pay fees, costs and expenses in connection with the Offer and to provide working capital for the EMI Group.

### 2.1 Equity Financing

Terra Firma entered into equity commitment letters addressed to Maltby on 21 May 2007, pursuant to which Terra Firma has irrevocably and unconditionally undertaken to procure that Maltby directly or indirectly receives, in aggregate, not less than £1,472 million in freely transferable funds within such time from the date on which the Offer is declared unconditional in all respects as is sufficient to enable Maltby to satisfy its obligations to settle the cash consideration for the Offer under Rule 31.8 of the City Code.

### 2.2 Debt Financing

Maltby also entered into an interim facilities agreement on 21 May 2007 (the "**Interim Facilities Agreement**") with Citigroup Global Markets Limited as arranger, Citibank, N.A. as underwriter and Citibank International plc as interim facility agent and interim security agent.

The Interim Facilities Agreement provides for:

(a) a committed term facility of up to £2,500 million (the "**Term Facility**") which will be available to finance, amongst other things, the Offer, repayment of existing indebtedness of the EMI Group and certain costs and expenses; and

(b) a committed working capital facility of up to £350 million (the "**Working Capital Facility**") which will be available to finance the working capital requirements and/or the general corporate purposes of Maltby.

The Interim Facilities Agreement provides that only Maltby may borrow under the Term Facility and the Working Capital Facility.

Interest will be payable on any utilisation under the Interim Facilities Agreement at a rate per annum equal to the aggregate of (a) 2.50 per cent. (in the case of loans made under the Term Facility) or 2.50 per cent. (in the case of utilisations made under the Working Capital Facility), (b) LIBOR for the relevant interest period, and (c) any mandatory costs incurred by the lenders thereunder. Certain members of the Maltby Group have provided security over their material assets in support of the obligations of Maltby under the Interim Facilities Agreement. If still outstanding at such time, Maltby shall be required to repay all outstanding utilisations and other amounts due under the Interim Facilities Agreement on the date which is 60 days after the date of first utilisation under the Interim Facilities Agreement.

The Interim Facilities Agreement contains conditions precedent, representations and undertakings in favour of the lenders under the Interim Facilities Agreement which are usual for facilities of this type. The Interim Facilities Agreement also contains customary events of default upon the occurrence of which the lenders may terminate the interim facilities referred to above and demand repayment of all amounts outstanding under the Interim Facilities Agreement.

It is intended that the Interim Facilities Agreement will be refinanced with facilities to be provided under senior and subordinated facilities agreements.

In connection with those new facilities, after the Offer becomes wholly unconditionally Maltby expects that:

(i) certain members of the EMI Group will become borrowers under the new facilities;

(ii) certain members of the EMI Group will grant fixed and floating charges over certain of their assets in relation to the new facilities; and

(iii) payment of interest on amounts borrowed under the new facilities will be funded from the business of the EMI Group.

47

CITI-TF 00675828

## APPENDIX III

## FINANCIAL INFORMATION RELATING TO THE EMI GROUP

**Basis of Information**

On 21 May 2007, EMI announced its preliminary results for the year ended 31 March 2007. The announcement is set out in Part A of this Appendix III. Part B of this Appendix III sets out financial information relating to the EMI Group for the financial years ended 31 March 2006 and 31 March 2005 respectively, prepared in accordance with International Financial Reporting Standards (IFRS). Part C of this Appendix III sets out financial information relating to the EMI Group for the financial year ended 31 March 2004, prepared in accordance with accounting standards generally accepted in the UK (UK GAAP).

The financial information contained in this Appendix III does not constitute statutory accounts within the meaning of section 240 of the 1985 Act. The financial information has been extracted without material adjustment from the audited statutory financial statements of EMI for each of the three financial years ended 31 March 2004, 31 March 2006 and 31 March 2007. The statutory financial statements for each of the three financial years ended 31 March 2004, 31 March 2005 and 31 March 2006 have been delivered to the Registrar of Companies in England & Wales. The statutory financial statements for the financial year ended 31 March 2007 have not yet been delivered to the Registrar of Companies in England & Wales. The auditors of EMI made reports under section 235 of the 1985 Act in respect of each such set of statutory financial statements and each such report was an unqualified report and did not contain a statement under section 237(2) or (3) of the 1985 Act.

48

CITI-TF 00675829

## PART A – EMI's PRELIMINARY RESULTS FOR THE FINANCIAL YEAR ENDED 31 MARCH 2007

21 May 2007

**EMI GROUP PLC PRELIMINARY RESULTS FOR THE FINANCIAL YEAR ENDED 31 MARCH 2007**

- Underlying Group revenue fell by 15.8% on a reported basis and by 12.1% at constant currency

- As announced on 18 April 2007

  - EMI Music revenue fell by 15.0% at constant currency

  - EMI Music Publishing outperformed the recorded music market with revenue declining by only 0.9% at constant currency

- Group digital revenue increased by 46.5% from £112.1m to £164.2m on a reported basis representing 9.4% of total underlying Group revenue

- Continued success in finding and breaking long-term talent with top performing artists and songwriters in the financial year including:

  - EMI Music – Corinne Bailey Rae, Depeche Mode, Herbert Groenemeyer, Joss Stone, Keith Urban, Lily Allen, Norah Jones, RBD, Robbie Williams, The Beatles, The Kooks, 30 Seconds to Mars and Utada Hikaru

  - EMI Music Publishing – Amy Winehouse, Arctic Monkeys, Beyonce, Fergie, Gym Class Heroes, James Blunt, Jay-Z, Nelly Furtado, Norah Jones, Scissor Sisters and Vasco Rossi

- EMI Music operating margin reduced from 8.7% in the prior year to 3.3%, driven primarily by lower sales reflecting tough industry conditions and an unprecedented level of stock returns

- EMI Music Publishing operating margin improved from 25.1% to 26.3%, due to a reduction in the cost base and favourable revenue mix

- Underlying profit before tax decreased by 60.6% to £62.7m from £159.3m

- Underlying diluted earnings per share decreased to 5.8p from 15.7p

- As announced on 18 April, further dividend payments have been suspended until the benefits of the restructuring programme have been fully realised. The interim dividend of 2.0p per share has been paid

49

CITI-TF 00675830

**Financial Summary**

| | Year Ended 31 March 2007 £m | Year Ended 31 March 2006 £m |
|---|---|---|
| Underlying Group revenue | 1,751.5 | 2,079.9 |
| EBITDA[i] | 174.0 | 275.8 |
| Group profit from operations (EBITA)[ii] | 150.5 | 250.5 |
| Underlying PBT[iii] | 62.7 | 159.3 |
| Total (loss) profit before taxation | (263.6) | 118.1 |
| Underlying diluted earnings per share[iv] | 5.8p | 15.7p |
| Basic (loss) earnings per share | (36.3)p | 10.9p |
| Dividend per share | 8.0p | 8.0p |
| Return on sales[v] | 8.6% | 12.0% |
| Interest cover[vi] | 1.9x | 3.0x |

(i)   EBITDA is Group profit from operations before depreciation, operating exceptional items, amortisation, interest and tax.
(ii)  Group profit from operations (EBITA) is before operating exceptional items, amortisation, interest and tax.
(iii) Underlying PBT is before exceptional items, amortisation and tax.
(iv)  Underlying diluted earnings per share is before exceptional items and amortisation.
(v)   Return on sales is defined as Group profit from operations before operating exceptional items and amortisation as a percentage of Group revenue.
(vi)  Interest cover is defined as the number of times EBITDA is greater than Group finance charges, excluding non-periodic interest and non-standard charges.
Exceptional items include operating exceptional items and financial exceptional items. Operating exceptional items include impairment of goodwill and intangible assets, gains/(losses) on disposal of property, plant and equipment and remeasurement of listed investments. Finance exceptional items include remeasurement of financial assets and liabilities to be included within finance charges and exceptional refinancing costs.

Eric Nicoli, CEO of EMI Group, said, "This has been a challenging year for EMI Group primarily as a result of the worsening market conditions which affected the entire recorded music industry with revenue declines in every major music market across the world.

"This led us to implement a restructuring plan which, as well as removing cost from the business, will fundamentally change the way we do business. Moving forward, we will realign our investment focus and direct our resources to areas where we will make higher and more sustainable returns.

"We believe that digital sales will continue to grow strongly and are excited about the possibilities offered by partnerships and new business models across both our divisions.

"During the past year, we have multiplied our digital distribution channels by entering into agreements with partners who will make our music available across their platforms in many different ways. Our digital activity is extensive and pro-active and we are open to experimenting with all emerging business models. In April 2007, we were the first music major to make available a new digital rights management (DRM)-free premium sound quality download product as part of our strategy to provide consumers with compelling music propositions.

"We remain confident about our long-term future: while current trading conditions are difficult, consumers' appetite for music has never been greater. Although fewer CDs are being purchased, people are consuming more music in more ways than ever before. We are positioning ourselves to capture these new and expanding revenue opportunities as we build a progressive music business which is truly consumer focused and well-equipped for the digital age."

CITI-TF 00675831

**EMI Group performance review**

**Recorded music industry**

EMI Music operates in a marketplace that continues to undergo significant change, primarily driven by the rapid development of the digital music industry. Global digital markets increased by 68.3% in value over the financial year to account for 13.2% of the total industry, with both mobile and fixed line platforms enjoying strong growth. Challenging market conditions saw global physical sales decline by 13.6% over the financial year, resulting in an overall industry decline of 7.6% for the period.

The digital environment continues to be dynamic with new entrants, new services and new devices. Consumers are now able to access up to 4m tracks in the legitimate digital environment enjoying access to 24 hour music stores with unlimited shelf space.

This year, more people were able to access the digital environment due to the wide availability of broadband lines and music enabled mobile phones. In the past year, mobile music in particular has developed strongly, fuelled by new services such as full audio and video over the air delivery. The last year has seen significant expansion of mobile entertainment market in the US. Music videos and user generated content are also gaining in importance bolstered by the popularity of services such as Yahoo! Music. This is creating new commercial and promotional opportunities for artist videos. Furthermore, the way people discover music is changing. The past year has also seen the increasing popularity of social networking sites. This gives EMI a new way in which to market artists and is also a valuable resource in gathering information about consumer preferences. EMI continues to actively explore commercial opportunities around social networking.

The industry has continued to make progress in combating both physical and digital piracy. We have had notable legal victories against illegal peer to peer sites and continued in our efforts to get Internet Service Providers to take greater responsibility for providing access to unauthorised content from their sites. Such successes include KaZaa (Australia), Kuro (Taiwan), and Zoekmp3 (The Netherlands). This has improved the business landscape for legitimate music sales. Today there are over 498 legitimate online music services in over 40 countries.

**EMI Music**

2006/07 has been a challenging year for EMI Music. Sales declined by 15.0% at constant currency. This is partly a function of the decline within the total music industry as well as the disappointing performance of EMI Music's portfolio compared to the prior year. We generated seventeen 1m+ selling albums in the year including successes from Norah Jones, The Beatles, Keith Urban, Corinne Bailey Rae, Bob Seger and Joss Stone. Strong performers digitally included MIMS, Utada Hikaru, KT Tunstall and OK Go. Total digital revenue represented 10.4% of total EMI Music revenue in the year.

Profit from operations before exceptional items and amortisation (EBITA) declined to £44.9m, resulting in an operating margin of 3.3%. This decline in profitability was driven by the flow through to profits from the reduction in revenues. In April 2006, we announced a cost savings initiative of £30m for the Group of which £25m was targeted for EMI Music to be achieved by the end of 2007/08. During 2006/07, the Group achieved £20m of this target which was well ahead of the planned £10m. In January 2007, we also initiated a far-reaching restructuring programme to remove £110m from the Group cost base which will be completed by 31 March 2009. The majority of these cost reductions will be generated from EMI Music.

Digital technology is multiplying the ways in which we can monetise our music assets and our key strategic priority is to continue to make our music content available on all economically attractive platforms, formats and services to ensure the widest consumer reach. In April 2007, we announced that we were launching a new premium download product which provides our music at a higher sound quality and without the restrictions of digital rights management to consumers. We are the first major recorded music company to do this and it is a fundamental step towards removing the boundaries for consumers by enabling the interoperability of digital music between services and devices. Our recent partnership with Amazon to provide our new premium product in their digital music store illustrates how the absence of DRM is promoting competition between digital retailers. By removing DRM, we are able to provide a seamless experience for the consumer, which we believe will grow the demand for digital music.

We continued to broaden our digital distribution channels globally by entering into agreements with partners who will make our music available on their platforms. During the year, we entered into

51

CITI-TF 00675832

partnerships including: a multi-territory deal with Apple; regional partnerships with MTV, Yahoo, Last.fm and Sony; and national agreements with Amazon in the US, Baidu in China, Napster in Germany and Playlouder and BT Vision in the UK. In addition to establishing the right relationships on the right terms, we are at the forefront of the industry in exploiting the new product, format and windowing possibilities that digital enables. For example, during the year we distributed the 30 Seconds to Mars video using the latest Web 2.0 technology. The flash technology allows users to embed videos within their own websites and social networking pages, with a click through function which allows viewers of the web page to purchase the tracks and also allows us to generate additional revenue by putting advertising around the video content. EMI Music repertoire is now available digitally in 70 countries, up from 58 countries in the prior year. We believe that we have made significant progress within the digital arena during the year and that this will enable us to enhance value for our shareholders through the growth of this market in the future.

**EMI Music geographic review**

*North America*

2006/07 has been a challenging year for the North American market, which declined by 7.7% overall. Digital sales grew strongly by 80.1%, which was driven, in particular, by the mobile market. This growth has not compensated for the decline experienced in the physical market. Digital represented 20.8% of the total market during 2006/07.

Against this difficult backdrop, our North American business experienced a decline in revenue. We had key successes from US artists, Norah Jones, Keith Urban, Janet Jackson, 30 Seconds to Mars and Trace Adkins in combination with the effective marketing and promotion of international releases from The Beatles, Corinne Bailey Rae and Joss Stone. MIMS is our latest urban breakthrough act in the region; his debut single has performed very strongly with 1.3m ring tunes sold and 0.7m tracks downloaded globally in the financial year.

EMI Music's digital revenue in North America increased by 84% over the year. Mobile products grew at the fastest rate but online downloads continued to represent the largest digital segment for the region. EMI Music has consistently been an innovator of new products and services. Most recently, we reached an agreement with Amazon, making us the first music major to be in Amazon's new online music store. We were also the first music major to make its catalogue of recordings available to Qtrax, which will be the first advertising supported, legal peer-to-peer music distribution service. During the year, we provided tracks which were used as pre-loaded content when the Microsoft's Zune player was launched in November 2006.

We believe it is important to participate across all genres and in North America we have specific labels dedicated to Country (Capitol Nashville), Christian (CMG) and Jazz Music (Bluenote). All of these labels are well known for their ability to attract high calibre talent such as Anita Baker, Amy Grant and Kenny Rogers. During the year, they generated strong sellers with releases from Norah Jones, Keith Urban and Chris Tomlin.

In September 2006, we completed the sale and leaseback of the Capitol Tower in Los Angeles which resulted in an inflow of cash for the Group.

As part of the restructuring we announced in January 2007, we have merged our two main pop labels in the region, Capitol and Virgin, to form the Capitol Music Group. The combined artist roster, talent and market share of this new label group establishes it as one of North America's leading labels. The restructuring also involves additional overhead reductions throughout our operations in the region and an increased focus on building our digital capability.

*UK & Ireland*

Consistent with the global recorded music market, the UK market experienced very tough conditions over the last 12 months, particularly in the physical market which showed significant decline in the fourth quarter. Total physical sales declined by an estimated 11.8% in the year, while digital sales increased by 79.7% to give a total market decline of 8.8% over the 2006/07 financial year. This reflected the weakness in industry sales in the key Christmas period and continuing price erosion as the specialist retailers began to compete on price with the supermarkets.

The strength and depth of our UK artist roster was again demonstrated this year despite the difficult market conditions. Album releases from Robbie Williams and Corinne Bailey Rae each sold in excess of 2m physical units worldwide and The Beatles *Love* album sold 5m worldwide during

52

CITI-TF 00675833

the year. A number of new UK artists also broke through to success during the year, most notably The Kooks, Lily Allen, The Good, The Bad and The Queen and Jamie T. EMI's British artists had tremendous success in the US with Corinne Bailey Rae and KT Tunstall breaking through in the year. 12 of the top 40 best-selling UK albums in the US during 2006 were EMI releases, including seven of the top 12 which is more than any of our competitors. EMI Music continued to demonstrate its strength in the compilation market and, in the final quarter of the financial year, it had three of the top-10 selling compilations.

Our digital revenue for 2006/07 in the UK grew by 31% over the prior year with fixed line downloads increasing by 16%, mobile downloads increasing by 41% and subscription by 38% over the period. Digital delivery brings many opportunities for capturing new revenue streams which we continue to explore. For example, EMI Music UK has entered into a deal with Playlouder MSP to make available its extensive catalogue via Playlouder's bundled subscription and ISP service.

As part of the restructuring we announced in January 2007, we have scaled back in all areas and merged some functions of our four UK labels while maintaining the four imprints. We anticipate that this will take significant costs out of the business while maintaining excellent specialist A&R skills in each label that will enable EMI to capitalise on the opportunities for marketing its recorded music around the world.

### Continental Europe

Market conditions in Continental Europe were challenging over the financial year, with total industry sales declining by 8.3%.

EMI Music delivered a very commendable market share in a tough market environment. EMI gained market share in Spain, The Netherlands, Switzerland, Austria and Poland while also delivering good results in Greece, Belgium and Italy. Good performances came from a broad range of established and new artists. Herbert Groenemeyer sold over 1m units worldwide of his album 12 and it remained number 1 in the German album charts for five weeks in a row which has not been accomplished by a local artist since he also achieved this in 2002. French rap artist Diam's achieved the best-selling album in France in 2006 with Dans Ma Bulle, reaching 1m units since its release. Diams also won Best French Act at the 2006 MTV Europe Music Awards.

We have sustained digital growth in the region during the financial year, with revenue increasing by 30%. However, our digital growth in Continental Europe is constrained by the lack of local fixed line retail stores in major markets such as Benelux and Scandinavia and a lack of marketing support for download stores. Mobile products represented a greater portion of digital sales in Europe than in the US or the UK, although fixed line sales still account for the majority of digital sales. The key issue remained the heavy level of piracy, particularly in Spain, Greece and Italy. However, EMI Music continues to explore all profitable digital models. For example, EMI Music has announced an advertising supported, pan-European agreement with Yahoo!Music, the biggest online video-on-demand service in the world together with AOL and MTV, to enable consumers of online services to watch videos from EMI's digital catalogue free of charge. EMI has also signed a pan-European agreement with online social community Last.fm, to make music from EMI available to its users and a deal with Sony to pre-load EMI Music onto the Sony memory stick as well as a number of pre-load handset deals including with Nokia.

During the year, as part of the cost reduction programme announced in April 2006, the region redeveloped its organisation and business approach to address changes in consumer trends and the consumption of music including the establishment of shared service centres for finance processing and advanced CRM capability and practices, in particular in France and Spain. This programme will continue with the further restructuring announced in January 2007.

### Japan

The Japanese market declined by 2.4% overall during the 2006/07 year with digital sales representing 12.4% of the overall industry.

Against this backdrop, our Japanese business performed strongly with its market share improving by 0.6 percentage points. This was driven by successful releases from Utada Hikaru selling over 1m physical units in the region along with local releases from DJ Ozma and Glay. International best sellers included Sarah Brightman and The Beatles. Utada Hikaru also performed phenomenally in digital format, with the Flavor of Life track selling 4.4m ring tunes in the financial year and continues to sell strongly. Overall, digital revenue showed an increase of 69% in the

CITI-TF 00675834

year, with mobile continuing to represent the majority of total digital sales. Digital revenues represented 19.6% of total revenue in Japan.

In April 2006, we announced a major restructuring of this business to improve the efficiency of our operations, to reinvest a proportion of these savings in the key areas of A&R and marketing, and to introduce a new multi-label organisational structure. During the year, we have implemented all the initiatives to ensure that we achieve the associated cost savings by the end of March 2008. In conjunction with this restructuring, we sold and leased back two freehold properties in Tokyo, with a substantial cash inflow generated from the transaction.

In December 2006, EMI announced the purchase from Toshiba of its 45% minority interest in Toshiba-EMI for £93m. We expect to complete the purchase in the first half of the 2007/8 financial year and EMI will then own 100% of our Japanese operations. Owning 100% of the business will provide us with full strategic flexibility in the region.

### South East Asia

The major markets in South East Asia suffered sales declines as physical and digital piracy continued to take their toll. Overall, our business suffered a slight decrease in share in the region, but continues to deliver acceptable profit levels.

EMI's digital growth in the region was robust, with download revenue growing by a factor of four times and subscription revenue growing by a factor of six times, as the region experienced a pick up in broadband penetration. We gained digital market share over the year and digital revenue accounted for nearly 15% of the region's revenue. Major local releases in the region included Jolin Tsai, S.H.E, David Tao and ADA Band. Top-selling international artists included The Beatles and Robbie Williams.

Music in China is an excellent opportunity for us, particularly within digital formats. During the year, we embraced the growing market in China by being the first music major to announce a pioneering strategic partnership with Baidu to launch an advertising-supported, online music streaming service in China, the first revenue-sharing arrangement between an internet search engine and an international music company in that country.

We are currently implementing cost reductions in the region as part of our restructuring programme.

### Australasia

Market conditions in Australasia worsened during the 2006/07 financial year. EMI Music's market share was modestly down. During the year, we generated releases from local superstars, The 12th Man and Silverchair, as well as selling international titles from The Beatles, Norah Jones and Robbie Williams. Our restructuring programme has already been implemented in the region. iTunes launched in New Zealand during December 2006 and this leaves the region well placed for growth in the digital market.

### Latin America

Our Latin American business had a disappointing 2006/07 year, largely because of problems experienced in Brazil. In October 2006, an accounting fraud was discovered in our recorded music operations in Brazil, which had a £9m negative profit impact. Following our investigation of the events and factors which led to and contributed to the fraud, we have conducted a thorough review of our policies and procedures both in Brazil and throughout our operations which we believe should mitigate the possibility of similar issues in the future. EMI Music Brazil has also been thoroughly restructured and new senior management has been appointed. The refocus of the company culture is now well underway.

Local superstars RBD had another good year, selling almost 3m units globally of their six currently released albums in the financial year. Releases from local artists Kumbia All Starz and Intocable were also successful, as were the new artists Fonseca, Shaila, Kudai and teen talent Belinda. The Latin music icon, Juan Luis Guerra, has recently been signed to EMI-Televisa.

As part of the restructuring plan announced in January 2007, the Latin American regional head office has been reorganised and each country within the region now reports directly to EMI Music International.

We believe that EMI's Latin music business, both in Latin America and in the US, will improve its creative and business performance due to our recent management changes and to the growing

54

CITI-TF 00675835

economic development of the Latin demographic. We are well positioned to develop and exploit this through our joint venture with Grupo Televisa S.A., the largest broadcaster in Mexico and the largest Spanish language conglomerate in the world.

Digital revenues for 2006/07 were almost four times larger than in the previous year and the rising penetration of mobile phones in most of Latin America provides a great opportunity for the legal distribution of music in the immediate future. EMI Latin America is focused on its mobile strategy and has completed a regional deal with Telefonica Movistar as well as most of the America Movil's carriers throughout the region. It has teamed up with Sony Ericsson and Nokia for the creation of preloaded content campaigns supporting the new albums of a number of local and international artists. For example, as part of the release campaign for Robbie William's *Rudebox*, his *Intensive Care* album was preloaded and sold in 850,000 units of Sony Ericsson handsets.

### EMI Classics

EMI and Virgin Classics had a good year during 2006/07 with particular success in France where they grew their market share by 7% and had a huge hit with *The Miracle of the Voice* from the critically acclaimed soprano, Natalie Dessay. Japan also performed well with the Sarah Brightman *Diva* collection and Simon Rattle's recording of *The Planets*.

The superstar pianist, Evgeny Kissin, has just been signed to EMI Classics joining other great names such as Nigel Kennedy, Leif Ove Andsnes and Angela Gheorghiu. Virgin Classics added the brilliant young pianist, David Fray, and the German soprano, Diana Damrau, to its expanding roster.

EMI Classics is one of the oldest record labels in the world. EMI Classics has started a drive to tap further into this incredible resource and share it with music lovers across the globe. In March 2007, EMI Classics and iTunes teamed up to celebrate the 80th birthday of the late Matislav Rostropovich, who was one of the world's greatest cellists. EMI Classics is running an international campaign in conjunction with iTunes giving music lovers access to his entire EMI discography as cellist, conductor and pianist.

### EMI Music Publishing

EMI Music Publishing once again delivered a solid performance for the financial year ended 31 March 2007. Profit from operations before exceptional items and amortisation (EBITA), increased to £105.6m, an increase of 4.2% at constant currency with operating margin improving to 26.3%. Due to recorded music market conditions, as well as some phasing of income, revenue decreased by 0.9% at constant currency to £401.3m. Overall, this performance reflected both the underlying health and resilience of the business, as well as the early effects of efficiencies from our comprehensive restructuring programme which, in turn, is part of the evolution of the business. EMI Music Publishing has implemented a new strategy that will reshape the business for future growth and flexibility while, at the same time, building on and holding true to past successes. There are four key pillars to this strategy: continued excellence in A&R evidenced by the signing of today's top songwriters; helping to reform the industry's infrastructure through process and systems re-engineering; and deepening and expanding our client relationships.

Continued success in signing songwriters is essential for our future profitability. This year, a broad range of songs, songwriters and products underpinned our continued ability to sign the world's best songwriters, while reflecting the quality and depth of the catalogue. Notable successes during the period included songs by Beyonce, Fergie, Gym Class Heroes, Jay-Z, Norah Jones, Panic! At The Disco, The Fray, Nelly Furtado, Tool, Young Jeezy, Pink, Amy Winehouse, Arctic Monkeys, James Blunt, Jamiroquai, Kasabian, My Chemical Romance, Scissor Sisters, The Fratellis, The Feeling, Andreas Johnson, Estopa, Silbermond, La Roi Soleil, The Veronicas, and Vasco Rossi.

With the world's best collection of songs, we are working to drive industry reform in order to ensure that our songwriters are paid for their works. Nowhere is this more appropriate than in the world of digital revenues.

Digital revenues continued to grow strongly during 2006/07, increasing by 35.5% at constant currency on the prior year, to £25.3m. Revenues from digital music are currently classified amongst the various revenue categories – mechanical, performance, synchronisation and other uses – based on the varying status of income collection for these new uses in different countries.

55

CITI-TF 00675836

The use of songs in mobile phone products remains the most significant early digital revenue contributor for EMI Music Publishing and continues to enjoy very strong growth. For the revenue from mobile products, we have seen the percentage contribution from ring tunes increase significantly during the year whilst the contribution from ring tones has decreased. This trend is expected to continue as technology, handsets and networks continue to drive a product shift in the mobile space. Revenues from digital downloads (up 158.3% at constant currency in the year), and other newer products, such as video downloads, have also grown strongly and are starting to contribute more to the division's growth. EMI Music Publishing remains at the forefront of digital music by fostering relationships with new media-companies at all stages of development in order to maximise the exploitation of our songwriters' music.

However, growth in digital revenues in music publishing continues to lag the recorded music industry, reflecting an under-developed industry infrastructure for the tracking and collection of digital royalties and the lack of agreements on digital royalty rates for certain products in some regions. EMI Music Publishing is at the forefront of the industry's effort to ensure that the right structures and rates are in place to identify and collect fully all past and future digital revenues. We were pleased to join the 'Centralised European Licensing and Administration Services' initiative, which is based on an agreement between the UK's MCPS-PRS Alliance and Germany's GEMA collection societies to establish a pan-European licensing and collection mechanism for mobile and online digital rights. This pan-European one-stop shop for the licensing of online rights, which went live in January 2007, is a groundbreaking initiative in the publishing industry. EMI Music Publishing is involved in many of industry developments and rate-setting negotiations around the globe, all in the interest of making sure our songwriters are properly and fairly paid for their works.

### Mechanical revenue
Our mechanical revenues, which are derived from the sale of recorded music, declined by 6.7% at constant currency, reflecting the continued declines in the global recorded music market during the same period. Mechanical revenues now represent 42.6% of total divisional sales on a constant currency basis. On a regional basis, weaknesses in Eastern Europe and Scandinavia were partially offset by increases in Southeast Asia, while the US, the UK and Continental Europe were down marginally.

### Performance revenue
Performance revenues, earned when a song is performed live on stage, played in a bar or other public venue or broadcast on the radio or television, grew by 10.1% at constant currency for the year and now represent 30.0% of divisional revenues on a constant currency basis. Key drivers of growth in this business are the chart success of songs from our roster of active songwriters and the proliferation of new media channels, especially across Europe. On a regional basis, performance income was particularly strong in the US, reflecting timing differences and strong underlying growth.

### Synchronisation revenue
Synchronisation revenue, which is generated by the use of songs in audiovisual works such as advertisements, television programmes, films, computer games and in mobile phones, increased by 5.6% at constant currency, resulting in more than 12 years of consecutive growth. From the record level achieved in 2005/06, EMI Music Publishing was able to drive meaningful growth in synchronization by gaining greater penetration in multiple channels, particularly in the US and the UK. This growth is an early reflection of our strategy to deepen and broaden our customer relationships with licensors of music. Significant licences were issued worldwide for a number of major advertising campaigns, including Toyota, Kirin Beer, Pantene, General Electric, Maxwell House, Ford, Verizon, Proctor & Gamble, Starwood, Macy's, Pier 1 and O₂.

### Other revenue
Other revenue typically represents about 10% of revenues, although the absolute amount can vary significantly from year to year. An important driver of the change in other revenue in recent years has been revenue gained from stepped up efforts in enforcing proper use of our copyrights. By their nature, these revenues tend to be irregular and unpredictable, accounting for the overall decline on a constant currency basis in this revenue category.

56

CITI-TF 00675837

A-1448

## EMI Group future outlook

The recorded music market continues to undergo significant change as it becomes increasingly digitised. At this stage, uncertainty exists as to the timing and extent of future market development. We have seen physical sales declining at a significantly faster rate than the industry had anticipated but the Company remains positive on the long-term trends for the industry and, in particular, that there will be continued strong demand for digital music products of all types. We believe that the launch of our DRM-free, superior sound quality downloads, will boost sales of digital music and help unlock the many opportunities of the digital market. Our premium download product will be available with various retail partners including iTunes, Amazon, VirginMega and Telenor. We are currently in negotiations with many other retail services for the launch of this product.

In January 2007, we announced a restructuring programme and an update to our strategy to secure sustainable growth in underlying profits and cash flow. These initiatives will generate annualised cost savings of £110m and we expect £76m of these savings to be achieved by March 2008, with the full run rate being reflected in the financial results for the year to 31 March 2009.

We will continue to invest significantly in A&R to allow a continuing strong focus on artist and songwriter development. We are also investing to develop further our digital expertise so that we remain positioned at the forefront of the industry in capitalising on the opportunities arising from the market's evolution.

In the current financial year, EMI Music is planning releases from Kasey Chambers, Korn, Kylie Minogue, Lenny Kravitz, LeToya, M, Moby, Raphael, Thalia, The Chemical Brothers and Vasco Rossi. EMI Music Publishing expects to see releases from songwriters including Alicia Keys, Ashlee Simpson, Arctic Monkeys, Chris Cornell, Kanye West, Kelly Clarkson, Shiny Toy Guns, The Police, The Used and White Stripes. We have a world renowned catalogue in both EMI Music and EMI Music Publishing and we will continue to exploit them for the benefit of all stakeholders.

CITI-TF 00675838

**Financial review for the year ended 31 March 2007**

**Revenue**

Reported underlying Group revenue decreased by 15.8% or £328.4m to £1,751.5m. Excluding the effects of unfavourable currency movements the decrease was 12.1% or £252.2m. The unfavourable exchange movement was largely driven by an increase in the weighted average rate of the US Dollar against Sterling from $1.78 last year to $1.90 in 2006/07.

At constant currency, revenue in EMI Music declined by 15.0%, with notable decreases in North America, UK and Ireland and Latin America.

At constant currency, revenue in EMI Music Publishing was down 0.9% versus the prior year due mainly to declines in physical mechanical sales as well as minor phasing adjustments. The 6.7% decrease in mechanical revenue was largely offset by solid growth in performance and synchronisation revenues.

Group digital revenue increased to £164.2m from £112.1m in the prior year, an increase of 46.5%. Digital revenue represented 9.4% of total underlying Group revenue for the year.

**Costs**

The underlying gross margin, after distribution costs, declined from 37.2% to 34.9%. This is the result of a gross margin decline in the Music division. Royalty, copyright manufacturing and distribution costs are all largely variable with revenue and have decreased in absolute terms in the year. Marketing and promotion costs, however, were lower in absolute terms but 2.6 percentage points higher as a percentage of total sales. Controlling marketing spend is a key area of focus for the Music business this year.

In April 2006, we announced a cost saving initiative to deliver £30m of annualised savings for the Group. During 2006/07, we achieved £20m of savings, well ahead of the £10m planned, and we remain on course for the full £30m in 2007/08.

In January 2007, we announced a comprehensive restructuring programme to realign our investment approach and streamline our operations. This programme will deliver £110m of annualised savings with £76m currently anticipated to be achieved in 2007/08.

**Profit from operations**

Group profit from operations (EBITA)[i] decreased by £100.0m or 39.9% from £250.5m to £150.5m. Excluding exchange, the decrease in EBITA was £94.6m or 37.8%. Group operating margin decreased from 12.0% to 8.6% in the year.

EMI Music delivered EBITA of £44.9m, a decline of £100.2m or 68.2% at constant currency on the prior year. This decrease in EBITA was largely driven by the revenue declines particularly in North America, UK and Ireland and Latin America mentioned above. The operating margin reduced from 8.7% to 3.3%.

EMI Music Publishing generated EBITA of £105.6m, a growth of 4.2% at constant currency on the prior year. Operating margin improved from 25.1% to 26.3%, reflecting the partial effects of the restructuring programme and its efficiencies.

The Group's share of profit in its associated company investments increased from £1.0m in 2005/06 to £1.8m in 2006/07. Consequently, the total underlying profit from operations for the Group is £152.3m this year compared to £251.5m last year.

Group finance charges, excluding exceptional finance charges, reduced by £2.6m to £89.6m. This reflected a 3.2% decrease in average net borrowings, an increase in pension fund interest receivable offset by higher rates in three of our major funding territories (US, UK and Europe).

Underlying profit before tax declined by 60.5% from £159.3m to £62.7m, reflecting the reduction in revenue and underlying profit from operations discussed above.

The Group underlying tax rate, before amortisation and exceptional items, was 22% against 17.6% in the prior year. The increased rate reflected a movement in profitability towards countries where there were higher tax rates together with losses in territories where we cannot recognise the loss. This was offset by the settlement of prior liabilities.

Notes:
(i) Group profit from operations (EBITA) is before exceptional items and amortisation and before share of profit in associates.

58

CITI-TF 00675839

A-1450

As a result of the above, the Group's underlying profit after taxation decreased from £131.2m to £48.9m, a decrease of 62.7%.

Underlying basic earnings per share[ii] was 5.8p, a decrease of 10.4p from the prior year. Underlying diluted earnings per share, the calculation of which includes the impact of the potential conversion of convertible bonds (and related bond interest) together with the possible exercise of dilutive share options, decreased from 15.7p to 5.8p.

**Other items affecting earnings**

Exceptional items and amortisation comprise operating exceptional costs, finance exceptional costs and amortisation of music copyrights and intangibles.

The Group is reporting operating exceptional costs of £256.3m compared with income of £4.0m in the prior year. Operating exceptional costs are net of a £50.2m gain on disposal of property (including the sale and leaseback transactions completed for our offices in Tokyo and the Capitol Tower in Los Angeles) and a gain following settlement of an infringement case with Bertelsmann AG in March. The exceptional costs include £191.5m for our restructuring programmes announced in April 2006 and January 2007 (largely headcount and roster reduction) and the results of our balance sheet review announced on 12 January 2007 and concluded as anticipated on 31 March 2007. The review resulted in a charge of £164.0m reported as exceptional this year. The final elements of this year's exceptional cost are a £0.2m loss on revaluation of investments and £7.6m for aborted corporate transactions.

The Group is reporting finance exceptional net costs relating to remeasurements and refinancing costs of £17.3m compared to net income of £4.7m last year. Finance exceptionals include the loss on revaluation to fair value of the convertible bond derivative of £5.7m (2005/06: £4.1m gain), the loss on revaluation of the Eurobond embedded call feature of £21.3m (2005/06 £8.2m gain) and the foreign exchange gain on Euro borrowings of £8.1m (2005/06: £4.1m loss). The finance exceptional net costs for 2006/07 include exceptional refinancing costs of £1.1m in connection with the refinancing programme carried out in March 2007 (2005/06: £5.2m refinancing programme carried out in July 2005).

Amortisation and impairment of music copyrights and other intangibles amounted to £52.7m in comparison with £49.9m last year.

The minority interest cost reduced from a charge of £3.9m in the previous year to a charge of £1.5m this year. This was the consequence of reduced profitability in the Music business in Japan in which there was a 45% minority share for eight and a half months of the year. In December 2006, we agreed to acquire the 45% minority share from Toshiba for approximately £93m. The cash cost is due to be paid in the first half of 2007/08.

The loss attributable to members of the Company was £(288.5)m in comparison with an attributable profit last year of £86.1m.

As announced in April 2007, the Board is suspending dividend payments until the benefits of the restructuring process have been fully realised. The interim dividend of 2p per share was paid on 2 April 2007.

**Reported results**

Total Group loss from operations (including share of associates) was £(156.7)m in comparison with a profit of £205.6m last year. This decrease was entirely due to the decline in revenue compounded by exceptional costs of £309.0m this year compared to £45.9m last year.

Total loss before taxation was £(263.6)m compared to a profit of £118.1m in the prior year. This decrease reflected the reduction in Group profit from operations above and a change in the finance exceptional from net income to a net cost.

**Cash flow and net borrowings**

Improvement in cash conversion and overall cash management remains a key area of focus for the Group. The net cash inflow from operating activities was £7.3m, a significant reduction from last year's inflow of £188.3m, reflecting a significant working capital outflow in the Music division as a

Notes:
(ii) Before exceptional items and amortisation.

59

result of changes in trading patterns, the costs of our restructuring programme announced in January 2007 and the lower EBITA reported this year.

After the net cash inflow from operating activities, we had cash inflows of £65.8m for investment activity and cash inflows of £85.1m for financing activity including an outflow of £50.8m for dividends. Taking into account the gain on exchange of foreign currency denominated borrowings of £43.7m, year-end net debt increased by £24.7m from £879.5m to £904.2m.

The net cash inflow from operations after investing activities has approximated the operating result of both divisions in recent years.

CITI-TF 00675841

**FINANCIAL SUMMARY**

for the year ended 31 March 2007

| | Year ended 31 March 2007 £m | Year ended 31 March 2006 £m |
|---|---|---|
| Underlying revenue | 1,751.5 | 2,079.9 |
| Underlying EBITDA[(i)] | 174.0 | 275.8 |
| Underlying Group profit from operations (EBITA)[(ii)] | 150.5 | 250.5 |
| Underlying PBT[(iii)] | 62.7 | 159.3 |
| Total (loss) profit before taxation | (263.6) | 118.1 |
| | | |
| Underlying diluted earnings per share[(iv)] | 5.6p | 15.7p |
| Basic (loss) earnings per share | (36.3)p | 10.9p |
| Dividends per share | 8.0p | 8.0p |
| | | |
| Return on sales[(v)] | 8.6% | 12.0% |
| Interest cover[(vi)] | 1.9x | 3.0x |

(i) Underlying EBITDA is Group profit from operations before depreciation and exceptional items and amortisation.
(ii) Underlying Group profit from operations (EBITA) is before exceptional items and amortisation.
(iii) Underlying PBT is before exceptional items and amortisation.
(iv) Underlying diluted earnings per share is before exceptional items and amortisation.
(v) Return on sales is defined as Group profit from operations before exceptional items and amortisation as a percentage of Group revenue.
(vi) Interest cover is defined as the number of times EBITDA is greater than Group net finance charges excluding finance exceptional items.

Exceptional items include operating exceptional items and finance exceptional items. Operating exceptional items include impairment of goodwill, gains (losses) on disposal of property, plant and equipment and remeasurement of listed investments. Finance exceptional items include remeasurement of financial assets and liabilities to be included within finance charges and exceptional refinancing costs.

61

CITI-TF 00675842

A-1453

## GROUP CONSOLIDATED INCOME STATEMENT
for the year ended 31 March 2007

| | Year ended 31 March 2007 | | Year ended 31 March 2006 | |
| --- | --- | --- | --- | --- |
| | Total £m | Underlying £m | Underlying £m | Total £m |
| Revenue | 1,808.3 | 1,751.5 | 2,079.9 | 2,079.9 |
| Group profit from operations before exceptional items and amortisation | 207.3 | 150.5 | 250.5 | 250.5 |
| Exceptional charge and amortisation | (416.0) | — | — | (53.3) |
| Exceptional income | 50.2 | — | — | 7.4 |
| Share of profits from associates | 1.8 | 1.8 | 1.0 | 1.0 |
| Profit from operations* | (156.7) | 152.3 | 251.5 | 205.6 |
| Finance charges | | | | |
| Finance income | 79.3 | 63.0 | 57.4 | 71.4 |
| Finance costs | (186.2) | (152.6) | (149.6) | (158.9) |
| Total net finance charges | (106.9) | (89.6) | (92.2) | (87.5) |
| Profit (loss) before taxation | (263.6) | 62.7 | 159.3 | 118.1 |
| Overseas | (33.4) | (23.8) | (33.1) | (33.1) |
| UK | 10.0 | 10.0 | 5.0 | 5.0 |
| Total taxation | (23.4) | (13.8) | (28.1) | (28.1) |
| Profit (loss) from continuing operations after taxation | (287.0) | 48.9 | 131.2 | 90.0 |
| Attributable to: | | | | |
| Equity holders of the parent | (288.5) | | | 86.1 |
| Minority interest | 1.5 | | | 3.9 |

* The following items are included within Profit from operations

| | | | | |
| --- | --- | --- | --- | --- |
| Cost of sales | (1,270.9) | (1,069.6) | (1,230.4) | (1,280.3) |
| Distribution costs | (69.9) | (69.9) | (75.0) | (75.0) |
| Gross Profit | 467.5 | 611.8 | 774.5 | 724.6 |
| Administration expenses | (681.5) | (466.9) | (532.4) | (533.5) |
| Other operating income, net | 55.6 | 5.6 | 8.4 | 13.5 |

### Earnings per share (EPS)

| | Year ended 31 March 2007 | Year ended 31 March 2006 |
| --- | --- | --- |
| Basic (loss) earnings per Ordinary Share (note 6) | (36.3)p | 10.9p |
| Diluted (loss) earnings per Ordinary Share (note 6) | (36.3)p | 10.5p |
| Underlying basic earnings per Ordinary Share (note 6) | 5.8p | 16.2p |
| Underlying diluted earnings per Ordinary Share (note 6) | 5.8p | 15.7p |

*Underlying earnings are included as they provide a better understanding of the underlying trading performance of the Group on a normalised basis.*

### Average exchange rates for the year

| | Year ended 31 March 2007 | Year ended 31 March 2006 |
| --- | --- | --- |
| US Dollar to £1 | 1.90 | 1.78 |
| Euro to £1 | 1.48 | 1.47 |
| Yen to £1 | 223.20 | 203.69 |

*The results for the year have been translated into Sterling at the appropriate average exchange rates.*

** *Exceptional items and amortisation include operating exceptional items, amortisation and finance exceptional items and tax on the exceptional items. See the Group accounting policies section of these financial statements for definitions of these terms and for examples of the types of transactions that may fall into each category.*

62

# GROUP CONSOLIDATED BALANCE SHEET
for the year ended 31 March 2007

| | At 31 March 2007 £m | At 31 March 2006 £m |
|---|---|---|
| **ASSETS** | | |
| **Non-current assets** | | |
| Music copyrights and intangibles | 305.7 | 389.3 |
| Goodwill | 28.9 | 43.0 |
| Property, plant and equipment | 132.0 | 196.8 |
| Investments in associates | 8.1 | 8.8 |
| Financial assets | 20.1 | 56.3 |
| Deferred taxation | 12.0 | 22.8 |
| Other receivables | 3.7 | 4.4 |
| | 510.5 | 721.4 |
| **Current assets** | | |
| Inventories | 30.4 | 37.2 |
| Advances | 217.9 | 330.1 |
| Trade receivables | 289.6 | 408.5 |
| Corporation tax recoverable | 15.9 | 16.7 |
| Other receivables | 100.8 | 110.3 |
| Financial assets | 0.2 | 0.3 |
| Investments: liquid funds | 1.5 | 1.6 |
| Cash and cash equivalents | 331.7 | 190.9 |
| | 988.0 | 1,095.6 |
| **Total assets** | 1,498.5 | 1,817.0 |
| **LIABILITIES** | | |
| **Non-current liabilities** | | |
| Financial liabilities | | |
| Other payables | (1,317.0) | (1,149.7) |
| Deferred taxation | (6.5) | (9.5) |
| Pension provisions | (3.7) | (5.1) |
| | (42.2) | (31.1) |
| | (1,369.4) | (1,195.4) |
| **Current liabilities** | | |
| Financial liabilities | | |
| Other payables | (12.3) | (22.6) |
| Current tax liability | (1,044.7) | (1,149.0) |
| Other provisions for liabilities and charges | (112.2) | (143.1) |
| | (110.9) | (33.5) |
| **Total liabilities** | (1,280.1) | (1,348.2) |
| | (2,649.5) | (2,543.6) |
| **NET LIABILITIES** | (1,151.0) | (726.6) |
| **EQUITY** | | |
| **Capital and reserves** | | |
| Share capital | | |
| Share premium account | 112.0 | 110.7 |
| Capital redemption reserve | 455.4 | 447.8 |
| Foreign exchange reserve | 495.8 | 495.8 |
| Other reserves | 19.5 | (17.1) |
| Retained earnings | 214.7 | 206.4 |
| | (2,451.0) | (2,019.0) |
| Equity attributable to equity holders of the parent | (1,153.6) | (775.4) |
| Minority interests (equity) | 2.6 | 48.8 |
| **TOTAL EQUITY** | (1,151.0) | (726.6) |
| **Year end exchange rates** | | |
| US Dollar to £1 | 1.97 | 1.73 |
| Euro to £1 | 1.47 | 1.43 |
| Yen to £1 | 231.53 | 204.66 |

The balance sheet has been translated into Sterling at the appropriate year end exchange rates.

CITI-TF 00675844

**GROUP CONSOLIDATED STATEMENT OF RECOGNISED INCOME AND EXPENSE**

for the year ended 31 March 2007

|  | At 31 March 2007 £m | At 31 March 2006 £m |
|---|---|---|
| **Income and expense recognised directly in equity** |  |  |
| Revaluation of music copyrights and intangibles | — | 4.8 |
| Exchange difference on retranslation of foreign operations | 32.5 | (21.2) |
| Pension funds: actuarial gains and losses | (26.6) | 58.3 |
| Gains (losses) on the revaluation to fair value of available-for-sale investments | 1.4 | (0.9) |
| **Net income directly recognised in equity** | 7.3 | 41.0 |
| Profit for the year | (287.0) | 90.0 |
| **Total recognised income and expense for the year** | (279.7) | 131.0 |
| **Attributable to:** |  |  |
| Equity holders of the parent | (277.1) | 126.4 |
| Minority interest | (2.6) | 4.6 |
| **Total recognised income and expense for the year** | (279.7) | 131.0 |

64

CITI-TF 00675845

**GROUP CONSOLIDATED CASH FLOW STATEMENT**
for the year ended 31 March 2007

|  | 2007 £m | 2006 £m |
|---|---|---|
| **Cash flows from operating activities.** | | |
| Cash receipts from operations | 1,909.4 | 1,982.4 |
| Cash used in operations | (1,862.8) | (1,754.3) |
| Tax paid | (39.3) | (39.8) |
| Net cash generated from operating activities | 7.3 | 188.3 |
| **Cash flows from investing activities** | | |
| Purchase of businesses, net of cash acquired | (3.1) | (6.9) |
| Deferred consideration paid | (5.4) | (0.9) |
| Purchase of associates | (0.9) | (0.3) |
| Disposal of associates | 0.8 | — |
| Purchase of music copyrights and intangibles | (4.8) | (4.1) |
| Disposal of music copyrights and intangibles | 6.8 | 7.3 |
| Purchase of property, plant and equipment | (26.9) | (30.2) |
| Disposal of property, plant and equipment | 92.8 | 16.3 |
| Purchase of other investments | (0.6) | — |
| Dividends received from investments | 4.6 | — |
| Dividends received from associated undertakings | 0.6 | 1.0 |
| Disposal of other investments | 0.3 | 5.9 |
| Interest received | 1.8 | 9.3 |
| Net cash generated from (used in) investing activities | 65.8 | (2.6) |
| **Cash flows from financing activities** | | |
| Issue of ordinary share capital | 3.6 | 0.6 |
| Purchase of own shares | (5.5) | (0.5) |
| Equity dividends paid | (50.8) | (61.2) |
| Dividends paid to minorities | (3.2) | (2.5) |
| Financing: | | |
| New loans | 453.9 | 207.8 |
| Loans repaid | (206.5) | (277.6) |
| Capital element of finance lease repayments | (1.2) | (0.6) |
| Interest paid | (104.5) | (111.6) |
| Interest element of finance lease repayments | (0.7) | (0.7) |
| Net cash generated from (used in) financing activities | 85.1 | (246.3) |
| Net increase (decrease) in cash and cash equivalents | 158.2 | (60.6) |
| Cash and cash equivalents at the beginning of the year | 171.3 | 229.1 |
| Exchange gains (losses) on cash and cash equivalents in the year | (7.3) | 2.8 |
| Cash and cash equivalents at the end of the year | 322.2 | 171.3 |
| Cash and cash equivalents at the end of the year comprise of: | | |
| Cash at bank and in hand | 331.7 | 190.9 |
| Overdrafts | (9.5) | (19.6) |
| | 322.2 | 171.3 |

65

CITI-TF 00675846

**NOTE TO THE GROUP CONSOLIDATED CASH FLOW STATEMENT**
for the year ended 31 March 2007

*Reconciliation of Group profit from operations to net cash flow from operating activities:*

|  | 2007 £m | 2006 £m |
|---|---|---|
| Group (loss) profit from operations (before share of profit in associates) | (158.5) | 204.6 |
| Depreciation and impairment charge | 38.6 | 26.4 |
| Gain on disposal of property, plant and equipment and music copyrights and intangibles | (58.5) | (9.4) |
| Amortisation and impairment of music copyrights and intangibles | 52.7 | 49.9 |
| Impairment of goodwill | 15.1 | — |
| Remeasurements – revaluation to fair value of listed investments | 0.2 | (2.6) |
| Share-based payment transactions | 5.0 | 4.9 |
| Amounts provided | 158.1 | 18.2 |
| Provisions utilised | (72.7) | (36.1) |
| (Increase) decrease in inventories | 4.3 | (7.3) |
| (Increase) decrease in receivables | 196.3 | (74.1) |
| Increase (decrease) in payables | (136.0) | 53.6 |
| **Net cash generated from operations** | 48.6 | 228.1 |
| Tax paid | (39.3) | (39.8) |
| **Net cash generated from operating activities** | 7.3 | 188.3 |

CITI-TF 00675847

# GROUP ACCOUNTING POLICIES

**Authorisation of financial statements**

The financial statements of EMI Group plc and its subsidiaries (the "Group") for the year ended 31 March 2007 were authorised for issue by the board of Directors on 21 May 2007 and the balance sheet was signed on the board's behalf by Eric Nicoli and Martin Stewart. EMI Group plc is a public limited company incorporated and domiciled in England and Wales. The Company's ordinary shares are traded on the London Stock Exchange.

**Basis of preparation**

The consolidated financial information comprises the accounts of the Company and its subsidiaries which have been prepared in accordance with applicable International Financial Reporting Standards (IFRSs) as adopted by the European Union as they apply it to the financial statements of the Group for the year ended 31 March 2007. The Group's principal accounting policies under IFRS are set out below.

Where applicable, prior year figures have been adjusted to disclose them on the same basis as current year figures. The most significant adjustment relates to the classification of financial assets and financial liabilities which were previously classified within financial derivatives, other investments and borrowings on the balance sheet; these have been reclassified to financial assets and financial liabilities to more accurately reflect the nature of the assets and liabilities.

This preliminary financial information for the year ended 31 March 2007 does not constitute statutory accounts under S.235 of the Companies Act 1985. The statutory accounts for the year have not yet been delivered to the registrar of companies but include the auditor's report which was unqualified and did not contain a statement under S.237 (2 or 3) of the Companies Act 1985. The preliminary financial information for the year ended 31 March 2006 did not constitute statutory accounts under S.235 but those accounts have been filed with the registrar of companies with an unqualified audit report.

At the date of authorisation of these financial statements the following Standards and Interpretations which have not been applied in these financial statements were in issue but not yet effective:

| International Accounting Standards (IAS/IFRS) | Effective from date |
| --- | --- |
| IFRS 7 *Financial Instruments: Disclosures* | 1 January 2007 |
| IFRS 8 *Operating Segments* | 1 January 2009 |
| IAS 1 *Amendment – Presentation of Financial Statements: Capital Disclosures* | 1 January 2007 |
| | |
| International Financial Reporting Interpretations Committee (IFRIC) | |
| IFRIC 8 *Scope of IFRS 2* | 1 May 2006 |
| IFRIC 9 *Reassessment of Embedded Derivatives* | 1 June 2006 |
| IFRIC 11 *IFRS 2 – Group and Treasury Share Transactions* | 1 March 2007 |

The Directors anticipate that the adoption of these Standards and Interpretations in future periods will have no material impact on the financial statements of the Group in the period of initial application. The exception is for IFRS 7 where additional disclosures on financial instruments, their significance and the nature and the extent of risks that they give rise to are required. More specifically the Group will need to disclose the fair values of its financial instruments and its risk exposure in greater detail. There will be no effect on the reported income or net assets. The Group expects to adopt the above standards for the year ending 31 March 2008 with the exception of IFRS 8 which it expects to adopt for the year ending 31 March 2010.

The significant accounting policies and key assumptions of the future that have a significant risk of causing material adjustments have been detailed within the notes to the financial statements.

All amounts in the financial statements are rounded to the nearest £0.1m unless otherwise indicated.

**Basis of consolidation**

The consolidated financial statements comprise the financial statements of EMI Group plc and its subsidiaries for the year ended 31 March 2007.

67

CITI-TF 00675848

All intercompany balances and transactions, including unrealised profits and losses arising from intra-group transactions, have been eliminated in full.

Subsidiaries are consolidated from the date on which control is transferred to the Group and cease to be consolidated from the date on which control is transferred out of the Group. Where there is a loss of control of a subsidiary, the consolidated financial statements include the results for the part of the reporting year during which EMI Group plc has control.

For purchases of minority interest in subsidiaries the Group applies the 'equity concept method'. Under this method, the entire difference between the cost of the additional interest in the subsidiary and the minority interest's share of the assets and liabilities reflected in the consolidated balance sheet at the date of acquisition of the minority interests is reflected as being a transaction between owners.

### Foreign currency translation

Sterling (£) is the functional currency of the parent undertaking and the presentational currency of the Group. The functional currency of subsidiaries, joint ventures and associated companies ("foreign operations") is the currency of the primary economic environment in which they operate.

Transactions in foreign currencies are initially recorded in the functional currency at the rate ruling on the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated at the functional currency rate of exchange ruling at the balance sheet date. All differences are taken to the income statement with the exception of differences on foreign currency borrowings that provide a hedge against a net investment in a foreign operation. These are taken directly to equity until the disposal of the net investment, at which time they are recognised in the income statement. Tax charges and credits attributable to exchange differences on those borrowings are also dealt with in equity. Non-monetary items that are measured in terms of historical cost in a foreign currency are translated using the exchange rates at the dates of the initial transactions. Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair values were determined.

The assets and liabilities of foreign operations are translated into sterling at the rate of exchange ruling at the balance sheet date and their income statements are translated at the weighted average exchange rates for the period. The exchange differences arising on the retranslation of foreign operations are taken directly to a separate component of equity. On disposal of a foreign operation, the deferred cumulative amount recognised in equity relating to that particular foreign operation is recognised in the income statement.

### Business combinations and goodwill

The purchase method of accounting is used to account for the acquisition of subsidiaries. The cost of an acquisition is measured as the fair value of the assets given, equity instruments issued and liabilities incurred or assumed at the date of exchange, plus costs directly attributable to the acquisition. Identifiable assets acquired, and liabilities and contingent liabilities assumed, in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any minority interest. The excess of the cost of the acquisition over the fair value of the Group's share of the identifiable net assets acquired is recorded as goodwill.

Goodwill on acquisition is initially measured at cost. Following initial recognition, goodwill is measured at cost less any accumulated impairment losses.

Due to the adoption of IFRS 3 Business Combinations from 1 April 2003, goodwill on acquisitions from 1 April 2003 is not amortised and goodwill already carried in the balance sheet is not amortised from 1 April 2003. Goodwill is reviewed for impairment annually, or more frequently if events or changes in circumstances indicate that the carrying value may be impaired.

For an asset, such as goodwill, that does not generate largely independent cash flows, the recoverable amount, which is the higher of fair value less cost to sell and value in use, is determined for the smallest identifiable group of assets including that asset that generates cash inflows that are largely independent of the cash inflows from other assets or groups of assets (a 'cash generating unit').

68

CITI-TF 00675849

A-1460

### Intangible assets

Intangible assets include music copyrights and other intangibles. Intangible assets acquired separately are capitalised at cost, whilst those acquired as part of a business acquisition are capitalised at fair value at the date of acquisition.

Following initial recognition, intangible assets with finite lives are amortised on a systematic basis over their economic useful lives. These lives are estimated on an individual basis at periods of anything up to and including 20 years. Intangible assets are tested for impairment if events or changes in circumstances indicate that the carrying value may be impaired. Useful lives are examined on an annual basis and adjustments, where applicable, are made on a prospective basis.

Intangible assets created within the business that cannot be distinguished from the cost of developing the business as a whole are not capitalised. Any relevant expenditure is charged against profit from operations in the period in which the expenditure is incurred.

### Property, plant and equipment

Property, plant and equipment are stated at cost less accumulated depreciation and any impairment in value. Depreciation is calculated on a straight line basis to write off the cost, less residual value, of assets over the estimated useful life of the asset. The annual rates used are:

| | |
|---|---|
| Freehold buildings | 2% |
| Property held under finance leases and leasehold improvements | Lower of lease term and useful economic life |
| Plant, equipment and vehicles | $10 - 33^1/_3\%$ |

The carrying values of property, plant and equipment are reviewed for impairment when events or changes in circumstances indicate that the carrying value may not be recoverable. Where an indicator of impairment exists, the Group makes an estimate of the recoverable amount, which is the higher of the asset's net selling price and value in use. Where the carrying amount of an asset exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount.

Assets are derecognised upon disposal or when no future economic benefits are expected to arise from the continued use of the asset. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying value of the asset) is included in the income statement in the period in which the item is derecognised.

Assets are held at historical cost with the exception that certain properties in the subsidiary undertaking Toshiba-EMI Limited were carried at revalued amounts that were frozen until their disposal during the financial year ended 31 March 2007. This frozen carrying value was deemed cost in the case of these properties.

### Leases

Assets which are held under a finance lease, which transfers to the Group substantially all the risks and benefits incidental to ownership of the leased item, are capitalised at the inception of the lease, with a corresponding liability being recognised for the fair value of the leased asset or, if lower, at the present value of the minimum lease payments. Lease payments are apportioned between finance charges and a reduction of the lease liability so as to achieve a constant rate of interest on the remaining balance of the lease liability. Capitalised leased assets are depreciated over the shorter of the estimated useful life of the asset and the lease term.

Leases where the lessor retains substantially all the risks and benefits of ownership of the asset are classified as operating leases. Operating lease payments are recognised as an expense in the income statement on a straight line basis over the lease term.

### Investments in joint ventures and associates

The Group's investments in its associates are accounted for using the equity method. The investment is carried in the balance sheet at cost plus post-acquisition changes in the Group's share of net assets of the associate, less any impairment in value or dividends received. The Group's share of the results after interest and tax of the associate are included in profit from operations. When an associate has recognised a change in net assets other than through the

69

CITI-TF 00675850

income statement, the Group recognises its share of the change and discloses it, when applicable, in the statement of recognised income and expense.

The Group has a number of jointly controlled operations where there is no separate legal entity. The expenses that the Group incurs, and the share of the income that the Group earns from the sale of goods by these jointly controlled operations, are included in the income statement. The assets that the Group controls, and the liabilities that the Group incurs, in respect of these jointly controlled operations are included in the balance sheet.

## Financial assets

Financial assets are recognised when the Group becomes party to the contracts that give rise to them and are classified as financial assets at fair value through profit or loss; loans and receivables; held-to-maturity investments; or as available-for-sale financial assets, as appropriate. The Group determines the classification of its financial assets at initial recognition and re-evaluates this designation at each financial year end. When financial assets are recognised initially, they are measured at fair value, being the transaction price, in the case of financial assets not at fair value through profit or loss, directly attributable transaction costs.

Those investments classified as held-to-maturity or available-for-sale are designated as non-current assets. Available-for-sale investments are held on the balance sheet at fair value, with any changes in value being recognised in equity. When fair value is not available, the available-for-sale investments are held on the balance sheet at cost less any impairment in value. Held-to-maturity investments are held on the balance sheet at cost less any impairment in value.

Those investments classified as fair value through profit and loss are designated as current assets and are held on the balance sheet at fair value, with any changes in fair value being recognised in the income statement along with gains or losses on disposal.

## Inventories

Inventories are valued at the lower of cost and net realisable value.

## Advances

In the ordinary course of business the Group pays advances and other expenses recoupable from future royalties to performing artists, songwriters, producers and third party repertoire owners. The amounts paid are carried at cost less recoupment and less an allowance for any unrecoupable amounts. The allowance is based on past revenue performance, current popularity and projected revenue.

Advances are recoupable during the business operating cycle. All advances are therefore reported as current assets, including advances recoupable more than 12 months after the balance sheet date.

## Trade receivables

Trade receivables, which generally have 30-90 day terms, are recognised and carried at the originally invoiced amount less an allowance for any doubtful debts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off when identified.

## Cash and cash equivalents

Cash and cash equivalents in the balance sheet comprise cash at bank and in hand and short-term deposits with an original maturity of three months or less. For the purpose of the consolidated cash flow statement, cash and cash equivalents consist of cash at bank and in hand and short term deposits net of outstanding bank overdrafts

## Financial liabilities
### Borrowings

All loans and borrowings are initially recognised at the fair value of the consideration received net of issue costs associated with the borrowing. After initial recognition, interest-bearing loans and borrowings are subsequently measured at amortised cost using the effective interest method. Amortised cost is calculated by taking into account any issue costs and any discount or premium on settlement. Gains and losses on derecognition are recognised in finance charges.

70

CITI-TF 00675851

Hedge accounting is adopted where derivatives, such as "fixed to floating" interest rate swaps, are held as fair value hedges against fixed interest rate borrowings. Under fair value hedge accounting, fixed interest rate borrowings are revalued at each balance sheet date by the change in fair value attributable to the interest rate risk being hedged.

**Financial derivatives**

The Group uses derivative financial instruments such as interest rate swaps and foreign currency contracts to hedge risks associated with interest and exchange rate fluctuations. Such derivative financial instruments are stated at fair value. The fair values of interest rate swaps and foreign currency contracts are determined by reference to market rates for similar instruments.

Hedges are classified as fair value hedges when they hedge the exposure to changes in the fair value of a recognised asset or liability.

In relation to fair value hedges (e.g. fixed to floating interest rate swaps held as fair value hedges against fixed interest rate borrowings) which meet the conditions for hedge accounting, any gain or loss from remeasuring the hedging instrument at fair value is recognised immediately in the income statement. Any gain or loss on the hedged item attributable to the hedged risk is adjusted against the carrying amount of the hedged item and recognised in the income statement.

For derivatives that do not qualify for hedge accounting, any gains or losses arising from changes in fair value are taken directly to the income statement.

**Net investment hedges**

The Group designates certain foreign currency borrowings as hedges of net investments in foreign operations. Any gain or loss on foreign currency borrowings designated in an effective hedging relationship is recognised in equity; any gain or loss relating to an ineffective portion of the hedge is recognised immediately in the income statement.

Gains and losses accumulated in equity are included in the income statement on disposal or impairment of the foreign operation.

**Convertible bond**

The component of the guaranteed convertible bonds that exhibits characteristics of a liability is recognised as a liability in the balance sheet, net of issue costs. On issue of the guaranteed convertible bonds, the fair value of the liability component was determined using a market rate for an equivalent non-convertible bond. This amount is carried as a liability on an amortised cost basis until extinguished on conversion or redemption. As the convertible bonds are denominated in US dollars but are convertible to sterling shares, the remainder of the proceeds is allocated to the conversion option that is recognised and included as a derivative liability, net of issue costs. The value of the conversion option is revalued to fair value at each balance sheet date, with movements in fair value reflected as finance costs or finance income.

Issue costs were apportioned between the liability and derivative components of the guaranteed convertible bonds based on the allocation of proceeds to the liability and derivative components when the instruments were first recognised.

**Embedded call feature**

The host contract of the €425m 8.625% senior notes allows the Group to redeem the debt at fixed redemption prices on or after 15 October 2008.

On issue of the €425m 8.625% senior notes, the fair value of the liability component was determined using market rates. This amount is carried as a liability on an amortised cost basis until extinguished on redemption. The difference between the fair value of the liability component and fair value of the senior notes represents the embedded call feature that is recognised and included as a financial asset on the balance sheet. The call feature is revalued to fair value at each balance sheet date, with movements in fair value reflected as exceptional finance costs or exceptional finance income.

**Provisions**

Provisions are recognised when the Group has a present obligation (legal or constructive) as a result of a past event, when it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and when a reliable estimate can be made of the

71

amount of the obligation. Where the Group expects some or all of a provision to be reimbursed, for example under an insurance contract, the reimbursement is recognised as a separate asset but only when the reimbursement is virtually certain. The expense relating to any provision is presented in the income statement net of any reimbursement. If the effect of the time value of money on the quantification of the provision is material, provisions are determined by discounting the expected future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability. Where discounting is used, the increase in the provision due to the passage of time is recognised as finance costs.

### Pensions and other employee benefits

The Group operates three major defined benefit pension schemes, plus a number of smaller defined benefit pension schemes. The cost of providing benefits under the schemes is determined separately for each scheme using the projected unit actuarial valuation method.

Liabilities of the schemes are discounted by the current rate of return of an AA-rated corporate bond of equivalent term and currency to the liabilities. Assets of the schemes are measured at fair value at the balance sheet date. Actuarially calculated surpluses or deficits on the defined benefit schemes are included within the consolidated balance sheet. The current service cost of each of the schemes is charged against profit from operations. Expected returns on defined benefit scheme assets and interest on defined benefit scheme liabilities are included as finance income and finance costs respectively. With effect from 1 April 2004, the Group adopted the amendment to IAS 19 Employee Benefits that permits actuarial gains and losses to be charged or credited directly to equity through the statement of recognised income and expense.

In addition, the Group operates a number of defined contribution schemes. Contributions to defined contribution schemes are charged to the income statement as incurred.

Employee benefits other than post-employment benefits that can be carried forward if they have not been used are accrued as they are earned until the benefit is paid or used. Those employee benefits that are foregone if not taken at the time are expensed when incurred.

### Revenue

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured. The following specific recognition criteria must also be met before revenue is recognised:

- Sale of goods: revenue is recognised when the significant risks and rewards of ownership of the goods have passed to the buyer and can be reliably measured. Revenue is measured at fair value after making provision in respect of expected future returns of goods and services supplied by the Group prior to the balance sheet date;

- Royalty and other income: all royalty and other income is recognised when it has been earned and can be reliably measured.

Interest income is recognised when it has been earned and can be reliably measured.

### Share-based payments

The share option programme allows certain Group employees to acquire shares of the Company. The fair value of options granted is recognised as an employee expense with a corresponding increase in equity. The fair value is measured at grant date and the expense is spread over the period during which the employees become unconditionally entitled to the options. The fair value of the options granted is measured using a binomial lattice model, taking into account the terms and conditions upon which the options were granted.

The amount recognised as an expense reflects the extent to which the vesting period has expired and the Group's best estimate of the number of awards that will ultimately vest. No expense is recognised for awards that do not ultimately vest, except for awards where the vesting is conditional upon a market condition, which are treated as vesting irrespective of whether or not the market condition is satisfied, provided that all other performance conditions are satisfied.

Employees of certain subsidiaries of the Group participate in the employee share incentive plans and the Group has an employee share trust to satisfy non-transferable options granted to executives and senior employees. Shares in the Group held by the employee share trust are treated as treasury shares and presented in the balance sheet as a deduction from equity.

72

CITI-TF 00675853

The Group has taken advantage of the transitional provisions of IFRS 2 in respect of equity-settled awards and has applied IFRS 2 only to equity-settled awards granted after 7 November 2002 that had not vested on or before 1 January 2005.

### Finance charges

Finance costs comprise interest payable on borrowings calculated using the effective interest rate method, foreign exchange losses and losses on hedging instruments that are recognised in the income statement and interest payable on defined benefit pension scheme liabilities.

Finance income comprises interest receivable on funds invested calculated using the effective interest rate method, dividend income, foreign exchange gains and gains on hedging instruments that are recognised in the income statement and interest receivable on defined benefit pension scheme assets.

### Income tax

Income tax on the profit or loss for the period comprises current and deferred tax. Income tax is recognised in the income statement except to the extent that it relates to items recognised directly in equity, in which case it is recognised in equity.

Current tax is the expected tax payable on the taxable income for the period, using tax rates enacted or substantively enacted at the balance sheet date and any adjustment to tax payable in respect of previous periods.

Deferred tax is recognised for all temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the tax base. The following temporary differences are not provided for: the initial recognition of goodwill or of assets or liabilities that affect neither accounting nor taxable profit that is not a business combination; and temporary differences relating to investments in subsidiaries, joint ventures and associates where the timing of the reversal of the temporary difference can be controlled and to the extent that it is probable that the temporary difference will not reverse in the foreseeable future. The amount of deferred tax provided is based on the expected manner of realisation or settlement of the carrying amount of assets and liabilities, using tax rates enacted or substantively enacted at the balance sheet date.

A deferred tax asset is recognised only to the extent that it is probable that future taxable profits will be available against which the asset can be utilised.

### Segments

A business segment is a group of assets and operations engaged in providing products or services that are subject to risks and returns that are different from those of other business segments. A geographical segment is engaged in providing products, or services within a particular economic environment that are subject to risks, and returns that are different from those segments operating in other economic environments.

### Exceptional items and amortisation

Exceptional items and amortisation are excluded from underlying results in order to provide a better understanding of the normalised trading of the Group. The Group considers that such items would fall into either of two categories: operating exceptional items and amortisation; and finance exceptional items.

The Group defines operating exceptional items and amortisation as items which derive either from events or transactions that it considers fall outwith the ordinary activities of the Group or from events or transactions that fall within the ordinary activities of the Group but which, individually or, if of a similar type, in aggregate, need to be disclosed separately by virtue of their size or incidence if the financial statements are to give a true and fair view. Similarly, the Group defines finance exceptional items as items which derive either from events or transactions that it considers fall outwith the ordinary financing activities of the Group or from events or transactions that fall within the ordinary financing activities of the Group but which, individually or, if of a similar type, in aggregate, need to be disclosed separately by virtue of their size or incidence if the financial statements are to give a true and fair view.

Events or transactions that the Group would consider as falling outwith its ordinary activities could include, but are not limited to: the revaluation and/or disposal of property, plant and equipment; the revaluation and/or disposal of held-to-maturity or available-for-sale investments or investments at

73

CITI-TF 00675854

fair value through profit and loss; the disposal and/or closure of a business, jointly controlled operation or associate; and the costs of a fundamental reorganisation or restructuring. Events or transactions that the Group would consider as falling within its ordinary activities but which need to be disclosed separately could include, but are not limited to: the amortisation and impairment of music copyrights and intangibles; the impairment of goodwill; and the impairment of the cost of an investment in a business, jointly controlled operation or associate. Events or transactions that the Group would consider as falling outwith its ordinary financing activities could include, but are not limited to: gains or losses on the revaluation of derivative financial instruments; gains or losses on the retranslation of foreign currency-denominated borrowings to the extent that they do not provide a hedge against foreign currency-denominated investments; and gains or losses from the ineffectiveness of the interest rate swaps hedge. Events or transactions that the Group would consider as falling within its ordinary financing activities but which need to be disclosed separately could include, but are not limited to, costs incurred as part of the Group's refinancing programmes.

74

CITI-TF 00675855

## NOTES TO THE GROUP FINANCIAL STATEMENTS
as at 31 March 2007

### 1. Segmental analysis

At 31 March 2007, the Group is organised on a worldwide basis into two main business segments – Music and Music Publishing. These divisions are the basis on which the Group reports its primary segment information.

**Results**

| | EMI Music £m | EMI Music Publishing £m | 2007 Total £m | EMI Music £m | EMI Music Publishing £m | 2006 Total £m |
|---|---|---|---|---|---|---|
| Segment underlying revenue | 1,350.2 | 401.3 | 1,751.5 | 1,660.3 | 419.6 | 2,079.9 |
| Segment exceptional revenue | 28.4 | 28.4 | 56.8 | — | — | — |
| | 1,378.6 | 429.7 | 1,808.3 | 1,660.3 | 419.6 | 2,079.9 |
| Group profit (loss) from operations before exceptional items and amortisation | 44.9 | 105.6 | 150.5 | 145.1 | 105.4 | 250.5 |
| Segmental operating exceptional items and amortisation: | | | | | | |
| Amortisation of music copyrights and intangibles | (9.6) | (43.1) | (52.7) | (3.6) | (46.3) | (49.9) |
| Other exceptional items | (227.3) | (17.5) | (244.8) | 0.6 | (0.2) | 0.4 |
| Segmental result | (192.0) | 45.0 | (147.0) | 142.1 | 58.9 | 201.0 |
| Share of profit from associates | 1.0 | 0.8 | 1.8 | (0.1) | 1.1 | 1.0 |
| Non-segmental operating exceptional items and amortisation | | | (11.5) | | | 3.6 |
| Group profit from operations | | | (156.7) | | | 205.6 |
| Total net finance charges | | | (108.9) | | | (87.5) |
| Profit (loss) before taxation | | | (263.6) | | | 118.1 |
| Taxation | | | (23.4) | | | (28.1) |
| Profit (loss) from continuing operations after taxation | | | (287.0) | | | 90.0 |
| Other segmental items included in the income statement include: | | | | | | |
| Depreciation | (18.9) | (2.9) | (21.8) | (20.7) | (2.9) | (23.6) |
| Amortisation of music copyrights and intangibles | (3.4) | (41.9) | (45.3) | (3.5) | (44.3) | (47.8) |
| Impairment of music copyrights and intangibles | (6.1) | (1.2) | (7.3) | — | (2.0) | (2.0) |
| Impairment of goodwill | 14.0 | — | 14.0 | — | — | — |
| Headcount and roster reduction | (130.1) | (15.3) | (145.4) | — | — | — |
| Impairment of tangible assets | (115.9) | (16.0) | (131.9) | — | — | — |
| Write down of inventories | (17.0) | — | (17.0) | — | — | — |
| Provision for other liabilities | (22.8) | (0.3) | (23.1) | — | — | — |
| Impairment of property | — | — | — | (0.9) | (0.2) | (1.1) |
| Release of overprovision for reorganisation costs charged in prior years | — | — | — | (2.3) | — | (2.3) |
| Reorganisation costs | — | — | — | 2.3 | — | 2.3 |

75

CITI-TF 00675856

**Assets and liabilities**

| | EMI Music £m | EMI Music Publishing £m | 2007 Total £m | EMI Music £m | EMI Music Publishing £m | 2006 Total £m |
|---|---|---|---|---|---|---|
| Segment assets | 628.9 | 458.7 | 1,087.6 | 928.3 | 578.0 | 1,504.3 |
| Investment associates | 5.0 | 2.5 | 7.5 | 5.9 | 2.3 | 8.2 |
| Unallocated assets | | | 403.4 | | | 304.5 |
| Consolidated total assets | | | 1,498.5 | | | 1,817.0 |
| Segmental liabilities | (764.2) | (276.1) | (1,040.3) | (898.1) | (282.4) | (1,180.5) |
| Unallocated liabilities | | | (1,609.2) | | | (1,363.1) |
| Consolidated total liabilities | | | (2,649.5) | | | (2,543.6) |
| Other segment items included in the balance sheet include: | | | | | | |
| Capital expenditure | 21.7 | 10.0 | 31.7 | 25.5 | 8.8 | 34.3 |
| Average employees (No.) | 4,818 | 640 | 5,458 | 5,672 | 640 | 6,312 |

Profit from operations is analysed instead of profit before taxation as finance charges are borne centrally and are not allocated to the operating businesses.

The Group's two business segments operate in six main geographical areas, even though they are managed on a worldwide basis.

| | United Kingdom £m | Rest of Europe £m | Latin America £m | North America £m | Asia Pacific £m | Other £m | 2007 Total £m |
|---|---|---|---|---|---|---|---|
| Segment underlying revenue | 283.5 | 570.1 | 48.1 | 517.4 | 311.0 | 21.4 | 1,751.5 |
| Segment exceptional revenue | 5.6 | 8.1 | 1.2 | 36.9 | 5.0 | — | 56.8 |
| | 289.1 | 578.2 | 49.3 | 554.3 | 316.0 | 21.4 | 1,808.3 |
| Segment assets | 204.1 | 258.1 | 36.3 | 441.6 | 79.2 | 68.3 | 1,087.6 |
| Investment associates | — | 0.4 | — | 5.9 | 1.2 | — | 7.5 |
| Unallocated assets | — | — | — | — | — | — | 403.4 |
| Consolidated total assets | 204.1 | 258.5 | 36.3 | 447.5 | 80.4 | 68.3 | 1,498.5 |
| Capital expenditure | 11.4 | 5.8 | 0.4 | 10.9 | 2.4 | 0.8 | 31.7 |
| Average Employees (No.) | 1,079 | 1,235 | 266 | 1,843 | 911 | 124 | 5,458 |

| | United Kingdom £m | Rest of Europe £m | Latin America £m | North America £m | Asia Pacific £m | Other £m | 2006 Total £m |
|---|---|---|---|---|---|---|---|
| Segment revenue | 348.0 | 630.2 | 84.4 | 649.1 | 338.8 | 29.4 | 2,079.9 |
| Segment assets | 267.1 | 288.5 | 58.8 | 657.5 | 155.6 | 76.8 | 1,504.3 |
| Investment associates | — | 0.4 | — | 5.8 | 1.2 | — | 7.5 |
| Unallocated assets | — | — | — | — | — | — | 304.5 |
| Consolidated total assets | 267.1 | 288.9 | 58.8 | 664.1 | 156.8 | 76.8 | 1,817.0 |
| Capital expenditure | 15.3 | 6.9 | 0.6 | 8.7 | 2.2 | 0.6 | 34.3 |
| Average Employees (No.) | 1,201 | 1,393 | 311 | 2,034 | 1,241 | 132 | 6,312 |

Unallocated assets and liabilities include financial derivatives, corporation tax, deferred tax and net borrowings. These items are managed centrally and are not allocated to the operating businesses.

76

CITI-TF 00675857

## 2. Exceptional items and amortisation

Exceptional items and amortisation are excluded from underlying results in order to provide a better understanding of the normalised trading of the Group, and include operating exceptional items and amortisation and finance exceptional items. The Group has responded to the unprecedented decline in the global markets for physical product by implementing a series of strategic remedies. The cost of these remedies in accounting terms is as reported below. Amongst the strategic remedies are headcount and roster reductions and a change in estimating methodology for advances.

Certain other transactions are reported below because they fall within the Group's definition of Exceptional items and amortisation as per the accounting policies section of the financial statements.

### (i) Operating exceptional items and amortisation

| | 2007 £m | 2006 £m |
|---|---|---|
| Restructuring and reorganisation costs: | | |
| Headcount and roster reduction | (149.1) | — |
| Impairment of goodwill[1] | (15.1) | — |
| Impairment of tangible assets | (131.9) | — |
| Write down of inventories | (17.0) | — |
| Provision for other liabilities | (42.4) | — |
| Reorganisation costs in respect of prior year reorganisation programmes | — | (2.3) |
| Release of overprovision for reorganisation costs charged in prior years | — | 2.3 |
| Income from Bertelsmann litigation settlement | 56.8 | — |
| Net gain on sale of property, plant and equipment | 50.2 | 1.5 |
| Gain on disposal of business | — | 1.0 |
| Gain (loss) on revaluation to fair value of investments at fair value through profit and loss | (0.2) | 2.6 |
| Property impairment | — | (1.1) |
| Amortisation and impairment of music copyrights and intangibles | (52.7) | (49.9) |
| Cost incurred in connection with the possible transaction with Warner Music Group | (6.4) | — |
| Costs of defending abortive bid approach | (1.2) | — |
| **Total** | **(309.0)** | **(45.9)** |

1  Impairment of goodwill includes £1.1m (2006: £nil) relating to goodwill in associates.

The attributable taxation charge relating to operating exceptional items and amortisation is £9.8m (2006: £nil). The share of the operating exceptional items and amortisation attributable to minority interests is £1.2m (2006: £0.1m).

### (ii) Finance exceptional items

| | 2007 £m | 2006 £m |
|---|---|---|
| Fair value revaluation of convertible bond derivative liability | (5.7) | 4.1 |
| Fair value revaluation of interest rate swaps | 5.2 | 1.4 |
| Fair value revaluation of forward purchase of JPY | (1.3) | — |
| Fair value revaluation of Eurobond call feature derivative asset | (21.3) | 8.2 |
| Foreign exchange on unhedged Euro borrowings | 8.1 | (4.1) |
| Foreign exchange on unhedged foreign currency borrowings | 3.0 | 0.3 |
| Amortisation of fair value adjustment (US$500m 8.375% guaranteed notes) | (4.2) | — |
| Exceptional refinancing costs | (1.1) | (5.2) |
| **Total** | **(17.3)** | **4.7** |

The attributable taxation charge relating to finance exceptional items is £nil (2006: £nil).

CITI-TF 00675858

3.    Finance charges

|  | 2007 £m | 2006 £m |
|---|---|---|
| Finance costs: | | |
| Interest payable on bank overdrafts and loans | 98.6 | 92.8 |
| Interest payable on other loans | 5.1 | 7.4 |
| Interest payable on finance leases | 0.7 | 0.7 |
| | 104.4 | 100.9 |
| Interest payable on defined benefit pension scheme liabilities | 48.2 | 48.7 |
| | 152.6 | 149.6 |
| Finance income: | | |
| Interest receivable on bank balances | (1.8) | (2.1) |
| Other interest receivable | — | (0.3) |
| | (1.8) | (2.4) |
| Expected return from defined benefit pension scheme assets | (61.2) | (55.0) |
| Underlying finance charges | (63.0) | (57.4) |
| Net finance charges | 89.6 | 92.2 |
| Finance exceptional items (see Note 2) | 17.3 | (4.7) |
| Total net finance charges | 106.9 | 87.5 |

4.    Taxation

|  | 2007 £m | 2006 £m |
|---|---|---|
| Current tax | 15.2 | 23.8 |
| Deferred tax | 8.2 | 4.3 |
| | 23.4 | 28.1 |

The tax on the Group's profit before tax differs from the theoretical amount that would arise using the weighted average tax rate applicable to profits of the consolidated companies as follows:

|  | | |
|---|---|---|
| Profit before tax | (263.6) | 118.1 |
| Tax calculated at domestic rates applicable to profits in the respective countries at 36.6% (2006: 38.8%) | (96.5) | 45.8 |
| Effects of: | | |
| Expenses not deductible for tax purposes | 92.4 | 19.5 |
| Utilisation of previously unrecognised tax losses | (2.3) | (42.3) |
| Tax losses for which no deferred income tax asset was recognised | 51.5 | 16.9 |
| Adjustment in respect of prior years | (21.7) | (11.8) |
| Total tax charged in the Income Statement | 23.4 | 28.1 |

5.    Dividends (equity)

|  | 2007 Per share | 2006 Per share | 2007 £m | 2006 £m |
|---|---|---|---|---|
| Ordinary dividends: | | | | |
| 2006/2005 final dividend | 6.0p | 6.0p | 47.5 | 47.2 |
| 2006/2005 interim dividend | 2.0p | 2.0p | 15.7 | 15.7 |
| Total | 8.0p | 8.0p | 63.2 | 62.9 |

78

CITI-TF 00675859

A-1470

The interim dividend of 2.0p per share was paid on 3 April 2006 to shareholders on the register at the close of business on 13 January 2006. The final dividend of 6.0p per share was paid on 2 October 2006 to shareholders on the register at the close of business on 21 July 2006.

An interim dividend of 2.0p per Ordinary Share was paid on 2 April 2007 to shareholders on the register at the close of business on 12 January 2007. As announced on 18 April 2007, the Board has decided to suspend further dividend payments until the benefits of the restructuring process, announced on 12 January 2007, have been fully realised. The Board will keep the situation under review.

6.    Earnings per Ordinary share

|  | 2007 | 2006 |
|---|---|---|
| Earnings per Ordinary Share is calculated using the following: | | |
| Earnings | £(288.5)m | £86.1m |
| Underlying earnings | £46.2m | £127.4m |
| **Basic** | | |
| Weighted average number of Ordinary Shares | 794.8m | 786.8m |
| **Diluted** | | |
| Adjusted weighted average number of Ordinary Shares | 794.8m | 874.2m |
| **Diluted underlying** | | |
| Adjusted weighted average number of Ordinary Shares | 802.4m | 874.2m |

The adjusted weighted average number of Ordinary Shares used in the diluted underlying earnings per share calculations, 802.4m (2006: 874.2m), is the weighted average number of Ordinary shares, 794.8m (2006: 786.8m), adjusted by the effects of dilutive share options, 7.6m (2006: 8.5m).

The number of Ordinary Shares arising from the conversion of convertible bond options, 78.9m (2006: nil), is not included in the calculation of the diluted underlying earnings per share because of its anti-dilutive effect. However, it was included in the calculation of the diluted earnings per share calculation in 2006 because of its dilutive effect. It is also excluded in the calculation of diluted earnings per share in 2007 because it is anti-dilutive.

Reconciliation of adjusted earnings

|  | Year ended 31 March 2007 | | Year ended 31 March 2006 | |
|---|---|---|---|---|
|  | £m | Per Share | £m | Per Share |
| Earnings/basic EPS | (288.5) | (36.3)p | 86.1 | 10.9p |
| Dilutive adjustments: | | | | |
| Convertible bond — attributable interest cost* and dilution | — | | 5.4 | (0.3)p |
| Dilutive share options – dilution | — | 0.0p | — | (0.1)p |
| Earnings adjusted for effects of dilution / diluted EPS | (288.5) | (36.3)p | 91.5 | 10.5p |

* Including fair value revaluation of convertible bond derivative liability included within finance exceptional items.

79

CITI-TF 00675860

**Reconciliation from basic to underlying basic and underlying diluted earnings per share**

| | Year ended 31 March 2007 | | Year ended 31 March 2006 | |
|---|---|---|---|---|
| | £m | Per Share | £m | Per Share |
| Earnings/basic EPS | (288.5) | (36.3)p | 86.1 | 10.9p |
| Exceptional items and amortisation: | | | | |
| Operating exceptional items and attributable taxation | 250.8 | 31.6p | (4.0) | (0.5)p |
| Amortisation of music copyrights and intangibles | 45.4 | 5.7p | 47.9 | 6.1p |
| Impairment of music copyrights and intangibles | 7.3 | 0.9p | 2.0 | 0.3p |
| Impairment of goodwill | 15.1 | 1.9p | — | 0.0p |
| Minority interest in operating exceptional items and attributable taxation | (1.0) | (0.1)p | 0.4 | 0.1p |
| Minority interest in amortisation of music copyrights and intangibles | (0.2) | (0.1)p | (0.3) | (0.1)p |
| Finance exceptional items | 17.3 | 2.2p | (4.7) | (0.6)p |
| Underlying earnings / underlying basic EPS | 46.2 | 5.8p | 127.4 | 16.2p |
| Dilutive adjustments: | | | | |
| Convertible bond- attributable interest cost and dilution | — | — | 9.5 | (0.4)p |
| Dilutive share options – dilution | — | 0.0p | — | (0.1)p |
| Underlying earnings adjusted for effects of dilution / underlying diluted EPS | 46.2 | 5.8p | 136.9 | 15.7p |

**7.    Financial liabilities**

| | 2007 £m | 2006 £m |
|---|---|---|
| **Non-current** | | |
| US$500m 8.375% guaranteed notes | 252.0 | 287.7 |
| £325m 8.25% Sterling bonds | 324.0 | 323.1 |
| US$243.3m 5.25% guaranteed convertible bonds | 109.4 | 121.1 |
| €425m 8.625% senior notes | 280.1 | 300.0 |
| Long-term committed facilities – term loan* | 245.3 | (1.5) |
| Term loan | — | 2.0 |
| | 1,210.8 | 1,032.4 |
| Finance leases | 15.8 | 17.0 |
| Interest rate swaps – fair value hedge | 8.8 | 13.6 |
| Convertible bond derivative | 81.6 | 86.7 |
| | 1,317.0 | 1,149.7 |
| **Current** | | |
| Overdrafts | 9.5 | 19.6 |
| Term loan | — | 1.2 |
| Forward currency contracts | 1.5 | — |
| Finance leases | 1.3 | 1.8 |
| | 12.3 | 22.6 |
| Total financial liabilities | 1,329.3 | 1,172.3 |

* Includes issue costs of syndicated loan facility of £14.7m (2006: £1.5m).

80

CITI-TF 00675861

### Interest rate swaps

The notional principal amounts of the outstanding interest rate swap contracts at 31 March 2007 were £542.9m (2006: £586.2m). At 31 March 2007 the fixed interest rates vary from 8.38% to 8.63% (2006: 8.38% to 8.63%) and the main floating rates are 3 month LIBOR + 465 basis points and 3 month EURIBOR + 440 basis points (2006: 3 month LIBOR + 465 basis points and 3 month EURIBOR + 440 basis points). The fair value of the interest rate swaps is equal to the book value.

### Convertible bond

The US$243.3m 5.25% guaranteed convertible bond which was issued in October 2003 is repayable in October 2010. The bonds are convertible into US$1,000 Preference Shares of the issuer which will be exchangeable immediately upon issue for Ordinary Shares in the Company. The number of Ordinary Shares for which a Preference Share may be exchanged will be determined by dividing the paid-up value of the Preference Share, translated into Sterling at the fixed rate of US$1.5957, by the exchange price initially set at 193.38p per Ordinary Share. Conversion by the holder at 193.38p per Ordinary Share may occur after 11 November 2003 until seven days prior to the final redemption date. Conversion by the issuer, after 16 October 2007, of all but not part, may occur if the average price per Ordinary Share on at least 20 dealing days in any period of 30 consecutive dealing days has been 130p; or at any time if 85% or more of the aggregate principal amount has been previously purchased, redeemed or cancelled. Redemption by the issuer, after 16 October 2007, may occur if the same aggregate principal amount has been previously purchased, redeemed or cancelled. Redemption by the holder, after 16 October 2007, may occur if the same conditions which apply to conversion by the issuer are met. Final redemption is on 2 October 2010 at 100% of principal and accrued interest.

### Convertible bond derivative

On issue of the guaranteed convertible bond, the fair value of the liability component was determined using a market rate for an equivalent non-convertible bond. As the convertible bond is denominated in US Dollars but convertible into Sterling shares, the remainder of the proceeds were allocated to the conversion option that is recognised and included as a derivative liability, net of issue costs. The value of the call feature is revalued to fair value at each balance sheet date, with movements in the fair value reflected as finance costs or finance income.

### Forward Currency Contract

In December 2006 the Company entered into an agreement to purchase Toshiba's 45% minority interest in its subsidiary, Toshiba-EMI Limited. Given the Group's policy not to hedge trading transaction exposure apart from materially large one-off items that have a high degree of certainty of occurring, this large firm commitment was hedged by means of a forward currency contract.

### Revolving Credit Facilities

In March 2007 the Group replaced its existing £450m revolving credit facility with a new £700m credit facility due 29th May 2009. The new credit facility also provides the financing for the purchase of the TOEMI minority and the costs associated with the restructuring project. This resulted in exceptional refinancing costs of £1.1m (2006: £5.2m) in respect of the write off of issue costs of the £450m revolving credit facility.

Borrowings under the new £700m credit facility are governed by certain financial covenants based on the results and financial position of the Group, including the requirement that the interest coverage ratio and the leverage ratio (each as defined in the credit agreement) remain within certain limits. The covenants are tested, for the prior twelve month period as appropriate, at each balance sheet date. The Group is currently in compliance with both covenants.

The new £700m credit facility has two tranches, a £400m term loan facility and a £300m revolving credit facility. The term loan of £245.3m was drawn under the new credit facility in March 2007 (2006: July 2004 to December 2005). One single repayment will be made in May 2009. The loan carries a floating rate of interest, whose margin over LIBOR is determined by a leverage ratio grid (net borrowings/EBITDA as defined in the credit facility), currently set at LIBOR + 2.5%. In March 2006 there was a term loan of £3.2m drawn under a separate facility which was prepaid and cancelled during the year.

CITI-TF 00675862

### Other financial liabilities

On 11 March 2003 Moody's Investor Service downgraded the Group's credit rating from Baa2 to Ba1. As a consequence the coupon of the £325m 8.25% Sterling bonds was increased from 8.25% to 9.75% with effect from 20 May 2003.

At 31 March 2007 the Group had available £452.3m (2006: £437.1m) of undrawn committed borrowing facilities in respect of which all conditions precedent had been met.

All the Group's financial liabilities (excluding finance leases) are unsecured.

#### Year ended 31 March 2007

| | Current coupon rate | Effective interest rate | Within 1 year £m | 1-2 years £m | 2-3 years £m | 3-4 years £m | 4-5 years £m | More than 5 years £m | Total £m |
|---|---|---|---|---|---|---|---|---|---|
| **Fixed Rate** | | | | | | | | | |
| US$500m 8.375% guaranteed notes | 8.375% | 8.49% | — | — | 252.0 | — | — | — | 252.0 |
| £325m 8.25% Sterling bonds | 9.75% | 9.92% | — | 324.0 | — | — | — | — | 324.0 |
| US$243.3m 5.25% guaranteed convertible bonds | 5.25% | 9.30% | — | — | — | 109.4 | — | — | 109.4 |
| £425m 8.625% senior notes | 8.625% | 8.94% | — | — | — | — | — | 280.1 | 280.1 |
| Finance leases | | | 1.3 | 1.3 | 1.4 | 1.5 | 1.6 | 10.0 | 17.1 |
| | | | 1.3 | 325.3 | 253.4 | 110.9 | 1.6 | 290.1 | 982.6 |
| **Floating rate** | | | | | | | | | |
| Overdrafts | | | 9.5 | — | — | — | — | — | 9.5 |
| Term loan | | | — | — | 245.3 | — | — | — | 245.3 |
| Interest rate swaps – long term commitments | | | — | — | 7.4 | — | — | 1.4 | 8.8 |
| Forward currency contract | | | 1.5 | — | — | — | — | — | 1.5 |
| | | | 11.0 | — | 252.7 | — | — | 1.4 | 265.1 |

#### Year ended 31 March 2006

| | Current coupon rate | Effective interest rate | Within 1 year £m | 1-2 years £m | 2-3 years £m | 3-4 years £m | 4-5 years £m | More than 5 years £m | Total £m |
|---|---|---|---|---|---|---|---|---|---|
| **Non-current** | | | | | | | | | |
| US$500m 8.375% guaranteed notes | 8.375% | 8.49% | — | — | — | 287.7 | — | — | 297.7 |
| £325m 8.25% Sterling bonds | 9.75% | 9.92% | — | — | 323.1 | — | — | — | 323.1 |
| US$243.3m 5.25% guaranteed convertible bonds | 5.25% | 9.30% | — | — | — | — | 121.1 | — | 121.1 |
| £425m 8.625% senior notes | 8.625% | 8.94% | — | — | — | — | — | 300.0 | 300.0 |
| Long-term committed facilities | | | | | | | | | |
| Finance leases | | | 1.8 | 1.8 | 1.5 | 1.3 | (1.5) | 10.0 | (1.5) |
| | | | 1.8 | 1.8 | 325.2 | 289.0 | 121.2 | 309.9 | 1,049.2 |
| **Floating rate** | | | | | | | | | |
| Overdrafts | | | 19.6 | — | — | — | — | — | 19.6 |
| Term loan | | | 1.2 | 2.0 | — | — | — | — | 3.2 |
| Interest rate swaps – fair value hedge (excluding accrued interest) | | | — | — | — | — | — | 13.6 | 13.6 |
| | | | 20.8 | 2.0 | — | — | — | 13.6 | 36.4 |

### Credit risk

The Group's principal financial assets are bank balances, cash and trade and other receivables.

The Group's credit risk is primarily attributable to its trade and other receivables. The amounts presented in the balance sheet are net of allowances for doubtful debts. Such an allowance is made where there is an identified loss event which, based on previous experience, is evidence of a reduction in the recoverability of the debt.

The credit risk on bank balances is limited because the counterparties are financial institutions with high credit ratings assigned by international credit rating agencies.

The Group has no significant concentration of credit risk, with exposure spread over a large number of geographically dispersed counterparties.

### Net investment in foreign operations

During the year the Group borrowed Japanese Yen totalling JPY 22,300m with a carrying value of £107.1m, in March 2007 all of these borrowings were repaid. In April 2006 borrowings of JPY 11,500m (£55.8m) were designated as a hedge of the Group's net investment in its Japanese subsidiaries, hedging the Group's exposure to foreign exchange risk on these investments. Upon

82

CITI-TF 00675863

repayment in March 2007, the borrowings were dedesignated as a hedge and the gain on retranslation of the borrowing hedge transferred to equity to offset the loss on translation of the net investment in the Japanese subsidiaries, whilst the translation gain on the remaining borrowings (£3.0m) was immediately recognised in profit and loss (finance exceptional items).

*Fair values of financial assets and liabilities*

The fair value of publicly traded borrowings has been calculated using the appropriate market prices at the balance sheet date. For the borrowings which are not publicly traded, the fair value has been calculated by discounting their future cash flows at the appropriate market rate. The directors estimate the fair value of the Group's borrowings to be as follows:

| | Book value | | Fair value | |
|---|---|---|---|---|
| | 2007 £m | 2005 £m | 2007 £m | 2006 £m |
| **Financial assets** | | | | |
| Held-to-maturity investments | 3.2 | 7.9 | 3.2 | 7.9 |
| Available-for-sale-investments | 7.8 | 7.1 | 7.8 | 7.1 |
| Interest rate swaps – fair value hedge (excluding accrued interest) | — | 11.0 | — | 11.0 |
| €425m 8.625% senior notes embedded call feature | 9.1 | 30.3 | 9.1 | 30.3 |
| Investments at fair value through profit and loss | 0.2 | 0.3 | 0.2 | 0.3 |
| | 20.3 | 56.6 | 20.3 | 56.6 |
| **Financial liabilities** | | | | |
| Loans and overdrafts | - | 19.6 | 9.5 | 19.6 |
| US$500m 8.375% guaranteed notes | 252.0 | 287.7 | 266.0 | 306.0 |
| £325m 8.25% Sterling bonds | 324.0 | 323.1 | 337.1 | 348.0 |
| US$243.3m 5.25% guaranteed convertible bonds | 109.4 | 121.1 | 119.4 | 133.5 |
| €425m 8.625% senior notes | 280.1 | 300.0 | 323.9 | 368.1 |
| Long-term committed facilities | — | (1.5) | — | (1.5) |
| Term loan | 245.3 | 3.2 | 245.3 | 3.2 |
| Finance leases | 17.1 | 18.8 | 17.1 | 18.8 |
| Interest rate swaps | 8.8 | 13.6 | 8.8 | 13.6 |
| Foreign currency contract | 1.5 | — | 1.5 | — |
| Convertible bond derivative | 81.6 | 86.7 | 81.6 | 86.7 |
| | 1,329.3 | 1,172.3 | 1,410.2 | 1,296.0 |

*Fair value hedges*

The Group holds equivalent US Dollar nominal value interest rate swaps matching the coupon and the term of the US$500m 8.375% guaranteed notes effectively converting the interest basis of the issue to floating rate (set in arrears). See Note 15 for the derivative portion of the borrowing. From 1 April 2006, this swap was designated as a hedge for hedge accounting purposes.

The Group holds equivalent Euro nominal value interest rate swaps matching the coupon and the term of the €425m 8.625% senior notes effectively converting the interest basis of the issue to floating rate (set in arrears).

CITI-TF 00675864

8. **Other provisions for liabilities and charges**

| | Trading £m | Employee Benefits £m | Acquisition and Integration £m | Disposal and fundamental reorganisation £m | Total £m |
|---|---|---|---|---|---|
| At 1 April 2006 .................. | 27.2 | 0.8 | 5.1 | 0.4 | 33.5 |
| Currency retranslation.......... | (2.6) | — | — | — | (2.6) |
| Provisions utilised .............. | (65.1) | (0.3) | (4.5) | (0.1) | (70.0) |
| Charged (released) ............ | 150.0 | 0.2 | — | (0.2) | 150.0 |
| At 31 March 2007 .............. | 109.5 | 0.7 | 0.6 | 0.1 | 110.9 |
| Current portion: | | | | | |
| At 1 April 2006................. | 27.2 | 0.8 | 5.1 | 0.4 | 33.5 |
| At 31 March 2007............ | 109.5 | 0.7 | 0.6 | 0.1 | 110.9 |
| Total: | | | | | |
| At 1 April 2006................. | 27.2 | 0.8 | 5.1 | 0.4 | 33.5 |
| At 31 March 2007............ | 109.5 | 0.7 | 0.6 | 0.1 | 110.9 |

*Trading*

Trading provisions include royalty audit charged through profit from operations before operating exceptional items and amortisation. They also include restructuring and reorganisation provisions charged through operating exceptional items.

*Employee benefits*

This provision relates to long term benefits and termination benefits.

*Disposal and fundamental reorganisation*

This provision relates to the reorganisation costs for the closure and/or sale of EMI's manufacturing businesses in North America and Europe.

*Acquisition and Integration*

This provision relates to acquisition and integration costs that were created for earnouts. Earnouts are contractual commitments under which the seller of a business is entitled to additional future compensation based if the acquired business achieves certain future financial targets.

CITI-TF 00675865

## PART B – FINANCIAL INFORMATION OF EMI FOR THE FINANCIAL YEARS ENDED 31 MARCH 2006 AND 31 MARCH 2005

**Group consolidated income statement**

for the years ended 31 March 2006 and 31 March 2005

| | Notes | Year ended 31 March 2006 Total £m | Exceptional items and amortisation £m | Underlying £m | Year ended 31 March 2005 Underlying Restated £m | Exceptional items and amortisation £m | Total Restated £m |
|---|---|---|---|---|---|---|---|
| Revenue | 1 | 2,079.9 | — | 2,079.9 | 2,001.2 | — | 2,001.2 |
| Group profit from operations before exceptional items and amortisation | 1 | 250.5 | — | 250.5 | 225.1 | — | 225.1 |
| Exceptional items and amortisation | 8 | (45.9) | (45.9) | — | | (55.5) | (55.5) |
| Share of profit from associates | | 1.0 | — | 1.0 | 1.1 | — | 1.1 |
| Profit from operations** | 1 & 2 | 205.6 | (45.9) | 251.5 | 226.2 | (65.5) | 160.7 |
| Finance charges: | | | | | | | |
| Finance income | 5 & 8 | 71.4 | 14.0 | 57.4 | 58.6 | 32.9 | 91.5 |
| Finance costs | 5 & 8 | (158.9) | (9.3) | (149.6) | (143.7) | (9.7) | (153.4) |
| Total net finance charges | | (87.5) | 4.7 | (92.2) | (85.1) | 23.2 | (61.9) |
| Profit (loss) before taxation | | 118.1 | (41.2) | 159.3 | 141.1 | (42.3) | 98.8 |
| Overseas | | (33.1) | | (33.1) | (38.5) | 7.6 | (30.9) |
| UK | | 5.0 | — | 5.0 | 7.0 | — | 7.0 |
| Total taxation | 6 | (28.1) | — | (28.1) | (31.5) | 7.6 | (23.9) |
| Profit (loss) from continuing operations after taxation | | 90.0 | (41.2) | 131.2 | 109.6 | (34.7) | 74.9 |
| Attributable to: | | | | | | | |
| Equity holders of the parent | | 86.1 | | | | | 75.4 |
| Minority interest | | 3.9 | | | | | (0.5) |
| * The following items are included within Profit from operations | | | | | | | |
| Cost of sales | | (1,280.3) | (49.5) | (1,230.4) | (1,201.8) | (45.8) | (1,247.6) |
| Distribution costs | | (75.0) | | (75.0) | (70.3) | | (70.3) |
| Gross profit | | 724.6 | (49.9) | 774.5 | 729.1 | (45.8) | 883.3 |
| Administration expenses | | (533.5) | (1.1) | (532.4) | (508.9) | (20.7) | (527.5) |
| Other operating income, net | | 13.5 | 5.1 | 8.4 | 2.8 | 1.0 | 3.8 |

** Exceptional items and amortisation include operating exceptional items and amortisation and finance exceptional items. See the Group accounting policies section of these financial statements for definitions of these terms and for examples of the types of transactions that may fall into each category.

### Earnings per share (EPS)

| | Notes | Year ended 31 March 2006 | Year ended 31 March 2005 |
|---|---|---|---|
| Basic earnings per Ordinary Share | 9 | 10.9p | 9.6p |
| Diluted earnings per Ordinary Share | 9 | 10.5p | 6.1p |
| Underlying basic earnings per Ordinary Share | 9 | 16.2p | 13.4p |
| Underlying diluted earnings per Ordinary Share | 9 | 15.7p | 13.1p |

Underlying earnings are included as they provide a better understanding of the trading performance of the Group on a normalised basis.

### Average exchange rates for the year

| | Year ended 31 March 2006 | Year ended 31 March 2005 |
|---|---|---|
| US Dollar to £1 | 1.78 | 1.85 |
| Euro to £1 | 1.47 | 1.45 |
| Yen to £1 | 203.69 | 199.32 |

The results for the year of subsidiaries reporting in foreign currencies have been translated into Sterling at the appropriate average exchange rates.

CITI-TF 00675866

**Group consolidated balance sheet**
at 31 March 2006

| | Notes | At 31 March 2006 £m |
|---|---|---|
| ASSETS | | |
| Non-current assets | | |
| Music copyrights and intangibles | 10 | 389.3 |
| Goodwill | 11 | 43.0 |
| Property, plant and equipment | 12 | 196.8 |
| Investments in associates | 13 | 9.8 |
| Other investments | 14 | 15.0 |
| Deferred taxation | 24 | 22.8 |
| Financial derivatives | 15 | 41.3 |
| Other receivables | 17 | 4.4 |
| | | 721.4 |
| Current assets | | |
| Inventories | 16 | 37.2 |
| Advances | 17 | 330.1 |
| Trade receivables | 17 | 408.5 |
| Corporation tax recoverable | 17 | 16.7 |
| Other receivables | 17 | 110.8 |
| Investments: liquid funds | | 1.6 |
| Cash and cash equivalents | 18 | 190.9 |
| | | 1,095.6 |
| Total assets | | 1,817.0 |
| LIABILITIES | | |
| Non-current liabilities | | |
| Borrowings | 19 | (1,049.4) |
| Other payables | 23 | (9.5) |
| Deferred taxation | 24 | (5.1) |
| Pension provisions | 26 | (31.1) |
| Financial derivatives | 15 | (100.3) |
| | | (1,195.4) |
| Current liabilities | | |
| Borrowings | 19 | (22.6) |
| Other payables | 22 | (1,149.0) |
| Current tax liability | | (143.1) |
| Other provisions for liabilities and charges | 25 | (33.5) |
| | | (1,348.2) |
| Total liabilities | | (2,543.6) |
| NET LIABILITIES | | (726.6) |
| EQUITY | | |
| Capital and reserves | | |
| Share capital | 27 | 110.7 |
| Share premium account | 27 | 447.8 |
| Capital redemption reserve | 28 | 495.8 |
| Foreign exchange reserve | 28 | (17.1) |
| Other reserves | 28 | 208.4 |
| Retained earnings | 28 | (2,019.0) |
| Equity attributable to equity holders of the parent | | (775.4) |
| Minority interests (equity) | | 48.8 |
| TOTAL EQUITY | | (726.6) |
| Year end exchange rates | | |
| US Dollar to £1 | | 1.73 |
| Euro to £1 | | 1.43 |
| Yen to £1 | | 204.66 |

*The balance sheets of subsidiaries reporting in foreign currencies have been translated into Sterling at the appropriate year end exchange rates.*

86

CITI-TF 00675867

**Group consolidated statement of recognised income and expense**
for the years ended 31 March 2006 and 31 March 2005

|  | Year ended 31 March 2006 £m | Year ended 31 March 2005 £m |
|---|---|---|
| Income and expense recognised directly in equity |  |  |
| Revaluation of intangibles | — | — |
| Exchange difference on retranslation of foreign operations | 4.8 | — |
| Pension funds: actuarial gains and losses | (21.2) | 0.2 |
| Gains (losses) on the revaluation to fair value of available-for-sale investments | 58.3 | 4.7 |
|  |  | (0.9) |
| Net income directly recognised in equity | 41.0 | 4.9 |
| Profit for the year | 90.0 | 74.9 |
| Total recognised income and expense for the year | 131.0 | 79.8 |
| Attributable to: |  |  |
| Equity holders of the parent | 126.4 | 92.7 |
| Minority interest | 4.6 | (12.9) |
| Balance at 31 March | 131.0 | 79.8 |

CITI-TF 00675868

## Group Consolidated Cash Flow Statement
for the year ended 31 March 2006

| | Notes | 2006 £m |
|---|---|---|
| **Cash flows from operating activities** | | |
| Cash receipts from operations | | 1,982.4 |
| Cash used in operations | | (1,754.3) |
| Tax paid | | (39.8) |
| Net cash generated from operating activities | 8 | 188.3 |
| **Cash flows from investing activities** | | |
| Purchase of businesses, net of cash acquired | | (6.9) |
| Deferred consideration paid | | (0.9) |
| Purchase of associates | | (0.3) |
| Purchase of music copyrights and intangibles | 13 | (4.1) |
| Disposal of music copyrights and intangibles | 10 | 7.3 |
| Purchase of property, plant and equipment | | (30.2) |
| Disposal of property, plant and equipment | 12 | 16.3 |
| Dividends received from associates | | 1.0 |
| Disposal of other investments | | 5.9 |
| Interest received | | 9.3 |
| Net cash used in investing activities | | (2.6) |
| **Cash flows from financing activities** | | |
| Issue of ordinary share capital | | 0.6 |
| Purchase of own shares | | (0.5) |
| Equity dividends paid | | (61.2) |
| Dividends paid to minorities | | (2.5) |
| Management of liquid funds | | (0.6) |
| Financing: | | |
| New loans | | 207.8 |
| Loans repaid | | (277.6) |
| Capital element of finance lease repayments | | (0.6) |
| Interest paid | | (111.6) |
| Interest element of finance lease repayments | | (0.7) |
| Net cash used in financing activities | | (246.9) |
| Net decrease in cash and cash equivalents | | (61.2) |
| Cash and cash equivalents at the beginning of the period | | 227.3 |
| Exchange gains on cash and cash equivalents in the year | | 2.6 |
| Cash and cash equivalents at the end of the year | | 168.7 |
| Cash and cash equivalents at the end of the year comprise of | | |
| Cash at bank and in hand | 18 | 188.3 |
| Overdrafts | 19 | (19.6) |
| | | 168.7 |

## Note to The Group Consolidated Cash Flow Statement
for the year ended 31 March 2006

### a)    Reconciliation of Group profit from operations to net cash flow from operating activities

| | Notes | 2006 £m |
|---|---|---|
| Group profit from operations (before share of profit in associates) | 1 | 204.6 |
| Depreciation charge | 12 | 25.3 |
| Property impairment charge | 8 & 12 | 1.1 |
| Gain on disposal of property, plant and equipment and music copyrights and intangibles | | (9.4) |
| Amortisation and impairment of music copyrights and intangibles | 10 | 49.9 |
| Impairment of goodwill | 11 | — |
| Remeasurement–revaluation to fair value of investments at fair value through profit and loss | | (2.6) |
| Share–based payment transactions | | 4.9 |
| Amounts provided | 29 | 18.2 |
| Provisions utilised | | (36.1) |
| Increase in inventories | | (7.3) |
| Increase in receivables | | (74.1) |
| Increase in payables | | 53.6 |
| Net cash generated from operations | | 228.1 |
| Tax paid | | (39.8) |
| Net cash generated from operating activities | | 188.3 |

88

CITI-TF 00675869

## GROUP ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial information comprises the accounts of the Company and its subsidiaries which have been prepared in accordance with applicable accounting standards. Following a regulation adopted by the European Parliament, the consolidated financial information has been prepared in accordance with International Financial Reporting Standards (IFRS). The Group's principal accounting policies under IFRS are set out below. The transition date for the application of IFRS is 1 April 2004, and the comparative figures for year ended 31 March 2005 have been restated accordingly.

### IFRS 1 *First-time adoption of IFRS*

When preparing its IFRS balance sheet as at 31 March 2006, the Group has taken the following options available under IFRS 1 in applying IFRS:

- The requirements of IFRS 3 *Business Combinations* have been applied prospectively from 1 April 2003;

- Certain properties were held at revalued amount as at 31 March 2004. On conversion, these revalued amounts were frozen and deemed cost in the case of these properties;

- All actuarial gains and losses in respect of defined benefit pension and post-retirement schemes have been recognised in full in equity from 1 April 2004;

- Cumulative translation differences relating to net investments in overseas companies that arose prior to 1 April 2004 have been set to zero and will not be included in any subsequent calculation of profit or loss on disposal;

- Only those employee share options granted after 7 November 2002 that had not vested as at 1 January 2005 have been remeasured at fair value; and

- The Group has chosen to adopt IAS 32 *Financial Instruments: Disclosure and Presentation* and IAS 39 *Financial Instruments: Recognition and Measurement* from 1 April 2004.

### Basis of consolidation

The consolidated financial statements comprise the financial statements of EMI Group plc and its subsidiaries for the year ended 31 March 2006.

All intercompany balances and transactions, including unrealised profits and losses arising from intra-group transactions, have been eliminated in full.

Subsidiaries are consolidated from the date on which control is transferred to the Group and cease to be consolidated from the date on which control is transferred out of the Group. Where there is a loss of control of a subsidiary, the consolidated financial statements include the results for the part of the reporting year during which EMI Group plc has control.

### Foreign currency translation

Sterling (£) is the functional currency of the parent undertaking and the presentational currency of the Group. The functional currency of subsidiaries, joint ventures and associated companies ("foreign operations") is the currency of the primary economic environment in which they operate.

Transactions in foreign currencies are initially recorded in the functional currency at the rate ruling on the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated at the functional currency rate of exchange ruling at the balance sheet date. All differences are taken to the income statement with the exception of differences on foreign currency borrowings that provide a hedge against a net investment in a foreign operation. These are taken directly to equity until the disposal of the net investment, at which time they are recognised in the income statement. Tax charges and credits attributable to exchange differences on those borrowings are also dealt with in equity. Non-monetary items that are measured in terms of historical cost in a foreign currency are translated using the exchange rates at the dates of the initial transactions. Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair values were determined.

The assets and liabilities of foreign operations are translated into sterling at the rate of exchange ruling at the balance sheet date and their income statements are translated at the weighted average exchange rates for the period. The exchange differences arising on the retranslation of

89

foreign operations are taken directly to a separate component of equity. On disposal of a foreign operation, the deferred cumulative amount recognised in equity relating to that particular foreign operation is recognised in the income statement.

**Business combinations and goodwill**

The purchase method of accounting is used to account for the acquisition of subsidiaries. The cost of an acquisition is measured as the fair value of the assets given, equity instruments issued and liabilities incurred or assumed at the date of exchange, plus costs directly attributable to the acquisition. Identifiable assets acquired, and liabilities and contingent liabilities assumed, in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any minority interest. The excess of the cost of the acquisition over the fair value of the Group's share of the identifiable net assets acquired is recorded as goodwill.

Goodwill on acquisition is initially measured at cost. Following initial recognition, goodwill is measured at cost less any accumulated impairment losses.

Due to the adoption of IFRS 3 *Business Combinations* from 1 April 2003, goodwill on acquisitions from 1 April 2003 is not amortised and goodwill already carried in the balance sheet is not amortised from 1 April 2003. Goodwill is reviewed for impairment annually, or more frequently if events or changes in circumstances indicate that the carrying value may be impaired.

For an asset, such as goodwill, that does not generate largely independent cash flows, the recoverable amount is determined for the smallest identifiable group of assets including that asset that generates cash inflows that are largely independent of the cash inflows from other assets or groups of assets (a 'cash generating unit').

**Intangible assets**

Intangible assets include music copyrights and other intangibles. Intangible assets acquired separately are capitalised at cost, whilst those acquired as part of a business acquisition are capitalised at fair value at the date of acquisition.

Following initial recognition, intangible assets with finite lives are amortised on a systematic basis over their economic useful lives. These lives are estimated on an individual basis at periods of anything up to and including 20 years. Intangible assets are tested for impairment if events or changes in circumstances indicate that the carrying value may be impaired. Useful lives are examined on an annual basis and adjustments, where applicable, are made on a prospective basis.

Intangible assets created within the business that cannot be distinguished from the cost of developing the business as a whole are not capitalised. Any relevant expenditure is charged against profit from operations in the period in which the expenditure is incurred.

**Property, plant and equipment**

Property, plant and equipment are stated at cost less accumulated depreciation and any impairment in value. Depreciation is calculated on a straight line basis to write off the cost, less residual value, of assets over the estimated useful life of the asset. The annual rates used are:

| | |
|---|---|
| Freehold buildings | 2% |
| Property held under finance leases and leasehold improvements | Period of lease |
| Plant, equipment and vehicles | 10 – 33⅓% |

The carrying values of property, plant and equipment are reviewed for impairment when events or changes in circumstances indicate that the carrying value may not be recoverable. Where an indicator of impairment exists, the Group makes an estimate of the recoverable amount. Where the carrying amount of an asset exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount.

Assets are derecognised upon disposal or when no future economic benefits are expected to arise from the continued use of the asset. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying value of the asset) is included in the income statement in the period in which the item is derecognised.

90

CITI-TF 00675871

Assets are held at historical cost with the exception that certain properties in the subsidiary undertaking Toshiba-EMI Limited are carried at revalued amounts that were frozen. This frozen carrying value was deemed cost in the case of these properties.

## Leases

Assets which are held under a finance lease, which transfers to the Group substantially all the risks and benefits incidental to ownership of the leased item, are capitalised at the inception of the lease, with a corresponding liability being recognised for the fair value of the leased asset or, if lower, at the present value of the minimum lease payments. Lease payments are apportioned between finance charges and a reduction of the lease liability so as to achieve a constant rate of interest on the remaining balance of the lease liability. Capitalised leased assets are depreciated over the shorter of the estimated useful life of the asset or the lease term.

Leases where the lessor retains substantially all the risks and benefits of ownership of the asset are classified as operating leases. Operating lease payments are recognised as an expense in the income statement on a straight line basis over the lease term.

## Investments in joint ventures and associates

The Group's investments in its associates are accounted for using the equity method. The investment is carried in the balance sheet at cost plus post-acquisition changes in the Group's share of net assets of the associate, less any impairment in value or dividends received. The Group's share of the results after interest and tax of the associate are included in profit from operations. When an associate has recognised a change in net assets other than through the income statement, the Group recognises its share of the change and discloses it, when applicable, in the statement of recognised income and expense.

The Group has a number of jointly controlled operations where there is no separate legal entity. The expenses that the Group incurs, and the share of the income that the Group earns from the sale of goods by these jointly controlled operations, are included in the income statement. The assets that the Group controls, and the liabilities that the Group incurs, in respect of these jointly controlled operations are included in the balance sheet.

## Other Investments

All investments are initially recognised at cost, being the fair value of the consideration given and including acquisition charges associated with the investment. At acquisition, all investments are classified as either fair value through profit and loss, held-to-maturity or available-for-sale in accordance with IAS 39 *Financial Instruments: Recognition and Measurement*.

Those investments classified as held-to-maturity or available-for-sale are designated as non-current assets. Unlisted held-to-maturity or available-for-sale investments are held on the balance sheet at cost less any impairment in value. Listed held-to-maturity or available-for-sale investments are held on the balance sheet at fair value, with any changes in fair value being recognised in equity.

Those investments classified as fair value through profit and loss are designated as current assets and are held on the balance sheet at fair value, with any changes in fair value being recognised in the income statement along with gains or losses on disposal.

## Advances

In the ordinary course of business the Group pays advances and other expenses recoupable from future royalties to performing artists, songwriters, producers and third party repertoire owners. The amounts paid are carried at cost less recoupment and less an allowance for any unrecoupable amounts. The allowance is based on past revenue performance, current popularity and projected revenue.

Advances are recoupable during the business operating cycle. All advances are therefore reported as current assets, including advances recoupable more than 12 months after the balance sheet date.

## Inventories

Inventories are valued at the lower of cost and net realisable value. Cost includes manufacturing overheads where appropriate.

91

CITI-TF 00675872

**Trade receivables**

Trade receivables, which generally have 30-90 day terms, are recognised and carried at the originally invoiced amount less an allowance for any doubtful debts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off when identified.

**Cash and cash equivalents**

Cash and cash equivalents in the balance sheet comprise cash at bank and in hand and short-term deposits with an original maturity of three months or less. For the purpose of the Group consolidated cash flow statement, cash and cash equivalents consist of cash at bank and in hand, as defined above, net of outstanding bank overdrafts.

**Borrowings**

All loans and borrowings are initially recognised at the fair value of the consideration received net of issue costs associated with the borrowing. After initial recognition, interest-bearing loans and borrowings are subsequently measured at amortised cost using the effective interest method. Amortised cost is calculated by taking into account any issue costs and any discount or premium on settlement. Gains and losses on derecognition are recognised in finance charges.

Hedge accounting is adopted where derivatives, such as "fixed to floating" interest rate swaps, are held as fair value hedges against fixed interest rate borrowings. Under fair value hedge accounting, fixed interest rate borrowings are revalued at each balance sheet date by the change in fair value attributable to the interest rate risk being hedged.

**Financial derivatives**

The Group uses derivative financial instruments such as interest rate swaps and foreign currency contracts to hedge risks associated with interest and exchange rate fluctuations. Such derivative financial instruments are stated at fair value. The fair values of interest rate swaps and foreign currency contracts are determined by reference to market rates for similar instruments.

For the purpose of hedge accounting, hedges are classified as either: fair value hedges when they hedge the exposure to changes in the fair value of a recognised asset or liability; or cash flow hedges where they hedge exposure to variability in cash flows that is attributable to either a particular risk associated with a recognised asset or liability or a forecast transaction.

In relation to fair value hedges (e.g. fixed to floating interest rate swaps held as fair value hedges against fixed interest rate borrowings) which meet the conditions for hedge accounting, any gain or loss from remeasuring the hedging instrument at fair value is recognised immediately in the income statement. Any gain or loss on the hedged item attributable to the hedged risk is adjusted against the carrying amount of the hedged item and recognised in the income statement.

For derivatives that do not qualify for hedge accounting, any gains or losses arising from changes in fair value are taken directly to the income statement.

**Guaranteed convertible bonds**

The component of the guaranteed convertible bonds that exhibits characteristics of a liability is recognised as a liability in the balance sheet, net of issue costs. On issue of the guaranteed convertible bonds, the fair value of the liability component was determined using a market rate for an equivalent non-convertible bond. This amount is carried as a liability on an amortised cost basis until extinguished on conversion or redemption. As the convertible bonds are denominated in US dollars but are convertible to sterling shares, the remainder of the proceeds is allocated to the conversion option that is recognised and included as a derivative liability, net of issue costs. The value of the conversion option is revalued to fair value at each balance sheet date, with movements in fair value reflected as finance costs or finance income.

Issue costs were apportioned between the liability and derivative components of the guaranteed convertible bonds based on the allocation of proceeds to the liability and derivative components when the instruments were first recognised.

**Provisions**

Provisions are recognised when the Group has a present obligation (legal or constructive) as a result of a past event, when it is probable that an outflow of resources embodying economic

92

CITI-TF 00675873

benefits will be required to settle the obligation and when a reliable estimate can be made of the amount of the obligation. Where the Group expects some or all of a provision to be reimbursed, for example under an insurance contract, the reimbursement is recognised as a separate asset but only when the reimbursement is virtually certain. The expense relating to any provision is presented in the income statement net of any reimbursement. If the effect of the time value of money on the quantification of the provision is material, provisions are determined by discounting the expected future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability. Where discounting is used, the increase in the provision due to the passage of time is recognised as finance costs.

## Pensions and other employee benefits

The Group operates three major defined benefit pension schemes, plus a number of smaller defined benefit pension schemes. The cost of providing benefits under the schemes is determined separately for each scheme using the projected unit actuarial valuation method.

Liabilities of the schemes are discounted by the current rate of return of an AA-rated corporate bond of equivalent term and currency to the liabilities. Assets of the schemes are measured at fair value at the balance sheet date. Actuarially calculated surpluses or deficits on the defined benefit schemes are included within the consolidated balance sheet. The current service cost of each of the schemes is charged against profit from operations. Expected returns on defined benefit scheme assets and interest on defined benefit scheme liabilities are included as finance income and finance costs respectively. With effect from 1 April 2004, the Group has adopted the amendment to IAS 19 *Employee Benefits* that permits actuarial gains and losses to be charged or credited directly to equity through the statement of recognised income and expense.

In addition, the Group operates a number of defined contribution schemes. Contributions to defined contribution schemes are charged to the income statement as incurred.

Employee benefits other than post-employment benefits that can be carried forward if they have not been used are accrued as they are earned until the benefit is paid or used. Those employee benefits that are foregone if not taken at the time are expensed when incurred.

## Revenue

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured. The following specific recognition criteria must also be met before revenue is recognised:
– Sale of goods: revenue is recognised when the significant risks and rewards of ownership of the goods have passed to the buyer and can be reliably measured. Revenue is measured at fair value after making provision in respect of expected future returns of goods and services supplied by the Group prior to the balance sheet date;
– Royalty and other income: all royalty and other income is recognised when it has been earned and can be reliably measured.

Interest income is recognised when it has been earned and can be reliably measured.

## Share-based payments

The share option programme allows certain Group employees to acquire shares of the Company. The fair value of options granted is recognised as an employee expense with a corresponding increase in equity. The fair value is measured at grant date and the expense is spread over the period during which the employees become unconditionally entitled to the options. The fair value of the options granted is measured using a binomial lattice model, taking into account the terms and conditions upon which the options were granted.

The amount recognised as an expense reflects the extent to which the vesting period has expired and the Group's best estimate of the number of awards that will ultimately vest. No expense is recognised for awards that do not ultimately vest, except for awards where the vesting is conditional upon a market condition, which are treated as vesting irrespective of whether or not the market condition is satisfied, provided that all other performance conditions are satisfied.

Employees of certain subsidiaries of the Group participate in the employee share incentive plans and the Group has an employee share trust to satisfy non-transferable options granted to executives and senior employees. Shares in the Group held by the employee share trust are treated as treasury shares and presented in the balance sheet as a deduction from equity.

93

CITI-TF 00675874

The Group has taken advantage of the transitional provisions of IFRS 1 in respect of equity-settled awards and has applied IFRS 2 only to equity-settled awards granted after 7 November 2002 that had not vested on or before 1 January 2005.

**Finance charges**

Finance costs comprise interest payable on borrowings calculated using the effective interest rate method, foreign exchange losses and losses on hedging instruments that are recognised in the income statement.

Finance income comprises interest receivable on funds invested calculated using the effective interest rate method, dividend income, foreign exchange gains and gains on hedging instruments that are recognised in the income statement.

**Income tax**

Income tax on the profit or loss for the period comprises current and deferred tax. Income tax is recognised in the income statement except to the extent that it relates to items recognised directly in equity, in which case it is recognised in equity.

Current tax is the expected tax payable on the taxable income for the period, using tax rates enacted or substantively enacted at the balance sheet date and any adjustment to tax payable in respect of previous periods.

Deferred tax is recognised for all temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the tax base. The following temporary differences are not provided for: the initial recognition of goodwill or of assets or liabilities that affect neither accounting nor taxable profit that is not a business combination; and temporary differences relating to investments in subsidiaries, joint ventures an associates where the timing of the reversal of the temporary difference can be controlled and to the extent that it is probable that the temporary difference will not reverse in the foreseeable future. The amount of deferred tax provided is based on the expected manner of realisation or settlement of the carrying amount of assets and liabilities, using tax rates enacted or substantially enacted at the balance sheet date.

A deferred tax asset is recognised only to the extent that it is probable that future taxable profits will be available against which the asset can be utilised.

**Segments**

A business segment is a group of assets and operations engaged in providing products or services that are subject to risks and returns that are different from those of other business segments. A geographical segment is engaged in providing products or services within a particular economic environment that are subject to risks and returns that are different from those segments operating in other economic environments.

**Exceptional items and amortisation**

Exceptional items and amortisation are excluded from underlying results in order to provide a better understanding of the normalised trading of the Group. The Group considers that such items would fall into either of two categories: operating exceptional items and amortisation; and finance exceptional items.

The Group defines operating exceptional items and amortisation as items which derive either from events or transactions that it considers fall outwith the ordinary activities of the Group or from events or transactions that fall within the ordinary activities of the Group but which, individually or if of a similar type, in aggregate, need to be disclosed separately by virtue of their size or incidence if the financial statements are to give a true and fair view. Similarly, the Group defines finance exceptional items as items which derive either from events or transactions that it considers fall outwith the ordinary financing activities of the Group or and from events or transactions that fall within the ordinary financing activities of the Group but which, individually or, if of a similar type, in aggregate, need to be disclosed separately by virtue of their size or incidence if the financial statements are to give a true and fair view.

Events or transactions that the Group would consider as falling outwith its ordinary activities could include, but are not limited to: the revaluation and/or disposal of property, plant and equipment; the revaluation and/or disposal of held-to-maturity or available-for-sale investments or investment at fair value through profit and loss; the disposal and/or closure of a business, jointly controlled operation

94

CITI-TF 00675875

or associate; and the costs of a fundamental reorganisation or restructuring. Events or transactions that the Group would consider as falling within its ordinary activities but which need to be disclosed separately could include, but are not limited to: the amortisation and impairment of music copyrights and intangibles; the impairment of goodwill; and the impairment of the cost of an investment in a business, jointly controlled operation or associate. Events or transactions that the Group would consider as falling outwith its ordinary financing activities could include, but are not limited to: gains or losses on the revaluation of derivative financial instruments; gains or losses on the retranslation of foreign currency-denominated borrowings to the extent that they do not provide a hedge against foreign currency-denominated investments; and gains or losses from the ineffectiveness of the interest rate swaps hedge. Events or transactions that the Group would consider as falling within its ordinary financing activities but which need to be disclosed separately could include, but are not limited to, costs incurred as part of the Group's refinancing programmes.

95

CITI-TF 00675876

## NOTES TO THE GROUP FINANCIAL STATEMENTS
for the year ended 31 March 2006

### 1. Segmental analyses

At 31 March 2006, the Group is organised on a worldwide basis into two main business segments — Music and Music Publishing. These divisions are the basis on which the Group reports its primary segment information.

**Results**

| | EMI Music £m | EMI Music Publishing £m | 2006 Total £m | EMI Music Restated £m | EMI Music Publishing Restated £m | 2005 Total Restated £m |
|---|---|---|---|---|---|---|
| Segment revenue | 1,660.3 | 419.6 | 2,079.9 | 1,600.5 | 400.7 | 2,001.2 |
| | | | | | | |
| Group profit (loss) from operations before exceptional items and amortisation | 145.1 | 105.4 | 250.5 | 125.5 | 99.6 | 225.1 |
| Share of profit (loss) from associates | (0.1) | 1.1 | 1.0 | 0.6 | 0.5 | 1.1 |
| Segmental operating exceptional items and amortisation: | | | | | | |
| Amortisation of music copyrights and intangibles | (3.6) | (46.3) | (49.9) | (3.0) | (42.8) | (45.8) |
| Gain on disposal of property, plant and equipment | 0.6 | (0.2) | 0.4 | (17.7) | — | (17.7) |
| Segmental result | 142.0 | 60.0 | 202.0 | 105.4 | 57.3 | 162.7 |
| Non-segmental operating exceptional items and amortisation | | | 3.6 | | | (2.0) |
| Group profit from operations | | | 205.6 | | | 160.7 |
| Total net finance charges | | | (87.5) | | | (61.9) |
| Profit (loss) before taxation | | | 118.1 | | | 98.8 |
| Taxation | | | (28.1) | | | (23.9) |
| Profit (loss) from continuing operations after taxation | | | 90.0 | | | 74.9 |
| | | | | | | |
| Other segment items included in the income statement include: | | | | | | |
| Depreciation | 22.1 | 3.2 | 25.3 | 22.0 | 3.1 | 25.1 |
| Amortisation of music copyrights and intangibles | 3.6 | 44.3 | 47.9 | 3.0 | 42.8 | 45.8 |
| Impairment of music copyrights and intangibles | — | 2.0 | 2.0 | — | — | — |
| Impairment of goodwill | — | — | — | 2.2 | — | 2.2 |
| Impairment of property | 0.9 | 0.2 | 1.1 | 18.5 | — | 18.5 |
| Release of overprovision for reorganisation costs charged in prior years | (2.3) | — | (2.3) | (3.8) | — | (3.8) |
| Reorganisation costs | 2.3 | — | 2.3 | 3.8 | — | 3.8 |

Profit from operations is analysed instead of profit before taxation as finance charges are borne centrally and are not allocated to the operating businesses.

96

CITI-TF 00675877

## Assets and liabilities

| | EMI Music £m | EMI Music Publishing £m | 2006 Total £m |
|---|---|---|---|
| Segment assets | 926.3 | 578.0 | 1,504.3 |
| Investment in associates | 5.9 | 2.3 | 8.2 |
| Unallocated assets | | | 304.5 |
| Consolidated total assets | | | 1,817.0 |
| Segment liabilities | (898.1) | (282.4) | (1,180.5) |
| Unallocated liabilities | | | (1,363.1) |
| Consolidated total liabilities | | | (2,543.6) |
| Other segment items included in the balance sheet include: | | | |
| Capital expenditure | 25.5 | 8.8 | 34.3 |
| Average employees (No.) | 5,672 | 640 | 6,312 |

The Group's two business segments operate in six main geographical areas, even though they are managed on a worldwide basis.

| | United Kingdom £m | Rest of Europe £m | Latin America £m | North America £m | Asia Pacific £m | Other £m | 2006 Total £m |
|---|---|---|---|---|---|---|---|
| Segment revenue | 348.0 | 630.2 | 84.4 | 649.1 | 338.8 | 29.4 | 2,079.9 |
| Segment assets | 267.1 | 288.5 | 58.8 | 657.5 | 155.6 | 76.8 | 1,504.3 |
| Investment in associates | — | 0.4 | — | 6.6 | 1.2 | — | 8.2 |
| Unallocated assets | — | — | — | — | — | — | 304.5 |
| Consolidated total assets | 267.1 | 288.9 | 58.8 | 664.1 | 156.8 | 76.8 | 1,817.0 |
| Capital expenditure | 15.3 | 6.9 | 0.6 | 8.7 | 2.2 | 0.6 | 34.3 |
| Average employees (No.) | 1,201 | 1,393 | 311 | 2,034 | 1,241 | 132 | 6,312 |

| | United Kingdom £m | Rest of Europe £m | Latin America £m | North America £m | Asia Pacific £m | Other £m | 2005 Total £m |
|---|---|---|---|---|---|---|---|
| Segment revenue | 339.6 | 633.9 | 55.6 | 581.2 | 366.3 | 24.4 | 2,001.2 |

97

CITI-TF 00675878

A-1489

## 2. Profit from operations

The following items have been included in arriving at profit from operations

|  | 2006 £m | 2005 Restated £m |
|---|---|---|
| Staff costs (see Note 4) | | |
| Cost of inventories recognised as an expense (included in cost of sales) | 370.5 | 347.3 |
| Depreciation of property, plant and equipment | 252.2 | 245.8 |
| Owned assets | | |
| Leased assets | 22.2 | 21.0 |
|  | 3.1 | 4.1 |
| Amortisation and impairment of music copyrights and intangibles (included in cost of sales) | 49.9 | 45.8 |
| Impairment of goodwill (included in administration expenses) | — | 2.2 |
| (Gain) loss on disposal of property, plant and equipment | (1.5) | (0.8) |
| (Gain) loss on disposal of business | (1.0) | — |
| Operating lease rentals payable | 29.5 | 31.6 |
| Contributions to defined contribution pension schemes | 5.7 | 5.8 |
| Other investments: | | |
| (Gains) losses on revaluation to fair value of investments at fair value through profit and loss | (2.6) | (0.2) |
| Net exchange differences on foreign currency borrowings less deposits | 3.8 | 9.5 |

## 3. Fees to auditors

|  | 2006 £m | 2005 £m |
|---|---|---|
| Audit fees paid to Ernst & Young LLP | 2.5 | 2.4 |
| Audit fees paid to other firms | 0.2 | 0.1 |
| Other fees paid to Ernst & Young LLP: | | |
| UK | 0.9 | 0.1 |
| Non-UK | 0.5 | 0.4 |
|  | 4.1 | 3.0 |

£0.6m (2005: £0.5m) of the Group audit fees shown above were paid in respect of the parent company.

Other fees include £0.4m (2005: £0.3m) paid to Ernst & Young LLP for tax compliance and planning services and £1.0m (2005: £0.2m) for regulatory and other assurance services.

In addition to the above services, Ernst & Young LLP acted as auditor to the EMI Group Pension Fund in the UK. The appointment of auditors to the Group's UK pension fund and the fees paid in respect of those audits are agreed by the trustees of the fund, who act independently from the management of the Group. The aggregate fees paid to Ernst & Young LLP for audit services to the pension fund during the year were £0.1m (2005: £0.1m).

## 4. Directors' and employees' costs

|  | 2006 £m | 2005 Restated £m |
|---|---|---|
| Aggregate emoluments paid to directors | 12.2 | 9.7 |
| Wages and salaries | 295.8 | 276.8 |
| Social security costs | 42.2 | 41.4 |
| Other pension costs | 20.3 | 19.4 |
|  | 370.5 | 347.3 |

See Note 1 for average employee numbers.

98

CITI-TF 00675879

**Key management personnel**

| | 2006 £m | 2005 Restated £m |
|---|---|---|
| Salaries and short-term employee benefits | 17.7 | 12.2 |
| Post-employment benefits | — | — |
| Other long-term benefits | — | — |
| Termination benefits | — | — |
| Share-based payments | 0.6 | 0.2 |
| | 18.3 | 12.4 |

As required by IAS 24 *Related Party Transactions*, key management includes non-executive as well as executive directors, and also certain other senior managers.

**5.    Finance charges**

| | 2006 £m | 2005 Restated £m |
|---|---|---|
| Finance costs: | | |
| Interest payable on bank overdrafts and loans | 92.8 | 83.8 |
| Interest payable on other loans | 7.4 | 11.3 |
| Interest payable on finance leases | 0.7 | 0.5 |
| | 100.9 | 95.6 |
| Interest payable on defined benefit pension scheme liabilities | 48.7 | 48.1 |
| | 149.6 | 143.7 |
| Finance income: | | |
| Interest receivable on bank balances | (2.1) | (2.2) |
| Other interest receivable | (0.3) | (0.6) |
| | (2.4) | (2.8) |
| Expected return from defined benefit pension scheme assets | (55.0) | (55.8) |
| | (57.4) | (58.6) |
| Net finance charges | 92.2 | 85.1 |
| Finance exceptional items (see Note 8(ii)) | (4.7) | (23.2) |
| **Total net finance charges** | **87.5** | **61.9** |

99

CITI-TF 00675880

## 6.    Taxation

| | 2006 £m | 2005 Restated £m |
|---|---|---|
| Current tax | 23.8 | 28.4 |
| Deferred tax (Note 24) | 4.3 | (4.5) |
| | 28.1 | 23.9 |

The tax on the Group's profit before tax differs from the theoretical amount that would arise using the weighted average tax rate applicable to profits of the consolidated companies as follows:

| | | |
|---|---|---|
| Profit before tax | 118.1 | 98.8 |
| Tax calculated at domestic rates applicable to profits in the respective countries at 38.8% (2005: 40.0%) | 45.8 | 39.6 |
| Effects of: | | |
| Income not subject to tax | (4.2) | (7.7) |
| Expenses not deductible for tax purposes | 23.7 | 21.0 |
| Utilisation of previously unrecognised tax losses | (42.3) | (37.9) |
| Tax losses for which no deferred income tax asset was recognised | 16.9 | 15.8 |
| Adjustment in respect of prior years | (11.8) | (6.9) |
| Current tax on profit (loss) before taxation | 28.1 | 23.9 |

## 7.    Dividends (equity)

| | 2006 Per share | 2005 Per share | 2006 £m | 2005 Restated £m |
|---|---|---|---|---|
| Ordinary dividends: | | | | |
| 2005/2004 final dividend | 6.0p | 6.0p | 47.2 | 47.1 |
| 2005/2004 interim dividend | 2.0p | 2.0p | 15.7 | 15.8 |
| Total | 8.0p | 8.0p | 62.9 | 62.9 |

The interim dividend of 2.0p per share was paid on 1 April 2005 to shareholders on the register at the close of business on 4 March 2005. The final dividend of 6.0p per share was paid on 7 October 2005 to shareholders on the register at the close of business on 9 September 2005.

## 8.    Exceptional items and amortisation

Exceptional items and amortisation are excluded from underlying results in order to provide a better understanding of the normalised trading of the Group, and include operating exceptional items and amortisation and finance exceptional items. See the Group accounting policies section of these financial statements for definitions of these terms and for examples of the types of transactions that may fall into each category.

100

CITI-TF 00675881

(i)    *Operating exceptional items and amortisation*

| | 2006 £m | 2005 Restated £m |
|---|---|---|
| Net gain on sale of property, plant and equipment | | |
| Gain on disposal of business | 1.5 | 0.8 |
| Gain on revaluation to fair value of investments at fair value through profit and loss | 1.0 | — |
| Restructuring and reorganisation costs: | 2.6 | 0.2 |
| Music: headcount reduction | (2.3) | (3.8) |
| Release of overprovision for reorganisation costs charged in prior years | 2.3 | 3.8 |
| Property impairment | (1.1) | (18.5) |
| Amortisation and impairment of music copyrights and intangibles | (49.9) | (45.8) |
| Impairment of goodwill | — | (2.2) |
| **Total** | **(45.9)** | **(65.5)** |

The attributable taxation charge (credit) relating to operating exceptional items and amortisation is £nil (2005: £(7.6)m).

The share of the operating exceptional items and amortisation attributable to minority interests is £0.1m (2005: £(5.1)m).

(ii)    *Finance exceptional items*

| | 2006 £m | 2005 Restated £m |
|---|---|---|
| Fair value revaluation of convertible bond derivative liability | 4.1 | 31.2 |
| Fair value revaluation of interest rate swaps | 1.4 | 1.7 |
| Fair value revaluation of Eurobond call feature derivative asset | 8.2 | (0.2) |
| Foreign exchange on unhedged Euro borrowings | (4.1) | (9.5) |
| Foreign exchange on unhedged foreign currency borrowings | 0.3 | — |
| Exceptional refinancing costs | (5.2) | — |
| **Total** | **4.7** | **23.2** |

The attributable taxation charge relating to finance exceptional items is £nil (2005: £nil).

See Note 19 for further details on exceptional refinancing costs.

9.    **Earnings per Ordinary Share (EPS)**

| | 2006 | 2005 Restated |
|---|---|---|
| Earnings per Ordinary Share is calculated using the following: | | |
| Earnings | £86.1m | £75.4m |
| Underlying earnings | £127.4m | £105.0m |
| **Basic** | | |
| Weighted average number of Ordinary Shares | 786.8m | 785.6m |
| **Diluted** | | |
| Adjusted weighted average number of Ordinary Shares | 874.2m | 872.8m |

The adjusted weighted average number of Ordinary Shares used in the diluted earnings per share calculations, 874.2m (2005: 872.8m), is the weighted average number of Ordinary shares, 786.8m (2005: 785.6m), plus adjustments for dilutive share options, 8.5m (2005: 8.4m) plus adjustments for convertible bond options, 78.9m (2005: 78.9m).

101

CITI-TF 00675882

*Reconciliation from basic to diluted earnings per share*

| | Year ended 31 March 2006 | | Year ended 31 March 2005 | |
|---|---|---|---|---|
| | £m | Per Share | Restated £m | Restated Per Share |
| Earnings/basic EPS | 86.1 | 10.9p | 75.4 | 9.6p |
| Dilutive adjustments: | | | | |
| Convertible bond – attributable interest cost* and dilution | 5.4 | (0.3)p | (22.2) | (3.4)p |
| Dilutive share options – dilution | — | (0.1)p | — | (0.1)p |
| Earnings adjusted for effects of dilution/ diluted EPS | 91.5 | 10.5p | 53.2 | 6.1p |

\*   *Including fair value revaluation of convertible bond derivative liability included within finance exceptional items.*

*Reconciliation from basic to underlying basic and underlying diluted earnings per ordinary share*

| | Year ended 31 March 2006 | | Year ended 31 March 2005 | |
|---|---|---|---|---|
| | £m | Per Share | Restated £m | Restated Per Share |
| Earnings/basic EPS | 86.1 | 10.9p | 75.4 | 9.6p |
| Exceptional items and amortisation: | | | | |
| Operating exceptional items and attributable taxation | (4.0) | (0.5)p | 9.9 | 1.3p |
| Amortisation of music copyrights and intangibles | 47.9 | 6.1p | 45.8 | 5.8p |
| Impairment of music copyrights and intangibles | 2.0 | 0.3p | — | 0.0p |
| Impairment of goodwill | — | 0.0p | 2.2 | 0.3p |
| Minority interest in operating exceptional items and attributable taxation | 0.4 | 0.1p | (4.8) | (0.6)p |
| Minority interest in amortisation of music copyrights and intangibles | (0.3) | (0.1)p | (0.3) | 0.0p |
| Finance exceptional items | (4.7) | (0.6)p | (23.2) | (3.0)p |
| Underlying earnings/underlying basic EPS | 127.4 | 16.2p | 105.0 | 13.4p |
| Dilutive adjustments: | | | | |
| Convertible bond – attributable interest cost and dilution | 9.5 | (0.4)p | 9.0 | (0.2)p |
| Dilutive share options – dilution | — | (0.1)p | — | (0.1)p |
| Underlying earnings adjusted for effects of dilution/ underlying diluted EPS | 136.9 | 15.7p | 114.0 | 13.1p |

102

CITI-TF 00675883

## 10.  Music copyrights and intangibles

|  | 2006 £m |
|---|---|
| **Cost** | |
| Beginning of the year | 776.4 |
| Currency retranslation | 57.6 |
| Acquisition of businesses | 3.7 |
| Additions | 4.1 |
| Disposals | (4.6) |
| **End of the year** | 837.2 |
| **Amortisation** | |
| Beginning of the year | 371.8 |
| Currency retranslation | 30.1 |
| Charge for year | 49.9 |
| Disposals | (3.9) |
| **End of the year** | 447.9 |
| **Carrying amount** | 389.3 |

## 11.  Goodwill

|  | 2006 £m |
|---|---|
| **Cost** | |
| Beginning of the year | 35.1 |
| Currency retranslation | 1.5 |
| Acquisition of businesses | 6.5 |
| Disposals | (0.1) |
| **End of the year** | 43.0 |

CITI-TF 00675884

## 12.  Property, plant and equipment

| | Freehold property £m | Leasehold property £m | Plant, equipment and vehicles £m | Total £m |
|---|---|---|---|---|
| **Cost** | | | | |
| At 31 March 2005 (restated) | 115.8 | 80.5 | 192.3 | 388.6 |
| Currency retranslation and reclassification | 2.5 | 1.7 | 11.7 | 15.9 |
| Acquisition of businesses | — | — | — | — |
| Disposal of businesses | — | — | — | — |
| Additions | 6.0 | 4.9 | 19.3 | 30.2 |
| Disposals | (23.0) | (1.1) | (51.1) | (75.2) |
| At 31 March 2006 | 101.3 | 86.0 | 172.2 | 359.5 |
| **Comprising:** | | | | |
| At cost | 101.3 | 86.0 | 172.2 | 359.5 |
| At 31 March 2006 | 101.3 | 86.0 | 172.2 | 359.5 |
| **Accumulated depreciation and impairment** | | | | |
| At 31 March 2005 (restated) | 43.4 | 19.4 | 125.8 | 188.6 |
| Currency retranslation and reclassification | 1.3 | (0.7) | 9.7 | 10.3 |
| Disposal of businesses | — | — | — | — |
| Depreciation charge for the year | 2.0 | 3.2 | 20.1 | 25.3 |
| Impairment | 1.1 | — | — | 1.1 |
| Disposals | (13.6) | (1.0) | (48.0) | (62.6) |
| At 31 March 2006 | 34.2 | 20.9 | 107.6 | 162.7 |
| **Carrying amount** | | | | |
| At 31 March 2006 | 67.1 | 65.1 | 64.6 | 196.8 |

Freehold property includes land having a cost of £28.1m which is not depreciated.

The depreciation charge for the year includes depreciation of assets held under finance leases of £0.4m.

| | 2006 £m |
|---|---|
| The carrying values shown above include the following: | |
| Finance lease assets | 18.9 |
| Assets in the course of construction | 15.0 |

Properties held by Toshiba-EMI Limited were carried at a revalued amount prior to the implementation of IAS16 *Tangible Fixed Assets* in the year ended 31 March 2005. The revalued amount was based on third party expert valuation. Under the transitional arrangements of that standard, the carrying value of these properties has been frozen and carried forward as deemed cost. These properties are currently held at net book value of £30.4m. The comparable amount under the historical cost convention would be £3.9m.

104

CITI-TF 00675885

### 13. Investments in associates

|  | 2006 £m |
|---|---|
| Beginning of the year | 8.5 |
| Currency retranslation | 0.5 |
| Additions and new loans | 0.3 |
| Share of profit (loss)* | 1.0 |
| Dividends | (1.0) |
| Disposals, provisions and loans repaid | (0.5) |
| End of the year | 8.8 |

*  Share of profit (loss) is after tax

Investments in associates as at 31 March 2006 includes goodwill of £2.5m. None of the Group's associates are listed.

The following table provides summarised financial information of the Group's share of its associates:

|  | 2006 £m | 2005 £m |
|---|---|---|
| Non-current assets | 0.6 | |
| Current assets | 4.7 | |
| Gross assets | 5.3 | |
| Current liabilities | (3.2) | |
| Non-current liabilities | — | |
| Gross liabilities | (3.2) | |
| Share of net assets | 2.1 | |
| Revenue | 14.8 | 12.4 |
| Net profit (loss) | 1.0 | 1.1 |

### 14. Other investments

|  | 2006 £m |
|---|---|
| Held-to-maturity investments | 7.9 |
| Available-for-sale investments | 7.1 |
| Investments at fair value through profit and loss | 0.3 |
|  | 15.3 |
| Current portion: | |
| Investments at fair value through profit and loss | 0.3 |
|  | 0.3 |
| Non-current portion: | |
| Held-to-maturity investments | 7.9 |
| Available-for-sale investments | 7.1 |
|  | 15.0 |

105

CITI-TF 00675886

The held-to-maturity investments included above represent unlisted equity investments which are held by the Group for long-term return which is broadly determinable. They are valued at cost.

The available-for-sale investments included above represent both listed and unlisted equity investments which offer the Group the opportunity of return through dividend income. The fair values of the listed element of these investments are based on quoted market prices. Fair value gains and losses on these investments are charged directly to equity. The unlisted element of these investments is valued at cost.

The investments at fair value through profit and loss included above represent listed equity investments which offer the Group the opportunity of returns through dividends income and fair value gains. The fair values of these investments are based on quoted market prices. Fair value gains and losses on these investments are charged to profit and loss.

### 15. Financial derivatives

| | Assets £m | 2006 Liabilities £m |
|---|---|---|
| Interest rate swaps – fair value hedge (excluding accrued interest) | 11.0 | (13.6) |
| Convertible bond derivative | — | (86.7) |
| €425m 8.625% senior notes embedded call feature | 30.3 | — |
| | 41.3 | (100.3) |

#### Interest rate swaps

The notional principal amounts of the outstanding interest rate swap contracts at 31 March 2006 were £586.2m. At 31 March 2006 the fixed interest rates vary from 8.38% to 8.63% and the main floating rates are 3 month LIBOR + 465 basis points and 3 month EURIBOR + 440 basis points. The fair value of the interest rate swaps is equal to the book value.

#### Convertible bond derivative

On issue of the guaranteed convertible bond, the fair value of the liability component was determined using a market rate for an equivalent non-convertible bond. As the convertible bond is denominated in US Dollars but convertible into Sterling shares, the remainder of the proceeds were allocated to the conversion option that is recognised and included as a derivative liability, net of issue costs. The value of the call feature is revalued to fair value at each balance sheet date, with movements in the fair value reflected as finance costs or finance income.

#### €425m 8.625% senior notes

On or after 15 October 2008 the Company may redeem all or part of the notes at redemption prices (plus accrued interest) fixed for the 12 month period starting at the date shown (15 October 2008, 104.3125%; 15 October 2009, 102.8750%; 15 October 2010, 101.4375%; and from 15 October 2011 at 100.0000%). At 31 March 2006 this embedded call feature had a fair value of £30.3m and is included as a derivative asset.

#### Net investments in foreign operations

In addition to the €425m 8.625% senior notes the Group had Euro and Yen denominated drawings under its £450m revolving credit facility. These drawings were fully repaid at 31 March 2006. During the year the Euro borrowing had foreign exchange losses of £4.1m (2005: £9.5m loss) while the Yen borrowing had foreign exchange gains of £0.3m (2005: £nil). The foreign exchange loss on the Euro borrowing has been treated as an finance exceptional item and charged to the income statement. As the Yen borrowing is a partial hedge of the net investment in the Group's Japanese subsidiary, the foreign exchange gain on translation of the borrowing to Sterling at the balance sheet date was recognised in 'other reserves' in shareholders' equity to the extent that the borrowing provided a hedge against the net investment, the remainder £0.3m (2005: £nil) being credited to the income statement.

#### Credit risk

The Group's principal financial assets are bank balances, cash and trade and other receivables.

106

CITI-TF 00675887

The Group's credit risk is primarily attributable to its trade and other receivables. The amounts presented in the balance sheet are net of allowances for doubtful debts. Such an allowance is made where there is an identified loss event which, based on previous experience, is evidence of a reduction in the recoverability of the debt.

The credit risk on bank balances is limited because the counterparties are financial institutions with high credit ratings assigned by international credit rating agencies.

The Group has no significant concentration of credit risk, with exposure spread over a large number of geographically dispersed counterparties.

**16. Inventories**

|  | 2006 £m |
|---|---|
| Raw materials and consumables | 1.4 |
| Work in progress | |
| Finished goods | 35.8 |
| **Total** | 37.2 |

**17. Receivables**

|  | 2006 £m | 2006 £m |
|---|---|---|
| Current receivables: | | |
| Trade receivables | | 408.5 |
| Advances | | 330.1 |
| Corporation tax recoverable | | 16.7 |
| Other receivables: | | |
| Amounts owed by associates | 1.1 | |
| Other debtors (including current portion of other investments) | 73.4 | |
| Prepayments and accrued income | 36.1 | |
| | | 110.6 |
| | | 865.9 |
| Non-current receivables: | | |
| Other receivables | | 4.4 |
| Prepayments and accrued income | | — |
| | | 4.4 |
| **Total** | | 870.3 |

The Directors consider that the carrying amount of receivables due both within and after more than one year approximates to their fair value.

**18. Cash and cash equivalents**

|  | 2006 £m |
|---|---|
| Cash at bank and in hand | 188.3 |
| Short-term deposits | 2.6 |
| | 190.9 |

Cash at bank earns interest at floating rates based on daily bank deposit rates. Short-term deposits are ordinarily made for periods varying between one day and one month, although can

107

CITI-TF 00675888

extend to periods of up to three months, depending on the immediate cash requirements of the Group, and earn interest at the respective short-term deposit rates.

The Group has balances of cash and cash equivalents totalling £60.7m held with banks within the UK and £130.2m held with banks outside, but freely transferable to, the UK.

### 19.  Borrowings

| | 2006 £m |
|---|---|
| **Non-current** | |
| US$500m 8.375% guaranteed notes | 287.7 |
| £325m 8.25% Sterling bonds | 323.1 |
| US$243.3m 5.25% guaranteed convertible bonds | 121.1 |
| €425m 8.625% senior notes | 300.0 |
| Long-term committed facilities* | (1.5) |
| Term loan | 2.0 |
| Finance leases | 17.0 |
| | 1,049.4 |
| **Current** | |
| Overdrafts | 19.6 |
| Term loan | 1.2 |
| US$123.8m 6.96% senior notes (first instalments) | — |
| Finance leases | 1.8 |
| | 22.6 |
| **Total borrowings** | 1,072.0 |

\*   *Includes issue costs of syndicated loan facility of £1.5m.*

The fair value of publicly traded borrowings has been calculated using the appropriate market prices at the balance sheet date. For the borrowings which are not publicly traded, the fair value has been calculated by discounting their future cash flows at the appropriate market rate. The directors estimate the fair value of the Group's borrowings to be as follows:

| | Book value 2006 £m | Fair value 2006 £m |
|---|---|---|
| Loans and overdrafts | 19.6 | 19.6 |
| US$500m 8.375% guaranteed notes | 287.7 | 306.0 |
| £325m 8.25% Sterling bonds | 323.1 | 348.0 |
| US$243.3m 5.25% guaranteed convertible bonds | 121.1 | 133.5 |
| €425m 8.625% senior notes | 300.0 | 368.1 |
| Long-term committed facilities | (1.5) | (1.5) |
| Term loan | 3.2 | 3.2 |
| Finance leases | 18.8 | 18.8 |
| | 1,072.0 | 1,195.7 |

108

CITI-TF 00675889

| Year ended 31 March 2006 | Current coupon rate | Effective interest rate | Within 1 year £m | 1-2 years £m | 2-3 years £m | 3-4 years £m | 4-5 years £m | More than 5 years £m | Total £m |
|---|---|---|---|---|---|---|---|---|---|
| **Non-current** | | | | | | | | | |
| US$500m 8.375% guaranteed notes | 8.375% | 8.49% | — | — | — | 287.7 | — | — | 287.7 |
| £325m 8.25% Sterling bonds | 9.75% | 9.92% | — | — | 323.1 | — | — | — | 323.1 |
| US$243.3m 5.25% guaranteed convertible bonds | 5.25% | 9.30% | — | — | — | — | 121.1 | — | 121.1 |
| €425m 8.625% senior notes | 8.625% | 8.94% | — | — | — | — | 121.1 | — | 121.1 |
| Long-term committed facilities | | | — | — | — | — | — | 300.0 | 300.0 |
| Term loan | | | — | 2.0 | — | — | (1.5) | — | (1.5) |
| Finance leases | | | — | — | — | — | — | 17.0 | 2.0 |
| | | | | | | | | | 17.0 |
| | | | — | 2.0 | 323.1 | 287.7 | 119.6 | 317.0 | 1,049.4 |
| **Current** | | | | | | | | | |
| Overdrafts | | | 19.6 | — | — | — | — | — | 19.6 |
| Term loan | | | 1.2 | — | — | — | — | — | 1.2 |
| Finance leases | | | 1.8 | — | — | — | — | — | 1.8 |
| | | | 22.6 | | | | | | 22.6 |
| Total borrowings | | | 22.6 | 2.0 | 323.1 | 287.7 | 119.6 | 317.0 | 1,072.0 |

In July 2005 the Group signed a new £450m revolving credit facility with a group of banks. This facility replaced a revolving credit facility (£250m), a 364 day facility (£100m) and enabled a subsidiary to repay the US$123.8m 6.96% senior notes. In addition two bilateral facilities (£40m) were not renewed. This resulted in exceptional refinancing costs of £5.2m (2005: £nil) of which £3.5m was in respect of issue and repayment costs of the US$123.8m 6.96% senior notes and £1.7m in respect of issue costs relating to the £250m revolving credit facility.

On 11 March 2003 Moody's Investor Service downgraded the Group's credit rating from Baa2 to Ba1. As a consequence the coupon of the £325m 8.25% Sterling bonds was increased from 8.25% to 9.75% with effect from 20 May 2003 and the coupon of the US$ 123.8m 6.96% senior notes was increased from 6.96% to 8.46% with effect from 21 August 2003.

The Group holds equivalent US Dollar nominal value interest rate swaps matching the coupon and the term of the US$500m 8.375% guaranteed notes effectively converting the interest basis of the issue to floating rate (set in arrears). See Note 15 for the derivative portion of the borrowing.

The Group holds equivalent Euro nominal value interest rate swaps matching the coupon and the term of the €425m 8.625% senior notes effectively converting the interest basis of the issue to floating rate (set in arrears). See Note 15 for the derivative portion of the borrowing.

At 31 March 2006 the Group had available £437.1m of undrawn committed borrowing facilities in respect of which all conditions precedent had been met.

The term loan of £3.2m was raised in the period July 2004 to December 2005. Repayments will commence in August 2006 and will continue until January 2008. The loan carries a floating rate of interest at LIBOR + 1.5%.

Overdrafts are unsecured, repayable on demand, and are charged interest at variable rates.

For details regarding the Group's obligations under finance leases, see Note 21.

CITI-TF 00675890