# 11-0126-cv

# United States Court of Appeals

*for the*

# Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 19 of 65 (Pages A-5401 to A-5700)

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

## TABLE OF CONTENTS

|  | Page |
|---|---|
| District Court Docket Entries .................................... | A-1 |
| Summons and Complaint, dated December 11, 2009 | A-39 |
| Declaration of Adrian Briggs, for Defendants, in Support of Motion to Dismiss, dated January 20, 2010, with attached *Curriculum Vitae* .................. | A-89 |
| Declaration of Strauss, for Plaintiffs, in Opposition to Defendants' Motion, dated February 2010, with attached *Curriculum Vitae* ............................ | A-106 |
| Second Declaration of Adrian Briggs, for Defendants, in Support of Motion to Dismiss, dated February 11, 2010 ........................................ | A-137 |
| Defendants' Answer to Plaintiff's Complaint, dated April 7, 2010 .......................................................... | A-149 |
| Notice of Motion for Summary Judgment, by Defendants, dated August 13, 2010 ...................... | A-171 |
| Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment, dated August 13, 2010 ......... | A-173 |
| Declaration of Gary R. Carney, in Support of Defendants' Motion for Summary Judgment, dated August 13, 2010 ...................................... | A-199 |
| Exhibit 1 to Carney Declaration - Terra Firma Private Placement Memorandum, dated April 2006 .................................................... | A-217 |
| Exhibit 2 to Carney Declaration - Terra Firma Capital Partners II Q3 2007 report, dated November 2007 ............................................ | A-318 |

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006................................................ A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006................................................ A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006................................................ A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007................................................ A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings................................ A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007................................................ A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010.... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007................................................ A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ........................... A-404

iii

**Page**

Exhibit 13 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachments...........................  A-415

Exhibit 14 to Carney Declaration -
E-mail from Ashcroft to Wormsley *et al.*, dated
April 23, 2007, with attachment ............................  A-427

Exhibit 15 to Carney Declaration -
EMI News Release, dated May 4, 2007 ................  A-437

Exhibit 16 to Carney Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.......................................................  A-439

Exhibit 17 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
February 5, 2007..................................................  A-441

Exhibit 18 to Carney Declaration -
Memorandum from Seymour to Punja, dated
March 2, 2007......................................................  A-457

Exhibit 19 to Carney Declaration -
E-mail from Reid to Seymour, dated
May 16, 2007.......................................................  A-462

Exhibit 20 to Carney Declaration -
Music Industry Key Market Outlook Summary of
Findings prepared by L.E.K. Consulting, dated
May 15, 2007.......................................................  A-656

Exhibit 21 to Carney Declaration -
Project Dice Limited Scope Financial Due
Diligence Report, dated May 17, 2007.................  A-783

Exhibit 22 to Carney Declaration -
Project Mulberry Limited Scope Financial Due
Diligence Report, Volume I, dated May 4, 2007 ...  A-887

iv

**Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments ............................ A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 .................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007 ........................................................ A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 .......................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007 .................. A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 ................... A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments ................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment ............................................................ A-995

v

**Page**

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007    A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007....................................................    A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007.......................................................    A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007.....................................................    A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007.......................................................    A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007.....................................................    A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007.......................................................    A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007.......................................................    A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 .............................    A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ...................................    A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 . A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments .................................. A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007........................................................ A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 .............................. A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007........................................................ A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007........................................................ A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007........................................................ A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007........................................................ A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 .................................... A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007........................................................ A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007.......................................................... A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007.......................................................... A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007.......................................................... A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007.......................................................... A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ................................................ A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007.......................................................... A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007.......................................................... A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007.......................................................... A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment...................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007.....  A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007........................................................  A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007........................................................  A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007........................................................  A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007........................................................  A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007........................................................  A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007........................................................  A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007........................................................  A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007........................................................  A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007................................. A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007.......................................................... A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007.......................................................... A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007..................... A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007..................... A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007.......................................................... A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc........................................................ A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007................................................ A-1554

**x**

Page

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ....................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................................ A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................................ A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 .......................................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ....................................................... A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................................ A-1590

**xi**

                                                                    **Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma .................................................................... A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ............... A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007 .................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ............... A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ........................................................ A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ........................................................ A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ........................ A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 ............................................... A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008 ................................................... A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008.....................................................  A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008........................................................  A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009.....................................................  A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009.....................................................  A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008...........................................................  A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008...........................................................  A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart..........................  A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update.......................  A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 .....................................  A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008...........................................................  A-2301

xiii

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ......    A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ...............    A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009 ...........................    A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 .........................................................    A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 ...............................................    A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 ....................................................    A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 .....................................................    A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 ..............................................    A-2479

xiv

                                                              **Page**

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009............................  A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ...............................................  A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 .........................  A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 ..........................................  A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009...................  A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 ...............................................  A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes...................  A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007 ....................  A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 ........................................................  A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 ................................................. A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 ..................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................. A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 .................................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code............................. A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010................ A-2602

Mark Nimrod Barak, dated July 15, 2010 ................. A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 ................... A-2631

Simon A. Borrows, dated June 25, 2010.................... A-2702

Andre Bourbonnais, dated July 13, 2010................... A-2779

Andrew Chadd, dated July 23, 2010
    (Reproduced herein at pp. CA-1-CA-53)

xvi

**Page**

Ricardo Hacelas Coats, dated June 23, 2010 ............. A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010 .................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010 .................. A-2959

Elio Leoni-Sceti, dated June 25, 2010 ..................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010 ........................ A-3027

Eric Nicoli, dated July 5, 2010 ................................. A-3039

Timothy Pryce, dated July 22, 2010 ........................ A-3087

Riaz Punja, dated July 28, 2010 ................................ A-3130

Michael Slattery, dated August 6, 2010 ................... A-3169

Martin David Stewart, dated July 7 and 8, 2010 ........ A-3177

Iain Stokes, dated August 6, 2010 ............................ A-3183

Kamal Fouad Tabet, dated July 29, 2010 .................. A-3238

Francois Van der Spuy, dated July 7, 2010 ............... A-3242

Julie Williamson, dated July 28, 2010 ...................... A-3267

Alexander Wolf, dated July 14, 2010 ........................ A-3280

David Wormsley, dated July 20, 2010 ...................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated
   July 30, 2010 ........................................................ A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ................ A-3340

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006]
EWCA Civ 1601 .................................................... A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007]
EWHC 1151 (Comm) ............................................ A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal
Bank of Scotland Plc* [2010] EWHC 1392
(Comm) ................................................................ A-3493

*BSkyB Ltd v Sky Subscribers Services Limited*
[2010] EWHC 86 .................................................. A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus
Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006]
EWHC 2887 (QB) (Comm), [2007] EWCA Civ
811 ...................................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ...................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ........................... A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ..................... A-4240

*Bradford Building Society v Borders* [1941] 2 All
ER 205 ................................................................. A-4258

*Downs v Chappell* [1997] 1 WLR 426 ..................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009]
EWCA Civ 169 .................................................... A-4325

xviii

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All
ER 583 ............................................... A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER
(Comm) 573 ........................................ A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd*
[2007] EWHC 2541 (QB)................................... A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd*
[1964] AC 465 ...................................... A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC
145 ................................................ A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson &
Co* [1991] 2 QB 113................................. A-4671

*Bankers Trust International v Dharmala Sakti
Sejahtera* [1996] CLC 518............................ A-4688

*Valse Holdings SA v Merrill Lynch International
Bank Ltd* [2004] EWHC 2471 .......................... A-4741

*Peekay Intermark v Australia and New Zealand
Banking Group* [2006] EWCA Civ 386................. A-4779

*JP Morgan Chase Bank v Springwell Navigation
Corp* [2008] EWHC 1186 (Comm) ....................... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland
Plc* [2010] EWHC 211 (Comm) ......................... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight
Couriers Ltd* [2008] EWHC 1686 (Comm),
[2009] 1 All ER (Comm) 16, [2009] EWCA Civ
290 ............................................... A-5126

xix

**Page**

*IFE Fund SA v Goldman Sachs International* 1 [2007] Lloyd's Rep 264 .......................................... A-5184

*William Sindall plc v Cambridgeshire County Council* [1994] 1 WLR 1016 ................................ A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 ........................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co* [1892] AC 25 ...................................................... A-5325

*Allen v Flood* [1898] AC 1 ........................................ A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 .............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019 (Ch) ................................................................... A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries Ltd* (No. 2) [1982] Ch 204 ................................... A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ................ A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25 ...................................................................... A-5708

*Smith New Court Securities v Citibank NA* [1997] AC 254.................................................................. A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142 and 6-158 ............................................................ A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs 8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

**Page**

*McGregor on Damages*, 17th Edition, paragraph 1-021 ........................................................ A-5774

*Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 ........................................ A-5777

*Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 .............. A-5780

*The Unfair Contract Terms Act 1977* ........................ A-5783

Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 ............................................ A-5807

Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 ......... A-5883

Exhibit A to Randell Declaration - Handwritten Notes ................................................ A-5887

Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 ........................ A-5891

Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 .................................................... A-5894

Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 .................................................... A-6101

Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 .................................................... A-6280

**xxi**

                                                                        **Page**

Declaration of Christopher E. Duffy in Opposition
     to Defendants' Motion for Summary Judgment,
     dated September 2, 2010........................................  A-6447

Exhibit 1 to Duffy Declaration -
     Amended and Restated Advisory Agreement
     relating to Terra Firma Investments (GP) 2
     Limited and Terra Firma Capital Partners
     Limited, dated October 9, 2003 ...........................  A-6471

Exhibit 2 to Duffy Declaration -
     Advisory Agreement relating to Terra Firma
     Capital Partners III, L.P., dated February 8, 2006 .  A-6493

Exhibit 3 to Duffy Declaration -
     Minutes of a Terra Firma Investments (GP) 2
     Limited Directors' meeting, dated May 20, 2007 ..  A-6512

Exhibit 4 to Duffy Declaration -
     Minutes of a Terra Firma Investments (GP) 3
     Limited Directors' meeting, dated May 20, 2007 ..  A-6515

Exhibit 5 to Duffy Declaration -
     E-mail from Rowland to Laskowski and Crocker,
     dated September 18, 2008, with attachment ..........  A-6517

Exhibit 6 to Duffy Declaration -
     E-mail from Smith to Small, dated May 21, 2007.  A-6521

Exhibit 7 to Duffy Declaration -
     E-mail from Wormsley to Hands, dated
     November 7, 2006 ................................................  A-6523

Exhibit 8 to Duffy Declaration -
     E-mail from Wormsley to Hands, dated
     September 19, 2007 ...............................................  A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 ................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ............................................... A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006................................................. A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007......................................................... A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 ................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et
al.*, dated November 16, 2007............................... A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 ............... A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007......................................................... A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007................................. A-6571

**xxiii**

                                                                      **Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...  A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006........................................  A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 .................................................  A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment.............................................  A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 .................................................  A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 .......................................  A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 ........................................................  A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 ..............................................  A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................  A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................  A-6640

**xxiv**

                                                                **Page**

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 ............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007.................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................. A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ........................... A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 .............................. A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 .......................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ......................................................... A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ......................................................... A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 .......................................................... A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 ........................................................ A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 ........................................................ A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 ........................................................ A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 ................................................ A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................ A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 ........................................................ A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 ........................................................ A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 ........................................................ A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ............................ A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 .................................  A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 ........................................................  A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 ..............................................  A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment ...........................................  A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 ........................................................  A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 ........................................................  A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 ..............................................  A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 ........................................................  A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ................................ A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ......................................................... A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ......................................................... A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007 ........................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ................................ A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ................................ A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 ............................................... A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 ................................................ A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment.............................................. A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007  A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007  A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ........................................................ A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ........................................................ A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment.............................................. A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007..................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" .................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ........................................................ A-6835

**xxx**

**Page**

Exhibit 87 to Duffy Declaration -
E-mail from Simonian to Smith, dated
May 21, 2007 ........................................................ A-6837

Exhibit 88 to Duffy Declaration -
E-mail from Wormsley to Lindsay, dated
September 17, 2007 ................................................ A-6838

Exhibit 89 to Duffy Declaration -
Memorandum from Simpkin *et al.* to Klein *et al.*,
dated November 16, 2007
(Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration -
E-mail from Borrows to Nicoli, Gildersleeve and
Parker, dated July 31, 2007 .................................... A-6843

Exhibit 91 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................ A-6844

Exhibit 92 to Duffy Declaration -
E-mail from Grigorova to Cockerill, *et al.*, dated
September 5, 2007 ................................................. A-6846

Exhibit 93 to Duffy Declaration -
E-mail from Sckerl to Cockerill, dated June 9,
2009 with Attachment
(Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration -
E-mail from Grigorova to Sckerl, dated
February 16, 2009 ................................................. A-6850

Exhibit 95 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 23, 2007 ............................................... A-6855

xxxi

**Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment.............. A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009...................................................... A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment.................... A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ................................................ A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 ...................................................... A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009................................................. A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010 ...................................................... A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007 ......................................................... A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ........................................................ A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................... A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ......................................... A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ....................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 ............................... A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 ............................... A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007 .... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 .......................................................... A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 .................................................... A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006 ................................................ A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006 ................................................ A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006 ................................................... A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ......................................................... A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ................................................. A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 ........................................................... A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007 ....................................................... A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ..................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ........................................................... A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 ......................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ..................................................... A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ........................................................... A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ........................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 ......................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 ..................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007......................................................... A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 ............................................... A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007......... A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ...................................................... A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 ........................................................ A-7410

xxxvi

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 ................... A-7473

xxxvii

**Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 .................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 .................................................. A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009.......................................................... A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ............................................ A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 ................................................ A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

                                                                    **Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009.....................................  A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007..  A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 .  A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 ........................................................  A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010...............  A-7553

Mark Nimrod Barak, dated July 15, 2010 ................  A-7557

Jason Bazinet, dated June 30, 2010 ..........................  A-7564

Peter Edward Bell, dated June 22, 2010 ...................  A-7601

Simon A. Borrows, dated June 25, 2010...................  A-7705

Andre Bourbonnais, dated July 13, 2010..................  A-7827

Andrew Chadd, dated July 23, 2010
   (Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
   (Reproduced at pp. CA-295-CA-315)

xxxix

|  | **Page** |
|---|---|
| John Gildersleeve, dated June 30, 2010 | A-7832 |
| Guy Hands, dated July 15, 2010 | A-7848 |
| Guy Hayward-Cole, dated July 27, 2010 | A-7901 |
| David Robert Paul Hill, dated August 4, 2010 | A-7918 |
| Michael Klein, dated July 19, 2010 | A-7923 |
| Chad Leat, dated June 18, 2010 | A-7935 |
| John Loveridge, dated July 30, 2010 | A-7941 |
| Bruce MacInnes, dated July 8, 2010 | A-7966 |
| Eric Nicoli, dated July 5, 2010 | A-7970 |
| Riaz Punja, dated July 28, 2010 | A-8039 |
| Timothy Pryce, dated July 22, 2010 (Reproduced at pp. CA-316-CA-335) | |
| Elio Leoni-Sceti, dated June 25, 2010 (Reproduced at pp. CA-336-CA-385) | |
| Paul Simpkin, dated July 5, 2010 | A-8056 |
| Michael Slattery, dated August 6, 2010 | A-8073 |
| Matthew Canning Smith, dated August 3, 2010 (Day 1) | A-8077 |
| Matthew Canning Smith, dated August 9, 2010 (Day 2) | A-8116 |
| Iain Stokes, dated August 6, 2010 | A-8127 |
| Kamal Fouad Tabet, dated July 29, 2010 | A-8157 |
| Francois Van der Spuy, dated July 7, 2010 | A-8171 |

xl

**Page**

Julie Williamson, dated July 28, 2010
  (Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010........................ A-8175

David Wormsley, dated July 20, 2010
  (Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
  Defendants' Motion for Summary Judgment,
    dated August 27, 2010 ............................................ A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
  44.1, dated August 27, 2010 .................................. A-8195

Appendices to the Report of Nicholas S. Strauss
  Q.C. Pursuant to Rule 44.1 .................................... A-8245

Exhibit 1 to Strauss Report -
*AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
CLC 265 ................................................................ A-8249

Exhibit 2 to Strauss Report -
*AIC Limited v. ITS Testing Services (UK) Ltd,*
[2006] EWCA Civ 1601 ........................................ A-8262

Exhibit 3 to Strauss Report -
*Angus v. Clifford,* [1891] 2 Ch 449 ...................... A-8371

Exhibit 4 to Strauss Report -
*Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

Exhibit 5 to Strauss Report -
*Assicurazione Generali v. Arab Insurance Group,*
[2003] I.R.L.R. 131 ............................................... A-8422

Exhibit 6 to Strauss Report -
*Attorney General of Belize v. Belize Telecom
Limited,* [2009] 1 W.L.R. 1988 ............................ A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 .................. A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International
(Overseas) Ltd (In Liquidation) v. Price
Waterhouse (No.2),* [1998] PNLR 564 ............... A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan
Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ................................................. A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ...................................... A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 ..................................................... A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 ................................. A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ............................. A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ................ A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................ A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ............................................. A-9042

**xlii**

**Page**

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................................  A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton
(London) Ltd,* [1957] 2 QB 621 CA ....................  A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925  ......  A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ................................................................  A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484  ..................  A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 ......................................................................  A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 ......................................................................  A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337  ................  A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ...............  A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777  ...............  A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ ..............................................  A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne & Co Ltd. v. Heller & Partners Ltd.,* [1964] AC 465 .............................. A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),* [1995] 2 AC 145 HL .............................. A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247 CA ........................................................ A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De Productos Agricolas SA De CV,* [2003] EWCA Civ 1104 ............................................... A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,* [2006] EWHCA 2887 (QB) (Comm) .................. A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West Bromwich Building Society,* [1998] 1 W.L.R. 896 A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,* [2004] EWCA Civ 1244 ...................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom & Co.,* [1983] 1 All E.R. 583 ......................................... A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation Corp.,* [2008] EWHC 2286 (Comm) ................... A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)*
*Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 ................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 ............................................. A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson*
*& Co.,* [1991] 2 QB 113 ....................... A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand*
*Banking Group,* [2006] EWCA Civ 386 .............. A-10148

Exhibit 45 to Strauss Report -
*Raiffseisen Zentralbank Osterreich AG v. The*
*Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) ............................................. A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ................ A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District*
*Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

xlv

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL ............................................. A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 ................................................................... A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 ......................................................... A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National*
*Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ..................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ..................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and*
*Company of the Bank of England (No.3),* [2001]
UKHL 16 ............................................................ A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 ......................................... A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................. A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016............................ A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 ......................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 .................. A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) ............................................................. A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) ............................................................. A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) ......................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

**Page**

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) ............................. A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). ......................... A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ...................... A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss ........................... A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss ................................................................ A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement ............................... A-11178

Affidavit of Service, sworn to September 2, 2010..... A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 ..................... A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010.................................................. A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration -
Responses and Objections of Plaintiffs Terra
Firma Investments (GP) 2 Ltd. and Terra Firma
Investments (GP) 3 Ltd. To Defendants' First
Request for Production of Documents, dated
March 9, 2010 ....................................................... A-11216

Exhibit 131 to Carney Reply Declaration -
Journey Log Book for Guy Hands's flight to
London, dated May 20, 2007 ................................ A-11244

Exhibit 132 to Carney Reply Declaration -
Reservation for Guy Hands's flight to London,
dated May 20, 2007 .............................................. A-11247

Exhibit 133 to Carney Reply Declaration -
Report for Guy Hands's flight from the Airport
Landing Dues Information System of Guernsey
Airport, dated May 20, 2007 ................................. A-11248

Exhibit 134 to Carney Reply Declaration -
Daily Confirmed Handling report of Blue Islands
at Guernsey Airport, dated May 20, 2007 ............. A-11249

Exhibit 135 to Carney Reply Declaration -
Phone records of Guy Hands for the months of
April and May 2007 .............................................. A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010 ............... A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 .......................... A-11363

John Gildersleeve, dated June 30, 2010 .................... A-11376

Guy Hands, dated July 15, 2010 ............................... A-11380

xlix

                                                                     **Page**

John Loveridge, dated July 30, 2010 ........................  A-11395

Eric Nicoli, dated July 5, 2010 .................................  A-11410

Timothy Pryce, dated July 22, 2010 ........................  A-11419

Riaz Punja, dated July 28, 2010................................  A-11439

Michael Slattery, dated August 6, 2010 ....................  A-11457

Martin David Stewart, dated July 7 and 8, 2010........  A-11473

Iain Stokes, dated August 6, 2010.............................  A-11477

Francois Van der Spuy, dated July 7, 2010 ...............  A-11501

Alec Werner, dated August 19, 2010 ........................  A-11513

David Wormsley, dated July 20, 2010 ......................  A-11520

Second Report of Ewan McQuater, Pursuant to Rule
    44.1, dated September 3, 2010, with Exhibit 1......  A-11532

Affidavit of Service, sworn to September 23, 2010...  A-11566

Summary Judgment Hearing Transcript, dated
    September 10, 2010 .............................................  A-11568

Letter from Christopher E. Duffy to the Honorable
    Jed S. Rakoff, dated September 13, 2010, with
    attachments ...........................................................  A-11620

Letter from Jay Cohen to the Honorable Jed S.
    Rakoff, dated September 13, 2010, with
    attachments ...........................................................  A-11646

Order of the Honorable Jed S. Rakoff, dated
    September 14, 2010, filed September 15, 2010.....  A-11664

Notice of Motion *in Limine* No. 2 to exclude the
    Testimony of Marianne Demario, by Defendants,
    dated October 4, 2010...........................................  A-11666

l

Page

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* to exclude certain
    Testimony and Evidence, dated October 4, 2010 .. A-11668

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* to exclude certain
    Testimony and Evidence, dated October 4, 2010 .. A-11677

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* Nos. 1 through 5,
    dated October 4, 2010........................................... A-11686

Exhibit 1 to Levi Declaration -
Expert Report of David J. Teece, dated
June 14, 2010
(Reproduced at pp. CA-481-CA-544)

Exhibit 4 to Levi Declaration -
Complaint in the above-captioned matter, dated
December 11, 2009................................................. A-11695

Exhibit 16 to Levi Declaration -
Expert Report of Daniel R. Fischel, dated
July 7, 2010
(Reproduced at pp. CA-545-CA-586)

Exhibit 17 to Levi Declaration -
Microsoft Excel Spreadsheet printed from the
native file produced by Plaintiffs and bearing
bates number TF0000635801
(Reproduced at pp. CA-587-CA-592)

Exhibit 18 to Levi Declaration -
Expert Report of Marianne DeMario, dated
June 14, 2007
(Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) ..............  A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers*
*(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 .......  A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ......................................................  A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ....................................................  A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 ........................  A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007 ..........................  A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

**Page**

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010.................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
    (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
    (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010.................... A-12146

Eric Nicoli, dated July 5, 2010 ................................. A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

**liii**

**Page**

Declaration of Karen C. Dyer in Support of
    Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
    and Terra Firma Investments (GP) 3 Ltd's
    Memoranda in Oppositions to Defendants'
    Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration -
    Wise Men Committee meeting minutes, dated
    July 27, 2007 ......................................................... A-12186

Exhibit 14 to Dyer Declaration -
    "Project Record Valuation Considerations"
    prepared by Merrill Lynch for Cerberus, dated
    May 17, 2007 ........................................................ A-12188

Exhibit 15 to Dyer Declaration -
    Citi's Project Dice Credit Approval
    Memorandum, dated May 17, 2007 ....................... A-12209

Exhibit 16 to Dyer Declaration -
    Citi's "Fairness Committee Materials," dated
    May 21, 2007 ........................................................ A-12303

Exhibit 17 to Dyer Declaration -
    Excerpts from American Society of Appraisers,
    *ASA Business Valuation Standards* (2009) ............. A-12309

Exhibit 18 to Dyer Declaration -
    "Project Mulberry Valuation Materials," dated
    May 21, 2007 ........................................................ A-12315

Exhibit 19 to Dyer Declaration -
    E-mail from Barak to Reid *et al.*, dated
    March 2, 2007 ....................................................... A-12324

Exhibit 20 to Dyer Declaration -
    Letter from Borrows to Nicoli, dated
    July 19, 2007 ......................................................... A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ........................................................ A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 .............................................. A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ........................................................ A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ..................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ...................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 ................................................... A-12462

lv

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 ..................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................. A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................. A-14551

Trial Transcript, dated November 2, 2010 ................. A-14877

Trial Transcript, dated November 3, 2010 ................. A-15102

Trial Transcript, dated November 4, 2010 ................. A-15292

**lvi**

**Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
　　E-mail from Wormsley to Nicoli re call from
　　GH, dated May 21, 2007.................................. A-15300

Terra Firma Exhibit 2 -
　　E-mail from Tabet to Wormsley re
　　Conversation with Guy Hands, dated
　　May 21, 2007 ...................................... A-15301

Terra Firma Exhibit 3 -
　　E-mail from Wormsley to Lindsay re
　　financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
　　E-mail from Simonian to Smith re Bids, dated
　　May 21, 2007 .................................... A-15309

Terra Firma Exhibit 9 -
　　E-mail from Randell to Terra Firma re May
　　21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
　　Draft Minutes of a meeting of a committee of
　　the board of directors of Terra Firma (GP) 2
　　Limited, dated May 21, 2007 ........................... A-15311

Terra Firma Exhibit 11 -
　　E-mail from Wormsley to Gildersleeve re Dice,
　　dated May 9, 2007 ............................................ A-15316

Terra Firma Exhibit 12 -
　　E-mail from Smith to Kirshenbaum re EMI
　　deal, dated May 21, 2007 .................................... A-15319

Terra Firma Exhibit 13 -
　　E-mail from Smith to Mehta re EMI, dated
　　May 21, 2007 .................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
    E-mail from Smith to Badhe re EMI, dated
    May 21, 2007 ................................................... A-15322

Terra Firma Exhibit 15 -
    E-mail from Wormsley to Tague re Congrats
    on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
    E-mail from Poyser to Vakilian re Terra Firma
    Recommended Cash Offer, dated
    May 21, 2007 ................................................... A-15324

Terra Firma Exhibit 17 -
    E-mail from Grigorova to Cockerill re
    EMI/Maltby CCR July, dated
    September 5, 2007 ............................................ A-15326

Terra Firma Exhibit 19 -
    E-mail from Smith to Small re CITI M&A
    wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
    E-mail from Rowland to Laskowski and
    Crocker re Terra Firma, dated
    September 18, 2008 .......................................... A-15332

Terra Firma Exhibit 22 -
    E-mail from Miller to Zogheb re EMI, dated
    May 16, 2007 ................................................... A-15336

Terra Firma Exhibit 23 -
    E-mail from Gildersleeve to Wormsley re
    Roles, dated April 20, 2007 ............................ A-15338

**lviii**

Page

Terra Firma Exhibit 24 -
Citi Franchise Risk Assessment Template for
Maltby Investments Limited, Appendix 6B,
dated June 1, 2009 ............................................ A-15339

Terra Firma Exhibit 25 -
E-mail from Smith to Poyser re Chaka
Feedback, dated May 17, 2007 ........................ A-15340

Terra Firma Exhibit 26 -
E-mail from Wormsley to Poyser, *et al.*, re
EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
E-mail from Wormsley to Smith re FW: E-mail
from Wormsley to McBride, dated
May 21, 2007 ................................................... A-15342

Terra Firma Exhibit 28 -
E-mail from Wormsley to Leat and Klein re
marginal deal for Terra Firma, dated
July 14, 2007 ................................................... A-15345

Terra Firma Exhibit 29 -
E-mail from Wormsley to Hands re DAIG fees,
dated November 7, 2006 ................................... A-15346

Terra Firma Exhibit 30 -
E-mail from Wormsley to Hands re DAIG,
dated October 23, 2006 .................................... A-15347

Terra Firma Exhibit 31 -
E-mail from Wormsley to Hands re proposal,
dated November 15, 2006 ................................. A-15348

Terra Firma Exhibit 32 -
E-mail from Wormsley to Klein re Citi/Terra
Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
E-mail from Klein to Hands re Business
Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
E-mail from Tague to Lindsay re NBM #159
Europe, dated March 9, 2007 ........................... A-15351

Terra Firma Exhibit 35 -
E-mail from Tabet to Blagdon, Klein and
Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
E-mail from Wormsley to Miller re call from
Guy Hands, dated May 8, 2007 ........................ A-15357

Terra Firma Exhibit 40 -
E-mail from Smith to Wormsley re talk with
JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
E-mail from Wormsley to Nicoli, Gildersleeve,
Stewart re FW: Terra Firma, dated
May 18, 2007 ................................................... A-15359

Terra Firma Exhibit 42 -
E-mail from Shott to Bell re auction process
and Antitrust Confirmation, dated
May 20, 2007 ................................................... A-15360

Terra Firma Exhibit 43 -
E-mail from Ashcroft to Stewart re Conference
call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
E-mail from Wormsley to Nicoli re EMI media
Review, dated May 20, 2007 ............................ A-15366

lx

**Page**

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 ........................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 .............................. A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 ..................................................... A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007.................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ......................................... A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ......................................... A-15420

**lxi**

**Page**

Terra Firma Exhibit 61 -
    E-mail from Wormsley to Klein and Smith re
    proposals from Cerberus and Fortress, dated
    April 19, 2007 ................................................... A-15421

Terra Firma Exhibit 62 -
    E-mail from Barclay re EMI Media Review - 13
    May 2007, dated May 13, 2007 ....................... A-15422

Terra Firma Exhibit 63 -
    E-mail from Klein to Nicoli re General, dated
    May 18, 2007 ................................................... A-15424

Terra Firma Exhibit 64 -
    E-mail from Smith to Wormsley re EMI, dated
    May 18, 2007 ................................................... A-15425

Terra Firma Exhibit 125 -
    Interoffice memorandum from Lindsay to
    Drayton, *et al.* re East Surrey Holdings, dated
    February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
    Letter from Smith to Stewart re Engagement
    Letter, dated September 4, 2006 ..................... A-15433

Terra Firma Exhibit 195 -
    E-mail from Wormsley to Hands, dated
    September 8, 2006 .......................................... A-15440

Terra Firma Exhibit 197 -
    Terra Firma - Perspectives on Threshers, dated
    September 25, 2006 ........................................ A-15441

Terra Firma Exhibit 201 -
    Project Prince Working Party List, dated
    November 1, 2006 ........................................... A-15461

**lxii**

Page

Terra Firma Exhibit 209 -
E-mail from Wormsley to Mylchreest, dated
November 23, 2006 .......................................... A-15490

Terra Firma Exhibit 214 -
EMI Group plc - Statement re preliminary
approach from Permira, dated
November 28, 2006 .......................................... A-15493

Terra Firma Exhibit 215 -
E-mail from Miller to Simpkin re EMI, dated
November 28, 2006 .......................................... A-15494

Terra Firma Exhibit 220 -
E-mail from Badhe to Hill re Fairness Opinion
Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
Minutes from EMI Meeting of Directors, dated
November 29, 2006 .......................................... A-15498

Terra Firma Exhibit 224 -
E-mail from Smith to Wormsley, dated
November 30, 2006 .......................................... A-15504

Terra Firma Exhibit 230 -
E-mail from Ashcroft to Smith re Prince, dated
December 6, 2006 ............................................ A-15505

Terra Firma Exhibit 232 -
Minutes from EMI Meeting of Directors, dated
December 7, 2006 ............................................ A-15506

Terra Firma Exhibit 237 -
E-mail from Bell to Smith, dated
December 14, 2006 .......................................... A-15519

**lxiii**

**Page**

Terra Firma Exhibit 238 -
    E-mail from Smith to Wormsley, dated
    December 14, 2006 .......................................... A-15520

Terra Firma Exhibit 239 -
    E-mail from Smith to Wormsley re FW: Draft
    announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
    E-mail from Wormsley to Robertson re
    Agenda, dated December 14, 2006 ................... A-15524

Terra Firma Exhibit 241 -
    E-mail from Nicoli to Gildersleeve re Project
    Prince, dated December 14, 2006 ..................... A-15525

Terra Firma Exhibit 242 -
    E-mail from McBride to Citi re EMI cessation
    announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
    E-mail from Wormsley to Smith and EMI re
    TF For Urgent Reply Please, dated
    December 14, 2006 .......................................... A-15528

Terra Firma Exhibit 244 -
    Letter from Kelly to EMI Group plc, dated
    December 14, 2006 .......................................... A-15530

Terra Firma Exhibit 248 -
    "EMI Group plc - Statement re preliminary
    approach," EMI Press Release, dated
    December 14, 2006 .......................................... A-15532

Terra Firma Exhibit 250 -
    Letter from Nicoli to Kelly, dated
    December 15, 2006 .......................................... A-15533

lxiv

**Page**

Terra Firma Exhibit 274 -
E-mail from Simpkin to Miller re EMI, dated
January 4, 2007 ................................................ A-15534

Terra Firma Exhibit 280 -
Minutes from EMI Meeting of Directors, dated
January 10, 2007 .............................................. A-15536

Terra Firma Exhibit 281 -
E-mail from Jones to Cockerill re Pepe - terms,
dated January 11, 2007...................................... A-15539

Terra Firma Exhibit 283 -
EMI Press Release announcing restructuring,
dated January 12, 2007 ..................................... A-15545

Terra Firma Exhibit 285 -
E-mail from Smith to Wormsley, dated
January 12, 2007............................................... A-15548

Terra Firma Exhibit 314 -
EMI Press Release, dated February 14, 2007 ... A-15550

Terra Firma Exhibit 315 -
E-mail from Smith to Wormsley re EMI
Announcement, dated February 14, 2007......... A-15551

Terra Firma Exhibit 317 -
E-mail from Smith to Swannell and Wormsley
re 6am Cut, dated February 15, 2007................. A-15552

Terra Firma Exhibit 318 -
Citigroup Analyst Report "EMI Group plc
Another Month, Another Warning," dated
February 15, 2007............................................. A-15557

Terra Firma Exhibit 329 -
EMI group confirms approach from Warner
Music group, dated February 20, 2007 ............. A-15569

lxv

Page

Terra Firma Exhibit 346 -
   Minutes of a Meeting of the Board of Directors
   of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
   Valuation Update, dated March 1, 2007 ........... A-15582

Terra Firma Exhibit 348 -
   EMI Board Meeting Minutes, dated
   March 1, 2007 ................................................. A-15597

Terra Firma Exhibit 366 -
   "EMI GROUP plc - Statement re Possible
   Offer," PR Newswire UK Disclose, dated
   March 12, 2007 ............................................... A-15608

Terra Firma Exhibit 368 -
   E-mail from Wormsley to Hands, dated
   March 3, 2008 ................................................. A-15610

Terra Firma Exhibit 377 -
   E-mail from Steffno to Cockerill re EMI
   Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
   E-mail from Nicoli to Faxon re Full year
   target, dated March 12, 2007 ........................... A-15624

Terra Firma Exhibit 387 -
   E-mail from Smith to CIB-CBKG re Viacom's
   music publishing, dated March 22, 2007 ......... A-15627

Terra Firma Exhibit 391 -
   E-mail from Smith to Wormsley re EMI, dated
   March 26, 2007 ............................................... A-15629

**lxvi**

**Page**

Terra Firma Exhibit 392 -
E-mail from Hill to Simpkin re (EUR) Wolters
Kluwer Education falls to Bridgepoint, dated
March 26, 2007 ................................................. A-15630

Terra Firma Exhibit 410 -
E-mail from Simpkin to Smith re EMI - staple,
dated April 3, 2007 ......................................... A-15633

Terra Firma Exhibit 412 -
E-mail from Llewelyn-Jones to CIB-GFI re
EMI, dated April 13, 2007 ............................... A-15635

Terra Firma Exhibit 416 -
Letter from EMI board of Directors to
Gildersleeve re the proposal, dated
April 16, 2007 ................................................. A-15636

Terra Firma Exhibit 424 -
E-mail from Seaton to Smith re FW: Trading
statement, dated April 17, 2007 ...................... A-15646

Terra Firma Exhibit 427 -
E-mail from Wormsley to Hands re new idea,
dated April 18, 2007 ....................................... A-15651

Terra Firma Exhibit 429 -
E-mail from EMI Investor Relations re EMI
Group plc - trading statement, dated
April 18, 2007 ................................................. A-15652

Terra Firma Exhibit 436 -
E-mail from Smith to Estacio and Hill re Fee,
dated April 19, 2007 ....................................... A-15654

Terra Firma Exhibit 438 -
E-mail from Klein to Hands cc Wormsley,
Burns, dated April 19, 2007 ............................ A-15655

lxvii

**Page**

Terra Firma Exhibit 439 -
E-mail from Wormsley to Hands, Klein, cc
Burns, dated April 19, 2007 ............................. A-15657

Terra Firma Exhibit 443 -
Minutes of a Meeting of the Board of Directors
of EMI, dated April 20, 2007 ........................... A-15659

Terra Firma Exhibit 444 -
E-mail from Klein to Wormsley re Roles, etc.,
dated April 20, 2007 ......................................... A-15667

Terra Firma Exhibit 445 -
E-mail from Barak to Citi financing re Strictly
Private & Confidential, dated April 20, 2007 ... A-15669

Terra Firma Exhibit 446 -
E-mail from Barak to Citi financing re
Cerberus Indication, dated April 20, 2007 ........ A-15681

Terra Firma Exhibit 447 -
E-mail from Gildersleeve to Nicoli and
Borrows re FW: E-mail from Wormsley to
Gildersleeve, dated April 20, 2007 ................... A-15692

Terra Firma Exhibit 448 -
E-mail from Smith to Seaton re Roles, dated
April 20, 2007 .................................................... A-15694

Terra Firma Exhibit 449 -
E-mail from Smith to Wormsley re Roles,
dated April 20, 2007 ........................................... A-15696

Terra Firma Exhibit 454 -
E-mail from Smith to Wormsley re Roles,
dated April 22, 2007 ........................................... A-15698

lxviii

**Page**

Terra Firma Exhibit 455 -
    E-mail from Ashcroft to Wormsley re OEP
    Letter, dated April 23, 2007 .............................. A-15700

Terra Firma Exhibit 462 -
    E-mail from Ashcroft to Citi financing re
    Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
    Letter from Smith to Baxter (Takeover Panel),
    dated April 24, 2007........................................... A-15714

Terra Firma Exhibit 464 -
    E-mail from Tabet to Swannell, Klein and
    Wormsley re Hands, dated April 25, 2007 ......... A-15716

Terra Firma Exhibit 465 -
    E-mail from Gildersleeve to Ashcroft re Citi
    and Deutsche, dated April 26, 2007 .................. A-15717

Terra Firma Exhibit 468 -
    Letter from Smith to Stewart re provisions of
    advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
    E-mail from Coleman to Wolf re EMI, dated
    April 27, 2007 ................................................... A-15721

Terra Firma Exhibit 470 -
    E-mail from Smith to Wormsley re A3 page
    valuation summary, dated April 27, 2007 ......... A-15723

Terra Firma Exhibit 479 -
    E-mail from Smith to Bell re EMI consent
    letter, Side letter re financing bidders, dated
    April 28, 2007 ................................................... A-15726

**lxix**

**Page**

Terra Firma Exhibit 480 -
    E-mail from Smith to Stewart re Project
    Mulberry, dated April 30, 2007........................ A-15729

Terra Firma Exhibit 481 -
    E-mail from Smith to Ashcroft re Project
    Mulberry, dated April 30, 2007........................ A-15732

Terra Firma Exhibit 484 -
    Global FEG Working List Client Account List,
    dated May 1, 2007............................................. A-15735

Terra Firma Exhibit 492 -
    E-mail from Wormsley to Hands, dated
    May 3, 2007 ...................................................... A-15754

Terra Firma Exhibit 496 -
    EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
    E-mail from Cole to Ashcroft re Panel, dated
    May 4, 2007 ...................................................... A-15757

Terra Firma Exhibit 498 -
    E-mail from Cole to Bell re DB financing
    trees, dated May 4, 2007 ................................... A-15761

Terra Firma Exhibit 501 -
    EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
    "EMI Group plc - Statement re preliminary
    approach," EMI Press Release, dated
    May 4, 2007 ...................................................... A-15764

Terra Firma Exhibit 516 -
    E-mail from McCluskey to Yang re FW:, dated
    May 6, 2007 ...................................................... A-15765

**lxx**

**Page**

Terra Firma Exhibit 532 -
E-mail from Smith to Wormsley re Terra
Firma/EMI, dated May 8, 2007......................... A-15766

Terra Firma Exhibit 537 -
E-mail from Hands to Wormsley re EMI, dated
May 9, 2007 ..................................................... A-15767

Terra Firma Exhibit 538 -
E-mail from Borrows to Gildersleeve re Dice,
dated May 9, 2007............................................ A-15768

Terra Firma Exhibit 539 -
E-mail from Smith to Hill & Estacio fw OEP,
dated May 9, 2007............................................ A-15772

Terra Firma Exhibit 540 -
E-mail from Wormsley to Gildersleeve re Dice,
dated May 9, 2007............................................ A-15773

Terra Firma Exhibit 541 -
E-mail from Bell to Wormsley re Terra Firma
Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
E-mail from Simpkin to Wormley and Smith re
Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
E-mail from Smith to Poyser re Project
Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
E-mail from Ashcroft to Gildersleeve fw
TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
Project Mulberry Bidders Contact Details,
dated May 11, 2007.......................................... A-15789

**lxxi**

**Page**

Terra Firma Exhibit 552 -
  E-mail from Wormsley to Bell re Mulberry,
  dated May 11, 2007 ............................................ A-15814

Terra Firma Exhibit 553 -
  E-mail from Bell to Smith and Wormsley re
  Mondays meeting, dated May 11, 2007 ............. A-15816

Terra Firma Exhibit 554 -
  E-mail from Smith to McCluskey re Just left
  you a voicemail, dated May 11, 2007 ............... A-15820

Terra Firma Exhibit 555 -
  E-mail from Simpkin to Edwards re Hope you
  are well. re EMI, dated May 11, 2007 ............... A-15821

Terra Firma Exhibit 558 -
  E-mail from Gildersleeve to EMI re Mulberry -
  Data Room - IMPALA, dated May 13, 2007 ..... A-15822

Terra Firma Exhibit 564 -
  E-mail from Barak to Smith re Citi Financing,
  dated May 14, 2007 ........................................... A-15826

Terra Firma Exhibit 570 -
  E-mail from Estacio to Klein fw Full DDT
  procedures - Project Mulberry, dated
  May 15, 2007 .................................................... A-15828

Terra Firma Exhibit 578 -
  E-mail from Bell to Citi Financing re Project
  Mulberry Update, dated May 16, 2007 .............. A-15834

Terra Firma Exhibit 579 -
  E-mail from Zogheb to Miller re EMI, dated
  May 16, 2007 .................................................... A-15835

**lxxii**

**Page**

Terra Firma Exhibit 582 -
E-mail from Wormsley to Gildersleeve and
Nicoli re call from Guy Hands, dated
May 16, 2007 ..................................................... A-15837

Terra Firma Exhibit 593 -
Project Mulberry Working Party List, dated
May 17, 2007 ..................................................... A-15838

Terra Firma Exhibit 594 -
E-mail from Brumpton to Klein re LF/SEC
call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
E-mail from Klein to Wormsley re EMI Credit
call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
E-mail from Leat to Klein re Call, dated
May 17, 2007 ..................................................... A-15866

Terra Firma Exhibit 599 -
E-mail from Wormsley to Klein re Call Guy
Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
E-mail from Curtis to Klein re David
Wormsley called, VERY URGENT, dated
May 17, 2007 ..................................................... A-15868

Terra Firma Exhibit 604 -
E-mail from Bell to Gildersleeve re Update
from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
E-mail from Wormsley to Klein, dated
May 17, 2007 ..................................................... A-15870

**lxxiii**

**Page**

Terra Firma Exhibit 608 -
    E-mail from Klein to Hands re Call, dated
    May 17, 2007 ..................................................... A-15871

Terra Firma Exhibit 619 -
    E-mail from Wormsley to Poyser re Issue on
    covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
    E-mail from Wormsley to Tabet re Covenants,
    dated May 18, 2007............................................ A-15873

Terra Firma Exhibit 621 -
    E-mail from Poyser to Wormsley re interest
    coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
    E-mail from Smith to Poyser re Debt approval,
    dated May 18, 2007........................................... A-15875

Terra Firma Exhibit 630 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 2 Ltd 8:00am,
    dated May 18, 2007........................................... A-15877

Terra Firma Exhibit 631 -
    E-mail from Stewart to Wormsley re call, dated
    May 18, 2007 .................................................... A-15889

Terra Firma Exhibit 632 -
    E-mail from Stewart to Wormsley re returning
    call, dated May 18, 2007.................................... A-15890

Terra Firma Exhibit 636 -
    E-mail from Nicoli to Stewart re Draft process
    E-mail to be sent to bidders tomorrow, dated
    May 18, 2007 .................................................... A-15891

lxxiv

**Page**

Terra Firma Exhibit 640 -
  E-mail from Watson to Cole & Citi re
  Mulberry Mark-ups of Crimson Documents,
  dated May 18, 2007...........................................  A-15894

Terra Firma Exhibit 643 -
  Greenhill: Fairness Opinion/Advice Review
  Form, dated May 18, 2007..................................  A-15896

Terra Firma Exhibit 644 -
  E-mail from Barak to Bell *et al.* re Update on
  calls with bidders, dated May 18, 2007 .............  A-15898

Terra Firma Exhibit 645 -
  E-mail from Borrows to Gildersleeve re
  Hands, dated May 18, 2007 ..............................  A-15902

Terra Firma Exhibit 648 -
  E-mail from Borrows to Bell re draft process,
  dated May 18, 2007...........................................  A-15903

Terra Firma Exhibit 649 -
  E-mail from O'Brien to Citi and EMI re EMI-
  NY Post, Dow Jones, dated May 18, 2007 ........  A-15905

Terra Firma Exhibit 659 -
  Minutes of the Meeting of the Board of
  Directors of Terra Firma (GP) 3 Ltd 8:30am,
  dated May 18, 2007...........................................  A-15911

Terra Firma Exhibit 661 -
  E-mail from Pryce to Burrows cc Wormsley re
  Terra Firma, dated May 18, 2007 .....................  A-15923

Terra Firma Exhibit 674 -
  E-mail from Bell to Gildersleeve re EMI
  conference call, dated May 19, 2007  ...............  A-15924

**lxxv**

                                                                    **Page**

Terra Firma Exhibit 694 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 3 Ltd 4:00pm,
    dated May 20, 2007...........................................  A-15925

Terra Firma Exhibit 702 -
    E-mail from Watson to Ashcroft, cc Smith,
    Cole, *et al.*, re Mulberry - Key Issues Table and
    Turquoise Position, dated May 20, 2007 ...........  A-15928

Terra Firma Exhibit 715 -
    E-mail from Quigley to O'Haire, Van der Spuy
    re FW: Update on Dice financing for
    discussion tomorrow, dated May 20, 2007 ........  A-15935

Terra Firma Exhibit 720 -
    E-mail from Smith to Wormsley re Mulberry
    Key issues table and Turquoise position, dated
    May 20, 2007 .....................................................  A-15940

Terra Firma Exhibit 726 -
    E-mail from Bell to Borrows re Trustee
    meeting notes, dated May 20, 2007  ..................  A-15943

Terra Firma Exhibit 729 -
    E-mail from Wormsley to Hands, dated
    May 20, 2007  ....................................................  A-15944

Terra Firma Exhibit 736 -
    Minutes of a Meeting of a Committee of the
    Board of Directors of Terra Firma (GP) 3 Ltd
    at 8:00am, dated May 21, 2007.........................  A-15947

Terra Firma Exhibit 744 -
    E-mail from Hill to Shah re Citi M&A Wins:
    EMI Group/Terra Firma, dated May 21, 2007  ..  A-15950

lxxvi

**Page**

Terra Firma Exhibit 746 -
      Project Mulberry Fairness Committee
      Materials, dated May 21, 2007  ........................ A-15952

Terra Firma Exhibit 749 -
      E-mail from Smith to Llewelyn-Jones re
      Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
      E-mail from Wormsley to Smith re Greenhill
      Draft, dated May 21, 2007  ................................ A-15960

Terra Firma Exhibit 752 -
      E-mail from Hill to Smith re EMI, dated
      May 21, 2007  .................................................... A-15963

Terra Firma Exhibit 756 -
      E-mail from Smith to Bichara, Estacio, Hill,
      Abbasi, Golebiewski re Citi M&A Wins: EMI
      Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
      E-mail from Smith to Swannell re EMI, dated
      May 21, 2007  .................................................... A-15966

Terra Firma Exhibit 758 -
      E-mail from Smith to Suen and Mcbride re
      EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
      Stokes Notebook, dated May 20, 2007  ............. A-15970

Terra Firma Exhibit 763 -
      E-mail from Vakilian to Poyser re (RNS) Terra
      Firma Invest Recommended Cash Offer, dated
      May 21, 2007 .................................................... A-15973

**lxxvii**

Page

Terra Firma Exhibit 765 -
    E-mail from Poyser to Lee re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ...................................................... A-15975

Terra Firma Exhibit 766 -
    E-mail from Poyser to Abbasi re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ...................................................... A-15977

Terra Firma Exhibit 767 -
    E-mail from Poyser to Vakilian re (RNS) Terra
    Firma Recommended Cash Offer, dated
    May 21, 2007 ...................................................... A-15979

Terra Firma Exhibit 768 -
    E-mail from Wormsley to Smith re update on
    call with GH, dated May 21, 2007 ................... A-15981

Terra Firma Exhibit 783 -
    Project Mulberry Valuation Materials,
    Greenhill & Co., dated May 21, 2007 .............. A-15982

Terra Firma Exhibit 787 -
    E-mail from Simpkin to Treco re Call, dated
    May 22, 2007 ..................................................... A-15991

Terra Firma Exhibit 788 -
    E-mail from Smith to Skarbek re Citi M&A
    wins, dated May 22, 2007 ................................. A-15992

Terra Firma Exhibit 791 -
    E-mail from Temming to Poyser re Example
    for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
    E-mail from Poyser to Smith re Example for us
    all, dated May 22, 2007 .................................... A-15995

**lxxviii**

Page

Terra Firma Exhibit 796 -
    E-mail from Poyser to Smith re Dice, dated
    May 22, 2007 ................................................... A-15996

Terra Firma Exhibit 802 -
    E-mail from Poyser to Smith re financing
    process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
    E-mail from Poyser to Smith re financing
    process, dated May 24, 2007............................ A-16001

Terra Firma Exhibit 815 -
    David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
    E-mail from Wormsley to Hands re Thistle
    Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
    E-mail from Gildersleeve to Wormsley, dated
    May 29, 2007 ................................................... A-16015

Terra Firma Exhibit 824 -
    E-mail from Nesbit to Grigorova re Project
    Dice, dated May 30, 2007................................. A-16016

Terra Firma Exhibit 827 -
    E-mail from Smith to Blackburn re MDs
    meeting Monday, June 4 at 8:15 UK time,
    dated May 31, 2007.......................................... A-16020

Terra Firma Exhibit 831 -
    Citi Markets & Banking Credit Risk
    Principles, Policies and Procedures, dated
    June 1, 2007 ..................................................... A-16022

**lxxix**

Page

Terra Firma Exhibit 833 -
    Recommended Cash Offer by Maltby-a
    company formed at the direction of Terra
    Firma-for EMI Group plc, dated June 7............. A-16246

Terra Firma Exhibit 846 -
    E-mail from Aldred (on behalf of Hands) to
    Van der Spuy re Message from Guy Hands -
    Project Dice, dated June 27, 2007..................... A-16410

Terra Firma Exhibit 872 -
    E-mail from Wormsley to Gildersleeve and
    Nicoli re Terra Firma, dated July 4, 2007 .......... A-16411

Terra Firma Exhibit 874 -
    E-mail from Poyser to Smith re Your revenue
    list as at 4th July 2007, dated July 4, 2007 ........ A-16412

Terra Firma Exhibit 882 -
    E-mail from King to Klein re Riverdeep, dated
    July 9, 2007...................................................... A-16414

Terra Firma Exhibit 883 -
    E-mail from Hill to Lee re your revenue list as
    at 4th July 2007, dated July 9, 2007................... A-16415

Terra Firma Exhibit 887 -
    E-mail between Wormsley and Leat regarding
    advice, dated July 9, 2007.................................. A-16416

Terra Firma Exhibit 903 -
    E-mail from Simpkin to Lavelle re EMI Equity
    Bridge, dated July 16, 2007 ............................... A-16417

Terra Firma Exhibit 917 -
    E-mail from Borrows to Gildersleeve, Nicoli,
    *et al.*, re Board Presentation, dated
    July 18, 2007.................................................... A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
  E-mail from King to Klein re Terra Firma
  (High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
  E-mail from Smith to Stewart re Invoice to
  Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
  E-mail from Cockerill to Grigorova and Jones
  re EMI CCR, dated July 31, 2007 ...................... A-16438

Terra Firma Exhibit 987 -
  E-mail from Hill to Smith, dated
  August 6, 2007 ................................................... A-16439

Terra Firma Exhibit 992 -
  E-mail from Klein to Prince re EMI-DO NOT
  FORWARD, dated August 8, 2007 .................... A-16440

Terra Firma Exhibit 993 -
  E-mail from Klein to Mehta re Warner-
  confidential, dated August 8, 2007 ................... A-16442

Terra Firma Exhibit 994 -
  E-mail from Wirdnam to Leat re Terra Firma
  Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
  E-mail from Klein to Volk *et al.* re W, "Guy
  Spoke to Edgar and offered 3B," dated
  August 11, 2007 ................................................. A-16444

Terra Firma Exhibit 1006 -
  E-mail from Klein to Volk *et al.* re FW: edgar,
  "4B value of EMI," dated August 12, 2007 ....... A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
    E-mail from Smith to Watson re Mulberry Citi
    Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
    E-mail from Barker to Leat fw EMI, dated
    August 24, 2007 ................................................ A-16447

Terra Firma Exhibit 1040 -
    E-mail from Smith to CMB-GBKG re Quote
    of the Day, dated September 10, 2007 .............. A-16448

Terra Firma Exhibit 1074 -
    Memorandum from Simpkin *et al.* to Klein *et*
    *al.* re Project Dice (Public to Private of EMI),
    dated November 16, 2007 .................................. A-16449

Terra Firma Exhibit 1080 -
    E-mail from Wormsley to Klein re Guy Hands,
    dated November 23, 2007 .................................. A-16459

Terra Firma Exhibit 1100 -
    E-mail from Wormsley to Lynn re meeting
    with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
    E-mail from Smith to Poyser re trusted adviser,
    dated January 30, 2008 ...................................... A-16461

Terra Firma Exhibit 1111 -
    E-mail from Wormsley to Hands cc Burns,
    dated February 1, 2008 ...................................... A-16463

Terra Firma Exhibit 1114 -
    E-mail from Wormsley to Hands, dated
    February 19, 2008 ............................................. A-16466

**lxxxii**

Page

Terra Firma Exhibit 1141 -
Franchise Rise Assessment Template, dated
July 2008..........................................................  A-16470

Terra Firma Exhibit 1144 -
Handwritten Notes of Cockerill, dated
September 1, 2008 ............................................  A-16471

Terra Firma Exhibit 1147 -
E-mail from Smith to Wormsley re FW:
Morgan Stanley CDs now officially higher than
EMI!!! Hurrah, dated September 18, 2008...........  A-16472

Terra Firma Exhibit 1158 -
Handwritten Notes of Cockerill, dated
November 16, 2008............................................  A-16473

Terra Firma Exhibit 1176 -
E-mail from Cox to Smith re City Speaker
Series - 12th February, Wormsley Presentation,
dated February 11, 2009....................................  A-16476

Terra Firma Exhibit 1196 -
Franchise Risk Assessment Template, Maltby
Investments Limited, dated June 2009..............  A-16529

Terra Firma Exhibit 1225 -
E-mail from Smith to Vakilian re Citigroup
accused of fraud over EMI sale, dated
December 13, 2009 ...........................................  A-16530

Terra Firma Exhibit 1241 -
Compliance "Tree" for EMI group, dated
January 14, 2010 ...............................................  A-16532

**lxxxiii**

**Page**

Terra Firma Exhibit 1251 -
Baughman to Duffy re supplement to Citi's
response to Terra Firma's Interrogatory No. 5,
dated March 25, 2010 ........................................ A-16536

Terra Firma Exhibit 1313 -
EMI Trading Update ........................................ A-16539

Terra Firma Exhibit 1346 -
EMI Stock Price.xls ........................................ A-16541

Terra Firma Exhibit 1365 -
E-mail from Wormsley to Hands re DAIG-
subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
E-mail from Wormsley to Smith, dated
November 28, 2006............................................ A-16592

Terra Firma Exhibit 1369 -
E-mail from Smith to Wormsley re EMI, dated
December 20, 2006 ............................................ A-16593

Terra Firma Exhibit 1370 -
E-mail from Wormsley to Klein re Call, dated
May 17, 2007 .................................................... A-16594

Terra Firma Exhibit 1371 -
E-mail from Coats to Dolenec re Project Dice,
dated May 21, 2007............................................ A-16595

Terra Firma Exhibit 1372 -
E-mail from Wormsley to Klein re EMI, dated
August 2, 2007.................................................. A-16596

Terra Firma Exhibit 1377 -
E-mail from Seymour to Van der Spuy re
Project Dice memo, dated May 15, 2007........... A-16597

lxxxiv

**Page**

Terra Firma Exhibit 1380 -
Minutes of the May 20, 2007 Meeting of the
IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
Kirsten Randell notebook ................................. A-16610

Terra Firma Exhibit 1395 -
Amended and Restated Fee Letter, dated
August 13, 2007 ................................................. A-16751

Terra Firma Exhibit 1400 -
E-mail from Rawlings to Silva, Reeves cc
Govinida, Dubin re Maltby - fees, dated
August 31, 2007 ................................................. A-16761

Terra Firma Exhibit 1407 -
E-mail from Wormsley to Klein, dated
November 21, 2007 ............................................ A-16763

Terra Firma Exhibit 1409 -
E-mail from Wormsley to Hands re BUPA
hospitals, dated June 18, 2007 ......................... A-16764

Terra Firma Exhibit 1415 -
E-mail from Seth to Simpkin, *et al.*, re EMI
staple plan, attaching EMI Recd Financing.xls
and EMI Group Financing.xls, dated
April 1, 2007 ..................................................... A-16765

Terra Firma Exhibit 1434 -
David Wormsley deposition excerpts (pp. 159-
170:18), dated July 20, 2010 ............................. A-16872

Terra Firma Exhibit 1436 -
Stipulation re Eric Nicoli .................................. A-16885

**lxxxv**

Page

Citi Exhibit A-1 -
    Page 27, Paragraph 109 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
    Page 28, Paragraph 110 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
    Pages 31-32, Paragraph 126 of Complaint in
    *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16890

Citi Exhibit A-8 -
    Page 32, Paragraph 128 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
    Page 32-33, paragraphs 127-129 of Complaint
    in *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16895

Citi Exhibit C -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re URGENT & IMPORTANT-
    EMI, dated May 6, 2007 .................................... A-16898

Citi Exhibit D -
    Minutes of May 7, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma, dated May 7, 2007 ................................. A-16900

Citi Exhibit E -
    E-mail from Seymour to Becker, *et al.*, with
    attached Project Dice Memo to the GP, dated
    May 7, 2007 ...................................................... A-16902

lxxxvi

**Page**

Citi Exhibit H -
Minutes of May 15, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma, dated May 15, 2007 .............................. A-16914

Citi Exhibit I -
Memo from Punja, *et al.*, to the IAC re Project
Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
E-mail thread ending with E-mail from Slattery
to Randell, *et al.*, re IAC Distribution List
DICE, dated May 19, 2007 .............................. A-16923

Citi Exhibit K -
Minutes of May 18, 2007, Terra Firma
Investment Advisory Committee Meeting,
dated May 18, 2007 .......................................... A-16927

Citi Exhibit L -
Minutes of May 20, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners Limited, dated
May 20, 2007 .................................................... A-16929

Citi Exhibit P -
Project Dice Update to the IAC, dated
June 28, 2007 .................................................... A-16931

Citi Exhibit W -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice: 2008 Forecast vs.
Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
Project Mulberry Limited Scope Vendor Due
Diligence Report, dated May 4, 2007 .............. A-16959

**lxxxvii**

**Page**

Citi Exhibit BL -
   Letter from Stokes to Gildersleeve re Terra
   Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
   Project Mulberry Valuation Materials, dated
   May 21, 2007 ................................................... A-17011

Citi Exhibit BP -
   E-mail from Night BA to Amstutz, *et al.*, re
   EMI Co-Investment Opportunity, with attached
   EMI Presentation to Co-Investors, dated
   August 20, 2007 .............................................. A-17020

Citi Exhibit BR -
   E-mail thread ending with E-mail from Night
   BA to Tequila Bone, with attached co-investor
   presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
   E-mail from Vallance to TF Team Dice re EMI
   Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
   E-mail thread ending with E-mail from Punja
   to Hands re Revised financing E-mail, dated
   May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
   Guernsey Airport Landing Dues Information
   System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
   Memo from Punja, *et al.*, to IAC, *et al.*, re
   Project Dice Phase One Due Diligence, dated
   February 5, 2007 .............................................. A-17071

**lxxxviii**

**Page**

Citi Exhibit DT -
> E-mail from Vallance on behalf of Hands to
> Wormsley re Hands' desire to speak with
> Wormsley ASAP, dated May 6, 2007 ............... A-17087

Citi Exhibit DW -
> E-mail from Vallance on behalf of Hands to
> Punja, *et al.*, re Project Dice, dated
> May 7, 2007 ................................... A-17088

Citi Exhibit DX -
> E-mail thread ending with E-mail from Hands
> to Hedegaard, *et al.*, re Project Dice, dated
> May 6, 2007 ................................... A-17090

Citi Exhibit DY -
> Minutes of May 8, 2007, Meeting of the Board
> of Directors at 10:00 a.m. (GP3), dated
> May 8, 2007 ................................... A-17092

Citi Exhibit EA-1 -
> Terra Firma's telephone records from British
> Telecom, dated August 2, 2007 ......................... A-17101

Citi Exhibit EA-2 -
> Airtime Billing Reporting Team Itemisation
> Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
> E-mail thread ending with E-mail from
> Vallance on behalf of Hands to Klein re request
> for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
> E-mail thread ending with E-mail from
> Vallance on behalf of Hands to Wormsley re
> request for Wormsley to call Hands, dated
> May 18, 2007 ................................... A-17205

lxxxix

**Page**

Citi Exhibit ED -
E-mail thread ending with E-mail from Tabet
to Hands re EMI, dated May 18, 2007 .............  A-17206

Citi Exhibit EE -
E-mail thread ending with E-mail from Aldred
to Hands, *et al.*, re Relationship between Roger
Ames and Cerberus Capital Management,
dated September 24, 2007 ................................  A-17208

Citi Exhibit EH -
Project Dice Presentation by Terra Firma, with
E-mail thread ending with E-mail from Punja
to Hands re Process, dated May 20, 2007 .........  A-17209

Citi Exhibit EI -
E-mail thread ending with E-mail from Punja
to Hands re Process, dated May 20, 2007 .........  A-17286

Citi Exhibit EJ -
Minutes of May 20, 2007, Meeting of the Terra
Firma (GP) 2 Board of Directors, dated
May 20, 2007 ...................................................  A-17290

Citi Exhibit EL -
E-mail thread ending with E-mail from Hands
to Wormsley re outstanding issues between Citi
and Terra Firma, dated May 20, 2007 ...............  A-17293

Citi Exhibit EO -
Minutes of May 23, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners, Limited, dated
May 23, 2007 ...................................................  A-17296

xc

**Page**

Citi Exhibit EQ -
   E-mail from Vallance to Terra Firma Team
   Dice, *et al.*, re Weekly Dice Updates for IAC,
   dated June 14, 2007 ........................................... A-17298

Citi Exhibit ET -
   Press release re Recommended Cash Offer for
   EMI Group plc by Maltby Limited, dated
   July 20, 2007 .................................................... A-17299

Citi Exhibit FB-1 -
   Declaration of John Loveridge, dated
   February 3, 2010 ............................................... A-17302

Citi Exhibit FD -
   Terra Firma Investments (GP) 3 Limited
   Advisory Agreement Relating to Terra Firma
   Capital Partners III, L.P., dated
   February 8, 2006 ............................................... A-17311

Citi Exhibit FG -
   Draft Memo from Punja, *et al.* to the IAC re
   Project Dice: Presentation and Success Fee,
   dated May 18, 2007 ........................................... A-17331

Citi Exhibit FI -
   Minutes of May 15, 2007, Meeting of Terra
   Firma (GP) 3 Board of Directors, dated
   May 15, 2007 ................................................... A-17332

Citi Exhibit FN -
   Minutes of May 20, 2007, Meeting of the
   Board of Directors at 4:00 p.m. (GP3), dated
   May 20, 2007 ................................................... A-17334

xci

**Page**

Citi Exhibit FO -
Minutes of May 21, 2007, Meeting of the
Board of Directors at 7:30 a.m. (GP2), dated
May 21, 2007 ...................................................... A-17337

Citi Exhibit FP -
Terra Firma Presentation to GP re Project Dice,
dated May 21, 2007............................................ A-17340

Citi Exhibit FR -
Memo Recommending Cash Offer by Maltby
Limited for EMI Group plc, dated
May 30, 2007 .................................................... A-17350

Citi Exhibit FV -
Letter from Kelly to EMI Group plc re Terra
Firma's interest as a potential offeror for EMI,
dated December 14, 2006 .................................. A-17512

Citi Exhibit FX -
E-mail from Van der Spuy to Bell, *et al.*, with
attached Project Dice: Management Meeting
questions and attendees, dated
May 11, 2007 .................................................... A-17514

Citi Exhibit GF -
Letter from Kelly to Gildersleeve re Summary
Proposal for Terra Firma potential offer, dated
May 8, 2007 ...................................................... A-17533

Citi Exhibit GG -
Minutes of May 8, 2007, Meeting of the Board
of Directors at 8:45 a.m. (GP2), dated
May 8, 2007 ...................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
    E-mail thread ending with E-mail from Nicoli
    to Stewart, *et al.*, re E-mail to be sent to
    bidders tomorrow, dated May 18, 2007 ............. A-17548

Citi Exhibit GN -
    E-mail thread ending with E-mail from
    Wormsley to Simpkin, *et al.*, re Terra
    Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
    Terra Firma Presentation to Investment
    Advisory Committee re Project Dice, dated
    May 18, 2007 .................................................... A-17552

Citi Exhibit GQ -
    E-mail from Pryce to Burrows, *et al.*, re Terra
    Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
    E-mail from Melvin to Hands, *et al.*, re Urgent-
    EMI/Terra, dated May 22, 2007 ....................... A-17713

Citi Exhibit HH -
    E-mail from Shaw to Nicoli re Trading
    statement, dated April 18, 2007 ....................... A-17714

Citi Exhibit HU -
    Project Dice Presentation: Update to the IAC,
    dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
    E-mail thread ending with E-mail from Van der
    Spuy to O'Haire, *et al.*, re Update on Dice
    Financing for Discussion Tomorrow, dated
    May 20, 2007 .................................................... A-17738

xciii

**Page**

Citi Exhibit IC -
E-mail from Vallance to Hudson, *et al.*, re
Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
Court Order in the High Court of Justice,
Queen's Bench Division, dated
August 16, 2010 ................................................ A-17749

Citi Exhibit IE -
Journey Log Book for aircraft Cs-DXJ
registered with the Portuguese Registry
entitled, "Diário de Navegaçao," dated
May 24, 2007 .................................................... A-17758

Citi Exhibit IF -
Screen Shot: Build Reservation for Terra
Firma, dated May 20, 2007 ................................ A-17761

Citi Exhibit IW -
Terra Firma Capital Partners II Q3 2007, dated
November 1, 2007 ............................................. A-17762

Citi Exhibit JC -
E-mail from Reid to Seymour re Final Version
of McK docs, dated, with attachment
May 16, 2007 .................................................... A-17807

Citi Exhibit JD -
Terra Firma Music Industry Key Market
Outlook, dated May 15, 2007 ............................ A-18001

Citi Exhibit JE -
KPMG Report - Project Dice - Limited Scope
due financial diligence report, dated
May 17, 2007 ................................................... A-18128

xciv

Page

Citi Exhibit JI -
E-mail from Vallance on behalf of Hands to TF
Team Dice re Dice and RBS, dated
May 8, 2007 ....................................................... A-18232

Citi Exhibit JN -
Minutes of the May 18, 2007, EMI Group plc
meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated June 28, 2007 ................. A-18240

Citi Exhibit JQ -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 13, 2007 ................. A-18246

Citi Exhibit JS -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 20, 2007 ................. A-18249

Citi Exhibit JT -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 28, 2007 ................. A-18252

Citi Exhibit KA -
E-mail from Dowler to Hands re Dice, dated
May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
E-mail from Robert-Tissot to Hands re
Gatwick, dated February 6, 2009....................... A-18257

xcv

**Page**

Citi Exhibit KH -
E-mail from Wormsley to Cabrey re Hands -
Invitation to Terra Firma Annual Clay Pigeon
Shoot, dated July 1, 2008 ................................. A-18259

Citi Exhibit KJ -
Terra Firma Annual Review 2007, dated
June 29, 2005 ................................................ A-18262

Citi Exhibit KY -
Terra Firma Private Placement Memorandum,
dated April 1, 2006 ........................................... A-18382

Citi Exhibit LI -
Memo from Punja, *et al.*, to Hands, *et al.*, re
EMI Preliminary Discussion, dated
December 1, 2006 ............................................ A-18482

Citi Exhibit MB -
Signed Minutes of the February 5, 2007,
Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
Letter from Smith to Stewart re Provision of
Advisory and Corporate Broking Services by
Citigroup, dated April 27, 2007 ....................... A-18493

Citi Exhibit OF -
Letter from Kelly to Gildersleeve re possible
offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
E-mail thread ending with E-mail from Miller
to Wormsley, dated May 8, 2007 ..................... A-18499

Citi Exhibit OJ -
E-mail from Wormsley to Hands re EMI, dated
May 8, 2007 ................................................... A-18500

xcvi

Page

Citi Exhibit OM -
   Project Mulberry Bidders Contact Detail, dated
   May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
   E-mail thread ending with E-mail from Van der
   Spuy to Simpkin, *et al.*, re Project Dice:
   Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
   Minutes of May 15, 2007, Meeting of the
   Board of Directors at 7:30 p.m. (GP2), dated
   May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
   E-mail thread ending with E-mail from Klein
   to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
   E-mail from Wilkins to Nicoli, *et al.*, re
   Wormsley call, dated May 18, 2007 ................. A-18533

Citi Exhibit RU -
   E-mail thread ending with E-mail from Nicoli
   to Wormsley re EMI media review, dated
   May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
   E-mail thread ending with E-mail from
   Simpkin to Dolenec, *et al.*, re securitisation
   colleagues, dated May 20, 2007 ....................... A-18537

Citi Exhibit UF -
   E-mail thread ending with E-mail from Tabet
   to Wormsley re just spoke to GH, dated
   May 21, 2007 .................................................. A-18540

xcvii

**Page**

Citi Exhibit VP -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:00 p.m. (GP2), dated
    May 23, 2007 .................................................. A-18543

Citi Exhibit VQ -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:15 p.m. (GP3), dated
    May 23, 2007 .................................................. A-18545

Citi Exhibit WI -
    Memo from Punja, *et al.*, to the IAC, *et al.*, re
    Project Dice Update and Budget, with attached
    Presentation re IAC update: Project Dice,
    dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
    E-mail from Cabrey to Wormsley, *et al.*, re
    Villa Saletta Shoot, with attached Fax Reply
    Form, dated August 15, 2007 ........................... A-18555

Citi Exhibit AAO -
    E-mail from MacInnes to Punja, *et al.*, with
    attached Dresdner invoice to Maltby, dated
    August 17, 2007 ............................................... A-18560

Citi Exhibit ABL -
    Memo from Pryce to TFCP Personnel re Public
    to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
    Letter from Terra Firma Investments (GP) 3
    Limited to Citi re the amendment letter, dated
    December 21, 2007, dated January 11, 2008 .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
  E-mail from Dicks to Wormsley, *et al.*, re DW
  Menu selection Die Sauberflote, attached
  menu, dated June 23, 2008 ............................... A-18571

Citi Exhibit AGF -
  Terra Firma Capital Partners II, Q1 2008, dated
  March 31, 2009 ................................................ A-18574

Citi Exhibit AHA -
  Presentations re EMI and the Terra Firma/Citi
  Relationship, dated August 1, 2009 ................. A-18623

Citi Exhibit AJJ -
  Cell phone Records for David Wormsley, dated
  April 26, 2007 ................................................. A-18643

Citi Exhibit AJT -
  Guy Hands' Calendar for May 18, 2007, dated
  May 18, 2007 .................................................. A-18671

Citi Exhibit AKL -
  EMI Recorded Music Presentation, dated
  April 1, 2009 .................................................... A-18672

Citi Exhibit AKT -
  Stipulated Phone Numbers................................. A-18698

Citi Exhibit AKY -
  TFCP III Co-Investment 2 L.P. Project Dice
  Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
  Citigroup Structure Chart................................... A-19064

Citi Exhibit ALK -
  E-mail thread ending with E-mail from
  Wormsley to Dicks re shotgun certificate form,
  dated October 4, 2007 ....................................... A-19065

**xcix**

**Page**

Citi Exhibit ALU -
    E-mail thread ending with E-mail from
    Grigorova to Lynn, *et al.*, re EMI Summary
    Exposure, dated November 21, 2009 .................. A-19067

Citi Exhibit ALY -
    Paragraph 22, Page 5 of Joint Statement
    Pursuant to Individual Practices 4(a) of the
    Facts and Other Matters on Which the Parties
    Agree .................................................................. A-19072

Citi Exhibit EEB-3 -
    Table 1B of Expert Report of Marianne
    DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
    Appendix 1 of Expert Report of Marianne
    DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
    Corrected Expert Report of Marianne DeMario
    in *Andrews v. Raphaelson*, *et al.*, dated
    October 19, 2006 .............................................. A-19078

Citi Exhibit EEJ -
    *Caiola v. Citibank*, Expert Report of Marianne
    DeMario ........................................................... A-19095

Citi Exhibit EEY -
    Client List for Spectrum Consulting Partners .... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
    Handwritten Notes ............................................ A-19126

Terra Firma Exhibit 48 -
    Nicoli Mobile Phone Records
    (Reproduced at pp. CA-826-CA-837)

c

**Page**

Letter Brief of Terra Firma to the Honorable Jed S.
    Rakoff, dated October 25, 2010............................ A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed
    S. Rakoff, dated October 25, 2010........................ A-19137

The Court's Proposed Jury Instructions, dated
    November 1, 2010 ................................................ A-19147

Memorandum of the Honorable Jed S. Rakoff,
    dated November 2, 2010........................................ A-19163

Verdict Sheet, dated November 4, 2010 ................... A-19179

Judgment, So-Ordered on December 9, 2010,
    Appealed From ...................................................... A-19180

Notice of Appeal, dated January 10, 2011 ................ A-19187

Case: 11-126    Document: 63    Page: 102    04/25/2011    272927    401

A-5401

A man may lawfully drain his own land, even if his sole object be vexatiously to prevent another from having the benefit of an overflow he has previously enjoyed. Numerous other illustrations might be given. But there are many cases in which the existence of a wrong motive, or malice, in the popular meaning of the word, does render that actionable which in its absence would not be so. *Gibbs* v. *Pike* (1) was an action for wrongfully registering as a judgment under 1 & 2 Vict. c. 110, an Order of the Court of Chancery. Baron Alderson says (2): "How is registering the order an injurious or wrongful act to any one? It is clear it is not. It causes no damage; it is no injurious act, and therefore, in order to enable the plaintiff to maintain this action it is incumbent on him to shew that this act, in its nature not wrongful, has become so in consequence of its having been done through a bad motive. For this purpose, and in order to render the act wrongful and injurious, he is bound to add to the fact of registering the order the absence of reasonable and probable cause, and a malicious motive for doing so." I pass over without comment actions for libel or slander, as Lord Coleridge's remarks thereon in *Bowen* v. *Hall* (3) seem to me of some weight. In *Ratcliffe* v. *Evans* (4) Lord Bowen, in giving the judgment of the Court of Appeal, says (5): "That an action will lie for written or oral falsehoods, not actionable per se nor even defamatory, where they are maliciously published, where they are calculated in the ordinary course of things to produce, and where they do produce, actual damage, is established law. Such an action is not one of libel or of slander, but an action on the case for damage wilfully or intentionally done without just occasion or excuse, analogous to an action for slander of title." In *Bradford Corporation* v. *Pickles* (6) Lindley L.J. says (7): "The only question a court of law or equity can consider is whether the defendant has a right to do what he threatens and intends to do. If he has, he cannot be interfered with, however selfish, vexatious, or even malicious his conduct may be." But the learned judge's very next words shew that he was dealing with the particular case before him, and that in his view there are cases in which an improper object or motive does make an otherwise lawful act actionable. An action for malicious prosecution is a good instance of such cases. Unless the plaintiff can prove the absence of reasonable and probable cause for the prosecution, the right to prosecute is absolute, and the motive is just as immaterial as it would have been if the prosecution had succeeded. Even when such cause is shewn not to exist, the defendant may still succeed if he can prove that he acted without malice, e.g., that he did bonâ fide believe there was reasonable cause to prosecute. The plaintiff cannot claim to be protected against a prosecution where there is reasonable and probable cause; or even where there is no such cause, but there is an absence of malice. If such cause is absent, and there is malice, the prosecution is wrongful; and the one vital question there is as to the intention of the prosecutor, the state of his mind: did he act with malice or not? If he did, the action against him will succeed; if not, it will fail. While

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

North J.

(1) 9 M. & W. 351.          (4) [1892] 2 Q. B. 524.
(2) 9 M. & W. at p. 362.    (5) [1892] 2 Q. B. at p. 527.
(3) 6 Q. B. D. 333.         (6) [1895] 1 Ch. 145.
            (7) [1895] 1 Ch. at p. 159.

Case: 11-126    Document: 63    Page: 103    04/25/2011    272927    401

A-5402

H. L. (E.)

1897

ALLEN

*v.*

FLOOD.

North J.

on this subject, I crave in aid the decision in the *Mogul Case* (1) itself. The ratio decidendi there was that the acts of the defendants were all within the limits of allowable trade competition; but the case would have been very different if the defendants' acts had been without just cause or excuse. I have quoted Lord Coleridge's and Lord Bowen's language on the subject; and the same idea is expressed in some of the other speeches, and appears to pervade many of them. It seems to me, if I may say so with deference, that it would have been useless to consider at length in that case whether the defendants had just cause or excuse for what they did, if the plaintiffs would have had no right of action for interference with their trade, even though the defendants had been acting maliciously, and no just cause or excuse had existed.

Applying these principles to the present case, the question is whether Allen's interference with the employment of the plaintiffs was with just cause or excuse or not. If it was merely in the legitimate exercise of his own rights, without malice, the *Mogul Case* (1) applies, and there is no cause of action. But the plaintiffs also have a right to the protection of the law against improper interference with their trade; and Allen cannot justify such interference, unless it is with just cause and excuse, i.e., in the lawful exercise of rights of his own. If his action was in excess of this, and was without just cause or excuse—if it was done to injure the plaintiffs or their employers, or to benefit Allen and his men at the expense of the plaintiffs, otherwise than by lawful trade competition—then there was a wrongful act, giving to the plaintiffs a right of action. Allen denies, no doubt, that he had any personal feeling against the plaintiffs, whom he did not know; but then he denies that he wanted them discharged, or even knew that they were discharged! Assuming, however, that there was no hostile feeling by Allen against the plaintiffs as individuals, there seem to me ample materials in the evidence from which the jury might find a desire on the part of the branch delegate to prevent the further employment of, and to injure, the two well-known shipwrights who defied his union; and also to injure the business of the Glengall Company, by forcing them not to employ the plaintiffs, as they had a right to do. In the *Mogul Case* (2), Fry L.J. pointed out, as a material circumstance, that there was there no evidence of express malice, or of any activity of the defendants against the plaintiffs, except as rival and competing shipowners: that the defendants did not aim at any general injury of the plaintiffs' trade, or any reduction of them to poverty or insolvency, but only desired to drive them away from particular ports, where the defendants conceived that the plaintiffs' presence interfered with their own gain, and that the damage to be inflicted on the plaintiffs was to be strictly limited by the gain which the defendants desired to win for themselves. The state of facts disclosed in the case now before your Lordships is very different from that referred to by the Lord Justice. As to what the true result of the evidence is, I refrain from expressing any opinion. That is for the jury to decide, and your Lordships have not asked the opinion of the judges about it.

There was one other matter strongly pressed by the appellant's counsel, upon which I desire to add a few remarks. It is not disputed that the cases of

---

(1) 23 Q. B. D. 598; [1892] A. C. 25.          (2) 23 Q. B. D. at p. 625.

Case: 11-126    Document: 63    Page: 104    04/25/2011    272927    401

A-5403

*Lumley* v. *Gye* (1) and *Bowen* v. *Hall* (2) establish, so far as the Courts below are concerned, that wrongfully inducing the breach of a contract of service for a fixed period may give ground of action; but it is said this cannot be so when the service is at will only. It is true that in each of those cases the engagement was for a defined period; while in the present case it was not. But it was an engagement for the job, according to the recognised practice of the trade, though determinable earlier by notice; it was intended to last until the work was done, and would in fact have so lasted but for Allen's intervention. Its continuance was assured by its being the common wish and for the mutual advantage of the employer and employed, just as much as if there had been an engagement for a definite time; and one can readily divine what the answer of a layman would be who was told that the law made a distinction between the two cases, and the officious intermeddling of Allen would be justifiable in the one but not in the other. In the present case I think that the layman's censure would not be deserved, and that no such legal distinction exists. There are numerous cases shewing clearly that a wrongful interference between employer and employed, from which damage ensues, gives a cause of action, even where the employment is at will only, and not for a fixed period. In *Thompson* v. *Ross* (3), a case of seduction, Bramwell B. said: "In the ordinary case of a person living in a house as a member of a family, it is very reasonable to hold that the relation of master and servant (determinable at will) exists between the parties." In *Bennett* v. *Allcott* (4) the action was by a farmer for trespass and the debauching of his grown-up daughter; and this passage occurs in the judgment: "Neither is it material whether the servant be or not hired for a year, or whether she has any wages, it being sufficient that she is a servant de facto." If it is said that cases arising from seduction are anomalous, *Evans* v. *Walton* (5) was a case of enticing away a daughter where an action for seduction could not have been brought, and the long judgments of Bovill C.J. and Willes J. and Montague Smith J. are full of law upon this point. In the course thereof the Chief Justice said: "No authority is to be found where it has been held that in an action for enticing away the plaintiff's daughter a binding contract of service must be alleged and proved; but there are abundant authorities to shew the contrary." Willes J. said (6), speaking of father and daughter: "if she is in his service whether de son bon gré or sur retainer, he is equally entitled to her services and to maintain an action against one who entices her away. Assuming that the service was at the will of both parties, like a tenancy at will, the relation must be put an end to in some way before the rights of the master under it can be lost. As a question of fact, was the daughter in the service of her father at the time the cause of action arose?" And Montague Smith J. (7), after referring to the contention that there must be proof of some binding contract of service, said: "It appears to me, however, that there is abundant authority for holding that there was an existing relation

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

North J.

(1) 2 E. & B. 216.                    (4) (1787) 2 T. R. 166.
(2) 6 Q. B. D. 333.                  (5) (1867) L. R. 2 C. P. 615.
(3) (1859) 5 H. & N. 16.          (6) L. R. 2 C. P. at p. 622.
                    (7) L. R. 2 C. P. at p. 623.

Case: 11-126    Document: 63    Page: 105    04/25/2011    272927    401

**A-5404**

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.
North J.

of master and servant here, by interfering with which the defendant was guilty of an actionable wrong. But for the defendant the service would have remained uninterrupted." The Lord Chief Justice and Willes J. also cited from the Year Books several cases of a different class, shewing that a master has a right of action for an assault on his toll-gatherer, labourer, or other servant by which his services were lost to the master, even though the man was not a servant on retainer, but at will only.

These authorities shew that the real question is whether Allen did or did not wrongfully interfere with the existing relation between employer and employed ; and the duration of the employment is immaterial, except on a question of amount of damages, which is not now under consideration. It is not in dispute that he did in fact intervene while that relation was subsisting ; that but for such interference it would have continued uninterrupted until the job was completed ; and that in consequence of such interference, and by means of the pressure brought to bear upon the employer, that relation was summarily determined the same evening. It was said that Allen merely left it to Halkett to adopt whichever of two courses he thought best ; but the same thing might be said of the highwayman's option to the unarmed traveller. It was also said that if Allen had not appeared upon the scene at all the boiler-makers would have left ; and, to induce them to return, Halkett would have been driven to discharge the plaintiffs. But assuming this conjecture to be well founded, it is no defence to an action against Allen for a wrongful act to say that the same end might have been arrived at by the adoption of other means which would not have been open to the imputation of illegality.

For these reasons I answer your Lordships' question by saying that there was evidence of a cause of action fit to be left to the jury, namely, of an interference by the appellant with the plaintiffs in the exercise of their lawful trade without just cause or excuse.

WILLS J. My Lords, the first step towards answering your Lordships' question is to state the facts which might legitimately be inferred from the evidence given by the witnesses for the plaintiffs.

In consequence of the form of your Lordships' question, I have confined myself entirely to the evidence given on behalf of the plaintiffs. Perhaps, however, I may be permitted to say that amongst the evidence given for the defendant there are passages which would, in my opinion, add to the materials proper to be left to the jury on behalf of the plaintiffs.

The plaintiffs were employed by the day as shipwrights on certain work in the shipbuilding yard of the Glengall Iron Company. Other work was being done in the same yard and on the same ship by boiler-makers. The work which was being done by the plaintiffs was not work to which the boiler-makers laid claim, nor had the boiler-makers any cause of complaint against them, except that they had a short time previously in another shipyard done work of a class which the boiler-makers wished to secure to themselves, to the exclusion of shipwrights. The defendant was the delegate of the boiler-makers' union, and known as filling that position to the managing director of the Glengall Company. The defendant went to the managing director and spoke to him about the employment by the Glengall Company of the plaintiffs. So far the

Case: 11-126    Document: 63    Page: 106    04/25/2011    272927    401

evidence is distinct and categorical. The details of the conversation, however, are not given with precision, and probably not very exactly remembered. There was, however, abundant evidence that the defendant said, not only that the boiler-makers would be called out, but that he would call them out, if the Glengall Company continued to employ the plaintiffs, and that he, as well as the other boiler-makers, had made up his mind that they should be called out, not only of the Glengall Company's yard, but of any other yard on the Thames where the plaintiffs might get work. There is also evidence that he gave as a reason for this action that it was difficult to know whether particular ship-wrights had offended against the boiler-makers by getting work which the boiler-makers wished to secure for themselves, that the plaintiffs had been found out, and that wherever they went the same course would be pursued with regard to them. In other words, there is evidence that he said that he and the other boiler-makers were determined to make an example of the plaintiffs, and, if possible, to deprive them of the means of living, as a punishment to them and a warning to other shipwrights who might be disposed to compete with the boiler-makers. There was, of course, a disclaimer, which is to be gathered from the evidence of the plaintiffs' witnesses, by the defendant of any personal ill-will towards the plaintiffs as individuals; but the jury were entitled to judge for themselves of the sincerity of that disclaimer, and to come to the conclusion that the defendant as well as his friends had a spiteful feeling towards the persons, whoever they might be, who had transgressed against their interests, and presumed, although not boiler-makers, to compete with them for particular kinds of work, and that it was that spiteful feeling which induced the boiler-makers and the defendant, as one of them and as representing them, to go to the employers on the errand in question. The employers hereupon refused to allow the plaintiffs to work for them any longer, which but for the action of the defendant they would have done, and each plaintiff suffered in consequence pecuniary damage. I believe I have correctly stated the substance of the evidence; and if such a state of facts constitutes an actionable wrong, it appears to me that your Lordships' question must be answered in the affirmative. If it does not, the answer must be in the negative.

That the object the defendant had in view was the punishment of the plaintiffs for having done acts which were perfectly lawful, but which the defendant believed it was for the advantage of the boiler-makers to prevent them from repeating, or others from doing, seems to me absolutely beyond controversy, though perhaps I ought rather to say that there is abundance of evidence to that effect. As a means to an end which he believed would be advantageous to the boiler-makers he, beyond all doubt, meant to inflict upon the plaintiffs as much mischief as lay in his power, and there is ample evidence that it was the interference of the defendant which induced the employers to refuse to continue the employment of the plaintiffs. To prevent a working man from earning his daily bread in any of the places where alone he was likely to find the opportunity of so doing is to cause him as direct and as great a damage as can well be inflicted upon him. There is no doubt that this was the defendant's avowed object.

The act done by the defendant was, therefore, one both calculated and intended to inflict upon the plaintiffs great loss and suffering. It does not,

Case: 11-126    Document: 63    Page: 107    04/25/2011    272927    401

A-5406

however, follow that it is actionable. There is no case exactly like this present one, and some discussion of principle is therefore necessary.

There are, of course, acts which are unmistakable violations of definite legal rights, as to which no controversy can arise, and as to which motive cannot be material. A good motive will not make them the less actionable; a bad motive will not make them the more so.

There are, on the other hand, acts which a man has a definite legal right to do without any qualification, and which therefore cannot be actionable. Here, again, motive is immaterial. A good motive does not increase, a bad motive does not diminish, the right to do them. If no interference with ancient lights, for instance, be involved, a man may erect upon his own land a building which may ruin his neighbour's industry exercised upon the adjoining land. No action could be maintained, though it were demonstrated that his only purpose in making the erection was to spite and damage his neighbour. Illustrations might be multiplied to any extent. Equally any right given by contract may be exercised as against the giver by the person to whom it is granted, no matter how wicked, cruel, or mean the motive may be which determines the enforcement of the right. It is hardly too much to say that some of the most cruel things that come under the notice of a judge are mere exercises of rights given by contract—a fact illustrated perhaps by some of the decisions upon bills of sale.

In such cases it is, I apprehend, perfectly clear law that the addition to the statement of the cause of action of the epithet "malicious" and proof that the thing done was done from the worst of motives will not make the matter complained of actionable: *Bradford Corporation v. Pickles.* (1) Certainly no one is more keenly alive than myself to the mischief that would be caused by any relaxation of this rule.

But there is a large class of cases which belong to an intermediate category, and in which it can neither be said that the thing done by the defendant gives an indisputable and unqualified right of action no matter what the circumstances, nor can it be said that the defendant has an absolute and unqualified right to do it whatever the consequences to others. These are exercises of personal freedom which are perfectly legitimate in themselves, but which cannot be indulged in without interfering with rival exercises of personal freedom by others. One must give way to the other, and questions immediately arise as to which is to prevail, and whether the diminution of either by the exercise of the rival freedom gives rise to a right of action. It is an exercise of a man's personal freedom to shout and make a noise, and if nobody else is interfered with he may shout as loud and as often as he likes. But it is an exercise of another's personal freedom to pass his time in peace and quiet. Each must submit in some degree to the other. The man who loves quiet must make some allowance for his neighbour's freedom to shout. The shouting man must pay some respect to his neighbour's peace, and if he goes beyond what is reasonable he commits an actionable wrong. Here and in many cases the test of whether that which in itself and so far as its mere nature goes is not unlawful constitutes a cause of action or not is degree. There are other cases in which the motive becomes

(1) [1895] A. C. 587.

Case: 11-126    Document: 63    Page: 108    04/25/2011    272927    401

A-5407

the test. A man may write or speak to a person having a common interest in the subject-matter of the communication with the utmost freedom about another man, and may say things most damaging to that other, so long as he does it honestly. But if he makes the opportunity the cloak for spite and ill-will he creates a cause of action. A man may prosecute another even without reasonable cause, so long as he does it honestly, and no action will lie against him. Let him do it out of spite or from a discreditable motive, and he is liable. The thing he does is in each case the same, so far as the very thing is concerned of which complaint is made, and its consequences to the sufferer are the same. But if it be done honestly there is no action; if it be done dishonestly or out of spite there is an action.

The notion, therefore, that the same thing may be unlawful or may be lawful, may or may not constitute a cause of action, according as it is or is not done out of spite and ill-will, or from some improper motive, is very well known to our law. There seems to be on principle no difficulty or impropriety in applying it to the present case. Surely, to do your best to take away another man's bread, and to succeed in doing so, may very well be a cause of action, if it be done out of pure spite and to punish a rival for having competed with you and your friends for work which he has as good a right as yourself or they to secure; whereas, if it be done fairly and honestly in the exercise of legitimate competition and without the intention of injuring a particular individual, except in so far as he may necessarily be injured by the course of conduct adopted for reasons not involving the desire to punish and distress him, it would be none. The *Mogul Case* (1) shews that competition may legitimately carry both individuals and combinations of persons very far in the attempt to keep others out of the field of gain. But there is surely a difference between saying, "I *will advise those I can influence not to work with anyone who will compete* with them for a particular class of work," and saying, "I will advise the boiler-makers, and as far as I can I will take means myself to punish men who have once competed with them and me for work which they and I are determined that none but men of my own class shall have." I see nothing unreasonable in saying that in the one case the defendant has done nothing more than he has a right to do, and that in the other he has gone beyond his rights and committed an unlawful act.

*Keeble* v. *Hickeringill* (2) is an authority of great importance in this connection. There was nothing unlawful in itself in the firing of guns by the defendant on his own land, but it was done, not for the protection of his own interests nor in the exercise of any absolute and unqualified right, but merely in the exercise of a personal freedom and for the express purpose of damaging the plaintiff. It is true that "maliciously" as then used in declarations in actions upon the case certainly did not necessarily imply that the act was done for that purpose, but the question arose upon a motion in arrest of judgment, and it is clear from one report (3) that it was treated as a case in which the act had been done for the mere purpose of damaging the plaintiff, as, after a verdict, the Court was clearly entitled to do. If it were not so understood the case

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Wills J.

(1) [1892] A. C. 25.                    (2) 11 East, 574, n.

(3) 11 Mod. 74.

48                              HOUSE OF LORDS                              [1898]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Wills J.

would be even stronger, for it would then shew that an act wilfully done, which was calculated to do mischief to the plaintiff's property, though not done with that motive, would support the action, provided the defendant could not shew a legal right to do it. A case in which the act complained of is really done out of spite must be a stronger case than that of a disturbance merely without any definite legal justification. Lord Holt puts the case of what he calls "a malicious act done to a man's occupation or way of getting a livelihood" on the same footing, and I can hardly doubt, looking to the instances he gives and the cases he cites, that he meant to use the word "malicious" in the larger and non-natural sense given to it by generations of lawyers. Bowen L.J., in the *Mogul Case* (1), following *Bromage* v. *Prosser* (2) and several earlier cases, treats it as equivalent to an allegation that the act was intentional, likely to do harm to another, and done without just cause or excuse. I believe that the more the subject is examined the more correct his interpretation of the term will be found to be. It is difficult, without refreshing one's memory at the ancient fountains, to appreciate the wealth of abusive epithets bestowed by the old pleaders upon acts complained of. "Wicked," "malicious," "deceitful," "fraudulent," "covinous," are the commonplaces, and will be met with in nearly every declaration in an action upon the case, in Brown's Vade Mecum, Herne's Pleader, and most of the old books of entries. Aston's Entries is the only book of early precedents I know from which they are occasionally absent. They are applied indiscriminately to the loss of a package by a carrier, to the disturbance of a pew, to riding a hired horse too hard, to a refusal by an inn-keeper to accommodate a guest, to interference with a watercourse, as well as to the withholding of a disputed debt; in the last case possibly at times with more truth than in the other instances I have mentioned. In the majority of cases no one ever thought of proving them, but the ordinary plea was not guilty; and these epithets negatived the existence of just cause or excuse. They, on the other hand, were negatived if just cause or excuse was established; and so the epithet "malicious" came into general use as a sort of anticipatory assertion that no just excuse existed. In some instances, as I have shewn, it was necessary to prove that the act deserved the epithet. Even then, however, it was only because in particular cases, such as defamation upon a privileged occasion, the only way of negativing just excuse was by shewing an improper motive. In the present instance, however, it is unnecessary to consider these refinements, for there was clearly evidence that the act of the defendant was done out of a desire to punish the plaintiffs, and the mere fact that there may have been over and above the malicious purpose and motive a hope of some remote advantage in the way of giving an object lesson to others cannot make it the less an act of spite against the plaintiffs. Neither the *Mogul Case* (3) nor any other says that the promotion of one's own interest will justify any and every means by which that end can be accomplished, and the utmost that can be said about self-interest as a justification for doing mischief to others is that it is one of the circumstances to be taken into con-

---

(1) 23 Q. B. D. 614.                              (2) 4 B. & C. 255.
(3) [1892] A. C. 25.

sideration in determining whether there is or is not just excuse for the wilful infliction of loss upon others.

It appears to me, therefore, to follow from Lord Holt's statement of the law that in cases of the kind under discussion, where there is no absolute and unqualified right to be protected from the thing complained of, in order to support an action two conditions must be satisfied. 1. The act must be malicious; 2. It must cause to the plaintiff some damage of a kind which the law recognises. One instance of such damage is the destruction or deterioration of property : see *Hannam* v. *Mockett*. (1) Another consists of hindering a man in getting his livelihood, which obviously ought to stand upon the same footing in this respect as property. Lord Holt's authority is very great, and I cannot find that *Keeble* v. *Hickeringill* (2) has ever been doubted. In *Ibbotson* v. *Peat* (3) it was treated as undoubted law.

I have only to add a few remarks upon the three or four cases which are supposed to bear more directly upon the present question, and which are said by the appellant to have been erroneously decided. It is not necessary to do so at length, because it is clear that their correctness is under review upon the present occasion.

*Lumley* v. *Gye* (4) was decided forty-four years ago, and, with the exception of the judgment of Lord Coleridge in the Court of Appeal in *Bowen* v. *Hall* (5), I am not aware of any subsequent recorded expression of judicial opinion adverse to its principles, or even of any unfavourable criticisms in legal literature beyond some not very definite hint that it may be open to reconsideration contained in a note to *Ashby* v. *White* (6) by Willes J. There are no doubt weighty arguments in the dissentient judgment of Coleridge J., but they are directed to shewing that the narrow grounds upon which the judgments of Crompton and Wightman JJ. proceeded were erroneous and hardly touch the broader question of principle which I have attempted to discuss. Even were it otherwise, cases constantly occur in which there is much to be said on both sides, and when a case like *Lumley* v. *Gye* (4) has passed for nearly half a century into the regular current of authority, where it cannot fail to have influenced many a decision, there is so much mischief done in the way of unsettling the law by overruling it that it should not be lightly disturbed. With the greatest respect I cannot say that Lord Coleridge's criticisms upon it appear to me to be well founded. He seems to think that there is something unreasonable in making a cause of action depend in any case upon the motive with which the thing complained of is done, and further that such a doctrine would be an anomaly in our law. I cannot see anything unreasonable or impracticable in the proposition. I am dealing, ex hypothesi, with cases in which things have been done as to which one man has no absolute definite legal right to do them and another has no absolute definite legal right that they should not be done. Why should they not be protected from suit, if done honestly and fairly and under circumstances which should not prevent

(1) 2 B. & C. 934.
(2) 11 East, 574, n.
(3) 3 H. & C. 644.
A. C. 1898.

(4) 2 E. & B. 216.
(5) 6 Q. B. D. 333.
(6) 1 Sm. L. C. (4th ed.) 222.

3                    E

Case: 11-126    Document: 63    Page: 111    04/25/2011    272927    401

A-5410

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Wills J.

a reasonable man from doing them, and why should they not give rise to an action when they are done under such circumstances that no right-minded man, reasonably careful of what he owes to others, would think of doing them? In cases of actions for injury by negligence one constantly has to ask a jury whether what has been done is or is not what a man reasonably careful of the lives, or limbs, or property of other people ought to do. So far from the proposition being anomalous, it seems that the very case Lord Coleridge mentions as presenting a fallacious analogy really depends upon the same principle. Why is it that privileged communications are protected though defamatory? Surely, because if honestly made, it is better for the world at large that the individual who suffers in consequence of them should be without remedy than that freedom of speech should, under the circumstances which give rise to the privilege, be checked. But it is not for the public advantage that he should be without remedy where the occasion is abused out of spite or other improper motive, and accordingly if this exists the action lies. If it does not, the action does not lie. To go back to the phrase that all defamation is in presumption of law malicious, that privilege sets to rest that presumption, and that malice in fact again establishes it, is to take refuge in words. The substance is that, under identical circumstances, the same thing is actionable or not according as it is shewn or not shewn that it is done from a motive which the law does not admit as an excuse for mischief caused to another, and which lawyers have for centuries designated by that unfortunate epithet "malicious."

The case of malicious prosecution presents a still closer illustration of the principle which Lord Coleridge so severely criticises, and which was adopted by the majority of the Court in *Bowen v. Hall.* (1) No one can deny that when every other element of the cause of action is clear, whether the action will or will not lie depends upon the motive with which the accuser made or persisted in the charge, and upon nothing else.

The common law is elastic so long as its principles are observed; and to me it seems that this case should be decided upon principles alike sound, old, and of wide application, and that if the matter complained of was certain to cause mischief, was done with no lawful justification or excuse, but out of spite and a desire to punish, the action is maintainable. I cannot see anything contrary to sound sense, good morals, or public policy, or even inconvenient in saying that upon an occasion like that with which we are dealing the right of action may depend upon a motive.

Except in the judgment of Erle J., *Lumley v. Gye* (2) does not seem to have been dealt with on any broad grounds of principle. The analogy or want of analogy between the relation of an opera singer to the lessee and stage manager of the theatre and that of a servant to a master seems to have been the principal topic of discussion. Even if that case were wrongly decided it would not follow that the action would not lie in the present case. There was no allegation in the declaration that the plaintiff carried on the business of making money by providing theatrical or operatic exhibitions. But I do not pursue this matter, as I have no desire to deal with the present inquiry in any narrow or technical spirit. The true view of *Lumley v. Gye* (2) is, in my

---

(1) 6 Q. B. D. 333.                    (2) 2 E. & B. 216.

Case: 11-126    Document: 63    Page: 112    04/25/2011    272927    401

A-5411

opinion, that the facts bring it within the principle laid down by Lord Holt in *Keeble* v. *Hickeringill*. (1)

*Bowen* v. *Hall* (2) was, I think, rightly decided, and in one respect only does it appear to me to be open to criticism. The Master of the Rolls treats the purpose of benefiting the defendant at the expense of the plaintiff as necessarily in legal phraseology a malicious purpose. Again, with the greatest deference I am obliged to say that this seems to me to be going a great deal too far; and I think the question whether the act complained of was malicious would depend upon whether the defendant had in pursuing his own interests done so by such means and with such a disregard of his neighbour as no honest and fair-minded man ought to resort to.

This observation applies also to some parts of the judgments in *Temperton* v. *Russell*. (3) It follows from what I have said before that that case was, in my opinion, rightly decided, though it certainly does not necessarily govern this case. The distinction between inducing people to break contracts and inducing them not to enter into contracts cannot, in my opinion, be ignored; but it appears to me that it is one of circumstance rather than one of essence. If I am right in the view I take of the present case, it is because Lord Holt was right in saying that a malicious act done to a man's way of getting his livelihood is a cause of action. It does not seem to me to matter what the particular act is, so long as it is not one which the person doing it has a definite legal right by contract, or by the common or statute law to do, no matter what may be the consequences to others, and the nature of the act is only material as one of the elements from which the jury are to judge of the conduct and motives of the doer.

For these reasons I am of opinion that your Lordships' question should be answered in the affirmative.

GRANTHAM J. My Lords, as the answer to the question your Lordships have just put to us must depend on the evidence given at the trial, it is necessary to state briefly what that evidence was.

The two men, Flood and Taylor (the plaintiffs), were shipwrights, who, after passing through their apprenticeship of seven years in the Glengall Iron Company's works, were fully competent to work both on wood and iron work in repairing or building wood or iron ships. They belonged to the Shipwrights' Provident Union, and had been in regular work from the time they had been out of their apprenticeship, a period of about two years. During a part of that time (four months) they had been employed at Messrs. Mills & Knight's shipyard, Nelson Dock, Rotherhithe, and had while there been employed on both wood and iron work on wooden and iron ships without any molestation or complaint. Having finished their work at Mills & Knight's on April 11, 1896, they were taken on, on April 12, at the Glengall Iron Company's dock, to work on a ship called the *Sam Weller* on the terms of a usual recognised practice, that they should be kept on the job till the work slackened, when the men are gradually discharged till the job is finished. When the job is finished the men

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Wills J.

---

(1) 11 East, 574, n.                    (2) 6 Q. B. D. 333.
(3) [1893] 1 Q. B. 715.

3        E 2

Case: 11-126    Document: 63    Page: 113    04/25/2011    272927    401

A-5412

H. L. (E.)
1897
~~~~
ALLEN
v.
FLOOD.

Grantham J.
———

work on another ship if in dock, or wait for one to come into dock, or, if they like, they seek work elsewhere.  The men are not paid either by the day or by the piece, but by the job, and are allowed to draw a certain sum per day (about 8s.) on account of their work, and the plus, or balance of their wages earned, is not ascertained or paid to them till the job is finished, and the plus, or balance, is then divided amongst all the men according to the time they have worked.  Though at Mills & Knight's they had worked at ironwork on iron ships, at the Glengall Company's dock they had only worked on wood.

On April 13, without any warning, they were discharged at a minute's notice by the foreman of the Glengall Iron Company (Mr. Edmonds), who said that they were good men, and told them that he was sorry to discharge them, that it was not his fault, that he could not employ them anywhere at the yard while the iron-men worked there, for if he did all the iron-men would come out and strike, and their business would be ruined, as the coming out of the iron-men would stop their business altogether, the iron-men there mentioned being the men belonging to the boiler-makers' union, of which defendant was a delegate.  After they were thus discharged they got no work till April 17, when they were employed at docking a ship for a few hours (not regular ship-wrights' work), and since then, though not altogether unemployed, they had not got employment as readily as before, and in many yards where previous to that they were given work they were not put on at all.

It must be admitted, therefore, that these men had, subject to a right of dismissal on the part of the employers, an engagement on a continuous employment which, had it not been put an end to by the defendant's interference, would have continued for a long period.   Now let us see what was the evidence of malice in the mind of the defendant, relied on by the plaintiffs, and what was the cause of action, if any, fit to be left to the jury.

The evidence shews that the defendant, being a delegate of the boiler-makers' union, was determined to punish the plaintiffs, and to prevent their getting work anywhere else on the London river (the district in which they always worked), because of the work they had done on iron ships at Mills & Knight's. He called on Mr. Halkett, the managing director of the Glengall Iron Company's works, on the 13th, and said to him that unless Flood and Taylor were discharged from their employment that day all the ironworkers belonging to his society would leave off work, and that he would withdraw the iron-workers from all the works of the Glengall Iron Company wherever that work was. He said these men, the plaintiffs, were known men, i.e., marked men, that it was so difficult to get them known, but these men were known, and wherever they were employed the same action would be taken ; and as the ironworkers and boiler-makers' union men were by far the most numerous (were about 100 to 22 of the shipwrights employed on the Glengall Iron Works), the masters would have no option but to discharge them, as they could not carry on their business without the men of the boiler-makers' union.  Mr. Halkett stated that, from what defendant said, he understood that he had only to hold up his finger and all the men would knock off, and that he would call the men out if these men were not discharged, and he believed that the threat would be enforced unless he submitted and discharged the plaintiffs at once ; and he also said that the defendant came to dictate to him, and when he remonstrated with

Case: 11-126    Document: 63    Page: 114    04/25/2011    272927    401

A-5413

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Grantham J.

him on the injustice it was to his firm, the defendant said, to shew doubtless he wished to injure the plaintiffs only and not the Glengall Iron Company more than any other employers, that the men would be called out from any yard they (the plaintiffs) went to, and they would not be allowed to work anywhere on the London river. Defendant said also the men were a bad lot, and of no principle whatever, which, as Mr. Halkett said, he knew to be untrue. Surely no better evidence could be found of intimidation to the employer and a determination to injure the employed, and, therefore, evidence of malice of the worst form towards the plaintiffs.

The right of the plaintiffs to work as they had done, and the custom for them to do it, was proved beyond a doubt, and also that it was comparatively recent that the boiler-makers had been accustomed to work on general ironwork as well as on boilers. That is the evidence in the case on the part of the plaintiffs, without touching the evidence of the defendant at all. In my judgment, there was ample evidence of malice as it stood; but can any one say that there was no evidence? And if, therefore, there was some evidence, it was the duty of the judge to call for an answer on the part of the defendant, and when we come to the evidence given by the defendant's witnesses, whatever doubt there was as to malice was clearly removed. The defendant admitted that the plaintiffs were doing nothing wrong at the time they were discharged, nor had they been doing anything wrong during the time they were in the employ of the Glengall Iron Company. By "wrong" defendant meant nothing contrary to his own ideas, or to any of the rules of the defendant's society. Mr. Knight, the general secretary of the defendant's union, and Mr. Jackson, the chairman of the union, also both stated in their evidence that they had never given any authority to Allen to threaten any employer in any way whatever, and that they knew nothing of his action in the matter till they were themselves served with a writ in the action. They also said that Allen had no power to withdraw men from any work on which they were engaged; and, although it was his duty to report what he did as a delegate in the district to the executive council in relation to this matter, he had never done so, and that when shipwrights, like the plaintiffs, who had been working on iron, had ceased to do so, neither the union nor the union men, even according to their own rules, had any right whatever to interfere with them, or to refuse to work with them, when they were working on other work.

Was this malicious conduct or was it not? Can it be said that it was only carrying on their own trade by a trade union as they liked and for their own interests? It was not their own trade, but the plaintiffs' trade they were interfering with, for the boiler-makers were not capable of doing the work the plaintiffs were doing; and as to the maliciousness of the conduct of defendant, the motive of the defendant being the desire to punish and to ruin for an imaginary or alleged wrong in the past is about as strong a proof of malice as can be found in any case reported in our law-books.

How can it be said that to act spitefully against a person and to make false statements as to his own position and authority for the purpose of forcing some one else to do that person an injury are not evidence of malice? Can it be said that by the law of England the plaintiffs had no legal right in their employment—no right to be protected from malicious interference or molestation in

54                              HOUSE OF LORDS.                        [1898]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Grantham J.

that employment, and that the employer could be made to turn them out against his own will by a malicious action as against them, without giving them a right of action against the person so acting maliciously—that the law will protect a person in his trade of killing wild ducks (*Keeble* v. *Hickeringill* (1)), or of supplying the natives of Africa with gunpowder and cheap gin (*Tarleton* v. *M'Gawley* (2)) from malicious interference and molestation in those trades, but will not protect the labouring man from similar malicious conduct, which deprives him of the means of earning his livelihood? Or can it be said that it will protect a person from malicious interference with his work if he is under a contract that can only last a day or a week or for some limited time, but it will not protect him from the same malicious interference in reference to that employment which would but for the interference last for months or years? This right to work as he likes is as much a personal right of the individual as is his right not to be molested in his person or in his property. It is a right of personal liberty. No one would deny that it would be illegal to forcibly prevent him from working in his garden; why is it not illegal, therefore, by a wrongful (i.e.) malicious act to prevent him working for hire for some one else who wishes to employ him in his garden? It is not contended on behalf of the plaintiffs that all malicious conduct on the part of a third person which is injurious to another is actionable, nor that the mere inducement of another to break his contract or engagement would of itself without malice be actionable but it is contended that malicious conduct is actionable when it is a direct interference with a right of the person injured, and not merely a malicious exercise of a right of the person guilty of malice. In other words, can it be said our law is such that, it being admitted that the foundation of capital is labour, you will protect capital and the employment of capital, but will decline to protect that labour which creates it?

There is, it must be remembered, a great difference between so managing your own business to make a profit for yourself that you indirectly cause loss to another, and the directly injuring another that profit may accrue to yourself. In my judgment, therefore, the inducing the plaintiffs' employers to discharge them by threats of injury to those employers if they did not discharge them was a good cause of action, because it was done maliciously, and that there was ample evidence of malice surely no one can doubt.

Were it not for the importance of the case and the unusual circumstances which have led to Her Majesty's judges being summoned to the House of Lords, I should content myself with the above observations; but as so much time has been spent in discussing various authorities I feel bound to make some reference to them, though I cannot help saying that almost the whole of the time occupied by the counsel for the appellant (the defendant) was taken up in endeavouring to explain away the decisions that they quoted, and they did not bring forward a single case which could be called an authority in their favour. All the cases seem to me to be unanimously in favour of the principle relied upon by the plaintiffs, and the reason for there being no case directly upon the point is not far to seek. It is this, that until the influence of the trade unions became as great as it is now no workman was or could be exposed to such an

───────────────────

(1), 11 East, 574, n.                        (2) 1 Peake, N. P. C. 270.

injury as we are now discussing, because no men or body of men would previously have had the power to dictate to their employers as they can now.

Let us, therefore, see what is the law to be gathered from the various authorities that have been so freely quoted during the argument of this case.

First, we find in the Year Books the cases that have been called the Schoolmasters' Cases (29 Ed. 3, 18 (1) and 11 Hen. 4, 47). In the former case the boys were maliciously frightened and thus prevented from going to school, and so it was held an action would lie, but not in the latter case, because the injury only resulted from the competition arising from the defendant setting up a rival school; in other words, an action would lie where there was a malicious interference with a man's trade, though no contractual interest was interfered with or involved. In Comyn's Digest, title "Action on the case," A, we find: "In all cases where a man has a temporal loss or damage by the wrong of another he may have an action on the case to be repaired in damages." That is this case. And again, title "Misfeasance, A 6": "If a man threaten the tenants of another whereby they depart from their tenures action will lie," and this is so says Holt C.J. in the next case, even if they are tenants at will (it may be said in this case that the plaintiffs were workmen as well). In *Keeble* v. *Hickeringill* (2), note to *Carrington* v. *Taylor* (3) Holt C.J. says: "Suppose the defendant had shot on his own ground, if he had occasion to shoot it would have been one thing, but to shoot on purpose to damage the plaintiff is another thing." Applying that judgment, therefore, to this case, it seems to be strictly in point. If the defendant had merely persuaded the master to give employment to the men of his union no action, but as he maliciously forced him not to employ the plaintiffs to injure them, action will lie. Then how completely the next remark of Holt C.J. applies. He says: "I am of opinion that this action for shooting on his own land to frighten ducks off the plaintiff's decoy doth lie. It seems to be new in its instance, but not new in the reason or principle of it" (exactly as in this case), "for the employment of his ground for the purpose of a decoy is profitable to the plaintiff as is the skill and management of that employment," &c. "It is as lawful to use art and skill to seduce ducks into a decoy," &c. "And when a man uses his art and skill to take them to dispose of them for his profit, that is his trade, and he that hinders another in his trade or livelihood is liable to an action," &c.

Is not the work of the plaintiffs their "art and skill and trade" just as much as that of the decoy man, and why are they not therefore to be protected as much as he? Then, again, Holt C.J. says: "Where a violent or malicious act is done to a man's occupation, possession, or way of getting a livelihood, there an action will lie in all cases, but not if the injury is by using the same employment." And again in another case (4) Holt C.J. says: "The third sort of damage to a man's property, as where he is forced to expend money in necessary charges to acquit himself of the crime of which he is accused. That a man is put to expense is without doubt, which is an injury to his property, and if that injury is done to him maliciously it is reasonable he shall have an action to

(1) [The only case at all of this class on the page referred to is trespass for disturbing a fair. *Ideo quære.*—F. P.]

(2) 11 East, 574, n.
(3) 11 East, 571.
(4) *Savile* v. *Roberts*, 1 Ld. Raym. 374, 378.

Case: 11-126   Document: 63   Page: 117   04/25/2011   272927   401

A-5416

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Grantham J.

repair himself"; and later on he says: "From above it follows that the damage is the ground of action." In *Bowen v. Hall* (1) it was held that if the persuasion be used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff, it is a malicious act which is in law a wrongful act, and therefore an actionable act if injury ensues from it.

Then on the question of whether there must be an existing contract of time that is interfered with, see what is said in *Blake v. Lanyon* (2), where it was held that the plaintiff who employed his men to work by the piece could bring an action against another master who persuaded the plaintiff's men to work for him before the job was finished. There, only persuasion made the defendant liable. Here in this case the job was not finished when the defendant forced the master to dismiss them, and it was not persuasion by which the mischief was done, but malicious conduct and falsehood on the part of the defendant. *Hart v. Aldridge* (3) is very similar, and *Green v. Button*. (4)

In *Savile v. Roberts* (5) Holt C.J. held that an action will lie for a malicious indictment which puts the party to expense though the charge it contains neither scandalises him nor endangers his personal liberty or security. And in *Green v. London General Omnibus Co*. (6) it was held that an action would lie against defendants' company for wilfully and maliciously obstructing another omnibus belonging to another company. They did what was called "nursing" the rival omnibus. Erle C.J. said the Court unhesitatingly found that the action was maintainable because it was done maliciously. The plaintiff had in that case no contractual right to run his omnibus. The learned counsel for the appellant in this case, apparently feeling the force of the authority against them, endeavoured to shew that the decision was founded on some injury or interference with a public highway; but the closest perusal of the case shews there was no foundation whatever for that suggestion.

*Lumley v. Gye* (7) was decided no doubt on the ground that the plaintiff had a contract for the exclusive services of Johanna Wagner for a specific period; but Crompton J. says (8): "suppose a trader, with a malicious intent to ruin a rival trader, goes to a banker or another party who owes money to his rival and begs him not to pay the money which he owes him, and by that means ruins or greatly prejudices the party, I am by no means prepared to say that an action could not be maintained"; and later on he says the malicious injury is the gist of the action.

Again, in the *Mogul Steamship Co. v. McGregor* (9), which was relied upon by the appellants, the judgments of all the learned Lords are distinctly in favour of the contentions of the plaintiffs in this case. Lord Watson says: "I apprehend to substantiate their claim the appellants must shew either that the object of the agreement was unlawful or that illegal methods were resorted to in its prosecution;" and again: "it has not been suggested that the respondents used misrepresentation or compulsion for the purpose of obtaining the object of their combination." Here both are used by the defendant. Lord Field says:

(1) 6 Q. B. D. 333.          (5) 1 Ld. Raym. 374.
(2) (1795) 6 T. R. 221.      (6) 7 C. B. (N.S.) 290.
(3) (1774) 1 Cowp. 54.       (7) 2 E. & B. 216.
(4) 2 C. M. & R. 707.        (8) 2 E. & B. at p. 230.
                  (9) [1892] A. C. 25.

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Grantham J.

"Of course it is otherwise, as pointed out by Lord Holt, if the acts complained of, although done in the way or under the guise of competition or other lawful right, are in themselves violent or purely malicious, or have for their ultimate object injury to another for ill-will to him and not the pursuit of lawful rights." Bowen L.J. (1) says : " Now intentionally to do that which is calculated in the ordinary course of events to damage and which does in fact damage another in that other person's property or trade is actionable if done without just cause or excuse. Such intentional action when done without just cause or excuse is what the law calls a malicious wrong." In that case it was held that the defendants had just cause or excuse, because what they did was only in reference to carrying on their trade in their own way ; but here the evidence is exactly the reverse. And again Bowen L.J. says : " No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden ; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause." With regard to the suggested difficulty that might arise in the application of this principle to domestic servants, I see none whatever. If one servant simply says to her master she will leave if another does not, no action would lie, but if she, from malicious motives, says, " I will force every servant to leave your service if you don't get rid of your butler," and because the master cannot get on without her he does discharge the butler, I see no reason why an action should not lie, provided damages were sustained. In conclusion, I will only mention Bradford Corporation v. Pickles (2), which is an instructive case relied on by the appellant, because it shews the class of cases in which no action would lie. What the defendant did there was to do something on his own property which he had a right to do, though the doing it would and did injure the plaintiffs, and he was acting maliciously towards them ; but it was never suggested that if the defendant had gone off his own property or had interfered with the plaintiffs' own property he would not have been liable.

Having shewn, therefore, that the principle of law which was applied in deciding this case by the learned judge who tried it at Nisi Prius, and by the judges of the Court of Appeal who confirmed his judgment, and also by the learned judge and the Lords Justices who tried and decided the case of Temperton v. Russell (3), is the same that has been the guiding principle of all the judges who have considered the question from the earliest time to the present day ; and if, as I believe is the case, six of my learned brethren agree with the views that I have expressed, there is an almost overwhelming consensus of opinion as to what the common law of England has been and is on this question. I do not speak of the law of Scotland, for I am not familiar with it if it differs from ours ; but the judges of the Court of Chancery have, as far as I know, on the few occasions on which they had to determine it, agreed with the law as laid down by the common law judges. This, as far as I am aware is, however, the first time that the question has been brought up to the House of Lords, and I can only trust that a law which has been acted on for so many years, and

---

(1) 23 Q. B. D. 613.                    (2) [1895] A. C. 587.

(3) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 119    04/25/2011    272927    401

A-5418

H. L. (E.)

1897

ALLEN
v.
FLOOD.

which is manifestly for the welfare of working men, will not be found to be bad law.

For the reasons above given, my answer is in the affirmative.

LAWRANCE J. (1)    My Lords, I am of opinion that the question proposed by your Lordships must be answered in the affirmative.

I think that the principles on which this case is to be decided are to be found in the dicta of Holt C.J. in the case of *Keeble* v. *Hickeringill* (2): "(1.) He that hinders another in his trade and livelihood is liable to an action for so hindering.    (2.) Where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases." The conditions necessary to support an action are, I think, well stated by Lord Bramwell, in his judgment in the *Mogul Steamship Co.* v. *McGregor, Gow & Co.* (3) as " trespass, violence, force, fraud, or breach of contract, or any direct tort or violation of any right of the plaintiffs, like the case of firing to frighten birds from a decoy, or any act the ultimate object of which is to injure the plaintiffs, having its origin in malice or ill-will to them." It seems to me that this definition includes those exceptions which have been grafted on the more general propositions of Holt C.J., namely, the case of fair competition, if without malice (see the judgments of Lords Field and Hannen), of which the *Mogul Steamship Co.'s Case* (3) is the principal example; and, secondly, the case of the lawful use of a man's own property, as decided in the case of the *Bradford Corporation* v. *Pickles*. (4)

There are numerous cases decided both before and after the case of *Keeble* v. *Hickeringill* (2), all of which rest upon the doctrine above stated: the *Abbot of Densham's Case* (5), where it was held actionable to prevent persons from coming to the plaintiff's fair; the case in Year Book 11 Hen. 4, 47, where the same doctrine is re-asserted but distinguished, the distinction (namely, that a fair is a franchise and that a private school is not) being very material in the latter case, where the only act complained of was setting up a rival school, but not being material in the former, where the right of the plaintiff to be undisturbed in holding the market is no greater than that of a tradesman to be undisturbed in exercising his trade.    In 9 Hen. 7, 8, it was held actionable to disturb a man's tenants at will, and to cause them to leave their tenancies; and in *Garret* v. *Taylor* (6) an action was held to lie against a man for threatening workmen and customers, and thereby preventing them from resorting to the plaintiff's quarry.

Since the decision of *Keeble* v. *Hickeringill* (2) many cases are to be found. *Tarleton* v. *M'Gawley* (7) was an action against the master of a ship for maliciously intending to hinder and deter negroes from trading with the plaintiff by firing cannon at them, whereby the plaintiff lost his trade.    *Carrington* v. *Taylor* (8), which re-affirms the principle of *Keeble* v. *Hickeringill* (2);

---

(1) Read by Grantham J. in Lawrance J.'s absence.

(2) 11 East, 574, n.

(3) [1892] A. C. 25.

(4) [1895] A. C. 587.

(5) 29 Edw. 3, c. 18.

(6) Cro. Jac. 567.

(7) 1 Peake, N. P. C. 270.

(8) 11 East, 571.

*Ibbotson* v. *Peat* (1), which is to the same effect; *Young* v. *Hichens* (2), in which the plaintiff had inclosed fish in a net when the defendant disturbed the fish and prevented their capture. Held that no action would lie in trespass, as the fish were not reduced into possession, but that action in case for disturbance would have lain.

These cases, as well as numerous others, avowedly rest upon the principle of *Keeble's Case* (3); but there is another class of cases which seem to me to be referred more satisfactorily to the principle of that case than to any other, such as the *Western Counties Manure Co.* v. *Lawes' Chemical Manure Co.* (4), where Lord Bramwell thus states the law applicable to cases of defamation of a man's goods: "It seems to me, however, that where a plaintiff says, 'You have without lawful cause made a false statement about my goods to their comparative disparagement, which false statement has caused me to lose customers,' an action is maintainable; . . . . on the general principle, therefore, an untrue statement disparaging a man's goods published without lawful occasion and causing him special damage is actionable."

In *Thorley's Cattle Food Co.* v. *Massam* (5) an injunction was granted against the defendant restraining him from publishing an advertisement stating that he was alone possessed of the secret of compounding Thorley's Food for Cattle, and from issuing a circular warning his customers against the plaintiffs, who were seeking to foist on the public an article which they pretended was the same as that manufactured by the late Joseph Thorley. The Court held the circular and advertisement contained untrue representations calculated to injure the plaintiffs in their trade, and that the issue ought to be restrained.

*Riding* v. *Smith* (6) was an action brought by the plaintiff charging the defendant with a slander on his wife, who assisted him in his business, whereby certain persons had ceased to deal with him. Held, that the action was maintainable. It seems difficult to see on what principle this case could be decided except on the doctrine of *Keeble* v. *Hickeringill* (3), as being a malicious interference with the plaintiff in the carrying on of his business, and Holt C.J. especially refers to such cases: "Why otherwise are scandalous words spoken of a man in his profession actionable, when without his profession they are not so? They do not effect any damage, yet are they mischievous in themselves; and therefore, in their own nature productive of damage, and therefore an action lies against him. Such are all words that are spoken of a man to disparage him in his trade that may bring damage to him, though they do not charge him with any crime that may make him obnoxious to punishment, as to say a merchant is broken, or that he is failing or is not able to pay his debts."

The case of *Lumley* v. *Gye* (7), which was much discussed during the hearing of the present case, seems to me to throw but little light upon the question now to be decided, except that for the first time it established the proposition that a plaintiff who had made a contract with another was entitled to recover damages from a third person who had maliciously persuaded that other person

(1) 3 H. & C. 644.                    (4) L. R. 9 Ex. 218.
(2) (1844) 6 Q. B. 606.               (5) (1879) 14 Ch. D. 763.
(3) 11 East, 574, n.                  (6) 1 Ex. D. 91.
                    (7) 2 E. & B. 216.

60                              HOUSE OF LORDS                    [1898]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lawrance J.

to break his contract; the only principle on which this conclusion could be based being, I think, that it was a malicious interference with the plaintiff's mode of carrying on his business. It also decided that there must be a binding contract of service between the servant and his employer in all actions for maliciously persuading a servant to quit his employment.

*Bowen* v. *Hall* (1), which was another case of an action brought by a person who had contracted with others against the defendants, who had persuaded them to break their contracts, was decided expressly on the authority of *Lumley* v. *Gye* (2), and scarcely differs in principle from that case.

I think that the true principle on which both these cases rest is not whether the relation of master and servant existed between the plaintiffs and the persons with whom the contracts were made, but upon the doctrine of *Keeble's Case* (3), that the plaintiffs, having entered into contracts in the course of their business, and those contracts being broken by the malicious interference of the defendants, they were prevented from carrying on their business in a profitable manner, and suffered damage in consequence.

In *Temperton* v. *Russell* (4) no question arose as to the position of the parties with whom the contracts had been made and the plaintiff. They were contracts made in the usual course of trade, and the action was brought against the defendants for maliciously causing the parties to the contracts not to fulfil their obligations to the plaintiffs under such contracts. It was held that the action was maintainable, and that the right of action is not confined to contracts in the nature of personal service. The direction of Collins J. is valuable as containing a clear definition of malice. He said: "Now, in my judgment, it is perfectly clear law, that to induce a person who has made a contract with another to break that contract in order to hurt the person with whom it has been made, to hamper him in his trade, or to put undue pressure on him, or to procure some indirect advantage for the person himself, to induce another to break a contract for any of those motives, is, in point of law, to do it maliciously; therefore, in this case, if you are of opinion that the plaintiff has satisfied you that any of the defendants had induced any of the parties to break his contract with the plaintiff, of the existence of which he was aware, in order to hurt the plaintiff in his trade . . . . and if his object in doing that was by hurting him in his trade to compel him to do something which he did not want to do . . . . that would be ' maliciously ' in point of law, and a course of action would be established."

Such being the decisions in the principal cases relating to the subject-matter of the present action, the question arises as to whether the present case is brought within any of those principles. In order to determine that question it is necessary to ascertain what is the proper inference to be drawn from the evidence produced at the trial.

The evidence may, I think, be thus briefly stated. The defendant was the district delegate of a trade union called the United Society of Boiler Makers and Iron Ship Builders, whose headquarters were at Newcastle. Certain members

(1) 6 Q. B. D. 333.                    (3) 11 East, 574, n.
(2) 2 E. & B. 216.                     (4) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 122    04/25/2011    272927    401

A-5421

of the union were employed by the Glengall Iron Company at Millwall, of which Charles Halkett was the managing director, and John Edmonds the foreman. The plaintiffs, who were members of the Shipwrights' Provident Union, were employed by the Glengall Company to work in a certain ship on which repairs were being done, and at the time at which the matters complained of took place they were engaged in doing woodwork upon the said ship, the boiler-makers being employed in the same ship to do the ironwork. The plaintiffs had previously worked in the yard of the firm of Mills & Knight, and had there been employed in doing ironwork, but no such work was done by them in the Glengall Company's yard. The men belonging to the boiler-makers' union working at the Glengall Company's yard were unwilling to continue their employment if the plaintiffs were continued on the work at the ship; not because the plaintiffs were then doing ironwork, but because they had done so at Mills & Knight's some months before. They communicated with the defendant as their delegate upon the subject, and he, in consequence of such communication, went to the yard where the plaintiffs and the men belonging to the boiler-makers' union were employed. According to his own account the defendant saw the men's representative, Elliott, who said the men complained and threatened to leave their work if the plaintiffs were continued in their employment. He told him that if the men did strike it would be at their own risk, and that he would see as far as his influence was concerned that they would be deprived of all benefit from the society, and be fined in addition, if they left their work. After his interview with the men's representative the defendant saw both Halkett and Edmonds, and to both he stated that the men would strike if the plaintiffs were continued at their work. Acting under the pressure of this threat the managing director, in order to avoid loss of time in the repair of the ship, discharged the plaintiffs from their work, and this action was brought to recover damages for the loss of their employment.

No one can, I suppose, doubt that if the defendant had acted merely as the delegate and mouthpiece of the men, and had stated to the Glengall Company the determination of the men to strike (if such had been the fact), he would have been guilty of no actionable wrong; but it appears to me to be strong evidence of malice to tell the Glengall Company that the men were about to strike when he had himself informed the men that not only would a strike not be permitted by the union, but that the men would be fined if they were to adopt that course. By reason of that fraudulent statement he induced the company to discharge the men, and, therefore, in my judgment, brought himself under the principle of the cases above referred to, namely, " of having done an act the ultimate object of which was to injure the plaintiffs, having its origin in malice and ill-will to them."

It is to be observed that this action differs from all the cases which were cited at the hearing of the appeal, inasmuch as it is brought by the men who were discharged for the disturbance of their employment, and not by the masters for the loss of their service. Had the latter been the case it would have been necessary to have proved the existence of a contract of service before the master could sue; but in this case a contract between the men and their masters could make no further difference except so far as it might enhance the damages, and regulate the amount to which the plaintiffs would be entitled, or

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lawrance J.

Case: 11-126    Document: 63    Page: 123    04/25/2011    272927    401

A-5422

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.

Lawrance J.

so far as it might be an indication of malice, if it were shewn that the defendant knew of the existence of such a contract.

In this case the damages to the men were but small, as they were able to get employment shortly, but the right to bring the action would not depend on the existence of a contract.

It seems to me that the case was properly left to the jury by Kennedy J., and the jury having found that the defendant was actuated by malice (of which there was, in my judgment, ample proof), the respondents are entitled to succeed on this appeal.

WRIGHT J.    My Lords, in my opinion your Lordships' question ought to be answered in the negative.

In order to answer it there are, as it seems to me, three, and only three, questions which must be considered. The first is whether, apart from malice, there is evidence of any cause of action; the second is, whether and in what sense malice is shewn; the third is, whether and in what (if any) cases a person can be liable to an action for doing with a malicious motive that which he might lawfully do without such a motive.  There are no other questions, because it was ruled at the trial that there was no evidence of conspiracy or intimidation or breach of contract, and the judge was not asked to leave to the jury any issue as to those charges, or as to violence or coercion or fraud, or any other illegal conduct.

The first question may be thus stated : Does a plaintiff, by proving that a defendant has wilfully procured persons to refuse to make or renew contracts with the plaintiff in the way of his trade or employment, and that damage has directly resulted, prove any wrong or injuria ?  I am not sure that such a contention has been raised apart from malicious motive. Certainly no authority has been cited in its support (apart from malicious motive), and it is negatived impliedly in *Lumley* v. *Gye* (1), and expressly by the Judicial Committee of the Privy Council in *Rogers* v. *Rajendro Dutt*. (2)   In *Lumley* v. *Gye* (1) the point did not directly arise, because there the breach of an existing contract had been procured ; but each of the judges who then held that the action lay did so expressly on the ground that there was an existing contract.   Crompton J. says that in the previous cases "the question as to there being or not being a binding contract of service in existence at the time seems to have been regarded as the real question."  Erle J. says : "The right of action in the matter arises from the wrongful act of the defendant in procuring that the person hired should break his contract by putting an end to the relation of employer and employed." Wightman J. says : "It was undoubtedly, primâ facie, an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant maliciously to procure her to do so."   And it seems plain that, in the numerous ancient cases relating to the seduction of labourers, whether brought at common law or under the Statute of Labourers, which are cited by Coleridge J., the points which were argued would have been mostly immaterial if the doctrine now in question had been recognised.

(1) 2 E. & B. 216.          (2) 13 Moo. P. C. 209, 237, 241.

Case: 11-126    Document: 63    Page: 124    04/25/2011    272927    401

In *Rogers v. Rajendro Dutt* (1) the very point directly arose in relation to trade, and was decided. There the superintendent of a port directed his pilots not to continue to employ the plaintiff's tug. The plaintiff recovered damages in the Supreme Court of Calcutta, but on appeal the judgment was reversed in the Privy Council, and it is laid down that "the foundation of every action of tort, apart from the question of malice, is an act wrongful, and which may be qualified legally as an injury. . . . It is essential to an action in tort that the act complained of should under the circumstances be legally wrongful as regards the party complaining, that is, it must prejudicially affect him in some legal right; merely that it will, however directly, do him harm in his interests is not enough." This decision is cited as an authority by Bowen L.J. in the *Mogul Case.* (2)

The second question is, whether and in what sense there was evidence of malice. Since there was not otherwise any wrong or *injuria,* it follows that there could not be malice in the ordinary legal sense of that term, as compendiously stating the wilful infringement of a legal right or breach of a legal duty without matter of legal justification or excuse: upon which may be cited *Bromage v. Prosser* (3), per cur.; *McPherson v. Daniels* (4), per Littledale J.; *Ferguson v. Kinnoull* (5), per Lord Brougham and Lord Campbell; *Lumley v. Gye* (6), per Crompton J.; *Reg. v. Ward* (7), per Blackburn J.

These and other authorities shew that in general wherever the term "malice" or "maliciously" forms part of a statement of a cause of action or of a crime, it imports not an inference of motive to be found by the jury, but a conclusion of law which follows on a finding that the defendant has violated a right and has done so knowingly, unless he shews some overriding justification. A striking illustration is to be found in the law of murder. In *R. v. Oneby* (8) it was resolved by all the twelve judges to the effect that it was for the Court to direct the jury whether there was malice or not, according to the facts found or to be found by the jury. They pointed out that in all the once numerous special verdicts in case of murder there was no instance of a finding by the jury on the question of malice. So in the latest instance of such a special verdict, *Reg. v. Dudley.* (9) So in libel or malicious prosecution. Though a jury should think that a defendant in an action for a libel intentionally published by him had a *bona fide* and reasonable belief that he was acting on a legal ground of privilege, still if in law the privilege did not exist there is legal malice. In an action for malicious prosecution, if there were a special verdict finding that the defendant did not think that there was any ground for prosecution, the conclusion of malice in law would be inevitable without any express finding of malice by the special verdict.

The only kind, therefore, of malice which can be suggested in the present case is malice in its popular sense, importing a malicious motive, spite, and ill-will. It seems to me impossible to say that there was not evidence fit to be

---

(1) 13 Moo. P. C. 209, 237, 241.          (5) (1842) 9 Cl. & F. at pp. 303, 321.
(2) 23 Q. B. D. at p. 613.                (6) 2 E. & B. 216.
(3) 4 B. & C. 247.                        (7) (1872) L. R. 1 C. C. 356.
(4) (1829) 10 B. & C. 263.                (8) (1727) 2 Ld. Raym. 1485.
(9) (1884) 14 Q. B. D. 273.

Case: 11-126    Document: 63    Page: 125    04/25/2011    272927    401

A-5424

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Wright J.

left to the jury of malice in this sense. The mere demeanour of the defendant as a witness is often the best indication of motive which the nature of the inquiry admits, and is sometimes cogent.

Then if there was not in the present case any cause of action in the absence of malicious motive, can the addition of a malicious motive create an injuria? Can that which in the absence of malicious motive it is lawful to do wilfully and with the knowledge that it will cause damage, as in *Rogers v. Rajendro Dutt* (1), become unlawful and constitute a cause of action when done from an indirect or malicious motive? That question is one of equal consequence and difficulty, and it was expressly left open in *Rogers v. Rajendro Dutt* (1), though I think not so much as a general question as in relation to a possible case which might depend upon considerations of oppression or misuse of power by a public officer.

Nor is it, I think, to be regarded as decided by the opinions expressed in *Chasemore v. Richards* (2), per Lord Wensleydale, or in *Bradford Corporation v. Pickles* (3), for those cases appear to rest on the positive rights of owners of property; nor by the *Mogul Case* (4), where the ground of the decision was that the action of the defendants had been determined by motives of ordinary and legitimate self-interest. Neither of those cases seems either to affirm or negative the general proposition that where there is no injuria, malicious motive and damage can supply its place. And possibly *Stevenson v. Newnham* (5) may be regarded as resting on a similar ground.

Such a proposition, if of general application, would be of the highest importance, and had it formed part of our law it would seem that it must have long since become established in precedents and text-books, and have received frequent illustration by decided cases. The respondents have not been able to cite any clear authority before the present case in which the doctrine on which the present case has been decided is stated by the whole or the majority of any court as general and established law. In *Bowen v. Hall* (6) malice was not even alleged, and there was breach of contract. In *Temperton v. Russell* (7) the majority of the Court of Appeal proceeded as to part of the case on the same ground of breach of contract, and as to the other part on conspiracy. Whether there exists any such doctrine limited to cases of interference with trade must be presently considered; but, apart from such cases, I think that the few and isolated authorities which have been cited as supporting the general doctrine, even if not referable to other grounds, such as nuisance, slander of title, violence, fraud, or intimidation, are insufficient to establish it, and for the most part even imply the negative of it from the fact that such other grounds are relied on.

Great stress was laid by the respondents' counsel on the expression in Lord Holt's revised judgment in *Ashby v. White* (8), that it is the fraud and the malice that entitles the party to the action. But there is not the least doubt

---

(1) 13 Moo. P. C. 209, 237, 241.          (6) 6 Q. B. D. 333.
(2) (1859) 7 H. L. C. 349.                (7) [1893] 1 Q. B. 715.
(3) [1895] A. C. 587.                     (8) Holt's Judgments, ed. 1837,
(4) [1892] A. C. 25.                          12, 32.
(5) 13 C. B. 285.

what the real effect of *Ashby v. White* (1) is. Lord Holt decided it on the ground, for which the case has passed into the common stock of legal knowledge, that legal right and legal remedy are co-extensive, ubi jus, ibi remedium. This proposition the House of Lords, and afterwards Lord Holt himself, qualified in relation to the particular class of cases, adding that it must appear that the plaintiff's right was wilfully infringed. And so the case has always been understood. See *Drewe v. Coulton* (2); *Harman v. Tappenden* (3), per Lawrence J.; *Milward v. Sargeant* (4); *Cullen v. Morris* (5), where *Ashby v. White* (1) was much discussed, and Abbott C.J. says: "In order to sustain this action it is necessary for the plaintiff to shew, in the first place, that he had a right to vote," and he proceeds to shew that a malicious intention must also be proved.

But the matter does not rest merely on the absence or insufficiency of authority in support of the suggested doctrine as a general one. There is a well-known authority which, subject to the observation that I have made upon it in connection with *Chasemore v. Richards* (6) and *Bradford v. Pickles* (7), seems expressly to negative it. In the considered decision of the Exchequer Chamber, in *Stevenson v. Newnham* (8), the ground of the judgment delivered by Parke B., for himself and Coleridge, Wightman, Erle, and Crompton J.J., and Platt and Martin BB., in a case of distress, was that "an act which does not amount to a legal injury cannot be actionable because it is done with a bad intent."

The same view is clearly implied in *Lumley v. Gye* (9), where the demurrer necessarily admitted a malicious damage to the plaintiff; but it did not occur to counsel or to any of the judges that this amounted to a cause of action, although such a view would have afforded an obvious ground of decision, and would have rendered immaterial or unnecessary most of the arguments of counsel and of the reasoning of the judges.

And in accordance with the same view is the decision in Ireland in the case of *Kearney v. Lloyd* (10), decided by Palles C.B., Dowse B. and Andrews J. There the jury found (inter alia) that the defendants had procured persons to discontinue their subscriptions to the sustentation fund of a curate, and had done so partly from a malicious motive, in order to drive him out of the parish; and Palles C.B., after citing *Rogers v. Rajendro Dutt* (11), said: "To support the action the words 'injury' and 'injured' must be read in their strict legal sense as meaning the infringement of some legal right vested in the plaintiff." Where no such infringement can be shewn, I should adopt the words of Lord Bramwell in *Capital and Counties Bank v. Henty* (12): "It seems to me that the defendant's motive is immaterial, and that he might do what he did though out of anger or malice."

On the ground, therefore, of authority as well as of principle, I think that

(1) 1 Sm. L. C. (10th ed.) 231.
(2) (1787) 1 East, 563, n.
(3) (1801) 1 East, 555.
(4) (1786) 1 East, 567.
(5) (1819) 2 Stark. N. P. 577.
(6) 7 H. L. C. 349.
A. C. 1898.

(7) [1895] A. C. 587.
(8) 13 C. B. 285.
(9) 2 E. & B. 216.
(10) (1890) 26 L. R. Ir. 268.
(11) 13 Moo. P. C. 209.
(12) (1882) 7 App. Cas. at p. 793.

Case: 11-126    Document: 63    Page: 127    04/25/2011    272927    401

A-5426

H. L. (E.)
1897

ALLEN
*v.*
FLOOD.

Wright J.

the right conclusion is that malicious motive, as distinguished from the wilful violation of a known right, though it is sometimes material in aggravation of damages for infringement of a right, and sometimes, as in actions for defamation or malicious prosecution, and probably in certain cases of nuisance, in some sense a necessary ingredient for a cause of action, is not of itself in conjunction with damage enough in general to constitute a cause of action where no legal right is infringed; and, if so, the ground on which this case was decided cannot be supported.

There is no exception in cases of slander or libel, for in them a legal right is infringed. I think that there is none in the case of malicious prosecution. It is not indeed easy to define the legal right the infringement of which is, when coupled with malice in either sense of that term, the ground of action in that class of cases. Lord Holt, in *Savile* v. *Roberts* (1), suggests three grounds, namely, in some cases the scandal to reputation; in others the danger to life, limb, or property; in others the forcing of the plaintiff to spend his money in necessary charges for his defence. Possibly it rather rests on the ground that a prosecution known to be groundless is an abuse of the right, given on public grounds, of bringing a person before the criminal courts and of subjecting him to the inconveniences of criminal procedure. At any rate, this action has always been considered as resting on a ground of injuria as well as of malice.

Then, if there is no such general doctrine as that which the respondents maintain, is there a limited doctrine of the same kind in relation to interference with a man's trade or employment? Beyond the important dicta of Lord Holt in *Keeble* v. *Hickeringill* (2), the authorities cited do not appear to be adequate to sustain the weight of such a proposition.

If such were the law, it would be reasonable to suppose that it would long since have been established by recognised precedents of pleading, and by numerous cases dealing with a question of such frequent occurrence and affecting such varied and important interests, and by at least some cases affirming it after discussion of the grounds and limits of so anomalous and important an exception to the general rule. In fact, however, the authorities cited in support of it are, until *Temperton* v. *Russell* (3), no more than dicta, and, with the exception of Lord Holt's dicta in *Keeble* v. *Hickeringill* (2), they are indistinct and referable to other grounds, as was pointed out by Bowen L.J. in the *Mogul Case* (4), either violence or threat of violence, as in *Garret* v. *Taylor* (5) and *Tarleton* v. *M'Gawley* (6); or conspiracy and actual disturbance of trade, as in *Gregory* v. *Duke of Brunswick* (7), or obstruction in the use of the highway, or physical interference with trade, as in *Green* v. *London General Omnibus Co.* (8); or slander of title, or nuisance, or other similar grounds. *Keeble* v. *Hickeringill* (2) itself cannot be said to have obtained recognition as establishing any general doctrine of law. Decided in the time of Queen Anne, and reported then, and more at large in 1809 (in the note to

(1) 1 Ld. Raym. 374.
(2) 11 East, 574, n.
(3) [1893] 1 Q. B. 715.
(4) 23 Q. B. D. 611, et seq.
(5) Cro. Jac. 567.
(6) 1 Peake, N. P. C. 270.
(7) 6 M. & G. 205, 953.
(8) 7 C. B. (N.S.) 290.

Case: 11-126    Document: 63    Page: 128    04/25/2011    272927    401

A-5427

*Carrington* v. *Taylor* (1)), it must have been known to lawyers for nearly two centuries. Yet no reference to it is to be found in Smith's Leading Cases or in Bullen and Leake's Precedents. In Buller's Nisi Prius it is barely mentioned, and there, and in Selwyn's Nisi Prius, the dicta for which it is now cited are not mentioned at all.

Against such slender, uncertain, and qualified authorities are the unqualified decision in *Stevenson* v. *Newnham* (2) already cited, and the negative inference to be drawn from the absence of mention of any such doctrine in precedents of pleadings and in keenly contested cases, of which it would have afforded a ready solution. In *Lumley* v. *Gye* (3) the demurrer was to a declaration which alleged that the defendant contriving, and wrongfully and maliciously intending, to injure, prejudice, and aggrieve the plaintiff in his possession and management of his theatre, and in the gains and profits derived therefrom, did the alleged wrong, and that damage of the intended kind was caused to the plaintiff by the defendant's act, and all this was necessarily admitted on the demurrer; yet none of the very eminent judges or counsel in the case seem to have been aware of the doctrine now suggested. If it had been known to them, some mention of it must have been made, and it would have rendered unnecessary most of the arguments and elaborate reasoning on other points. It seems difficult to suppose that such a doctrine is part of the common law, and yet was not known to either Crompton J., Erle J., Wightman J., or Coleridge J.

It seems to me that these considerations outweigh the authority of Lord Holt's dicta in *Keeble* v. *Hickeringill* (4), and that it must be held that the supposed exception to the general law is not established.

For these reasons I answer your Lordships' question in the negative.

The House took time for consideration.

Dec. 14.    LORD HALSBURY L.C. My Lords, in this case the two plaintiffs sued three persons as defendants for having maliciously and wrongfully, and with intent to injure the plaintiffs, intimidated and coerced the employers, videlicet, a certain company called the Glengall Iron Company, to break contracts, and not to enter into contracts with them, whereby the plaintiffs had suffered damage.

I have compendiously stated the cause of action, as I conceive it to be, in order to discuss by itself the main and important principle which is at stake in the determination of this appeal; but I shall return to the question of the pleadings and to the course of the trial before Kennedy J., since it appears to me that some confusion has been created by not keeping

(1) 11 East, 571.          (3) 2 E. & B. 216.
(2) 13 C. B. 285.          (4) 11 East, 574, n.

3       F 2

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

separate objections directed to those subordinate parts of the appeal from the cause of action itself as I have stated it.

The two plaintiffs were shipwrights, and were working in their trade on board a vessel called the *Sam Weller*. The vessel was being repaired, and the two plaintiffs were engaged by the Glengall Iron Company to work at their trade in the repair of the vessel.

I think there is much to be said for the doubt thrown out by Hawkins J. in his elaborate and most able opinion, whether the assumption was accurate on which both parties conducted the case, namely, that there was no contractual relation between the employers and employed so as to bring into debate the question of whether there was any inducement offered to the Glengall Iron Company to break contracts with the plaintiffs. But for the present I will assume that there was no contract by which the company were bound to keep the plaintiffs in their service till the repairs of the vessel were completed, while on the other hand there was no reasonable doubt that but for what was done by the defendant they would have been kept at work until the termination of the repairs.

My Lords, I am not concerned to discuss minutely the evidence where the witnesses are in conflict, or where it may be contended that the witnesses relied on by the plaintiffs have exaggerated or misunderstood what was said by the defendant. Such questions were for the jury, and if there was any reasonable evidence for them it was for them, and not for me or for anyone else, to decide.

The plaintiffs gave evidence that while thus employed the defendant Allen came to the responsible manager of the Glengall Iron Company and made certain communications (which I will deal with presently, because upon the character of those communications much depends), and that in consequence of those communications they were discharged from their employment. As to the one being the consequence of the other, although in a certain sense it is still a question of fact, I confess I am surprised in no small degree to hear a doubt suggested that it was not in consequence of the communications made by Allen that the plaintiffs were discharged. One of the officers

Case: 11-126    Document: 63    Page: 130    04/25/2011    272927    401

A-5429

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

of the defendant company, it is true, explains that it was for peace and quietness in the yard; but though his words are accompanied by such expressions as these, I should have thought no one could have seriously doubted that what he meant (and, indeed, I think what he said), in the ordinary intelligible use of language, was that he discharged them because he could not have the work in his yard interrupted. I confess I am wholly unable to understand what is stated by some of your Lordships that the men were not discharged by reason of anything that Allen said, and that the boiler-makers would have ceased working even if Allen had said nothing: this is not the evidence, and, what is more important, it is in the teeth of the express finding of the jury in answer to Kennedy J.'s question, as I will presently shew. And, in truth, if this were accurate, there would be nothing to discuss, since, in that case, Allen would have done nothing that caused any damage to anyone.

And now I will quote, as nearly as I can, the language which is alleged to have been used by Allen in his communications. I quote first what was stated by Mr. Halkett, who was the managing director of the Glengall Iron Company. Allen said, "He had received word from *some* of the boiler-makers that were working in our yard that they wanted to see him, and he came round and had an interview with these men, and they told him that we had two shipwrights engaged in our employment who were known to have done ironwork before in Mills & Knight's yard, and that unless these two men were discharged from our employment that day, all the ironworkers belonging to his society would leave off work that day; and they gave as the only reason that these men were guilty of doing ironwork in Mills & Knight's yard . . . . The substance of what he said was that they were *really trying to put an end to this practice* of doing ironwork by the shipwrights—to stop shipwrights being engaged in ironwork. That it was not from any ill-feeling against ourselves nor against any men in particular —Flood and Taylor; but they—that is, the boiler-makers— had made up their minds—or we have made up our minds— that wherever it is known that any shipwrights have been engaged doing ironwork, their workmen—that is, the boiler-

Case: 11-126   Document: 63   Page: 131   04/25/2011   272927   401

A-5430

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

makers'—would cease work on the same ship on the same employment."

Then a question was asked, " Did he say anything in regard to Flood and Taylor in respect of other yards besides yours ? " And the answer was, " Not in a particular sense ; in a general sense that these men would be followed—that these men were known—it was so difficult to get them known ; that these men were known, and wherever these men were employed the same action would be taken there as had been taken in our place." He also said, " You have no option.  If you continue to engage these men our men will leave . . . . It was in consequence of that that the men were discharged.  It was the fear of the threat being carried out—of the men leaving—the boiler-makers.  If the boiler-makers had left or had been called out it would seriously have impeded our business . . . . The threat to withdraw these ironworkers extended to every workman we had in our employment at whatever place."  He goes on to say (after an embarrassing interruption) that " the threat was to withdraw the ironworkers in the employment of the Glengall Iron Company from every ship or every job upon which the Glengall Iron Company were engaged on which the men of their union were employed."

Mr. Edmonds, the foreman of the Glengall Iron Company, deposed as follows : " Mr. Halkett sent for me and when I got in the room he said, ' Mr. Allen has come here and says that if those two men '—that is, Flood and Taylor—' are not discharged all of the iron-men will knock off work or be called out.'  I will not be sure what term he used.  I asked Mr. Allen the reason why.  He said because those two men had been working at Messrs. Mills & Knight's on ironworks.  I told him I thought it was very arbitrary on his part to do anything like that.  I told him I thought it was not right that Messrs. Mills & Knight's sins should be visited upon us."

(Q.) " Did anything else take place ? "

(A.) " For the reason that we were not employing the ship-wrights on ironwork, and never had done so—not at the Glengall.  There was a lot of other conversation, but that is not material to this case.  He says that was the case, and if

these men were not discharged, their men would be called out
or 'knock off'—I will not be sure what term he used. Me
and Mr. Allen had a few words, but that is immaterial to this.
I think that is all that is material to this case."

(Q.) " Was anything said about other yards?"

(A.) " Yes. When I spoke about it not being right to visit
Mills & Knight's sins on us, he said the men would be called
out from any yard they went to—they would not be allowed to
work anywhere in London river."

As I have said, in the face of this evidence, how anyone can
doubt that it was the communications made by Allen that
caused the dismissal of these two men, I am not able to under-
stand; and in what I have to say hereafter I shall assume as
proved, or, at all events, as established by evidence proper to
be submitted to a jury, that it was Allen who caused the
dismissal of the plaintiffs.

The first objection made to the plaintiffs' right to recover for
the loss which they thus undoubtedly suffered is that no right
of the plaintiffs was infringed, and that the right contended for
on their behalf is not a right recognised by law, or, at all events,
only such a right as everyone else is entitled to deprive them of
if they stop short of physical violence or obstruction. I think the
right to employ their labour as they will is a right both recognised
by the law and sufficiently guarded by its provisions to make
any undue interference with that right an actionable wrong.

Very early authorities in the law have recognised the right;
and, in my view, no authority can be found which questions or
qualifies it. The schoolmaster who complained that his scholars
were being assaulted and brought an action (1), the quarry owner
who complained that his servants were being menaced and
molested, were both held to have a right of action. And it
appears to me that the importance of those cases, and the prin-
ciple established by them, have not been sufficiently considered.
It is said that threats of violence or actual violence were
unlawful means: the lawfulness of the means I will discuss
hereafter. But the point on which these cases are important
is the existence of the right. It was not the schoolmaster who

(1) [See note (1), p. 55 above.—F. P.]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

72                         HOUSE OF LORDS                    [1898]

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

was assaulted; it was not the quarry owner who was assaulted or threatened; but, nevertheless, the schoolmaster was held entitled to bring an action in respect of the loss of scholars attending his school, and the quarry owner in respect of the loss of workmen to his quarry. They were third persons; no violence or threats were applied to them, and the cause of action, which they had a right to insist on, was the indirect effect upon themselves of violence and threats applied to others.

My Lords, in my view these are binding authorities to shew that the preliminary question, namely, whether there was any right of the plaintiffs to pursue their calling unmolested, must be answered in the affirmative. The question of what is the right invaded would seem to be reasonably answered, and the universality of the right to all Her Majesty's subjects seems to me to be no argument against its existence. It is, indeed, part of that freedom from restraint, that liberty of action, which, in my view, may be found running through the principles of our law.

As I have said, I will deal separately both with the remedy for the infringement of that right, if it has been infringed, and with the means by which it is alleged to have been infringed.

Upon this part of the case I wish to quote and make my own the language of Bramwell B. in *Reg.* v. *Druitt* (1): "When the law gave, or rather acknowledged, a right, it provided a punishment or a remedy for the violation of that right. That was a cardinal rule and an obvious one. The old expression that 'there was no wrong without a remedy' might also be interpreted to mean that there was also no right without a remedy. Sometimes the remedy was by a criminal proceeding, sometimes by a civil action, sometimes by both. Having made those general remarks he would make another, which was also familiar to all Englishmen—namely, that there was no right in this country under our laws so sacred as the right of personal liberty. No right of property or capital, about which there had been so much declamation, was so sacred or so carefully guarded by the law of this land as that of personal liberty. They were quite aware of the pains taken by the common law, by the writ, as it was called, of habeas

(1) 10 Cox, C. C. 600.

corpus, and supplemented by statute, to secure to every man his personal freedom—that he should not be put in prison without lawful cause, and that if he was he should be brought before a competent magistrate within a given time, and be set at liberty or undergo punishment. But that liberty was not liberty of the body only. It was also a liberty of the mind and will; and the liberty of a man's mind and will, to say how he should bestow himself and his means, his talents and his industry, was as much a subject of the law's protection as was that of his body. Generally speaking, the way in which people had endeavoured to control the operation of the minds of men was by putting restraints on their bodies, and therefore we had not so many instances in which the liberty of the mind was vindicated as was that of the body. Still, if any set of men agreed among themselves to coerce that liberty of mind and thought by compulsion and restraint, they would be guilty of a criminal offence—namely, that of conspiring against the liberty of mind and freedom of will of those towards whom they so conducted themselves. He was referring to coercion or compulsion—something that was unpleasant and annoying to the mind operated upon, and he laid it down as clear and undoubted law that if two or more persons agreed that they would by such means co-operate together against that liberty they would be guilty of an indictable offence."

It is said, indeed, that an action for the infringement of such a right is a novelty; but I do not concur that it is, or that if it were it would be a sufficient argument. The whole history of the action upon the case, from 13 Edw. 1, c. 24, downwards affirms the principle that where cases fall under the same right and require a like remedy new precedents should be created.

So in *Pasley* v. *Freeman* (1), per Ashhurst J.: "Another argument which has been made use of is that this is a new case, and that there is no precedent for such an action. Where cases are new in their *principle*, there I admit that it is necessary to have recourse to legislative interposition in order to remedy the grievance; but where the case is only new in the *instance*, and the only question is upon the application of a

<div align="right">

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

</div>

Case: 11-126    Document: 63    Page: 135    04/25/2011    272927    401

HOUSE OF LORDS [1898]

H. L. (E.)
1897

ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

principle recognised in the law to such new case, it will be just as competent to courts of justice to apply the principle to any case which may arise two centuries hence as it was two centuries ago. If it were not so, we ought to blot out of our law books one-fourth part of the cases that are to be found in them."

First it is said that the company were acting within their legal rights in discharging the plaintiffs. So they were; but does that affect the question of the responsibility of the person who caused them so to act by the means he used? The scholars who went away from the school were entitled to do so. The miners were entitled to cease working at the quarry. The natives were entitled to avoid running the risk of being shot; but the question is, What was the cause of their thus exercising their legal right?

The question must be whether what was done in fact, and what did in fact procure the dismissal of the plaintiff, was an actionable wrong or not. I have never heard that a man who was dismissed from his service by reason of some slander could not maintain an action against the slanderer because the master had a legal right to discharge him.

In treating the question I can desire no more apt exposition of the law than what is contained in Bowen L.J.'s admirably reasoned judgment in the *Mogul Case* (1) in the Court of Appeal: "Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it. The intentional driving away of customers by shew of violence: *Tarleton* v. *M'Gawley* (2); the obstruction of actors on the stage by preconcerted hissing: *Clifford* v. *Brandon* (3); *Gregory* v. *Brunswick* (4); the disturbance of wild fowl in decoys by the firing of guns: *Carrington* v. *Taylor* (5) and *Keeble* v. *Hickeringill* (6); the impeding or threatening servants or workmen: *Garret* v. *Taylor* (7); the inducing persons under personal contracts to break their con-

---

(1) 23 Q. B. D. 614.　　　　　　(4) 6 Man. & G. 205, 953.
(2) 1 Peake, N. P. C. 270.　　　　(5) 11 East, 571.
(3) 2 Camp. 358.　　　　　　　　(6) 11 East, 574, n.
(7) Cro. Jac. 567.

Case: 11-126   Document: 63   Page: 136   04/25/2011   272927   401

A-5435

tracts: *Bowen* v. *Hall* (1) ; *Lumley* v. *Gye* (2)—all are instances of such forbidden acts."

It will be observed that in what Bowen L.J. says, intimidation, obstruction or molestation, or intentional procurement of a violation of individual rights, contractual or other (always assuming that there is no just cause for it), are each of them, where damage has been caused, actionable wrongs. And so Sir William Erle, in a passage quoted by the late Master of the Rolls (Lord Esher), points out that "every person has a right under the law, as between himself and his fellow-subjects, to full freedom in disposing of his own labour or his own capital according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another in the exercise of the right comprised within this description, done, not in the exercise of the actor's own right, but for the purpose of obstruction, would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition" (Erle on Trade Unions, p. 12).

The Lord Justice was too keen a reasoner not to observe that the words "without just cause or excuse" which he had used required exposition to render his reasoning complete, and accordingly he explains in another part of his judgment what his view was of malice. His Lordship thus describes the state of mind which, in his view, would negative just cause or excuse (*Mogul Steamship Co.* v. *McGregor, Gow & Co.* (3)) : " Now intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong: see *Bromage* v. *Prosser* (4) ; *Capital and Counties Bank* v. *Henty* (5), per Lord Blackburn."

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

(1) 6 Q. B. D. 333.          (3) 23 Q. B. D. 613.
(2) 2 E. & B. 216.           (4) 4 B. & C. 247.
          (5) 7 App. Cas. 741, at p. 772.

Case: 11-126   Document: 63   Page: 137   04/25/2011   272927   401

A-5436

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Halsbury
L.C.

My Lords, I must for my own part disclaim the idea that you can get rid of observations such as these in the learned judge's judgment by saying that they are obiter. Of course, one is familiar with the observation that such and such an opinion expressed by a learned judge was not necessary for the decision of the case. But where a distinction is being drawn between what is lawful and what is not, and where, as in this case, the observations form part of the reasoning by which the conclusion is arrived at, it appears to me that whichever way the decision may be one part of the judgment is as much an authoritative exposition of the law as the other.

Now, it will be observed that Bowen L.J. points out that not only contractual rights are comprehended within his view but other rights, such as the right to carry on the business of an actor and the like.

In the same case, when appealed to this House (1), it appears to me that the principle upon which that decision was arrived at is an important one, as excluding what is here suggested to be lawful. I myself asked in that case: "What legal right is interfered with? What coercion of the mind or will or of the person is effected? All are free to trade upon what terms they will, and nothing has been done, except in rival trading, which can be supposed to interfere with the appellants' interests."

Lord Watson pointed out that the withdrawal of agents at first appeared to him to be a matter attended with difficulty, but that on consideration he was satisfied that it could not be regarded as an illegal act: "In the first place, it was impossible that any honest man could impartially discharge his duty of finding freights to parties who occupied the hostile position of the appellants and respondents; and, in the second place, the respondents gave the agents the option of continuing to act for one or other of them in circumstances which placed the appellants at no disadvantage." And he added "that it had not been proved and not been suggested that the respondents used either misrepresentation or compulsion for the purpose of attaining the object of their combination."

And Lord Bramwell begins his judgment by saying that the

(1) [1892] A. C. 38.

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Halsbury
L.C.

plaintiffs in that case "did not complain of any trespass, violence, force, fraud, or breach of contract, nor of any direct tort or violation of any right of the plaintiffs, like the case of firing to frighten birds from a decoy; nor of any act the ultimate object of which was to injure the plaintiffs having its origin in malice or ill-will to them."

Lord Morris expressed his intention to adopt entirely the principles laid down by Bowen L.J.; and Lord Macnaghten read and adopted Lord Bramwell's judgment.

Lord Field justifies his opinion, which he says may be supported upon the principles laid down in *Keeble* v. *Hickeringill* (1), as to which I shall have a word to say hereafter. But he goes on to say that "everything that was done by the respondents was done in the exercise of their right to carry on their own trade, and was bonâ fide so done. There was not only no malice or indirect object in fact, but the existence of the right to exercise a lawful employment, in the pursuance of which the respondents acted, negatives the presumption of malice which arises when the purposed infliction of loss and injury upon another cannot be attributed to any legitimate cause, and is therefore presumably due to nothing but its obvious object of harm."

And Lord Hannen says "that he considered that a different case would have arisen if the evidence had shewn that the object of the defendants was a malicious one—namely, to injure the plaintiffs, whether they, the defendants, should be benefited or not." And he concludes his judgment by saying "that it appears to him that in that case there was nothing indicating an intention to injure the plaintiffs, except in so far as such injury would be the result of the defendants obtaining for themselves the benefits of the carrying trade, by giving better terms to customers than their rivals, the plaintiffs, were willing to offer."

My Lords, I have been careful to call attention to the opinions of the noble and learned Lords, not only because I think a use has been made of the decision in that case which is not justified by anything in the opinions delivered, but rather because I

(1) 11 East, 574, n.

Case: 11-126    Document: 63    Page: 139    04/25/2011    272927    401

A-5438

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

think that, upon the principles I have indicated before, these opinions form a very considerable body of authority that, if the elements which each noble Lord in turn pointed out did not exist in that case had in fact existed, the decision would have been the other way.

My Lords, I do not think that the case of *Keeble* v. *Hickeringill* (1) stands alone, though if it did, considering who decided it, and that certainly in later years it has been much quoted and commented on, and never until now, so far as I am aware, criticised or questioned, I should be quite content to rely upon the authority of so profound a lawyer as Sir John Holt, and such an expositor as he was of the spirit of freedom which runs through the English law; but it will be also observed that in this House Lords Bramwell and Field, and in the Court of Appeal Bowen L.J., assume it to be good law.

It is interesting to observe that that case has been recognised and acted upon in the American courts, where these questions of capital and labour have not infrequently arisen.

In *Walker* v. *Cronin* (2) it was held that an action of tort would lie upon a count alleging that the plaintiff was a manufacturer of shoes, and for the prosecution of his business it was necessary for him to employ many shoemakers; that the defendant, well knowing this, did unlawfully, and without justifiable cause, molest him in carrying on the said business with the unlawful purpose of preventing him from carrying it on, and wilfully induced many shoemakers who were in his employment, and others who were about to enter into it, to abandon it without his consent and against his will, and that thereby he lost their services and the profits, &c., to be derived therefrom, and was put to expense, &c. The second count alleges contracts between the plaintiff and the shoemakers to make stock into shoes, and that the defendant, " well knowing this, with the unlawful purpose of preventing him (the plaintiff) from carrying on his business, induced them to return the stock unfinished to the factory, and to neglect and refuse to make it into shoes as they had agreed to do." The third count alleges that the defendant enticed and procured a shoemaker in the plaintiff's service

(1) 11 East, 574, n.                    (2) 107 Mass. 555.

H. L. (E.)

1897

ALLEN
v.
FLOOD.

1Lord Halsbury
L.C.

and employment who had agreed to make three cases of shoes to leave the plaintiff's service and employment. There was a demurrer to the declaration, and this demurrer was allowed in the Superior Court, whereupon the plaintiff appealed. Wells J., after citing Com. Dig. Action on the case A : " in all cases where a man has a temporal loss or damage by the wrong of another, he may have an action on the case to be repaired in damages," goes on to review in order *Keeble* v. *Hickeringill* (1) ; *Tarleton* v. *M'Gawley* (2) ; *Green* v. *Button* (3) ; *Gunter* v. *Astor* (4) ; *Hart* v. *Aldridge* (5) ; *Shepherd* v. *Wakeman* (6) ; *Winsmore* v. *Green-back* (7) ; *Lumley* v. *Gye.* (8) He overruled the demurrer, and, holding that the declaration sufficiently alleged (1.) intentional and wilful acts, (2.) calculated to cause damage to the plaintiff in his lawful business, (3.) done with the unlawful purpose to cause such damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice), and (4.) actual damage and loss resulting, held that each of the three counts disclosed a good cause of action. "This decision," continues the learned judge, "does not apply to a case of inter-ference by way of friendly advice, honestly given ; nor is it in denial of the right to free expression of opinion. We have no occasion now to consider what would constitute justifiable cause."

*Benton* v. *Pratt* (9) and *Rice* v. *Manley* (10) were both cases where the defendant through false words caused a third person, who had entered into contracts of sale (in the first-named case of cheese, in the second of hogs) void by the Statute of Frauds, to break such contracts. An action was held to lie in each case.

In *Bixby* v. *Dunlap* (11) it was held that exemplary damages could be recovered from a defendant who knowingly procured a servant to leave a master whom she had contracted to serve without ever being actually in his employment. *Lumley* v.

(1) 11 East, 574, n.
(2) 1 Peake, N. P. C. 270.
(3) 2 C. M. & R. 707.
(4) (1819) 4 J. B. Moore, 12.
(5) (1774) 1 Cowp. 54.
(6) 1 Sid. 79.
(7) (1745) Willes, 577.
(8) 2 E. & B. 216.
(9) (1829) 2 Wend. 385.
(10) (1876) 66 N. Y. (21 Sickels) 82.
(11) 22 Amer. Rep. 475.

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

*Gye* (1) is here taken as having laid down the law on this subject.

In *Angle* v. *Chicago, &c., Ry. Co.* (2), it was alleged that the United States had granted lands in the State of Wisconsin in aid of the construction of railways. The State of Wisconsin had granted a portion of these lands to the defendant company for the purpose of constructing a particular railway. It had also granted other lands to another company, the Portage Company, to construct another and somewhat competing railway: this latter railway was to be completed within a certain time. This could not be done, and the State of Wisconsin enlarged the time for completion. The Portage Company then employed the plaintiff to complete the line, and he was actively prosecuting the work when the defendant company, conspiring with certain officials of the Portage Company, induced the State of Wisconsin to revoke the concession to the Portage Company, whereby the plaintiff lost his employment. He accordingly brought his action. The Court held, following *Lumley* v. *Gye* (1) and *Bowen* v. *Hall* (3), that the defendant company were liable to the plaintiff.

My Lords, I now revert to that part of the case which I admit has to be carefully considered: whether in what the defendant did in order to procure the dismissal of the plaintiffs he came within any of the rules which have been laid down in the cases quoted. Now, to my mind, he was guilty of intimidation and coercion through that intimidation. In using that word " intimidation," I am not using it in the technical sense which the statutes upon the subject have been construed to mean; I will explain in what sense I do understand the word; but in passing I must deprecate the language which has been used to minimise the effect of what Allen said. I observe it is described as " inconvenience." That is not how it is described by the witness. Edmonds, the foreman of the Glengall Company, thus describes what would have been the effect upon the business of the firm. He says: " They were rather busy just then with the boiler-makers; that they employed three times

(1) 2 E. & B. 216.          (2) (1893) 151 U. S. 1.
(3) 6 Q. B. D. 333.

Case: 11-126   Document: 63   ~~Page: 142~~   04/25/2011   272927   401

A-5441

as many boiler-makers as shipwrights, and if the boiler-makers had knocked off work or struck, it would have stopped the business of the company altogether—entirely—at that time, and that it was a very serious matter to the firm, and that the discharge of the men was in order to prevent their having to stop their business."

My Lords, it seems to me very obvious to ask whether the threat to do that which will have such an effect as the witness described is a coercion of the will or not. The men were good workmen and of good character; they were working, even according to Allen's own view, at their own trade as ship-wrights, but they had worked upon a former occasion for a different employer upon an iron ship.

I think the dissatisfaction among the boiler-makers at these two men being employed has been greatly exaggerated. The man Elliott, who actually sent for Allen, gives this account of it: "We were having a talk together at breakfast-time, and some of them felt dissatisfied about it. Some of them said we had better leave our work. I said, 'Do not do anything of the kind' . . . . I sent a telegram to Allen . . . . When I met Mr. Allen at breakfast-time the next morning he said to me, ' Well, what is this here little bit of a trouble here ?' ' Well,' I said, ' the chaps are dissatisfied about these here two plaintiffs Flood and Taylor being in the habit of working over at Mills & Knight's.' ' Well,' he said, ' what do they want ?' ' Some of them are saying they are going to leave their work.' He says, ' The best thing you can do is to go in and tell them not to leave their work until things are settled; wait and see how things settle.' I said, ' Very good; I will tell them what you say now.' "

The cross-examination is important with reference to what took place afterwards, and as exhibiting the extent and degree to which even some of the men—for it goes no further—expressed their wishes. The learned counsel asks: " Their wishes were that these men whose conduct they objected to at Mills & Knight's should not be kept in the same employ with themselves ?—(A.) Oh, no.   (Q.) That was the feeling, was it not ?—(A.) No.   (Q.) Well, let me understand.—(A.) They

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

did not say they should not be kept in the employ of the firm at all. (Q.) They did not say they should not be kept on the job on which they were being employed?—(A.) They did not wish them among our midst. (Q.) Working on the same ship?—(A.) Yes."

It will be observed how limited are the numbers in respect of which the allegation of discontent is put forward, and it will be observed that this witness entirely repudiated any wish to prevent these men being employed; but even that wish is limited to the desire that they should not be employed upon the same ship. But perhaps the most astonishing part of the case is to be found in Allen's own evidence.

Allen denies that he had ever said anything about the men being called out. He denies in terms that he said the same thing would happen in any yard where the two men were employed. He denies that he used that memorable language, "We have made up our minds that wherever it is known that there are any shipwrights who have been engaged doing iron-work the boiler-makers will leave work in that yard." Being asked whether he wished the step to be taken of the two men being discharged, he said, "He had no such thought floating in his mind at the time." This is, of course, in direct conflict with the evidence given by the manager and the foreman of the Glengall Company; but, as I have said, the credibility of the witness was for the jury and not for me.

And now it is important to call attention to the exact question which was left to the jury. Kennedy J. said: "The question that I want you to answer is that, if you find he induced the Glengall Iron Company by the threat which is suggested by the plaintiffs of calling out all the men on strike, and he continued in that course of conduct if there was any attempt to employ them again, did he do that with the malicious intention which I have endeavoured to explain, that is merely, not for the purpose of forwarding that which he believed to be his interest as a delegate of his union in the fair consideration of that interest, but for the purpose of injuring these plaintiffs, and preventing them doing that which they were each of them entitled to do." Observe the phrase used,

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

"the threat suggested by the plaintiffs of calling out all the men on strike," and that that induced the Glengall Iron Company to discharge the plaintiffs; and yet it is to be said that Allen's threat had nothing to do with the discharge of the plaintiffs. It will be observed that Kennedy J. draws a distinction between the conduct which he assumes to be lawful on Allen's part to do what he did do if it were merely for the purpose of forwarding that which he believed to be his interest as a delegate of his union in fair consideration of that interest on the one hand, and on the other hand his conduct if what he did was done for the purpose of injuring these plaintiffs.

My Lords, it appears to me that that is a direction of which the defendants cannot complain, since it puts what is to my mind an alternative more favourable to them. In my view, his belief that what he was doing was for his interest as a delegate of his union would not justify the doing of what he did do. It is alleged, and to my mind and to the mind of the jury proved, that the employers were compelled under pressure of the threats that he used to discharge the plaintiffs.

I have not used the word "intimidated," because I observe the learned judge says there was no intimidation in a legal sense. If what was meant by that was that there was no threat of violence to person or property, it is true; but the word "intimidation" is not always to be construed as it has been construed under 6 Geo. 4, c. 129. The construction of it in that statute flowed from the other words with which the word "intimidate" is associated; and if, without using the word "intimidate," that which was held out as the inducement to dismiss the plaintiffs was that such a stoppage of the works should be occasioned as that the business of the company would seriously suffer, I should think that would be a thing which would be likely to produce fear of the consequences of the company retaining them in their employment, and a company which abstained from doing so by reason of that fear would justly be described as "intimidated."

But the objection made by the defendants appears to be that the word "malicious" adds nothing; that if the thing was lawful it was lawful absolutely; if it was not lawful it was

84                    HOUSE OF LORDS                    [1898]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

unlawful—the addition of the word "malicious" can make no difference. The fallacy appears to me to reside in the assumption that everything must be absolutely lawful or absolutely unlawful. There are many things which may become lawful or unlawful according to circumstances.

In a decision of this House it has undoubtedly been held that whatever a man's motives may be, he may dig into his own land and divert subterranean water which but for his so treating his own land might have reached his neighbour's land. But that is because the neighbour had no right to the flow of the subterranean water in that direction, and he had an absolute right to do what he would with his own property. But what analogy has such a case with the intentional inflicting of injury upon another person's property, reputation, or lawful occupation? To dig into one's own land under the circumstances stated requires no cause or excuse. He may act from mere caprice, but his right on his own land is absolute, so long as he does not interfere with the rights of others.

But, referring to Bowen L.J.'s observation, which to my mind is exactly accurate, "in order to justify the intentional doing of that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade," you must have some just cause or excuse.

Now, the word "malicious" appears to me to negative just cause or excuse; and without attempting an exhaustive exposition of the word itself, it appears to me that, if I apply the language of Bowen L.J., it is enough to shew that this was within the meaning of the law "malicious."

It appears to me that no better illustration can be given of the distinction on which I am insisting between an act which can be legally done and an act which cannot be so done because tainted with malice, than such a colloquy between the representative of the master and the representative of the men as might have been held on the occasion which has given rise to this action. If the representative of the men had in good faith and without indirect motive pointed out the inconvenience that might result from having two sets of men working together on

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

the same ship, whose views upon the particular question were so diverse that it would be inexpedient to bring them together, no one could have complained; but if his object was to punish the men belonging to another union because on some former occasion they had worked on an iron ship, it seems to me that the difference of motive may make the whole difference between the lawfulness or unlawfulness of what he did.

I see it is suggested by one of your Lordships that the action for malicious prosecution is supposed to be an exception. I am not quite certain that I understand what is the proposition to which it is an exception. If it means that there is no other form of procedure known to the law wherein malice may make the distinction between a lawful and an unlawful act, I am unable to agree. Maliciously procuring a person to be made a bankrupt, maliciously and without reasonable or probable cause presenting a petition to wind up a company, or maliciously procuring an arrest, are equally cases wherein the state of mind of the person procuring the arrest may affect the question of the lawfulness or unlawfulness of the act done.

Again, in slander or libel the right to preserve one's character or business from attack appears to me quite as vague and general a right as it is suggested is the right to pursue one's occupation unmolested; and it cannot be denied that in both these cases the lawfulness or unlawfulness of what is said or written may depend upon the absence or presence of malice.

Doubtless there are cases in which the mere presence of malice in an act done will not necessarily give a right of action, since no damage may result; and in this case, however malicious Allen's intervention may have been, if the employers had defied Allen's threats instead of yielding to them, the plaintiffs could not have succeeded in an action, because they would not have been injured: see *Quartz Hill Co.* v. *Eyre* (1); *Gibbs* v. *Pike* (2); *Jenings* v. *Florence.* (3)

On the same principle an action will not lie against a sheriff for a false return to a writ of execution if the plaintiff has not

(1) 11 Q. B. D. 674.  (2) 9 M. & W. 351.
(3) (1857) 2 C. B. (N.S.) 467.

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

suffered actual damage in consequence of the false return : see *Wylie* v. *Birch.* (1)

I turn now to the course of the trial, which is important in more ways than one. It is manifest that both the form of the statement of claim and the evidence directed at the trial were intended to raise the question of the right of the Boiler Makers' Union to use what I will call their union for the combined action against the individual plaintiffs who belonged to another union.

The plaintiffs apparently proceeded upon the assumption that what was represented to them as having been said by Allen was said in his character of delegate of and speaking with the authority of the Boiler Makers' Union, and, accordingly, the general secretary of this trades union and the chairman at the time of these transactions were both joined as defendants. Had they adopted or been proved to authorize the course taken by Allen, a question would have arisen whether or not they were all three parties to a conspiracy. Whether that charge could have been maintained against them or not I at present desire to say nothing. Such a question may arise again, and I wish to keep myself free to consider that question when it arises. But the chairman and the secretary of the union absolutely disclaimed any general or specific authority on the part of Allen either to threaten the employers or to withdraw the men. As to specific authority, the chairman proved that he had never heard of the dispute until he was served with the writ in the action. He says in terms that he never gave any authority to Mr. Allen to threaten employers to withdraw men from the work, and to do any such thing he regarded as a very serious matter for any delegate to take upon himself; and so far was he from adopting what Allen is sworn to have said, namely, that the union would hunt the two men out of every employment where they were known to be because they had once worked on an iron ship, he emphatically denies the right of his union to do anything of the sort; he says in terms, "providing that the shipwright after being at the ironwork started in some other place for instance, then I would say we have no right

(1) (1843) 4 Q. B. 566.

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

whatever to interfere with him unless we were then beginning ironwork again. If he started at woodwork, we would not interfere with him in any other place."

The learned counsel then put a question to him (I think somewhat under a misapprehension as to what the learned judge himself meant by a question he put), "You say that may depend on circumstances?" And his answer is, "I do not say they would in that instance, because in no instance have I ever known men interfering with him when he went to some other works and started his own particular work."

My Lords, I think it is only just to the Boiler Makers' Union to point out how emphatically and distinctly their authorized officers (chairman and general secretary) disclaimed any such practice or principle as that which Allen is sworn to have attributed to them; and accordingly no imputation or liability could properly be attributed to the Boiler Makers' Union or their authorized officers. But does that relieve Allen from the consequences of what he did?

If concerted collective action to enforce, by ruining the men's employment, the will of a large number of men upon a minority, whether the minority consists of a small or of a large number, be a cause of action where the actual damage is produced, it would seem to be a very singular result that an individual who falsely assumes the character of representing a large body, uses the name of that large body to give force and support to the threat which he utters, and so produces the injury to the individual, or to the minority, could shield himself from responsibility by proving that the body whose power and influence he had falsely invoked as his supporters had given him no authority for his threats; so that, if they in truth authorized him, he and they might all have been responsible, while the false statement that he made, though acting upon the employer by the same pressure because it was believed and producing the same mischief to the person against whom it was directed, could establish no cause of action against himself because it was false.

My Lords, I now come to the question raised upon the pleadings—that the falsehood of Allen's allegations is not set

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Halsbury
L.C.

out. I venture to think that this objection is founded upon an erroneous assumption that the action must be brought for false representations, and that accordingly the false representations must be set out in the statement of claim. As I say, I think this is an erroneous assumption; that the action is what it is; that the defendant maliciously and wrongfully, and with intent to injure the plaintiffs, intimidated and coerced the Glengall Iron Company not to enter into contracts with the plaintiffs, whereby the plaintiffs have suffered damage.

The objection may be treated as one of form or as one of substance; treating it as one of form only, I do not think that it ever was necessary in the pleadings, where an unlawful procuring something to be done was the cause of action, to set out the means by which that something was procured. It is not necessary, says Willes C.J. in *Winsmore* v. *Greenbank* (1), " to set forth all the facts to shew how a thing which is charged to be unlawfully done was unlawful; that would make the pleadings intolerable, and would increase the length and expense unnecessarily:" And even in an indictment for conspiracy it is not necessary to state the means employed: see *Rex* v. *Sterling* (2); *Rex* v. *Kinnersley and Another* (3); see also *Sydserff* v. *Reg.* (4)

So also upon an indictment under 37 Geo. 3, c. 70, the preamble of which states that, " Whereas divers wicked and evil-disposed persons, by the publication of written or printed papers, and by malicious and advised speaking, have of late industriously endeavoured to seduce persons serving in His Majesty's forces by sea and land from their duty and allegiance to His Majesty, and to incite them to mutiny and disobedience," it was enacted "that any person who shall maliciously and advisedly endeavour to seduce any person or persons serving in His Majesty's forces, by sea or land, from his or their duty and allegiance to His Majesty, or to incite or stir up any such person or persons to commit an act of mutiny," &c., should be guilty of felony. It was held that it was unnecessary in the indictment to do more than charge the defendants with having

(1) Willes, 577.                    (3) (1719) 1 Str. 193.
(2) (1664) 1 Lev. 125.              (4) (1847) 11 Q. B. 245.

A-5449

endeavoured to seduce persons from their allegiance without setting forth any of the words or writings by which that endeavour was made: *Rex* v. *Fuller*. (1)

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Halsbury
L.C.

If treating it as matter of substance, the objection would be that without giving notice to the defendant, and without any such specified objection being submitted to the jury, it was being imputed to him that he had said what was false, it is almost impossible to suggest that here there could be any such objection of substance. What he said and did by way of inducement, threat, or coercion was in truth the whole question in the case. He gave evidence denying what was imputed to him, and, so far from setting up the right on behalf of his union to exercise their right of withdrawing their men if the demand for the discharge of the two plaintiffs were not complied with, he absolutely denied that he had ever done so; and the proper authorities of his union, as I have pointed out already, negatived any authority to make such representations as the other witnesses proved that he did make, or that they had been parties, or would consent to be parties, to the most offensive of his threats—namely, the hunting down of the two shipwrights because they had once worked upon iron ships. This question was before the jury, and the jury could not have answered the question as they did if they had not disbelieved Allen's statement.

It seems to me, therefore, that neither in substance nor in form can any objection be made to the topic (for it is but the topic, and not the substance of the cause of action) that he was guilty of false representations as fortifying the threats that he was making. It can scarcely be contended that because he had not that authority behind him which he represented, because he was not truly representing either the wishes or the commands of his union, that could furnish him with any excuse. As well might it be contended that the highwayman was not responsible for the coercion he exercised towards his victim if he put a pistol to his head because it should afterwards turn out that the pistol was unloaded.

My Lords, I regret that I am compelled to differ so widely

(1) (1797) 1 B. & P. 180.

Case: 11-126    Document: 63    Page: 151    04/25/2011    272927    401

A-5450

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Halsbury
L.C.

with some of your Lordships; but my difference is founded on the belief that in denying these plaintiffs a remedy we are departing from the principles which have hitherto guided our Courts in the preservation of individual liberty to all. I am encouraged, however, by the consideration that the adverse views appear to me to overrule the views of most distinguished judges, going back now for certainly 200 years, and that up to the period when this case reached your Lordships' House there was an unanimous consensus of opinion; and that of eight judges who have given us the benefit of their opinions, six have concurred in the judgments which your Lordships are now asked to overrule.

LORD WATSON. My Lords, this appeal, in which the litigants are members of two rival associations of working men, registered under the Trade Unions Act of 1871, raises some important questions, upon which there appears to be room for considerable difference of opinion. The appellant is a member, and the London delegate, of the boiler-makers' society, an association which restricts the labour of its members to ironwork; whilst the two respondents belong to the society of shipwrights, whose members are permitted to work either in wood or iron—an alternative which, whether rightly or wrongly, is not regarded with favour by the boiler-makers.

In the month of April, 1894, about forty men of the boiler-makers' society were engaged at the Regent Dock, Millwall, in repairing an iron ship, on the employment of the Glengall Iron Company. The respondents were at the same time employed by the company to execute repairs upon the woodwork of the vessel. The boiler-makers having learned that the respondents, although they were at that time engaged in carpenter-work, had on previous occasions undertaken and executed ironwork in other shipyards, resolved that they would not continue at the same job with workmen who wrought in iron as well as wood; and they were accordingly prepared to leave the Regent Dock in a body as soon as their engagement with the Glengall Iron Company, which was merely from day to day, expired. Being apprehensive, however, that they might not be allowed

strike pay by their union if they left their work without the
approval of some of its office-bearers, they on April 12 tele-
graphed for the appellant, who, in compliance with their
request, went to the yard on the morning of the day following.
He was there met by one of the workmen who had sent for
him, who on their behalf informed him that they objected to
the respondents, who had done ironwork elsewhere, working
among them, and that they intended in consequence to leave
the work on that day after the dinner-hour. The appellant
intimated that in his opinion the men would not be justified in
striking work as they contemplated until an attempt had been
made to settle the matter otherwise. He then had an interview
with the managing director of the Glengall Iron Company, at
which the foreman of the yard was present, the result being
that on the afternoon of the same day the services of the
respondents were dispensed with by the company, and the
boiler-men continued at their work.

The present action was brought against the appellant in
the beginning of July, 1894, and in February 1895 it was
tried before Kennedy J. and a jury, who returned affirmative
answers to these two questions : " (1.) Did the defendant Allen
maliciously induce the Glengall Iron Company to discharge the
plaintiffs, or either of them, from their employment ? (2.) Did
the defendant Allen maliciously induce the Glengall Iron Com-
pany not to engage the plaintiffs, or either of them ? " and
assessed damages to each of the respondents at 20*l*.

The appellant contends that judgment ought to be entered
in his favour, inasmuch as the findings of the jury, when
rightly interpreted, do not disclose any cause of action against
him ; and, alternatively, that these findings being against the
weight of evidence, the case ought to be sent back for new
trial. I have not found it necessary to consider the second of
these propositions, having arrived at the conclusion that the
first of them is well founded.

The substance of the verdict may be resolved into these three
findings : first, that the Glengall Iron Company discharged the
respondents from their employment and did not re-engage
them ; secondly, that the company were induced to do so by

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Watson

Case: 11-126    Document: 63    Page: 153    04/25/2011    272927    401

A-5452

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Watson.

the appellant; and, thirdly, that the appellant maliciously induced the action of the company. There is no expression in the verdict which can be held, either directly or by implication, to impeach the legality of the company's conduct in discharging the respondents. The mere fact of an employer discharging or refusing to engage a workman does not imply or even suggest the absence of his legal right to do either as he may choose. It is true that the company is not a party to this suit; but it is also obvious that the character of the act induced, whether legal or illegal, may have a bearing upon the liability in law of the person who procured it. The whole pith of the verdict, in so far as it directly concerns the appellant, is contained in the word "maliciously"—a word which is susceptible of many different meanings. The expression "maliciously induce," as it occurs upon the face of the verdict, is ambiguous : it is capable of signifying that the appellant knowingly induced an act which of itself constituted a civil wrong, or it may simply mean that the appellant procured, with intent to injure the respondents, an act which, apart from motive, would not have amounted to a civil wrong; and it is, in my opinion, material to ascertain in which of these senses it was used by the jury.

Although the rule may be otherwise with regard to crimes, the law of England does not, according to my apprehension, take into account motive as constituting an element of civil wrong. Any invasion of the civil rights of another person is in itself a legal wrong, carrying with it liability to repair its necessary or natural consequences, in so far as these are injurious to the person whose right is infringed, whether the motive which prompted it be good, bad, or indifferent. But the existence of a bad motive, in the case of an act which is not in itself illegal, will not convert that act into a civil wrong for which reparation is due. A wrongful act, done knowingly and with a view to its injurious consequences, may, in the sense of law, be malicious; but such malice derives its essential character from the circumstance that the act done constitutes a violation of the law. There is a class of cases which have sometimes been referred to as evidencing that a bad motive

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Watson.

may be an element in the composition of civil wrong; but in these cases the wrong must have its root in an act which the law generally regards as illegal, but excuses its perpetration in certain exceptional circumstances from considerations of public policy. These are well known as cases of privilege, in which the protection which the law gives to an individual who is within the scope of these considerations consists in this—that he may with immunity commit an act which is a legal wrong and but for his privilege would afford a good cause of action against him, all that is required in order to raise the privilege and entitle him to protection being that he shall act honestly in the discharge of some duty which the law recognises, and shall not be prompted by a desire to injure the person who is affected by his act. Accordingly, in a suit brought by that person, it is usual for him to allege and necessary for him to prove an intent to injure in order to destroy the privilege of the defendant. But none of these cases tend to establish that an act which does not amount to a legal wrong, and therefore needs no protection, can have privilege attached to it; and still less that an act in itself lawful is converted into a legal wrong if it was done from a bad motive.

Lord Bowen (at that time Bowen L.J.), in the case of the *Mogul Steamship Co.* v. *McGregor*, laid it down that in order to constitute legal malice the act done must, apart from bad motive, amount to a violation of law. The learned judge, with his accustomed accuracy and felicity said (1): " We were invited by the plaintiffs' counsel to accept the position from which their argument started, that an action will lie if a man maliciously and wrongfully conducts himself so as to injure another in that other's trade. Obscurity resides in the language used to state this proposition. The terms 'maliciously,' 'wrongfully,' and 'injure' are words all of which have accurate meanings, well known to the law, but which also have a popular and less precise signification, into which it is necessary to see that the argument does not imperceptibly slide. An intent to ' injure ' in strictness means more than an intent to harm. It connotes an attempt to do wrongful harm. 'Maliciously,' in

(1) 23 Q. B. D. 612.

Case: 11-126    Document: 63    Page: 155    04/25/2011    272927    401

A-5454

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Watson.

like manner, means and implies an intention to do an act which is wrongful to the detriment of another. The term ' wrongful ' imports in its term the infringement of some right."

The words which I have quoted are in substantial agreement with the language used by Bayley J. in *Bromage* v. *Prosser* (1), to the effect that "malice in common acceptation means ill-will against a person, but in its legal sense it means a wrongful act done intentionally without just cause or excuse." According to the learned judge, in order to constitute legal malice, the act done must be wrongful, which plainly means an illegal act subjecting the doer in responsibility for its consequences, and the intentional doing of that wrongful act will make it a malicious wrong in the sense of law. Whilst it is true that no act in itself lawful requires an excuse, it is equally true that some acts in themselves illegal admit of a legal excuse, and it is to these that Bayley J. obviously refers.

The root of the principle is that, in any legal question, malice depends, not upon evil motive which influenced the mind of the actor, but upon the illegal character of the act which he contemplated and committed. In my opinion it is alike consistent with reason and common sense that when the act done is, apart from the feelings which prompted it, legal, the civil law ought to take no cognizance of its motive.

It does not appear to me to admit of doubt that the jury, in finding the action of the company to have been maliciously induced by the appellant, simply meant to affirm that the appellant was influenced by a bad motive, namely, an intention to injure the respondents in their trade or calling of shipwrights. At the trial, the case for the plaintiff was conducted, and was submitted to the jury by the learned judge who presided, upon the lines laid down by the Master of the Rolls and Lopes L.J. in *Temperton* v. *Russell*. (2) When the present case was before the Appeal Court, the same doctrine was repeated by the Master of the Rolls and Lopes L.J., and was expounded at great length by Lord Esher. Rigby L.J. deferred to, but did not express his concurrence in, the authority of *Temperton* v. *Russell* (2), which he accepted as binding upon

(1) 4 B. & C. 255.                          (2) [1893] 1 Q. B. 715.

A-5455

him.   The doctrine is thus stated by the Master of the Rolls (1) : "Now it is clear that merely to persuade a person who has contracted to break his contract gives no cause of action at all. But, if it is done maliciously, for the purpose of injuring the person to whom the advice is given, or for the purpose of injuring some one else, the person against whom the malice is directed and carried out has a cause of action, not on the ground of the persuasion to break the contract, but on the ground of the malice directed against him.   To my mind, the result is the same whether the persuasion is to break a contract or not to make a contract.   One person has a perfect right to advise another not to make a particular contract, and that other is at perfect liberty to follow that advice.   But, if the person uses that persuasion with intent to injure the other, or to injure the other with whom he is going to make the contract, then the act is malicious, and the malice makes that unlawful which would otherwise be lawful."   In that state of the law, as expounded in the Appeal Court, it is not surprising to find that Kennedy J., whilst he did not suggest to the jury that the action of the appellant, apart from its motive, constituted a legal wrong, directed them to consider whether the appellant acted "maliciously," and explained that by that word he meant "with the intention and for the purpose of doing an injury to the plaintiffs in their business."

I do not dispute that the law laid down in this case by the presiding judge, and upheld by the Court of Appeal, would justify the verdict of the jury.   It simply comes to this : that to induce another person to commit an act which is within his legal right does not in itself afford a cause of action ; but that the person who procures his action is guilty of a legal wrong, if he was actuated by an intent to injure, and is liable in reparation to those against whom his evil intent was directed.   The words which I have already quoted clearly disclose the doctrine which runs through Lord Esher's judgment.   Whether mere "persuasion " or mere " advice " entails liability on the person using them appears to me to be a speculation which it would be unprofitable to discuss, and I shall therefore assume that the

<div align="right">
H. L. (E.)

1897;

ALLEN

v.

FLOOD.

———

Lord Watson.
</div>

(1) [1895] 2 Q. B. 37.

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.
Lord Watson.

words refer to the means used by a person who, in the sense of law, "procures" the act of another. A breach of contract is in itself a legal wrong; and in *Lumley* v. *Gye* (1) it was said by Erle J. (afterwards Erle C.J.): "It is clear that the procurement of the violation of a right is a cause of action in all cases where the violation is an actionable wrong." In the same case it was held by the majority of the learned judges that the defendant was liable in damages upon the express ground that, in knowingly procuring an illegal act, he had committed a wrong which the law regards as malicious. They regarded malice as signifying in law, not that the defendant had been actuated by a bad motive, but that he had procured the commission of an act which he knew to be illegal.

There are, in my opinion, two grounds only upon which a person who procures the act of another can be made legally responsible for its consequences. In the first place, he will incur liability if he knowingly and for his own ends induces that other person to commit an actionable wrong. In the second place, when the act induced is within the right of the immediate actor, and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment of a third party; and in that case, according to the law laid down by the majority in *Lumley* v. *Gye* (2), the inducer may be held liable if he can be shewn to have procured his object by the use of illegal means directed against that third party.

The question submitted by the House for the opinion of the learned judges who have favoured us with their assistance was: "Assuming the evidence given by the plaintiffs' witnesses to be correct, was there any evidence of a cause of action fit to be left to the jury?" The terms in which the query is framed afford an opportunity, of which some of the learned judges have not been slow to avail themselves, of referring to the evidence of the respondents' witnesses in quest of some fact which might impart a legal and not a conventional meaning to malice as found by the jury. But, according to my apprehension, it was not intended, nor would it be legitimate, in pursuing that investigation to disregard the pleadings of the

(1) 2 E. & B. 216, 232.            (2) 2 E. & B. 216.

respondents, or the course which was followed by their counsel, at the trial of the cause. To deal with the case on any other terms would be to start issues which the respondents themselves never raised until they came to the bar of this House, and to apply to these issues evidence which was directed, not to these, but to other points. I therefore find it necessary to express an opinion upon various questions which were canvassed in the course of the argument addressed to us.

First of all, although the statement of claim set forth that the appellant induced the Glengall Iron Company to " break and refuse to perform their contract" with the respondents, the allegation is not borne out by their own evidence. One of them (Taylor) only goes the length of saying that " When a man is once put on he is entitled to come back, day by day, until the job is finished or he is discharged " ; and the other (Flood) stated substantially the same thing, with the addition that there was no rule as to the time of notice. Then, at the trial, the cross-examination for the appellant in regard to the matter of contract was stopped by the presiding judge with the observation, " So far as the breach of contract was opened, in fact there was no breach of contract, because the employment was day by day, and terminated at the end of each day." And in charging the jury the learned judge, referring to the averment of breach in the statement of claim, again observed, without objection or exception taken by the respondents' counsel, " that has altogether fallen through, because it is quite clear that there was no contract existing which the defendants or any of them could have induced the Glengall Iron Company to break with the plaintiff."

Assuming that the Glengall Iron Company, in dispensing with the further services of the respondents, were guilty of no wrong, I am willing to take it that any person who procured their act might incur responsibility to those who were injuriously affected by it, if he employed unlawful means of inducement directed against them. According to the decision of the majority in *Lumley* v. *Gye* (1), already referred to, a person who by illegal means, that is means which in themselves are in the nature of

A. C. 1898.         (1) 2 E. & B. 216.        3      H

Case: 11-126    Document: 63    Page: 159    04/25/2011    272927    401

A-5458

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Watson.

civil wrongs, procures the lawful act of another, which act is calculated to injure, and does injure, a third party, commits a wrong for which he may be made answerable. So long as the word "means" is understood in its natural and proper sense that rule appears to me to be intelligible; but I am altogether unable to appreciate the loose logic which confounds internal feelings with outward acts, and treats the motive of the actor as one of the means employed by him.

It has been maintained, and some of the learned judges who lent their assistance to the House have favoured the argument, that the appellant used coercion as a means of compelling the Glengall Iron Company to terminate their connection with the respondents; but that conclusion does not appear to me to be the fair result of the evidence. If coercion, in the only legal sense of the term, was employed, it was a wrong done as much to the Glengall Iron Company, who are the parties said to have been coerced, as to the respondents. Its result might be prejudicial to the respondents, but its efficacy wholly depended upon its being directed against and operating upon the company. It must be kept in view that the question of what amounts to wrongful coercion in a legal sense involves the same considerations which I have discussed in relation to the elements of a civil wrong as committed by the immediate actor. According to my opinion, coercion, whatever be its nature, must, in order to infer the legal liability of the person who employs it, be intrinsically and irrespectively of its motive a wrongful act. According to the doctrine ventilated in *Temperton* v. *Russell* (1) and the present case it need not amount to a wrong, but will become wrongful if it was prompted by a bad motive.

It is, in my opinion, the absolute right of every workman to exercise his own option with regard to the persons in whose society he will agree or continue to work. It may be deplorable that feelings of rivalry between different associations of working men should ever run so high as to make members of one union seriously object to continue their labour in company with members of another trade union; but so long as they commit no legal wrong, and use no means which are illegal, they are at

(1) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 160    04/25/2011    272927    401

perfect liberty to act upon their own views. That the boiler-makers who were employed at the Regent Dock, Millwall, did seriously resent the presence among them of the respondents very plainly appears from the evidence of the respondents themselves; and that they would certainly have left the dock had the respondents continued to be employed appears to me to be an undoubted fact in the case. They were not under any continuing engagement to their employers, and, if they had left their work and gone out on strike, they would have been acting within their right, whatever might be thought of the propriety of the proceeding. Not only so; they were, in my opinion, entitled to inform the Glengall Iron Company of the step which they contemplated, as well as of the reasons by which they were influenced, and that either by their own mouth, or, as they preferred, by the appellant as their repre-sentative. If the workmen had made the communication themselves, and had been influenced by bad motives towards the respondents, then, according to the law which has been generally accepted by the Courts below, they would have each and all of them have incurred responsibility to the respondents. But it was clearly for the benefit of the employers that they should know what would be the result of their retaining in their service men to whom the majority of their workmen objected; and the giving of such information did not, in my opinion, amount to coercion of the employers, who were in no proper sense coerced, but merely followed the course which they thought would be most conducive to their own interests.

I think it is right to observe that if the evidence had, in my opinion, contained statements sufficient to support a charge of coercion, I should have declined in the circumstances of the present case to give effect to it. It is quite true that in the 5th count of the statement of claim intimidation and coercion are alleged; but it is equally true that from the time when that pleading was filed until the second argument upon this appeal the word "coercion" or its equivalents have never been heard except in one instance. It does not even occur in the re-spondents' case; and the exception to which I have referred is to be found in the charge of the learned judge who, without

Case: 11-126     Document: 63     Page: 161     04/25/2011     272927     401

A-5460

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Watson.

any challenge by the respondents' counsel, made the observation to the jury: "There is no evidence here, of course, of anything amounting to intimidation or coercion in any legal sense of the term." The evidence now relied on as shewing intimidation and coercion was adduced to prove, and was represented to the jury as proving, the malus animus of the appellant, and nothing else. I entertain little doubt as to the incompetency, but none as to the inexpediency of this House entertaining and deciding an issue of fact which, if not formally abandoned, was not brought forward at the trial or submitted to the jury, and that upon evidence which was not directed to it, for the purpose of patching up a verdict which is impeached in point of law.

The doctrine laid down by the Court of Appeal in this case, and in *Temperton* v. *Russell* (1), with regard to the efficacy of evil motives in making—to use the words of Lord Esher— "that unlawful which would otherwise be lawful,".is stated in wide and comprehensive terms; but the majority of the consulted judges who approve of the doctrine have only dealt with it as applying to cases of interference with a man's trade or employment. Even in that more limited application it would lead in some cases to singular results. One who committed an act not in itself illegal, but attended with consequences detrimental to several other persons, would incur liability to those of them whom it was proved that he intended to injure, and the rest of them would have no remedy. A master who dismissed a servant engaged from day to day, or whose contract of service had expired, and declined to give him further employment because he disliked the man, and desired to punish him, would be liable in an action for tort. And ex pari ratione, a servant would be liable in damages to a master whom he disliked if he left his situation at the expiry of his engagement and declined to be re-engaged, in the knowledge and with the intent that the master would be put to considerable inconvenience, expense, and loss before he could provide a substitute. If that be the state of the law, it is somewhat remarkable that there is no case to be found in the books of any such action having been sustained. The authority which is mainly relied

(1) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 162    04/25/2011    272927    401

A-5461

on as supporting the doctrine of the recent decisions is *Keeble* v. *Hickeringill* (1), which was decided by the Court of Queen's Bench about two centuries ago. I am very far from suggesting that the antiquity of a decision furnishes a good objection to its weight; but it is a circumstance which certainly invites and requires careful consideration, unless the decision is clearly in point, and its principle has since been recognised and acted upon.

In *Keeble* v. *Hickeringill* (1) the plaintiff sued for the disturbance of a decoy upon his property, which he used for the purpose of capturing wild fowl and sending them to market. The defendant, who was an adjoining proprietor, had fired guns upon his own land, not with the view of killing game or wild fowl, but with the sole object of frightening the birds, and either driving them out of his neighbour's decoy pond or preventing them from entering it. The act complained of was, in substance, the making of a noise so close to the lands of the plaintiff as to be a nuisance to him. Upon that aspect of the case I do not find it necessary to express any opinion as to the conduct of the defendant; but this much is clear, that no proprietor has an absolute right to create noises upon his own land, because any right which the law gives him is qualified by the condition that it must not be exercised to the nuisance of his neighbours or of the public. If he violates that condition he commits a legal wrong, and if he does so intentionally, he is guilty of a malicious wrong, in its strict legal sense. Holt C.J., who delivered the opinion of his Court, treated the case as one of interference with the plaintiff's trade, consisting in the capture and sale of wild fowl. He distinguishes it from the case of invading a franchise, which, I apprehend, would in itself amount to a legal wrong, and thus states the law applicable to it: "Where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases." I see no reason to doubt that by a "violent act" the learned judge had in view an act of violence done in such circumstances as to make it amount to a legal wrong; and I see as little reason why, in speaking of a "malicious act," he should not be understood as using the word

(1) 11 East, 574, n.

Case: 11-126    Document: 63    Page: 163    04/25/2011    272927    401

A-5462

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Watson.

"malicious" in its proper legal sense, and as referring to other wrongs, not accompanied by violence, but done intentionally, and, therefore, in the eye of the law, maliciously. The object of an act, that is, the results which will necessarily or naturally follow from the circumstances in which it is committed, may give it a wrongful character, but it ought not to be confounded with the motive of the actor. To discharge a loaded gun is, in many circumstances, a perfectly harmless proceeding; to fire it on the highway, in front of a restive horse, might be a very different matter.

The learned Chief Justice proceeds to give various illustrations of the general rule which he had formulated. He first notices a case in which it had been held that a schoolmaster had no cause of action against a defendant who had attracted his pupils and injured his school by setting up a rival establishment, a proceeding which was obviously in the ordinary course of competition, and then adds: "But suppose Mr. Hickeringill should lie in the way with his guns, and fright the boys from going to school, and their parents would not let them go thither; sure that schoolmaster might have an action for the loss of his scholars." From that observation I see no reason to differ, because, in my opinion, frightening a child with a gun so that it cannot get to school is in itself a violent and unlawful act, directed both against the child and its schoolmaster. The learned judge then refers to three instances in which the defendant would be liable in an action upon the case: (1.) where he obstructs a person in charge of a horse, who is taking it to a market for sale, and prevents his reaching the market, thereby depriving the market owner of his dues; (2.) where, to the detriment of a proprietor, he by threats frightens away his tenants-at-will; and (3.) when he beats a servant, and so hinders him from taking his master's tolls. It must be observed that, apart from any question of motive, all these cases involve the use of means in themselves illegal—obstruction, coercion by means of threats, and personal assault.

But assuming, what to my mind is by no means clear, that *Keeble* v. *Hickeringill* (1) was meant to decide that an evil

(1) 11 East, 574, n.

Case: 11-126   Document: 63   Page: 164   04/25/2011   272927   401

A-5463

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.
Lord Watson.

motive will render unlawful an act which otherwise would be lawful, it is necessary to consider how far that anomalous principle has been recognised in subsequent decisions. Laying aside the recent decisions which are under review in this appeal, only one case has been cited to us in which the Court professed that they were guided by the reasoning of Holt C.J. That instance is to be found in *Carrington* v. *Taylor* (1), a decision which I venture to think that no English Court would at this day care to repeat. The facts of the case resembled those which occurred in *Keeble* v. *Hickeringill* (2) in this single respect, that the plaintiff was the owner of a decoy for wild fowl. The defendant was the owner of a boat in which he rowed along the coast and earned a livelihood by shooting wild fowl for the market, which he was lawfully entitled to do. But some of the shots fired by him in the pursuit of that occupation had the effect of scaring birds which otherwise would or might have entered the plaintiff's decoy; and, in respect of that disturbance, he was held liable in damages to the plaintiff. Whatever construction might be put upon the judgment of Holt C.J., it does not appear to me to contain a single expression which would justify that result. I am not surprised to find that an eminent judge, with whose opinion as a whole I am unable to concur, has had the courage to express his dissent from the judgment in *Carrington* v. *Taylor* (1), as he failed " to see what wrong the defendant in that case had done." To my mind the case is of considerable importance, because it shews that in the year 1809 the Court of Queen's Bench did not regard *Keeble* v. *Hickeringill* (2) as establishing the doctrine that a lawful act, done with intent to injure, will afford a cause of action. In the case before them there was no allegation and no evidence of any intent to injure the plaintiff's decoy. The sole motive of the defendant in firing his gun was to earn his livelihood by killing wild fowl for the market. I cannot avoid the conclusion that the learned judges accepted *Keeble* v. *Hickeringill* (2) as an authority to the effect that, apart from any question of motive, the disturbance of a lawful decoy is an illegal invasion of the private right of its proprietor.

(1) 11 East, 571.                    (2) 11 East, 574, n.

A-5464

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Watson.

A variety of well-known cases, including even *Lumley* v. *Gye* (1), were relied on by the respondents as shewing that the so-called principle of *Keeble* v. *Hickeringill* (2) has been from time to time applied by the English Courts since the date of that judgment. Except in the case of *Carrington* v. *Taylor* (3), which I have already noticed, I have been unable to discover in these authorities, which I do not consider it necessary to examine in detail, any trace of the doctrine for which the respondents contend until recent years, when it is first firmly foreshadowed in a dictum which occurs in *Bowen* v. *Hall* (4), and is subsequently developed in *Temperton* v. *Russell* (5) and in the present case. The authorities antecedent to *Bowen* v. *Hall* (4), as well as that decision itself, are all cases belonging to one or other of these three classes : (1.) cases of privilege, where the perpetrator of an act which per se constituted a legal wrong was protected from its usual consequences in the event of its being proved that he was actuated by an honest desire to fulfil a public or private duty ; (2.) cases in which the act complained of was in itself a plain violation of private right ; and (3.) cases in which an act detrimental to others, but affording no remedy against the immediate actor, had been procured by illegal means.

The early case of *Garret* v. *Taylor* (6) furnishes an apt illustration of the third class. According to the report, which is very brief, the plaintiff, a quarryman, complained that the defendant had, by threats to " mayhem " and annoy them with litigation, induced or coerced some of his customers to discontinue buying stones from his quarry. Decree passed in absence, and the case was reheard on an appeal brought by the defendant in arrest of judgment upon the ground that the declaration did not disclose any cause of action. The declaration (7) discloses facts which, if true, as they were necessarily assumed to be, did amount to illegal means used in order to influence the action of the plaintiff's customers. One learned judge has assumed that the judgment went on the principle

(1) 2 E. & B. 216.            (4) 6 Q. B. D. 333.
(2) 11 East, 574, n.          (5) [1893] 1 Q. B. 715.
(3) 11 East, 571.             (6) Cro. Jac. 567.
                (7) 2 Roll. Rep. 162.

that every man " has a right to carry on his trade without disturbance," a proposition which was not involved in the case, but which I should not demur to if he meant "illegal" disturbance. The decision really went upon the terms of the declaration, which appears to me to disclose a clear case of the employment of unlawful means. I am not at present prepared to hold that threats of vexatious litigation, which might cause anxious apprehension in the minds of many, will in no circumstances amount to unlawful influence; but I entertain no doubt that these, when coupled with serious threats of personal violence going the length of mutilation or demembration, do, when the party threatened is overcome by and yields to them, constitute legal coercion.

*Tarleton* v. *M'Gawley* (1) is a case of the same complexion. Two British ships, the *Othello* and the *Bannister*, were lying near to each other off the Calabar coast, both engaged in the same kind of adventure, that of bartering their cargoes for palm-oil and other West African produce. A canoe manned by natives desiring to trade was approaching the *Bannister* for that purpose, when the master of the *Othello* directed against it and fired a cannon loaded with gunpowder and shot and killed one of its crew, an outrage which occasioned such a panic amongst the native tribes that the season's trade of the *Bannister* was lost. The master of the *Othello* was held to be responsible for that result, which was the direct and natural consequence of his wrongful and criminal act. The case was just the same as if some person had persisted in firing bullets at all and sundry who were about to enter a particular shop with the effect of driving away its customers and ruining the shopkeeper's business. Such an act could not be reasonably described as lawful but for the motive by which it was dictated.

I have already indicated that, in my opinion, no light is thrown upon the decision of the present question by *Pitt* v. *Donovan* (2) and other cases of that class. The defendant had in that case represented, contrary to the fact, that the plaintiff was insane at the time when he executed a particular deed.

(1) 1 Peake, N. P. C. 270.         (2) 1 M. & S. 639.

Case: 11-126    Document: 63    Page: 167    04/25/2011    272927    401

A-5466

H. L. (E.)
1897

ALLEN
*v.*
FLOOD.

Lord Watson.

The communication was made to a person to whom the defendant was under a legal duty to make the disclosure if it had been true; and the defendant was in law absolved from the ordinary consequences of his having circulated a libel which was false and injurious, if he honestly believed it to be true. The law applicable in cases of that description is, I apprehend, beyond all doubt; but the rule by which the law in certain exceptional cases excuses the perpetration of a wrong, by reason of the absence of evil motive, is insufficient to establish or to support the converse and very different proposition, that the presence of an evil motive will convert a legal act into a legal wrong. *Lumley* v. *Gye* (1) is a weighty authority in this branch of the law, but it does not lend any aid to the respondents' argument. It was an action of damages against a defendant who had induced a professional singer to break her engagement with the plaintiff to his detriment, and it was resisted mainly upon the ground that the engagement broken did not constitute the relationship of master and servant between the contracting parties. That plea was overruled, and the defendant found liable. The principle of the decision (from which Coleridge J. alone dissented) was clearly explained by Mr. Justice (afterwards Chief Justice) Erle, whose opinion is in complete accordance with the views expressed by the other learned judges who constituted the majority of the Court. He said : " The authorities are numerous and uniform that an action will lie against a person who procures that a servant should unlawfully leave his service. The principle involved in these cases comprises the present, for there the right of action in the master arises from the wrongful act of the defendant in procuring that the person hired should break his contract by putting an end to the relation of employer and employed, and the present case is the same." The learned judge went on to say, in language which I have already referred to : " It is clear that the procurement of the violation of a right is a cause of action in all cases where the violation is an actionable wrong." These statements embody an intelligible and a salutary principle, and they contain a full explanation of the law upon which the case was decided.

(1) 2 E. & B. 216.

He who wilfully induces another to do an unlawful act which, but for his persuasion, would or might never have been committed, is rightly held to be responsible for the wrong which he procured. None of the learned judges made any reference to the case of *Keeble* v. *Hickeringill* (1), and not a single expression is to be found in their opinions tending to suggest that an injurious motive can impart a wrongful character either to a lawful act or to its procurement by means which are not in themselves illegal.

In *Bowen* v. *Hall* (2) the wrong complained of was the intentional inducing of a breach of contract to the detriment of the plaintiff, who was obviously entitled to succeed if *Lumley* v. *Gye* (3) had been well decided. According to the opinion expressed by Erle C.J. and the other judges of the majority in that case, the defendant in *Bowen* v. *Hall* (2) had been guilty of a wrong which was in the sense of law malicious because he had knowingly procured the commission of an illegal act. The judgment in *Lumley* v. *Gye* (3) was followed by Earl Selborne and by Lord Esher (at that time Brett L.J.), whilst Coleridge C.J. adhered to the opposite view, which had been taken by Coleridge J. Lord Esher, in delivering the judgment of Earl Selborne and himself, substantially affirms the reasoning of the majority in *Lumley* v. *Gye* (3); but there are one or two sentences in his judgment relating to points with which the learned judges who decided that case did not deal, and which were not raised by the facts either of *Lumley* v. *Gye* (3) or of the case before him. His Lordship said: " Merely to persuade a man to break his contract may not be wrongful in law or fact as in the second case put by Coleridge J. But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act, if injury ensues from it. We think that it cannot be doubted that a malicious act, such as is above described, is a wrongful act in law and in fact." These words are obviously susceptible of two

(1) 11 East, 574, n.            (2) 6 Q. B. D. 333.

(3) 2 E. & B. 216.

Case: 11-126    Document: 63    Page: 169    04/25/2011    272927    401

A-5468

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Watson.

very different constructions, according as they are understood to refer to the procurement of an act which is in violation of the law, and therefore a legal wrong, or to the procurement of a lawful act. Primâ facie, they would have appeared to me to refer to the procuring of an illegal act, because the assumption upon which the whole passage is framed is that there has been successful persuasion to break a contract, which is an undoubted violation of the law; and in that case there would be a malicious wrong as it is defined in *Lumley* v. *Gye.* (1) But the words have now been explained by their author to mean, not merely that the procuring of an unlawful act with intent to injure is a malicious wrong, giving a good cause of action, but that the presence of injurious intent in the mind of the procurer gives a good cause of action, although the act procured is in itself lawful. In that aspect of them, the words can only be regarded as obiter dicta, because no such question was raised by the circumstances of the case.

I do not think it necessary to notice at length *Temperton* v. *Russell* (2), in which substantially the same reasons were assigned by the Master of the Rolls and Lopes L.J. as in the present case. It is to my mind very doubtful whether in that case there was any question before the Court with regard to the effect of the animus of the actor in making that unlawful which would otherwise have been lawful. The only findings of the jury which the Court had to consider were: (1.) that the defendants had maliciously induced certain persons to break their contracts with the plaintiffs, and (2.) that the defendants had maliciously conspired to induce, and had thereby induced, certain persons not to make contracts with the plaintiffs. There having been undisputed breaches of contract by the persons found to have been induced, the first of these findings raised the same question which had been disposed of in *Lumley* v. *Gye.* (1) According to the second finding, the persons induced merely refused to make contracts, which was not a legal wrong on their part; but the defendants who induced were found to have accomplished their object, to the injury of the plaintiffs, by means of unlawful conspiracy—a clear ground of liability according to

(1) 2 E. & B. 216.                    (2) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 170    04/25/2011    272927    401

A-5469

*Lumley* v. *Gye* (1) if, as the Court held, there was evidence to prove it.

I am quite alive to the fact that the question which we have to decide is one of importance, and also that it has never been previously considered by this House. Having come to the conclusion, with the majority of your Lordships who have heard the appeal, that the doctrine advanced by the respondents is neither sound in principle nor supported by authority, I move that the order appealed from be reversed, and judgment entered for the appellant, and that the appellant have his costs of this appeal, and costs in both Courts below, including the costs of the trial.

LORD ASHBOURNE. (2)  My Lords, the controversy in this case is between the plaintiffs, who are shipwrights and members of the Shipwrights' Provident Union, and the defendant Allen, a member and the London delegate of the Independent Society of Boilermakers and Iron and Steel Shipbuilders. It is not a dispute between employers and employed—between capital and labour—but rather one between the members of one trade union and of another trade union; and on the facts of the case there is little real difference. The question is now narrowed to that presented to Her Majesty's judges, whose opinions afford such valuable aid in forming a conclusion in the case.

The plaintiffs for some years previous to 1894 had pursued the calling of shipwrights in the port of London. They had been taught to work both in iron and wood in all kinds of ships, and they had found occasional employment at the Nelson Docks at Rotherhithe, where wood and iron work was commonly done by the same shipwrights. In the north of England the wood and iron work is done generally, if not exclusively, by separate sets of men, and the same is the practice in many London docks, including the Glengall Company's Regent Dock. There was apparently much jealousy between the two unions: the ironworkers held that the proper business of shipwrights was to work in wood, and that shipwrights who worked in iron

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Watson.

(1) 2 E. & B. 216.
(2) Read by Lord Morris in Lord Ashbourne's absence.

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Ashbourne.

trespassed on the trade of the boiler-makers' union. The plaintiffs had been frequently employed at the Glengall Company's Docks, but they always worked there solely at woodwork. They had been taken on "for the job" on April 12, 1894, to assist in the repair of the *Sam Weller*; and on the 13th they were at work on woodwork with twenty-two other shipwrights, and at the same time a large body of boiler-makers were engaged on ironwork.

The plaintiffs were employed in the usual and customary way "for the job," and were expected to come day by day until it was finished, or they were discharged by their employers. The men had a reasonable and probable expectation of continued employment until the job was finished, and, according to Allen, they should not themselves leave their work " without tangible reasons."

The plaintiffs for some months immediately before their employment on the woodwork of the *Sam Weller* had been working at the Nelson Dock, doing there both wood and iron work. This fact having become known to Elliott, then engaged in the ironwork of the *Sam Weller* and a member of the boiler-makers' society, he communicated with the defendant. What the defendant then did has led to this action.

On April 13, after seeing Elliott, he had an interview with Mr. Halkett, the managing director of the Glengall Company, at his office. He told him that, as the two plaintiffs had been guilty of doing ironwork at the Nelson Dock of Mills & Knight, the iron-men would leave unless the plaintiffs were discharged; that the men would cease to work in any yard the plaintiffs went to; that they would not be allowed to work anywhere in the London Docks; that it was not easy to know men, but the plaintiffs were known, and the same action would be taken wherever they got employment.

Mr. Halkett did not want the business of the yard stopped; and, being told by the defendant there was "no option," reluctantly ordered the plaintiffs to be discharged that night and not to be employed again. The plaintiffs at the time of their discharge were working on wood; the boilermakers had no complaint with what they were then doing, and the defendant's

action was to "punish" them for what they had done in the course of a previous employment in another yard. The plaintiffs accordingly were dismissed, and a ban was placed on their future employment.

The natural result of the defendant's words and intervention would be that the plaintiffs would not then or in future be free to carry on their lawful trade—even confining themselves to woodwork—wherever boiler-makers were employed. This action was not an effort, by competition, to enable the boiler-makers to get the work instead, but to punish the plaintiffs by causing the employment of other shipwrights in their room.

Was this evidence fit to be submitted to the jury of coercion by the defendant on the Glengall Company to terminate their employment of the plaintiffs? Was there evidence that the defendant intimidated and coerced the Glengall Company not to enter into new contracts with the plaintiffs? Was there evidence that the defendant maliciously induced the company not to engage the plaintiffs? I am unable myself to see room for doubt that there was ample evidence of such conduct on the part of the defendant, and there is no question that it damaged the plaintiffs. I should infer even from the evidence of the defendant himself that the rules of the boiler-makers' society, as was clearly testified by their general secretary and chairman, would not support punishing the plaintiffs for their past action by procuring their dismissal from an employment where they were working blamelessly. I should also gather from his evidence that the defendant himself on consideration would not say that such conduct was right. He was asked, "Were the men right or wrong, according to your opinion, in declining to act with Flood and Taylor because of something they had done in the past?" And his reply was, "That would be wrong, of course, according to the rules of our society, if they left their work; but they did not take such an action." But the question here is not on the rules of the society, or on the opinions of the defendant on reflection, but whether there was evidence of his alleged conduct for the jury. The question is, Have the plaintiffs a remedy for their loss found to have been caused by the defendant?

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Ashbourne.

HOUSE OF LORDS    [1898]

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Ashbourne.

The plaintiffs had, in my opinion, a clear right to pursue their lawful calling, to have the full benefit of their employment, and the right to enjoy the legitimate, reasonable, and probable expectation of a continuance of their employment. It would be, I think, an unsatisfactory state of the law that allowed the wilful invader of such a right without lawful cause or justification to escape from the consequences of his action—that would not hold him liable for maliciously inducing men being denied their accustomed employment, and that would not afford to those he had injured legal grounds of action.

The law is stated with precision and vigour by Sir William Erle in his work on Trade Unions (p. 12): "Every person has a right under the law, as between him and his fellow subjects, to full freedom in disposing of his own labour or his own capital according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another in the exercise of the right comprised within this description, done, not in the exercise of the actor's own right, but for the purpose of obstruction, would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition, and the violation of this prohibition by a single person is a wrong to be remedied either by action or by indictment, as the case may be."

In my opinion this is a clear statement of the law, and I have heard no satisfactory attempt to answer or explain it away. It is supported not only by good sense and by those considerations of justice and fair play one would expect to find in any legal system, but by a mass of powerful authority. Holt C.J., in the case so often referred to (*Keeble* v. *Hickeringill* (1)), laid it down with clearness and certainty that "he that hinders another in his trade or livelihood is liable to an action for so doing."

In no subsequent decision of any Court has doubt been thrown upon the effect of that authority, or a suggestion made that

(1) 11 East, 574, n.

the weighty conclusions of Holt C.J. could with advantage to our law be reviewed or pushed aside. The reason, it has not been questioned, is because, as I conceive, it rested firmly on the great common law principle that every man has a right to carry on his trade without disturbance. The case of *Tarleton v. M'Gawley* (1), decided in 1794, strongly supports the view that such a right was the settled law of this country, for it was then held that an action lay against the master of a vessel for purposely firing a cannon at negroes and thereby preventing them from trading with the plaintiff; and it was pointed out that " the defendant had expressed an intention not to permit any to trade until a debt due from the natives to himself was satisfied."

I need not go in detail through the celebrated case of *Lumley v. Gye* (2), which for nearly half a century has passed into the regular current of legal authority, and which was followed by Lord Selborne and Lord Esher in *Bowen v. Hall.* (3)

In the *Mogul Case* (4) it was apparently accepted as undoubted law that a trader has a right to carry on his business without disturbance, except in the way of fair competition. Bowen L.J. there says: " No man, whether trader or not, can justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it. The intentional driving away of customers by shew of violence; the obstruction of actors on the stage by preconcerted hissing; the disturbance of wild fowl in decoys by the firing of guns; the impeding or threatening servants or workmen; the inducing persons under personal contracts to break their contracts; all are instances of such forbidden acts." It is worthy of note that this great judge refers expressly to the case of *Keeble v. Hickeringill* (5) as clear and accepted law; as did Lord Bramwell and Lord Field in this House.

(1) 1 Peake, N. P. 270.    (3) 6 Q. B. D. 333.
(2) 2 E. & B. 216.     (4) 23 Q. B. D. 598.
<div align="center">(5) 11 East, 574, n.</div>

Case: 11-126    Document: 63    Page: 175    04/25/2011    272927    401

A-5474

The fact that the plaintiffs could make no claim against the Glengall Company, and that what the company did was, as between them and the plaintiffs, not unlawful, cannot, I think, exonerate the defendant from liability for his own wrongful conduct.    On the question of the evidence of "malice" in the defendant, I do not think I could with advantage add anything to what has been so well and so fully said by my noble and learned friend on the woolsack.

The last case I desire to refer to is *Temperton* v. *Russell* (1), tried before Collins J., whose direction was confirmed by the Court of Appeal, where Lord Esher gave it as his opinion that there was no real distinction between a malicious inducement to break a contract and a malicious inducement not to enter into new contracts of service.    The consequences to a workman so treated are alike disastrous : he depends for his bread upon his existing and future contracts.    To intimidate an employer into breaking a contract with a particular workman, and to coerce or maliciously induce an otherwise willing employer not to give him future employment, alike does that workman serious damage in his trade and prevents him from earning his wages. The object of the wrongdoer is the same in each case.    Here the motive of the defendant was founded on the determination to inflict punishment on the plaintiffs for their past action by driving them out of their employment.

In my opinion there was evidence that the defendant acted without legal excuse or justification in invading the right of the plaintiffs to exercise their calling without hindrance ; and there was evidence to go to the jury that the defendant intimidated and coerced or maliciously induced the Glengall Iron Company not to enter into new contracts with the plaintiffs.

I entirely concur in the conclusion of the Lord Chancellor, and think that the appeal should be dismissed.

LORD HERSCHELL.    My Lords, in this case the respondents, who were the plaintiffs in the action, were members of the shipwrights' union.    The appellant is an official—the delegate of the London district—of the United Society of Boiler Makers

(1) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 176    04/25/2011    272927    401

A-5475

and Iron Ship Builders.  It appears that before the time of the occurrences which gave rise to this action a controversy had existed between these unions and the members of whom they were respectively composed.  The boiler-makers' union insisted that it was not a legitimate part of the work of a shipwright to execute ironwork upon ships, and that they ought to confine themselves to the woodwork.  On the other hand, the ship-wrights' union contended that ironwork, as well as woodwork, fell properly within their craft.  In April, 1894, the respondents were engaged to do certain piecework upon a ship called the *Sam Weller*, in the Regent's Dock, Millwall, for the Glengall Iron Company.  They were employed only upon woodwork. Just before this engagement they had been doing iron ship-building work for another firm.  This was known to the boiler-makers and ironworkers engaged upon the *Sam Weller*, who were much annoyed at the presence in their midst of men who they considered had been unfairly trenching upon their trade or calling.  It is clear that they were indisposed to work in com-pany with them.  In consequence of the feeling which had been excited, one of the ironworkers telegraphed to the appellant to come to the ship.  On his arrival, he learned that the iron-workers, or some of them, had determined to throw down their tools and leave at once.  He told the ironworker who had telegraphed to him to inform them that if they did so he should use his influence with the executive council of the union to deprive them of any benefit from that society.  He then pro-ceeded to an interview with the manager and foreman of the Glengall Company.  There is some conflict of evidence as to what passed at that interview—whether the appellant intimated that the boiler-makers engaged on the ship would be called out if the respondents were allowed to continue to work on board her, or whether he merely represented that the men belonging to his union would cease to work for the company if the em-ployment of the respondents continued.  I shall return to this point presently.  It is, at all events, clear that the manager of the Glengall Company came to the conclusion that if he con-tinued to employ the respondents the boiler-makers would cease to work for him.  In view of this, he determined that the

Case: 11-126    Document: 63    Page: 177    04/25/2011    272927    401

A-5476

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

company would not continue the employment of the respondents. It is said that they were "discharged" in consequence of the defendant's action. This is true in the sense that they were no longer employed; it is untrue if intended to imply that any right by contract or otherwise was violated by their discharge.

In consequence of the step taken by the Glengall Company this action was brought. Besides the appellant, Jackson and Knight, the chairman and secretary of the union, were made defendants. Kennedy J., before whom the case was tried, left to the jury the following questions: (1.) Did the defendant Allen maliciously induce the Glengall Iron Company to discharge the plaintiffs from their employment? (2.) Did he maliciously induce the Glengall Iron Company not to engage the plaintiffs, or either of them? The jury answered both questions in the affirmative, and assessed the damages at 20l. for each plaintiff. They also found that the other defendants did not authorize the defendant Allen in acting as he did, and that the settlement of the dispute was a matter within the discretion of Allen. Upon these findings the learned judge entered judgment for the plaintiffs against the appellant, but entered judgment for the other defendants.

This judgment was affirmed by the Court of Appeal. Rigby L.J., however, only concurred in the judgment because he regarded the question as practically settled by the judgment in *Temperton* v. *Russell.* (1)

It was argued at the bar for the respondents that the jury must be taken to have adopted the view that the evidence for the plaintiffs was correct, and that the appellant did intimate that he would call the boiler-makers out if the company continued to employ the respondents. In my opinion, it is not material whether the account of the conversation given by the appellant or by the manager of the ironworks is the correct one; but I cannot concur in the contention of the respondents that the jury must be taken to have adopted the latter account.

The learned judge, no doubt, indicated an opinion, which I am not able to share, that it would have a bearing on the question whether the appellant induced the company to decline

(1) [1893] 1 Q. B. 715.

to employ the respondents, and also, on the question of malice, whether the one account of the conversation or the other was the correct one. But he did not lay this down as a matter of law; he left it for the jury to decide. Under these circumstances, I do not think the case can properly be dealt with on the assumption that the finding of the jury involves a finding that that version of what passed given by the plaintiffs' witnesses is the correct one. I have said that I do not share the opinion entertained by the learned judge that the point upon which there was a conflict of testimony had a bearing upon the question whether the company were induced by the appellant to cease to employ or decline employing the respondents. What induced them to do so is plain : it was their belief that if they employed the respondents the ironworkers would cease to work for them, and a sense of the inconvenience which this would cause. It is certain that this belief was engendered by the statement which the appellant made to them. They would be equally induced to take the action, and induced in precisely the same sense, whether the representation was that the ironworkers would cease working, or that they would be called out. Nor was the motive different, whichever representation was made. In my judgment, there can be no difference in the legal effect of these two representations. If the one would give a cause of action, the other, in my opinion, would equally do so.

The question is whether the findings of the jury entitled the plaintiffs to judgment. After a careful and prolonged consideration of the arguments addressed to your Lordships when the case was first presented at the bar of this House, I arrived at the conclusion that the question must be answered in the negative. The reasons for this conclusion, which I then prepared, are in substance those to which I now invite your Lordships' attention. I have since carefully reconsidered the matter in view of the opinions which have been expressed by the learned judges who were summoned on the occasion of the second argument at the bar, but I have seen no ground for changing the opinion at which I had previously arrived. I have, however, added some observations upon the views presented by the learned judges.

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.

Lord Herschell.

It is to be observed, in the first place, that the company in declining to employ the plaintiffs were violating no contract— they were doing nothing wrongful in the eye of the law. The course which they took was dictated by self-interest: they were anxious to avoid the inconvenience to their business which would ensue from a cessation of work on behalf of the iron-workers. It was not contended at the bar that merely to induce them to take this course would constitute a legal wrong, but it was said to do so because the person inducing them acted maliciously. The Master of the Rolls declined in the present case to define what was meant by "maliciously": he considered this a question to be determined by a jury. But if acts are, or are not, unlawful and actionable, according as this element of malice be present or absent, I think it is essential to determine what is meant by it. I can imagine no greater danger to the community than that a jury should be at liberty to impose the penalty of paying damages for acts which are otherwise lawful, because they choose, without any legal definition of the term, to say that they are malicious. No one would know what his rights were. The result would be to put all our actions at the mercy of a particular tribunal whose view of their propriety might differ from our own. However malice may be defined, if motive be an ingredient of it, my sense of the danger would not be diminished.

The danger is, I think, emphasised by the opinions of some of the learned judges. In a case to which I shall allude immediately the Master of the Rolls included within his definition of malicious acts persuasion used for the purpose "of benefiting the defendant at the expense of the plaintiff." Wills J. thinks this "going a great deal too far," and that, whether the act complained of was malicious depends upon whether the defendant has, in pursuing his own interests, "done so by such means and with such a disregard of his neighbour as no honest and fair-minded man ought to resort to." Here it will be seen that malice is not made dependent on motive. The assumed motive is a legitimate one—the pursuit of one's own interest. The malice depends on the means used and the disregard of one's neighbour, and the test of its existence is whether these

Case: 11-126    Document: 63    Page: 180    04/25/2011    272927    401

are such as no honest and fair-minded man ought to resort to. There is here room for infinite differences of opinion. Some, I dare say, applying this test would consider that a strike by workmen at a time damaging to the employer, or a "lock-out" by an employer at a time of special hardship to the workmen, were such means, and exhibited such a disregard of his neighbour as an honest and fair-minded man ought not to resort to. Others would be of the contrary opinion. The truth is, this suggested test makes men's responsibility for their actions depend on the fluctuating opinions of the tribunal before whom the case may chance to come as to what a right-minded man ought or ought not to do in pursuing his own interests. Again, the late Cave J. (whom I cannot name without deploring his loss) expressed the view that the action of the appellant might have been justified on the principles of trade competition if it had been confined to the time when the men were doing iron-work, but that it "was without just cause or excuse, and consequently malicious," inasmuch as the respondents were not at the time engaged upon ironwork. On the other hand, it is evident, from the reasoning of some of the learned judges, who think the respondents entitled to succeed, that they would not be prepared to adopt this distinction, and would regard the act as "malicious" in either case.

The present case was treated in the Court below as governed practically by the previous decisions of the same Court in *Bowen v. Hall* (1) and *Temperton v. Russell.* (2) The former of these cases was an action brought against the defendant for maliciously inducing a person who had entered into a contract of service with the plaintiff to break that contract. It raised, for the first time in the Court of Appeal, the question whether *Lumley v. Gye* (3) was rightly decided. The Master of the Rolls (then Brett L.J.) delivered the judgment of the Court, in which the late Lord Selborne concurred, the late Lord Chief Justice dissenting. The law was thus laid down in the judgment of the majority of the Court: "Merely to persuade a person to break his contract may not be wrongful in law or fact as in the second

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

(1) 6 Q. B. D. 333.        (2) [1893] 1 Q. B. 715.
(3) 2 E. & B. 216.

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Herschell.

case put by Coleridge J.   But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act, if injury ensues from it. We think that it cannot be doubted that a malicious act, such as is above described, is a wrongful act in law and in fact."

This case was followed, and the view of the law thus expressed was reasserted by the Master of the Rolls in *Temperton* v. *Russell.* (1)   It will be seen that "malicious" is here defined as the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff.   It is said that a malicious act thus defined is, in law and in fact, a wrong act, and therefore a wrongful act.   I am not sure that I quite understand what is meant by saying that it is "in fact" a wrong act, as distinguished from its being so "in law," and that because so wrong it is therefore wrongful.   I can only understand it as meaning that it is an act morally wrong. The law certainly does not profess to treat as a legal wrong every act which may be disapproved of in point of morality; but, further, I cannot agree that all persuasion where the object is to benefit the person who uses the persuasion at the expense of another is morally wrong.   Numberless instances might be put in which such persuasion, which is of constant occurrence in the affairs of life, would not be regarded by any one as reprehensible. The judgment is grounded almost wholly upon the presence of this element—that the purpose of the inducement is to injure the plaintiff, or to benefit the defendant at his expense.   The fact that the act which is induced by the persuasion is the breach of a contract with the plaintiff is treated as a subordinate matter which without this element would not be a wrong act, or an act wrongful and therefore actionable.   The motive of the person who did the act complained of was thus treated as the gist of the action.   In *Temperton* v. *Russell* (1), the further step was taken by the majority of the Court, A. L. Smith L.J. reserving his opinion on the point, of asserting that it was immaterial that the act induced was not the

(1) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 182    04/25/2011    272927    401

A-5481

breach of a contract, but only the not entering into a contract, provided that the motive of desiring to injure the plaintiff, or to benefit the defendant at the expense of the plaintiff, was present. It seems to have been regarded as only a small step from the one decision to the other, and it was said that there seemed to be no good reason why, if an action lay for maliciously inducing a breach of contract, it should not equally lie for maliciously inducing a person not to enter into a contract. So far from thinking it a small step from the one decision to the other, I think there is a chasm between them. The reason for a distinction between the two cases appears to me to be this: that in the one case the act procured was the violation of a legal right, for which the person doing the act which injured the plaintiff could be sued as well as the person who procured it; whilst in the other case no legal right was violated by the person who did the act from which the plaintiff suffered: he would not be liable to be sued in respect of the act done, whilst the person who induced him to do the act would be liable to an action.

I think this was an entirely new departure. A study of the case of *Lumley* v. *Gye* (1) has satisfied me that in that case the majority of the Court regarded the circumstance that what the defendant procured was a breach of contract as the essence of the cause of action. It is true that the word ": maliciously" was to be found in the declaration the validity of which was then under consideration; but I do not think the learned judges regarded the allegation as involving the necessity of proving an evil motive on the part of the defendant, but merely as implying that the defendant had wilfully and knowingly procured a breach of contract. Indeed, Crompton J. appears to me to indicate this in express terms. He says: "It must now be considered clear law that a person who wrongfully and maliciously, or which is the same thing, with notice, interrupts the relation subsisting between master and servant by procuring the servant to depart from the master's service, or by harbouring and keeping him as servant after he has quitted it, and during the time stipulated for as the period of service,

(1) 2 E. & B. 216.

122　　　　　　　　　　　HOUSE OF LORDS　　　　　　　　　　　[1898]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

whereby the master is injured, commits a wrongful act for which he is responsible at law." He then proceeds to consider whether the same law is applicable to a contract for future service in the case of a theatrical singer.

Erle J. said: "The authorities are numerous and uniform that an action will lie by a master against a person who procures that a servant should unlawfully leave his service. The principle involved in these cases comprises the present, for there the right of action in the master arises from the wrongful act of the defendant in procuring that the person hired should break his contract by putting an end to the relation of employer and employed." Not a word, be it observed, is said about the motive as constituting an element in the wrongful act. This is made, if possible, clearer by the answer which the learned judge gives to the objection that this class of actions for procuring the breach of a contract of hiring rested upon no principle, and ought not to be extended beyond the cases theretofore decided relating to trade, manufacture, or household service. "The answer," said the learned judge, "appears to me to be that the class of cases referred to rests upon the principle that the procurement of the violation of the right is a cause of action, and that when this principle is applied to a violation of a right arising upon a contract of hiring the nature of the service contracted for is immaterial."

I think the view of Wightman J. was substantially the same. He relies much upon the case of *Winsmore* v. *Greenbank*. (1) In relation to that case he says: "It was primâ facie an unlawful act of the wife to live apart from her husband, and it was unlawful, and therefore tortious, in the defendant to procure and persuade her to do an unlawful act; and as damage to the plaintiff was thereby occasioned, an action on the case was maintainable. This case appears to me to be an exceedingly strong authority in the plaintiff's favour. It was undoubtedly, primâ facie, an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant maliciously to procure her to do so."

It is true the learned judge here uses the word "maliciously,"

(1) Willes, 577.

but I think he means no more by this than "wilfully and knowing that he was procuring an unlawful act." The essence of the tort was manifestly regarded by the learned judge as the procuring one person to do an unlawful act to the injury of another. In *Winsmore* v. *Greenbank* (1), which the learned judge relied upon as a strong authority in support of the plaintiff's case, there was not even an allegation of malice in the first count. The allegation was that the defendant "unlawfully and unjustly" procured a wife not to return to her husband, whereby he was damnified. Willes C.J. in his judgment said, in answer to objections that were taken to the first count: "It must be an unlawful procuring, and it need not be shewn on the pleadings how it is unlawful. It was said that it was necessary for the plaintiff to add 'by false insinuations,' but it is not material whether they were true or false. If they were true, and by means of them the defendant persuaded the plaintiff's wife to do an unlawful act, it was unlawful in the defendant."

Upon a review, then, of the judgment in *Lumley* v. *Gye* (2), I am satisfied that the procuring what was described as an unlawful act—namely, a breach of contract, was regarded as the gist of the action. I think the judgment would have been precisely the same if, instead of the word "maliciously," the words "wilfully and with notice of the contract," had been found in the declaration. Every word of the reasoning of the three learned judges would have been equally applicable to that case. I am not concerned now to inquire whether the decision in *Lumley* v. *Gye* (2) was right. I admit the force of the reasons given by the learned judges for holding that an action lies not only against a person who breaks a contract, but against anyone procuring a breach of contract to the detriment of the plaintiff. There are, however, arguments the other way, and I must not be understood as expressing an opinion one way or the other, whether such an action can be maintained.

It is certainly a general rule of our law that an act primâ facie lawful is not unlawful and actionable on account of the

(1) Willes, 577.             (2) 2 E. & B. 216.

Case: 11-126    Document: 63    Page: 185    04/25/2011    272927    401

A-5484

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Herschell.

motive which dictated it.  I put aside the case of conspiracy, which is anomalous in more than one respect.

It has recently been held in this House, in the case of *Bradford Corporation* v. *Pickles* (1), that acts done by the defendant upon his own land were not actionable when they were within his legal rights, even though his motive were to prejudice his neighbour.  The language of the noble and learned Lords was distinct.  The Lord Chancellor said : " This is not a case where the state of mind of the person doing the act can affect the right.  If it was a lawful act, however ill the motive might be, he had a right to do it.  If it was an unlawful act, however good the motive might be, he would have no right to do it." The statement was confined to the class of cases then before the House ; but I apprehend that what was said is not applicable only to rights of property, but is equally applicable to the exercise by an individual of his other rights.

The common law on the subject was emphatically expressed by Parke B. in delivering the judgment of the Court in *Stevenson* v. *Newnham.* (2)  In that case the question was whether a declaration was good which averred that the defendant " maliciously " distrained for more rent than was due.  It was held that the allegation of malice did not make it good.  Parke B. said : " An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent."

More than one of the learned judges who were summoned refers with approval to the definition of malice by Bayley J. in the case of *Bromage* v. *Prosser* (3) : " Malice in common acceptation of the term means ill-will against a person, but in its legal sense it means a wrongful act done intentionally without just cause or excuse."  It will be observed that this definition eliminates motive altogether.  It includes only . " *wrongful* " acts intentionally done.  I may remark in passing that I am quite unable to see how the definition assists the respondents.  It seems to me to tell the other way.  In the present case the contention is that the malicious motive makes " wrongful " an act that otherwise would not be so.

(1) [1895] A. C. 587, 594.            (2) 13 C. B. 285, 297.
(3) 4 B. & C. 247, 255.

It may be convenient here to refer to *Green* v. *London General Omnibus Co.* (1), which was relied on as shewing that a malicious motive may make actionable acts otherwise innocent. In my opinion it affords no support to such a proposition. Acts were charged in the declaration which manifestly interfered with the plaintiff in the free use of the highway to which he was entitled. The declaration averred that he was obstructed in the use of it. It was demurred to on the ground that a corporation could not be guilty of malice, and that this was of the essence of the cause of action. The decision was only that the declaration was good. It was not held that a malicious motive was essential. Erle C.J., in delivering the judgment of the Court, stated as the ground of the demurrer, that the declaration charged " a wilful and intentional wrong," and that the defendants being a corporation could not be guilty of such a wrong. He obviously gave the averment of malice the meaning attributed to it by Bayley J. in the case just referred to—namely, that the wrongful acts were done intentionally.

Great stress was laid at the bar on the circumstance that in an action for maliciously and without reasonable and probable cause putting in motion legal process an evil motive is an essential ingredient. I have always understood, and I think that has been the general understanding, that this was an exceptional case. The person against whom proceedings have been initiated without reasonable and probable cause is primâ facie wronged. It might well have been held that an action always lay for thus putting the law in motion. But I apprehend that the person taking proceedings was saved from liability if he acted in good faith, because it was thought that men might otherwise be too much deterred from enforcing the law, and that this would be disadvantageous to the public. Some of the learned judges cite actions of libel and slander as instances in which the legal liability depends on the presence or absence of malice. I think this a mistake. The man who defames another by false allegations is liable to an action, however good his motive, and however honestly he believed in the statement he made. It is true that in a limited class of

(1) 7 C. B. (N.S.) 290.

Case: 11-126    Document: 63    Page: 187    04/25/2011    272927    401

A-5486

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Herschell.

cases the law, under certain circumstances, regards the occasion as privileged, and exonerates the person who has made false defamatory statements from liability if he has made them in good faith. But if there be not that duty or interest which in law creates the privilege, then, though the person making the statements may have acted from the best of motives, and felt it his duty to make them, he is none the less liable. The gist of the action is that the statement was false and defamatory. Because in a strictly limited class of cases the law allows the defence that the statements were made in good faith, it seems to me, with all deference, illogical to affirm that malice constitutes one of the elements of the torts known to the law as libel and slander. But even if it could be established that in cases falling within certain well-defined categories, it is settled law that an evil motive renders actionable acts otherwise innocent, that is surely far from shewing that such a motive always makes actionable acts prejudicial to another which are otherwise lawful, or that it does so in cases like the present utterly dissimilar from those within the categories referred to.

The question raised by the decision under appeal is one of vast importance and wide-reaching consequences. In *Temperton* v. *Russell* (1) it was held that the principle of *Lumley* v. *Gye* (2), and *Bowen* v. *Hall* (3), was not confined to breaches of contract of service, but applied to breaches of any contract. The law laid down in *Bowen* v. *Hall* (3) in terms applies to all contracts, and I quite agree that the nature of the contract can make no difference.

If the judgment under appeal is to stand, and the fact that the act procured was unlawful as being a breach of contract be immaterial, it follows that every person who persuades another not to enter into any contract with a third person may be sued by that third person if the object were to benefit himself at the expense of such person. Such a case is within the very words employed in *Bowen* v. *Hall* (3) as applied in the present judgment. I do not think it possible to maintain such a proposition. It would obviously apply where one trader

(1) [1893] 1 Q. B. 715.              (2) 2 E. & B. 216.
(3) 6 Q. B. D. 333.

induced another not to contract with a third person with
whom he was in negotiation, but to make the contract with
himself instead, a proceeding which occurs every day, and the
legitimacy of which no one would question. Yet it is within
the very language used in *Bowen* v. *Hall*. (1)  He induces
a person not to enter into a contract with a third person,
and his object is to benefit himself at the expense of the
person who would otherwise have obtained the contract, and
thus necessarily to injure him by depriving him of it. It was
said at the bar by the learned counsel for the respondents, in
answer to this difficulty, that there was an exception in favour
of trade competition. I know of no ground for saying that
such an exercise of individual right is treated with exceptional
favour by the law. I shall revert to this point presently in
connection with another branch of the respondents' argument.
But it is possible to give many illustrations to which no such
answer would apply. I give one: a landowner persuades
another to sell him a piece of land for which a neighbour is
negotiating. It is so situated that it will improve the value of
the property of whichever of them obtains it. His motive is to
benefit himself at his neighbour's expense; he induces the
owner of the land not to contract with his neighbour. The
case is within the terms of the judgment in *Bowen* v. *Hall*. (1)
Would it be possible to contend that an action lay in such a
case? If the fact be that malice is the gist of the action for
inducing or procuring an act to be done to the prejudice of
another, and not that the act induced or procured is an unlawful
one as being a breach of contract or otherwise, I can see no
possible ground for confining the action to cases in which the
thing induced is the not entering into a contract. It seems to
me that it must equally lie in the case of every lawful act
which one man induces another to do where his purpose is to
injure his neighbour or to benefit himself at his expense. I
cannot hold that such a proposition is tenable in principle, and
no authority is to be found for it. I should be the last to
suggest that the fact that there was no precedent was in all
cases conclusive against the right to maintain an action. It is

(1) 6 Q. B. D. 333.

H. L. (E.)

1897

Allen
*v.*
Flood.

Lord Herschell.

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.

Lord Herschell.

the function of the Courts to apply established legal principles to the changing circumstances and conditions of human life. But the motive of injuring one's neighbour or of benefiting oneself at his expense is as old as human nature. It must for centuries have moved men in countless instances to persuade others to do or to refrain from doing particular acts. The fact that under such circumstances no authority for an action founded on these elements has been discovered does go far to shew that such an action cannot be maintained. I think these considerations (subject to a point which I will presently discuss) are sufficient to shew that the present action cannot be maintained.

It is said that the statement that the defendant would call the men out, if made, was a threat. It is this aspect of the case which has obviously greatly influenced some of the learned judges. Hawkins J. says that the defendant without excuse or justification " wilfully, unlawfully, unjustly, and tyrannically invaded the plaintiffs' right by intimidating and coercing their employers to deprive them of their present and future employment," and that the plaintiffs are therefore entitled to maintain this action. But " excuse or justification " is only needed where an act is primâ facie wrongful. Whether the defendant's act was so is the matter to be determined. To say that the defendant acted " unlawfully " is with all respect to beg the question, which is whether he did so or not. To describe his acts as unjust and tyrannical proves nothing, for these epithets may be and are, in popular language, constantly applied to acts which are within a man's rights, and unquestionably lawful. In my opinion these epithets do not advance us a step towards the answer to the question which has to be solved. The proposition is therefore reduced to this, that the appellant invaded the plaintiffs' right by intimidating and coercing their employers. In another passage in his opinion the learned judge says that there is no authority for the proposition that to render threats, menaces, intimidation or coercion available as elements in a cause of action, they must be of such a character as to create fear of personal violence. I quite agree with this. The threat of violence to property is equally a threat in the eye of the law.

And many other instances might be given. On the other hand it is undeniable that the terms "threat," "coercion," and even "intimidation," are often applied in popular language to utterances which are quite lawful and which give rise to no liability either civil or criminal. They mean no more than this, that the so-called threat puts pressure, and perhaps extreme pressure, on the person to whom it is addressed to take a particular course. Of this again numberless instances might be given. Even then if it can be said without abuse of language that the employers were "intimidated and coerced" by the appellant, even if this be in a certain sense true, it by no means follows that he committed a wrong or is under any legal liability for his act. Everything depends on the nature of the representation or statement by which the pressure was exercised. The law cannot regard the act differently because you choose to call it a threat or coercion instead of an intimation or warning.

I understood it to be admitted at the Bar, and it was indeed stated by one of the learned judges in the Court of Appeal, that it would have been perfectly lawful for all the ironworkers to leave their employment and not to accept a subsequent engagement to work in the company of the plaintiffs. At all events, I cannot doubt that this would have been so. I cannot doubt either that the appellant or the authorities of the union would equally have acted within his or their rights if he or they had "called the men out." They were members of the union. It was for them to determine whether they would become so or not, and whether they would follow or not follow the instructions of its authorities, though no doubt if they had refused to obey any instructions which under the rules of the union it was competent for the authorities to give they might have lost the benefits they derived from membership. It is not for your Lordships to express any opinion on the policy of trade unions, membership of which may undoubtedly influence the action of those who have joined them. They are now recognised by law; there are combinations of employers as well as of employed. The members of these unions, of whichever class they are composed, act in the interest of their class. If they resort to unlawful acts they may be indicted or sued. If they

A. C. 1898.　　　　　　　　　　　　　3　　K

130                            HOUSE OF LORDS                        [1898]

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

do not resort to unlawful acts they are entitled to further their interests in the manner which seems to them best, and most likely to be effectual.

If, then, the men had ceased to work for the company either of their own motion or because they were "called out," and the company in order to secure their return had thought it expedient no longer to employ the plaintiffs, they could certainly have maintained no action. Yet the damage to them would have been just the same. The employers would have been subjected to precisely the same "coercion" and "intimidation," save that it was by act and not by prospect of the act; they would have yielded in precisely the same way to the pressure put upon them, and been actuated by the same motive, and the aim of those who exercised the pressure would have been precisely the same. The only difference would have been the additional result that the company also might have suffered loss. I am quite unable to conceive how the plaintiffs can have a cause for action, because, instead of the ironworkers leaving, either of their own motion or because they were called out, there was an intimation beforehand that either the one or the other of these courses would be pursued. The ironworkers were employed on the terms that they might leave at the close of any day, and that on the other hand the employers might, if they saw fit, then discharge them. The company had employed the men knowing that they were members of the union, and they had on one occasion, at least, dealt with the appellant as its delegate. They had no ground for complaint if the men left, as they were by contract entitled to do, whether the men left of their own motion or followed the instruction of their union leaders. It is said that the company were in the power of the men because of the business loss to which the withdrawal of the men would subject them. But to what was this due, if not to the act of the company themselves in employing these men under a contract which either party might any day determine? Under such circumstances, to compare the act of the company to that of the traveller who, on a pistol being presented to his head, hands his purse to the highwayman, appears to me grotesque.

The object which the appellant and the ironworkers had in view was that they should be freed from the presence of men with whom they disliked working, or to prevent what they deemed an unfair interference with their rights by men who did not belong to their craft doing the work to which they had been trained. Whether we approve or disapprove of such attempted trade restrictions, it was entirely within the right of the ironworkers to take any steps, not unlawful, to prevent any of the work which they regarded as legitimately theirs being entrusted to other hands.

Some stress was laid in the Court below upon the fact that the plaintiffs were not at the time in question engaged upon ironwork, although immediately before that time they had been so employed elsewhere. This, it was said, shewed that the motive of the defendant and the ironworkers was the "punishment" of the plaintiffs for what they had previously done. I think the use of the word "punishment" has proved misleading. That word does not necessarily imply that vengeance is being wreaked for an act already done, though no doubt it is sometimes used in that sense. When a Court of justice, for example, awards punishment for a breach of the law the object is not vengeance. The purpose is to deter the person who has broken the law from a repetition of his act, and to deter other persons also from committing similar breaches of the law.

In the present case it was admitted that the defendant had no personal spite against the plaintiffs. His object was, at the utmost, to prevent them in the future from doing work which he thought was not within their province, but within that of the ironworkers. If he had acted in exactly the same manner as he did at a time when the plaintiffs were engaged upon ironwork, his motive would have been precisely the same as it was in the present case, and the result to the plaintiffs would have been in nowise different. I am unable to see, then, that there is any difference either in point of ethics or law between the two cases. The ironworkers were no more bound to work with those whose presence was disagreeable to them than the plaintiffs were bound to refuse to work because they found that

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

3       K 2

A-5492

132                          HOUSE OF LORDS                          [1898]

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Herschell.

this was the case. The object which the defendant, and those whom he represented, had in view throughout was what they believed to be the interest of the class to which they belonged; the step taken was a means to that end. The act which caused the damage to the plaintiffs was that of the iron company in refusing to employ them. The company would not subordinate their own interests to the plaintiffs. It is conceded that they could take this course with impunity. Why, then, should the defendant be liable because he did not sub-ordinate the interests of those he represented to the plaintiffs'? Self interest dictated alike the act of those who caused the damage, and the act which is found to have induced them to cause it.

I have been dealing so far with the ground upon which the judgment in the Court below proceeded. The learned counsel for the respondents, however, rested their arguments mainly upon a different ground, and it is this ground, and not that taken in the Court below, which has found most favour with the learned judges who think the plaintiffs entitled to judgment.

It was contended that the defendant by the course he took had interfered with the plaintiffs in their trade or calling, and that this of itself was an actionable wrong. In support of this very broad proposition reliance was mainly placed on the case of *Keeble* v. *Hickeringill*. (1) The declaration charged the defendant with firing a gun with design to damnify the plaintiff, and frighten the wild fowl from his decoy. In one report (2) it is stated that the plaintiff was lord of a manor, and had a decoy, and the plaintiff had also made a decoy upon his own ground, which was next adjoining the defendant's ground, and there the plaintiff had decoy and other ducks, of which he made profit. It was held that the action lay. In another report (3) this observation is attributed to Lord Holt: "Suppose defendant had shot in his own ground, if he had occasion to shoot it would have been one thing, but to shoot on purpose to damage the plaintiff is another thing, and a wrong." In another report (1) Lord Holt is reported as saying: "The action lies, for, first,

(1) 11 East, 574, n.          (2) Holt, 14; 11 East, 573, n.
              (3) 11 Mod. 74.

using or making a decoy is lawful ; secondly, this employment of his ground for that use is profitable to the plaintiff, as is the skill and management of that employment." It is argued that this decision rests upon the principle that intentional interference with the trade of another is wrongful. If it was intended by the decision to draw a distinction between firing by the defendant on his own land when the decoy was kept by the plaintiff for purposes of trade profit, and doing the same act when the decoy was kept for purposes of pleasure only, I can see no ground for such a distinction. The defendant in firing upon his own land in such a way as to frighten the birds from the plaintiff's land, was either acting within his own rights or not. If he was not, he would surely be liable, whether the plaintiff was using his land for pleasure or profit. If he was within his rights he would not be liable in either case, and I do not see how his rights could depend on the circumstance that the plaintiff traded in ducks and did not merely use his decoy for purposes of sport, or that he sold them, and did not merely use them for consumption by his household. I cannot think that the right of action depended on the circumstance that the plaintiff traded in ducks, or that there would have been no right of action, all other circumstances being the same, if he had not done so. The case may be supported, and the observation of Lord Holt, which has been quoted, explained by the circumstance that if the defendant merely fired on his own land in the ordinary use of it, his neighbour could make no complaint, whilst, if he was not firing for any legitimate purpose, connected with the ordinary use of land, he might be held to commit a nuisance. In this view of it *Keeble* v. *Hickeringill* (1) has, of course, no bearing on the present case.

It is, however, treated in their opinions by the majority of the learned judges as establishing the wide and far-reaching proposition that every man has a right to pursue his trade or calling without molestation or obstruction, and that anyone who by any act, though it be not otherwise unlawful, molests or obstructs him is guilty of a wrong unless he can shew lawful justification or excuse for so doing.

(1) 11 East, 574, n.

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.

Lord Herschell.

The case of *Keeble* v. *Hickeringill* (1) was decided about two centuries ago, but I cannot find that it has ever been treated, unless it be quite recently, as establishing the broad general proposition alleged. No such proposition is to be found stated, so far as I am aware, as the ground of any decision, or in any standard text-book of the English law. In Smith's Leading Cases, which were selected, and the notes on which were written by one of the most eminent lawyers of his day, the case of *Keeble* v. *Hickeringill* (1) is not even referred to. And the first editors of the work, after Mr. J. W. Smith's death, Willes and Keating JJ., lawyers on whose eminence it is unnecessary to dilate, equally passed it by without notice. If the view taken by the majority of the learned judges whose opinions were given at the bar be correct, *Keeble* v. *Hickeringill* (1) ought to have been itself treated as a leading case.

It has not, as I believe, been an authority on which subsequent decisions have been based, except in cases relating to the disturbance of decoys of wild birds. It is, nevertheless, suggested by the learned judges that it embodies the principle on which many subsequent cases have been decided, though it was not referred to, and the judges who pronounced the judgments were apparently unconscious of the authority they are said to have followed.

It is remarkable that amongst these cases are *Lumley* v. *Gye* (2) and *Bowen* v. *Hall* (3), which I have already discussed. They are said by several of the judges to rest on the principle established in *Keeble* v. *Hickeringill.* (1) Some of the judges, indeed, criticise adversely the grounds upon which these cases were decided, and intimate that they can only be supported on the ground taken by Lord Holt in *Keeble* v. *Hickeringill.* (1) That case, however, was not even cited by the counsel who argued *Lumley* v. *Gye* (2) or *Bowen* v. *Hall* (3), or by any of the judges who decided them. If it establishes the proposition contended for, it is astonishing that those very learned and distinguished judges were unaware of any such legal proposition, and instead of taking this short cut to their

(1) 11 East, 574, n.                    (2) 2 E. & B. 216.
(3) 6 Q. B. D. 333.

decision based it upon elaborate reasoning entirely unconnected with it.

Great reliance was placed by the respondents on certain dicta of Holt C.J. in *Keeble* v. *Hickeringill.* (1) That learned judge is reported to have said that if a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, an action lies in all cases. And he gives the following illustrations: " If H. should lie in the way with guns and fright boys from going to school, and their parents would not let them go thither, that schoolmaster would have an action for loss of his scholars. A man hath a market to which he hath toll of horses sold, a man is bringing his horse to market to sell, a stranger hinders and obstructs him from going to the market, an action lies, because it imports damage. Again, an action on the case lies against one that by threats frightens away his tenants at will." In all these cases I think the Chief Justice was referring to acts in themselves wrongful. Firing guns in such a manner as to terrify persons lawfully passing along the highway would, I take it, be an offence. And the other illustrations given import, I think, that the obstruction and frightening were of such a character as to be unlawful, quite independently of the motives which led to them.

The case of *Carrington* v. *Taylor* (2) was also relied on by the respondents. It is, I believe, the only case which has been expressly based on *Keeble* v. *Hickeringill.* (1) The plaintiff there possessed an ancient decoy, and the defendant sought his livelihood by shooting wild fowl from a boat on the water, for which boat, with small arms, he had a license from the Admiralty for fishing and coasting along the shores of Essex. The decoy was near a salt creek where the tide ebbs and flows. The only proof of disturbance of the decoy by the defendant was that, being in his boat shooting wild fowl in a part of the open creek, he had fired his fowling-piece, first within a quarter of a mile of the decoy and afterwards within 200 yards of it, and had killed several widgeons. The judge left these facts to the jury as evidence of a wilful disturbance of the plaintiff's decoy by the defendant. The jury returned a verdict for 40*s.* damages,

(1) 11 East, 574, n.          (2) 11 East, 571.

136                           HOUSE OF LORDS                        [1898]

and the Court, on the motion for a new trial, refused to disturb the verdict. They gave no reasons for their judgment. Unless a decoy possesses some peculiar privileges in the eye of the law, I confess myself quite unable to understand why the defendant was liable to an action or was not within his rights in shooting the wild fowl at the place he did for the purpose of gaining a livelihood, which is stated to have been his object. In any case, the decision affords no support to the contention now under consideration. For there was no allegation that the plaintiff traded in wild fowl; "great profits and advantages," in pleader's language, might well have accrued to him without his doing so. And there was no proof that he did so. Although some of the learned judges, who support the judgment below, rely on this case, one at least thinks it bad law. The case is important as shewing, as I think it clearly does, that the judges of the Court of King's Bench in 1809 did not regard the judgment in *Keeble* v. *Hickeringill* (1) as founded on interference with trade or dependent on the presence of malice.

I turn now to the other cases which are relied on by the learned judges in support of the proposition on which they found their conclusion in favour of the respondents, and which are said to have been decided upon the principle embodied in *Keeble* v. *Hickeringill*. (1) Amongst the earliest of these is *Garret* v. *Taylor*. (2) The declaration alleged that the plaintiff was a mason, and used to sell stones, and employed workmen in his stone pit. "Al queux"—I quote from the fuller statement of the pleading in 2 Rolle's Reports, p. 162—"le defendant tantas et frequentas minas de vita et de mutilatione membrorum suorum et bonorum devastatione per diversas sectas legis dedit" whereby the plaintiff's workmen left, and he was unable to obtain others. After judgment this declaration was held to disclose a cause of action. It is suggested that it is difficult to explain this decision except on the ground that the law recognises in every man a right to carry on his trade without disturbance. I am unable to see the difficulty or to think that the decision rests on any principle specially relating to trade.

        (1) 11 East, 574, n.                    (2) Cro. Jac. 567.

Case: 11-126    Document: 63    Page: 198    04/25/2011    272927    401

A-5497

If the plaintiff had not been a tradesman, but the owner of a house, and the same menaces had been uttered to those who came from time to time to visit him, I cannot but think that he would equally have had a cause of action. He would have been affected prejudicially in the occupation and enjoyment of his property by acts in themselves wrongful. Again, in *Tarleton* v. *M'Gawley* (1), a gun was fired at a canoe coming to the plaintiff's ship, whereby one of the natives in it was killed, and so natives were deterred by fright from approaching the ship for the purpose of trading. It is said that the essence of the wrong in this case was that the plaintiff was disturbed in his trade. I do not think so. Can it be doubted that if the shipowner had desired the presence of persons on board his ship for any other purpose, and the same wrongful act had deterred them from approaching the ship, the shipowner might have maintained a similar action to recover damages for any loss or inconvenience to which he had been put owing to the wrongful act of the defendant?

I will not trouble your Lordships by going through all the cases referred to. Speaking generally, I believe these actions would equally have been maintainable if a similar wrongful act had caused damage to, or had affected the legal rights of, a person wholly unconnected with trade. In all of them the act complained of was in its nature wrongful ; violence, menaces of violence, false statements. In none of them was the proposition now contended for laid down or hinted at, and they can be supported without resort to any such principle. No doubt in some of the cases referred to the wrong was of such a nature that it is difficult to imagine circumstances in which precisely the same wrong could have caused damage to a person not in trade ; but the act was not wrongful merely because it affected the man in his trade, though it was this circumstance which occasioned him loss. Among the authorities relied on were those relating to slander of a man in the way of his trade. This action again was traced to the principle that a man's trade must not be interfered with. It is true that slander of a man in the way of his trade is actionable without proof of special

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Herschell.

(1) 1 Peake, N. P. C. 270.

138                           HOUSE OF LORDS                          [1898]

damage; but whatever the slander, the wrong is precisely the same, that defamatory words have been uttered. And slander of a man in the way of his office, if it be an office of profit or even of dignity, where it is one from which the holder may be removed, is actionable without proof of special damage in precisely the same way as slander of a man in the way of his trade.

I now proceed to consider on principle the proposition advanced by the respondents, the alleged authorities for which I have been discussing. I do not doubt that everyone has a right to pursue his trade or employment without "molestation" or "obstruction" if those terms are used to imply some act in itself wrongful. This is only a branch of a much wider proposition, namely, that everyone has a right to do any lawful act he pleases without molestation or obstruction. If it be intended to assert that an act not otherwise wrongful always becomes so if it interferes with another's trade or employment, and needs to be excused or justified, I say that such a proposition in my opinion has no solid foundation in reason to rest upon. A man's right not to work or not to pursue a particular trade or calling, or to determine when or where or with whom he will work is in law a right of precisely the same nature, and entitled to just the same protection as a man's right to trade or work. They are but examples of that wider right of which I have already spoken. That wider right embraces also the right of free speech. A man has a right to say what he pleases, to induce, to advise, to exhort, to command, provided he does not slander or deceive or commit any other of the wrongs known to the law of which speech may be the medium. Unless he is thus shewn to have abused his right, why is he to be called upon to excuse or justify himself because his words may interfere with some one else in his calling?

In the course of the argument one of your Lordships asked the learned counsel for the respondents whether, if a butler on account of a quarrel with the cook told his master that he would quit his service if the cook remained in it, and the master preferring to keep the butler terminated his contract with the cook, the latter could maintain an action against the butler.

One of the learned judges answers this question without hesita-
tion in the affirmative.  As in his opinion the present action
would lie, I think he was logical in giving this answer.  But
why, I ask, was not the butler in the supposed case entitled to
make his continuing in the employment conditional on the
cook ceasing to be employed ?  And if so, why was he not
entitled to state the terms on which alone he would remain,
and thus give the employer his choice ?  Suppose after the
quarrel each of the servants made the termination of the con-
tract with the other a condition of remaining in the master's
service, and he chose to retain one of them, would this choice
of his give the one parted with a good cause of action against
the other ?  In my opinion a man cannot be called upon to
justify either act or word merely because it interferes with
another's trade or calling ; any more than he is bound to justify
or excuse his act or word under any other circumstances, unless
it be shewn to be in its nature wrongful, and thus to require
justification.

The notion that there may be a difference in this respect
between acts affecting trade or employment and other acts
seems to be largely founded on certain dicta of Bowen L.J. in
the case of the Mogul Steamship Company.  It must be
remembered that these were obiter dicta, for the decision was
that the defendants were not liable.  The passage perhaps
chiefly relied upon is the following : "Now intentionally to do
that which is calculated in the ordinary course of events to
damage, and which does in fact damage, another in that other
person's property or trade is actionable if done without just
cause or excuse.  Such intentional action when done without
just cause or excuse is what the law calls a malicious wrong." (1)
It will be noted that the learned judge here makes no distinc-
tion between acts which interfere with property and those
which interfere with trade.  For the purpose then in hand the
statement of the law may be accurate enough, but if it means
that a man is bound in law to justify or excuse every wilful act
which may damage another in his property or trade, then I say,
with all respect, the proposition is far too wide ; everything

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

(1) 23 Q. B. D. at p. 613.

Case: 11-126    Document: 63    Page: 201    04/25/2011    272927    401

A-5500

depends on the nature of the act, and whether it is wrongful or not.

Whatever may be the effect of the dicta of some of the judges in the case of *Mogul Steamship Co.* v. *McGregor* (1), I regard it as an authority supporting the appellant's case. Certain owners of ships formed an association with the object of securing to themselves exclusively a particular carrying trade. They allowed a rebate on the freights to all shippers who shipped only with members of the association. They also sent ships to ports where the plaintiffs were endeavouring to obtain cargoes, to carry at unremunerative rates, in order to secure the trade to themselves. A circular was sent by an agent of the defendants, reminding shippers at a particular port that shipments for London by any of the plaintiffs' steamers at any of the ports in China would exclude the firm making the shipment from participation in the returns of freight during the whole six-monthly period in which they had been made, even though the firm elsewhere might have given exclusive support to the steamers of the combination. It was held by this House that the plaintiffs had no cause of action. This, too, be it observed, though the action was in respect of a conspiracy, what was done being in pursuance of a common course of action concerted by several shipowners.

In that case the very object of the defendants was to induce shippers to contract with them, and not to contract with the plaintiffs, and thus to benefit themselves at the expense of the plaintiffs, and to injure them by preventing them from getting a share of the carrying trade. Its express object was to molest and interfere with the plaintiffs in the exercise of their trade. It was said that this was held lawful because the law sanctions acts which are done in furtherance of trade competition. I do not think the decision rests on so narrow a basis, but rather on this, that the acts by which the competition was pursued were all lawful acts, that they were acts not in themselves wrongful, but a mere exercise of the right to contract with whom, and when, and under what circumstances and upon what conditions they pleased. I am aware of no ground for saying that com-

(1) 23 Q. B. D. 598.

Case: 11-126    Document: 63    Page: 202    04/25/2011    272927    401

petition is regarded with special favour by the law; at all events, I see no reason why it should be so regarded. It may often press as hardly on individuals as the defendant's acts are alleged to have done in the present case. But if the alleged exception could be established, why is not the present case within it? What was the object of the defendant, and the workmen he represented, but to assist themselves in their competition with the shipwrights? A man is entitled to take steps to compete to the best advantage in the employment of his labour, and to shut out, if he can, what he regards as unfair competition, just as much as if he was carrying on the business of a shipowner. The inducement the appellant used to further his end was the prospect that the members of his union would not work in company with what they deemed unfair rivals in their calling. What is the difference between this case and that of a union of shipowners who induce merchants not to enter into contracts with the plaintiffs, by the prospect that if at any time they employ the plaintiffs' ships they will suffer the penalty of being made to pay higher charges than their neighbours at the time when the defendants' ships alone visit the ports? In my opinion there is no difference in principle between the two cases.

A further point to which I have not yet alluded was raised by the junior counsel for the respondents on the first argument at the bar. It was strenuously insisted upon by both learned counsel on the occasion of the second argument. It was said that the appellant had been guilty of misrepresentation, which had induced the company to take the course they did. No such point is to be found suggested in the pleadings; no such point was raised at the trial or in the Court of first instance, or until the junior counsel for the respondents addressed your Lordships. The jury were not asked whether there had been a misrepresentation, and have not found that this was the case. It is certainly not admitted by the appellant. Under these circumstances it would, in my opinion, be without justification and contrary to precedent for your Lordships to attach any weight to the point now. But I think it right to add that it does not seem to me to have been made good as a matter of

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Herschell.

H. L. (E.)
1897.
ALLEN
v.
FLOOD.

Lord Herschell.

fact. It is contended, as I understand, that the appellant represented that all the iron-workers in the union would leave if the plaintiffs continued to be employed, whereas some only had said that they would do so. I think the contention rests on a misapprehension. It is true that some only appear to have said that they would leave at once, but I think that this referred to an immediate departure without waiting till the end of the day, or at all events without awaiting the result of the interview between the appellant and the employers. The witness Elliot, whose evidence is relied on, himself says that "the chaps" were dissatisfied, and that there was only one way of settling it, and that was in accordance with the wishes of their men, these wishes being that the plaintiffs should not be continued upon work in the same ship. Even if a misrepresentation by the appellant to the Glengall Company would be sufficient in any circumstances to afford a right of action to the plaintiffs, I think it could scarcely be contended that it could do so, unless the misrepresentation were wilful and intentional. Of this there is, in my opinion, not a tittle of evidence. The appellant may well have believed from the statements made to him, that if the plaintiffs continued to work in the ship, all the ironworkers would cease to work. On the evidence I should come without hesitation to the conclusion that they would have done so.

For the reasons I have given I think the judgment should be reversed, and judgment entered in the action for the defendant with costs.

I have only very recently had the opportunity of knowing the views entertained by my noble and learned friend on the woolsack with regard to this case. In consequence of them, I think it right to add the following observations. I am not behind my noble and learned friend in the desire to preserve individual liberty. But I think it is never in greater danger than when a tribunal is urged to restrict liberty of action because the manner in which it has been exercised in a particular instance may be distasteful.

I am unable to regard as altogether accurate the statement of my noble and learned friend that up to the period when this

case reached your Lordships' House there was a unanimous consensus of opinion. I think he has overlooked the following facts. When the Court of Appeal in *Bowen* v. *Hall* (1) held that an action lay for maliciously inducing another to break his contract, the late Lord Chief Justice, differing from his two colleagues, was of opinion that even in such a case an action could not be maintained. When in *Temperton* v. *Russell* (2) Lord Esher and Lopes L.J. carried the doctrine further, and held that an action would lie for maliciously inducing another not to enter into a contract, A. L. Smith L.J., notwithstanding the strong expression of opinion by those learned judges, significantly reserved his own opinion on the point. And when in the present case Lord Esher and Lopes L.J. re-affirmed the opinions they had previously pronounced, Rigby L.J. only concurred in the judgment under appeal in deference to the opinions expressed in the previous case.

In my opinion the conclusion at which I have arrived is not in conflict with any decision or even with the pronounced opinions of any judges except those enunciated in the recent cases now under review. On the contrary, I believe with all deference to my noble and learned friend on the woolsack that any other conclusion would run counter to principles of the common law which have been long well established.

I regret to have trespassed so long on your Lordships' time. My excuse must be that I regard the decision under appeal as one absolutely novel, and which can only be supported by affirming propositions far-reaching in their consequences and in my opinion dangerous and unsound.

LORD MACNAGHTEN. My Lords, I am sorry to say that I must begin by recapitulating the facts of the case. For the findings of the jury, taken by themselves, do not convey to my mind any definite meaning. The jury have found that the appellant Allen "maliciously induced" the Glengall Iron Company to discharge the respondents from their service, and they have awarded damages in consequence. I do not know what the jury meant by the word "induced"; I am not sure that I

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord Herschell.

(1) 6 Q. B. D. 333.                (2) [1893] 1 Q. B. 715.

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord
Macnaghten.

know what they meant by the word "maliciously." Sometimes, indeed, I rather doubt whether I quite understand that unhappy expression myself. I am therefore compelled to turn for help to the evidence at the trial, accepting, as I suppose the jury must have accepted, the account given by the respondents in preference to that offered by the appellant wherever there may be any shadow of difference between them.

There is a dry dock at Millwall called the Regent's Dock. It belongs to the Glengall Iron Company, Limited, and is used by them for repairing ships. In the beginning of April, 1894, a ship named the *Sam Weller* was lying there and under repair. There were at work at the time on this ship some twenty shipwrights and a much larger number of boiler-makers, or iron-men, as they are called. On the evening of April 11 the job was about half finished. So far there had been no difficulty with the men. Shipwrights and iron-men were working together and apparently on good terms.

Shipwrights in the port of London are apprenticed and trained to work in iron as well as in wood. And there, though I believe not elsewhere, shipwrights in some yards are put to do ironwork. Boiler-makers, or iron-men, on the other hand, are taught to work in iron or on iron ships only. They have no skill in woodwork. The London shipwrights have a trade union called the Shipwrights' Provident Union. The iron-men too have a trade union—a union larger and more powerful than that of the shipwrights, and not confined to the port of London. It is generally known as the Boiler-makers' Union. The headquarters of the society are at Newcastle-on-Tyne. The executive council meets there; but there are district delegates and district committees in different parts of the country.

For some time past there has been a good deal of jealousy between the two unions. Reasonably or unreasonably, the iron-men hold that the only proper business of shipwrights is to work in wood, and that any shipwright who presumes to work in iron is trespassing on their domain. Such a man, it seems, has "no principle whatever"—at least, that appears to be the view expressed by an intelligent boiler-maker who has attained the position of district delegate for London.

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord
Macnaghten.

On the morning of April 12 the respondents Flood and Taylor, two shipwrights who had served their time with the Glengall Iron Company, and were members of the Shipwrights' Union, were taken on to work upon the *Sam Weller*. They were set to do woodwork with the other shipwrights on the job. The Glengall Company employ about three times as many iron-men as shipwrights, and they make it a rule never to put shipwrights on iron work. But unfortunately Flood and Taylor had come straight from a yard close by belonging to Messrs. Mills & Knight, where, owing to a dispute which occurred some few years ago about this very question, shipwrights only are now employed, and do both iron and woodwork. Flood and Taylor had been in this yard about four months taking the bottom out of a big iron ship. Their presence there had been observed, and it was known what they were doing. They were excellent workmen, skilful, steady, and well-behaved. But in the eyes of the iron-men they had committed an unpardonable offence.

As soon as they came into the Regent's Dock and the story of their late employment got about there was a ferment among the iron-men. In their leisure moments, at breakfast-time, and again in the dinner-hour, they collected in groups and clusters, talking among themselves and eyeing the new-comers "with a stern glance," as though they meant mischief. "I could see they meant harm," says Flood in his evidence-in-chief, and Taylor confirms what Flood says.

In the afternoon, one of the iron-men, called Elliott, who seems to have been the first or among the first to recognise Flood and Taylor, and to have taken a leading part in "the agitation," as it was called, telegraphed to the appellant, Allen, who was the London delegate of the boiler-makers' union. Allen came to the Regent's Dock the next morning and saw Elliott for a few minutes, just as the men were going back to work after breakfast. Elliott told him what the trouble was about, and said that the men were talking of throwing down their tools at dinner-time. Allen warned Elliott that the men must be careful; they were not to leave their work: if they took the law into their own hands, and left without the sanction

Case: 11-126    Document: 63    Page: 207    04/25/2011    272927    401

A-5506

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord
Macnaghten.

of the union, he would use his influence to have them deprived of the benefits of their society, and fined besides; they must stay on until the matter was settled. Then Allen saw Edmonds, the foreman of the shipwrights, who rather resented Allen's interference in the matter.

In the meantime Mr. Halkett, the managing director of the company, had been sent for. He knew Allen as the London delegate of the boiler-makers' union, and had settled some former difficulties with him. He came down to the dock, and had an interview with Allen in the board-room. Edmonds was called in. There is very little conflict as to what passed at this interview. At any rate, the account given by Mr. Halkett, who was called as a witness by Flood and Taylor, may be accepted as accurate. Allen shewed Mr. Halkett Elliott's telegram, and said that the men belonging to his union felt aggrieved at having to work with Flood and Taylor; the ill-feeling was serious; if Flood and Taylor were continued on the job, the iron-men would leave off work or be called out. Mr. Halkett could not say which expression was used. He thought they came to the same thing, and I must say I think so too. Mr. Halkett said it was very hard on his company. Then Edmonds seems to have taken up the cudgels for the two shipwrights, and words passed between him and Allen. Allen thinks Edmonds was excited. Edmonds complains that Allen was arbitrary. Why, he asked, were Mills & Knight's sins to be visited on them? Allen replied that there was no ill-feeling towards the Glengall Company or towards Flood and Taylor personally; but their men were determined to put an end to the practice of shipwrights encroaching on their trade: it was so difficult to trace the offenders; where the men were known, the same thing would occur, in every yard on the Thames. Mr. Halkett seems to have taken the matter very quietly all through. He was only concerned for his employers. It would not do, he said, to have the work stopped just for the sake of two men. So he told Edmonds that Flood and Taylor were to be discharged, and not employed again until the affair was settled. In the meantime, orders were given not to engage shipwrights who were known to have been working on iron

Case: 11-126    Document: 63    Page: 208    04/25/2011    272927    401

A-5507

elsewhere, " for the sake," as Mr. Halkett put it, " of peace and
quietness for ourselves."　That evening Flood and Taylor were
discharged, and they were out of work for a few days.

In dismissing Flood and Taylor as he did, Mr. Halkett did
not break any contract with them.　They were engaged on
piece-work, and liable to be discharged at the end of any day,
though in ordinary course a man engaged on such a job would
be kept on until the job was finished, or until the work slackened
so that his services were no longer required.

On their dismissal, Flood and Taylor brought this action
against Allen.　Each party had the financial support of their
union.　The plaintiffs joined as co-defendants Jackson and
Knight, the chairman and secretary of the boiler-makers' union.
Jackson and Knight had no more to do with the matter than
any of your Lordships.　The jury found that they did not
authorize Allen in acting as he did.　On further consideration,
the action was dismissed against them, and the dismissal was
affirmed on appeal.　It is not necessary for me to say anything
about this part of the case, except that I cannot help thinking
that the fact of the judge leaving any question to the jury as
regards the chairman and secretary of the union must have
rather tended to confuse the issue as between the plaintiffs and
Allen.　Although the learned judge pointed out that there was
no evidence of conspiracy, it must, I should think, have given
some colour to the suggestion of oppressive combination as an
element to be considered—whereas in the course of the trial the
case was in fact, as it seems to me, reduced to a claim against
Allen for what he did in his individual capacity.

Now before I proceed to consider the legal grounds on which
Kennedy J. and the Court of Appeal decided the case against
Allen, I should like to ask what there was wrong in Allen's
conduct.　He had nothing to do with the origin of the ill-feeling
against Flood and Taylor.　He did nothing to increase it.　He
went to the dock simply because he was sent for by one of the
men of his union.　It seems to be considered the duty of a
district delegate to listen to the grievances of the members of
his union within his district, and to settle the difficulty if
possible.　The jury found that the settlement of this dispute

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord
Macnaghten.

3　　L 2

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord
Macnaghten.

was a matter within Allen's discretion. The only way in which he could settle it was by going and seeing the manager. There was surely nothing wrong in that. There was nothing wrong in his telling the manager that the iron-men would leave their work unless the two shipwrights against whom they had a grudge were dismissed, if he really believed that that was what his men intended to do. As far as their employers were concerned the iron-men were perfectly free to leave their work for any reason, or for no reason, or even for a bad reason; any one of them might have gone singly to the manager, or they might have gone to him all together (if they went quietly and peaceably), and told him that they would not stay any longer with Flood and Taylor at work among them.

If so, it is difficult to see why fault should be found with Allen for going in their place and on their behalf and saying what they would have said themselves. Then, did Allen say or do anything in the course of his interview with Mr. Halkett which, in the events which have happened, gives Flood and Taylor a right of action against him? That brings me to the case presented to the jury.

In the statement of claim there were serious allegations for which, as it turned out, there was no foundation whatever in fact. It was alleged that Allen and his co-defendants had induced the company to break contracts with the plaintiffs. That was a mistake: there was no contract to break. It was alleged that Allen and his co-defendants had conspired against the plaintiffs. That was a mistake too; there was not, as the learned judge said, " a shred of evidence of any conspiracy at all." Then there was a charge of intimidation and coercion. That charge vanished too. The only reference the learned judge made to it was to say: " There is no evidence here, of course, of anything amounting to intimidation or coercion in any legal sense of the term." The case as launched broke down.

The learned judge, however, saved two questions from the wreck and put them to the jury. They were these: 1. Did Allen maliciously induce the company to discharge the plaintiffs? 2. Did Allen maliciously induce the company not to engage the

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord
Macnaghten.

plaintiffs? In putting these questions the learned judge explained that the word "maliciously" was a term of art in law —a proposition, at any rate, not universally true. "It means," he said, "connected with the word 'induce' this—that it was not for the mere purpose of forwarding fairly Allen's own interests, but from the indirect motive of doing a mischief to the plaintiffs in their lawful business." That comes near the ordinary meaning of "malice" if "deliberate mischief" be taken as its ordinary meaning. And it is to be observed that in the cases professedly founded on *Lumley* v. *Gye* (1), I refer particularly to *Bowen* v. *Hall* (2), *Temperton* v. *Russell* (3), and the present case in the Court of Appeal, the word "malice" seems to be used in a sense not far removed from its ordinary and popular signification.

As regards the meaning of the word "induce," I do not think the jury got much assistance. I rather gather from the summing-up that the jury were given to understand that if they thought that Allen merely represented the state of things as it was—and the feeling of the iron-men at the Regent's Dock—they would be at liberty to answer the questions put to them about Allen in the negative. But the answer must be the other way if they thought that Allen went further, and assumed to represent the union, and to speak as if he had the power of the union at his back; that would be a threat and would amount to "inducing." Now, I must say that I do not think it can be said that Allen did "induce" the company to discharge the plaintiffs. Certainly it cannot be truly said that he procured them to be discharged. It was not his act that prevented the company from continuing to employ them. If the whole story had been a fiction and an invention on his part I could have understood the finding of the jury. But I do not think there was any misrepresentation on Allen's part. I do not think there was any exaggeration. Nor, indeed, was any such point made at the trial. The evidence of the plaintiffs themselves proves that the iron-men were in a very nasty temper. They believed the iron-men meant mischief. Allen

(1) 2 E. & B. 216.          (2) 6 Q. B. D. 333.
          (3) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 211    04/25/2011    272927    401

A-5510

H. L. (E.)
1897
⎯
ALLEN
v.
FLOOD.
⎯
Lord
Macnaghten.

evidently thought they were bent on striking, for he spent the whole of the time he was talking to Elliott in warnings against that step. I should infer that Edmonds, the foreman, thought the position very critical, for in the evening, some time after the interview between Allen and Mr. Halkett, when Flood and Taylor were discharged, he told them to go back and take their tools out and let the iron-men see them, thus giving the iron-men a sort of triumph which I should think was the last thing he would have done if he could have helped it. Edmonds, indeed, says he thought Allen "had only just to hold up his hand and the whole of the men would go off." But he gathered this from Allen's manner, not from what he said. When he was asked about what Allen said, he answered very fairly : "Did not he tell you this ? " he was asked, " that from what he knew of the feeling of your men he believed if those two men continued the boiler-makers would leave ? " Answer : "Yes." Question : "Are those pretty nearly the words he used ? " Answer : " As near as I can tell."

But, after all, whatever Edmonds may have gathered from Allen's manner, it was not Edmonds who discharged the plaintiffs. It was Mr. Halkett, and he did it without consulting Edmonds. Mr. Halkett says nothing to shew that he was afraid of Allen. He must have known too much about trade unions to have supposed for a moment that a subordinate officer in Allen's position could have taken upon himself to call the men out. It is quite plain what it was that induced Mr. Halkett to discharge the plaintiffs. It was nothing that originated with Allen. It was no misrepresentation on his part. It was not fear of his personal influence. It was simply a very natural desire for peace and quiet. Mr. Halkett did not want the yard upset. He did not want a row between two sets of workmen which was pretty sure to end in a strike.

So we see now, I think, what the findings of the jury come to if they are to be treated as being in accordance with the evidence. They must mean that Allen induced the company to discharge the plaintiffs, by representing to the manager, not otherwise than in accordance with the truth, the state of feeling in the yard, and the intentions of the workmen, and that he

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord
Macnaghten.

did so "maliciously," because he must have known what the issue of his communication to the manager would be, and naturally perhaps he was not sorry to see an example made of persons obnoxious to his union. But is his conduct actionable? It would be very singular if it were. No action would lie against the company for discharging the two shipwrights. No action would lie against the iron-men for striking against them. No action would lie against the officers of the union for sanctioning such a strike. But if the respondents are right the person to answer in damages is the man who happened to be the medium of communication between the iron-men and the company—the most innocent of the three parties concerned, for he neither set the "agitation" on foot, nor did he do anything to increase it, nor was it his order that put an end to the connection between employer and employed. It seems to me that the result would have been just the same if Edmonds had told Mr. Halkett what was going on in the yard, or if Mr. Halkett had learned it from Flood and Taylor themselves.

Even if I am wrong in my view of the evidence and the verdict, if the verdict amounts to a finding that Allen's conduct was malicious in every sense of the word, and that he procured the dismissal of Flood and Taylor, that is, that it was his act and conduct alone which caused their dismissal, and if such a verdict were warranted by the evidence, I should still be of opinion that judgment was wrongly entered for the respondents. I do not think that there is any foundation in good sense or in authority for the proposition that a person who suffers loss by reason of another doing or not doing some act which that other is entitled to do or to abstain from doing at his own will and pleasure, whatever his real motive may be, has a remedy against a third person who, by persuasion or some other means not in itself unlawful, has brought about the act or omission from which the loss comes, even though it could be proved that such person was actuated by malice towards the plaintiff, and that his conduct if it could be inquired into was without justification or excuse.

The case may be different where the act itself to which the loss is traceable involves some breach of contract or some

Case: 11-126    Document: 63    Page: 213    04/25/2011    272927    401

A-5512

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord
Macnaghten.

breach of duty, and amounts to an interference with legal rights. There the immediate agent is liable, and it may well be that the person in the background who pulls the strings is liable too, though it is not necessary in the present case to express any opinion on that point.

But if the immediate agent cannot be made liable, though he knows what he is about and what the consequences of his action will be, it is difficult to see on what principle a person less directly connected with the affair can be made responsible unless malice has the effect of converting an act not in itself illegal or improper into an actionable wrong. But if that is the effect of malice, why is the immediate agent to escape? Above all, why is he to escape when there is no one else to blame and no one else answerable? And yet many cases may be put of harm done out of malice without any remedy being available at law. Suppose a man takes a transfer of a debt with which he has no concern for the purpose of ruining the debtor, and then makes him bankrupt out of spite, and so intentionally causes him to lose some benefit under a will or settlement—suppose a man declines to give a servant a character because he is offended with the servant for leaving —suppose a person of position takes away his custom from a country tradesman in a small village merely to injure him on account of some fancied grievance not connected with their dealings in the way of buying and selling—no one, I think, would suggest that there could be any remedy at law in any of those cases. But suppose a customer, not content with taking away his own custom, says something not slanderous or otherwise actionable or even improper in itself to induce a friend of his not to employ the tradesman any more. Neither the one nor the other is liable for taking away his own custom. Is it possible that the one can be made liable for inducing the other not to employ the person against whom he has a grudge? If so, a fashionable dressmaker might now and then, I fancy, be plaintiff in a very interesting suit. The truth is that questions of this sort belong to the province of morals rather than to the province of law. Against spite and malice the best safeguards are to be found in self-interest and public opinion. Much

more harm than good would be done by encouraging or permitting inquiries into motives when the immediate act alleged to have caused the loss for which redress is sought is in itself innocent or neutral in character, and one which anybody may do or leave undone without fear of legal consequences. Such an inquisition would, I think, be intolerable, to say nothing of the probability of injustice being done by juries in a class of cases in which there would be ample room for speculation and wide scope for prejudice.

In order to prevent any possible misconstruction of the language I have used I should like to add that in my opinion the decision of this case can have no bearing on any case which involves the element of oppressive combination. The vice of that form of terrorism commonly known by the name of "boycotting," and other forms of oppressive combination, seems to me to depend on considerations which are, I think, in the present case conspicuously absent.

As regards authority, there is, I think, very little to be said. It is hardly necessary to go further back than *Lumley* v. *Gye* (1) in 1853. There is not much help to be found in the earlier cases that were cited at the bar, not even, I think, in the great case about frightening ducks in a decoy, whatever the true explanation of that decision may be. In *Lumley* v. *Gye* (1) it was held that an action would lie for procuring a person to break a contract for personal service. The subsequent cases of *Bowen* v. *Hall* (2) and *Temperton* v. *Russell* (3) are authorities for the proposition that the principle is not confined to contracts for personal service. There is no doubt much to be said for that proposition. But the judgment under appeal does not depend on *Lumley* v. *Gye* (1) or on any decision before or after that case. It rests only on certain dicta to be found first in *Bowen* v. *Hall* (2), and afterwards repeated in *Temperton* v. *Russell.* (3) Those dicta are of great weight, owing to the eminence of the judge by whom they were pronounced, but they certainly were not necessary for the decision in either case. *Lumley* v. *Gye* (1) was heard on demurrer. The counts

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord
Macnaghten.

(1) 2 E. & B. 216.                    (2) 6 Q. B. D. 333.
            (3) [1893] 1 Q. B. 715.

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord
Macnaghten.

which were demurred to alleged that the defendant knew "the premises," that is, the existence of the contract stated in the declaration, and was "maliciously intending to injure the plaintiff." Mr. Willes, for the defendant, in reply, pointing out that malice was never averred in actions for seducing servants, argued that "the averment of malice can make no difference"; and that seems to have been the opinion of the majority of the Court, who thought the action would lie. Crompton J. treats the allegation of malice as meaning nothing more than the allegation of notice, and Erle J. indicates that the principle on which the action is to be rested is that "the procurement of the violation of the right"—that is, the plaintiff's right under the contract—"is a cause of action." If so, it would seem to follow that, provided the violation is committed knowingly, it cannot matter whether the thing is done maliciously or not. And, therefore, with all deference to the opinion of Blackburn J., who, if I rightly understand his words in *Cattle* v. *Stockton Waterworks* (1), seems to say that "malicious intention" was the gist of the action, I should be disposed to hold that if a right has been knowingly violated an allegation of malice is superfluous, and that if there has been no violation of any right, malice by itself is not a cause of action. I cannot, therefore, agree with the late Master of the Rolls in thinking that the act complained of was "wrongful" because it was "malicious," and that if there be a malicious act, and loss resulting from that act, it does not matter whether there has been a violation of right or not.

I am of opinion that judgment should be entered for the appellant.

LORD MORRIS. My Lords, if this was an ordinary case I should be satisfied by merely expressing my concurrence in the able and exhaustive judgment of the Lord Chancellor, which deals so fully both with the law and the facts of the case; but as the judgment of this House about to be pronounced overturns, as I consider, the overwhelming judicial opinion of England, I feel bound to state shortly my views without reiterating

(1) (1875) L. R. 10 Q. B. 458.

Case: 11-126    Document: 63    Page: 216    04/25/2011    272927    401

A-5515

the common facts of the case or going into the evidence in detail, as both have already been so often repeated.

The first question that would arise is : Was there not a de facto contractual relation between the Glengall Iron Company, the employers, and the plaintiffs, the employees, which would have continued but for the malicious interference of the defendant ? The plaintiffs were only day-labourers, but with a certainty of their employment being continued de die in diem for a considerable time. In my opinion it is actionable to disturb a man in his business by procuring the determination of a contract at will, or by even preventing the formation of a contract, when the motive is malicious and damage ensues.

The question of actual contractual relations in this case was not dealt with, as during the course of the trial it was assumed that there was no contractual relation existing between the Glengall Iron Company and the plaintiffs which was determined by the action of the defendant. I desire, however, to deal with the case on the finding of the jury, namely, "That the defendant did maliciously induce the Glengall Iron Company to discharge the plaintiffs from their employment."

At common law a workman had a *right* to work with any person who was willing to employ him. Both had a right to trade in labour as in any other commodity and as they thought fit. This was part of the personal liberty enjoyed by every man, and, like personal liberty, was the subject of peculiar safeguards, notably—it was a right which like that of personal liberty could not be bartered away. A contract restraining one's right to trade, with certain exceptions not material here, was, like a contract to become a slave, null and void. One right as well as the other was inalienable.

The existence of this right to trade was established at least as far back as the reign of Queen Anne. In *Keeble* v. *Hickeringill* (of which there is a note in 11 East, p. 574) it was held that an action on the case lay for discharging guns near the decoy pond of another with a design to damnify the owner by frightening away the wild fowl resorting thereto, by which the wild fowl were frightened away and the owner damnified. It is to be observed that the act of discharging the gun was per se

Case: 11-126    Document: 63    Page: 217    04/25/2011    272927    401

A-5516

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Morris.

lawful.  The ground of Holt C.J.'s judgment was as follows:
" Then when a man useth his art or skill to take them, to sell
or dispose of for his profit, this is his trade, and he that hinders
another in his trade or livelihood is liable to an action for so
hindering him."  Then later on he says: " Now there are two
sorts of acts for doing damage to a man's employment for which
an action lies.  The one is in respect of a man's privilege or
in respect of his property.  The other is where a violent or
malicious act is done to a man's occupation, profession, or
way of getting a livelihood.  There an action lies in all
cases; but if a man doth him damage by using the same
employment, as if Mr. Hickeringill had set up another decoy
on his own ground near the plaintiff's and that had spoiled
the custom of the plaintiff no action could lie."  Why?
" Because he had as much liberty to make and use a decoy as
the plaintiff."

These words, in my opinion, draw the distinction between an
act in se legal which is rendered unlawful when done mali-
ciously and the same act which remains lawful, although it
does harm to another, because it was done in the exercise of
the owner's right to trade, and that harm resulted from trade
competition.

Erle C.J. in his work upon Trade Unions at p. 12 lays down
the proposition thus: " Every person has a right under the law
as between him and his fellow subjects to full freedom in dis-
posing of his own labour or his own capital according to his
own will."  So far as to the existence of the right.  What are
its limits?  Or, in other words, what will amount to an infringe-
ment of it?  This also is clearly stated by Erle C.J.: " It
follows that every other person is subject to the correlative duty
arising therefrom and is prohibited from any obstruction to the
fullest exercise of this right which can be made compatible with
the exercise of similar rights by others.  Every act causing an
obstruction to another in the exercise of the right comprised
within this description done, not in the exercise of the actor's
own right, but for the purpose of obstruction, would, if damage
should be caused thereby to the party obstructed, be a violation
of this prohibition, and the violation of this prohibition *by a*

Case: 11-126    Document: 63    Page: 218    04/25/2011    272927    401

A-5517

*single person* is a wrong to be remedied by action or indictment as the case may be."

To what extent have these opinions and the judgment in *Keeble* v. *Hickeringill* (1) been dissented from or approved of in subsequent judicial proceedings? I am not aware of any judicial expression of dissent from them, whilst the judgments of several of the judges in the *Mogul Case* (2), in the Appeal Court and in this House, largely support them. In the admirably logical and scientific judgment of Bowen L.J. he says (3) : " The plaintiffs had a right to be protected against certain kinds of conduct, and we have to consider what conduct would pass this legal line or boundary. Now intentionally to do that which is calculated in the ordinary course of events to damage, and which does in fact damage, another in that other person's property or *trade* is actionable if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong." Again he says (4) : " Intimidation, obstruction, and molestation are forbidden ; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it." Amongst several cases he cites is that of *Keeble* v. *Hickeringill.* (1) He proceeds to decide in favour of the defendants upon the ground that there was a just cause or excuse for them. He adds (5) : " Such legal justification would not exist when the act was merely done with the intention of causing temporal harm without reference to one's own lawful gain, or the lawful enjoyment of one's own rights. The good sense of the tribunal which had to decide would have to analyze the circumstances and to discover on which side of the line each case fell."

In this House in the judgment of Lord Bramwell, which was read in his absence by Lord Macnaghten, who expressed his agreement, it is stated : " The plaintiffs do not complain of any act the ultimate object of which was to injure the plaintiffs, having its origin in malice or ill-will to them,"

(1) 11 East, 574, n.
(2) 23 Q. B. D. 598; [1892] A. C. 25.
(3) 23 Q. B. D. 613.
(4) 23 Q. B. D. 614.
(5) 23 Q. B. D. 618.

Case: 11-126    Document: 63    Page: 219    04/25/2011    272927    401

A-5518

H. L. (E.)
1897
ALLEN
*v.*
FLOOD.
Lord Morris.

and he refers generally, without giving its name, to *Keeble* v. *Hickeringill.* (1)

Lord Field, in his judgment, says : "I think that this appeal may be decided upon the principles laid down by Holt C.J. in *Keeble* v. *Hickeringill*." (1)    After pointing out that "acts done by a trader in the lawful way of his business, although by the necessary results of effective competition interfering injuriously with the trade of another, are not the subject of any action," he proceeds thus : "Of course it is otherwise, as pointed out by Holt C.J., if the acts complained of, although done in the way or under the guise of competition or other lawful right, are in themselves violent or purely malicious, or have for their ultimate object injury to another from ill-will to him and not the pursuit of lawful rights."

In this House opinions were expressed by seven of their Lordships.    Not one expressed any disapproval or adverse criticism of the case of *Keeble* v. *Hickeringill.* (1)

My Lords, if the principle of *Keeble* v. *Hickeringill* (1) is applicable to this case, as in my opinion it is, I fail to see how Kennedy J. could have withdrawn the case from the jury.    In his charge he put Allen's case, as it seems to me, most favourably to the jury.    He says (I merely summarise it) : "Now bearing in mind how Allen came, you have to consider whether the plaintiffs have proved to you not merely that he represented to the employers what the men working in that yard would be likely to do unless they could come to some settlement, and left to the employers . . . . the choice of action—and I do not think in that case you would say that was an inducement . . . . that he felt himself in this position : I am a district delegate ; in the interest alike of the doing of the employers' work as well as of the men, it is better that I should go and tell the employers what the facts are after telling the men that they are to take no hurried action—to let the matter either be settled peaceably by the employers, or if it cannot be settled by them be brought in due course before the executive of the union."

The charge of the learned judge seems to me to put the case

(1) 11 East, 574, n.

Case: 11-126    Document: 63    Page: 220    04/25/2011    272927    401

favourably for Allen; but it appears to me that some of your Lordships have put yourselves in the place of the jury by coming to the conclusion that Allen had gone to the employers merely to intimate, as has been said, or represent to them the feelings and views of the men—to be their messenger or mouth-piece—that being the very case that was negatived by the jury. Indeed, my noble and learned friend Lord James in his judgment, which I have had the advantage of reading, has gone further, for he says: "For him (Allen) to communicate such intention to the company did not injure the respondents." If this was correct, there was no necessity to go any further. The plaintiffs would not have suffered damage by the act of the defendant. In my opinion it was for the jury, the constituted tribunal in such cases, and not for your Lordships, to say whether Allen went to the employers as peacemaker, intimator, representer, messenger, or mouthpiece, as was stated by him, or rather for him by some of your Lordships, or whether he went with the object and for the purpose of having the plaintiffs punished for past alleged offences by getting them discharged at once from their employment.

The defendant gave a complete denial to the substance of Mr. Halkett's evidence. The defendant did not take in his evidence the position which is now taken up for him by some of your Lordships of being a messenger or an intimator of what had occurred. He was conscious he had done wrong, and accordingly, to try to save himself, he denied altogether what Mr. Halkett had proved. The jury disbelieved him. His untruthful evidence gave colour to his conduct and action which, in my opinion, amounted to this. He was an outsider, though he was telegraphed for by Elliott. He proceeded to threaten the employers with the withdrawal of the boiler-makers which would be most injurious to the employers, unless the plaintiffs were dismissed at once. His object was to injure the plaintiffs and to punish them, and he had the intention of further persecuting them by not allowing them to work any-where, which was not the wish of the men or their union. His conduct was unauthorized, and he misrepresented to the employers both the wishes of the men and their objects, and

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Morris.

Case: 11-126    Document: 63    Page: 221    04/25/2011    272927    401

A-5520

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Morris.

acted outside the scope of his authority as a district delegate of the union.

I therefore conclude by adopting as my own the last paragraph of Hawkins J.'s opinion on the question propounded to the judges by your Lordships : " Being satisfied that the right of the plaintiffs is established by law, I think there is an abundance of evidence fit to be left to the jury that without excuse or justification, and not in the exercise of any privilege or in defence of any right either of his own or of the boiler-makers, the defendant wilfully, unlawfully, unjustly, and tyrannically invaded and violated the plaintiffs' right by intimidating and coercing their employers to deprive them of their present and future employment."

I am therefore of opinion that the considered judgment of Kennedy J., which was unanimously affirmed by the Court of Appeal, should be affirmed by this House.

LORD SHAND.  My Lords, I am of opinion that the judgment complained of should be reversed, and judgment entered for the defendant with costs.

Certain facts have, with reference to the evidence and the verdict of the jury, been clearly established.  In the first place, it is clear that the plaintiffs had no contract with their employers, the Glengall Iron Company, entitling them to continuous employment.  They were engaged to work by the day, entitled to leave the employment at the end of each day, and, on the other hand, subject to the risk that their employers might at any time cease to employ them further.  While this was so, it is however to be observed that it is matter of clear inference, and indeed of some direct evidence, that the employment would have gone on for some time longer than it did if the employers had not been induced to discontinue it.

It is, in my opinion, further clear that the employment was discontinued by the employers, the Glengall Iron Company, because of the representations made to them by the defendant Allen.  This has, I think, been proved, and indeed has been expressly affirmed by the verdict of the jury.

There is no real controversy as to the statement or represen-

Case: 11-126    Document: 63    Page: 222    04/25/2011    272927    401

A-5521

tation made by the defendant which induced the employers to dispense with the plaintiffs' services.  The defendant, in effect, stated that if the plaintiffs were continued as workers, even at woodwork only, on the vessel then in the course of being repaired, the boiler-makers then engaged at the ironwork on the ship would cease work, and so put a stop to the completion of the repairs.

There has been considerable criticism by some of the learned consulted judges of the statement on this subject made by the defendant Allen in his character of representative of the boiler-makers.  It has been said, and it was indeed maintained in the argument, that the defendant exaggerated the state of matters in the shipbuilding yard in regard to the boiler-makers, that he gave too highly coloured an account of the feelings of discontent of the boiler-makers towards the plaintiffs, whom they considered to be improperly intruding into a department of work which they regarded as theirs exclusively, at least so far as shipwrights were concerned.  I confess I attach no importance to any such considerations, and this for two reasons. I find no evidence of exaggeration or misrepresentation on the part of the defendant ; but, further, no such point was taken, or presented by the learned judge to the jury for their consideration and verdict.  It seems impossible from a perusal of the evidence to come to any other conclusion than this—that the boiler-makers had made up their minds they would not continue to work on the same vessel with the plaintiffs.  That the boiler-makers had made up their minds as to the course they would pursue is clear from their meetings and demeanour before they sent for the defendant to come to the yard, and from the fact that they did send for him and required him to make the communication he did to the employers.  I think the evidence proves that in these communications he made no false representation, but simply informed the employers of the true state of matters.  But it is enough that no such point was put before the jury.  Had the plaintiffs' counsel meant to maintain that the defendant had used improper means, in the sense of making false representations as to the attitude of the boiler-makers or the resolution they had come to, they were bound to

A. C. 1898.                    3    M

162                    HOUSE OF LORDS                    [1898]

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Shand.

put this distinctly in issue. Evidence would have been specially directed to the subject, and a special question would have been put to the jury. Not having done so, the question cannot, in my opinion, be now raised.

Up to this point, then, the case stands thus—that the plaintiffs lost the prospect, it might even be fairly said the certainty, of continued employment in consequence of representations made by the defendant Allen as to the resolution of the boiler-makers, but that these representations were true in fact. The plaintiffs have proved the issue that the defendant by his representations induced their employers to discontinue the employment; but this must be taken with the qualification that he did so by no improper means, by which I mean that he used neither fraud nor violence, but merely stated to the employers the true state of matters in the building yard. Nevertheless, the jury have found that the defendant maliciously induced the employers to discontinue their employment of the plaintiffs.

This leads to the notice of the only other matter of fact which must be kept in view in the determination of the question of law to be decided. The fact is that the defendant was not actuated by malice towards the plaintiffs, in anything he said or did, in his communications with the employers, taking that word in its popular and ordinary sense, as meaning personal ill-will. He did not even know the plaintiffs. He came on the scene only because he was sent for by the boiler-makers, and he acted only officially as their delegate and representative. All this is perfectly clear, but in addition the following passage in the charge of the learned judge shews that the verdict cannot be taken as a finding of personal malice. "The word 'malice' is a word of art in law . . . . and it does not mean, you may take it from me, in this case a personal dislike—a personal feeling of resentment against the two plaintiffs. It is clear from the evidence of the men and of their employers that there was no such personal feeling in this case."

The jury has, however, found expressly by their verdict that the defendant did "maliciously induce the Glengall Iron Company not to engage the plaintiffs," and under the direction of the learned judge assessed damages, for which his Lordship

granted a decree. With the utmost deference to the opinions of those who think otherwise, I am unable, as I have been from the beginning of the argument, to find any ground in law (and the question is one entirely of law) on which this verdict can be justified. The explanation of the verdict is to be found in the following passage in the charge of the learned judge, which immediately succeeds what I have already quoted : "You will take it from me that here 'maliciously' means with the intention of doing an injury to the plaintiffs in their business, with the intention, for the purpose of doing such an injury to the plaintiffs in their business, and in the knowledge that what they were doing would so injure them ; . . . that it was not for the mere purpose of forwarding fairly Allen's own interests, but from the indirect motive of doing a mischief to the plaintiffs in their lawful business." And in a succeeding sentence his Lordship explains that, "while there are acts which one may lawfully do without complaint, the same act if done for the purpose of depriving or hindering another person to your knowledge in the doing of something which he has a right to do, or in the enjoyment of something which he has the right to enjoy," may be malicious, and, in the view to which his Lordship gave effect, might warrant a claim of damages.

The learned judge was probably bound to lay down the law in the terms he used, having regard to the judgments delivered in the Court of Appeal in the case of *Temperton* v. *Russell* (1), which, in the view of Rigby L.J., governed the decision of this case.

I confess that, even if the direction given were sound in law, as I think it was not, the facts of the case were such as I should have thought should have precluded such a verdict being given, if these, with the assistance of the learned judge, had received the weight to which they were entitled at the hands of the jury. If anything is clear on the evidence, it seems to me to be this—that the defendant was bent; and bent exclusively, on the object of furthering the interests of those he represented in all he did—that this was his motive of action,

(1) [1893] 1 Q. B. 715.

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Shand.

and not a desire, to use the words of the learned judge, "to do mischief to the plaintiffs in their lawful calling."

The case was one of competition in labour, which, in my opinion, is in all essentials analogous to competition in trade, and to which the same principles must apply; and I ask myself what would be the thought of the application of the word "malicious" to the conduct of a tradesman who induces the customer of another tradesman to cease making purchases from one with whom he had long dealt, and instead to deal with him, a rival in trade. The case before the jury was, in my view, in no way different, except that in the one case there was competition in labour—in the other there would be competition in trade.

Some of the learned consulted judges speak of Allen's conduct as having been caused by a desire to inflict "punishment" on the shipwrights for past acts, and indicate that, if the shipwrights had been actually working at ironwork on the vessel at the time, the case would have been different. I cannot agree in any such view. "Punishment" in a wide and popular sense may possibly be used, though incorrectly, to describe the boiler-makers' action; but it is quite clear that what they were resolved to do, and really did, was, while marking their sense of the injury which they thought (rightly or wrongly is not the question) the shipwrights were doing to them in trenching on their proper line of business, to take a practical measure in their own defence. Their object was to benefit themselves in their own business as working boiler-makers, and to prevent a recurrence in the future of what they considered an improper invasion on their special department of work. How this could possibly be regarded as "malicious," even in any secondary sense that can reasonably be attributed to that term, I cannot see.

Again, the expression was repeatedly used in the argument, and has been also adopted by some of the learned judges, that the men, or rather their representative, Allen, had used "threats" in his communications with the employers which were represented as improper, and which afforded evidence to support the view that their action was malicious. What were

these threats? Simply this—that if the plaintiffs were continued in the employment they, the boiler-makers, would leave. Threats may, like false or fraudulent representations, be of such a nature, if used, as to amount to improper and unlawful means used to induce action which may be injurious to others, causing them loss and damage, and I should not for a moment say that damages might not in cases of such threats be recoverable. But this can only apply to threats of violence, intimidation, obstruction, or the like—threats which may be described as menace which improperly affects freedom of action in the person who is induced to act or to refrain from acting. The boiler-makers were quite entitled to resolve that they would not then or at any future time work at the same vessel, or even in the same yard, with the plaintiffs. No one can dispute their right so to resolve. They were quite entitled, having formed that resolution, to inform their employers that they had done so; indeed, I should say that the defendant Allen was only doing what was right and proper in intimating this resolution to the employers, in place of allowing the men to leave without notice to the employers of what would certainly cause them great inconvenience and loss. There was no threat of the nature of menace so as to amount to the use of illegal means to induce the employers to act—no threat to do anything beyond the exercise of their legal right. A master who warns his servant that a repetition of certain faults will result in dismissal may be said to use a threat; but he is not only acting lawfully, but in most cases is to be commended for so doing in place of giving an instant dismissal.

One of the learned judges—the late Cave J.—has expressed the opinion that if a butler who, for some reason or another, has made up his mind that he will no longer continue in service with the cook, with whom he has been in the same employment, should intimate his resolution to the employer, and the services of the cook should thereupon be dispensed with, the cook will have in law a claim of damages against the butler. If this view were sound, then the plaintiffs in this case might be entitled to succeed. Indeed, I have always thought throughout the course of the argument that the case put by the learned

A-5526

H. L. (E.)
1897
ALLEN
v.
FLOOD.
——
Lord Shand.

judge is perhaps the simplest form in which the very question now under discussion could be raised. But, with great deference to the opinion of the learned judge, no such claim could arise in such circumstances, because it cannot be truly said that on the part of the butler there was either an unlawful act, or unlawful means used in the doing of a lawful act. A servant is surely entitled, for any reason sufficient in his judgment, or even from caprice, I should say, to resolve that he will no longer continue, after the expiry of a current engagement, in service with another servant in the same employment. This being unquestionable, the only limitation on his right to act is that he must not use unlawful means to induce his employer to dispense with the services of his fellow-servant. Should his master ask him the reason for his giving up the service, he is surely entitled to give the true reason, leaving the master to act as he thinks best in determining with which of two servants he will part; and the notion of a claim of damages by his fellow-servant would be extravagant. It can make no difference that he thinks it right at his own hand to inform his master of the resolution he has taken, and I must add, with reference to what I have immediately to say, that his action being lawful, and no unlawful means being used in carrying it out, the motive, even if it be personal ill-will to another, would not, in my opinion, create liability to a claim of damages.

Coming now directly to the merits of the question in controversy in the case, the argument of the plaintiffs and the reasons for the opinions of the majority of the consulted judges seem to me to fail, because, although it is no doubt true that the plaintiffs were entitled to pursue their trade as workmen "without hindrance," their right to do so was qualified by an equal right, and indeed the same right, on the part of other workmen. The hindrance must not be of an unlawful character. It must not be by unlawful action. Amongst the rights of all workmen is the right of competition. In the like manner and to the same extent as a workman has a right to pursue his work or labour without hindrance, a trader has a right to trade without hindrance. That right is subject to the right of others to trade also, and to subject him to competition—competition

Case: 11-126    Document: 63    Page: 228    04/25/2011    272927    401

A-5527

which is in itself lawful, and which cannot be complained of where no unlawful means (in the sense I have already explained) have been employed.   The matter has been settled in so far as competition in trade is concerned by the judgment of this House in the *Mogul Steamship Co. Case*. (1)  I can see no reason for saying that a different principle should apply to competition in labour.   In the course of such competition, and with a view to secure an advantage to himself, I can find no reason for saying that a workman is not within his legal rights in resolving that he will decline to work in the same employment with certain other persons, and in intimating that resolution to his employers.

It is further to be observed, distinguishing the case from one in which a contract might have subsisted between the plaintiffs and their employers for a definite period, or for the work, it might be, on a particular ship until the whole was completed (in which case the refusal to continue to give the work would be a breach of contract on the employers' part), that there was here no such breach of contract.   The employers' act in dispensing with the services of the plaintiffs at the end of any day was a lawful act on their part.   The defendant induced them only to do what they were entitled to do, and, in the absence of any fraud or other unlawful means used to bring this about, the action fails.

As already fully explained, there was no case of malice in the ordinary sense of the term, as meaning personal ill-will, presented to the jury; but I agree with those of your Lordships who hold that, even if such a motive had existed in the mind of the defendant, this would not have created liability in damages. On the grounds already stated, I think the defendant only exercised a legal right in intimating that the boiler-makers would leave work if the plaintiffs were continued; he used no fraud or illegal means in the assertion of that right; and the exercise by a person of a legal right does not become illegal because the motive of action is improper or malicious : *Bradford Corporation* v. *Pickles* (2) and the *Mogul Steamship Co. Case* (1) already cited. In the former of these cases my noble and learned friend Lord

H. L. (E.) ]
1897
ALLEN
v.
FLOOD.]
Lord Shand.

(1) [1892] A. C. 25.          (2) [1895] A. C. 587.

Case: 11-126    Document: 63    Page: 229    04/25/2011    272927    401

A-5528

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord Shand.

Watson said : " No use of property which would be legal, if due to a proper motive, can become illegal because it is prompted by a motive which is improper or even malicious." It seems to me with reference also to the judgment in the latter case, bearing on the rights of competitors in trade, that on the same principle it may be affirmed that the exercise of any legal right in the course of competition in labour or in trade does not become illegal because it is prompted by a motive which is improper or even malicious.

My noble and learned friends Lord Herschell and Lord Macnaghten have reserved their opinions as to the law applicable to a case in which the ground of action is that the defendant had induced an employer to commit a breach of contract, as in the cases of *Lumley* v. *Gye* (1), *Bowen* v. *Hall* (2), and the first branch of *Temperton* v. *Russell*. (3) I desire also to reserve my opinion as to that case. The person who has committed a breach of contract is of course liable in damages in consequence. If it has not yet been decided by this House that a third party who had, without the use of fraud or other unlawful means, induced the contracting party to break his contract himself thereby incurs liability in damages, the question seems to me worthy of full discussion and consideration. The proper and usual application of the maxim " Qui facit per alium facit per se " in cases in which a wrongful act has been performed is to hold the person who has committed the wrong, i.e. in the case supposed, the person who has broken his contract, liable although his act has been done through another acting for him ; and it is at least open to consideration whether the maxim would apply to one who is not himself the wrong-doer committing a breach of contract, but only persuades or induces another to do so.

I have little, if anything, to add to what I have already said as giving my reasons or grounds of judgment. The case was not presented by the learned judge to the jury as one of conspiracy, and does not raise any question of that kind. Combination of different persons in pursuit of a legitimate trade

(1) 2 E. & B. 216.                    (2) 6 Q. B. D. 333.
(3) [1893] 1 Q. B. 715.

Case: 11-126   Document: 63   Page: 230   04/25/2011   272927   401

A-5529

object occurred in the case of the Mogul Steamship Company, and was there held to be lawful. Combination for no such object but in pursuit really of a malicious purpose to ruin or injure another would, I should say, be clearly unlawful; but this case raises no such question.

H. L. (Æ.)
1897
ALLEN
v.
FLOOD.
Lord Shand.

As to the older authorities referred to in the argument, I agree in the views of my noble and learned friends Lord Herschell and Lord Watson, and I agree in thinking with them and with my learned and noble friend Lord Macnaghten that *Lumley* v. *Gye* (1) was not decided on any question of malice.

It was urged by the counsel for the respondent that a disapproval of the law laid down in *Temperton* v. *Russell* (2) and repeated in this case will be attended with dangerous consequences as extending the power of trades unions or combinations beyond limits which these cases laid down, and I am not insensible to the truth of the observation that a certain amount of restraint which these cases introduced will be removed. But if that measure of restraint was not founded, as I believe it was not, on sound legal principle, it is only right that by legal decision in this court of last resort it should be removed. And if the force of combination should be harshly or oppressively used—if it should be used in circumstances in which right-minded men would deplore its use—it must be observed that those against whom combination is so employed have precisely the same liberty of action for resisting oppressive measures and for causing those who use them to desist from that course of action.

LORD DAVEY. My Lords, in this case the jury have found (1.) that the defendant Allen maliciously induced the Glengall Iron Company to discharge the plaintiffs from their employment; (2.) that the defendant Allen maliciously induced the company not to engage the plaintiffs; and (3.) that damages to the extent of 20*l*. to each plaintiff was thereby suffered by the plaintiffs.

The learned judge directed the jury that there was no evidence of any breach of contract involved in the plaintiffs

(1) 2 E. & B. 216.                    (2) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 231    04/25/2011    272927    401

A-5530

H. L. (E.)
1897
——
ALLEN
v.
FLOOD.
——
Lord Davey.
——

being discharged by the company; that there was not a shred of evidence of any conspiracy at all; and that there was no evidence of anything amounting to intimidation or coercion in any legal sense of the term. No exception has been taken, or in my opinion could be taken, to these directions. We must, therefore, take the finding of the jury to mean that the company were "induced" by the persuasion and representations of Allen to discharge the plaintiffs, i.e., not to continue to employ them. The sense in which "maliciously" was intended to be used in the verdict is shewn, by the passage in the summing-up which has already been read and commented on by your Lordships, to be the popular sense of intending to do a mischief to the respondents. The main question which has been argued before your Lordships was whether the plaintiffs were entitled to judgment notwithstanding the findings of the jury.

The learned judge in his judgment, on further consideration after verdict, followed the decision of the Court of Appeal in *Temperton* v. *Russell* (1), and gave judgment for the plaintiffs. The Court of Appeal affirmed that decision. The Master of the Rolls considered that *Temperton* v. *Russell* (1) was an authority binding on that Court—that a thing which you may lawfully do to the injury of another, if you do it without malice, is made unlawful, and gives him a right of action if you do it with malice. The learned Lord gave additional reasons for his decision, in the course of which he laid down that whether the advice is to break a contract or not to make a contract, it has just the same effect, and that if you give advice to one not to make a contract with intent of doing an injury to the person who is going to make the contract with him, then the malice is the thing which makes that thing, which would have been a lawful thing without malice, unlawful. Lopes L.J. also said that he could see no distinction between inducing a party to a contract to break it and inducing a party to discharge a servant, as in the present case. Rigby L.J. simply followed *Temperton* v. *Russell.* (1)

I have stated the views expressed by the Court of Appeal at some length because they exactly express the points on which

(1) [1893] 1 Q. B. 715.

I am constrained to differ from them. The proposition of those learned judges, when analyzed, seems to me to amount to this: that damnum absque injuria, if accompanied by malicious intent, will give a right of action, or that a malicious motive per se amounts, or may in certain circumstances amount, to injuria. I am unable to assent to either of these propositions. "Malice, in common acceptation," says Bayley J. in the well-known case of *Bromage* v. *Prosser* (1), "means ill-will against a person; but in its legal sense it means a wrongful act done intentionally without just cause or excuse." If so, it seems to be an argument in a circle to say that an act not otherwise wrongful becomes so if malicious. Nor can I agree that there is no legal difference between persuasion to break a contract and persuasion not to enter into a contract. In the former case, if the persuasion is successful, the other party is deprived of the benefit of having his contract completed. In the latter case, he loses nothing to which he has a legal right, and he has no legal ground of complaint against the person who refuses to contract with him. In the one case there is a violation of right; in the other case there is not.

I accept for the present purpose without comment the doctrine laid down in *Lumley* v. *Gye* (2) and *Bowen* v. *Hall* (3), that to maliciously induce one to break a contract of exclusive personal service with an employer to the injury of that employer is actionable. But a perusal of the judgments delivered by the learned judges in *Lumley* v. *Gye* (2) shews that in their opinion at any rate it was vital to the plaintiffs' case that there was a subsisting contract of service. Crompton J. says (4) that a person who maliciously interrupts the relation subsisting between master and servant during the time stipulated as the period of service commits a wrongful act for which he is responsible at law. And answering the argument that the rule did not apply where the service had not commenced, although there was an existing contract, the learned judge says: " I think that the relation of master and servant subsists sufficiently for the purpose of such an action during the time for which

(1) 4 B. & C. at p. 247.
(2) 2 E. & B. 216.
(3) 6 Q. B. D. 333.
(4) 2 E. & B. 224.

Case: 11-126    Document: 63    Page: 233    04/25/2011    272927    401

A-5532

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Davey.

there is in existence a binding contract of hiring and service between the parties." Erle J. states the general principle thus: (1) "He who maliciously procures a damage to another by violation of his right ought to be made to indemnify, and that whether he procures an actionable wrong or a breach of contract."

An employer may discharge a workman (with whom he has no contract), or may refuse to employ one from the most mistaken, capricious, malicious, or morally reprehensible motives that can be conceived, but the workman has no right of action against him. It seems to me strange to say that the principal who does the act is under no liability, but the accessory who has advised him to do so without any otherwise wrongful act is under liability.

To persuade a person to do or abstain from doing what that person is entitled at his own will to do or abstain from doing is lawful and in some cases meritorious, although the result of the advice may be damage to another. This, I will remind your Lordships, is not a case of conspiracy. I do not say whether, if it were, it would or would not make an essential difference. But I do say that I am not aware of any authority binding on this House for holding, and it humbly appears to me to be against sound principle to hold, that the additional ingredient of malicious motive should give a right of action against an individual for an act which if done without malice would not be wrongful, although it results in damage to a third person. The case of libel on a privileged occasion is, of course, altogether different. A libel is held to be excused if the words complained of were used on a privileged occasion. But that excuse may be rebutted by proof of express malice and abuse of the privilege.

In my opinion the somewhat anomalous action for malicious prosecution is based on the same principle. From motives of public policy the law gives protection to persons prosecuting, even where there is no reasonable or probable cause for the prosecution. But if the person abuses his privilege for the indulgence of his personal spite he loses the protection, and is

(1) 2 E. & B. 233.

liable to an action, not for the malice but for the wrong done in subjecting another to the annoyance, expense, and possible loss of reputation of a causeless prosecution.

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord Davey.

It was, however, argued that the act of the appellant in the present case was a violation of the right which every man has to pursue a lawful trade and calling, and that the violation of this right is actionable.   I remark in passing that, if this be so, the right of action must be independent of the question of malice, except in the legal sense.   The right which a man has to pursue his trade or calling is qualified by the equal right of others to do the same and compete with him, though to his damage.   And it is obvious that a general abstract right of this character stands on a different footing from such a private particular right as the right to performance of a contract into which one has entered.   A man has no right to be employed by any particular employer, and has no right to any particular employment if it depends on the will of another.

But is there any such general cause of action irrespective of the means employed or mode of interference?  I think it unnecessary to comment on all the cases which have been cited by counsel, and are referred to by the learned judges.  I have read them carefully, and I am satisfied that in no one of them was anything decided which is an authority for the abstract proposition maintained.  In every one of them you find there was either violence or the threat of violence, obstruction of the highway, or the access to the plaintiff's premises, nuisance, or other unlawful acts done to the damage of the plaintiff.  Nor does it appear to me that the gist of the action in those cases was that the plaintiff was a trader or exercised a profitable calling.  That circumstance, no doubt, afforded evidence of the damage.  But I suppose that if a person obstructed the access to my house or to my vessel by molesting and firing guns at persons resorting thither on their lawful occasions, I may have my action against him, though I do not keep a school, or I am not a trader, but sailing in my yacht for my own pleasure.  Or, if a person obstructs my free use of the highway, and I suffer damage thereby, I have a right of action, though my carriage does not ply for hire, but is used

H. L. (E.)
1897
ALLEN
v.
FLOOD.
Lord Davey.

only for my own purposes. It is strange that if there be any such right of action for interference with trade, there is not to be found some clear authority in the law books in its favour. And, as remarked by one of the learned judges, if those who argued and those who decided *Lumley* v. *Gye* (1) had been aware of any such general doctrine, it would have disposed of that case without the elaborate consideration to be found in the judgments. I do not think that the well-known action for slander of a trader's goods supports the larger proposition attempted to be founded on it. Blackstone treats that action as a particular example of slanderous words. And it appears to me an obvious fallacy to argue backwards from the existence of some recognised and well-known cause of action to a larger and wider legal proposition of which the cause of action in question might be treated as a particular case if the larger proposition had been generally recognised.

The authority most relied on in support of the proposition maintained by the respondents is the well known case of *Keeble* v. *Hickeringill* (2), or, more properly, the dicta of Lord Holt as reported in the note to 11 East. That case was an action by the owner of a decoy pond against the defendant for driving away his wild fowl by firing guns with intent to damnify the plaintiff. It appears to have been twice argued, and there are four separate reports of it, which do not altogether agree as to the grounds of the judgment. But I think it was decided on the ground that the act of the defendant was a wilful disturbance of the enjoyment by the plaintiff of his own land for a lawful and profitable purpose, and what is called in law a nuisance. The reported cases in which the case has been followed, *Carrington* v. *Taylor* (3) and *Ibbotson* v. *Peat* (4), support this view. If this be a correct view of the decision, it is no authority for the larger proposition founded on it by the respondents; and the dicta of Lord Holt, however much entitled to respect, are inadequate to support the weight which it is sought to place upon them.

Another point was made at your Lordships' bar. It was

(1) 2 E. & B. 216.                    (3) 11 East, 571.
(2) 11 East, 574, n.                    (4) 3 H. & C. 644.

Case: 11-126    Document: 63    Page: 236    04/25/2011    272927    401

A-5535

contended that Allen was guilty of wilful misrepresentation in
what he told Halkett—that the men never really intended to
strike ; and that Allen knowingly exceeded his instructions, or
what the men had authorized him to say, when he said that
they would do so.    This is a question of fact to be determined
on the evidence, and it might and should have been submitted
to the jury.    In my view such a state of facts amounting to a
charge of fraud would have constituted a legal wrong and have
been of the essence of the action.    The point should therefore,
in my opinion, have been pleaded.    But it is not to be found
in the pleadings, and I cannot find a trace of its having been
taken at the trial.    No reference to such a question is to be
found in the very full summing-up of the learned judge.    At
the end of the summing-up the judge, having read the ques-
tions he proposed to leave to the jury, asked the learned
counsel whether there was any other question which either of
them wished to suggest—to which they replied in the negative.
The point was not raised by the leading counsel for the
respondents at the first hearing at your Lordships' bar, and it
was made by Mr. Isaacs, the junior counsel, for the first time.
It was, however, adopted by Mr. Lawson Walton at the second
hearing.    So far as I can understand, the contention of counsel
for the respondents at the trial was the exact contrary, as they
were then endeavouring to recover against the other defendants,
the representatives of the union.    It is not the practice of your
Lordships where there has been a trial by jury to allow a new
issue or question to be raised at the bar which might and ought
to have been, but was not, submitted to the jury for their con-
sideration on the evidence.    To do so would be to usurp the
function of the jury.    I do not, therefore, find it necessary to
express any opinion on the point.

I am of opinion that the judgment of the Court of Appeal
should be reversed, and judgment entered for the appellant.

LORD JAMES of HEREFORD. (1)  My Lords, this action is
brought by certain shipwrights, members of a trades union,
who were in April, 1894, employed by the Glengall Iron

(1) Read by Lord Shand in Lord James's absence.

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord James of
Hereford.

Company on the repairs of a ship called the *Sam Weller*.  The defendant Allen was a district delegate of the boiler-makers' union, also a trades union.  Workmen belonging to this latter union were also in the employ of the Glengall Company, and objection was taken by these workmen to the employment of the plaintiffs by the company.  This objection was founded on the fact that shortly before such employment the plaintiffs had, whilst in the employ of another firm, executed certain iron-work—a class of work which the boiler-makers' union claimed should be executed only by boiler-makers.

In order to enforce this objection one of the workmen belonging to the boiler-makers' union telegraphed to the defendant to come to the ship under repair.  He complied with the request, and in his official capacity as a district delegate had an inter-view with the boiler-makers working on the ship.  From them he learnt that their discontent on account of the shipwrights being employed by the company was so great that they (the boiler-makers) had determined at once to cease work.  Against the pursuing of such a course the defendant—the present appellant—strongly and successfully protested.  He then sought an interview with the representatives of the employing company, and informed them that if they continued to employ the plaintiffs—the present respondents—the boiler-makers would cease to work for the company.  There is a conflict of evidence as to the exact words used by the appellant in order to convey this information.  It is left in doubt whether he said that if the shipwrights' employment continued the boiler-makers would be called out by their union, or would discontinue work of their own accord.  The complexion of the evidence more favourable to the respondents ought to prevail.  The exact words used, however, do not appear to me to affect the decision that should be given in this case.

In consequence of this communication made by the appellant the company's representatives determined to discontinue the employment of the respondents.  This determination was arrived at in order to avoid the inconvenience that would arise if the boiler-makers discontinued to work on the ship under repair.  It is an important fact that by carrying this deter-

Case: 11-126    Document: 63    Page: 238    04/25/2011    272927    401

A-5537

H. L. (E.)

1897

ALLEN
v.
FLOOD.

Lord James of
Hereford.

mination into effect the company committed no unlawful act; no contract was broken ; there was simply a refusal to renew a hiring—that is, to enter into a new contract.

Upon this state of facts the respondents brought their action against the present appellant and others, the cause of action in the 5th paragraph of the claim being thus alleged : " The defendant has maliciously and wrongfully, and with intent to injure the plaintiffs, intimidated and coerced the Glengall Company to break their contracts with the plaintiffs to the plaintiffs' damage, and has further intimidated and coerced the Glengall Company and others not to enter into new contracts with the plaintiffs whereby the plaintiffs have suffered damage."

It was admitted during the trial that the first head of this claim could not be supported, for, as I have said, the Glengall Company broke no contract. The question, therefore, is confined within the second alleged cause of action. Thus your Lordships have to determine whether there was sufficient evidence given at the trial to support the allegation that the appellant "intimidated and coerced the Glengall Company " not to employ the respondents ; and, secondly, it is advisable to consider whether in any view of the appellant's conduct there was evidence to support a cause of action.

Looking at the facts, I come to the conclusion that the appellant cannot be said to have intimidated or coerced (within the legal meaning to be given to those words) the Glengall Company. It is true he informed the company's representative of the existing intention of the boiler-makers ; but that intention to discontinue work if the respondents were further employed was not formed in consequence of any words or act of the appellant. He had learnt that that intention was formed by the boiler-makers before his arrival at the ship. For him to communicate such intention to the company did not injure the respondents. The boiler-makers would have acted upon it whether the company knew or were ignorant of their resolution. For they were about to desert their work when the appellant by his threat prevented them from doing so, and prevailed upon them to give him an opportunity of communicating with the representatives of the company.

A. C. 1898.                                          3        N

H. L. (E.)
1897
ALLEN
v.
FLOOD.

Lord James of
Hereford.

For myself I believe that the appellant communicated only the boiler-makers' preformed intention; but even if he said that the union would call out the boiler-makers if the respondents were further employed, I presume he was only communicating that which he knew would be the fact, and he was therefore warning the company's representatives not to pursue a course which would be detrimental to the company's interests.

The appellant doubtless desired that the boiler-makers' view of their claim, that they alone should execute ironwork, should prevail, and, therefore, that steps should be taken to secure to them the success of that claim, and so naturally he would use solicitation and persuasion to the company's representatives with the intention of procuring the non-employment of the respondents. Thus it appears to me that the question for your Lordships' decision is thus resolved: Is it actionable for A. to solicit and persuade B. not to enter into a contract with C.?

Before dealing with the answer that ought to be given to this question, it is worthy of observation that there were three actors in the events leading to the non-employment of the respondents: (1.) the boiler-makers who refused to work with them; (2.) the appellant who communicated that refusal to the Glengall Company; and (3.) the representatives of the company who, in consequence of the expressed intention of the boiler-makers, determined not further to employ the respondents.

In all substance the injury inflicted upon the respondents proceeded in the first degree from the action of the boiler-makers, and in the second from the action of the company in yielding to the demand of the boiler-makers. That the appellant took part in the transaction is true, but he played but a very minor part, and if he had never appeared on the scene at all the injury to the respondents would have been the same, for the company would equally have exercised their option and would have refused to employ the respondents in order to secure the services of the boiler-makers. Under these circumstances it seems strange that it is not alleged that any action lies against the boiler-makers, and that it should be distinctly

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord James of
Hereford.

admitted that no cause of action can be maintained against the company.

If the principles laid down in the judgment of Lord Esher in the case of *Bowen* v. *Hall* (1) and in the case of *Temperton* v. *Russell* (2) were applied to the ordinary affairs of life, great inconvenience as well as injustice would ensue. Every competitor for a contract who alleged that he was the best person to fulfil it would be liable to an action. Take the case of an architect who seeks to be employed to the exclusion of his rivals. He says : " My plans are the best, and following them will produce the best house at the least cost. Therefore employ me and not A. or B." If he be so employed the architect would, according to the dicta in *Bowen* v. *Hall* (1), be liable to an action at the suit of his rivals. For he has induced a person not to enter into a contract with a third person, and his object clearly was to benefit himself at the expense of such third person. Indeed, if the opinion delivered by the late Cave J., that it is actionable for a cook to say to her master, " Discharge the butler or I will leave you," is correct, in that case the ingredient of " being desirous to benefit herself at the expense of a third person " is wanting. For the objection of the cook might well proceed from a motive which would not represent any gain to herself.

But I am aware that it was urged at the Bar that, even if the views which I have expressed to your Lordships be correct, there is an exception from general principles in favour of those whose trade or employment has been interfered with. I do not assent to this view. Before discussing the question it is necessary that some definition of the words " interfered with " in their legal sense should be given. Every man's business is liable to be " interfered with " by the action of another, and yet no action lies for such interference. Competition represents " interference," and yet it is in the interest of the community that it should exist. A new invention utterly ousting an old trade would certainly " interfere with " it. If, too, this loose language is to be held to represent a legal definition of liability, very grave consequences would follow.

(1) 6 Q. B. D. 333.       (2) [1893] 1 Q. B. 715.

Case: 11-126    Document: 63    Page: 241    04/25/2011    272927    401

A-5540

H. L. (E.)

1897

ALLEN
*v.*
FLOOD.

Lord James of
Hereford.

Of course the conduct of the boiler-makers in the case before your Lordships amounted to an interference with the plaintiffs' business, and yet, as has been pointed out, it is not said that an action lies against them. Every organiser of a strike, in order to obtain higher wages, "interferes with" the employer carrying on his business; also every member of an employers' federation who persuades his co-employer to lock out his workmen must "interfere with" those workmen. Yet I do not think it will be argued that an action can be maintained in either case on account of such interference. But whatever meaning may be attached to the words "interfere with," I see no ground for saying that any different rule should be applied to cases of interference with a man when carrying on his trade or business, or when he is engaged in any other pursuit. In the *Mogul Steamship Co. Case* (1) there was an extreme case of interference with the plaintiffs' business by methods which directly injured the plaintiffs in their trade for the express purpose of benefiting the defendants. The admitted interference was carried on by several defendants in a combination which in one sense amounted to a conspiracy, yet it was held by this House that no action could be maintained, for the acts done were not unlawful and the combination was not a criminal conspiracy.

My Lords, I abstain from passing in review the older cases which refer to interference with trade or business, for they have already been very fully reviewed and dealt with. I content myself with saying that I do not think they establish more than that the interference which is in itself unlawful constitutes a cause of action. It seems somewhat contrary to common sense that an interference which is rightful when applied to general subjects becomes wrongful when a trade or business is subjected to it.

For these reasons I have, after some hesitation, come to the conclusion that inasmuch as the appellant has used no unlawful means to produce a result, and that as the result produced represents nothing that is unlawful, this action cannot be maintained. I therefore think that the decision of the Court

(1) 23 Q. B. D. 598; [1892] A. C. 25.

of Appeal should be reversed, and that judgment should be entered for the appellant.

> *Order of the Court of Appeal reversed and judg-*
> *ment entered for the appellant with costs here*
> *and below including the costs of the trial ;*
> *cause remitted to the Queen's Bench Division.*

*Lords' Journals,* December 14, 1897.

Solicitors for appellant: *Shaen, Roscoe, Massey & Co.*
Solicitors for respondents: *C. J. Smith & Hudson.*

[The discussion of malicious prosecution and similar causes of action (see references in the head-note) seems independent of the actual *ratio decidendi,* but points, it is submitted, to the conclusion that in such cases evil motive is material because the defendant's act is in itself of a wrongful nature, and is privileged when done and only when done in good faith.—F. P.]

---

[HOUSE OF LORDS.]

THE GOVERNOR AND COMPANY OF
THE BANK OF IRELAND . . . . } APPELLANTS ;

AND

LOUISA McCARTHY . . . . . RESPONDENT.

*Will—General Charge of Legacies on Real Estate if Personal Estate insufficient*
*—Subsequent Specific Devise—Presumption of Law rebutted by Intention.*

A testator bequeathed pecuniary legacies to be charged in the first place upon his personalty, and if the same should be insufficient to be charged upon his real and personal estates. He then specifically devised lands at A. to G. and other lands at other places (naming them) to F. There was no residuary devise. The lands at A. and the lands specifically devised to F. formed the whole of the testator's realty. The personalty being insufficient the pecuniary legatees claimed a charge upon the lands at A. :—

*Held,* that upon the true construction of the will the testator's intention was that the lands at A. should be charged with the legacies, and that the presumption of law contra was therefore rebutted.

The decision of the Court of Appeal in Ireland, [1897] 1 I. R. 86, affirmed.

DANIEL McCARTHY, of Glencurragh, county Cork, by his will made in July 1859, after bequeathing various specific legacies and appointing under a power in a settlement the sum of 2000*l.* to his three daughters, to be paid to them respectively in equal

Status: 🖼 Positive or Neutral Judicial Treatment

## *785 ISAAC Oren and Another v Red Box Toy Factory Limited and Others

In the Patents Court

1 February 1999

**[1999] F.S.R. 785**

Mr Justice Jacob

February 1, 1999

Registered design—Foldable mattress—Validity—Whether novel—Whether a principle of construction—Expert evidence—Infringement—Two configurations on registration certificates—Whether both configurations must be infringed—Whether exclusive licensee entitled to sue—Interference with contractual relations.

Copyright, Designs and Patents Act 1988 , ss.101 and 234 .

Patents Acts 1977 , ss.67 and 68 .

Registered Designs Act 1949 , ss.1, 7 and 19 .

Stamp Act 1891 , s.14(4) .

The first plaintiff was an Israeli citizen and proprietor of a United Kingdom registered design. The second plaintiff was an Israeli company and exclusive licensee under the registered design in the United Kingdom. The registration was in respect of a square foldable mattress with hoops crossing from the corners. The certificate of registration had attached to it representations of the mattress with the hoops both in a folded ( *i.e.* flat) and unfolded ( *i.e.* erect) configuration. The defendants, in two sets of proceedings, manufactured or sold foldable mattresses of two designs (one per action) which the first plaintiff alleged were infringements of his registered design. The "Red Box" design in the first action was for a rectangular mattress in which two flaps protruded from each end, whilst the "Telly Tubbies" design in the second action was for a circular mattress. The defendants in both actions argued that:

a. the registered design was invalid in that it lacked novelty and/or was a design that covered a method of principle of construction;

b. the defendants' products were different from the registered design, either in the unfolded configuration, or in the folded configuration or in both; and

c. the second defendant, as exclusive licensee of a registered design, had no entitlement to sue for infringement.

The plaintiffs contended that the second plaintiff was entitled to sue because the defendants had unlawfully interfered with the exclusive licence agreement between the first and second plaintiffs.
*786

Held, finding that the registered design was valid and infringed by the "Red Box" product, but not infringed by the "Telly Tubbies" product, and that the exclusive licensee had no entitlement to sue for registered design infringement:

(1) When considering whether the registered design was the same as or only immaterially different from an earlier article the matter should be judged by the eye, and particularly by the eye of a consumer or potential consumer. The eye of the ordinary consumer needed no education from experts to judge an article which was not a technical product. An ordinary consumer would have seen that the registered design was visually different from the earlier article. The registered design was novel. (paras 9–12)

AMP Incorporated v. Utilux Proprietary Limited [1972] R.P.C. 103 referred to.

(2) In an area in which expert evidence was unnecessary a party should not feel that their case was disadvantaged by not having an expert. (para. 11)

(3) Expert evidence of technical or factual matters as opposed to consumer "eye appeal" may be necessary to give the court information or understanding which it could not provide itself. (para. 11)

(4) It was clear that it was possible to make a device which was visually different from the registered design, yet worked in the same way. The registered design was not a method of principle of construction. (paras 14 and 15)

(5) Although the registered design certificate included illustrations of the design in its folded configuration, the folded configuration was not a feature to which, when looked at through the eyes of a consumer, any particular significance would attach. Accordingly, when considering whether the defendants' products infringed the rights in the registered design what mattered was what the product looked like when unfolded. In their unfolded configurations the "Red Box" product but not the "Telly Tubbies" product infringed the rights in the registered design. (paras 16–23)

Portable Concrete Buildings Ltd v. Bathcrete Ltd [1962] R.P.C. 49 distinguished. Kevi A/S v. Suspa-Verein U.K. Limited [1982] R.P.C. 173 followed.

(6) An exclusive licensee had no right to sue for infringement of a registered design under the Registered Designs Act 1949 as he may do under the Copyright, Designs and Patents Act 1988 in relation to copyright or unregistered design rights or under the Patents Act 1977 in relation to patents.

(7) The actions of the defendants had not amounted to an interference with contractual relations. Whilst the infringement of the rights in the registered design might have made the exploitation of the licence less commercially successful it had not affected the contractual relationship between the first and second plaintiffs or their respective obligations in relation to the contract. (paras 29–34) *787

Thomson (D.C.) & Co. Ltd v. Deakin and Others [1952] 1 Ch. 646 referred to G.W.K. Ltd v. Dunlop Rubber Co. Ltd, 42 T.L.R. 376 distinguished.

(8) The defendants did not have the requisite intention to have committed the tort of interference with contractual relations by unlawful means. The tort required that the unlawful conduct of the tortfeasor was in some real sense aimed at the contract concerned. It was insufficient for the purposes of the tort that the defendants knew that the natural and probable consequences of their unlawful conduct was the interference. The defendants intended to sell their products. It was a matter of indifference to them whether this conduct affected the contractual relationship of the plaintiffs. (paras 35–41)

Gollins v. Gollins [1962] A.C. 644 and Millar v. Bassey and Another [1994] E.M.L.R. 44 referred to.

(9) It was not for the courts to invent a right for the exclusive licensee of a registered design to sue an infringer when Parliament had omitted to do so. (para. 42)

The following cases were referred to in the judgment:

AMP Incorporated v. Utilux Proprietary Limited [1972] R.P.C. 103 .

British Industrial Plastics Ltd. v. Ferguson [1940] 1 All E.R. 479 .

British Motor Trade Association Ltd. v. Salvadori [1949] Ch. 556 .

De Francesco v. Barnum [1890] 45 Ch.D. 430 .

G.W.K. Ltd v. Dunlop Rubber Co. Ltd, 42 T.L.R. 376 .

Gollins v. Gollins [1962] A.C. 644 .

Heap v. Hartley (1889) 42 Ch.D. 461 .

Kevi A/S v. Suspa-Verein U.K. Limited [1982] R.P.C. 173 .

Millar v. Bassey and Another [1994] E.M.L.R. 44 .

National Phonographic Co. Ltd v. Edison-Bell Consolidated Phonograph Co. Ltd, 24 T.L.R. 201; [1908] 1 Ch. 335 .

Portable Concrete Buildings Ltd v. Bathcrete Ltd [1962] R.P.C. 49 .

Thomson (D.C.) & Co. Ltd v. Deakin and Others [1952] 1 Ch. 646 .

### Representation

Peter Prescott, Q.C. , instructed by Schneider & Co. appeared for the plaintiffs. Roger Wyand, Q.C. and Ashley Roughton , instructed by Messrs Llewelyn Zietman , Messrs Turner Parkinson and Messrs Charles Russell for the defendants.

Jacob J.:

1. Mr Isaac Oren and Tiny Love Ltd sue for infringement of registered design number 2,037,060. Mr Oren is an Israeli citizen and Tiny Love Ltd is an Israeli company. It claims to have an exclusive licence under the registered design. There are two actions. The first (number 1102) is against Martin Yaffe Ltd and Argos Distributors Ltd. Argos have settled with the plaintiffs and play no part in the remainder of the action. The other action (number 1103) is against Red Box Toy Factory Ltd, Red Box Toy (UK) Ltd and Index Ltd. It is common ground that the three defendants stand or fall together.

2. Mr Oren's design registration is in respect of the application of the design to a "foldable mattress". The registration certificate has attached to it *788 representations consisting of eleven drawings. The most important are of the unfolded configuration. I reproduce them here:

Unfolded configuration—front perspective view

Unfolded configuration—rear perspective view

3. There are also drawings of the unfolded configuration from above, below and from two sides. No one suggests these drawings add anything of significance save that they make it clear that the hoops are not, as at first sight appears, of different cross-sections. There are also five drawings of the folded configuration. The most important of these I reproduce: *789

Folded configuration—perspective view

4. The statement of novelty reads as follows:

The novelty of the design resides in the features of shape or configuration applied to the article as shown in the representations.

5. I have an actual embodiment of the plaintiff's product which is called "The Gymini 3D Activity Gym". There is unchallenged evidence that since its introduction in 1994 the Gymini has been immensely successful. On a worldwide basis sales have in five years reached nearly 500,000 in all. Gymini has received several awards, for instance a "toy of the year award" in 1994 by *Parenting Magazine* of the USA. Other awards are cited in the affidavit of Mrs Oren, the wife of the first plaintiff and the managing director of the second plaintiff. She also gives unchallenged evidence that imitations of the Gymini followed very quickly upon its success. Clearly that success is due to a number of factors. These include function but in my judgment also include the design of the article—it is an elegant shape.

6. The Gymini, and its rivals, are sold for use with small babies. The baby is laid on its back underneath the hoops from which attractive things are dangled. Mr Oren was not the first to have the idea of such a product, expressed at this level of generality. Some examples of earlier products are exhibited to Mrs Oren's affidavit. They are rather clumsy by comparison with the Gymini.

### Validity

7. The validity of the registration is attacked on two grounds, alleged lack of novelty and an allegation that the design covers a method or principle of construction.

8. Section 1 of the Registered Designs Act 1949 as amended by the Copyright Designs and Patents

Act 1988, reads as follows: *790

In this Act "design" means features of shape, configuration, pattern or ornament applied to an article by any industrial process, being features which in the finished article appeal to and are judged by the eye, but does not include—

(a) a method or principle of construction, or

(b) features of shape or configuration of an article which—

(i) are dictated solely by the function which the article has to perform, or

(ii) are dependent upon the appearance of another article of which the article is intended by the author of the design to form an integral part.

A design may be registered only if it is "new" ( see section 1(2) ). By section 1(4) :

A design shall not be regarded as new for the purposes of this Act if it is the same as a design—

(a) registered in respect of the same or any other article in pursuance of a prior application, or

(b) published in the United Kingdom in respect of the same or any other article before the date of the application, or

if it differs from such a design only in immaterial details or in features which are variants commonly used in the trade.

9. The defendants attack novelty on the basis of a picture of a "Children's Dream House" illustrated in a magazine called "Asian Resources". The plaintiffs accept that this was published in August 1991 which was prior to the design registration date of August 11, 1993. Is the "Children's Dream House" the same as the registered design or does it differ from it only in immaterial details? The parties accepted that this is a matter to be judged by the eye and particularly the eye of a consumer or potential consumer—an ordinary parent or grandparent would do.

10. The defendants put in affidavits from two experts, Mr Anslow and Ms Stevenson. I have to say that I did not find either report helpful. This design is not for a technical product. The eye of the ordinary consumer needs no education from experts for this sort of article. Ms Stevenson, for instance, asserts that the registered design has "very little that is visually appealing" at all because colour print on the mat and the toys are all missing. That the colour, print and toys are missing is not a matter upon which I need expert evidence. As to her assertion that the actual shape is not visually appealing, her opinion is no better than mine. For myself, I think there is distinct visual appeal in Mr Oren's design. It has an elegance which appeals to the eye, or at least to my eye. As Lord Reid said in AMP Inc. v. Utilux Proprietary Ltd [1972] R.P.C. 103 at 107 and 108:

Those who wish to purchase an article for use are often influenced in their choice not only by practical efficiency but by appearance. Common experience shows that not all are influenced in the same way. Some look for artistic merit. Some are attracted by a design which is strange or bizarre. Many simply choose the article which catches their eye. Whatever the reason may be, one article with a particular design may sell better than one without it: then it is profitable to use the design.

Referring to finished articles sold to members of the public, he said:

The onus is on the person who attacks the validity of the registration of a design. *791 So he would have to show on a balance of probability that an article with the design would have no greater appeal by reason of its appearance to any member of the public than an article which did not have this design. Looking to the great variety of popular tastes this would seem an almost impossible burden to discharge.

11. I do not think, generally speaking, that "expert" evidence of this opinion sort (i.e. as to what ordinary consumer would see) in cases involving registered designs for consumer products is ever likely to be useful. There is a feeling amongst lawyers that one must always have an expert, but this is

not so. No-one should feel that their case might be disadvantaged by not having an expert in an area when expert evidence is unnecessary. Evidence of technical or factual matters, as opposed to consumer "eye appeal" may, on the other hand, sometimes have a part to play—that would be to give the court information or understanding which it could not provide itself.

12. The "Dream House" photographs are as follows (the originals are in colour):

To my eye, doing the best I can to envisage the "Children's Dream House", it is not only different from the registered design but materially so. The "Dream House" has blow up ribs attached to a material to make a kind of tent. The ribs form two hoops actually joined together rather than overlapping. There is not so far as I can see a mattress at all but merely a material square base. Visually one would see the hoops only as part of the whole tent whereas in Mr Oren's design one sees only the hoops. To my mind they are visually different as well as functionally different things and I believe that parents would see them as such. I bear in mind that according to the catalogue a variant of the "Dream House" was available with "see through nylon mesh roofing". I imagine the mesh would be something like muslin. I am not sure you will be able to see all of each of the "hoops" unless you looked from on top. In making my assessment I have disregarded the printing on the "roofing" actually illustrated. I think the attack on novelty fails.

13. I turn to the other attack, namely the suggestion that the registered design is to a "method of principle of construction". Mr Wyand's real point here was in the nature of "a squeeze". The "Red Box" alleged infringement *792 collapses in a different way from that shown in the registered design. So, he said, if the scope of the design is wide enough to catch the "Red Box", then the design is to the principle of a baby gym with two crossing hoops which can be folded in some manner or other.

14. I reject that argument. It is clear that it is possible to make a device which is visually very different from Mr Oren's designs but which works the same way. See for example the three alternatives illustrated schematically by Mrs Oren. One of these is a pyramid shaped device, another has loops looking like goal posts and the third has hoops consisting of four sides of a pentagon. I illustrate them below.

15. Manifestly, designs of that shape are not within the scope of the registration. It follows that there is no principle monopolised here—only a visual embodiment of a device constructed in accordance with a principle. That is so whether one regards the principle as being two crossed hoops and mattress which folds as specifically shown or as a wider principle—such as a device which folds flat somehow. I do not think the registration is to a method or principle of construction. *793

## Infringement—The Red Box

16. In its unfolded configuration the "Red Box" is to my eye extremely close to the registered design. It uses a rectangular rather than square mat, the ends of the hoops are situated at the longer edge of the rectangle but so that the four ends form a square. The thing looks like Mr Oren's with two small flaps protruding at each end. In the unfolded configuration I hold that the "Red Box" falls within section 7 of the Act. It is:

An article in respect of which the design is registered and to which that design or a design not substantially different from it has been applied.

17. To be fair, Mr Wyand did not heavily press differences in relation to the unfolded configuration. He relied upon the folded configuration. The "Red Box" hoops are fixed at their point of intersection whereas the plaintiffs are fitted together by a popper which is undone to fold it. The fixing means that when you fold the "Red Box" you have to twist the hoops so that they are nested. The mat folds in half as a consequence. You can then fold it up more or less within the arc formed by the hoops though the folded mat only extends about half way. The result looks different from the folded configuration of the registered design in which the hoops remain visibly attached to opposite corners. Moreover, in the registered design, the mattress and hoops all have much the same "footprint" and the folded hoops have a different configuration.

18. Mr Wyand said that these differences were material. There are no less than five drawings of the folded configuration. Of these three make it plain exactly how the device is to be folded. The "Red Box" is not folded that way so there can be no infringement. I do not think anything turns on the side

and edge views of the folded configurations which are particularly uninstructive but Mr Wyand's point is clearly apparent from the other three folded configuration views.

19. Mr Wyand reinforced his point by a reference to Portable Concrete Buildings Ltd v. Bathcrete Ltd [1962] R.P.C. 49 . In that case the registered design was for a fairly mundane looking portable building—a garage. The proprietor said that the "novelty lies in the shape of the article having the *794 ends coloured blue shaped in the representation." The defendant made a garage in which only one end looked like that shown in the design registration. Lloyd-Jacob J. said as follows:

But the real distinction between the designs as applied to garages or portable buildings for use as garages arises, as I see it, from the presence of the design feature at both ends in the construction to which the registered design relates and only at the entrance end in the defendants' Senator construction. It is no doubt true that in actual use the entrance face of structures such as this will be more frequently observed, not only by the user but possibly also by passers by and persons in the neighbourhood; but that, in my judgment, can be no proper reason for omitting the special shaping of the rear end when forming the mind's eye picture of the registered design, against which the question of infringement must necessarily be posed. To take a parallel, a substantial identity between the breeches or trousers and boots worn by two men would not obscure the marked differentiation that would be observable in their appearance, were one of them to have only one leg and the other two legs.

20. Mr Wyand said that just as in the garage case where the proprietor had specifically made the appearance of both ends part of his monopoly, so here the proprietor has made the appearance of the folded configuration part of his monopoly and he should be held to it. Mr Wyand postulated an alternative alleged infringement whose folded form looked very much like the pictures but whose unfolded form was different. Would that infringe he asked forensically? He suggested that if the plaintiffs were right and one could ignore the folded configuration drawings then the opposite would also be true and one could ignore the unfolded drawings.

21. I do not accept these submissions. The Act concentrates on "features which in the finished article appeal to and are judged by the eye". Suppose one had a design registration of a vase which included a picture of the underside, never seen in use. An exact imitation, even if it had a wildly different underside, would surely infringe. It would do so because the features which appeal to and are judged by the eye had been taken. Much the same approach was taken by Falconer J. in Kevi A/S v. Suspa-Verein U.K. Ltd. [1982] R.P.C. 173 , where the differing undersides of the castor of the registered design and the caster of the alleged infringement did not matter.

22. What matters in the case of this article is what it looks like when unfolded. I do not think looking at this through the eye of the consumer that any particular significance is attached to the appearance of the folded article. As a matter of convenience the article does fold and can be put away. Both articles fold flat and to my mind considering the design as a whole from a visual point of view, the "Red Box" is not substantially different. It infringes.

### Infringement—"Telly Tubbies"

23. This product differs from the registered design in that it has a circular mattress and its hoops relative to the mattress stand higher. To my eye these differences create a different visual impact from that of the registered design. I do not think the "Telly Tubbies" infringes and there is really no more to be said about it. *795

### Entitlement of Exclusive Licensee to Sue

24. Mr Oren entered in to an agreement of March 31, 1994 with Tiny Love and two other companies, Shilav and Shesek. Clause 5.14 provides (in English translation):

By signing this Agreement, Isaac Oren grants herewith to the Companies, a perpetual exclusive license, irrevocable for unlimited use (including the manner of use and/or territory), including the right to grant sub licenses, in all of his rights (the registered and the non registered), in all Patents, Trademarks and Trade names, Designs and/or Copyrights which are related to the products, and/or businesses of the Companies. Isaac Oren is obliged to sign any document and

take any action which will be needed in order to bring in to force or to maintain the validity of the License according to this Section.

The registered design is one of the rights subject to this clause. The evidence discloses that Shilav and Shesek only operate in Israel. So the registered design is not related to their businesses or products. The result is that exclusivity in the registered design is granted only to Tiny Love.

25. The original of this agreement is in Hebrew. The defendants' lawyers have seen the full text but with figures redacted. Fairly obviously the agreement is governed by Israeli law (being in Hebrew, between an Israeli citizen and Israeli companies and made in Israel). It was accepted that consideration is not a doctrine of Israeli law and it was accordingly accepted that the agreement is in force.

26. The defendants take two points in relation to the agreement, first that being unstamped the plaintiffs may not rely upon it by virtue of the provisions of underline section 14(4) of the Stamp Act 1891, which provides:

   Save as aforesaid, an instrument ... shall not, except in criminal proceedings, be given in evidence, or be available for any purpose whatever, unless it is duly stamped ...

Mr Prescott, Q.C. for the plaintiffs said that his clients had considered whether or not to give an undertaking to get the document stamped but that they had concluded that the document did not need stamping. Accordingly he said the point failed from the outset. Mr Wyand was unable to specify in detail why the document needed stamping. I think the point was not made out and that accordingly Tiny Love are entitled to rely upon their exclusive licence.

27. The Registered Designs Act 1949, as amended by the Copyright, Designs and Patents Act 1988, contains no provision entitling an exclusive licensee to bring proceedings. The only reference to the position of the licensee is contained in underline section 19(1), which provides that:

   Where any person becomes entitled by assignment, transmission or operation of law to a registered design or to a share in a registered design or becomes entitled as mortgagee, licensee or otherwise to any other interest in a registered design, he shall apply to the Registrar in the prescribed manner for the registration of his title as proprietor or co-proprietor or, if the case may be, of notice of his interests, in the register of designs."

Section 19(2) enables the licensor also to apply for registration. The sanction for non-registration is no more than that the document of title: *796

   Shall not be admitted in any court as evidence of the title of any person to a registered design or share of or interest in a registered design unless the court otherwise directs ( s.19(5) ).

This document has been duly registered as a licensee and so no point under section 19(5) arises.

28. By contrast other intellectual property statutes do make provision for an exclusive licensee to sue. Most notably section 67 of the Patents Act 1977 (following on from section 63 of the 1949 Act) and section 101 of the Copyright, Designs and Patents Act 1988 do so. In relation to patents, there is a much stronger sanction in respect of failure to register the exclusive licence: subject to a narrow exception, the right to damages is lost if the transaction is not registered within six months (see section 68).

29. And so the question of law arises: can an exclusive licensee of a registered design sue, even though the only person given an exclusive right is the registered proprietor (see section 7)? Mr Prescott asserted that he could provided that the defendant had been given notice of the exclusive licence. He said that an infringer who had such notice, from the time of such notice would be guilty of the tort of interference with contractual relations by unlawful means. He relied upon the well known passage in the judgment of Jenkins L.J. in D.C. Thomson & Co. Ltd v. Deakin [1952] 1 Ch. 646 at 693:

   With these two propositions in mind I turn to consider what are the necessary ingredients of an

actionable interference with contractual rights.

The breach of contract complained of must be brought about by some act of a third party (whether alone or in concert with the contract breaker), which is in itself unlawful, but that act need not necessarily take the form of persuasion or procurement or inducement of the contract breaker, in the sense above indicated.

Direct persuasion or procurement or inducement applied by the third party to the contract breaker, with knowledge of the contract and the intention of bringing about its breach, is clearly to be regarded as a wrongful act in itself, and where this is shown a case of actionable interference in its primary form is made out: Lumley v. Gye. 2 El. & Bl. 216 .

But the contract breaker may himself be a willing party to the breach, without any persuasion by the third party, and there seems to be no doubt that if a third party, with knowledge of a contract between the contract breaker and another, has dealings with the contract breaker which the third party knows to be inconsistent with the contract, he has committed an actionable intereference: see, for example, British Industrial Plastics Ltd v. Ferguson [1940] 1 All E.R. 479 , where the necessary knowledge was held not to have been brought home to the third party; and British Motor Trade Association v. Salvadori [1949] Ch. 556 . The inconsistent dealing between the third party and the contract breaker may, indeed, be commenced without knowledge by the third party of the contract thus broken; but, if it is continued after the third party has notice of the contract, an actionable interference has been committed by him: see, for example, De Francesco v. Barnum [1890] 45 Ch.D. 430 .

Again, so far from persuading or inducing or procuring one of the parties to the contract to break it, the third party may commit an actionable intereference with the contract, against the will of both and without the knowledge of either, if, with knowledge of the contract, he does an act which, if done by one of the parties to *797 it would have been a breach. Of this type of interference the case of G.W.K. Ltd v. Dunlop Rubber Co. Ltd 42 T.L.R. 376 affords a striking example.

Further, I apprehend that an actionable interference would undoubtedly be committed if a third party, with knowledge of a contract and intent to bring about its breach, placed physical restraint upon one of the parties to the contract so as to prevent him from carrying it out.

It is to be observed that in all these cases there is something amounting to a direct invasion by the third party of the rights of one of the parties to the contract by prevailing upon the other party to do, or doing in concert with him, or doing without reference to either party, that which is inconsistent with the contract; or by preventing, by means of actual physical restraint, one of the parties from being where he should be, or doing what he should do, under the contract.

30. Mr Prescott also relied upon G.W.K., Jenkins L.J.'s "striking example". What happened there was that GWK, who made cars had agreed with the other plaintiff who made "Bal-lon-ette" tyres that all new cars made by GWK should, when sold or offered for sale, be fitted with "Bal-lon-ettes" except in cases where a customer gave express instructions to the contrary. Prior to an important exhibition, agents of Dunlop snuck in and swapped the "Bal-lon-ette" tyres for Dunlop tyres. So when the exhibition opened the GWK car had the wrong tyres on. The substitution of the tyres was a trespass to goods and it is not surprising that the plaintiffs succeeded against Dunlop. The report of Lord Hewart C.J.'s judgment reads as follows:

In Quinn v. Leathem 17 T.L.R., 749; [1901] A.C. 495 , Lord Macnaghten said, at page 510:

Speaking for myself, I have no hestitation in saying that I think the decision [ i.e., in Lumley v. Gye, 2 E. and B. , 216] was right, not on the ground of malicious intention—that was not, I think, the gist of the action—but on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognised by law, if there be no sufficient justification for the interference.

Lord Lindley, at page 535 of the same case, said:

But if the interference is wrongful and is intended to damage a third person, and he is damaged in fact—in other words, if he is wrongfully and intentionally struck at through

others, and is thereby damnified—the whole aspect of the case is changed: the wrong done to others reaches him, his rights are infringed although indirectly, and damage to him is not remote or unforeseen, but is the direct consequence of what has been done. Our law, as I understand it, is not so defective as to refuse him a remedy by an action under such circumstances ... The principle which underlies the decision [ i.e., in Lumley v. Gye, supra ] reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him.

In National Phonographic Company Limited v. Edison-Bell Consolidated Phonograph Company Limited 24 T.L.R. 201; [1908] 1 Ch. 335 , the Court of Appeal held that the principles laid down in the foregoing passages were not confined to cases of conspiracy, and applied them to a case in which, it was true, the facts were different from those in the present case, but in which, in his opinion, there was not, with reference to the application of the principles of law involved, any essential distinction in the facts.

In his opinion the defendants had knowingly committed a violation of the A.R.M. Company's legal rights by interfering, without any justification *798  whatever, with the contractual relations existing between them and the G.W.K. Company, and he thought that the defendants so interfered with the intention of damaging the A.R.M. Company, and that the company had been thereby damnified.

31. Mr Wyand took two points. First he said that his client's activities did not amount to an interference with contractual relations. Secondly, he said that his clients did not have any relevant intention to interfere with contractual relations. I think he was right on both points.

32. It is important, before considering whether there was an interference, to analyse just what the contract between Mr Oren and Tiny Love provided. It seems to me that it amounted to three elements:

(1) A licence. This in law amounted to no more than rendering lawful any act which might be done by Tiny Love within the scope of protection of the registered design.

(2) A grant of exclusivity. This in law meant that Mr Oren would not licence any other party and not to exploit the design himself.

(3) An obligation on Mr Oren to take all necessary administrative acts to keep the licence valid. Such acts would include, for instance, signing documents or making appropriate registrations.

33. It is not suggested that obligation (3) is affected by anything done by the defendants. Elements (1) and (2) are not matters requiring performance. They merely adjust the legal rights of the parties. Neither of them are altered or impeded in any way by the activities of infringement. It is true that the exploitation of the licence may not have been so successful commercially by reason of the infringement, but the contractual relations and their performance remain completely unaffected. I do not think that there was any interference with the contract between Mr Oren and Tiny Love.

34. By contrast, if one considers the G.W.K. case, one can see that the performance of the contract was affected by Dunlop's trespass. GWK had contracted to exhibit their cars with "Bal-lon-ette" tyres. They had exhibited with Dunlop tyres instead. So they had not done what they had contracted to do. It may be that they would have had a defence to a claim for breach of contract based upon the doctrine of frustration but there is no doubt that the performance of the contract was impeded.

35. As to the question of intention, Mr Wyand submitted that his clients had no intention of interfering with contractual relations. Their intention was to sell their products and it remained unaffected by their being informed of the exclusive licence. Mr Prescott said that it was enough for the tort for him to show that interference was the natural and probable consequence of the defendants' activities and that the defendants knew this was so.

36. Natural and probable consequence and intention have always been matters which the law finds difficult. In Gollins v. Gollins [1964] A.C. 644 at 664, Lord Reid observed:

In fact people often intend something quite different from what they know to be the natural and probable result of what they are doing. To take a trivial example, *799  if I say I intend to reach the green, people will believe me although we all know that the odds are ten to one against my

succeeding; and no-one but a lawyer would say that I must be presumed to have intended to put my ball in the bunker because that was the natural and probable result of my shot.

37. Are these defendants, like Lord Reid's golfer, intending to put their ball in the bunker? If Mr Prescott were right then, once a defendant had sufficient notice of a contract, a defendant guilty of any unlawful conduct which affected contractual relations of any third parties, would be liable for the tort. This would be so, however unrelated to the contract the unlawful conduct was. I do not think the cases go that far: the unlawful conduct must in some real sense be "aimed at" the contract.

38. Mr Prescott particularly relied upon Millar v. Bassey [1994] E.M.L.R. 44 but I do not think it supports him. Miss Bassey refused to perform her contract with her recording company Dreampace. As a result Dreampace could not deliver an album to the plaintiffs which it had contracted to do. The Court of Appeal was dealing with a strike out application in which it was complained that there was no pleading of a specific intention by Miss Bassey to interfere with the contract between Dreampace and the plaintiffs. Beldam L.J. said that Miss Bassey:

Must have intended that Dreampace would be unable to fulfil its obligations to the appellants. In such circumstances it seems to me unnecessary to assert a specific intention to interfere with the performance of the appellants' contracts which must necessarily follow from her own refusal to perform her obligations to Dreampace. In the absence of any explanation advanced by the respondent for her actions, the only reasonable inference is that in refusing to perform she must have had a purpose of her own to serve which she pursued at the expense of the plaintiffs' right to contractual performance by Dreampace of its obligations.

Peter Gibson L.J. dissented, saying:

In *Clerk & Lindsell on Torts,* 16th ed. (1989), para. 15-03, it is said of the tort of procuring a breach of contract:

The plaintiff must show that there was an intentional invasion of his contractual rights and not merely that the breach of contract was the natural consequence of the defendant's conduct.

(See also para. 15-19 and the illuminating article by Hazel Carty: Intentional Violation of Economic Interests (1988) 104 L.Q.R. 250 .)

There are strong policy reasons why the law should restrict the ambit of the tort in this way. The tort gives a plaintiff a right of action in respect of a failure to comply with the terms of a contract against a person who is not a party to the contract. This is inconsistent with contractual principles, in particular in breaching the privity rule (see Cane: *Tort Law and Economic Interests* (1991), pp. 122–125). As Hobhouse J. said in Rickless v. United Artists Corporation [1986] F.S.R. 502 at 524 of the tort of wrongful interference with contractual relations:

Unless the tort is to become virtually equivalent to the enforcement of contracts against third parties, it must remain an essential element of the tort that the interference occurs with the requisite actual intent [sc. To cause a breach of the plaintiff's contract].

39. Ralph Gibson L.J. "inclined" to the view of Peter Gibson L.J. but felt it inappropriate to decide the point of law on a strike out application.

40. I, with great respect, think that Peter Gibson L.J. was right. If it were *800 necessary I would therefore conclude that the defendants did not have the requisite intention. All they wanted to do was to sell their product: whether or not it affected anyone's contract was a matter of indifference to them.

41. I should refer to one other case, Heap v. Hartley (1889) 42 Ch.D. 461 . It was decided at a time when Parliament had not conferred a right to sue on an exclusive licensee under a patent. The Court of Appeal held on the facts that a notice of the exclusive licence had not been adequately given. It also held that an exclusive licence was not a grant of property like the actual grant of a patent right. It analysed an exclusive licence in just the same way as I have done above. Cotton L.J. thought that the consequence ( *i.e.* that the plaintiff had no patent right) meant he should fail. So also did Fry L.J. Whether or not a cause of action lay in unlawful interference with contractual relations remained

undecided. The case does not assist.

42. I would add this: the right to sue under intellectual property rights created and governed by statute are inherently governed by the statute concerned. Parliament in various intellectual property statutes has, in some cases, created a right to sue, and in others not. In the case of the 1988 Act it expressly re-conferred the right on a copyright exclusive licensee, conferred the right on an exclusive licensee under the new form of property called an unregistered design right (see section 234) but did not create an independent right to sue on a registered design exclusive licensee. It is not for the courts to invent that which Parliament did not create.

43. That is not to say that those in the position of an exclusive licensee under a registered design necessarily have no remedy of their own. They could, for instance, arrange for a right to sue in the name of the registered proprietor. And they may well have a right themselves to be registered as proprietors, as suggested by Mr Blanco White, Q.C. in his still invaluable work *Patents for Inventions and the Protection of Industrial Designs* (4th ed. (1974)). At paragraph 12-102 Mr Blanco White suggests that an exclusive licensee whose exclusivity extends to manufacture is a "proprietor" by virtue of section 2(2) and can accordingly insist on registration and then sue. If that is right then of course there would be no question of outflanking the scheme set up by the Act, merely its implementation. Whether or not, if he can be so registered, an exclusive licensee can sue for past infringements would be a further point to be decided, if and when it arises.

44. In end, however, I conclude that Tiny Love has no cause of action. Mr Oren's claim against Red Box succeeds, that against Martin Yaffe fails, as do the two counterclaims. *801

© 2010 Sweet & Maxwell



Case: 11-126    Document: 63    Page: 254    04/25/2011    272927    401

A-5553

A

[COURT OF APPEAL]

R.C.A. CORPORATION AND ANOTHER v. POLLARD

[1981 R. No. 1981]

B  1982  June 29, 30;                                    Lawton, Oliver and
          July 1; 22                                         Slade L.JJ.

*Tort—Cause of action—Whether arising from commission of
statutory offence—Plaintiffs having exclusive recording rights—
Sale of unlawful recordings—Resultant damage to plaintiffs'
property rights—Whether cause of action against dealer—
Dramatic and Musical Performers' Protection Act 1958 (6 & 7
Eliz. 2, c. 44), s. 1*

C

The plaintiffs claimed the exclusive right to exploit for
profit recordings of the performances of a musical performer.
Recordings of performances were made without the consent
of the performer and offered for sale in contravention of section
1 of the Dramatic and Musical Performers' Protection Act
1958.[1] The plaintiffs issued a writ alleging that the defendant
was knowingly dealing in such unlawful recordings, thereby
causing damage to private or proprietary rights of the plaintiffs
which they were entitled to have protected from such inter-
ference, and seeking consequential relief. The defendant applied
for an order striking out the statement of claim on the ground
that it disclosed no reasonable cause of action. The judge
dismissed the application.

E

On appeal by the defendant:—

*Held,* allowing the appeal, that there was no jurisdiction to
grant the plaintiffs relief against the defendant in relation to
the commission of offences under the Dramatic and Musical
Performers' Protection Act 1958 on the ground that damage
was thereby being caused to a property interest of the
plaintiffs; that recording companies did not fall within a class
of persons for whose benefit or protection the Act of 1958
was passed so as to enable them to bring proceedings to
restrain breaches of its provisions; and that, accordingly, the
statement of claim disclosed no reasonable cause of action and
would be struck out (post, pp. 147H—148D, F—G, 150C—D, H—
151A, 154C—E, 157B—C, H—158A).

*Lonrho Ltd.* v. *Shell Petroleum Co. Ltd. (No. 2)* [1982]
A.C. 173, H.L.(E.) applied.

G

*Ex parte Island Records Ltd.* [1978] Ch. 122, C.A. not
followed in part.

*Emperor of Austria* v. *Day and Kossuth* (1861) 3 De G. F.
& J. 217 and *Springhead Spinning Co. Ltd.* v. *Riley* (1868)
L.R. 6 Eq. 551 considered.

Decision of Vinelott J. [1982] 1 W.L.R. 979; [1982] 2 All
E.R. 468 reversed.

H

[1] Dramatic and Musical Performers' Protection Act 1958, s. 1: "...if a person
knowingly—(*a*) makes a record...of the performance of a dramatic or musical
work without the consent in writing of the performers, or (*b*) sells or lets for hire,
or distributes for the purposes of trade...a record made in contravention of this
Act...he shall be guilty of an offence under this Act..."

136

A

The following cases are referred to in the judgments:

*Austria (Emperor of)* v. *Day and Kossuth* (1861) 3 De G. F. & J. 217.
*Beaudesert Shire Council* v. *Smith* (1966) 120 C.L.R. 145.
*Coote* v. *Stone* [1971] 1 W.L.R. 279; [1971] 1 All E.R. 657, C.A.
*Cutler* v. *Wandsworth Stadium Ltd.* [1949] A.C. 398; [1949] 1 All E.R.
    544, H.L.(E.).
*Dyson* v. *Attorney-General* [1911] 1 K.B. 410, C.A.
*Exchange Telegraph Co. Ltd.* v. *Gregory & Co.* [1896] 1 Q.B. 147, C.A.

B

*G.W.K. Ltd.* v. *Dunlop Rubber Co. Ltd.* (1926) 42 T.L.R. 376.
*Gorris* v. *Scott* (1874) L.R. 9 Ex. 125.
*Gouriet* v. *Union of Post Office Workers* [1978] A.C. 435; [1977] 3
    W.L.R. 300; [1977] 3 All E.R. 70, H.L.(E.).
*Island Records Ltd., Ex parte* [1978] Ch. 122; [1978] 3 W.L.R. 23; [1978]
    3 All E.R. 824, C.A.
*Lonrho Ltd.* v. *Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173; [1981]

C

    3 W.L.R. 33; [1981] 2 All E.R. 456, H.L.(E.).
*Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D.
    598, C.A.
*National Phonograph Co. Ltd.* v. *Edison-Bell Consolidated Phonograph
    Co. Ltd.* [1908] 1 Ch. 335, C.A.
*Prudential Assurance Co.* v. *Knott* (1875) L.R. 10 Ch.App. 142.
*Springhead Spinning Co.* v. *Riley* (1868) L.R. 6 Eq. 551.

D

*Thomson (D. C.) & Co. Ltd.* v. *Deakin* [1952] Ch. 646; [1952] 2 All E.R.
    361, C.A.

The following additional cases were cited in argument:

*Pcuk* v. *Diamond Shamrock Industrial Chemicals Ltd.* [1981] F.S.R. 427
*Warnink (Erven) Besloten Vennootschap* v. *J. Townend & Sons (Hull)
    Ltd.* [1979] A.C. 731; [1979] 3 W.L.R. 68; [1979] 2 All E.R. 927,
    H.L.(E.).

E

APPEAL from Vinelott J.

By writ dated June 25, 1981, it was alleged that the first plaintiffs,
R.C.A. Corporation, had at all material times the benefit of exclusive record-
ing contracts with Elvis Presley whereby they were entitled to the exclusive
right to exploit for profit records of all performances of Elvis Presley; that

F

the second plaintiffs, R.C.A. Ltd., were at all material times licensed by the
first plaintiffs in respect of the manufacture, sale and distribution in the
United Kingdom of records of the performances of Elvis Presley; that in
the premises the plaintiffs had the right to the exclusion of all others (in
particular the defendant, Geoffrey Pollard) to exploit for profit records of
the performances of Elvis Presley; that the plaintiffs had private or

G

proprietary rights and interests which they were entitled to have protected
from unlawful interference which caused them damage; that "bootlegging"
(acting in contravention of the Performers' Protection Acts 1958 to 1972)
caused loss and damage to those rights and interests; and that the
defendant had been bootlegging and dealing in bootleg records of
performances of Elvis Presley. The plaintiffs claimed (1) a declaration that

H

the defendant was not entitled to engage in making or selling or letting
for hire or distributing for the purpose of trade or by way of trade exposing
or offering for sale or hire or using for the purposes of a public performance

A    any record of a performance or performances of Elvis Presley without the
consent in writing by or on behalf of Elvis Presley, and that the doing
of any such act was an unlawful interference of the proprietary rights of
the plaintiffs; (2) an injunction to restrain the defendant from doing such
acts; (3) an order that the defendant deliver up to the plaintiffs' solicitors
each and every record in his possession, power, custody or control the
sale of which without the licence of the plaintiffs would be in breach of
B    the injunction prayed for, and that within seven days thereafter the
defendant make and serve on the plaintiffs' solicitors a true affidavit
stating that that order had been complied with; (4) special damages of
£360·50 plus interest; (5) an inquiry as to damages; (6) costs; and (7)
further or other relief. The defendant gave notice that the court would
be moved on November 16, 1981, for an order that the statement of
C    claim be struck out on the grounds that it disclosed no reasonable cause
of action and/or in the exercise of the inherent jurisdiction of the court.
On February 26, 1982, Vinelott J. refused to make any order on the
motion save that the plaintiffs' costs of the motion were to be borne by the
defendant in any event.

The defendant appealed by notice dated April 26, 1982, on the grounds
D    that (1) the judge wrongly held on the facts alleged in the statement of
claim that the first plaintiff might be able to show that it had a right of
property in performances by Elvis Presley which it had the exclusive right
to record, and that the acts of the defendant complained of were unlawful
interferences with that right of property giving a right of action to the
plaintiffs; (2) the judge wrongly held as a matter of law that an exclusive
E    contract for the services of a recording artist was capable of being a right
of property, damage to which caused by an act unlawful in itself gave a
right of action to the person with whom the artist made the contract; (3)
the judge, having rightly held that a breach of the Performers' Protection
Acts 1958 to 1972 did not give to persons other than the performers
affected by such breach a right of action against the person committing
such breach, wrongly held that record companies who had at some time
F    had an exclusive recording contract with the performer might nonetheless
bring an action for damages in respect of such breach; (4) the judge
wrongly assumed that on the facts alleged in the statement of claim the
defendant was guilty of distributing in the course of trade bootleg records
of performances of Elvis Presley, the plaintiffs being the owners of
legitimate recordings of the same performances; (5) the judge wrongly
G    held that a person who had no part in the wrongful recording of the
performance of a performer under an exclusive contract to a recording
company, but whose breach of the Performers' Protection Acts 1958 to 1972
consisted in copying or distributing for the purposes of trade bootleg
records made by others committed an act which was capable of infringing
any property right which the recording company might have; (6) the judge
should have held that the Performers' Protection Acts 1958 to 1972 and
H    the Copyright Act 1956 provided a complete code for the protection of
the interests of the performers in their performances and of the producers
of phonograms in the records produced by them, and that no rights of
action existed in respect of breaches of those statutes other than those

138

which on a true construction were provided by the statutes themselves; and <span style="float:right">A</span>
(7) the judge should have held that the statement of claim disclosed no
reasonable cause of action against the defendant.

By respondent's notice dated May 5, 1982, the plaintiffs gave notice of
their intention to contend that the judge's decision should be affirmed on
the additional grounds that (1) the Performers' Protection Acts 1958 to
1972 were passed not only for the protection of performers but also for
recording companies which had exclusive contracts with performers; (2) <span style="float:right">B</span>
accordingly those Acts conferred a civil right of action on such recording
companies; (3) a person who suffered damages in consequence of contra-
vention by another individual of any statutory provision had a civil right of
action if the damage was of the kind which the statute was designed to
prevent, and was suffered by a person who was a member of the class which
the statute was designed to protect notwithstanding that it did not confer <span style="float:right">C</span>
any private right on the members of that class; and (4) the recording
companies having exclusive recording contracts with performers were
members of the class which the Performers' Protection Acts 1958 to 1972
were designed to protect.

The facts are stated in the judgment of Lawton L.J.

*Nicholas R. Pumfrey* for the defendant.  As the judge rightly held, <span style="float:right">D</span>
on a true construction the Performers' Protection Acts 1958–1972 do not
give to persons other than performers affected by a breach of the Acts a
right of action against the person committing such breach.

Where a person suffers loss by reason of a contravention by another
of the provisions of a penal statute an action lies at the suit of the person
suffering such loss only if the statute, on a true construction, confers such
a right of action: see *Lonrho Ltd.* v. *Shell Petroleum Co. Ltd. (No. 2)* <span style="float:right">E</span>
[1982] A.C. 173, 183.

But the judge held that the plaintiffs might be able to sue the defendant
for the tort of unlawful interference with rights of property.  The judge's
formulation of such a tort was too wide and the principle involved
inappropriate to the facts of the present case.

The only question which the judge should have asked is the one <span style="float:right">F</span>
enunciated in *Cutler* v. *Wandsworth Stadium Ltd.* [1949] A.C. 398.
Returning to the *Lonrho* case [1982] A.C. 173, 183, 187, Lord Diplock
states that where a statute is a penal one the question is: does that statute
on its true construction afford a right of action to the plaintiff? In relation
to the Dramatic and Musical Performers' Protection Act 1958, Lord
Diplock suggested that the answer was in the affirmative in respect of <span style="float:right">G</span>
performers but left it open in regard to record companies.  The judge
answered the question—the only question in a case of this nature—in the
negative in the present case and having done so, there was nothing further
to be said.

The Copyright Act 1956 confers rights of action on copyright owners
in relation to infringements and also creates various offences in relation
to dealing with infringing copies.  The position under the Performers' <span style="float:right">H</span>
Protection Acts is different: while imposing various criminal sanctions in
regard to acts in relation to live performances, the Acts do not give the
right of civil action to a performer whose performance has been boot-

A    legged.   In the general scheme of the statutes, therefore, there is a very clear division between rights of action and sanctions.

Before *Lonrho Ltd.* v. *Shell Petroleum Co. Ltd.* (No. 2) [1982] A.C. 173 there were two authorities which stated that the Performers' Protection Acts did not confer on performers a civil right of action for breach of the statutes and which held that the only remedy was a criminal one with the imposition of penalties under the Acts.

B    The effect of Lord Diplock's speech in *Lonrho* was twofold: besides holding that the Act of 1958 was an Act to protect performers, it stated that, if and in so far as *Ex parte Island Records Ltd.* [1978] Ch. 122 relied on the wide principle that when a lawful business of an individual suffers damage as the consequence of a contravention by another of any statutory prohibition he has a civil right of action, it was wrong.  In the light of what was argued and what was decided in *Lonrho* the statement

C    of claim in the present case discloses no arguable point.

Lord Diplock said that so far as the performers were concerned the order in *Ex parte Island Records Ltd.* could have been made on purely orthodox principles, i.e. *Cutler* v. *Wandsworth Stadium Ltd.* [1949] A.C. 398, but he expressly left open the question of whether the record companies would have had a right of action on their own.  To apply the

D    orthodox test one asks: does the statute confer either a right of action on a defined class of which the plaintiff is a member or a public right in relation to which the plaintiff has suffered special damage?  Both possibilities were considered by the judge in the present case and decided against the plaintiffs.  If the plaintiffs are not members of a special class and there is no enforceable public right, that should be an end of the

E    matter.  It was inconsistent, in view of the decision in the *Lonrho* case [1982] A.C. 173, for the judge to go on to say that there was an actionable right of unlawful interference with the plaintiffs' property rights.  [Reference was made to *Ex parte Island Records Ltd.* [1978] Ch. 122.]

However, if that is wrong and an unlawful act which damages a right of property is actionable at the suit of the person whose right is damaged,

F    as between the record company and the recording artist the rights are too nebulous to be capable of being protected by an action of that sort. It is not plain that the right to which the judge refers is the same as the property right under consideration in *Ex parte Island Records Ltd.*  The grounds on which Waller L.J. found in favour of granting the order in *Ex parte Island Records Ltd.* [1978] Ch. 122, 144–145 were inconsistent

G    with the principles in *Lonrho* and must be taken to have been rejected. In any case, *Island Records* was only concerned with the jurisdiction to grant an interlocutory injunction, not a claim for damages.

The person who made the illicit recording did not interfere with the obligation placed on the performer by his contract; a fortiori, any person who deals with it in the course of trade and ex hypothesi knows that it was made without consent has no connection with any right of property

H    the plaintiffs may have as regards the performer and does nothing which affects the performance of the contract though it might affect its commercial value.

In *Exchange Telegraph Co. Ltd.* v. *Gregory & Co.* [1896] 1 Q.B.

140
          **R.C.A. Corpn. v. Pollard (C.A.)**         **[1983]**

147 there was a direct inducement to act in breach of contract. Similarly, A
in *National Phonograph Co. Ltd.* v. *Edison-Bell Consolidated Phono-
graph Co. Ltd.* [1908] 1 Ch. 335 there was a direct and intentional
interference with the contract. Neither case is authority for the wider
proposition relied on by the judge in the present case.

    Though the tort of interference with contractual rights is not limited
to inducing a breach of contract, the defendant is not doing anything
which might fall within such wider scope. In *Lonrho* [1982] A.C. 173, B
187–188 Lord Diplock expressly said that it is not the law of England
that unlawful interference with trade is actionable.

    [Reference was made to *Erven Warnink Besloten Vennootschap* v.
*J. Townend & Sons (Hull) Ltd.* [1979] A.C. 731.] In *Pcuk* v. *Diamond
Shamrock Industrial Chemicals Ltd.* [1981] F.S.R. 427 it was said that a C
sole licensee of a patent could sue for unlawful interference with his trade
relying on the *Island Records* case [1978] Ch. 122, though he had no
statutory cause of action. But a patent right is itself a right of property
and a licence thereunder can also be a right of property.

    If the judge is right the provisions of the statute can be circumvented
and a right of action conferred where the statute provides none.

    *Robin Jacob Q.C.* and *Mary Vitoria* for the plaintiffs. Acceptance of D
the propositions advanced by the defendant would mean that record
companies have no cause of action to prevent what amounts to a crime
and strikes at the heart of their business and affects their exclusive
contractual rights.

    It is sufficient for the plaintiffs that they have an arguable cause of
action, and one of the possible bases for the plaintiffs' cause of action, and
which the defendant seeks to strike out, is a matter which has been expressly E
left open by the House of Lords in *Lonrho Ltd.* v. *Shell Petroleum Co.
Ltd. (No. 2)* [1982] A.C. 173. In those circumstances the court should
be slow to accede to his application.

    The defendant's whole argument hinges on the *Lonrho* case and he
has to say that a series of lower court decisions were overruled by that
case. F

    The jurisdiction of the court of equity to protect property rights and
rights akin to rights of property is not as narrow as the defendant
submits: see R.S.C., Ord. 104, r. 2, note 10; *Emperor of Austria* v. *Day
and Kossuth* (1861) 3 De G.F. & J. 217, 253–254 and *Springhead Spinning
Co.* v. *Riley* (1868) L.R. 6 Eq. 551, 558–559, 560. The *Emperor of
Austria's* case which is equivalent to a Court of Appeal decision, has G
remained unchallenged since it was decided and was not an interlocutory
case.

    The performance of a contract can be the subject of an interference
and though there is no breach by either party the court will intervene.
The essential ingredient of the recording contract is that there should
be no records of the performer other than the plaintiffs'. There does
appear to be a jurisdiction when there is a direct interference with the H
intentions of the parties to a contract which goes to the very heart of the
contract and which is unlawful.

    [Reference was made to *Prudential Assurance Co.* v. *Knott* (1875)

1 Ch.                    R.C.A. Corpn. v. Pollard (C.A.)

A  L.R. 10 Ch.App. 142 and *Gouriet* v. *Union of Post Office Workers* [1978]
A.C. 435.] There remains the principle after *Gouriet's* case that someone
who suffers special damage to a property interest as a result of a criminal
act can sue, provided the damage is connected with the criminal act.

To obtain an injunction under the principle based on some statutory
obligation or duty, a plaintiff must establish one of two things: a private
civil right of action conferred by the statute, or special damage over and
B  above that sustained by the public of the kind the statute was designed to
prevent. As a result of the defendant's breach of the Performers' Pro-
tection Acts 1958–1972, the plaintiffs and the estate of the performer in
the present case are suffering special damage over and above any damage
suffered by the public at large.

[OLIVER L.J. The only interest the public has in the present matter
C  is a general interest in securing that the law is observed, but in *Gouriet's*
case that was said to be insufficient.]

In that case *Gouriet's* case shows that the *Springhead Spinning Co. Ltd.*
v. *Riley*, L.R. 6 Eq. 551, principle is not dead but very much alive.

In *Ex parte Island Records Ltd.* [1978] Ch. 122, 128 three arguments
were put forward as a basis of jurisdiction: (1) damaging a man's business
by unlawful interference (see Lord Denning M.R. at p. 136); (2) the
D  jurisdiction of the court of equity to protect property rights damaged by a
crime (see Waller L.J. at pp. 144–145 and Lord Denning M.R. at p. 135);
and (3) the Act of 1958 on a true construction provided the plaintiffs
with a right of action.

[Reference was made to *National Phonograph Co. Ltd.* v. *Edison-Bell
Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, 335–336, and *G.W.K.
E  Ltd.* v. *Dunlop Rubber Co. Ltd.* (1926) 42 T.L.R. 376.] The tort of
interference with contractual relations has become an important part of
the law and developed because the courts decided that it was not
sufficient to leave the parties to their contractual rights. It is an elabora-
tion of the principle that the court of equity will act to protect property
rights being damaged by a crime, which was the narrower ground of the
decision in the *Island Records* case [1978] Ch. 122 to which the
F  strictures in Lord Diplock's speech in *Lonrho's* case [1982] A.C. 173 did
not extend.

It would be most unfortunate if any distinction was drawn between
the original bootlegger and those further down the chain whose dealings
are carried out via the original tortfeasor. It would be wrong to regard
the activities of such a person as not affecting the contract directly.

G  *Pumfrey* in reply. The "tort" of interference with property rights
by a wrongful act, as formulated by the plaintiffs, does not have inherent
in it any element of knowledge so far as concerns those further down the
chain, and that would raise a very difficult tort indeed.

The right being relied on in the present case is the hope of profit
arising out of the recording contract. That is as vague and inchoate a right
as that relied on in the *Emperor of Austria's* case, 3 De G.F. & J. 217.
H  That case was interlocutory and is not authority for the proposition that
the Emperor of Austria did have a right of action: the injunction was
granted to protect his right if at the trial it was found to exist: see
pp. 238, 240, 253–254.

142

R.C.A. Corpn. v. Pollard (C.A.)                    [1983]

*Lonrho Ltd.* v. *Shell Petroleum Co. Ltd.* (*No.* 2) [1982] A.C. 173    A
was the first case in which a penal statute was involved in the formulation
of a tort of the sort the plaintiffs are seeking to establish, and the answer
which the House of Lords gave was that one must apply the principles in
*Cutler* v. *Wandsworth Stadium Ltd.* [1949] A.C. 398.

The *National Phonograph* case [1908] 1 Ch. 335 is distinguishable
because it did not involve a penal statute. If the plaintiffs' formulation
of the tort is correct, it is difficult to see why the plaintiffs in that case did    B
not succeed in respect of the dealers' transactions, since there was an
unlawful act by the dealers and damage to an expectation arising out
of a contract.

The Performers' Protection Acts and the Copyright Act 1956 provide a
complete code to deal with the situations which arise in the manufacture of
records and, though Parliament was obviously aware of the problem of    C
wrongful recording of performances, it gave no right in relation thereto
to recording companies whose business might be adversely affected.

*Cur. adv. vult.*

July 22.  The following judgments were read.

LAWTON L.J.  When opening the plaintiffs' case Mr. Jacob stated that    D
the issue raised in the appeal was of the greatest importance in the record-
ing industry, of which both plaintiffs are leading members.  Broadly it can
be stated in these terms.  The recording companies invest large sums in
fees to artistes and in paying for high quality recordings of their songs and
music and for the marketing of the results of their efforts and expenditure.
If the defendant's contentions are right anyone making a recording of an    E
artiste's performance, without his consent, in a theatre or at a concert or
elsewhere can market that recording (known in the recording industry as a
bootleg recording) without paying any fee to the artiste and in competition
with the recording companies who have paid fees and incurred great
expense in marketing their products.  This is said to be so notwithstanding
that under section 1 of the Dramatic and Musical Performers' Protection
Act 1958 making such recordings and selling, letting for hire or distributing    F
them for the purposes of trade is a criminal offence punishable by a fine.

There can be no doubt that the making and distribution of bootleg
records is causing serious economic loss to the recording companies. Until
the decision of the House of Lords in *Lonrho Ltd.* v. *Shell Petroleum
Co. Ltd.* (*No.* 2) [1982] A.C. 173 the recording companies were confident
that English law provided them with remedies by way of injunction and
damages against those who made or distributed bootleg records. This was    G
because of the decision of this court in *Ex parte Island Records Ltd.* [1978]
Ch. 122.

The defendant, by his counsel Mr. Pumfrey, has submitted that the
*Lonrho* case has, by necessary implication, overruled the *Island Records*
case and has left the recording companies without a civil remedy against
bootleggers. The problem for which we have to find an answer comes    H
before this court by way of an appeal by the defendant from a refusal by
Vinelott J. on February 26, 1982, to strike out the plaintiffs' statement of
claim against him. As striking out is a matter of judicial discretion, at

1 Ch.                R.C.A. Corpn. v. Pollard (C.A.)                Lawton L.J.

A  least to some extent, we discussed with counsel whether this procedure
was the best way of getting an important point decided. Mr. Pumfrey
persuaded me that what had to be decided was a matter of law; that there
were enough averments of fact in the statement of claim for this court to
reach a conclusion; that even if the statement of claim were not struck
out, he would advise the defendant to raise the same issue in his defence
and apply under R.S.C., Ord. 33 for points of law to be argued; and
B  finally that a decision in this appeal would result in a great saving of costs,
which was of particular importance because the defendant was legally
aided.

    The statement of claim starts by defining some of the expressions used
in it and in particular the words " exclusive recording contract." It is
defined as:

C      " a contract between two parties whereby the first party has the right
    to the exclusion of all others to exploit for profit records of the
    performances of the second party and whereby the second party has
    the right to receive, directly or indirectly, royalties or other remuner-
    ation or gain the value of which depends on the success of such
    exploitation and whereby that second party expressly or impliedly
    contracts not to consent, either in writing or at all, to persons other
D      than the first party or those approved by the first party making
    records of his performances."

It goes on in paragraph 2 to aver that the plaintiffs and each of them at all
material times have been engaged in the business of making and distributing
records of a wide variety of music. The third paragraph alleges that at all
E  material times the first plaintiffs, a United States corporation, had the
benefit of exclusive recording contracts with the late Elvis Presley whereby
they are and have been entitled to the exclusive right to exploit for profit
records of all his performances. The second plaintiffs are and have been
licensed by the first plaintiffs in respect of the manufacture, sale and
distribution in the United Kingdom of all Elvis Presley's performances.
F  Paragraphs 4 and 5 describe how and why the plaintiffs made profits from
their recording business. Paragraph 6 is in these terms:

    " In the premises the plaintiffs have private or proprietary rights and
    interests which they are entitled to have protected from unlawful
    interference which causes them damage."

Paragraph 7 alleges that bootlegging, presumably meaning thereby all the
G  acts described in section 1 of the Act of 1958, is unlawful and paragraph 8
describes the extent of bootlegging in the United Kingdom, the damage
which it causes to the plaintiffs and others in the recording industry and
the steps which have had to be taken by that industry to restrict and stop
it. Paragraph 9 starts with the words:

    " Prior to the issue of the writ herein the defendant has been
H      bootlegging and dealing in bootleg records of performances of Elvis
    Presley."

There follow lengthy particulars of the defendant's unlawful acts and
facts from which it is averred that he must have known that what he was

144
Lawton L.J.          R.C.A. Corpn. v. Pollard (C.A.)          [1983]

doing was unlawful. The statement of claim ends with an averment that    A
the plaintiffs and each of them have suffered damage and that the
defendant threatens and intends to continue the acts complained of: The
relief sought is, first, a declaration that the defendant is not entitled to
make or deal in bootleg records of Elvis Presley's performances; secondly,
an injunction to restrain the defendant from doing those kinds of acts;
thirdly, an order for delivery up of such bootleg records as he has in his
possession; fourthly, judgment for £360 and interest or damages; and,    B
fifthly, an inquiry as to damages.

In my judgment, this appeal calls for a detailed analysis as to what
was decided in the *Island Records* [1978] Ch. 122 and *Lonrho* [1982]
A.C. 173 cases. In the latter case Lord Diplock made some critical com-
ments about what was decided in the other case. The other members of the
House agreed with his speech. If his criticisms were part of and necessary    C
for the decision in the *Lonrho* case then what he said is binding on us and
goes a long way, but perhaps not all the way, to deciding this appeal. If,
however, his criticisms were obiter, the *Island Records* case is binding on us.

It will be convenient to start with an analysis of the *Island Records*
case [1978] Ch. 122. Thirty plaintiffs, being performers and recording
companies with whom the performers had exclusive contracts to record    D
their performances, complained that they were suffering serious damage
from the activities of bootleggers and sought an injunction to restrain a
named defendant from committing any acts in contravention of section 1
of the Act of 1958. Walton J. refused an injunction on the ground that he
had no jurisdiction to grant the relief claimed because, although · the
plaintiffs could show that they had suffered damage, they had no right of
property infringed by the defendant's acts. The plaintiffs appealed.    E

This court, by a majority (Lord Denning M.R. and Waller L.J., Shaw
L.J. dissenting) adjudged that there was jurisdiction in the High Court to
grant the relief claimed. Lord Denning M.R.'s decision was based on this
proposition, at p. 136: " A man who is carrying on a lawful trade or calling
has a right to be protected from any unlawful interference with it ..."
Amongst the many authorities quoted as support for that proposition was    F
*Emperor of Austria* v. *Day and Kossuth* (1861) 3 De G. F. & J. 217. That
case is one of the foundation stones of the plaintiffs' submission in this
case. The unlawful interference may be a tort or a crime. It matters not
which it is. Lord Denning M.R. said [1978] Ch. 122, 136–137:

" the courts must allow a private individual himself to bring an
action against the offender—in those cases where his private rights    G
and interests are specially affected by the breach. This principle is
capable of extension so as to apply not only to rights of property or
rights in the nature of it, but to other rights or interests, such as the
right of a man to his good name and reputation: see *Argyll (Duchess)*
v. *Argyll (Duke)* [1967] Ch. 302, 344: and his right to the lawful
transmission of his mail: see my illustration in *Gouriet's* case [1977]    H
Q.B. 729, 756–757."

He went on to consider what were the rights and interests which the
plaintiffs in that case were entitled to have protected from unlawful

A    interference. He described those rights and interests in these terms, at
p. 137:

" The recording companies have the right to exploit the records
made by them of the performances. The performers have the right to
the royalty payable to them out of those records. Those rights are
buttressed by the contracts between the recording companies and the
B    performers. They are rights in the nature of rights of property."

In this case Mr. Pumfrey has submitted that a right to exploit records
is not a right of property anyway. It is nothing more than the economic
advantage which a recording company gets from its exclusive contract
with the performer. The recording company's right is to have the contract
performed. That right can be protected by the court if there is unlawful
C    interference with performance; but a bootlegger does not interfere with the
performance of the contract itself even though his acts make the contract
less valuable.

Waller L.J. founded his decision on a narrower base than did Lord
Denning M.R.  He was of the opinion, at pp. 144–145:

" that in equity there is jurisdiction for a court to grant an in-
D    junction to a person who claims that he suffered special damage
to a property interest of his by a crime and that in the circumstances
of this case both the record company and the performer would be
entitled to such injunction."

In concluding as he did he relied upon the *Emperor of Austria's* case,
3 De G. F. & J. 217, *Springhead Spinning Co.* v. *Riley* (1868) L.R. 6
E    Eq. 551, 560 and *National Phonograph Co. Ltd.* v. *Edison-Bell Con-
solidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, 361.

It is pertinent to consider Shaw L.J.'s dissenting judgment. The
plaintiffs had put forward two propositions. The first was that section 1
of the Act of 1958 had the result of creating a statutory duty to performers
(who were included amongst the plaintiffs) which invested them with a
cause of action and gave them a right of action for appropriate relief
F    against any person who was in breach of that duty by reason of committing
an offence under that section. Shaw L.J. said that he could not accept this
proposition, as did Waller L.J. If there was no right to relief for
performers, there could not have been any for recording companies.

It follows, so it seems to me, that if the *Island Records* case [1978]
Ch. 122 is binding on us, we must accept that the present plaintiffs have a
G    property right, which the law protects, in the economic advantages to be
obtained from their exclusive contract with the late Elvis Presley. That
means that the statement of claim does disclose a cause of action.

I turn now to the decision of the House of Lords in the *Lonrho* case
[1982] A.C. 173. The appellants alleged that they had suffered damage
through the alleged contravention by two oil companies of the Southern
H    Rhodesia (Petroleum) Order 1965 which made it a criminal offence to
supply oil to Southern Rhodesia. The appellants based their claim on
three grounds, first, alleged breaches of contract, secondly, that the
alleged breaches of the Order had caused them special damage and,
thirdly, " the breaches were an unlawful interference with, and resulted in

146

damage to, the appellants' rights of property . . .": see p. 179, where     A
counsel's argument on this point is summarised.

It is pertinent to remember that the *Lonrho* case started in the court
as a special case stated for the decision of the court pursuant to section 1
of the Arbitration Act 1950. A number of questions had to be answered.
The relevant one, for the purposes of this appeal, numbered 5 (a), being in
these terms:                                                               B

"Even if there were breaches by the respondents of the 1965 and
1968 Orders (a) whether breaches of those Orders would give rise to
a right of action in the claimants for damage alleged to have been
caused by those breaches . . ."

In my judgment, that question did raise the issue whether damage to a
private property right due to a criminal act was recoverable. In their       C
filed case the appellants sought to rely on the *Island Records* case and
did so in these terms:

" In addition to the cases mentioned above, the appellants rely on
the decision of the Court of Appeal in *Ex parte Island Records Ltd.*
[1978] Ch. 122 in which, although the majority of the court (Shaw
and Waller L.JJ.) held that the relevant Act, the Dramatic and Musical     D
Performers' Protection Act 1958, was not a statute passed for the
protection of the public or of a particular section of it such that a
breach of it was an actionable breach of duty, nevertheless Lord
Denning M.R. and Waller L.J. held that recording companies and
performers were entitled to an injunction to restrain third parties
from damaging their private interests by making and marketing
recordings in breach of the Act. Lord Denning M.R. based his               E
decision on the fact that the criminal act caused or threatened to cause
special damage to the plaintiffs (p. 135) and that the plaintiffs had the
right to be protected from any unlawful interference with the lawful
carrying on of their business (p. 136). So here, it is submitted that the
appellants have the right to be protected in carrying on their lawful
business of operating the pipeline, from interference from criminal
acts on the part of the respondents. Waller L.J. based his decision on     F
the jurisdiction to restrain unlawful (including criminal) interference
with rights of property or rights akin to the rights of property (p. 144).
If that is a correct analysis, the appellants point to the unlawful
interference, by breaches of the sanctions Orders, with their property,
namely, the pipeline and their entitlement to exploit it commercially."

                                                                           G

The respondents answered this contention in their case but were not
called upon to do so orally at the hearing. They submitted that the Order
did not alter the legal relationship between them and Lonrho, that *Cutler
v. Wandsworth Stadium Ltd.* [1949] A.C. 398 applied, that if the *Island
Records* case could not be distinguished it should not be applied for two
reasons: first, because it would be contrary to the decision in *Cutler's*
case and of the Court of Appeal itself in *Coote v. Stone* [1971] 1 W.L.R.   H
279. They pointed out that in the first of these cases there was injury to
the plaintiff's business and in the second to his property. Their second
reason was that this case would be inconsistent with the well established

A  principle that the statute must not only be for the plaintiff's benefit but the plaintiff's loss must be loss of the particular kind which it was the object of the statute to prevent. They quoted *Gorris* v. *Scott* (1874) L.R. 9 Ex. 125 in support. It follows, so it seems to me, that the House was being invited to consider whether what was decided in the *Island Records* case [1978] Ch. 122 was sound law which could be applied in the *Lonrho* case [1982] A.C. 173. Neither in the cases as filed nor in the appellants' argument was

B  any reference made to either the *Emperor of Austria's* case, 3 De G. F. & J. 217 or the *Springhead Spinning Co.'s* case, L.R. 6 Eq. 551; but when considering the appellants' submission and in particular when reading the judgments in the *Island Records* case their Lordships would have seen and taken into account the quotations from these two cases which Waller L.J. relied upon for his decision.

C  I turn now to consider the way in which Lord Diplock, with whose speech the other members of the House concurred, answered question 5 (a). He considered first whether on their true construction the relevant statutory provisions were imposed for the benefit of a particular class of persons or whether they created any public right to be enjoyed by all Her Majesty's subjects and concluded that they did neither [1982] A.C. 173, 186. This

D  disposed of the appellants' submission that the alleged breaches of the Order had caused them special damage. There remained, however, their alternative submission about unlawful interference with their property rights. Lord Diplock did not say specifically that he was going to consider the alternative submission. What he did do was to say, at p. 186, that he was going to mention two cases, one being the *Island Records* case [1978] Ch. 122. That case was relevant because of this court's decision that the

E  plaintiffs therein were entitled to relief because of the defendant's alleged interference by a crime with their " property interest " (I use Waller L.J.'s words). Lord Diplock pointed out, at p. 187, that performers under exclusive recording contracts could claim that the Act of 1958 was passed for their protection and that in consequence an *Anton Piller* order could be granted for " entirely orthodox reasons." He continued, at p. 187:

F  "The Act was passed for the protection of a particular class of individuals, dramatic and musical performers; even the short title said so. Whether the record companies would have been entitled to obtain the order in a civil action to which the performers whose performances had been bootlegged were not parties is a matter which for present purposes it is not necessary to decide. Lord Denning M.R., however, with whom Waller L.J. agreed (Shaw L.J. dissenting)[,]

G  appears to enunciate a wider general rule, which does not depend upon the scope and language of the statute by which a criminal offence is committed, that whenever a lawful business carried on by one individual in fact suffers damage as the consequence of a contravention by another individual of any statutory prohibition the former has a civil right of action against the latter for such damage. My Lords,

H  with respect, I am unable to accept that this is the law; . . ."

Clearly Lord Diplock did not accept the wide principle which Lord Denning M.R. had enunciated [1978] Ch. 122, 136. Waller L.J., however, did not say that he agreed with this way of putting the law. As I have

148
Lawton L.J.          R.C.A. Corpn. v. Pollard (C.A.)          [1983]

already commented, he based his decision on the narrower ground of the    A
right to the protection of a property interest. Under a cross-heading "The
present case" Lord Denning M.R., at p. 137, referred specifically to
"rights in the nature of rights of property." Was Lord Diplock saying that
this too was wrong in law? I infer that he was. What he said disposed of
the appellants' alternative submission that the respondents had unlawfully
interfered with their property which could only have been the commercial
benefit which they would have got from the pipeline but for the alleged    B
breaches of the Order. The damage which the present plaintiffs allege
they have suffered and will continue to suffer is the loss of the commercial
benefits which they hope to obtain from their exclusive recording contract
with Elvis Presley, whose personal representatives did not join in this
action. The defendant's alleged criminal acts did not alter any legal
relationship between him and the plaintiffs. None existed either before or    C
after the acts of which complaints were made. It follows, in my judgment,
that what Lord Diplock said about the *Island Records* case was not obiter;
it was necessary for the determination of one of the issues before the
House and by implication overruled the decision of this court in the
*Island Records* case on the injury to property point.

   That still leaves, however, the question whether on its true construction    D
the Act of 1958 was passed for the benefit or protection of recording
companies. Lord Diplock did not express any opinion about this; but that
very issue was discussed and decided in the *Island Records* case [1978]
Ch. 122. I have already referred to Shaw L.J.'s opinion on the effect of
the Act of 1958. Waller L.J. was of the same opinion. He referred, at p. 142,
to the submission which had been made on behalf of the plaintiffs that    E
the Act created a duty of permission or omission for the benefit of a class
of persons which included recording companies. After considering the
terms of the Act and a number of authorities he concluded, at p. 142:
"I am satisfied therefore that no action can be brought for a simple
breach of statutory duty under this section." It follows that the very point
which Lord Diplock was referring to and about which he expressed no
opinion had already been decided by this court. The consequences seem    F
to be these. In the *Island Records* case the plaintiffs asked for relief on two
grounds. They were adjudged by Shaw and Waller L.JJ. not to be entitled
to it on one ground but by Lord Denning M.R. and Waller L.J. to be
entitled to it on another. If my opinion about the effect of the *Lonrho*
case [1982] A.C. 173 is right the present plaintiffs are not entitled to any
relief, first, because of what the House of Lords decided in that case and,    G
secondly, because of what this court decided in the *Island Records* case
[1978] Ch. 122. It follows, in my judgment, that the *Island Records* case
is binding upon us on the very point which Lord Diplock did not discuss.
This means that the statement of claim should be struck out. This is a
result which I find unpleasing; but I remind myself that it is for Parliament,
not the judges, to provide new remedies for new wrongs.

   Having regard to the opinion I have formed about the effect of the    H
*Lonrho* case upon the *Island Records* case it is unnecessary for me to
consider whether the *Lonrho* case by implication overrules a long line of
equity cases going back to Lord Eldon's time and of which the leading

149

1 Ch.                    R.C.A. Corpn. v. Pollard (C.A.)                Lawton L.J.

A   one is the *Emperor of Austria's* case, 3 De G. F. & J. 217. Save in a limited respect, nothing in this judgment should be read as questioning in any way the underlying principles enunciated in those cases. One of the questions in this case has been whether the commercial value of a contractual right is the kind of property which the Court of Chancery did protect and which this court should protect when, as in this case, the defendant has done nothing to interfere with the right itself.

B       I would allow the appeal.

    OLIVER L.J. The action out of which this appeal arises is one in which the plaintiff record companies are seeking to restrain the admittedly criminal activity of the defendant and the only question which this court has to determine is whether they have any arguable case for so doing
C   which justifies the exercise by the judge of his discretion to decline to strike out the plaintiffs' statement of claim as disclosing no reasonable cause of action. For the purposes of this appeal it must be taken as admitted by the defendant that the plaintiffs have a contract with the personal representatives of the late Elvis Presley under which they have been given, so far as it is possible to do so contractually, the exclusive
D   right to record and exploit recordings of Mr. Presley's live performances. It must also be taken as admitted that the economic value of them of that contractual right will be diminished if recordings of such live performances not of their manufacture and not made from their recordings (in which, of course, they have a copyright) are made and sold by other persons. It is, however, important to bear in mind what their contractual right is,
E   for the expression "exclusive right" can be misleading if it is not subjected to some analysis. An artist who performs a dramatic or musical work obtains no "right" in relation to his performance except that which arises from the contract with the entrepreneur under which he performs. There is no copyright in the performance as such, although of course the owner of the copyrights in the lyrics and music can restrain unauthorised publications of the performance. Thus the performer has, as the law now
F   stands, no cause of action against a person who records his performance or deals in a recording of it made by somebody else, save to the extent that such a cause of action is conferred upon him by the Performers' Protection Acts or to the extent that there is some other general principle of law which comes to his assistance. Subject to this, the "exclusive right" which he contracts to confer on a recording company is no more than an
G   undertaking that he will not give consent to a recording by anybody else.

    Mr. Pollard, the defendant, is a bootlegger, that is to say, he is a person who either makes or sells (or possibly both) recordings of live performances by theatrical artistes (and in particular by Mr. Presley), and it must be taken for present purposes that he does so in the knowledge of the contract between the plaintiffs and Mr. Presley's representatives. The
H   recordings which he makes or sells are not recordings reproducing the plaintiffs' recordings—that would, of course, infringe the plaintiffs' own copyright. They are records reproducing recordings made by someone else who was present at the concert at which Mr. Presley performed or who made a recording of a live broadcast of that concert, and it may be

150
Oliver L.J.          R.C.A. Corpn. v. Pollard (C.A.)          [1983]

assumed that they were made and are being sold without the consent of     A
Mr. Presley or his personal representatives. So the question is, do the
plaintiffs have any right which will be recognised by the court to restrain
the sale of such recordings in a civil action for an injunction and damages?

There are—or to be more accurate, there were until comparatively
recently—three ways in which such a claim could be framed. First, there
is the argument advanced in the plaintiffs' statement of claim, that the
Performers' Protection Acts, although they do no more on their face than
impose criminal penalties, are Acts which in fact confer a civil right on     B
the plaintiffs to restrain that which is an offence under the Acts. Secondly,
there is the argument that the Acts confer some general right in the public
to have their provisions enforced and that the plaintiffs as persons who
suffer some special damage as a result of a breach of the prohibition, are
entitled to bring an action for an injunction without enlisting the assistance
of the Attorney-General. Thirdly, reliance is placed upon some wider     C
principle of equity which entitles the court to intervene to prevent the
commission of a crime which causes damage to the property or interests
of an individual.

As regards the first of these, the matter is, as I see it, concluded
against the plaintiffs by the decision of this court in *Ex parte Island*
*Records Ltd.* [1978] Ch. 122 where it was held that the Performers'     D
Protection Acts conferred no right of action on the performers or the
recording companies with whom they had contracted. That decision is
binding upon us and, for my part, it seems to me, if I may respectfully
say so, to be well founded. It was suggested by the judge in the instant case
that the case had, in some way, been overruled by the House of Lords,
so far as performers are concerned, in *Lonrho Ltd.* v. *Shell Petroleum Co.*     E
*Ltd.* (*No.* 2) [1982] A.C. 173 in which Lord Diplock (with whose speech
all their other Lordships concurred) expressed the view, at p. 187, that the
decision in *Island Records* [1978] Ch. 122 could be justified, so far as the
performers were concerned, for what he referred to as " entirely orthodox
reasons." The Act, he went on to say, was passed for the protection of a
particular class of individuals, dramatic and musical performers. This,     F
the judge considered, amounted to a holding that the case was wrongly
decided in so far as it was based upon the proposition that the Act con-
ferred no civil right of action on performers. I do not so read it. What I
think Lord Diplock was referring to was the second principle referred to
above, namely, that where there is a breach of a statutory provision for
the protection of a class of whom the plaintiff is one and he can show that     G
he is specially damaged by the breach, he may bring proceedings to
enforce, not his own civil right of action, but the public duty which has
been interfered with or not observed. The matter is, however, academic in
the instant case, for the performer is not a plaintiff here and the judge was,
in my judgment, right to hold that the Act cannot be said to confer
any right on recording companies and that they cannot be said to be     H
persons falling within the class for whose protection it was passed.

Thus, it seems to me, the plaintiffs in this case do not fall into either
of the possible classes of persons who can commence in their own names
an action for the enforcement of public rights which would otherwise

A  have to be commenced in the name of the Attorney-General. If they are to maintain an action at all, therefore, they must, in my judgment, do so by virtue of some other principle enabling them to sue.

It was suggested by Lord Denning M.R. in the *Island Records* case [1978] Ch. 122, 136 that there was some broad principle which conferred a cause of action in tort upon anyone who was lawfully carrying on a business and whose business has been injuriously affected by a criminal

B  activity carried on by the defendant. That was decisively rejected by the House of Lords in the *Lonrho* case [1982] A.C. 173, 187. The plaintiffs, however, argue that authorities which are binding upon this court demonstrate the existence of a narrower principle, expressed thus by Lord Alverstone C.J. in *National Phonograph Co. Ltd.* v. *Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, 355–356: "...an illegal

C  act causing injury to a person or to his rights of property, is an actionable wrong and affords ground for an action on the case." The *National Phonograph* case was one in which the defendants' liability arose out of a conspiracy between the defendants and two of their employees to obtain goods of the plaintiffs by means of fraudulent representations made to factors and it was strictly unnecessary to base the case on the principle so stated. Nevertheless, it is clear that both Buckley and Kennedy L.JJ.

D  based themselves upon the following passage from the judgment of Bowen L.J. in *Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, 614:

"No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the

E  intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it."

The case was, however, one of fraudulent conduct aimed specifically at the plaintiffs and those with whom they had contracts and it is doubtful how far it supports the general proposition enunciated by Lord Alverstone C.J.

F  That proposition is, it is submitted, supported by the earlier decision of this court in *Exchange Telegraph Co. Ltd.* v. *Gregory & Co.* [1896] 1 Q.B. 147 (which was referred to by Buckley L.J. in the *National Phonograph* case [1908] 1 Ch. 335, 361), but, again, that case was a simple case of direct inducement to breach of contract and does not, I think, assist in the present context. Nor, for my part, do I derive any assistance from *G.W.K. Ltd.* v. *Dunlop Rubber Co. Ltd.* (1926) 42 T.L.R. 376 cited

G  on behalf of the plaintiffs, for that was simply a case of a direct physical interference with the carrying out of the plaintiffs' contract with a third party.

The proposition upon which the plaintiffs rest their case really depends upon the majority judgments in the *Island Records* case [1978] Ch. 122 and upon two cases in the last century. The first is *Emperor of Austria*

H  v. *Day and Kossuth*, 3 De G. F. & J. 217, a decision of Lord Campbell L.C. and Knight-Bruce and Turner L.JJ., on appeal from Stuart V.-C. That case, save to the extent to which it has been overruled either expressly or by necessary implication, is binding upon us. It was, indeed, a very unusual case and it cannot, as I think, be explained save upon some such

152
Oliver L.J.              R.C.A. Corpn. v. Pollard (C.A.)              [1983]

principle as that relied on by the plaintiffs in the present case, although
the act there complained of—the printing of banknotes in the name of a
proposed revolutionary government of Hungary—does not appear to have
been illegal under English law. The court was unanimous in upholding, at
the suit of the Emperor of Austria, an order of Stuart V.-C. restraining
the further printing and delivery of the notes and ordering their delivery
up, Turner L.J. observing, at p. 253, " I agree that the jurisdiction of this
court in a case of this nature rests upon injury to property actual or
prospective . . ."  The same principle was adopted in *Springhead Spinning
Co.* v. *Riley*, L.R. 6 Eq. 551 where Malins V.-C. restrained the defendants
from issuing advertisements which had the effect of deterring potential
employees from engaging themselves to work for the plaintiffs. Malins V.-C.
observed, at pp. 558–559, 560:

> " The jurisdiction of this court is to protect property, and it will
> interfere by injunction to stay proceedings, whether connected with
> crime or not, which go to the immediate, or tend to the ultimate,
> destruction of property, or to make it less valuable or comfortable for
> use or occupation.... The truth, I apprehend, is that the court will
> interfere to prevent acts amounting to crime, if they do not stop at
> crime, but also go to the destruction or deterioration of the value of
> property. That was the principle on which the court restrained the
> proceedings of M. Kossuth, with regard to Hungarian notes in the
> case of *Emperor of Austria* v. *Day*."

The actual decision in that case was subsequently overruled in
*Prudential Assurance Co.* v. *Knott* (1875) L.R. 10 Ch.App. 142 on the
ground that, as the law then stood, the court would not restrain by injunc-
tion the publication of a libel, but the case was treated as still being
authority for the principle stated by Malins V.-C. by Viscount Dilhorne in
*Gouriet* v. *Union of Post Office Workers* [1978] A.C. 435, 492.

The principle was expressed thus by Waller L.J. in the *Island Records*
case [1978] Ch. 122, 144–145:

> " In equity there is jurisdiction for a court to grant an injunction to a
> person who claims that he suffered special damage to a property
> interest of his by a crime . . ."

The same principle, albeit in the context of the enforcement by an
individual of a public duty, is also found in the judgment of Lord
Denning M.R., at p. 135, in the same case adopting the argument of
Mr. Gibson as amicus, at p. 130:

> " A review of the cases shows that the Court of Equity would protect
> property rights by granting an injunction to prevent a crime which
> would affect such rights: . . ."

It is upon this principle that the plaintiffs are compelled to rely if they
are to support this action. Two questions arise. First, assuming such a
principle still to be part of English law, how far does it extend? Is it
restricted to damage which is the direct and intended result of the act or
does it extend to any case where economic damage, whether intended or
not, is in fact occasioned to some property right as the result of a

A     defendant's criminal activity? It is to be observed that in all the cases to which reference has been made, damage to the plaintiff's property or business (using " property " in, perhaps, a rather loose sense, having regard to *Emperor of Austria* v. *Day*, 3 De G. F. & J. 217) was the direct and intended consequence of the defendant's act. In the *Emperor of Austria's* case, the object and intent of the defendant Kossuth was to depreciate the official Austrian currency. In the *Springhead* case, L.R. 6 Eq. 551 the libel

B     was intended to sterilise the plaintiffs' business by depriving it of labour. In the *Exchange Telegraph Co.* case [1896] 1 Q.B. 147 there was a direct and intentional interference with the contract to which the plaintiff was a party. The same is true of the *National Phonograph* case [1908] 1 Ch. 335 and *G.W.K. Ltd.* v. *Dunlop Rubber Co. Ltd.*, 42 T.L.R. 376. No case cited to us has gone so far as to confer a cause of action where the damage

C     complained of is merely economic damage as an incidental result of the breach of a prohibition in a statute not designed to protect the interests of a class to which the plaintiff belongs. If the principle extends thus far, I can, I confess, see no logical reason why it does not extend to the full extent suggested by Lord Denning M.R. in the *Island Records* case [1978] Ch. 122. The possibilities are indeed startling. Does an action for an

D     injunction lie at the suit of a householder in Chelsea to restrain a known burglar from robbing houses in the borough because the publicity attached to burglaries in Chelsea depreciates the value of his property?

    Furthermore, since section 21 (1) of the Copyright Act 1956 makes it an offence to make for sale any article which the defendant knows to be an infringing copy, it would seem that anyone who makes his living by buying and selling material in which copyright subsists (for instance, a bookseller

E     or the owners of a record shop) can apply to the court for an injunction on the footing that the sale of infringing material potentially reduces his profits. Fortunately, such speculation is, in my judgment, rendered unnecessary by Mr. Pumfrey's second submission. For myself, I feel the gravest doubt whether, allowing some such principle as that claimed to exist, it extends to a case such as the present where the defendant's

F     conduct involves no interference with the contractual relationships of the plaintiffs but merely potentially reduces the profits which they make as the result of the performance by Mr. Presley's executors of their contractual obligations. The " property " of the plaintiffs here is the benefit of the undertaking given by Mr. Presley or his representatives not to consent to reproductions otherwise than by the plaintiffs and the nature of that

G     " property " is exactly commensurate to the probability or improbability of other people making reproductions without such consent. The defendant's conduct may, of course, result in the plaintiffs selling fewer copies of their recordings of the Elvis Presley album because recordings of the same songs are thus made available from other sources, but it is a little difficult to see how it can be said that the value of the plaintiffs' " property " in their contractual right to prevent the Presley representatives

H     from giving consent to reproduction is affected.

    It is, however, unnecessary to decide the point, for Mr. Pumfrey submits that the rejection by the House of Lords in the *Lonrho* case [1982] A.C. 173 of Lord Denning M.R.'s wide proposition necessarily

154

Oliver L.J.   R.C.A. Corpn. v. Pollard (C.A.)   [1983]

involved also the rejection of the more narrowly expressed proposition
which appeared .elsewhere in Lord Denning M.R.'s judgment and in the
judgment of Waller L.J. In my judgment, this submission is well founded.
We have looked at the transcript of the judgments in the Court of Appeal
in the *Lonrho* case, which are not reported in the Law Reports, and it is
clear that the majority decision of the Court of Appeal in *Ex parte
Island Records Ltd.* [1978] Ch. 122 was relied on by the plaintiffs in that
case. It appears to have been rejected both by Lord Denning M.R. and by
Eveleigh L.J. on the ground that, in contrast to the *Island Records* case,
the statutory prohibition in *Lonrho* was not one for the protection of
private rights. It seems, however, from the judgment of Fox L.J. that
reliance was also placed on the Australian case of *Beaudesert Shire Council
v. Smith* (1966) 120 C.L.R. 145 and that this argument too was rejected.
As Lawton L.J. has mentioned, both this wide *Beaudesert* point and
the slightly narrower formulation of Waller L.J.—which encapsulates the
plaintiffs' submission in the instant case—were distinctly raised in the
appellants' case on appeal to the House of Lords, which we have also
seen, and were as distinctly challenged in the respondents' case, so that
both were clearly before their Lordships' House. The question asked in the
consultative case—which was in effect whether the circumstances in which
the plaintiffs' property had been injured gave rise to *any* cause of action—
necessarily involved the considerations of precisely similar arguments to
those advanced in the instant case. The question was answered in the
negative and Lord Diplock's remarks with regard to the innominate tort
suggested by Lord Denning M.R. must, in my judgment, equally apply to
the innominate tort referred to in the judgment of Waller L.J. I have had
the advantage of reading in draft the judgment of Lawton L.J. and I
respectfully agree with and adopt his analysis of the case. I too would
allow the appeal.

  This may seem regrettable, for the defendant who makes money out of
regular and persistent breaches of the criminal law can scarcely be said
to be over-burdened with merit. But that being said, the position of
performers of musical and dramatic works has clearly been considered
carefully by the legislature not only in the light of this country's domestic
requirements but also on its obligations under international convention and
it is not, I think, for the courts to strengthen the plaintiffs' business
position by manufacturing for them a new monopoly which the legislature
has not seen fit to confer upon them.

  SLADE L.J. I have had the great advantage of reading in draft the
judgment of Lawton L.J. Since I agree with both his conclusion and his
reasoning, I wish to add only a few observations of my own, out of
deference to Vinelott J.

  First, I am bound to say that my initial reaction to this appeal was
to wonder whether this could possibly be a suitable case in which to
interfere with the exercise of his discretion, in refusing to strike out the
plaintiffs' statement of claim. In accordance with well established prin-
ciples, a plaintiff should not be driven from the judgment seat by the
striking out of his pleading, on the ground that it discloses no reasonable

A  cause of action, unless the court is satisfied that the action as pleaded has
no realistic prospect of success at the trial. Furthermore, the decision of
this court in *Dyson* v. *Attorney-General* [1911] 1 K.B. 410 affirmed the
general principle that the striking out procedure " ought not to be applied
to an action involving serious investigation of ancient law and questions
of general importance ": *per* Cozens-Hardy M.R., at p. 414.  This case
certainly involves a question of general importance and also some reference
B  to old authorities. As it happens, the defendant is legally aided, but I do
not think that this factor should make the court any more inclined to grant
him relief. I have also been troubled by the fact that in dealing with his
application, the court is bound to proceed on the assumption that at the
trial the plaintiffs would be able to prove no less, but no more, than all
the material facts asserted in the statement of claim. I wondered whether
C  the answer to the questions of law now placed before the court might not
to some extent depend on the manner in which the evidence supporting
these bare assertions of fact would emerge at the trial.

However, Mr. Jacob, as I understood his argument, did not seek to
rely on this latter point. The issues of law raised by the defendant on this
application are difficult as well as important, but he did not seek to submit
D  that they would become less difficult by waiting for them to be decided
at the trial. In these circumstances, I have been satisfied that, with a view
to a possible avoidance of prolonged and expensive litigation, the court
should proceed to consider, with due care, Mr. Pumfrey's reasons for
submitting that the action as pleaded is legally unsustainable and that,
if convinced by those submissions, it should strike out the statement of
E  claim.

Principally for the reasons given by Lawton L.J. I have been so
convinced. There is only one aspect of the legal issues involved upon which
I wish to add anything of my own. The judge said [1982] 1 W.L.R. 979,
990:

F       " It must be I think at least strongly arguable that a person who
      obtains admission to a performance by a pop star, knowing that the
      performer has entered into an exclusive recording contract with a
      recording company, and who makes a secret recording with a view
      to distributing it by way of trade equally commits an unlawful act
      (indeed one which might be unlawful apart from the Performers'
      Protection Act inasmuch as it might be possible to infer that persons
      admitted to the concert impliedly agreed not to make any recording
G     of it) and one which interferes directly with the recording company's
      contractual rights."

There is a well recognised tort which is commonly referred to as
interference with contractual relations. Liability under this head can arise
in many different situations of which a number of examples were given
in a passage which the judge cited from the judgment of Jenkins L.J. in
H  *D. C. Thomson & Co. Ltd.* v. *Deakin* [1952] Ch. 646, 694:

      " Direct persuasion or procurement or inducement applied by the
      third party to the contract breaker, with knowledge of the contract
      and the intention of bringing about its breach, is clearly to be regarded

156

as a wrongful act in itself, and where this is shown a case of
actionable interference in its primary form is made out: *Lumley* v.
*Gye* (1853) 2 El. & Bl. 216.

"But the contract breaker may himself be a willing party to the
breach, without any persuasion by the third party, and there seems to
be no doubt that if a third party, with knowledge of a contract
between the contract breaker and another, has dealings with the
contract breaker which the third party knows to be inconsistent with
the contract, he has committed an actionable interference: see, for
example, *British Industrial Plastics Ltd.* v. *Ferguson* [1940] 1 All
E.R. 479, where the necessary knowledge was held not to have been
brought home to the third party; and *British Motor Trade Association*
v. *Salvadori* [1949] Ch. 556. The inconsistent dealing between the
third party and the contract breaker may, indeed, be commenced
without knowledge by the third party of the contract thus broken;
but, if it is continued after the third party has notice of the contract,
an actionable interference has been committed by him: see, for
example, *De Francesco* v. *Barnum* (1890) 45 Ch.D. 430.

"Again, so far from persuading or inducing or procuring one of
the parties to the contract to break it, the third party may commit an
actionable interference with the contract, against the will of both and
without the knowledge of either, if, with knowledge of the contract,
he does an act which, if done by one of the parties to it, would have
been a breach. Of this type of interference the case of *G.W.K. Ltd.*
v. *Dunlop Rubber Co. Ltd.*, 42 T.L.R. 376 affords a striking example."

Vinelott J. [1982] 1 W.L.R. 979, 990 summarised the facts of *G.W.K.
Ltd.* v. *Dunlop Rubber Co. Ltd.*, 42 T.L.R. 376 and also of *National
Phonographic Co. Ltd.* v. *Edison-Bell Consolidated Phonograph Co. Ltd.*
[1908] 1 Ch. 335 as examples of cases, where the tort of interference with
contractual relations was found to have been committed.

If I thought it seriously arguable that on the basis of the facts pleaded
in the statement of claim, the defendant could be liable for the tort of
interference with contractual relations as established in the line of cases
to which I have referred, I would for my own part allow this action to
proceed. But, as I understand the facts of all these cases where liability
has been established under this particular head of tort, there has been an
interference or attempt to interfere with the *performance* by a third party
of his contractual obligations. There is nothing in *this* line of authority
which I have been able to discover which suggests that A may be liable to
B under this head of tort merely because A does an act (even an illegal act)
which he knows is likely to render less valuable certain contractual rights
of B as against C without actually interfering with the performance by C
of the contractual obligations owed by him to B.

In these circumstances, with great respect to him, I am not able to
agree with the judge's suggestion [1982] 1 W.L.R. 979, 990–991 that in a
case such as the present it could be seriously argued that at least the person
who actually made the bootleg records would be under a liability to the
recording companies on the basis of the tort of interference with contractual
relations, as recognised in *D. C. Thomson & Co. Ltd.* v. *Deakin* [1952]

A    Ch. 646. A fortiori a claim based on this tort would not, in my opinion, be available in the present case where it is not alleged that the defendant had any part in the making of any bootleg records. On the pleaded facts it cannot, I think, be said that he has interfered in any way, directly or indirectly, with the *performance* of the contractual obligations of Elvis Presley or his personal representatives to the plaintiffs. If, therefore, the plaintiffs are to have any hope of success at the trial, they must, in my opinion, point to some other arguable head of liability.

B    The House of Lords in the *Lonrho case* [1982] A.C. 173 found it unnecessary to decide whether section 1 of the Dramatic and Musical Performers' Protection Act 1958 created a statutory duty to recording companies, such as the plaintiffs, as well as to performers, and conferred on such companies a right of action. A claim based on an alleged statutory duty of this kind, for what that claim is worth, would therefore be open to the plaintiffs in the House of Lords. However, I agree with Lawton L.J. that this very point was decided adversely to recording companies by Shaw and Waller L.JJ. in the *Island Records* case [1978] Ch. 122. The point is not, therefore, open to the plaintiffs in argument in this court in opposition to the present appeal.

C

D    The remaining point that has been strongly pressed in argument on behalf of the plaintiffs in this court is based on the general proposition that the court can grant an injunction to a person who claims that he has suffered special damage to a right of property by a crime. As the judge pointed out [1982] 1 W.L.R. 979, 991, this proposition appears to derive some support from cases decided both before and after the Judicature Acts. Among those cited to us have been *Emperor of Austria v. Day and Kossuth,* 3 De G.F. & J. 217 (see at pp. 253–254 *per* Turner L.J.); *Springhead Spinning Co.* v. *Riley,* L.R. 6 Eq. 551, 560 *per* Malins V.-C. and the *National Phonograph* case [1908] 1 Ch. 355. It is significant that in the latter case, Buckley L.J., at pp. 360–361, considered that liability had been established on two grounds, namely, interference with contractual relations and what he termed interference with "rights of property." He thus clearly regarded the two heads of liability as separate and distinct. Lord Alverstone C.J. in that case stated the position even more broadly in saying, at pp. 355–356:

E

F

    "It is, in my opinion, clearly established that an illegal act causing injury to a person, or to his rights of property, is an actionable wrong and affords ground for an action on the case."

G    In the *Island Records* case [1978] Ch. 122 Lord Denning M.R. and Waller L.J., as I understand their decisions, applied this "injury to property" principle in holding that the recording companies were entitled to an injunction for the protection of their property rights, consisting of the benefit of their contracts with the performers.

    If the *Island Records* case stood on its own, I think this court would be entitled and indeed bound to follow it and to hold that the plaintiffs in the present case, on the basis of the facts pleaded, have established at least a strongly arguable case. In my judgment, however, for the reasons given in more detail by Lawton L.J., the observations by Lord Diplock in the *Lonrho* case [1982] A.C. 173, 187 about the *Island Records* decision,

H

Ch. 1983—8

Slade L.J.          R.C.A. Corpn. v. Pollard (C.A.)          [1983]

concurred in, as they were, by the rest of their Lordships, by necessary          A
implication overruled that decision in so far as it decided that the plaintiffs
had a cause of action based on the " injury to property " principle. When
Lord Diplock left open the question whether the recording companies
would have been entitled to obtain an injunction in a civil action to which
the performers whose performances had been bootlegged were not parties,
I understand him to have been merely leaving open the question whether,
on the construction of the Act of 1958, recording companies were included          B
among the persons for whose protection that Act was passed, so as to give
them a civil remedy on this ground. How far the " injury to property "
principle has in general survived the *Lonrho* decision may be a matter for
debate hereafter. For present purposes it is sufficient to say that, in my
opinion, in view of the *Lonrho* decision, it cannot avail the plaintiffs in
the present case.
                                                                                  C
     Thus, even if this action were to proceed to trial and the plaintiffs
were to establish all the facts alleged by them, the trial judge, in my
judgment, would at the end of the day be bound to dismiss the action.

     In all the circumstances, I think that nothing useful can be achieved
by allowing the proceedings to continue. Though some may think that
the absence of a remedy for recording companies in this situation          D
constitutes an undesirable gap in the law, this is a gap which can only be
filled by the House of Lords or by Parliament. I would allow this appeal
and grant the order sought, by dismissing the action and striking out the
statement of claim.

                              *Appeal allowed with costs.*
                              *Statement of claim struck out.*          E
                              *Action dismissed with costs.*
                              *Leave to appeal.*

Solicitors: *George W. Mills & Son, Washington; A. E. Hamlin & Co.*

                                        C. N.          F

                    ————————          G

                                        H

Neutral Citation Number: [2010] EWHC 1019 (Ch)

Case No: HC09C04467

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 11/05/2010

Before :

THE HON MR JUSTICE FLOYD
– – – – – – – – – – – – – – – – – – – – –

Between :

FUTURE INVESTMENTS SA                                    Claimant
– and –
FEDERATION INTERNATIONALE DE                          Defendant
FOOTBALL ASSOCIATION

– – – – – – – – – – – – – – – – – – – – –
– – – – – – – – – – – – – – – – – – – – –

Madeleine Heal (instructed by Hansel Henson) for the Claimant
Thomas Raphael (instructed by Olswang LLP) for the Defendant

Hearing dates: 28th & 29th April 2010
– – – – – – – – – – – – – – – – – – – – –

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of
this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HON MR JUSTICE FLOYD

**Mr Justice Floyd :**

1.  The claimant, Future Investments SA ("Future"), a company domiciled in Switzerland, claims to be entitled to exclusive rights to the production and exploitation of the international television signal and all other copyright works in the 1998 Football World Cup ("WC98") matches and opening and closing ceremonies. In particular it claims the "exclusive rights" to produce and exploit home video of the 1998 World Cup. The defendant is the world governing body of Association Football ("FIFA") and arranges the football World Cup every four years. It is also domiciled in Switzerland. The issue raised in this application is whether Future can invoke the jurisdiction of the English Court under the Lugano Convention to complain about the grant by FIFA to an English third party of rights which include rights to home videograms of WC98.

2.  Future claims to have derived the exclusive rights on which it relies by a chain of agreements starting with a licence from FIFA to Organización de la Televisión Ibroamericana ("The FIFA−OTI Agreement"). OTI is the regional broadcasting union (RBU) for Central and South America. There are RBUs for the other regions of the world: the EBU is the RBU for Europe. From OTI, Future claims to have derived its rights via, firstly, an agreement between OTI and a company also called Future Panama SA, but domiciled in Panama ("Future Panama"), and secondly an agreement between Future Panama and itself. The OTI Agreement is governed by Swiss law, and contains an arbitration clause in favour of arbitration in Switzerland.

3.  The FIFA−OTI Agreement was entered into in March 1987, long before WC98. The Agreement was concluded in Switzerland with OTI, which is domiciled in Mexico. Clause 1.1 of the FIFA−OTI Agreement granted OTI the broadcasting rights (essentially in South America, but including non−English language transmission to US and non English/French for Canada) in respect of the 1990−1998 World Cups, and a right to make videograms "only for the purpose of those transmissions". No reliance is placed by Future on this clause. Clause 1.3 provides as follows:

> "All rights not expressly granted to OTI hereunder remain reserved to FIFA. As a matter of record it is noted, though, that the exclusive videogram production and exploitation rights, with the exception only of the English language rights for the USA and the English and French language rights are, with regard to the 1994 and 1998 Cup with the Consortium (internally OTI). With regard to the 1990 Cup a separate agreement with OTI has been reached. "

4.  Future says that clause 1.3 is a recognition that FIFA has already granted exclusive videogram production rights to the Consortium. The reference to the Consortium is explained a little further in the first recital to the Agreement, as including the European Broadcasting Union.

5.    Future's originally pleaded case alleged three alternative consequences of clause 1.3 of the FIFA−OTI Agreement.

    i)    at paragraphs 10 and 11 of the Particulars of Claim, Future alleged that clause 1.3 was a warranty that (subject to the language exception) the exclusive rights to home videograms of WC98 were owned by OTI and that OTI's rights were not derived from the Agreement ("the Warranty"). It was said that the Warranty gave rise to a contractual obligation owed by FIFA to OTI, its licensees and assigns (including Future) not itself to produce or assert any entitlement to grant rights to any third party to produce or exploit home videograms of WC98.

    ii)    Alternatively, by paragraphs 12 and 13 of the Particulars of Claim, it was alleged that clause 1.3 acknowledged OTI's exclusive right to WC98 videograms worldwide subject to the language exception, and meant that FIFA was estopped from asserting (it did not say against whom) any rights by itself or licensees to produce such videograms. This was referred to as "the Acknowledgment".

    iii)    Alternatively, at paragraph 14 of the Particulars of Claim, it was alleged that Clause 1.3 granted OTI the exclusive right to produce such home videograms. This was called "the Transfer".

6.    The basic complaint in the action is that FIFA has licensed IMG Media Limited (formerly known as TWI (UK) Limited) ("IMG") to market and sell a DVD called FIFA FEVER, first released in 2004 and designed to celebrate the FIFA centennial. FIFA FEVER contains footage of WC98, the very World Cup in which Future claim to have acquired exclusive rights.

7.    The FIFA−IMG Agreement was concluded in 2004 and signed by FIFA in Switzerland and IMG (then TWI) in England. By clause 3.1 of the FIFA−IMG Agreement FIFA granted exclusive rights to IMG in the Home Video Rights. The Home Video Rights were defined in clause 1.1 as the exclusive right to make and sell copies of the Picture for non−commercial viewing. The Picture was defined in recital A as the documentary which became FIFA FEVER. Clause 4.1 of the FIFA−IMG Agreement reads as follows:

"FIFA has the right to enter into and perform its obligations pursuant to this Agreement and to grant to [IMG] all of the rights and licences granted therein."

8.    IMG was to be able to use "FIFA Archive Material" which was defined in a way (which includes WC98) as:

"the moving images and footage of the official films of the historical FIFA World Cups × (excluding the official films of

the 1994 and 2002 FIFA World Cups), currently operated and managed by Infront Sports & Media in Ipswich, England".

9.    FIFA had rights of approval over the contents of the film. IMG compiled and created the basic digital master of the film in England, but sub-licensed the manufacture and distribution of FIFA FEVER to a Swiss Company called Cult Licenz AG, which handled distribution through the DVD label run by its Swiss subsidiary Evolution Entertainment AG. A German company, Tonix, Pictures GmbH, handled the authoring (adding menus etc). The final master copy for stamping was supplied to Evolution in Switzerland by Tonix. Evolution then arranged for distribution through a network of 20 sub-licenses throughout the world. The UK sub-licensee was called Green Umbrella.

10.    It is important to be clear at the outset what the action is not about. Whilst the WC98 footage is presumably the subject of copyright and is amongst the rights exclusively licensed to OTI/Future Panama/Future, there is no attempt by Future in the present action to bring proceedings for infringement of copyright either against IMG or against FIFA for authorising copyright infringement, or as a joint copyright infringer with IMG. Further, as the claim was originally formulated it included a claim by Future for breach of contract against FIFA. That claim has now been discontinued. Moreover, Future no longer asserts that the FIFA-OTI Agreement conferred any rights in respect of home videograms of WC98. It relies exclusively on the assertion that those rights were conferred by some prior agreement, which they are unable to produce, and FIFA has not yet identified.

11.    The only claim sought to be maintained by Future against FIFA is based on the tort of causing harm by unlawful means. As originally formulated, the plea of causing harm by unlawful means did not specifically identify the unlawful means relied on. The relevant section of the pleading, commencing at paragraph 48, merely said that the whole of the first 47 paragraphs of the pleading were repeated. These paragraphs covered "The Parties", "The Agreements", "Subsequent Ownership of WC98 Home Video Rights to WC98 Games" and "FIFA's Breach of Contract". The breach of contract alleged against FIFA was a breach of the FIFA-OTI Agreement: see paragraph 45, although paragraph 40 alleged that FIFA were in breach of the Warranty and/or the Transfer and/or had acted contrary to the Acknowledgment (in the FIFA-OTI Agreement) set out in paragaphs 10-16 by entering into the FIFA-IMG Agreement.

12.    It is not necessary to explore further the basis of these claims, because it is plain that the only illegality which was relied on for the purposes of the originally pleaded case of causing harm by unlawful means was FIFA's breach of the various rights arising out of or recognised by the FIFA-OTI Agreement. Whilst paragraph 40 exhibited a copy of the FIFA-IMG Agreement, it was exhibited for the purposes of demonstrating that FIFA were in breach of the FIFA-OTI Agreement, or possibly the other rights so recognised. There was no allegation of any breach by FIFA of the FIFA-IMG Agreement, or of any other unlawful means used by FIFA against IMG.

13.    Very shortly before present application, Future applied to amend its pleading. Part of th simply to give effect to the discontinuance of the breach of contract is also sought to the case of causing harm by unlawful means using loss by unlawful means is now structured as follows:

    i)    Paragraph 3 ph 40) now only alleges that entering into the FIFA–IMG was in conflict with the acknowledgment in the FIFA–C OTI's (the Consortium's) existing rights. It repeats the FIFA FEVER DVD was made in the United Kingdom b s distribution was controlled by IMG from England.

    ii)    Paragraphs cribe the launch and distribution of the FIFA FEVER DV xplains the revenues which Future and Future Panama ha piting or licensing footage from WC98 since 1998. Parag that complaints by Future in 1998 concerning the release official film led to requests thereafter to FIFA for such fo d to Future Panama until 2001. Paragraph 45–46 rela censing by Future Panama in 2002 of footage of WC98 led JMA for the production of a series of programmes Future acquired JMA in 2002. Paragraph 49 alleges that ed in its attempts to re-release Legends by licensing in countries in 2005 because of direct competition from FIFA 51 alleges that licensees or potential licensees are likely to as sold its rights to footage of WC98 to FIFA or FIFA's agen

    iii)    Paragraph 5 lows:

        "In the pre s set out in paragraphs 35 to 51 hereof, FIF means intended to cause loss to Future. By e FIFA–IMG Agreement, FIFA:

        (a) had th economic harm to Future ;

        (b) acted IMG by inter alia:

            (i) o IMG pursuant to clause 4.1 of the ment that FIFA had the right to ent its obligations pursuant to the FIF t and a right to grant to IMG all of ces granted therein contrary to the WC98;

            (ii) inclusion in England within the con ER of WC98 Games by granting IM Archive Material of WC98

Games held in England pursuant
FIFA–IMG Agreement;

(iii) permitting IMG to compile
FEVER in England from FIFA
which content included WC98 G
informing IMG that the rights to
first to be purchased from Future
Acquisition Budget pursuant to
FIFA–IMG Agreement;

(iv) giving its final approval to
FIFA–IMG Agreement to the conte
chosen by IMG

　　1. being compiled in England

　　2. including WC98 Games; an

(v) permitting IMG to produce m
relating to FIFA FEVER in England
WC98 Games without informing I
and

(c) that such unlawful action affected IMG'
with Future in respect of inter alia rights to W

14.　　Thus it is clear that the tort now alleged to have b IFA is that it used unlawful means against IMG. An essential m that FIFA acted unlawfully in relation to IMG is the warranty ause 4.1. If no express or implied warranty to grant the rights e agreement, the acts pleaded in paragraphs b(ii) to b(v) would n le by IMG, nor could they even arguably have affected IMG's fre uture.

15.　　Future's case, however, is that because of the　y, IMG was wrongfully reassured that it need not deal with Future fore that, as FIFA knew of the prior grant of rights to OT ors in title, acknowledged in the OTI Agreement and elsewhere, ally causing harm to Future by unlawful means.

## The Applications before the Court and the issues

16.　　The first application in time was FIFA's jurisdictional ontends that the action, whether as originally formulated or as no be brought within any of the exceptions to the principle establis the Lugano Convention, that a defendant should be sued in the c of domicile. The only exception in play is Article 5(3) which cre r actions in

tort in favour of the courts where the harmful event occurred. FIFA contends that the harmful event did not occur in this country.

17.    FIFA sought, in the alternative, a stay of the action in favour of Swiss arbitration under the arbitration clause in the FIFA—OTI agreement. The latter application has fallen away in the light of the fact that there is no longer any action brought against FIFA for breach of the FIFA—OTI agreement.

18.    The second application is Future's application to amend its pleadings in the way I have indicated above. FIFA objects to the amendment on the grounds (a) that it does not raise a seriously arguable case, (b) that it is too late, and it would prejudice FIFA to allow it to be introduced now and (c) that it should not be allowed while a jurisdictional challenge is pending as it raises a new cause of action.

**Causing harm by unlawful means - law**

19.    The law in this area has recently been clarified by the House of Lords in *OBG v Allen* [2008] 1 AC 1; [2007] UKHL 21. The elements of the tort are dealt with in the speech of Lord Hoffmann at [45] to [64]. At [47] Lord Hoffmann, with whom Lord Brown and Baroness Hale agreed, said:

> "The essence of the tort therefore appears to be (a) a wrongful interference with the actions of a third party in which the claimant has an economic interest and (b) an intention thereby to cause loss to the claimant."

20.    At [49] Lord Hoffmann explained that (subject to the qualification that there is no need for proof of loss by the third party), acts against third parties will be unlawful for the purposes of the tort if they would be actionable (subject to the qualification about loss) by the third party.

21.    By contrast it is not unlawful for a person to use unlawful means against a third party which do not affect the third party's freedom to deal with the claimant: see [51].

22.    Attempts to use the tort of causing harm by unlawful means as a substitute for a directly enforceable intellectual property right have not enjoyed success historically. In *RCA v Pollard* [1983] 1 Ch 135, the Court of Appeal struck out an action by the exclusive licensee of a performer's recording rights (granted by the estate of Elvis Presley) against a bootlegger (a person making unauthorised recordings in breach of the Dramatic and Musical Performers Protection Acts). Despite the fact that the bootlegger was knowingly committing unlawful acts which were damaging to the exclusive licensee, the Court of Appeal held that the exclusive licensee had no cause of action. The statute, being designed to protect a narrow class of persons, created no cause of action in favour of the recording companies. The plaintiffs relied on a broad principle of equity to protect property rights by granting an injunction to prevent a

crime which would affect such rights. The majority of the Court of Appeal held that such a broad proposition had been rejected by the House of Lords in *Lonrho v Shell* [1982] AC 173. Oliver LJ expressed the view (at 153) that even if such a principle existed it would not be wide enough to confer a cause of action in the present case. He reasoned that the sales by the bootlegger did not reduce the value of the plaintiffs' exclusive licence. That was a right to prevent their licensor from granting licences to reproduce to others: that *right* was unaffected by the bootlegger's sales.

23.     Oliver LJ's *obiter* view received the approval of Lord Hoffmann in *OBG v Allan* at [52]–[53]. He explained why the exclusive licensor's action failed in these terms:

    "The wrongful act did not interfere with the estate's liberty of
    action in relation to the plaintiff".

24.     Similarly in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785 an action by the exclusive licensee of a registered design against an infringer of that registered design failed. No statutory right is given to an exclusive license of a registered design to sue infringers (unlike the case of patents and copyright, where such a right is expressly given). In a passage which received the approval of Lord Hoffmann in *OBG v Allan* at [54] Jacob J held that

    "It is true that the exploitation of the licence may not have been
    so successful commercially by reason of the infringement, but
    the contractual relations and their performance remain
    completely unaffected."

25.     These are cases of unlawful acts in relation to licensors of rights which fail to satisfy the requirements for the tort of causing harm by unlawful means because they do not interfere with the freedom of the licensor to perform the contract with the claimant licensee. There is no direct authority in relation to a case based on an unlawful act in relation to a third party who is said to require a licence from an exclusive licensee. But what these cases do indicate is that it is important to enquire with precision into the question of whether the unlawful act complained of does in truth interfere with the third party's freedom of action in relation to the claimant. They also show that the relevant damage for the purposes of the tort is the damage which is caused by the interference with the third party's freedom of action. Damage which is suffered by the claimant which is not the consequence of interference with the third party's freedom of action (such as the loss in value of the exclusive licence in Pollard) is not within the purview of the tort.

## Jurisdiction – Law

26.     The principles to be applied to a jurisdictional challenge of the kind being run by FIFA are simple to state. The basic principle is that the defendant is entitled to be sued in the courts of the state where he is domiciled. Article 5(3) of the Convention provides an exception to this general rule in cases of based on tort. In such cases the claimant can sue "in the courts for the place where the harmful event occurred". This

latter expression was interpreted by the Court of Justice in *Bier v Mines de Potasse d'Alsace* Case 21/76 [1976] ECR 1735 as meaning both the courts of the place where the damage occurred and the courts of the place where the event which gives rise to the damage occurred. Where these two places are not the same, the claimant has the option of suing in either court.

27.     The claimant must show to the standard of a good arguable case those elements which are necessary to carry it through the jurisdictional gateway. In *Canada Trust v Stolzenburg No 2* [1998] 1 WLR 547 at 555, Waller LJ explained what a good arguable case meant in the context of a jurisdiction challenge:

> ""Good arguable case" reflects in that context that one side has a much better argument on the material available. It is the concept which the phrase reflects on which it is important to concentrate, i.e. of the court being as satisfied as it can be having regard to the limitations which an interlocutory process imposes that factors exist which allow the court to take jurisdiction."

28.     That passage was endorsed by the Privy Council in *Bols Distilleries v Superior Yacht Services Limited* [2007] 1 Lloyds LR 684; [2005] UKPC 45 at [26]–[28].

**Does Future's claim have a real prospect of success?**

29.     I should not give Future permission to amend unless the pleaded case has a realistic prospect of success. I should approach this question by assuming in favour of Future that it will establish the facts pleaded at trial. If those facts do not disclose a cause of action, or one with a realistic prospect of success I should refuse permission.

30.     Future's case in a nutshell is that FIFA has, by warranting, contrary to the fact, that it has the right to grant licences to WC 98, caused harm to Future's economic interests because IMG have been discouraged from approaching Future for a licence.

31.     Future's case proceeds in the following way:

i)      it would be a breach of the warranty in clause 4.1 of the FIFA–IMG Agreement (that FIFA had the right to grant licences) for Future to establish that FIFA did not have the right to licence IMG to include WC98 footage in FIFA FEVER;

ii)     FIFA did not have the right to grant such a licence, because FIFA had already granted exclusive rights to OTI as evidenced by the Acknowledgment contained in Clause 1.3 of the FIFA–OTI Agreement;

iii)   The breach of clause 4.1 of the FIFA–IMG Agreement was therefore a wrong, actionable at the suit of IMG, against FIFA;

iv)   The effect of the wrong committed by FIFA on IMG was that IMG was reassured it had all the necessary rights, and did not need to seek any rights to WC98 from any other party, in particular Future;

v)   In fact, Future do own the exclusive rights by virtue of the chain of transactions through Future Panama;

vi)   IMG needed to obtain a licence from Future;

vii)   Accordingly the wrong committed by FIFA against IMG caused harm to Future's economic interests, because IMG were thereby reassured that it did not need to obtain a licence from Future, and were thereby discouraged from applying to Future for a licence;

viii)   IMG's freedom to enter into contractual relations with Future was thereby interfered with.

32.   Mr Thomas Raphael, who appears on behalf of FIFA, submits that the cause of action thus pleaded is defective because, whilst the activity licensed by FIFA may make whatever exclusive rights are possessed by Future less valuable, it did not even arguably have the effect of interfering with the ability of IMG to contract with Future. Clause 4.1 was there for the protection of IMG, it did not have any impact on IMG's ability to deal with Future.

33.   Ms Madeleine Heal, who appeared on behalf of Future, submitted in her skeleton argument that the effect of FIFA's actions against IMG "militated against the existence of Future's rights". If by this she meant that, in some way, FIFA's actions against IMG compromised Future's rights, I cannot see how this is so. Future either has the right to demand royalties from IMG or it does not: FIFA's warranty that it had the right to grant the licence to IMG cannot make those rights disappear or even make them less valuable.

34.   I think the most that can be said, on the basis of Future's pleaded case, is that IMG was somehow discouraged from approaching Future for a licence. At one level this might be thought to be analogous to the cases of causing loss by unlawful means based on intimidation of customers, of which *Tarleton v McGawley* (1794) Peake 270 provides a colourful example. In that case the master of a ship used cannons to prevent a potential customer from approaching a rival ship. IMG was a potential customer of Future for a licence to WC98 footage, but was turned away by FIFA's authoritative and (so say Future) wrongful assertion of the right to grant a licence itself.

35.    It seems to me, however, that there is a fundamental and decisive difference between keeping your rivals away from your competitor's goods and keeping them away from your competitor's intellectual property rights. In the former case the customer has, and should have a free choice as to where to purchase goods, and that choice is being interfered with by the activity of the tortfeasor in scaring them away. But in the case of an intellectual property right, there is no question of any choice. One either needs a licence or one does not. Once IMG had decided to include WC98 footage in its FIFA FEVER DVD, if Future's factual case is correct, it required a licence from Future. IMG never had any freedom of action to include WC98 footage without a licence from Future, and nothing that FIFA has done through clause 4.1 of the FIFA–IMG Agreement has conferred any such freedom on them. Equally, if Future had the right to prevent IMG from including WC98 footage in FIFA FEVER, it continued to enjoy that right notwithstanding anything that FIFA has done. The relations between IMG on the one hand and Future on the other are wholly unaffected.

36.    I would accordingly hold that the pleading as amended does not disclose a cause of action in causing loss by unlawful means with a realistic prospect of success. The facts alleged do not give rise to a realistically arguable case that IMG's freedom to deal with Future is in any material respect interfered with. It follows that I should refuse permission to amend.

37.    It is therefore not necessary for me to decide FIFA's points about the lateness of the amendment and amendment during jurisdictional challenge. It is sufficient therefore for me to say that I was not persuaded that FIFA was, in the end, materially prejudiced by the lateness of the amendment, as it was able to present its arguments more than adequately. However, I would have been inclined to hold that the amendment raised a new cause of action. The amendment relied for the first time on illegal acts directed at IMG, and the loss claimed is, for the first time, that which arises through the interference with IMG's freedom. That is a quite different cause of action to the case of causing harm by unlawful means originally pleaded, which, for reasons I have given, relied at most on rights arising out of or acknowledged by the FIFA–OTI Agreement. I would accordingly have held, in the light of *Gruppo Torras v Al–Sabah* [1995] 1 Lloyds Rep 374 at 5.2 and *News International v Bourgognon* (unrep Court of Appeal 5th March 1998), that the amendment should not have been allowed for this reason as well.

## Jurisdiction

38.    The finding that I should refuse permission to amend is sufficient to deal with this application, as it is not suggested that, in these circumstances, the originally pleaded case can survive. However, in case I am wrong about that I should consider Future's cause of action from the point of view of jurisdiction.

*Place where the harmful event occurs.*

39. FIFA submits that the place where the harmful event occurred was where FIFA signed the FIFA–IMG Agreement. That was in Switzerland. It submits that in deciding where the harmful event occurs, the focus is on the tortfeasor. Thus in *Shevill v Press Alliance* [1995] ECR I–415, it was the place where the newspaper publisher was established, not the place where the defamatory newspapers were read. In *Domicrest v Swiss Bank Corporation* [1999] QB 548 it was the place where the negligent misstatement was made, not where it was received.

40. Future submits that the harmful event does not occur at the point where the agreement was signed by FIFA, because the Agreement could have been performed without the incorporation of any WC98 material: the Agreement does not require IMG to include such material, although it may be commercially essential. Accordingly Future says that it is not until FIFA equips IMG with WC98 material from the archive and gives its approval to its incorporation on the compiled DVD that the event giving rise to the harm occurs.

41. In my judgment the harmful event occurred when FIFA signed the FIFA–IMG Agreement. This is the origin of the harm of which Future complains, and its case depends on the assertion that the Agreement warranted that FIFA owned the rights in WC98. For example Future points to the fact that certain rights are excluded from the definition of FIFA Archive Material, but not WC98. Whilst it may be the case that other events had to occur before Future's case on damage is made good, the origin of the harmful event is, at it seems to me, undoubtedly the signing of the Agreement which contained the warranty complained of.

*Place where the damage occurred*

42. FIFA contends that the damage occurred when Future did not receive licence revenue from IMG for IMG's activities. That was a loss which was suffered by Future in Switzerland. Payment would have been made in Switzerland into Future's bank account.

43. Future contends that the damage occurred in England, when FIFA equipped IMG with WC98 footage and/or gave its approval to IMG to include WC98 footage in FIFA FEVER.

44. One has to be somewhat cautious about claims in jurisdictional challenges under the Lugano Convention that the claimant suffers loss in the state of its domicile because that is the place where it ultimately suffers loss to its bottom line. As Christopher Clarke J pointed out in *Dolphin Maritime & Aviation Services v Sveriges Angartygs Assurans* [2009] EWHC 716 (Comm) at [30] to [31], the claimant will ultimately suffer all economic loss at the place where its books are made up, which is likely in most cases to be the place of his domicile. If this were sufficient to establish that the loss occurred there, it would create a very large exception to the Article 2 principle that a defendant should be sued in the state of *his* domicile. The special jurisdiction under Article 5(3) must accordingly be interpreted more strictly than this, in line with

the judgment of the Court in *Kalfelis v Backhaus Schroder* [1988] ECR 5565. It is for this reason that in *Dumez France v Hessiche Landesbank* [1990] ECR I–49, the Court stated at [20] that the place where the damage occurred:

> "can be understood only as indicating the place where the event giving rise to the damage, and entailing tortious, delictual or quasi–delictual liability, directly produced its harmful effects upon the person who is the immediate victim of that event".

45.     The reference in that extract to the "immediate victim" arose because it was a subsidiary of the claimant which had sustained the damage in that case, and the claimant was claiming for the indirect effect on itself of the harm to its subsidiary. Normally it will be sufficient to ask where the event directly produced its harmful effect on the claimant.

46.     Notwithstanding the reasoning in these cases, the conclusion may, in a proper case, be that the claimant did indeed sustain a loss for the first time at the place where its books are made up.

47.     In cases of tort where the harm complained of is economic harm, it may be useful to enquire what the position would have been if the tort had not been committed, and compare that with the situation in fact: see *Dolphin* at [59] and *Domicrest* at 568 E–G.

48.     In the present case there is no question of Future claiming indirectly for harm caused to IMG, or IMG being the victim. I should therefore ask where the event giving rise to damage and entailing tortious liability directly produced its harmful effects upon the claimant. The event which gives rise to tortious liability in this case, is, as I have held, the warranty that FIFA had the right to licence IMG in respect of WC98. There remain two further questions: what is the harmful effect of the tortious conduct complained of and where did that effect occur?

49.     In my judgment the harmful effect of the event giving rise to tortious liability is the alleged interference with IMG's freedom to deal with Future in respect of rights to WC98. As soon as IMG are in receipt of the warranty in the FIFA–IMG Agreement, consistently with Future's case, they are persuaded that they do not need to apply to Future for and obtain a licence. The result is, on this theory, that Future's licensing revenue is reduced.

50.     I reject Future's submission that it is the equipping of IMG with the materials necessary to use WC98 footage which is the relevant harmful effect. It is here that it is essential to keep in mind that it is the interference with IMG's freedom to deal with Future which is the wrong complained of. Future's submission elides the present cause of action with one of procuring a tort by IMG. It may be that the acts of equipping etc are acts which reduce the value of Future's exclusive licence, but they are not acts of interfering with IMG's freedom to act.

A-5590

51.  Where does that harmful effect of interference with IMG's freedom to act occur?  In my judgment it occurs where the contract with Future would have been made, if there had been no interference with IMG.  It seems to me, on the evidence available to me, that such a contract would have been made in Switzerland, where Future was based.  The evidence certainly does not establish that there is a good arguable case that a Future—IMG licence agreement would have been signed in England.

52.  Accordingly I would hold that the jurisdictional challenge succeeds.

1

[2002] 2 AC                                    Johnson v Gore Wood & Co (HL(E))

A                              House of Lords

# Johnson *v* Gore Wood & Co (a firm)

2000  July 17, 19, 20;        Lord Bingham of Cornhill, Lord Goff of Chieveley,
      Dec 14                         Lord Cooke of Thorndon, Lord Hutton
                                                              and Lord Millett

B    *Company — Shareholder — Rights — Action by company for damages for breach of*
     *     duty — Subsequent action by majority shareholder in respect of personal losses*
     *     sustained — Whether losses recoverable where not merely reflective of*
     *     company's losses*
     *Damages — Contract — Breach — Measure of damages — Whether damages for*
     *     mental distress and anxiety recoverable*
     *Estoppel — Convention, by — Underlying assumption — Validity of test*
C    *Practice — Pleadings — Striking out — Abuse of process — Company bringing*
     *     action against solicitors for damages for professional negligence — Action*
     *     compromised — Majority shareholder subsequently bringing action in respect of*
     *     personal losses sustained — Whether question of abuse of process to be judged*
     *     broadly on merits*

         The plaintiff, a businessman, conducted his affairs through a number of
D    companies, including W Ltd, in which he held all but two of the issued shares. On
     behalf of W Ltd he instructed the defendants, a firm of solicitors, who from time to
     time also acted on behalf of himself personally and of others of his companies, to act
     for W Ltd in connection with a proposed purchase of land, which it planned to
     develop. It had an option to purchase the land, and the defendants were instructed to
     serve a notice exercising the option. Service of the notice was followed by a dispute
E    as to its validity and consequent proceedings in the Chancery Division, where an
     order for specific performance was made against the vendor. By the time the
     conveyance was completed W Ltd had suffered substantial loss because of the cost of
     the Chancery proceedings, in which the vendor had been legally aided, its inability to
     recover damages and costs from the vendor, the collapse of the property market and
     interest charges that it had incurred. In January 1991 it started proceedings against
     the defendants for professional negligence in connection with the exercise of the
F    option. Before the action came to trial, solicitors representing W Ltd notified
     solicitors acting for the defendants that the plaintiff also had a personal claim against
     the defendants, arising out of the same matters, which he would pursue in due course.
     Subsequently, a solicitor acting for the plaintiff and a solicitor representing the
     defendants discussed the plaintiff's personal claim on the telephone and the plaintiff's
     solicitor explained that it had been thought better to wait until the company's claim
     had been concluded before dealing with the personal claim. An overall settlement of
G    W Ltd's claim and the plaintiff's claim was discussed, as was a settlement of the
     plaintiff's claim. W Ltd's proceedings were eventually compromised during the trial
     on payment to W Ltd of a substantial proportion of the sum claimed by it. In April
     1993 the plaintiff issued a writ against the defendants. In December 1997 the
     defendants applied for the action to be struck out as an abuse of the process of the
     court. They also sought determination of preliminary issues as to whether they had
     owed the plaintiff a duty of care and whether the damages claimed by him were in
H    principle recoverable on the facts pleaded. The judge declined to strike out the
     plaintiff's claim, holding that the defendants were estopped by convention from
     contending that the plaintiff's action was an abuse of process. He further held that
     the heads of damage pleaded were not irrecoverable as a matter of law in respect of
     the breaches alleged by the plaintiff. The Court of Appeal, on appeal by the
     defendants, ordered that the judge's order be set aside in so far as he had dismissed

                                                                    2 AC 2002—1

2

Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC

the defendants' application to strike out the proceedings as an abuse of the process of    A
the court but not otherwise.

On appeal by the plaintiff and cross-appeal by the defendants—

*Held*, (1) allowing the appeal, that there was a public interest in the finality of
litigation and in a defendant not being vexed twice in the same matter; but that
whether an action was an abuse of process as offending against that public interest
should be judged broadly on the merits taking account of all the public and private
interests involved and all the facts of the case, the crucial question being whether the    B
plaintiff was in all the circumstances misusing or abusing the process of the court; and
that, in all the circumstances, the plaintiff's action was not abusive ( post, pp 30H–31F,
32C–33A, 34C–G, 38F–G, 42D–F, 50H, 58G–60C, F–61A).

*Henderson v Henderson* (1843) 3 Hare 100 considered.

Observations as to estoppel by convention ( post, pp 33C–G, 38H–41C, 60H–61A).

(2) Dismissing the cross-appeal but varying the order of the Court of Appeal, that
the plaintiff was in principle entitled to recover in respect of any loss that he had    C
himself suffered that was not merely a reflection of the loss suffered by W Ltd; that,
save for his claims in respect of the dimunition in value of his pension and of his
majority shareholding in W Ltd in so far as they were merely a reflection of W Ltd's
loss, the plaintiff's heads of claim in respect of quantifiable damage should not be
struck out; that damages for breach of contract could not generally include damages
for mental distress and anxiety; that (Lord Cooke of Thorndon dissenting) the        D
plaintiff's claim for damages under that head should be struck out; and that his claim
for aggravated damages should also be struck out ( post, pp 35E–37A, D, 38C–D,
41E–42C, 48B–D, 50G, 55D–56B, 67C, G–68C).

. *Addis v Gramophone Co Ltd* [1909] AC 488, HL(E) applied.

Decision of the Court of Appeal [1999] Lloyd's Rep PN 91; [1999] PNLR 426
reversed in part.

The following cases are referred to in their Lordships' opinions:                        E

*Addis v Gramophone Co Ltd* [1909] AC 488, HL(E)
*Amalgamated Investment and Property Co Ltd v Texas Commerce International
  Bank Ltd* [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577, CA
*Arnold v National Westminster Bank plc* [1991] 2 AC 93; [1991] 2 WLR 1177;
  [1991] 3 All ER 41, H L(E)
*Ashmore v British Coal Corpn* [1990] 2 QB 338; [1990] 2 WLR 1437; [1990] 2 All
  ER 981, CA
*Bailey v Bullock* [1950] 2 All ER 1167                                                  F
*Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427, CA
*Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257; [1996] 1 All ER 981, CA
*Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482; [1999] 4 All
  ER 217, CA
*Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1982] 2 Lloyd's
  Rep 132, CA
*Brisbane City Council v Attorney General for Queensland* [1979] AC 411; [1978]        G
  3 WLR 299; [1978] 3 All ER 30, PC
*Brown v Waterloo Regional Board of Comrs of Police* (1982) 136 DLR (3d) 49;
  (1983) 150 DLR (3d) 729
*C (A Minor) v Hackney London Borough Council* [1996] 1 WLR 789; [1996] 1 All
  ER 973, CA
*Christensen v Scott* [1996] 1 NZLR 273
*Clark Boyce v Mouat* [1994] 1 AC 428; [1993] 3 WLR 1021; [1993] 4 All ER 268,        H
  PC
*Fischer (George) (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260,
  CA
*Foss v Harbottle* (1843) 2 Hare 461
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443, CA

3

[2002] 2 AC                                    Johnson v Gore Wood & Co (HL(E))

A   *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510; [1977] 3 All ER 54
    *Greenhalgh v Mallard* [1947] 2 All ER 255, CA
    *Halliday v Shoesmith* [1993] 1 WLR 1, CA
    *Hayes v James & Charles Dodd* [1990] 2 All ER 815, CA
    *Henderson v Henderson* (1843) 3 Hare 100
    *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145; [1994] 3 WLR 761; [1994]
        3 All ER 506, HL(E)
B   *Heron International Ltd v Lord Grade* [1983] BCLC 244, CA
    *Hobbs v London and South Western Railway Co* (1875) LR 10 QB 111
    *Home and Colonial Insurance Co Ltd, In re* [1930] 1 Ch 102
    *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241; [1990] 3 WLR 347; [1990]
        2 All ER 990, CA
    *Howard (R P) Ltd v Woodman Matthews & Co* [1983] BCLC 117
    *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529; [1981] 3 WLR
C       906; [1981] 3 All ER 727, HL(E)
    *Lee v Sheard* [1956] 1 QB 192; [1955] 3 WLR 951; [1955] 3 All ER 777, CA
    *Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20; [1997]
        3 WLR 95; [1997] 3 All ER 1, HL(E)
    *Manson v Vooght* [1999] BPIR 376, CA
    *Mouat v Clark Boyce* [1992] 2 NZLR 559
    *President of India v Lips Maritime Corpn* [1988] AC 395; [1987] 3 WLR 572; [1987]
        3 All ER 110, HL(E)
D   *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204;
        [1982] 2 WLR 31; [1982] 1 All ER 354, CA
    *Ruxley Electronics and Construction Ltd v Forsyth* [1996] AC 344; [1995] 3 WLR
        118; [1995] 3 All ER 268, CA
    *Stein v Blake* [1998] 1 All ER 724, CA
    *Talbot v Berkshire County Council* [1994] QB 290; [1993] 3 WLR 708; [1993] 4 All
        ER 9, CA
E   *Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd (Note)* [1982] QB 133;
        [1981] 2 WLR 576; [1981] 1 All ER 897
    *Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145; [1982] 2 WLR 855; [1982]
        2 All ER 144, HL(E)
    *Walker v Stones* [2001] QB 902; [2001] 2 WLR 623; [2000] 4 All ER 412, CA
    *Watson v Dutton Forshaw Motor Group Ltd* (unreported) 22 July 1998; Court of
        Appeal (Civil Division) Transcript No 1284 of 1998, CA
F   *Watts v Morrow* [1991] 1 WLR 1421; [1991] 4 All ER 937, CA
    *Whelan v Waitaki Meats Ltd* [1991] 2 NZLR 74
    *Windsor Steam Coal Co (1901) Ltd, In re* [1929] 1 Ch 151, CA
    *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581; [1975] 2 WLR
        690, PC

    The following additional cases were cited in argument:

G   *Allison (Kenneth) Ltd v A E Limehouse & Co* [1992] 2 AC 105; [1991] 3 WLR 671;
        [1991] 4 All ER 500, HL(E)
    *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853; [1966] 3 WLR
        125; [1966] 2 All ER 536, HL(E)
    *Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain Gregos)
        (No 2)* [1990] 2 Lloyd's Rep 395, CA
    *Farley v Skinner* (unreported) 6 April 2000; Court of Appeal (Civil Division)
H       Transcript No 577 of 2000, CA
    *Fox v Star Newspaper Co Ltd* [1898] 1 QB 636, CA; [1900] AC 19, HL(E)
    *Goodwill v British Pregnancy Advisory Service* [1996] 1 WLR 1397; [1996] 2 All
        ER 161, CA
    *Hall v Governor and Co of the Bank of England* (unreported) 19 April 2000; Court
        of Appeal (Civil Division) Transcript No 725 of 2000, CA

4
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC

*Hiscox v Outhwaite* [1992] 1 AC 562; [1991] 2 WLR 1321; [1991] 3 All ER 124,    A
    CA; [1992] 1 AC 562; [1991] 3 WLR 297; [1991] 3 All ER 641, HL(E)
*Ketteman v Hansel Properties Ltd* [1987] AC 189; [1987] 2 WLR 312; [1987] 1 All
    ER 38, HL(E)
*L R v Witherspoon* [1999] Lloyd's Rep PN 401, CA
*MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 2 BCLC 659, CA
*Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord)* [1988]
    2 Lloyd's Rep 343, CA                                                       B
*Verderame v Commercial Union Assurance Co plc* [1992] BCLC 793, CA
*Wapshott v Davis Donovan & Co* [1996] PNLR 361, CA

APPEAL and CROSS-APPEAL from the Court of Appeal
    This was an appeal by the plaintiff, William Henry John Johnson, by leave
of the House of Lords (Lord Hope of Craighead, Lord Clyde and Lord
Millett) given on 25 May 1999 and a cross-appeal by the defendants, Gore    C
Wood & Co (a firm), by leave of the House of Lords (Lord Hope of
Craighead, Lord Clyde and Lord Millett) given on 3 November 1999 from a
judgment of the Court of Appeal (Nourse, Ward and Mantell LJJ) given on
11 November 1998.
    By its judgment, the Court of Appeal had allowed an appeal by the
defendants from an order of Pumfrey J dated 21 May 1998. The judge, on    D
application by the defendants, had declined to strike out the plaintiff's claim
against them. On preliminary issues ordered by Sir Richard Scott V-C sitting
as an additional judge of the Queen's Bench Division, the judge had
determined that (a) the facts and matters relied on by the plaintiff as
constituting breaches of duty by the defendants were capable of constituting
the breach of a contractual, tortious or fiduciary duty owed as a matter of
law by the defendants to the plaintiff and (b) the heads of damage alleged in    E
paragraphs 23 and 24 of the re-amended statement of claim were not
irrecoverable as a matter of law as damages for the pleaded breaches alleged
by the plaintiff. The Court of Appeal ordered that his judgment be set aside
in so far as he had dismissed the defendants' application to strike out the
proceedings as an abuse of the process of the court but not further or
otherwise. It held that one head of damage, namely diminution in the value    F
of the plaintiff's shareholding in Westway Homes Ltd, should be struck out
of the re-amended statement of claim.
    The facts are stated in the opinion of Lord Bingham of Cornhill.

    *Roger ter Haar QC* and *Simon Howarth* for the plaintiff. The Court of
Appeal correctly identified the underlying principle in all cases of abuse of    G
process as that articulated by Lord Diplock in *Hunter v Chief Constable of
the West Midlands Police* [1982] AC 529, 536C–D. The Court of Appeal's
decision is inconsistent with *Bradford and Bingley Building Society v
Seddon* [1999] 1 WLR 1482. No "additional element" of the type suggested
in that case is present here, nor was any such additional element identified by
the Court of Appeal. The Court of Appeal appears to have regarded it as
being for the plaintiff to establish that special circumstances existed; the    H
approach in *Bradford and Bingley* is to be preferred as being more
consonant with justice and consistent with Lord Diplock's dicta in *Hunter*
and dicta in *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975]
AC 581, 590 and *Brisbane City Council v Attorney General for Queensland*
[1979] AC 411, 425. May LJ in *Manson v Vooght* [1999] BPIR 376, 387–

5

[2002] 2 AC            Johnson v Gore Wood & Co (HL(E))

A   388, in a dictum correctly stating the effect of the authorities, said that "it may in particular cases be sensible to advance cases separately". This was such a case. The Court of Appeal appears to have regarded the mere fact of "re"-litigation as sufficient to amount to abuse of process: compare *Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482, 1492G. In effect, this equated the case to one of issue estoppel, which it is not. With abuse of process, one is looking at much broader issues of justice; many cases

B   involve a collateral attack on a previous decision. If necessary, *Talbot v Berkshire County Council* [1994] QB 290 should be overruled. [Reference was also made to *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853.]

Further, the Court of Appeal gave no or inadequate consideration to the reasons put forward in the plaintiff's affidavit explaining the reasons for the

C   course adopted. Its reference to full legal aid having been available "long before the trial" was incorrect. The plaintiff was obliged to have regard, and did have regard, to the interests of the other shareholders and creditors of the company in reaching his decision. The Court of Appeal was wrong to hold that the plaintiff was "in control throughout". His options were severely limited.

D   It appears, although it is not entirely clear, that the Court of Appeal accepted that "most practitioners [in 1992] would not have thought the rule [in *Henderson v Henderson* (1843) 3 Hare 100] applied at all". If that is so, then the pursuit of the personal claim separately from the company claim was not an abuse of process: see per Lord Kilbrandon in *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581, 590. Whilst the diligence or lack of diligence of a legal adviser may not be relevant in a true

E   case of issue estoppel, it is relevant where the court is considering questions of abuse of process (as here) or exercise of its discretion. On the other hand, if the Court of Appeal took the view that most practitioners in 1992 would have thought that the rule in *Henderson v Henderson* applied, then the defendants could and should have taken the point then and it was unconscionable for them to take it for the first time in December 1997.

F   Moreover, the consequence will be that court time will not be saved by striking out this action as suggested by the Court of Appeal [1999] Lloyd's Rep PN 91, 114; on the contrary, it will now be occupied by further and more complicated litigation against the solicitors and counsel advising the plaintiff in respect of his personal claim in 1992. Further, in deciding whether the commencement of the present proceedings was an abuse of process the applicable principles are those applying in 1992, not those

G   current in 1998; accordingly, the Court of Appeal was wrong to take into account, "the current reform of civil justice". In deciding whether the present proceedings constitute an abuse of process it is relevant to consider not only the plaintiff's conduct but also that of the defendants. The Court of Appeal's approach is contrary to recent comments made in *L R v Witherspoon* [1999] Lloyd's Rep PN 401, where the guidance in *Halliday v Shoesmith* [1993] 1 WLR 1 was approved and followed. The Court of

H   Appeal in the present case appears to have considered that there were conflicting decisions of the court as to the proper approach to be adopted in the circumstances, comparing, at pp 113–114, *Halliday v Shoesmith* with *Goodwill v British Pregnancy Advisory Service* [1996] 1 WLR 1397. The true rule, which both *Halliday* and *Goodwill* support, is that where a case is

hopeless the court should accede to an application to strike out however late    A
it is made because it is bound to save time and costs. If, however, the claim is
arguable in law then a belated application to strike it out without a trial on
the merits should only be entertained on receiving a valid explanation for the
delay in making it. The Court of Appeal accepted, that the reason for the
point not being taken earlier was that it had not been considered until
Mr Steinfeld was instructed. The plaintiff also accepts that that is the    B
explanation for the delay. It is a bad reason for failure to take such a point:
see *L R v Witherspoon* [1999] Lloyd's Rep PN 401 and *Ketteman v Hansel
Properties Ltd* [1987] AC 189, 219–220. There was accordingly no proper
reason for the delay.

In the circumstances, the present proceedings do not constitute an abuse
of process. Applying the dictum of Lord Diplock in *Hunter v Chief
Constable of the West Midlands Police* [1982] AC 529, 536C, bringing them    C
is not "manifestly unfair" to the defendants, because they settled the original
company proceedings on the basis that the plaintiff's personal claim would
be litigated or settled later. To allow this claim to be pursued would not
"bring the administration of justice into disrepute among right-thinking
people" given that the defendants settled the company proceedings on the
basis that they knew that the personal claim would be brought, that they    D
obtained valuable concessions on the basis that it would he litigated or
settled later and that both they and the plaintiff acted for a considerable time
on a common assumption that it would be made and would be entertained
by the court. If it is necessary for the plaintiff to show "special
circumstances", these matters constitute them. The plaintiff is not the same
party as the company, nor are his claims the same.

To apply the rule in *Henderson v Henderson* 3 Hare 100 to a party in the    E
plaintiff's position is a substantial and unnecessary extension of the law in so
far as it applies to issue estoppel. So far as that doctrine is concerned, it is
desirable that it should be clearly and unambiguously applied so that parties
know where they stand and should not depend on questions as to whether
an action "should" have been joined with another. In so far as wider
considerations apply in respect of abuse of process, the mere fact that the    F
plaintiff could more conveniently have joined in the earlier action against
the defendant does not render the later claim an abuse of process: see
*C (A Minor) v Hackney London Borough Council* [1996] 1 WLR 789 and
*Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482. In
these circumstances the court is concerned with wider questions of justice
and fairness than the strict ratio of *Henderson v Henderson*. In so far as the
Court of Appeal extended the rule in *Henderson v Henderson* by treating    G
this case as an instance of issue estoppel they were wrong to do so. In so far
as they considered it to be a case of abuse of process going beyond
*Henderson v Henderson* they failed to consider the matter in the round. Had
they done so, they should have concluded that the significant differences
between the company and the personal claims and the reason for proceeding
first with the company claim justified (or excused) the course taken.

One of the main reasons for the rule in *Henderson v Henderson* is the    H
prevention of the risk that different courts seized of different actions dealing
with the same subject matter and raising the same issues will come to
different conclusions. This would be unfair to the parties, particularly to an
initially successful party who fails in a subsequent proceeding, and likely to

A-5597

A    bring the administration of justice into disrepute. It is self-evident that
where there is a settlement of the first action these dangers fall away. It is
open to a party fearful of a second action following settlement of the first to
negotiate terms of settlement that preclude his adversary from issuing
further proceedings. To hold that the rule applies where there has been a
compromise of the first action gives rise to practical problems. Is the rule to
B    apply (and if so how) in a situation where two actions are started and one is
settled by a prompt payment into court? There is no reason why the second
action should be regarded as an abuse of process. The defendant is aware of
both actions, has chosen to settle one and has thereby removed the risk of
inconsistent results. No one could have contemplated in the instant case that
as soon as the company action was settled the plaintiff's personal action
should immediately have been struck out.

C        As to estoppel by convention, the judgment of the Court of Appeal
confuses it with estoppel by representation, is contrary to previous binding
authority and is illogical and contrary to principle. The defendants knew
that another action was likely to be commenced and also knew that it would
involve repetition of allegations made in the company action. An objection
to a second action per se (ie, to its very existence rather than to the time
when it was launched or the detail of the case made in it) would necessarily
D    always be open to the defendant. Accordingly, such an objection could and
should have been perceived at the time of the settlement agreement and the
defendants could and should expressly have reserved their right to take it if
they had wished to preserve such a right. There was unchallenged evidence
that the plaintiff would not have agreed to the undertakings he gave in the
settlement agreement if there had been any intimation that this point would
E    be taken. Silence on the matter amounted to an undertaking not to take it.
That the defendants not only kept silent but also obtained concessions in
relation to the second action shows that the parties were proceeding on the
assumption that a second action could be brought if commenced in time
and properly constituted. Otherwise, the concessions extracted from the
plaintiff make no sense.

F        The Court of Appeal appear to have misunderstood or misconstrued the
meaning of "common assumption" in this context. They identified, at p 113,
as the assumption on which the estoppel was based as being that if the rule in
*Henderson v Henderson* did apply it would not be raised. That formulation
was not suggested by the plaintiff and he disputes its accuracy. "Assume"
means "take as being true, for purpose of argument or action": see *Concise
Oxford English Dictionary*, 7th ed (1982). In the present case, for the
G    purpose of entering into the settlement agreement the parties took it as being
true that the plaintiff could bring a second action against the defendants
provided that it was brought within time and disclosed a reasonable cause
of action. There could not have been any relevant assumption in relation
to *Henderson v Henderson* because no one had spotted the point. The
assumption must, therefore, be formulated in more general terms. The court
should not inquire into the reasons why the assumption was made once it is
H    satisfied that it existed and was relied on. If the Court of Appeal were
correct, a distinction would be drawn between a case where the parties form
their assumption because a point is overlooked and one where they notice
the point but mistakenly believe that it is a bad one. In consequence of this
distinction, an estoppel would arise in the latter case but not in the former.

8
Johnson v Gore Wood & Co (HL(E))                                [2002] 2 AC

Such a distinction is not logical or justifiable in principle. Further, it is not    A
clear how any rule involving such a distinction would apply where party
A misses the point entirely and party B spots the point but, thinking it a bad
one, does not mention it to party A. The parties then proceed on the
assumption that the point is not available but party B then changes his mind
as to its merits. There ought to be an estoppel, because the important factor
that suggests (as a matter of broad justice) the application of an estoppel    B
would be present. The parties would both have acted in good faith on
the basis that the point was not available. [Reference was made to
*Amalgamated Investment and Property Co Ltd v Texas Commerce
International Bank Ltd* [1982] QB 84, 122; *Ashmore v British Coal Corpn*
[1990] 2 QB 338; *Barrow v Bankside Members Agency Ltd* [1996] 1 WLR
257; *Hiscox v Outhwaite* [1992] 1 AC 562 and *Kenneth Allison Ltd v
A E Limehouse & Co* [1992] 2 AC 105.]                                          C

*Alan Steinfeld QC* and *Elizabeth Overy* for the defendants. The Court of
Appeal was correct to hold that the rule in *Henderson v Henderson* 3 Hare
100 prima facie applies to these proceedings. In so far as the principle covers
matters that might have been, but were not, brought forward, it is now well
established that it depends not on a strict application of the doctrine of res
judicata but on the public policy that requires that there should be an end to    D
litigation and so treats actions falling within it as an abuse of process: see
*Talbot v Berkshire County Council* [1994] QB 290, 296D. This case is
concerned with that wider, public policy, aspect of the *Henderson v
Henderson* principle. The policy itself has assumed greater importance with
the much greater stress now laid on case management under the Civil
Procedure Rules. It is not possible for the court properly to direct the parties    E
how to manage the case unless both it and the parties know the full range of
the issues that lie between the parties.
    There are three vices in litigating or relitigating issues that have already
been litigated or should have been, any one of which is sufficient to
constitute an abuse of process. (i) It is a substantial waste of court time and
is unfair to other litigants; to that extent the rule in *Henderson v Henderson*
is founded in public policy. The courts should be wary of finding that the    F
parties agreed that the rule should not apply. (ii) It subjects, or potentially
subjects, the defendant to more than one set of proceedings, which is prima
facie unfair. It substantially increases costs, as in the present case. (iii) In
many cases, relitigation may constitute a collateral attack on the outcome of
the previous proceedings. There are two objections to this: it offends against
the principle that there should be an end of litigation, and it could result in    G
conflicting decisions. Here, where the plaintiff takes the view that the
amount recovered by the company in its proceedings was not enough to put
it back on its feet, all three vices are present.
    The fact that the roots of the principle lie in public policy offers guidance
both on the question whether it should be applied in circumstances where it
is contended that a party could and should have brought his case forward at
an earlier stage but the factual situation differs from the precise situation    H
outlined in *Henderson v Henderson* 3 Hare 100 and on the question of the
exercise of discretion. The question of prima facie application is ultimately
whether to permit the claim to proceed would amount to a misuse of
procedure in the way indicated by Lord Diplock in *Hunter v Chief Constable*

A   of the West Midlands Police [1982] AC 529, 536C. The existence of the wider *Henderson v Henderson* principle and its foundation in public policy were clearly recognised in *Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145, 157F, 163B–E. [Reference was also made to *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581 and *Brisbane City Council v Attorney General for Queensland* [1979] AC 411.]

B     *Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482 suggests that in the application of *Henderson v Henderson* 3 Hare 100 a distinction is to be drawn between cases in which the narrower principle is relevant, where the principle applies unless there are special circumstances, and those in which the wider principle is invoked, where it is for the person alleging abuse of process to establish that when all the circumstances are weighed there will be found to be an abuse. No sufficient warrant for such a

C   distinction is to be found in any of the former authorities or was made in the present case. Public policy points clearly against relitigation and thus a prima facie abuse exists equally in any relitigation case. The need for a careful examination of all the circumstances was recognised in both *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581 and *Brisbane City Council v Attorney General for Queensland* [1979] AC 411, but with no indication that something over and above the abuse normally resulting

D   from relitigation had to be shown. *Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257 involved consideration of the wider *Henderson v Henderson* principle and is not properly to be relied on in the way in which it was relied on in *Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482. Auld LJ seems to suggest that the House of Lords in *Arnold v National Westminster Bank plc* [1991] 2 AC 93 was dealing with issue

E   estoppel in its strict form and not deciding anything in relation to the wider principle based on abuse of process. It is clear, however (see at pp 106B and 108G–H), that their Lordships were not drawing any distinction between cases in which the issue had actually been decided and those in which the relevant point might have been brought forward but was not. As *Talbot v Berkshire County Council* [1994] QB 290 shows, that is the very distinction between the narrower and the wider aspects of the principle. *Bradford and*

F   *Bingley Building Society v Seddon* [1999] 1 WLR 1482 should, therefore, be overruled in so far as it requires a different approach to the two types of case. Any balancing process comes only at the stage of the exercise of discretion.

    The Court of Appeal was correct to hold that the rule in *Henderson v Henderson* 3 Hare 100 applies to a privy of the claimant in the first action as it would to the claimant himself and that the plaintiff was a privy of

G   Westway Homes Ltd ("WWH") for the purposes of the rule. As to privity generally, an abuse of process objection based on relitigation may be taken against a person who is a privy of the original claimant in the sense of having a common interest in the determination of the original action: see *Ashmore v British Coal Corpn* [1990] 2 QB 338; *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241 and *MCC Proceeds Inc v Lehman Bros International*

H   *(Europe)* [1998] BCLC 793. There is no logical justification for distinguishing between the position of a privy in a case of estoppel under the narrower *Henderson v Henderson* principle and his position in a case of abuse of process under the wider principle. It follows that the general rule should be that in the latter case as in the former there is no need to show any special or exceptional circumstances before a privy may be bound. The real

question is who is a privy of the original party for these purposes. [Reference    A
was made to *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC
853.]

The plaintiff contended in the Court of Appeal that the application of the
wider *Henderson v Henderson* 3 Hare 100 principle to privies was an
extension that could have dramatic and unfair consequences and so should
not be made. If it is an extension at all, rather than a case not previously    B
considered but plainly within the original rule, then it is an extension that
ensures a consistent approach to all aspects of *Henderson v Henderson*. The
difficulties identified by the plaintiff in the Court of Appeal all stem from a
choice by two closely related parties bringing claims covering substantially
the same issues to proceed independently. In such circumstances, the answer
lies in proper case management. Both claims have in fact been put forward
and it is for the parties and the court to manage the litigation in such a way    C
that the court's process is not abused by exposing the defendants to
relitigation. The argument does not show a basis for the House of Lords to
determine that the *Henderson v Henderson* principle does not apply to a
privy. The misuse of procedure test is satisfied.

As to privity specifically in this case, the test in *Gleeson v J Whippell & Co
Ltd* [1977] 1 WLR 510, 515F is correct. The essence of the plaintiff's case is    D
that WWH was his alter ego. There is the closest possible identification
between him and WWH, the original party. In substance they are one and
the same for present purposes, and it is just that the plaintiff should be bound
under the principle binding privies. Further, he relies on allegations that the
defendants owed him duties in exactly the same terms as they did to
WWH and were in breach of those duties in exactly the same way. The
Court of Appeal [1999] PLR 426, 462F rightly said that those allegations    E
encompass "practically the whole of the ground traversed for six weeks" in
the company proceedings. The plaintiff is fairly and squarely covered by the
approach of Stuart-Smith LJ in *House of Spring Gardens Ltd v Waite* [1991]
1 QB 241, 254A–B. If the company action had gone on to judgment and
been dismissed on a finding that the defendants had not been negligent, it is
inconceivable that he would not have been estopped by that judgment in the
same way as the plaintiff in the *Spring Gardens* case was so as to preclude his    F
bringing his personal claim. He is therefore to be regarded as a privy of
WWH not only as a matter of practical identity but also through his conduct
in relation to the company proceedings.

The Court of Appeal was correct to hold that the rule in *Henderson v
Henderson* 3 Hare 100 was capable of applying in the situation where the
first action was compromised rather than continued through to judgment    G
and that the rule applied in the present case having regard (if necessary) to
the stage the company proceedings had reached when they were
compromised. The significance of the reference in *Henderson v Henderson*
to adjudication is that adjudication is a final form of resolution after
consideration of the merits. There is no reason in principle why a
compromise should not have the same effect, given that it is equally a final
form of resolution of the parties' disputes relating to the particular subject    H
matter after consideration of the merits. There is no basis in public policy
for distinguishing the two classes of case.

It is immaterial at what stage of the proceedings the compromise is
reached. There is no basis on which the plaintiff can say that the trial of the

11

[2002] 2 AC

Johnson v Gore Wood & Co (HL(E))

A   company proceedings had not got far enough.  In any event, the principle in *Henderson v Henderson* 3 Hare 100 should apply where the action has gone beyond the stage at which the court would permit the claimant to discontinue and start again.  That will be so where the claimant has opened his case (and a fortiori once, as here, he has closed his case on liability): see *Fox v Star Newspaper Co Ltd* [1898] 1 QB 636; [1900] AC 19.  The situation is then comparable with the primary *Henderson v Henderson* case, in which the court and the parties will have full awareness of the material issues on which the court is adjudicating.  On any view, the company proceedings had gone far enough for *Henderson v Henderson* to apply.

B

The Court of Appeal was correct to determine that there were no special circumstances that required that the present action should not be struck out despite the prima facie application of the rule in *Henderson v Henderson* 3 Hare 100.  As to the first special circumstance relied on by the plaintiff, namely, his reasons for not bringing his personal claim at the same time as the company claim, all his arguments stem ultimately from his and the company's lack of financial resources.  Difficulties in funding litigation do not in themselves amount to special circumstances for the purposes of the *Henderson v Henderson* principle: see *Manson v Vooght* [1999] BPIR 376. Any other approach would involve the risk that a claimant would pursue one head of claim after another as funding for each became available, whether from borrowing, legal aid, a contingency fee arrangement or even the fruits of success on previous heads.  Such a process would clearly be oppressive to the defendant.

C

D

As to the second special circumstance relied on, namely, the defendants' conduct relating to the plaintiff's personal claim, essentially the matters of conduct amount to no more than that the defendants did not ask the plaintiff to join his claim with that of WWH in the company proceedings, contemplated but did not achieve settlement of the personal claim and did not raise the abuse point until late in the day.  Complaint is also made that the defendants are not prepared to make concessions (i e, to admit liability) that would reduce the length of the trial.  Save in so far as his conduct may found an estoppel argument, a potential defendant is under no obligation to advise a claimant how to make his claim so that a successful application to strike out on the ground of abuse of process may be avoided.  Similarly, a defendant is not obliged to concede points not determined against him so that the claimant cannot be said to be relitigating those issues.  The Court of Appeal rightly found that the delay was not a special circumstance.

E

F

As to the third special circumstance relied on, namely, the fact that the plaintiff was not warned by his legal advisers of the potential challenge to the personal claim, this should not be visited on the defendants as a special circumstance taking this case out of the *Henderson v Henderson* 3 Hare 100 principle.  The mischief of relitigation between the original parties or their privies is the same in either case.

G

The Court of Appeal was correct to determine that the defendants were not estopped by convention from alleging that the present action was an abuse of the process of the court.  The difference on this point between the Court of Appeal and Pumfrey J arose not from any difference as to the applicable law but because on the facts the Court of Appeal held that the common assumption on the basis of which the parties had acted was more limited than Pumfrey J had found.  The classic statement of the principle

H

underlying estoppel by convention on the basis of which both Pumfrey J and                    A
the Court of Appeal proceeded is that of Lord Denning MR in *Amalgamated
Investment and Property Co Ltd v Texas Commerce International Bank Ltd*
[1982] QB 84, 122. [Reference was also made to *Kenneth Allison Ltd v
A E Limehouse & Co* [1992] 2 AC 105, 127D–G.] It is an essential feature of
the application of the principle that each party should be aware of the
assumption made by the other and that they should conduct their dealings                       B
on the basis of those assumptions: see *Norwegian American Cruises A/S v
Paul Mundy Ltd (The Vistafjord)* [1988] 2 Lloyd's Rep 343, 351 and
*Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain
Gregos) (No 2)* [1990] 2 Lloyd's Rep 395, 405. It is not sufficient that the
assumption is common to both if they are not also both aware that it is
common to both; in that sense, the assumption must be not only common                          C
but agreed. It is also an essential feature that the estoppel should arise on the
basis of an assumption as to facts or law. It does not arise on the basis of a
representation by one party to the other either as to fact or as to that party's
future conduct: see *The Vistafjord*, p 351 and *Spencer Bower and Turner,
Estoppel by Representation*, 3rd ed (1977), p 157, para 157. The inquiry
concerns not what a party will do but what a state of affairs is. In *Hiscox v
Outhwaite* [1992] 1 AC 562, which led Pumfrey J to his conclusion, there                        D
was no departure from those principles. The argument addressed to the
Court of Appeal related solely to the facts of the case: see p 565H. The case is
no more than an illustration of the application of the principles to particular
factual circumstances. To succeed in the present case on the footing of
estoppel by convention on the basis of the circumstances of and surrounding
the settlement of the company proceedings and the terms of that settlement,
the plaintiff needs to show an agreed assumption that as and when he made                       E
his personal claim it would not be open to attack as an abuse of process on
the basis of *Henderson v Henderson* 3 Hare 100. An agreed assumption that
the defendants would not adopt a particular line of attack would not be
sufficient. The agreed assumption found by Pumfrey J that "the personal
claim would be made, and would be entertained by the court" appears to be
an assumption as to the future conduct of the plaintiff and, if it is intended to                F
extend to an assumption that the claim would be considered on its merits, as
to the future conduct either of the court or of the defendants. It could not
support the estoppel by convention that the judge found.

    The Court of Appeal was correct to hold that the facts did not evidence a
common assumption of the necessary nature. The fact that the defendants
did nothing to indicate that they accepted that the threatened claim was or
might be a good one or one capable of being maintained (i e, in this context,                    G
a claim that would not be vulnerable to a striking-out application on the
ground of abuse of process) and that they would limit the nature of any
defences or objections that they might have is fatal to the plaintiff's case. It is
in fact inconceivable that there should have been an agreed assumption
about possible lines of attack on the plaintiff's present claim at a time when
there was no pleading in existence and in view of the fact that the claim as
now formulated *is very different* from the claim then notified. If the                          H
plaintiff's personal claim had been statute-barred, there was nothing in the
compromise or in the defendants' conduct to give rise to an estoppel that
would have prevented them from taking a limitation point in the personal
action when it was brought. There is no logical distinction between that and

13

[2002] 2 AC                                        Johnson v Gore Wood & Co (HL(E))

A    any other defence or objection. The position is not affected by bringing into the equation the defendants' delay in making the striking-out application. It is true that when the claim was actually brought and pleaded they became able to assess to some degree whether or not it was an abuse of process. (The position became clearer after completion of service of the plaintiff's factual and expert evidence.) It cannot be said, however, that conduct consisting of nothing more than, on the one part, failure to make an application and, on

B    the other, continuing with the action involves a communication between the parties of the fact that each is proceeding on the assumption that the action is not an abuse of process. Delay is to be considered, as it was by the Court of Appeal and Pumfrey J, in relation to the issues of special circumstances and the exercise of the striking-out power.

    As to the possibility of an estoppel by representation, if the point is sought

C    to be raised, there is nothing in the evidence to show any representation by the defendants to the plaintiff that they would conduct their defence of the action in any particular way or without taking any particular point.

    There are no grounds for attacking the Court of Appeal's exercise of its discretion to strike out the plaintiff's claim as an abuse of process. Once the abuse of process has been shown, the court has a duty to put an end to it by

D    striking the action out unless in the exercise of its discretion it concludes that its duty to do so is outweighed by other considerations. It "defies common sense" (see *Goodwill v British Pregnancy Advisory Service* [1996] 1 WLR 1397, 1402), and would defeat the general public policy underlying *Henderson v Henderson* 3 Hare 100, to refuse to prevent an abuse of the court's process simply to punish the defendants for their delay. *Goodwill* should be preferred to *Halliday v Shoesmith* [1993] 1 WLR 1. It shows that

E    the decision in *Halliday* should be confined to similarly exceptional cases.

    "Special circumstances" cannot be resurrected at the discretion stage as contended for by the plaintiff. The points raised are explicit or implicit in the issues already considered and do not support an independent attack on the exercise of discretion. The present action is manifestly unfair to the defendants, who only some years after the settlement of the company

F    proceedings became aware of the extent to which the plaintiff proposed to go over again issues extensively canvassed in the previous action. That could not have been foreseen from the sketchy details available at the end of November 1992. It would bring the administration of justice into disrepute to allow the plaintiff to do this simply because through his alter ego (and by his own choice) he did not recover as much in the company proceedings as he

G    would have liked to. Alternatively, on any view the Court of Appeal was entitled to exercise its discretion as it did, having regard to the overall principle of *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 and cannot be said to have been plainly wrong.

    As to delay, the prospect of a trial of at least eight weeks (the parties' current estimate), which ex hypothesi constitutes an abuse of process, has to be balanced against the time, effort and expense incurred in the progress of

H    the litigation to date and the stress of the litigation on the plaintiff. His advisers are sufficiently compensated for their time and effort through their entitlement to costs. While the plaintiff has himself spent time on the action and has experienced stress, that is the consequence of his having persisted in an action that will be found to have been an abuse. When the balancing

14
Johnson v Gore Wood & Co (HL(E))                                   [2002] 2 AC

exercise has been performed, it is a decision not to strike out the action that    A
would be plainly wrong.

  On the cross-appeal, the first five principles put forward by the Court of
Appeal [1999] PNLR 456B–F are correct. The fundamental principle is that,
as a general rule, the company is the proper claimant in an action to recover
loss that it has itself suffered: see *Foss v Harbottle* (1843) 2 Hare 461.
A shareholder cannot in substance avoid that rule by bringing a personal    B
claim to recover damages for loss in the value of his shares merely because
the company in which he is interested has suffered damage, even if the
conduct of which he complains gave him personally, and not the company
alone, a cause of action: see *Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204, 222H–223A. He is suing for loss that
simply reflects loss to the company. The *Prudential* principle is, as the Court
of Appeal [1999] PNLR 457F said, salutary. It ensures that loss to the    C
company is recovered only by the company and that the proceeds of
recovery are not diverted to the shareholders to the potential prejudice of
creditors. It similarly ensures that the process of recovery is conducted only
by the company and that the company's right to recover is not adversely
affected by outside compromises with the shareholders to the potential
prejudice of creditors. It applies to loss of benefits as a director as well as    D
to loss of dividends. There is no exception to it by which a shareholder
can recover in respect of reflective loss that the company itself has for any
reason failed to recover: see *Prudential*, at p 223E, and *Gerber Garment
Technology Inc v Lectra Systems Ltd* [1997] RPC 443, 471.

  The loss claimed by the plaintiff as shareholder is entirely a reflection of
WWH's loss, being referable to lack of available funds in WWH at a
particular time and/or the compromise of the company proceedings for (it is    E
alleged) a sum substantially less than the full amount of WWH's loss. The
duties breach of which is alleged to have caused the plaintiff's loss are the
same in content as those relied on in the company proceedings and are
alleged to have been broken in the same way.

  In any event, in accordance with general principles as to recoverability of
damage a shareholder cannot recover for loss stemming from delayed
payment of damages to him, a fortiori from delayed payment of damages to    F
the company: see *Verderame v Commercial Union Assurance Co plc* [1992]
BCLC 793. The essence of the claim to additional loss in such circumstances
is that the claimant, having been deprived of financial resources to be
expected from the company, has suffered a further loss resulting from his
reflective loss. A claim by the company to consequential loss arising from
deprivation of financial resources would be met by the general policy    G
objection to recovery of damages for loss resulting from delayed payment
and impecuniosity. A fortiori that policy constitutes a ground of objection
to recovery of such damages by a shareholder whose right of recovery is only
through the company, in accordance with *Prudential Assurance Co Ltd v
Newman Industries Ltd (No 2)* [1982] Ch 204. It is essentially a policy
limitation based on the ground that one party is not to be taken to    H
contemplate that a breach of duty will cause the other to suffer additional
loss of which the immediate cause is his impecuniosity. [Reference was made
to *Lee v Sheard* [1956] 1 QB 192; *R P Howard Ltd v Woodman Matthews
& Co* [1983] BCLC 117; *Heron International Ltd v Lord Grade* [1983]
BCLC 244; *George Fischer (Great Britain) Ltd v Multi Construction Ltd*

A     [1995] 1 BCLC 260; *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427
and *Hall v Governor and Co of the Bank of England* (unreported) 19 April
2000.]

    *Christensen v Scott* [1996] 1 NZLR 273 is inconsistent with the above
principles, and the Court of Appeal [1999] PNLR 457G was correct to hold
that it should not be followed in this country. Although Hobhouse LJ in
B   *Gerber Garment Technology Inc v Lectra Syatems Ltd* [1997] RPC 443
expressed approval of *Christensen*, he reached his conclusion for reasons
that in no way depended on the correctness of anything in *Christensen*. The
Court of Appeal, at p 457C–F, also rightly approved the approach of
Millett LJ in *Stein v Blake* [1998] 1 All ER 724. [Reference was also made to
*Hayes v James & Charles Dodd* [1990] 2 All ER 815; *Wapshott v Davis
Donovan & Co* [1996] PNLR 361, 377–378; *Watson v Dutton Forshaw
C   Motor Group Ltd* (unreported) 22 July 1998 and *Farley v Skinner*
(unreported) 6 April 2000.]

    Damages for mental distress and anxiety in respect of a breach of duty
causing purely economic loss in circumstances in which no physical injury
was reasonably foreseeable as a consequence of the breach are not
recoverable, and the plaintiff's claim to such damages accordingly fails. His
D   mental distress and anxiety were the consequence of the financial position of
WWH and are irrecoverable under the *Prudential* principle: see *Hayes v
James & Charles Dodd* [1990] 2 All ER 815 and *Verderame v Commercial
Union Assurance Co plc* [1992] BCLC 793. [Reference was also made to
*Wapshott v Davis Donovan & Co* [1996] PNLR 361, 377F–378D.].

    As to aggravated damages, the facts pleaded in the re-amended statement
of claim make it clear that the plaintiff's complaint is not as to the manner in
E   which the wrong was committed but as to the manner in which the claims
have been defended. That does not constitute aggravation of the damage in
circumstances such as the present. When aggravated damages are claimed
on the basis of the manner of defence in defamation actions, it is because the
defendant has pleaded justification and so by his defence has continued to
repeat the wrong of which the claimant complains. No such case can be
F   made out here.

    *ter Haar QC* in reply. It is important to look at the actual mischief that is
said to have been caused by the alleged abuse of process.

    On the cross-appeal, the primary relationship was that between the
defendants and the plaintiff rather than between them and the company. In
so far as they acted on behalf of the company they did so in support of
G   the plaintiff's business plans. As to the cost of the plaintiff's personal
borrowings (loan capital and interest), bank interest and charges and
mortgage charges and interest, these losses can be grouped together. In one
sense they can be said to relate to the impecuniosity of the company, but that
is an incomplete analysis. All the losses are the plaintiff's personal losses. To
characterise them as losses arising out of a shortage of funds in the company
gives inadequate weight to the facts that the plaintiff's personal wealth was
H   substantially concentrated in the company; that if the company were to lose
its only substantial asset he would be liable on the guarantees given by him
to support it and that support of it in its litigation could only come from him
personally in circumstances where his principal asset had been rendered
worthless unless the litigation succeeded; and that, accordingly, his ability to

borrow to finance his personal expenditure and other investments was A
increasingly constrained: the longer the litigation continued, the more the
need for it to succeed increased while his creditworthiness decreased.

As to diminution in value of the plaintiff's pension/majority shareholding
in Westway Homes Ltd, this claim is primarily related to loss of pension
rights. The plaintiff has suffered a loss that is separate from the company's
and that would not have been recompensed even if the company had B
achieved a 100% recovery in its action.

As to loss of the 12.5% shareholding in Westway Homes Ltd, this loss is
the plaintiff's and from its nature could not be the company's. Additional
tax liability is again in its very nature a loss suffered by the plaintiff.

The true ratio of *Stein v Blake* [1998] 1 All ER 724 and *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 is in each
case that no separate duty was owed to the shareholder. The decision in C
*Heron International Ltd v Lord Grade* [1983] BCLC 244 is explicable on
the basis that no actionable duty was owed to the shareholders in respect of
the loss in question: see p 263. *Christensen v Scott* [1996] 1 NZLR 273 is a
good statement of the law. There is no difference between English law and
the law in New Zealand. No English authority supports the defendants'
propositions. [Reference was made to *R P Howard Ltd v Woodman D
Matthews & Co* [1983] BCLC 117; *Walker v Stones* [2001] QB 902 and
*Wapshott v Davis Donovan & Co* [1996] PNLR 361.]

In so far as the plaintiff has received indemnification for his losses as a
result of the settlement of the company claim, credit will have to be given.
The proper way to deal with this, as the judge observed, is to recognise the
risks of double recovery and to ensure that appropriate directions are given
so as to ensure that the true measure of loss is established. E

As to damages for mental distress and anxiety and aggravated damages,
the judge and the Court of Appeal were right to allow these heads of damage
to proceed.

As to remoteness, this is essentially fact-driven and the facts should be
found first.

*Steinfeld QC* replied on the cross-appeal. F

Their Lordships took time for consideration.

14 December. **LORD BINGHAM OF CORNHILL** My Lords, there are
two parties before the House. The first is Mr Johnson, the plaintiff in the
action, who appeals against a decision of the Court of Appeal dismissing the
action as an abuse of the process of the court. The other is Gore Wood &
Co, a firm of solicitors, who cross-appeal against a decision of the Court of G
Appeal, on a preliminary issue of law, that certain heads of damage pleaded
by Mr Johnson should not be struck out as irrecoverable. Both appeal and
cross-appeal raise questions of legal principle which your Lordships' House
has not, in recent years, had occasion to consider.

*The facts*                                                      H

Mr Johnson is a businessman who conducted his business affairs through
a number of companies. One of his businesses was property development,
which he carried on through a company, Westway Homes Ltd ("WWH"), of

A .which he was managing director and holder of all but two of the issued shares. For all practical purposes WWH was the corporate embodiment of Mr Johnson.

Acting on behalf of WWH, Mr Johnson instructed Gore Wood & Co ("GW"), through a partner in the firm named Robert Wood, to act as solicitors for WWH in connection with a proposed purchase of land at Burlesdon in Hampshire from a Mr Moores. WWH planned to develop the

B land, but the project was one of some complexity, since the title of Mr Moores was to some extent doubtful and access to the land was dependent on acquisition of a strip of land owned by a third party. WWH had an option to purchase Mr Moores's land, and WWH instructed GW to serve a notice exercising this option.

Mr Johnson contends that from early April 1987, even before GW was

C formally instructed to act as solicitor for WWH, Mr Johnson engaged the firm, usually acting through Mr Wood, to advise him personally and act on behalf of certain of his companies in addition to WWH, as a result of which GW and in particular Mr Wood gained a detailed knowledge of his financial affairs and those of the companies concerned. He further contends that GW through Mr Wood knew and intended that advice given to him in connection with any business matter would or might be acted upon by him

D in relation to the conduct of his business affairs generally, including his personal financial affairs. Since the present proceedings have not progressed beyond determination of the preliminary issues giving rise to this appeal and cross-appeal there has been no detailed investigation of the facts, some of which are in dispute between the parties. But GW accepts that from time to time the firm acted on behalf of Mr Johnson personally and some of his

E companies other than WWH.

In February 1988 GW served notice exercising WWH's option on Mr Moores's solicitors. Mr Moores and the solicitors acting for him asserted that the notice had not been validly served since it had not been served upon Mr Moores personally. Having obtained the advice of counsel WWH instructed GW to issue proceedings against Mr Moores for specific performance of the contract created by the exercise of the option. This was

F done in March 1988. An alternative claim was made against Mr Moores's solicitors alleging breach of warranty of authority. GW continued to act for WWH in those proceedings until the end of November 1989. The proceedings came on for trial in the Chancery Division in January 1990, when an order for specific performance was made against Mr Moores and an inquiry into damages ordered. The alternative claim against Mr Moores's

G solicitors was dismissed. Mr Moores had been legally aided from an early stage of the litigation and now, because of his mental condition, was acting through a guardian ad litem. He appealed against the judge's decision, but his appeal was dismissed by the Court of Appeal on 20 February 1991, although on different grounds.

For reasons outside the control of Mr Johnson or WWH there was further

H delay before the land was conveyed to WWH. It was April 1992, more than four years after the exercise of the option, before the conveyance was completed. By this time WWH had suffered substantial loss because of the cost of the Chancery proceedings, the inability of WWH to recover damages and costs from Mr Moores, who had no assets save for the balance of the purchase price of the Burlesdon land, the collapse of the property market

and the high interest charges borne by WWH.  On 8 January 1991    A
WWH started proceedings for professional negligence against GW.  In those
proceedings GW admitted that it had owed WWH a duty to exercise
reasonable care in connection with the exercise of the option, but denied that
that duty had been broken or that the damages claimed were recoverable.
WWH applied for summary judgment.  This application succeeded at first
instance but failed on appeal.  WWH was now in serious financial difficulty.    B
     WWH's action against GW came to trial before a deputy judge on
26 October 1992.  The hearing was estimated to last 10 to 12 days.  This
estimate was greatly exceeded.  In the sixth week of trial, the company's
evidence on liability had been completed and Mr Wood was in the course of
giving evidence for GW when the action was compromised upon payment
by GW to WWH of £1,480,000, which represented a very substantial
proportion of the sum claimed by WWH, and costs in the agreed sum of    C
£320,000.
     Mr Johnson claims that because he had retained GW to advise and act for
him personally as well as for WWH, the firm owed him as well as WWH a
duty of care in contract and tort in relation to the exercise of the option, the
advice which Mr Johnson contends was given to him personally as well as to
WWH concerning the prospects of success in and the likely duration of the
Chancery proceedings and the conduct of the Chancery proceedings.  He    D
claims that GW breached that duty and so caused him substantial loss.
Whether GW owed Mr Johnson personally such a duty and whether (if so) it
breached that duty will be live issues in this action if it proceeds.  But for
purposes of the issues now before the House, GW accepts that the facts
pleaded by Mr Johnson are capable of supporting his case on these issues if
established at trial.    E
     Mr Johnson did not initiate proceedings to enforce any personal claims
against GW at the time when WWH began its action against the firm.  In an
affidavit sworn on 6 March 1998 he deposed to his reasons for not doing so
at that stage.  His reasons were: (1) that he was in no position to bring a
personal claim against GW until he was granted full legal aid in October
1992, his previous certificate having been limited; (2) that advancing his
personal claims would have substantially delayed the progress and ultimate    F
resolution of WWH's action against GW, which would have led to
WWH going into liquidation before the trial of its action; (3) that the
financial resources of both Mr Johnson and WWH had been exhausted by
this litigation, said to have been caused by GW's negligence; (4) that joining
the personal claim to WWH's claims would have led to an adjournment of
the October 1992 trial date fixed for WWH's action; (5) that the more    G
complicated nature of Mr Johnson's personal claims would have had an
adverse effect on the costly and time-consuming work required to prepare
WWH's case for trial; and (6) that the time which Mr Johnson could devote
to the conduct of litigation was restricted by his need, from June 1991, to
find new employment.  GW does not deny that these were the reasons which
led Mr Johnson not to proceed personally at that time, but does not accept
that they provided valid or reasonable grounds for not doing so.    H
     On 17 January 1991, well before WWH's action came to trial, solicitors
representing that company notified the solicitors for GW that Mr Johnson
had a personal claim against the firm which he would pursue in due course.
No details of the claim were given.  On 6 December 1991 solicitors

A   representing Mr Johnson informed GW that he had received a legal aid
    certificate to take proceedings against the firm for damages for negligence.
    The letter, couched in general terms, contended that GW had owed a duty to
    Mr Johnson personally as well as to WWH. While making no admission,
    GW's insurers in January 1992 invited Mr Johnson's solicitors to give full
    details of the quantum of his personal claim. Mr Johnson's solicitors replied
B   in February 1992, outlining certain heads of claim and giving estimates in
    round figures of claims approaching £2m. In October 1992, on the eve of
    trial of WWH's action against GW, Mr Johnson's solicitors wrote to GW's
    solicitors, referring to his legal aid certificate and giving notice that his
    personal claim would be pursued whether the company's claim culminated
    in judgment or settlement. Since a substantial payment into court had been
    made on behalf of GW, Mr Johnson and WWH expected a favourable
C   outcome of the company's action. On 19 November 1992, when trial of the
    company's action against GW was well advanced, Mr Pugh (a solicitor
    representing Mr Johnson) spoke to Mrs MacLennan (the solicitor
    representing GW) on the telephone and discussed Mr Johnson's personal
    claim: Mr Pugh said that it had been thought better to wait until the
    company's claim had been concluded before dealing with the personal claim;
D   Mrs MacLennan asked whether Mr Pugh would object to an overall
    settlement of the company's claim and Mr Johnson's personal claim; he said
    that he would have to take instructions but could not himself see any
    objections "provided the figures were all right". He gave her a rough idea of
    the heads of claim and the figures. Mr Johnson instructed Mr Pugh that he
    would not be adverse to an overall settlement provided it was reasonably
E   satisfactory. Mrs MacLennan indicated that GW (or its insurers) also were
    not adverse to an overall settlement if the figures could be agreed. On
    1 December 1992 Mr Pugh met Mrs MacLennan at court to try to negotiate
    a settlement of his personal claim. His attendance note of this meeting read:

        "She mentioned an overall cap and said that she could not settle for
    more. I said that John Johnson's claim was a separate one and she said
F   that so far as it was not related to the actual company's claim it might well
    be different. After some discussion it was agreed that so far as his claim
    as shareholder and only relating to a loss of dividends income and
    capital distribution there would be a cap at a figure to be agreed. This
    would not affect all the other claims on the list as previously discussed.
    Mrs McClenan [sic] reiterated her previous view but said it would be a
G   separate claim and it would really be a matter for separate negotiation in
    due course. A cap was agreed at £250,000 excluding interest and costs."

    The settlement agreement made between WWH and GW on 2 December
    1992 was signed by solicitors for both sides; the solicitors representing
    WWH also, for this purpose, represented Mr Johnson.
        By the settlement agreement GW agreed to pay the sums already
    mentioned with no admission of liability, in full and final satisfaction of all
H   claims of WWH against GW and vice versa. The sum of £1m which GW had
    paid into court was to be paid out to WWH's solicitors. WWH undertook
    that any of its liabilities personally guaranteed by Mr Johnson would be
    discharged out of the sums received under the settlement agreement, the
    object plainly being to limit the quantum of any claim which Mr Johnson

might thereafter make personally.  Clause 3 of the settlement agreement      A
provided:

> "Mr Johnson undertakes that the amount of any claim made by him
> personally in any action against [GW] in respect of any losses suffered by
> him by reason of loss of income, dividends or capital distribution in
> respect of his position as a shareholder of [WWH] will not exceed          B
> £250,000 not including interest accruing in respect of any period after the
> date of this agreement nor costs.  This undertaking does not limit any
> other of Mr Johnson's rights against [GW]."

A confidentiality clause in the agreement contained an exception "In
connection with any action which Mr Johnson may bring against [GW]."

Mr Johnson issued his writ in the present proceedings against GW on
7 April 1993.  Over the next 4½ years the parties pleaded and repleaded       C
their respective cases.  A payment into court was made by GW.  Witness
statements were exchanged.  Mr Johnson served his accountancy evidence.
On 20 November 1997 the action was fixed for trial in January 1999.  On
3 December 1997 GW's solicitors intimated, for the first time, that it
intended to apply to strike out the action as an abuse of the process of the
court.  Notice was also given that GW would seek the determination of        D
preliminary issues whether it had owed Mr Johnson a duty of care and
whether the damages which he claimed were in principle recoverable on the
facts pleaded.  On 25 February 1998 it was ordered that preliminary issues
be tried, the second of which was:

> "to what extent (if at all) on the basis of and assuming the truth of the
> facts pleaded as set out above are any of the heads of damage pleaded in
> paragraphs 23 and 24 of the re-amended statement of claim irrecoverable    E
> as a matter of law by [Mr Johnson] by way of damages for the pleaded
> breaches of the duties owed to him."

In paragraph 6 of his re-amended statement of claim Mr Johnson pleaded
an implied term of his personal retainer of GW that it would exercise all due
skill and care in execution of that retainer, and a like duty of care in tort.  In    F
paragraph 9 it was pleaded:

> "Without prejudice to the generality of paragraph 6 above it was the
> duty of [GW], in carrying out its retainer on behalf of [Mr Johnson] in
> accordance with the implied term pleaded in the said paragraph, or
> alternatively in discharging its duty of care in tort owed to [Mr Johnson],
> to (a) exercise all due skill and care in connection with the exercise of the    G
> said option to purchase land and/or any further steps which were
> necessary to obtain possession of the land; (b) advise [Mr Johnson]
> fully and accurately of all developments in connection with the exercise
> of the said option which might affect the financial requirements and
> prospects of [WWH]; (c) advise [Mr Johnson] of the implications of such
> developments for his personal financial situation and other business        H
> projects, including his existing liabilities and new financial commitments
> contemplated; (d) advise and/or warn [Mr Johnson] fully and accurately
> of any delay or difficulty in exercising the said option to purchase
> land, which might adversely affect [Mr Johnson's] personal financial
> situation and other business projects, including his existing liabilities

A   and new financial commitments contemplated; (e) advise and/or warn
[Mr Johnson] fully and accurately of the implications of any advice given
or steps taken by [GW] on behalf of [WWH] which might adversely affect
[Mr Johnson's] personal financial situation and other business projects."

In paragraph 12 it was pleaded that GW had acted in breach of the terms
pleaded in paragraphs 6 and 9 in connection with the exercise of WWH's
B   option to purchase the Burlesdon land, and in paragraph 16 it was pleaded
that between February 1988 and November 1989 GW had acted negligently
or in breach of the implied terms of its retainer pleaded in paragraphs 6 and
9 in advising Mr Johnson from time to time as to the likely duration and
outcome of the earlier proceedings against Mr Moores.  The claims for
damages made by Mr Johnson in paragraphs 23 and 24 of his re-amended
statement of claim are the subject of detailed consideration below.
C   The preliminary issues came for hearing at first instance before Pumfrey J
who, in a careful judgment delivered on 21 May 1998, resolved them in
favour of Mr Johnson.  On the abuse issue he found that GW was estopped
by convention from contending that the action was an abuse.  Applying
*Amalgamated Investment and Property Co Ltd v Texas Commerce
International Bank Ltd* [1982] QB 84 he concluded:
D
    "that in reaching the settlement, [GW] and Mr Johnson did act on the
    common assumption that the personal claim would be made, and would
    be entertained by the court.  I think that it is now unconscionable for
    [GW] to allege that the personal claim is an abuse of process in the light of
    *Henderson v Henderson* (1843) 3 Hare 100."

E   He resolved the duty issue in favour of Mr Johnson.  He concluded that the
heads of damage claimed by Mr Johnson were not irrecoverable as a matter
of law as damages for the breaches alleged by Mr Johnson.
GW appealed.  In a judgment of the court (Nourse, Ward and Mantell LJJ)
given on 12 November 1998, the Court of Appeal agreed with the judge that
on the facts pleaded a duty of care had arguably been owed by GW to
Mr Johnson.  The Court of Appeal shared the judge's view on the difficulty
F   of the damage issue but agreed with his conclusion that the pleaded heads of
damage were arguably recoverable, save as to one head of damage which it
would have struck out.
The Court of Appeal held, differing from the judge, that there had been no
estoppel by convention.  But it also held that there had been an abuse under
the rule in *Henderson v Henderson* (1843) 3 Hare 100.  It said:
G
    "Mr ter Haar submits that the rule has no application because different
    issues arise in the two sets of proceedings.  In this action there are entirely
    new questions about the extent of the duty owed to the plaintiff
    personally and the losses he has suffered.  On the other hand, there was in
    our view a substantial similarity, particularly as to whether or not [GW's]
    conduct as solicitors fell below the required standard in connection with
    the exercise of the option and the conduct of the Chancery litigation
H   [against Mr Moores] as well as the overlapping loss suffered by the
    company.  This encompasses practically the whole of the ground
    traversed for six weeks in the company action.  In our judgment, narrowly
    to circumscribe the application of the rule would defeat its purpose.
    Mr Johnson was the alter ego of the company: he controlled the

company's decisions and through him the company's claim was brought.    A
Within days after that writ was issued, he was intimating his personal
claim. He could have brought it then. Although his legal aid was then
limited in some way which is not clear to us, no explanation has been
given for the delay in removing whatever limitations had been imposed
and he had full cover by October, long before the trial. For reasons which
appeared good to him, he preferred not to delay the company action but
to pursue it vigorously before the company was forced into liquidation.    B
That does not, in our judgment, excuse him from failing to launch his
own claims. If he could have done so, he should have done so."

*Abuse of process*

The rule of law depends upon the existence and availability of courts
and tribunals to which citizens may resort for the determination of    C
differences between them which they cannot otherwise resolve. Litigants
are not without scrupulous examination of all the circumstances to be
denied the right to bring a genuine subject of litigation before the court:
*Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581, 590
per Lord Kilbrandon, giving the advice of the Judicial Committee; *Brisbane
City Council v Attorney General for Queensland* [1979] AC 411, 425 per    D
Lord Wilberforce, giving the advice of the Judicial Committee). This does
not however mean that the court must hear in full and rule on the merits of
any claim or defence which a party to litigation may choose to put
forward. For there is, as Lord Diplock said at the outset of his speech in
*Hunter v Chief Constable of the West Midlands Police* [1982] AC 529,
536, an    E

"inherent power which any court of justice must possess to prevent
misuse of its procedure in a way which, although not inconsistent with
the literal application of its procedural rules, would nevertheless be
manifestly unfair to a party to litigation before it, or would otherwise
bring the administration of justice into disrepute among right-thinking
people. The circumstances in which abuse of process can arise are very
varied; those which give rise to the instant appeal must surely be unique.    F
It would, in my view, be most unwise if this House were to use this
occasion to say anything that might be taken as limiting to fixed
categories the kinds of circumstances in which the court has a duty
(I disavow the word discretion) to exercise this salutary power."

One manifestation of this power was to be found in RSC Ord 18, r 19 which
empowered the court, at any stage of the proceedings, to strike out any    G
pleading which disclosed no reasonable cause of action or defence, or
which was scandalous, frivolous or vexatious, or which was otherwise an
abuse of the process of the court. A similar power is now to be found in
CPR r 3.4.

GW contends that Mr Johnson has abused the process of the court by
bringing an action against it in his own name and for his own benefit when
such an action could and should have been brought, if at all, as part of or at    H
the same time as the action brought against the firm by WWH. The
allegations of negligence and breach of duty made against the firm by
WWH in that action were, it is argued, essentially those upon which
Mr Johnson now relies. The oral and documentary evidence relating to each

A  action is substantially the same. To litigate these matters in separate actions on different occasions is, GW contends, to duplicate the cost and use of court time involved, to prolong the time before the matter is finally resolved, to subject GW to avoidable harassment and to mount a collateral attack on the outcome of the earlier action, settled by GW on the basis that liability was not admitted.

B      This form of abuse of process has in recent years been taken to be that described by Sir James Wigram V-C in *Henderson v Henderson* 3 Hare 100, 114–115:

      "In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court

C     requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the

D     court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time."

      Thus the abuse in question need not involve the reopening of a matter already decided in proceedings between the same parties, as where a party is

E     estopped in law from seeking to relitigate a cause of action or an issue already decided in earlier proceedings, but, as Somervell LJ put it in *Greenhalgh v Mallard* [1947] 2 All ER 255, 257, may cover

      "issues or facts which are so clearly part of the subject-matter of the litigation and so clearly could have been raised that it would be an abuse of the process of the court to allow a new proceeding to be started in

F     respect of them."

      A series of cases, mostly in recent years, has explored this form of abuse. Reference need not be made to all of them. In the *Yat Tung* case abuse was found where a claimant who had unsuccessfully sued a bank on one ground brought a further action against the same bank and another party on a different ground shortly thereafter. Giving the advice of the Judicial

G     Committee of the Privy Council, Lord Kilbrandon said, at pp 589–590:

      "The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships agree with the view expressed by McMullin J that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not

H     been, in the decision in no 969, any formal repudiation of the pleas raised by the appellant in no 534. Nor was Choi Kee, a party to no 534, a party to no 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings."

In *Brisbane City Council v Attorney General for Queensland* [1979]  **A**
AC 411 the Privy Council expressly endorsed Somervell LJ's reference to
abuse of process and observed, at p 425:

> "This is the true basis of the doctrine and it ought only to be applied
> when the facts are such as to amount to an abuse: otherwise there is a
> danger of a party being shut out from bringing forward a genuine subject  **B**
> of litigation."

In *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529, in
which *Henderson v Henderson* was not cited, the plaintiff sought to
challenge in civil proceedings a decision in a criminal case against which he
had not appealed on the ground which he sought to raise in the civil
proceedings. The proceedings were struck out.

In *Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145 the appellant,  **C**
who had failed in English proceedings to annul her marriage, had succeeded
in doing so in Belgium on different grounds and sought recognition in
England of the Belgian decree. Lord Hailsham of St Marylebone LC, at
p 157, described the rule in *Henderson v Henderson* as "both a rule of public
policy and an application of the law of res judicata" and said of it:

> "whatever the limits of *Henderson v Henderson* 3 Hare 100 (which  **D**
> I regard as a sound rule in ordinary civil litigation) may ultimately turn
> out to be, I believe that it must apply to a case like the present, where the
> petitioner in the first proceedings not merely does not rely on the grounds
> then already in theory available to her, but deliberately conceals the real
> facts (on which she now relies) from the court in order to put forward a
> bogus case which is radically inconsistent with them."
                                                                          **E**

*Ashmore v British Coal Corpn* [1990] 2 QB 338 involved an attempt to
reopen issues which had been decided adversely to the appellant's
contentions in rulings which, although not formally binding on her, had
been given in sample cases selected from a group of claims of which hers had
been one. The Court of Appeal held that it was not in the interests of justice
to allow her to pursue her claim. Reliance was placed on *Bragg v Oceanus  **F**
Mutual Underwriting Association (Bermuda) Ltd* [1982] 2 Lloyds Rep 132
in which Kerr LJ said, at p 137:

> "To take the authorities first, it is clear that an attempt to relitigate in
> another action issues which have been fully investigated and decided in a
> former action *may* constitute an abuse of process, quite apart from any
> question of res judicata or issue estoppel on the ground that the parties or
> their privies are the same. It would be wrong to attempt to categorise the  **G**
> situations in which such a conclusion would be appropriate."

In *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241 the plaintiffs
sued three defendants in England to enforce a judgment which they had
obtained against those defendants in Ireland. The defendants pleaded in
defence that the Irish judgment had been obtained by fraud. That was a
contention which two of the defendants, but not the third (a Mr McLeod),  **H**
had raised in Irish proceedings to set aside the judgment, but the allegation
had been dismissed by Egan J. Summary judgment was given against the
three defendants in England but Mr McLeod appealed against that
judgment. The Court of Appeal held that Mr McLeod, like the other

A defendants, was estopped from mounting what was in effect a collateral challenge to the decision of Egan J. It also held that Mr McLeod's defence was an abuse of process. Stuart-Smith LJ said, at p 255:

> "The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this court, it having been tried and determined by Egan J in Ireland. In my judgment
B it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to relitigate matters which have twice been extensively investigated and decided in their favour in the natural forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves. The Waites have not appealed Sir Peter Pain's judgment, and they were quite right not to do so. The plaintiffs will no
C doubt proceed to execute their judgment against them. What could be a greater source of injustice, if in years to come, when the issue is finally decided, a different decision is in Mr McLeod's case reached? Public policy requires that there should be an end of litigation and that a litigant should not be vexed more than once in the same cause."

D *Arnold v National Westminster Bank plc* [1991] 2 AC 93 was a case of issue estoppel. Tenants invited the court to construe the terms of a rent review provision in the sub-underlease under which they held premises. The provision had been construed in a sense adverse to them in earlier proceedings before Walton J, but they had been unable to challenge his decision on appeal. Later cases threw doubt on his construction. The question was whether the rules governing issue estoppel were subject to
E exceptions which would permit the matter to be reopened. The House held that they were. Lord Keith of Kinkel said, at p 109:

> "In my opinion your Lordships should affirm it to be the law that there may an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or
F not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result, as was observed by Lord Upjohn in the passage which I have quoted above
G from his speech in *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853, 947."

In the passage referred to Lord Upjohn had said:

> "All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding
H consideration in mind.".

*Talbot v Berkshire County Council* [1994] QB 290 arose out of a motor accident in which both the driver and his passenger were severely injured. The passenger sued the driver. The driver's insurers, without notice to the driver, made a third party claim against the Berkshire County Council,

26
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Bingham of Cornhill

claiming contribution as between joint tortfeasors but including no claim for    A
the driver's own injuries. Not until after the expiry of the limitation period
for bringing a personal claim did the driver learn of the third party claim
against the county council. At trial, the passenger succeeded in full, damages
being apportioned between the driver and the county council. The driver
then sued the county council to recover damages for his own injuries. On the
trial of preliminary issues, the judge held that the driver was prima facie    B
estopped from bringing the action but that there were special circumstances
which enabled the court to permit the action to be pursued. The county
council successfully challenged that conclusion on appeal. Stuart-
Smith LJ said, at p 298:

    "There can be no doubt that the [driver's] personal injury claim could
    have been brought at the time of [the passenger's] action. It could have    C
    been included in the original third party notice issued against the council
    (RSC Ord 16, r 1(b)(c)); it could have been started by a separate writ and
    consolidated with or ordered to be tried with [the passenger's] action:
    Ord 4, r 9. The third party proceedings could have been amended at any
    time before trial and perhaps even during the trial to include such a claim,
    notwithstanding that it was statute-barred, since it arose out of the same    D
    or substantially the same facts as the cause of action in respect of which
    relief was already claimed, namely, contribution or indemnity in respect
    of [the passenger's] claim: Ord 20, r 5. In my opinion, if it was to be
    pursued, it should have been so brought."

Stuart-Smith LJ considered that the insurers' solicitors appeared to have
been negligent but that the claim against the county council should be struck
out unless there were special circumstances, and concluded that there were    E
not. With his conclusions Mann and Nourse LJJ agreed. Since the driver's
claim against the county council was held by the judge to be statute-barred, a
claim against the solicitors may have offered the driver his only hope of
recovery.

    The plaintiff in *C (A Minor) v Hackney London Borough Council* [1996]
    1 WLR 789 lived in the house of which her mother was tenant. She suffered    F
from Down's syndrome and claimed in this action to have suffered personal
injury caused by the negligence and breach of statutory duty of the borough
council as housing authority. Her mother had previously made a similar
claim which had been the subject of a consent order in the county court. The
borough council applied to set aside a judgment entered in the plaintiff's
favour in default of defence and to strike out the claim on the ground that
the plaintiff's action was an abuse of the process of the court. Reliance was    G
placed in particular on *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd*
[1975] AC 581 and *Talbot v Berkshire County Council* [1994] QB 290. This
argument was accepted by the judge, who held that the plaintiff's action
should have been advanced at the same time as her mother's, the more so as
the plaintiff was dependent on her mother. The plaintiff's appeal against this
decision succeeded. Simon Brown LJ said, at pp 794–795:    H

    "I therefore reject entirely the submission that *Yat Tung Investment Co
    Ltd v Dao Heng Bank Ltd* justifies extending the *Talbot v Berkshire
    County Council* principle—that an unlitigated monetary claim is barred if
    it could have been advanced and established in earlier proceedings (itself

A    to my mind an extended application of the res judicata doctrine)—to those not themselves party to the earlier proceedings.

"It follows from all this that in my judgment the doctrine of res judicata even in its widest sense has simply no application to the circumstances of the present case and that the judge erred in ruling to the contrary. One does not, therefore, reach the point of asking here whether special circumstances exist to exclude it; C's erstwhile solicitors'
B    suggested negligence is, frankly, an irrelevance. Nor, in my judgment, does this case come within measurable distance of any other form of abuse of process based on public policy considerations analogous to those underlying the res judicata doctrine: see, for instance, the Court of Appeal's decision in *Ashmore v British Coal Corpn* [1990] 2 QB 338.

"All that said, this judgment should not be taken as any
C    encouragement to lawyers or their clients to follow the course in fact adopted here. As the judge rightly recognised, in circumstances such as these, it is plainly in the public interest to have a single action in which the claims of all the affected members of the household are included rather than a multiplicity of actions . . ."

*Barrow v Bankside Agency Ltd* [1996] 1 WLR 257 was one of the flood
D    of cases which arose out of losses in the Lloyd's insurance market. Mr Barrow was a member of an action group which had successfully sued a number of members' agents for negligent underwriting. Having substantially succeeded, but recovered only a proportion of the damages he had claimed, Mr Barrow issued fresh proceedings against his members' agent on a different ground. It was clear that this claim, even if made earlier,
E    would not have been tried at the same time as the earlier action, since the scheduling of cases was the subject of detailed management by the Commercial Court. The members' agent contended that to bring this further claim, not raised at the time of the earlier proceedings, was an abuse. In the Court of Appeal it was said, at p 260:

"The rule in *Henderson v Henderson* 3 Hare 100 is very well known.
F    It requires the parties, when a matter becomes the subject of litigation between them in a court of competent jurisdiction, to bring their whole case before the court so that all aspects of it may be finally decided (subject, of course, to any appeal) once and for all. In the absence of special circumstances, the parties cannot return to the court to advance arguments, claims or defences which they could have put forward for decision on the first occasion but failed to raise. The rule is not based on
G    the doctrine of res judicata in a narrow sense, nor even on any strict doctrine of issue or cause of action estoppel. It is a rule of public policy based on the desirability, in the general interest as well as that of the parties themselves, that litigation should not drag on for ever and that a defendant should not be oppressed by successive suits when one would do. That is the abuse at which the rule is directed."

H    The rule was described, at p 263, as a salutary one, and the court suggested that its application should not be circumscribed by unnecessarily restrictive rules. On the facts it was held that the procedure adopted by Mr Barrow was not an abuse. The court also held that if, contrary to its opinion, the case did fall within the mischief at which *Henderson v*

*Henderson* was directed, there were special circumstances which justified     A
non-application of the rule.

   In *Manson v Vooght* [1999] BPIR 376, the plaintiff had sued
administrative receivers of a company of which he had been managing
director and principal shareholder in a 1990 action which culminated in a
judgment adverse to him in 1993. There were other proceedings leading to
other judgments, also given in 1993, relating to certain of the same issues:     B
proceedings to disqualify the plaintiff as a director, in which findings adverse
to him were made; and summonses issued in the liquidation of the company,
when the court refused to allow issues which had been decided in the
disqualification proceedings to be re-litigated. In 1994 the plaintiff issued a
further writ making claims against the administrative receivers and others.
His proceedings against the administrative receivers were struck out on the
ground that these claims should have been raised, if at all, in the 1990 action.     C
This decision was upheld by the Court of Appeal. Giving the leading
judgment May LJ said, at pp 387–388:

   "In my view, the use in this context of the phrase 'res judicata' is
   perhaps unhelpful, and this not only because it is Latin. We are not
   concerned with cases where a court has decided the matter; but rather
   cases where the court has not decided the matter, but where in a (usually     D
   late) succeeding action someone wants to bring a claim which should
   have been brought, if at all, in earlier concluded proceedings. If in all the
   circumstances the bringing of the claim in the succeeding action is an
   abuse, the court will strike it out unless there are special circumstances.
   To find that there are special circumstances may, for practical purposes,
   be the same thing as deciding that there is no abuse, as Sir Thomas     E
   Bingham MR came close to holding on the facts in *Barrow v Bankside
   Agency Ltd* [1996] 1 WLR 257. The bringing of a claim which could
   have been brought in earlier proceedings may not be an abuse. It may in
   particular cases be sensible to advance cases separately. It depends on all
   the circumstances of each case. Once the court's consideration is directed
   clearly towards the question of abuse, it will be seen that the passage from     F
   Sir James Wigram V-C's judgment in *Henderson v Henderson* 3 Hare 100
   is a full modern statement of the law so long as it is not picked over
   semantically as if it were a tax statute.
   "The extent of any coincidence of causes of action, facts or even the
   capacities in which parties are sued, though relevant, will not necessarily
   determine the outcome."
                                                                                  G

May LJ continued, at pp 388–389:

   "[Counsel for Mr Manson] submits that the kind of abuse of process
   relied on by the first defendant in this appeal is to be narrowly confined
   and precisely defined so that legitimate claims are not stifled and so that
   potential litigants know where they stand. Otherwise they may be driven
   to include in one proceedings related but distinct claims which might     H
   sensibly be left for later consideration. The law should not thus
   encourage premature litigation which may prove unnecessary. He further
   submits that delay is the subject of the law of limitation and should not
   feature additionally as an element of abuse.

29

[2002] 2 AC

Johnson v Gore Wood & Co (HL(E))
Lord Bingham of Cornhill

A    "It is of course axiomatic that the court will only strike out a claim as an abuse after most careful consideration. But the court has to balance a plaintiff's right to bring before the court genuine and legitimate claims with a defendant's right to be protected from being harassed by multiple proceedings where one should have sufficed. Abuse of process is a concept which defies precise definition in the abstract. In particular cases, the court has to decide whether there is abuse sufficiently serious to justify
B    preventing the offending litigant from proceeding. In cases such as the present, the abuse is sufficiently defined in *Henderson* which itself is encapsulated in the proposition that the litigant could and should have raised the matter in question in earlier concluded proceedings. Special circumstances may negative or excuse what would otherwise be an abuse. But there may in particular cases be elements of abuse additional to the
C    mere fact that the matter could and should have been raised in the earlier proceedings."

May LJ added, at p 389:

    "Mr Manson relies on special circumstances to negative or excuse the abuse. He says that the scope of the 1990 action was limited because he
D    had legal expenses insurance for that action which only covered some of his claims and that the insurers were not prepared to support the claims which he now wants to bring. Although this may be an explanation, in my view it does not excuse the abuse nor does it amount to special circumstances. It is commonplace for litigants to have difficulties in affording the cost of litigation. But lack of means cannot stand as an excuse for abuse of process."

E    Last in this series of cases comes *Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482, a decision later in time than the Court of Appeal's judgment in the present case but given by two of the same Lords Justices. Mr Seddon had made an investment on the advice of an accountant, Mr Hancock, which he had financed by taking a mortgage loan from the Bradford and Bingley Building Society. The investment failed.
F    Mr Seddon claimed damages or an indemnity against Mr Hancock, who admitted liability to indemnify Mr Seddon to the extent of about 75% of Mr Seddon's claim. Judgment was entered in Mr Seddon's favour for this admitted sum and Mr Hancock was given leave to defend as to the balance. Mr Seddon was unable to enforce his judgment as Mr Hancock had no money, and the residual claim was not pursued. The building society then
G    proceeded against Mr Seddon to enforce the debt owed to it under the mortgage loan. Mr Seddon sought to join as third parties Mr Hancock, in order to pursue the residual claim, and two of his partners, Mr Seddon's contention being that the advice tended to him had been given by the firm to which Mr Hancock and his partners belonged. An application to strike out the third party claim was upheld by the judge and Mr Seddon appealed. In the course of a judgment with which Nourse and Ward LJJ agreed,
H    Auld LJ said, at pp 1490–1491:

    "In my judgment, it is important to distinguish clearly between res judicata and abuse of process not qualifying as res judicata, a distinction delayed by the blurring of the two in the courts' subsequent application of the above dictum [of Sir James Wigram V-C in *Henderson v Henderson*

30
Johnson v Gore Wood & Co (HL(E))                    [2002] 2 AC
Lord Bingham of Cornhill

3 Hare 100]. The former, in its cause of action estoppel form, is an    A
absolute bar to relitigation, and in its issue estoppel form also, save in
'special cases' or 'special circumstances': see *Thoday v Thoday* [1964]
P 181, 197–198, per Diplock LJ, and *Arnold v National Westminster
Bank plc* [1991] 2 AC 93. The latter, which may arise where there is no
cause of action or issue estoppel, is not subject to the same test, the task of
the court being to draw the balance between the competing claims of one
party to put his case before the court and of the other not to be unjustly    B
hounded given the earlier history of the matter . . .

    "Thus, abuse of process may arise where there has been no earlier
decision capable of amounting to res judicata (either or both because the
parties or the issues are different) for example, where liability between
new parties and/or determination of new issues should have been resolved
in the earlier proceedings. It may also arise where there is such an    C
inconsistency between the two that it would be unjust to permit the later
one to continue."

Auld LJ continued, at pp 1492–1493:

    "In my judgment mere 're'-litigation, in circumstances not giving rise
to cause of action or issue estoppel, does not necessarily give rise to abuse
of process. Equally, the maintenance of a second claim which could have    D
been part of an earlier one, or which conflicts with an earlier one, should
not, per se, be regarded as an abuse of process. Rules of such rigidity
would be to deny its very concept and purpose. As Kerr LJ and Sir David
Cairns emphasised in *Bragg v Oceanus Mutual Underwriting Association
(Bermuda) Ltd* [1982] 2 Lloyd's Rep 132, 137, 138–139 respectively, the
courts should not attempt to define or categorise fully what may amount    E
to an abuse of process; see also per Stuart-Smith LJ in *Ashmore v British
Coal Corpn* [1992] 2 QB 338, 352. Sir Thomas Bingham MR underlined
this in *Barrow v Bankside Agency Ltd* [1996] 1 WLR 257, stating,
at p 263B, that the doctrine should not be 'circumscribed by unnecessarily
restrictive rules' since its purpose was the prevention of abuse and it
should not endanger the maintenance of genuine claims; see also per    F
Saville LJ, at p 266D–E.

    "Some additional element is required, such as a collateral attack on a
previous decision (see e g *Hunter v Chief Constable of the West Midlands
Police* [1982] AC 529; *Bragg's* case [1982] 2 Lloyd's Rep 132, per
Kerr LJ and Sir David Cairns, at pp 137 and 139 respectively, and
*Ashmore's* case [1990] 2 QB 338), some dishonesty (see e g per
Stephenson LJ in *Bragg's* case, at p 139, and Potter LJ in *Morris v    G
Wentworth-Stanley* [1999] 2 WLR 470, 480 and 481; or successive
actions amounting to unjust harassment (see e g *Manson v Vooght* [1999]
BPIR 376 . . .))."

The Court of Appeal held that Mr Seddon's third party proceedings were not
an abuse of process, and the appeal succeeded.

    It may very well be, as has been convincingly argued (Watt, "The Danger    H
and Deceit of the Rule in *Henderson v Henderson*: A new approach to
successive civil actions arising from the same factual matter" (2000) 19 CLJ
287), that what is now taken to be the rule in *Henderson v Henderson* has
diverged from the ruling which Wigram V-C made, which was addressed to

A    res judicata. But *Henderson v Henderson* abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The

B    bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but

C    where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an

D    approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether,

E    on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask

F    whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice.

    Mr ter Haar, for Mr Johnson, submitted (as the judge had held) that GW was estopped by convention from contending that the bringing of an

G    action to enforce his personal claims was an abuse of process. In resisting GW's complaint of abuse, Mr ter Haar relied, as he did in the courts below, on three features of this case in particular. The first was the acute financial predicament in which Mr Johnson personally and WWH found themselves as a result, as Mr Johnson alleges, of GW's negligence. The burden of financing the continuing operation of WWH, and of its very expensive litigation against GW, fell on him. His means was stretched to the utmost.

H    The only hope of financial salvation lay in an early and favourable outcome to the company's claim against GW. Mr Johnson did not have a full legal aid certificate to pursue a personal claim. In any event, the addition of a personal claim would have complicated and delayed the trial of the company's claim, which might well have jeopardised the company's

32
Johnson v Gore Wood & Co (HL(E))                    [2002] 2 AC
Lord Bingham of Cornhill

survival. Secondly, Mr ter Haar relied on the conduct of the parties after the    A
settlement agreement was made (if, contrary to his earlier submission, there
was no estoppel by convention). He pointed out that $4\frac{1}{2}$ years elapsed from
the issue of Mr Johnson's writ in this action before GW first intimated their
intention to apply to strike out the proceedings as an abuse of the court's
process, during which period pleadings and evidence were exchanged,
considerable costs were incurred, a substantial payment into court was made    B
and a trial date fixed. This procedural history, he submitted, was evidence of
the expectation of the parties at the time when the company's action was
settled, and was in itself ground for rejecting GW's application: *Halliday v
Shoesmith* [1993] 1 WLR 1, 5. Thirdly, Mr ter Haar submitted that, to the
extent that issues litigated in the company's action were to be relitigated in
this action, it was because GW had insisted on this and rejected the
invitation of Mr Johnson to treat the evidence given in the earlier action as if    C
given in this action.

Two subsidiary arguments were advanced by Mr ter Haar in the courts
below and rejected by each. The first was that the rule in *Henderson v
Henderson* 3 Hare 100 did not apply to Mr Johnson since he had not been
the plaintiff in the first action against GW. In my judgment this argument
was rightly rejected. A formulaic approach to application of the rule would    D
be mistaken. WWH was the corporate embodiment of Mr Johnson. He
made decisions and gave instructions on its behalf. If he had wished to
include his personal claim in the company's action, or to issue proceedings in
tandem with those of the company, he had power to do so. The correct
approach is that formulated by Sir Robert Megarry V-C in *Gleeson v
J Wippell & Co Ltd* [1977] 1 WLR 510 where he said, at p 515:

> "Second, it seems to me that the substratum of the doctrine is that a    E
> man ought not to be allowed to litigate a second time what has already
> been decided between himself and the other party to the litigation. This is
> in the interest both of the successful party and of the public. But I cannot
> see that this provides any basis for a successful defendant to say that the
> successful defence is a bar to the plaintiff suing some third party, or for
> that third party to say that the successful defence prevents the plaintiff    F
> from suing him, unless there is a sufficient degree of identity between the
> successful defendant and the third party. I do not say that one must be the
> alter ego of the other: but it does seem to me that, having due regard to
> the subject matter of the dispute, there must be a sufficient degree of
> identification between the two to make it just to hold that the decision to
> which one was party should be binding in proceedings to which the other    G
> is party. It is in that sense that I would regard the phrase 'privity of
> interest.'"

On the present facts that test was clearly satisfied.

The second subsidiary argument was that the rule in *Henderson v
Henderson* 3 Hare 100 did not apply to Mr Johnson since the first action
against GW had culminated in a compromise and not a judgment. This    H
argument also was rightly rejected. An important purpose of the rule is to
protect a defendant against the harassment necessarily involved in repeated
actions concerning the same subject matter. A second action is not the less
harassing because the defendant has been driven or thought it prudent to

A    settle the first; often, indeed, that outcome would make a second action the
     more harassing.

     On the estoppel by convention issue, Mr Steinfeld for GW submitted that
     the Court of Appeal had been right and the judge wrong. There had been no
     common understanding between the parties on the issue of abuse, a topic
     which had never been raised. There was nothing to suggest that GW had
     tacitly agreed to forgo any defence properly open to it. Mr Steinfeld further
B    submitted that the present proceedings did amount to an abuse, as the Court
     of Appeal had rightly held. Mr Johnson could have advanced his personal
     claim at the same time as the company's claim and therefore should have
     done so. The consequence of his not doing so was to expose GW to the
     harassment of further proceedings canvassing many of the same issues as
     had been canvassed in the earlier action, with consequential waste of time
C    and money and detriment to other court users. The facts relied on to excuse
     his earlier inaction were not accepted. He should have sought a full legal aid
     certificate earlier. He could not rely on lack of means. Any loss caused to
     Mr Johnson by GW's delay in applying to strike out could be compensated
     in costs.

     Neither party challenged the correctness in principle of Lord
D    Denning MR's statement in *Amalgamated Investment and Property Co Ltd
     v Texas Commerce International Bank Ltd* [1982] QB 84, 122 which,
     despite its familiarity, I quote:

          "The doctrine of estoppel is one of the most flexible and useful in the
     armoury of the law. But it has become overloaded with cases. That is
     why I have not gone through them all in this judgment. It has evolved
E    during the last 150 years in a sequence of separate developments:
     proprietary estoppel, estoppel by representation of fact, estoppel by
     acquiescence, and promissory estoppel. At the same time it has been
     sought to be limited by a series of maxims: estoppel is only a rule of
     evidence, estoppel cannot give rise to a cause of action, estoppel cannot
     do away with the need for consideration, and so forth. All these can now
     be seen to merge into one general principle shorn of limitations. When
F    the parties to a transaction proceed on the basis of an underlying
     assumption—either of fact or of law—whether due to misrepresentation
     or mistake makes no difference—on which they have conducted the
     dealings between them—neither of them will be allowed to go back on
     that assumption when it would be unfair or unjust to allow him to do so.
     If one of them does seek to go back on it, the courts will give the other
     such remedy as the equity of the case demands."
G
     The question is whether the parties to the settlement of WWH's action
     (relevantly, Mr Johnson and GW) proceeded on the basis of an underlying
     assumption that a further proceeding by Mr Johnson would not be an abuse
     of process and whether, if they did, it would be unfair or unjust to allow
     GW to go back on that assumption. In my judgment both these conditions
     were met on the present facts. Mr Johnson was willing in principle to try to
H    negotiate an overall settlement of his and the company's claims but this was
     not possible in the time available and it was GW's solicitor who said that the
     personal claim "would be a separate claim and it would really be a matter for
     separate negotiation in due course". It is noteworthy that Mr Johnson
     personally was party to the settlement agreement, and that the agreement

34
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Bingham of Cornhill

contained terms designed to preclude (in one instance) and limit (in another)    A
personal claims by him.  Those provisions only made sense on the
assumption that Mr Johnson was likely to make a personal claim.  GW did
not, of course, agree to forgo any defence the firm might have to
Mr Johnson's claim if brought, and the documents show that GW's solicitor
was alert to issues of remoteness and duplication.  Had Mr Johnson delayed
unduly before proceeding, a limitation defence would have become            B
available.  But an application to strike out for abuse of process is not a
defence; it is an objection to an action being brought at all.  The terms of the
settlement agreement and the exchanges which preceded it in my view point
strongly towards acceptance by both parties that it was open to Mr Johnson
to issue proceedings to enforce a personal claim, which could then be tried or
settled on its merits, and I consider that it would be unjust to permit GW to
resile from that assumption.                                                 C

    If, contrary to my view, GW is not estopped by convention from seeking
to strike out Mr Johnson's action, its failure to take action to strike out over
a long period of time is potent evidence not only that the action was not seen
as abusive at the time but also that, on the facts, it was not abusive.  The
indicia of true abuse are not so obscure that an experienced professional
party, advised by leading counsel (not, at that stage, Mr Steinfeld), will fail    D
to recognise them.  It is accepted that Mr Johnson had reasons which he
regarded as compelling to defer prosecution of his personal claim.  If, as he
contended, the urgency of obtaining an early and favourable decision in the
company's action was itself a result of GW's breach of duty to the company
and to him, it would seem to me wrong to stigmatise as abusive what was, in
practical terms, unavoidable.  I agree with GW that it would certainly have
been preferable if the judge who tried the company's action, and thereby       E
became familiar with much of the relevant detail and evidence, had been
able at the same time or shortly thereafter to rule on the personal claim.
That would have been efficient and economical.  But there were reasons
accepted at least implicitly by both parties at the time for not proceeding in
that way, and GW could, if it wishes, limit the extent to which issues
extensively canvassed in the earlier action are to be reopened.  It is far-
fetched to suggest that this action involves a collateral attack on GW's non-   F
admission of liability in the first action when that action was settled by
insurers on terms quite inconsistent with any realistic expectation that
GW would not be found liable.

    In my opinion, based on the facts of this case, the bringing of this action
was not an abuse of process.  The Court of Appeal adopted too mechanical
an approach, giving little or no weight to the considerations which led       G
Mr Johnson to act as he did and failing to weigh the overall balance of
justice.  I would allow Mr Johnson's appeal.

*The recoverability of the damages claimed by Mr Johnson*

    By its notice of cross-appeal GW challenged the Court of Appeal's ruling
that all the heads of damage pleaded on behalf of Mr Johnson (with one
exception) were or might be recoverable in principle if the pleaded facts were    H
fully proved.

    GW's first argument before the House, applicable to all save two of the
pleaded heads of damage, was in principle very simple.  It was that this
damage, if suffered at all, had been suffered by WWH and Mr Johnson,

A    being for this purpose no more than a shareholder in the company, could not sue to recover its loss. As the Court of Appeal pointed out in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 210:

> "A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested."

B

Here, it was argued, Mr Johnson was seeking to recover damage which had been suffered by WWH.

Mr Johnson's response was equally simple. It was accepted, for purposes of the application to strike out the damages claim, that GW owed a duty to

C    him personally and was in breach of that duty. Therefore, subject to showing that the damage complained of was caused by GW's breach of duty and was not too remote, which depended on the facts established at trial and could not be determined on the pleadings, he was entitled in principle to recover any damage which he had himself suffered as a personal loss separate and distinct from any loss suffered by the company.

On this issue we were referred to a number of authorities which included

D    *Lee v Sheard* [1956] 1 QB 192; *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204; *Heron International Ltd v Lord Grade* [1983] BCLC 244; *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117; *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260; *Christensen v Scott* [1996] 1 NZLR 273; *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427; *Gerber Garment Technology Inc v*

E    *Lectra Systems Ltd* [1997] RPC 443; *Stein v Blake* [1998] 1 All ER 724 and *Watson v Dutton Forshaw Motor Group Ltd* (unreported) 22 July 1998; Court of Appeal (Civil Division) Transcript No 1284 of 1998.

These authorities support the following propositions. (1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution

F    in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from *Prudential Assurance Co Ltd*

G    *v Newman Industries Ltd (No 2)* [1982] Ch 204, particularly at pp 222–223, *Heron International*, particularly at pp 261–262, *George Fischer*, particularly at pp 266 and 270–271, *Gerber* and *Stein v Blake*, particularly at pp 726–729. (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by *Lee v*

H    *Sheard* [1956] 1 QB 192, 195–196, *George Fischer* and *Gerber*. (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may

36
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Bingham of Cornhill

recover loss caused to the other by breach of the duty owed to that other.    A
I take this to be the effect of *Lee v Sheard*, at pp 195–196, *Heron International*, particularly at p 262, *R P Howard*, particularly at p 123, *Gerber* and *Stein v Blake*, particularly at p 726. I do not think the observations of Leggatt LJ in *Barings* at p 435B and of the Court of Appeal of New Zealand in *Christensen v Scott* at p 280, lines 25–35, can be reconciled with this statement of principle.

These principles do not resolve the crucial decision which a court must    B
make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not    C
recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use    D
the language of *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 223) the loss claimed is "merely a reflection of the loss suffered by the company". In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably,    E
a finer judgment will be called for. At the strike-out stage any reasonable doubt must be resolved in favour of the claimant.

I turn to consider the heads of claim now pleaded by Mr Johnson. (1) Collector Piece Video Ltd and Adfocus Ltd. The claim is for sums which Mr Johnson, acting on GW's advice, invested in these companies and lost. This claim is unobjectionable in principle, as Mr Steinfeld came close to accepting. (2) Cost of personal borrowings: loan capital and interest. The    F
claim is for sums which Mr Johnson claims he was obliged to borrow at punitive rates of interest to fund his personal outgoings and those of his businesses. Both the ingredients and the quantum of this claim will call for close examination, among other things to be sure that it is not a disguised claim for loss of dividend, but it cannot at this stage be struck out as bad on its face. The same is true of Mr Johnson's claims for bank interest and    G
charges and mortgage charges and interest (which will raise obvious questions of remoteness). (3) Diminution in value of Mr Johnson's pension and majority shareholding in WWH. In part this claim relates to payments which the company would have made into a pension fund for Mr Johnson: I think it plain that this claim is merely a reflection of the company's loss and I would strike it out. In part the claim relates to enhancement of the value of Mr Johnson's pension if the payments had been duly made. I do not regard    H
this part of the claim as objectionable in principle. An alternative claim, based on the supposition that the company would not have made the pension payments, that its assets would thereby have been increased and that the value of Mr Johnson's shareholding would thereby have been enhanced,

A   is also a reflection of the company's loss and I would strike it out. (4) Loss of 12·5% of Mr Johnson's shareholding in WWH. Mr Johnson claims that he transferred these shares to a lender as security for a loan and that because of his lack of funds, caused by GW's breach of duty, he was unable to buy them back. This claim is not in my view objectionable in principle. (5) Additional tax liability. If proved, this is a personal loss and I would not strike it out.

B   The second limb of GW's argument on the cross-appeal was directed to Mr Johnson's claim for damages for mental distress and anxiety. This is a claim for general damages for

"the mental distress and anxiety which he has suffered as a result of the protracted litigation process to which he has been subjected, the extreme financial embarrassment in which he and his family have found themselves, and the deterioration in his family relationships, particularly with his wife and son, as a result of the matters complained of in the re-amended statement of claim."

Closely allied to this was a claim, pleaded at length, for aggravated damages "by reason of the fact that the manner of the commission of [GW's] tort was such as to injure his pride and dignity". GW contended that damages for mental distress and anxiety did not lie for breach of a commercial contract such as the present and that this was not a class of case in which aggravated damages were in principle recoverable. Mr ter Haar took issue with both these points.

The general rule laid down in *Addis v Gramophone Co Ltd* [1909] AC 488 was that damages for breach of contract could not include damages for mental distress. Cases decided over the last century established some inroads into that general rule: see, generally, *McGregor on Damages*, 16th ed (1997), paras 98–104. But the inroads have been limited and McGregor describes as a useful summary a passage in *Watts v Morrow* [1991] 1 WLR 1421, 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead."

Your Lordships' House had occasion to touch on this question in *Ruxley Electronics and Construction Ltd v Forsyth* [1996] AC 344, an unusual case in which the issue concerned the measure of compensation recoverable by a building owner against a contractor who had built a swimming pool which was 18 inches shallower at the deep end than the contract specified. Lord Lloyd of Berwick said, at p 374:

"*Addis v Gramophone Co Ltd* established the general rule that in claims for breach of contract, the plaintiff cannot recover damages for his injured feelings. But the rule, like most rules, is subject to exceptions. One of the well established exceptions is when the object of the contract is

to afford pleasure, as, for example, where the plaintiff has booked a    A
holiday with a tour operator. If the tour operator is in breach of contract
by failing to provide what the contract called for, the plaintiff may
recover damages for his disappointment: see *Jarvis v Swans Tours Ltd*
[1973] QB 233 and *Jackson v Horizon Holidays Ltd* [1975] 1 WLR 1468.

"This was, as I understand it, the principle which Judge Diamond
applied in the present case. He took the view that the contract was one    B
'for the provision of a pleasurable amenity'. In the event, Mr Forsyth's
pleasure was not so great as it would have been if the swimming pool had
been 7 feet 6 inches deep. This was a view which the judge was entitled to
take. If it involves a further inroad on the rule in *Addis v Gramophone Co
Ltd* [1909] AC 488, then so be it. But I prefer to regard it as a logical
application or adaptation of the existing exception to a new situation."    C

I do not regard this observation as throwing doubt on the applicability of
*Addis v Gramophone Co Ltd* in a case such as the present. It is undoubtedly
true that many breaches of contract cause intense frustration and anxiety to
the innocent party. I am not, however, persuaded on the argument presented
on this appeal that the general applicability of *Addis v Gramophone Co Ltd*
should be further restricted.

I would strike out Mr Johnson's claim for damages for mental distress    D
and anxiety. I would also strike out his claim for aggravated damages: I see
nothing in the pleaded facts which would justify any award beyond the basic
compensatory measure of damages.

*Conclusion*

For these reasons I would allow Mr Johnson's appeal and dismiss GW's    E
cross-appeal, save that I would strike out his claims (identified in (3) above)
for pension payments and the enhanced value of his shareholding, and for
damages for mental distress and anxiety and aggravated damages. I would
order GW to pay Mr Johnson's costs before the Court of Appeal and the
judge, and the costs of the appeal and the cross-appeal to this House.

F

LORD GOFF OF CHIEVELEY My Lords,

*(1) The appeal*

*(a) Abuse of process*

On the question whether there was an abuse of process on the part of the
plaintiff, my noble and learned friend, Lord Bingham of Cornhill, has
reviewed the facts and the relevant authorities in lucid detail. I find myself to    G
be in complete agreement with his analysis of the authorities, and with his
conclusion that on the facts there was no abuse of process on the part of the
plaintiff; and I do not propose to burden this opinion with a repetition of his
reasoning. I only wish to add a few words on the separate question of
estoppel, with regard to the nature of the estoppel on which the plaintiff
could, if necessary, have relied.    H

*(b) Estoppel*

The conclusion of the judge, and the contention of Mr ter Haar for the
plaintiff, was that the relevant estoppel was estoppel by convention.

39

[2002] 2 AC                    Johnson v Gore Wood & Co (HL(E))
                                              Lord Goff of Chieveley

A    Reliance was placed in particular on a well known passage in the judgment of Lord Denning MR in *Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84, 122:

"The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved
B    during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now
C    be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption—either of fact or of law—whether due to misrepresentation or mistake makes no difference—on which they have conducted the dealings between them—neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so.
D    If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands."

This broad statement of law is most appealing. I yield to nobody in my admiration for Lord Denning; but it has to be said that his attempt in this passage to identify a common criterion for the existence of various forms of estoppel—he refers in particular to proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel—
E    is characteristically bold; and that the criterion which he chooses, viz that the parties to a transaction should have proceeded on the basis of an underlying assumption, was previously thought to be relevant only in certain cases (for example, it was adopted by Oliver J in his important judgment in *Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd (Note)* [1982]
F    QB 133) and, in particular, in the case of estoppel by convention, a species of estoppel which Lord Denning does not mention. Furthermore, if he intended that his broad statement of principle should apply in the case of estoppel by convention, a further problem arises in that, in relation to that doctrine, it has been authoritatively stated in *Spencer Bower & Turner, The Law Relating to Estoppel by Representation*, in the scholarly and much admired third edition (1977) by Sir Alexander Turner, at pp 167–168, that:
G
"Just as the representation which supports an estoppel *in pais* must be a representation of *fact*, the assumed state of affairs which is the necessary foundation of an estoppel by convention must be an assumed state of facts presently in existence . . . No case has gone so far as to support an estoppel by convention precluding a party resiling from a promise or assurance, not effective as a matter of contract, as to future conduct or as
H    to a state of affairs not yet in existence. And there is no reason to suppose that the doctrine will ever develop so far. To allow such an estoppel would amount to the abandonment of the doctrine of consideration, and to accord contractual effect to assurances as to the future for which no consideration has been given."

40
Johnson v Gore Wood & Co (HL(E))                    [2002] 2 AC
Lord Goff of Chieveley

I myself suspect that this statement may be too categorical; but we cannot    A
ignore the fact that it embodies a fundamental principle of our law of
contract. The doctrine of consideration may not be very popular nowadays;
but although its progeny, the doctrine of privity, has recently been abolished
by statute, the doctrine of consideration still exists as part of our law.

I myself was the judge of first instance in *Amalgamated Investment and
Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84.    B
I remember the doctrine of estoppel by convention being urged upon me; but
the case was concerned with the scope of a guarantee, which was a matter of
law, and, in the light of the passage in *Spencer Bower & Turner* which I have
just quoted, I hesitated to adopt the doctrine. Cautiously, and I still think
wisely, I founded my conclusion on a broader basis of unconscionability. In
the Court of Appeal, however, both Eveleigh and Brandon LJJ expressly
founded the relevant parts of their judgments on the doctrine of estoppel by    C
convention. They did so relying on the statement of principle from *Spencer
Bower & Turner* which I have already cited, which limits the doctrine to
cases where there has been an agreed assumption as to *facts*, but nevertheless
applied that statement to a case where the agreed assumption (as to the
scope of the guarantee) was one of law. If Lord Denning's statement of
principle is to be read as applying to the case of estoppel by convention, he
implicitly rejected the statement of the law in *Spencer Bower & Turner*,    D
holding that there could be an estoppel whether the common underlying
assumption was one of fact or of law.

I accept that in certain circumstances an estoppel may have the effect of
enabling a party to enforce a cause of action which, without the estoppel,
would not exist. Examples are given in my judgment in *Amalgamated
Investment and Property Co Ltd v Texas Commerce International Bank*    E
[1982] QB 84, 105–107. But in my opinion it is not enough for that
purpose that the estoppel may be characterised as an estoppel by convention,
or that it can be said to be founded upon a common assumption by the
parties.

Against this background I am, despite my great admiration for Lord
Denning, reluctant to proceed on the basis of estoppel by convention in the
present case. The function of the estoppel is here said to be to preclude the    F
defendant firm from contending that Mr Johnson, by personally advancing a
separate claim to damages against the defendant firm instead of doing so at
the same time as pursuing his company's claim, was abusing the process of
the court. That, as I see it, must relate to a matter of law. It could, however,
be appropriate subject matter for an estoppel by representation, whether in
the form of promissory estoppel or of acquiescence, on account of which the    G
firm is, by reason of its prior conduct, precluded from enforcing its strict
legal rights against Mr Johnson (to claim that his personal proceedings
against the firm constituted an abuse of the process of the court). Such an
estoppel is not, as I understand it, based on a common underlying
assumption so much as on a representation by the representor that he does
not intend to rely upon his strict legal rights against the representee which is
so acted on by the representee that it is inequitable for the representor    H
thereafter to enforce those rights against him. This approach, as I see it, is
consistent with the conclusion of my noble and learned friend, Lord Millett,
who considers that the firm would be so precluded by virtue of its
acquiescence in the manner in which Mr Johnson had conducted the

A    litigation hitherto. In the context of the present case, moreover, I can see no
     material difference between invoking promissory estoppel or acquiescence
     as the ground on which the defendant firm should be precluded from
     asserting that the plaintiff had abused the process of the court. The truth of
     the matter is that the defendant firm, by its conduct and in particular by
     participating in negotiations for settlement of the company's claim against it
     on the basis that Mr Johnson would thereafter be free to pursue his own
B    personal claim against it, lulled Mr Johnson into a sense of security that he
     was free to pursue such a claim against the firm, without objection, in
     separate proceedings, with the effect that it became unconscionable for the
     firm to contend that his personal proceedings constituted an abuse of the
     process of the court. In the end, I am inclined to think that the many
     circumstances capable of giving rise to an estoppel cannot be accommodated
C    within a single formula, and that it is unconscionability which provides the
     link between them.
         For these reasons I would, like the remainder of your Lordships, allow the
     appeal; and I now turn to the cross-appeal of the defendant firm.

     *(2) The cross-appeal*

D        Here the question is whether certain heads of claim advanced by the
     plaintiff, Mr Johnson, against the defendant firm, should be struck out. The
     relevant heads of claim are usefully recorded in the opinion of my noble and
     learned friend, Lord Bingham of Cornhill. I do not propose to repeat them in
     this opinion. The Court of Appeal held that each of the heads of damage
     pleaded in paragraphs 23 and 24 of the re-amended statement of claim is
     recoverable as a matter of law by the plaintiff by way of damages for the
E    breaches of duty pleaded by him, and so should not be struck out. It is
     against that decision that the defendant firm now cross-appeals to your
     Lordships' House.
         The principal ground on which it is said by the respondent firm that some
     of these heads of claim should be struck out is derived from the well-known
     case of *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)*
F    [1982] Ch 204. I agree with the analysis of that case, and of the other cases
     following upon it, set out in the opinion of my noble and learned friend,
     Lord Millett (which I have had the opportunity of reading in draft).
     I accordingly agree with his conclusion, post, p 126C–D that:

         "On the assumption which we are bound to make for the purpose of
     this appeal, which is that the firm was in breach of a duty of care owed to
G    Mr Johnson personally, he is in principle entitled to recover damages in
     respect of all heads of non-reflective consequential loss which are not too
     remote."

         On that basis I, like Lord Millett, agree with my noble and learned friend,
     Lord Bingham of Cornhill, that the heads of damage specified by him as
     items 1, 2, 4 and 5 are unobjectionable and should not be struck out. Item
H    3 relates to the diminution in value of the plaintiff's pension policy set up by
     the company and accruing to the benefit of the plaintiff as part of his
     remuneration in his capacity as director of the company. In so far as the
     claim relates to payments which the company would have made into a
     pension fund for the plaintiff, I agree that the claim is merely a reflection of
     the company's loss and should therefore be struck out. But in so far as it

relates to enhancement of the value of his pension if the payments had been    A
made, it is unobjectionable and should be allowed to stand.

The second ground relates to the plaintiff's claims for general damages for
mental distress, and for aggravated damages based on the fact that the
manner of commission of the respondent firm's wrong was "such as to injure
his pride and dignity". I agree with my noble and learned friend, Lord
Bingham of Cornhill, that, as a matter of principle, damages on these    B
grounds are not generally recoverable: see *Addis v Gramophone Co Ltd*
[1909] AC 488; *Watts v Morrow* [1991] 1 WLR 1421, 1445, per
Bingham LJ; *McGregor on Damages*, paras 98–104. It is true that there has
in recent years been a softening of this principle in certain respects (see
*McGregor on Damages* and *Mahmud v Bank of Credit and Commerce
International SA* [1998] AC 20), but none of these developments has, so far
as I can see, gone so far as to allow recovery on the broad grounds here    C
pleaded. I also would therefore strike out these two heads of claim.

For these reasons, I agree with the order proposed by my noble and
learned friend, Lord Bingham of Cornhill, as to the disposal of both the
appeal and the cross-appeal. I also agree with the order proposed by him as
to costs.

**LORD COOKE OF THORNDON**  My Lords, having had the advantage    D
of reading in draft the speech of my noble and learned friend, Lord Bingham
of Cornhill, I agree with all that he says on the subject of abuse of process.
The course adopted by the parties of settling Westway Homes Ltd's claim
against Gore Wood & Co, but leaving open any personal claim by
Mr Johnson against the same solicitors, subject to a cap on certain heads of
damages and an undertaking concerning personal guarantees, strikes me as a    E
sensible one: the personal claim against the solicitors plainly involves
different and more difficult issues. The belated raising by the defendants of
the contention, more ingenious than realistic, that the settlement had the
effect of preventing the personal claim seems to me closer to abuse of process
than the plaintiff's conduct in pursuing the claim. The defendants are saved
from that stigma by the acceptance of their contention by the Court of
Appeal, but I agree that on this part of the case the appeal of the plaintiff    F
must be allowed.

On the recoverability of personal damages, I have much more difficulty,
for the following reasons. It will be convenient to deal first with the claim
for quantifiable financial loss, secondly with the claim based on other forms
of suffering.

*Damages for quantifiable financial loss*                                    G

As the present is an action by one claiming to be a personal client against
solicitors, not an action by a shareholder against a company and directors,
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]
Ch 204, including the well known passage at pp 222–223, has only a limited
bearing. The cash box illustration given by the Court of Appeal (Cumming-
Bruce, Templeman and Brightman LJJ) is not helpful in this case because it    H
does not envisage any loss except of the company's £100,000. It is by no
means self-evident that, if the controlling shareholder had lost a valuable
business opportunity for want of prompt access to the company's money, he
would have been unable to recover damages for that loss caused by the

[2002] 2 AC

Johnson v Gore Wood & Co (HL(E))
Lord Cooke of Thorndon

A  defendant's deceit and theft of the cash box. The court did give as a possible instance of a recoverable personal loss the cost caused to the shareholder in consequence of a fraudulent circular, such as the cost of attending a meeting; but this single specific example is not fully illuminating. Nothing that I am about to say involves any criticism of the decision in the *Prudential* case or anything said in it. My point is simply that it was not concerned with the kind of issue arising in the present case and contains no observations about

B  this kind of issue. The same applies to *Stein v Blake* [1998] 1 All ER 724.

I respectfully agree that the three numbered propositions set out in the speech of Lord Bingham are supported by the English authorities cited by him. But these authorities and the propositions are not comprehensive. Nor, as my noble and learned friend also indicates, do they resolve the crucial question arising on a strike-out application in a case such as the

C  present. This is a case about solicitors' negligence. The English authorities cited include only one relating to the not uncommon situation of a solicitor acting both for a client personally and for a company controlled by the latter. This is *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117. In that case the solicitor was negligent in failing initiate a timely application for statutory protection of the company's lease. The company

D  negotiated with the landlord a new lease on terms less favourable than could have been obtained with the bargaining power of an extant application (loss A). The new lease also stipulated that the shareholder could not sell his shares without the landlord's consent (loss B). Against the solicitor Staughton J awarded the company loss A and the shareholder loss B. Although it flowed from the company's loss of bargaining power, loss B was not suffered by the company. So, too, in the present case Mr Johnson claims

E  that at least the greater part of the losses for which he sues were not suffered by the company.

As the report of *Christensen v Scott* [1996] 1 NZLR 273 may not be readily available in England, it is as well to reproduce here the whole of the relevant passage in the judgment of the Court of Appeal delivered by Thomas J. I must not conceal that I was a member of the court of five on

F  behalf of whom the judge spoke, although I confess to little independent recollection of the case. It was a case in which the defendants, firms of chartered accountants and solicitors, acted for the plaintiffs personally and in the course of doing so advised on channelling their assets into a company taking a lease of farm land. Naturally the defendants came to act for the company as well. By reason of alleged negligence on the part of the

G  defendants the consent of the landlord's mortgagees was not obtained, nor was a caveat registered against the title. Consequently the land was lost and the company failed. The company's claim against the defendants was settled by the liquidator for a sum alleged by the plaintiffs to be totally inadequate. The Court of Appeal held that the personal claims should not be struck out before trial. Thomas J said, at pp 280–281:

H      "We do not need to enter upon a close examination of the *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 decision. It has attracted not insignificant and, at times, critical comment. See eg L C B Gower, *Gower's Principles of Modern Company Law*, 5th ed (1992), pp 647–653; L S Sealy, 'Problems of Standing, Pleading and Proof in Corporate Litigation' (ed B G Pettet), p 1, esp pp 6–10; and

M J Sterling, 'The Theory and Policy of Shareholder Actions in Tort' (1987) 50 MLR 468, esp pp 470–474. It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in *Foss v Harbottle* (1843) 2 Hare 461. But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective of whether he or she is a member, has personal rights and these rights are invaded, the rule in *Foss v Harbottle* is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of duty owed to the company but from a breach of duty owed to the individuals. The individual is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed prior to the alleged default of their accountants and solicitors. (For a discussion of the policy issues which arise in considering these questions, see Sterling, at pp 474–491.)

"In circumstances of this kind the possibility that the company and the member may seek to hold the same party liable for the same loss may pose a difficulty. Double recovery, of course, cannot be permitted. The problem does not arise in this case, however, as the company has chosen to settle its claim. Peat Marwick and McCaw Lewis accepted a compromise in the knowledge that Mr and Mrs Christensen's claim was outstanding. It may well be, as was acknowledged by Mr Pidgeon in the course of argument, that an allowance will need to be made for the amount already paid to the liquidator in settlement of the company's claim.

"It is to be acknowledged, however, that the problem of double recovery may well arise in other cases. No doubt, such a possibility is most likely with smaller private companies where the interrelationship between the company, the directors and the shareholders may give rise to independent duties on the part of the professional advisers involved. But the situation where one defendant owes a duty to two persons who suffer a common loss is not unknown in the law, and it will need to be examined in this context. It may be found that there is no necessary reason why the company's loss should take precedence over the loss of the individuals who are owed a separate duty of care. To meet the problem of double

45

A    recovery in such circumstances it will be necessary to evolve principles to
     determine which party or parties will be able to seek or obtain recovery.
     A stay of one proceeding may be required. Judgment, with a stay of
     execution against one or other of the parties, may be in order. An
     obligation to account in whole or in part may be appropriate. The
     interest of creditors who may benefit if one party recovers and not the
B    other may require consideration. As the problem of double recovery does
     not arise in this case, however, it is preferable to leave an examination of
     these issues to a case where that problem is squarely in point.
          "Essentially, Mr and Mrs Christensen are alleging that as a result of
     Peat Marwick and McCaw Lewis's breach of duty owed to them
     personally they suffered a personal loss, that is, a reduction in the value of
     their assets. Their assets in this case had been channelled into their
C    company. Thus, it is arguable that the diminution in the value of their
     shareholding is the measure of that loss. It may well be that when the
     evidence is heard it will be apparent that Mr and Mrs Christensen's claim
     is inflated, but that is a matter for the trial.
          "We are not prepared to hold at this stage that they do not have an
     arguable case to recover damages for the breach of an acknowledged
     duty."
D
          When that passage is read as a whole, two features will be noted. It will
     be seen not only that the whole passage is throughout guarded and
     provisional, but also that the court recognised both that double recovery
     cannot be permitted and that the interests of creditors may require
     consideration. In this field, if a client is suing his own solicitor, it would
E    appear that only the problems of double recovery or prejudice to the
     company's creditors would justify denying or limiting the right to recover
     personal damages which, on ordinary principles of foreseeability, would
     otherwise arise. One other observation should be made about the passage in
     Thomas J's judgment. Although he did mention that *Prudential Assurance
     Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 had not gone
     without criticism, he did not find it necessary to examine that case closely.
F    I would repeat that in no way am I criticising it. On the contrary I accept it
     to the full.
          The next closest of the English reported cases cited is *Barings plc v
     Coopers & Lybrand* [1997] 1 BCLC 427, 435. In that case (arising from the
     activities of Mr Leeson) a United Kingdom company was suing the auditors
     of its Singapore subsidiary; the auditors were also responsible for supplying
G    audit information for the group accounts. On a pre-trial appeal,
     Leggatt LJ stated the law in terms which, albeit briefer, are much the same as
     those of Thomas J in *Christensen v Scott* [1996] 1 NZLR 273 which case
     was cited by Leggatt LJ.
          *Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443 is
     more distant from the present case on the facts. It was a suit for
     infringement of patents in which some of the lost profits for which the
H    plaintiff company claimed damages were suffered by subsidiary companies
     in which it held all the shares. The decision was that, when a shareholder
     has a cause of action but his company has none, he can recover damages
     measured by the reduction in value of his shareholding; but that the plaintiff
     must prove the amount of his own loss and that it cannot be assumed that

this is the same as the loss suffered by the company.  Such relevance as the    A
case has lies in the reasoning of Hobhouse LJ in the Court of Appeal.  At
p 474 he described *Christensen v Scott* [1996] 1 NZLR 273 as "a good
illustration of the application of the relevant principles".  After an extensive
quotation from the judgment in that case, he added, at p 475:

> "There is no reason to suppose that this case would have been
> differently decided in England.  The decision helpfully illustrates that,    B
> provided that the plaintiff can establish a personal cause of action and can
> prove a personal loss caused by the defendant's actionable wrong, then
> the fact that the loss is felt by the plaintiff in the form of the loss of the
> value of the plaintiff's shares in a company is no answer to the plaintiff's
> claim.  (In that case, as in the present case, no question of remoteness
> arose.)"
>                                                                                C

Thus *Christensen v Scott* does not appear to have caused problems for
English judges hitherto, and I would hope that this position might continue.
But it is necessary to add some further discussion of principle, as on the facts
the present case is not on all fours with that case or any of the others cited in
argument.

Assuming that this is a fairly typical case of a man carrying on business         D
wholly or partly through a company or companies controlled by him, the
first question at a trial will be whether Gore Wood & Co owed duties to
Mr Johnson personally as well as to Westway Homes Ltd.  Such personal
duties could arise from a contract of retainer or in tort because of the
closeness of relations ("proximity"), or from both sources concurrently.
*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 finally established in
English law the legitimacy of recognising that professional advisers may owe    E
to the same client a duty to exercise reasonable care and skill derived from
both contract and tort law.  Conceivably the rules as to remoteness or the
measure of damages could produce different consequences; but in the
interests of justice and the clarity of the law this should obviously be avoided
unless forced upon the courts.  The duty in such a case is most simply seen as
a civil law obligation to conform to professional standards.  In the argument    F
it was not suggested that for the purposes of this appeal there is any material
difference.

Although more elaborately pleaded here, the duty owed to the personal
claimant would be to exercise reasonable care and professional skill in
handling the legal side of his affairs and those of his relevant company.  In
this case it would include the elementary responsibility of exercising
efficiently the company's option to purchase Mr Moores's land, on the basis    G
that the risk of personal loss to Mr Johnson from a questionable exercise of
the option was reasonably foreseeable by Gore Wood & Co.  The duty was
one of taking reasonable steps to safeguard his interests, not one of
indemnity.  Subject to that important qualification, there is some analogy
with a contract of insurance When a solicitor is acting for both a shareholder
personally and his company, the essence of the personal relationship is that
the individual looks to the solicitor for care to provide personal financial      H
protection.

That brings the discussion to what is perhaps the crucial point in this case.
The required degree of personal protection will extend, I think, to protection
against the operation of rules of law that might foreseeably restrict the

Case: 11-126    Document: 63    Page: 338    04/25/2011    272927    401

A-5637

A   individual's right to recover damages if no duty were owed to him personally by the solicitor. In cases of the present class, two such rules may be relevant among other factors. One may be called the rule in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, using that as a shorthand to convey that a shareholder in a company has as such no right to recover from a third party damages for breach of the latter's duty to the company. The other may be called the rule in *The Lips*, using that as

B   shorthand for the proposition in *President of India v Lips Maritime Corpn* [1988] AC 395, per Lord Brandon of Oakbrook at p 425: "There is no such thing as a cause of action in damages for late payment of damages. The only remedy which the law affords for delay in paying damages is the discretionary award of interest pursuant to statute."

    But for the solicitor's duty owed to the individual client, such restrictions

C   could result in inability on the part of the latter to recover damages caused to him by the solicitor's negligence. Thus in the present case, whereas the option should have been exercised in a unquestionable manner in February 1988, it was not until more than four years later that the land was belatedly conveyed to Westway Homes Ltd, and not until a further period of about eight months had elapsed that the company obtained a monetary settlement of its claim against the solicitors.

D    Mr Johnson alleges (inter alia) that in the meantime the property market had collapsed, the development project had ceased to be financially advantageous, and he had incurred very high interest charges for personal borrowings. To the extent that he can establish at a trial that the delay in the obtaining by the company of the land or monetary compensation was caused or materially contributed to by negligence on the part of the defendant

E   solicitors, there would appear to be no sound reason for denying him personal relief for any damages foreseeably caused to him personally by the delay: provided always that double recovery is not sanctioned and the interests of the company's creditors are protected.

    While double recovery has to be avoided, at this pre-trial stage I would not rule out the possibility that, on the close scrutiny at trial spoken of by Lord Bingham, it will be found that the ultimate agreed payment to the

F   company was not intended to and did not in fact adequately compensate Mr Johnson for the company's want of title to the land in early 1988. It may be chiefly a matter of the timing. The rule in *The Lips* would not exclude the plaintiff's personal claim; he is not claiming damages for delay in paying damages to him. Rather he is claiming damages for the fact that his company did not have the land in 1988—a claim outside the provenance and

G   the purview of the rule in *The Lips*.

    Thus the true scope of the settlement in 1992 is one of the matters requiring examination. In the instant case the settlement covered a very large part of the company's claim. It may well have been a reasonable settlement, reached after having due regard to the interests of the company's creditors, who could not successfully claim that more should have been recovered. There may nevertheless be some possibility that, in addition to

H   any other right to personal damages that he may have against the solicitors, Mr Johnson could be heard to say against them that in any event he should be compensated for his company not having recovered fully. Such a possibility may be more significant in a case like *Christensen v Scott* [1996] 1 NZLR 273 where the shareholder has opposed and complains of the

48
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Cooke of Thorndon

inadequacy of the company's settlement; but I do not think that it can be ignored in the present case at this stage.

In a company winding up the liquidator may be liable to the company for negligence on his part in making a compromise: see *In re Windsor Steam Coal Co (1901) Ltd* [1929] 1 Ch 151; *In re Home and Colonial Insurance Co Ltd* [1930] 1 Ch 102. Accordingly I think that in cases within that principle the court should avoid sanctioning not only double recovery, but also any real prospect of double recovery. As this aspect was not explored in argument, it need not now be explored further.

Apart from the question of any shortfall in the company's recovery, I think that Mr Johnson could have a good personal claim against the solicitors for compensation on the basis already stated, that is to say on the basis that the damages claimed by him were not suffered by the company. Accordingly I agree with Lord Bingham that the claimed heads of damages numbered in his speech 1, 2, 4 and 5 should not be struck out before trial, and that the same applies to the part of head 3 relating to the enhancement of the value of Mr Johnson's pension if the payments had been duly made. I am rather less clear that the remaining parts of head 3 should be struck out. Certainly, however, these claims relating to lost payments into a pension fund or retention of corresponding amounts in the company's assets look very much like claims for double recovery. As the other members of your Lordships' Appellate Committee are in no doubt that they should be struck out, I am content to concur in that conclusion.

In short, agreeing that at the strike-out stage any reasonable doubt must be resolved in favour of the claimant, I think it safer to avoid fine distinctions, especially before trial; and, with the very limited exceptions just mentioned, to leave all the extant claims in this case of complicated facts open for examination at trial. The open questions would include remoteness. And I would add one other cautionary remark. The trial judge would have to consider, not only issues of double recovery by Mr Johnson and the company, but also any issue of overlapping among Mr Johnson's claims themselves.

*Damages for general suffering*

In *Watts v Morrow* [1991] 1 WLR 1421, Bingham LJ said, at p 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead. If the law did not cater for this exceptional category of case it would be defective. A contract to survey the condition of a house for a prospective purchaser does not, however, fall within this exceptional category.

"In cases not falling within this exceptional category, damages are in my view recoverable for physical inconvenience and discomfort caused by the breach and mental suffering directly related to that inconvenience and

A    discomfort. If those effects are foreseeably suffered during a period when
defects are repaired I am prepared to accept that they sound in damages
even though the cost of the repairs is not recoverable as such. But I also
agree that awards should be restrained, and that the awards in this case
far exceeded a reasonable award for the injury shown to have been
suffered. I agree with the figures which Ralph Gibson LJ proposes to
substitute."

B
    I regard that as an authoritative statement of the present law of England
regarding commercial contracts. The exceptional category is not confined,
in my view, to contracts to provide pleasure and the like. For example,
breaches of contracts for status such as membership of a trade union or a
club may carry damages for injured feelings; but it is unnecessary to go into
C    that area further, as I accept that, if there was a contract between
Mr Johnson and Gore Wood & Co, it is to be classified in English law as
commercial in the sense that damages for mere distress are not available.
Contract-breaking is treated as an incident of commercial life which players
in the game are expected to meet with mental fortitude. For present
purposes it may be assumed that the same principle applies in so far as the
claim is grounded in tort: see *Hayes v James & Charles Dodd* [1990] 2 All
D    ER 815, 826, per Purchas LJ. A fuller discussion of these various matters
can be found in *Mouat v Clark Boyce* [1992] 2 NZLR 559 (a stage of the
litigation not under consideration by the Privy Council in *Clark Boyce v
Mouat* [1994] 1 AC 428).
    But that does not quite dispose of Mr Johnson's claim for non-
quantifiable damage. He alleges extreme financial embarrassment; it is said
E    that from a state of some prosperity he was reduced to subsistence on social
security benefit. He also alleges deterioration in his family relationships,
particularly with his wife and son. Although the pleader has treated them as
mental distress, such consequences are in truth significantly more than
mental distress. They are more akin to the physical inconvenience and
discomfort referred to in Bingham LJ's third paragraph. In my opinion the
common law would be defective and stray too far from reality, humanity
F    and justice if it remorselessly shut out even a restrained award under these
heads. Hence I would leave the claim in this part of the case standing also,
although only on the footing that damages could not be awarded merely for
injured feelings, nor could aggravated damages be awarded merely on that
account.
    English case law has fluctuated as to the recoverability of damages in
G    contract for mental distress, as is detailed in *McGregor on Damages* (1997),
paras 98–106. See also Dr Harvey McGregor's preface at pp vii–viii. But it
has been established since Victorian times that, by contrast with mere
mental distress, damages are recoverable for substantial inconvenience and
discomfort. Thus in *Hobbs v London and South Western Railway Co*
(1875) LR 10 QB 111, a court including Cockburn CJ and Blackburn and
Mellor JJ upheld an award to a husband and wife for the inconvenience of
H    having to walk home with young children four or five miles late on a
drizzling night, although the wife's catching of a cold was found too remote.
That case was applied by Barry J in *Bailey v Bullock* [1950] 2 All ER 1167 in
awarding damages against solicitors for the inconvenience to the plaintiff of
having to live in an overcrowded house. Such authorities are treated in

*McGregor on Damages*, paras 93 to 96, as surviving the recent restriction of    A
damages for mental distress. The third paragraph already quoted from
Bingham LJ in *Watts v Morrow* [1991] 1 WLR 1421, 1445 is largely
supported by them. The line may not always be easy to draw, and it is
particularly difficult before trial to assess the weight of the claims in the
present case. But both a changed way of life because of poverty and
damaged family relationships can be grievous forms of non-pecuniary harm.    B
I am respectfully unable to agree that they should be ruled out of the law's
purview.

Before parting with the case I would say something about *Addis v
Gramophone Co Ltd* [1909] AC 488. In severely confining damages for
wrongful dismissal, your Lordships' House of those days appears to have
seen the relationship of employer and employee as no more than an ordinary
commercial one. This is a world away from the concept now, and in    C
*Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20 the
House accepted that there is an implied obligation of mutual trust and
confidence, and that an employer is under an implied obligation that he will
not, without reasonable and proper cause, conduct his business in a manner
likely to destroy or seriously damage that relationship. Damages for
financial loss, including impaired employment prospects, caused by harm to    D
reputation could be recovered. It is true that *Addis* was distinguished on the
ground that it related to injury to feelings caused by the manner of
termination of the relationship, which question did not arise in *Mahmud*: see
per Lord Nicholls of Birkenhead, at p 38, and Lord Steyn, at p 51. But the
philosophy is altogether different, as is the philosophy embodied in modern
employment legislation. Again, as Lord Bingham has pointed out, *Addis*    E
was not applied in *Ruxley Electronics and Construction Ltd v Forsyth*
[1996] AC 344. *Addis* has not uniformly been followed in the
Commonwealth: see *Brown v Waterloo Regional Board of Comrs of Police*
(1982) 136 DLR (3d) 49, a judgment of Linden J (the author of *Canadian
Tort Law*, now in its sixth edition). The decision was reversed on other
grounds, but Linden J's statements of principle were substantially accepted:    F
(1983) 150 DLR (3d) 729. According to that authority, an employee
wrongfully dismissed may recover damages for mental distress in some
circumstances. To the same effect is *Whelan v Waitaki Meats Ltd* [1991]
2 NZLR 74, which contains an instructive survey of the authorities by
Gallen J. I take leave to doubt the permanence of *Addis* in English law. But
it is not a question arising in the present case either; I make these
observations only to avoid being identified with any approbation of *Addis*.

For the reasons already given, I would allow Mr Johnson's appeal and    G
would dismiss the cross-appeal except as to the two claims identified by Lord
Bingham of Cornhill in his head 3 and as to aggravated damages. In the
result the one point on which I differ concerns the claims for damages for
financial embarrassment and injury to family relationships: those I would
permit to go to trial. I concur in the order for costs proposed by Lord
Bingham.

    H

LORD HUTTON My Lords, I have had the advantage of reading in draft
the speech of my noble and learned friend, Lord Bingham of Cornhill. I am
in full agreement with his speech on the subject of abuse of process and I wish
to confine my observations to the issue whether the damages claimed by

A   Mr Johnson are recoverable as a matter of law. The case advanced by Mr Johnson is that he instructed a firm of solicitors, Gore Wood & Co ("GW"), to advise him personally as to the conduct of his businesses, including the business of property development which he carried on through a company Westway Homes Ltd ("WWH") of which he was the managing director and in which he held the entire shareholding with the exception of two shares, and that acting on behalf of WWH he also instructed GW to advise that company. He contends that in advising him as to the business affairs of the company, GW owed him a duty of care in contract and tort and in breach of that duty caused him very substantial financial loss. The question whether the damages claimed are recoverable comes before the House as a preliminary issue and is to be approached on the basis that the facts pleaded by Mr Johnson are capable of establishing a breach of a duty owed to him which caused him loss.

    I consider it to be clear that where a shareholder is personally owed a duty of care by a defendant and a breach of that duty causes him loss, he is not debarred from recovering damages because the defendant owed a separate and similar duty of care to the company, provided that the loss suffered by the shareholder is separate and distinct from the loss suffered by the company. This principle was recently stated in the judgment in the Court of Appeal delivered by Sir Christopher Slade in *Walker v Stones* [2001] QB 902, 932–933, that a claimant is entitled to recover damages where:

> "(a) the plaintiff can establish that the defendant's conduct has constituted a breach of some legal duty owed to him personally (whether under the law of contract, torts, trusts or any other branch of the law) and (b) on its assessment of the facts, the court is satisfied that such breach of duty has caused him personal loss, separate and distinct from any loss that may have been occasioned to any corporate body in which he may be financially interested. I further conclude that, if these two conditions are satisfied, the mere fact that the defendant's conduct may also have given rise to a cause of action at the suit of a company in which the plaintiff is financially interested (whether directly as a shareholder or indirectly as, for example, a beneficiary under a trust) will not deprive the plaintiff of his cause of action; in such a case, a plea of double jeopardy will not avail the defendant."

    But a more difficult question arises where the shareholder claims a loss which is not separate and distinct from the loss suffered by the company but his loss flows from loss suffered by the company. In *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, the claimants sued the directors of the company alleging that they had issued a circular to the shareholders containing a fraudulent misrepresentation concerning the true value of certain assets, and the court stated, at pp 222–223:

> "But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which

52
Johnson v Gore Wood & Co (HL(E))                    [2002] 2 AC
Lord Hutton

A

he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."

B

I shall call this statement "the *Prudential Assurance* principle".

In *Christensen v Scott* [1996] 1 NZLR 273, the Court of Appeal of New Zealand decided that where a plaintiff alleges a breach of duty owed to him personally by accountants and solicitors he is entitled to recover damages notwithstanding that his loss flows from loss suffered by a company in which he is a shareholder through a similar breach of duty owed to the company. In that case two shareholders claimed damages for the diminution in the value of their shareholding in a company caused by the negligence of their accountants and solicitors. In delivering the judgment of the court, after setting out part of the above passage in the judgment in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 Thomas J stated, at p 280:

C

D

"It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in *Foss v Harbottle* 2 Hare 461. But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in *Foss v Harbottle* is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of the duty owed to the company but from a breach of duty owed to the individuals. The individuals is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

E

F

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss."

G

The approach taken by the Court of Appeal of New Zealand has been approved in a number of judgments of the Court of Appeal. In *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 the plaintiff, a company holding shares in a subsidiary company, claimed damages against the defendants, a firm of accountants, in respect of loss it suffered through loss sustained by its subsidiary, BFS, on the ground that the defendants were in breach of duties of care owed both to the plaintiff and to the subsidiary in carrying out an

H

A    audit of the subsidiary's accounts. The defendants applied to set aside service of the writ in reliance on the *Prudential Assurance* principle. The defendants' application was rejected by the Court of Appeal and Leggatt LJ stated , at p 435:

B    "[*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204] decides that a shareholder in a company has no independent right of action based on an allegation of diminution in the value of his shares occasioned by damage to the company. Mr Kentridge seeks to rely on it as authority for the proposition that where a company may have a cause of action for damage caused to it by a tortfeasor, a person who enjoys an independent right of action against the tortfeasor cannot sue him, at least in so far as his damages are measured by a diminution in the value of the company's shares. But in my judgment that

C    is a misapplication of the principle. If C & LS are in breach of a duty of care owed to Barings in respect of audit information supplied to them and the breach causes damage, Barings cannot be disentitled from suing merely because the damages for which C & LS are said to be liable to Barings would or might include damages for which they are said to be liable to BFS. For C & LS are also in breach of a different duty, whether

D    contractual or tortious, owed to BFS. Whereas complications might arise if these claims were made in separate actions, any risk of double jeopardy or of double recovery, such as were envisaged by the New Zealand Court of Appeal in *Christensen v Scott* [1996] 1 NZLR 273, 280–281, can be avoided if both claims are made in the same action. It may be, for instance, that C & LS are not liable to Barings for loss of the value of the

E    shares in either BFS or any company which has a cause of action against C & LS for such loss.

   "The present case differs from the *Prudential Assurance* case because here the person in the position of shareholder, namely Barings, has a right of action independent of the company, BFS. On the other hand, unlike the situation in [*George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260], BFS does have a right of action itself. As that

F    case shows, there is no legal principle that a holding company is unable to recover damages for loss in the value of its subsidiaries, resulting directly from a breach of duty owed to it, as distinct from a duty owed (or not owed as the case may be) to the subsidiaries."

   In *Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443

G    the plaintiff was entitled to damages for infringement of patent rights held by it and sought to recover damages for losses suffered by subsidiary companies in which it held all the shares, and which themselves had no cause of action, and the defendant contended that the claim was barred by the *Prudential Assurance* principle. That argument was rejected by the Court of Appeal and Hobhouse LJ cited the judgment of the Court of Appeal of New Zealand in *Christensen v Scott* [1996] 1 NZLR 273 and stated , at p 475:

H    "There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the

54
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Hutton

value of the plaintiff's shares in a company is no answer to the plaintiff's    A
claim. (In that case, as in the present case, no question of remoteness
arose.)"

The judgments in *Prudential Assurance* and *Christensen v Scott* are
difficult to reconcile, and it is also difficult to reconcile the judgment in
*Barings plc v Coopers & Lybrand* with the judgment in the former case          B
because the ground on which Leggatt LJ sought to distinguish it, namely,
that in *Prudential Assurance* the shareholders did not have an individual
right of action, is invalid, the court in *Prudential Assurance* stating, at p 222,
that the defendants owed the shareholders a duty to give sound advice.
*Gerber Garment Technology* can be distinguished from *Prudential
Assurance* on the ground that the companies in which the plaintiff held
shares did not themselves have a cause of action against the defendant. But   C
I consider that the ruling in *Prudential Assurance* that the shareholders could
not recover damages cannot be explained on the ground of causation, which
was the explanation advanced by Hobhouse LJ, at p 471; I think, in
agreement with the Court of Appeal of New Zealand in *Christensen v Scott*,
that the shareholders can be regarded as suffering a loss caused by breach of
duty of the defendant notwithstanding that their loss is reflective of loss
suffered by the company. Therefore I consider that the issue to be decided is   D
whether this House should follow the reasoning set out in *Prudential
Assurance* or the reasoning set out in *Christensen v Scott*.

My Lords, I consider, with respect, that part of the reasoning in
*Prudential Assurance* is open to criticism. In my opinion the view of the
Court of Appeal of New Zealand that the loss suffered by a shareholder
through the diminution in the value of his shareholding is a personal loss is a   E
more realistic assessment than the view of the Court of Appeal in *Prudential
Assurance* that the shareholder's loss is merely a reflection of the loss
suffered by the company and that the shareholder suffers no personal loss.
This view has been criticised in an article by Mr M J Sterling on "The Theory
and Policy of Shareholder Actions in Tort" (1987) 50 MLR 468, 470, 471:

"The description of the Court of Appeal is not wrong, in that the value    F
of a share is related to the present and expected future levels of dividend
of the company and the right to receive dividends is a right of
participation in the company, but it is suspiciously limited because a share
is commonly treated as a piece of personal property. The fact that a share
is valuable because it is a right of participation in a company does not
preclude one as a matter of logic from regarding it as a piece of
property. . .                                                              G
"The Court of Appeal gave no reason for preferring their description of
a share to one which includes its nature as an item of personal property
but some good reason is surely necessary to justify exclusion of this
obvious characteristic. It is therefore suggested that, if necessary, a share
can be regarded as a piece of personal property and a shareholder could
be allowed to sue for injury to it."
                                                                          H

In my respectful opinion there is force in this criticism. However, even if
this criticism be accepted, there remains the need to ensure that there is no
double recovery and that creditors and the other shareholders of the
company are protected. It was this need which was emphasised by

A  Millett LJ in *Stein v Blake* [1998] 1 All ER 724, 730, as the reason why the
   principle in *Prudential Assurance* should be followed:

   "If this action were allowed to proceed and the plaintiff were to recover
   for the lost value of his shareholding from the first defendant, this would
   reduce his ability to meet any judgment which might thereafter be
   obtained by the liquidators, or by any of the old companies which were
B  not in liquidation, to the prejudice of their creditors. The plaintiff would
   have obtained by a judgment of the court the very same extraction of
   value from the old companies at the expense of their creditors that the
   first defendant is alleged to have obtained by fraud and deceit."

   In *Christensen v Scott* [1996] 1 NZLR 273 the court considered that the
   problem of double recovery did not arise in that case as the defendants had
C  settled the company's claim with the knowledge that the plaintiffs' claim was
   outstanding. But the court recognised that double recovery cannot be
   permitted and that the interests of the creditors of a company must be
   protected. In my opinion the resolution of the conflict between *Prudential
   Assurance* and *Christensen v Scott* narrows down to the issue whether, as
   held in the former case, the shareholder is debarred from bringing to trial an
   action claiming loss where such loss is merely reflective of loss suffered by
D  the company, or whether the shareholder is entitled to proceed to trial on
   such a claim, it being a matter for the trial judge, if the plaintiff establishes
   his claim, to ensure that there is no double recovery and that creditors and
   other shareholders of the company do not suffer loss, which was the course
   which Pumfrey J held should be followed.

   My Lords, whilst in a case such as *Christensen v Scott* there may be merit
E  in permitting an individual shareholder to sue, the decision in *Prudential
   Assurance* has stood in England for almost 20 years and, whilst the decision
   has sometimes been distinguished on inadequate grounds, it has been
   regarded as establishing a clear principle which the Court of Appeal has
   followed in other cases. I further consider that the principle has the
   advantage that, rather than leaving the protection of creditors and other
F  shareholders of the company to be given by the trial judge in the
   complexities of a trial to determine the validity of the claim made by the
   plaintiff against the defendant, where conflicts of interest may arise between
   directors and some shareholders, or between the liquidator and some
   shareholders, the principle ensures at the outset of proceedings that where
   the loss suffered by the plaintiff is sustained because of loss to the coffers of
   the company, there will be no double recovery at the expense of the
G  defendant nor loss to creditors of the company and other shareholders.
   Therefore whilst I think that this House should uphold the *Prudential
   Assurance* principle, I also consider that it is important to emphasise that the
   principle does not apply where the loss suffered by the shareholder is
   separate and distinct from the loss suffered by the company.

   The five heads of claim pleaded by Mr Johnson have been set out in the
   speech of my noble and learned friend, Lord Bingham of Cornhill. I consider
H  that the losses claimed in heads 1, 2, 4 and 5 are separate and distinct from
   loss sustained by WWH and that those heads of claim should not be struck
   out. In respect of head 3 I am also in agreement with the opinion of Lord
   Bingham that because it is not a separate and distinct loss, Mr Johnson
   cannot claim in respect of the moneys which WWH would have paid into a

56
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Hutton

A
pension fund for him if those moneys had been available to it, and that that
part of the claim should be struck out, but that Mr Johnson can claim in
respect of enhancement of the value of the pension if the payments had been
made.

B
    For the reasons given by Lord Bingham I would strike out Mr Johnson's
claims for damages for mental distress and anxiety and for aggravated
damages.    Accordingly, I would allow Mr Johnson's appeal and dismiss
GW's cross-appeal, save that I would strike out his claim in head 3 for
pension payments (or, in the alternative, for the increase in the value of his
shareholding if those pension payments had not been made), and for
damages for mental distress and anxiety and for aggravated damages.
I would concur in the order for costs proposed by Lord Bingham.

C
**LORD MILLETT** My Lords, my noble and learned friend, Lord Bingham of
Cornhill, has recounted the facts and I need not set them out again at any
length.    The appellant, Mr Johnson, is an entrepreneur who carried on
business through a number of companies which he owned and controlled.
One of them was Westway Homes Ltd ("the company"). Mr Johnson was its
managing director and virtually only shareholder.    The respondent firm
("the firm") is a firm of solicitors. Mr Johnson was in the habit of instructing
the firm from time to time to act for him in connection with his personal
affairs as well as for his various companies.

D
    In 1988 the company held a valuable option to buy land for development.
Mr Johnson instructed the firm to exercise the option on the company's
behalf. The firm accepted his instructions and served the appropriate notice,
but failed to do so in a manner which was incapable of challenge by the
vendor. The vendor claimed that the option had not been validly exercised,
and the company was obliged to bring proceedings for specific performance
against him in the Chancery Division ("the Chancery proceedings"). These
were not straightforward, and although the company was ultimately
successful it was unable to obtain title to the land until April 1992, that is to
say more than four years after it had exercised the option.    It was awarded
damages and costs against the vendor, but these proved to be irrecoverable.

F
    The firm's failure to deal with the option in a manner which put its
exercise beyond dispute caused the company substantial loss.    As well as
having to bear the costs of the Chancery proceedings, it sustained heavy
financial loss as a result of the delay in obtaining title to the land. This loss
was of two kinds. First, until the company established its title, it was unable
to offer the land as security for its borrowings and so obtain a reduction in
the very high interest charges it was paying.    Secondly, delay in obtaining
title to the land caused a corresponding delay in the commencement and
completion of the development and thus in the time when the company
could hope to realise any profit from the venture.    As it happens, the delay
frustrated the development altogether, for the collapse in the property
market which took place during the currency of the Chancery proceedings
made the venture unprofitable.    But this was obviously not foreseeable in
1988, or Mr Johnson would not have caused the company to exercise the
option and the vendor would not have resisted its claim to have done so.

    In January 1991 the company brought proceedings against the firm for
professional negligence. The firm admitted that it had been retained by the
company to exercise the option and that it had owed the company a duty of

E

G

H

Case: 11-126    Document: 63    Page: 348    04/25/2011    272927    401

A  care in doing so. But it denied both liability and quantum. The action came on for trial in October 1992 and was estimated to last 10 to 12 days. In December 1992, after the trial had already lasted for six weeks and evidence was still being given on behalf of the firm, the case was settled upon payment by the firm of £1,480,000 and £320,000 towards the company's costs. The sum of £1,480,000 represented the greater part of the damages claimed.

B  Mr Johnson has always claimed that the firm's negligence in the manner in which it exercised the option also caused substantial financial loss to him personally. In April 1993 he brought his own proceedings against the firm. This can have come as no surprise. Mr Johnson had made no secret of his intention to bring such a claim. He had indicated as much in January 1991, well before the company's action came to trial, and his solicitors had been in correspondence with the firm's insurers during 1991–92. On the eve of the

C  trial his solicitors told those representing the firm that his personal claim would be pursued whether the current proceedings resulted in judgment or settlement. During the settlement negotiations in December 1992 the parties' respective solicitors discussed the possibility of an overall settlement of both Mr Johnson's personal claim and the company's claim, but the paucity of information to enable his personal claim to be quantified made this impossible. It was left that it was a separate claim which would be a

D  matter for separate negotiation in due course. In agreeing the terms on which the company's claim was settled, Mr Johnson submitted to having most of his personal claim capped at £250,000 excluding interest and costs, and the company agreed to apply the settlement moneys in the discharge of liabilities of the company in respect of which Mr Johnson had given personal guarantees. This was designed to avoid the possibility of double recovery in

E  respect of these liabilities if Mr Johnson brought his own proceedings and was successful.

For the next 4½ years the proceedings brought by Mr Johnson followed the normal course. The parties served and amended their pleadings and exchanged witness statements. Mr Johnson served expert evidence. The firm made a payment into court. A trial date was obtained. But then came a

F  sudden change of tack. The firm instructed fresh leading counsel. In December 1997 the firm's solicitors indicated, for the first time, that it intended to apply inter alia for an order to strike the action out as an abuse of the process of the court. In February 1998 the court ordered the trial of two preliminary issues: (i) whether the proceedings should be struck out as an abuse of the process of the court; and (ii) to what extent (if at all) and assuming the truth of the facts pleaded the heads of damages pleaded in

G  paragraphs 23 and 24 of the re-amended statement of claim were irrecoverable by Mr Johnson as a matter of law by way of damages for the pleaded breaches of duty owed to him.

Mr Johnson pleaded his claim in both contract and tort, and alleged that he had retained the firm to act for him personally as well as for the company in connection with the exercise of the company's option. He alleged that the firm had acted negligently in the manner in which it caused the option to be

H  exercised, and that it had from time to time negligently and with unwarranted optimism advised him personally as to the likely duration and outcome of the Chancery proceedings.

On the first question, the judge (Pumfrey J) found that the proceedings might well have been an abuse of the process of the court, but that in the

58
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Millett

light of the circumstances in which the company's action had been settled the      A
firm was estopped by convention from contending that they were. Both
parties had acted on the common assumption that Mr Johnson would bring
his own proceedings and that these would be entertained by the court. On
the second question he ruled that none of the heads of damage pleaded was
irrecoverable in law.

The Court of Appeal (Nourse, Ward and Mantell LJJ) allowed the firm's         B
appeal. It held that there was no excuse for Mr Johnson's failure to launch
his own claims when the company brought its action. "If he could have done
so", Mantell LJ said, "he should have done so". It held that there was no
estoppel by convention; the parties shared a common assumption that
Mr Johnson would bring his own proceedings, but they made no assumption
one way or the other whether the court would entertain them; they never
thought about the matter. On the second question the court differed from        C
the judge on the authorities, which it agreed were in an unsatisfactory state,
but held that, with only one exception, the pleaded heads of damage were
arguably recoverable. Both parties now appeal to the House. Mr Johnson
appeals on the first question; the firm cross-appeals on the second.

*Mr Johnson's appeal: abuse of process*                                              D

In describing the proceedings brought by Mr Johnson as an abuse of the
process of the court, the Court of Appeal was seeking to apply the well
known principle which Sir James Wigram V-C formulated in *Henderson v
Henderson* (1843) 3 Hare 100, 114–115:

"... I believe I state the rule of the court correctly, when I say, that       E
where a given matter becomes the subject of litigation in, *and of
adjudication by,* a court of competent jurisdiction, the court requires the
parties to that litigation to bring forward their whole case, and will not
(except under special circumstances) permit the same parties to open the
same subject of litigation in respect of matter which might have been
brought forward as part of the subject in contest, but which was not
brought forward, only because they have, from negligence, inadvertence,
or even accident, omitted part of their case. *The plea of res judicata          F
applies,* except in special cases, not only to points upon which the court
was actually required by the parties to form an opinion and pronounce a
judgment, but to every point which properly belonged to the subject of
litigation, and which the parties, exercising reasonable diligence, might
have brought forward at the time." (My emphasis.)

As the passages which I have emphasised indicate, Sir James Wigram V-C         G
did not consider that he was laying down a new principle, but rather that he
was explaining the true extent of the existing plea of res judicata. Thus he
was careful to limit what he was saying to cases which had proceeded to
judgment, and not, as in the present case, to an out-of-court settlement.
Later decisions have doubted the correctness of treating the principle as an
application of the doctrine of res judicata, while describing it as an extension
of the doctrine or analogous to it. In *Barrow v Bankside Members Agency          H
Ltd* [1996] 1 WLR 257, Sir Thomas Bingham MR explained that it is not
based on the doctrine in a narrow sense, nor on the strict doctrines of issue or
cause of action estoppel. As May LJ observed in *Manson v Vooght* [1999]
BPIR 376, 387, it is not concerned with cases where a court has decided the

A    matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined

B    to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented.

    In one respect, however, the principle goes further than the strict doctrine of res judicata or the formulation adopted by Sir James Wigram V-C, for I agree that it is capable of applying even where the first action concluded in a settlement. Here it is necessary to protect the integrity of the settlement

C    and to prevent the defendant from being misled into believing that he was achieving a complete settlement of the matter in dispute when an unsuspected part remained outstanding.

    However this may be, the difference to which I have drawn attention is of critical importance. It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the

D    opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms (1953). While, therefore, the doctrine of res judicata in all its branches may properly be

E    regarded as a rule of substantive law, applicable in all save exceptional circumstances, the doctrine now under consideration can be no more than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In *Brisbane City Council v Attorney General for Queensland* [1979] AC 411, 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, explained that the true basis of the rule in *Henderson v Henderson* 3 Hare 100 is abuse

F    of process and observed that it "ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation". There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could

G    have brought them as part of or at the same time as the company's action. This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson *could* have brought his action as part of or at the same time as the company's action. But it does not at all follow that he *should* have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the

H    process of the court. As May LJ observed in *Manson v Vooght* [1999] BPIR 376, 387, it may in a particular case be sensible to advance claims separately. In so far as the so-called rule in *Henderson v Henderson* suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should

60
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Millett

always rest upon the defendant to establish that it is oppressive or an abuse      A
of process for him to be subjected to the second action.

The rule in *Henderson v Henderson* 3 Hare 100 cannot sensibly be
extended to the case where the defendants are different. There is then no
question of double vexation. It may be reasonable and sensible for a plaintiff
to proceed against A first, if that is a relatively simple claim, in order to use
the proceeds to finance a more complex claim against B. On the other hand,
it would I think normally be regarded as oppressive or an abuse of process      B
for a plaintiff to pursue his claims against a single defendant separately in
order to use the proceeds of the first action to finance the second, at least
where the issues largely overlap so as to form, in Sir James Wigram V-C's
words, at p 115, "the same subject of litigation".

Particular care, however, needs to be taken where the plaintiff in the
second action is not the same as the plaintiff in the first, but his privy. Such      C
situations are many and various, and it would be unwise to lay down any
general rule. The principle is, no doubt, capable in theory of applying to a
privy; but it is likely in practice to be easier for him to rebut the charge that
his proceedings are oppressive or constitute an abuse of process than it
would be for the original plaintiff to do so.

Mr Johnson conceded that he and the company are privies. He was in a
position to decide when to pursue the two claims and whether to pursue      D
them together or separately, and that is enough for present purposes. But
Mr Johnson and the company are different legal persons, each with its own
creditors, and that is a fact of critical significance. Mr Johnson's personal
claims raised difficult issues not present in the company's action: (i) did he
retain the firm to act for him personally? (ii) should the firm have foreseen
that failure to exercise the option properly would cause loss to Mr Johnson      E
personally as well as to the company? (iii) which if any of his personal losses
were recoverable (the issues in the cross-appeal)? (iv) quantum. It was not
in the company's interest for his personal claims to be joined with its own
much simpler claim, or for its case to be delayed until Mr Johnson's own
case was ready for trial. Had the company been in liquidation and its action
brought by the liquidator, he would have been well advised to insist on      F
separate trials and to object to any delay in the trial of the company's action.

In these circumstances I am satisfied that Mr Johnson, who was bound to
have regard to the interests of the company and its creditors, was entitled to
defer the bringing of his own claims until after the company's claim had been
resolved. Even if he had chosen to join the two claims in the same writ, it
would have been both possible and appropriate for separate trials to be held
of (i) liability (ii) quantum (company) (iii) Mr Johnson's title to sue and      G
(iv) quantum (Mr Johnson); and for (iii) and (iv) to be held over until after
(i) and (ii) had been determined. Even as things are, there is no real question
of double vexation. The firm was always liable to be sued by two different
plaintiffs each with its own cause of action and its own heads of loss. The
only area of overlap is in relation to the standard of care which the firm
observed. Given that Mr Johnson and the company are privies, neither of
them could reopen an adverse judgment on this, being bound by issue      H
estoppel; while the parties could make their own arrangements in the event
of a settlement.

Accordingly, I would reject the firm's contention that it was an abuse of
process for Mr Johnson to bring his action after the company's claim had

61

[2002] 2 AC                                    Johnson v Gore Wood & Co (HL(E))
                                                              Lord Millett

A   been resolved. Even if this were not the case, however, I agree with the trial
    judge that it would be unconscionable for the firm to raise the issue after the
    way in which it handled the negotiations for the settlement of the company's
    action. I would not myself put it on the ground of estoppel by convention.
    Like the Court of Appeal, I have some difficulty in discerning a common
    assumption in regard to a matter about which neither party thought at all.
    This is not to say that estoppel has no part to play in this field. I would
B   regard it as operating in the opposite way. Given that Mr Johnson was
    entitled to defer the bringing of his own proceedings until after the
    company's claims had been resolved, it would have been unconscionable for
    him to have stood by without disclosing his intentions and knowingly
    allowed the firm to settle the company's action in the belief that it was
    dealing finally with all liability arising from its alleged negligence in the
C   exercise of the option. To bring his own claim in such circumstances would,
    in my opinion, amount to an abuse of the process of the court. But nothing
    like this took place.
        This makes it unnecessary to deal with Mr Johnson's submission that it is
    too late for the firm to raise the issue. If necessary, however, I should have
    regarded the delay as fatal. Indeed, I should have regarded it as more than
    delay; I think it amounted to acquiescence. There is no proper analogy with
D   the case which discloses no cause of action. Although it is obviously
    desirable to apply to strike out a claim which is doomed to fail at the earliest
    opportunity, there is no point in proceeding with a trial which serves no
    useful purpose. Even if the point is taken at the trial itself, it is a matter for
    the trial judge to decide whether to hear the evidence and adjudicate on the
    facts before deciding whether they give rise to liability, or to assume that the
E   plaintiff will establish his allegations and decide whether, as a matter of law,
    they give rise to liability.
        But the premise in the present case is that Mr Johnson has a good cause of
    action which he should have brought earlier if at all. I do not consider that a
    defendant should be permitted to raise such an objection as late as this.
    A defendant ought to know whether the proceedings against him are
    oppressive. It is not a question which calls for nice judgment. If he defends
F   on the merits, this should be taken as acquiescence. It might well be
    otherwise if the ground on which the proceedings are alleged to be an abuse
    of process were different. But in a case of the present kind the court is not so
    much protecting its own process as the interests of the defendant.
        Accordingly, I would allow Mr Johnson's appeal on the first question.

G   *The firm's cross-appeal: recoverable heads of damage*

        A company is a legal entity separate and distinct from its shareholders. It
    has its own assets and liabilities and its own creditors. The company's
    property belongs to the company and not to its shareholders. If the company
    has a cause of action, this is a legal chose in action which represents part of
    its assets. Accordingly, where a company suffers loss as a result of an
    actionable wrong done to it, the cause of action is vested in the company and
H   the company alone can sue. No action lies at the suit of a shareholder suing
    as such, though exceptionally he may be permitted to bring a derivative
    action in right of the company and recover damages on its behalf: see
    *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]
    Ch 204, 210. Correspondingly, of course, a company's shares are the

62
Johnson v Gore Wood & Co (HL(E))                                    [2002] 2 AC
Lord Millett

property of the shareholder and not of the company, and if he suffers loss as     *A*
a result of an actionable wrong done to him, then prima facie he alone can
sue and the company cannot. On the other hand, although a share is an
identifiable piece of property which belongs to the shareholder and has an
ascertainable value, it also represents a proportionate part of the company's
net assets, and if these are depleted the diminution in its assets will be
reflected in the diminution in the value of the shares. The correspondence
may not be exact, especially in the case of a company whose shares are         *B*
publicly traded, since their value depends on market sentiment. But in the
case of a small private company like this company, the correspondence is
exact.

   This causes no difficulty where the company has a cause of action and the
shareholder has none; or where the shareholder has a cause of action and the
company has none, as in *Lee v Sheard* [1956] 1 QB 192, *George Fischer*       *C*
*(Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, and
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443.
Where the company suffers loss as a result of a wrong to the shareholder but
has no cause of action in respect of its loss, the shareholder can sue and
recover damages for his own loss, whether of a capital or income nature,
measured by the diminution in the value of his shareholding. He must, of       *D*
course, show that he has an independent cause of action of his own and that
he has suffered personal loss caused by the defendant's actionable wrong.
Since the company itself has no cause of action in respect of its loss, its assets
are not depleted by the recovery of damages by the shareholder.

   The position is, however, different where the company suffers loss caused
by the breach of a duty owed both to the company and to the shareholder. In    *E*
such a case the shareholder's loss, in so far as this is measured by the
diminution in value of his shareholding or the loss of dividends, merely
reflects the loss suffered by the company in respect of which the company has
its own cause of action. If the shareholder is allowed to recover in respect of
such loss, then either there will be double recovery at the expense of the
defendant or the shareholder will recover at the expense of the company and
its creditors and other shareholders. Neither course can be permitted. This    *F*
is a matter of principle; there is no discretion involved. Justice to the
defendant requires the exclusion of one claim or the other; protection of the
interests of the company's creditors requires that it is the company which is
allowed to recover to the exclusion of the shareholder. These principles have
been established in a number of cases, though they have not always been
faithfully observed. The position was explained in a well known passage
in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]          *G*
Ch 204, 222–223:

   "But what [the shareholder] cannot do is to recover damages merely
   because the company in which he is interested has suffered damage. He
   cannot recover a sum equal to the diminution in the market value of his
   shares, or equal to the likely diminution in dividend, because such a 'loss'
   is merely a reflection of the loss suffered by the company. The shareholder   *H*
   does not suffer any personal loss. His only 'loss' is through the company,
   in the diminution of the value of the net assets of the company, in which
   he has (say) a 3% shareholding. The plaintiff's shares are merely a right of
   participation in the company on the terms of the articles of association.

A  The shares themselves, his right of participation, are not directly affected by the wrongdoing.  The plaintiff still holds all the shares as his own absolutely unencumbered property.  The deceit practised upon the defendant does not affect the shares; it merely enables the defendant to rob the company.  A simple illustration will prove the logic of this approach.  Suppose that the sole asset of a company is a cash box

B containing £100,000.  The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money.  The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil.  There are

C two wrongs, the deceit practised on the plaintiff and the robbery of the company.  But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company.  The deceit was merely a step in the robbery.  The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company."

D It is indeed obvious that (on the given facts, where no consequential losses are stated to have arisen) the defendant cannot be made liable for more than £100,000 in total.  It is equally obvious, however, that if the damages were recoverable by the shareholder instead of by the company, this would achieve the same extraction of the company's capital to the prejudice of the

E creditors of the company as the defendant's misappropriation had done.

  It has sometimes been suggested (see, for example, *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] BCLC 260, 266G–1) that *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 is authority only for the proposition that a shareholder cannot recover for the company's loss, and is confined to the case where the defendant is not

F in breach of any duty owed to the shareholder personally.  That is not correct.  The example of the safe-deposit box makes this clear.  It is the whole point of the somewhat strained business of the key.  The only reason for this is to demonstrate that the principle applies even where the loss is caused by a wrong actionable at the suit of the shareholder personally.

  *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* was

G followed in *Stein v Blake* [1998] 1 All ER 724, where the facts bore some resemblance to the illustration in the earlier case.  The defendant was a 50% shareholder and the sole director of a group of companies ("the old companies").  The plaintiff, who was the other 50% shareholder, alleged that, in breach of fiduciary duty, the defendant had misappropriated the assets of the old companies by purchasing them at an undervalue and transferring them to other companies in his sole ownership.  The plaintiff,

H who could have brought a derivative action on behalf of the old companies, chose instead to bring a personal action, claiming that he had been deprived of the opportunity to sell his shares in the old companies at their proper value and had suffered personal loss.  The Court of Appeal set aside an earlier grant of leave to appeal from the judge's order striking out the plaintiff's action.

64
Johnson v Gore Wood & Co (HL(E))
Lord Millett

[2002] 2 AC

The plaintiff sought to distinguish *Prudential Assurance Co Ltd v
Newman Industries Ltd (No 2)* [1982] Ch 204 by arguing that the defendant
was in breach of a duty owed to him personally. But, as I pointed out, that
was not the problem. The problem was that the only conduct relied upon as
constituting a breach of that duty was the misappropriation of assets
belonging to the old companies, so that the only loss suffered by the plaintiff
consisted of the diminution in the value of his shareholding which reflected
the depletion of the assets of the old companies. The old companies had
their own cause of action to recover their loss, and the plaintiff's own loss
would be fully remedied by the restitution to the companies of the value of
the misappropriated assets. It was not alleged that the plaintiff had been
induced or compelled to dispose of his shares in the companies; he still had
them. If he were allowed to recover for the diminution in their value, and the
companies for the depletion of their assets, there would be double recovery.
Moreover, if the action were allowed to proceed and the plaintiff were to
recover for the lost value of his shares, the defendant's ability to meet any
judgment which the old companies or their liquidators might obtain against
him would be impaired to the prejudice of their creditors. The plaintiff
would have obtained by a judgment of the court the very same extraction of
value from the old companies at the expense of their creditors as the
defendant was alleged to have obtained by fraud.

*Heron International Ltd v Lord Grade* [1983] BCLC 244 was a case on
the other side of the line. In the course of a contested take-over bid, the
directors of the target company who owned a majority of the company's
voting shares were alleged, in breach of their duties both to the company and
to its shareholders, to have accepted proposals which would reduce the value
of the company's assets and hence of its shares and induce the shareholders
to accept the lower of two rival offers. The Court of Appeal granted the
shareholders injunctive relief. It observed that the decision of the directors,
if implemented, would cause loss in two directions. First, the company
would suffer loss to the extent that the value of its assets would be
depreciated. That loss would be borne exclusively by the company. It was
not a loss in respect of which the shareholders could recover, even if the
market value of their shares fell in consequence. The other loss would be to
the pockets of the shareholders because they were deprived of the
opportunity of accepting the higher offer. That loss would be suffered
exclusively by the shareholders. It was not a loss to the coffers of the
company, which would remain totally unaffected. That could readily be
demonstrated. If, as a result of the decision of the board which was
impugned, the take-over went through and the entire shareholding in the
company became vested in one bidder at a lower price than was available
from the other, the recovery of damages by the company would not
compensate the former shareholders for their loss. Only a direct action by
those shareholders in their own right, and not in right of the company, could
provide the necessary compensation.

In *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117 a
company and its principal shareholder brought an action in negligence
against a firm of solicitors, alleging that, as a result of the firm's failure to
advise an application for a new tenancy under the Landlord and Tenant Act
1954, the company had been obliged to accept a new lease on terms less
favourable than those it would have obtained under the Act. In addition, the

A     principal shareholder was obliged to agree that he would not sell his controlling interest in the company without the landlord's consent. The judge (Staughton J) distinguished *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 on the ground that the shareholder was not seeking to recover a sum which merely reflected the loss suffered by the company but his own independent loss because his shares were less easily saleable and therefore had a lesser market value. This is capable of being

B     misunderstood, but was correct on the facts, since the shareholder's claim was rightly limited to the loss arising from the requirement to obtain the landlord's consent to any sale of the shares. This was additional to and did not reflect the loss suffered by the company as a result of the terms of the new lease. The shareholder made no claim on his own account in respect of the diminution in the value of his shares due to this.

C     In *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 a parent company, brought an action in negligence against the auditors of a wholly-owned subsidiary. Leggatt LJ correctly distinguished both *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, where the shareholder had no independent cause of action of his own, and *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260,

D     where the company had none. Here each of them had its own cause of action. But he stated, at p 435B-E, that if the shareholder suffered loss as a result of a breach of duty on the part of the defendant owed to it, it could not be disentitled from suing merely because the damages claimed would or might include damages for which the defendant was liable to the company. There was, he said, no legal principle which debarred a holding company from recovering damages for loss in the value of its subsidiaries resulting

E     directly from the breach of a duty owed to the holding company as distinct from a duty owed to the subsidiaries. I do not accept this as correct.

    In *Christensen v Scott* [1996] 1 NZLR 273 the company carried on the business of potato-farming on tenanted land. The landlord defaulted on a mortgage of the land and the mortgagee entered into possession and exercised its power of sale. Access to the standing crop was refused and the company was unable to harvest it, with disastrous financial consequences.

F     The company went into liquidation and receivership, and the receiver and the liquidator brought proceedings for negligence against the company's professional advisers. The action was settled. The shareholders, who had guaranteed the company's debts, opposed the settlement, alleging that the sums offered by way of settlement were totally inadequate. In due course they brought their own proceedings, alleging that the defendants owed

G     duties of care to them personally. They claimed damages representing the diminution in the value of their shareholdings arising from the defendants' negligence. The judge held that such damages reflected the company's loss and could not be recovered by the shareholders. The Court of Appeal of New Zealand allowed the shareholders' appeal.

    In giving the judgment of the court, Thomas J distinguished *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 104 on the

H     ground that it did not necessarily exclude a claim brought by a shareholder to whom a separate duty was owed and who suffered his own personal loss as a result of that breach of duty. So far, of course, this is correct: *Heron International Ltd v Lord Grade* [1983] BCLC 244 and *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117 are just such cases. The judge

66
Johnson v Gore Wood & Co (HL(E))                    [2002] 2 AC
Lord Millett

observed that the fact that the loss was also suffered by the company did not    A
mean that it was not also a personal loss suffered by the shareholder.
"Indeed," he added, at p 280:

> "the diminution in the value of Mr and Mrs Christensen's shares in the
> company is by definition a personal loss and not a corporate loss.. The
> loss suffered by the company is the loss of the lease and the profit which    B
> would have been obtained from harvesting the potato crop. That loss is
> reflected in the diminution in the value of Mr and Mrs Christensen's
> shares. They can no longer realise their shares at the value they enjoyed
> prior to the alleged default of their accountants and solicitors."

I cannot accept this reasoning as representing the position in English law. It
is of course correct that the diminution in the value of the plaintiffs' shares    C
was by definition a personal loss and not the company's loss, but that is not
the point. The point is that it merely reflected the diminution of the
company's assets. The test is not whether the company could have made a
claim in respect of the loss in question; the question is whether, treating the
company and the shareholder as one for this purpose, the shareholder's loss
is franked by that of the company. If so, such reflected loss is recoverable by
the company and not by the shareholders.                                          D
    Thomas J acknowledged that double recovery could not be permitted, but
thought that the problem did not arise where the company had settled its
claim. He considered that it would be sufficient to make an allowance for
the amount paid to the liquidator. With respect, I cannot accept this either.
As Hobhouse LJ observed in *Gerber Garment Technology Inc v Lectra
Systems Ltd* [1997] RPC 443, 471, if the company chooses not to exercise its    E
remedy, the loss to the shareholder is caused by the company's decision not
to pursue its remedy and not by the defendant's wrongdoing. By a parity of
reasoning, the same applies if the company settles for less than it might have
done. Shareholders (and creditors) who are aggrieved by the liquidator's
proposals are not without a remedy; they can have recourse to the
Companies Court, or sue the liquidator for negligence.
    But there is more to it than causation. The disallowance of the             F
shareholder's claim in respect of reflective loss is driven by policy
considerations. In my opinion, these preclude the shareholder from going
behind the settlement of the company's claim. If he were allowed to do so
then, if the company's action were brought by its directors, they would be
placed in a position where their interest conflicted with their duty; while if it
were brought by the liquidator, it would make it difficult for him to settle the
action and would effectively take the conduct of the litigation out of his       G
hands. The present case is a fortiori; Mr Johnson cannot be permitted to
challenge in one capacity the adequacy of the terms he agreed in another.
    Reflective loss extends beyond the diminution of the value of the shares; it
extends to the loss of dividends (specifically mentioned in *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204) and all
other payments which the shareholder might have obtained from the
company if it had not been deprived of its funds. All transactions or putative    H
transactions between the company and its shareholders must be disregarded.
Payment to the one diminishes the assets of the other. In economic terms, the
shareholder has two pockets, and cannot hold the defendant liable for his
inability to transfer money from one pocket to the other. In principle, the

[2002] 2 AC

A   company and the shareholder cannot together recover more than the shareholder would have recovered if he had carried on business in his own name instead of through the medium of a company. On the other hand, he is entitled (subject to the rules on remoteness of damage) to recover in respect of a loss which he has sustained by reason of his inability to have recourse to the company's funds and which the company would not have sustained itself.

B   The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim. The plaintiff's primary claim lies against the company, and the existence of the liability does not increase the total recoverable by the company, for this already includes the amount necessary to enable the company to meet it.

C   On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote. Mr Johnson's principal complaint is that the firm negligently failed to exercise the company's option in a manner which would be incontestable. Even if this constituted a breach of a duty owed to Mr Johnson personally as well as to the company, there was a single breach which made it impossible for the company to establish that it had exercised the option without litigation. In the event this delayed by four years the commencement of the development by the company and the time when the company could raise money at normal commercial rates of interest on the security of the land and commence the proposed development. Damages in respect of these heads of damage are recoverable by the company, and in so far as they are reflected in the diminution in the value of Mr Johnson's shares in the company are not recoverable by him.

D   There is a subsidiary complaint, that the firm represented both to the company and to Mr Johnson personally that the Chancery proceedings were certain of success and that judgment would be obtained within a relatively short time. These are separate representations which may be separately sued upon by each representee. In so far as Mr Johnson relied upon the representation made to him and suffered a separate and distinct loss qua representee and not merely qua shareholder or potential recipient of money from the company, he is entitled to recover.

G   Lord Bingham has identified the various heads of financial loss alleged in the statement of claim. I agree with his analysis and do not wish to add anything except in relation to Mr Johnson's pension. Mr Johnson claims that, but for its lack of funds resulting from the firm's failure to exercise the option properly, the company would have continued to make contributions to Mr Johnson's pension scheme. For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason. But Mr Johnson's claim in respect of the enhancement of his pension is a different matter. The problem here is one of remoteness of damage, not

reflective loss, for the loss (or strictly the net loss) is one which the company          A
could not have sustained itself. Had Mr Johnson carried on business in his
own name instead of through the medium of the company, then (subject only
to the question of remoteness) he would have been entitled to recover a sum
representing the lost increase in the value of his pension after giving credit
for the amount saved in respect of the contributions and interest. Such loss is
separate and distinct from the loss suffered by the company, and while          B
Mr Johnson's claim to recover it faces obvious difficulties it should not be
struck out at this stage. But if he does establish his claim, he will have to give
credit for the contributions which would have been required, whether by the
company (reflective loss) or by himself (which he has saved), together with
interest thereon.

For the reasons given by Lord Bingham, I too would strike out
Mr Johnson's claims to damages for mental distress and anxiety and          C
aggravated damages.

Accordingly, I would dismiss the cross-appeal while varying the order of
the Court of Appeal in the manner proposed.

*Appeal allowed.*          D
*Cross-appeal dismissed save that*
*paragraphs 8 (except last sentence),*
*10 and 13 of schedule of loss served*
*pursuant to order of 16 October*
*1998 and paragraph 24 of re-*
*amended statement of claim of 31*
*March 1994 be struck out.*          E
*Defendants to pay plaintiff's costs in*
*House of Lords and below, to*
*include costs of appeal and cross-*
*appeal.*

*Solicitors: Shoosmiths, Fareham; Beachcroft Wansbroughs.*

M G          F

204

[COURT OF APPEAL]

[1982]

A

PRUDENTIAL ASSURANCE CO. LTD. v. NEWMAN INDUSTRIES
LTD. AND OTHERS (No. 2)

[1976 P. No. 112]

1981  March 23, 24, 25, 26, 27, 30, 31;                     Cumming-Bruce,    B
        April 1, 2, 3, 6, 7, 8, 9, 13, 14, 15, 28, 29, 30;        Templeman and
        May 1, 5, 6, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22;     Brightman L.JJ.
        June 2, 3, 4, 5, 10, 11, 22;
        July 27, 28, 30, 31;
        Oct. 5

*Company — Shareholder — Rights against company directors —
Minority shareholder's action — Directors advising acquisition
of another company's assets — Majority of shareholders voting
to acquire assets — Directors having no control over voting
rights — Whether minority shareholder entitled to bring action
on behalf of itself, company and other shareholders suffering
damage — Whether right to bring derivative action to be
determined as preliminary issue*

The plaintiffs, P Ltd., held 3·2 per cent. of the issued
ordinary shares in N Ltd., the first defendant.  B, the second
defendant, was at the material time the chairman and chief
executive of N Ltd. and the third defendant, L, was a non-
executive director and its vice-chairman.  B was also the
non-executive chairman of the fourth defendant, T.P.G., and
L its vice-chairman and chief executive.

Between 1972 and the end of 1974, T.P.G. acquired the
assets of S Ltd. whose shares were beneficially owned by B
and L and which owned 35 per cent. of T.P.G.'s shares and
some of N Ltd.'s shares.  T.P.G. increased its holding in N
Ltd. to 25 per cent. and also acquired shares in various other
companies which it financed by the issue of its own shares
and bank loans.  By January 1975, T.P.G. was in serious
financial difficulties and the "January agreements" were
entered into whereby, undisclosed to the board of N Ltd., N
Ltd. agreed to buy T.P.G.'s holdings in two companies for
£85,000 and £146,000 respectively, and under the agreement,
unbeknown to the board, N Ltd. paid £215,950.

B then prepared a memorandum ("the strategy docu-
ment") which recommended that the board of N Ltd. should
purchase from T.P.G. all its assets, except its shareholding
in N Ltd. and a loan from S Ltd. of £100,000, in considera-
tion of N Ltd. assuming T.P.G.'s liabilities and paying T.P.G.
the sum of £350,000.  At a board meeting all the directors
except M agreed to accept the proposals in principle.  On M's
suggestion a report was obtained from N Ltd.'s auditors.
The January agreements were concealed from the auditors
who valued the assets as £325,000 and the board of N Ltd.
accepted that valuation as a basis of negotiation.

On June 3, 1975, B signed the agreement on behalf of N
Ltd. ("the June agreement") for the purchase of the assets
of T.P.G. for £325,000 which was conditional, as required by
Stock Exchange regulations, on the approval of the share-
holders of N Ltd. and T.P.G.  Extraordinary general meetings

C

D

E

F

G

H

A  of both companies were convened. The notice which convened the extraordinary general meeting of N Ltd. contained a letter signed by B, with documents annexed (" the circular ") which recommended shareholders to vote in favour of the proposal and which referred to a payment of £216,000 by N Ltd. as being an advance payment for the purchase of T.P.G.'s assets. All the members of a committee of the board approved the letter apart from M. The extraordinary general

B  meeting was postponed as a result of the pressure by M, the plaintiffs and other institutional investors in order that a report be prepared by a merchant bank, but before the report was ready, the meeting was held on July 29, 1975, and a resolution passed approving the purchase of T.P.G.'s assets by N Ltd.

By an amended writ and statement of claim, the plaintiffs claimed, inter alia, declaratory relief and as against B, L and

C  T.P.G. damages on behalf of the plaintiffs, N Ltd. and all the shareholders of N Ltd. on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to relief. The plaintiffs were claiming in a direct capacity, in a derivative action on behalf of N Ltd. and in a representative capacity on behalf of the shareholders.

By a summons of May 10, 1979, the defendants applied to have heard as a preliminary issue whether the plaintiffs as a minority shareholder in N Ltd. were entitled to maintain

D  the claim against them. On June 18, 1979, Vinelott J. refused the application and dismissed the summons.

On the hearing of the action in February 1980, Vinelott J. held, inter alia, that B and L, in order to benefit T.P.G. had conspired to injure N Ltd. and indirectly its shareholders whereby the shareholders had suffered damage and that, on the evidence, the interests of justice required that the plain-

E  tiffs as a minority shareholder in N Ltd. should be permitted to prosecute an action on behalf of the company.

On appeal by B and L: —

*Held*, allowing the appeal in part, (1) that on the evidence the serious findings against B and L of conspiracy and fraudulent conduct were not substantiated other than that they dishonestly concealed the January agreements and payments thereunder from the directors and shareholders of N Ltd. in

F  order to facilitate the acceptance of the proposals in the strategy document; and that the dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment by N Ltd. of £216,000 to T.P.G. whereby the assets purchased by N Ltd. were overvalued by £45,000, thereby causing damage to N Ltd. by that amount (post, pp. 232B–D, 234D–E).

(2) That where fraud was practised on a company, it was

G  the company that prima facie should bring the action and it was only in circumstances where the board of the company was under the control of the fraudsters that a derivative action should be brought; that the question whether a company was under the control of those practising an alleged fraud on it should be determined before a derivative action was heard and, accordingly, the judge erred in not determining as a

H  preliminary issue whether the plaintiffs should be allowed to proceed in their derivative action (post, pp. 211A, 221A–B); but that, since the action had been heard and N Ltd. had indicated that it would, as a party to the action, take the benefit of an order made in its favour, the question

206

A

whether the plaintiffs had status to bring the derivative action did not arise for determination (post, p. 220c–f).

*Per curiam.* It is doubtful whether it is a practical test of an exception to the rule in *Foss* v. *Harbottle* (1843) 2 Hare 461 that the justice of the case requires the bringing of a derivative action (post, pp. 221f–222b). The right to bring a derivative action should not be determined as a preliminary issue on the hypothesis that all the allegations in the statement of claim of "fraud" and "control" are facts. Whatever may be the properly defined boundaries of the exception to the rule, the plaintiff before proceeding with his action ought at least to be required to establish a prima facie case that the company is entitled to the relief claimed and the action falls within the proper boundaries of the exception to the rule in *Foss* v. *Harbottle* (post, p. 221f—222b).

B

(3) That the plaintiffs' personal action, to which the representative action was linked, was an action to recover damages on the basis that the company in which the plaintiffs were interested had suffered damage; that, since the plaintiffs' right as holders of shares was merely a right of participation in the company on the terms of the articles of association, any damage done to the company had not affected that right and, accordingly, the action was misconceived (post, pp. 222f—223b).

C

Order of Vinelott J. [1981] Ch. 257; [1980] 3 W.L.R. 543; [1980] 2 All E.R. 841 varied in part.

D

The following cases are referred to in the judgment:

*Atwool* v. *Merryweather* (1867) L.R. 5 Eq. 464; 37 L.J.Ch. 35.
*Baillie* v. *Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503, C.A.
*Clinch* v. *Financial Corporation* (1868) L.R. 5 Eq. 450.
*Cotter* v. *National Union of Seamen* [1929] 2 Ch. 58, C.A.

E

*East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather* (1864) 2 Hem. & M. 254.
*Edwards* v. *Halliwell* [1950] 2 All E.R. 1064, C.A.
*Foss* v. *Harbottle* (1843) 2 Hare 461.
*Gray* v. *Lewis* (1873) L.R. 8 Ch.App. 1035.
*Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A.

F

*Russell* v. *Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474.

The following additional cases were cited in argument:

*Cockburn* v. *Thompson* (1809) 16 Ves.Jun. 321.
*Wallworth* v. *Holt* (1841) 4 Myl. & Cr. 619.

G

APPEAL from Vinelott J.

The plaintiffs, Prudential Assurance Co. Ltd., held 3·2 per cent. of the issued ordinary shares of the first defendant, Newman Industries Ltd. The second defendant, Alan Frank Bartlett, was at the material time the chairman and chief executive of Newman and the third defendant, John Knox Laughton, was a non-executive director and its vice-chairman. Mr. Bartlett was also the non-executive chairman of the fourth defendant, Thomas Poole & Gladstone China Ltd. (T.P.G.) and Mr. Laughton its vice-chairman and chief executive.

H

A    Between 1972 and the end of 1974, T.P.G. acquired interests in various companies including the assets of Strongpoint Ltd., whose shares were beneficially owned by Mr. Bartlett and Mr. Laughton and which owned 35 per cent. of the shares of T.P.G. and a number of Newman shares. T.P.G. also increased its holding in Newman to 25 per cent. and acquired shares in Alfred Clough Ltd., S. Newman Ltd. (a private company), Dover Engineering Ltd., Metropole Industries Ltd. and Agar Cross Ltd. T.P.G.

B also formed a new company, Smithamcote Ltd., to acquire shares in two other companies in exchange for shares in Smithamcote. T.P.G. took 49 per cent. of voting shares of Smithamcote and sold to Smithamcote for £100,000 (which remained outstanding as a debt due from Smithamcote) shares of an investment company into which had been put T.P.G.'s minority holding of shares of S. Newman Ltd. T.P.G.'s acquisitions were

C financed by the issue of its own shares and loans from banks. By January 1975 it was in serious financial difficulty and, in those circumstances, the "January agreements" were entered into by which, undisclosed to the Newman board, Newman agreed to buy T.P.G.'s shareholdings in Metropole and Dover for £85,000 and £146,000 respectively. The amount was above the value of those shares on the Stock Exchange and, under the agreements, Newman paid £215,950 unknown to the Newman board,

D although the sum mentioned in the circular referred to below was £216,000.

   Mr. Bartlett then prepared a memorandum (" the strategy document "), which made a recommendation to the Newman board, inter alia, that Newman should purchase from T.P.G. all its assets, except its shareholding in Newman and a loan from Strongpoint of £100,000, in consideration for Newman assuming T.P.G.'s liabilities and paying to T.P.G. the sum of

E £350,000. At a board meeting all the directors, except Mr. Angus Murray, agreed to accept the recommendation in principle and, on Mr. Murray's suggestion, a report was to be obtained from Newman's auditors, Deloitte & Co. Mr. Cooper of Deloitte made a valuation of the net assets to be acquired by Newman but, in making that valuation, the January agreements were concealed from him, and, after speaking to Mr. Laughton, he increased

F his provisional assessment of the assets from £235,000 to £325,000. The board accepted that valuation as a basis for negotiation. On June 3, Mr. Bartlett signed on behalf of Newman an agreement for the purchase of the assets of T.P.G. for £325,000 (" the June agreement ") but the agreement was conditional on the approval of Newman and T.P.G. As the agreement was between companies having among their directors the same people, the Stock Exchange regulations required that the agreement be

G approved at extraordinary general meetings of Newman and T.P.G. With the notice convening the extraordinary general meeting of Newman, a letter signed by Mr. Bartlett with documents annexed (" the circular ") was sent to the shareholders. The letter stated that the directors of the Newman board recommended that the shareholders voted in favour of the proposal. The letter had been approved by the members of a com-

H mittee of the board except for Mr. Murray, who objected to it on the basis that not all the directors had considered and approved the proposals. The extraordinary general meeting was postponed as a result of pressure from Mr. Murray, the plaintiffs and other institutional investors, so that

208          Prudential Assurance v. Newman Industries (C.A.)          [1982]

a report could be prepared by the merchant bankers, Schroder, Wagg & Co. The report could not be produced in time, and a resolution was passed at an extraordinary general meeting of Newman held on July 29, 1975, approving the purchase of T.P.G.'s assets by Newman.

By an amended writ and statement of claim, the plaintiffs, Prudential Assurance Co. Ltd., sued (i) on behalf of themselves and all the shareholders of Newman other than Mr. Bartlett and T.P.G.; (ii) in the plaintiffs' personal capacity; and (iii) on behalf of all the shareholders of Newman on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to damages. They claimed, inter alia, a declaration that the circular sent by Newman to their shareholders and signed by Mr. Bartlett, was and had at all times been misleading and/or tricky; damages against Mr. Bartlett and Mr. Laughton for conspiracy and breach of duty; and further or in the alternative as against the fourth defendant T.P.G., a declaration that in entering into the agreement of June 3, 1975, or in the alternative in receiving the money under the terms of the agreement, when it knew or ought reasonably to have known that for Newman to enter into the agreement, upon the terms on which it did so, involved a conspiracy and breach of duty on the part of Mr. Bartlett and Mr. Laughton. T.P.G. (a) acquired the benefit of the agreement as constructive trustees of Newman and, accordingly, held the benefit of the agreement on trust for Newman, and (b) was liable to account to Newman for the full amount of the loss suffered by Newman as a result of the acquisition of the benefit.

By their defence the defendants denied the allegations made by the plaintiffs and claimed that the plaintiffs were not entitled to any of the relief claimed. They sought to have heard as a preliminary issue whether the plaintiffs, as a minority shareholder in Newman, were entitled under the rule in *Foss v. Harbottle* (1843) 2 Hare 461 to maintain the claim against them. On June 18, 1979, Vinelott J. refused the defendants' application: see [1981] Ch. 229, 233.

Vinelott J. found that Mr. Bartlett and Mr. Laughton had conspired to injure Newman and indirectly the shareholders with the result that Newman had acquired T.P.G.'s assets for £445,000 more than Newman need have paid for them. He held that since the plaintiffs' personal, derivative and representative claims were all founded on the conspiracy to injure Newman, there was no objection to them being joined in one action and, although Mr. Bartlett and Mr. Laughton did not have control of Newman, it was doubtful whether the shareholders would have the independent advice which would enable them to exercise a proper judgment on whether Newman should bring an action and, in those circumstances, justice required the court to entertain the action of a minority shareholder.

The defendants Mr. Bartlett and Mr. Laughton appealed. On July 27, 28, 30, 31 the Court of Appeal delivered a reserved judgment divided into seven chapters under the headings: (1) Introduction; (2) The position of Newman Ltd. and T.P.G. Ltd. on March 31, 1973; (3) Events after March 31, 1973; (4) The proceedings; (5) The law; (6) The examination

209

**1 Ch.**          **Prudential Assurance v. Newman Industries (C.A.)**

A    of the judgment of Vinelott J.; and (7) Conclusions. Only chapters 5 and 7 are included in this report.

On July 31, no order was made by the court and the matter was adjourned for argument on the form of the order and costs. On October 5 the parties stated that all outstanding matters between them had been settled.

B    The second and third defendants, Mr. Bartlett and Mr. Laughton, appeared in person on the hearing of the appeal.

*Leonard Caplan Q.C., Peter Curry Q.C.* and *Philip Heslop* for the plaintiffs.

*Robert Reid Q.C.* and *David Hodge* for the first defendant.

The fourth defendant did not appear and was not represented on the hearing of the appeal.

C    *Judith Jackson,* on October 5, for the second and third defendants.

*Jules Sher Q.C.* and *Charles Turnbull,* on October 5, for the fourth defendant.

*Caplan Q.C.* for the plaintiffs. The rule in *Foss* v. *Harbottle* (1843) 2 Hare 461 is a rule of procedure and not of substantive law. A minority

D    shareholder can sue the company where the needs of justice so require. The rule is of respectable antiquity and on the facts of the present case, the plaintiffs were entitled to prosecute an action on behalf of the company as a minority shareholder in the interests of justice.

[On June 10, 1981, the court stated that argument on the exception to the rule in *Foss* v. *Harbottle* was not open to the plaintiffs as a demurrer

E    because the preliminary issue was not the subject of appeal in the court. The preliminary point had been overtaken by the decision in the trial before Vinelott J. [1981] Ch. 257. For these reasons, the court did not wish to hear further argument on the matter.]

*Cur. adv. vult.*

F    July 27, 28, 30, 31. CUMMING-BRUCE, TEMPLEMAN and BRIGHTMAN L.JJ. took it in turns to read the following judgment of the court. In the course of the introduction their Lordships said:

The great length of this judgment has naturally caused us to consider whether it would be sensible to hand down a typed or printed version, as an alternative to the many hours in court which will inevitably be spent on delivering our judgment. We have rejected this obvious and convenient

G    expedient for two reasons. First, the appellants have been found guilty by the trial judge of a civil conspiracy in circumstances which, subject to stricter procedures, could equally well have led to their conviction on a charge of criminal conspiracy. In such circumstances we think that whichever way our verdict may go we should express our conclusions orally in open court. Secondly, the delay which would be caused by typing or

H    printing and then proof-reading a written judgment suitable for handing down would postpone judgment over the Long Vacation. When men's reputations are at stake, we do not think it is right to impose an avoidable two months delay. [Having read chapters one to four, they continued:]

*Chapter 5—The law*

A

As we have indicated, when, on January 9, 1976, the writ was issued the plaintiffs, Prudential Assurance Co. Ltd., sued only in their personal capacity and sought only to establish that the June agreement had not been duly approved at a valid meeting. When the writ was first amended in red on March 8, 1976, the title of the plaintiffs was altered so as to indicate that it was suing on behalf of Newman, the first defendant, using the time-honoured formula for this purpose " On behalf of themselves and all other shareholders, etc. . . ." The writ was also amended by adding Mr. Laughton and T.P.G. as defendants. The writ was expanded by claiming as against T.P.G. rescission of the agreement and damages; and also, as against Mr. Bartlett and Mr. Laughton, damages for breach of duty and damages for conspiracy.

B

As we have already related, it was a matter of debate in the court below whether the action as reconstituted was exclusively a " derivative " action for an injury allegedly done to Newman, as counsel for Mr. Bartlett and Mr. Laughton assumed, or was additionally a " personal " action for injury allegedly done to the plaintiffs and other shareholders. Whether the action as then constituted and the claim as then formulated could properly be regarded as pursuing both derivative and personal remedies is not a matter which we need to consider.

C

A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule in *Foss* v. *Harbottle* (1843) 2 Hare 461 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence. The rule in *Foss* v. *Harbottle* also embraces a related principle, that an individual shareholder cannot bring an action in the courts to complain of an irregularity (as distinct from an illegality) in the conduct of the company's internal affairs if the irregularity is one which can be cured by a vote of the company in general meeting. We are not concerned with this aspect of the rule.

D

E

F

The classic definition of the rule in *Foss* v. *Harbottle* is stated in the judgment of Jenkins L.J. in *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064 as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm

G

H

A  a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers them-

B  selves, being in control, would not allow the company to sue.

By their summons issued on May 10, 1979, Mr. Bartlett and Mr. Laughton invoked the rule in *Foss* v. *Harbottle.* After some 2½ days of argument Vinelott J. dismissed the summons on June 18, 1979, not on the ground that the plaintiffs were entitled to bring a derivative action but on the ground that it was more convenient to decide that issue after the action had been tried. For reasons which we explain later we have no doubt

C  whatever that that was a wrong decision.

Although not a party to the summons of May 10, Newman supported it. Newman was represented by leading counsel, who made a forceful statement on day 1 to the effect that, although the action was brought for the benefit of Newman, " it is the concern of the board that the company shall not be killed by kindness." He added that not only was it

D  the view of the board that the action was one which they did not wish to pursue on behalf of the company but that it was quite contrary to the interests of the company that the transaction should now be the subject of any rescission or criticism. He said: " I am therefore concerned . . . that this action . . . shall not proceed—a fortiori . . . it should be disposed of as quickly as possible." This protest was repeated at the close of the

E  plaintiffs' case on day 34, when counsel formally withdrew in order to avoid needless expense. This is what counsel then told the court:

" My clients, Newman Industries Ltd., are necessary formal parties to this action, but they are neither prosecuting it as a corporate entity nor now defending it in a combative role. The circumstances of the case . . . as far as my researches go are unique. They are unique from

F  the company's point of view in this particular material respect in that, although the action is framed in part as a minority shareholder's action, there is in fact no shareholding or board control vested in the personal defendants. Indeed, as regards the Newman board Mr. Laughton has not been a director since before the commencement of this action, and Mr. Bartlett, although holding such office, has at all material times been but one only of a number of directors compris-

G  ing the present Newman board. As I indicated briefly to your Lordship at the commencement of this trial, my learned junior and I were at pains to defend it by decision of the independent board, that is to say Mr. Bartlett taking no part in that decision. The independent board, so I have it, was motivated by the desire and wish that your Lord-ship might be afforded every assistance which a substantial public quoted company might be expected to render a court concerned with

H  its affairs. . . . The independent board itself has throughout main-tained the view that, whilst it was powerless to prevent the Prudential from pursuing the action, it was not one it, the independent board,

212

wished to adopt on Newman's behalf, nor had it been approached by any shareholder requesting that it should. It has been and in fact remains the view of the independent board that any advantage to the company which this action could procure for it is vastly outweighed by harm being inflicted upon it by the action continuing with the consequent adverse publicity and other side effects." **A**

Observe what was being said on behalf of Newman to the judge: " any advantage to the company which this action could procure is *vastly outweighed* by harm being inflicted upon it." This was an apparently responsible statement made by eminent leading counsel on the instructions of persons said to be the independent members of the board. The judge does not refer to this statement in his judgment; he does not say that he did not believe it; he does not say that he regarded the independent members of the board as acting under the influence of Mr. Bartlett. He does not seem to have asked himself the all-important question: " Ought I to be trying a derivative action? " **B**

**C**

The assertion by Newman's counsel that the independent board " was powerless to prevent the Prudential from pursuing the action " may have been based on the supposition that the plaintiffs had on the facts alleged in the statement of claim a personal cause of action for damages against Mr. Bartlett and Mr. Laughton independently of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued its own summons before the trial in order to test the right of the Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings. **D**

**E**

At the end of the day the judge found that a fraud had been committed by Mr. Bartlett and Mr. Laughton against Newman. The judge then addressed his mind to the question whether the right of a shareholder to sue in a case of fraud extended beyond a case of voting control by the wrongdoers. It was not pleaded, and could not be alleged, that Mr. Bartlett and Mr. Laughton had voting control. The conclusion reached by the judge was that a shareholder was entitled to prosecute an action on behalf of the company if " the interests of justice do require that a minority action should be permitted " see [1981] Ch. 257, 327; and that this was established in the instant case because the judge was satisfied on the evidence as a whole: **F**

" that there was no way in which Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction including in particular Mr. Cooper's valuation." **G**

In widening the scope of the accepted exception to the rule in *Foss* v. *Harbottle* by holding that a derivative action can be maintained whenever the interests of justice so require, the judge, at pp. 322–323, drew attention to references to " the justice of the case " which appear in some of the **H**

A    reported authorities on this topic: *Russell v. Wakefield Waterworks Co.*
(1875) L.R. 20 Eq. 474, 480 and *Edwards v. Halliwell* [1950] 2 All E.R.
1064, 1067; to which may be added *Baillie v. Oriental Telephone and
Electric Co. Ltd.* [1915] 1 Ch. 503, 518; *Cotter v. National Union of
Seamen* [1929] 2 Ch. 58, 69 and *Heyting v. Dupont* [1964] 1 W.L.R.
843, 851.

B    We turn now to certain of the authorities, starting with *Foss v. Harbottle*,
2 Hare 461. It came before Sir James Wigram V.-C., on demurrer. The
facts are narrated in that report at intimidating length and can be sum-
marised as follows. The company concerned was the Victoria Park Com-
pany, which had been incorporated by Act of Parliament in 1837 to
develop certain plots of land. There were eight promoters, Harbottle,
Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane. The
directors were the first five of these gentlemen.

C    Lane was the architect and Bunting the solicitor. Foss and Turton
were the complaining shareholders. They filed a bill on behalf of them-
selves and all other shareholders in the company (except the defendants)
against the eight promoters, including the assignees of three of them who
had become bankrupt. It was alleged that the plots had been bought by
the company in pursuance of an arrangement fraudulently concocted

D    between seven of the promoters to enable them to derive a personal benefit
from the establishment of the company and the sale to it of the plots at
exorbitant prices. It was further alleged, at pp. 478–479, 480:

"... the defendants concealed from the plaintiffs ... the several
fraudulent and improper acts of the ... defendants, and the plaintiffs
... had only recently ascertained the particulars thereof ... and they
were unable to set forth the same more particularly,—the defendants

E    having refused to make any discovery thereof, or to allow the plaintiffs
to inspect the books, accounts, or papers of the company ... and that
at [general meetings of the company] false and delusive statements
respecting the circumstances and prospects of the company were made
by the directors to the proprietors who attended such meetings, and
the truth of the several fraudulent and improper acts and proceedings

F    therein complained of was not disclosed."

The bill charged that, in the circumstances, the defendants were jointly
and severally liable to make good to the company the losses incurred in
consequence of the wrongful and fraudulent acts and proceedings to
which they were parties or privies. The defendants (except Byrom, who

G    took no part) demurred to the bill on the ground that the corporation was
not before the court, and that the defect could not be cured by making
the corporation a defendant because the plaintiffs were not entitled to
represent the corporation.

For the purposes of the application Wigram V.-C. made the assump-
tion that the company was entitled, as matters then stood, to complain

H    of the transactions mentioned in the bill. He continued at pp. 490–491,
492:

"... the bill ... is brought by two individual corporators, professedly
on behalf of themselves and all the other members of the corporation,

214

except those who committed the injuries complained of,—the plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

A

"It was not, nor could it successfully be argued, that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law, the corporation, and the aggregate members of the corporation, are not the same thing for purposes like this; and the only question can be, whether the facts alleged in this case justify a departure from the rule which prima facie would require that the corporation should sue in its own name and in its corporate character, or in the name of some one whom the law has appointed to be its representative. . . . If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth* v. *Holt*, and other cases, would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

B

C

D

"But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from,—rules, which, though in a sense technical, are founded on general principles of justice and convenience; and the question is, whether a case is stated in this bill, entitling the plaintiffs to sue in their private characters."

E

Wigram V.-C. then proceeded to answer this question in the negative, for the reasons indicated in the following extracts from his judgment, at pp. 492–493:

". . . the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within the scope of the company's powers, as well as to control the directors in any acts which they may have originated. . . . The first ground of complaint is one which, though it might prima facie entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation. . . ."

F

G

Wigram V.-C. then considered the second ground of complaint (which we need not deal with) and continued, at pp. 493, 494–495:

H

". . . whilst the supreme governing body, the proprietors at a special

1 Ch.        Prudential Assurance v. Newman Industries (C.A.)

A   general meeting assembled, retain the power of exercising the func-
tions conferred upon them by the act of incorporation, it cannot be
competent to individual corporators to sue in the manner proposed
by the plaintiffs on the present record . . . the majority of the pro-
prietors at a special general meeting assembled, independently of any
general rules of law upon the subject, by the very terms of the incor-
poration in the present case, has power to bind the whole body, and
B   every individual corporator must be taken to have come into the
corporation upon the terms of being liable to be so bound. How then
can this court act in a suit constituted as this is, if it is to be assumed,
for the purposes of the argument, that the powers of the body of the
proprietors are still in existence, and may lawfully be exercised for a
purpose like that I have suggested? Whilst the court may be declaring
the acts complained of to be void at the suit of the present plaintiffs,
C   who in fact may be the only proprietors who disapprove of them,
the governing body of proprietors may defeat the decree by lawfully
resolving upon the confirmation of the very acts which are the subject
of the suit. The very fact that the governing body of proprietors
assembled at the special general meeting may so bind even a reluctant
minority, is decisive to show that the frame of this suit cannot be
D   sustained whilst that body retains its functions. In order then that this
suit may be sustained, it must be shown either that there is no such
power as I have supposed remaining in the proprietors, or, at least,
that all means have been resorted to and found ineffectual to set that
body in motion: this latter point is nowhere suggested in the bill:
there is no suggestion that an attempt has been made by any pro-
E   prietor to set the body of proprietors in motion, or to procure a
meeting to be convened for the purpose of revoking the acts com-
plained of. The question then is, whether this bill is so framed as of
necessity to exclude the supposition that the supreme body of pro-
prietors is now in a condition to confirm the transactions in question;
or, if those transactions are to be impeached in a court of justice,
whether the proprietors have not power to set the corporation in
F   motion for the purpose of vindicating its own rights."

These questions were answered against the plaintiffs.

The next case which falls for consideration related to the fraudulent
promotion of some worthless lead mines. There were in fact two actions.
It is important to observe that in the first action there was a motion to
strike out, but no such motion in the second action, which proceeded to
G   trial. The first action is reported as *East Pant Du United Lead Mining Co.
Ltd.* v. *Merryweather* (1864) 2 Hem. & M. 254. It was alleged that
Merryweather, a director of the company, acting in concert with one of
his co-directors, Whitworth, had fraudulently sold the mines to the
company for £4,000 cash, which they shared between themselves, and
600 shares, to be allotted to Merryweather. In June 1864 a bill was filed
H   in the name of the company against Merryweather to set aside the sale.
In August the defendant moved to strike out the bill by way of demurrer.
The court adjourned the application in order to allow an opportunity for
a general meeting to be held. The meeting was held in October. A resolu-

216

tion was proposed for adopting the proceedings and continuing the action. **A**
Whitworth proposed an amendment to stay the action and refer the
dispute to arbitration. The amendment was put to the vote, and a poll
was taken. Out of 668 votes cast 324 were against the stay and 344 were
in favour of the stay, but of the latter 78 votes were cast by Merryweather
and 28 votes by Whitworth; if Merryweather had not voted, the motion
would have been supported by only 266 votes and would have been lost.
It was argued by counsel for the company, at p. 257: **B**

> " If a minority of a company were allowed to file a bill in the
> company's name, charging fraud against some of the majority, and
> alleging that those persons were not to be considered as shareholders
> or entitled to vote, and thus endeavouring to turn their minority into
> a majority so as to acquire the right to use the name of the company,
> any company's affairs might be made the subject of litigation, upon **C**
> allegations of fraud which might be entirely false; and yet, as this
> could not be proved till the hearing, irremediable mischief might be
> done in the meantime."

Page Wood V.-C. acceded to the motion, expressing his reasons, at p. 261:

> " Then comes the question, has the company now sanctioned the suit?
> To decide that it has done so, would be to discard Mr. Merryweather's **D**
> votes, and to do that would, in effect, be to decide now on this appli-
> cation the question at issue in the suit. But if I assume, as upon this
> motion I must assume, that Mr. Merryweather was entitled to the
> 600 shares which he actually holds in the company, the further
> question occurs, has he a right to vote in respect of such shares upon
> a question in which he is personally interested? Now as to the **E**
> management of the company by the board, no director is entitled to
> vote as a director in respect of any contract in which he is interested;
> but the case is different when he acts as one of the whole body of
> shareholders. The shareholders of one company may have dealings
> with interests in other companies, and therefore it would be mani-
> festly unfair to prevent an individual shareholder from voting as a **F**
> shareholder in the affairs of the company.  At a general meeting,
> therefore, Mr. Merryweather's votes must be held to be good, so
> long as he continues to hold his shares. Further than this, the court
> cannot be asked now to give an opinion, for to do so would be to
> decide the very question at issue in the cause."

A shareholder then began another action in December, suing on behalf **G**
of himself and all other shareholders (except Merryweather and Whit-
worth) against Merryweather, Whitworth and the company. This is
reported as *Atwool v. Merryweather* in a footnote to *Clinch v. Financial
Corporation* (1868) L.R. 5 Eq. 450, 464, and more fully in 37 L.J.Ch. 35.
On this occasion the defendant did not move to strike out the bill. The
action was fought to a finish. Page Wood V.-C. held, first, that the contract **H**
was a complete fraud, and secondly, that there was not such a defect in
the constitution of the suit as would be fatal according to the authority of
*Foss v. Harbottle.* Page Wood V.-C. referred to the fact that there was

1 Ch.        Prudential Assurance v. Newman Industries (C.A.)

A    plainly a majority of shareholders, independent of those implicated in the fraud, who supported the bill.

The principles which seem to emerge from these two cases are (i) that if the defendant against whom fraud is alleged applies to strike out the action in limine, it will not be assumed that he was guilty of fraud so as to disentitle him from casting his votes at a general meeting against the action; but, (ii) that if the action is in fact fought to a conclusion, and

B    the court finds the defendant guilty of fraud, it will in those circumstances discount the votes of those implicated in the fraud in reaching a conclusion whether the plaintiff is authorised to sue on the company's behalf. What the two cases leave open is the question in what circumstances the alleged delinquent, or the company, can halt the proceedings in limine.

Vinelott J. placed considerable reliance on this case in widening the accepted exception to the rule in *Foss* v. *Harbottle.* He said [1981] Ch.

C    257, 320:

"... *Atwool* v. *Merryweather,* L.R. 5 Eq. 464 shows that the court has jurisdiction to entertain a claim by a minority shareholder and to make an order in favour of the defendant company even where the other defendants, alone or together with the plaintiffs, do not have a majority of votes in general meeting and where the other shareholders are not parties. If that is so, then as I see it, the exception can only be

D    founded on a general jurisdiction of the court to make an order for recovery of property or damages in favour of a defendant company against co-defendants where the jurisdiction is invoked by a minority shareholder."

We doubt whether *Atwool* v. *Merryweather* goes so far in support of

E    the judge's conclusion. It was not a case in which the company or the delinquents sought to stop the action in limine. The action had been fought to a conclusion, the liability of the defendant directors had been established, and nothing, therefore, remained except for the company to reap the benefit of the judgment. The court could hardly deny the right of the plaintiff to an order in favour of the company to give effect to its proved rights, in the face of a resolution which, excluding the votes of

F    the proven fraudsters, was a majority resolution.  Page Wood V.-C. said, at p. 468:

"having it plainly before me that I have a majority of the shareholders, independent of those implicated in the fraud, supporting the bill, it would be idle to go through the circuitous course of saying that

G    leave must be obtained to file a bill for the company, and pro forma have a totally different litigation."

There is a clear distinction to be drawn between the application of the rule in *Foss* v. *Harbottle* when it is sought to stay proceedings in limine, and its application when nothing remains but to enforce a judgment in a derivative action which has been permitted to proceed.

H    · A simple application of the first aspect of the rule in *Foss* v. *Harbottle* is to be found in *Gray* v. *Lewis* (1873) L.R. 8 Ch.App. 1035.  The facts, shortly stated, were as follows: Charles Lafitte & Co. Ltd. (" the company ") was incorporated in December 1865 to purchase the right to extend to this

218    Prudential Assurance v. Newman Industries (C.A.)    [1982]

country the business of Charles Lafitte & Co. of Paris ("the partner-    A
ship"). The plaintiff Gray subscribed for shares. The company never
acquired anything from the partnership, and was ordered to be wound
up in November 1866. Shortly thereafter Gray filed a bill on behalf of
himself and all other shareholders in the company, against the company,
its directors, its liquidator and the National Bank, alleging that the assets of
the company had been misapplied by the National Bank and by the directors
of the company, and seeking an order that the bank and the directors of    B
the company might be declared liable to make "good to the shareholders
of the company" the loss sustained "by the shareholders." Sir Richard
Malins V.-C. made a decree declaring that the bank and the directors
were liable to replace the money, and directed that the amount found due
should be paid into court. The National Bank, and Lewis and Henshaw,
two of the directors, appealed. The appeal of the National Bank was    C
compromised with the concurrence of the liquidator, on the basis (clearly
unobjectionable) that the National Bank should discharge the debts of
the company. The appeal by Lewis and Henshaw came before the Court
of Appeal in Chancery, and was allowed. The reasons were put trenchantly
by James L.J., with whom Mellish L.J. agreed, in these words at p. 1050:

" The bill should not have been filed by a shareholder on behalf of    D
himself and all other shareholders. It is very important, in order
to avoid oppressive litigation, to adhere to the rule laid down in
*Mozley* v. *Alston* (1847) 1 Ph. 790 and *Foss* v. *Harbottle*, 2 Hare 464,
which cases have always been considered as settling the law of this
court, that where there is a corporate body capable of filing a bill for
itself to recover property either from its directors or officers, or from    E
any other person, that corporate body is the proper plaintiff, and the
only proper plaintiff. One object of incorporating bodies of this kind
was, in my opinion, to avoid the multiplicity of suits which might have
arisen where one shareholder was allowed to file a bill on behalf of
himself and a great number of other shareholders. The shareholder
who first filed a bill might dismiss it, and if he was a poor man the
defendant would be unable to obtain his costs, then another share-    F
holder might file a bill, and so on. It was also stated to us in the
course of the argument that even after the plaintiff had dismissed his
bill against a particular defendant a fresh bill might be filed against
the defendant so dismissed. Therefore there might be as many bills
as there are shareholders multiplied into the number of defendants.
The result would be fearful, and I think the defendant has a right to
have the case made against him by the real body who are entitled to    G
complain of what he has done.
" Now in this case I am of opinion that the only person—if you
may call it a person—having a right to complain was the incorporated
society called Charles Laffitte & Co. In its corporate character it was
liable to be sued, and was entitled to sue; and if the company sued
in its corporate character, the defendant might allege a release or a
compromise by the company in its corporate character—a defence    H
which would not be open in a suit where a plaintiff is suing on behalf
of himself and other shareholders. I think it is of the utmost import-

A   ance to maintain the rule laid down in *Mozley* v. *Alston* and *Foss* v. *Harbottle,* to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their powers for the purpose of doing something fraudulent against the minority, who are overwhelmed by them, as in *Atwool* v. *Merryweather,* L.R. 5 Eq. 464, where Page Wood V.-C. under those circumstances, sustained a bill

B   by a shareholder on behalf of himself and others, and there it was after an attempt had been made to obtain a proper authority from the corporate body itself in public meeting assembled."

This case highlights what the rule in *Foss* v. *Harbottle* is primarily concerned with, namely, is a plaintiff shareholder entitled to prosecute an action on behalf of the company for a wrong done to it, or ought the

C   action to be struck out on the footing that it is for the company and not for a shareholder to sue? That is what *Foss* v. *Harbottle* itself was about, and what the first *East Pant Du* case, 2 Hem. & M. 254, was about. The second *East Pant Du* case, *Atwool* v. *Merryweather,* L.R. 5 Eq. 464, raised a related but different question, namely, if at the end of the day fraud is proved, are the circumstances such that the company is capable of condoning the fraud? Clearly not, if the fraud will only be confirmed

D   by a majority by the use of the fraudsters' own voting power.

It is commonly said that an exception to the rule in *Foss* v. *Harbottle* arises if the corporation is " controlled " by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see *Russell* v. *Wakefield Waterworks Co.,* L.R. 20 Eq. 474, 482. But this proposition leaves two questions at large,

E   first, what is meant by " control," which embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Secondly, what course is to be taken by the court if, as happened in *Foss* v. *Harbottle,* in the *East Pant Du* case and in the instant case, but did *not* happen in *Atwool* v. *Merryweather,* the court is confronted

F   by a motion on the part of the delinquent or by the company, seeking to strike out the action? For at the time of the application the existence of the fraud is unproved. It is at this point that a dilemma emerges. If, upon such an application, the plaintiff can require the court to assume as a fact every allegation in the statement of claim, as in a true demurrer, the plaintiff will frequently be able to outmanoeuvre the primary purpose

G   of the rule in *Foss* v. *Harbottle* by alleging fraud and " control " by the fraudster. If on the other hand the plaintiff has to prove fraud and " control " before he can establish his title to prosecute his action, then the action may need to be fought to a conclusion before the court can decide whether or not the plaintiff should be permitted to prosecute it. In the latter case the purpose of the rule in *Foss* v. *Harbottle* disappears.

H   Either the fraud has not been proved, so cadit quaestio; or the fraud has been proved and the delinquent is accountable unless there is a valid decision of the board or a valid decision of the company in general meeting, reached without impropriety or unfairness, to condone the fraud.

We think that this brief look at the authorities is sufficient for present purposes. For it so happens that this court cannot properly on this appeal decide the scope of the exception to the rule in *Foss* v. *Harbottle*. The reason is this. Vinelott J. permitted the action by the plaintiffs on behalf of Newman to proceed, and there was no appeal from that decision. In the result he found that Newman was entitled as against Mr. Bartlett and Mr. Laughton to damages for conspiracy and breach of fiduciary duty, and he directed an inquiry as to damages subject to a stay in case of an appeal. Thereafter, Newman had three choices, subject to the operation of the stay. First, it might do nothing. In this case the plaintiffs would be entitled, if they so desired, to issue a summons to proceed with the inquiry. Secondly, Newman might decide for some proper reason, assuming that a proper reason might exist, and duly resolve at a proper board or general meeting, to proceed no further with the claim against Mr. Bartlett and Mr. Laughton. In this event, assuming that the resolution of the board or of the company in general meeting was in all respects proper, the plaintiffs would be unable to proceed with the inquiry because a valid release could be pleaded by Mr. Bartlett and Mr. Laughton. Thirdly, Newman might adopt the order which the plaintiffs had obtained on its behalf and pursue the inquiry accordingly. This would occasion no procedural problem nor even any special procedural step. Any party, plaintiff or defendant, can issue a summons to proceed upon an order. It would not be necessary for Newman to apply to be made a plaintiff, or to start a fresh action and rely upon the principle of res judicata, as was suggested at one time in the course of the argument. The order has been made. Newman is a party to the action. Newman can enforce the order. If this course were adopted, the rule in *Foss* v. *Harbottle* is irrelevant. The rule has no room to operate where the company itself is proceeding with an action, or to enforce a judgment, pursuant to a valid board or company resolution.

Newman by its counsel, acting (as we must assume) upon due authority conferred by the company, stated before us that if the finding of fraud stood it would accept the benefit of the order made in its favour. That is the end of *Foss* v. *Harbottle* so far as this appeal is concerned. It is plainly impossible for Mr. Bartlett or Mr. Laughton to prevent the board of Newman instructing its solicitors to proceed with the inquiry, and recovering from Mr. Bartlett and Mr. Laughton what may be certified to be due.

It was in the light of these considerations that we declined to hear any argument from Mr. Caplan and Mr. Curry on the topic of *Foss* v. *Harbottle*. However desirable it might be in the public interest that we should express our conclusions on Vinelott J.'s analysis of the rule in *Foss* v. *Harbottle* and what he saw as the exception to it, it was necessary for us to bear in mind that the rule had ceased to be of the slightest relevance to the case. It would have been a grave injustice to all parties to increase the already horrendous costs of this litigation by allowing time for argument on an interesting but irrelevant point. Such consideration of the law as appears in this judgment is, apart from a few sub-

A  missions made by Mr. Bartlett, merely a reflection of our own thoughts without the benefit of sustained argument.

In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in *Foss* v. *Harbottle*. We desire, however, to say two things. First, as we have already said, we have no doubt whatever that Vinelott J. erred in dismissing the summons of May 10, 1979. He ought to have determined

B  as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action. Such an approach defeats the whole purpose of the rule in *Foss* v. *Harbottle* and sanctions the very mischief that the rule is designed to prevent. By the time a

C  derivative action is concluded, the rule in *Foss* v. *Harbottle* can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company; or the wrong is not proved, so cadit quaestio. In the present case a board, of which all the directors save one were disinterested, with the benefit of the Schroder-Harman report, had reached the conclusion before the start of the action that the

D  prosecution of the action was likely to do more harm than good. That might prove a sound or unsound assessment, but it was the commercial assessment of an apparently independent board. Obviously the board would not have expected at that stage to be as well informed about the affairs of the company as it might be after 36 days of evidence in court and an intense examination of some 60 files of documents. But the board

E  clearly doubted whether there were sufficient reasons for supposing that the company would at the end of the day be in a position to count its blessings; and clearly feared, as counsel said, that it might be killed by kindness. Whether in the events which have happened Newman (more exactly the disinterested body of shareholders) will feel that it has all been well worth while, or must lick its wounds and render no thanks to those who have interfered in its affairs, is not a question which we can answer.

F  But we think it is within the bounds of possibility that if the preliminary issue had been argued, a judge might have reached the considered view that the prosecution of this great action should be left to the decision of the board or of a specially convened meeting of the shareholders, albeit less well informed than a judge after a 72-day action.

So much for the summons of May 10. The second observation which

G  we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in *Foss* v. *Harbottle* whenever the justice of the case so requires. We are not convinced that this is a practical test, particularly if it involves a full-dress trial before the test is applied. On the other hand we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all

H  the allegations in the statement of claim of "fraud" and "control" are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding

222

with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss* v. *Harbottle*. On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting.

We turn to the personal action. In the statement of claim, as amended on day 12, the plaintiffs pleaded that Mr. Bartlett and Mr. Laughton

" in breach . . . of their obligation to the shareholders . . . conspired together to benefit T.P.G. at the expense of . . . the shareholders," and that " in furtherance of such conspiracy and in breach of . . . their obligation to the shareholders . . . the defendants Bartlett and Laughton procured the circular to be . . . distributed . . . well knowing and intending it to be misleading and tricky "; and " by reason of the foregoing the defendants Bartlett and Laughton are in breach of . . . their obligation to the shareholders."

In the amended prayer the plaintiffs in their personal capacity as a shareholder in Newman claimed damages for conspiracy against Mr. Bartlett and Mr. Laughton, and a declaration to the like effect on behalf of all other shareholders who had suffered damages and were on the register on July 29, 1975 (the date of the adjourned extraordinary general meeting). Counsel for the plaintiffs agreed before us that no facts are relied upon in support of the personal claim which are not relied upon in support of the derivative claim.

Vinelott J. upheld the plaintiffs' personal claim, and also the representative claim with which it was linked. He began with the proposition, which accorded with his findings, that Newman had been induced by fraud to approve an agreement under which Newman paid more (he thought about £445,000 more) than the value of the assets acquired and thus £445,000 more than it needed to pay; therefore Newman's indebtedness to its bankers immediately after the transaction (about £5m.) was £445,000 more than it would have been but for the fraud; therefore the fraud caused a reduction in net profits, which must have affected the quoted price of Newman shares; therefore, the plaintiffs suffered some damage in consequence of the conspiracy and that was sufficient to complete the cause of action, the quantum of damages being left to an inquiry.

In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr. Bartlett did not dispute, that he and Mr. Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the

A   market value of his shares, or equal to the likely diminution in dividend, because such a " loss " is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only " loss " is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves,

B   his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has

C   an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff

D   and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.

E   Counsel for the plaintiffs sought to answer this objection by agreeing that there cannot be double recovery from the defendants, but suggesting that the personal action will lie if the company's remedy is for some reason not pursued. But how can the failure of the company to pursue its remedy against the robber entitle the shareholder to recover for himself? What happens if the robbery takes place in year 1, the shareholder sues in year 2, and the company makes up its mind in year 3 to pursue

F   its remedy? Is the shareholder's action stayed, if still on foot? Supposing judgment has already been recovered by the shareholder and satisfied, what then?

   A personal action could have the most unexpected consequences. If a company with assets of £500m. and an issued share capital of £50m. were defrauded of £500,000 the effect on dividends and share prices would

G   not be discernible. If a company with assets of £10m. were defrauded, there would be no effect on share prices until the fraud was discovered; if it were first reported that the company had been defrauded of £500,000 and subsequently reported that the company had discovered oil in property acquired by the company as part of the fraud and later still reported that the initial loss to the company could not have exceeded £50,000, the

H   effect on share prices would be bewildering and the effect on dividends would either be negligible or beneficial.

   The plaintiffs in this action were never concerned to recover in the personal action. The plaintiffs were only interested in the personal action

as a means of circumventing the rule in *Foss* v. *Harbottle*. The plaintiffs succeeded. A personal action would subvert the rule in *Foss* v. *Harbottle* and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed upon them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration. In this case it is neither necessary nor desirable to draw any general conclusions.

The rule in *Foss* v. *Harbottle* is founded on principle but it also operates fairly by preserving the rights of the majority. We were invited to give judicial approval to the public spirit of the plaintiffs who, it was said, are pioneering a method of controlling companies in the public interest without involving regulation by a statutory body. In our view the voluntary regulation of companies is a matter for the City. The compulsory regulation of companies is a matter for Parliament. We decline to draw general conclusions from the exceptional circumstances of the present case. But the results of the present action give food for thought. Vinelott J. thought it possible that Newman had suffered damage amounting to £445,000 by the fraud of Mr. Bartlett and Mr. Laughton. Counsel for Newman submitted in the court below that damage to Newman by the prosecution of the action exceeded the benefits liable to be derived from the action. The costs of the proceedings at the end of the trial were said in newspaper reports to be in the region of £750,000. If the judge's order is upheld and if the damages suffered by Newman are assessed at £445,000 and the costs at £750,000 then those damages and about 95 per cent. of the costs will fall on T.P.G. pursuant to the judge's order except in so far as they are recovered from Mr. Bartlett and Mr. Laughton. If Newman recover any damages they must indemnify the plaintiffs thereout against the difference between the costs of the plaintiffs paid by T.P.G. and (with small exceptions) the costs of the plaintiffs on a common fund basis. Part of Newman's costs must be borne by Newman in any event. Part of the plaintiffs' costs must be borne by the plaintiffs in any event.

If this appeal succeeds the burden of the costs on the plaintiffs will be enormous. The innocent shareholders of Newman, T.P.G. and the plaintiffs may well wonder, whether this appeal succeeds or not, if there is not something to be said after all for the old fashioned rule in *Foss* v. *Harbottle*.

**1 Ch.**          Prudential Assurance v. Newman Industries (C.A.)

A   [Their Lordships then read Chapter 6 in which they examined the judgment of Vinelott J. and continued : ]

### Chapter 7—Conclusions

The problems involved in this case were caused by the fact that the Prudential were the wrong plaintiffs.

If, indeed, Mr. Bartlett and Mr. Laughton defrauded Newman then
B the proper plaintiff was Newman. In an action by Newman against Mr. Bartlett and Mr. Laughton for defrauding the company, and against T.P.G. for enjoying the fruits of the fraud, the circular would be largely evidential. The principal frauds pleaded would have been frauds practised on the directors and practised on Mr. Cooper. Each fraudulent representation or fraudulent concealment would have been pleaded with particularity.
C Furthermore, in an action by Newman against Mr. Bartlett and Mr. Laughton all the documents necessary to enable Newman to plead its case and to make sensible discovery would have been in the possession of Newman at the outset. Newman would have known which documents held by T.P.G. were relevant to be discovered. Newman would then have been in a position to determine which of the discovered documents were sufficiently important to produce to the court.
D   Mr. Caplan frankly admitted that the plaintiffs pleaded and relied upon the circular because that was the only document revealed to the plaintiffs as a shareholder and the only document upon which they could make out a case on the pleadings prior to discovery. Mr. Caplan also frankly admitted that conspiracy was only pleaded because the plaintiffs thought that a direct action could not succeed in the absence of a plea
E of conspiracy. The direct action was only pleaded because it was feared that the derivative action might be defeated by the rule in Foss v. Harbottle, 2 Hare 461.

In these circumstances discovery was a shambles, there was no proper selection of documents to be used at the trial because no one knew what to select and what to discard, and the pleadings were never adequately
F clarified or timeously amended. The complications and obscurities of the statement of claim and the reliance on the circular and the enormous weight of the discovered documents made it impossible for the defendants adequately to prepare for the trial or to foresee the course or length of the trial or to cope with the many trials of strength with regard to their recollection and probity.

The obscurities and confusion of the pleadings, the mass of docu-
G mentary evidence, the fact that the Prudential, not being the proper plaintiffs, had no knowledge of what had gone on inside Newman and the assumed need to prove conspiracy led to the plaintiffs submitting that every Newman and T.P.G. document and every act or omission by Mr. Bartlett or Mr. Laughton was a badge of fraud, and to submit that Mr. Cooper's valuation was only explicable by cunning on the part of
H Mr. Laughton and incompetence on the part of Mr. Cooper, and that the directors of Newman were bemused and the advisers of Newman blinded.

The task of the judge was made very difficult because the pleadings of the plaintiffs were concentrated on the circular for tactical reasons

226

connected with the personal action; the statement of claim was vague and A
obscure; the real issues were buried under general assertions of trickiness.
The defendants' advisers, no doubt overwhelmed by the number of
ingenious accusations of fraud which emerged, were not able adequately
to assist the judge by defining those accusations which were material and
sounded in damages, those accusations which were relevant but which did
not give rise to any damage, and those accusations which were wholly
irrelevant save as to credit. B

As the case proceeded and the nature of the plaintiffs' accusations
were gradually disclosed, it is not surprising that the judge decided to
intervene and himself to ask questions in order to clarify the evidence
being given by the witnesses. But we must criticise some of the inter-
ventions of the judge. When Mr. Murray was giving evidence, some of
the interventions appeared only capable of being answered in a way which C
would confirm the views already formed by the judge. In the case of the
evidence of Mr. Bartlett and Mr. Cooper some of the judge's interventions
indicated that he had already formed a hostile view of the explanations
that the witnesses were trying to give. Experienced counsel represented
the plaintiffs and Mr. Bartlett. The judge should have allowed Mr. Scott
to elucidate from his witnesses the evidence that they were trying to give,
without interruption save in so far as it was necessary for clarification. D
And it was for Mr. Scott and Mr. Caplan to make their points in cross-
examination. It is not appropriate for leading questions to be put from the
Bench.

The judge found a conspiracy which had never been pleaded, and
fraudulent conduct which had never been particularised. The plaintiffs,
in this court, attempted to overwhelm us with 30 or more accusations of E
fraud, but in the end fell back on six claims which they submitted had been
pleaded and found proven. Of those six the second was abandoned in the
course of the submissions of Mr. Caplan.

The first claim concerns the commercial reasons. Those reasons must
be read in the context of the information furnished by the circular with
regard to the size of the minority shareholdings which were to be acquired F
in associated companies, the activities and trading results of the principal
associated companies and the management influence said to have been
obtained by the vendor T.P.G. through those minority shareholdings. So
read, the commercial reasons informed the Newman shareholders that
Newman would benefit from a development and expansion of Newman's
international trade which would result from a partnership between
Newman and the associated companies secured by the acquisition of G
T.P.G.'s minority shareholdings. In effect, Mr. Bartlett was imparting to
the Newman shareholders his belief that he could influence the manage-
ment of the affairs of Newman and the associated companies for the
benefit of all concerned. So he believed. Therefore, to this limited extent
the circular was not misleading or tricky to the knowledge of Mr. Bartlett
and Mr. Laughton. But it does not follow, because there were valid H
commercial reasons for the transaction, that Mr. Bartlett and Mr.
Laughton, as directors of Newman, recommended the transaction to the
Newman shareholders in the bona fide belief that it was a transaction into

227

A   which Newman ought to enter. On this aspect we express our conclusion
later.

The second claim was abandoned. The third claim was that the circular
was tricky and misleading in concealing that the attributed values of quoted
associated companies were much higher than their current stock market
values: see statement of claim added by amendment after the trial began,
and the judgment [1981] Ch. 257, 294, 297.

B   The argument is that appendix 3 of the circular ought to have included
a comparison between the stock market price and Mr. Cooper's value of
each quoted shareholding in Metropole, Dover, Agar Cross and Clough.

The exact charge against Mr. Bartlett and Mr. Laughton is still not
spelled out. The claim may mean that Mr. Bartlett and Mr. Laughton
believed that Mr. Cooper's value exceeded a fair value for Newman to
C   pay. It may mean that Mr. Bartlett and Mr. Laughton knew and believed
that it was excessive for Newman to pay a price significantly in excess
of the stock market price. It may mean that Mr. Bartlett and Mr. Laughton
believed that Mr. Cooper's value represented a fair price for Newman
to pay but realised that nevertheless the shareholders of Newman ought
to have an opportunity of comparing the Stock Exchange price with Mr.
Cooper's value. Whichever charge is made we consider that it has not
D   been proved.

There is no evidence that Mr. Bartlett or Mr. Laughton thought that
the value of the shares of Clough, Dover, Agar Cross and Metropole
suggested in Mr. Laughton's letter to Mr. Cooper of April 11, 1975, was
excessive for Newman to pay. There is no evidence that they were afraid
of revealing Stock Exchange prices. Mr. Bartlett gave evidence that he
E   did not believe that Stock Exchange prices were a reliable guide to the
value of the shareholdings, carrying with them the opportunities and
potentialities for which they had been purchased and which Newman
acquired from T.P.G. Neither Mr. Cooper nor Schroders appear to have
taken the view that Stock Exchange prices were a reliable guide. It was
impossible for Mr. Bartlett to explain to the shareholders in the circular
that Clough was a buy or sell situation together with the reasons. It was
F   impossible to reveal to the shareholders the plans of Mr. Laughton and
Mr. Bartlett with regard to Dover, Metropole and Agar Cross.

The fourth claim was that the circular was tricky and misleading in the
indication that the £100,000 Smithamcote loan was worth its face
value: statement of claim, paragraph 16; judgment [1981] Ch. 257, 296.
The evidence is that Mr. Bartlett and Mr. Laughton believed that the
G   loan was worth the S. Newman Ltd. shares and that the S. Newman Ltd.
shares were worth more than £100,000.

The fifth claim is that the circular was tricky and misleading in the
indication that the £30,000 Abbott debt was worth its face value:
statement of claim, paragraph 16A added after the trial began, and
judgment at p. 297. The evidence is that Mr. Bartlett and Mr. Laughton
H   believed the Abbott loan to be worth £30,000 and that T.P.G. was willing
to give Newman a guarantee of payment of principal and interest.

It did not occur to Mr. Cooper to reduce the value of the debt because
of the terms of the payment or the rate of interest. That being so, it is

228

not permissible to infer that Mr. Bartlett or Mr. Laughton considered that the value of the loan ought to be reduced and fraudulently concealed their belief.

The sixth claim is that the circular was tricky and misleading in that it concealed the January agreements: statement of claim, paragraph 18A.

We have already indicated that there was ample evidence to justify the finding of the judge that the January agreements, and the payments thereunder, were dishonestly concealed from the directors of Newman (to the extent that we have indicated) and from the shareholders of Newman with the object, inter alia, of facilitating the acceptance of the proposals set forth in the strategy document, and that this dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment of £216,000 by Newman to T.P.G.

As Mr. Angus Murray made plain in his evidence, he was always puzzled because it was difficult, in discussions with Mr. Bartlett, to discover whether, as he spoke, he was wearing a Newman or a T.P.G. hat. T.P.G. was a dealing and investment holding company. Newman was a trading company. If T.P.G. identified and developed a commercial opportunity, the moment might come when it would be sensible, in the interests of the companies, for Newman to take over the T.P.G. interest in a particular company. Hence Mr. Bartlett's proposals for "restructure" of Newman and T.P.G. interests in associated companies in early December 1974. And in its development of opportunities by improving the management of associates T.P.G. introduced into its associated companies those directors of Newman who were most suited to bring T.P.G.'s plans to fruition. Further, the T.P.G. holding in Newman shares, and the option held by Newman over shares of T.P.G., had the double effect that T.P.G. had a financial interest in the success of Newman, and Newman could use T.P.G.'s shareholding to protect Newman from a takeover by a third party at a time when its shares were unduly depressed on the market as a consequence of the general financial climate which had nothing to do with the profitability or assets of Newman. The period at the end of 1974, when T.P.G. was in serious liquidity trouble, coincided with the occasion when Mr. Bartlett genuinely regarded Newman as needing strengthening through diversification as Newman's existing manufacturing activities showed signs of contraction. Mr. Bartlett and Mr. Laughton were optimists, and Mr. Bartlett was always eager to impress his personal commercial judgment upon his colleagues on the Newman board. He met his match in Mr. Angus Murray, who was concerned about the administrative capacity and organisation in Newman, worried about the risk of muddle through the close relationship of Newman and T.P.G., and rightly cautious about the risk of overstretching Newman's resources. He knew very little about the T.P.G. shareholdings, or about the reasons of Mr. Laughton in selecting them. In this his position was vastly different from that of Mr. Bartlett, Mr. Laughton, Mr. Bush and Mr. Baldwin, and from officials such as Mr. Gollop who understood the opportunities presented to Newman when the chance for stepping into T.P.G.'s shoes presented itself to Newman in February 1975. The first

A serious Newman boardroom conflict was manifested on January 2, 1975.
The evidence proves that Mr. Bartlett, with Mr. Laughton's support, then
used every weapon available to carry the board with him as far as he
could. He kept Mr. Murray in the dark and proceeded to enter into the
January agreements and to arrange payments of the consideration to
T.P.G. which in the event amounted to £216,000, knowing full well that
Mr. Murray would have tried to prevent it had he known what was

B happening. Once embarked on this course Mr. Bartlett and Mr. Laughton
could or would not disclose to Mr. Murray and the Newman board as a
board what they had done, and Mr. Bartlett ended by confusing the
history of the £216,000 to Mr. Fryer of the Stock Exchange and misrepre-
senting it to the shareholders on July 8.

 But these deceptions of Mr. Murray and of the shareholders at the

C extraordinary general meeting were not because they believed that the
net consideration of £350 to £325,000 was too high. We are satisfied that
throughout Mr. Bartlett believed that his original figure was about right
and was content to rely upon his expectation that Deloittes would, after
their independent investigation, arrive at much the same conclusion.

 The judge accepted the plaintiffs' submission that Mr. Bartlett and
Mr. Laughton must have known, and did know, that £350 to £325,000 was

D much too much. So he never had to consider the question whether the
explanation of the facts lay in an attempt by Mr. Bartlett, with Mr.
Laughton's concurrence, to keep Mr. Murray in the dark and thus carry
the rest of the board with him.

 So what the judge would have found about this explanation must
remain unknown. But we are ourselves satisfied that this is the inference

E that should be drawn from the evidence of primary fact about the conceal-
ment of the January agreements and the advance payments of £216,000
made pursuant thereto.

 Turning from the plaintiffs' claims as submitted in this court to the
issues which we indicated in chapter 6, the first issue is whether Mr.
Bartlett and Mr. Laughton genuinely believed that it was in Newman's

F interest to accept the proposals contained in the strategy document. The
evidence establishes that the transaction recommended in the strategy
document, namely, the purchase by Newman of the undertaking of T.P.G.
with certain exceptions, was a gamble from the start. In our judgment Mr.
Angus Murray was quite right in 1975 in urging that it was not a gamble
which Newman ought to take. The question, however, is whether Mr.
Bartlett and Mr. Laughton genuinely believed that it was a gamble which

G it was in the interests of Newman to take, or whether they merely put
forward the strategy document because T.P.G. needed to be rescued from
a gamble which had failed. If Mr. Bartlett and Mr. Laughton urged
Newman to gamble on the strategy document transaction not because they
believed Newman should take the gamble but only because they could
see no other way of rescuing T.P.G., then Mr. Bartlett and Mr. Laughton

H were fraudulent; it would matter not that they hoped the gamble would
succeed and were content for the price to be assessed by an independent
valuer. If, on the other hand, they believed that the strategy document
recommendation was for the benefit of Newman because it represented

230

a golden opportunity for Newman to reap the benefit of T.P.G.'s initiative at a fair price; then they were not fraudulent.          A

Quite rightly, counsel for the plaintiffs emphasised, both here and below, the financial difficulties which faced T.P.G. It does not follow that Mr. Bartlett and Mr. Laughton were guilty of fraud or breach of duty because the transaction benefited T.P.G. more than Newman, or even that it was inspired as a rescue operation for T.P.G. If a conflict of interest          B
and duty arises because a transaction is proposed between two companies, and directors of one company are also directors of the other company, there are two, and only two, possible legal views on the legal viability of the transaction. Either the transaction is one which the directors can properly propose to each company, *despite* their conflict of interest and duty, or it is one which they cannot properly propose *because of* their conflict of interest and duty. The second view is basically correct in the          C
case of overlapping trusteeships. The first view is rightly accepted as correct in the present case.

If, as we must assume, the transaction could properly go ahead despite the conflict of interest and duty, then Mr. Bartlett and Mr. Laughton were entitled to propose the transaction in order to benefit T.P.G.; and similarly they were entitled to propose the transaction in order to benefit Newman. Indeed, they were not entitled to propose the transaction except          D
for the purpose of benefiting both Newman and T.P.G.

The court cannot and will not enter into an inquiry in order to discover whether the transaction would benefit one company more than the other, or whether Mr. Bartlett and Mr. Laughton believed it would. If such an inquiry were relevant, it would mean that the court would have to hold such a transaction void unless the transaction would be, or was          E
thought to be, of equal benefit (whatever that might mean) to each company. Such an inquiry would be quite impracticable. It also follows that the transaction is capable of being upheld although initiated as a rescue operation for T.P.G. Every contract of sale must be initiated either by the vendor or by the purchaser. If a sale is legally viable between a particular vendor and a particular purchaser, the existence and nature and          F
weight of the pressures affecting the initiator may explain the existence of a fraud but do not justify an inference of fraud.

The judge's findings that there was a conspiracy to benefit T.P.G. at the expense of Newman appear to indicate that he believed that the strategy document was not bona fide propounded by Mr. Bartlett and Mr. Laughton in the interests of Newman. But this and other indications          G
in the judgment to the like effect are contradicted by the judge's comment [1981] Ch. 257, 330, that Mr. Bartlett

"may well have believed that it would be for the ultimate benefit of Newman that it should be placed in relation to the network of associated companies in the central position which was originally to have been occupied by T.P.G."          H

We need not resolve these contradictions in the judgment because we do not consider that a dishonest motive on the part of Mr. Bartlett and Mr.

A  Laughton in urging the adoption of the recommendations contained in the strategy document can now sound in damages.

Even if the recommendation by Mr. Bartlett and Mr. Laughton that Newman should gamble on the strategy document proposal was not bona fide made in the interests of Newman, in the result Newman did gamble, and gambled successfully. For obvious reasons Newman decided to keep the fruits of the gamble rather than demand repayment of the stake and hand over the fruits. If a punter is induced by fraud to bet on a horse B  and the horse loses, then the punter can recover his stake from the fraudster. But if the horse wins, then the punter cannot both keep his winnings and claim back his stake. In the present case Newman decided to keep its winnings. It is true that the purchase of the Smithamcote shares shows a loss against the value attributed to the Smithamcote shares by Mr. Cooper, but the transaction offered by T.P.G. and accepted by C  Newman was one transaction in which Newman gambled £1·5 million and obtained advantages which it has elected to keep. If Newman were induced to purchase the T.P.G. assets by fraud, then Newman, on discovering the fraud, could rescind the contract of purchase and claim damages, or, alternatively, claim damages for the fraud without rescission. But Newman having abandoned the remedy of rescission because the D  gamble paid off, has suffered no damage as a result of that fraud.

The second issue is whether Mr. Bartlett and Mr. Laughton believed that £350,000 was a fair price for Newman to pay for the acquisition of T.P.G.'s undertaking. The net consideration of £350,000 was based on assets worth £1·5 million subject to liabilities of £1,150,000. If Mr. Bartlett and Mr. Laughton thought that the assets were not worth £1·5 million but E  were only worth, for example, £1·3 million, then irrespective of any fraud involved in inducing Newman to gamble at all, Mr. Bartlett and Mr. Laughton were guilty of fraud in advising Newman to pay a price which to the knowledge of Mr. Bartlett and Mr. Laughton exceeded the price which Newman should be advised to pay. The fact that the gamble succeeded and that Newman intend to keep its winnings is irrelevant. Newman, on this hypothesis, lost £200,000 because they paid £200,000 F  more than Mr. Bartlett and Mr. Laughton knew to be a fair price for Newman to pay to acquire the assets.

In our judgment, however, there was no, or no sufficient, evidence from which the judge could properly find that Mr. Bartlett and Mr. Laughton did not genuinely believe that the assets were worth £1·5 million subject to an independent valuation.

G  There was no challenge to Mr. Bartlett's explanation of the origin of the figure of £350,000 in the strategy document or in the origin of the pro forma balance sheet. There was no, or no sufficient, evidence to support the theory of a conspiracy to procure a persuadable accountant instead of a non-persuadable merchant banker to act as valuer and then to persuade the valuer to accept inflated values for the Smithamcote H  shares, the Smithamcote loan and the Abbott loan, which were not capable of being inflated. There is no evidence that Mr. Laughton did not genuinely believe in the values he put forward in his letter dated April 11, 1975. All the events which we have chronicled and all the con-

232
**Prudential Assurance v. Newman Industries (C.A.)**     [1982]

temporaneous written evidence go to show that Mr. Bartlett and Mr. Laughton were confident rather than crooked and that Mr. Laughton's disappointment when Mr. Cooper first put forward a net consideration of less than £350,000 was genuine. The theory that Mr. Laughton then over-persuaded Mr. Cooper over the telephone is not supported by any evidence and was contradicted by Mr. Cooper. The theory that Mr. Cooper was over-persuaded was then fortified by the theory that Mr. Cooper was not competent.

The third issue is whether Mr. Bartlett or Mr. Laughton made false representations to, or knowingly concealed facts from, Mr. Cooper which might influence his valuation.

There is no, or no sufficient, evidence of any false representations to, or deliberate concealment from, Mr. Cooper in relation to any matter other than the January agreements and the payments thereunder. Again the plaintiffs' theories are unsupported by the contemporaneous evidence. We have dealt fully with the facts and inferences which are relevant to the January agreements and to the payments thereunder.

It must now be accepted that the January agreements and the payments thereunder were dishonestly concealed from the board of Newman to the extent indicated. They were not disclosed to Mr. Cooper. They should have been disclosed to Mr. Cooper because by accepting and retaining £215,950 in advance under the January agreements T.P.G. was adhering to the prices specified in the January agreements. Thus Mr. Bartlett should have mentioned the January agreements in the body of the strategy document, should have mentioned the January agreements to the board and should have told Mr. Cooper the facts concerning the January agreements and the payments. The January agreements and the payments should have been disclosed also because Mr. Laughton, who had agreed on behalf of T.P.G. to sell 800,000 Dover shares for £146,000 and to sell the Metropole shares for £85,000, had written to Mr. Cooper on April 11, 1975, saying that 832,000 Dover shares were worth £240,000 and that the Metropole shares were worth £350,000. The last payment of the instalments of the aggregate sum of £215,950 was made after Mr. Cooper had been instructed. Mr. Laughton should have told Mr. Cooper that £215,950 had been paid in advance when he was putting forward his arguments that £75,000 should be included in Mr. Cooper's valuation under the heading of interest. When Mr. Cooper later found out about the payment of £215,950 he was allowed to believe that the payments had been made on account of the strategy document transaction. Then Mr. Bartlett lied about the origin and purpose of the payments in advance to the share-holders at the extraordinary general meeting. He did that in order to conceal the existence of the January agreements, but there was no point in concealing the January agreements unless they were thought to be relevant or possibly relevant to the strategy document proposals and to the value of the assets. If Mr. Bartlett had been truthful at the extra-ordinary general meeting then at the very least there would, or might, have been a demand for Mr. Cooper to reconsider his valuation in the light of the January agreements and the payments thereunder. When the circular was prepared Mr. Bartlett knew that the January agreements

233

A   were material because in evidence he said that the position was that if the strategy document proposals had not been accepted by the shareholders, then the January agreements would have been put forward. When the circular was prepared Mr. Bartlett and Mr. Laughton must have known that the statement that £216,000 was an advance payment for the strategy document transaction was at best a half-truth. They were originally payments on account of the January agreements and those payments had

B   never been formally ratified and continued as payments on account of the strategy document proposal. If the circular had been revised so as to disclose the January agreements and the payments, then Mr. Cooper, as a member of Deloittes considering and playing a prominent part in the production of the circular, would have had at least an opportunity to inquire about the January agreements and to reconsider his valuation in the light of those agreements.

C       The judge appears to have found that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper, because in his judgment Vinelott J. said:

        " Mr. Cooper was not told of the sale in January of the shares in Metropole to Newman at the price of £85,000. He agreed that if he had known of this sale he would have found it impossible to attribute

D       any value to the shares of Metropole except the agreed £85,000."

The judge made a similar comment about the Dover shares.

        It is unsatisfactory that because the statement of claim was directed wholly to the circular, Mr. Bartlett and Mr. Laughton were not directly accused, and the judge did not directly hold, that Mr. Bartlett and Mr.

E   Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper. But we consider that the dishonest concealment from the board and the shareholders (amply proved) necessarily involved dishonest concealment from Mr. Cooper, even if Mr. Bartlett and Mr. Laughton did not appreciate wholly or at all the significance to Mr. Cooper of the January agreements in connection with value. Mr. Bartlett's untrue statements to the shareholders at the extraordinary general

F   meeting and his acquiescence in misleading Mr. Cooper and in the form of the circular support the inference that from start to finish Mr. Bartlett and Mr. Laughton were dishonest in concealing the agreements from everybody concerned, namely, the board, Mr. Cooper and the shareholders. Although the statement of claim was directed in terms solely to the circular, Mr. Bartlett and Mr. Laughton must have appreciated, once the

G   statement of claim raised the issue of the January agreements, that they were accused of concealing the January agreements and the payments thereunder at all times from January 7, 1975, until completion of the sale in July 1975, including concealment from Mr. Cooper. Mr. Bartlett gave evidence to explain why the January agreements and the payments thereunder were not disclosed and that explanation was not accepted by

H   the judge.

        It is not possible to be certain whether and to what extent Mr. Cooper's valuation would have been affected by a disclosure of the January agreements and payments. It was only after some tendentious

Assurance v. Newman Industries (C.A.) [1982]

cross-e... Mr. Caplan and some forceful intervention by the judge ... was persuaded to reach the conclusion which the judge ... ached, and to make the remarks upon which the ju... A

Ne... k that Mr. Cooper must have been impressed, and ought ... pressed, by the fact that T.P.G. had accepted the prices ... January agreements as fair and reasonable values for the ...ropole shares, provided that the £215,950 was paid by inst...g in January. And £215,950 was paid in advance by Ne...ted by T.P.G. between January and April 1975. Had M... the facts he would have valued the Dover shares at £150...uary price of £146,000 for 800,000 Dover shares adjuste... at Mr. Cooper was valuing 832,000 shares. He would ... Metropole shares at £85,000, the January price, instead ...is would have reduced the net consideration by £45,000... £225,000 to £180,000. B

C

On ... damage caused to Newman by the dishonest conceal...uary agreements and the payments thereunder from M...45,000. The damages are not affected by the fact that Ne...ted the transaction from T.P.G. and have kept their win...eclaiming their stake. D

In th...sider that the evidence, the statement of claim and the...inelott J. establish Newman's entitlement to damages...concealment of the January agreements. That conceal...eeable loss to Newman of £45,000. Where such dishonest...ses foreseeable loss, a cause of action in fraud is establi...n the defendants did not deliberately intend to cause the...having been established, we do not consider that the...r of the pleadings requires this court to relieve Mr. Bart...hton from the consequences of that fraud. E

No an...evidence by Mr. Laughton or any other witness could ex...imitted fact that T.P.G. had accepted £215,950 as advan...under the January agreements, that Mr. Angus Murray a...new nothing of the January agreements or the payments...that Mr. Bartlett, with the acquiescence and knowledg...n, lied to the shareholders about the nature of the payme... F

The i...connection with the January agreements was clearly ra...dings, albeit that the express allegation was directed...The dishonest concealment of the January agreement...clearly established by the evidence. We have commente...the manner in which the whole action was clouded b...ad the presentation of the case, but we do not consider...enable Mr. Bartlett and Mr. Laughton to escape fr...nces of the one relevant fraud which was pleaded, pl...decided. G

We wi...ent in due course about costs in the court below and...P.G. may wish to ask this court to review the order f...hem made by the judge. We also wish to hear H

1 Ch.          Prudential Assurance v. Newman Industries ((

A  argument about the plaintiffs' costs and their possible
Newman's costs in the light of the plaintiffs' responsi
the personal action and thereby prevailing upon the
derivative action despite the protests of Newman. We
arguments as to whether the enormous costs incurred b
result of their own pleadings and presentation of the
visited upon Mr. Bartlett and Mr. Laughton. We

B  argument whether in the exceptional circumstances
Mr. Bartlett and Mr. Laughton are entitled to be reli
in respect of the costs, or part of the costs, which we
Bartlett and Mr. Laughton themselves in repelling
attacks which were made upon them, in a case in w
which alone founds our finding of damages was ne

C  We may have to consider whether it was practicable
to consider paying something into court, if they we
£450,000, but perhaps £45,000 or thereabouts—and
the risk of paying lawyers' costs due to one side or
million or more. At present we know nothing abo
lamentable litigation, and we wish to know about
on all sides as costs in the High Court and this c

D  parties to present those figures when we hear the a
on the date arranged for restoring the appeal in ord
of the court, and to decide upon the proper orders f
hear argument as to whether the £45,000 should be
benefited from the fraud, or by Mr. Bartlett and Mr.

We would add this. The plaintiffs have painted

E  Laughton as crooks, deliberately milking Newman of
for their own benefit. This very serious allegation, pe
in this court, has not been proved. Mr. Bartlett and
successfully established that that case was based on
standings. The plaintiffs have proved that in order t
battle in January, and to carry through a transaction
be advantageous to Newman, Mr. Bartlett and Mr.

F  Angus Murray in the dark about the January
advance payments made thereunder. Once embark
concealment they could not, or would not, make a
the matters they had concealed, and so were led into
ments—from Mr. Cooper and ultimately from the
foreseeable that as a consequence of the non-disclo
valuation would be too high, and though £45,000 is

G  in relation to £1·5 million, it is significant enough to
of minimal.

We are sorry that Mr. Laughton was not he
pronounce that all but one of the serious allegati
were not proved.

H  Before we rise we would say one thing. It is p
case in order to determine the form of the or
submissions of the parties about costs, and the da
arranged is October 2. It is difficult to predict ho

236

Prudential Assurance v. Newman Industries (C.A.)       [1982]

of the parties will be. There are five parties concerned and the submissions may be fairly long. Mr. Bartlett and Mr. Laughton in the court below evidently spent a small fortune on their own costs and we know nothing about their present financial position; but if it is practicable for them, they may think that there would be great advantage in their instructing their solicitors again to instruct counsel, who are already familiar with the case, in order to argue those questions of costs which Mr. Bartlett and Mr. Laughton wish to submit, and also to make any submissions which are appropriate on how the liability for the £45,000 should fall as between T.P.G., who enjoyed the cash consideration from the purchase, and the two personal defendants. Whether it will be practicable for Mr. Bartlett and Mr. Laughton to dig again into their pockets for the purpose of legal representation on the order for costs we do not know. As we have said, we do not know what the figures are. It may be that the figures altogether might run into, not five figures but six. So that if it is practicable for the two gentlemen we have mentioned to make a further investment—whether it would be properly described as commercial judgment or a gamble we know not—that might be to their advantage.

*Hearing adjourned.*

Solicitors: *C. F. Whitehorn; Macfarlanes.*

October 5. On the resumed hearing, counsel announced that the parties had agreed the terms of a settlement and by consent the following order was made.

> *Appeal allowed in part.*
> *Respondent's notice dismissed.*
> *Order of Vinelott J. varied to extent stated in judgment.*
> *Leave granted to fourth defendant to proceed with appeal from judgment of Vinelott J. in terms of amended notice of appeal.*
> *On basis that all parties had agreed terms of settlement on all matters (including any party's rights to damages, costs or any other relief) no further order made.*
> *All further proceedings stayed.*

Solicitors: *Simmons & Simmons; C. F. Whitehorn; Macfarlanes; Hopkins, Fuller.*

L. G. S.

Case: 11-126    Document: 63    Page: 393    04/25/2011    272927    401

A-5692

Butterworths Company Law Cases/BCLC 2004 2/Gardner v Parker - [2004] 2 BCLC 554

[2004] 2 BCLC 554

# Gardner v Parker

[2004] EWCA Civ 781

COURT OF APPEAL, CIVIL DIVISION

MANCE, NEUBERGER LJJ AND BODEY J

26, 27 MAY, 23 JUNE 2004

*Director - Breach of fiduciary duty - Breach of duty causing loss to both shareholder/creditor of company and to company - Whether shareholder/creditor debarred from recovering his loss by rule against recovery of reflective loss.*

The defendant owned 85% of the issued shares of a company (BDC), the remaining 15% being held by trusts created for the benefit of the claimant and his family. BDC's two largest assets were 9% of the issued share capital of a company (S Ltd) and a debt of £799,000 owed to BDC by S Ltd. The defendant, who was in substance the sole director of both BDC and S Ltd, owned the remaining 91% of S Ltd's issued shares. In December 1992 the defendant procured the transfer by S Ltd of an asset it owned to another company in which he had an interest. Subsequently, BDC went into liquidation and, by its liquidator, assigned to the claimant all BDC's rights of action in respect of shares, properties and other assets and the benefit of all other rights of action and choses in action. The claimant brought proceedings against the defendant claiming damages for breach of fiduciary duty alleging that the transfer by S Ltd had been at a substantial undervalue, that the defendant's purpose in procuring it was to extract from S Ltd its most valuable asset to the detriment of BDC or to cause damage to BDC and that as a result of the transfer S Ltd became insolvent and subsequently went into administrative receivership. He further alleged that as a consequence of the transfer BDC's assets were substantially reduced and its holding in S Ltd and the value of the loan due from S Ltd was reduced to nothing or a negligible amount. The judge determined as preliminary issues that the duties, facts and matters pleaded by the claimant in relation to the transfer were capable of amounting to a breach by the defendant of the pleaded fiduciary duties owed by him to BDC as its director but that the claimant was debarred from recovering the damages claimed, ie BDC's loss, under the no reflective loss principle, since the breach of duty also caused the company loss which it was entitled to recover from the defendant. The claimant appealed against the judge's finding that the rule against recovery of reflective loss defeated his claim contending (i) that the rule did not apply to a claim for breach of a fiduciary duty since the nature of the relief granted for such breach was equitable or proprietory in nature which was different in kind from the relief accorded in a common law claim, (ii) that, even if the rule would otherwise apply in the present case it had ceased to apply because, by his actions, in particular by joining in a settlement releasing him from any liability, the defendant had effectively disabled S Ltd from bringing

[2004] 2 BCLC 554  at  555

proceedings for recovery of its loss, as a result of which the shareholder, BDC, was entitled to do so, and (iii) that the rule did not apply to the present claim in so far as it related to the loss or irrecoverability of the loan since there was no reason to extend the rule to a claim by a person who sued as a creditor rather than a shareholder of a company in which he had a relatively small interest. The defendant contended that any loss suffered by BDC was loss that it suffered as a shareholder in, and creditor of, S Ltd, as a result of his alleged actions, and, while those actions would have been breaches of his duty to BDC, they would also have been breaches of his duty to S Ltd, and could properly found the basis of a claim against him by S Ltd and, accordingly, that the damages claimed by the claimant, ie BDC's loss, was reflective loss which BDC, and

therefore the claimant, could not recover as a matter of principle.

**Held** - (1) The rule against reflective loss was not concerned with barring causes of action as such but with barring recovery of certain types of loss and therefore whether the cause of action lay in common law or equity and whether the remedy lay in damages or restitution made no difference as to its applicability. Furthermore, since the foundation of the rule against reflective loss was the need to avoid double recovery, there was a powerful case for saying that it should be applied in a case where, in its absence, both the beneficiary and the company would be able to recover effectively the same damages from the defaulting trustee/director. Accordingly, the fact that a claim was brought for breach of fiduciary duty did not prevent the claim being barred by the application of the rule against reflective loss (see at [46], [49], [53], below); *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452, [2003] 1 BCLC 157 applied.

(2) Although the rule against reflective loss did not apply where the wrongdoer had disabled the company from pursuing its claim against him, the mere fact that the company chose not to claim against the defendant, or settled with him on comparatively generous terms, did not, without more, justify disapplying the rule. In the circumstances there was no evidence that S Ltd or the receivers had been pressurised to release the defendant from liability for any wrongdoing by the settlement or that S Ltd was prevented from pursuing him because of its impecuniosity or that such impecuniosity had been caused by any wrongdoing by him. Moreover, the mere fact that S Ltd was in administrative receivership did not of itself prevent that company from starting an action. Accordingly, the rule against reflective loss would not be disapplied as a result of the settlement (see at [55], [60]-[64], below); *Johnson v Gore Wood & Co (a firm)* [2001] 1 BCLC 313 and *Giles v Rhind* [2002] EWCA Civ 1428, [2003] 1 BCLC 1 applied.

(3) The rule against reflective loss was not limited to claims brought by a shareholder in his capacity as such but also applied to him in his capacity as an employee of the company with a right or even an expectation of receiving contributions to his pension fund. There was therefore no logical reason why it should not apply to a shareholder in his capacity as a creditor of the company expecting repayment of his debt. Accordingly the claim based on the loan was therefore barred by the rule against reflective loss. It followed that the appeal would be dismissed (see at [70], [71], [76], below); *Johnson v Gore Wood & Co (a firm)* [2001] 1 BCLC 313 applied.

*[2004] 2 BCLC 554  at  556*

Decision of Blackburne J [2003] EWHC 1463 (Ch), [2004] 1 BCLC 417 affirmed.

**Cases referred to in judgments**

*Christensen v Scott* [1996] 1 NZLR 273, NZ CA.

*Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189.

*Giles v Rhind* [2002] EWCA Civ 1428, [2003] 1 BCLC 1, [2002] 4 All ER 977, [2003] Ch 618, [2003] 2 WLR 237, CA; *rvsg* [2001] 2 BCLC 582.

*Humberclyde Finance Group Ltd v Hicks* [2001] All ER (D) 202 (Nov).

*Johnson v Gore Wood & Co (a firm)* [2001] 1 BCLC 313, [2001] 1 All ER 481, [2002] 2 AC 1, [2001] 2 WLR 72, HL; *rvsg in part* [1999] Lloyd's Rep PN 91, CA.

*Lucking's Will Trusts, Re, Remwick v Lucking* [1967] 3 All ER 726, [1968] 1 WLR 866.

*Medforth v Blake* [1999] 3 All ER 97, [2000] Ch 86, [1999] 3 WLR 922, CA.

*Prudential Assurance Co Ltd v Newman Industries Ltd* (*No 2*) [1982] 1 All ER 354, [1982] Ch 204, [1982] 2 WLR 31, CA.

*Shaker v Al-Bedrawi* [2002] EWCA Civ 1452, [2003] 1 BCLC 157, [2002] 4 All ER 835, [2003] Ch 350, [2003] 2 WLR 922, Ch D and CA.

*Walker v Stones* [2000] 4 All ER 412, [2001] QB 902, [2001] 2 WLR 623, CA; leave to appeal given 11 June 2001, [2001] 1 WLR 1341, HL.

### Appeal

The claimant, Rodney Mark Gardner, appealed from the judgment of Blackburne J ([2003] EWHC 1463 (Ch), [2004] 1 BCLC 417) given on 26 June 2003 dismissing his claims against the defendant, Alan Parker, for damages for breach of fiduciary duty on the ground that his claims were barred by the no reflective loss principle. The facts are set out in the judgment of Neuberger LJ.

*Alan Steinfeld QC* and *Stuart Adair* (instructed by *Willan Bootland*, Manchester) for the claimant.

*Peter Crampin QC* and *Ulick Staunton* (instructed by *Eversheds*, Leeds) for the defendant.

*Cur adv vult*

23 June 2004. The following judgments were delivered.

### NEUBERGER LJ

(delivering the first judgment at the invitation of Mance LJ).

[1] This appeal raises, not for the first time, the ambit and limits of the rule against reflective loss discussed in *Johnson v Gore Wood & Co* (*a firm*) [2001] 1 BCLC 313, [2002] 2 AC 1. In other words, it is concerned with the extent to which a shareholder or creditor of a company who has suffered loss, as the result of a breach of duties owed both to him and the company by a defendant, is none the less debarred from recovering that loss, because the breach of duty also caused the company loss, which it is or was entitled to recover from the defendant.

*[2004] 2 BCLC 554 at 557*

### The facts

[2] The present proceedings were begun on 18 August 1998 by Mr Rodney Gardner against Mr Alan Parker. The re-amended statement of claim contains the following allegations of fact.

[3] Mr Parker owned 85% of the issued share capital of a company called Barclays Development Corp plc (BDC). The remaining 15% of the issued shares in BDC were owned by trusts created for the benefit of Mr Gardner and his family.

[4] BDC's two largest assets were: (i) 9% of the issued share capital of a company called Scoutvale Ltd (Scoutvale); (ii) a debt of £799,000 owed to BDC by Scoutvale (the loan). The remaining 91% of the issued shares in Scoutvale were owned by Mr Parker who was, in substance, the sole director of both BDC and Scoutvale.

[5] On or about 8 December 1992, Mr Parker procured the transfer by Scoutvale of an asset it owned, namely 80% of the issued share capital of a company called Old Hall Estates Ltd (the Old Hall shares) to Bweralley Ltd (Bweralley), a company in which Mr Parker had an interest. In this transfer (the transfer) the consideration for the transfer of the Old Hall shares was stated to be £400,000, the payment of which was deferred. The audited accounts of Scoutvale for the financial year ending 30 April 1991 placed a value on those shares of approximately £5m.

[6] On 10 August 1998, BDC, acting by its liquidator, assigned to Mr Gardner all BDC's rights of action in respect of shares, properties and other assets and the benefit of all other rights of action and choses in action. Mr Gardner's claim is accordingly based on this assignment, and he is seeking to recover damages to which, on his case, BDC is entitled to recover from Mr Parker.

[7] In para 7 of the re-amended statement of claim, it is alleged that, as a director of that company, Mr Parker 'owed fiduciary duties to act at all times in good faith in the interests of and for the proper purposes of [BDC] and not to allow his own interests to conflict with those of [BDC]'. In para 10, it is contended that Mr Parker 'procured the sale by Scoutvale of its 80% shareholding in Old Hall [Estates Ltd] to Bweralley Limited, a company controlled by Mr Parker at a substantial undervalue'.

[8] In para 11 of the re-amended statement of claim it is alleged that Mr Parker's purpose in that connection was 'to extract from Scoutvale its single most valuable asset to the detriment of [BDC]', or 'to cause damage to [BDC]'. Paragraph 13 contains the allegation that 'as a consequence of the Transfer, Scoutvale became insolvent and subsequently went into administrative receivership'.

[9] The damage which BDC is said to have suffered as a result of this is set out in para 14 of the re-amended statement of claim in these terms:

> 'Further, as a consequence of the transfer [BDC's] assets were substantially reduced: (i) [BDC's] 9% shareholding in Scoutvale was reduced in value from £450,000 to nothing, or a nominal value; (ii) the value of [the Loan] due from Scoutvale was reduced to nothing, or a negligible amount.'

[10] Paragraph 15 alleges that, in procuring the transfer, Mr Parker acted in breach of fiduciary duty, and that 'he acted deliberately in furtherance of his own interests at the expense of [BDC] and its assets'. Paragraph 16

*[2004] 2 BCLC 554  at  558*

quantifies the loss at £1.249m. In the prayer for relief, Mr Gardner claims from Mr Parker 'damages or compensation for breach of fiduciary duty', and he seeks orders that Mr Parker pays £1.249m together with interest and costs.

[11] In his defence Mr Parker, while admitting the existence and terms of the transfer and the insolvency of Scoutvale, denies most of the other allegations in para 10 and following of the re-amended statement of claim. In particular, he denies that the transfer involved the Old Hall shares being sold at an undervalue and he further denies that Mr Gardner has suffered any loss or damage.

[12] The case proceeded to trial in the normal way, with disclosure, inspection, exchange of witness statements, and preparation of bundles - ten in all. A quick perusal of the evidence suggests that there would have been a substantial conflict between the parties as to many of the issues raised in the re-amended statement of claim.

[13] Before turning to what happened at trial, it is appropriate to refer to one aspect of that evidence, to which relatively little reference was made in the pleadings, but which was referred to in argument, and in the judgment below.

[14] At all material times, Westpac Banking Corp plc (Westpac) was a creditor of Scoutvale (and, indeed, of BDC). In that capacity, Westpac had been granted a fixed and floating charge over all Scoutvale's assets by a mortgage debenture dated 7 July 1989.

[15] On 5 August 1993, Westpac appointed administrative receivers (receivers) over Scoutvale's property. On 19 May 1994 Westpac commenced proceedings against Bweralley under s 423 of the Insolvency Act 1986, alleging that the transfer was a transaction at an undervalue entered into for the purpose of putting assets, namely the Old Hall shares, beyond the reach of Westpac. By those proceedings (the s 423 proceedings) Westpac sought the return of the Old Hall shares to Scoutvale. By virtue of s 424(2) of the 1986 Act, those proceedings were deemed to have been brought on behalf of all 'victims' of the transaction, which would, in principle, have included BDC at least in its capacity as a creditor of Scoutvale pursuant to the loan.

[16] The s 423 proceedings were compromised by a settlement dated 2 March 1995 (the 1995 settlement) to which Westpac, Scoutvale acting by the receivers, Mr Parker and his wife, Old Hall Estates Ltd, Bweralley and N M Rothschild & Sons Ltd ('Rothschilds', to whom the Old Hall shares may have been charged by Bweralley as security) were parties. By the 1995 settlement, a payment of £350,000 was to be made to Westpac, Westpac agreed to discontinue the s 423 proceedings, and Mr Parker was released from all claims which Westpac or Scoutvale might have might have against him:

> '... save that nothing in this agreement shall operate to release [inter alia, Mr Parker] from claims that vest solely in the liquidators of Scoutvale and the Receiver's having no authority in that regard.'

Following payment of the £350,000 to Westpac, the s 423 proceedings were discontinued on the agreed terms on 9 May 1995.

[17] Shortly before the present claim was due to come on for hearing, it appears that counsel for the parties agreed to invite the court, at the beginning of the trial, to determine two preliminary issues. This was

*[2004] 2 BCLC 554  at 559*

presumably on the basis that, if either issue was resolved in Mr Parker's favour, the claim would be dismissed.

[18] The two preliminary issues were:

> '(1) whether the duties, facts and matters pleaded by Mr Gardner in relation to the Transfer are capable of amounting to a breach by Mr Parker of the pleaded fiduciary duties owed by him to BDC as its director; [and] (2) whether on Mr Gardner's pleaded case, assuming that the Transfer was in breach of the fiduciary duties owed by Mr Parker to both BDC and Scoutvale, the losses identified in paragraphs 14 and 16 of the reamended statement of claim are recoverable by Mr Gardner.'

[19] Those two issues were argued before Blackburne J when the case came on for hearing on 10 June 2003. In his reserved judgment dated 26 June 2003 (see [2003] EWHC 1463 (Ch), [2004] 1 BCLC 417), the judge found in favour of Mr Gardner on the first issue. He said that Mr Parker 'was as much in a position of conflict as a director of BDC (as between his duty to that company and his personal interests through Bweralley as the proposed transferee of the shares) as he was as a director of Scoutvale' if he had permitted the transfer to be effected at a substantial undervalue. Mr Parker does not seek to challenge that decision, to my mind rightly.

[20] The judge went on to find in favour of Mr Parker on the second issue, holding that 'Mr Gardner's claims are barred by the no reflective loss principle'. It is against that decision that Mr Gardner now appeals.

[21] Mr Parker's basic contention is that any loss suffered by BDC was loss that it suffered as a shareholder in, and creditor of, Scoutvale, as a result of his alleged actions and, while those actions would have been breaches of his duty to BDC, they would also have been breaches of his duty to Scoutvale, and could properly found the basis of a claim against him by Scoutvale. Accordingly, runs Mr Parker's argument, the damages claimed by Mr Gardner, ie BDC's loss, is reflective loss which BDC, and therefore Mr Gardner, cannot recover as a matter of principle. In other words, he relies on what may be characterised as the rule against reflective loss, which, he contends, serves to defeat Mr Gardner's claim.

[22] As I have mentioned, the judge accepted that proposition and therefore dismissed Mr Gardner's claim. In a full and careful judgment, he referred to, and quoted fairly extensively from, speeches in *Johnson's* case, and judgments in the two most relevant subsequent decisions of this court, namely *Giles v Rhind* [2002] EWCA Civ 1428, [2003] 1 BCLC 1, [2003] Ch 618 and *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452, [2003] 1 BCLC 157, [2003] Ch 350.

**The rule against reflective loss**

[23] The rule against reflective loss originates, at least judicially, in the judgment of the Court of Appeal in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354, [1982] Ch 204. That was a case concerned with the right of a shareholder in a company to bring proceedings against a defendant who had caused harm to the company, which, in turn, had led to damage to the shareholder through the medium of his shares having a reduced or nil value. The Court of Appeal referred to

[2004] 2 BCLC 554  at  560

the uncontroversial proposition that the mere fact that the company had a cause of action against the defendant did not mean that the shareholder had a cause of action against the defendant. As the court said ([1982] 1 All ER 354 at 357, [1982] Ch 204 at 210):

> 'This is sometimes referred to as the rule in *Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence.'

[24] The Court of Appeal then turned to the more controversial question of the rights of a shareholder where the defendant is in breach of duty not only to the company, but also the shareholder. The Court of Appeal said ([1982] 1 All ER 354 at 366, [1982] Ch 204 at 222-223):

> '[A shareholder] cannot ... recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3% shareholding.'

[25] This principle, which I have called the rule against reflective loss, was considered in a number of subsequent cases at first instance and in the Court of Appeal, and was authoritatively discussed by the House of Lords in *Johnson's* case. In that case, Mr Johnson, who owned virtually all the shares in a company, sought to recover damages from solicitors who had, he claimed, caused damage to both him and the company in breach of their duty owed, separately, to him and the company. The company had issued proceedings against the solicitors, and those proceedings were settled. Mr Johnson then brought proceedings against the solicitors. One of the preliminary issues in those latter proceedings was the extent to which his claims were barred by the rule against reflective loss.

[26] The speeches of Lord Bingham of Cornhill and Lord Millett in *Johnson's* case have been so extensively quoted in a number of reported (and unreported) cases that it is unnecessary to set them out again in full. The kernel of the reasoning of those two speeches are to be found per Lord Bingham ([2001] 1 BCLC 313 at 337-338, [2002] 2 AC 1 at 35-36) and per Lord Millett ([2001] 1 BCLC 313 at 365, 368-369, [2002] 2 AC 1 at 61-62, 65-66), from which extensive passages were quoted, for instance, in the judgment of Waller LJ in *Giles v Rhind* [2003] 1 BCLC 1 at [23]-[26], [2003] Ch 618 at [23]-[26].

[27] In light of the arguments which have been addressed in this case, I should, however, refer to a few short extracts from those speeches. Lord Bingham said ([2001] 1 BCLC 313 at 337, [2002] 2 AC 1 at 35):

> 'A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss.'

[28] He said ([2001] 1 BCLC 313 at 338, [2002] 2 AC 1 at 36):

*[2004] 2 BCLC 554  at  561*

> 'On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be as astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation.'

[29] In his speech ([2001] 1 BCLC 313 at 365-366, [2002] 2 AC 1 at 62), Lord Millett turned to:

> 'The position is ... different where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder. In such a case the shareholder's loss, in so far as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action. If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved.'

[30] Later, Lord Millett said ([2001] 1 BCLC 313 at 369, [2002] 2 AC 1 at 66):

> '[I]f the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing. By parity of reasoning, the same applies if the company settles for less than it might have done. Shareholders (and creditors) who are aggrieved by the liquidator's proposals are not without a remedy; they can have recourse to the Companies Court, or sue the liquidator for negligence.'

He then continued in the following terms ([2001] 1 BCLC 313 at 370, [2002] 2 AC 1 at 66):

> 'But there is more to it than causation. The disallowance of the shareholder's claim in respect of reflective loss is driven by policy considerations. In my opinion, these preclude the shareholder from going behind the settlement of the company's claim. If he were allowed to do so then, if the company's action were brought by its directors, they would be placed in a position where their interest conflicted with their duty; while if it were brought by the liquidator, it would make it difficult for him to settle the action and would effectively take the conduct of the litigation out of his hands.'

[31] I cite three further short passages in the speech of Lord Millett. First, he said ([2001] 1 BCLC 313 at 370, [2002] 2 AC 1 at 66):

> 'Reflective loss extends beyond the diminution of the value of the shares; it extends to the loss of dividends ... and all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds.'

He added ([2001] 1 BCLC 313 at 370, [2002] 2 AC 1 at 67):

*[2004] 2 BCLC 554  at  562*

> 'The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim.'

[32] Finally, Lord Millett turned to the claim by the shareholder in that case for pension contributions which would have been made by the company if it had been in funds. He said ([2001] 1 BCLC 313 at 371, [2002] 2 AC 1 at 67):

> 'For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason.'

[33] I think that the effect of the speeches in *Johnson*'s case can be taken as accurately summarised by Blackburne J at first instance in *Giles v Rhind* [2001] 2 BCLC 582 at [27], subject to the qualifications expressed in the judgment of Chadwick LJ in the Court of Appeal (see [2003] 1 BCLC 1 at [61] and [62],

[2003] Ch 618 at [61] and [62]). As amended by those two qualifications, it seems to me that Blackburne J's formulation was approved by this court (Keene LJ having agreed with Chadwick LJ) in the following terms, so far as relevant:

> '(1) a loss claimed by a shareholder which is merely reflective of a loss suffered by the company - ie a loss which would be made good if the company had enforced in full its rights against the defendant wrongdoer - is not recoverable by the shareholder [*save in a case where, by reason of the wrong done to it, the company is unable to pursue its claim against the wrongdoer*]; (2) where there is no reasonable doubt that that is the case, the court can properly act, in advance of trial, to strike out the offending heads of claim; (3) the irrecoverable loss (being merely reflective of the company's loss) is not confined to the individual claimant's loss of dividends on his shares or diminution in the value of his shareholding in the company but extends ... to "all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds" and also ... "to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder" [*save that this does not apply to the loss of future benefits to which the claimant had an expectation but no contractual entitlement*]; (4) the principle is not rooted simply in the avoidance of double recovery in fact; it extends to heads of loss which the company could have claimed but has chosen not to and therefore includes the case where the company has settled for less than it might ...; (5) provided the loss claimed by the shareholder is merely reflective of the company's loss and provided the defendant wrongdoer owed duties both to the company and to the shareholder, it is irrelevant that the duties so owed may be different in content.' (Emphasis added.)

(The italicised text is taken from the judgment of Chadwick LJ ([2003] 1 BCLC 1 at [61] and [62], [2003] Ch 618 at [61] and [62].)

*[2004] 2 BCLC 554  at  563*

**The issues**

[34] In light of the first, and unchallenged, finding of Blackburne J, the threshold requirement for the engagement of the rule against reflective loss is satisfied, namely that the defendant, Mr Parker, owed separate duties to the company, Scoutvale, and to the shareholder, BDC. In each case, the defendant's liability arose from the fact that he was a director, but the source of each liability was different, in that his liability to the shareholder was attributable to the fact that he was a director of the shareholder, whereas his liability to the company was attributable to the fact that he was a director of the company.

[35] On analysis, the present case appears to contain the two essential ingredients which result in the rule against reflective loss being engaged, namely: (i) the losses claimed to have been suffered by BDC are losses suffered in its capacity as shareholder in, or creditor of, Scoutvale: that is made as clear as could be in para 14 of the re-amended statement of claim; (ii) the damages claimed in these proceedings against Mr Parker, being based on the losses suffered by BDC as a result of the transfer of the Old Hall shares at a substantial undervalue, are damages which would have been made good if Scoutvale 'had enforced its rights against' Mr Parker. The fact that BDC only had a proportion of the issued shares in Scoutvale, and the fact that one may not be able to 'trace' Scoutvale's loss to the shareholders, without effecting some sort of adjustment, cannot make any difference. If it were otherwise, then the reflective loss principle would in practice rarely apply.

[36] On behalf of Mr Gardner, Mr Alan Steinfeld QC, who appears with Mr Stuart Adair, contends that there are none the less two reasons why the rule against reflective loss does not apply to the claim for loss of value in BDC's shares in Scoutvale or to the claim for the loss, or irrecoverability, of the loan. First, he contends that the rule against reflective loss has no application in a case where, as here, the shareholder is seeking to recover from the defendant by virtue of breach of a fiduciary duty towards the shareholder, independent of the defendant's duty to the company concerned. Secondly, he contends that the exception to the rule, as established in *Giles v Rhind*, either applies, or ought to be extended so as to apply, to the present claim. This second contention is advanced on the basis that, by his actions, in particular by joining in the 1995 settlement, Mr Parker effectively disabled Scoutvale from bringing proceedings for recovery of its loss, as a result of which the shareholder, BDC, is entitled to do so. I shall consider those two contentions in turn. I shall then turn to Mr Steinfeld's third contention, which is that the rule against reflective loss does not apply to the present claim in so far as it relates to the loss or irrecoverability of the loan.

**The first contention: the rule against reflective loss does not apply to a claim for breach of fiduciary**

**duty**

[37] The first contention raised on behalf of Mr Gardner is that because the duty owed by Mr Parker to BDC, and allegedly breached by Mr Parker, was fiduciary in nature the rule against reflective loss has no application. Mr Steinfeld justifies that contention, so far as principle is concerned, at least in part by relying on the fact that the nature of the relief granted for breach of a fiduciary duty is equitable or proprietary in nature, which is

*[2004] 2 BCLC 554  at  564*

different in kind from the relief accorded in a common law claim, for breach of contract or tort, such as that contemplated in the *Prudential* and *Johnson* cases.

[38] Mr Steinfeld reinforces his argument by pointing out the curious practical results if the rule against reflective loss applied in such a case. He puts forward the example of three trustees of a settlement which owned shares in a company of which one of the trustees was a director. If that trustee conducted the affairs of the company in breach of his duty to the beneficiary under the settlement and in breach of his duty as director to the company, it could lead to a curious result, so far as his fellow trustees were concerned, if he could avoid liability to the beneficiary on the basis of the rule against reflective loss. He, as the person principally responsible for the damage to the value of the settlement, could avoid liability to the beneficiary by invoking the rule against reflective loss, whereas his co-trustees, who may have been relatively innocent of any wrongdoing, could not avoid such liability, because, as they were not directors of the company, there would be no question of their being able to invoke the rule against reflective loss.

[39] In my view, the contention that a claim, which would otherwise be defeated by the rule against reflective loss, is not so defeated because it is brought for breach of fiduciary duty must be rejected. That contention was considered and rejected by this court in *Shaker v Al-Bedrawi* [2003] 1 BCLC 157, [2003] Ch 350. In that case, the claimant contended that a substantial number of shares in a company were held on trust for him by the company's sole director. The claimant brought proceedings against the director in respect of a large sum of money which, the claimant contended, represented part of the proceeds of sale of the company's assets, which had been misappropriated by the director and wrongly distributed. At first instance, the judge dismissed the claim on the basis of a preliminary point which he decided in favour of the defendant director, namely that even if the claimant otherwise established his case, his claim was barred by the rule against reflective loss.

[40] The Court of Appeal allowed the claimant's appeal (which was argued on a different footing) on the basis that, without a full trial, it could not be clearly established that the company was in fact entitled to recover the sums claimed by the claimant. The uncertainty principally arose because the company was subject not to English, but to Pennsylvanian, law: see the judgment of the court given by Peter Gibson LJ ([2003] 1 BCLC 157 at [60]-[72] and [84]-[86], [2003] Ch 350 at [60]-[72] and [84]-[86]). Accordingly, as it was unclear that the company had a claim for any loss suffered as a result of the action of the trustee/director, it could not be determined that the rule against reflective loss applied.

[41] While allowing the claimant's appeal on this ground, the Court of Appeal, in their judgment, also considered another argument raised on behalf of the claimant. Peter Gibson LJ said ([2003] 1 BCLC 157 at [73], [2003] Ch 350 at [73]):

> 'The question which therefore arises is whether the [rule against reflective loss] also applies in circumstances where a beneficiary with an equitable interest in a company's shares which are held in trust by a trustee sues the trustee for an account of the profit taken by the trustee,

*[2004] 2 BCLC 554  at  565*

> that profit being moneys in respect of which the company may have a prior claim against the trustee in his capacity as a director of the company for breach of fiduciary duty.'

[42] The Court of Appeal answered that question, where Peter Gibson LJ said ([2003] 1 BCLC 157 at [81] and [83], [2003] Ch 350 at [81] and [83]):