# 11-0126-cv

# United States Court of Appeals

*for the*

# Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 20 of 65 (Pages A-5701 to A-6000)

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Summons and Complaint, dated December 11, 2009    A-39

Declaration of Adrian Briggs, for Defendants, in
Support of Motion to Dismiss, dated January 20,
2010, with attached *Curriculum Vitae* ..................    A-89

Declaration of Strauss, for Plaintiffs, in Opposition
to Defendants' Motion, dated February 2010,
with attached *Curriculum Vitae* ............................    A-106

Second Declaration of Adrian Briggs, for
Defendants, in Support of Motion to Dismiss,
dated February 11, 2010 .........................................    A-137

Defendants' Answer to Plaintiff's Complaint, dated
April 7, 2010 .........................................................    A-149

Notice of Motion for Summary Judgment, by
Defendants, dated August 13, 2010 ......................    A-171

Defendants' Local Rule 56.1 Statement of
Undisputed Facts in Support of Motion for
Summary Judgment, dated August 13, 2010 ........    A-173

Declaration of Gary R. Carney, in Support of
Defendants' Motion for Summary Judgment,
dated August 13, 2010 ............................................    A-199

Exhibit 1 to Carney Declaration -
Terra Firma Private Placement Memorandum,
dated April 2006 ....................................................    A-217

Exhibit 2 to Carney Declaration -
Terra Firma Capital Partners II Q3 2007 report,
dated November 2007............................................    A-318

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006................................................ A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006................................................ A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006................................................ A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007........................................................ A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings................................ A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007........................................................ A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010.... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007........................................................ A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ........................... A-404

iii

**Page**

Exhibit 13 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachments........................... A-415

Exhibit 14 to Carney Declaration -
E-mail from Ashcroft to Wormsley *et al.*, dated
April 23, 2007, with attachment ........................... A-427

Exhibit 15 to Carney Declaration -
EMI News Release, dated May 4, 2007 ................ A-437

Exhibit 16 to Carney Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007........................................................ A-439

Exhibit 17 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
February 5, 2007................................................... A-441

Exhibit 18 to Carney Declaration -
Memorandum from Seymour to Punja, dated
March 2, 2007....................................................... A-457

Exhibit 19 to Carney Declaration -
E-mail from Reid to Seymour, dated
May 16, 2007........................................................ A-462

Exhibit 20 to Carney Declaration -
Music Industry Key Market Outlook Summary of
Findings prepared by L.E.K. Consulting, dated
May 15, 2007........................................................ A-656

Exhibit 21 to Carney Declaration -
Project Dice Limited Scope Financial Due
Diligence Report, dated May 17, 2007.................. A-783

Exhibit 22 to Carney Declaration -
Project Mulberry Limited Scope Financial Due
Diligence Report, Volume I, dated May 4, 2007 ... A-887

iv

                                                                    **Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments ............................ A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 .................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007 ................................................... A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 ..................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007 .................. A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 .................. A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments .................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment ....................................................... A-995

v

Page

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007    A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007......................................................    A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007........................................................    A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007......................................................    A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007........................................................    A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007......................................................    A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007........................................................    A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007........................................................    A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 ..............................    A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ...................................    A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 . A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments ................................... A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007 ....................................................... A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 .............................. A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007 ....................................................... A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ....................................................... A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ....................................................... A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007 ....................................................... A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 ................................... A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007 ....................................................... A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007........................................................ A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007........................................................ A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007........................................................ A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007........................................................ A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ............................................. A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007........................................................ A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007........................................................ A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007........................................................ A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment.................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007.....   A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007.......................................................   A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007.......................................................   A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007.......................................................   A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007.......................................................   A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007.......................................................   A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007.......................................................   A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007.......................................................   A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007.......................................................   A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007.................................    A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007........................................................    A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007........................................................    A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007.....................    A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007.....................    A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007........................................................    A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc......................................................    A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007 ..............................................    A-1554

x

**Page**

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ....................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................. A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................. A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 ....................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ..................................... A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................ A-1590

xi

**Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma .................................................................... A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ................ A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007 .................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ................ A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ........................................................ A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ........................................................ A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ......................... A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 ................................................ A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008 .................................................... A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008.....................................................    A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008.......................................................    A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009....................................................    A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009....................................................    A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008.........................................................    A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008.........................................................    A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart...........................    A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update.......................    A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 ....................................    A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008.........................................................    A-2301

**xiii**

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ......    A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ................    A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009 .............................    A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 .........................................................    A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 ................................................    A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 .....................................................    A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ......................................................    A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 ...............................................    A-2479

xiv

**Page**

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009 ............................ A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ............................................ A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 ......................... A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 ......................................... A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009 ................... A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 .............................................. A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes ................... A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007 .................... A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 ...................................................... A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 ................................ A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 .................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................ A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 .................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code............................ A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-2602

Mark Nimrod Barak, dated July 15, 2010 ................ A-2611

Jason Bazinet, dated June 30, 2010 ......................... A-2617

Peter Edward Bell, dated June 22, 2010 ................... A-2631

Simon A. Borrows, dated June 25, 2010................... A-2702

Andre Bourbonnais, dated July 13, 2010.................. A-2779

Andrew Chadd, dated July 23, 2010
    (Reproduced herein at pp. CA-1-CA-53)

xvi

**Page**

Ricardo Hacelas Coats, dated June 23, 2010 ............. A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010.................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010.................. A-2959

Elio Leoni-Sceti, dated June 25, 2010 ...................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010......................... A-3027

Eric Nicoli, dated July 5, 2010 ................................. A-3039

Timothy Pryce, dated July 22, 2010 ......................... A-3087

Riaz Punja, dated July 28, 2010................................ A-3130

Michael Slattery, dated August 6, 2010 ................... A-3169

Martin David Stewart, dated July 7 and 8, 2010........ A-3177

Iain Stokes, dated August 6, 2010............................ A-3183

Kamal Fouad Tabet, dated July 29, 2010.................. A-3238

Francois Van der Spuy, dated July 7, 2010 ............... A-3242

Julie Williamson, dated July 28, 2010 ...................... A-3267

Alexander Wolf, dated July 14, 2010........................ A-3280

David Wormsley, dated July 20, 2010 ...................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated
  July 30, 2010............................................................ A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ................ A-3340

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006]
    EWCA Civ 1601 .................................................... A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007]
    EWHC 1151 (Comm) ............................................ A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal*
    *Bank of Scotland Plc* [2010] EWHC 1392
    (Comm)................................................................ A-3493

*BSkyB Ltd v Sky Subscribers Services Limited*
    [2010] EWHC 86 ................................................ A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus*
    *Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006]
    EWHC 2887 (QB) (Comm), [2007] EWCA Civ
    811 .................................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................ A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ..................... A-4240

*Bradford Building Society v Borders* [1941] 2 All
    ER 205 ............................................................... A-4258

*Downs v Chappell* [1997] 1 WLR 426 ..................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009]
    EWCA Civ 169 .................................................. A-4325

**xviii**

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All ER 583 .......................................... A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER (Comm) 573 ........................................ A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd* [2007] EWHC 2541 (QB).................................... A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465 ......................................... A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 ............................................ A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson & Co* [1991] 2 QB 113............................... A-4671

*Bankers Trust International v Dharmala Sakti Sejahtera* [1996] CLC 518..................................... A-4688

*Valse Holdings SA v Merrill Lynch International Bank Ltd* [2004] EWHC 2471 ........................... A-4741

*Peekay Intermark v Australia and New Zealand Banking Group* [2006] EWCA Civ 386................. A-4779

*JP Morgan Chase Bank v Springwell Navigation Corp* [2008] EWHC 1186 (Comm) ...................... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland Plc* [2010] EWHC 211 (Comm) ........................... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* [2008] EWHC 1686 (Comm), [2009] 1 All ER (Comm) 16, [2009] EWCA Civ 290 ....................................................... A-5126

xix

**Page**

*IFE Fund SA v Goldman Sachs International* 1 [2007] Lloyd's Rep 264 .......................... A-5184

*William Sindall plc v Cambridgeshire County Council* [1994] 1 WLR 1016 ................................ A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 .......................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co* [1892] AC 25 ........................................ A-5325

*Allen v Flood* [1898] AC 1 ........................................ A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019 (Ch) ................................................. A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries Ltd* (No. 2) [1982] Ch 204 ................................... A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ................ A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25 ........................................................ A-5708

*Smith New Court Securities v Citibank NA* [1997] AC 254................................................. A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142 and 6-158 ................................................ A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs 8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

**Page**

*McGregor on Damages*, 17th Edition, paragraph 1-021 ........................................................ A-5774

*Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 ........................................... A-5777

*Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 .............. A-5780

*The Unfair Contract Terms Act 1977* ........................ A-5783

Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 ........................................... A-5807

Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 ......... A-5883

    Exhibit A to Randell Declaration - Handwritten Notes ................................................ A-5887

Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 ........................ A-5891

    Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 ................................................... A-5894

    Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 ................................................... A-6101

    Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 ................................................... A-6280

xxi

Page

Declaration of Christopher E. Duffy in Opposition
   to Defendants' Motion for Summary Judgment,
   dated September 2, 2010 ....................................... A-6447

Exhibit 1 to Duffy Declaration -
Amended and Restated Advisory Agreement
relating to Terra Firma Investments (GP) 2
Limited and Terra Firma Capital Partners
Limited, dated October 9, 2003 ............................ A-6471

Exhibit 2 to Duffy Declaration -
Advisory Agreement relating to Terra Firma
Capital Partners III, L.P., dated February 8, 2006 . A-6493

Exhibit 3 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 20, 2007 .. A-6512

Exhibit 4 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Directors' meeting, dated May 20, 2007 .. A-6515

Exhibit 5 to Duffy Declaration -
E-mail from Rowland to Laskowski and Crocker,
dated September 18, 2008, with attachment .......... A-6517

Exhibit 6 to Duffy Declaration -
E-mail from Smith to Small, dated May 21, 2007 . A-6521

Exhibit 7 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 7, 2006 ................................................ A-6523

Exhibit 8 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
September 19, 2007 ................................................ A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 ................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ............................................... A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006................................................ A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007........................................................ A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 ................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et
al.*, dated November 16, 2007................................ A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 ............... A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007........................................................ A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007................................. A-6571

xxiii

**Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...  A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006.......................................  A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 ...............................................  A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment...........................................  A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 ...............................................  A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 ......................................  A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 ........................................................  A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 ..............................................  A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................  A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................  A-6640

**xxiv**

                                                                  **Page**

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 .............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007...................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007...................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................. A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ........................... A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 ............................. A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 ........................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ........................................................ A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ........................................................ A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 ........................................................ A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 ...................................................... A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 ...................................................... A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 ...................................................... A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 .............................................. A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 .............................................. A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 ...................................................... A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 ...................................................... A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 ...................................................... A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ............................ A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 ................................... A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 .................................................... A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 .............................................. A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment ........................................... A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 .................................................... A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 .................................................... A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 ............................................. A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 .................................................... A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ................................ A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ......................................................... A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ......................................................... A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007........................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 ............................................... A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 ............................................... A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment.............................................. A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007  A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007  A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ....................................................... A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ....................................................... A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment............................................. A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007.................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" .................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ....................................................... A-6835

**xxx**

|  | **Page** |
|---|---|
| Exhibit 87 to Duffy Declaration - E-mail from Simonian to Smith, dated May 21, 2007 ........................................................ | A-6837 |
| Exhibit 88 to Duffy Declaration - E-mail from Wormsley to Lindsay, dated September 17, 2007 ................................................. | A-6838 |
| Exhibit 89 to Duffy Declaration - Memorandum from Simpkin *et al.* to Klein *et al.*, dated November 16, 2007 (Reproduced at pp. CA-67-CA-76) | |
| Exhibit 90 to Duffy Declaration - E-mail from Borrows to Nicoli, Gildersleeve and Parker, dated July 31, 2007.................................... | A-6843 |
| Exhibit 91 to Duffy Declaration - Minutes of a Wise Men Committee meeting, dated July 23, 2007 ................................................. | A-6844 |
| Exhibit 92 to Duffy Declaration - E-mail from Grigorova to Cockerill, *et al.*, dated September 5, 2007 .................................................. | A-6846 |
| Exhibit 93 to Duffy Declaration - E-mail from Sckerl to Cockerill, dated June 9, 2009 with Attachment (Reproduced at pp. CA-77-CA-80) | |
| Exhibit 94 to Duffy Declaration - E-mail from Grigorova to Sckerl, dated February 16, 2009.................................................. | A-6850 |
| Exhibit 95 to Duffy Declaration - E-mail from Wormsley to Klein, dated November 23, 2007 ................................................. | A-6855 |

**xxxi**

                                                                    **Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment.............  A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009.......................................  A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment...................  A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ..................................  A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 ....................................  A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009..................................  A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010....................................  A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007......................................  A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ....................................................... A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................. A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ......................................... A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ....................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 ............................... A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 ............................... A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007.... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ......................................................... A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 ................................................... A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006..................................................  A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006..................................................  A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006...................................................  A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ........................................................  A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ..................................................  A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 ..........................................................  A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007.......................................................  A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 ..  A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ...................................................... A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 ..................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ...................................................... A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ...................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 ..................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 ................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007 ......................................................... A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 ............................................... A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007 ......... A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ..................................................... A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 ....................................................... A-7410

xxxvi

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 ................... A-7473

**xxxvii**

                                                              **Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 ..................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................. A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 ..................................................... A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ............................................................ A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ............................................. A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 .................................................. A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

**Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009....................................... A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007 .. A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 . A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 ....................................................... A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-7553

Mark Nimrod Barak, dated July 15, 2010 ................ A-7557

Jason Bazinet, dated June 30, 2010 .......................... A-7564

Peter Edward Bell, dated June 22, 2010 ................... A-7601

Simon A. Borrows, dated June 25, 2010................... A-7705

Andre Bourbonnais, dated July 13, 2010.................. A-7827

Andrew Chadd, dated July 23, 2010
(Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
(Reproduced at pp. CA-295-CA-315)

xxxix

**Page**

John Gildersleeve, dated June 30, 2010....................  A-7832

Guy Hands, dated July 15, 2010 .............................  A-7848

Guy Hayward-Cole, dated July 27, 2010..................  A-7901

David Robert Paul Hill, dated August 4, 2010 ..........  A-7918

Michael Klein, dated July 19, 2010 .........................  A-7923

Chad Leat, dated June 18, 2010...............................  A-7935

John Loveridge, dated July 30, 2010 ........................  A-7941

Bruce MacInnes, dated July 8, 2010.........................  A-7966

Eric Nicoli, dated July 5, 2010 .................................  A-7970

Riaz Punja, dated July 28, 2010................................  A-8039

Timothy Pryce, dated July 22, 2010
    (Reproduced at pp. CA-316-CA-335)

Elio Leoni-Sceti, dated June 25, 2010
    (Reproduced at pp. CA-336-CA-385)

Paul Simpkin, dated July 5, 2010 .............................  A-8056

Michael Slattery, dated August 6, 2010 ....................  A-8073

Matthew Canning Smith, dated August 3, 2010
    (Day 1)..................................................................  A-8077

Matthew Canning Smith, dated August 9, 2010
    (Day 2)..................................................................  A-8116

Iain Stokes, dated August 6, 2010............................  A-8127

Kamal Fouad Tabet, dated July 29, 2010..................  A-8157

Francois Van der Spuy, dated July 7, 2010 ...............  A-8171

xl

**Page**

Julie Williamson, dated July 28, 2010
(Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010........................ A-8175

David Wormsley, dated July 20, 2010
(Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
Defendants' Motion for Summary Judgment,
dated August 27, 2010 ............................................ A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated August 27, 2010 .................................. A-8195

Appendices to the Report of Nicholas S. Strauss
Q.C. Pursuant to Rule 44.1 .................................... A-8245

Exhibit 1 to Strauss Report -
*AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
CLC 265 ................................................................. A-8249

Exhibit 2 to Strauss Report -
*AIC Limited v. ITS Testing Services (UK) Ltd,*
[2006] EWCA Civ 1601 ........................................ A-8262

Exhibit 3 to Strauss Report -
*Angus v. Clifford,* [1891] 2 Ch 449 ...................... A-8371

Exhibit 4 to Strauss Report -
*Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

Exhibit 5 to Strauss Report -
*Assicurazione Generali v. Arab Insurance Group,*
[2003] I.R.L.R. 131 ............................................... A-8422

Exhibit 6 to Strauss Report -
*Attorney General of Belize v. Belize Telecom
Limited,* [2009] 1 W.L.R. 1988 ............................ A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 ..................    A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International*
*(Overseas) Ltd (In Liquidation) v. Price*
*Waterhouse (No.2),* [1998] PNLR 564 ...............    A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan*
*Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ...............................................    A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ....................................    A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 .......................................................    A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 ...............................    A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ...........................    A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ...............    A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................    A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ...........................................    A-9042

xlii

**Page**

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................    A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton*
*(London) Ltd,* [1957] 2 QB 621 CA .....................    A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925  ......    A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ................................................    A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484 ..................    A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 ................................................    A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 ................................................    A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337 .................    A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ...............    A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777 ...............    A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ ................................    A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne & Co Ltd. v. Heller & Partners
Ltd.,* [1964] AC 465 .............................. A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),*
[1995] 2 AC 145 HL .............................. A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247
CA .............................................. A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De
Productos Agricolas SA De CV,* [2003] EWCA
Civ 1104 ....................................... A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,*
[2006] EWHCA 2887 (QB) (Comm) .................. A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West
Bromwich Building Society,* [1998] 1 W.L.R. 896  A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,*
[2004] EWCA Civ 1244 ......................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom & Co.,* [1983] 1
All E.R. 583 .................................. A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation
Corp.,* [2008] EWHC 2286 (Comm) ............... A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)*
*Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 ................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 ............................................. A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson*
*& Co.,* [1991] 2 QB 113 ........................ A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand*
*Banking Group,* [2006] EWCA Civ 386 .............. A-10148

Exhibit 45 to Strauss Report -
*Raiffseisen Zentralbank Osterreich AG v. The*
*Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) ............................................. A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ................ A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District*
*Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

xlv

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL ............................................. A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 .................................................................... A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour*
*Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 .......................................................... A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National*
*Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ....................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ..................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and*
*Company of the Bank of England (No.3),* [2001]
UKHL 16 ............................................................. A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 ......................................... A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................ A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016............................. A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 ......................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 .................. A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) ............................................................ A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) ............................................................ A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) ......................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

**Page**

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) ............................. A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). ......................... A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ...................... A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss ........................... A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss ................................................................ A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement ............................... A-11178

Affidavit of Service, sworn to September 2, 2010..... A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 ..................... A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010.................................................... A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration -
Responses and Objections of Plaintiffs Terra
Firma Investments (GP) 2 Ltd. and Terra Firma
Investments (GP) 3 Ltd. To Defendants' First
Request for Production of Documents, dated
March 9, 2010...................................................... A-11216

Exhibit 131 to Carney Reply Declaration -
Journey Log Book for Guy Hands's flight to
London, dated May 20, 2007 ................................ A-11244

Exhibit 132 to Carney Reply Declaration -
Reservation for Guy Hands's flight to London,
dated May 20, 2007 .............................................. A-11247

Exhibit 133 to Carney Reply Declaration -
Report for Guy Hands's flight from the Airport
Landing Dues Information System of Guernsey
Airport, dated May 20, 2007................................. A-11248

Exhibit 134 to Carney Reply Declaration -
Daily Confirmed Handling report of Blue Islands
at Guernsey Airport, dated May 20, 2007............. A-11249

Exhibit 135 to Carney Reply Declaration -
Phone records of Guy Hands for the months of
April and May 2007.............................................. A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010............... A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 .......................... A-11363

John Gildersleeve, dated June 30, 2010.................... A-11376

Guy Hands, dated July 15, 2010 ............................... A-11380

xlix

                                                                    **Page**

John Loveridge, dated July 30, 2010 ........................  A-11395

Eric Nicoli, dated July 5, 2010 .................................  A-11410

Timothy Pryce, dated July 22, 2010 .........................  A-11419

Riaz Punja, dated July 28, 2010 ...............................  A-11439

Michael Slattery, dated August 6, 2010 ....................  A-11457

Martin David Stewart, dated July 7 and 8, 2010 ........  A-11473

Iain Stokes, dated August 6, 2010 .............................  A-11477

Francois Van der Spuy, dated July 7, 2010 ...............  A-11501

Alec Werner, dated August 19, 2010 ........................  A-11513

David Wormsley, dated July 20, 2010 ......................  A-11520

Second Report of Ewan McQuater, Pursuant to Rule
    44.1, dated September 3, 2010, with Exhibit 1 ......  A-11532

Affidavit of Service, sworn to September 23, 2010...  A-11566

Summary Judgment Hearing Transcript, dated
    September 10, 2010 ..............................................  A-11568

Letter from Christopher E. Duffy to the Honorable
    Jed S. Rakoff, dated September 13, 2010, with
    attachments ...........................................................  A-11620

Letter from Jay Cohen to the Honorable Jed S.
    Rakoff, dated September 13, 2010, with
    attachments ...........................................................  A-11646

Order of the Honorable Jed S. Rakoff, dated
    September 14, 2010, filed September 15, 2010.....  A-11664

Notice of Motion *in Limine* No. 2 to exclude the
    Testimony of Marianne Demario, by Defendants,
    dated October 4, 2010 ...........................................  A-11666

l

**Page**

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 .. A-11668

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 .. A-11677

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* Nos. 1 through 5,
   dated October 4, 2010........................................... A-11686

   Exhibit 1 to Levi Declaration -
   Expert Report of David J. Teece, dated
   June 14, 2010
   (Reproduced at pp. CA-481-CA-544)

   Exhibit 4 to Levi Declaration -
   Complaint in the above-captioned matter, dated
   December 11, 2009................................................ A-11695

   Exhibit 16 to Levi Declaration -
   Expert Report of Daniel R. Fischel, dated
   July 7, 2010
   (Reproduced at pp. CA-545-CA-586)

   Exhibit 17 to Levi Declaration -
   Microsoft Excel Spreadsheet printed from the
   native file produced by Plaintiffs and bearing
   bates number TF0000635801
   (Reproduced at pp. CA-587-CA-592)

   Exhibit 18 to Levi Declaration -
   Expert Report of Marianne DeMario, dated
   June 14, 2007
   (Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) .............  A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers*
*(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 .......  A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ........................................................  A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ......................................................  A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 .........................  A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007 ..........................  A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

**Page**

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010....................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
    (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
    (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010.................... A-12146

Eric Nicoli, dated July 5, 2010 ................................. A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

**liii**

**Page**

Declaration of Karen C. Dyer in Support of
  Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
  and Terra Firma Investments (GP) 3 Ltd's
  Memoranda in Oppositions to Defendants'
  Motions *In Limine*, dated October 12, 2010 .......... A-12180

  Exhibit 1 to Dyer Declaration -
  Wise Men Committee meeting minutes, dated
  July 27, 2007 ........................................................ A-12186

  Exhibit 14 to Dyer Declaration -
  "Project Record Valuation Considerations"
  prepared by Merrill Lynch for Cerberus, dated
  May 17, 2007 ........................................................ A-12188

  Exhibit 15 to Dyer Declaration -
  Citi's Project Dice Credit Approval
  Memorandum, dated May 17, 2007 ...................... A-12209

  Exhibit 16 to Dyer Declaration -
  Citi's "Fairness Committee Materials," dated
  May 21, 2007 ........................................................ A-12303

  Exhibit 17 to Dyer Declaration -
  Excerpts from American Society of Appraisers,
  *ASA Business Valuation Standards* (2009) ............. A-12309

  Exhibit 18 to Dyer Declaration -
  "Project Mulberry Valuation Materials," dated
  May 21, 2007 ........................................................ A-12315

  Exhibit 19 to Dyer Declaration -
  E-mail from Barak to Reid *et al.*, dated
  March 2, 2007 ........................................................ A-12324

  Exhibit 20 to Dyer Declaration -
  Letter from Borrows to Nicoli, dated
  July 19, 2007 ........................................................ A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ....................................................... A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 .............................................. A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ....................................................... A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ..................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ...................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 .................................................. A-12462

lv

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 .................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 ................. A-12835

Trial Transcript, dated October 19, 2010 ................. A-12997

Trial Transcript, dated October 20, 2010 ................. A-13188

Trial Transcript, dated October 21, 2010 ................. A-13347

Trial Transcript, dated October 22, 2010 ................. A-13463

Trial Transcript, dated October 25, 2010 ................. A-13685

Trial Transcript, dated October 26, 2010 ................. A-13855

Trial Transcript, dated October 27, 2010 ................. A-14046

Trial Transcript, dated October 28, 2010 ................. A-14249

Trial Transcript, dated October 29, 2010 ................. A-14432

Trial Transcript, dated November 1, 2010 ................ A-14551

Trial Transcript, dated November 2, 2010 ................ A-14877

Trial Transcript, dated November 3, 2010 ................ A-15102

Trial Transcript, dated November 4, 2010 ................ A-15292

**lvi**

**Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
    E-mail from Wormsley to Nicoli re call from
    GH, dated May 21, 2007 ................................... A-15300

Terra Firma Exhibit 2 -
    E-mail from Tabet to Wormsley re
    Conversation with Guy Hands, dated
    May 21, 2007 ..................................................... A-15301

Terra Firma Exhibit 3 -
    E-mail from Wormsley to Lindsay re
    financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
    E-mail from Simonian to Smith re Bids, dated
    May 21, 2007 ................................................... A-15309

Terra Firma Exhibit 9 -
    E-mail from Randell to Terra Firma re May
    21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
    Draft Minutes of a meeting of a committee of
    the board of directors of Terra Firma (GP) 2
    Limited, dated May 21, 2007 ........................... A-15311

Terra Firma Exhibit 11 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007 ............................................ A-15316

Terra Firma Exhibit 12 -
    E-mail from Smith to Kirshenbaum re EMI
    deal, dated May 21, 2007 .................................. A-15319

Terra Firma Exhibit 13 -
    E-mail from Smith to Mehta re EMI, dated
    May 21, 2007 ................................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
E-mail from Smith to Badhe re EMI, dated
May 21, 2007 ................................................... A-15322

Terra Firma Exhibit 15 -
E-mail from Wormsley to Tague re Congrats
on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
E-mail from Poyser to Vakilian re Terra Firma
Recommended Cash Offer, dated
May 21, 2007 ................................................... A-15324

Terra Firma Exhibit 17 -
E-mail from Grigorova to Cockerill re
EMI/Maltby CCR July, dated
September 5, 2007 ........................................... A-15326

Terra Firma Exhibit 19 -
E-mail from Smith to Small re CITI M&A
wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
E-mail from Rowland to Laskowski and
Crocker re Terra Firma, dated
September 18, 2008 ......................................... A-15332

Terra Firma Exhibit 22 -
E-mail from Miller to Zogheb re EMI, dated
May 16, 2007 ................................................... A-15336

Terra Firma Exhibit 23 -
E-mail from Gildersleeve to Wormsley re
Roles, dated April 20, 2007 ............................. A-15338

lviii

**Page**

Terra Firma Exhibit 24 -
Citi Franchise Risk Assessment Template for
Maltby Investments Limited, Appendix 6B,
dated June 1, 2009 ............................................. A-15339

Terra Firma Exhibit 25 -
E-mail from Smith to Poyser re Chaka
Feedback, dated May 17, 2007 ........................ A-15340

Terra Firma Exhibit 26 -
E-mail from Wormsley to Poyser, *et al.*, re
EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
E-mail from Wormsley to Smith re FW: E-mail
from Wormsley to McBride, dated
May 21, 2007 .................................................... A-15342

Terra Firma Exhibit 28 -
E-mail from Wormsley to Leat and Klein re
marginal deal for Terra Firma, dated
July 14, 2007 .................................................... A-15345

Terra Firma Exhibit 29 -
E-mail from Wormsley to Hands re DAIG fees,
dated November 7, 2006 .................................. A-15346

Terra Firma Exhibit 30 -
E-mail from Wormsley to Hands re DAIG,
dated October 23, 2006 .................................... A-15347

Terra Firma Exhibit 31 -
E-mail from Wormsley to Hands re proposal,
dated November 15, 2006 ................................ A-15348

Terra Firma Exhibit 32 -
E-mail from Wormsley to Klein re Citi/Terra
Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
    E-mail from Klein to Hands re Business
    Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
    E-mail from Tague to Lindsay re NBM #159
    Europe, dated March 9, 2007 ........................... A-15351

Terra Firma Exhibit 35 -
    E-mail from Tabet to Blagdon, Klein and
    Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
    E-mail from Wormsley to Miller re call from
    Guy Hands, dated May 8, 2007 ....................... A-15357

Terra Firma Exhibit 40 -
    E-mail from Smith to Wormsley re talk with
    JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
    E-mail from Wormsley to Nicoli, Gildersleeve,
    Stewart re FW: Terra Firma, dated
    May 18, 2007 ................................................... A-15359

Terra Firma Exhibit 42 -
    E-mail from Shott to Bell re auction process
    and Antitrust Confirmation, dated
    May 20, 2007 ................................................... A-15360

Terra Firma Exhibit 43 -
    E-mail from Ashcroft to Stewart re Conference
    call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
    E-mail from Wormsley to Nicoli re EMI media
    Review, dated May 20, 2007 ........................... A-15366

lx

                                                                    **Page**

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records ........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 .......................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 .............................. A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 ..................................................... A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007.................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ......................................... A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ......................................... A-15420

**lxi**

**Page**

Terra Firma Exhibit 61 -
  E-mail from Wormsley to Klein and Smith re
  proposals from Cerberus and Fortress, dated
  April 19, 2007 ................................................... A-15421

Terra Firma Exhibit 62 -
  E-mail from Barclay re EMI Media Review - 13
  May 2007, dated May 13, 2007 ........................ A-15422

Terra Firma Exhibit 63 -
  E-mail from Klein to Nicoli re General, dated
  May 18, 2007 ................................................... A-15424

Terra Firma Exhibit 64 -
  E-mail from Smith to Wormsley re EMI, dated
  May 18, 2007 ................................................... A-15425

Terra Firma Exhibit 125 -
  Interoffice memorandum from Lindsay to
  Drayton, *et al.* re East Surrey Holdings, dated
  February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
  Letter from Smith to Stewart re Engagement
  Letter, dated September 4, 2006 ...................... A-15433

Terra Firma Exhibit 195 -
  E-mail from Wormsley to Hands, dated
  September 8, 2006 ........................................... A-15440

Terra Firma Exhibit 197 -
  Terra Firma - Perspectives on Threshers, dated
  September 25, 2006 ......................................... A-15441

Terra Firma Exhibit 201 -
  Project Prince Working Party List, dated
  November 1, 2006 ............................................ A-15461

lxii

**Page**

Terra Firma Exhibit 209 -
    E-mail from Wormsley to Mylchreest, dated
    November 23, 2006 .......................................... A-15490

Terra Firma Exhibit 214 -
    EMI Group plc - Statement re preliminary
    approach from Permira, dated
    November 28, 2006 .......................................... A-15493

Terra Firma Exhibit 215 -
    E-mail from Miller to Simpkin re EMI, dated
    November 28, 2006 .......................................... A-15494

Terra Firma Exhibit 220 -
    E-mail from Badhe to Hill re Fairness Opinion
    Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
    Minutes from EMI Meeting of Directors, dated
    November 29, 2006 .......................................... A-15498

Terra Firma Exhibit 224 -
    E-mail from Smith to Wormsley, dated
    November 30, 2006 .......................................... A-15504

Terra Firma Exhibit 230 -
    E-mail from Ashcroft to Smith re Prince, dated
    December 6, 2006 ............................................. A-15505

Terra Firma Exhibit 232 -
    Minutes from EMI Meeting of Directors, dated
    December 7, 2006 ............................................. A-15506

Terra Firma Exhibit 237 -
    E-mail from Bell to Smith, dated
    December 14, 2006 ........................................... A-15519

**lxiii**

                                                                    **Page**

Terra Firma Exhibit 238 -
    E-mail from Smith to Wormsley, dated
    December 14, 2006 .......................................... A-15520

Terra Firma Exhibit 239 -
    E-mail from Smith to Wormsley re FW: Draft
    announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
    E-mail from Wormsley to Robertson re
    Agenda, dated December 14, 2006 .................... A-15524

Terra Firma Exhibit 241 -
    E-mail from Nicoli to Gildersleeve re Project
    Prince, dated December 14, 2006 ..................... A-15525

Terra Firma Exhibit 242 -
    E-mail from McBride to Citi re EMI cessation
    announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
    E-mail from Wormsley to Smith and EMI re
    TF For Urgent Reply Please, dated
    December 14, 2006 .......................................... A-15528

Terra Firma Exhibit 244 -
    Letter from Kelly to EMI Group plc, dated
    December 14, 2006 .......................................... A-15530

Terra Firma Exhibit 248 -
    "EMI Group plc - Statement re preliminary
    approach," EMI Press Release, dated
    December 14, 2006 .......................................... A-15532

Terra Firma Exhibit 250 -
    Letter from Nicoli to Kelly, dated
    December 15, 2006 .......................................... A-15533

lxiv

**Page**

Terra Firma Exhibit 274 -
E-mail from Simpkin to Miller re EMI, dated
January 4, 2007 ................................................ A-15534

Terra Firma Exhibit 280 -
Minutes from EMI Meeting of Directors, dated
January 10, 2007 .............................................. A-15536

Terra Firma Exhibit 281 -
E-mail from Jones to Cockerill re Pepe - terms,
dated January 11, 2007...................................... A-15539

Terra Firma Exhibit 283 -
EMI Press Release announcing restructuring,
dated January 12, 2007  .................................... A-15545

Terra Firma Exhibit 285 -
E-mail from Smith to Wormsley, dated
January 12, 2007................................................ A-15548

Terra Firma Exhibit 314 -
EMI Press Release, dated February 14, 2007  ... A-15550

Terra Firma Exhibit 315 -
E-mail from Smith to Wormsley re EMI
Announcement, dated February 14, 2007.......... A-15551

Terra Firma Exhibit 317 -
E-mail from Smith to Swannell and Wormsley
re 6am Cut, dated February 15, 2007................. A-15552

Terra Firma Exhibit 318 -
Citigroup Analyst Report "EMI Group plc
Another Month, Another Warning," dated
February 15, 2007 ............................................. A-15557

Terra Firma Exhibit 329 -
EMI group confirms approach from Warner
Music group, dated February 20, 2007  ............. A-15569

**lxv**

**Page**

Terra Firma Exhibit 346 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
    Valuation Update, dated March 1, 2007 ........... A-15582

Terra Firma Exhibit 348 -
    EMI Board Meeting Minutes, dated
    March 1, 2007 .................................................. A-15597

Terra Firma Exhibit 366 -
    "EMI GROUP plc - Statement re Possible
    Offer," PR Newswire UK Disclose, dated
    March 12, 2007 ................................................ A-15608

Terra Firma Exhibit 368 -
    E-mail from Wormsley to Hands, dated
    March 3, 2008 .................................................. A-15610

Terra Firma Exhibit 377 -
    E-mail from Steffno to Cockerill re EMI
    Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
    E-mail from Nicoli to Faxon re Full year
    target, dated March 12, 2007 ........................... A-15624

Terra Firma Exhibit 387 -
    E-mail from Smith to CIB-CBKG re Viacom's
    music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
    E-mail from Smith to Wormsley re EMI, dated
    March 26, 2007 ................................................ A-15629

**lxvi**

Page

Terra Firma Exhibit 392 -
    E-mail from Hill to Simpkin re (EUR) Wolters
    Kluwer Education falls to Bridgepoint, dated
    March 26, 2007 ................................................. A-15630

Terra Firma Exhibit 410 -
    E-mail from Simpkin to Smith re EMI - staple,
    dated April 3, 2007 ......................................... A-15633

Terra Firma Exhibit 412 -
    E-mail from Llewelyn-Jones to CIB-GFI re
    EMI, dated April 13, 2007 ................................ A-15635

Terra Firma Exhibit 416 -
    Letter from EMI board of Directors to
    Gildersleeve re the proposal, dated
    April 16, 2007 ................................................. A-15636

Terra Firma Exhibit 424 -
    E-mail from Seaton to Smith re FW: Trading
    statement, dated April 17, 2007 ....................... A-15646

Terra Firma Exhibit 427 -
    E-mail from Wormsley to Hands re new idea,
    dated April 18, 2007 ........................................ A-15651

Terra Firma Exhibit 429 -
    E-mail from EMI Investor Relations re EMI
    Group plc - trading statement, dated
    April 18, 2007 ................................................. A-15652

Terra Firma Exhibit 436 -
    E-mail from Smith to Estacio and Hill re Fee,
    dated April 19, 2007 ........................................ A-15654

Terra Firma Exhibit 438 -
    E-mail from Klein to Hands cc Wormsley,
    Burns, dated April 19, 2007 ............................. A-15655

lxvii

**Page**

Terra Firma Exhibit 439 -
   E-mail from Wormsley to Hands, Klein, cc
   Burns, dated April 19, 2007 ............................ A-15657

Terra Firma Exhibit 443 -
   Minutes of a Meeting of the Board of Directors
   of EMI, dated April 20, 2007 ........................... A-15659

Terra Firma Exhibit 444 -
   E-mail from Klein to Wormsley re Roles, etc.,
   dated April 20, 2007 ...................................... A-15667

Terra Firma Exhibit 445 -
   E-mail from Barak to Citi financing re Strictly
   Private & Confidential, dated April 20, 2007 ... A-15669

Terra Firma Exhibit 446 -
   E-mail from Barak to Citi financing re
   Cerberus Indication, dated April 20, 2007 ........ A-15681

Terra Firma Exhibit 447 -
   E-mail from Gildersleeve to Nicoli and
   Borrows re FW: E-mail from Wormsley to
   Gildersleeve, dated April 20, 2007 ................... A-15692

Terra Firma Exhibit 448 -
   E-mail from Smith to Seaton re Roles, dated
   April 20, 2007 ................................................ A-15694

Terra Firma Exhibit 449 -
   E-mail from Smith to Wormsley re Roles,
   dated April 20, 2007........................................ A-15696

Terra Firma Exhibit 454 -
   E-mail from Smith to Wormsley re Roles,
   dated April 22, 2007......................................... A-15698

**lxviii**

Page

Terra Firma Exhibit 455 -
    E-mail from Ashcroft to Wormsley re OEP
    Letter, dated April 23, 2007 ............................. A-15700

Terra Firma Exhibit 462 -
    E-mail from Ashcroft to Citi financing re
    Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
    Letter from Smith to Baxter (Takeover Panel),
    dated April 24, 2007........................................... A-15714

Terra Firma Exhibit 464 -
    E-mail from Tabet to Swannell, Klein and
    Wormsley re Hands, dated April 25, 2007 ......... A-15716

Terra Firma Exhibit 465 -
    E-mail from Gildersleeve to Ashcroft re Citi
    and Deutsche, dated April 26, 2007 .................. A-15717

Terra Firma Exhibit 468 -
    Letter from Smith to Stewart re provisions of
    advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
    E-mail from Coleman to Wolf re EMI, dated
    April 27, 2007 ................................................... A-15721

Terra Firma Exhibit 470 -
    E-mail from Smith to Wormsley re A3 page
    valuation summary, dated April 27, 2007.......... A-15723

Terra Firma Exhibit 479 -
    E-mail from Smith to Bell re EMI consent
    letter, Side letter re financing bidders, dated
    April 28, 2007 ................................................... A-15726

lxix

**Page**

Terra Firma Exhibit 480 -
E-mail from Smith to Stewart re Project
Mulberry, dated April 30, 2007......................... A-15729

Terra Firma Exhibit 481 -
E-mail from Smith to Ashcroft re Project
Mulberry, dated April 30, 2007......................... A-15732

Terra Firma Exhibit 484 -
Global FEG Working List Client Account List,
dated May 1, 2007............................................. A-15735

Terra Firma Exhibit 492 -
E-mail from Wormsley to Hands, dated
May 3, 2007 ...................................................... A-15754

Terra Firma Exhibit 496 -
EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
E-mail from Cole to Ashcroft re Panel, dated
May 4, 2007 ...................................................... A-15757

Terra Firma Exhibit 498 -
E-mail from Cole to Bell re DB financing
trees, dated May 4, 2007 .................................. A-15761

Terra Firma Exhibit 501 -
EMI Press Release, dated May 4, 2007 ............ A-15762

Terra Firma Exhibit 508 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
May 4, 2007 ...................................................... A-15764

Terra Firma Exhibit 516 -
E-mail from McCluskey to Yang re FW:, dated
May 6, 2007 ...................................................... A-15765

lxx

**Page**

Terra Firma Exhibit 532 -
    E-mail from Smith to Wormsley re Terra
    Firma/EMI, dated May 8, 2007......................... A-15766

Terra Firma Exhibit 537 -
    E-mail from Hands to Wormsley re EMI, dated
    May 9, 2007 ..................................................... A-15767

Terra Firma Exhibit 538 -
    E-mail from Borrows to Gildersleeve re Dice,
    dated May 9, 2007............................................. A-15768

Terra Firma Exhibit 539 -
    E-mail from Smith to Hill & Estacio fw OEP,
    dated May 9, 2007............................................. A-15772

Terra Firma Exhibit 540 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007............................................. A-15773

Terra Firma Exhibit 541 -
    E-mail from Bell to Wormsley re Terra Firma
    Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
    E-mail from Simpkin to Wormley and Smith re
    Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
    E-mail from Smith to Poyser re Project
    Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
    E-mail from Ashcroft to Gildersleeve fw
    TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
    Project Mulberry Bidders Contact Details,
    dated May 11, 2007........................................... A-15789

lxxi

**Page**

Terra Firma Exhibit 552 -
E-mail from Wormsley to Bell re Mulberry,
dated May 11, 2007...........................................  A-15814

Terra Firma Exhibit 553 -
E-mail from Bell to Smith and Wormsley re
Mondays meeting, dated May 11, 2007.............  A-15816

Terra Firma Exhibit 554 -
E-mail from Smith to McCluskey re Just left
you a voicemail, dated May 11, 2007 ...............  A-15820

Terra Firma Exhibit 555 -
E-mail from Simpkin to Edwards re Hope you
are well. re EMI, dated May 11, 2007 ...............  A-15821

Terra Firma Exhibit 558 -
E-mail from Gildersleeve to EMI re Mulberry -
Data Room - IMPALA, dated May 13, 2007.....  A-15822

Terra Firma Exhibit 564 -
E-mail from Barak to Smith re Citi Financing,
dated May 14, 2007...........................................  A-15826

Terra Firma Exhibit 570 -
E-mail from Estacio to Klein fw Full DDT
procedures - Project Mulberry, dated
May 15, 2007 ....................................................  A-15828

Terra Firma Exhibit 578 -
E-mail from Bell to Citi Financing re Project
Mulberry Update, dated May 16, 2007..............  A-15834

Terra Firma Exhibit 579 -
E-mail from Zogheb to Miller re EMI, dated
May 16, 2007 ....................................................  A-15835

lxxii

**Page**

Terra Firma Exhibit 582 -
    E-mail from Wormsley to Gildersleeve and
    Nicoli re call from Guy Hands, dated
    May 16, 2007 ..................................................... A-15837

Terra Firma Exhibit 593 -
    Project Mulberry Working Party List, dated
    May 17, 2007 ..................................................... A-15838

Terra Firma Exhibit 594 -
    E-mail from Brumpton to Klein re LF/SEC
    call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
    E-mail from Klein to Wormsley re EMI Credit
    call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
    E-mail from Leat to Klein re Call, dated
    May 17, 2007 ..................................................... A-15866

Terra Firma Exhibit 599 -
    E-mail from Wormsley to Klein re Call Guy
    Hands, dated May 17, 2007 .............................. A-15867

Terra Firma Exhibit 600 -
    E-mail from Curtis to Klein re David
    Wormsley called, VERY URGENT, dated
    May 17, 2007 ..................................................... A-15868

Terra Firma Exhibit 604 -
    E-mail from Bell to Gildersleeve re Update
    from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
    E-mail from Wormsley to Klein, dated
    May 17, 2007 ..................................................... A-15870

lxxiii

Page

Terra Firma Exhibit 608 -
    E-mail from Klein to Hands re Call, dated
    May 17, 2007 ..................................................... A-15871

Terra Firma Exhibit 619 -
    E-mail from Wormsley to Poyser re Issue on
    covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
    E-mail from Wormsley to Tabet re Covenants,
    dated May 18, 2007........................................... A-15873

Terra Firma Exhibit 621 -
    E-mail from Poyser to Wormsley re interest
    coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
    E-mail from Smith to Poyser re Debt approval,
    dated May 18, 2007........................................... A-15875

Terra Firma Exhibit 630 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 2 Ltd 8:00am,
    dated May 18, 2007........................................... A-15877

Terra Firma Exhibit 631 -
    E-mail from Stewart to Wormsley re call, dated
    May 18, 2007 ..................................................... A-15889

Terra Firma Exhibit 632 -
    E-mail from Stewart to Wormsley re returning
    call, dated May 18, 2007.................................... A-15890

Terra Firma Exhibit 636 -
    E-mail from Nicoli to Stewart re Draft process
    E-mail to be sent to bidders tomorrow, dated
    May 18, 2007 ..................................................... A-15891

lxxiv

Page

Terra Firma Exhibit 640 -
  E-mail from Watson to Cole & Citi re
  Mulberry Mark-ups of Crimson Documents,
  dated May 18, 2007............................................ A-15894

Terra Firma Exhibit 643 -
  Greenhill: Fairness Opinion/Advice Review
  Form, dated May 18, 2007.................................. A-15896

Terra Firma Exhibit 644 -
  E-mail from Barak to Bell *et al.* re Update on
  calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
  E-mail from Borrows to Gildersleeve re
  Hands, dated May 18, 2007 .............................. A-15902

Terra Firma Exhibit 648 -
  E-mail from Borrows to Bell re draft process,
  dated May 18, 2007........................................... A-15903

Terra Firma Exhibit 649 -
  E-mail from O'Brien to Citi and EMI re EMI-
  NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
  Minutes of the Meeting of the Board of
  Directors of Terra Firma (GP) 3 Ltd 8:30am,
  dated May 18, 2007........................................... A-15911

Terra Firma Exhibit 661 -
  E-mail from Pryce to Burrows cc Wormsley re
  Terra Firma, dated May 18, 2007 ..................... A-15923

Terra Firma Exhibit 674 -
  E-mail from Bell to Gildersleeve re EMI
  conference call, dated May 19, 2007 ............... A-15924

lxxv

**Page**

Terra Firma Exhibit 694 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 3 Ltd 4:00pm,
dated May 20, 2007........................................... A-15925

Terra Firma Exhibit 702 -
E-mail from Watson to Ashcroft, cc Smith,
Cole, *et al.*, re Mulberry - Key Issues Table and
Turquoise Position, dated May 20, 2007 ........... A-15928

Terra Firma Exhibit 715 -
E-mail from Quigley to O'Haire, Van der Spuy
re FW: Update on Dice financing for
discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
E-mail from Smith to Wormsley re Mulberry
Key issues table and Turquoise position, dated
May 20, 2007 ..................................................... A-15940

Terra Firma Exhibit 726 -
E-mail from Bell to Borrows re Trustee
meeting notes, dated May 20, 2007 .................. A-15943

Terra Firma Exhibit 729 -
E-mail from Wormsley to Hands, dated
May 20, 2007 .................................................... A-15944

Terra Firma Exhibit 736 -
Minutes of a Meeting of a Committee of the
Board of Directors of Terra Firma (GP) 3 Ltd
at 8:00am, dated May 21, 2007.......................... A-15947

Terra Firma Exhibit 744 -
E-mail from Hill to Shah re Citi M&A Wins:
EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

lxxvi

**Page**

Terra Firma Exhibit 746 -
   Project Mulberry Fairness Committee
   Materials, dated May 21, 2007 ........................ A-15952

Terra Firma Exhibit 749 -
   E-mail from Smith to Llewelyn-Jones re
   Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
   E-mail from Wormsley to Smith re Greenhill
   Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
   E-mail from Hill to Smith re EMI, dated
   May 21, 2007 .................................................. A-15963

Terra Firma Exhibit 756 -
   E-mail from Smith to Bichara, Estacio, Hill,
   Abbasi, Golebiewski re Citi M&A Wins: EMI
   Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
   E-mail from Smith to Swannell re EMI, dated
   May 21, 2007 .................................................. A-15966

Terra Firma Exhibit 758 -
   E-mail from Smith to Suen and Mcbride re
   EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
   Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
   E-mail from Vakilian to Poyser re (RNS) Terra
   Firma Invest Recommended Cash Offer, dated
   May 21, 2007 .................................................. A-15973

lxxvii

**Page**

Terra Firma Exhibit 765 -
   E-mail from Poyser to Lee re (RNS) Terra
   Firma Invest Recommended Cash Offer, dated
   May 21, 2007 ..................................................... A-15975

Terra Firma Exhibit 766 -
   E-mail from Poyser to Abbasi re (RNS) Terra
   Firma Invest Recommended Cash Offer, dated
   May 21, 2007 ..................................................... A-15977

Terra Firma Exhibit 767 -
   E-mail from Poyser to Vakilian re (RNS) Terra
   Firma Recommended Cash Offer, dated
   May 21, 2007 ..................................................... A-15979

Terra Firma Exhibit 768 -
   E-mail from Wormsley to Smith re update on
   call with GH, dated May 21, 2007 ................... A-15981

Terra Firma Exhibit 783 -
   Project Mulberry Valuation Materials,
   Greenhill & Co., dated May 21, 2007 .............. A-15982

Terra Firma Exhibit 787 -
   E-mail from Simpkin to Treco re Call, dated
   May 22, 2007 .................................................... A-15991

Terra Firma Exhibit 788 -
   E-mail from Smith to Skarbek re Citi M&A
   wins, dated May 22, 2007 ................................ A-15992

Terra Firma Exhibit 791 -
   E-mail from Temming to Poyser re Example
   for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
   E-mail from Poyser to Smith re Example for us
   all, dated May 22, 2007 .................................... A-15995

lxxviii

**Page**

Terra Firma Exhibit 796 -
  E-mail from Poyser to Smith re Dice, dated
  May 22, 2007  .................................................... A-15996

Terra Firma Exhibit 802 -
  E-mail from Poyser to Smith re financing
  process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
  E-mail from Poyser to Smith re financing
  process, dated May 24, 2007............................ A-16001

Terra Firma Exhibit 815 -
  David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
  E-mail from Wormsley to Hands re Thistle
  Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
  E-mail from Gildersleeve to Wormsley, dated
  May 29, 2007 .................................................... A-16015

Terra Firma Exhibit 824 -
  E-mail from Nesbit to Grigorova re Project
  Dice, dated May 30, 2007................................. A-16016

Terra Firma Exhibit 827 -
  E-mail from Smith to Blackburn re MDs
  meeting Monday, June 4 at 8:15 UK time,
  dated May 31, 2007........................................... A-16020

Terra Firma Exhibit 831 -
  Citi Markets & Banking Credit Risk
  Principles, Policies and Procedures, dated
  June 1, 2007 ..................................................... A-16022

**lxxix**

Page

Terra Firma Exhibit 833 -
Recommended Cash Offer by Maltby-a
company formed at the direction of Terra
Firma-for EMI Group plc, dated June 7............. A-16246

Terra Firma Exhibit 846 -
E-mail from Aldred (on behalf of Hands) to
Van der Spuy re Message from Guy Hands -
Project Dice, dated June 27, 2007..................... A-16410

Terra Firma Exhibit 872 -
E-mail from Wormsley to Gildersleeve and
Nicoli re Terra Firma, dated July 4, 2007 .......... A-16411

Terra Firma Exhibit 874 -
E-mail from Poyser to Smith re Your revenue
list as at 4th July 2007, dated July 4, 2007 ........ A-16412

Terra Firma Exhibit 882 -
E-mail from King to Klein re Riverdeep, dated
July 9, 2007......................................................... A-16414

Terra Firma Exhibit 883 -
E-mail from Hill to Lee re your revenue list as
at 4th July 2007, dated July 9, 2007................... A-16415

Terra Firma Exhibit 887 -
E-mail between Wormsley and Leat regarding
advice, dated July 9, 2007................................... A-16416

Terra Firma Exhibit 903 -
E-mail from Simpkin to Lavelle re EMI Equity
Bridge, dated July 16, 2007 ............................... A-16417

Terra Firma Exhibit 917 -
E-mail from Borrows to Gildersleeve, Nicoli,
*et al.*, re Board Presentation, dated
July 18, 2007....................................................... A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
E-mail from King to Klein re Terra Firma
(High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
E-mail from Smith to Stewart re Invoice to
Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
E-mail from Cockerill to Grigorova and Jones
re EMI CCR, dated July 31, 2007 ...................... A-16438

Terra Firma Exhibit 987 -
E-mail from Hill to Smith, dated
August 6, 2007 .................................................... A-16439

Terra Firma Exhibit 992 -
E-mail from Klein to Prince re EMI-DO NOT
FORWARD, dated August 8, 2007 .................... A-16440

Terra Firma Exhibit 993 -
E-mail from Klein to Mehta re Warner-
confidential, dated August 8, 2007 ................... A-16442

Terra Firma Exhibit 994 -
E-mail from Wirdnam to Leat re Terra Firma
Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
E-mail from Klein to Volk *et al.* re W, "Guy
Spoke to Edgar and offered 3B," dated
August 11, 2007 ................................................. A-16444

Terra Firma Exhibit 1006 -
E-mail from Klein to Volk *et al.* re FW: edgar,
"4B value of EMI," dated August 12, 2007 ....... A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
    E-mail from Smith to Watson re Mulberry Citi
    Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
    E-mail from Barker to Leat fw EMI, dated
    August 24, 2007 ................................................ A-16447

Terra Firma Exhibit 1040 -
    E-mail from Smith to CMB-GBKG re Quote
    of the Day, dated September 10, 2007 .............. A-16448

Terra Firma Exhibit 1074 -
    Memorandum from Simpkin *et al.* to Klein *et
    al.* re Project Dice (Public to Private of EMI),
    dated November 16, 2007 .................................. A-16449

Terra Firma Exhibit 1080 -
    E-mail from Wormsley to Klein re Guy Hands,
    dated November 23, 2007 .................................. A-16459

Terra Firma Exhibit 1100 -
    E-mail from Wormsley to Lynn re meeting
    with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
    E-mail from Smith to Poyser re trusted adviser,
    dated January 30, 2008 ...................................... A-16461

Terra Firma Exhibit 1111 -
    E-mail from Wormsley to Hands cc Burns,
    dated February 1, 2008 ...................................... A-16463

Terra Firma Exhibit 1114 -
    E-mail from Wormsley to Hands, dated
    February 19, 2008 ............................................. A-16466

**lxxxii**

**Page**

Terra Firma Exhibit 1141 -
    Franchise Rise Assessment Template, dated
    July 2008.................................................... A-16470

Terra Firma Exhibit 1144 -
    Handwritten Notes of Cockerill, dated
    September 1, 2008 ............................................ A-16471

Terra Firma Exhibit 1147 -
    E-mail from Smith to Wormsley re FW:
    Morgan Stanley CDs now officially higher than
    EMI!!! Hurrah, dated September 18, 2008........... A-16472

Terra Firma Exhibit 1158 -
    Handwritten Notes of Cockerill, dated
    November 16, 2008............................................ A-16473

Terra Firma Exhibit 1176 -
    E-mail from Cox to Smith re City Speaker
    Series - 12th February, Wormsley Presentation,
    dated February 11, 2009.................................... A-16476

Terra Firma Exhibit 1196 -
    Franchise Risk Assessment Template, Maltby
    Investments Limited, dated June 2009.............. A-16529

Terra Firma Exhibit 1225 -
    E-mail from Smith to Vakilian re Citigroup
    accused of fraud over EMI sale, dated
    December 13, 2009 ........................................... A-16530

Terra Firma Exhibit 1241 -
    Compliance "Tree" for EMI group, dated
    January 14, 2010 .............................................. A-16532

**lxxxiii**

**Page**

Terra Firma Exhibit 1251 -
   Baughman to Duffy re supplement to Citi's
   response to Terra Firma's Interrogatory No. 5,
   dated March 25, 2010 ....................................... A-16536

Terra Firma Exhibit 1313 -
   EMI Trading Update ....................................... A-16539

Terra Firma Exhibit 1346 -
   EMI Stock Price.xls ....................................... A-16541

Terra Firma Exhibit 1365 -
   E-mail from Wormsley to Hands re DAIG-
   subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
   E-mail from Wormsley to Smith, dated
   November 28, 2006........................................... A-16592

Terra Firma Exhibit 1369 -
   E-mail from Smith to Wormsley re EMI, dated
   December 20, 2006 ........................................... A-16593

Terra Firma Exhibit 1370 -
   E-mail from Wormsley to Klein re Call, dated
   May 17, 2007 .................................................... A-16594

Terra Firma Exhibit 1371 -
   E-mail from Coats to Dolenec re Project Dice,
   dated May 21, 2007........................................... A-16595

Terra Firma Exhibit 1372 -
   E-mail from Wormsley to Klein re EMI, dated
   August 2, 2007................................................. A-16596

Terra Firma Exhibit 1377 -
   E-mail from Seymour to Van der Spuy re
   Project Dice memo, dated May 15, 2007........... A-16597

lxxxiv

**Page**

Terra Firma Exhibit 1380 -
  Minutes of the May 20, 2007 Meeting of the
  IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
  Kirsten Randell notebook  ................................. A-16610

Terra Firma Exhibit 1395 -
  Amended and Restated Fee Letter, dated
  August 13, 2007................................................. A-16751

Terra Firma Exhibit 1400 -
  E-mail from Rawlings to Silva, Reeves cc
  Govinida, Dubin re Maltby - fees, dated
  August 31, 2007................................................. A-16761

Terra Firma Exhibit 1407 -
  E-mail from Wormsley to Klein, dated
  November 21, 2007............................................ A-16763

Terra Firma Exhibit 1409 -
  E-mail from Wormsley to Hands re BUPA
  hospitals, dated June 18, 2007 .......................... A-16764

Terra Firma Exhibit 1415 -
  E-mail from Seth to Simpkin, *et al.*, re EMI
  staple plan, attaching EMI Recd Financing.xls
  and EMI Group Financing.xls, dated
  April 1, 2007 ..................................................... A-16765

Terra Firma Exhibit 1434 -
  David Wormsley deposition excerpts (pp. 159-
  170:18), dated July 20, 2010.............................. A-16872

Terra Firma Exhibit 1436 -
  Stipulation re Eric Nicoli  .................................. A-16885

**lxxxv**

**Page**

Citi Exhibit A-1 -
Page 27, Paragraph 109 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
Page 28, Paragraph 110 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
Pages 31-32, Paragraph 126 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 ........................... A-16890

Citi Exhibit A-8 -
Page 32, Paragraph 128 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
Page 32-33, paragraphs 127-129 of Complaint in *Terra Firma v. Citigroup*, dated December 11, 2009 ........................... A-16895

Citi Exhibit C -
E-mail from Vallance on behalf of Hands to Punja, *et al.*, re URGENT & IMPORTANT-EMI, dated May 6, 2007 ................................. A-16898

Citi Exhibit D -
Minutes of May 7, 2007, Meeting of the Investment Advisory Committee of Terra Firma, dated May 7, 2007 ................................. A-16900

Citi Exhibit E -
E-mail from Seymour to Becker, *et al.*, with attached Project Dice Memo to the GP, dated May 7, 2007 ..................................... A-16902

lxxxvi

**Page**

Citi Exhibit H -
Minutes of May 15, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma, dated May 15, 2007 .............................. A-16914

Citi Exhibit I -
Memo from Punja, *et al.*, to the IAC re Project
Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
E-mail thread ending with E-mail from Slattery
to Randell, *et al.*, re IAC Distribution List
DICE, dated May 19, 2007 .............................. A-16923

Citi Exhibit K -
Minutes of May 18, 2007, Terra Firma
Investment Advisory Committee Meeting,
dated May 18, 2007 .......................................... A-16927

Citi Exhibit L -
Minutes of May 20, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners Limited, dated
May 20, 2007 .................................................... A-16929

Citi Exhibit P -
Project Dice Update to the IAC, dated
June 28, 2007 .................................................... A-16931

Citi Exhibit W -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice: 2008 Forecast vs.
Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
Project Mulberry Limited Scope Vendor Due
Diligence Report, dated May 4, 2007 .............. A-16959

**lxxxvii**

**Page**

Citi Exhibit BL -
    Letter from Stokes to Gildersleeve re Terra
    Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
    Project Mulberry Valuation Materials, dated
    May 21, 2007 ................................................... A-17011

Citi Exhibit BP -
    E-mail from Night BA to Amstutz, *et al.*, re
    EMI Co-Investment Opportunity, with attached
    EMI Presentation to Co-Investors, dated
    August 20, 2007 .............................................. A-17020

Citi Exhibit BR -
    E-mail thread ending with E-mail from Night
    BA to Tequila Bone, with attached co-investor
    presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
    E-mail from Vallance to TF Team Dice re EMI
    Due Diligence, dated September 25, 2007........ A-17065

Citi Exhibit CK -
    E-mail thread ending with E-mail from Punja
    to Hands re Revised financing E-mail, dated
    May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
    Guernsey Airport Landing Dues Information
    System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
    Memo from Punja, *et al.*, to IAC, *et al.*, re
    Project Dice Phase One Due Diligence, dated
    February 5, 2007 ............................................. A-17071

**lxxxviii**

Page

Citi Exhibit DT -
E-mail from Vallance on behalf of Hands to
Wormsley re Hands' desire to speak with
Wormsley ASAP, dated May 6, 2007 ...............  A-17087

Citi Exhibit DW -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice, dated
May 7, 2007 ....................................  A-17088

Citi Exhibit DX -
E-mail thread ending with E-mail from Hands
to Hedegaard, *et al.*, re Project Dice, dated
May 6, 2007 ....................................  A-17090

Citi Exhibit DY -
Minutes of May 8, 2007, Meeting of the Board
of Directors at 10:00 a.m. (GP3), dated
May 8, 2007 ....................................  A-17092

Citi Exhibit EA-1 -
Terra Firma's telephone records from British
Telecom, dated August 2, 2007.........................  A-17101

Citi Exhibit EA-2 -
Airtime Billing Reporting Team Itemisation
Report for TFCP Ltd., dated April 1, 2007 .......  A-17167

Citi Exhibit EB -
E-mail thread ending with E-mail from
Vallance on behalf of Hands to Klein re request
for Klein to call Hands, dated May 18, 2007.....  A-17204

Citi Exhibit EC -
E-mail thread ending with E-mail from
Vallance on behalf of Hands to Wormsley re
request for Wormsley to call Hands, dated
May 18, 2007 ...................................  A-17205

lxxxix

**Page**

Citi Exhibit ED -
   E-mail thread ending with E-mail from Tabet
   to Hands re EMI, dated May 18, 2007 .............  A-17206

Citi Exhibit EE -
   E-mail thread ending with E-mail from Aldred
   to Hands, *et al.*, re Relationship between Roger
   Ames and Cerberus Capital Management,
   dated September 24, 2007 ................................  A-17208

Citi Exhibit EH -
   Project Dice Presentation by Terra Firma, with
   E-mail thread ending with E-mail from Punja
   to Hands re Process, dated May 20, 2007 .........  A-17209

Citi Exhibit EI -
   E-mail thread ending with E-mail from Punja
   to Hands re Process, dated May 20, 2007 .........  A-17286

Citi Exhibit EJ -
   Minutes of May 20, 2007, Meeting of the Terra
   Firma (GP) 2 Board of Directors, dated
   May 20, 2007 ...................................................  A-17290

Citi Exhibit EL -
   E-mail thread ending with E-mail from Hands
   to Wormsley re outstanding issues between Citi
   and Terra Firma, dated May 20, 2007 ...............  A-17293

Citi Exhibit EO -
   Minutes of May 23, 2007, Meeting of the
   Investment Advisory Committee of Terra
   Firma Capital Partners, Limited, dated
   May 23, 2007 ...................................................  A-17296

**xc**

                                                                     **Page**

Citi Exhibit EQ -
E-mail from Vallance to Terra Firma Team
Dice, *et al.*, re Weekly Dice Updates for IAC,
dated June 14, 2007 ........................................... A-17298

Citi Exhibit ET -
Press release re Recommended Cash Offer for
EMI Group plc by Maltby Limited, dated
July 20, 2007 ................................................... A-17299

Citi Exhibit FB-1 -
Declaration of John Loveridge, dated
February 3, 2010 .............................................. A-17302

Citi Exhibit FD -
Terra Firma Investments (GP) 3 Limited
Advisory Agreement Relating to Terra Firma
Capital Partners III, L.P., dated
February 8, 2006 .............................................. A-17311

Citi Exhibit FG -
Draft Memo from Punja, *et al.* to the IAC re
Project Dice: Presentation and Success Fee,
dated May 18, 2007 ........................................... A-17331

Citi Exhibit FI -
Minutes of May 15, 2007, Meeting of Terra
Firma (GP) 3 Board of Directors, dated
May 15, 2007 ................................................. A-17332

Citi Exhibit FN -
Minutes of May 20, 2007, Meeting of the
Board of Directors at 4:00 p.m. (GP3), dated
May 20, 2007 ................................................. A-17334

xci

**Page**

Citi Exhibit FO -
    Minutes of May 21, 2007, Meeting of the
    Board of Directors at 7:30 a.m. (GP2), dated
    May 21, 2007 ...................................................... A-17337

Citi Exhibit FP -
    Terra Firma Presentation to GP re Project Dice,
    dated May 21, 2007............................................ A-17340

Citi Exhibit FR -
    Memo Recommending Cash Offer by Maltby
    Limited for EMI Group plc, dated
    May 30, 2007 ..................................................... A-17350

Citi Exhibit FV -
    Letter from Kelly to EMI Group plc re Terra
    Firma's interest as a potential offeror for EMI,
    dated December 14, 2006 .................................. A-17512

Citi Exhibit FX -
    E-mail from Van der Spuy to Bell, *et al.*, with
    attached Project Dice: Management Meeting
    questions and attendees, dated
    May 11, 2007 ..................................................... A-17514

Citi Exhibit GF -
    Letter from Kelly to Gildersleeve re Summary
    Proposal for Terra Firma potential offer, dated
    May 8, 2007 ...................................................... A-17533

Citi Exhibit GG -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 8:45 a.m. (GP2), dated
    May 8, 2007 ...................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
   E-mail thread ending with E-mail from Nicoli
   to Stewart, *et al.*, re E-mail to be sent to
   bidders tomorrow, dated May 18, 2007 ............ A-17548

Citi Exhibit GN -
   E-mail thread ending with E-mail from
   Wormsley to Simpkin, *et al.*, re Terra
   Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
   Terra Firma Presentation to Investment
   Advisory Committee re Project Dice, dated
   May 18, 2007 .................................................. A-17552

Citi Exhibit GQ -
   E-mail from Pryce to Burrows, *et al.*, re Terra
   Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
   E-mail from Melvin to Hands, *et al.*, re Urgent-
   EMI/Terra, dated May 22, 2007 ........................ A-17713

Citi Exhibit HH -
   E-mail from Shaw to Nicoli re Trading
   statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
   Project Dice Presentation: Update to the IAC,
   dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
   E-mail thread ending with E-mail from Van der
   Spuy to O'Haire, *et al.*, re Update on Dice
   Financing for Discussion Tomorrow, dated
   May 20, 2007 .................................................. A-17738

xciii

**Page**

Citi Exhibit IC -
    E-mail from Vallance to Hudson, *et al.*, re
    Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
    Court Order in the High Court of Justice,
    Queen's Bench Division, dated
    August 16, 2010 ............................................... A-17749

Citi Exhibit IE -
    Journey Log Book for aircraft Cs-DXJ
    registered with the Portuguese Registry
    entitled, "Diário de Navegaçao," dated
    May 24, 2007 .................................................... A-17758

Citi Exhibit IF -
    Screen Shot: Build Reservation for Terra
    Firma, dated May 20, 2007 ............................... A-17761

Citi Exhibit IW -
    Terra Firma Capital Partners II Q3 2007, dated
    November 1, 2007 ............................................. A-17762

Citi Exhibit JC -
    E-mail from Reid to Seymour re Final Version
    of McK docs, dated, with attachment
    May 16, 2007 .................................................... A-17807

Citi Exhibit JD -
    Terra Firma Music Industry Key Market
    Outlook, dated May 15, 2007 ........................... A-18001

Citi Exhibit JE -
    KPMG Report - Project Dice - Limited Scope
    due financial diligence report, dated
    May 17, 2007 ................................................... A-18128

xciv

**Page**

Citi Exhibit JI -
E-mail from Vallance on behalf of Hands to TF
Team Dice re Dice and RBS, dated
May 8, 2007 ...................................................... A-18232

Citi Exhibit JN -
Minutes of the May 18, 2007, EMI Group plc
meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated June 28, 2007 ................. A-18240

Citi Exhibit JQ -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 13, 2007 ................ A-18246

Citi Exhibit JS -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 20, 2007 ................ A-18249

Citi Exhibit JT -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 28, 2007 ................ A-18252

Citi Exhibit KA -
E-mail from Dowler to Hands re Dice, dated
May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
E-mail from Robert-Tissot to Hands re
Gatwick, dated February 6, 2009 ...................... A-18257

xcv

Page

Citi Exhibit KH -
    E-mail from Wormsley to Cabrey re Hands -
    Invitation to Terra Firma Annual Clay Pigeon
    Shoot, dated July 1, 2008 .................................. A-18259

Citi Exhibit KJ -
    Terra Firma Annual Review 2007, dated
    June 29, 2005 ................................................... A-18262

Citi Exhibit KY -
    Terra Firma Private Placement Memorandum,
    dated April 1, 2006 ........................................... A-18382

Citi Exhibit LI -
    Memo from Punja, *et al.*, to Hands, *et al.*, re
    EMI Preliminary Discussion, dated
    December 1, 2006 ............................................. A-18482

Citi Exhibit MB -
    Signed Minutes of the February 5, 2007,
    Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
    Letter from Smith to Stewart re Provision of
    Advisory and Corporate Broking Services by
    Citigroup, dated April 27, 2007 ....................... A-18493

Citi Exhibit OF -
    Letter from Kelly to Gildersleeve re possible
    offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
    E-mail thread ending with E-mail from Miller
    to Wormsley, dated May 8, 2007 ...................... A-18499

Citi Exhibit OJ -
    E-mail from Wormsley to Hands re EMI, dated
    May 8, 2007 ..................................................... A-18500

xcvi

**Page**

Citi Exhibit OM -
  Project Mulberry Bidders Contact Detail, dated
  May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
  E-mail thread ending with E-mail from Van der
  Spuy to Simpkin, *et al.*, re Project Dice:
  Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
  Minutes of May 15, 2007, Meeting of the
  Board of Directors at 7:30 p.m. (GP2), dated
  May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
  E-mail thread ending with E-mail from Klein
  to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
  E-mail from Wilkins to Nicoli, *et al.*, re
  Wormsley call, dated May 18, 2007 ................. A-18533

Citi Exhibit RU -
  E-mail thread ending with E-mail from Nicoli
  to Wormsley re EMI media review, dated
  May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
  E-mail thread ending with E-mail from
  Simpkin to Dolenec, *et al.*, re securitisation
  colleagues, dated May 20, 2007 ....................... A-18537

Citi Exhibit UF -
  E-mail thread ending with E-mail from Tabet
  to Wormsley re just spoke to GH, dated
  May 21, 2007 .................................................. A-18540

xcvii

**Page**

Citi Exhibit VP -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:00 p.m. (GP2), dated
    May 23, 2007 .................................................. A-18543

Citi Exhibit VQ -
    Minutes of May 23, 2007, Meeting of the
    Board of Directors at 2:15 p.m. (GP3), dated
    May 23, 2007 .................................................. A-18545

Citi Exhibit WI -
    Memo from Punja, *et al.*, to the IAC, *et al.*, re
    Project Dice Update and Budget, with attached
    Presentation re IAC update: Project Dice,
    dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
    E-mail from Cabrey to Wormsley, *et al.*, re
    Villa Saletta Shoot, with attached Fax Reply
    Form, dated August 15, 2007 ........................... A-18555

Citi Exhibit AAO -
    E-mail from MacInnes to Punja, *et al.*, with
    attached Dresdner invoice to Maltby, dated
    August 17, 2007 .............................................. A-18560

Citi Exhibit ABL -
    Memo from Pryce to TFCP Personnel re Public
    to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
    Letter from Terra Firma Investments (GP) 3
    Limited to Citi re the amendment letter, dated
    December 21, 2007, dated January 11, 2008 .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
   E-mail from Dicks to Wormsley, *et al.*, re DW
   Menu selection Die Sauberflote, attached
   menu, dated June 23, 2008 ............................... A-18571

Citi Exhibit AGF -
   Terra Firma Capital Partners II, Q1 2008, dated
   March 31, 2009 ................................................ A-18574

Citi Exhibit AHA -
   Presentations re EMI and the Terra Firma/Citi
   Relationship, dated August 1, 2009 .................. A-18623

Citi Exhibit AJJ -
   Cell phone Records for David Wormsley, dated
   April 26, 2007 ................................................. A-18643

Citi Exhibit AJT -
   Guy Hands' Calendar for May 18, 2007, dated
   May 18, 2007 .................................................. A-18671

Citi Exhibit AKL -
   EMI Recorded Music Presentation, dated
   April 1, 2009 .................................................... A-18672

Citi Exhibit AKT -
   Stipulated Phone Numbers................................. A-18698

Citi Exhibit AKY -
   TFCP III Co-Investment 2 L.P. Project Dice
   Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
   Citigroup Structure Chart.................................. A-19064

Citi Exhibit ALK -
   E-mail thread ending with E-mail from
   Wormsley to Dicks re shotgun certificate form,
   dated October 4, 2007 ....................................... A-19065

xcix

**Page**

Citi Exhibit ALU -
   E-mail thread ending with E-mail from
   Grigorova to Lynn, *et al.*, re EMI Summary
   Exposure, dated November 21, 2009 ................... A-19067

Citi Exhibit ALY -
   Paragraph 22, Page 5 of Joint Statement
   Pursuant to Individual Practices 4(a) of the
   Facts and Other Matters on Which the Parties
   Agree ............................................................. A-19072

Citi Exhibit EEB-3 -
   Table 1B of Expert Report of Marianne
   DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
   Appendix 1 of Expert Report of Marianne
   DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
   Corrected Expert Report of Marianne DeMario
   in *Andrews v. Raphaelson*, *et al.*, dated
   October 19, 2006 ............................................ A-19078

Citi Exhibit EEJ -
   *Caiola v. Citibank*, Expert Report of Marianne
   DeMario .......................................................... A-19095

Citi Exhibit EEY -
   Client List for Spectrum Consulting Partners .... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
   Handwritten Notes ........................................... A-19126

Terra Firma Exhibit 48 -
   Nicoli Mobile Phone Records
   (Reproduced at pp. CA-826-CA-837)

c

Page

Letter Brief of Terra Firma to the Honorable Jed S.
Rakoff, dated October 25, 2010............................ A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed
S. Rakoff, dated October 25, 2010........................ A-19137

The Court's Proposed Jury Instructions, dated
November 1, 2010 ................................................. A-19147

Memorandum of the Honorable Jed S. Rakoff,
dated November 2, 2010........................................ A-19163

Verdict Sheet, dated November 4, 2010 ................... A-19179

Judgment, So-Ordered on December 9, 2010,
Appealed From .................................................... A-19180

Notice of Appeal, dated January 10, 2011 ................ A-19187

Case: 11-126    Document: 64    Page: 102    04/25/2011    272930    401

A-5701

'[81] ... We agree ... that if the claim by [the claimant] for an account is in substance a claim to moneys to which [the company] has a claim against [the defendant], then consistently with the reasoning in *Johnson v Gore Wood & Co (a firm)* the [rule against reflective loss] would bar [the claimant's] claim for what in effect reflects part of the loss suffered by [the company], and it matters not that the causes of action of [the claimant] and [the company] are different. Nor does it matter that [the company] has not yet brought proceedings against [the defendant]: the ... principle still bars a claim reflective of the company's loss ...

[83] In our judgment the [rule against reflective loss] does not preclude an action brought by a claimant not as a shareholder but as a beneficiary under a trust against his trustee for a profit *unless it can be shown by the defendants that the whole of the claimed profit reflects what the company has lost and which it has a cause of action to recover.* As the ... principle is an exclusionary rule denying a claimant what otherwise would be his right to sue, the onus must be on the defendants to establish its applicability. Further, *it would not be right to bar the claimant's action unless the defendants can establish not merely that the company has a claim to recover a loss reflected by the profit, but that such claim is available on the facts ...*' (Emphasis added.)

[43] Thus it appears clearly to have been determined in *Shaker*'s case that, even when the claim is brought by a beneficiary against a trustee for breach of fiduciary duty, it can be barred by the rule against reflective loss. In that connection I would refer to the passages I have quoted from the judgment in that case ([2003] 1 BCLC 157 at [81] and [83], [2003] Ch 350 at [81] and [83]), delivered by Peter Gibson LJ. My reliance on para [81] is, I think, self-explanatory. So far as para [83] is concerned, it seems to me to be borne out by the words I have emphasised at the end of the first and third sentences of my citation of that paragraph.

[44] Mr Steinfeld argues that those observations should not be followed. He suggests that they were obiter, and in any event were inconsistent with the decision and reasoning of Cross J in *Re Lucking's Will Trusts, Renwick v Lucking* [1967] 3 All ER 726 at 731-733, [1968] 1 WLR 866 at 873-875, and the decision and reasoning of this court in *Walker v Stones* [2000] 4 All ER 412 at 438-439, [2001] QB 902 at 932-934. I do not propose to rehearse in detail his arguments in this connection, because they appear to be substantially the same as those which were raised in *Shaker*'s case, and which were considered and discussed by the Court of Appeal in that case ([2003] 1 BCLC 157 at [75]-[81], [2003] Ch 350 at [75]-[81]). As the court in *Shaker*'s case said in the last of those paragraphs, the decisions in *Re Lucking's Will Trusts* and *Walker v Stones* 'were decided prior to the decision of the House of Lords in *Johnson*'s case'. In the same paragraph, the Court of Appeal made reference to the fact that the judge at first instance in that case considered that 'at least part of the reasoning in the

[2004] 2 BCLC 554 at 566

*Walker* case cannot stand with *Johnson*'s case'. It seems to me that, in the passage which immediately follows those observations, and which I have quoted above, the Court of Appeal effectively agreed with that contention. Indeed, if they had not done so, they could not have reached the decision that they did.

[45] In my view, the conclusion that the rule against reflective loss would have applied in *Shaker*'s case if the company had had a claim against the defendant under Pennsylvania law was part of the ratio decidendi of the Court of Appeal. That is not merely because the court raised the issue, considered it in detail and disposed of it over the course of its judgment (see [2003] 1 BCLC 157 at [73]-[83], [2003] Ch 350 at [73]-[83]). It is also because it was, in terms of case management, necessary to dispose of the issue. As a result of the conclusion that it was unclear whether the company had a claim in Pennsylvania law, the Court of Appeal remitted the case back for trial. If the rule against reflective loss had had no application, it would have been unnecessary for the trial judge below to hear evidence and argument as to whether the company had a claim; if as the court found, the rule did apply, such evidence and argument would be necessary.

[46] However, whether or not the decision of this court in *Shaker*'s case on this point was strictly obiter or not, I am satisfied that we should follow it. The court specifically identified the point (see [2003] 1 BCLC 157 at [73], [2003] Ch 350 at [73]), and, in the next paragraph, summarised the contention that the rule against reflective loss should not apply to a claim for breach of fiduciary duty. The court then considered the arguments and the authorities relating to that contention, and rejected it (see [2003] 1 BCLC 157 at [75]-[83], [2003] Ch 350 at [75]-[83]). Particularly as this is a difficult and developing topic, it would, to my mind, require a very cogent case to be made out before this court should refuse to follow its own recent clear, unanimous and fully-reasoned conclusion on an important aspect of the rule against reflective loss.

[47] Mr Steinfeld has not persuaded me that the decision and reasoning of the court on this issue in *Shaker's* case was wrong, especially when its application to the facts of this case is considered. So far as the decision in *Re Lucking's Will Trusts* is concerned, I do not consider it takes matters any further. First, the rule against reflective loss was not raised, although it is true that a not dissimilar argument was advanced and rejected; secondly, it does not seem to me that the rule against reflective loss was actually applicable on the facts; thirdly, it is a first instance decision, albeit one to be accorded particular respect as it was decided by Cross J; fourthly, it pre-dated the *Prudential* and *Johnson* cases.

[48] As to *Walker v Stones*, it was also decided before *Johnson's* case. Although it is fair to say that a passage in the judgment of Sir Christopher Slade was cited with approval by Lord Hutton in *Johnson's* case [2001] 1 BCLC 313 at 354, [2002] 2 AC 1 at 51, that passage represents a general summary of the law, and the decision was otherwise not referred to in any of the speeches in *Johnson's* case. Further, no doubt was cast in *Walker v Stones* [2000] 4 All ER 412 at 438, [2001] QB 902 at 932-934 on the rule against reflective loss. On the contrary: it was applied to bar another aspect of the claim (see [2000] 4 All ER 412 at 455-456, [2001] QB 902 at 952-953). It seems to me that the rule against reflective loss considered and applied in *Walker v Stones* by Sir Christopher Slade was slightly, but

[2004] 2 BCLC 554 at 567

crucially, different from what it was subsequently stated to be by Lord Millett. That appears from Sir Christopher's citation of the principles, and especially principle (5) contained in this court's reasoning in *Johnson's* case [1999] Lloyd's Rep PN 91 at 98 (see [2000] 4 All ER 412 at 436, [2001] QB 902 at 930-931). This difference is reflected in the fact that the defendant's appeal to the House of Lords in *Johnson's* case on the reflected loss issue was, albeit to a limited extent, successful.

[49] It is clear, from the analysis and discussion in the cases to which I have referred, that the rule against reflective loss is not concerned with barring causes of action as such, but with barring recovery of certain types of loss. On that basis, there is obviously a powerful argument for concluding, as this court did in *Shaker's* case, that, whether the cause of action lies in common law or equity, and whether the remedy lies in damages or restitution, should make no difference as to the applicability of the rule against reflective loss. Furthermore, given that the foundation of the rule is the need to avoid double recovery, there is a powerful case for saying that the rule should be applied in a case where, in its absence, both the beneficiary and the company would be able to recover effectively the same damages from the defaulting trustee/director.

[50] As Mr Peter Crampin QC, who appears with Mr Ulick Staunton for Mr Parker, points out, the present facts arguably give rise to rather a stronger candidate than those in *Shaker's* case for the application of the rule against reflective loss. Here, the nature of the claim by the company, Scoutvale, against the defendant, Mr Parker, is very similar in nature to that by the shareholder, BDC, against the same defendant. In each case, the claim is for breach of fiduciary duty by a director (in one case as a director of the company, in the other as a director of the shareholder) in permitting an asset of the company to be transferred at a significant undervalue to a third party in which the defendant had an interest. On the other hand, there was a greater difference between the nature of the claim in *Shaker's* case, namely a beneficiary's claim against the defendant as a trustee of the settlement, and a company's claim against the defendant as a director of the company. While, as I have said, the nature of the two claims is not the centrally significant matter when deciding whether the rule against reflective loss applies, it seems to me that it is not an irrelevant factor when considering Mr Steinfeld's contention that, notwithstanding the decision in *Shaker's* case, the rule should not be applied in the present case. Furthermore, the nature of the remedy appropriate to each of the two causes of action in the present case is arguably much closer than it was in *Shaker's* case.

[51] The anomaly raised by Mr Steinfeld gives one pause for thought: on the not unlikely hypothetical set of facts he posits, it would seem surprising that only two of the three trustees could be liable to the beneficiary, particularly when it is the third trustee who, as director of the company, could be said to be the person one would expect to be primarily liable.

[52] However, on reflection, I do not consider that the alleged anomaly assists Mr Gardner's case. First, although it is perhaps a little more difficult to conceive of circumstances in which it might arise, the same point could be made where three persons are jointly liable in contract or tort to the shareholder, and only one

of them is so liable to the company. Secondly, it may well be that, in a case such as that posited by Mr Steinfeld, the

*[2004] 2 BCLC 554 at 568*

beneficiary would not be able to recover damages from the other two trustees, on the basis that the loss which founds his claim has the character of reflective loss and is therefore irrecoverable. Alternatively, if the two trustees were sued by the beneficiary, the remedy would lie in their hands, namely by joining the trustee director and the company to the proceedings, with a view to protecting their position by ensuring that the court's primary order involved the trustee/director having to reimburse the company for its loss, thereby enabling the other two trustees to avoid liability.

[53] Accordingly, I am unpersuaded that the alleged anomaly justifies this court refusing to follow its recent and carefully considered decision in *Shaker*'s case. First, the anomaly, if it exists, would apply, at least in principle, to any type of claim, and not merely to a claim for fiduciary duty, where the rule against reflective loss might apply. Secondly, the anomaly may not even arise, for reasons of principle or in practice. In any event the anomaly would be an insufficient reason, in my view, to justify our refusing to follow *Shaker*'s case.

**The second contention: the rule against reflective loss should be disapplied as a result of the 1995 settlement?**

[54] The second contention raised on behalf of Mr Gardner is that, even if the rule against reflective loss would otherwise apply in the present case, it has ceased to apply as a result of the 1995 settlement. In this connection, Mr Steinfeld relies on the exception to the rule established by this own court in *Giles v Rhind*. In that case, the defendant had conducted a business in competition with a company in which he and the claimant owned the shares. By carrying on his business, the defendant acted in breach of his duty to the company and in breach of contract with the claimant. As a consequence, the company went into administrative receivership. The company issued proceedings against the defendant, but, following a successful application by the defendant for security for costs which it could not meet, the company discontinued on terms that it would bring no further proceedings. Thereafter, the claimant started proceedings against the defendant to recover the damages he had suffered, including the loss in value of his shares in the company and loss of the remuneration he would have earned. The defendant applied to strike out that claim on the ground that the damages sought were reflective loss. While it is clear that the majority of damages claimed in that case by the claimant constituted reflective loss, the Court of Appeal none the less unanimously held that the claimant's claim was not debarred by the rule.

[55] In so doing, the court held that the rule against reflective loss does not apply in a case where the claim is against--

'a wrongdoer who, in breach of his contract with the company and its shareholders, "steals" the whole of the company's business, with the intention that the company should be so denuded of funds that it cannot pursue its action against him, and who gives effect to that intention by an application for security for costs which his own breach of contract has made it impossible for the company to provide.' (See [2003] 1 BCLC 1 at [66], [2003] Ch 618 at [66] per Chadwick LJ.)

As Chadwick LJ went on to say in the same paragraph:

*[2004] 2 BCLC 554 at 569*

'I would not find it easy to reconcile [such a] result with Lord Bingham's observation ([2001] 1 BCLC 313 at 338, [2002] 2 AC 1 at 36), that "the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation".'

[56] To much the same effect, Waller LJ said ([2003] 1 BCLC 1 at [34], [2003] Ch 618 at [34]):

'One situation which is not addressed [in *Johnson*'s case] is the situation in which the wrongdoer by the breach of duty owed to the shareholder has actually disabled the company from pursuing such cause of action as the company had. It seems hardly right that the wrongdoer who is in breach of contract to a shareholder can answer the shareholder by saying, "The company had a cause of action which it is true I prevented it from bringing, but that fact alone means that I the wrongdoer do not have to pay anybody".'

He went on to hold that the contention that the wrongdoer could answer the shareholder's claim in this way was 'unarguable' (see [2003] 1 BCLC 1 at [35], [2003] Ch 618 at [35]).

[57] The reasoning in *Giles v Rhind*, as I understand it, was that the objection to a shareholder suing the wrongdoer for what would otherwise be reflective loss would not be sustained for a combination of two reasons. First, from the claimant's point of view, application of the rule against reflective loss would represent an 'arbitrary den[ial] of fair compensation' if he was prevented from suing, in circumstances where the company could not sue for its loss, because of the very wrongdoing of which complaint was being made. Secondly, from the defendant's point of view, and indeed, from the point of view of principle, there could be no objection to the claimant suing in such a case, because the ultimate reason for the rule against reflective loss is the need to avoid the risk of double recovery from the defendant, and if the company cannot sue, the defendant is not exposed to such a risk.

[58] On behalf of Mr Gardner, it is contended that the reasoning in *Giles v Rhind* applies in the present case, or, if it does not, that the exception to the rule against reflective loss established in *Giles v Rhind* should be extended to cover the present case. In this connection, reliance is placed on the 1995 settlement, whereby, through the agency of the receivers, Scoutvale released Mr Parker from any liability he might have (other than a liability to a liquidator of Scoutvale, which is of no direct relevance, because Scoutvale, even now, is not in liquidation). Mr Steinfeld contends that Mr Gardner's case for avoiding the rule against reflective loss is even stronger than that of the claimant in *Giles v Rhind* because, when the 1995 settlement was entered into, Mr Parker owed a continuing fiduciary duty to BDC, namely to reinstate its asset which, by his breach of duty to BDC he had caused to be lost.

[59] The first problem faced by this argument is that the preliminary point which the judge was invited to consider was, in terms, by reference to 'Mr Gardner's pleaded case'. Although it is true that the re-amended statement of claim includes the allegation that Scoutvale was put into administrative receivership by Westpac, and that Westpac appointed the receivers, that is as far as the pleadings go. In those circumstances, any

*[2004] 2 BCLC 554 at 570*

reliance on the 1995 settlement, let alone the circumstances in which that settlement was entered into, faces obvious difficulties. That is not a mere pleading point. Given that there were no pleaded allegations that Scoutvale was forced to release Mr Parker from any liability, owing to Scoutvale's impecuniosity, and that the impecuniosity was attributable to the wrongdoing alleged against Mr Parker, there was little, if any, evidence in the form of witness statements or other documents, which would have impinged upon those sort of allegations if the hearing had gone ahead.

[60] Secondly, over and above any point that might be taken on the pleadings, it is important to bear in mind the limits of the exception established in *Giles v Rhind* to the rule against reflective loss. As was made clear by Lord Millett in *Johnson*'s case [2001] 1 BCLC 313 at 369, [2002] 2 AC 1 at 66, cited above at [30], the mere fact that the company chooses not to claim against the defendant, or settles with the defendant on comparatively generous terms, does not, at least without more, justify disapplying the rule against reflective loss (and in this connection it is perhaps worth noting that he was supported by similar observations in this court in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354 at 367, [1982] Ch 204 at 223). Accordingly, the court must be satisfied that the sort of circumstances described in *Giles v Rhind* [2003] 1 BCLC 1 at [34], [2003] Ch 618 at [34] by Waller LJ or at [66] by Chadwick LJ exist, before the fact that the company has abandoned, or settled on apparently generous terms, its claim against the defendant, justifies disapplying of the rule against reflective loss.

[61] In my judgment, there was simply no evidence before the judge to support the contention that the release of Mr Parker, as contained in the 1995 settlement, was forced upon Scoutvale by Mr Parker, let alone that Scoutvale was prevented from pursuing Mr Parker because of its impecuniosity, or even that any such impecuniosity had been caused by the wrongdoing alleged in the re-amended statement of claim against Mr Parker.

[62] The mere fact that Scoutvale was in administrative receivership plainly did not of itself prevent that

company starting an action, as is evidenced by the existence of the s 423 proceedings. Further, in his judgment, the judge said ([2004] 1 BCLC 417 at [47]):

> 'It is not suggested by [counsel then appearing for Mr Gardner] that it can be shown (and it is certainly neither pleaded nor a matter of common ground between the parties) that Scoutvale was disabled from pursuing any claim against Mr Parker by reason of a lack of financial means caused by his wrongdoing. On the contrary, [counsel] very fairly conceded in his skeleton argument that "the financial pressures on ... [Scoutvale] may have that effect [ie an inability to pursue any claim against Mr Parker] independent of any action taken by Mr Parker to deplete its assets". Nor does the fact, if fact it be, that Mr Parker has continued to control Scoutvale mean that Scoutvale has been disabled from bringing a claim.'

[63] The fact that Mr Parker was a party to, and was released from liability by, the 1995 settlement is not by any means even indicative of the fact that there was financial, or indeed any, pressure on Scoutvale or the receivers, to release him from liability for any wrongdoing. The receivers

*[2004] 2 BCLC 554  at 571*

may well have taken the view that, because they considered that any claim was worth much less than the re-amended statement of claim suggests, or because of the existence of rights of third parties (such as Rothschilds), or because of the relative impecuniosity of Mr Parker, the terms agreed in the 1995 settlement were commercially attractive. Further, it is not as if Mr Parker was a party to the 1995 settlement purely for the purpose of releasing him from any liability: there were other provisions in the document whereby he released various parties, including Scoutvale itself, from any claims which he might have against them.

[64] The fact that the 1995 settlement looks generous to Mr Parker on the basis of the facts and figures which are alleged in the re-amended statement of claim, but which are neither established nor agreed, cannot of itself justify the conclusion that the present case falls within the ambit of the exception to the rule as established in *Giles v Rhind*. Accordingly, especially in light of the concessions recorded by the judge as having been made on behalf of Mr Gardner, no doubt on the basis of the fairly voluminous evidence before the court, it appears to me that the judge's rejection of his contention on this issue was inevitable. Even without those contentions, there was simply no evidence to support it.

[65] I turn to Mr Steinfeld's submission that Mr Parker effectively committed a breach of his fiduciary duty to BDC when he entered into the 1995 settlement. First, if it is thereby intended to suggest that there is a separate claim which could be raised against Mr Parker, it is simply not pleaded. Secondly, although attractive at first sight, the submission is flawed, because it assumes that, at the time of the 1995 settlement, Mr Parker was under an obligation to pay substantial damages to BDC, an assumption which is inconsistent with the rejection of the first argument raised on behalf of Mr Gardner.

[66] In light of the suggestion that this conclusion may leave Scoutvale and, whether directly or indirectly, BDC without any claim, even if Mr Parker ought not to have been released, it is right to add this, albeit with diffidence, in light of the fact that the receivers are not party to the present proceedings. If it were the case that the terms on which the receivers released Mr Parker from any liability to Scoutvale were too generous, it could well be that Scoutvale would have a cause of action for damages (which may by now be time-barred) against the receivers for breach of duty. In that connection, I would refer to the reasoning and cases cited in *Medforth v Blake* [1999] 3 All ER 97 at 106–107, 110–111, [2000] Ch 86 at 97–100, 101–102.

**The third contention: BDC's claim as creditor is not barred by the rule against reflective loss.**

[67] If, as I believe to be the case for the reasons given, the claim against Mr Parker for the loss suffered by BDC in relation to its shares in Scoutvale is barred by the rule against reflective loss, Mr Steinfeld's final contention is that the rule does not apply in so far as Mr Gardner's claim is based on BDC's inability to recover the loan from Scoutvale, and the judge was wrong to conclude otherwise. In this connection, Mr Steinfeld points out that the observations of the Court of Appeal in the *Prudential* case in relation to reflected loss were directed to claims by shareholders who have suffered a diminution in the value of their shares and a loss of dividends

*[2004] 2 BCLC 554  at 572*

payable in respect of those shares, and that the plaintiff in *Johnson's* case was effectively the sole shareholder in the company concerned. Accordingly, he argues that there is no reason to extend the rule against reflective loss to a claim by a person who sues as a creditor, rather than a shareholder, of a company concerned in which he has a relatively small interest.

[68] In my view, the rule against reflected loss bars any claim by BDC for the loss of its ability to recover on the loan, just as much as any loss it suffered in respect of its shares in Scoutvale, in light of the reasoning of the House of Lords, in particular that of Lord Millett, in *Johnson's* case. Lord Bingham dealt briefly with Mr Johnson's claim in that case for loss of payments which the company would have made to the plaintiff's pension fund. He said ([2001] 1 BCLC 313 at 338, [2002] 2 AC 1 at 36):

> '... this claim relates to payments which the company would have made into a pension fund for Mr Johnson: I think it plain that this claim is merely a reflection of the company's loss and I would strike it out.'

[69] Lord Millett reached the same conclusion in the passage I have quoted at [32] above.

[70] It is clear from those observations, and indeed from that aspect of the decision, in *Johnson's* case that the rule against reflective loss is not limited to claims brought by a shareholder in his capacity as such; it would also apply to him in his capacity as an employee of the company with a right (or even an expectation) of receiving contributions to his pension fund. On that basis, there is no logical reason why it should not apply to a shareholder in his capacity as a creditor of the company expecting repayment of his debt. Indeed, it is hard to see why the rule should not apply to a claim brought by a creditor (or indeed, an employee) of the company concerned, even if he is not a shareholder. While it is unnecessary to decide the point, as BDC was a shareholder in Scoutvale, it is hard to see any logical or commercial reason why the rule against reflective loss should apply to a claim brought by a creditor or employee, who happens to be a shareholder, of the company, if it does not equally apply to an otherwise identical claim by another creditor or employee, who is not a shareholder in the company.

[71] There are observations, which I have quoted, in the speech of Lord Millett in *Johnson's* case which appear to me strongly to reinforce the conclusion that the rule against reflective loss does indeed bar BDC's claim against Mr Parker in so far as it is based on the loan. Thus, in the passage from his speech I have quoted at [30] above, Lord Millett does not merely refer to 'shareholders' but also to 'creditors'. Secondly, in the passage cited at [31] above, Lord Millett emphasised that reflective loss does not only extend to 'diminution of the value of the shares' and 'loss of dividends', but also to 'all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds'. Similarly, he said in terms that the fact that Mr Johnson was claiming, as it were, qua employee, rather than qua shareholder, made no difference (see [2001] 1 BCLC 313 at 370, [2002] 2 AC 1 at 67). I can see no basis whatever in logic or principle as to why, if a claim qua employee is barred by the rule, a claim made qua creditor is not similarly so barred. In most cases where an employee's claim is barred by the rule against reflective loss, the employee will be a creditor of the company. It is hard to see why a creditor who is an employee should

*[2004] 2 BCLC 554 at 573*

be treated differently from any other creditor of the company when it comes to applying the rule against reflective loss.

[72] I should make two further comments about this part of the appeal. First, it seems to me that, in his judgment in *Walker v Stones* [2000] 4 All ER 412 at 439, [2001] QB 902 at 934, Sir Christopher Slade appears to have taken the view that, if (contrary to his opinion) a claim against a trustee/director by a beneficiary is barred by the rule against reflective loss, then a claim by the beneficiary against other trustees would similarly be barred. That observation seems to me consistent with the view taken by Lord Millett in *Johnson's* case in the passages to which I have just referred.

[73] Secondly, when reaching his conclusion that the claim based on the loan was barred by the rule against reflective loss, the judge disagreed with an obiter view I had expressed at first instance in *Humberclyde Finance Group Ltd v Hicks* [2001] All ER (D) 202 (Nov) at paras 29 and 33. I had suggested that, if the shareholder in that case had had only a few shares in the company concerned, rather than effectively being

a sole shareholder, it would probably have been wrong to strike out his claim for lost pension rights. Blackburne J was right to express disagreement with my view in view of what was said by Lord Bingham and Lord Millett in *Johnson*'s case. It appears to me that, even if the claimant in *Humberclyde* had held no shares in the company, his claim would almost certainly have been barred by the rule against reflective loss. In any event, it is clear that, provided the claimant owns some shares in the company concerned, his claim for lost pension rights is liable to fail owing to the rule against reflective loss. As Mr Crampin points out, this view is strongly reinforced by the observations of Chadwick LJ in his judgment in *Giles v Rhind* [2003] 1 BCLC 1 at [81], [2003] Ch 618 at [81].

[74] Mr Steinfeld suggests that this is a rather surprising result. However, if a creditor (or employee) whose claim is barred by the rule against reflective loss is not repaid, he is not without remedies. If the company concerned is solvent, he can sue the company for his loss. If the company is insolvent, the creditor (or employee) can put the company into liquidation (if that has not already happened) and can either fund a claim by the liquidator against the defendant or, as Mr Gardner did in relation to BDC, he can take an assignment of the company's claim. Indeed, the creditor (or employee) could probably take an assignment of the company's claim without seeking to wind it up.

[75] Part of Mr Steinfeld's argument in relation to his third (and indeed, his second) contention appears to me to question or challenge the justice of applying the rule against reflective loss in cases other than when the claim is made for diminution in the value of the claimant's shares or loss of dividends (as in the *Prudential* case) or where the claim is brought by a person who effectively owns the company (as in *Johnson*'s case). That challenge, it seems to me, is not consistent with the principle established in *Johnson*'s case, and perhaps most clearly expressed by Lord Millett ([2001] 1 BCLC 313 at 365-366, 369-370, [2002] 2 AC 1 at 62, 66 (cited at [29] and [30] above). The approach suggested by Mr Steinfeld appears to me to be more consistent with that of Thomas J in *Christensen v Scott* [1996] 1 NZLR 273, discussed in *Johnson*'s case [2001] 1 BCLC 313 at 368-369, [2002] 2 AC 1 at 65-66 with disapproval by Lord Millett, and, indeed, discussed by Lord Cooke of Thorndon (see [2001] 1 BCLC 313 at

*[2004] 2 BCLC 554 at 574*

346-348, [2002] 2 AC 1 at 43-45). As with many points relating to reflective loss, Mr Steinfeld's arguments in this connection appear to me to be not without force, although not without difficulties either. However, in light of the decision and reasoning in *Johnson*'s case, as subsequently applied in this court, those arguments could only be determined in the House of Lords, and then only if it was appropriate for their Lordships to reconsider the rule against reflective loss.

**Conclusion**

[76] In these circumstances, I am of the view that the decision of Blackburne J was correct, and it follows that Mr Gardner's appeal must be dismissed.


**BODEY J.**

[77] I agree.


**MANCE LJ.**

[78] I also agree.

*Appeal dismissed. Any ancillary issues to be dealt with at a later date.*

Mary Rose Plummer Barrister.

Case: 11-126    Document: 64    Page: 109    04/25/2011    272930    401

A-5708

[HOUSE OF LORDS.]

LIVINGSTONE . . . . . . . . . APPELLANT;          H. L. (Sc.)

THE RAWYARDS COAL COMPANY . . RESPONDENTS.          1880
Feb. 13.

*Coal Mine worked by Mistake beyond Boundary—Compensation—Evidence of the Measure of Damage—Royalty—Surface Damage—Way-leave.*

*A.* was the owner of a small feu of about an acre and a half in extent. The surface of the ground was occupied by miners' cottages, and underneath was coal. When *A.* purchased the feu, he was under the impression that all the minerals under the feu, as under all the ground surrounding it, had been reserved to the superior; but that was a mistake, for in the deed granting the feu there was no reservation of coal. The superior granted the whole property in the coals in all the surrounding land to *R.* and *C.* They, under the impression that they had the whole of the coal, including the coal under the acre and a half, worked out and disposed of the coal under *A.*'s acre and a half; and in doing so damaged the surface.

*A.* could not have worked the coal to a profit himself; there was no person to whom he could dispose of it but to *R.* and *C.*; and the element of wilful trespass, and the element of special and exceptional need of support to the surface, were absent.

In a claim by *A.* for (1) the value of the coal; (2) a sum for " way-leave" and the advantage obtained by working through instead of round the feu; and (3) for damages done to the houses on the surface :—

*Held,* affirming the decision of the Court below, that the value of the coal taken must be the value of the coal to the person from whom it is taken, at the time it is taken, and that the best evidence in the peculiar circumstances of this case of that value was the royalty paid by *R.* and *C.* for the surrounding coal field; therefore *A.* was entitled to the lordship on the coal excavated, calculated at that rate; together with the payment of a sum for damage done to the houses on the surface.

*Held,* also, that as the question of "way-leave" was not argued before the First Division of the Court of Session, it could not be entertained in this House.

The principle of *Jegon* v. *Vivian* (Law Rep. 6 Ch. 742) sustained.

APPEAL from the First Division of the Court of Session in *Scotland.*

In 1837 Mr. *Gavin Black,* then proprietor of the lands of *Rawyards,* near *Airdrie, Lanarkshire,* feued out a small portion of land, namely, 1 acre 30 falls and 21 ells, to the *Monkland Iron and Steel Company.* By the feu disposition the grantor specially

Case: 11-126    Document: 64    Page: 110    04/25/2011    272930    401

A-5709

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

reserved to himself, his heirs and successors, the whole ironstone in the ground feued; but the deed contained no reservation of coal.

In 1869 the Appellant, Mr. *James Livingstone*, purchased the feu, and some thirty miners' cottages, which covered the surface, for £80, from the *Monkland Iron and Steel Company*. The Appellant appears to have been under the impression that all the minerals under the feu, as under all the ground surrounding it, had been reserved by the superior.

In 1871 Mr. *Gavin Black* died, and was succeeded by Mr. *John Motherwell*, the present proprietor of the lands of *Rawyards*. He, in the belief that all the coal on the estate had been reserved, granted in 1872 a lease of the whole property in the coal—as far as this appeal is concerned—to the Respondents, the *Rawyards Coal Company*, at a royalty of 6*d*. per ton. They, just as the Appellant was ignorant of his rights, were ignorant of theirs; for they believed they were the owners of all the coal, including the coal under the Appellant's feu. Accordingly, in the ordinary course of their working, and between May, 1871, and May, 1876, they wrought out and removed the coal under the Appellant's acre and a half, to the amount of 5895 tons. When this was done, and the coal disposed of, it was discovered what the real titles were, through the Appellant examining his titles for the prosecution of a claim for surface damage; for the Respondents in working under the acre and a half had, by letting down the ground, caused damage to the miners' cottages. The question under these circumstances came to be, what was the measure of damages the Appellant was entitled to. It was admitted that what was done, was done in perfect ignorance, and that there was no bad faith, nor sinister intention on the part of the Respondents. The Appellant in his action claimed (1) the value of the coal, under the deduction of proper allowances for raising the same; (2) a sum for way-leave, in respect that large quantities of coal had been carried from the adjacent coal field through the Appellant's feu; (3) damages done to the miners' cottages. The Respondents, admitting they had taken the Appellant's coal, tendered in discharge of the action £450 10*s*. This offer being

refused by the Appellant, the Lord Ordinary (1), after a proof, found, June 10, 1878, *inter alia,*

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

"That the coal removed from the Pursuer's (Appellant's) feu by the Defenders (Respondents) consisted of 4300 tons or thereby of free (or common) coal, 1275 or thereby of dross, and 320 tons or thereby of gas coal, in all 5895 tons or thereby; and the value of these at the pithead, according to a reasonable calculation of the market value, was as follows: common coal, at 6s. per ton, £1290; dross, at 1s. 6d. per ton, £95 12s. 6d.; and gas coal, at £1 3s. 11d. per ton, £382 13s. 4d.; thus amounting in all to    .    .    .    .    .    .    .    . £1768  5 10

"(5) That a fair price for working the said coal may reasonably
be fixed at 4s. 3d. per ton over head; this sum including
everything except lordship and capital charges, the amount
at this rate being in the aggregate  .    .    .    .    .     1252 13  9

"And leaving as free profit or value in the hands of the
Defenders, derived from coal belonging to the Pursuer, the
sum of   .    .    .    .    .    .    .    .    .    .     £515 12  1
    "In the second place that the Pursuer is entitled to recover the said sum of
£515 12s. 1d. from the Defenders: finds Pursuer entitled to the expenses of
process, &c."

The Lord Ordinary disallowed the Appellant's claim for damage to his houses by subsidence of the surface, holding that was a loss which the Appellant must necessarily have incurred had he himself worked out the coal. The Lord Ordinary also rejected the claim by the Appellant for "way-leave," amounting to £33 6s. 8d., calculated at the rate of about 2d. per ton; and the Appellant's claim for £110 9s. 8d., as the amount alleged to have been saved to the Respondents by working through, instead of round the Appellant's feu. And these claims were not mentioned by the Appellant's counsel when the case was argued before the First Division. The Respondents being of opinion that the Lord Ordinary had misapprehended the nature of their contention, and had greatly underrated the expense of working the coal, presented a reclaiming note against his decision. The First Division, on the 20th of May, 1879, reversing the Lord Ordinary's interlocutor, found that the Appellant was entitled to £171 7s. 6d., being the amount of lordship on the coal excavated, calculated at the rate paid by the Respondents to the superior for the surrounding coal field, with, in addition, a further sum of £200 as

(1) Lord *Craighill,*

Case: 11-126    Document: 64    Page: 112    04/25/2011    272930    401

A-5711

H. L. (Sc.)
1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

compensation for damage done to the houses on the surface.   In respect of the tender their Lordships gave the Respondents their costs from the date of the said tender (1).

Mr. *Davey*, Q.C., and Mr. *Guthrie Smith*, for the Appellant, contended that he was entitled to the value of the coal after deduction of the cost of severance and bringing it to the surface.   Here the value of the coal was the free profit made by the Respondents. The Appellant was content with the Lord Ordinary's finding; but the judgment of the First Division was in effect to compel the real owner of the coal to receive a royalty, giving the whole profit made to the trespassers.   That finding was not consistent with the principle of *Jegon* v. *Vivian* (2) and the earlier cases. Where the coal is taken by fraud or negligence, the proper estimate of damage is the value of the coal when gotten, without deducting the expense of getting it: *Martin* v. *Porter* (3), *Wild* v. *Holt* (4), and *Phillips* v. *Homfray* (5).   But where taken by mistake, and an encroachment under title, a milder rule prevails, though in *Morgan* v. *Powell* (6) the Defendant was not allowed the cost of the severance of the coal.   So in *Wood* v. *Morewood* (7), a case at *Nisi Prius*, *Parke*, B., told the jury that if they thought the defendant was not guilty of fraud or negligence, but acted fairly and honestly, in the full belief that he had a right to do what he had, they might give the fair value of the coals as if the coal field had been purchased from the Plaintiff. The jury found that there was no fraud, and estimated the damages accordingly.   That case was the precedent for the principle on which *Jegon* v. *Vivian* (2) was decided: see also *Hilton* v. *Woods* (8), remarks of *Malins*, V.C. (9); *In re United Merthyr Collieries Company* (10).

The value of the coal taken was the profit admittedly gained by the Respondents, but the Court below thought the question of

(1) Court of Sess. Cas. 4th Series, vol. vi. p. 922; Scotch Law Rep. vol. xvi. p. 530.
(2) Law Rep. 6 Ch. 742.
(3) 5 M. & W. 351.
(4) 9 M. & W. 672.

(5) Law Rep. 6 Ch. 770.
(6) 3 Q. B. 278.
(7) Ibid. 440, n.
(8) Law Rep. 4 Eq. 432.
(9) Ibid. at p. 440.
(10) Ibid. 15 Eq. 46.

the profit realized by the trespasser not of the least relevancy. If that judgment is right then the real owner would be wrong in claiming his own coal lying at the pit's mouth, for it would be a sufficient answer for the trespasser to tender the lordship. The fact ought to weigh that the Appellant did not want the coal removed, on the contrary it was of great value to him having a firm foundation in a county so honeycombed as *Lanarkshire.*

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

[LORD BLACKBURN:—The Court below decided this case on the peculiar circumstances that no one could work this coal at a profit unless he had the facilities of the Respondents.]

It was no answer that the Appellant could not have worked the coal himself. He was entitled to have the chattel taken, restored, or, if that was impossible, then the profit made out of it must be handed over to him.

The Appellant was satisfied with the amount awarded by the Court below for surface damage, but submitted he was also entitled to the clear profit made out of the coal.

They further maintained that a sum should be allowed the Appellant for "way-leave," or for the advantage reaped by the Respondents by working their tramways through, instead of round the feu.

[EARL CAIRNS:—That question was not argued before the Inner House, and it is not usual to argue points in this House that have not been argued before the Court below.]

On the whole matter they submitted that the Appellant was entitled to the profit made, and to costs.

Mr. *E. E. Kay*, Q.C., and Mr. *Gloag*, maintained for the Respondents—putting aside the compensation for surface damage— that all the Appellant was entitled to was the value of the coal *in situ*; that principle was laid down in both *Wood* v. *Morewood* (1) and *Jegon* v. *Vivian* (2). The question was not what the trespasser made of the coal, but what the owner *could* have made of it. The Appellant had no right to follow the coal; nor was the profit made on it by the Respondents any test of its value

(1) 3 Q. B. 440, n.                    (2) Law Rep. 6 Ch. 742.

H. L. (Sc.)
1880
—
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

*in situ.* The circumstances here were most peculiar,—the Appellant could not sink a shaft and work the coal himself at a profit; nor was there a single person he could sell the right of working it to, except the Respondents; and the Appellant's own surveyor advised him to take the ordinary royalty given for the coal in the neighbourhood. Therefore the value of the coal to the Appellant was accurately given by the Court of Session, and the principle of the cases cited had been applied.

Mr. *Guthrie Smith*, in reply.

EARL CAIRNS, L.C.:—

My Lords, there are two minor points in this appeal which I may mention in the first place, for the purpose of putting them on one side. I mean the question of an allowance for way-leave, and the question of an allowance for what is termed the advantage obtained by working through, instead of round, the feu of the Appellant. Both those points were insisted upon before the Lord Ordinary; but when the matter came before the First Division, the contest of the Appellant with regard to those points does not appear to have been renewed; and, therefore, to enter upon them now would be in substance to entertain in this House an appeal from the Lord Ordinary, and not from the First Division.

Upon the main question which has been argued the case is one of some peculiarity. The Appellant is the owner of a small feu of about an acre and a half in extent near *Airdrie*. The surface of the ground is occupied by miners' cottages or houses, and underneath there was coal. When the Appellant bought the feu some time ago he appears to have been under the impression that the minerals under this feu, as under all the ground which surrounded it, had been reserved by the superior. In point of fact that was a mistake. The superior kept in his hand the minerals under all the ground around, but under this acre and a half the coal had not been reserved in the grant of the feu now owned by the Appellant. The Appellant, therefore, although he did not know it, was the owner of the coal under this acre and a half of ground. The superior granted the whole property in all the surrounding

land to the company who are the Respondents, and they, just as the
Appellant was ignorant of his rights, appear to have been ignorant
of theirs.  They appear to have been under the impression that they
had the whole of the coal, including the coal under the acre and
a half.  They had the coal which surrounded the acre and a half,
but they had not the coal which was underneath the acre and a
half.  In the process of their working they worked out the coal
under the acre and a half, and when that was done it was ascer-
tained (it is unnecessary to observe how the discovery came to be
made) what the real titles were, and that this coal really belonged
to the Appellant, and did not belong to the Respondents, who had
got it and disposed of it.  I ought to add that in working under
the acre and a half of ground they had, by letting down or cracking
the ground, caused some damage to the miners' cottages which
stood upon the surface of the acre and a half.

Now, my Lords, under these circumstances the question arises,
what is the measure of damage to which the Appellant is entitled ?
We may put aside some elements which might occur in some cases,
but which do not occur in the present case.  There is absent here
the element of any wilful trespass or wilful taking of coal, which
the person taking it knew did not belong to him.  What was done
was done in perfect ignorance, and there was no bad faith or sinister
intention in that which was done.  We may put aside another
element which might have occurred.  It might have been the case
that the support of the coal under this acre and a half of ground
had been of some peculiar advantage or benefit to the Appellant, for
which no money would compensate him.  Either by some use
made of the surface, or by some specific use intended to be made
of the surface, there might have been a peculiar need for the
support of the minerals underneath, which might either have
made it impossible to estimate the damage, or might have made
the estimate of the damage exceptionally high.  Neither of these
elements occurring—neither the element of what I will call wilful
trespass, nor the element of special and exceptional need of
support—the case is one in which your Lordships have simply to
ascertain what is the ordinary measure of damage for the coal
taken, or what, in other words, is the value of the coal that was
taken.

H. L. (Sc.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Earl Cairns, L.C.

32                          HOUSE OF LORDS                    [VOL. V.

H. L. (Sc.)
1880
LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Earl Cairns, L.C.

Of course the value of the coal taken must be the value to the person from whom it was taken, because I do not understand that there is any rule in this country, or in *Scotland*, that you have a right to follow the article which is taken away, the coal which is severed from the inheritance, into whatever place it may be carried or under whatever circumstances it may come to be disposed of, and to fasten upon any increment of value which from exceptional circumstances may be found to attach to that coal. The question is, what may fairly be said to have been the value of the coal to the person from whose property it was taken at the time it was taken.

I own that it appears to me that the Court of Session have adopted a principle which is not unsatisfactory for the purpose of ascertaining that value. They have said, The value to this Appellant is not the value which he could have derived from himself working the coal and taking it into the market, because he could not have worked it; the area is so small that it would have been impossible for himself to have worked and used the coal, and earned a profit, or put an additional value upon the coal by so working it; he must have gone to some person, or waited till some person came to him who had the power of working the coal from adjacent working; therefore (say they) the value is that which he could have obtained from somebody else who would have come and taken the coal as it stood *in situ*, and who would have worked it and turned it to account. Then they go to the witnesses of the Appellant, and they must take Mr. *Rankine*, his principal witness; and I observe that another witness of the same stamp and character as Mr. *Rankine* immediately follows, who wishes his testimony to be taken as repeating Mr. *Rankine's in omnibus*. Therefore those two witnesses must be taken to say this. Mr. *Rankine* is asked this question: "Suppose you had been asked by Pursuer whether it would be advisable for him to sell the whole of these minerals to Defenders for £100, the Defenders paying compensation for the damage to the houses, would you have advised him to take it?" And his reply is: "The advice I have invariably given—I have done it in two instances within the last two years—is, 'Don't let your coal for a less lordship than that obtained by the adjoining proprietor;' and in that case I should have said to the Pursuer,

'Do not take less than £171 7s. 6d. for the coal, plus the damage to the houses.'" He says that the advice which he would have given to his client would have been not to sell for less than (which implies, of course, to sell for) £171 7s. 6d., plus the damage done to the surface; that is to say, that if there had come to him some person who, from possession of the adjoining property, had been able to work this coal, and had asked the Appellant to sell the coal to him, the Appellant would have been advised to reply, "I will sell you the coal for a royalty, that is to say, a sum per ton which will produce to me £171 7s. 6d.; but in addition, you must undertake to pay me whatever damage is done to my houses which are upon the surface of the land;" and, for the purpose of the present argument the amount of damage as ascertained and not objected to is a sum of £200.

H. L. (Sc.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Earl Cairns, L.C.

Upon that evidence the Court of Session say, "We are of opinion that the value to this Appellant of this coal was the money that would have been produced if he had sold the coal, and the money that he would have got if he had sold the coal would have been £171 7s. 6d.; but that would have been accompanied and guarded by a further payment which would have indemnified him for the damage done to the houses upon the surface in getting the coal, and that further sum he must have, in addition to the £171 7s. 6d."

My Lords, I own that under the very peculiar circumstances of this case, there being only the element to consider to which I have referred, namely, the element of value to the Appellant, I think he has received in the judgment of the Court of Session that which is the proper value, and I see no reason for differing from the judgment of the learned Judges. I therefore advise your Lordships, and move your Lordships, that the appeal be dismissed with costs.

LORD HATHERLEY :—

My Lords, after carefully considering the case I have come to the same conclusion, though at one time I was under the impression that there was more in the question of the sale by royalty being as it were enforced than I at present think.

The case is certainly a very peculiar case, and, without with-

Case: 11-126    Document: 64    Page: 118    04/25/2011    272930    401

A-5717

H. L. (Sc.)
1880
——
LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.
——
Lord Hatherley.

drawing from any of the principles which I found in the case of *Jegon* v. *Vivian* (1) to be established by the prior authorities, I think this case may be disposed of, and will be disposed of, by your Lordships in entire consistency with those principles. There is no doubt that if a man furtively and in bad faith robs his neighbour of property, and, because it is underground, is probably not for some time detected, the Court of Equity in this country will struggle, or I would rather say will assert its authority, to punish fraud by fixing the person with the value of the whole of the property which he has so furtively taken, and making him no allowance in respect of what he has so done as would have been justly made to him if the parties had been working by agreement, or if, as in the present case, they had been the one working and the other permitting the working through a mistake.

The Courts have already made a wide distinction between that which is done by the common error of both parties, and that which is done by fraud. In the present case, it is clear on both sides that each party was ignorant of the rights of the Pursuer, and consequently the matter is not to be treated as a case of forced sale, but as a case of sale which has taken place by in-advertence; and what we, as a Court of Justice, have to do is to see that under these untoward circumstances that which never ought to have been done at all, but which has been done either through want of watchfulness or through want of knowledge, as the case may be, and which has occasioned in the doing an injury to either of the parties, is remedied and set right, so far as it can be, upon equitable principles. Those principles are no doubt settled by the authorities, many of which have been cited in the course of this argument; those principles are that the owner shall be re-possessed as far as possible of that which was his property, and that, in respect of that which has been destroyed, or removed, or sold, or disposed of, and which cannot therefore be restored in specie, there shall be such compensation made to him as will in fairness between both parties give to the one party the whole of that which was his, or the whole value of that which was his, and will at the same time give to the other, in calculating that value, just allowances for all those outlays which he would have been obliged to make if he had been entering into a contract for that

(1) Law Rep. 6 Ch. 742.

Case: 11-126    Document: 64    Page: 119    04/25/2011    272930    401

A-5718

being done which has, by misfortune and inadvertence on both sides, and through no fault, been done. Perhaps the law may have even gone a step further than in some cases might be necessary. Each case must stand upon its own particular foundation in that respect; but, regard being had to the rule *vigilantibus non dormientibus*, it requires to be carefully considered in each particular case how far the principle is just which deals with property under such circumstances as property which has been acquired by one person from another without payment, and by inadvertence. But when we once arrive at the fact that an inadvertence has been the cause of the misfortune, then the simple course is to make every just allowance for outlay on the part of the person who has so acquired the property, and to give back to the owner, so far as is possible under the circumstances of the case, the full value of that which cannot be restored to him in specie.

In this case we are singularly free from any difficulty upon the point, and the parties seem to have carried on the litigation on a principle which does them credit, and on which one wishes to see all litigation carried on. They say, "The misfortune has taken place: we neither of us knew anything about this at the time, and now that it has taken place let us see what can best be done to remedy the misfortune which has so occurred." We find the position of the case to be a very singular one indeed, and one which is not likely to recur in many instances, though it may in some instances—it is this. A small piece of ground, an acre and half in extent, being the property of the Pursuer, is surrounded by the property of the Defenders; and the Defenders thought (and the Pursuer thought so too) that it was included in their property, instead of being a separate portion surrounded by their property. That being the case, one thing was perfectly clear (and I shall make it clearer presently by reading the Pursuer's own evidence), that nothing could be made by the Pursuer of this acre and a half of ground by working it himself. He would not sink a shaft or put up a steam-engine, or use any of the ordinary modes of working a mine, in respect of this acre and a half of ground; and indeed, that is what he tells us himself, because, in words which were read by the learned counsel who last addressed your Lordships, the Pursuer says, in his own appendix of proofs, on re-cross-

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Hatherley.

3        D 2

Case: 11-126    Document: 64    Page: 120    04/25/2011    272930    401

A-5719

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Hatherley.

examination: "If the Defenders had not taken away this coal, I might have arranged with them to take it away through their pit, but I don't think it would have been profitable to have done so; I would rather have it standing. I don't think there was any way in which I could have turned this coal into money;" and then he goes to another subject. Several houses were built upon this property; they were apparently small cottages, not of a very heavy description in themselves, and he complains that if he were minded (though it does not appear that he ever was so minded) to build a manufactory or some large building upon the ground, he would not, in consequence of its being so worked by the Defenders, be in a position to find a foundation for his building. Whether he refers to that when he says that he would rather have it remain as it was I do not know, because in his evidence he touches upon it very lightly; but he says that he could not work it himself, and that there were no people to whom he could dispose of it but the Defenders themselves.

My Lords, that being so I do not know what better mode there could have been for ascertaining what the value of the property in this case was, than by doing what the Pursuer himself says he should have been obliged to do in order to turn it into money, and what his own agent, Mr. *Rankine*, said he always advised him to do. Mr. *Rankine*, his agent, said: "It is not workable by yourself in consequence of its small size, and of its so being surrounded by other property—so make the best you can of it, only do not let yourself be driven into a corner. You may perhaps find yourself put to a disadvantage by having only one purchaser; nevertheless, do not part with it for a less royalty than you could get from anybody else, and whatever others are willing to pay I should stand upon, and if you cannot get that I should insist upon retaining the property in its present shape." That being so, the Pursuer says in his evidence, "I don't think that there was any way in which I could have turned this coal into money. It was about the middle of 1875, when the houses began to crack, that I first knew the Defenders were in the course of working out coal under my feu. I spoke about the matter to Mr. John *Motherwell*. I did not ask that the working should be stopped. I suggested that it should have been wrought stoop-and-room for the sake of

Case: 11-126    Document: 64    Page: 121    04/25/2011    272930    401

protecting the property as much as possible. I made no objection to their going on with the working out of the coal below the feu; I was quite content that they should go on with the working." That was before he knew that the coal under the property was his own. Up to that time he could not of course know very well what rights he had to stop this working; but when you put the two sentences together,—one, that he could not have disposed of the property to any other persons, and the other, that he did not think of taking any steps to stop the working, I think he cannot complain that he has got from the gentlemen the very same terms that he would have got from the adjoining proprietors with whom he has to deal.

The learned Judges in the Court below seem to have proceeded upon that footing. The Lord President says, "In addition to the consideration above mentioned, it must be kept in view that the coal in question was surrounded on all sides by the coalfield of the superior, which is leased to the Defenders. As the Pursuer's estate is only one and a half acres in extent it is evident that the coal under it could not have been worked to profit by himself working independently. Nobody but the superior or his lessees could have worked the coal to any profit. Now, let us consider the position of the Pursuer before the Defenders commenced to work his coal. He was then in possession of a certain piece of coal, and his object must be assumed to be to make the most of it. It cannot be assumed that he could contemplate keeping the coal as a support for his cottages, instead of working it out. It was situated in a part of the country where every available bit of mineral is in use to be wrought. Now, at that point of time, had the parties come together the coal would in all probability have been disposed of to the Defenders on terms mutually advantageous. The Pursuer says indeed, that he could have made exceptionally good terms for himself, as his coal stood in the way of the Defenders' working. But I think when Mr. *Smith* spoke of the Defenders' necessity being the Pursuer's opportunity he went too far. I do not think that the purchase of the Pursuer's coal was a matter of necessity to the Defenders, but only a matter of convenience. There was nothing to prevent their working round his coal. But, on the other hand, if the Pursuer wished to

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
BAWYARDS
COAL
COMPANY.

Lord Hatherley.

Case: 11-126    Document: 64    Page: 122    04/25/2011    272930    401

A-5721

H. L. (Sc.)
1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Hatherley.

make the most of his coal he must have taken what the Defenders would give him, or let it stand." In that state of things, and finding that the coal has so been worked out, the learned Judges say, "We find that the best mode, in this particular case, of ascertaining the proper measure of damages is to give the Pursuer what the books and cases tell us we are to give him, that is to say :—As far as possible, the value of his coal, and that we will do by saying that he shall be compensated to the same extent as others have been compensated in adjoining properties ; besides that he shall be compensated, and he has been by the decree compensated, for any damage done to the buildings upon the surface." That has been estimated at £200, and acquiesced in by both parties. He is paid for the royalty £171 ; he is paid for the value of the coal which has been disposed of ; and therefore it seems to me that all he can possibly ask for has been given.

The question of way-leave does not seem to have been argued in the Court below, but if it had been argued I should have been prepared to say that I acquiesce in this particular case, and under all the circumstances of this case—which I think are extremely different in many remarkable particulars from those of *Jegon* v. *Vivian* (1)—in the interlocutor pronounced by the Lord Ordinary. But, looking at the form in which this case has been brought before us, no question of this kind arises. Nothing could have been properly estimated and given as the value of the right exercised by the Defenders of taking their waggons and coals from time to time through the ground of the Pursuer, they assuming it to be their own ground. What profit can be said to have been derived from that ? The profit is this : that you save distance ; you save other payments which you might have had to make, and therefore, inasmuch as the Pursuer cannot make out that the slightest damage has accrued to him in respect of that user, what you have to pay to him is only the value of his coal plus the damages to the surface. It appears to me to be quite consistent, and that the Pursuer rightly has not pressed that case of the way-leave, because he would have done so with very little effect.

Therefore, under all these circumstances, I am prepared to acquiesce entirely in the judgment of the Court below.

(1) Law Rep. 6 Ch. 742.

LORD BLACKBURN :—

I also think that the judgment of the Court below should be affirmed, and that consequently the appeal should be dismissed with costs.

The point may be reduced to a small compass when you come to look at it. I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages you should as nearly as possible get at that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation. That must be qualified by a great many things which may arise—such, for instance, as by the consideration whether the damage has been maliciously done, or whether it has been done with full knowledge that the person doing it was doing wrong. There could be no doubt that there you would say that everything would be taken into view that would go most against the wilful wrongdoer—many things which you would properly allow in favour of an innocent mistaken trespasser would be disallowed as against a wilful and intentional trespasser on the ground that he must not qualify his own wrong, and various things of that sort. But in such a case as the present, where it is agreed that the Defenders, without any fault whatever on their part, have innocently, and, being ignorant, with as little negligence or carelessness as possible, taken this coal, believing it to be their own, when in fact it belonged to the Pursuer, then comes the question,—how are we to get at the sum of money which will compensate them ?

Now, my Lords, there was a technical rule in the English Courts in these matters. When something that was part of the realty (we are talking of coal in this particular case) is severed from the realty and converted into a chattel, then instantly on its becoming a chattel, it becomes the property of the person who had been the owner of the fee in the land whilst it remained a portion of the land; and then in estimating the damages against a person who had carried away that chattel, it was considered and decided that the owners of the fee was to be paid the value of the chattel at

Case: 11-126    Document: 64    Page: 124    04/25/2011    272930    401

A-5723

H. L. (Sc.)
1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Blackburn.

the time when it was converted, and it would in fact have been improper, as qualifying his own wrong, to allow the wrongdoer anything for that mischief which he had done, or for that expense which he had incurred in converting the piece of rock into a chattel, which he had no business to do.

Such was the rule of the Common Law. Whether or not that was a judicious rule at any time I do not take upon myself to say; but a long while ago (and when I say a long while I mean twenty-five years ago) Mr. Baron *Parke* put this qualification on it, as far as I am aware for the first time. He said, If however the wrong-doer has taken it perfectly innocently and ignorantly, without any negligence and so forth, and if the jury, in estimating the damages, are convinced of that, then you should consider the mischief that has been really done to the Plaintiff who lost it whilst it was part of the rock, and therefore you should not consider its value when it had been turned into a piece of coal after it had been severed from the rock, but you should treat it at what would have been a fair price if the wrongdoer had bought it whilst it was yet a por-tion of the land as you would buy a coal-field (1). That was the rule to be applied where it was an innocent person that did the wrong; that rule was followed in the case of *Jegon* v. *Vivian* (2), which has been so much mentioned; it was followed in the Court of Chancery, and, so far as I know, it has never been questioned since, that where there is an innocent wrongdoing the point that is to be made out for the damages is, as was expressed in the minutes of the decree:—" The Defendants to be charged with the fair value of such coal and other minerals at the same rate as if the mines had been purchased by the Defendants at the fair market value of the district;" that I understand to mean as if the mines had been purchased while the minerals were yet part of the soil. That, I apprehend, is what is to be done here, and that is what both the Lord Ordinary and the First Division of the Court of Session have endeavoured to do. They have come to different pecuniary results, and the question really comes to be which is correct.

Upon that the Lord Ordinary, as I understand, has gone upon this position. He said, "I have taken evidence, and the result of

(1) *Wood* v. *Morewood*, 3 Q. B. n. 440.        (2) Law Rep. 6 Ch. 742.

H. L. (Sc.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Lord Blackburn.

that is, that it is agreed on all hands that this coal, when it was brought to the surface, actually did sell for £1768 5s. 10d. I look at the evidence, and I take the evidence to be that the actual amount expended by the Defendants (there is contradictory evidence on such points as might have been expected, and it is not all very clear), was 4s. 3d. per ton"—and, deducting that from the £1768 5s. 10d., he makes it £515 12s. 1d., which is what he says is the sum that the Pursuer ought to recover taking off all the expenses that the Defenders have incurred. But then, as it would necessarily follow, when you took away the coals that were below the land, that the surface of the land would come down, you must not take the sum which would be given as compensation for the injury to the surface twice over. You must not take that sum as being a matter which you are to be paid for, and also take the coals as if they had been got out without damage. On the Lord Ordinary's figures, as it seems to me, the £515 12s. 1d. would be right, and if there was no other way of getting at the figures, if you could not get evidence of the value of the coal *in situ* in a more correct way, I suppose it would be right to take them in that way. It is always a difficult thing to ascertain the actual expenses, and you may go wrong, but you must come as near to it as you can.

But then the Lord Ordinary himself observes that, taking that way of getting it, and giving the Pursuer £515 12s. 1d., "The truth of the matter is, that the removal of the Pursuer's coal by the Defenders, in place of being a misfortune, has been to the Pursuer a singular stroke of luck. The size of his feu is less than an acre and a half, and the coal which it contained could not have been wrought to profit by itself. The expense of sinking a pit and providing machinery would many times over have exceeded the value of the minerals. Possibly, no doubt, the Pursuer might have endeavoured to make with the Defenders terms upon which his coal might have been raised along with the coal of which they were the tenants. But the return which would have been rendered to him under such an arrangement must have fallen far short of what has been awarded by the Lord Ordinary. The lordship, in the circumstances, could not be expected to be higher than that paid by the Defenders for the adjoining portions of the seam ;

A-5725

42                          HOUSE OF LORDS                          [VOL. V.

H. L. (Sc.)
1880
LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Lord Blackburn.

and this, upon the quantity taken out, even if increased by reasonable damages for injury through subsidence to the houses on the surface, would certainly have fallen considerably short of £500." Now, when you find that the Lord Ordinary himself, who is professing to ascertain what is the money value of the damage that the Pursuer has received, says: "I have got at it in this particular way, but that money value is very considerably above the damage that you have received: it has been a singular stroke of good luck to you that you should get it," it occurs to one at once, *primá facie*, that there must have been something wrong in the way in which that money value was got at, and I think that there was an error in it, and that error was that the Lord Ordinary thought he was bound by decisions (which I do not think he was) to take that mode, and that mode only, of getting at the value of the coal *in situ*, namely, the price which the coal fetched when it was sold, deducting from that the cost of hewing and drawing and so forth, and so to ignore totally the fact this was an isolated small patch of land from which the Pursuer, as he himself admits, could not possibly have got coal by any practical means whatever, except by bargaining with the Defenders. I think there the Lord Ordinary was under a mistake. The Lord President points out very clearly to my mind that the Pursuer could not have made any use of his coal at all as long as he did not let it to the Defenders, who were the only people who could take it. He cannot do more than ask for his damage to the surface. That he is of course entitled to, as the Defenders have taken his coal without his leave and against his will. If they had taken it with full knowledge *scienter* there would have been very much more damage given; but they have innocently and ignorantly taken away his coal. "And then" (says the Lord Ordinary), "we must see what was the value of the coal *in situ* as it stood there to the Pursuer at the time when the Defenders by mistake took it away, and for that we must give compensation." Then he takes the evidence of Mr. *Rankine*, and says, "That is the best evidence that we could have of the value of the coal," and that sum is what the Court of Session has given.

My Lords, I only wish to say one word to guard against any misapprehension on a point which I at first a little misappre-

Case: 11-126    Document: 64    Page: 127    04/25/2011    272930    401

hended.   I do not think that this decision of the Court of Session
is that the royalty is the measure of the damages.   It is only that
it is evidence of the value which is the measure of the damages.
As to the other matters, about the way-leave and so forth, I quite
agree with what has been said by my noble and learned friend on
the woolsack, that inasmuch as in the Court of Session on appeal
from the Lord Ordinary those questions were not raised again
they are not before this House at all.   If they were, I should be
inclined to agree with what has been said by my noble and
learned friend opposite (1), and the Pursuer would gain very little
benefit from that contention.

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Blackburn.

> *Interlocutor appealed against affirmed ; and appeal*
> *dismissed with costs.*
>
> *Lords' Journals, Feb.* 13, 1880.

Agent for Appellant: *Andrew Beveridge.*
Agents for Respondents: *Simson & Wakeford.*

(1) Lord *Hatherley*, see p. 38.

254

[1997]

[HOUSE OF LORDS]

SMITH NEW COURT SECURITIES LTD. . . APPELLANT
CROSS-RESPONDENT

AND

CITIBANK N.A. . . . . . . RESPONDENT
CROSS-APPELLANT

[On appeal from SMITH NEW COURT SECURITIES LTD. v. SCRIMGEOUR
VICKERS (ASSET MANAGEMENT) LTD. AND ANOTHER]

1996 June 24, 25, 26, 27;    Lord Browne-Wilkinson, Lord Keith of Kinkel,
July 1, 2, 3;                Lord Mustill, Lord Slynn of Hadley
Nov. 21                      and Lord Steyn

*Damages—Measure of damages—Misrepresentation—Sale of shares—
Misrepresentation inflating price of shares above market value—
Unconnected fraud later discovered likely to depress price of
shares—Whether court to take account of unconnected fraud in
assessing damages—Whether loss flowing from misrepresentation
difference between price paid for shares and market value
disregarding fraud*

On 21 July 1989 an employee of the second defendant, which
was acting as broker for the first defendant, made representations,
subsequently discovered to be false, that in buying shares in a
public company the plaintiff would be competing with two other
bidders, that he would disclose the competing bids after the
plaintiff had made its bid and that two other named companies
had made bids. The plaintiff bought 28,141,424 shares in the
company at 82½p each with a view to holding them as a market-
making risk and selling them when an appropriate opportunity
arose. By September 1989 it became known that a fraud had been
perpetrated on the company, which caused a slump in the value
of its shares. Between 20 November 1989 and 30 April 1990 the
plaintiff sold the shares in small parcels for a total of just over
£11m. It brought an action against both defendants for damages.
The judge dismissed the action against the first defendant but
found that the plaintiff was entitled to recover damages from the
second defendant equivalent to the difference between the price
paid and the true value of the shares, which he found to be 44p
each as at 21 July 1989. The judge found that if there had been
no misrepresentation the plaintiff would have offered 78p for
each share. The Court of Appeal allowed the second defendant's
appeal, holding that, although the judge had misdirected himself
on one aspect of the facts, his decision on liability of the second
defendant was correct on other grounds. The court concluded
that the correct measure of damages was the difference between
the price per share actually paid by the plaintiff of 82½p and the
price which, in the absence of misrepresentation, the shares would
have fetched on the open market on 21 July 1989, namely 78p,
and reduced the damages to £1,196,010.

On appeal by the plaintiff and cross-appeal by the second
defendant:—

255

A.C.                Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))

A    *Held,* (1) dismissing the cross-appeal, that the second and
third representations made by the employee were proved, but not
the first; that the judge had found ample evidence for the
conclusion that in the absence of those representations the
plaintiff would have withdrawn from the transaction; and that,
accordingly, the essentials of the tort of deceit were established
(post, pp. 260B–C, 268G–269C, G–H, 278A–D).

B    (2) Allowing the appeal, that where a contract was induced
by fraudulent misrepresentation the measure of damages was
reparation for all the loss directly caused by entering the
transaction, whether or not it was foreseeable, and included
consequential loss; that the plaintiff was under a duty to mitigate
his loss once he became aware of the fraud and that he had to
give credit for any benefit received including, as a general rule,
the market value of property acquired at the date of acquisition;
but that the general rule as to market value at the date of
C    acquisition would not normally apply where the misrepresentation
continued to operate so as to induce the plaintiff to retain the
asset, or where the circumstances were such that by reason of the
fraud the plaintiff was locked into the property; and that,
accordingly, in the circumstances since the plaintiff's loss flowed
directly from the acquisition of the shares rather than from their
retention and since to require it to give credit for a value of 78p
D    per share as at the date of acquisition would not compensate it
for its loss since it could not have sold the shares at that price on
that date, the correct measure was the difference between the
price paid and the amount subsequently realised on sale (post,
pp. 264H–265E, 266H–267C, 268A–D, G–269A, C–D, F–H, 281G–H,
282B–E, 285F–286A).

Dictum of Lord Atkin in *Clark v. Urquhart* [1930] A.C. 28,
68, H.L.(N.I.) and *Doyle v. Olby (Ironmongers) Ltd.* [1969]
E    2 Q.B. 158, C.A. applied.

*Twycross v. Grant* (1877) 2 C.P.D. 469, D.C. and C.A.;
*Waddell v. Blockey* (1879) 4 Q.B.D. 678, C.A.; *Peek v. Derry*
(1887) 37 Ch.D. 541, C.A. and *McConnel v. Wright* [1903] 1 Ch.
546, C.A. considered.

Dicta of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R.
426, 443G, 444B, C.A. disapproved.

F    Decision of the Court of Appeal [1994] 1 W.L.R. 1271; [1994]
4 All E.R. 225 reversed.

The following cases are referred to in the opinions of their Lordships:

*Arkwright v. Newbold* (1881) 17 Ch.D. 301, Fry J. and C.A.
*Attorney-General of Hong Kong v. Wong Muk Ping* [1987] A.C. 501; [1987]
2 W.L.R. 1033; [1987] 2 All E.R. 488, P.C.
G    *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C.
191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Broome v. Speak* [1903] 1 Ch. 586, C.A.
*Cemp Properties (U.K.) Ltd. v. Dentsply Research & Development Corporation*
[1991] 2 E.G.L.R. 197, C.A.
*Clark v. Urquhart* [1930] A.C. 28, H.L.(N.I.)
*County Personnel (Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987]
H    1 W.L.R. 916; [1987] 1 All E.R. 289, C.A.
*Davidson v. Tulloch* (1860) 2 L.T. 97, H.L.(Sc.)
*Dodd Properties (Kent) Ltd. v. Canterbury City Council* [1980] 1 W.L.R. 433;
[1980] 1 All E.R. 928, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.

256

Doyle v. Olby (Ironmongers) Ltd. [1969] 2 Q.B. 158; [1969] 2 W.L.R. 673;    A
    [1969] 2 All E.R. 119, C.A.
East v. Maurer [1991] 1 W.L.R. 461; [1991] 2 All E.R. 733, C.A.
H. (Minors) (Sexual Abuse: Standard of Proof), In re [1996] A.C. 563; [1996]
    2 W.L.R. 8; [1996] 1 All E.R. 1, H.L.(E.)
IBL Ltd. v. Coussens [1991] 2 All E.R. 133, C.A.
Johnson v. Agnew [1980] A.C. 367; [1979] 2 W.L.R. 487; [1979] 1 All E.R. 883,
    H.L.(E.)
Livingstone v. Rawyards Coal Co. (1880) 5 App.Cas. 25, H.L.(Sc.)    B
McConnel v. Wright [1903] 1 Ch. 546, C.A.
Overseas Tankship (U.K.) Ltd. v. Morts Dock & Engineering Co. Ltd. (The
    Wagon Mound) [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1 All E.R.
    404, P.C.
Pasley v. Freeman (1789) 3 Durn. & E. 51
Peek v. Derry (1887) 37 Ch.D. 541, C.A.; (1889) 14 App.Cas. 337, H.L.(E.)    C
Potts v. Miller (1940) 64 C.L.R. 282
Royscot Trust Ltd. v. Rogerson [1991] 2 Q.B. 297; [1991] 3 W.L.R. 57; [1991]
    3 All E.R. 294, C.A.
Ruxley Electronics and Construction Ltd. v. Forsyth [1996] A.C. 344; [1995]
    3 W.L.R. 118; [1995] 3 All E.R. 268, H.L.(E.)
Shepheard v. Broome [1904] A.C. 342, H.L.(E.)
Smith Kline & French Laboratories Ltd. v. Long [1989] 1 W.L.R. 1; [1988]    D
    3 All E.R. 887, C.A.
Toteff v. Antonas (1952) 87 C.L.R. 647
Twycross v. Grant (1877) 2 C.P.D. 469, D.C. and C.A.
Waddell v. Blockey (1879) 4 Q.B.D. 678, C.A.
Yorkshire Dale Steamship Co. Ltd. v. Ministry of War Transport [1942] A.C.
    691; [1942] 2 All E.R. 6, H.L.(E.)

The following additional cases were cited in argument:    E

Akerhielm v. De Mare [1959] A.C. 789; [1959] 3 W.L.R. 108; [1959] 3 All E.R.
    485, P.C.
Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45; [1986] 3 W.L.R. 414;
    [1986] 3 All E.R. 468, C.A.
Bradford Third Equitable Benefit Building Society v. Borders [1941] 2 All E.R.
    205, H.L.(E.)
Clemance v. Hollis [1987] 2 N.Z.L.R. 471    F
Cornwall Coast Country Club v. Cardgrange Ltd. [1987] 1 E.G.L.R. 146
Electricity Supply Nominees Ltd. v. London Clubs Ltd. [1988] 2 E.G.L.R. 152
Gould v. Vaggelas (1985) 157 C.L.R. 215
Hinchcliffe v. Crabtree [1972] A.C. 707; [1971] 3 W.L.R. 821; [1971] 3 All E.R.
    967, H.L.(E.)
Hontestroom, S.S. v. S.S. Sagaporack [1927] A.C. 37, H.L.(E.)
Jamal v. Moolla Dawood Sons & Co. [1916] 1 A.C. 175, P.C.    G
Khoo Sit Hoh v. Lim Thean Tong [1912] A.C. 323, P.C.
Lynall, decd., In re [1972] A.C. 680; [1971] 3 W.L.R. 759; [1971] 3 All E.R.
    914, H.L.(E.)
Montgomerie & Co. Ltd. v. Wallace-James [1904] A.C. 73, H.L.(Sc.)
Nautamix B.V. v. Jenkins of Retford Ltd. [1975] F.S.R. 385
Onassis and Calogeropoulos v. Vergottis [1968] 2 Lloyd's Rep. 403, H.L.(E.)
P. Caland and Freight (Owners of the) v. Glamorgan Steamship Co. Ltd. [1893]    H
    A.C. 207, H.L.(E.)
Quinn v. Leathem [1901] A.C. 495, H.L.(I.)
Reg. v. Secretary of State for the Home Department, Ex parte Khawaja [1984]
    A.C. 74; [1983] 2 W.L.R. 321; [1983] 1 All E.R. 765, H.L.(E.)

257

A.C.                Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))

A    *Reg. v. Wolverhampton Coroner, Ex parte McCurbin* [1990] 1 W.L.R. 719;
        [1990] 2 All E.R. 732, C.A.
      *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
        3 All E.R. 785, H.L.(E.)
      *Watt or Thomas v. Thomas* [1947] A.C. 484; [1947] 1 All E.R. 582, H.L.(Sc.)

B     APPEAL and CROSS-APPEAL from the Court of Appeal.
        This was an appeal by the plaintiff, Smith New Court Securities Ltd.
      ("Smith"), and a cross-appeal by the second defendant, Citibank N.A.,
      pursuant to leave to appeal granted on 8 December 1994 by the Appeal
      Committee of the House of Lords (Lord Keith of Kinkel, Lord Browne-
      Wilkinson and Lord Lloyd of Berwick) and leave to cross-appeal granted
      on 31 January 1995 by the Appeal Committee (Lord Keith of Kinkel,
C     Lord Mustill and Lord Lloyd of Berwick) from a decision dated
      17 February 1994 of the Court of Appeal (Nourse, Rose and
      Hoffmann L.JJ.). The court allowed an appeal by Citibank from an order
      dated 25 March 1992 of Chadwick J. and varied the order by, inter alia,
      substituting £1,196,010, for £10,764,005, which were awarded by the judge
      to Smith by way of damages.
        In an action by Smith against the first defendant, Scrimgeour Vickers
D     (Asset Management) Ltd., to which Citibank was added as the second
      defendant, the judge found, dismissing the action against the first
      defendant that Smith was induced to enter into an agreement to buy
      certain shares in Ferranti International Signal Plc. by false and fraudulent
      representations made by Citibank's representative. The judge, accordingly,
      decided that Smith was entitled to recover damages of £10,754,005,
E     together with interest from Citibank. That sum represented the difference
      between the price paid by Smith and the true value of the shares at the
      date of acquisition.
        The first defendant took no part in the appeals.
        The facts are stated in the opinions of Lord Browne-Wilkinson and
      Lord Steyn.

F       *Jonathan Sumption Q.C.* and *Anthony Mann Q.C.* for Citibank. Where
      a serious allegation, such as fraud, is made in civil proceedings, the
      requirements of the civil standard of proof do not differ materially from
      those of the criminal standard: see *Reg. v. Secretary of State for the Home
      Department, Ex parte Khawaja* [1984] A.C. 74; *Reg. v. Wolverhampton
      Coroner, Ex parte McCurbin* [1990] 1 W.L.R. 719 and *In re H. (Minors)
G     (Sexual Abuse: Standard of Proof)* [1996] A.C. 563, 586–587, *per* Lord
      Nicholls of Birkenhead.
        An appellate court ought not to disagree with a judge's assessment of
      the credibility of a witness, unless there is some demonstrable error on the
      judge's part: see *Khoo Sit Hoh v. Lim Thean Tong* [1912] A.C. 323, 325;
      *S.S. Hontestroom v. S.S. Sagaporack* [1927] A.C. 37, 47, *per* Lord Sumner
      and *Akerhielm v. De Mare* [1959] A.C. 789, 806.
H       The fact that a judge does not mention some evidence specifically
      should not be taken to mean that he did not have it in mind: *Watt or
      Thomas v. Thomas* [1947] A.C. 484 and *Onassis and Calogeropoulos v.
      Vergottis* [1968] 2 Lloyd's Rep. 403, 431.

258

*Anthony Grabiner Q.C., Ian Glick Q.C.* and *John McCaughran* for    A
Smith. The court of last resort ought not to disturb concurrent findings of
facts made by the courts below unless those findings are clearly erroneous:
see *Halsbury's Laws of England,* 4th ed., vol. 10 (1975), pp. 340–341,
para. 744; *Owners of the P. Caland and Freight v. Glamorgan Steamship
Co. Ltd.* [1893] A.C. 207 and *Montgomerie & Co. Ltd. v. Wallace-James*
[1904] A.C. 73.

The appropriate measure of damages is the sum of money which will    B
put the injured party in the same position as he would have been in if he
had not sustained the wrong: *Livingstone v. Rawyards Coal Co.* (1880)
5 App.Cas. 25. If there had been no fraud Smith would not have made
the agreement and would not have suffered loss. That loss is the difference
between the real value of the shares and the price paid by Smith. The real
value is the value as at the date of acquisition. Alternatively, Smith is    C
entitled to its realised loss, i.e. to recover the difference between the price
it paid and what it sold the shares for. The Court of Appeal's decision
will result in a fraudster's charter since a fraudster, for a small price, can
save himself or his company large sums of money. If that decision is right
*Twycross v. Grant* (1877) 2 C.P.D. 469; *Peek v. Derry* (1887) 37 Ch.D.
541; *Waddell v. Blockey* (1879) 4 Q.B.D. 678 have to be overruled in so    D
far as they establish that the date on which the value has to be assessed is
the date of acquisition.

The real value may be different from the market price which, at the
time of purchase, may be a mistaken estimate of the value. Where
the market has been misled, not by the defendant but by someone else,
the market price is no less a mistaken estimate of the value. Economic
theory reflected in the market price from time to time is no substitute for    E
a sound rule of law: see *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C.
45, 64. *In re Lynall, decd.* [1972] A.C. 680 is not in point. [Reference was
also made to *Hinchcliffe v. Crabtree* [1972] A.C. 707 and *Potts v. Miller*
(1940) 64 C.L.R. 282 and *Toteff v. Antonas* (1952) 87 C.L.R. 647.]

All relevant evidence is admissible to prove a contested allegation of
fact: see *Peek v. Derry,* 37 Ch.D. 541; *Davidson v. Tulloch* (1860) 2 L.T.
97; *Twycross v. Grant,* 2 C.P.D. 469; *Waddell v. Blockey,* 4 Q.B.D. 678;    F
*Broome v. Speak* [1903] 1 Ch. 586; *Shepheard v. Broome* [1904] A.C. 342
and *Clark v. Urquhart* [1930] A.C. 28.

Damages for fraud and for breach of contract are assessed differently.
In the case of fraud the plaintiff is entitled to damages for whatever sum
he has lost by the fraud: see *Doyle v. Olby (Ironmongers) Ltd.* [1969]
2 Q.B. 158, 166–167, 171. As to damages for negligence, see *Banque*    G
*Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191.
[Reference was also made to *Gould v. Vaggelas* (1985) 157 C.L.R. 215;
*Cemp Properties (U.K.) Ltd. v. Dentsply Research & Development
Corporation* [1991] 2 E.G.L.R. 197 and *Royscot Trust Ltd. v. Rogerson*
[1991] 2 Q.B. 297.]

In other branches of the law the courts have adopted a flexible    H
approach to damages. In assessing damages for breach of contract for the
sale of land, there is no absolute rule requiring the value of the land to be
assessed as at the date of breach. The court has power to fix such other
date as may be appropriate in the circumstances: see *Johnson v. Agnew*

A  [1980] A.C. 367, 400–401. The plaintiff has a duty to mitigate his loss: see
*Treitel, The Law of Contract*, 9th ed. (1995), pp. 864–865. The principle
of assessment by reference to the time of breach is based on two
assumptions: first, that the injured party knows of the breach as soon as
it is committed, and second, that he is able, immediately following the
breach, to resort to the market so as to mitigate his loss. Where the
plaintiff can be said to have assumed to himself the risk of the market
B  falling, he may not recover from the defendant loss occasioned by a fall
in the market: see *Jamal v. Moolla Dawood Sons & Co.* [1916] 1 A.C. 175.
      *Sumption Q.C.* resuming. In any process of valuation of shares it has
to be assumed that there is a willing buyer and a willing seller, that the
buyer knows matters which are within the public knowledge, and that the
negotiations are conducted at arm's length. The measure of damages in a
C  share dealing is the difference between the price paid by the buyer and the
market value of the shares at the date of the transaction. The market
value is determined by evidence of the price at which they could have
been bought and sold between willing parties: see *Electricity Supply
Nominees Ltd. v. London Clubs Ltd.* [1988] 2 E.G.L.R. 152 and *Cornwall
Coast Country Club v. Cardgrange Ltd.* [1987] 1 E.G.L.R. 146. Later
events are irrelevant.
D       The victim of a fraudulent representation is entitled only to the actual
damage directly flowing from the fraud: see *Clark v. Urquhart* [1930] A.C.
28, 68. Prima facie the victim's loss cannot exceed the difference between
what he paid and what he received at the time he received it. The
assessment of damages as at that date is usually necessary in order to
exclude loss caused by extraneous or coincidental factors: see *Waddell v.
E  Blockey*, 4 Q.B.D. 678. The date of the transaction is the same as the
date of the breach of duty, the breach being incomplete until the
misrepresentation is acted on: *Peek v. Derry*, 37 Ch.D. 541, 591–594 and
*Twycross v. Grant*, 2 C.P.D. 469, 544–545, 546. *Davidson v. Tulloch*,
2 L.T. 97, a case of a misrepresentation in a prospectus, is not in point.
The courts will not allow a defendant to take advantage of his own
F  default. A fair value is the one which is arrived at without the influence of
deceit: *Broome v. Speak* [1903] 1 Ch. 586 and *Potts v. Miller* (1940)
64 C.L.R. 282.
      Foreseeability does not arise in fraud. The intention to injure negatives
all excuses and disposes of any question of remoteness of damage: see
*Quinn v. Leathem* [1901] A.C. 495, 536–537; *Nautamix B.V. v. Jenkins of
Retford Ltd.* [1975] F.S.R. 385 and *Clemance v. Hollis* [1987] 2 N.Z.L.R.
G  471, 478–479. Consequential damages for fraud are not limited to what
was foreseeable: *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158.
[Reference was also made to *Target Holdings Ltd. v. Redferns* [1996] A.C.
421.]
      Where the defendant's breach of duty is alleged to have caused the
plaintiff to suffer loss in relation to property, damages are awarded as at
the date of breach of duty. But this rule is displaced in special cases where
H  assessment at another date may more accurately reflect the overriding
compensatory rule: see *County Personnel (Employment Agency) Ltd. v.
Alan R. Pulver & Co.* [1987] 1 W.L.R. 916. If the plaintiff would have
suffered loss even where the representation had been the appropriate

260

Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          [1997]

conclusion would, ordinarily, be that the loss did not flow from the
representation: see *Downs v. Chappell* [1997] 1 W.L.R. 426.

A

   *Grabiner Q.C.*, in reply, referred to *Peek v. Derry* (1889) 14 App.Cas.
337, 374–375 and *Bradford Third Equitable Benefit Building Society v.
Borders* [1941] 2 All E.R. 205, 211.

   Their Lordships took time for consideration.

B

   21 November. LORD BROWNE-WILKINSON. My Lords, I have had
the advantage of reading in draft the speech to be delivered by my noble
and learned friend, Lord Steyn. As to the issue of liability raised by the
cross-appeal, I agree with his reasoning and conclusions: I would restore
the judge's finding that Smith New Court Securities Ltd. ("Smith") had
established that Citibank N.A. (through Mr. Roberts) fraudulently
induced Smith to purchase the Ferranti shares by making the second and
third representations, but not the first representation.

C

   The damages issue which is the subject matter of the appeal raises for
decision for the first time in your Lordships' House the question of the
correct measure of damages where a plaintiff has acquired property in
reliance on a fraudulent misrepresentation made by the defendant. The
position in the present case is complicated by the fact that there are two
frauds involved. The first, "Roberts fraud," is the fraudulent representation
made by Mr. Roberts on behalf of Citibank on 21 July 1989 which
induced Smith to buy 28,141,424 Ferranti shares for £23,141,424. The
second, "Guerin fraud," is the fraud practised by Mr. Guerin on Ferranti.
Although the Guerin fraud was committed before 21 July 1989, its
existence was unknown to Citibank, Smith, Ferranti and the market until
after that date. Shortly stated the question is who should bear the risk of
the Guerin fraud: Smith (which still held the Ferranti shares when the
Guerin fraud was discovered) or Citibank which by its servant had
fraudulently induced Smith to buy the Ferranti shares.

D

E

   The relevant facts lie within a comparatively narrow compass. The
judge held that Smith bought the Ferranti shares at 82¼p as a market-
making risk, i.e. with a view to holding them on its books over a
comparatively long period to be sold on at a later date. He further held
that Smith would not have bought at that price at all apart from the
Roberts fraud. Such a purchase is to be contrasted with a "bought deal"
where the market maker buys the shares with a view to its agency branch
selling them on in smaller parcels to its clients, such sales usually taking
place within a matter of hours. The judge held that, if Smith had been
considering a bought deal, it could not have bid more than 78p, at which
price Citibank would not have sold to Smith. From these facts, two points
emerge: first, as a result of the Roberts fraud Smith bought the Ferranti
shares with a view to holding them for a comparatively long period;
second, if Smith had bid on the basis of a bought deal, it would not have
acquired the shares.

F

G

   The history of the Ferranti shares subsequent to 21 July 1989 was as
follows. On 11 August 1989 Ferranti published its annual reports and
accounts for the year ending 31 March 1989 which confirmed the results
stated in a preliminary announcement made on 14 July 1989. On

H

A.C.            Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))    Lord Browne-Wilkinson

A  11 September 1989 the directors of Ferranti announced that information
had come to their attention which required a restatement of the 1989
accounts. At their request dealing in Ferranti shares was suspended. On
29 September the chairman of Ferranti wrote to the shareholders telling
them that Ferranti had been the victim of a major fraud by Mr. Guerin.
Trading in Ferranti shares resumed on 3 October. On 17 November
B  Ferranti published its revised audited accounts which showed that the
effect of the Guerin fraud was even worse than had been thought.
    Smith had retained all the Ferranti shares which it had bought on
21 July. But from 20 November 1989 onwards Smith began to trickle
these shares onto the market and obtained prices ranging from 49p down
to 30p. By 30 April 1990 it had sold them all for a total of £11,788,204,
i.e. at a loss of £11,353,220. It was not suggested at the trial that Smith's
C  retention of the shares until November 1989 or their subsequent sales were
in any way unreasonable.
    The judge found that Smith first learned of Mr. Roberts fraud on
5 December 1989 although there was evidence to suggest that by mid-
November 1989 Smith was suspicious of the truth of Mr. Roberts's
representations. On 2 January 1990 solicitors for Smith wrote to Citibank
purporting to rescind the contract for the purchase of the 28m. Ferranti
D  shares. At the trial, the claim to rescind was persisted in until the closing
speech for Smith when it was expressly abandoned for reasons not
examined before your Lordships. Thereafter the only claim by Smith has
been for damages for deceit. Both before the trial judge, Chadwick J., and
the Court of Appeal, Nourse, Rose and Hoffmann L.JJ., the argument
proceeded on the basis that, where a fraudulent misrepresentation has
E  induced the plaintiff to enter into a contract of purchase, the measure of
damages is, in general, the difference between the contract price and the
true open market value of the property purchased, *valued as at the date of
the contract of purchase.* This was the law as laid down in a series of cases
decided at the end of the 19th century, usually in relation to shares
purchased in reliance on a fraudulent prospectus: see *Twycross v. Grant*
(1877) 2 C.P.D. 469; *Waddell v. Blockey* (1879) 4 Q.B.D. 678; *Peek v.*
F  *Derry* (1887) 37 Ch.D. 541 and subsequently treated as settled law by the
Court of Appeal in *McConnel v. Wright* [1903] 1 Ch. 546. It was common
ground that there was one exception to this general rule: where the open
market at the transaction date was a false market, in the sense that the
price was inflated because of a misrepresentation made to the market
generally *by the defendant,* the market value is not decisive: in such
G  circumstances the "true" value as at the transaction date has to be
ascertained but with the benefit of hindsight: *McConnel v. Wright.*
    Now in the present case the market value of the Ferranti shares at the
transaction date (21 July 1989) was inflated, since the existence of the
Guerin fraud was then unknown: there was, in one sense, a false market.
But that false market was not attributable to the fraud of the defendant,
Citibank: the Roberts fraud had no impact on the open market price. The
H  difference between Chadwick J. and the Court of Appeal lay in the fact
that Chadwick J. held that there was a latent defect (i.e. the Guerin fraud)
in the Ferranti shares and that, even though the false market was not due
to the fraud of Citibank, he had to find the "true" value of the Ferranti

262

Lord Browne-
Wilkinson        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

A

shares, using hindsight. He accordingly valued the Ferranti shares at what would have been their open market value had the market known of the Guerin fraud on 21 July 1989. The judge fixed this value at 44p per share giving a total true value of the shares on the transaction date of £12,382,226. He accordingly awarded as damages the difference between the contract price and that figure, i.e. £10,764,005.

B

The Court of Appeal on the other hand took the view that it was only legitimate, in the case of quoted shares, to depart from the market price as at the transaction date where that price was falsified *by the defendant's misrepresentation*. In all other cases the market value has to be taken to be the quoted value. The Court of Appeal therefore reduced the damages to £1,196,010, being the difference between the contract price and the value of the shares at 78p a share, being the value at which on 21 July 1989 Smith itself would have been prepared to buy. The Court of Appeal was conscious that, in so holding, they were throwing the whole risk of catastrophic events onto the innocent purchaser rather than the fraudulent vendor. But they held that such injustice stemmed from the rigidity of two rules (both of which had been common ground before them): first, the denial of rescission where a plaintiff cannot return in specie the very shares which were the subject matter of the fraudulent sale; second, the rule which requires the damages to be calculated as at the date of sale.

C

D

As to the first rule referred to by the Court of Appeal, the reasons why Smith abandoned their claim to rescind were not explored before your Lordships. I will therefore say nothing about the point save that if the current law in fact provides (as the Court of Appeal thought) that there is no right to rescind the contract for the sale of quoted shares once the specific shares purchased have been sold, the law will need to be closely looked at hereafter. Since in such a case other, identical, shares can be purchased on the market, the defrauded purchaser can offer substantial restitutio in integrum which is normally sufficient.

E

As to the second rule referred to by the Court of Appeal—the rule requiring damages to be assessed as at the date of the transaction— Mr. Grabiner, for Smith, submitted that the basis on which the 19th century cases were decided was erroneous and that later decisions show the right approach to the assessment of damages. I agree with those submissions and rather than consider the sterilities of the argument surrounding the 19th century cases proceed at once to consider the more modern law.

F

As ever in considering damages in tort, the starting point must be to repeat, yet again, the well known statement of Lord Blackburn in *Livingstone v. Rawyards Coal Co.* (1880) 5 App.Cas. 25, 39:

G

"I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages you should as nearly as possible get that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation."

H

A    To that statement he added these important words which are less frequently quoted:

"That must be qualified by a great many things which may arise—such, for instance, as by the consideration whether the damage has been maliciously done, or whether it has been done with full knowledge that the person doing it was doing wrong. There could be
B    no doubt that there you would say that everything would be taken into view that would go most against the wilful wrongdoer—many things which you would properly allow in favour of an innocent mistaken trespasser would be disallowed as against a wilful and intentional trespasser on the ground that he must not qualify his own wrong, and various things of that sort."

C    In *Clark v. Urquhart* [1930] A.C. 28, 67–68, Lord Atkin cast doubt on whether the measure of damages laid down in the 19th century cases as summarised in *McConnel v. Wright* [1903] 1 Ch. 546 was correct. He said:

"I find it difficult to suppose that there is any difference in the measure of damages in an action of deceit depending upon the nature of the transaction into which the plaintiff is fraudulently induced to
D    enter. Whether he buys shares or buys sugar, whether he subscribes for shares, or agrees to enter into a partnership, or in any other way alters his position to his detriment, in principle, the measure of damages should be the same, and whether estimated by a jury or a judge. I should have thought it would be based on the actual damage directly flowing from the fraudulent inducement. The formula in *McConnel v. Wright* may be correct or it may be expressed in too
E    rigid terms. I reserve the right to consider it if it should ever be in issue in this House."

In the High Court of Australia, Dixon J. in *Potts v. Miller* (1940) 64 C.L.R. 282, 299–300, whilst loyally applying the old inflexible rule was plainly unhappy with it: see also *Toteff v. Antonas* (1952) 87 C.L.R. 647.
The decision which restated the law correctly is *Doyle v. Olby*
F    *(Ironmongers) Ltd.* [1969] 2 Q.B. 158. In that case the plaintiff had been induced by the fraudulent misrepresentation of the defendant to buy an ironmonger's business for £4,500 plus stock at a valuation of £5,000. Shortly after the purchase, he discovered the fraud and started the action. But despite this he had to remain in occupation: "he had burned his boats and had to carry on with the business as best he could." After three years,
G    he managed to sell the business for £3,700, but in the meantime he had incurred business debts. Lord Denning M.R., after referring to Lord Atkin's dictum, stated the principle as follows, at p. 167:

"On principle the distinction seems to be this: in contract, the defendant has made a promise and broken it. The object of damages is to put the plaintiff in as good a position, as far as money can do
H    it, as if the promise had been performed. In fraud, the defendant has been guilty of a deliberate wrong by inducing the plaintiff to act to his detriment. The object of damages is to compensate the plaintiff for all the loss he has suffered, so far, again, as money can do it. In contract, the damages are limited to what may reasonably be supposed

264

to have been in the contemplation of the parties. In fraud, they are      A
not so limited. The defendant is bound to make reparation for all the
actual damages directly flowing from the fraudulent inducement. The
person who has been defrauded is entitled to say: 'I would not have
entered into this bargain at all but for your representation. Owing to
your fraud, I have not only lost all the money I paid you, but, what
is more, I have been put to a large amount of extra expense as well       B
and suffered this or that extra damages.' All such damages can be
recovered: and it does not lie in the mouth of the fraudulent person
to say that they could not reasonably have been foreseen. For
instance, in this very case Mr. Doyle has not only lost the money
which he paid for the business, which he would never have done if
there had been no fraud: he put all that money in and lost it; but also
he has been put to expense and loss in trying to run a business which     C
has turned out to be a disaster for him. He is entitled to damages for
all his loss, subject, of course to giving credit for any benefit that he
has received. There is nothing to be taken off in mitigation: for there
is nothing more that he could have done to reduce his loss. He did
all that he could reasonably be expected to do."

In the same case Winn L.J. said, at p. 168:                               D

"It appears to me that in a case where there has been a breach of
warranty of authority, and still more clearly where there has been a
tortious wrong consisting of a fraudulent inducement, the proper
starting point for any court called upon to consider what damages
are recoverable by the defrauded person is to compare his position
before the representation was made to him with his position after it,     E
brought about by that representation, always bearing in mind that no
element in the consequential position can be regarded as attributable
loss and damage if it be too remote a consequence: it would be too
remote not necessarily because it was not contemplated by the
representor, but in any case where the person deceived has not himself
behaved with reasonable prudence, reasonable common sense, or can
in any true sense be said to have been the author of his own             F
misfortune. The damage that he seeks to recover must have flowed
directly from the fraud perpetrated upon him."

The damages awarded by the Court of Appeal in that case were
calculated (admittedly on a rough and ready basis as to the figures) as
follows, at pp. 169-170. The plaintiff was treated as having lost £9,500,
the price paid for the business and stock. Against this, he had to give    G
credit for £3,500, i.e. not for the value of the business at the transaction
date but for the amount he actually received on the resale of the business
three years later. To this £3,500 there were added other benefits which he
had received so as to give a total of £7,000 benefits received to be set
against the sum lost of £9,500, i.e. a balance of loss of £2,500. In addition,
the plaintiff was awarded by way of consequential damages the sum of
£3,000 in respect of liabilities incurred by him in running the business.   H
Thus the total award for direct and consequential damages was £5,500.

*Doyle v. Olby (Ironmongers) Ltd.* establishes four points. First, that
the measure of damages where a contract has been induced by fraudulent

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))

A     misrepresentation is reparation for all the actual damage directly flowing from (i.e. caused by) entering into the transaction. Second, that in assessing such damages it is not an inflexible rule that the plaintiff must bring into account the value as at the transaction date of the asset acquired: although the point is not adverted to in the judgments, the basis on which the damages were computed shows that there can be circumstances in which it is proper to require a defendant only to bring
B     into account the actual proceeds of the asset provided that he has acted reasonably in retaining it. Third, damages for deceit are not limited to those which were reasonably foreseeable. Fourth, the damages recoverable can include consequential loss suffered by reason of having acquired the asset.

      In my judgment *Doyle v. Olby (Ironmongers) Ltd.* was rightly decided on all these points. It is true, as to the second point, that there were not
C     apparently cited to the Court of Appeal the 19th century cases which established the "inflexible rule" that the asset acquired has to be valued as at the transaction date: the successful appellant was not legally represented. But in my judgment the decision on this second point is correct. The old "inflexible rule" is both wrong in principle and capable of producing manifest injustice. The defendant's fraud may have an effect continuing
D     after the transaction is completed, e.g. if a sale of gold shares was induced by a misrepresentation that a new find had been made which was to be announced later it would plainly be wrong to assume that the plaintiff should have sold the shares before the announcement should have been made. Again, the acquisition of the asset may, as in *Doyle v. Olby (Ironmongers) Ltd.* itself, lock the purchaser into continuing to hold the asset until he can effect a resale. To say that in such a case the plaintiff
E     has obtained the value of the asset as at the transaction date and must therefore bring it into account flies in the face of common sense: how can he be said to have received such a value if, despite his efforts, he has been unable to sell.

      *Doyle v. Olby (Ironmongers) Ltd.* has subsequently been approved and followed by the Court of Appeal in *East v. Maurer* [1991] 1 W.L.R. 461
F     and *Downs v. Chappell* [1997] 1 W.L.R. 426. In both cases the plaintiffs had purchased a business as a going concern in reliance on the defendant's fraudulent misrepresentation. In each case after discovery of the fraud they sold the business at a loss and recovered by way of damages the difference between the original purchase price and the price eventually realised on a resale, i.e. the old date of transaction rule was not applied.
G     In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191 your Lordships treated the measure of damages for fraud as being in a special category regulated by the principles of *Doyle v. Olby (Ironmongers) Ltd.*

      Turning for a moment away from damages for deceit, the general rule in other areas of the law has been that damages are to be assessed as at the date the wrong was committed. But recent decisions have emphasised
H     that this is only a general rule: where it is necessary in order to compensate the plaintiff for the damage suffered by reason of the defendant's wrong a different date of assessment can be selected. Thus in the law of contract, the date of breach rule "is not an absolute rule: if to

follow it would give rise to injustice, the court has power to fix such other date as may be appropriate in the circumstances:" *per* Lord Wilberforce in *Johnson v. Agnew* [1980] A.C. 367, 401A. Similar flexibility applies in assessing damages for conversion (*IBL Ltd. v. Coussens* [1991] 2 All E.R. 133) or for negligence (*Dodd Properties (Kent) Ltd. v. Canterbury City Council* [1980] 1 W.L.R. 433). As Bingham L.J. said in *County Personnel (Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987] 1 W.L.R. 916, 925–926:

> "While the general rule undoubtedly is that damages for tort or breach of contract are assessed at the date of the breach . . . this rule also should not be mechanistically applied in circumstances where assessment at another date may more accurately reflect the overriding compensatory rule."

In the light of these authorities the old 19th century cases can no longer be treated as laying down a strict and inflexible rule. In many cases, even in deceit, it will be appropriate to value the asset acquired as at the transaction date if that truly reflects the value of what the plaintiff has obtained. Thus, if the asset acquired is a readily marketable asset and there is no special feature (such as a continuing misrepresentation or the purchaser being locked into a business that he has acquired) the transaction date rule may well produce a fair result. The plaintiff has acquired the asset and what he does with it thereafter is entirely up to him, freed from any continuing adverse impact of the defendant's wrongful act. The transaction date rule has one manifest advantage, namely that it avoids any question of causation. One of the difficulties of either valuing the asset at a later date or treating the actual receipt on realisation as being the value obtained is that difficult questions of causation are bound to arise. In the period between the transaction date and the date of valuation or resale other factors will have influenced the value or resale price of the asset. It was the desire to avoid these difficulties of causation which led to the adoption of the transaction date rule. But in cases where property has been acquired in reliance on a fraudulent misrepresentation there are likely to be many cases where the general rule has to be departed from in order to give adequate compensation for the wrong done to the plaintiff, in particular where the fraud continues to influence the conduct of the plaintiff after the transaction is complete or where the result of the transaction induced by fraud is to lock the plaintiff into continuing to hold the asset acquired.

Finally, it must be emphasised that the principle in *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158, strict though it is, still requires the plaintiff to mitigate his loss once he is aware of the fraud. So long as he is not aware of the fraud, no question of a duty to mitigate can arise. But once the fraud has been discovered, if the plaintiff is not locked into the asset and the fraud has ceased to operate on his mind, a failure to take reasonable steps to sell the property may constitute a failure to mitigate his loss requiring him to bring the value of the property into account as at the date when he discovered the fraud or shortly thereafter.

In sum, in my judgment the following principles apply in assessing the damages payable where the plaintiff has been induced by a fraudulent

A.C.    Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))    Lord Browne-Wilkinson

A    misrepresentation to buy property: (1) the defendant is bound to make reparation for all the damage directly flowing from the transaction; (2) although such damage need not have been foreseeable, it must have been directly caused by the transaction; (3) in assessing such damage, the plaintiff is entitled to recover by way of damages the full price paid by him, but he must give credit for any benefits which he has received as a result of the transaction; (4) as a general rule, the benefits received by him

B    include the market value of the property acquired as at the date of acquisition; but such general rule is not to be inflexibly applied where to do so would prevent him obtaining full compensation for the wrong suffered; (5) although the circumstances in which the general rule should not apply cannot be comprehensively stated, it will normally not apply where either (a) the misrepresentation has continued to operate after the

C    date of the acquisition of the asset so as to induce the plaintiff to retain the asset or (b) the circumstances of the case are such that the plaintiff is, by reason of the fraud, locked into the property. (6) In addition, the plaintiff is entitled to recover consequential losses caused by the transaction; (7) the plaintiff must take all reasonable steps to mitigate his loss once he has discovered the fraud.

D    Before seeking to apply those principles to the present case, there are two points I must make. First, in *Downs v. Chappell* [1997] 1 W.L.R. 426, Hobhouse L.J. having quantified the recoverable damage very much along the lines that I have suggested, sought to cross-check his result by looking to see what the value of the business would have been if the misrepresentations had been true and then comparing that value to the contract price. Whilst Hobhouse L.J. accepted that this was not the

E    correct measure of damages, he was seeking to check that the plaintiff was not being compensated for a general fall in market prices (for which the defendant was not accountable) rather than for the wrong done to him by the defendant. In my view, such a cross-check is not likely to be helpful and is conducive to over-elaboration both in the evidence and in argument. Second, in *Royscot Trust Ltd. v. Rogerson* [1991] 2 Q.B. 297 the *Doyle v.*

F    *Olby (Ironmongers) Ltd.* measure of damages was adopted in assessing damages for innocent misrepresentation under the Misrepresentation Act 1967. I express no view on the correctness of that decision.

How then do those principles apply in the present case? First, there is no doubt that the total loss incurred by Smith was caused by the Roberts fraud, unless it can be said that Smith's own decision to retain the shares until after the revelation of the Guerin fraud was a causative factor. The

G    Guerin fraud had been committed before Smith acquired the shares on 21 July 1989. Unknown to everybody, on that date the shares were already pregnant with disaster. Accordingly when, pursuant to the Roberts fraud, Smith acquired the Ferranti shares they were induced to purchase a flawed asset. This is not a case of the difficult kind that can arise where the depreciation in the asset acquired between the date of acquisition and the

H    date of realisation may be due to factors affecting the market which have occurred after the date of the defendant's fraud. In the present case the loss was incurred by reason of the purchasing of the shares which were pregnant with the loss and that purchase was caused by the Roberts fraud.

268

Lord Browne-
Wilkinson          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          [1997]

Can it then be said that the loss flowed not from Smith's acquisition but from Smith's decision to retain the shares? In my judgment it cannot. The judge found that the shares were acquired as a market-making risk and at a price which Smith would only have paid for an acquisition as a market-making risk. As such, Smith could not dispose of them on 21 July 1989 otherwise than at a loss. Smith were in a special sense locked into the shares having bought them for a purpose and at a price which precluded them from sensibly disposing of them. It was not alleged or found that Smith acted unreasonably in retaining the shares for as long as they did or in realising them in the manner in which they did.

In the circumstances, it would not in my judgment compensate Smith for the actual loss they have suffered (i.e. the difference between the contract price and the resale price eventually realised) if Smith were required to give credit for the shares having a value of 78p on 21 July 1989. Having acquired the shares at 82½p for stock Smith could not commercially have sold on that date at 78p. It is not realistic to treat Smith as having received shares worth 78p each when in fact, in real life, they could not commercially have sold or realised the shares at that price on that date. In my judgment, this is one of those cases where to give full reparation to Smith, the benefit which Smith ought to bring into account to be set against its loss for the total purchase price paid should be the actual resale price achieved by Smith when eventually the shares were sold.

Finally I must mention a point raised by Mr. Sumption, namely, that it is not open to Smith to argue before your Lordships that the damages should be assessed in the manner which I have proposed. On the pleadings, the damages claimed were the difference between the contract price and either the "true" value on 21 July 1989 or their value when the fraud was discovered. Mr. Sumption urged, in addition to the point on the pleadings, that it would be unfair to Citibank to entertain the new argument since, if the point had been pleaded Citibank would itself have pleaded and led evidence of a failure by Smith to mitigate its loss and as to the reasonableness of Smith's conduct.

Although the pleading point is technically correct (and could be cured by amendment) I am not satisfied that Citibank is prejudiced by allowing this point to be argued before your Lordships. In opening his case before the judge, Mr. Grabiner conceded that, in any event, he could not recover more than Smith's actual realised loss. It could therefore have been an issue at the trial, if Citibank had chosen to make it one, whether Smith should have sold earlier or at a better price. Indeed, as I understand it, those matters were investigated in that context at the trial and the judge found that Smith had acted reasonably. In the circumstances, I can see no injustice to Citibank in deciding this case on the new point raised before your Lordships.

For these reasons I would hold that the damages recoverable amount to £11,352,220 being the difference between the contract price and the amount actually realised by Smith on the resale of the shares. However, as there was no appeal by Smith against the judge's assessment of the damages at £10,764,005, Smith's claim must be limited to that latter amount. I would therefore allow the appeal and restore the judge's order.

269

A    LORD KEITH OF KINKEL.  My Lords, for the reasons given in the speeches to be delivered by my noble and learned friends, Lord Browne-Wilkinson and Lord Steyn, which I have read in draft and with which I agree, I would allow the appeal, dismiss the cross-appeal and restore the order of the trial judge as to damages.

B    LORD MUSTILL.  My Lords, the speech to be delivered by my noble and learned friend, Lord Steyn, deals with both liability and damages. On the issue of liability I gratefully adopt the analysis of law and fact, and agree that in respect of the second and third occasions it has, but in respect of the first it has not, been established that an actionable mis-representation was made by Citibank N.A. (acting through Mr. Roberts) to Smith New Court Securities Ltd. I also agree that the conclusion
C    regarding the first occasion, which differs from that of the Court of Appeal, does not affect the liability of Citibank for having induced Smith to enter into the purchase of Ferranti shares.

On the question of damages I further agree that they should be assessed on the basis of the difference between the contract price and the amount actually realised by Smith on the resale, and would therefore
D    allow the appeal and restore the award of the trial judge on damages. On this aspect of the dispute I wish, however, to add a very few words. Notwithstanding the high authority of its source I cannot regard the judgment of Lord Denning M.R. in *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158 as an invariable guide to the assessment of damages for fraudulent misrepresentation. The appeal in that case was not fully argued by counsel. The judgments were not reserved and do not sit very easily
E    together. To my mind the propositions which on the argument of the present appeal were sought to be extracted from the decision were painted with too broad a brush to deal accurately with all the problems which may arise. True, the assessment of damages often involves so many unquantifiable contingencies and unverifiable assumptions that in many cases realism demands a rough and ready approach to the facts. True also
F    that in a case of fraud there are good reasons for departing in some respect from the ordinary rules: and the irrelevance of foreseeability provides an example. Nevertheless, there are instances where more is required in the way of analysis than can be found in *Doyle v. Olby (Ironmongers) Ltd.*, and this is one. For my part, I would suggest that in the future when faced with situations such as the present courts would do well to be guided by the seven propositions set out by my noble and
G    learned friend, Lord Browne-Wilkinson in the latter part of his speech. The fourth and fifth of these are, I believe, amply sufficient to show that the damages awarded by the judge ought to be upheld.

LORD SLYNN OF HADLEY.  My Lords, I have had the advantage of reading the text of the speech prepared by my noble and learned friends,
H    Lord Browne-Wilkinson and Lord Steyn. I agree that for the reasons they give the appeal of Smith New Court Securities Ltd. should be allowed and that the order of Chadwick J. as to damages be restored and that the cross-appeal on liability should be dismissed.

270

LORD STEYN.   My Lords, there is an appeal and cross-appeal against   A
the judgment of the Court of Appeal dated 17 February 1994 to be
considered. The Court of Appeal upheld a judgment dated 25 March 1992
by Chadwick J. so far as he concluded that the plaintiff in an action in
the Chancery Division had established actionable fraudulent misrepresenta-
tions in respect of the sale of a parcel of shares. Despite the fact that
Chadwick J. had come to his conclusions in a witness action the Court of   B
Appeal held that he had misdirected himself on one aspect of the issues of
fact on liability. Accordingly the Court of Appeal felt free to consider the
case afresh without being rigidly bound by all the judge's findings of fact.
In the result the Court of Appeal affirmed the judgment on liability of
Chadwick J. on additional grounds. The correctness of the Court of
Appeal's decision on liability is the subject matter of the cross-appeal. The
arguments on the cross-appeal were addressed to issues of pure fact.   C
Moreover, in material respects the arguments of counsel for the cross-
appellant challenged concurrent findings of fact of the trial judge and the
Court of Appeal.

By contrast the appeal challenges the decision of the Court of Appeal
on a question of principle, namely the correct measure of damages in an
action for deceit. The judge adopted a valuation method to assess damages
and held that the buyers were entitled to damages in a sum of the order   D
of £10·7m. In arriving at this conclusion the judge took into account a
subsequent fall in the value of the shares, which was caused by a pre-
existing and unconnected fraud which had been perpetrated on the
company concerned. The Court of Appeal ruled that as a matter of law
the judge applied the wrong measure of damages, and that the correct
measure was the difference between the price paid by the buyer and the
price which, absent the misrepresentations, the shares would have fetched   E
on the open market on the acquisition date. It was common ground that
on that date the fraud perpetrated by the third party was not known to
the market. On this basis the Court of Appeal reduced the damages to
which the buyers were entitled to a sum of the order of £1·1m.

My Lords, a detailed review of the testimonial battleground at trial
has left me in no doubt that the cross-appeal ought to be dismissed. I will   F
have to explain my reasons for this firm conclusion in some detail. The
helpful judgments of Chadwick J. [1992] B.C.L.C. 1104 and the Court of
Appeal [1994] 1 W.L.R. 1271 are now reported. It is therefore possible to
deal with the cross-appeal on liability somewhat more economically than
would otherwise have been the case. I will then turn to the important
question of law as to the correct legal measure of damages. I will explain
why I think that the appeal should be allowed and that the award of   G
damages made by Chadwick J. should be restored.

*Liability*

*The story of the Ferranti shares*

In July 1988 Citibank N.A., a company carrying on business as a bank   H
in London, made available a loan facility of £23m. to Parent Industries
Inc., a United States company. As security for the loan Parent charged
28m. shares in Ferranti International Signal Inc. to Citibank.

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          Lord Steyn

A  Mr. Guerin, a former director of Ferranti, was the beneficial owner of Parent. Mr. Peck was Mr. Guerin's man at Parent and occupied the position of president. By mid-July 1989 Parent was in default under the loan agreement. Citibank was urgently considering the realisation of the security for its loan. In the phrase often used at the trial it was a "forced sale" situation.

B  On 21 July 1989 Citibank, acting through the brokers Scrimgeour Vickers (Asset Management) Ltd., sold the 28m. Ferranti shares to Smith New Court Securities Ltd. ("Smith") for about £23m., the price per share being 82p. Mr. Roberts, a senior employee of Citibank and director of Scrimgeour, arranged the sale. In doing so he dealt with Mr. Lewis and Mr. Abrahams, two directors of Smith and market-makers by occupation.

C  At the trial the case of Smith was that Mr. Roberts induced Smith by fraudulent misrepresentations to buy the Ferranti shares. In order to understand the nature of Smith's case it is necessary to explain the vicissitudes of the value of shares in Ferranti. On 14 July 1989 Ferranti made a preliminary announcement of its financial results for the year ended 31 March 1989. On the basis of that information the market value of the parcel of Ferranti shares was probably of the order of 78p to 82p
D  per share, i.e. a few pence lower than the prices quoted on the Stock Exchange. Ferranti, Citibank and Smith, as well as the individuals acting for these companies, and the market generally, did not know that a massive fraud had been perpetrated on Ferranti. In real terms the market price of the Ferranti shares on 21 July 1989 was a fictitious price. There was a false market in Ferranti shares. The fact of the fraud and its impact
E  on the value of Ferranti shares only became known in September 1989. By a letter of 29 September 1989 together with unaudited group accounts the Chairman of the Board of Ferranti explained to shareholders that the fraud had caused a reduction in the net worth of the Ferranti Group as at 31 March 1989 of approximately £170m. (from £370·8m. to £198·5m.) and a reduction in profit for the year of approximately £18m. (from £29·3m. to £10·9m.). In November 1989 Ferranti published the revised audited
F  accounts for the year ended 31 March 1989. Those accounts confirmed the pessimistic predictions made in late September. In these changed circumstances, and between 20 November 1989 and 30 April 1990, Smith disposed of the Ferranti shares by selling them in the market in relatively small parcels at prices ranging from 49p per share to 30p per share. The difference between the total price paid by Smith and the total of the prices received was £11·3m.
G  That brings me to the events of 21 July 1989 so far as they are relevant to the alleged fraudulent misrepresentations. In order to render the shape of the case intelligible it will be necessary to give a chronological account of the sequence of events, with the rival contentions of the parties as to the principal disputes interspersed. Shortly before 9.30 a.m. on 21 July 1989 Mr. Roberts asked Mr. Lewis whether Smith would be interested in
H  buying the Ferranti shares. At 9.43 a.m. Mr. Lewis phoned Mr. Roberts. Mr. Abrahams was also a party to the conversation. The discussion lasted 13 minutes. Mr. Lewis confirmed that Smith was interested in purchasing the Ferranti shares. Smith's case was that during the conversation

Mr. Roberts said that Smith would be in competition with two other
bidders interested in buying the Ferranti shares, namely a company in the
Citicorp Group and another bidder not in the securities industry.
Mr. Roberts identified the first company as Citicorp Scrimgeour Vickers
Ltd. ("C.S.V."), a company carrying on business as stockbrokers and
market makers in London. This was the first alleged representation. At
trial Mr. Roberts said that he went no further than to say that there were
at least two other parties interested. There was in fact no bidder for the
Ferranti shares from outside the securities industry. The dispute as to
what was said in the 9.43 a.m. conversation was a major issue at the trial.
What was not in issue was that Mr. Lewis and Mr. Abrahams came to
believe that Smith would be in competition for the Ferranti shares with a
bidder from outside the securities industry.

Following the 9.43 a.m. conversation, Mr. Abrahams and Mr. Lewis
attended a meeting with other employees of Smith to discuss whether
Smith should bid for the Ferranti shares and, if so, at what price.
Mr. Lewis and Mr. Abrahams told those present at the meeting that
Smith would be bidding in competition against C.S.V. and one other
bidder from outside the securities industry. The decision taken at the
meeting was that Smith should bid 82p per share. The reasoning that led
to this decision is of some relevance. The facts are common ground. Smith
had a choice. It could have bought the shares as a "bought deal" or as a
market-making risk. The first would have involved Smith buying the
Ferranti shares and selling them through Smith's agency arm, at a profit,
within a matter of hours to institutional clients. In a transaction of the
magnitude of buying 28m. shares in Ferranti it would have been normal
for Smith to do a bought deal. Instead Smith chose to do a transaction of
the second type. This involved buying the shares with a view to holding
them as a market-making risk and only selling them as and when the
opportunity or opportunities to do so might arise. Smith took the view
that the Ferranti shares could not be sold to institutional clients at a price
above 80p per share without a recommendation to clients, which Smith's
agency arm was not prepared to give. In order to do a bought deal Smith
would have had to buy the Ferranti shares at below 80p. If Smith had not
believed that it was in competition with a bidder from outside the
securities industry, it would have bid for the shares at a price consistent
with doing a bought deal at a profit. That price would have been 78p per
share. It was agreed that if Smith had bid 78p per share, the bid would
not have been accepted by Citibank.

In the presence of Mr. Abrahams, Mr. Lewis telephoned Mr. Roberts
at 10.42 a.m. This call lasted about two minutes. It was made some
20 minutes after the conclusion of the pricing meeting. At the trial
Mr. Lewis and Mr. Abrahams testified that Mr. Lewis told Mr. Roberts
that Smith had decided to bid for the Ferranti shares; that Mr. Lewis
asked him to attend at Smith's offices so that Smith could make the bid
in person; and that Mr. Lewis asked Mr. Roberts to bring with him the
other two bids in sealed envelopes to Smith's offices. Mr. Roberts agreed
that Mr. Lewis asked him to come to Smith's offices to hear the bid. But
Mr. Roberts denied that anything else was said about bringing the other
bids in sealed envelopes.

A.C.        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        Lord Steyn

A    Mr. Roberts arrived at the offices of Smith shortly after noon. A meeting then took place between Mr. Roberts and three employees of Smith, namely Mr. Lewis, Mr. Abrahams and Mr. Marks. Mr. Marks had been present at the pricing meeting. It is common ground that Mr. Lewis said that Smith would bid 82p per share. Mr. Roberts did not have authority to accept the bid but he said that he would recommend the bid. What is in dispute is the rest of the conversation. Mr. Lewis said that

B    Mr. Roberts said at the start of the meeting that he would disclose the competing bids after Smith had made its bid. This was called the second representation. Mr. Lewis, Mr. Abrahams and Mr. Marks said that after Mr. Lewis made the bid at 82p Mr. Roberts said that Aeritalia (an Italian company) had bid 81p for the shares and C.S.V. had bid 75–77p. This was called the third representation. Mr. Roberts said that he made no

C    mention of bids: he said that he said that Aeritalia and C.S.V. had given indications in the 81p and 75–77p regions. Neither Aeritalia nor C.S.V. had made any bid. It was conceded that if the second and third representations had been made, they would have been fraudulently made.

    Mr. Roberts returned to his office and told the decision-makers at Citibank about the bid. While the bid had formally lapsed because it was not immediately accepted Smith remained a willing buyer of the Ferranti

D    shares at 82p per share throughout the afternoon. Shortly after 5 p.m. on the same day the bargain was struck. It was done in a telephone conversation between Mr. Lewis and Mr. Abrahams, on the Smith side, and Mr. Fisher, a director and senior dealer at Scrimgeour. The main reason for the additional ½p was to establish that the contract was made after trading hours on Friday 21 July, so that it would not have to be reported under Stock Exchange rules until the following business day.

E    The rest of the story can be taken quite briefly. After the suspension of Ferranti shares in September 1989, Smith started to investigate the circumstances in which it had purchased the Ferranti shares. Smith discovered that Aeritalia had never bid for the Ferranti shares. That discovery led to the institution of the proceedings in January 1990.

F    *The trial and the judgment of Chadwick J. on liability*

    The trial took place between 25 November 1991 and 17 January 1992. The judge gave judgment [1992] B.C.L.C. 1104 on 25 March 1992. He found that in advance of earlier criminal proceedings against Mr. Roberts Serious Fraud Office officials had asked Mr. Lewis and Mr. Abrahams to pool their recollections; that they falsely denied this at the criminal trial; and that in the civil trial they falsely pretended that they had forgotten

G    how their statements came into existence. In the result the judge found that the first representation, which depended exclusively on the evidence of Mr. Lewis and Mr. Abrahams, had not been proved. But, in the light of the totality of the evidence before him, the judge found that Mr. Roberts had made the second and third representations on behalf of Citibank; that those representations were false; and that Smith had been

H    induced to enter into the contract by those fraudulent misrepresentations.

    *The appeal and the judgment of the Court of Appeal*

    Citibank appealed against the judge's findings on liability. Smith served a respondent's notice which invited the Court of Appeal to uphold the

274
Lord Steyn        Smith New Court Ltd. v. Serimgeour Vickers (H.L.(E.))        [1997]

judge's conclusions on liability on additional grounds. And that is what    **A**
the Court of Appeal did. The Court of Appeal [1994] 1 W.L.R. 1271 held
that the judge had misdirected himself in respect of the 9.43 a.m.
conversation by considering the credibility and reliability of Mr. Lewis
and Mr. Abrahams in isolation. After a review of all the evidence the
Court of Appeal found, as a matter of fact, that all three representations
were made and made fraudulently and that they induced Smith to enter    **B**
into the contract. In the result the Court of Appeal dismissed Citibank's
appeal on liability.

*The submissions for Citibank*

    Counsel for Citibank put in the forefront of his submissions the
undisputed proposition that while as a matter of law fraud only has to be    **C**
proved to the civil standard, proof to that standard must necessarily take
into account the consideration that the more serious the allegation is, the
greater the proof is needed to persuade a court that it can be satisfied that
the allegation is established. In other words, the very gravity of an
allegation of fraud is a circumstance which has to be weighed in the scale
in deciding as to the balance of probabilities: *In re H. (Minors) (Sexual*
*Abuse: Standard of Proof)* [1996] A.C. 563, 586c–587F, *per* Lord Nicholls    **D**
of Birkenhead. But counsel accepted that both Chadwick J. and the Court
of Appeal correctly directed themselves in accordance with this standard.
    Counsel for Citibank reviewed the minutiae of the evidence. He
highlighted undoubted inconsistencies between the accounts of Mr. Lewis
and Mr. Abrahams. He argued that there were improbabilities inherent in
their accounts. But throughout his speech there was the theme that since
Chadwick J. found on proper grounds that Mr. Lewis and Mr. Abrahams    **E**
had lied it is impossible to sort out in their evidence truth from falsehood.
That is an argument worthy of careful consideration. It has rightly been
said that a cocktail of truth, falsity and evasion is a more powerful
instrument of deception that undiluted falsehood. It is also difficult to
detect. But counsel had to face the fact that on the third representation
Mr. Marks supported the accounts of Mr. Lewis and Mr. Abrahams. And    **F**
at the trial counsel never challenged the credibility of Mr. Marks. Counsel
for Citibank put the matter quite simply: he said Mr. Marks's evidence
was too thin a thread to bear the weight of an elaborate case of fraud.
Moreover, counsel argued that the Court of Appeal was not entitled to
substitute their view for that of the judge on the first representation. Once
it was accepted that the first representation had not been proved he said
that it was simply impossible to be satisfied that the second and third    **G**
representations were made. In the broadest outline these were the principal
submissions of counsel for Citibank.

*The approach to an attack on concurrent findings of fact*

    The principle is well settled that where there has been no misdirection
on an issue of fact by the trial judge the presumption is that his conclusion    **H**
on issues of fact is correct. The Court of Appeal will only reverse the trial
judge on an issue of fact when it is convinced that his view is wrong. In
such a case, if the Court of Appeal is left in doubt as to the correctness of

A.C.        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        Lord Steyn

A     the conclusion, it will not disturb it. That is the first difficulty·in the way
of upholding the arguments of counsel for Citibank. But there is an
additional obstacle. The Court of Appeal upheld the findings of fact of
the trial judge on the actionability of the second and third representations.
While the jurisdiction of the House is not in doubt, it is most reluctant to
disturb concurrent findings of fact. There are two reasons for this
approach. First, the prime function of the House of Lords is to review
B     questions of law of general public importance. That function it cannot
properly discharge if it often has to hear appeals on pure fact. This point
is underlined by the fact that, despite the economy of presentation of
counsel, the hearing on liability lasted more than three days. Secondly, in
the case of concurrent findings of fact, the House is confronted with the
combined views of the first instance judge and the Court of Appeal.
C     A suggestion that the House can be expected to take a different view on
concurrent findings *of fact* generally gives rise to an initial sense of
disbelief. Nevertheless, I must examine the merits of the argument of
counsel for Citibank.

    *The reasons why the concurrent findings are unassailable*

D         It seems to me that there are five principal reasons why the attack on
the concurrent findings of fact must fail. First, having found that
Mr. Lewis and Mr. Abrahams had lied on a collateral matter, the judge
approached their evidence with great caution. Rightly, he rejected the
notion that falsity in one thing involves falsity in all. Reviewing their
accounts as to the second and third representations against the whole
body of evidence he accepted, as he was entitled to do, their accounts.
E     Secondly, the judge was plainly considerably influenced by the fact that
on the third representation Mr. Marks in all material respects supported
Mr. Lewis and Mr. Abrahams. He accepted the evidence of Mr. Marks.
Thirdly, it is not in dispute that between 10 a.m. and 10.30 a.m. on the
morning of 21 July 1989, at the pricing meeting, which was attended by
Mr. Lewis, Mr. Abrahams and Mr. Marks, Smith fixed their bid at 82p
F     on the footing that they would be bidding in competition with two other
bidders, one of whom was from outside the securities industry. This fact
strongly supported Smith's case. Fourthly, while disputed by counsel for
Citibank, it seems to me inescapable that on Citibank's theory of the case,
Mr. Lewis and Mr. Abrahams fabricated the story that they had been told
that there were other bidders and the price of the bids several months
before the issue of misrepresentation arose. There is the undisputed
G     evidence of Mr. Smith, another employee of Smith, that the account of
the rival bids surfaced on 21 July 1989, i.e. the day of the transaction.
Given this fact, and Mr. Marks's evidence, the theory of a fabrication is
absurd. Fifthly, as against these factors, the judge had to weigh the
evidence of Mr. Roberts. The judge rejected Mr. Roberts's evidence. That
necessarily involved a finding that Mr. Roberts gave untruthful evidence.
The judge was entitled to take this course. Taking into account counsel's
H     submissions I have reviewed the whole of the evidence of Mr. Roberts,
given over more than two days. He was a most unimpressive witness. He
testified that at the midday meeting he had said that Aeritalia had given
an indication (shorthand for saying they were interested parties) at 81p. It

276

Lord Steyn        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

is perfectly clear, however, that Aeritalia was only interested in an option    A
to buy the Ferranti shares for two months. The sale of the shares was,
however, a matter of urgency and both Citibank and Parent, acting
through Mr. Peck, wanted an outright sale. Mr. Roberts said that he had
been told by another Citibank employee that Mr. Peck had said that
Aeritalia might make an outright bid. In Mr. Roberts's own words that
was "a zero possibility" by midday on 21 July 1989. Cumulatively, these    B
five factors are sufficient in the particular circumstances of this case to
demonstrate convincingly that the attack on the concurrent findings of
Chadwick J. and the Court of Appeal must be rejected. In sustaining the
second and third representations as actionable fraudulent misrepresenta-
tions Chadwick J. in my judgment came to a correct conclusion. So far as
the Court of Appeal affirmed the findings of Chadwick J. I am in
respectful agreement with their concurrent views.                            C

The Court of Appeal's views on the facts

It is now necessary to consider the exceptional course taken by the
Court of Appeal regarding the first representation. It will be recollected
that the judge did not find the first representation proved but he did find
the second and third representations proved. The clue to this conclusion
is to be found in the following passage in the judgment at first instance    D
[1992] B.C.L.C. 1104, 1116:

"it would, in my view, be unsafe to make a finding of dishonesty
against Mr. Roberts on the unsupported evidence of Mr. Lewis and
Mr. Abrahams, I approach the examination of the events of 21 July
1989 on the basis that little, if any, weight can be given to their
evidence where it is in conflict with that given by Mr. Roberts."      E

The Court of Appeal concluded that the judge erred by not subsequently
reviewing this conclusion in the light of all the evidence. Counsel for
Citibank vigorously challenged the conclusion of the Court of Appeal. It
is necessary to analyse the position on a step by step basis.

In making findings of credibility and reliability it is unsafe for a trial    F
judge to compartmentalise the case. In Attorney-General of Hong Kong v.
Wong Muk Ping [1987] A.C. 501, 510, Lord Bridge of Harwich explained:

"It is commonplace of judicial experience that a witness who makes a
poor impression in the witness box may be found at the end of the
day, when his evidence is considered in the light of all the other
evidence bearing upon the issue, to have been both truthful and
accurate. Conversely, the evidence of a witness who at first seemed    G
impressive and reliable may at the end of the day have to be rejected.
Such experience suggests that it is dangerous to assess the credibility
of the evidence given by any witness in isolation from other evidence
in the case which is capable of throwing light on its reliability; . . ."

In other words, an initial and provisional conclusion that a witness is not    H
credible on a particular point may be falsified when considered against the
possibilities, probabilities and certainties emerging from the whole body
of evidence before the court. That is the error into which the judge fell.
He ought to have reconsidered his understandable unwillingness to act on

A    the unsupported evidence of Mr. Lewis and Mr. Abrahams in respect of
the first representation in the light of the evidence about the pricing
meeting, Mr. Marks's account and the inherent probabilities. There is no
internal indication in his judgment that he ever did so.

It follows that the Court of Appeal was entitled to conclude that in
respect of the first representation the trial judge misdirected himself. That
meant that the Court of Appeal was at large to disregard the judge's
B    findings of fact, even though based on credibility. I understood counsel
for Citibank at one stage to suggest that this vitiates all the judge's
findings of fact and the whole case on fraud collapses. That is quite
unrealistic. The impact of a misdirection is not governed by fixed rules.
The appropriate course is dictated by considerations of common sense
and fairness as well as close attention to the nature of the misdirection
C    and the circumstances of the particular case. Here the Court of Appeal
was fully entitled to take the view that the misdirection only vitiated the
judge's findings on the first representation. In all other respects the Court
of Appeal was entitled to act on the judge's findings so far as they were
unaffected by the misdirection.

On the first representation the Court of Appeal was entitled to come
D    to its own conclusion. The principal reasons for the conclusion of the
Court of Appeal were spelt out as follows [1994] I W.L.R. 1271, 1279:

"Events at the pricing meeting and the making of the second and
third representations as found by the judge are all inexplicable unless
the first representation had also been made. . . . The judge failed to
stand back and consider his finding as to the first representation in
E    the light of his findings as to the second and third. Had he done so,
we have little doubt that he would have been driven to conclude, as
we do, that the first representation was also made."

In effect the Court of Appeal held that on the first representation the
judge should in all the circumstances also have accepted the evidence of
F    Mr. Lewis and Mr. Abrahams, and rejected the evidence of Mr. Roberts.
To this extent I respectfully agree with the admittedly exceptional course
taken by the Court of Appeal.

That is, however, not the end of the matter. On the first representation,
counsel for Citibank was able to demonstrate that, even on an acceptance
of the evidence of Mr. Lewis and Mr. Abrahams, there was considerable
scope for misunderstanding between the participants in the 9.43 a.m.
G    telephone conversation. In the discussions at 10.42 a.m. and at midday
Mr. Lewis and Mr. Abrahams on their evidence (and the evidence
of Mr. Marks) unambiguously spoke of actual bids. But Mr. Lewis and
Mr. Abrahams were less clear about the discussion at 9.43 a.m.: they both
said that Mr. Roberts either spoke of bids or about bids to be made.
Counsel for Smith argued that Mr. Roberts impliedly represented that he
H    had bona fide and reasonable grounds for saying that bids would be made
that day and that he had no such grounds. There is force in this argument.
But on any view that is a far less clear-cut position than existed in respect
of the second and third representation. That brings me back to another

278

Lord Steyn    ...d. v. Scrimgeour Vickers (H.L.(E.))    [1997]

passage in...st instance. The judge said [1992] B.C.L.C.  **A**
1104, 1129:

> "I am ... first representation was made in the earlier
> telepho... the morning of 21 July 1989 in sufficiently
> unequi... form the basis for an action in deceit; ..."

Making due...judge's earlier misdirection, I attach weight  **B**
to this pass...too, am not persuaded that the evidence of
Mr. Lewis a...established the first representation in clear
enough term...tify a finding of deceit. Differing from the
Court of Ap...retation of the evidence of Mr. Lewis and
Mr. Abraha...hat in respect of the 9.43 a.m. conversation
an actionabl...presentation has not been established.

### Conclusion o...    **C**

In my ...sion that the actionability of the first
representation...established does not affect the outcome of
this appeal. T...ions at the midday meeting on 21 July 1989
induced Smit...he transaction shortly after 5 p.m. on that
day. After all...found on ample evidence (including that of  **D**
Mr. Marks) ...d have withdrawn from the transaction if
these misrepre...not been made. The Court of Appeal agreed
with this cond... The essentials of the tort of deceit were
established. I ...he cross-appeal on liability.

### Damages

#### The issue    **E**

Given the subsequent dramatic fall in the value of
Ferranti shares...y the disclosure of an earlier fraud practised
on Ferranti by ...the question is whether Smith is entitled to
recover against...s entire loss arising from the fraudulently
induced transac...bmits that the Court of Appeal adopted the  **F**
wrong measure...o recover damages calculated on the basis of
the price paid ...regate of subsequent realisations. Citibank
contends that th...utable to the subsequent disclosure of the
fraud by a third...isfortune risk and is irrecoverable. Citibank
argues that the C...eal adopted the correct measure.

#### Horses and share...    **G**

The fraud p...y Mr. Roberts on Smith related to shares
quoted on the ...ange. Undoubtedly, the legal measure of
damages in an ac...t when applied to transactions in shares may
throw up special ...it is not simply a matter of the perception of
the market as to ...of the shares. If loss is to be determined by
way of the price ...valuation of the shares at a given date, the  **H**
determination of ...r true value of the shares, absent the deceit
forming the basis ...laim, may give rise to difficult hypothetical
problems. Even ...ult problems arise if it is alleged that for
extrinsic reasons th...en a false market, e.g. because investors have

A.C.     Smith New Court Ltd. v. Scrimgeour V. Lord Steyn

A   been misled by widespread false statements a the stock of the company. None of these practical consid; adoption of a special rule in respect of share transactio; principle must govern sales of shares, goods, a busine; therefore possible to simplify the problem. The exampl;urn C.J. in *Twycross v. Grant* (1877) 2 C.P.D. 469 ; said, at pp. 544–545:

B

    "If a man buys a horse, as a racehorse, esentation that it has won some great race, while in ;e of very inferior speed, and he pays ten or twenty t the horse is worth, and after the buyer has got the ar; of some latent disease inherent in its system at the i; he may claim the entire price he gave; the horse w;the latent

C    mischief worthless when he bought; but if i;sease and dies, the buyer cannot claim the entire valu;hich he is no longer in a condition to restore, but on; between the price he gave and the real value at the ti

    Counsel for Citibank argued that Cockburn C.;ng that if the horse had some latent disease at the time of the buyer

D    may claim the entire price he paid. He argued ;ase there was no sufficient causal link between the latent ; eventual death of the horse. Counsel for Smith argued th;on, which was induced by deceit, directly led to the loss o;ue of the horse. On any view it is clear that, if Cockbur;, the law imposes liability in an action for deceit for some that were

E    unforeseen and unforeseeable when the tortfeaso;e wrong. And if that is right it may tell us something abou;isposal of the present case.

*The justification for distinguishing between deceit an*

F    That brings me to the question of policy wheth;ustification for differentiating between the extent of liability for;depending on where in the sliding scale from strict liability to ;rongdoing the particular civil wrong fits in. It may be said tha;metry and a policy of not punishing intentional wrongdoers ;bies favour a uniform rule. On the other hand, it is a rational ;le strategy to impose wider liability on an intentional wro ;*Hart and*

G    *Honoré, Causation in the Law*, 2nd ed. (1985), p. 304;n innocent plaintiff may, not without reason, call on a ;rehensible defendant to pay the whole of the loss he caused. ;h of heads of loss in the law of negligence, which reflects c;s of legal policy, does not necessarily avail the intentional wr;ch a policy of imposing more stringent remedies on an intentic;oer serves two purposes. First it serves a deterrent purpose i;ing fraud.

H    Counsel for Citibank argued that the sole purpo;aw of tort generally, and the tort of deceit in particular, should;pensate the victims of civil wrongs. That is far too narrow a view; Glanville Williams identified four possible purposes of an a;amages in

280

tort: appeasement, justice, deterrence and compensation: see "The Aims
of the Law of Tort" (1951) 4 C.L.P. 137. He concluded, at p. 172:                    A

> "Where possible the law seems to like to ride two or three horses at
> once; but occasionally a situation occurs where one must be selected.
> The tendency is then to choose the deterrent purpose for tort of
> intention, the compensatory purpose for other torts."

And in the battle against fraud civil remedies can play a useful and       B
beneficial role. Secondly, as between the fraudster and the innocent party,
moral considerations militate in favour of requiring the fraudster to bear
the risk of misfortunes directly caused by his fraud. I make no apology
for referring to moral considerations. The law and morality are inextricably
interwoven. To a large extent the law is simply formulated and declared
morality. And, as *Oliver Wendell Holmes, The Common Law* (ed. M. De   C
W. Howe), p. 106, observed, the very notion of deceit with its overtones
of wickedness is drawn from the moral world.

*The old cases*

    For more than 100 years at least English law has adopted a policy
of imposing more extensive liability on intentional wrongdoers than on
merely careless defendants. This policy was trenchantly spelt out by Lord   D
Blackburn in *Livingstone v. Rawyards Coal Co.* (1880) 5 App.Cas. 25. He
said, at p. 39:

> "There could be no doubt that there you would say that everything
> would be taken into view that would go most against the wilful
> wrongdoer—many things which you would properly allow in favour
> of an innocent mistaken trespasser would be disallowed as against a   E
> wilful and intentional trespasser on the ground that he must not
> qualify his own wrong, and various things of that sort."

Since Victorian times there have been great developments in our law of
obligations. But there has been no retreat from the policy spelt out by
Lord Blackburn. On the other hand, the way in which the law can           F
distinguish between the intentional wrongdoer and a man who caused loss
by a foolish but honest mistake was not worked out clearly in the old
cases. *Pasley v. Freeman* (1789) 3 Durn. & E. 51, decided more than 200
years ago, marks the emergence of the tort of deceit. In cases framed in
deceit the measure of damages was held to involve ascertainment of the
"real" or "face" value of the shares at the time of allotment or purchase:
see *Davidson v. Tullock* (1860) 2 L.T. 97; *Peek v. Derry* (1887) 37 Ch.D.   G
541 (reversed on liability (1889) 14 App.Cas. 337); *Arkwright v. Newbold*
(1880) 17 Ch.D. 301 (reversed on liability (1881) 17 Ch.D. 313); *Broome
v. Speak* [1903] 1 Ch. 586 (affirmed *Shepheard v. Broome* [1904] A.C. 342).
Except for some useful general observations on valuation as a method of
measuring loss, and the explanation of the inquiry into a past hypothetical
event in the sense of the valuation of shares absent the fraud, I do not
think those cases help much. And, except for the obiter dictum of          H
Cockburn C.J. in *Twycross v. Grant*, 2 C.P.D. 469, 544, the earlier cases
do not touch on the problems in the present case. Finally, even in the last
century it was realised that there must be sensible and practical limits to

A  the heads of loss for which even an intentional wrongdoer can be held
liable. Thus in *Twycross v. Grant* Cockburn C.J. said that if the
fraudulently misdescribed horse subsequently catches a disease and dies
the buyer cannot claim the entire value of the horse. But it took a long
time before the precise nature of those limitations were clearly understood
and explained.

B
*Doyle v. Olby (Ironmongers) Ltd.*

Eventually, the idea took root that an intentional wrongdoer is not
entitled to the benefit of the reasonable foreseeability test of remoteness.
He is to be held liable in respect of "the actual damage directly flowing
from the fraudulent inducement:" see the obiter dictum of Lord Atkin in
C  *Clark v. Urquhart* [1930] A.C. 28, 68: and compare dicta of Dixon J. in
*Potts v. Miller* (1940) 64 C.L.R. 282, 298–299, and in *Toteff v. Antonas*
(1952) 87 C.L.R. 647, 650. It was, however, not until the decision of the
Court of Appeal in *Doyle v. Olby (Ironmongers) Ltd.* [1969] 2 Q.B. 158
that the governing principles were clearly laid down. By fraudulent
misrepresentation the defendant induced the plaintiff to buy a business.
D  The trial judge awarded damages to the plaintiff on the basis of a
contractual measure of damages, i.e. the cost of making good the
representations. The Court of Appeal ruled that this was an error and
substituted a higher figure assessed on the basis of the tort measure,
i.e. restoration of the status quo ante. Lord Denning M.R. explained, at
p. 167:

E      "In contract, the damages are limited to what may reasonably be
supposed to have been in the contemplation of the parties. In fraud,
they are not so limited. The defendant is bound to make reparation
for all the actual damages directly flowing from the fraudulent
inducement. The person who has been defrauded is entitled to say:
'I would not have entered into this bargain at all but for your
representation. Owing to your fraud, I have not only lost all the
F      money I paid you, but, what is more, I have been put to a large
amount of extra expense as well and suffered this or that extra
damages.' All such damages can be recovered: and it does not lie in
the mouth of the fraudulent person to say that they could not
reasonably have been foreseen."

G  Winn and Sachs L.JJ. expressed themselves in similar terms.
The logic of the decision in *Doyle v. Olby (Ironmongers) Ltd.* justifies
the following propositions. (1) The plaintiff in an action for deceit is not
entitled to be compensated in accordance with the contractual measure of
damage, i.e. the benefit of the bargain measure. He is not entitled to be
protected in respect of his positive interest in the bargain. (2) The plaintiff
in an action for deceit is, however, entitled to be compensated in respect
H  of his negative interest. The aim is to put the plaintiff into the position he
would have been in if no false representation had been made. (3) The
practical difference between the two measures was lucidly explained
in a contemporary case note on *Doyle v. Olby (Ironmongers) Ltd.:*

282

Lord Steyn          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          [1997]

G. H. Treitel, "Damages for Deceit" (1969) 32 M.L.R. 556, 558–559. The
author said:

> "If the plaintiff's bargain would have been a bad one, even on the
> assumption that the representation was true, he will do best under the
> tortious measure. If, on the assumption that the representation was
> true, his bargain would have been a good one, he will do best under
> the first contractual measure (under which he may recover something
> even if the actual value of what he has recovered is greater than the
> price)."

(4) Concentrating on the tort measure, the remoteness test whether the
loss was reasonably foreseeable had been authoritatively laid down in *The
Wagon Mound* in respect of the tort of negligence a few years before *Doyle
v. Olby (Ironmongers) Ltd.* was decided: *Overseas Tankship (U.K.) Ltd. v.
Morts Dock & Engineering Co. Ltd. (The Wagon Mound)* [1961] A.C. 388.
*Doyle v. Olby (Ironmongers) Ltd.* settled that a wider test applies in an
action for deceit. (5) The dicta in all three judgments, as well as the actual
calculation of damages in *Doyle v. Olby (Ironmongers) Ltd.*, make clear
that the victim of the fraud is entitled to compensation for all the actual
loss directly flowing from the transaction induced by the wrongdoer. That
includes heads of consequential loss. (6) Significantly in the present
context the rule in the previous paragraph is not tied to any process of
valuation at the date of the transaction. It is squarely based on the
overriding compensatory principle, widened in view of the fraud to cover
all direct consequences. The legal measure is to compare the position of
the plaintiff as it was before the fraudulent statement was made to him
with his position as it became as a result of his reliance on the fraudulent
statement.

*Doyle v. Olby (Ironmongers) Ltd.* was subsequently applied by the
Court of Appeal in two Court of Appeal decisions: *East v. Maurer* [1991]
1 W.L.R. 461 and *Smith Kline & French Laboratories Ltd. v. Long* [1989]
1 W.L.R. 1. *East v. Maurer* is of some significance since it throws light on
a point which arose in argument. Counsel for Citibank argued that in the
case of a fraudulently induced sale of a business, loss of profits is only
recoverable on the basis of the contractual measure and never on the basis
of the tort measure applicable to fraud. This is an oversimplification. The
plaintiff is not entitled to demand that the defendant must pay to him the
profits of the business as represented. On the other hand, *East v. Maurer*
shows that an award based on the hypothetical profitable business in
which the plaintiff would have engaged but for deceit is permissible: it is
classic consequential loss. Turning to the *Smith Kline* case it has been
suggested that the *Doyle v. Olby (Ironmongers) Ltd.* rule was wrongly
applied: Burrows, *Remedies for Torts and Breach of Contract*, 2nd ed.
(1994), pp. 173–174. The correctness of that comment I need not examine.
In my view it is sufficient to say that the principles emerging from *Doyle
v. Olby (Ironmongers) Ltd.* are good law.

*Side-tracking*

At the risk of being side-tracked I must now refer to two Court of
Appeal decisions which were discussed in argument. In *Royscot Trust Ltd.*

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        Lord Steyn

A    *v. Rogerson* [1991] 2 Q.B. 297 the Court of Appeal held that under
section 2(1) of the Misrepresentation Act 1967 damages in respect of an
honest but careless representation are to be calculated as if the
representation had been made fraudulently. The question is whether the
rather loose wording of the statute compels the court to treat a person
who was morally innocent as if he was guilty of fraud when it comes to
the measure of damages. There has been trenchant academic criticism of
B    the *Royscot* case: see Richard Hooley, "Damages and the Misrepresentation
Act 1967" (1991) 107 L.Q.R. 547. Since this point does not directly arise
in the present case, I express no concluded view on the correctness of the
decision in the *Royscot* case. The second case is the decision of the Court
of Appeal in *Downs v. Chappell* [1997] 1 W.L.R. 426. The context is the
rule that in an action for deceit the plaintiff is entitled to recover all his
C    loss directly flowing from the fraudulently induced *transaction*. In the case
of a negligent misrepresentation the rule is narrower: the recoverable loss
does not extend beyond the consequences flowing from the negligent
*misrepresentation*: see *Banque Bruxelles Lambert S.A. v. Eagle Star
Insurance Co. Ltd.* [1997] A.C. 191. In *Downs v. Chappell* [1997] 1 W.L.R.
426, Hobhouse L.J. applied this narrower rule to an action for deceit. He
enunciated the following "qualification" of the conventional rule, at
D    p. 443:

    "In my judgment, having determined what the plaintiffs have lost
    as a result of entering into the transaction—their contract with
    Mr. Chappell—it is still appropriate to ask the question whether that
    loss can properly be treated as having been caused by the defendants'
    torts, notwithstanding that the torts caused the plaintiffs to enter into
E    the transaction."

That led Hobhouse L.J., at p. 444, "to compare the loss consequent upon
entering into the transaction with what would have been the position had
the represented, or supposed, state of affairs actually existed." The
correctness of this proposition in a case of deceit was debated at the bar.
Counsel for Citibank in whose interest it was to adopt this proposition
F    felt some difficulty in doing so. In my view the orthodox and settled rule
that the plaintiff is entitled to all losses directly flowing from the
transaction caused by the deceit does not require a revision. In other
words, it is not necessary in an action for deceit for the judge, after he
had ascertained the loss directly flowing from the victim having entered
into the transaction, to embark on a hypothetical reconstruction of what
the parties would have agreed had the deceit not occurred. The rule in
G    deceit is justified by the grounds already discussed. I would hold that on
this point *Downs v. Chappell* was wrongly decided.

*The date of transaction rule*

    That brings me to the perceived difficulty caused by the date of
transaction rule. The Court of Appeal [1994] 1 W.L.R. 1271, 1283G,
H    referred to the rigidity of "the rule in *Waddell v. Blockey* (1879) 4 Q.B.D.
678, which requires the damages to be calculated as at the date of sale."
No doubt this view was influenced by the shape of arguments before the
Court of Appeal which treated the central issue as being in reality a

284
Lord Steyn        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

valuation exercise. It is right that the normal method of calculating the      A
loss caused by the deceit is the price paid less the real value of the subject
matter of the sale. To the extent that this method is adopted, the selection
of a date of valuation is necessary. And generally the date of the
transaction would be a practical and just date to adopt. But it is not
always so. It is only prima facie the right date. It may be appropriate to
select a later date. That follows from the fact that the valuation method is      B
only a means of trying to give effect to the overriding compensatory rule:
*Potts v. Miller,* 64 C.L.R. 282, 299, *per* Dixon J. and *County Personnel
(Employment Agency) Ltd. v. Alan R. Pulver & Co.* [1987] 1 W.L.R. 916,
925–926, *per* Bingham L.J. Moreover, and more importantly, the date of
transaction rule is simply a second order rule applicable only where the
valuation method is employed. If that method is inapposite, the court is
entitled simply to assess the loss flowing directly from the transaction      C
without any reference to the date of transaction or indeed any particular
date. Such a course will be appropriate whenever the overriding
compensatory rule requires it. An example of such a case is to be found
in *Cemp Properties (U.K.) Ltd. v. Dentsply Research & Development
Corporation* [1991] 2 E.G.L.R. 197, 201, *per* Bingham L.J. There is in
truth only one legal measure of assessing damages in an action for deceit:
the plaintiff is entitled to recover as damages a sum representing the      D
financial loss flowing directly from his alteration of position under the
inducement of the fraudulent representations of the defendants.
The analogy of the assessment of damages in a contractual claim on the
basis of cost of cure or difference in value springs to mind. In *Ruxley
Electronics and Construction Ltd. v. Forsyth* [1996] A.C. 344, 360G, Lord
Mustill said: "There are not two alternative measures of damages, as      E
opposite poles, but only one; namely, the loss truly suffered by the
promisee." In an action for deceit the price paid less the valuation at the
transaction date is simply a method of measuring loss which will
satisfactorily solve many cases. It is not a substitute for the single legal
measure: it is an application of it.

*Causation*      F

    So far I have discussed in general terms the scope of a fraudster's
liability in accordance with the rule identified with *Doyle v. Olby
(Ironmongers) Ltd.* [1969] 2 Q.B. 158. It is now necessary to consider
separately the three limiting principles which, even in a case of deceit,
serve to keep wrongdoers' liability within practical and sensible limits. The
three concepts are causation, remoteness and mitigation. In practice the
inquiries under these headings overlap. But they are distinct legal concepts.      G
For present purposes causation is the most important. The major issue in
the present case is whether there is a causal link between the fraud and
the loss arising by reason of the pre-existing fraud perpetrated on Ferranti.
How should this matter be approached? The development of a single
satisfactory theory of causation has taxed great academic minds: see *Hart
and Honoré, Causation in the Law* and Honoré, "Necessary and Sufficient      H
Conditions in Tort Law," in *Owen, Philosophical Foundations of Tort Law,*
p. 363. But, as yet, it seems to me that no satisfactory theory capable of
solving the infinite variety of practical problems has been found. Our case

A.C.          Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))          Lord Steyn

A    law yields few secure footholds. But it is settled that at any rate in the law of obligations causation is to be categorised as an issue of fact. What has further been established is that the "but for" test, although it often yields the right answer, does not always do so. That has led judges to apply the pragmatic test whether the condition in question was a substantial factor in producing the result. On other occasions judges assert that the guiding criterion is whether in common sense terms there is a sufficient causal connection: see *Yorkshire Dale Steamship Co. Ltd. v. Minister of War Transport* [1942] A.C. 691, 706, *per* Lord Wright. There is no material difference between these two approaches. While acknowledging that this hardly amounts to an intellectually satisfying theory of causation, that is how I must approach the question of causation.

C    *Remoteness and mitigation*

The second limiting principle is remoteness. I have already discussed the special rule of remoteness developed by the courts in the context of deceit. This requirement is in issue in the present case: if there is a sufficient causal link it must still be shown that the entire loss suffered by Smith is a direct consequence of the fraudulently induced transaction. The third limiting principle is the duty to mitigate. The plaintiff is not entitled to damages in respect of loss which he could reasonably have avoided. This limiting principle has no special features in the context of deceit. There is no issue under this heading and I need say no more about it.

E    *Taking stock*

It is now necessary to take stock of the case. The distinctive features of the case are (1) that the fraud of Mr. Roberts induced Smith to buy the Ferranti shares, the value of which were already at the date of sale doomed to collapse due to the fraud practised on the company by a third party; and (2) that by reason of the fraud of Mr. Roberts, Smith was induced to buy the shares as a market making risk, i.e. to hold on to the shares for sale at a later stage.

F    In these circumstances Smith was truly locked into the transaction by reason of the fraud perpetrated on it. And the causative influence of the fraud is not significantly attenuated or diluted by other causative factors acting simultaneously with or subsequent to the fraud. The position would have been different if the loss suffered by Smith arose from a subsequent fraud. That would be a case like the misrepresented horse in Cockburn C.J.'s example in *Twycross v. Grant*, 2 C.P.D. 469, 544–545, where the buyer plainly cannot recover the entire value of the horse if it subsequently catches a disease and dies. In the actual circumstances of this case I am satisfied that there was a sufficient causal link between the fraud and Smith's loss. Moreover, for substantially the same reasons, I would hold that Smith's losses, calculated on the basis of the difference between the price paid and the proceeds of subsequent realisations, flow directly from the fraud. In my view Smith would on this basis be entitled to recover the sum of about £11·3m. Smith merely seeks restoration of the order for payment of £10,764,005 which Chadwick J. made on a different basis. In law Smith are entitled to succeed on this appeal to that extent.

286

Lord Steyn        Smith New Court Ltd. v. Scrimgeour Vickers (H.L.(E.))        [1997]

*Conclusion*                                                                                                A

 I have not lost sight of counsel for Citibank's argument that, given the
way the case was pleaded, Smith should not be allowed to succeed on this
legal basis. In my view the argument that Citibank was prejudiced is quite
unreal. I reject it.

 I would allow Smith's appeal on damages and restore the order of
Chadwick J.                                                                                                B

> *Appeal allowed.*
> *Cross-appeal dismissed.*
> *Citibank to pay costs in*
> *   Court of Appeal and*
> *   House of Lords.*                                                                     C

Solicitors: *Wilde Sapte; Ashurst Morris Crisp.*

                                                                                    A. R.

                                                                                                D

---

[HOUSE OF LORDS]                                                                           E

O'HARA    .    .    .    .    .    .    .    .    APPELLANT

AND

CHIEF CONSTABLE OF THE ROYAL
    ULSTER CONSTABULARY    .    .    .    .    . RESPONDENTS

1996  Oct. 2;                              Lord Goff of Chieveley, Lord Mustill,    F
      Dec. 12                                  Lord Steyn, Lord Hoffmann and
                                               Lord Hope of Craighead

> *Arrest—Arrest without warrant—Validity—Police officers briefed on*
> *anti-terrorist operation—Constable arresting plaintiff on basis of*
> *information then received—Whether constable having reasonable*
> *grounds for suspicion so as to justify arrest—Whether information*       G
> *received at briefing sufficient grounds for suspicion—Prevention of*
> *Terrorism (Temporary Provisions) Act 1984 (c. 8), s. 12(1)(b)*

> The plaintiff was summarily arrested at his home on
> 28 December 1985 by a detective constable of the Royal Ulster
> Constabulary under section 12(1) of the Prevention of Terrorism
> (Temporary Provisions) Act 1984.[1] Apart from information
> received at a briefing earlier that morning, during which he was        H
> told that the plaintiff had been involved in a murder, the constable

---

[1] Prevention of Terrorism (Temporary Provisions) Act 1984, s. 12(1)(*b*): see post,
p. 298F–G.

THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## THIRTIETH EDITION

### VOLUME I

### GENERAL PRINCIPLES

SWEET & MAXWELL             THOMSON REUTERS

6–141    CHAP. 6—MISREPRESENTATION

seller or supplier and a consumer" and "has not been individually negotiated".[585] Thus clauses limiting the authority of agents or defining the terms of the contract, which are not caught by s.3 of the Misrepresentation Act 1967,[586] will be covered.

### 6. CONTRACTS UBERRIMAE FIDEI

6–142    **Non-disclosure.** Mere non-disclosure of fact, material or not, does not ordinarily amount to misrepresentation, and the general rule is that in order to be actionable a representation must take an "active" form.[587] But in certain cases a stricter rule is enforced. The most important of these are the contracts uberrimae fidei[588] in which knowledge of the material facts generally lies with one party alone; that party is under a duty to make a full disclosure of these facts, and failure to do so makes the contract voidable. However, even if the non-disclosure is negligent, it does not give rise to liability in damages under Misrepresentation Act 1967 s.2(1) or, without more, at common law.[589] The duty varies in its extent from one type of contract to another. Contracts of insurance of every kind form the main group of contracts uberrimae fidei. Other examples generally included though these are probably not all uberrimae fidei in the strict sense and do not involve such extensive duties of disclosure, are contracts to subscribe for shares in a company,[590] family settlements;[591] contracts for the sale of land,[592] contracts for suretyship,[593] and partnerships. To this list may be added general releases. Contracts of service are not uberrimae fidei[594] nor are contracts of sale of goods.[595]

6–143    **Rescission but not damages.** A breach of the duty to disclose will give rise to the right to rescind the contract but, it is submitted, not to a right to damages even if the other party kept quiet "fraudulently" in the sense of intended deliberately to mislead the claimant. In *Conlon v Simms* it was said that

"... where the breach of the duty of disclosure is fraudulent, a party to whom the duty is owed who suffers loss by reason of the breach may recover damages for that loss

---

[585] Regulations 1999 reg.5(1).
[586] See above, para.6–137.
[587] See above, para.6–014.
[588] For the others, see above, paras 6–014—6–018. A party in whom trust and confidence reposed may also have, in effect, a duty of disclosure: below, para.7–094.
[589] *Banque Keyser Ullman SA v Skandia (UK) Insurance Co Ltd* [1990] 1 Q.B. 665, 789, 790–805; affirmed on other grounds [1991] 2 A.C. 249. See above, para.1–134.
[590] Below, para.6–153.
[591] Below, para.6–155.
[592] Below, para.6–156.
[593] Below, para.6–158.
[594] *Bell v Lever Bros Ltd* [1932] A.C. 161, 227; *Nottingham University v Fishel* [2000] 1462(5) . . . . . .
[595] *Jewson & Sons Ltd v Arcos Ltd* (1932) 39 Com. Cas. 59.

6–156                    CHAP. 6—MISREPRESENTATION

completion.[657] However, as it appears that all defects must be revealed whether known to the vendor or not, and that if a latent defect is not revealed the purchaser may recover damages for breach of contract, it seems that the duty must be based on an implied term of the contract.[658]

6–157    It seems that any fact which will prevent the purchaser from obtaining such a title as he was led to expect may constitute a defect in title.[659] So where the subject of the sale was a leasehold interest, and the lease contained onerous and unusual covenants which were not disclosed by the vendor, the purchaser was held to be entitled to rescind the contract.[660] It has also been suggested that a tenant who is selling his leasehold interest is bound to disclose receipt of notice from his landlord of an intention to proceed under a rent review clause.[661] A purchaser may, of course, contract to accept a defective title, but even an express agreement to this effect will not (it seems) save the vendor where he fails to disclose defects known to him.[662] A purchaser is not obliged to disclose any information he may have which may affect the value of the property; but it has been held that a purchaser who applies for planning permission in the name of the vendor prior to the exchange of contracts is acting as a self-appointed agent and may thereby come under fiduciary duties to the vendor.[663]

### (e) Contracts of suretyship

6–158    Suretyship or insurance.[664] It seems that contracts of suretyship are not contracts uberrimae fidei properly so-called, although they are sometimes said to bear certain characteristics of that class. One difficulty is that it may be a matter for doubt whether a given contract is one of suretyship or of insurance. In Seaton v Heath[665] Romer L.J. said that many contracts may with equal propriety be called contracts of insurance or contracts of suretyship, and that whether a contract requires uberrima fides or not depends not upon what it is called but upon its substantial character and how it came to be effected. Considering its substantial character and how it came to be effected, he said: "Sureties, at least, are generally persons who know the risk they undertake without it being explained to them, and who if they do not know it, would make inquiry on the subject; in contracts of insurance, on the other hand, the person desiring to be insured has means of knowledge of the risk which the insurer does not possess, and he puts the risk before the insurer as a business proposition."

---

[657] Harpum (1992) 108 L.Q.R. 208, relying on, inter alia, Carlish v Salt [1906] 1 Ch. 355 and Reeve v Berridge (1888) 20 QBD 423. The existence of such a duty was accepted by at least the majority of the Court of Appeal in Peyman v Lanjani [1985] Ch. 457, 482, 496–497.
[658] Harpum (1992) 108 L.Q.R. 208, 332–333.
[659] But see Re Flynn and Newman's Contract [1948] I.rR. 104.
[660] Molyneux v Hawtrey [1903] 2 K.B. 487.
[661] F. & H. Entertainments Ltd v Leisure Enterprises Ltd (1976) 120 S.J. 331.
[662] Becker v Partridge [1966] 2 Q.B. 155.
[663] English v Dedham Vale Properties Ltd [1978] 1 W.L.R. 93; Rignall Developments Ltd [1988] Ch. 190.
[664] See Vol.II, Ch.44.
[665] [1899] 1 Q.B. 782, 792–793.

[588]

A-5763

THE COMMON LAW LIBRARY

# CLERK & LINDSELL

## ON

# TORTS

*NINETEENTH EDITION*

*LONDON*
SWEET & MAXWELL
2006

:NCE                                  2. DUTY OF CARE                          8–101

a member of a general class of

**Dependence and vulnerability** In the leading Australian High Court decision   8–100
of *Perre v Apand Pty Ltd*[62] McHugh J. suggested that "reliance and assumption
of responsibility are merely indicators of the claimant's vulnerability to harm
from the defendant's conduct" and that it is "the concept of vulnerability rather
than these evidentiary factors which is the most relevant criterion for determining

is one of reasonable reliance *or*
ctual reliance by the claimant on
s the claimant's loss is usually
it but this is not always the case.
ant had lost his job as a result of
efendant, his ex-employer to his
at the employment relationship
on the defendant.[57] But to dis-
he claimant actually relies on the
-laimant as reasonably depending
rence.[58] This is all the more the
members of the House of Lords
mant, a disappointed beneficiary,
nce. Lord Nolan described the
d in the earlier case of *Ross v*
assive reliance". Lord Browne-
personal reliance but justified a
ely on solicitors to carry out their
may be helpful to describe this as
distinguish it from a situation of
rmed reliance or dependence, the
the claimant to rely or depend on
e defendant expressly assumes a
reasonable for the claimant to trust
ice of an express undertaking, g
the reasonableness question: the
t, the availability of independent
y to secure contractual safeguard
the informal context in which the

whether a duty of care exists." He argued that in a case such as *White*, vulnerabil-
ity could rest on the defendant's control of the claimant's right, interest or
expectation and the court may be spared the necessity of finding some element
of reliance. This attractive analysis formed part of a broader thesis that the
reasons for "upholding or denying a duty in particular cases should be regarded
as the principles to be applied in determining whether a duty exists in cases
within that category".[61] The contrast of two House of Lords' decisions illustrates
the point. In *Smith v Bush*[64] a surveyor was held to owe a duty to a house
purchaser to whom the third party lender had passed his report. The purchaser
was not independent of the third party, rather he had paid a valuation fee to that
third party out of which the surveyor had been paid. The purchaser was not in a
position to make any necessary judgments himself. He had already paid for a
valuation and it would be unreasonable to expect him to pay for a second,
independent valuation. It was unlikely that he would be able to obtain insurance
against the inherent defects which should have been revealed by the survey. By
contrast, in *Caparo Industries plc v Dickman*[65] the take-over bidder who had
received the audit report as a shareholder, was independent, an "entrepreneur
taking high risks for high reward",[66] and well able to make any necessary
judgments itself. No duty was owed. Another obvious example of vulnerability
and dependence is provided by *Gorham v British Telecommunications Plc*[67]
where the court of appeal followed *White v Jones* when imposing a duty on a
pension adviser to the dependants of its client.

**Availability of independent advice** In *McNaughton Papers Group Ltd v*   8–101
*Hicks Anderson & Co (a firm)* Neill L.J. observed that "In business transactions
conducted at arms' length it may sometimes be difficult for an advisee to prove
that he was entitled to act on a statement without taking any independent
advice".[68] On the facts, he found that it was to be anticipated that the claimant,
an experienced businessman, "would have access to and would consult with his
own accountancy advisers". He was not entitled to rely on the draft accounts
prepared by the defendants when purchasing the defendants' client. Similar
conclusions have been reached where the claimant has relied on informal or

ly provided by employers to their empl
ided by an employer, it is plain that
in the preparation of the reference be

er example of loss caused to a claiman

relation to a fact situation like that in *Sp*
that the claimant had not factually reli

---

[62] (1999) A.L.R. 606 at 639
[63] McHugh J. identified indeterminacy of liability, autonomy of the individual, the claimant's
vulnerability to risk and the defendant's knowledge of that risk as being the four principles relevant
to the duty question and around which the law should be structured. Kirby J. in *Perre* argued that
these were no more than criteria for "giving content to the universal requirement of undertaking the
policy analysis required by the third stage of the *Caparo* approach"
[64] [1990] A.C. 881
[65] [1990] 2 A.C. 605
[66] per Hoffmann L.J. in *Morgan Crucible v Hill Samuel* [1991] Ch. 295 at 302, when drawing the
distinction between *Smith* and *Caparo* in terms of the fairness and justice of the relationship
[67] [2000] 1 W.L.R. 2129
[68] [1991] 2 Q.B. 113 at 126

[457]

qualified[69] statements of accountants when purchasing the client. Conversely, the more formal the context in which the advice is given[70] or the more it is cast in the form of an assurance,[71] the more the recipient may be entitled to rely rather than having to verify.

8-102    **Contractual context** The contractual context may also be relevant to whether it is reasonable to impose a duty. In *Henderson v Merrett Syndicates Ltd*[72] the House of Lords held that Lloyd's managing agents owed a duty of care to Names for whom they indirectly acted, the Names' direct contracts being with member's agents who, in turn, retained the managing agents. The relationship was such that the Names were reasonably entitled to rely on the managing agents. Lord Goff noted that the case was:

> "most unusual; in many cases in which a contractual chain comparable to the present case is constructed it may well prove to be inconsistent with an assumption of responsibility which has the effect of short-cutting the contractual structure so put in place by the parties. . . . [for example, under] the ordinary building contract, [where] the main contractor sub-contracts with sub-contractors or suppliers (often nominated by the building owner) . . . it will not ordinarily be open to the building owner to sue the sub-contractor or supplier direct under the *Hedley Byrne* principle."

This suggests that the earlier Lords' decision in *Junior Books Ltd v Veitchi Co Ltd*[73] where a nominated subcontractor responsible for negligently laying defective flooring was held liable to the building owner for the economic loss resulting from having to replace the flooring, should be regarded as exceptional. It might be justifiable on the ground that the subcontractor was nominated for its special skill on which the employer was reasonably entitled to rely. An example of a contractual context inconsistent with a tortious duty is provided by *Pacific Associates Inc v Baxter*.[74] The claimants were contractors engaged in dredging work under the supervision of the defendant engineer who was retained by the employer. The claimants' contract with the employer contained clauses providing that the engineer would not be personally liable for acts under the contract and for the arbitration of disputes between the contractor and employer. The contractor claimed that the geological information in the tender document issued by the engineer had under-estimated the amount of hard materials to be dredged and that the engineer had acted negligently in rejecting the contractor's claims for extra payment for removal of unforeseen hard materials. The contractor recovered some of its alleged loss from the employer following an arbitration settlement and then sought to recover the balance through a negligence action against

---

[69] *Peach Publishing Ltd v Slater & Co* [1998] P N L R  364
[70] See for example, *ADT v Binder Hamlyn* [1996] B C C  808, where the statements were made by the accountants at a meeting arranged specifically for the purchasers to satisfy themselves before proceeding.
[71] See for example the assurance given by the defendant solicitors in *Allied Finance and Investment Ltd v Haddow & Co* [1983] N Z L R  22, NZCA
[72] [1995] 2 A.C.  145 at 195
[73] [1983] 1 A C  520
[74] [1990] 1 Q B  993

the employer.
a *Hedley Byrn*
structure of n
entered"

**Scope of c**
defendant and
*Chong Hing 1*
tortious duty
contractual du
Lord Scarman
between contr
justified on the
the duties imp
*Electric Prote*
somewhat sim
defendants neg
to the claima
warranties wer
defendants not
varying the con
noted that in N
terms of the co
no inconsistenc
express scope
stated the positi

In our opinio
cannot arise in
aspects of the
involving mor

the difficulty of
is illustrate by the
*Edi's D Lea & A*
[1990] Lloyd's Re
accountants and dist
*Nova Pacific Ltd v*
consultant engineer
[1986] A C  80
[1995] 2 A C  14
and Social Services
in the contractual
negligence." It is al
at 454, cited Lord
when giving a refer
contract
[1972] 26 D L R
[1996] P N L R

ild who had been referred to the rised as "personal injury" but in n *Phelps* in concluding that an n respect of economic loss to a personal dealings between the *liams* but the majority in *Merrett* n the status of directors and not se of Lords to consider and it is employee should be a factor to a claimant's reliance on that

is given informally it is unlikely e. An oral answer to a planning n informal and half-remembered business inquiry[93] or statements give rise to liability. Similarly, cial it may not be reasonable for lly accountable. For this reason, ynn and Woolf doubted whether ould give rise to liability under *hry v Prabhakar*[96] liability was it, who advised a friend on the *Hedley Byrne* duty to the friend e expected was subjective rather concession on duty was correct social regulations and responsi- s". However, Stuart-Smith L.J. existed in the absence of the

_____

*nt Travel Investment Co Ltd v Butcom*

1994] N.P.C. 136; *The Times* November

'd on other grounds [1999] Lloyd's Rep.

*ns (Excavations) Ltd* [1978] Q.B. 574, ompany chartering barges was not under acity of a barge in an oral, off the cuff duty was owed where "the opinion. t appears that it *is* unconsidered and it n taking further steps to check it". Shaw of the inquiry was so important and the : defendant was under a duty. See also d's Rep. P.N. 398, where a telephone ve did not give rise to a duty.
'84) 8 DLR (4th) 96, was held not liable ee before making an unconditional offer

---

concession, arguing that the principal-agent relationship between the parties indicated that the occasion is not a purely social one, but to use Lord Reid's expression, is in a business connection".[97] It is submitted that the view of May L.J. should be followed. It would be unfair to impose a duty where the relation- ship is social in origin, unless there is clear evidence that the person is assuming legal responsibility for the advice he gives.[98]

(iii) *Disclaimers*[99]

**Effect of disclaimers** A disclaimer of liability in respect of a statement or     8–108
service may be sufficient to preclude a finding of assumption of responsibility and reasonable reliance. This was the case in *Hedley Byrne* itself where the credit reference provided by the defendant bank was stated to be given without respon- sibility and as a result the bank was held to owe no duty. In *McCullagh v Lane Fox & Partners Ltd*[1] Hobhouse L.J. explained that a disclaimer was not to be construed narrowly in the same way as an exclusion clause, rather the court should "treat the existence of the disclaimer as one of the facts relevant to answering the question whether there has been an assumption of responsibility by the defendants for the relevant statement. This question must be answered objectively by reference to what the reasonable person in the position [of the claimant] would have understood at the time he finally relied upon the repre- sentation." The estate agent's disclaimer in the case was contained in the particulars of the property and provided that "all statements contained in these particulars are made without responsibility". Hobhouse L.J. criticised the approach of the trial judge in treating this disclaimer as if it were a contractual exclusion and construing it narrowly so as not to apply to the oral misrepresenta- tion of the agent. Rather, he concluded that "the mere fact that [the employee] when showing [the claimant] around the property, gave the same information [as had been in the written particulars] orally would not lead a reasonable person to conclude that the defendants were thereby choosing to assume responsibility for the statement which they said in the particulars they were not assuming responsi- bility for."[2] However, the wording must be sufficient to cover the conduct of the defendant[3] and to disclaim responsibility. In *Henderson v Merrett Syndicates Ltd*[4]

_____

However, the principal-agent relationship was itself conceded by the defendant Stocker L.J. whilst basing his decision on the concession, commented that

"The first question is whether any duty of care is owed where the relationship between the parties is such that no voluntary assumption of legal responsibility was intended or can properly be imputed and where the giving of legal advice was motivated out of friendship. In my view, in the absence of other factors giving rise to such a duty, the giving of advice sought in the context of family, domestic or social relationships will not in itself give rise to any duty in respect of such advice."

This same policy is applied in contractual actions. See *Balfour v Balfour* [1919] 2 K.B. 571 A party to social or family arrangement will not be held liable in contract unless there is positive evidence that the party intended to enter into a contractual relationship

See further paras 3-104 *et seq.* and 10-15 to 10-18 and 10-149 to 10-152.
[1996] P.N.L.R. 205
[1996] P.N.L.R. 205 at 23:

See for example, *Duncan Investments Ltd v Underwoods (a firm)* [1998] P.N.L.R. 754, in which the Court of Appeal held that a clause disclaiming an estate agent's responsibility for representations made on behalf of the vendor, could not apply to advice given on its own behalf.
[1995] 2 A.C. 145 at 183

[463]

8–108                               CHAPTER 8—NEGLIGENCE

wording which provided that Lloyd's agents had absolute discretion as to the acceptance of risks on behalf of Names, was held to be insufficient. Lord Goff said that "in the present case the words . . . should [have been] directed towards the scope of the agents' authority" to be effective. An exclusion or limitation of liability clause in a contract between the defendant and its contractual employer may also be held to affect or limit the defendant's liability to a third party claimant arising from performance of its contractual duties.[5]

8–109        **Statutory control of disclaimers**[6] The Unfair Contract Terms Act 1977 applies to disclaimers.[7] As a result, a disclaimer will only be effective as an exclusion of duty if it would be "fair and reasonable to allow reliance on it having regard to all the circumstances obtaining when liability arose".[8] In applying this test, courts will have regard to the nature of the relationship between the parties. In *Smith v Eric S Bush*[9] the surveyor's disclaimer of responsibility for the valuation passed on by the lender to the purchaser was regarded as unreasonable and ineffective. Lord Griffiths stressed four factors: the claimant's lack of bargaining power; the unreasonableness of expecting the claimant to seek a private valuation given that he would then be paying twice for the same service; the elementary level of skill required in compiling a valuation report which needs to note only observable defects; and finally, the fact that "denying the surveyor the right to exclude liability would distribute the risk of his negligence amongst all house purchasers through an increase in his fees to cover insurance" whereas otherwise "the whole risk would fall on the one unfortunate purchaser".[10] By contrast, the disclaimer in *McCullagh v Lane Fox & Partners Ltd*[11] was regarded as reasonable as the prospective purchaser could be expected to verify the particulars of the property himself. The purpose and scope of the disclaimer will also be relevant. In *Omega Trust Co Ltd v Wright Son & Pepper*[12] a disclaimer in a property valuation for a commercial lender which stated that it was not to be relied on by third parties, was held to be reasonable as against another lender who joined the client in making a loan on the security of the property. Henry L.J said:

"It seems to me that this professional valuer, valuing expensive properties in a commercial context, was entitled to know who his client was and to whom his duty was owed. He was entitled . . . to refuse to assume liability to any unknown lender. Indeed, I would go further and say that he is entitled to refuse to assume liability to any known lender to whom he had not agreed. He was entitled to increase the fee as a term of

[5] See *Killick v PriceWaterhouseCoopers* [2001] P.N.L.R. 1
[6] See further below paras 3–105 to 3–109 and para.10–16
[7] *Smith v Eric S Bush* [1990] 1 A.C. 831, HL, decided that disclaimers fell within s.13(1) of the Act which provides that to the extent to which s.2 prevents the exclusion or restriction of liability, it also prevents "excluding or restricting liability by reference to terms or notices which restrict the relevant obligation or duty".
[8] S.2(2) of the Unfair Contract Terms Act which provides that a person cannot in the course of his business "exclude or restrict his liability for negligence except in so far as the term [which he relies on] or notice satisfies the requirement of reasonableness"
[9] [1990] 1 A.C. 831
[10] [1990] 1 A.C. 831 at 857. See further below para 10–149
[11] [1996] P.N.L.R. 205 at 239
[12] [1997] P.N.L.R. 424.

[464]

CHAPTER 18

DECEIT

1 Introduction                                                              18-01
2 Requirements                                                             18-04
   (a) Representation                                                      18-04
   (b) State of mind                                                       18-17
        (i) The belief of the defendant                                   18-17
        (ii) State of mind vicarious liability                            18-24
   (c) Representation intended to be acted on by the claimant             18-28
   (d) Claimant must have been influenced by misrepresentation            18-32
3 Damages                                                                  18-36
4 Defences                                                                 18-45
5 Misrepresentation as to credit of third persons                          18-48
6 Statutory liability for misstatements in a prospectus                   18-50
7 The action for fraud arising out of bribery                             18-51

## 1 INTRODUCTION

**Definition** The modern development of the tort of deceit (sometimes called   **18-01**
simply "fraud") dates from *Pasley v Freeman* in 1789 There the defendant
falsely represented to the claimant that a third party was creditworthy when he
knew he was not, the plaintiff suffered loss as a result of extending credit to him
The claimant was held to have an action [1] The tort involves a perfectly general
principle [2] Where a defendant makes a false representation knowing it to be
untrue, or being reckless as whether it is true and intends that the claimant
should act in reliance on it then in so far as the latter does so and suffers loss[3]
the defendant is liable for that loss Each aspect of the tort is discussed in detail
below [4]

---

[1] (1789) 3 T R 51
  Though note that today the representation would have to be in writing Statute of Frauds (Amendment) Act 1828 See para 18-48 below.
  An argument that it could not apply in a family context or between cohabitees was smartly rebutted
by Stanley Burnton J in *P v B (Paternity Damages for Deceit)* [2001] 1 F L R 1041 (action by
cohabitee against girlfriend for duping him into thinking a child was his and hence paying for its
upkeep) The existence of liability it was said would not tend to subvert intimate relationships
particularly since a claimant was unlikely to sue while the relationship was still on foot. See too
*Standard Chartered Bank v Pakistan National Shipping Corp (No 2)* [2003] 1 A C 959 [2002]
UKHL 43 where the House of Lords rejected an argument that an agent who lied on his principal's
orders could not be personally liable to the representee for loss suffered (on which see Pitket [2003]
1 M & C L Q 1)
[3] Damage is the gist of the action see *Smith v Chadwick* (1884) 9 App Cas 187 at 190 (Lord
Blackburn)
  On summary judgment an action for fraud is within the scope of CPR r 24 However it is likely
that there would have to be very strong evidence of fraud for this to apply

[1081]



was sound when, as the owner knew, it was not. The Court of Appeal upheld a finding that the owner was not liable to the purchaser in deceit.

**Partners** Under s.10 of the Partnership Act 1890, partners are liable for **18–27** wrongful acts committed by any one of their number while "acting in the ordinary course of the business of the firm". This liability may of course include cases of fraud committed by a partner, provided the act of the errant partner is closely connected to the business of the firm, as where a partner in an account-ancy firm forges share transfers and then fraudulently confirms their genuineness to stockbrokers.[14] But the limits of this liability should be noted: if no reasonable person would think the transaction was part of the firm's ordinary business, then the firm will not be liable.[15] Furthermore, the same restriction applies here as with vicarious liability[16]: all the acts of the partner which were necessary to make him liable in deceit must have been committed in the course of the firm's business.[17]

### (e) *Representation intended to be acted on by the claimant*

**Representation must be intended to be acted on by claimant** In order to **18–28** give a cause of action in deceit, not only must the statement complained of be untrue to the defendant's knowledge, but it must in addition be made with intent to deceive the claimant: with intent, that is to say, that it shall be acted upon by him.[18] It seems that intent, for these purposes, includes not only the case where the defendant actually desires the claimant to rely on what he says, but also where he appreciates that in the absence of some unforeseen intervention he will actually do so.[19] But if intent of this kind is not shown, then the claimant will fail. So where the defendant, a director of an oil company, untruly stated to a broker that the company had received no news of a major find, intending by this untruth to protect the company's interests and not to induce shareholders to sell their holdings, it was held that no action for fraud lay at the suit of a shareholder.[20] But provided the defendant intended the claimant to act on the representation, it is

---

[14] *McHugh v Kerr* [2003] EWHC 2985 (Ch). *cf. Dubai Aluminium Co Ltd v Salaam*, [2003] 2 AC 366, [2002] UKHL 48 (similar principles re dishonest breach of fiduciary duty).
[15] *Coughlan (JJ) Ltd v Ruparelia* [2004] P.N.L.R. 56; [2003] EWCA Civ 1057 (solicitor, supposedly acting in his capacity as partner, dishonestly puffs a fraudulent investment scheme promising implausible returns of 6,000% per year: no liability, since cannot be said that "viewed fairly and properly, it is the kind of transaction which forms part of the ordinary business of a solicitor".)
[16] Above, para.18–24.
[17] *Dubai Aluminium Co Ltd v Salaam* [2003] 2 AC 366; [2002] UKHL 48 (actually concerning dishonest breach of fiduciary duty, but still in point).
[18] *Peek v Gurney* (1873) L.R. 6 H.L. at 377, 411–413 (Lord Cairns). *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 211; *Ratcher v Fordham* [1955] 2 Lloyd's Rep. 705, at 707.
[19] *Shankar Bank Ltd v Sea Containers Ltd* [2000] 2 Lloyd's Rep. 406 (buyer signing receipts for undelivered goods knowing seller would use them to obtain bank finance: liable to bank in deceit when seller collapsed). This criterion of "intent" is borrowed from criminal law, see *R. v Woollin* [1999] 1 A.C. 82.
[20] *Jockey v McBain* [1912] A.C. 186. See too *Goose v Wilson Sandford & Co (No.2)* [2001] Lloyd's Rep. P.N. 189.

18–28                          CHAPTER 18.—DECEIT

immaterial whether he intended him so to act in the precise way in which he did.[21]

18–29      **Representation not made to claimant directly** A representation made to the claimant directly causes no problems. But a representation made to a third party with intent that it be passed on to the claimant to be acted on by him will equally suffice.[22] Thus in *Swift v Winterbotham*[23] a plaintiff who gave credit on the basis of a fraudulent banker's reference successfully sued in deceit even though the reference had been sent not to him but to his own bank. All that is required for these purposes is that the representation be intended, in one way or another, to reach the claimant in order to induce him to act on it.[24] Nor is it even necessary that the defendant know precisely who the statement is intended for, provided he intends it to be relied on by someone in the claimant's position[25]: thus in another banker's reference case a bank was held liable when it sent a fraudulent reference to another bank for the benefit of a customer of whose identity it was entirely unaware.[26] Indeed, in one case it was even held that an action for deceit could be based on a newspaper advertisement, provided the claimant showed that he was one of the class of persons at whom it was directed.[27]

18–30      Nevertheless, it must be shown that there was an actual intention to deceive the claimant in question, whether individually or by reference to a class to which he belongs; it will not be enough merely to show that the misstatement is reasonably

---

[21] *Goose v Wilson Sandford & Co (No 2)* [2001] Lloyd's Rep. P.N. 189
[22] "Every man must be held responsible for the consequences of a false representation made by him to another, upon which a third person acts, and so acting is damnified, provided it appear that such false representation was made with the intent that it should be acted upon by such third person in the manner that occasions the injury or loss", per Page Wood V.C. in *Barry v Croskey* (1861) 2 J. & H. 1, 23. This case was approved by Lord Cairns in *Peek v Gurney* (1873) 6 H.L. 377, at 412. And see *Brown Jenkinson and Co Ltd v Perry Dalton (London) Ltd* [1957] 2 Q.B. 621, *Commercial Banking of Sydney v R. H. Brown & Co* (1972) 126 C.L.R. 337
[23] (1873) L.R. 8 Q.B. 244 (appealed on other grounds, L.R. 9 Q.B. 301). See also *Langridge v Levy* (1837) 2 M. & W. 519, 4 M. & W. 337 (untrue statement to buyer that shotgun was sound relayed to buyer's son, who was injured using it, son successfully recovered in deceit); *Pilmore v Hood* (1838) 5 Bing. N.C. 97 (false representations made to X regarding sale of business, P knew X passed on to P; D sold to P without correcting).
[24] "In order to enable a person injured by a false representation to sue for damages, it is not necessary that the representation should be made to the plaintiff directly; it is sufficient if the representation is made to a third person to be communicated to the plaintiff, or to be communicated to a class of persons of whom the plaintiff is one, or even if it is made to the public generally, with a view to its being acted on, and the plaintiff as one of the public acts on it and suffers damage thereby."
Quain J. in *Swift v Winterbotham* (1873) L.R. 8 Q.B. 244, at 253, cited with approval by Blackburn J. in *Richardson v Silvester* (1873) L.R. 9 Q.B. 34, at 36. See also *Pilmore v Hood* (1838) 5 Bing. N.C. 97 (false representations made to X regarding sale of business, P knew X passed on to P; D sold to P without correcting); *Barry v Croskey* (1861) 2 J. & H. 1, 23, *Brown Jenkinson and Co Ltd v Perry Dalton (London) Ltd* [1957] 2 Q.B. 631.
[25] See *Standard Chartered Bank v Pakistan National Shipping Corporation (No 2)* [1998] 1 Lloyd's Rep. 684, at 696: enough that claimant "within the class of persons within their contemplation as likely to be deceived"
[26] *Commercial Banking Co of Sydney v R. H. Brown & Co* (1972) 126 C.L.R. at 337. *cf. Brown Jenkinson & Co Ltd v Perry Dalton (London) Ltd.* [1957] 2 Q.B. 621 (carrier who knowingly issued false bills of lading liable to consignees in deceit, since he intended them to be relied on by any number of consignees, bankers and indorsees).
[27] *Richardson v Silvester* (1873) L.R. 9 Q.B. 34 (false advertisement that farm for sale; would-be buyer can recover wasted expenses)

[1096]

## 2. REQUIREMENTS                                    18–32

calculated to deceive him Thus the House of Lords in *Peek v Gurney* [*] held that promoters of a company, who issued a fraudulent prospectus as a prospectus and as nothing more. were not liable for so doing to persons who not being original allottees of the company's shares purchased their shares in the market the reason being that the promoters had no object in making the false statements except to get the shares taken up they had no intent to influence market dealings[*] Again, in *Gross v Lewis Hillman Ltd*[*] sellers of commercial property made certain misrepresentations to the buyers about it the buyers agreed to purchase it but then assigned the benefit of the contract to the plaintiffs The plaintiffs' claim in deceit failed even if the representations had been fraudulent (which they had not) they had been made to the buyers and the plaintiffs could not sue in respect of them

It is obviously a question of fact whether in a particular case a person was    18–31
intended to rely on a false statement In practice however the test is often
whether it was in the defendant's interest that he should do so So where persons
spread a false rumour for the purpose of raising the price of certain stock they
were not liable in damages to those who dealt with other persons on the faith of
such rumour being true[*] there being no intention to deceive any persons other
than those who dealt with the defendants themselves given the defendants had
nothing to gain unless the investors dealt with themselves[*]

### (d) Claimant must have been influenced by misrepresentation

**The claimant must have been influenced by the misrepresentation** To    18–32
entitle a claimant to succeed in an action in deceit he must show that he acted
in reliance on the defendant's misrepresentation[*] If he would have done the
same thing even in the absence of it he will fail[*] However the misrepresenta-
tion need not have been the sole cause of the claimant acting as he did  provided

---

(1873) L R 6 H L 377 S e too *Jackie v McBain* [1912] A C 186 (untrue denial of injury tind by oil company made to protect company's interests generally not to influence market no liability to shareholder who sold on faith of it)

*cf Andrews v Mockford* [1896] 1 Q B 372 when there was an intent to boost the shares in the market generally and hence a purchaser in that market successfully sued

[1970] Ch 445

Se per Page Wood V C in *Barry v Croskey* (1861) 2 J & H 1 18  also per Lord Cairns in *Peek v Gurney* (1873) L R 6 H L 377  at 412

Note in *Langridge v Levy* (1837) 2 M & W 519  4 M & W 337 the defendant having sold a gun to the plaintiff's father for the use of himself and his son and his son  sold it as sound and secure which he knew it to be unsafe  was held liable in an action of deceit to the plaintiff who was wounded by the bursting of the gun  There the court upheld the verdict expressly upon the ground that the declaration contained an averment that the gun was sold for the use of the purchaser and his son  Lord Atkin in *Donoghue v Stevenson* [1932] A C 562  at 587  588  referring to this case said  "Used by the plaintiff was one of the acts contemplated by the fraudulent defendant  This case can hardly be regarded as having decided any principle of general application"

See e g  *Holmes v Jones* (1907) 4 C L R 1692  The correct criterion is whether the claimant would have acted as he did had the representation not been made  He would not then causation is made out  that he would have acted in the same way had he been told the truth is irrelevant  See *Downs v Chappell* [1997] 1 W L R 426

*cf Smith v Chadwick* (1883  84) 9 App Cas 187  *Arkwright v Newbold* [1905] 2 Ch 237 (compare prospectus cases  plaintiffs failed to prove reliance)

[1097]

18–32                      CHAPTER 18—DECEIT

it substantially contributed to deceive him, that will be enough.[   ] If the claimant's mind was partly influenced by the defendant's misstatements the defendant will not be any the less liable because the claimant was also partly influenced by a mistake of his own.[   ]

It seems clear that the claimant must have acted himself to his detriment. If his loss results, not from his own reliance but from that of third parties, the defendant may be liable for torts of unlawful interference with trade,[   ] passing off or malicious falsehood or even negligence[   ] but he will not be liable in deceit.[   ]

18–33      An ambiguous statement true in one sense but not in another may be fraudulent if intended to be read in its untrue connotation.[   ] Nevertheless in such a case the claimant must of course show that he acted upon it in the sense in which it is false. In *Arkwright v Newbold*[   ] Cotton L.J. said:

In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement according to the construction put on it by the court is false when the plaintiff does not venture to swear that he understood the statement in the sense which the court puts on it

18–34      **Carelessness of claimant in not discovering the untruth no defence** A person to whom a misrepresentation is made is not deceived if he actually knows the truth. But it is no answer to an action for deceit that the claimant might have discovered the falsity by the exercise of ordinary care: it does not lie in the mouth of a liar to argue that the claimant was foolish to take him at his word.[   ] Thus where a vendor of a public house was sued in deceit for misrepresenting the takings of the business it was held to be no defence that the vendor's books were in the house at the time and would have disclosed the truth had the plaintiff chosen to look at them.[   ] Nor can the representor escape liability on the ground

---

[   ] Paul & Vincent v O'Reilly (1913) 49 I.L.T. 89 *cf* the negligent misrepresentation case of *HB Lasurers Ltd v Marks Bloom & Co* [1983] 1 All E.R. 583 at 589 (Stephenson L.J.)
[   ] See *Edgington v Fitzmaurice* (1885) 29 Ch. 459 at 483 (Bowen L.J.); also *Peek v Derry* (1887) 37 Ch.D. 541; *cf Tatton v Wade* (1856) 18 C.B. 371
[   ] In *National Phonograph Co v Edison-Bell* [1908] 1 Ch. 335 lies told to third parties in order to gain an economic advantage at the expense of the plaintiff were held to be unlawful means through no action in deceit could have been brought by the third parties who themselves were not harmed. *National Phonograph* has been accepted by the Court of Appeal in *Lonrho v Fayed*; Dillon L.J. asserting that liability for unlawful interference with trade did not depend on a completed tort. [1990] 2 Q.B. 479 at 489
[   ] *cf Ministry of Housing v Sharp* [1970] 2 Q.B. 223 much embarrassment by registrar to purchaser of house causing incumbrancer to lose charge.
[   ] See the Australian decision in *Parkins v Chelmer Holdings Ltd* [1965] Qd.R. 68 (architect misrepresented that work not completed, money is a result withheld from builder: no action in deceit)
[   ] See para 18–23 above.
[   ] (1881) 17 Ch.D. 301 at 325
[   ] See Lord Chelmsford in *Veale v Vale* and *Central Rv v Kisch* (1867) L.R. 2 H.L. 99 at 120; see also *White v Michael Cullen & Partners* [1993] E.G.C.S. 193 and *Commission for the New Towns v Cooper (Great Britain) Ltd The Times* March 3 1995 CA (party to a contract can be bound by a unilateral mistake) Nor is the Law Reform (Contributory Negligence) Act 1945 available here to reduce the damages: see para 18–45 below
[   ] *Dobell v Stevens* (1825) 3 B. & C. 623 and see *Pilmore v Hood* (1838) 5 Bing. N.C. 97 *cf* non the contract case of *Redgrave v Hurd* (1881) 20 Ch.D. 1 and *Inntrim v Butcher Time Share Resort Ltd* [1991] 2 N.Z.L.R. 641 N/CA

[1098]

§ DAMAGES                                                18–38

be enough.[35] If the claim-
isstatements the defendant
s also partly influenced by

self to his detriment. If his
that of third parties, the
ence with trade,[37] passing
t he will not be liable in

not in another, may be
on.[40] Nevertheless, in such
ed upon it in the sense in
J. said:

it to give a plaintiff relief on
onstruction put on it by the
wear that he understood the

e untruth no defence A
eived if he actually knows
t the claimant might have
t does not lie in the mouth
him at his word.[42] Thus,
t for misrepresenting the
the vendor's books must
he truth had the plaintiff
pe liability on the ground

that knowledge of the truth must be imputed to the representee; as, for example
where the representee's agent knew the true facts.[44]

**Reliance and materiality** Since the reasonableness of the claimant's reliance     18–35
is not relevant to liability in deceit, it is submitted that it equally follows that the
materiality or otherwise of the defendant's statement is out of account. All that
is required is reliance: once this is shown the fraudulent defendant should not be
permitted to argue that what he said would not have induced a reasonable person
to so act.[45]

3. DAMAGES[46]

**Proof of damage** Deceit is not actionable *per se*: damage, in other words, is     18–36
of the gist of the action.[47] The damage recovered in deceit cases is normally
pecuniary loss; but it may take the form of personal injury, loss of property, real
inconvenience or discomfort, or substantial mental distress.[48]

**Measure of damages** The measure of damages in deceit is the loss directly     18–37
flowing from the claimant's reliance on the defendant's statement[49]: that is,
generally speaking, the sum that will put him in the same position as if he had
not relied on it.[50] Credit must of course be given for any gains made by the
claimant.[51]

**Position if representation true irrelevant** Since the claimant's entitlement is     18–38
to be put in the position he would have occupied had he not relied on the
defendant's representation, it follows that no account is taken of what his

---

misrepresentation case of *J.E.B.*
(Stephenson L.J.).
L.J.); also *Peck v Derry* (1887)

told to third parties in order to
d to be unlawful means, though
to themselves were not harmed.
n *Lonrho v Fayed*, Dillon L.J.
depend on "a complete ion":

ement by registrar to purchaser

*ld* [1965] Qd.R. 68 (architect
old from builder; no action in

2 H.L., 99 at 120; see also *Whyte*
*t for the New Towns v Cooper*
act can be bound by its induced
45 available here to reduce the

838) 5 Bing.N.C. 97. *cf.* too the
*Birches Time Share Resort Ltd*

[44] *Wells v Smith* [1914] 3 K.B. 722. See, however, *Strover v Harrington* [1988] Ch. 390, where the
agents were purchaser's solicitors who by implication had actual authority to receive all relevant
information on their client's behalf. *Wells v Smith* was distinguished as a case where the plaintiff's
agent himself was a party to the defendant's fraud. *Sed quaere*
[45] Compare the contract decision in *Museprime Properties Ltd v Adhill Properties Ltd* (1990) 61 P.
& C.R. 111.
[46] Treitel, *Damages for Deceit* (1969) 32 M.L.R. 556; Tettenborn *et al. Law of Damages*,
paras 17.64–17.87.
[47] See *Smith v Chadwick* (1884) 9 App Cas. 187, at 190 (Lord Blackburn); *Diamond v Bank of
London & Montreal Ltd* [1979] Q.B. 333, at 349 (Stephenson L.J.).
[48] See below, para.18–42.
[49] "The defendant is bound to make reparation for all the actual damages directly flowing from the
fraudulent inducement."—Lord Denning M.R. in *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158,
at 167. See too *Clark v Urquhart* [1930] A.C. 28, at 67–68 (Lord Atkin).
[50] See *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, at 167 (Lord Denning M.R.)
[51] *Smith New Court Securities Ltd v Citibank N.A.* [1997] A.C. 254, at 267 (Lord Browne-Wilkinson).
See, e.g. *Komercni Banka AS v Stone & Rolls Ltd* [2003] 1 Lloyd's Rep. 383, [2002] EWHC 2263
(Comm) (bank deceived into paying out on fraudulent letter of credit: credit for fee received for
issuing it). The defendant bears the burden of proving such benefits: *Mulco Holdings Ltd v Piper*
[2004] N.P.C. 59, [2004] EWCA Civ 476.

THE COMMON LAW LIBRARY

# McGREGOR
## ON
# DAMAGES

**BY**

**HARVEY McGREGOR**
Q.C., D.C.L., S.J.D.

CHAPTER 42 ON THE HUMAN RIGHTS ACT CONTRIBUTED BY
MARTIN SPENCER Q.C.

CHAPTERS 43–45 ON PROCEDURE REVISED BY
JULIAN PICTON

*SEVENTEENTH EDITION*

LONDON
SWEET & MAXWELL
2003

Case: 11-126   Document: 64   Page: 176   04/25/2011   272930   401

A-5775

a liability and the extent of a liability, particularly in the tort of negligence. But this is no good reason for reciting most of the law of tort and contract, and, as the difficulties of distinction are very much localised to the tort of negligence, they can be dealt with adequately in the treatment of the general problem of the limits of liability[54] and the particular problem of remoteness of damage.[55]

1–020      At the other end of the scale from *damnum sine injuria* is *injuria sine damno.* Even if no loss has been incurred, nominal damages will be awarded if a wrong has been committed. The reason for the award of any damages, even nominal, in such circumstances is a technical one. To base a judgment for a claimant the law requires not damage but a wrong; and, since the only judgment available to the court is for damages, a judgment for nominal damages is given. Again, a textbook on damages should not and cannot deal with the question of when a wrong has been committed where no damage has been incurred, any more than with the question of when a wrong has been committed where there is a loss.[56]

### 3. OBJECT OF AN AWARD OF DAMAGES

#### (1) The principle of compensation

1–021      The object of an award of damages[57] is to give the claimant compensation for the damage, loss or injury[58] he has suffered.[59] The heads or elements of damage recognised as such by the law are divisible into two main groups: pecuniary and non-pecuniary loss. The former comprises all financial and material loss incurred, such as loss of business profits or expenses of medical treatment. The latter comprises all losses which do not represent an inroad upon a person's financial or material assets, such as physical pain or injury to feelings. The former, being a money loss, is capable of being arithmetically calculated in money, even though the calculation must sometimes be a rough

[54] See Ch.4, below.
[55] See Ch.6, below.
[56] Nominal damages are dealt with in Ch.10, below.
[57] Other than in the exceptional cases dealt with at para.1–002, above.
[58] No distinction is drawn between these three words which can be used interchangeably. However, whether the use of one or more of the three is to be construed as confined to physical damage, loss or injury or as extending to cover the purely financial or economic has arisen in the context of clauses introducing exemptions from liability. While the wider construction prevailed in *Nippon Yusen Kaisha v Acme Shipping Corp* [1972] 1 W.L.R. 74, CA, the narrower was upheld in *Louis Dreyfus & Cie v Parnaso Cia Naviera* [1959] 1 Q.B. 408. In the particular context of whether a time limit for lodging claims under the Warsaw Convention on international air carriage applied, "damage" to baggage was held in *Fothergill v Monarch Airlines* [1981] A.C. 251 to include loss of contents of baggage.
[59] The proposition that the basic criterion is what the claimant has lost and not what the defendant ought fairly and reasonably to pay finds a valuable illustration in *General Tire & Rubber Co v Firestone Tyre & Rubber Co* [1975] 1 W.L.R. 819, HL; see the case at para.40–030, below.

[12]

A-5776

one where there are difficulties of proof. The latter, however, is not so
calculable. Money is not awarded as a replacement for other money, but as a
substitute for that which is generally more important than money: it is the best
that a court can do.[60]

The statement of the general rule from which one must always start in        **1–022**
resolving a problem as to the measure of damages, a rule equally applicable
to tort and contract, has its origin in the speech of Lord Blackburn in
*Livingstone v Rawyards Coal Co.*[61] He there defined the measure of damages
as—

> "that sum of money which will put the party who has been injured, or
> who has suffered, in the same position as he would have been in if he had
> not sustained the wrong for which he is now getting his compensation or
> reparation."

This statement has been consistently referred to or cited with approval,[62] or
restated in similar language.[63] It is thus a statement which has stood the test
of time, and is not to be regarded as in any way compromised by Lord
Hoffmann's well-known speech in *Banque Bruxelles Lambert v Eagle Star
Insurance Co* (commonly referred to as *SAAMCO*).[64] He there disagreed with
the description of Lord Blackburn's principle by the Court of Appeal in
*SAAMCO* as "the necessary point of departure" in arriving at the correct
measure of damages, and said:

> "I think that this was the wrong place to begin. Before one can consider
> the principle on which one should calculate the damages to which a
> plaintiff is entitled as compensation for loss, it is necessary to decide for
> what kind of loss he is entitled to compensation."[65]

---

[60] *cf. The Mediana* [1900] A.C. 113 at 116, *per* Lord Halsbury L.C.: "How is anybody to
measure pain and suffering in moneys counted? Nobody can suggest that you can by arithmetical
calculation establish what is the exact sum of money which would represent such a thing as the
pain and suffering which a person has undergone by reason of an accident. But nevertheless the
law recognises that as a topic upon which damages may be given." See similarly *Fletcher v
Autocar and Transporters* [1968] 2 Q.B. 322 at 339, CA, *per* Diplock L.J.; *Parry v Cleaver*
[1970] A.C. 1 at 22, *per* Lord Morris.

[61] (1880) 5 App.Cas. 25 at 39.

[62] As in *Banco de Portugal v Waterlow* [1932] A.C. 452 at 474, *per* Viscount Sankey L.C.; in
*Monarch S.S. Co v Karlshamns Oljefabriker* [1949] A.C. 196 at 221, *per* Lord Wright; in *British
Transport Commission v Gourley* [1956] A.C. 185 at 197, *per* Earl Jowitt; in *Czarnikow v Koufos*
[1969] 1 A.C. 350 at 420, *per* Lord Upjohn; in *General Tire & Rubber Co v Firestone Tyre &
Rubber Co* [1975] 1 W.L.R. 819, HL, at 824C, *per* Lord Wilberforce; in *Swingcastle v Gibson*
[1991] 2 A.C. 223 at 232D, *per* Lord Lowry; in *Alfred McAlpine Construction Ltd v Panatown
Ltd* [2001] 1 A.C. 518 at 562G, *per* Lord Jauncey.

[63] As in *Victoria Laundry v Newman* [1949] 2 K.B. 528, CA, at 539, *per* Asquith L.J. ("in the
same position, so far as money can do so, as if his rights had been observed"); in *The Albazero*
[1977] A.C. 774 at 841C, *per* Lord Diplock ("to put the person whose right has been invaded in
the same position as if it had been respected so far as the award of a sum of money can do
so").

[64] [1997] A.C. 191.

[65] *ibid.* at 211A.

[13]

A-5777

# HALSBURY'S

# Laws of England

FOURTH EDITION
REISSUE

Volume 33

Case: 11-126    Document: 64    Page: 179    04/25/2011    272930    401

A-5778

of care to names in relation to decisions taken by the managing agents despite the fact that such a duty would be owed in contract.

16   See *Norwich City Council v Harvey* [1989] 1 All ER 1180, [1989] 1 WLR 828, CA; *Southern Water Authority v Carey* [1985] 2 All ER 1077; and *Greater Nottingham Co-operative Society Ltd v Cementation Piling and Foundations Ltd* [1989] QB 71, [1988] 2 All ER 971, CA.

17   See *Pacific Associates Inc v Baxter* [1990] 1 QB 993, [1989] 2 All ER 159, CA.

**614. Negligent statements.** Where a defendant makes a statement which is reasonably relied upon by a plaintiff in the way intended by the defendant, there may be an assumption of responsibility sufficient to give rise to liability for economic loss flowing from the reliance[1]. It is not necessary that the statement be made directly to the plaintiff; communication through an intermediary is sufficient[2]. However, it is necessary that the defendant knows that his statement will be communicated to the plaintiff either specifically or as a member of an ascertainable class, and that the statement is likely to be acted upon by the plaintiff for the purpose for which the statement was made[3] and that such was objectively the intention of the defendant[4]. That purpose may be clear from the terms in which it is requested[5] or required[6], but it may also be implied from the circumstances. Thus the purpose of a surveyor's report to a building society is not only to enable the society to meet the statutory requirement for the property to be valued but also to inform the purchaser; for it is common practice for such valuations to be passed to, and relied upon by, the purchaser[7]. Similarly, it may be implied that a financial statement, expressly directed to company shareholders, is also intended to influence those bidding for the company[8], or that a prospectus issued to support the flotation of shares was also intended to influence those subsequently purchasing the shares on the stock market[9]. However, the fact that the plaintiff notified the defendant of the purpose for which he wished to rely on the statement will not support a finding that the statement was intended for that purpose[10], unless the defendant acknowledged that the notified use now constituted one of the purposes for which it was supplied[11]. The plaintiff's reliance on the statement must be reasonable in order to give rise to a duty[12]. The nature of the relationship between the parties, for example its commercial context[13] or informal nature[14], may suggest that reliance is not reasonable. The specific circumstances may suggest that the plaintiff should have verified the information before placing reasonable reliance upon it[15]; but the fact that the statement is one of opinion[16], or even as to future policy[17], does not preclude reasonable reliance provided the maker of the statement presented himself as having the requisite knowledge or authority. Where the plaintiff's reliance on a negligent statement leads to foreseeable physical damage, the defendant will be liable provided that there is sufficient proximity and that the imposition of a duty would be fair and reasonable[18].

1   *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, [1963] 2 All ER 575, HL, where the plaintiffs asked their bankers to inquire into the financial stability of a company with which they were having business dealings. The bankers made inquiries of the company's bankers, the defendants, who carelessly gave favourable references about the company. Reliance on those references caused the plaintiffs loss. An action based on those careless statements failed solely because the defendants had expressly disclaimed any responsibility. As to the effect of the Unfair Contract Terms Act 1977 on disclaimers see para 674 post.

2   See *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, [1963] 2 All ER 575, HL.

3   *Caparo Industries plc v Dickman* [1990] 2 AC 605, [1990] 1 All ER 568, HL.

4   'Such intent is objectively established if the representor expressly communicates intent to the representee ... [W]here it is not expressly communicated, the representee must establish that he reasonably relied on the representation and that he reasonably believed that the representor intended him to act upon it. Accordingly, if the subjective intention of the representor is not expressly communicated to him, the existence of a subjective intention alone is insufficient to found an action unless the existence of such an intention on the part of the representor was reasonably to be inferred by the representee': *Possfund Custodian Trustee Ltd v Diamond (McGrigor Donald (a firm), third party)* [1996] 2 All ER 774 at 786–787 per Lightman J.

5   See *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, [1963] 2 All ER 575, HL.

6   In *Caparo Industries plc v Dickman* [1990] 2 AC 605, [1990] 1 All ER 568, HL, the court determined the purpose of the audit statement by examining the nature of the statutory audit requirement.

7   *Smith v Eric S Bush* [1990] 1 AC 831, [1989] 2 All ER 514, HL. See also *Beaumont v Humberts* [1988] 2 EGLR 171 (on appeal [1990] 2 EGLR 166, CA) (surveyor valuing for mortgage purposes owed no duty to purchaser who relied on valuation for fire insurance purposes); and *Beresforde v Chesterfield Borough Council* [1989] 2 EGLR 149, CA (building society liable to purchaser for presenting valuation report as its own).

8   See *Morgan Crucible Co plc v Hill Samuel & Co Ltd* [1991] Ch 295, sub nom *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1991] 1 All ER 148, CA.

9   See *Possfund Custodian Trustee Ltd v Diamond (McGrigor Donald (a firm), third party)* [1996] 2 All ER 774; doubting *Al-Nakib Investments (Jersey) Ltd v Longcroft* [1990] 3 All ER 321, [1990] 1 WLR 1390.

10  See *Lowe Lippmann Figdor & Franck v AGC (Advances) Ltd* [1992] 2 VR 671, Vict SC, where a creditor relied on an inaccurate audit report of a company to review its credit facility. It was held that there would only be liability if the audit report itself was made with the intention of inducing the creditor to extend further credit.

11  See *Kripps v Touche Ross & Co* (1992) 94 DLR (4th) 284, BC CA, where accountants allegedly consented to their opinions in audit statements being included in debenture prospectuses subsequently distributed by their client. On the basis that the allegation was true, the court held that a duty would be owed to those who invested on the basis of the prospectus.

12  *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465 at 486, [1963] 2 All ER 575 at 583, HL, per Lord Reid; *James McNaughton Papers Group Ltd v Hicks Anderson & Co* [1991] 2 QB 113 at 126–128, [1991] 1 All ER 134 at 145–146, CA, per Neill LJ.

13  Thus where an insurance company gave investment advice to a policyholder, it was held that no duty arose as the company had no commercial expertise in that form of advice: *Mutual Life and Citizens' Assurance Co Ltd v Evatt* [1971] AC 793, [1971] 1 All ER 150, PC. The overall nature of the commercial relationship was considered relevant by Hoffmann J at first instance in *Morgan Crucible Co plc v Hill Samuel & Co Ltd* [1991] Ch 295 at 302, sub nom *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1990] 3 All ER 330 at 335 (on appeal sub nom *Morgan Crucible Co plc v Hill Samuel & Co Ltd* [1991] Ch 295, sub nom *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1991] 1 All ER 148, CA). See also *London Drugs Ltd v Kuehne & Nagel International Ltd* (1992) 97 DLR (4th) 261, Can SC, where the employee's lack of financial resources and opportunity to decline the risk were taken into account when concluding that reliance on an ordinary employee would rarely if ever be reasonable in the absence of an express or implied undertaking of responsibility by the employee: see further para 616 post.

14  *Howard Marine and Dredging Co Ltd v A Ogden & Sons (Excavations) Ltd* [1978] QB 574, [1978] 2 All ER 1134, CA (a company chartering barges was not liable in negligence when one of their employees misrepresented the capacity of a barge in an unconsidered oral response to an inquiry). But see also *Chaudhry v Prabhakar* [1988] 3 All ER 718, [1989] 1 WLR 29, CA, in which a duty was somewhat doubtfully conceded in the context of a social relationship in which one party advised the other on the purchase of a car.

15  In a transaction between experienced business men it was to be anticipated that the plaintiff would consult his own accountancy advisers: see *James McNaughton Papers Group Ltd v Hicks Anderson & Co* [1991] 2 QB 113 at 128, [1991] 1 All ER 134 at 146, CA, per Neill LJ. See also *Gran Gelato Ltd v Richcliff (Group) Ltd* [1992] Ch 560, [1992] 1 All ER 865; and *Tidman v Reading Borough Council* (1994) Times, 10 November.

16  See eg *Esso Petroleum Co Ltd v Mardon* [1976] QB 801, [1976] 2 All ER 5, CA (petrol company negligently advised a prospective tenant of its petrol station about the likely throughput of petrol); and *Edwards v Lee* [1991] NLJR 1517 (negligent character reference provided by a solicitor to someone giving credit to a client).

17  See eg *Meates v A-G* [1983] NZLR 308, NZ CA (policy statement by government minister); and *Unilan Holdings Pty Ltd v Kerin* (1992) 107 ALR 709 (policy statement by government minister).

18  *Marc Rich & Co AG v Bishop Rock Marine Co Ltd* [1996] AC 211, sub nom *Marc Rich & Co AG v Bishop Rock Marine Co Ltd, The Nicholas H* [1995] 3 All ER 307, HL. See also *Clayton v Woodman & Son (Builders) Ltd* [1962] 2 QB 533, [1961] 3 All ER 249, where an architect was liable to a bricklayer for careless statements about how to carry on building work which resulted in harm to the bricklayer who relied on those statements; revsd on another point [1962] 2 All ER 33, [1962] 1 WLR 585, CA.

**615. Defective products or buildings.** A person who unknowingly acquires a product or building which is defective may suffer loss in repairing or replacing it when the defect is discovered. For a period it was considered that where the defect was dangerous, the repair or replacement loss should be treated as equivalent to physical damage on the ground that it was necessary to avoid the possibility of damage being

THE CONTRACT LAW LIBRARY

# MISREPRESENTATION, MISTAKE AND NON-DISCLOSURE

By

John Cartwright B.C.L., M.A.
Reader in the Law of Contract,
University of Oxford
Tutor in Law, Christ Church, Oxford
Solicitor

LONDON
Sweet and Maxwell
2007

acts.[8] This step forward in the use of *Hedley Byrne* as authority was taken by the House of Lords in *Henderson v Merrett Syndicates Ltd.*[9] In that case, in applying *Hedley Byrne* outside the context of careless statements, emphasis was placed on the need to show the defendant's "assumption of responsibility"[10] towards the claimant, rather than the other language[11] used in *Hedley Byrne* to describe the source of the special relationship under which the defendant's duty arose in favour of the claimant. This use of *Hedley Byrne* outside the context of statements need not concern us, since claims for economic loss consequent on careless acts (or failure to act), by contrast with claims based on careless statements (or failure to speak), are outside the scope of the book. No attempt will therefore be made here to explore in detail this aspect of the limits of the *Hedley Byrne* principle, nor to consider the difficulties which arise in the courts' attempt to define a general test for the duty of care in respect of economic loss caused by careless acts and omissions.[12] But in so far as the House of Lords has identified a principle which emerges from *Hedley Byrne* and which therefore inevitably casts light on the proper interpretation of *Hedley Byrne* itself, even when considered as authority for its particular context of careless statements, the recent cases (and the emphasis on the principle of the defendant's "assumption of responsibility") will be discussed.[13]

## II. ELEMENTS OF THE CLAIM IN THE TORT OF NEGLIGENCE

**Overview of the elements of the claim.** In general terms, the representee 6.13 may recover damages in the tort of negligence if he can show that, in respect of the loss which he has suffered, the defendant owed him a duty to take reasonable care in making the representation; that the representee was in breach of that duty by failing to take reasonable care; and that in con-sequence of the breach of duty he has suffered loss of a kind that is within the scope of the duty and is not too remote. This remedy differs from the other principal remedies for misrepresentation: here, the claim is based on the representor's failure to fulfil a duty of care in making the representation,

---

[8] Or omissions to act: see *White v Jones* [1995] 2 A.C. 207, HL.
[9] [1995] 2 A.C. 145, HL, at 178–181 (Lord Goff, with whom the other members of the House agreed). Lord Goff had also very recently stated this principle in his judgment in *Spring v Guardian Assurance Plc* [1995] 2 A.C. 296, HL, at 317–319, below, paras 6.24–6.25 and 6.39 (although there the issue was liability for a careless statement, albeit one not addressed to the claimant). For earlier indications in the HL that *Hedley Byrne* could apply outside the context of careless statements, see *Junior Books Ltd v Veitchi Co Ltd* [1983] A.C. 520 at 546; *D. & F. Estates Ltd v Church Commissioners for England* [1989] A.C. 177 at 215; *Murphy v Brentwood DC* [1991] 1 A.C. 398 at 466, 481.
[10] Above, n.51.
[11] Above, nn.49 and 50.
[12] For such a discussion, see Winfield & Jolowicz, paras 5.30–5.34; K. Barker, "Unreliable Assumptions in the Modern Law of Negligence" (1993) 109 L.Q.R. 461. And see the detailed consideration by the House of Lords in *Commissioners of Customs & Excise v Barclays Bank Plc* [2006] UKHL 28; [2006] 3 W.L.R. 1.
[13] Below, para.6.25.



6.12                   LIABILITY IN TORT FOR MISREPRESENTATION: II

not simply the falsity of the statement.⁹ A representation may be false without having been made negligently. The terms of the inquiry are therefore different from those in relation to such remedies as rescission and the tort of deceit: the general elements of a claim in misrepresentation, discussed in Chapter 3, are not often raised directly in a claim in negligence.⁹⁰ And the tort of negligence is not aimed specifically at misrepresentations ‐indeed, we have already seen⁹¹ that it was extended to cover misrepresentations only cautiously during the later twentieth century. Any discussion of the elements of the claim in negligence for misrepresentation must therefore look more generally to the elements of a claim in negligence. These elements will be discussed in this section, although the focus will be the application of the elements of the claim to a case involving careless statements. The defences which can be raised by the defendant once the representee has established the elements of his claim and the quantification of the damages recoverable in the tort of negligence will be discussed in later sections in this chapter.

*(1) Duty of care*

*(a) General principles*

6.13     **The test for a duty of care: categorisation of duties.** The claimant in an action of negligence will seek to show that his case falls within the principles of an established category of duty: that is, a situation in which the courts have held that a duty of care is owed by a person in the defendant's position to a person in the claimant's position. If he can point to no such established category, he will seek to argue from an existing category or categories, or from general principle, that a duty should be recognised in his case.⁹² This test is essentially an application of the general rules of precedent: the question is whether the case in hand falls within the authority of an earlier case or line of cases; or, if not, whether an extension should be made to the

⁸⁹ *Banbury v Bank of Montreal* [1918] A.C. 626, HL, at 713; *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] A.C. 465, HL, at 511; *W. B. Anderson & Sons Ltd v Rhodes (Liverpool) Ltd* [1967] 2 All E.R. 850 at 865.
⁹⁰ And so, for example, the law fact opinion distinction is not raised, at least not in the same terms (nor the same language of analysis) as in a claim for rescission: above, paras 3.13 and 4.25; see, e.g. *Hasan v ICI Chemicals & Polymers Ltd* [2002] I.R.L.R. 31 at [98] [103] (Elias J.: no rigid distinction between statements of fact, opinion and intention for the tort of negligence). And although the reliance of the representee on the careless statement is a requirement for the tort of negligence, it is not approached in the same way as in rescission or deceit (where there is a presumption of reliance: above, paras 3.53, 4.33 and 5.25; below, para.6.51). This is not to say that there is no underlying unity of principle in the courts' approach to the remedies for misrepresentation; simply that the language of the cases ‐ the formal elements of the claim ‐ is different here. For discussion of some of the common threads uniting the remedies, see above, paras 3.45‐3.47.
⁹¹ Above, paras 6.06‐6.11.
⁹² *Caparo Industries Plc v Dickman* [1990] 2 A.C. 605, HL, at 618, 628, 633, adopting into English law the approach set out by Brennan J. in *Sutherland Shire Council v Heyman* [1985] 157 C.L.R. 424, HCA, at 481. For later applications of this test in the English cases, see, e.g. *X v Bedfordshire CC* [1995] 2 A.C. 633, HL, at 751, 762; *Henderson v Merrett Syndicates Ltd* [1995] 2 A.C. 145, HL, at 182; *Stovin v Wise* [1996] A.C. 923, HL, at 948‐949; *Barrett v Enfield LBC* [2001] 2 A.C. 550, HL, at 556, 564.

# Unfair Contract Terms Act 1977

## 1977 CHAPTER 50

*An Act to impose further limits on the extent to which under the law of England and Wales and Northern Ireland civil liability for breach of contract, or for negligence or other breach of duty, can be avoided by means of contract terms and otherwise, and under the law of Scotland civil liability can be avoided by means of contract terms*

[26th October 1977]

BE IT ENACTED by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—

### Part I
### Amendment of Law for England and Wales and Northern Ireland

*Introductory*

**1 Scope of Part I**

(1)    For the purposes of this Part of this Act, "negligence" means the breach—

    (a)    of any obligation, arising from the express or implied terms of a contract, to take reasonable care or exercise reasonable skill in the performance of the contract;

    (b)    of any common law duty to take reasonable care or exercise reasonable skill (but not any stricter duty);

    (c)    of the common duty of care imposed by the Occupiers' Liability Act 1957 or the Occupiers' Liability Act (Northern Ireland) 1957.

(2)    This Part of this Act is subject to Part III; and in relation to contracts, the operation of sections 2 to 4 and 7 is subject to the exceptions made by Schedule 1.

(3)    In the case of both contract and tort, sections 2 to 7 apply (except where the contrary is stated in section 6(4)) only to business liability, that is liability for breach of obligations or duties arising—

    (a)    from things done or to be done by a person in the course of a business (whether his own business or another's); or

    (b)    from the occupation of premises used for business purposes of the occupier;

and references to liability are to be read accordingly [but liability of an occupier of premises for breach of an obligation or duty towards a person obtaining access to the premises for recreational or educational purposes, being liability for loss or damage suffered by reason of the dangerous state of the premises, is not a business liability of the occupier unless granting that person such access for the purposes concerned falls within the business purposes of the occupier].

(4)    In relation to any breach of duty or obligation, it is immaterial for any purpose of this Part of this Act whether the breach was inadvertent or intentional, or whether liability for it arises directly or vicariously.

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

NOTES

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).
**Extent**
This section does not extend to Scotland: see s 32(2).
**Amendment**
Sub-s (3): words in square brackets inserted, in relation to England and Wales, by the Occupiers' Liability Act 1984, s 2.

*Avoidance of liability for negligence, breach of contract, etc*

**2 Negligence liability**

(1)    A person cannot by reference to any contract term or to a notice given to persons generally or to particular persons exclude or restrict his liability for death or personal injury resulting from negligence.

(2)    In the case of other loss or damage, a person cannot so exclude or restrict his liability for negligence except in so far as the term or notice satisfies the requirement of reasonableness.

(3)    Where a contract term or notice purports to exclude or restrict liability for negligence a person's agreement to or awareness of it is not of itself to be taken as indicating his voluntary acceptance of any risk.

NOTES

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).
**Extent**
This section does not extend to Scotland: see s 32(2).

**3 Liability arising in contract**

(1)    This section applies as between contracting parties where one of them deals as consumer or on the other's written standard terms of business.

(2)    As against that party, the other cannot by reference to any contract term—

    (a)    when himself in breach of contract, exclude or restrict any liability of his in respect of the breach; or

    (b)    claim to be entitled—

        (i)    to render a contractual performance substantially different from that which was reasonably expected of him, or

        (ii)    in respect of the whole or any part of his contractual obligation, to render no performance at all,

except in so far as (in any of the cases mentioned above in this subsection) the contract term satisfies the requirement of reasonableness.

NOTES

**Initial Commencement**

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5785

*Specified date*
Specified date: 1 February 1978: see s 31(1).

**Extent**
This section does not extend to Scotland: see s 32(2).

**4 Unreasonable indemnity clauses**

(1)    A person dealing as consumer cannot by reference to any contract term be made to indemnify another person (whether a party to the contract or not) in respect of liability that may be incurred by the other for negligence or breach of contract, except in so far as the contract term satisfies the requirement of reasonableness.

(2)    This section applies whether the liability in question—

 (a)    is directly that of the person to be indemnified or is incurred by him vicariously;

 (b)    is to the person dealing as consumer or to someone else.

**NOTES**
**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).

**Extent**
This section does not extend to Scotland: see s 32(2).

*Liability arising from sale or supply of goods*

**5 "Guarantee" of consumer goods**

(1)    In the case of goods of a type ordinarily supplied for private use or consumption, where loss or damage—

 (a)    arises from the goods proving defective while in consumer use; and

 (b)    results from the negligence of a person concerned in the manufacture or distribution of the goods,

liability for the loss or damage cannot be excluded or restricted by reference to any contract term or notice contained in or operating by reference to a guarantee of the goods.

(2)    For these purposes—

 (a)    goods are to be regarded as "in consumer use" when a person is using them, or has them in his possession for use, otherwise than exclusively for the purposes of a business; and

 (b)    anything in writing is a guarantee if it contains or purports to contain some promise or assurance (however worded or presented) that defects will be made good by complete or partial replacement, or by repair, monetary compensation or otherwise.

(3)    This section does not apply as between the parties to a contract under or in pursuance of which possession or ownership of the goods passed.

**NOTES**
**Initial Commencement**

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

*Specified date*
Specified date: 1 February 1978: see s 31(1).

**Extent**
This section does not extend to Scotland: see s 32(2).

**6 Sale and hire-purchase**

(1)     Liability for breach of the obligations arising from—

   (a)     [section 12 of the Sale of Goods Act 1979] (seller's implied undertakings as to title, etc);

   (b)     section 8 of the Supply of Goods (Implied Terms) Act 1973 (the corresponding thing in relation to hire-purchase),

cannot be excluded or restricted by reference to any contract term.

(2)     As against a person dealing as consumer, liability for breach of the obligations arising from—

   (a)     [section 13, 14 or 15 of the 1979 Act] (seller's implied undertakings as to conformity of goods with description or sample, or as to their quality or fitness for a particular purpose);

   (b)     section 9, 10 or 11 of the 1973 Act (the corresponding things in relation to hire-purchase),

cannot be excluded or restricted by reference to any contract term.

(3)     As against a person dealing otherwise than as consumer, the liability specified in subsection (2) above can be excluded or restricted by reference to a contract term, but only in so far as the term satisfies the requirement of reasonableness.

(4)     The liabilities referred to in this section are not only the business liabilities defined by section 1(3), but include those arising under any contract of sale of goods or hire-purchase agreement.

**NOTES**

**Initial Commencement**
   *Specified date*
   Specified date: 1 February 1978: see s 31(1).

**Extent**
   This section does not extend to Scotland: see s 32(2).

**Amendment**
   Sub-ss (1), (2): words in square brackets substituted by the Sale of Goods Act 1979, s 63, Sch 2, para 19.

**7 Miscellaneous contracts under which goods pass**

(1)     Where the possession or ownership of goods passes under or in pursuance of a contract not governed by the law of sale of goods or hire-purchase, subsections (2) to (4) below apply as regards the effect (if any) to be given to contract terms excluding or restricting liability for breach of obligation arising by implication of law from the nature of the contract.

(2)     As against a person dealing as consumer, liability in respect of the goods'

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

correspondence with description or sample, or their quality or fitness for any particular purpose, cannot be excluded or restricted by reference to any such term.

(3)    As against a person dealing otherwise than as consumer, that liability can be excluded or restricted by reference to such a term, but only in so far as the term satisfies the requirement of reasonableness.

[(3A)    Liability for breach of the obligations arising under section 2 of the Supply of Goods and Services Act 1982 (implied terms about title etc in certain contracts for the transfer of the property in goods) cannot be excluded or restricted by references to any such term.]

(4)    Liability in respect of—

    (a)    the right to transfer ownership of the goods, or give possession; or

    (b)    the assurance of quiet possession to a person taking goods in pursuance of the contract,

cannot [(in a case to which subsection (3A) above does not apply)] be excluded or restricted by reference to any such term except in so far as the term satisfies the requirement of reasonableness.

(5)    . . .

**NOTES**

**Initial Commencement**
    *Specified date*
    Specified date: 1 February 1978: see s 31(1).
**Extent**
    This section does not extend to Scotland: see s 32(2).
**Amendment**
    Sub-s (3A): inserted by the Supply of Goods and Services Act 1982, s 17(2), (3).
    Sub-s (4): words in square brackets inserted by the Supply of Goods and Services Act 1982, s 17(2), (3).
    Sub-s (5): repealed in relation to England and Wales by SI 2005/871, art 6, Schedule and in relation to Northern Ireland by the Law Reform (Miscellaneous Provisions) (Northern Ireland) Order 2005, SI 2005/1452, art 24, Sch 2.
        Date in force (in relation to England and Wales): 6 April 2005: see SI 2005/871, art 1.
        Date in force (in relation to Northern Ireland): 15 November 2005: see the Law Reform (Miscellaneous Provisions) (2005 Order) (Commencement and Transitional Saving) Order (Northern Ireland) 2005, SR 2005/494, art 2(1)(d).

*Other provisions about contracts*

**8 Misrepresentation**

. . .

**NOTES**

**Initial Commencement**
    *Specified date*
    Specified date: 1 February 1978: see s 31(1).
**Extent**

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5788

This section does not extend to Scotland: see s 32(2).

**Amendment**

This section substitutes the Misrepresentation Act 1967, s 3 and the Misrepresentation Act (Northern Ireland) 1967, s 3.

**9 Effect of breach**

(1)    Where for reliance upon it a contract term has to satisfy the requirement of reasonableness, it may be found to do so and be given effect accordingly notwithstanding that the contract has been terminated either by breach or by a party electing to treat it as repudiated.

(2)    Where on a breach the contract is nevertheless affirmed by a party entitled to treat it as repudiated, this does not of itself exclude the requirement of reasonableness in relation to any contract term.

**NOTES**

**Initial Commencement**

*Specified date*

Specified date: 1 February 1978: see s 31(1).

**Extent**

This section does not extend to Scotland: see s 32(2).

**10 Evasion by means of secondary contract**

A person is not bound by any contract term prejudicing or taking away rights of his which arise under, or in connection with the performance of, another contract, so far as those rights extend to the enforcement of another's liability which this Part of this Act prevents that other from excluding or restricting.

**NOTES**

**Initial Commencement**

*Specified date*

Specified date: 1 February 1978: see s 31(1).

**Extent**

This section does not extend to Scotland: see s 32(2).

*Explanatory provisions*

**11 The "reasonableness" test**

(1)    In relation to a contract term, the requirement of reasonableness for the purposes of this Part of this Act, section 3 of the Misrepresentation Act 1967 and section 3 of the Misrepresentation Act (Northern Ireland) 1967 is that the term shall have been a fair and reasonable one to be included having regard to the circumstances which were, or ought reasonably to have been, known to or in the contemplation of the parties when the contract was made.

(2)    In determining for the purposes of section 6 or 7 above whether a contract term satisfies the requirement of reasonableness, regard shall be had in particular to the matters specified in Schedule 2 to this Act; but this subsection does not prevent the court or arbitrator from holding, in accordance with any rule of law, that a term which purports to exclude or restrict any relevant liability is not a term of the contract.

(3)    In relation to a notice (not being a notice having contractual effect), the requirement of

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

reasonableness under this Act is that it should be fair and reasonable to allow reliance on it, having regard to all the circumstances obtaining when the liability arose or (but for the notice) would have arisen.

(4)    Where by reference to a contract term or notice a person seeks to restrict liability to a specified sum of money, and the question arises (under this or any other Act) whether the term or notice satisfies the requirement of reasonableness, regard shall be had in particular (but without prejudice to subsection (2) above in the case of contract terms) to—

(a)    the resources which he could expect to be available to him for the purpose of meeting the liability should it arise; and

(b)    how far it was open to him to cover himself by insurance.

(5)    It is for those claiming that a contract term or notice satisfies the requirement of reasonableness to show that it does.

**NOTES**

**Initial Commencement**
   *Specified date*
   Specified date: 1 February 1978: see s 31(1).

**Extent**
   This section does not extend to Scotland: see s 32(2).

**12 "Dealing as consumer"**

(1)    A party to a contract "deals as consumer" in relation to another party if—

(a)    he neither makes the contract in the course of a business nor holds himself out as doing so; and

(b)    the other party does make the contract in the course of a business; and

(c)    in the case of a contract governed by the law of sale of goods or hire-purchase, or by section 7 of this Act, the goods passing under or in pursuance of the contract are of a type ordinarily supplied for private use or consumption.

[(1A)    But if the first party mentioned in subsection (1) is an individual paragraph (c) of that subsection must be ignored.]

[(2)    But the buyer is not in any circumstances to be regarded as dealing as consumer—

(a)    if he is an individual and the goods are second hand goods sold at public auction at which individuals have the opportunity of attending the sale in person;

(b)    if he is not an individual and the goods are sold by auction or by competitive tender.]

(3)    Subject to this, it is for those claiming that a party does not deal as consumer to show that he does not.

**NOTES**

**Initial Commencement**
   *Specified date*
   Specified date: 1 February 1978: see s 31(1).

**Extent**

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

This section does not extend to Scotland: see s 32(2).

**Amendment**
    Sub-s (1A): inserted by SI 2002/3045, reg 14(1), (2).
        Date in force: 31 March 2003: see SI 2002/3045, reg 1(1).
    Sub-s (2): substituted by SI 2002/3045, reg 14(1), (3).
        Date in force: 31 March 2003: see SI 2002/3045, reg 1(1).

## 13 Varieties of exemption clause

(1)    To the extent that this Part of this Act prevents the exclusion or restriction of any liability it also prevents—

    (a)    making the liability or its enforcement subject to restrictive or onerous conditions;

    (b)    excluding or restricting any right or remedy in respect of the liability, or subjecting a person to any prejudice in consequence of his pursuing any such right or remedy;

    (c)    excluding or restricting rules of evidence or procedure;

and (to that extent) sections 2 and 5 to 7 also prevent excluding or restricting liability by reference to terms and notices which exclude or restrict the relevant obligation or duty.

(2)    But an agreement in writing to submit present or future differences to arbitration is not to be treated under this Part of this Act as excluding or restricting any liability.

**NOTES**
**Initial Commencement**
    *Specified date*
    Specified date: 1 February 1978: see s 31(1).
**Extent**
    This section does not extend to Scotland: see s 32(2).

## 14 Interpretation of Part I

In this Part of this Act—

    "business" includes a profession and the activities of any government department or local or public authority;

    "goods" has the same meaning as in [the Sale of Goods Act 1979];

    "hire-purchase agreement" has the same meaning as in the Consumer Credit Act 1974;

    "negligence" has the meaning given by section 1(1);

    "notice" includes an announcement, whether or not in writing, and any other communication or pretended communication; and

    "personal injury" includes any disease and any impairment of physical or mental condition.

**NOTES**
**Initial Commencement**
    *Specified date*
    Specified date: 1 February 1978: see s 31(1).
**Extent**
    This section does not extend to Scotland: see s 32(2).

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

**Amendment**

   Words in square brackets in definition "goods" substituted by the Sale of Goods Act 1979,
s 63, Sch 2, para 20.

## Part II
## Amendment of Law for Scotland

### 15 Scope of Part II

(1)      This Part of this Act . . ., is subject to Part III of this Act and does not affect the validity of
any discharge or indemnity given by a person in consideration of the receipt by him of
compensation in settlement of any claim which he has.

(2)      Subject to subsection (3) below, sections 16 to 18 of this Act apply to any contract only to
the extent that the contract—

   (a)      relates to the transfer of the ownership or possession of goods from one person to
           another (with or without work having been done on them);

   (b)      constitutes a contract of service or apprenticeship;

   (c)      relates to services of whatever kind, including (without prejudice to the foregoing
           generality) carriage, deposit and pledge, care and custody, mandate, agency, loan
           and services relating to the use of land;

   (d)      relates to the liability of an occupier of land to persons entering upon or using that
           land;

   (e)      relates to a grant of any right or permission to enter upon or use land not amounting
           to an estate or interest in the land.

(3)      Notwithstanding anything in subsection (2) above, section 16 to 18—

   (a)      do not apply to any contract to the extent that the contract—

             (i)      is a contract of insurance (including a contract to pay an annuity
                      on human life);

             (ii)      relates to the formation, constitution or dissolution of any body
                       corporate or unincorporated association or partnership;

   (b)      apply to—

             a contract of marine salvage or towage;

             a charter party of a ship or hovercraft;

             a contract for the carriage of goods by ship or hovercraft; or,

             a contract to which subsection (4) below relates,

   only to the extent that—

             (i)      both parties deal or hold themselves out as dealing in the course
                      of a business (and then only in so far as the contract purports to exclude or
                      restrict liability for breach of duty in respect of death or personal injury); or

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

(ii)    the contract is a consumer contract (and then only in favour of the consumer).

(4)    This subsection relates to a contract in pursuance of which goods are carried by ship or hovercraft and which either—

(a)    specifies ship or hovercraft as the means of carriage over part of the journey to be covered; or

(b)    makes no provision as to the means of carriage and does not exclude ship or hovercraft as that means,

in so far as the contract operates for and in relation to the carriage of the goods by that means.

**NOTES**

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).

**Extent**
This section applies to Scotland only: see s 32(3).

**Amendment**
Words omitted repealed by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, ss 68(2), (6), 74(2), Sch 9.

**16 Liability for breach of duty**

(1)    [Subject to subsection (1A) below,] where a term of a contract [, or a provision of a notice given to persons generally or to particular persons,] purports to exclude or restrict liability for breach of duty arising in the course of any business or from the occupation of any premises used for business purposes of the occupier, that term [or provision]—

(a)    shall be void in any case where such exclusion or restriction is in respect of death or personal injury;

(b)    shall, in any other case, have no effect if it was not fair and reasonable to incorporate the term in the contract [or, as the case may be, if it is not fair and reasonable to allow reliance on the provision].

[(1A)    Nothing in paragraph (b) of subsection (1) above shall be taken as implying that a provision of a notice has effect in circumstances where, apart from that paragraph, it would not have effect.]

(2)    Subsection (1)(a) above does not affect the validity of any discharge and indemnity given by a person, on or in connection with an award to him of compensation for pneumoconiosis attributable to employment in the coal industry, in respect of any further claim arising from his contracting that disease.

(3)    Where under subsection (1) above a term of a contract [or a provision of a notice] is void or has no effect, the fact that a person agreed to, or was aware of, the term [or provision] shall not of itself be sufficient evidence that he knowingly and voluntarily assumed any risk.

**NOTES**

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

**Extent**
> This section applies to Scotland only: see s 32(3).

**Amendment**
> Sub-s (1): words in square brackets inserted by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 68 (3)(a), (6).
> Sub-s (1A): inserted by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 68(3)(b), (6).
> Sub-s (3): words in square brackets inserted by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 68 (3)(c), (6).

**17 Control of unreasonable exemptions in consumer or standard form contracts**

(1)      Any term of a contract which is a consumer contract or a standard form contract shall have no effect for the purpose of enabling a party to the contract—

> (a)    who is in breach of a contractual obligation, to exclude or restrict any liability of his to the consumer or customer in respect of the breach;

> (b)    in respect of a contractual obligation, to render no performance, or to render a performance substantially different from that which the consumer or customer reasonably expected from the contract;

if it was not fair and reasonable to incorporate the term in the contract.

(2)      In this section "customer" means a party to a standard form contract who deals on the basis of written standard terms of business of the other party to the contract who himself deals in the course of a business.

**NOTES**

**Initial Commencement**
> *Specified date*
> Specified date: 1 February 1978: see s 31(1).

**Extent**
> This section applies to Scotland only: see s 32(3).

**18 Unreasonable indemnity clauses in consumer contracts**

(1)      Any term of a contract which is a consumer contract shall have no effect for the purpose of making the consumer indemnify another person (whether a party to the contract or not) in respect of liability which that other person may incur as a result of breach of duty or breach of contract, if it was not fair and reasonable to incorporate the term in the contract.

(2)      In this section "liability" means liability arising in the course of any business or from the occupation of any premises used for business purposes of the occupier.

**NOTES**

**Initial Commencement**
> *Specified date*
> Specified date: 1 February 1978: see s 31(1).

**Extent**
> This section applies to Scotland only: see s 32(3).

**19 "Guarantee of consumer goods"**

(1)      This section applies to a guarantee—

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

(a)   in relation to goods which are of a type ordinarily supplied for private use or consumption; and

(b)   which is not a guarantee given by one party to the other party to a contract under or in pursuance of which the ownership or possession of the goods to which the guarantee relates is transferred.

(2)     A term of a guarantee to which this section applies shall be void in so far as it purports to exclude or restrict liability for loss or damage (including death or personal injury)—

(a)   arising from the goods proving defective while—

(i)   in use otherwise than exclusively for the purposes of a business; or

(ii)   in the possession of a person for such use; and

(b)   resulting from the breach of duty of a person concerned in the manufacture or distribution of the goods.

(3) For the purposes of this section, any document is a guarantee if it contains or purports to contain some promise or assurance (however worded or presented) that defects will be made good by complete or partial replacement, or by repair, monetary compensation otherwise.

**NOTES**

**Initial Commencement**

*Specified date*

    Specified date: 1 February 1978: see s 31(1).

**Extent**

    This section applies to Scotland only: see s 32(3).

**20 Obligations implied by law in sale and hire-purchase contracts**

(1)     Any term of a contract which purports to exclude or restrict liability for breach of the obligations arising from—

(a)   section 12 of the Sale of Goods Act [1979] (seller's implied undertakings as to title etc.);

(b)   section 8 of the Supply of Goods (Implied Terms) Act 1973 (implied terms as to title in hire-purchase agreements),

shall be void.

(2)     Any term of a contract which purports to exclude or restrict liability for breach of the obligations arising from—

(a)   section 13, 14 or 15 of the said Act of [1979] (seller's implied undertakings as to conformity of goods with description or sample, or as to their quality or fitness for a particular purpose);

(b)   section 9, 10 or 11 of the said Act of 1973 (the corresponding provisions in relation to hire-purchase),

shall—

(i)   in the case of a consumer contract, be void against the

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

consumer;

(ii)    in any other case, have no effect if it was not fair and reasonable to incorporate the term in the contract.

**NOTES**

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).

**Extent**
This section applies to Scotland only: see s 32(3).

**Amendment**
Sub-ss (1), (2): words in square brackets substituted by the Sale of Goods Act 1979, ss 62, 63, Sch 2, para 21.

**21 Obligations implied by law in other contracts for the supply of goods**

(1)    Any term of a contract to which this section applies purporting to exclude or restrict liability for breach of an obligation—

(a)    such as is referred to in subsection (3)(a) below—

(i)    in the case of a consumer contract, shall be void against the consumer, and

(ii)    in any other case, shall have no effect if it was not fair and reasonable to incorporate the term in the contract;

(b)    such as is referred to in subsection (3)(b) below, shall have no effect if it was not fair and reasonable to incorporate the term in the contract.

(2)    This section applies to any contract to the extent that it relates to any such matter as is referred to in section 15(2)(a) of this Act, but does not apply to—

(a)    a contract of sale of goods or a hire-purchase agreement; or

(b)    a charter party of a ship or hovercraft unless it is a consumer contract (and then only in favour of the consumer).

(3)    An obligation referred to in this subsection is an obligation incurred under a contract in the course of a business and arising by implication of law from the nature of the contract which relates—

(a)    to the correspondence of goods with description or sample, or to the quality or fitness of goods for any particular purpose; or

(b)    to any right to transfer ownership or possession of goods, or to the enjoyment of quiet possession of goods.

(4)    . . .

**NOTES**

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

**Extent**
> This section applies to Scotland only: see s 32(3).

**Amendment**
> Sub-s (4): repealed by SI 2005/871, art 6, Schedule.
> Date in force: 6 April 2005: see SI 2005/871, art 1.

### 22 Consequence of breach

For the avoidance of doubt, where any provision of this Part of this Act requires that the incorporation of a term in a contract must be fair and reasonable for that term to have effect—

(a) if that requirement is satisfied, the term may be given effect to notwithstanding that the contract has been terminated in consequence of breach of that contract;

(b) for the term to be given effect to, that requirement must be satisfied even where a party who is entitled to rescind the contract elects not to rescind it.

**NOTES**

**Initial Commencement**
> **Specified date**
> Specified date: 1 February 1978: see s 31(1).

**Extent**
> This section applies to Scotland only: see s 32(3).

### 23 Evasion by means of secondary contract

Any term of any contract shall be void which purports to exclude or restrict, or has the effect of excluding or restricting—

(a) the exercise, by a party to any other contract, of any right or remedy which arises in respect of that other contract in consequence of breach of duty, or of obligation, liability for which could not by virtue of the provisions of this Part of this Act be excluded or restricted by a term of that other contract;

(b) the application of the provisions of this Part of this Act in respect of that or any other contract.

**NOTES**

**Initial Commencement**
> **Specified date**
> Specified date: 1 February 1978: see s 31(1).

**Extent**
> This section applies to Scotland only: see s 32(3).

### 24 The "reasonableness" test

(1) In determining for the purposes of this Part of this Act whether it was fair and reasonable to incorporate a term in a contract, regard shall be had only to the circumstances which were, or ought reasonably to have been, known to or in the contemplation of the parties to the contract at the time the contract was made.

(2) In determining for the purposes of section 20 or 21 of this Act whether it was fair and reasonable to incorporate a term in a contract, regard shall be had in particular to the matters specified in Schedule 2 to this Act; but this subsection shall not prevent a court or arbiter from holding, in accordance with any rule of law, that a term which purports to exclude or restrict any

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

relevant liability is not a term of the contract.

[(2A)    In determining for the purposes of this Part of this Act whether it is fair and reasonable to allow reliance on a provision of a notice (not being a notice having contractual effect), regard shall be had to all the circumstances obtaining when the liability arose of (but for the provision) would have arisen.]

(3)    Where a term in a contract [or a provision of a notice] purports to restrict liability to a specified sum of money, and the question arises for the purposes of this Part of this Act whether it was fair and reasonable to incorporate the term in the contract [or whether it is fair and reasonable to allow reliance on the provision], then, without prejudice to subsection (2) above [in the case of a term in a contract], regard shall be had in particular to—

    (a)    the resources which the party seeking to rely on that term [or provision] could expect to be available to him for the purpose of meeting the liability should it arise;

    (b)    how far it was open to that party to cover himself by insurance.

(4)    The onus of proving that it was fair and reasonable to incorporate a term in a contract [or that it is fair and reasonable to allow reliance on a provision of a notice] shall lie on the party so contending.

**NOTES**

**Initial Commencement**
    *Specified date*
    Specified date: 1 February 1978: see s 31(1).

**Extent**
    This section applies to Scotland only: see s 32(3).

**Amendment**
    Sub-ss (3), (4): words in square brackets inserted by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 68(4)(b), (c), (6).
    Sub-s (2A): inserted by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 68(4)(a), (6).

**25 Interpretation of Part II**

(1)    In this Part of this Act—

    "breach of duty" means the breach—

        (a)    of any obligation, arising from the express or implied terms of a contract, to take reasonable care or exercise reasonable skill in the performance of the contract;

        (b)    of any common law duty to take reasonable care or exercise reasonable skill;

        (c)    of the duty of reasonable care imposed by section 2(1) of the Occupiers' Liability (Scotland) Act 1960;

    "business" includes a profession and the activities of any government department or local or public authority;

    "consumer" has the meaning assigned to that expression in the definition in this section of "consumer contract";

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

"consumer contract" means [subject to subsections (1A) and (1B) below] a contract . . . in which—

> (a)    one party to the contract deals, and the other party to the contract ("the consumer") does not deal or hold himself out as dealing, in the course of a business, and

> (b)    in the case of a contract such as is mentioned in section 15(2)(a) of this Act, the goods are of a type ordinarily supplied for private use or consumption;

and for the purposes of this Part of this Act the onus of proving that a contract is not to be regarded as a consumer contract shall lie on the party so contending;

"goods" has the same meaning as in [the Sale of Goods Act 1979];

"hire-purchase agreement" has the same meaning as in section 189(1) of the Consumer Credit Act 1974;

["notice" includes an announcement, whether or not in writing, and any other communication or pretended communication;]

"personal injury" includes any disease and any impairment of physical or mental condition.

[(1A)    Where the consumer is an individual, paragraph (b) in the definition of "consumer contract" in subsection (1) must be disregarded.

(1B)    The expression of "consumer contract" does not include a contract in which—

(a)    the buyer is an individual and the goods are second hand goods sold by public auction at which individuals have the opportunity of attending in person; or

(b)    the buyer is not an individual and the goods are sold by auction or competitive tender.]

(2)    In relation to any breach of duty or obligation, it is immaterial for any purpose of this Part of this Act whether the act or omission giving rise to that breach was inadvertent or intentional, or whether liability for it arises directly or vicariously.

(3)    In this Part of this Act, any reference to excluding or restricting any liability includes—

(a)    making the liability or its enforcement subject to any restrictive or onerous conditions;

(b)    excluding or restricting any right or remedy in respect of the liability, or subjecting a person to any prejudice in consequence of his pursuing any such right or remedy;

(c)    excluding or restricting any rule of evidence or procedure;

(d)    . . .

but does not include an agreement to submit any question to arbitration.

(4)    . . .

(5)    In sections 15 and 16 and 19 to 21 of this Act, any reference to excluding or restricting liability for breach of an obligation or duty shall include a reference to excluding or restricting the obligation or duty itself.

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

**NOTES**

**Initial Commencement**
    *Specified date*
        Specified date: 1 February 1978: see s 31(1).

**Extent**
    This section applies to Scotland only: see s 32(3).

**Amendment**
    Sub-s (1): in definition "consumer contract" words "subject to subsections (1A) and (1B) below" in square brackets inserted by SI 2002/3045, reg 14(1), (4)(a)(i).
        Date in force: 31 March 2003: see SI 2002/3045, reg 1(1).
    Sub-s (1): in definition "consumer contract" words omitted repealed by SI 2002/3045, reg 14(1), (4)(a)(ii).
        Date in force: 31 March 2003: see SI 2002/3045, reg 1(1).
    Sub-s (1): in definition "goods" words in square brackets substituted by the Sale of Goods Act 1979, ss 62, 63, Sch 2, para 22.
    Sub-s (1): definition "notice" inserted by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 68(5)(a), (6).
    Sub-ss (1A), (1B): inserted by SI 2002/3045, reg 14(1), (4)(b).
        Date in force: 31 March 2003: see SI 2002/3045, reg 1(1).
    Sub-s (3): para (d) repealed by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, ss 68(5)(b), (6), 74(2), Sch 9.
    Sub-s (4): repealed by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, ss 68(5)(b), (6), 74(2), Sch 9.

## Part III
### Provisions applying to whole of United Kingdom

*Miscellaneous*

**26 International supply contracts**

(1)    The limits imposed by this Act on the extent to which a person may exclude or restrict liability by reference to a contract term do not apply to liability arising under such a contract as is described in subsection (3) below.

(2)    The terms of such a contract are not subject to any requirement of reasonableness under section 3 or 4: and nothing in Part II of this Act shall require the incorporation of the terms of such a contract to be fair and reasonable for them to have effect.

(3)    Subject to subsection (4), that description of contract is one whose characteristics are the following—

    (a)    either it is a contract of sale of goods or it is one under or in pursuance of which the possession or ownership of goods passes; and

    (b)    it is made by parties whose places of business (or, if they have none, habitual residences) are in the territories of different States (the Channel Islands and the Isle of Man being treated for this purpose as different States from the United Kingdom).

(4)    A contract falls within subsection (3) above only if either—

    (a)    the goods in question are, at the time of the conclusion of the contract, in the course of carriage, or will be carried, from the territory of one State to the territory of another; or

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

(b) the acts constituting the offer and acceptance have been done in the territories of different States; or

(c) the contract provides for the goods to be delivered to the territory of a State other than that within whose territory those acts were done.

**NOTES**

**Initial Commencement**

*Specified date*
Specified date: 1 February 1978: see s 31(1).

**27 Choice of law clauses**

(1)     Where the [law applicable to] a contract is the law of any part of the United Kingdom only by choice of the parties (and apart from that choice would be the law of some country outside the United Kingdom) sections 2 to 7 and 16 to 21 of this Act do not operate as part [of the law applicable to the contract].

(2)     This Act has effect notwithstanding any contract term which applies or purports to apply the law of some country outside the United Kingdom, where (either or both)—

(a) the term appears to the court, or arbitrator or arbiter to have been imposed wholly or mainly for the purpose of enabling the party imposing it to evade the operation of this Act; or

(b) in the making of the contract one of the parties dealt as consumer, and he was then habitually resident in the United Kingdom, and the essential steps necessary for the making of the contract were taken there, whether by him or by others on his behalf.

(3)     In the application of subsection (2) above to Scotland, for paragraph (b) there shall be substituted—

"(b) the contract is a consumer contract as defined in Part II of this Act, and the consumer at the date when the contract was made was habitually resident in the United Kingdom, and the essential steps necessary for the making of the contract were taken there, whether by him or by others on his behalf.".

**NOTES**

**Initial Commencement**

*Specified date*
Specified date: 1 February 1978: see s 31(1).

**Amendment**
Sub-s (1): words in square brackets substituted by the Contracts (Applicable Law) Act 1990, s 5, Sch 4, para 4.

**28 Temporary provision for sea carriage of passengers**

(1)     This section applies to a contract for carriage by sea of a passenger or of a passenger and his luggage where the provisions of the Athens Convention (with or without modification) do not have, in relation to the contract, the force of law in the United Kingdom.

(2)     In a case where—

(a) the contract is not made in the United Kingdom, and

(b) neither the place of departure nor the place of destination under it is in the United

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5801

Kingdom,

a person is not precluded by this Act from excluding or restricting liability for loss or damage, being loss or damage for which the provisions of the Convention would, if they had the force of law in relation to the contract, impose liability on him.

(3)    In any other case, a person is not precluded by this Act from excluding or restricting liability for that loss or damage—

    (a)    in so far as the exclusion or restriction would have been effective in that case had the provisions of the Convention had the force of law in relation to the contract; or

    (b)    in such circumstances and to such extent as may be prescribed, by reference to a prescribed term of the contract.

(4)    For the purposes of subsection (3) (*a*), the values which shall be taken to be the official values in the United Kingdom of the amounts (expressed in gold francs) by reference to which liability under the provisions of the Convention is limited shall be such amounts in sterling as the Secretary of State may from time to time by order made by statutory instrument specify.

(5)    In this section,—

    (a)    the references to excluding or restricting liability include doing any of those things in relation to the liability which are mentioned in section 13 or section 25 (3) and (5); and

    (b)    "the Athens Convention" means the Athens Convention relating to the Carriage of Passengers and their Luggage by Sea, 1974; and

    (c)    "prescribed" means prescribed by the Secretary of State by regulations made by statutory instrument;

and a statutory instrument containing the regulations shall be subject to annulment in pursuance of a resolution of either House of Parliament.

**NOTES**

**Initial Commencement**
    ***Specified date***
    Specified date: 1 February 1978: see s 31(1).

**29 Saving for other relevant legislation**

(1)    Nothing in this Act removes or restricts the effect of, or prevents reliance upon, any contractual provision which—

    (a)    is authorised or required by the express terms or necessary implication of an enactment; or

    (b)    being made with a view to compliance with an international agreement to which the United Kingdom is a party, does not operate more restrictively than is contemplated by the agreement.

(2)    A contract term is to be taken—

    (a)    for the purposes of Part I of this Act, as satisfying the requirement of reasonableness; and

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

(b)     for those of Part II, to have been fair and reasonable to incorporate,

if it is incorporated or approved by, or incorporated pursuant to a decision or ruling of, a competent authority acting in the exercise of any statutory jurisdiction or function and is not a term in a contract to which the competent authority is itself a party.

(3)     In this section—

"competent authority" means any court, arbitrator or arbiter, government department or public authority;

"enactment" means any legislation (including subordinate legislation) of the United Kingdom or Northern Ireland and any instrument having effect by virtue of such legislation; and

"statutory" means conferred by an enactment.

**NOTES**

**Initial Commencement**
     *Specified date*
     Specified date: 1 February 1978: see s 31(1).

**30 . . .**

. . .

**NOTES**

**Amendment**
     Repealed by the Consumer Safety Act 1978, s 10(1), Sch 3.

*General*

**31 Commencement; amendments; repeals**

(1)     This Act comes into force on 1st February 1978.

(2)     Nothing in this Act applies to contracts made before the date on which it comes into force; but subject to this, it applies to liability for any loss or damage which is suffered on or after that date.

(3)     The enactments specified in Schedule 3 to this Act are amended as there shown.

(4)     The enactments specified in Schedule 4 to this Act are repealed to the extent specified in column 3 of that Schedule.

**NOTES**

**Initial Commencement**
     *Specified date*
     Specified date: 1 February 1978: see sub-s (1) above.

**32 Citation and extent**

(1)     This Act may be cited as the Unfair Contract Terms Act 1977.

(2)     Part I of this Act extends to England and Wales and to Northern Ireland; but it does not extend to Scotland.

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5803

(3)      Part II of this Act extends to Scotland only.

(4)      This Part of this Act extends to the whole of the United Kingdom.

**NOTES**
**Initial Commencement**
    *Specified date*
    Specified date: 1 February 1978: see s 31(1).

## SCHEDULE 1
### SCOPE OF SECTIONS 2 TO 4 AND 7

Section 1(2)

**1**

Sections 2 to 4 of this Act do not extend to—

(a)      any contract of insurance (including a contract to pay an annuity on human life);

(b)      any contract so far as it relates to the creation or transfer of an interest in land, or to the termination of such an interest, whether by extinction, merger, surrender, forfeiture or otherwise;

(c)      any contract so far as it relates to the creation or transfer of a right or interest in any patent, trade mark, copyright [or design right], registered design, technical or commercial information or other intellectual property, or relates to the termination of any such right or interest;

(d)      any contract so far as it relates—

    (i)      to the formation or dissolution of a company (which means any body corporate or unincorporated association and includes a partnership), or

    (ii)      to its constitution or the rights or obligations of its corporators or members;

(e)      any contract so far as it relates to the creation or transfer of securities or of any right or interest in securities.

**2**

Section 2(1) extends to—

(a)      any contract of marine salvage or towage;

(b)      any charterparty of a ship or hovercraft; and

(c)      any contract for the carriage of goods by ship or hovercraft;

but subject to this sections 2 to 4 and 7 do not extend to any such contract except in favour of a person dealing as consumer.

**3**

Where goods are carried by ship or hovercraft in pursuance of a contract which either—

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5804

(a)    specifies that as the means of carriage over part of the journey to be covered, or

(b)    makes no provision as to the means of carriage and does not exclude that means,

then sections 2(2), 3 and 4 do not, except in favour of a person dealing as consumer, extend to the contract as it operates for and in relation to the carriage of the goods by that means.

**4**

Section 2(1) and (2) do not extend to a contract of employment, except in favour of the employee.

**5**

Section 2(1) does not affect the validity of any discharge and indemnity given by a person, on or in connection with an award to him of compensation for pneumoconiosis attributable to employment in the coal industry, in respect of any further claim arising from his contracting that disease.

**NOTES**

**Initial Commencement**
   *Specified date*
   Specified date: 1 February 1978: see s 31(1).

**Amendment**
   Para 1: the reference to a trade mark in sub-para (c) includes a reference to a service mark, by virtue of the Patents, Designs and Marks Act 1986, s 2(3), Sch 2, Part I; words in square brackets inserted by the Copyright, Designs and Patents Act 1988, s 303(1), Sch 7, para 24.

**Modification**
   References to trade marks or registered trade marks within the meaning of the Trade Marks Act 1938 shall, unless the context otherwise requires, be construed as references to trade marks or registered trade marks within the meaning of the Trade Marks Act 1994; see the Trade Marks Act 1994, Sch 4, para 1.

## SCHEDULE 2
## "GUIDELINES" FOR APPLICATION OF REASONABLENESS TEST

Sections 11(2), 24(2)

The matters to which regard is to be had in particular for the purposes of sections 6(3), 7(3) and (4), 20 and 21 are any of the following which appear to be relevant—

(a)    the strength of the bargaining positions of the parties relative to each other, taking into account (among other things) alternative means by which the customer's requirements could have been met;

(b)    whether the customer received an inducement to agree to the term, or in accepting it had an opportunity of entering into a similar contract with other persons, but without having to accept a similar term;

(c)    whether the customer knew or ought reasonably to have known of the existence and extent of the term (having regard, among other things, to any custom of the trade and any previous course of dealing between the parties);

(d)    where the term excludes or restricts any relevant liability if some condition is not complied with, whether it was reasonable at the time of the contract to expect that

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5805

compliance with that condition would be practicable;

(e) whether the goods were manufactured, processed or adapted to the special order of the customer.

**NOTES**

**Initial Commencement**
   *Specified date*
   Specified date: 1 February 1978: see s 31(1).

## SCHEDULE 3
### AMENDMENT OF ENACTMENTS

Section 31(3)

. . .

**NOTES**

**Initial Commencement**
   *Specified date*
   Specified date: 1 February 1978: see s 31(1).

**Amendment**
   Repealed in part by the Sale of Goods Act 1979, s 63(2), Sch 3 and the Statute Law (Repeals) Act 1981; remainder amends the Supply of Goods (Implied Terms) Act 1973, ss 14, 15.

## SCHEDULE 4
### REPEALS

Section 31(4)

| Chapter | Short Title | Extent of Repeal |
|---|---|---|
| 56 & 57 Vict c 71 | Sale of Goods Act 1893 | In section 55, subsections (3) to (11). |
| | | Section 55A. |
| | | Section 61(6). |
| | | In section 62(1) the definition of "contract for the international sale of goods". |
| 1962 c 46 | Transport Act 1962 | Section 43(7). |
| 1967 c 45 | Uniform Laws on International Sales Act 1967 | In section 1(4), the words "55 and 55A". |
| 1972 c 33 | Carriage by Railway Act 1972 | In section 1(1), the words from "and shall have" onwards. |

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5806

| | | |
|---|---|---|
| 1973 c 13 | Supply of Goods (Implied Terms) Act 1973 | Section 5(1). |
| | | Section 6. |
| | | In section 7(1), the words from "contract for the international sale of goods" onwards. |
| | | In section 12, subsections (2) to (9). |
| | | Section 13. |
| | | In section 15(1), the definition of "consumer sale". |

NOTES

**Initial Commencement**
*Specified date*
Specified date: 1 February 1978: see s 31(1).

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis Butterworths

A-5807

*Corrected Version*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                :

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED     :
(for and on behalf of the six limited partnerships    :
constituting the Terra Firma Capital Partners II Fund),  :  09-CV-10459 (JSR)
and TERRA FIRMA INVESTMENTS (GP) 3       :
LIMITED (for and on behalf of Terra Firma Capital  :  **ECF Case**
Partners III, L.P.),                               :

      Plaintiffs,                          :

           v.                              :

CITIGROUP INC., CITIBANK N.A.,            :
CITIGROUP GLOBAL MARKETS LIMITED, and   :
CITIGROUP GLOBAL MARKETS, INC.        :

      Defendants.                       :
-----------------------------------------------------------------X

**RESPONSE OF PLAINTIFFS TERRA FIRMA
INVESTMENTS (GP) 2 LTD. AND TERRA FIRMA INVESTMENTS (GP) 3 LTD.
TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO
LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd (collectively, "Plaintiffs") respectfully submit this Response to Defendants' Statement of Undisputed Facts dated August 13, 2007.

**Specific Responses**

1.      Plaintiffs Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited the (the "GPS") are part of a broader group of Terra Firma entities and are the general partners, respectively, of six limited partnerships that constitute the Terra Firma Capital Partners II Fund and the Terra Firma Capital Partners III  Limited Partnership. (Compl. ¶¶ 18-19.)

**Response to No. 1**:            Not disputed.

2.      Terra Firma has invested billions in equity capital in distressed companies. (*Id.* ¶20; Ex. 1 at CITI-TF 586295.)[1]

**Response to No. 2**:            Disputed in part.   The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) because the evidence cited does not state that the companies in which Terra Firma invested were "distressed."

3.      In keeping with its "contrarian interventionist strategy," Terra Firma "invests in large buyouts of business that most other private equity firms tend to avoid: companies in unfashionable sectors that are supported by assets; complex businesses with

---

[1] References to "Ex.__" refer to exhibits annexed to the Declaration of Gary R. Carney In Support of Defendants' Motion for Summary Judgment.  References to "Pl. Ex.__" refer to exhibits annexed to the Declaration of Christopher E. Duffy In Opposition to Defendants' Motion for Summary Judgment ("Duffy Declaration"). References to "_ Tr." refer to the excerpted deposition transcripts, which have been collected and included as exhibits to the Duffy Declaration in a separate volume organized by witness.

structural and regulatory issues; and businesses that are in need of change-operational, strategic and managerial." (Ex. 2 at i-iii.)

**Response to No. 3**:            Not disputed.

4.      The GPs are "investment management companies that are responsible for making all the decisions concerning the various private equity fund partnerships." (Ex. 127 at ¶¶ 5-6; *see also* Ex. 1 at 46.)

**Response to No. 4**:            Disputed in part.  The Terra Firma GPs are investment management companies that are responsible, generally, "for making all decisions concerning the various private equity fund partnerships for which they serve as general partners." (Ex. 127 ¶5.) However, the Terra Firma GPs may occasionally have delegated decision-making authority to Terra Firma Capital Partners Limited.  (Stokes Tr. 36:22- 38:2.)

5.      The GPs act through their respective boards of directors.  (Loveridge Dep. at 54:24-55:6.)

**Response to No. 5**:            Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  The evidence cited states "The management decisions of each of the Terra Firma GPs have at all times been taken solely by or under the authority of their boards of directors." (Loveridge Dep. at 54:24-55:6.)  The management decisions of the Terra Firma GPs are influenced by recommendations from Terra Firma Capital Partners Limited.  (Stokes Tr. 47:9-48:1.)

6.      In May 2007, the board of each GP consisted of John Loveridge, Iain Stokes, Fraser Duncan, Nigel Carey and Guy Hands; Loveridge was the chairman.  (Ex. 127 at ¶ 8; Loveridge Dep. at 19:3-20:2.)

**Response to No. 6**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it references only that Mr. Loveridge was chairman at the time of his deposition in this case on July 31, 2010.

However, not disputed.

7.      The GP boards make investment decisions with input from "the Advisor," non-party Terra Firma Capital Partners Limited ("TFCPL"), the private equity firm chaired by Guy Hands.  (Hands Dep. at 6:4-16.)

**Response to No. 7**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it does not support a finding that Mr. Hands is the chairman of TFCPL, nor does it support a finding that the GP boards make investment decisions.  However, not disputed.

8.      In 2007, the Advisor typically presented recommendations through its Investment Advisory Committee (the "IAC"), a group of four senior professionals, including Guy Hands, who worked to "maintain [] pricing discipline" in Terra Firma's transactions. (Ex. 1 at 9; *see also* Loveridge Dep. at 33:23-34:24.)

**Response to No. 8:**    Disputed in part.  The IAC acts as part of the review process of the Advisor.  (Stokes Tr. 59:25-60:9.)

9.      Notwithstanding the IAC's input, the final decision on all investments rested with the directors of the GPs. (Ex. 127 at ¶ 6; Loveridge Dep. at 33:23-34:24; Strokes Dep. at 60:10-18.)

**Response to No. 9**:          Not disputed.

10.      Citi is a leading global financial services company and, as is relevant to this case, has provided investment banking assistance and commercial and other lending services to private equity firms, including Terra Firma. (Compl. ¶4; Answer ¶4.)

**Response to No. 10**:          Not disputed.

11.      Citi has also, from time to time between 2000 and 2007, provided services to EMI Group plc ("EMI"), and has also acted as a banker for EMI. (Compl. ¶ 48; Answer ¶ 48.)

**Response to No. 11**:          Disputed in part.  Citi extensively advised EMI and was a lender, broker and advisor to EMI as of May of 2007.  (Borrows Tr. at 30:4-5; Pl. Ex. 18 at 3; Hill Tr. at 44:15 to 45:2.)

12.      Terra Firma and Citi each is a sophisticated party who dealt with each other in an arms-length, commercial relationship.  (*See* Hands Dep. at 12:11-25, 48:15-50:11.)

**Response to No. 12**:          Disputed in part.   The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  None of the testimony cited indicates that either party acted at "arms-length."   Moreover, Mr. Hands testified Terra Firma's "relationship was very, very close with Citigroup."  (Hands Tr. 43:22-23.)

A-5812

13.    Terra Firma knew that Citi was acting as sell-side advisor to EMI, not an advisor to Terra Firma.  (Compl. ¶¶62-64; *see also* Hands Dep. at 109:16-23.)

**Response to No. 13**:        Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  Mr. Hands testified that he believed that, in connection with the EMI transaction "Citigroup was working for Terra Firma prior to the auction."  (Hands Tr. 47:16-20.)  Moreover, one or more of Citi's own witnesses referred to certain Citi executives as being on the "Terra Firma deal team," acting for Terra Firma, and providing it with "investment banking advice" in connection with its possible bid for EMI.  (*See* Smith Tr. at 139:25 to 140:4; 141:13-15; 142:8-9.)

14.    In November 2006, a private equity group, Permira, indicated its interest in bidding for EMI at a price of £3.20 per share, but withdrew its preliminary offer a few weeks later. (Compl. ¶ 61; Ex. 3.)

**Response to No. 14**:        Objection.  Exhibit 3 is not admissible as required by Local Rule 56.1(d).  The document is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  However, not disputed.

15.    In December 2006, Terra Firma expressed an interest in seeking information about EMI in connection with a possible bid, an inquiry that EMI rebuffed. (Exs. 4-5.)

**Response to No. 15**:          Disputed.  EMI did not grant Terra Firma's request for the

diligence material because (1) Permira had withdrawn and thus EMI was no longer in an offer

period, (2) Terra Firma had not put forth "a specific proposal" which  the EMI which the Board

considers to be "attractive, well founded and capable of implementation."  (*See* Pl. Ex. 114; *see*

*also* Pl. Ex. 115; Nicoli Tr. at 243:25 to 244:20.)  Further, one of the exhibits (Ex. 5) cited by

Defendants is not admissible as required by Local Rule 56.1(d).  The document is inadmissible

hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to

prove the truth of the matter asserted.

16.    On February 20, 2007, following two profit warnings by EMI, the

company's long-time suitor, Warner Music Group ("WMG"), made an approach regarding a

potential acquisition at £2.60 per share.  (Compl. ¶ 92; Ex. 6.)

**Response to No. 16**:          Disputed in part.  The evidence cited does not support

Defendants' contention as required by Local Rule 56.1(d) insofar as it fails to make any

reference to profit warnings by EMI, fails to indicate that Warner was a "long-time suitor" of

EMI's and fails to identify any price component.  Furthermore, the £2.60 bid from Warner group

was discounted by EMI to a value of "at best" £2.25 due to the regulatory uncertainty and tax

liability that would accompany a possible acquisition by Warner.   (Pl. Ex. 160 at TF1463596.)

17.    EMI determined WMG's bid to be too low (see Ex. 7), and began

planning for the possible sale of the company to a private equity firm after it completed its

March 31 fiscal year. (Ex. 8 at 8-10.)

**Response to No. 17**:          Disputed in part.  EMI determined that the WMG "proposal

should be rejected, with particular reference to the threshold issue of anti-trust risk and the fact

that the true value of the proposal, having regard to the assumptions to which it was subject, was

significantly below both the indicated 260p per share and the Company's current share price."

(Ex. 8 at 9.)  One of the exhibits (Ex. 7) cited by Defendants is not admissible as required by

Local Rule 56.1(d).  The document is inadmissible hearsay under Rule 802 of the Federal Rules

of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The

document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the

Federal Rules of Evidence.  Further, the evidence cited does not support Defendants' contention

as required by Local Rule 56.1(d) in that it makes no mention of EMI plans for a "possible sale

of the company to a private equity firm after it completed its March 31 fiscal year."


          18.     In late 2006, Citi (led by David Wormsley) and Deutsche Bank acted as

EMI's lead investment bankers.  (Borrows Dep. at 219:6-220:9.)


**Response to No. 18**:          Not disputed.


          19.     In 2007, EMI's recently appointed chairman, John Gildersleeve, decided

to appoint as lead advisor an investment bank that did not have any commercial relationships

with private equity funds that would be likely bidders for the company.  (Gildersleeve Dep. at

56:9-57:6; Nicoli Dep. at 67:2-68:13; Ex.9.)


**Response to No. 19**:          Objection.  Greenhill had been appointed to act as

additional financial advisor in November of 2006 in order to provide the "independent" advice

required under Rule 3 of the City Code on Takeovers and Mergers.  (Pl. Ex. 116 at TF549267.)

7

A-5815

In addition, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that the advisor chosen was the "lead advisor."   The cited Nicoli testimony indicates EMI appointed Greenhill as independent advisor in 2006, not 2007.   Furthermore, the exhibit (Ex. 9) cited by Defendants is not admissible as required by Local Rule 56.1(d).  The document is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.   However, not disputed.

20.   Rule 3 of the English Takeover Code requires companies in receipt of an offer to have an independent advisor to advise the board regarding the pending offer.  (Bell Dep. at 276:23-277:2; Borrows Dep. at 312:9-16; Ex. 128.)

**Response to No. 20**:   Not disputed.

21.   Gildersleeve selected Greenhill & Company, Inc. ("Greenhill") as the EMI board's independent "Rule 3" advisor and instructed Greenhill to run the auction process and take the lead in negotiations with prospective bidders.  (Gildersleeve Dep. 56:9-57:6; Nicoli Dep. at 67:2-68:13; Ex.9.)

**Response to No. 21**:   Disputed.   Greenhill was appointed to act as an additional financial advisor in November of 2006 in order to provide the "independent" advice required under Rule 3 of the City Code on Takeovers and Mergers.  (Pl. Ex. 116 at TF549267.)  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate Greenhill was to "take the lead" nor "run the auction."   To the contrary

8

Mr. Gildersleeve states "I want all negotiations with any potential bidders to be led by me." (Ex. 9.) Furthermore, the exhibit (Ex. 9) cited by Defendants is not admissible as required by Local Rule 56.1(d). The document is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

22.    Gildersleeve intentionally relegated Citi and Deutsche Bank to secondary roles. (Ex. 10 at ¶¶ 6-8; Ex. 9; Gildersleeve Dep. at 56:9-57:6; Bell Dep. at 59:13-63:17, 280:25-282; Hayward-Cole Dep. at 72:16-74:2.)

**Response to No. 22**:    Disputed. The phrase "secondary roles" is ambiguous. The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Citi's or Deutsche Bank's role was "secondary." Furthermore, the exhibit (Ex. 9) cited by Defendants is not admissible as required by Local Rule 56.1(d). The document is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

23.    EMI's board met on April 20, 2007 to discuss the potential sale of the company. (Ex. 11 at 5-7; Borrows Dep. at 255:2-6.)

**Response to No. 23**:    Not disputed.

9

(a)    Neither Wormsley nor anyone from Citi attended the meeting. (Ex. 11; Nicoli Dep. at 186:17-187:10.)

**Response to No. 23(a)**:        Not disputed.

24.    By the time of the April 20 EMI board meeting, two private equity firms, Cerberus and Fortress, had put in so-called indicative bids (non-binding bids subject to due diligence) for the company.  Cerberus made an indicative bid at £2.62 and Fortress did so at a range between £2.50 to £2.60. (Exs. 12-13.)

**Response to No. 24**:        Not disputed.   However, the exhibits cited by Defendants (Exs. 12 & 13) are not admissible as required by Local Rule 56.1(d).  The documents are inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which are offered by Defendants to prove the truth of the matters asserted. The documents do not fall within any of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

25.    At the April 20 meeting, the EMI board determined that it would "consider seriously" offers at or above £2.60 per share, in effect setting a floor for any bid likely to receive the board's recommendation.  (Ex. 11 at 7; Borrows Dep. at 255:20-20-257:2; *see also* Nicoli Dep. at 176:23-177:7, 243:8-17.)

**Response to No. 25**:        Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  None of the evidence cited states that £2.60 was a "floor."   The EMI Board minutes state only "that any offer at or above 260p per share would be one the Board would have to consider seriously.  Only 'Jack', with its potential for significant synergies, was likely to be able achieve a price materially in excess of that level."   (Ex. 11 at 7.)

10

26.     On April 23, 2007, a third private equity firm, One Equity, submitted an indicative bid in the same range as Fortress.  (Ex. 14.)

**<u>Response to No. 26</u>**:          Not disputed.

27.     On May 4, 2007, EMI issued a release confirming that it had received expressions of interest from unnamed private equity firms.  (Ex. 15.)

**<u>Response to No. 27</u>**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that the expressions of interest had been made by "private equity firms"; the evidence cited states "Further to recent speculation, EMI Group plc (the Company) confirms that it has received a number of preliminary indications of interest to acquire the Company."  (Ex. 15.)  However, not disputed.

28.     On May 10, 2007, WMG again expressed its interest in acquiring EMI, submitting an indicative bid of £2.60 per share. (Ex. 16.)

**<u>Response to No. 28</u>**:          Not disputed.  However, EMI significantly discounted a bid from WMG believing that "the true value of the proposal" was "significantly below…the indicated 260p per share."  (Ex. 8 at 9.)

29.     Terra Firma continued to evaluate a potential bid for EMI in the first quarter of 2007, authorizing the expenditure of £800,000 for "Project Dice," the code name assigned to EMI.  (Exs. 17-18; van der Spuy Dep. at 56:23-57:4; Hands Dep. at 37:16-41:5.)

11

**Response to No. 29**:         Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Terra Firma "authorized an expenditure of £800,000 for 'Project Dice'."   The evidence cited indicates only that the "team" sought "IAC approval of a budget for up to £800,000 to conduct Phase 1 diligence to determine whether the team should return to the IAC to recommend submitting a conditional non-binding offer letter to the Dice Board, which could then permit the team to conduct confirmatory due diligence and agree a recommended offer to the shareholders." (Ex. 17 at 1.)

30.    Terra Firma retained a number of financial and industry experts and advisors to assist its evaluation of the potential acquisition.  (Ex. 17.)

**Response to No. 30**:         Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Terra Firma "retained" any experts or advisors, nor can it be determined what is meant by "a number of" here.  However, not disputed.

(a)    McKinsey provided evaluations on the "cost improvement potential" available to Terra Firma. (Ex. 19.)

**Response to No. 30(a)**:         Not disputed.

(b)    L.E.K. and Enders, music industry specialists, provided assessments of the future direction of the industry.  (MacInnes Dep. at 65:9-66:17; van der Spuy Dep. at 84:15-85:24; Ex. 20.)

**Response to No. 30(b)**:  Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that L.E.K. was a "music industry specialist" nor indicate that Enders "provided assessments of the future direction of the industry."  L.E.K. "developed music market forecasts" for certain territories; "purchased proprietary research on consumer behavior and key trends in music buying; interviewed a wide selection of industry executives and experts to inform likely future scenarios and trends; assisted in limited management interviews; and provided qualitative counsel to Terra Firma on industry dynamics."  (Ex. 20 at 2.)   Exhibit (Ex. 20) cited by Defendants is not admissible as required by Local Rule 56.1(d).  The document has not been authenticated as required under Rule 901 of the Federal Rules of Evidence.

(c)      KPMG conducted financial analysis of EMI's performance based on figures provided by EMI's accountant, Deloitte. (MacInnes Dep. at 66:25- 67:5; van der Spuy Dep. at 86:2-7; Ex. 21; *see also* Ex. 22.)

**Response to No. 30(c)**:       Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  KPMG conducted financial due diligence limited to the "vendor due diligence report dated 4 May 2007 prepared by Deloitte and Touche LLP, information available in the public domain and information provided in the data room."  (Ex. 21 at 3.)  KPMG "had no access to the premises of Dice," "no access to the management and personnel of Dice other than meetings on 14 May 2007," and no access to the audit files.  (Ex. 21 at 3.)  Further, the exhibits (Exs. 21 & 22) cited by Defendants are not admissible as required by Local Rule 56.1(d).

13

A-5821

(d)    Weil, Gotshal & Manges conducted legal due diligence.  (MacInnes Dep. at 64:3-

10.)

**Response to No. 30(d)**:    Disputed.  The phrase "legal due diligence" is vague.  Weil,

Gotshal & Manges were legal advisor to Terra Firma in connection with Terra Firma's bid for

EMI.  (MacInnes Dep. at 64:3-10.)


(e)    Dresdner Kleinwort advised Terra Firma on the financial aspects of the EMI

acquisition. (van der Spuy Dep. at 155:15-18; *see* Ex. 23.)

**Response to No. 30(e)**:    Disputed.  The evidence cited does not support Defendants'

contention as required by Local Rule 56.1(d) insofar as it does not indicate that Dresdner

Kleinwort provided advice on the "financial aspects" of the EMI acquisition.  Further, the exhibit

(Ex. 23) cited by Defendants is not admissible as required by Local Rule 56.1(d).


31.    On May 6, 2007, Hands met with Eric Nicoli, the CEO of EMI.  (Ex. 24; Hands

Dep. at 62:25-65:10; Nicoli Dep. at 162:24-163:12, 233:12-236:13).

**Response to No. 31**:    Not disputed.


32.    Hands questioned Nicoli about the accuracy of Terra Firma's assumptions on the

prospects of EMI and the recorded music industry.  (Ex. 24)

**Response to No. 32**:    Disputed in part.   The evidence cited does not support

Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate Mr.

Hands questioned Mr. Nicoli regarding Terra Firma's assumptions "on the prospects of EMI and

the recorded music industry"; rather, it indicates that Mr. Nicoli allowed Mr. Hands to ask

questions regarding Terra Firma's business plan assumptions for EMI.

33.    Immediately after the meeting, Hands instructed his team to make changes to

Terra Firma's working business plan for EMI based on the information received from Nicoli, and

to prepare a memorandum for the IAC recommending an indicative bid of £2.65 per share. (*Id.*)

**Response to No. 33**:  Disputed in part.  The phrase "immediately" is vague.  Mr. Hands

and Mr. Nicoli met on the morning of Sunday, May 6, 2007.  (Nicoli Tr. 233:12-23.)  Mr. Hands

sent the May 6th email cited by Defendants (Ex. 24) at 1:32 p.m.  Moreover, the evidence cited

does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not

state that the changes to Terra Firma's working business plan for EMI were based on information

received from Mr. Nicoli.

34.    The next day, Hands recounted the potential "enormous upsides" of an acquisition

of EMI at £2.65 per share and outlined nine reasons why Terra Firma should attempt to "win" the

EMI auction, a message he repeated in the days leading up to the May 21 bid. (Exs. 25-26.)

**Response to No. 34**:                Disputed.  The evidence cited does not support Defendants'

contention as required by Local Rule 56.1(d).  The "nine reasons" outlined in the email from

Hands (Ex. 25) are nine reasons that Hands wrote "it is worth spending time to focus on this

deal"; they are not "nine reasons" that Terra Firma should attempt to "win" the EMI auction.

This message was not repeated.  The list of points contained in the May 19th email cited by

Defendants (Ex. 26) is unrelated to the list of points in the May 7th email (Ex. 25).  In fact, the

list in the May 19th email (Ex. 26) is unrelated to any reason to "win" or "focus on" EMI.

Moreover, Mr. Hands only use of the word "win" in the May 19th email is in its last sentence, in which he states, "I am convinced one of these days we will win one of these deals and hopefully this will be it."

35.     The Project Dice team, led by TFCPL managing director Riaz Punja, prepared a memorandum recommending an indicative bid along the lines laid out by Hands based on the assumptions derived from the "conversation between Guy Hands and Eric Nicoli, CEO of Dice." (Ex. 27 at 3.)

**Response to No. 35**:  Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not identify Mr. Punja's position at TFCPL or on the Project Dice team.  In addition, the document cited by Defendants (Ex. 27) does not (1) itself recommend an indicative bid, (2) state that any indicative bid was "along the lines laid out by Hands," or (3) state that any indicative bid was based on the assumptions derived from the "conversation between Guy Hands and Eric Nicoli, CEO of Dice."  Rather, the memorandum, which was prepared by Project Dice team, of which Riaz Punja—a TFCPL managing director—was a senior member (Punja Tr. at 60:22-61:2.),  "propos[ed] that the IAC recommends to the GP to submit an indicative bid of 265p to the Dice Board." (Ex. 27 at 1.)  This recommendation was based on "operating and financing assumptions" that "emerged through conversation" between Mr. Hands and Mr. Nicoli.  (*Id.*)  The memorandum contains a placeholder for the IAC to approve or reject a recommendation "[t]o recommend to the GP to approve the submission of an indicative bid to the Dice Board to acquire Dice at 265p/share." (*Id.* at 7.)  The version of the memorandum cited by Defendants is unsigned and does not contain the IAC's decision; the IAC did, however, approve the recommendation.  (Pl. Ex. 117.)

36.    The IAC recommended to the boards of the Plaintiff GPs that they submit an indicative bid for EMI.  The GPs so authorized an indicative bid at £2.65 per share and transmitted it to EMI on May 8, 2007. (Ex. 28 at 5-9.)

**Response to No. 36**:    Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that the IAC recommended to the boards of Plaintiff GPs that they submit an indicative bid or that an indicative bid was transmitted to EMI.  The evidence cited by Defendants (Ex. 28 at p. 5) does not state what the IAC recommended.  It instead references a document containing "[t]he recommendation of the Investment Advisory Committee of Terra Firma Capital Partners Limited ('TFCPL') dated 7 May 2007."  This document is the May 7th memorandum by the Project Dice team containing the IAC's decision "[t]o recommend to the GP to approve the submission of an indicative bid to the Dice Board to acquire Dice at 265p/share."  (*See* Pl. Ex. 117.)  Plaintiff GPs did submit an indicative offer to EMI on May 8, 2007.  (*See* Pl. Ex. 118.)

37.    Having made an indicative bid, Terra Firma began the process required to proceed to a binding offer.  (Bell Dep. at 292:22-293:15.)

**Response to No. 37**:    Disputed.  The phrase "began the process required to proceed to a binding offer" is vague.  Moreover, Terra Firma did not begin any "process" upon the submission of its indicative offer.  Rather, it signed a non-disclosure agreement (Ex. 29) and obtained access to EMI's electronic data room and Deloitte's vendor due diligence report.  (*See* Bell Dep. at 292:22-293:15.)

17

38.    On May 9, 2007, Plaintiffs and EMI executed the Project Mulberry Agreement ("PMA"), providing the terms under which the parties would exchange information and setting forth limitations on liability resulting from the provision of such information.  (Ex. 29.)

**Response to No. 38**:          Disputed in part.  Plaintiffs and EMI did execute the Project Mulberry Agreement ("PMA") on May 9, 2007.  Plaintiffs respectfully refer the Court to Exhibit 29 for a true and complete statement of the PMA's provisions.  Otherwise, Plaintiffs dispute Defendants' statement as calling for a legal conclusion.

39.    By its express terms, the parties covered by the PMA include not only EMI and Terra Firma, but also "Connected Persons," which is defined as follows:

> (a)    "Connected Persons means, in relation to each of us, to the extent that they are involved in or have knowledge of the Proposal . . . (b) officers, employees and partners of our advisors, agents and representatives or of their respective group undertakings . . . ."  (Ex. 29 at ¶ (e).)

**Response to No. 39(a)**:          Disputed in part.  The PMA does contain a definition of "Connected Persons," and Plaintiffs respectfully refer this Court to ¶ (e) for a true and complete statement of this provision.  Otherwise, Plaintiffs dispute Defendants' statement as calling for a legal conclusion.

40.    The PMA provides, *inter alia*:

(a)    "Information" provided to Plaintiffs "does not purport to be all- inclusive and that no representation or warranty is made by any person as to the accuracy, reliability or completeness of any of the Information."  (Ex. 29 at ¶ 10.)

**Response to No. 40(a)**:        Disputed in part.  The PMA does contain provisions regarding "Information."   Paragraph 10 is one such provision, and Plaintiffs respectfully refer this Court to that paragraph for a true and complete statement of its contents.  Otherwise, Plaintiffs dispute Defendants' statement as calling for a legal conclusion

    (b)        "Information" is defined broadly to include "information supplied by each of us or by any of our respective Connected Persons orally, in writing or in any other form to the other or its Authorised Recipients whether before, on or after the date of this letter in connection with the Proposal as well as all documents and other information which contain or reflect or are generated or derived from the information we each supply to the other."  (Ex. 29 at 1.)

**Response to No. 40(b)**:        Disputed in part.  The PMA expressly defines "Information" *as* "information supplied by each of us or by any of our respective Connected Persons orally, in writing or in any other form to the other or its Authorised Recipients whether before, on or after the date of this letter in connection with the Proposal as well as all documents and other information which contain or reflect or are generated or derived from the information we each supply to the other."  (Ex. 29 at 1.)  Plaintiffs dispute Defendants' statement to the extent the word "includes" implies the provision cited by Defendants is not the true and complete definition of "Information."  Moreover, Plaintiffs dispute Defendants' characterization of Information as "defined broadly" as this is nowhere contained in the document.

    (c)        Neither party nor any of their Connected Persons "shall have any liability to the other or any other person resulting from the use of Information by us or them;" or "shall be under any obligation to provide further Information, to update Information or to correct any inaccuracies."  (Ex. 29 at ¶ 10(a)-(b).)

**Response to No. 40(c)**:        Disputed in part.  The PMA does contain provisions regarding "Connected Persons."   Paragraph 10 is one such provision, and Plaintiffs respectfully refer this Court to that paragraph for a true and complete statement of its contents.  Otherwise, Plaintiffs dispute Defendants' statement as calling for a legal conclusion.

41.    The only exception to this waiver of liability is for fraud:  "[n]othing in this letter excludes any liability for, or remedy in respect of, fraudulent misrepresentation."  (Ex. 29 at ¶ 10.)

**Response to No. 41**:  Disputed. The PMA expressly provides that fraudulent misrepresentation is an exception to any waiver of liability.  It, however, does not expressly limit the exceptions to any waiver of liability to only fraudulent misrepresentation.  Plaintiffs respectfully refer the Court to ¶¶ 10-13 for provisions regarding "[r]epresentations and warranties."  Otherwise, Plaintiffs dispute Defendants' statement as calling for a legal conclusion.

42.    Under the PMA, neither party "nor any of [their] respective Connected Persons shall owe any duty of care to the other, to the other's Connected Persons or to any other Person." (Ex. 29 at ¶11.)

**Response to No. 42**:        Disputed in part.  The PMA does contain provisions regarding "Connected Persons."   Paragraph 11 is one such provision, and Plaintiffs respectfully refer this Court to that paragraph for a true and complete statement of its contents.  Otherwise, Plaintiffs dispute Defendants' statement as calling for a legal conclusion.

43.     The PMA provides for the application of English law.  (Ex. 29 at ¶ 30.)

**Response to No. 43**:          Not disputed.


44.     On May 14, Terra Firma representatives, including professional advisors, conducted an all-day due diligence meeting with EMI's senior management team.  (Ex. 30.)

**Response to No. 44**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not state that the meeting actually took place.  In addition, the evidence (Ex. 30) cited by Defendants is not admissible as required by Local Rule 56.1(d).  The document is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  However, not disputed.


45.     Terra Firma conducted follow-up due diligence, including review of the extensive materials contained in the virtual data room set up by EMI.  (Ex. 31 at 1.)


**Response to No. 45**:  Disputed in part.  Terra Firma conducted follow-up due diligence. However, the materials contained in the virtual data room were not necessarily "extensive" as they did not include certain information, including projections regarding EMI's future financial performance and certain commercial contracts.  (Bell Tr. at 92:18-93:9; 121:12-22; *see also* Alexander Tr. at 50:7-18.)  In addition, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate what due diligence was undertaken after the May 14 management meeting.

46.     Terra Firma made arrangements to secure financing for a binding offer for EMI, contacting a half a dozen banks, including Citi and Deutsche Bank; each of those banks attended the May 14 due diligence session at EMI.  (*See* Ex. 31 at 1; Ex. 30 at TF323477; *see also* Ex. 32.)

**Response to No. 46**:            Disputed.  From the time Plaintiffs submitted an indicative offer letter to EMI on May 8, 2007 until Maltby executed the Facilities Agreement with Citi on August 13, 2007, Terra Firma communicated with a number of banks regarding debt financing for an acquisition of EMI (*see* Pl. Ex. 119) but not necessarily debt financing for a binding offer for EMI, as Terra Firma also considered acquiring EMI through a scheme of arrangement (*see* Ex. 69 at 4-7).   Moreover, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not state that six banks attended the May 14, 2007 due diligence session at EMI; rather, it indicates that five banks were scheduled to attend. (*See* Ex. 30 at TF323477.)  Finally, some of the evidence (Ex. 30) cited by Defendants is not admissible as required by Local Rule 56.1(d).  Exhibit 30 is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The document does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

47.     EMI authorized both Citi and Deutsche Bank to provide financing to potential bidders, including Terra Firma. (Ex. 33; Bell Dep. at 278:20-25, 283:2-284:17; Borrows Dep. at 316:6-317:3.)

22

**Response to No. 47**:            Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar it does not state that EMI authorized Citi and Deutsche Bank to provide financing to Terra Firma specifically.  Rather, the evidence pertains to authorization to provide financing to Cerberus, One Equity, and Fortress, and "prospective bidders."  (*See* Ex. 33; Bell Dep. at 278:20-25, 283:2-284:17; Borrows Dep. at 316:6-317:3.)  On April 27, 2007, Matthew Smith, on behalf of Citi, executed a letter that would allow Citi to provide debt financing to "Fortress, Cerberus, and One Equity Partners (and any other potential bidders specifically agreed with EMI)."  (Pl. Ex. 120.)  In addition, some of the evidence (Ex. 33 & Bell Dep. at 278:20-25) cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  In addition, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as Exhibit 33 indicates only that authorization had been sought, not that it had been granted.

48.    Consistent with industry practice, Citi set up separate financing teams or "trees" for Terra Firma and Cerberus.  (*See*, *e.g.*, Exs. 34-35; Coats Dep. at 106:3-11.)

**Response to No. 48**:            Disputed.  Citi's purported "trees" were not consistent with industry practice; the sponsor of Terra Firma's financing package, Paul Simpkin had little grasp of who was on what tree at any given time, including the people with whom Simpkin was sharing Terra Firma's confidential information  (*See* Simpkin Tr. at 197:23-198:10; 198:11-202:3; 202:24-203:19; 195:5-9.)  At least one member of the Terra Firma financing tree, Scott

23

Miller, was involved with Cerberus financing, and at least one member of the Cerberus financing tree, David Wirdnam, was involved with Terra Firma financing, prior to the closing of the Terra Firma/EMI financing deal on August 17, 2007.  (*See* Pl. Exs. 121-126.)   In addition, both Michael Klein and David Wormsley, neither of whom were assigned to either compliance "tree," attended and spoke during a May 17, 2007 call to approve financing of a Terra Firma bid.  (Tabet Tr. 67:6-72:24; Pl. Ex. 127.)  Wormsley also asked Matthew Smith to join; Smith declined stating "I am on the opposite side."  (Pl. Ex. 127.)  Citi's Project Dice compliance records show that Citi employees' membership status was changing daily, (*see* Pl. Ex. 126 at 197), and that Citi moved people on to and off of teams and altered their statuses, to apparently cover violations of its own conflict rules.  (*See* Pl. Ex. 128; Pl. Ex. 126; and Pl. Ex. 129.)

Further, Richard Zogheb, a member of Citi's Credit Committee who was purportedly "above the wall" and therefore had access to information within various "trees," revealed the confidential terms of Terra Firma's financing to Providence, a private equity competitor firm that had expressed interest in EMI, during a golf outing.  (*See* Pl. Ex. 121 at 934; Pl. Ex. 130 at 713; and Pl. Ex. 131.)

In addition, with the exception of Mr. Coats' testimony, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  The documents (Exs. 34 & 35) are also incomplete to the extent listed attachments have not been included.  Furthermore, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it makes no mention of Cerberus and fails to indicate what the industry practice might be.

24

49.    Deutsche Bank also established trees for each of the four private equity bidders. (Hayward-Cole Dep. 111:19-115:14; Exs. 36-37.)

**Response to No. 49**:    Disputed in part.    Deutsche Bank established separate financing trees for Cerberus, One Equity, Fortress, and Terra Firma as of May 10, 2007.    (Exs. 36-37; Hayward-Cole Dep. 111:19-115:14.)    Plaintiffs, however, dispute Defendants' statement to the extent that the word "also" implies Citi maintained trees.    Citi did not adequately maintain trees.    *See* Response to No. 48, above.    In addition, with the exception of Mr. Hayward-Cole's testimony, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d). The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

50.    EMI and Greenhill recognized the advantages to EMI of permitting these large banks to participate on the financing side of the transaction. (Ex. 33; Bell Dep. at 277:18-278:11; Borrows Dep. at 316:10-23.)

**Response to No. 50**:    Disputed in part.    Greenhill's advice to EMI to allow Citi and Deutsche Bank to participate on the financing side of the transaction was conditioned on undertakings by Citi and Deutsche Bank that they "would use their usual protocols and Chinese walls to preserve the confidentiality on the advisory side of our process."    (Borrows Tr. at 315:25-316:5; *see also* Borrows Tr. at 351:22-352:9.)    Moreover, Greenhill also recognized the disadvantages to EMI of permitting Citi and Deutsche Bank to participate on the financing side of the transaction.    Peter Bell testified that "there was a potential conflict of interest between an investment bank such as Citi acting as adviser to EMI, while also providing finance to a potential

25

bidder." (Bell Tr. at 88:2-17.) Simon Borrows also testified, with respect to the efficacy of

Chinese walls, "my view was why take the risk on something like that. . . . The difficulty

companies face when dealing with the bulge bracket banks is, you know, whether it be private

equity funds or whether it be hedge funds, the fees that those banks receive from those entities

are a multiple of the likely fees they will receive from some of their corporate clients, so if

there's any sort of conflict or issue between them, it's very clear who will win out in that

situation." (Borrows Tr. at 232:19-233:12.) Finally, the document cited by Defendants (Ex. 33)

is not admissible as required by Local Rule 56.1(d). The evidence is inadmissible hearsay under

Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of

the matter asserted. The evidence does not fall within one of the enumerated exceptions to

hearsay under Rule 802 of the Federal Rules of Evidence.


        51.      Deutsche Bank initially took the lead on financing a potential Terra Firma bid.

(Ex. 31 at 2.)

        **<u>Response to No. 51</u>**:          Disputed. The phrase "took the lead" is vague and

ambiguous. Nonetheless, Plaintiffs interpret Defendants' statement as asserting Deutsche Bank

emerged as Terra Firma's primary option for debt financing for its potential acquisition of EMI.

Plaintiffs dispute this assertion; as of May 15, 2007, *both* Citi and Deutsche Bank appeared to

"be the two banks with the highest probably [sic] of obtaining credit committee approval before

or on Friday." (*See* Ex. 31 at 3; *see also* Pl. Ex. 132.) Moreover, the evidence cited does not

support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate

that Deutsche Bank "took the lead," noting only that a "financing package" had been received

from Deutsche Bank and that certain "financing related assumptions" were based on that package.  (Ex. 31 at 3-4.)

52.     Hands reached out to a number of senior Citi executives, including Wormsley, London-based banker Kamal Tabet and investment banking head Michael Klein, concerning the financing. (Exs. 25, 32, 38-42; Hands Dep. at 125:10-18, 130:5-139:4; Tabet Dep. at 117:5-13.)

**<u>Response to No. 52</u>**:        Disputed.  The phrase "reached out" is vague and ambiguous.  Citi was anxious to finance Terra Firma's bid; on May 17, 2007 Matthew Smith wrote to David Wormsley:  "As I mentioned yesterday, Greenhill seems to be assuming we will recommend an offer from Cerberus next Wed.  I assume One Equity and Fortress have receded. We should discuss how we get better visibility and what help we can appropriately give TF to get there as well." (Pl. Ex. 67.)  In addition, some of the evidence cited by Defendants (Exs. 38, 39 & 42) is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

53.     The Citi Credit Committee approved the Terra Firma borrowing, in principle, in the late evening hours of May 17.   (Ex. 43.)

**<u>Response to No. 53</u>**:        Disputed.  The Citi Credit Committee approved a number of terms associated with a potential debt package for Terra Firma in the late evening hours of May 17.  These terms were not comprehensive.  (*See* Ex. 43 ("We look forward to seeing the

clear market, exclusivity and flex language we understand will be included in the next turn of documents.").)  Moreover, the final term sheet was not circulated until 6:24 a.m. on Monday, May 21, 2007.  (*See* Ex. 49.)

54.    Acting at arms-length, Terra Firma and Citi negotiated a commitment letter, reaching agreement on one on May 21.  (Exs.4 4-49.)

**Response to No. 54**:        Disputed in part.  "Arms length" is vague and ambiguous. The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not use the term or otherwise define "arms-length."  Plaintiffs do not dispute that the parties did negotiate a commitment letter, reaching agreement on May 21.

55.    In the same period, Terra Firma continued to negotiate with Deutsche Bank and other potential lenders (*see* Ex. 50 at 4; Ex. 51 at TF81389; Ex. 52), securing a commitment for a portion of the borrowing from Deutsche Bank on May 20. (*See* Ex. 53).

**Response to No. 55**:        Disputed in part.  First, Plaintiffs construe "[i]n this same period" as referring to May 17, 2007 through May 21, 2007.   Second, Deutsche Bank "approved" financing for 1/3 of the debt prior to May 20, 2007.  (Pl. Ex. 132.)  Moreover, some of the evidence cited by Defendants (Exs. 52 & 53) is not admissible as required by Local Rule 56.1(d).  In addition, the documents (Exs. 52 & 53) are inadmissible under Rule 1003 of the Federal Rules of Evidence because neither duplicate is a true copy of the original and thus, "it would be unfair to admit the duplicate in lieu of the original."  FRE 1003.

56.    On May 18, at Greenhill's suggestion, the EMI Board decided to require binding offers by 9:00 am on May 21.  (Borrows Dep. at 84:24-89:4, 252:12-23; Nicoli Dep. at 109:6-110:6.)

**Response to No. 56**:   Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not state that the "EMI Board" made the decision.  It is not disputed that EMI decided to require binding offers by 9:00 am on May 21.


57.    Until that date, the working assumption had been that bids would be due on May 23 when EMI intended to announce its final financial results for its fiscal year.  (Exs. 54-55.)

**Response to No. 57**:            Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate the May 23rd deadline was a "working assumption."  Prior to May 18, 2007 bidders understood that bids would be due on May 23, 2007.  (Exs. 54-55.)  In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.


58.    Neither Wormsley nor anyone else at Citi played a role in the decision to move up the bid deadline. (Borrows Dep. at 252:24-253:2; Ex. 56.)

**Response to No. 58**:            Not disputed.

29

59.     Greenhill communicated the May 21 deadline to the four private equity bidders on May 18.  Terra Firma, through Hands, informed Greenhill that it had already intended to submit a binding offer on that timetable.  (Borrows Dep. at 277:18-22; Bell Dep. at 174:4-14; Exs. 55, 57-58.)

**Response to No. 59**:            Disputed in part.  None of the evidence cited by Defendants supports the proposition that Terra Firma had planned to submit "a binding offer" on Monday, May 21, 2007.  Terra Firma communicated only that it "expects" to be in a position to bid on Monday.  (Ex. 55)   In addition, the exhibits cited by Defendants are not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  Further, Exhibit 58, which is not relevant to the statement in support of which it is offered, is inadmissible under Rule 402 of the Federal Rules of Evidence.

60.     Cerberus indicated that it expected to be in a position to submit a binding offer by 9:00 am on Monday, May 21. (Bell Dep. at 193:3-200:7; Ex. 55.)

**Response to No. 60**:            Disputed.  Wormsley certainly conveyed to Terra Firma, beginning on May 18, 2007 or earlier, that Cerberus was bidding 262 pence on May 21, 2007, but there does not appear to be any evidence or basis upon which Wormsley predicated his statement(s) that Cerberus definitely would submit a bid on that date, nor is there any evidence as to the amount of that bid.  Cerberus, through a witness designated to testify under Fed. R. Civ. P. 30(b)(6), has made clear that, while it "conveyed a very positive tone" during a telephone

conversation with EMI's chairman Mr. Gildersleeve on May 18, 2007, it did so "without saying anything specific on certainty or on value." (*See* Wolf Tr. at 159:4-25.) Mr. Bell of Greenhill testified that he did not have "any prior indication as of that Friday of what price Cerberus might bid if it did indeed make a firm offer on the Monday," and could not recall any discussions on that topic on that day. (*See* Bell Tr. at 328:5-12.) In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d). The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.


61.    Fortress and One Equity both expressed concern with the acceleration of the bid deadline but did not inform Borrows that they would not meet it. (Ex. 55.)

**Response to No. 61**:        Disputed.  One Equity informed Simon Borrows that they "didn't think they would be ready to bid by Monday morning." (Ex. 55 at 2195.) Fortress informed Simon Borrows that they were "not sure they can meet this new timetable" and "expressed disappointment that [the acceleration] may disadvantage them." (Ex. 55 at 2194.) Greenhill did not believe that One Equity or Fortress would meet the deadline.  (Bell Tr.195:13-18; 198:23-199:7.) In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d). The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

A-5839

62.     There is no evidence that anyone transmitted to Wormsley any of the information concerning Cerberus received by Greenhill.  The only discussion on price that Wormsley had with any of the bidders on May 18 involved Terra Firma.  On the morning of May 18, Hands called Borrows, the lead banker at Greenhill, suggesting that Wormsley had told Hands that the EMI board would be favorably disposed to a binding offer of £2.40.  (Borrows Dep. at 74:22-75:22.)

**Response to No. 62**:          Disputed.  There is ample evidence that Wormsley obtained information concerning Cerberus.  Throughout the auction process, Mr. Nicoli had provided Mr. Wormsley with updates on the status of potential bidders.  For example, on April 19, 2007, Mr. Wormsley sent an e-mail message to Mr. Klein and Mr. Smith recounting a conversation with Mr. Nicoli in which he learned about the indicative offers made by Cerberus and Fortress.  (*See* Pl. Ex. 105.)  And on May 17, 2007, Mr. Wormsley responded to an e-mail from Mr. Smith regarding the status of the potential bidders by writing: "I have had a long chat to JG and EN. Things are moving."  (*See* Pl. Ex. 67.)

Moreover, at 11:45 a.m. on May 20, just 29 minutes after of the conclusion of the 10:30 a.m. teleconference to discuss the fact that Cerberus would not place a bid on Monday, Mr. Nicoli spoke to Mr. Wormsley for 3 minutes and 14 seconds.  (*See* Pl. Ex. 65 at 1030813.)

Phone records also show that at 2:47 p.m. on May 20, Mr. Nicoli called Mr. Wormsley on his mobile phone, and they spoke again for 7 minutes and 59 seconds.  (*See* Pl. Ex. 66, at 7.)  Mr. Nicoli testified that the only topic he recalls discussing with Mr. Wormsley during that call was the fact that Warner Music was purportedly briefing the press regarding EMI, and whether EMI should complain to the Takeover Panel.  (*See* Nicoli Tr. at 123:20 to 124:8; 173:7-11.)  The record shows, however, that it was Guy Hayward-Cole of Deutsche Bank – not Mr. Wormsley or

32

anyone else at Citi – who was responsible for managing EMI's relationship with the Takeover Panel.  (*See* Gildersleeve Tr. at 66:21 to 67:10; Hayward-Cole Tr. at 72:14 to 74:2.)

 With respect to Friday, May 18, 2007, Mr. Wormsley and Mr. Hands had at least two conversations regarding price, including a phone call that morning in which Mr. Wormsley informed Mr. Hands that Cerberus was going to bid 262p/share for EMI on Monday, May 21, and that Terra Firma needed to bid 265p/share or it would lose the asset.  (Hands Tr. at 162:18 to 163:14.)  Mr. Hands later relayed the contents of this conversation to Tim Pryce, who was then General Counsel of TFCPL.  (Pryce Tr. at 44:21 to 45:6.)  With respect to the conversation with Mr. Borrows, Mr. Hands did not say that Mr. Wormsley suggested a price of 240 pence. (Borrows Tr. 261:24-262:6; Pl. Ex. 133.)  Finally, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not reference Mr. Wormsley in any way.  Nor does the evidence indicate that Mr. Borrows was the lead banker at Greenhill or that there were not other calls regarding price.

  (a) Borrows viewed the Hands call as a "try-on" or a testing of the waters and told Hands that a bid of £2.40 would be inadequate.  (*Id*.)

 **Response to No. 62(a)**: Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate Mr. Hands was told a price of £2.40 would be inadequate, but rather only that Mr. Borrows gave Mr. Hands "short shrift."

63.     Advised of the Hands effort, Wormsley called Hands to rebuke him for representing to Borrows something that Wormsley had not said.  (Wormsley Dep. at 29:15-31:17.)

**Response to No. 63**:          Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  Mr. Wormsley did not testify that Mr. Hands represented anything to Mr. Borrows; Mr. Wormsley could not recollect to whom the alleged statements by Mr. Hands had been made or from whom Mr. Wormsley had learned of the alleged statements.  (Wormsley Tr. at 31:18-20.)

64.     At Hands' direction, the general counsel of Terra Firma, Tim Pryce, sent an email to Borrows and Wormsley, admitting that Wormsley had not suggested a £2.40 offer to Hands and acknowledging that a binding bid at the indicative bid price of £2.65 would "clearly be subject to the competitive landscape at the time that any such offer was forthcoming." (Ex. 59.)

**Response to No. 64**:          Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Mr. Pryce sent the email at Mr. Hands' direction nor does it indicate that Mr. Pryce "admitted" that "Wormsley had not suggested a £2.40 offer to Hands."  Exhibit 59 states only that "it has never been suggested that were your clients to receive a possible offer in the region of £2.40 per share that this might receive their recommendation."

65.     Cerberus' investment bankers informed Borrows on the evening of May 19 that Cerberus had determined not to make a bid on its own, and sought permission to make a joint bid

A-5842

with Fortress.  (Wolf Dep. at 130:5-19; Bell Dep. at 209:19-210:20; Borrows Dep. at 112:23-114:13; Ex. 61.)

**Response to No. 65**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it makes no mention of Fortress.  In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  However, not disputed.

66.      Borrows advised that such permission for a joint bid would have to be obtained from EMI's chairman, Gildersleeve. (Wolf Dep. at 130:5-21.)

**Response to No. 66**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not make any reference to a joint bid or to any statements by Mr. Borrows.   In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The testimony cited by Defendants is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Plaintiff's to prove the truth of the matter asserted.  The testimony does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  However, not disputed.

67.     Cerberus managing director Alex Wolf spoke with Gildersleeve on Sunday, May 20 to request permission for Cerberus to explore a joint bid with Fortress.  (Ex. 62; Wolf Dep. at 206:15-208:3.)

**Response to No. 67**:  Not disputed.


68.     Gildersleeve refused to grant such permission, advising Wolf that he would await developments with respect to bids the next day. (Wolf Dep. at 168:3-170:3,206:20- 207:11; Exs. 62-63.)

**Response to No. 68**:          Objection.  The evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  However, not disputed.


69.     Wolf testified that he never spoke to Wormsley (Wolf Dep. at 171:7- 172:17), and there is no evidence that anyone else at Cerberus conveyed to Wormsley Cerberus's decision not to bid.

**Response to No. 69**:          Not disputed.


70.     Greenhill advised senior management of EMI about the Cerberus decision in a conference call on Sunday morning, May 20.  (Ex. 64; Bell Dep. at 213:3-215:22; Borrows Dep. at 120:16-122:25.)

**Response to No. 70**:          Not disputed.

71.     Six participants to that conference call have testified–Borrows, Bell, Gildersleeve, Nicoli, EMI CFO Martin Stewart, and EMI head of strategy, Mark Barak.  None testified to conveying any information about Cerberus to Wormsley.  (Borrows Dep. at 128:18- 25, 269:20-270:5; Bell Dep. at 324:5-19; Nicoli Dep. at 158:8-14, 192:22-193:3; Stewart Dep. at 141:21-142:13; Barak Dep. at 59:13-61:25; *see also* Gildersleeve Dep. at 184:25-185:12.)

**Response to No. 71**:          Disputed in part.  Nicoli testified only that he does not "believe" that he "told Mr. Wormsley that Cerberus had dropped out or even hinted that Cerberus had dropped out" and has "no recollection" of conveying information about Cerberus to Wormsley.  (Nicoli Dep. 158: 8-14; 192:22-193:3.) Likewise, Barak testified only that he does not "recall" having a conversation with Wormsley regarding Cerberus.  (Barak Dep. at 59:13-61:25.)  In addition, the testimony of Mr. Gildersleeve, which is not relevant to the statement in support of which it is offered, is inadmissible under Rule 402 of the Federal Rules of Evidence.


72.     Greenhill did not invite Wormsley to participate in the call and he did not. (Bell Dep. at 213:3-16; Ex. 64.)

**Response to No. 72**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Mr. Wormsley was not invited to participate in the call, only that he was not a recipient of the email and did not participate in the call.  However, not disputed.


73.     Wormsley has confirmed that he received no information about the Cerberus decision.  (Wormsley Dep. at 274:2-8.)

A-5845

**Response to No. 73**:  Disputed. While Wormsley testified under oath, however, that prior to May 21, 2007, he had no basis to tell anyone whether or not Cerberus would make a formal offer.  (Wormsley Tr. at 106:17-22 ("I don't believe I had the basis to make such an assertion because I don't believe I had any insights into what Cerberus were doing.")), he also appears at points unable to recall what information he may have received over the weekend regarding the Cerberus decision.  (Wormsley Tr. at 106: 5-107:2; 274:2-8)  Matthew Smith also testified that "after the complaint was filed" he and Wormsley discussed Wormsley's knowledge of Cerberus' bidding status over the weekend of May 19-20[th] and that Wormsley "couldn't recall what we knew and David was asking me to try to help color it in for him."  (Smith Tr. (Aug. 9, 2010) 8:25-9:23.)


74.    Deutsche Bank similarly was not informed of the status of the Cerberus developments.  (Hayward-Cole Dep. at 110:25-111: 14.)

**Response to No. 74**:  Disputed as to "similarly."


75.    Hands testified that during each of three conversations between May 18 and approximately midnight on May 20, 2007, Wormsley telephoned him to say that Cerberus intended to bid £2.62 on May 21 and that Terra Firma needed to bid £2.65 to win the auction for EMI.  (Hands Dep. at 266:18-269:4; *see also* id. at 241:2-9,250:22-251:18.)

**Response to No. 75**:         Not disputed.

76.     Hands testified that the first call occurred on Friday, the second on Sunday afternoon and the third shortly before midnight Sunday night.  (*Id.* at 159:10-164:9, 165:24-167:18, 168:19-170:5.)

**<u>Response to No. 76</u>**:          Not disputed.


77.     Hands claims that he relayed the contents of the Friday conversation to Terra Firma general counsel Pryce (*Id.* at 178:12-20); the Sunday afternoon call to the directors present at the GP Board meeting held in Guernsey that day (*id.* at 167:5-168:18); and the Sunday midnight call to Punja.  (*Id.* at 171:4-11.)

**<u>Response to No. 77</u>**:          Not disputed.


(a)     Pryce testified that he received the information from Hands that Friday (Pryce Dep. at 44:15-45:6); and Punja testified that he received information concerning a Cerberus bid from Hands sometime over the weekend of May 19 and 20 but could not confirm that it occurred at midnight on Sunday.  (Punja Dep. at 15:23-17:3, 22:18-25:11.)

**<u>Response to No. 77(a)</u>**:          Disputed in part.  Punja could not confirm that it occurred at midnight on Sunday but did confirm that he had one conversation with Hands over the weekend, "later in the evening," about the topic of whether Cerberus was going to bid and that Mr. Hands said "I talked to David Wormsley.  He tells me that Cerberus will be putting in a bid of 2.62 tomorrow." (Punja Dep. 22:18 to 23:8; Punja Tr. 130:13 to 24.)

39

A-5847

(b)    As to the Sunday afternoon call, one director, Loveridge, testified that Hands advised him that an unidentified source at "Citi" told Hands that Cerberus would bid either £2.62 or £2.63 the next day.  (Loveridge Dep. at 59:12- 61:2, 146:8-147:18.)

**Response to No. 77(b)**:    Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Mr. Hands said "an unidentified source" provided the information, only that Mr. Hands said he spoke to "Citi."  However, not disputed.

(c)    Another director, Stokes, testified that he learned that Hands had "intelligence" that Cerberus would bid somewhere between £2.60 and £2.65, but does not know the source of that information.  (Stokes Dep. at 54:2-55:23, 92:13- 25.)

**Response to No. 77(c)**:    Not disputed as stated.  However, Mr. Stokes also testified that it was not "unreasonable" for the GPs to have "thought the source was from Citi" because Citi were "advising the vendor."  (Stokes Tr. 89:15-22; 92:20-25.)

78.    No contemporaneous documents reflect the alleged statements by Wormsley. (*See* Hands Dep. at 165:4-6, 170:9-13,248:5-17; Loveridge Dep. at 147:4-12; Stokes Dep. at 160:20-165:12; Punja Dep. at 35:13-16; Pryce Dep. at 38:3-5, 45:13-14; *see also*, *e.g*., Exs. 26, 65.)

**Response to No. 78**:    Disputed.  Several contemporaneous documents reflect the alleged statements by Wormsley.  Kirsten Randell's handwritten notes of the May 20, 2007 IAC meeting reflect that a question was asked regarding the presence of "other bidders" and that the answer "one at 262" was given.  (Declaration of Kirsten Randell, Aug. 2010 ("Randell Decl.")

¶¶6-10, Ex. A.)  Draft minutes of the May 21st GP meeting state that "the consortium of Cerberus and Fortress had made an offer of £2.63 per Dice share." (Pl. Ex. 143.)  Michael Slattery's handwritten notes from May 16, 2007 reflect that Terra Firma was receiving "intelligence" from Wormsley.  (Pl. Ex. 161 at 760.)  In addition, the testimony cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that "no" documents exist on this issues, but rather only that the witnesses were not aware of any such documents.  Furthermore, some of the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The exhibits cited (Exs. 26 & 65) are not relevant to the statement in support of which they are offered and are therefore inadmissible under Rule 402 of the Federal Rules of Evidence.

79.    Wormsley unambiguously testified that he had no knowledge that Cerberus had dropped out of the auction for EMI prior to May 21.  (Wormsley Dep. at 273:8-25.)

**Response to No. 79**:  Disputed.  While Wormsley testified under oath, however, that prior to May 21, 2007, he had no basis to tell anyone whether or not Cerberus would make a formal offer.  (Wormsley Tr. at 106:17-22 ("I don't believe I had the basis to make such an assertion because I don't believe I had any insights into what Cerberus were doing.")), he also appears at points unable to recall what information he may have received over the weekend regarding the Cerberus decision.  (Wormsley Tr. at 106: 5-107:2; 274:2-8.)  Matthew Smith also testified that "after the complaint was filed" he and Wormsley discussed Wormsley's knowledge of Cerberus' bidding status over the weekend of May 19-20th and that Wormsley "couldn't recall what we knew and David was asking me to try to help color it in for him."  (Smith Tr. (Aug. 9, 2010) 8:25-9:23.)

80.    The alleged misrepresentations related to the sale of a company headquartered in London that traded publicly on the London Stock Exchange.  (Ex. 77 at 67, 140.)

**Response to No. 80**:    Disputed as the term "headquartered".   The evidence cited by Defendants (Ex. 77) does not state that EMI was "headquartered" in London; the evidence cited states only that "the registered office of EMI, and the business address of each of the Directors of EMI, is at 27 Wrights Lane, London."  Further, Exhibit 77 is not admissible as required by Local Rule 56.1(d).  The document is inadmissible under Rule 1003 of the Federal Rules of Evidence because it is not a true copy of the original and thus, "it would be unfair to admit the duplicate in lieu of the original."

81.    By the morning of May 18, the "Project Dice" team had compiled a comprehensive 159-page analysis for the IAC. (Ex. 51.)

**Response to No. 81**:  Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate when on May 18 the document was compiled, nor does it indicate that it is "comprehensive" or an "analysis."

82.    The May 18 IAC presentation recounted the commercial, financial, and legal due diligence completed by the Terra Firma team and its advisors.  (*Id.*)  This presentation:

**Response to No. 82**:            Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent Defendants' contend that the May 18 presentation recounted only the due diligence completed by the Terra Firma team and its

42

advisors.   The May 18 IAC presentation contains a page outlining the "status" of diligence conducted by various parties.  (Ex. 51 at 23.)

       (a)      Set out a detailed financial analysis of EMI and modeled three cases (base, upside, and downside) for the improved financial performance of EMI under Terra Firma management and control.  (*See* Punja Dep. at 90:25- 94:10.)

**Response to No. 82(a)**:      Disputed as to term "detailed."  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it does not state that the financial analysis was "detailed" and the meaning of the term "detailed" is ambiguous.

       (b)      Summarized for the IAC the team's competitive intelligence on the status of other prospective bidders. (Ex. 51 at 6.)

**Response to No. 82(b)**:      Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it does not state that it is a "summary" of "competitive intelligence on the status of other prospective bidders."

       (c)      Reported a rumor that a "consortium" of Fortress and Cerberus had been rumored to have bid below the £2.60 price being sought by the EMI Board.  (*Id*.)

**Response to No. 82(c)**:      Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not identify the consortium bid information as being based on a "rumor" but rather that this information had been "reported." Moreover, Exhibit 51 does not state that the consortium had been rumored *to have bid* below

£2.60; rather, it states, "It has been reported that Cerberus & Fortress *may* attempt to submit an offer below this the 260p sought by the Board."  (Ex. 51 at 6, emphasis added)

> (d)    Noted that the press had reported on the participation of other private equity bidders as well as WMG.  (*Id.*)

**Response to No. 82(d)**:    Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it only states that One Equity has been "rumoured in the press to be interested in Dice." (Ex. 51 at 6.)  Exhibit 51 does not attribute intelligence regarding the status of WMG, Cerberus, Fortress, Permira or Apollo/KKR to any statements in the press.

> (e)    Recommended moving forward with a binding offer of £2.65, which would likely be "compelling" to the EMI Board and "position" Terra Firma to secure a "recommended offer."  (*Id.*)

**Response to No. 82(e)**:    Disputed.   First, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  The May 18 Presentation to the IAC does not "recommend moving forward with a binding offer" but recommends that the IAC consider recommending a binding bid. (Ex. 51 at 5.)  The  IAC recommended proceeding by way of a scheme of arrangement, not an offer.  (Ex. 69 at 4-5.)

> 83.    The IAC recommended to the Plaintiffs' directors that the GPs submit a binding offer of £2.65. (Ex. 67.)

**Response to No. 83**:          Disputed.  The IAC recommended proceeding by way of a

scheme of arrangement, not an offer.  (Ex. 69 at 4-5.)


84.     In meetings held on the morning on May 18, the GP directors expressly

authorized a binding offer of £2.65 per EMI share. (Exs. 68-69.)

**Response to No. 84**:          Disputed.  The GPs approved a scheme of arrangement, not

an offer, with investment of "up to 2.65 or such lesser sum as may be negotiated."  (Ex. 69, at 3-

7, Ex. 68 at 3-7.)  Moreover, this approval did not require Terra Firma to make a bid at 265p or

any level, the GPs in fact formed a committee on May 18, 2007 "to consider any further matters

required to be considered by the Board in connection with Project Dice."  (Ex. 69 at 9.)


85.     The approval was not contingent on a binding offer by Cerberus or any other

potential bidder.  (*See* Exs. 68-69.)

**Response to No. 85**:          Disputed.  The final approval occurred in the early morning

of May 21, 2007 and was contingent on there being no change in Terra Firma's belief that

Cerberus was bidding 262p on May 21, 2007.  (Loveridge Tr. 153: 24 to 154: 19.)  Moreover,

the letter from Greenhill providing instructions to bidders for making a bid did not allow for

offers being contingent on the submission of bids by other potential offerors. (Pl. Ex. 147.)

Further, to the extent Citi seeks to suggest that Terra Firma's offer to shareholders pursuant to

section 2.5 of the Takeover Code could be conditioned on Cerberus also submitting a bid on May

21, 2007, Citi has not, nor can it, assert that such a conditional bid would comply with the

Takeover Code, including, but not necessarily limited to, sections 2.5 and 13.1 of the Takeover

Code.

45

86.     The May 18 meetings of the IAC and the GPs boards of directors authorizing the £2.65 bid occurred prior to any of the three conversations with Wormsley alleged to comprise the fraud.  (Hands Dep. at 159:10-160:23.)

**Response to No. 86**:          Disputed.  Although Mr. Hands recalled three conversations with Mr. Wormsley, one on Friday May 18th and two on Sunday May 20th, in which Mr. Wormsley expressed that Cerberus would bid 2.62 on Monday, May 21, Michael Slattery's handwritten notes and testimony reflect that Mr. Hands was receiving "intelligence" from Mr. Wormsley prior to Friday May 18th.  (Pl. Ex. 161 at 760.)  Mr. Pryce also testified that Mr. Wormsley was providing information regarding Cerberus' bid as early as Tuesday, May 15th.  (Pryce Tr. 40:12-41:8.)  In addition, at the May 18 meetings the GPs approved a scheme of arrangement, not an offer, with investment of "up to 2.65 or such lesser sum as may be negotiated."  (Ex. 69 at 3-7)

87.     No participant in the IAC or GP board meetings on May 18 has testified that a potential bid by Cerberus was discussed.  (*See* Punja Dep. at 103:25-105:1; Pryce Dep. at 186:10-187:1; Slattery Dep. at 129:2-12; Loveridge Dep. at 130:13-19; van der Spuy Dep. at 123:15-19; Williamson Dep. at 22:5-24:25.)

**Response to No. 87**:          Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it suggests that Ms. Williamson or Mr. Punja were "participants" in the IAC or GP board meetings on May 18 or that that any of the witnesses testified that a potential bid by Cerberus was not discussed.  Pryce testified only that he could not recall what was discussed; Punja testified only that he could not recall attending

46

either meeting; Slattery testified only that he could not recall discussion of Cerberus; Loveridge

testified only that he did not recall discussing Cerberus on May 18th; van der Spuy testified he

did not recall discussion of a Cerberus bid; and Williamson likewise did not recall what was

discussed.  (Punja Dep. at 103:25-105:1; Pryce Dep. at 186:10-187:1; Slattery Dep. at 129:2-12;

Loveridge Dep. at 130:13-19; van der Spuy Dep. at 123:15-19; Williamson Dep. at 22:5-24:25.)


     88.     On May 19, Hands noted that Terra Firma was in a position to "win" the auction

for EMI, and instructed his team to analyze how much additional equity would be required to

increase the bid from the £2.65 authorized by the GPs to £2.85.  (Ex. 26.)

**<u>Response to No. 88</u>**:     Disputed.  The evidence cited does not support Defendants'

contention as required by Local Rule 56.1(d).  First, Mr. Hands did not state that Terra Firma

was in a position to "win" the auction for EMI.  Mr. Hands wrote only "I am convinced one of

these days we will win one of these deals and hopefully this will be it."  (Ex. 26 at 2.)  Second,

the GPs did not "authorize" a bid of £2.65 on May 18, 2007.  The GPs approved a scheme of

arrangement, not an offer, with investment of "up to 2.65 or such lesser sum as may be

negotiated." (Ex. 69 at 2-4; Ex. 68, 3-7.)  Moreover, the GPs approval of investment "up to 2.65

or such lesser sum as may be negotiated" did not require Terra Firma to make a bid at 265p or

any level.  On May 18, 2007 the GPs in fact formed a committee "to consider any further matters

required to be considered by the Board in connection with Project Dice,"  (Ex. 69 at 9), and on

May 19, 2007 Terra Firm arranged to convene a meeting of the GPs on May 20, 2007.  (Ex. 26.)

89.    The Project Dice team prepared a new presentation for a meeting of the IAC on May 20.  That presentation reflected the financial and business case for making a higher bid than £2.65, including up to £2.85.  (Exs. 70-71.)

**Response to No. 89**:          Not disputed.

90.    Although Hands testified that Wormsley informed him of Cerberus's intent to bid £2.62 on May 18, the May 20 presentation discussed a possible bid by a consortium of Cerberus and Fortress at a price below £2.60.  (Ex. 70 at 5.)

**Response to No. 90**:          Disputed as stated.  The May 20 IAC presentation does not discuss a "consortium" of Cerberus and Fortress but states that "Cerberus and Fortress may attempt to submit an offer below the 260p sought by the Board."  (Ex. 70 at 5.)

91.    At the May 20 meeting, the IAC "resolved that a recommendation be made to [Plaintiffs] to approve proceeding with the offer for Dice at 265 pence per share with the ability to increase this offer to 285 pence per share subject to receipt of sufficient funding," a recommendation that the GPs later adopted.  (Ex. 71 at TF1669647; Ex. 121 at TFI771624.)

**Response to No. 91**:          Not disputed.  However, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as the minutes are not signed.  In addition, the GPs did not adopt the recommendation to increase the offer to 285 pence per share until after Terra Firma had submitted its bid on May 21, 2007.  (Ex. 121.)

92.    Nothing in the IAC presentation or the minutes of the IAC meeting indicates anything at all about a Cerberus bid at £2.62.  Nor does any witness recall such a discussion at

the meeting. (Hands Dep. at 233:8-18; Punja Dep. at 103:25-104:21; Pryce Dep. at 53:12-56:9;

van der Spuy Dep. at 123:15-19; Slattery Dep. at 107:22-25.)

**Response to No. 92**:                Disputed.  The handwritten notes of Kirsten Randell, a

Terra Firma Business Assistant,  taken during the May 20, 2007 IAC meeting reflect that during

that meeting there was a query regarding "other bidders" and an answer given: "one at 262."

(Randell Decl.¶¶6-9, Exhibit A.)


93.    The only notes of the meeting, prepared by Terra Firma lawyer Michael

Slattery, recite that "Fortress won't get there" but contain no reference to Cerberus.  (Ex 120 at

TF-SLAT 775.)

**Response to No. 93**:  Disputed.  The evidence cited does not support Defendants'

contention as required by Local Rule 56.1(d) that the only notes of the May 20 IAC meeting are

those of Michael Slattery.  In fact, Michael Slattery's notes are not the only notes of the May 20,

2007 IAC meeting.  Kirsten Randell, Terra Firma Business Assistant, also took notes of the

meeting and those notes reflect that there was a query regarding "other bidders" and an answer

given: "one at 262."  (Randell Decl.¶¶ 6-9, Exhibit A.)


94.    The GPs met in the afternoon of May 20 to review the status of the EMI bid.

(Exs. 72-73.)

**Response to No. 94**:                Not disputed.

95.     At the conclusion of those May 20 GP meetings, Plaintiffs appointed a committee of two directors (which did not include Hands) to meet the next morning to determine the final bid price and execute the papers required to make a binding offer for EMI.  (Exs. 72-73.)

**Response to No. 95**:          Disputed in part.  During the May 20 GP meetings the GPs formed a committee of two directors "for the purposes of considering the final consideration and approval of certain matters and any documents in connection with Project Dice" and to "negotiate and approve any documents… and to do every other act or thing in the name of the Company which the Committee…may deem desirable, necessary or appropriate in connection with the negotiation of the final consideration and approval of certain matters and any documents in connection with Project Dice."  (Ex. 72 at 2; Ex. 73 at 2.)  .  In addition, John Loveridge testified that the authority of the committee to proceed with a bid for EMI was contingent, *inter alia*, on there having been "no significant change in what had happened relative to Cerberus." (Loveridge Tr. 153: 7-23.)

96.     The committee had sole authority to decide whether to proceed with a bid for EMI and at what price. (Stokes Dep. at 142:21-143:14.)

**Response to No. 96**:  Disputed.   The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as the testimony relied upon does not indicate that the committee had "sole" authority.  In addition, John Loveridge testified that the authority of the committee to proceed with a bid for EMI was contingent, *inter alia*, on there having been "no significant change in what had happened relative to Cerberus."  (Loveridge Tr. 153:7-23.)

50

97.    The GP committee met at 7:30 am on Monday, May 21.  It authorized a binding offer to acquire EMI at £2.65 per share, the same price that had been authorized the preceding Friday, May 18.  (Exs.74-75.)

**<u>Response to No. 97</u>**:    Disputed in part.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it characterizes the May 18 meeting as authorizing a binding offer to acquire EMI at £2.65 per share.   The May 18 meetings of the IAC and the GPs approved a scheme, not an offer, with investment of "up to 2.65 or such lesser sum as may be negotiated."  (Exs. 68 at 3-7 & 69 at 3-7.)

98.    Hands played no role in that decision. (*Id*.; Loveridge Dep. at 215:1-15; Stokes Dep. at 195:12-25.)

**<u>Response to No. 98</u>**:    Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  Although Mr. Hands did not participate in the final vote, Mr. Hands did play a "role" in the GPs' decision by virtue, among other things, of his communication, via Mr. Pryce, of the information received from Wormsley regarding the price at which Cerberus planned to bid.  (Pryce Tr. at 57:6-20; 59:21-60:1, 60:12-14; Loveridge Tr. at 153: 7-23.)  In addition, John Loveridge testified that the authority of the committee to proceed with a bid for EMI was contingent, *inter alia*, on there having been "no significant change in what had happened relative to Cerberus."  (Loveridge Tr. 153: 7-23.)

99.    The minutes of the relevant meetings of the GPs on May 18, 20 and 21 make no reference to a Cerberus bid at £2.62. The only contemporaneous notes of any of those meetings, taken by Stokes, do not mention Cerberus.  (Stokes Dep. at 160:20-165:12, 192:2-18.)

**Response to No. 99**:  Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) that the only contemporaneous notes of any of those meetings were taken by Stokes; Mr. Stokes did not testify as to whether other parties may have taken notes of the meeting nor did he testify as to the contents of the minutes from the GP meetings.  Draft minutes of a May 21 GP Committee meeting reference that Mr. Punja reported to the Committee that "the consortium of Cerberus and Fortress had made an offer of £2.63 per Dice share and that TFCPL believed that they were unlikely to increase this offer."  (Pl. Ex. 159 at 7057.)

100.    There is no contemporaneous document supporting the claim that but for the Cerberus £2.62 bid, Plaintiffs would not gone forward with the EMI transaction.  (*See* Hands Dep. at 165:4-6, 170:9-13,248:5-17; Loveridge Dep. at 147:4-12; Stokes Dep. at 160:20-165:12; Punja Dep. at 35:13-16; Pryce Dep. at 38:3-5, 45:13-14; van der Spuy Dep. at 123:15-19; Dolenec Dep. at 98:7-20.)

**Response to No. 100**:        Disputed.  This mischaracterizes Plaintiffs claim.  Plaintiffs' claim is that but for the Cerberus £2.62 bid Plaintiffs would not have bid £2.65 at 9 am on Monday, May 21, 2007.  (Compl. ¶¶ 13-14; Hands Dep. at 240:21-241:9; Stokes Dep. at 54:20-55:8, 162:17-21; Stokes Tr. at 90:8-12, 184:10-16.)  Further, there are contemporaneous documents showing that the belief regarding a competing bid of 262p did prompt Plaintiffs to submit a bid at 265p on Monday May 21, 2007.  (*See* Randell Decl. ¶¶6-9, Ex. A; Pl. Ex. 70.)  In addition, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d); none of the relied upon testimony references whether or not Terra Firma would have gone forward with the EMI bid absent the information about Cerberus.

101.    On May 21, Plaintiffs transmitted the offer of £2.65 to EMI on behalf of the English acquisition vehicle they had created, Maltby Limited, at the 9:00 am deadline set by EMI.  (Ex. 76.)

**Response to No. 101**:        Not disputed.

102.    The offer letter recited that Plaintiffs were "clearly very focused on securing the agreement of the board of the Company" and that they could increase their offer in excess of £2.65 if "the competitive nature of this process" required them to do so.  (*Id.*)

**Response to No. 102**:        Disputed in part.  The offer letter states: "If the competitive nature of this process required us to increase our offer price we believe that we could be in a position to do so."

103.    The offer letter submitted by Plaintiffs on May 21 did not condition the £2.65 bid on a £2.62 bid by Cerberus.  (*Id.*)

**Response to No. 103**:        Not disputed.  However, the letter from Greenhill providing instructions to bidders for making a bid did not provide for offers being made contingent on the submission of bids by other potential offerors.  (Pl. Ex. 147.)

104.    Terra Firma did not condition its binding offer on a competing offer by Cerberus at £2.62 or any other price.  (*Id.*; Hands Dep. at 271:8-13.)

**Response to No. 104**:        Not disputed.  However, to the extent Citi seeks to suggest that Terra Firma's binding offer could be conditioned on Cerberus also submitting a bid on May

21, 2007, Citi has not, nor can it, assert that such a conditional bid would comply with the

Takeover Code, including, but not necessarily limited to, sections 2.5 and 13.1 of the Takeover

Code.


      105.    The only condition to completing the offer was the receipt of acceptance by 90%

of EMI's shareholders. (Compl. ¶ 145; Ex. 77 at 24.)

    **Response to No. 105**:   Disputed in part.  The evidence cited does not support

Defendants' contention as required by Local Rule 56.1(d).  Defendants' Ex. 77 lists nine (9)

conditions to completing the offer, of which the 90% acceptance provision was but one. In

addition, the evidence cited by Defendants (Ex. 77) is not admissible as required by Local Rule

56.1(d).  The document is inadmissible under Rule 1003 of the Federal Rules of Evidence

because it is not a true copy of the original and thus, "it would be unfair to admit the duplicate in

lieu of the original."  FRE 1003.


      106.    No other party made an offer on May 21, and at a meeting held that afternoon, the

EMI Board recommended acceptance of the Terra Firma offer.  (Ex. 78 at 5-6.)

    **Response to No. 106**:      Not disputed as stated.  However, the evidence cited does

not support Defendants' contention as required by Local Rule 56.1(d).  The EMI Board minutes

do not specify that only Terra Firma had made an offer; the minutes state that "the purpose of the

meeting was to consider the proposals of the parties that had expressed an interest in making an

offer for the Company, and if thought fit, approve the terms of the best proposed offer."  (Ex. 78

at 1.)  EMI did not inform the public that the only offer it had received was from Terra Firma and

instead represented that the EMI board had received "a number of proposals from several

different parties." (Pl. Ex. 148.)  In addition, Citi continued to state that Cerberus had bid at the

auction.  On May 21, 2007, Mr. Smith wrote to one of his Citi colleagues, Mark Simonian, that

"We got 2 bids this morning with TF highest so we announced it."  *See* Pl. Ex. 87.  During his

deposition, Mr. Smith was unable to offer any explanation for the source of his incorrect

statement (*e.g.*, whether Mr. Wormsley told him).  (*See* Smith Tr. at 239:21 to 242:16.)  In an e-

mail message to Mr. Hands on September 17, 2007, Paul Simpkin of Citi incorrectly

characterized Cerberus as "a bidder for EMI in May."  (*See* Pl. Ex. 88 at 828029.)  Mr. Simpkin

forwarded the message to Mr. Wormsley and Simon Lindsay.  (*See id.* at 828028.)  Mr. Lindsay

then wrote to Mr. Wormsley:  "The reference to Cerberus at the end is particularly masterful."

*See id.*  Mr. Wormsley replied:  "Lovely isnt it."


        107.    Terra Firma posted Maltby's formal offer to the shareholders of EMI on May 30,

2007. (Ex. 77.)

        **Response to No. 107**:        Not disputed.  However, the evidence cited by Defendants

(Ex. 77) is not admissible as required by Local Rule 56.1(d).  The document is inadmissible

under Rule 1003 of the Federal Rules of Evidence because it is not a true copy of the original

and thus, "it would be unfair to admit the duplicate in lieu of the original."  FRE 1003.


        108.    Plaintiffs' formal offer to the shareholders of EMI contains no mention of a

possible bid by Cerberus.  (Ex. 77 at 140; Loveridge Dep. at 219:19-222:5; Stokes Dep. at 202:7-

13.)

        **Response to No. 108**:        Not disputed.  However, the evidence cited by Defendants

(Ex. 77) is not admissible as required by Local Rule 56.1(d).  The document is inadmissible

under Rule 1003 of the Federal Rules of Evidence because it is not a true copy of the original

and thus, "it would be unfair to admit the duplicate in lieu of the original."  FRE 1003.   In

addition, the evidence cited does not support Defendants' contention as required by Local Rule

56.1(d) insofar as Mr. Loveridge was not testifying as to whether the document included the

information about Cerberus.  Moreover, to the extent Citi seeks to assert that Terra Firma's offer

to shareholders pursuant to section 2.5 of the Takeover Code could be conditioned on Cerberus

also submitting a bid on May 21, 2007, Citi has not, nor can it, assert that such a conditional bid

would comply with the Takeover Code, including, but not necessarily limited to, sections 2.5 and

13.1 of the Takeover Code.


109.    Under the applicable terms of the Takeover Code, Terra Firma had an obligation

to keep its offer open until June 27.  (Takeover Code Rule 31.1 (Ex. 128); Ex. 77 at 1, 24;

Borrows Dep. at 306:10-307:16.)

**Response to No. 109**:        Not disputed.   However, some of the evidence cited by

Defendants is not admissible as required by Local Rule 56.1(d).  Exhibit 77 is inadmissible under

Rule 1003 of the Federal Rules of Evidence because it is not a true copy of the original and thus,

"it would be unfair to admit the duplicate in lieu of the original."  FRE 1003.


110.    Less than 4% of EMI's shareholders accepted by June 27.  (*See* Ex. 79.)

**Response to No. 110**:        Not disputed.


111.    Plaintiffs had no legal duty to extend the June 27 deadline.  (Borrows Dep. at

306:10-307:9; Stokes Dep. at 215:24-216:9; Pryce Dep. at 239:14-240:14; Ex. 122 at 18-20.)

A-5864

**Response to No. 111**:  Plaintiffs object to Defendants statement as calling for a legal conclusion.

112.    With respect to a potential extension of the deadline, Hands stated "[u]nder no circumstances should it be just assumed that we will."  (Ex. 80; Hands Dep. at 307:6-308:4.)

**Response to No. 112**:         Not disputed as stated.  However, Hands testified that the "email was sent to the team to keep the team going" and "get people moving forward."  (Hands Dep. 305:24-306:23.)

113.    The GPs understood that Plaintiffs had the right to "walk away."  (Stokes Dep. at 215:24-216:9.)

**Response to No. 113**:         Disputed.  Plaintiffs did not have the "right" to walk away without considering the impact walking away would have on Terra Firma's ability to meet its obligations to those limited partners.  Moreover, if Terra Firma had allowed the offer to lapse, Terra Firma "would find it very difficult to ever mount a public to private transaction in the UK again."  (*See* Borrows Tr. at 249:10-25.)  Citi too recognized the consequences of the bid lapsing, determining that its "overriding consideration should [sic] to avoid the perception of Citi being principally to blame for the transaction being pulled" and, if the transaction did not close, planned to undertake a public effort to blame Terra Firma, thus shifting to Terra Firma the "reputational, legal and franchise risks" about which Citi's top leadership was concerned.  (*See* Pl. Ex. 91 at 1- 2.)  Further, under the Takeover Code, if Terra Firma allowed the offer to lapse for lack of shareholder acceptance, Terra Firma would have been precluded from re-bidding for 12 months, absent certain exceptions which were not in the control of Terra Firma.  Takeover

Code, Rule 35.1. Finally, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as Mr. Stokes was testifying as to his own knowledge, not that of the "GPs."

114.     Plaintiffs voluntarily agreed to extend the deadline on June 27, and did so again four more times, on July 5, July 13, July 20, and July 28. (Exs. 79, 81-84; Hands Dep. at 323:5-15; Bell Dep. at 298:20-300:21, 305:7-306:3, 337:3-16.) On each of those occasions Plaintiffs had the right to abandon the deal but did not.

**Response to No. 114**:  Disputed.  Plaintiffs did not have the "right" to "abandon the deal" without considering the impact that would have on Terra Firma's ability to meet its obligations to its limited partners.  Moreover, if Terra Firma had allowed the offer to lapse, Terra Firma "would find it very difficult to ever mount a public to private transaction in the UK again." (*See* Borrows Tr. at 249:10-25.) Citi too recognized the consequences of the bid lapsing, determining that its "overriding consideration should [sic] to avoid the perception of Citi being principally to blame for the transaction being pulled" and, if the transaction did not close, planned to undertake a public effort to blame Terra Firma, thus shifting to Terra Firma the "reputational, legal and franchise risks" about which Citi's top leadership was concerned.  (*See* Pl. Ex. 91 at 1- 2.)  Further, under the Takeover Code, if Terra Firma allowed the offer to lapse for lack of shareholder acceptance, Terra Firma would have been precluded from re-bidding for 12 months, absent certain exceptions which were not in the control of Terra Firma.  Takeover Code, Rule 35.1.  Thus, if Plaintiffs had "abandoned the deal" they could have been precluded from bidding again on EMI for twelve months.  Finally, the evidence cited does not support

Defendants' contention as required by Local Rule 56.1(d); neither the testimony nor the exhibits

make any reference as to whether Plaintiffs had a right to "abandon the deal."

115.   Terra Firma reached the 90% shareholder acceptance threshold on August 1, and

closed the offer on August 17, 2007.  (Ex. 85; Ex. 86 at 3.)

**Response to No. 115**:        Not disputed.  However, the evidence cited by Defendants,

in part, is not admissible as required by Local Rule 56.1(d).  Exhibit 85 is inadmissible hearsay

under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the

truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions

to hearsay under Rule 802 of the Federal Rules of Evidence.

116.   Plaintiffs contributed approximately £1.502 billion in equity to acquire EMI and

borrowed the remainder, approximately £2.74 billion, from Citi through financing agreements

entered into on August 13, 2007.  (Ex. 87 at 4775; Exs. 88-90.)

**Response to No. 116**:        Not disputed.   However, the evidence cited by Defendants,

in part, is not admissible as required by Local Rule 56.1(d).  Exhibit 87 is inadmissible under

Rule 1003 of the Federal Rules of Evidence because it is not a true copy of the original and thus,

"it would be unfair to admit the duplicate in lieu of the original."  FRE 1003.

117.   The financial press reported on May 21 that Cerberus did not bid.  (Ex. 91.)

**Response to No. 117**:        Disputed.  The email cited by Defendants is from Andrew

Dowler, an employee of Financial Dynamics.  (Ex. 91.)  Mr. Dowler recounts information he

believes the "FT has."  The Financial Times did not subsequently report that Cerberus was out.

In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted. The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.

118.    Although the Takeover Code permitted Cerberus, or any other entity interested in acquiring EMI, to put in a higher bid (Borrows Dep. at 287:5-288:13), Cerberus did not do so.

**<u>Response to No. 118</u>**:          Not disputed.

119.    On May 22, Cerberus, through one of its financial advisers, raised with Terra Firma the possibility of Cerberus making a preferred investment in Terra Firma's offer.  (Punja Dep. at 135:12-138:7; Ex. 92.)

**<u>Response to No. 119</u>**:          Objection.   The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it does not indicate that Cerberus reached out to Terra Firma through a financial advisor nor that it did so on May 22. However, not disputed.

120.    Terra Firma and Cerberus subsequently met to discuss the terms of such an investment, but never reached agreement.  (Wolf Dep. at 197:20-199:8.)

**<u>Response to No. 120</u>**:          Objection.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as Mr. Wolf did not testify

with respect to any "meeting," limiting his testimony instead to a "phone call." However, not

disputed.

121.    On September 24, 2007, about six weeks after Terra Firma acquired control of
EMI, Terra Firma managing director Stephen Alexander, now the Chairman of the holding
company that controls EMI (*see* Alexander Dep. at 128:10-11), informed Hands by email that
Cerberus had not put in a bid on May 21.  (Ex. 93.)

**Response to No. 121**:        Disputed.  The evidence cited does not support Defendants'
contention as required by Local Rule 56.1(d).  Stephen Alexander did not "inform hands that
Cerberus had not put in a bid" but wrote only that it was his "understanding" that "whilst they
did do due diligence, Cerberus never actually submitted a formal offer for the business."  (Ex.
93.)

        (a)        Hands forwarded Alexander's e-mail to the entire Project Dice team; none
reacted to the report that Cerberus had not bid.  (Ex. 94.)

**Response to No. 121 (a)**:        Disputed.  The evidence cited does not support Defendants'
contention as required by Local Rule 56.1(d).  First, Alexander's email was forwarded by
Christine Vallance, not Guy Hands.  Second, nothing in Ex. 94 supports the contention
that no member of the Project Dice team "reacted" to the forwarded email.  The evidence
is also inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is
offered by Defendants to prove the truth of the matter asserted.  The evidence does not
fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal
Rules of Evidence.

61

A-5869

122.    A few months later, Hands asked Terra Firma's general counsel Tim Pryce to review the history of the EMI auction.  (Hands Dep. at 182:14-183:11, 193:3-15; Pryce Dep. at 223:22-226:2.)

**Response to No. 122**:  Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d); neither Mr. Hands nor Mr. Pryce testified that Mr. Hands asked Mr. Pryce to "review the history of the EMI auction" nor does the testimony indicate that that Mr. Hands' inquiry regarding Cerberus occurred "a few months" after the Alexander email.

123.    Pryce reported definitively to Hands in the second quarter of 2008 that Cerberus had not bid. (Pryce Dep. at 270:21-271:9.)

**Response to No. 123**:  Not disputed.

124.    Hands did not communicate with Wormsley or anyone else at Citi when he received the Alexander e-mail in September of 2007.  (Hands Dep. at 197:5-198:17.)

**Response to No. 124**:   Plaintiffs dispute this statement as vague and ambiguous regarding subjects of communication about which Hands may have communicated with Citi or Wormsley or when those may have occurred.

125.    Hands did not communicate with Wormsley or anyone else at Citi when his general counsel, Pryce, advised him that Cerberus did not bid. (*See* Hands Dep. at 199:18-201:23; *see also* Pryce Dep. at 270:21-271:9.)

**Response to No. 125**:          Disputed.  The evidence cited does not support Defendants'

contention as required by Local Rule 56.1(d) insofar as it does not indicate that Mr. Hands did

not contact persons at Citi other than Mr. Wormsley.  Plaintiffs also dispute this statement as

vague and ambiguous regarding subjects of communication about which Hands may have

communicated with Citi or Wormsley or when those may have occurred.


126.    To the contrary, Hands and Terra Firma continued to work with Citi and

Wormsley.

**Response to No. 126**:          Objection.  Defendants fail to identify any admissible

evidence in support of its contention as required by Local Rule 56.1(d).  Plaintiffs also object on

the grounds that "work with" is vague and ambiguous.  However, not disputed.


(a)      At Hands' request, Wormsley continued to assist in negotiations with Terra Firma

regarding "Project Poker," Terra Firma's proposed sale of EMI Recorded Music to

Warner.  (*See, eg.*, Exs. 95-96)

**Response to No. 126(a)**:          Disputed.  The evidence cited does not support Defendants'

contention as required by Local Rule 56.1(d) regarding the characterization of Project Poker.

Project Poker referred to the proposed purchase of Warner recorded music by EMI.  (*See* Pl. Ex.

149.)


(b)      In April, 2008, Terra Firma suggested that Wormsley speak to the press

about Terra Firma and Hands.  (Ex. 97)

63

**Response to No. 126(b)**:       Disputed.   The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).   The evidence cited states only that Andrew Dowler, a Financial Dynamics employee, suggested that Bloomberg speak to David Wormsley.  In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).


       (c)      In early 2009, Terra Firma retained Citigroup to advise it in connection with Terra Firma's proposed acquisition of Gatwick Airport.  (*See*, *e.g.*, Exs. 98-99)

**Response to No. 126(c)**:     Not disputed.  However, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as neither exhibit indicates Citi was "retained" to advise Terra Firma.  In addition, the evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  Neither Exhibit 98 nor 99 falls within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.


      127.    Hands also maintained a social relationship with Wormsley.  (*See*, *e.g.*, Exs. 100-101.)

**Response to No. 127**:         Disputed; "social relationship" is vague and ambiguous.  The evidence cited shows only that Guy Hands invited David Wormsley to Covent Garden and Terra Firma's Annual Clay Pigeon Shoot.   Exhibit 101 does not support Defendants' contention as required by Local Rule 56.1(d) insofar as it fails to support a finding that Mr. Hands and Mr. Wormsley interacted socially; it indicates only that Mr. Wormsley was invited to a Clay Pigeon

Shoot hosted by Terra Firma, not that he actually attended or that he socialized with Mr. Hands. The evidence cited by Defendants is also not admissible as required by Local Rule 56.1(d). Exhibit 100 is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  Exhibit 100 does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence. The evidence is also inadmissible because neither exhibit has been authenticated as required under Rule 901 of the Federal Rules of Evidence.

128.    Plaintiffs never raised misrepresentations by Wormsley during the extensive discussions between Terra Firma and Citi during 2008 and 2009 about potential restructuring of the Maltby debt, and did not do so before filing the Complaint in this action.  (*See*, *e.g.*, Exs. 107, 109, 111, 123.)

**Response to No. 128**:        Disputed.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) to the extent it does not indicate that discussions were "extensive."  Exhibit 109 is nothing more than a Senior Quarterly Compliance Certificate from Maltby Investments Limited to Citibank International plc and does not mention any restructuring discussions.

129.    Nor did Terra Firma ever inform its co-investors either that the EMI acquisition was based on the belief that Cerberus had bid at £2.62, or that no such bid had been placed.  The CPPIB, which in January 2008 acquired 10% of EMI's indirect parent company, Maltby Capital (Bourbonnais Dep. at 26:16-18), learned about the alleged misrepresentations only when it received a copy of the Complaint.  (*Id.* at 12:10-13:13, 18:7-21:22.)

**Response to No. 129**:          Objection and disputed.  The evidence cited does not

support Defendants' contention as required by Local Rule 56.1(d).  Mr. Bourbonnais testified

only that he did not have "any recollection" of a conversation with Mr. Hands wherein Mr.

Hands told him that he believed at the time of the Terra Firma bid for EMI that Cerberus

intended to bid.  (Bourbonnais Dep. 19:1-7.)  Defendants fail to identify any evidence in support

of its contention that co-investors, other than CPPIB, were not informed about the

misrepresentations.


130.     Upon closing the transaction, Maltby Limited, a vehicle created by Plaintiffs to

undertake the EMI transaction, became the sole shareholder of EMI.  (Chadd Dep. at 36:8-19.)

**Response to No. 130**:  Not disputed.   However, the evidence cited does not support

Defendants' contention as required by Local Rule 56.1(d) insofar as the cited testimony does not

indicate that "Maltby Limited" is the shareholder of EMI, nor does it indicate that Plaintiffs had

created "Maltby Limited" to undertake the EMI transaction.


131.     Maltby Limited has since changed its name, and is now known as Maltby

Acquisitions Limited.  (*Id*. at 25:23-26:6.)

**Response to No. 131**:  Not disputed.


132.     Plaintiffs indirectly own EMI through intermediate holding companies.  (*Id*. at

36:16-40:1; Ex. 102.)

**Response to No. 132**:          Not disputed.

133.    Plaintiffs' only relationship with EMI is as indirect shareholders.  (*Id*. at 38:13-39:3.)

        (a)      Plaintiffs are shareholders in Maltby Capital Limited.

        (b)      Maltby Capital Limited owns Maltby Holdings Limited.

        (c)      Maltby Holdings Limited owns Maltby Investments Limited.

        (d)      Maltby Investments Limited owns Maltby Acquisition Limited.

        (e)      Maltby Acquisition Limited owns EMI.
(Ex. 102.)

**Response to No. 133 (a) - (e)**:  Plaintiffs do not dispute that they are indirect shareholders of EMI and do not dispute the corporate structure as presented in 133 (a) - (e). However, the Exhibit (Ex. 102) cited by Defendants is not admissible as required by Local Rule 56.1(d).  The testimony cited in 133 does not support the statement that "Plaintiffs' only relationship with EMI" is that of indirect shareholder; the witness was only asked whether he was aware of relationships between Plaintiffs and Maltby, he was not asked about the relationship between Plaintiffs and EMI.  (*See* Chadd Dep. at 38:13 to 39:3.)

134.    Plaintiffs are not parties to any financing agreements with Citi; the EMI debt is owed by an indirect subsidiary, Maltby Acquisitions Limited.  (Chadd Dep. at 25:13-22.)

**Response to No. 134**:  Not disputed.   However, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as Mr. Chadd testified only that Maltby Acquisitions Limited is the borrower not that Maltby Acquisitions Limited is an indirect subsidiary nor that Plaintiffs are not "parties" to "any" financing agreements with Citi.

135.    Citi arranged the debt financing for Maltby through its London branch pursuant to financing agreements governed by English law.  (*See* Ex. 88 at ¶ 42; Ex. 89 at ¶ 39; Ex. 90 at ¶ 39.)

**Response to No. 135**:        Disputed in part.  The financing agreements are governed by English law.  However, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as the evidence do not state or indicate that the debt was "arranged" through Citi's London branch.

136.    Citi's London branch manages the Maltby debt.  (*See*, *e.g*., Exs. 107; 111)

**Response to No. 136**:        Disputed; "manages" is vague and ambiguous.  The evidence cited does not support Defendants' contention as required by Local Rule 56.1(d).  The evidence cited shows only that Maltby addressed correspondence to a Citi branch in London not that the debt was "managed" by the London branch.   Other correspondence concerning the debt was sent from a Citi office in New York.  (S*ee, e.g.* Def's Ex. 123).The evidence cited by Defendants is also not admissible as required by Local Rule 56.1(d); none of the exhibits have been authenticated as required under Rule 901 of the Federal Rules of Evidence.

137.    Citigroup and Maltby have long had discussions about Maltby's ability to meet its loan covenants and exchanged proposals for restructuring the debt.  (*See*, *e.g.*, Exs. 103, 107-108, 110-111.)

**Response to No. 137**:  Not disputed.   However, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar as Exhibit 103 (the document bearing the earliest date) makes no mention of Maltby, referencing the Plaintiffs only.  Further,

Defendants' statement is misleading to the extent it suggests that Defendants primarily communicated with Maltby, rather than with Terra Firma, regarding the loan covenants and proposals for restructuring.  (*See, e.g.,* Exs. 114-16, 123; Pl. Exs. 150-152).


138.    On several occasions, Maltby injected cash into EMI, in the form of "equity cures," to avoid failing the covenant tests. (Ex. 112 at 16-17; Ex. 109.)

**Response to No. 138**:         Objection. The evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible because none of the exhibits have been authenticated as required under Rule 901 of the Federal Rules of Evidence. Exhibit 112 also states that, in order to meet covenant tests in 2008 and 2009, Maltby applied funds originally provided by Plaintiffs under the equity cure provisions of the facility agreements and that equity cures required after December 31, 2009 would have to be made using funds provided by Plaintiffs.  (Ex. 112 at 16-17.)   However, not disputed.


139.    Throughout 2009, Terra Firma made various proposals to restructure the Maltby debt but the parties did not reach agreement.  (*See*, *e.g.*, Exs. 114-116.)

**Response to No. 139**:         Not disputed.

140.    Citi had no legal duty to restructure the Maltby debt on the terms proposed by Terra Firma.  (*See* Leoni-Sceti Dep. at 55:22-58:19; Chadd Dep. at 97:13-98:24; Hands Dep. at 343:17-346:20; Williamson Dep. at 71:9-74:11.)

**Response to No. 140**:         Plaintiffs object to Defendants' statement as calling for a legal conclusion and dispute to the extent Citi acted in breach of the obligations of good faith and fair dealing.  The evidence cited does not support Defendants' contention as required by Local

69

Rule 56.1(d) insofar as none of the relied-upon witnesses testified as to whether Citi had a "legal duty" to restructure the "Maltby debt."

141.    Discussions between the parties terminated in November of 2009, a few weeks before Plaintiffs filed this case.  (Ex. 123.)

**Response to No. 141**:    Objection.   The evidence cited by Defendants is not admissible as required by Local Rule 56.1(d).  The evidence is inadmissible hearsay under Rule 802 of the Federal Rules of Evidence, which is offered by Defendants to prove the truth of the matter asserted.  The evidence does not fall within one of the enumerated exceptions to hearsay under Rule 802 of the Federal Rules of Evidence.  However, not disputed.

142.    EMI's financial difficulties and the negotiations between Terra Firma and Citigroup received significant attention from the financial press.  (*See*, *e.g.*, Exs. 113, 117-118.)

**Response to No. 142**:    Objection.  Plaintiffs object to "significant" as vague and ambiguous and to the inclusion of Exhibit 18, an article published by Reuters, not the financial press.

143.    On September 15, 2009, Citigroup's research division issued an analyst report on WMG (the "Analyst Report"), authored by media analyst Jason Bazinet.  (Ex. 119; Compl. ¶ 155.)

**Response to No. 143**:    Not disputed.

144.    In that report, Bazinet opined that EMI's financial difficulties could lead to a possible combination of the recorded music businesses of EMI and WMG.  (Ex. 119 at 3.)

**Response to No. 144**:            Not disputed.

145.    The Analyst Report also commented upon EMI's financial prospects, its relationship with its lender and the prospect of the lender enforcing its rights under the loan agreements.  (Ex. 119.)

**Response to No. 145**:            Disputed as stated.  The Analyst Report commented upon Terra Firma's relationship with its lender, Citigroup, and the prospect of the lender "push[ing] EMI into insolvency."  (Ex. 119 at 7-8; Pl. Ex. 152.)

146.    Bazinet testified that he based his opinions entirely on public sources, such as public filings and press reports.  (Bazinet Dep. at 87:11-87:20, 184:23-185:8.)

**Response to No. 146**:            Disputed as stated.   Mr. Bazinet testified that his calculations of the "synergies" of an EMI/Warner merger (Bazinet Dep. at 87:4-20) and the "factual statements" about EMI (*id.* at 184:23-185:8) were based on public sources, not that his own opinions were based on public sources.

147.    Due to institutional restrictions on the flow of information to the research side of Citi, Bazinet had no non-public knowledge of the relationship between Citi and Terra Firma, and has had no communications at all with any Citi banker involved with Terra Firma or Maltby. (*Id.* at 119:4-25, 183:19-184:22.)

**Response to No. 147**:        Disputed.  An email from Mr. Bazinet to Scott Cohen demonstrates that Bazinet possessed non-public information regarding the relationship between Citi and Terra Firma and this non-public information formed the basis of his opinions.  (Pl. Ex. 113.)  In addition, the evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) because Mr. Bazinet was not asked whether he had non-public information regarding the relationship between Citi and Terra Firma.  Rather, he was asked about conversations with people outside of the research group and whether he or his team had reviewed documents "generated by Citi bankers, or those within other parts of the Citi business."


148.    Bazinet believed the report to be accurate when he issued it. (*Id*. at 185:9-18.)

**Response to No. 148**:  Disputed.  Mr. Bazinet was not asked whether he believed the report was accurate "when he issued it."  Rather, he was asked whether anything in the Analyst Report was either false or inaccurate.  (Bazinet Dep. 185:9-18).  In response to that question Mr. Bazinet responded "no."  *Id.*  Mr. Bazinet also testified, however, that the report contained errors and omitted facts.   (Bazinet Tr. 72:25 to 73:3; 74:2-19; 162:15-18).


149.    The Analyst Report has not affected in any way EMI's or Maltby's contractual or other dealings with Plaintiffs.  No dividend or other payments to Plaintiffs have been interrupted, and the Plaintiffs continue to possess all of their rights as shareholders of Maltby.  (Chadd Dep. at 43:5-44:7, 45:19-47:9.)

**Response to No. 149**:        Disputed.  Defendants' campaign against Terra Firma, which included the publication of the Analyst Report, caused EMI to lose artist revenue and prevented it from completing strategic disposals of non-core assets.  (*See*, *e.g.,* Leoni-Sceti Tr. at

55:17 to 56:15, 60:4 to 62:2, 110:16 to 111:8, 112:5-17, 113:9 to 114:16, 146:18 to 147:6; Chadd

Tr. at 102:16-24, 108:24 to109:19; Williamson Tr. at 45:23 to 46:25, 48:15 to 49:16; Faxon Tr.

at 105:21 to 107:23, 133:16 to 137:2, 138:4-9, 204:2 to 208:21; Pl. Ex. 154; Pl. Ex. 155; Pl. Ex.

156; Pl. Ex. 157; and Pl. Ex. 140.)  EMI's EBITDA declined as a result and EMI failed to satisfy

the loan covenants in March 2010.  (Leoni-Sceti Tr. at 101:13-17, 113:19 to 114:16.)  Plaintiffs

continue to possess their rights as shareholders only by virtue of an equity injection made in June

2010.  (*See* Declaration of John Loveridge, Aug. 27, 2010 ("Loveridge Decl.") ¶¶4-9.)  In

addition, the evidence cited does not support Defendants' contention as required by Local Rule

56.1(d) insofar as the cited testimony makes no mention of EMI and does not speak to the issue

of whether dividends were ever paid or considered to be paid to Plaintiffs.


150.    Plaintiffs' only claimed injury from Citi's alleged tortious conduct is diminution in

value of their holdings in EMI.  (*Id*. at 66:2-69:13.)

**Response to No. 150**:          Disputed.  Citi's interference with Terra Firma's

relationship to EMI caused Terra Firma to invest an additional £66.6 million to retain the

relationship.  (*See* Loveridge Decl. ¶¶4-9.)  In addition, the evidence cited does not support

Defendants' contention as required by Local Rule 56.1(d) insofar as Mr. Chadd did not testify as

to what the Plaintiff's claimed injuries are.  Further, the evidence cited by Defendants is not

admissible as required by Local Rule 56.1(d).  The testimony of Mr. Chadd is not admissible

because his competency to testify to this issue under Rule 602 of the Federal Rules of Evidence

has not been established.

151    The purported injury to EMI that allegedly led to this diminution in Plaintiffs'

investment took place in England, where EMI is headquartered.  (Compl. ¶ 167; Chadd Dep. at

57:21-58:3, 63:10-·66:16; Hands Dep. at 345:12-346:20.)

**Response to No. 151**:        Disputed.  The Analyst Report was authored by Jason

Bazinet in New York and published by a division of Citigroup Global Markets Inc. a New York

corporation headquartered in New York.  (Pl. Ex. 158; Bazinet Tr. 12:14-19)  EMI is global

corporation, active in over 40 countries.  (Pl. Ex. 136.)  The location of the injury to EMI arising

from Defendants' tortious conduct is a legal issue and not a statement of fact.  Further, the

evidence cited does not support Defendants' contention as required by Local Rule 56.1(d) insofar

as it fails to indicate where an injury to EMI occurred.  Also, the referenced testimony by Mr.

Hands is wholly unrelated to the contentions in Paragraph 151.


Dated: August 27, 2010                      Respectfully submitted,
       New York, New York

                                            BOIES, SCHILLER & FLEXNER LLP

                        By:    _____

                                            David Boies
                                            DBoies@BSFLLP.com
                                            333 Main Street
                                            Armonk, New York 10504
                                            Tel.: 914-749-8200

                                            Jonathan Sherman
                                            JSherman@BSFLLP.com
                                            William C. Jackson
                                            WJackson@BSFLLP.com
                                            5301 Wisconsin Avenue, N.W.
                                            Washington, D.C.  20015
                                            Tel.: 202-237-2727

Christopher E. Duffy
CDuffy@BSFLLP.com
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel.: 212-446-2300

*Attorneys for Plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TERRA FIRMA INVESTMENTS (GP) 2 LIMITED    :
(for and on behalf of the six limited partnerships    :
constituting the Terra Firma Capital Partners II Fund),    :   09-CV-10459 (JSR)(AJP)
and TERRA FIRMA INVESTMENTS (GP) 3    :
LIMITED (for and on behalf of Terra Firma Capital    :   **ECF Case**
Partners III, L.P.),    :
          :
          Plaintiffs,    :
          :
          :
          v.    :
          :
CITIGROUP INC., CITIBANK N.A.,    :
CITIGROUP GLOBAL MARKETS LIMITED, and    :
CITIGROUP GLOBAL MARKETS, INC.    :
          :
          Defendants.    :
------------------------------------------------------------X

## <u>DECLARATION OF KIRSTEN RANDELL</u>

Kirsten Randell declares, pursuant to 28 U.S.C. § 1746:

    1.    I submit this declaration based on my personal knowledge in support of Plaintiffs'

opposition to Defendants' motion for summary judgment.

    2.    I am currently employed as Business Assistant for Terra Firma Capital Partners

Limited.  I have been so employed since 20 September 2004.

    3.    As part of my regular course of duties, I was expected to attend, either in person

or via teleconference, meetings of Terra Firma Capital Partners Limited's Investment Advisory

Committee (the "IAC").

    4.    I attended IAC meetings on May 18 and May 20, 2007 in the regular course of my

duties.  On both occasions, I simultaneously recorded what was said by making notations in my

own handwriting during the course of the meeting.

5.      I have been shown a document attached hereto as Exhibit A.  I recognize this

document as a copy of my personal handwritten notes from the May 18 and May 20, 2007 IAC

meetings.

6.      Exhibit A was produced in this matter and bears Bates stamp numbers

TF0001980128 through 1980131.

        a.      Pages TF0001980128 to 1980129 encompass my notes from the IAC

meeting held on Friday, May 18, 2007.

        b.      Pages TF0001980130 to 1980131 encompass my notes from the IAC

meeting held on Sunday, May 20, 2007.

7.      Page TF0001980130 reads as follows:

                                        MS

        IAC Meeting            Sunday 20 May 2007

        Tim, Chris R, Fraser, Cormac, Guy – all dialed in
        Henry
        Tom Q, Stephen A, Michael H, Q – all dialed in
        Mayamiko – dialed in
        Office – Riaz, Michael S, Frankie, Chris B, Stephen S,
        Don, Karen, Trudy
        ~~Karen, Trudy~~        DICE  -
        GH – Article in press today.  Management
        meetings today.

        Pensions and liabilities.  Equity/debt
        Leverage.
        Financing the offer.
        Other bidders – one at 262.

Fvds  - Pension plan – 50m upfront 120 on exit
        Downside      70m upfront then 20/20/20

Bid 265      then    5p higher- high yield on
    DB package is correct? Fvds- Yes
    TFCP II – 398m      TFCP II        1.9bn

2

Market purchases discussed
GH – Securitisation Bridge – I am concerned about
fees.
Publishing at 20 multiple = 2.5bn – so
What are the fees?
F  – £21m + take out fee £8m = £29m for citigroup
GH -  Which package is better? I feel DB??
GP to take decision on  financing package
Up to 285 (but bid letter at 265 with flex to increase)

Business strategy discussed.  S


8.      Page TF0001980131 reads as follows:

Split publishing and recording and run
numbers

Operational Business Plan discussed with
Stephen A.

Bank terms discussed with Karen D.

GH – we will pay an IPO etc but not
willing to pay break fee & then have to pay
someone else to do the transaction.  Soften with
Full commitment
Hedging – right to match 50% maximum
Liability management means taking out
the bond – Euro bonds in October with
fees to be agreed for 425m bonds.
Acq facility  -  ok
securitisation  - DB at 2 years
CB-  Execution of transaction management quite
bullish    CFO & Head of Finance   - every
expectation they could execute 4-6 months.
Cap    - 300 over 400 over

Financing either Citigroup or DB – 2
Commitment letters  -  9am tomorrow morning

Up to 285 p/per share agreed

Tim 2 issues:

   • inducement fee

3

- pay us break fee if they switch or recommend another offer

9.      The notes transcribed here indicate the following with respect to the attendees of the May 20, 2007 IAC meeting:

    a.      The following persons attended the May 20, 2007 IAC meeting via telephone: Tim Pryce, Chris Roling, Fraser Duncan, Cormac O'Haire, Guy Hands, Henry Ford, Tom Quigley, Stephen Alexander, Michael Hedegaard, Quentin Stewart, and Mayamiko Kachingwe.

    b.      The following persons were present with me in the offices of Terra Firma Capital Partners Limited:  Riaz Punja, Michael Slattery, Francois van der Spuy, Chris Barnes, Stephen Seymour, Don Hoang, Karen Dolenec and Trudy Cooke.

10.      The notation "other bidders" is my recordation of a question that was asked during the meeting.  The notation "one at 262" following the hyphen after "other bidders" is my recordation of the answer that was given to the question regarding "other bidders."

11.      Exhibit A was prepared in the regular course of my duties as a Business Assistant for Terra Firma Capital Partners Limited.

12.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed:      August 26, 2010
               London, England

                                    _____
                                    Kirsten Randell

1AC Meeting   Friday 18 May 2007
  Chair
at OGH  — Guy, Fraser, Cormac, Tim, Henry, ChisR
    Q, Phyel, Julie, Marginto
UK — Ron Q, Riaz, Michael S, Trudy, Frankie, Don, Stephen S, Karen, &
    Michael H,
    DLe

  Bruce McKnins - Dresdner


Karen - Financing update   lots of protection
  GH - we need to be covenant light
KD - Leveraf.
    Bid Tactics / Process
  Well gotcha - Results announcement one
  minute before offer announcement .
  GH - Break fee ?


  Frankie — $1.7bn   GH - what is price per share ?
  18p/p share .
  GH - we need to see Trustee .


  Riaz — EMI has 2 businesses . Relatively
stable & good at collecting money . Not good at signing
artists  in US . - Digital
  Co - Explain artist reluctance to release backlog?
RP - They will be and it will be huge .
Western Europe
  GH - Publishing business stable . Recorded news is declining
        my understanding is
  and a digital facing levels of piracy . But even if
  recording collapsed the publishing business is strong ?
  Riaz - Yes . Run off in 2 year time and sell back
                            downside
  catalogue  - should eet higher than case presented .
  GH — Downside run off case & downside - please present .

Base Case pg 20, 53 for assumptions.

Riaz - sell Japan (no competitive advantage) reprioritise
central america. Wind down pop/rock US new release
- keep country/jazz but hold presence in US.
Pg 89 Malcolm H - interviews with industry insiders -
lose cost management culture.
Procurement - internal categories. Savings
CR- Fixed?
MH - 18 month movement. Cost + room.
F? - People vs non people costs?
MH - Not

US strategy? Christina /country /jazz
FD - Bridge to securitisation - structuring. Then
within timeframe,
name - best/fin package (no RP) pg 60.
Structure mirror underlying assets. DB & Citi
Pg 77 - cashflows & royalties - costs in transaction
structure

6 scenarios, sensitivity, xmas tree
up to 205 p/per share
presentation 18 May

Confidential                                    TF0001980129

(MS)

IAC Meeting   Sunday 20 May 2007
Tim, Chris R, Fraser, Cormac, Guy — dialled in
Henry
Tom Q, Stephen A, Michael H, Q — dialled in
office - Riaz, Michael S, Frankie, Chris B, Stephen,
Mayanka - dialled in
Don, Karen, Trudy
Karen + Trudy  DICE —

GH - Article in press today . Management
meeting today .

Pennons and liabilities . Equity / debt .
Leverage .
Financing in offer .
Other bidders — one at 262 .

Fras - Pension plan — 50m upfront  120 a cost
Downside  7m upfront then 30/20/20 .

Bid 265   Then Sp higher — high yield on
DB package is correct . Fras - yes .
TFCP 11 - 398m   TFCP 11  1.9 bn

Market purchases discussed .
GH - Securitisation Bridge — Ian concerned about
fees .
Purchasing at 20 multiple = 2.5bn — so
what are the fees?
F  - £21m + take out fees = £29m for citigroup
GH - Which package is better? I feel DB ??
GP to take decision a financing package .
Up to 285  (but bid letter at 265
with flex to increase)

Business strategy discussed . S

Confidential

TF0001980130

Split publishing and recording and run numbers.

Operational Zns Na discussed with Stephen A.

Bank terms discussed with Karen D.

GH – We will pay on IPO etc but not willing to pay break fee & other have to pay someone else to do the transaction. Softer with Full commitment

Hedging – right to watch 50% maximum

Liability management means taking out the bond – Euro bonds in October, with fees to be agreed for £25m bonds.

Acq facility – OK

Securitisation – DB at 2 years

CB – Execution of transaction management quite bullish   CFO & Head of finance – every expectation they could execute 4-6 months.

Cap – 300 one, 400 one

Financing either Citigroup or DB – 2 commitment letters – 9am tomorrow morning

Up to 285 £/per share agreed.

Tim 2 issues:
• inducement fee
• pay us break fee if they end or recommend another offer

Confidential

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                                    :
TERRA FIRMA INVESTMENTS (GP) 2 LIMITED          :
(for and on behalf of the six limited partnerships       :
constituting the Terra Firma Capital Partners II Fund),  :    09-CV-10459 (JSR)
and TERRA FIRMA INVESTMENTS (GP) 3              :
LIMITED (for and on behalf of Terra Firma Capital      :    **ECF Case**
Partners III, L.P.),                                             :
                                                                    :
        Plaintiffs,                                          :
                                                                    :
            v.                                               :
                                                                    :
CITIGROUP INC., CITIBANK N.A.,                        :
CITIGROUP GLOBAL MARKETS LIMITED, and         :
CITIGROUP GLOBAL MARKETS, INC.                     :
                                                                    :
        Defendants.                                         :
----------------------------------------------------------------------X

## DECLARATION OF JOHN LOVERIDGE

John Loveridge declares, pursuant to 28 U.S.C. § 1746:

1.      I submit this declaration based on my personal knowledge in support of Plaintiffs'

opposition to Defendants' motion for summary judgment.

2.      I am the Chairman of the Boards of Directors of each of the two Plaintiffs in this

action, Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited

(collectively, "Terra Firma").

3.      Terra Firma has a controlling interest in EMI Group Limited ("EMI Group")

through intermediate holding companies Maltby Capital Limited, Maltby Holdings Limited,

Maltby Investments Limited ("Maltby") and Maltby Acquisitions Limited (formerly known as

Maltby Limited).

1

4.      Maltby is party to all three of the facilities agreements (the "Financing Agreements") entered into with Citigroup entities ("Citi") pursuant to which a series of Total Net Debt to Maintenance EBITDA ratios  are tested periodically in respect of rolling one year periods and by reference either to the Recorded Music Division or the Music Publishing Division of the EMI Group ("covenant test").  (*See* Ex. A ¶ 27.2; Ex. B ¶ 24.2; Ex. C ¶ 24.2.)

5.      The Financing Agreements provide that if the required ratios of Total Net Debt to Maintenance EBITDA are not met as at the relevant test dates, there will be an Event of Default unless a notice of intention to equity cure is delivered and the breach of financial covenant is cured by the injection at the Maltby level of additional "equity" funds in an amount which is sufficient to make up the shortfall in Maintenance EBITDA by not later than the 20th  Business Day after delivery of the relevant financial statements (Ex. A ¶ 27.1; Ex. B ¶24.1(a); Ex. C ¶24.1(a)). Upon the occurrence of an Event of Default which is continuing Citi has, amongst other things, the right to demand immediate payment of all amounts outstanding under the Financing Agreements and, if these amounts are not paid, to enforce its security and take control of the EMI Group (Ex. A ¶ 29.3(a); Ex. B ¶26.3(a); Ex. C ¶26.3(a).)

6.      Maltby required a fresh injection of £87.5 million to make up the shortfall in Maintenance EBITDA necessary to cure the breach of the covenant test for the Recorded Music Division for the test period ending March 31, 2010 (the "March Covenant Test").

7.      On June 9, 2010 meetings of the Boards of Directors of Terra Firma were held for the purpose of approving an injection of £66.6 million of equity cure monies into Maltby (indirectly via the intermediate holding companies) which represented Terra Firma's share of Maltby's equity cure requirement.

2

8.      On June 9, 2010 the Boards of Directors of Terra Firma passed the relevant resolutions to make this injection of equity cure monies into Maltby .

9.      On June 10, 2010 Maltby received net proceeds of £87.5 million (which included the £66.6 million injected by Terra Firma). Upon receipt of these monies by Maltby, the breach of  the March Covenant Test was cured.

10.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed:    August 27, 2010
             St. Peter Port, Guernsey

                                        _____
                                              John Loveridge

3

£1,175,000,000

**SENIOR FACILITIES AGREEMENT**
dated 13 August 2007

for MALTBY LIMITED
as the Company

with

CITIBANK INTERNATIONAL PLC
acting as Agent

and

CITIBANK, N.A., LONDON BRANCH
acting as Security Agent

arranged by

CITIGROUP GLOBAL MARKETS LIMITED
as Mandated Lead Arranger

with

CITIBANK, N.A., LONDON BRANCH
acting as Issuing Bank

[London #293508 v19]

i

**TABLE OF CONTENTS**
(continued)

<div align="right">Page</div>

| | | |
|---|---|---:|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | THE FACILITIES | 48 |
| 3. | PURPOSE | 50 |
| 4. | CONDITIONS OF UTILISATION | 51 |
| 5. | UTILISATION OF LOANS | 54 |
| 6. | UTILISATION BY WAY OF LETTERS OF CREDIT | 56 |
| 7. | LETTERS OF CREDIT | 59 |
| 8. | INTENTIONALLY OMITTED | 62 |
| 9. | OPTIONAL CURRENCIES | 62 |
| 10. | ANCILLARY FACILITIES | 62 |
| 11. | REPAYMENT | 69 |
| 12. | ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION | 69 |
| 13. | MANDATORY PREPAYMENT | 71 |
| 14. | RESTRICTIONS | 83 |
| 15. | INTEREST | 85 |
| 16. | INTEREST PERIODS | 86 |
| 17. | CHANGES TO THE CALCULATION OF INTEREST | 87 |
| 18. | FEES | 88 |
| 19. | TAX GROSS UP AND INDEMNITIES | 90 |
| 20. | INCREASED COSTS | 93 |
| 21. | MITIGATION | 94 |
| 22. | OTHER INDEMNITIES | 95 |
| 23. | COSTS AND EXPENSES | 97 |
| 24. | GUARANTEE | 99 |
| 25. | REPRESENTATIONS | 103 |
| 26. | INFORMATION UNDERTAKINGS | 107 |
| 27. | FINANCIAL COVENANTS | 112 |
| 28. | GENERAL UNDERTAKINGS | 120 |
| 29. | EVENTS OF DEFAULT | 136 |
| 30. | CHANGES TO THE LENDERS | 141 |
| 31. | CHANGES TO THE OBLIGORS | 147 |
| 32. | ROLE OF THE AGENT, THE ARRANGER, THE ISSUING BANK AND OTHERS | 150 |
| 33. | CONDUCT OF BUSINESS BY THE FINANCE PARTIES | 155 |
| 34. | SHARING AMONG THE FINANCE PARTIES | 155 |

Confidential

CITI-TF 00701514

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 35. | PAYMENT MECHANICS | 157 |
| 36. | SET-OFF | 159 |
| 37. | NOTICES | 159 |
| 38. | CALCULATIONS AND CERTIFICATES | 160 |
| 39. | PARTIAL INVALIDITY | 161 |
| 40. | REMEDIES AND WAIVERS | 161 |
| 41. | AMENDMENTS AND WAIVERS | 161 |
| 42. | GOVERNING LAW | 165 |
| 43. | ENFORCEMENT | 165 |
| 44. | COUNTERPARTS | 165 |
| SCHEDULE 1 THE ORIGINAL PARTIES | | 166 |
| SCHEDULE 2 CONDITIONS PRECEDENT | | 167 |
| SCHEDULE 3 REQUESTS | | 171 |
| SCHEDULE 4 MANDATORY COST FORMULAE | | 176 |
| SCHEDULE 5 FORM OF TRANSFER AGREEMENT | | 179 |
| SCHEDULE 6 FORM OF ACCESSION LETTERS | | 181 |
| SCHEDULE 7 FORM OF RESIGNATION LETTER | | 183 |
| SCHEDULE 8 FORM OF COMPLIANCE CERTIFICATE | | 184 |
| SCHEDULE 9 LMA FORM OF CONFIDENTIALITY UNDERTAKING | | 185 |
| SCHEDULE 10 TIMETABLES | | 189 |
| SCHEDULE 11 FORM OF LETTER OF CREDIT | | 191 |
| SCHEDULE 12 AGREED SECURITY PRINCIPLES | | 194 |
| SCHEDULE 13 TRANSACTION SECURITY | | 198 |
| SCHEDULE 14 ADDITIONAL ACQUISITION FACILITY COMMITMENT NOTICE | | 199 |
| SCHEDULE 15 PERFECTION REQUIREMENTS | | 201 |

[London #293508 v19]

Confidential

CITI-TF 00701515

A-5897

THIS AGREEMENT is dated 13 August 2007 and made between:

(1)     **MALTBY LIMITED**, a company registered in England and Wales with company registration number 6226803 and registered office at One South Place, London EC2M 2WG (the "**Company**");

(2)     **MALTBY INVESTMENTS LIMITED**, a company incorporated in England and Wales with company registration number 6226775 and registered office at One South Place, London EC2M 2WG (the "**Parent**");

(3)     **CITIGROUP GLOBAL MARKETS LIMITED** as mandated lead arranger (the "**Arranger**");

(4)     **THE FINANCIAL INSTITUTIONS** listed in Part II of Schedule 1 (*The Original Parties*) as lenders (the "**Original Lenders**");

(5)     **CITIBANK INTERNATIONAL PLC** as agent of the Lenders (the "**Agent**");

(6)     **CITIBANK, N.A., LONDON BRANCH** as Security Agent for the Secured Parties (the "**Security Agent**"); and

(7)     **CITIBANK, N.A., LONDON BRANCH** as Issuing Bank.

IT IS AGREED as follows:

SECTION 1
INTERPRETATION

1.      **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**
        In this Agreement:

        "**A&R Arrangement**" means any arrangement (including by way of Joint Venture) with an artist and repertoire executive entered into in the ordinary course of the Group's music business and consistent with past practices.

        "**Acceptable Bank**" means:

        (a)     a bank or financial institution which has a rating for its long-term unsecured and non credit-enhanced debt obligations of A+ or higher by S&P or Fitch or A1 or higher by Moody's or a comparable rating from an internationally recognised credit rating agency; or

        (b)     any other bank or financial institution approved by the Agent.

        "**Accession Letter**" means a document substantially in the form set out in Part I of Schedule 6 (*Form of Accession Letters*) or such other form as may be agreed between the Agent and the Company.

        "**Accounting Principles**" means accounting principles, policies, standards and practices which are generally accepted in the United Kingdom as at the Closing Date and approved or adopted by the Accounting Standards Board including IFRS.

        "**Accounting Reference Date**" means 31 March.

1

Confidential

"**Accounting Reference Period**" means each 12-month period ending on an Accounting Reference Date.

"**Acquisition**" means the acquisition by the Company of the entire issued share capital of the Target which, if such acquisition is contemplated by way of a Scheme, will involve the cancellation of the Target Shares and the issue of the New Shares.

"**Acquisition Costs**" means all fees, costs and expenses, stamp, registration and other Taxes incurred (or required to be paid) by the Company or any other member of the Group in connection with the Acquisition or the Transaction Documents.

"**Acquisition Documents**" means the Scheme Documents or the Offer Documents, as the case may be.

"**Acquisition Facility**" means the term loan facility made available under this Agreement as described in Clause 2.1(a)(ii) (*The Facilities*), as such facility may be increased from time to time pursuant to Clause 2.4 (*Additional Acquisition Facility Commitments*).

"**Acquisition Facility Commitment**" means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Acquisition Facility Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Acquisition Facility Commitment transferred to it under this Agreement or allocated to it pursuant to Clause 2.4 (*Additional Acquisition Facility Commitments*); and

(b)     in relation to any other Lender, the amount in the Base Currency of any Acquisition Facility Commitment transferred to it under this Agreement or allocated to it pursuant to Clause 2.4 (*Additional Acquisition Facility Commitments*),

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Acquisition Facility Loan**" means a loan made or to be made under the Acquisition Facility or the principal amount outstanding for the time being of that loan.

"**Acquisition Loan**" means a Senior B Facility Loan or a Revolving Facility Loan which is to be made for any of the purposes described in Clause 3.1(a) (*Purpose*).

"**Act**" means the Companies Act 1985, as amended.

"**Additional Acquisition Facility Commitment**" means:

(a)     in relation to an entity identified as a Lender in an Additional Acquisition Facility Commitment Notice, the amount set out in such Additional Acquisition Facility Commitment Notice as its Additional Acquisition Facility Commitment and the amount of any other Additional Acquisition Facility Commitment transferred to it under this agreement; or

(b)     in relation to any other Lender, the amount of any Additional Acquisition Facility Commitment transferred to it under this Agreement to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Additional Acquisition Facility Commitment Cancellation Notice**" means a notice delivered by the Company and which cancels all or part of an undrawn Additional Acquisition Facility

2

Confidential

Commitment and specifying which Additional Acquisition Facility Commitment (by reference to the suffix) allocated to increased Commitments is so cancelled.

"**Additional Acquisition Facility Commitment Fee Letter**" means each fee letter entered into between a member of the Group and the Lenders or other banks or financial institutions which commit Additional Acquisition Facility Commitments.

"**Additional Acquisition Facility Commitment Notice**" means a notice substantially in the form set out in Schedule 14 (*Additional Acquisition Facility Commitment Notice*) or such other notice as may be agreed between the Agent and the Company delivered by the Company to the Agent in accordance with Clause 2.4 (*Additional Acquisition Facility Commitments*).

"**Additional Acquisition Funding**" means:

(a)     the net proceeds of any issue and sale of Capital Stock in the Parent, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant acquisition and not used for any other purposes; plus

(b)     the net proceeds of any Shareholder Debt, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant acquisition and not used for any other purposes; plus

(c)     up to 75 per cent. of the amount of Retained Excess Cashflow; plus

(d)     the amount of any drawings under the Acquisition Facility provided that no more than £100 million of the drawings under the Acquisition Facility will be available for the acquisition of a business carrying on the activities of the Recorded Music Division.

"**Additional Assets**" means:

(a)     any property or assets used or to be used by any member of the Group or otherwise useful in a Related Business;

(b)     the Capital Stock of a person that is engaged in a Related Business and becomes a member of the Group as a result of the acquisition of such Capital Stock by another member of the Group; or

(c)     Capital Stock constituting a minority interest in any person that at such time is a member of the Group.

"**Additional Borrower**" means each person who becomes a Borrower in accordance with Clause 31.2 (*Additional Borrowers*).

"**Additional Cost Rate**" has the meaning given to it in Schedule 4 (*Mandatory Cost Formulae*).

"**Additional Guarantor**" means a person which becomes a Guarantor in accordance with Clause 31.3 (*Additional Guarantors*).

"**Additional Obligor**" means an Additional Borrower or an Additional Guarantor.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Agent's Spot Rate of Exchange**" means the Agent's spot rate of exchange (as certified by the Agent to the Company at the relevant time) for the purchase of the relevant currency with the

3

A-5900

relevant Base Currency in the London foreign exchange market at or about 11:00 a.m. on a particular day or such other rate as the Agent shall reasonably determine and agree with the Obligors' Agent.

"**Agreed Security Principles**" means the principles set out in Schedule 12 (*Agreed Security Principles*).

"**Ancillary Commencement Date**" means, in relation to an Ancillary Facility, the date on which that Ancillary Facility is first made available, which date shall be a Business Day within the Availability Period for the Revolving Facility.

"**Ancillary Commitment**" means, in relation to an Ancillary Lender and an Ancillary Facility, the maximum Base Currency Amount which that Ancillary Lender has agreed (whether or not subject to satisfaction of conditions precedent and whether or not utilised) to make available from time to time under an Ancillary Facility and which has been authorised as such under Clause 10 (*Ancillary Facilities*), to the extent that amount is not cancelled or reduced under this Agreement or the Ancillary Documents relating to that Ancillary Facility.

"**Ancillary Document**" means each document relating to or evidencing the terms of an Ancillary Facility.

"**Ancillary Facility**" means any ancillary facility made available by an Ancillary Lender in accordance with Clause 10 (*Ancillary Facilities*).

"**Ancillary Lender**" means each Lender (or Affiliate of a Lender) which makes available an Ancillary Facility in accordance with Clause 10 (*Ancillary Facilities*).

"**Ancillary Outstandings**" means, at any time, in relation to an Ancillary Lender and an Ancillary Facility the aggregate of the equivalents (as calculated by that Ancillary Lender, acting reasonably) in the Base Currency of the following amounts outstanding under that Ancillary Facility then in force:

(a)     the principal amount under each overdraft facility and on-demand short term loan facility (net of any credit balances on any account of any Borrower of an Ancillary Facility with the Ancillary Lender making available that Ancillary Facility to the extent that such credit balance is freely available to be set off by that Ancillary Lender against liabilities owed to it by that Borrower under that Ancillary Facility);

(b)     the face amount of each guarantee, bond and letter of credit under that Ancillary Facility (as the same may be reduced in accordance with its terms and only to the extent that cash cover has not been provided with respect thereto); and

(c)     the amount fairly representing the aggregate exposure (excluding interest and similar charges) of that Ancillary Lender under each other type of accommodation provided under that Ancillary Facility,

in each case as determined by such Ancillary Lender in accordance with the relevant Ancillary Document, acting reasonably in accordance with its normal banking practice but excluding any interest, fees and similar charges.

"**Auditors**" means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche (or their Affiliates) or such other firm approved in advance by the Majority Lenders (such approval not to be unreasonably withheld or delayed).

[London #293508 v19]

4

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means:

(a)   in relation to the Senior B Facility, the period from and including the Signing Date to and including the earlier of:

    (i)   the last day of the Certain Funds Period; and

    (ii)   the date on which the Offer lapses or is withdrawn or, if the Acquisition is intended to be completed as a Scheme, the date on which the Scheme lapses or is withdrawn;

(b)   in relation to the Acquisition Facility, the period commencing on the day after the first Utilisation Date in respect of the Senior B Facility to and including the fourth anniversary of the Closing Date;

(c)   in relation to the Revolving Facility, the period from and including the Signing Date to and including the date falling one Month prior to the Final Maturity Date applicable to the Revolving Facility; and

(d)   in relation to any increase in the Acquisition Facility resulting from the delivery of an Additional Acquisition Facility Commitment Notice, the period from the date falling five (5) Business Days after delivery of the Additional Acquisition Facility Commitment Notice to the earlier of the date specified in such notice and the fourth anniversary of the Closing Date.

"**Available Commitment**" means, in relation to a Facility, a Lender's Commitment under that Facility minus (subject to Clause 10.8 (*Affiliates of Lenders as Ancillary Lenders*) and as set out below):

(a)   the Base Currency Amount of its participation in any outstanding Utilisations under that Facility; and

(b)   in relation to any proposed Utilisation, the Base Currency Amount of its participation in any other Utilisations that are due to be made under that Facility on or before the proposed Utilisation Date and, in the case of the Revolving Facility only, the Base Currency Amount of its Ancillary Commitment in relation to any new Ancillary Facility that is due to be made available on or before the proposed Utilisation Date.

For the purposes of calculating a Lender's Available Commitment in relation to any proposed Utilisation under the Revolving Facility only, that Lender's participation in any Revolving Facility Utilisations that are due to be repaid or prepaid on or before the proposed Utilisation Date shall not be deducted from that Lender's Commitment under that Facility.

"**Available Facility**" means, in relation to a Facility, the aggregate for the time being of each Lender's Available Commitment in respect of that Facility.

"**Average Life**" means, as of the date of determination, with respect to any Financial Indebtedness, the quotient obtained by dividing (x) the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Financial Indebtedness multiplied by the amount of such payment by (y) the sum of all such payments.

5

CITI-TF 00701520

"**Base Case Model**" means the section of the financial model delivered to the Arranger on or before the Closing Date and described as the 'bank case model', including profit and loss and cashflow projections in agreed form relating to the Group (for these purposes assuming completion of the Acquisition).

"**Base Currency**" means Sterling or, in the case of the Senior B Facility, euro.

"**Base Currency Amount**" means (subject to the provisions of Clause 6.7 (*Revaluation of Letters of Credit*)):

(a)   in relation to a Utilisation, the amount specified in the Utilisation Request delivered by or on behalf of a Borrower for that Utilisation (or, if the amount requested is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Spot Rate of Exchange on the date which is three (3) Business Days before the Utilisation Date or, if later, on the date the Agent receives the Utilisation Request in accordance with the terms of this Agreement) and, in the case of a Letter of Credit, as revalued under Clause 6.7 (*Revaluation of Letters of Credit*) at six-Monthly intervals; and

(b)   in relation to an Ancillary Commitment, the amount specified as such in the notice delivered to the Agent by the Company pursuant to Clause 10.2 (*Availability*) (or, if the amount specified is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Spot Rate of Exchange on the date which is three (3) Business Days before the Ancillary Commencement Date for that Ancillary Facility or, if later, the date the Agent receives the notice of the Ancillary Commitment in accordance with the terms of this Agreement),

as adjusted to reflect any repayment, prepayment, consolidation or division of a Utilisation, or (as the case may be) cancellation or reduction of an Ancillary Commitment.

"**Basel II Costs**" has the meaning given to it in paragraph (b)(iv) of Clause 20.1 (*Increased Costs*).

"**Borrower**" means the Original Borrower or an Additional Borrower.

"**Break Costs**" means the amount (if any) by which:

(a)   the interest (excluding the Margin and the Mandatory Costs) which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)   the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Budget**" means:

(a)   in relation to the period from the Signing Date to 31 March 2008, the Base Case Model to be delivered to the Agent pursuant to Clause 4.1 (*Initial conditions precedent*); and

[London #293508 v19]

6

A-5903

(b)     in relation to any other period, any budget delivered by the Parent to the Agent in respect of that period pursuant to Clause 26.4 (*Budget*).

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and:

(a)     (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; or

(b)     (in relation to any date for payment or purchase of euro) any TARGET Day.

"**Business Separation**" means the legal, contractual and operational separation of the Music Publishing Division from the rest of the business carried on by the Group in order to achieve the Permitted Securitisation within the time period contemplated in the Securitisation Bridge Facility Agreement.

"**Capital Lease Obligation**" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with the Accounting Principles. The amount of Financial Indebtedness represented by such obligation shall be the capitalised amount of such obligation determined in accordance with the Accounting Principles and the maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Capital Stock**" of any person means any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"**Cash Equivalent Investments**" means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank;

(b)     any investment in marketable debt obligations issued or guaranteed by the government of the United States, the United Kingdom, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

          (i)     for which a recognised trading market exists;

          (ii)    issued by an issuer incorporated in the United States, the United Kingdom, any member state of the European Economic Area or any Participating Member State;

          (iii)   which matures within one year after the relevant date of calculation; and

          (iv)    which has a credit rating of either A-1 or higher by S&P or Fitch or P-1 or higher by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

7

Confidential

(d)     any investment accessible within 30 days in money market funds which (i) have a credit rating of either A-1 or higher by S&P or Fitch or P-1 or higher by Moody's and (ii) invest substantially all their assets in securities of the types described in sub-paragraphs (a) to (c) above; or

(e)     any other debt security approved by the Majority Lenders,

in each case, to which any member of the Group is beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than one arising under the Transaction Security Documents).

"**Centre of Main Interests**" means the "centre of main interests" for the purposes of Council Regulation (EC) No. 1346/2000 of 29 May 2000.

"**Certain Funds Period**" means the period from and including the Signing Date to and including the earlier of:

(a)     the date falling 270 days after the date of the Commitment Letter;

(b)     the date falling 15 days after the Closing Date;

(c)     if the Acquisition proceeds by way of an Offer, the date on which the Offer lapses or is withdrawn; and

(d)     if the Acquisition proceeds by way of the Scheme, the date on which the Scheme lapses, is withdrawn or is rejected by the court.

"**Change of Control**" has the meaning given to it in Clause 13.1 *(Change of Control, Listing and Sale).*

"**Charged Property**" means all of the assets of the Obligors over which from time to time Security is, or is expressed to be, created pursuant to any Transaction Security Document.

"**Clean-Up Date**" means the date falling 120 days after the Unconditional Date.

"**Clean-Up Period**" means the period commencing on the Unconditional Date and ending on the Clean-Up Date.

"**Closing Date**" means:

(a)     (in the case of the Scheme) the date falling no later than 14 days from the Effective Date, being the date upon which the consideration for the Acquisition is to be paid; or

(b)     (in the case of an Offer) the date on which the Company has paid for the shares of the Target tendered as at the Unconditional Date and, as a consequence, the Target becomes a subsidiary of the Company.

"**Commitment**" means a Senior B Facility Commitment, Acquisition Facility Commitment or Revolving Facility Commitment.

"**Commitment Letter**" means the commitment letter dated 21 May 2007 from the Arranger to the Company relating to the Facilities (as amended, supplemented or restated from time to time).

Confidential

CITI-TF 00701523

"**Compliance Certificate**" means a certificate substantially in the form set out in Schedule 8 (*Form of Compliance Certificate*) or such other form as may be agreed between the Agent and the Company.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in the form set out in Schedule 9 (LMA Form of Confidentiality Undertaking) or in a recommended form of the LMA from time to time or in any other form agreed between the Company and the Agent.

"**Consolidated Cash and Cash Equivalents**" has a meaning given to it in Clause 27.1 (*Financial definitions*).

"**Consolidated Incurrence EBITDA**" for any period, means the sum of Consolidated Profit for that period, plus the following (to the extent deducted in calculating such Consolidated Profit), without duplication:

(a)    all income or corporate tax expense of the Group;

(b)    Consolidated Interest Expense plus any capitalised expense and any non-cash interest (including interest on Shareholder Debt);

(c)    depreciation and amortisation expense of the Group;

(d)    the amount of any minority interest expense deducted in calculating Consolidated Profit;

(e)    Management Fees;

(f)    unrealized non-cash gains (losses) resulting from foreign currency balance sheet adjustments and unrealized gains (losses) relating to interest rate Treasury Transactions in each case required by the Accounting Principles;

(g)    all other non-cash charges of the Group (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period);

(h)    Acquisition Costs and any fees, expenses, charges or other costs relating to equity or debt financings, investments or other acquisitions (including amounts paid in connection with the acquisition or retention of one or more individuals comprising part of the management team retained to manage the acquired business, provided that such payments are made at the time of such acquisition and are consistent with the customary practice in the industry at the time of such acquisition), whether or not successful, or the non-cash amortisation thereof; and

(i)    any non-recurring redundancy and restructuring charge not otherwise included in the preceding clauses (g) and (h),

in each case for such period. Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation, amortisation, exchange gains and losses and non-cash charges and restructuring charge of, a member of the Group shall be added to Consolidated Profit to compute Consolidated Incurrence EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net profit or loss of such member of the Group was included in calculating Consolidated Profit.

"**Consolidated Interest Expense**" means, for any period, the total interest expense of the Group for such period, plus, to the extent not included in such total interest expense, and to the extent incurred by a member of the Group, without duplication:

9

CITI-TF 00701524

A-5906

(a)      interest expense attributable to Capital Lease Obligations;

(b)      amortisation of debt discount;

(c)      capitalised interest (but excluding such interest on Shareholder Debt);

(d)      non-cash interest expense (but excluding such interest in relation to Shareholder Debt);

(e)      commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(f)      net payments pursuant to Treasury Transactions but excluding realized and unrealized foreign exchange gains and losses with respect to Treasury Transactions and unrealized gains and losses associated with interest rate Treasury Transactions in each case in accordance with the Accounting Principles;

(g)      dividends accrued in respect of Disqualified Stock of the Parent or in respect of Preferred Stock of any member of the Group, in either case held by persons other than a member of the Group (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Parent); and

(h)      interest accruing on any Financial Indebtedness of any other person to the extent such Financial Indebtedness is guaranteed by (or secured by the assets of) a member of the Group.

**"Consolidated Leverage Debt"** means the sum of the aggregate outstanding Financial Indebtedness of the Group, less Consolidated Cash and Cash Equivalents, as of the relevant date of calculation on a consolidated basis in accordance with the Accounting Principles.

**"Consolidated Operating Cashflow"** has the meaning given to that term in Clause 27.1 (*Financial definitions*).

**"Consolidated Profit"** means for any period, the profit (loss) from continuing operations of the Group on a consolidated basis for such period; provided, however, that there shall not be included in such Consolidated Profit:

(a)      any net profit (or loss) of any person (other than the Parent) if such person is not a Subsidiary, except that subject to the exclusion contained in paragraph (c) below, the Parent's equity in the net profit of any such person for such period shall be included in such Consolidated Profit up to the aggregate amount of cash or Cash Equivalent Investments actually distributed by such person during such period to the Parent or a member of the Group as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a member of the Group, to the limitations contained in paragraph (b) below);

(b)      any net profit (or loss) of any member of the Group (other than a member of the Group which has granted an unconditional unlimited guarantee of the obligations of the other Obligors under the Finance Documents) to the extent the declaration or payment of dividends or making of distributions to the Parent by that member of the Group of its net profit is not at the date of determination permitted, directly or indirectly by any restriction or encumbrance, unless such restriction or encumbrance constitutes a Permitted Restriction; provided, however, that:

[London #293508 v19]

Confidential

CITI-TF 00701525

(i)     Consolidated Profit of the relevant member of the Group for any relevant period shall be increased by the amount of dividends, distributions or other payments (other than extensions of credit) actually paid in cash or Cash Equivalent Investments (or converted during such period into cash or Cash Equivalent Investments) to such member of the Group or (subject to the limitations of this paragraph (b)) a Subsidiary of such member of the Group; and

(ii)    the Parent's equity in a net loss of any such member of the Group for such period shall be included in determining such Consolidated Profit;

(iii)   any net after-tax gain (or loss) realized upon (A) the sale or other disposition of any assets of the Issuer, its consolidated Subsidiaries or any other Person (including pursuant to any sale-and-leaseback arrangement) which is not sold or otherwise disposed of in the ordinary course of business or (B) the sale or other disposition of any Capital Stock of any Person;

(c)     the non-cash impact of capitalised interest on Shareholder Debt;

(d)     any net after-tax extraordinary gain or loss;

(e)     any non-cash compensation expense realized for grants of performance shares, stock options, restricted stock or other rights to officers, directors and employees of a member of the Group, provided that such shares, options, stock or other rights can be redeemed at the option of the holder only for shares of the Parent (other than Disqualified Stock);

(f)     the cumulative effect of any change in Accounting Principles after the Signing Date;

(g)     any net after tax gains (loss) from any write-off or forgiveness of Financial Indebtedness;

(h)     the net profit of any person acquired in a pooling of interests transaction shall not be included for any period prior to the date of such acquisition; and

(i)     the effect of any non-cash items resulting from:

(i)     any amortisation, write-up, write-down or write-off of assets (including deferred financing costs) in connection with any past or future acquisition, merger, consolidation or similar transaction; or

(ii)    any unusual, exceptional or non-recurring gains, losses or charges.

"**Constitutional Documents**" means the memorandum and articles of association of the Company, the Parent and Holdco together with the certificate of incorporation of the Company, the Parent and Holdco and certificates on change of name (if any) of the Company, the Parent and Holdco.

"**Court Order**" means an order of the High Court of Justice in England and Wales sanctioning the Scheme under Section 425 of the Act.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 29 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default, save and except that, if by reason of the express provisions of any Finance Document, a matter, circumstance or thing would not be an Event of Default unless a materiality threshold is exceeded then the occurrence of any such matter, circumstance or thing shall not be a Default unless and until that materiality threshold is exceeded.

Confidential

CITI-TF 00701526

"**Deferred Purchase Price of a Permitted Investment**" means in respect of a Permitted Investment, the portion of the purchase price the payment of which is deferred pursuant to the terms of the acquisition documentation in the form of a contractual adjustment to the purchase price the amount of which is not certain at the time of completion of such Permitted Investment. For the avoidance of doubt a Deferred Purchase Price of a Permitted Investment shall exclude any deferral of all or part of the purchase price in the nature of a loan from the seller or as a method of raising finance or of financing all or part of the purchase price with the exception of a deferral not exceeding fifteen (15) Business Days between the date on which the amount of a Deferred Purchase Price of a Permitted Investment becomes certain and the date on which it is actually paid.

"**Delegate**" means any delegate, agent or attorney appointed by the Security Agent.

"**Designated Gross Amount**" has the meaning given to that term in Clause 10.2 (*Availability*).

"**Designated Net Amount**" has the meaning given to that term in Clause 10.2 (*Availability*).

"**Disinterested Director**" means, with respect to any transaction or series of related transactions, a member of the relevant company's board of directors who does not have any material direct or indirect financial interest in or with respect to such transaction or series of related transactions or is not an Affiliate, or an officer, director or employee of any person who has any direct or indirect financial interest in or with respect to such transaction or series of related transactions.

"**Disqualified Stock**" means, with respect to any person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(a)     matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable at the option of the holder for Financial Indebtedness or Disqualified Stock; or

(c)     is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part,

in each case on or prior to the first anniversary of the Final Maturity Date for any Facility provided that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the first anniversary of the Final Maturity Date for any Facility shall not constitute Disqualified Stock if:

(i)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favourable to the holders of such Capital Stock than the terms of the Finance Documents; and

(ii)     any such requirement only becomes operative after compliance with the terms of the Finance Documents.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount

12

Confidential

CITI-TF 00701527

of such Disqualified Stock is to be determined pursuant to this Agreement provided that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such person.

**"Documentary Conditions"** means the documents listed paragraphs 1, 2(a) to (d) (inclusive), 3 and 4(a) to (e) (inclusive) in Part I of Schedule 2 (*Conditions Precedent*).

**"Effective Date"** means the date on which the Court Order (or an office copy of the Court Order) is filed with the Registrar of Companies, as required by Section 425 of the Act.

**"Environmental Claim"** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

**"Environmental Law"** means any applicable law or regulation which relates to:

(a)     the pollution or protection of the environment;

(b)     harm to or the protection of human health;

(c)     the conditions of the workplace relating to health and safety; or

(d)     any emission or substance capable of causing harm to any living organism or the environment.

**"Environmental Permits"** means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Target Group conducted on or from the properties owned or used by any member of the Target Group.

**"Equity Interests"** of any person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interest in (however designated) the equity of such person, including any Preferred Stock, any limited or general partnership interest and any limited liability company membership interest, and including (other than for the purposes of the definition of 'Financial Indebtedness' and any other definitions in this Clause 1.1 or in Clause 27.1 (*Financial definitions*)), any non-cash interest bearing debt securities (but, for the avoidance of doubt excluding any cash interest bearing debt securities convertible into such equity).

**"EURIBOR"** means, in relation to any Loan in euro:

(a)     the applicable Screen Rate; or

(b)     (if no Screen Rate is available for the Interest Period of that Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request quoted by the Reference Banks to leading banks in the European interbank market,

as of the Specified Time on the Quotation Day for the offering of deposits in euro for a period comparable to the Interest Period of the relevant Loan.

**"Event of Default"** means any event or circumstance specified as such in Clause 29 (*Events of Default*).

**"Excess Cashflow"** has the meaning given to that term in Clause 27.1 (*Financial definitions*).

13

CITI-TF 00701528

"**Excess Takeout Proceeds**" has the meaning given to that term in Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*).

"**Excluded Proceeds**" has the meaning given to that term in Clause 13.4 (*Excluded Proceeds and Excess Takeout Proceeds*).

"**Existing Financial Indebtedness**" means the Financial Indebtedness of the Target Group which is existing on the Unconditional Date or, as the case may be, on the Effective Date.

"**Expiry Date**" means, for a Letter of Credit, the last day of its Term.

"**Facility**" means a Term Facility or the Revolving Facility.

"**Facility Office**" means the office notified by a Lender or the Issuing Bank to the Agent in writing on or before the date it becomes a Lender or the Issuing Bank (or, following that date, by not less than five (5) Business Days' written notice) as the office through which it will perform its obligations under this Agreement.

"**Fee Letter**" means:

(a)   any letter or letters (as the same may be amended from time to time) between, as the case may be, the Arranger and the Company or the Agent and the Company, setting out any of the fees referred to in Clause 18 (*Fees*) or any other fees payable by the Company in connection with the Facilities and/or this Agreement; and

(b)   any other agreement setting out fees referred to in Clause 7.2 (*Fees payable in respect of Letters of Credit*) or Clause 10.9 (*Interest, Commitment Commission and Fees on Ancillary Facilities*).

"**Final Maturity Date**" means in relation to:

(a)   the Senior B Facility, the date falling eight years after the first Financial Quarter Ending Date to occur after the Closing Date;

(b)   the Acquisition Facility, the date falling seven years after the first Financial Quarter Ending Date to occur after the Closing Date; and

(c)   the Revolving Facility, the date falling seven years after the first Financial Quarter Ending Date to occur after the Closing Date,

or, in each case, if such day would not be a Business Day, the first succeeding Business Day, unless such day would fall in the next Month, in which case the immediately preceding Business Day.

"**Finance Document**" means:

(a)   this Agreement;

(b)   any Accession Letter;

(c)   any Additional Acquisition Facility Commitment Fee Letter;

(d)   any Additional Acquisition Facility Commitment Notice;

[London #293508 v19]

(e)     any Ancillary Document;

(f)     the Commitment Letter;

(g)     any Fee Letter;

(h)     any Hedging Agreement;

(i)     the Intercreditor Agreement;

(j)     any Resignation Letter;

(k)     any Transaction Security Document; and

(l)     any other document designated as a "Finance Document" by the Agent and the Company.

"**Finance Party**" means the Agent, the Arranger, the Security Agent, a Lender, the Issuing Bank, a Hedge Counterparty or any Ancillary Lender.

"**Financial Indebtedness**" means, with respect to any person on any date of determination (without duplication):

(a)     the principal in respect of:

    (i)     indebtedness of such person for money borrowed; and

    (ii)     indebtedness evidenced by notes, debentures, bonds (other than performance bonds issued by a member of the Group in relation to the obligations of another member of the Group) or other similar instruments for the payment of which such person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)     all Capital Lease Obligations of such person;

(c)     all obligations of such person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such person and all obligations of such person under any title retention agreement, in each case that are due more than 12 months after the date on which such property is acquired (but excluding trade accounts payable arising in the ordinary course of business);

(d)     all obligations of such person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in paragraphs (a) to (c) above) entered into in the ordinary course of business of such person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

(e)     the amount of all obligations of such person with respect to the redemption, repayment, liquidation or other repurchase of any Disqualified Stock of such person or, with respect to any Subsidiary of such person, any Preferred Stock or if less (or if such Capital Stock has no fixed price), to the involuntary redemption, repayment or other purchase price thereof calculated in accordance with the terms of such Capital Stock if such Capital Stock were redeemed, repaid or repurchased on such date of determination, or if

Confidential

CITI-TF 00701530

determined by the value of such Capital Stock, the fair market value of such Capital Stock as determined in good faith by the Board of Directors (but in each case, excluding accrual of dividends);

(f)    all obligations of the type referred to in paragraphs (a) to (e) above of other persons and all dividends of other persons for the payment of which, in either case, such person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise;

(g)    all obligations of the type referred to in paragraphs (a) to (f) above of other persons secured by any Security on any property or asset of such person (whether or not such obligation is assumed by such person), the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured;

(h)    to the extent not otherwise included in this definition, Treasury Transactions of such person (the amount of any such Financial Indebtedness to be equal at any time to the notional amount of such Treasury Transactions); and

(i)    any liability of any member of the Group to the trustees of any pension fund to the extent such obligations are secured by any Security on any property or asset of such person, the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured,

if and to the extent that any of the foregoing Financial Indebtedness (other than the Financial Indebtedness described in paragraphs (b), (d), (f), (h) or (i) or to the extent relating to any such clause) would appear as a liability on the balance sheet (excluding footnotes thereto) of the relevant person prepared in accordance with the Accounting Principles.

Notwithstanding the foregoing the term "Financial Indebtedness" will exclude contingent obligations incurred in the ordinary course of business. In addition, in connection with the purchase by a member of the Group of any business, the term "Financial Indebtedness" will exclude post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing provided that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 90 days thereafter.

The amount of Financial Indebtedness of any person at any date shall be the outstanding balance at such date of all unconditional obligations as described above provided that in the case of Financial Indebtedness sold at a discount, the amount of such Financial Indebtedness at any time will be the accreted value thereof at such time.

"Financial Quarter" has the meaning given to that term in Clause 27.1 (*Financial definitions*).

"Financial Quarter Ending Date " means each of 31 March, 30 June, 30 September and 31 December in each year.

"Financial Year" has the meaning given to that term in Clause 27.1 (*Financial definitions*).

"First Utilisation Date" means the date on which the first Utilisation is made under this Agreement.

"Fitch" means Fitch Ratings Ltd, or any successor to its rating business.

16

"**Funds Flow Statement**" means a funds flow statement detailing the proposed movement of funds on the Closing Date in agreed form.

"**Group**" means the Parent and its Subsidiaries from time to time including, for the avoidance of doubt, the Target and its Subsidiaries from the Effective Date or the Unconditional Date, as the case may be, but following the Separation Date, only the Parent and members of the Group which are in the Recorded Music Division shall be included in the definition of "Group" and not any Securitisation Entities and, for the avoidance of doubt, any Subsidiary of the Parent that is the Holding Company of any Securitisation Entity and not a Subsidiary of any Securitisation Entity will be a member of the Group both before and after the Separation Date.

"**Group Business**" means the business carried on by the Group as at the Closing Date.

"**Group Structure Chart**" means the group structure chart delivered to the Agent on or before the Closing Date.

"**Guarantor**" means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 31.5 (*Resignation of a Guarantor*).

"**Hedge Counterparty**" means a provider of hedging arrangements which has entered into those arrangements in accordance with this Agreement and which has become a party to the Intercreditor Agreement as a Hedge Counterparty in accordance with the provisions of the Intercreditor Agreement. For the avoidance of doubt this expression includes any person who was, at the time of entry into those hedging arrangements, but is no longer, a Lender or an Affiliate of a Lender.

"**Hedging Agreement**" means any master agreement, confirmation, schedule or other agreement in the agreed form entered into or to be entered into by the Company and a Hedge Counterparty for the purpose of hedging interest rate liabilities in relation to the Term Facilities in accordance with Clause 28.9 (*Treasury Transactions*).

"**Hedging Letter**" means a letter between the Agent and the Parent in the agreed form dated on or before the Signing Date (and executed by the Parent) describing the hedging arrangements to be entered into in respect of the interest rate liabilities of the Borrowers.

"**Holdco**" means Maltby Holdings Limited, a company registered in England and Wales with company registration number 6226830 and registered office at One South Place, London EC2M 2WG.

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary.

"**Implementation Agreement**" means an agreement between the Company and the Target in respect of the implementation of the Scheme.

"**Incur**" means issue, assume, guarantee, incur or otherwise become liable for (and, in the case of Financial Indebtedness for which interest is capitalised, accrued or accreted, the amount of such Financial Indebtedness Incurred shall at all times be the then-current accreted value or shall include all then capitalised or accrued interest) provided that any Financial Indebtedness of a person existing at the time such person becomes a member of the Group (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such person at the time it becomes a member of the Group.

17

Confidential

A-5914

"Incurrence Leverage Ratio" means, as of any date of determination, the ratio of:

(a)    Consolidated Leverage Debt at such date;

       to

(b)    the aggregate amount of Consolidated Incurrence EBITDA for the period of the most recent four consecutive Financial Quarters ending prior to the date of such determination for which internal consolidated financial statements of the Parent are available provided that for the purposes of calculating Consolidated Incurrence EBITDA for such period, if, as of such date of determination:

       (i)    if any member of the Group has Incurred any Financial Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Incurrence Leverage Ratio is an Incurrence of Financial Indebtedness, or both, Consolidated Incurrence EBITDA for such period shall be calculated after giving effect on a pro forma basis to such Financial Indebtedness as if such Financial Indebtedness had been Incurred on the first day of such period;

       (ii)    if any member of the Group has repaid, repurchased, defeased or otherwise discharged any Financial Indebtedness since the beginning of such period or if any Financial Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Financial Indebtedness Incurred under the Revolving Facility unless such Financial Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Incurrence Leverage Ratio, Consolidated Incurrence EBITDA for such period shall be calculated on a pro forma basis as if such discharge had occurred on the first day of such period and as if the relevant member of the Group had not earned the interest income actually earned during such period in respect of cash or Cash Equivalent Investments used to repay, repurchase, defease or otherwise discharge such Financial Indebtedness;

       (iii)    if since the beginning of such period a member of the Group shall have disposed of any asset or business, Consolidated Incurrence EBITDA for such period shall be reduced by an amount equal to Consolidated Incurrence EBITDA (if positive) directly attributable to the assets or business which are the subject of such disposal for such period, or increased by an amount equal to Consolidated Incurrence EBITDA (if negative), directly attributable thereto for such period;

       (iv)    if since the beginning of such period any member of the Group (by merger or otherwise) shall have made a Permitted Investment, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, Consolidated Incurrence EBITDA for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Financial Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

       (v)    if since the beginning of such period any person (that subsequently became a member of the Group or was merged with or into a member of the Group since the beginning of such period) shall have disposed of any asset or business, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by a member of the Group during such period, Consolidated Incurrence EBITDA for such period shall be

18

[London #293508 v19]

Confidential

calculated after giving pro forma effect thereto as if such disposal, Investment or acquisition had occurred on the first day of such period.

For the purposes of this definition, whenever 'pro forma effect' is to be given to an acquisition of assets and the amount of profit or earnings relating thereto, the pro forma calculations shall give effect to all cost savings and synergies reasonably expected to be realized from such acquisition within the first 12 months after closing such acquisition and shall be determined in good faith by a responsible financial or accounting officer. If any Financial Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Financial Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Agreement applicable to such Financial Indebtedness if such Hedging Agreement has a remaining term in excess of 12 months). For the purposes of this definition, whenever pro forma effect is to be given to any Financial Indebtedness Incurred pursuant to a revolving credit facility, the amount outstanding on the date of such calculation will be computed based on (1) the average daily balance of such Financial Indebtedness during such four Financial Quarters or such shorter period for which such facility was outstanding or (2) if such facility was created after the end of such four Financial Quarters, the average daily balance of such Financial Indebtedness during the period from the date of creation of such facility to the date of such calculation.

"**Independent Financial Advisor**" means an investment banking firm, accounting firm or appraisal firm of international standing provided that such firm is not an Affiliate of a member of the Group.

"**Information Memorandum**" means the document in the form approved by the Company concerning the Original Obligors and the Target Group which is to be prepared in relation to this transaction and distributed by the Arranger prior to the Syndication Date in connection with the syndication of the Facilities.

"**Information Package**" means the Reports and the Base Case Model.

"**Intellectual Property**" means:

(a)     any patents, trade marks, service marks, designs, business names, copyrights, design rights, moral rights, inventions, know-how and other intellectual property rights and interests, whether registered or unregistered; and

(b)     the benefit of all applications and rights to use such assets of each member of the Group.

"**Intercreditor Agreement**" means the intercreditor agreement made or to be made between, among others, the Obligors, the Agent, the Security Agent, the Issuing Bank, the Lenders, the Ancillary Lenders and the Hedge Counterparties, in the agreed form.

"**Interest Period**" means, in relation to a Loan, each period determined in accordance with Clause 16 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 15.3 (*Default interest*).

"**Interim Facilities Agreement**" means the £2,850,000,000 interim facilities agreement dated 21 May 2007 entered into between, inter alios, the Company and the Arranger.

"**Interim Facility**" means each facility made available under the Interim Facilities Agreement.

"**Investment Documents**" means the Constitutional Documents and any agreement or instruments relating to the Shareholder Debt.

Confidential

CITI-TF 00701534

"**Investments**" means, with respect to any person, all investments by such person in other persons (including Affiliates) in the form of loans or other extension of credit (including guarantees or grants of Security and similar arrangements but excluding any loans or extensions of credit represented by a bank deposit other than a time deposit and the endorsement of negotiable instruments and documents in the ordinary course of business), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, artists, writers, composers or suppliers and commissions in each case, made in the ordinary course of business), purchases or other acquisitions for consideration of Financial Indebtedness, Capital Stock or other securities issued by any other person and investments that are required by Accounting Principles to be classified on the balance sheet (excluding the footnotes) of the relevant person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. The acquisition by a member of the Group of a person that holds an Investment in a third person will be deemed to be an Investment by the relevant member of the Group in such third person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its fair market value at the time the Investment is made and without giving effect to subsequent changes in value.

"**Investors**" mean the Original Investors and their or any subsequent successors or permitted assigns or transferees and management of the Group (in their capacity as investors) including any vehicle holding the Equity Interests of management.

"**Issuing Bank**" means each Lender identified above as an issuing bank and any other Lender which has notified the Agent that it has agreed to the Company's request to be an Issuing Bank pursuant to the terms of this Agreement (and if more than one Lender has so agreed, such Lenders shall be referred to whether acting individually or together as the "Issuing Bank") provided that, in respect of a Letter of Credit issued or to be issued pursuant to the terms of this Agreement, the "Issuing Bank" shall be the Issuing Bank which has issued or agreed to issue that Letter of Credit.

"**Issuing Bank Accession Agreement**" means a document substantially in the form set out in Part II of Schedule 6 (*Form of Accession Letters*) or such other form as may be agreed between the Agent and the Company.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity that is not a member of the Group but shall not include arrangements formed in the ordinary course of the Group's business and consistent with past practices for the exploitation of individual album projects entered into in the ordinary course between a member of the Group and a third party owner or licensor of sound recordings or musical compositions, or in respect of which the only contribution to the arrangement by a member of the Group is of rights to exploit sound recordings or music compositions, and such arrangement does not constitute an entity with separate legal personality.

"**KPMG Financial Due Diligence Report**" means the Limited Scope Due Diligence Report dated 16 May 2007 prepared by KMPG and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

"**Legal Due Diligence Report**" means the legal due diligence report dated 21 May 2007 prepared by Weil, Gotshal & Manges relating to the Target Group and addressed to, and/or capable of being relied upon by, the Arranger, the Agent and the other Secured Parties.

"**Legal Reservations**" means:

(a)    the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court, the principle of reasonableness and fairness, the limitation of

[London #293508 v19]

Confidential

enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors;

(b)     the time barring of claims under applicable limitation laws and defences of acquiescence, set-off or counterclaim (including the English Limitation Acts) and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of UK stamp duty may be void;

(c)     the principle that in certain circumstances security granted by way of fixed charge may be recharacterised as a floating charge or that security purported to be constituted as an assignment may be recharacterised as a charge;

(d)     the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void;

(e)     the principle that an English court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant;

(f)     the principle that the creation or purported creation of security over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which security has purportedly been created;

(g)     similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(h)     any other general principles which are set out as qualifications or reservations (however described) as to matters of law in the legal opinions delivered to a Finance Party under the Finance Documents.

"**LEK Report**" means the Summary Music Market Outlook Report dated 15 May 2007 prepared by LEK and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

"**Lender**" means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party in accordance with Clause 30 (*Changes to the Lenders*),

which in each case has not ceased to be a Party in accordance with the terms of this Agreement.

"**Letter of Credit**" means:

(a)     a letter of credit substantially in the form set out in Schedule 11 (*Form of Letter of Credit*) or in any other form requested by a Borrower and agreed with the Issuing Bank (such consent not to be unreasonably withheld or delayed); or

(b)     any other guarantee, bond, indemnity, counter-indemnity, letter of credit, documentary or other credit or any other instrument of suretyship or payment, issued, undertaken or made by the Issuing Bank under the Revolving Facility in a form requested by a Borrower and agreed with the Issuing Bank (such consent not to be unreasonably withheld or delayed).

Confidential

CITI-TF 00701536

A-5918

"**Letter of Credit Proportion**" means, in relation to a Lender in respect of any Letter of Credit, the proportion (expressed as a percentage) borne by that Lender's Available Commitment to the Available Facility in relation to the Revolving Facility immediately prior to the issue of that Letter of Credit, adjusted to reflect any assignment or transfer under this Agreement to or by that Lender.

"**LIBOR**" means, in relation to any Loan:

(a)    the applicable Screen Rate; or

(b)    (if no Screen Rate is available for the currency or Interest Period of that Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request quoted by the Reference Banks to leading banks in the London interbank market,

as of the Specified Time on the Quotation Day for the offering of deposits in the currency of that Loan and for a period comparable to the Interest Period for that Loan.

"**LMA**" means the Loan Market Association.

"**Loan**" means a Term Loan or a Revolving Facility Loan.

"**Maintenance EBITDA**" has the meaning given to that term in Clause 27.1 (*Financial definitions*).

"**Major Event of Default**" means an event or circumstance set out in Clauses 29.1 (*Failure to pay*), 29.2 (*Incorrect representation*) (but only in so far is it relates to a Major Representation), 29.3 (*Breach of agreement*) (but only in so far as it relates to a Major Undertaking), 29.6 (*Insolvency*) to 29.8 (*Insolvency proceedings*) (inclusive) and 29.9 (*Invalidity and unlawful performance*).

"**Major Representations**" means a representation as set out in Clauses 25.1 (*Status*) to 25.3 (*Obligations binding*) (inclusive), 25.5 (*Non-conflict*), 25.13 (*Authorisations*) and 25.23 (*Insolvency*) and, for these purposes only, any reference to 'Finance Documents' in paragraph (a) of Clauses 25.3 (*Obligations binding*) and 25.5 (*Non-conflict*) will only refer to those Finance Documents listed in Part I of Schedule 2 (*Conditions Precedent*).

"**Major Undertaking**" means an undertaking set out in Clause 28.15 (*Scheme undertakings*), 28.16 (*Offer undertakings*), 28.17 (*Ownership*), 28.19 (*Financial Indebtedness*), 28.20 (*Share issuance and sales*), 28.21 (*Security*), 28.22 (*Restricted Payments*), 28.23 (*Asset disposals*) and 28.25 (*Merger and consolidation*).

"**Majority Lenders**" means, at any time, a Lender or Lenders whose Available Commitments and participations in the Utilisations then outstanding aggregate more than $66^2/_3$ per cent of the Available Facilities and all the Utilisations then outstanding.

"**Management Fees**" means:

(a)    annual fees payable for the performance of monitoring services by Terra Firma Capital Partners Limited, the Investors or any of their respective Affiliates for the Group, provided that such fees shall not, in the aggregate, exceed £2.5 million per annum (or its equivalent); and

(b)    customary fees and related expenses for the performance of transaction, management, consulting, financial or other advisory services or underwriting, placement or other

[London #293508 v19]

22

CITI-TF 00701537

investment banking activities, including in connection with mergers, acquisitions, dispositions or joint ventures, by Terra Firma Capital Partners Limited, the Investors or any of their respective Affiliates for the Group.

"Mandatory Cost" means the percentage rate per annum calculated by the Agent in accordance with Schedule 4 (*Mandatory Cost Formulae*) and, for the avoidance of doubt, excluding any Basel II Costs.

"Margin" means:

(a)     in relation to any Senior B Facility Loan 2.75 per cent. per annum;

(b)     in relation to any Acquisition Facility Loan 2.25 per cent. per annum;

(c)     in relation to any Revolving Facility Loan 2.25 per cent. per annum;

(d)     in relation to any Unpaid Sum relating or referable to a Facility, the rate per annum specified above for that Facility; and

(e)     in relation to any other Unpaid Sum, the highest rate specified above,

subject, in each case, to adjustment in accordance with Clause 15.5 (*Adjustment of Margin*) and provided that in the case of Acquisition Facility Loans which are made pursuant to an Additional Acquisition Facility Commitment Notice, the Margins for such Loans shall be those set out in the relevant Additional Acquisition Facility Commitment Notice, as adjusted in accordance with the provisions of the Additional Acquisition Facility Commitment Notice.

"Material Adverse Effect" means any event or circumstance (after taking account of any warranty, indemnity or other right of recourse against any third party with respect to the relevant event or circumstance including, without limitation, coverage by insurances and rights of recovery, where "**taking account of**" includes consideration of all relevant facts and circumstances, including the timing and likelihood of successful recovery and potential counterclaims and other related claims against any member of the Group with respect to the relevant event or circumstance) which:

(a)     is materially adverse to:

(i)     the business, assets (as a whole) or financial condition of the Group (taken as a whole); and

(ii)     the ability of any Obligor (taking into account the guarantee obligations of other members of the Group) to perform any of its payment obligations under any Finance Document; or

(b)     subject to the Legal Reservations and any Perfection Requirements, affects the validity or the enforceability of any of the Finance Documents in a manner which would be materially adverse to the interests of the Lenders under the Finance Documents taken as a whole, and if capable of remedy, is not remedied within 20 Business Days of the Company becoming aware of the issue or being given notice of the issue by the Agent.

"Material Intellectual Property" has the meaning given to that term in Clause 25.19 (*Intellectual Property*).

"Material Subsidiary" means, at any time:

Confidential

CITI-TF 00701538

(a)    the Target; and

(b)    a Subsidiary of the Target which has gross assets or Maintenance EBITDA representing 5 per cent. or more of the gross assets or Maintenance EBITDA of the Group, calculated on a consolidated basis.

If a Subsidiary has been acquired since the date as at which the latest audited consolidated financial statements of the Group were prepared, the financial statements shall be deemed to be adjusted on a pro forma basis in order to take into account the acquisition of that Subsidiary (that adjustment being certified by the finance director of the Company as representing an accurate reflection of the revised gross assets or Maintenance EBITDA).

"**McKinsey Report**" means the Assessment of Potential Sources of Major Upside Report dated 14 May 2007 and the Cost Improvement Potential Report dated 1 March 2007 and updated for cost information in the vendor due diligence on 15 May 2007 each prepared by McKinsey and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

"**Mezzanine Facility**" means the loan facility made available to the Parent pursuant to the Mezzanine Facility Agreement.

"**Mezzanine Facility Agreement**" means the £155,000,000 mezzanine facility agreement dated on or around the Signing Date between (amongst others) the Parent, Citigroup Global Markets Limited as arranger and certain parties named therein as lenders.

"**Mezzanine Loan**" means a loan made under the Mezzanine Facility.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)    (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)    if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)    if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period. "**Monthly**" shall be construed accordingly.

"**Moody's**" means Moody's Investors Service Limited or any successor to its ratings business.

"**Music Publishing Division**" means the businesses in the Group that are involved in acquiring, protecting, administering, publishing and exploiting rights in musical compositions and artists and any other related or incidental activities (including, without limitation, any related or incidental activities being carried on at the date of this Agreement).

"**Music Publishing Division Acquisition Loan**" means an Acquisition Facility Loan which is used to fund a Permitted Investment in relation to the Music Publishing Division.

24

[London #293508 v19]

"**Music Publishing Division Excess Cashflow**" has the meaning given to that term in Clause 27.1 (*Financial definitions*)

"**New Shares**" means the new ordinary shares in the capital of the Target and issued by the Target to the Company pursuant to the Scheme.

"**Obligor**" means a Borrower or a Guarantor.

"**Obligors' Agent**" means the Company, appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to Clause 2.3 (*Obligors' Agent*).

"**Offer**" means the offer for all of the shares in Target made by the Company to the shareholders of Target on the terms contained in the Offer Document (as such offer may from time to time be amended, extended, revised, renewed or waived in accordance with this Agreement).

"**Offer Document**" means any offer document which may be issued by the Company to the shareholders of Target in respect of the Offer.

"**Offer Press Release**" means the formal press announcement of the Offer issued, or to be issued, by or on behalf of the Company which must be approved in advance by the Arranger (acting reasonably).

"**Officers' Certificate**" means a certificate, in the form and substance satisfactory to the Security Agent (acting reasonably), signed by two officers of the relevant company or, in the event there are less than two officers, one officer.

"**OID Amount**" means an amount equal to the OID Percentage of the Senior B Facility Loans advanced under the Senior B Facility on the Closing Date.

"**OID Percentage**" means 3 per cent.

"**Opinion of Counsel**" means a written opinion in form and substance satisfactory to the Security Agent, from legal counsel who is acceptable to the Security Agent (acting reasonably).

"**Optional Currency**" means a currency (other than the Base Currency) which complies with the conditions set out in Clause 4.4 (*Conditions relating to Optional Currencies*).

"**Original Borrower**" means the Company.

"**Original Financial Statements**" means in relation to the Target, its consolidated audited financial statements for its Financial Year ended 31 March 2007.

"**Original Guarantor**" means the Company or the Parent.

"**Original Investors**" has the meaning given to it in Clause 13.1 (*Change of Control*).

"**Original Obligor**" means an Original Borrower or an Original Guarantor.

"**Participating Member State**" means any member state of the European Communities that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

"**Perfection Requirements**" means the making or the procuring of the appropriate registrations, filings, endorsements, notarisation, stampings and/or notifications of the Transaction Security

25

A-5922

Documents and/or the Security created thereunder, including those described in Schedule 15 (*Perfection Requirements*).

"**Permitted Affiliate Transaction**" means:

(a)     any Restricted Payment permitted to be made pursuant to Clause 28.22 (*Restricted Payments*) and any Permitted Payment or Permitted Investment;

(b)     the issuance of Capital Stock pursuant to, or for the purpose of the funding of, employment arrangements, stock options and stock ownership plans provided that the terms thereof are or have been previously approved by the relevant member of the Group's board of directors;

(c)     transactions between or among Obligors for fair market value;

(d)     reasonable and customary fees and compensation paid to, and indemnities provided on behalf of (and similar arrangements with) directors, officers, employees and consultants of any member of the Group (whether performed directly or indirectly and including through any person owned or controlled by any of such directors, officers, employees or consultants) provided that the board of directors of the relevant member of the Group has approved the terms thereof in good faith and deemed the services theretofore or thereafter to be performed for such compensation or payments to be fair consideration therefore;

(e)     the performance of obligations of any member of the Group under the terms of agreements to which such member of the Group is party which are existing as at the Signing Date and any amendment, modification or supplement thereto provided that:

(A)     following such amendment, modification or supplement the terms of any such agreement so amended, modified or supplemented are not materially more disadvantageous to the Finance Parties and any member of the Group than the original agreement as in effect on the Signing Date;

(B)     such amendment or modification is on a basis substantially similar to that which would be conducted in an arm's-length transaction with third parties who are not Affiliates; and

(C)     in the case of any transaction (other than a transaction in the ordinary course relating to the supply of recorded music soundcarriers, such as compact disc or relating to the licensing between members of the Group of the right to sell and exploit recorded music repertoire) which involves an amount in excess of £10 million or its equivalent, the relevant member of the Group will deliver a resolution of its board of directors resolving with the participation of a majority of the Disinterested Directors that such transaction complies with paragraph (B) above;

(f)     the issuance of Shareholder Debt;

(g)     transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business, which are fair to the Group as a whole in the reasonable determination of the board of directors of the relevant member of the Group or are on terms no less favourable than those that could reasonably have been obtained at such time from an unaffiliated party; and

26

Confidential

CITI-TF 00701541

(h)   the issuance of Capital Stock to Affiliates of the Company which is not otherwise prohibited under the terms of the Finance Documents.

**"Permitted Disposal"** means any Disposal on arm's length terms:

(a)   of assets in exchange for other assets which are, in the reasonable opinion of the person effecting the exchange, useful and productive in the business of the Group;

(b)   of cash or Cash Equivalent Investments for cash or in exchange for other Cash Equivalent Investments;

(c)   arising as a result of any Permitted Encumbrance;

(d)   of assets which are seized, expropriated or acquired by compulsory purchase by or by the order of any central or local government authority;

(e)   which is a Permitted Investment or a Restricted Payment that is permitted to be made pursuant to Clause 28.22 (*Restricted Payments*);

(f)   in connection with a Permitted Sale and Leaseback; and

(g)   to which the Majority Lenders have provided their written consent.

**"Permitted Encumbrance"** means:

(a)   title retention arrangements arising in the ordinary course of business;

(b)   any Security arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by any member of the Group;

(c)   Security created pursuant to the Transaction Security Documents;

(d)   any Security created by a member of the Group which is not an Obligor securing Permitted Indebtedness incurred by such person, or created by an Obligor securing Permitted Indebtedness incurred that:

(i)   any such Security does not relate to any asset subject to the Security granted pursuant to the Transaction Security Documents, and is not extended to cover any Financial Indebtedness other than Permitted Indebtedness; and

(ii)   the amount of Financial Indebtedness secured thereby is not increased other than pursuant to the instrument under which such Security was created;

(e)   Security constituted by any Capitalised Lease Obligations, finance leases or hire purchase agreements permitted pursuant to the terms of this Agreement;

(f)   Security for Taxes which are being contested in good faith by appropriate proceedings (and with adequate reserves);

(g)   deposits to secure the performance of bids, trade contracts, leases, intellectual property rights, statutory obligations, insurance contracts, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

27

Confidential

(h)   Security securing Financial Indebtedness of any member of the Group incurred to finance the acquisition of fixed or capital assets (including Security granted pursuant to escrow arrangements in connection with any Permitted Investment) provided that:

   (i)    such Security shall be created substantially simultaneously with the acquisition of such fixed or capital assets;

   (ii)   such Security does not at any time encumber any assets other than the assets the acquisition of which was financed by such Financial Indebtedness; and

   (iii)  the amount of Financial Indebtedness secured thereby is not increased (other than pursuant to the instrument under which such encumbrance was created);

(i)   Security securing Financial Indebtedness existing on any property or assets at the time of its acquisition by a member of the Group or existing on property or assets of any person that becomes a member of the Group after the date hereof at the time such person becomes a member of the Group, provided that:

   (i)    the Financial Indebtedness was not created in contemplation of such acquisition;

   (ii)   in the case of Security existing on any property or assets acquired by a member of the Group, the Financial Indebtedness secured thereby is assumed by the relevant acquiring member of the Group and no other person or, in the case of Security on property or assets of a person who becomes a member of the Group, is not assumed by any other person;

   (iii)  no such Security is extended to cover any additional property or assets; and

   (iv)   the amount of Financial Indebtedness secured thereby is not increased (other than pursuant to the instrument under which such Security was created);

(j)   Security on the property of any member of the Group in favour of the landlord of such property securing licences, subleases or leases permitted hereunder (including rental deposits);

(k)   attachment or judgment Security or Security otherwise arising as a result of legal proceedings and assessments by authorities not constituting an Event of Default;

(l)   Security not otherwise permitted hereunder so long as:

   (i)    the Financial Indebtedness secured thereby does not exceed £15 million (or its equivalent) in aggregate at any time; and

   (ii)   the fair market value of the assets subject thereto does not, when aggregated with the value of any assets the subject of a Permitted Sale and Leaseback, exceed £22.5 million (or its equivalent) in aggregate at any time;

(m)   Security over goods and documents of title to goods arising in the ordinary course of letter of credit transactions entered into in the ordinary course of business;

(n)   Security ranking pari passu, subject to the terms of the Intercreditor Agreement, in favour of any pension trustees of the Group securing obligations which do not exceed:

   (i)    £100 million (or its equivalent) in aggregate at any time in respect of the pension obligations of members of the Recorded Music Division; and

[London #293508 v19]

Confidential

CITI-TF 00701543

(ii)  £50 million (or its equivalent) in aggregate at any time in respect of the pension obligations of members of the Music Publishing Division;

(o)  encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Security incidental to the conduct of the business of the Group or to the ownership of its properties which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of the Group;

(p)  Security securing Refinancing Indebtedness in respect of Financial Indebtedness permitted to be incurred pursuant to the Finance Documents which has been secured by Security permitted by the Finance Documents provided that:

(i)  any such Security shall not extend to or cover any assets not securing the Financial Indebtedness so refinanced; and

(ii)  the Financial Indebtedness so refinanced shall have been permitted to be incurred pursuant to Clause 28.19 (*Financial Indebtedness*);

(q)  Security securing the proceeds from the offering of any debt securities (including interest thereon) permitted to be incurred under the Finance Documents paid into an escrow account with an independent escrow agent on the date of the applicable offering pursuant to escrow arrangements that permit the release of amounts on deposit in such escrow account upon satisfaction of certain conditions or the occurrence of certain events for the benefit of the related holders of such debt securities (or the underwriters or arrangers thereof) or on cash proceeds of any debt securities or Cash Equivalent Investments purchased with such cash proceeds, in either case to the extent such cash or Cash Equivalent Investments pre-fund the payment of interest on such debt securities and are held in an escrow account or similar arrangement to be applied for such purpose;

(r)  Security over any cash or Cash Equivalent Investments paid into trust to defease or satisfy and discharge obligations under any debt security (provided such defeasance, satisfaction or discharge is permitted under the terms of the Finance Documents);

(s)  Security under netting or set-off arrangements under Treasury Transactions permitted to be entered into under the terms of the Finance Documents where the obligations of the parties are calculated by reference to a net exposure;

(t)  Security granted by a member of the Group which is not an Obligor to a bank or other lender as part of the arrangements for that bank or other lender to provide banking facilities to that member of the Group in an amount not exceeding £15 million (or its equivalent) in aggregate for all such members of the Group;

(u)  Security granted as part of a bank's standard terms and conditions;

(v)  in connection with a Permitted Sale and Leaseback;

(w)  any Security granted:

29

(i)      over any master recording, copyright or similar asset which has been or is made, created or produced by or in the course of the music, video or entertainment business of any Obligor;

(ii)     created in favour of an artist, performer or writer whose performance or work is embodied in that asset; and

(iii)    created to secure the payment of advances and/or royalties due or to become due to that artist, performer or writer under the relevant recording contract, copyright or similar asset,

but only if the basis on which the principal amount of the indebtedness secured by that Security is calculated is not changed after the date of the relevant recording contract, copyright or similar asset in such a way as to cause that principal amount to be increased; and

(x)-     any other Security to which the Majority Lenders have given their prior written consent.

**"Permitted Guarantee"** means:

(a)      the endorsement of negotiable instruments in the ordinary course of business;

(b)      any indemnities or guarantees granted in the ordinary course of business in respect of the performance by a member of the Group under any contract (but not including indemnities or guarantees in respect of any indebtedness); and

(c)      any guarantee given in respect of netting or set-off arrangements constituting a Permitted Encumbrance;

(d)      any guarantee constituted by Permitted Indebtedness;

(e)      any guarantees or counter-indemnities granted to landlords in respect of the obligations of Thorn Limited (formerly Thorn plc) and any of its Subsidiaries (together, the **"Thorn Group"**) under the terms of real property leases entered into by the Thorn Group provided that the obligations guaranteed or counter-indemnified thereunder do not exceed £9,600,000 at any time;

(f)      any guarantees or counter-indemnities granted to landlords in respect of the obligations of HMV Group plc and any of its Subsidiaries under the terms of any real property leases entered into by the Thorn Group provided that the obligations guaranteed or counter-indemnified thereunder do not exceed £16,000,000 at any time;

(g)      any guarantee not permitted by the preceding paragraphs provided that the total aggregate amount permitted under this paragraph (g) may not exceed £10 million (or its equivalent) at any time outstanding; and

(h)      any other guarantee provided with the prior written consent of the Majority Lenders;

30

[London #293508 v19]

"**Permitted High Yield Issuance**" means an issuance of high yield securities by the Parent in an amount sufficient for the Net Proceeds (as defined in Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*)) of such issuance to repay in full all amounts outstanding under the Mezzanine Facility on the terms set out in the Intercreditor Agreement.

"**Permitted Indebtedness**" means Financial Indebtedness:

(a)     arising under the Transaction Documents, the Securitisation Bridge Facility and the Mezzanine Facility;

(b)     incurred under local banking facilities with banks in the jurisdiction of members of the Group provided that the aggregate amount outstanding under such facilities does not exceed £25 million (or its equivalent) at any time;

(c)     which is Existing Financial Indebtedness or is incurred under banking facilities or debt securities of any member of the Target Group which, in each case, the Arranger has agreed in writing will not be repaid, prepaid or redeemed (as applicable) on the Closing Date;

(d)     under finance or capital leases of vehicles, plant, equipment or computers, provided that the aggregate capital value of all such items so leases under outstanding leases by members of the Group does not exceed £5 million (or its equivalent) at any time;

(e)     owing by an Obligor to another Obligor;

(f)     owing by a member of the Group which is not an Obligor to another member of the Group which is not an Obligor;

(g)     Incurred by the Parent, constituting Subordinated Indebtedness provided that the aggregate amount of Subordinated Indebtedness outstanding does not exceed £50 million (or its equivalent) at any time;

(h)     to the extent covered by a Letter of Credit or other letter of credit, guarantee or indemnity issued under an Ancillary Facility;

(i)     arising under a foreign exchange transaction for spot or forward delivery entered into in connection with the protection against fluctuation in currency rates where that foreign exchange exposure arises in the ordinary course of business or in respect of Utilisations made in Optional Currencies, but not a foreign exchange transaction for investment or speculative purposes;

(j)     of any person acquired by a member of the Group after the Closing Date which is incurred under arrangements in existence at the date of acquisition, but not incurred or increased or its maturity date extended in contemplation of, or since, that acquisition, not exceeding £15 million (or its equivalent) at any time and outstanding for less than a period of three (3) months following the date of acquisition;

(k)     under a Permitted Investment or a Permitted Guarantee;

(l)     (i)     which is a Permitted Refinancing, or

         (ii)    which is Refinancing Indebtedness in respect of Financial Indebtedness Incurred pursuant to (A) paragraph (a) of Clause 28.19 (*Financial Indebtedness*) but only to the extent that the original maturity of such Financial Indebtedness falls after

Confidential

CITI-TF 00701546

the latest maturity date of the Facilities or (B) paragraph (a), (c) or this sub-paragraph (I)(ii) of the definition of Permitted Indebtedness;

(m)     arising from the honouring by a bank or other financial institution of a cheque, draft or similar instrument drawn against insufficient funds in the ordinary course of business provided that such Financial Indebtedness is extinguished within five (5) Business Days of Incurrence;

(n)     Incurred by any Obligor constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits of licenses from governmental authorities, or other Financial Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(o)     under the finance lease in respect of the real property at Mont Cenis, France provided that the capitalised amount under such finance lease does not exceed £15,400,000;

(p)     in addition to the items referred to in paragraphs (a) to (o) of this definition, Financial Indebtedness of the Obligors in an aggregate outstanding principal amount which, when taken together with all other Financial Indebtedness Incurred pursuant to this paragraph (p), does not exceed £15 million (or its equivalent); and

(q)     not listed above to which the Majority Lenders have given their prior written consent.

"Permitted Investment" means:

(a)     any Investment by an Obligor in another Obligor;

(b)     any Investment:

(i)     by a member of the Group which is not an Obligor in another member of the Group which is not an Obligor;

(ii)    by an Obligor in a member of the Group which is not an Obligor by way of loan or guarantee in an aggregate amount not exceeding £20 million (or its equivalent) provided that Security is granted to the Obligor providing the loan or guarantee on the same basis as set out in the Agreed Security Principles to the extent that the principal amount of such loan or guarantee exceeds £5 million (or its equivalent) and the aggregate amount of any such loans or guarantees which are not secured does not exceed £5 million (or its equivalent);

(c)     any acquisition of cash and/or Cash Equivalent Investments;

(d)     any acquisition of a similar business to the Group Business (or all of the Capital Stock of a limited liability company or partnership principally engaged in such business) (the "Proposed Target") having an aggregate fair market value which does not exceed (when aggregated with all other investments made pursuant to this paragraph) the aggregate of any Additional Acquisition Funding available for the purposes of that acquisition, provided that in the case of any individual acquisition having a fair market value greater than £25 million (or its equivalent), or to the extent such company or business had negative EBITDA for the previous financial year;

32

Confidential

A-5929

(1) the Proposed Target shall have had positive earnings before interest, tax, depreciation and amortisation (or, if negative, not negative by more than £1,000,000) (calculated on the same basis as Maintenance EBITDA) on a *pro forma* stand alone basis (taking into account projected cost savings and synergies that would reasonably be expected to arise by combining the operations of such Proposed Target with the operations of the Group) during the 12 month period ending on the most recent month end prior to the date of acquisition (or, if not ascertainable, for the financial year of such Proposed Target most recently ended prior to its acquisition);

(2) the Company shall deliver to the Agent a certificate signed by a director of the Company which includes calculations showing in reasonable detail that on a pro forma basis that the Company would reasonably be expected to be able to comply with its obligations under Clause 27 (*Financial Covenants*) for the Relevant Period ending on the last day of the fourth complete Financial Quarter following the date of the proposed acquisition; and

(3) the Company shall deliver to the Agent copies of any due diligence reports (including accounting, legal and tax reports) and, to the extent usual or customary for the relevant provider in the circumstances, addressed to (or otherwise capable of being relied upon by) the Finance Parties;

(e) Investments to the extent the payment for which consists of Equity Interests of Holdco or any of its direct or indirect parent companies;

(f) purchases and acquisitions of inventory, supplies, material or equipment;

(g) Investments in a wholly-owned Subsidiary organised for the purposes of a Permitted Refinancing (including a receivables subsidiary, a high yield notes issuer or a property company) that, in the good faith determination of the Company, are necessary or advisable to effect any Permitted Refinancing;

(h) advances to, or guarantees of indebtedness of, directors, employees, officers and consultants not in excess of £1 million (or its equivalent) outstanding at any one time, in aggregate;

(i) loans and advances:

(i) to directors, officers and employees incurred in the ordinary course of business to fund such person's purchase of Equity Interests in Holdco or any direct or indirect Holding Company of Holdco; and

(ii) to the trustees of any employee stock ownership plan operated by any member of the Group,

provided that the aggregate amount of such loans and advances outstanding at any one time does not exceed £1 million (or its equivalent);

(j) Investments in Joint Ventures (other than, for the avoidance of doubt, A&R Arrangements) in an aggregate amount not to exceed £10 million (or its equivalent) in any Financial Year and £40 million (or its equivalent) at any one time, plus the net proceeds of any issue and sale of Capital Stock in the Parent, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant Investment and not used for any other purposes, plus the net proceeds of any

33

Shareholder Debt, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant Investment and not used for any other purposes;

(k)    Investments in A&R Arrangements;

(l)    acquisitions of assets made from the aggregate amount of Net Proceeds of any Disposal or any Excluded Proceeds to the extent permitted pursuant to the terms of the Finance Documents; and

(m)    payroll, travel and similar advances to employees to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(n)    Capital Stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to any member of the Group or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(o)    Investments made as a result of the receipt of non-cash consideration from an asset disposition and Investments in Additional Assets from the proceeds of an asset disposition, in each case, made pursuant to and in compliance with Clause 28.23 (*Asset disposals*);

(p)    Investments in existence on, or made pursuant to legally binding commitments in existence on, the Closing Date provided that the principal amount of such Investments not paid for on or before the Closing Date does not exceed £5 million (or its equivalent) and loans to the trustees of any employee stock ownership plan operated by any member of the Group and in existence on the Closing Date provided that the principal amount of such loans and advances outstanding at any one time does not exceed £6.5 million;

(q)    Treasury Transactions, which transactions or obligations are incurred in compliance with this Agreement;

(r)    deposits with respect to leases or utilities provided to third parties in the ordinary course of business or Security otherwise described in the definition of 'Permitted Encumbrances' or made in connection with Security permitted under Clause 28.21 (*Security*);

(s)    Permitted Guarantees;

(t)    the payment of cash or Cash Equivalent Investments into trust to defease or satisfy and discharge obligations under any debt securities, so long as such payment is otherwise permitted to be paid hereunder and such obligations are permitted to be discharged or defeased in each case pursuant to the Finance Documents;

(u)    Investments by any member of the Group, together with all other Investments pursuant to this paragraph (u) and all payments permitted to be made pursuant to paragraph (g) of the definition of 'Permitted Payment' below, in an aggregate amount at the time of such Investment not to exceed five per cent. of the amount by which Consolidated Incurrence EBITDA of the Recorded Music Division for the preceding four Financial Quarters exceeds £225 million (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value);

(v)    Investments in capital expenditure in connection with the relocation and re-organisation of the head office of the Music Publishing Division including, without limitation, the

{London #293508 v19}

Confidential

CITI-TF 00701549

implementation of a new royalties-related IT system provided that the maximum aggregate amount of Investments in such capital expenditure shall not exceed £10 million; and

(w)     any other investments to which the Majority Lenders shall have given their prior consent.

**"Permitted Payment"** means:

(a)     payments due in respect of Permitted Indebtedness;

(b)     payments due in respect of the Deferred Purchase Price of a Permitted Investment;

(c)     any payment made in respect of the purchase of shares from departing directors or employees of a member of the Group pursuant to a management incentive or employee stock scheme;

(d)     payments made by the Group (including by way of payments to any Holding Company of the Company):

(i)     to reimburse Taxes, overhead, audit, legal and other necessary expenses, including management costs, pursuant to secondment agreements and financial-advisory agreements up to a maximum aggregate amount of £2 million (or its equivalent) in any Financial Year; and

(ii)     for payments in respect of Management Fees;

(e)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of redemption of Capital Stock or Disqualified Stock or Subordinated Indebtedness of the Company or any other Obligor made by exchange for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Company or such other Obligor provided such other Obligor was the issuer of such Capital Stock, Disqualified Stock or Subordinated Indebtedness (other than Disqualified Stock and other than Capital Stock issued or sold to a Subsidiary or an employee stock ownership plan or similar trust to the extent such sale to an employee stock ownership plan or similar trust is financed by loans from or guaranteed by any member of the Group unless such loans have been repaid with cash on or prior to the date of determination);

(f)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company or any other Obligor made by exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Indebtedness by the same borrower or issuer or any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company that, in each case, is permitted to be incurred under this Agreement;

(g)     Restricted Payments in an aggregate amount not to exceed an amount equal to:

(i)     five per cent. of the amount by which Consolidated Incurrence EBITDA of the Recorded Music Division for the preceding four Financial Quarters exceeds £225 million; less

(ii)     the amount of any payments made during such four Financial Quarters pursuant to paragraph (d) above,

Confidential                                                                 CITI-TF 00701550

A-5932

provided that prior to the first anniversary of the Closing Date no Restricted Payments may be made pursuant to this paragraph (g) if such Restricted Payment is, or is used to fund, any dividend, distribution or other payment to Holdco or its shareholders (other than pursuant to paragraph (d)(i) above); and

(h)    such other payments to which the Majority Lenders have given their prior written consent.

"**Permitted Refinancing**" means:

(a)    the Permitted Securitisation; or

(b)    the Permitted High Yield Issuance.

"**Permitted Restriction**" means any restriction or encumbrance on the ability of a member of the Group to pay dividends, return capital, make any other payment or distribution, or transfer assets to another member of the Group which:

(a)    arise under the Finance Documents, the Securitisation Bridge Facility Agreement or the Mezzanine Facility Agreement each as in effect on the Signing Date; or

(b)    permitted pursuant to paragraph (b)(v) or, save with respect to a determination made in connection with a Restricted Payment, (b)(iii) of Clause 28.27 (*Limitation on restrictions on distributions from Subsidiaries*).

"**Permitted Sale and Leaseback**" means the disposal of real property assets of the Group on terms whereby they are leased to or reacquired by a member of the Group in circumstances where the transaction is entered into as a method of raising Financial Indebtedness, provided that:

(a)    the net cash proceeds of such disposal and leasing are applied in mandatory prepayment of the Facilities pursuant to Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*); and

(b)    the maximum value of the assets disposed of do not exceed £15 million (or its equivalent) in aggregate.

"**Permitted Securitisation**" means a securitisation of the assets of the Music Publishing Division on the terms set out in the Intercreditor Agreement.

"**Permitted Share Issuance**" means an issue or sale of:

(a)    ordinary shares of the Parent to the Investors, paid for in full in cash upon issue and which by their terms are not redeemable and where (i) such shares are of the same class and on the same terms as those initially issued by the Parent and (ii) such issue does not lead to a Change of Control;

(b)    shares of a member of the Group to its immediate Holding Company or a wholly owned member of the Group where (if the existing shares of the Subsidiary are subject to the Security created by the Transaction Security Documents) the newly-issued shares also become subject to such Security on the same terms and if such Subsidiary is not a wholly owned Subsidiary, shares issued for cash to minority shareholders on a pro rata basis; and

(c)    shares to which the Majority Lenders have given their prior written consent.

36

[London #293508 v19]

A-5933

**"Preferred Stock"** as applied to the Capital Stock of any person, means share capital of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such person, over shares of any other class of such person.

**"Qualifying Lender"** has the meaning given to that term in Clause 19 (*Tax Gross-Up and Indemnities*).

**"Quotation Day"** means, in relation to any period for which an interest rate is to be determined:

(a)     if the currency is the Base Currency, the first day of that period;

(b)     if the currency is euro, two (2) TARGET Days before the first day of that period; or

(c)     (for any other currency) two (2) Business Days before the first day of that period,

unless market practice differs in the Relevant Interbank Market for a currency, in which case the Quotation Day for that currency will be determined by the Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

**"Receiving Bankers"** means the receiving bankers to the Offer or the Scheme, as the case may be, appointed by the Target.

**"Recorded Music Division"** means the businesses in the Group that are involved in signing and developing artists, marketing and promoting them and distributing and exploiting their music.

**"Recorded Music Division Acquisition Loan"** means an Acquisition Facility Loan which is used to fund a Permitted Investment in relation to the Recorded Music Division.

**"Redenomination Notice"** means a notice of redenomination delivered to the Agent pursuant to Clause 9.3 (*Redenomination of Senior B Loans*).

**"Reference Banks"** means:

(a)     in relation to LIBOR, the principal London offices of Citigroup Global Markets Limited and two (2) other banks to be appointed by the Agent with the consent of the Company; and

(b)     in relation to EURIBOR, the principal London office of Citibank International plc and two (2) other banks to be appointed by the Agent with the consent of the Company,

or such other banks as may be appointed by the Agent in accordance with Clause 32.15 (*Reference Banks*).

**"Refinance"** means, in respect of any Financial Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Financial Indebtedness. **"Refinanced"** and **"Refinancing"** shall have correlative meanings.

**"Refinancing Indebtedness"** means Financial Indebtedness that Refinances Financial Indebtedness of a member of the Group existing on the Closing Date or Incurred in compliance with the Finance Documents (including Financial Indebtedness that Refinances Refinancing Indebtedness) provided that:

Confidential

CITI-TF 00701552

A-5934

(a)    such Refinancing Indebtedness has a Stated Maturity no earlier than the stated maturity of the Financial Indebtedness being Refinanced;

(b)    such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Financial Indebtedness being Refinanced;

(c)    such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium and defeasance costs) under the Financial Indebtedness being Refinanced plus reasonable and customary fees and expenses in connection with such Refinancing; and

(d)    if the Financial Indebtedness being Refinanced is subordinated in right of payment to the amounts outstanding under the Finance Documents, such Refinancing Indebtedness is subordinated in right of payment to the amounts outstanding under the Finance Documents at least to the same extent as the Financial Indebtedness being Refinanced.

"**Related Business** " means any business in which the Target Group was engaged in on the Unconditional Date and any business which is related, incidental, ancillary or complementary thereto.

"**Related Fund**" means, in relation to a fund (the "**first fund**"), a fund which is managed or advised by the same investment manager or adviser as the first fund or, if it is managed by a different investment manager or adviser, a fund whose investment manager or adviser is an Affiliate of the investment manager or adviser of the first fund.

"**Relevant Interbank Market**" means in relation to Euro, the European interbank market and, in relation to any other currency, the London interbank market.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)    its jurisdiction of incorporation;

(b)    any jurisdiction where any asset subject to or intended to be subject to the Security created by the Transaction Security Documents is situated;

(c)    any jurisdiction where it conducts its business; and

(d)    the jurisdiction whose laws govern the perfection of any Transaction Security Documents entered into by it.

"**Relevant Period**" has the meaning given to that term in Clause 27.1 (*Financial definitions*).

"**Renewal Request**" means a written notice delivered to the Agent in accordance with Clause 6.6 (*Renewal of a Letter of Credit*).

"**Repeating Representations**" means each of the representations set out in Clauses 25.1 (*Status*) to 25.7 (*Financial statements*) (inclusive) provided that the representation in paragraph (b) of Clause 25.7 (*Financial statements*) will only be repeated on the date of each Request for a Utilisation under the Revolving Facility.

"**Report**" means each of:

38

[London #293508 v19]

Confidential

CITI-TF 00701553

(a)     the McKinsey Report;

(b)     the LEK Report;

(c)     the KPMG Financial Due Diligence Report;

(d)     the Structure Memorandum; and

(e)     the Legal Due Diligence Report,

in each case (other than (a)) addressed to or capable of being relied on by each Finance Party.

"**Resignation Letter**" means a letter substantially in the form set out in Schedule 7 (*Form of Resignation Letter*) or such other form as may be agreed between the Agent and the Company.

"**Restricted Payment**" with respect to any person, means:

(a)     the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such person) or similar payment to the direct or indirect holders of its Capital Stock (other than (i) dividends or distributions payable solely in its Capital Stock, (ii) dividends or distributions payable solely to an Obligor and (C) pro rata dividends or other distributions made by an Obligor that is not wholly owned to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a company)) and any payment of cash interest on Shareholder Debt;

(b)     the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of an Obligor or Shareholder Debt held by any person, including in connection with any merger or consolidation and including the exercise of any option to exchange any Capital Stock;

(c)     the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Indebtedness of any member of the Group (other than (A) from an Obligor or (B) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal instalment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

(d)     the making of any Investment (other than a Permitted Investment) in any person.

"**Retained Excess Cashflow**" has the meaning given to that term in Clause 27.1 (*Financial definitions*).

"**Revolving Facility**" means the revolving credit facility made available under this Agreement as described in Clause 2.1(a)(iii) (*The Facilities*).

"**Revolving Facility Commitment**" means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Revolving Facility Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Revolving Facility Commitment transferred to it under this Agreement; and

39

(b)    in relation to any other Lender, the amount in the Base Currency of any Revolving Facility Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

**"Revolving Facility Loan"** means a loan made or to be made under the Revolving Facility or the principal amount outstanding for the time being of that loan.

**"Revolving Facility Utilisation"** means a utilisation of the Revolving Facility by way of a Revolving Facility Loan or the issuance of a Letter of Credit.

**"Rollover Loan"** means one or more Revolving Facility Loans:

(a)    made or to be made on the same day that:

    (i)    a maturing Revolving Facility Loan is due to be repaid; or

    (ii)    a demand by the Agent pursuant to a drawing in respect of a Letter of Credit is due to be met;

(b)    the aggregate amount of which is equal to or less than the maturing Revolving Facility Loan or the relevant claim in respect of that Letter of Credit;

(c)    in the same currency as the maturing Revolving Facility Loan (unless it arose as a result of the operation of Clause 9.2 (*Unavailability of a currency*)) or the relevant claim in respect of that Letter of Credit; and

(d)    made or to be made to the same Borrower for the purpose of:

    (i)    refinancing that maturing Revolving Facility Loan; or

    (ii)    satisfying the relevant claim in respect of that Letter of Credit.

**"S&P"** means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

**"Scheme"** means a scheme of arrangement made pursuant to Section 425 of the Act in relation to the cancellation of the issued share capital of the Target and subsequent issue of the New Shares as contemplated by the Scheme Press Release and, when issued, the Scheme Documents.

**"Scheme Circular"** means the circular to the shareholders of the Target, issued, or to be issued by the Target, setting out the proposals for the Scheme.

**"Scheme Conversion"** means the Company procuring the lapse or withdrawal of the Offer and the issue of a Scheme Press Announcement in accordance with paragraph (b) of Clause 3.2 (*Conversion of Offer to Scheme*).

**"Scheme Conversion Notice"** has the meaning given to that term in paragraph (a) of Clause 3.2 (*Conversion of Offer to Scheme*).

**"Scheme Documents"** means together the Scheme Press Release, the Scheme Circular, the Scheme Resolutions and the Implementation Agreement.

[London #293508 v19]

Confidential

CITI-TF 00701555

A-5937

"**Scheme Press Release**" means a press announcement released by the Company and/or Target to announce the terms of the Scheme which must be approved in advance by the Arranger (acting reasonably).

"**Scheme Resolutions**" means the resolutions referred to and substantially in the form set out in the Scheme Circular.

"**Screen Rate**" means:

(a)    in relation to EURIBOR, the percentage rate per annum determined by the Banking Federation of the European Union for the relevant period; and

(b)    in relation to LIBOR, the British Bankers' Association Interest Settlement Rate for the relevant currency and period,

displayed on the appropriate page of the Telerate screen (or, if the Telerate service is unavailable, the appropriate Reuters screen). If the agreed page is replaced or service ceases to be available, the Agent may specify another page or service displaying the appropriate rate after consultation with the Company and the Lenders.

"**Secured Parties**" means each Finance Party from time to time party to this Agreement, and any Delegate.

"**Securitisation Bridge Facility**" means the loan facility made available to the Company and certain of its Subsidiaries pursuant to the Securitisation Bridge Facility Agreement.

"**Securitisation Bridge Facility Agreement**" means the £1,410,000,000 securitisation bridge facility agreement dated on or around the Signing Date between (amongst others) the Company, Citigroup Global Markets Limited as arranger and certain parties named therein as lenders.

"**Securitisation Bridge Facility Lender**" means each lender in respect of a Securitisation Bridge Loan.

"**Securitisation Bridge Loan**" means a loan made under the Securitisation Bridge Facility.

"**Securitisation Entity**" means each person which is, directly or indirectly, owned or controlled by the Parent or any Holding Company of the Parent and which carries on any part of the business of or owns any assets of, the Music Publishing Division.

"**Security**" means any mortgage, charge (fixed or floating), pledge, lien, hypothecation, assignment, reservation of title or other security interest (including any conditional sale or other title retention agreement or licence in nature thereof).

"**Selection Notice**" means a notice substantially in the form set out in Part III of Schedule 3 (*Requests*) (or such other form as may be agreed between the Agent and the Company) given in accordance with Clause 16 (*Interest Periods*) in relation to a Term Facility.

"**Senior B Facility**" means the term loan facility made available under this Agreement as described in Clause 2.1(a)(i) (*The Facilities*).

"**Senior B Facility Commitment**" means:

(a)    in relation to an Original Lender, the amount in the Base Currency which is, on the Closing Date, the Base Currency equivalent (based on the Agent's Spot Rate of Exchange) of the amount set opposite its name under the heading "Senior B Facility

41

A-5938

Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Senior B Facility Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Senior B Facility Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement,

"**Senior B Facility Lender**" means each lender in respect of a Senior B Facility Loan.

"**Senior B Facility Loan**" means a loan made or to be made under the Senior B Facility or the principal amount outstanding for the time being of that loan.

"**Senior Indebtedness**" means all Financial Indebtedness of the Company other than:

(a)     Financial Indebtedness Incurred in violation of the provisions of this Agreement;

(b)     any obligation of the Company to a member of the Group;

(c)     any liability for Tax owing by the Company;

(d)     any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(e)     any Financial Indebtedness of the Company that is expressly subordinate in right of payment to any other Financial Indebtedness of the Company; or

(f)     any Capital Stock.

"**Separation Date**" means the date on which the Business Separation occurs in accordance with Clause 28.13 (*Business Separation*).

"**Shareholder Debt**" means any loan (whether arising under a loan agreement, loan notes, bond issue or other debt instrument) by the Investors to an Obligor and which is subordinated to the Facilities pursuant to the Intercreditor Agreement.

"**Signing Date**" means the date of this Agreement.

"**Specified Time**" means a time determined in accordance with Schedule 10 (*Timetables*).

"**Stated Maturity**" means, with respect to any security or obligation, the date specified in such security or obligation as the fixed date on which the final payment of principal of such security or obligation is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security or obligation at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Structural Adjustment**" has the meaning given to it in Clause 41.6 (*Structural Adjustment*).

"**Structure Memorandum**" means the structure memorandum prepared by KPMG and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

"**Subordinated Indebtedness**" means, with respect to a person, any Financial Indebtedness of such person which is subordinate or junior in right of payment to the amounts payable under (or

42

Confidential

CITI-TF 00701557

guaranteed under) the Finance Documents, as the case may be, pursuant to the terms of the Intercreditor Agreement and shall include, for the avoidance of doubt, any Shareholder Debt.

"**Subsidiary**" means, in relation to a company or corporation, a company or corporation:

(a)    which is controlled, directly or indirectly, by the first-mentioned company or corporation;

(b)    more than half the issued share capital of which is beneficially owned, directly or indirectly, by the first-mentioned company or corporation; or

(c)    which is a Subsidiary of another Subsidiary of the first-mentioned company or corporation,

and, for these purposes, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to determine the composition of a majority of its board of directors or equivalent body.

"**Successful Syndication**" has the meaning given to it in the Commitment Letter.

"**Super-Majority Lenders**" means:

(a)    Lenders whose Commitments aggregate more than 90 per cent. of the Total Commitments; or

(b)    (if the Total Commitments have been reduced to zero) Lenders whose Commitments aggregated more than 90 per cent. of the Total Commitments immediately before such reduction.

"**Syndication Date**" means the earlier of (i) the day on which the Arranger confirms that Successful Syndication has occurred and (ii) the date falling 90 days after the Closing Date.

"**Takeover Code**" means the City Code on Takeovers and Mergers.

"**Takeover Panel**" means the Panel on Takeovers and Mergers.

"**Target**" means EMI Group plc, a company incorporated in England and Wales with its registered office at 27 Wrights Lane, London W8 5SW and with company registration number 00229231.

"**TARGET**" means Trans-European Automated Real-time Gross Settlement Express Transfer payment system.

"**TARGET Day**" means any day on which TARGET is open for the settlement of payments in euro.

"**Target Group**" means the Target and its Subsidiaries.

"**Target Shares**" means the existing issued shares of the Target, all options to purchase shares in the Target and any further such shares which are unconditionally allotted or issued between the Signing Date and the Unconditional Date (including any shares issued under the terms of any convertible bonds or other instruments issued by the Target prior to the Signing Date) or, if the Acquisition is contemplated by way of a Scheme, the Effective Date (or, in either case, until such later date as the Company may decide with the prior written consent of the Agent, such consent not to be unreasonably withheld or delayed).

43

CITI-TF 00701558

"**Tax**" means any present or future tax, levy, assessment, impost, deduction, duty and withholding and any charge of a similar nature (including any related interest, penalty or fine) and "**Taxation**" shall be construed accordingly.

"**Term**" means each period determined under this Agreement for which the Issuing Bank is under a liability under a Letter of Credit.

"**Term Facility**" means the Senior B Facility or the Acquisition Facility.

"**Term Loan**" means a Senior B Facility Loan or an Acquisition Facility Loan.

"**Test Date**" means each date on which the financial covenant in Clause 27 (*Financial covenant*) is tested.

"**Third Parties Act**" has the meaning given to that term in Clause 1.4 (*Third Party Rights*).

"**Third Party Disposal**" has the meaning given to that term in Clause 31.3 (*Resignation of a Borrower*).

"**Total Acquisition Facility Commitments**" means the aggregate of the Acquisition Facility Commitments.

"**Total Commitments**" means the aggregate of the Total Senior B Facility Commitments, the Total Acquisition Facility Commitments and the Total Revolving Facility Commitments.

"**Total Net Debt**" has the meaning given to that term in Clause 27.1 (*Financial definitions*).

"**Total Revolving Facility Commitments**" means the aggregate of the Revolving Facility Commitments.

"**Total Senior B Facility Commitments**" means the aggregate of the Senior B Facility Commitments.

"**Transaction Documents**" means the Finance Documents, the Acquisition Documents and the Investment Documents.

"**Transaction Security**" means the Security created or expressed to be created in favour of the Finance Parties pursuant to the Transaction Security Documents.

"**Transaction Security Documents**" means any document creating or expressed to create any Security listed in Schedule 13 (*Transaction Security*) and any other document creating or expressed to create any Security in respect of the obligations of any of the Obligors under any of the Finance Documents.

"**Transfer Agreement**" means an agreement substantially in one of the forms set out in Schedule 5 (*Form of Transfer Agreement*) or any other form agreed between the Agent and the Company.

"**Transfer Date**" means, in relation to a transfer, the later of:

(a)     the proposed Transfer Date specified in the Transfer Agreement; and

(b)     the date on which the Agent executes the Transfer Agreement.

"**Treasury Transactions**" means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price.

[London #293508 v19]

44

Confidential

CITI-TF 00701559

"UK" and "United Kingdom" means the United Kingdom of Great Britain and Northern Ireland.

"Unconditional Date" means the date on which the Offer is declared or becomes unconditional in all respects (unless a Scheme Conversion has occurred, in which case it means the Effective Date unless the context otherwise requires).

"Unpaid Sum" means any sum due and payable but unpaid by an Obligor under the Finance Documents.

"Unsecured Indebtedness" means Financial Indebtedness which does not benefit from any Security or guarantee.

"US" and "United States" means the United States of America, its territories, possessions and other areas subject to the jurisdiction of the United States of America.

"US Bankruptcy Law" means the United States Bankruptcy Code 1978 or any other United States Federal or State bankruptcy, insolvency or similar law.

"US Obligor" means an Obligor that is incorporated or organised under the laws of the United States of America or any State of the United States of America (including the District of Columbia) or that has a place of business or property in the United States of America.

"Utilisation" means a utilisation of the Facilities by way of a Loan, a Letter of Credit (but not a utilisation of an Ancillary Facility).

"Utilisation Date" means the date on which a Utilisation is made.

"Utilisation Request" means a notice substantially in the relevant form set out in Part I, II, III or IV (as the case may be) of Schedule 3 (*Requests*) or such other form as may be agreed between the Agent and the Company.

"VAT" means value added tax.

"Withholding Form" means US Internal Revenue Service Form W-8BEN, W-8ECI or W-9 (or, in each case, any successor form) or any other Internal Revenue Service form by which a person may claim complete exemption from withholding of US federal income tax on interest payments to that person.

**1.2    Construction**

(a)    Unless a contrary indication appears, a reference in this Agreement to:

    (i)    the "Agent", the "Arranger", any "Finance Party", any "Issuing Bank", any "Lender", any "Obligor", any "Party", any "Secured Party", the "Security Agent" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

    (ii)    a document in "agreed form" is a document which is previously agreed in writing by or on behalf of the Company and the Agent;

    (iii)    "assets" includes present and future properties, revenues and rights of every description;

Confidential

CITI-TF 00701560

A-5942

(iv) references to the "**equivalent**" of an amount specified in a particular currency shall be construed as a reference to the amount of the other relevant currency which can be purchased at the Agent's Spot Rate of Exchange;

(v) a "**Finance Document**" or a "**Transaction Document**" or any other agreement or instrument is a reference to that Finance Document or Transaction Document or other agreement or instrument as amended or novated (however fundamentally);

(vi) "**indebtedness**" includes any obligation (whether incurred as principal or as surety or in respect of a guarantee or indemnity) for the payment or repayment of money, whether present or future, actual or contingent;

(vii) a Lender's "**participation**" in relation to a Letter of Credit, shall be construed as a reference to the relevant amount that is or may be payable by a Lender in relation to that Letter of Credit;

(viii) a "**person**" includes any person, firm, company, corporation, government, state or agency of a state or any grouping (whether or not having separate legal personality) of two or more of the foregoing;

(ix) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(x) "**trustee, fiduciary and fiduciary duty**" has in each case the meaning given to that term under any applicable law;

(xi) a provision of law is a reference to that provision as amended or re-enacted; and

(xii) a time of day is a reference to London time.

(b) Section, Clause and Schedule headings are for ease of reference only.

(c) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d) A Borrower providing "**cash cover**" for a Letter of Credit or an Ancillary Facility means a Borrower paying an amount in the currency of the Letter of Credit or Ancillary Facility (as the case may be) to an interest-bearing account in the name of the Borrower and the following conditions being met:

(i) the account is with the Agent (if the cash cover is to be provided for all the Lenders) or with a Lender or Ancillary Lender (if the cash cover is to be provided for that Lender or Ancillary Lender, as the case may be);

(ii) until no amount is or may be outstanding under that Letter of Credit or Ancillary Facility, withdrawals from the account may only be made to pay a Finance Party amounts due and payable to it under this Agreement in respect of that Letter of Credit or Ancillary Facility; and

(iii) the Borrower has executed a security document over that account, in form and substance satisfactory to the Agent or the Lender or Ancillary Lender (in each case acting

46

Confidential

CITI-TF 00701561

A-5943

reasonably) with which that account is held, creating a first ranking security interest over that account.

(e)    A Default is **"continuing"** if it has not been remedied or waived.

(f)    A Borrower **"repaying"** or **"prepaying"** a Letter of Credit or any Ancillary Outstandings means:

(i)    that Borrower providing cash cover for that Letter of Credit or in respect of the Ancillary Outstandings;

(ii)    the maximum amount payable under or in respect of the Letter of Credit or Ancillary Outstandings, as the case may be, being reduced or cancelled in accordance with its terms; or

(iii)    the Issuing Bank, Lender or Ancillary Lender being satisfied that it has no further liability under or in respect of that Letter of Credit or those Ancillary Outstandings,

and the amount by which a Letter of Credit or Ancillary Outstandings is repaid or prepaid under sub-paragraphs (f)(i) and (f)(ii) above is the amount of the relevant cash cover or reduction.

(g)    An amount borrowed includes any amount utilised by way of Letter of Credit or under an Ancillary Facility.

(h)    A Lender funding its participation in a Utilisation includes a Lender participating in a Letter of Credit.

(i)    An outstanding amount of a Letter of Credit at any time is the maximum amount that is or may be payable by the relevant Borrower in respect of that Letter of Credit at that time.

**1.3    Currency**

"euro" and "€" mean the single currency unit of the Participating Member States, "£" and "Sterling" denote the lawful currency of the United Kingdom and **"dollars"** denotes the lawful currency of the United States of America.

**1.4    Third Party Rights**

(a)    Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "Third Parties Act") to enforce or enjoy the benefit of any term of this Agreement.

(b)    Unless expressly provided to the contrary in this Agreement, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

47

Confidential

<div align="center">

**SECTION 2**
**THE FACILITIES**

</div>

**2.    THE FACILITIES**

**2.1    The Facilities**

(a)    Subject to the terms of this Agreement, the Lenders make available to the Borrowers:

    (i)    a term loan facility, in an amount equal to the Total Senior B Facility Commitments (being the Base Currency equivalent (of £725,000,000 at the Closing Date);

    (ii)    a multicurrency term loan facility, the Base Currency Amount of which is equal to the Total Acquisition Facility Commitments (being £100,000,000 at the Signing Date); and

    (iii)    a multicurrency revolving credit facility, the Base Currency Amount of which is equal to the Total Revolving Facility Commitments (being £350,000,000 at the Signing Date).

(b)    Subject to the terms of this Agreement and the Ancillary Documents, an Ancillary Lender may make available an Ancillary Facility to a Borrower in place of all or part of such Ancillary Lender's Revolving Facility Commitment.

**2.2    Finance Parties' rights and obligations**

(a)    The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c)    A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

**2.3    Obligors' Agent**

(a)    Each Obligor (other than the Company) by its execution of this Agreement or an Accession Letter irrevocably appoints the Company to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

    (i)    the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of a Borrower, Utilisation Requests), to execute on its behalf any Accession Letter, to make such agreements and to effect the relevant amendments, supplements and variations (in each case, however fundamental) capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor (notwithstanding that they may increase the Obligor's obligations or otherwise affect the Obligor) and to give confirmation as to continuation of surety obligations, without further reference to or the consent of that Obligor; and

    (ii)    each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

and in each case the Obligor shall be bound as though the Obligor itself, had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made

[London #293508 v19]

<div align="center">48</div>

the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)    Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document on behalf of another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document or the Parent executed this Agreement) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it. In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

**2.4    Additional Acquisition Facility Commitments**

(a)    The Company may at any time after the Closing Date request one or more Lenders or any other bank or financial institution to make available Additional Acquisition Facility Commitments by delivering an Additional Acquisition Facility Commitment Notice to the Agent.

(b)    Each Additional Acquisition Facility Commitment Notice is irrevocable and will not be regarded as having been duly completed unless it specifies:

(i)     the date on which the Additional Acquisition Facility Commitments are to become confirmed;

(ii)    the amount in respect of which the Additional Acquisition Facility Commitments are to be provided (which when aggregated with any Additional Acquisition Facility Commitments previously made available (except to the extent cancelled prior to such date) must be no greater than £200,000,000 (or its equivalent));

(iii)   that the amount of the Additional Acquisition Facility Commitments which one or more Lenders (or any other bank or financial institution) have made available will increase the Acquisition Facility in accordance with paragraph (e) below;

(iv)    the name(s) of the borrower(s) under the Additional Acquisition Facility Commitments;

(v)     the amount of the Additional Acquisition Facility Commitment allocated to each Lender or other bank or financial institution named in the Additional Acquisition Facility Commitment Notice; and

(vi)    the Margin applicable to each Loan to be made available under the Additional Acquisition Facility Commitments and, if applicable, any Margin ratchet table which is to apply (to the extent different from that set out in Clause 15.5 (*Adjustment of Margin*)) in respect of such Loans.

Each Additional Acquisition Facility Commitment Notice shall be countersigned by each Lender or other bank or financial institution to which Additional Acquisition Facility Commitments are allocated. Any bank or financial institution to which Additional Acquisition Facility Commitments are allocated and which is not already a Lender shall comply with the provisions of Clause 30 (*Changes to the Lenders*) to become a Lender. By countersigning the Additional Acquisition Facility Commitment Form each such Lender or other bank or financial institution agrees to make available the Additional Acquisition Facility Commitments set out against its name. For the avoidance of doubt, no Lender will be obliged to countersign an Additional Acquisition Facility Commitment Notice nor to make any Additional Acquisition Facility Commitment available.

49

(c)     No Additional Acquisition Facility Commitment Notice may be delivered less than five (5) Business Days prior to the date of any related Utilisation.

(d)     Upon receipt of a duly completed Additional Acquisition Facility Commitment Notice, the Agent shall inform the Lenders of such receipt.

(e)     Following delivery of an Additional Acquisition Facility Commitment Notice, the Company may at any time cancel a part of such Additional Acquisition Facility Commitments by delivering to the Agent an Additional Acquisition Facility Commitment Cancellation Notice. The total amount of Additional Acquisition Facility Commitments, whether utilised or unutilised, excluding those in respect of which an Additional Acquisition Facility Commitment Cancellation Notice has been received by the Agent, shall not exceed £200,000,000 (or its equivalent) in aggregate.

(f)     The Agent shall notify the Company and the Lenders of the increased amounts of the Acquisition Facility Commitments and outstandings under the Acquisition Facility promptly after receipt of each Additional Acquisition Facility Commitment Notice and each Additional Acquisition Facility Commitment Cancellation Notice.

(g)     For the avoidance of doubt, the Additional Acquisition Facility Commitments shall have (i) the same terms (other than as to Margin and fees, availability and conditions precedent under Clauses 4.1 (*Initial conditions precedent*), 4.2 (*Certain Funds*) and 4.3 (*Further conditions precedent*)) as the Acquisition Facility and (ii) the pricing (including interest rate, arrangement, underwriting and/or commitment fees) which shall be set out in a separate Additional Acquisition Facility Commitment Fee Letter entered into by the Company and the relevant Lenders or other banks or financial institutions.

3.      **PURPOSE**
3.1     **Purpose**
(a)     Each Borrower shall apply the proceeds of each Senior B Facility Loan borrowed by it (directly or indirectly) towards (in each case, only on or after the Closing Date):

        (i)     the satisfaction of the consideration payable by the Company to the holders of the Target Shares either:

                (A)     if the Acquisition is being completed pursuant to an Offer, pursuant to the terms of the Offer and pursuant to the operation of the procedures contained in Part 28 of the Companies Act 2006; or

                (B)     if the Acquisition is being completed pursuant to a Scheme, pursuant to the terms of the Scheme;

        (ii)    refinancing the Financial Indebtedness of the Company incurred under the Interim Facilities Agreement (and if any amount is outstanding under the Interim Facility, no amount may be applied under this Agreement for any purpose other than refinancing the amounts outstanding until they are repaid in full);

        (iii)   payment of the Acquisition Costs; and

        (iv)    refinancing certain Existing Financial Indebtedness (including the amount of any breakage or prepayment costs or fees) and providing cash collateral in respect of certain obligations of the Target Group existing on the Unconditional Date or the Effective Date, as the case may be (the "Existing Financial Indebtedness Refinancing").

(b)     Each Borrower shall apply all amounts borrowed by it under the Acquisition Facility towards:

50

[London #293508 v19]

Confidential

(i)    the consideration payable by it in respect of any Permitted Investment;

(ii)    any costs and expenses incurred by a member of the Group in connection with a Permitted Investment; and

(iii)    the refinancing of Financial Indebtedness of any entity acquired by such Borrower pursuant to a Permitted Investment (including the amount of any breakage or prepayment costs or fees).

(c)    Each Borrower shall apply all amounts borrowed by it under the Revolving Facility, and any Letters of Credit for:

(i)    the general corporate and working capital purposes of the Group including towards the Existing Financial Indebtedness Refinancing (up to an amount equal to £170 million and provided that any Revolving Facility Loan applied towards the Existing Financial Indebtedness Refinancing may only be used to refinance revolving credit facilities which have been applied towards the seasonal working capital requirements of the Target Group) and for payment of the OID Amount and not any other purpose set out under paragraph (a) above; or

(ii)    any consideration payable by a member of the Group in connection with a Permitted Investment.

(d)    No amount borrowed under the Facilities shall be applied in any manner that would be illegal or contravene any applicable law or regulation in any Relevant Jurisdiction concerning financial assistance by a company for the acquisition of or subscription for its own shares or the shares of its parent or any of its other holding companies.

(e)    Upon confirmation by the Agent that the Documentary Conditions have been provided to it (each in form and substance satisfactory to it, acting reasonably), the Company shall, on such date, be deemed to have given notice to the lenders under the Interim Facilities Agreement of the immediate cancellation in full of the Interim Facility pursuant to clause 9 of the Interim Facilities Agreement.

**3.2**    **Conversion of Offer to Scheme**

(a)    At any time before the Unconditional Date, the Company may give written notice (a "Scheme Conversion Notice") to the Agent that it wants to lapse or withdraw from the Offer and to launch a Scheme instead.

(b)    Within 14 days of the date of the delivery of a Scheme Conversion Notice, the Company shall procure that:

(i)    the Offer lapses or is withdrawn; and

(ii)    a Scheme Press Release is issued.

**3.3**    **Monitoring**

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

**4.**    **CONDITIONS OF UTILISATION**

**4.1**    **Initial conditions precedent**

The obligations of each Lender under Clause 5.4 (Lenders' participation) to make an Acquisition Loan are subject to the conditions precedent that on the date on which such Acquisition Loan is to be made:

51

CITI-TF 00701566

(a) the Agent has received, or has waived the requirement to receive all of the documents and evidence set out in Part 1 of Schedule 2 (*Conditions Precedent*) in form and substance satisfactory to it, acting reasonably;

(b) the Major Representations are correct in all respects and will remain correct in all respects immediately after the making of the Acquisition Loan;

(c) no Major Event of Default is outstanding or would result from the making of the Acquisition Loan; and

(d) it is not illegal or contrary to any applicable law or regulation for such Lender to make an Acquisition Loan.

### 4.2    Certain funds

Subject to Clause 4.1 (*Initial conditions precedent*) above, during the Certain Funds Period and notwithstanding any other term of this Agreement or any other Finance Document, neither the Issuing Bank nor any Lender may:

(a) refuse to participate in or make available any Acquisition Loan;

(b) cancel any Senior B Facility Commitment or a Revolving Facility Commitment;

(c) exercise any right of rescission, set-off, counterclaim or similar right or remedy which it may have in relation to this Agreement or any Acquisition Loan; or

(d) accelerate any Acquisition Loan or otherwise demand or require repayment or prepayment of any Acquisition Loan or enforce any security under any Transaction Security Document other than pursuant to Clause 12.1 (*Illegality*) or while a Major Event of Default is outstanding,

*provided that* immediately upon the expiry of the Certain Funds Period all such rights, remedies and entitlements shall be available to the Finance Parties notwithstanding that they would not have been available for use during the Certain Funds Period.

### 4.3    Further conditions precedent

Subject to Clause 4.2 (*Certain funds*), the Lenders will only be obliged to comply with Clause 5.4 (*Lenders' participation*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a) in the case of a Rollover Loan which is for an Interest Period not exceeding one month, no notice has been delivered under Clause 29.13 (*Acceleration*);

(b) in the case of any other Utilisation, no Default is continuing or would result from the proposed Utilisation; and

(c) in relation to any Utilisation on the Closing Date, all the representations and warranties in Clause 25 (*Representations*) which are made or deemed to be made on the Closing Date in accordance with Clause 25.24 (*Repetition*) or, in relation to any other Utilisation, the Repeating Representations, to be made by each Obligor are true and accurate.

### 4.4    Conditions relating to Optional Currencies
(a) A currency will constitute an Optional Currency in relation to a Utilisation if:

(i) it is readily available in the amount required and freely convertible into the Base Currency in the Relevant Interbank Market at the Specified Time or, if later, on the date the Agent receives the relevant Utilisation Request and the Utilisation Date for that Utilisation; and

[London #293508 v19]

Confidential

CITI-TF 00701567

(ii)     it is euro or dollars or (in the case of a Utilisation of the Revolving Facility or the Acquisition Facility) has been approved by the Agent (acting on the instructions of all the Lenders) on or prior to receipt by the Agent of the relevant Utilisation Request for that Utilisation.

(b)     If the Agent has received a written request from the Company for a currency to be approved under paragraph (a)(ii) above, the Agent will confirm to the Company by the Specified Time:

(i)     whether or not the Lenders have granted their approval; and

(ii)     if approval has been granted, the minimum amount for any subsequent Utilisation in that currency.

### 4.5     Maximum number of Utilisations

(a)     Subject as set out in paragraph (c) below, a Borrower may not deliver a Utilisation Request or request that a Senior B Facility Loan or an Acquisition Facility Loan be divided if as a result of the proposed Utilisation:

(i)     more than 10 Senior B Facility Loans would be outstanding;

(ii)     more than 15 Acquisition Facility Loans would be outstanding;

(iii)     more than 30 Revolving Facility Loans would be outstanding; or

(iv)     more than 10 Letters of Credit would be outstanding.

(b)     Any Loan made by a single Lender under Clause 9.2 (*Unavailability of a currency*) shall not be taken into account in this Clause 4.5.

(c)     Paragraph (a) above shall not apply to Utilisations pursuant to an Additional Acquisition Facility Commitment Notice. There shall be no limit on the number of Additional Acquisition Facility Commitment Notices which may be delivered provided that the aggregate principal amount of Commitments and Utilisations under all Additional Acquisition Facility Commitment Notices (except to the extent cancelled pursuant to one or more Additional Acquisition Facility Commitment Cancellation Notice) may not exceed £200,000,000 (or its equivalent).

### 4.6     Utilisation in respect of an Offer

If the Acquisition proceeds by way of an Offer, any amount of the Senior B Loan which is not required on the Closing Date to satisfy the consideration payable by the Company to the holders of the Target Shares shall be paid into a bank account held at an Acceptable Bank or with the Agent or Security Agent which shall be subject to the Transaction Security and paid out only in order to complete the Acquisition in accordance with Part 28 of the Companies Act 2006.

53

Confidential

A-5950

## SECTION 3
## UTILISATION

**5.    UTILISATION OF LOANS**

5.1    **Delivery of a Utilisation Request**

A Borrower (or the Obligors' Agent on its behalf) may utilise a Facility by delivery to the Agent of a duly completed Utilisation Request not later than the Specified Time or, in respect of any Utilisation of Acquisition Loans to be made in Sterling on the Closing Date, no later than 9:00 a.m. on the Closing Date.

5.2    **Completion of a Utilisation Request**

(a)    Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

   (i)      it identifies the Facility to be utilised;

   (ii)     it identifies the relevant Borrower;

   (iii)    the proposed Utilisation Date is, in the case of any Acquisition Loan, the Closing Date or otherwise a Business Day in each case within the Availability Period applicable to that Facility;

   (iv)     the currency and amount of the Utilisation comply with Clause 5.3 (*Currency and amount*);

   (v)      the proposed Interest Period complies with Clause 16 (*Interest Periods*);

   (vi)     it specifies the account and bank (which, in the case of euro, must be in the principal financial centre of a Participating Member State in which banks are open for general business on that day or London or, in the case of an Optional Currency the principal financial centre of the country of the currency of the Utilisation) to which the proceeds of the Utilisation are to be credited; and

   (vii)    in the case of a Utilisation of the Revolving Facility, it identifies the relevant business division for which that Facility is to be utilised and, in case of an Acquisition Loan, it identifies whether that Acquisition Loan is a Music Publishing Division Acquisition Loan or a Recorded Music Division Acquisition Loan.

(b)    Multiple Utilisations may be requested in a Utilisation Request on the First Utilisation Date. Only one Utilisation may be requested in each subsequent Utilisation Request.

5.3    **Currency and amount**

(a)    The currency specified in a Utilisation Request must be:

   (i)      in relation to the Senior B Facility, the Base Currency; and

   (ii)     in relation to the Acquisition Facility or the Revolving Facility, the Base Currency or an Optional Currency.

(b)    Unless the Agent otherwise agrees, the amount of the proposed Utilisation must be an amount whose Base Currency Amount is not more than the Available Facility (adjusted, where applicable, to take account of any additional Utilisations which are scheduled to take place on or before the relevant Utilisation Date and ignoring, in the case of a Rollover Loan, the amount to be so refinanced) and which is:

[London #293508 v19]

54

Confidential

CITI-TF 00701569

(i)    if the currency selected is the Base Currency, a minimum of £5,000,000 and integral multiples of £1,000,000 thereafter (in respect of the Senior B Facility and the Acquisition Facility), or a minimum of £2,000,000 and integral multiples of £500,000 thereafter (in respect of the Revolving Facility (other than for Letters of Credit, which are subject to the limit in paragraph (b) of Clause 6.4 (*Currency and amount*))) or in each case, or, if less, the relevant Available Facility; or

(ii)    if the currency selected is euro or dollars, a minimum of €5,000,000 or $5,000,000 and integral multiples of €1,000,000 or $1,000,000 (as the case may be) thereafter (in respect of the Senior B Facility and the Acquisition Facility), or a minimum of €2,000,000 or $2,000,000 and integral multiples of €500,000 or $500,000 (as the case may be) thereafter (in respect of the Revolving Facility (other than for Letters of Credit, which are subject to the limit in paragraph (b) of Clause 6.4 (*Currency and amount*))) or in each case, if less, the Available Facility; or

(iii)    if the currency selected is an Optional Currency other than euro or dollars, the minimum amount specified by the Agent pursuant to paragraph (b)(ii) of Clause 4.4 (*Conditions relating to Optional Currencies*) or, if less, the relevant Available Facility.

**5.4   Lenders' participation**

(a)    If the conditions set out in this Agreement have been met, each Lender shall make its participation in each Loan available by the Utilisation Date through its Facility Office.

(b)    Subject to paragraph (d) below, the amount of each Lender's participation in each Loan will be equal to the proportion borne by its relevant Available Commitment to the relevant Available Facility immediately prior to making the Loan provided that for the avoidance of doubt only Lenders which have accepted an allocation of Additional Acquisition Facility Commitments shall be required to participate in a corresponding Term Loan.

(c)    The Agent shall determine the Base Currency Amount of each Loan which is to be made in an Optional Currency and notify each relevant Lender of the amount, currency and the Base Currency Amount of each Loan and the amount of its participation in that Loan by the Specified Time or, in the case of any Utilisation under the Term Loans to be made on the Closing Date, as soon as practicable after receipt of the relevant Utilisation Request.

(d)    Each Borrower agrees that each Senior B Facility Lender may deduct by way of original issue discount an amount equal to the OID Percentage of each Senior B Facility Loan advanced by that Senior B Facility Lender provided that an equivalent amount is available for drawing under the Revolving Facility as described in Clause 3.1(c) (*Purpose*).

**5.5   Limitations on Utilisations**

(a)    The relevant Lenders shall be under no obligation to comply with Clause 5.4 (*Lenders' participation*) in respect of a Revolving Facility Utilisation if to do so would cause the aggregate of the Base Currency Amount of Letters of Credit or Ancillary Outstandings provided and requested to be provided, together with the outstanding Revolving Facility Loans to exceed the Total Revolving Facility Commitments.

(b)    Notwithstanding anything to the contrary, the relevant Lenders shall be under no obligation to comply with Clause 5.4 (*Lenders' participation*) if to do so would cause the aggregate of any outstanding Utilisations to exceed the Total Commitments.

(c)    The maximum aggregate amount of the Ancillary Commitments of all the Lenders shall not at any time exceed £30 million.

Confidential

CITI-TF 00701570

A-5952

(d) The maximum aggregate amount of the Revolving Facility Commitments for utilisation by the Music Publishing Division shall not at any time exceed £75 million (the "**Music Publishing Division Revolving Facility**").

(e) The maximum aggregate amount of the Revolving Facility Commitments for utilisation by the Recorded Music Division shall not at any time exceed £275 million (the "**Recorded Music Division Revolving Facility**").

(f) The maximum aggregate amount of the Acquisition Facility Commitments for utilisation by the Music Publishing Division shall not at any time exceed £50 million (with respect to amounts committed on the date of this Agreement) or £150 million (with respect to amounts committed after the date of this Agreement) (the "**Music Publishing Division Acquisition Facility**").

(g) The maximum aggregate amount of the Acquisition Facility Commitments for utilisation by the Recorded Music Division shall not at any time exceed £50 million (with respect to amounts committed on the date of this Agreement) or £50 million (with respect to amounts committed after the date of this Agreement).

5.6 **Clean down**

The Company shall ensure that the aggregate of the Base Currency Amounts of:

(a) all Revolving Facility Loans;

(b) any cash loan element of the Ancillary Outstandings under all the Ancillary Facilities; less

(c) the OID Amount,

shall not exceed 0 for a period of not less than 10 successive days in each of its Financial Years, including the Financial Year in which the Closing Date occurs.

6. **UTILISATION BY WAY OF LETTERS OF CREDIT**

6.1 **The Revolving Facility**

(a) Subject to Clause 5.5 (*Limitations on Utilisations*), the Revolving Facility may be utilised by way of Letters of Credit.

(b) Other than Clause 5.5 (*Limitations on Utilisations*), Clause 5 (*Utilisation of Loans*) does not apply to a Utilisation by way of Letters of Credit.

(c) The maximum aggregate amount of Letters of Credit issued under the Revolving Facility shall not at any time exceed £60 million.

6.2 **Delivery of a Utilisation Request for Letters of Credit**

A Borrower (or the Obligors' Agent on its behalf) may request a Letter of Credit or the renewal of an existing Letter of Credit by delivery to the Agent of a duly completed Utilisation Request in the form of Part II of Schedule 3 (*Requests*) not later than the Specified Time.

6.3 **Completion of a Utilisation Request for Letters of Credit**

Each Utilisation Request for a Letter of Credit is irrevocable and will not be regarded as having been duly completed unless:

(a) it specifies that it is for a Letter of Credit;

(b) it identifies the Borrower of the Letter of Credit;

[London #293508 v19]

Confidential

CITI-TF 00701571

(c)   it identifies the Issuing Bank which has agreed to issue the Letter of Credit;

(d)   the proposed Utilisation Date is a Business Day within the Availability Period applicable to the Revolving Facility;

(e)   the currency and amount of the Letter of Credit comply with Clause 6.4 (*Currency and amount*);

(f)   the form of Letter of Credit is attached or it is in the form agreed with the Issuing Bank;

(g)   the Expiry Date of the Letter of Credit falls on or before the Final Maturity Date in relation to the Revolving Facility (unless cash cover has been provided in relation to such Letter of Credit prior to the Final Maturity Date);

(h)   the delivery instructions for the Letter of Credit are specified;

(i)   it specifies the identity of the beneficiary of the Letter of Credit (and the Issuing Bank is not prevented from guaranteeing such beneficiary under legal and regulatory restrictions);

(j)   in the case of a Utilisation Request for the renewal of a Letter of Credit the terms shall be the same or substantially similar as those of the Letter of Credit to be renewed except that its Term shall start on the date which was the Expiry Date of the Letter of Credit to be renewed and shall end on the proposed Expiry Date specified in the renewal Utilisation Request; and

(k)   it identifies the relevant business division for which the Letter of Credit is to be utilised.

**6.4   Currency and amount**

(a)   The currency for the Letter of Credit specified in a Utilisation Request must be the Base Currency or an Optional Currency.

(b)   The amount of the proposed Letter of Credit must be an amount whose Base Currency Amount is not more than the Available Facility in respect of the Revolving Facility and which:

(i)   if the currency selected is the Base Currency, is a minimum of £1,000,000 or, if less, the Available Facility in respect of the Revolving Facility;

(ii)   if the currency selected is euro or dollars, is a minimum of €1,000,000 or $1,000,000, as the case may be, or its equivalent or, if less, the Available Facility in respect of the Revolving Facility; or

(iii)   if the currency selected is an Optional Currency other than euro or dollars, is the minimum amount specified by the Agent pursuant to paragraph (b)(ii) of Clause 4.4 (*Conditions relating to Optional Currencies*) or, if less, the Available Facility in respect of the Revolving Facility.

**6.5   Issue of Letters of Credit**

(a)   If the conditions set out in this Agreement have been met, the Issuing Bank shall:

(i)   issue the Letter of Credit on the Utilisation Date; and

(ii)   if so requested amend and reissue any Letter of Credit on its Expiry Date.

Confidential

CITI-TF 00701572

(b)    The Issuing Bank will only be obliged to comply with paragraph (a) above if on the date of the Utilisation Request and on the proposed Utilisation Date:

    (i)    in the case of a Letter of Credit to be renewed in accordance with Clause 6.6 (*Renewal of a Letter of Credit*) no notice has been delivered under Clause 29.13 (*Acceleration*) and in the case of any other Utilisation for a Letter of Credit, no Default is continuing or would result from such proposed Utilisation; and

    (ii)    all of the representations and warranties in Clause 25 (*Representations*) which are or which are deemed to be made or repeated by any Obligor on such date pursuant to Clause 25.24 (*Repetition*) are true in all material respects.

(c)    The amount of each Lender's participation in each Letter of Credit will be equal to the proportion borne by its Available Commitment to the Available Facility (in each case in relation to the Revolving Facility) immediately prior to the issue or re-issue of the Letter of Credit.

(d)    The Agent shall determine the Base Currency Amount of each Letter of Credit which is to be issued in an Optional Currency and shall notify the Issuing Bank and each Lender of the details of the requested Letter of Credit and its participation in that Letter of Credit by the Specified Time.

(e)    If requested by the relevant Borrower, the Issuing Bank may agree to issue a Letter of Credit that has automatic extension provisions save where the Issuing Bank would not have been permitted to issue such Letter of Credit in its extended or revised form under the terms of the Revolving Facility, or the Majority Lenders deliver notice not less than five Business Days prior to the relevant extension date that they have elected not to permit such extension.

**6.6    Renewal of a Letter of Credit**

(a)    A Borrower (or the Obligors' Agent on its behalf) may request that any Letter of Credit issued on behalf of that Borrower be renewed by delivery to the Agent of a Renewal Request in substantially similar form to a Utilisation Request for a Letter of Credit by the Specified Time.

(b)    The Finance Parties shall treat any Renewal Request in the same way as a Utilisation Request for a Letter of Credit except that the conditions set out in paragraph (f) of Clause 6.3 (*Completion of a Utilisation Request for Letters of Credit*) shall not apply.

(c)    The terms of each renewed Letter of Credit shall be the same as those of the relevant Letter of Credit immediately prior to its renewal, except that:

    (i)    its amount may be less than the amount of the Letter of Credit immediately prior to its renewal; and

    (ii)    its Term shall start on the date which was the Expiry Date of the Letter of Credit immediately prior to its renewal, and shall end on the proposed Expiry Date specified in the Renewal Request.

(d)    If the conditions set out in this Agreement have been met, the Issuing Bank shall amend and re issue any Letter of Credit pursuant to a Renewal Request.

**6.7    Revaluation of Letters of Credit**

(a)    If any Letters of Credit are denominated in an Optional Currency, the Agent shall at the end of each half of each of its Financial Years recalculate the Base Currency Amount of each Letter of Credit by notionally converting into the Base Currency the outstanding amount of that Letter of Credit on the basis of the Agent's Spot Rate of Exchange on the date of calculation.

[London: 8293508 v19]

Confidential

CITI-TF 00701573

(b) The Company shall, if requested by the Agent within 5 days of any calculation under paragraph (a) above, ensure that within three (3) Business Days sufficient Revolving Facility Utilisations are prepaid to the extent necessary to prevent the Base Currency Amount of the Revolving Facility Utilisations exceeding the Total Revolving Facility Commitments (after deducting the total Ancillary Commitments) following any adjustment to a Base Currency Amount under paragraph (a) of this Clause 6.7.

**7.     LETTERS OF CREDIT**

**7.1    Immediately payable**

If a Letter of Credit or any amount outstanding under a Letter of Credit is expressed to be immediately payable, the Borrower that requested (or on behalf of which the Obligors' Agent requested) the issue of that Letter of Credit shall repay or prepay that amount immediately or, if payment is being funded by a Utilisation of the Revolving Facility, within two (2) Business Days (or, if such payment is in an Optional Currency, four (4) Business Days) of demand.

**7.2    Fees payable in respect of Letters of Credit**

(a) The Company or each Borrower shall pay to the Issuing Bank a fronting fee in respect of each Letter of Credit requested by it at the rate of 0.125 per cent. per annum on the outstanding amount which is counter-indemnified by the other Lenders (and not an Affiliate of the Issuing Bank) on each Letter of Credit issued at its request for the period from the issue of that Letter of Credit until its Expiry Date save to the extent the relevant Letter of Credit is cash covered.

(b) The Company or each Borrower shall pay to the Agent (for the account of each Lender) a Letter of Credit fee in the Base Currency computed at the rate equal to the Margin applicable to a Revolving Facility Loan on the outstanding amount of each Letter of Credit requested by it for the period from the issue of that Letter of Credit until its Expiry Date save to the extent the relevant Letter of Credit is cash covered. This fee shall be distributed according to each Lender's Letter of Credit Proportion of that Letter of Credit.

(c) The accrued fronting fee and accrued Letter of Credit fee on a Letter of Credit shall be payable on the last day of each successive period of three (3) months from the Closing Date for so long as any Lender has any contingent liability under a Letter of Credit and on the date on which the Lenders cease to have any obligation towards the Borrowers under the Revolving Facility.

**7.3    Claims under a Letter of Credit**

(a) Each Borrower irrevocably and unconditionally authorises the Issuing Bank to pay any claim made or purported to be made under a Letter of Credit requested by it (or requested by the Company on its behalf) and which appears on its face to be in order (a "claim").

(b) Each Borrower shall immediately following receipt of a demand therefor, if such payment is to be funded by a Revolving Facility Loan, shall within three (3) Business Days following receipt of a demand (or, if such payment is in an Optional Currency, four (4) Business Days) pay to the Agent for the Issuing Bank an amount equal to the amount of any claim provided that if such drawing is for the same amount and in the same currency of such Letter of Credit it shall be treated as a Rollover Loan.

(c) Each Borrower and each Lender acknowledges that the Issuing Bank:

(i) is not obliged to carry out any investigation or seek any confirmation from any other person before paying a claim; and

(ii) deals in documents only and will not be concerned with the legality of a claim or any underlying transaction or any available set-off, counterclaim or other defence of any person.

59

CITI-TF 00701574

(d)    The obligations of a Borrower and each Lender under this Clause 7.3 will not be affected by:

    (i)    the sufficiency, accuracy or genuineness of any claim or any other document; or

    (ii)    any incapacity of, or limitation on the powers of, any person signing a claim or other document.

**7.4    Indemnities**

(a)    Each Borrower shall within three (3) Business Days of demand (except as otherwise specified in this Clause 7) indemnify the Issuing Bank against any cost, loss or liability incurred by the Issuing Bank (otherwise than by reason of the Issuing Bank's gross negligence or, wilful misconduct) in acting as the Issuing Bank under any Letter of Credit requested by (or on behalf of) that Borrower.

(b)    Each Lender shall immediately on demand indemnify the Issuing Bank against such Lender's Letter of Credit Proportion of any cost, loss or liability incurred by the Issuing Bank (otherwise than by reason of the Issuing Bank's gross negligence or wilful misconduct) in acting as the Issuing Bank under any Letter of Credit (unless the Issuing Bank has been reimbursed by an Obligor pursuant to a Finance Document).

(c)    If any Lender is not permitted (by its constitutional documents or any applicable law) to comply with paragraph (b) above, then that Lender will not be obliged to comply with paragraph (b) and shall instead be deemed to have taken, on the date the Letter of Credit is issued (or if later, on the date the Lender's participation in the Letter of Credit is transferred or assigned to the Lender in accordance with the terms of this Agreement), an undivided interest and participation in the Letter of Credit in an amount equal to its Letter of Credit Proportion of that Letter of Credit. On receipt of demand from the Agent, that Lender shall pay to the Agent (for the account of the Issuing Bank) an amount equal to its Letter of Credit Proportion of the amount demanded.

(d)    The Borrower which requested (or on behalf of which the Obligors' Agent requested) a Letter of Credit shall immediately on demand reimburse any Lender for any payment it makes to the Issuing Bank under this Clause 7.4 in respect of that Letter of Credit.

(e)    The obligations of each Lender under this Clause 7.4 are continuing obligations and will extend to the ultimate balance of sums payable by that Lender in respect of any Letter of Credit, regardless of any intermediate payment or discharge in whole or in part.

(f)    The obligations of any Lender or Borrower under this Clause 7.4 will not be affected by any act, omission matter or thing which, but for this Clause 7.4, would reduce, release or prejudice any of its obligations under this Clause 7.4 (without limitation and whether or not known to it or any other person) including:

    (i)    any time, waiver or consent granted to, or composition with, any Obligor, any beneficiary under a Letter of Credit or other person;

    (ii)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor or any member of the Group;

    (iii)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor, any beneficiary under a Letter of Credit or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

[London #293508 v19]

Confidential

CITI-TF 00701575

(iv)  any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor, any beneficiary under a Letter of Credit or any other person;

(v)  any amendment (however fundamental) or replacement of a Finance Document, any Letter of Credit (provided that the Obligors' Agent or the relevant Borrower has provided its written consent to such amendment) or any other document or security;

(vi)  any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document, any Letter of Credit or any other document or security (unless such unenforceability, illegality or invalidity is attributable to the gross negligence or wilful misconduct of the Issuing Bank); or

(vii)  any insolvency or similar proceedings.

(g)  This Clause 7.4 shall not apply to the extent that the relevant cost, loss or liability is compensated for by Clause 19.2 (*Tax gross-up*) (or could have been compensated but was not so compensated solely because one of the exclusions in Clause 19.2(d) (*Tax gross-up*) applied).

**7.5  Rights of contribution**
No Obligor will be entitled to any right of contribution or indemnity from any Finance Party in respect of any payment it may make under this Clause 7.

**7.6  Settlement Conditional**
Any settlement or discharge between a Lender and the Issuing Bank shall be conditional upon no security or payment to the Issuing Bank by a Lender or any other person on behalf of a Lender being avoided or reduced by virtue of any laws relating to bankruptcy, insolvency, liquidation or similar laws of general application and, if any such security or payment is so avoided or reduced, the Issuing Bank shall be entitled to recover the value or amount of such security or payment from such Lender subsequently as if such settlement or discharge had not occurred.

**7.7  Exercise of Rights**
The Issuing Bank shall, to the fullest extent permitted by mandatory provisions of applicable law, not be obliged before exercising any of the rights, powers or remedies conferred upon it in respect of any Lender by this Agreement or by law:

(a)  to take any action or obtain judgment in any court against any Obligor;

(b)  to make or file any claim or proof in a winding-up or dissolution of any Obligor; or

(c)  to enforce or seek to enforce any other security taken in respect of any of the obligations of any Obligor under this Agreement.

Confidential

CITI-TF 00701576

**7.8 Letters of Credit to become Loans**

(a)     Any amount of principal demanded from and paid by the Issuing Bank under a Letter of Credit representing a drawing of the Revolving Facility Commitments, subject in each case to paragraph (b) below, shall constitute a Revolving Facility Loan made by the Issuing Bank on behalf of the Revolving Facility Lenders to the relevant Borrowers severally in the same proportions as their liabilities arise with respect to such Letter of Credit pursuant to Clause 7.4 (*Indemnities*), in each case to the extent that there remains a sufficient amount of the Revolving Facility Commitments undrawn at the time (for this purpose the relevant utilisation by Letter of Credit being deemed not to be outstanding to the extent of the amount demanded).

(b)     All provisions of this Agreement relating to a Revolving Facility Loan that is a Rollover Loan (as applicable) and the making thereof (including, without limitation, the provisions of paragraph (b) of Clause 4.3 (*Further conditions precedent*) and all provisions relating to the payment of interest thereon and the repayment and prepayment of principal thereof) shall apply thereto. The proceeds of such Loan shall be applied in satisfaction of the relevant Borrower's obligations to the Lenders in respect of such Letter of Credit under this Agreement.

**8.     INTENTIONALLY OMITTED**

**9.     OPTIONAL CURRENCIES**

**9.1   Selection of currency**
A Borrower (or the Obligors' Agent on its behalf) shall select the currency of a Utilisation in a Utilisation Request.

**9.2   Unavailability of a currency**
If before the Specified Time on any Quotation Day:

(a)     a Lender notifies the Agent that the Optional Currency requested is not readily available to it in the amount required; or

(b)     a Lender notifies the Agent that compliance with its obligation to participate in a Loan in the proposed Optional Currency would contravene a law or regulation applicable to it,

the Agent will give notice to the relevant Borrower (or the Obligors' Agent on behalf of such Borrower) to that effect by the Specified Time on that day. In this event, any Lender that gives notice pursuant to this Clause 9.2 will be required to participate in the Loan in the Base Currency (in an amount equal to that Lender's proportion of the Base Currency Amount, or in respect of a Rollover Loan, an amount equal to that Lender's proportion of the Base Currency Amount of the Rollover Loan that is due to be made) and its participation will be treated as a separate Loan denominated in the Base Currency during that Interest Period.

**9.3   Redenomination of Senior B Loans**
At any time prior to the Syndication Date the Company may, by delivering to the Agent a notification of its intent to redenominate one or more Senior B Loans (a "Redenomination Notice") at least three (3) Business Days prior to the requested date of redenomination (which date may, for the avoidance of doubt, include the Closing Date), request that Senior B Loans in an aggregate principal amount of up to the Base Currency equivalent of £240 million be redenominated from euro to dollars based on the Agent's Spot Rate of Exchange on the date falling two (2) Business Days after receipt by the Agent of such Redenomination Notice. The Agent shall give the Company not less than five (5) Business Days' prior notice of the occurrence of the Syndication Date.

**10.    ANCILLARY FACILITIES**

**10.1  Type of Facility**
An Ancillary Facility may be by way of:

(a)    an overdraft facility, automated payment, cheque drawing or other current account facilities;

(b)    a short term loan facility;

(c)    a foreign exchange or derivatives facility;

(d)    a guarantee, bonding, or documentary or standby letter of credit facility; and/or

(e)    any other facilities or financial accommodations required in connection with the business of the Group and which is agreed by the Company with an Ancillary Lender.

**10.2    Availability**

(a)    If the Company and a Lender agree and except as otherwise provided in this Agreement, the Lender may provide an Ancillary Facility on a bilateral basis in place of all or part of that Lender's unutilised Revolving Facility Commitment (which shall (except for the purpose of determining the Majority Lenders or the Super-Majority Lenders) be reduced by the amount of the Ancillary Commitment under that Ancillary Facility).

(b)    An Ancillary Facility shall not be made available unless, not later than five (5) Business Days prior to the Ancillary Commencement Date for the Ancillary Facility, the Agent has received from the Company:

(i)    a notice in writing requesting the establishment of an Ancillary Facility and specifying:

(A)    the proposed Borrower(s) which may use the Ancillary Facility;

(B)    the proposed Ancillary Commencement Date and expiry date of the Ancillary Facility;

(C)    the proposed type of Ancillary Facility to be provided;

(D)    the proposed Ancillary Lender;

(E)    the proposed Ancillary Commitment, the maximum amount of the Ancillary Facility (specified as an amount in the Base Currency) and, if the Ancillary Facility is an overdraft facility comprising more than one account, its maximum gross amount (that amount being the "**Designated Gross Amount**") and its maximum net amount (that amount being the "**Designated Net Amount**"); and

(F)    the proposed currency of the Ancillary Facility (if not denominated in the Base Currency);

(ii)    a copy of the proposed Ancillary Document; and

(iii)    any other information which the Agent may reasonably request in connection with the Ancillary Facility.

The Agent shall promptly notify the Company, the Ancillary Lender and the other Lenders of the establishment of an Ancillary Facility. No amendment or waiver of a term of any Ancillary Facility shall require the consent of any Finance Party other than the relevant Ancillary Lender unless such amendment or waiver itself relates to or gives rise to a matter which would require an amendment of or under this Agreement (including, for the avoidance of doubt, under this

63

CITI-TF 00701578

Clause 10.2). In such a case, the provisions of this Agreement with regard to amendments and waivers will apply.

(c)    Subject to compliance with paragraph (b) above:

    (i)    the Lender concerned will become an Ancillary Lender; and

    (ii)    the Ancillary Facility will be available,

with effect from the date agreed by the Company and the Ancillary Lender.

**10.3    Terms of Ancillary Facilities**

(a)    Except as provided below, the terms of any Ancillary Facility will be those agreed by the Ancillary Lender and the Company.

(b)    Notwithstanding paragraph (a) above, those terms:

    (i)    must be based upon normal commercial terms at that time (except as varied by this Agreement);

    (ii)    must require that any Ancillary Facility be used for the general corporate and working capital purposes of the Group;

    (iii)    may allow only Borrowers to use the Ancillary Facility;

    (iv)    may not allow the Ancillary Outstandings to exceed the Ancillary Commitment;

    (v)    may not allow the Ancillary Commitment of a Lender to exceed the Available Commitment with respect to the Revolving Facility of that Lender; and

    (vi)    must require that the Ancillary Commitment is reduced to nil, and that all Ancillary Outstandings are repaid (or cash cover provided in respect of all the Ancillary Outstandings) not later than the Final Maturity Date for the Revolving Facility.

(c)    If there is any inconsistency between any term of an Ancillary Facility and any term of this Agreement, this Agreement shall prevail except for (i) Clause 38.3 (*Day count convention*) which shall not prevail for the purposes of calculating fees, interest or commission relating to an Ancillary Facility and (ii) an Ancillary Facility comprising more than one account where the terms of the Ancillary Documents shall prevail.

(d)    Interest, commission and fees on Ancillary Facilities are dealt with in Clause 10.9 (*Interest, Commitment Commission and Fees on Ancillary Facilities*).

**10.4    Repayment of Ancillary Facility**

(a)    An Ancillary Facility shall cease to be available on the Final Maturity Date in relation to the Revolving Facility or such earlier date on which its expiry date occurs or on which it is cancelled in accordance with the terms of this Agreement.

(b)    If an Ancillary Facility expires in accordance with its terms the Ancillary Commitment of the Ancillary Lender shall be reduced to zero (and its Revolving Facility Commitment shall be increased accordingly).

(c)    No Ancillary Lender may demand repayment or prepayment of any amounts or demand cash cover for any liabilities made available or incurred by it under its Ancillary Facility (except

Confidential

A-5961

where the Ancillary Facility is provided on a net limit basis to the extent required to bring any gross outstandings down to the net limit) unless:

(i)     the Total Revolving Facility Commitments have been cancelled in full, or all outstanding Utilisations under the Revolving Facility have become due and payable in accordance with the terms of this Agreement, or the Agent has declared all outstanding Utilisations under the Revolving Facility immediately due and payable, or the expiry date of the Ancillary Facility occurs; or

(ii)    it becomes unlawful in any applicable jurisdiction for the Ancillary Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in its Ancillary Facility; or

(iii)   the Ancillary Outstandings (if any) under that Ancillary Facility can be refinanced by a Revolving Facility Utilisation under the Revolving Facility and the Ancillary Lender gives sufficient notice to enable a Utilisation of the Revolving Facility to be made to refinance those Ancillary Outstandings.

(d)     For the purposes of determining whether or not the Ancillary Outstandings under an Ancillary Facility mentioned in sub-paragraph (iii) of paragraph (c) above can be refinanced by a Utilisation of the Revolving Facility:

(i)     the Revolving Facility Commitment of the Ancillary Lender will be increased by the amount of its Ancillary Commitment; and

(ii)    the Utilisation may (so long as sub-paragraph (i) of paragraph (c) above does not apply) be made irrespective of whether a Default is outstanding or any other applicable condition precedent is not satisfied (but only to the extent that the proceeds are applied in refinancing those Ancillary Outstandings) and irrespective of whether Clause 4.5 (*Maximum number of Utilisations*) or paragraph (iii) of Clause 5.2 (*Completion of a Utilisation Request*) applies.

(e)     On the making of a Utilisation of the Revolving Facility to refinance Ancillary Outstandings:

(i)     each Lender will participate in that Utilisation in an amount (as determined by the Agent) which will result as nearly as possible in the aggregate amount of its participation in the Revolving Facility Utilisations then outstanding bearing the same proportion to the aggregate amount of the Revolving Facility Utilisations then outstanding as its Revolving Facility Commitment bears to the Total Revolving Facility Commitments; and

(ii)    the relevant Ancillary Facility shall be cancelled.

(f)     In relation to an Ancillary Facility which comprises an overdraft facility where a Designated Net Amount has been established, the Ancillary Lender providing that Ancillary Facility shall only be obliged to take into account for the purposes of calculating compliance with the Designated Net Amount those credit balances which it is permitted to take into account by the then current law and regulations in relation to its reporting of exposures to the Financial Services Authority or its applicable regulator as netted for capital adequacy purposes.

10.5    **Ancillary Outstandings**
Each Borrower and each Ancillary Lender agrees with and for the benefit of each Lender that:

(a)     the Ancillary Outstandings under any Ancillary Facility provided by that Ancillary Lender shall not exceed the Ancillary Commitment applicable to that Ancillary Facility

65

and, where the Ancillary Facility is an overdraft facility comprising more than one account, Ancillary Outstandings under that Ancillary Facility shall not exceed the Designated Net Amount in respect of that Ancillary Facility; and

(b)     where all or part of the Ancillary Facility is an overdraft facility comprising more than one account, the Ancillary Outstandings (calculated on the basis that the words in brackets in paragraph (a) of the definition of that term were deleted) shall not exceed the Designated Gross Amount applicable to that Ancillary Facility.

**10.6    Adjustment for Ancillary Facilities upon acceleration**
In this Clause 10.6:

"**Revolving Outstandings**" means, in relation to a Lender, the aggregate of the equivalent in the Base Currency of (i) its participation in each Revolving Facility Utilisation then outstanding, and (ii) if the Lender is also an Ancillary Lender, the Ancillary Outstandings in respect of Ancillary Facilities provided by that Ancillary Lender.

"**Total Revolving Outstandings**" means the aggregate of all Revolving Outstandings.

(a)     If a notice is served under Clause 29.13 (*Acceleration*) (other than a notice declaring Utilisations to be due on demand), each Lender and each Ancillary Lender shall adjust by corresponding transfers (to the extent necessary) their claims in respect of amounts outstanding to them under the Revolving Facility and each Ancillary Facility to ensure that, after such transfers, the Revolving Outstandings of each Lender bears the same proportion to the Total Revolving Outstandings as such Lender's Revolving Facility Commitment bears to the Total Revolving Facility Commitments, each as at the date the notice is served under Clause 29.13 (*Acceleration*).

(b)     If an amount outstanding under an Ancillary Facility is a contingent liability and that contingent liability becomes an actual liability or is reduced to zero after the original adjustment is made under paragraph (a) above, then each Lender and each Ancillary Lender will make a further adjustment by corresponding transfers (to the extent necessary) to put themselves in the position they would have been in had the original adjustment been determined by reference to the actual liability or, as the case may be, zero liability and not the contingent liability.

(c)     Prior to the application of the provisions of paragraph (a) of this Clause 10.6, an Ancillary Lender that has provided an overdraft comprising more than one account under an Ancillary Facility shall set-off any liabilities owing to it under such overdraft facility against credit balances on any account comprised in such overdraft facility.

(d)     All calculations to be made pursuant to this Clause 10.6 shall be made by the Agent based upon information provided to it by the Lenders and Ancillary Lenders.

**10.7    Information**
Each Borrower and each Ancillary Lender shall, promptly upon request by the Agent, supply the Agent with any information relating to the operation of an Ancillary Facility (including the Ancillary Outstandings) as the Agent may reasonably request from time to time. Each Borrower consents to all such information being released to the Agent and the other Finance Parties.

**10.8    Affiliates of Lenders as Ancillary Lenders**
(a)     Subject to the terms of this Agreement, an Affiliate of a Lender may become an Ancillary Lender. In such case, the Lender and its Affiliate shall be treated as a single Lender whose Revolving Facility Commitment is the amount set out opposite the relevant Lender's name in Part II of Schedule 1 (*The Original Parties*). For the purposes of calculating the Lender's

66

Confidential

CITI-TF 00701581

Available Commitment with respect to the Revolving Facility, the Lender's Commitment shall be reduced to the extent of the aggregate of the Ancillary Commitments of its Affiliates.

(b) The Company shall specify any relevant Affiliate of a Lender in any notice delivered by the Company to the Agent pursuant to paragraph (b)(i) of Clause 10.2 (*Availability*).

(c) An Affiliate of a Lender which becomes an Ancillary Lender shall accede to this Agreement and the Intercreditor Agreement by delivery to the Security Agent of a duly completed accession undertaking in the form scheduled to the Intercreditor Agreement.

(d) If a Lender assigns all of its rights and benefits or transfers all of its rights and obligations to a New Lender (as defined in Clause 30 (*Changes to the Lenders*)), its Affiliate shall be deemed to have assigned or transferred all of its rights and benefits and/or obligations under this Agreement or any Ancillary Document to such New Lender or to an Affiliate of such New Lender.

(e) Where this Agreement or any other Finance Document imposes an obligation on an Ancillary Lender and the relevant Ancillary Lender is an Affiliate of a Lender which is not a party to that document, the relevant Lender shall ensure that the obligation is performed by its Affiliate.

**10.9 Interest, Commitment Commission and Fees on Ancillary Facilities**

(a) The rate and time of payment of interest, commission, fees and any other remuneration in respect of each Ancillary Facility shall be determined by agreement between the Ancillary Lender and the Borrower concerned (or the Company on behalf of that Borrower) based upon normal market rates and terms.

(b) A reference in this Agreement to a Fee Letter shall include the provisions of any document setting out the agreement between the Ancillary Lender and the Borrower under such Ancillary Facility or the Company in respect of interest, commission, fees and other remuneration.

(c) Accrued interest, commission, fees and other remuneration in respect of an Ancillary Facility shall also be payable to the Ancillary Lender on cancellation of the Ancillary Commitment in respect of that Ancillary Facility at the time the cancellation is effective if the Ancillary Commitment is cancelled in full.

**10.10 Cross default**

(a) The Lenders agree that if any Ancillary Lender makes a demand for payment under the terms of an Ancillary Document, that demand shall not be an Event of Default for the purposes of Clause 29.4 (*Cross Default*) if such demand is satisfied in full within three (3) Business Days of the date of such demand.

(b) Subject to compliance with the conditions of this Agreement, any Borrower shall be entitled to draw down a Revolving Facility Loan to repay an Ancillary Lender making a demand as envisaged in paragraph (a) above and, for the purposes of paragraph (a) of Clause 4.3 (*Further conditions precedent*), the Lenders will be obliged to participate in such Revolving Loan as if it were a Rollover Loan (but without prejudice to the other conditions to such Revolving Facility Loan as provided in this Agreement).

(c) In calculating the Available Commitment of the Revolving Facility for this purpose the amount of the Ancillary Facilities provided by that Ancillary Lender shall be added back but only to the extent that the resulting Revolving Loan is paid direct to the relevant Ancillary Lender and applied in reduction of Ancillary Outstandings. In such circumstances, if any other Event of Default has occurred, the Finance Parties may exercise all of their rights under Clause 29 (*Events of Default*) and the Security Agent may enforce the Transaction Security Documents, including in respect of the amount so demanded by any Ancillary Lender.

67

Confidential

A-5964

(d)    If any Ancillary Facility is made available on a committed basis, the relevant Ancillary Lender agrees that it will not make demand under the terms of any Ancillary Document forming part of those committed facilities unless all or part of the outstanding Utilisation and Ancillary Outstandings have been declared due and payable under Clause 29.13 (*Acceleration*).

(e)    If any Ancillary Lender makes a demand in the circumstances envisaged in paragraph (d) above, the Lenders and each Ancillary Lender shall make such adjustments as are necessary in accordance with Clause 10 (*Ancillary Facilities*).

[London #293508 v19]

68

CITI-TF 00701583

## SECTION 4
## REPAYMENT, PREPAYMENT AND CANCELLATION

**11. REPAYMENT**

**11.1 Repayment of Term Loans**

(a) The Borrowers under the Senior B Facility shall repay the aggregate Senior B Facility Loans in full on the Final Maturity Date for the Senior B Facility.

(b) The Borrowers under the Acquisition Facility shall repay the aggregate Acquisition Facility Loans in full on the Final Maturity Date for Acquisition Facility.

**11.2 Repayment of Revolving Facility Loans**

(a) Each Borrower which has drawn a Revolving Facility Loan shall repay that Loan on the last day of its Interest Period.

(b) Where, on the same day on which a Borrower is due to repay a Revolving Facility Loan, such Borrower has also requested a Rollover Loan be made to it, the amount to be so repaid and the amount to be so drawn down shall be netted off against each other so that the amount which the Borrower is actually required to repay shall be the net amount remaining after such netting off.

(c) Any Revolving Facility Loan remaining outstanding on the Final Maturity Date applicable to the Revolving Facility shall be repaid on that date.

(d) Each Borrower under the Revolving Facility shall repay each Letter of Credit requested by that Borrower on the Final Maturity Date applicable to the Revolving Facility.

**11.3 Repayment of Ancillary Facilities**

On the Final Maturity Date applicable to the Revolving Facility, each Borrower under an Ancillary Facility shall repay all amounts (if any) owing or outstanding under that Ancillary Facility.

**12. ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION**

**12.1 Illegality**

If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in any Utilisation:

(a) that Lender shall promptly notify the Agent upon becoming aware of that event;

(b) upon the Agent notifying the Company, the Commitment of that Lender will be immediately cancelled and reduced to the extent of such illegality;

(c) each Borrower shall repay that Lender's reduced and cancelled participation in the Utilisations made to that Borrower on the last day of the Interest Period for each Utilisation occurring after the Agent has notified the Company or, if earlier, the date specified by the Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law); and

(d) the Company shall have the right to serve notice pursuant to Clause 41.5 (*Replacement of a Lender*).

**12.2 Illegality in relation to Issuing Bank**

If it becomes unlawful for an Issuing Bank to issue or leave outstanding any Letter of Credit, then:

69

CITI-TF 00701584

(a)    that Issuing Bank shall promptly notify the Agent upon becoming aware of that event;

(b)    upon the Agent notifying the Company, the Issuing Bank shall not be obliged to issue any Letter of Credit;

(c)    the Company shall procure that the relevant Borrower shall (i) use all its reasonable endeavours (provided that by doing so it suffers no material commercial detriment) to procure the release of each Letter of Credit issued by that Issuing Bank and outstanding at such time and (ii) provide cash cover in respect of each Letter of Credit which has not been released and is outstanding at such time; and

(d)    unless any other Lender has agreed to be an Issuing Bank pursuant to the terms of this Agreement, the Revolving Facility shall cease to be available for the issue of Letters of Credit.

**12.3    Voluntary cancellation**

(a)    The Company may, if it gives the Agent not less than three (3) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part (being a minimum amount of £5 million) of an Available Facility. Any cancellation under this Clause 12.3 shall reduce rateably the Commitments of the Lenders under that Facility.

(b)    Any Available Commitment pursuant to an Additional Acquisition Facility Commitment Notice may be cancelled during its Availability Period by delivery of an Additional Acquisition Facility Commitment Cancellation Notice to the Agent.

**12.4    Automatic Cancellation**

(a)    At the close of business on the last day of the relevant Availability Period in respect of the Acquisition Facility and the Revolving Facility, the Available Commitment of each Lender under the relevant Facility shall be (if it has not already been) immediately cancelled and reduced to zero.

(b)    At the close of business on the earlier of:

(i)    the first Utilisation Date; and

(ii)    the last day of the relevant Availability Period in respect of the Senior B Facility,

the Available Commitment of each Lender under the Senior B Facility shall be (if it has not already been) immediately cancelled and reduced to zero.

(c)    The Available Commitment of each Lender under the each Facility shall be cancelled and reduced to zero if at close of business on the last day of the Availability Period in respect of the Senior B Facility, the Senior B Facility has not been utilised.

**12.5    Voluntary prepayment of Term Loans**

The Company may, if it gives the Agent not less than three (3) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of that Term Loan (but, if in part, being an amount that reduces the Base Currency Amount of that Term Loan by a minimum amount of £5 million).

**12.6    Voluntary prepayment of Revolving Facility Utilisations**

A Borrower to which a Revolving Facility Utilisation has been made may, if it or the Company gives the Agent not less than three (3) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of a Revolving Facility Utilisation

[London #293508 v19]

Confidential

CITI-TF 00701585

(but if in part, being an amount that reduces the Base Currency Amount of the Revolving Facility Utilisation by a minimum amount of £5 million).

**12.7    Application of voluntary prepayments**

Any proceeds to be applied in prepayment of the Term Loans in accordance with Clause 12.5 (*Voluntary prepayments of Term Loans*) shall be applied against the Term Loans as the Borrowers (or the Obligors' Agent on their behalf) direct.

**12.8    Right of cancellation and repayment in relation to a single Lender or Issuing Bank**

(a)    If:

(i)    any sum payable to any Lender by an Obligor is required to be increased under paragraph (c) of Clause 19.2 (*Tax gross-up*); or

(ii)    any Lender or Issuing Bank claims indemnification from the Company or an Obligor under Clause 19.3 (*Tax indemnity*) or Clause 20.1 (*Increased costs*),

the Company may, whilst the circumstance giving rise to the requirement or indemnification continues, give the Agent notice:

(i)    (if such circumstances relate to a Lender) of cancellation of the Commitment of that Lender and its Ancillary Commitment (if any) and its intention to procure the repayment of that Lender's participation in the Utilisations and that Lender's Ancillary Outstandings and its Ancillary Facility; or

(ii)    (if such circumstances relate to the Issuing Bank) of repayment of any outstanding Letter of Credit issued by it and cancellation of its appointment as an Issuing Bank under this Agreement in relation to any Letters of Credit to be issued in the future,

or may, if such circumstances relate to a Lender, instead exercise its rights under Clause 41.5 (*Replacement of Lender*).

(b)    On receipt of a notice referred to in paragraph (a) above in relation to a Lender, the Commitment of that Lender shall immediately be reduced to zero.

(c)    On the last day of each Interest Period which ends after the Company has given notice under paragraph (a) above in relation to a Lender (or, if earlier, the date specified by the Company in that notice), each Borrower to which a Utilisation or a utilisation of an Ancillary Facility is outstanding shall repay that Lender's participation in that Utilisation or utilisation of an Ancillary Facility granted by that Lender together with all interest and other amounts accrued under the Finance Documents or, as the case may be, provide full cash cover in respect of any Letter of Credit issued by the Issuing Bank or a contingent liability under an Ancillary Facility.

**13.    MANDATORY PREPAYMENT**

**13.1    Change of Control**

(a)    In this Clause 13.1:

"**Change of Control**" means the Original Investors (as defined below) ceasing to have the power, directly or indirectly, to vote or direct the voting of shares having a majority of the ordinary voting power for the election of directors of Holdco or any other Holding Company of the Company; provided that the occurrence of the foregoing event shall not be deemed a Change of Control if:

(i)    at any time prior to the consummation of an underwritten Initial Public Offering (as defined below) and for any reason whatever:

71

A-5968

(A) the Original Investors otherwise have the right to designate (and do so designate) a majority of the board of directors of such company; or

(B) the Original Investors and their employees, directors and officers (the "**Original Investors Group**") (or any of them) own legally and beneficially an amount of the ordinary share capital of Holdco or any other Holding Company of the Company equal to at least 50% of the percentage of ordinary share capital of Holdco or any other Holding Company of the Company owned by the Original Investors Group (taken together) legally and beneficially as at the Unconditional Date and such ownership by the Original Investors Group represents the largest single block of voting shares of such company held by any person or persons acting in concert; or

(ii) at any time after the consummation of an underwritten Initial Public Offering and for any reason whatever, no person or persons acting in concert, excluding the Original Investors Group, has become the beneficial owner, directly or indirectly, of more than the greater of:

(A) 35% of the shares then outstanding; and

(B) the percentage of the then outstanding voting shares of such company owned beneficially by the Original Investors Group (taken together),

and the board of directors of such company shall consist of a majority of Continuing Directors.

For the purposes of this definition of Change of Control:

"**affiliate**" as to any person, means any other person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such person;

"**Continuing Directors**" means, at any time and in relation to a company, any member of the board of directors of that company who:

(i) was a member of such board of directors after the Unconditional Date (and immediately following any elections or resignations after the completion of the Acquisition); or

(ii) was nominated for election or elected to such board of directors with, or whose nomination for election or election to such board of directors was approved by, the affirmative vote of a majority of the Continuing Directors who were members of such board of directors at the time of such nomination or election; or

(iii) is a designee of the Sponsor (as defined below) or was nominated by the Sponsor or any designees of the Sponsor on such board of directors.

"**control**" of a person means the power, directly or indirectly, either to:

(i) vote more than 50.0% of the shares (or stock, as applicable) having ordinary voting power for the election of directors of such person; or

(ii) direct or cause the direction of the management and policies of such person, whether by contract or otherwise;

[London #293508 v19]

72

A-5969

"**Initial Public Offering**" means a listing of all or any part of the share capital of Holdco or any of its Subsidiaries or any Holding Company of Holdco on any recognised investment exchange (as that term is used in the Financial Services and Markets Act 2000) or in or on any exchange or market replacing the same or any other exchange or market in any jurisdiction or country.

"**Original Investors**" means Terra Firma Investments (GP) 2 Limited, Terra Firma Investments (GP) 3 Limited and each of their affiliates from time to time (including any other fund managed and/or advised by any such entity) (the "**Sponsor**" or "**The Terra Firma Group**") and, subject to The Terra Firma Group (taken as a whole) maintaining control over not less than 50.1 per cent. of the voting interests of Holdco, any existing investor in the Terra Firma funds and any other investors of similar financial standing acceptable to the Arranger (acting reasonably), its and their principals and their affiliates and management to whom any interest in Holdco has been transferred on or before the date falling six months after the Closing Date or as may otherwise be agreed between the Sponsor with the Arrangers (such agreement not to be unreasonably conditioned, withheld or delayed).

(b)    If a Change of Control or a disposal of substantially all of the business and/or assets of the Parent and its Subsidiaries occurs:

(i)    the Company shall promptly notify the Agent upon becoming aware of that event;

(ii)    a Lender shall not be obliged to fund a Utilisation or a utilisation of an Ancillary Facility; and

(iii)    if a Lender (a "**Change of Control Lender**") so requires, the Agent must, by notice to the Company:

(A)    cancel that Change of Control Lender's Commitments; and

(B)    declare that Change of Control Lender's proportion of the outstanding Utilisations and Ancillary Outstandings, together with accrued interest and all other amounts accrued under the Finance Documents to be immediately due and payable, and full cash cover in an amount equal to that Change of Control Lender's Letter of Credit Proportion in respect of each Letter of Credit or contingent liability under an Ancillary Facility shall become immediately due and payable.

**13.2    Disposal, Insurance, Recovery Proceeds and Excess Cashflow**

(a)    For the purposes of this Clause 13.2, Clause 13.3 (*Application of mandatory prepayments*) and Clause 27 (*Financial Covenants*):

"**De Minimis Threshold**" means (as applied to each relevant definition in this Clause 13.2) £2 million or its equivalent in any Financial Year.

"**Disposal**" means a sale, lease, licence, transfer or other disposal by a person (whether by a voluntary or involuntary single transaction or series of transactions).

"**Excess Takeout Proceeds**" means, in relation to the Net Proceeds of the Permitted Securitisation, Permitted High Yield Issuance, any Music Publishing Division Sale or Recorded Music Division Sale, the balance of the Net Proceeds thereof after application in prepayment of Financial Indebtedness in accordance with the provisions of this Agreement, the Securitisation Bridge Facility Agreement and the Mezzanine Facility Agreement.

"**Excluded Music Publishing Division Insurance Proceeds**" means Music Publishing Division Insurance Proceeds which, when aggregated with any such other proceeds received by the Music

A-5970

Publishing Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)    satisfaction of the liability, damage or loss to which they relate;

(ii)    the purchase of assets which are used or useful for the Music Publishing Division; or

(iii)    as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period,

provided that there shall be no Excluded Music Publishing Division Insurance Proceeds while there is any amount outstanding or available under the Securitisation Bridge Facility or the Music Publishing Division Acquisition Facility.

"Excluded Music Publishing Division Proceeds" means Net Proceeds of a Music Publishing Division Sale:

(i)    which:

    (A)    are received by a member of the Group in respect of any one transaction or series of connected transactions and which do not exceed £750,000 (or its equivalent);

    (B)    when aggregated with the Net Proceeds of all Music Publishing Division Sales made in any one Financial Year, do not exceed £1,500,000 (or its equivalent); and

    (C)    when aggregated with the Net Proceeds of all Music Publishing Division Sales which are Excluded Music Publishing Division Proceeds by virtue of paragraphs (i) or (ii) above, do not exceed £2,500,000 (or its equivalent);

(ii)    which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to reinvest those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards the purchase of assets which are used or useful for the Music Publishing Division or as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period; or

(iii)    which are received by any member of the Group in respect of any one or series of connected transactions pursuant to paragraph (g) of the definition of "Permitted Music Publishing Disposal Proceeds",

provided that, other than Excluded Music Publishing Division Proceeds described in paragraph (iii) above which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to reinvest those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards the purchase of assets which are used or useful for the Music Publishing Division or as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period, there shall be no Excluded Music Publishing Division Proceeds while there is any amount outstanding or available under the Securitisation Bridge Facility or the Music Publishing Division Acquisition Facility.

"Excluded Music Publishing Division Recovery Proceeds" means any Music Publishing Division Recovery Proceeds which, when aggregated with any such other proceeds received by

74

[London #293508 v19]

Confidential

the Music Publishing Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)     satisfaction of the liability, damage or loss to which they relate;

(ii)    the purchase of assets which are used or useful for the Music Publishing Division; or

(iii)   as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period,

provided that there shall be no Excluded Music Publishing Division Recovery Proceeds while there is any amount outstanding or available under the Securitisation Bridge Facility or the Music Publishing Division Acquisition Facility.

"Excluded Recorded Music Division Insurance Proceeds" means Recorded Music Division Insurance Proceeds which, when aggregated with any such other proceeds received by the Recorded Music Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)     satisfaction of the liability, damage or loss to which they relate;

(ii)    the purchase of assets which are used or useful for the Recorded Music Division; or

(iii)   as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period.

"Excluded Recorded Music Division Proceeds" means Net Proceeds of a Recorded Music Division Sale which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to reinvest those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards the purchase of assets which are used or useful for the Recorded Music Division or as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period.

"Excluded Recorded Music Division Recovery Proceeds" means any Recorded Music Division Recovery Proceeds which, when aggregated with any such other proceeds received by the Recorded Music Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)     satisfaction of the liability, damage or loss to which they relate;

(ii)    the purchase of assets which are used or useful for the Recorded Music Division; or

(iii)   as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period.

"Insurance Proceeds" means the Net Proceeds of any insurance claim (save for any insurance for third party liability, business interruption, loss of earnings, credit insurance or similar claims) received by a member of the Group.

75

**"Mandatory Prepayment Account"** means an interest bearing account:

(i)  held at an Acceptable Bank by a Borrower with the Agent or Security Agent;

(ii)  identified in a letter from the Company to the Agent as a Mandatory Prepayment Account;

(iii)  subject to Security in favour of the Security Agent which Security is in form and substance satisfactory to the Agent and the Security Agent; and

(iv)  from which no withdrawals may be made by any members of the Group except as contemplated by this Agreement,

(as the same may be redesignated, substituted or replaced from time to time).

**"Material Tax Costs"** means, in respect of an amount to be prepaid under this Agreement, an amount equal to four (4) per cent. of such amount.

**"Music Publishing Division Insurance Proceeds"** means Insurance Proceeds received by the Music Publishing Division.

**"Music Publishing Division Recovery Proceeds"** means Recovery Proceeds received or recovered by the Music Publishing Division.

**"Music Publishing Division Sale"** means:

(i)  a Disposal of any asset, business or undertaking comprising part of the Music Publishing Division or the Capital Stock of any person which owns any such assets, business or undertaking; or

(ii)  a Disposal of all or any part of the Music Publishing Division.

**"Net Proceeds"** means the cash proceeds actually received by a member of the Group or a Securitisation Entity (and if the proceeds are received by a person that is not a wholly-owned member of the Group, the amount of the proceeds that are proportionate to the interest in such person held by the Group) in connection with any Disposal, insurance claim and claims against professionals in relation to the Reports after deducting:

(i)  fees, costs and expenses incurred by any member of the Group with respect to such Disposal or claim to persons who are not members of the Group (including any bonus or similar payments to management of any disposed of business);

(ii)  any Tax incurred and required to be paid by the seller or claimant (including by way of application of any Tax credits or amounts reasonably reserved in respect of Taxes) in connection with that Disposal or claim (as may reasonably be determined by such seller or claimant) or the transfer of the proceeds thereof intra-Group;

(iii)  amounts retained to cover potential liabilities in connection with the Disposal or claim;

(iv)  any third party indebtedness secured on the assets which are disposed of that is required to be repaid out of those proceeds; and

(v)  any costs of closure, relocation, reorganisation, restructuring or other costs incurred in preparing the asset for a disposal.

76

[London #293508 v19]

A-5973

"**Recorded Music Division Insurance Proceeds**" means Insurance Proceeds received by the Recorded Music Division.

"**Recorded Music Division Recovery Proceeds**" means Recovery Proceeds received or recovered by the Recorded Music Division.

"**Recorded Music Division Sale**" means:

(i)     a Disposal of any asset, business or undertaking comprising part of the Recorded Music Division or the Capital Stock of any person which owns any such assets, business or undertaking; or

(ii)    a Disposal of all or any part of the Recorded Music Division,

in either case to the extent that the Net Proceeds realised from such Disposal exceed £2 million (or the equivalent thereof in any other currency).

"**Recovery Proceeds**" means the Net Proceeds received or recovered by any member of the Group in respect of any Report or any related breach of contract or reliance letter or legal action or proceedings (whether by way of judgment or on settlement of such claim) in relation to any Report.

"**Surplus Music Publishing Proceeds**" has the meaning given to it in Clause 13.3 (*Application of mandatory prepayments*).

"**Surplus Proceeds**" has the meaning given to it in Clause 13.3 (*Application of mandatory prepayments*).

"**Surplus Recorded Music Proceeds**" has the meaning given to it in Clause 13.3 (*Application of mandatory prepayments*).

(b)     The Company shall, or shall ensure that the relevant Borrowers will:

(i)     subject to Clause 13.5 (*Restrictions on upstreaming monies*), prepay outstanding Utilisations or, as the case may be, Securitisation Bridge Loans in the following amounts at the times and in the order of application contemplated by Clause 13.3 (*Application of mandatory prepayments*):

(A)     the Net Proceeds of any Music Publishing Division Sale (other than Excluded Music Publishing Division Proceeds);

(B)     the amount of Music Publishing Division Insurance Proceeds (other than Excluded Music Publishing Division Insurance Proceeds);

(C)     the amount of Recorded Music Division Insurance Proceeds (other than Excluded Recorded Music Division Insurance Proceeds);

(D)     the amount of any Music Publishing Division Recovery Proceeds (other than Excluded Music Publishing Division Recovery Proceeds);

(E)     the amount of any Recorded Music Division Recovery Proceeds (other than Excluded Recorded Music Division Recovery Proceeds);

77

Confidential

A-5974

(F) on the last day of the first Interest Period which ends 14 days or more after the date of delivery of the Group's audited consolidated financial statements in respect of the first full Financial Year to complete following the Unconditional Date, the Company shall apply, or procure that there is applied, by way of prepayment in accordance with Clause 13.3 (*Application of mandatory prepayments*), 90 per cent. of any Excess Cashflow (other than Music Publishing Division Excess Cashflow) for such Financial Year unless the Compliance Certificate delivered to the Agent in respect of such audited consolidated financial statements demonstrates that the Incurrence Leverage Ratio is equal to or less than 2.00:1, in which case 50 per cent of any Excess Cashflow (other than Music Publishing Excess Cashflow) for such Financial Year will be required to be used for prepayments;

(G) on the last day of the first Interest Period which ends 14 days or more after the date of delivery of the Group's unaudited consolidated financial statements in respect of each Financial Quarter ending on and after the Unconditional Date, the Company shall apply, or procure that there is applied, by way of prepayment in accordance with Clause 13.3 (*Application of mandatory prepayments*), 100 per cent of any Music Publishing Division Excess Cashflow for such Financial Quarter; and

(ii) prepay outstanding Utilisations and, if applicable, Mezzanine Loans with the Net Proceeds of any Recorded Music Division Sale (other than Excluded Recorded Music Division Proceeds) at the times and in the order of application contemplated by Clause 13.3 (*Application of mandatory prepayments*).

**13.3 Application of mandatory prepayments**

(a) Any proceeds to be applied in prepayment of outstanding Utilisations under:

(i) paragraph (b)(i)(A) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall be applied, to the fullest extent permitted by mandatory provisions of applicable law, in prepayment (or cancellation) of:

(A) first, the Securitisation Bridge Loans, the Music Publishing Division Acquisition Loans and the Music Publishing Division Revolving Facility and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves (and the pro rata amount applied to the Revolving Facility shall be applied first to repay Music Publishing Division Revolving Facility Loans and thereafter in cancellation of Available Commitments under the Revolving Facility); and

(B) second, after repayment in full of the Securitisation Bridge Loans, the Music Publishing Division Acquisition Loans and the Music Publishing Division Revolving Facility Loans, in the order contemplated in paragraph (b)(i) below; and

(ii) paragraph (b)(i)(G) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall be applied, to the fullest extent permitted by mandatory provisions of applicable law, in prepayment of:

(A) first, the Securitisation Bridge Loans and the Music Publishing Division Acquisition Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata; and

[London #293508 v19]

Confidential

CITI-TF 00701593

(B)    second, after repayment in full of the Securitisation Bridge Loans and the Music Publishing Division Acquisition Loans, in the order contemplated in paragraph (b)(i) below.

(b)    Any proceeds to be applied in prepayment of outstanding Utilisations under:

(i)    paragraphs (b)(i)(B) and (b)(i)(D) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied in the following order:

(A)    first, in prepayment of Securitisation Bridge Loans and Music Publishing Division Acquisition Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves;

(B)    secondly, in cancellation of Available Commitments under the Music Publishing Division Revolving Facility (and the Available Commitment of the Lenders under the Music Publishing Division Revolving Facility will be cancelled rateably);

(C)    thirdly, in prepayment and cancellation of Utilisations and Commitments under the Music Publishing Division Revolving Facility; and

(D)    fourthly, in repayment and cancellation pro rata of the Ancillary Outstandings and Ancillary Commitments and in repayment and cancellation of, or application of cash cover for any Letter of Credit issued under the Revolving Facility or, after the Separation Date, the Ancillary Outstandings and Ancillary Commitments which have been allocated to the Music Publishing Division by the Lenders and the Company,

provided that if there are no Music Publishing Division Acquisition Facility Loans to be prepaid, the Acquisition Facility Commitments in respect of the Music Publishing Division will be reduced and permanently cancelled on a pro rata basis by the amount that would have otherwise been prepaid and the balance of any such proceeds (being "**Surplus Music Publishing Proceeds**") shall be retained by the Group or distributed for any purpose not otherwise prohibited by the terms of this Agreement;

(ii)    paragraphs (b)(i)(C), (b)(i)(E) and (b)(i)(F) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied in the following order:

(A)    first, in prepayment of Senior B Loans and Recorded Music Division Acquisition Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves;

(B)    secondly, in cancellation of Available Commitments under the Recorded Music Division Revolving Facility (and the Available Commitment of the Lenders under the Recorded Music Division Revolving Facility will be cancelled rateably);

(C)    thirdly, in prepayment and cancellation of Utilisations and Commitments under the Recorded Music Division Revolving Facility; and

Confidential

CITI-TF 00701594

(D)    fourthly, in repayment and cancellation pro rata of the Ancillary Outstandings and Ancillary Commitments and in repayment and cancellation of, or application of cash cover for any Letter of Credit issued under the Recorded Music Division Revolving Facility,

provided that if there are no Senior B Loans to be prepaid, the Senior B Facility Commitments will be reduced and permanently cancelled on a pro rata basis by the amount that would have otherwise been prepaid and the balance of any such proceeds (being "**Surplus Recorded Music Proceeds**" and, together with the Surplus Music Publishing Proceeds, the "**Surplus Proceeds**") shall be retained by the Group or distributed for any purpose not otherwise prohibited by the terms of this Agreement.

(c)    Any proceeds to be applied in prepayment of outstanding Utilisations under paragraph (b)(ii) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*), shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied as follows:

(i)    if:

(A)    the relevant Net Proceeds are received by a member of the Group prior to the earlier of (x) the first anniversary of the Closing Date and (y) the completion of the Permitted High Yield Issuance; and

(B)    the ratio of Total Net Debt to Maintenance EBITDA of the Recorded Music Division for the 12 month period ending on the most recent Financial Quarter Ending Date prior to the date on which such Net Proceeds are received by a member of the Group is either in line with or better than as described in the Base Case Model,

then such proceeds shall be applied in prepayment of Senior B Loans, in prepayment of any Recorded Music Division Acquisition Loans, in prepayment of the Recorded Music Division Revolving Facility (and the pro rata amount applied to the Recorded Music Division Revolving Facility shall be applied first to repay Recorded Music Division Revolving Facility Loans and thereafter in cancellation of Available Commitments under the Recorded Music Division Revolving Facility) and in prepayment of Mezzanine Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves; or

(ii)    in all other cases, in prepayment of Senior B Loans, in prepayment of any Recorded Music Division Acquisition Loans and in prepayment of the Recorded Music Division Revolving Facility and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves (and the pro rata amount applied to the Recorded Music Division Revolving Facility shall be applied first to repay Recorded Music Division Revolving Facility Loans and thereafter in cancellation of Available Commitments under the Recorded Music Division Revolving Facility).

(d)    Unless the Company makes an election under paragraph (e) below, the Company shall procure that the relevant Financial Indebtedness is repaid at the following times:

(i)    in the case of any prepayment made under paragraphs (b)(i)(A) to (b)(i)(E) and (b)(ii) above (inclusive) promptly upon receipt of the relevant Net Proceeds; and

(ii)    in the case of any prepayment made under paragraphs (b)(i)(F) and (b)(i)(G), on the dates specified in such paragraphs.

80

Confidential

A-5977

(e)    Subject to paragraph (f) below, the Company may elect that any prepayment under Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) be applied in prepayment of a Loan on the last day of the Interest Period relating to that Loan. If the Company makes that election then a proportion of the Loan equal to the amount of the relevant prepayment will be due and payable on the last day of its Interest Period.

(f)    If the Company has made an election under paragraph (e) above but an Event of Default has occurred and is continuing, that election shall no longer apply and a proportion of the Loan in respect of which the election was made equal to the amount of the relevant prepayment shall be immediately due and payable (unless the Majority Lenders otherwise agree in writing).

(g)    The relevant Borrowers shall receive credit against the liability to make prepayments under paragraphs (b)(i)(F) and (b)(i)(G) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) for any voluntary or mandatory prepayments made under Clauses 12 (*Illegality, Voluntary Prepayment and Cancellation*) or 13 (*Mandatory Prepayment*) which are:

(i)    (to the extent not already taken into account in calculating any credit for the Borrowers under this subparagraph (i) and subparagraph (ii) below) made during the relevant Financial Year (in the case of paragraph (b)(i)(F)) or the relevant Financial Quarter (in the case of paragraph (b)(i)(G)); and

(ii)    (without duplication) made (x) during the period from the end of the relevant Financial Year to the date of delivery of the Annual Financial Statements (in the case of paragraph (b)(i)(F)) or (y) during the period from the end of the relevant Financial Quarter to the date of delivery of the relevant Quarterly Financial Statements (in the case of paragraph (b)(i)(G)).

in each case provided amounts so repaid may not be re-borrowed.

**13.4    Excluded proceeds and Excess Takeout Proceeds**

(a)    Where Excluded Music Publishing Division Insurance Proceeds, Excluded Recorded Music Division Insurance Proceeds, Excluded Music Publishing Division Proceeds, Excluded Recorded Music Division Proceeds, Excluded Music Publishing Division Recovery Proceeds or Excluded Recorded Music Division Recovery Proceeds (collectively, **"Excluded Proceeds"**) include amounts which are intended to be used for a specific purpose within a specified period (as set out in the definitions of the relevant Excluded Proceeds), the Company shall ensure that those amounts are used for that purpose and shall promptly deliver a certificate to the Agent on or before the end of such period confirming the amount (if any) which has been so applied within the requisite time periods provided for in the relevant definition. If those amounts are not reinvested for the purpose and within the period specified in the definitions of the relevant Excluded Proceeds, the Company shall ensure that the relevant Borrowers prepay such proceeds in accordance with paragraph (b) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) and paragraphs (b) to (e) (inclusive) of Clause 13.3 (*Application of Mandatory Prepayments*).

(b)    Notwithstanding any other provision of this Agreement, Excess Takeout Proceeds and any Surplus Proceeds may, at the discretion of the Company be used for any of the following purposes:

(i)    the payment of a dividend or other distribution to the Investors provided that:

(A)    prior to and after (on a pro forma basis) the declaration and payment of such distribution or dividend, the Incurrence Leverage Ratio is not greater than 2.00:1; and

81

CITI-TF 00701596

> (B)  in the case of Excess Takeout Proceeds resulting from the Permitted Securitisation or Music Publishing Division Sale, there are no amounts available or outstanding under the Securitisation Bridge Facility nor any Music Publishing Division Acquisition Loans outstanding;

(ii)  the general working capital purposes of the Group; or

(iii)  any other purpose permitted by the Majority Lenders.

**13.5  Restrictions on upstreaming moneys**

If:

(i)  any amount is required to be applied in prepayment or repayment of the Facilities under this Clause 13 but, in order to be so applied, a member of the Group which is not incorporated or established in England and Wales (a "**Foreign Group Member**") has to make payments upstream or otherwise transfer moneys to another a member of the Group to effect that prepayment or repayment; and

(ii)  those moneys cannot be so upstreamed or transferred without:

> (A)  breaching a financial assistance prohibition or other legal restriction applicable to such Foreign Group Member or causing any director or officer or legal representative of any member of the Group to breach any fiduciary duty or give rise to any material risk of personal liability of such director, officer or legal representative in relation to such payment; or
>
> (B)  such Foreign Group Member incurring a Material Tax Cost (either as a result of paying additional Taxes or incurring tax inefficiencies or otherwise),

there will be no obligation to make that payment or repayment until that impediment no longer applies provided that in the case of subparagraph (ii)(B) above the Borrowers shall fulfil their prepayment obligations using other available cash (after deducting the amount of Taxes that would have been payable had the monies been upstreamed) or, in the case of Recovery Proceeds, Insurance Proceeds or the Net Proceeds of a Music Publishing Division Sale or Recorded Music Division Sale, such proceeds are used to repay other Financial Indebtedness of the relevant Foreign Group Member. Each Obligor will use reasonable endeavours to overcome any such impediment.

**13.6  Mandatory Prepayment Account**

(a)  Subject to paragraphs (b) and (c) below, Insurance Proceeds, Recovery Proceeds and the Net Proceeds from a Recorded Music Division Sale may be retained by the relevant member of the Group until required to be prepaid in accordance with Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) unless the aggregate amount of such amounts retained exceed £15 million (or its equivalent) at any time (the "**Threshold Amount**") in which case the relevant member of the Group must ensure that amounts received in excess of the Threshold Amount are paid into a Mandatory Prepayment Account as soon as reasonably practicable after receipt by that member of the Group.

(b)  The Company must ensure that:

(i)  the Net Proceeds of a Music Publishing Division Sale;

(ii)  any Music Publishing Division Insurance Proceeds; and

{London #293508 v19}

Confidential

CITI-TF 00701597

(iii)    any Music Publishing Division Recovery Proceeds,

are paid into a Mandatory Prepayment Account as soon as reasonably practicable after receipt by a member of the Group.

(c)    The Company must ensure that any Music Publishing Division Excess Cashflow for a Financial Quarter is:

    (i)    applied in prepayment of the required outstanding Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves; or

    (ii)    paid into a Mandatory Prepayment Account for application in prepayment at the end of the relevant Interest Period of such Loans,

in each case within five Business Days after the date of delivery of the Group's unaudited consolidated financial statements in respect of such Financial Quarter.

(d)    The Company and each Borrower authorise the Agent to apply amounts credited to the Mandatory Prepayment Account which have not been applied in reinvestment, replacement, reinstatement or repair (as the case may be) within the requisite period (or such longer time period as the Agent may agree) to pay amounts due and payable under Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) and otherwise under the Finance Documents.

**13.7    Cash Balance**

(a)    On the Closing Date, the Company shall deposit an amount which is not less than £10 million into a bank account of the Company which is subject to Security granted in favour of the Security Agent (the "Blocked Account").

(b)    The Security Agent shall promptly release the Security over the Blocked Account and the Company shall immediately be entitled to all amounts standing to the credit of the Blocked Account upon the earliest of the following to occur:

    (i)    31 December 2011;

    (ii)    a refinancing of the Facilities in full; or

    (iii)    upon receipt of written confirmation by the Agent from the Company that the Total Net Debt to Maintenance EBITDA in respect of each Relevant Period from the date of such written confirmation until 31 December 2011 will not be greater than 10:1.

**14.    RESTRICTIONS**

**14.1    Notices of Cancellation or Prepayment**

Any notice of cancellation or prepayment given by any Party under Clause 12 (*Illegality, voluntary prepayment and cancellation*) or Clause 13 (*Mandatory prepayment*) shall (subject to the following paragraph) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment. A notice of prepayment in full of the Facilities in connection with a full refinancing of the Facilities (including in connection with a Change of Control) (an "Original Prepayment Notice") may be revoked by written counter-notice no later than one Business Day prior to the date of prepayment as specified in such Original Prepayment Notice provided that the Borrowers shall pay any Break Costs and other amounts due in respect of any such revocation (and the failure to make a prepayment pursuant to

Confidential

an Original Prepayment Notice shall not constitute an Event of Default under Clause 29.1 (*Failure to pay*)).

**14.2    Interest and other amounts**

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

**14.3    No reborrowing of Term Facilities**

No Borrower may reborrow any part of a Term Facility which is prepaid.

**14.4    Reborrowing of Revolving Facility**

Unless a contrary indication appears in this Agreement, any part of the Revolving Facility which is prepaid (other than amounts prepaid pursuant to Clauses 12.1 (*Illegality*) and 12.2 (*Illegality in relation to Issuing Bank*)) may be reborrowed in accordance with the terms of this Agreement.

**14.5    Prepayment in accordance with this Agreement**

No Borrower shall repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

**14.6    No reinstatement of Commitments**

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

**14.7    Agent's receipt of Notices**

If the Agent receives a notice or election under Clause 12 (*Illegality, voluntary prepayment and cancellation*) or Clause 13 (*Mandatory prepayment*) it shall promptly forward a copy of that notice or election to either the Company or the affected Lender, as appropriate.

[London #293508 v19]

Confidential

CITI-TF 00701599

**SECTION 5**
**COSTS OF UTILISATION**

**15.    INTEREST**

**15.1   Calculation of interest**

The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

(a)    Margin;

(b)    LIBOR or, in relation to any Loan in euro, EURIBOR; and

(c)    Mandatory Cost, if any.

**15.2   Payment of interest**

The Borrower to which a Loan has been made shall pay accrued interest on that Loan on the last day of each Interest Period (and, if any Interest Period is longer than six (6) Months, on the dates falling at six Monthly intervals after the first day of that Interest Period).

**15.3   Default interest**

(a)    If an Obligor fails to pay any amount payable by it under a Finance Document (other than under a Hedging Agreement but only to the extent that interest accrues under such agreement on overdue amounts) on its due date, interest shall accrue, to the fullest extent permitted by law, on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is one per cent. higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Agent (acting reasonably). Any interest accruing under this Clause 15.3 shall be immediately payable by the Obligor on demand by the Agent.

(b)    If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i)    the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii)   the rate of interest applying to the overdue amount during that first Interest Period shall be one per cent. higher than the rate which would have applied if the overdue amount had not become due.

**15.4   Notification of rates of interest**

The Agent shall promptly notify the Lenders and the relevant Borrower (or the Company) of the determination of a rate of interest under this Agreement.

**15.5   Adjustment of Margin**

(a)    Subject to this Clause 15.5, the Margin applicable to each Utilisation under the Senior B Facility, the Acquisition Facility and the Revolving Facility shall be the rate per annum specified in the definition of Margin set out in Clause 1.1 (*Definitions*) adjusted, by reference to the ratio of Total Net Debt to Maintenance EBITDA as shown in the then most recent Compliance Certificate received by the Agent, to equal the rate per annum specified opposite the relevant range set out in the following table in which the ratio of Total Net Debt to Maintenance EBITDA falls:

85

Confidential

CITI-TF 00701600

A-5982

| Total Net Debt to Maintenance EBITDA | Senior B Facility Margin % p.a. | Acquisition Facility Margin % p.a. | Revolving Facility Margin % p.a. |
|---|---|---|---|
| Greater than 2:1 | 2.75 | 2.25 | 2.25 |
| Equal to or less than 2:1 | 2.50 | 2.00 | 2.00 |

(b)    In respect of Loans made pursuant to an Additional Acquisition Facility Commitment Notice, the table (if any) set out in the relevant Additional Acquisition Facility Commitment Notice shall apply in lieu of the table above.

(c)    No adjustment shall be made to the Margin under paragraph (a) above until the delivery of the consolidated financial statements for the Group in accordance with this Agreement in respect of the third full Financial Quarter after the Unconditional Date.

(d)    Any adjustment to the Margin under paragraph (a) above shall take effect on the date of receipt by the Agent of the relevant Compliance Certificate.

(e)    If the Margin for a Utilisation is reduced or increased for any period under this Clause 15.5 but the annual audited consolidated financial statements of the Group (and the Compliance Certificate with which they are required by this Agreement to be delivered) subsequently received by the Agent do not confirm the basis for that reduction or increase, that reduction or increase shall be reversed with retrospective effect. In that event the Margin for that Utilisation shall be the rate per annum specified opposite the relevant range set out in the table above and the revised ratio of Total Net Debt to Maintenance EBITDA calculated using the figures in that Compliance Certificate. Any adjusting payments will be promptly made by the Company or, as applicable offset against the next following interest payments to be made by the Borrower in such amounts as are necessary to put the Agent and Lenders in the position they would have been in had the appropriate rate of the Margin applied during that period.

(f)    While an Event of Default under Clause 29.1 (*Failure to pay*) or Clause 29.3(a) (*Breach of Agreement*) is continuing or if the Company fails to deliver a Compliance Certificate at the time specified in this Agreement, the Margin applicable to each Loan or the original Margin in the definition of "Margin" as applicable shall revert to the highest percentage per annum set out above for a Loan to the relevant Borrower under that Facility. If such Event of Default is remedied or waived, the Margin shall be readjusted by reference to the ratio of Total Net Debt to Maintenance EBITDA as shown in the most recent Compliance Certificate (and the financial statements with which it is required by this Agreement to be delivered) received by the Agent. Any such readjustment shall take effect on the date on which the relevant Event of Default has been remedied or waived.

**16.    INTEREST PERIODS**

**16.1    Selection of Interest Periods and Terms**

(a)    A Borrower (or the Obligors' Agent on behalf of a Borrower) may select an Interest Period for a Loan in the Utilisation Request for that Loan or (if the Loan is a Term Loan and has already been borrowed) in a Selection Notice.

(b)    Each Selection Notice for a Term Loan is irrevocable and must be delivered to the Agent by the Borrower (or the Obligors' Agent on behalf of the Borrower) to which that Term Loan was made not later than the Specified Time.

86

Confidential

(c)     If a Borrower (or the Obligors' Agent) fails to deliver a Selection Notice to the Agent in accordance with paragraph (b) above, the relevant Interest Period will, subject to this Clause 16, be three (3) Months.

(d)     Subject to this Clause 16, a Borrower (or the Obligors' Agent) may select an Interest Period of one (1), two (2), three (3) or six (6) Months or any other period agreed between the Obligors' Agent and the Agent (acting on the instructions of the Majority Lenders if the duration of the Interest Period selected by the Borrower is more than six (6) Months).

(e)     An Interest Period for a Loan shall not extend beyond the Final Maturity Date applicable to its Facility.

(f)     Each Interest Period for a Term Loan shall start on the Utilisation Date or (if already made) on the last day of its preceding Interest Period.

(g)     A Revolving Facility Loan has one Interest Period only.

(h)     Prior to the Syndication Date, Interest Periods shall be one Month or such other period as the Agent and the Obligors' Agent may agree and any Interest Period which would otherwise end during the Month preceding or extend beyond the Syndication Date shall end on the Syndication Date.

**16.2    Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar Month (if there is one) or the preceding Business Day (if there is not).

**16.3    Consolidation and Division of Term Loans**

(a)     Subject to paragraph (b) below, if two or more Interest Periods:

(i)     relate to Term Loans from the same Facility in the same currency;

(ii)    end on the same date; and

(iii)   are made to the same Borrower,

those Term Loans will, unless that Borrower (or the Obligors' Agent on its behalf) specifies to the contrary in the Selection Notice for the next Interest Period, be consolidated into, and treated as, a single Term Loan on the last day of the Interest Period.

(b)     Subject to Clause 4.5 (*Maximum number of Utilisations*) and Clause 5.3 (*Currency and amount*), if a Borrower (or the Obligors' Agent on its behalf) requests in a Selection Notice that a Term Loan be divided into two or more Term Loans, that Term Loan will, on the last day of its Interest Period, be so divided into Base Currency Amounts specified in that Selection Notice, being an aggregate Base Currency Amount equal to the Base Currency Amount of the Term Loan immediately before its division.

**17.      CHANGES TO THE CALCULATION OF INTEREST**

**17.1    Absence of quotations**

Subject to Clause 17.2 (*Market disruption*), if LIBOR or, if applicable, EURIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by the Specified Time on the Quotation Day, the applicable LIBOR or EURIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

87

CITI-TF 00701602

**17.2 Market disruption**

(a)      If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on each Lender's share of that Loan for the Interest Period shall be the rate per annum which is the sum of:

      (i)      the Margin;

      (ii)     the rate notified to the Agent by that Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in that Loan from whatever source it may reasonably select; and

      (iii)    the Mandatory Cost, if any, applicable to that Lender's participation in the Loan.

(b)      In this Agreement "**Market Disruption Event**" means:

      (i)      at or about noon on the Quotation Day for the relevant Interest Period the Screen Rate is not available and none or only one of the Reference Banks supplies a rate to the Agent to determine LIBOR or, if applicable, EURIBOR for the relevant currency and Interest Period; or

      (ii)     before close of business in London on the Quotation Day for the relevant Interest Period, the Agent receives notifications from a Lender or Lenders (whose participations in a Loan exceed thirty five (35) per cent. of that Loan) that the cost to it of obtaining matching deposits in the Relevant Interbank Market would be in excess of LIBOR or, if applicable, EURIBOR.

**17.3 Alternative basis of interest or funding**

(a)      If a Market Disruption Event occurs and the Agent or the Company so requires, the Agent and the Company shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest.

(b)      Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Company, be binding on all Parties.

**17.4 Break Costs**

(a)      Each Borrower shall, within five (5) Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of a Loan or Unpaid Sum being paid by that Borrower on a day other than the last day of an Interest Period for that Loan or Unpaid Sum.

(b)      Each Lender shall, as soon as reasonably practicable after a demand by the Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

**18.    FEES**

**18.1 Commitment fee**

(a)      Subject to paragraph (e) below, the Company shall pay (or procure that a Borrower pays) to the Agent (for the account of each Lender) a fee in the Base Currency computed at the rate of:

      (i)      0.50 per cent. per annum on that Lender's Available Commitment under the Senior B Facility for the period commencing on the date which is 60 calendar days following the Signing Date and ending on the last day of the Availability Period applicable to the Senior B Facility;

[London #293508 v19]

Confidential

CITI-TF 00701603

(ii)   0.50 per cent. per annum on that Lender's Available Commitment under the Acquisition Facility for the period commencing on the Closing Date and ending on the last day of the Availability Period applicable to the Acquisition Facility;

(iii)   0.50 per cent. per annum on that Lender's Available Commitment under the Revolving Facility for the period commencing on the Closing Date and ending on the last day of the Availability Period applicable to the Revolving Facility; and

(iv)   the rate per annum set out in an Additional Acquisition Facility Commitment Notice on that Lender's Available Commitment under the Additional Acquisition Facility Commitments confirmed in that Additional Acquisition Facility Commitment Notice.

(b)   On each date on which the Margin applicable to a Utilisation under the Revolving Facility or the Acquisition Facility is adjusted under Clause 15.5 (*Adjustment of Margin*), the rate at which the commitment fee payable in respect of the Revolving Facility or the Acquisition Facility (as applicable) is computed shall be adjusted to equal the rate per annum specified opposite the relevant range set out in the following table in which the ratio of Total Net Debt to Maintenance EBITDA falls:

| Ratio | Commitment fee (% p.a.) |
|---|---|
| Higher than 2.00:1 | 0.50 |
| Equal to or lower than 2.00:1 | 0.375 |

(c)   While an Event of Default is continuing, the commitment fee under the Revolving Facility and the Acquisition Facility shall revert to the rate specified in paragraph (a)(ii) or (iii) above respectively.

(d)   The accrued commitment fee is payable on the last day of each successive period of three (3) Months which ends during the relevant Availability Period, on the last day of the relevant Availability Period and on the cancelled amount of the relevant Lender's Commitment at the time the cancellation is effective.

(e)   No commitment fee will be payable if none of the Facilities are utilised.

**18.2 Underwriting fee**
The Company shall pay to the Arranger (for its own account) an underwriting fee in the amounts and at the times agreed in a Fee Letter.

**18.3 Agency fee**
The Company shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

**18.4 Closing Date**
Notwithstanding any other provision of this Clause 18, no fees under this Clause 18 shall be payable if the Closing Date does not occur.

89

Confidential

<div align="center">

**SECTION 6**
**ADDITIONAL PAYMENT OBLIGATIONS**

</div>

**19.    TAX GROSS UP AND INDEMNITIES**

**19.1    Definitions**

(a)    In this Agreement:

"**Protected Party**" means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Qualifying Lender**" means a Lender which is generally eligible to receive interest payments in respect of the Facilities without a Tax Deduction either by virtue of being a Treaty Lender or by virtue of the fact that no such Tax Deduction is required under the law of the jurisdiction of incorporation of the relevant Obligor or, if different, of any jurisdiction:

(i)    in which such Obligor is treated as resident for Tax purposes; or

(ii)    in which such Obligor has a permanent establishment through which interest payments are made.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of, any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 19.2 (*Tax gross-up*) or a payment under Clause 19.3 (*Tax indemnity*).

"**Treaty Lender**" means a Lender which is entitled under a double taxation treaty to receive payments of interest from an Obligor without a Tax Deduction (subject to the completion of any necessary procedural formalities).

Unless a contrary indication appears, in this Clause 19 a reference to "**determines**" or "**determined**" means a determination made in the absolute discretion of the person making the determination, acting reasonably and in good faith.

**19.2    Tax gross-up**

(a)    Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    The Company shall, promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction), notify the Agent accordingly. Similarly, a Lender or Issuing Bank shall notify the Agent on becoming so aware in respect of a payment payable to that Lender. If the Agent receives such notification from a Lender or Issuing Bank it shall notify the Company.

(c)    If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    An Obligor is not required to make an increased payment to a Lender under paragraph (c) above for a Tax Deduction from a payment under a Finance Document, if on the date on which the payment falls due:

<div align="center">90</div>

(i)      the payment could have been made to the relevant Lender without a Tax Deduction if it was a Qualifying Lender, but on that date that Lender is not or has ceased to be a Qualifying Lender other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or double taxation agreement, or any published practice or concession of any relevant taxing authority; or

(ii)      the relevant Lender is a Treaty Lender with respect to that payment which has not complied with its obligations under paragraph (g) below and the Obligor making the payment is able to demonstrate that the payment could have been made to the Lender without the Tax Deduction had that Lender complied with its obligations under paragraph (g) below.

(e)      If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(f)      Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Agent for the Finance Party entitled to the payment an original receipt (or certified copy thereof), or if unavailable, evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

(g)      A Lender and each Obligor which makes a payment to which that Lender is entitled shall, upon specific written request, co-operate in completing any procedural formalities necessary for that Obligor to obtain authorisation to make that payment without a Tax Deduction (including but not limited to any such procedural formalities required under any relevant double taxation agreement).

(h)      In relation to each Borrower which is a US Obligor, each Lender which is a Qualifying Lender shall submit to that Borrower, promptly after receipt of any written request to do so, two duly completed and signed copies of the relevant Withholding Form. However, no Lender shall be required to submit any Withholding Form if that Lender is not allowed validly to do so. The Lender shall take reasonable steps to obtain any exemption (if any) from US federal withholding tax on interest payable by the relevant Borrower to that Lender on Loans under this Agreement that is available to that Lender in the circumstances.

**19.3    Tax indemnity**

(a)      The Company shall (within five (5) Business Days of demand by the Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document as a result of the introduction of, or a change in the interpretation or application of, any law or regulation relating to Tax occurring after the Signing Date (or compliance by any Protected Party with any such law or regulation).

(b)      Paragraph (a) above shall not apply:

(i)      with respect to any Tax assessed on a Protected Party:

(A)      under the law of the jurisdiction in which that Protected Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Protected Party is treated as resident for tax purposes;

91

CITI-TF 00701606

(B) under the law of the jurisdiction in which that Protected Party 's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net profit received or receivable or the net profit made (but not any sum deemed to be received or receivable) by that Protected Party; or

(ii) to the extent a loss, liability or cost:

(A) is compensated for by an increased payment under Clause 19.2 (*Tax gross-up*); or

(B) would have been compensated for by an increased payment under Clause 19.2 (*Tax gross-up*) but was not so compensated solely because one of the exclusions in paragraph (d) of Clause 19.2 (*Tax gross-up*) applied; or

(c) A Protected Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Agent of the event which will give, or has given, rise to the claim (and include in such notification the legal basis of such claim by providing references to relevant statutes), following which the Agent shall notify the Company (and include in such notification the legal basis of such claim by providing references to the relevant statutes).

(d) A Protected Party shall, on receiving a payment from an Obligor under this Clause 19.3, notify the Agent.

19.4    **Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party (acting reasonably) determines that:

(a) a Tax Credit is attributable either to an increased payment of which that Tax Payment forms part or to that Tax Payment; and

(b) that Finance Party has obtained, utilised and fully retained that Tax Credit on an affiliated group basis,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

19.5    **Stamp taxes**

The Company shall pay and, within five (5) Business Days of demand, indemnify each Secured Party and Arranger against any cost, loss or liability that Secured Party or Arranger incurs in relation to all stamp duty, stamp duty land tax, registration and other similar Taxes payable in respect of the entry into, performance or enforcement of any Finance Document.

19.6    **Value added tax**

(a) All amounts set out, or expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for VAT purposes shall be deemed to be exclusive of any VAT. Subject to paragraph (c) below, if VAT is chargeable on any supply made by any Finance Party to any Party in connection with a Finance Document, that Party shall pay to the Finance Party (in addition to and at the same time as paying the consideration) an amount equal to the amount of the VAT (and any such Finance Party shall promptly provide an appropriate VAT invoice to such party).

(b) If VAT is chargeable on any supply made by any Finance Party (the "**Supplier**") to any other Finance Party (the "**Recipient**") in connection with a Finance Document, and any Party is

92

[London 9293508 v19]

Confidential

CITI-TF 00701607

A-5989

required by the terms of any Finance Document to pay an amount equal to the consideration for such supply to the Supplier, such Party shall also pay to the Supplier (in addition to and at the same time as paying such amount) an amount equal to the amount of such VAT. The Recipient will pay to that Party an amount equal to any credit or repayment from the relevant tax authorities which it determines relates to the VAT chargeable on that supply.

(c)     Where a Finance Document requires any Party to reimburse a Finance Party for any costs or expenses, that Party shall also at the same time pay and indemnify the Finance Party against all VAT incurred by the Finance Party in respect of the costs or expenses to the extent that the Finance Party reasonably determines that neither it nor any other member of any group of which is a member for VAT purposes is entitled to credit or repayment from the relevant tax authority in respect of the VAT.

**20.     INCREASED COSTS**
**20.1   Increased costs**
(a)     Subject to paragraph (b) below, if the introduction of, or a change in, or a change in the interpretation, administration or application of, any law, regulation or treaty occurring after the Signing Date, or compliance with any law, regulation or treaty made after the Signing Date results in any Finance Party (a **"Claiming Party"**) or any Affiliate of it incurring any Increased Cost (as defined in paragraph (d) below):

(i)     the Claiming Party will notify the Company and the Agent of the circumstances giving rise to that Increased Cost as soon as reasonably practicable after becoming aware of it and will as soon as reasonably practicable provide a certificate confirming the amount of that Increased Cost; and

(ii)     within five Business Days of demand by the Claiming Party, the Company will pay to the Claiming Party the amount of any Increased Cost incurred by it (or any Affiliate of it).

(b)     The Company will not be obliged to compensate any Claiming Party under paragraph (a) above in relation to any Increased Cost:

(i)     to the extent already compensated for by payment of any Mandatory Costs or under Clause 19 (*Tax gross up and indemnities*) (or would have been so compensated but for an exception in Clauses 19.2 (*Tax gross-up*) or 19.3 (*Tax Indemnity*)); or

(ii)     attributable to a change in the rate of Tax on the overall net profit of the Claiming Party (or any Affiliate of it) or of the Facility Office of the Claiming Party; or

(iii)     attributable to the wilful breach by the Claiming Party of any law, regulation or treaty; or

(iv)     attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the Signing Date ("Basel II") or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates).

(c)     If any Affiliate of a Finance Party suffers a cost which would have been recoverable by that Finance Party under this Clause 20 if that cost had been imposed on that Finance Party, that Finance Party shall be entitled to recover the amount of that cost under this paragraph on behalf of the relevant Affiliate.

(d)     In this Agreement "Increased Cost" means:

93

CITI-TF 00701608

A-5990

(i)      an additional or increased cost;

(ii)     a reduction of any amount due and payable to the Claiming Party under any Finance Document; or

(iii)    a reduction in the rate of return on the Claiming Party's (or its Affiliate's) overall capital,

suffered or incurred by a Claiming Party (or any Affiliate of it) as a result of it having entered into or performing its obligations under any Finance Document or making or maintaining its participation in any Loan.

(e)      Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs.

**20.2    Requirement to notify**

(a)      If a Lender does not notify the Agent of its intention to claim pursuant to this Clause 20 within 90 days after the date on which that Lender becomes aware of the amount which it would be entitled to claim in respect of the relevant Increased Cost, reduction, payment or foregone interest or other return, that Lender shall not be entitled to claim indemnification for such increased costs, reduction, payment or foregone interest or other return in respect of any period more than 90 days before such date on which that Lender does notify the Agent of its intention to make such a claim.

(b)      No Finance Party shall be entitled to make any claim pursuant to this Clause 20 on any date falling later than nine months after the discharge of the obligations (both actual and contingent) of the Obligors under this Agreement and the cancellation of the Commitments in full.

**21.     MITIGATION**

(a)      If circumstances arise which entitle a Finance Party:

(i)      to receive payment of an additional amount under Clause 19 (*Tax gross up and indemnities*); or

(ii)     to demand payment of any amount under Clause 20 (*Increased Costs*); or

(iii)    to require cancellation or prepayment to it of any amount under Clause 12.1 (*Illegality*),

then that Finance Party will take all reasonable steps to mitigate the effect of those circumstances (including by transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office) and the Company may, by not less than two Business Days' notice to the Agent and the relevant Finance Party:

(iv)     require the relevant Finance Party to transfer its Commitments and all of its rights and obligations under the Finance Documents to a person acceptable to the Company; or.

(v)      repay all amounts owing to the relevant Finance Party under the Finance Documents and cancel the Commitments of such Finance Party.

(b)      No Finance Party will be obliged to take any such steps or action if to do so is likely in its opinion (acting in good faith) to be unlawful or to have an adverse effect on its business, operations or financial condition or breach its banking policies or require it to disclose any confidential information.

94

[London #293508 v19]

Confidential

A-5991

(c)    The Company shall, within five Business Days of demand by the relevant Finance Party, indemnify such Finance Party for any reasonable costs or expenses incurred by it as a result of taking any steps or action under this Clause.

(d)    This Clause does not in any way limit, reduce or qualify the obligations of the Company under the Finance Documents.

## 22.    OTHER INDEMNITIES
### 22.1    Currency indemnity
(a)    If any sum due from an Obligor under the Finance Documents (a "Sum"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "First Currency") in which that Sum is payable into another currency (the "Second Currency") for the purpose of:

   (i)     making or filing a claim or proof against that Obligor; or

   (ii)    obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within five (5) Business Days of demand, indemnify to the extent permitted by law the Arranger and each other Finance Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)    Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 22.2    Miscellaneous Indemnity
The Company shall (or shall procure that an Obligor will), within five (5) Business Days of demand, indemnify the Arranger and each other Finance Party (other than by reason of the gross negligence or wilful misconduct of such Finance Party) against any funding or other cost, loss or liability incurred by it as a result of:

(a)    the occurrence of any Event of Default;

(b)    a failure by an Obligor to pay any amount due under a Finance Document on its due date, including any reasonable cost, loss or liability arising as a result of Clause 34 (*Sharing among the Finance Parties*);

(c)    funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone);

(d)    issuing or making arrangements to issue a Letter of Credit requested by the Company or a Borrower in a Utilisation Request but not issued by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone);

(e)    a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company; or

95

CITI-TF 00701610

(f)  the receipt by the Agent of any part of a Loan, or an Unpaid Sum, otherwise than on the last day of its Interest Period (from which shall be deducted any sum paid by the Company (or another Obligor) in respect of the same event under Clause 17.4 (*Break Costs*)) but shall not include loss of Margin;

(g)  its taking any steps under Clause 21 (*Mitigation*); or

(h)  the taking, holding, protection or enforcement of the Security constituted by the Transaction Security Documents (including any liability under Environmental Laws) or the exercise of any of the rights, powers and remedies vested in any Finance Party by the Finance Documents or by law or which otherwise relate to any of the Transaction Security Documents or the performance by the Security Agent of the terms of the Finance Documents.

**22.3  Acquisition Financing Indemnity**

(a)  The Company shall (or shall procure that the Obligors shall), within five (5) Business Days of demand, indemnify each Finance Party, each of their respective Affiliates and each of their respective directors, officers, employees or agents (each an "**Indemnified Party**") against any cost, expense, loss or liability (including reasonable legal fees) properly incurred by that Indemnified Party (otherwise than to the extent resulting from the gross negligence or wilful misconduct of that Indemnified Party or, a breach of this Agreement by that Indemnified Party) related to, arising out of or in connection with any investigation, litigation, arbitral or other proceeding (collectively, "**Proceeding**") in each case made by a person who is not a party to a Finance Document arising out of or in connection with:

(i)  any Indemnified Party financing or refinancing, or agreeing to finance or refinance, the Acquisition (whether or not completed); or

(ii)  the use of proceeds of any Utilisation.

(b)  An Indemnified Party shall notify the Company as soon as reasonably practical of any circumstances of which it is aware and which would be reasonably likely to give rise to any Proceeding.

(c)  An Indemnified Party will provide the Company on request (and, to the extent practicable, without any waiver of legal professional privilege or breach of confidentiality obligation) with copies of material correspondence in relation to a Proceeding and allow the Company to attend all material meetings in relation to a Proceeding, receive copies of material legal advice obtained by the Indemnified Party in relation to the Proceeding and consult with the Company, taking into account the Company's views in relation to the Proceeding and any decision whether or not to settle any Proceeding.

(d)  The Obligors will keep strictly confidential all information received by any of them in connection with a Proceeding and will not disclose any information to any third party without the prior written consent of the Indemnified Party unless required to do so by law.

(e)  No Obligor shall be liable for any settlement of any Proceeding unless the Company has been consulted in relation to that settlement.

(f)  No Indemnified Party shall be required to comply with paragraphs (b) or (c) nor shall paragraph (e) apply unless the Indemnified Party is and continues to be indemnified on a current basis for its costs and expenses.

96

Confidential

CITI-TF 00701611

(g)    To the extent that any Indemnified Party is not a party to this Agreement, such Indemnified Party shall have the benefit of and shall be entitled to enforce, any provision of this Clause 22.3, as if such Indemnified Party were a Party.

**22.4  Indemnity to the Agent**
The Company shall promptly indemnify the Agent and the Security Agent against any cost, loss or liability incurred by the Agent or the Security Agent (acting reasonably) as a result of:

(a)    conducting an investigation in accordance with Clause 26.8 (*Investigation*);

(b)    entering into or performing any foreign exchange contract for the purposes of paragraph (b) of Clause 35.9 (*Change of currency*); or

(c)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised.

**22.5  Indemnity to the Security Agent**
(a)    Each Obligor shall promptly indemnify the Security Agent and every Delegate against any cost, loss or liability incurred by any of them as a result of:

(i)    the taking, holding, protection or enforcement of the Transaction Security;

(ii)    the exercise of any of the rights, powers, discretions and remedies vested in the Security Agent and each Delegate by the Finance Documents or by law; and

(iii)    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents.

(b)    The Security Agent may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 22.5 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all monies payable to it.

**23.  COSTS AND EXPENSES**
**23.1  Transaction expenses**
The Company shall, within five (5) Business Days of demand pay the Agent, the Arranger, the Issuing Bank and the Security Agent the amount of all pre-agreed costs and expenses (including reasonable legal fees) reasonably incurred by any of them (and, in the case of the Security Agent, by any Delegate) in connection with the negotiation, preparation, printing, execution, syndication (subject to an agreed cap) and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the Signing Date,

up to a maximum aggregate amount (if any) set out in any letter between the Arranger and the Company, provided that no such costs and expenses (other than any agreed legal fees) shall be payable if the Closing Date does not occur and if the Closing Date occurs shall not be payable before the date falling five (5) Business Days after receipt of a reasonably detailed statement of account in respect thereof.

**23.2  Amendment costs**
If (a) an Obligor requests an amendment, waiver or consent or (b) an amendment is required pursuant to Clause 35.9 (*Change of currency*), the Company shall, within five (5) Business Days

97

CITI-TF 00701612

A-5994

of demand, reimburse each of the Agent and the Security Agent for the amount of all costs and expenses (including reasonable legal fees) reasonably incurred by the Agent and the Security Agent (and, in the case of the Security Agent, by any Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

23.3    **Enforcement and preservation costs**

The Company shall, within five (5) Business Days of demand, pay to the Arranger, the Agent, the Security Agent and each other Finance Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

[London #293508 v19]

Confidential

CITI-TF 00701613

**SECTION 7**
**GUARANTEE**

24.    **GUARANTEE**

24.1   **Guarantee**

Each Guarantor irrevocably and unconditionally jointly and severally:

(a)    guarantees to each Finance Party punctual performance by each other Obligor of all that Obligor's obligations under the Finance Documents;

(b)    undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c)    indemnifies each Finance Party immediately on demand against any cost, loss or liability suffered by that Finance Party (i) if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal or (ii) by operation of law. The amount of the cost, loss or liability shall be equal to the amount which that Finance Party would otherwise have been entitled to recover.

24.2   **Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents regardless of any intermediate payment or discharge in whole or in part. The obligations of each Guarantor under Clause 24.1 (*Guarantee*):

(a)    will remain in full force and effect until all amounts which may be or become payable by any Borrower guaranteed by it under or in connection with any Finance Document have been irrevocably paid in full; and

(b)    are subject to any limitation which is set out in this Clause 24 or contained in the Accession Letter by which that Guarantor becomes a Guarantor.

24.3   **Reinstatement**

If any payment by an Obligor or any discharge given by a Finance Party (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is avoided or reduced as a result of insolvency or any similar event:

(a)    the liability of each Obligor shall continue as if the payment, discharge, avoidance or reduction had not occurred; and

(b)    each Finance Party shall be entitled to recover the value or amount of that security or payment from each Obligor, as if the payment, discharge, avoidance or reduction had not occurred.

24.4   **Waiver of defences**

The obligations of each Guarantor under this Clause 24 will not be affected by an act, omission, matter or thing which, but for this Clause 24, would reduce, release or prejudice any of its obligations under this Clause 24 (without limitation and whether or not known to it or any Finance Party) including:

(a)    any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

Confidential

CITI-TF 00701614

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)    any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case, however fundamental and of whatsoever nature) or replacement of a Finance Document or any other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)    any insolvency or similar proceedings.

**24.5   Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 24. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**24.6   Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 24.

**24.7   Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents:

(a)    to be indemnified by an Obligor;

(b)    to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents; and/or

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party.

100

Confidential

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and shall promptly pay or transfer the same to the Agent or as the Agent may direct for application in accordance with Clause 35 (*Payment Mechanics*).

**24.8  Release of Guarantors' right of contribution**

If any Guarantor (a "Retiring Guarantor") ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a)     that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)     each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

**24.9  Additional security**

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

**24.10  Guarantor intent**

Without prejudice to the generality of Clause 24.4 (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, amendment, restatement, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following (without limitation):

(a)     acquisitions of any nature;

(b)     increasing working capital;

(c)     enabling investor distributions to be made;

(d)     carrying out restructurings;

(e)     refinancing existing facilities;

(f)     refinancing any other indebtedness;

(g)     making facilities available to new borrowers;

(h)     any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and

(i)     any fees, costs and/or expenses associated with any of the foregoing.

101

CITI-TF 00701616

**24.11  Guarantee limitations**
(a)    For the purpose of this Clause 24.11, **"Guarantee Obligations"** means the obligations and liabilities of the relevant Obligor under Clause 24.1 (*Guarantee*).

(b)    **Limitations on English Guarantors**
The Guarantee Obligations will not extend to cover any indebtedness which, if they did so extend, would cause the infringement of section 151 of the Act.

(c)    **Limitations on United States Guarantors**
The obligations of each US Obligor under this Clause 24 shall be limited to a maximum aggregate amount equal to the greatest amount that would not render such US Obligor's obligations under this Clause 24 subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the US Bankruptcy Law or any applicable provisions of comparable law of one or more of the states comprising the United States of America (collectively, the **"Fraudulent Transfer Laws"**), in each case after giving effect to all other liabilities of such US Obligor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such US Obligor:

(i)    in respect of intercompany indebtedness to any member of the Group to the extent that such indebtedness would be discharged in an amount equal to the amount paid by such US Obligor hereunder; and

(ii)    under any guarantee of senior unsecured indebtedness or indebtedness subordinated in right of payment to obligations of the Obligors outstanding under this Agreement, which guarantee contains a limitation as to maximum amount similar to that set forth in this paragraph,

pursuant to which the liability of such US Obligor hereunder is included in the liabilities taken into account in determining such maximum amount) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, contribution, reimbursement, indemnity or similar right of such US Obligor pursuant to:

(A)    applicable law; or

(B)    any agreement providing for an equitable allocation among such US Obligor and other affiliates of the Borrowers of obligations arising under this Clause 24 by such parties.

(d)    **Limitations on other Guarantors**
A Guarantor's obligations will also be subject to any limitation on the amount guaranteed which is contained in the Accession Letter (if applicable) by which that Guarantor becomes a Guarantor.

[London #293508 v19]

102

Confidential                                                    CITI-TF 00701617

A-5999

**REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT**

**25.     REPRESENTATIONS**

Subject to Clause 29.14 (*Clean-Up Period*) with respect to the Target Group each Obligor (for itself and, to the extent expressed to be applicable to them, its Subsidiaries) makes the representations and warranties set out in Clause 25.1 (*Status*) to Clause 25.23 (*Insolvency*) to each Finance Party on the dates set out in Clause 25.24 (*Repetition*).

**25.1     Status**

Each Obligor is a limited liability company duly incorporated and validly existing under the laws of its jurisdiction of incorporation.

**25.2     Powers**

(a)     Each Obligor has power to enter into and deliver, and to exercise its rights and perform its obligations under, the Transaction Documents to which it is a party. No limit on its powers will be exceeded as a result of any borrowing or the giving of any guarantee or security by it under the Transaction Documents.

(b)     Each Obligor has taken all necessary corporate action to authorise the entry into and delivery of and the performance by it of its obligations under each Transaction Document to which it is a party.

(c)     Each member of the Group has the power to own its assets and carry on its business as it is being conducted.

**25.3     Obligations binding**

Subject to the Legal Reservations and Perfection Requirements:

(a)     the obligations expressed to be assumed by each Obligor under each Finance Document to which it is a party constitute its legal, valid, binding and enforceable obligations; and

(b)     without limiting the generality of paragraph (a) above, each Transaction Security Document to which an Obligor is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

**25.4     No Filing or Stamp Taxes**

Other than the Perfection Requirements or the payment of any associated fees or in relation to any Transfer Agreement, under the laws of its Relevant Jurisdiction it is not necessary that the Finance Documents be notarised, filed, recorded, registered or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

**25.5     Non-conflict**

The entry into and delivery of, and the exercise by an Obligor of its rights and the performance of its obligations under, each Finance Document to which it is a party do not and will not breach or conflict with:

(a)     any law, statute, rule or regulation, judgment, decree or permit to which it is subject in any material respect;

(b)     any of its constitutional documents; or

Confidential

CITI-TF 00701618

(c)    any agreement or document binding upon it or any of its assets which result in a default or right of any person to terminate any such agreement or documents, in each case, in a manner which would have a Material Adverse Effect or would result in the creation or imposition of any Security (other than any Permitted Encumbrance).

**25.6    Governing Law and Judgments**

Subject to the Legal Reservations, in any legal proceedings taken in the jurisdiction of incorporation of any Obligor in relation to any of the Transaction Documents to which it is party, the choice of law expressed in any of such documents to be the governing law of such document and any judgment obtained in such jurisdiction will be recognised and enforced.

**25.7    Financial Statements**

(a)    The most recent Financial Statements (excluding for the avoidance of doubt the Original Financial Statements) (including their notes) have been prepared in accordance with Accounting Principles consistently applied and give a true and fair view of (if audited) or fairly present (if unaudited) the consolidated financial condition of that Obligor as at the end of, and the consolidated results of operations of the Group for, the period to which they relate.

(b)    There has been no material adverse change in the assets, business or consolidated financial condition of the Group since the date of the Original Financial Statements.

**25.8    Information Package**

Save as disclosed in writing to the Arranger prior to the date of this Agreement:

(a)    all factual information contained in the Information Package (other than information of a general economic nature) was, taken as a whole, complete and accurate in all material respects as at the date of the relevant Report or document containing the information and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading in the circumstances of a person determining whether or not to extend credit to a borrower and in light of the circumstances under which statements were or are made;

(b)    the financial projections, financial models and business plans contained in the Information Package have been prepared in good faith on the basis of assumptions that were, in the opinion of the Company, reasonable at the time they were made (excluding any uncertainties or contingencies that are inherent in preparing such projections and plans) and were arrived at after due and careful consideration by the Company; and

(c)    no event or circumstance has occurred or arisen, and no information has been omitted from the Information Package, that results in the factual information, opinions, intentions, forecasts or projections contained in the Information Package being untrue or misleading in any material respect, taken as a whole.

**25.9    Documents provided**

The copies of the Transaction Documents and constitutional documents delivered to the Finance Parties are true, complete and accurate in all material respects and have not been amended, varied or supplemented in any way.

**25.10    Group Structure Chart**

Assuming the Unconditional Date has occurred, the Group Structure Chart delivered to the Agent is, to the best of the Company's knowledge and belief, true, complete and accurate in all material respects and shows the following information:

[London #293508 v19]

104