# 11-0126-cv

# United States Court of Appeals
### *for the*
## Second Circuit

———

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 21 of 65 (Pages A-6001 to A-6300)

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Summons and Complaint, dated December 11, 2009 ... A-39

Declaration of Adrian Briggs, for Defendants, in
Support of Motion to Dismiss, dated January 20,
2010, with attached *Curriculum Vitae* ................... A-89

Declaration of Strauss, for Plaintiffs, in Opposition
to Defendants' Motion, dated February 2010,
with attached *Curriculum Vitae* ............................. A-106

Second Declaration of Adrian Briggs, for
Defendants, in Support of Motion to Dismiss,
dated February 11, 2010 ........................................ A-137

Defendants' Answer to Plaintiff's Complaint, dated
April 7, 2010 .......................................................... A-149

Notice of Motion for Summary Judgment, by
Defendants, dated August 13, 2010 ...................... A-171

Defendants' Local Rule 56.1 Statement of
Undisputed Facts in Support of Motion for
Summary Judgment, dated August 13, 2010 ........ A-173

Declaration of Gary R. Carney, in Support of
Defendants' Motion for Summary Judgment,
dated August 13, 2010 ........................................... A-199

Exhibit 1 to Carney Declaration -
Terra Firma Private Placement Memorandum,
dated April 2006 .................................................... A-217

Exhibit 2 to Carney Declaration -
Terra Firma Capital Partners II Q3 2007 report,
dated November 2007 ............................................ A-318

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006 ................................................ A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006 ................................................ A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006 ................................................ A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007 ........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007 ................................................ A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings ................................ A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ................................................ A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010 .... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007 ................................................ A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ........................... A-404

iii

|  | **Page** |
|---|---|
| Exhibit 13 to Carney Declaration - E-mail from Barak to Wormsley *et al.,* dated April 20, 2007, with attachments | A-415 |
| Exhibit 14 to Carney Declaration - E-mail from Ashcroft to Wormsley *et al.,* dated April 23, 2007, with attachment | A-427 |
| Exhibit 15 to Carney Declaration - EMI News Release, dated May 4, 2007 | A-437 |
| Exhibit 16 to Carney Declaration - Letter from Bronfman to Gildersleeve, dated May 10, 2007 | A-439 |
| Exhibit 17 to Carney Declaration - Memorandum from Punja *et al.* to the IAC, dated February 5, 2007 | A-441 |
| Exhibit 18 to Carney Declaration - Memorandum from Seymour to Punja, dated March 2, 2007 | A-457 |
| Exhibit 19 to Carney Declaration - E-mail from Reid to Seymour, dated May 16, 2007 | A-462 |
| Exhibit 20 to Carney Declaration - Music Industry Key Market Outlook Summary of Findings prepared by L.E.K. Consulting, dated May 15, 2007 | A-656 |
| Exhibit 21 to Carney Declaration - Project Dice Limited Scope Financial Due Diligence Report, dated May 17, 2007 | A-783 |
| Exhibit 22 to Carney Declaration - Project Mulberry Limited Scope Financial Due Diligence Report, Volume I, dated May 4, 2007 | A-887 |

iv

**Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments............................ A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ............................ A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007 ......................................................... A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 ........................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007.................. A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 ................... A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments ................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment............................................................... A-995

v

**Page**

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007    A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007........................................................... A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007............................................................... A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007............................................................. A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007............................................................... A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007............................................................. A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007............................................................... A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007............................................................... A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 ............................... A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ..................................... A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 .  A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments ...................................  A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007 ........................................................  A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 ..............................  A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007 ........................................................  A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ........................................................  A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007 ........................................................  A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007 ........................................................  A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 ...................................  A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007 ........................................................  A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007 ........................................................ A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007 ........................................................ A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007 ........................................................ A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007 ........................................................ A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ............................................... A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007 ........................................................ A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007 ........................................................ A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007 ........................................................ A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment ..................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007..... A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007........................................................ A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007........................................................ A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007........................................................ A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007........................................................ A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007........................................................ A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007........................................................ A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007........................................................ A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007........................................................ A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007................................. A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007......................................................... A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007......................................................... A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007..................... A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007..................... A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007......................................................... A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc....................................................... A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007 ............................................... A-1554

**x**

**Page**

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ....................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................................ A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................................ A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 ......................................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ...................................................... A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................................ A-1590

**xi**

                                                                    **Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma .................................................................... A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ................ A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007 .................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ................ A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ........................................................ A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ........................................................ A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ......................... A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 ............................................... A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008 ................................................... A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008 .................................................... A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008 ....................................................... A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009 .................................................... A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009 .................................................... A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008 .......................................................... A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008 .......................................................... A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart ........................... A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update ........................ A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 ...................................... A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008 .......................................................... A-2301

**xiii**

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ......    A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ................    A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009 .............................    A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 .........................................................    A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 ...............................................    A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 .....................................................    A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ......................................................    A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 ...............................................    A-2479

xiv

**Page**

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009............................  A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ...............................................  A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 ..........................  A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 ............................................  A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009...................  A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 ................................................  A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes....................  A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007 .....................  A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 .........................................................  A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 ................................................ A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 .................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................ A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 .................................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code ............................ A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010 ............... A-2602

Mark Nimrod Barak, dated July 15, 2010 ................. A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 ................... A-2631

Simon A. Borrows, dated June 25, 2010 ................... A-2702

Andre Bourbonnais, dated July 13, 2010 .................. A-2779

Andrew Chadd, dated July 23, 2010
(Reproduced herein at pp. CA-1-CA-53)

xvi

                                                                    **Page**

Ricardo Hacelas Coats, dated June 23, 2010 ............. A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010.................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010.................. A-2959

Elio Leoni-Sceti, dated June 25, 2010 ..................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010......................... A-3027

Eric Nicoli, dated July 5, 2010 ................................. A-3039

Timothy Pryce, dated July 22, 2010 ........................ A-3087

Riaz Punja, dated July 28, 2010................................ A-3130

Michael Slattery, dated August 6, 2010 ................... A-3169

Martin David Stewart, dated July 7 and 8, 2010........ A-3177

Iain Stokes, dated August 6, 2010............................ A-3183

Kamal Fouad Tabet, dated July 29, 2010.................. A-3238

Francois Van der Spuy, dated July 7, 2010 ............... A-3242

Julie Williamson, dated July 28, 2010 ..................... A-3267

Alexander Wolf, dated July 14, 2010........................ A-3280

David Wormsley, dated July 20, 2010 ...................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated
   July 30, 2010........................................................ A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ................ A-3340

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006]
    EWCA Civ 1601 ............................................ A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007]
    EWHC 1151 (Comm) ...................................... A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal*
    *Bank of Scotland Plc* [2010] EWHC 1392
    (Comm) ...................................................... A-3493

*BSkyB Ltd v Sky Subscribers Services Limited*
    [2010] EWHC 86 ........................................... A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus*
    *Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006]
    EWHC 2887 (QB) (Comm), [2007] EWCA Civ
    811 ........................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................ A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ...................... A-4240

*Bradford Building Society v Borders* [1941] 2 All
    ER 205 ....................................................... A-4258

*Downs v Chappell* [1997] 1 WLR 426 ...................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009]
    EWCA Civ 169 ............................................ A-4325

xviii

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All
ER 583 .......................................................... A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER
(Comm) 573 .................................................. A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd*
[2007] EWHC 2541 (QB)................................ A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd*
[1964] AC 465 .............................................. A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC
145 ............................................................... A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson &
Co* [1991] 2 QB 113...................................... A-4671

*Bankers Trust International v Dharmala Sakti
Sejahtera* [1996] CLC 518............................. A-4688

*Valse Holdings SA v Merrill Lynch International
Bank Ltd* [2004] EWHC 2471 ....................... A-4741

*Peekay Intermark v Australia and New Zealand
Banking Group* [2006] EWCA Civ 386................ A-4779

*JP Morgan Chase Bank v Springwell Navigation
Corp* [2008] EWHC 1186 (Comm) ...................... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland
Plc* [2010] EWHC 211 (Comm) ........................... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight
Couriers Ltd* [2008] EWHC 1686 (Comm),
[2009] 1 All ER (Comm) 16, [2009] EWCA Civ
290 .............................................................. A-5126

xix

**Page**

*IFE Fund SA v Goldman Sachs International* 1 [2007] Lloyd's Rep 264 .......................... A-5184

*William Sindall plc v Cambridgeshire County Council* [1994] 1 WLR 1016 ................................ A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 .......................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co* [1892] AC 25 ...................................... A-5325

*Allen v Flood* [1898] AC 1 ........................................ A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019 (Ch) ........................................................ A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries Ltd* (No. 2) [1982] Ch 204 ................................. A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ............... A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas 25 ........................................................ A-5708

*Smith New Court Securities v Citibank NA* [1997] AC 254 .................................................... A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142 and 6-158 ............................................... A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs 8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

|  | Page |
|---|---|
| *McGregor on Damages*, 17th Edition, paragraph 1-021 | A-5774 |
| *Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 | A-5777 |
| *Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 | A-5780 |
| *The Unfair Contract Terms Act 1977* | A-5783 |
| Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 | A-5807 |
| Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 | A-5883 |
| Exhibit A to Randell Declaration - Handwritten Notes | A-5887 |
| Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 | A-5891 |
| Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 | A-5894 |
| Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 | A-6101 |
| Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 | A-6280 |

xxi

**Page**

Declaration of Christopher E. Duffy in Opposition
   to Defendants' Motion for Summary Judgment,
   dated September 2, 2010 ....................................... A-6447

Exhibit 1 to Duffy Declaration -
Amended and Restated Advisory Agreement
relating to Terra Firma Investments (GP) 2
Limited and Terra Firma Capital Partners
Limited, dated October 9, 2003 ............................ A-6471

Exhibit 2 to Duffy Declaration -
Advisory Agreement relating to Terra Firma
Capital Partners III, L.P., dated February 8, 2006 . A-6493

Exhibit 3 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 20, 2007 .. A-6512

Exhibit 4 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Directors' meeting, dated May 20, 2007 .. A-6515

Exhibit 5 to Duffy Declaration -
E-mail from Rowland to Laskowski and Crocker,
dated September 18, 2008, with attachment .......... A-6517

Exhibit 6 to Duffy Declaration -
E-mail from Smith to Small, dated May 21, 2007 . A-6521

Exhibit 7 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 7, 2006 ................................................ A-6523

Exhibit 8 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
September 19, 2007 ............................................... A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 ................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ................................................ A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006................................................. A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007......................................................... A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 .................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et
al.*, dated November 16, 2007............................... A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 ............... A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007....................................................... A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007.................................. A-6571

**xxiii**

                                                                    **Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...   A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006.......................................   A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 ................................................   A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment.............................................   A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 ................................................   A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 ......................................   A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 ........................................................   A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 ..............................................   A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................   A-6640

**xxiv**

Page

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 .............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007......................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.......................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................... A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ............................ A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 ............................... A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 ........................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ........................................................... A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ........................................................... A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 ............................................................ A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 .......................................................... A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 .......................................................... A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 .......................................................... A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 ............................................... A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ............................................... A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 .......................................................... A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 .......................................................... A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 .......................................................... A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ............................ A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 ................................... A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 ....................................................... A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 .............................................. A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment ........................................... A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 ....................................................... A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 ....................................................... A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 .............................................. A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 ....................................................... A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ................................ A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ........................................................ A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ........................................................ A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007........................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 .............................................. A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 ............................................... A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment.............................................. A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007   A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007   A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ....................................................... A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ....................................................... A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment.............................................. A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007.................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" .................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ....................................................... A-6835

**xxx**

                                                                    **Page**

Exhibit 87 to Duffy Declaration -
E-mail from Simonian to Smith, dated
May 21, 2007 ........................................................ A-6837

Exhibit 88 to Duffy Declaration -
E-mail from Wormsley to Lindsay, dated
September 17, 2007 ................................................ A-6838

Exhibit 89 to Duffy Declaration -
Memorandum from Simpkin *et al.* to Klein *et al.*,
dated November 16, 2007
(Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration -
E-mail from Borrows to Nicoli, Gildersleeve and
Parker, dated July 31, 2007 ................................... A-6843

Exhibit 91 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ................................................ A-6844

Exhibit 92 to Duffy Declaration -
E-mail from Grigorova to Cockerill, *et al.*, dated
September 5, 2007 .................................................. A-6846

Exhibit 93 to Duffy Declaration -
E-mail from Sckerl to Cockerill, dated June 9,
2009 with Attachment
(Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration -
E-mail from Grigorova to Sckerl, dated
February 16, 2009 .................................................. A-6850

Exhibit 95 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 23, 2007 ................................................ A-6855

**xxxi**

                                                                    **Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment............... A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009..................................................... A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment.................... A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ............................................... A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 .................................................... A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009................................................ A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010..................................................... A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007........................................................ A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 .................................................... A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................ A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ........................................ A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ..................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 .............................. A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 .............................. A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007 .... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ...................................................... A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 ................................................. A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006.................................................... A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006.................................................... A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006..................................................... A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ......................................................... A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ................................................... A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 .......................................................... A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007........................................................ A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 .................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ........................................................ A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 ...................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 .................................................... A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ........................................................ A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ....................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 ...................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 .................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007 ........................................................   A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 ...............................................   A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007 .........   A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 .....................................................   A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 .......................................................   A-7410

xxxvi

Page

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 ................... A-7473

xxxvii

**Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 .................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 .................................................. A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 .......................................................... A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ............................................ A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 ................................................ A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

**Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009.................................... A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007.. A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 . A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 ....................................................... A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-7553

Mark Nimrod Barak, dated July 15, 2010 ................ A-7557

Jason Bazinet, dated June 30, 2010 .......................... A-7564

Peter Edward Bell, dated June 22, 2010 ................... A-7601

Simon A. Borrows, dated June 25, 2010................... A-7705

Andre Bourbonnais, dated July 13, 2010.................. A-7827

Andrew Chadd, dated July 23, 2010
(Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
(Reproduced at pp. CA-295-CA-315)

**xxxix**

|  | Page |
|---|---|
| John Gildersleeve, dated June 30, 2010 | A-7832 |
| Guy Hands, dated July 15, 2010 | A-7848 |
| Guy Hayward-Cole, dated July 27, 2010 | A-7901 |
| David Robert Paul Hill, dated August 4, 2010 | A-7918 |
| Michael Klein, dated July 19, 2010 | A-7923 |
| Chad Leat, dated June 18, 2010 | A-7935 |
| John Loveridge, dated July 30, 2010 | A-7941 |
| Bruce MacInnes, dated July 8, 2010 | A-7966 |
| Eric Nicoli, dated July 5, 2010 | A-7970 |
| Riaz Punja, dated July 28, 2010 | A-8039 |
| Timothy Pryce, dated July 22, 2010 (Reproduced at pp. CA-316-CA-335) | |
| Elio Leoni-Sceti, dated June 25, 2010 (Reproduced at pp. CA-336-CA-385) | |
| Paul Simpkin, dated July 5, 2010 | A-8056 |
| Michael Slattery, dated August 6, 2010 | A-8073 |
| Matthew Canning Smith, dated August 3, 2010 (Day 1) | A-8077 |
| Matthew Canning Smith, dated August 9, 2010 (Day 2) | A-8116 |
| Iain Stokes, dated August 6, 2010 | A-8127 |
| Kamal Fouad Tabet, dated July 29, 2010 | A-8157 |
| Francois Van der Spuy, dated July 7, 2010 | A-8171 |

xl

**Page**

Julie Williamson, dated July 28, 2010
  (Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010........................ A-8175

David Wormsley, dated July 20, 2010
  (Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
  Defendants' Motion for Summary Judgment,
    dated August 27, 2010 ............................................ A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
  44.1, dated August 27, 2010 ................................... A-8195

Appendices to the Report of Nicholas S. Strauss
  Q.C. Pursuant to Rule 44.1 .................................... A-8245

  Exhibit 1 to Strauss Report -
  *AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
  CLC 265 ................................................................. A-8249

  Exhibit 2 to Strauss Report -
  *AIC Limited v. ITS Testing Services (UK) Ltd,*
  [2006] EWCA Civ 1601 ........................................ A-8262

  Exhibit 3 to Strauss Report -
  *Angus v. Clifford,* [1891] 2 Ch 449 ...................... A-8371

  Exhibit 4 to Strauss Report -
  *Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

  Exhibit 5 to Strauss Report -
  *Assicurazione Generali v. Arab Insurance Group,*
  [2003] I.R.L.R. 131 ............................................... A-8422

  Exhibit 6 to Strauss Report -
  *Attorney General of Belize v. Belize Telecom
  Limited,* [2009] 1 W.L.R. 1988 ............................ A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 .................. A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International
(Overseas) Ltd (In Liquidation) v. Price
Waterhouse (No.2),* [1998] PNLR 564 ............... A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan
Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ................................................ A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ..................................... A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 ..................................................... A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 .............................. A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ........................... A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ................ A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................ A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ............................................ A-9042

xlii

**Page**

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................................ A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton*
*(London) Ltd,* [1957] 2 QB 621 CA ...................... A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925 ...... A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ................................................................ A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484 .................. A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 ...................................................................... A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 ...................................................................... A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337 ................ A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ................ A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777 ................ A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ .............................................. A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne & Co Ltd. v. Heller & Partners
Ltd.,* [1964] AC 465 ............................................. A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),*
[1995] 2 AC 145 HL ............................................ A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247
CA ....................................................................... A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De
Productos Agricolas SA De CV,* [2003] EWCA
Civ 1104 .............................................................. A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,*
[2006] EWHCA 2887 (QB) (Comm) .................... A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West
Bromwich Building Society,* [1998] 1 W.L.R. 896  A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,*
[2004] EWCA Civ 1244 ....................................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom & Co.,* [1983] 1
All E.R. 583 ......................................................... A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation
Corp.,* [2008] EWHC 2286 (Comm) .................... A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)*
*Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 ................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 .............................................. A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson*
*& Co.,* [1991] 2 QB 113 ....................... A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand*
*Banking Group,* [2006] EWCA Civ 386 .............. A-10148

Exhibit 45 to Strauss Report -
*Raiffseisen Zentralbank Osterreich AG v. The*
*Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) ............................................... A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ................ A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District*
*Council,* [1996] 2 E.G.L.R. 219 ........................... A-10302

xlv

Page

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL ............................................. A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour
Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 .................................................................. A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour
Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 ........................................................ A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National
Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ..................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ..................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and
Company of the Bank of England (No.3),* [2001]
UKHL 16 ............................................................ A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 ......................................... A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................. A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016............................. A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 .......................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 ................... A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) .............................................................. A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) .............................................................. A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) ........................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

**Page**

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) ............................  A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). .........................  A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ......................  A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss ...........................  A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss ................................................................  A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement ...............................  A-11178

Affidavit of Service, sworn to September 2, 2010.....  A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 .....................  A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010....................................................  A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration -
Responses and Objections of Plaintiffs Terra
Firma Investments (GP) 2 Ltd. and Terra Firma
Investments (GP) 3 Ltd. To Defendants' First
Request for Production of Documents, dated
March 9, 2010......................................................... A-11216

Exhibit 131 to Carney Reply Declaration -
Journey Log Book for Guy Hands's flight to
London, dated May 20, 2007 ................................ A-11244

Exhibit 132 to Carney Reply Declaration -
Reservation for Guy Hands's flight to London,
dated May 20, 2007 ............................................... A-11247

Exhibit 133 to Carney Reply Declaration -
Report for Guy Hands's flight from the Airport
Landing Dues Information System of Guernsey
Airport, dated May 20, 2007.................................. A-11248

Exhibit 134 to Carney Reply Declaration -
Daily Confirmed Handling report of Blue Islands
at Guernsey Airport, dated May 20, 2007.............. A-11249

Exhibit 135 to Carney Reply Declaration -
Phone records of Guy Hands for the months of
April and May 2007............................................... A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010............... A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 .......................... A-11363

John Gildersleeve, dated June 30, 2010..................... A-11376

Guy Hands, dated July 15, 2010 ............................... A-11380

xlix

                                                                      **Page**

John Loveridge, dated July 30, 2010 ........................  A-11395

Eric Nicoli, dated July 5, 2010 .................................  A-11410

Timothy Pryce, dated July 22, 2010 .........................  A-11419

Riaz Punja, dated July 28, 2010................................  A-11439

Michael Slattery, dated August 6, 2010 ....................  A-11457

Martin David Stewart, dated July 7 and 8, 2010........  A-11473

Iain Stokes, dated August 6, 2010.............................  A-11477

Francois Van der Spuy, dated July 7, 2010 ...............  A-11501

Alec Werner, dated August 19, 2010 ........................  A-11513

David Wormsley, dated July 20, 2010 ......................  A-11520

Second Report of Ewan McQuater, Pursuant to Rule
     44.1, dated September 3, 2010, with Exhibit 1......  A-11532

Affidavit of Service, sworn to September 23, 2010...  A-11566

Summary Judgment Hearing Transcript, dated
     September 10, 2010 ..............................................  A-11568

Letter from Christopher E. Duffy to the Honorable
     Jed S. Rakoff, dated September 13, 2010, with
     attachments ............................................................  A-11620

Letter from Jay Cohen to the Honorable Jed S.
     Rakoff, dated September 13, 2010, with
     attachments ............................................................  A-11646

Order of the Honorable Jed S. Rakoff, dated
     September 14, 2010, filed September 15, 2010.....  A-11664

Notice of Motion *in Limine* No. 2 to exclude the
     Testimony of Marianne Demario, by Defendants,
     dated October 4, 2010............................................  A-11666

**l**

                                                                    **Page**

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* to exclude certain
    Testimony and Evidence, dated October 4, 2010 ..  A-11668

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* to exclude certain
    Testimony and Evidence, dated October 4, 2010 ..  A-11677

Declaration of Daniel H. Levi in Support of
    Defendants' Motions *in Limine* Nos. 1 through 5,
    dated October 4, 2010...........................................  A-11686

    Exhibit 1 to Levi Declaration -
    Expert Report of David J. Teece, dated
    June 14, 2010
    (Reproduced at pp. CA-481-CA-544)

    Exhibit 4 to Levi Declaration -
    Complaint in the above-captioned matter, dated
    December 11, 2009................................................  A-11695

    Exhibit 16 to Levi Declaration -
    Expert Report of Daniel R. Fischel, dated
    July 7, 2010
    (Reproduced at pp. CA-545-CA-586)

    Exhibit 17 to Levi Declaration -
    Microsoft Excel Spreadsheet printed from the
    native file produced by Plaintiffs and bearing
    bates number TF0000635801
    (Reproduced at pp. CA-587-CA-592)

    Exhibit 18 to Levi Declaration -
    Expert Report of Marianne DeMario, dated
    June 14, 2007
    (Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) ............. A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers
(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 ....... A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ...................................................... A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ..................................................... A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 ......................... A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007.......................... A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

**Page**

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010.................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
     (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
     (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010..................... A-12146

Eric Nicoli, dated July 5, 2010 .................................. A-12152

Riaz Punja, dated July 28, 2010................................. A-12158

Iain Stokes, dated August 6, 2010 ............................. A-12174

**liii**

**Page**

Declaration of Karen C. Dyer in Support of
Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
and Terra Firma Investments (GP) 3 Ltd's
Memoranda in Oppositions to Defendants'
Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration -
Wise Men Committee meeting minutes, dated
July 27, 2007 ......................................................... A-12186

Exhibit 14 to Dyer Declaration -
"Project Record Valuation Considerations"
prepared by Merrill Lynch for Cerberus, dated
May 17, 2007 ......................................................... A-12188

Exhibit 15 to Dyer Declaration -
Citi's Project Dice Credit Approval
Memorandum, dated May 17, 2007 ....................... A-12209

Exhibit 16 to Dyer Declaration -
Citi's "Fairness Committee Materials," dated
May 21, 2007 ......................................................... A-12303

Exhibit 17 to Dyer Declaration -
Excerpts from American Society of Appraisers,
*ASA Business Valuation Standards* (2009) ............. A-12309

Exhibit 18 to Dyer Declaration -
"Project Mulberry Valuation Materials," dated
May 21, 2007 ......................................................... A-12315

Exhibit 19 to Dyer Declaration -
E-mail from Barak to Reid *et al.*, dated
March 2, 2007 ......................................................... A-12324

Exhibit 20 to Dyer Declaration -
Letter from Borrows to Nicoli, dated
July 19, 2007 ......................................................... A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ....................................................... A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 .............................................. A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ......................................................... A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ...................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ...................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 .................................................... A-12462

**lv**

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 .................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 .................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................ A-14551

Trial Transcript, dated November 2, 2010 ................ A-14877

Trial Transcript, dated November 3, 2010 ................ A-15102

Trial Transcript, dated November 4, 2010 ................ A-15292

**lvi**

                                                                    **Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
    E-mail from Wormsley to Nicoli re call from
    GH, dated May 21, 2007.................................. A-15300

Terra Firma Exhibit 2 -
    E-mail from Tabet to Wormsley re
    Conversation with Guy Hands, dated
    May 21, 2007 ..................................................... A-15301

Terra Firma Exhibit 3 -
    E-mail from Wormsley to Lindsay re
    financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
    E-mail from Simonian to Smith re Bids, dated
    May 21, 2007  .................................................. A-15309

Terra Firma Exhibit 9 -
    E-mail from Randell to Terra Firma re May
    21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
    Draft Minutes of a meeting of a committee of
    the board of directors of Terra Firma (GP) 2
    Limited, dated May 21, 2007 ............................ A-15311

Terra Firma Exhibit 11 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007 ............................................ A-15316

Terra Firma Exhibit 12 -
    E-mail from Smith to Kirshenbaum re EMI
    deal, dated May 21, 2007 .................................. A-15319

Terra Firma Exhibit 13 -
    E-mail from Smith to Mehta re EMI, dated
    May 21, 2007  ................................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
    E-mail from Smith to Badhe re EMI, dated
    May 21, 2007 .................................................. A-15322

Terra Firma Exhibit 15 -
    E-mail from Wormsley to Tague re Congrats
    on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
    E-mail from Poyser to Vakilian re Terra Firma
    Recommended Cash Offer, dated
    May 21, 2007 .................................................. A-15324

Terra Firma Exhibit 17 -
    E-mail from Grigorova to Cockerill re
    EMI/Maltby CCR July, dated
    September 5, 2007 ........................................... A-15326

Terra Firma Exhibit 19 -
    E-mail from Smith to Small re CITI M&A
    wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
    E-mail from Rowland to Laskowski and
    Crocker re Terra Firma, dated
    September 18, 2008 ......................................... A-15332

Terra Firma Exhibit 22 -
    E-mail from Miller to Zogheb re EMI, dated
    May 16, 2007 .................................................. A-15336

Terra Firma Exhibit 23 -
    E-mail from Gildersleeve to Wormsley re
    Roles, dated April 20, 2007 ............................. A-15338

**lviii**

**Page**

Terra Firma Exhibit 24 -
Citi Franchise Risk Assessment Template for
Maltby Investments Limited, Appendix 6B,
dated June 1, 2009 ............................................. A-15339

Terra Firma Exhibit 25 -
E-mail from Smith to Poyser re Chaka
Feedback, dated May 17, 2007 ......................... A-15340

Terra Firma Exhibit 26 -
E-mail from Wormsley to Poyser, *et al.*, re
EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
E-mail from Wormsley to Smith re FW: E-mail
from Wormsley to McBride, dated
May 21, 2007 .................................................... A-15342

Terra Firma Exhibit 28 -
E-mail from Wormsley to Leat and Klein re
marginal deal for Terra Firma, dated
July 14, 2007 .................................................... A-15345

Terra Firma Exhibit 29 -
E-mail from Wormsley to Hands re DAIG fees,
dated November 7, 2006 ................................... A-15346

Terra Firma Exhibit 30 -
E-mail from Wormsley to Hands re DAIG,
dated October 23, 2006 .................................... A-15347

Terra Firma Exhibit 31 -
E-mail from Wormsley to Hands re proposal,
dated November 15, 2006 ................................. A-15348

Terra Firma Exhibit 32 -
E-mail from Wormsley to Klein re Citi/Terra
Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
    E-mail from Klein to Hands re Business
    Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
    E-mail from Tague to Lindsay re NBM #159
    Europe, dated March 9, 2007 ........................... A-15351

Terra Firma Exhibit 35 -
    E-mail from Tabet to Blagdon, Klein and
    Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
    E-mail from Wormsley to Miller re call from
    Guy Hands, dated May 8, 2007 ....................... A-15357

Terra Firma Exhibit 40 -
    E-mail from Smith to Wormsley re talk with
    JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
    E-mail from Wormsley to Nicoli, Gildersleeve,
    Stewart re FW: Terra Firma, dated
    May 18, 2007 ................................................... A-15359

Terra Firma Exhibit 42 -
    E-mail from Shott to Bell re auction process
    and Antitrust Confirmation, dated
    May 20, 2007 ................................................... A-15360

Terra Firma Exhibit 43 -
    E-mail from Ashcroft to Stewart re Conference
    call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
    E-mail from Wormsley to Nicoli re EMI media
    Review, dated May 20, 2007 ........................... A-15366

lx

**Page**

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 .......................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 .............................. A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 ...................................................... A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007.................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ......................................... A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ......................................... A-15420

**lxi**

**Page**

Terra Firma Exhibit 61 -
  E-mail from Wormsley to Klein and Smith re
  proposals from Cerberus and Fortress, dated
  April 19, 2007 ................................................... A-15421

Terra Firma Exhibit 62 -
  E-mail from Barclay re EMI Media Review - 13
  May 2007, dated May 13, 2007 ........................ A-15422

Terra Firma Exhibit 63 -
  E-mail from Klein to Nicoli re General, dated
  May 18, 2007 ................................................... A-15424

Terra Firma Exhibit 64 -
  E-mail from Smith to Wormsley re EMI, dated
  May 18, 2007 ................................................... A-15425

Terra Firma Exhibit 125 -
  Interoffice memorandum from Lindsay to
  Drayton, *et al.* re East Surrey Holdings, dated
  February 17, 2005 ............................................. A-15426

Terra Firma Exhibit 194 -
  Letter from Smith to Stewart re Engagement
  Letter, dated September 4, 2006 ...................... A-15433

Terra Firma Exhibit 195 -
  E-mail from Wormsley to Hands, dated
  September 8, 2006 ............................................ A-15440

Terra Firma Exhibit 197 -
  Terra Firma - Perspectives on Threshers, dated
  September 25, 2006 .......................................... A-15441

Terra Firma Exhibit 201 -
  Project Prince Working Party List, dated
  November 1, 2006 ............................................. A-15461

**lxii**

Page

Terra Firma Exhibit 209 -
    E-mail from Wormsley to Mylchreest, dated
    November 23, 2006 .......................................... A-15490

Terra Firma Exhibit 214 -
    EMI Group plc - Statement re preliminary
    approach from Permira, dated
    November 28, 2006 .......................................... A-15493

Terra Firma Exhibit 215 -
    E-mail from Miller to Simpkin re EMI, dated
    November 28, 2006 .......................................... A-15494

Terra Firma Exhibit 220 -
    E-mail from Badhe to Hill re Fairness Opinion
    Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
    Minutes from EMI Meeting of Directors, dated
    November 29, 2006 .......................................... A-15498

Terra Firma Exhibit 224 -
    E-mail from Smith to Wormsley, dated
    November 30, 2006 .......................................... A-15504

Terra Firma Exhibit 230 -
    E-mail from Ashcroft to Smith re Prince, dated
    December 6, 2006 ............................................. A-15505

Terra Firma Exhibit 232 -
    Minutes from EMI Meeting of Directors, dated
    December 7, 2006 ............................................. A-15506

Terra Firma Exhibit 237 -
    E-mail from Bell to Smith, dated
    December 14, 2006 ........................................... A-15519

**lxiii**

**Page**

Terra Firma Exhibit 238 -
E-mail from Smith to Wormsley, dated
December 14, 2006 .......................................... A-15520

Terra Firma Exhibit 239 -
E-mail from Smith to Wormsley re FW: Draft
announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
E-mail from Wormsley to Robertson re
Agenda, dated December 14, 2006 .................... A-15524

Terra Firma Exhibit 241 -
E-mail from Nicoli to Gildersleeve re Project
Prince, dated December 14, 2006 ...................... A-15525

Terra Firma Exhibit 242 -
E-mail from McBride to Citi re EMI cessation
announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
E-mail from Wormsley to Smith and EMI re
TF For Urgent Reply Please, dated
December 14, 2006 .......................................... A-15528

Terra Firma Exhibit 244 -
Letter from Kelly to EMI Group plc, dated
December 14, 2006 .......................................... A-15530

Terra Firma Exhibit 248 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
December 14, 2006 .......................................... A-15532

Terra Firma Exhibit 250 -
Letter from Nicoli to Kelly, dated
December 15, 2006 .......................................... A-15533

**lxiv**

**Page**

Terra Firma Exhibit 274 -
  E-mail from Simpkin to Miller re EMI, dated
  January 4, 2007 ................................................. A-15534

Terra Firma Exhibit 280 -
  Minutes from EMI Meeting of Directors, dated
  January 10, 2007 ............................................... A-15536

Terra Firma Exhibit 281 -
  E-mail from Jones to Cockerill re Pepe - terms,
  dated January 11, 2007...................................... A-15539

Terra Firma Exhibit 283 -
  EMI Press Release announcing restructuring,
  dated January 12, 2007 .................................... A-15545

Terra Firma Exhibit 285 -
  E-mail from Smith to Wormsley, dated
  January 12, 2007............................................... A-15548

Terra Firma Exhibit 314 -
  EMI Press Release, dated February 14, 2007 ... A-15550

Terra Firma Exhibit 315 -
  E-mail from Smith to Wormsley re EMI
  Announcement, dated February 14, 2007......... A-15551

Terra Firma Exhibit 317 -
  E-mail from Smith to Swannell and Wormsley
  re 6am Cut, dated February 15, 2007................ A-15552

Terra Firma Exhibit 318 -
  Citigroup Analyst Report "EMI Group plc
  Another Month, Another Warning," dated
  February 15, 2007.............................................. A-15557

Terra Firma Exhibit 329 -
  EMI group confirms approach from Warner
  Music group, dated February 20, 2007 ............. A-15569

**lxv**

**Page**

Terra Firma Exhibit 346 -
Minutes of a Meeting of the Board of Directors
of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
Valuation Update, dated March 1, 2007 ........... A-15582

Terra Firma Exhibit 348 -
EMI Board Meeting Minutes, dated
March 1, 2007 .................................................. A-15597

Terra Firma Exhibit 366 -
"EMI GROUP plc - Statement re Possible
Offer," PR Newswire UK Disclose, dated
March 12, 2007 ................................................ A-15608

Terra Firma Exhibit 368 -
E-mail from Wormsley to Hands, dated
March 3, 2008 .................................................. A-15610

Terra Firma Exhibit 377 -
E-mail from Steffno to Cockerill re EMI
Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
E-mail from Nicoli to Faxon re Full year
target, dated March 12, 2007 ........................... A-15624

Terra Firma Exhibit 387 -
E-mail from Smith to CIB-CBKG re Viacom's
music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
E-mail from Smith to Wormsley re EMI, dated
March 26, 2007 ................................................ A-15629

**lxvi**

**Page**

Terra Firma Exhibit 392 -
E-mail from Hill to Simpkin re (EUR) Wolters
Kluwer Education falls to Bridgepoint, dated
March 26, 2007 ................................................. A-15630

Terra Firma Exhibit 410 -
E-mail from Simpkin to Smith re EMI - staple,
dated April 3, 2007 ........................................... A-15633

Terra Firma Exhibit 412 -
E-mail from Llewelyn-Jones to CIB-GFI re
EMI, dated April 13, 2007 ................................ A-15635

Terra Firma Exhibit 416 -
Letter from EMI board of Directors to
Gildersleeve re the proposal, dated
April 16, 2007 ................................................... A-15636

Terra Firma Exhibit 424 -
E-mail from Seaton to Smith re FW: Trading
statement, dated April 17, 2007 ....................... A-15646

Terra Firma Exhibit 427 -
E-mail from Wormsley to Hands re new idea,
dated April 18, 2007 ......................................... A-15651

Terra Firma Exhibit 429 -
E-mail from EMI Investor Relations re EMI
Group plc - trading statement, dated
April 18, 2007 ................................................... A-15652

Terra Firma Exhibit 436 -
E-mail from Smith to Estacio and Hill re Fee,
dated April 19, 2007 ......................................... A-15654

Terra Firma Exhibit 438 -
E-mail from Klein to Hands cc Wormsley,
Burns, dated April 19, 2007 ............................. A-15655

lxvii

Page

Terra Firma Exhibit 439 -
    E-mail from Wormsley to Hands, Klein, cc
    Burns, dated April 19, 2007 ............................ A-15657

Terra Firma Exhibit 443 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated April 20, 2007 ........................... A-15659

Terra Firma Exhibit 444 -
    E-mail from Klein to Wormsley re Roles, etc.,
    dated April 20, 2007 ........................................ A-15667

Terra Firma Exhibit 445 -
    E-mail from Barak to Citi financing re Strictly
    Private & Confidential, dated April 20, 2007 ... A-15669

Terra Firma Exhibit 446 -
    E-mail from Barak to Citi financing re
    Cerberus Indication, dated April 20, 2007 ........ A-15681

Terra Firma Exhibit 447 -
    E-mail from Gildersleeve to Nicoli and
    Borrows re FW: E-mail from Wormsley to
    Gildersleeve, dated April 20, 2007 ................... A-15692

Terra Firma Exhibit 448 -
    E-mail from Smith to Seaton re Roles, dated
    April 20, 2007 ................................................... A-15694

Terra Firma Exhibit 449 -
    E-mail from Smith to Wormsley re Roles,
    dated April 20, 2007.......................................... A-15696

Terra Firma Exhibit 454 -
    E-mail from Smith to Wormsley re Roles,
    dated April 22, 2007.......................................... A-15698

**lxviii**

Page

Terra Firma Exhibit 455 -
    E-mail from Ashcroft to Wormsley re OEP
    Letter, dated April 23, 2007 .............................. A-15700

Terra Firma Exhibit 462 -
    E-mail from Ashcroft to Citi financing re
    Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
    Letter from Smith to Baxter (Takeover Panel),
    dated April 24, 2007........................................... A-15714

Terra Firma Exhibit 464 -
    E-mail from Tabet to Swannell, Klein and
    Wormsley re Hands, dated April 25, 2007 ......... A-15716

Terra Firma Exhibit 465 -
    E-mail from Gildersleeve to Ashcroft re Citi
    and Deutsche, dated April 26, 2007 .................. A-15717

Terra Firma Exhibit 468 -
    Letter from Smith to Stewart re provisions of
    advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
    E-mail from Coleman to Wolf re EMI, dated
    April 27, 2007 .................................................... A-15721

Terra Firma Exhibit 470 -
    E-mail from Smith to Wormsley re A3 page
    valuation summary, dated April 27, 2007 .......... A-15723

Terra Firma Exhibit 479 -
    E-mail from Smith to Bell re EMI consent
    letter, Side letter re financing bidders, dated
    April 28, 2007 .................................................... A-15726

**lxix**

**Page**

Terra Firma Exhibit 480 -
 E-mail from Smith to Stewart re Project
 Mulberry, dated April 30, 2007......................... A-15729

Terra Firma Exhibit 481 -
 E-mail from Smith to Ashcroft re Project
 Mulberry, dated April 30, 2007......................... A-15732

Terra Firma Exhibit 484 -
 Global FEG Working List Client Account List,
 dated May 1, 2007............................................ A-15735

Terra Firma Exhibit 492 -
 E-mail from Wormsley to Hands, dated
 May 3, 2007 ..................................................... A-15754

Terra Firma Exhibit 496 -
 EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
 E-mail from Cole to Ashcroft re Panel, dated
 May 4, 2007 ..................................................... A-15757

Terra Firma Exhibit 498 -
 E-mail from Cole to Bell re DB financing
 trees, dated May 4, 2007 ................................... A-15761

Terra Firma Exhibit 501 -
 EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
 "EMI Group plc - Statement re preliminary
 approach," EMI Press Release, dated
 May 4, 2007 ..................................................... A-15764

Terra Firma Exhibit 516 -
 E-mail from McCluskey to Yang re FW:, dated
 May 6, 2007 ..................................................... A-15765

**lxx**

Page

Terra Firma Exhibit 532 -
    E-mail from Smith to Wormsley re Terra
    Firma/EMI, dated May 8, 2007......................... A-15766

Terra Firma Exhibit 537 -
    E-mail from Hands to Wormsley re EMI, dated
    May 9, 2007 ..................................................... A-15767

Terra Firma Exhibit 538 -
    E-mail from Borrows to Gildersleeve re Dice,
    dated May 9, 2007............................................. A-15768

Terra Firma Exhibit 539 -
    E-mail from Smith to Hill & Estacio fw OEP,
    dated May 9, 2007............................................. A-15772

Terra Firma Exhibit 540 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007............................................. A-15773

Terra Firma Exhibit 541 -
    E-mail from Bell to Wormsley re Terra Firma
    Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
    E-mail from Simpkin to Wormley and Smith re
    Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
    E-mail from Smith to Poyser re Project
    Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
    E-mail from Ashcroft to Gildersleeve fw
    TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
    Project Mulberry Bidders Contact Details,
    dated May 11, 2007............................................ A-15789

**lxxi**

**Page**

Terra Firma Exhibit 552 -
E-mail from Wormsley to Bell re Mulberry,
dated May 11, 2007............................................ A-15814

Terra Firma Exhibit 553 -
E-mail from Bell to Smith and Wormsley re
Mondays meeting, dated May 11, 2007............. A-15816

Terra Firma Exhibit 554 -
E-mail from Smith to McCluskey re Just left
you a voicemail, dated May 11, 2007 ................ A-15820

Terra Firma Exhibit 555 -
E-mail from Simpkin to Edwards re Hope you
are well. re EMI, dated May 11, 2007 ............... A-15821

Terra Firma Exhibit 558 -
E-mail from Gildersleeve to EMI re Mulberry -
Data Room - IMPALA, dated May 13, 2007..... A-15822

Terra Firma Exhibit 564 -
E-mail from Barak to Smith re Citi Financing,
dated May 14, 2007............................................ A-15826

Terra Firma Exhibit 570 -
E-mail from Estacio to Klein fw Full DDT
procedures - Project Mulberry, dated
May 15, 2007 ..................................................... A-15828

Terra Firma Exhibit 578 -
E-mail from Bell to Citi Financing re Project
Mulberry Update, dated May 16, 2007.............. A-15834

Terra Firma Exhibit 579 -
E-mail from Zogheb to Miller re EMI, dated
May 16, 2007 ..................................................... A-15835

lxxii

**Page**

Terra Firma Exhibit 582 -
    E-mail from Wormsley to Gildersleeve and
    Nicoli re call from Guy Hands, dated
    May 16, 2007 ..................................................... A-15837

Terra Firma Exhibit 593 -
    Project Mulberry Working Party List, dated
    May 17, 2007 ..................................................... A-15838

Terra Firma Exhibit 594 -
    E-mail from Brumpton to Klein re LF/SEC
    call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
    E-mail from Klein to Wormsley re EMI Credit
    call 5pm New York Time, dated May 17, 2007 . A-15865

Terra Firma Exhibit 598 -
    E-mail from Leat to Klein re Call, dated
    May 17, 2007 ..................................................... A-15866

Terra Firma Exhibit 599 -
    E-mail from Wormsley to Klein re Call Guy
    Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
    E-mail from Curtis to Klein re David
    Wormsley called, VERY URGENT, dated
    May 17, 2007 ..................................................... A-15868

Terra Firma Exhibit 604 -
    E-mail from Bell to Gildersleeve re Update
    from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
    E-mail from Wormsley to Klein, dated
    May 17, 2007 ..................................................... A-15870

lxxiii

**Page**

Terra Firma Exhibit 608 -
E-mail from Klein to Hands re Call, dated
May 17, 2007 .................................................... A-15871

Terra Firma Exhibit 619 -
E-mail from Wormsley to Poyser re Issue on
covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
E-mail from Wormsley to Tabet re Covenants,
dated May 18, 2007........................................... A-15873

Terra Firma Exhibit 621 -
E-mail from Poyser to Wormsley re interest
coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
E-mail from Smith to Poyser re Debt approval,
dated May 18, 2007........................................... A-15875

Terra Firma Exhibit 630 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 2 Ltd 8:00am,
dated May 18, 2007........................................... A-15877

Terra Firma Exhibit 631 -
E-mail from Stewart to Wormsley re call, dated
May 18, 2007 .................................................... A-15889

Terra Firma Exhibit 632 -
E-mail from Stewart to Wormsley re returning
call, dated May 18, 2007................................... A-15890

Terra Firma Exhibit 636 -
E-mail from Nicoli to Stewart re Draft process
E-mail to be sent to bidders tomorrow, dated
May 18, 2007 .................................................... A-15891

lxxiv

**Page**

Terra Firma Exhibit 640 -
    E-mail from Watson to Cole & Citi re
    Mulberry Mark-ups of Crimson Documents,
    dated May 18, 2007............................................ A-15894

Terra Firma Exhibit 643 -
    Greenhill: Fairness Opinion/Advice Review
    Form, dated May 18, 2007.................................. A-15896

Terra Firma Exhibit 644 -
    E-mail from Barak to Bell *et al.* re Update on
    calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
    E-mail from Borrows to Gildersleeve re
    Hands, dated May 18, 2007 .............................. A-15902

Terra Firma Exhibit 648 -
    E-mail from Borrows to Bell re draft process,
    dated May 18, 2007............................................ A-15903

Terra Firma Exhibit 649 -
    E-mail from O'Brien to Citi and EMI re EMI-
    NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 3 Ltd 8:30am,
    dated May 18, 2007............................................ A-15911

Terra Firma Exhibit 661 -
    E-mail from Pryce to Burrows cc Wormsley re
    Terra Firma, dated May 18, 2007 ...................... A-15923

Terra Firma Exhibit 674 -
    E-mail from Bell to Gildersleeve re EMI
    conference call, dated May 19, 2007 ................ A-15924

lxxv

**Page**

Terra Firma Exhibit 694 -
Minutes of the Meeting of the Board of
Directors of Terra Firma (GP) 3 Ltd 4:00pm,
dated May 20, 2007............................................ A-15925

Terra Firma Exhibit 702 -
E-mail from Watson to Ashcroft, cc Smith,
Cole, *et al.*, re Mulberry - Key Issues Table and
Turquoise Position, dated May 20, 2007 ........... A-15928

Terra Firma Exhibit 715 -
E-mail from Quigley to O'Haire, Van der Spuy
re FW: Update on Dice financing for
discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
E-mail from Smith to Wormsley re Mulberry
Key issues table and Turquoise position, dated
May 20, 2007 ..................................................... A-15940

Terra Firma Exhibit 726 -
E-mail from Bell to Borrows re Trustee
meeting notes, dated May 20, 2007 .................. A-15943

Terra Firma Exhibit 729 -
E-mail from Wormsley to Hands, dated
May 20, 2007 ..................................................... A-15944

Terra Firma Exhibit 736 -
Minutes of a Meeting of a Committee of the
Board of Directors of Terra Firma (GP) 3 Ltd
at 8:00am, dated May 21, 2007.......................... A-15947

Terra Firma Exhibit 744 -
E-mail from Hill to Shah re Citi M&A Wins:
EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

lxxvi

**Page**

Terra Firma Exhibit 746 -
Project Mulberry Fairness Committee
Materials, dated May 21, 2007 ........................ A-15952

Terra Firma Exhibit 749 -
E-mail from Smith to Llewelyn-Jones re
Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
E-mail from Wormsley to Smith re Greenhill
Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
E-mail from Hill to Smith re EMI, dated
May 21, 2007 ................................................... A-15963

Terra Firma Exhibit 756 -
E-mail from Smith to Bichara, Estacio, Hill,
Abbasi, Golebiewski re Citi M&A Wins: EMI
Group/Terra Firma, dated May 21, 2007 ........... A-15964

Terra Firma Exhibit 757 -
E-mail from Smith to Swannell re EMI, dated
May 21, 2007 ................................................... A-15966

Terra Firma Exhibit 758 -
E-mail from Smith to Suen and Mcbride re
EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
E-mail from Vakilian to Poyser re (RNS) Terra
Firma Invest Recommended Cash Offer, dated
May 21, 2007 ................................................... A-15973

lxxvii

**Page**

Terra Firma Exhibit 765 -
    E-mail from Poyser to Lee re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15975

Terra Firma Exhibit 766 -
    E-mail from Poyser to Abbasi re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15977

Terra Firma Exhibit 767 -
    E-mail from Poyser to Vakilian re (RNS) Terra
    Firma Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15979

Terra Firma Exhibit 768 -
    E-mail from Wormsley to Smith re update on
    call with GH, dated May 21, 2007 .................... A-15981

Terra Firma Exhibit 783 -
    Project Mulberry Valuation Materials,
    Greenhill & Co., dated May 21, 2007 ............... A-15982

Terra Firma Exhibit 787 -
    E-mail from Simpkin to Treco re Call, dated
    May 22, 2007 ..................................................... A-15991

Terra Firma Exhibit 788 -
    E-mail from Smith to Skarbek re Citi M&A
    wins, dated May 22, 2007 ................................. A-15992

Terra Firma Exhibit 791 -
    E-mail from Temming to Poyser re Example
    for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
    E-mail from Poyser to Smith re Example for us
    all, dated May 22, 2007 .................................... A-15995

**lxxviii**

**Page**

Terra Firma Exhibit 796 -
   E-mail from Poyser to Smith re Dice, dated
   May 22, 2007  ................................................... A-15996

Terra Firma Exhibit 802 -
   E-mail from Poyser to Smith re financing
   process, dated May 23, 2007 ............................ A-15998

Terra Firma Exhibit 806 -
   E-mail from Poyser to Smith re financing
   process, dated May 24, 2007............................. A-16001

Terra Firma Exhibit 815 -
   David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
   E-mail from Wormsley to Hands re Thistle
   Hotels, dated May 29, 2007 .............................. A-16014

Terra Firma Exhibit 820 -
   E-mail from Gildersleeve to Wormsley, dated
   May 29, 2007 ..................................................... A-16015

Terra Firma Exhibit 824 -
   E-mail from Nesbit to Grigorova re Project
   Dice, dated May 30, 2007.................................. A-16016

Terra Firma Exhibit 827 -
   E-mail from Smith to Blackburn re MDs
   meeting Monday, June 4 at 8:15 UK time,
   dated May 31, 2007............................................ A-16020

Terra Firma Exhibit 831 -
   Citi Markets & Banking Credit Risk
   Principles, Policies and Procedures, dated
   June 1, 2007 ...................................................... A-16022

**lxxix**

**Page**

Terra Firma Exhibit 833 -
 Recommended Cash Offer by Maltby-a
 company formed at the direction of Terra
 Firma-for EMI Group plc, dated June 7............. A-16246

Terra Firma Exhibit 846 -
 E-mail from Aldred (on behalf of Hands) to
 Van der Spuy re Message from Guy Hands -
 Project Dice, dated June 27, 2007...................... A-16410

Terra Firma Exhibit 872 -
 E-mail from Wormsley to Gildersleeve and
 Nicoli re Terra Firma, dated July 4, 2007 .......... A-16411

Terra Firma Exhibit 874 -
 E-mail from Poyser to Smith re Your revenue
 list as at 4th July 2007, dated July 4, 2007 ........ A-16412

Terra Firma Exhibit 882 -
 E-mail from King to Klein re Riverdeep, dated
 July 9, 2007......................................................... A-16414

Terra Firma Exhibit 883 -
 E-mail from Hill to Lee re your revenue list as
 at 4th July 2007, dated July 9, 2007................... A-16415

Terra Firma Exhibit 887 -
 E-mail between Wormsley and Leat regarding
 advice, dated July 9, 2007.................................. A-16416

Terra Firma Exhibit 903 -
 E-mail from Simpkin to Lavelle re EMI Equity
 Bridge, dated July 16, 2007 ............................... A-16417

Terra Firma Exhibit 917 -
 E-mail from Borrows to Gildersleeve, Nicoli,
 *et al.*, re Board Presentation, dated
 July 18, 2007....................................................... A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
E-mail from King to Klein re Terra Firma
(High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
E-mail from Smith to Stewart re Invoice to
Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
E-mail from Cockerill to Grigorova and Jones
re EMI CCR, dated July 31, 2007...................... A-16438

Terra Firma Exhibit 987 -
E-mail from Hill to Smith, dated
August 6, 2007................................................... A-16439

Terra Firma Exhibit 992 -
E-mail from Klein to Prince re EMI-DO NOT
FORWARD, dated August 8, 2007 .................... A-16440

Terra Firma Exhibit 993 -
E-mail from Klein to Mehta re Warner-
confidential, dated August 8, 2007 .................... A-16442

Terra Firma Exhibit 994 -
E-mail from Wirdnam to Leat re Terra Firma
Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
E-mail from Klein to Volk *et al.* re W, "Guy
Spoke to Edgar and offered 3B," dated
August 11, 2007 ................................................ A-16444

Terra Firma Exhibit 1006 -
E-mail from Klein to Volk *et al.* re FW: edgar,
"4B value of EMI," dated August 12, 2007 ....... A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
E-mail from Smith to Watson re Mulberry Citi
Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
E-mail from Barker to Leat fw EMI, dated
August 24, 2007 ................................................ A-16447

Terra Firma Exhibit 1040 -
E-mail from Smith to CMB-GBKG re Quote
of the Day, dated September 10, 2007 .............. A-16448

Terra Firma Exhibit 1074 -
Memorandum from Simpkin *et al.* to Klein *et al.* re Project Dice (Public to Private of EMI),
dated November 16, 2007 .................................. A-16449

Terra Firma Exhibit 1080 -
E-mail from Wormsley to Klein re Guy Hands,
dated November 23, 2007 .................................. A-16459

Terra Firma Exhibit 1100 -
E-mail from Wormsley to Lynn re meeting
with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
E-mail from Smith to Poyser re trusted adviser,
dated January 30, 2008 ...................................... A-16461

Terra Firma Exhibit 1111 -
E-mail from Wormsley to Hands cc Burns,
dated February 1, 2008 ...................................... A-16463

Terra Firma Exhibit 1114 -
E-mail from Wormsley to Hands, dated
February 19, 2008 ............................................. A-16466

**lxxxii**

                                                                    **Page**

Terra Firma Exhibit 1141 -
    Franchise Rise Assessment Template, dated
    July 2008............................................................ A-16470

Terra Firma Exhibit 1144 -
    Handwritten Notes of Cockerill, dated
    September 1, 2008 ............................................. A-16471

Terra Firma Exhibit 1147 -
    E-mail from Smith to Wormsley re FW:
    Morgan Stanley CDs now officially higher than
    EMI!!! Hurrah, dated September 18, 2008........... A-16472

Terra Firma Exhibit 1158 -
    Handwritten Notes of Cockerill, dated
    November 16, 2008............................................ A-16473

Terra Firma Exhibit 1176 -
    E-mail from Cox to Smith re City Speaker
    Series - 12th February, Wormsley Presentation,
    dated February 11, 2009.................................... A-16476

Terra Firma Exhibit 1196 -
    Franchise Risk Assessment Template, Maltby
    Investments Limited, dated June 2009............... A-16529

Terra Firma Exhibit 1225 -
    E-mail from Smith to Vakilian re Citigroup
    accused of fraud over EMI sale, dated
    December 13, 2009 ........................................... A-16530

Terra Firma Exhibit 1241 -
    Compliance "Tree" for EMI group, dated
    January 14, 2010 .............................................. A-16532

**lxxxiii**

                                                              **Page**

Terra Firma Exhibit 1251 -
    Baughman to Duffy re supplement to Citi's
    response to Terra Firma's Interrogatory No. 5,
    dated March 25, 2010 ...................................... A-16536

Terra Firma Exhibit 1313 -
    EMI Trading Update ....................................... A-16539

Terra Firma Exhibit 1346 -
    EMI Stock Price.xls ....................................... A-16541

Terra Firma Exhibit 1365 -
    E-mail from Wormsley to Hands re DAIG-
    subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
    E-mail from Wormsley to Smith, dated
    November 28, 2006........................................... A-16592

Terra Firma Exhibit 1369 -
    E-mail from Smith to Wormsley re EMI, dated
    December 20, 2006 .......................................... A-16593

Terra Firma Exhibit 1370 -
    E-mail from Wormsley to Klein re Call, dated
    May 17, 2007 ................................................... A-16594

Terra Firma Exhibit 1371 -
    E-mail from Coats to Dolenec re Project Dice,
    dated May 21, 2007........................................... A-16595

Terra Firma Exhibit 1372 -
    E-mail from Wormsley to Klein re EMI, dated
    August 2, 2007 ................................................. A-16596

Terra Firma Exhibit 1377 -
    E-mail from Seymour to Van der Spuy re
    Project Dice memo, dated May 15, 2007........... A-16597

lxxxiv

**Page**

Terra Firma Exhibit 1380 -
    Minutes of the May 20, 2007 Meeting of the
    IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
    Kirsten Randell notebook ................................ A-16610

Terra Firma Exhibit 1395 -
    Amended and Restated Fee Letter, dated
    August 13, 2007 ................................................ A-16751

Terra Firma Exhibit 1400 -
    E-mail from Rawlings to Silva, Reeves cc
    Govinida, Dubin re Maltby - fees, dated
    August 31, 2007 ................................................ A-16761

Terra Firma Exhibit 1407 -
    E-mail from Wormsley to Klein, dated
    November 21, 2007 ........................................... A-16763

Terra Firma Exhibit 1409 -
    E-mail from Wormsley to Hands re BUPA
    hospitals, dated June 18, 2007 ......................... A-16764

Terra Firma Exhibit 1415 -
    E-mail from Seth to Simpkin, *et al.*, re EMI
    staple plan, attaching EMI Recd Financing.xls
    and EMI Group Financing.xls, dated
    April 1, 2007 ..................................................... A-16765

Terra Firma Exhibit 1434 -
    David Wormsley deposition excerpts (pp. 159-
    170:18), dated July 20, 2010 ............................ A-16872

Terra Firma Exhibit 1436 -
    Stipulation re Eric Nicoli ................................. A-16885

**lxxxv**

                                                                    **Page**

Citi Exhibit A-1 -
    Page 27, Paragraph 109 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
    Page 28, Paragraph 110 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
    Pages 31-32, Paragraph 126 of Complaint in
    *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16890

Citi Exhibit A-8 -
    Page 32, Paragraph 128 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
    Page 32-33, paragraphs 127-129 of Complaint
    in *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16895

Citi Exhibit C -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re URGENT & IMPORTANT-
    EMI, dated May 6, 2007 ................................... A-16898

Citi Exhibit D -
    Minutes of May 7, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma, dated May 7, 2007 ................................ A-16900

Citi Exhibit E -
    E-mail from Seymour to Becker, *et al.*, with
    attached Project Dice Memo to the GP, dated
    May 7, 2007 ..................................................... A-16902

**lxxxvi**

**Page**

Citi Exhibit H -
  Minutes of May 15, 2007, Meeting of the
  Investment Advisory Committee of Terra
  Firma, dated May 15, 2007 .............................. A-16914

Citi Exhibit I -
  Memo from Punja, *et al.*, to the IAC re Project
  Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
  E-mail thread ending with E-mail from Slattery
  to Randell, *et al.*, re IAC Distribution List
  DICE, dated May 19, 2007 .............................. A-16923

Citi Exhibit K -
  Minutes of May 18, 2007, Terra Firma
  Investment Advisory Committee Meeting,
  dated May 18, 2007 .......................................... A-16927

Citi Exhibit L -
  Minutes of May 20, 2007, Meeting of the
  Investment Advisory Committee of Terra
  Firma Capital Partners Limited, dated
  May 20, 2007 .................................................... A-16929

Citi Exhibit P -
  Project Dice Update to the IAC, dated
  June 28, 2007 .................................................... A-16931

Citi Exhibit W -
  E-mail from Vallance on behalf of Hands to
  Punja, *et al.*, re Project Dice: 2008 Forecast vs.
  Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
  Project Mulberry Limited Scope Vendor Due
  Diligence Report, dated May 4, 2007 .............. A-16959

**lxxxvii**

**Page**

Citi Exhibit BL -
Letter from Stokes to Gildersleeve re Terra
Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
Project Mulberry Valuation Materials, dated
May 21, 2007 ................................................... A-17011

Citi Exhibit BP -
E-mail from Night BA to Amstutz, *et al.*, re
EMI Co-Investment Opportunity, with attached
EMI Presentation to Co-Investors, dated
August 20, 2007 ............................................... A-17020

Citi Exhibit BR -
E-mail thread ending with E-mail from Night
BA to Tequila Bone, with attached co-investor
presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
E-mail from Vallance to TF Team Dice re EMI
Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
E-mail thread ending with E-mail from Punja
to Hands re Revised financing E-mail, dated
May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
Guernsey Airport Landing Dues Information
System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
Memo from Punja, *et al.*, to IAC, *et al.*, re
Project Dice Phase One Due Diligence, dated
February 5, 2007 .............................................. A-17071

**lxxxviii**

**Page**

Citi Exhibit DT -
  E-mail from Vallance on behalf of Hands to
  Wormsley re Hands' desire to speak with
  Wormsley ASAP, dated May 6, 2007 ............... A-17087

Citi Exhibit DW -
  E-mail from Vallance on behalf of Hands to
  Punja, *et al.*, re Project Dice, dated
  May 7, 2007 .................................... A-17088

Citi Exhibit DX -
  E-mail thread ending with E-mail from Hands
  to Hedegaard, *et al.*, re Project Dice, dated
  May 6, 2007 .................................... A-17090

Citi Exhibit DY -
  Minutes of May 8, 2007, Meeting of the Board
  of Directors at 10:00 a.m. (GP3), dated
  May 8, 2007 .................................... A-17092

Citi Exhibit EA-1 -
  Terra Firma's telephone records from British
  Telecom, dated August 2, 2007........................ A-17101

Citi Exhibit EA-2 -
  Airtime Billing Reporting Team Itemisation
  Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
  E-mail thread ending with E-mail from
  Vallance on behalf of Hands to Klein re request
  for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
  E-mail thread ending with E-mail from
  Vallance on behalf of Hands to Wormsley re
  request for Wormsley to call Hands, dated
  May 18, 2007 ................................... A-17205

lxxxix

**Page**

Citi Exhibit ED -
  E-mail thread ending with E-mail from Tabet
  to Hands re EMI, dated May 18, 2007 .............  A-17206

Citi Exhibit EE -
  E-mail thread ending with E-mail from Aldred
  to Hands, *et al.*, re Relationship between Roger
  Ames and Cerberus Capital Management,
  dated September 24, 2007 ................................  A-17208

Citi Exhibit EH -
  Project Dice Presentation by Terra Firma, with
  E-mail thread ending with E-mail from Punja
  to Hands re Process, dated May 20, 2007 .........  A-17209

Citi Exhibit EI -
  E-mail thread ending with E-mail from Punja
  to Hands re Process, dated May 20, 2007 .........  A-17286

Citi Exhibit EJ -
  Minutes of May 20, 2007, Meeting of the Terra
  Firma (GP) 2 Board of Directors, dated
  May 20, 2007 ....................................................  A-17290

Citi Exhibit EL -
  E-mail thread ending with E-mail from Hands
  to Wormsley re outstanding issues between Citi
  and Terra Firma, dated May 20, 2007 ...............  A-17293

Citi Exhibit EO -
  Minutes of May 23, 2007, Meeting of the
  Investment Advisory Committee of Terra
  Firma Capital Partners, Limited, dated
  May 23, 2007 ....................................................  A-17296

xc

**Page**

Citi Exhibit EQ -
  E-mail from Vallance to Terra Firma Team
  Dice, *et al.*, re Weekly Dice Updates for IAC,
  dated June 14, 2007 ........................................... A-17298

Citi Exhibit ET -
  Press release re Recommended Cash Offer for
  EMI Group plc by Maltby Limited, dated
  July 20, 2007 .................................................... A-17299

Citi Exhibit FB-1 -
  Declaration of John Loveridge, dated
  February 3, 2010 ............................................... A-17302

Citi Exhibit FD -
  Terra Firma Investments (GP) 3 Limited
  Advisory Agreement Relating to Terra Firma
  Capital Partners III, L.P., dated
  February 8, 2006 ............................................... A-17311

Citi Exhibit FG -
  Draft Memo from Punja, *et al.* to the IAC re
  Project Dice: Presentation and Success Fee,
  dated May 18, 2007 ........................................... A-17331

Citi Exhibit FI -
  Minutes of May 15, 2007, Meeting of Terra
  Firma (GP) 3 Board of Directors, dated
  May 15, 2007 ................................................... A-17332

Citi Exhibit FN -
  Minutes of May 20, 2007, Meeting of the
  Board of Directors at 4:00 p.m. (GP3), dated
  May 20, 2007 ................................................... A-17334

xci

**Page**

Citi Exhibit FO -
Minutes of May 21, 2007, Meeting of the
Board of Directors at 7:30 a.m. (GP2), dated
May 21, 2007 ..................................................... A-17337

Citi Exhibit FP -
Terra Firma Presentation to GP re Project Dice,
dated May 21, 2007............................................ A-17340

Citi Exhibit FR -
Memo Recommending Cash Offer by Maltby
Limited for EMI Group plc, dated
May 30, 2007 ..................................................... A-17350

Citi Exhibit FV -
Letter from Kelly to EMI Group plc re Terra
Firma's interest as a potential offeror for EMI,
dated December 14, 2006 .................................. A-17512

Citi Exhibit FX -
E-mail from Van der Spuy to Bell, *et al.*, with
attached Project Dice: Management Meeting
questions and attendees, dated
May 11, 2007 ..................................................... A-17514

Citi Exhibit GF -
Letter from Kelly to Gildersleeve re Summary
Proposal for Terra Firma potential offer, dated
May 8, 2007 ...................................................... A-17533

Citi Exhibit GG -
Minutes of May 8, 2007, Meeting of the Board
of Directors at 8:45 a.m. (GP2), dated
May 8, 2007 ...................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
E-mail thread ending with E-mail from Nicoli
to Stewart, *et al.*, re E-mail to be sent to
bidders tomorrow, dated May 18, 2007 ............. A-17548

Citi Exhibit GN -
E-mail thread ending with E-mail from
Wormsley to Simpkin, *et al.*, re Terra
Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
Terra Firma Presentation to Investment
Advisory Committee re Project Dice, dated
May 18, 2007 ................................................... A-17552

Citi Exhibit GQ -
E-mail from Pryce to Burrows, *et al.*, re Terra
Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
E-mail from Melvin to Hands, *et al.*, re Urgent-
EMI/Terra, dated May 22, 2007 ........................ A-17713

Citi Exhibit HH -
E-mail from Shaw to Nicoli re Trading
statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
Project Dice Presentation: Update to the IAC,
dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
E-mail thread ending with E-mail from Van der
Spuy to O'Haire, *et al.*, re Update on Dice
Financing for Discussion Tomorrow, dated
May 20, 2007 ................................................... A-17738

xciii

**Page**

Citi Exhibit IC -
    E-mail from Vallance to Hudson, *et al.*, re
    Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
    Court Order in the High Court of Justice,
    Queen's Bench Division, dated
    August 16, 2010 ................................. A-17749

Citi Exhibit IE -
    Journey Log Book for aircraft Cs-DXJ
    registered with the Portuguese Registry
    entitled, "Diário de Navegaçao," dated
    May 24, 2007 ................................... A-17758

Citi Exhibit IF -
    Screen Shot: Build Reservation for Terra
    Firma, dated May 20, 2007 ................................. A-17761

Citi Exhibit IW -
    Terra Firma Capital Partners II Q3 2007, dated
    November 1, 2007 ............................. A-17762

Citi Exhibit JC -
    E-mail from Reid to Seymour re Final Version
    of McK docs, dated, with attachment
    May 16, 2007 ................................... A-17807

Citi Exhibit JD -
    Terra Firma Music Industry Key Market
    Outlook, dated May 15, 2007 ........................... A-18001

Citi Exhibit JE -
    KPMG Report - Project Dice - Limited Scope
    due financial diligence report, dated
    May 17, 2007 ................................... A-18128

xciv

**Page**

Citi Exhibit JI -
   E-mail from Vallance on behalf of Hands to TF
   Team Dice re Dice and RBS, dated
   May 8, 2007 ...................................................... A-18232

Citi Exhibit JN -
   Minutes of the May 18, 2007, EMI Group plc
   meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated June 28, 2007 ................ A-18240

Citi Exhibit JQ -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 13, 2007 ................ A-18246

Citi Exhibit JS -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 20, 2007 ................ A-18249

Citi Exhibit JT -
   Recommended Cash Offer by Maltby Limited
   for EMI Group, dated July 28, 2007 ................ A-18252

Citi Exhibit KA -
   E-mail from Dowler to Hands re Dice, dated
   May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
   E-mail from Robert-Tissot to Hands re
   Gatwick, dated February 6, 2009...................... A-18257

xcv

**Page**

Citi Exhibit KH -
  E-mail from Wormsley to Cabrey re Hands -
  Invitation to Terra Firma Annual Clay Pigeon
  Shoot, dated July 1, 2008 .................................. A-18259

Citi Exhibit KJ -
  Terra Firma Annual Review 2007, dated
  June 29, 2005 .................................................... A-18262

Citi Exhibit KY -
  Terra Firma Private Placement Memorandum,
  dated April 1, 2006 ............................................ A-18382

Citi Exhibit LI -
  Memo from Punja, *et al.*, to Hands, *et al.*, re
  EMI Preliminary Discussion, dated
  December 1, 2006 ............................................. A-18482

Citi Exhibit MB -
  Signed Minutes of the February 5, 2007,
  Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
  Letter from Smith to Stewart re Provision of
  Advisory and Corporate Broking Services by
  Citigroup, dated April 27, 2007 ....................... A-18493

Citi Exhibit OF -
  Letter from Kelly to Gildersleeve re possible
  offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
  E-mail thread ending with E-mail from Miller
  to Wormsley, dated May 8, 2007 ...................... A-18499

Citi Exhibit OJ -
  E-mail from Wormsley to Hands re EMI, dated
  May 8, 2007 .................................................... A-18500

xcvi

**Page**

Citi Exhibit OM -
    Project Mulberry Bidders Contact Detail, dated
    May 11, 2007 .................................................. A-18501

Citi Exhibit OO -
    E-mail thread ending with E-mail from Van der
    Spuy to Simpkin, *et al.*, re Project Dice:
    Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
    Minutes of May 15, 2007, Meeting of the
    Board of Directors at 7:30 p.m. (GP2), dated
    May 15, 2007 .................................................. A-18529

Citi Exhibit PY -
    E-mail thread ending with E-mail from Klein
    to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
    E-mail from Wilkins to Nicoli, *et al.*, re
    Wormsley call, dated May 18, 2007 ................. A-18533

Citi Exhibit RU -
    E-mail thread ending with E-mail from Nicoli
    to Wormsley re EMI media review, dated
    May 20, 2007 .................................................. A-18534

Citi Exhibit UD -
    E-mail thread ending with E-mail from
    Simpkin to Dolenec, *et al.*, re securitisation
    colleagues, dated May 20, 2007 ....................... A-18537

Citi Exhibit UF -
    E-mail thread ending with E-mail from Tabet
    to Wormsley re just spoke to GH, dated
    May 21, 2007 .................................................. A-18540

xcvii

**Page**

Citi Exhibit VP -
   Minutes of May 23, 2007, Meeting of the
   Board of Directors at 2:00 p.m. (GP2), dated
   May 23, 2007 .................................................. A-18543

Citi Exhibit VQ -
   Minutes of May 23, 2007, Meeting of the
   Board of Directors at 2:15 p.m. (GP3), dated
   May 23, 2007 .................................................. A-18545

Citi Exhibit WI -
   Memo from Punja, *et al.*, to the IAC, *et al.*, re
   Project Dice Update and Budget, with attached
   Presentation re IAC update: Project Dice,
   dated May 31, 2007 .......................................... A-18547

Citi Exhibit AAG -
   E-mail from Cabrey to Wormsley, *et al.*, re
   Villa Saletta Shoot, with attached Fax Reply
   Form, dated August 15, 2007 ........................... A-18555

Citi Exhibit AAO -
   E-mail from MacInnes to Punja, *et al.*, with
   attached Dresdner invoice to Maltby, dated
   August 17, 2007 .............................................. A-18560

Citi Exhibit ABL -
   Memo from Pryce to TFCP Personnel re Public
   to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
   Letter from Terra Firma Investments (GP) 3
   Limited to Citi re the amendment letter, dated
   December 21, 2007, dated January 11, 2008 .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
E-mail from Dicks to Wormsley, *et al.*, re DW
Menu selection Die Sauberflote, attached
menu, dated June 23, 2008 ............................... A-18571

Citi Exhibit AGF -
Terra Firma Capital Partners II, Q1 2008, dated
March 31, 2009 ................................................. A-18574

Citi Exhibit AHA -
Presentations re EMI and the Terra Firma/Citi
Relationship, dated August 1, 2009 .................. A-18623

Citi Exhibit AJJ -
Cell phone Records for David Wormsley, dated
April 26, 2007 .................................................. A-18643

Citi Exhibit AJT -
Guy Hands' Calendar for May 18, 2007, dated
May 18, 2007 ................................................... A-18671

Citi Exhibit AKL -
EMI Recorded Music Presentation, dated
April 1, 2009 .................................................... A-18672

Citi Exhibit AKT -
Stipulated Phone Numbers................................. A-18698

Citi Exhibit AKY -
TFCP III Co-Investment 2 L.P. Project Dice
Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
Citigroup Structure Chart.................................. A-19064

Citi Exhibit ALK -
E-mail thread ending with E-mail from
Wormsley to Dicks re shotgun certificate form,
dated October 4, 2007 ....................................... A-19065

xcix

**Page**

Citi Exhibit ALU -
E-mail thread ending with E-mail from
Grigorova to Lynn, *et al.*, re EMI Summary
Exposure, dated November 21, 2009 .................. A-19067

Citi Exhibit ALY -
Paragraph 22, Page 5 of Joint Statement
Pursuant to Individual Practices 4(a) of the
Facts and Other Matters on Which the Parties
Agree ................................................................ A-19072

Citi Exhibit EEB-3 -
Table 1B of Expert Report of Marianne
DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
Appendix 1 of Expert Report of Marianne
DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
Corrected Expert Report of Marianne DeMario
in *Andrews v. Raphaelson*, *et al.*, dated
October 19, 2006 ............................................. A-19078

Citi Exhibit EEJ -
*Caiola v. Citibank*, Expert Report of Marianne
DeMario ........................................................... A-19095

Citi Exhibit EEY -
Client List for Spectrum Consulting Partners .... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
Handwritten Notes ............................................ A-19126

Terra Firma Exhibit 48 -
Nicoli Mobile Phone Records
(Reproduced at pp. CA-826-CA-837)

c

**Page**

Letter Brief of Terra Firma to the Honorable Jed S.
    Rakoff, dated October 25, 2010............................ A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed
    S. Rakoff, dated October 25, 2010........................ A-19137

The Court's Proposed Jury Instructions, dated
    November 1, 2010 ................................................ A-19147

Memorandum of the Honorable Jed S. Rakoff,
    dated November 2, 2010........................................ A-19163

Verdict Sheet, dated November 4, 2010 ................... A-19179

Judgment, So-Ordered on December 9, 2010,
    Appealed From ...................................................... A-19180

Notice of Appeal, dated January 10, 2011 ................ A-19187

A-6001

(a)    each member of the Group, including current name and company registration number, its jurisdiction of incorporation and/or establishment and indicating whether a company is or is not a company with limited liability; and

(b)    all minority interests in any member of the Group and any person in which any member of the Group holds shares in its issued share capital or equivalent ownership interest of such person.

**25.11 Structure Memorandum**

The Structure Memorandum sets out the material steps to be taken at or before the Closing Date and reflects (together with the Funds Flow Statement) all payments and discharge of indebtedness due to be made at or about the Closing Date.

**25.12 Financial Indebtedness and Security**

(a)    No member of the Group has or owes any Financial Indebtedness other than Permitted Indebtedness.

(b)    No Security exists over all or any of the present or future assets of any member of the Group other than Permitted Encumbrances.

**25.13 Authorisations**

(a)    All Authorisations required:

    (i)    to enable it lawfully to enter into, and exercise its rights and comply with its material obligations under each Transaction Document to which it is a party; and

    (ii)    to make any Transaction Document to which it is a party admissible in evidence in its Relevant Jurisdictions (subject to any Legal Reservations),

have been obtained or effected and are in full force and effect except for those necessary to satisfy the Perfection Requirements.

(b)    All Authorisations necessary for the conduct of the business, trade and ordinary activities of the Group have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or is reasonably likely to have a Material Adverse Effect.

**25.14 Deduction of tax**

On the basis that all of the Lenders are Qualifying Lenders and that all Treaty Lenders comply with their obligations under Clause 19.2 (*Tax gross-up*), no Obligor is required to make any deduction for or on account of Tax from any payment it may make under the Finance Documents.

**25.15 Taxation**

No Obligor is overdue (taking into account any extension or grace period) in the filing of any Tax returns or in the payment of any amount of Tax other than:

(a)    in respect of Taxes being contested by it in good faith; or

(b)    where the failure to file such Tax return or pay such Taxes would not have a Material Adverse Effect.

**25.16 No litigation**

No litigation, alternative dispute resolution, arbitration, administrative proceedings or labour disputes are current or threatened against a member of the Group which are reasonably likely to be adversely determined and, if adversely determined, are reasonably likely to have a Material Adverse Effect.

Confidential

CITI-TF 00701620

**25.17 Environmental laws**

(a)     Each member of the Group is in compliance with Clause 28.3 (*Environmental compliance*) and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance in a manner or to an extent which has or is reasonably likely to have a Material Adverse Effect.

(b)     No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any member of the Group where that claim has or is reasonably likely, if determined against that member of the Group, to have a Material Adverse Effect.

**25.18 No default**

(a)     No Event of Default is continuing or is reasonably likely to result from the making of any Utilisation.

(b)     No member of the Group is in breach of or in default under any agreement to which it is a party or which is binding on it or any of its assets to an extent or in a manner which constitutes a Material Adverse Effect.

**25.19 Intellectual Property**
        Each member of the Group:

(a)     is the sole legal and beneficial owner of or has licensed to it on normal commercial terms all the Intellectual Property which is required by it in order to carry on its business as it is being conducted and as contemplated in the Base Case Model (the "Material Intellectual Property") save where failure so to do would have a Material Adverse Effect;

(b)     does not, in carrying on its businesses, infringe any Intellectual Property of any third party in any respect which has or is reasonably likely to have a Material Adverse Effect;

(c)     has taken all formal or procedural actions (including payment of fees) required to maintain any Material Intellectual Property owned by it where failure so to do would have a Material Adverse Effect.

**25.20 Title to assets**

(a)     The Company will, upon the Closing Date, become the legal and beneficial owner of (subject to completion of any 'squeeze-out' procedures to be undertaken pursuant to Part 28 of the Companies Act 2006 (if any)) the entire issued share capital of the Target and all other securities issued by the Target and/or giving access to the share capital of the Target free from any Security, claims or competing interests whatsoever.

(b)     On the Closing Date, members of the Group will have good title to or valid leases or licences of or otherwise be entitled to use all assets necessary to conduct the Group Business taken as a whole as it is conducted on the Closing Date where failure to do so or to so have would have a Material Adverse Effect.

**25.21 Pension schemes**
        The levels of contribution to the pension schemes for the time being operated by the Group are and continue to be sufficient to comply with all material obligations of the Group whether under such schemes or generally at law.

[London #293508 v19]

Confidential                                                                CITI-TF 00701621

**25.22 Centre of Main Interests**

Where an Obligor is incorporated in a Participating Member State, its Centre of Main Interests is the place in which its registered office is situated.

**25.23 Insolvency**

No:

(a)    corporate action, legal proceeding or other procedure or step described in Clause 29.8 (*Insolvency proceedings*); or

(b)    creditors' process described in Clause 29.5 (*Cessation and expropriation*),

has been taken or, to the knowledge of the Company, threatened in relation to an Obligor or a Material Subsidiary and none of the circumstances described in Clause 29.6 (*Insolvency*) applies to an Obligor or a Material Subsidiary.

**25.24 Repetition**

(a)    The Obligors make each representation and warranty in Clause 25.1 (*Status*) to Clause 25.23 (*Insolvency*) on the Signing Date and on the Closing Date by reference to the facts and circumstances then existing, other than the representations in Clause 25.8 (*Information Package*), which shall be given on the dates referred to in paragraph (b) below.

(b)    The Obligors make the representation and warranty in Clause 25.8 (*Information Package*) on the date the Information Memorandum is approved by the Company (subject to any disclosures made by the Company on or before that date) and on the date on which it is released to the Arranger for distribution in connection with the syndication of the Facilities and on the Syndication Date.

(c)    The Repeating Representations are deemed to be made by each Obligor (for itself and, to the extent expressed to be applicable to them, each other member of the Group) by reference to the facts and circumstances then existing on:

(i)      the date of each Utilisation Request;

(ii)     each Utilisation Date;

(iii)    the first day of each Interest Period; and

(iv)    in the case of an Additional Obligor, the day on which the company becomes an Additional Obligor,

save for the representation and warranty contained in Clause 25.7 (*Financial Statements*) only, which shall be deemed to be made on the date on which the most recent Financial Statements are delivered to the Agent (and then only in respect of the most recent Financial Statements so delivered).

**26.    INFORMATION UNDERTAKINGS**

The undertakings in this Clause 26 remain in force from the Signing Date for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

In this Clause 26:

"**Annual Financial Statement**" means the financial statements for a Financial Year delivered pursuant to paragraph (a) of Clause 26.1 (*Financial Statements*).

107

CITI-TF 00701622

"**Financial Statement**" means, as applicable, the Annual Financial Statements, the Quarterly Financial Statements or the Monthly Financial Statements.

"**Monthly Financial Statement**" means the financial statements delivered pursuant to paragraph (c) of Clause 26.1 (*Financial Statements*).

"**Quarterly Financial Statement**" means the financial statements delivered pursuant to paragraph (b) of Clause 26.1 (*Financial Statements*).

**26.1    Financial Statements**

(a)    **Annual Financial Statements**

(i)    The Parent shall deliver to the Agent copies of the audited consolidated profit and loss account, balance sheet and cashflow statement of the Group for each Accounting Reference Period of the Parent ending after the Signing Date as soon as approved by the board of directors or equivalent body (but not later than 180 days (or, in respect of financial statements delivered during the period from the Closing Date until the first anniversary of the Closing Date, 210 days) from the end of such Accounting Reference Period).

(ii)    The Parent shall procure the delivery with the audited consolidated financial statements of a Compliance Certificate signed by a corporate officer of the Parent together with a certificate issued by the Auditors of the Group certifying that Compliance Certificate (but recognising that any Auditor's certification will be in a form which the Auditors are prepared to give and only to the extent that firms of auditors of international repute have not adopted a general policy of not delivering certifications of such Compliance Certificates). The Compliance Certificate to be provided under this paragraph shall be in addition to the Compliance Certificate required by paragraph (b) of Clause 26.1 (*Quarterly financial statements*).

(b)    **Quarterly Financial Statements**
The Parent shall deliver to the Agent copies of the unaudited consolidated interim financial statements for the Group within 45 days (or, in respect of Financial Statements delivered during the period from the Closing Date until the first anniversary of the Closing Date, 75 days) after the end of each Financial Quarter. Such Quarterly Financial Statements shall be on a quarter-to-quarter and cumulative basis and shall include a profit and loss account, the debt and cash position, working capital position and (in respect of Quarterly Financial Statements to be delivered after the date falling 9 months after the Closing Date) balance sheet and cashflow statements. The Quarterly Financial Statements shall also contain a comparison of actual performance by the Group with the performance in the corresponding period in the previous Accounting Reference Period. Each set of Quarterly Financial Statements delivered pursuant to this paragraph (b) shall be accompanied by a Compliance Certificate signed by a corporate officer of the Parent.

(c)    **Monthly Financial Statements**
Unless the Incurrence Leverage Ratio is less than 2.00:1, the Parent shall deliver to the Agent copies of its unaudited consolidated monthly financial management report for the Group (which will be in summary form and contain key performance indicators, revenue, EBITDA and cash flow) as soon as it is available (but no later than 45 days from the end of the relevant month), provided that no such statements will be delivered:

(i)    for period during the first six months following the Closing Date; and

[London #293508 v19]

Confidential                                                     CITI-TF 00701623

> (ii)    for the last month in a Financial Quarter in respect of which Quarterly Financial Statements are prepared.

(d)   **Other information.**

> (i)    The Parent shall deliver to the Agent such other information concerning the general state of the business or financial condition of the Group (or any part of it) as the Agent may reasonably request.

> (ii)    Without prejudice to Clause 4.2 (*Certain funds*), on or before the Closing Date the Company shall deliver to the Agent copies of:

> > (A)    the Funds Flow Statement; and

> > (B)    the Original Financial Statements.

> (iii)    The Parent shall deliver to the Agent an updated Group Structure Chart promptly following the occurrence of any material change to the structure of the Group.

**26.2   Consistent application**

The Parent shall ensure that all Financial Statements submitted to the Agent are consistent with Accounting Principles applied in the preparation of the Original Financial Statements, except (i) for adjustments of a minor and technical nature, (ii) with the prior approval of the Majority Lenders or (iii) where Accounting Principles requires an amendment to be made and, in each such case:

(a)    the Parent shall promptly so advise the Agent, providing a full description of the relevant change and sufficient information, in such detail and format as may be reasonably requested by the Agent, to enable a proper comparison to be made between the Financial Statements delivered and those which would have been delivered had no such change occurred;

(b)    the Parent and the Agent shall negotiate in good faith (for no more than 60 days from the date on which the Parent notified the Agent of such changes) with a view to agreeing such amendments (if any) to Clause 27 (*Financial Covenant*), paragraph (b)(i)(F) of Clause 13.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*), paragraph (c) of Clause 13.3 (*Application of mandatory prepayments*), paragraph (b) of Clause 13.4 (*Excluded proceeds and Excess Takeout Proceeds*), Clause 15.5 (*Adjustment of Margin*) and paragraph (b) of Clause 18.1 (*Commitment fee*) and/or any definitions used in these Clauses as are necessary to give the Lenders and the Obligors comparable protection to that contemplated at the Signing Date (and in the case of agreement within such 30 day period, such amendments shall take immediate effect); and

(c)    if amendments are not so agreed as provided in paragraph (b) above, the Parent shall deliver to the Agent with each set of Financial Statements required to be delivered under this Agreement another set (or appropriate reconciliation statement) prepared using the existing Accounting Principles which shall be used for purposes of calculating the financial covenants and for any calculation of Margin, Commitment Fees or mandatory prepayments.

**26.3   Accounting Reference Period**

(a)    The Parent shall procure that the Accounting Reference Period of each member of the Group is adjusted to end on 31 March of each year, in accordance with the Structure Memorandum (save where otherwise required under any applicable law or regulation or pursuant to local practice).

(b)    The Parent shall ensure that:

Confidential

CITI-TF 00701624

(i)     no member of the Group alters its Accounting Reference Period to end other than on the Accounting Reference Date; and

(ii)     the Accounting Reference Date of each member of the Group is the same.

**26.4   Budget**

The Parent shall deliver to the Agent the final itemised consolidated budget approved by the board of directors or equivalent body of the Parent to include for each Financial Quarter, consolidated statements of forecast profit and loss, turnover and cashflow and a balance sheet, together with a written analysis concerning the basic assumptions of such projected financial statements no later than 30 days after the beginning of each Accounting Reference Period (and for the first time in respect of the Accounting Reference Date starting on 1 April 2008).

**26.5   Litigation/Labour disputes**

The Company shall advise the Agent promptly upon becoming aware of details of any litigation, arbitration, administrative or regulatory proceedings current, pending or (to the best of its knowledge) threatened against any member of the Group or of any labour disputes affecting it or any member of the Group which, if adversely determined, would be reasonably likely to have a Material Adverse Effect.

**26.6   Defaults**

The Company shall notify the Agent of any Default promptly upon becoming aware of it and the steps (if any) being taken to remedy it.

**26.7   General information**

Each of the Parent and the Company shall supply to the Agent:

(a)     copies of all documents required by law to be despatched by the Parent and the Company to their shareholders, in their capacity as shareholders generally (or any class of them), at the same time as they are despatched;

(b)     copies of all documents despatched by the Parent and the Company to their creditors generally (or any class of them); and

(c)     promptly, such information as the Agent may reasonably require regarding the financial condition, assets and operations of the Group and/or any member of the Group as any Finance Party through the Agent may reasonably request.

**26.8   Investigation**

(a)     Each Obligor shall permit the Agent (or a representative of the Agent), while an Event of Default is continuing or the Agent reasonably believes that an Event of Default is continuing, upon reasonable notice and during regular business hours only and at a time convenient to management, to visit any of its offices (in the presence of a representative of the Company) to inspect any of its books and records and to discuss it financial matters with its officers and Auditors (provided that a representative of the Company shall be entitled to be present at any such discussions with the Auditors), provided that all information obtained as a result of such access shall be subject to the confidentiality restrictions set out in the Finance Documents.

(b)     Any reasonable cost and expense of each such visit referred to in paragraph (a) above shall be borne by the Group, unless in respect of any investigation instigated by the Agent as a result of any Finance Party believing that an Event of Default had occurred and the investigation shows that no Event of Default has occurred, in which case the cost and expense shall be for the account of the Lenders.

110

## 26.9 Websites

Any Obligor may satisfy its obligation under this Agreement to deliver any information in relation to those Lenders (the "**Website Lenders**") who accept this method of communication by posting this information onto an electronic website designated by the Company and the Agent (the "**Designated Website**") if:

(a)    the Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

(b)    both the Company and the Agent are aware of the address of and any relevant password specifications for the Designated Website; and

(c)    the information is in a format previously agreed between the Company and the Agent.

If any Lender does not agree to the delivery of information electronically then the Agent shall notify the Company accordingly and the Obligors shall supply the information to the Agent in paper form. In any event the Obligors shall supply the Agent with one copy (but no more than one copy) in paper form of any information required to be provided by it.

(a)    The Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company and the Agent.

(b)    The Company shall promptly upon becoming aware of its occurrence notify the Agent if:

(i)    the Designated Website cannot be accessed due to technical failure;

(ii)    the password specifications for the Designated Website change;

(iii)    any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(iv)    any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(v)    the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If the Company notifies the Agent under paragraph (b)(i) or paragraph (b)(v) above, all information to be provided by the Parent or an Obligor under this Agreement after the date of that notice shall be supplied in paper form unless and until the circumstances giving rise to the notification are no longer continuing.

(c)    Any Website Lender may request, through the Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. The Company shall procure that any such request is complied with within ten (10) Business Days.

## 26.10  Know your Customer Requirements

(a)    Each Obligor shall promptly upon the request of the Agent or any Lender, and each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective New Lender) in order for the Agent, such Lender or any prospective New Lender to carry out and be satisfied with the results of all

Confidential

CITI-TF 00701626

A-6008

necessary "know your customer" or other checks in relation to the identity of any person that it is required (in order to comply with applicable money laundering laws and regulations) to carry out in relation to the transactions contemplated in the Finance Documents and/or any Additional Obligor.

(b)    The Company shall, by not less than ten (10) Business Days' written notice to the Agent, notify the Agent (which shall promptly notify the Lenders) of the date on which any of its Subsidiaries becomes an Additional Guarantor or Additional Borrower pursuant to Clause 31 (*Changes to the Obligors*).

(c)    Following the giving of any notice pursuant to paragraph (b) above, the Company shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective New Lender) in order for the Agent, such Lender or any prospective New Lender to carry out and be satisfied with the results of all necessary "know your client" or other checks in relation to the identity of any person that it is required to carry out in relation to the accession of the Additional Borrower or such Additional Guarantor to this Agreement.

## 27.    FINANCIAL COVENANTS

### 27.1    Financial definitions

In this Clause 27.1:

"**Borrowings**" means any indebtedness for or in respect of:

(a)    monies borrowed;

(b)    any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)    any amount raised pursuant to any note purchase facility or the issue of bonds (other than a performance bond issued in the ordinary course of business by one member of the Group in respect of the performance obligations of another member of the Group), notes, debentures, loan stock or any similar instrument;

(d)    the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease (and, for the avoidance of doubt, when calculating the portion of the liability constituting Financial Indebtedness only the capitalised value thereof shall be included);

(e)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis or any credit notes given in the ordinary course of business);

(f)    any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

(g)    any amount raised under any other transaction (including any forward sale or purchase agreement) required to be accounted for as a borrowing except:

(i)    unconditional purchase obligations arising in the normal course of business;

(ii)    obligations in respect of pensions; and

(iii)    investment grants for fixed assets;

112

[London #293508 v19]

A-6009

(h)    any liability of any member of the Group to the trustees of any pension fund to the extent such obligations are secured by any Security on any property or asset of such person, the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured; and

(i)    without double counting, the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (h) above.

**"Consolidated Cash and Cash Equivalents"** means, at any time, the aggregate of:

(a)    the Relevant Group's cash at bank, in hand or on deposit;

(b)    the Relevant Group's Cash Equivalent Investments,

(in each case which is capable of being applied against the Relevant Group's consolidated Borrowings).

**"Consolidated Operating Cashflow"** means, for any Relevant Period and for the Relevant Group (without double counting), Maintenance EBITDA for that Relevant Period:

(a)    **minus** any increase in Working Capital or **plus** any decrease in Working Capital in each case to the extent not included in Maintenance EBITDA;

(b)    **minus** amounts paid in cash in respect of corporation or other taxes and **plus** tax credits or tax rebates received in cash (including, without limitation, refunds of tax overpaid);

(c)    **plus** (to the extent not included in paragraph (a) above) the amount of non-cash debits and charges taken into account in calculating Maintenance EBITDA for that Relevant Period;

(d)    **minus** (to the extent not take into account in paragraph (a) above) the amount of any non-cash credits and income taken into account in Maintenance EBITDA for that Relevant Period;

(e)    **plus** or **minus** any extraordinary items, Exceptional Items, redundancy, reorganisation, restructuring and non-recurring pension costs received or paid in cash provided however, that any cash payments in respect of said items that are funded from Retained Excess Cashflow retained by the Group in respect of any previous Accounting Reference Period or any Excess Equity Contribution shall be added back;

(f)    **plus** Acquisition Costs (to the extent not included in Maintenance EBITDA);

(g)    **minus** any consideration paid for Permitted Investments (save to the extent funded from Permitted Financial Indebtedness or under the Revolving Facility or funded from Retained Excess Cashflow in respect of any previous Accounting Reference Period or any Excess Equity Contribution);

(h)    **minus** cash dividends paid by the Parent to its shareholders and by the other members of the Group to minority shareholders not being members of the Relevant Group (other than to the extent already deducted in accordance with paragraph (l) below) **plus** cash dividends received;

113

CITI-TF 00701628

(i) **plus**, to the extent not already taken into account in calculating Maintenance EBITDA, income from participating interests in associated undertakings to the extent received in cash and minus any payments made to associated undertakings during that Relevant Period;

(j) **plus** cash flows arising from operational hedging transactions (not relating to Borrowings) to the extent not already taken into account in calculating Maintenance EBITDA;

(k) **plus** realised foreign exchange gains and minus realised foreign exchange losses charged during that period to the extent not already taken into account in calculating Maintenance EBITDA for that period and not relating to Borrowings;

(l) **excluding** dividends declared prior to the Unconditional Date;

(m) **minus** cash amounts paid in respect of stock options issued by the Relevant Group before the Unconditional Date.

"**Current Assets**" means the aggregate of inventory, trade receivables, credit notes, receivables from other associated companies, fixed assets receivables, prepaid expenses and deferred charges, sundry debtors and other debtors and other assets of each member of the Relevant Group (but excluding cash at bank and Cash Equivalent Investments and prepaid interest and tax receivables) maturing within twelve (12) months from the relevant testing date and excluding amounts due from any vendor in connection with a Permitted Investment and further excluding intra-Group items.

"**Current Liabilities**" means the aggregate of all liabilities (including trade payables, fixed assets payables, other liabilities, accruals, trading provisions, other creditors, provision for pensions and other liabilities and deferred income and payments received in advance) of each member of the Relevant Group falling due within twelve (12) months from the relevant testing date but excluding consolidated aggregate Borrowings of the Relevant Group (and any interest on those Borrowings) falling due within such period and excluding amounts due in respect of dividends or taxation or amounts due to any vendors in connection with a Permitted Investment and further excluding intra-Group items.

"**Equity Injection**" has the meaning given to it in the definition of Maintenance EBITDA.

"**Exceptional Items**" means material items, which are derived from events or transactions which fall within the ordinary activities of the Relevant Group, but which material items either individually or, if of a similar type, in aggregate, are unusual or occur infrequently.

"**Excess Cashflow**" means, in respect of each Accounting Reference Period, the amount calculated in the Base Currency of the Consolidated Operating Cashflow less Total Debt Service and (without double counting):

(a) less any amounts of Retained Excess Cashflow in respect of any previous Accounting Reference Period or Excess Equity Contribution or share capital subscription or Shareholder Debt taken into account in the calculation of Consolidated Operating Cashflow in the Relevant Period;

(b) less amounts funded from a Utilisation of the Revolving Facility or the Acquisition Facility in the Relevant Period;

(c) less any one-off severance payments to management included in the calculation of Consolidated Operating Cashflow in the Relevant Period;

114

[London #293508 v19]

(d)    less any gains resulting from the disposal of real estate assets included in Maintenance EBITDA in accordance with paragraph (e)(ii) of the definition of Maintenance EBITDA;

(e)    less any Disposal Proceeds, Insurance Proceeds and Recovery Proceeds taken into account in the calculation of Consolidated Operating Cashflow for such Relevant Period;

(f)    less any Pending Investment Amount for that Relevant Period (or plus any Pending Investment Amount from the previous Relevant Period); and

(g)    less any extraordinary items, Exceptional Items, redundancy, reorganisation, restructuring and non-recurring pension costs referred to in paragraph (e) of Consolidated Operating Cashflow but not deducted in accordance with the provisions of that paragraph.

"**Excess Equity Contribution**" means for the Relevant Group the amount by which (i) the sources of cash demonstrated in the Funds Flow Statement exceeds (ii) the aggregate actual uses of cash as demonstrated in the Funds Flow Statement which as regards the uses, for the avoidance of doubt, will only include:

(a)    the purchase price payable by the Company in respect of the Acquisition;

(b)    the amount of Borrowings of the Target Group to be repaid on or about the Closing Date;

(c)    any costs, commissions, prepayment premiums, fees and expenses incurred in relation to the refinancing of existing Borrowings of the Target Group;

(d)    the fair market value of the interest rate derivative transactions entered into by the Target Group and existing as at the Unconditional Date; and

(e)    any costs, commissions, fees and expenses incurred in relation to the Transaction Documents and paid on the Closing Date or within five (5) Business Days thereafter.

"**Financial Quarter**" means each quarterly period in each Financial Year (each comprising three consecutive monthly periods) ending on 31 December, 31 March, 30 June and 30 September in each such Financial Year.

"**Financial Year**" means each period of twelve (12) months ended on 31 December or after adjustments in accordance with the Structure Memorandum, 31 March.

"**Maintenance EBITDA**" means for any Relevant Period (without double counting), the consolidated net profit of the Relevant Group:

(a)    adding back any Restructuring Expenses;

(b)    adding back Total Net Interest;

(c)    adding back Taxes on income or gains (including any provision on account of Taxation);

(d)    adding back any depreciation or amortisation of tangible or intangible assets (including goodwill);

(e)

Confidential

CITI-TF 00701630

(i) adding back any amount related to the impairment of any asset and any provision for risk and charges and deducting any provision reversals (except for provision reversals contemplated in the Base Case Model);

(ii) deducting any non-cash gains and adding back any non-cash losses arising on the disposal or revaluation of fair value adjustment of assets other than in the ordinary course of business including amounts attributable to goodwill or step up written-off during such period or charged to the profit and loss account of the Relevant Group during such period; and

(iii) deducting any unrealised exchange gains and adding back any unrealised exchange losses;

(f) adding back any negative or deducting any positive Exceptional Items, extraordinary items, redundancy, reorganisation, restructuring and non-recurring pension costs;

(g) adding back any Acquisition Costs and any fees, expenses or charges related to any equity financing, debt financing, investments or acquisitions whether or not successful and the amount of any one-off severance payments to existing senior management and sign-on bonus payments relating to new appointments to senior management;

(h) adding back any Management Fees paid to all Investors relating to their investment in the Relevant Group;

(i) adding back any costs or losses recovered through a claim under any insurance, warranty or indemnity;

(j) adding back any business interruption or loss recovered through insurance proceeds;

(k) deducting any realised exchange gains and adding back any realised exchange losses related to balance sheet hedging of the Relevant Group;

(l) adding back any non cash charges relating to any employee equity plan; and

(m) adding back any expense related to stock options issued by the Relevant Group before the Unconditional Date,

provided that for the purposes of Clause 27.2 (*Financial condition*) only:

(i) the level of Maintenance EBITDA may be increased by the amount equal to the net proceeds of any equity or Shareholder Debt paid directly or indirectly into the Parent which is equal to the amount required to be added to Maintenance EBITDA to cure any breach of Clause 27.2 (*Financial condition*) that would have occurred but for such increase (an "**Equity Injection**");

(ii) any such Equity Injection may be made at any time from the first day of the Relevant Period to which it is expressly stated to relate up to twenty (20) Business Days after delivery of the financial statements for a Relevant Period and shall be treated as having been contributed in the last Financial Quarter of that Relevant Period;

(iii) any Equity Injection shall be treated as Maintenance EBITDA for (i) the Financial Quarter in respect of which it is received for the purpose of calculating the financial covenants for that quarter and (ii) the immediately following three Financial Quarters; and

116

Confidential

CITI-TF 00701631

(iv)    during the period from the date on which the Parent notifies the Agent that it intends to make an Equity Injection to cure a breach of Clause 27.2 (*Financial condition*) to the date falling 20 Business Days after the date on which the Parent has delivered to the Agent (in accordance with Clause 26.1 (*Financial statements*)) the financial statements which show such breach of Clause 27.2 (*Financial condition*), no Secured Party may, in respect of such breach, exercise any rights it may have under Clause 29.13 (*Acceleration*), cancel any Commitments or enforce any Transaction Security Document solely on the basis of such breach.

"**Music Publishing Division Excess Cashflow**" means Excess Cashflow that is directly attributable to that portion of the Group Business constituting the Music Publishing Division.

"**Pending Investment Amount**" means, in respect of any Relevant Period, the aggregate cash amounts to be paid in respect of the consideration for any Permitted Investments for which a member of the Group has entered into a commitment by no later than the end of the Relevant Period and completed by no later than the date which is six (6) months following the commencement of the following Relevant Period.

"**Relevant Group**" means the Parent and its Subsidiaries which are members of the Group and which are fully consolidated in accordance with the Accounting Principles in the consolidated accounts of the Group.

"**Relevant Period**" means (i) in the case of any determination of Music Publishing Division Excess Cashflow, the relevant Financial Quarter or (ii) in any other case, the four Financial Quarters ending on the last day of the relevant Financial Quarter.

"**Restructuring Expenses**" means expenses incurred in connection with restructuring the Relevant Group.

"**Retained Excess Cashflow**" means Excess Cashflow which is not required to be applied in prepayment of the Facilities under the terms of this Agreement and which has not otherwise been applied for one of the specified purposes set out in and in accordance with the terms of this Agreement.

"**Total Debt Service**" means in respect of any Relevant Period and for the Relevant Group, the aggregate of:

(a)    Total Net Cash Interest Expense; and

(b)    scheduled (but not voluntary or mandatory) repayments of Borrowings (as reduced by any voluntary or mandatory prepayments) excluding any principal amount which fell due under any overdraft, working capital or revolving credit facility and which was available for simultaneous redrawing according to the terms of such facility or a similar facility and excluding the amount of any payments falling due under any finance leases.

"**Total Net Cash Interest Expense**" means in respect of any Relevant Period, the aggregate amount of the consolidated cash interest, commission, fees, discounts and other finance payments payable by any member of the Relevant Group to a person which is not a member of the Relevant Group, in respect of such period in respect of the Relevant Group's consolidated Borrowings or interest rate hedging arrangements (excluding any Shareholder Debt and excluding any amortisation of Acquisition Costs or other transaction costs (to the extent included) and capitalised interest) but deducting:

117

CITI-TF 00701632

(a)     any commission, fees, discounts and other finance payments receivable by any member of the Relevant Group under any interest rate hedging instrument permitted by this Agreement;

(b)     any interest receivable by any member of the Relevant Group on any deposit including from Cash Equivalent Investments, time deposit investments and credit balances on bank accounts; and

(c)     all fees incurred by any Obligor in connection with the Incurrence of any Financial Indebtedness.

"**Total Net Debt**" means at the relevant date:

(a)     the aggregate of the Relevant Group's consolidated Borrowings other than:

(i)      Borrowings under Shareholder Debt; and

(ii)     for the avoidance of doubt, after the Separation Date, any amounts outstanding under the Securitisation Bridge Facility and any Music Publishing Division Acquisition Loans; minus

(b)     Consolidated Cash and Cash Equivalents.

"**Total Net Interest**" for any period means Total Net Cash Interest Expense plus capitalised interest payable in that period by any member of the Relevant Group to any person which is not a member of the Relevant Group.

"**Working Capital**" means, at any time, Current Assets at that time less Current Liabilities at that time.

27.2    **Financial condition**

The Parent shall ensure that the ratio of Total Net Debt to Maintenance EBITDA of the Recorded Music Division in respect of any Relevant Period specified in column 1 below shall be or shall be less than the ratio set out in column 2 below opposite that Relevant Period, provided that in calculating the amount of Total Net Debt and Maintenance EBITDA of the Recorded Music Division, any amount of Total Net Debt denominated in a currency other than the Base Currency shall be translated into the Base Currency at the same average rate used for the translation into the Base Currency of amounts in that currency for the purposes of the preparation of the profit and loss account for the Financial Statements relating to the Relevant Period prepared in accordance with Clause 26.1 (*Financial Statements*):

| Column 1 Relevant Period | Column 2 Ratio |
|---|---|
| Period expiring on 30 June 2008 | 7.11:1 |
| Period expiring on 30 September 2008 | 5.88:1 |
| Period expiring on 31 December 2008 | 5.92:1 |
| Period expiring on 31 March 2009 | 4.20:1 |
| Period expiring on 30 June 2009 | 5.02:1 |
| Period expiring on 30 September 2009 | 4.38:1 |
| Period expiring on 31 December 2009 | 4.36:1 |

[London #293508 v19]

Confidential

CITI-TF 00701633

| Column 1<br>Relevant Period | Column 2<br>Ratio |
|---|---|
| Period expiring on 31 March 2010 | 3.30:1 |
| Period expiring on 30 June 2010 | 4.09:1 |
| Period expiring on 30 September 2010 | 3.53:1 |
| Period expiring on 31 December 2010 | 3.61:1 |
| Period expiring on 31 March 2011 | 2.52:1 |
| Period expiring on 30 June 2011 | 3.32:1 |
| Period expiring on 30 September 2011 | 2.86:1 |
| Period expiring on 31 December 2011 | 2.98:1 |
| Period expiring on 31 March 2012 | 2.00:1 |
| Period expiring on 30 June 2012 | 2.74:1 |
| Period expiring on 30 September 2012 | 2.24:1 |
| Period expiring on 31 December 2012 | 2.35:1 |
| Period expiring on 31 March 2013 | 2.00:1 |
| Period expiring on 30 June 2013 | 2.08:1 |
| Period expiring on 30 September 2013 | 2.00:1 |
| Period expiring on 31 December 2013 | 2.00:1 |
| Period expiring on 31 March 2014 | 2.00:1 |
| Period expiring on 30 June 2014 | 2.00:1 |
| Period expiring on 30 September 2014 | 2.00:1 |
| Period expiring on 31 December 2014 | 2.00:1 |
| Period expiring on 31 March 2015 | 2.00:1 |
| Period expiring on 30 June 2015 | 2.00:1 |
| Period expiring on 30 September 2015 | 2.00:1 |

provided that this covenant shall be tested for the first time in respect of the Relevant Period ending on 30 June 2008.

Confidential

CITI-TF 00701634

A-6016

**27.3 Calculations**

Maintenance EBITDA, Total Debt Service, Total Net Cash Interest Expense and Total Net Debt shall be calculated and interpreted on a consolidated basis in accordance with Accounting Principles.

**27.4 Pro Forma Calculation**

(a) Where a company or business is acquired during a Relevant Period as a result of a Permitted Investment the contribution of that company or business to Maintenance EBITDA shall for the purposes of Clause 27.2 (*Financial condition*) above be included on a pro forma basis as if the acquisition had been made on the first day of the Relevant Period.

(b) Where a company or business is to be disposed of during a subsequent Relevant Period, the contribution of that company or business shall not be excluded for the purposes of the calculation of the financial covenants of the Relevant Period.

**27.5 General**

No item shall be taken into account more than once in any calculation.

**28. GENERAL UNDERTAKINGS**

The undertakings in this Clause 28 remain in force from the Signing Date for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

**Positive Undertakings**

**28.1 Authorisations**

Each Obligor shall promptly:

(a) obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b) upon written request supply certified copies to the Agent of,

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(i) enable it to perform its obligations under any Transaction Documents to which it is a party;

(ii) ensure the legality, validity, enforceability or admissibility in evidence of any Transaction Document to which it is a party; and

(iii) carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

**28.2 Compliance with laws**

Each Obligor shall (and the Parent shall procure that each member of the Group will) comply in all respects with all laws to which it may be subject if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

**28.3 Environmental compliance**

Each obligor shall (and the Parent shall procure that each member of the Group will):

(a) comply with all Environmental Law; and

(b) obtain, maintain and ensure compliance with all requisite Environmental Permits,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

120

[London #293508 v19]

Confidential

CITI-TF 00701635

**28.4    Insurance**

Each Obligor shall (and the Parent shall procure that each member of the Group will) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially the same business. All insurances must be with reputable independent insurance companies or underwriters.

**28.5    Taxation**

Each Obligor shall (and the Parent shall procure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring material penalties unless and only to the extent that:

(a)    such payment is being contested in good faith;

(b)    adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Agent under Clause 26.1 (*Financial statements*);

(c)    such payment can be lawfully withheld; and

(d)    failure to pay those Taxes does not have, nor is it reasonably likely to have, a Material Adverse Effect.

**28.6    Intellectual Property**

Each Obligor shall (and the Parent shall procure that each member of the Group will):

(a)    preserve and maintain the subsistence and validity of its Material Intellectual Property;

(b)    use reasonable endeavours to prevent any infringement in any material respect of the Material Intellectual Property;

(c)    make registrations and pay all registration fees and taxes necessary to maintain the Material Intellectual Property in full force and effect and record its interest in that Intellectual Property; and

(d)    not use or permit the Material Intellectual Property to be used in a way or take any step or omit to take any step in respect of that Material Intellectual Property which may materially and adversely affect the existence or value of the Material Intellectual Property or imperil the right of any member of the Group to use such property,

where failure to do so, in the case of paragraphs (a), (b) and (c) above, or, in the case of paragraph (d) above, such use, permission to use, omission or discontinuation, is reasonably likely to have a Material Adverse Effect.

**28.7    Pari passu ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

**28.8    Cash balances**

(a)    Subject to paragraph (b) below, each Obligor will procure that none of its Subsidiaries which are not Obligors will, at any time hold cash or Cash Equivalent Investments greater than required for its projected cashflow requirements for the next 12 months (the amount of such excess being the

121

CITI-TF 00701636

"**Cash Balance**") and any such Cash Balance shall be lent or otherwise transferred by the relevant Subsidiary to an Obligor which has created Transaction Security over its bank accounts.

(b)  No member of the Group shall be obliged at any time to lend or otherwise transfer or to procure that a Subsidiary lend or otherwise transfer any Cash Balance under paragraph (a) above if (despite using all reasonable efforts to avoid the breach or result) to do so would breach any applicable law or result in personal liability for the Obligor or the Subsidiary or any of such person's directors or management or result in the Group incurring a cost (whether as a result of paying additional Taxes or otherwise) equal to or greater than five (5) *per cent.* of the moneys to be lent or otherwise transferred.

### 28.9  Treasury Transactions

(a)  No Obligor shall (and the Parent will procure that no members of the Group will) enter into any Treasury Transaction, other than:

(i)  the hedging transactions contemplated by the Hedging Letter and documented by the Hedging Agreements;

(ii)  spot and forward delivery foreign exchange contracts entered into in the ordinary course of business and not for speculative purposes; and

(iii)  any Treasury Transaction entered into for the hedging of actual or projected real exposures arising in the ordinary course of business of a member of the Group and not for speculative purposes.

(b)  The Parent shall ensure that all currency and interest rate hedging arrangements contemplated by the Hedging Letter are implemented in accordance with the terms of the Hedging Letter and that such arrangements are not terminated, varied or cancelled without the consent of the Agent (acting on the instructions of the Majority Lenders), save (in the case of arrangements documented by the Hedging Agreements) as permitted by the Intercreditor Agreement.

### 28.10  Further assurances

(a)  Subject to the Agreed Security Principles, each Obligor shall (and the Parent shall procure that each member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(i)  to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law;

(ii)  to confer on the Security Agent or confer on the Finance Parties Security over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii)  to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b)  Subject at all times to the Agreed Security Principles, each Obligor shall (and the Parent shall procure that each member of the Group shall) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation,

Confidential

CITI-TF 00701637

perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Finance Parties by or pursuant to the Finance Documents.

**28.11 Financial assistance**

Each Obligor shall (and the Parent shall procure each member of the Group will) comply in all respects with Sections 151 to 158 of the Act and any equivalent legislation in other jurisdictions including in relation to the execution of the Transaction Security Documents and payment of amounts due under this Agreement.

**28.12 Steps paper**

The Company shall, within 6 weeks after the Closing Date (or such later date as the Arranger may agree) deliver to the Lenders a steps paper, in form and substance satisfactory to the Lenders (acting reasonably), setting out the details of the steps proposed to be taken to ensure the Business Separation and debt pushdown.

**28.13 Business Separation**

(a)    Each Obligor shall (and the Parent shall procure that each member of the Group will) use their reasonable endeavours to:

(i)    achieve the Business Separation as soon as reasonably practicable and in any event within 6 months after the Unconditional Date, subject at all times to having due consideration to the commercial, economic and tax impact of the Business Separation;

(ii)    novate, to the extent permissible and practicable, the Securitisation Bridge Loans to the entity or entities holding the Music Publishing Division's assets and business; and

(iii)    subject at all times to having due consideration to the commercial, economic and tax impact, as soon as reasonably practicable and in any event within 6 months after acquisition, ensure that any music publishing business acquired after the Closing Date is separated from the recorded music business acquired with that business and sold for fair market value to a Securitisation Entity.

(b)    The Parties will, on or before the occurrence of the Business Separation (and each acting reasonably), agree on amendments to the covenants applicable to the entity or entities holding the Music Publishing Division's assets and business in order that the covenants are consistent with those customary for a securitisation transactions.

(c)    The Parties will on or before the occurrence of the Business Separation (and each acting reasonably), agree on amendments to the Transaction Security Documents and the Intercreditor Agreement to ensure that, after completion of the Business Separation, the Securitisation Bridge Facility Lenders, the Lenders of Music Publishing Division Acquisition Loans and the Hedge Counterparties which have entered into hedging arrangements in respect of Securitisation Bridge Loans or Music Publishing Division Acquisition Loans will have first ranking Security over the assets of the Music Publishing Division and the remaining Lenders and Hedge Counterparties will have silent second ranking Security over such assets.

**28.14 Security and guarantees**

(a)    The Company shall ensure that as soon as practicable after the Closing Date and in any event within 120 days after the Closing Date:

(i)    each Material Subsidiary; and

(ii)    each member of the Group whose business forms part of the Music Publishing Division,

Confidential

will, subject to the Agreed Security Principles, become an Additional Guarantor in accordance with Clause 31 (*Changes to the Obligors*) and will provide the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) as Security to secure its obligations as Guarantor under the Finance Documents such that members of the Group whose aggregate:

(A)    unconsolidated gross assets represent not less than 85 per cent. of the consolidated gross assets of the Group as at the Closing Date; and

(B)    unconsolidated Maintenance EBITDA represent not less than 85 per cent. of the consolidated Maintenance EBITDA of the Group as at the Closing Date,

shall have become Additional Guarantors in accordance with Clause 31 (*Changes to the Obligors*) and shall have provided the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) as Security to secure its obligations as Guarantor under the Finance Documents;

(b)    The Company shall:

(i)    promptly notify the Agent if any member of the Group becomes a Material Subsidiary; and

(ii)    within 90 days of request by the Agent, procure that :

(A)    each Subsidiary acquired by the Company, directly or indirectly, which is a Material Subsidiary after the Signing Date; and

(B)    any other Subsidiary which becomes a Material Subsidiary after the Signing Date,

will, subject to the Agreed Security Principles, become an Additional Guarantor and deliver to the Agent an Accession Letter duly executed by itself and the relevant Material Subsidiary together with the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to such Material Subsidiary all in form and substance satisfactory to the Agent.

(c)    The Parent will ensure that, at all times after the date which is 120 days after the Closing Date:

(i)    the aggregate unconsolidated gross assets of the Guarantors represents at least 85 per cent. of the consolidated gross assets of the Group;

(ii)    the aggregate unconsolidated Maintenance EBITDA of the Guarantors represents at least 85 per cent. of the consolidated Maintenance EBITDA of the Group,

provided that where each member of the Group:

(A)    whose gross assets and Maintenance EBITDA account for 3 per cent. or more of the consolidated gross assets or consolidated Maintenance EBITDA of the Group; and

(B)    which is not excused from becoming an Additional Guarantor pursuant to the Agreed Security Principles,

has become an Additional Guarantor, the gross assets and Maintenance EBITDA of any member of the Group which is not eligible or required to be a Guarantor pursuant to the Agreed Security Principles shall not be included in the calculation of consolidated gross assets or consolidated Maintenance EBITDA of the Group for the purposes of subparagraphs (i) and (ii) above.

Confidential

(d)     No Obligor shall (and the Company shall ensure that no other member of the Group will) do, or consent to the doing of, anything which might prejudice the validity, enforceability or priority of any of the Security created pursuant to the Transaction Security Documents in any material respect.

**28.15 Scheme undertakings**

If the Scheme Conversion has occurred, the Company will:

(a)     procure the issue of the Scheme Press Release within five business days of the Signing Date;

(b)     dispatch the Scheme Circular as soon as practicable and in any event within 28 days of the date of issue of the Scheme Press Release (or, if later, promptly after the date on which the Court convenes a meeting of the holders of the Target shares to consider the Scheme);

(c)     procure that the terms of the Scheme Circular are not inconsistent with, or contrary to, the terms of the draft Scheme Press Release delivered as a condition precedent to signing this Agreement where failure to do so would be materially prejudicial to the interests of the Finance Parties, unless the Finance Parties have approved in writing such change in advance (such consent not to be unreasonably withheld or delayed);

(d)     promptly inform the Agent of any material developments in relation to the Scheme and promptly on reasonable request provide the Agent with:

(i)     information as to the progress of the Scheme; and

(ii)    any material information or advice received in relation to the Scheme and will notify the Agent promptly following becoming aware that the Court Order has been issued;

(e)     not increase, and ensure that there is no increase in, the amount of cash payable by it in respect of the Target Shares pursuant to the Scheme or otherwise vary the cash consideration payable pursuant to the Scheme other than in circumstances where the Company does not incur any additional Financial Indebtedness for the purpose of satisfying any amount of increased consideration payable in respect of the Target Shares pursuant to the Scheme other than Shareholder Debt;

(f)     not take any action (and procure, so far as it is able to do so, that no person, Acting in Concert (as defined in the Takeover Code) with it or otherwise, takes any action) which would compel it to make an offer to shareholders in the Target under Rule 9 of the Takeover Code;

(g)     not waive or amend (and use reasonable endeavours to ensure there is no waiver or amendment to) or declare or treat as satisfied any condition of the Scheme where such waiver or consent would be materially prejudicial to the interests of the Finance Parties unless either:

(i)     the Arranger has given its consent; or

(ii)    to the extent required by the Takeover Code, the Takeover Panel or the Court;

(h)     if it becomes aware of a circumstance or event which is or could reasonably be construed to be covered by any condition of the Scheme which, if not waived, would entitle it

125

CITI-TF 00701640

A-6022

(with the Takeover Panel's and/or the Court's consent, if needed) to lapse or withdraw the Scheme, promptly to notify the Agent; and

(i)   if a circumstance or event referred to in paragraph (h) above occurs and the Agent states that, in its *bona fide* opinion, that circumstance or event could reasonably be expected to have a Material Adverse Effect:

    (i)   promptly request the Takeover Panel and/or the Court to agree to the lapsing or withdrawal of the Scheme as a result of the non-satisfaction of that condition; and

    (ii)   if the Takeover Panel and/or the Court so agrees, not waive that condition or treat it as satisfied, and withdraw the Scheme at the earliest opportunity;

(j)   make full written disclosure to the Agent as soon as reasonably practicable of all information which comes to its attention and which is material to any decision about whether to waive any condition of the Scheme or which suggests that any condition to that Acquisition will or may not be satisfied, or will or may require to be waived; and

(k)   inform the Arranger and consult with it (except to the extent necessary to comply with any obligations of confidentiality to any regulatory authority, and unless otherwise required by the Takeover Code, the Takeover Panel, any regulation, any applicable stock exchange, any applicable government or other regularity authority) as to:

    (i)   the terms and conditions of any assurance or undertaking proposed to be given by or on behalf of the Company or, so far as Company is aware, the Target to any person for the purpose of obtaining any authorisation or clearance in connection with the Acquisition; and

    (ii)   any terms or conditions proposed in connection with any authorisation required by law in connection with the Acquisition.

### 28.16 Offer Undertakings

If the Scheme Conversion has not occurred, the Company will:

(a)   procure the issue of the Offer Press Announcement within five Business Days of the Signing Date;

(b)   procure that the Offer Document is posted within 28 days of the issue of the Offer Press Announcement (or such longer time period as the Agent and the Takeover Panel may agree);

(c)   keep the Agent informed as to any material developments in relation to the Offer and promptly on reasonable request provide the Agent with information as to the progress of the Offer and with any material information or advice received in relation to the Offer;

(d)   not increase, and ensure there is no increase in, the amount of cash payable by it in respect of the Target Shares pursuant to the Offer or otherwise vary the cash consideration payable pursuant to the Offer other than in circumstances where the Company does not incur any additional Financial Indebtedness for the purpose of satisfying any amount of increased consideration payable in respect of the Target Shares pursuant to the Scheme other than Shareholder Debt;

(e)   not take any action (and procure, so far as it is able to do so, that no person, Acting in Concert (as defined in the Takeover Code) with it or otherwise, takes any action) which

[London #293508 v19]

Confidential

CITI-TF 00701641

would compel it to make an offer to shareholders in the Target under Rule 9 of the Takeover Code;

(f) not waive or amend (and use reasonable endeavours to ensure there is no waiver or amendment to) or declare or treat as satisfied any condition of the Offer where such waiver or consent would be materially prejudicial to the interests of the Interim Lenders unless either:

(i) the Lenders have given their consent; or

(ii) to the extent required by the Takeover Code, the Takeover Panel or the Court;

(iii) extend the Offer beyond the Certain Funds Period;

(g) procure that the terms of the Offer Document are not inconsistent with, or contrary to, the terms of the Offer Press Announcement delivered as a condition precedent under this Agreement where failure to do so would be materially prejudicial to the interests of the Finance Parties, unless the Agent (acting on the instructions of the Majority Lenders) has approved in writing such changes in advance (such consent not to be unreasonably withheld or delayed);

(h) promptly notify the Agent if it becomes aware of a circumstance or event which is or could reasonably be construed to be covered by any condition of the Offer which, if not waived, would entitle the Company (with the Takeover Panel's consent, if needed) to lapse the Offer;

(i) if a circumstance or event referred to in paragraph (h) above occurs and the Agent (acting on the instructions of the Majority Lenders) states that, in its bona fide opinion, that circumstance or event could reasonably be expected to have a Material Adverse Effect:

(i) promptly request the Takeover Panel to agree to the lapsing or withdrawal of the Offer as a result of the non-satisfaction of that condition; and

(ii) if the Takeover Panel so agrees, not waive that condition or treat it as satisfied and declare the Offer lapsed at the earliest opportunity;

(j) within 28 days of the later of:

(i) the Offer becoming or being declared wholly unconditional; and

(ii) the date on which acceptances of the Offer have been received from holders of not less than 90% of each class of the Target Shares to which the Offer relates,

procure that one of its directors issues a statutory declaration pursuant to section 980(4) of the Companies Act 2006 and gives notice to all the remaining holders of Target Shares that it intends to acquire their shares, pursuant to Part 28 of the Companies Act 2006, and the Company shall subsequently purchase such shares as soon as legally possible.

**28.17 Ownership**
The Company will ensure that the Target remains its wholly owned Subsidiary.

**28.18 United States laws**
(a) In this Clause:

127

CITI-TF 00701642

**"Anti-Terrorism Law"** means each of:

(i)    Executive Order No. 13224 on Terrorist Financing: Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism issued 23 September 2001, as amended by order 13268 (as so amended, the **"Executive Order"**);

(ii)    the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act);

(iii)    the Money Laundering Control Act of 1986, 18 U.S.C. Sect. 1956; and

(iv)    any similar law enacted in the United States of America subsequent to the Signing Date.

**"Code"** means the United States Internal Revenue Code of 1986.

**"ERISA"** means the United States Employee Retirement Fund Income Security Act of 1974 as amended and the applicable regulations thereunder.

**"ERISA Affiliate"** means any person treated as a single employer with any Obligor for the purpose of section 414 of the Code.

**"investment company"** has the meaning given to it in the United States Investment Company Act of 1940.

**"Plan"** means an employee benefit plan as defined in section 3(3) of ERISA:

(i)    maintained by any Obligor or any ERISA Affiliate;

(ii)    to which any Obligor or any ERISA Affiliate is required to make any payment or contribution.

**"public utility"** has the meaning given to it in the United States Federal Power Act of 1920.

**"Reportable Event"** means:

(i)    an event specified as such in section 4043 of ERISA or any related regulation, other than an event in relation to which the requirement to give 30-day notice of that event is waived by any regulation; or

(ii)    a failure to meet the applicable minimum funding standard under section 412 of the Code or section 302 of ERISA, whether or not there has been any waiver of notice or waiver of the minimum funding standard under section 412 of the Code.

**"Restricted Party"** means any person listed:

(i)    in the Annex to the Executive Order;

(ii)    on the "Specially Designated Nationals and Blocked Persons" list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or

(iii)    in any successor list to either of the foregoing.

[London #293508 v19]

Confidential

CITI-TF 00701643

(b) Each Obligor must, promptly upon becoming aware of it, notify the Agent of:

    (i) any Reportable Event with respect to a Plan that is a single employer plan (as defined in ERISA);

    (ii) the termination of or complete or partial withdrawal from, or any circumstances reasonably likely to result in the termination of or withdrawal from, any Plan subject to Title IV of ERISA which is reasonably likely to have a Material Adverse Effect; and

    (iii) a claim or other communication alleging material non-compliance with any law or regulation relating to any Plan which is reasonably likely to have a Material Adverse Effect.

(c) Each Obligor and its ERISA Affiliates must be, and remain, in compliance in all respects with all law and regulations relating to each of its Plans, where failure to do so is reasonably likely to have a Material Adverse Effect.

(d) Each of the Obligors and its ERISA Affiliates must ensure that no event or condition exists at any time in relation to a Plan which is reasonably likely to result in the imposition of a Security (other than as permitted under this Agreement) on any of its assets or which is reasonably likely to have a Material Adverse Effect.

(e) No Borrower may:

    (i) use any part or proceeds of a Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately:

        (A) to purchase or to carry margin stock or to extend credit to others for the purpose of purchasing or carrying "margin stock" (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System of the United States of America, as amended to the date hereof) or to refund indebtedness originally incurred for such purposes; or

        (B) for any purpose which violates or is inconsistent with the provisions of Regulations U or X of the Board of Governors of the Federal Reserve System; or

    (ii) extend any credit for the purpose, directly or indirectly, of buying or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States of America, as amended to the date hereof).

(f) No Obligor may be or become:

    (i) a public utility or subject to regulation under the United States Federal Power Act of 1920;

    (ii) an investment company required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or

    (iii) subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee indebtedness.

(g) No Obligor nor any of its Affiliates may:

    (i) be controlled by a Restricted Party;

Confidential

CITI-TF 00701644

A-6026

(ii)  receive funds or other property from a Restricted Party; or

(iii)  be in breach of or is the subject of any action or investigation under any Anti-Terrorism Law,

in each case to the extent that such laws are applicable to it or such Affiliates.

(h)  Each Obligor and its Affiliates must take reasonable measures to ensure compliance with the Anti-Terrorism Laws to the extent such laws are applicable to it or such Affiliates.

(i)  No Obligor may be engaged principally in, nor have as one of its important activities, the business of extending credit for the purpose of purchasing or carrying any "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States of America, as amended from time to time) and, if requested by a Lender, the Borrower will furnish to that Lender a statement on Federal Reserve Form U-1 or G-3.

**Negative undertakings**

**28.19 Financial Indebtedness**

(a)  No Obligor shall (and the Parent shall procure that no member of the Group will) Incur, directly or indirectly, any Financial Indebtedness, provided that any Obligor may Incur Financial Indebtedness if, on the date of such Incurrence and after giving effect thereto on a pro-forma basis, the Incurrence Leverage Ratio would be equal to or below 2.00:1.

(b)  Notwithstanding paragraph (a) above, any member of the Group will be permitted to Incur Permitted Indebtedness.

(c)  For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Clause 28.19:

(i)  in the event that an item of Indebtedness meets the criteria of paragraph (a) above and/or more than one of the paragraphs of the definition of Permitted Indebtedness, the Company, at its sole discretion, will classify or, from time to time, may reclassify or divide such item of Indebtedness (or any portion thereof) in any manner that complies with this covenant and only be required to include the amount and type of such Financial Indebtedness in one of the above paragraphs;

(ii)  an item of Indebtedness may be divided and classified under more than one of the types of Financial Indebtedness described above, and in that connection the Company shall be entitled to treat a portion of such Indebtedness as having been Incurred under the first paragraph above and thereafter the remainder of such Financial Indebtedness having been Incurred under the second paragraph above;

(iii)  obligations with respect to letters of credit, bankers' acceptances, Guarantees or Security, in each case supporting Financial Indebtedness otherwise included in the determination of such particular amount will not be included;

(iv)  if obligations in respect of letters of credit, bankers' acceptances, or other similar instruments are Incurred pursuant to any Financial Indebtedness and are being treated as Incurred pursuant to this covenant and the letters of credit, bankers' acceptances or other similar instruments relate to other Financial Indebtedness, then such other Financial Indebtedness shall not be included;

(v)  the maximum amount of Financial Indebtedness that can be Incurred pursuant to this Clause shall not be deemed to be exceeded, with respect to any outstanding

130

Confidential

CITI-TF 00701645

Indebtedness, due solely to the result of fluctuations in the exchange rates of currencies; and

(vi)     the amount of Financial Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined on the basis of the Accounting Principles.

**28.20  Share issuance and sales**

(a)     No Obligor shall (and the Parent shall procure that no member of the Group will) issue or sell any Capital Stock of a member of the Group provided that the Parent may issue Disqualified Stock or Preferred Stock if, on the date of such issuance and after giving effect thereto on a pro forma basis, the Incurrence Leverage Ratio would be equal to or below 2.00:1.

(b)     Notwithstanding paragraph (a) above, any member of the Group will be permitted to issue or sell Capital Stock pursuant to a Permitted Share Issuance and will be permitted to sell all (but not part) of the Capital Stock of a member of the Group in accordance with Clause 28.23 (*Asset disposals*).

**28.21  Security**

(a)     No Obligor shall (and the Parent shall ensure that no other member of the Group will) create or permit to subsist any Security over any of its assets;

(b)     No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(i)      sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Group;

(ii)     sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iv)     enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c)     Paragraphs (a) and (b) above shall not apply to any Permitted Encumbrance.

**28.22  Restricted Payments**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) make a Restricted Payment (other than a Permitted Payment or Permitted Investment) if at the time the relevant member of the Group makes such Restricted Payment (and after giving effect thereto):

(a)     a Default shall have occurred and be continuing; or

(b)     the Incurrence Leverage Ratio would be greater than 2.00:1.

**28.23  Asset disposals**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into a single transaction or series of transactions (whether related or not) and whether voluntary or involuntary, to sell, lease, transfer or otherwise dispose of any asset (other than a Permitted Disposal) unless:

131

A-6028

(a) the relevant member of the Group receives consideration (including by way of relief from, or by any other person assuming responsibility for, any liabilities, contingent or otherwise) at the time of such disposition at least equal to the fair market value (including as to the value of all non-cash consideration) of the shares and assets subject to such disposition (which shall be determined in good faith by the Board of Directors of that member of the Group where the value of the shares and assets subject to such disposition (or the consideration receivable therefore) exceeds £10 million (or its equivalent));

(b) at least 50% of the consideration thereof received by the relevant member of the Group is in the form (or contribution) of cash or Cash Equivalent Investments (or securities with a face amount that are converted into cash or Cash Equivalent Investments with an equivalent face value within 60 days of such disposition); and

(c) the proceeds received in the form of cash or Cash Equivalent Investments are applied in accordance with the terms of this Agreement.

### 28.24 Affiliate Transactions

No Obligor shall (and the Parent shall procure that no other member of the Group will) enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any of its Affiliates (an "**Affiliate Transaction**") other than a Permitted Affiliate Transaction unless:

(a) the terms of the Affiliate Transaction are no less favourable, taken as a whole, to the relevant member of the Group than those that could reasonably be expected to be obtained at the time in a comparable transaction with in arm's length dealings with a person who is not an Affiliate;

(b) if such Affiliate Transaction involves an amount in excess of £10 million (or its equivalent), a majority of the members of the Board of Directors of the relevant member of the Group who are disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in paragraph (a) are satisfied and have approved the relevant Affiliate Transaction; and

(c) if such Affiliate Transaction involves an amount in excess of £25 million (or its equivalent), the Board of Directors of the relevant member of the Group shall also have received a written opinion from an Independent Financial Advisor to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the relevant member of the Group or is not less favourable, taken as a whole, to the relevant member of the Group than could reasonably be expected to be obtained at the time in a comparable transaction with in arm's length dealings with a person who was not an Affiliate.

### 28.25 Merger and consolidation

No Obligor will consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any person (other than an Obligor), unless:

(a) the resulting, surviving or transferee person (the "**Successor Obligor**"), if not the original Obligor shall be a person organized and existing under the laws of any state or country that is a member of the European Union, Switzerland, Norway, Japan, Australia, Canada, the United States of America, any State thereof or the District of Columbia and the Successor Obligor (if not the original Obligor) shall expressly assume, by executing an Accession Letter (and/or such other documents as the Security Agent may reasonably require), all the obligations of the original Obligor under the Finance Documents;

[London #29350§ v19]

Confidential

CITI-TF 00701647

A-6029

(b)      immediately after giving pro forma effect to such transaction or transactions (and treating any Financial Indebtedness which becomes an obligation of the Successor Obligor as a result of such transaction as having been Incurred by such Successor Obligor at the time of such transaction or transactions), no Default shall have occurred and be continuing;

(c)      immediately after giving pro forma effect to such transaction or transactions, either:

(i)      the Successor Obligor would be able to Incur an additional £1.00 of Financial Indebtedness pursuant to Clause 28.19 (*Financial Indebtedness*); or

(ii)     the Incurrence Leverage Ratio would be no less than the Incurrence Leverage Ratio immediately preceding such transaction; and

(d)      the Company shall have delivered to the Security Agent an Officers' Certificate and an Opinion of Counsel, each in form and substance reasonably satisfactory to the Security Agent and stating that such consolidation, merger or transfer and such Accession Letter (or other documentation (if any)) comply with this Agreement and that all conditions precedent in this Agreement relating to such transaction have been satisfied and that the Accession Letter (or other documentation (if any)) constitute legal, valid and binding obligations of the Successor Obligor, enforceable (subject to customary exceptions) in accordance with their terms.

Notwithstanding the foregoing, (1) any member of the Group may consolidate with, merge into or transfer all or part of its properties and assets to a Borrower and (2) any Borrower may merge with an Affiliate of a Borrower which is a corporate entity organised solely for the purpose of reorganizing such Borrower in another jurisdiction in the UK, the US or a Participating Member State (as comprised as at January 1, 2004) to realise Tax or other benefits.

### 28.26   Limitation on Layering

(a)      No Obligor shall Incur secured Financial Indebtedness that is not Senior Indebtedness (except to the extent such Financial Indebtedness is secured only by a Permitted Encumbrance) unless, at the time of such Incurrence, provision is made to secure the obligations of such Obligor under the Finance Documents equally and ratably with (or on a senior basis to, in the case of Financial Indebtedness subordinated in right of payment to the relevant Obligor's obligations under the Finance Documents) such secured Financial Indebtedness for as long as such secured Financial Indebtedness benefits from Security.

(b)      No Obligor shall guarantee, directly or indirectly, any Financial Indebtedness of any other member of the Group that is subordinate or junior in right of payment to any Senior Indebtedness of such member of the Group unless such guarantee is expressly subordinate in right of payment to, or ranks pari passu with, the obligations of such Obligor under the Finance Documents.

### 28.27   Limitation on restrictions on distributions from Subsidiaries

(a)      The Company shall not (and the Parent shall procure that no member of the Group will) create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any member of the Group to:

(i)      pay dividends or make any other distributions on its Capital Stock to any other member of the Group or pay any Financial Indebtedness owed to any other member of the Group;

(ii)     make any loans or advances to any other member of the Group; or

Confidential

CITI-TF 00701648

(iii)    transfer any of its property or assets to any other member of the Group.

provided that (x) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock or ordinary shares and (y) the subordination of (including the application of any payment blockage, standstill or turnover requirements) loans or advances made to another member of the Group to other Financial Indebtedness Incurred by such member of the Group shall not be deemed to constitute such an encumbrance or restriction.

(b)    Paragraph (a) above will not prohibit encumbrances or restrictions existing under, by reason of or with respect to:

(i)    applicable law, rule, regulation (including any requirement of any regulatory authority), order or governmental license, permit or concession;

(ii)    the Finance Documents, the Securitisation Bridge Facility Agreement or the Mezzanine Facility Agreement;

(iii)    a Permitted Refinancing or an agreement or instrument (a "Refinancing Agreement") effecting a refinancing of Financial Indebtedness or Disqualified Stock incurred pursuant to, or that otherwise extends, renews, refunds, refinances or replaces, an agreement or instrument or obligation in effect or entered into on the Closing Date (an "Initial Agreement") or contained in any amendment, supplement or other modifications to an Initial Agreement (an "Amendment") provided that the encumbrances and restrictions contained in any such Refinancing Agreement or Amendment are not materially less favourable to the Finance Parties taken as a whole than the encumbrances and restrictions contained in the Initial Agreement or Initial Agreements to which such Refinancing Agreement or Amendment relates (as determined in good faith by the Company);

(iv)    a member of the Group pursuant to an agreement relating to any Financial Indebtedness Incurred by such member of the Group on or prior to the date on which such member of the Group was acquired by the Company or any of its Subsidiaries (other than Financial Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such member of the Group became a member of the Group or was acquired by the Company or any of its Subsidiaries) and outstanding on such date;

(v)    any agreement or instrument:

(A)    relating to any Financial Indebtedness or Disqualified Stock permitted to be Incurred pursuant to the provisions of this Agreement:

(1)    if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favourable to the Finance Parties than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Company); or

(2)    if the encumbrances and restrictions, taken as a whole, are no more disadvantageous to the Finance Parties than is customary in comparable financings (as determined in good faith by the Company) and either:

I.    the Company determines that such encumbrance or restriction will not adversely affect the Company's ability to make principal and

[London #293508 v19]

134

CITI-TF 00701649

interest payments under the Finance Documents as and when they come due; or

II.   such encumbrances and restrictions apply only during the continuance of a default in respect of a payment or financial maintenance covenant relating to such Financial Indebtedness;

(B)   constituting an intercreditor agreement on terms substantially equivalent to the Intercreditor Agreement; or

(C)   relating to any loan or advance by a member of the Group to another member of the Group provided that the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favourable to the Finance Parties than the encumbrances and restrictions contained in this Agreement and the Intercreditor Deed;

(vi)   a member of the Group pursuant to an agreement entered into for the sale or other disposition of Capital Stock or assets of such member of the Group (including by way of merger or consolidation) pending the closing of such sale or disposition;

(vii)   cash or other deposits or net worth imposed by customers under contract entered into in the ordinary course of business;

(viii)   a member of the Group as a co-venturer in a Joint Venture or the ownership interests of a member of the Group in a Joint Venture, in each case contained in the terms of the agreement or agreements governing such Joint Venture provided that any such encumbrance or restriction:

(A)   is customary in joint venture agreements;

(B)   is not less favourable to the other members of the Group than to any other joint venturer; and

(C)   will not materially affect the Company's ability to make principal or interest payments under this Agreement, as determined by the Company in good faith at the time of entering such agreement or agreements (and at the time of any modification of the terms of any such encumbrance or restriction);

(ix)   any encumbrance or restriction permitted under Clause 28.21 (*Security*), including any encumbrance or restriction contained in mortgages, pledges or other security arrangements thereunder to the extent such encumbrances or restrictions restrict the transfer of the property or assets subject to such security arrangements;

(x)   customary non-assignment provisions in leases governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder or the subletting of such property;

(xi)   any escrow agreement, pledge of proceeds of disposals, security agreement or mortgage securing Financial Indebtedness of a member of the Group to the extent such encumbrance or restriction restricts the transfer of the property subject to such escrow agreement, pledge of proceeds of disposals, security agreements or mortgages;

(xii)   any encumbrance or restriction:

Confidential

CITI-TF 00701650

(A) that restricts in a customary matter the subletting, assignment or transfer of any property or asset that is subject to a lease, licence or similar contract, or the assignment or transfer of any lease, licence or other contract (including, for the avoidance of doubt, non-assignment provisions in leases, licences, distribution and administration agreements with artists, composers, writers, producers or other similar persons or other agreements or restrictions on sub-licencing); or

(B) pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of any Obligor; and

(xiii) pursuant to Treasury Transactions.

### 28.28 Limitation on lines of business

(a) The Company shall not (and the Parent shall procure that no member of the Group shall) engage in any business other than a Related Business.

(b) Each member of the Group which is a Holding Company of the Target shall not engage in any business or activity other than the ownership of the Capital Stock of its Subsidiary, the borrowing of funds under this Agreement, the Mezzanine Facility Agreement and the Securitisation Bridge Facility Agreement and activities incidental thereto.

### 28.29 Structure Memorandum and Business Separation

(a) The Company shall keep the Agent informed about the completion of the steps identified in the Structure Memorandum and the Group's progress of achieving a Business Separation.

(b) Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that each of the steps set out in the Structure Memorandum (including as it may be amended and revised with the consent of the Agent (acting reasonably) to set out steps to achieve a Business Separation) in order to achieve the desired structure of the Group are in each case specifically permitted.

### 28.30 Pension obligations

The Company shall (and the Parent shall procure that each member of the Group shall) use the proceeds (which shall not form part of the £1,490,000,000 proceeds received on the Closing Date) expressly designated for that purpose of either an issue and sale of Capital Stock in the Parent or of Shareholder Debt (such proceeds being "**Additional Pensions Equity**") to fund the existing pension scheme deficit of any member of the Target Group to the extent that this forms part of the funding arrangements agreed with the Trustees of the pension scheme in connection with the Acquisition and related financing transactions, and shall not use the cash flow or assets of any member of the Group or the Target Group (other than to the extent coming from such Additional Pensions Equity) or the incurrence of any liabilities of any member of the Group or the Target Group to fund, guarantee or support, such deficit (save for Permitted Encumbrances under paragraph (n) of the definition thereof).

### 29. EVENTS OF DEFAULT

Each of the events or circumstances set out in this Clause 29 (other than Clauses 29.13 (*Acceleration*) and 29.14 (*Clean-Up Period*)) is an Event of Default.

### 29.1 Failure to pay

An Obligor does not pay:

(a) on the due date any interest or principal payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless its failure to pay is caused by administrative or technical error and payment is made within three (3) Business Days of its due date; or

[London #293508 v19]

(b)     any other amount payable pursuant to a Finance Document at the place and in the currency in which it is expressed to be payable and payment is made within five (5) Business Days of its due date.

29.2    **Incorrect representation**

Subject to Clause 29.14 (*Clean-Up Period*), any representation, warranty or written statement made by or in relation to any member of the Group in any Finance Document, or in any written certificate, statement or notice provided under or pursuant to any of the Finance Documents being incorrect (in the case of any such written certificate, statement or notice, provided under or pursuant to any Finance Document and not contained therein, in any respect materially prejudicial to the Lenders) when made or deemed repeated unless the underlying circumstances (if capable of remedy) are remedied within 20 Business Days after the earlier of the Agent giving notice to the member of the Group or the member of the Group becoming aware of the breach.

29.3    **Breach of Agreement**

Subject to Clause 29.14 (*Clean- Up Period*):

(a)     failure by any Obligor to comply with any of the provisions of Clause 27 (*Financial Covenant*); or

(b)     failure by any Obligor to comply with any of its obligations under any Finance Document (other than those referred to in Clause 29.1 (*Failure to pay*) and Clause 29.2 (*Incorrect representation*) or paragraph (a) of this Clause 29.3) where such default (if capable of remedy) is not remedied within 20 Business Days after the earlier of the Agent giving notice to the member of the Group or that member of the Group becoming aware of the breach.

29.4    **Cross Default**

Subject to Clause 29.14 (*Clean-Up Period*):

(a)     failure by any member of the Group to pay any Financial Indebtedness on its due date (or within any applicable grace period provided for in the original documents relating to that indebtedness);

(b)     any Financial Indebtedness becomes or is declared due and payable (or is capable of being declared due and payable) before its Stated Maturity or is placed on demand by reason of an event of default (howsoever described) or any circumstances arise as a result of which any Financial Indebtedness could be so declared due and payable before its Stated Maturity; or

(c)     any Financial Indebtedness repayable on demand (other than the Ancillary Facilities) is not repaid on demand being made,

PROVIDED THAT no Event of Default will occur under this Clause 29.4:

(d)     if the aggregate amount of outstanding Financial Indebtedness falling within paragraphs (a) to (c) above is less than £10 million (or its equivalent in other currencies) at any time; or

(e)     in respect of any Financial Indebtedness to the extent covered by a guarantee issued under an Ancillary Facility.

137

CITI-TF 00701652

**29.5  Cessation and expropriation**

(a)   The cessation or threatened cessation of all or a substantial part of the Target's or any Obligor's operations or business (except as a result of a disposal permitted under this Agreement).

(b)   The seizure, expropriation, nationalisation or compulsory acquisition of all or a substantial part of the Target's or any Obligor's property or assets by any governmental, regulatory or other competent authority which has or is reasonably likely to have a Material Adverse Effect.

**29.6  Insolvency**

(a)   Any Obligor or any Material Subsidiary is unable or admits inability to pay its debts as they fall due or is deemed to or declared to be unable to pay its debts under applicable law, suspends or threatens to suspend making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (other than the Finance Parties in their capacity as such) with a view to rescheduling any of its indebtedness.

(b)   A moratorium is declared in respect of any indebtedness of any Obligor or any Material Subsidiary. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

(c)   Any of the following occurs in respect of a US Obligor:

(i)   it makes a general assignment for the benefit of creditors;

(ii)   it commences a voluntary case or proceeding under any US Bankruptcy Law;

(iii)   an involuntary case under any US Bankruptcy Law is commenced against it and is not controverted within 20 days or is not dismissed or stayed within 60 days after commencement of the case; or

(iv)   an order for relief or other order approving any case or proceeding is entered under any US Bankruptcy Law

**29.7  Distress and judgment debt**

(a)   Subject to Clause 29.14 (*Clean-Up Period*), any distress, attachment, sequestration, execution, expropriation, security enforcement or other legal process is levied against any assets (having an aggregate value in excess of £10 million) of any Obligor or any Material Subsidiary and is not discharged or paid out within 20 Business Days.

(b)   Subject to Clause 29.14 (*Clean-Up Period*), any judgment or decree for the payment of money in excess of £10 million is entered against any Obligor or any Material Subsidiary and is not discharged, waived or stayed within 20 Business Days following such judgment.

**29.8  Insolvency proceedings**

(a)   Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(i)   the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Obligor or any Material Subsidiary;

(ii)   a composition, compromise, assignment or arrangement with any creditor of any Obligor or any Material Subsidiary;

[London #293508 v19]

Confidential

CITI-TF 00701653

(iii)  the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any Obligor or any Material Subsidiary or any of its assets; or

(iv)  enforcement of any Security over any assets of any Obligor or Material Subsidiary,

or any analogous procedure or step is taken in any jurisdiction.

(b)  Paragraph (a) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 20 Business Days of commencement or, if earlier, the date on which it is advertised.

**29.9  Invalidity and unlawful performance**
Subject to Clause 29.14 (*Clean-Up Period*):

(a)  it is or becomes unlawful for any Obligor to perform any of its material obligations under the Finance Documents or any Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective or any subordination created under the Intercreditor Agreement is or becomes unlawful;

(b)  any material obligation or obligations of any Obligor under the Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Lenders under the Finance Documents;

(c)  any Finance Document ceases to be in full force and effect or any Security created by the Transaction Security Documents or any subordination created under the Intercreditor Agreement:

(i)  ceases to be legal, valid, binding, enforceable or effective (and (if capable of remedy) such ineffectiveness is not remedied within 20 Business Days of the earlier of the Agent giving notice to the Company or any member of the Group becoming aware of the ineffectiveness); or

(ii)  is alleged by a party to it (other than a Finance Party) to be ineffective.

**29.10  Litigation**
Subject to Clause 29.14 (*Clean-Up Period*), any litigation, arbitration or similar proceeding is brought against a member of the Group which is reasonably likely to be adversely determined and which if adversely determined would result in a Material Adverse Effect.

**29.11  Other Documents**
Any party (other than a Finance Party) to the Intercreditor Agreement fails to comply with its material obligations therein, in a manner which is materially prejudicial to the interests of the Finance Parties hereunder and, if the non-compliance is capable of remedy, it is not remedied within 20 Business Days of the earlier of the Agent giving notice to that party or that party becoming aware of the non-compliance.

**29.12  Auditors' report**
The Auditors qualify their report to the Annual Financial Statements of the Parent in a manner which is materially adverse to the interests of the Finance Parties.

**29.13  Acceleration**
(a)  On and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

139

CITI-TF 00701654

(i)     cancel the Total Commitments and/or Ancillary Commitments at which time they shall immediately be cancelled;

(ii)     declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

(iii)     declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders;

(iv)     declare that cash cover in respect of each Letter of Credit is immediately due and payable at which time it shall become immediately due and payable;

(v)     declare that cash cover in respect of each Letter of Credit is payable on demand at which time it shall immediately become due and payable on demand by the Agent on the instructions of the Majority Lenders;

(vi)     declare all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Ancillary Facilities to be immediately due and payable, at which time they shall become immediately due and payable;

(vii)     declare that all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Ancillary Facilities be payable on demand, at which time they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders; and/or

(viii)     exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

(b)     If an Event of Default described in Clause 29.6(c) (*Insolvency*) occurs, the Total Commitments will, if not already cancelled under this Agreement, be immediately and automatically cancelled and all amounts outstanding under the Finance Documents will be immediately due and payable.

**29.14 Clean-Up Period**

If during the Clean-Up Period a matter or circumstance exists in respect of the Target Group which would constitute a Default, such matter or circumstance will not constitute a Default until after the end of the Clean-Up Period (if such Default is continuing at such time), PROVIDED THAT such Default (1) is capable of being cured by the final day of the Clean-Up Period and that reasonable steps are being taken to cure such matter and (2) was not procured by, or expressly approved by, the Company or the Parent and PROVIDED FURTHER THAT any matter contained in this Clause 29.14 shall be without prejudice to the rights of the Lenders in respect of any breach of representation, covenant or default which continues to exist or arises after the expiry of the Clean-Up Period.

[London #293508 v19]

Confidential

CITI-TF 00701655

**SECTION 9**
**CHANGES TO PARTIES**

**30.    CHANGES TO THE LENDERS**

**30.1    Assignments and transfers by the Lenders**

Subject to this Clause 30, a Lender (the "**Existing Lender**") may:

(a)    assign any of its rights; or

(b)    transfer any of its rights (including such as relate to that Lender's participation in each Loan) and obligations,

under any Finance Document to (i) another bank or financial institution or (ii) a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (a "**Fund Lender**") (each of (i) or (ii) being the "**New Lender**").

**30.2    Conditions of assignment or transfer**

(a)    The consent of the Company is required before an Existing Lender may make an assignment or transfer under Clause 30.1 (*Assignments and transfers by the Lenders*) unless:

(i)    the assignment or transfer is to another Lender or an Affiliate of a Lender (including, for the avoidance of doubt, if the Existing Lender is a fund, to a fund which is a Related Fund of the Existing Lender); or

(ii)    an Event of Default has occurred and is continuing.

(b)    The consent of the Company shall not be unreasonably withheld or delayed and shall be deemed to have been given on the date falling ten (10) Business Days after the date on which the Existing Lender has requested the Company's consent if the Company has not refused consent by that date.

(c)    The consent of the Issuing Bank is required for any assignment or transfer by an Existing Lender of any of its rights and/or obligations under the Revolving Facility (such consent not to be unreasonably withheld or delayed).

(d)    An assignment will only be effective as among the Finance Parties on:

(i)    receipt by the Agent (whether in a Transfer Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Agent) that the New Lender has become entitled to the same rights and will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it was an Original Lender;

(ii)    the New Lender entering into the documentation required for it to accede as a party to the Intercreditor Agreement; and

(iii)    the performance by the Agent of all "know your customer" or other checks relating to any person that it is required to carry out in relation to such assignment to a New Lender.

(e)    A transfer will only be effective if the New Lender enters into the documentation required for it to accede as a party to the Intercreditor Agreement and if the procedure set out in Clause 30.5 (*Procedure for transfer*) is complied with.

Confidential

CITI-TF 00701656

**A-6038**

(f)    Unless the Company otherwise consents, no Lender may assign or transfer in part any of its rights or obligations under any Finance Document unless:

(i)    where the Commitments assigned or transferred are in respect of the Senior B Facility Commitments, the Commitments assigned or transferred are in an amount of not less than €1,000,000 or $1,000,000 (in aggregate), as applicable (or, if less, the whole of the Existing Lender's participation in the Senior B Facility);

(ii)    where the Commitments assigned or transferred are in respect of the Acquisition Facility Commitments, the Commitments assigned or transferred are in an amount of not less than £1,000,000, €1,000,000 or $1,000,000 (in aggregate) as applicable (or, if less, the whole of the Existing Lender's participation in the Acquisition Facility); or

(iii)    where the Commitments assigned or transferred are in respect of the Revolving Facility Commitments, the Commitments assigned or transferred are in an amount of not less than £2,500,000 (in aggregate) or its equivalent (or, if less, the whole of the Existing Lender's participation in the Revolving Facility),

in each case, other than assignments or transfers:

(a)    to an Affiliate of the Existing Lender; or

(b)    to a Lender,

provided that after giving effect to any such transfers or assignments the Existing Lender's participation (together with the participation of any Affiliate and/or Related Fund of such Existing Lender) shall be either:

(A)    not less than:

(1)    €1,000,000 or $1,000,000 (as applicable) in respect of a participation in the Senior B Facility or the Acquisition Facility; or

(2)    £2,500,000 (or its equivalent) in respect of a participation in the Revolving Facility; or

(B)    £/€/$0.

(g)    If:

(i)    a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 19 (*Tax Gross-Up and Indemnities*) or Clause 20 (*Increased Costs*),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.

142

[London #293508 v19]

Confidential

CITI-TF 00701657

A-6039

**30.3    Assignment or transfer fee**

Unless the Agent otherwise agrees and excluding an assignment or transfer (i) to an Affiliate of a Lender or (ii) made in connection with primary syndication of the Facilities, the New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Agent (for its own account) a fee of £1,500.

**30.4    Limitation of responsibility of Existing Lenders**

(a)    Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i)    the legality, validity, effectiveness, adequacy or enforceability of the Transaction Documents, the Transaction Security or any other documents;

(ii)    the financial condition of any Obligor;

(iii)    the performance and observance by any Obligor of its obligations under the Transaction Documents or any other documents; or

(iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Transaction Document or any other document,

and any representations or warranties implied by law are excluded.

(b)    Each New Lender confirms to the Existing Lender, the other Finance Parties and the Secured Parties that it:

(i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and each other member of the Group in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other Finance Party in connection with any Transaction Document or the Transaction Security; and

(ii)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and each other member of the Group whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c)    Nothing in any Finance Document obliges an Existing Lender to:

(i)    accept a re-transfer from a New Lender of any of the rights and obligations assigned or transferred under this Clause 30; or

(ii)    support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Transaction Documents or otherwise.

**30.5    Procedure for transfer**

(a)    Subject to the conditions set out in Clause 30.2 (*Conditions of assignment or transfer*) a transfer is effected in accordance with paragraph (c) below when the Agent executes an otherwise duly completed Transfer Agreement delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to paragraph (b) below, within five (5) Business Days after receipt by it of a duly completed Transfer Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Agreement.

Confidential

CITI-TF 00701658

A-6040

(b)    The Agent shall only be obliged to execute a Transfer Agreement delivered to it by the Existing Lender and the New Lender upon its completion of all "know your customer" or other checks relating to any person that it is required to carry out in relation to the transfer to such New Lender.

(c)    On the Transfer Date:

(i)    to the extent that, in the Transfer Agreement, the Existing Lender seeks to transfer its rights and obligations under the Finance Documents and in respect of the Transaction Security, the Existing Lender shall be discharged to the extent provided for in the Transfer Agreement from further obligations towards the Obligors and the other Finance Parties;

(ii)    the rights and obligations of the Existing Lender with respect to each Obligor shall be transferred to the New Lender, to the extent provided for in the Transfer Agreement;

(iii)    the Agent, the Arranger, the Security Agent, the New Lender, the other Lenders, the Issuing Bank and any relevant Ancillary Lender shall acquire the same rights and assume the same obligations between themselves and in respect of the Finance Documents as they would have acquired and assumed had the New Lender been an Original Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Agent, the Arranger, the Security Agent, the Issuing Bank and any relevant Ancillary Lender and the Existing Lender shall each be released from further obligations to each other under the Finance Documents; and

(iv)    the New Lender shall become a Party as a "Lender".

30.6    **Copy of Transfer Agreement to Company**
The Agent shall, as soon as reasonably practicable after it has executed a Transfer Agreement, send to the Company a copy of that Transfer Agreement.

30.7    **Disclosure of information**
The Finance Parties will keep confidential all Finance Documents and all information relating to any Obligor, the Group and the Finance Documents which they acquire under or in connection with the Finance Documents save that any Finance Party may, subject to applicable law, disclose to any of its Affiliates or any other person:

(a)    to (or through) whom that Lender assigns or transfers (or may potentially assign or transfer) all or any of its rights and obligations under the Finance Documents;

(b)    with (or through) whom that Lender enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made by reference to, the Finance Documents or any Obligor;

(c)    which is a rating agency;

(d)    to whom, and to the extent that, information is required to be disclosed by any applicable law or regulation;

(e)    for whose benefit that Lender charges, assigns or otherwise creates a Security Interest (or may do so) pursuant to Clause 30.9 (*Security interests over Lenders' rights*);

(f)    which is one of its professional advisers (the "**Advisers**"); or

144

Confidential

CITI-TF 00701659

(g)    with the consent of the Company,

any information about any Obligor, the Group and the Finance Documents as that Lender or other Finance Party shall consider appropriate PROVIDED THAT, (i) in relation to paragraphs (a), (b), (c), (e) and (f) above, the person to whom the information is to be given has entered into a Confidentiality Undertaking or in the case of an Adviser is subject to professional secrecy and confidentiality rules as a result of the nature of its duties and (ii) the Finance Party has delivered to the Company a notification identifying the recipient and the information disclosed.

**30.8    Affiliates of Lenders as Hedge Counterparties**

(a)    An Affiliate of a Lender which becomes a Hedge Counterparty shall accede to this Agreement and to the Intercreditor Agreement by delivery to the Security Agent of a duly completed accession undertaking in the form required under the Intercreditor Agreement.

(b)    Where this Agreement or any other Finance Document imposes an obligation on a Hedge Counterparty and the relevant Hedge Counterparty is an Affiliate of a Lender and is not a party to that document, the relevant Lender shall ensure that the obligation is performed by its Affiliate.

**30.9    Security Interests over Lenders' rights**

In addition to the other rights provided to Lenders under this Clause 30, each Lender may, without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create a Security Interest in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a)    any charge, assignment or other Security Interest to secure obligations to a federal reserve or central bank; and

(b)    in the case of any Lender which is a fund, any charge, assignment or other Security Interest granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security Interest shall:

(a)    release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security Interest for the Lender as a party to any of the Finance Documents;

(b)    require any payments to be made by an Obligor or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents; or

(c)    create a Security Interest in any Charged Property (other than for the purpose of securing the obligations of the Obligors under the Finance Documents on the terms set out in the Transaction Security Documents).

**30.10   New Issuing Banks**

(a)    The Issuing Bank may (with the consent of the Agent) resign on giving three (3) months' notice (or such shorter period as the Agent and the Issuing Bank may agree) to the Company and the Agent. In this event, the Agent may, with the consent of the Company and the Lender concerned, designate any Lender as a replacement Issuing Bank for future Letters of Credit. Any such resignation will not extend to or affect Letters of Credit issued before the resignation.

Confidential

CITI-TF 00701660

(b)    The relevant Lender will only become an Issuing Bank when:

    (i)    it delivers an Issuing Bank Accession Agreement to the Agent; and

    (ii)    the Agent executes the Issuing Bank Accession Agreement.

### 30.11  Sub-participations

(a)    Any Lender may at any time sub-participate or sub-contract any of its rights or obligations under the Finance Documents, if the sub-participant is not entitled pursuant to the sub-participation arrangements to approve any amendment or waiver or consent requested by any Obligor in respect of this Agreement.

(b)    The consent of the Company is required for a Lender to sub-participate any of its rights or obligations under the Finance Documents where the sub-participant is entitled pursuant to the sub-participation arrangements to approve any amendment or waiver or consent requested by an Obligor in respect of this Agreement accordance with paragraph (a) above unless:

    (i)    the sub-participation is entered into with another Lender or an Affiliate of a Lender (including, for the avoidance of doubt, if the Existing Lender is a fund, with a fund which is a Related Fund of the Existing Lender); or

    (ii)    an Event of Default has occurred and is continuing.

(c)    The consent of the Company, if required pursuant to paragraph (b) above, shall not be unreasonably withheld or delayed and shall be deemed to have been given on the date falling ten (10) Business Days after the date on which the Lender has requested the Company's consent if the Company has not refused consent by that date.

### 30.12  Additional Acquisition Facility Commitment Lenders

Any bank or financial institution which accepts an Additional Acquisition Facility Commitment shall, with the relevant Additional Acquisition Facility Commitment Notice, deliver to the Agent the documents required under paragraph (f) of Clause 30.2 (*Conditions of assignment or transfer*) and paragraph (b) of Clause 30.5 (*Procedure for transfer*) as though it were a New Lender, failing which it shall not become a Lender and no Additional Acquisition Facility Commitment shall be allocated to it. Upon delivery of such documents, such bank or financial institution shall be deemed to be a party to this Agreement as Lender and the provisions of paragraph (c)(iii) of Clause 30.5 (*Procedure for transfer*) above shall apply to it as though it were a New Lender.

### 30.13  Register of Lenders

Upon request by the Company and on reasonable notice, the Agent shall provide a list of the Lenders under the Facilities (including for the avoidance of doubt any sub-participant which has acquired control over a Lender's voting rights or any other sub-participant of which the Agent is aware) (the "**Lenders' List**"). The Lenders' List shall include:

(a)    the identity of each of the Lenders;

(b)    the Commitments of each of the Lenders; and

(c)    details of any transfers or assignments that have been completed since the most recent Lenders' List (the "**Previous List**") was delivered to the Company (including the name of the Lender at the time of the Previous List and the Lender at the time of the Lenders' List, the amount of the Commitments transferred or assigned, the price of each transfer or assignment (if available) and the effective date of each transfer or assignment).

[London #393508 v19]

Confidential

CITI-TF 00701661

**31.    CHANGES TO THE OBLIGORS**

**31.1    Assignment and transfers by Obligors**

Other than for the purpose of assignments required by and set out in the Transaction Security Documents (or as a result of a permitted merger referred to in Clause 28.25 (*Merger and consolidation*)), no Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**31.2    Additional Borrowers**

(a)    Subject to compliance with the provisions of paragraphs (b) and (c) of Clause 26.10 (*Know Your Customer Requirements*), the Company may request that any of its wholly owned Subsidiaries becomes a Borrower. That Subsidiary will become a Borrower if:

(i)    it is incorporated in the same jurisdiction as an existing Borrower and the Majority Lenders approve the addition of that Subsidiary or otherwise if all the Lenders approve the addition of that Subsidiary;

(ii)    the Company and that Subsidiary deliver to the Agent a duly completed and executed Accession Letter;

(iii)    that Subsidiary is (or becomes) a Guarantor prior to becoming a Borrower;

(iv)    the Company confirms that no Default is continuing or would occur as a result of that Subsidiary becoming an Additional Borrower; and

(v)    the Agent has received (or waived the requirement to receive) all of the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Borrower, each in form and substance satisfactory to the Agent (acting reasonably).

(b)    The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Borrower.

**31.3    Resignation of a Borrower**

(a)    In this Clause 31.3, Clause 31.5 (*Resignation of a Guarantor*) and Clause 31.7 (*Resignation and release of Security*), "**Third Party Disposal**" means the disposal of an Obligor to a person which is not a member of the Group where that disposal is permitted under Clause 28.23 (*Asset disposals*) or made with the approval of the Majority Lenders.

(b)    If a Borrower is the subject of a Third Party Disposal or the Super-Majority Lenders have consented to the resignation of that Borrower, the Company may request that such Borrower (other than the Company) ceases to be a Borrower by delivering to the Agent a Resignation Letter.

(c)    The Agent shall accept a Resignation Letter and notify the Company and the other Finance Parties of its acceptance if:

(i)    the Company has confirmed that no Default is continuing or would result from the acceptance of the Resignation Letter;

(ii)    the Borrower is under no actual or contingent obligations as a Borrower under any Finance Document;

147

CITI-TF 00701662

(iii)     where the Borrower is also a Guarantor (unless its resignation has been accepted in accordance with Clause 31.5 (*Resignation of a Guarantor*)), its obligations in its capacity as Guarantor continue to be legal, valid, binding and enforceable and in full force and effect (subject to the Legal Reservations) and the amount guaranteed by it as a Guarantor is not decreased (and the Company has confirmed this is the case); and

(iv)     the Company has confirmed that it shall ensure that any Net Proceeds of a Third Party Disposal will be applied in accordance with Clause 13.3 (*Application of mandatory prepayments*).

(d)     Upon notification by the Agent to the Company of its acceptance of the resignation of a Borrower, that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents as a Borrower except that the resignation shall not take effect (and the Borrower will continue to have rights and obligations under the Finance Documents) until the date on which the Third Party Disposal takes effect.

**31.4   Additional Guarantors**

(a)     A member of the Group shall become an Additional Guarantor if:

(i)     the Company and the proposed Additional Guarantor deliver to the Agent a duly completed and executed Accession Letter; and

(ii)     the Agent has received (or waived the requirement to receive) all of the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the Agent (acting reasonably).

(b)     The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Guarantor.

**31.5   Resignation of a Guarantor**

(a)     The Company may request that a Guarantor (other than the Company) ceases to be a Guarantor by delivering to the Agent a Resignation Letter if:

(i)     that Guarantor is being disposed of by way of a Third Party Disposal and the Company has confirmed this is the case; or

(ii)     the Super-Majority Lenders have consented to the resignation of that Guarantor.

(b)     The Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(i)     the Company has confirmed that no Default is continuing or would result from the acceptance of the Resignation Letter;

(ii)     no payment is due from the Guarantor under Clause 24.1 (*Guarantee*);

(iii)     the Company has confirmed that it shall ensure that the Net Proceeds of the Third Party Disposal will be applied, in accordance with Clause 13.3 (*Application of mandatory prepayments*).

(c)     The resignation of that Guarantor shall not be effective until the date of the relevant Third Party Disposal at which time that company shall cease to be a Guarantor and shall have no further rights or obligations under the Finance Documents as a Guarantor.

[London #293508 v19]

Confidential

CITI-TF 00701663

**31.6    Repetition of Representations**

Delivery of an Accession Letter constitutes confirmation by the relevant Subsidiary that the representations and warranties referred to in paragraph (c)(iv) of Clause 25.24 (*Repetition*) are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

**31.7    Resignation and release of Security**

(a)    If a Borrower or Guarantor is or is proposed to be the subject of a Third Party Disposal then:

    (i)    where that Borrower or Guarantor created Transaction Security over any of its assets or business in favour of the Security Agent, or Transaction Security in favour of the Security Agent was created over the shares (or equivalent) of that Borrower or Guarantor, the Security Agent shall, at the cost and request of the Company, release those assets, business or shares (or equivalent);

    (ii)    the resignation of that Borrower or Guarantor and related release of Transaction Security referred to in paragraph (a) above shall not become effective until the date of that disposal; and

    (iii)    if the disposal of that Borrower or Guarantor is not made, the Resignation Letter of that Borrower or Guarantor and the related release of Transaction Security referred to in paragraph (a) above shall have no effect and the obligations of the Borrower or Guarantor and the Transaction Security created or intended to be created by or over that Borrower or Guarantor shall continue in full force and effect.

(b)    If an Obligor disposes of any assets and such disposal is permitted by this Agreement, the Security Agent shall (and is irrevocably so authorised by the Finance Parties), on request of the Company, execute all documents necessary to release that asset from the Transaction Security in order to allow that disposal to be completed.

(c)    If a member of the Group whose shares are subject to a Transaction Security is to be merged into an Obligor and such merger is permitted by this Agreement, the Security Agent shall (and is irrevocably so authorised by the Finance Parties), on request of the Company, execute all documents necessary to release that Transaction Security in order to allow that merger to be completed.

149

CITI-TF 00701664

A-6046

## SECTION 10
## THE FINANCE PARTIES

**32.  ROLE OF THE AGENT, THE ARRANGER, THE ISSUING BANK AND OTHERS**

**32.1  Appointment of the Agent**

(a)  Each of the Arranger, the Lenders and the Issuing Bank appoints Citibank International plc (or any other person who becomes the Agent in accordance with this Agreement) to act as the Agent under and in connection with the Finance Documents.

(b)  Each of the Finance Parties authorises the Agent to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

**32.2  Duties of the Agent**

(a)  The Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent for that Party by any other Party.

(b)  Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(c)  If the Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(d)  If the Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Agent, the Arranger or the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

(e)  The duties of the Agent under the Finance Documents are solely mechanical and administrative in nature.

**32.3  Role of the Arranger**

Except as specifically provided in the Finance Documents the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

**32.4  No fiduciary duties**

(a)  Nothing in this Agreement constitutes the Agent, the Security Agent, the Arranger or the Issuing Bank as a trustee or fiduciary of any other person.

(b)  None of the Agent, the Security Agent, the Arranger, the Issuing Bank or any Ancillary Lender shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

**32.5  Business with the Group**

The Agent, the Security Agent, the Arranger, the Issuing Bank and each Ancillary Lender may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

150

[London #293508 v19]

CITI-TF 00701665

**32.6    Rights and discretions**

(a)    The Agent, the Security Agent, the Issuing Bank and each Ancillary Lender may rely on:

    (i)    any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

    (ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

(b)    The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

    (i)    no Default has occurred (unless it has actual knowledge of a Default arising under Clause 29.1 (*Failure to pay*));

    (ii)    any right, power, authority or discretion vested in any Party or the Majority Lenders has not been exercised; and

    (iii)    any notice or request made by the Company (other than a Utilisation Request or Selection Notice) is made on behalf of and with the consent and knowledge of all the Obligors.

(c)    The Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

(d)    The Agent may act in relation to the Finance Documents through its personnel and agents.

(e)    The Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(f)    Notwithstanding any other provision of any Finance Document to the contrary, none of the Agent, the Arranger or the Issuing Bank, is obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

**32.7    Majority Lenders' instructions**

(a)    Unless a contrary indication appears in a Finance Document, the Agent shall (i) exercise any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by the Majority Lenders (or, if so instructed by the Majority Lenders, refrain from exercising any right, power, authority or discretion vested in it as Agent) and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with an instruction of the Majority Lenders.

(b)    Unless a contrary indication appears in a Finance Document, any instructions given by the Majority Lenders will be binding on all the Finance Parties other than the Security Agent.

(c)    The Agent may refrain from acting in accordance with the instructions of the Majority Lenders (or, if appropriate, the Lenders) until it has received such security as it may require for any cost, loss or liability (together with any associated VAT) which it may incur in complying with the instructions.

151

CITI-TF 00701666

(d)     In the absence of instructions from the Majority Lenders, (or, if appropriate, the Lenders) the Agent may act (or refrain from taking action) as it considers to be in the best interest of the Lenders.

(e)     The Agent is not authorised to act on behalf of a Lender in any legal or arbitration proceedings relating to any Finance Document. This paragraph (e) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Transaction Security Documents or enforcement of the Transaction Security or Transaction Security Documents without having first obtained that Lender's authority to act on its behalf in those proceedings.

**32.8    Responsibility for documentation**
None of the Agent, the Arranger, the Issuing Bank or any Ancillary Lender:

(a)     is responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Agent, the Arranger, the Issuing Bank, an Ancillary Lender, an Obligor or any other person given in or in connection with any Finance Document or the Information Memorandum or the Reports or the transactions contemplated in the Finance Documents; or

(b)     is responsible for the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document or the Transaction Security.

**32.9    Exclusion of liability**
(a)     Without limiting paragraph (b) below, none of the Agent, the Security Agent, the Issuing Bank, or any Ancillary Lender will be liable for any action taken by it under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct.

(b)     No Party (other than the Agent, the Security Agent, the Issuing Bank, or an Ancillary Lender (as applicable)) may take any proceedings against any officer, employee or agent of the Agent, the Security Agent, the Issuing Bank or any Ancillary Lender, in respect of any claim it might have against the Agent, the Security Agent, the Issuing Bank or an Ancillary Lender or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Transaction Document and any officer, employee or agent of the Agent, the Issuing Bank or any Ancillary Lender may rely on this Clause 32.9 and the Third Parties Act.

(c)     The Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(d)     Nothing in this Agreement shall oblige the Agent or the Arranger to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Agent and the Arranger that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent or the Arranger.

**32.10  Lenders' indemnity to the Agent**
Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Agent, within three (3) Business Days of demand, against any cost, loss or liability incurred by the Agent (otherwise than by reason of the Agent's gross

[London #293508 v19]

Confidential

CITI-TF 00701667

A-6049

negligence or wilful misconduct) in acting as Agent under the Finance Documents (unless the Agent has been reimbursed by an Obligor pursuant to a Finance Document).

**32.11 Resignation of the Agent**

(a) The Agent may resign and appoint one of its Affiliates acting through an office in the United Kingdom as successor by giving notice to the Lenders and the Company.

(b) Alternatively the Agent may resign by giving notice to the Lenders and the Company, in which case the Majority Lenders (after consultation with the Company) may appoint a successor Agent.

(c) If the Majority Lenders have not appointed a successor Agent in accordance with paragraph (b) above within 30 days after notice of resignation was given, the Agent (after consultation with the Company) may appoint a successor Agent (acting through an office in the United Kingdom).

(d) The retiring Agent or shall, at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.

(e) The Agent's resignation notice shall only take effect upon the appointment of a successor.

(f) Upon the appointment of a successor, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 32. Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(g) After consultation with the Company, the Majority Lenders may, by notice to the Agent, require it to resign in accordance with paragraph (b) above. In this event, the Agent shall resign in accordance with paragraph (b) above.

**32.12 Confidentiality**

(a) The Agent (in acting as agent for the Finance Parties) shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b) If information is received by another division or department of the Agent it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

(c) Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent nor the Arranger are obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would or might in its reasonable opinion constitute a breach of any law or a breach of a fiduciary duty.

**32.13 Relationship with the Lenders**

(a) The Agent may treat each Lender as a Lender, entitled to payments under this Agreement and acting through its Facility Office unless it has received not less than five (5) Business Days prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b) Each Lender shall supply the Agent with any information required by the Agent in order to calculate the Mandatory Cost in accordance with Schedule 4 (*Mandatory Cost Formulae*).

(c) Each Lender shall supply the Agent with any information that the Security Agent may reasonably specify (through the Agent) as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent. Each Lender shall deal with the Security Agent exclusively through the Agent and shall not deal directly with the Security Agent.

153

Confidential

CITI-TF 00701668

A-6050

### 32.14 Credit appraisal by the Lenders, Issuing Bank and Ancillary Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender, Issuing Bank, and Ancillary Lender confirms to the Agent, the Arranger, the Issuing Bank and each Ancillary Lender that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)     the financial condition, status and nature of each member of the Group;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)     whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(d)     the adequacy, accuracy and/or completeness of the Information Memorandum, the Reports and any other information provided by the Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)     the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

### 32.15 Reference Banks

If a Reference Bank (or, if a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Agent and the Company shall agree the appointment of another Lender or an Affiliate of a Lender to replace that Reference Bank.

### 32.16 Deduction from amounts payable by the Agent

If any Party owes an amount to the Agent under the Finance Documents, the Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

### 32.17 Reliance and engagement letters

Each Finance Party and Secured Party confirms that each of the Arranger and the Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Arranger or Agent) the terms of any reliance letter or engagement letters relating to the Reports or any reports or letters provided by accountants in connection with the Finance Documents or the transactions contemplated in the Finance Documents (including any net asset letter in connection with the financial assistance procedures) and to bind it in respect of those Reports, reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

154

[London #293508 v19]

**33.     CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

No provision of this Agreement will:

(a)     interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)     oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)     oblige any Finance Party to disclose any information relating to its affairs (Tax or otherwise) or any computations in respect of Tax.

**34.     SHARING AMONG THE FINANCE PARTIES**

**34.1    Payments to Finance Parties**

If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from an Obligor other than in accordance with Clause 35 (*Payment mechanics*) and applies that amount to a payment due under the Finance Documents then:

(a)     the Recovering Finance Party shall, within three (3) Business Days, notify details of the receipt or recovery, to the Agent;

(b)     the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with Clause 35 (*Payment mechanics*), without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(c)     the Recovering Finance Party shall, within three (3) Business Days of demand by the Agent, pay to the Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 35.5 (*Partial payments*).

**34.2    Redistribution of payments**

The Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) in accordance with Clause 35.5 (*Partial payments*).

**34.3    Recovering Finance Party's rights**

(a)     On a distribution by the Agent under Clause 34.2 (*Redistribution of payments*), the Recovering Finance Party will be subrogated to the rights of the Finance Parties which have shared in the redistribution.

(b)     If and to the extent that the Recovering Finance Party is not able to rely on its rights under paragraph (a) above, the relevant Obligor shall be liable to the Recovering Finance Party for a debt equal to the Sharing Payment which is immediately due and payable.

**34.4    Reversal of redistribution**

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)     each Finance Party which has received a share of the relevant Sharing Payment pursuant to Clause 34.2 (*Redistribution of payments*) shall, upon request of the Agent, pay to the Agent for account of that Recovering Finance Party an amount equal to the appropriate

155

CITI-TF 00701670

part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay); and

(b)     that Recovering Finance Party's rights of subrogation in respect of any reimbursement shall be cancelled and the relevant Obligor will be liable to the reimbursing Finance Party for the amount so reimbursed.

**34.5    Exceptions**

(a)     This Clause 34 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause 34, have a valid and enforceable claim against the relevant Obligor.

(b)     A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)      it notified the other Finance Party of the legal or arbitration proceedings; and

(ii)     the other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

(c)     This Clause 34 shall not apply in respect of any receipt or recovery by a Hedge Counterparty.

**34.6    Ancillary Lenders**

(a)     This Clause 34 shall not apply to any receipt or recovery by a Lender in its capacity as an Ancillary Lender at any time prior to service of notice under Clause 29.13 (*Acceleration*) after which time the provisions of Clause 10.6 (*Adjustment for Ancillary Facilities upon acceleration*) shall apply.

(b)     Following service of notice under Clause 29.13 (*Acceleration*), this Clause 34 shall apply to all receipts or recoveries by Ancillary Lenders except to the extent that the receipt or recovery represents a reduction from the Designated Gross Amount for an Ancillary Facility to its Designated Net Amount.

156

[London #393508 v19]

CITI-TF 00701671

## SECTION 11
## ADMINISTRATION

**35.    PAYMENT MECHANICS**

**35.1    Payments to the Agent**

(a)    On each date on which an Obligor or a Lender is required to make a payment under a Finance Document excluding a payment under the terms of an Ancillary Document, that Obligor or Lender shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in a Participating Member State or London) with such bank as the Agent specifies.

**35.2    Distributions by the Agent**

Each payment received by the Agent under the Finance Documents for another Party shall, subject to Clause 35.3 (*Distributions to an Obligor*) and Clause 35.4 (*Clawback*) be made available by the Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Agent by not less than five (5) Business Days' notice with a bank in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London).

**35.3    Distributions to an Obligor**

The Agent may (with the consent of the Obligor or in accordance with Clause 36 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**35.4    Clawback**

(a)    Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)    If the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

**35.5    Partial payments**

(a)    If the Agent receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Agent, shall, subject to the provisions of the Intercreditor Agreement, apply that payment towards the obligations of that Obligor under those Finance Documents in the following order:

(i)    first, in or towards payment pro rata of any unpaid fees, costs and expenses of the Agent, the Issuing Bank and the Security Agent under those Finance Documents;

(ii)    secondly, in or towards payment pro rata of any accrued interest, fee or commission due but unpaid under those Finance Documents;

Confidential

CITI-TF 00701672

(iii) **thirdly,** in or towards payment pro rata of any principal due but unpaid under those Finance Documents, any amount due but unpaid under Clause 7.3 (*Claims under a Letter of Credit*) and Clause 7.4 (*Indemnities*) and any breakage costs incurred in respect of the termination of any Hedging Agreement;

(iv) **fourthly,** in or towards payment pro rata of any other sum due but unpaid under the Finance Documents;

(b) The Agent shall, if so directed by the Majority Lenders, vary the order set out in paragraphs (a)(ii) to (iv) above.

(c) Paragraphs (a) and (b) above will override any appropriation made by an Obligor.

**35.6   No set-off by Obligors**
All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

**35.7   Business Days**
(a) Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**35.8   Currency of account**
(a) Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b) A repayment of a Utilisation or Unpaid Sum or a part of a Utilisation or Unpaid Sum shall be made in the currency in which that Utilisation or Unpaid Sum is denominated on its due date.

(c) Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated when that interest accrued.

(d) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e) Any amount expressed to be payable in a currency other than the Base Currency shall be paid in that other currency.

**35.9   Change of currency**
(a) Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i) any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Company); and

(ii) any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

158

[London #293508 v19]

(b)    ·If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.·

36.    SET-OFF

(a)    A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(b)    Any credit balances taken into account by an Ancillary Lender when operating a net limit in respect of any overdraft under an Ancillary Facility shall on enforcement of the Finance Documents be applied first in reduction of the overdraft provided under that Ancillary Facility in accordance with its terms.

(c)    No Security is created, or is intended to be created, by the operation of this Clause 36.

37.    ·NOTICES

37.1    Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter or by electronic mail or other electronic means as per Clause 37.5 (*Electronic communication*).

37.2    Addresses

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)    in the case of the Parent or the Company, that identified with its name below;

(b)    in the case of each Lender, the Issuing Bank, each Ancillary Lender or any other Obligor, that notified in writing to the Agent on or prior to the date on which it becomes a Party; and

(c)    in the case of the Agent or the Security Agent, that identified with its name below,

or any substitute address, fax number or department or officer as the Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five (5) Business Days' notice.

37.3    Delivery

(a)    Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)     if by way of fax, when received in legible form; or

(ii)    if by way of letter, when it has been left at the relevant address as evidenced by an acknowledgement of receipt,

and, if a particular department or officer is specified as part of its address details provided under Clause 37.2 (*Addresses*), if addressed to that department or officer.

159

CITI-TF 00701674

A-6056

(b)     Any communication or document to be made or delivered to the Agent or the Security Agent will be effective only when actually received by the Agent or Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Agent's or Security Agent's signature below (or any substitute department or officer as the Agent or Security Agent shall specify for this purpose).

(c)     All notices from or to an Obligor shall be sent through the Agent.

(d)     Any communication or document made or delivered to the Company in accordance with this Clause 37.3 will be deemed to have been made or delivered to each of the Obligors.

**37.4    Notification of address and fax number**
Promptly upon receipt of notification of an address, and fax number or change of address or fax number pursuant to Clause 37.2 (*Addresses*) or changing its own address or fax number, the Agent shall notify the other Parties.

**37.5    Electronic communication**
(a)     Any communication to be made between the Agent or the Security Agent and a Lender under or in connection with the Finance Documents may be made by electronic mail or other electronic means, if the Agent or, as the case may be, the Security Agent and the relevant Lender:

    (i)     agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

    (ii)    notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

    (iii)   notify each other of any change to their address or any other such information supplied by them.

(b)     Any electronic communication made between the Agent and a Lender or the Security Agent will be effective only when actually received in readable form and in the case of any electronic communication made by a Lender to the Agent or the Security Agent only if it is addressed in such a manner as the Agent or Security Agent shall specify for this purpose.

**37.6    English language**
(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

    (i)     in English; or

    (ii)    if not in English, and if so reasonably requested by the Agent, accompanied by an English translation (and in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document).

**38.    CALCULATIONS AND CERTIFICATES**
**38.1    Accounts**
In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are prima facie evidence of the matters to which they relate.

[London #293508 v19]

Confidential

CITI-TF 00701675

**38.2  Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document and by an Issuing Bank as to the amount paid out by that Issuing Bank in respect of any Letter of Credit is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**38.3  Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 days (in the case of amounts denominated in Sterling) or 360 days (in the case of amounts denominated in euro) or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

**39.  PARTIAL INVALIDITY**

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**40.  REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

**41.  AMENDMENTS AND WAIVERS**

**41.1  Required consents**

(a)  Subject to Clause 41.2 (*Exceptions*), 41.3 (*Technical Amendments*), Clause 41.4 (*Amendments by Security Agent*) and Clause 41.6 (*Structural Adjustment*) and the provisions of the Intercreditor Agreement or unless the provisions of any Finance Document expressly provide otherwise, any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and the Obligors' Agent and any such amendment or waiver will be binding on all Parties.

(b)  The Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 41.

(c)  Each Obligor and the Obligors' Agent agrees to any such amendment or waiver permitted by this Clause 41 which is agreed to by the Obligors' Agent. This includes any amendment or waiver which would, but for this paragraph (c), require the consent of all of the Guarantors.

(d)  A Lender shall not be included for the purposes of calculation of the Majority Lenders or Super Majority Lenders, if such Lender has failed to respond (without consideration as to whether such response would have been positive or negative) to a request for the consent of such Lender to an amendment or waiver within fifteen (15) Business Days of such request being presented to the Agent.

**41.2  Exceptions**

(a)  An amendment or waiver that has the effect of changing or which relates to:

(i)  a reduction in the Margin (other than pursuant to Clause 15.5 (*Margin adjustment*)) or a reduction in the amount of any scheduled payment of principal, interest, fees or commission payable to a Lender under the Finance Documents;

Confidential

CITI-TF 00701676

(ii)    an extension of any Availability Period applicable to any Facility (other than pursuant to a Structural Adjustment);

(iii)    the definition of "Super-Majority Lenders" or "Majority Lenders" in Clause 1.1 (*Definitions*) or this Clause 41 (other than pursuant to a Structural Adjustment);

(iv)    any provision which expressly requires the consent of all the Lenders;

(v)    Clause 2.2 (*Finance Parties' rights and obligations*), Clause 30 (*Changes to the Lenders*) or Clause 34 (*Sharing among the Finance Parties*); or

(vi)    any amendment to the order of priority or of subordination of the Lenders' claims under the Intercreditor Agreement,

shall not be made without the prior consent of all the Lenders.

(b)    An amendment or waiver which relates to the rights or obligations of the Agent, the Arranger, the Issuing Bank, the Security Agent, a Hedge Counterparty or any Ancillary Lender may not be effected without the consent of the Agent, the Arranger, the Issuing Bank, the Security Agent, that Hedge Counterparty or that Ancillary Lender.

**41.3    Technical Amendments**

Notwithstanding Clause 41.1 (*Required consents*), the Agent may determine administrative matters and make technical amendments arising out of manifest errors on the face of this Agreement, where such amendments would not prejudice or otherwise be adverse to the position of any Lender under this Agreement, without reference to the Lenders

**41.4    Amendments by Security Agent**

Unless the provisions of any Finance Document expressly provide otherwise, the Security Agent may, if authorised by the Majority Lenders, amend the terms of, waive any of the requirements of, or grant consents under, any of the Transaction Security Documents, any such amendment, waiver or consent being binding on all the parties to this Agreement except that:

(a)    the prior consent of the Super Majority Lenders is required to authorise:

(i)    any amendment of any Transaction Security Document which would affect the nature or the scope of the Charged Property or the manner in which proceeds of enforcement are distributed; and

(ii)    any release of all or any part of the Charged Property which is not otherwise provided for under the terms of Clause 31.7 (*Resignation and release of security*); and

(b)    no waiver or amendment may impose any new or additional obligations on any person without the consent of that person.

**41.5    Replacement of a Lender**

(a)    If at any time:

(i)    any Lender becomes a Non-Funding Lender (as defined in paragraph (c) below) or a Non-Consenting Lender (as defined in paragraph (d) below); or

(ii)    an Obligor becomes obliged to repay any amount in accordance with Clause 12.1 (*Illegality*) or to pay additional amounts pursuant to Clause 19.2 (*Tax gross-up*) or

162

Confidential

A-6059

Clause 20 (*Increased Costs*) to any Lender in excess of amounts payable to the other Lenders generally; or

(iii) any Lender becomes insolvent and its assets become subject to a receiver, liquidator, trustee, custodian or other person having similar powers or any winding-up, dissolution or administration,

then the Obligors' Agent may, on fifteen (15) Business Days prior written notice to the Agent and such Lender, replace such Lender by requiring such Lender to (and such Lender shall) transfer pursuant to Clause 30 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement and any associated hedging liabilities to a Lender or other bank or financial institution or Fund Lender (a **"Replacement Lender"**) selected by the Company, and which is acceptable to the Agent (acting reasonably) and (in the case of any transfer of a Revolving Facility Commitment) the Issuing Bank, which confirms its willingness to assume and does assume all the obligations of the transferring Lender (including the assumption of the transferring Lender's participations on the same basis as the transferring Lender) for a purchase price in cash payable at the time of transfer equal to the outstanding principal amount of such Lender's participation in the outstanding Loans and/or Letters of Credit and all accrued interest (and any breakage costs) and fees and other amounts payable thereunder.

(b) The replacement of a Lender pursuant to this Clause 41 shall be subject to the following conditions:

(i) the Company shall have no right to replace the Agent or the Security Agent;

(ii) neither the Agent nor the Lender to be replaced under this Clause 41 shall have any obligation to the Company to find a Replacement Lender;

(iii) in the event of a replacement of a Non-Consenting Lender such replacement must take place no later than 90 days after the date the Non-Consenting Lender notified the Company and the Agent of its failure or refusal to agree to any consent, waiver or amendment to the Finance Documents requested by the Company;

(iv) in no event shall the Lender to be replaced under this Clause 41 be required to pay or surrender to such Replacement Lender any of the fees received by such Lender pursuant to the Finance Documents; and

(v) in the event of replacement of a Non-Funding Lender, such replacement must take place no later than 90 days after the date the Non-Funding Lender failed or refused to participate in the relevant Utilisation.

(c) A "Non-Funding Lender" is a Lender who either refuses or fails to participate is a Loan where:

(i) the Agent has notified each Lender of the details of the requested Utilisation and the amount of its share in that Utilisation;

(ii) the conditions to provision of a Utilisation set out in this agreement have all been met and the relevant Lender is not entitled to refuse to participate in that Utilisation; and

(iii) the Company has notified that Lender it will be treated as a Non-Funding Lender.

(d) If:

(i) the Company or the Agent (at the request of the Company) has requested the Lenders to consent to a waiver or amendment of any provisions of the Finance Documents;

163

CITI-TF 00701678

(ii)  the waiver or amendment in question requires the consent of all the Lenders or the Super-Majority Lenders; and

(iii)  the Majority Lenders have consented to such waiver or amendment,

then any Lender who does not and continues not to agree to such waiver or amendment shall be deemed to be a "Non-Consenting Lender".

(e)  Prepayments made under this Clause 41.5:

(i)  will be at par and will include all accrued interest, fees, Break Costs and other amounts payable in relation thereto under the Finance Documents; and

(ii)  may be made out of the proceeds new Equity Injections made expressly for that purpose or Retained Excess Cashflow.

**41.6  Structural Adjustment**

(a)  In this Clause 41.6, a "**Structural Adjustment**" means:

(i)  the introduction of any additional tranche or facility into the Finance Documents;

(ii)  any increase in or addition of any Commitment, any extension of a Commitment's maturity or availability or the redenomination of a Commitment into another currency; and

(iii)  any changes to the Finance Documents (including changes to or the taking of Security but, in the case of a release and retaking of Security, where that would have (in the opinion of the Security Agent (acting reasonably)) a material and prejudicial impact on the interests of the Finance Parties, no such release may occur without the prior consent of the Super-Majority Lenders) consequential on or required by reason of applicable law effectively to implement any of the foregoing, in each case other than in respect of Additional Acquisition Facility Commitments.

(b)  An amendment or waiver that is a Structural Adjustment or which is consequential on or required to implement a Structural Adjustment may be approved with the consent of each of the following, subject to the provisions of the Intercreditor Agreement:

(i)  the Majority Lenders; and

(ii)  each Lender that is assuming a new Commitment or an increased Commitment in the relevant Facility or whose Commitment is being extended or redenominated, or to whom any amount (including interest), which is being redenominated is due,

and any such amendment or waiver will be binding on all Parties.

[London #293508 v19]

Confidential

CITI-TF 00701679

### SECTION 12
### GOVERNING LAW AND ENFORCEMENT

**42.    GOVERNING LAW**
This Agreement is governed by English law.

**43.    ENFORCEMENT**
**43.1    Jurisdiction of English courts**
(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) (a "Dispute").

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    This Clause 43.1 is for the benefit of the Finance Parties and Secured Parties only.  As a result, no Finance Party or Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Finance Parties and Secured Parties may take concurrent proceedings in any number of jurisdictions.

**43.2    Service of process**
(a)    Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(i)    irrevocably appoints the Company as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document (and the Company by its execution of this Agreement, accepts that appointment); and

(ii)    agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within 5 Business Days of such event taking place) appoint another agent on terms acceptable to the Agent.  Failing this, the Agent may appoint another agent for this purpose.

**44.    COUNTERPARTS**
Any Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of such Finance Document.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

165

CITI-TF 00701680

A-6062

## SCHEDULE 1

### The Original Parties

#### PART I
#### The Original Obligors

| Name of Original Borrower | Place of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Maltby Limited | England & Wales | 6226803 |

| Name of Original Guarantor | Place of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Maltby investments Limited | England & Wales | 6226775 |

#### PART II
#### The Original Lenders

| Name of Original Lender | Senior B Facility Commitment | Acquisition Facility Commitment | Revolving Facility Commitment |
|---|---|---|---|
| Citibank, N.A., London Branch | £725,000,000 | £100,000,000 | £350,000,000 |
| Total | £725,000,000 | £100,000,000 | £350,000,000 |

[London #293508 v19]

166

Confidential

CITI-TF 00701681

## SCHEDULE 2
### CONDITIONS PRECEDENT
### PART I
### CONDITIONS PRECEDENT TO UTILISATION

1.  **Corporate documents**

(a)  A copy of the Constitutional Documents.

(b)  A copy of a resolution of the board of directors of the Company, the Parent and Holdco:

  (i)  approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute, deliver and perform the Transaction Documents to which it is a party;

  (ii)  approving the release of the Offer Press Release or, if the Scheme Conversion has occurred, the Scheme Press Release;

  (iii)  authorising a specified person or persons to execute the Transaction Documents to which it is a party on its behalf; and

  (iv)  authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Transaction Documents to which it is a party.

(c)  A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Transaction Documents and related documents.

(d)  A certificate of the Company (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it or the Parent to be exceeded.

(e)  A certificate of an authorised signatory of the Company (as at a date no earlier than the Closing Date) certifying that each copy document relating to it, the Parent or Holdco, as the case may be, specified in this Part I of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded and confirming that the execution of the Transaction Documents to which it, the Parent or Holdco as the case may be, is party is lawful and complies with its constitution.

2.  **Finance Documents**

(a)  This Agreement executed by the members of the Group party to this Agreement.

(b)  The Fee Letter(s) executed by the Company.

(c)  The Intercreditor Agreement executed by members of the Group party to that agreement.

(d)  The Hedging Letter executed by the parties to that letter.

(e)  At least two originals of the Transaction Security Documents listed in Schedule 13 (*Transaction Security*) executed by the Company, the Parent and/or Holdco (as applicable) together with any notices or documents required to be given or executed or made under the terms of those Transaction Security Documents.

Confidential                                                CITI-TF 00701682

3.    **Legal opinions**

A legal opinion of Cleary Gottlieb Steen & Hamilton LLP, legal advisers to the Arranger in England, as to English law in respect of the Finance Documents.

4.    **Other documents and evidence**

(a)    The Securitisation Bridge Facility Agreement executed by members of the Group party to that agreement, together with evidence that the conditions precedent to funding under the Securitisation Bridge Facility Agreement have been satisfied (other than any condition relating to the satisfaction of conditions precedent under this Agreement).

(b)    The Mezzanine Facility Agreement executed by members of the Group party to that agreement, together with evidence that the conditions precedent to funding under the Mezzanine Facility Agreement have been satisfied (other than any condition relating to the satisfaction of conditions precedent under this Agreement).

(c)    A copy of each Report.

(d)    The Base Case Model and the Structure Memorandum.

(e)    Any information and evidence in respect of the Company required by each Finance Party to enable it to be satisfied with the results of all *"know your customer"* or other checks which it is required to carry out in relation to such person provided that such information and evidence is requested not less than five Business Days prior to the date of the Scheme Press Release.

(f)    If the Scheme Conversion has occurred, a certificate of an authorised signatory of the Company addressed to the Agent attaching certified copies of the following documents:

(i)    the Court Order; and

(ii)    the certificate of the Registrar of Companies confirming registration of the Court Order.

(g)    If the Scheme Conversion has not occurred, a certificate of an authorised signatory of the Company confirming that the Offer has been declared wholly unconditional.

(h)    To the extent that they have been updated since the date on which they were delivered prior to the date of the Interim Facilities Agreement, copies of the documents delivered pursuant to paragraphs (c) and (d) above.

(i)    Evidence that the fees, costs and expenses then due from the Company under Clause 23 (*Costs and Expenses*) and Clause 19.5 (*Stamp taxes*) have been paid or will be paid on or by the first Utilisation Date.

(j)    Evidence that the funds necessary to complete the Acquisition (other than those available to the Company under this Agreement, the Securitisation Bridge Facility Agreement and the Mezzanine Facility Agreement) being an amount equal to £1,490,000,000 have been received by the Company in cash on or before the first Utilisation Date in accordance with the Structure Memorandum.

[London #293508 v19]

168

## PART II
### CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL OBLIGOR

1.   An Accession Letter executed by the Additional Obligor and the Company.

2.   A copy of the constitutional documents of the Additional Obligor.

3.   A copy of a resolution of the board of directors (if any) of the Additional Obligor and, where applicable, the supervisory board or advisory board:

   (a)   approving the terms of, and the transactions contemplated by, the Accession Letter and the Finance Documents and resolving that it execute the Accession Letter and any other Finance Document to which it is a party;

   (b)   authorising a specified person or persons to execute the Accession Letter and other Finance Documents on its behalf; and

   (c)   (where applicable) authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to the Additional Borrower, any Utilisation Request or Selection Notice) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

   (d)   in the case of any Additional Obligor authorising the Company to act as its agent in connection with the Finance Documents.

4.   A specimen of the signature of each person authorised by the resolution referred to in paragraph 3 above.

5.   (If required by law or on the advice of counsel to the Agent in each jurisdiction), a copy of a resolution signed by all the holders of the issued shares of an Additional Obligor which is an Additional Guarantor and, if applicable, its board of supervisory directors, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Guarantor is a party.

6.   A certificate of the Additional Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

7.   A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Part II of Schedule 2 is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Letter.

8.   If available, the latest audited financial statements of the Additional Obligor.

9.   The following legal opinions, each addressed to the Agent, the Security and the Lenders:

   (a)   A legal opinion of the legal advisers to the Agent in England and Wales, as to English law in the form distributed to the Agent prior to signing the Accession Letter.

   (b)   If the Additional Obligor is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Agent or, as the case may be, such Additional Obligor (based on what is the accepted practice as to delivery of legal opinions in financing transactions in the jurisdiction of the governing law of that Finance Document (the "Relevant Jurisdiction")) as to the law of the Relevant Jurisdiction and the capacity and due authorisation of the Additional Obligor, in the form

169

CITI-TF 00701684

A-6066

distributed to the Agent prior to signing the Accession Letter (or such other form as may be agreed by the Agent).

10.  In relation to Additional Obligors incorporated in England and Wales or Scotland, evidence that members of the Group incorporated in England and Wales or Scotland have done all that is necessary (including, without limitation, by re-registering as a private company) to follow the procedures set out in Sections 151 to 158 of the Act in order to enable each relevant Obligor to enter into the Finance Documents and perform its obligations under the Finance Documents. Such evidence shall include copies of the resolutions, statutory declarations, auditor's report and net assets letter (addressed to the Finance Parties) for each Additional Obligor and copies of the registers of directors and shareholders of each Additional Obligor.

11.  The Transaction Security Documents executed by the Additional Obligor which are required by the Agent in accordance with the Agreed Security Principles.

12.  Any notices or documents required to be given or executed or made under the terms of those Transaction Security Documents.

13.  An accession memorandum to the Intercreditor Deed executed by the Additional Obligor.

14.  Copies of such documentation and other evidence as the Agent (for itself or on behalf of any Lender) may reasonably request to carry out and be satisfied with the results of all necessary "know your customer" requirements or other checks in relation to the identity of any person that it is required (in order to comply with applicable money laundering laws and regulations) to carry out in relation to the Additional Obligor.

170

[London #293508 v19]

Confidential

CITI-TF 00701685

## SCHEDULE 3
### REQUESTS

### PART I
### UTILISATION REQUEST
#### LOANS

From:    [Borrower] [Company]*

To:    [Agent]

Dated:    [_____]

Dear Sirs

**MALTBY LIMITED - £1,175,000,000 Senior Facilities Agreement dated [_____] (the "Facilities Agreement")**

1.    We refer to the Facilities Agreement. This is a Utilisation Request. Terms defined in the Facilities Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.    We wish to borrow a Loan on the following terms:

|     |     |     |
| --- | --- | --- |
| (a) | Borrower: | [_____] |
| (b) | Proposed Utilisation Date: | [_____] (or, if that is not a Business Day, the next Business Day) |
| (c) | Facility to be utilised: | [Senior B Facility]/ [Acquisition Facility]/[Revolving Facility]** |
| (d) | Currency of Loan: | [_____] |
| (e) | Amount: | [_____] or, if less, the Available Facility |
| (f) | Interest Period: | [_____] |
| (g) | Business division for which Loan is to be utilised (and in case of an Acquisition Loan, whether it is a Music Publishing Division Acquisition Loan or a Recorded Music Division Acquisition Loan): | [_____] |

3.    We confirm that each condition specified in Clause 4.3 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request.

4.    [We confirm that the Loan to be made available hereunder is for the purpose of a Permitted Investment.] ***

5.    [The proceeds of this Loan should be credited to [account]].

6.    This Utilisation Request is irrevocable.

171

CITI-TF 00701686

A-6068

Yours faithfully

......................................................

authorised signatory for
[the Company on behalf of [insert name of relevant Borrower]]/ [insert name of Borrower]*

Notes:

\*        Amend as appropriate. The Utilisation Request can be given by the Borrower or by the
         Company.

\*\*       Select the Facility to be utilised and delete references to the other Facilities. Specify if it is a
         Loan made under an Additional Acquisition Facility Commitment Notice by adding suffix "A".

\*\*\*      For Loans under an Additional Acquisition Facility Commitment Notice.

[London #293508 v19]

172

Confidential

CITI-TF 00701687

A-6069

**PART II**
**UTILISATION REQUEST**
**LETTERS OF CREDIT**

From:   [Borrower]
        [Company]*

To:     [Agent]

Dated:  [_____]


Dear Sirs

**MALTBY LIMITED – £1,175,000,000 Senior Facilities Agreement**
**dated [_____] (the "Facilities Agreement")**

1.  We refer to the Facilities Agreement. This is a Utilisation Request. Terms defined in the Facilities Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.  We wish to arrange for a Letter of Credit to be [issued/renewed] by the Issuing Bank specified below (which has agreed to do so) on the following terms:

    (a)  Beneficiary:                      [_____]

    (b)  Issuing Bank:                     [_____]

    (c)  Proposed Utilisation             [_____] (or, if that is not a Business Day, the next Business
         Date:                             Day)

    (d)  Facility to be utilised:         Revolving Facility

    (e)  Currency of Letter of            [_____]
         Credit:

    (f)  Amount:                           [_____] or, if less, the Available Facility in relation to the
                                           Revolving Facility

    (g)  Term:                             [_____]

    (h)  Expiry Date                       [_____]

    (i)  Business division for            [_____]
         which Letter of Credit
         is to be utilised:

3.  We confirm that each condition specified in paragraph (c) of Clause 6.5 (*Issue of Letters of Credit*) is satisfied on the date of this Utilisation Request.

4.  We attach a copy of the proposed Letter of Credit.

5.  The purpose of this proposed Letter of Credit is [_____].

173

CITI-TF 00701688

A-6070

6.    This Utilisation Request is irrevocable.

Yours faithfully

......................................
authorised signatory for
[the Company on behalf of [*insert name of relevant Borrower*]]/ [*insert name of Borrower*]*

Notes:
*       *Amend as appropriate*. The Utilisation Request can be given by the Borrower or by the
Company.

[London #293508 v19]

174

Confidential

CITI-TF 00701689

A-6071

## PART III
### SELECTION NOTICE

**Applicable to a Term Loan**

From:    [*Borrower*] [*Company*]*

To:    [*Agent*]

Dated:    [_____]

Dear Sirs

**MALTBY LIMITED - £1,175,000,000 Senior Facilities Agreement
dated [_____] (the "Facilities Agreement")**

1.    We refer to the Facilities Agreement. This is a Selection Notice. Terms defined in the Facilities Agreement have the same meaning in this Selection Notice unless given a different meaning in this Selection Notice.

2.    We refer to the following Term Loan[s],

Utilisation Date:        [_____]

Amount:            [_____]

Final day of Interest Period    [_____]

We request that the next Interest Period for the above Term Loan[s] is [_____].

3.    This Selection Notice is irrevocable.

Yours faithfully

............................................
authorised signatory for
[the Company on behalf of] [*insert name of relevant Borrower*]*

............................................

Notes:
*    Amend as appropriate. The Selection Notice can be given by the Borrower or the Company.

175

CITI-TF 00701690

A-6072

## SCHEDULE 4

### MANDATORY COST FORMULAE

1.  The Mandatory Cost is an addition to the interest rate to compensate Lenders for the cost of compliance with (a) the requirements of the Bank of England and/or the Financial Services Authority (or, in either case, any other authority which replaces all or any of its functions) or (b) the requirements of the European Central Bank.

2.  On the first day of each Interest Period (or as soon as possible thereafter) the Agent shall calculate, as a percentage rate, a rate (the "**Additional Cost Rate**") for each Lender, in accordance with the paragraphs set out below. The Mandatory Cost will be calculated by the Agent as a weighted average of the Lenders' Additional Cost Rates (weighted in proportion to the percentage participation of each Lender in the relevant Loan) and will be expressed as a percentage rate per annum.

3.  The Additional Cost Rate for any Lender lending from a Facility Office in a Participating Member State will be the percentage notified by that Lender to the Agent. This percentage will be certified by that Lender in its notice to the Agent to be its reasonable determination of the cost (expressed as a percentage of that Lender's participation in all Loans made from that Facility Office) of complying with the minimum reserve requirements of the European Central Bank in respect of loans made from that Facility Office.

4.  The Additional Cost Rate for any Lender lending from a Facility Office in the United Kingdom will be calculated by the Agent as follows:

    (a)    in relation to a Sterling Loan:

    $$\frac{AB + C(B-D) + E \times 0.01}{100 - (A+C)} \text{ per cent. per annum}$$

    (b)    in relation to a Loan in any currency other than sterling:

    $$\frac{E \times 0.01}{300} \text{ per cent. per annum.}$$

Where:

A.    is the percentage of Eligible Liabilities (assuming these to be in excess of any stated minimum) which that Lender is from time to time required to maintain as an interest free cash ratio deposit with the Bank of England to comply with cash ratio requirements.

B.    is the percentage rate of interest (excluding the Margin and the Mandatory Cost and, if the Loan is an Unpaid Sum, the additional rate of interest specified in paragraph (a) of Clause 15.3 (Default interest)) payable for the relevant Interest Period on the Loan.

C.    is the percentage (if any) of Eligible Liabilities which that Lender is required from time to time to maintain as interest bearing Special Deposits with the Bank of England.

D.    is the percentage rate per annum payable by the Bank of England to the Agent on interest bearing Special Deposits.

E.    is designed to compensate Lenders for amounts payable under the Fees Rules and is calculated by the Agent as being the average of the most recent rates of charge supplied by the Reference Banks to the Agent pursuant to paragraph 7 below and expressed in pounds per £1,000,000.

5.  For the purposes of this Schedule:

176

[London #293508 v19]

CITI-TF 00701691

A-6073

(a) **"Eligible Liabilities"** and **"Special Deposits"** have the meanings given to them from time to time under or pursuant to the Bank of England Act 1998 or (as may be appropriate) by the Bank of England;

(b) **"Fees Rules"** means the rules on periodic fees contained in the FSA Supervision Manual or such other law or regulation as may be in force from time to time in respect of the payment of fees for the acceptance of deposits;

(c) **"Fee Tariffs"** means the fee tariffs specified in the Fees Rules under the activity group A.1 Deposit acceptors (ignoring any minimum fee or zero rated fee required pursuant to the Fees Rules but taking into account any applicable discount rate); and

(d) **"Tariff Base"** has the meaning given to it in, and will be calculated in accordance with, the Fees Rules.

6.   In application of the above formulae, A, B, C and D will be included in the formulae as percentages (i.e. 5 per cent. will be included in the formula as 5 and not as 0.05). A negative result obtained by subtracting D from B shall be taken as zero. The resulting figures shall be rounded to four decimal places.

7.   If requested by the Agent, each Reference Bank shall, as soon as practicable after publication by the Financial Services Authority, supply to the Agent the rate of charge payable by that Reference Bank to the Financial Services Authority pursuant to the Fees Rules in respect of the relevant financial year of the Financial Services Authority (calculated for this purpose by that Reference Bank as being the average of the Fee Tariffs applicable to that Reference Bank for that financial year) and expressed in pounds per £1,000,000 of the Tariff Base of that Reference Bank.

8.   Each Lender shall supply any information required by the Agent for the purpose of calculating its Additional Cost Rate. In particular, but without limitation, each Lender shall supply the following information on or prior to the date on which it becomes a Lender:

(a)   the jurisdiction of its Facility Office; and

(b)   any other information that the Agent may reasonably require for such purpose.

Each Lender shall promptly notify the Agent of any change to the information provided by it pursuant to this paragraph.

9.   The percentages of each Lender for the purpose of A and C above and the rates of charge of each Reference Bank for the purpose of E above shall be determined by the Agent based upon the information supplied to it pursuant to paragraphs 7 and 8 above and on the assumption that, unless a Lender notifies the Agent to the contrary, each Lender's obligations in relation to cash ratio deposits and Special Deposits are the same as those of a typical bank from its jurisdiction of incorporation with a Facility Office in the same jurisdiction as its Facility Office.

10.   The Agent shall have no liability to any person if such determination results in an Additional Cost Rate which over or under compensates any Lender and shall be entitled to assume that the information provided by any Lender or Reference Bank pursuant to paragraphs 3, 7 and 8 above is true and correct in all respects.

11.   The Agent shall distribute the additional amounts received as a result of the Mandatory Cost to the Lenders on the basis of the Additional Cost Rate for each Lender based on the information provided by each Lender and each Reference Bank pursuant to paragraphs 3, 7 and 8 above.

Confidential

CITI-TF 00701692

A-6074

12. Any determination by the Agent pursuant to this Schedule in relation to a formula, the Mandatory Cost, an Additional Cost Rate or any amount payable to a Lender shall, in the absence of manifest error, be conclusive and binding on all Parties.

13. The Agent may from time to time, after consultation with the Company and the Lenders, determine and notify to all Parties any amendments which are required to be made to this Schedule in order to comply with any change in law, regulation or any requirements from time to time imposed by the Bank of England, the Financial Services Authority or the European Central Bank (or, in any case, any other authority which replaces all or any of its functions) and any such determination shall, in the absence of manifest error, be conclusive and binding on all Parties.

[London #293508 v19]

Confidential

CITI-TF 00701693

A-6075

## SCHEDULE 5
### FORM OF TRANSFER AGREEMENT

To:        [_____] as Agent

From:    [*The Existing Lender*] (the "**Existing Lender**") and [The New Lender] (the "**New Lender**")

Dated:    [_____]

Dear Sirs

### MALTBY LIMITED – £1,175,000,000 Senior Facilities Agreement
#### dated [_____] (the "Facilities Agreement")

1.    We refer to the Facilities Agreement. This is a Transfer Agreement. Terms defined in the Facilities Agreement have the same meaning in this Transfer Agreement unless given a different meaning in this Transfer Agreement.

2.    We refer to Clause 30.5 (*Procedure for transfer*):

    (a)    The Existing Lender and the New Lender agree to the transfer of [all] [the part specified in the Schedule to this Transfer Agreement] of the Existing Lender's Commitment, rights and obligations referred to in the Schedule in accordance with Clause 30.5 (*Procedure for transfer*).

    (b)    The proposed Transfer Date is [_____].

    (c)    The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 37.2 (*Addresses*) are set out in the Schedule.

3.    The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of Clause 30.4 (*Limitation of responsibility of Existing Lenders*).

4.    The New Lender agrees to be bound by the terms of the Intercreditor Agreement as a Senior Lender.[1]

5.    This Transfer Agreement is governed by English law.

---

[1]    New Lender should execute accession document to Intercreditor Agreement.

179

CITI-TF 00701694

A-6076

**THE SCHEDULE**
**Commitment/rights and obligations to be transferred**
*[insert relevant details]* *

*[Facility Office address, fax number and attention details for notices and account details for payments.]*

[Existing Lender]                           [New Lender]

By: ...............................................          By: ...............................................

This Transfer Agreement is accepted by the Agent and the Transfer Date is confirmed as [_____].
[Agent]

By: ...............................................

Notes:
*        Specify if Commitments relate to Additional Acquisition Facility Commitments by using the
        suffix "A".

[London #293508 v19]

Confidential

CITI-TF 00701695

A-6077

**SCHEDULE 6**
**FORM OF ACCESSION LETTERS**
**PART I**
**ACCESSION LETTER**

To:      [_____] as Agent

From:   [*Subsidiary*] and [*Company*]

Dated:  [_____]

Dear Sirs

**MALTBY LIMITED - £1,175,000,000 Senior Facilities Agreement**
**dated [_____] (the "Facilities Agreement")**

1.   We refer to the Facilities Agreement. This is an Accession Letter. Terms defined in the Facilities Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

2.   [Subsidiary] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Facilities Agreement, the Intercreditor Agreement and the other Finance Documents as an Additional [Borrower]/[Guarantor] pursuant to Clause [31.2 (*Additional Borrower*)]/[Clause 31.3 (*Additional Guarantors*)] of the Facility Agreement and as an [Obligor] pursuant to Clause [_____] of the Intercreditor Agreement. [Subsidiary] is a company duly incorporated under the laws of [name of relevant jurisdiction] and is a limited liability company and registered number [_____].

3.   [Subsidiary's] administrative details are as follows:

     Address:    [_____]
     Fax No.:    [_____]
     Attention:  [_____]

4.   [Guarantee limitation, if applicable.]

5.   This Accession Letter is governed by English law.

     [This Guarantor Accession Letter is entered into by deed.]

     [Company]                          [Subsidiary]

Confidential                                              CITI-TF 00701696

A-6078

**PART II**
FORM OF ISSUING BANK ACCESSION AGREEMENT

To:      [Agent]

From:    [Proposed Issuing Bank]

Date:    [_____]

Dear Sirs

**MALTBY LIMITED – £1,175,000,000 Senior Facilities Agreement**
**dated [_____] (the "Facilities Agreement")**

We refer to the Facilities Agreement. This is an Issuing Bank Accession Agreement.

1.      [Name of Lender/Bank Affiliate of Lender] of [address/registered office] agrees to become:

(a)     the Issuing Bank under the Agreement and to be bound by the terms of the Agreement as an Issuing Bank; and

(b)     a Senior Creditor under the Intercreditor Agreement and to be bound by the Intercreditor Agreement as a Senior Creditor.

This Issuing Bank Accession Agreement is governed by English law.

[_____]

By: [_____]

[London #293508 v19]

Confidential

CITI-TF 00701697

## SCHEDULE 7
### FORM OF RESIGNATION LETTER

To:      [_____] as Agent

From:    [resigning Obligor] and [Company]

Dated:   [_____]

Dear Sirs

**MALTBY LIMITED - £1,175,000,000 Senior Facilities Agreement**
dated [_____] (the "Facilities Agreement")

1.  We refer to the Facilities Agreement. This is a Resignation Letter. Terms defined in the Facilities Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2.  Pursuant to [Clause 31.3 (*Resignation of a Borrower*) and] Clause 31.5 (*Resignation of a Guarantor*), we request that [resigning Obligor] be released from its obligations as a [Borrower and] Guarantor under the Facilities Agreement, the Intercreditor Agreement and the Finance Documents.

3.  We confirm that:

    (a)  no Default is continuing or would result from the acceptance of this request; and

    (b)  *[[this request is given in relation to a Third Party Disposal of [resigning Obligor];

    (c)  [the Disposal Proceeds have been or will be applied in accordance with Clause 13.3 (*Application of mandatory prepayments*);]**]

    (d)  [_____]***

4.  This letter is governed by English law.


[Company]                                    [resigning Obligor]


By: ...........................................          By: ...........................................

Notes:
*        Insert where resignation only permitted in case of a Third Party Disposal.
**       Amend as appropriate, e.g. to reflect agreed procedure for payment of proceeds into a specified account.
***      Insert any other conditions required by the Facilities Agreement.

Confidential

CITI-TF 00701698

A-6080

**SCHEDULE 8**
**FORM OF COMPLIANCE CERTIFICATE**

To:        [_____] as Agent

From:    [Parent]

Dated:    [_____]

Dear Sirs

**MALTBY LIMITED - £1,175,000,000 Senior Facilities Agreement**
**dated [_____] (the "Facilities Agreement")**

1.    We refer to the Facilities Agreement. This is a Compliance Certificate. Terms defined in the
      Facilities Agreement have the same meaning when used in this Compliance Certificate unless
      given a different meaning in this Compliance Certificate.

2.    We confirm that the ratio of Total Net Debt on the Test Date to Maintenance EBITDA for that
      Relevant Period was [_____] to 1 and that, therefore, the Senior B Facility Margin should
      be [_____] per cent., the Acquisition Facility Margin should be [_____] per cent., the
      Revolving Facility Margin should be [_____] per cent and the commitment fee for the
      Revolving Facility should be [_____] per cent.]

3.    [We confirm that no Default is continuing.]*

4.    [We confirm that the following companies constitute Material Companies for the purposes of the
      Facility Agreement: [_____]].

Signed

      ................................................

      Director
      Of
      [Parent]

---

*    If this statement cannot be made, the certificate should identify any Default that is continuing and the
     steps, if any, being taken to remedy it.

184

[London #293508 v19]

Confidential

CITI-TF 00701699

A-6081

## SCHEDULE 9
## LMA FORM OF CONFIDENTIALITY UNDERTAKING

[Letterhead of Arranger]

To:

|  |
|---|
| [insert name of Potential Lender] |

Re:    The Facilit[y/ies]

| Borrower: Maltby Limited (the "Borrower") |
|---|
| Amount: |
| Agent: |

Dear Sirs

We understand that you are considering participating in the Facilit[y/ies]. In consideration of us agreeing to make available to you certain information and to prevent front-running of the Facilit[y/ies], by your signature of a copy of this letter you agree as follows:

(A)    **CONFIDENTIALITY**

1.    **Confidentiality Undertaking**
You undertake:

   (a)    to keep the Confidential Information confidential and not to disclose it to anyone except as provided for by paragraph A2 below and to ensure that the Confidential Information is protected with security measures and a degree of care that would apply to your own confidential information;

   (b)    to keep confidential and not disclose to anyone except as provided for by paragraph A2 below the fact that the Confidential Information has been made available or that discussions or negotiations are taking place or have taken place between us in connection with the Facilities;

   (c)    to use the Confidential Information only for the Permitted Purpose; and

   (d)    to use all reasonable endeavours to ensure that any person to whom you pass any Confidential Information (unless disclosed under paragraph A2(b) below) acknowledges and complies with the provisions of this letter as if that person were also a party to it.

2.    **Permitted Disclosure**
We agree that you may disclose Confidential Information and those matters referred to in paragraph 1(b) above:

   (a)    to members of the Participant Group and their officers, directors, employees and professional advisers to the extent necessary for the Permitted Purpose and to any auditors of members of the Participant Group;

   (b)    (i) where requested or required by any court of competent jurisdiction or any competent judicial, governmental, supervisory or regulatory body, (ii) where required by the rules of any stock exchange on which the shares or other securities of any member of the

185

CITI-TF 00701700

A-6082

Participant Group are listed or (iii) where required by the laws or regulations of any country with jurisdiction over the affairs of any member of the Participant Group; or

(c)     with the prior written consent of us and the Borrower.

3.     **Notification of Required or Unauthorised Disclosure**

You agree (to the extent permitted by law and except where disclosure is to be made to any competent supervisory or regulatory body during the ordinary course of its supervisory or regulatory function over you) to inform us of the full circumstances of any disclosure under paragraph A2(b) or upon becoming aware that Confidential Information has been disclosed in breach of this letter.

4.     **Return of Copies**

If we so request in writing, you shall return all Confidential Information supplied to you by us and destroy or permanently erase (to the extent technically practicable) all copies of Confidential Information made by you and use all reasonable endeavours to ensure that anyone to whom you have supplied any Confidential Information destroys or permanently erases (to the extent technically practicable) such Confidential Information and any copies made by them, in each case save to the extent that you or the recipients are required to retain any such Confidential Information by any applicable law, rule or regulation or by any competent judicial, governmental, supervisory or regulatory body or in accordance with internal policy, or where the Confidential Information has been disclosed under paragraph A2(b) above.

5.     **Continuing Obligations**

The obligations in this letter are continuing and, in particular, shall survive the termination of any discussions or negotiations between you and us.  Notwithstanding the previous sentence, the obligations in this letter shall cease on the earlier of (a) the date you become a party to or otherwise acquire (by assignment or otherwise) a direct interest in the Facilities [and] (b) twelve Months after you have returned all Confidential Information supplied to you by us and destroyed or permanently erased (to the extent technically practicable) all copies of Confidential Information made by you (other than any such Confidential Information or copies which have been disclosed under paragraph A2 above (other than sub-paragraph A2(a)) or which, pursuant to paragraph A4 above, are not required to be returned or destroyed)[ and (c) in any event [      ] Months from the date of this letter].

6.     **No Representation; Consequences of Breach, etc**

You acknowledge and agree that:

(a)     neither we nor any of our officers, employees or advisers (each a "Relevant Person") (i) make any representation or warranty, express or implied, as to, or assume any responsibility for, the accuracy, reliability or completeness of any of the Confidential Information or any other information supplied by us or any member of the Group or the assumptions on which it is based or (ii) shall be under any obligation to update or correct any inaccuracy in the Confidential Information or any other information supplied by us or any member of the Group or be otherwise liable to you or any other person in respect to the Confidential Information or any such information; and

(b)     we or members of the Group may be irreparably harmed by the breach of the terms of this letter and damages may not be an adequate remedy; each Relevant Person or member of the Group may be granted an injunction or specific performance for any threatened or actual breach of the provisions of this letter by you.

7.     **No Waiver; Amendments, etc**

This letter sets out the full extent of your obligations of confidentiality owed to us in relation to the information the subject of this letter.  No failure or delay in exercising any right, power or privilege under this letter will operate as a waiver thereof nor will any single or partial exercise of any right, power or privilege preclude any further exercise thereof or the exercise of any other right, power or

[London #293508 v19]

186

CITI-TF 00701701

privileges under this letter. The terms of this letter and your obligations under this letter may only be amended or modified by written agreement between us.

**8.  Inside Information**

You acknowledge that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and you undertake not to use any Confidential Information for any unlawful purpose.

**9.  Nature of Undertakings**

The undertakings given by you under Part A of this letter are given to us and (without implying any fiduciary obligations on our part) are also given for the benefit of the Borrower and each other member of the Group.

**(B)  MISCELLANEOUS**

**1.  Third party rights**

Subject to paragraph A6 and paragraph A9 the terms of this letter may be enforced and relied upon only by you and us and the operation of the Contracts (Rights of Third Parties) Act 1999 is excluded.Notwithstanding any provisions of this letter, the parties to this letter do not require the consent of any Relevant Person or any member of the Group to rescind or vary this letter at any time.

**2.  Governing Law and Jurisdiction**

This letter (including the agreement constituted by your acknowledgement of its terms) shall be governed by and construed in accordance with the laws of England and the parties submit to the non-exclusive jurisdiction of the English courts.

**3.  Definitions**

In this letter (including the acknowledgement set out below):

"**Arranger Group**" means us, each of our holding companies and subsidiaries and each subsidiary of each of our holding companies (as each such term is defined in the Companies Act 1985) and each of our or their directors, officers and employees (including any sales and trading teams) provided that when used in this letter in respect of an Arranger it applies severally only in respect of that Arranger, each of that Arranger's holding companies and subsidiaries, each subsidiary of each of its holding companies and each director, officer and employee (including any sales and trading teams) of that Arranger or any of the foregoing and not, for the avoidance of doubt, those of another Arranger.

"**Confidential Information**" means any information relating to the Borrower, the Group, and the Facilities provided to you by us or any of our affiliates or advisers, in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that (a) is or becomes public knowledge other than as a direct or indirect result of any breach of this letter or (b) is known by you before the date the information is disclosed to you by us or any of our affiliates or advisers or is lawfully obtained by you after that date, other than from a source which is connected with the Group and which, in either case, as far as you are aware, has not been obtained in violation of, and is not otherwise subject to, any obligation of confidentiality.

the "**Facility Agreement**" means the facility agreement to be entered into in relation to the Facilities.

"**Group**" means the Borrower and each of its holding companies and subsidiaries and each subsidiary of each of its holding companies (as each such term is defined in the Act).

187

CITI-TF 00701702

**"Participant Group"** means you, each of your holding companies and subsidiaries and each subsidiary of each of your holding companies (as each such term is defined in the Companies Act 1985) and where such term is used in Part B of this letter and the definition of "Front Running" each of your or their directors, officers and employees (including any sales and trading teams).

**"Permitted Purpose"** means considering and evaluating whether to enter into the Facilities.

Please acknowledge your agreement to the above by signing and returning the enclosed copy.

Yours faithfully


...............................
For and on behalf of
[Arranger]



To:        [Arranger]

        The Borrower and each other member of the Group


We acknowledge and agree to the above:

...............................
For and on behalf of
[Potential Lender]

[London #293508 v19]

Confidential

CITI-TF 00701703

### SCHEDULE 10
#### TIMETABLES[*]
#### PART I
#### LOANS

| | Loans in euro | Loans in Sterling | Loans in other currencies |
|---|---|---|---|
| Approval as an Optional Currency, if required (Clause 4.4 (*Conditions relating to Optional Currencies*)) | | | |
| Agent notifies the Company if a currency is approved as an Optional Currency in accordance with Clause 4.4 (*Conditions relating to Optional Currencies*) | | | U-4 |
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*) or a Selection Notice (Clause 16.1 (*Selection of Interest Periods and Terms*) | U-3 9:30 a.m. | U-1 9:30 a.m. | U-3 9:30 a.m. |
| Agent determines (in relation to a Utilisation) the Base Currency Amount of the Loan, if required under Clause 5.4 (*Lenders' participation*) | U-3 11:00 a.m. | U-1 11:00 a.m. | U-3 11:00 a.m. |
| Agent notifies the Lenders of the Loan in accordance with Clause 5.4 (*Lenders' participation*) | U-3 3:00 p.m. | U-1 3:00 p.m. | U-3 3:00 p.m. |
| Agent receives a notification from a Lender under Clause 9.2 (*Unavailability of a currency*) | | U-1 5:00 p.m. | U-1 5:00 p.m. |
| Agent gives notice in accordance with Clause 9.2 (*Unavailability of a currency*) | | U 9:30 a.m. | U-2 9:30 a.m. |
| Agent determines amount of the Loan in Optional Currency in accordance with Clause 35.9 (*Change of currency*) | | U-1 11:00 a.m. | U-3 11:00 a.m. |

---

[*] [When completing the timetables, not all times should be determined by reference to the Utilisation Date. In certain cases (i.e. in relation to Clause 8.2 (*Unavailability of a Currency*) the time inserted should be determined by reference to the Quotation Day or the relevant day during the Interest Period.]

189

| | Loans in euro | Loans in Sterling | Loans in other currencies |
|---|---|---|---|
| LIBOR or EURIBOR is fixed | Quotation Day as of 11:30 a.m. (London time) in respect of LIBOR and as of 11:30 a.m. (Brussels time) in respect of EURIBOR. | Quotation Day as of 12:00 noon | Quotation Day as of 11:30 a.m. |

"U"     =   date of utilisation
"U - X"  =   X Business Days prior to date of utilisation

### PART II
### LETTERS OF CREDIT

| | |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 6.2 (*Delivery of a Utilisation Request for Letters of Credit*) | U-3<br>9:30 a.m. |
| Agent determines (in relation to a Utilisation) the Base Currency Amount of the Letter of Credit if required under paragraph (e) of Clause 6.5 (*Issue of Letters of Credit*) and notifies the Issuing Bank and Lenders of the Letter of Credit in accordance with paragraph (e) of Clause 6.5 (*Issue of Letters of Credit*). | U-3<br>11:00 a.m. |
| Delivery of duly completed Renewal Request | U-3<br>9:30 a.m. |

"U"     =   date of utilisation
"U- X"  =   Business Days prior to date of utilisation

[London #293508 v19]

Confidential

CITI-TF 00701705

A-6087

## SCHEDULE 11
### FORM OF LETTER OF CREDIT

To:    [Beneficiary] (the "**Beneficiary**")

Date [_____]

### Irrevocable Standby Letter of Credit no. [_____]

At the request of [_____], [Issuing Bank] (the "**Issuing Bank**") issues this irrevocable standby Letter of Credit ("**Letter of Credit**") in your favour on the following terms and conditions:

1.    **Definitions**
      In this Letter of Credit:

      "**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London.

      "**Demand**" means a demand for a payment under this Letter of Credit in the form of the schedule to this Letter of Credit.

      "**Expiry Date**" means [_____].

      "**Total L/C Amount**" means [_____].

2.    **Issuing Bank's agreement**

      (a)    The Beneficiary may request a drawing or drawings under this Letter of Credit by giving to the Issuing Bank a duly completed Demand. A Demand must be received by the Issuing Bank by [_____] p.m. (London time) on the Expiry Date.

      (b)    Subject to the terms of this Letter of Credit, the Issuing Bank unconditionally and irrevocably undertakes to the Beneficiary that, within [ten (10)] Business Days of receipt by it of a Demand, it must pay to the Beneficiary the amount demanded in that Demand.

      (c)    The Issuing Bank will not be obliged to make a payment under this Letter of Credit if as a result the aggregate of all payments made by it under this Letter of Credit would exceed the Total L/C Amount.

3.    **Expiry**

      (a)    The Issuing Bank will be released from its obligations under this Letter of Credit on the date (if any) notified by the Beneficiary to the Issuing Bank as the date upon which the obligations of the Issuing Bank under this Letter of Credit are released.

      (b)    Unless previously released under paragraph (a) above, on 5:00 p.m.(London time) on the Expiry Date the obligations of the Issuing Bank under this Letter of Credit will cease with no further liability on the part of the Issuing Bank except for any Demand validly presented under the Letter of Credit that remains unpaid.

      (c)    When the Issuing Bank is no longer under any further obligations under this Letter of Credit, the Beneficiary must return the original of this Letter of Credit to the Issuing Bank.

191

CITI-TF 00701706

A-6088

4.    **Payments**
All payments under this Letter of Credit shall be made in [_____] and for value on the due date to the account of the Beneficiary specified in the Demand.

5.    **Delivery of Demand**
Each Demand shall be in writing, and, unless otherwise stated, may be made by letter, fax or telex and must be received in legible form by the Issuing Bank at its address and by the particular department or office (if any) as follows:
[_____]

6.    **Assignment**
The Beneficiary's rights under this Letter of Credit may not be assigned or transferred.

7.    **UCP**
[Except to the extent it is inconsistent with the express terms of this Letter of Credit, this Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.]

8.    **Governing Law**
This Letter of Credit is governed by English law.

9.    **Jurisdiction**
The courts of England has exclusive jurisdiction to settle any dispute arising out of or in connection with this Letter of Credit.

Yours faithfully

Notes:
*      This may need to be amended depending on the currency of payment under the Letter of Credit.

[London #293508 v19]

192

Confidential

CITI-TF 00701707

**SCHEDULE**
**FORM OF DEMAND**

To:     [ISSUING BANK]

[Date]

Dears Sirs

**Standby Letter of Credit no. [_____] issued in favour of [BENEFICIARY] (the "Letter of Credit")**

We refer to the Letter of Credit. Terms defined in the Letter of Credit have the same meaning when used in this Demand.

1.    We certify that the sum of [_____] is due [and has remained unpaid for at least [_____] Business Days] [under [set out underlying contract or agreement]]. We therefore demand payment of the sum of [_____].

2.    Payment should be made to the following account:
      Name:              [_____]
      Account Number:    [_____]
      Bank:              [_____]

3.    The date of this Demand is not later than the Expiry Date.

Yours faithfully

.............................................
(Authorised Signatory)                    (Authorised Signatory)

For

[BENEFICIARY]

Confidential                                    CITI-TF 00701708

## SCHEDULE 12
### AGREED SECURITY PRINCIPLES

**1.**    **Agreed Security Principles**

(a)    The guarantees and security to be provided will be given in accordance with certain agreed security principles (the "*Agreed Security Principles*"). This Schedule addresses the manner in which the Agreed Security Principles will impact on the guarantees and security proposed to be taken in relation to the Facilities.

(b)    The Agreed Security Principles embody a recognition by all parties that there may be certain legal and practical difficulties in obtaining effective guarantees and/or security from all members of the Group in every jurisdiction in which members of the Group are located. In particular:

(i)    general statutory limitations, financial assistance, corporate benefit, fraudulent preference, "*thin capitalisation*" rules, retention of title claims and similar principles may limit the ability of a member of the Group to provide a guarantee or security or may require that the guarantee be limited by an amount or otherwise;

(ii)    a key factor in determining whether or not guarantees shall be granted or security shall be taken is the applicable cost which shall not be disproportionate to the benefit to the Finance Parties (or other beneficiary of the security) of obtaining such security;

(iii)    where there is material incremental cost involved in creating security over all assets owned by a member of the Group in a particular category (e.g., real estate) the principle stated at paragraph (b)(ii) above shall apply and, subject to the Agreed Security Principles, only the material assets in that category (e.g., material real estate) shall be subject to security;

(iv)    it is expressly acknowledged that in certain jurisdictions it may be either impossible or impractical to grant guarantees or create security over certain categories of assets in which event such guarantees will not be granted and security will not be taken over such assets;

(v)    any assets subject to third party arrangements (including shareholder agreements or joint venture agreements) which prevent those assets from being charged will be excluded from any relevant security document; *provided that* reasonable endeavours to obtain consent to charging any such assets shall be used by the Group if the Arrangers determine the relevant asset is material and the Borrower determines that such endeavours will not involve placing commercial relationships with third parties in jeopardy;

(vi)    members of the Group will not be required to give guarantees or enter into security documents if

a.    it is not within the legal capacity of the relevant members of the Group to do so;

b.    to do so would contravene any applicable legal prohibition; or

c.    if the same would conflict with the fiduciary duties of the directors of the relevant Group member and the same would have the potential to result in a risk of personal or criminal liability on the part of any such director; *provided that* the relevant member of the Group shall use reasonable endeavours to overcome any such obstacle;

(vii)    the giving of a guarantee, the granting of security or the perfection of the security granted will not be required if:

194

[London #293508 v19]

Confidential

a. it would have a material adverse effect on the ability of the relevant Obligor to conduct its operations and business in the ordinary course as otherwise permitted by the finance documents (and will not be required to the extent the grant or creation in any form would cause such material adverse effect); or

b. it would have a material adverse effect on the tax arrangements of the Group or any member of the Group; *provided, in each case, that* the relevant member of the Group shall use reasonable endeavours to overcome any such obstacle;

(viii) any subsidiary of the Parent that is a Controlled Foreign Corporation (as defined in the United States Internal Revenue Code) may not give a guarantee or pledge any of its assets (including shares in a subsidiary) as security for an obligation of a United States Person (as defined in the United States Internal Revenue Code). Furthermore, not more than 65% of the total combined voting power of all classes of shares entitled to vote of any such subsidiary may be pledged directly or indirectly as security for an obligation of a United States Person. These principles also apply with respect to any entity that becomes a United States Person and/or a Controlled Foreign Corporation following any guarantee or pledge of assets or shares. These principles also apply to any relevant provision under any other finance document (including any permitted hedging document); and

(ix) pledges over shares in Joint Ventures or the assets owned by such Joint Venture vehicles will not be required.

The *"Security Jurisdictions"* for the purposes of this Schedule shall be the United Kingdom, the United States and any other jurisdiction in which security is customarily taken for leveraged finance transactions.

2.    **Guarantors and Security**

Subject to the due execution of all relevant guarantee and security documents, completion of relevant perfection formalities within statutorily prescribed time limits, payment of all registration fees and documentary taxes, any other rights arising by operation of law, obtaining any relevant foreign legal opinions and subject to any qualifications set out in the Finance Documents and any relevant foreign legal opinions obtained and subject to the requirements of the Agreed Security Principles, it is further acknowledged that:

(a) each guarantee will be an upstream, cross-stream and downstream guarantee and each guarantee and security will be for all liabilities of the Obligors under the finance documents in accordance with, and subject to, the requirements of the Agreed Security Principles in each relevant jurisdiction;

(b) where an Obligor pledges shares, the security document will (subject to agreed exceptions) be governed by the law of the company whose shares are being pledged and not by the law of the country of the pledgor;

(c) the Security Agent shall:

(i) (in the case of those security documents creating pledges or charges over shares in a company or other entity) obtain a first priority valid charge or analogous or equivalent encumbrance over all of the shares in issue at any time in that company or other entity to which such security document relates and which are owned by a member of the Group;

(ii) subject to the intercreditor agreement, be able to enforce such security as is created by way of a security document without any restraint from (x) the constitutional

Confidential

CITI-TF 00701710

documents of the relevant pledgor or chargor, (y) any company or entity which is or whose assets are the subject of such security document or (z) any shareholders of the foregoing not being party to the relevant security document;

(iii)  not require that any *ad valorem* registration taxes be payable by the Group upon the creation or perfection of any security; and

(iv)  not require that any costs, fee, taxes or other amounts payable in connection with any re-taking, novation or re-registration of any security in connection with an assignment or transfer by any Lender be for the account of the Group; and

(d)  any company that is or becomes a Material Subsidiary and that is incorporated in a Security Jurisdiction, but subject to the Agreed Security Principles, shall grant a guarantee and create security in accordance with the Agreed Security Principles as soon as reasonably practical after it has been demonstrated (by reference to financial statements) that such subsidiary constitutes a Material Subsidiary, and in any event within 60 days after it being so demonstrated.

The Finance Parties acknowledge and agree that, notwithstanding Clause 2(a) above, due to applicable corporate benefit and financial assistance restrictions, each guarantee and security given by an Obligor incorporated in the United States, the United Kingdom and any other relevant jurisdiction in which security is taken shall be limited as provided for in the Finance Documents.

3.  **Terms of Security Documents**

The following principles will be reflected in the terms of any security taken as part of this transaction:

(a)  security will not be enforceable until an Event of Default has occurred and notice of such Event of Default has been given by the relevant Agent and notice of acceleration has been given or deemed given under the applicable Finance Documents (and for the purposes of this Term Sheet "*acceleration*" means any requirement for immediate repayment of the Facilities);

(b)  notification of pledges over bank accounts will be given to the bank holding the account; *provided that* this is not inconsistent with the Group retaining control over the balance and operation of the account;

(c)  notification of receivables security to debtors will only be given if an Event of Default has occurred and notice of such Event of Default has been given by the relevant Agent and notice of acceleration has been given or deemed given under the applicable Finance Documents, other than where such notification is necessary under applicable laws to create a security interest over the relevant receivables;

(d)  notification of any security interest over insurance policies, rights under Acquisition Documents, intra-Group receivables and material contracts will be given at time security is taken will be served on any insurer of the Group assets (other than in respect of any run-off insurance policy maintained by the vendor), counterparty to the Acquisition Documents, intra-Group receivables and material contracts (unless otherwise agreed by the Agents);

(e)  the security documents will only operate to create security rather than to impose new commercial obligations. Accordingly, they should not contain additional representation or undertakings (such as in respect of insurance, information or the payment of costs) unless these are the same as or consistent with those contained in the Senior Facilities Agreement

[London #293508 v19]

Confidential

CITI-TF 00701711

and the Mezzanine Facility Agreement or are required for the creation, maintenance or perfection of the security;

(f)    in respect of the share pledges, until an Event of Default has occurred and notice of acceleration has been given, the pledgor will be permitted to retain and to exercise voting rights to any shares pledged by them in a manner which does not adversely affect the validity or enforceability of the security or cause an Event of Default to occur and the pledgors should be permitted to pay dividends upstream on pledged shares to the extent permitted under the Facilities Agreements with the proceeds to be available to the Parent and its subsidiaries;

(g)    the Finance Parties should only be able to exercise any power of attorney granted to them under the security documents following an Event of Default in respect of which notice of enforcement has been given by the relevant Agent following failure to comply with a further assurance or perfection obligation or in order to remedy a breach of covenant by the relevant Obligor in the relevant security document after the relevant Agent has given notice of such failure to the relevant Obligor; and

(h)    the security documents should not operate so as to prevent any transactions which are permitted under the Finance Documents, including without limitation, any disposals of assets where such disposal is permitted under the Finance Documents.

197

CITI-TF 00701712

A-6094

**SCHEDULE 13**
**TRANSACTION SECURITY**

| PARTY | DESCRIPTION OF SECURITY |
|---|---|
| Holdco | First ranking pledge of the shares in the Parent. |
| Parent | First ranking security over all its assets and undertaking (including the shares in the Company). |
| The Company | First ranking security over all its assets and undertaking (including the shares in the Target). |

[London #293508 v19]

198

Confidential

CITI-TF 00701713

### SCHEDULE 14
### ADDITIONAL ACQUISITION FACILITY COMMITMENT NOTICE

**Additional Acquisition Facility Commitment Notice number: [1/2/3 ...]**

To: The Agent

From: The Company

Dated: [_____]

Dear Sirs,

**MALTBY LIMITED – £1,175,000,000 Senior Facilities Agreement
dated [_____] (the "Facilities Agreement")**

1. We refer to the Facilities Agreement.

2. We have agreed with the following institutions that they commit Additional Acquisition Facility Commitments as follows:

| Name of Institution | Existing Lenders (yes/no) | Additional Acquisition Facility Commitment (€) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  | TOTAL: |  |

3. The date on which the Additional Acquisition Facility Commitments referred to above are confirmed is [DATE].

4. The Borrowers and amounts are:

   [●]                    £[●]

5. The Margin applicable shall be as follows (at the date of this Notice):

   [●] % p.a.

[insert ratchet provisions if applicable or confirm that Clause 15.5 (*Adjustment of Margin*) applies unchanged]

[insert commitment fees applicable]

Terms defined in the Facilities Agreement have the same meaning when used in this Additional Acquisition Facility Commitment Notice.

.......................................
[Authorised Signatory]
For and on behalf of Company

Confidential

CITI-TF 00701714

A-6096

Countersigned by:

..................................
[Authorised Signatory]
[Name of Lender]

..................................

[Name of bank/financial institution]

[London #293508 v19]

200

Confidential

CITI-TF 00701715

## SCHEDULE 15

### PERFECTION REQUIREMENTS

In respect of each Transaction Security Document entered into by a company incorporated in England and Wales, delivery of a completed Form 395 along with the relevant Transaction Security Document and the prescribed particulars (as defined in the Act) to Companies House within 21 days after the execution of such Transaction Security Document.

201

CITI-TF 00701716

SIGNATURES

THE PARENT

MALTBY INVESTMENTS LIMITED
By:

Address:
Fax:
Attention:


THE COMPANY

MALTBY LIMITED
By:

Address:
Fax:
Attention:

[London 4300381 v1]

1

CITI-TF 00701717

**THE ARRANGER**

**CITIGROUP GLOBAL MARKETS LIMITED**

By:

Address:
Fax:
Attention:

**THE AGENT**

**CITIBANK INTERNATIONAL PLC**

By:

Address:
Fax:
Email:
Attention:

**THE SECURITY AGENT**

**CITIBANK, N.A., LONDON BRANCH**

By:
Address:
Fax:                    Carl Hardie
Email:                  Vice President
Attention:

**THE ISSUING BANK**

**CITIBANK, N.A., LONDON BRANCH**
By:
Address:
Fax:
Email:
Attention:

**THE ORIGINAL LENDER**

**CITIBANK, N.A., LONDON BRANCH**
By:
Address:
Fax:
Email:
Attention:

Confidential

CITI-TF 00701718

**THE ARRANGER**

**CITIGROUP GLOBAL MARKETS LIMITED**

By:

Address:
Fax:
Attention:

**THE AGENT**

**CITIBANK INTERNATIONAL PLC**

By:

Address:
Fax:
Email:
Attention:

**THE SECURITY AGENT**

**CITIBANK, N.A., LONDON BRANCH**

By:
Address:
Fax:
Email:
Attention:

**THE ISSUING BANK**

**CITIBANK, N.A., LONDON BRANCH**
By:
Address:
Fax:
Email:
Attention:

**THE ORIGINAL LENDER**

**CITIBANK, N.A., LONDON BRANCH**
By:
Address:
Fax:
Email:
Attention:

CITI-TF 00701719

£1,410,000,000

**SECURITISATION BRIDGE FACILITY AGREEMENT**
dated 13 August 2007

for MALTBY LIMITED
as the Company

with

CITIBANK INTERNATIONAL PLC
acting as Agent

and

CITIBANK, N.A., LONDON BRANCH
acting as Security Agent

arranged by

CITIGROUP GLOBAL MARKETS LIMITED
as Mandated Lead Arranger

[London #294447 v13]

Confidential

CITI-TF 00701720

## TABLE OF CONTENTS

Page

1.   DEFINITIONS AND INTERPRETATION ........................................................ 1
2.   THE FACILITY ........................................................................................ 46
3.   PURPOSE .............................................................................................. 47
4.   CONDITIONS OF UTILISATION ............................................................. 48
5.   UTILISATION OF LOANS ....................................................................... 50
6.   EXTENSION OF THE FINAL MATURITY DATE ....................................... 51
7.   OPTIONAL CURRENCIES ....................................................................... 52
8.   REPAYMENT ......................................................................................... 53
9.   ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION ............. 53
10.  MANDATORY PREPAYMENT ................................................................. 54
11.  RESTRICTIONS ..................................................................................... 66
12.  INTEREST ............................................................................................ 67
13.  INTEREST PERIODS .............................................................................. 67
14.  CHANGES TO THE CALCULATION OF INTEREST ................................... 68
15.  FEES .................................................................................................... 69
16.  TAX GROSS UP AND INDEMNITIES ...................................................... 71
17.  INCREASED COSTS ............................................................................... 74
18.  MITIGATION ........................................................................................ 75
19.  OTHER INDEMNITIES ........................................................................... 76
20.  COSTS AND EXPENSES ......................................................................... 78
21.  GUARANTEE ......................................................................................... 80
22.  REPRESENTATIONS ............................................................................... 84
23.  INFORMATION UNDERTAKINGS ........................................................... 88
24.  FINANCIAL COVENANTS ....................................................................... 93
25.  GENERAL UNDERTAKINGS .................................................................. 101
26.  EVENTS OF DEFAULT .......................................................................... 120
27.  CHANGES TO THE LENDERS ................................................................ 124
28.  CHANGES TO THE OBLIGORS ............................................................... 129
29.  ROLE OF THE AGENT, THE ARRANGER AND OTHERS ........................... 132
30.  CONDUCT OF BUSINESS BY THE FINANCE PARTIES ............................. 136
31.  SHARING AMONG THE FINANCE PARTIES ............................................ 137
32.  PAYMENT MECHANICS ........................................................................ 139
33.  SET-OFF .............................................................................................. 141
34.  NOTICES .............................................................................................. 141
35.  CALCULATIONS AND CERTIFICATES .................................................... 142

[London #294447 v13]

i

**TABLE OF CONTENTS**
(continued)

                                                                                    Page

36.     PARTIAL INVALIDITY ................................................................143
37.     REMEDIES AND WAIVERS ...........................................................143
38.     AMENDMENTS AND WAIVERS ......................................................143
39.     GOVERNING LAW .....................................................................147
40.     ENFORCEMENT .........................................................................147
41.     COUNTERPARTS .......................................................................147
SCHEDULE 1 THE ORIGINAL PARTIES ..................................................148
SCHEDULE 2 CONDITIONS PRECEDENT ................................................149
SCHEDULE 3 REQUESTS ......................................................................153
SCHEDULE 4 MANDATORY COST FORMULAE ........................................155
SCHEDULE 5 FORM OF TRANSFER AGREEMENT .....................................158
SCHEDULE 6 FORM OF ACCESSION LETTER ..........................................160
SCHEDULE 7 FORM OF RESIGNATION LETTER .......................................161
SCHEDULE 8 FORM OF COMPLIANCE CERTIFICATE ...............................162
SCHEDULE 9 LMA FORM OF CONFIDENTIALITY UNDERTAKING ...............163
SCHEDULE 10 TIMETABLES ..................................................................167
SCHEDULE 11 AGREED SECURITY PRINCIPLES ......................................169
SCHEDULE 12 TRANSACTION SECURITY ...............................................173
SCHEDULE 13 PERFECTION REQUIREMENTS ..........................................174

[London #294447 v13]

ii

Confidential

CITI-TF 00701722

A-6104

THIS AGREEMENT is dated 13 August 2007 and made between:

(1)    **MALTBY LIMITED**, a company registered in England and Wales with company registration number 6226803 and registered office at One South Place, London EC2M 2WG (the "**Company**");

(2)    **MALTBY INVESTMENTS LIMITED**, a company incorporated in England and Wales with company registration number 6226775 and registered office at One South Place, London EC2M 2WG (the "**Parent**");

(3)    **CITIGROUP GLOBAL MARKETS LIMITED** as mandated lead arranger (the "**Arranger**");

(4)    **THE FINANCIAL INSTITUTIONS** listed in Part II of Schedule 1 (*The Original Parties*) as lenders (the "**Original Lenders**");

(5)    **CITIBANK INTERNATIONAL PLC** as agent of the Lenders (the "**Agent**"); and

(6)    **CITIBANK, N.A., LONDON BRANCH** as security agent for the Secured Parties (the "**Security Agent**").

IT IS AGREED as follows:

**SECTION 1**
**INTERPRETATION-**

**1.    DEFINITIONS AND INTERPRETATION**

**1.1    Definitions**
In this Agreement:

"**A&R Arrangement**" means any arrangement (including by way of Joint Venture) with an artist and repertoire executive entered into in the ordinary course of the Group's music business and consistent with past practices.

"**Acceptable Bank**" means:

(a)    a bank or financial institution which has a rating for its long-term unsecured and non credit-enhanced debt obligations of A+ or higher by S&P or Fitch or A1 or higher by Moody's or a comparable rating from an internationally recognised credit rating agency; or

(b)    any other bank or financial institution approved by the Agent.

"**Accession Letter**" means a document substantially in the form set out in Schedule 6 (*Form of Accession Letter*) or such other form as may be agreed between the Agent and the Company.

"**Accounting Principles**" means accounting principles, policies, standards and practices which are generally accepted in the United Kingdom as at the Closing Date and approved or adopted by the Accounting Standards Board including IFRS.

"**Accounting Reference Date**" means 31 March.

"**Accounting Reference Period**" means each 12-month period ending on an Accounting Reference Date.

Confidential

**A-6105**

"**Acquisition**" means the acquisition by the Company of the entire issued share capital of the Target which, if such acquisition is contemplated by way of a Scheme will involve, the cancellation of the Target Shares and the issue of the New Shares.

"**Acquisition Costs**" means all fees, costs and expenses, stamp, registration and other Taxes incurred (or required to be paid) by the Company or any other member of the Group in connection with the Acquisition or the Transaction Documents.

"**Acquisition Documents**" means the Scheme Documents or the Offer Documents, as the case may be.

"**Acquisition Facility**" has the meaning given to it in the Senior Facilities Agreement.

"**Acquisition Facility Commitment**" has the meaning given to it in the Senior Facilities Agreement.

"**Acquisition Facility Loan**" has the meaning given to it in the Senior Facilities Agreement.

"**Act**" means the Companies Act 1985, as amended.

"**Additional Acquisition Facility Commitment**" has the meaning given to it in the Senior Facilities Agreement.

"**Additional Acquisition Funding**" has the meaning given to it in the Senior Facilities Agreement.

"**Additional Assets**" means:

(a)     any property or assets used or to be used by any member of the Group or otherwise useful in a Related Business;

(b)     the Capital Stock of a person that is engaged in a Related Business and becomes a member of the Group as a result of the acquisition of such Capital Stock by another member of the Group; or

(c)     Capital Stock constituting a minority interest in any person that at such time is a member of the Group.

"**Additional Borrower**" means each person who becomes a Borrower in accordance with Clause 28.2 (*Additional Borrowers*).

"**Additional Cost Rate**" has the meaning given to it in Schedule 4 (*Mandatory Cost Formulae*).

"**Additional Guarantor**" means a person which becomes a Guarantor in accordance with Clause 28.4 (*Additional Guarantors*).

"**Additional Obligor**" means an Additional Borrower or an Additional Guarantor.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Agent's Spot Rate of Exchange**" means the Agent's spot rate of exchange (as certified by the Agent to the Company at the relevant time) for the purchase of the relevant currency with the Base Currency in the London foreign exchange market at or about 11:00 a.m. on a particular day or such other rate as the Agent shall reasonably determine and agree with the Obligors' Agent.

Confidential

CITI-TF 00701724

A-6106

"**Agreed Security Principles**" means the principles set out in Schedule 11 (*Agreed Security Principles*).

"**Ancillary Commitment**" has the meaning given to it in the Senior Facilities Agreement.

"**Ancillary Outstandings**" has the meaning given to it in the Senior Facilities Agreement.

"**Auditors**" means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche (or their Affiliates) or such other firm approved in advance by the Majority Lenders (such approval not to be unreasonably withheld or delayed).

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the Signing Date to and including the earlier of:

(a)     the last day of the Certain Funds Period; and

(b)     the date on which the Offer lapses or is withdrawn or, if the Acquisition is intended to be completed as a Scheme, the date on which the Scheme lapses or is withdrawn.

"**Available Commitment**" means a Lender's Commitment under the Facility minus:

(a)     the Base Currency Amount of its participation in any outstanding Utilisations under the Facility; and

(b)     in relation to any proposed Utilisation, the Base Currency Amount of its participation in any other Utilisations that are due to be made under the Facility on or before the proposed Utilisation Date.

"**Available Facility**" means the aggregate for the time being of each Lender's Available Commitment.

"**Average Life**" means, as of the date of determination, with respect to any Financial Indebtedness, the quotient obtained by dividing (x) the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Financial Indebtedness multiplied by the amount of such payment by (y) the sum of all such payments.

"**Base Case Model**" means the section of the financial model delivered to the Arranger on or before the Closing Date and described as the 'bank case model', including profit and loss and cashflow projections in agreed form relating to the Group (for these purposes assuming completion of the Acquisition).

"**Base Currency**" means Sterling.

"**Base Currency Amount**" means, in relation to a Utilisation, the amount specified in the Utilisation Request delivered by or on behalf of a Borrower for that Utilisation (or, if the amount requested is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Spot Rate of Exchange on the date which is three (3) Business Days before the Utilisation Date or, if later, on the date the Agent receives the Utilisation Request in accordance with the terms of this Agreement).

3

"Basel II Costs" has the meaning given to it in paragraph (b)(iv) of Clause 17.1 (*Increased Costs*).

"Borrower" means the Original Borrower or an Additional Borrower.

"Break Costs" means the amount (if any) by which:

(a)     the interest (excluding the Margin and the Mandatory Costs) which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"Budget" means:

(a)     in relation to the period from the Signing Date to 31 March 2008, the Base Case Model to be delivered to the Agent pursuant to Clause 4.1 (*Initial conditions precedent*); and

(b)     in relation to any other period, any budget delivered by the Parent to the Agent in respect of that period pursuant to Clause 23.4 (*Budget*).

"Business Day" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and:

(a)     (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; or

(b)     (in relation to any date for payment or purchase of euro) any TARGET Day.

"Business Separation" means the legal, contractual and operational separation of the Music Publishing Division from the rest of the business carried on by the Group in order to achieve the Permitted Securitisation within the time period contemplated in this Agreement.

"Capital Lease Obligation" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with the Accounting Principles. The amount of Financial Indebtedness represented by such obligation shall be the capitalised amount of such obligation determined in accordance with the Accounting Principles and the maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Capital Stock" of any person means any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

[London #294447 v13]

Confidential

CITI-TF 00701726

A-6108

**"Cash Equivalent Investments"** means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank;

(b)     any investment in marketable debt obligations issued or guaranteed by the government of the United States, the United Kingdom, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

(i)      for which a recognised trading market exists;

(ii)     issued by an issuer incorporated in the United States, the United Kingdom, any member state of the European Economic Area or any Participating Member State;

(iii)    which matures within one year after the relevant date of calculation; and

(iv)     which has a credit rating of either A-1 or higher by S&P or Fitch or P-1 or higher by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d)     any investment accessible within 30 days in money market funds which (i) have a credit rating of either A-1 or higher by S&P or Fitch or P-1 or higher by Moody's and (ii) invest substantially all their assets in securities of the types described in sub-paragraphs (a) to (c) above; or

(e)     any other debt security approved by the Majority Lenders,

in each case, to which any member of the Group is beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than one arising under the Transaction Security Documents).

**"Centre of Main Interests"** means the "centre of main interests" for the purposes of Council Regulation (EC) No. 1346/2000 of 29 May 2000.

**"Certain Funds Period"** means the period from and including the Signing Date to and including the earlier of:

(a)     the date falling 270 days after the date of the Commitment Letter;

(b)     the date falling 15 days after the Closing Date;

(c)     if the Acquisition proceeds by way of an Offer, the date on which the Offer lapses or is withdrawn; and

(d)     if the Acquisition proceeds by way of the Scheme, the date on which the Scheme lapses, is withdrawn or is rejected by the court.

**"Change of Control"** has the meaning given to it in Clause 10.1 (*Change of Control*).

5

CITI-TF 00701727

"**Charged Property**" means all of the assets of the Obligors over which from time to time Security is, or is expressed to be, created pursuant to any Transaction Security Document.

"**Clean-Up Date**" means the date falling 120 days after the Unconditional Date.

"**Clean-Up Period**" means the period commencing on the Unconditional Date and ending on the Clean-Up Date.

"**Closing Date**" means:

(a)     (in the case of the Scheme) the date falling no later than 14 days from the Effective Date, being the date upon which the consideration for the Acquisition is to be paid; or

(b)     (in the case of an Offer) the date on which the Company has paid for the shares of the Target tendered as at the Unconditional Date and, as a consequence, the Target becomes a subsidiary of the Company.

"**Commitment**" means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Commitment Letter**" means the commitment letter dated 21 May 2007 from the Arranger to the Company relating to the Facility (as amended, supplemented or restated from time to time).

"**Compliance Certificate**" means a certificate substantially in the form set out in Schedule 8 (*Form of Compliance Certificate*) or such other form as may be agreed between the Agent and the Company.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in the form set out in Schedule 9 (*LMA Form of Confidentiality Undertaking*) or in a recommended form of the LMA from time to time or in any other form agreed between the Company and the Agent.

"**Consolidated Cash and Cash Equivalents**" has a meaning given to it in Clause 24.1 (*Financial definitions*).

"**Consolidated Incurrence EBITDA**" for any period, means the sum of Consolidated Profit for that period, plus the following (to the extent deducted in calculating such Consolidated Profit), without duplication:

(a)     all income or corporate tax expense of the Group;

(b)     Consolidated Interest Expense plus any capitalised expense and any non-cash interest (including interest on Shareholder Debt);

(c)     depreciation and amortisation expense of the Group;

(d)     the amount of any minority interest expense deducted in calculating Consolidated Profit;

6

(e)      Management Fees;

(f)      unrealized non-cash gains (losses) resulting from foreign currency balance sheet adjustments and unrealized gains (losses) relating to interest rate Treasury Transactions in each case required by the Accounting Principles;

(g)      all other non-cash charges of the Group (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period);

(h)      Acquisition Costs and any fees, expenses, charges or other costs relating to equity or debt financings, investments or other acquisitions (including amounts paid in connection with the acquisition or retention of one or more individuals comprising part of the management team retained to manage the acquired business, provided that such payments are made at the time of such acquisition and are consistent with the customary practice in the industry at the time of such acquisition), whether or not successful, or the non-cash amortisation thereof; and

(i)      any non-recurring redundancy and restructuring charge not otherwise included in the preceding clauses (g) and (h),

in each case for such period. Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation, amortisation, exchange gains and losses and non-cash charges and restructuring charge of, a member of the Group shall be added to Consolidated Profit to compute Consolidated Incurrence EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net profit or loss of such member of the Group was included in calculating Consolidated Profit.

"**Consolidated Interest Expense**" means, for any period, the total interest expense of the Group for such period, plus, to the extent not included in such total interest expense, and to the extent incurred by a member of the Group, without duplication:

(a)      interest expense attributable to Capital Lease Obligations;

(b)      amortisation of debt discount;

(c)      capitalised interest (but excluding such interest on Shareholder Debt);

(d)      non-cash interest expense (but excluding such interest in relation to Shareholder Debt);

(e)      commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(f)      net payments pursuant to Treasury Transactions but excluding realized and unrealized foreign exchange gains and losses with respect to Treasury Transactions and unrealized gains and losses associated with interest rate Treasury Transactions in each case in accordance with the Accounting Principles;

(g)      dividends accrued in respect of Disqualified Stock of the Parent or in respect of Preferred Stock of any member of the Group, in either case held by persons other than a member of the Group (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Parent); and

7

CITI-TF 00701729

(h)     interest accruing on any Financial Indebtedness of any other person to the extent such Financial Indebtedness is guaranteed by (or secured by the assets of) a member of the Group.

"**Consolidated Leverage Debt**" means the sum of the aggregate outstanding Financial Indebtedness of the Group (other than under the Revolving Facility) as of the relevant date of calculation on a consolidated basis in accordance with the Accounting Principles.

"**Consolidated Operating Cashflow**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Consolidated Profit**" means for any period, the profit (loss) from continuing operations of the Group on a consolidated basis for such period; provided, however, that there shall not be included in such Consolidated Profit:

(a)     any net profit (or loss) of any person (other than the Parent) if such person is not a Subsidiary, except that subject to the exclusion contained in paragraph (c) below, the Parent's equity in the net profit of any such person for such period shall be included in such Consolidated Profit up to the aggregate amount of cash or Cash Equivalent Investments actually distributed by such person during such period to the Parent or a member of the Group. as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a member of the Group, to the limitations contained in paragraph (b) below);

(b)     any net profit (or loss) of any member of the Group (other than a member of the Group which has granted an unconditional unlimited guarantee of the obligations of the other Obligors under the Finance Documents) to the extent the declaration or payment of dividends or making of distributions to the Parent by that member of the Group of its net profit is not at the date of determination permitted, directly or indirectly by any restriction or encumbrance, unless such restriction or encumbrance constitutes a Permitted Restriction; provided, however, that:

(i)      Consolidated Profit of the relevant member of the Group for any relevant period shall be increased by the amount of dividends, distributions or other payments (other than extensions of credit) actually paid in cash or Cash Equivalent Investments (or converted during such period into cash or Cash Equivalent Investments) to such member of the Group or (subject to the limitations of this paragraph (b))) a Subsidiary of such member of the Group; and

(ii)     the Parent's equity in a net loss of any such member of the Group for such period shall be included in determining such Consolidated Profit;

(iii)    any net after-tax gain (or loss) realized upon (A) the sale or other disposition of any assets of the Issuer, its consolidated Subsidiaries or any other Person (including pursuant to any sale-and-leaseback arrangement) which is not sold or otherwise disposed of in the ordinary course of business or (B) the sale or other disposition of any Capital Stock of any Person;

(c)     the non-cash impact of capitalised interest on Shareholder Debt;

(d)     any net after-tax extraordinary gain or loss;

(e)     any non-cash compensation expense realized for grants of performance shares, stock options, restricted stock or other rights to officers, directors and employees of a member

Confidential

of the Group, provided that such shares, options, stock or other rights can be redeemed at the option of the holder only for shares of the Parent (other than Disqualified Stock);

(f)     the cumulative effect of any change in Accounting Principles after the Signing Date;

(g)     any net after tax gains (loss) from any write-off or forgiveness of Financial Indebtedness;

(h)     the net profit of any person acquired in a pooling of interests transaction shall not be included for any period prior to the date of such acquisition; and

(i)     the effect of any non-cash items resulting from:

(i)     any amortisation, write-up, write-down or write-off of assets (including deferred financing costs) in connection with any past or future acquisition, merger, consolidation or similar transaction; or

(ii)    any unusual, exceptional or non-recurring gains, losses or charges.

"**Constitutional Documents**" means the memorandum and articles of association of the Company, the Parent and Holdco together with the certificate of incorporation of the Company, the Parent and Holdco and certificates on change of name (if any) of the Company, the Parent and Holdco.

"**Court Order**" means an order of the High Court of Justice in England and Wales sanctioning the Scheme under Section 425 of the Act.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 26 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default save and except that, if by reason of the express provisions of any Finance Document, a matter, circumstance or thing would not be an Event of Default unless a materiality threshold is exceeded then the occurrence of any such matter, circumstance or thing shall not be a Default unless and until that materiality threshold is exceeded.

"**Deferred Purchase Price of a Permitted Investment**" means in respect of a Permitted Investment, the portion of the purchase price the payment of which is deferred pursuant to the terms of the acquisition documentation in the form of a contractual adjustment to the purchase price the amount of which is not certain at the time of completion of such Permitted Investment. For the avoidance of doubt a Deferred Purchase Price of a Permitted Investment shall exclude any deferral of all or part of the purchase price in the nature of a loan from the seller or as a method of raising finance or of financing all or part of the purchase price with the exception of a deferral not exceeding fifteen (15) Business Days between the date on which the amount of a Deferred Purchase Price of a Permitted Investment becomes certain and the date on which it is actually paid.

"**Delegate**" means any delegate, agent or attorney appointed by the Security Agent.

"**Disinterested Director**" means, with respect to any transaction or series of related transactions, a member of the relevant company's board of directors who does not have any material direct or indirect financial interest in or with respect to such transaction or series of related transactions or is not an Affiliate, or an officer, director or employee of any person who has any direct or indirect financial interest in or with respect to such transaction or series of related transactions.

Confidential

CITI-TF 00701731

**"Disqualified Stock"** means, with respect to any person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(a)     matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable at the option of the holder for Financial Indebtedness or Disqualified Stock; or

(c)     is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part,

in each case on or prior to the first anniversary of the Final Maturity Date provided that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the first anniversary of the Final Maturity Date shall not constitute Disqualified Stock if:

(i)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favourable to the holders of such Capital Stock than the terms of the Finance Documents; and

(ii)    any such requirement only becomes operative after compliance with the terms of the Finance Documents.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to this Agreement provided that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such person.

**"Documentary Conditions"** means the documents listed paragraphs 1, 2(a) to (d) (inclusive), 3 and 4(a) to (e) (inclusive) in Part I of Schedule 2 (Conditions Precedent).

**"Effective Date"** means the date on which the Court Order (or an office copy of the Court Order) is filed with the Registrar of Companies, as required by Section 425 of the Act.

**"Environmental Claim"** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

**"Environmental Law"** means any applicable law or regulation which relates to:

(a)     the pollution or protection of the environment;

(b)     harm to or the protection of human health;

(c)     the conditions of the workplace relating to health and safety; or

(d)     any emission or substance capable of causing harm to any living organism or the environment.

[London #294447 v13]

10

"**Environmental Permits**" means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Target Group conducted on or from the properties owned or used by any member of the Target Group.

"**Equity Interests**" of any person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interest in (however designated) the equity of such person, including any Preferred Stock, any limited or general partnership interest and any limited liability company membership interest, and including (other than for the purposes of the definition of 'Financial Indebtedness' and any other definitions in this Clause 1.1 or in Clause 24.1 (*Financial definitions*)), any non-cash interest bearing debt securities (but, for the avoidance of doubt excluding any cash interest bearing debt securities convertible into such equity).

"**EURIBOR**" means, in relation to any Loan in euro:

(a)    the applicable Screen Rate; or

(b)    (if no Screen Rate is available for the Interest Period of that Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request quoted by the Reference Banks to leading banks in the European interbank market,

as of the Specified Time on the Quotation Day for the offering of deposits in euro for a period comparable to the Interest Period of the relevant Loan.

"**Event of Default**" means any event or circumstance specified as such in Clause 26 (*Events of Default*).

"**Excess Cashflow**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Excess Takeout Proceeds**" has the meaning given to that term in Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*).

"**Excluded Proceeds**" has the meaning given to that term in Clause 10.4 (*Excluded Proceeds and Excess Takeout Proceeds*).

"**Excluded Subsidiary**" means:

(a)    a Subsidiary of the Parent which:

    (i)    does not carry on any Music Publishing Business;

    (ii)    does not own (or have any other interest in) any business or assets (other than shares in another Subsidiary) which are used by the Music Publishing Division for the purposes of carrying on Music Publishing Business; and

    (iii)    owes no obligations to, nor has any rights against, any Subsidiary of the Parent which carries on any Music Publishing Business;

(b)    EMI Music Brasil Ltda;

(c)    EMI Group Hong Kong Ltd; and

(d)    EMI Industries (Pty) Ltd.

Confidential                                                    CITI-TF 00701733

"**Existing Financial Indebtedness**" means the Financial Indebtedness of the Target Group which is existing on the Unconditional Date or, as the case may be, on the Effective Date.

"**Extension Date**" means the first anniversary of the first Financial Quarter Ending Date to occur after the Closing Date.

"**Facility**" means the term loan facility made available under this Agreement as described in Clause 2.1 (*The Facility*).

"**Facility Office**" means the office notified by a Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five (5) Business Days' written notice) as the office through which it will perform its obligations under this Agreement.

"**Fee Letter**" means any letter or letters (as the same may be amended from time to time) between, as the case may be, the Arranger and the Company or the Agent and the Company, setting out any of the fees referred to in Clause 15 (*Fees*) or any other fees payable by the Company in connection with the Facility and/or this Agreement.

"**Final Maturity Date**" means:

(a)     the first anniversary of the first Financial Quarter Ending Date to occur after the Closing Date; or

(b)     if the Loans are not extended in accordance with Clause 6 (*Extension of the Final Maturity Date*) on the date referred to in paragraph (a) above, the eighth anniversary of the first Financial Quarter Ending Date to occur after the Closing Date.

"**Finance Document**" means:

(a)     this Agreement;

(b)     any Accession Letter;

(c)     the Commitment Letter;

(d)     any Fee Letter;

(e)     any Hedging Agreement;

(f)     the Intercreditor Agreement;

(g)     any Resignation Letter;

(h)     any Transaction Security Document; and

(i)     any other document designated as a "Finance Document" by the Agent and the Company.

"**Finance Party**" means the Agent, the Arranger, the Security Agent, a Lender or a Hedge Counterparty.

"**Financial Indebtedness**" means, with respect to any person on any date of determination (without duplication):

12

Confidential

CITI-TF 00701734

(a)     the principal in respect of:

  (i)     indebtedness of such person for money borrowed; and

  (ii)    indebtedness evidenced by notes, debentures, bonds (other than performance bonds issued by a member of the Group in relation to the obligations of another member of the Group) or other similar instruments for the payment of which such person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)     all Capital Lease Obligations of such person;

(c)     all obligations of such person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such person and all obligations of such person under any title retention agreement, in each case that are due more than 12-months after the date on which such property is acquired (but excluding trade accounts payable arising in the ordinary course of business);

(d)     all obligations of such person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in paragraphs (a) to (c) above) entered into in the ordinary course of business of such person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

(e)     the amount of all obligations of such person with respect to the redemption, repayment, liquidation or other repurchase of any Disqualified Stock of such person or, with respect to any Subsidiary of such person, any Preferred Stock or if less (or if such Capital Stock has no fixed price), to the involuntary redemption, repayment or other purchase price thereof calculated in accordance with the terms of such Capital Stock if such Capital Stock were redeemed, repaid or repurchased on such date of determination, or if determined by the value of such Capital Stock, the fair market value of such Capital Stock as determined in good faith by the Board of Directors (but in each case, excluding accrual of dividends);

(f)     all obligations of the type referred to in paragraphs (a) to (e) above of other persons and all dividends of other persons for the payment of which, in either case, such person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise;

(g)     all obligations of the type referred to in paragraphs (a) to (f) above of other persons secured by any Security on any property or asset of such person (whether or not such obligation is assumed by such person), the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured;

(h)     to the extent not otherwise included in this definition, Treasury Transactions of such person (the amount of any such Financial Indebtedness to be equal at any time to the notional amount of such Treasury Transactions); and

(i)     any liability of any member of the Group to the trustees of any pension fund to the extent such obligations are secured by any Security on any property or asset of such person, the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured,

Confidential

CITI-TF 00701735

if and to the extent that any of the foregoing Financial Indebtedness (other than the Financial Indebtedness described in paragraphs (b), (d), (f), (h) or (i) or to the extent relating to any such clause) would appear as a liability on the balance sheet (excluding footnotes thereto) of the relevant person prepared in accordance with the Accounting Principles.

Notwithstanding the foregoing the term "Financial Indebtedness" will exclude contingent obligations incurred in the ordinary course of business. In addition, in connection with the purchase by a member of the Group of any business, the term "Financial Indebtedness" will exclude post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing provided that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 90 days thereafter.

The amount of Financial Indebtedness of any person at any date shall be the outstanding balance at such date of all unconditional obligations as described above provided that in the case of Financial Indebtedness sold at a discount, the amount of such Financial Indebtedness at any time will be the accreted value thereof at such time.

"**Financial Quarter**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Financial Quarter Ending Date** " means each of 31 March, 30 June, 30 September and 31 December in each year.

"**Financial Year**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**First Utilisation Date**" means the date on which the first Utilisation is made under this Agreement.

"**Fitch**" means Fitch Ratings Ltd, or any successor to its rating business.

"**Funds Flow Statement**" means a funds flow statement detailing the proposed movement of funds on the Closing Date in agreed form.

"**Group**" means the Parent and its Subsidiaries from time to time including, for the avoidance of doubt, the Target and its Subsidiaries from the Effective Date or the Unconditional Date, as the case may be, but following the Separation Date, only the Parent and members of the Group which are in the Music Publishing Division shall be included in the definition of "Group".

"**Group Business**" means the business carried on by the Group as at the Closing Date.

"**Group Structure Chart**" means the group structure chart delivered to the Agent on or before the Closing Date.

"**Guarantor**" means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 28.5 (*Resignation of a Guarantor*).

"**Hedge Counterparty**" means a provider of hedging arrangements which has entered into those arrangements in accordance with this Agreement and which has become a party to the Intercreditor Agreement as a Hedge Counterparty in accordance with the provisions of the Intercreditor Agreement. For the avoidance of doubt this expression includes any person who was, at the time of entry into those hedging arrangements, but is no longer, a Lender or an Affiliate of a Lender.

[London #294447 v13]

Confidential

CITI-TF 00701736

**"Hedging Agreement"** means any master agreement, confirmation, schedule or other agreement in the agreed form entered into or to be entered into by the Company and a Hedge Counterparty for the purpose of hedging interest rate liabilities in relation to the Facility in accordance with Clause 25.9 (*Treasury Transactions*).

**"Hedging Letter"** means a letter between the Agent and the Parent in the agreed form dated on or before the Signing Date (and executed by the Parent) describing the hedging arrangements to be entered into in respect of the interest rate liabilities of the Borrowers.

**"Holdco"** means Maltby Holdings Limited, a company registered in England and Wales with company registration number 6226830 and registered office at One South Place, London EC2M 2WG.

**"Holding Company"** means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary.

**"Implementation Agreement"** means an agreement between the Company and the Target in respect of the implementation of the Scheme.

**"Incur"** means issue, assume, guarantee, incur or otherwise become liable for (and, in the case of Financial Indebtedness for which interest is capitalised, accrued or accreted, the amount of such Financial Indebtedness Incurred shall at all times be the then-current accreted value or shall include all then capitalised or accrued interest) provided that any Financial Indebtedness of a person existing at the time such person becomes a member of the Group (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such person at the time it becomes a member of the Group.

**"Incurrence Leverage Ratio"** means, as of any date of determination, the ratio of:

(a)     Consolidated Leverage Debt at such date;

        to

(b)     the aggregate amount of Consolidated Incurrence EBITDA for the period of the most recent four consecutive Financial Quarters ending prior to the date of such determination for which internal consolidated financial statements of the Parent are available provided that for the purposes of calculating Consolidated Incurrence EBITDA for such period, if, as of such date of determination:

        (i)     if any member of the Group has Incurred any Financial Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Incurrence Leverage Ratio is an Incurrence of Financial Indebtedness, or both, Consolidated Incurrence EBITDA for such period shall be calculated after giving effect on a pro forma basis to such Financial Indebtedness as if such Financial Indebtedness had been Incurred on the first day of such period;

        (ii)    if any member of the Group has repaid, repurchased, defeased or otherwise discharged any Financial Indebtedness since the beginning of such period or if any Financial Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Financial Indebtedness Incurred under the Revolving Facility unless such Financial Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Incurrence Leverage Ratio, Consolidated Incurrence EBITDA for such period shall be calculated on a pro forma basis as if such

15

CITI-TF 00701737

discharge had occurred on the first day of such period and as if the relevant member of the Group had not earned the interest income actually earned during such period in respect of cash or Cash Equivalent Investments used to repay, repurchase, defease or otherwise discharge such Financial Indebtedness;

(iii)     if since the beginning of such period a member of the Group shall have disposed of any asset or business, Consolidated Incurrence EBITDA for such period shall be reduced by an amount equal to Consolidated Incurrence EBITDA (if positive) directly attributable to the assets or business which are the subject of such disposal for such period, or increased by an amount equal to Consolidated Incurrence EBITDA (if negative), directly attributable thereto for such period;

(iv)     if since the beginning of such period any member of the Group (by merger or otherwise) shall have made a Permitted Investment, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, Consolidated Incurrence EBITDA for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Financial Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

(v)     if since the beginning of such period any person (that subsequently became a member of the Group or was merged with or into a member of the Group since the beginning of such period) shall have disposed of any asset or business, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by a member of the Group during such period, Consolidated Incurrence EBITDA for such period shall be calculated after giving pro forma effect thereto as if such disposal, Investment or acquisition had occurred on the first day of such period.

For the purposes of this definition, whenever 'pro forma effect' is to be given to an acquisition of assets and the amount of profit or earnings relating thereto, the pro forma calculations shall give effect to all cost savings and synergies reasonably expected to be realized from such acquisition within the first 12 months after closing such acquisition and shall be determined in good faith by a responsible financial or accounting officer. If any Financial Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Financial Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Agreement applicable to such Financial Indebtedness if such Hedging Agreement has a remaining term in excess of 12 months). For the purposes of this definition, whenever pro forma effect is to be given to any Financial Indebtedness Incurred pursuant to a revolving credit facility, the amount outstanding on the date of such calculation will be computed based on (1) the average daily balance of such Financial Indebtedness during such four Financial Quarters or such shorter period for which such facility was outstanding or (2) if such facility was created after the end of such four Financial Quarters, the average daily balance of such Financial Indebtedness during the period from the date of creation of such facility to the date of such calculation.

"**Independent Financial Advisor**" means an investment banking firm, accounting firm or appraisal firm of international standing provided that such firm is not an Affiliate of a member of the Group.

"**Information Memorandum**" means the document in the form approved by the Company concerning the Original Obligors and the Target Group which is to be prepared in relation to this transaction and distributed by the Arranger prior to the Syndication Date in connection with the syndication of the Facility.

[London #294447 v13]

Confidential

CITI-TF 00701738

"Information Package" means the Reports and the Base Case Model.

"Intellectual Property" means:

(a)    any patents, trade marks, service marks, designs, business names, copyrights, design rights, moral rights, inventions, know-how and other intellectual property rights and interests, whether registered or unregistered; and

(b)    the benefit of all applications and rights to use such assets of each member of the Group.

"Intercreditor Agreement" means the intercreditor agreement made or to be made between, among others, the Obligors, the Agent, the Security Agent, the Lenders and the Hedge Counterparties in the agreed form.

"Interest Period" means, in relation to a Loan, each period determined in accordance with Clause 13 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 12.3 (*Default interest*).

"Interim Facilities Agreement" means the £2,850,000,000 interim facilities agreement dated 21 May 2007 entered into between, inter alios, the Company and the Arranger.

"Interim Facility" means each facility made available under the Interim Facilities Agreement.

"Investment Documents" means the Constitutional Documents and any agreement or instruments relating to the Shareholder Debt.

"Investments" means, with respect to any person, all investments by such person in other persons (including Affiliates) in the form of loans or other extension of credit (including guarantees or grants of Security and similar arrangements but excluding any loans or extensions of credit represented by a bank deposit other than a time deposit and the endorsement of negotiable instruments and documents in the ordinary course of business), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, artists, writers, composers or suppliers and commissions in each case, made in the ordinary course of business), purchases or other acquisitions for consideration of Financial Indebtedness, Capital Stock or other securities issued by any other person and investments that are required by Accounting Principles to be classified on the balance sheet (excluding the footnotes) of the relevant person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. The acquisition by a member of the Group of a person that holds an Investment in a third person will be deemed to be an Investment by the relevant member of the Group in such third person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its fair market value at the time the Investment is made and without giving effect to subsequent changes in value.

"Investors" mean the Original Investors and their or any subsequent successors or permitted assigns or transferees and management of the Group (in their capacity as investors) including any vehicle holding the Equity Interests of management.

"Joint Venture" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity that is not a member of the Group but shall not include arrangements formed in the ordinary course of the Group's business and consistent with past practices for the exploitation of individual album projects entered into in the ordinary course between a member of the Group and a third party owner or licensor of sound recordings or musical compositions, or in respect of which the only contribution to the arrangement by a member of the Group is of rights to exploit sound

17

CITI-TF 00701739

recordings or music compositions, and such arrangement does not constitute an entity with separate legal personality.

**"KPMG Financial Due Diligence Report"** means the Limited Scope Due Diligence Report dated 16 May 2007 prepared by KPMG and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

**"Legal Due Diligence Report"** means the legal due diligence report dated 21 May 2007 prepared by Weil, Gotshal & Manges relating to the Target Group and addressed to, and/or capable of being relied upon by, the Arranger, the Agent and the other Secured Parties.

**"Legal Reservations"** means:

(a)    the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court, the principle of reasonableness and fairness, the limitation of enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors;

(b)    the time barring of claims under applicable limitation laws and defences of acquiescence, set-off or counterclaim (including the English Limitation Acts) and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of UK stamp duty may be void;

(c)    the principle that in certain circumstances security granted by way of fixed charge may be recharacterised as a floating charge or that security purported to be constituted as an assignment may be recharacterised as a charge;

(d)    the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void;

(e)    the principle that an English court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant;

(f)    the principle that the creation or purported creation of security over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which security has purportedly been created;

(g)    similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(h)    any other general principles which are set out as qualifications or reservations (however described) as to matters of law in the legal opinions delivered to a Finance Party under the Finance Documents.

**"LEK Report"** means the Summary Music Market Outlook Report dated 15 May 2007 prepared by LEK and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

**"Lender"** means:

(a)    any Original Lender; and

(b)    any bank, financial institution, trust, fund or other entity which has become a Party in accordance with Clause 27 (*Changes to the Lenders*),

[London #294447 v13]

18

which in each case has not ceased to be a Party in accordance with the terms of this Agreement.

**"Letter of Credit"** has the meaning given to it in the Senior Facilities Agreement.

**"LIBOR"** means, in relation to any Loan:

(a)    the applicable Screen Rate; or

(b)    (if no Screen Rate is available for the currency or Interest Period of that Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request quoted by the Reference Banks to leading banks in the London interbank market,

as of the Specified Time on the Quotation Day for the offering of deposits in the currency of that Loan and for a period comparable to the Interest Period for that Loan.

**"LMA"** means the Loan Market Association.

**"Loan"** means a loan made or to be made under the Facility or the principal amount outstanding for the time being of that loan.

**"Maintenance EBITDA"** has the meaning given to that term in Clause 24.1 (*Financial definitions*).

**"Major Event of Default"** means an event or circumstance set out in Clauses 26.1 (*Failure to pay*), 26.2 (*Incorrect representation*) (but only in so far is it relates to a Major Representation), 26.3 (*Breach of agreement*) (but only in so far as it relates to a Major Undertaking), 26.6 (*Insolvency*) to 26.8 (*Insolvency proceedings*) (inclusive) and 26.9 (*Invalidity and unlawful performance*).

**"Major Representations"** means a representation as set out in Clauses 22.1 (*Status*) to 22.3 (*Obligations binding*) (inclusive), 22.5 (*Non-conflict*), 22.13 (*Authorisations*) and 22.23 (*Insolvency*), and, for these purposes only, any reference to 'Finance Documents' in paragraph (a) of Clauses 22.3 (*Obligations binding*) and 22.5 (*Non-conflict*) will only refer to those Finance Documents listed in Part I of Schedule 2 (*Conditions Precedent*).

**"Major Undertaking"** means an undertaking set out in Clause 25.15 (*Scheme undertakings*), 25.16 (*Offer undertakings*), 25.17 (*Ownership*), 25.20 (*Financial Indebtedness*), 25.21 (*Share issuance and sales*), 25.22 (*Security*), 25.23 (*Restricted Payments*), 25.24 (*Asset disposals*) and 25.26 (*Merger and consolidation*).

**"Majority Lenders"** means, at any time, a Lender or Lenders whose Available Commitments and participations in the Utilisations then outstanding aggregate more than $66^2/_3$ per cent of the Available Facilities and all the Utilisations then outstanding.

**"Management Fees"** means:

(a)    annual fees payable for the performance of monitoring services by Terra Firma Capital Partners Limited, the Investors or any of their respective Affiliates for the Group, provided that such fees shall not, in the aggregate, exceed £2.5 million per annum (or its equivalent); and

(b)    customary fees and related expenses for the performance of transaction, management, consulting, financial or other advisory services or underwriting, placement or other

19

investment banking activities, including in connection with mergers, acquisitions, dispositions or joint ventures, by Terra Firma Capital Partners Limited, the Investors or any of their respective Affiliates for the Group.

**"Mandatory Cost"** means the percentage rate per annum calculated by the Agent in accordance with Schedule 4 (*Mandatory Cost Formulae*) and, for the avoidance of doubt, excluding any Basel II Costs.

**"Margin"** means 2.00 per cent. per annum increasing by 0.25 per cent. per annum at the end of each 3 month period commencing on the Closing Date provided that:

(a)     the maximum Margin shall (subject to paragraph (b) below) be 3.00 per cent. per annum; and

(b)     the Margin shall, on the date falling 9 months after the Closing Date, be increased by 0.50 per cent. per annum if indicative ratings from the Rating Agencies for the Permitted Securitisation have not been obtained by such date and by an additional 0.25 per cent. per annum on each of (i) the date falling 12 months after the Closing Date and (ii) the date falling 18 months after the Closing Date, if by such dates such indicative ratings have not been obtained provided that once indicative ratings have been obtained the Margin shall revert to the level it was at prior to any increase pursuant to this paragraph (b).

**"Material Adverse Effect"** means any event or circumstance (after taking account of any warranty, indemnity or other right of recourse against any third party with respect to the relevant event or circumstance including, without limitation, coverage by insurances and rights of recovery, where **"taking account of"** includes consideration of all relevant facts and circumstances, including the timing and likelihood of successful recovery and potential counterclaims and other related claims against any member of the Group with respect to the relevant event or circumstance) which:

(a)     is materially adverse to:

(i)     the business, assets (as a whole) or financial condition of the Group (taken as a whole); and

(ii)     the ability of any Obligor (taking into account the guarantee obligations of other members of the Group) to perform any of its payment obligations under any Finance Document; or

(b)     subject to the Legal Reservations and any Perfection Requirements, affects the validity or the enforceability of any of the Finance Documents in a manner which would be materially adverse to the interests of the Lenders under the Finance Documents taken as a whole, and if capable of remedy, is not remedied within 20 Business Days of the Company becoming aware of the issue or being given notice of the issue by the Agent.

**"Material Intellectual Property"** has the meaning given to that term in Clause 22.19 (*Intellectual Property*).

**"Material Subsidiary"** means, at any time:

(a)     the Target; and

[London #294447 v13]

Confidential

CITI-TF 00701742

(b)     a Subsidiary of the Target which has gross assets or Maintenance EBITDA representing 5 per cent. or more of the gross assets or Maintenance EBITDA of the Group, calculated on a consolidated basis.

If a Subsidiary has been acquired since the date as at which the latest audited consolidated financial statements of the Group were prepared, the financial statements shall be deemed to be adjusted on a pro forma basis in order to take into account the acquisition of that Subsidiary (that adjustment being certified by the finance director of the Company as representing an accurate reflection of the revised gross assets or Maintenance EBITDA).

"**McKinsey Report**" means the Assessment of Potential Sources of Major Upside Report dated 14 May 2007 and the Cost Improvement Potential Report dated 1 March 2007 and updated for cost information in the vendor due diligence on 15 May 2007 each prepared by McKinsey and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

"**Mezzanine Facility**" means the loan facility made available to the Parent pursuant to the Mezzanine Facility Agreement.

"**Mezzanine Facility Agreement**" means the £155,000,000 mezzanine facility agreement dated on or around the Signing Date between (amongst others) the Parent, Citigroup Global Markets Limited as arranger and certain parties named therein as lenders.

"**Mezzanine Loan**" means a loan made under the Mezzanine Facility.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)     if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period. "**Monthly**" shall be construed accordingly.

"**Moody's**" means Moody's Investors Service Limited or any successor to its ratings business.

"**Music Publishing Business**" means the business of acquiring, protecting, administering, publishing and exploiting rights in musical compositions and artists and any other related or incidental activities (including, without limitation, any related or incidental activities being carried on at the date of this Agreement).

"**Music Publishing Division**" means the businesses in the Group that are involved in the Music Publishing Business.

"**Music Publishing Division Acquisition Facility**" has the meaning given to it in the Senior Facilities Agreement.

21

Case: 11-126    Document: 65    Page: 226    04/25/2011    272935    401

A-6125

"**Music Publishing Division Acquisition Loan**" has the meaning given to it in the Senior Facilities Agreement.

"**Music Publishing Division Excess Cashflow**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Music Publishing Division Revolving Facility**" has the meaning given to it in the Senior Facilities Agreement.

"**Music Publishing Group**" means the Parent and its Subsidiaries from time to time including, for the avoidance of doubt, the Target and its Subsidiaries from the Effective Date or the Unconditional Date, as the case may be but excluding any Excluded Subsidiary.

"*Music Publishing Material Adverse Effect*" means a material adverse effect on:

(a)    (i) the business, assets (as a whole) or financial condition of the Music Publishing Group (taken as a whole); and

(ii) the ability of a member of the Music Publishing Group (taking into account the guarantee obligations of other members of the Music Publishing Group) to perform its obligations under the Finance Documents; or

(b)    (subject to the Legal Reservations and any Perfection Requirements) the validity or enforceability of any of the Finance Documents in a manner which would be materially adverse to the interests of the Lenders under the Finance Documents taken as a whole and if capable of remedy, is not remedied within 20 Business Days of the Company becoming aware of the issue or being given notice of the issue by the Agent.

"**New Shares**" means the new ordinary shares in the capital of the Target and issued by the Target to the Company pursuant to the Scheme.

"**Obligor**" means a Borrower or a Guarantor.

"**Obligors' Agent**" means the Company, appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to Clause 2.3 (*Obligors' Agent*).

"**Offer**" means the offer for all of the shares in Target made by the Company to the shareholders of Target on the terms contained in the Offer Document (as such offer may from time to time be amended, extended, revised, renewed or waived in accordance with this Agreement).

"**Offer Document**" means any offer document which may be issued by the Company to the shareholders of Target in respect of the Offer.

"**Offer Press Release**" means the formal press announcement of the Offer issued, or to be issued, by or on behalf of the Company which must be approved in advance by the Arranger (acting reasonably).

"**Officers' Certificate**" means a certificate, in the form and substance satisfactory to the Security Agent (acting reasonably), signed by two officers of the relevant company or, in the event there are less than two officers, one officer.

"**Opinion of Counsel**" means a written opinion in form and substance satisfactory to the Security Agent, from legal counsel who is acceptable to the Security Agent (acting reasonably).

"**Optional Currency**" means a currency (other than the Base Currency) which complies with the conditions set out in Clause 4.4 (*Conditions relating to Optional Currencies*).

22

[London #294447 v13]

Confidential

CITI-TF 00701744

"**Original Borrower**" means the Company.

"**Original Financial Statements**" means in relation to the Target, its consolidated audited financial statements for its Financial Year ended 31 March 2007.

"**Original Guarantor**" means the Company or the Parent.

"**Original Investors**" has the meaning given to it in Clause 10.1 (*Change of Control*).

"**Original Obligor**" means an Original Borrower or an Original Guarantor.

"**Participating Member State**" means any member state of the European Communities that adopts or has adopted the euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

"**Perfection Requirements**" means the making or the procuring of the appropriate registrations, filings, endorsements, notarisation, stampings and/or notifications of the Transaction Security Documents and/or the Security created thereunder, including those described in Schedule 13 (*Perfection Requirements*).

"**Permitted Affiliate Transaction**" means:

(a)    any Restricted Payment permitted to be made pursuant to Clause 25.23 (*Restricted Payments*) and any Permitted Payment or Permitted Investment;

(b)    the issuance of Capital Stock pursuant to, or for the purpose of the funding of, employment arrangements, stock options and stock ownership plans provided that the terms thereof are or have been previously approved by the relevant member of the Group's board of directors;

(c)    transactions between or among Obligors for fair market value;

(d)    reasonable and customary fees and compensation paid to, and indemnities provided on behalf of (and similar arrangements with) directors, officers, employees and consultants of any member of the Group (whether performed directly or indirectly and including through any person owned or controlled by any of such directors, officers, employees or consultants) provided that the board of directors of the relevant member of the Group has approved the terms thereof in good faith and deemed the services theretofore or thereafter to be performed for such compensation or payments to be fair consideration therefore;

(e)    the performance of obligations of any member of the Group under the terms of agreements to which such member of the Group is party which are existing as at the Signing Date and any amendment, modification or supplement thereto provided that:

(A)    following such amendment, modification or supplement the terms of any such agreement so amended, modified or supplemented are not materially more disadvantageous to the Finance Parties and any member of the Group than the original agreement as in effect on the Signing Date;

23

CITI-TF 00701745

(B)   such amendment or modification is on a basis substantially similar to that which would be conducted in an arm's-length transaction with third parties who are not Affiliates; and

(C)   in the case of any transaction (other than a transaction in the ordinary course relating to the supply of recorded music soundcarriers, such as compact disc or relating to the licensing between members of the Group of the right to sell and exploit recorded music repertoire) which involves an amount in excess of £10 million or its equivalent, the relevant member of the Group will deliver a resolution of its board of directors resolving with the participation of a majority of the Disinterested Directors that such transaction complies with paragraph (B) above;

(f)   the issuance of Shareholder Debt;

(g)   transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business, which are fair to the Group as a whole in the reasonable determination of the board of directors of the relevant member of the Group or are on terms no less favourable than those that could reasonably have been obtained at such time from an unaffiliated party; and

(h)   the issuance of Capital Stock to Affiliates of the Company which is not otherwise prohibited under the terms of the Finance Documents.

"**Permitted Disposal**" means any Disposal on arm's length terms:

(a)   of assets in exchange for other assets which are, in the reasonable opinion of the person effecting the exchange, useful and productive in the business of the Group;

(b)   of cash or Cash Equivalent Investments for cash or in exchange for other Cash Equivalent Investments;

(c)   arising as a result of any Permitted Encumbrance;

(d)   of assets which are seized, expropriated or acquired by compulsory purchase by or by the order of any central or local government authority;

(e)   which is a Permitted Investment or a Restricted Payment that is permitted to be made pursuant to Clause 25.23 (*Restricted Payments*);

(f)   in connection with a Permitted Sale and Leaseback; and

(g)   to which the Majority Lenders have provided their written consent.

"**Permitted Encumbrance**" means:

(a)   title retention arrangements arising in the ordinary course of business;

(b)   any Security arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by any member of the Group;

(c)   Security created pursuant to the Transaction Security Documents;

[London #294447 v13]

Confidential

CITI-TF 00701746

(d)    any Security created by a member of the Group which is not an Obligor securing Permitted Indebtedness incurred by such person, or created by an Obligor securing Permitted Indebtedness incurred by such Obligor provided that:

    (i)    any such Security does not relate to any asset subject to the Security granted pursuant to the Transaction Security Documents, and is not extended to cover any Financial Indebtedness other than Permitted Indebtedness; and

    (ii)    the amount of Financial Indebtedness secured thereby is not increased other than pursuant to the instrument under which such Security was created;

(e)    Security constituted by any Capitalised Lease Obligations, finance leases or hire purchase agreements permitted pursuant to the terms of this Agreement;

(f)    Security for Taxes which are being contested in good faith by appropriate proceedings (and with adequate reserves);

(g)    deposits to secure the performance of bids, trade contracts, leases, intellectual property rights, statutory obligations, insurance contracts, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h)    Security securing Financial Indebtedness of any member of the Group- incurred to finance the acquisition of fixed or capital assets (including Security granted pursuant to escrow arrangements in connection with any Permitted Investment) provided that:

    (i)    such Security shall be created substantially simultaneously with the acquisition of such fixed or capital assets;

    (ii)    such Security does not at any time encumber any assets other than the assets the acquisition of which was financed by such Financial Indebtedness; and

    (iii)    the amount of Financial Indebtedness secured thereby is not increased (other than pursuant to the instrument under which such encumbrance was created);

(i)    Security securing Financial Indebtedness existing on any property or assets at the time of its acquisition by a member of the Group or existing on property or assets of any person that becomes a member of the Group after the date hereof at the time such person becomes a member of the Group, provided that:

    (i)    the Financial Indebtedness was not created in contemplation of such acquisition;

    (ii)    in the case of Security existing on any property or assets acquired by a member of the Group, the Financial Indebtedness secured thereby is assumed by the relevant acquiring member of the Group and no other person or, in the case of Security on property or assets of a person who becomes a member of the Group, is not assumed by any other person;

    (iii)    no such Security is extended to cover any additional property or assets; and

    (iv)    the amount of Financial Indebtedness secured thereby is not increased (other than pursuant to the instrument under which such Security was created);

(j)    Security on the property of any member of the Group in favour of the landlord of such property securing licences, subleases or leases permitted hereunder (including rental deposits);

Confidential

CITI-TF 00701747

(k)   attachment or judgment Security or Security otherwise arising as a result of legal proceedings and assessments by authorities not constituting an Event of Default;

(l)   Security not otherwise permitted hereunder so long as:

   (i)   the Financial Indebtedness secured thereby does not exceed £15 million (or its equivalent) in aggregate at any time; and

   (ii)  the fair market value of the assets subject thereto does not, when aggregated with the value of any assets the subject of a Permitted Sale and Leaseback, exceed £22.5 million (or its equivalent) in aggregate at any time;

(m)   Security over goods and documents of title to goods arising in the ordinary course of letter of credit transactions entered into in the ordinary course of business;

(n)   Security ranking pari passu, subject to the terms of the Intercreditor Agreement, in favour of any pension trustees of the Group securing obligations which do not exceed:

   (i)   £100 million (or its equivalent) in aggregate at any time time in respect of the pension obligations of members of the Recorded Music Division; and

   (ii)  £50 million (or its equivalent) in aggregate at any time in respect of the pension obligations of members of the Music Publishing Division;

(o)   encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Security incidental to the conduct of the business of the Group or to the ownership of its properties which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of the Group;

(p)   Security securing Refinancing Indebtedness in respect of Financial Indebtedness permitted to be incurred pursuant to the Finance Documents which has been secured by Security permitted by the Finance Documents provided that:

   (i)   any such Security shall not extend to or cover any assets not securing the Financial Indebtedness so refinanced; and

   (ii)  the Financial Indebtedness so refinanced shall have been permitted to be incurred pursuant to Clause 25.20 (*Financial Indebtedness*);

(q)   Security securing the proceeds from the offering of any debt securities (including interest thereon) permitted to be incurred under the Finance Documents paid into an escrow account with an independent escrow agent on the date of the applicable offering pursuant to escrow arrangements that permit the release of amounts on deposit in such escrow account upon satisfaction of certain conditions or the occurrence of certain events for the benefit of the related holders of such debt securities (or the underwriters or arrangers thereof) or on cash proceeds of any debt securities or Cash Equivalent Investments purchased with such cash proceeds, in either case to the extent such cash or Cash Equivalent Investments pre-fund the payment of interest on such debt securities and are held in an escrow account or similar arrangement to be applied for such purpose;

(r)     Security over any cash or Cash Equivalent Investments paid into trust to defease or satisfy and discharge obligations under any debt security (provided such defeasance, satisfaction or discharge is permitted under the terms of the Finance Documents);

(s)     Security under netting or set-off arrangements under Treasury Transactions permitted to be entered into under the terms of the Finance Documents where the obligations of the parties are calculated by reference to a net exposure;

(t)     Security granted by a member of the Group which is not an Obligor to a bank or other lender as part of the arrangements for that bank or other lender to provide banking facilities to that member of the Group in an amount not exceeding £15 million (or its equivalent) in aggregate for all such members of the Group;

(u)     Security granted as part of a bank's standard terms and conditions;

(v)     in connection with a Permitted Sale and Leaseback;

(w)     any Security granted:

  (i)      over any master recording, copyright or similar asset which has been or is made, created or produced by or in the course of the music, video or entertainment business of any Obligor;

  (ii)     created in favour of an artist, performer or writer whose performance or work is embodied in that asset; and

  (iii)    created to secure the payment of advances and/or royalties due or to become due to that artist, performer or writer under the relevant recording contract, copyright or similar asset,

  but only if the basis on which the principal amount of the indebtedness secured by that Security is calculated is not changed after the date of the relevant recording contract, copyright or similar asset in such a way as to cause that principal amount to be increased; and

(x)     any other Security to which the Majority Lenders have given their prior written consent.

"Permitted Guarantee" means:

(a)     the endorsement of negotiable instruments in the ordinary course of business;

(b)     any indemnities or guarantees granted in the ordinary course of business in respect of the performance by a member of the Group under any contract (but not including indemnities or guarantees in respect of any indebtedness); and

(c)     any guarantee given in respect of netting or set-off arrangements constituting a Permitted Encumbrance;

(d)     any guarantee constituted by Permitted Indebtedness;

(e)     any guarantees or counter-indemnities granted to landlords in respect of the obligations of Thorn Limited (formerly Thorn plc) and any of its Subsidiaries (together, the "Thorn Group") under the terms of real property leases entered into by the Thorn Group provided that the obligations guaranteed or counter-indemnified thereunder do not exceed £9,600,000 at any time;

27

CITI-TF 00701749

(f)     any guarantees or counter-indemnities granted to landlords in respect of the obligations of HMV Group plc and any of its Subsidiaries under the terms of any real property leases entered into by the Thorn Group provided that the obligations guaranteed or counter-indemnified thereunder do not exceed £16,000,000 at any time;

(g)     any guarantee not permitted by the preceding paragraphs provided that the total aggregate amount permitted under this paragraph (g) may not exceed £10 million (or its equivalent) at any time outstanding; and

(h)     any other guarantee provided with the prior written consent of the Majority Lenders;

"**Permitted High Yield Issuance**" means an issuance of high yield securities by the Parent in an amount sufficient for the Net Proceeds (as defined in Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*)) of such issuance to repay in full all amounts outstanding under the Mezzanine Facility on the terms set out in the Intercreditor Agreement.

"**Permitted Indebtedness**" means Financial Indebtedness:

(a)     arising under the Transaction Documents, the Senior Facilities Agreement and the Mezzanine Facility Agreement;

(b)     incurred under local banking facilities with banks in the jurisdiction of members of the Group provided that the aggregate amount outstanding under such facilities does not exceed £25 million (or its equivalent) at any time;

(c)     which is Existing Financial Indebtedness or is incurred under banking facilities or debt securities of any member of the Target Group which, in each case, the Arranger has agreed in writing will not be repaid, prepaid or redeemed (as applicable) on the Closing Date;

(d)     under finance or capital leases of vehicles, plant, equipment or computers, provided that the aggregate capital value of all such items so leases under outstanding leases by members of the Group does not exceed £5 million (or its equivalent) at any time;

(e)     owing by an Obligor to another Obligor;

(f)     owing by a member of the Group which is not an Obligor to another member of the Group which is not an Obligor;

(g)     Incurred by the Parent, constituting Subordinated Indebtedness provided that the aggregate amount of Subordinated Indebtedness outstanding does not exceed £50 million (or its equivalent) at any time;

(h)     to the extent covered by a Letter of Credit or other letter of credit, guarantee or indemnity issued under an Ancillary Facility;

(i)     arising under a foreign exchange transaction for spot or forward delivery entered into in connection with the protection against fluctuation in currency rates where that foreign exchange exposure arises in the ordinary course of business or in respect of Utilisations made in Optional Currencies, but not a foreign exchange transaction for investment or speculative purposes;

(j)     of any person acquired by a member of the Group after the Closing Date which is incurred under arrangements in existence at the date of acquisition, but not incurred or

[London #294447 v13]

28

Confidential

increased or its maturity date extended in contemplation of, or since, that acquisition, not exceeding £15 million (or its equivalent) at any time and outstanding for less than a period of three (3) months following the date of acquisition;

(k)    under a Permitted Investment or a Permitted Guarantee;

(l)    (i)    which is a Permitted Refinancing, or

        (ii)    which is Refinancing Indebtedness in respect of Financial Indebtedness Incurred pursuant to (A) paragraph (a) of Clause 25.20 (*Financial Indebtedness*) but only to the extent that the original maturity of such Financial Indebtedness falls after the Final Maturity Date or (B) paragraph (a), (c) or this sub-paragraph (l)(ii) of the definition of Permitted Indebtedness;

(m)    arising from the honouring by a bank or other financial institution of a cheque, draft or similar instrument drawn against insufficient funds in the ordinary course of business provided that such Financial Indebtedness is extinguished within five (5) Business Days of Incurrence;

(n)    Incurred by any Obligor constituting reimbursement obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including without limitation letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Financial Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(o)    under the finance lease in respect of the real property at Mont Cenis, France provided that the capitalised amount under such finance lease does not exceed £15,400,000;

(p)    in addition to the items referred to in paragraphs (a) to (o) of this definition, Financial Indebtedness of the Obligors in an aggregate outstanding principal amount which, when taken together with all other Financial Indebtedness Incurred pursuant to this paragraph (p), does not exceed £15 million (or its equivalent); and

(q)    not listed above to which the Majority Lenders have given their prior written consent.

"Permitted Investment" means:

(a)    any Investment by an Obligor in another Obligor;

(b)    any Investment:

        (i)    by a member of the Group which is not an Obligor in another member of the Group which is not an Obligor;

        (ii)    by an Obligor in a member of the Group which is not an Obligor by way of loan or guarantee in an aggregate amount not exceeding £20 million (or its equivalent) provided that Security is granted to the Obligor providing the loan or guarantee on the same basis as set out in the Agreed Security Principles to the extent that the principal amount of such loan or guarantee exceeds £5 million (or its equivalent) and the aggregate amount of any such loans or guarantees which are not secured does not exceed £5 million (or its equivalent);

Confidential

CITI-TF 00701751

(c)    any acquisition of cash and/or Cash Equivalent Investments;

(d)    any acquisition of a similar business to the Group Business (or all of the Capital Stock of a limited liability company or partnership principally engaged in such business) (the "**Proposed Target**") having an aggregate fair market value which does not exceed (when aggregated with all other investments made pursuant to this paragraph) the aggregate of any Additional Acquisition Funding available for the purposes of such acquisition, provided that in the case of any individual acquisition having a fair market value greater than £25 million (or its equivalent), or to the extent such company or business had negative EBITDA for the previous financial year:

(i)    the Proposed Target shall have had positive earnings before interest, tax, depreciation and amortisation (or, if negative, not negative by more than £1,000,000) (calculated on the same basis as Maintenance EBITDA) on a *pro forma* stand alone basis (taking into account projected cost savings and synergies that would reasonably be expected to arise by combining the operations of such Proposed Target with the operations of the Group) during the 12 month period ending on the most recent month end prior to the date of acquisition (or, if not ascertainable, for the financial year of such Proposed Target most recently ended prior to its acquisition);

(ii)    the Company shall deliver to the Agent a certificate signed by a director of the Company which includes calculations showing in reasonable detail that on a pro forma basis that the Company would reasonably be expected to be able to comply with its obligations under Clause 24 (*Financial Covenants*) for the Relevant Period ending on the last day of the fourth complete Financial Quarter following the date of the proposed acquisition; and

(iii)    the Company shall deliver to the Agent copies of any due diligence reports (including accounting, legal and tax reports) and, to the extent usual or customary for the relevant provider in the circumstances, addressed to (or otherwise capable of being relied upon by) the Finance Parties;

(e)    Investments to the extent the payment for which consists of Equity Interests of Holdco or any of its direct or indirect parent companies;

(f)    purchases and acquisitions of inventory, supplies, material or equipment;

(g)    Investments in a wholly-owned Subsidiary organised for the purposes of a Permitted Refinancing (including a receivables subsidiary, a high yield notes issuer or a property company) that, in the good faith determination of the Company, are necessary or advisable to effect any Permitted Refinancing;

(h)    advances to, or guarantees of indebtedness of, directors, employees, officers and consultants not in excess of £1 million (or its equivalent) outstanding at any one time, in the aggregate;

(i)    loans and advances:

(i)    to directors, officers and employees incurred in the ordinary course of business to fund such person's purchase of Equity Interests in Holdco or any direct or indirect Holding Company of Holdco; and

(ii)    to the trustees of any employee stock ownership plan operated by any member of the Group,

30

[London #294447 v13]

CITI-TF 00701752

provided that the aggregate amount of such loans and advances outstanding at any one time does not exceed £1 million (or its equivalent);

(j)     Investments in Joint Ventures (other than, for the avoidance of doubt, A&R Arrangements) in an aggregate amount not to exceed £10 million (or its equivalent) in any Financial Year and £40 million (or its equivalent) at any one time, plus the net proceeds of any issue and sale of Capital Stock in the Parent, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant Investment and not used for any other purposes, plus the net proceeds of any Shareholder Debt, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant Investment and not used for any other purposes;

(k)     Investments in A&R Arrangements;

(l)     acquisitions of assets made from the aggregate amount of Net Proceeds of any Disposal or any Excluded Proceeds to the extent permitted pursuant to the terms of the Finance Documents; and

(m)     payroll, travel and similar advances to employees to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(n)     Capital Stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to any member of the Group or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(o)     Investments made as a result of the receipt of non-cash consideration from an asset disposition and Investments in Additional Assets from the proceeds of an asset disposition, in each case, made pursuant to and in compliance with Clause 25.24 (*Asset disposals*).

(p)     Investments in existence on, or made pursuant to legally binding commitments in existence on, the Closing Date provided that the principal amount of such Investments not paid for on or before the Closing Date does not exceed £5 million (or its equivalent) and loans to the trustees of any employee stock ownership plan operated by any member of the Group and in existence on the Closing Date provided that the principal amount of such loans and advances outstanding at any one time does not exceed £6.5 million;

(q)     Treasury Transactions, which transactions or obligations are incurred in compliance with this Agreement;

(r)     deposits with respect to leases or utilities provided to third parties in the ordinary course of business or Security otherwise described in the definition of 'Permitted Encumbrances' or made in connection with Security permitted under Clause 25.22 (*Security*);

(s)     Permitted Guarantees;

(t)     the payment of cash or Cash Equivalent Investments into trust to defease or satisfy and discharge obligations under any debt securities, so long as such payment is otherwise permitted to be paid hereunder and such obligations are permitted to be discharged or defeased in each case pursuant to the Finance Documents;

31

CITI-TF 00701753

(u)     Investments by any member of the Group, together with all other Investments pursuant to this paragraph (u) and all payments permitted to be made pursuant to paragraph (g) of the definition of 'Permitted Payment' below, in an aggregate amount at the time of such Investment not to exceed five per cent. of the amount by which Consolidated Incurrence EBITDA of the Recorded Music Division for the preceding four Financial Quarters exceeds £225 million (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value);

(v)     Investments in capital expenditure in connection with the relocation and re-organisation of the head office of the Music Publishing Division including, without limitation, the implementation of a new royalties-related IT system provided that the maximum aggregate amount of Investments in such capital expenditure shall not exceed £10 million; and

(w)     any other investments to which the Majority Lenders shall have given their prior consent.

"**Permitted Music Publishing Division Disposal**" means any Disposal on arm's length terms:

(a)     made in the ordinary course of day to day business of the disposing entity;

(b)     of any asset by a member of the Group to another member of the Group so long as the acquiring entity is an Obligor and, if security has previously been given by the disposing entity, then equivalent security must also be granted by the acquiring entity;

(c)     of assets in exchange for other assets comparable or superior as to type, value or quality;

(d)     of obsolete or redundant fixed assets;

(e)     of cash or Cash Equivalent Investments for cash or in exchange for other Cash Equivalent Investments;

(f)     which is a Permitted Investment or a Restricted Payment that is permitted to be made pursuant to Clause 25.23 (*Restricted Payments*);

(g)     of assets the consideration for which does not exceed £25 million in any Financial Year; and

(h)     to which the Majority Lenders have provided their written consent.

"**Permitted Music Publishing Division Encumbrance**" means:

(a)     prior to the Separation Date, Security described in the definition of "Permitted Encumbrance" above; and

(b)     on or after the Separation Date, Security described in the definition of "Permitted Encumbrance" above provided that:

        (i)     the reference to "£15 million" in paragraph (l)(i) of the definition "Permitted Encumbrance" shall be replaced with "£7.5 million";

        (ii)    the reference to "£20 million" in paragraph (l)(ii) of the definition "Permitted Encumbrance" shall be replaced with "£10 million"; and

32

(iii)    the reference to "£15 million" in paragraph (t) of the definition of "Permitted Encumbrance" shall be replaced with "£5 million".

"Permitted Music Publishing Division Indebtedness" means:

(a)    prior to the Separation Date, Financial Indebtedness described in the definition of "Permitted Indebtedness" above; and

(b)    on or after the Separation Date, Financial Indebtedness described in the definition of "Permitted Indebtedness" above provided that:

(i)    the reference to "£25 million" in paragraph (b) of the definition of Permitted Indebtedness" shall be replaced with "£12,500,000";

(ii)    the reference to "£5 million" in paragraph (d) of the definition of Permitted Indebtedness" shall be replaced with "£1 million";

(iii)    the reference to "£15 million" in paragraph (j) of the definition of Permitted Indebtedness" shall be replaced with "£5 million"; and

(iv)    the reference to "£15 million" in paragraph (p) of the definition of Permitted Indebtedness" shall be replaced with "£7.5 million".

"Permitted Music Publishing Division Investment" means:

(a)    prior to the Separation Date, acquisitions, Investments or other transactions described in the definition of "Permitted Investment" above; and

(b)    on or after the Separation Date, acquisitions, Investments or other transactions described in the definition of "Permitted Investment" above provided that:

(i)    the reference to "£20 million" in paragraph (b)(ii) of the definition of "Permitted Investment" shall be replaced with "£10 million";

(ii)    each reference to "£5 million" in paragraph (b)(ii) of the definition of "Permitted Investment" shall be replaced with "£2,500,000";

(iii)    the reference to "£10 million" in paragraph (j) of the definition of "Permitted Investment" shall be replaced with "£5 million";

(iv)    the reference to "£40 million" in paragraph (j) of the definition of "Permitted Investment" shall be replaced with "£20 million";

(v)    the reference to "£6,500,000" in paragraph (p) of the definition of "Permitted Investment" shall be replaced with "£2,500,000"; and

(vi)    paragraph (u) of the definition of "Permitted Investment" shall be replaced with the following:

"Investments by any member of the Group, together with all other Investments pursuant to this paragraph (u), in an aggregate amount at the time of such Investment not to exceed £6 million (with the fair market value of such Investment being measured at the time made and without giving effect to subsequent changes in value)",

33

CITI-TF 00701755

provided further that, in the case of any acquisition by a member of the Group in the Music Publishing Division the following conditions must be satisfied:

(1)     no Default has occurred and is continuing on the closing date for the acquisition or would occur as a result of the acquisition;

(2)     the consolidated Total Net Debt to Maintenance EBITDA for the combined business shall not be greater than the level which is no greater than 5% below the required covenant level for that Relevant Period calculated on the basis that the acquisition was made at the beginning of the Relevant Period (for example, in circumstances where the covenant level for the relevant period is 10:1, the permissible level pursuant to this paragraph would be 9.5:1);

(3)     to the extent that the shares in any acquired company are owned by an Obligor, security over the shares of that company in form and substance satisfactory to the Security Agent (acting reasonably) is created in favour of the Security Agent within 30 days of the closing date of such acquisition or, to the extent that there are any governmental, regulatory or other constraints on so doing, as soon as reasonably practicable;

(4)     if the consideration payable for such acquisition is equal to or in excess of £5 million (or its equivalent) then, in all respects subject to the Agreed Security Principles, the member of the Group making such acquisition (or the company or person so acquired) shall create security in favour of the Security Agent over the assets acquired (or owned) in form and substance satisfactory to the Security Agent (acting reasonably) within 30 days of the closing date of such acquisition or, to the extent that there are any governmental, regulatory or other constraints on so doing, as soon as reasonably practicable;

(5)     in the case of an acquisition of a company or person, the member of the Group making such acquisition shall create security in favour of the Security Agent over all of shares or ownership interests acquired, in each case in form and substance satisfactory to the Security Agent (acting reasonably) within 30 days of the closing date of such acquisition or, to the extent that there are any governmental, regulatory or other constraints on so doing, as soon as reasonably practicable;

(6)     the acquisition must be of a similar business to the business of the Music Publishing Division or to the extent that the acquisition is of a business engaged in businesses similar to both the business of the Music Publishing Division and the Recorded Music Division, the business of the acquired entity which is similar to the business of the Music Publishing Division must be separated within 3 months of the closing date of such acquisition (subject at all times to having due consideration to the commercial, economic and tax impact); and

(7)     at least 25 per cent. of the consideration payable for such acquisition is funded by:

(A)     the net proceeds of an issue and sale of Capital Stock in the Parent, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant acquisition and not used for any other purposes; and/or

(B)     the net proceeds of any Shareholder Debt, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant acquisition and not used for any other purposes,

34

[London #294447 v13]

Confidential

provided that there shall be no obligation to issue and sell Capital Stock in the Parent or to incur any Shareholder Debt for these purposes until the aggregate consideration paid or payable in respect of all such acquisitions made since the most recent issuance and sale of Capital Stock in the Parent or incurrence of Shareholder Debt for these purposes, exceeds £20 million (or its equivalent).

"Permitted Music Publishing Division Payment" means:

(a)    prior to the Separation Date, payments described in the definition of "Permitted Payment" below; and

(b)    on or after the Separation Date, payments described in the definition of "Permitted Payment" below provided that paragraph (g) of the definition of "Permitted Payments" shall be replaced with the following:

    "Restricted Payments in an aggregate amount not to exceed £6 million in any Financial Year provided that prior to the first anniversary of the Closing Date no Restricted Payments may be made pursuant to this paragraph (g) if such Restricted Payment is, or is used to fund, any dividend, distribution or other payment to Holdco or its shareholders (other than pursuant to paragraph (d)(i) above)".

"Permitted Music Publishing Division Share Issuance" means the issuances or sales described in the definition of "Permitted Share Issuance" below.

"Permitted Payment" means:

(a)    payments due in respect of Permitted Indebtedness;

(b)    payments due in respect of the Deferred Purchase Price of a Permitted Investment;

(c)    any payment made in respect of the purchase of shares from departing directors or employees of a member of the Group pursuant to a management incentive or employee stock scheme;

(d)    payments made by the Group (including by way of payments to any Holding Company of the Company):

    (i)    to reimburse Taxes, overhead, audit, legal and other necessary expenses, including management costs, pursuant to secondment agreements and financial advisory agreements up to a maximum aggregate amount of £2 million (or its equivalent) in any Financial Year; and

    (ii)    for payments in respect of Management Fees,

    provided that no payment made by a member of the Music Publishing Division shall be permitted pursuant to this paragraph unless such payment constitutes consideration for goods or services provided to such member of the Music Publishing Division on an arm's length basis;

(e)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement of redemption of Capital Stock or Disqualified Stock or Subordinated Indebtedness of the Company or any other Obligor made by exchange for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Company or such other Obligor provided such other Obligor was the issuer of such Capital Stock, Disqualified Stock or

35

Subordinated Indebtedness (other than Disqualified Stock and other than Capital Stock issued or sold to a Subsidiary or an employee stock ownership plan or similar trust to the extent such sale to an employee stock ownership plan or similar trust is financed by loans from or guaranteed by any member of the Group unless such loans have been repaid with cash on or prior to the date of determination);

(f)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company or any other Obligor made by exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Indebtedness by the same borrower or issuer or any purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company that, in each case, is permitted to be incurred under this Agreement;

(g)     Restricted Payments in an aggregate amount not to exceed an amount equal to:

        (i)     five per cent. of the amount by which Consolidated Incurrence EBITDA of the Recorded Music Division for the preceding four Financial Quarters exceeds £225 million; less

        (ii)    the amount of any payments made during such four Financial Quarters pursuant to paragraph (d) above,

        provided that prior to the first anniversary of the Closing Date no Restricted Payments may be made pursuant to this paragraph (g) if such Restricted Payment is, or is used to fund, any dividend, distribution or other payment to Holdco or its shareholders (other than pursuant to paragraph (d)(i) above); and

(h)     such other payments to which the Majority Lenders have given their prior written consent.

"**Permitted Refinancing**" means:

(a)     the Permitted Securitisation; or

(b)     the Permitted High Yield Issuance.

"**Permitted Restriction**" means any restriction or encumbrance on the ability of a member of the Group to pay dividends, return capital, make any other payment or distribution, or transfer assets to another member of the Group which:

(a)     arise under the Finance Documents, the Senior Facilities Agreement or the Mezzanine Facility Agreement each as in effect on the Signing Date; or

(b)     permitted pursuant to paragraph (b)(v) or, save with respect to a determination made in connection with a Restricted Payment, (b)(iii) of Clause 25.28 (*Limitation on restrictions on distributions from Subsidiaries*).

"**Permitted Sale and Leaseback**" means the disposal of real property assets of the Group on terms whereby they are leased to or reacquired by a member of the Group in circumstances where the transaction is entered into as a method of raising Financial Indebtedness, provided that:

(a)     the net cash proceeds of such disposal and leasing are applied in mandatory prepayment of the Facility pursuant to Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*); and

36

[London #294447 v13]

(b)     the maximum value of the assets disposed of do not exceed £15 million (or its equivalent) in aggregate.

"**Permitted Securitisation**" means a securitisation of the assets of the Music Publishing Division on the terms set out in the Intercreditor Agreement.

"**Permitted Share Issuance**" means an issue or sale of:

(a)     ordinary shares of the Parent to the Investors, paid for in full in cash upon issue and which by their terms are not redeemable and where (i) such shares are of the same class and on the same terms as those initially issued by the Parent and (ii) such issue does not lead to a Change of Control;

(b)     shares of a member of the Group to its immediate Holding Company or a wholly owned member of the Group where (if the existing shares of the Subsidiary are subject to the Security created by the Transaction Security Documents) the newly-issued shares also become subject to such Security on the same terms and if such Subsidiary is not a wholly owned Subsidiary, shares issued for cash to minority shareholders on a pro rata basis; and

(c)     shares to which the Majority Lenders have given their prior written consent.

"**Preferred Stock**" as applied to the Capital Stock of any person, means share capital of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such person, over shares of any other class of such person.

"**Qualifying Lender**" has the meaning given to that term in Clause 16 (*Tax Gross-up and Indemnities*).

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined:

(a)     if the currency is the Base Currency, the first day of that period;

(b)     if the currency is euro, two (2) TARGET Days before the first day of that period; or

(c)     (for any other currency) two (2) Business Days before the first day of that period,

unless market practice differs in the Relevant Interbank Market for a currency, in which case the Quotation Day for that currency will be determined by the Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days).

"**Rating Agency**" means any rating agency which is appointed to provide a credit rating for any securities issued in connection with the Permitted Securitisation.

"**Recorded Music Division**" means the businesses in the Group that are involved in signing and developing artists, marketing and promoting them and distributing and exploiting their music.

"**Recorded Music Division Acquisition Loan**" has the meaning given to it in the Senior Facilities Agreement.

37

"**Recorded Music Division Revolving Facility**" has the meaning given to it in the Senior Facilities Agreement.

"**Reference Banks**" means:

(a)  in relation to LIBOR, the principal London offices of Citigroup Global Markets Limited and two (2) other banks to be appointed by the Agent with the consent of the Company; and

(b)  in relation to EURIBOR, the principal London office of Citibank International plc and two (2) other banks to be appointed by the Agent with the consent of the Company,

or such other banks as may be appointed by the Agent in accordance with Clause 29.15 (*Reference Banks*).

"**Refinance**" means, in respect of any Financial Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Financial Indebtedness. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Refinancing Indebtedness**" means Financial Indebtedness that Refinances Financial Indebtedness of a member of the Group existing on the Closing Date or Incurred in compliance with the Finance Documents (including Financial Indebtedness that Refinances Refinancing Indebtedness) provided that:

(a)  such Refinancing Indebtedness has a Stated Maturity no earlier than the stated maturity of the Financial Indebtedness being Refinanced;

(b)  such Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Financial Indebtedness being Refinanced;

(c)  such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium and defeasance costs) under the Financial Indebtedness being Refinanced plus reasonable and customary fees and expenses in connection with such Refinancing; and

(d)  if the Financial Indebtedness being Refinanced is subordinated in right of payment to the amounts outstanding under the Finance Documents, such Refinancing Indebtedness is subordinated in right of payment to the amounts outstanding under the Finance Documents at least to the same extent as the Financial Indebtedness being Refinanced.

"**Related Business** " means any business in which the Target Group was engaged in on the Unconditional Date and any business which is related, incidental, ancillary or complementary thereto.

"**Related Fund**" means, in relation to a fund (the "**first fund**"), a fund which is managed or advised by the same investment manager or adviser as the first fund or, if it is managed by a different investment manager or adviser, a fund whose investment manager or adviser is an Affiliate of the investment manager or adviser of the first fund.

"**Relevant Interbank Market**" means in relation to Euro, the European interbank market and, in relation to any other currency, the London interbank market.

38

[London #294447 v13]

Confidential                                                          CITI-TF 00701760

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a)    its jurisdiction of incorporation;

(b)    any jurisdiction where any asset subject to or intended to be subject to the Security created by the Transaction Security Documents is situated;

(c)    any jurisdiction where it conducts its business; and

(d)    the jurisdiction whose laws govern the perfection of any Transaction Security Documents entered into by it.

"**Relevant Period**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Repeating Representations**" means each of the representations set out in Clauses 22.1 (*Status*) to 22.7 (*Financial statements*) (inclusive).

"**Report**" means each of:

(a)    the McKinsey Report;

(b)    the LEK Report;

(c)    the KPMG Financial Due Diligence Report;

(d)    Structure Memorandum; and

(e)    the Legal Due Diligence Report,

in each case (other than (a)) addressed to or capable of being relied on by each Finance Party.

"**Resignation Letter**" means a letter substantially in the form set out in Schedule 7 (*Form of Resignation Letter*) or such other form as may be agreed between the Agent and the Company.

"**Restricted Payment**" with respect to any person, means:

(a)    the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such person) or similar payment to the direct or indirect holders of its Capital Stock (other than (i) dividends or distributions payable solely in its Capital Stock, (ii) dividends or distributions payable solely to an Obligor and (C) pro rata dividends or other distributions made by an Obligor that is not wholly owned to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a company)) and any payment of cash interest on Shareholder Debt;

(b)    the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of any Capital Stock of an Obligor or Shareholder Debt held by any person, including in connection with any merger or consolidation and including the exercise of any option to exchange any Capital Stock;

(c)    the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Indebtedness of any member of the Group (other than (A) from an Obligor or (B) the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness purchased in anticipation of

39

CITI-TF 00701761

satisfying a sinking fund obligation, principal instalment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or retirement); or

(d)     the making of any Investment (other than a Permitted Investment) in any person.

"Retained Excess Cashflow" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"Revolving Facility" has the meaning given to it in the Senior Facilities Agreement.

"Revolving Facility Commitment" has the meaning given to it in the Senior Facilities Agreement.

"Revolving Facility Loan" has the meaning given to it in the Senior Facilities Agreement.

"Revolving Facility Utilisation" has the meaning given to it in the Senior Facilities Agreement.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. or any successor to its rating business.

"Scheme" means a scheme of arrangement made pursuant to Section 425 of the Act in relation to the cancellation of the issued share capital of the Target and subsequent issue of the New Shares as contemplated by the Scheme Press Release and, when issued, the Scheme Documents.

"Scheme Circular" means the circular to the shareholders of the Target, issued, or to be issued by the Target, setting out the proposals for the Scheme.

"Scheme Conversion" means the Company procuring the lapse or withdrawal of the Offer and the issue of a Scheme Press Announcement in accordance with paragraph (b) of Clause 3.2 (*Conversion of Offer to Scheme*).

"Scheme Conversion Notice" has the meaning given to that term in paragraph (a) of Clause 3.2 (*Conversion of Offer to Scheme*).

"Scheme Documents" means together the Scheme Press Release, the Scheme Circular, the Scheme Resolutions and the Implementation Agreement.

"Scheme Press Release" means a press announcement released by the Company and/or Target to announce the terms of the Scheme which must be approved in advance by the Arranger (acting reasonably).

"Scheme Resolutions" means the resolutions referred to and substantially in the form set out in the Scheme Circular.

"Screen Rate" means:

(a)     in relation to EURIBOR, the percentage rate per annum determined by the Banking Federation of the European Union for the relevant period; and

(b)     in relation to LIBOR, the British Bankers' Association Interest Settlement Rate for the relevant currency and period,

displayed on the appropriate page of the Telerate screen (or, if the Telerate service is unavailable, the appropriate Reuters screen). If the agreed page is replaced or service ceases to be available,

Confidential

the Agent may specify another page or service displaying the appropriate rate after consultation with the Company and the Lenders.

"**Secured Parties**" means each Finance Party from time to time party to this Agreement, and any Delegate.

"**Securitisation Entity**" means each person which is, directly or indirectly, owned or controlled by the Parent or any Holding Company of the Parent and which carries on any part of the business of or owns any assets of, the Music Publishing Division.

"**Security**" means any mortgage, charge (fixed or floating), pledge, lien, hypothecation, assignment, reservation of title or other security interest (including any conditional sale or other title retention agreement or licence in nature thereof).

"**Selection Notice**" means a notice substantially in the form set out in Part II of Schedule 3 (*Requests*) (or such other form as may be agreed between the Agent and the Company) given in accordance with Clause 13 (*Interest Periods*) in relation to a Term Facility.

"**Senior B Loan**" has the meaning given to it in the Senior Facilities Agreement.

"**Senior Facilities Agreement**" means the £1,175,000,000 senior facilities agreement dated on or around the Signing Date between (amongst others) the Company, Citigroup Global Markets Limited as arranger and certain parties named therein as lenders.

"**Senior Facility**" means a facility made available under the Senior Facilities Agreement.

"**Senior Indebtedness**" means all Financial Indebtedness of the Company other than:

(a)    Financial Indebtedness Incurred in violation of the provisions of this Agreement;

(b)    any obligation of the Company to a member of the Group;

(c)    any liability for Tax owing by the Company;

(d)    any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(e)    any Financial Indebtedness of the Company that is expressly subordinate in right of payment to any other Financial Indebtedness of the Company; or

(f)    any Capital Stock.

"**Separation Date**" means the date on which the Business Separation occurs in accordance with Clause 25.13 (*Business Separation*).

"**Shareholder Debt** " means any loan (whether arising under a loan agreement, loan notes, bond issue or other debt instrument) by the Investors to an Obligor and which is subordinated to the Facility pursuant to the Intercreditor Agreement.

"**Signing Date**" means the date of this Agreement.

"**Specified Time**" means a time determined in accordance with Schedule 10 (*Timetables*).

"**Stated Maturity**" means, with respect to any security or obligation, the date specified in such security or obligation as the fixed date on which the final payment of principal of such security

41

CITI-TF 00701763

or obligation is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security or obligation at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Structural Adjustment**" has the meaning given to it in Clause 38.6 (*Structural Adjustment*).

"**Structure Memorandum**" means the structure memorandum prepared by KPMG and addressed to, and/or capable of being relied upon by the Arranger, the Agent and the other Secured Parties.

"**Subordinated Indebtedness**" means, with respect to a person, any Financial Indebtedness of such person which is subordinate or junior in right of payment to the amounts payable under (or guaranteed under) the Finance Documents, as the case may be, pursuant to the terms of the Intercreditor Agreement and shall include, for the avoidance of doubt, any Shareholder Debt.

"**Subsidiary**" means, in relation to a company or corporation, a company or corporation:

(a)     which is controlled, directly or indirectly, by the first-mentioned company or corporation;

(b)     more than half the issued share capital of which is beneficially owned, directly or indirectly, by the first-mentioned company or corporation; or

(c)     which is a Subsidiary of another Subsidiary of the first-mentioned company or corporation,

and, for these purposes, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to determine the composition of a majority of its board of directors or equivalent body.

"**Successful Syndication**" has the meaning given to it in the Commitment Letter.

"**Super-Majority Lenders**" means:

(a)     Lenders whose Commitments aggregate more than 90 per cent. of the Total Commitments; or

(b)     (if the Total Commitments have been reduced to zero) Lenders whose Commitments aggregated more than 90 per cent. of the Total Commitments immediately before such reduction.

"**Syndication Date**" means the earlier of (i) the day on which the Arranger confirms that Successful Syndication has occurred and (ii) the date falling 90 days after the Closing Date.

"**Takeover Code**" means the City Code on Takeovers and Mergers.

"**Takeover Panel**" means the Panel on Takeovers and Mergers.

"**Target**" means EMI Group plc, a company incorporated in England and Wales with its registered office at 27 Wrights Lane, London W8 5SW and with company registration number 00229231.

"**TARGET**" means Trans-European Automated Real-time Gross Settlement Express Transfer payment system.

42

[London #294447 v13]

"**TARGET Day**" means any day on which TARGET is open for the settlement of payments in euro.

"**Target Group**" means the Target and its Subsidiaries.

"**Target Shares**" means the existing issued shares of the Target, all options to purchase shares in the Target and any further such shares which are unconditionally allotted or issued between the Signing Date and the Unconditional Date (including any shares issued under the terms of any convertible bonds or other instruments issued by the Target prior to the Signing Date) or, if the Acquisition is contemplated by way of a Scheme, the Effective Date (or, in either case, until such later date as the Company may decide with the prior written consent of the Agent, such consent not to be unreasonably withheld or delayed).

"**Tax**" means any present or future tax, levy, assessment, impost, deduction, duty and withholding and any charge of a similar nature (including any related interest, penalty or fine) and "**Taxation**" shall be construed accordingly.

"**Test Date**" means each date on which the financial covenant in Clause 24 (*Financial covenant*) is tested.

"**Third Parties Act**" has the meaning given to that term in Clause 1.4 (*Third Party Rights*).

"**Third Party Disposal**" has the meaning given to that term in Clause 28.3 (*Resignation of a Borrower*).

"**Total Commitments**" means the aggregate of the Commitments.

"**Total Net Debt**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Transaction Documents**" means the Finance Documents, the Acquisition Documents and the Investment Documents.

"**Transaction Security**" means the Security created or expressed to be created in favour of the Finance Parties pursuant to the Transaction Security Documents.

"**Transaction Security Documents**" means any document creating or expressed to create any Security listed in Schedule 12 (*Transaction Security*) and any other document creating or expressed to create any Security in respect of the obligations of any of the Obligors under any of the Finance Documents.

"**Transfer Agreement**" means an agreement substantially in one of the forms set out in Schedule 5 (*Form of Transfer Agreement*) or any other form agreed between the Agent and the Company.

"**Transfer Date**" means, in relation to a transfer, the later of:

(a)     the proposed Transfer Date specified in the Transfer Agreement; and

(b)     the date on which the Agent executes the Transfer Agreement.

"**Treasury Transactions**" means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price.

"**UK**" and "**United Kingdom**" means the United Kingdom of Great Britain and Northern Ireland.

43

CITI-TF 00701765

"**Unconditional Date**" means the date on which the Offer is declared or becomes unconditional in all respects (unless a Scheme Conversion has occurred, in which case it means the Effective Date unless the context otherwise requires).

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the Finance Documents.

"**Unsecured Indebtedness**" means Financial Indebtedness which does not benefit from any Security or guarantee.

"**US**" and "**United States**" means the United States of America, its territories, possessions and other areas subject to the jurisdiction of the United States of America.

"**US Bankruptcy Law**" means the United States Bankruptcy Code 1978 or any other United States Federal or State bankruptcy, insolvency or similar law.

"**US Obligor**" means an Obligor that is incorporated or organised under the laws of the United States of America or any State of the United States of America (including the District of Columbia) or that has a place of business or property in the United States of America.

"**Utilisation**" means a utilisation of the Facility by way of a Loan.

"**Utilisation Date**" means the date on which a Utilisation is made.

"**Utilisation Request**" means a notice substantially in the relevant form set out in Part I or II (as the case may be) of Schedule 3 (*Requests*) (or such other form as may be agreed between the Agent and the Company).

"**VAT**" means value added tax.

"**Withholding Form**" means US Internal Revenue Service Form W-8BEN, W-8ECI or W-9 (or, in each case, any successor form) or any other Internal Revenue Service form by which a person may claim complete exemption from withholding of US federal income tax on interest payments to that person.

1.2    **Construction**

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    the "**Agent**", the "**Arranger**", any "**Finance Party**", any "**Lender**", any "**Obligor**", any "**Party**", any "**Secured Party**", the "**Security Agent**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii)    a document in "**agreed form**" is a document which is previously agreed in writing by or on behalf of the Company and the Agent;

(iii)    "**assets**" includes present and future properties, revenues and rights of every description;

(iv)    references to the "**equivalent**" of an amount specified in a particular currency shall be construed as a reference to the amount of the other relevant currency which can be purchased at the Agent's Spot Rate of Exchange;

Confidential

CITI-TF 00701766

(v)    a **"Finance Document"** or a **"Transaction Document"** or any other agreement or instrument is a reference to that Finance Document or Transaction Document or other agreement or instrument as amended or novated (however fundamentally);

(vi)    **"indebtedness"** includes any obligation (whether incurred as principal or as surety or in respect of a guarantee or indemnity) for the payment or repayment of money, whether present or future, actual or contingent;

(vii)    a **"person"** includes any person, firm, company, corporation, government, state or agency of a state or any grouping (whether or not having separate legal personality) of two or more of the foregoing;

(viii)    a **"regulation"** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(ix)    **"trustee, fiduciary and fiduciary duty"** has in each case the meaning given to that term under any applicable law;

(x)    a provision of law is a reference to that provision as amended or re-enacted; and

(xi)    a time of day is a reference to London time.

(b).    Section, Clause and Schedule headings are for ease of reference only.

(c)    Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d)    A Default is **"continuing"** if it has not been remedied or waived.

**1.3**    **Currency**
"euro" and "€" mean the single currency unit of the Participating Member States, "£" and "Sterling" denote the lawful currency of the United Kingdom and "dollars" denotes the lawful currency of the United States of America.

**1.4**    **Third Party Rights**
(a)    Unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "Third Parties Act") to enforce or enjoy the benefit of any term of this Agreement.

(b)    Unless expressly provided to the contrary in this Agreement, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

45

CITI-TF 00701767

## SECTION 2
## THE FACILITY

**2.    THE FACILITY**

**2.1    The Facility**

Subject to the terms of this Agreement, the Lenders make available to the Borrowers a term loan facility in an amount equal to the Total Commitments, being £1,410,000,000 at the Signing Date.

**2.2    Finance Parties' rights and obligations**

(a)    The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c)    A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

**2.3    Obligors' Agent**

(a)    Each Obligor (other than the Company) by its execution of this Agreement or an Accession Letter irrevocably appoints the Company to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

   (i)    the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of a Borrower, Utilisation Requests), to execute on its behalf any Accession Letter, to make such agreements and to effect the relevant amendments, supplements and variations (in each case, however fundamental) capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor (notwithstanding that they may increase the Obligor's obligations or otherwise affect the Obligor) and to give the confirmation as to continuation of surety obligations, without further reference to or the consent of that Obligor; and

   (ii)    each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

   and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)    Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document on behalf of another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document or the Parent executed this Agreement) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it. In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

[London 8294447 v13]

Confidential

CITI-TF 00701768

**3.    PURPOSE**
**3.1    Purpose**
(a)    Each Borrower shall apply the proceeds of each Loan borrowed by it (directly or indirectly) towards (in each case, only on or after the Closing Date):

    (i)    the satisfaction of the consideration payable by the Company to the holders of the Target Shares either:

        (A)    if the Acquisition is being completed pursuant to an Offer, pursuant to the terms of the Offer and pursuant to the operation of the procedures contained in Part 28 of the Companies Act 2006; or

        (B)    if the Acquisition is being completed pursuant to a Scheme, pursuant to the terms of the Scheme;

    (ii)    refinancing the Financial Indebtedness of the Company incurred under the Interim Facilities Agreement (and if any amount is outstanding under the Interim Facility, no amount may be applied under this Agreement for any purpose other than refinancing the amounts outstanding until they are repaid in full);

    (iii)-    payment of the Acquisition Costs; and

    (iv)    refinancing certain Existing Financial Indebtedness (including the amount of any breakage or prepayment costs or fees) and providing cash collateral in respect of certain obligations of the Target Group existing on the Unconditional Date or the Effective Date, as the case may be (the "**Refinancing**").

(b)    No amount borrowed under the Facility shall be applied in any manner that would be illegal or contravene any applicable law or regulation in any Relevant Jurisdiction concerning financial assistance by a company for the acquisition of or subscription for its own shares or the shares of its parent or any of its other holding companies.

(c)    Upon confirmation by the Agent that the Documentary Conditions have been provided to it (each in form and substance satisfactory to it, acting reasonably), the Company shall, on such date, be deemed to have given notice to the lenders under the Interim Facilities Agreement of the immediate cancellation in full of the Interim Facility pursuant to clause 9 of the Interim Facilities Agreement.

**3.2    Conversion of Offer to Scheme**
(a)    At any time before the Unconditional Date, the Company may give written notice (a "**Scheme Conversion Notice**") to the Agent that it wants to lapse or withdraw from the Offer and to launch a Scheme instead.

(b)    Within 14 days of the date of the delivery of a Scheme Conversion Notice, the Company shall procure that:

    (i)    the Offer lapses or is withdrawn; and

    (ii)    a Scheme Press Release is issued.

**3.3    Monitoring**
No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

47

    CITI-TF 00701769

A-6151

4.  **CONDITIONS OF UTILISATION**

4.1  **Initial conditions precedent**

The obligations of each Lender under Clause 5.4 (*Lenders' participation*) to make a Loan are subject to the conditions precedent that on the date on which such Loan is to be made:

(a)  the Agent has received, or has waived the requirement to receive all of the documents and evidence set out in Part 1 of Schedule 2 (*Conditions Precedent*) in form and substance satisfactory to it, acting reasonably;

(b)  the Major Representations are correct in all respects and will remain correct in all respects immediately after the making of the Loan;

(c)  no Major Event of Default is outstanding or would result from the making of the Loan; and

(d)  it is not illegal or contrary to any applicable law or regulation for such Lender to make a Loan.

4.2  **Certain funds**

Subject to Clause 4.1 (*Initial conditions precedent*) above, during the Certain Funds Period and notwithstanding any other term of this Agreement or any other Finance Document, no Lender may:

(a)  refuse to participate in or make available any Loan;

(b)  cancel any Commitment;

(c)  exercise any right of rescission, set-off, counterclaim or similar right or remedy which it may have in relation to this Agreement or any Loan; or

(d)  accelerate any Loan or otherwise demand or require repayment or prepayment of any Loan or enforce any security under any Transaction Security Document other than pursuant to Clause 9.1 (*Illegality*) or while a Major Event of Default is outstanding,

provided that immediately upon the expiry of the Certain Funds Period all such rights, remedies and entitlements shall be available to the Finance Parties notwithstanding that they would not have been available for use during the Certain Funds Period.

4.3  **Further conditions precedent**

Subject to Clause 4.2 (*Certain funds*), the Lenders will only be obliged to comply with Clause 5.4 (*Lenders' participation*) if on the date of the Utilisation Request and on the proposed Utilisation Date:

(a)  no Default is continuing or would result from the proposed Utilisation; and

(b)  in relation to any Utilisation on the Closing Date, all the representations and warranties in Clause 22 (*Representations*) which are made or deemed to be made on the Closing Date in accordance with Clause 22.24 (*Repetition*) or, in relation to any other Utilisation, the Repeating Representations, to be made by each Obligor are true and accurate.

4.4  **Conditions relating to Optional Currencies**

(a)  A currency will constitute an Optional Currency in relation to a Utilisation if:

(i)  it is readily available in the amount required and freely convertible into the Base Currency in the Relevant Interbank Market at the Specified Time or, if later, on the date

48

Confidential                                                   CITI-TF 00701770

the Agent receives the relevant Utilisation Request and the Utilisation Date for that Utilisation; and

(ii)   it is euro or dollars or has been approved by the Agent (acting on the instructions of all the Lenders) on or prior to receipt by the Agent of the relevant Utilisation Request for that Utilisation.

(b)   If the Agent has received a written request from the Company for a currency to be approved under paragraph (a)(ii) above, the Agent will confirm to the Company by the Specified Time:

(i)   whether or not the Lenders have granted their approval; and

(ii)   if approval has been granted, the minimum amount for any subsequent Utilisation in that currency.

**4.5   Maximum number of Utilisations**

(a)   A Borrower may not deliver a Utilisation Request or request that a Loan be divided if as a result of the proposed Utilisation more than five Loans would be outstanding.

(b)   Any Loan made by a single Lender under Clause 7.2 (*Unavailability of a currency*) shall not be taken into account in this Clause 4.5.

**4.6   Utilisation in respect of an Offer**

If the Acquisition proceeds by way of an Offer, any amount of the Loan which is not required on the Closing Date to satisfy the consideration payable by the Company to the holders of the Target Shares shall be paid into a bank account held at an Acceptable Bank or with the Agent or Security Agent which shall be subject to the Transaction Security and paid out only in order to complete the Acquisition in accordance with Part 28 of the Companies Act 2006.

49

**SECTION 3**
**UTILISATION**

**5.    UTILISATION OF LOANS**

**5.1    Delivery of a Utilisation Request**

A Borrower (or the Obligors' Agent on its behalf) may utilise the Facility by delivery to the Agent of a duly completed Utilisation Request not later than the Specified Time or, in respect of any Utilisation to be made in Sterling on the Closing Date, no later than 9:00 a.m. on the Closing Date.

**5.2    Completion of a Utilisation Request**

(a)    Each Utilisation Request is irrevocable and will not be regarded as having been duly completed unless:

(i)    it identifies the relevant Borrower;

(ii)    the proposed Utilisation Date is, in the case of the first Loan, the Closing Date or otherwise a Business Day in each case within the Availability Period;

(iii)    the currency and amount of the Loan comply with Clause 5.3 (*Currency and amount*);

(iv)    the proposed Interest Period complies with Clause 13 (*Interest Periods*); and

(v)    it specifies the account and bank (which, in the case of euro, must be in the principal financial centre of a Participating Member State in which banks are open for general business on that day or London or, in the case of an Optional Currency the principal financial centre of the country of the currency of the Utilisation) to which the proceeds of the Utilisation are to be credited.

(b)    Multiple Utilisations may be requested in a Utilisation Request on the First Utilisation Date. Only one Utilisation may be requested in each subsequent Utilisation Request.

**5.3    Currency and amount**

(a)    The currency specified in a Utilisation Request must be the Base Currency or an Optional Currency.

(b)    Unless the Agent otherwise agrees, the amount of the proposed Utilisation must be an amount whose Base Currency Amount is not more than the Available Facility (adjusted, where applicable, to take account of any additional Utilisations which are scheduled to take place on or before the relevant Utilisation Date) and which is:

(i)    if the currency selected is the Base Currency, a minimum of £5,000,000 and integral multiples of £1,000,000 thereafter or, if less, the relevant Available Facility; or

(ii)    if the currency selected is euro or dollars, a minimum of €5,000,000 and integral multiples of €1,000,000 thereafter or a minimum of $5,000,000 and integral multiples of $1,000,000 thereafter, as the case may be, or, if less, the Available Facility; or

(iii)    if the currency selected is an Optional Currency other than euro or dollars, the minimum amount specified by the Agent pursuant to paragraph (b)(ii) of Clause 4.4 (*Conditions relating to Optional Currencies*) or, if less, the relevant Available Facility.

**5.4    Lenders' participation**

(a)    If the conditions set out in this Agreement have been met, each Lender shall make its participation in each Loan available by the Utilisation Date through its Facility Office.

50

[London #294447 v13]

CITI-TF 00701772

(b)     The amount of each Lender's participation in each Loan will be equal to the proportion borne by its Available Commitment to the Available Facility immediately prior to making the Loan.

(c)     The Agent shall determine the Base Currency Amount of each Loan which is to be made in an Optional Currency and notify each relevant Lender of the amount, currency and the Base Currency Amount of each Loan and the amount of its participation in that Loan by the Specified Time or, in case of any Utilisation to be made on the Closing Date, as soon as practicable after receipt of the relevant Utilisation Request.

5.5     **Limitations on Utilisations**
Notwithstanding anything to the contrary, the relevant Lenders shall be under no obligation to comply with Clause 5.4 (*Lenders' participation*) if to do so would cause the aggregate of any outstanding Utilisations to exceed the Total Commitments.

6.      **EXTENSION OF THE FINAL MATURITY DATE**

(a)     The Borrowers (or the Obligors' Agent on their behalf) may by notice to the Agent (the "**Extension Request**") at any time prior to the Extension Date, request that the Final Maturity Date be extended to the eighth anniversary of the first Financial Quarter Ending Date to occur after the Closing Date if, on the date of the Extension Request:

(i)     no:

(A)     corporate action, legal proceeding or other procedure or step described in Clause 26.8 (*Insolvency proceedings*); or

(B)     creditors' process described in Clause 26.5 (*Cessation and expropriation*),

has been taken or, to the knowledge of the Company, threatened in relation to an Obligor and none of the circumstances described in Clause 26.6 (*Insolvency*) applies to a member of the Group;

(ii)    no Event of Default under Clause 26.1 (*Failure to pay*) has occurred and is continuing; and

(iii)   no:

(A)     member of the Group has failed to pay any Financial Indebtedness in an amount in excess of £10 million (or its equivalent) on its due date (or within any applicable grace period provided for in the original documents relating to that Financial Indebtedness);

(B)     Financial Indebtedness of any member of the Group has become or been declared due and payable (or is capable of being declared due and payable) before its Stated Maturity or is placed on demand by reason of an event of default (howsoever described) nor have any circumstances arisen as a result of which any Financial Indebtedness in an amount in excess of £10 million (or its equivalent) could be so declared due and payable before its Stated Maturity; and

(C)     Financial Indebtedness in an amount in excess of £10 million (or its equivalent) which is repayable on demand has not repaid on demand being made.

(b)     The Agent must promptly notify the Lenders of any Extension Request.

Confidential

CITI-TF 00701773

(c)    If an Extension Request has been received by the Agent in accordance with the terms of this Agreement, the Final Maturity Date shall, with effect from the date of such Extension Request, be extended to the eighth anniversary of the first Financial Quarter Ending Date to occur after the Closing Date. Any Loans which are not repaid on the first anniversary of the first Financial Quarter Ending Date to occur after the Closing Date shall be "**Extended Securitisation Loans**".

## 7.    OPTIONAL CURRENCIES

### 7.1    Selection of currency

A Borrower (or the Obligors' Agent on its behalf) shall select the currency of a Utilisation in a Utilisation Request.

### 7.2    Unavailability of a currency

If before the Specified Time on any Quotation Day:

(a)    a Lender notifies the Agent that the Optional Currency requested is not readily available to it in the amount required; or

(b)    a Lender notifies the Agent that compliance with its obligation to participate in a Loan in the proposed Optional Currency would contravene a law or regulation applicable to it,

the Agent will give notice to the relevant Borrower (or the Obligors' Agent on behalf of such Borrower) to that effect by the Specified Time on that day. In this event, any Lender that gives notice pursuant to this Clause 7.2 will be required to participate in the Loan in the Base Currency (in an amount equal to that Lender's proportion of the Base Currency Amount) and its participation will be treated as a separate Loan denominated in the Base Currency during that Interest Period.

[London #294447 v13]

Confidential

CITI-TF 00701774

**A-6156**

**SECTION 4**
**REPAYMENT, PREPAYMENT AND CANCELLATION**

**8.    REPAYMENT**
The Borrowers shall repay the Loans in full on the Final Maturity Date.

**9.    ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION**
**9.1    Illegality**
If it becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in any Utilisation:

(a)    that Lender shall promptly notify the Agent upon becoming aware of that event;

(b)    upon the Agent notifying the Company, the Commitment of that Lender will be immediately cancelled and reduced to the extent of such illegality;

(c)    each Borrower shall repay that Lender's reduced and cancelled participation in the Utilisations made to that Borrower on the last day of the Interest Period for each Utilisation occurring after the Agent has notified the Company or, if earlier, the date specified by the Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law); and

(d)    the Company shall have the right to serve notice pursuant to Clause 38.5 (*Replacement of a Lender*).

**9.2    Voluntary cancellation**
The Company may, if it gives the Agent not less than three (3) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part (being a minimum amount of £5 million) of the Available Facility. Any cancellation under this Clause 9.2 shall reduce rateably the Commitments of each Lender.

**9.3    Automatic Cancellation**
At the close of business on the earlier of the first Utilisation Date and the last day of the Availability Period, the Available Commitment of each Lender shall be (if it has not already been) immediately cancelled and reduced to zero.

**9.4    Voluntary prepayment**
The Company may, if it gives the Agent not less than three (3) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of a Loan (but, if in part, being an amount that reduces the Base Currency Amount of that Loan by a minimum amount of £5 million).

**9.5    Application of voluntary prepayments**
Any proceeds to be applied in prepayment of the Loans in accordance with Clause 9.4 (*Voluntary prepayments of Term Loans*) shall be applied against the Loans as the Borrowers (or the Obligors' Agent on their behalf) direct.

**9.6    Right of cancellation and repayment in relation to a single Lender**
(a)    If:

(i)    any sum payable to any Lender by an Obligor is required to be increased under paragraph (c) of Clause 16.2 (*Tax gross-up*); or

Confidential

CITI-TF 00701775

(ii)     any Lender claims indemnification from the Company or an Obligor under Clause 16.3 (*Tax indemnity*) or Clause 17.1 (*Increased costs*),

the Company may, whilst the circumstance giving rise to the requirement or indemnification continues, give the Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation in the Utilisations or may instead exercise its rights under Clause 38.5 (*Replacement of a Lender*).

(b)     On receipt of a notice referred to in paragraph (a) above in relation to a Lender, the Commitment of that Lender shall immediately be reduced to zero.

(c)     On the last day of each Interest Period which ends after the Company has given notice under paragraph (a) above in relation to a Lender (or, if earlier, the date specified by the Company in that notice), each Borrower to which a Utilisation is outstanding shall repay that Lender's participation in that Utilisation together with all interest and other amounts accrued under the Finance Documents.

**10.     MANDATORY PREPAYMENT**
**10.1   Change of Control**
(a)     In this Clause 10.1:

"**Change of Control**" means the Original Investors (as defined below) ceasing to have the power, directly or indirectly, to vote or direct the voting of shares having a majority of the ordinary voting power for the election of directors of Holdco or any other Holding Company of the Company; provided that the occurrence of the foregoing event shall not be deemed a Change of Control if:

(i)     at any time prior to the consummation of an underwritten Initial Public Offering (as defined below) and for any reason whatever:

(A)     the Original Investors otherwise have the right to designate (and do so designate) a majority of the board of directors of such company; or

(B)     the Original Investors and their employees, directors and officers (the "**Original Investors Group**") (or any of them) own legally and beneficially an amount of the ordinary share capital of Holdco or any other Holding Company of the Company equal to at least 50% of the percentage of ordinary share capital of Holdco or any other Holding Company of the Company owned by the Original Investors Group (taken together) legally and beneficially as at the Unconditional Date and such ownership by the Original Investors Group represents the largest single block of voting shares of such company held by any person or persons acting in concert; or

(ii)     at any time after the consummation of an underwritten Initial Public Offering (as defined below) and for any reason whatever, no person or persons acting in concert, excluding the Original Investors Group, has become the beneficial owner, directly or indirectly, of more than the greater of:

(A)     35% of the shares then outstanding; and

(B)     the percentage of the then outstanding voting shares of such company owned beneficially by the Original Investors Group (taken together),

and the board of directors of such company shall consist of a majority of Continuing Directors.

[London #294447 v13]

Confidential

CITI-TF 00701776

For the purposes of this definition of Change of Control:

**"affiliate"** as to any person, means any other person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such person;

**"Continuing Directors"** means, at any time and in relation to a company, any member of the board of directors of that company who:

(i)       was a member of such board of directors after the Unconditional Date (and immediately following any elections or resignations after the completion of the Acquisition); or

(ii)      was nominated for election or elected to such board of directors with, or whose nomination for election or election to such board of directors was approved by, the affirmative vote of a majority of the Continuing Directors who were members of such board of directors at the time of such nomination or election; or

(iii)     is a designee of the Sponsor (as defined below) or was nominated by the Sponsor or any designees of the Sponsor on such board of directors.

**"control"** of a person means the power, directly or indirectly, either to:

(i)       vote more than 50.0% of the shares (or stock, as applicable) having ordinary voting power for the election of directors of such person; or

(ii)      direct or cause the direction of the management and policies of such person, whether by contract or otherwise;

**"Initial Public Offering"** means a listing of all or any part of the share capital of Holdco or any of its Subsidiaries or any Holding Company of Holdco on any recognised investment exchange (as that term is used in the Financial Services and Markets Act 2000) or in or on any exchange or market replacing the same or any other exchange or market in any jurisdiction or country.

**"Original Investors"** means Terra Firma Investments (GP) 2 Limited, Terra Firma Investments (GP) 3 Limited and each of their affiliates from time to time (including any other fund managed and/or advised by any such entity) (the **"Sponsor"** or **"The Terra Firma Group"**) and, subject to The Terra Firma Group (taken as a whole) maintaining control over not less than 50.1 per cent. of the voting interests of Holdco, any existing investor in the Terra Firma funds and any other investors of similar financial standing acceptable to the Arranger (acting reasonably), its and their principals and their affiliates and management to whom any interest in Holdco has been transferred on or before the date falling six months after the Closing Date or as may otherwise be agreed between the Sponsor with the Arrangers (such agreement not to be unreasonably conditioned, withheld or delayed).

(b)    If a Change of Control or a disposal of substantially all of the business and/or assets of the Parent and its Subsidiaries occurs:

(i)       the Company shall promptly notify the Agent upon becoming aware of that event;

(ii)      a Lender shall not be obliged to fund a Utilisation; and

(iii)     if a Lender (a **"Change of Control Lender"**) so requires, the Agent must, by notice to the Company:

(A)    cancel that Change of Control Lender's Commitments; and

Confidential

CITI-TF 00701777

(B)    declare that Change of Control Lender's proportion of the outstanding Utilisations, together with accrued interest and all other amounts accrued under the Finance Documents to be immediately due and payable.

**10.2**  **Disposal, Insurance, Recovery Proceeds and Excess Cashflow**

(a)   For the purposes of this Clause 10.2, Clause 10.3 (*Application of mandatory prepayments*) and Clause 24 (*Financial Covenants*):

"**De Minimis Threshold**" means £2 million or its equivalent in any Financial Year.

"**Disposal**" means a sale, lease, licence, transfer or other disposal by a person (whether by a voluntary or involuntary single transaction or series of transactions).

"**Excess Takeout Proceeds**" means, in relation to the Net Proceeds of the Permitted Securitisation, Permitted High Yield Issuance, any Music Publishing Division Sale or Recorded Music Division Sale, the balance of the Net Proceeds thereof after application in prepayment of Financial Indebtedness in accordance with the provisions of this Agreement, the Senior Facilities Agreement and the Mezzanine Facility Agreement.

"**Excluded Music Publishing Division Insurance Proceeds**" means Music Publishing Division Insurance Proceeds which, when aggregated with any such other proceeds received by the Music Publishing Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)    satisfaction of the liability, damage or loss to which they relate;

(ii)   the purchase of assets which are used or useful for the Music Publishing Division; or

(iii)  as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period,

provided that there shall be no Excluded Music Publishing Division Insurance Proceeds while there is any amount outstanding or available under the Facility or the Music Publishing Division Acquisition Facility.

"**Excluded Music Publishing Division Proceeds**" means Net Proceeds of a Music Publishing Division Sale:

(i)    which:

    (A)   are received by a member of the Group in respect of any one transaction or series of connected transactions and which do not exceed £750,000 (or its equivalent);

    (B)   when aggregated with the Net Proceeds of all Music Publishing Division Sales made in any one Financial Year, do not exceed £1,500,000 (or its equivalent); and

    (C)   when aggregated with the Net Proceeds of all Music Publishing Division Sales which are Excluded Music Publishing Division Proceeds by virtue of paragraphs (i) or (ii) above, do not exceed £2,500,000 (or its equivalent);

(ii)   which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to reinvest those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact

56

[London #294447 v13]

CITI-TF 00701778

reinvested by the end of that period) towards the purchase of assets which are used or useful for the Music Publishing Division or as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period; or

(iii)   which are received by any member of the Group in respect of any one or series of connected transactions pursuant to paragraph (g) of the definition of "Permitted Music Publishing Disposal Proceeds",

provided that, other than Excluded Music Publishing Division Proceeds described in paragraph (iii) above which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to reinvest those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards the purchase of assets which are used or useful for the Music Publishing Division or as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period, there shall be no Excluded Music Publishing Division Proceeds while there is any amount outstanding or available under the Facility or the Music Publishing Division Acquisition Facility.

"Excluded Music Publishing Division Recovery Proceeds" means any Music Publishing Division Recovery Proceeds which, when aggregated with any such other proceeds received by the Music Publishing Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)   satisfaction of the liability, damage or loss to which they relate;

(ii)   the purchase of assets which are used or useful for the Music Publishing Division; or

(iii)   as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period,

provided that there shall be no Excluded Music Publishing Division Recovery Proceeds while there is any amount outstanding or available under the Facility or the Music Publishing Division Acquisition Facility.

"Excluded Recorded Music Division Insurance Proceeds" means Recorded Music Division Insurance Proceeds which, when aggregated with any such other proceeds received by the Recorded Music Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)   satisfaction of the liability, damage or loss to which they relate;

(ii)   the purchase of assets which are used or useful for the Recorded Music Division; or

(iii)   as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period.

"Excluded Recorded Music Division Proceeds" means Net Proceeds of a Recorded Music Division Sale which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to reinvest those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by

Confidential

CITI-TF 00701779

the end of that period) towards the purchase of assets which are used or useful for the Recorded Music Division or as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period.

**"Excluded Recorded Music Division Recovery Proceeds"** means any Recorded Music Division Recovery Proceeds which, when aggregated with any such other proceeds received by the Recorded Music Division do not exceed the De Minimis Threshold or which are applied within 365 days after receipt (or an irrevocable commitment is made by the relevant Group member within such 365 day period to apply those proceeds within 180 days of the end of such 365 day period and those proceeds are in fact reinvested by the end of that period) towards:

(i)     satisfaction of the liability, damage or loss to which they relate;

(ii)    the purchase of assets which are used or useful for the Recorded Music Division; or

(iii)   as otherwise agreed by the Majority Lenders, including for the avoidance of doubt, an extension of the reinstatement or replacement period.

**"Insurance Proceeds"** means the Net Proceeds of any insurance claim (save for any insurance for third party liability, business interruption, loss of earnings, credit insurance or similar claims) received by a member of the Group.

**"Mandatory Prepayment Account"** means an interest bearing account:

(i)     held at an Acceptable Bank by a Borrower with the Agent or Security Agent;

(ii)    identified in a letter from the Company to the Agent as a Mandatory Prepayment Account;

(iii)   subject to Security in favour of the Security Agent which Security is in form and substance satisfactory to the Agent and the Security Agent; and

(iv)    from which no withdrawals may be made by any members of the Group except as contemplated by this Agreement,

(as the same may be redesignated, substituted or replaced from time to time).

**"Material Tax Costs"** means, in respect of an amount to be prepaid under this Agreement, an amount equal to four (4) per cent. of such amount.

**"Music Publishing Division Insurance Proceeds"** means Insurance Proceeds received by the Music Publishing Division.

**"Music Publishing Division Recovery Proceeds"** means Recovery Proceeds received or recovered by the Music Publishing Division.

**"Music Publishing Division Sale"** means:

(i)     a Disposal of any asset, business or undertaking comprising part of the Music Publishing Division or the Capital Stock of any person which owns any such assets, business or undertaking; or

(ii)    a Disposal of all or any part of the Music Publishing Division.

58

[London #294447 v13]

Confidential

"**Net Proceeds**" means the cash proceeds actually received by a member of the Group or a Securitisation Entity (and if the proceeds are received by a person that is not a wholly-owned member of the Group, the amount of the proceeds that are proportionate to the interest in such person held by the Group) in connection with the Permitted Securitisation, any Disposal, insurance claim and claims against professionals in relation to the Reports after deducting:

(i)     fees, costs and expenses incurred by any member of the Group with respect to such Permitted Securitisation, Disposal or claim to persons who are not members of the Group (including any bonus or similar payments to management of any disposed of business);

(ii)    any Tax incurred and required to be paid by the seller or claimant (including by way of application of any Tax credits or amounts reasonably reserved in respect of Taxes) in connection with that Permitted Securitisation, Disposal or claim (as may reasonably be determined by such seller or -claimant) or the transfer of the proceeds thereof intra-Group;

(iii)   amounts retained to cover potential liabilities in connection with the Permitted Securitisation, Disposal or claim;

(iv)    any third party indebtedness secured on the assets which are disposed of that is required to be repaid out of those proceeds; and

(v)     any costs of closure, relocation, reorganisation, restructuring or other costs incurred in preparing the asset for a disposal.

"**Recorded Music Division Insurance Proceeds**" means Insurance Proceeds received by the Recorded Music Division.

"**Recorded Music Division Recovery Proceeds**" means Recovery Proceeds received or recovered by the Recorded Music Division.

"**Recorded Music Division Sale**" means:

(i)     a Disposal of any asset, business or undertaking comprising part of the Recorded Music Division or the Capital Stock of any person which owns any such assets, business or undertaking; or

(ii)    a Disposal of all or any part of the Recorded Music Division,

in either case to the extent that the Net Proceeds realised from such Disposal exceed £2 million (or the equivalent thereof in any other currency).

"**Recovery Proceeds**" means the Net Proceeds received or recovered by any member of the Group in respect of any Report or any related breach of contract or reliance letter or legal action or proceedings (whether by way of judgment or on settlement of such claim) in relation to any Report.

"**Surplus Music Publishing Proceeds**" has the meaning given to it in Clause 10.3 (*Application of mandatory prepayments*).

"**Surplus Proceeds**" has the meaning given to it in Clause 10.3 (*Application of mandatory prepayments*).

59

CITI-TF 00701781

"Surplus Recorded Music Proceeds" has the meaning given to it in Clause 10.3 (*Application of mandatory prepayments*).

(b)    The Company shall, or shall ensure that the relevant Borrowers will:

(i)    subject to Clause 10.5 (*Restrictions on upstreaming monies*), prepay outstanding utilisations in the following amounts at the times and in the order of application contemplated by Clause 10.3 (*Application of mandatory prepayments*):

(A)    the Net Proceeds of any Music Publishing Division Sale (other than Excluded Music Publishing Division Proceeds);

(B)    the amount of Music Publishing Division Insurance Proceeds (other than Excluded Music Publishing Division Insurance Proceeds);

(C)    the amount of Recorded Music Division Insurance Proceeds (other than Excluded Recorded Music Division Insurance Proceeds);

(D)    the amount of any Music Publishing Division Recovery Proceeds (other than Excluded Music Publishing Division Recovery Proceeds);

(E)    the amount of any Recorded Music Division Recovery Proceeds (other than Excluded Recorded Music Division Recovery Proceeds);

(F)    on the last day of the first Interest Period which ends 14 days or more after the date of delivery of the Group's audited consolidated financial statements in respect of the first full Financial Year to complete following the Unconditional Date, the Company shall apply, or procure that there is applied, by way of prepayment in accordance with Clause 10.3 (*Application of mandatory prepayments*), 90 per cent. of any Excess Cashflow (other than Music Publishing Division Excess Cashflow) for such Financial Year unless the Compliance Certificate delivered to the Agent in respect of such audited consolidated financial statements demonstrates that the Incurrence Leverage Ratio is equal to or less than 2.00:1, in which case 50 per cent. of any Excess Cashflow (other than Music Publishing Excess Cashflow) for such Financial Year will be required to be used for prepayments;

(G)    on the last day of the first Interest Period which ends 14 days or more after the date of delivery of the Group's unaudited consolidated financial statements in respect of each Financial Quarter ending on and after the Unconditional Date, the Company shall apply, or procure that there is applied, by way of prepayment in accordance with Clause 10.3 (*Application of mandatory prepayments*), 100 per cent. of any Music Publishing Division Excess Cashflow for such Financial Quarter; and

(H)    the Net Proceeds of the Permitted Securitisation; and

(ii)    prepay outstanding utilisations under the Senior Facilities Agreement and, if applicable, Mezzanine Loans with the Net Proceeds of any Recorded Music Division Sale (other than Excluded Recorded Music Division Proceeds) at the times and in the order of application contemplated by Clause 10.3 (*Application of mandatory prepayments*).

10.3    **Application of mandatory prepayments**

(a)    Any proceeds to be applied in prepayment of any outstanding Utilisations under:

[London #294447 v13]

Confidential

CITI-TF 00701782

(i)     paragraph (b)(i)(A) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall be applied, to the fullest extent permitted by mandatory provisions of applicable law, in prepayment (or cancellation) of:

    (A)     first, the Loans, the Music Publishing Division Acquisition Loans and the Music Publishing Division Revolving Facility and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves (and the pro rata amount applied to the Revolving Facility shall be applied first to repay Music Publishing Division Revolving Facility Loans and thereafter in cancellation of available commitments under the Revolving Facility); and

    (B)     second, after repayment in full of the Loans, the Music Publishing Division Acquisition Loans and the Music Publishing Division Revolving Facility Loans, in the order contemplated in paragraph (b)(i) below; and

(ii)    paragraph (b)(i)(G) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall be applied, to the fullest extent permitted by mandatory provisions of applicable law, in prepayment of:

    (A)     first, the Loans and the Music Publishing Division Acquisition Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata; and

    (B)     second, after repayment in full of the Loans and the Music Publishing Division Acquisition Loans, in the order contemplated in paragraph (b)(i) below.

(b)     Any proceeds to be applied in prepayment of outstanding utilisations under:

(i)     paragraphs (b)(i)(B) and (b)(i)(D) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied in the following order:

    (A)     first, in prepayment of Loans and Music Publishing Division Acquisition Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves;

    (B)     secondly, in cancellation of Available Commitments under the Music Publishing Division Revolving Facility (and the available commitment of the Lenders under the Music Publishing Division Revolving Facility will be cancelled rateably);

    (C)     thirdly, in prepayment and cancellation of Utilisations and Commitments under the Music Publishing Division Revolving Facility Commitments; and

    (D)     fourthly, in repayment and cancellation pro rata of the Ancillary Outstandings and Ancillary Commitments and in repayment and cancellation of, or application of cash cover for any Letter of Credit issued under the Revolving Facility or, after the Separation Date, the Ancillary Outstandings and Ancillary Commitments which have been allocated to the Music Publishing Division by the Lenders and the Company,

provided that if there are no Music Publishing Division Acquisition Facility Loans to be prepaid, the Acquisition Facility Commitments in respect of the Music Publishing Division will be reduced and permanently cancelled on a pro rata basis by the amount

61

CITI-TF 00701783

that would have otherwise been prepaid and the balance of any such proceeds (being **"Surplus Music Publishing Proceeds"**) shall be retained by the Group or distributed for any purpose not otherwise prohibited by the terms of this Agreement;

(ii)     paragraphs (b)(i)(C), (b)(i)(E) and (b)(i)(F) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied in the following order:

(A)     first, in prepayment of Senior B Loans, in prepayment of any Recorded Music Division Acquisition Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves;

(B)     secondly, in cancellation of available commitments under the Recorded Music Division Revolving Facility (and the available commitments of the Lenders under the Recorded Music Division Revolving Facility will be cancelled rateably);

(C)     thirdly, in prepayment and cancellation of Utilisations and commitments under the Recorded Music Division Revolving Facility; and

(D)     fourthly, in repayment and cancellation pro rata of the Ancillary Outstandings and Ancillary Commitments and in repayment and cancellation of, or application of cash cover for any Letter of Credit issued under the Recorded Music Division Revolving Facility,

provided that if there are no Senior B Loans to be prepaid, the Senior B Facility Commitments will be reduced and permanently cancelled on a pro rata basis by the amount that would have otherwise been prepaid and the balance of any such proceeds (being **"Surplus Recorded Music Proceeds"** and, together with the Surplus Music Publishing Proceeds, the **"Surplus Proceeds"**) shall be retained by the Group or distributed for any purpose not otherwise prohibited by the terms of this Agreement.

(iii)    paragraph (b)(i)(H) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied in prepayment of the Loans and any other amounts outstanding under the Finance Documents.

(c)    Any proceeds to be applied in prepayment of outstanding Utilisations under paragraph (b)(ii) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) shall, to the fullest extent permitted by mandatory provisions of applicable law, be applied as follows:

(i)    if:

(A)     the relevant Net Proceeds are received by a member of the Group prior to the earlier of (x) the first anniversary of the Closing Date and (y) the completion of the Permitted High Yield Issuance; and

(B)     the ratio of Total Net Debt to Maintenance EBITDA of the Recorded Music Division for the 12 month period ending on the most recent Financial Quarter Ending Date prior to the date on which such Net Proceeds are received by a member of the Group is either in line with or better than as described in the Base Case Model,

then such proceeds shall be applied in prepayment of Senior B Loans, in prepayment of any Recorded Music Division Acquisition Loans, in prepayment of the Recorded Music

[London #294447 v13]

Confidential

CITI-TF 00701784

Division Revolving Facility (and the pro rata amount applied to the Recorded Music Division Revolving Facility shall be applied first to repay Recorded Music Division Revolving Facility Loans and thereafter in cancellation of available commitments under the Recorded Music Division Revolving Facility) and in prepayment of Mezzanine Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves; or

(ii)    in all other cases, in prepayment of Senior B Loans, in prepayment of any Recorded Music Division Acquisition Loans and in prepayment of the Recorded Music Division Revolving Facility and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves (and the pro rata amount applied to the Recorded Music Division Revolving Facility shall be applied first to repay Recorded Music Division Revolving Facility Loans and thereafter in cancellation of available commitments under the Revolving Facility).

(d)    Unless the Company makes an election under paragraph (e) below, the Company shall procure that the relevant Financial Indebtedness is repaid at the following times:

(i)    in the case of any prepayment made under paragraphs (b)(i)(A) to (b)(i)(E), (b)(i)(H) and (b)(ii) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) (inclusive) promptly upon receipt of the relevant Net Proceeds; and

(ii)    in the case of any prepayment made under paragraphs (b)(i)(F) and (b)(i)(G), on the dates specified in such paragraphs.

(e)    Subject to paragraph (f) below, the Company may elect that any prepayment under Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) be applied in prepayment of a Loan on the last day of the Interest Period relating to that Loan. If the Company makes that election then a proportion of the Loan equal to the amount of the relevant prepayment will be due and payable on the last day of its Interest Period.

(f)    If the Company has made an election under paragraph (e) above but an Event of Default has occurred and is continuing, that election shall no longer apply and a proportion of the Loan in respect of which the election was made equal to the amount of the relevant prepayment shall be immediately due and payable (unless the Majority Lenders otherwise agree in writing).

(g)    The relevant Borrowers shall receive credit against the liability to make prepayments under paragraphs (b)(i)(F) and (b)(i)(G) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) for any voluntary or mandatory prepayments made under Clauses 9 (*Illegality, Voluntary Prepayment and Cancellation*) or 10 (*Mandatory Prepayment*) which are:

(i)    (to the extent not already taken into account in calculating any credit for the Borrowers under this subparagraph (i) and subparagraph (ii) below) made during the relevant Financial Year (in the case of paragraph (b)(i)(F)) or the relevant Financial Quarter (in the case of paragraph (b)(i)(G)); and

(ii)    (without duplication) made (x) during the period from the end of the relevant Financial Year to the date of delivery of the Annual Financial Statements (in the case of paragraph (b)(i)(F)) or (y) during the period from the end of the relevant Financial Quarter to the date of delivery of the relevant Quarterly Financial Statements (in the case of paragraph (b)(i)(G)).

in each case provided amounts so repaid may not be re-borrowed.

63

CITI-TF 00701785

**10.4  Excluded proceeds and Excess Takeout Proceeds**

(a)  Where Excluded Music Publishing Division Insurance Proceeds, Excluded Recorded Music Division Insurance Proceeds, Excluded Music Publishing Division Insurance Proceeds, Excluded Recorded Music Division Proceeds, Excluded Music Publishing Division Recovery Proceeds or Excluded Recorded Music Division Recovery Proceeds (collectively, "**Excluded Proceeds**") include amounts which are intended to be used for a specific purpose within a specified period (as set out in the definitions of the relevant Excluded Proceeds), the Company shall ensure that those amounts are used for that purpose and shall promptly deliver a certificate to the Agent on or before the end of such period confirming the amount (if any) which has been so applied within the requisite time periods provided for in the relevant definition. If those amounts are not reinvested for the purpose and within the period specified in the definitions of the relevant Excluded Proceeds, the Company shall ensure that the relevant Borrowers prepay such proceeds in accordance with paragraph (b) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) and paragraphs (b) to (e) (inclusive) of Clause 10.3 (*Application of Mandatory Prepayments*).

(b)  Notwithstanding any other provision of this Agreement, Excess Takeout Proceeds and any Surplus Proceeds may, at the discretion of the Company be used for any of the following purposes:

(i)    the payment of a dividend or other distribution to the Investors provided that:

(A)    prior to and after (on a pro forma basis) the declaration and payment of such distribution or dividend, the Incurrence Leverage Ratio is not greater than 2.00:1; and

(B)    in the case of Excess Takeout Proceeds resulting from the Permitted Securitisation or Music Publishing Division Sale, there are no amounts available or outstanding under the Facility nor any Music Publishing Division Acquisition Loans outstanding;

(ii)   the general working capital purposes of the Group; or

(iii)  any other purpose permitted by the Majority Lenders.

**10.5  Restrictions on upstreaming moneys**

If:

(i)    any amount is required to be applied in prepayment or repayment of the Facility under this Clause 10 but, in order to be so applied, a member of the Group which is not incorporated or established in England and Wales (a "**Foreign Group Member**") has to make payments upstream or otherwise transfer moneys to another a member of the Group to effect that prepayment or repayment; and

(ii)   those moneys cannot be so upstreamed or transferred without:

(A)    breaching a financial assistance prohibition or other legal restriction applicable to such Foreign Group Member or causing any director or officer or legal representative of any member of the Group to breach any fiduciary duty or give rise to any material risk of personal liability of such director, officer or legal representative in relation to such payment; or

(B)    such Foreign Group Member incurring a Material Tax Cost (either as a result of paying additional Taxes or incurring tax inefficiencies or otherwise),

Confidential

there will be no obligation to make that payment or repayment until that impediment no longer applies provided that in the case of subparagraph (ii)(B) above the Borrowers shall fulfil their prepayment obligations using other available cash (after deducting the amount of Taxes that would have been payable had the monies been upstreamed) or, in the case of Recovery Proceeds, Insurance Proceeds or the Net Proceeds of a Music Publishing Division Sale or Recorded Music Division Sale, such proceeds are used to repay other Financial Indebtedness of the relevant Foreign Group Member. Each Obligor will use reasonable endeavours to overcome any such impediment.

**10.6    Mandatory Prepayment Account**

(a)     Subject to paragraphs (b) and (c) below, Insurance Proceeds, Recovery Proceeds and the Net Proceeds from a Recorded Music Division Sale may be retained by the relevant member of the Group until required to be prepaid in accordance with Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) unless the aggregate amount of such amounts retained exceed £15 million (or its equivalent) at any time (the "**Threshold Amount**") in which case the relevant member of the Group must ensure that amounts received in excess of the Threshold Amount are paid into a Mandatory Prepayment Account as soon as reasonably practicable after receipt by that member of the Group.

(b)     The Company must ensure that:

(i)      the Net Proceeds of a Music Publishing Division Sale;

(ii)     any Music Publishing Division Insurance Proceeds; and

(iii)    any Music Publishing Division Recovery Proceeds,

are paid into a Mandatory Prepayment Account as soon as reasonably practicable after receipt by a member of the Group.

(c)     The Company must ensure that any Music Publishing Division Excess Cashflow for a Financial Quarter is:

(i)      applied in prepayment of the required outstanding Loans and in payment of any associated termination costs payable pursuant to any Hedging Agreements entered into in respect of such loans pro rata between themselves; or

(ii)     paid into a Mandatory Prepayment Account for application in prepayment at the end of the relevant Interest Period of such Loans,

in each case within five Business Days after the date of delivery of the Group's unaudited consolidated financial statements in respect of such Financial Quarter.

(d)     The Company and each Borrower authorise the Agent to apply amounts credited to the Mandatory Prepayment Account which have not been applied in reinvestment, replacement, reinstatement or repair (as the case may be) within the requisite period (or such longer time period as the Agent may agree) to pay amounts due and payable under Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*) and otherwise under the Finance Documents.

**10.7    Cash Balance**

(a)     On the Closing Date, the Company shall deposit an amount which is not less than £10 million into a bank account of the Company which is subject to Security granted in favour of the Security Agent (the "**Blocked Account**").

Confidential

CITI-TF 00701787

(b)   The Security Agent shall promptly release the Security over the Blocked Account and the Company shall immediately be entitled to all amounts standing to the credit of the Blocked Account upon the earliest of the following to occur:

(i)   31 December 2011;

(ii)   a refinancing of the Facility in full; or

(iii)   upon receipt of written confirmation by the Agent from the Company that the Total Net Debt to Maintenance EBITDA in respect of each Relevant Period from the date of such written confirmation until 31 December 2011 will not be greater than 10:1.

## 11.   RESTRICTIONS

### 11.1   Notices of Cancellation or Prepayment

Any notice of cancellation or prepayment given by any Party under Clause 9 (*Illegality, voluntary prepayment and cancellation*) or Clause 10 (*Mandatory prepayment*) shall (subject to the following paragraph) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment. A notice of prepayment in full of the Facility in connection with a full refinancing of the Facility (including in connection with a Change of Control) (an "Original Prepayment Notice") may be revoked by written counter-notice no later than one Business Day prior to the date of prepayment as specified in such Original Prepayment Notice provided that the Borrowers shall pay any Break Costs and other amounts due in respect of any such revocation (and the failure to make a prepayment pursuant to an Original Prepayment Notice shall not constitute an Event of Default under Clause 26.1 (*Failure to pay*)).

### 11.2   Interest and other amounts

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

### 11.3   No reborrowing

No Borrower may reborrow any part of the Facility which is prepaid.

### 11.4   Prepayment in accordance with this Agreement

No Borrower shall repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

### 11.5   No reinstatement of Commitments

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

### 11.6   Agent's receipt of Notices

If the Agent receives a notice or election under Clause 9 (*Illegality, voluntary prepayment and cancellation*) or Clause 10 (*Mandatory prepayment*) it shall promptly forward a copy of that notice or election to either the Company or the affected Lender, as appropriate.

66

[London #294447 v13]

**SECTION 5**
**COSTS OF UTILISATION**

**12.    INTEREST**

**12.1    Calculation of interest**

The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

(a)    Margin;

(b)    LIBOR or, in relation to any Loan in euro, EURIBOR; and

(c)    Mandatory Cost, if any.

**12.2    Payment of interest**

The Borrower to which a Loan has been made shall pay accrued interest on that Loan on the last day of each Interest Period (and, if any Interest Period is longer than six (6) Months, on the dates falling at six Monthly intervals after the first day of that Interest Period).

**12.3    Default interest**

(a)    If an Obligor fails to pay any amount payable by it under a Finance Document (other than under a Hedging Agreement but only to the extent that interest accrues under such agreement on overdue amounts) on its due date, interest shall accrue, to the fullest extent permitted by law, on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is one per cent. higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Agent (acting reasonably). Any interest accruing under this Clause 12.3 shall be immediately payable by the Obligor on demand by the Agent.

(b)    If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i)    the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii)    the rate of interest applying to the overdue amount during that first Interest Period shall be one per cent. higher than the rate which would have applied if the overdue amount had not become due.

**12.4    Notification of rates of interest**

The Agent shall promptly notify the Lenders and the relevant Borrower (or the Company) of the determination of a rate of interest under this Agreement.

**13.    INTEREST PERIODS**

**13.1    Selection of Interest Periods and Terms**

(a)    A Borrower (or the Obligors' Agent on behalf of a Borrower) may select an Interest Period for a Loan in the Utilisation Request for that Loan or (if the Loan has already been borrowed) in a Selection Notice.

(b)    Each Selection Notice is irrevocable and must be delivered to the Agent by the Borrower (or the Obligors' Agent on behalf of the Borrower) to which that Loan was made not later than the Specified Time.

67

CITI-TF 00701789

(c) If a Borrower (or the Obligors' Agent) fails to deliver a Selection Notice to the Agent in accordance with paragraph (b) above, the relevant Interest Period will, subject to this Clause 13, be three (3) Months.

(d) Subject to this Clause 13, a Borrower (or the Obligors' Agent) may select an Interest Period of one (1), two (2), three (3) or six (6) Months or any other period agreed between the Obligors' Agent and the Agent (acting on the instructions of the Majority Lenders if the duration of the Interest Period selected by the Borrower is more than six (6) Months).

(e) An Interest Period for a Loan shall not extend beyond the Final Maturity Date applicable to its Facility.

(f) Each Interest Period for a Loan shall start on the Utilisation Date or (if already made) on the last day of its preceding Interest Period.

(g) Prior to the Syndication Date, Interest Periods shall be one Month or such other period as the Agent and the Obligors' Agent may agree and any Interest Period which would otherwise end during the Month preceding or extend beyond the Syndication Date shall end on the Syndication Date.

**13.2 Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar Month (if there is one) or the preceding Business Day (if there is not).

**13.3 Consolidation and Division of Term Loans**

(a) Subject to paragraph (b) below, if two or more Interest Periods:

(i) relate to Loans in the same currency;

(ii) end on the same date; and

(iii) are made to the same Borrower,

those Term Loans will, unless that Borrower (or the Obligors' Agent on its behalf) specifies to the contrary in the Selection Notice for the next Interest Period, be consolidated into, and treated as, a single Term Loan on the last day of the Interest Period.

(b) Subject to Clause 4.5 (*Maximum number of Utilisations*) and Clause 5.3 (*Currency and amount*), if a Borrower (or the Obligors' Agent on its behalf) requests in a Selection Notice that a Loan be divided into two or more Loans, that Loan will, on the last day of its Interest Period, be so divided into Base Currency Amounts specified in that Selection Notice, being an aggregate Base Currency Amount equal to the Base Currency Amount of the Loan immediately before its division.

**14. CHANGES TO THE CALCULATION OF INTEREST**

**14.1 Absence of quotations**

Subject to Clause 14.2 (*Market disruption*), if LIBOR or, if applicable, EURIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by the Specified Time on the Quotation Day, the applicable LIBOR or EURIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

68

### 14.2 Market disruption

(a) If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on each Lender's share of that Loan for the Interest Period shall be the rate per annum which is the sum of:

    (i) the Margin;

    (ii) the rate notified to the Agent by that Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in that Loan from whatever source it may reasonably select; and

    (iii) the Mandatory Cost, if any, applicable to that Lender's participation in the Loan.

(b) In this Agreement "Market Disruption Event" means:

    (i) at or about noon on the Quotation Day for the relevant Interest Period the Screen Rate is not available and none or only one of the Reference Banks supplies a rate to the Agent to determine LIBOR or, if applicable, EURIBOR for the relevant currency and Interest Period; or

    (ii) before close of business in London on the Quotation Day for the relevant Interest Period, the Agent receives notifications from a Lender or Lenders (whose participations in a Loan exceed thirty five (35) per cent. of that Loan) that the cost to it of obtaining matching deposits in the Relevant Interbank Market would be in excess of LIBOR or, if applicable, EURIBOR.

### 14.3 Alternative basis of interest or funding

(a) If a Market Disruption Event occurs and the Agent or the Company so requires, the Agent and the Company shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest.

(b) Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Company, be binding on all Parties.

### 14.4 Break Costs

(a) Each Borrower shall, within five (5) Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of a Loan or Unpaid Sum being paid by that Borrower on a day other than the last day of an Interest Period for that Loan or Unpaid Sum.

(b) Each Lender shall, as soon as reasonably practicable after a demand by the Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

### 15. FEES

### 15.1 Commitment fee

(a) Subject to paragraph (c) below, the Company shall pay (or procure that a Borrower pays) to the Agent (for the account of each Lender) a fee in the Base Currency computed at the rate of 0.50 per cent. per annum on that Lender's Available Commitment for the period commencing on the date which is 60 calendar days following the Signing Date and ending on the last day of the Availability Period;

(b) The accrued commitment fee is payable on the last day of each successive period of three (3) Months which ends during the relevant Availability Period, on the last day of the relevant

69

CITI-TF 00701791

Availability Period and on the cancelled amount of the relevant Lender's Commitment at the time the cancellation is effective.

(c)     No commitment fee will be payable if the Facility is not utilised.

15.2    **Underwriting fee**
The Company shall pay to the Arranger (for its own account) an underwriting fee in the amounts and at the times agreed in a Fee Letter.

15.3    **Agency fee**
The Company shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

15.4    **Closing Date**
Notwithstanding any other provision of this Clause 15, no fees under this Clause 15 shall be payable if the Closing Date does not occur.

[London #294447 v13]

Confidential

CITI-TF 00701792

## SECTION 6
## ADDITIONAL PAYMENT OBLIGATIONS

**16.    TAX GROSS UP AND INDEMNITIES**

**16.1    Definitions**

(a)    In this Agreement:

"**Protected Party**" means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

"**Qualifying Lender**" means a Lender which is generally eligible to receive interest payments in respect of the Facility without a Tax Deduction either by virtue of being a Treaty Lender or by virtue of the fact that no such Tax Deduction is required under the law of the jurisdiction of incorporation of the relevant Obligor or, if different, of any jurisdiction:

·(i)      in which such Obligor is treated as resident for Tax purposes; or

(ii)      in which such Obligor has a permanent establishment through which interest payments are made.

"**Tax Credit**" means a credit against, relief or remission for, or repayment of, any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

"**Tax Payment**" means either the increase in a payment made by an Obligor to a Finance Party under Clause 16.2 (*Tax gross-up*) or a payment under Clause 16.3 (*Tax indemnity*).

"**Treaty Lender**" means a Lender which is entitled under a double taxation treaty to receive payments of interest from an Obligor without a Tax Deduction (subject to the completion of any necessary procedural formalities).

Unless a contrary indication appears, in this Clause 16 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination, acting reasonably and in good faith.

**16.2    Tax gross-up**

(a)    Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    The Company shall, promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction), notify the Agent accordingly. Similarly, a Lender shall notify the Agent on becoming so aware in respect of a payment payable to that Lender. If the Agent receives such notification from a Lender it shall notify the Company.

(c)    If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    An Obligor is not required to make an increased payment to a Lender under paragraph (c) above for a Tax Deduction from a payment under a Finance Document, if on the date on which the payment falls due:

71

Confidential

CITI-TF 00701793

(i)    the payment could have been made to the relevant Lender without a Tax Deduction if it was a Qualifying Lender, but on that date that Lender is not or has ceased to be a Qualifying Lender other than as a result of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or double taxation agreement, or any published practice or concession of any relevant taxing authority; or

(ii)    the relevant Lender is a Treaty Lender with respect to that payment which has not complied with its obligations under paragraph (g) below and the Obligor making the payment is able to demonstrate that the payment could have been made to the Lender without the Tax Deduction had that Lender complied with its obligations under paragraph (g) below.

(e)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(f)    Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Agent for the Finance Party entitled to the payment an original receipt (or certified copy thereof), or if unavailable, evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

(g)    A Lender and each Obligor which makes a payment to which that Lender is entitled shall, upon specific written request, co-operate in completing any procedural formalities necessary for that Obligor to obtain authorisation to make that payment without a Tax Deduction (including but not limited to any such procedural formalities required under any relevant double taxation agreement).

(h)    In relation to each Borrower which is a US Obligor, each Lender which is a Qualifying Lender shall submit to that Borrower, promptly after receipt of any written request to do so, two duly completed and signed copies of the relevant Withholding Form. However, no Lender shall be required to submit any Withholding Form if that Lender is not allowed validly to do so. The Lender shall take reasonable steps to obtain any exemption (if any) from US federal withholding tax on interest payable by the relevant Borrower to that Lender on Loans under this Agreement that is available to that Lender in the circumstances.

**16.3   Tax indemnity**

(a)    The Company shall (within five (5) Business Days of demand by the Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document as a result of the introduction of, or a change in the interpretation or application of, any law or regulation relating to Tax occurring after the Signing Date (or compliance by any Protected Party with any such law or regulation).

(b)    Paragraph (a) above shall not apply:

(i)    with respect to any Tax assessed on a Protected Party:

(A)    under the law of the jurisdiction in which that Protected Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Protected Party is treated as resident for tax purposes;

[London #294447 v13]

Confidential

CITI-TF 00701794

A-6176

(B)     under the law of the jurisdiction in which that Protected Party 's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net profit received or receivable or the net profit made (but not any sum deemed to be received or receivable) by that Protected Party; or

(ii)     to the extent a loss, liability or cost:

(A)     is compensated for by an increased payment under Clause 16.2 (*Tax gross-up*); or

(B)     would have been compensated for by an increased payment under Clause 16.2 (*Tax gross-up*) but was not so compensated solely because one of the exclusions in paragraph (d) of Clause 16.2 (*Tax gross-up*) applied; or

(c)     A Protected Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Agent of the event which will give, or has given, rise to the claim (and include in such notification the legal basis of such claim by providing references to relevant statutes), following which the Agent shall notify the Company (and include in such notification the legal basis of such claim by providing references to the relevant statutes).

(d)     A Protected Party shall, on receiving a payment from an Obligor under this Clause 16.3, notify the Agent.

**16.4    Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party (acting reasonably) determines that:

(a)     a Tax Credit is attributable either to an increased payment of which that Tax Payment forms part or to that Tax Payment; and

(b)     that Finance Party has obtained, utilised and fully retained that Tax Credit on an affiliated group basis,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

**16.5    Stamp taxes**

The Company shall pay and, within five (5) Business Days of demand, indemnify each Secured Party and Arranger against any cost, loss or liability that Secured Party or Arranger incurs in relation to all stamp duty, stamp duty land tax, registration and other similar Taxes payable in respect of the entry into, performance or enforcement of any Finance Document.

**16.6    Value added tax**

(a)     All amounts set out, or expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for VAT purposes shall be deemed to be exclusive of any VAT. Subject to paragraph (c) below, if VAT is chargeable on any supply made by any Finance Party to any Party in connection with a Finance Document, that Party shall pay to the Finance Party (in addition to and at the same time as paying the consideration) an amount equal to the amount of the VAT (and any such Finance Party shall promptly provide an appropriate VAT invoice to such party).

(b)     If VAT is chargeable on any supply made by any Finance Party (the "Supplier") to any other Finance Party (the "Recipient") in connection with a Finance Document, and any Party is

Confidential

CITI-TF 00701795

**A-6177**

required by the terms of any Finance Document to pay an amount equal to the consideration for such supply to the Supplier, such Party shall also pay to the Supplier (in addition to and at the same time as paying such amount) an amount equal to the amount of such VAT. The Recipient will pay to that Party an amount equal to any credit or repayment from the relevant tax authorities which it determines relates to the VAT chargeable on that supply.

(c)    Where a Finance Document requires any Party to reimburse a Finance Party for any costs or expenses, that Party shall also at the same time pay and indemnify the Finance Party against all VAT incurred by the Finance Party in respect of the costs or expenses to the extent that the Finance Party reasonably determines that neither it nor any other member of any group of which is a member for VAT purposes is entitled to credit or repayment from the relevant tax authority in respect of the VAT.

## 17.    INCREASED COSTS
### 17.1    Increased costs
(a)    Subject to paragraph (b) below, if the introduction of, or a change in, or a change in the interpretation, administration or application of, any law, regulation or treaty occurring after the Signing Date, or compliance with any law, regulation or treaty made after the Signing Date results in any Finance Party (a "**Claiming Party**") or any Affiliate of it incurring any Increased Cost (as defined in paragraph (d) below):

    (i)    the Claiming Party will notify the Company and the Agent of the circumstances giving rise to that Increased Cost as soon as reasonably practicable after becoming aware of it and will as soon as reasonably practicable provide a certificate confirming the amount of that Increased Cost; and

    (ii)    within five Business Days of demand by the Claiming Party, the Company will pay to the Claiming Party the amount of any Increased Cost incurred by it (or any Affiliate of it).

(b)    The Company will not be obliged to compensate any Claiming Party under paragraph (a) above in relation to any Increased Cost:

    (i)    to the extent already compensated for by payment of any Mandatory Costs or under Clause 16 (*Tax gross up and indemnities*) (or would have been so compensated but for an exception in Clauses 16.2 (*Tax gross-up*) or 16.3 (*Tax Indemnity*)); or

    (ii)    attributable to a change in the rate of Tax on the overall net profit of the Claiming Party (or any Affiliate of it) or of the Facility Office of the Claiming Party;

    (iii)    attributable to the wilful breach by the Claiming Party of any law, regulation or treaty; or

    (iv)    attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the Signing Date ("Basel II") or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates).

(c)    If any Affiliate of a Finance Party suffers a cost which would have been recoverable by that Finance Party under this Clause 17 if that cost had been imposed on that Finance Party, that Finance Party shall be entitled to recover the amount of that cost under this paragraph on behalf of the relevant Affiliate.

(d)    In this Agreement "Increased Cost" means:

[London #294447 v13]

Confidential

CITI-TF 00701796

(i)     an additional or increased cost;

(ii)    a reduction of any amount due and payable to the Claiming Party under any Interim Finance Document; or

(iii)   a reduction in the rate of return on the Claiming Party's (or its Affiliate's) overall capital,

suffered or incurred by a Claiming Party (or any Affiliate of it) as a result of it having entered into or performing its obligations under any Finance Document or making or maintaining its participation in any Loan.

(e)   Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs.

**17.2  Requirement to notify**

(a)   If a Lender does not notify the Agent of its intention to claim pursuant to this Clause 17 within 90 days after the date on which that Lender becomes aware of the amount which it would be entitled to claim in respect of the relevant Increased Cost, reduction, payment or foregone interest or other return, that Lender shall not be entitled to claim indemnification for such increased costs, reduction, payment or foregone interest or other return in respect of any period more than 90 days before such date on which that Lender does notify the Agent of its intention to make such a claim.

(b)   No Finance Party shall be entitled to make any claim pursuant to this Clause 17 on any date falling later than nine months after the discharge of the obligations (both actual and contingent) of the Obligors under this Agreement and the cancellation of the Commitments in full.

**18.   MITIGATION**

(a)   If circumstances arise which entitle a Finance Party:

(i)     to receive payment of an additional amount under Clause 16 (*Tax gross up and indemnities*); or

(ii)    to demand payment of any amount under Clause 17 (*Increased Costs*); or

(iii)   to require cancellation or prepayment to it of any amount under Clause 9.1 (*Illegality*),

then that Finance Party will take all reasonable steps to mitigate the effect of those circumstances (including by transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office) and the Company may, by not less than two Business Days' notice to the Agent and the relevant Finance Party:

(iv)    require the relevant Finance Party to transfer its Commitments and all of its rights and obligations under the Finance Documents to a person acceptable to the Company; or

(v)    repay all amounts owing to the relevant Finance Party under the Finance Documents and cancel the Commitments of such Finance Party.

(b)   No Finance Party will be obliged to take any such steps or action if to do so is likely in its opinion (acting in good faith) to be unlawful or to have an adverse effect on its business, operations or financial condition or breach its banking policies or require it to disclose any confidential information.

75

CITI-TF 00701797

(c) The Company shall, within five Business Days of demand by the relevant Finance Party, indemnify such Finance Party for any reasonable costs or expenses incurred by it as a result of taking any steps or action under this Clause.

(d) This Clause does not in any way limit, reduce or qualify the obligations of the Company under the Finance Documents.

## 19. OTHER INDEMNITIES

### 19.1 Currency indemnity

(a) If any sum due from an Obligor under the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

    (i) making or filing a claim or proof against that Obligor; or

    (ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within five (5) Business Days of demand, indemnify to the extent permitted by law the Arranger and each other Finance Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 19.2 Miscellaneous Indemnity

The Company shall (or shall procure that an Obligor will), within five (5) Business Days of demand, indemnify the Arranger and each other Finance Party (other than by reason of the gross negligence or wilful misconduct of such Finance Party) against any funding or other cost, loss or liability incurred by it as a result of:

(a) the occurrence of any Event of Default;

(b) a failure by an Obligor to pay any amount due under a Finance Document on its due date, including any reasonable cost, loss or liability arising as a result of Clause 31 (*Sharing among the Finance Parties*);

(c) funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone);

(d) a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company; or

(e) the receipt by the Agent of any part of a Loan, or an Unpaid Sum, otherwise than on the last day of its Interest Period (from which shall be deducted any sum paid by the Company (or another Obligor) in respect of the same event under Clause 14.4 (*Break Costs*)) but shall not include loss of Margin;

76

[London: ff294447 v13]

CITI-TF 00701798

(f)     its taking any steps under Clause 18 (*Mitigation*); or

(g)     the taking, holding, protection or enforcement of the Security constituted by the Transaction Security Documents (including any liability under Environmental Laws) or the exercise of any of the rights, powers and remedies vested in any Finance Party by the Finance Documents or by law or which otherwise relate to any of the Transaction Security Documents or the performance by the Security Agent of the terms of the Finance Documents.

**19.3    Acquisition Financing Indemnity**

(a)     The Company shall (or shall procure that the Obligors shall), within five (5) Business Days of demand, indemnify each Finance Party, each of their respective Affiliates and each of their respective directors, officers, employees or agents (each an **"Indemnified Party"**) against any cost, expense, loss or liability (including reasonable legal fees) properly incurred by that Indemnified Party (otherwise than to the extent resulting from the gross negligence or wilful misconduct of that Indemnified Party or, a breach of this Agreement by that Indemnified Party) related to, arising out of or in connection with any investigation, litigation, arbitral or other proceeding (collectively, **"Proceeding"**) in each case made by a person who is not a party to a Finance Document arising out of or in connection with:

(i)     any Indemnified Party financing or refinancing, or agreeing to finance or refinance, the Acquisition (whether or not completed); or

(ii)    the use of proceeds of any Utilisation.

(b)     An Indemnified Party shall notify the Company as soon as reasonably practical of any circumstances of which it is aware and which would be reasonably likely to give rise to any Proceeding.

(c)     An Indemnified Party will provide the Company on request (and, to the extent practicable, without any waiver of legal professional privilege or breach of confidentiality obligation) with copies of material correspondence in relation to a Proceeding and allow the Company to attend all material meetings in relation to a Proceeding, receive copies of material legal advice obtained by the Indemnified Party in relation to the Proceeding and consult with the Company, taking into account the Company's views in relation to the Proceeding and any decision whether or not to settle any Proceeding.

(d)     The Obligors will keep strictly confidential all information received by any of them in connection with a Proceeding and will not disclose any information to any third party without the prior written consent of the Indemnified Party unless required to do so by law.

(e)     No Obligor shall be liable for any settlement of any Proceeding unless the Company has been consulted in relation to that settlement.

(f)     No Indemnified Party shall be required to comply with paragraphs (b) or (c) nor shall paragraph (e) apply unless the Indemnified Party is and continues to be indemnified on a current basis for its costs and expenses.

(g)     To the extent that any Indemnified Party is not a party to this Agreement, such Indemnified Party shall have the benefit of and shall be entitled to enforce, any provision of this Clause 19.3, as if such Indemnified Party were a Party.

**19.4    Indemnity to the Agent**

The Company shall promptly indemnify the Agent and the Security Agent against any cost, loss or liability incurred by the Agent or the Security Agent (acting reasonably) as a result of:

77

CITI-TF 00701799

(a)    conducting an investigation in accordance with Clause 23.8 (*Investigation*);

(b)    entering into or performing any foreign exchange contract for the purposes of paragraph (b) of Clause 32.9 (*Change of currency*); or

(c)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised.

**19.5    Indemnity to the Security Agent**

(a)    Each Obligor shall promptly indemnify the Security Agent and every Delegate against any cost, loss or liability incurred by any of them as a result of:

(i)    the taking, holding, protection or enforcement of the Transaction Security;

(ii)    the exercise of any of the rights, powers, discretions and remedies vested in the Security Agent and each Delegate by the Finance Documents or by law; and

(iii)    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents.

(b)    The Security Agent may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 19.5 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all monies payable to it.

**20.    COSTS AND EXPENSES**

**20.1    Transaction expenses**

The Company shall, within five (5) Business Days of demand pay the Agent, the Arranger and the Security Agent the amount of all pre-agreed costs and expenses (including reasonable legal fees) reasonably incurred by any of them (and, in the case of the Security Agent, by any Delegate) in connection with the negotiation, preparation, printing, execution, syndication (subject to an agreed cap) and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the Signing Date,

up to a maximum aggregate amount (if any) set out in any letter between the Arranger and the Company, provided that no such costs and expenses (other than any agreed legal fees) shall be payable if the Closing Date does not occur and if the Closing Date occurs shall not be payable before the date falling five (5) Business Days after receipt of a reasonably detailed statement of account in respect thereof.

**20.2    Amendment costs**

If (a) an Obligor requests an amendment, waiver or consent or (b) an amendment is required pursuant to Clause 32.9 (*Change of currency*), the Company shall, within five (5) Business Days of demand, reimburse each of the Agent and the Security Agent for the amount of all costs and expenses (including reasonable legal fees) reasonably incurred by the Agent and the Security Agent (and, in the case of the Security Agent, by any Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

[London #294447 v13]

Confidential

CITI-TF 00701800

A-6182

**20.3    Enforcement and preservation costs**

The Company shall, within five (5) Business Days of demand, pay to the Arranger, the Agent, the Security Agent and each other Finance Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

Confidential

CITI-TF 00701801

**SECTION 7**
**GUARANTEE**

**21.    GUARANTEE**

**21.1    Guarantee**

Each Guarantor irrevocably and unconditionally jointly and severally:

(a)    guarantees to each Finance Party punctual performance by each other Obligor of all that Obligor's obligations under the Finance Documents;

(b)    undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c)    indemnifies each Finance Party immediately on demand against any cost, loss or liability suffered by that Finance Party (i) if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal or (ii) by operation of law. The amount of the cost, loss or liability shall be equal to the amount which that Finance Party would otherwise have been entitled to recover.

**21.2    Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents regardless of any intermediate payment or discharge in whole or in part. The obligations of each Guarantor under Clause 21.1 (*Guarantee*):

(a)    will remain in full force and effect until all amounts which may be or become payable by any Borrower guaranteed by it under or in connection with any Finance Document have been irrevocably paid in full; and

(b)    are subject to any limitation which is set out in this Clause 21 or contained in the Accession Letter by which that Guarantor becomes a Guarantor.

**21.3    Reinstatement**

If any payment by an Obligor or any discharge given by a Finance Party (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is avoided or reduced as a result of insolvency or any similar event:

(a)    the liability of each Obligor shall continue as if the payment, discharge, avoidance or reduction had not occurred; and

(b)    each Finance Party shall be entitled to recover the value or amount of that security or payment from each Obligor, as if the payment, discharge, avoidance or reduction had not occurred.

**21.4    Waiver of defences**

The obligations of each Guarantor under this Clause 21 will not be affected by an act, omission, matter or thing which, but for this Clause 21, would reduce, release or prejudice any of its obligations under this Clause 21 (without limitation and whether or not known to it or any Finance Party) including:

(a)    any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

[London #294447 v13]

Confidential                                                        CITI-TF 00701802

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)     any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)     any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case, however fundamental and of whatsoever nature) or replacement of a Finance Document or any other document or security;

(f)     any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)     any insolvency or similar proceedings.

**21.5    Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 21. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**21.6    Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b)     hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 21.

**21.7    Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Agent otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents:

(a)     to be indemnified by an Obligor;

(b)     to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents; and/or

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party.

81

CITI-TF 00701803

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for the Finance Parties and shall promptly pay or transfer the same to the Agent or as the Agent may direct for application in accordance with Clause 32 (*Payment Mechanics*).

21.8    **Release of Guarantors' right of contribution**

If any Guarantor (a **"Retiring Guarantor"**) ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a)    that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)    each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

21.9    **Additional security**

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

21.10    **Guarantor intent**

Without prejudice to the generality of Clause 21.4 (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, amendment, restatement, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following (without limitation):

(a)    acquisitions of any nature;

(b)    increasing working capital;

(c)    enabling investor distributions to be made;

(d)    carrying out restructurings;

(e)    refinancing existing facilities;

(f)    refinancing any other indebtedness;

(g)    making facilities available to new borrowers;

(h)    any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and

(i)    any fees, costs and/or expenses associated with any of the foregoing.

82

[London #294447 v13]

Confidential

**21.11 Guarantee limitations**

(a)     For the purpose of this Clause 21.11, **"Guarantee Obligations"** means the obligations and liabilities of the relevant Obligor under Clause 21.1 (*Guarantee*).

(b)     **Limitations on English Guarantors**

The Guarantee Obligations will not extend to cover any indebtedness which, if they did so extend, would cause the infringement of section 151 of the Act.

(c)     **Limitations on United States Guarantors**

The obligations of each US Obligor under this Clause 21 shall be limited to a maximum aggregate amount equal to the greatest amount that would not render such US Obligor's obligations under this Clause 21 subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the US Bankruptcy Law or any applicable provisions of comparable law of one or more of the states comprising the United States of America (collectively, the **"Fraudulent Transfer Laws"**), in each case after giving effect to all other liabilities of such US Obligor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such US Obligor:

(i)     in respect of intercompany indebtedness to any member of the Group to the extent that such indebtedness would be discharged in an amount equal to the amount paid by such US Obligor hereunder; and

(ii)    under any guarantee of senior unsecured indebtedness or indebtedness subordinated in right of payment to obligations of the Obligors outstanding under this Agreement, which guarantee contains a limitation as to maximum amount similar to that set forth in this paragraph,

pursuant to which the liability of such US Obligor hereunder is included in the liabilities taken into account in determining such maximum amount) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, contribution, reimbursement, indemnity or similar right of such US Obligor pursuant to:

(A)     applicable law; or

(B)     any agreement providing for an equitable allocation among such US Obligor and other affiliates of the Borrowers of obligations arising under this Clause 21 by such parties.

(d)     **Limitations on other Guarantors**

A Guarantor's obligations will also be subject to any limitation on the amount guaranteed which is contained in the Accession Letter (if applicable) by which that Guarantor becomes a Guarantor.

Confidential

CITI-TF 00701805

A-6187

**SECTION 8**
**REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT**

22. **REPRESENTATIONS**

Subject to Clause 26.14 (*Clean-Up Period*) with respect to the Target Group, each Obligor (for itself and, to the extent expressed to be applicable to them, its Subsidiaries) makes the representations and warranties set out in Clause 22.1 (*Status*) to Clause 22.23 (*Insolvency*) to each Finance Party on the dates set out in Clause 22.24 (*Repetition*).

22.1 **Status**

Each Obligor is a limited liability company duly incorporated and validly existing under the laws of its jurisdiction of incorporation.

22.2 **Powers**

(a) Each Obligor has power to enter into and deliver, and to exercise its rights and perform its obligations under, the Transaction Documents to which it is a party. No limit on its powers will be exceeded as a result of any borrowing or the giving of any guarantee or security by it under the Transaction Documents.

(b) Each Obligor has taken all necessary corporate action to authorise the entry into and delivery of and the performance by it of its obligations under each Transaction Document to which it is a party.

(c) Each member of the Group has the power to own its assets and carry on its business as it is being conducted.

22.3 **Obligations binding**

Subject to the Legal Reservations and Perfection Requirements:

(a) the obligations expressed to be assumed by each Obligor under each Finance Document to which it is a party constitute its legal, valid, binding and enforceable obligations; and

(b) without limiting the generality of paragraph (a) above, each Transaction Security Document to which an Obligor is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

22.4 **No Filing or Stamp Taxes**

Other than the Perfection Requirements or the payment of any associated fees or in relation to any Transfer Agreement, under the laws of its Relevant Jurisdiction it is not necessary that the Finance Documents be notarised, filed, recorded, registered or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

22.5 **Non-conflict**

The entry into and delivery of, and the exercise by an Obligor of its rights and the performance of its obligations under, each Finance Document to which it is a party do not and will not breach or conflict with:

(a) any law, statute, rule or regulation, judgment, decree or permit to which it is subject in any material respect;

(b) any of its constitutional documents; or

84

[London #294447 v13]

(c)     any agreement or document binding upon it or any of its assets which result in a default or right of any person to terminate any such agreement or documents, in each case, in a manner which would have a Material Adverse Effect or would result in the creation or imposition of any Security (other than any Permitted Encumbrance).

**22.6    Governing Law and Judgments**

Subject to the Legal Reservations, in any legal proceedings taken in the jurisdiction of incorporation of any Obligor in relation to any of the Transaction Documents to which it is party, the choice of law expressed in any of such documents to be the governing law of such document and any judgment obtained in such jurisdiction will be recognised and enforced.

**22.7    Financial Statements**

(a)     The most recent Financial Statements (excluding for the avoidance of doubt the Original Financial Statements) (including their notes) have been prepared in accordance with Accounting Principles consistently applied and give a true and fair view of (if audited) or fairly present (if unaudited) the consolidated financial condition of that Obligor as at the end of, and the consolidated results of operations of the Group for, the period to which they relate.

(b)     There has been no material adverse change in the assets, business or consolidated financial condition of the Group since the date of the Original Financial Statements.

**22.8    Information Package**

Save as disclosed in writing to the Arranger prior to the date of this Agreement:

(a)     all factual information contained in the Information Package (other than information of a general economic nature) was, taken as a whole, complete and accurate in all material respects as at the date of the relevant Report or document containing the information and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading in the circumstances of a person determining whether or not to extend credit to a borrower and in light of the circumstances under which statements were or are made;

(b)     the financial projections, financial models and business plans contained in the Information Package have been prepared in good faith on the basis of assumptions that were, in the opinion of the Company, reasonable at the time they were made (excluding any uncertainties or contingencies that are inherent in preparing such projections and plans) and were arrived at after due and careful consideration by the Company; and

(c)     no event or circumstance has occurred or arisen, and no information has been omitted from the Information Package, that results in the factual information, opinions, intentions, forecasts or projections contained in the Information Package being untrue or misleading in any material respect, taken as a whole.

**22.9    Documents provided**

The copies of the Transaction Documents and constitutional documents delivered to the Finance Parties are true, complete and accurate in all material respects and have not been amended, varied or supplemented in any way.

**22.10   Group Structure Chart**

Assuming the Unconditional Date has occurred, the Group Structure Chart delivered to the Agent is, to the best of the Company's knowledge and belief, true, complete and accurate in all material respects and shows the following information:

85

CITI-TF 00701807

(a)     each member of the Group, including current name and company registration number, its jurisdiction of incorporation and/or establishment and indicating whether a company is or is not a company with limited liability; and

(b)     all minority interests in any member of the Group and any person in which any member of the Group holds shares in its issued share capital or equivalent ownership interest of such person.

## 22.11  Structure Memorandum

The Structure Memorandum sets out the material steps to be taken at or before the Closing Date and reflects (together with the Funds Flow Statement) all payments and discharge of indebtedness due to be made at or about the Closing Date.

## 22.12  Financial Indebtedness and Security

(a)     No member of the Group has or owes any Financial Indebtedness other than Permitted Indebtedness.

(b)     No Security exists over all or any of the present or future assets of any member of the Group other than Permitted Encumbrances.

## 22.13  Authorisations

(a)     All Authorisations required:

   (i)      to enable it lawfully to enter into, and exercise its rights and comply with its material obligations under each Transaction Document to which it is a party; and

   (ii)     to make any Transaction Document to which it is a party admissible in evidence in its Relevant Jurisdictions (subject to any Legal Reservations),

have been obtained or effected and are in full force and effect except for those necessary to satisfy the Perfection Requirements.

(b)     All Authorisations necessary for the conduct of the business, trade and ordinary activities of the Group have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or is reasonably likely to have a Material Adverse Effect.

## 22.14  Deduction of tax

On the basis that all of the Lenders are Qualifying Lenders and that all Treaty Lenders comply with their obligations under Clause 16.2 (*Tax gross-up*), no Obligor is required to make any deduction for or on account of Tax from any payment it may make under the Finance Documents.

## 22.15  Taxation

No Obligor is overdue (taking into account any extension or grace period) in the filing of any Tax returns or in the payment of any amount of Tax other than:

(a)     in respect of Taxes being contested by it in good faith; or

(b)     where the failure to file such Tax return or pay such Taxes would not have a Material Adverse Effect.

## 22.16  No litigation

No litigation, alternative dispute resolution, arbitration, administrative proceedings or labour disputes are current or threatened against a member of the Group which are reasonably likely to be adversely determined and, if adversely determined, are reasonably likely to have a Material Adverse Effect.

86

Confidential

CITI-TF 00701808

**22.17 Environmental laws**

(a) Each member of the Group is in compliance with Clause 25.3 (*Environmental compliance*) and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance in a manner or to an extent which has or is reasonably likely to have a Material Adverse Effect.

(b) No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any member of the Group where that claim has or is reasonably likely, if determined against that member of the Group, to have a Material Adverse Effect.

**22.18 No default**

(a) No Event of Default is continuing or is reasonably likely to result from the making of any Utilisation.

(b) No member of the Group is in breach of or in default under any agreement to which it is a party or which is binding on it or any of its assets to an extent or in a manner which constitutes a Material Adverse Effect.

**22.19 Intellectual Property**

Each member of the Group:

(a) is the sole legal and beneficial owner of or has licensed to it on normal commercial terms all the Intellectual Property which is required by it in order to carry on its business as it is being conducted and as contemplated in the Base Case Model (the "**Material Intellectual Property**") save where failure so to do would have a Material Adverse Effect;

(b) does not, in carrying on its businesses, infringe any Intellectual Property of any third party in any respect which has or is reasonably likely to have a Material Adverse Effect;

(c) has taken all formal or procedural actions (including payment of fees) required to maintain any Material Intellectual Property owned by it where failure so to do would have a Material Adverse Effect.

**22.20 Title to assets**

(a) The Company will, upon the Closing Date, become the legal and beneficial owner of (subject to completion of any 'squeeze-out' procedures to be undertaken pursuant to Part 28 of the Companies Act 2006 (if any)) the entire issued share capital of the Target and all other securities issued by the Target and/or giving access to the share capital of the Target free from any Security, claims or competing interests whatsoever.

(b) On the Closing Date, members of the Group will have good title to or valid leases or licences of or otherwise be entitled to use all assets necessary to conduct the Group Business taken as a whole as it is conducted on the Closing Date where failure to do so or to so have would have a Material Adverse Effect.

**22.21 Pension schemes**

The levels of contribution to the pension schemes for the time being operated by the Group are and continue to be sufficient to comply with all material obligations of the Group whether under such schemes or generally at law.

87

**22.22  Centre of Main Interests**

Where an Obligor is incorporated in a Participating Member State, its Centre of Main Interests is the place in which its registered office is situated.

**22.23  Insolvency**

No:

(a)    corporate action, legal proceeding or other procedure or step described in Clause 26.8 (*Insolvency proceedings*); or

(b)    creditors' process described in Clause 26.5 (*Cessation and expropriation*),

has been taken or, to the knowledge of the Company, threatened in relation to an Obligor or a Material Subsidiary and none of the circumstances described in Clause 26.6 (*Insolvency*) applies to an Obligor or a Material Subsidiary.

**22.24  Repetition**

(a)    The Obligors make each representation and warranty in Clause 22.1 (*Status*) to Clause 22.23 (*Insolvency*) on the Signing Date and on the Closing Date by reference to the facts and circumstances then existing, other than the representations in Clause 22.8 (*Information Package*), which shall be given on the dates referred to in paragraph (b) below.

(b)    The Obligors make the representation and warranty in Clause 22.8 (*Information Package*) on the date the Information Memorandum is approved by the Company (subject to any disclosures made by the Company on or before that date) and on the date on which it is released to the Arranger for distribution in connection with the syndication of the Facility and on the Syndication Date.

(c)    The Repeating Representations are deemed to be made by each Obligor (for itself and, to the extent expressed to be applicable to them, each other member of the Group) by reference to the facts and circumstances then existing on:

(i)    the date of each Utilisation Request;

(ii)    each Utilisation Date;

(iii)    the first day of each Interest Period; and

(iv)    in the case of an Additional Obligor, the day on which the company becomes an Additional Obligor,

save for the representation and warranty contained in Clause 22.7 (*Financial Statements*) only, which shall be deemed to be made on the date on which the most recent Financial Statements are delivered to the Agent (and then only in respect of the most recent Financial Statements so delivered).

**23.    INFORMATION UNDERTAKINGS**

The undertakings in this Clause 23 remain in force from the Signing Date for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

In this Clause 23:

[London #294447 v13]

Confidential

CITI-TF 00701810

"**Annual Financial Statement**" means the financial statements for a Financial Year delivered pursuant to paragraph (a) of Clause 23.1 (*Financial Statements*).

"**Financial Statement**" means, as applicable, the Annual Financial Statements, the Quarterly Financial Statements or the Monthly Financial Statements.

"**Monthly Financial Statement**" means the financial statements delivered pursuant to paragraph (c) of Clause 23.1 (*Financial Statements*).

"**Quarterly Financial Statement**" means the financial statements delivered pursuant to paragraph (b) of Clause 23.1 (*Financial Statements*).

**23.1   Financial Statements**

(a)   **Annual Financial Statements**

(i)   The Parent shall deliver to the Agent copies of the audited consolidated profit and loss account, balance sheet and cashflow statement of the Group for each Accounting Reference Period of the Parent ending after the Signing Date as soon as approved by the board of directors or equivalent body (but not later than 180 days (or, in respect of financial statements delivered during the period from the Closing Date until the first anniversary of the Closing Date, 210 days) from the end of such Accounting Reference Period).

(ii)   The Parent shall procure the delivery with the audited consolidated financial statements of a Compliance Certificate signed by a corporate officer of the Parent together with a certificate issued by the Auditors of the Group certifying that Compliance Certificate (but recognising that any Auditor's certification will be in a form which the Auditors are prepared to give and only to the extent that firms of auditors of international repute have not adopted a general policy of not delivering certifications of such Compliance Certificates). The Compliance Certificate to be provided under this paragraph shall be in addition to the Compliance Certificate required by paragraph (b) of Clause 23.1 (*Quarterly financial statements*).

(b)   **Quarterly Financial Statements**

The Parent shall deliver to the Agent copies of the unaudited consolidated interim financial statements for the Group within 45 days (or, in respect of Financial Statements delivered during the period from the Closing Date until the first anniversary of the Closing Date, 75 days) after the end of each Financial Quarter. Such Quarterly Financial Statements shall be on a quarter-to-quarter and cumulative basis and shall include a profit and loss account, the debt and cash position, working capital position and (in respect of Quarterly Financial Statements to be delivered after the date falling 9 Months after the Closing Date) balance sheet and cashflow statements. The Quarterly Financial Statements shall also contain a comparison of actual performance by the Group with the performance in the corresponding period in the previous Accounting Reference Period. Each set of Quarterly Financial Statements delivered pursuant to this paragraph (b) shall be accompanied by a Compliance Certificate signed by a corporate officer of the Parent.

(c)   **Monthly Financial Statements**

Unless the Incurrence Leverage Ratio is less than 2.00:1, the Parent shall deliver to the Agent copies of its unaudited consolidated monthly financial management report for the Group (which will be in summary form and contain key performance indicators, revenue, EBITDA and cash flow) as soon as it is available (but no later than 45 days from the end of the relevant month), provided that no such statements will be delivered:

Confidential

CITI-TF 00701811

(i)      for period during the first six months following the Closing Date; and

(ii)     for the last month in a Financial Quarter in respect of which Quarterly Financial Statements are prepared.

(d)   **Music Publishing Group**
The Parent shall, as soon as reasonably practicable and in any event not later than the date falling 6 months after the Closing Date (the **"Delivery Date"**), deliver to the Agent management accounts for the Music Publishing Group for the twelve-month period ending on the last day of the most recent Financial Quarter Ending Date to occur at least 45 days prior to the Delivery Date. Such management accounts shall be prepared on the basis consistent to that used in preparing the management accounts for the Financial Year ending 31 March 2007.

(e)   **Other information**

(i)     The Parent shall deliver to the Agent such other information concerning the general state of the business or financial condition of the Group (or any part of it) as the Agent may reasonably request.

(ii)    Without prejudice to Clause 4.2 (*Certain funds*), on or before the Closing Date the Company shall deliver to the Agent copies of:

(A)   the Funds Flow Statement; and

(B)   the Original Financial Statements.

(iii)   The Parent shall deliver to the Agent an updated Group Structure Chart promptly following the occurrence of any material change to the structure of the Group.

**23.2**   **Consistent application**
The Parent shall ensure that all Financial Statements submitted to the Agent are consistent with Accounting Principles applied in the preparation of the Original Financial Statements, except (i) for adjustments of a minor and technical nature, (ii) with the prior approval of the Majority Lenders or (iii) where Accounting Principles requires an amendment to be made and, in each such case:

(a)   the Parent shall promptly so advise the Agent, providing a full description of the relevant change and sufficient information, in such detail and format as may be reasonably requested by the Agent, to enable a proper comparison to be made between the Financial Statements delivered and those which would have been delivered had no such change occurred;

(b)   the Parent and the Agent shall negotiate in good faith (for no more than 60 days from the date on which the Parent notified the Agent of such changes) with a view to agreeing such amendments (if any) to Clause 24 (*Financial Covenant*), paragraph (b)(i)(F) of Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*), paragraph (c) of Clause 10.3 (*Application of mandatory prepayments*) and paragraph (b) of Clause 10.4 (*Excluded proceeds and Excess Takeout Proceeds*) and/or any definitions used in these Clauses as are necessary to give the Lenders and the Obligors comparable protection to that contemplated at the Signing Date (and in the case of agreement within such 30 day period, such amendments shall take immediate effect); and

(c)   if amendments are not so agreed as provided in paragraph (b) above, the Parent shall deliver to the Agent with each set of Financial Statements required to be delivered under this Agreement another set (or appropriate reconciliation statement) prepared using the existing Accounting Principles which shall be used for purposes of calculating the

90

[London #294447 v13]

CITI-TF 00701812

financial covenants and for any calculation of Margin, Commitment Fees or mandatory prepayments.

**23.3  Accounting Reference Period**

(a)    The Parent shall procure that the Accounting Reference Period of each member of the Group is adjusted to end on 31 March of each year, in accordance with the Structure Memorandum (save where otherwise required under any applicable law or regulation or pursuant to local practice).

(b)    The Parent shall ensure that:

(i)    no member of the Group alters its Accounting Reference Period to end other than on the Accounting Reference Date; and

(ii)    the Accounting Reference Date of each member of the Group is the same.

**23.4  Budget**

The Parent shall deliver to the Agent the final itemised consolidated budget approved by the board of directors or equivalent body of the Parent to include for each Financial Quarter, consolidated statements of forecast profit and loss, turnover and cashflow and a balance sheet, together with a written analysis concerning the basic assumptions of such projected financial statements no later than 30 days after the beginning of each Accounting Reference Period (and for the first time in respect of the Accounting Reference Date starting on 1 April 2008).

**23.5  Litigation/Labour disputes**

The Company shall advise the Agent promptly upon becoming aware of details of any litigation, arbitration, administrative or regulatory proceedings current, pending or (to the best of its knowledge) threatened against any member of the Group or of any labour disputes affecting it or any member of the Group which, if adversely determined, would be reasonably likely to have a Material Adverse Effect.

**.23.6  Defaults**

The Company shall notify the Agent of any Default promptly upon becoming aware of it and the steps (if any) being taken to remedy it.

**23.7  General information**

Each of the Parent and the Company shall supply to the Agent:

(a)    copies of all documents required by law to be despatched by the Parent and the Company to their shareholders, in their capacity as shareholders generally (or any class of them), at the same time as they are despatched;

(b)    copies of all documents despatched by the Parent and the Company to their creditors generally (or any class of them); and

(c)    promptly, such information as the Agent may reasonably require regarding the financial condition, assets and operations of the Group and/or any member of the Group as any Finance Party through the Agent may reasonably request.

**23.8  Investigation**

(a)    Each Obligor shall permit the Agent (or a representative of the Agent), while an Event of Default is continuing or the Agent reasonably believes that an Event of Default is continuing, upon reasonable notice and during regular business hours only and at a time convenient to management, to visit any of its offices (in the presence of a representative of the Company) to inspect any of its books and records and to discuss it financial matters with its officers and Auditors (provided that a representative of the Company shall be entitled to be present at any

Confidential

such discussions with the Auditors), provided that all information obtained as a result of such access shall be subject to the confidentiality restrictions set out in the Finance Documents.

(b)     Any reasonable cost and expense of each such visit referred to in paragraph (a) above shall be borne by the Group, unless in respect of any investigation instigated by the Agent as a result of any Finance Party believing that an Event of Default had occurred and the investigation shows that no Event of Default has occurred, in which case the cost and expense shall be for the account of the Lenders.

**23.9    Websites**

Any Obligor may satisfy its obligation under this Agreement to deliver any information in relation to those Lenders (the "Website Lenders") who accept this method of communication by posting this information onto an electronic website designated by the Company and the Agent (the "Designated Website") if:

(a)     the Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

(b)     both the Company and the Agent are aware of the address of and any relevant password specifications for the Designated Website; and

(c)     the information is in a format previously agreed between the Company and the Agent.

If any Lender does not agree to the delivery of information electronically then the Agent shall notify the Company accordingly and the Obligors shall supply the information to the Agent in paper form. In any event the Obligors shall supply the Agent with one copy (but no more than one copy) in paper form of any information required to be provided by it.

(a)     The Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company and the Agent.

(b)     The Company shall promptly upon becoming aware of its occurrence notify the Agent if:

(i)      the Designated Website cannot be accessed due to technical failure;

(ii)     the password specifications for the Designated Website change;

(iii)    any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(iv)    any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(v)     the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If the Company notifies the Agent under paragraph (b)(i) or paragraph (b)(v) above, all information to be provided by the Parent or an Obligor under this Agreement after the date of that notice shall be supplied in paper form unless and until the circumstances giving rise to the notification are no longer continuing.

(c)     Any Website Lender may request, through the Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated

92

[London #294447 v13]

Confidential

CITI-TF 00701814

Website. The Company shall procure that any such request is complied with within ten (10) Business Days.

**23.10  Know your Customer Requirements**

(a)     Each Obligor shall promptly upon the request of the Agent or any Lender, and each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective New Lender) in order for the Agent, such Lender or any prospective New Lender to carry out and be satisfied with the results of all necessary "know your customer" or other checks in relation to the identity of any person that it is required (in order to comply with applicable money laundering laws and regulations) to carry out in relation to the transactions contemplated in the Finance Documents and/or any Additional Obligor.

(b)     The Company shall, by not less than ten (10) Business Days' written notice to the Agent, notify the Agent (which shall promptly notify the Lenders) of the date on which any of its Subsidiaries becomes an Additional Guarantor or Additional Borrower pursuant to Clause 28 (*Changes to the Obligors*).

(c)     Following the giving of any notice pursuant to paragraph (b) above, the Company shall promptly upon the request of the Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective New Lender) in order for the Agent, such Lender or any prospective New Lender to carry out and be satisfied with the results of all necessary "know your client" or other checks in relation to the identity of any person that it is required to carry out in relation to the accession of the Additional Borrower or such Additional Guarantor to this Agreement.

**24.     FINANCIAL COVENANTS**

**24.1   Financial definitions**

In this Clause 24.1:

"**Borrowings**" means any indebtedness for or in respect of:

(a)     monies borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds (other than a performance bond issued in the ordinary course of business by one member of the Group in respect of the performance obligations of another member of the Group), notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease (and, for the avoidance of doubt, when calculating the portion of the liability constituting Financial Indebtedness only the capitalised value thereof shall be included);

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis or any credit notes given in the ordinary course of business);

(f)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

Confidential

CITI-TF 00701815

(g)    any amount raised under any other transaction (including any forward sale or purchase agreement) required to be accounted for as a borrowing except:

(i)    unconditional purchase obligations arising in the normal course of business;

(ii)    obligations in respect of pensions; and

(iii)    investment grants for fixed assets;

(h)    any liability of any member of the Group to the trustees of any pension fund to the extent such obligations are secured by any Security on any property or asset of such person, the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured; and

(i)    without double counting, the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (h) above.

"Consolidated Cash and Cash Equivalents" means, at any time, the aggregate of:

(a)    the Relevant Group's cash at bank, in hand or on deposit;

(b)    the Relevant Group's Cash Equivalent Investments,

(in each case which is capable of being applied against the Relevant Group's consolidated Borrowings).

"Consolidated Operating Cashflow" means, for any Relevant Period and for the Relevant Group (without double counting), Maintenance EBITDA for that Relevant Period:

(a)    minus any increase in Working Capital or plus any decrease in Working Capital in each case to the extent not included in Maintenance EBITDA;

(b)    minus amounts paid in cash in respect of corporation or other taxes and plus tax credits or tax rebates received in cash (including, without limitation, refunds of tax overpaid);

(c)    plus (to the extent not included in paragraph (a) above) the amount of non-cash debits and charges taken into account in calculating Maintenance EBITDA for that Relevant Period;

(d)    minus (to the extent not take into account in paragraph (a) above) the amount of any non-cash credits and income taken into account in Maintenance EBITDA for that Relevant Period;

(e)    plus or minus any extraordinary items, Exceptional Items, redundancy, reorganisation, restructuring and non-recurring pension costs received or paid in cash provided however, that any cash payments in respect of said items that are funded from Retained Excess Cashflow retained by the Group in respect of any previous Accounting Reference Period or any Excess Equity Contribution shall be added back;

(f)    plus Acquisition Costs (to the extent not included in Maintenance EBITDA);

(g)    minus any consideration paid for Permitted Investments (save to the extent funded from Permitted Financial Indebtedness or under the Revolving Facility or funded from

94

[London #294447 v13]

Confidential

Case: 11-126    Document: 65    Page: 299    04/25/2011    272935    401

A-6198

Retained Excess Cashflow in respect of any previous Accounting Reference Period or any Excess Equity Contribution);

(h)    minus cash dividends paid by the Parent to its shareholders and by the other members of the Group to minority shareholders not being members of the Relevant Group (other than to the extent already deducted in accordance with paragraph (s) below) plus cash dividends received;

(i)    plus, to the extent not already taken into account in calculating Maintenance EBITDA, income from participating interests in associated undertakings to the extent received in cash and minus any payments made to associated undertakings during that Relevant Period;

(j)    plus cash flows arising from operational hedging transactions (not relating to Borrowings) to the extent not already taken into account in calculating Maintenance EBITDA;

(k)    plus realised foreign exchange gains and minus realised foreign exchange losses charged during that period to the extent not already taken into account in calculating Maintenance EBITDA for that period and not relating to Borrowings;

(l)    excluding dividends declared prior to the Unconditional Date; and

(m)    minus cash amounts paid in respect of stock options issued by the Relevant Group before the Unconditional Date.

"Current Assets" means the aggregate of inventory, trade receivables, credit notes, receivables from other associated companies, fixed assets receivables, prepaid expenses and deferred charges, sundry debtors and other debtors and other assets of each member of the Relevant Group (but excluding cash at bank and Cash Equivalent Investments and prepaid interest and tax receivables) maturing within twelve (12) months from the relevant testing date and excluding amounts due from any vendor in connection with a Permitted Investment and further excluding intra-Group items.

"Current Liabilities" means the aggregate of all liabilities (including trade payables, fixed assets payables, other liabilities, accruals, trading provisions, other creditors, provision for pensions and other liabilities and deferred income and payments received in advance) of each member of the Relevant Group falling due within twelve (12) months from the relevant testing date but excluding consolidated aggregate Borrowings of the Relevant Group (and any interest on those Borrowings) falling due within such period and excluding amounts due in respect of dividends or taxation or amounts due to any vendors in connection with a Permitted Investment and further excluding intra-Group items.

"Equity Injection" has the meaning given to it in the definition of Maintenance EBITDA.

"Exceptional Items" means material items, which are derived from events or transactions which fall within the ordinary activities of the Relevant Group, but which material items either individually or, if of a similar type, in aggregate, are unusual or occur infrequently.

"Excess Cashflow" means, in respect of each Accounting Reference Period, the amount calculated in the Base Currency of the Consolidated Operating Cashflow less Total Debt Service and (without double counting):

(a)    less any amounts of Retained Excess Cashflow in respect of any previous Accounting Reference Period or Excess Equity Contribution or share capital subscription or

Confidential                                                                                                                          CITI-TF 00701817

Shareholder Debt taken into account in the calculation of Consolidated Operating Cashflow in the Relevant Period;

(b)     less amounts funded from a Utilisation of the Revolving Facility or the Acquisition Facility in the Relevant Period;

(c)     less any one-off severance payments to management included in the calculation of Consolidated Operating Cashflow in the Relevant Period;

(d)     less any gains resulting from the disposal of real estate assets included in Maintenance EBITDA in accordance with paragraph (e)(ii) of the definition of Maintenance EBITDA;

(e)     less any Disposal Proceeds, Insurance Proceeds and Recovery Proceeds taken into account in the calculation of Consolidated Operating Cashflow for such Relevant Period;

(f)     less any Pending Investment Amount for that Relevant Period (or plus any Pending Investment Amount from the previous Relevant Period); and

(g)     less any extraordinary items, Exceptional Items, redundancy, reorganisation, restructuring and non-recurring pension costs referred to in paragraph (e) of Consolidated Operating Cashflow but not deducted in accordance with the provisions of that paragraph.

**"Excess Equity Contribution"** means for the Relevant Group the amount by which (i) the sources of cash demonstrated in the Funds Flow Statement exceeds (ii) the aggregate actual uses of cash as demonstrated in the Funds Flow Statement which as regards the uses, for the avoidance of doubt, will only include:

(a)     the purchase price payable by the Company in respect of the Acquisition;

(b)     the amount of Borrowings of the Target Group to be repaid on or about the Closing Date;

(c)     any costs, commissions, prepayment premiums, fees and expenses incurred in relation to the refinancing of existing Borrowings of the Target Group;

(d)     the fair market value of the interest rate derivative transactions entered into by the Target Group and existing as at the Unconditional Date; and

(e)     any costs, commissions, fees and expenses incurred in relation to the Transaction Documents and paid on the Closing Date or within five (5) Business Days thereafter.

**"Financial Quarter"** means each quarterly period in each Financial Year (each comprising three consecutive monthly periods) ending on 31 December, 31 March, 30 June and 30 September in each such Financial Year.

**"Financial Year"** means each period of twelve (12) months ended on 31 December or after adjustments in accordance with the Structure Memorandum, 31 March.

**"Maintenance EBITDA"** means for any Relevant Period (without double counting), the consolidated net profit of the Relevant Group:

(a)     adding back any Restructuring Expenses;

(b)     adding back Total Net Interest;

96

[London #294447 v13]

(c)     adding back Taxes on income or gains (including any provision on account of taxation);

(d)     adding back any depreciation or amortisation of tangible or intangible assets (including goodwill);

(e)

      (i)     adding back any amount related to the impairment of any asset and any provision for risk and charges and deducting any provision reversals (except for provision reversals contemplated in the Base Case Model);

      (ii)     deducting any non-cash gains and adding back any non-cash losses arising on the disposal or revaluation of fair value adjustment of assets other than in the ordinary course of business including amounts attributable to goodwill or step up written-off during such period or charged to the profit and loss account of the Relevant Group during such period; and

      (iii)     deducting any unrealised exchange gains and adding back any unrealised exchange losses;

(f)     adding back any negative or deducting any positive Exceptional Items, extraordinary items, redundancy, reorganisation, restructuring and non-recurring pension costs;

(g)     adding back any Acquisition Costs and any fees, expenses or charges related to any equity financing, debt financing, investments or acquisitions whether or not successful and the amount of any one-off severance payments to existing senior management and sign-on bonus payments relating to new appointments to senior management;

(h)     adding back any Management Fees paid to all Investors relating to their investment in the Relevant Group;

(i)     adding back any costs or losses recovered through a claim under any insurance, warranty or indemnity;

(j)     adding back any business interruption or loss recovered through insurance proceeds;

(k)     deducting any realised exchange gains and adding back any realised exchange losses related to balance sheet hedging of the Relevant Group;

(l)     adding back any non cash charges relating to any employee equity plan; and

(m)     adding back any expense related to stock options issued by the Relevant Group before the Unconditional Date,

**provided that** for the purposes of Clause 24.2 (*Financial condition*) only:

      (i)     the level of Maintenance EBITDA may be increased by the amount equal to the net proceeds of any equity or Shareholder Debt paid directly or indirectly into the Parent which is equal to the amount required to be added to Maintenance EBITDA to cure any breach of Clause 24.2 (*Financial condition*) that would have occurred but for such increase (an "**Equity Injection**");

      (ii)     any such Equity Injection may be made at any time from the first day of the Relevant Period to which it is expressly stated to relate up to twenty (20) Business Days after delivery of the financial statements for a Relevant Period and

97

CITI-TF 00701819

shall be treated as having been contributed in the last Financial Quarter of that Relevant Period;

(iii) any Equity Injection shall be treated as Maintenance EBITDA for (i) the Financial Quarter in respect of which it is received for the purpose of calculating the financial covenants for that quarter and (ii) the immediately following three Financial Quarters; and

(iv) during the period from the date on which the Parent notifies the Agent that it intends to make an Equity Injection to cure a breach of Clause 24.2 (*Financial condition*) to the date falling 20 Business Days after the date on which the Parent has delivered to the Agent (in accordance with Clause 23.1 (*Financial statements*)) the financial statements which show such breach of Clause 24.2 (*Financial condition*), no Secured Party may, in respect of such breach, exercise any rights it may have under Clause 26.13 (*Acceleration*), cancel any Commitments or enforce any Transaction Security Document solely on the basis of such breach.

"**Music Publishing Division Excess Cashflow**" means Excess Cashflow that is directly attributable to that portion of the Group Business constituting the Music Publishing Division.

"**Pending Investment Amount**" means, in respect of any Relevant Period, the aggregate cash amounts to be paid in respect of the consideration for any Permitted Investments for which a member of the Group has entered into a commitment by no later than the end of the Relevant Period and completed by no later than the date which is six (6) months following the commencement of the following Relevant Period.

"**Relevant Group**" means the Parent and its Subsidiaries which are members of the Group and which are fully consolidated in accordance with the Accounting Principles in the consolidated accounts of the Group.

"**Relevant Period**" means (i) in the case of any determination of Music Publishing Division Excess Cashflow, the relevant Financial Quarter or (ii) in any other case, the four Financial Quarters ending on the last day of the relevant Financial Quarter.

"**Restructuring Expenses**" means expenses incurred in connection with restructuring the Relevant Group.

"**Retained Excess Cashflow**" means Excess Cashflow which is not required to be applied in prepayment of the Facility under the terms of this Agreement and which has not otherwise been applied for one of the specified purposes set out in and in accordance with the terms of this Agreement.

"**Total Debt Service**" means in respect of any Relevant Period and for the Relevant Group, the aggregate of:

(a) Total Net Cash Interest Expense; and

(b) scheduled (but not voluntary or mandatory) repayments of Borrowings (as reduced by any voluntary or mandatory prepayments) excluding any principal amount which fell due under any overdraft, working capital or revolving credit facility and which was available for simultaneous redrawing according to the terms of such facility or a similar facility and excluding the amount of any payments falling due under any finance leases.

"**Total Net Cash Interest Expense**" means in respect of any Relevant Period, the aggregate amount of the consolidated cash interest, commission, fees, discounts and other finance

98

[London #294447 v13]

Confidential

payments payable by any member of the Relevant Group to a person which is not a member of the Relevant Group, in respect of such period in respect of the Relevant Group's consolidated Borrowings or interest rate hedging arrangements (excluding any Shareholder Debt and excluding any amortisation of Acquisition Costs or other transaction costs (to the extent included) and capitalised interest) but deducting:

(a)   any commission, fees, discounts and other finance payments receivable by any member of the Relevant Group under any interest rate hedging instrument permitted by this Agreement;

(b)   any interest receivable by any member of the Relevant Group on any deposit including from Cash Equivalent Investments, time deposit investments and credit balances on bank accounts; and

(c)   all fees incurred by any Obligor in connection with the Incurrence of any Financial Indebtedness.

"**Total Net Debt**" means at the relevant date the aggregate of the Relevant Group's consolidated Borrowings other than:

(a)   Borrowings under Shareholder Debt;

(b)   Borrowings under the Revolving Facility; and

(c)   for the avoidance of doubt, after the Separation Date, the principal amount of the Parent's liability under the Senior Facilities Agreement (other than in respect of Music Publishing Division Acquisition Loans) and the Mezzanine Facility Agreement.

"**Total Net Interest**" for any period means Total Net Cash Interest Expense plus capitalised interest payable in that period by any member of the Relevant Group to any person which is not a member of the Relevant Group.

"**Working Capital**" means, at any time, Current Assets at that time less Current Liabilities at that time.

24.2   **Financial condition**

The Parent shall ensure that the ratio of Total Net Debt to Maintenance EBITDA of the Music Publishing Division in respect of any Relevant Period specified in column 1 below shall be or shall be less than the ratio set out in column 2 below opposite that Relevant Period, provided that in calculating the amount of Total Net Debt and Maintenance EBITDA of the Music Publishing Division, any amount of Total Net Debt denominated in a currency other than the Base Currency shall be translated into the Base Currency at the same average rate used for the translation into the Base Currency of amounts in that currency for the purposes of the preparation of the profit and loss account for the Financial Statements relating to the Relevant Period prepared in accordance with Clause 23.1 (*Financial Statements*):

| Column 1<br>Relevant Period | Column 2<br>Ratio |
| --- | --- |
| Period expiring on 30 June 2008 | 13.08:1 |
| Period expiring on 30 September 2008 | 12.44:1 |
| Period expiring on 31 December 2008 | 12.15:1 |
| Period expiring on 31 March 2009 | 12.05:1 |

Confidential

CITI-TF 00701821

| Column 1<br>Relevant Period | Column 2<br>Ratio |
|---|---|
| Period expiring on 30 June 2009 | 12.16:1 |
| Period expiring on 30 September 2009 | 11.98:1 |
| Period expiring on 31 December 2009 | 11.90:1 |
| Period expiring on 31 March 2010 | 11.72:1 |
| Period expiring on 30 June 2010 | 11.62:1 |
| Period expiring on 30 September 2010 | 11.46:1 |
| Period expiring on 31 December 2010 | 11.37:1 |
| Period expiring on 31 March 2011 | 11.21:1 |
| Period expiring on 30 June 2011 | 11.21:1 |
| Period expiring on 30 September 2011 | 11.06:1 |
| Period expiring on 31 December 2011 | 10.98:1 |
| Period expiring on 31 March 2012 | 10.83:1 |
| Period expiring on 30 June 2012 | 10.85:1 |
| Period expiring on 30 September 2012 | 10.73:1 |
| Period expiring on 31 December 2012 | 10.68:1 |
| Period expiring on 31 March 2013 | 10.56:1 |
| Period expiring on 30 June 2013 | 10.59:1 |
| Period expiring on 30 September 2013 | 10.48:1 |
| Period expiring on 31 December 2013 | 10.43:1 |
| Period expiring on 31 March 2014 | 10.33:1 |
| Period expiring on 30 June 2014 | 10.27:1 |
| Period expiring on 30 September 2014 | 10.18:1 |
| Period expiring on 31 December 2014 | 10.14:1 |
| Period expiring on 31 March 2015 | 10.05:1 |
| Period expiring on 30 June 2015 | 10.00:1 |
| Period expiring on 30 September 2015 | 9.92:1 |

[London #294447 v13]

Confidential

CITI-TF 00701822

provided that this covenant shall be tested for the first time in respect of the Relevant Period ending on 30 June 2008.

**24.3    Calculations**

Maintenance EBITDA, Total Debt Service, Total Net Cash Interest Expense and Total Net Debt shall be calculated and interpreted on a consolidated basis in accordance with Accounting Principles.

**24.4    Pro Forma Calculation**

(a)    Where a company or business is acquired during a Relevant Period as a result of a Permitted Investment the contribution of that company or business to Maintenance EBITDA shall for the purposes of Clause 24.2 (*Financial condition*) above be included on a pro forma basis as if the acquisition had been made on the first day of the Relevant Period.

(b)    Where a company or business is to be disposed of during a subsequent Relevant Period, the contribution of that company or business shall not be excluded for the purposes of the calculation of the financial covenants of the Relevant Period.

**24.5    General**

No item shall be taken into account more than once in any calculation.

**25.    GENERAL UNDERTAKINGS**

The undertakings in this Clause 25 remain in force from the Signing Date for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

**Positive Undertakings**

**25.1.    Authorisations**

(a)    Each Obligor shall promptly:

(i)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

(ii)    upon written request, supply certified copies to the Agent of,

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(A)    enable it to perform its obligations under any Transaction Documents to which it is a party;

(B)    ensure the legality, validity, enforceability or admissibility in evidence of any Transaction Document to which it is a party; and

(C)    carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

(b)    The Parent shall procure that each member of the Music Publishing Group:

(i)    has the right and is duly qualified to own its assets and to conduct its business in all applicable jurisdictions; and

(ii)    promptly does all things necessary or desirable to obtain, preserve and keep in full force and effect all rights (including, without limitation, all contracts, licences and consents) which are necessary for the conduct of its business,

101

CITI-TF 00701823

A-6205

save in each case where failure to do so would not have, or be reasonably likely to have, a Music Publishing Material Adverse Effect.

**25.2    Compliance with laws**

(a)    Each Obligor shall (and the Parent shall procure that each member of the Group will) comply in all respects with all laws to which it may be subject if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

(b)    The Parent shall procure that each member of the Music Publishing Group shall comply with all agreements or other documents binding on it if failure so to comply has or is reasonably likely to have a Music Publishing Material Adverse Effect.

**25.3    Environmental compliance**

Each Obligor shall (and the Parent shall procure that each member of the Group will):

(a)    comply with all Environmental Law; and

(b)    obtain, maintain and ensure compliance with all requisite Environmental Permits,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

**25.4    Insurance**

Each Obligor shall (and the Parent shall procure that each member of the Group will) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially the same business. All insurances must be with reputable independent insurance companies or underwriters.

**25.5    Taxation**

Each Obligor shall (and the Parent shall procure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring material penalties unless and only to the extent that:

(a)    such payment is being contested in good faith;

(b)    adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Agent under Clause 23.1 (*Financial statements*);

(c)    such payment can be lawfully withheld; and

(d)    failure to pay those Taxes does not have, nor is it reasonably likely to have, a Material Adverse Effect.

**25.6    Intellectual Property**

Each Obligor shall (and the Parent shall procure that each member of the Group will):

(a)    preserve and maintain the subsistence and validity of its Material Intellectual Property;

(b)    use reasonable endeavours to prevent any infringement in any material respect of the Material Intellectual Property;

(c)    make registrations and pay all registration fees and taxes necessary to maintain the Material Intellectual Property in full force and effect and record its interest in that Intellectual Property; and

[London #294647 v13]

Confidential

CITI-TF 00701824

(d) not use or permit the Material Intellectual Property to be used in a way or take any step or omit to take any step in respect of that Material Intellectual Property which may materially and adversely affect the existence or value of the Material Intellectual Property or imperil the right of any member of the Group to use such property,

where failure to do so, in the case of paragraphs (a) (b) and (c) above, or, in the case of paragraph (d) above, such use, permission to use, omission or discontinuation, is reasonably likely to have a Material Adverse Effect or, in the case of a member of the Music Publishing Group, a Music Publishing Material Adverse Effect.

**25.7 Pari passu ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

**25.8 Cash balances**

(a) Subject to paragraph (b) below, each Obligor will procure that none of its Subsidiaries which are not Obligors will, at any time hold cash or Cash Equivalent Investments greater than required for its projected cashflow requirements for the next 12 months (the amount of such excess being the "Cash Balance") and any such Cash Balance shall be lent or otherwise transferred by the relevant Subsidiary to an Obligor which has created Transaction Security over its bank accounts.

(b) No member of the Group shall be obliged at any time to lend or otherwise transfer or to procure that a Subsidiary lend or otherwise transfer any Cash Balance under paragraph (a) above if (despite using all reasonable efforts to avoid the breach or result) to do so would breach any applicable law or result in personal liability for the Obligor or the Subsidiary or any of such person's directors or management or result in the Group incurring a cost (whether as a result of paying additional Taxes or otherwise) equal to or greater than five (5) *per cent.* of the moneys to be lent or otherwise transferred.

**25.9 Treasury Transactions**

(a) No Obligor shall (and the Parent will procure that no members of the Group will) enter into any Treasury Transaction, other than:

(i) the hedging transactions contemplated by the Hedging Letter and documented by the Hedging Agreements;

(ii) spot and forward delivery foreign exchange contracts entered into in the ordinary course of business and not for speculative purposes; and

(iii) any Treasury Transaction entered into for the hedging of actual or projected real exposures arising in the ordinary course of business of a member of the Group and not for speculative purposes.

(b) The Parent shall ensure that all currency and interest rate hedging arrangements contemplated by the Hedging Letter are implemented in accordance with the terms of the Hedging Letter and that such arrangements are not terminated, varied or cancelled without the consent of the Agent (acting on the instructions of the Majority Lenders), save (in the case of arrangements documented by the Hedging Agreements) as permitted by the Intercreditor Agreement.

**25.10 Further assurances**

(a) Subject to the Agreed Security Principles, each Obligor shall (and the Parent shall procure that each member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security

Confidential

Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(i)  to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law;

(ii)  to confer on the Security Agent or confer on the Finance Parties Security over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii)  to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b)  Subject at all times to the Agreed Security Principles, each Obligor shall (and the Parent shall procure that each member of the Group shall) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Finance Parties by or pursuant to the Finance Documents.

**25.11  Financial assistance**

Each Obligor shall (and the Parent shall procure each member of the Group will) comply in all respects with Sections 151 to 158 of the Act and any equivalent legislation in other jurisdictions including in relation to the execution of the Transaction Security Documents and payment of amounts due under this Agreement.

**25.12  Steps paper**

The Company shall, within 6 weeks after the Closing Date (or such later date as the Arranger may agree) deliver to the Lenders a steps paper, in form and substance satisfactory to the Lenders (acting reasonably), setting out the details of the steps proposed to be taken to ensure the Business Separation and debt pushdown.

**25.13  Business Separation**

(a)  Each Obligor shall (and the Parent shall procure that each member of the Group will) use their reasonable endeavours to:

(i)  achieve the Business Separation as soon as reasonably practicable and in any event within 6 Months after the Unconditional Date, subject at all times to having due consideration to the commercial, economic and tax impact of the Business Separation;

(ii)  novate, to the extent permissible and practicable, the Loans to the entity or entities holding the Music Publishing Division's assets and business; and

(iii)  subject at all times to having due consideration to the commercial, economic and tax impact, as soon as reasonably practicable and in any event within 6 months after acquisition, ensure that any music publishing business acquired after the Closing Date is separated from the recorded music business acquired with that business and sold for fair market value to a Securitisation Entity.

(b)  The Parties will, on or before the occurrence of the Business Separation (and each acting reasonably), agree on amendments to the covenants applicable to the entity or entities holding

104

the Music Publishing Division's assets and business in order that the covenants are consistent with those customary for a securitisation transactions.

(c) The Parties will, on or before the occurrence of the Business Separation (and each acting reasonably), agree on amendments to the Transaction Security Documents and the Intercreditor Agreement to ensure that, after completion of the Business Separation, the Lenders, the lenders of Music Publishing Division Acquisition Loans and the Hedge Counterparties which have entered into hedging arrangements in respect of Loans or Music Publishing Division Acquisition Loans will have first ranking Security over the assets of the Music Publishing Division and the remaining lenders under the Senior Facilities Agreement, the lenders under the Mezzanine Facility Agreement and the remaining Hedge Counterparties will have silent second ranking Security over such assets.

**25.14 Security and guarantees**

(a) The Company shall ensure that as soon as practicable after the Closing Date and in any event within 120 days after the Closing Date:

(i) each Material Subsidiary; and

(ii) each member of the Group whose business forms part of the Music Publishing Division,

will, subject to the Agreed Security Principles, become an Additional Guarantor in accordance with Clause 28 (*Changes to the Obligors*) and will provide the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) as Security to secure its obligations as Guarantor under the Finance Documents such that members of the Group whose aggregate:

(A) unconsolidated gross assets represent not less than 85 per cent. of the consolidated gross assets of the Group as at the Closing Date; and

(B) unconsolidated Maintenance EBITDA represent not less than 85 per cent. of the consolidated Maintenance EBITDA of the Group at the Closing Date,

shall have become Additional Guarantors in accordance with Clause 28 (*Changes to the Obligors*) and shall have provided the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) as Security to secure its obligations as Guarantor under the Finance Documents.

(b) The Company shall:

(i) promptly notify the Agent if any member of the Group becomes a Material Subsidiary; and

(ii) within 90 days of request by the Agent, procure that :

(A) each Subsidiary acquired by the Company, directly or indirectly, which is a Material Subsidiary after the Signing Date; and

(B) any other Subsidiary which becomes a Material Subsidiary after the Signing Date,

will, subject to the Agreed Security Principles, become an Additional Guarantor and deliver to the Agent an Accession Letter duly executed by itself and the relevant Material Subsidiary together with the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to such Material Subsidiary all in form and substance satisfactory to the Agent.

Confidential

(c) The Parent will ensure that, at all times after the date which is 120 days after the Closing Date:

    (i) the aggregate unconsolidated gross assets of the Guarantors represents at least 85 per cent. of the consolidated gross assets of the Group;

    (ii) the aggregate unconsolidated Maintenance EBITDA of the Guarantors represents at least 85 per cent. of the consolidated Maintenance EBITDA of the Group,

provided that where each member of the Group:

    (A) whose gross assets and Maintenance EBITDA account for 3 per cent. or more of the consolidated gross assets or consolidated Maintenance EBITDA of the Group; and

    (B) which is not excused from becoming an Additional Guarantor pursuant to the Agreed Security Principles,

has become an Additional Guarantor, the gross assets and Maintenance EBITDA of any member of the Group which is not eligible or required to be a Guarantor pursuant to the Agreed Security Principles shall not be included in the calculation of consolidated gross assets or consolidated Maintenance EBITDA of the Group for the purposes of subparagraphs (i) and (ii) above.

(d) No Obligor shall (and the Company shall ensure that no other member of the Group will) do, or consent to the doing of, anything which might prejudice the validity, enforceability or priority of any of the Security created pursuant to the Transaction Security Documents in any material respect.

**25.15 Scheme undertakings**

If the Scheme Conversion has occurred, the Company will:

(a) procure the issue of the Scheme Press Release within five Business Days of the Signing Date;

(b) dispatch the Scheme Circular as soon as practicable and in any event within 28 days of the date of issue of the Scheme Press Release (or, if later, promptly after the date on which the Court convenes a meeting of the holders of the Target shares to consider the Scheme);

(c) procure that the terms of the Scheme Circular are not inconsistent with, or contrary to, the terms of the draft Scheme Press Release delivered as a condition precedent to signing this Agreement where failure to do so would be materially prejudicial to the interests of the Finance Parties, unless the Finance Parties have approved in writing such change in advance (such consent not to be unreasonably withheld or delayed);

(d) promptly inform the Agent of any material developments in relation to the Scheme and promptly on reasonable request provide the Agent with:

    (i) information as to the progress of the Scheme; and

    (ii) any material information or advice received in relation to the Scheme and will notify the Agent promptly following becoming aware that the Court Order has been issued;

(e) not increase, and ensure that there is no increase in, the amount of cash payable by it in respect of the Target Shares pursuant to the Scheme or otherwise vary the cash

[London #294447 v13]

Confidential

CITI-TF 00701828

consideration payable pursuant to the Scheme other than in circumstances where the Company does not incur any additional Financial Indebtedness for the purpose of satisfying any amount of increased consideration payable in respect of the Target Shares pursuant to the Scheme other than Shareholder Debt;

(f) not take any action (and procure, so far as it is able to do so, that no person, Acting in Concert (as defined in the Takeover Code) with it or otherwise, takes any action) which would compel it to make an offer to shareholders in the Target under Rule 9 of the Takeover Code;

(g) not waive or amend (and use reasonable endeavours to ensure there is no waiver or amendment to) or declare or treat as satisfied any condition of the Scheme where such waiver or consent would be materially prejudicial to the interests of the Finance Parties unless either:

(i) the Arranger has given its consent; or

(ii) to the extent required by the Takeover Code, the Takeover Panel or the Court;

(h) if it becomes aware of a circumstance or event which is or could reasonably be construed to be covered by any condition of the Scheme which, if not waived, would entitle it (with the Takeover Panel's and/or the Court's consent, if needed) to lapse or withdraw the Scheme, promptly to notify the Agent; and

(i) if a circumstance or event referred to in paragraph (h) above occurs and the Agent states that, in its *bona fide* opinion, that circumstance or event could reasonably be expected to have a Material Adverse Effect:

(i) promptly request the Takeover Panel and/or the Court to agree to the lapsing or withdrawal of the Scheme as a result of the non-satisfaction of that condition; and

(ii) if the Takeover Panel and/or the Court so agrees, not waive that condition or treat it as satisfied, and withdraw the Scheme at the earliest opportunity;

(j) make full written disclosure to the Agent as soon as reasonably practicable of all information which comes to its attention and which is material to any decision about whether to waive any condition of the Scheme or which suggests that any condition to that Acquisition will or may not be satisfied, or will or may require to be waived; and

(k) inform the Arranger and consult with it (except to the extent necessary to comply with any obligations of confidentiality to any regulatory authority, and unless otherwise required by the Takeover Code, the Takeover Panel, any regulation, any applicable stock exchange, any applicable government or other regulatory authority) as to:

(i) the terms and conditions of any assurance or undertaking proposed to be given by or on behalf of the Company or, so far as Company is aware, the Target to any person for the purpose of obtaining any authorisation or clearance in connection with the Acquisition; and

(ii) any terms or conditions proposed in connection with any authorisation required by law in connection with the Acquisition.

**25.16 Offer Undertakings**

If the Scheme Conversion has not occurred, the Company will:

Confidential

CITI-TF 00701829

(a) procure the issue of the Offer Press Announcement within five Business Days of the Signing Date;

(b) procure that the Offer Document is posted within 28 days of the issue of the Offer Press Announcement (or such longer time period as the Agent and the Takeover Panel may agree);

(c) keep the Agent informed as to any material developments in relation to the Offer and promptly on reasonable request provide the Agent with information as to the progress of the Offer and with any material information or advice received in relation to the Offer;

(d) not increase, and ensure there is no increase in, the amount of cash payable by it in respect of the Target Shares pursuant to the Offer or otherwise vary the cash consideration payable pursuant to the Offer other than in circumstances where the Company does not incur any additional Financial Indebtedness for the purpose of satisfying any amount of increased consideration payable in respect of the Target Shares pursuant to the Scheme other than Shareholder Debt;

(e) not take any action (and procure, so far as it is able to do so, that no person, Acting in Concert (as defined in the Takeover Code) with it or otherwise, takes any action) which would compel it to make an offer to shareholders in the Target under Rule 9 of the Takeover Code;

(f) not waive or amend (and use reasonable endeavours to ensure there is no waiver or amendment to) or declare or treat as satisfied any condition of the Offer where such waiver or consent would be materially prejudicial to the interests of the Lenders unless either:

  (i) the Lenders have given their consent; or

  (ii) to the extent required by the Takeover Code, the Takeover Panel or the Court;

  (iii) extend the Offer beyond the Certain Funds Period;

(g) procure that the terms of the Offer Document are not inconsistent with, or contrary to, the terms of the Offer Press Announcement delivered as a condition precedent under this Agreement where failure to do so would be materially prejudicial to the interests of the Finance Parties, unless the Agent (acting on the instructions of the Majority Lenders) has approved in writing such changes in advance (such consent not to be unreasonably withheld or delayed);

(h) promptly notify the Agent if it becomes aware of a circumstance or event which is or could reasonably be construed to be covered by any condition of the Offer which, if not waived, would entitle the Company (with the Takeover Panel's consent, if needed) to lapse the Offer;

(i) if a circumstance or event referred to in paragraph (h) above occurs and the Agent (acting on the instructions of the Majority Lenders) states that, in its bona fide opinion, that circumstance or event could reasonably be expected to have a Material Adverse Effect:

  (i) promptly request the Takeover Panel to agree to the lapsing or withdrawal of the Offer as a result of the non-satisfaction of that condition; and

108

[London #294447 v13]

Confidential

CITI-TF 00701830

(ii)    if the Takeover Panel so agrees, not waive that condition or treat it as satisfied and declare the Offer lapsed at the earliest opportunity;

(j)    within 28 days of the later of:

(i)    the Offer becoming or being declared wholly unconditional; and

(ii)    the date on which acceptances of the Offer have been received from holders of not less than 90% of each class of the Target Shares to which the Offer relates,

procure that one of its directors issues a statutory declaration pursuant to section 980(4) of the Companies Act 2006 and gives notice to all the remaining holders of Target Shares that it intends to acquire their shares, pursuant to Part 28 of the Companies Act 2006, and the Company shall subsequently purchase such shares as soon as legally possible.

**25.17 Ownership**
The Company will ensure that the Target remains its wholly owned Subsidiary.

**25.18 United States laws**
(a)    In this Clause:

**"Anti-Terrorism Law"** means each of:

(i)    Executive Order No. 13224 on Terrorist Financing: Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism issued 23 September 2001, as amended by order 13268 (as so amended, the **"Executive Order"**);

(ii)    the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act);

(iii)    the Money Laundering Control Act of 1986, 18 U.S.C. Sect. 1956; and

(iv)    any similar law enacted in the United States of America subsequent to the Signing Date.

**"Code"** means the United States Internal Revenue Code of 1986.

**"ERISA"** means the United States Employee Retirement Fund Income Security Act of 1974 as amended and the applicable regulations thereunder.

**"ERISA Affiliate"** means any person treated as a single employer with any Obligor for the purpose of section 414 of the Code.

**"investment company"** has the meaning given to it in the United States Investment Company Act of 1940.

**"Plan"** means an employee benefit plan as defined in section 3(3) of ERISA:

(i)    maintained by any Obligor or any ERISA Affiliate; or

(ii)    to which any Obligor or any ERISA Affiliate is required to make any payment or contribution.

Confidential

CITI-TF 00701831

"public utility" has the meaning given to it in the United States Federal Power Act of 1920.

"Reportable Event" means:

(i)    an event specified as such in section 4043 of ERISA or any related regulation, other than an event in relation to which the requirement to give 30-day notice of that event is waived by any regulation; or

(ii)    a failure to meet the applicable minimum funding standard under section 412 of the Code or section 302 of ERISA, whether or not there has been any waiver of notice or waiver of the minimum funding standard under section 412 of the Code.

"Restricted Party" means any person listed:

(i)    in the Annex to the Executive Order;

(ii)    on the "Specially Designated Nationals and Blocked Persons" list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or

(iii)    in any successor list to either of the foregoing.

(b)    Each Obligor must, promptly upon becoming aware of it, notify the Agent of:

(i)    any Reportable Event with respect to a Plan that is a single employer plan (as defined in ERISA);

(ii)    the termination of or complete or partial withdrawal from, or any circumstances reasonably likely to result in the termination of or withdrawal from, any Plan subject to Title IV of ERISA which is reasonably likely to have a Material Adverse Effect; and

(iii)    a claim or other communication alleging material non-compliance with any law or regulation relating to any Plan which is reasonably likely to have a Material Adverse Effect.

(c)    Each Obligor and its ERISA Affiliates must be, and remain, in compliance in all respects with all law and regulations relating to each of its Plans, where failure to do so is reasonably likely to have a Material Adverse Effect.

(d)    Each of the Obligors and its ERISA Affiliates must ensure that no event or condition exists at any time in relation to a Plan which is reasonably likely to result in the imposition of a Security (other than as permitted under this Agreement) on any of its assets or which is reasonably likely to have a Material Adverse Effect.

(e)    No Borrower may:

(i)    use any part or proceeds of a Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately:

(A)    to purchase or to carry margin stock or to extend credit to others for the purpose of purchasing or carrying "margin stock" (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System of the United States of America, as amended to the date hereof) or to refund indebtedness originally incurred for such purposes; or

Confidential

(B)    for any purpose which violates or is inconsistent with the provisions of Regulations U or X of the Board of Governors of the Federal Reserve System; or

(ii)    extend any credit for the purpose, directly or indirectly, of buying or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States of America, as amended to the date hereof).

(f)    No Obligor may be or become:

(i)    a public utility or subject to regulation under the United States Federal Power Act of 1920;

(ii)    an investment company required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or

(iii)    subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee indebtedness.

(g)    No Obligor nor any of its Affiliates may:

(i)    be controlled by a Restricted Party;

(ii)    receive funds or other property from a Restricted Party; or

(iii)    be in breach of or is the subject of any action or investigation under any Anti-Terrorism Law,

in each case to the extent that such laws are applicable to it or such Affiliates.

(h)    Each Obligor and its Affiliates must take reasonable measures to ensure compliance with the Anti-Terrorism Laws to the extent such laws are applicable to it or such Affiliates.

(i)    No Obligor may be engaged principally in, nor have as one of its important activities, the business of extending credit for the purpose of purchasing or carrying any "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States of America, as amended from time to time) and, if requested by a Lender, the Borrower will furnish to that Lender a statement on Federal Reserve Form U-1 or G-3.

**25.19  Securitisation**

Subject to the terms of Clause 25.13 (*Business separation*), each Obligor shall (and the Parent shall procure that each member of the Group shall) take all such action as the Lenders may reasonably request and provide timely assistance to the Lenders (or any of them) necessary for the completion of the Permitted Securitisation, which shall include (but shall not be limited to):

(a)    co-operating and working with the Lenders in good faith and using best efforts to complete the Permitted Securitisation as soon as is reasonably practicable, and not taking (or omitting to take) any action which may reasonably be expected to prejudice the Permitted Securitisation;

(b)    using best efforts to ensure that the Permitted Securitisation benefits from the lending relationships of the Group;

(c)    using best efforts to provide, amongst other things, all relevant information about the Obligors, the business plan, business, assets, conditions and prospects of the Obligors

111

CITI-TF 00701833

and the Group and any other information (including, without limitation, any amended form of business plan and cashflow forecast reflecting the updated information) as in the reasonable opinion of any of the Lenders is necessary to complete the Permitted Securitisation (including, without limitation, all information requested by any listing authority, Rating Agency, and, to the extent reasonably necessary, due diligence reports, tax opinions and legal opinions in form and substance satisfactory to the Lenders (acting reasonably), the issuer of any notes, any security trustee and (other than in respect of due diligence or negative assurance opinions, reports or letters) any bond trustee and addressed to and capable of being relied upon by such persons);

(d)     making available each Obligor's and other member of the Group's senior representatives, directors, officers, agents, employees and advisers for the purposes of making presentations to, and/or holding meetings with, potential Lenders, any Rating Agencies, and any fixed income investors at such times and in such places as the Lenders may reasonably request;

(e)     assisting in the preparation of one or more information memoranda or other offer documents in connection with the Permitted Securitisation containing, among other things, all relevant information about the Obligors, the Group and the business plan. Each such information memorandum or other offer document will be subject to the Parent's approval (not to be unreasonably withheld) prior to its distribution by the Lenders; on your behalf to potential Lenders, rating agencies, and fixed income investors and will be the subject of customary representations to be made by the Obligors. The Lenders will not independently verify any such information memorandum or other offer document;

(f)     arranging due diligence site visits for representatives of potential lenders, Rating Agencies, participating in investor meetings;

(g)     taking such acts and executing all such documents (including without limitation, passing board and shareholder resolutions, using all reasonable endeavours to procure the delivery of legal, tax and accounting opinions in form and substance satisfactory to the Lenders (acting reasonably) and the Rating Agencies, and the satisfaction of other conditions precedent customary for a securitisation in the nature of the Permitted Securitisation and making all necessary filings, registrations and declarations) as may be reasonably required in connection with the performance of its obligations hereunder;

(h)     subject to the policies and approval requirements applicable to companies that are members of the Citigroup group of companies, incorporating such insolvency remote "orphan" special purpose companies as may be required in connection with any Permitted Securitisation;

(i)     making such alterations to the legal structure of the financing structure for the Facility and/or to the Group as may be necessary to complete the Permitted Securitisation;

(j)     the issuing of any notes pursuant to the Permitted Securitisation and (if required) the channelling; by the issuer of the notes, of the proceeds of such issue directly or indirectly (including by way of loan or receivables purchase) to the Borrowers;

(k)     executing such new Transaction Documents and making such amendments to the Finance Documents as the Lenders shall reasonably require in order to secure the implementation and completion of the Permitted Securitisation;

(l)     entering into negotiations with counterparties to any material contract for the purposes of negotiating amendments to such contract (including, but without limitation, amendments

112

[London #294447 v13]

Confidential

to remove (i) any prohibitions on charging and/or assigning by way of security and (ii) any provisions providing for the termination thereof upon the appointment of a receiver or liquidator);

(m)   obtaining any regulatory approvals necessary in the opinion of the Lenders in connection with the Permitted Securitisation; and

(n)   the preparation of marketing materials regarding the business, operations and prospects of the Group, including financial projections necessary in the reasonable opinion of the Lenders in connection with the Permitted Securitisation.

**Negative undertakings**

**25.20   Financial Indebtedness**

(a)   No Obligor shall (and the Parent shall procure that no member of the Group will) Incur, directly or indirectly, any Financial Indebtedness, provided that any Obligor may Incur Financial Indebtedness if, on the date of such Incurrence and after giving effect thereto on a pro forma basis, the Incurrence Leverage Ratio would be equal or below 2.00:1.

(b)   Notwithstanding paragraph (a) above, any member of the Group will be permitted to Incur Permitted Indebtedness.

(c)   Notwithstanding paragraphs (a) and (b) above, the Parent shall procure that no member of the Music Publishing Group shall Incur, directly or indirectly, any Financial Indebtedness other than Permitted Music Division Financial Indebtedness.

(d)   For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Clause 25.20:

(i)   in the event that an item of Indebtedness meets the criteria of paragraph (a) above and/or more than one of the paragraphs of the definition of Permitted Indebtedness, the Company, at its sole discretion, will classify or, from time to time, may reclassify or divide such item of Indebtedness (or any portion thereof) in any manner that complies with this covenant and only be required to include the amount and type of such Financial Indebtedness in one of the above paragraphs;

(ii)   an item of Indebtedness may be divided and classified under more than one of the types of Financial Indebtedness described above, and in that connection the Company shall be entitled to treat a portion of such Indebtedness as having been Incurred under the first paragraph above and thereafter the remainder of such Financial Indebtedness having been Incurred under the second paragraph above;

(iii)   obligations with respect to letters of credit, bankers' acceptances, Guarantees or Security, in each case supporting Financial Indebtedness otherwise included in the determination of such particular amount will not be included;

(iv)   if obligations in respect of letters of credit, bankers' acceptances, or other similar instruments are Incurred pursuant to any Financial Indebtedness and are being treated as Incurred pursuant to this covenant and the letters of credit, bankers' acceptances or other similar instruments relate to other Financial Indebtedness, then such other Financial Indebtedness shall not be included;

(v)   the maximum amount of Financial Indebtedness that can be Incurred pursuant to this Clause shall not be deemed to be exceeded, with respect to any outstanding

113

Indebtedness, due solely to the result of fluctuations in the exchange rates of currencies; and

(vi)    the amount of Financial Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined on the basis of the Accounting Principles.

**25.21  Share issuance and sales**
(a)    No Obligor shall (and the Parent shall procure that no member of the Group will) issue or sell any Capital Stock of a member of the Group provided that the Parent may issue Disqualified Stock or Preferred Stock if, on the date of such issuance and after giving effect thereto on a pro forma basis, the Incurrence Leverage Ratio would be equal or below 2.00:1.

(b)    Notwithstanding paragraph (a) above, any member of the Group will be permitted to issue or sell Capital Stock pursuant to a Permitted Share Issuance and will be permitted to sell all (but not part) of the Capital Stock of a member of the Group in accordance with Clause 25.24 (*Asset disposals*).

**25.22  Security**
(a)    No Obligor shall (and the Parent shall ensure that no other member of the Group will) create or permit to subsist any Security over any of its assets.

(b)    No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(i)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Group;

(ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iv)    enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c)    Paragraphs (a) and (b) above shall not apply to:

(i)    any Permitted Encumbrance created by, or in respect of the assets of, any Excluded Subsidiary; and

(ii)    any Permitted Music Publishing Division Encumbrance.

**25.23  Restricted Payments**
(a)    No Obligor shall (and the Parent shall ensure that no other member of the Group will) make a Restricted Payment (other than a Permitted Payment or Permitted Investment) if at the time the relevant member of the Group makes such Restricted Payment (and after giving effect thereto):

(i)    a Default shall have occurred and be continuing; or

(ii)    the Incurrence Leverage Ratio would be greater than 2.00:1.

114

[London 9294447 v13]

(b)    Notwithstanding paragraph (a) above, the Parent shall ensure that no member of the Music Publishing Group will make a Restricted Payment (other than a Permitted Music Publishing Division Payment or a Permitted Music Publishing Division Investment).

**25.24  Asset disposals**

(a)    No Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into a single transaction or series of transactions (whether related or not) and whether voluntary or involuntary, to sell, lease, transfer or otherwise dispose of any asset (other than a Permitted Disposal) unless:

   (i)    the relevant member of the Group receives consideration (including by way of relief from, or by any other person assuming responsibility for, any liabilities, contingent or otherwise) at the time of such disposition at least equal to the fair market value (including as to the value of all non-cash consideration) of the shares and assets subject to such disposition (which shall be determined in good faith by the Board of Directors of that member of the Group where the value of the shares and assets subject to such disposition (or the consideration receivable therefore) exceeds £10 million (or its equivalent));

   (ii)   at least 50% of the consideration thereof received by the relevant member of the Group is in the form (or contribution) of cash or Cash Equivalent Investments (or securities with a face amount that are converted into cash or Cash Equivalent Investments with an equivalent face value within 60 days of such disposition); and

   (iii)  the proceeds received in the form of cash or Cash Equivalent Investments are applied in accordance with the terms of this Agreement.

(b)    Notwithstanding paragraph (a) above, the Parent shall ensure that:

   (i)    no member of the Group will enter into a single transaction or series of transactions (whether related or not) and whether voluntary or involuntary, to sell, lease, transfer or otherwise dispose of any Capital Stock in any member of the Music Publishing Group; and

   (ii)   no member of the Music Publishing Group will enter into a single transaction or series of transactions (whether related or not) and whether voluntary or involuntary, to sell, lease, transfer or otherwise dispose of any asset other than pursuant to a Permitted Music Publishing Division Disposal.

**25.25  Affiliate Transactions**

No Obligor shall (and the Parent shall procure that no other member of the Group will) enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any of its Affiliates (an "Affiliate Transaction") other than a Permitted Affiliate Transaction unless:

(a)    the terms of the Affiliate Transaction are no less favourable, taken as a whole, to the relevant member of the Group than those that could reasonably be expected to be obtained at the time in a comparable transaction with in arm's length dealings with a person who is not an Affiliate;

(b)    if such Affiliate Transaction involves an amount in excess of £10 million (or its equivalent) a majority of the members of the Board of Directors of the relevant member of the Group who are disinterested with respect to such Affiliate Transaction have

115

CITI-TF 00701837

determined in good faith that the criteria set forth in paragraph (a) are satisfied and have approved the relevant Affiliate Transaction; and

(c)    if such Affiliate Transaction involves an amount in excess of £25 million (or its equivalent), the Board of Directors of the relevant member of the Group shall also have received a written opinion from an Independent Financial Advisor to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the relevant member of the Group or is not less favourable, taken as a whole, to the relevant member of the Group than could reasonably be expected to be obtained at the time in a comparable transaction with in arm's length dealings with a person who was not an Affiliate.

### 25.26 Merger and consolidation

No Obligor will consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any person (other than an Obligor), unless:

(a)    the resulting, surviving or transferee person (the "Successor Obligor"), if not the original Obligor shall be a person organized and existing under the laws of any state or country that is a member of the European Union, Switzerland, Norway, Japan, Australia, Canada, the United States of America, any State thereof or the District of Columbia and the Successor Obligor (if not the original Obligor) shall expressly assume, by executing an Accession Letter (and/or such other documents as the Security Agent may reasonably require), all the obligations of the original Obligor under the Finance Documents;

(b)    immediately after giving pro forma effect to such transaction or transactions (and treating any Financial Indebtedness which becomes an obligation of the Successor Obligor as a result of such transaction as having been Incurred by such Successor Obligor at the time of such transaction or transactions), no Default shall have occurred and be continuing;

(c)    immediately after giving pro forma effect to such transaction or transactions, either:

    (A)    the Successor Obligor would be able to Incur an additional £1.00 of Financial Indebtedness pursuant to Clause 25.20 (*Financial Indebtedness*); or

    (B)    the Incurrence Leverage Ratio would be no less than the Incurrence Leverage Ratio immediately preceding such transaction; and

(d)    the Company shall have delivered to the Security Agent an Officers' Certificate and an Opinion of Counsel, each in form and substance reasonably satisfactory to the Security Agent and stating that such consolidation, merger or transfer and such Accession Letter (or other documentation (if any)) comply with this Agreement and that all conditions precedent in this Agreement relating to such transaction have been satisfied and that the Accession Letter (or other documentation (if any)) constitute legal, valid and binding obligations of the Successor Obligor, enforceable (subject to customary exceptions) in accordance with their terms.

Notwithstanding the foregoing, (1) any member of the Group may consolidate with, merge into or transfer all or part of its properties and assets to a Borrower and (2) any Borrower may merge with an Affiliate of a Borrower which is a corporate entity organised solely for the purpose of reorganizing such Borrower in another jurisdiction in the UK, the US or a Participating Member State (as comprised as at January 1, 2004) to realise Tax or other benefits.

116

[London #294447 v13]

CITI-TF 00701838

### 25.27  Limitation on Layering

(a)  No Obligor shall Incur secured Financial Indebtedness that is not Senior Indebtedness (except to the extent such Financial Indebtedness is secured only by a Permitted Encumbrance) unless, at the time of such Incurrence, provision is made to secure the obligations of such Obligor under the Finance Documents equally and ratably with (or on a senior basis to, in the case of Financial Indebtedness subordinated in right of payment to the relevant Obligor's obligations under the Finance Documents) such secured Financial Indebtedness for as long as such secured Financial Indebtedness benefits from Security.

(b)  No Obligor shall guarantee, directly or indirectly, any Financial Indebtedness of any other member of the Group that is subordinate or junior in right of payment to any Senior Indebtedness of such member of the Group unless such guarantee is expressly subordinate in right of payment to, or ranks pari passu with, the obligations of such Obligor under the Finance Documents.

### 25.28  Limitation on restrictions on distributions from Subsidiaries

(a)  The Company shall not (and the Parent shall procure that no member of the Group will) create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any member of the Group to:

    (i)  pay dividends or make any other distributions on its Capital Stock to any other member of the Group or pay any Financial Indebtedness owed to any other member of the Group;

    (ii)  make any loans or advances to any other member of the Group; or

    (iii)  transfer any of its property or assets to any other member of the Group.

provided that (x) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock or ordinary shares and (y) the subordination of (including the application of any payment blockage, standstill or turnover requirements) loans or advances made to another member of the Group to other Financial Indebtedness Incurred by such member of the Group shall not be deemed to constitute such an encumbrance or restriction.

(b)  Paragraph (a) above will not prohibit encumbrances or restrictions existing under, by reason of or with respect to:

    (i)  applicable law, rule, regulation (including any requirement of any regulatory authority), order or governmental license, permit or concession;

    (ii)  the Finance Documents, the Securitisation Bridge Facility Agreement or the Mezzanine Facility Agreement;

    (iii)  a Permitted Refinancing or an agreement or instrument (a "Refinancing Agreement") effecting a refinancing of Financial Indebtedness or Disqualified Stock incurred pursuant to, or that otherwise extends, renews, refunds, refinances or replaces, an agreement or instrument or obligation in effect or entered into on the Closing Date (an "Initial Agreement") or contained in any amendment, supplement or other modifications to an Initial Agreement (an "Amendment") provided that the encumbrances and restrictions contained in any such Refinancing Agreement or Amendment are not materially less favourable to the Finance Parties taken as a whole than the encumbrances and restrictions contained in the Initial Agreement or Initial Agreements to which such Refinancing Agreement or Amendment relates (as determined in good faith by the Company);

117

CITI-TF 00701839

(iv) a member of the Group pursuant to an agreement relating to any Financial Indebtedness Incurred by such member of the Group on or prior to the date on which such member of the Group was acquired by the Company or any of its Subsidiaries (other than Financial Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such member of the Group became a member of the Group or was acquired by the Company or any of its Subsidiaries) and outstanding on such date;

(v) any agreement or instrument:

    (A) relating to any Financial Indebtedness or Disqualified Stock permitted to be Incurred pursuant to the provisions of this Agreement:

        (1) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favourable to the Finance Parties than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Company); or

        (2) if the encumbrances and restrictions, taken as a whole, are no more disadvantageous to the Finance Parties than is customary in comparable financings (as determined in good faith by the Company) and either:

            I. the Company determines that such encumbrance or restriction will not adversely affect the Company's ability to make principal and interest payments under the Finance Documents as and when they come due; or

            II. such encumbrances and restrictions apply only during the continuance of a default in respect of a payment or financial maintenance covenant relating to such Financial Indebtedness;

    (B) constituting an intercreditor agreement on terms substantially equivalent to the Intercreditor Agreement; or

    (C) relating to any loan or advance by a member of the Group to another member of the Group provided that the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favourable to the Finance Parties than the encumbrances and restrictions contained in this Agreement and the Intercreditor Deed;

(vi) a member of the Group pursuant to an agreement entered into for the sale or other disposition of Capital Stock or assets of such member of the Group (including by way of merger or consolidation) pending the closing of such sale or disposition;

(vii) cash or other deposits or net worth imposed by customers under contract entered into in the ordinary course of business;

(viii) a member of the Group as a co-venturer in a Joint Venture or the ownership interests of a member of the Group in a Joint Venture, in each case contained in the terms of the agreement or agreements governing such Joint Venture provided that any such encumbrance or restriction:

    (A) is customary in joint venture agreements;

[London #294447 v13]

Confidential

CITI-TF 00701840

(B)    is not less favourable to the other members of the Group than to any other joint venturer; and

(C)    will not materially affect the Company's ability to make principal or interest payments under this Agreement, as determined by the Company in good faith at the time of entering such agreement or agreements (and at the time of any modification of the terms of any such encumbrance or restriction);

(ix)    any encumbrance or restriction permitted under Clause 25.22 (*Security*), including any encumbrance or restriction contained in mortgages, pledges or other security arrangements thereunder to the extent such encumbrances or restrictions restrict the transfer of the property or assets subject to such security arrangements;

(x)    customary non-assignment provisions in leases governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder or the subletting of such property;

(xi)    any escrow agreement, pledge of proceeds of disposals, security agreement or mortgage securing Financial Indebtedness of a member of the Group to the extent such encumbrance or restriction restricts the transfer of the property subject to such escrow agreement, pledge of proceeds of disposals, security agreements or mortgages;

(xii)    any encumbrance or restriction:

(A)    that restricts in a customary matter the subletting, assignment or transfer of any property or asset that is subject to a lease, licence or similar contract, or the assignment or transfer of any lease, licence or other contract (including, for the avoidance of doubt, non-assignment provisions in leases, licences, distribution and administration agreements with artists, composers, writers, producers or other similar persons or other agreements or restrictions on sub-licencing); or

(B)    pursuant to customary provisions restricting dispositions of real property interests set forth in any reciprocal easement agreements of any Obligor; and

(xiii)    pursuant to Treasury Transactions.

**25.29  Limitation on lines of business**

(a)    The Company shall not (and the Parent shall procure that no member of the Group shall) engage in any business other than a Related Business.

(b)    Each member of the Group which is a Holding Company of the Target shall not engage in any business or activity other than the ownership of the Capital Stock of its Subsidiary, the borrowing of funds under this Agreement, the Senior Facilities Agreement and the Mezzanine Facility Agreement and activities incidental thereto.

(c)    The Parent shall procure that no member of the Music Publishing Group shall engage in any business other than the Music Publishing Business.

**25.30  Material contracts**

The Parent shall ensure that no member of the Music Publishing Group shall enter into any material contract, agreement or arrangement after the Closing Date which contains any prohibition on the charging of its right, title, interest and benefit to such contract, agreement or arrangement.

119

A-6223

**25.31 Structure Memorandum and Business Separation**

(a)    The Company shall keep the Agent informed about the completion of the steps identified in the Structure Memorandum and the Group's progress of achieving a Business Separation.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that each of the steps set out in the Structure Memorandum (including as it may be amended and revised with the consent of the Agent (acting reasonably) to set out steps to achieve a Business Separation) in order to achieve the desired structure of the Group are in each case specifically permitted.

**25.32 Pension obligations**

The Company shall (and the Parent shall procure that each member of the Group shall) use the proceeds (which shall not form part of the £1,490,000,000 proceeds received on the Closing Date) expressly designated for that purpose of either an issue and sale of Capital Stock in the Parent or of Shareholder Debt (such proceeds being "**Additional Pensions Equity**") to fund the existing pension scheme deficit of any member of the Target Group to the extent that this forms part of the funding arrangements agreed with the Trustees of the pension scheme in connection with the Acquisition and related financing transactions, and shall not use the cash flow or assets of any member of the Group or the Target Group (other than to the extent coming from such Additional Pensions Equity) or the incurrence of any liabilities of any member of the Group or the Target Group to fund, guarantee or support, such deficit (save for Permitted Encumbrances under paragraph (n) of the definition thereof).

**26.    EVENTS OF DEFAULT**

Each of the events or circumstances set out in this Clause 26 (other than Clauses 26.13 (*Acceleration*) and 26.14 (*Clean-Up Period*)) is an Event of Default.

**26.1    Failure to pay**

An Obligor does not pay:

(a)    on the due date any interest or principal payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless its failure to pay is caused by administrative or technical error and payment is made within three (3) Business Days of its due date; or

(b)    any other amount payable pursuant to a Finance Document at the place and in the currency in which it is expressed to be payable and payment is made within five (5) Business Days of its due date.

**26.2    Incorrect representation**

Subject to Clause 26.14 (*Clean-Up Period*), any representation, warranty or written statement made by or in relation to any member of the Group in any Finance Document, or in any written certificate, statement or notice provided under or pursuant to any of the Finance Documents being incorrect (in the case of any such written certificate, statement or notice, provided under or pursuant to any Finance Document and not contained therein, in any respect materially prejudicial to the Lenders) when made or deemed repeated unless the underlying circumstances (if capable of remedy) are remedied within 20 Business Days after the earlier of the Agent giving notice to the member of the Group or the member of the Group becoming aware of the breach.

**26.3    Breach of Agreement**

Subject to Clause 26.14 (*Clean-Up Period*):

(a)    failure by any Obligor to comply with any of the provisions of Clause 24 (*Financial Covenant*); or

120

[London #294447 v13]

Confidential

(b)     failure by any Obligor to comply with any of its obligations under any Finance Document (other than those referred to in Clause 26.1 (*Failure to pay*) and Clause 26.2 (*Incorrect representation*), paragraph (a) of this Clause 26.3 or Clause 10.7 (*Cash Balance*)) where such default (if capable of remedy) is not remedied within 20 Business Days after the earlier of the Agent giving notice to the member of the Group or that member of the Group becoming aware of the breach.

**26.4    Cross Default**

Subject to Clause 26.14 (*Clean-Up Period*):

(a)     failure by any member of the Group to pay any Financial Indebtedness on its due date (or within any applicable grace period provided for in the original documents relating to that indebtedness);

(b)     any Financial Indebtedness becomes or is declared due and payable (or is capable of being declared due and payable) before its Stated Maturity or is placed on demand by reason of an event of default (howsoever described) or any circumstances arise as a result of which any Financial Indebtedness could be so declared due and payable before its Stated Maturity; or

(c)     any Financial Indebtedness repayable on demand is not repaid on demand being made,

PROVIDED THAT no Event of Default will occur under this Clause 26.4 if the aggregate amount of outstanding Financial Indebtedness falling within paragraphs (a) to (c) above is less than £10 million (or its equivalent in other currencies) at any time.

**26.5    Cessation and expropriation**

(a)     The cessation or threatened cessation of all or a substantial part of the Target's or any Obligor's operations or business (except as a result of a disposal permitted under this Agreement).

(b)     The seizure, expropriation, nationalisation or compulsory acquisition of all or a substantial part of the Target's or any Obligor's property or assets by any governmental, regulatory or other competent authority which has or is reasonably likely to have a Material Adverse Effect.

**26.6    Insolvency**

(a)     Any Obligor or any Material Subsidiary is unable or admits inability to pay its debts as they fall due or is deemed to or declared to be unable to pay its debts under applicable law, suspends or threatens to suspend making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (other than the Finance Parties in their capacity as such) with a view to rescheduling any of its indebtedness.

(b)     A moratorium is declared in respect of any indebtedness of any Obligor or any Material Subsidiary. If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

(c)     Any of the following occurs in respect of a US Obligor:

(i)     it makes a general assignment for the benefit of creditors;

(ii)    it commences a voluntary case or proceeding under any US Bankruptcy Law;

(iii)   an involuntary case under any US Bankruptcy Law is commenced against it and is not controverted within 20 days or is not dismissed or stayed within 60 days after commencement of the case; or

121

CITI-TF 00701843

(iv)    an order for relief or other order approving any case or proceeding is entered under any US Bankruptcy Law

**26.7    Distress and judgment debt**

(a)    Subject to Clause 26.14 (*Clean-Up Period*), any distress, attachment, sequestration, execution, expropriation, security enforcement or other legal process is levied against any assets (having an aggregate value in excess of £10 million) of any Obligor or any Material Subsidiary and is not discharged or paid out within 20 Business Days.

(b)    Subject to Clause 26.14 (*Clean-Up Period*), any judgment or decree for the payment of money in excess of £10 million is entered against any Obligor or any Material Subsidiary and is not discharged, waived or stayed within 20 Business Days following such judgment.

**26.8    Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Obligor or any Material Subsidiary;

(ii)    a composition, compromise, assignment or arrangement with any creditor of any Obligor or any Material Subsidiary;

(iii)    the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any Obligor or any Material Subsidiary or any of its assets; or

(iv)    enforcement of any Security over any assets of any Obligor or any Material Subsidiary,

or any analogous procedure or step is taken in any jurisdiction.

(b)    Paragraph (a) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 20 Business Days of commencement or, if earlier, the date on which it is advertised.

**26.9    Invalidity and unlawful performance**

Subject to Clause 26.14 (*Clean-Up Period*):

(a)    it is or becomes unlawful for any Obligor to perform any of its material obligations under the Finance Documents or any Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective or any subordination created under the Intercreditor Agreement is or becomes unlawful;

(b)    any material obligation or obligations of any Obligor under the Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Lenders under the Finance Documents;

(c)    any Finance Document ceases to be in full force and effect or any Security created by the Transaction Security Documents or any subordination created under the Intercreditor Agreement:

(i)    ceases to be legal, valid, binding, enforceable or effective (and (if capable of remedy) such ineffectiveness is not remedied within 20 Business Days of the

[London #294447 v13]

122

CITI-TF 00701844

earlier of the Agent giving notice to the Company or any member of the Group becoming aware of the ineffectiveness); or

    (ii)    is alleged by a party to it (other than a Finance Party) to be ineffective.

## 26.10 Litigation

Subject to Clause 26.14 (*Clean-Up Period*), any litigation, arbitration or similar proceeding is brought against a member of the Group which is reasonably likely to be adversely determined and which if adversely determined would result in a Material Adverse Effect.

## 26.11 Other Documents

Any party (other than a Finance Party) to the Intercreditor Agreement fails to comply with its material obligations therein, in a manner which is materially prejudicial to the interests of the Finance Parties hereunder and, if the non-compliance is capable of remedy, it is not remedied within 20 Business Days of the earlier of the Agent giving notice to that party or that party becoming aware of the non-compliance.

## 26.12 Auditors' report

The Auditors qualify their report to the Annual Financial Statements of the Parent in a manner which is materially adverse to the interests of the Finance Parties.

## 26.13 Acceleration

(a)    On and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

    (i)    cancel the Total Commitments at which time they shall immediately be cancelled;

    (ii)    declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

    (iii)    declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders;

    (iv)    exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

(b)    If an Event of Default described in Clause 26.6(c) (*Insolvency*) occurs, the Total Commitments will, if not already cancelled under this Agreement, be immediately and automatically cancelled and all amounts outstanding under the Finance Documents will be immediately due and payable.

## 26.14 Clean-Up Period

If during the Clean-Up Period a matter or circumstance exists in respect of the Target Group which would constitute a Default, such matter or circumstance will not constitute a Default until after the end of the Clean-Up Period (if such Default is continuing at such time), PROVIDED THAT such Default (1) is capable of being cured by the final day of the Clean-Up Period and that reasonable steps are being taken to cure such matter and (2) was not procured by, or expressly approved by, the Company or the Parent and PROVIDED FURTHER THAT any matter contained in this Clause 26.14 shall be without prejudice to the rights of the Lenders in respect of any breach of representation, covenant or default which continues to exist or arises after the expiry of the Clean-Up Period.

Confidential

CITI-TF 00701845

**SECTION 9**
**CHANGES TO PARTIES**

**27.    CHANGES TO THE LENDERS**

**27.1    Assignments and transfers by the Lenders**

Subject to this Clause 27, a Lender (the "Existing Lender") may:

(a)    assign any of its rights; or

(b)    transfer any of its rights (including such as relate to that Lender's participation in each Loan) and obligations,

under any Finance Document to (i) another bank or financial institution or (ii) a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (a "Fund Lender") (each of (i) or (ii) being the "New Lender").

**27.2    Conditions of assignment or transfer**

(a)    The consent of the Company is required before an Existing Lender may make an assignment or transfer under Clause 27.1 (*Assignments and transfers by the Lenders*) unless:

(i)    the assignment or transfer is to another Lender or an Affiliate of a Lender (including, for the avoidance of doubt, if the Existing Lender is a fund, to a fund which is a Related Fund of the Existing Lender); or

(ii)    an Event of Default has occurred and is continuing.

(b)    The consent of the Company shall not be unreasonably withheld or delayed and shall be deemed to have been given on the date falling ten (10) Business Days after the date on which the Existing Lender has requested the Company's consent if the Company has not refused consent by that date.

(c)    An assignment will only be effective as among the Finance Parties on:

(i)    receipt by the Agent (whether in a Transfer Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Agent) that the New Lender has become entitled to the same rights and will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it was an Original Lender;

(ii)    the New Lender entering into the documentation required for it to accede as a party to the Intercreditor Agreement; and

(iii)    the performance by the Agent of all "know your customer" or other checks relating to any person that it is required to carry out in relation to such assignment to a New Lender.

(d)    A transfer will only be effective if the New Lender enters into the documentation required for it to accede as a party to the Intercreditor Agreement and if the procedure set out in Clause 27.5 (*Procedure for transfer*) is complied with.

(e)    Unless the Company otherwise consents, no Lender may assign or transfer in part any of its rights or obligations under any Finance Document unless the Commitments assigned or transferred are in an amount of not less than £1,000,000, €1,000,000 or $1,000,000 (in aggregate), as applicable (or, if less, the whole of the Existing Lender's participation in the Facility) other than assignments or transfers to:

124

[London #294447 v13]

Confidential

CITI-TF 00701846

(i)     an Affiliate of the Existing Lender; or

(ii)    a Lender,

provided that after giving effect to any such transfers or assignments the Existing Lender's participation (together with the participation of any Affiliate and/or Related Fund of such Existing Lender) shall be either:

(A)     not less than £1,000,000, €1,000,000 or $1,000,000 (as applicable); or

(B)     £/€/$0.

(f)     If:

(i)     a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under Clause 16 (*Tax Gross-up and Indemnities*) or Clause 17 (*Increased Costs*),

then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.

27.3    **Assignment or transfer fee**
Unless the Agent otherwise agrees and excluding an assignment or transfer (i) to an Affiliate of a Lender or (ii) made in connection with primary syndication of the Facility, the New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Agent (for its own account) a fee of £1,500.

27.4    **Limitation of responsibility of Existing Lenders**
(a)     Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i)     the legality, validity, effectiveness, adequacy or enforceability of the Transaction Documents, the Transaction Security or any other documents;

(ii)    the financial condition of any Obligor;

(iii)   the performance and observance by any Obligor of its obligations under the Transaction Documents or any other documents; or

(iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Transaction Document or any other document,

and any representations or warranties implied by law are excluded.

(b)     Each New Lender confirms to the Existing Lender, the other Finance Parties and the Secured Parties that it:

Confidential                                                    CITI-TF 00701847

       (i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and each other member of the Group in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other Finance Party in connection with any Transaction Document or the Transaction Security; and

       (ii)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and each other member of the Group whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c)    Nothing in any Finance Document obliges an Existing Lender to:

       (i)    accept a re-transfer from a New Lender of any of the rights and obligations assigned or transferred under this Clause 27; or

       (ii)    support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Transaction Documents or otherwise.

**27.5   Procedure for transfer**

(a)    Subject to the conditions set out in Clause 27.2 (*Conditions of assignment or transfer*) a transfer is effected in accordance with paragraph (c) below when the Agent executes an otherwise duly completed Transfer Agreement delivered to it by the Existing Lender and the New Lender. The Agent shall, subject to paragraph (b) below, within five (5) Business Days after receipt by it of a duly completed Transfer Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Agreement.

(b)    The Agent shall only be obliged to execute a Transfer Agreement delivered to it by the Existing Lender and the New Lender upon its completion of all "know your customer" or other checks relating to any person that it is required to carry out in relation to the transfer to such New Lender.

(c)    On the Transfer Date:

       (i)    to the extent that, in the Transfer Agreement, the Existing Lender seeks to transfer its rights and obligations under the Finance Documents and in respect of the Transaction Security, the Existing Lender shall be discharged to the extent provided for in the Transfer Agreement from further obligations towards the Obligors and the other Finance Parties;

       (ii)    the rights and obligations of the Existing Lender with respect to each Obligor shall be transferred to the New Lender, to the extent provided for in the Transfer Agreement;

       (iii)    the Agent, the Arranger, the Security Agent, the New Lender and the other Lenders shall acquire the same rights and assume the same obligations between themselves and in respect of the Finance Documents as they would have acquired and assumed had the New Lender been an Original Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Agent, the Arranger, the Security Agent and the Existing Lender shall each be released from further obligations to each other under the Finance Documents; and

       (iv)    the New Lender shall become a Party as a "Lender".

[London #294447 v13]

Confidential

CITI-TF 00701848

**27.6    Copy of Transfer Agreement to Company**

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Agreement, send to the Company a copy of that Transfer Agreement.

**27.7    Disclosure of information**

The Finance Parties will keep confidential all Finance Documents and all information relating to any Obligor, the Group and the Finance Documents which they acquire under or in connection with the Finance Documents save that any Finance Party may, subject to applicable law, disclose to any of its Affiliates or any other person:

(a)    to (or through) whom that Lender assigns or transfers (or may potentially assign or transfer) all or any of its rights and obligations under the Finance Documents;

(b)    with (or through) whom that Lender enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made by reference to, the Finance Documents or any Obligor;

(c)    which is a rating agency;

(d)    to whom, and to the extent that, information is required to be disclosed by any applicable law or regulation;

(e)    for whose benefit that Lender charges, assigns or otherwise creates a Security Interest (or may do so) pursuant to Clause 27.9 (*Security interests over Lenders' rights*);

(f)    which is one of its professional advisers (the "**Advisers**"); or

(g)    with the consent of the Company,

any information about any Obligor, the Group and the Finance Documents as that Lender or other Finance Party shall consider appropriate PROVIDED THAT, (i) in relation to paragraphs (a), (b), (c), (e) and (f) above, the person to whom the information is to be given has entered into a Confidentiality Undertaking or in the case of an Adviser is subject to professional secrecy and confidentiality rules as a result of the nature of its duties and (ii) the Finance Party has delivered to the Company a notification identifying the recipient and the information disclosed.

**27.8    Affiliates of Lenders as Hedge Counterparties**

(a)    An Affiliate of a Lender which becomes a Hedge Counterparty shall accede to this Agreement and to the Intercreditor Agreement by delivery to the Security Agent of a duly completed accession undertaking in the form required under the Intercreditor Agreement.

(b)    Where this Agreement or any other Finance Document imposes an obligation on a Hedge Counterparty and the relevant Hedge Counterparty is an Affiliate of a Lender and is not a party to that document, the relevant Lender shall ensure that the obligation is performed by its Affiliate.

**27.9    Security Interests over Lenders' rights**

In addition to the other rights provided to Lenders under this Clause 27, each Lender may, without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create a Security Interest in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

127

CITI-TF 00701849

(a)  any charge, assignment or other Security Interest to secure obligations to a federal reserve or central bank; and

(b)  in the case of any Lender which is a fund, any charge, assignment or other Security Interest granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security Interest shall:

(c)  release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security Interest for the Lender as a party to any of the Finance Documents;

(d)  require any payments to be made by an Obligor or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents; or

(e)  create a Security Interest in any Charged Property (other than for the purpose of securing the obligations of the Obligors under the Finance Documents on the terms set out in the Transaction Security Documents).

**27.10   Sub-participations**

(a)  Any Lender may at any time sub-participate or sub-contract any of its rights or obligations under the Finance Documents, if the sub-participant is not entitled pursuant to the sub-participation arrangements to approve any amendment or waiver or consent requested by any Obligor in respect of this Agreement.

(b)  The consent of the Company is required for a Lender to sub-participate any of its rights or obligations under the Finance Documents where the sub-participant is entitled pursuant to the sub-participation arrangements to approve any amendment or waiver of consent requested by an Obligor in respect of this Agreement accordance with paragraph (a) above unless:

(i)  the sub-participation is entered into with another Lender or an Affiliate of a Lender; or

(ii)  an Event of Default has occurred and is continuing.

(c)  The consent of the Company, if required pursuant to paragraph (b) above, shall not be unreasonably withheld or delayed and shall be deemed to have been given on the date falling ten (10) Business Days after the date on which the Lender has requested the Company's consent if the Company has not refused consent by that date.

**27.11   Register of Lenders**

Upon request by the Company and on reasonable notice, the Agent shall provide a list of the Lenders under the Facility (including for the avoidance of doubt any sub-participant which has acquired control over a Lender's voting rights or any other sub-participant of which the Agent is aware) (the "**Lenders' List**").  The Lenders' List shall include:

(a)  the identity of each of the Lenders;

(b)  the Commitments of each of the Lenders; and

(c)  details of any transfers or assignments that have been completed since the most recent Lenders' List (the "**Previous List**") was delivered to the Company (including the name of the Lender at the time of the Previous List and the Lender at the time of the Lenders'

[London #294447 v13]

Confidential

CITI-TF 00701850

List, the amount of the Commitments transferred or assigned, the price of each transfer or assignment (if available) and the effective date of each transfer or assignment).

**28.     CHANGES TO THE OBLIGORS**

**28.1    Assignment and transfers by Obligors**

Other than for the purpose of assignments required by and set out in the Transaction Security Documents (or as a result of a permitted merger referred to in Clause 25.26 (*Merger and consolidation*)), no Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**28.2    Additional Borrowers**

(a)     Subject to compliance with the provisions of paragraphs (b) and (c) of Clause 23.10 (*Know Your Customer Requirements*), the Company may request that any of its wholly owned Subsidiaries becomes a Borrower. That Subsidiary will become a Borrower if:

(i)      it is incorporated in the same jurisdiction as an existing Borrower and the Majority Lenders approve the addition of that Subsidiary or otherwise if all the Lenders approve the addition of that Subsidiary;

(ii)     the Company and that Subsidiary deliver to the Agent a duly completed and executed Accession Letter;

(iii)    that Subsidiary is (or becomes) a Guarantor prior to becoming a Borrower;

(iv)     the Company confirms that no Default is continuing or would occur as a result of that Subsidiary becoming an Additional Borrower; and

(v)      the Agent has received (or waived the requirement to receive) all of the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Borrower, each in form and substance satisfactory to the Agent (acting reasonably).

(b)     The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Borrower.

**28.3    Resignation of a Borrower**

(a)     In this Clause 28.3, Clause 28.5 (*Resignation of a Guarantor*) and Clause 28.7 (*Resignation and release of Security*), "Third Party Disposal" means the disposal of an Obligor to a person which is not a member of the Group where that disposal is permitted under Clause 25.24 (*Asset disposals*) or made with the approval of the Majority Lenders.

(b)     If a Borrower is the subject of a Third Party Disposal or the Super-Majority Lenders have consented to the resignation of that Borrower, the Company may request that such Borrower (other than the Company) ceases to be a Borrower by delivering to the Agent a Resignation Letter.

(c)     The Agent shall accept a Resignation Letter and notify the Company and the other Finance Parties of its acceptance if:

(i)      the Company has confirmed that no Default is continuing or would result from the acceptance of the Resignation Letter;

(ii)     the Borrower is under no actual or contingent obligations as a Borrower under any Finance Document;

A-6233

(iii) where the Borrower is also a Guarantor (unless its resignation has been accepted in accordance with Clause 28.5 (*Resignation of a Guarantor*)), its obligations in its capacity as Guarantor continue to be legal, valid, binding and enforceable and in full force and effect (subject to the Legal Reservations) and the amount guaranteed by it as a Guarantor is not decreased (and the Company has confirmed this is the case); and

(iv) the Company has confirmed that it shall ensure that any Net Proceeds of a Third Party Disposal will be applied in accordance with Clause 10.3 (*Application of mandatory prepayments*).

(d) Upon notification by the Agent to the Company of its acceptance of the resignation of a Borrower, that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents as a Borrower except that the resignation shall not take effect (and the Borrower will continue to have rights and obligations under the Finance Documents) until the date on which the Third Party Disposal takes effect.

**28.4    Additional Guarantors**

(a) A member of the Group shall become an Additional Guarantor if:

(i) the Company and the proposed Additional Guarantor deliver to the Agent a duly completed and executed Accession Letter; and

(ii) the Agent has received (or waived the requirement to receive) all of the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the Agent (acting reasonably).

(b) The Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part II of Schedule 2 (*Conditions Precedent*) in relation to that Additional Guarantor.

**28.5    Resignation of a Guarantor**

(a) The Company may request that a Guarantor (other than the Company) ceases to be a Guarantor by delivering to the Agent a Resignation Letter if:

(i) that Guarantor is being disposed of by way of a Third Party Disposal and the Company has confirmed this is the case; or

(ii) the Super-Majority Lenders have consented to the resignation of that Guarantor.

(b) The Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(i) the Company has confirmed that no Default is continuing or would result from the acceptance of the Resignation Letter;

(ii) no payment is due from the Guarantor under Clause 21.1 (*Guarantee*);

(iii) the Company has confirmed that it shall ensure that the Net Proceeds of the Third Party Disposal will be applied in accordance with Clause 10.3 (*Application of mandatory prepayments*).

130

[London #294447 v13]

Confidential

(c)     The resignation of that Guarantor shall not be effective until the date of the relevant Third Party Disposal at which time that company shall cease to be a Guarantor and shall have no further rights or obligations under the Finance Documents as a Guarantor.

**28.6    Repetition of Representations**

Delivery of an Accession Letter constitutes confirmation by the relevant Subsidiary that the representations and warranties referred to in paragraph (c)(iv) of Clause 22.24 (*Repetition*) are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

**28.7    Resignation and release of Security**

(a)     If a Borrower or Guarantor is or is proposed to be the subject of a Third Party Disposal then:

(i)     where that Borrower or Guarantor created Transaction Security over any of its assets or business in favour of the Security Agent, or Transaction Security in favour of the Security Agent was created over the shares (or equivalent) of that Borrower or Guarantor, the Security Agent shall, at the cost and request of the Company, release those assets, business or shares (or equivalent);

(ii)     the resignation of that Borrower or Guarantor and related release of Transaction Security referred to in paragraph (a) above shall not become effective until the date of that disposal; and

(iii)     if the disposal of that Borrower or Guarantor is not made, the Resignation Letter of that Borrower or Guarantor and the related release of Transaction Security referred to in paragraph (a) above shall have no effect and the obligations of the Borrower or Guarantor and the Transaction Security created or intended to be created by or over that Borrower or Guarantor shall continue in full force and effect.

(b)     If an Obligor disposes of any assets and such disposal is permitted by this Agreement, the Security Agent shall (and is irrevocably so authorised by the Finance Parties), on request of the Company, execute all documents necessary to release that asset from the Transaction Security in order to allow that disposal to be completed.

(c)     If a member of the Group whose shares are subject to a Transaction Security is to be merged into an Obligor and such merger is permitted by this Agreement, the Security Agent shall (and is irrevocably so authorised by the Finance Parties), on request of the Company, execute all documents necessary to release that Transaction Security in order to allow that merger to be completed.

131

CITI-TF 00701853

**SECTION 10**
**THE FINANCE PARTIES**

**29.    ROLE OF THE AGENT, THE ARRANGER AND OTHERS**

**29.1    Appointment of the Agent**

(a)    Each of the Arranger and the Lenders appoints Citibank International plc (or any other person who becomes the Agent in accordance with this Agreement) to act as the Agent under and in connection with the Finance Documents.

(b)    Each of the Finance Parties authorises the Agent to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

**29.2    Duties of the Agent**

(a)    The Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Agent for that Party by any other Party.

(b)    Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(c)    If the Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(d)    If the Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than the Agent, the Arranger or the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

(e)    The duties of the Agent under the Finance Documents are solely mechanical and administrative in nature.

**29.3    Role of the Arranger**

Except as specifically provided in the Finance Documents the Arranger has no obligations of any kind to any other Party under or in connection with any Finance Document.

**29.4    No fiduciary duties**

(a)    Nothing in this Agreement constitutes the Agent or the Arranger as a trustee or fiduciary of any other person.

(b)    None of the Agent, the Security Agent or the Arranger shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

**29.5    Business with the Group**

The Agent, the Security Agent and the Arranger may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

**29.6    Rights and discretions**

(a)    The Agent and the Security Agent may rely on:

(i)    any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

[London #294447 v13]

Confidential

CITI-TF 00701854

(ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

(b)    The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

        (i)    no Default has occurred (unless it has actual knowledge of a Default arising under Clause 26.1 (*Failure to pay*));

        (ii)    any right, power, authority or discretion vested in any Party or the Majority Lenders has not been exercised; and

        (iii)    any notice or request made by the Company (other than a Utilisation Request or Selection Notice) is made on behalf of and with the consent and knowledge of all the Obligors.

(c)    The Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

(d)    The Agent may act in relation to the Finance Documents through its personnel and agents.

(e)    The Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(f)    Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent nor the Arranger is obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

### 29.7 Majority Lenders' instructions

(a)    Unless a contrary indication appears in a Finance Document, the Agent shall (i) exercise any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by the Majority Lenders (or, if so instructed by the Majority Lenders, refrain from exercising any right, power, authority or discretion vested in it as Agent) and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with an instruction of the Majority Lenders.

(b)    Unless a contrary indication appears in a Finance Document, any instructions given by the Majority Lenders will be binding on all the Finance Parties other than the Security Agent.

(c)    The Agent may refrain from acting in accordance with the instructions of the Majority Lenders (or, if appropriate, the Lenders) until it has received such security as it may require for any cost, loss or liability (together with any associated VAT) which it may incur in complying with the instructions.

(d)    In the absence of instructions from the Majority Lenders, (or, if appropriate, the Lenders) the Agent may act (or refrain from taking action) as it considers to be in the best interest of the Lenders.

(e)    The Agent is not authorised to act on behalf of a Lender in any legal or arbitration proceedings relating to any Finance Document. This paragraph (e) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Transaction Security Documents or enforcement of the Transaction Security or Transaction Security

CITI-TF 00701855

Documents without having first obtained that Lender's authority to act on its behalf in those proceedings.

**29.8   Responsibility for documentation**
Neither the Agent nor the Arranger:

(a)   is responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Agent, the Arranger or an Obligor or any other person given in or in connection with any Finance Document or the Information Memorandum or the Reports or the transactions contemplated in the Finance Documents; or

(b)   is responsible for the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document or the Transaction Security.

**29.9   Exclusion of liability**
(a)   Without limiting paragraph (b) below, neither the Agent nor the Security Agent will be liable for any action taken by it under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct.

(b)   No Party (other than the Agent or the Security Agent (as applicable)) may take any proceedings against any officer, employee or agent of the Agent in respect of any claim it might have against the Agent or the Security Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Transaction Document and any officer, employee or agent of the Agent or the Security Agent may rely on this Clause 29.9 and the Third Parties Act.

(c)   The Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(d)   Nothing in this Agreement shall oblige the Agent or the Arranger to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Agent and the Arranger that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Agent or the Arranger.

**29.10   Lenders' indemnity to the Agent**
Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Agent, within three (3) Business Days of demand, against any cost, loss or liability incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct) in acting as Agent under the Finance Documents (unless the Agent has been reimbursed by an Obligor pursuant to a Finance Document).

**29.11   Resignation of the Agent**
(a)   The Agent may resign and appoint one of its Affiliates acting through an office in the United Kingdom as successor by giving notice to the Lenders and the Company.

(b)   Alternatively the Agent may resign by giving notice to the Lenders and the Company, in which case the Majority Lenders (after consultation with the Company) may appoint a successor Agent.

134

[London #294447 v13]

CITI-TF 00701856

(c) If the Majority Lenders have not appointed a successor Agent in accordance with paragraph (b) above within 30 days after notice of resignation was given, the Agent (after consultation with the Company) may appoint a successor Agent (acting through an office in the United Kingdom).

(d) The retiring Agent or shall, at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.

(e) The Agent's resignation notice shall only take effect upon the appointment of a successor.

(f) Upon the appointment of a successor, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of this Clause 29. Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(g) After consultation with the Company, the Majority Lenders may, by notice to the Agent, require it to resign in accordance with paragraph (b) above. In this event, the Agent shall resign in accordance with paragraph (b) above.

## 29.12 Confidentiality

(a) The Agent (in acting as agent for the Finance Parties) shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b) If information is received by another division or department of the Agent it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

(c) Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent nor the Arranger are obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would or might in its reasonable opinion constitute a breach of any law or a breach of a fiduciary duty.

## 29.13 Relationship with the Lenders

(a) The Agent may treat each Lender as a Lender, entitled to payments under this Agreement and acting through its Facility Office unless it has received not less than five (5) Business Days prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b) Each Lender shall supply the Agent with any information required by the Agent in order to calculate the Mandatory Cost in accordance with Schedule 4 (*Mandatory Cost Formulae*).

(c) Each Lender shall supply the Agent with any information that the Security Agent may reasonably specify (through the Agent) as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent. Each Lender shall deal with the Security Agent exclusively through the Agent and shall not deal directly with the Security Agent.

## 29.14 Credit appraisal by the Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender confirms to the Agent and the Arranger that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a) the financial condition, status and nature of each member of the Group;

Confidential

CITI-TF 00701857

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)    whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(d)    the adequacy, accuracy and/or completeness of the Information Memorandum, the Reports and any other information provided by the Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)    the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 29.15    Reference Banks

If a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Agent and the Company shall agree the appointment of another Lender or an Affiliate of a Lender to replace that Reference Bank.

## 29.16    Deduction from amounts payable by the Agent

If any Party owes an amount to the Agent under the Finance Documents, the Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

## 29.17    Reliance and engagement letters

Each Finance Party and Secured Party confirms that each of the Arranger and the Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Arranger or Agent) the terms of any reliance letter or engagement letters relating to the Reports or any reports or letters provided by accountants in connection with the Finance Documents or the transactions contemplated in the Finance Documents (including any net asset letter in connection with the financial assistance procedures) and to bind it in respect of those Reports, reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

## 30.    CONDUCT OF BUSINESS BY THE FINANCE PARTIES

No provision of this Agreement will:

(a)    interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)    oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

136

[London #294447 v13]

Confidential

(c)   oblige any Finance Party to disclose any information relating to its affairs (Tax or otherwise) or any computations in respect of Tax.

## 31.   SHARING AMONG THE FINANCE PARTIES

### 31.1   Payments to Finance Parties

If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from an Obligor other than in accordance with Clause 32 (*Payment mechanics*) and applies that amount to a payment due under the Finance Documents then:

(a)   the Recovering Finance Party shall, within three (3) Business Days, notify details of the receipt or recovery, to the Agent;

(b)   the Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Agent and distributed in accordance with Clause 32 (*Payment mechanics*), without taking account of any Tax which would be imposed on the Agent in relation to the receipt, recovery or distribution; and

(c)   the Recovering Finance Party shall, within three (3) Business Days of demand by the Agent, pay to the Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 32.5 (*Partial payments*).

### 31.2   Redistribution of payments

The Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Finance Party) in accordance with Clause 32.5 (*Partial payments*).

### 31.3   Recovering Finance Party's rights

(a)   On a distribution by the Agent under Clause 31.2 (*Redistribution of payments*), the Recovering Finance Party will be subrogated to the rights of the Finance Parties which have shared in the redistribution.

(b)   If and to the extent that the Recovering Finance Party is not able to rely on its rights under paragraph (a) above, the relevant Obligor shall be liable to the Recovering Finance Party for a debt equal to the Sharing Payment which is immediately due and payable.

### 31.4   Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

(a)   each Finance Party which has received a share of the relevant Sharing Payment pursuant to Clause 31.2 (*Redistribution of payments*) shall, upon request of the Agent, pay to the Agent for account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay); and

(b)   that Recovering Finance Party's rights of subrogation in respect of any reimbursement shall be cancelled and the relevant Obligor will be liable to the reimbursing Finance Party for the amount so reimbursed.

Confidential

CITI-TF 00701859

**31.5   Exceptions**

(a)   This Clause 31 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause 31, have a valid and enforceable claim against the relevant Obligor.

(b)   A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)   it notified the other Finance Party of the legal or arbitration proceedings; and

(ii)   the other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

(c)   This Clause 31 shall not apply in respect of any receipt or recovery by a Hedge Counterparty.

[London #294447 v13]

138

Confidential

CITI-TF 00701860

**SECTION 11**
**ADMINISTRATION**

**32.    PAYMENT MECHANICS**

**32.1    Payments to the Agent**

(a)    On each date on which an Obligor or a Lender is required to make a payment under a Finance Document that Obligor or Lender shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in a Participating Member State or London) with such bank as the Agent specifies.

**32.2    Distributions by the Agent**

Each payment received by the Agent under the Finance Documents for another Party shall, subject to Clause 32.3 (*Distributions to an Obligor*) and Clause 32.4 (*Clawback*) be made available by the Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office) to such account as that Party may notify to the Agent by not less than five (5) Business Days' notice with a bank in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London).

**32.3    Distributions to an Obligor**

The Agent may (with the consent of the Obligor or in accordance with Clause 33 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

**32.4    Clawback**

(a)    Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)    If the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

**32.5    Partial payments**

(a)    If the Agent receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Agent, shall, subject to the provisions of the Intercreditor Agreement, apply that payment towards the obligations of that Obligor under those Finance Documents in the following order:

(i)    **first**, in or towards payment pro rata of any unpaid fees, costs and expenses of the Agent and the Security Agent under those Finance Documents;

(ii)    **secondly**, in or towards payment pro rata of any accrued interest, fee or commission due but unpaid under those Finance Documents;

139

CITI-TF 00701861

(iii) **thirdly**, in or towards payment pro rata of any principal due but unpaid under those Finance Documents and any breakage costs incurred in respect of the termination of any Hedging Agreement;

(iv) **fourthly**, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents;

(b) The Agent shall, if so directed by the Majority Lenders, vary the order set out in paragraphs (a)(ii) to (iv) above.

(c) Paragraphs (a) and (b) above will override any appropriation made by an Obligor.

**32.6 No set-off by Obligors**
All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

**32.7 Business Days**
(a) Any payment which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**32.8 Currency of account**
(a) Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b) A repayment of a Utilisation or Unpaid Sum or a part of a Utilisation or Unpaid Sum shall be made in the currency in which that Utilisation or Unpaid Sum is denominated on its due date.

(c) Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated when that interest accrued.

(d) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e) Any amount expressed to be payable in a currency other than the Base Currency shall be paid in that other currency.

**32.9 Change of currency**
(a) Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i) any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Company); and

(ii) any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

140

[London #294447 v13]

Confidential

(b)    If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.

**33.**    **SET-OFF**

(a)    A Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

(b)    No Security is created, or is intended to be created, by the operation of this Clause 33.

**34.**    **NOTICES**

**34.1**    **Communications in writing**

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter or by electronic mail or other electronic means as per Clause 34.5 (*Electronic communication*).

**34.2**    **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)    in the case of the Parent or the Company, that identified with its name below;

(b)    in the case of each Lender or any Obligor, that notified in writing to the Agent on or prior to the date on which it becomes a Party; and

(c)    in the case of the Agent or the Security Agent, that identified with its name below,

or any substitute address, fax number or department or officer as the Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five (5) Business Days' notice.

**34.3**    **Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)    if by way of fax, when received in legible form; or

(ii)    if by way of letter, when it has been left at the relevant address as evidenced by an acknowledgement of receipt,

and, if a particular department or officer is specified as part of its address details provided under Clause 34.2 (*Addresses*), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Agent or the Security Agent will be effective only when actually received by the Agent or Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Agent's or Security Agent's signature below (or any substitute department or officer as the Agent or Security Agent shall specify for this purpose).

141

CITI-TF 00701863

(c)   All notices from or to an Obligor shall be sent through the Agent.

(d)   Any communication or document made or delivered to the Company in accordance with this Clause 34.3 will be deemed to have been made or delivered to each of the Obligors.

**34.4   Notification of address and fax number**
Promptly upon receipt of notification of an address, and fax number or change of address or fax number pursuant to Clause 34.2 (*Addresses*) or changing its own address or fax number, the Agent shall notify the other Parties.

**34.5   Electronic communication**
(a)   Any communication to be made between the Agent or the Security Agent and a Lender under or in connection with the Finance Documents may be made by electronic mail or other electronic means, if the Agent or, as the case may be, the Security Agent and the relevant Lender:

   (i)    agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

   (ii)   notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

   (iii)  notify each other of any change to their address or any other such information supplied by them.

(b)   Any electronic communication made between the Agent and a Lender or the Security Agent will be effective only when actually received in readable form and in the case of any electronic communication made by a Lender to the Agent or the Security Agent only if it is addressed in such a manner as the Agent or Security Agent shall specify for this purpose.

**34.6   English language**
(a)   Any notice given under or in connection with any Finance Document must be in English.

(b)   All other documents provided under or in connection with any Finance Document must be:

   (i)    in English; or

   (ii)   if not in English, and if so reasonably requested by the Agent, accompanied by an English translation (and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document).

**35.   CALCULATIONS AND CERTIFICATES**
**35.1   Accounts**
In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are prima facie evidence of the matters to which they relate.

**35.2   Certificates and determinations**
Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**35.3   Day count convention**
Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 365 days (in the case of amounts denominated in Sterling) or 360 days (in the case of amounts denominated in

142

[London #294447 v13]

euro) or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

**36.    PARTIAL INVALIDITY**

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**37.    REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under the Finance Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

**38.    AMENDMENTS AND WAIVERS**

**38.1    Required consents**

(a)    Subject to Clause 38.2 (*Exceptions*), 38.3 (*Technical Amendments*), Clause 38.4 (*Amendments by Security Agent*) and Clause 38.6 (*Structural Adjustment*) and the provisions of the Intercreditor Agreement or unless the provisions of any Finance Document expressly provide otherwise, any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and the Obligors' Agent and any such amendment or waiver will be binding on all Parties.

(b)    The Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 38.

(c)    Each Obligor and the Obligors' Agent agrees to any such amendment or waiver permitted by this Clause 38 which is agreed to by the Obligors' Agent. This includes any amendment or waiver which would, but for this paragraph (c), require the consent of all the Guarantors.

(d)    A Lender shall not be included for the purposes of calculation of the Majority Lenders or Super Majority Lenders, if such Lender has failed to respond (without consideration as to whether such response would have been positive or negative) to a request for the consent of such Lender to an amendment or waiver within fifteen (15) Business Days of such request being presented to the Agent.

**38.2    Exceptions**

(a)    An amendment or waiver that has the effect of changing or which relates to:

(i)    a reduction in the Margin (other than pursuant to the definition of "Margin" in Clause 1.1 (*Definitions*)) or a reduction in the amount of any scheduled payment of principal, interest, fees or commission payable to a Lender under the Finance Documents;

(ii)    an extension of the Availability Period (other than pursuant to a Structural Adjustment);

(iii)    the definition of "Super-Majority Lenders" or "Majority Lenders" in Clause 1.1 (*Definitions*) or this Clause 38 (other than pursuant to a Structural Adjustment);

(iv)    any provision which expressly requires the consent of all the Lenders;

(v)    Clause 2.2 (*Finance Parties' rights and obligations*), Clause 27 (*Changes to the Lenders*) or Clause 31 (*Sharing among the Finance Parties*); or

143

(vi)   any amendment to the order of priority or of subordination of the Lenders' claims under the Intercreditor Agreement,

shall not be made without the prior consent of all the Lenders.

(b)   An amendment or waiver which relates to the rights or obligations of the Agent, the Arranger the Security Agent or a Hedge Counterparty may not be effected without the consent of the Agent, the Arranger, the Security Agent or that Hedge Counterparty.

**38.3   Technical Amendments**
Notwithstanding Clause 38.1 (*Required consents*), the Agent may determine administrative matters and make technical amendments arising out of manifest errors on the face of this Agreement, where such amendments would not prejudice or otherwise be adverse to the position of any Lender under this Agreement, without reference to the Lenders

**38.4   Amendments by Security Agent**
Unless the provisions of any Finance Document expressly provide otherwise, the Security Agent may, if authorised by the Majority Lenders, amend the terms of, waive any of the requirements of, or grant consents under, any of the Transaction Security Documents, any such amendment, waiver or consent being binding on all the parties to this Agreement except that:

(a)   the prior consent of the Super Majority Lenders is required to authorise:

(i)   any amendment of any Transaction Security Document which would affect the nature or the scope of the Charged Property or the manner in which proceeds of enforcement are distributed; and

(ii)   any release of all or any part of the Charged Property which is not otherwise provided for under the terms of Clause 28.7 (*Resignation and release of security*); and

(b)   no waiver or amendment may impose any new or additional obligations on any person without the consent of that person.

**38.5   Replacement of Lender**
(a)   If at any time:

(i)   any Lender becomes a Non-Funding Lender (as defined in paragraph (c) below) or a Non-Consenting Lender (as defined in paragraph (d) below); or

(ii)   an Obligor becomes obliged to repay any amount in accordance with Clause 9.1 (*Illegality*) or to pay additional amounts pursuant to Clause 16.2 (*Tax gross-up*) or Clause 17 (*Increased Costs*) to any Lender in excess of amounts payable to the other Lenders generally; or

(iii)   any Lender becomes insolvent and its assets become subject to a receiver, liquidator, trustee, custodian or other person having similar powers or any winding-up, dissolution or administration,

then the Obligors' Agent may, on fifteen (15) Business Days prior written notice to the Agent and such Lender, replace such Lender by requiring such Lender to (and such Lender shall) transfer pursuant to Clause 27 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to a Lender or other bank or financial institution or Fund Lender (a "**Replacement Lender**") selected by the Company, and which is acceptable to the Agent (acting reasonably), which confirms its willingness to assume and does assume all the

144

[London #294447 v13]

Confidential

obligations of the transferring Lender (including the assumption of the transferring Lender's participations on the same basis as the transferring Lender) for a purchase price in cash payable at the time of transfer equal to the outstanding principal amount of such Lender's participation in the outstanding Loans and all accrued interest (and any breakage costs) and fees and other amounts payable thereunder.

(b)     The replacement of a Lender pursuant to this Clause 38 shall be subject to the following conditions:

    (i)     the Company shall have no right to replace the Agent or the Security Agent;

    (ii)    neither the Agent nor the Lender to be replaced under this Clause 38 shall have any obligation to the Company to find a Replacement Lender;

    (iii)   in the event of a replacement of a Non-Consenting Lender such replacement must take place no later than 90 days after the date the Non-Consenting Lender notified the Company and the Agent of its failure or refusal to agree to any consent, waiver or amendment to the Finance Documents requested by the Company;

    (iv)    in no event shall the Lender to be replaced under this Clause 38 be required to pay or surrender to such Replacement Lender any of the fees received by such Lender pursuant to the Finance Documents; and

    (v)     in the event of replacement of a Non-Funding Lender, such replacement must take place no later than 90 days after the date the Non-Funding Lender failed or refused to participate in the relevant Utilisation.

(c)     A "Non-Funding Lender" is a Lender who either refuses or fails to participate is a Loan where:

    (i)     the Agent has notified each Lender of the details of the requested Utilisation and the amount of its share in that Utilisation;

    (ii)    the conditions to provision of a Utilisation set out in this agreement have all been met and the relevant Lender is not entitled to refuse to participate in that Utilisation; and

    (iii)   the Company has notified that Lender it will be treated as a Non-Funding Lender.

(d)     If:

    (i)     the Company or the Agent (at the request of the Company) has requested the Lenders to consent to a waiver or amendment of any provisions of the Finance Documents;

    (ii)    the waiver or amendment in question requires the consent of all the Lenders or the Super-Majority Lenders; and

    (iii)   the Majority Lenders have consented to such waiver or amendment,

then any Lender who does not and continues not to agree to such waiver or amendment shall be deemed to be a "Non-Consenting Lender".

(e)     Prepayments made under this Clause 38.5:

    (i)     will be at par and will include all accrued interest, fees, Break Costs and other amounts payable in relation thereto under the Finance Documents; and

145

CITI-TF 00701867

(ii)    may be made out of the proceeds new Equity Injections made expressly for that purpose or Retained Excess Cashflow.

**38.6   Structural Adjustment**

(a)    In this Clause 38.6, a "**Structural Adjustment**" means:

(i)    the introduction of any additional tranche or facility into the Finance Documents;

(ii)    any increase in or addition of any Commitment, any extension of a Commitment's maturity or availability or the redenomination of a Commitment into another currency; and

(iii)    any changes to the Finance Documents (including changes to or the taking of Security but, in the case of a release and retaking of Security, where that would have (in the opinion of the Security Agent (acting reasonably)) a material and prejudicial impact on the interests of the Finance Parties, no such release may occur without the prior consent of the Super-Majority Lenders) consequential on or required by reason of applicable law effectively to implement any of the foregoing, in each case other than in respect of Additional Acquisition Facility Commitments.

(b)    An amendment or waiver that is a Structural Adjustment or which is consequential on or required to implement a Structural Adjustment may be approved with the consent of each of the following, subject to the provisions of the Intercreditor Agreement:

(i)    the Majority Lenders; and

(ii)    each Lender that is assuming a new Commitment or an increased Commitment in the relevant Facility or whose Commitment is being extended or redenominated, or to whom any amount (including interest), which is being redenominated is due,

and any such amendment or waiver will be binding on all the Parties.

[London #294447 v13]

146

CITI-TF 00701868

## SECTION 12
## GOVERNING LAW AND ENFORCEMENT

**39.    GOVERNING LAW**

This Agreement is governed by English law.

**40.    ENFORCEMENT**

**40.1    Jurisdiction of English courts**

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) (a "**Dispute**").

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    This Clause 40.1 is for the benefit of the Finance Parties and Secured Parties only.  As a result, no Finance Party or Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Finance Parties and Secured Parties may take concurrent proceedings in any number of jurisdictions.

**40.2    Service of process**

(a)    Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(i)    irrevocably appoints the Company as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document (and the Company by its execution of this Agreement, accepts that appointment); and

(ii)    agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within 5 Business Days of such event taking place) appoint another agent on terms acceptable to the Agent.  Failing this, the Agent may appoint another agent for this purpose.

**41.    COUNTERPARTS**

Any Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of such Finance Document.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

147

## SCHEDULE 1
### THE ORIGINAL PARTIES
#### PART I
#### THE ORIGINAL OBLIGORS

| Name of Original Borrower | Place of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Maltby Limited | England & Wales | 6226803 |

| Name of Original Guarantor | Place of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Maltby investments Limited | England & Wales | 6226775 |

#### PART II
#### THE ORIGINAL LENDERS

| Name of Original Lender | Commitment |
|---|---|
| Citibank, N.A., London Branch | £1,410,000,000 |
| Total | £1,410,000,000 |

148

[London #294447 v13]

Confidential

CITI-TF 00701870

## SCHEDULE 2
### CONDITIONS PRECEDENT
### PART I
### CONDITIONS PRECEDENT TO UTILISATION

1. **Corporate documents**

(a)   A copy of the Constitutional Documents.

(b)   A copy of a resolution of the board of directors of the Company, the Parent and Holdco:

    (i)   approving the terms of, and the transactions contemplated by, the Transaction Documents to which it is a party and resolving that it execute, deliver and perform the Transaction Documents to which it is a party;

    (ii)   approving the release of the Offer Press Release or, if the Scheme Conversion has occurred, the Scheme Press Release;

    (iii)   authorising a specified person or persons to execute the Transaction Documents to which it is a party on its behalf; and

    (iv)   authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Transaction Documents to which it is a party.

(c)   A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Transaction Documents and related documents.

(d)   A certificate of the Company (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it or the Parent to be exceeded.

(e)   A certificate of an authorised signatory of the Company (as at a date no earlier than the Closing Date) certifying that each copy document relating to it, the Parent and/or Holdco, as the case may be, specified in this Part I of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded and confirming that the execution of the Transaction Documents to which it, the Parent or Holdco as the case may be, is party is lawful and complies with its constitution.

2. **Finance Documents**

(a)   This Agreement executed by the members of the Group party to this Agreement.

(b)   The Fee Letter(s) executed by the Company.

(c)   The Intercreditor Agreement executed by members of the Group party to that agreement.

(d)   The Hedging Letter executed by the parties to that letter.

(e)   At least two originals of the Transaction Security Documents listed in Schedule 12 (*Transaction Security*) executed by the Company, the Parent and/or Holdco (as applicable) together with any notices or documents required to be given or executed or made under the terms of those Transaction Security Documents.

149

CITI-TF 00701871

A-6253

3. **Legal opinions**

A legal opinion of Cleary Gottlieb Steen & Hamilton LLP, legal advisers to the Arranger in England, as to English law in respect of the Finance Documents.

4. **Other documents and evidence**

(a)    The Senior Facilities Agreement executed by members of the Group party to that agreement, together with evidence that the conditions precedent to funding under the Senior Facilities Agreement have been satisfied (other than any condition relating to the satisfaction of conditions precedent under this Agreement).

(b)    The Mezzanine Facility Agreement executed by members of the Group party to that agreement, together with evidence that the conditions precedent to funding under the Mezzanine Facility Agreement have been satisfied (other than any condition relating to the satisfaction of conditions precedent under this Agreement).

(c)    A copy of each Report.

(d)    The Base Case Model and the Structure Memorandum.

(e)    Any information and evidence in respect of the Company required by each Finance Party to enable it to be satisfied with the results of all *"know your customer"* or other checks which it is required to carry out in relation to such person provided that such information and evidence is requested not less than five Business Days prior to the date of the Scheme Press Release.

(f)    If the Scheme Conversion has occurred, a certificate of an authorised signatory of the Company addressed to the Agent attaching certified copies of the following documents:

(i)    the Court Order; and

(ii)    the certificate of the Registrar of Companies confirming registration of the Court Order.

(g)    If the Scheme Conversion has not occurred, a certificate of an authorised signatory of the Company confirming that the Offer has been declared wholly unconditional.

(h)    To the extent that they have been updated since the date on which they were delivered prior to the date of the Interim Facilities Agreement, copies of the documents delivered pursuant to paragraphs (c) and (d) above.

(i)    Evidence that the fees, costs and expenses then due from the Parent and the Company under Clause 20 (*Costs and Expenses*) and Clause 16.5 (*Stamp taxes*) have been paid or will be paid on or by the first Utilisation Date.

(j)    Evidence that the funds necessary to complete the Acquisition (other than those available to the Company under this Agreement, the Senior Facilities Agreement and the Mezzanine Facility Agreement) being an amount equal to £1,490,000,000 have been received by the Company in cash on or before the first Utilisation Date in accordance with the Structure Memorandum.

[London #294447 v13]

Confidential

CITI-TF 00701872

## PART II
### CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL OBLIGOR

1.  An Accession Letter executed by the Additional Obligor and the Company.

2.  A copy of the constitutional documents of the Additional Obligor.

3.  A copy of a resolution of the board of directors (if any) of the Additional Obligor and, where applicable, the supervisory board or advisory board:

    (a)  approving the terms of, and the transactions contemplated by, the Accession Letter and the Finance Documents and resolving that it execute the Accession Letter and any other Finance Document to which it is a party;

    (b)  authorising a specified person or persons to execute the Accession Letter and other Finance Documents on its behalf; and

    (c)  (where applicable) authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to the Additional Borrower, any Utilisation Request or Selection Notice) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

    (d)  in the case of any Additional Obligor authorising the Company to act as its agent in connection with the Finance Documents.

4.  A specimen of the signature of each person authorised by the resolution referred to in paragraph 3 above.

5.  (If required by law or on the advice of counsel to the Agent in each jurisdiction), a copy of a resolution signed by all the holders of the issued shares of an Additional Obligor which is an Additional Guarantor and, if applicable, its board of supervisory directors, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Guarantor is a party.

6.  A certificate of the Additional Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

7.  A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Part II of Schedule 2 is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Letter.

8.  If available, the latest audited financial statements of the Additional Obligor.

9.  The following legal opinions, each addressed to the Agent, the Security and the Lenders:

    (a)  A legal opinion of the legal advisers to the Agent in England and Wales, as to English law in the form distributed to the Agent prior to signing the Accession Letter.

    (b)  If the Additional Obligor is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Agent or, as the case may be, such Additional Obligor (based on what is the accepted practice as to delivery of legal opinions in financing transactions in the jurisdiction of the governing law of that Finance Document (the "**Relevant Jurisdiction**")) as to the law of the Relevant Jurisdiction and the capacity and due authorisation of the Additional Obligor, in the form

151

**A-6255**

distributed to the Agent prior to signing the Accession Letter (or such other form as may be agreed by the Agent).

10.   In relation to Additional Obligors incorporated in England and Wales or Scotland, evidence that members of the Group incorporated in England and Wales or Scotland have done all that is necessary (including, without limitation, by re-registering as a private company) to follow the procedures set out in Sections 151 to 158 of the Act in order to enable each relevant Obligor to enter into the Finance Documents and perform its obligations under the Finance Documents. Such evidence shall include copies of the resolutions, statutory declarations, auditor's report and net assets letter (addressed to the Finance Parties) for each Additional Obligor and copies of the registers of directors and shareholders of each Additional Obligor.

11.   The Transaction Security Documents executed by the Additional Obligor which are required by the Agent in accordance with the Agreed Security Principles.

12.   Any notices or documents required to be given or executed or made under the terms of those Transaction Security Documents.

13.   An accession memorandum to the Intercreditor Deed executed by the Additional Obligor.

14.   Copies of such documentation and other evidence as the Agent (for itself or on behalf of any Lender) may reasonably request to carry out and be satisfied with the results of all necessary "know your customer" requirements or other checks in relation to the identity of any person that it is required (in order to comply with applicable money laundering laws and regulations) to carry out in relation to the Additional Obligor.

152

[London #294447 v13]

Confidential

CITI-TF 00701874

## SCHEDULE 3
### REQUESTS

### PART I
### UTILISATION REQUEST

From:    [Borrower] [Company]*

To:    [Agent]

Dated:    [_____]

Dear Sirs

**MALTBY LIMITED - £1,410,000,000 Securitisation Bridge Facility Agreement**
**dated [_____] (the "Facility Agreement")**

1.    We refer to the Facility Agreement. This is a Utilisation Request. Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.    We wish to borrow a Loan on the following terms:

    (a)    Borrower:                                [_____]

    (b)    Proposed Utilisation Date:              [_____] (or, if that is not a Business Day, the next Business Day)

    (c)    Currency of Loan:                       [_____]

    (d)    Amount:                                 [_____] or, if less, the Available Facility

    (e)    Interest Period:                        [_____]

3.    We confirm that each condition specified in Clause 4.3 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request.

4.    [The proceeds of this Loan should be credited to [account]].

5.    This Utilisation Request is irrevocable.

Yours faithfully

..............................................
authorised signatory for
[the Company on behalf of [insert name of relevant Borrower]]/ [insert name of Borrower]*

Notes:
*       Amend as appropriate. The Utilisation Request can be given by the Borrower or by the Company.

Confidential                                                      CITI-TF 00701875

## PART II
## SELECTION NOTICE

**Applicable to a Term Loan**

From:    [*Borrower*] [*Company*]*

To:      [*Agent*]

Dated:   [_____]

Dear Sirs

**MALTBY LIMITED – £1,410,000,000 Securitisation Bridge Facility Agreement
dated [_____] (the "Facility Agreement")**

1.   We refer to the Facility Agreement. This is a Selection Notice. Terms defined in the Facility Agreement have the same meaning in this Selection Notice unless given a different meaning in this Selection Notice.

2.   We refer to the following Term Loan[s],

|   |   |
|---|---|
| Utilisation Date: | [_____] |
| Amount: | [_____] |
| Final day of Interest Period | [_____] |

     We request that the next Interest Period for the above Term Loan[s] is [_____].

3.   This Selection Notice is irrevocable.

Yours faithfully

..................................................
authorised signatory for
[the Company on behalf of] [*insert name of relevant Borrower*]*
..................................................

Notes:
*        Amend as appropriate. The Selection Notice can be given by the Borrower or the Company.

154

[London #294447 v13]

## SCHEDULE 4

### MANDATORY COST FORMULAE

1.  The Mandatory Cost is an addition to the interest rate to compensate Lenders for the cost of compliance with (a) the requirements of the Bank of England and/or the Financial Services Authority (or, in either case, any other authority which replaces all or any of its functions) or (b) the requirements of the European Central Bank.

2.  On the first day of each Interest Period (or as soon as possible thereafter) the Agent shall calculate, as a percentage rate, a rate (the **"Additional Cost Rate"**) for each Lender, in accordance with the paragraphs set out below. The Mandatory Cost will be calculated by the Agent as a weighted average of the Lenders' Additional Cost Rates (weighted in proportion to the percentage participation of each Lender in the relevant Loan) and will be expressed as a percentage rate per annum.

3.  The Additional Cost Rate for any Lender lending from a Facility Office in a Participating Member State will be the percentage notified by that Lender to the Agent. This percentage will be certified by that Lender in its notice to the Agent to be its reasonable determination of the cost (expressed as a percentage of that Lender's participation in all Loans made from that Facility Office) of complying with the minimum reserve requirements of the European Central Bank in respect of loans made from that Facility Office.

4.  The Additional Cost Rate for any Lender lending from a Facility Office in the United Kingdom will be calculated by the Agent as follows:

    (a)    in relation to a Sterling Loan:

    $$\frac{AB + C(B-D) + E \times 0.01}{100 - (A+C)} \text{ per cent. per annum}$$

    (b)    in relation to a Loan in any currency other than sterling:

    $$\frac{E \times 0.01}{300} \text{ per cent. per annum.}$$

Where:

A.    is the percentage of Eligible Liabilities (assuming these to be in excess of any stated minimum) which that Lender is from time to time required to maintain as an interest free cash ratio deposit with the Bank of England to comply with cash ratio requirements.

B.    is the percentage rate of interest (excluding the Margin and the Mandatory Cost and, if the Loan is an Unpaid Sum, the additional rate of interest specified in paragraph (a) of Clause 12.3 (Default interest)) payable for the relevant Interest Period on the Loan.

C.    is the percentage (if any) of Eligible Liabilities which that Lender is required from time to time to maintain as interest bearing Special Deposits with the Bank of England.

D.    is the percentage rate per annum payable by the Bank of England to the Agent on interest bearing Special Deposits.

E.    is designed to compensate Lenders for amounts payable under the Fees Rules and is calculated by the Agent as being the average of the most recent rates of charge supplied by the Reference Banks to the Agent pursuant to paragraph 7 below and expressed in pounds per £1,000,000.

5.  For the purposes of this Schedule:

155

CITI-TF 00701877

(a) **"Eligible Liabilities"** and **"Special Deposits"** have the meanings given to them from time to time under or pursuant to the Bank of England Act 1998 or (as may be appropriate) by the Bank of England;

(b) **"Fees Rules"** means the rules on periodic fees contained in the FSA Supervision Manual or such other law or regulation as may be in force from time to time in respect of the payment of fees for the acceptance of deposits;

(c) **"Fee Tariffs"** means the fee tariffs specified in the Fees Rules under the activity group A.1 Deposit acceptors (ignoring any minimum fee or zero rated fee required pursuant to the Fees Rules but taking into account any applicable discount rate); and

(d) **"Tariff Base"** has the meaning given to it in, and will be calculated in accordance with, the Fees Rules.

6. In application of the above formulae, A, B, C and D will be included in the formulae as percentages (i.e. 5 per cent. will be included in the formula as 5 and not as 0.05). A negative result obtained by subtracting D from B shall be taken as zero. The resulting figures shall be rounded to four decimal places.

7. If requested by the Agent, each Reference Bank shall, as soon as practicable after publication by the Financial Services Authority, supply to the Agent the rate of charge payable by that Reference Bank to the Financial Services Authority pursuant to the Fees Rules in respect of the relevant financial year of the Financial Services Authority (calculated for this purpose by that Reference Bank as being the average of the Fee Tariffs applicable to that Reference Bank for that financial year) and expressed in pounds per £1,000,000 of the Tariff Base of that Reference Bank.

8. Each Lender shall supply any information required by the Agent for the purpose of calculating its Additional Cost Rate. In particular, but without limitation, each Lender shall supply the following information on or prior to the date on which it becomes a Lender:

(a) the jurisdiction of its Facility Office; and

(b) any other information that the Agent may reasonably require for such purpose.

Each Lender shall promptly notify the Agent of any change to the information provided by it pursuant to this paragraph.

9. The percentages of each Lender for the purpose of A and C above and the rates of charge of each Reference Bank for the purpose of E above shall be determined by the Agent based upon the information supplied to it pursuant to paragraphs 7 and 8 above and on the assumption that, unless a Lender notifies the Agent to the contrary, each Lender's obligations in relation to cash ratio deposits and Special Deposits are the same as those of a typical bank from its jurisdiction of incorporation with a Facility Office in the same jurisdiction as its Facility Office.

10. The Agent shall have no liability to any person if such determination results in an Additional Cost Rate which over or under compensates any Lender and shall be entitled to assume that the information provided by any Lender or Reference Bank pursuant to paragraphs 3, 7 and 8 above is true and correct in all respects.

11. The Agent shall distribute the additional amounts received as a result of the Mandatory Cost to the Lenders on the basis of the Additional Cost Rate for each Lender based on the information provided by each Lender and each Reference Bank pursuant to paragraphs 3, 7 and 8 above.

[London #294447 v13]

Confidential

CITI-TF 00701878

A-6260

12. Any determination by the Agent pursuant to this Schedule in relation to a formula, the Mandatory Cost, an Additional Cost Rate or any amount payable to a Lender shall, in the absence of manifest error, be conclusive and binding on all Parties.

13. The Agent may from time to time, after consultation with the Company and the Lenders, determine and notify to all Parties any amendments which are required to be made to this Schedule in order to comply with any change in law, regulation or any requirements from time to time imposed by the Bank of England, the Financial Services Authority or the European Central Bank (or, in any case, any other authority which replaces all or any of its functions) and any such determination shall, in the absence of manifest error, be conclusive and binding on all Parties.

157

CITI-TF 00701879

### SCHEDULE 5
### FORM OF TRANSFER AGREEMENT

To:       [_____] as Agent

From:    [*The Existing Lender*] (the "Existing Lender") and [The
          New Lender] (the "New Lender")

Dated:    [_____]

Dear Sirs

### MALTBY LIMITED – £1,410,000,000 Securitisation Bridge Facility
### dated [_____] (the "Facility Agreement")

1.    We refer to the Facility Agreement. This is a Transfer Agreement. Terms defined in the Facility
      Agreement have the same meaning in this Transfer Agreement unless given a different meaning
      in this Transfer Agreement.

2.    We refer to Clause 27.5 (*Procedure for transfer*):

      (a)    The Existing Lender and the New Lender agree to the transfer of [all] [the part specified
             in the Schedule to this Transfer Agreement] of the Existing Lender's Commitment, rights
             and obligations referred to in the Schedule in accordance with Clause 27.5 (*Procedure
             for transfer*).

      (b)    The proposed Transfer Date is [_____].

      (c)    The Facility Office and address, fax number and attention details for notices of the New
             Lender for the purposes of Clause 34.2 (*Addresses*) are set out in the Schedule.

3.    The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set
      out in paragraph (c) of Clause 27.4 (*Limitation of responsibility of Existing Lenders*).

4.    The New Lender agrees to be bound by the terms of the Intercreditor Agreement as a Senior
      Lender.

5.    This Transfer Agreement is governed by English law.

[London #294447 v13]

Confidential

CITI-TF 00701880

A-6262

**THE SCHEDULE**
**Commitment/rights and obligations to be transferred**
*[insert relevant details]*

*[Facility Office address, fax number and attention details for notices and account details for payments.]*

[Existing Lender]                    [New Lender]

By: ................................                    By: ................................

This Transfer Agreement is accepted by the Agent and the Transfer Date is confirmed as [_____].
[Agent]

By: ................................

159

CITI-TF 00701881

## SCHEDULE 6
### FORM OF ACCESSION LETTER

To:      [_____] as Agent

From:    [*Subsidiary*] and [*Company*]

Dated:    [_____]

Dear Sirs

**MALTBY LIMITED – £1,410,000,000 Securitisation Bridge Facility**
**dated [_____] (the "Facility Agreement")**

1. We refer to the Facility Agreement. This is an Accession Letter. Terms defined in the Facility Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

2. [Subsidiary] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Facility Agreement, the Intercreditor Agreement and the other Finance Documents as an Additional [Borrower]/[Guarantor] pursuant to Clause [28.2 (*Additional Borrower*)]/[Clause 28.4 (*Additional Guarantors*)] of the Facility Agreement and as an [Obligor] pursuant to Clause [_____] of the Intercreditor Agreement. [Subsidiary] is a company duly incorporated under the laws of [name of relevant jurisdiction] and is a limited liability company and registered number [_____].

3. [Subsidiary's] administrative details are as follows:

      Address:    [_____]
      Fax No.:    [_____]
      Attention:  [_____]

4. [Guarantee limitation, if applicable.]

5. This Accession Letter is governed by English law.

      [This Guarantor Accession Letter is entered into by deed.]

[Company]                       [Subsidiary]

160

[London #294447 v13]

CITI-TF 00701882

## SCHEDULE 7
### FORM OF RESIGNATION LETTER

To:        [            ] as Agent

From:    [resigning Obligor] and [Company]

Dated:    [            ]

Dear Sirs

**MALTBY LIMITED – £1,410,000,000 Securitisation Bridge Facility Agreement**
dated [_____] (the "Facility Agreement")

1.    We refer to the Facility Agreement. This is a Resignation Letter. Terms defined in the Facility Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2.    Pursuant to [Clause 28.3 (*Resignation of a Borrower*) and] 28.5 (*Resignation of a Guarantor*), we request that [resigning Obligor] be released from its obligations as a [Borrower and] Guarantor under the Facility Agreement, the Intercreditor Agreement and the Finance Documents.

3.    We confirm that:

      (a)    no Default is continuing or would result from the acceptance of this request; and

      (b)    *[[this request is given in relation to a Third Party Disposal of [resigning Obligor];

      (c)    [the Disposal Proceeds have been or will be applied in accordance with Clause 10.3 (*Application of mandatory prepayments*);]**]

      (d)    [_____]***

4.    This letter is governed by English law.


[Company]                                    [resigning Obligor]


By: ...................................................    By: ...................................................

Notes:
*        Insert where resignation only permitted in case of a Third Party Disposal.
**      Amend as appropriate, e.g. to reflect agreed procedure for payment of proceeds into a specified account.
***    Insert any other conditions required by the Facility Agreement.

161

CITI-TF 00701883

## SCHEDULE 8
### FORM OF COMPLIANCE CERTIFICATE

To:         [_____] as Agent

From:    [Parent]

Dated:    [_____]

Dear Sirs

**MALTBY LIMITED – £1,410,000,000 Securitisation Bridge Facility
dated [_____] (the "Facility Agreement")**

1.    We refer to the Facility Agreement. This is a Compliance Certificate. Terms defined in the
      Facility Agreement have the same meaning when used in this Compliance Certificate unless
      given a different meaning in this Compliance Certificate.

2.    We confirm that the ratio of Total Net Debt on the Test Date to Maintenance EBITDA for that
      Relevant Period was [_____] to 1.

3.    [We confirm that no Default is continuing.]*

4.    [We confirm that the following companies constitute Material Companies for the purposes of the
      Facility Agreement: [_____]].

Signed    ...........................................................

      Director                         Director
      Of                               Of
      [Parent]                         [Parent]

      ...........................................................

---

*    If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any,
     being taken to remedy it.

162

[London #294447 v13]

Confidential

CITI-TF 00701884

**SCHEDULE 9**
**LMA FORM OF CONFIDENTIALITY UNDERTAKING**

**[Letterhead of Arranger]**

To:

*[insert name of Potential Lender]*

Re:    **The Facility**

*Borrower:*   Maltby Limited (the "Borrower")
*Amount:*
*Agent:*

Dear Sirs

We understand that you are considering participating in the Facility. In consideration of us agreeing to make available to you certain information and to prevent front-running of the Facility, by your signature of a copy of this letter you agree as follows:

(A)    **CONFIDENTIALITY**

1.    **Confidentiality Undertaking**
You undertake:

(a)    to keep the Confidential Information confidential and not to disclose it to anyone except as provided for by paragraph A2 below and to ensure that the Confidential Information is protected with security measures and a degree of care that would apply to your own confidential information;

(b)    to keep confidential and not disclose to anyone except as provided for by paragraph A2 below the fact that the Confidential Information has been made available or that discussions or negotiations are taking place or have taken place between us in connection with the Facility;

(c)    to use the Confidential Information only for the Permitted Purpose; and

(d)    to use all reasonable endeavours to ensure that any person to whom you pass any Confidential Information (unless disclosed under paragraph A2(b) below) acknowledges and complies with the provisions of this letter as if that person were also a party to it.

2.    **Permitted Disclosure**
We agree that you may disclose Confidential Information and those matters referred to in paragraph 1(b) above:

(a)    to members of the Participant Group and their officers, directors, employees and professional advisers to the extent necessary for the Permitted Purpose and to any auditors of members of the Participant Group;

(b)    (i) where requested or required by any court of competent jurisdiction or any competent judicial, governmental, supervisory or regulatory body, (ii) where required by the rules of any stock exchange on which the shares or other securities of any member of the

Confidential

CITI-TF 00701885

Participant Group are listed or (iii) where required by the laws or regulations of any country with jurisdiction over the affairs of any member of the Participant Group; or

(c)    with the prior written consent of us and the Borrower.

3.    **Notification of Required or Unauthorised Disclosure**
You agree (to the extent permitted by law and except where disclosure is to be made to any competent supervisory or regulatory body during the ordinary course of its supervisory or regulatory function over you) to inform us of the full circumstances of any disclosure under paragraph A2(b) or upon becoming aware that Confidential Information has been disclosed in breach of this letter.

4.    **Return of Copies**
If we so request in writing, you shall return all Confidential Information supplied to you by us and destroy or permanently erase (to the extent technically practicable) all copies of Confidential Information made by you and use all reasonable endeavours to ensure that anyone to whom you have supplied any Confidential Information destroys or permanently erases (to the extent technically practicable) such Confidential Information and any copies made by them, in each case save to the extent that you or the recipients are required to retain any such Confidential Information by any applicable law, rule or regulation or by any competent judicial, governmental, supervisory or regulatory body or in accordance with internal policy, or where the Confidential Information has been disclosed under paragraph A2(b) above.

5.    **Continuing Obligations**
The obligations in this letter are continuing and, in particular, shall survive the termination of any discussions or negotiations between you and us.  Notwithstanding the previous sentence, the obligations in this letter shall cease on the earlier of (a) the date you become a party to or otherwise acquire (by assignment or otherwise) a direct interest in the Facility [and] (b) twelve months after you have returned all Confidential Information supplied to you by us and destroyed or permanently erased (to the extent technically practicable) all copies of Confidential Information made by you (other than any such Confidential Information or copies which have been disclosed under paragraph A2 above (other than sub-paragraph A2(a)) or which, pursuant to paragraph A4 above, are not required to be returned or destroyed)[ and (c) in any event [      ] months from the date of this letter].

6.    **No Representation; Consequences of Breach, etc**
You acknowledge and agree that:

(a)    neither we nor any of our officers, employees or advisers (each a "**Relevant Person**") (i) make any representation or warranty, express or implied, as to, or assume any responsibility for, the accuracy, reliability or completeness of any of the Confidential Information or any other information supplied by us or any member of the Group or the assumptions on which it is based or (ii) shall be under any obligation to update or correct any inaccuracy in the Confidential Information or any other information supplied by us or any member of the Group or be otherwise liable to you or any other person in respect to the Confidential Information or any such information; and

(b)    we or members of the Group may be irreparably harmed by the breach of the terms of this letter and damages may not be an adequate remedy; each Relevant Person or member of the Group may be granted an injunction or specific performance for any threatened or actual breach of the provisions of this letter by you.

7.    **No Waiver; Amendments, etc**
This letter sets out the full extent of your obligations of confidentiality owed to us in relation to the information the subject of this letter.  No failure or delay in exercising any right, power or privilege under this letter will operate as a waiver thereof nor will any single or partial exercise of any right, power or privilege preclude any further exercise thereof or the exercise of any other right, power or

164

[London #294447 v13]

Confidential

privileges under this letter. The terms of this letter and your obligations under this letter may only be amended or modified by written agreement between us.

**8.    Inside Information**
You acknowledge that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and you undertake not to use any Confidential Information for any unlawful purpose.

**9.    Nature of Undertakings**
The undertakings given by you under Part A of this letter are given to us and (without implying any fiduciary obligations on our part) are also given for the benefit of the Borrower and each other member of the Group.

**(B)    MISCELLANEOUS**

**1.    Third party rights**
Subject to paragraph A6 and paragraph A9 the terms of this letter may be enforced and relied upon only by you and us and the operation of the Contracts (Rights of Third Parties) Act 1999 is excluded. Notwithstanding any provisions of this letter, the parties to this letter do not require the consent of any Relevant Person or any member of the Group to rescind or vary this letter at any time.

**2.    Governing Law and Jurisdiction**
This letter (including the agreement constituted by your acknowledgement of its terms) shall be governed by and construed in accordance with the laws of England and the parties submit to the non-exclusive jurisdiction of the English courts.

**3.    Definitions**
In this letter (including the acknowledgement set out below):

**"Arranger Group"** means us, each of our holding companies and subsidiaries and each subsidiary of each of our holding companies (as each such term is defined in the Companies Act 1985) and each of our or their directors, officers and employees (including any sales and trading teams) provided that when used in this letter in respect of an Arranger it applies severally only in respect of that Arranger, each of that Arranger's holding companies and subsidiaries, each subsidiary of each of its holding companies and each director, officer and employee (including any sales and trading teams) of that Arranger or any of the foregoing and not, for the avoidance of doubt, those of another Arranger.

**"Confidential Information"** means any information relating to the Borrower, the Group, and the Facilt[y/ies] provided to you by us or any of our affiliates or advisers, in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that (a) is or becomes public knowledge other than as a direct or indirect result of any breach of this letter or (b) is known by you before the date the information is disclosed to you by us or any of our affiliates or advisers or is lawfully obtained by you after that date, other than from a source which is connected with the Group and which, in either case, as far as you are aware, has not been obtained in violation of, and is not otherwise subject to, any obligation of confidentiality.

the **"Facility Agreement"** means the facility agreement to be entered into in relation to the Facility.

**"Group"** means the Borrower and each of its holding companies and subsidiaries and each subsidiary of each of its holding companies (as each such term is defined in the Act).

165

CITI-TF 00701887

**"Participant Group"** means you, each of your holding companies and subsidiaries and each subsidiary of each of your holding companies (as each such term is defined in the Companies Act 1985) and where such term is used in Part B of this letter and the definition of "Front Running" each of your or their directors, officers and employees (including any sales and trading teams).

**"Permitted Purpose"** means considering and evaluating whether to enter into the Facility.

Please acknowledge your agreement to the above by signing and returning the enclosed copy.

Yours faithfully

............................................
For and on behalf of
[Arranger]

To:        [Arranger]

The Borrower and each other member of the Group

We acknowledge and agree to the above:

............................................
For and on behalf of
[Potential Lender]

166

[London #294447 v13]

Confidential

CITI-TF 00701888

## SCHEDULE 10
### TIMETABLES[*]

| | Loans in euro | Loans in Sterling | Loans in other currencies |
|---|---|---|---|
| Approval as an Optional Currency, if required (Clause 4.4 (*Conditions relating to Optional Currencies*)) | | | |
| Agent notifies the Company if a currency is approved as an Optional Currency in accordance with Clause 4.4 (*Conditions relating to Optional Currencies*) | | | U-4 |
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*) or a Selection Notice (Clause 13.1 (*Selection of Interest Periods and Terms*) | U-3 9:30 a.m. | U-1 9:30 a.m. | U-3 9:30 a.m. |
| Agent determines (in relation to a Utilisation) the Base Currency Amount of the Loan, if required under Clause 5.4 (*Lenders' participation*) | U-3 11:00 a.m. | U-1 11:00 a.m. | U-3 11:00 a.m. |
| Agent notifies the Lenders of the Loan in accordance with Clause 5.4 (*Lenders' participation*) | U-3 3:00 p.m. | U-1 3:00 p.m. | U-3 3:00 p.m. |
| Agent receives a notification from a Lender under Clause 7.2 (*Unavailability of a currency*) | | U-1 5:00 p.m. | U-1 5:00 p.m. |
| Agent gives notice in accordance with Clause 7.2 (*Unavailability of a currency*) | | U 9:30 a.m. | U-2 9:30 a.m. |
| Agent determines amount of the Loan in Optional Currency in accordance with Clause 32.9 (*Change of currency*) | | U-1 11:00 a.m. | U-3 11:00 a.m. |

---

[*] [When completing the timetables, not all times should be determined by reference to the Utilisation Date. In certain cases (i.e. in relation to Clause 8.2 (*Unavailability of a Currency*)) the time inserted should be determined by reference to the Quotation Day or the relevant day during the Interest Period.]

Confidential                                    CiTI-TF 00701889

| | Loans in euro | Loans in Sterling | Loans in other currencies |
|---|---|---|---|
| LIBOR or EURIBOR is fixed | Quotation Day as of 11:30 a.m. (London time) in respect of LIBOR and as of 11:30 a.m. (Brussels time) in respect of EURIBOR. | Quotation Day as of 12:00 noon | Quotation Day as of 11:30 a.m. |

"U"  =  date of utilisation

"U - X"  =  X Business Days prior to date of utilisation

168

[London #294447 v13]

Confidential

CITI-TF 00701890

A-6272

**SCHEDULE 11**
**AGREED SECURITY PRINCIPLES**

1. **Agreed Security Principles**

(a)     The guarantees and security to be provided will be given in accordance with certain agreed security principles (the *"Agreed Security Principles"*). This Schedule addresses the manner in which the Agreed Security Principles will impact on the guarantees and security proposed to be taken in relation to the Facility.

(b)     The Agreed Security Principles embody a recognition by all parties that there may be certain legal and practical difficulties in obtaining effective guarantees and/or security from all members of the Group in every jurisdiction in which members of the Group are located. In particular:

    (i)     general statutory limitations, financial assistance, corporate benefit, fraudulent preference, *"thin capitalisation"* rules, retention of title claims and similar principles may limit the ability of a member of the Group to provide a guarantee or security or may require that the guarantee be limited by an amount or otherwise;

    (ii)     a key factor in determining whether or not guarantees shall be granted or security shall be taken is the applicable cost which shall not be disproportionate to the benefit to the Finance Parties (or other beneficiary of the security) of obtaining such security;

    (iii)     where there is material incremental cost involved in creating security over all assets owned by a member of the Group in a particular category (*e.g.*, real estate) the principle stated at paragraph (b)(ii) above shall apply and, subject to the Agreed Security Principles, only the material assets in that category (*e.g.*, material real estate) shall be subject to security;

    (iv)     it is expressly acknowledged that in certain jurisdictions it may be either impossible or impractical to grant guarantees or create security over certain categories of assets in which event such guarantees will not be granted and security will not be taken over such assets;

    (v)     any assets subject to third party arrangements (including shareholder agreements or joint venture agreements) which prevent those assets from being charged will be excluded from any relevant security document; *provided that* reasonable endeavours to obtain consent to charging any such assets shall be used by the Group if the Arrangers determine the relevant asset is material and the Borrower determines that such endeavours will not involve placing commercial relationships with third parties in jeopardy;

    (vi)     members of the Group will not be required to give guarantees or enter into security documents if

        a.     it is not within the legal capacity of the relevant members of the Group to do so;

        b.     to do so would contravene any applicable legal prohibition; or

        c.     if the same would conflict with the fiduciary duties of the directors of the relevant Group member and the same would have the potential to result in a risk of personal or criminal liability on the part of any such director; *provided that* the relevant member of the Group shall use reasonable endeavours to overcome any such obstacle;

    (vii)     the giving of a guarantee, the granting of security or the perfection of the security granted will not be required if:

169

CITI-TF 00701891

a. it would have a material adverse effect on the ability of the relevant Obligor to conduct its operations and business in the ordinary course as otherwise permitted by the finance documents (and will not be required to the extent the grant or creation in any form would cause such material adverse effect); or

b. it would have a material adverse effect on the tax arrangements of the Group or any member of the Group; *provided, in each case, that* the relevant member of the Group shall use reasonable endeavours to overcome any such obstacle;

(viii) any subsidiary of the Parent that is a Controlled Foreign Corporation (as defined in the United States Internal Revenue Code) may not give a guarantee or pledge any of its assets (including shares in a subsidiary) as security for an obligation of a United States Person (as defined in the United States Internal Revenue Code). Furthermore, not more than 65% of the total combined voting power of all classes of shares entitled to vote of any such subsidiary may be pledged directly or indirectly as security for an obligation of a United States Person. These principles also apply with respect to any entity that becomes a United States Person and/or a Controlled Foreign Corporation following any guarantee or pledge of assets or shares. These principles also apply to any relevant provision under any other finance document (including any permitted hedging document); and

(ix) pledges over shares in Joint Ventures or the assets owned by such Joint Venture vehicles will not be required.

The "*Security Jurisdictions*" for the purposes of this Schedule shall be the United Kingdom, the United States and any other jurisdiction in which security is customarily taken for leveraged finance transactions.

2.    **Guarantors and Security**

Subject to the due execution of all relevant guarantee and security documents, completion of relevant perfection formalities within statutorily prescribed time limits, payment of all registration fees and documentary taxes, any other rights arising by operation of law, obtaining any relevant foreign legal opinions and subject to any qualifications set out in the Finance Documents and any relevant foreign legal opinions obtained and subject to the requirements of the Agreed Security Principles, it is further acknowledged that:

(a) each guarantee will be an upstream, cross-stream and downstream guarantee and each guarantee and security will be for all liabilities of the Obligors under the finance documents in accordance with, and subject to, the requirements of the Agreed Security Principles in each relevant jurisdiction;

(b) where an Obligor pledges shares, the security document will (subject to agreed exceptions) be governed by the law of the company whose shares are being pledged and not by the law of the country of the pledgor;

(c) the Security Agent shall:

(i) (in the case of those security documents creating pledges or charges over shares in a company or other entity) obtain a first priority valid charge or analogous or equivalent encumbrance over all of the shares in issue at any time in that company or other entity to which such security document relates and which are owned by a member of the Group;

(ii) subject to the intercreditor agreement, be able to enforce such security as is created by way of a security document without any restraint from (x) the constitutional

Confidential

documents of the relevant pledgor or chargor, (y) any company or entity which is or whose assets are the subject of such security document or (z) any shareholders of the foregoing not being party to the relevant security document;

(iii)    not require that any *ad valorem* registration taxes be payable by the Group upon the creation or perfection of any security; and

(iv)    not require that any costs, fee, taxes or other amounts payable in connection with any re-taking, novation or re-registration of any security in connection with an assignment or transfer by any Lender be for the account of the Group; and

(d)    any company that is or becomes a Material Subsidiary and that is incorporated in a Security Jurisdiction, but subject to the Agreed Security Principles, shall grant a guarantee and create security in accordance with the Agreed Security Principles as soon as reasonably practical after it has been demonstrated (by reference to financial statements) that such subsidiary constitutes a Material Subsidiary, and in any event within 60 days after it being so demonstrated.

The Finance Parties acknowledge and agree that, notwithstanding Clause 2(a) above, due to applicable corporate benefit and financial assistance restrictions, each guarantee and security given by an Obligor incorporated in the United States, United Kingdom and any other relevant jurisdiction in which security is taken shall be limited as provided for in the Finance Documents.

3.    **Terms of Security Documents**

The following principles will be reflected in the terms of any security taken as part of this transaction:

(a)    security will not be enforceable until an Event of Default has occurred and notice of such Event of Default has been given by the Agent and notice of acceleration has been given or deemed given under the applicable Finance Documents (and for the purposes of this Term Sheet *"acceleration"* means any requirement for immediate repayment of the Facility);

(b)    notification of pledges over bank accounts will be given to the bank holding the account; *provided that* this is not inconsistent with the Group retaining control over the balance and operation of the account;

(c)    notification of receivables security to debtors will only be given if an Event of Default has occurred and notice of such Event of Default has been given by the Agent and notice of acceleration has been given or deemed given under the applicable Finance Documents, other than where such notification is necessary under applicable laws to create a security interest over the relevant receivables;

(d)    notification of any security interest over insurance policies, rights under Acquisition Documents, intra-Group receivables and material contracts will be given at time security is taken will be served on any insurer of the Group assets (other than in respect of any run-off insurance policy maintained by the vendor), counterparty to the Acquisition Documents, intra-Group receivables and material contracts (unless otherwise agreed by the Agent);

(e)    the security documents will only operate to create security rather than to impose new commercial obligations. Accordingly, they should not contain additional representation or undertakings (such as in respect of insurance, information or the payment of costs) unless these are the same as or consistent with those contained in the Senior Facilities Agreement and the Mezzanine Facility Agreement or are required for the creation, maintenance or perfection of the security;

Confidential

CITI-TF 00701893

A-6275

(f)    in respect of the share pledges, until an Event of Default has occurred and notice of acceleration has been given, the pledgor will be permitted to retain and to exercise voting rights to any shares pledged by them in a manner which does not adversely affect the validity or enforceability of the security or cause an Event of Default to occur and the pledgors should be permitted to pay dividends upstream on pledged shares to the extent permitted under the Facility Agreement with the proceeds to be available to the Parent and its subsidiaries;

(g)    the Finance Parties should only be able to exercise any power of attorney granted to them under the security documents following an Event of Default in respect of which notice of enforcement has been given by the relevant Agent following failure to comply with a further assurance or perfection obligation or in order to remedy a breach of covenant by the relevant Obligor in the relevant security document after the relevant Agent has given notice of such failure to the relevant Obligor; and

(h)    the security documents should not operate so as to prevent any transactions which are permitted under the Finance Documents, including without limitation, any disposals of assets where such disposal is permitted under the Finance Documents.

[London #294447 v13]

172

Confidential

CITI-TF 00701894

A-6276

**SCHEDULE 12**
**TRANSACTION SECURITY**

| PARTY | DESCRIPTION OF SECURITY |
|---|---|
| **Holdco** | First ranking pledge of the shares in the Parent. |
| **Parent** | First ranking security over all its assets and undertaking (including the shares in the Company). |
| **The Company** | First ranking security over all its assets and undertaking (including the shares in the Target). |

173

Confidential

CITI-TF 00701895

A-6277

## SCHEDULE 13

### PERFECTION REQUIREMENTS

In respect of each Transaction Security Document entered into by a company incorporated in England and Wales, delivery of a completed Form 395 along with the relevant Transaction Security Document and the prescribed particulars (as defined in the Act) to Companies House within 21 days after the execution of such Transaction Security Document.

Confidential

CITI-TF 00701896

A-6278

SIGNATURES

THE PARENT

MALTBY INVESTMENTS LIMITED
By:

Address:
Fax:
Attention:


THE COMPANY

MALTBY LIMITED
By:

Address:
Fax:
Attention:


Confidential

CITI-TF 00701897

THE ARRANGER

**CITIGROUP GLOBAL MARKETS LIMITED**

By:

Address:
Fax:
Attention:

THE AGENT

**CITIBANK INTERNATIONAL PLC**

By:

Address:
Fax:
Email:
Attention:

THE SECURITY AGENT

**CITIBANK, N.A., LONDON BRANCH**

By:
Address:
Fax:                    Carl Hardie
Email:                  Vice President
Attention:

THE ORIGINAL LENDER

**CITIBANK, N.A., LONDON BRANCH**
By:
Address:
Fax:
Email:
Attention:

Confidential

£155,000,000

**MEZZANINE FACILITY AGREEMENT**
dated 13 August 2007

for

MALTBY INVESTMENTS LIMITED
as the Parent

with

CITIBANK INTERNATIONAL PLC
acting as Agent

and

CITIBANK, N.A., LONDON BRANCH
acting as Security Agent

arranged by

CITIGROUP GLOBAL MARKETS LIMITED
as Mandated Lead Arranger

[London #297777 v7]

Confidential

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | THE FACILITY | 40 |
| 3. | PURPOSE | 41 |
| 4. | CONDITIONS OF UTILISATION | 42 |
| 5. | UTILISATION OF LOANS | 44 |
| 6. | EXTENSION OF THE FINAL MATURITY DATE | 44 |
| 7. | RESERVED | 45 |
| 8. | REPAYMENT | 46 |
| 9. | ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION | 46 |
| 10. | MANDATORY PREPAYMENT | 47 |
| 11. | RESTRICTIONS | 59 |
| 12. | INTEREST | 60 |
| 13. | INTEREST PERIODS | 61 |
| 14. | CHANGES TO THE CALCULATION OF INTEREST | 61 |
| 15. | FEES | 62 |
| 16. | TAX GROSS UP AND INDEMNITIES | 64 |
| 17. | INCREASED COSTS | 67 |
| 18. | MITIGATION | 68 |
| 19. | OTHER INDEMNITIES | 69 |
| 20. | COSTS AND EXPENSES | 71 |
| 21. | GUARANTEE | 72 |
| 22. | REPRESENTATIONS | 76 |
| 23. | INFORMATION UNDERTAKINGS | 81 |
| 24. | FINANCIAL COVENANTS | 85 |
| 25. | GENERAL UNDERTAKINGS | 92 |
| 26. | EVENTS OF DEFAULT | 108 |
| 27. | CHANGES TO THE LENDERS | 113 |
| 28. | CHANGES TO THE OBLIGORS | 118 |
| 29. | ROLE OF THE AGENT, THE ARRANGER AND OTHERS | 120 |
| 30. | CONDUCT OF BUSINESS BY THE FINANCE PARTIES | 124 |
| 31. | SHARING AMONG THE FINANCE PARTIES | 125 |
| 32. | PAYMENT MECHANICS | 127 |
| 33. | SET-OFF | 129 |
| 34. | NOTICES | 129 |
| 35. | CALCULATIONS AND CERTIFICATES | 131 |

[London #297777 v7]

i

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| 36. | PARTIAL INVALIDITY | 131 |
| 37. | REMEDIES AND WAIVERS | 131 |
| 38. | AMENDMENTS AND WAIVERS | 131 |
| 39. | GOVERNING LAW | 135 |
| 40. | ENFORCEMENT | 135 |
| 41. | COUNTERPARTS | 135 |
| SCHEDULE 1 THE ORIGINAL PARTIES | | 136 |
| SCHEDULE 2 CONDITIONS PRECEDENT | | 137 |
| SCHEDULE 3 REQUESTS | | 141 |
| SCHEDULE 4 MANDATORY COST FORMULAE | | 144 |
| SCHEDULE 5 FORM OF TRANSFER AGREEMENT | | 147 |
| SCHEDULE 6 FORM OF ACCESSION LETTER | | 149 |
| SCHEDULE 7 FORM OF RESIGNATION LETTER | | 150 |
| SCHEDULE 8 FORM OF COMPLIANCE CERTIFICATE | | 151 |
| SCHEDULE 9 LMA FORM OF CONFIDENTIALITY UNDERTAKING | | 152 |
| SCHEDULE 10 TIMETABLES | | 156 |
| SCHEDULE 11 AGREED SECURITY PRINCIPLES | | 157 |
| SCHEDULE 12 TRANSACTION SECURITY | | 161 |
| SCHEDULE 13 PERFECTION REQUIREMENTS | | 162 |

[London #297777 v7]

ii

THIS AGREEMENT is dated 13 August 2007 and made between:

(1)    MALTBY INVESTMENTS LIMITED, a company incorporated in England and Wales with company registration number 6226775 and registered office at One South Place, London EC2M 2WG (the "Parent" and the "Borrower");

(2)    MALTBY LIMITED, a company registered in England and Wales with company registration number 6226803 and registered office at One South Place, London EC2M 2WG (the "Company");

(3)    CITIGROUP GLOBAL MARKETS LIMITED as mandated lead arranger (the "Arranger");

(4)    THE FINANCIAL INSTITUTIONS listed in Part II of Schedule 1 (*The Original Parties*) as lenders (the "Original Lenders");

(5)    CITIBANK INTERNATIONAL PLC as agent of the Lenders (the "Agent"); and

(6)    CITIBANK, N.A., LONDON BRANCH as security agent for the Secured Parties (the "Security Agent").

IT IS AGREED as follows:

## SECTION 1
## INTERPRETATION

1.    **DEFINITIONS AND INTERPRETATION**

1.1    Definitions

In this Agreement:

"**A&R Arrangements**" means any arrangement (including by way of Joint Venture) with an artist and repertoire executive entered into in the ordinary course of the Group's music business and consistent with past practices.

"**Acceptable Bank**" means:

(a)    a bank or financial institution which has a rating for its long-term unsecured and non credit-enhanced debt obligations of A+ or higher by S&P or Fitch or A1 or higher by Moody's or a comparable rating from an internationally recognised credit rating agency; or

(b)    any other bank or financial institution approved by the Agent.

"**Accession Letter**" means a document substantially in the form set out in Schedule 6 (*Form of Accession Letter*) or such other form as may be agreed between the Agent and the Company.

"**Accounting Principles**" means accounting principles, policies, standards and practices which are generally accepted in the United Kingdom as at the Closing Date and approved or adopted by the Accounting Standards Board including IFRS.

"**Accounting Reference Date**" means 31 March.

"**Accounting Reference Period**" means each 12-month period ending on an Accounting Reference Date.

[London #297777 v7]

1

**A-6284**

"**Acquisition**" means the acquisition by the Company of the entire issued share capital of the Target which, if such acquisition is contemplated by way of a Scheme, will involve the cancellation of the Target Shares and the issue of the New Shares.

"**Acquisition Costs**" means all fees, costs and expenses, stamp, registration and other Taxes incurred (or required to be paid) by the Company or any other member of the Group in connection with the Acquisition or the Transaction Documents.

"**Acquisition Documents**" means the Scheme Documents or the Offer Documents, as the case may be.

"**Acquisition Facility**" means the term loan facility made available under the Senior Facilities Agreement as described in Clause 2.1(a)(ii) (*The Facilities*) of the Senior Facilities Agreement, as such facility may be increased from time to time pursuant to Clause 2.4 (*Additional Acquisition Facility Commitments*) of the Senior Facilities Agreement.

"**Acquisition Facility Commitment**" means:

(a)     in relation to an Original Lender under the Senior Facilities Agreement, the amount in the Base Currency (as defined in the Senior Facilities Agreement) set opposite its name under the heading "Acquisition Facility Commitment" in Part II of Schedule 1 (*The Original Parties*) of the Senior Facilities Agreement) and the amount of any other Acquisition Facility Commitment transferred to it under the Senior Facilities Agreement or allocated to it pursuant to Clause 2.4 (*Additional Acquisition Facility Commitments*) of the Senior Facilities Agreement; and

(b)     in relation to any other Lender under the Senior Facilities Agreement, the amount in the Base Currency (as defined in the Senior Facilities Agreement) of any Acquisition Facility Commitment transferred to it under the Senior Facilities Agreement or allocated to it pursuant to Clause 2.4 (*Additional Acquisition Facility Commitments*) of the Senior Facilities Agreement,

to the extent not cancelled, reduced or transferred by it under the Senior Facilities Agreement.

"**Acquisition Facility Loan**" means a loan made or to be made under the Acquisition Facility or the principal amount outstanding for the time being of that loan.

"**Act**" means the Companies Act 1985, as amended.

"**Additional Acquisition Facility Commitment**" means:

(a)     in relation to an entity identified as a Lender under the Senior Facilities Agreement in an Additional Acquisition Facility Commitment Notice (as defined in the Senior Facilities Agreement), the amount set out in such Additional Acquisition Facility Commitment Notice as its Additional Acquisition Facility Commitment and the amount of any other Additional Acquisition Facility Commitment transferred to it under the Senior Facilities Agreement; or

(b)     in relation to any other Lender under the Senior Facilities Agreement, the amount of any Additional Acquisition Facility Commitment transferred to it under the Senior Facilities Agreement to the extent not cancelled, reduced or transferred by it under the Senior Facilities Agreement.

"**Additional Acquisition Funding**" means:

(a)     the net proceeds of any issue and sale of Capital Stock in the Parent, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant acquisition and not used for any other purposes; plus

2

Confidential

(b) the net proceeds of any Shareholder Debt, to the extent that all or part of such proceeds have been designated as being for the purposes of the relevant acquisition and not used for any other purposes; plus

(c) up to 75 per cent. of the amount of Retained Excess Cashflow; plus

(d) the amount of any drawings under the Acquisition Facility provided that no more than £100 million of the drawings under the Acquisition Facility will be available for the acquisition of a business carrying on the activities of the Recorded Music Division.

"**Additional Assets**" means:

(a) any property or assets used or to be used by any member of the Group or otherwise useful in a Related Business;

(b) the Capital Stock of a person that is engaged in a Related Business and becomes a member of the Group as a result of the acquisition of such Capital Stock by another member of the Group; or

(c) Capital Stock constituting a minority interest in any person that at such time is a member of the Group.

"**Additional Cost Rate**" has the meaning given to it in Schedule 4 *(Mandatory Cost Formulae)*.

"**Additional Guarantor**" means a person which becomes a Guarantor in accordance with Clause 28.2 *(Additional Guarantors)*.

"**Additional Pensions Equity**" has the meaning given to it in Clause 25.30 *(Pension obligations)*.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Agent's Spot Rate of Exchange**" means the Agent's spot rate of exchange (as certified by the Agent to the Company at the relevant time) for the purchase of the relevant currency with the Base Currency in the London foreign exchange market at or about 11:00 a.m. on a particular day or such other rate as the Agent shall reasonably determine and agree with the Obligors' Agent.

"**Agreed Security Principles**" means the principles set out in Schedule 11 *(Agreed Security Principles)*.

"**Ancillary Commitment**" means, in relation to an Ancillary Lender and an Ancillary Facility, the maximum Base Currency Amount (as defined in the Senior Facilities Agreement) which that Ancillary Lender has agreed (whether or not subject to satisfaction of conditions precedent and whether or not utilised) to make available from time to time under an Ancillary Facility and which has been authorised as such under Clause 10 *(Ancillary Facilities)* of the Senior Facilities Agreement, to the extent that amount is not cancelled or reduced under the Senior Facilities Agreement or the Ancillary Documents relating to that Ancillary Facility.

"**Ancillary Document**" means each document relating to or evidencing the terms of an Ancillary Facility.

"**Ancillary Facility**" means any ancillary facility made available by an Ancillary Lender under the Senior Facilities Agreement in accordance with Clause 10 *(Ancillary Facilities)* of the Senior Facilities Agreement.

"**Ancillary Lender**" means each Lender under the Senior Facilities Agreement (or Affiliate of such Lender) which makes available an Ancillary Facility in accordance with Clause 10 *(Ancillary Facilities)* of the Senior Facilities Agreement.

"**Ancillary Outstandings**" means, at any time, in relation to an Ancillary Lender and an Ancillary Facility the aggregate of the equivalents (as calculated by that Ancillary Lender, acting reasonably) in

3

the Base Currency (as defined in the Senior Facilities Agreement) of the following amounts outstanding under that Ancillary Facility then in force:

(a)     the principal amount under each overdraft facility and on-demand short term loan facility (net of any credit balances on any account of any borrower of an Ancillary Facility with the Ancillary Lender making available that Ancillary Facility to the extent that such credit balance is freely available to be set off by that Ancillary Lender against liabilities owed to it by that borrower under that Ancillary Facility);

(b)     the face amount of each guarantee, bond and letter of credit under that Ancillary Facility (as the same may be reduced in accordance with its terms and only to the extent that cash cover has not been provided with respect thereto); and

(c)     the amount fairly representing the aggregate exposure (excluding interest and similar charges) of that Ancillary Lender under each other type of accommodation provided under that Ancillary Facility,

in each case as determined by such Ancillary Lender in accordance with the relevant Ancillary Document, acting reasonably in accordance with its normal banking practice but excluding any interest, fees and similar charges.

"**Auditors**" means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche (or their Affiliates) or such other firm approved in advance by the Majority Lenders (such approval not to be unreasonably withheld or delayed).

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the Signing Date to and including the earlier of:

(a)     the last day of the Certain Funds Period; and

(b)     the date on which the Offer lapses or is withdrawn or, if the Acquisition is intended to be completed as a Scheme, the date on which the Scheme lapses or is withdrawn.

"**Available Commitment**" means a Lender's Commitment under the Facility minus:

(a)     the Base Currency Amount of its participation in any outstanding Utilisations under the Facility; and

(b)     in relation to any proposed Utilisation, the Base Currency Amount of its participation in any other Utilisations that are due to be made under the Facility on or before the proposed Utilisation Date.

"**Available Facility**" means the aggregate for the time being of each Lender's Available Commitment.

"**Average Life**" means, as of the date of determination, with respect to any Financial Indebtedness, the quotient obtained by dividing (x) the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of or redemption or similar payment with respect to such Financial Indebtedness multiplied by the amount of such payment by (y) the sum of all such payments.

"**Base Case Model**" means the section of the financial model delivered to the Arranger on or before the Closing Date and described as the 'bank case model', including profit and loss and cashflow projections in agreed form relating to the Group (for these purposes assuming completion of the Acquisition).

"**Base Currency**" means Sterling.

"**Base Currency Amount**" means, in relation to a Utilisation, the amount specified in the Utilisation Request delivered by or on behalf of the Borrower for that Utilisation as adjusted to reflect any repayment, prepayment, consolidation or division of a Utilisation.

"**Basel II Costs**" has the meaning given to it in paragraph (b)(iv) of Clause 17.1 (*Increased Costs*).

"**Break Costs**" means the amount (if any) by which:

(a)     the interest (excluding the Margin and the Mandatory Costs) which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Budget**" means:

(a)     in relation to the period from the Signing Date to 31 March 2008, the Base Case Model to be delivered to the Agent pursuant to Clause 4.1 (*Initial conditions precedent*); and

(b)     in relation to any other period, any budget delivered by the Parent to the Agent in respect of that period pursuant to Clause 23.4 (*Budget*).

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and:

(a)     (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; or

(b)     (in relation to any date for payment or purchase of euro) any TARGET Day.

"**Business Separation**" means the legal, contractual and operational separation of the Music Publishing Division from the rest of the business carried on by the Group in order to achieve the Permitted Securitisation within the time period contemplated in the Securitisation Bridge Facility Agreement.

"**Capital Lease Obligation**" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with the Accounting Principles. The amount of Financial Indebtedness represented by such obligation shall be the capitalised amount of such obligation determined in accordance with the Accounting Principles and the maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Capital Stock**" of any person means any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"**Cash Equivalent Investments**" means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank;

5

(b)     any investment in marketable debt obligations issued or guaranteed by the government of the United States, the United Kingdom, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

(i)     for which a recognised trading market exists;

(ii)    issued by an issuer incorporated in the United States, the United Kingdom, any member state of the European Economic Area or any Participating Member State;

(iii)   which matures within one year after the relevant date of calculation; and

(iv)    which has a credit rating of either A-1 or higher by S&P or Fitch or P-1 or higher by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d)     any investment accessible within 30 days in money market funds which (i) have a credit rating of either A-1 or higher by S&P or Fitch or P-1 or higher by Moody's and (ii) invest substantially all their assets in securities of the types described in sub-paragraphs (a) to (c) above; or

(e)     any other debt security approved by the Majority Lenders,

in each case, to which any member of the Group is beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than one arising under the Transaction Security Documents).

"**Cash Margin**" means:

(a)     prior to the Extension Date, 4.50 per cent. per annum increasing by 0.50 per cent. per annum at the end of each 3 month period commencing on the Closing Date; and

(b)     on or after the Extension Date, 4.50 per cent. per annum.

"**Centre of Main Interests**" means the "centre of main interests" for the purposes of Council Regulation (EC) No. 1346/2000 of 29 May 2000.

"**Certain Funds Period**" means the period from and including the Signing Date to and including the earlier of:

(a)     the date falling 270 days after the date of the Commitment Letter;

(b)     the date falling 15 days after the Closing Date;

(c)     if the Acquisition proceeds by way of an Offer, the date on which the Offer lapses or is withdrawn; and

(d)     if the Acquisition proceeds by way of the Scheme, the date on which the Scheme lapses, is withdrawn or is rejected by the court.

"**Change of Control**" has the meaning given to it in Clause 10.1 (*Change of Control*).

Confidential

CITI-TF 00701907

"**Charged Property**" means all of the assets of the Obligors over which from time to time Security is, or is expressed to be, created pursuant to any Transaction Security Document.

"**Clean-Up Date**" means the date falling 120 days after the Unconditional Date.

"**Clean-Up Period**" means the period commencing on the Unconditional Date and ending on the Clean-Up Date.

"**Closing Date**" means:

(a)     (in the case of the Scheme) the date falling no later than 14 days from the Effective Date, being the date upon which the consideration for the Acquisition is to be paid; or

(b)     (in the case of an Offer) the date on which the Company has paid for the shares of the Target tendered as at the Unconditional Date and, as a consequence, the Target becomes a subsidiary of the Company.

"**Commitment**" means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Commitment transferred to it under this Agreement, and

(b)     in relation to any other Lender, the amount in the Base Currency of any Commitment transferred to it under this Agreement,

          to the extent not cancelled, reduced or transferred by it under this Agreement.

"**Commitment Letter**" means the commitment letter dated 21 May 2007 from the Arranger to the Company relating to the Facility (as amended, supplemented or restated from time to time).

"**Company**" means Maltby Limited, a company registered in England and Wales with company registration number 6226803 and registered office at One South Place, London EC2M 2WG.

"**Compliance Certificate**" means a certificate substantially in the form set out in Schedule 8 (*Form of Compliance Certificate*) or such other form as may be agreed between the Agent and the Company.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in the form set out in Schedule 9 (LMA Form of Confidentiality Undertaking) or in a recommended form of the LMA from time to time or in any other form agreed between the Company and the Agent.

"**Consolidated Cash and Cash Equivalents**" has a meaning given to it in Clause 24.1 (*Financial definitions*).

"**Consolidated Incurrence EBITDA**" for any period, means the sum of Consolidated Profit for that period, plus the following (to the extent deducted in calculating such Consolidated Profit), without duplication:

(a)     all income or corporate tax expense of the Group;

(b)     Consolidated Interest Expense plus any capitalised expense and any non-cash interest (including interest on Shareholder Debt);

(c)     depreciation and amortisation expense of the Group;

(d)     the amount of any minority interest expense deducted in calculating Consolidated Profit;

7

(e)    Management Fees;

(f)    unrealized non-cash gains (losses) resulting from foreign currency balance sheet adjustments and unrealized gains (losses) relating to interest rate Treasury Transactions in each case required by the Accounting Principles;

(g)    all other non-cash charges of the Group (excluding any such non-cash charge to the extent that it represents an accrual of or reserve for cash expenditures in any future period);

(h)    Acquisition Costs and any fees, expenses, charges or other costs relating to equity or debt financings, investments or other acquisitions (including amounts paid in connection with the acquisition or retention of one or more individuals comprising part of the management team retained to manage the acquired business, provided that such payments are made at the time of such acquisition and are consistent with the customary practice in the industry at the time of such acquisition), whether or not successful, or the non-cash amortisation thereof; and

(i)    any non-recurring redundancy and restructuring charge not otherwise included in the preceding clauses (g) and (h),

in each case for such period. Notwithstanding the foregoing, the provision for taxes based on the income or profits of, and the depreciation, amortisation, exchange gains and losses and non-cash charges and restructuring charge of, a member of the Group shall be added to Consolidated Profit to compute Consolidated Incurrence EBITDA only to the extent (and in the same proportion, including by reason of minority interests) that the net profit or loss of such member of the Group was included in calculating Consolidated Profit.

"**Consolidated Interest Expense**" means, for any period, the total interest expense of the Group for such period, plus, to the extent not included in such total interest expense, and to the extent incurred by a member of the Group, without duplication:

(a)    interest expense attributable to Capital Lease Obligations;

(b)    amortisation of debt discount;

(c)    capitalised interest (but excluding such interest on Shareholder Debt);

(d)    non-cash interest expense (but excluding such interest in relation to Shareholder Debt);

(e)    commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

(f)    net payments pursuant to Treasury Transactions but excluding realized and unrealized foreign exchange gains and losses with respect to Treasury Transactions and unrealized gains and losses associated with interest rate Treasury Transactions in each case in accordance with the Accounting Principles;

(g)    dividends accrued in respect of Disqualified Stock of the Parent or in respect of Preferred Stock of any member of the Group, in either case held by persons other than a member of the Group (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Parent); and

(h)    interest accruing on any Financial Indebtedness of any other person to the extent such Financial Indebtedness is guaranteed by (or secured by the assets of) a member of the Group.

"**Consolidated Leverage Debt**" means the sum of the aggregate outstanding Financial Indebtedness of the Group, less Consolidated Cash and Cash Equivalents, as of the relevant date of calculation on a consolidated basis in accordance with the Accounting Principles.

[London #297777 v7]

8

**"Consolidated Operating Cashflow"** has the meaning given to that term in Clause 24.1 (*Financial definitions*).

**"Consolidated Profit"** means for any period, the profit (loss) from continuing operations of the Group on a consolidated basis for such period; provided, however, that there shall not be included in such Consolidated Profit:

(a)     any net profit (or loss) of any person (other than the Parent) if such person is not a Subsidiary, except that subject to the exclusion contained in paragraph (c) below, the Parent's equity in the net profit of any such person for such period shall be included in such Consolidated Profit up to the aggregate amount of cash or Cash Equivalent Investments actually distributed by such person during such period to the Parent or a member of the Group as a dividend or other distribution (subject, in the case of a dividend or other distribution paid to a member of the Group, to the limitations contained in paragraph (b) below);

(b)     any net profit (or loss) of any member of the Group (other than a member of the Group which has granted an unconditional unlimited guarantee of the obligations of the other Obligors under the Finance Documents) to the extent the declaration or payment of dividends or making of distributions to the Parent by that member of the Group of its net profit is not at the date of determination permitted, directly or indirectly by any restriction or encumbrance, unless such restriction or encumbrance constitutes a Permitted Restriction; provided, however, that:

    (i)     Consolidated Profit of the relevant member of the Group for any relevant period shall be increased by the amount of dividends, distributions or other payments (other than extensions of credit) actually paid in cash or Cash Equivalent Investments (or converted during such period into cash or Cash Equivalent Investments) to such member of the Group or (subject to the limitations of this paragraph (b)) a Subsidiary of such member of the Group; and

    (ii)     the Parent's equity in a net loss of any such member of the Group for such period shall be included in determining such Consolidated Profit;

    (iii)     any net after-tax gain (or loss) realized upon (A) the sale or other disposition of any assets of the Issuer, its consolidated Subsidiaries or any other Person (including pursuant to any sale-and-leaseback arrangement) which is not sold or otherwise disposed of in the ordinary course of business or (B) the sale or other disposition of any Capital Stock of any Person;

(c)     the non-cash impact of capitalised interest on Shareholder Debt;

(d)     any net after-tax extraordinary gain or loss;

(e)     any non-cash compensation expense realized for grants of performance shares, stock options, restricted stock or other rights to officers, directors and employees of a member of the Group, provided that such shares, options, stock or other rights can be redeemed at the option of the holder only for shares of the Parent (other than Disqualified Stock);

(f)     the cumulative effect of any change in Accounting Principles after the Signing Date;

(g)     any net after tax gains (loss) from any write-off or forgiveness of Financial Indebtedness;

(h)     the net profit of any person acquired in a pooling of interests transaction shall not be included for any period prior to the date of such acquisition; and

(i)     the effect of any non-cash items resulting from:

9

CITI-TF 00701910

A-6292

> (i)   any amortisation, write-up, write-down or write-off of assets (including deferred financing costs) in connection with any past or future acquisition, merger, consolidation or similar transaction; or
>
> (ii)   any unusual, exceptional or non-recurring gains, losses or charges.

"**Constitutional Documents**" means the memorandum and articles of association of the Company, the Parent and Holdco together with the certificate of incorporation of the Company, the Parent and Holdco and certificates on change of name (if any) of the Company, the Parent and Holdco.

"**Court Order**" means an order of the High Court of Justice in England and Wales sanctioning the Scheme under Section 425 of the Act.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 0 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default save and except that, if by reason of the express provisions of any Finance Document, a matter, circumstance or thing would not be an Event of Default unless a materiality threshold is exceeded then the occurrence of any such matter, circumstance or thing shall not be a Default unless and until that materiality threshold is exceeded.

"**Deferred Purchase Price of a Permitted Investment**" means in respect of a Permitted Investment, the portion of the purchase price the payment of which is deferred pursuant to the terms of the acquisition documentation in the form of a contractual adjustment to the purchase price the amount of which is not certain at the time of completion of such Permitted Investment. For the avoidance of doubt a Deferred Purchase Price of a Permitted Investment shall exclude any deferral of all or part of the purchase price in the nature of a loan from the seller or as a method of raising finance or of financing all or part of the purchase price with the exception of a deferral not exceeding fifteen (15) Business Days between the date on which the amount of a Deferred Purchase Price of a Permitted Investment becomes certain and the date on which it is actually paid.

"**Delegate**" means any delegate, agent or attorney appointed by the Security Agent.

"**Disinterested Director**" means, with respect to any transaction or series of related transactions, a member of the relevant company's board of directors who does not have any material direct or indirect financial interest in or with respect to such transaction or series of related transactions or is not an Affiliate, or an officer, director or employee of any person who has any direct or indirect financial interest in or with respect to such transaction or series of related transactions.

"**Disqualified Stock**" means, with respect to any person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(a)   matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(b)   is convertible or exchangeable at the option of the holder for Financial Indebtedness or Disqualified Stock; or

(c)   is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part,

in each case on or prior to the first anniversary of the Final Maturity Date provided that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the first anniversary of the Final Maturity Date shall not constitute Disqualified Stock if:

Confidential

<ol type="i">
<li>the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favourable to the holders of such Capital Stock than the terms of the Finance Documents; and</li>
<li>any such requirement only becomes operative after compliance with the terms of the Finance Documents.</li>
</ol>

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to this Agreement provided that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such person.

"**Documentary Conditions**" means the documents listed paragraphs 1, 2(a) to (d) (inclusive), 3 and 4(a) to (e) (inclusive) in Part I of Schedule 2 (*Conditions Precedent*).

"**Effective Date**" means the date on which the Court Order (or an office copy of the Court Order) is filed with the Registrar of Companies, as required by Section 425 of the Act.

"**Environmental Claim**" means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

"**Environmental Law**" means any applicable law or regulation which relates to:

(a)    the pollution or protection of the environment;

(b)    harm to or the protection of human health;

(c)    the conditions of the workplace relating to health and safety; or

(d)    any emission or substance capable of causing harm to any living organism or the environment.

"**Environmental Permits**" means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Target Group conducted on or from the properties owned or used by any member of the Target Group.

"**Equity Interests**" of any person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interest in (however designated) the equity of such person, including any Preferred Stock, any limited or general partnership interest and any limited liability company membership interest, and including (other than for the purposes of the definition of "Financial Indebtedness" and any other definitions in this Clause 1.1 or in Clause 24.1 (*Financial definitions*)), any non-cash interest bearing debt securities (but, for the avoidance of doubt excluding any cash interest bearing debt securities convertible into such equity).

"**Event of Default**" means any event or circumstance specified as such in Clause 0 (*Events of Default*).

"**Excess Cashflow**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Excess Takeout Proceeds**" has the meaning given to that term in Clause 10.2 (*Disposal, Insurance, Recovery Proceeds and Excess Cashflow*).

"**Excluded Proceeds**" has the meaning given to that term in Clause 10.4 (*Excluded Proceeds and Excess Takeout Proceeds*).

11

CITI-TF 00701912

"**Existing Financial Indebtedness**" means the Financial Indebtedness of the Target Group which is existing on the Unconditional Date or, as the case may be, on the Effective Date.

"**Extension Date**" means the first anniversary of the first Financial Quarter Ending Date to occur after the Closing Date.

"**Facility**" means the term loan facility made available under this Agreement as described in Clause 2.1 *(The Facility)*.

"**Facility Office**" means the office notified by a Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five (5) Business Days' written notice) as the office through which it will perform its obligations under this Agreement.

"**Fee Letter**" means any letter or letters (as the same may be amended from time to time) between, as the case may be, the Arranger and the Company or the Agent and the Company, setting out any of the fees referred to in Clause 15 *(Fees)* or any other fees payable by the Company in connection with the Facility and/or this Agreement.

"**Final Maturity Date**" means:

(a)     the first anniversary of the first Financial Quarter Ending Date to occur after the Closing Date; or

(b)     if the Loans are extended in accordance with Clause 6 *(Extension of the Final Maturity Date)* on the date referred to in paragraph (a) above, the tenth anniversary of the first Financial Quarter Ending Date to occur after the Closing Date.

"**Finance Document**" means:

(a)     this Agreement;

(b)     any Accession Letter;

(c)     the Commitment Letter;

(d)     any Fee Letter;

(e)     any Hedging Agreement;

(f)     the Intercreditor Agreement;

(g)     any Resignation Letter;

(h)     any Transaction Security Document; and

(i)     any other document designated as a "Finance Document" by the Agent and the Company.

"**Finance Party**" means the Agent, the Arranger, the Security Agent, a Lender or a Hedge Counterparty.

"**Financial Indebtedness**" means, with respect to any person on any date of determination (without duplication):

(a)     the principal in respect of:

(i)     indebtedness of such person for money borrowed; and

[London #297777 v7]

Confidential

CITI-TF 00701913

(ii)   indebtedness evidenced by notes, debentures, bonds (other than performance bonds issued by a member of the Group in relation to the obligations of another member of the Group) or other similar instruments for the payment of which such person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)   all Capital Lease Obligations of such person;

(c)   all obligations of such person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such person and all obligations of such person under any title retention agreement, in each case that are due more than 12 months after the date on which such property is acquired (but excluding trade accounts payable arising in the ordinary course of business);

(d)   all obligations of such person for the reimbursement of any obligor on any letter of credit, bankers' acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in paragraphs (a) to (c) above) entered into in the ordinary course of business of such person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following payment on the letter of credit);

(e)   the amount of all obligations of such person with respect to the redemption, repayment, liquidation or other repurchase of any Disqualified Stock of such person or, with respect to any Subsidiary of such person, any Preferred Stock or if less (or if such Capital Stock has no fixed price), to the involuntary redemption, repayment or other purchase price thereof calculated in accordance with the terms of such Capital Stock if such Capital Stock were redeemed, repaid or repurchased on such date of determination, or if determined by the value of such Capital Stock, the fair market value of such Capital Stock as determined in good faith by the Board of Directors (but in each case, excluding accrual of dividends);

(f)   all obligations of the type referred to in paragraphs (a) to (e) above of other persons and all dividends of other persons for the payment of which, in either case, such person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise;

(g)   all obligations of the type referred to in paragraphs (a) to (f) above of other persons secured by any Security on any property or asset of such person (whether or not such obligation is assumed by such person), the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured;

(h)   to the extent not otherwise included in this definition, Treasury Transactions of such person (the amount of any such Financial Indebtedness to be equal at any time to the notional amount of such Treasury Transactions); and

(i)   any liability of any member of the Group to the trustees of any pension fund to the extent such obligations are secured by any Security on any property or asset of such person, the amount of such obligation being deemed to be the lesser of the value (as determined in good faith by the Company) of such property or assets and the amount of the obligation so secured,

if and to the extent that any of the foregoing Financial Indebtedness (other than the Financial Indebtedness described in paragraphs (b), (d), (f), (h) or (i) or to the extent relating to any such clause) would appear as a liability on the balance sheet (excluding footnotes thereto) of the relevant person prepared in accordance with the Accounting Principles.

Notwithstanding the foregoing the term "Financial Indebtedness" will exclude contingent obligations incurred in the ordinary course of business. In addition, in connection with the purchase by a member of the Group of any business, the term "Financial Indebtedness" will exclude post-closing payment adjustments to

13

which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing provided that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 90 days thereafter.

The amount of Financial Indebtedness of any person at any date shall be the outstanding balance at such date of all unconditional obligations as described above provided that in the case of Financial Indebtedness sold at a discount, the amount of such Financial Indebtedness at any time will be the accreted value thereof at such time.

"**Financial Quarter**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**Financial Quarter Ending Date** " means each of 31 March, 30 June, 30 September and 31 December in each year.

"**Financial Year**" has the meaning given to that term in Clause 24.1 (*Financial definitions*).

"**First Utilisation Date**" means the date on which the first Utilisation is made under this Agreement.

"**Fitch**" means Fitch Ratings Ltd, or any successor to its rating business.

"**Funds Flow Statement**" means a funds flow statement detailing the proposed movement of funds on the Closing Date in agreed form.

"**Group**" means the Parent and its Subsidiaries from time to time including, for the avoidance of doubt, the Target and its Subsidiaries from the Effective Date or the Unconditional Date, as the case may be, but following the Separation Date, only the Parent and members of the Group which are in the Recorded Music Division shall be included in the definition of "Group" and not any Securitisation Entities and, for the avoidance of doubt, any Subsidiary of the Parent that is the Holding Company of any Securitisation Entity and not a Subsidiary of any Securitisation Entity will be a member of the Group both before and after the Separation Date.

"**Group Business**" means the business carried on by the Group as at the Closing Date.

"**Group Structure Chart**" means the group structure chart delivered to the Agent on or before the Closing Date.

"**Guarantor**" means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 28.3 (*Resignation of a Guarantor*).

"**Hedge Counterparty**" means a provider of hedging arrangements which has entered into those arrangements in accordance with this Agreement and which has become a party to the Intercreditor Agreement as a Hedge Counterparty in accordance with the provisions of the Intercreditor Agreement. For the avoidance of doubt this expression includes any person who was, at the time of entry into those hedging arrangements, but is no longer, a Lender or an Affiliate of a Lender.

"**Hedging Agreement**" means any master agreement, confirmation, schedule or other agreement in the agreed form entered into or to be entered into by the Company and a Hedge Counterparty for the purpose of hedging interest rate liabilities in relation to the Facility in accordance with Clause 25.9 (*Treasury Transactions*).

"**Hedging Letter**" means a letter between the Agent and the Parent in the agreed form dated on or before the Signing Date (and executed by the Parent) describing the hedging arrangements to be entered into in respect of the interest rate liabilities of the Borrower.

14

[London #297777 v7]

Confidential

CITI-TF 00701915

"**Holdco**" means Maltby Holdings Limited, a company registered in England and Wales with company registration number 6226830 and registered office at One South Place, London EC2M 2WG.

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary.

"**Implementation Agreement**" means an agreement between the Company and the Target in respect of the implementation of the Scheme.

"**Incur**" means issue, assume, guarantee, incur or otherwise become liable for (and, in the case of Financial Indebtedness for which interest is capitalised, accrued or accreted, the amount of such Financial Indebtedness Incurred shall at all times be the then-current accreted value or shall include all then capitalised or accrued interest) provided that any Financial Indebtedness of a person existing at the time such person becomes a member of the Group (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such person at the time it becomes a member of the Group.

"**Incurrence Leverage Ratio**" means, as of any date of determination, the ratio of:

(a)     Consolidated Leverage Debt at such date;

        to

(b)     the aggregate amount of Consolidated Incurrence EBITDA for the period of the most recent four consecutive Financial Quarters ending prior to the date of such determination for which internal consolidated financial statements of the Parent are available provided that for the purposes of calculating Consolidated Incurrence EBITDA for such period, if, as of such date of determination:

        (i)     if any member of the Group has Incurred any Financial Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Incurrence Leverage Ratio is an Incurrence of Financial Indebtedness, or both, Consolidated Incurrence EBITDA for such period shall be calculated after giving effect on a pro forma basis to such Financial Indebtedness as if such Financial Indebtedness had been Incurred on the first day of such period;

        (ii)    if any member of the Group has repaid, repurchased, defeased or otherwise discharged any Financial Indebtedness since the beginning of such period or if any Financial Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Financial Indebtedness Incurred under the Revolving Facility unless such Financial Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Incurrence Leverage Ratio, Consolidated Incurrence EBITDA for such period shall be calculated on a pro forma basis as if such discharge had occurred on the first day of such period and as if the relevant member of the Group had not earned the interest income actually earned during such period in respect of cash or Cash Equivalent Investments used to repay, repurchase, defease or otherwise discharge such Financial Indebtedness;

        (iii)   if since the beginning of such period a member of the Group shall have disposed of any asset or business, Consolidated Incurrence EBITDA for such period shall be reduced by an amount equal to Consolidated Incurrence EBITDA (if positive) directly attributable to the assets or business which are the subject of such disposal for such period, or increased by an amount equal to Consolidated Incurrence EBITDA (if negative), directly attributable thereto for such period;

        (iv)    if since the beginning of such period any member of the Group (by merger or otherwise) shall have made a Permitted Investment, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, which

15

constitutes all or substantially all of an operating unit of a business, Consolidated Incurrence EBITDA for such period shall be calculated after giving pro forma effect thereto (including the Incurrence of any Financial Indebtedness) as if such Investment or acquisition had occurred on the first day of such period; and

(v)    if since the beginning of such period any person (that subsequently became a member of the Group or was merged with or into a member of the Group since the beginning of such period) shall have disposed of any asset or business, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by a member of the Group during such period, Consolidated Incurrence EBITDA for such period shall be calculated after giving pro forma effect thereto as if such disposal, Investment or acquisition had occurred on the first day of such period.

For the purposes of this definition, whenever 'pro forma effect' is to be given to an acquisition of assets and the amount of profit or earnings relating thereto, the pro forma calculations shall give effect to all cost savings and synergies reasonably expected to be realized from such acquisition within the first 12 months after closing such acquisition and shall be determined in good faith by a responsible financial or accounting officer. If any Financial Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Financial Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Agreement applicable to such Financial Indebtedness if such Hedging Agreement has a remaining term in excess of 12 months). For the purposes of this definition, whenever pro forma effect is to be given to any Financial Indebtedness Incurred pursuant to a revolving credit facility, the amount outstanding on the date of such calculation will be computed based on (1) the average daily balance of such Financial Indebtedness during such four Financial Quarters or such shorter period for which such facility was outstanding or (2) if such facility was created after the end of such four Financial Quarters, the average daily balance of such Financial Indebtedness during the period from the date of creation of such facility to the date of such calculation.

"**Independent Financial Advisor**" means an investment banking firm, accounting firm or appraisal firm of international standing provided that such firm is not an Affiliate of a member of the Group.

"**Information Memorandum**" means the document in the form approved by the Company concerning the Original Obligors and the Target Group which is to be prepared in relation to this transaction and distributed by the Arranger prior to the Syndication Date in connection with the syndication of the Facility.

"**Information Package**" means the Reports and the Base Case Model.

"**Intellectual Property**" means:

(a)    any patents, trade marks, service marks, designs, business names, copyrights, design rights, moral rights, inventions, know-how and other intellectual property rights and interests, whether registered or unregistered; and

(b)    the benefit of all applications and rights to use such assets of each member of the Group.

"**Intercreditor Agreement**" means the intercreditor agreement made or to be made between, among others, the Obligors, the Agent, the Security Agent, the Lenders and the Hedge Counterparties, in the agreed form.

"**Interest Period**" means, in relation to a Loan, each period determined in accordance with Clause 13 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with Clause 12.4 (*Default interest*).

"**Interim Facilities Agreement**" means the £2,850,000,000 interim facilities agreement dated 21 May 2007 entered into between, inter alios, the Company and the Arranger.

"**Interim Facility**" means each facility made available under the Interim Facilities Agreement.

16

[London #297777 v7]

"**Investment Documents**" means the Constitutional Documents and any agreement or instruments relating to the Shareholder Debt.

"**Investments**" means, with respect to any person, all investments by such person in other persons (including Affiliates) in the form of loans or other extension of credit (including guarantees or grants of Security and similar arrangements but excluding any loans or extensions of credit represented by a bank deposit other than a time deposit and the endorsement of negotiable instruments and documents in the ordinary course of business), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, artists, writers, composers or suppliers and commissions in each case, made in the ordinary course of business), purchases or other acquisitions for consideration of Financial Indebtedness, Capital Stock or other securities issued by any other person and investments that are required by Accounting Principles to be classified on the balance sheet (excluding the footnotes) of the relevant person in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. The acquisition by a member of the Group of a person that holds an Investment in a third person will be deemed to be an Investment by the relevant member of the Group in such third person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its fair market value at the time the Investment is made and without giving effect to subsequent changes in value.

"**Investors**" mean the Original Investors and their or any subsequent successors or permitted assigns or transferees and management of the Group (in their capacity as investors) including any vehicle holding the Equity Interests of management.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity that is not a member of the Group but shall not include arrangements formed in the ordinary course of the Group's business and consistent with past practices for the exploitation of individual album projects entered into in the ordinary course between a member of the Group and a third party owner or licensor of sound recordings or musical compositions, or in respect of which the only contribution to the arrangement by a member of the Group is of rights to exploit sound recordings or music compositions, and such arrangement does not constitute an entity with separate legal personality.

"**KPMG Financial Due Diligence Report**" means the Limited Scope Due Diligence Report dated 16 May 2007 prepared by KPMG and addressed to, and/or capable of being relied upon by, the Arranger, the Agent and the other Secured Parties.

"**Legal Due Diligence Report**" means the legal due diligence report dated 21 May 2007 prepared by Weil, Gotshal & Manges relating to the Target Group and addressed to, and/or capable of being relied upon by, the Arranger, the Agent and the other Secured Parties.

"**Legal Reservations**" means:

(a)     the principle that equitable remedies are remedies which may be granted or refused at the discretion of the court, the principle of reasonableness and fairness, the limitation of enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganisation, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors;

(b)     the time barring of claims under applicable limitation laws and defences of acquiescence, set-off or counterclaim (including the English Limitation Acts) and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of UK stamp duty may be void;

(c)     the principle that in certain circumstances security granted by way of fixed charge may be recharacterised as a floating charge or that security purported to be constituted as an assignment may be recharacterised as a charge;

17

CITI-TF 00701918

(d)  the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void;

(e)  the principle that an English court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant;

(f)  the principle that the creation or purported creation of security over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which security has purportedly been created;

(g)  similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(h)  any other general principles which are set out as qualifications or reservations (however described) as to matters of law in the legal opinions delivered to a Finance Party under the Finance Documents.

"**LEK Report**" means the Summary Music Market Outlook Report dated 15 May 2007 prepared by LEK and addressed to, and/or capable of being relied upon by, the Arranger, the Agent and the other Secured Parties.

"**Lender**" means:

(a)  any Original Lender; and

(b)  any bank, financial institution, trust, fund or other entity which has become a Party in accordance with Clause 27 (*Changes to the Lenders*),

which in each case has not ceased to be a Party in accordance with the terms of this Agreement.

"**Letter of Credit**" means:

(a)  a letter of credit substantially in the form set out in Schedule 11 (*Form of Letter of Credit*) of the Senior Facilities Agreement or in any other form requested by a Borrower under the Senior Facilities Agreement and agreed with the Issuing Bank (such consent not to be unreasonably withheld or delayed); or

(b)  any other guarantee, bond, indemnity, counter-indemnity, letter of credit, documentary or other credit or any other instrument of suretyship or payment, issued, undertaken or made by the Issuing Bank under the Revolving Facility in a form requested by a Borrower under the Senior Facilities Agreement and agreed with the Issuing Bank (such consent not to be unreasonably withheld or delayed).

"**LIBOR**" means, in relation to any Loan:

(a)  the applicable Screen Rate; or

(b)  (if no Screen Rate is available for the currency or Interest Period of that Loan) the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request quoted by the Reference Banks to leading banks in the London interbank market,

as of the Specified Time on the Quotation Day for the offering of deposits in the currency of that Loan and for a period comparable to the Interest Period for that Loan.

"**LMA**" means the Loan Market Association.

[London #297777 v7]

18