# 11-0126-cv

## United States Court of Appeals

*for the*

## Second Circuit

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED, TERRA FIRMA
INVESTMENTS (GP) 3 LIMITED,

*Plaintiffs-Appellants,*

– v. –

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP
GLOBAL MARKETS INC., CITIBANK, N.A.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 44 of 65 (Pages A-12901 to A-13200)

PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Summons and Complaint, dated December 11, 2009    A-39

Declaration of Adrian Briggs, for Defendants, in
Support of Motion to Dismiss, dated January 20,
2010, with attached *Curriculum Vitae* ..................    A-89

Declaration of Strauss, for Plaintiffs, in Opposition
to Defendants' Motion, dated February 2010,
with attached *Curriculum Vitae* ............................    A-106

Second Declaration of Adrian Briggs, for
Defendants, in Support of Motion to Dismiss,
dated February 11, 2010 ........................................    A-137

Defendants' Answer to Plaintiff's Complaint, dated
April 7, 2010 ...........................................................    A-149

Notice of Motion for Summary Judgment, by
Defendants, dated August 13, 2010 ......................    A-171

Defendants' Local Rule 56.1 Statement of
Undisputed Facts in Support of Motion for
Summary Judgment, dated August 13, 2010 ........    A-173

Declaration of Gary R. Carney, in Support of
Defendants' Motion for Summary Judgment,
dated August 13, 2010 ...........................................    A-199

Exhibit 1 to Carney Declaration -
Terra Firma Private Placement Memorandum,
dated April 2006 ....................................................    A-217

Exhibit 2 to Carney Declaration -
Terra Firma Capital Partners II Q3 2007 report,
dated November 2007 .............................................    A-318

ii

**Page**

Exhibit 3 to Carney Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006 ................................................ A-363

Exhibit 4 to Carney Declaration -
Letter from Kelly to EMI Group plc, dated
December 14, 2006 ................................................ A-366

Exhibit 5 to Carney Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006 ................................................ A-368

Exhibit 6 to Carney Declaration -
EMI Press Release, dated February 20, 2007 ........ A-369

Exhibit 7 to Carney Declaration -
Letter from Gildersleeve to Bronfman, dated
March 2, 2007 ........................................................ A-371

Exhibit 8 to Carney Declaration -
Minutes of March 1 and March 2, 2007 EMI
Group plc Directors meetings ................................ A-372

Exhibit 9 to Carney Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ........................................................ A-383

Exhibit 10 to Carney Declaration -
Witness statement of Nicoli, dated July 5, 2010 .... A-385

Exhibit 11 to Carney Declaration -
EMI Group plc Directors meeting, dated
April 20, 2007 ........................................................ A-396

Exhibit 12 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachment ............................ A-404

iii

**Page**

Exhibit 13 to Carney Declaration -
E-mail from Barak to Wormsley *et al.*, dated
April 20, 2007, with attachments........................... A-415

Exhibit 14 to Carney Declaration -
E-mail from Ashcroft to Wormsley *et al.*, dated
April 23, 2007, with attachment ........................... A-427

Exhibit 15 to Carney Declaration -
EMI News Release, dated May 4, 2007 ............... A-437

Exhibit 16 to Carney Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007.................................................... A-439

Exhibit 17 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
February 5, 2007................................................. A-441

Exhibit 18 to Carney Declaration -
Memorandum from Seymour to Punja, dated
March 2, 2007.................................................... A-457

Exhibit 19 to Carney Declaration -
E-mail from Reid to Seymour, dated
May 16, 2007..................................................... A-462

Exhibit 20 to Carney Declaration -
Music Industry Key Market Outlook Summary of
Findings prepared by L.E.K. Consulting, dated
May 15, 2007..................................................... A-656

Exhibit 21 to Carney Declaration -
Project Dice Limited Scope Financial Due
Diligence Report, dated May 17, 2007................. A-783

Exhibit 22 to Carney Declaration -
Project Mulberry Limited Scope Financial Due
Diligence Report, Volume I, dated May 4, 2007 ... A-887

iv

**Page**

Exhibit 23 to Carney Declaration -
E-mail from Bell to Wormsley and Smith, dated
May 9, 2007, with attachments ............................ A-929

Exhibit 24 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja *et al.*, dated May 6, 2007 ........................... A-937

Exhibit 25 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ..................................... A-939

Exhibit 26 to Carney Declaration -
E-mail from Randell to Slattery, dated
May 19, 2007 ........................................................ A-940

Exhibit 27 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 7, 2007 .......................................................... A-944

Exhibit 28 to Carney Declaration -
Terra Firma Investments (GP) 3 Limited Board of
Directors meeting, dated May 8, 2007 .................. A-954

Exhibit 29 to Carney Declaration -
Agreement between Terra Firma Investments
(GP) 2 Limited and Terra Firma Investments
(GP) 3 Limited and EMI Group plc regarding
Project Mulberry, dated May 9, 2007 ................... A-963

Exhibit 30 to Carney Declaration -
E-mail from Van der Spuy to Bell and Punja,
dated May 11, 2007, with attachments ................. A-976

Exhibit 31 to Carney Declaration -
E-mail from Van der Spuy to TFCP Managing
Directors and Ford, dated May 15, 2007, with
attachment ............................................................. A-995

v

**Page**

Exhibit 32 to Carney Declaration -
E-mail from Punja to Hands, dated May 17, 2007    A-1003

Exhibit 33 to Carney Declaration -
E-mail from Borrows to Bell, dated
April 26, 2007 ........................................................    A-1005

Exhibit 34 to Carney Declaration -
E-mail from Lee to Scelfo *et al.*, dated
May 2, 2007 ...........................................................    A-1006

Exhibit 35 to Carney Declaration -
E-mail from Fong to Vakilian, dated
May 15, 2007 .........................................................    A-1007

Exhibit 36 to Carney Declaration -
E-mail from Hayward-Cole to Bell, dated
May 4, 2007 ...........................................................    A-1008

Exhibit 37 to Carney Declaration -
E-mail from Ashcroft to Gildersleeve, dated
May 10, 2007 .........................................................    A-1009

Exhibit 38 to Carney Declaration -
E-mail from Wormsley to Smith, dated
May 6, 2007 ...........................................................    A-1011

Exhibit 39 to Carney Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 ...........................................................    A-1012

Exhibit 40 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice, dated May 8, 2007 ............................    A-1013

Exhibit 41 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 17, 2007 ...................................    A-1014

vi

**Page**

Exhibit 42 to Carney Declaration -
E-mail from Curtis to Klein, dated May 17, 2007 .   A-1015

Exhibit 43 to Carney Declaration -
E-mail from Van der Spuy to Hoang, dated May
18, 2007, with attachments ...................................   A-1016

Exhibit 44 to Carney Declaration -
E-mail from Ginsburg to Billington, dated
May 20, 2007........................................................   A-1020

Exhibit 45 to Carney Declaration -
E-mail from Govindia to Rawlings, Lorkin, and
Dolenec, dated May 20, 2007 ...............................   A-1022

Exhibit 46 to Carney Declaration -
E-mail from Rawlings to Dolenec, dated
May 20, 2007........................................................   A-1024

Exhibit 47 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007........................................................   A-1026

Exhibit 48 to Carney Declaration -
E-mail from Dolenec to Simpkin, dated
May 20, 2007........................................................   A-1029

Exhibit 49 to Carney Declaration -
E-mail from Ginsburg to Dolenec, dated
May 21, 2007........................................................   A-1033

Exhibit 50 to Carney Declaration -
E-mail from Quigley to O'Haire and Van der
Spuy, dated May 20, 2007 ....................................   A-1036

Exhibit 51 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 18, 2007........................................................   A-1041

vii

**Page**

Exhibit 52 to Carney Declaration -
E-mail from Khan to Dolenec *et al.*, dated
May 19, 2007 .......................................................... A-1202

Exhibit 53 to Carney Declaration -
E-mail from Dolenec to Hands, dated
May 20, 2007 .......................................................... A-1203

Exhibit 54 to Carney Declaration -
E-mail from Bell to Wormsley *et al.*, dated
May 16, 2007 .......................................................... A-1207

Exhibit 55 to Carney Declaration -
E-mail from Barak to Bell *et al.*, dated
May 18, 2007 .......................................................... A-1208

Exhibit 56 to Carney Declaration -
Minutes of EMI Group plc Directors meeting,
dated May 18, 2007 ................................................ A-1212

Exhibit 57 to Carney Declaration -
E-mail from Bell to Borrows, dated
May 17, 2007 .......................................................... A-1220

Exhibit 58 to Carney Declaration -
E-mail from Bell to Stewart and Barak, dated
May 18, 2007 .......................................................... A-1221

Exhibit 59 to Carney Declaration -
E-mail from Pryce to Hands, dated May 18, 2007 ... A-1225

Exhibit 60 to Carney Declaration -
E-mail from Stewart to Barak, dated
May 20, 2007 .......................................................... A-1226

Exhibit 61 to Carney Declaration -
E-mail from Shott to Bell, dated May 20, 2007,
with attachment...................................................... A-1231

viii

**Page**

Exhibit 62 to Carney Declaration -
E-mail from Wolf to Holt, dated May 20, 2007..... A-1235

Exhibit 63 to Carney Declaration -
E-mail from Gildersleeve to Ashcroft *et al.*, dated
May 20, 2007........................................................ A-1237

Exhibit 64 to Carney Declaration -
E-mail from Ashcroft to Stewart *et al.*, dated
May 20, 2007........................................................ A-1239

Exhibit 65 to Carney Declaration -
E-mail from Hands to Wormsley, dated
May 20, 2007........................................................ A-1241

Exhibit 66 to Carney Declaration -
E-mail from Punja to Van der Spuy *et al.*, dated
May 22, 2007........................................................ A-1245

Exhibit 67 to Carney Declaration -
Memorandum from Punja *et al.* to the IAC, dated
May 18, 2007........................................................ A-1246

Exhibit 68 to Carney Declaration -
Draft Minutes of a Terra Firma Investments (GP)
2 Limited Board of Directors meeting, dated
May 18, 2007........................................................ A-1247

Exhibit 69 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 18, 2007........................................................ A-1259

Exhibit 70 to Carney Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007........................................................ A-1271

ix

**Page**

Exhibit 71 to Carney Declaration -
Minutes of a meeting of the Investment Advisory
Committee of Terra Firma Capital Partners
Limited, dated May 20, 2007................................  A-1348

Exhibit 72 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Board of Directors meeting, dated
May 20, 2007.........................................................  A-1350

Exhibit 73 to Carney Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Board of Directors meeting, dated
May 20, 2007.........................................................  A-1354

Exhibit 74 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 21, 2007....................  A-1356

Exhibit 75 to Carney Declaration -
Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 3 Limited, dated May 21, 2007....................  A-1359

Exhibit 76 to Carney Declaration -
Letter from Stokes to EMI Group plc, dated
May 21, 2007.........................................................  A-1362

Exhibit 77 to Carney Declaration -
Recommended Cash Offer by Maltby Limited for
EMI Group plc.......................................................  A-1372

Exhibit 78 to Carney Declaration -
Minutes of a EMI Group plc Directors meeting,
dated May 21, 2007 ..............................................  A-1554

**x**

Page

Exhibit 79 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated June 28, 2007 .................... A-1563

Exhibit 80 to Carney Declaration -
E-mail from Vallance on behalf of Hands to TF
Team Dice *et al.*, dated June 14, 2007 ................... A-1567

Exhibit 81 to Carney Declaration -
Offer Update and Extension of the
Recommended Cash Offer by Maltby Limited for
EMI Group plc, dated July 5, 2007 ....................... A-1568

Exhibit 82 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 13, 2007 ................................................. A-1571

Exhibit 83 to Carney Declaration -
Update and Extension of the Recommended Cash
Offer by Maltby Limited for EMI Group plc,
dated July 20, 2007 ................................................. A-1574

Exhibit 84 to Carney Declaration -
Extension of the Recommended Cash Offer by
Maltby Limited for EMI Group plc, dated
July 28, 2007 .......................................................... A-1577

Exhibit 85 to Carney Declaration -
E-mail from Seaton to Foreman *et al.*, dated
August 1, 2007 ........................................................ A-1580

Exhibit 86 to Carney Declaration -
Maltby Capital Ltd. Annual Review for the Year
Ended 31 March 2008 ............................................ A-1590

xi

**Page**

Exhibit 87 to Carney Declaration -
EMI Business Description prepared by Terra
Firma .................................................................... A-1691

Exhibit 88 to Carney Declaration -
£1,175,000,000 Senior Facilities Agreement for
Maltby Limited, dated August 13, 2007 ............... A-1693

Exhibit 89 to Carney Declaration -
£1,410,000,000 Securitisation Bridge Facility
Agreement for Maltby Limited, dated
August 13, 2007 ................................................... A-1900

Exhibit 90 to Carney Declaration -
£155,000,000 Mezzanine Facility Agreement for
Maltby Limited, dated August 13, 2007 ............... A-2079

Exhibit 91 to Carney Declaration -
E-mail from Dowler to Hands, dated
May 21, 2007 ....................................................... A-2246

Exhibit 92 to Carney Declaration -
E-mail from Melvin to Hands *et al.*, dated
May 22, 2007 ....................................................... A-2248

Exhibit 93 to Carney Declaration -
E-mail from Aldred on behalf of Alexander to
Hands, dated September 24, 2007 ........................ A-2249

Exhibit 94 to Carney Declaration -
E-mail from Vallance to TF Team Dice, dated
September 25, 2007 .............................................. A-2250

Exhibit 95 to Carney Declaration -
E-mail from Draffan to Simpkin and Smith, dated
January 14, 2008 .................................................. A-2253

xii

**Page**

Exhibit 96 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 1, 2008 ...................................................... A-2254

Exhibit 97 to Carney Declaration -
E-mail from Womsley to Miles, dated
April 30, 2008 ......................................................... A-2256

Exhibit 98 to Carney Declaration -
E-mail from Wormsley to Hands, dated
February 6, 2009 ...................................................... A-2258

Exhibit 99 to Carney Declaration -
E-mail from Robert-Tissot to Hands, dated
February 6, 2009 ...................................................... A-2261

Exhibit 100 to Carney Declaration -
E-mail from Hands to Wormsley, dated
July 8, 2008 ............................................................ A-2263

Exhibit 101 to Carney Declaration -
E-mail from Wormsley to Cabrey, dated
July 1, 2008 ............................................................ A-2266

Exhibit 102 to Carney Declaration -
EMI Investment Structure Chart ............................ A-2269

Exhibit 103 to Carney Declaration -
November 2007 IAC EMI Update ......................... A-2270

Exhibit 104 to Carney Declaration -
Memorandum from Simpkin *et al.* to Leat *et al.*,
dated December 21, 2007 ...................................... A-2296

Exhibit 105 to Carney Declaration -
E-mail from Burns to Prior *et al.*, dated
July 4, 2008 ............................................................ A-2301

**xiii**

**Page**

Exhibit 106 to Carney Declaration -
Minutes of a meeting of the Board of Directors of
Maltby Capital Limited, dated March 6, 2009 ......    A-2307

Exhibit 107 to Carney Declaration -
Letter from Maltby Acquisitions Limited and
Maltby Investments Limited to Citibank
International plc, dated March 10, 2008 ................    A-2312

Exhibit 108 to Carney Declaration -
Letter from Citibank International plc to Maltby
Acquisitions Limited and Maltby Investments
Limited, dated March 17, 2009 .............................    A-2314

Exhibit 109 to Carney Declaration -
Compliance Certificate from Maltby Acquisitions
Limited to Citibank International plc, dated
May 14, 2009 .........................................................    A-2317

Exhibit 110 to Carney Declaration -
Letter from Sckerl to Chadd, dated
September 24, 2009 ................................................    A-2327

Exhibit 111 to Carney Declaration -
Letter from Maltby Investments Limited to
Citibank N.A., London Branch, dated
October 7, 2009 .....................................................    A-2329

Exhibit 112 to Carney Declaration -
Maltby Investments Limited Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ......................................................    A-2334

Exhibit 113 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated July 15, 2009 ...............................................    A-2479

xiv

**Page**

Exhibit 114 to Carney Declaration -
E-mail from Leat to Lynn, Cockerill, and
Simpkin, dated March 26, 2009 ............................ A-2480

Exhibit 115 to Carney Declaration -
E-mail from Simpkin to Cockerill and Lynn,
dated April 18, 2009 ............................................. A-2481

Exhibit 116 to Carney Declaration -
E-mail from Smith on behalf of Hands to Lynn
and Leat, dated August 19, 2009 .......................... A-2482

Exhibit 117 to Carney Declaration -
E-mail from Lo to Bazinet, Kulp, and Harlalka,
dated August 15, 2009 .......................................... A-2484

Exhibit 118 to Carney Declaration -
Article titled, "Terra Firma in EMI Restructuring
Talks With Citi," dated July 13, 2009 ................... A-2487

Exhibit 119 to Carney Declaration -
Citi Investment Research & Analysis Report
regarding Warner Music Group, dated
September 15, 2009 ............................................... A-2489

Exhibit 120 to Carney Declaration -
Michael Slattery's Project Dice notes ................... A-2510

Exhibit 121 to Carney Declaration -
Draft Minutes of a meeting of a Committee of the
Board of Directors of Terra Firma Investments
(GP) 2 Limited, dated May 23, 2007 .................... A-2558

Exhibit 122 to Carney Declaration -
Update to the IAC regarding Project Dice, dated
June 21, 2007 ....................................................... A-2560

xv

**Page**

Exhibit 123 to Carney Declaration -
Letter from Leat to Hands, dated
November 10, 2009 ................................................ A-2581

Exhibit 124 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Klein, dated May 18, 2007 .................................... A-2583

Exhibit 125 to Carney Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 18, 2007 ............................ A-2584

Exhibit 126 to Carney Declaration -
E-mail from Tabet to Hands, dated May 18, 2007. A-2586

Exhibit 127 to Carney Declaration -
Declaration of John Loveridge in Opposition to
Defendants' Motion to Dismiss executed on
February 3, 2010 and filed in this action on
February 4, 2010 .................................................... A-2588

Exhibit 128 to Carney Declaration -
Excerpts of The Takeover Code............................ A-2597

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-2602

Mark Nimrod Barak, dated July 15, 2010 ................ A-2611

Jason Bazinet, dated June 30, 2010 .......................... A-2617

Peter Edward Bell, dated June 22, 2010 ................... A-2631

Simon A. Borrows, dated June 25, 2010................... A-2702

Andre Bourbonnais, dated July 13, 2010.................. A-2779

Andrew Chadd, dated July 23, 2010
  (Reproduced herein at pp. CA-1-CA-53)

xvi

**Page**

Ricardo Hacelas Coats, dated June 23, 2010 ............. A-2795

Karen Dolenec, dated June 18, 2010 ........................ A-2799

John Gildersleeve, dated June 30, 2010 .................... A-2803

Guy Hands, dated July 15, 2010 ............................... A-2813

Guy Hayward-Cole, dated July 27, 2010 .................. A-2959

Elio Leoni-Sceti, dated June 25, 2010 ..................... A-2974

John Loveridge, dated July 30, 2010 ........................ A-2982

Bruce MacInnes, dated July 8, 2010 ........................ A-3027

Eric Nicoli, dated July 5, 2010 ................................. A-3039

Timothy Pryce, dated July 22, 2010 ........................ A-3087

Riaz Punja, dated July 28, 2010 ............................... A-3130

Michael Slattery, dated August 6, 2010 ................... A-3169

Martin David Stewart, dated July 7 and 8, 2010 ....... A-3177

Iain Stokes, dated August 6, 2010 ........................... A-3183

Kamal Fouad Tabet, dated July 29, 2010 ................. A-3238

Francois Van der Spuy, dated July 7, 2010 .............. A-3242

Julie Williamson, dated July 28, 2010 ..................... A-3267

Alexander Wolf, dated July 14, 2010 ....................... A-3280

David Wormsley, dated July 20, 2010 ..................... A-3305

Report Pursuant to Rule 44.1 of McQuater, dated
    July 30, 2010 ..................................................... A-3316

Appendix 1 —

*Curriculum Vitae* of Ewan McQuater QC ............... A-3340

xvii

**Page**

Appendix 2 —

*AIC Limited v ITS Testing Services (UK) Ltd* [2006]
    EWCA Civ 1601 .................................................... A-3346

*Uzinterimpex JSC v Standard Bank Plc* [2007]
    EWHC 1151 (Comm) ............................................ A-3455

*Raiffeisen Zentralbank Osterreich AG v The Royal
    Bank of Scotland Plc* [2010] EWHC 1392
    (Comm).................................................................. A-3493

*BSkyB Ltd v Sky Subscribers Services Limited*
    [2010] EWHC 86 .................................................. A-3606

*Re H and Others* (Minors) [1996] AC 563 ............... A-4074

*MCI WorldCom International Inc v Primus
    Telecommunications Inc* [2004] EWCA Civ 957 .. A-4105

*IFE Fund SA v Goldman Sachs International* [2006]
    EWHC 2887 (QB) (Comm), [2007] EWCA Civ
    811 ....................................................................... A-4119

*Derry v Peek* (1889) 14 App Cas 337 ....................... A-4163

*Angus v Clifford* [1891] 2 Ch 449 ............................ A-4207

*Armstrong v Strain* [1951] 1 TLR 856 ...................... A-4240

*Bradford Building Society v Borders* [1941] 2 All
    ER 205 .................................................................. A-4258

*Downs v Chappell* [1997] 1 WLR 426 ...................... A-4277

*Edgington v Fitzmaurice* (1882) 29 Ch Div 459 ....... A-4298

*Dadourian Group International Inc v Simms* [2009]
    EWCA Civ 169 .................................................... A-4325

xviii

**Page**

*JEB Fasteners v Marks Bloom & Co* [1983] 1 All
ER 583 ............................................. A-4395

*Avon Insurance v Swire Fraser* [2000] 1 All ER
(Comm) 573 ...................................... A-4403

*Renault UK Ltd v Fleetpro Technical Services Ltd*
[2007] EWHC 2541 (QB).................... A-4471

*Hedley Byrne & Co Ltd v Heller & Partners Ltd*
[1964] AC 465 ................................... A-4522

*Henderson v Merrett Syndicates Ltd* [1995] 2 AC
145 .................................................. A-4598

*Williams v Natural Life Foods* [1998] 1 WLR 830.... A-4661

*McNaughton Paper Group Ltd v Hicks Anderson &
Co* [1991] 2 QB 113........................... A-4671

*Bankers Trust International v Dharmala Sakti
Sejahtera* [1996] CLC 518.................... A-4688

*Valse Holdings SA v Merrill Lynch International
Bank Ltd* [2004] EWHC 2471 ............ A-4741

*Peekay Intermark v Australia and New Zealand
Banking Group* [2006] EWCA Civ 386.............. A-4779

*JP Morgan Chase Bank v Springwell Navigation
Corp* [2008] EWHC 1186 (Comm) ...... A-4803

*Titan Steel Wheels Limited v Royal Bank of Scotland
Plc* [2010] EWHC 211 (Comm) ........... A-5085

*Trident Turboprop (Dublin) Ltd v First Flight
Couriers Ltd* [2008] EWHC 1686 (Comm),
[2009] 1 All ER (Comm) 16, [2009] EWCA Civ
290 .................................................. A-5126

xix

Page

*IFE Fund SA v Goldman Sachs International* 1
 [2007] Lloyd's Rep 264 ......................................... A-5184

*William Sindall plc v Cambridgeshire County
 Council* [1994] 1 WLR 1016 ................................. A-5200

*Tudor Grange Holdings v Citibank* [1992] Ch 53 ..... A-5231

*OBG Ltd v Allen* [2007] UKHL 21 .......................... A-5250

*Mogul Steamship Co Ltd v McGregor Gow & Co*
 [1892] AC 25 ....................................................... A-5325

*Allen v Flood* [1898] AC 1 ....................................... A-5361

*Isaac Oren v Red Box Toy Factory* [1999] FSR 785 . A-5542

*RCA Corporation v Pollard* [1983] CH 135 ............. A-5553

*Future Investments SA v FIFA* [2010] EWHC 1019
 (Ch) .................................................................... A-5577

*Johnson v Gore Wood* [2002] 2 AC 1 ....................... A-5591

*Prudential Assurance Co Ltd v Newman Industries
 Ltd* (No. 2) [1982] Ch 204 .................................... A-5659

*Gardner v Parker* [2004] EWCA Civ 781 ................ A-5692

*Livingstone v Rawyards Coal Co* (1880) 5 App Cas
 25 ....................................................................... A-5708

*Smith New Court Securities v Citibank NA* [1997]
 AC 254 ................................................................ A-5727

*Chitty on Contracts*, 13th Edition, paragraphs 6-142
 and 6-158 ............................................................ A-5760

*Clerk & Lindsell on Torts*, 19th Edition, paragraphs
 8-101, 8-108, 18-01, 18-28, 18-32, 18-36, 18-37 .. A-5763

xx

|  | Page |
|---|---|
| *McGregor on Damages*, 17th Edition, paragraph 1-021 | A-5774 |
| *Halsbury's Laws of England*, 4th Edition, Vol 33, paragraph 614 | A-5777 |
| *Cartwright on Misrepresentation, Mistake and Non-Disclosure*, 2nd Edition, paragraph 6.12 | A-5780 |
| *The Unfair Contract Terms Act 1977* | A-5783 |
| Response of Plaintiffs to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated August 27, 2010 | A-5807 |
| Declaration of Kirsten Randell, in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated August 26, 2010 | A-5883 |
| Exhibit A to Randell Declaration - Handwritten Notes | A-5887 |
| Declaration of John Loveridge, in Support of Plaintiffs' Opposition to Motion for Summary Judgment, dated August 27, 2010 | A-5891 |
| Exhibit A to Loveridge Declaration - Senior Facilities Agreement, dated August 13, 2007 | A-5894 |
| Exhibit B to Loveridge Declaration - Securitisation Bridge Facility Agreement, dated August 13, 2007 | A-6101 |
| Exhibit C to Loveridge Declaration - Mezzanine Facility Agreement, dated August 13, 2007 | A-6280 |

**xxi**

                                                                        **Page**

Declaration of Christopher E. Duffy in Opposition
   to Defendants' Motion for Summary Judgment,
   dated September 2, 2010 ...................................... A-6447

Exhibit 1 to Duffy Declaration -
Amended and Restated Advisory Agreement
relating to Terra Firma Investments (GP) 2
Limited and Terra Firma Capital Partners
Limited, dated October 9, 2003 ............................ A-6471

Exhibit 2 to Duffy Declaration -
Advisory Agreement relating to Terra Firma
Capital Partners III, L.P., dated February 8, 2006 . A-6493

Exhibit 3 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 20, 2007 .. A-6512

Exhibit 4 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Directors' meeting, dated May 20, 2007 .. A-6515

Exhibit 5 to Duffy Declaration -
E-mail from Rowland to Laskowski and Crocker,
dated September 18, 2008, with attachment .......... A-6517

Exhibit 6 to Duffy Declaration -
E-mail from Smith to Small, dated May 21, 2007 . A-6521

Exhibit 7 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 7, 2006 ................................................ A-6523

Exhibit 8 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
September 19, 2007 .............................................. A-6524

xxii

**Page**

Exhibit 9 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
October 23, 2006 ................................................... A-6529

Exhibit 10 to Duffy Declaration -
E-mail from Wormsley to Hands, dated
November 15, 2006 ............................................... A-6530

Exhibit 11 to Duffy Declaration -
E-mail from Klein to Hands, dated
December 13, 2006................................................ A-6531

Exhibit 12 to Duffy Declaration -
E-mail from Smith to Del Rio, dated
July 20, 2007.......................................................... A-6532

Exhibit 13 to Duffy Declaration -
Answer and Affirmative Defenses of Defendant
Citigroup Inc. to Plaintiffs' Amended Complaint
in *Sungate Securities LLLP v. Citigroup, Inc.*
(Case No. 09-040664 CA 43) in the Circuit Court
of the Ninth Judicial District of the State of
Florida, dated July 22, 2010 ................................. A-6533

Exhibit 14 to Duffy Declaration -
Memorandum from Simpkin, *et al.* to Klein, *et al.*, dated November 16, 2007............................... A-6549

Exhibit 15 to Duffy Declaration -
Interoffice memorandum from Lindsay to
Drayton, *et al.*, dated February 17, 2005 ............... A-6559

Exhibit 16 to Duffy Declaration -
E-mail from Tague to Lindsay, *et al.*, dated
March 9, 2007........................................................ A-6566

Exhibit 17 to Duffy Declaration -
E-mail from Bayazid to Favaro, Richards and
Pavlus, dated April 19, 2007................................. A-6571

xxiii

**Page**

Exhibit 18 to Duffy Declaration -
July 2006 "EMI Group plc 2006 Annual Review"...    A-6576

Exhibit 19 to Duffy Declaration -
Two letters from Smith for and on behalf of
Citigroup Global Markets Limited to Stewart,
dated September 4, 2006.......................................    A-6593

Exhibit 20 to Duffy Declaration -
E-mail from Nicoli to Gildersleeve, *et al.*, dated
November 28, 2006 ................................................    A-6611

Exhibit 21 to Duffy Declaration -
E-mail from Wormsley to Dicks, dated May 22,
2007, with attachment...........................................    A-6613

Exhibit 22 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 21, 2006 ................................................    A-6615

Exhibit 23 to Duffy Declaration -
E-mail from Ashcroft to Borrows and Nicoli,
dated December 11, 2006 .......................................    A-6616

Exhibit 24 to Duffy Declaration -
E-mail from Wormsley to Smith, dated
May 21, 2007 .......................................................    A-6617

Exhibit 25 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated April 20, 2007 .............................................    A-6620

Exhibit 26 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................    A-6628

Exhibit 27 to Duffy Declaration -
E-mail from Barak to Wormsley, *et al.*, dated
April 20, 2007, with attachments...........................    A-6640

**xxiv**

Page

Exhibit 28 to Duffy Declaration -
EMI Press Release, dated January 12, 2007 .......... A-6651

Exhibit 29 to Duffy Declaration -
EMI Press Release, dated February 14, 2007 ........ A-6654

Exhibit 30 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ...................................................... A-6655

Exhibit 31 to Duffy Declaration -
E-mail from Gildersleeve to Nicoli and Borrows,
dated April 20, 2007 .............................................. A-6656

Exhibit 32 to Duffy Declaration -
E-mail from Gildersleeve to Wormsley, dated
April 20, 2007 ...................................................... A-6658

Exhibit 33 to Duffy Declaration -
E-mail from Klein to Wormsley and Smith, dated
April 20, 2007 ...................................................... A-6659

Exhibit 34 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 22, 2007 ...................................................... A-6661

Exhibit 35 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
April 13, 2007 ...................................................... A-6663

Exhibit 36 to Duffy Declaration -
E-mail from Smith to Stewart and Barak, dated
April 30, 2007, with attachment ........................... A-6664

Exhibit 37 to Duffy Declaration -
EMI Press Release, dated May 4, 2007 ................. A-6667

Exhibit 38 to Duffy Declaration -
E-mail from Ashcroft to Wormsley, *et al.*, dated
April 23, 2007, with attachment ........................... A-6669

xxv

**Page**

Exhibit 39 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
March 1, 2007....................................................... A-6679

Exhibit 40 to Duffy Declaration -
Letter from Bronfman to Gildersleeve, dated
May 10, 2007....................................................... A-6683

Exhibit 41 to Duffy Declaration -
Mobile telephone records of David Wormsley ...... A-6685

Exhibit 42 to Duffy Declaration -
E-mail from Vallance to Wormsley and Lindsay,
dated March 2, 2007 ............................................... A-6693

Exhibit 43 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, dated May 6, 2007 ........................... A-6694

Exhibit 44 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Wormsley, dated May 6, 2007 ............................... A-6696

Exhibit 45 to Duffy Declaration -
E-mail from Borrows to Tuke, Stewart and
Gildersleeve, dated May 8, 2007 ........................... A-6697

Exhibit 46 to Duffy Declaration -
Letter from Kelly for and on behalf of Terra
Firma Investments (GP) 2 Limited and Terra
Firma Investments (GP) 3 Limited, dated
May 8, 2007 ........................................................... A-6699

Exhibit 47 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve, dated
May 9, 2007 ........................................................... A-6703

xxvi

**Page**

Exhibit 48 to Duffy Declaration -
E-mail from Wormsley to Miller, dated
May 8, 2007 ........................................................ A-6706

Exhibit 49 to Duffy Declaration -
E-mail from Miller to Zogheb, dated
May 16, 2007 ...................................................... A-6707

Exhibit 50 to Duffy Declaration -
E-mail from Barclay to Conroy, *et al.*, dated
May 13, 2007 ...................................................... A-6709

Exhibit 51 to Duffy Declaration -
E-mail from Bell to Wormsley, *et al.*, dated
May 16, 2007 ...................................................... A-6711

Exhibit 52 to Duffy Declaration -
E-mail from Gildersleeve to Borrows, *et al.*,
dated May 13, 2007 ............................................ A-6712

Exhibit 53 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ............................................ A-6716

Exhibit 54 to Duffy Declaration -
E-mail from Wormsley to Poyser, dated
May 18, 2007 ...................................................... A-6718

Exhibit 55 to Duffy Declaration -
E-mail from Wormsley to Tabet, dated
May 18, 2007 ...................................................... A-6719

Exhibit 56 to Duffy Declaration -
E-mail from Poyser to Wormsley, dated
May 18, 2007 ...................................................... A-6720

Exhibit 57 to Duffy Declaration -
E-mail from Wormsley to Poyser, Klein and
Brumpton, dated May 17, 2007 ........................... A-6721

xxvii

**Page**

Exhibit 58 to Duffy Declaration -
E-mail from Wormsley to Gildersleeve and
Nicoli, dated May 16, 2007 .................................... A-6722

Exhibit 59 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 17, 2007 ........................................................ A-6723

Exhibit 60 to Duffy Declaration -
E-mail from Tessler to Teitelbaum and Wolf,
dated May 18, 2007 ............................................... A-6724

Exhibit 61 to Duffy Declaration -
E-mail from Shott to Bell, *et al.*, dated May 20,
2007, with attachment ........................................... A-6726

Exhibit 62 to Duffy Declaration -
E-mail from Ashcroft to Stewart, *et al.*, dated
May 20, 2007 ........................................................ A-6730

Exhibit 63 to Duffy Declaration -
Teleconference Information from May 20, 2007
(Reproduced at p. CA-54)

Exhibit 64 to Duffy Declaration -
E-mail from Watson to Rawlinson, *et al.*, dated
May 20, 2007 ........................................................ A-6732

Exhibit 65 to Duffy Declaration -
Mobile telephone records of David Wormsley,
dated June 27, 2007 .............................................. A-6736

Exhibit 66 to Duffy Declaration -
May 2007 mobile telephone records of Nicoli
(Reproduced at pp. CA-55-CA-66)

Exhibit 67 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
May 17, 2007 ........................................................ A-6746

xxviii

**Page**

Exhibit 68 to Duffy Declaration -
Minutes of a Terra Firma Capital Partners
Limited Investment Advisory Committee
meeting, dated May 20, 2007 ............................... A-6747

Exhibit 69 to Duffy Declaration -
Excerpts of handwritten notes of Michael Slattery.... A-6749

Exhibit 70 to Duffy Declaration -
E-mail from Wormsley to Nicoli, dated
May 21, 2007 ......................................................... A-6755

Exhibit 71 to Duffy Declaration -
E-mail from Tabet to Wormsley, dated
May 21, 2007 ......................................................... A-6756

Exhibit 72 to Duffy Declaration -
E-mail from Nicoli to Ashcroft, *et al.*, dated
May 2, 2007 ........................................................... A-6759

Exhibit 73 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6765

Exhibit 74 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 3
Limited Committee of the Board of Directors'
meeting, dated May 21, 2007 ............................... A-6768

Exhibit 75 to Duffy Declaration -
E-mail from Thornton on behalf of Hands to Bell,
dated May 21, 2007 ................................................ A-6771

Exhibit 76 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 3
Limited to Gildersleeve, dated May 21, 2007 ....... A-6772

xxix

**Page**

Exhibit 77 to Duffy Declaration -
Minutes of an EMI Group plc Directors' meeting,
dated May 21, 2007 ................................................ A-6782

Exhibit 78 to Duffy Declaration -
E-mail from Watson to Dowler, dated May 21,
2007, with attachment.............................................. A-6791

Exhibit 79 to Duffy Declaration -
E-mail from Smith to Badhe, dated May 21, 2007   A-6818

Exhibit 80 to Duffy Declaration -
E-mail from Smith to Mehta, dated May 21, 2007   A-6819

Exhibit 81 to Duffy Declaration -
E-mail from Smith to Kirshenbaum, dated
May 21, 2007 ....................................................... A-6821

Exhibit 82 to Duffy Declaration -
E-mail from Wormsley to Tague, dated
May 22, 2007 ....................................................... A-6822

Exhibit 83 to Duffy Declaration -
Letter from Smith to Stewart, dated July 19,
2007, with attachment............................................. A-6823

Exhibit 84 to Duffy Declaration -
E-mail from Smith to Watson, dated
August 17, 2007.................................................... A-6827

Exhibit 85 to Duffy Declaration -
November 2009 presentation titled, "EMI Debt
Interest Expense Analysis" .................................... A-6828

Exhibit 86 to Duffy Declaration -
E-mail from Poyser to Vakilian, dated
May 21, 2007 ....................................................... A-6835

xxx

**Page**

Exhibit 87 to Duffy Declaration -
E-mail from Simonian to Smith, dated
May 21, 2007 ......................................................... A-6837

Exhibit 88 to Duffy Declaration -
E-mail from Wormsley to Lindsay, dated
September 17, 2007 ............................................... A-6838

Exhibit 89 to Duffy Declaration -
Memorandum from Simpkin *et al.* to Klein *et al.*,
dated November 16, 2007
(Reproduced at pp. CA-67-CA-76)

Exhibit 90 to Duffy Declaration -
E-mail from Borrows to Nicoli, Gildersleeve and
Parker, dated July 31, 2007.................................... A-6843

Exhibit 91 to Duffy Declaration -
Minutes of a Wise Men Committee meeting,
dated July 23, 2007 ............................................... A-6844

Exhibit 92 to Duffy Declaration -
E-mail from Grigorova to Cockerill, *et al.*, dated
September 5, 2007 ................................................. A-6846

Exhibit 93 to Duffy Declaration -
E-mail from Sckerl to Cockerill, dated June 9,
2009 with Attachment
(Reproduced at pp. CA-77-CA-80)

Exhibit 94 to Duffy Declaration -
E-mail from Grigorova to Sckerl, dated
February 16, 2009.................................................. A-6850

Exhibit 95 to Duffy Declaration -
E-mail from Wormsley to Klein, dated
November 23, 2007 ............................................... A-6855

**xxxi**

**Page**

Exhibit 96 to Duffy Declaration -
E-mail from Grigorova to Cockerill and Sckerl,
dated February 2, 2009, with attachment............... A-6856

Exhibit 97 to Duffy Declaration -
E-mail from Rochford to Trask and Zogheb,
dated June 25, 2009
(Reproduced at pp. CA-81-CA-83)

Exhibit 98 to Duffy Declaration -
E-mail from Romero-Apsilos to Hurst, dated
March 17, 2009..................................................... A-6859

Exhibit 99 to Duffy Declaration -
E-mail from Bazinet to Salamander, dated
September 28, 2009, with attachment.................... A-6860

Exhibit 100 to Duffy Declaration -
E-mail from Bronfman to Rosen, dated
September 29, 2009 ............................................... A-6882

Exhibit 101 to Duffy Declaration -
E-mail from Bronfman to Fleisher, dated
October 7, 2009 .................................................... A-6883

Exhibit 102 to Duffy Declaration -
E-mail from Cotton to Pastor, dated
December 21, 2009................................................ A-6885

Exhibit 103 to Duffy Declaration -
E-mail from Smith to Ponti and Hands, dated
March 22, 2010 ..................................................... A-6886

Exhibit 104 to Duffy Declaration -
E-mail from Nicoli to Wormsley, dated
May 20, 2007 ........................................................ A-6889

xxxii

**Page**

Exhibit 105 to Duffy Declaration -
E-mail from Wormsley to Klein and Smith, dated
April 19, 2007 ........................................................ A-6893

Exhibit 106 to Duffy Declaration -
Memorandum from Punja, *et al.* to the IAC,
dated May 7, 2007 ................................................. A-6894

Exhibit 107 to Duffy Declaration -
Revised memorandum from Punja, *et al.* to the
IAC, dated May 7, 2007 ........................................ A-6904

Exhibit 108 to Duffy Declaration -
E-mail from Vallance on behalf of Hands to
Punja, dated May 7, 2007 ...................................... A-6914

Exhibit 109 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 18, 2007 ............................... A-6916

Exhibit 110 to Duffy Declaration -
Presentation titled, "Project Dice: Presentation to
the IAC," dated May 20, 2007 ............................... A-7076

Exhibit 111 to Duffy Declaration -
Agreement (the "PMA") between Terra Firma
Investments (GP) 2 Limited and Terra Firma
Investments (GP) 3 Limited and EMI Group plc
regarding Project Mulberry, dated May 9, 2007 .... A-7153

Exhibit 112 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ......................................................... A-7166

Exhibit 113 to Duffy Declaration -
E-mail from Bazinet to Cohen, dated
October 14, 2009 ................................................... A-7168

xxxiii

**Page**

Exhibit 114 to Duffy Declaration -
Letter from Nicoli to Kelly, dated
December 15, 2006................................................. A-7169

Exhibit 115 to Duffy Declaration -
E-mail from Smith to Wormsley, dated
December 14, 2006................................................. A-7170

Exhibit 116 to Duffy Declaration -
E-mail from Frederick to Nicoli, *et al.*, dated
December 5, 2006................................................... A-7171

Exhibit 117 to Duffy Declaration -
E-mail from Randell to Becker, dated
May 10, 2007 ......................................................... A-7178

Exhibit 118 to Duffy Declaration -
Letter from Terra Firma Investments (GP) 2 and
Terra Firma Investments (GP) 3 to Gildersleeve,
dated May 8, 2007 ................................................... A-7190

Exhibit 119 to Duffy Declaration -
E-mail from Van der Spuy to Punja, dated
May 9, 2007 ........................................................... A-7194

Exhibit 120 to Duffy Declaration -
Letter from Smith to Stewart, dated
April 27, 2007......................................................... A-7197

Exhibit 121 to Duffy Declaration -
E-mail from Tabet to Klein, dated May 17, 2007 .. A-7199

Exhibit 122 to Duffy Declaration -
E-mail from Plotnik to Miller, *et al.*, dated
May 19, 2007
(Reproduced at pp. CA-84-CA-87)

xxxiv

**Page**

Exhibit 123 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................... A-7324

Exhibit 124 to Duffy Declaration -
E-mail from Zogheb to Miller, dated
May 16, 2007 ...................................................... A-7326

Exhibit 125 to Duffy Declaration -
E-mail from Wirdnam to Leat, dated
August 9, 2007 .................................................... A-7328

Exhibit 126 to Duffy Declaration -
Compliance "tree" for Citigroup, dated
January 14, 2010 ................................................. A-7329

Exhibit 127 to Duffy Declaration -
E-mail from Smith to Poyser, dated
May 18, 2007 ...................................................... A-7333

Exhibit 128 to Duffy Declaration -
E-mail from Heh to Llewelyn-Jones, dated
June 13, 2007 ..................................................... A-7335

Exhibit 129 to Duffy Declaration -
E-mail from Fong to Llewelyn-Jones, dated
August 1, 2007 .................................................... A-7337

Exhibit 130 to Duffy Declaration -
Leveraged Finance Memorandum, dated
May 18, 2007
(Reproduced at pp. CA-88-CA-153)

Exhibit 131 to Duffy Declaration -
E-mail from Masiello to Nelson, dated
August 16, 2007 ................................................... A-7338

xxxv

**Page**

Exhibit 132 to Duffy Declaration -
E-mail from Dolenec to Hands *et al.*, dated
May 18, 2007 ........................................................   A-7340

Exhibit 133 to Duffy Declaration -
E-mail from Pryce to Burrows and Wormsley,
dated May 18, 2007 ...............................................   A-7342

Exhibit 134 to Duffy Declaration -
Article from Music Week titled, "Cheques in the
City: EMI Joins Hands," dated June 2, 2007 ........   A-7343

Exhibit 135 to Duffy Declaration -
August 2009 Classified Credit Report (CCR)
belonging to Maltby Limited/EMI Group
(Reproduced at pp. CA-154-CA-156)

Exhibit 136 to Duffy Declaration -
Maltby Investments Limited – Director's Report
and Consolidated Financial Statements, dated
March 31, 2009 ....................................................   A-7345

Exhibit 137 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009
(Reproduced at pp. CA-157-CA-163)

Exhibit 138 to Duffy Declaration -
October 2009 Citi presentation titled, "ICG Top
10 Risks"
(Reproduced at pp. CA-164-CA-264)

Exhibit 139 to Duffy Declaration -
E-mail from Cockerill to Bates and Dean, dated
June 11, 2009 .......................................................   A-7410

xxxvi

**Page**

Exhibit 140 to Duffy Declaration -
E-mail from Schmitt to O'Driscoll and Leoni-
Sceti, dated December 8, 2009
(Reproduced at pp. CA-265-CA-266)

Exhibit 141 to Duffy Declaration -
Chart entitled, "EMI Investment Structure" .......... A-7413

Exhibit 142 to Duffy Declaration -
E-mail from Stewart to Smith and Barak, dated
May 13, 2007 ........................................................ A-7414

Exhibit 143 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors meeting, dated May 25, 2007 ... A-7415

Exhibit 144 to Duffy Declaration -
Project Mulberry Bidders Contact Details, dated
May 11, 2007 ........................................................ A-7420

Exhibit 145 to Duffy Declaration -
Project Mulberry Working Party List, dated
May 17, 2007 ........................................................ A-7445

Exhibit 146 to Duffy Declaration -
Summary of certain information from telephone
records that are available in their original form as
Exhibits 41, 63, 65, 66, 144 and 145 to this
declaration
(Reproduced at pp. CA-267-CA-268)

Exhibit 147 to Duffy Declaration -
E-mail from Ball to Punja *et al.*, dated
May 20, 2007 ........................................................ A-7470

Exhibit 148 to Duffy Declaration -
Recommended cash offer for EMI Group plc by
Maltby Limited, dated May 21, 2007 ................... A-7473

**xxxvii**

**Page**

Exhibit 149 to Duffy Declaration -
Presentation titled, "Project Poker," dated
January 14, 2008 ..................................................... A-7499

Exhibit 150 to Duffy Declaration -
E-mail and attachment from Simpkin to Cockerill
and Lynn, dated April 18, 2009 ............................ A-7505

Exhibit 151 to Duffy Declaration -
E-mail and attachments from Grigorova to
Sckerl, dated June 29, 2009
(Reproduced at pp. CA-269-CA-274)

Exhibit 152 to Duffy Declaration -
E-mail from Sckerl to Slattery and Prior, dated
February 16, 2009 ................................................. A-7510

Exhibit 153 to Duffy Declaration -
Article from Billboard.biz titled, "Terra Firma In
EMI Restructuring Talks With Citi," dated
July 13, 2009 ........................................................ A-7511

Exhibit 154 to Duffy Declaration -
E-mail from Smith to CazzyDog and Hands,
dated March 22, 2010 ........................................... A-7513

Exhibit 155 to Duffy Declaration -
E-mail from Leoni-Sceti to Williamson, dated
November 21, 2009 ............................................... A-7516

Exhibit 156 to Duffy Declaration -
E-mail from Leoni-Sceti to Hands, dated
October 2, 2009
(Reproduced at pp. CA-275-CA-276)

**xxxviii**

**Page**

Exhibit 157 to Duffy Declaration -
Memorandum from Faxon titled, "External
Pressure on Business Performance," dated
November 23, 2009
(Reproduced at pp. CA-277-CA-278)

Exhibit 158 to Duffy Declaration -
Citi analyst report on Warner Music Group Corp,
dated September 15, 2009..................................... A-7523

Exhibit 159 to Duffy Declaration -
Minutes of a Terra Firma Investments (GP) 2
Limited Directors' meeting, dated May 25, 2007.. A-7544

Exhibit 160 to Duffy Declaration -
E-mail from Barak to Reid, dated March 2, 2007 . A-7549

Exhibit 161 to Duffy Declaration -
Michael Slattery's handwritten notes from
May 16, 2007 ....................................................... A-7552

Excerpts of Deposition Transcripts:

Stephen Alexander, dated August 11, 2010............... A-7553

Mark Nimrod Barak, dated July 15, 2010 ................ A-7557

Jason Bazinet, dated June 30, 2010 .......................... A-7564

Peter Edward Bell, dated June 22, 2010 ................... A-7601

Simon A. Borrows, dated June 25, 2010................... A-7705

Andre Bourbonnais, dated July 13, 2010.................. A-7827

Andrew Chadd, dated July 23, 2010
(Reproduced at pp. CA-279-CA-294)

Roger Faxon, dated July 23, 2010
(Reproduced at pp. CA-295-CA-315)

**xxxix**

|  | Page |
|---|---|
| John Gildersleeve, dated June 30, 2010 | A-7832 |
| Guy Hands, dated July 15, 2010 | A-7848 |
| Guy Hayward-Cole, dated July 27, 2010 | A-7901 |
| David Robert Paul Hill, dated August 4, 2010 | A-7918 |
| Michael Klein, dated July 19, 2010 | A-7923 |
| Chad Leat, dated June 18, 2010 | A-7935 |
| John Loveridge, dated July 30, 2010 | A-7941 |
| Bruce MacInnes, dated July 8, 2010 | A-7966 |
| Eric Nicoli, dated July 5, 2010 | A-7970 |
| Riaz Punja, dated July 28, 2010 | A-8039 |
| Timothy Pryce, dated July 22, 2010 (Reproduced at pp. CA-316-CA-335) | |
| Elio Leoni-Sceti, dated June 25, 2010 (Reproduced at pp. CA-336-CA-385) | |
| Paul Simpkin, dated July 5, 2010 | A-8056 |
| Michael Slattery, dated August 6, 2010 | A-8073 |
| Matthew Canning Smith, dated August 3, 2010 (Day 1) | A-8077 |
| Matthew Canning Smith, dated August 9, 2010 (Day 2) | A-8116 |
| Iain Stokes, dated August 6, 2010 | A-8127 |
| Kamal Fouad Tabet, dated July 29, 2010 | A-8157 |
| Francois Van der Spuy, dated July 7, 2010 | A-8171 |

xl

**Page**

Julie Williamson, dated July 28, 2010
  (Reproduced at pp. CA-386-CA-398)

Alexander Wolf, dated July 14, 2010........................ A-8175

David Wormsley, dated July 20, 2010
  (Reproduced at pp. CA-399-CA-480)

Declaration of Timothy Pryce, in Opposition to
  Defendants' Motion for Summary Judgment,
    dated August 27, 2010 ............................................ A-8193

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
  44.1, dated August 27, 2010 .................................. A-8195

Appendices to the Report of Nicholas S. Strauss
  Q.C. Pursuant to Rule 44.1 .................................... A-8245

Exhibit 1 to Strauss Report -
*AEG (UK) Ltd. v. Logic Resource Ltd,* [1996]
CLC 265 .............................................................. A-8249

Exhibit 2 to Strauss Report -
*AIC Limited v. ITS Testing Services (UK) Ltd,*
[2006] EWCA Civ 1601 ........................................ A-8262

Exhibit 3 to Strauss Report -
*Angus v. Clifford,* [1891] 2 Ch 449 ...................... A-8371

Exhibit 4 to Strauss Report -
*Armstrong v. Strain,* [1951] 1 TLR 856 ................ A-8404

Exhibit 5 to Strauss Report -
*Assicurazione Generali v. Arab Insurance Group,*
[2003] I.R.L.R. 131 ............................................... A-8422

Exhibit 6 to Strauss Report -
*Attorney General of Belize v. Belize Telecom
Limited,* [2009] 1 W.L.R. 1988 ............................ A-8472

xli

**Page**

Exhibit 7 to Strauss Report -
*In re B (Children),* [2008] UKHL 35 .................. A-8483

Exhibit 8 to Strauss Report -
*Bank of Credit and Commerce International
(Overseas) Ltd (In Liquidation) v. Price
Waterhouse (No.2),* [1998] PNLR 564 ............... A-8511

Exhibit 9 to Strauss Report -
*Bank of Tokyo-Mitsubishi UFJ Ltd v. Baskan
Gida Sanayi Ve Pazarlama A.S.,* [2009] EWHC
1276 Ch ............................................................... A-8539

Exhibit 10 to Strauss Report -
*Bankers Trust Int'l v. Dharmala Sakti Sejahtera,*
[1996] CLC 518 ................................................... A-8811

Exhibit 11 to Strauss Report -
*Barings v. Coopers & Lybrand,* [2002] B.C.L.C.
410 ....................................................................... A-8864

Exhibit 12 to Strauss Report -
*Barlow Clowes Int'l Ltd v. Eurotrust Int'l Ltd.,*
[2006] 1 WLR 1476 ............................................. A-8902

Exhibit 13 to Strauss Report -
*Barton v. County NatWest Ltd.,* [1999] Lloyd's
Reports (Banking) 408 ......................................... A-8911

Exhibit 14 to Strauss Report -
*Bell v. Lever Bros Ltd.,* [1932] AC 161 ................ A-8930

Exhibit 15 to Strauss Report -
*BCCI v. Ali,* [2001] 1 A.C. 251 ............................ A-9008

Exhibit 16 to Strauss Report -
*Bradford Building Society v. Borders,* [1941] 2
All ER 205 ............................................................ A-9042

**xlii**

Page

Exhibit 17 to Strauss Report -
*Bristol & West Building Society v. Mothew,*
[1998] Ch. 1 CA Civ ............................................ A-9061

Exhibit 18 to Strauss Report -
*Brown Jenkinson & Co Ltd v. Percy Dalton*
*(London) Ltd,* [1957] 2 QB 621 CA ..................... A-9089

Exhibit 19 to Strauss Report -
*Brownlie v. Campbell,* [1880] 5 App Cas 925 ...... A-9119

Exhibit 20 to Strauss Report -
*Caparo Industries Plc v. Dickman,* [1990] 2 A.C.
605 HL ................................................................. A-9154

Exhibit 21 to Strauss Report -
*Conlon v. Simms,* [2008] 1 WLR 484 .................. A-9213

Exhibit 22 to Strauss Report -
*Cream Holdings Ltd v. Davenport,* [2009] B.C.C.
183 ...................................................................... A-9254

Exhibit 23 to Strauss Report -
*Cremdean Properties Ltd v. Nash,* [1977] 244 EG
547 ...................................................................... A-9261

Exhibit 24 to Strauss Report -
*Derry v. Peek,* [1889] 14 App Cas 337 ................ A-9265

Exhibit 25 to Strauss Report -
*Downs v. Chappell,* [1997] 1 WLR 426 ............... A-9309

Exhibit 26 to Strauss Report -
*Evans v. Edmonds,* [1853] 13 C.B. 777 ............... A-9330

Exhibit 27 to Strauss Report -
*Galoo Ltd v. Bright Grahame Murray,* [1994] 1
WLR 1360 CA Civ .............................................. A-9335

xliii

**Page**

Exhibit 28 to Strauss Report -
*In re H and Others (Minors),* [1996] AC 563 ....... A-9365

Exhibit 29 to Strauss Report -
*Hedley Byrne & Co Ltd. v. Heller & Partners
Ltd.,* [1964] AC 465 ............................... A-9396

Exhibit 30 to Strauss Report -
*Henderson v. Merrett Syndicates Ltd (No.1),*
[1995] 2 AC 145 HL ............................... A-9472

Exhibit 31 to Strauss Report -
*Hornal v. Neuberger Products,* [1957] 1 QB 247
CA ................................................ A-9535

Exhibit 32 to Strauss Report -
*Huyton SA v. Distribuidora Internacional De
Productos Agricolas SA De CV,* [2003] EWCA
Civ 1104 .......................................... A-9556

Exhibit 33 to Strauss Report -
*IFE Fund SA v. Goldman Sachs International,*
[2006] EWHCA 2887 (QB) (Comm) .................. A-9573

Exhibit 34 to Strauss Report -
*Investors Compensation Scheme v. West
Bromwich Building Society,* [1998] 1 W.L.R. 896   A-9589

Exhibit 35 to Strauss Report -
*Item Software (UK) Ltd v. Kouroush Fassihi,*
[2004] EWCA Civ 1244 ........................... A-9612

Exhibit 36 to Strauss Report -
*JEB Fasteners v. Marks Bloom & Co.,* [1983] 1
All E.R. 583 ...................................... A-9637

Exhibit 37 to Strauss Report -
*JP Morgan Chase Bank v. Springwell Navigation
Corp.,* [2008] EWHC 2286 (Comm) ................. A-9645

xliv

**Page**

Exhibit 38 to Strauss Report -
*John D Wood & Co (Residential & Agricultural)
Ltd v Knatchbull,* [2003] PNLR 17 ...................... A-9927

Exhibit 39 to Strauss Report -
*Kuddus v. Chief Constable of Leicestershire,*
[2002] 2 AC 122 ................................... A-9943

Exhibit 40 to Strauss Report -
*Longstaff v. Birtles,* [2002] 1 WLR 470 ............... A-9986

Exhibit 41 to Strauss Report -
*Mannai Investment Co. Ltd. v. Eagle Star,* [1997]
A.C. 749 ............................................. A-9995

Exhibit 42 to Strauss Report -
*McNaughton Paper Group Ltd v. Hicks Anderson
& Co.,* [1991] 2 QB 113 ....................... A-10030

Exhibit 43 to Strauss Report -
*Murphy v. Brentwood DC,* [1991] 1 AC 398 ........ A-10047

Exhibit 44 to Strauss Report -
*Peekay Intermark v. Australia and New Zealand
Banking Group,* [2006] EWCA Civ 386 .............. A-10148

Exhibit 45 to Strauss Report -
*Raiffseisen Zentralbank Osterreich AG v. The
Royal Bank of Scotland Plc,* [2010] EWHC 1392
(Comm) .............................................. A-10171

Exhibit 46 to Strauss Report -
*In re S-B (Children),* [2009] UKSC 17 ................ A-10284

Exhibit 47 to Strauss Report -
*Slough Estates v. Welwyn Hatfield District
Council,* [1996] 2 E.G.L.R. 219 ............................ A-10302

xlv

**Page**

Exhibit 48 to Strauss Report -
*Smith v. Eric S Bush,* [1990] 1 A.C. 831 HL ......... A-10336

Exhibit 49 to Strauss Report -
*Smith New Court Securities Ltd v. Citibank NA,*
[1997] A.C. 254 HL ............................................. A-10382

Exhibit 50 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour
Vickers (Asset Management) Ltd.,* [1992] BCLC
1104 .................................................................... A-10415

Exhibit 51 to Strauss Report -
*Smith New Court Securities Ltd v. Scrimgeour
Vickers (Asset Management) Ltd.,* [1994] 1
W.L.R.1271 ......................................................... A-10460

Exhibit 52 to Strauss Report -
*Standard Chartered Bank v. Pakistan National
Shipping Corp.,* [2000] 1 Lloyd's Report 218 ...... A-10475

Exhibit 53 to Strauss Report -
*Swindle v. Harrison,* [1997] 4 All E.R. 705 CA
Civ ...................................................................... A-10511

Exhibit 54 to Strauss Report -
*Tackey v. McBain,* [1912] A.C. 186 ...................... A-10543

Exhibit 55 to Strauss Report -
*Three Rivers District Council v. Governor and
Company of the Bank of England (No.3),* [2001]
UKHL 16 ............................................................ A-10551

Exhibit 56 to Strauss Report -
*Twinsectra Ltd v. Yardley,* [2002] UKHL 12 ......... A-10845

Exhibit 57 to Strauss Report -
*UCB Corporate Services Limited v. Williams,*
[2002] EWCA Civ 555 ........................................ A-10886

xlvi

**Page**

Exhibit 58 to Strauss Report -
*Uzinterimpex JSC v. Standard Bank Plc,* [2007]
EWHC 1151 (Comm) ........................................... A-10910

Exhibit 59 to Strauss Report -
*White v. Jones,* [1995] 2 A.C. 207 HL ................. A-10948

Exhibit 60 to Strauss Report -
*William Sindall plc v. Cambridgeshire County
Council,* [1994] 1 W.L.R. 1016............................ A-11037

Exhibit 61 to Strauss Report -
The Misrepresentation Act 1967 ......................... A-11068

Exhibit 62 to Strauss Report -
The Unfair Contract Terms Act 1977 .................. A-11070

Exhibit 63 to Strauss Report -
Mark Blackett-Ord, *Partnership Law* § 11-16 (3d
ed. 2007) ............................................................. A-11094

Exhibit 64 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law of Actionable Misrepresentation* § l15 (3d
ed. 1974) ............................................................. A-11098

Exhibit 65 to Strauss Report -
George Spencer Bower & Alexander Turner, *The
Law Relating to Actionable Non-Disclosure*
§ 14.02 (2d ed. 1990) ......................................... A-11100

Exhibit 66 to Strauss Report -
Jolm Cartwright, *Misrepresentation, Mistake and
Non-Disclosure* §§ 3.54, 5.46, 5.23, 9.22 (2007) .. A-11105

Exhibit 67 to Strauss Report -
*Chitty on Contracts* §§ 6-036, 6-044 (13th ed.) .... A-11115

xlvii

**Page**

Exhibit 68 to Strauss Report -
*Clerk & Lindsell on Torts* §§18-11, 18-12, 18-18,
18-20, 18-22, 18-28 (19th ed.) ............................ A-11118

Exhibit 69 to Strauss Report -
31 Lord Mackay of Clashfern, *Halsbury's Laws
of England* § 757 (4th ed. 2003). ........................ A-11127

Exhibit 70 to Strauss Report -
Harvey McGregor, *McGregor on Damages*
§§ 41-038, 41-040 (17th Ed. 2003) ...................... A-11130

Exhibit 71 to Strauss Report -
Declaration of Adrian Briggs in Support of
Defendants' Motion to Dismiss ........................... A-11133

Exhibit 72 to Strauss Report -
Declaration of Nicholas Strauss in Support of
Plaintiffs' Opposition to Defendants' Motion to
Dismiss ................................................... A-11150

Exhibit 73 to Strauss Report -
Project Mulberry Agreement ............................... A-11178

Affidavit of Service, sworn to September 2, 2010..... A-11191

Reply Declaration of Gary R. Carney in Further
Support of Defendants' Motion for Summary
Judgment, dated September 3, 2010 ..................... A-11193

Exhibit 129 to Carney Reply Declaration -
Plaintiffs' Rule 26(a)(1) Initial Disclosures, dated
February 3, 2010 ......................................... A-11198

xlviii

**Page**

Exhibit 130 to Carney Reply Declaration -
Responses and Objections of Plaintiffs Terra
Firma Investments (GP) 2 Ltd. and Terra Firma
Investments (GP) 3 Ltd. To Defendants' First
Request for Production of Documents, dated
March 9, 2010......................................................... A-11216

Exhibit 131 to Carney Reply Declaration -
Journey Log Book for Guy Hands's flight to
London, dated May 20, 2007 ................................. A-11244

Exhibit 132 to Carney Reply Declaration -
Reservation for Guy Hands's flight to London,
dated May 20, 2007 ............................................... A-11247

Exhibit 133 to Carney Reply Declaration -
Report for Guy Hands's flight from the Airport
Landing Dues Information System of Guernsey
Airport, dated May 20, 2007.................................. A-11248

Exhibit 134 to Carney Reply Declaration -
Daily Confirmed Handling report of Blue Islands
at Guernsey Airport, dated May 20, 2007.............. A-11249

Exhibit 135 to Carney Reply Declaration -
Phone records of Guy Hands for the months of
April and May 2007................................................ A-11250

Deposition Excerpts:

Stephen Alexander, dated August 11, 2010................ A-11353

Mark Nimrod Barak, dated July 15, 2010 ................. A-11358

Jason Bazinet, dated June 30, 2010 ........................... A-11363

John Gildersleeve, dated June 30, 2010..................... A-11376

Guy Hands, dated July 15, 2010 ................................ A-11380

xlix

|  | Page |
|---|---|
| John Loveridge, dated July 30, 2010 | A-11395 |
| Eric Nicoli, dated July 5, 2010 | A-11410 |
| Timothy Pryce, dated July 22, 2010 | A-11419 |
| Riaz Punja, dated July 28, 2010 | A-11439 |
| Michael Slattery, dated August 6, 2010 | A-11457 |
| Martin David Stewart, dated July 7 and 8, 2010 | A-11473 |
| Iain Stokes, dated August 6, 2010 | A-11477 |
| Francois Van der Spuy, dated July 7, 2010 | A-11501 |
| Alec Werner, dated August 19, 2010 | A-11513 |
| David Wormsley, dated July 20, 2010 | A-11520 |
| Second Report of Ewan McQuater, Pursuant to Rule 44.1, dated September 3, 2010, with Exhibit 1 | A-11532 |
| Affidavit of Service, sworn to September 23, 2010 | A-11566 |
| Summary Judgment Hearing Transcript, dated September 10, 2010 | A-11568 |
| Letter from Christopher E. Duffy to the Honorable Jed S. Rakoff, dated September 13, 2010, with attachments | A-11620 |
| Letter from Jay Cohen to the Honorable Jed S. Rakoff, dated September 13, 2010, with attachments | A-11646 |
| Order of the Honorable Jed S. Rakoff, dated September 14, 2010, filed September 15, 2010 | A-11664 |
| Notice of Motion *in Limine* No. 2 to exclude the Testimony of Marianne Demario, by Defendants, dated October 4, 2010 | A-11666 |

**l**

                                                    **Page**

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 .. A-11668

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* to exclude certain
   Testimony and Evidence, dated October 4, 2010 .. A-11677

Declaration of Daniel H. Levi in Support of
   Defendants' Motions *in Limine* Nos. 1 through 5,
   dated October 4, 2010........................................... A-11686

   Exhibit 1 to Levi Declaration -
   Expert Report of David J. Teece, dated
   June 14, 2010
   (Reproduced at pp. CA-481-CA-544)

   Exhibit 4 to Levi Declaration -
   Complaint in the above-captioned matter, dated
   December 11, 2009................................................ A-11695

   Exhibit 16 to Levi Declaration -
   Expert Report of Daniel R. Fischel, dated
   July 7, 2010
   (Reproduced at pp. CA-545-CA-586)

   Exhibit 17 to Levi Declaration -
   Microsoft Excel Spreadsheet printed from the
   native file produced by Plaintiffs and bearing
   bates number TF0000635801
   (Reproduced at pp. CA-587-CA-592)

   Exhibit 18 to Levi Declaration -
   Expert Report of Marianne DeMario, dated
   June 14, 2007
   (Reproduced at pp. CA-593-CA-702)

li

**Page**

Exhibit 19 to Levi Declaration -
*Re Howie & others & Crawford's arbitration,*
[1990] BCLC 686 (Chancery Div. 1990) .............  A-11743

Exhibit 20 to Levi Declaration -
*Smith New Court Secs. Ltd v. Scrimgeour Vickers*
*(Asset Mgmt.) Ltd.* [1992] BCLC 1104, 1143 .......  A-11749

Exhibit 21 to Levi Declaration -
Project Dice Presentation to the IAC, dated
May 20, 2007 ......................................................  A-11781

Exhibit 22 to Levi Declaration -
EMI Directors' Meeting Minutes, dated
April 20, 2007 ....................................................  A-11858

Exhibit 23 to Levi Declaration -
Project Mulberry Valuation Materials
Spreadsheet, dated May 21, 2007 .........................  A-11866

Exhibit 24 to Levi Declaration -
Project Blackjack Presentation, dated
August 20, 2007
(Reproduced at pp. CA-703-CA-712)

Exhibit 25 to Levi Declaration -
Letter, dated January 11, 2008 re an Amendment
Letter, dated December 21, 2007 ..........................  A-11876

Exhibit 26 to Levi Declaration -
EMI Presentation to Co-Investors, dated
September 2007
(Reproduced at pp. CA-713-CA-744)

lii

**Page**

Exhibit 42 to Levi Declaration -
Response of Plaintiffs Terra Firma Investments
(GP) 2 Ltd. and Terra Firma Investments (GP) 3
Ltd. to Defendants' Statement of Undisputed
Facts Pursuant to Local Rule 56.1, dated
August 27, 2010 ..................................................... A-11878

Exhibit 43 to Levi Declaration -
Project Record Valuation Considerations, dated
May 17, 2007
(Reproduced at pp. CA-745-CA-766)

Exhibit 44 to Levi Declaration -
E-mail from Moore to Pryce, dated March 14,
2007, with attachment
(Reproduced at pp. CA-767-CA-780)

Excerpts of Deposition Transcripts:

Peter E. Bell, dated June 22, 2010
   (Reproduced at pp. CA-781-CA-806)

Simon A. Borrows, dated June 25, 2010
   (Reproduced at pp. CA-807-CA-828)

Marianne DeMario, dated July 19, 2010 .................. A-11954

Karen Dolenec, dated June 18, 2010 ........................ A-12120

John Gildersleeve, dated June 30, 2010.................... A-12146

Eric Nicoli, dated July 5, 2010 ................................ A-12152

Riaz Punja, dated July 28, 2010................................ A-12158

Iain Stokes, dated August 6, 2010 ............................ A-12174

**liii**

**Page**

Declaration of Karen C. Dyer in Support of
Plaintiffs' Terra Firma Investments (GP) 2 Ltd's.
and Terra Firma Investments (GP) 3 Ltd's
Memoranda in Oppositions to Defendants'
Motions *In Limine*, dated October 12, 2010 .......... A-12180

Exhibit 1 to Dyer Declaration -
Wise Men Committee meeting minutes, dated
July 27, 2007 ......................................................... A-12186

Exhibit 14 to Dyer Declaration -
"Project Record Valuation Considerations"
prepared by Merrill Lynch for Cerberus, dated
May 17, 2007 ......................................................... A-12188

Exhibit 15 to Dyer Declaration -
Citi's Project Dice Credit Approval
Memorandum, dated May 17, 2007 ....................... A-12209

Exhibit 16 to Dyer Declaration -
Citi's "Fairness Committee Materials," dated
May 21, 2007 ......................................................... A-12303

Exhibit 17 to Dyer Declaration -
Excerpts from American Society of Appraisers,
*ASA Business Valuation Standards* (2009) ............. A-12309

Exhibit 18 to Dyer Declaration -
"Project Mulberry Valuation Materials," dated
May 21, 2007 ......................................................... A-12315

Exhibit 19 to Dyer Declaration -
E-mail from Barak to Reid *et al.*, dated
March 2, 2007 ....................................................... A-12324

Exhibit 20 to Dyer Declaration -
Letter from Borrows to Nicoli, dated
July 19, 2007 ......................................................... A-12327

liv

**Page**

Exhibit 21 to Dyer Declaration -
Financial Dynamics Business Communications
press cutting, dated June 28, 2007 ........................ A-12328

Exhibit 22 to Dyer Declaration -
Excerpts of the deposition of Peter Bell, dated
June 22, 2010 ....................................................... A-12329

Exhibit 23 to Dyer Declaration -
Excerpts from the deposition of Simon Borrows,
dated June 25, 2010 .............................................. A-12345

Exhibit 24 to Dyer Declaration -
Excerpts of the deposition of Marianne DeMario,
dated July 19, 2010 ............................................... A-12378

Exhibit 25 to Dyer Declaration -
Excerpts of the deposition of Daniel Fischel,
dated July 28, 2010 ............................................... A-12406

Exhibit 26 to Dyer Declaration -
Excerpts of the deposition of Guy Hands, dated
July 15, 2010 ........................................................ A-12413

Exhibit 27 to Dyer Declaration -
Excerpts from the deposition of Guy Hayward-
Cole, dated July 27, 2010 ...................................... A-12422

Exhibit 28 to Dyer Declaration -
Excerpts of the deposition of John Loveridge,
dated July 30, 2010 ............................................... A-12438

Exhibit 30 to Dyer Declaration -
Excerpts of the deposition of Iain Stokes, dated
August 6, 2010 ..................................................... A-12452

Exhibit 33 to Dyer Declaration -
*Livingstone v. Rawyards Coal Co.* [1880] 5
Appeal Cases 25 .................................................. A-12462

lv

**Page**

Exhibit 34 to Dyer Declaration -
*Smith New Court Sec. Ltd. v. Citibank M.A.*
[1997] A.C. 254 .................................................... A-12471

Proposed Pre-Trial Consent Order, dated
October 12, 2010 with Exhibits ............................ A-12504

Plaintiffs' Proposed Jury Instructions, dated
October 12, 2010 ................................................. A-12684

Defendants' Proposed Jury Instructions, dated
October 12, 2010 ................................................. A-12718

Report of Nicholas S. Strauss Q.C. Pursuant to Rule
44.1, dated October 12, 2010 ................................ A-12790

Trial Transcript, dated October 18, 2010 .................. A-12835

Trial Transcript, dated October 19, 2010 .................. A-12997

Trial Transcript, dated October 20, 2010 .................. A-13188

Trial Transcript, dated October 21, 2010 .................. A-13347

Trial Transcript, dated October 22, 2010 .................. A-13463

Trial Transcript, dated October 25, 2010 .................. A-13685

Trial Transcript, dated October 26, 2010 .................. A-13855

Trial Transcript, dated October 27, 2010 .................. A-14046

Trial Transcript, dated October 28, 2010 .................. A-14249

Trial Transcript, dated October 29, 2010 .................. A-14432

Trial Transcript, dated November 1, 2010 ................. A-14551

Trial Transcript, dated November 2, 2010 ................. A-14877

Trial Transcript, dated November 3, 2010 ................. A-15102

Trial Transcript, dated November 4, 2010 ................. A-15292

**lvi**

**Page**

Trial Exhibits:

Terra Firma Exhibit 1 -
    E-mail from Wormsley to Nicoli re call from
    GH, dated May 21, 2007 ................................... A-15300

Terra Firma Exhibit 2 -
    E-mail from Tabet to Wormsley re
    Conversation with Guy Hands, dated
    May 21, 2007 ..................................................... A-15301

Terra Firma Exhibit 3 -
    E-mail from Wormsley to Lindsay re
    financing/hedging, dated September 17, 2007... A-15304

Terra Firma Exhibit 5 -
    E-mail from Simonian to Smith re Bids, dated
    May 21, 2007 ................................................... A-15309

Terra Firma Exhibit 9 -
    E-mail from Randell to Terra Firma re May
    21st GP meeting, dated May 20, 2007 .............. A-15310

Terra Firma Exhibit 10 -
    Draft Minutes of a meeting of a committee of
    the board of directors of Terra Firma (GP) 2
    Limited, dated May 21, 2007 ........................... A-15311

Terra Firma Exhibit 11 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007 ............................................ A-15316

Terra Firma Exhibit 12 -
    E-mail from Smith to Kirshenbaum re EMI
    deal, dated May 21, 2007 .................................. A-15319

Terra Firma Exhibit 13 -
    E-mail from Smith to Mehta re EMI, dated
    May 21, 2007 ................................................... A-15320

lvii

**Page**

Terra Firma Exhibit 14 -
E-mail from Smith to Badhe re EMI, dated
May 21, 2007 .................................... A-15322

Terra Firma Exhibit 15 -
E-mail from Wormsley to Tague re Congrats
on EMI, dated May 22, 2007 ........................... A-15323

Terra Firma Exhibit 16 -
E-mail from Poyser to Vakilian re Terra Firma
Recommended Cash Offer, dated
May 21, 2007 .................................... A-15324

Terra Firma Exhibit 17 -
E-mail from Grigorova to Cockerill re
EMI/Maltby CCR July, dated
September 5, 2007 ............................ A-15326

Terra Firma Exhibit 19 -
E-mail from Smith to Small re CITI M&A
wins, dated May 21, 2007 ................................ A-15330

Terra Firma Exhibit 20 -
E-mail from Rowland to Laskowski and
Crocker re Terra Firma, dated
September 18, 2008 ........................... A-15332

Terra Firma Exhibit 22 -
E-mail from Miller to Zogheb re EMI, dated
May 16, 2007 .................................... A-15336

Terra Firma Exhibit 23 -
E-mail from Gildersleeve to Wormsley re
Roles, dated April 20, 2007 ............................ A-15338

lviii

**Page**

Terra Firma Exhibit 24 -
   Citi Franchise Risk Assessment Template for
   Maltby Investments Limited, Appendix 6B,
   dated June 1, 2009 ............................................. A-15339

Terra Firma Exhibit 25 -
   E-mail from Smith to Poyser re Chaka
   Feedback, dated May 17, 2007 ......................... A-15340

Terra Firma Exhibit 26 -
   E-mail from Wormsley to Poyser, *et al.*, re
   EMI credit call 5pm, dated May 17, 2007 ........ A-15341

Terra Firma Exhibit 27 -
   E-mail from Wormsley to Smith re FW: E-mail
   from Wormsley to McBride, dated
   May 21, 2007 .................................................... A-15342

Terra Firma Exhibit 28 -
   E-mail from Wormsley to Leat and Klein re
   marginal deal for Terra Firma, dated
   July 14, 2007 .................................................... A-15345

Terra Firma Exhibit 29 -
   E-mail from Wormsley to Hands re DAIG fees,
   dated November 7, 2006 ................................... A-15346

Terra Firma Exhibit 30 -
   E-mail from Wormsley to Hands re DAIG,
   dated October 23, 2006 .................................... A-15347

Terra Firma Exhibit 31 -
   E-mail from Wormsley to Hands re proposal,
   dated November 15, 2006 ................................. A-15348

Terra Firma Exhibit 32 -
   E-mail from Wormsley to Klein re Citi/Terra
   Firma party, dated November 21, 2006 ............ A-15349

lix

**Page**

Terra Firma Exhibit 33 -
  E-mail from Klein to Hands re Business
  Relationship, dated December 13, 2006 .......... A-15350

Terra Firma Exhibit 34 -
  E-mail from Tague to Lindsay re NBM #159
  Europe, dated March 9, 2007 ........................... A-15351

Terra Firma Exhibit 35 -
  E-mail from Tabet to Blagdon, Klein and
  Wormsley re TFCP III, dated May 2, 2007 ....... A-15356

Terra Firma Exhibit 38 -
  E-mail from Wormsley to Miller re call from
  Guy Hands, dated May 8, 2007 ....................... A-15357

Terra Firma Exhibit 40 -
  E-mail from Smith to Wormsley re talk with
  JG and EN, dated May 17, 2007 ...................... A-15358

Terra Firma Exhibit 41 -
  E-mail from Wormsley to Nicoli, Gildersleeve,
  Stewart re FW: Terra Firma, dated
  May 18, 2007 ................................................. A-15359

Terra Firma Exhibit 42 -
  E-mail from Shott to Bell re auction process
  and Antitrust Confirmation, dated
  May 20, 2007 ................................................. A-15360

Terra Firma Exhibit 43 -
  E-mail from Ashcroft to Stewart re Conference
  call at 10.30 am, dated May 20, 2007 ............... A-15364

Terra Firma Exhibit 46 -
  E-mail from Wormsley to Nicoli re EMI media
  Review, dated May 20, 2007 ........................... A-15366

lx

**Page**

Terra Firma Exhibit 47 -
    David Wormsley Mobile Phone Records........... A-15367

Terra Firma Exhibit 50 -
    E-mail from Wormsley to Klein re Markets and
    Banking, dated May 21, 2007 .......................... A-15377

Terra Firma Exhibit 51 -
    E-mail from Wormsley to Borrows fw Terra
    Firma, dated May 21, 2007 .............................. A-15378

Terra Firma Exhibit 52 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated May 21, 2007 ............................ A-15380

Terra Firma Exhibit 53 -
    E-mail from Watson to Dowler re Mulberry
    Final Press Announcement, dated
    May 21, 2007 .................................................... A-15389

Terra Firma Exhibit 55 -
    Minutes of a Telephone Meeting of the Wise
    Men Committee, dated July 23, 2007 .............. A-15416

Terra Firma Exhibit 56 -
    E-mail from Borrows to Nicoli *et al.* re EMI-
    Possible Script, dated July 31, 2007.................... A-15418

Terra Firma Exhibit 59 -
    E-mail from Wormsley to Klein re I spoke,
    dated April 17, 2007 ......................................... A-15419

Terra Firma Exhibit 60 -
    E-mail from Smith to Wormsley re FW: EMI,
    dated April 13, 2007 ......................................... A-15420

**lxi**

**Page**

Terra Firma Exhibit 61 -
E-mail from Wormsley to Klein and Smith re
proposals from Cerberus and Fortress, dated
April 19, 2007 .................................................. A-15421

Terra Firma Exhibit 62 -
E-mail from Barclay re EMI Media Review - 13
May 2007, dated May 13, 2007 ........................ A-15422

Terra Firma Exhibit 63 -
E-mail from Klein to Nicoli re General, dated
May 18, 2007 .................................................. A-15424

Terra Firma Exhibit 64 -
E-mail from Smith to Wormsley re EMI, dated
May 18, 2007 .................................................. A-15425

Terra Firma Exhibit 125 -
Interoffice memorandum from Lindsay to
Drayton, *et al.* re East Surrey Holdings, dated
February 17, 2005 ............................................ A-15426

Terra Firma Exhibit 194 -
Letter from Smith to Stewart re Engagement
Letter, dated September 4, 2006 ...................... A-15433

Terra Firma Exhibit 195 -
E-mail from Wormsley to Hands, dated
September 8, 2006 ........................................... A-15440

Terra Firma Exhibit 197 -
Terra Firma - Perspectives on Threshers, dated
September 25, 2006 ......................................... A-15441

Terra Firma Exhibit 201 -
Project Prince Working Party List, dated
November 1, 2006 ........................................... A-15461

**lxii**

Page

Terra Firma Exhibit 209 -
E-mail from Wormsley to Mylchreest, dated
November 23, 2006 ........................................... A-15490

Terra Firma Exhibit 214 -
EMI Group plc - Statement re preliminary
approach from Permira, dated
November 28, 2006 ........................................... A-15493

Terra Firma Exhibit 215 -
E-mail from Miller to Simpkin re EMI, dated
November 28, 2006 ........................................... A-15494

Terra Firma Exhibit 220 -
E-mail from Badhe to Hill re Fairness Opinion
Committee, dated November 29, 2006 ............. A-15496

Terra Firma Exhibit 221 -
Minutes from EMI Meeting of Directors, dated
November 29, 2006 ........................................... A-15498

Terra Firma Exhibit 224 -
E-mail from Smith to Wormsley, dated
November 30, 2006 ........................................... A-15504

Terra Firma Exhibit 230 -
E-mail from Ashcroft to Smith re Prince, dated
December 6, 2006 ............................................. A-15505

Terra Firma Exhibit 232 -
Minutes from EMI Meeting of Directors, dated
December 7, 2006 ............................................. A-15506

Terra Firma Exhibit 237 -
E-mail from Bell to Smith, dated
December 14, 2006 ........................................... A-15519

**lxiii**

**Page**

Terra Firma Exhibit 238 -
 E-mail from Smith to Wormsley, dated
 December 14, 2006 .......................................... A-15520

Terra Firma Exhibit 239 -
 E-mail from Smith to Wormsley re FW: Draft
 announcement, dated December 14, 2006 ........ A-15521

Terra Firma Exhibit 240 -
 E-mail from Wormsley to Robertson re
 Agenda, dated December 14, 2006 .................... A-15524

Terra Firma Exhibit 241 -
 E-mail from Nicoli to Gildersleeve re Project
 Prince, dated December 14, 2006 ...................... A-15525

Terra Firma Exhibit 242 -
 E-mail from McBride to Citi re EMI cessation
 announcement, dated December 14, 2006 ......... A-15527

Terra Firma Exhibit 243 -
 E-mail from Wormsley to Smith and EMI re
 TF For Urgent Reply Please, dated
 December 14, 2006 ............................................ A-15528

Terra Firma Exhibit 244 -
 Letter from Kelly to EMI Group plc, dated
 December 14, 2006 ............................................ A-15530

Terra Firma Exhibit 248 -
 "EMI Group plc - Statement re preliminary
 approach," EMI Press Release, dated
 December 14, 2006 ............................................ A-15532

Terra Firma Exhibit 250 -
 Letter from Nicoli to Kelly, dated
 December 15, 2006 ............................................ A-15533

**lxiv**

**Page**

Terra Firma Exhibit 274 -
E-mail from Simpkin to Miller re EMI, dated
January 4, 2007 ................................................. A-15534

Terra Firma Exhibit 280 -
Minutes from EMI Meeting of Directors, dated
January 10, 2007 .............................................. A-15536

Terra Firma Exhibit 281 -
E-mail from Jones to Cockerill re Pepe - terms,
dated January 11, 2007....................................... A-15539

Terra Firma Exhibit 283 -
EMI Press Release announcing restructuring,
dated January 12, 2007 ..................................... A-15545

Terra Firma Exhibit 285 -
E-mail from Smith to Wormsley, dated
January 12, 2007 ............................................... A-15548

Terra Firma Exhibit 314 -
EMI Press Release, dated February 14, 2007 ... A-15550

Terra Firma Exhibit 315 -
E-mail from Smith to Wormsley re EMI
Announcement, dated February 14, 2007.......... A-15551

Terra Firma Exhibit 317 -
E-mail from Smith to Swannell and Wormsley
re 6am Cut, dated February 15, 2007................. A-15552

Terra Firma Exhibit 318 -
Citigroup Analyst Report "EMI Group plc
Another Month, Another Warning," dated
February 15, 2007 ............................................. A-15557

Terra Firma Exhibit 329 -
EMI group confirms approach from Warner
Music group, dated February 20, 2007 ............. A-15569

lxv

**Page**

Terra Firma Exhibit 346 -
Minutes of a Meeting of the Board of Directors
of EMI, dated March 1, 2007 ........................... A-15571

Terra Firma Exhibit 347 -
Valuation Update, dated March 1, 2007 ........... A-15582

Terra Firma Exhibit 348 -
EMI Board Meeting Minutes, dated
March 1, 2007 .................................................. A-15597

Terra Firma Exhibit 366 -
"EMI GROUP plc - Statement re Possible
Offer," PR Newswire UK Disclose, dated
March 12, 2007 ................................................ A-15608

Terra Firma Exhibit 368 -
E-mail from Wormsley to Hands, dated
March 3, 2008 .................................................. A-15610

Terra Firma Exhibit 377 -
E-mail from Steffno to Cockerill re EMI
Greenlight Memo, dated March 9, 2007 .......... A-15615

Terra Firma Exhibit 380 -
E-mail from Nicoli to Faxon re Full year
target, dated March 12, 2007 ........................... A-15624

Terra Firma Exhibit 387 -
E-mail from Smith to CIB-CBKG re Viacom's
music publishing, dated March 22, 2007 .......... A-15627

Terra Firma Exhibit 391 -
E-mail from Smith to Wormsley re EMI, dated
March 26, 2007 ................................................ A-15629

**lxvi**

**Page**

Terra Firma Exhibit 392 -
  E-mail from Hill to Simpkin re (EUR) Wolters
  Kluwer Education falls to Bridgepoint, dated
  March 26, 2007 .................................................. A-15630

Terra Firma Exhibit 410 -
  E-mail from Simpkin to Smith re EMI - staple,
  dated April 3, 2007 .......................................... A-15633

Terra Firma Exhibit 412 -
  E-mail from Llewelyn-Jones to CIB-GFI re
  EMI, dated April 13, 2007 ................................ A-15635

Terra Firma Exhibit 416 -
  Letter from EMI board of Directors to
  Gildersleeve re the proposal, dated
  April 16, 2007 .................................................. A-15636

Terra Firma Exhibit 424 -
  E-mail from Seaton to Smith re FW: Trading
  statement, dated April 17, 2007 ....................... A-15646

Terra Firma Exhibit 427 -
  E-mail from Wormsley to Hands re new idea,
  dated April 18, 2007 ......................................... A-15651

Terra Firma Exhibit 429 -
  E-mail from EMI Investor Relations re EMI
  Group plc - trading statement, dated
  April 18, 2007 .................................................. A-15652

Terra Firma Exhibit 436 -
  E-mail from Smith to Estacio and Hill re Fee,
  dated April 19, 2007 ......................................... A-15654

Terra Firma Exhibit 438 -
  E-mail from Klein to Hands cc Wormsley,
  Burns, dated April 19, 2007 ............................. A-15655

lxvii

**Page**

Terra Firma Exhibit 439 -
    E-mail from Wormsley to Hands, Klein, cc
    Burns, dated April 19, 2007 ............................ A-15657

Terra Firma Exhibit 443 -
    Minutes of a Meeting of the Board of Directors
    of EMI, dated April 20, 2007 ........................... A-15659

Terra Firma Exhibit 444 -
    E-mail from Klein to Wormsley re Roles, etc.,
    dated April 20, 2007 ......................................... A-15667

Terra Firma Exhibit 445 -
    E-mail from Barak to Citi financing re Strictly
    Private & Confidential, dated April 20, 2007 ... A-15669

Terra Firma Exhibit 446 -
    E-mail from Barak to Citi financing re
    Cerberus Indication, dated April 20, 2007 ........ A-15681

Terra Firma Exhibit 447 -
    E-mail from Gildersleeve to Nicoli and
    Borrows re FW: E-mail from Wormsley to
    Gildersleeve, dated April 20, 2007 .................... A-15692

Terra Firma Exhibit 448 -
    E-mail from Smith to Seaton re Roles, dated
    April 20, 2007 .................................................... A-15694

Terra Firma Exhibit 449 -
    E-mail from Smith to Wormsley re Roles,
    dated April 20, 2007............................................ A-15696

Terra Firma Exhibit 454 -
    E-mail from Smith to Wormsley re Roles,
    dated April 22, 2007............................................ A-15698

lxviii

**Page**

Terra Firma Exhibit 455 -
   E-mail from Ashcroft to Wormsley re OEP
   Letter, dated April 23, 2007 .............................. A-15700

Terra Firma Exhibit 462 -
   E-mail from Ashcroft to Citi financing re
   Fortress follow up letter, dated April 24, 2007 .. A-15710

Terra Firma Exhibit 463 -
   Letter from Smith to Baxter (Takeover Panel),
   dated April 24, 2007.......................................... A-15714

Terra Firma Exhibit 464 -
   E-mail from Tabet to Swannell, Klein and
   Wormsley re Hands, dated April 25, 2007......... A-15716

Terra Firma Exhibit 465 -
   E-mail from Gildersleeve to Ashcroft re Citi
   and Deutsche, dated April 26, 2007.................. A-15717

Terra Firma Exhibit 468 -
   Letter from Smith to Stewart re provisions of
   advisory, dated April 27, 2007 .......................... A-15719

Terra Firma Exhibit 469 -
   E-mail from Coleman to Wolf re EMI, dated
   April 27, 2007 ................................................... A-15721

Terra Firma Exhibit 470 -
   E-mail from Smith to Wormsley re A3 page
   valuation summary, dated April 27, 2007.......... A-15723

Terra Firma Exhibit 479 -
   E-mail from Smith to Bell re EMI consent
   letter, Side letter re financing bidders, dated
   April 28, 2007 ................................................... A-15726

**lxix**

**Page**

Terra Firma Exhibit 480 -
E-mail from Smith to Stewart re Project
Mulberry, dated April 30, 2007......................... A-15729

Terra Firma Exhibit 481 -
E-mail from Smith to Ashcroft re Project
Mulberry, dated April 30, 2007......................... A-15732

Terra Firma Exhibit 484 -
Global FEG Working List Client Account List,
dated May 1, 2007............................................. A-15735

Terra Firma Exhibit 492 -
E-mail from Wormsley to Hands, dated
May 3, 2007 ..................................................... A-15754

Terra Firma Exhibit 496 -
EMI Press Release, dated May 4, 2007 ............. A-15755

Terra Firma Exhibit 497 -
E-mail from Cole to Ashcroft re Panel, dated
May 4, 2007 ..................................................... A-15757

Terra Firma Exhibit 498 -
E-mail from Cole to Bell re DB financing
trees, dated May 4, 2007 .................................. A-15761

Terra Firma Exhibit 501 -
EMI Press Release, dated May 4, 2007 ............. A-15762

Terra Firma Exhibit 508 -
"EMI Group plc - Statement re preliminary
approach," EMI Press Release, dated
May 4, 2007 ..................................................... A-15764

Terra Firma Exhibit 516 -
E-mail from McCluskey to Yang re FW:, dated
May 6, 2007 ..................................................... A-15765

**lxx**

                                                            **Page**

Terra Firma Exhibit 532 -
    E-mail from Smith to Wormsley re Terra
    Firma/EMI, dated May 8, 2007........................ A-15766

Terra Firma Exhibit 537 -
    E-mail from Hands to Wormsley re EMI, dated
    May 9, 2007 ...................................................... A-15767

Terra Firma Exhibit 538 -
    E-mail from Borrows to Gildersleeve re Dice,
    dated May 9, 2007............................................ A-15768

Terra Firma Exhibit 539 -
    E-mail from Smith to Hill & Estacio fw OEP,
    dated May 9, 2007............................................ A-15772

Terra Firma Exhibit 540 -
    E-mail from Wormsley to Gildersleeve re Dice,
    dated May 9, 2007............................................ A-15773

Terra Firma Exhibit 541 -
    E-mail from Bell to Wormsley re Terra Firma
    Support Letter, dated May 9, 2007 ................... A-15777

Terra Firma Exhibit 543 -
    E-mail from Simpkin to Wormley and Smith re
    Project Dice/TF, dated May 10, 2007 ............... A-15784

Terra Firma Exhibit 544 -
    E-mail from Smith to Poyser re Project
    Dice/TF, dated May 10, 2007............................ A-15785

Terra Firma Exhibit 546 -
    E-mail from Ashcroft to Gildersleeve fw
    TF/DB financing tree, dated May 10, 2007 ....... A-15787

Terra Firma Exhibit 548 -
    Project Mulberry Bidders Contact Details,
    dated May 11, 2007........................................... A-15789

lxxi

**Page**

Terra Firma Exhibit 552 -
    E-mail from Wormsley to Bell re Mulberry,
    dated May 11, 2007 ........................................... A-15814

Terra Firma Exhibit 553 -
    E-mail from Bell to Smith and Wormsley re
    Mondays meeting, dated May 11, 2007 ............. A-15816

Terra Firma Exhibit 554 -
    E-mail from Smith to McCluskey re Just left
    you a voicemail, dated May 11, 2007 ............... A-15820

Terra Firma Exhibit 555 -
    E-mail from Simpkin to Edwards re Hope you
    are well. re EMI, dated May 11, 2007 ............... A-15821

Terra Firma Exhibit 558 -
    E-mail from Gildersleeve to EMI re Mulberry -
    Data Room - IMPALA, dated May 13, 2007 ..... A-15822

Terra Firma Exhibit 564 -
    E-mail from Barak to Smith re Citi Financing,
    dated May 14, 2007 ........................................... A-15826

Terra Firma Exhibit 570 -
    E-mail from Estacio to Klein fw Full DDT
    procedures - Project Mulberry, dated
    May 15, 2007 ..................................................... A-15828

Terra Firma Exhibit 578 -
    E-mail from Bell to Citi Financing re Project
    Mulberry Update, dated May 16, 2007 .............. A-15834

Terra Firma Exhibit 579 -
    E-mail from Zogheb to Miller re EMI, dated
    May 16, 2007 ..................................................... A-15835

**lxxii**

**Page**

Terra Firma Exhibit 582 -
  E-mail from Wormsley to Gildersleeve and
  Nicoli re call from Guy Hands, dated
  May 16, 2007 ...................................................... A-15837

Terra Firma Exhibit 593 -
  Project Mulberry Working Party List, dated
  May 17, 2007 ...................................................... A-15838

Terra Firma Exhibit 594 -
  E-mail from Brumpton to Klein re LF/SEC
  call, dated May 17, 2007.................................... A-15863

Terra Firma Exhibit 597 -
  E-mail from Klein to Wormsley re EMI Credit
  call 5pm New York Time, dated May 17, 2007. A-15865

Terra Firma Exhibit 598 -
  E-mail from Leat to Klein re Call, dated
  May 17, 2007 ...................................................... A-15866

Terra Firma Exhibit 599 -
  E-mail from Wormsley to Klein re Call Guy
  Hands, dated May 17, 2007 ............................... A-15867

Terra Firma Exhibit 600 -
  E-mail from Curtis to Klein re David
  Wormsley called, VERY URGENT, dated
  May 17, 2007 ...................................................... A-15868

Terra Firma Exhibit 604 -
  E-mail from Bell to Gildersleeve re Update
  from C, dated May 17, 2007 .............................. A-15869

Terra Firma Exhibit 607 -
  E-mail from Wormsley to Klein, dated
  May 17, 2007 ...................................................... A-15870

lxxiii

**Page**

Terra Firma Exhibit 608 -
    E-mail from Klein to Hands re Call, dated
    May 17, 2007 ..................................................... A-15871

Terra Firma Exhibit 619 -
    E-mail from Wormsley to Poyser re Issue on
    covenants, dated May 18, 2007......................... A-15872

Terra Firma Exhibit 620 -
    E-mail from Wormsley to Tabet re Covenants,
    dated May 18, 2007........................................... A-15873

Terra Firma Exhibit 621 -
    E-mail from Poyser to Wormsley re interest
    coverage covenant, dated May 18, 2007............ A-15874

Terra Firma Exhibit 623 -
    E-mail from Smith to Poyser re Debt approval,
    dated May 18, 2007........................................... A-15875

Terra Firma Exhibit 630 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 2 Ltd 8:00am,
    dated May 18, 2007........................................... A-15877

Terra Firma Exhibit 631 -
    E-mail from Stewart to Wormsley re call, dated
    May 18, 2007 ................................................... A-15889

Terra Firma Exhibit 632 -
    E-mail from Stewart to Wormsley re returning
    call, dated May 18, 2007................................... A-15890

Terra Firma Exhibit 636 -
    E-mail from Nicoli to Stewart re Draft process
    E-mail to be sent to bidders tomorrow, dated
    May 18, 2007 ................................................... A-15891

lxxiv

**Page**

Terra Firma Exhibit 640 -
  E-mail from Watson to Cole & Citi re
  Mulberry Mark-ups of Crimson Documents,
  dated May 18, 2007............................................ A-15894

Terra Firma Exhibit 643 -
  Greenhill: Fairness Opinion/Advice Review
  Form, dated May 18, 2007.................................. A-15896

Terra Firma Exhibit 644 -
  E-mail from Barak to Bell *et al.* re Update on
  calls with bidders, dated May 18, 2007 ............. A-15898

Terra Firma Exhibit 645 -
  E-mail from Borrows to Gildersleeve re
  Hands, dated May 18, 2007 ............................... A-15902

Terra Firma Exhibit 648 -
  E-mail from Borrows to Bell re draft process,
  dated May 18, 2007............................................ A-15903

Terra Firma Exhibit 649 -
  E-mail from O'Brien to Citi and EMI re EMI-
  NY Post, Dow Jones, dated May 18, 2007 ........ A-15905

Terra Firma Exhibit 659 -
  Minutes of the Meeting of the Board of
  Directors of Terra Firma (GP) 3 Ltd 8:30am,
  dated May 18, 2007............................................ A-15911

Terra Firma Exhibit 661 -
  E-mail from Pryce to Burrows cc Wormsley re
  Terra Firma, dated May 18, 2007 ...................... A-15923

Terra Firma Exhibit 674 -
  E-mail from Bell to Gildersleeve re EMI
  conference call, dated May 19, 2007 ................ A-15924

**lxxv**

Page

Terra Firma Exhibit 694 -
    Minutes of the Meeting of the Board of
    Directors of Terra Firma (GP) 3 Ltd 4:00pm,
    dated May 20, 2007............................................. A-15925

Terra Firma Exhibit 702 -
    E-mail from Watson to Ashcroft, cc Smith,
    Cole, *et al.*, re Mulberry - Key Issues Table and
    Turquoise Position, dated May 20, 2007 ........... A-15928

Terra Firma Exhibit 715 -
    E-mail from Quigley to O'Haire, Van der Spuy
    re FW: Update on Dice financing for
    discussion tomorrow, dated May 20, 2007 ........ A-15935

Terra Firma Exhibit 720 -
    E-mail from Smith to Wormsley re Mulberry
    Key issues table and Turquoise position, dated
    May 20, 2007 ...................................................... A-15940

Terra Firma Exhibit 726 -
    E-mail from Bell to Borrows re Trustee
    meeting notes, dated May 20, 2007 .................. A-15943

Terra Firma Exhibit 729 -
    E-mail from Wormsley to Hands, dated
    May 20, 2007 ...................................................... A-15944

Terra Firma Exhibit 736 -
    Minutes of a Meeting of a Committee of the
    Board of Directors of Terra Firma (GP) 3 Ltd
    at 8:00am, dated May 21, 2007.......................... A-15947

Terra Firma Exhibit 744 -
    E-mail from Hill to Shah re Citi M&A Wins:
    EMI Group/Terra Firma, dated May 21, 2007 .. A-15950

lxxvi

**Page**

Terra Firma Exhibit 746 -
Project Mulberry Fairness Committee
Materials, dated May 21, 2007 ........................ A-15952

Terra Firma Exhibit 749 -
E-mail from Smith to Llewelyn-Jones re
Project Maverik, dated May 21, 2007 ............... A-15958

Terra Firma Exhibit 750 -
E-mail from Wormsley to Smith re Greenhill
Draft, dated May 21, 2007 ................................ A-15960

Terra Firma Exhibit 752 -
E-mail from Hill to Smith re EMI, dated
May 21, 2007 ................................................... A-15963

Terra Firma Exhibit 756 -
E-mail from Smith to Bichara, Estacio, Hill,
Abbasi, Golebiewski re Citi M&A Wins: EMI
Group/Terra Firma, dated May 21, 2007 .......... A-15964

Terra Firma Exhibit 757 -
E-mail from Smith to Swannell re EMI, dated
May 21, 2007 ................................................... A-15966

Terra Firma Exhibit 758 -
E-mail from Smith to Suen and Mcbride re
EMI M&A Wins, dated May 21, 2007 .............. A-15967

Terra Firma Exhibit 760 -
Stokes Notebook, dated May 20, 2007 ............. A-15970

Terra Firma Exhibit 763 -
E-mail from Vakilian to Poyser re (RNS) Terra
Firma Invest Recommended Cash Offer, dated
May 21, 2007 ................................................... A-15973

lxxvii

**Page**

Terra Firma Exhibit 765 -
    E-mail from Poyser to Lee re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15975

Terra Firma Exhibit 766 -
    E-mail from Poyser to Abbasi re (RNS) Terra
    Firma Invest Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15977

Terra Firma Exhibit 767 -
    E-mail from Poyser to Vakilian re (RNS) Terra
    Firma Recommended Cash Offer, dated
    May 21, 2007 ..................................................... A-15979

Terra Firma Exhibit 768 -
    E-mail from Wormsley to Smith re update on
    call with GH, dated May 21, 2007 ................... A-15981

Terra Firma Exhibit 783 -
    Project Mulberry Valuation Materials,
    Greenhill & Co., dated May 21, 2007 ............... A-15982

Terra Firma Exhibit 787 -
    E-mail from Simpkin to Treco re Call, dated
    May 22, 2007 ..................................................... A-15991

Terra Firma Exhibit 788 -
    E-mail from Smith to Skarbek re Citi M&A
    wins, dated May 22, 2007 ................................. A-15992

Terra Firma Exhibit 791 -
    E-mail from Temming to Poyser re Example
    for us all, dated May 22, 2007 ......................... A-15994

Terra Firma Exhibit 795 -
    E-mail from Poyser to Smith re Example for us
    all, dated May 22, 2007 .................................... A-15995

lxxviii

**Page**

Terra Firma Exhibit 796 -
    E-mail from Poyser to Smith re Dice, dated
    May 22, 2007 .................................................. A-15996

Terra Firma Exhibit 802 -
    E-mail from Poyser to Smith re financing
    process, dated May 23, 2007 ........................... A-15998

Terra Firma Exhibit 806 -
    E-mail from Poyser to Smith re financing
    process, dated May 24, 2007............................ A-16001

Terra Firma Exhibit 815 -
    David Wormsley Mobile Phone Records .......... A-16006

Terra Firma Exhibit 819 -
    E-mail from Wormsley to Hands re Thistle
    Hotels, dated May 29, 2007 ............................. A-16014

Terra Firma Exhibit 820 -
    E-mail from Gildersleeve to Wormsley, dated
    May 29, 2007 .................................................. A-16015

Terra Firma Exhibit 824 -
    E-mail from Nesbit to Grigorova re Project
    Dice, dated May 30, 2007................................. A-16016

Terra Firma Exhibit 827 -
    E-mail from Smith to Blackburn re MDs
    meeting Monday, June 4 at 8:15 UK time,
    dated May 31, 2007.......................................... A-16020

Terra Firma Exhibit 831 -
    Citi Markets & Banking Credit Risk
    Principles, Policies and Procedures, dated
    June 1, 2007 .................................................... A-16022

**lxxix**

**Page**

Terra Firma Exhibit 833 -
Recommended Cash Offer by Maltby-a
company formed at the direction of Terra
Firma-for EMI Group plc, dated June 7............. A-16246

Terra Firma Exhibit 846 -
E-mail from Aldred (on behalf of Hands) to
Van der Spuy re Message from Guy Hands -
Project Dice, dated June 27, 2007...................... A-16410

Terra Firma Exhibit 872 -
E-mail from Wormsley to Gildersleeve and
Nicoli re Terra Firma, dated July 4, 2007 .......... A-16411

Terra Firma Exhibit 874 -
E-mail from Poyser to Smith re Your revenue
list as at 4th July 2007, dated July 4, 2007 ........ A-16412

Terra Firma Exhibit 882 -
E-mail from King to Klein re Riverdeep, dated
July 9, 2007........................................................ A-16414

Terra Firma Exhibit 883 -
E-mail from Hill to Lee re your revenue list as
at 4th July 2007, dated July 9, 2007................... A-16415

Terra Firma Exhibit 887 -
E-mail between Wormsley and Leat regarding
advice, dated July 9, 2007.................................. A-16416

Terra Firma Exhibit 903 -
E-mail from Simpkin to Lavelle re EMI Equity
Bridge, dated July 16, 2007 ............................... A-16417

Terra Firma Exhibit 917 -
E-mail from Borrows to Gildersleeve, Nicoli,
*et al.*, re Board Presentation, dated
July 18, 2007..................................................... A-16418

**lxxx**

**Page**

Terra Firma Exhibit 918 -
E-mail from King to Klein re Terra Firma
(High Importance), dated July 18, 2007 ............ A-16432

Terra Firma Exhibit 923 -
E-mail from Smith to Stewart re Invoice to
Stewart, dated July 19, 2007 .............................. A-16434

Terra Firma Exhibit 971 -
E-mail from Cockerill to Grigorova and Jones
re EMI CCR, dated July 31, 2007 ...................... A-16438

Terra Firma Exhibit 987 -
E-mail from Hill to Smith, dated
August 6, 2007 .................................................. A-16439

Terra Firma Exhibit 992 -
E-mail from Klein to Prince re EMI-DO NOT
FORWARD, dated August 8, 2007 .................... A-16440

Terra Firma Exhibit 993 -
E-mail from Klein to Mehta re Warner-
confidential, dated August 8, 2007 ................... A-16442

Terra Firma Exhibit 994 -
E-mail from Wirdnam to Leat re Terra Firma
Project Update, dated August 9, 2007 ............... A-16443

Terra Firma Exhibit 1004 -
E-mail from Klein to Volk *et al.* re W, "Guy
Spoke to Edgar and offered 3B," dated
August 11, 2007 ................................................ A-16444

Terra Firma Exhibit 1006 -
E-mail from Klein to Volk *et al.* re FW: edgar,
"4B value of EMI," dated August 12, 2007 ....... A-16445

lxxxi

Page

Terra Firma Exhibit 1019 -
    E-mail from Smith to Watson re Mulberry Citi
    Payment, dated August 17, 2007 ...................... A-16446

Terra Firma Exhibit 1026 -
    E-mail from Barker to Leat fw EMI, dated
    August 24, 2007 ................................................ A-16447

Terra Firma Exhibit 1040 -
    E-mail from Smith to CMB-GBKG re Quote
    of the Day, dated September 10, 2007 .............. A-16448

Terra Firma Exhibit 1074 -
    Memorandum from Simpkin *et al.* to Klein *et
    al.* re Project Dice (Public to Private of EMI),
    dated November 16, 2007 .................................. A-16449

Terra Firma Exhibit 1080 -
    E-mail from Wormsley to Klein re Guy Hands,
    dated November 23, 2007 .................................. A-16459

Terra Firma Exhibit 1100 -
    E-mail from Wormsley to Lynn re meeting
    with EMI, dated January 4, 2008 ...................... A-16460

Terra Firma Exhibit 1109 -
    E-mail from Smith to Poyser re trusted adviser,
    dated January 30, 2008 ...................................... A-16461

Terra Firma Exhibit 1111 -
    E-mail from Wormsley to Hands cc Burns,
    dated February 1, 2008 ...................................... A-16463

Terra Firma Exhibit 1114 -
    E-mail from Wormsley to Hands, dated
    February 19, 2008 ............................................. A-16466

**lxxxii**

Page

Terra Firma Exhibit 1141 -
Franchise Rise Assessment Template, dated
July 2008.............................................................. A-16470

Terra Firma Exhibit 1144 -
Handwritten Notes of Cockerill, dated
September 1, 2008 ............................................. A-16471

Terra Firma Exhibit 1147 -
E-mail from Smith to Wormsley re FW:
Morgan Stanley CDs now officially higher than
EMI!!! Hurrah, dated September 18, 2008........... A-16472

Terra Firma Exhibit 1158 -
Handwritten Notes of Cockerill, dated
November 16, 2008........................................... A-16473

Terra Firma Exhibit 1176 -
E-mail from Cox to Smith re City Speaker
Series - 12th February, Wormsley Presentation,
dated February 11, 2009.................................... A-16476

Terra Firma Exhibit 1196 -
Franchise Risk Assessment Template, Maltby
Investments Limited, dated June 2009............... A-16529

Terra Firma Exhibit 1225 -
E-mail from Smith to Vakilian re Citigroup
accused of fraud over EMI sale, dated
December 13, 2009 ........................................... A-16530

Terra Firma Exhibit 1241 -
Compliance "Tree" for EMI group, dated
January 14, 2010 .............................................. A-16532

**lxxxiii**

**Page**

Terra Firma Exhibit 1251 -
    Baughman to Duffy re supplement to Citi's
    response to Terra Firma's Interrogatory No. 5,
    dated March 25, 2010 ........................................ A-16536

Terra Firma Exhibit 1313 -
    EMI Trading Update ........................................ A-16539

Terra Firma Exhibit 1346 -
    EMI Stock Price.xls ........................................ A-16541

Terra Firma Exhibit 1365 -
    E-mail from Wormsley to Hands re DAIG-
    subject to contract, dated November 23, 2006... A-16590

Terra Firma Exhibit 1367 -
    E-mail from Wormsley to Smith, dated
    November 28, 2006............................................ A-16592

Terra Firma Exhibit 1369 -
    E-mail from Smith to Wormsley re EMI, dated
    December 20, 2006 ........................................... A-16593

Terra Firma Exhibit 1370 -
    E-mail from Wormsley to Klein re Call, dated
    May 17, 2007 .................................................... A-16594

Terra Firma Exhibit 1371 -
    E-mail from Coats to Dolenec re Project Dice,
    dated May 21, 2007............................................ A-16595

Terra Firma Exhibit 1372 -
    E-mail from Wormsley to Klein re EMI, dated
    August 2, 2007.................................................. A-16596

Terra Firma Exhibit 1377 -
    E-mail from Seymour to Van der Spuy re
    Project Dice memo, dated May 15, 2007........... A-16597

lxxxiv

**Page**

Terra Firma Exhibit 1380 -
Minutes of the May 20, 2007 Meeting of the
IAC of TFCPL, dated May 20, 2007 ................. A-16608

Terra Firma Exhibit 1381 -
Kirsten Randell notebook ................................ A-16610

Terra Firma Exhibit 1395 -
Amended and Restated Fee Letter, dated
August 13, 2007 ................................................. A-16751

Terra Firma Exhibit 1400 -
E-mail from Rawlings to Silva, Reeves cc
Govinida, Dubin re Maltby - fees, dated
August 31, 2007 ................................................. A-16761

Terra Firma Exhibit 1407 -
E-mail from Wormsley to Klein, dated
November 21, 2007 ............................................ A-16763

Terra Firma Exhibit 1409 -
E-mail from Wormsley to Hands re BUPA
hospitals, dated June 18, 2007 .......................... A-16764

Terra Firma Exhibit 1415 -
E-mail from Seth to Simpkin, *et al.*, re EMI
staple plan, attaching EMI Recd Financing.xls
and EMI Group Financing.xls, dated
April 1, 2007 ..................................................... A-16765

Terra Firma Exhibit 1434 -
David Wormsley deposition excerpts (pp. 159-
170:18), dated July 20, 2010 .............................. A-16872

Terra Firma Exhibit 1436 -
Stipulation re Eric Nicoli .................................. A-16885

**lxxxv**

                                                                    **Page**

Citi Exhibit A-1 -
    Page 27, Paragraph 109 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16886

Citi Exhibit A-2 -
    Page 28, Paragraph 110 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16888

Citi Exhibit A-7 -
    Pages 31-32, Paragraph 126 of Complaint in
    *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16890

Citi Exhibit A-8 -
    Page 32, Paragraph 128 of Complaint in *Terra
    Firma v. Citigroup*, dated December 11, 2009 .. A-16893

Citi Exhibit A-11 -
    Page 32-33, paragraphs 127-129 of Complaint
    in *Terra Firma v. Citigroup*, dated
    December 11, 2009 ........................................... A-16895

Citi Exhibit C -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re URGENT & IMPORTANT-
    EMI, dated May 6, 2007 .................................... A-16898

Citi Exhibit D -
    Minutes of May 7, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma, dated May 7, 2007 ................................. A-16900

Citi Exhibit E -
    E-mail from Seymour to Becker, *et al.*, with
    attached Project Dice Memo to the GP, dated
    May 7, 2007 ...................................................... A-16902

**lxxxvi**

**Page**

Citi Exhibit H -
Minutes of May 15, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma, dated May 15, 2007 .............................. A-16914

Citi Exhibit I -
Memo from Punja, *et al.*, to the IAC re Project
Dice update, dated May 15, 2007 .................... A-16916

Citi Exhibit J -
E-mail thread ending with E-mail from Slattery
to Randell, *et al.*, re IAC Distribution List
DICE, dated May 19, 2007 .............................. A-16923

Citi Exhibit K -
Minutes of May 18, 2007, Terra Firma
Investment Advisory Committee Meeting,
dated May 18, 2007 ......................................... A-16927

Citi Exhibit L -
Minutes of May 20, 2007, Meeting of the
Investment Advisory Committee of Terra
Firma Capital Partners Limited, dated
May 20, 2007 ................................................... A-16929

Citi Exhibit P -
Project Dice Update to the IAC, dated
June 28, 2007 .................................................. A-16931

Citi Exhibit W -
E-mail from Vallance on behalf of Hands to
Punja, *et al.*, re Project Dice: 2008 Forecast vs.
Model, dated August 24, 2007 ......................... A-16957

Citi Exhibit AK -
Project Mulberry Limited Scope Vendor Due
Diligence Report, dated May 4, 2007 .............. A-16959

lxxxvii

**Page**

Citi Exhibit BL -
Letter from Stokes to Gildersleeve re Terra
Firma, dated May 21, 2007 .............................. A-17001

Citi Exhibit BM -
Project Mulberry Valuation Materials, dated
May 21, 2007 ................................................... A-17011

Citi Exhibit BP -
E-mail from Night BA to Amstutz, *et al.*, re
EMI Co-Investment Opportunity, with attached
EMI Presentation to Co-Investors, dated
August 20, 2007 ............................................... A-17020

Citi Exhibit BR -
E-mail thread ending with E-mail from Night
BA to Tequila Bone, with attached co-investor
presentation, dated September 7, 2007 ............. A-17032

Citi Exhibit CA -
E-mail from Vallance to TF Team Dice re EMI
Due Diligence, dated September 25, 2007......... A-17065

Citi Exhibit CK -
E-mail thread ending with E-mail from Punja
to Hands re Revised financing E-mail, dated
May 17, 2007 ................................................... A-17068

Citi Exhibit DP -
Guernsey Airport Landing Dues Information
System, dated August 3, 2010........................... A-17070

Citi Exhibit DR -
Memo from Punja, *et al.*, to IAC, *et al.*, re
Project Dice Phase One Due Diligence, dated
February 5, 2007 .............................................. A-17071

lxxxviii

**Page**

Citi Exhibit DT -
    E-mail from Vallance on behalf of Hands to
    Wormsley re Hands' desire to speak with
    Wormsley ASAP, dated May 6, 2007 ............... A-17087

Citi Exhibit DW -
    E-mail from Vallance on behalf of Hands to
    Punja, *et al.*, re Project Dice, dated
    May 7, 2007 .................................... A-17088

Citi Exhibit DX -
    E-mail thread ending with E-mail from Hands
    to Hedegaard, *et al.*, re Project Dice, dated
    May 6, 2007 .................................... A-17090

Citi Exhibit DY -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 10:00 a.m. (GP3), dated
    May 8, 2007 .................................... A-17092

Citi Exhibit EA-1 -
    Terra Firma's telephone records from British
    Telecom, dated August 2, 2007......................... A-17101

Citi Exhibit EA-2 -
    Airtime Billing Reporting Team Itemisation
    Report for TFCP Ltd., dated April 1, 2007 ....... A-17167

Citi Exhibit EB -
    E-mail thread ending with E-mail from
    Vallance on behalf of Hands to Klein re request
    for Klein to call Hands, dated May 18, 2007..... A-17204

Citi Exhibit EC -
    E-mail thread ending with E-mail from
    Vallance on behalf of Hands to Wormsley re
    request for Wormsley to call Hands, dated
    May 18, 2007 ................................... A-17205

lxxxix

**Page**

Citi Exhibit ED -
    E-mail thread ending with E-mail from Tabet
    to Hands re EMI, dated May 18, 2007 .............. A-17206

Citi Exhibit EE -
    E-mail thread ending with E-mail from Aldred
    to Hands, *et al.*, re Relationship between Roger
    Ames and Cerberus Capital Management,
    dated September 24, 2007 ................................. A-17208

Citi Exhibit EH -
    Project Dice Presentation by Terra Firma, with
    E-mail thread ending with E-mail from Punja
    to Hands re Process, dated May 20, 2007 ......... A-17209

Citi Exhibit EI -
    E-mail thread ending with E-mail from Punja
    to Hands re Process, dated May 20, 2007 ......... A-17286

Citi Exhibit EJ -
    Minutes of May 20, 2007, Meeting of the Terra
    Firma (GP) 2 Board of Directors, dated
    May 20, 2007 ................................................... A-17290

Citi Exhibit EL -
    E-mail thread ending with E-mail from Hands
    to Wormsley re outstanding issues between Citi
    and Terra Firma, dated May 20, 2007 ............... A-17293

Citi Exhibit EO -
    Minutes of May 23, 2007, Meeting of the
    Investment Advisory Committee of Terra
    Firma Capital Partners, Limited, dated
    May 23, 2007 ................................................... A-17296

**xc**

                                                                    **Page**

Citi Exhibit EQ -
    E-mail from Vallance to Terra Firma Team
    Dice, *et al.*, re Weekly Dice Updates for IAC,
    dated June 14, 2007 ........................................... A-17298

Citi Exhibit ET -
    Press release re Recommended Cash Offer for
    EMI Group plc by Maltby Limited, dated
    July 20, 2007 .................................................... A-17299

Citi Exhibit FB-1 -
    Declaration of John Loveridge, dated
    February 3, 2010 ............................................... A-17302

Citi Exhibit FD -
    Terra Firma Investments (GP) 3 Limited
    Advisory Agreement Relating to Terra Firma
    Capital Partners III, L.P., dated
    February 8, 2006 ............................................... A-17311

Citi Exhibit FG -
    Draft Memo from Punja, *et al.* to the IAC re
    Project Dice: Presentation and Success Fee,
    dated May 18, 2007 .......................................... A-17331

Citi Exhibit FI -
    Minutes of May 15, 2007, Meeting of Terra
    Firma (GP) 3 Board of Directors, dated
    May 15, 2007 ................................................... A-17332

Citi Exhibit FN -
    Minutes of May 20, 2007, Meeting of the
    Board of Directors at 4:00 p.m. (GP3), dated
    May 20, 2007 ................................................... A-17334

xci

**Page**

Citi Exhibit FO -
    Minutes of May 21, 2007, Meeting of the
    Board of Directors at 7:30 a.m. (GP2), dated
    May 21, 2007 ...................................................... A-17337

Citi Exhibit FP -
    Terra Firma Presentation to GP re Project Dice,
    dated May 21, 2007............................................. A-17340

Citi Exhibit FR -
    Memo Recommending Cash Offer by Maltby
    Limited for EMI Group plc, dated
    May 30, 2007 ..................................................... A-17350

Citi Exhibit FV -
    Letter from Kelly to EMI Group plc re Terra
    Firma's interest as a potential offeror for EMI,
    dated December 14, 2006 .................................. A-17512

Citi Exhibit FX -
    E-mail from Van der Spuy to Bell, *et al.*, with
    attached Project Dice: Management Meeting
    questions and attendees, dated
    May 11, 2007 ..................................................... A-17514

Citi Exhibit GF -
    Letter from Kelly to Gildersleeve re Summary
    Proposal for Terra Firma potential offer, dated
    May 8, 2007 ...................................................... A-17533

Citi Exhibit GG -
    Minutes of May 8, 2007, Meeting of the Board
    of Directors at 8:45 a.m. (GP2), dated
    May 8, 2007 ...................................................... A-17537

xcii

**Page**

Citi Exhibit GM -
E-mail thread ending with E-mail from Nicoli
to Stewart, *et al.*, re E-mail to be sent to
bidders tomorrow, dated May 18, 2007 ............. A-17548

Citi Exhibit GN -
E-mail thread ending with E-mail from
Wormsley to Simpkin, *et al.*, re Terra
Firma/EMI, dated May 8, 2007 ........................ A-17551

Citi Exhibit GP -
Terra Firma Presentation to Investment
Advisory Committee re Project Dice, dated
May 18, 2007 ................................................... A-17552

Citi Exhibit GQ -
E-mail from Pryce to Burrows, *et al.*, re Terra
Firma, dated May 18, 2007 ................................ A-17712

Citi Exhibit GY -
E-mail from Melvin to Hands, *et al.*, re Urgent-
EMI/Terra, dated May 22, 2007 ........................ A-17713

Citi Exhibit HH -
E-mail from Shaw to Nicoli re Trading
statement, dated April 18, 2007 ........................ A-17714

Citi Exhibit HU -
Project Dice Presentation: Update to the IAC,
dated June 21, 2007 .......................................... A-17717

Citi Exhibit HZ -
E-mail thread ending with E-mail from Van der
Spuy to O'Haire, *et al.*, re Update on Dice
Financing for Discussion Tomorrow, dated
May 20, 2007 ................................................... A-17738

xciii

**Page**

Citi Exhibit IC -
  E-mail from Vallance to Hudson, *et al.*, re
  Cerberus/TF call, dated June 1, 2007 ............... A-17744

Citi Exhibit ID -
  Court Order in the High Court of Justice,
  Queen's Bench Division, dated
  August 16, 2010 ................................................ A-17749

Citi Exhibit IE -
  Journey Log Book for aircraft Cs-DXJ
  registered with the Portuguese Registry
  entitled, "Diário de Navegaçao," dated
  May 24, 2007 .................................................... A-17758

Citi Exhibit IF -
  Screen Shot: Build Reservation for Terra
  Firma, dated May 20, 2007 ................................ A-17761

Citi Exhibit IW -
  Terra Firma Capital Partners II Q3 2007, dated
  November 1, 2007 ............................................. A-17762

Citi Exhibit JC -
  E-mail from Reid to Seymour re Final Version
  of McK docs, dated, with attachment
  May 16, 2007 .................................................... A-17807

Citi Exhibit JD -
  Terra Firma Music Industry Key Market
  Outlook, dated May 15, 2007 ............................ A-18001

Citi Exhibit JE -
  KPMG Report - Project Dice - Limited Scope
  due financial diligence report, dated
  May 17, 2007 ................................................... A-18128

xciv

**Page**

Citi Exhibit JI -
E-mail from Vallance on behalf of Hands to TF
Team Dice re Dice and RBS, dated
May 8, 2007 ...................................................... A-18232

Citi Exhibit JN -
Minutes of the May 18, 2007, EMI Group plc
meeting of the Directors, dated May 18, 2007... A-18233

Citi Exhibit JP -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated June 28, 2007 ................. A-18240

Citi Exhibit JQ -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 5, 2007 ................... A-18243

Citi Exhibit JR -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 13, 2007 ................. A-18246

Citi Exhibit JS -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 20, 2007 ................. A-18249

Citi Exhibit JT -
Recommended Cash Offer by Maltby Limited
for EMI Group, dated July 28, 2007 ................. A-18252

Citi Exhibit KA -
E-mail from Dowler to Hands re Dice, dated
May 21, 2007 ................................................... A-18255

Citi Exhibit KF -
E-mail from Robert-Tissot to Hands re
Gatwick, dated February 6, 2009 ...................... A-18257

xcv

**Page**

Citi Exhibit KH -
  E-mail from Wormsley to Cabrey re Hands -
  Invitation to Terra Firma Annual Clay Pigeon
  Shoot, dated July 1, 2008 ................................. A-18259

Citi Exhibit KJ -
  Terra Firma Annual Review 2007, dated
  June 29, 2005 ................................................... A-18262

Citi Exhibit KY -
  Terra Firma Private Placement Memorandum,
  dated April 1, 2006 ........................................... A-18382

Citi Exhibit LI -
  Memo from Punja, *et al.*, to Hands, *et al.*, re
  EMI Preliminary Discussion, dated
  December 1, 2006 ............................................. A-18482

Citi Exhibit MB -
  Signed Minutes of the February 5, 2007,
  Meeting of the IAC, dated February 5, 2007 ..... A-18491

Citi Exhibit NE -
  Letter from Smith to Stewart re Provision of
  Advisory and Corporate Broking Services by
  Citigroup, dated April 27, 2007 ....................... A-18493

Citi Exhibit OF -
  Letter from Kelly to Gildersleeve re possible
  offer for EMI Group plc, dated May 8, 2007 .... A-18495

Citi Exhibit OG -
  E-mail thread ending with E-mail from Miller
  to Wormsley, dated May 8, 2007 ..................... A-18499

Citi Exhibit OJ -
  E-mail from Wormsley to Hands re EMI, dated
  May 8, 2007 ................................................... A-18500

xcvi

**Page**

Citi Exhibit OM -
    Project Mulberry Bidders Contact Detail, dated
    May 11, 2007 .................................................... A-18501

Citi Exhibit OO -
    E-mail thread ending with E-mail from Van der
    Spuy to Simpkin, *et al.*, re Project Dice:
    Financing Timeline, dated May 11, 2007 ......... A-18526

Citi Exhibit OW -
    Minutes of May 15, 2007, Meeting of the
    Board of Directors at 7:30 p.m. (GP2), dated
    May 15, 2007 .................................................... A-18529

Citi Exhibit PY -
    E-mail thread ending with E-mail from Klein
    to Wormsley, dated May 17, 2007 ................... A-18531

Citi Exhibit QH -
    E-mail from Wilkins to Nicoli, *et al.*, re
    Wormsley call, dated May 18, 2007 ................. A-18533

Citi Exhibit RU -
    E-mail thread ending with E-mail from Nicoli
    to Wormsley re EMI media review, dated
    May 20, 2007 .................................................... A-18534

Citi Exhibit UD -
    E-mail thread ending with E-mail from
    Simpkin to Dolenec, *et al.*, re securitisation
    colleagues, dated May 20, 2007 ...................... A-18537

Citi Exhibit UF -
    E-mail thread ending with E-mail from Tabet
    to Wormsley re just spoke to GH, dated
    May 21, 2007 .................................................... A-18540

xcvii

**Page**

Citi Exhibit VP -
   Minutes of May 23, 2007, Meeting of the
   Board of Directors at 2:00 p.m. (GP2), dated
   May 23, 2007  .................................................. A-18543

Citi Exhibit VQ -
   Minutes of May 23, 2007, Meeting of the
   Board of Directors at 2:15 p.m. (GP3), dated
   May 23, 2007  .................................................. A-18545

Citi Exhibit WI -
   Memo from Punja, *et al.*, to the IAC, *et al.*, re
   Project Dice Update and Budget, with attached
   Presentation re IAC update: Project Dice,
   dated May 31, 2007 ........................................... A-18547

Citi Exhibit AAG -
   E-mail from Cabrey to Wormsley, *et al.*, re
   Villa Saletta Shoot, with attached Fax Reply
   Form, dated August 15, 2007 ........................... A-18555

Citi Exhibit AAO -
   E-mail from MacInnes to Punja, *et al.*, with
   attached Dresdner invoice to Maltby, dated
   August 17, 2007 ............................................... A-18560

Citi Exhibit ABL -
   Memo from Pryce to TFCP Personnel re Public
   to Private Policy, dated October 31, 2007 ......... A-18564

Citi Exhibit ACM -
   Letter from Terra Firma Investments (GP) 3
   Limited to Citi re the amendment letter, dated
   December 21, 2007, dated January 11, 2008  .... A-18569

xcviii

**Page**

Citi Exhibit AEI -
E-mail from Dicks to Wormsley, *et al.*, re DW
Menu selection Die Sauberflote, attached
menu, dated June 23, 2008 ............................... A-18571

Citi Exhibit AGF -
Terra Firma Capital Partners II, Q1 2008, dated
March 31, 2009 ................................................. A-18574

Citi Exhibit AHA -
Presentations re EMI and the Terra Firma/Citi
Relationship, dated August 1, 2009 .................. A-18623

Citi Exhibit AJJ -
Cell phone Records for David Wormsley, dated
April 26, 2007 .................................................. A-18643

Citi Exhibit AJT -
Guy Hands' Calendar for May 18, 2007, dated
May 18, 2007 ................................................... A-18671

Citi Exhibit AKL -
EMI Recorded Music Presentation, dated
April 1, 2009 .................................................... A-18672

Citi Exhibit AKT -
Stipulated Phone Numbers ................................ A-18698

Citi Exhibit AKY -
TFCP III Co-Investment 2 L.P. Project Dice
Bible of Documents, dated January 1, 2008 ...... A-18699

Citi Exhibit AKZ -
Citigroup Structure Chart ................................. A-19064

Citi Exhibit ALK -
E-mail thread ending with E-mail from
Wormsley to Dicks re shotgun certificate form,
dated October 4, 2007 ....................................... A-19065

xcix

**Page**

Citi Exhibit ALU -
    E-mail thread ending with E-mail from
    Grigorova to Lynn, *et al.*, re EMI Summary
    Exposure, dated November 21, 2009 ................. A-19067

Citi Exhibit ALY -
    Paragraph 22, Page 5 of Joint Statement
    Pursuant to Individual Practices 4(a) of the
    Facts and Other Matters on Which the Parties
    Agree................................................................. A-19072

Citi Exhibit EEB-3 -
    Table 1B of Expert Report of Marianne
    DeMario, dated June 14, 2010 ......................... A-19073

Citi Exhibit EEB-9 -
    Appendix 1 of Expert Report of Marianne
    DeMario, dated June 14, 2010 ......................... A-19077

Citi Exhibit EEG -
    Corrected Expert Report of Marianne DeMario
    in *Andrews v. Raphaelson*, *et al.*, dated
    October 19, 2006 .............................................. A-19078

Citi Exhibit EEJ -
    *Caiola v. Citibank*, Expert Report of Marianne
    DeMario ........................................................... A-19095

Citi Exhibit EEY -
    Client List for Spectrum Consulting Partners.... A-19125

Terra Firma Exhibits Not Admitted:

Terra Firma Exhibit 6 -
    Handwritten Notes ............................................ A-19126

Terra Firma Exhibit 48 -
    Nicoli Mobile Phone Records
    (Reproduced at pp. CA-826-CA-837)

c

**Page**

Letter Brief of Terra Firma to the Honorable Jed S.
  Rakoff, dated October 25, 2010............................ A-19127

Letter Brief of Citigroup Inc. to the Honorable Jed
  S. Rakoff, dated October 25, 2010........................ A-19137

The Court's Proposed Jury Instructions, dated
  November 1, 2010 ................................................ A-19147

Memorandum of the Honorable Jed S. Rakoff,
  dated November 2, 2010........................................ A-19163

Verdict Sheet, dated November 4, 2010 ................... A-19179

Judgment, So-Ordered on December 9, 2010,
  Appealed From ..................................................... A-19180

Notice of Appeal, dated January 10, 2011 ................ A-19187

1    deals they were not together.

2         Now, next slide.

3         I just want you to see the numbers; okay?  They paid

4    4 billion for the company.  That's what Mr. Hands paid.  Terra

5    Firma, Mr. Hands' company, put up 1.5 billion, and Citi put up

6    2.7 billion.  Both sides, since all of that money was put up,

7    have suffered huge losses.  Both sides have suffered huge

8    losses.  But Citi at no time tricked Guy Hands into buying

9    Terra Firma.  We put up the money to make the doggone purchase.

10   More money from Citi than any place else.

11        Now the real question in this case is, why did Terra

12   Firma bid 2.65 for EMI?  Why did they do it?  You've got to

13   focus on two questions during this trial.

14        Did Wormsley make false statements to hands about

15   Cerberus?  And did Terra Firma submit its bid of 2.65 on May 21

16   in reliance on Wormsley's supposed statements that Cerberus

17   would bid 2.62?  Those are questions you've got to ask as

18   jurors ultimately.

19        Now let me talk for a minute about David Wormsley.

20   He's married, he's got kids.  And he's going to take that stand

21   and he's going to make plain to you, one, that he didn't lie to

22   Hands, two, that he did not know what Cerberus intended to bid

23   on May 21.  He did not know.  And three, he did not know that

24   Cerberus had dropped out.  He will tell you all of those things

25   from the witness stand.

0ailter2                         Opening - Mr. Wells

1          Now Mr. Hands is the only person who will testify that

2    he had a conversation with Mr. Wormsley concerning the issue of

3    what Cerberus bid.  Mr. Hands will testify he took no notes and

4    he has no documents recording that he had such conversations,

5    and there's no evidence that will be introduced in this trial,

6    I submit, that David Wormsley knew that Cerberus had dropped

7    out.

8          Now on the second issue, this issue of reliance, okay,

9    it's different from the issue of false statements, is the issue

10   of whether or not, did they buy this company, did they spend

11   £4 billion because of something Wormsley said or did they spend

12   the £4 billion because they wanted the company and they thought

13   it was a good buy at that price.  And what you're going to see

14   from the evidence is that Terra Firma decided to bid 2.65

15   before any supposed lie from Mr. Wormsley.  They had already

16   decided to bid 2.65.  And let me emphasize, there was no lie.

17   That didn't happen.

18         Secondly, Terra Firma did all of this work.  They had

19   a massive, what you'd call due diligence to study whether or

20   not they should try to buy the company.  And why do you do due

21   diligence?  If you're going to put up $4 billion, you're going

22   to study it up one way and down the other.  You're going to do

23   your homework.  And you're going to see document after document

24   after document where they did their homework, and what all the

25   documents show -- what all the documents show is that they

0ai1ter2                    Opening - Mr. Wells

1   thought there was a good buy at 2.65.

2          Lastly, none of the internal memos or referrals that

3   explain why they bought the company, why they put up $4 billion

4   say anything about a statement by David Wormsley concerning

5   what Cerberus was going to bid.  There are no such documents.

6   And if they bought that company based on something David

7   Wormsley had said, it would be in a document somewhere.  That's

8   how corporate America works.  You do not spend $4 billion based

9   on something that's not in the documents.

10         Look at the documents.  That's one of the few things I

11  agree with Mr. Boies about.  Look at e-mails and look at the

12  documents.

13         Now in terms of Mr. Wormsley and his background, as I

14  told you, he's married, he's got three children, he's 50 years

15  old.  He's got no incentive to lie to one of his largest

16  clients.  I want to make the point -- sometimes he is

17  representing Terra Firma and other times he is negotiating

18  against Terra Firma.  That is the nature of the business.

19         Now in terms of Mr. Hands, Mr. Hands, as I told you,

20  he is a corporate executive.  He started out at Goldman Sachs

21  in Europe.  He rose way up in Goldman Sachs.  He became head of

22  their Euro bond operation.  Then he left Goldman Sachs and he

23  went to Normura, a big Japanese bank, and he had a private

24  equity business within Normura, and then he started his own

25  private equity business called Terra Firma.  And what he has

0ailter2                    Opening - Mr. Wells

1    done for a number of years, he bought companies, and he was

2    very successful in doing it until he bought EMI, and when he

3    bought EMI, it didn't go so well.  It did not go well.  It was

4    a bad investment.  Not because of anything David Wormsley said.

5            Now that last point:  Wealth and reputation at risk

6    because of EMI transaction.  You will learn from the evidence

7    that Mr. Wormsley [sic] has a lot of his wealth tied up in that

8    deal.  You will learn that his reputation is tied up in that

9    deal.  And that's one of the things you should consider when he

10   testifies.  Does he have a motive because of all the money he's

11   got tied up in that deal now to say, "It wasn't my fault.

12   Somebody tricked me.  The bank tricked me"?  Well, I'm going to

13   show you from the evidence that it was his fault.  He bought

14   the company, he knew what he was buying, and the fact that the

15   business didn't do that well, that's not Citibank's

16   responsibility, except for the fact that we loaned the money.

17   And that is our responsibility, and we're on the hook still

18   because we loaned the money.

19           Now in terms of this suggestion that Mr. Wormsley knew

20   that Cerberus had dropped out, Mr. Wormsley did not know that.

21   He didn't know because Mr. Wormsley was not part of the inner

22   circle of the financial advisers that were talking to Terra

23   Firma, to EMI.  He was not the lead person.

24           Let me show you what the testimony will be in terms of

25   the fact he was not told that Cerberus had dropped out.  This

1    is from Simon Borrows, who's the lead financial adviser on this

2    deal.  Play the tape.

3              (Video played)

4              MR. WELLS:  Let me show you another tape.  Eric

5    Nicoli.  He was the CEO.  He will tell you he did not tell

6    Mr. Wormsley.

7              (Video played)

8              MR. WELLS:  Mr. Wormsley did not know.  Mr. Boies

9    stood up here and told you that Mr. Wormsley told a lie about

10   something, you're going to learn from the evidence, he didn't

11   even know about.  He didn't even know about it.  And no witness

12   will take that stand and say he knew about it.

13             Now what you are going to see, this is a very

14   important e-mail.  It's an e-mail from Mr. Pryce, and it's sent

15   to Mr. Borrows and sent on Friday, May 18th.  That's the day

16   that Mr. Boies says Mr. Wormsley was telling lies.  Well, what

17   the truth is going to show is that on May 18th Mr. Hands told

18   a lie about Mr. Wormsley.  Mr. Hands went to Simon Borrows and

19   said, "David Wormsley said we could get the company for 2.40."

20   That was false.  And Mr. Wormsley heard about it, and he called

21   Mr. Hands and he confronted him and he said, "Why did you say

22   that?  I never said that.  You've got to straighten that out.

23   I want to you straighten that out immediately."  And Mr. Hands

24   said, "I'm sorry.  I apologize.  I was trying to see if I could

25   get a lower price."  He said, "I'll straighten it out."

1              And this e-mail is sent later that day, sent by

2     Mr. Hands' lawyer to say, "In any conversation that Guy might

3     have had with David Wormsley, it has never been suggested that

4     were your clients to receive a possible offer in the region of

5     2.40 per share that this might receive their recommendation."

6              He had to straighten it out because he had lied on

7     Mr. Wormsley that very morning.  And they had to straighten it

8     out, about the very type of thing they are trying to do in this

9     courtroom, the very type of thing they are doing in this

10    courtroom.

11             Now you're going to hear -- first witness I think is

12    going to be a Mr. Tim Pryce.  He's the CEO of the Terra Firma

13    firm.  But I want to make one thing clear.  Mr. Pryce, that's

14    the person who actually sends that e-mail.  Then he was the

15    general counsel, but it's Mr. Hands who owns 100 percent of the

16    stock of the advisory company that Mr. Pryce works for.

17    Mr. Hands owns all the stock, all the stock.

18             Now in terms of how things work, there were three

19    advisers on this deal.  There was Greenhill, there was Deutsche

20    Bank, and there was Citi.  They were the advisers to EMI.  They

21    were not the advisers to Terra Firma.  EMI was trying to sell

22    itself.  It had hired three advisers to help it sell itself.

23    But one of the things EMI did, it appointed Greenhill to be the

24    lead adviser, and one of the reasons it did that was because

25    EMI wanted Citi to play two roles.  It wanted Citi to advise

1  EMI, but it also wanted Citi, if it could, to help loan people

2  like Mr. Hands money to buy the company.  Only way they could

3  sell the company.  Only way you could sell your house, you've

4  got to get somebody who can get a mortgage; okay?

5         Now in this situation, Mr. Hands wants to borrow

6  $2.5 billion.  There are only so many financial institutions in

7  the world who can put up $2.5 billion.  So what EMI did, they

8  said, "You're the financial adviser, but to the extent you can

9  help finance a potential buyer, we want you to do that."  And

10  you had to clear conflicts to do it.  Because it was a

11  conflict.  We ultimately end up on both sides of the table and,

12  you've got to clear the conflict.

13         Next slide.

14         I'm going to get there in a minute.  I'm going to show

15  you the e-mails.

16         Now four points I want to make.  What you're going to

17  see from the evidence is that Terra Firma is experienced, it

18  follows an established process, with exhaustive due diligence,

19  because that's why -- you don't put up $4 billion, $4 billion,

20  if you haven't done your homework.

21         2.  That they decided to bid the 2.65 long before any

22  conversation about Cerberus with Wormsley.  You're going to see

23  documents before May 18th where they say, "2.65, we can get

24  it for that price, it's a good price, and we want it."

25         3.  Terra Firma's approvals of the deal don't say

0ai1ter2                    Opening - Mr. Wells

1    anything about any conversations about Cerberus with Wormsley.

2         And 4.  What you're going to find is that Terra Firma

3    thought about walking away from the deal even after they

4    learned all this.  You're going to learn in a minute, it's not

5    like a regular auction like you see on TV, and somebody's

6    buying some artwork, the hammer goes down, "Painting sold to

7    you."  It don't work that way.  This is just the first step in

8    the process.  You can win the auction on Monday and somebody

9    still had the right to come in and put in a higher bid on

10   Wednesday, and somebody else could put a higher bid in on

11   Friday.  It's not like the type of auction you see when you

12   watch a television show.

13        Now in terms of Terra Firma as a firm, the important

14   thing to understand, what they would tell people is that they

15   had the ability to see potential where others see problems.

16   They called it a contrarian investment philosophy.  They would

17   go against the grain.  So you could take a company like EMI

18   that was not doing well, was a problem company, but they would

19   say, "Oh, no, we see potential.  We can turn tin into gold."

20   Mr. Hands thought he had the golden touch, and he did for quite

21   awhile until he bought EMI.

22        Now financial summary again.  They're huge.

23   16 billion in equity raised.  11 billion invested.  42 billion

24   of value.

25        Next slide.

1      Here's the investment process.  You're going to start

2  to hear about it today with the first witness, Mr. Pryce.  It's

3  a three-stage process.

4      1.  You do a proposal and analysis.  You do your

5  homework.

6      2.  Then you go to this committee called the IAC.

7  This is all within Mr. Hands' firm.  They make a formal

8  recommendation to what's called the board of directors, and

9  they make the final approval.  And all of that was done in this

10  case.  And what you will see from the records, they did all the

11  homework and they made a decision to bid 2.65, not on the basis

12  of what David Wormsley said about Cerberus.

13      Now you'll see at 8 a.m. on May 18th, before any of

14  these supposed false statements were made, the board had

15  already approved -- "The investment is hereby approved at a

16  price of up to 2.65 per Target Ordinary Share."  That was done

17  before any of these supposed conversations took place, at 8 in

18  the morning.  You're going to see the document.

19      Next slide.

20      You're going to see the approvals, repeated approvals,

21  board minutes, and they say nothing about Cerberus bidding

22  2.62, or about any conversation from David Wormsley.  Again,

23  look at the paper.  We are talking about a massive corporate

24  transaction, a massive corporate transaction.  And if people

25  are spending $4 billion, and there's a particular reason

0ailter2                    Opening - Mr. Wells

1   they're doing something, it's going to be in the documents.

2          Now they could have walked away from this deal

3   repeatedly.  You're going to see there's an e-mail.  He says,

4   "With regard to EMI, clearly we have the option to extend or

5   not extend our bid on a number of different occasions going

6   forward, starting from June 27."  "Under no circumstances

7   should it be assumed that we will."  May 21 was not the end of

8   the process.  May 21 was not -- that was just the beginning.

9   They could have walked away from that deal repeatedly.  They

10  thought about it; they decided not to do it.  Nothing to do

11  with Citi or David Wormsley.  And I'm going to show you, as we

12  get into the evidence, how -- all of the various dates that

13  they had the opportunity to walk away, and each one is really

14  like a new deal.  The deal really doesn't close till August the

15  1st.

16         Next slide.

17         Now let me talk about this notion of Citi and David

18  Wormsley being on both sides of the issue.  What you're going

19  to hear from the evidence is that David Wormsley got involved

20  on the finance side at Mr. Hands' request.  Why?  Because he

21  needed to borrow £2.5 billion and he needed to borrow it in

22  about two weeks.  It's like you walking down the street, you

23  look at the Empire State Building, you say, "I'd like to buy

24  it."  Well, you know what?  Where are you going to get a

25  mortgage to buy the Empire State Building in two weeks?  I

0ai1ter2                    Opening - Mr. Wells

1    don't care if you're Donald Trump.  It's going to take some

2    time to get a mortgage to buy that building.  They wanted

3    $2.5 billion put up in two weeks.  So Mr. Hands says to

4    Mr. Wormsley, "Can Citi help?"  EMI says to Mr. Wormsley, "Can

5    Citi help?"  Because everything was moving fast and somebody

6    had to put up the money, $2.5 billion.  Okay.  It was no

7    secret.

8            Go back.

9            It was no secret that Citi was on both sides.  The

10   finances benefited both Terra Firma and EMI.  EMI wanted the

11   company sold, Terra Firma wanted to buy the company, but the

12   only way you could do a deal is, somebody had to put up the

13   money.

14           They talked about credit committee meeting.  Okay.

15   You're going to hear about a credit committee meeting.

16   Nothing -- there was nothing wrong at this credit committee

17   meeting, 'cause Mr. Wormsley was invited to be at the meeting

18   'cause he was telling the people at the meeting, you got to put

19   it up in two to three weeks, got to go fast.

20           Next slide.

21           Okay.  Now what you're going to hear, after

22   Mr. Wormsley and Citibank agreed to put up the $2.5 billion,

23   what did Mr. Hands do?  He wrote e-mails, thank you to

24   Mr. Klein, thank you to Mr. Wormsley, thank you to Mr. Tabet --

25   another guy you'll hear about.  He was thanking them, 'cause he

0ai1ter2                    Opening - Mr. Wells

1   wanted to get the money to buy the company.  How are you going

2   to buy a $4 billion company in basically a two-week span unless

3   you go find a major bank to put up the money?

4           Next slide.

5           Now the evidence will show that Mr. Hands and Terra

6   Firma did not act like the victims of a fraud.  What does that

7   mean?  Mr. Boies told you, well, Terra Firma, the only reason

8   they bid was because they thought Cerberus was going to bid.

9   Well, if that was so, you would think, if they found out

10  Cerberus didn't bid, they would have a very serious attitude.

11  They'd be upset.  Well, let's see what happened when they found

12  out Cerberus didn't bid.

13          There's an e-mail dated September 24.  Remember, the

14  deal closes August 1st, '07.  So about 60 days later, one of

15  Mr. Hands' right-hand people, Mr. Alexander -- he's a key

16  person at Terra Firma -- he writes to Mr. Hands.  In the

17  e-mail, "Cerberus never actually submitted a formal offer."  So

18  they know.  They know in September, only 60 days after they

19  closed the deal, that Cerberus did not bid.  Now if that was so

20  important to them, if they thought they had been lied to, you

21  would have thought they would have picked up the phone and he

22  would have called David Wormsley, he would have said, "You lied

23  to me.  You told me they were going to bid.  I just heard they

24  didn't bid."  You would have thought he'd call Citibank, "I'm

25  not going to do business with you anymore."

0ai1ter2                    Opening - Mr. Wells

1          Well, what happens after September 24?  Nothing.

2     'Cause at that time the business hasn't gone down the tubes.

3     At that time Mr. Hands, he invites Mr. and Mrs. Wormsley to his

4     villa in Italy.  Mr. Hands, later on he invites Mr. and

5     Mrs. Wormsley to go with them to the opera.  He invites

6     Mr. Wormsley to go to their annual clay pigeon shoot, where

7     they're shooting birds out the sky.  I mean, this is all some

8     guy who supposedly has told him a big lie that tricked him into

9     buying a $4 billion company.  You will learn from the evidence,

10    they didn't care what Cerberus was bidding on that day.  They

11    wanted to win the bid and they wanted to win it at 2.65.  And

12    when they heard Cerberus didn't bid in September of 2007,

13    nothing changed.  Nothing happened.

14         But something did change.  The business investment

15    didn't do that well.  He thought he could turn around EMI.

16    Turned out he had too much what they call leverage.  He had

17    borrowed too much money, and the business didn't make enough

18    money to pay off the debt that he had incurred, and so all the

19    investors didn't do that well.  And then suddenly, two years

20    after he learned that Cerberus did not bid, now we got a

21    lawsuit.  Now we have a lawsuit.

22         Citi did not defraud anybody, David Wormsley did not

23    defraud anybody.  This was a bad business decision by Guy

24    Hands, and he can't get a do-over by suddenly saying he was

25    cheated or tricked when that didn't happen.

0ai1ter2

1              Thank you.

2              THE COURT:  All right.  Thank you very much.

3              As you can see, ladies and gentlemen, there are some

4    modest differences between the parties here.  So you will have

5    to sort this all out.  But first you need to go have your

6    lunch.  So we'll see you at a quarter after 2.

7              (Jury excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0ai1ter2

1              (In open court; jury not present)

2              THE COURT:  Please be seated.

3              So I have to say that it is thrilling to me to see two

4     professionals of this quality put to good use the adversary

5     system, the greatest device, in my view, known to mankind for

6     ascertaining the truth.  And when I think of all the cheap

7     sentiments of TV dramas about the courts and lawyers or the

8     gross simplifications that so often occur in describing this

9     process, it is just wonderful to see this glorious process in

10    the hands of people who know how to make it work.

11             Having said all that, who's the first witness for the

12    plaintiff?

13             MR. BOIES:  Mr. Tim Pryce.

14             THE COURT:  All right.  So we'll start again at 2:15

15    with Mr. Pryce.

16             MR. BOIES:  Thank you, your Honor.

17             (Luncheon recess)

18             (Continued on next page)

19

20

21

22

23

24

25

0AI3TER3

<div align="center">AFTERNOON SESSION</div>

<div align="center">2:15 p.m.</div>

3    THE COURT:  This really goes more to some of the folks

4  who are in the audience than to counsel, but I want to mention

5  it nonetheless.  Hard as it is to believe, I actually have

6  other cases.  And when we break, I will always give counsel

7  five minutes to clear things out.  But then I need to continue

8  those other cases.  So everyone needs to be out of the

9  courtroom if you want to talk.  Of course the hallway is fully

10  available.

11    I'm sorry.  After moving things along, I just learned

12  that a bunch of the jurors are stuck on line with security.  So

13  my courtroom deputy is going to go down and get them

14  prioritized.

15    So while we're waiting, I don't know if any of you had

16  a chance to check with your experts as to a proposed date for

17  the Rule 702 hearing.

18    MR. COHEN:  Professor Fischel could be here Thursday

19  or Friday evening.

20    THE COURT:  Thursday doesn't work for me, but Friday

21  would be fine.

22    MR. BOIES:  Friday will work for us, your Honor.

23    THE COURT:  For both witnesses?

24    MR. BOIES:  Yes.

25    THE COURT:  Excellent.  So as you know, we have to

0AI3TER3

1   stop at 3:30 on Friday anyway, so that's perfect.  We'll just

2   have the hearing then.

3        Also, I remind counsel that in terms of depositions

4   that are going to be introduced, if there are objections in

5   what you've submitted to me, I need to know approximately 24

6   hours before the witness is going to testify so I can make my

7   rulings at that time.

8        I thought we were all set to go.  I didn't realize the

9   jurors were stuck.  Is there anything else any counsel wants to

10  raise?  There is a gentleman making sign language at the door

11  to one of the plaintiffs.  You can come on in and speak in

12  English if you'd prefer.

13       On Thursday we will only sit in the morning.  But

14  otherwise I don't see any scheduling problems for the rest of

15  the week.

16       MR. BOIES:  Your Honor, with the Court's permission, I

17  will not be here on Thursday morning.  Other counsel will be

18  covering it.

19       THE COURT:  That's fine.

20       MR. BOIES:  Thank you.

21       THE COURT:  One other thing.  I noticed that one of

22  the jurors is taking notes.  I allow jurors to take notes.  I

23  don't particularly encourage them to take notes.  I leave it to

24  their individual option.  But I did notice that one juror was

25  taking notes.

A-12918

84

0AI3TER3

1          I also noticed that the photographs of Mr. Hands and

2     Mr. Wormsley submitted by the respective parties were clearly

3     taken by different photographers.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0AI3TER3

1          (Jury present)

2          THE COURT:  Please call your first witness.

3          MR. BOIES:  Thank you, your Honor.  We call as our

4    first witness Mr. Tim Pryce.

5          (Witness sworn)

6          THE DEPUTY CLERK:  State your name and spell it slowly

7    for the record.

8          THE WITNESS:  My name is Tim Pryce.  T-i-m P-r-y-c-e.

9    TIM PRYCE,

10         called as a witness by the Plaintiff,

11         having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. BOIES:

14   Q.  Good afternoon, Mr. Pryce.

15   A.  Good afternoon.

16   Q.  What is your present position?

17   A.  I am currently the chief executive officer of Terra Firma

18   Capital Partners Limited.

19   Q.  How long have you held that position?

20   A.  Since the 1st of April, 2009.

21   Q.  What do you do before then?

22   A.  I was the general counsel of Terra Firma.

23   Q.  How long did you hold that position?

24   A.  Since the end of March, 2002.

25   Q.  Is that when Terra Firma was founded?

A-12920

0AI3TER3                    Pryce - direct

1    A.  That is correct, yes.

2    Q.  Could you explain the relationship between Terra Firma

3    Capital Partners Limited and the two Terra Firma limited

4    partnerships that are the plaintiffs in this action?

5    A.  Yes, I can.  Terra Firma Capital Partners Limited is an

6    investment advisor.  It provides investment advice to the two

7    plaintiffs in this case, Terra Firma investments GP2 and Terra

8    Firma Investments GP3.

9    Q.  During opening statements, there was reference to something

10   called IAC.  Are you familiar with that?

11   A.  Yes, I am.

12   Q.  Would you explain to the jury what that means.

13   A.  Yes.  IAC stands for the investment advisory committee.

14   That is the committee of Terra Firma Capital Partners Limited

15   that considers all deal proposals.

16   Q.  What is the business of Terra Firma?

17   A.  Terra Firma is a private equity firm.  What that means is

18   that we raise money from pension funds and we use that money to

19   make investments in companies.  We tend to pick companies which

20   are under-performing, and what we do is we try and change those

21   companies.  Sometimes we change them by changing the management

22   in the company, sometimes we change them by changing the

23   business of the company, sometimes we spend time investing in

24   new business within those companies.  But ultimately, what we

25   are doing, is trying to improve the performance of those

OAI3TER3                    Pryce - direct

1    companies, and at the end of the day, sell them and make money

2    for our pension fund investors.

3    Q.  Now, does Terra Firma have a internal rate of return target

4    or some projected profitability standard that it uses in order

5    to determine whether or not to make an investment?

6    A.  Yes.  We have a target of making a 20 percent IRR or

7    internal rate of return.

8    Q.  Has Terra Firma been successful in doing that historically?

9    A.  Yes, it has.

10   Q.  Has it in fact exceeded that target 20 percent internal

11   rate of return?

12   A.  Yes, it has.

13   Q.  I want to turn your attention now to EMI.  And am I correct

14   that there had been consideration on the part of Terra Firma of

15   acquiring EMI for some period of time before 2007?

16   A.  Yes, that's correct.  It is a company that Terra Firma had

17   been looking at for a number of years.

18   Q.  What happened in 2007?

19   A.  EMI was the subject of a number of bids by private equity

20   firms like Terra Firma.  And Terra Firma became interested in

21   looking at the company.

22   Q.  When did that happen?

23   A.  From memory, that was at the beginning of May, 2007.

24   Q.  What happened at the beginning of May of 2007?

25   A.  We were contacted and asked whether we would be interested

OAI3TER3                        Pryce - direct

1    in participating in the auction of EMI.

2    Q.  Who contacted Terra Firma?

3    A.  David Wormsley of Citigroup.

4    Q.  You mentioned an auction.  Can you explain what the auction

5    process is.

6    A.  Yes.

7    Q.  We all know what an auction is when you're dealing with

8    some other things but --

9    A.  Yes.  EMI had decided to put itself up for sale.  And it

10   had decided to do this by way of an auction.  What that means

11   is that a number of interested parties were asked to express

12   their interest in acquiring the company, and they were given a

13   certain amount of time within which to come up with a firm

14   price for the company.

15   Q.  How were the parties asked to express their interest?

16   A.  We were asked to send a letter to the company expressing

17   our interest in acquiring the company, and also expressing a --

18   an indicative non-binding price at which we would be interested

19   in buying the company.

20   Q.  Is the indicative price that you referred to sometimes

21   referred to as an indicative bid?

22   A.  Yes, it is.

23   Q.  Is that indicative bid a preliminary non-binding bid?

24   A.  Yes, obviously at that stage in the process, we had not had

25   access to any information in relation to the company, and

0AI3TER3                    Pryce - direct

1    therefore, the bid price was merely an indication of what we

2    thought we might be able to bid.

3    Q.  After placing this indicative bid and writing a letter, did

4    you begin to get due diligence?

5    A.  Yes.  Following the receipt of that letter, the company

6    provided us with certain information about its businesses.  And

7    I believe that they also arranged some management meetings

8    where we were able to meet with the management of EMI.

9    Q.  Do you recall when Terra Firma sent this indicative bid

10   letter?

11   A.  I think it would have been at the beginning of May.

12   Q.  It obviously would have been after Mr. Wormsley contacted

13   you in May, correct?

14   A.  Correct.

15   Q.  Can you be any more specific at this time from memory?  I

16   think we have the document we may be able to show it to you.

17   Just from memory, do you remember it?

18   A.  It would have been sometime in May.

19   Q.  Okay.  After that, you did get due diligence, correct?

20   A.  Yes, that's correct.

21   Q.  Who at Terra Firma led this due diligence process for

22   examining EMI?

23   A.  At Terra Firma we have a number of deal teams.  And so far

24   as EMI was concerned, the deal team was led by two individuals,

25   Riaz Punja, who is a financial managing director at Terra

0AI3TER3                          Pryce - direct

1    Firma, if you like, he was the numbers guy.  He was the person
2    who was responsible for valuing the business.  And the second
3    person was Stephen Alexander.  Stephen had a wealth of
4    experience managing companies, and therefore his expertise was
5    helping Terra Firma work on a business plan for the company and
6    also assessing EMI's management team.
7    Q.   In May, were you aware of other parties who were also
8    expressing indicative interest in acquiring EMI?
9    A.   Yes, we were.
10   Q.   What other parties do you remember as being interested in
11   acquiring EMI at that time?
12   A.   Cerberus, another private equity firm like Terra Firma.
13   Q.   Did you have any understanding as to who your primary main
14   potential competition was in acquiring EMI?
15   A.   Yes, I did.  It was Cerberus.
16   Q.   When did you come to the understanding that Cerberus was
17   Terra Firma's main competitor for EMI?
18   A.   In the week that led up to us putting our binding bid on
19   the table.
20   Q.   The binding bid that you put on the table was put on
21   May 21, correct?
22   A.   That's correct.
23   Q.   So this would have been the week preceding May 21?
24   A.   That is correct.  I think it was on the Tuesday or the
25   Wednesday of the preceding week.

0AI3TER3                    Pryce - direct

1    Q.  Which I believe would have been May 15 or May 16.

2    A.  Yes.

3    Q.  How did you come to the understanding that Cerberus was

4    Terra Firma's main competitor for EMI?

5    A.  Through a conversation which I had with my boss.

6    Q.  Who is that?

7    A.  Guy Hands.

8    Q.  What did Mr. Hands tell you?

9           MR. COHEN:  Objection, your Honor.

10          THE COURT:  Sustained.

11          MR. BOIES:  May we approach, your Honor?

12          THE COURT:  Well, are you offering it for its truth?

13          MR. BOIES:  I am not, your Honor.

14          THE COURT:  What is the relevance of this witness's

15   understanding?  Is why you what to approach?

16          MR. BOIES:  Yes.

17          (Continued on next page)

18

19

20

21

22

23

24

25

0AI3TER3                    Pryce - direct

1              (At the side bar)

2              MR. BOIES:  An issue has been raised including the

3     opening statement as to whether Mr. Hands is making up the

4     representations by Mr. Wormsley after the fact because the

5     business has not turned out well.  This goes to prove that it's

6     not a recent fabrication by Mr. Hands, in that he expressed

7     these views contemporaneously.

8              THE COURT:  No, I think that is your offering it for

9     its truth and that is hearsay.  Sustained.

10             MR. BOIES:  The truth of?

11             THE COURT:  The truth of Mr. Hands' statement as to

12    what was in his mind.

13             MR. BOIES:  No.  I'm offering it to show that

14    Mr. Hands' statements are not recent fabrications.

15             THE COURT:  Which statements?

16             MR. BOIES:  His statements about what Mr. Wormsley

17    told him.  I think that's an exception, your Honor.

18             THE COURT:  I agree it is an exception, but I don't

19    think this goes to that.  It has to be tied much more

20    specifically.  I thought I misunderstood the colloquy before

21    you came to the side bar.  I thought you were offering it for

22    the witness's state of mind, and I queried what this witness's

23    state of mind had to do with the issue.

24             As I understand it, you are offering it as evidence of

25    Mr. Hands' state of mind, to show that he already perceived

0AI3TER3                    Pryce - direct

1    Cerberus as the main rival.  Do I have that wrong?

2         MR. BOIES:  You have that partly right, your Honor.

3    And in addition, because the charge is what Mr. Hands is now

4    saying is a recent fabrication, I'm offering it in addition to

5    what the Court says --

6         THE COURT:  No, to claim that it is a recent

7    fabrication opens the door to prior consistent statements.  But

8    I don't see what this is a statement consistent with.  I didn't

9    hear in the opening statement any claim by the defendants that

10   your client didn't think that Cerberus was a rival, which is

11   all this goes to.

12        MR. BOIES:  I think that maybe the best thing to do is

13   do an offer of proof.  Because I believe the testimony will be

14   that Mr. Wormsley told him that Cerberus was their main

15   competitor.

16        THE COURT:  Yes.  And what subsequent statement by

17   Mr. Hands that they are attacking as not true is that

18   consistent with?

19        MR. BOIES:  I think they are challenging that

20   Mr. Wormsley in this period told Mr. Hands that Cerberus was

21   Terra Firma's main competitor.

22        THE COURT:  No, I didn't hear that.  I didn't hear

23   that.

24        MR. BOIES:  If they are not challenging that, I would

25   like to hear it from counsel.

0AI3TER3                    Pryce - direct

1          THE COURT:  At the moment, no foundation has been laid

2    sufficient to bring this in under the prior consistent

3    statement exception to the hearsay rule.  So, if something

4    comes up on cross that makes you think you can renew that

5    proffer, of course I'll hear you then.  Sustained.

6          (Continued on next page)

0AI3TER3                    Pryce - direct

1              (In open court)

2    BY MR. BOIES:

3    Q.  Mr. Pryce, did you have any conversations with Mr. Wormsley

4    personally in the week leading up to the time when Terra Firma

5    put in its binding bid?

6    A.  Yes, I did.

7    Q.  Did you have more than one such conversation?

8    A.  I had one conversation with Mr. Wormsley.

9    Q.  When was that conversation?

10   A.  That would have been on the Thursday of that week.

11             THE COURT:  Just so the jury is clear, what date is

12   that?  Maybe counsel can agree on what date.

13             MR. BOIES:  Yes.  It would be the 17th.  I believe.

14   May 17.

15             THE COURT:  May 17.  Very good.

16   Q.  Was this an in person or by telephone conversation?

17   A.  It was by telephone.

18   Q.  What did Mr. Wormsley tell you in that conversation?

19   A.  He told me that he had been participating in the Citigroup

20   credit committee meeting.  That the meeting was going well.

21   And that he believed that Citigroup would be in a position to

22   lend us the necessary money to enable us to buy EMI.  But he

23   said that we were going to have to move very quickly.

24   Q.  Did he say what he meant by moving very quickly?  What were

25   you going to have to do very quickly?

0AI3TER3                        Pryce - direct

1    A.  I understood that to mean that we would have to put a

2    binding bid for the company on the table.

3              MR. COHEN:  Move to strike, your Honor.

4              THE COURT:  No, I think that is within the realm of

5    his reasonable lay perceptions of what was said.  The jury can

6    evaluate it or not as they see fit.

7              MR. COHEN:  It was the responsiveness to the question.

8              THE COURT:  I think it was responsive.  Overruled.

9    Q.  You talked about what the leaders or who the leaders of the

10   due diligence team for Terra Firma were in connection with EMI.

11   Were you involved in that process personally?

12   A.  I was not, but my team were.  I had a team of lawyers and

13   tax accountants who were working on the project.

14   Q.  As a general matter, does the amount of due diligence that

15   Terra Firma does with a particular prospective purchase vary

16   from purchase to purchase?

17   A.  Yes, it obviously does, on the basis of the amount of time

18   that you have available to do that investigatory work.

19   Q.  Does the existence of an auction affect how much time you

20   have to do due diligence?

21   A.  Yes, it generally does.  Because an auction always involves

22   the setting of a deadline, a time by which you have to put your

23   bid on the table.  You don't have any control over that.  The

24   company that you are buying does.  And therefore, that does

25   have an impact on the amount of due diligence that you can do.

0AI3TER3                    Pryce - direct

1    Q.  What is that impact?

2    A.  The impact is that you know that you have to submit a bid

3    on the date required by the target company.

4    Q.  Does that reduce the amount of due diligence that you are

5    able to do?

6    A.  Logically, it would do.  If you didn't have a deadline, the

7    due diligence process is one that can go on for quite a few

8    weeks.

9    Q.  In your general experience at Terra Firma, if you're not

10   involved in an auction, does it take an extended period of time

11   to do due diligence and negotiation in terms of acquiring a

12   multibillion dollar company?

13           MR. COHEN:  Objection, your Honor.

14           THE COURT:  Ground?

15           MR. COHEN:  Leading.

16           THE COURT:  Sustained.

17   Q.  What has been your experience at Terra Firma with respect

18   to the length of time that is required for due diligence and

19   negotiations in general?

20   A.  If you're not in an auction process, then generally the

21   period of time that you have available to conduct your

22   investigation into the business of the company tends to be

23   longer.

24   Q.  Let me direct your attention to Friday, May 18.  This is

25   the day after your conversation with Mr. Wormsley.  Did you

0AI3TER3                    Pryce - direct

1   attend a meeting of the IAC?

2   A.  Yes, I did.

3   Q.  What was discussed at the IAC?

4   A.  The proposed bid for EMI.

5   Q.  What was the general strategy of Terra Firma with respect

6   to that bid?

7   A.  Meetings of the general partners always take place in

8   Guernsey, and as all of the directors were there, it was

9   decided that that would be a suitable time to actually discuss

10  the bid for EMI.  At that particular stage, we didn't have the

11  financing in place from Citigroup, and therefore, in those

12  circumstances what we were trying to do was to get approval

13  from the two general partners to bid the maximum that we

14  thought was possible at that point in time with a view to then

15  giving us the ability over the weekend to finalize our work,

16  and at that stage then decide whether we were going to bid for

17  the company, and if so, at what price we were going to bid.

18  Q.  I'd like you to look at a document that has been previously

19  marked as plaintiff's trial exhibit 630 and one that has been

20  marked as plaintiff's trial exhibit 659.

21          Your Honor, if I could approach.

22          THE COURT:  Yes.

23  Q.  First, Exhibit 659.  Do you have that?

24  A.  Yes, I do.

25          MR. BOIES:  Perhaps we can put that up on the screen.

OAI3TER3                    Pryce - direct

1        THE COURT:  Has it been admitted?

2        MR. BOIES:  Oh, your Honor, I don't think there is an

3   objection.

4        MR. COHEN:  I have no objection.

5        THE COURT:  659 is received.

6        (Plaintiff's Exhibit 659 received in evidence)

7        MR. BOIES:  I would offer 630 at the same time.

8        MR. COHEN:  No objection.

9        THE COURT:  630 is also received.

10        (Plaintiff's Exhibit 630 received in evidence)

11   Q.  Can you identify what this is.

12   A.  Yes.  This, these are minutes of the meeting of the board

13   of directors of GP3 in the case of document 659.

14        THE COURT:  By the way, I should mention, ladies and

15   gentlemen, that at the end of the trial, all the exhibits will

16   be submitted to you in the jury room along with a exhibit list

17   so you can find whatever you need at that time.  Go ahead.

18        MR. BOIES:  Thank you.

19   Q.  Am I correct that there were two board meetings because

20   there were two Terra Firma partnerships that were investing in

21   or considering investing in EMI?

22   A.  Yes, that's correct.

23   Q.  If you can look at Exhibit 630.  Is this the minutes of the

24   board of directors meeting the same day for Terra Firma

25   investments GP2?

0AI3TER3                          Pryce - direct

1    A.  Yes, that's correct.

2    Q.  In each of these cases, was there an authorization that was

3    granted?

4    A.  Yes, I believe there was.

5    Q.  Can you identify where in the minutes that authorization

6    appears.  Look at 6.10 or 6.9 depending on the minutes.

7    A.  Yes.

8    Q.  Let me begin with 630 since that's up on the screen.  And

9    on page four, you see 6.10?

10   A.  Yes.

11   Q.  It says "After due consideration it was unanimously

12   resolved that Project Dice" -- is that the code name for EMI?

13   A.  That's correct, yes.

14   Q.  "Be and is hereby approved and the investment in relation

15   to Project Dice be and is hereby approved at a price of up to

16   2.65 pounds per ordinary share or such lesser sum as may be

17   negotiated."  Do you see that?

18   A.  Yes, I do.

19   Q.  What was the significance of the "or such lesser sum as may

20   be negotiated"?

21           MR. COHEN:  Objection, your Honor.

22           THE COURT:  Sustained.

23   Q.  You participated in this meeting, did you not, sir?

24   A.  I participated in most of this meeting.  Not all of it.

25   Q.  Did you participate in the portion of the meeting in which

0AI3TER3                    Pryce - direct

1  this decision was made?

2  A.  I don't have a direct recollection of that.

3  Q.  Did you have an understanding as to what the direction was

4  coming out of this meeting?

5  A.  Yes, I did.

6           MR. COHEN:  Objection, your Honor.

7           THE COURT:  To that question the objection is

8  overruled.  The question was did he have an understanding and

9  answer is yes.  But I have a feeling you may object to the next

10  question that's going to be put.  But let me hear the question

11  anyway.

12  Q.  My next question, the question behind the question, is what

13  did you understand the direction from the board of directors to

14  be?

15           MR. COHEN:  Objection, your Honor.

16           THE COURT:  I'm unclear.  You were present for a

17  portion of the meeting?

18           THE WITNESS:  I believe that I was present for a

19  portion of the meeting because I had to go back to London and I

20  had to be back in London at the beginning of the afternoon.

21           THE COURT:  So was that before the meeting concluded?

22           THE WITNESS:  I think it was.

23           THE COURT:  So, had the determination that is

24  reflected in paragraph 6.10 been made before or after you left?

25           THE WITNESS:  I believe it would have been made after

0AI3TER3                              Pryce - direct

1    I left.

2                    THE COURT:  Sustained.

3    Q.  At the time of this meeting, during the portion that you

4    attended, did you have an understanding about whether Cerberus

5    continued to be involved in the auction?

6    A.  My understanding was that Cerberus were our main

7    competition.

8    Q.  This was on Friday, May 18, correct?

9    A.  Correct.

10   Q.  Was further action of the board of the general partners or

11   GPs necessary before Terra Firma could submit an offer, a

12   formal offer for EMI?

13   A.  Yes, it was.

14   Q.  Why was that?

15   A.  At the time that these meetings took place, we did not have

16   a financing in place from Citigroup.  Therefore, we would not

17   have been in a position to have bid for the company, or,

18   indeed, determine the price at which we might want to bid until

19   that financing had been finalized.

20   Q.  As of May 18 of 2007, did Terra Firma continue to hope to

21   avoid an auction or did it expect it would have to participate

22   in an auction?

23                   MR. COHEN:  Objection, your Honor.

24                   THE COURT:  Sustained as to form.

25                   MR. BOIES:  I'll rephrase it, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AI3TER3                    Pryce - direct

1   Q.  As of May 18, did Terra Firma have a preference as to

2   whether or not it participated in an auction or in a

3   negotiation?

4           MR. COHEN:  Objection, again, your Honor.

5           THE COURT:  Was that a matter that was discussed at

6   this meeting?

7           THE WITNESS:  I don't have a recollection of that.

8           THE COURT:  Sustained.

9   Q.  At a general practice, at Terra Firma, does Terra Firma

10  have a preference as to whether it participates in an auction

11  or a negotiation?

12  A.  Yes.

13  Q.  What is that preference?

14  A.  We would rather not participate in an auction.  We would

15  rather have the opportunity to be able to negotiate the price

16  with the seller of a business.

17  Q.  Why is that?

18  A.  In those circumstances, if you are not participating in an

19  auction, and you don't have other parties which are interested

20  in buying the company, you have an opportunity to acquire the

21  company at a better price.

22  Q.  As of May 18, did you have a view one way or the other as

23  to whether an auction of EMI was inevitable?

24          MR. COHEN:  Objection, your Honor.

25          THE COURT:  I lost that on my screen.

0AI3TER3                        Pryce - direct

1                (The record was read)

2                THE COURT:  Sustained.

3    Q.  On May 18, after the meeting that you attended of the GP

4    board meeting in Guernsey, did you have any conversation with

5    Mr. Hands or any conversations with Mr. Hands regarding other

6    bidders for EMI?

7    A.  Yes, I did.

8    Q.  When did the first such conversation occur?

9    A.  I had a conversation when I was back in London sometime in

10   the afternoon with Guy.

11   Q.  Where were you when you had that conversation?

12   A.  I remember it well as I was outside the passport office

13   where I was renewing my passport.

14   Q.  Was this a telephone call?

15   A.  Yes, it was a telephone call.

16   Q.  Did Mr. Hands tell you anything about what he expected

17   Cerberus to bid?

18                MR. COHEN:  Objection, your Honor.

19                MR. BOIES:  May we approach, your Honor?

20                THE COURT:  Yes.

21                (Continued on next page)

22

23

24

25

0AI3TER3                    Pryce - direct

1          (At the side bar)

2          MR. BOIES:  While I am always a little reluctant to

3   make too firm of an offer of proof as to witnesses I have not

4   personally prepared, I believe that if permitted to testify, he

5   would testify that he had a phone call with Mr. Hands in which

6   Mr. Hands informed him that EMI was going to receive a firm bid

7   of 226 pence from Cerberus.  That the decision had been made to

8   move the final bid deadline from Wednesday, May 23, to Monday,

9   May 21.

10         THE COURT:  You're offering that as a prior consistent

11  statement since their opening clearly did attack his

12  credibility as to that, so let me hear from defense counsel.

13         MR. COHEN:  The first point, your Honor, it's a recent

14  fabrication reasons for support before Mr. Hands testified, we

15  haven't had any testimony from Mr. Hands.

16         THE COURT:  But you have on this one, there is really

17  no doubt as to what he's going to say and there is also no

18  doubt as to what your position is, namely that he's making it

19  up.

20         MR. COHEN:  Your Honor, I think under the case law for

21  801(d)(1), the witness has to testify first.  They chose to

22  call --

23         THE COURT:  What case are you referring to?

24         MR. COHEN:  I can give you the case.  I have it at my

25  table.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AI3TER3                      Pryce - direct

1        THE COURT:  All right.  Let me take a look at the

2   case.

3        MR. COHEN:  Phoenix Associates from the Second

4   Circuit, your Honor.  I only have one copy.  At page 103.  I

5   can find it if it's easier for your Honor.

6        THE COURT:  Yes.  I thought for sure you'd bring me

7   the yellow marked up copy.

8        MR. COHEN:  So did I.  The Second Circuit has to be

9   consistent with the prior -- with the witness's prior

10   testimony.  Mr. Hands hasn't testified.

11        THE COURT:  This has nothing do with the issue --

12   putting aside the fact that the overall issue is whether the

13   trial judge abused his discretion in an evidentiary hearing.

14   The specific question here is whether a particular statement

15   that was excluded should have been admitted as a prior

16   consistent statement.  And they're saying there are three

17   elements:  That the prior consistent statement is consistent

18   with the witness's in-court testimony, that's a quote; that the

19   prior consistent statement is being offered to rebut an express

20   or implied charge against the witness of recent fabrication;

21   and that the prior inconsistent statement was made prior to the

22   time when the proposed motive to falsify arose.  They don't go

23   off on the fact that the statement may have been referred to in

24   opening statements.  In fact, they say -- actually, I'm sorry.

25   It was admitted, and the question was whether it was properly

OAI3TER3                    Pryce - direct

1    admitted, and they say, quote, the rule does not require

2    appellants to point to a specific inconsistent statement by

3    Ambrosini for the four memoranda to be admissible.

4         So if anything, it seems to me to be more supportive

5    of your adversary's position than yours, because here, it is a

6    reference to something that everyone knows, and both sides in

7    effect canvassed in their opening statements as going to be

8    said by Mr. Hands.  And you must also know from the depositions

9    that he is going to say this.

10        So what you're suggesting is that in every such

11   situation, I have to let your adversary recall this witness so

12   that he can then put in the prior consistent statement, even

13   though we know it's a prior consistent statement, and even

14   though you in your opening had attacked the prior consistent

15   statement as a recent fabrication.  I don't see why that would

16   make any sense.

17        MR. WELLS:  Your Honor, on the record in this case, it

18   is more complex.  As your Honor may recall, I put on the screen

19   an e-mail from May 18 that Mr. Pryce wrote basically saying to

20   Mr. Borrows that something Mr. Hands may have suggested earlier

21   in the day that Mr. Borrows -- that Mr. Wormsley had said was

22   incorrect, and that Mr. Wormsley did not make that statement.

23        Now that is important because we have the option, and

24   I don't know where I am going to land and I may land in both

25   places in all candor, on what Mr. Hands may or may not have

0AI3TER3                        Pryce - direct

1    said on May 18 about Mr. Wormsley.  I could take the position

2    it is a recent fabrication.  Alternatively I could take the

3    position he got information from Mr. Nicoli or some other

4    source he shouldn't have gotten information for.  And he put it

5    in Mr. Wormsley's mouth.  Just as on that day, he incorrectly

6    said to Mr. Borrows that Mr. Wormsley said 240 would do the

7    deal.

8            The problem we have is that until we hear from

9    Mr. Hands and until I cross-examine Mr. Hands, it is difficult

10   for me to say am I going left, right, or both left and right.

11           And Mr. Hands was supposed to be the first witness.

12   We got an e-mail on Saturday saying Mr. Boies had decided to

13   put Mr. Pryce on first.  That's his prerogative, of course.

14   But on this set of facts, I think the right position is not to

15   have him testify on these issues until my cross, because until

16   I hear what he says, until I do my cross, whether I am going to

17   argue that he could have said it but he was lying back then to

18   cover up for Mr. Nicoli or some other source from which he was

19   getting information from or whether it is a recent fabrication

20   or whether the jurors can decide one or other, it's hard for me

21   to say.  So I'm not in a position to commit.  And I certainly

22   didn't commit I think in my opening on this issue.

23           THE COURT:  First of all, the committing you're

24   talking about in theory could be made as late as your

25   summation, and it wouldn't be fair to exclude this evidence

1    until that time.

2              MR. WELLS:  I agree with that.

3              THE COURT:  So, you want to defer this testimony from

4    Mr. Pryce until after Mr. Hands testifies; is that what you are

5    saying?

6              MR. WELLS:  Yes, sir.  Yes.

7              THE COURT:  Mr. Boies, what about that?

8              MR. BOIES:  Your Honor, I don't think that prejudices

9    me.  I think it makes it less coherent for the jury.  But if

10   the Court thinks that's the right way to do it, I'll do it that

11   way.  I don't think there can be any doubt about this, frankly,

12   but I'll do whatever the Court wants.

13             THE COURT:  If you had taken a stronger position, and

14   I appreciate as always that you're a model of restraint, just

15   like your adversary, but I would have said that it made more

16   sense to have this testimony now.  Because regardless of which

17   option Mr. Wells ultimately adopts or any of the three options,

18   the jury, having heard opening statement, would certainly be

19   inclined to be speculating that this was something that was

20   made up out of whole cloth rather than something that Mr. Hands

21   heard from someone else.  So it seems to me the door has

22   clearly been opened.  On the other hand, you might for tactical

23   reasons prefer to be able to call Mr. Pryce right after

24   Mr. Hands testifies.  So, I think the choice is yours.

25             MR. BOIES:  I do think that the idea of calling

OAI3TER3                    Pryce - direct

1   Mr. Pryce back is attractive.

2          THE COURT:  You got to fish or cut bait now.

3          MR. BOIES:  And if I can do that, I think I will do

4   that.

5          THE COURT:  Fine.  Then we're in agreement.

6          MR. BOIES:  But while we're at the side bar, it

7   reminds me, it has nothing to do with what we've just been

8   talking about.  Mr. Hands is diabetic.  And one of the concerns

9   over the weekend was he had an attack and he was under doctor's

10  care.  When he does testify, it would be very helpful if he

11  could take a break like every 60 to 75 minutes.

12         THE COURT:  That's fine.

13         MR. WELLS:  Your Honor, my colleagues have urged me to

14  withdraw and let's just get it over with.

15         THE COURT:  All right.  I think then, now we know that

16  the adversary system is alive and well.  I do think it will be

17  more comprehensible for the jury to hear it now.

18         MR. BOIES:  And I agree with that, your Honor.

19         (Continued on next page)

20

21

22

23

24

25

0AI3TER3                    Pryce - direct

1            (In open court)

2            THE COURT:  So ladies and gentlemen, let me explain

3    why we have side bars, because I know it's no fun for you to

4    just sit there twiddling your thumbs while we are talking at

5    the side bar.  Every once in a while I can only rule on whether

6    some evidence is admissible if I first hear the evidence over

7    there.  If I were to hear it in front of you and then to rule

8    it was not admissible, that would be like the cat would be out

9    of the bag so to speak.  So I have to hear it over at the side

10   bar and hear the arguments and then I make my ruling.  We are

11   only going to have these side bars when it's something of

12   importance, not for lesser matters.  But that's why we have

13   side bars.  So please bear with us when that happens.  So in

14   this case, the Court has concluded the testimony will be

15   allowed.

16   BY MR. BOIES:

17   Q.  Mr. Pryce, you said that you had a phone call with

18   Mr. Hands on May 18, on Friday after you got back to London.

19   Do you recall that?

20   A.  That's correct.

21   Q.  What did Mr. Hands tell you in that telephone conversation?

22   A.  He told me that the bid deadline had been changed from

23   Wednesday the 23rd of May to Monday the 21st.  So it had been

24   brought forwards by two days.  He also told me that Cerberus

25   were going to be bidding at 262 a share.  And he said clearly

0AI3TER3                         Pryce - direct

1    we therefore needed to be in a position that if we wanted to

2    acquire the company, we had to be ready by first thing on

3    Monday the 21st.

4    Q.   Do you remember this conversation clearly?

5    A.   Yes, I do.

6    Q.   Why is that?

7    A.   As I said, I remember it as I was standing outside the

8    passport office where I had just gone to renew my passport.

9    Q.   Did this development change Terra Firma's approach to due

10   diligence in any way?

11   A.   Yes, it did.

12   Q.   How?

13   A.   We had learned two very important things.  First of all, we

14   learned that our major competitor was going to bid 262.

15   Therefore, it was clear that if we wanted to buy EMI, we would

16   have to bid more than 262.  And then secondly, we knew that our

17   competitor was going to put its bid on the table on Monday, and

18   therefore, if we wanted to acquire the company, we were going

19   to have to do the same thing.  We would have to bid on that

20   Monday.

21            (Continued on next page)

22

23

24

25

0ai1ter4                    Pryce - direct

1   BY MR. BOIES:

2   Q.  Now going to May 19th, did you participate personally in

3   any meetings or conversations with respect to EMI on

4   May 19th?

5   A.  Not from recollection, no.

6   Q.  Now going to May 20th.  Did anything happen on

7   May 20th, 2007?

8   A.  Yes.  There was a meeting of the investment advisory

9   committee on the Sunday morning.

10  Q.  And did you personally participate in that?

11  A.  Yes, I participated in that meeting by phone.

12  Q.  And what was discussed at this investment advisory

13  committee meeting?

14  A.  A proposed bid for EMI and the price at which that bid

15  could take place.

16  Q.  Did the investment advisory committee make a recommendation

17  to the GP?

18  A.  I believe that it did, yes.

19  Q.  And was that recommendation based on the investment

20  advisory committee's understanding of what the competition was

21  at that point?

22          MR. COHEN:  Objection, your Honor.

23          THE COURT:  Sustained.

24  Q.  What was the investment advisory committee's recommendation

25  based on?

0ai1ter4                      Pryce - direct

A.   It was based on our understanding of where we were in the

auction process and on the basis of the work that the deal team

had been doing.

Q.   When you say where you were in the auction process, can you

explain what you mean by that.

A.   Yes.   I was a member of the investment advisory committee,

I was aware that our major competitor was Cerberus in this

bidding process, and I was aware that Cerberus were going to

bid 2.62 on Monday.   That was a relevant consideration that I

took into account when the committee decided on that Sunday

morning.

Q.   Now at the investment advisory committee meeting was there

any decision with respect to what price range would be

authorized?

A.   Yes.   My memory is that the recommendation was that the

price that we should recommend to the two general partners was

2.65 but with a possibility to increase that price to 2.85,

assuming that we got the money necessary to be able to increase

our bid.

Q.   Did there come a time when a committee of the board or of

the boards, because there are two of them, was appointed to

make the final decision as to whether or not to put in a bid

for EMI; and if so, at what price?

A.   I believe that a committee was created on that Sunday.

Q.   And do you remember who were the members of that committee?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0ai1ter4                         Pryce - direct

1           MR. COHEN:  Objection, your Honor.

2      I can explain.

3           THE COURT:  I'm sorry?

4           MR. COHEN:  I wanted to give the grounds, but I

5  shouldn't.

6           THE COURT:  No, go ahead.

7           MR. COHEN:  Foundation.

8           THE COURT:  Sustained.

9  Q.  What is your basis, if any, for knowing who the members of

10  the committee were?

11  A.  Because I participated in the committee meeting that took

12  place on Monday, the 21st of May.

13  Q.  And that was a meeting of this committee; is that correct?

14  A.  That's correct.

15  Q.  Who were the members of that committee?

16  A.  From memory, it was John Loveridge and Iain Stokes, both of

17  whom are directors of the two general partners.

18  Q.  You said you were a member of the investment advisory

19  committee; is that right?

20  A.  Yes, that's correct.

21  Q.  What was your purpose in providing for possible ability, if

22  the directors who were members of the committee approved, to

23  increase the offer above £2.65?

24  A.  We were aware that we were participating in an auction, we

25  were aware that there was a competing bidder.  In those types

0ai1ter4                          Pryce - direct

1   of situations it is always possible the competing bidder to up

2   its price.  What we were seeking to do on that Sunday is to get

3   the flexibility, if that was required, to be able to increase

4   our price, and that's the reason why we made the recommendation

5   to bid up to 2.85, assuming that we got the additional money

6   necessary to enable us to do that.

7   Q.  Following the investment advisory committee meeting on

8   Sunday, May 20th, when was the next time you spoke to

9   Mr. Hands?

10  A.  I spoke to Guy on that Monday morning, the 21st of May.

11  Q.  Can you tell the jury approximately when that was.

12  A.  It would have been sometime before 7:00 in the morning.

13  Q.  Why did you speak to Mr. Hands at that time?

14  A.  I knew that the committee meeting was taking place, and

15  obviously I wanted to know what my boss' view was in terms of

16  whether we should be bidding for EMI and also what price we

17  should be bidding, and I knew that the members of the

18  committee, John Loveridge and Iain Stokes, would also want to

19  know what Guy's view was.

20  Q.  Let me show you a document that has been previously marked

21  for identification Plaintiff's Exhibit 10.

22          MR. BOIES:  May I approach, your Honor?

23          THE COURT:  Yes.

24          MR. BOIES:  I would offer Plaintiff's Exhibit 10.

25          MR. COHEN:  Objection, your Honor.  May we approach?

0ai1ter4                    Pryce - direct

1          THE COURT:  Well, if there's an objection, give me in

2    one word, if you can, the ground.

3          MR. COHEN:  Can I use a few?  Foundation and 403.

4          THE COURT:  So let's start with foundation.  You want

5    to lay a foundation, Mr. Boies.

6          MR. BOIES:  And I think I can do it with respect to a

7    specific portion of it.

8    BY MR. BOIES:

9    Q.  Let me direct your attention to page 2, Section 6.4.  And I

10   would ask you to read that to yourself.

11   A.  (Witness complies.)

12   Q.  And let me know when you've finished.

13   A.  Yes, I've read that.

14   Q.  Does that paragraph accurately reflect what happened, or a

15   portion of what happened, because it's not the entire minutes,

16   at the meeting that you attended at 7:30 in the morning on

17   Monday, May 21st, 2007?

18          MR. COHEN:  Same objection.

19          THE COURT:  Well, let me ask the witness this:  Have

20   you seen this document before?

21          THE WITNESS:  Yes, I have.

22          THE COURT:  And generically, what is this document?

23          THE WITNESS:  These are draft minutes of the committee

24   meeting of (GP)2 that took place on that Monday, the 21st of

25   May.

0ai1ter4                    Pryce - direct

1          THE COURT:  And who, if you know, prepared this?

2          THE WITNESS:  These minutes would have been prepared

3    by the GP's administration company, Mourant Guernsey.

4          THE COURT:  And that is an affiliate of Terra Firma?

5          THE WITNESS:  No.  That's an independent fund

6    administration company.

7          THE COURT:  I see.  All right.  Then we need a

8    sidebar.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oai1ter4                        Pryce - direct

1           (At the sidebar)

2           MR. COHEN:  Your Honor --

3           THE COURT:  So, actually, that last answer gave me a

4    little pause because this exhibit, Trial Exhibit 10,

5    Plaintiff's Exhibit, on its face appears to be the draft

6    minutes of Terra Firma Investments (GP)2 Limited and on its

7    face bears the indicia of a ordinary business record.  However,

8    apparently it's not prepared in the regular course of Terra

9    Firma's business, or at least we haven't established that yet.

10   It's prepared apparently by Mourant Guernsey, which had a

11   representative present.

12          But assuming for the moment that this could be shown

13   to be an ordinary business record, what's your 403?

14          MR. COHEN:  No, foundation, plus, but your Honor, the

15   question was asked was, do you -- does this accurately reflect

16   what went on at the meeting, and --

17          THE COURT:  He only got into that after you objected

18   earlier to the --

19          MR. COHEN:  Right.  His testimony at the deposition,

20   in impeachment, was, "I don't have any recollection of the

21   meeting."  So he's reading the minutes and he's testifying as

22   to what happened at the meeting.

23          THE COURT:  But I'm not sure that that matters.  Well,

24   first of all, assuming, arguendo, this could be established to

25   be an ordinary business record, which he may not be able to do,

0ai1ter4                          Pryce - direct

1   given what I just said, assuming he could, then it comes in,

2   whether or not he recollects it or not.  So I still don't

3   understand what the 403 objection is.

4              MR. COHEN:  Well, 403 objection -- let me be clear.

5   We stipulated this was a business record so I'm not objecting

6   this was a business record.  Remember, we had this discussion

7   at the summary judgment argument.  This was the document.  So I

8   don't want to lead the Court down the wrong path.

9              THE COURT:  Okay.  Then I'm not quite sure what

10  you're --

11             MR. COHEN:  What I'm saying is that he doesn't

12  remember the meeting, and he's asking the witness to say what

13  took place at this meeting.  He doesn't remember the meeting,

14  he didn't prepare the document.  The document comes in, the

15  document can come in.  But to have his testimony about, well,

16  did it accurately reflect what happened at the meeting --

17             THE COURT:  Okay.  That was a subsequent question.

18  This was offered first before he asked that question, and you

19  objected on foundation.

20             MR. COHEN:  On foundation.

21             THE COURT:  And on 403.

22             MR. COHEN:  Right.

23             THE COURT:  Sounds like the foundation, since it's

24  stipulated that it's a business record, I don't know that any

25  other foundation has to be laid.

0ai1ter4                         Pryce - direct

1              And the 403, I'm still missing why it's 403.  That's

2      different from a question about, he says now that he

3      remembered.  Of course you can cross-examine and impeach him

4      with his prior testimony.  That's fair enough.  That goes to

5      cross-examination.

6              So the document will be admitted.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0ai1ter4                        Pryce - direct

1          (In open court)

2          THE COURT:  Plaintiff's Exhibit 10 is admitted.

3          (Plaintiff's Exhibit 10 received in evidence)

4          THE COURT:  Go ahead.

5   BY MR. BOIES:

6   Q.  Now, Mr. Pryce, do you have a present recollection of what

7   happened at the -- this meeting on May 21st, at 7:30 a.m.?

8   A.  I am aware of some things that were discussed.

9          THE COURT:  That wasn't the question.  The question

10  is:  As you sit here today, do you have an actual recollection

11  of anything that occurred at this meeting?  Just answer that

12  yes or no.

13         THE WITNESS:  No.

14         THE COURT:  No.  Okay.

15  Q.  Let me ask you to look at paragraph 6.4 --

16  A.  Yes.

17  Q.  -- and ask you whether that refreshes your recollection as

18  to what happened or a portion of what happened at that meeting.

19         THE COURT:  I don't think he indicated a failure of

20  recollection.  I mean, he said flat out that he didn't have a

21  recollection.

22         MR. BOIES:  He was present, though, your Honor.

23         THE COURT:  All right.  Go ahead.  I'll allow it.

24  Just for foundational purposes.

25         So what do you want him to look at?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Oai1ter4                        Pryce - direct

1          MR. BOIES:  Your Honor, since the document is in

2   evidence --

3          THE COURT:  Yes.

4          MR. BOIES:  -- I'll withdraw the question.  May I

5   display the document to the jury?

6          THE COURT:  Yes.

7          MR. BOIES:  Let me just put up page 2 of Exhibit 10,

8   Section 6.4.

9   BY MR. BOIES:

10  Q.  Now, Mr. Pryce, did you relay the information conveyed to

11  you by Mr. Hands the morning of May 21st to anyone?

12  A.  Yes, I did.  I immediately spoke to John Loveridge after my

13  call with Guy.

14  Q.  And did you convey to Mr. Loveridge what Mr. Hands had told

15  you?

16  A.  Yes.  I told Mr. Loveridge --

17         MR. COHEN:  Objection, your Honor.

18         THE COURT:  Ground.

19         MR. COHEN:  Hearsay.

20         THE COURT:  Well, I don't think this is being offered

21  for its truth.

22         MR. BOIES:  It is not, your Honor.

23         THE COURT:  And it seems to me, going back to some of

24  the sidebar, that this may be circumstantially relevant.

25  Overruled.

0ai1ter4                    Pryce - direct

 1  BY MR. BOIES:

 2  Q.  You may answer.

 3  A.  I told Mr. Loveridge that Guy had confirmed to me that

 4  nothing had changed overnight and that therefore his view was

 5  that we should stick at the price of 2.65 a share.  That's what

 6  I told John.

 7          MR. COHEN:  Your Honor, I'm going to renew my

 8  objection.  I think it is being offered for the truth.

 9          THE COURT:  It is circumstantial evidence bearing on

10  the prior consistent statement that was admitted for its truth,

11  of being said, at least, and maybe more, over a hearsay

12  objection at the sidebar.  This is corroborative and therefore

13  comes in under the same analysis.  Overruled.

14  Q.  Mr. Pryce, a few minutes ago you mentioned Mourant

15  Guernsey --

16  A.  Yes.

17  Q.  -- do you recall that?  And could you explain what Mourant

18  Guernsey's relationship is to Terra Firma.

19  A.  Mourant Guernsey provides administration services to Terra

20  Firma's Guernsey general partners, and as part of those

21  services, they prepare minutes such as these.

22  Q.  And are some of the Mourant Guernsey services secretarial

23  services?

24  A.  Correct.

25  Q.  And does Mourant Guernsey prepare documents, including

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

0ai1ter4                     Pryce - direct

1   these draft minutes or draft minutes like them, in the regular

2   course of business?

3   A.  Yes, it does.

4   Q.  Now after Terra Firma had submitted its bid for EMI was

5   there anything that prohibited Terra Firma, as a practical

6   matter, from simply allowing the bid to lapse or withdrawing

7   the bid?

8           MR. COHEN:  Objection, your Honor.

9           THE COURT:  Sustained.

10          MR. BOIES:  May we approach, your Honor?

11          THE COURT:  No.  The problem is form.

12          MR. BOIES:  Form.

13          THE COURT:  Yeah.  It's too vague.

14          MR. BOIES:  Thank you.

15  Q.  After Terra Firma had submitted its bid did Terra Firma

16  ever withdraw that bid?

17  A.  No, Terra Firma didn't.

18  Q.  Did it ever allow that bid to lapse?

19  A.  No, Terra Firma didn't.

20  Q.  Would there have been adverse consequences to Terra Firma

21  if it had either withdrawn the bid or allowed the bid to lapse?

22          MR. COHEN:  Objection, your Honor.

23          THE COURT:  Ground.

24          MR. COHEN:  Leading.

25          THE COURT:  I think in between the, as you would say,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0ai1ter4                    Pryce - direct

1  the Scylla and Charybdis of vagueness and leading, this is

2  permissible as a fair middle point.   Overruled.

3  A.   Yes, it was my belief that if we had allowed this offer to

4  be withdrawn, that would have had severe reputational

5  consequences for Terra Firma.

6  Q.   And would those reputational consequences to Terra Firma

7  have adversely or not affected Terra Firma's business in any

8  way?

9  A.   Yes, it would have done.

10  Q.   In what way?

11  A.   At this point in time we were looking at a number of these

12  types of deals, and if we had allowed our offer to be

13  withdrawn, it would have made it very much more difficult for

14  us to do these types of deals in the future.   These types of

15  deals are ones where you are seeking to get the approval and

16  the recommendation of the board of the company that you're

17  trying to buy, and if we, as we had done in relation to EMI,

18  having obtained the board's recommendation, then pulled that

19  offer, it would have made it very much more difficult in

20  discussions with other boards of directors, because they would

21  have always had this doubt about whether or not Terra Firma

22  would have withdrawn its offer.

23  Q.   Let me turn to one final subject, and that relates to when

24  you discovered or found out that Cerberus had not in fact bid.

25  And my first question to you would be:   When did you find that

0ai1ter4                    Pryce - direct

1   out in fact?

2   A.  I believe that I had a suspicion sometime in the second

3   half of 2007.

4   Q.  And what caused that suspicion?

5   A.  A conversation that I had with Guy.

6   Q.  And what did Mr. Hands say to you that caused you to have

7   this suspicion?

8   A.  He said to me that he had heard that Cerberus in fact had

9   not submitted a binding bid on that Monday, the 21st of May.

10  Q.  And did he ask you to do anything?

11  A.  Yes.  He asked me to investigate that situation in order to

12  find out whether or not that was true.

13  Q.  And did you do so?

14  A.  Yes, I did do that.

15  Q.  And when did you complete that investigation?

16          MR. COHEN:  Objection, your Honor.  If we can

17  approach?

18          THE COURT:  As to when?

19          MR. COHEN:  No.  To the subject matter of the

20  testimony.

21          THE COURT:  Oh.  Okay.  Come to the sidebar.

22          (Continued on next page)

23

24

25

0ai1ter4                    Pryce - direct

1          (At the sidebar)

2          THE COURT:  While we're waiting, are you going to be

3    more than five more minutes with this witness?

4          MR. BOIES:  Yes, your Honor.

5          THE COURT:  Okay.  Then maybe we should -- rather than

6    take this at the sidebar, why don't I give the jury their

7    midafternoon break and then --

8          MR. COHEN:  Sure.

9          (In open court)

10         THE COURT:  So ladies and gentlemen, since this

11   sidebar may take a little time, why don't we give you your

12   midafternoon break at this time.  We'll see you in about 15

13   minutes.

14         (Jury excused)

15         THE COURT:  And Mr. Pryce, why don't you go outside so

16   we can have this discussion out of your hearing, and we'll see

17   you in a few minutes.

18         (Witness excused)

19         (In open court; jury not present)

20         THE COURT:  All right.  Please be seated.

21         So go ahead, Mr. Cohen.

22         MR. COHEN:  Your Honor, the issue -- the issue, your

23   Honor, is sword and shield.  I mean, there is an investigation

24   that was conducted.  We know there was an investigation

25   conducted.  We're going to be cut off as to any of the

0ai1ter4                          Pryce - direct

1   contents.  We were cut off in the course of discovery.  So for

2   him to now affirmatively raise this investigation in bringing

3   the case and then hide behind the privilege with respect to the

4   substance of the investigation is unfair and for him to open

5   the privilege when we've been denied discovery into that

6   investigation would be equally unfair.

7          MR. BOIES:  Your Honor, I don't intend to go into the

8   substance at all.  I'm simply asking a question of when, which

9   is the kind of thing that typically is on a privilege log in

10  any event.  So I don't think this implicates privilege.  I

11  simply want to establish the time frame when the investigation

12  was completed.

13         MR. COHEN:  Your Honor, I can't probe that date.

14  Let's assume he says -- I assume it was done sometime in 2009.

15  I know he started his investigation in 2008.  Without

16  establishing what was done between 2008 and 2009, why should

17  the plaintiffs be able to argue to the jury, "We didn't finish

18  our investigation until 2009"?  They could have completed

19  99 percent in the first month of 2008 and left 1 percent for

20  2009, and I can't inquire.

21         THE COURT:  Well, I take it the broader question is

22  this:  The argument was made on defense counsel's opening that

23  the plaintiff knew in -- what was it, some point in 2007?  I

24  can't remember the date.

25         MR. WELLS:  September.

0ai1ter4                    Pryce - direct

1    THE COURT:  September? -- September 2007 that

2    Cerberus had not made a bid.  And the argument is they didn't

3    bring a lawsuit then and/or even call -- as I recall the

4    opening, Mr. Hands didn't call Wormsley and say, "You lied to

5    me" or anything like that.  So the fact that they're bringing a

6    lawsuit now is because you're just making it up in order to try

7    to recoup money for the bad performance of EMI.  Do I have the

8    essence of that argument?

9    MR. WELLS:  Yes, but it is more factually complex,

10   because the e-mail where Mr. Hands is told that Cerberus did

11   not bid is dated September 2007.  When we questioned both

12   Mr. Pryce and Mr. Hands and Mr. Alexander, who wrote the

13   e-mail, nobody remembers the e-mail.  They say they didn't

14   learn till months later when Mr. Hands was having a

15   conversation with another gentleman.  Jay, do you remember the

16   time of that conversation?

17   MR. COHEN:  Your Honor --

18   THE COURT:  Whoa, whoa.  What is the time of that

19   conversation?

20   MR. COHEN:  The other conversation --

21   MR. WELLS:  Late December.

22   THE COURT:  December.  Okay.  So I take it, Mr. Boies,

23   you want to respond to that argument in part, at least, by

24   saying that there was an investigation going on.  The

25   difficulty that defense counsel's raising is that, how can a

0ailter4                    Pryce - direct

1   jury evaluate that and how can they respond to it if they don't

2   know any of the particulars of that investigation?  For all

3   they know, the investigation might have concluded that you

4   don't have a leg to stand on or, if you bring this lawsuit,

5   it's based on conversations that we've been unable to

6   corroborate, or any of a million things, none of which they'll

7   be able to delve into because attorney/client privilege has

8   been asserted with respect to this investigation.  Do I have

9   the -- is that what happened; attorney/client privilege was

10  asserted?

11          MR. BOIES:  Yes, your Honor.  Yes.  But your Honor, if

12  I may --

13          THE COURT:  Yes.

14          MR. BOIES:  -- if this were an issue that was

15  disputed, that is, whether or not Cerberus actually put in a

16  bid or not, and we were offering this for evidence as to

17  whether or not they did, then I think it would implicate the

18  privilege and we should not be able to both have him testify

19  about it and not provide them with the discovery.  But that

20  doesn't in -- that's not what's involved here.  What's involved

21  here is, we're not, first, trying to use the substance of the

22  investigation; and second, there's no dispute as to the

23  ultimate fact.  This is simply designed to provide a time

24  frame.

25          MR. COHEN:  Your Honor --

0ai1ter4                    Pryce - direct

1      THE COURT:  The investigation began when and ended

2  when?

3      MR. BOIES:  It began in the last quarter of 2007 and

4  was completed by the second quarter of 2008.

5      THE COURT:  Yes.

6      MR. COHEN:  Your Honor, even that question, the

7  deposition of -- Mr. Hands' deposition, page 200:  "How long

8  did that investigation last?"  Instruction not to answer.  And

9  then there was a follow-up question after that, which he

10  couldn't recall.  "I can't recall."  But the first instruction

11  that was given was an instruction not to answer.

12      THE COURT:  Yes.  So implicit in what you're saying is

13  what I think makes sense, which is, if they want to offer here

14  how long the investigation took, which I think does not waive

15  the attorney/client privilege, then they should have allowed

16  you examination on how long the investigation took, which

17  you're saying they didn't.  So, all right.  So what about that,

18  Mr. Boies?

19      MR. BOIES:  Your Honor, I'd like to take a look at

20  that transcript, page and number.

21      THE COURT:  Yes, sure.

22      MR. BOIES:  Because I don't have it.

23      Thank you.

24      (Pause)

25      MR. BOIES:  Your Honor, for my purposes, I can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0ai1ter4                    Pryce - direct

1    withdraw this question --

2              THE COURT:  All right.

3              MR. BOIES:  -- and ask the question that they were

4    permitted to ask, which was, when did he go back and report to

5    Mr. Hands the results of the investigation.

6              THE COURT:  All right.

7              MR. BOIES:  For my purposes, that would be sufficient.

8              THE COURT:  All right.  That's fine.  Then I'll allow

9    it for that purpose.

10             All right.  We're going to only go to about 4:45, so

11   let's reconvene in about five minutes or so.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

0ai1ter4                          Pryce - direct

1                  (In open court; jury present)

2              THE COURT:  Please be seated.

3              Counsel.

4              MR. BOIES:  Thank you, your Honor.

5   BY MR. BOIES:

6   Q.  Mr. Pryce, before the break, you had said that in the

7   second -- or in the last quarter, last quarter of 2007,

8   Mr. Hands had asked you to investigate whether Cerberus had in

9   fact put in a bid.  Do you recall that?

10  A.  Yes, I do.

11  Q.  When did you first report back to Mr. Hands concerning the

12  results of your investigation?

13  A.  It would have been in the second quarter of 2008.

14  Q.  Now between the second quarter of 2008 and the time this

15  lawsuit was filed, were there any reasons why you did not file

16  the lawsuit earlier?

17              MR. COHEN:  Objection, your Honor.

18              THE COURT:  Well, as to this witness, I think the

19  objection stands.  Sustained.

20  Q.  In the period between second quarter of 2009 and the time

21  this lawsuit was filed, what was your position at Terra Firma?

22  A.  I was the general counsel until March, the end of March

23  2009, and then from the 1st of April 2009 I became CEO.

24              THE COURT:  It's with respect to the former part that

25  I think you have a problem.

1    MR. BOIES:  Yes, your Honor.

2    Q.  With respect to the period from April 1st, 2009 to the

3    time you filed the lawsuit, was there any reason why the

4    lawsuit was not filed earlier?

5    MR. COHEN:  Objection again, your Honor.

6    THE COURT:  Who made the determination, the ultimate

7    determination at Terra Firma's end to bring this lawsuit?

8    THE WITNESS:  It was the board of (GP)2 and (GP)3, who

9    are plaintiffs in this case, who took the decision to commence

10   the proceedings.

11   THE COURT:  All right.  And were you a member of those

12   boards?

13   THE WITNESS:  No, I wasn't.

14   THE COURT:  Sustained.

15   BY MR. BOIES:

16   Q.  What is your relationship to those boards; that is, what

17   role do you play?

18   A.  I am the CEO of the investment adviser to those two boards.

19   Q.  And in that capacity did you play any role in the board's

20   consideration of whether to bring a lawsuit?

21   A.  Yes, I did.

22   Q.  And what was the role that you played?

23   A.  I participated in the discussions which led to the decision

24   being taken.

25   Q.  And did you make recommendations?

0ai1ter4                        Pryce - direct

1    A.  Yes, I -- yes, I did.

2    Q.  And was there any reason why whatever recommendation you

3    made was not made earlier?

4            MR. COHEN:  Objection, your Honor.  May we approach?

5            THE COURT:  No.  I'm sustaining your objection.  If

6    you want to talk me out of it, you can.

7            Go ahead.

8    Q.  Between the second quarter of 2009 and the time this

9    lawsuit was brought, were there attempts made to settle the

10   claims that were ultimately brought in this lawsuit?

11           MR. COHEN:  Objection, your Honor.

12           MR. BOIES:  That's a yes or no question, your Honor.

13           THE COURT:  Overruled.

14   A.  Could you repeat the question, please.

15   Q.  Between the second quarter of 2009 and the time this

16   lawsuit was brought, were there efforts made to settle the

17   claims that are now made in this lawsuit, that is, efforts

18   between Terra Firma and Citibank?

19           MR. COHEN:  Objection, your Honor, to form.

20           THE COURT:  Well, it's not ideal, but I'll allow it.

21           Answer that question or no.  If you know.  Well, first

22   of all, do you know?  Do you know whether there were such

23   discussions?

24           THE WITNESS:  There were discussions between Terra

25   Firma and Citigroup, yes.

A-12971

0ai1ter4                           Pryce - cross

1           THE COURT:  Okay.  That's the answer to your question.

2           MR. BOIES:  Thank you, your Honor.

3           I have no more questions, your Honor.

4           THE COURT:  All right.  Cross-examination.

5           MR. COHEN:  Give me a moment.

6           (Pause)

7    CROSS-EXAMINATION

8    BY MR. COHEN:

9    Q.  Good afternoon, Mr. Pryce.

10   A.  Good afternoon.

11   Q.  Mr. Pryce, did you ever tell Citibank that you had a fraud

12   claim against them?

13   A.  My recollection is that we didn't tell them before we filed

14   the case.

15   Q.  So until December of 2009, when this case was filed, no one

16   on behalf of Terra Firma ever told Citi that Citi had

17   perpetrated a fraud; isn't that right?

18   A.  We didn't tell them that they had perpetrated a fraud

19   before bringing the proceedings.

20   Q.  And no one told Citi, prior to December of 2009, that

21   Mr. Wormsley had lied; correct?

22   A.  That is my understanding, yes.

23   Q.  Did I hear you testify about a May 20th meeting of the

24   IAC, on Sunday of the weekend in question?

25   A.  On a Sunday, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0ai1ter4                    Pryce - cross

1   Q.  And did I -- I tried to write this down accurately from the

2   transcript.  Do you remember saying that there was a meeting of

3   the investment advisory committee on Sunday morning?  Do you

4   recall testifying to that?  I don't want to put words in your

5   mouth.

6   A.  Yes, I do recollect that.

7   Q.  Do you recall testifying that the discussion at that

8   meeting was a bid for EMI and the price at which that bid could

9   take place?  Do you recall that?

10  A.  Yes, I do recall that.

11  Q.  Isn't it a fact that you have no memory at all of that

12  meeting?

13  A.  I know that I participated in that meeting.

14              MR. COHEN:  Your Honor, may I show him a transcript,

15  please, of the deposition?

16              THE COURT:  I don't think it's necessary.  I think

17  the -- because I don't think the answer was quite responsive to

18  your question.

19              The question is:  Do you remember, have an actual

20  memory of anything about this meeting?  Yes or no.

21              THE WITNESS:  Of that meeting, no.

22              THE COURT:  Okay.

23  BY MR. COHEN:

24  Q.  So when you testified that the meeting related to a

25  proposed bid for EMI and the price at which that bid could take

0ai1ter4                    Pryce - cross

1   place, in response to Mr. Boies' questions, you don't remember

2   those things; do you?

3   A.  I've seen the minutes, which confirm that that's what was

4   discussed at that meeting.

5   Q.  Yes.  But you don't have a recollection of anything that

6   anyone said at that meeting; correct?

7   A.  I don't have a specific recollection of points which were

8   discussed.

9   Q.  Do you have any memory of the meeting on May 20th, 2007,

10  of the IAC?

11          THE COURT:  May 20th?

12          MR. COHEN:  May 20th.

13  A.  No.

14  Q.  Now, sir, do you recall that Mr. Boies mentioned to you the

15  indicative bid that was placed by Terra Firma?

16  A.  Mr. Boies referred to indicative bid, yes.

17  Q.  And have you ever seen the indicative bid offer that Terra

18  Firma sent to EMI in the spring of 2007, May of 2007?

19  A.  Yes, I have seen a copy of that letter.

20          MR. COHEN:  May I approach, your Honor?

21          THE COURT:  Yes.

22  A.  Do you want me to read it?

23  Q.  Would you take a look at that, please.

24  A.  Mm-hmm.  (Witness complies.)

25          Okay.  I've read that letter.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0ai1ter4                    Pryce - cross

1   Q.  And you recognize that as being the indicative bid letter

2   for 265 pence per share that was sent on May 8th; correct?

3   A.  Yes.

4           MR. COHEN:  I'd offer OF, your Honor.

5           MR. BOIES:  No objection, your Honor.

6           THE COURT:  Defendant's Exhibit OF is received.

7           (Defendant's Exhibit OF received in evidence)

8   Q.  Sir, if you would look at the summary proposal on the first

9   page, it says that on May 8th, 2007, Terra Firma was putting

10  in an indicative offer price of 265 pence per share.  Do you

11  see that?

12  A.  Yes.

13  Q.  Terra Firma didn't know anything about the price at which

14  Cerberus was bidding when it put in that indicative bid offer;

15  did it?

16  A.  Not that I'm aware.

17  Q.  And the second bullet says that a substantial amount of

18  work undertaken based on publicly available information.  Do

19  you see that?

20  A.  I see that.

21  Q.  And that was accurate; was it not?  Was it accurate?

22  A.  Yes.  Work had been undertaken in relation to EMI before

23  this letter was submitted.

24  Q.  The third bullet says that only limited confirmatory due

25  diligence was required.  Do you see that?

0ailter4                    Pryce - cross

1    A.  I do.

2    Q.  All right.  You didn't tell EMI on May 8th, 2007 that

3    there wasn't enough time to do due diligence between May 8th

4    and the date of the bid; correct?

5            MR. BOIES:  Objection, your Honor.  He didn't write

6    this letter.

7            THE COURT:  Sustained.

8    Q.  Are you aware of anyone on behalf of Terra Firma ever

9    telling EMI that there was inadequate time to conduct due

10   diligence before making its bid?

11   A.  I'm not aware.

12   Q.  And in fact, one of the reasons why Terra Firma could move

13   quickly in May of 2007 is that it had begun its due diligence

14   on EMI months before; correct?

15   A.  Some work, from memory, had been undertaken in the first

16   quarter of 2007 in order to get a better understanding of the

17   music market.

18   Q.  The work that had been done, by memory, included hiring

19   outside advisers; correct?

20   A.  In order to be able to do that, that work, yes, outside

21   consultants had been hired.

22   Q.  So back in the first quarter of 2007, months before the

23   indicative bid was submitted, Terra Firma had hired McKinsey;

24   had it not?

25   A.  I'm aware that we had hired, yes, a consultant firm.

0ai1ter4                    Pryce - cross

1    Q.  Yeah.  What did McKinsey do?

2    A.  They are a management consultancy firm.

3           (Continued on next page)

0AI3TER5                    Pryce - cross

1    BY MR. COHEN:

2    Q.  They had been hired by Terra Firma back in the first

3    quarter of 2007, correct?

4    A.  I believe that's correct, yes.

5    Q.  Back in the first quarter of 2007, months before the

6    indicative bid letter was submitted, Terra Firma had hired

7    KPMG, isn't that so?

8    A.  I believe that's correct, yes.

9    Q.  What is KPMG?

10   A.  It is an accounting firm.

11   Q.  KPMG did accounting and tax due diligence for Terra Firma

12   on the EMI deal, did it not?

13   A.  I believe that's the case, yes.

14   Q.  Their work didn't start on May 8, 2007, did it?

15   A.  My memory is that the work that was done at an earlier

16   stage was principally the work with the consultants McKinsey at

17   that stage.

18   Q.  You don't remember KPMG being hired back in February of

19   2007?

20   A.  No, I don't remember that.

21           MR. COHEN:  May I approach, your Honor?

22           THE COURT:  Yes.

23   Q.  Mr. Pryce, I've handed you Exhibit MB for identification.

24   Those were minutes of a meeting of the investment advisory

25   committee of Terra Firma, correct?

0AI3TER5                      Pryce - cross

1   A.   That's what it says, yes.

2   Q.   Just again, because there are a lot of Terra Firmas and

3   it's early, so we can just refresh our recollection, the

4   investment advisory committee is a group of senior executives

5   at Terra Firma who have responsibility for reviewing

6   transactions, correct?

7   A.   Yes.   The investment advisory committee is a committee of

8   Terra Firma Capital Partners Limited, the investment advisor.

9   And it considers the recommendations that the deal teams put

10  forward.

11  Q.   Minutes of the meetings of the investment advisory

12  committee are kept in the ordinary course, are they not?

13  A.   Yes, they are.

14          MR. COHEN:   And I offer Exhibit MB, your Honor.

15          MR. BOIES:   No objection, your Honor.

16          THE COURT:   MB is received.

17          (Defendant's Exhibit MB received in evidence)

18  Q.   Let me focus you on the second page -- let me go to the

19  first page, first of these minutes, Exhibit MB.   This is a

20  meeting that was held on 5 February, 2007, do you see that,

21  sir?

22  A.   I do.

23  Q.   That's three months plus before the indicative bid was made

24  by Terra Firma for EMI?

25  A.   Yes.

0AI3TER5                    Pryce - cross

1   Q.  On February 5, 2007, what the IAC was discussing was

2   something called Project Dice.  Do you see that, sir?

3   A.  Yes, I do.

4   Q.  Project Dice, as Mr. Boies brought out in his examination,

5   that was the code name within Terra Firma for EMI?

6   A.  That's correct.

7   Q.  If you look at that first page at the bottom it says Riaz

8   Punja outlined Project Dice as the potential public to private

9   acquisition of Dice Group PLC, the world's largest recorded

10  music company and the second largest music publishing company.

11  The investment strategies, regulatory considerations, key risks

12  and exit considerations were discussed by the committee.

13         You see that?

14  A.  Yes, I do.

15  Q.  That was back in February, not in May, correct?

16  A.  This meeting took place in February, yes.

17  Q.  Actually, when Terra Firma first began to look at a

18  possible investment of EMI, that was in 2006, not in 2007,

19  correct?

20  A.  I am aware that we were interested in EMI in -- at the end

21  of 2006.

22  Q.  Right.  In fact, Terra Firma wrote a letter to EMI in 2006,

23  at the end of the year, to say that it was interested in a

24  possible acquisition of EMI, correct?

25  A.  Yes.  At that time EMI was the subject of an offer from

OAI3TER5                         Pryce - cross

1   another private equity firm, Permira, and at that stage, we

2   wrote a letter to the company confirming that we would be

3   interested in having access to the information that EMI had

4   given to Permira.

5   Q.  If you'd look at the second page of Exhibit MB.  It says

6   after due and careful consideration it was resolved that a

7   recommendation be made to TFI -- TF1 -- TFL, right?

8   A.  TFI.

9   Q.  GP2 to approve the budget of 800,000 pounds for phase one

10  due diligence in order to commission McKinsey & Co., Enders

11  Analysis, Weil Gotshal, KPMG, and a political consultant.  Do

12  you see that, sir?

13  A.  Yes.

14  Q.  Help me with the math.  800,000 pounds in early 2007 was

15  about a million and a half dollars?

16  A.  I don't know what the exchange rate at the time was.

17  Q.  Can you give me a ballpark, what you think the pound to

18  dollar was.  It was more than one to one, was it not?

19  A.  Yes, it was.

20  Q.  It was over a million dollars, right?

21  A.  Yes, yes.

22  Q.  In February, three months before the indicative bid, what

23  the IAC recommended was that the general partners spend over a

24  million dollars on due diligence, correct?

25  A.  That's correct.

0AI3TER5                    Pryce - cross

1   Q.  You see that not just McKinsey was hired, but Enders

2   Analysis, do you see that?

3   A.  I do.

4   Q.  What's Enders Analysis?

5   A.  I believe it is another consulting firm.

6   Q.  That specializes in the music business, does it not?

7   A.  I think that's correct.

8   Q.  Later, before May of 2007, before you got to the indicative

9   bid, you also hired another specialist in the music industry,

10  did you not?

11  A.  I don't have a memory of that.

12  Q.  LEK.  Do you remember the consulting firm being hired LEK?

13  A.  I don't have a memory of that.

14  Q.  You see that Weil Gotshal was hired?

15  A.  I do.

16  Q.  That was a law firm, right?

17  A.  They're indeed a law firm.

18  Q.  They were hired to do work on the regulatory

19  considerations.  That's up on the first -- under the first page

20  of the minutes, right?

21  A.  I don't know what they were specifically hired for at this

22  stage.

23  Q.  Well, eventually they looked at the regulatory

24  considerations, did they not?

25  A.  Yes, they did.

A-12982

0AI3TER5                    Pryce - cross

1   Q.  Your team was in charge of that aspect of the due

2   diligence, right?

3   A.  Yes, they worked with Weil Gotshal on that.

4   Q.  You also see that, I think you couldn't recall this before,

5   but that KPMG was also hired back in February, correct?

6   A.  That's what that says here.  I didn't remember that.

7   Q.  You don't doubt that the minutes are accurate, do you?

8   A.  No, I'm not saying that at all.

9   Q.  By the way, that signature where it says chairman that

10  signs the minutes, is that Mr. Hands' signature?

11  A.  That looks like Mr. Hands' signature, yes.

12  Q.  KPMG was hired back in February to do due diligence on this

13  deal, right?

14  A.  Correct.  As I have said before, I remember McKinseys and

15  other consultants being hired in that first quarter in order to

16  conduct investigations into the music market.

17  Q.  Was there any auction for EMI back in February of 2007 when

18  you hired these various consultants and authorized the

19  expenditure of over a million dollars?

20  A.  Not that I am aware, no.

21  Q.  You didn't start the due diligence for the acquisition of

22  EMI on May 8, did you?

23  A.  As I've said before, the work that was undertaken -- my

24  memory of the work that was undertaken in the first quarter of

25  2007, was focused on the work with the consultants.  I don't

0AI3TER5                    Pryce - cross

1   know how that budget breaks down between the different

2   consultant, the lawyers, and the accountants.

3   Q.  Right.  But in any case, the consultants that assisted you

4   in due diligence in this transaction, they were put in place in

5   February, not in May.  Correct?

6   A.  They were working on this in February, yes.

7   Q.  Mr. Punja, I think you testified about Mr. Punja and I

8   think we are going to hear from him this at this trial.  He was

9   the lead financial managing director on this transaction,

10  correct?

11  A.  Yes, he was the financial managing director.

12  Q.  Thank you for that correction.  What does a financial

13  managing director do at Terra Firma?

14  A.  Financial managing directors look for investment

15  opportunities for Terra Firma.  They are very much focused on

16  the valuation of businesses.  As I said before, they're numbers

17  people.

18  Q.  Mr. Punja was a senior numbers person at Terra Firma, was

19  he not?

20  A.  He was a financial managing director, yes.

21  Q.  He was one of the founders of the company along with you

22  and Mr. Hands, isn't that so?

23  A.  That is correct.

24  Q.  Mr. Punja didn't begin his work on Project Dice in May; he

25  started back in February, didn't he?

0AI3TER5                    Pryce - cross

1    A.  Yes.  As is clear from these minutes, his team started work

2    or were working on this in February.

3    Q.  Let me take you to May 18.  That's 10 days after the

4    indicative offer.  Do you remember we talked about that Friday,

5    May 18?  And am I correct that there was a meeting of the

6    investment advisory committee that morning?

7    A.  On May 18?

8    Q.  Yes, sir.

9    A.  Yes, I think that's correct.

10   Q.  That's the meeting in Guernsey that you testified about in

11   response to Mr. Boies' questions?

12   A.  Yes, I believe that that is correct.

13   Q.  Just help us.  Where's Guernsey?

14   A.  Guernsey is an island in the Channel, which is the sea that

15   divides England from France.

16   Q.  Terra Firma holds its board meetings from time to time in

17   Guernsey, right?

18   A.  GP2 and GP3 hold their board meetings always in Guernsey.

19   Q.  Right.  The directors of GP2 and GP3 include a number of

20   Guernsey directors, correct?

21   A.  Yes, that is correct.

22          MR. COHEN:  May I approach, your Honor?

23          THE COURT:  Yes.

24   Q.  If I can show you what we've marked as Exhibit K for

25   identification, Citi K.  Do you recognize these are the minutes

0AI3TER5                    Pryce - cross

1    of this meeting at 8 o'clock in the morning that you testified

2    about earlier today?

3    A.  I see that, yes, these are minutes of the investment

4    advisory committee meeting.

5    Q.  Yes.

6            MR. COHEN:  I offer Exhibit K, your Honor.

7            MR. BOIES:  No objection, your Honor.

8            THE COURT:  K is received.

9            (Defendant's Exhibit K received in evidence)

10   Q.  Now, sir, would you turn to the second page -- just on

11   first page, it notes the attendance at this meeting, do you see

12   that, sir?  You were present?

13   A.  Yes.

14   Q.  The people on top, Mr. Hands, Mr. Duncan, Mr. O'Haire,

15   Mr. Pryce, and Mr. Roling, they're members of the investment

16   advisory committee, right?

17   A.  Mr. Roling wasn't a member of the investment advisory

18   committee, but the other four people that you referred to were.

19   Q.  So the investment advisory committee included Mr. Hands,

20   Mr. Duncan, Mr. O'Haire and yourself, correct?

21   A.  Correct.

22   Q.  The way Terra Firma works is that the deal team makes

23   recommendations to the IAC based on the work that the deal team

24   does, right?

25   A.  That's correct.

OAI3TER5                    Pryce - cross

1    Q.  Mr. Punja was the senior financial managing director on the

2    deal team that related to EMI, is that correct?

3    A.  He was the team leader alongside Stephen Alexander, yes.

4    Q.  Mr. Alexander is something you call an operational managing

5    director?

6    A.  That's correct, yes.

7    Q.  They were both senior executives at Terra Firma the

8    advisor?

9    A.  They were both managing directors of Terra Firma Capital

10   Partners Limited, yes.

11   Q.  Just so we're clear, managing director, that's the highest

12   title at Terra Firma?

13   A.  That is correct.

14   Q.  So they were both senior executives, correct?

15   A.  Yes, they were.

16   Q.  If you turn to the second page of these minutes of May 18,

17   it says a memorandum and presentation dated May 18, 2007, was

18   produced to the meeting.  Do you see that, sir?

19   A.  I do.

20   Q.  Now, between May 8, when the indicative bid was put in, and

21   this meeting of May 18, Terra Firma did a lot of work on this

22   deal, did it not?

23   A.  Yes, we were involved in due diligence during that time.

24   Q.  Right.  The due diligence involved members of the Terra

25   Firma team, did it not?

1    A.  Yes, it would have done.

2    Q.  Mr. Punja had a whole team of people who assisted him on

3    the financial side, correct?

4    A.  Mr. Punja had a number of people who work for him, yes.

5    Q.  Right.  In fact, if we go back to the first page, a number

6    of them actually attended the meeting, right?  Mr. Punja's

7    team.

8    A.  Yes.  Some of them did, that's correct.

9    Q.  Mr. van der Spuy, he was a member of that team, right?

10   A.  Yes.

11   Q.  Next to the last name?

12   A.  Yes, that's correct.

13   Q.  Mr. Seymour a couple of names up, he was a member of that

14   team, right?

15   A.  My memory is he was also on the team, yes.

16   Q.  Mr. Hoang was a member of the team, H-o-a-n-g?

17   A.  Yes, that is also correct.

18   Q.  Mr. Hedegaard was a member of the team, correct?

19   A.  Yes, Mr. Hedegaard was working with Mr. Alexander.

20   Q.  That was the financial side of the Terra Firma team, right?

21   A.  Michael Hedegaard was on the operational side.

22   Q.  That was the side that was headed by Mr. Alexander, right?

23   A.  That's correct.

24   Q.  Again, just to help us with the terms.  The financial folks

25   are the numbers people?

0AI3TER5                         Pryce - cross

1    A.   That's correct.

2    Q.   They have responsibility for doing the valuations of the

3    companies that you are thinking about investing in, right?

4    A.   That's correct.

5    Q.   So, the job of Mr. Punja and his team was to figure out

6    what the company was worth, right, EMI?

7    A.   Yes, it was their -- it was their role to come up with a

8    range of values.

9    Q.   Mr. Alexander and his team -- was there anyone else on his

10   team besides Mr. Hedegaard?

11   A.   I only have a memory of Mr. Hedegaard being on that team at

12   this stage.

13   Q.   They had responsibility for coming up with a business plan

14   of how Terra Firma would operate EMI after it acquired it,

15   right?

16   A.   They helped on the production of that, yes.

17   Q.   The business plan would include things like how can we cut

18   costs out of this business so we, Terra Firma, can make it more

19   profitable than it is under current management, right?

20   A.   The business plan would set out how we believed that we

21   would be able to increase the value of this business.  And as I

22   said earlier on, that can take many different forms.  It can

23   take the form of changing management, it can take the form of

24   investing more money in the company, it can take the form of

25   changing parts of the company.

0AI3TER5                    Pryce - cross

Q.  All of those things were looked at in connection with EMI,

were they not?

A.  I believe that they were.

Q.  Terra Firma had never done a transaction as large as EMI

successfully through May of 2007, right?

A.  I think that this was the largest investment that Terra

Firma undertook, yes.

Q.  You, for a large investment, had a big team working on it,

did you not?

A.  It was not uncommon on the transactions that we looked at

at Terra Firma to have large teams.

Q.  Right.  Whether it was uncommon or not, in this

transaction, there was a large team, correct?

A.  Yes, it was a relatively large team, yes.

Q.  Some of the other people like Ms. Cooke and others, they

dealt with tax and legal aspects of the transaction, right?

A.  Yes.  I think Ms. Cooke was dealing with the legal side of

the financing.

Q.  Right.  Ms. Dolenec, the third name, she had responsibility

on the financing side, right?

A.  She was working on the financing, yes.

Q.  So in addition, and Mr. Slattery was one of the lawyers on

your team.  He had responsibility for doing work on the legal

side of this transaction?

A.  Yes, he was working on the legal due diligence and on the

0AI3TER5                    Pryce - cross

1   offer process, yes.

2   Q.   In addition to this whole team that was listed in

3   attendance on May 18, 2007, by that point you have all of your

4   outside advisors in place, right, and working?

5   A.   I believe that's the case, yes.

6   Q.   That included McKinsey, right?

7   A.   I don't have a memory of whether McKinsey was working at

8   this particular point in time.   That would be something that

9   Stephen and Riaz would --

10  Q.   KPMG was working, right?

11  A.   I believe they were, yes.

12  Q.   And you had an investment banker who was advising EMI on

13  this transaction, right?

14  A.   Yes, we did.

15  Q.   The investment banker who was working for Terra Firma, that

16  wasn't Citibank, was it?

17  A.   We had appointed Dresdner Kleinwort Benson as an advisor.

18  Q.   Your investment banker on the EMI transaction was not

19  Citibank, was it?

20  A.   Dresdner Kleinwort Benson were our investment advisor.

21  Q.   Only Dresdner Kleinwort Benson, correct?

22  A.   They were the -- yeah.   They were the investment bank that

23  was appointed to work with Terra Firma.

24  Q.   They got paid millions of dollars for doing this deal, did

25  they not?

0AI3TER5                    Pryce - cross

1   A.  I can't remember what they got paid.

2   Q.  I will see if I can refresh your recollection.  You don't

3   remember them being paid a percentage of the size of the

4   transaction?

5   A.  They clearly would have got paid.  I just can't remember

6   how much they got paid.

7   Q.  In any case, the investment banker who was representing

8   Terra Firma in the EMI transaction was Dresdner and not

9   Citibank.

10  A.  Dresdner acting for us, that's correct.

11  Q.  Sir, if you would turn to the second page of these minutes,

12  it says under Project Dice, do you see that, sir, at the top.

13  The first two lines, a memorandum and presentation dated

14  May 18, 2007, was produced to the meeting, a copy of which is

15  attached to these minutes.

16          Do you see that, sir?

17  A.  I do.

18  Q.  That was the way that the IAC commonly worked.  That is the

19  deal team would make a presentation to the IAC for its

20  consideration.   Right?

21  A.  Yes, that's correct.

22  Q.  That presentation would also be given to the general

23  partners, correct?

24  A.  Yes, it would,

25  Q.  Let me just be clear.  When the IAC is working on this

0AI3TER5                          Pryce - cross

1   transaction, it doesn't have the power to make the investment

2   decision, right?

3   A.   Absolutely not.

4   Q.   Right.   The investment decision is made by the general

5   partners?

6   A.   Correct.   The role of the investment advisory committee is

7   to make a recommendation to the board of the general partner.

8   But it is the general partner that makes the decision as to

9   whether or not to implement that recommendation.

10  Q.   So, the deal team makes a recommendation to the investment

11  advisory committee, right?

12  A.   Correct.

13  Q.   Then the investment advisory committee makes a

14  recommendation to the general partners, right?

15  A.   That is correct.

16  Q.   The general partners are the one who decide.   Correct?

17  A.   That is correct.

18           MR. COHEN:   Your Honor, can I show the witness Citi

19  demonstrative 1.

20           THE COURT:   All right.

21           MR. COHEN:   May we show it to the jury, your Honor?

22           THE COURT:   Any objection?

23           MR. BOIES:   No objection.

24           THE COURT:   You may show it.

25           MR. COHEN:   If we can put up Citi demonstrative 1.

0AI3TER5                    Pryce - cross

1   Q.  I want to make sure we understand how this transaction

2   worked at Terra Firma.  The Project Dice team, that's the team

3   that was led by Mr. Punja and Mr. Alexander.  Right?

4   A.  Yes, they led the deal team in Terra Firma.

5   Q.  They made a recommendation to the investment advisory

6   committee, that's the committee that you sat on and Mr. Hands

7   was the chair of, right?

8   A.  Yes.  That's correct.  They make a recommendation to the

9   IAC.

10  Q.  Then the IAC makes a formal recommendation to the board of

11  directors and the general partners, right, GP2 and GP3?

12  A.  That is also correct.

13  Q.  Again, just because I know we're used to these words.  GP2

14  is Terra Firma Capital Partners Limited, General Partner 2?

15  A.  GP2 is the management company of the Terra Firma Capital

16  Partners 2 Fund.  That's the pool of money that we raised when

17  we set up Terra Firma.

18  Q.  And GP3 is fund 3, right?

19  A.  GP3 is the management company of fund 3.  Yes.

20  Q.  GP2 and GP3 have the final approval with respect to making

21  a decision.

22  A.  Yes, that is correct.  They take all the decisions relating

23  to what fund 2 and fund 3 does.

24  Q.  Mr. Hands was on the board of fund 2 and fund 3, GP2 and

25  GP3 at that time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AI3TER5                         Pryce - cross

1    A.   Yes, he was.

2    Q.   You were not, right?

3    A.   No, I was not.

4    Q.   Sir, I want to talk a little bit about this presentation

5    that was made to the investment advisory committee at 8 o'clock

6    in the morning on May 18.

7              May I approach, your Honor?

8              THE COURT:  Yes.

9    Q.   Sir, I've handed you --

10             THE COURT:  Let me ask you this, Mr. Cohen, because we

11   need to end today at 4:45.

12             MR. COHEN:  This is a lengthy document, so this might

13   be a logical place to break.

14             THE COURT:  Ladies and gentlemen, I know you'll be

15   disappointed to hear that we are going to let you go five

16   minutes early.  In order to start promptly at 9 o'clock, it's

17   very important that we start at 9 o'clock to keep on schedule,

18   given the tight security of this courthouse, you probably need

19   to be downstairs by 8:45.  So go through security, go up to the

20   jury room, and we'll call you in to restart the trial at

21   9 o'clock.

22             Have a very good evening.  Remember not to discuss the

23   case.  Root for the Yankees, that's my advice, and we'll see

24   you tomorrow.

25             (Jury excused)

OAI3TER5                          Pryce - cross

1          THE COURT:  Mr. Pryce, I had one quick question just

2     out of curiosity.  The name Project Dice, was that a name that

3     Terra Firma came up with?

4          THE WITNESS:  Yes, it was.

5          THE COURT:  Was there a reason for that name?

6          THE WITNESS:  You'd have to ask the deal team members.

7     I didn't come up with that name.  But it is usual on all

8     transactions that we look at, we come up with a code name.

9          THE COURT:  But, I guess my question, frankly, is was

10    this intended to convey that this was a dicey transaction?

11         THE WITNESS:  No.  Absolutely not.

12         THE COURT:  Okay.  Very good.  Thanks very much.

13    We'll see you tomorrow at 9 o'clock.

14         (Witness excused)

15         THE COURT:  Anything else that counsel needs to raise

16    with the Court?

17         MR. BOIES:  Not from us, your Honor.

18         MR. COHEN:  No, your Honor.

19         THE COURT:  Very good.  We'll see you at 9 o'clock

20    tomorrow.

21         (Adjourned until October 19, 2010, at 9 a.m.)

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                            Page

 3     TIM PRYCE

 4     Direct By Mr. Boies . . . . . . . . . . . .85

 5     Cross By Mr. Cohen . . . . . . . . . . . 137

 6                        PLAINTIFF EXHIBITS

 7     Exhibit No.                            Received

 8       10    . . . . . . . . . . . . . . . 122

 9       630   . . . . . . . . . . . . . . . .99

10       659   . . . . . . . . . . . . . . . .99

11                        DEFENDANT EXHIBITS

12     Exhibit No.                            Received

13       K     . . . . . . . . . . . . . . . 151

14       MB    . . . . . . . . . . . . . . . 144

15       OF    . . . . . . . . . . . . . . . 140

16

17

18

19

20

21

22

23

24

25
```

```
0aj1ter1
```

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    TERRA FIRMA INVESTMENTS (GP) 2
     LIMITED (for and on behalf of
4    the six limited partnerships
     constituting the Terra Firma
5    Capital Partners II Fund), and
     TERRA FIRMA INVESTMENTS (GP) 3
6    LIMITED (for and on behalf of
     Terra Firma Capital Partners
7    III, L.P.),

8                    Plaintiffs,

9                v.                        09 CV 10459 (JSR)

10   CITIGROUP INC., CITIBANK,
     N.A., CITIGROUP GLOBAL MARKETS
11   LIMITED, AND CITIGROUP GLOBAL
     MARKETS, INC.,
12
                     Defendants.          Jury Trial
13
     ------------------------------x
14                                        New York, N.Y.
                                          October 19, 2010
15                                        9:25 a.m.

16   Before:

17                    HON. JED S. RAKOFF,

18                                        District Judge

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

0aj1ter1

1                          APPEARANCES

2   BOIES, SCHILLER & FLEXNER LLP
         Attorneys for Plaintiffs
3   BY:  DAVID BOIES, ESQ.
         WILLIAM C. JACKSON, ESQ.
4        KAREN C. DYER, ESQ.
         CHRISTOPHER DUFFY, ESQ.
5        ABBY L. DENNIS, ESQ.

6   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
         Attorneys for Defendants
7   BY:  THEODORE VON WELLS, JR., ESQ.
         JAY COHEN, ESQ.
8        JOHN F. BAUGHMAN, ESQ.
         KIRA DAVIS, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oajlter1

1              (Trial resumed)

2              (In open court; jury present)

3              THE COURT:  Please be seated.

4              Good morning, ladies and gentlemen.

5              THE JURORS:  Good morning.

6              THE COURT:  Thank you very much for your promptness.

7    I know a few of you got stuck on the security line, and we'll

8    try to always go to send someone down to try to move that along

9    so we can get going, but we are ready to proceed.

10             Counsel?

11             The Court reminds the witness he's still under oath.

12             THE WITNESS:  Yes.

13    TIM PRYCE, resumed.

14    CROSS-EXAMINATION

15    BY MR. COHEN:

16    Q.  Good morning, Mr. Pryce.

17    A.  Good morning.

18    Q.  Before we go back to where we were yesterday, I was

19    wondering if we could clear up one thing from yesterday.  Do

20    you recall -- and I can show you the testimony if you'd like.

21    Do you recall you testified yesterday in response to Mr. Boies'

22    questions that between the second quarter of 2009 and the time

23    this lawsuit was brought, there were efforts made to settle the

24    claims that are now made in this lawsuit between Terra Firma

25    and Citibank?

0aj1ter1                    Pryce - cross

1    A.  I think what I actually said was that there were

2    discussions between Terra Firma and Citigroup.

3    Q.  With respect to the claims in this lawsuit?

4    A.  There were discussions in connection with the financing on

5    EMI.

6    Q.  There were no discussions with respect to the claims in

7    this lawsuit, were there, sir, between the second quarter of

8    2009 and the time the complaint was brought?

9    A.  There were discussions in connection with the lawsuit.

10   Q.  With the claims brought in this lawsuit, sir.  Let me --

11          MR. COHEN:  Your Honor, may I show him the testimony

12   on the screen?

13          THE COURT:  No, because I think this is all

14   cumulative.  Didn't you go over this yesterday?

15          MR. COHEN:  No.

16          THE COURT:  I thought, if memory serves me correctly,

17   that you elicited from him that there were no discussions

18   regarding the fraud claims, and I take it that's what you mean

19   by the claims.

20          MR. COHEN:  Yes, your Honor.  I'll move on.

21   Q.  Let me show you, sir -- do you recall we were going to talk

22   about the May 18th presentation when we broke?

23   A.  Yes, I do.

24          MR. COHEN:  May I approach, your Honor?

25          THE COURT:  Yes.

0aj1ter1                    Pryce - cross

1   Q.  Now, sir, I've shown you what we've marked as Citi Exhibit

2   GP for identification, and do you recognize this as a

3   presentation that was made to the IAC on May 18$^{th}$, 2007?

4   A.  Yes, that's what this document looks like, yes.

5   Q.  And presentations like this were made to the IAC in

6   connection with Project Dice -- that is, the EMI transaction --

7   in the ordinary course of Terra Firma's business; right?

8   A.  Yes, that's correct.

9         MR. COHEN:  I offer Exhibit GP, your Honor.

10        MR. BOIES:  No objection, your Honor.

11        THE COURT:  GP is received.

12        (Defendant's Exhibit GP received in evidence)

13  Q.  Now, sir, if I could turn your attention to the page on GP

14  that says 6 of 160, part of the Executive Summary.  Let me know

15  when you're there.

16  A.  Yes, I'm there.

17  Q.  Now by the way, this 160-page document that was presented

18  in the morning of May 18$^{th}$, this reflected all of the

19  additional work that was done by the Project Dice team after

20  Terra Firma entered the auction; right?

21  A.  This presentation would have been prepared by the deal team

22  on the basis of the work that they'd done, yes.

23  Q.  All right.  So just to refresh our recollection, Terra

24  Firma entered the auction on May 8$^{th}$ when an indicative bid

25  was put in; right?

0aj1ter1                    Pryce - cross

1   A.   Correct.

2   Q.   And this presentation on May 18<sup>th</sup> reflected the work that

3   Terra Firma did between the 8<sup>th</sup> and the 18<sup>th</sup>, right, of May

4   2007?

5   A.   This reflected the work the deal team had done, yes.

6   Q.   All right.  And if we go to the first bullet, it says, "The

7   team recommends that the IAC consider recommending a binding

8   bid of 265 pence per share."  Do you see that, sir?

9   A.   Yes, I do.

10  Q.   All right.  And that in fact was the recommendation that

11  was made to the IAC that morning, Friday, May 18<sup>th</sup>, 2007;

12  right?

13  A.   Yes, I believe that is the case.

14  Q.   And that's the recommendation that the IAC adopted at the

15  meeting on Friday morning May 18<sup>th</sup>, 2007; right?

16  A.   I would have to have a look at the minutes to actually

17  confirm that.

18         MR. COHEN:  Okay.  Could we put Citi K back up,

19  please, that is in evidence.  Turn to the second page, please.

20  The next to last paragraph at the bottom, "After due and

21  careful consideration."  One more down, please.

22  Q.   "After due and careful consideration, it was resolved that

23  a recommendation be made to TFI (GP)2 and TFI (GP)3 to approve

24  the submission of an indicative bid to the Dice board at 265 p

25  per share."  Do you see that, sir?

0aj1ter1                    Pryce - cross

1   A.  Yes, I do.

2   Q.  And in fact, there's actually a mistake in those minutes.

3   That was not an indicative bid; was it?

4   A.  I think, as I had said yesterday, what we were seeking to

5   achieve was to make a recommendation to (GP)2 and (GP)3 to get

6   the highest bid possible approved, remembering at this stage

7   that we didn't have the financing in place and that for the

8   question of actually whether we would bid and at what price,

9   would have to be determined later.

10  Q.  Mr. Pryce, was the IAC discussing an indicative bid on

11  May 18th; yes or no?

12  A.  I don't believe it would have been discussing indicative

13  bid.

14  Q.  All right.  So that when the minutes say that it was in

15  submission of an indicative bid, that had actually been made

16  back on May 8th; correct?

17  A.  An indicative bid had been made on the 8th of May, yes.

18  Q.  And what the IAC was talking about on May 18th was the

19  submission of a binding bid to EMI; correct?

20  A.  I can't remember whether we were actually talking about

21  submitting a binding bid.  As I've said, I don't know why this

22  word "indicative" was used here, but it could have been to

23  reflect the fact that at this stage there was no financing

24  package that Citigroup had made available and therefore

25  wouldn't have been possible to sign off on a binding bid as of

0aj1ter1                    Pryce - cross

1    Friday, the 18th.

2    Q.  Didn't the general partners later that morning approve a

3    bid to EMI's board as up to 265 pence per share?

4    A.  They approved the bid, but at that stage the financing

5    terms had not been negotiated and therefore in those

6    circumstances, the GP would not have been able at that stage to

7    submit a binding bid.

8    Q.  Mr. Pryce, is there anything I can show you in the

9    minutes -- is there anything in the minutes that say that this

10   was contingent upon financing?

11              MR. COHEN:  Can I have Exhibit K, please, so he can

12   see the whole thing.

13              May I approach, your Honor?

14              THE COURT:  Yes.

15   A.  I read that now.

16   Q.  Is there anything that reflects conditionality on the

17   financing?

18   A.  There isn't anything that reflects conditionality in the

19   minutes.  However, the financing was not agreed at this stage.

20   Q.  Sir, if you can just try to answer my questions.

21              THE COURT:  No, no, counsel.  Counsel, just put a

22   question.

23   Q.  Is it true, Mr. Pryce, that your recollection is that what

24   was approved by the IAC on May 18th was a formal offer rather

25   than an indicative bid?

```
0aj1ter1                    Pryce - cross
```

1   A.  I believe what was approved was a -- was a price at which

2   we could bid.

3   Q.  It was a --

4   A.  As to whether it was a binding bid or a nonbinding bid, all

5   I can remember is that the financing at this stage, we were

6   unaware of what the terms were.

7            MR. COHEN:  Your Honor, may I show the witness his

8   deposition, please?

9            THE COURT:  Yes.

10            MR. COHEN:  And I'm going to give it to counsel and

11   your Honor, and what I'm interested in is page 186, lines 5 to

12   9.  186, 5 to 9, Mr. Pryce.

13            Your Honor, if I could put that up after you've had a

14   chance to bring it up.

15   A.  Sorry.  What's the reference again, please?

16   Q.  I want you to look first at 186, 5 to 9, and I'm just going

17   to wait for the Court before I ask you a question.

18            THE COURT:  Yes, go ahead.

19            MR. COHEN:  Okay.  Would you put up 186, 5 to 9.

20   Q.  Do you recall that I took your deposition this summer in

21   London, Mr. Pryce?

22   A.  Yes, I do.

23   Q.  All right.  And you were testifying under oath at that

24   point?

25   A.  I was.

0aj1ter1                    Pryce - cross

1    Q.  And do you recall that I asked you the following question:

2              "And is it correct that what was approved by the IAC

3    on May 18th was a formal offer for EMI of 265 pence per

4    share?

5              "A.  My recollection is that it was a formal offer

6    rather than an indicative bid."

7              Do you see that, sir?

8    A.  Yes, I do.

9    Q.  Okay.

10   A.  But I would -- I also remember that later on I remembered

11   that actually, this stage, the financing wasn't in place, and I

12   think somewhere in my deposition I actually mentioned that.

13   Q.  Did you give that answer to that question, sir?

14   A.  Sorry?

15   Q.  And was that truthful testimony?

16   A.  What I've said is that is the answer I gave, but if you

17   look in my deposition a bit further on, I remembered that the

18   financing package at this stage wasn't in place.

19   Q.  It was a formal offer, as you discussed that morning; was

20   it not, sir?

21   A.  I think, as I said previously, at this stage the financing

22   wasn't in place and therefore the GP would not have been able

23   to make a formal offer.

24   Q.  So that testimony that you gave under oath is incorrect?

25   A.  I don't think it was incorrect.  I think if you look

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter1                        Pryce - cross

1    further on in my deposition, I actually mentioned the fact that

2    I remembered that the financing wasn't in place and therefore

3    that was the reason why perhaps the word "indicative" was

4    actually used in the -- in the minutes.

5    Q.  Mr. Pryce, did you say anything about financing in this

6    answer?

7    A.  No, I didn't, but if you look further in my deposition, I

8    remember that, as I keep saying, that the financing had not

9    been agreed at this point in time and maybe that was the reason

10   why the word "indicative" was used.

11   Q.  Do you know why the word "indicative" was used?

12   A.  I can't -- I don't know at all.  I didn't draft those

13   minutes.

14   Q.  Right.  So you're speculating that that's why the word

15   "indicative" was used; correct?

16   A.  I think in answer to the question why was "indicative"

17   used, as you've done today, I've given my answer.

18              MR. BOIES:  Your Honor, could I ask the Court to look

19   at page 196, lines 2 to 21.

20              THE COURT:  Hold on.

21              All right.  So I think we need to put up, in the

22   interest of completeness, on the screen page 196, lines 2 to

23   21.

24              Is this what you were referring to?

25              THE WITNESS:  Yes, I believe it is.

0aj1ter1                     Pryce - cross

1          THE COURT:  All right.  Counsel?

2    BY MR. COHEN:

3    Q.  And is it correct, Mr. Pryce, that you don't know why the

4    words "indicative bid" were used in the minutes?

5    A.  I didn't draft the minutes, so I don't know why the person

6    that wrote them used the word "indicative."

7    Q.  And the bid that Terra Firma was discussing on May 18$^{th}$

8    was not an indicative bid; right?

9    A.  We were aware that the following week we were going to have

10   to be in a position to submit the binding bid.

11   Q.  Correct.  And the indicative bid had been submitted ten

12   days earlier, had it not?

13   A.  An indicative bid had been submitted earlier on in order to

14   get into the process.

15   Q.  Right.  And was there any expectation at Terra Firma on

16   May 18$^{th}$ that a second indicative bid would be put in?

17   A.  I don't have any recollection of that.

18   Q.  You were working towards a final bid; correct?

19   A.  Over this weekend, yes.

20          MR. COHEN:  Could we go back, please, to Exhibit GP.

21          THE COURT:  By the way, ladies and gentlemen, I should

22   explain to you what a deposition is.  Before a case goes to

23   trial, the lawyers for each side can take the testimony of

24   various witnesses in their offices.  The witnesses are under

25   oath but there's no judicial officer there, so what was said at

0aj1ter1                        Pryce - cross

1    those depositions only comes into evidence under certain rules,

2    which I won't bore you with, complicated rules, but once it

3    does come into evidence, as it just did in these respects, you

4    can consider it for all purposes.

5               Go ahead, counsel.

6    BY MR. COHEN:

7    Q.  Could you turn, please, to page 3 of 160, just the table of

8    contents for the 160-page document.  Do you see that, sir?

9    A.  Yes.

10   Q.  And these are the various things that were presented to the

11   IAC on the morning of May 18$^{th}$ with respect to the

12   consideration of the bid for EMI; correct?

13   A.  I can't remember the precise details of what was actually

14   presented in the meeting.

15   Q.  You don't remember the meeting on May 18$^{th}$?

16   A.  I remember participating in the meeting.  I don't remember

17   the detailed discussions.

18   Q.  Do you remember anything about the discussions on

19   May 18$^{th}$?

20   A.  As I've said, I don't remember the detailed discussions.  I

21   do remember participating in the meeting for part of it.

22   Q.  Do you remember anything anyone said in connection with

23   this 160-page presentation for the consideration of the bid for

24   EMI?

25   A.  No.

0aj1ter1                         Pryce - cross

1    Q.  Not a thing.

2    A.  I don't have a recollection of the discussions at that

3    meeting.

4    Q.  You remember your conversation with Mr. Hands later that

5    day; right?

6    A.  Yes, I do.  What Mr. Hands told me was -- was significant.

7    Q.  Okay.  And this wasn't significant?  The consideration of

8    the approval of a £4 billion offer, that wasn't significant?

9    A.  It was significant, but you have to remember, we had a

10   large number of investment advisory committee meetings.

11   Q.  Did you have another investment advisory committee meeting

12   before May 18$^{th}$ in which the IAC, of which you were a member,

13   was given a 160-page presentation with the reasons why the bid

14   should be put in?

15   A.  Over this period of time we were looking at a large number

16   of transactions, and it would not have surprised me if we had

17   other presentations that would have been quite detailed, yes.

18   Q.  I don't think my -- I don't think my question was clear.  I

19   apologize.

20           Do you remember another presentation of this length

21   about EMI before May 18$^{th}$, 2007?

22   A.  We would have received earlier presentations.  Whether it

23   was as long as this, I can't remember.

24   Q.  All right.  And even though this presentation goes on for

25   160 pages, you don't remember anything that anyone said in

Oaj1ter1                        Pryce - cross

1   connection with this presentation?

2   A.  I don't have a recollection, no.

3   Q.  But you do remember a conversation later in the day.

4   A.  Absolutely, yes.

5   Q.  And speaking of IAC meetings, you went to one on Sunday

6   morning, May 20th, as well?

7   A.  I believe that I participated in one, yes.

8   Q.  What do you remember about that meeting?

9   A.  I don't remember -- I don't remember the detailed

10  discussions of that either.

11  Q.  Did you go to the general partner meeting or part of it on

12  Friday morning, May 18th, 2007?

13  A.  I don't know at what point in the morning I left.  I do

14  know that I left the meeting early in order to get a flight to

15  return to London.

16  Q.  Didn't you testify yesterday, I believe in response to the

17  Court's question, that you attended a part of that meeting on

18  May 18th, the meeting of the general partners?

19  A.  I -- I don't know at what point I left the meeting.  What I

20  do know is that I was there for part of the meeting on -- on

21  that Friday morning.

22  Q.  And as a part of the meeting on Friday morning, May 18th,

23  2007, of the general partners, what do you remember about that?

24  A.  I think, as I've said before, I don't remember the detailed

25  discussions and -- at those meetings.

0aj1ter1                    Pryce - cross

1    Q.  Do you remember anything anybody said on Friday morning,

2    May 20th, at the meeting of the general partners, to consider

3    a bid for EMI?

4    A.  No, I don't.

5    Q.  And then you went to the meeting of the general partners on

6    Monday, May 21st; right?

7    A.  I believe that I participated in that committee meeting on

8    the Monday morning, yes.

9    Q.  That was by telephone; right?

10   A.  That was by telephone, yes.

11   Q.  What do you remember about that meeting?

12   A.  I don't have a recollection of the detailed discussions of

13   that meeting either.

14   Q.  So you don't remember the IAC meeting on the morning of

15   May 18th; correct?

16   A.  I do remember attending the meeting.  What I don't remember

17   was the detailed discussions at that meeting.

18   Q.  You don't remember any discussions of that meeting; do you?

19   A.  I don't have a recollection now today, no.

20   Q.  And you don't remember any of the discussions of the part

21   of the general partners meeting that you attended; correct?

22   A.  I don't --

23   Q.  On the 18th.

24   A.  I don't know.  I think we've already established I don't

25   know what -- whether or not at what point I left the meeting on

0aj1ter1                    Pryce - cross

1    that Friday.

2    Q.  Well, we established you went to part of the meeting;

3    right?

4    A.  What I said was that I attended a meeting on that Friday

5    morning.  At what point in time I left and therefore where in

6    the order of the meeting that took place, I can't remember.

7    Q.  Whenever you left, you don't remember anything that

8    happened that morning; correct?

9    A.  As I've said, I don't remember the detailed discussions at

10   that meeting, no.

11   Q.  And you don't remember any of the discussions from Sunday;

12   right?

13   A.  I don't, no.

14   Q.  And you don't remember any of the discussions from Monday.

15   A.  I remember certain discussions before the meeting and I

16   remember one area of discussion at that committee meeting on

17   the Monday.

18   Q.  But you don't remember anything anybody said at the meeting

19   on the 21st; right?

20   A.  The meeting on the Monday morning of the committee, I can

21   remember certain things that I said.

22   Q.  Do you remember anything anyone else said?

23   A.  No.

24   Q.  But you remember your conversation with Mr. Hands.

25   A.  Yes, I do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter1                    Pryce - cross

1   Q.  Let's turn back to page 6 of 160 of this IAC document.

2           Now just so we're clear again about the IAC, you were

3   a member; correct?

4   A.  Yes, I was a member of the investment advisory committee,

5   yes.

6   Q.  And you participated in the approval of the recommendation

7   that was set out in this presentation that morning; did you

8   not?

9   A.  As I've said, I can't remember at what point in time that

10  morning I left to go back to London, and therefore it's

11  difficult for me to say.

12  Q.  Didn't you sign the document that showed that this

13  recommendation had been approved?

14  A.  I'd have to see the minutes.

15  Q.  I'll show it to you, sir.

16          MR. COHEN:  May I approach, your Honor?

17          THE COURT:  Yes.

18  Q.  Now, sir, Exhibit FG for identification, Citi Exhibit FG,

19  is a memo to the IAC with certain approvals; right?

20  A.  That is correct.

21  Q.  And that was created in the ordinary course of the business

22  of Terra Firma?

23  A.  Yes, it was.

24          MR. COHEN:  I offer FG, your Honor.

25          MR. BOIES:  No objection, your Honor.

0aj1ter1                          Pryce - cross

1          THE COURT:  FG is received.

2          (Defendant's Exhibit FG received in evidence)

3          MR. COHEN:  Can we show -- go down a little bit,

4    please.  The middle, the middle part, under Recommendation, so

5    we can clarify.

6    Q.  Now, so the recommendation was, at that -- on the $18^{th}$,

7    was to recommend to (GP)2 and (GP)3 to approve proceeding with

8    the offer for Dice plc.  That's EMI; right?

9    A.  Yes, that's correct.

10   Q.  On the terms set out in the attached presentation; correct?

11   A.  Correct.

12   Q.  And the presentation is Exhibit GP, the one we've been

13   looking at, that big document; right?

14   A.  Yes.

15   Q.  And it says Approved.  Is that your handwriting?

16   A.  Yes, it is.

17   Q.  And go down below that, please.  Where it says "Confirmed,

18   Member of the Investment Advisory Committee."

19          The recommendation is confirmed by member of the

20   investment advisory committee, sir, and that's your signature;

21   is it not?

22   A.  Yes, that is my signature.

23   Q.  And then below it indicates that this recommendation was

24   approved by Lorna Kelly on behalf of the general partners;

25   right?

0aj1ter1                    Pryce - cross

1   A.  That's what that says.

2   Q.  And she's a member of the board of the GP; correct?

3   A.  I think she was an alternative director to one of the board

4   members, yes.

5   Q.  But she had the authority to sign this recommendation.

6   A.  Yes, she did.

7   Q.  So the recommendation that was approved on the 18$^{th}$ of

8   May was to proceed with the offer on the terms set out in the

9   presentation; right?

10  A.  If you're asking the question now as to what the GP

11  decided, I think you'd also have to look in the minutes of

12  those meetings.

13  Q.  I'm looking -- I'm talking about the -- let me clarify my

14  question.  I'm talking about the IAC.

15  A.  Okay.

16  Q.  Yes?

17  A.  Sorry.  What was your question?

18  Q.  The approval was to proceed with the offer on the terms set

19  out in the May 18$^{th}$ presentation.

20  A.  This is what that document says, yes.

21  Q.  Right.  And if we go back to that May 18$^{th}$ presentation

22  where we were on page 6 of 160 at the top, it says, "The team

23  recommends that the IAC consider recommending a binding bid of

24  265p per share"; correct?

25  A.  That's what it says, yes.

0ajlter1                          Pryce - cross

1   Q.  All right.  It doesn't say "indicative bid"; does it?

2   A.  No, it doesn't.

3   Q.  It doesn't say a binding bid conditioned on financing; does

4   it?

5   A.  No, it doesn't.

6   Q.  Go to the next line.  It says -- and I want to see if you

7   can explain this for me -- "TF Indie Case, assuming exit in FY

8   2012 of both Music and Publishing separately, generates IRR of

9   22.1% and CoCM of 2.7x."  Do you see that, sir?

10  A.  Yes, I do.

11  Q.  Let's go through that slowly.  The team had recommended --

12  had modeled what EMI would look like under Terra Firma

13  ownership; right?

14  A.  Yes.

15  Q.  And that's what Mr. Punja and his team do; they run a lot

16  of numbers and they figure out if Terra Firma can make money by

17  investing at 265 pence per share in EMI; right?

18  A.  Yes, they would run a number of different scenarios.

19  Q.  All right.  And Indie Case, the line below says, was the

20  Base Case; do you see that?

21  A.  Yes.

22  Q.  Now the Base Case means that's what we're investing on the

23  basis of; we could do better, we could do worse, but we think

24  this is the most likely way we're going to turn out; correct?

25  A.  Yes.  It's the Base Case.

0aj1ter1                    Pryce - cross

1   Q.  Right.  And the Base Case assumes that by investing at 265

2   pence per share, Terra Firma would generate what's called an

3   IRR of 22.1 percent; correct?

4   A.  That's what this says.

5   Q.  Okay.  Help us out.  Okay.  An IRR is an internal rate of

6   return?

7   A.  That's correct.

8   Q.  And I think you testified about that in response to

9   Mr. Boies' questions; correct?

10  A.  Correct.

11  Q.  And what an IRR of 22.1 percent means is that Terra Firma

12  would make 22 percent on its investment every year in EMI if it

13  bought the company at 265 pence per share; right?

14  A.  That's what this says.

15  Q.  And the CoCM, is that the cost of cash multiple?

16  A.  It's the cash on cash multiple.

17  Q.  Cash on cash multiple?

18  A.  It's the amount of cash that we get back.

19  Q.  Right.  And what a cash on cash multiple of 2.7 times

20  means, that in the five years that you were looking at through

21  2012, your initial investment would grow by 270 percent; right?

22  A.  By 2.7 percent; that's right.

23  Q.  So let's just use -- so if you were investing a billion

24  dollars -- you invested more than that in EMI, right -- but if

25  you were investing a billion dollars, what that means is at the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter1                      Pryce - cross

1    end of five years, you'd have $2.7 billion; right?

2    A.  That's correct.

3    Q.  And in fact, the investment was £4 billion; right?

4    A.  Yes.

5    Q.  So what -- what the team was telling the IAC on the day it

6    recommended this was that at the end of five years it expected

7    the £4 billion investment to be worth more than $10 billion;

8    correct?

9    A.  No, I don't think that's correct.  The cash on cash

10   multiple -- and I should just say, I'm not the expert here,

11   but -- the cash on cash multiple reflects the return that you

12   make on the equity that you've invested, not the debt.

13   Q.  Okay.  Well, let me do the numbers again.  The equity that

14   was invested, that's the money that Terra Firma put up as

15   opposed to the money that Terra Firma borrowed from Citi;

16   right?

17   A.  That's correct.

18   Q.  And what Terra Firma put up in 2007 was £1.5 billion of

19   equity; right?

20   A.  That is correct.

21   Q.  That's more than $2½ billion; right?

22   A.  Yes.  I don't know what the exchange rate is, but --

23   Q.  And what you were -- what the IAC was being told was at the

24   end of five years, that £1.5 billion would be worth more than

25   $4 billion -- £4 billion; right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter1                    Pryce - cross

1   A.   Yes.

2   Q.   You'd almost triple your money in five years if you bought

3   this company at 265 pence per share; right?

4   A.   That's what this presentation says.

5   Q.   Has it turned out that way?

6   A.   No, it hasn't.

7   Q.   And the reason why this transaction was approved on

8   May 18$^{th}$ is that everyone at Terra Firma was persuaded that

9   this would be a really good deal for Terra Firma; right?

10  A.   At this stage this was a transaction that we were

11  interested in pursuing, but as I've said, at this stage there

12  was no debt package in place.

13  Q.   Mr. Pryce, between Friday and Monday when you bid, did

14  Terra Firma persuade itself that it was no longer going to make

15  22 percent on this money?

16  A.   I can't remember what the next presentation would have

17  shown, but there were subsequent presentations to this.

18  Q.   But whatever those presentations showed -- and I can show

19  them to you -- you know, do you not, as a member of the IAC,

20  that why this transaction proceeded in May of 2007 was that

21  Terra Firma's expectation was that it would make more than

22  20 percent a year on its money; right?

23  A.   That was the basis on which we would be proceeding with the

24  transaction.

25  Q.   And almost tripling the value of its equity in five years;

0aj1ter1                    Pryce - cross

1   correct?

2   A.   The projections that the deal team put together would have

3   shown that scenario.

4   Q.   And you relied on those projections as a member of the IAC;

5   did you not?

6   A.   Those projections would have been utilized to show the

7   range of price that you could pay for the company.

8   Q.   You relied on it as a member of the IAC; did you not?

9   A.   Clearly, the deal team, I think as I said yesterday, would

10  have made the recommendation to the investment advisory

11  committee and we would have taken that into account in coming

12  to the conclusion on what recommendation to make to the GP.

13  Q.   Did you raise your hand and say, "No, I don't believe it"?

14  A.   I wouldn't have done that.  Remember, at this point in time

15  I was the general counsel of the firm and therefore, sitting on

16  the investment committee, I was principally focused on legal

17  matters.  I had other colleagues on the investment committee

18  who would have had more of a view on the valuation issues.

19  Q.   Do you remember anyone in any IAC meeting, between

20  May 18$^{th}$ and May 21$^{st}$, 2007, saying, "Let's not proceed

21  with this transaction because we're not going to make a lot of

22  money on it"?

23  A.   I think as I said earlier on, I can't remember the detailed

24  discussions at those meetings.

25  Q.   Does the IAC proceed by vote?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter1                    Pryce - cross

1    A.  Yes, it does.

2    Q.  And you voted on this recommendation on May 18$^{th}$; did you

3    not?

4    A.  Yes.  I voted in favor.

5    Q.  All right.  And you voted in favor of every recommendation

6    to proceed with this transaction between May 18$^{th}$ and

7    May 21$^{st}$; did you not?

8    A.  Yes, I did.

9    Q.  And no one on the IAC of Terra Firma dissented at any of

10   those meetings; did they?

11   A.  My recollection is that we all voted in favor of the

12   recommendation.

13   Q.  Because it was a transaction that you thought would make a

14   lot of money for Terra Firma; right?

15   A.  We thought it was a transaction that we should proceed

16   with.

17   Q.  Was the profitability important to Terra Firma?

18   A.  As I think I said yesterday, we invest in companies in

19   order to make money for our investors.

20   Q.  All right.  And I think what you said in response to

21   Mr. Boies' question is that you look for a minimum rate of

22   return of 20 percent; right?

23   A.  That was the case then, yes.

24   Q.  Right.  And therefore, when you all voted in favor of this

25   transaction, you thought you'd make at least 20 percent a year

0aj1ter1                    Pryce - cross

1   on Terra Firma; right -- on EMI?  Pardon me.

2   A.  This is what we were hoping that we would achieve.

3   Q.  Well, it wasn't just a hope; it was the product of an

4   enormous amount of work; was it not?

5   A.  Yes, it is, but in all of these cases these are projections

6   of the future.  The future can not always turn out as expected.

7   Q.  Absolutely right.  You never know what's going to happen;

8   is that correct?

9          THE COURT:  Are we engaging in homilies or --

10          MR. COHEN:  Apparently not, your Honor.  Let me move

11  on.

12  Q.  Mr. Pryce, let me show you another page of the executive

13  summary.  This is 7 of 160, the next page.

14  A.  Yes.

15  Q.  Now it says, "It is believed --" the top bullet "-- that

16  the board will be receptive to an offer of 260 pence."  Do you

17  see that, sir?

18  A.  Yes, I do.

19  Q.  And do you recall that the view of the IAC on May 18th

20  was that the EMI board was looking for a minimum bid of 260

21  pence?

22  A.  I can't remember.

23  Q.  Don't you remember that the minimum that the EMI board was

24  seeking was part of the strategy that Terra Firma used in

25  bid -- in coming up with its own bid price?

0aj1ter1                    Pryce - cross

1   A.  Sir, could you repeat that question again.

2   Q.  Sure.  It was a bad question.

3        Wasn't the amount that the EMI board was seeking

4   important to Terra Firma when it decided to bid 265 pence?

5   A.  Obviously you wanted to bid at the level that you would

6   believe the board would recommend.

7   Q.  And the next bullet says, "The team believes that the

8   primary competition is from a consortium of Cerberus and

9   Fortress."  Do you see that, sir, the beginning of that

10  sentence?

11  A.  Yes, I do.

12  Q.  And just help me out.  A consortium means that Cerberus and

13  Fortress, they would be bidding together?

14  A.  Yes, that would mean that they were teaming up together to

15  put in a joint bid.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

0AJ3TER2                          Pryce - cross

1    BY MR. COHEN:

2    Q.  What the team told the IAC that morning was that the

3    competition, the primary competition was from Cerberus and

4    Fortress together, right?

5    A.  That's what this statement says, yes.

6    Q.  When you're sitting as a member of the IAC, you expect

7    Mr. Punja and his team to give you an accurate presentation,

8    don't you?

9    A.  We would expect them to put together a presentation on the

10   basis of their knowledge, yes.

11   Q.  To give you their best judgment, right?

12   A.  Yes.

13   Q.  Their best judgment on the morning of May 18, is that the

14   primary competition wasn't from Cerberus, but from a consortium

15   of Cerberus and Fortress, right?

16   A.  That's what this says.

17   Q.  Now, would you go down to the next bullet.  It has been

18   reported that Cerberus and Fortress may attempt to submit an

19   offer below this, the 260p sought by the board.  Do you see

20   that, sir?

21   A.  I do.

22   Q.  The information that was provided to the IAC that morning

23   was that the primary competitors were going to bid below 260,

24   right?

25   A.  This statement refers to it being reported that that's what

OAJ3TER2                    Pryce - cross

1   this consortium might do.

2   Q.  Well, no one at this meeting talked about a bid at 262, did

3   they?

4   A.  As I said before, I can't remember the detailed discussions

5   at the meeting.

6   Q.  But the first time you heard anything about 262 was in your

7   conversation with Mr. Hands, correct, on that day?

8   A.  That's my recollection, yes.

9   Q.  Just so we have the chronology of the day correct, this

10  meeting was at 8 o'clock in the morning, right?

11  A.  That's correct.

12  Q.  Your call with Mr. Hands, the one at the passport office,

13  what time was that?

14  A.  I can't be precise but it was sometime in the afternoon.

15  Q.  In the afternoon, right?

16  A.  Yes.

17  Q.  So when you were at this meeting on the morning of May 18,

18  and you voted in favor of the recommendation, you had no

19  information at all about a bid by Cerberus at 262 pence; isn't

20  that correct?

21  A.  At that stage, that's correct.

22  Q.  The last bullet says:  As a result, the team believes that

23  a bid of 265p could be compelling to the board and position TF

24  to agree the terms of a recommended offer.

25          Do you see that, sir?

0AJ3TER2                    Pryce - cross

1   A.  Yes, I do.

2   Q.  You have to help us with the English English.  To agree the

3   terms of an offer.  That means, in American English, that you

4   would enter into an agreement, right?

5   A.  Correct.

6   Q.  So, what the team was telling you on Friday morning was

7   that if we bid 265, we can win.  Right?

8   A.  That's what this statement is saying.  It's the team's

9   belief.

10  Q.  When you say compelling to the board and agree the terms of

11  a recommended offer, what you mean was that the board would

12  tell the shareholders, after you made that offer, we think

13  that's a good offer for the shareholders and we want you to

14  accept it, right?

15  A.  That's what this would mean, yes.

16  Q.  Right.  That's actually what happened on Monday, the board

17  of EMI agreed the terms of Terra Firma's offer at 265, right?

18  A.  Yes, they did approve those.

19  Q.  They recommended it to their shareholders, correct?

20  A.  Yes, they did.

21  Q.  The strategy to get there was laid out on Friday morning,

22  May 18, before you ever heard anything about Cerberus bidding

23  262, isn't that right?

24  A.  What this presentation established was the price range

25  which we could bid.

OAJ3TER2                        Pryce - cross

1   Q.  Sir, the strategy of the team was to bid 265 to win.

2   Right?

3   A.  It doesn't say at this stage to win.  What it's saying is a

4   price at 265 could be compelling.

5   Q.  The team said it could be compelling and position Terra

6   Firma to win the auction, right?

7   A.  Correct.

8   Q.  The recommendation that was made, if we go back a page, I

9   don't think we have to, was in fact to bid 265, right?

10  A.  That was the recommendation.  But, no bid went in on the

11  Friday.

12  Q.  I know no bid went in on that Friday.  But that was the

13  recommendation, right?

14  A.  That was the recommendation.

15  Q.  That recommendation was made to the IAC by Mr. Punja and

16  his team without any knowledge about a Cerberus bid at 262,

17  correct?

18  A.  I can't comment what Mr. Punja at that point in time knew.

19  I can comment on what I knew.

20  Q.  You didn't know anything about it.

21  A.  I didn't know about the 262 price, no.

22  Q.  You voted in favor, right?

23  A.  Yes, I did vote in favor.

24  Q.  It went to the general partners that morning, with the 265

25  price, right?

0AJ3TER2                    Pryce - cross

1    A.   I believe it went, as we saw yesterday, it went -- the

2    recommendation from GP2 and GP3 was up to 265.

3    Q.   Up to 265.  And the point that they voted on Friday morning

4    for an offer of up to 265, the GP, the members of the board

5    weren't given any information about a Cerberus bid at 262,

6    right?

7    A.   Again, I can't remember the discussions at that meeting, so

8    I can't comment on that.

9    Q.   What time was the meeting of the general partners on

10   Friday?

11   A.   I can't recollect.

12   Q.   Didn't you leave in the middle of the meeting?

13   A.   I know that I left Guernsey at some point that morning, but

14   precisely when it was, I can't recollect.

15   Q.   Are you aware of any information that would tell us that

16   the general partners knew about a Cerberus bid at 262 when they

17   voted on Friday morning?

18   A.   I'm not aware.

19   Q.   Just to go back again on the competition.  After Cerberus

20   and Fortress, it says:  The presence of Warner Music cannot be

21   discounted, correct?

22   A.   That's what that says, yes.

23   Q.   You were aware in May that your competition for EMI

24   included Warner Music, right?

25   A.   No, I don't think that we believed that Warner Music was in

0AJ3TER2                        Pryce - cross

1   competition.

2   Q.   Okay.  So when the team said that the presence of Warner

3   Music cannot be discounted, you understood that to mean that

4   Warner Music was not going to make a bid?

5   A.   No.  I think what I am saying is we regarded our

6   competition as the other private equity firms, rather than

7   Warner.

8   Q.   You were aware, were you not, that Warner Music, like the

9   other private equity firms, had put in an indicative bid?

10  A.   Yes.

11  Q.   Warner did not withdraw from the auction for EMI until

12  July, is that so?

13  A.   Yes, that's correct.

14  Q.   So between May 21 and sometime in July, Warner Music was

15  still a potential competitor for EMI, right?

16  A.   I don't believe that we thought of Warner in the same

17  category as the other private equity firms, given that Warner

18  had a number of regulatory issues that they would have to deal

19  with if they were going to acquire EMI.

20  Q.   You understood they could bid at any time, right?

21  A.   I understood that they had given indicative interest of

22  interest in the company, yes.

23  Q.   When you were testifying earlier about you didn't have your

24  financing in place yet.  Do you remember that?

25  A.   Yes.

A-13031

0AJ3TER2                     Pryce - cross

1   Q.  As of May 18, Citi was not the only possible source of

2   financing for Terra Firma, was it?

3   A.  I believe we were in discussion with a number of banks.

4   Q.  Right.  You remember who those banks were?

5   A.  I believe one of them was Deutsche Bank, but as I wasn't

6   directly involved on financing, I don't know the details of it.

7   Q.  Right.  So, on May 18, Terra Firma had not yet decided who

8   was going to finance this transaction, correct?

9   A.  I believe that the team were running a number of banks in

10  competition with each other.

11  Q.  Could you put up page 17 of 160, please.  17.  I'm sorry.

12  If you look on the right side under Deutsche Bank, recurrent

13  status with each bank, do you see that, sir?

14  A.  Do you want me to read it?

15  Q.  Yes.  You can look at that, sure.  But the question I have

16  for you is when the team recommended an offer of 265 pence on

17  Friday morning, the possible lenders included Deutsche Bank,

18  Citi, and Barclays, right?

19  A.  I believe those were the banks that the team were in

20  discussion with.

21  Q.  So the action that was taken by the IAC on May 18, that

22  wasn't contingent upon Citi putting up the money, was it?

23  A.  Clearly the decision was taken on the basis that some

24  financing needed to be provided, otherwise the transaction

25  wouldn't be have been able to proceed.

0AJ3TER2                    Pryce - cross

1    Q.   From one of these three banks?

2    A.   The three banks were in competition at that stage, yes.

3    Q.   Okay.  Let me go to that conversation you had with

4    Mr. Hands in the afternoon of May 18.  That was sometime in the

5    afternoon, some number of hours after this meeting, right?

6    A.   Yes, it was on the Friday afternoon.

7    Q.   Mr. Hands told you that Cerberus was going to bid 262 on

8    Monday, right?

9    A.   Yes, he told me a number of things.

10   Q.   But among the things he told you was that Cerberus was

11   going to bid 262 on Monday, right?

12   A.   Correct.

13   Q.   This afternoon conversation, that's the first time you'd

14   ever heard that, right?

15   A.   That I had ever heard of --

16   Q.   Cerberus at 262 putting in a bid on Monday.

17   A.   It was the first time that I heard of the price of 262.

18   But I had heard earlier on in that week in an earlier

19   conversation that I had had with Guy that Cerberus were our

20   main competition.

21   Q.   Right.  You'd never heard of anything about Cerberus's bid

22   price before Friday, correct?

23   A.   My recollection is the first time I heard the 262 was

24   during that conversation on that Friday.

25   Q.   Hours after the IAC meeting that we just went through,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                    Pryce - cross

1   right?

2   A.  A few hours after the meeting, yeah.

3   Q.  Right.  Okay.  And did he tell you that the price was 263

4   or 262?

5   A.  My recollection is that he said it was 262.

6   Q.  Did he tell you that the primary competition was Cerberus

7   or that the primary competition was a consortium of Cerberus

8   and Fortress?

9   A.  He told me that Cerberus were bidding on Monday at 262.

10  Q.  Just Cerberus, right?

11  A.  Yes.

12       MR. COHEN:  Could we put up, please, Plaintiff's

13  Exhibit 10.  Section 6.4.  That was a document that was shown

14  by Mr. Boies yesterday.  Terra Firma 10 in evidence.  6.4.

15  Back one page, please.

16  Q.  This document says -- this is a draft of the minutes of

17  May 21.  It says:  Mr. Punja further advised that the

18  consortium of Cerberus and Fortress had made an offer of 2

19  pounds 63 per Dice share, and that Terra Firma Capital Partners

20  Limited believed that they were unlikely to increase this

21  offer.

22       Do you see that?

23  A.  Yes, I do.

24  Q.  That's not what Mr. Hands told you on Friday, is it?

25  A.  Absolutely not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                    Pryce - cross

1    Q.  No one ever told you that a consortium of Cerberus and

2    Fortress would be bidding 263, right?

3    A.  No.  But it had been reported in the press earlier on in

4    the week that Cerberus and Fortress might be bidding together.

5    Q.  At a price of 263?

6    A.  I don't remember that.  I just remember that Cerberus and

7    Fortress were commented in the press as potentially being a

8    consortium.

9    Q.  So these draft minutes don't reflect what Mr. Hands told

10   you what Mr. Wormsley said, right?

11   A.  Correct.

12   Q.  By the way, these are just the draft.  They are not the

13   final minutes, right?

14   A.  That's what it says on the first page.

15   Q.  You know, do you not, that this sentence is not in the

16   final minutes of the meeting?

17   A.  Yes, I am aware of that.

18   Q.  So when the board finally put together its final minutes.

19   There was no reference to Cerberus and Fortress at all, right?

20   A.  I think that's correct.  But we probably should see the

21   final version.

22          MR. COHEN:  May I approach, your Honor?

23          THE COURT:  Yes.

24   Q.  Sir, I've given you what we've marked as Citi trial exhibit

25   FO for identification.  Do you see that, sir?

1    A.  Yes, I do.

2    Q.  These are the final minutes of the meeting of May 21, 2007,

3    of Terra Firma Investments GP2 Limited that you participated

4    in, right?

5    A.  Yes, that's correct.

6         MR. COHEN:  I offer FO, your Honor.

7         MR. BOIES:  No objection, your Honor.

8         THE COURT:  FO is received.

9         (Defendant's Exhibit FO received in evidence)

10        MR. COHEN:  Could we put up 6.4 of FO.  First let's

11   put up FO, please, then if we can put them side by side.  6.4,

12   please, Jesse, the next page.

13   Q.  So the final minutes -- by the way, these final minutes --

14   the final minutes say:  The directors inquired about rival

15   offers and specifically the consortium of Cerberus and Fortress

16   and separately Warner Music Group.

17        Do you see that, sir?

18   A.  Yes.

19   Q.  Now, by the time you attended this meeting on Monday, your

20   information was that Cerberus was your competitor, right?

21   A.  Yes.

22   Q.  Do you recall correcting anyone about a consortium of

23   Cerberus and Fortress at that meeting?

24   A.  I have no recollection of a discussion around a consortium

25   of Cerberus and Fortress.

A-13036

0AJ3TER2                        Pryce - cross

1   Q.  So, as far as you know, you don't know one way or another

2   whether that was discussed at the meeting, right?

3   A.  I don't have a recollection, no.

4   Q.  Then it goes on to say that:  Mr. Punja advised that Warner

5   Music Group had to deal with regulatory issues which were not

6   in his opinion insurmountable, but would take time and

7   introduce an element of risk for shareholders.  Any offer by

8   Warner Music Group would therefore need to compensate

9   shareholders for both these items and would therefore have to

10   be substantially above 2 pounds 65 per Dice share.

11           Do you see that?

12   A.  Yes.

13   Q.  That's what you were referring to earlier, which is for

14   Warner to be the successful bidder, it would probably have to

15   bid more because there were some issues about being in the same

16   business that would make their bid slow, right?

17   A.  I think it was particularly the regulatory issue, which

18   would mean there would be at least a year's delay before the

19   deal could be completed, and therefore shareholders would

20   expect a higher price from Warners.

21   Q.  Because you were not in the music business, you, Terra

22   Firma, at that time, you were in a position to finish this deal

23   faster than Warner, right?

24   A.  Correct.

25   Q.  If we put 6.4 of the final FO next to Terra Firma Exhibit

OAJ3TER2                    Pryce - cross

1    10, 6.4, we see that the sentence about 263 and a consortium of

2    Cerberus and Fortress are not in the final minutes, right?

3    A.  Yes.

4    Q.  You didn't prepare these final minutes, did you?

5    A.  No.  These minutes would have been prepared by Mourant.

6    Q.  No one had a discussion with you, did they, about the draft

7    of these minutes?

8    A.  No.

9    Q.  They are not in the final.  Right?

10   A.  The -- that additional wording is not in the final version.

11   However, these minutes would have been reviewed by a lawyer on

12   my team.  I had a practice of ensuring that all presentations

13   and also minutes that went to the GP or the investment advisory

14   committee were reviewed by the lawyer on my team who was

15   working on the project.  I left it to them to exercise their

16   judgment as to what information in terms of sensitive

17   information they might wish to take out of presentations or the

18   minutes.  And I therefore assumed it was part of that review

19   process that this wording was removed.

20   Q.  Did anyone ever tell you that that sentence, this Mr. Punja

21   advised the consortium of Cerberus and Fortress, was taken out

22   as part of the review process by your lawyer?

23   A.  I wouldn't have been involved in that review process.  It

24   would have been the lawyer on the team who would have done

25   that.

0AJ3TER2                    Pryce - cross

1    Q.  So no one ever told you that the lawyer on your team asked

2    that that sentence be taken out, correct?

3    A.  Nobody told me that, no.

4    Q.  The practice that you just testified about, is it written

5    down somewhere?

6    A.  I don't believe it is written down.  But it is something

7    that I communicated to all of the lawyers on my team, and it is

8    a practice that all communications that go to the investment

9    advisory committee and to the GP are reviewed by a lawyer on

10   the legal team before they are then in final form and then sent

11   to the investment committee or to the GP.

12   Q.  But is there any documenting piece of paper we can look at

13   that would show us where these instructions are that you gave?

14   A.  No.  But it is something that I communicated to my team of

15   four lawyers.

16   Q.  You had a lot of documents that related to sensitive

17   information, did you not, at Terra Firma?

18   A.  What documents are you referring to?

19   Q.  Did you have a policy about how to deal with confidential

20   documents and what's called a public to private transaction?

21   A.  We had a policy on public to private transactions, correct.

22   Q.  So let's again just give the terms.  A public to private

23   transaction is when a public company like EMI is bought by a

24   private investor, like Terra Firma, and it no longer is a

25   public company, right?

0AJ3TER2                        Pryce - cross

1   A.   Yes.

2   Q.   Do you refer to that as a P to P?

3   A.   That is referred to as a P to P.

4           MR. COHEN:  May I approach, your Honor?

5           THE COURT:  Yes.

6   Q.   Sir, Citi exhibit ABL for identification is an e-mail from

7   you to everyone at Terra Firma, right?

8   A.   Correct.

9   Q.   That sets out the P to P policy of Terra Firma, right?

10  A.   Yes.

11          MR. COHEN:  I offer ABL, your Honor.

12          MR. BOIES:  No objection.

13          THE COURT:  ABL is received.

14          (Defendant's Exhibit ABL received in evidence)

15  Q.   If you would go through it, ABL.  You're pretty familiar

16  with this document, aren't you, Mr. Pryce?

17  A.   Yes, I wrote it.

18  Q.   Is there anywhere in this document that it says that drafts

19  of minutes will be reviewed by legal counsel to eliminate

20  sensitive information?

21  A.   No.  But I wouldn't expect it to be in this document.  This

22  document was produced because Terra Firma Capital Partners

23  Limited is a regulated company in the United Kingdom.  And my

24  memory is that at this point in time, our regulator had been

25  very focused on ensuring that employees in regulated firms were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                    Pryce - cross

1    aware of their obligations in connection specifically with

2    public to privates.  The practice which I talked about earlier

3    is not limited to the public to private -- the P to P policy.

4    This was a general practice which I adopted from day one in

5    taking on the general counsel role.  It isn't something that I

6    would have put down in writing.  I don't have a manual that

7    says all of the things that my lawyers do.  However, there are

8    clearly a lot of things that my lawyers do which they do

9    because I've asked them to do it.

10   Q.  Do you communicate with the lawyers on your team by e-mail?

11   A.  Sorry?

12   Q.  Do you communicate with the lawyers on your team by e-mail?

13   A.  I communicate via e-mail.  I also work with them.

14   Q.  Is there any e-mail that you are aware of that reflects

15   this practice that you are talking about?

16   A.  I'm not aware of any, but as there are only four lawyers on

17   the team, it was something that was extremely easy to mention

18   to them.

19   Q.  But in any case, if we go back to the two draft, the draft

20   of the minutes and final minutes, you can't testify as to your

21   own personal knowledge as to why that sentence about the

22   consortium of Cerberus and Fortress was taken out, correct?

23   A.  I didn't review those minutes and I didn't take the wording

24   out.

25   Q.  Because you don't remember the meeting, you don't know if

OAJ3TER2                    Pryce - cross

1   Cerberus and Fortress was discussed at that meeting, right?

2   A.  I don't have a recollection of that.

3   Q.  You testified also yesterday I believe that in your

4   conversation with Mr. Hands, on the afternoon of the 18th,

5   that's when you learned that the bid deadline had been moved up

6   by EMI, right?

7   A.  Yes, I did.

8   Q.  So, prior to that conversation in the afternoon of the

9   18th, your understanding was that bids were due on May 23?

10  A.  Yes, that is my understanding, that bids were to be due on

11  the following Wednesday, not the Monday.

12  Q.  You learned on Friday afternoon that the deadline was

13  actually on Monday, right?

14  A.  Yes, that's correct.

15  Q.  Terra Firma had never been planning to wait until May 23 to

16  put in a bid, had it?

17  A.  My recollection is that Wednesday the 23rd was the

18  timeframe which we were working to until that Friday afternoon,

19  when Mr. Hands called me and told me the timetable had changed.

20  Q.  Weren't you working to get in a bid on that Friday, the

21  18th, that entire week?

22  A.  My memory was that we were working towards the Wednesday,

23  the 23rd.

24  Q.  Let me show you again Exhibit GP.  We'll see if it helps

25  you help your memory.  GP, page five of 160.  At that's back to

OAJ3TER2                         Pryce - cross

1    the presentation of the team.

2              The last bullet, please, Jesse, on May 18 in the

3    morning.

4              Do you have that document in front of you, sir?  Is it

5    easier on the screen?

6    A.  I can see it on the screen.

7    Q.  The team believes that while the board may announce a

8    recommended offer on May 23, it is critical to be in position

9    to submit a fully financed binding offer (together with a draft

10   rule 2.5 announcement) to the board on Friday.

11             Do you see that?

12   A.  Yes, I do.

13   Q.  Friday was Friday, May 18.  Right?

14   A.  Correct.

15   Q.  What you had been working towards, the entire time, since

16   you entered into the auction, was to get in a bid in advance of

17   the 23rd, were you not?

18   A.  What this says is that the team wanted to be in a position

19   where they could do that on the Friday.  But the deadline we

20   were working to from my recollection was Wednesday.

21   Q.  Do you have any explanation for why the team thought it was

22   critical to submit an offer on Friday?

23   A.  No.  But it's not unusual that in Terra Firma that we are

24   in a position -- we are in a position to submit an offer in

25   advance of the actual date when the offer's got to be

0AJ3TER2                              Pryce - cross

1    submitted.

2    Q.  Right.  But I thought I understood from your answers, maybe

3    incorrectly, that you were surprised by the news on Friday,

4    your answers to Mr. Boies' question.  You had to speed up your

5    process.  Is that what you were trying to say?

6    A.  Yes, we did.

7    Q.  You were working towards a bid on Friday, were you not?

8    A.  That's not my recollection, no.

9    Q.  Let me show you another document, sir.

10         MR. COHEN:  May I approach?

11         THE COURT:  Yes.

12   Q.  Sir, I've given you Citi exhibit H for identification.

13   This is a minutes of the meetings of the IAC, your committee,

14   on May 15, 2007, right?

15   A.  That's correct.

16         MR. COHEN:  I offer the document, your Honor.

17         MR. BOIES:  No objection, your Honor.

18         THE COURT:  H is received.

19         (Defendant's Exhibit H received in evidence)

20   Q.  First page of Exhibit H, this shows this was a meeting in

21   Jersey.  Jersey I assume is not across the river, it's

22   somewhere near England?

23   A.  Jersey is an island which is next to Guernsey in the

24   Channel.

25   Q.  It was a meeting on May 15, 2007 of the IAC which you

1    attended, right?

2    A.  Yes, I believe that's correct.

3    Q.  Turn to the second page.  Just above four, the last

4    paragraph, please, above four.  After due and careful

5    consideration, it was resolved that a recommendation be made to

6    TFI GP2 and TFI GP3 to approve continuing evaluating and

7    refining the opportunity with a view to submitting a

8    fully-financed binding offer for Dice on 18 May, 2007.

9    Correct?

10   A.  That's what that says.

11   Q.  So you don't think the minutes are inaccurate, do you?

12   A.  No.  I'm just confirming that that's what the minutes say.

13   Q.  So the minutes show -- what the minutes show is that all

14   through the week leading up to the 18th, you were working

15   towards a bid on Friday, not the following Wednesday, isn't

16   that so?

17   A.  No.  I think what this is saying is the deal team were

18   trying to get into a position where they would be able to do

19   that.  But the actual timeframe that we were working towards

20   was the following Wednesday.

21          As it actually transpired, we were not in a position

22   to be able to submit it on Friday.  So on the Friday, my

23   recollection was that we were working towards the Wednesday.

24   And that's the reason why I remember the conversation so

25   vividly with Mr. Hands, because he told me that it was being

0AJ3TER2                          Pryce - cross

1   brought forward by 48 hours.  Given that I had responsibility

2   at that time for the legal team, that presented huge challenges

3   in terms of what needed to be done in a period of 48 hours to

4   be in a position to submit the bid on the Monday morning.

5   Q.  Your legal team had huge challenges that weekend?

6   A.  There was a lot of work that had to be done in order to get

7   into a position where if a bid was to be put in on Monday

8   morning, that we were in a position to do that.

9   Q.  You don't remember anything you did on that Saturday

10  relating to this transaction, do you?  The Saturday the 19th,

11  when you said there was a lot of work to be done, you did

12  nothing on this transaction, isn't that correct?

13  A.  No, I don't think that is correct.  But my team were fully

14  occupied on this over that 48 hour period.

15  Q.  Didn't Mr. Boies ask you yesterday what you did in

16  connection with this deal on Saturday, May 19, and didn't you

17  tell him you did nothing?

18  A.  I think I said I didn't have a recollection of what I did

19  on that day.

20  Q.  So you don't know what you were doing on the 19th?

21  A.  On the Saturday I don't have a recollection now of what I

22  was doing.

23  Q.  Do you remember the conversation on the 15th in which the

24  IAC resolved to continue to try to move towards an offer on the

25  18th?

0AJ3TER2                    Pryce - cross

1   A.  I don't have any recollection today of that discussion, no.

2   Q.  So that's another meeting that you just don't remember.

3   A.  Absolutely.

4   Q.  Is there any meeting of the IAC relating to EMI that you

5   remember?

6   A.  The detailed conversations, as I've said, over that

7   weekend, I don't have a recollection of today, no.

8   Q.  This was the week before.  You don't remember this

9   conversation either?

10  A.  No.

11  Q.  On Monday morning, you testified that you got a call from

12  Mr. Hands, right, Monday the 21st of May?

13  A.  That's correct.

14  Q.  In that conversation, did Mr. Hands say anything about

15  Cerberus?  Did he use the word Cerberus?

16  A.  As of today, I don't have a recollection of the word

17  Cerberus being used, no.

18  Q.  Or as of in the summer when I asked you the same question,

19  right?

20  A.  No, that's correct.

21  Q.  You don't remember Mr. Hands talking about 262 on Monday

22  morning, do you?

23  A.  I don't remember a discussion around price on that Monday

24  morning.  What I do remember is Guy confirming that nothing had

25  changed overnight.

0AJ3TER2                    Pryce - cross

1   Q.  Right.  I heard your testimony.  I just want to make sure

2   you didn't hear anything about 262, right?

3   A.  No.  But when he said nothing had changed overnight, it's

4   pretty clear that we were still expecting Cerberus to be

5   bidding at 262.

6   Q.  Did he say it, sir?

7   A.  No, no, no.  As I said yesterday, what he said is nothing

8   has changed.

9   Q.  Right.  Then you call Mr. Loveridge after you spoke to

10  Mr. Hands.  He was the chairman of the board of the GP, right?

11  A.  He was a director of the GP2 and GP3.

12  Q.  Did you discuss Cerberus in your discussion with

13  Mr. Loveridge?

14  A.  I have a recollection of conveying to John that I had

15  spoken to Guy, that nothing had changed overnight, and that we

16  therefore thought that we should stick with our bid at 265.

17  Q.  Maybe my question wasn't clear.  Did you tell Mr. Loveridge

18  anything about Cerberus bidding 262 -- please, sir -- 262 in

19  your call with him on Monday morning?

20  A.  I don't recollect having a discussion around 262 Cerberus

21  bid.

22  Q.  Have you ever had a conversation with Mr. Loveridge about

23  Cerberus bidding 262?

24  A.  I don't believe I did.

25  Q.  Have you ever had a conversation with any member of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                          Pryce - cross

1    board of GP2 and GP3 about Cerberus bidding 262?

2    A.  Yes.  With Mr. Hands.

3    Q.  Other than Mr. Hands.

4    A.  As of today, I don't recollect having that discussion.

5    Q.  Right.  There are Guernsey directors of GP2 and GP3, right?

6    A.  There are a number of directors of GP2 and GP3.

7    Q.  Who were they in 2007, before Mr. Hands and Mr. Loveridge?

8    A.  It would have been Mr. Carey, Mr. Stokes, and Mr. Duncan.

9    Q.  Did you ever discuss Cerberus at 262 with Mr. Carey?

10   A.  I don't have a recollection of having a discussion

11   concerning Cerberus or 262 other than with Mr. Hands.

12   Q.  So you never discussed it with Mr. Carey, right?

13   A.  Correct.

14   Q.  You never discussed it with Mr. Stokes, correct?

15   A.  I don't have a recollection of having had a discussion with

16   Mr. Stokes.

17   Q.  You don't remember any discussion about 262 and Cerberus

18   with Mr. Duncan, correct?

19   A.  I don't remember today having a discussion around Cerberus

20   with them.

21   Q.  There was an alternate director, Lorna Morton, right?

22   A.  Correct.

23   Q.  You don't remember discussing 262 and Cerberus with her

24   either, do you?

25   A.  No, I don't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                    Pryce - cross

1   Q.  Sir, did you ever have a conversation with Mr. Wormsley in

2   which Mr. Wormsley told you anything about the price at which

3   Cerberus was going to bid?

4   A.  I don't believe I had a conversation with Mr. Wormsley

5   about price, no.

6   Q.  So the source, the only source of your information about

7   what Mr. Wormsley supposedly said, is what Mr. Hands told you,

8   right?

9   A.  That is correct.

10  Q.  Is there a single document that you are aware of that shows

11  that Mr. Wormsley told Mr. Hands that Cerberus was going to bid

12  262 on Monday, May 21?

13  A.  I am not aware of a document.

14  Q.  Right.  You've produced -- and you are a lawyer, you've

15  produced to us in this pretrial process millions of pieces of

16  paper, have you not?

17  A.  I'm sure we produced a large quantity of information,

18  correct.

19  Q.  Terra Firma has given to Citi as part of this process all

20  of its files relating to the bid for EMI, correct?

21  A.  I'm sure my outside lawyers can confirm that.

22  Q.  That's your understanding, is it not?

23  A.  I don't know how many documents they've provided.

24  Q.  Is there one piece of paper in those millions of pieces of

25  paper that says that Mr. Wormsley told Mr. Hands that Cerberus

0AJ3TER2                    Pryce - cross

1    was going to bid 262?

2    A.  I'm not aware of a piece of paper.

3    Q.  On Friday morning you had -- May 18, or Friday afternoon,

4    May 18, you had another conversation with Mr. Hands, other than

5    the one in which he told you that Cerberus was going to bid

6    262, right?

7    A.  Yes, that's correct.

8    Q.  That conversation led you to send an e-mail to Mr. Borrows

9    of Greenhill and to Mr. Wormsley, right?

10   A.  Can I see that e-mail?

11   Q.  Yes.  Of course.  I am going to give it to you right now.

12   A.  Okay.

13              MR. COHEN:  May I approach, your Honor?

14              THE COURT:  Yes.

15   Q.  Sir, Exhibit GQ for identification, that's an e-mail that

16   you, Mr. Pryce, sent on Friday afternoon, May 18, to

17   Mr. Borrows at Greenhill and copied Mr. Wormsley, right?

18   A.  Yes.  It is an e-mail I drafted.

19              MR. COHEN:  I offer GQ, your Honor.

20              MR. BOIES:  No objection.

21              THE COURT:  GQ is received.

22              (Defendant's Exhibit GQ received in evidence)

23              MR. COHEN:  May we put GQ up?

24   Q.  This e-mail came about as a result of a conversation you

25   had with Mr. Hands that day, right?

0AJ3TER2                          Pryce - cross

1    A.  Yes, that's correct.  I had a conversation with Guy on that

2    Friday afternoon.

3    Q.  What Mr. Hands told you is that he had received a phone

4    call from Mr. Wormsley, right?

5    A.  That is correct.

6    Q.  He told you that Mr. Wormsley was upset with Mr. Hands

7    because Mr. Wormsley had heard that Mr. Hands had told someone

8    that Terra Firma could win the auction at a bid of 240 per

9    share, right?

10   A.  My recollection was Guy told me that David was upset

11   because EMI believed that David had told Terra Firma that the

12   board of EMI might be willing to accept an offer of 240.

13   Q.  Right.  What Mr. Hands told you is Mr. Wormsley said to

14   Mr. Hands, Guy, I didn't tell you anything about 240.  That was

15   the gist of what was being conveyed, right?

16   A.  My understanding is that David was upset because the board

17   believed that David had told Terra Firma that the board might

18   accept 240.

19   Q.  In fact, Mr. Hands told you that he had had a conversation

20   with Mr. Borrows of Greenhill that morning, right?

21   A.  Yes.  Guy had told me that he had called Greenhills in

22   order to test price.

23   Q.  Right.  By the way, it says S. Burrows.  Mr. Borrows' name

24   is actually with an O.  S. Burrows is S. Borrows.  Is that

25   right, sir?  That's who you meant to send the e-mail to?

OAJ3TER2                         Pryce - cross

1    A.  It was supposed to be sent to Simon Borrows.

2    Q.  Simon Borrows at Greenhill.  They were the lead advisor for

3    EMI?

4    A.  They were an advice to EMI on this, yes.

5    Q.  What Mr. Hands told you was that in his conversation

6    testing price with Mr. Borrows that morning, he had mentioned

7    240, right?

8    A.  He said to me that he had wanted to test the price that the

9    board might be willing to accept, and he had mentioned the

10   range of 240 to 265.

11   Q.  Mr. Hands told you he attributed that range to

12   Mr. Wormsley, correct?

13   A.  No, I don't believe he did that.

14   Q.  He didn't say one way or the other whether Mr. Wormsley

15   said it?

16   A.  No.  He said to me that he had been testing the water with

17   Simon Borrows, and had said that he understood the board might

18   be willing to accept the price of 240 to 265.

19   Q.  The e-mail was written to demonstrate to Mr. Borrows that

20   Mr. Wormsley had never said that, right?

21   A.  Correct.

22   Q.  So --

23   A.  Our understanding was that Simon Borrows thought that David

24   was the source of that.

25   Q.  Right.  You wanted to clear up that that information didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                    Pryce - cross

1    come from Mr. Wormsley, right?

2    A.  Yes.  Mr. Wormsley was upset.

3    Q.  So Mr. Borrows thought that Mr. Hands had told him that

4    Mr. Wormsley was the source of the 240.  Correct?

5    A.  Yes.  Mr. Wormsley believed that Mr. Borrows thought that

6    Mr. Hands had said that David was the source.

7    Q.  When you wrote:  In any conversation that Guy might have

8    had with David Wormsley, it has never been suggested that were

9    your clients to receive a possible offer in the region of 2

10   pounds 40 per share, that this might receive their

11   recommendation.

12            Do you see that?

13   A.  Yes, I do.

14   Q.  You were making clear to the lead advisor, Mr. Borrows,

15   that Mr. Wormsley had never said anything about Cerberus at --

16   about a bid at 240, right?

17   A.  Yes.  That's the purpose of that sentence.

18   Q.  What you don't know is whether Mr. Hands attributed the

19   information to Mr. Borrows or he didn't.  Right?

20   A.  I don't believe he did.  He didn't say to me that he had.

21   That's the reason why this is drafted in the -- in the wording

22   that it actually is.

23   Q.  Mr. Borrows would know, wouldn't he?

24   A.  I don't know.  Yes, I would assume he would.

25   Q.  Sir, I want to go back to May 21.  Or go forward to May 21.

0AJ3TER2                    Pryce - cross

1   On May 21 in the morning, Terra Firma put in a binding bid at 2

2   pounds 65 per share for EMI, right?

3   A.  That's correct.

4   Q.  What happened that day was the board of EMI recommended

5   that offer to the shareholders, right?

6   A.  Yes, we attained the recommendation of the board.

7   Q.  Now, when -- that happened sometime during that day on the

8   21st?

9   A.  Yes.  During the day.

10  Q.  When the board recommended that offer, was the auction

11  over?

12  A.  At that point in time, the board were clearly recommending

13  our bid.  But that would not prevent another party putting a

14  bid in at a later stage.

15  Q.  Actually, in England, there are rules about how these

16  takeovers work, right?

17  A.  Yes, there are.

18  Q.  There is something called a takeover code?

19  A.  That's correct.

20  Q.  You actually, as a lawyer, have some familiarity with the

21  takeover code, right?

22  A.  Yes, I have some familiarity, correct.

23  Q.  What the takeover code provides is that until there's final

24  acceptance of the offer by the shareholders, anyone else can

25  come in and try to make a higher offer, right?

0AJ3TER2                    Pryce - cross

1   A.   That is correct.

2   Q.   The fact that the board recommended it, that didn't mean

3   that it was -- that the shareholders had to accept it.  You and

4   EMI had to persuade the shareholders that your price was the

5   right price.

6   A.   The fact that the board had recommended the offer is

7   however helpful.

8   Q.   It was helpful, but it didn't compel any shareholder to do

9   it, right?

10  A.   No.  It was up to the individual shareholders to decide

11  whether they believed that the price that we were offering that

12  the board of company believed was a fair price is in fact a

13  fair price.

14  Q.   Right.  It wasn't like on the 21st the board recommended,

15  the hammer came down, and the auction was over.  That didn't

16  happen, right?

17  A.   No, no.  Then followed an offer period.

18  Q.   Right.  And in fact, you actually had to make a formal

19  offer to the shareholders, you had to put out a legal document

20  to the shareholders before you could even begin the process of

21  getting shareholder approval, right?

22  A.   That's correct.

23  Q.   That document was sent out to the shareholders of EMI at

24  the end of May?

25  A.   I can't remember precisely.

OAJ3TER2                     Pryce - cross

1    Q.  Let me help you with a document.

2           MR. COHEN:  May I approach, your Honor?

3           THE COURT:  Yes.

4    Q.  I've shown you what we've marked as Citi exhibit FR for

5    identification.  Do you see that, sir?

6    A.  Yes, I do.

7    Q.  This is the actual offer that Terra Firma made to the

8    shareholders, right?

9    A.  It would appear to be the offer document, yes.

10          MR. COHEN:  I offer Exhibit FR, your Honor.

11          MR. BOIES:  No objection.

12          THE COURT:  FR is received.

13          (Defendant's Exhibit FR received in evidence)

14   Q.  Sir, I am going to ask you to turn to what's called

15   appendix one.  First of all, this offer was made on May 30, was

16   it not?

17   A.  I can't see what date it was.

18   Q.  I'll find the date for you.  But it was made sometime after

19   May 21, right?

20   A.  Hmm-hmm, yes.

21   Q.  Let me ask you to turn to appendix one, which was page 24

22   of 162.  As a lawyer, the general counsel of Terra Firma, this

23   is a document you had some involvement in, right?

24   A.  I would have looked at this, yes.

25   Q.  It says:  The offer is subject to the following conditions.

0AJ3TER2                    Pryce - cross

1   A.  Valid acceptances being received and not, where permitted

2   withdrawn, by not later than 1 p.m. London time on 27 June 2007

3   or such later times and/or dates as Maltby may, subject to the

4   rules of the city code, decide in respect of not less than

5   90 percent.

6         It goes on from there.  Do you see that?

7   A.  Yes, I do.

8   Q.  Just because there is a new name being introduced.  Maltby

9   was the company that Terra Firma set up to actually buy the

10  shares, right?

11  A.  That's correct.

12  Q.  The GPs don't buy the shares in their own name, they set up

13  companies that acquire the shares when you do acquisitions,

14  right?

15  A.  The GPs make their investments through acquisition vehicles

16  like Maltby.

17  Q.  Maltby was a Terra Firma company.  That was who was

18  tendering, right?

19  A.  Yes.

20  Q.  What you told the shareholders was that for this offer to

21  go forward, for us to actually buy EMI, we need approval of

22  90 percent of the shareholders, right?

23  A.  That is correct.

24  Q.  There were millions of shares of EMI outstanding, were they

25  not?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                    Pryce - cross

1    A.  There were a large number.

2    Q.  It was a big company and it was held by institutional

3    investors and by individuals.  It was a lot of work to get

4    90 percent, right?

5    A.  Yes.

6    Q.  They had to tender the 90 percent by June 27.  Correct,

7    sir?

8    A.  That's correct.

9    Q.  If you didn't get 90 percent on June 27, 2007, you could

10   have walked away from the deal, right?

11   A.  Technically, if we hadn't achieved that 90 percent level on

12   the 27th, we would have had one of two options.  Either to

13   withdraw the offer, to allow the offer to lapse, or, to extend

14   the offer period.  It is quite common to extend the offer

15   period beyond, in this example the 27th of June.  The reason

16   why the 27th of June was established is the first acceptance

17   date was actually you have to leave offers open under the code

18   for 21 days.  So this would have been 21 days after this

19   document was sent to the shareholders.  It is common practice

20   to extend the offer period beyond 21 days.

21   Q.  But there was nothing in this city code or takeover code

22   that required Terra Firma to do it, right?

23   A.  There was nothing that required.  This acceptance condition

24   does allow offers to be withdrawn.  However, it would be

25   unusual practice not to extend the offer period beyond the

0AJ3TER2                    Pryce - cross

1    initial 21 days.

2    Q.  I heard that.  I just want to make sure that my question I

3    have the right answer to.  Your best testimony.  Which is you

4    didn't have to go forward, right?

5    A.  Technically under the code, we didn't have to go forward.

6    In practice, it would be highly unusual not to have extended

7    the offer period.

8    Q.  To extend the offer beyond the 27th, what Terra Firma had

9    to do was go through its internal process to decide whether to

10   do so, right?

11   A.  I do believe that it was something that we then considered,

12   the investment advisory committee, and at the two GP board

13   meetings.

14   Q.  Okay.  Let me see if I can help you again.

15          MR. COHEN:  May I approach, your Honor?

16          THE COURT:  Yes.  Mr. Cohen, we are probably going to

17   want to take our midmorning break in five minutes.

18          MR. COHEN:  Let me do this document.

19          THE COURT:  All right.

20          MR. COHEN:  Thank you.

21   Q.  Sir, this is a presentation which is an update to the IAC

22   on June 21.  Do you see that, sir?

23   A.  I do.

24   Q.  Would you turn to page -- well, before you do that, this

25   was prepared in the ordinary course?

0AJ3TER2                    Pryce - cross

1   A.  Yes, it would have been.

2          MR. COHEN:  I offer HU, your Honor.

3          MR. BOIES:  No objection.

4          THE COURT:  HU is received.

5          (Defendant's Exhibit HU received in evidence)

6   Q.  Would you turn to page 19 of 21.  This was a meeting --

7   this was in connection with a meeting of the IAC on the 21st of

8   June, right?

9   A.  That's what it says, yes.

10  Q.  There was a section of this presentation called offer

11  process, and the first thing that it noted was that as of 21st

12  of June, while you needed 90 percent shareholder approval, the

13  current acceptances were less than 1 percent.  Right?

14  A.  That's what this says, yes.

15  Q.  It said on the 27th of June, Maltby -- which was this Terra

16  Firma company -- they had three options, right?

17  A.  Hmm-hmm.

18  Q.  Yes?

19  A.  Yes.

20  Q.  The first option that's listed first in order is lapse the

21  offer, right?

22  A.  As I said, that's one of the options.  You can allow the

23  offer to lapse.

24  Q.  When the team told you that on the 27th of June -- below

25  that, please, Jesse -- that Terra Firma's company Maltby had

0AJ3TER2                        Pryce - cross

1   the right to walk away because the acceptance condition is not

2   satisfied, that was true, right?

3   A.  Technically, it is correct.  But as I say, it would be

4   highly unusual to lapse an offer after 21 days.

5   Q.  How many offers had Terra Firma done through an offer for a

6   public company in England prior to EMI?

7   A.  I believe we had successfully completed three takeovers of

8   which EMI was one.

9   Q.  Yes.  But the other two didn't involve offers using this

10  process, did they?

11  A.  They involved an offer process which was slightly

12  different, a scheme of arrangement.

13  Q.  Right.  Where you go to court to get approval, right?

14  A.  You get shareholder approval and you go to court.

15  Q.  You didn't go to court for this one.  This was the first

16  time that Terra Firma had ever done this process, right?

17  A.  This was the first successfully completed offer process

18  that Terra Firma had been involved in.

19  Q.  Well, it was the first offer process that you had even

20  participated in, had you not?

21  A.  I'm not sure that that is correct.  There were other offer

22  processes that we were involved in, but not ones where we had a

23  recommendation from the board.

24  Q.  Right.  So when you say it's common practice, your

25  experience at Terra Firma consisted solely of this transaction,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER2                     Pryce - cross

1   right?

2   A.   Prior to working at Terra Firma, I had worked on I think

3   two offers of this type.  And clearly, Terra Firma had the

4   experience of its investment banking advisors and legal

5   advisors who had worked on lots of these types of transactions.

6   Q.   That reminds me of something yesterday.  The investment

7   banking advisor that you are referring to is Dresdner, correct?

8   A.   Dresdner Kleinwort Benson were acting for us on this.

9   Q.   Just so we can clarify something.  You can answer this yes

10  or no.  Was Citibank Terra Firma's investment banking advisor

11  on the EMI transaction?

12  A.   Dresdner Kleinwort Benson were appointed as the advisor on

13  the offer.

14  Q.   I'm asking for a yes or no, because I think the record is

15  unclear.  You seem to not want to give me a yes or no.

16            Can you tell me, was Citibank the investment banking

17  advisor for Terra Firma on the EMI transaction?

18  A.   Citibank were acting in many different capacities on this

19  transaction.  I am very clear that the Dresdner Kleinwort

20  Benson were formally appointed as the advisor on this

21  transaction.

22  Q.   Mr. Pryce, you can't answer that question yes or no?  Was

23  Citibank appointed by Terra Firma to be the investment banking

24  advisor on the EMI transaction; yes or no?

25  A.   There wasn't a formal engagement letter with Citigroup, no.

OAJ3TER2                      Pryce - cross

1    Q.  They were not your investment banking advisor, were they?

2    A.  We had a very close relationship with Citigroup over a

3    number of years.  And they were assisting us in this process

4    getting the financing in place.

5    Q.  Getting financing in place.  That wasn't investment banking

6    advice, was it?

7    A.  They were providing us with financing, and they were

8    clearly giving us information in connection with the sale.

9    Q.  Mr. Pryce, was Citi or Dresdner Kleinwort your investment

10   banking advisor in the transaction?  I don't think the question

11   is complicated.

12   A.  I think, as I've said, Dresdner Kleinwort Benson was

13   formally appointed advisors to Terra Firma on this acquisition.

14   Q.  There was no engagement of Citi as the investment banking

15   advisor, correct?

16   A.  Citi wasn't formally appointed no.

17   Q.  Or informally appointed, correct?

18   A.  There was no engagement terms with Citi, no.

19   Q.  Citi was not your advisor.  Isn't that so?

20   A.  Citi were -- were providing us with support.

21   Q.  Was -- sir, I don't know why we're having a hard time.  Was

22   Citibank your investment banking advisor on the transaction,

23   yes or no?

24   A.  The institution wasn't appointed as our investment banking

25   advisor.

0AJ3TER2                          Pryce - cross

1   Q.  They were not your advisor, correct?

2   A.  I believe that we believed at Terra Firma that David

3   Wormsley was providing us with advice.

4   Q.  Was he the investment banker assisting Terra Firma in this

5   acquisition?

6   A.  He was -- he was providing us with information.

7   Q.  Did you engage him in an engagement letter?

8   A.  No.

9   Q.  Did you pay Citibank for its investment, any investment

10  banking advice on this transaction?

11  A.  We didn't pay him on this transaction.

12          MR. COHEN:  Your Honor, this would be a good time for

13  a break.

14          THE COURT:  Ladies and gentlemen, we'll take a 15

15  minute break at this time.

16          I'm sorry.  You may go back to the jury room.

17          (Jury excused)

18          (Witness not present)

19          (Continued on next page)

20

21

22

23

24

25

0AJ3TER2

1          THE COURT:  Anything counsel needs to raise with the

2     Court?

3          MR. BOIES:  Not from us, your Honor.

4          MR. BAUGHMAN:  We may have an application, your Honor,

5     relating to this witness.  I need to confer with Mr. Cohen.

6     May we possibly raise it at the second half of the break?

7          THE COURT:  No, because I have three other matters

8     that I am going to be taking in three minutes and you are all

9     going to have to clear out counsel table and take all

10    conversations into the hallway.

11         MR. BAUGHMAN:  Your Honor, I'll make the application,

12    if I may.  Mr. Pryce on cross-examination testified that he as

13    the general counsel had adopted a practice by which he informed

14    his lawyers on his deal team that, quote, sensitive information

15    had to be removed from the minutes relating to IAC meetings and

16    GP meetings.  That testimony came out on cross-examination.

17         We had never heard of this practice prior to the

18    summary judgment phase of this case when Mr. Pryce put in a

19    declaration in which he described this supposed practice.  In

20    that declaration, he took the position under oath in the

21    declaration that that practice was limited to public to private

22    transactions.

23         We had a discussion with the other side where we

24    urgently sought discovery of IAC and GP minutes relating to

25    transactions, other than the Terra Firma EMI transaction,

0AJ3TER2

1    because we wanted to test the limits of this policy and see

2    whether or not there were other transactions where, quote,

3    sensitive information appeared in the minutes.

4              Based on the representation of counsel, and based on

5    the representation in Mr. Pryce's declaration, we only pressed

6    for discovery relating to minutes relating to public to private

7    transactions.

8              In his testimony today, however, and I marked the

9    transcript, we can read it back if you'd like, Mr. Pryce very

10   clearly said that practice was not limited to private -- public

11   to private transactions.

12             So I am requesting that the other side be ordered to

13   turn over to us immediately IAC minutes and GP minutes relating

14   to transactions other than just public to private ones, and I

15   have a specific request relating to --

16             THE COURT:  I am going to deny your request.  And I

17   admire your passion on a matter that strikes me as utterly

18   trivial.

19             MR. BAUGHMAN:  Thank you, your Honor.

20             THE COURT:  The practice of lawyers sanitizing minutes

21   is a practice that virtually every company in the world engages

22   in, as must be known to any lawyer at Paul Weiss.  And any

23   discovery about that matter, as if it were something unusual or

24   other than routine, could have been pursued long ago,

25   regardless of any representations made.  The application is

0AJ3TER2

1    denied.

2              MR. BAUGHMAN:  Yes, your Honor.

3         (Recess)

4         (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0aj1ter3                          Pryce - cross

1                    (In open court; jury present)

2                    THE COURT:  Please be seated.

3                    All right.  Counsel?

4    BY MR. COHEN:

5    Q.  Mr. Pryce, if we could just go back to FR, I'd promised you

6    I'd find the date on that offer document.  With some help, I

7    think we got it.  6 of 162 in FR.

8    A.  Did you say page 3?

9    Q.  I was wrong.  Page 6.  6 of 162, sir.

10   A.  6.

11   Q.  I said I needed help; apparently I did.

12                    Do you see that the offer was actually posted on the

13   30$^{th}$ of May?

14   A.  Yes, I do.

15   Q.  And the first extension date was on the 27$^{th}$; right?  The

16   first deadline.

17   A.  Correct.

18   Q.  And I think we've established that Terra Firma did not have

19   the 90 percent acceptance as of that date; right?

20   A.  That's correct.

21   Q.  And what Terra Firma did then was that it extended the

22   offer for a first time on the 28$^{th}$ of June; correct?

23   A.  That is correct.

24   Q.  And let me just show you, if I may --

25                    MR. COHEN:  May I approach, your Honor?

0aj1ter3                        Pryce - cross

1          THE COURT:  Yes.

2   Q.  -- Exhibit JP for identification.

3          Now JP, Mr. Pryce, is an announcement of the first

4   extension of the offer?

5   A.  That's correct.

6          MR. COHEN:  I offer JP, your Honor.

7          MR. BOIES:  No objection, your Honor.

8          THE COURT:  JP is received.

9          (Defendant's Exhibit JP received in evidence)

10         MR. COHEN:  If we could put up, please, the first

11  page.

12  Q.  And again, just so we're clarified, Maltby Limited, a

13  company formed at the direction of Terra Firma, that's the

14  company that was formed to actually do the acquisition for the

15  GP; right?

16  A.  That's right.  It's the acquisition vehicle.

17  Q.  But one way or another, these are all Terra Firma

18  companies; correct?

19  A.  These are set up by Terra Firma in order to make

20  acquisitions, yes.

21  Q.  And on the 28$^{th}$ -- if we can go down a little bit,

22  please -- of June, what is announced is that the acceptances as

23  at 1 p.m. -- right under the acceptance -- as at 1 p.m. on the

24  27$^{th}$ of June was 3.53 percent; right?

25  A.  That's what it says, yes.

0aj1ter3                    Pryce - cross

1    Q.  Okay.  And the offer -- if we can go down please under the

2    extension of the offer -- was extended until the 4$^{th}$ of July;

3    right?

4    A.  Yes.

5    Q.  Now it could have been extended for a longer date, a longer

6    time; right?

7    A.  Yes.  It's up to the offeror to choose the period that it

8    decides to extend to.

9    Q.  And what Terra Firma decided was only to extend by a week;

10   correct?

11   A.  That's my memory, yes.

12   Q.  Okay.  And then on July 4, at Terra Firma -- did Terra

13   Firma get to the 90 percent that it needed for shareholder

14   approval?

15   A.  Not at that stage.

16          MR. COHEN:  May I approach again, your Honor?

17          THE COURT:  Yes.

18   Q.  I'm going to show you what we're going to mark as Exhibit

19   JQ for identification.

20          Now JQ, sir, is the announcement of the second

21   extension by Terra Firma; right?

22   A.  That's correct.

23          MR. COHEN:  I offer JQ, your Honor.

24          MR. BOIES:  I have no objection, your Honor.

25          THE COURT:  JQ is received.

0aj1ter3                    Pryce - cross

1           (Defendant's Exhibit JQ received in evidence)

2   Q.  Okay.  And if we go to sort of the same part of JQ as we

3   were on the previous document, we see that as of 1 p.m. on

4   July 4, Terra Firma still only had 3.56 percent of the

5   90 percent it needed of shareholder acceptance; right?

6   A.  That's correct.

7   Q.  And because the offer was conditioned on 90 percent

8   acceptance, Terra Firma had no obligation, under the takeover

9   code, to extend the offer a second time; did it?

10  A.  We had the option to either lapse or to extend the offer,

11  but as I say, it would have been highly unusual to have lapsed

12  at this stage.

13  Q.  And you did extend for another eight days; do you recall

14  that?

15  A.  I know we extended.  I can't remember the --

16  Q.  Yeah.  Take a look at the bottom of the page on JQ.  We see

17  that the offer was extended from July 4$^{th}$ to July 12$^{th}$;

18  correct?

19  A.  Correct.

20  Q.  So there's the first extension, and this was the second

21  extension, until July 12$^{th}$; right?

22  A.  Correct.

23          MR. COHEN:  May I approach, your Honor?

24          THE COURT:  Yes.

25  Q.  Now, Mr. Pryce, I've handed you Exhibit JR, Citi Exhibit JR

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter3                        Pryce - cross

1    for identification.  And do you recognize that as the

2    announcement of a third extension by Terra Firma of its offer

3    for EMI on the 13$^{th}$ of July?

4    A.   That's what this is, yes.

5              MR. COHEN:  I offer JR, your Honor.

6              MR. BOIES:  No objection, your Honor.

7              THE COURT:  JR is received.

8              (Defendant's Exhibit JR received in evidence)

9    Q.   Now if we look at the level of acceptances, as of the

10   12$^{th}$ of July, at 1:00 -- that's the day before the third

11   extension -- you were still below 4 percent of the shareholders

12   having voted, tendered their shares, right, given their shares

13   saying, "We will agree to the deal"; right?

14   A.   That's correct.

15   Q.   Okay.  You needed 90 and you have 3.82 percent, so you

16   extended again; right?

17   A.   Correct.

18   Q.   And extended for one more week; do you remember that?

19   A.   Yes, I do.

20   Q.   As we look at the bottom of JR, it says, "The board of

21   Maltby --" that's that Terra Firma company "-- announces that

22   the offer will be extended to the 19$^{th}$ of July."  Do you see

23   that?

24   A.   Yes, I do.

25   Q.   Okay.  So this was a third extension by Terra Firma; right?

0aj1ter3                    Pryce - cross

1   A.  Right.

2   Q.  With no obligation to extend even the first time, let alone

3   three times; right?

4   A.  As I reiterated, it would have been highly unusual to have

5   lapsed the offer at this stage.

6   Q.  Now let me show you another document.

7          MR. COHEN:  May I approach, your Honor?

8          THE COURT:  Yes.

9   Q.  Exhibit JS for identification.  Now JS --

10         THE COURT:  Are you offering JS?

11         MR. COHEN:  I was going to ask some questions.  But I

12  can offer it.

13         MR. BOIES:  No objection, your Honor.

14         THE COURT:  Received.

15         (Defendant's Exhibit JS received in evidence)

16  Q.  If you look at Exhibit JS in evidence, it shows that as of

17  July 19th, you were up to 26 percent; do you see that, sir?

18  A.  Yes, I do.

19  Q.  You needed 90, you have 26, so you extended for a fourth

20  time, the offer; correct?

21  A.  That's correct.

22  Q.  And if you look down at the bottom of the page, it says,

23  "Except with the consent of the panel, if the offer has not

24  been or been declared unconditional as to acceptances, on or

25  before 29 July 2007, it will not be extended thereafter and

0aj1ter3                    Pryce - cross

1   lapse."  Do you see that, sir?

2   A.  Yes, I do.

3   Q.  Now let's just spend a second on the words so we know what

4   it is.

5              The panel is something called the takeover panel in

6   London; right?

7   A.  That's correct.

8   Q.  And they set the rules for how you proceed with offers of

9   public companies?

10  A.  Yes, they do.

11  Q.  And the reason why the offer could not be extended again,

12  if you did not get 90 percent acceptance by the 29$^{th}$ of July,

13  is that, under the takeover panel's rules, you can only -- you

14  only get 60 days for an offer; right?

15  A.  That's correct.

16  Q.  So the offer document was posted on May 30, that was

17  Exhibit FR, and the last date for you to get 90 percent until

18  the offer lapsed was the 29$^{th}$ of July; right?

19  A.  That's correct.

20  Q.  So you extended a fourth time on the 29$^{th}$ of July; correct?

21  A.  That is correct.

22  Q.  But there was actually a fifth extension, was there not,

23  with the permission of the panel?

24  A.  Yes, there was.

25              MR. COHEN:  Okay.  May I approach, your Honor?

0aj1ter3                      Pryce - cross

1        THE COURT:  Yes.

2    Q.  Now Exhibit JT for identification is another announcement,

3    a fifth announcement of an extension of its offer by Terra

4    Firma; right?

5    A.  That's correct.

6        MR. COHEN:  I offer JT, your Honor.

7        MR. BOIES:  No objection, your Honor.

8        THE COURT:  JT is received.

9        (Defendant's Exhibit JT received in evidence)

10   Q.  And if we go to the first paragraph, it says, as of 5 p.m.

11   London time on the 27$^{th}$ of July -- that was the last business

12   day before the 29$^{th}$; right?

13   A.  Yes.

14   Q.  -- Terra Firma -- Maltby had received 84.94 percent.  Do

15   you see that?

16   A.  I do.

17   Q.  And so what EMI and Terra Firma did together is they went

18   to the panel and they said, "You know, give us until the first

19   of August rather than the 29$^{th}$ of July, extend the 60-day

20   deadline by three more days"; right?

21   A.  No, that's not correct.

22   Q.  Okay.  What happened?

23   A.  EMI approached the panel directly and asked, given that

24   there had been a postal strike that had occurred in the week

25   before and that therefore they believed that there were a

0aj1ter3                    Pryce - cross

1   certain number of acceptances which had actually got stuck in

2   the post and that they therefore believed that we would get to

3   the 90 percent threshold if those -- if those acceptances which

4   were stuck in the post were allowed to actually come through

5   the system, and so they asked the panel whether or not the

6   panel would be agreeable to extending the period by an extra

7   couple of days, and the panel then reverted to us and said that

8   they were happy to make that exceptional decision if Terra

9   Firma were happy.

10  Q.   And Terra Firma consented; right?

11  A.   And in those circumstances Terra Firma did consent.

12  Q.   All right.  And effectively, this was a fifth extension;

13  correct?

14  A.   This was a fifth extension.

15  Q.   So the offer which had been posted on May 30$^{th}$ and was

16  set to expire on June 27$^{th}$ if Terra Firma didn't get

17  90 percent shareholder approval was extended five times between

18  the 27$^{th}$ of June and the 1$^{st}$ of August; correct?

19  A.   That is correct.

20          MR. COHEN:  Your Honor, I pass the witness.

21          THE COURT:  All right.  Redirect.

22  REDIRECT EXAMINATION

23  BY MR. BOIES:

24  Q.   Good morning, Mr. Pryce.

25  A.   Good morning.

0aj1ter3                     Pryce - redirect

1   Q.  You said that it would have been highly unusual not to have

2   extended the offer.  If you had not extended the offer, would

3   there have been practical consequences for Terra Firma?

4   A.  Yes.  If we hadn't extended the offer, there would have

5   been the immediate consequence in relation to EMI that we

6   wouldn't have been able to bid for EMI for up to another 12

7   months; and then, as I said yesterday, it was my belief that

8   there would be serious reputational issues for Terra Firma in

9   having allowed this offer to lapse.

10  Q.  And am I correct that you would also have lost the breakup

11  fee, as indicated in one of the documents that counsel showed

12  you?

13          MR. COHEN:  Objection, your Honor.

14          THE COURT:  Well, it's leading.  However, the document

15  did indicate that, so I think it's harmless under the

16  circumstances.  I'll allow it.

17          Is that right?

18          THE WITNESS:  Correct.

19          THE COURT:  Okay.

20  Q.  Now you said that Citi was an adviser to Terra Firma but

21  that you did not pay them; do you recall that?

22  A.  Yes.

23  Q.  As an investment banker?

24  A.  Yes, I do.

25  Q.  Yet Citi nevertheless received fees in connection with the

0aj1ter3                          Pryce - redirect

1    financing of the EMI transaction.

2    A.  Yes, they did.

3            MR. BOIES:  And may I approach, your Honor?

4            THE COURT:  Yes.

5            MR. BOIES:  Your Honor, I would offer Plaintiff's

6    Exhibit 24, to which I think there is no objection.

7            MR. COHEN:  No objection, your Honor.

8            THE COURT:  24 is received.

9            (Plaintiff's Exhibit 24 received in evidence)

10   Q.  I'd like to direct your attention, Mr. Pryce -- this is a

11   document prepared and produced in this case by Citi.  And I'd

12   like to direct your attention to the last paragraph here, where

13   it says, "We," meaning Citi, "have significant franchise risk

14   in this transaction due to:"  And the first bullet is, "Citi

15   acted as both sell-side and buy-side advisor in Terra Firma's

16   takeover of EMI."  Do you see that?

17   A.  Yes, I do.

18   Q.  And is that consistent with your understanding, sir?

19   A.  Yes, it is.

20   Q.  Now counsel asked you a number of questions about whether

21   there had not been a decision to put in a binding bid on

22   May 18$^{th}$; do you recall that?

23   A.  Yes, I do.

24   Q.  And you said that you believed that there was not funding

25   available so you could not put in a binding bid; do you recall

0aj1ter3                    Pryce - redirect

1   that?

2   A.  Yes, I do.

3   Q.  Now I'd like to put up on the screen Exhibit GP that

4   counsel showed you, and I'd like to go to page 17, which he

5   also showed you, but I'd like to show you another portion of

6   that page.

7           And first counsel showed you the portion that talks

8   about Deutsche Bank and Citi and Barclays.  Do you see that?

9   A.  Yes, I do.

10  Q.  And I'd like to direct your attention to the two lines

11  right above that.  Maybe we could highlight that, where it

12  says, "None of the banks has credit committee approval yet."

13  Do you see that?

14  A.  Yes, I do.

15  Q.  And is that what you were talking about when you said you

16  thought that there was not financing yet in place?

17  A.  Correct.

18  Q.  Now in addition, we previously admitted Plaintiff's 630,

19  659, which are the meetings of the May 18$^{th}$ general partner

20  meeting, and that meeting followed the IAC meeting; correct?

21  A.  Correct.

22  Q.  Let me go first to Plaintiff's Exhibit 630.  And this is

23  the minutes for the (GP)2 partnership; correct?

24  A.  That's correct.

25  Q.  And that shows it taking place at 8 a.m. on May 18$^{th}$,

Oaj1ter3                    Pryce - redirect

1    2007; correct?

2    A.  Yes.

3    Q.  Now I'd like to direct your attention to paragraph 6.10.

4    And this is the approval; correct?

5    A.  Yes, it is.

6    Q.  And it says that, "After due consideration, it was

7    unanimously resolved that Project Dice be and is hereby

8    approved and the investment in relation to Project Dice be and

9    is hereby approved at a price of up to 2 pounds 65"; correct?

10   A.  That's correct.

11   Q.  "Or such lesser sum as may be negotiated"; is that correct?

12   A.  That's correct.

13   Q.  And was it still the intention at this point to try to have

14   negotiations?

15   A.  Yes, it was.

16   Q.  And in fact, counsel asked you about a telephone

17   conversation that Mr. Hands had with Mr. Borrows; do you recall

18   that?

19   A.  Yes, I do.

20   Q.  And he showed you an e-mail -- and I'll try to identify it

21   and get it up on the screen -- that you wrote later.  But he

22   talked about how Mr. Hands had called Mr. Borrows and tried to

23   see whether he could get acceptance for a bid at a level of

24   £2.40; do you recall that?

25   A.  Yes, I do.

Oaj1ter3                    Pryce - redirect

1           MR. BOIES:  And this is GQ, Exhibit GQ.  If we could

2    put that up.

3    Q.  And did this conversation that Mr. Hands had with

4    Mr. Borrows in which he was trying to negotiate at the £2.40

5    level happen before or after the May 18th general partnership

6    meeting?

7    A.  I'd have to --

8           MR. COHEN:  Objection, your Honor.

9           THE COURT:  Sustained as to form of the question.

10   Q.  Do you know when on May 18th, in relation to the general

11   partners meeting, the conversation between Mr. Hands and

12   Mr. Borrows occurred?

13   A.  I believe it was after the meeting.

14   Q.  After the meeting.

15   A.  Correct.

16   Q.  Do you know why Mr. Hands would be trying to negotiate a

17   240 per share price after the meeting?

18          MR. COHEN:  Objection, your Honor.

19          THE COURT:  Sustained.

20   Q.  Based on your understanding at the time, was it consistent

21   with what you understood happened on May 18th at the general

22   partners meeting or the IAC meeting which you attended?

23   A.  Yes, it was.

24   Q.  Now let me direct your attention to Plaintiff's

25   Exhibit 659.  These are the May 18th, 2007 (GP)3 minutes; is

A-13082

0aj1ter3                          Pryce - redirect

1    that correct?

2    A.   That's correct.

3    Q.   And this shows the meeting taking place on May 18<sup>th</sup> at

4    8:30 a.m.; correct?

5    A.   Correct.

6    Q.   Now let me go to paragraph 6.9.  And here you see, do you

7    not, the same approval with the same language of a price up to

8    2.65 per share or such lesser sum as may be negotiated; is that

9    correct?

10   A.   That's correct.

11   Q.   Now counsel asked you a number of questions about whether

12   Terra Firma was interested in acquiring EMI before 2007, and

13   you said that it was; do you recall that?

14   A.   Yes.

15   Q.   And he asked you whether Terra Firma was interested in

16   acquiring EMI in 2007, and you said it was; do you recall that?

17   A.   Yes.

18   Q.   And he asked you whether you thought and Terra Firma

19   thought that EMI was potentially a valuable company in 2007 and

20   you said it was; correct?

21   A.   Yes.

22   Q.   And he asked you whether Terra Firma was employing a lot of

23   advisers to help them decide EMI's value and what to do with it

24   if Terra Firma bought it, and you said they were; is that

25   correct?

0aj1ter3                     Pryce - redirect

1   A.  Correct.

2   Q.  And he asked you whether there was a big team working on

3   the EMI transaction, you said there was; correct?

4   A.  Correct.

5   Q.  Now does any of that have anything at all to do with

6   whether Citibank misrepresented the existence of an auction or

7   the existence of bidders to Terra Firma?

8              MR. COHEN:  Objection, your Honor.

9              THE COURT:  Sustained.

10  Q.  Was there anything that counsel showed you, sir, that in

11  your view was inconsistent with your testimony that Citibank

12  had, according to Mr. Hands, told him that there was an auction

13  and that Cerberus was bidding 260?

14             MR. COHEN:  Objection, your Honor.

15             THE COURT:  Sustained.  These are really arguments,

16  counsel.  You can make them on your summation.

17             MR. BOIES:  Very well, your Honor.

18  Q.  Did the existence or the perceived existence of an auction

19  have any effect on what Terra Firma was doing, despite all of

20  the teams you had working on it and the information that you

21  had?

22  A.  Yes.  The existence of the auction and the fact that there

23  was a deadline meant that we had to be in a position to submit

24  that bid by that deadline date if we wanted to have an

25  opportunity to acquire the company.

0aj1ter3                    Pryce - recross

1          MR. BOIES:  I have no more questions, your Honor.

2          THE COURT:  All right.  Very good.

3          Anything else?

4          MR. COHEN:  Just one or two questions.

5          THE COURT:  Go ahead.

6          MR. COHEN:  Could we put up 630, please, paragraph

7    6.10.  Terra Firma 630, 6.10.  Page 4 of 12.

8    RECROSS EXAMINATION

9    BY MR. COHEN:

10   Q.  Now, Mr. Pryce, Mr. Boies asked you about this paragraph in

11   the minutes of (GP)2 and also (GP)3, Exhibit 659.  Do you

12   recall that, sir?

13   A.  Yes.

14   Q.  You don't remember anything that was discussed at these

15   meetings; do you?

16   A.  I don't have a recollection of the detailed discussions at

17   this meeting.

18   Q.  So you can't tell us if there were any discussions at those

19   meetings of the general partners as to whether negotiations

20   were contemplated for a price below 265; right?

21   A.  I can read the minutes here.

22   Q.  Right.  All you're doing is reading the minutes.  You don't

23   know anything about the discussions at this meeting that led to

24   those minutes being prepared; correct?

25   A.  I do know what we were trying to achieve on that Friday.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter3                        Pryce - recross

1    Q.  Do you remember anything that any one of the directors said
2    about negotiating the lower price?
3    A.  I don't have any specific recollections of the discussions
4    at this meeting, but I do remember what we were trying to
5    achieve on that Friday.
6    Q.  And you were trying -- you always want to get the best
7    price you can, right, in business?
8    A.  Clearly we want to be able to buy the investments at the
9    best price that we had, yes.
10   Q.  But what the directors were saying is, "We'll pay 265 if we
11   have to"; right?
12   A.  265 was -- sat the upper end of the range, but it quite
13   clearly says, "or such lesser sums that may be negotiated."
14   Q.  And you don't know what any of the directors said at those
15   meetings about what they would want done if you couldn't
16   negotiate a lower price; correct?
17   A.  I can't remember the specific discussions of the directors,
18   but I do remember what we were trying to achieve on that
19   Friday.
20   Q.  But you don't -- you weren't at most of the meeting; were
21   you?
22           THE COURT:  I think this is all repetitive, counsel.
23           MR. COHEN:  Okay.  Nothing further, your Honor.
24           THE COURT:  All right.  Anything else?
25           MR. BOIES:  Just one, your Honor.

Oaj1ter3                         Pryce - redirect

1    REDIRECT EXAMINATION

2    BY MR. BOIES:

3    Q.  What were you trying to achieve on that Friday?

4    A.  We were trying to get approval to bid up to a certain price

5    so that over the weekend we would then be able to work out

6    whether we wanted to bid and at what price.

7            MR. BOIES:  Thank you, your Honor.

8            THE COURT:  All right.  Anything else?

9            MR. COHEN:  No, your Honor.

10           THE COURT:  Thank you very much.  You may step down.

11           (witness excused)

12           THE COURT:  Please call your next witness.

13           MR. BOIES:  Your Honor, we next call Mr. Guy Hands.

14           THE CLERK:  Please raise your right hand.

15           (Witness sworn)

16           THE CLERK:  Please be seated.

17           State your name and spell it slowly for the record.

18           THE WITNESS:  It's Guy Hands, spelled G-U-Y, and the

19   second name, Hands, H-A-N-D-S.

20    GUY HANDS,

21       called as a witness by the Plaintiff,

22       having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. BOIES:

25   Q.  Good morning, Mr. Hands.

0aj1ter3                    Hands - direct

1    A.   Good morning.

2    Q.   Would you tell the jury a little bit about yourself.   How

3    old are you?

4    A.   I'm 51 years old.

5    Q.   And are you married?

6    A.   I am.

7    Q.   How long have you been married?

8    A.   26 years.

9    Q.   Do you have any children?

10   A.   We have four children.

11   Q.   Boys, girls, combination?

12   A.   Two oldest, 23-year-old and 20-year-old, are boys; and we

13   have two girls who are 17 and 13.

14   Q.   Just very briefly, would you describe for the jury your

15   educational background.

16   A.   Yes.   My mother was a nursery schoolteacher.   I initially

17   went to her nursery school, then I went on to a primary school,

18   which in England starts about age 5.   When I was about 9 years

19   old, I was diagnosed as being very severely dyslexic and also

20   having dyspraxia, which is sort of a motor coordination

21   learning difficulty.   So I was sent to a special school for

22   about two and a half years.   After the special school I went to

23   a state -- I think you call them high school, and I was there

24   through to 18, and then I went to Oxford University.

25             THE COURT:   Mr. Hands, I think you're going to need to

0aj1ter3                          Hands - direct

1    speak a little bit louder.

2              All right.  Go ahead.

3    Q.  You can pull the microphone more in front of you.

4              Now there came a time when you founded Terra Firma;

5    correct?

6    A.  That is correct.

7    Q.  And when was that?

8    A.  That was 2002.

9    Q.  And you've been there ever since; correct?

10   A.  That's correct.

11   Q.  And you consider yourself a sophisticated businessperson;

12   correct?

13   A.  Yes, I do.

14   Q.  Are you experienced in evaluating businesses and looking at

15   them and determining whether or not to buy them?

16   A.  Yes, I am.

17   Q.  And did you make an effort to evaluate EMI?

18   A.  With my team, we did, yes.

19   Q.  And when did you first start looking at EMI?

20   A.  The original time was back in about 1994; we looked at it

21   off and on for -- for years.  Prior to 2007, we were looking at

22   it at around 2000 -- the end of 2006.

23   Q.  And did there come a time in 2007 when you began to

24   consider making the offer for EMI?

25   A.  Yes, I did.   (Continued on next page)

0AJ3TER4                    Hands - direct

1    BY MR. BOIES:

2    Q.  When was that?

3    A.  That would be post roughly first week in May.

4    Q.  Even prior to the first week in May, had you continued or

5    your team at Terra Firma continued to look at the possibility

6    of acquiring EMI?

7    A.  We looked at it from I would say probably December 2006

8    through to roughly March.  Then in March, at some point in

9    March we decided to -- that we would not compete, but just take

10   on a watch and breathe.  We decided we weren't going to buy at

11   that time.

12   Q.  What happened in May of 2007 with respect to EMI?

13   A.  I had conversations with David Wormsley, which encouraged

14   me to get involved in the auction process.

15   Q.  Do you recall when the first such conversation took place?

16   A.  It was in the week leading up to meeting I had with Eric

17   Nicoli.

18   Q.  Do you recall when that meeting was?

19   A.  That was in the Sunday, it would either be the first Sunday

20   depending on what dates existed in May, but I think it was

21   around the 7th which I think was the first Sunday.

22   Q.  Your conversation with Mr. Wormsley would have been just

23   prior to that in that week, is that correct?

24   A.  I think we had conversations leading up to that weekend.

25   Q.  In the first conversation that you had with Mr. Wormsley

0AJ3TER4                     Hands - direct

1   that first week in May, what did he say to you?

2   A.   We chatted.  He told me that EMI was in an auction process,

3   and that he felt it would be a company that would fit our

4   criteria and we should look at.  He told me that there was an

5   indicative price which was the leading indicative price at

6   around 262.

7        He told me that Citigroup and himself would be willing

8   to help us during the process.  We talked about financing.  He

9   mentioned that financing would be something he would help us

10  with.

11       We talked about access to management, being able to

12  talk to management.  And he said he would be able to arrange

13  that and we could arrange a meeting with -- he could arrange a

14  meeting with Eric Nicoli.  He mentioned that Citigroup knew the

15  company very, very well.  And he could help us with regard to

16  getting a general understanding looking for some of the upsides

17  in the company.

18       And we agreed that -- I had a concern about how much

19  money it was going to take.  But we agreed at a price above

20  262, slightly above 262, we probably would have sufficient

21  funds, depending what the financing looked like, and we agreed

22  we would keep each other fully updated on our progress.  Both

23  ways.  He would keep me updated with what was going on with

24  regard to EMI, and I would keep him updated with what was going

25  on with regarding Terra Firma.

OAJ3TER4                        Hands - direct

1   Q.  Did you discuss the possibility of Terra Firma putting in

2   an indicative bid at this time?

3   A.  We did.  I mean, we were behind.  And the question was how

4   do we get back -- get into an auction which we had decided not

5   participate in.  And so, the question here was, you know, if

6   there is an indicative bid at 262, you've got to put something

7   on the table which is attractive to the management team.  Based

8   on that, we came up with an indicative bid of 265.

9   Q.  Did Terra Firma put in an indicative bid at 265 at some

10  point?

11  A.  Yes.  I think approximately, about approximately a week

12  from when we first started talking a week later.

13  Q.  Following the time that Terra Firma put in an indicative

14  bid, did Terra Firma begin due diligence at EMI?

15  A.  Yes, we did.

16  Q.  Prior to the time that you put in an indicative bid, did

17  you have access to the management of EMI to ask them questions?

18  A.  No, we did not.

19  Q.  Prior to putting in the indicative bid, did you have an

20  opportunity to look at any of the internal financials of EMI?

21  A.  No, we did not.

22  Q.  Did you have an opportunity to look at any of the internal

23  projections or other non-public documents of EMI, prior to the

24  time that you put in your indicative bid?

25  A.  No, we did not.

0AJ3TER4                    Hands - direct

1    Q.  After you put in this indicative bid, did you begin to get

2    access to the internal documents of EMI and to EMI management?

3    A.  Yes.  Within a few days, almost immediately.

4    Q.  Is due diligence an important part of what Terra Firma does

5    in deciding whether to buy a company, and if so, at what price?

6    A.  It's incredibly important in terms of determining whether

7    you want to buy a company and up to what price.  The reality is

8    you always want to buy a company at the lowest price you can.

9    And therefore, the due diligence does not determine the price

10   you bid.  It determines the maximum price you feel you can pay.

11   Q.  In connection with the EMI transaction, did you do as much

12   due diligence as you would have done in the absence of an

13   auction?

14   A.  No.  I mean, when you don't have an auction on, you are in

15   a very different situation.  In an auction process, the

16   investment banks, bankers to the company and the company,

17   determine very much what information you can get.  And they

18   obviously try and give you sufficient to encourage you to bid,

19   but frankly, almost as little as they can get away with.

20        In a non-auction you are in the driving seat and you

21   can say this is what I want, if you don't get it I'm not going

22   to give you a bid, I'll take as long as I want.  You are in a

23   very, very different situation compared auction to non-auction.

24   Q.  If you are in the middle of an auction, does your leverage

25   at that target company change compared to a situation which

0AJ3TER4                    Hands - direct

1   you're not in an auction?

2   A.  Completely.  I mean, you have very little leverage when

3   there are other people bidding.  At the end of the day they are

4   going to simply look and say we've got covered bids, free bids,

5   you better be there.  Where if there isn't an auction, they are

6   relying on you to come to actually give them a firm offer.

7   Q.  If Terra Firma could have avoided an auction, would that

8   have been something that Terra Firma would have wanted to do?

9   A.  Absolutely.  That's our, you know, our normal practice is

10  always to try and avoid auctions.

11  Q.  Why is that?

12  A.  Because if you avoid an auction, you can take much longer,

13  you can pay less, you can move the price down.  You have more

14  time to arrange your financing.  There's lots of advantages to

15  avoiding an auction.

16  Q.  Did you have any conversations with Mr. Wormsley concerning

17  your views as to the desirability or undesirability of an

18  auction?

19  A.  David knew full well that was our policy and the way we

20  liked to do deals.  So, I mean, yes, it was something which was

21  fairly very widely known.

22  Q.  Had you worked with Mr. Wormsley before?

23  A.  Oh, yes.  For a large number of years.

24  Q.  Did you believe you knew him well?

25  A.  I believed I knew him very well.

0AJ3TER4                    Hands - direct

1   Q.  Did you trust him?

2   A.  Completely.

3   Q.  Did you consider him a close business colleague?

4   A.  I think outside of the people within Terra Firma, he was my

5   closest business colleague.

6   Q.  If you are in an auction and the auction is busted, does

7   that have an effect on the price at which you can acquire the

8   company by?

9   A.  It has an enormous effect on the price.

10  Q.  Why is that?

11  A.  Well, if, first of all, people out there will always

12  discover it's busted, so you've got, effectively got something

13  which is tarnished goods.  So the price goes down because

14  people say why is there no one wants to buy this?  Why did no

15  one put a firm bid in?  So the price goes down from that point

16  of view.

17          But more importantly, or just as importantly, you then

18  have the ability to negotiate, because the seller is trying to

19  sell something, and they have a busted auction and they have no

20  bid.  They are in a situation where they will have to take a

21  price from you.  You can either take a long time, which exposes

22  them to risk, they don't have to sell the business, or you can

23  put a low price in, just a fire sale price.

24  Q.  Now, we've had some testimony already that you know about

25  because you were sitting here about May 18.  Prior to May 18,

1  did you have additional conversations with Mr. Wormsley after

2  your initial conversation that first week in May?

3  A.  We had numerous conversations.  Both ways.  Me giving him

4  information, him giving me information.

5  Q.  What information did Mr. Wormsley give you between the

6  first conversation at the beginning of May, or early May, and

7  May 18?

8  A.  What happened as the month went on, was that the other

9  potential bidders dropped out.  Not all of them.  But Fortress

10  dropped out, he told me.  One of the reasons for that was that

11  Fortress was -- went and asked if they could team up with

12  Cerberus, which was reported in the newspapers.  He told me

13  that people had not been allowed to team up, so we knew that

14  Cerberus was out.  One Equity --

15  Q.  When you say Cerberus was out?

16  A.  Fortress.  I apologize.  Fortress was out.  We knew there

17  was no chance of -- I knew there was no chance of a bid between

18  Cerberus and Fortress, was going to be a Cerberus only bid.

19  One Equity had dropped out.

20       He -- we discussed Warners.  And came to the

21  conclusion that the issue with Warners was that if Warners bid,

22  they could bid very, very substantially higher than we could.

23  It really wasn't an oranges and oranges situation.  It was so

24  different.  They had enormous logistic advantages by having

25  offices all around the world which they could merge and make

0AJ3TER4                    Hands - direct

1   savings.  So our view was that Warner's bid, they could just

2   bid a number much, much higher.  But Warners, he told me, had

3   not gone into the data room, so therefore Warners was not in

4   the position to bid.

5           So the week leading up to the 18th, what he told me

6   was that really our competition was very much Cerberus, and

7   that was our competition leading up to that Friday.

8   Q.  Now I'd like to direct your attention to that Friday,

9   May 18, about which there's already been a lot of conversation.

10  And I'd like to direct your attention first to a document that

11  we used with Mr. Pryce.  Which is Plaintiff's Exhibit 630.

12  Which are the minutes of the meeting of the Terra Firma GP2

13  partnership 8 a.m., May 18, 2007.  Were you present, sir?

14  A.  Yes, I was.

15  Q.  I want to direct your attention to paragraph 6.10 on the

16  fourth page.  It says that the investment was approved at a

17  price of up to 2.65 pounds.  Do you see that?

18  A.  I do.

19  Q.  Then it says:  Or such lesser sum as may be negotiated.  Do

20  you see that?

21  A.  I do.

22  Q.  Was this approach consistent with Terra Firma's general

23  practice?

24  A.  Totally.

25  Q.  How so?

0AJ3TER4                    ·Hands - direct

1   A.  Well, we always get ourselves as quickly as possible in a

2   position where we can put forward a bid.  It gives you some

3   negotiating advantages.  And we always want to get the highest

4   price.  Then you leave it to the people who are negotiating to

5   negotiate the lowest price, and to try and negotiate down as

6   much as possible.  Depending on the circumstances you're

7   facing.

8   Q.  After this meeting on May 18, did you do anything to

9   attempt to negotiate or see if you could negotiate a lower

10  price?

11  A.  I did.  I phoned Greenhills.

12  Q.  You phoned who?

13  A.  Simon Borrows who is the lead investment bankers at

14  Greenhills on the deal.

15  Q.  Would you explain who Greenhill is?

16  A.  Greenhill was the people advising EMI on the sale.  They

17  were the lead advisor to EMI on the sale of the company.

18  Q.  What did you try to do with Mr. Borrows of Greenhill?

19  A.  I floated a range of price to him.  I think -- I don't have

20  an exact memory, but somewhere around 220, 240, and said was

21  that something he would be interested in.  And I said that I

22  had been talking price with David Wormsley.

23  Q.  Did you tell Mr. Borrows what price Mr. Wormsley had told

24  you?

25  A.  No.

0AJ3TER4                         Hands - direct

1  Q.  What was Mr. Borrows' reaction to the 240 or perhaps 220

2  price that you talked about?

3  A.  He -- he seemed to get a bit annoyed.  And just frankly,

4  he's not -- well, I never had a relationship with him.  So, he

5  just got off the phone.

6  Q.  After the board meeting that we just looked at, at

7  8 o'clock in the morning at Guernsey, on May 18, did you have

8  any conversations with Mr. Wormsley about the competitive

9  situation?

10  A.  Yes, we had a conversation sometime later that day after

11  the board meeting.  Where he told me that the auction was being

12  accelerated at the request of one of the other bidders, the

13  only bidder, Cerberus, and that it was being accelerated to the

14  Monday morning.  And that we needed to be in a position to put

15  a bid in Monday morning.  But Cerberus was confirming their 262

16  bid.  They would be bidding 262 on that Monday morning.  And

17  that if we were going to get a recommendation, and be able to

18  win the company, we better get ourselves in a position to be

19  able to bid 265 on Monday morning.

20          I pointed out to him that we didn't at that point in

21  time have financing.  And he said he would do what he could to

22  help get financing over the weekend.

23  Q.  I want to focus on some of the things you just said there.

24  You said that Mr. Wormsley told you that the bid deadline had

25  been changed from May 23, a Wednesday, to May 21, a Monday.  Is

OAJ3TER4                          Hands - direct

1   that correct?

2   A.   That's correct.

3   Q.   You said that he said that change had been at the request

4   of another bidder.

5   A.   That is correct.

6   Q.   I want to ask you, sir, whether you're certain that he said

7   that it had been changed at the request of another bidder.

8   A.   I think he said it had been changed at the request of

9   Cerberus.

10  Q.   That is, you think he actually gave you the name of the

11  bidder?

12  A.   I'm pretty sure that's what he said, yes.

13  Q.   You also said that he said that Cerberus had confirmed that

14  it would be bidding at 262.  Do you recall that?

15  A.   He told me they would be bidding at 262.

16  Q.   And again, are you certain he said that to you, sir?

17  A.   Yes, I am.

18  Q.   Now, there's been some suggestion that you heard while you

19  were sitting here that you made this up after the fact.

20         Did you tell anybody at the time, that is back in May,

21  that Mr. Wormsley had said these things to you?

22  A.   As of that date, I had told one person that it was

23  Mr. Wormsley who had told me that.  I told my team they needed

24  to change their approach.

25  Q.   Okay.  So, let me take it one step at a time.  Who was the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

one person that you told that Mr. Wormsley had given you this information?

A. That was Tim Pryce.

Q. What did you tell your team?

A. I told my team that the auction had been accelerated, that we needed to be in a -- we needed to be in a position to be able to bid on the Monday morning. Which needed -- meant we needed to get financing done and any due diligence that needed to be done over the weekend.

Q. Did Mr. Wormsley's conversation with you on May 18 cause you to do anything else?

A. Yes. We did two other things. One is the team started looking at not just bidding 265, but whether we could go higher than 265. The second thing is we set up a board meeting for the Sunday.

Q. That Sunday would have been May 20, is that correct?

A. That's correct. We set up the second board meeting for that Sunday.

Q. Now, on Sunday, May 20 -- let me go back to Saturday, May 19.

At any time on Saturday, May 19, did Mr. Wormsley call you to say that Cerberus had dropped out of the bidding?

A. No.

Q. Did anyone call you to tell you that Cerberus had dropped out of the bidding?

0AJ3TER4                    Hands - direct

1   A.  No.

2   Q.  If anyone had told you that Cerberus had dropped out of the

3   bidding, would that have changed what you were doing?

4   A.  Completely.

5   Q.  Why is that?

6   A.  Well, we would have known that there was a busted auction,

7   that we were the only bidder.  And at that point in time, we

8   would have just not bid on the Monday.  We would have been in a

9   situation where we had the leverage to dictate and negotiate on

10  price, on due diligence, on how long we wanted to take.

11  Q.  Let me go forward to Sunday, May 20.  There was a board

12  meeting, you said, is that correct?

13  A.  That is correct.

14  Q.  When did that board meeting take place?

15  A.  Say when or where?

16  Q.  I think I asked when.  But let me ask both.  When and

17  where.

18  A.  Okay.  It took place in the afternoon, late afternoon, in

19  an airport hangar in Guernsey.

20  Q.  Had you spoken to Mr. Wormsley on Sunday, May 20, before

21  that board meeting started?

22  A.  Not that I've got any memory of, no.

23  Q.  Did you speak to him at any time during the board meeting?

24  A.  Yes.  We had a phone call during the meeting.

25  Q.  What did Mr. Wormsley tell you during that phone call?

0AJ3TER4                    Hands - direct

1    A.  It was a reasonably short phone call.  He really phoned to

2    tell me that Cerberus were there, 262.  That we needed to get

3    our bid in the next morning at 9 a.m.  And also to inquire

4    about how, how we're doing.  And I said we're still working

5    through the financing.

6    Q.  By the financing, what were you referring to there?

7    A.  We still didn't have the debt.  When we buy companies, we

8    buy them with a mixture of equity and debt.  And without the

9    debt, we can't buy companies without a bank's financing.  You

10   know, we can't bid for companies.

11   Q.  Could you have put in any bid at all without having

12   financing?

13   A.  No.  We -- there is no bid of any type we can put in

14   without financing which is firm.

15   Q.  When did you get the financing in place?

16   A.  I don't know the exact timing of that.  But it would have

17   been sometime -- late that -- that same day in the evening.

18   Sometime late evening, early night.

19   Q.  That day would be Sunday, May 20, is that correct?

20   A.  That is correct.

21   Q.  Who was going to provide that financing?

22   A.  We were ending up with just one party who could provide the

23   financing at the time, which was Citibank.

24   Q.  After that telephone call that you had with Mr. Wormsley

25   during the board meeting, did you have any further

0AJ3TER4                    Hands - direct

1   conversations with Mr. Wormsley that day, that is Sunday,

2   May 20?

3   A.  Yes.  We had a final call that I can remember at around

4   about midnight.

5   Q.  Where were you when you had this call?

6   A.  I was upstairs in my house on -- in my study in the attic.

7   Q.  What did Mr. Wormsley tell you shortly before midnight on

8   May 20?

9   A.  He told me that Cerberus were there.  They were at 262.

10  That the bid had to be in by 9 a.m. the next morning.  He was

11  very insistent we had to get it in by 9 a.m. the next morning.

12  And he told me not to play any games on price.

13  Q.  After that conversation, did you communicate with anyone as

14  a result of that conversation?

15  A.  I had a conversation the next morning -- well, sorry.  Step

16  back.  When I -- straight after speaking to David, I spoke to

17  Riaz Punja who is the -- was the person, the senior person on

18  the financial side of the transaction.  Running it.  And I

19  spoke to him.  He would have been in the office in London.

20  Q.  What did you tell Mr. Punja?

21  A.  I told him that Cerberus was still there.  We had to get

22  our bid in at 262 and that -- I told him we had to be there at

23  262, so it was a bid away from us.  We had to be there by

24  9 a.m. the next morning, and, you know, just we had to get it

25  in there if we're going to have any chance of winning this

0AJ3TER4                    Hands - direct

1    company.

2    Q.  After that conversation, were there any other telephone

3    conversations that you had as a result of the conversation that

4    you had with Mr. Wormsley around midnight on May 20?

5    A.  Yes.  If I can remember, I spoke to Tim Pryce the next

6    morning, and I simply said that, you know, continue to --

7    continue with the bid, that I hadn't learned anything overnight

8    to change our position on this.

9    Q.  Now, why were you calling Mr. Pryce?

10   A.  Because Mr. Pryce was going to be on the committee call,

11   and additionally, Mr. Pryce could, if he needed to, phone

12   various members of the committee, one of the two committee

13   members.  And I was phoning him because if I wanted to stop the

14   bid, I needed to tell him.  We cut off and canceled committee

15   meetings.  What a committee meeting does is it has

16   authorization up to something.  It doesn't have authorization

17   obviously to go above that.  So we use them to counsel.  And I

18   called him because I think -- I spoke to him because I think if

19   he hadn't heard from me, he would have really worried.  So I

20   made it quite clear there was nothing to worry about, he can go

21   ahead.

22   Q.  You mentioned a committee.  Can you explain what that

23   committee was that you are talking about.

24   A.  Yes.  You have a board meeting, which really its main thing

25   is to approve things, what you can do.  That's the main purpose

A-13105

0AJ3TER4                          Hands - direct

1    of the board meeting.  You approve actions.  But quite often,

2    the actions that have to be done involve a lot of paperwork or

3    they occur at another time.  So what you do is you set up a

4    committee which is a subsection of that board, who then have

5    the authority to go ahead and do things, assuming that

6    nothing's changed.  If something changes, then you try -- you

7    make sure they know it's changed, and your assumption is or

8    your counsel board that they will then do something

9    differently.

10   Q.  Was there a committee set up in connection with the EMI

11   transaction?

12   A.  Yes.  At the board meeting in the aircraft hangar we agreed

13   to set up a subcommittee.  Set up a committee.

14   Q.  Who was on that committee?

15   A.  Best of my memory, it was Iain Stokes and John Loveridge.

16   Q.  Was it your understanding that this committee was going to

17   meet on May 21, prior to the time that any bid would be

18   submitted?

19   A.  That was my understanding.

20   Q.  What was the purpose of having the committee meet at that

21   time?

22   A.  Well, when we had agreed a bid, we obviously agreed it on a

23   number of different things.  And if anything changed, then you

24   wanted to stop it.  So they would meet, discuss where the

25   situation was, and if they felt that something important had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER4                    Hands - direct

1    changed, then they would be able to adjust the price downward,

2    or just not put a bid in.  They also had the authority to sign

3    documents as well.  But the main thing was the ability to do

4    something, if something changed.

5    Q.  Let me try to get the minutes of that May 21 meeting.

6            MR. BOIES:  Excuse me, your Honor.

7            THE COURT:  All right.

8            MR. BOIES:  I'm having some difficulty finding those

9    minutes.  You'd think those would be minutes we would have

10   handy, but apparently we don't.  We'll go on, but we'll come

11   back when we locate those.

12   Q.  What role, if any, did Mr. Wormsley's statements play in

13   your decision to put in a bid at 265 on May 21?

14   A.  They were totally key.

15   Q.  Why is that?

16   A.  Well, if he hadn't made those statements, we wouldn't have

17   been bidding on the Monday morning at all.  We just not --

18   would not have happened.

19   Q.  You said you were interested in buying EMI, correct?

20   A.  That is correct.

21   Q.  You said you thought you'd make money buying EMI, correct?

22   A.  Totally correct.

23   Q.  Why, then, would you not have put in a bid in the absence

24   of Mr. Wormsley's representations to you?

25   A.  If David hadn't spoken to me, we wouldn't have been in a

1   position to put in a bid on the Monday morning, because we

2   wouldn't have spent the weekend working to get ourselves there.

3   If he hadn't spoken to us, there wouldn't have been any need to

4   get there.

5   Q.  Why, if there hadn't been a need, would that have affected

6   timing and the amount of your bid?

7   A.  Because we were approaching the end of that week, we had

8   seen other bidders drop out.  We wanted to have the ability to

9   buy this company.  You know, we thought it was a good company.

10  We wanted to pay obviously the smallest price.  We were hoping

11  that we would end up with a busted auction.

12          You know, David telling us the reason for why the --

13  telling me the reason for why the auction was being accelerated

14  gave me the false assumption that it was being done because of

15  another bidder.  And that therefore, we either had to be there

16  or we couldn't.  If he hadn't told me that, then we wouldn't

17  have had any belief in that.  I wouldn't have had any belief in

18  that.

19  Q.  When you talked to Mr. Wormsley on May 20, if he had not

20  told you what he told you, but had simply refused to tell you

21  what was going on at that point, what effect would that have

22  had?

23  A.  I don't know how to put this politely.  We would have

24  smelled a rat.  We would have basically said, hey, there's

25  something going on here.  You know, we are going in a situation

OAJ3TER4                    Hands - direct

1   where there -- if he hadn't confirmed, we would have presumed

2   there wasn't a bid going on.  And we would have said, fine, we

3   are the only bidder.

4          His confirmation was incredibly important.

5   Q.  Let me, we've now found copies of certain minutes, and let

6   me ask you to look at Plaintiff's Exhibit 736.

7          MR. BOIES:  I'm not sure this is admitted, but I don't

8   believe there will be an objection.

9          MR. WELLS:  I have no objection.

10          THE COURT:  736 is it?  Mr. Boies, the number is 736?

11          MR. BOIES:  Yes, your Honor.

12          THE COURT:  736 is received.

13          (Plaintiff's Exhibit 736 received in evidence)

14   Q.  This is minutes of a meeting, of a committee of the board

15   of directors held 8 a.m. Monday, May 21, 2007.  Do you see

16   that?

17   A.  I do.

18   Q.  You see that Mr. Loveridge was one of the directors there?

19   A.  I do.

20   Q.  You identify him.  You also see that there is a Mr. Iain

21   Stokes there.  Do you recall that?

22   A.  I call him "Iain" Stokes.

23   Q.  Iain Stokes, I'm sorry.  Do you see that Mr. Stokes is

24   referenced there?

25   A.  I do.

0AJ3TER4                    Hands - direct

1   Q.  Does that refresh your recollection that there was a second

2   member of the committee in addition to Mr. Loveridge that you

3   had?

4   A.  Yes, it does.

5   Q.  Let me ask you to look at paragraph 6.4.  It says there,

6   the directors inquired about rival offers.  Do you see that?

7   A.  I do.

8   Q.  And then it goes on to say:  And specifically the

9   consortium of Cerberus and Fortress and separately Warner Music

10  Group.  Mr. Punja advised that Warner Music Group had to deal

11  with regulatory issues, which were not, in his opinion,

12  insurmountable, but would take time and introduce an element of

13  risk for shareholders.  Any offer by Warner Music Group would

14  therefore need to compensate shareholders for both these items,

15  and therefore would have to be substantially above 2.65 per

16  Dice share.

17          Do you see that?

18  A.  I do.

19  Q.  Was that consistent with your understanding at the time?

20  A.  Yes.  My understanding was that if Warner was going to put

21  a price in, it would have to be substantially above, and we

22  wouldn't be able to beat it.

23  Q.  From your discussions with other directors during the

24  period May 18 through May 20, did they indicate an interest in

25  whether or not there were other bidders, other than Terra Firma

A-13110

0AJ3TER4                    Hands - direct

1   for EMI?

2   A.  Yes.  Quite definitely.

3   Q.  Did you understand why that was important to them?

4   A.  Well, we were having another board meeting, and the board

5   meeting was increasing the price we could go up to from 2.65 to

6   2.85.  And not unnaturally, they were wondering why they were

7   having a board meeting on a Sunday to change the price we could

8   go up to.  Therefore, they were very interested in knowing

9   what, you know, what was the reasoning for this.

10  Q.  What did you explain the reason was?

11  A.  I explained the reason was that we had a -- I can't

12  remember the -- any of the actual exact conversations.  But

13  what I remember explaining in terms of why we're having a board

14  meeting, etc., was that we had a firm bid away from us at 262.

15  And we needed to be in a position to bid a bit higher.

16  Q.  Again, interpreting English for English, when you say a

17  firm bid away from us at 262, can you explain what you mean by

18  that?

19  A.  A bidder who wasn't us.  So there was another bid as

20  opposed to just us.  So there was a bid, someone who is bidding

21  against us.

22  Q.  There were a number of documents that were shown to

23  Mr. Pryce, and I can show you some of them, that referred to

24  putting in a binding bid.  Do you recall those documents

25  generally?

A-13111

0AJ3TER4                    Hands - direct

1   A.   Yes.

2   Q.   Did you believe at the time that Terra Firma put in a bid

3   on May 21, that it was in a practical sense a binding bid?

4   A.   I believed it was binding.  And that when we put that bid

5   in, we were effectively locked into the transaction.  That it

6   was not a practical way of getting out of it.

7   Q.   Why was that?

8   A.   Just my practical knowledge.  I wasn't aware of people who

9   had put bids in and got out of them.  It was just, you know,

10  what I knew from just practice in the market and what I'd seen.

11  I wasn't aware of people putting in bids and getting out of

12  them.

13  Q.   Did you believe in the period after the bid was put in and

14  when the bid was not being allowed to lapse, do you recall

15  there were extensions of the bid?

16  A.   Hmm-hmm.

17  Q.   Did you believe during that period of time that if you

18  failed to extend the bid, there would have been any effect on

19  Terra Firma and its ability to do business in the future?

20  A.   Yes.  I mean, I think the view I formed was, regardless of

21  whether one could technically get out, unless one had some

22  reason, I was never quite sure what that reason would be.  But

23  unless one had some reason in which one could justify to all

24  the shareholders and to the institutions and to the employees

25  and the company, if one just suddenly decided just to randomly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OAJ3TER4                    Hands - direct

1    get out, one better not do business again, frankly, in the

2    U.K., and possibly a broader field than that.

3    Q.  Do you have any knowledge one way or the other as to

4    whether Citi had the same view?

5    A.  I believe they did.

6    Q.  What's that based on?

7    A.  I had discussions with various people at Citi.  And my

8    understanding from them was that that was their view as well.

9    Q.  I want to turn to the subject of damage.  Do you have an

10   estimate of whether the actual value of EMI was greater or less

11   than what you ultimately ended up paying for it?

12              MR. WELLS:  Objection, your Honor.  702.

13              THE COURT:  I think on this one what I anticipate will

14   be coming up in the next few minutes, we probably ought to have

15   a side bar.  And I know we've deprived the jury of the pleasure

16   of a side bar so far, so let's have a side bar at this time.

17              (Continued on next page)

18

19

20

21

22

23

24

25

0AJ3TER4                    Hands - direct

1              (At the side bar)

2          THE COURT:  Before we get into this issue, I wanted to

3     call the side bar for two other reasons.  First, is I have to

4     take a conference call at 12:50, so we'll have to break in a

5     few minutes.

6          Secondly, I've been watching both yesterday and most

7     of this morning juror number five through large portions of

8     both yesterday and today, he has been paying no attention.  His

9     eyes are focused either on the floor or more often on the back

10    of the courtroom.  He has made several attempts to go to sleep

11    by slouching down in his chair, but unfortunately, for him, he

12    hasn't quite been able to pull it off so he keeps waking up.

13         So, I at least have to contemplate striking him, but

14    I'm not going to do anything at this point.  I just want to

15    flag it for counsel so they can take a look at him this

16    afternoon and give me the benefit of their observations.  Those

17    were the real reasons for the side bar.

18         Since we're here, let's talk about 702.

19         MR. WELLS:  With respect to the juror, we had a

20    sleeper during our last trial.  What I recollect you did, I

21    think you had your court deputy, with the consent of counsel,

22    mention it to the woman who we had the issue with.  And I would

23    suggest that we follow that procedure.  Or your Honor could say

24    something.

25         THE COURT:  I think that's a good idea.  You agree?

0AJ3TER4                    Hands - direct

1          MR. BOIES:  I do.  I think maybe the courtroom deputy

2     is a better person to do it than the Court.

3          THE COURT:  Right.

4          MR. WELLS:  I think that's what we did before.

5          THE COURT:  Good.  Let's do that.  I'll do that

6     sometime during the lunch break, I'll have my courtroom deputy

7     do that.  Then we'll see how things go this afternoon.  Now,

8     what's the story on the objection?

9          MR. COHEN:  If this is a --

10          THE COURT:  I think isn't Mr. Cohen the designated

11     objectioner?

12          MR. WELLS:  He's damages.

13          MR. COHEN:  That's not really a reputation that I

14     want, your Honor.

15          MR. BOIES:  Your Honor, if you are going to break in a

16     few minutes anyway, do you want to excuse the jury?

17          THE COURT:  Let me go take this conference call.  And

18     why don't you all come back say at 10 minutes before 2 and

19     we'll discuss all this at that time.

20               (Continued on next page)

21

22

23

24

25

0AJ3TER4                    Hands - direct

1              (In open court)

2              THE COURT:  All right, ladies and gentlemen.  Counsel

3    have told me they have lots of things to say, so we are going

4    to let you go to lunch and please be back at 2 o'clock.

5    Remembering that it takes some time to get through the line.

6    And we'll reconvene at 2.

7              (Jury excused)

8              THE COURT:  Counsel, we'll get together at 10 minutes

9    before 2 and take up those issues at that time.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oaj1ter5

                              AFTERNOON SESSION

                                 2:01 p.m.

1

2

3          (In open court; jury not present)

4          THE COURT:  Please be seated.

5          All right.  So maybe we should get a little more from

6    defense counsel as to the nature of the objection.

7          MR. COHEN:  Yes, your Honor.

8          THE COURT:  At this point I don't remember the

9    question, but --

10         MR. COHEN:  The question was I think -- I think

11   Mr. Boies introduced the subject of damages and asked him if he

12   had an opinion as to the value of EMI, something roughly --

13   roughly like that.  Our problem, your Honor, is that I think

14   that's expert testimony.  Now I assume what Mr. Boies is going

15   to say -- if it's expert testimony, obviously it hasn't been

16   disclosed.

17         THE COURT:  Well, I doubt it's expert testimony.  But

18   had the objection been lack of foundation, I would have

19   sustained the objection.  You may want to make that objection.

20         MR. COHEN:  Yes, and foundation, your Honor.

21         THE COURT:  At that point we'd be able to find out

22   what the basis for this is.  For example, if someone who runs a

23   business were to be making a calculation based on what he has

24   found out about the operations of this business -- I'm taking a

25   hypothetical now -- that would not be expert testimony; that

0aj1ter5

1    would be one that, although it would contain some hearsay,

2    would be well within the lay opinion or lay perception of a CEO

3    in my hypothetical business.  There are other situations where

4    the person's experience would not be enough and it would have

5    to be an expert who testified.  I can't tell that until I know

6    the foundation for --

7              MR. COHEN:  I understand.  I appreciate that.  Your

8    Honor, if I could just say two things.

9              One, in addition to the expert testimony they

10   attempted to proffer on the subject, at the hearing on Friday,

11   this is not a simple calculation.  The fund -- plaintiffs

12   actually valued, in a very complicated way, these businesses

13   for the purpose of what they tell their investors.  I don't

14   understand Mr. Hands to be involved in those valuations.  So --

15             THE COURT:  Well, I'll tell you what we'll do.  I

16   think, since we did break, why don't we put Mr. Hands on the

17   stand now and, outside the presence of the jury, find out what

18   the foundation is and whether there's a basis for putting this

19   question, and then if there is, we can redo it, so to speak, in

20   front of the jury.

21             (Witness resumes witness stand)

22             THE COURT:  So go ahead, Mr. Boies.

23             MR. BOIES:  Thank you, your Honor.

24   BY MR. BOIES:

25   Q.  Mr. Hands, as part of your regular business, do you have

0aj1ter5

1  necessity to try to value or have a sense of value of the

2  businesses that you're running?

3  A.  I do.

4  Q.  And why is that?

5  A.  Because when we -- obviously we buy or sell businesses, we

6  have to have a view of their value in terms of determining what

7  we can do with those businesses.  So we look at all our

8  businesses on a pretty regular basis and say, based on the

9  information we have, what do we think they're worth.

10         THE COURT:  But now don't you make that determination

11  only after you've had a whole slew of people look into the

12  matter?

13         THE WITNESS:  No.  I mean, I -- I tend to try and come

14  to a rough view very much based on a -- a few -- a few numbers.

15  It's not -- it's not particularly difficult.  You want to run

16  as many numbers as you can to get a thought for that, but, you

17  know, as the person at the end of the day who has to make --

18  who has more responsibility for the decision whether to buy it

19  than anyone else, I oftentimes take my own view.

20         THE COURT:  Okay.  Go ahead, Mr. Boies.

21  BY MR. BOIES:

22  Q.  And do you have experience in valuing businesses for

23  purposes of determining whether you should try to acquire them

24  and, if so, at what price?

25  A.  Yes, I do, over many years.

Oaj1ter5

1   Q.  Is that something that you did, not only in your capacity

2   as the head of Terra Firma but when you were employed by other

3   companies as well?

4   A.  I did.

5   Q.  And can you give the Court some examples of that.

6   A.  If you take, say, for example, the holdings that we bought

7   at Normura, back in those days we didn't have a whole slew of

8   people to do the valuation, so what we had to do is come to a

9   view, so we wanted to know some pretty basic things -- what was

10  the property worth, what were the earnings of the company, what

11  we think we could raise in debt, what cash flow did that leave,

12  and, based on that, what did we feel the company was worth,

13  company's value was.

14  Q.  And in the operation of your businesses, I take it you

15  receive information from a lot of other people; is that

16  correct?

17  A.  That is correct.

18  Q.  You also try to make your own judgment to what a business

19  is worth.

20  A.  Absolutely.

21  Q.  Why is that?

22  A.  Well, because people are often working from reasonably

23  complex numbers and they can get buried in detail.  What I'm

24  trying to do is very much more, and so what do I think this is

25  worth on a -- just a -- a view, which is based on how I see

0aj1ter5

1    businesses being bought and sold.

2        THE COURT:  All right.  Voir dire from the defense?

3        MR. WELLS:  I'm sorry, your Honor.  I'm just --

4        (Pause)

5        (Discussion off the record)

6        THE COURT:  Of course Mr. Boies is a New York lawyer,

7    he's, of course, soft spoken, as we all are, but Mr. Boies and

8    Mr. Hands, you need to speak louder.

9        MR. WELLS:  Can Mr. Baughman ask the voir dire?

10        THE COURT:  Absolutely.

11        MR. BAUGHMAN:  Thank you.

12   VOIR DIRE EXAMINATION

13   BY MR. BAUGHMAN:

14   Q.  Mr. Hands, is the valuation you have in mind written down

15   anywhere?

16        THE COURT:  What's the relevance of that?

17        MR. BAUGHMAN:  Your Honor, under 701, if the -- the

18   opinion is being offered under 701, it has to be rationally

19   based on his perception.  I want to understand if this is based

20   on anything he's looked at.

21        THE COURT:  Why does it matter whether it's written

22   down or not?

23        MR. BAUGHMAN:  Okay.  Well, he said he had -- all

24   right.  Let me ask --

25        THE COURT:  If the owner of a business came in here

0aj1ter5

1    and said, "My business, in my view, is worth X," he wouldn't

2    have had to write it down in order for it to be admissible.  So

3    the purpose of voir dire is to put questions that go to

4    admissibility.

5            MR. BAUGHMAN:  I understand, your Honor.  Let me ask a

6    different question.

7    BY MR. BAUGHMAN:

8    Q.  Mr. Hands, you said that your view was based on a couple

9    of -- a limited number of -- a limited set of numbers; correct?

10   A.  You take some high -- high -- high value numbers and from

11   that you can do it.

12   Q.  What are the categories of numbers you're referring to?

13   A.  We bought the business based on EBIDTA projections.  We now

14   know what the EBIDTA actually was for the year, and we know

15   where the business multiples were then and we know where the

16   multiples are today.  It's a pretty simple conversation.  I

17   mean, the only way of looking at two things, which are varied

18   in terms of --

19           THE COURT:  I'm sorry.  Is this your opinion as to

20   what it's worth today or what it was worth then?

21           THE WITNESS:  I can do it on both.

22           THE COURT:  Well, which one, Mr. Boies, are you

23   seeking to elicit?

24           MR. BOIES:  I was going to ask him on both, your

25   Honor.  I think --

0aj1ter5

1          THE COURT:  Okay.

2          MR. BOIES:  For his opinion for what it was worth in

3    2007, that is probably the relevant measure, although in

4    English law, I think there's an argument as to both.  So I

5    would ask as to both.

6          THE COURT:  All right.

7    BY MR. BAUGHMAN:

8    Q.  Mr. Hands, isn't it true that every year the people at EMI

9    do a valuation as to what the business is worth which is

10   presented to the owners of Maltby?

11   A.  Speaking as to EMI, I think we get valuations done by the

12   auditors.  Actually, you're right.  Maybe Maltby does as well.

13   But that's a -- that's not necessarily what it's worth.  That's

14   a valuation that they come to the conclusion on.  When I'm

15   talking worth, I'm saying, where will that business be selling

16   at in a normal market.

17   Q.  Isn't it true that in January of this year Julie

18   Williamson, direct of Maltby, had to sign off on a valuation of

19   what the company was worth?

20   A.  Yes, for -- for that basis, yes.

21   Q.  Did you review that document?

22   A.  I was talked through it, yes.

23   Q.  Do you know what it said?

24   A.  I can't remember, sitting here, no.

25   Q.  And that's the official valuation that is performed by

0aj1ter5

1   Maltby, the owner of EMI; right?

2   A.   That's an official valuation, yes.

3   Q.   Okay.  And that's the one that is presented to the

4   shareholders or the owners of -- the investors in the Terra

5   Firma companies; correct?

6   A.   That's correct.

7            MR. BAUGHMAN:  Nothing further, your Honor.

8            THE COURT:  Well, I don't really understand that voir

9   dire and the relevance of any of the voir dire.

10           But what was the value of EMI at the time of your

11  acquisition in 2007?

12           THE WITNESS:  If there had not been a competitive

13  auction, my view, the share price would have been below 200

14  and --

15           THE COURT:  And how did you compute that?

16           THE WITNESS:  Because the share price ran up to around

17  about 240 in the belief there was an auction, and our view --

18  my view is without that competitive tension, the share price

19  would have run back down to roughly 200.

20           THE COURT:  So this is based on your belief as to what

21  the market would have done but for the auction.

22           THE WITNESS:  Correct.

23           THE COURT:  Okay.  I'm not going to permit that.

24  That's far too speculative.  So though I'm mystified by the

25  voir dire, I sustain the objection.

0aj1ter5

1          MR. BOIES:  Your Honor, can I approach the question

2   one more time, because I think there may be a dual question

3   evaluation that's going on here.  One -- and I don't want to

4   put words in the witness' mouth.  I'd like to ask him.

5          THE COURT:  I think it would be within his experience

6   to say, if he can truthfully testify to this, that he has

7   observed price patterns with or without auction and how the

8   auction, in his opinion, in his view, his perception, has

9   affected, but not in monetary terms, not in specifics.  I'm not

10  going to allow that.

11         MR. BOIES:  I have more in terms of going back --

12  excuse me.  I have more in terms of going back to the EBIDTA

13  and multiple and cash flow analysis.

14         THE COURT:  But that's not what he gave.  He just gave

15  me something different.

16         MR. BOIES:  I know he did, and I think both of

17  those -- I think both of those are ways that he would value it,

18  but I think what he said in response to the earlier questions

19  of the Court --

20         THE COURT:  Well, let me hear the questions you would

21  put on in that alternative approach.

22  BY MR. BOIES:

23  Q.  In terms of valuing the business from the standpoint of

24  what you would buy it for or expect to buy it for in the

25  absence of an auction, or expect to sell it for, what factors

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter5

1   would you look into?

2   A.   If one was trying to come to a rough valuation, we would

3   take the EBIDTA and the multiples of businesses at that time of

4   that type that were trading.  At the time expected earnings

5   were around 300 million and the multiples were around about 13,

6   you'd end up with a price of around about 4 billion.

7        However, knowing what we now know, the actual earnings

8   were about 170, and keeping multiples the same, you'd end up

9   with a price of somewhere just north of 2 billion, about

10  somewhere about 2.3, 2.5 billion.  If you go forward to date,

11  multiples have come down substantially.  They're probably

12  around 6 times, so with 300 million of earnings today, the

13  business would be worth about 1.8 billion.

14       THE COURT:  Yes.

15       MR. COHEN:  Your Honor, if I could be heard.  This is

16  getting closer and closer to expert opinion.  I mean, they have

17  an expert, Ms. DeMario, if she's allowed to testify, who's

18  going to testify what the appropriate multiples were, what her

19  EBIDTA calculations are.  Maybe they're concerned that she's

20  not going to get to testify, but they've chosen a damages

21  expert.  I mean, we're now -- Mr. Hands has that -- we would

22  have gotten an opinion, we would have rounded up the market

23  evidence.  This opinion is not necessarily the same as

24  Ms. DeMario's.  He's giving expert opinion.  I'm not -- I'm not

25  disputing what Mr. Hands says, which is that he may look at

Oajlter5

1    this in the ordinary course, but there were lots of valuations

2    that were done by his team in connection with this.

3              THE COURT:  Yes.

4              MR. BOIES:  Your Honor, can I be heard --

5              THE COURT:  Sure, of course.

6              MR. BOIES:  -- one second on that.

7              This is not a question of him substituting for

8    Ms. DeMario.  He is the owner of the business in fact.  He is

9    testifying about what his valuation is of the business.  He's

10   also testifying about how he arrives at that valuation, but he

11   has a need, as he's testified, to value the business as it goes

12   forward.  That's the business that he's in.  He's now the owner

13   of this business and has been for a period of years.  And this

14   is exactly the kind of lay testimony that I think is ordinarily

15   accepted in terms of what the value of the business is.  And --

16             THE COURT:  Well --

17             MR. BOIES:  And he has even more than the normal owner

18   because he's in the business of buying and selling companies.

19             THE COURT:  Well, those are two different things.  He

20   can testify, perhaps, to what he perceived the business to be

21   worth at the time of acquisition based on how he went about his

22   valuation.  That would be, assuming truthful testimony, a

23   historical fact that may or may not be relevant to issues in

24   this case.  I'm not admitting that; I'm just saying that's a

25   possibility.  When he's testifying to what it is now worth

0aj1ter5

1   based on the methodology that he uses for sort of

2   seat-of-the-pants valuation for acquisition purposes, that

3   seems to me to be a far less reliable measure.  This is

4   something now that, precisely because he does own the company,

5   all the specific data is fully available, available to the

6   experts in this case, available to anyone.  And therefore, his,

7   if you will, seat-of-the-pants valuation seems to me to be

8   irrelevant and potentially much too soft, for lack of a better

9   word, to meet even the minimal reliability test for admission.

10  So I'm not going to let him testify on the basis you've just

11  suggested as to its present value.  As to the value that he

12  perceived at the time of acquisition, what's he going to say on

13  that?

14        MR. BOIES:  Let me ask him.

15        THE COURT:  All right.

16        MR. BOIES:  I think he already addressed that when he

17  came up with the $4 billion figure.  But --

18        THE COURT:  I'm sorry.  Mr. Boies, you're going to

19  have to keep your voice up.

20        MR. BOIES:  I think he addressed that when he was

21  addressing the Court's prior question.

22        THE COURT:  Yes.

23        MR. BOIES:  But let me just be clear on the record.

24        THE COURT:  Yes.

25  BY MR. BOIES:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter5

1   Q.  What was the valuation that you were addressing in terms of

2   your perception at the time that the bid was being put in?

3   A.  We were working on the earnings projections for the year

4   reaching around 300 million, and we were using a multiple of

5   somewhere between around 13, 14, which gave a total value of

6   the business of about £4 billion.

7           THE COURT:  Which would work out to what per share?

8           THE WITNESS:  About 265.

9           THE COURT:  All right.  So it seems to me that

10  conceivably is relevant on redirect, depending on the nature of

11  cross, as to how he went about his own personal valuation since

12  he was the person in a controlling position at the time this

13  bid was made.  So I may permit that on redirect, depending on

14  the cross, but not at this time.

15          All right.  Counsel, come to --

16          MR. BOIES:  Your Honor?

17          THE COURT:  Yeah.

18          MR. BOIES:  I'm focusing just on direct right now.

19          THE COURT:  Yes.

20          MR. BOIES:  But on direct, without asking him for the

21  ultimate valuation, can I bring out the way -- the factors that

22  he would have applied, that is, EBIDTA and multiple approach to

23  valuation?

24          THE COURT:  Yes.

25          MR. BOIES:  Thank you.

Oaj1ter5

1          THE COURT:  All right.  Counsel, come to sidebar.

2          (At the sidebar)

3          THE COURT:  So on the one hand, juror number 5, we

4     have good news in that department.  My courtroom deputy very

5     politely said we were a little concerned whether he was fully

6     focused, and he said that he promises us that he has been

7     totally attentive and focused, that he has problems sitting for

8     long periods, and so what I have been perceiving is, he

9     suspects, just a lot of moving around to try to, you know, have

10    movement when, you know, he doesn't want to get up and walk

11    around, so to speak.  So I think, you know, we'll continue to

12    monitor the situation, but based on those reassurances, I think

13    we don't have to do anything further at this time.

14          But with every good news there's bad news.  So we got

15    this note from juror number 4, who is the woman who is a

16    Sabbatarian.  I'll read it into the record.  We've marked it as

17    jury note number 1:

18          "I miscalculated the time of sundown on the upcoming

19    Fridays.  Last bus to Monsey leaves Wall Street/Trinity

20    Exchange Place at 2 p.m.  If I were to be excused at 1:45 p.m.,

21    I would greatly appreciate it.  I apologize for any

22    inconvenience this may cause the Court.  Thank you.  Juror

23    number 4."

24          Now we have made a pledge to this jury to keep this

25    trial within three weeks, and now we'd be losing a whole half

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter5

1   day.  It's one thing to lose an hour and a half; it's another

2   thing to lose a whole half day.  On the other hand, it occurred

3   to me that what we might be able to do, if the other jurors

4   were willing, was, we already provide them with a midmorning

5   snack.  We could provide them with a second snack and sit till

6   like 1:30 on Fridays and therefore not lose this juror because

7   we make up the time effectively.  So with counsel's permission,

8   I don't want to embarrass any juror by doing this here in the

9   courtroom, but I'll have my courtroom deputy at the end of the

10  day or first thing tomorrow put that question to the other

11  jurors and see if that's agreeable to them.

12          MR. WELLS:  That's fine.

13          MR. BOIES:  That's agreeable to us.

14          (Pause)

15          (In open court)

16          THE COURT:  All right.  So counsel, my courtroom

17  deputy talked to the jury and they're agreeable to that

18  arrangement for the schedule on Friday.  And I need to also

19  tell you that we can only go to about 4:15 today.  There's a

20  group of Chinese judges who are coming by to watch a

21  sentencing.  I said to them, "Oh, you should come watch a civil

22  jury trial."  They said, "We don't have juries and we've not

23  the slightest interest in that."  So we'll end at 4:15 today.

24          All right.  Let's bring in the jury.

25          (In open court; jury present)

0aj1ter5                          Hands - direct

1              THE COURT:  Please be seated.

2          So ladies and gentlemen, thank you very much for

3    working things out so we can accommodate juror number 4's

4    schedule.  So on Fridays, we'll sit to about 1:40, with two

5    short breaks, at each of which we will supply you with a snack,

6    and then you can go home at 1:40 on Fridays.

7              Also, just to remind you, this Thursday -- not every

8    Thursday, just this Thursday -- we will sit only in the

9    morning, and we'll probably end about 12:30 or so on Thursday.

10             JUROR:  Oh, okay.  Good.  Thank you.

11   BY MR. BOIES:

12   Q.  Good afternoon, Mr. Hands.

13   A.  Good afternoon.

14   Q.  I'd like to turn to the subject we addressed just before

15   the luncheon break.  At the time that the decision was being

16   made to put a bid in for EMI, what were the factors, the

17   primary factors that you looked at in determining the valuation

18   of that company?

19   A.  The two most important factors were the EBIDTA, the

20   earnings of the company, and second one was the multiples, and

21   that was where that company could trade, so a multiple of that

22   company's earnings.

23   Q.  Can you explain what EBIDTA is.

24   A.  It's earnings before interest, taxes, and depreciation, so

25   if you like, it's the purest form of what profit the company is

0aj1ter5                              Hands - direct

1   making.

2   Q.  Was there financial information that you found out about

3   the company after you purchased it that you did not know at the

4   time you put in the bid but that you could have found out if

5   you had additional due diligence and investigation?

6            MR. WELLS:  Objection, your Honor.  Leading,

7   foundation.

8            THE COURT:  Well, it's certainly leading, but I think

9   because of the way this issue was framed by both counsel on

10  opening statements, I will allow it in these circumstances.

11           You may answer.

12  A.  Yes, there was.

13  Q.  What did you find out in that regard?

14  A.  We found out a number of factors.  One which was very --

15  which was important in terms of where we would bid was, there

16  had been a settlement called the Bertelsmann settlement, which

17  was a large amount of money that EMI received, which was taken

18  to ordinary income, which they'd happened to take in ordinary

19  income, means the lenders of the company at the time, including

20  Citigroup, would have had their loan in default, and clearly

21  knowing the company was in default on its loan would have had a

22  big effect.

23           Other information which we didn't know at the time was

24  a channel stuffing.  What that is is where people overship

25  goods and book it as a profit and then, as time goes on, the

Oaj1ter5                    Hands - direct

1   goods come back to the company, and you have to reverse the

2   money.  And all companies ship more goods than they expect to

3   sell.  The problem was that EMI was shipping very substantially

4   more goods than they expected to sell, and it took a long time

5   for it to become evident just how much they were.

6          The next issue which was important was the -- the flow

7   of music through the year and with record releases, and what

8   happens was the record releases kept being put off, and

9   eventually we discovered the record releases just didn't --

10   didn't come or didn't perform the way they were meant to.

11          And the fourth -- the fourth bit of information which

12   we would have obviously liked to have had was much more

13   detailed information about each of the regions and the

14   profitability on a business-by-business basis rather than

15   consolidated up from 50 different countries and different

16   divisions.

17          So those are the -- those are the types of information

18   which would have been very important to us.

19   Q.  Now you mentioned in that answer Bertelsmann.  Is

20   Bertelsmann a company?

21   A.  Yes, it's a -- yes.

22   Q.  And is that a company that had a dispute with EMI and they

23   settled, with Bertelsmann paying EMI money?

24   A.  That is correct.

25   Q.  Let me go on to another subject.

Oaj1ter5                         Hands - direct

1      How did you view Citibank and Mr. Wormsley in

2  connection with the EMI transaction?  How did you view them in

3  relationship to Terra Firma and to you?

4  A.   I viewed them as -- I viewed David as my advisor, my -- my

5  banker, person -- person who was advising me what to do.  I

6  viewed Citigroup as advising us on the financing.  They had

7  obviously extensive knowledge of EMI, having worked with EMI

8  for a large number of years and been the banker for EMI.

9  Q.   And was Citibank paid for that financing advice, or

10  financing service?

11  A.   Yes, the financing service, they got into the hundreds of

12  millions of dollars.

13  Q.   Now I'd like to ask you to look at a document.

14           MR. BOIES:  Could we hand out -- we've got a binder.

15  With the Court's permission, we'll give one to counsel and the

16  Court as well.

17           THE COURT:  Okay.

18           MR. SHERMAN:  May I approach, your Honor?

19           THE COURT:  Yes.

20  Q.   Mr. Hands, I'd like you to turn to the tab in your binder

21  which is marked 846, which is a copy of Plaintiff's

22  Exhibit 846.

23  A.   Yes, I found that.

24  Q.   And do you recognize that document?

25  A.   It's an e-mail sent on my behalf.

0aj1ter5                    Hands - direct

1   Q.  And to whom was it sent?

2   A.  It was sent to -- I'm not going to pronounce this name

3   correct, but Francois Van Der Spuy, copied to the Terra Firma

4   team.

5   Q.  And was this -- this was sent on or about June 27th,

6   2007; is that correct?

7   A.  That is correct.

8            MR. BOIES:  Your Honor, offer 846.

9            MR. WELLS:  No objection.

10           THE COURT:  846 is received.

11           (Plaintiff's Exhibit 846 received in evidence)

12  Q.  Now I'd like to direct your attention to the first sentence

13  there where it says, "Clearly you will have seen the total

14  collapse of the US credit market, particularly securitised

15  products."  Do you see that?

16  A.  I do.

17  Q.  Did that have any significance to the EMI situation we've

18  been talking about?

19  A.  Yes, it did.

20  Q.  What is that significance?

21  A.  The major significance of it was that the debt that Citi

22  had underwritten could not be placed in the market, and as

23  importantly, because it couldn't be placed, EMI was locked into

24  a transaction on the debt side, which wasn't optimal for either

25  of us.

0aj1ter5                    Hands - direct

1    Q.   In terms of the timing of the acquisition of EMI, did this

2    have any significance in terms of whether you would have been

3    able to purchase EMI if you had not put in a bid at or about

4    the time that you did?

5    A.   Yes.   Once the markets collapsed, you had no chance of

6    being able to purchase the company.   They collapsed -- collapse

7    really started in the States and reached Europe within a few

8    weeks of the bid.

9    Q.   Let me -- let me turn next to when you discovered that

10   Cerberus had not put in a bid.

11         When -- in terms of your recollection, when is the

12   first time you recall that issue being raised with you?

13   A.   At the -- the first time I recall it in terms of a

14   conversation, when I can recall a conversation existing, was

15   with Roger Ames in -- that would be in probably third quarter

16   2007.   Now why I -- why I was discussing it with Ames, I can't

17   remember, but I think it was probably due to an e-mail, which

18   I've seen since, which I received prior to that, but I had a

19   conversation with Roger Ames, it was a touchy-feely

20   conversation about a large number of topics.   We were

21   considering him to be CEO of the company.   And I came out of

22   the conversation with Roger feeling very uncomfortable.

23   Q.   And let me see if I can find that e-mail that you're --

24   that you're referring to.

25         But did you say that you were considering him for a

1   position with the company?

2   A.  We were.  I mean, he --

3   Q.  Which company was that?

4   A.  This is EMI.  He was head of North America, where he was

5   number two to Eric Nicoli.  Eric Nicoli left before we

6   bought -- before we took over the company, and therefore we

7   needed a CEO, and he was the most obvious person to become CEO,

8   but we needed to determine -- I needed to determine whether he

9   was someone we could work with, trust, and felt appropriate to

10  run the business.

11  Q.  What did you do when you received the information that

12  possibly Cerberus did not put in a bid?

13  A.  I spoke to Tim Pryce and asked Tim Pryce to look into it.

14  Q.  And when did Mr. Pryce report back to you?

15  A.  I think he -- the first time he came back to me with

16  something definitive on --

17          MR. WELLS:  Your Honor, I'm going to object in terms

18  of "something definitive."

19          THE COURT:  Well, I think that phrase is a little

20  vague.  Mr. Boies, why don't you ask some clarifying questions.

21          MR. BOIES:  Yes.

22  Q.  First let me just ask you, without putting the definitive

23  qualification on it, when is the first time that you recall

24  Mr. Pryce reporting back to you with respect to the results of

25  that investigation?

Oaj1ter5                          Hands - direct

1   A.   The first time he gave me sort of what I described as an

2   interim report would be about June to -- roughly middle of

3   2008.

4   Q.   Middle of 2008, did you say?

5   A.   Yeah, that would be correct.

6   Q.   Now subsequent to that time did you have negotiations with

7   Citibank?

8   A.   Yes.  I mean, we negotiated with Citibank pretty well from

9   when the deal closed.

10  Q.   Now in the course of those negotiations did you accuse

11  Citibank of fraud, using those words?

12  A.   No.  I never used those -- those words.

13  Q.   Why not?

14  A.   I mean, if you accuse someone of fraud, it's really game

15  over in terms of conversations, and we were relying on Citi, as

16  banker to the company, and it's like, you know, putting a stick

17  in a dragon.  You can't do that.  It's the last thing you can

18  do.

19  Q.   Were you reluctant to bring this lawsuit?

20  A.   I was very reluctant.

21  Q.   Why?

22  A.   You know, from a business point of view of Terra Firma, the

23  reality is, our business relies on banks.  Suing your banker is

24  something you would only do as a very, very last resort.

25          Addition -- additionally, we had the issue of, with

Oaj1ter5                    Hands - direct

1   EMI, you've got the employees, the artists in EMI, and you

2   bring a -- a lawsuit, it makes any form of other negotiation,

3   you know, very, very difficult indeed.

4           On a personal, personal level, you know, David

5   Wormsley is someone who's a friend; someone who we'd worked

6   with very successfully over a very, very large number of years,

7   and to, you know, sue someone who is a friend and you've worked

8   with successfully is a difficult, difficult thing.

9           At the end we reached the point where negotiations

10  with Citi weren't going to get anywhere, and at that point

11  you've got an obligation to your investors, the pension funds

12  and down to the rest of the bus, and I came to the conclusion

13  that we had no alternative in those circumstances.

14  Q.  Now you testified that you considered David Wormsley to be

15  a trusted advisor.  Let me ask you to look at a document that

16  is already -- I believe it's already admitted, but if not, I

17  will offer it.  Plaintiff's Exhibit 1.

18          MR. BOIES:  Your Honor, I offer Plaintiff's Exhibit 1.

19  A.  Is it in here?

20          MR. BOIES:  I don't think there's an objection to the

21  document.

22          THE COURT:  Any objection?

23          MR. WELLS:  No objection, your Honor.

24          THE COURT:  Exhibit 1 is received.

25          (Plaintiff's Exhibit 1 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Oaj1ter5                    Hands - direct

1   Q.  This is an e-mail from David Wormsley to Mr. Nicoli.  And

2   you've identified Mr. Nicoli as EMI's CEO at the time that you

3   were bidding for EMI; correct?

4   A.  That's correct.

5   Q.  And this is a -- it's dated 12:00 a.m. on Monday,

6   May 21$^{st}$, 2007.  And that would be Sunday midnight; is that

7   correct?

8   A.  That is correct.

9   Q.  And you testified earlier that you had had a call with

10  Mr. Wormsley shortly before midnight; do you recall that?

11  A.  I do.

12  Q.  And you testified that he told you various things,

13  including not to play games on price?

14  A.  He did.

15  Q.  And this is an e-mail that he wrote a few minutes after

16  that call, to Mr. Nicoli.  "Just had a call from GH.  He is

17  going to credit at 6 a.m. and hopes to get something to you by

18  9."

19          Did you tell Mr. Wormsley that you were going to

20  credit at 6 a.m. and hoped to have something to EMI by 9:00?

21  A.  I did.

22  Q.  And what is meant by going to credit?

23  A.  It's effectively the final approval we needed.  He's mixing

24  credit, you know, which you have in a bank, with committee,

25  which is what we had in Terra Firma.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0aj1ter5                    Hands - direct

1   Q.  And he then goes on to say to Mr. Nicoli, "I reinforced the

2   point that he should not play games on price."  Do you see

3   that?

4   A.  I do.

5   Q.  At the time that you were dealing with Mr. Wormsley, did

6   you have any idea that he was reporting back to Mr. Nicoli on

7   his conversations with you?

8   A.  No, none.

9   Q.  If you had known that, would you have continued to rely on

10  information he was giving you?

11  A.  I mean, not in this way, no.

12  Q.  We've now located the e-mail that you had referred to, and

13  I want to show you that.  That's Plaintiff's Exhibit 3.

14          MR. BOIES:  Which I will offer.  No, I'm sorry.

15  That's a different -- that is not the e-mail that I thought it

16  was.  However, I would like to offer it anyway.  This is not

17  the e-mail that you mentioned before.  But this is an e-mail

18  that I want to offer.

19          MR. WELLS:  Your Honor, I would object.  This is --

20  this e-mail cannot come in through Mr. Hands.

21          THE COURT:  So you're objecting on the grounds of

22  hearsay.

23          MR. WELLS:  Yes, sir.

24          MR. BOIES:  Let me try to ask a couple questions, your

25  Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Oaj1ter5                          Hands - direct

1            THE COURT:  All right.

2    BY MR. BOIES:

3    Q.  You have Exhibit 3 in front of you; do you not, sir?

4    A.  I do.

5    Q.  And do you see the e-mail from Paul Simpkin to you dated

6    September 17th, 2007?

7    A.  I do.

8    Q.  With copies to a number of people at Citibank?

9    A.  I do.

10   Q.  As well as Tim Pryce and Michael Slattery and some others;

11   do you see that?

12   A.  I do.

13   Q.  Did you receive this e-mail on or about September 17th,

14   2007?

15   A.  I did.

16            MR. BOIES:  I would again offer the document, your

17   Honor.

18            THE COURT:  Who is Mr. Simpkin?  Mr. Hands, who is

19   Mr. Simpkin?

20            THE WITNESS:  Sorry.  He was the person at Citigroup

21   in London who was negotiating on the debt --

22            THE COURT:  Ah.  Okay.

23            THE WITNESS:  -- for Citigroup.

24            THE COURT:  All right.  Now that I know that, any

25   other objection?

Oaj1ter5                      Hands - direct

1          MR. WELLS:  Well, he will be able, your Honor, only to

2     get in the one where he was copied.  This is a whole string of

3     e-mails.

4          THE COURT:  Yes, that's correct.  Well, I take it

5     you're offering that e-mail.

6          MR. BOIES:  Your Honor, this entire e-mail string was

7     presented -- presented to us by Citibank as a single document.

8     This is a document produced from Citi's file.

9          THE COURT:  Was there an objection raised to this in

10    the pretrial order?  I don't have it in front of me.

11         MR. WELLS: · Yes.

12         THE COURT:  And the objection was hearsay?

13         MR. WELLS:  Yes.

14         MR. COHEN:  I believe it's 401, 403, your Honor.

15         THE COURT:  401?  401 and 403?

16         MR. COHEN:  Yes, sir.

17         THE COURT:  I can't imagine what the 403 objection

18    was.  But anyway -- and 401 is relevance.  So if that's the

19    objection, the objection is overruled.  Exhibit 3 is received.

20         (Plaintiff's Exhibit 3 received in evidence)

21    BY MR. BOIES:

22    Q.  Let me direct your attention to the second page of this

23    exhibit.  Up at the top, do you see where it refers to Cerberus

24    as a bidder for EMI in May?

25    A.  I do.

0aj1ter5                    Hands - direct

1   Q.  And when you received this on September 17$^{th}$, 2007, did

2   this confirm for you that Cerberus had in fact been a bidder

3   for EMI in May?

4   A.  It would have, yes.

5          MR. WELLS:  Objection, your Honor, to the "it would

6   have."  Did it or did it not?

7   Q.  I adopt Mr. Wells' question, Mr. Hands.  Did it confirm

8   that for you?

9   A.  Yes.

10  Q.  Did you ever receive any explanation from anybody at

11  Citibank as to why they were saying in September, months after

12  the bidding had been over and Cerberus had not put in a bid,

13  that Cerberus had been a bidder for EMI in May?

14  A.  No.  I presumed they were telling the truth.

15         MR. BOIES:  We have now found the other e-mail that I

16  thought this was, which is in the back of the binder, and it's

17  under DX CA, and CA refers to a Citigroup exhibit.  And again,

18  I believe this one has been offered.  I believe it's in.

19         MR. WELLS:  I don't have any objection.  We have no

20  objection.

21         THE COURT:  All right.  So I don't think it's been

22  offered previously.  So Citi Exhibit CA is received.

23         (Defendant's Exhibit CA received in evidence)

24  Q.  And if you go to the second page, at the top of the page,

25  there is a response to an e-mail that you had previously sent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    where it says, "Eric Nicoli did advise us that he/EMI had given

2    Roger Ames permission to work with Cerberus on a potential bid

3    for the company.  In the event it is my understanding that

4    whilst they did do due diligence, Cerberus never actually

5    submitted a formal offer for the business and Roger Ames

6    continued in his role in EMI."  Do you see that?

7    A.  I do.

8    Q.  And then if you go to the first page, the top e-mail, this

9    is an e-mail that is from Christine Vallance.  Do you see that?

10   A.  I do.

11   Q.  And it says, "Please see two responses attached from

12   Stephen Alexander and Stephen Seymour to Guy's e-mail below.

13   Guy asked that these were also forwarded to the Dice team."  Do

14   you see that?

15   A.  I do.

16   Q.  And did you ask Christine Vallance to forward that e-mail,

17   or those e-mails?

18   A.  I'm sure I did.

19   Q.  And who is Christine Vallance?

20   A.  Christine Vallance was my assistant.

21   Q.  I have just one more subject, Mr. Hands.

22           Let me ask you to look at Exhibit 30, which is in your

23   binder.  Is this an e-mail which you received on or about

24   October 23, 2006 from David Wormsley?

25   A.  It is.

0aj1ter5                          Hands - direct

1            MR. BOIES:  Your Honor, I would offer Exhibit 30.

2            MR. WELLS:  No objection.

3            THE COURT:  Received.

4            (Plaintiff's Exhibit 30 received in evidence)

5     Q.  Now first, can you tell me in general what was going on

6     with Mr. Wormsley and Citibank at this time, that is, the time

7     of October 23, 2006.

8     A.  Mr. Wormsley was working for us in terms of trying to

9     effectively find a solution, with Citibank, to find a way that

10    we could agree re fees on the Rotara (ph) transaction.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0AJ3TER6                    Hands - direct

1    BY MR. BOIES:

2    Q.  Let me ask you to look at the third paragraph, the next to

3    last sentence, that says:  You may be surprised.  Mr. Wormsley

4    writes you:  You may be surprised to hear that, within Citi,

5    Terra Firma is one of the examples we hold up of how, as a

6    group, we have consistently put the client before our own

7    interests and made the whole organization work for the client.

8            You see that?

9    A.  I do.

10   Q.  What effect, if any, did that statement have on your view

11   of Citibank and Mr. Wormsley?

12   A.  It made me feel very positive towards both.  And have a

13   view that they would constantly work for us, as the client, and

14   you know, put -- put -- put our interests at number one.  And

15   that they would only advise us to do stuff which they felt was

16   appropriate and sensible.

17   Q.  Let me ask you to turn to Plaintiff's Exhibit 29.  Is this

18   a e-mail that you received from Mr. Wormsley on or about

19   November 7, 2006?

20   A.  It is.

21   Q.  Does this e-mail also relate to the subject of the DAIG

22   fees?

23   A.  Yes, it does.

24   Q.  Let me ask you to look at the second paragraph, the first

25   sentence.

0AJ3TER6                        Hands - direct

1          MR. BOIES:  Can we put it on the board?  29?

2   A.  The second sentence is more broad than Deutsche Annington.

3   Q.  Can you say that again?

4   A.  The initials DAIG stand for Deutsche Annington.

5   Q.  Would you explain what that related to?

6   A.  Deutsche Annington is a housing company in Germany that

7   rents moderate cost housing to people.

8   Q.  What was the issue with respect to DAIG?

9   A.  The issue looks -- to the best of my memory was on the debt

10  fees that Citigroup should get paid.

11  Q.  So you were negotiating with Citi as to how much to pay

12  Citi, is that right?

13  A.  That is correct.

14          MR. BOIES:  Your Honor, I apologize because I think I

15  got ahead of myself.  I don't think I offered this exhibit.

16  I'd offer this exhibit.

17          MR. WELLS:  No objection.

18          THE COURT:  What is the number?

19          MR. BOIES:  This is 29.

20          THE COURT:  29.  29 is received.

21          (Plaintiff's Exhibit 29 received in evidence)

22  Q.  Now let me ask you to look at the first sentence on the

23  second paragraph where it says:  To start, please understand

24  that the reason for coming up with the proposal is to

25  demonstrate to you and Terra Firma that we see you as one of

0AJ3TER6                    Hands - direct

1   our closest relationships in Europe and are prepared to invest

2   and commit to that relationship.

3            You see that?

4   A.  I do.

5   Q.  Again, what was your reaction to statements such as that?

6   A.  A belief that they were happy to invest and commit to the

7   relationship and that they would work and do everything they

8   could for us to, you know, have our business successful.

9   Q.  Let me show you just one more of these which is Plaintiff's

10  Exhibit 31.

11           MR. BOIES:  Which I would offer.

12           MR. WELLS:  No objection.

13           THE COURT:  31 is received.

14           (Plaintiff's Exhibit 31 received in evidence)

15  Q.  If we just look at the top of that.  This indicates that

16  this is an e-mail from Mr. Wormsley to you November 15, 2006.

17  Is that correct?

18  A.  It is.

19  Q.  He says:  I know it may seem strange to advise you how to

20  handle the banks, but I am incapable of not trying to get you

21  to the best possible outcome.

22           You see that?

23  A.  I do.

24  Q.  Did that affect your judgment as to whether or not you

25  could trust and rely on statements that Mr. Wormsley made to

Case: 11-126    Document: 88    Page: 351    04/25/2011    273026    401

A-13150

0AJ3TER6                         Hands - direct

1    you?

2    A.  It did.

3           MR. BOIES:  Your Honor, I have no more questions.

4           THE COURT:  All right.  Cross-examination.

5           MR. WELLS:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. WELLS:

8    Q.  Mr. Hands, you testified on direct that you recalled

9    meeting with Eric Nicoli on Sunday, May 7, or May 6.  Is that

10   right?

11   A.  That is correct.

12   Q.  You testified that before you met with Mr. Nicoli, you had

13   had a meeting with Mr. Wormsley, correct?

14   A.  I don't think that's what I said, no.

15   Q.  You said you had talked to Mr. Wormsley before you met with

16   Mr. Nicoli, do you recall that?

17   A.  I did say I talked to him.  I didn't say I had a meeting.

18   Q.  Okay.  Do you recollect as you sit there now whether it was

19   a meeting or a telephone call?

20   A.  I would presume it was a telephone call.  I don't remember

21   a meeting.

22   Q.  Okay.  You testified that during that telephone call with

23   Mr. Wormsley, which took place before your meeting with

24   Mr. Nicoli, on Sunday, May 6, that you and Mr. Wormsley talked

25   about a number of items, correct?

0AJ3TER6                     Hands - cross

1    A.  I said there could be one call or several calls.

2    Q.  These calls preceded your meeting with Mr. Nicoli, right?

3    A.  Yes.

4    Q.  During the one call or several calls, before you ever met

5    with Mr. Nicoli, you said you and Mr. Wormsley had had

6    discussions, and during one of those discussions, Mr. Wormsley

7    had told you that there was an indicative bid price of 262 by

8    one of the bidders, right?

9    A.  That is correct.

10   Q.  During that conversation, did Mr. Wormsley identify the

11   name of the bidder?

12   A.  I'm not sure.  I don't -- I don't -- I don't know.

13   Q.  You have no recollection of that, correct?

14   A.  As I sit here today, I just can't remember, no.

15   Q.  In addition to identifying that there was a bidder who had

16   an indicative bid price of 262, you also said you and

17   Mr. Wormsley discussed financing, is that right?

18   A.  We discussed the fact that Terra Firma to bid would need to

19   have financing, yes.

20   Q.  You discussed the fact -- withdrawn.

21         Mr. Wormsley told you in the context of that

22   discussion about what Terra Firma would need with respect to

23   financing, that Citi would be willing to discuss with you the

24   provision of such financing, right?

25   A.  That's -- that's correct, yes.

0AJ3TER6                          Hands - cross

1    Q.  You also said in one of those discussions that took place

2    before your meeting with Mr. Nicoli on Sunday, May 6, that you

3    and Mr. Wormsley discussed the fact that Terra Firma should put

4    in an indicative bid of 2.65.  Is that right?

5    A.  We discussed what was going to get us into the auction,

6    yes.

7    Q.  What you were going to send to EMI based on your

8    discussions with Mr. Wormsley prior to the time you met with

9    Mr. Nicoli, it was an indicative bid at 2.65?

10   A.  We discussed the price level which would be attractive yes.

11   Q.  And the decision was, as you testified on direct, that you

12   should submit an indicative bid of 2.65, right?

13   A.  The actual decision to submit the indicative bid would have

14   taken place after the meeting with Nicoli.  The decision in

15   terms of working out what we would need to pay to get some

16   interest from the company was before.

17   Q.  Well, I am going to read from a rough transcript, and I

18   apologize.  We don't have a final.  But you said on direct that

19   during your discussions with Mr. Wormsley, it took place before

20   you ever met with Mr. Nicoli, that you and Mr. Wormsley decided

21   you came up -- "we came up with an indicative bid of 2.65."  Do

22   you remember that testimony?

23   A.  Yeah, that's correct.

24   Q.  You and Mr. Wormsley had a discussion and in the context of

25   that discussion, "we came up with an indicative bid of 2.65"?

0AJ3TER6                    Hands - cross

1          MR. BOIES:  Objection, your Honor.  I think he needs

2     to see the whole answer.  The first time he said it, it was

3     right.  The second time he said it, it was not.

4          THE WITNESS:  Can I see the whole answer?

5          THE COURT:  Well, I am not sure any of this is a

6     proper question.  He indicated in response to the last question

7     that he agreed with what you said in the last question.  Why

8     don't you put a follow up on that.

9  Q.  You and Mr. Wormsley discussed first that there was another

10    bidder who had put in an indicative bid at 2.62, right?

11 A.  Correct.

12 Q.  Then, based on that fact, the two of you decided that Terra

13    Firma should put in a bid, an indicative bid of 2.65, right?

14 A.  No.  I don't think that's what I said.  Based on that fact,

15    we decided if we were going to get into the auction, then a bid

16    of 2.65 was the level at which we would need to bid.

17 Q.  So you and Mr. Wormsley decided in the context of those

18    discussions, that if you got into the auction, the level you

19    would need to bid in terms of an indicative bid would be 2.65?

20 A.  If we were going to get into the auction, yes.

21 Q.  Right.  Okay.  Now, I put up on the board, I just want to

22    put up on an easel the things you say that you talked with

23    Mr. Wormsley about before you ever met with Mr. Nicoli on -- on

24    May 6, 2007.

25         THE COURT:  There's such limits to a legal education.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case: 11-126   Document: 88   Page: 355   04/25/2011   273026   401

A-13154

OAJ3TER6                          Hands - cross

1            MR. WELLS:  And I think he is an engineer by training.

2            MR. BAUGHMAN:  My mother would be so proud.

3            THE COURT:  Mr. Wells, we were going to give the jury

4     a break, quick midafternoon break.  Maybe this is the right

5     time.  So, I do want to hold it to just 10 minutes because we

6     have to end at 4:15 today.  So just a 10 minute break.

7            (Recess)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present).

2          THE COURT:  I wanted to mention one little thing which

3      is maybe totally out of place, but that's never stopped me.   In

4      some of the press coverage of this case, there has been a

5      suggestion that the nature of the case is too complicated for a

6      jury to understand.  And this touches a sensitive cord with me,

7      because in the 15 years I've been a judge, either I or my law

8      clerks have talked to the jury after each and every jury trial,

9      civil and criminal, and as a result of that, I've become a huge

10     fan of the jury system.

11         And my experience is that most cases, including this

12     one, come down largely to credibility contests.  That a jury of

13     everyday folks with everyday experience are supremely gifted in

14     ascertaining who is telling the truth and who is not, greatly,

15     greatly assisted in that case by able counsel and the virtues

16     of the adversary system.

17         And while it could with truth be said that some of the

18     evidence in this case is boring, none of it, in this Court's

19     view, is remotely beyond the ken of any one of our jurors, let

20     alone all nine.

21         So, I with apologies to all concerned, including the

22     very able members of the Fourth Estate who have been kind

23     enough to be here, I really think it is a misunderstanding to

24     think that this jury or any jury can't very, very ably follow

25     and decide this case.

OAJ3TER6                    Hands - cross

1          But, I will get off my soapbox now and let's continue

2    with the --

3          MR. BOIES:  Your Honor, if Mr. Wells and I can join

4    you on that soapbox just for a moment, I think we would both

5    concur exactly with what the Court has just said.

6          MR. WELLS:  A rare moment of agreement.

7          THE COURT:  Good.  Let's bring in the --

8          MR. BAUGHMAN:  I have copies for the Court of the

9    material.

10          THE COURT:  Yes, thank you very much.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0AJ3TER6                    Hands - cross

1          (Jury present)

2          THE COURT:  Counsel.

3    BY MR. WELLS:

4    Q.  Mr. Hands, before we had our technical difficulty, I had

5    stated for the record that I had put up on a chart that I've

6    marked as demonstrative exhibit 5 for Citigroup, four items

7    that you discussed with Mr. Wormsley prior to the time you met

8    with Mr. Nicoli.  Okay?

9    A.  Okay.

10   Q.  Is that a fair description of the four items?

11   A.  It obviously depends upon what you mean by two.  But one is

12   fair.  Two is to keep each other informed.  Number three, help

13   with financing is correct.  Based on the conversation Terra

14   Firma came up with the indicative bid 265.  They're broad

15   paraphrases of them.

16   Q.  Isn't it true that the decision to put in an indicative bid

17   of 2.65 did not come from Mr. Wormsley, but came from your

18   conversations with Mr. Nicoli?

19   A.  The decision to actually go ahead and put in the bid was

20   done post seeing Mr. Nicoli.  So without seeing Mr. Nicoli,

21   there was -- we would not have put a bid in.  The question of

22   understanding what sort of level we needed to bid came from the

23   conversations with David Wormsley.  There was a distinct

24   difference between the two.

25          You know, there wouldn't have been any point in having

0AJ3TER6                    Hands - cross

1   the meeting with Mr. Nicoli unless we believed we were able to

2   get to the sort of level of price we needed.  Having had the

3   meeting with Mr. Nicoli, we could then go in and put in the

4   indicative letter.  We wouldn't have put the letter in without

5   having a meeting with management.  Which is one of the things

6   that isn't on that list.

7   Q.  Let me show you an e-mail that you dictated and it's marked

8   as Exhibit C, but I put a book in front of you and the book has

9   tabs.  And it is tab number seven.  Will you go to tab number

10  seven.  Do you see the exhibit marked as C?

11  A.  I do.

12  Q.  Is that an e-mail that you dictated on May 6, 2007, with

13  respect to your meeting with Mr. Nicoli?

14  A.  I have no reason to doubt it.

15              MR. WELLS:  I offer the document, your Honor.

16              MR. BOIES:  No objection, your Honor.

17              THE COURT:  C is received.

18              (Defendant's Exhibit C received in evidence)

19              MR. WELLS:  I'm going to move this.  I don't want this

20  to be in the jury's way.  Is that a problem, your Honor?

21              THE COURT:  No, that's fine.

22              A JUROR:  Now we can't see.

23              MR. WELLS:  We're back to where we were.  Keep it back

24  here.

25  Q.  Now, this e-mail was dictated by you shortly after you met

OAJ3TER6                    Hands - cross

1    with Mr. Nicoli on Sunday, May 6, right?

2    A.   That is correct.

3    Q.   It shows a time of 12:32 p.m., right?

4    A.   It does.

5    Q.   I represent to you there is a stipulation between the

6    parties that on certain e-mails, including this one, the time

7    is off by an hour.  So the time actually should be 1:32.

8    Accept my representation?

9    A.   No reason to doubt it.

10   Q.   Now, the e-mail that you dictated to your assistant in

11   which she printed out which is now Exhibit C says Dear Riaz --

12   that's Mr. Punja, correct?

13   A.   That is correct.

14   Q.   You wrote:  I had a meeting today with Eric Nicoli of EMI

15   to discuss our business plan assumptions.  He had his plan and

16   I was not given it, however I could ask questions about our

17   assumptions.  The following changes need to be made to our

18   plan.

19            Then item number one says:  Bank financing.  Citigroup

20   and Deutsche Bank are offering 2.5 billion of acquisition debt

21   and I will have a conversation with David Wormsley to firm this

22   up.

23            Now, the e-mail goes on to read at the bottom:  If you

24   could please make these changes to the business plan as soon as

25   possible.

0AJ3TER6                        Hands - cross

1        Then it states:  Next, can you please put together an

2   IAC memo for tomorrow's IAC recommending that the GP sends a

3   note to the chairman of EMI requesting access and providing an

4   indicative bid of 265 pence.

5        So, is it correct that at least on the face of the

6   memo, the reference to 2.65 does not make any mention of a

7   conversation with David Wormsley; is that correct?

8   A.  No, it doesn't mention any conversation with David

9   Wormsley.  But, I'm not quite sure --

10  Q.  Is that yes or no, please.

11  A.  The answer to that is yes, it doesn't mention any

12  conversation with David Wormsley.

13  Q.  Okay.  Now, it goes on to say:  Currently, One Equity

14  working with JP Morgan, Cerberus working with Merrill Lynch,

15  Bank of America and Roger Ames and Fortress think they are

16  working with Levi's son and possibly Levi himself have booked

17  Tuesday, Wednesday and Thursday.

18       Did you understand at the time you dictated this memo

19  that the other potential bidders were One Equity, Cerberus, and

20  Fortress?

21  A.  I must have, yes.

22  Q.  Where did you get that information from?

23  A.  I can't remember.

24  Q.  Now, if we go in your book to tab nine, which is Citi

25  exhibit E, do you see that exhibit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-13161

0AJ3TER6                    Hands - cross

1   A.  I do.

2   Q.  That is an e-mail that you were copied on, correct?

3   A.  Correct.

4   Q.  It's from a Stephen Seymour, right?

5   A.  That is correct.

6   Q.  Who was he?

7   A.  Stephen Seymour I think was an associate in Terra Firma at

8   the time.

9           MR. WELLS:  I offer the document, your Honor.

10          MR. BOIES:  No objection, your Honor.

11          THE COURT:  E is received.  You are talking about the

12  not just the e-mail, but the whole document?

13          MR. WELLS:  That's correct.

14          THE COURT:  E is received.

15          (Defendant's Exhibit E received in evidence)

16  Q.  The e-mail is dated Monday, May 7, which is one day after

17  your May 6 meeting with Mr. Nicoli, correct?

18  A.  That's correct.

19  Q.  It says:  All please find attached the Project Dice memo

20  for the GP meeting tomorrow.  Correct?

21  A.  That's correct.

22  Q.  If we go to page three of the exhibit, what we see is a

23  memo written by Mr. Punja, correct?

24  A.  I am not sure it's written.  It's from Riaz Punja, Stephen

25  Seymour --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER6                          Hands - cross

1    Q.   It's from Mr. Punja?

2    A.   Yes, from him and his team.

3    Q.   One of the things you had said in the May 6 memo that you

4    directed to Mr. Punja was that he should put together an IAC

5    memo for tomorrow's meeting, right?

6    A.   That's correct.

7    Q.   If you go to the first page it says -- still on the third

8    page, it says offer to Dice board -- I want to stay on page

9    three, Jesse, I'm sorry.

10         It says:  Based on the operating and financial

11   assumptions that have emerged through conversation between Eric

12   Nicoli, CEO of Dice, and Guy Hands, the team proposes that the

13   IAC recommends to the GP to submit an indicative bid of

14   265 pence to the Dice board.

15         Do you see that, sir?

16   A.   I do.

17   Q.   Do you agree that there is no reference in the paragraph I

18   just read to any conversations between you and David Wormsley?

19   A.   That's correct.

20   Q.   Is that right?

21   A.   That is correct.

22   Q.   In fact, what Mr. Punja and his team wrote was that based

23   on operating and financial assumptions that have emerged

24   through conversations between Nicoli and yourself, a

25   recommendation to submit an indicative bid of 265 was going to

0AJ3TER6                    Hands - cross

1   be made, correct?

2   A.  I think all he's referring to --

3   Q.  Sir, is that right in terms of what's in the document?

4   A.  It's what the document says, yes.

5   Q.  Do you recall being asked questions in your deposition

6   about this document?

7   A.  Yes.

8   Q.  Do you recall you had no recollection of the document?

9   A.  I couldn't remember the document at the time, no.

10  Q.  Do you remember the document now?

11  A.  Well, only because I saw it then.  I'm seeing it again now.

12  Q.  You were ready to give an opinion about something you do

13  not recollect.

14  A.  The opinion I was going to give was my interpretation of --

15  Q.  I don't want your interpretation.  If you have a

16  recollection, that's different.

17  A.  Okay.

18  Q.  Now, if we go to tab 10 -- withdrawn.

19          I want to go to tab 92.  It's trial exhibit Terra

20  Firma 1377.

21          MR. WELLS:  I offer the document, your Honor.  It is a

22  Terra Firma exhibit.

23          MR. BOIES:  No objection, your Honor.

24          THE COURT:  Exhibit 1377 is received.

25          (Plaintiff's Exhibit 1377 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER6                    Hands - cross

1   Q.  That is an e-mail that's dated May 15, 2007, right?

2   A.  That is correct.

3   Q.  The prior document was dated, the e-mail was dated May 7,

4   2007, right?

5   A.  That is correct.

6   Q.  So we're eight days later, correct?

7   A.  Correct.

8   Q.  And that e-mail is from Francois van der Spuy to

9   Mr. Seymour, correct?

10  A.  That is correct.

11  Q.  It's actually from Mr. Seymour to Mr. van der Spuy, I

12  misspoke.

13  A.  Sorry.

14  Q.  If we go to the next page, which is page two, what we see

15  is that someone has scrubbed this memo to delete the fact that

16  you had had discussions with Mr. Nicoli about the indicative

17  bid price, is --

18          MR. BOIES:  Objection.

19  Q.  Do you see that?

20          MR. BOIES:  Objection, your Honor, to the form.

21          THE COURT:  Well, sustained as to form.

22  Q.  Do you see where it says offer to Dice board?  You see

23  that, sir?

24  A.  I do.

25  Q.  Do you see that the reference in the prior memo to the fact

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OAJ3TER6                    Hands - cross

1    that the 265 was based on conversations between you and

2    Mr. Nicoli, that that statement has been erased from the memo

3    eight days later?

4    A.  I can see it's not in this memo, no.

5              MR. WELLS:  Jesse, can we have a split screen so we

6    can see it?

7    Q.  So Mr. Hand, you now agree, now that the both memos are up

8    on the screen, that the memo that is in as Exhibit 1377 does

9    not contain the prior reference to your conversations with

10   Mr. Nicoli, right?

11             MR. BOIES:  Objection, your Honor.  He just said that.

12   I object to the form.

13             MR. WELLS:  Fine.

14             THE COURT:  He did just say it.

15             MR. WELLS:  Okay.

16   Q.  Now, you testified in your deposition that you had no

17   recollection of why the reference to your conversation with

18   Mr. Nicoli and the decision to bid 265 had been deleted from

19   the second memo, is that correct?

20   A.  I have no understanding why, no.

21   Q.  You just don't know.  It just happened.  You don't have any

22   idea.  Right?

23   A.  I have no idea.

24   Q.  Okay.  Now, I want to go to the complaint that you filed --

25   withdrawn.

OAJ3TER6                    Hands - cross

1          I want to go to the complaint that Terra Firma filed

2   in this action.  The complaint was filed in December of 2009,

3   do you recall that?

4   A.  I do.

5   Q.  You reviewed the complaint, correct?

6   A.  I would have read the complaint, yes.

7   Q.  You read it before it was filed, correct?

8   A.  I presume I did.

9   Q.  You understood that when you filed this complaint, that it

10  was making very serious allegations about the integrity of

11  David Wormsley, correct?

12  A.  Yes.

13  Q.  You understood you were making very serious charges and

14  accusing Mr. Wormsley of engaging in fraud, right?

15  A.  That's correct.

16  Q.  Once the document was filed in this courthouse, it became

17  available to the press, correct?

18  A.  I presume it's a public document.

19  Q.  Yes.  In fact, right after it was filed, there were all

20  sorts of newspaper articles in London about the fact that you

21  had accused Mr. Wormsley of fraud.  Right?

22  A.  To my memory there were newspaper articles, yes.

23  Q.  You understand that Mr. Wormsley is married, right?

24  A.  I do.

25  Q.  He has children, correct?

0AJ3TER6                    Hands - cross

1    A.  Yes, I understand that.

2          MR. BOIES:  I am going to object to this line, your

3    Honor.

4          THE COURT:  Well, it was brought out I think beginning

5    with opening statements that both the principal persons

6    involved in this case are married and have children.  And I

7    congratulate them on their fertility.  But, I do think it's

8    rather irrelevant to any issue in this case.

9    Q.  Now, in that complaint, you accuse Mr. Wormsley of being a

10   liar, right?

11   A.  Of misleading me, yes, and lying, yes.

12         MR. WELLS:  Your Honor, at this time, I would like to

13   offer as an admission paragraphs 109 and 110 of the complaint

14   and also the preamble of the complaint.  I'd like to question

15   the witness about those portions of the complaint.

16         THE COURT:  Any objection?

17         MR. BOIES:  Only if there is stuff that needs to be

18   added for context, which I don't have any objection to this

19   coming in as long as we can add things that are related for

20   context.

21         THE COURT:  Okay.

22         MR. WELLS:  Jesse --

23         THE COURT:  Forgive me.  I'm sorry, counsel, go ahead.

24         MR. WELLS:  Sure.  I want to start with paragraph 110

25   and I've marked that as Citi trial exhibit A-2 and I've marked

OAJ3TER6                    Hands - cross

1   for identification -- I'm not moving in the complaint but I've

2   marked the complaint as exhibit A.

3           THE COURT:  Okay.

4           MR. WELLS:  If we could first display the preamble to

5   the complaint.

6   Q.  The preamble reads:  Plaintiffs Terra Firma Investments GP2

7   Limited for and on behalf of the six limited partnerships

8   constituting the Terra Firma Capital Partners II Fund, and

9   Terra Firma Investments GP3 Limited for and on behalf of Terra

10  Firma Capital Partners 3 LP, collectively with Terra Firma

11  Investments GP2 Limited, Terra Firma, allege, with knowledge as

12  to their own actions, and as to events occurring in their

13  presence, and upon information and belief as to all other

14  matters as follows.

15          Now, Mr. Hands, with respect to the phrase "with

16  knowledge as to their own actions, and as to events occurring

17  in their presence," there are statements made in that complaint

18  that relate to conversations that you had with David Wormsley,

19  correct?

20  A.  I haven't read the complaint for a long time.

21  Q.  You have no recollection as you sit there today --

22  A.  No.  Look, I'm pretty sure there are.  But I haven't read

23  the complaint for a long time.

24  Q.  But you're pretty sure there are statements in there like

25  that, right?

1   A.  I would presume so, yes.

2   Q.  Now, if we go to paragraph 10 of the complaint, that was

3   filed by your firm in this courthouse, what it says is:

4   Shortly after this meeting, during the afternoon of May 6,

5   2007, Mr. Hands and Mr. Wormsley spoke by telephone.

6        If you just go back, sir, and look at paragraph nine,

7   look at the complaint.  It's exhibit A in the book.  Do we know

8   what tab it is?  Tab one.  Do you see that?

9        MR. WELLS:  This actually would be easier, Jesse, can

10  we get 110 and put 109 and 110 together?  I'd like to get 109

11  up there also.

12  Q.  So 110 is understandable, let's start with 109.  What the

13  firm said in the publicly filed complaint in paragraph 109 was

14  that:  On the morning of Sunday, May 6, 2007, some three weeks

15  after the other bidders had submitted their indicative bids,

16  Mr. Hands met with Mr. Nicoli for approximately two hours to

17  discuss Terra Firma's potential acquisition of EMI.  Mr. Hands

18  explained that due to the short time available, Terra Firma

19  would need assistance in obtaining access to due diligence,

20  would require outside financing to fund any acquisition of EMI,

21  and would need to know what the target price was.  Mr. Nicoli

22  told Mr. Hands that he should discuss financing and pricing

23  issues with Mr. Wormsley of Citi, and represented that EMI

24  would be helpful in providing due diligence to Terra Firma.

25        I am going to return to paragraph 109 in a minute.

1   Then let's go to paragraph 110, which refers to a telephone

2   call that you had following your May 6 meeting with Mr. Nicoli.

3   And you state in the complaint:  Shortly after this meeting,

4   during the afternoon of May 6, 2007, Mr. Hands and Mr. Wormsley

5   spoke by telephone.  Mr. Hands explained that Terra Firma would

6   put together a team to analyze a possible purchase of EMI, but

7   that Terra Firma would need help from Citi to finance the

8   transaction.  Mr. Wormsley responded that Citi knew EMI's

9   business well and knew what they were doing.  Mr. Wormsley

10  identified the other bidders as being Cerberus, Fortress, and

11  One Equity, and advised Terra Firma to submit an indicative bid

12  of 2.65 per share in order to enter the process and obtain

13  access to due diligence materials.

14          Now, my first question to you, Mr. Hands, is it a fact

15  that in your filed complaint, you stated that it was only after

16  you had met with Mr. Nicoli on May 6, that you had a

17  conversation with Mr. Hands and in which he advised you to

18  submit an indicative bid of 2.65?  Is that what the complaint

19  says?

20  A.  I said we had a conversation that afternoon, yes.

21  Q.  What you had testified to in this courtroom is that the

22  conversation occurred prior to the time you met with

23  Mr. Nicoli.  Correct?

24  A.  What I said is we had several conversations.  I do believe

25  I had a conversation with him prior.

OAJ3TER6                    Hands - cross

1    Q.   The complaint goes on to say that it was Mr. Wormsley who

2    identified the other bidders as being Cerberus, Fortress, and

3    One Equity.  That's what's stated in the complaint, right?

4    A.   That's correct.

5    Q.   I asked you a few minutes ago where did you get the

6    information about the other bidders, and you said you had no

7    recollection one way or the other, right?

8    A.   Sitting here today, no.

9    Q.   That's what's stated in the complaint and you don't have

10   any recollection of it today.  Right?

11   A.   Yeah.  Sitting here today, I can't remember that, no.

12   Q.   The complaint goes on to say that -- I am going up to

13   paragraph 109.  That Mr. Nicoli told you that you should

14   discuss financing and pricing issues with Mr. Wormsley of Citi.

15   Is that right?

16   A.   That is correct.

17   Q.   Now, your testimony in this courtroom is that prior to the

18   time you ever met with Mr. Nicoli, that Mr. Wormsley had

19   already told you that Citi would work with you to provide

20   financing.  Is that correct?

21   A.   Yes.

22   Q.   You also say in the complaint that Mr. Nicoli told you that

23   you should discuss pricing issues with Mr. Wormsley.  You see

24   that?

25   A.   Yes, I do.

0AJ3TER6                    Hands - cross

1    Q.  Do you have a recollection as you sit here now of

2    Mr. Nicoli telling you to discuss pricing issues with

3    Mr. Wormsley?

4    A.  Yes.

5    Q.  Okay.  Let's go back to the memo of the meeting you had

6    with Mr. Nicoli.  That is exhibit C.  Can you tell me where in

7    that memo there is any statement that Mr. Nicoli told you to

8    discuss pricing issues with Mr. Wormsley?

9    A.  There is not.

10   Q.  It does not exist, correct?

11   A.  Not in that memo.

12   Q.  There is a statement, however, that in the first number

13   one, that Mr. Nicoli told you that Citigroup and Deutsche Bank

14   are offering financing and that you were going to have a

15   conversation with Mr. Wormsley to firm this up, correct?

16   A.  That is correct.

17   Q.  In fact, right after you left the meeting, do you recall

18   you dictated or had your assistant send an e-mail to

19   Mr. Wormsley saying you wanted to talk to him as soon as

20   possible?  Do you recall that?

21   A.  I don't recall it, but if the e-mail exists, I'm sure it's

22   true.

23   Q.  The reason you sent the e-mail right after the meeting was

24   because you had never had a conversation with Mr. Wormsley

25   about financing before you met with Mr. Nicoli, isn't that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OAJ3TER6                    Hands - cross

1    true?

2    A.  That's not true.

3    Q.  Well, I want to refer you to tab eight which is Citi trial

4    exhibit DT.  It's an e-mail from you via your assistant.  I'd

5    like you to look at it.

6              MR. WELLS:  And I'd like to offer it in evidence, your

7    Honor.

8              MR. BOIES:  No objection, your Honor.

9              THE COURT:  DT is received.

10              (Defendant's Exhibit DT received in evidence)

11    Q.  I want to stipulate and the parties have agreed that the

12    time stamp on that e-mail is 2:08 -- they say this one is okay.

13    It's 2:08.

14              Right after you dictated the first memo at 1:32, you

15    had your assistant, Ms. Vallance send an e-mail to David

16    Wormsley:  Dear David, Guy asked me to drop you a line to let

17    you know that he would like to speak to you as soon as

18    possible.  I am sending him your other numbers, now have your

19    correct London home number, but not sure if the weekend one is

20    still good.  He is at home and will be on his mobiles.

21              Isn't it correct, Mr. Hands, that the reason you

22    dictated to your assistant the e-mail asking to speak to

23    Mr. Wormsley as soon as possible after your meeting with

24    Mr. Nicoli, was because Mr. Nicoli was the one who told you

25    that Citigroup was willing to offer financing?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AJ3TER6                    Hands - cross

1   A.  I knew that Citigroup was willing to offer financing.

2   Mr. Nicoli told me that with regard to working out that

3   financing, and it was quite sensible to say, I should speak to

4   David.  So I did.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0aj1ter7                    Hands - cross

1   BY MR. WELLS:

2   Q.  Sir, you testified to the jury that you and Mr. Wormsley

3   had had a conversation before you ever met with Mr. Nicoli on

4   May 6th where Mr. Wormsley told you that he was going to help

5   you with financing; right?

6   A.  That is correct.

7   Q.  So you didn't need Mr. Nicoli to tell you to talk to

8   Mr. Wormsley.

9   A.  What Mr. Nicoli gave me was the 2.5 billion number,

10  according to the memo.  I can't remember the memo.  But

11  according to that.  And he said to talk to David.  I mean, you

12  know, there's no inconsistency with him suggesting I talk to

13  David to firm it up.  Up until that meeting we didn't know we

14  were going to make an indicative bid, we didn't know we needed

15  to firm anything up.  I don't see what's inconsistent.

16  Q.  Let's go to another area.

17          I want to spend the rest of the time --

18          MR. WELLS:  Your Honor, you said we're breaking at

19  what time?

20          THE COURT:  4:15.

21          MR. WELLS:  4:15.

22  Q.  I want to start then asking you some questions about Terra

23  Firma, and I want to have you look at a document which is your

24  annual review for 2007, which I put in front of you, Citi Trial

25  Exhibit KG.  And that's the Terra Firma annual review for 2007?

0aj1ter7                    Hands - cross

1    A.  That is.

2          MR. WELLS:  I offer it, your Honor.  KJ.

3          THE COURT:  Any objection?

4          MR. BOIES:  No objection, your Honor.

5          THE COURT:  KJ is received.

6          (Defendant's Exhibit KJ received in evidence)

7    Q.  Now if we look at the first page, it says, "Terra Firma.  A

8    unique perspective."  And then if we go to the second page, we

9    see a statement, "The ability to see potential where others see

10   only problems."  Do you see that?

11   A.  I do.

12   Q.  And is it correct that the statement concerning a unique

13   perspective and the ability to see potential where others see

14   only problems is part of Terra Firma's contrarian investment

15   philosophy?

16   A.  It is.

17   Q.  And Terra Firma promoted itself as a company that could

18   purchase companies who were distressed or in underperforming

19   areas and turn those companies around and make money; right?

20   A.  We promoted the fact that we could take businesses which

21   were in trouble and add value to them so they would be

22   successful, yes.

23   Q.  And you said, in fact, in the annual report that your

24   investment philosophy was to go against the mainstream; right?

25   A.  I'm not sure we said it in those words, but effectively,

0aj1ter7                     Hands - cross

1    yes.

2    Q.  Now I want to ask you a question.  I want you to go to

3    page 12.  And on page 12 there, top of that says Review and

4    Highlights of 2007; right?

5    A.  It does.

6    Q.  And under TFCP III, that relates to Fund III; correct?

7    A.  That is correct.

8    Q.  And that was one of the funds that put its money into the

9    EMI acquisition in May 2007; correct?

10   A.  That is correct.

11   Q.  And what it says in the first paragraph, "In May Terra

12   Firma closed TFCP III with nearly 5.4 billion of investor

13   commitments."  Is that a true statement?

14   A.  That is a true statement.

15   Q.  And it goes on to say that "the total includes over

16   $200 million of commitments from Terra Firma and its employees,

17   creating a powerful alignment of interest between us and Terra

18   Firma's investors."  Is that right?

.19  A.  That is right.

20   Q.  And what you were saying to the investors is that one of

21   the reasons they should give Terra Firma money is that Terra

22   Firma's employees and senior executives, including yourself,

23   have put in significant sums of money into the fund; right?

24   A.  That is correct.

25   Q.  And so when you purchased a company like EMI, you were

Oaj1ter7                    Hands - cross

1   putting not only your investors' money into the company, you

2   were putting your own personal wealth; right?

3   A.   That is correct.

4   Q.   And if EMI failed, not only would your investors lose

5   money, but you would personally lose money; correct?

6   A.   That is correct.

7   Q.   And do you remember there came a time after the acquisition

8   of EMI when you spoke to the EMI employees?  Do you recall

9   that?

10            MR. BOIES:  Objection, your Honor.  May we approach?

11            THE COURT:  Pardon?

12            MR. BOIES:  May we approach?

13            THE COURT:  Yes.

14            MR. WELLS:  Well, why don't you let me do something

15   else and we can do this and then we can deal with this after

16   the jury goes, because I'm not going to get through this

17   document.

18            THE COURT:  That sounds fair.

19   BY MR. WELLS:

20   Q.   Now in terms of your background, sir, if we go to page 35

21   of the annual report, we see a reference or description of your

22   background; right?

23   A.   That's correct.

24   Q.   And what your background states is that you're the chief

25   executive officer and founder of Terra Firma Capital Partners;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   correct?

2   A.   That's correct.

3   Q.   And that you sit on the investment advisory committee and

4   general partners boards; right?

5   A.   That is correct.

6   Q.   And that you started your career with Goldman Sachs;

7   correct?

8   A.   That is correct.

9   Q.   And it says while you were at Goldman Sachs, you went on to

10  become the head of Eurobond trading and then head of Goldman

11  Sachs' Global Asset Structuring Group; right?

12  A.   That is correct.

13  Q.   And that you then left Goldman Sachs in 1994 to establish

14  the principal finance group at Nomura International; correct?

15  A.   That is correct.

16  Q.   And Nomura is a large international bank?

17  A.   Yes.  A lot smaller than Citigroup, but yes.

18  Q.   And it's housed -- its main headquarters are in Japan?

19  A.   In Tokyo, yes.

20  Q.   And what you did while you were at Nomura was, in essence,

21  establish a private equity group within the structure of

22  Nomura; right?

23  A.   That is correct.

24  Q.   And then you ultimately spun out your private equity group

25  at Nomura, and you started Terra Firma in 2002; correct?

0aj1ter7                    Hands - cross

1    A.  That is correct.

2    Q.  Now if we go to page 36, we see the background for Stephen

3    Alexander; is that correct?

4    A.  That is correct.

5    Q.  And Stephen Alexander, at the time this report was done, he

6    had become responsible for EMI's recorded music catalogue; is

7    that right?

8    A.  That is correct.

9    Q.  And prior to the time Mr. Alexander was the operations

10   managing director on the Terra Firma team that studied the EMI

11   acquisition; right?

12   A.  That is correct.

13   Q.  And Mr. Alexander is a very senior executive at Terra

14   Firma; correct?

15   A.  He was, yes, at that time.

16   Q.  And in fact, he was a former CEO at Dunkin' Donuts; right?

17   A.  That is correct.

18   Q.  Okay.  This was a very high-level executive; right?

19   A.  He was senior executive, yes.

20   Q.  And it's Mr. Alexander who sent you the e-mail in September

21   of 2007 that stated that Cerberus had not submitted a formal

22   bid.

23           MR. BOIES:  Objection, your Honor.  That's not what

24   the e-mail says.

25           MR. WELLS:  I can ask the question.

Oaj1ter7                    Hands - cross

1          THE COURT:  All right.  Well --

2          MR. WELLS:  It's on a good faith basis.

3          THE COURT:  He's saying it assumes a fact not in

4   evidence.  So why don't you rephrase it or find the relevant

5   document.

6          MR. WELLS:  Well, I don't -- the document's in

7   evidence.  Let's just put it on the screen.

8          Can we put it on the screen so, Jesse, they can see

9   Mr. Alexander.  It's Exhibit EE.

10          They tell me this is my -- this is my number; their

11   number is in evidence.  It will be quicker just to work with --

12          MR. BOIES:  No objection if he wants to put it in.

13          MR. WELLS:  Okay, fine.

14          THE COURT:  Okay.

15   BY MR. WELLS:

16   Q.  And that e-mail is dated September 24, 2007; correct?

17   A.  Correct.

18   Q.  It's from Stephen Alexander; right?

19   A.  Mm-hmm.

20   Q.  And that's the person who you just testified was the senior

21   executive at Terra Firma; correct?

22   A.  That is correct.

23   Q.  And what Mr. Alexander says to you in that e-mail is that,

24   in the second sentence, "In the event it is my understanding

25   that whilst they did do due diligence --"

0ajlter7                    Hands - cross

1          MR. BOIES:  Say it really fast.

2     Q.  "-- Cerberus never actually submitted a formal offer for

3     the business."

4          Now Mr. Alexander told you in that e-mail that

5     Cerberus never actually submitted a formal offer for EMI;

6     correct?

7     A.  No.  What he said was, it's in his understanding.  That is

8     English language simply to say that he had a view of it.  He is

9     an operational manager director, he wasn't on the finance team,

10    and a week before I received an e-mail from Citi saying that

11    Cerberus had bid.  Now, you know, am I going to take Stephen

12    Alexander, who is in a company, operating a company, or am I

13    going to take Citi, who are the bankers who should know?

14    Q.  Well, do you recall being deposed and saying you really

15    didn't have much recollection of that e-mail?

16    A.  Yes.  That's completely correct.  But --

17    Q.  So what you just told the jury about your decision to put

18    the view of Mr. Alexander under the view of what you heard from

19    Citi, that was not based on any recollection.

20    A.  No, that was based on seeing the e-mails today, and I saw

21    two e-mails today.

22    Q.  That's not what you said, sir.  Sir, isn't it a fact that

23    when we questioned you about the e-mail, you said you didn't

24    remember it?

25    A.  I couldn't remember it then, but now I've seen two e-mails

Oaj1ter7                          Hands - cross

1    today, one which was simply an e-mail the week before, and the

2    second e-mail was -- clearly what I did do with it was send it

3    to the entire group and see if anybody else was going to

4    respond.  Nobody else responded to the e-mail.

5          Then, as I did put in my testimony, when I met with

6    Roger Ames, I asked Roger Ames -- in summary, I discussed with

7    Roger Ames what he felt, and Roger Ames made -- got me uneasy,

8    so then I spoke to Tim Pryce.

9    Q.  You met with Mr. Ames two months after that e-mail was

10   sent; correct?

11   A.  Roger Ames was running --

12   Q.  Would you answer my question?

13   A.  I don't know when I met with Roger Ames after that.

14   Q.  It was months later; correct?

15   A.  I don't know.

16         THE COURT:  All right.  I think we need to end for

17   today, ladies and gentlemen, because I have other matters that

18   I have to take up.

19         You were terrific in your promptness this morning.

20   Therefore, I'm going to presume equal promptness tomorrow.  And

21   we will start quickly as you're all here.  So we'll see you

22   tomorrow at 9.

23         (Jury excused)

24         (Continued on next page)

25

0aj1ter7

1          (In open court; jury not present)

2          THE COURT:  Please be seated.

3          MR. BOIES:  Your Honor, could I hand up to the

4     Court -- this is --

5          THE COURT:  Please be seated and please be quiet.

6     Court is continuing.

7          MR. BOIES:  This is a binder of the Simon Borrows

8     deposition that incorporates both of our proposed --

9          THE COURT:  So he's the first one who will be coming

10    on?

11         MR. BOIES:  He's the first one.

12         THE COURT:  Okay.  Very good.

13         All right.  Just so I can get a handle on the schedule

14    for tomorrow, because I've just been handed one of the

15    depositions that I'll need to mark up, this is not binding in

16    any way, Mr. Wells, but give me a very ballpark estimate of how

17    long you'll be on cross.

18         MR. WELLS:  Anywhere from say three to five hours.

19         THE COURT:  Okay.  And then obviously there will be

20    some redirect, depending on what comes up.  So it looks like

21    the bulk of tomorrow will be on Mr. Hands.

22         If we get beyond Mr. Hands, who's the next witness?

23         MR. BOIES:  Your Honor, we're going to put Mr. Punja

24    on on Thursday because I'm not -- that's the day I'm not going

25    to be here.  Somebody else is going to do that.

0aj1ter7

1          THE COURT:  Right.

2          MR. BOIES:  So if we have time tomorrow, we will

3     either put on -- if we have enough time, we think we have

4     enough time to do it -- a short witness, Kirsten Randell.  If

5     we don't, then we would -- if the Court has time enough to do

6     that, we will play that.

7          THE COURT:  That's what I need to know.  So you may

8     reach this late tomorrow.  All right.  So I will get to it

9     later tonight then.

10          All right.  Very good.  Anything else that counsel

11     needs to take up?

12          MR. BOIES:  Not from us, your Honor.

13          MR. WELLS:  No, your Honor.

14          THE COURT:  All right.  Very good.  We'll see you

15     tomorrow.

16          MR. BOIES:  Thank you.

17          THE COURT:  And I remind everyone in this courtroom, I

18     have other matters that are starting right away, so take all

19     conversations outside.  Thank you.

20          (Adjourned to October 20, 2010, at 9:00 a.m.)

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

TIM PRYCE

Cross By Mr. Cohen . . . . . . . . . . . . . . . 165

Redirect By Mr. Boies  . . . . . . . . . . . . 242

Recross By Mr. Cohen . . . . . . . . . . . . 250

Redirect By Mr. Boies  . . . . . . . . . . . . 252

GUY HANDS

Direct By Mr. Boies . . . . . . . . . . . . . 252

Cross By Mr. Wells . . . . . . . . . . . . . . 316

PLAINTIFF EXHIBITS

Exhibit No.                                  Received

1    . . . . . . . . . . . . . . . . . 305

3    . . . . . . . . . . . . . . . . . 309

24   . . . . . . . . . . . . . . . . . 244

29   . . . . . . . . . . . . . . . . . 314

30   . . . . . . . . . . . . . . . . . 312

31   . . . . . . . . . . . . . . . . . 315

736  . . . . . . . . . . . . . . . . . 274

846  . . . . . . . . . . . . . . . . . 301

1377 . . . . . . . . . . . . . . . . . 329

```
1                          DEFENDANT EXHIBITS

2    Exhibit No.                              Received

3    ABL   . . . . . . . . . . . . . . . 205

4    C   . . . . . . . . . . . . . . . . 324

5    CA   . . . . . . . . . . . . . . . . 310

6    DT   . . . . . . . . . . . . . . . . 339

7    E   . . . . . . . . . . . . . . . . 327

8    FG   . . . . . . . . . . . . . . . . 181

9    FO   . . . . . . . . . . . . . . . . 201

10   FR   . . . . . . . . . . . . . . . . 222

11   GP   . . . . . . . . . . . . . . . . 167

12   GQ   . . . . . . . . . . . . . . . . 216

13   H   . . . . . . . . . . . . . . . . 209

14   HU   . . . . . . . . . . . . . . . . 226

15   JP   . . . . . . . . . . . . . . . . 235

16   JQ   . . . . . . . . . . . . . . . . 237

17   JR   . . . . . . . . . . . . . . . . 238

18   JS   . . . . . . . . . . . . . . . . 239

19   JT   . . . . . . . . . . . . . . . . 241

20   KJ   . . . . . . . . . . . . . . . . 342

21

22

23

24

25
```

OAK3TER1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  TERRA FIRMA INVESTMENTS (GP) 2
   LIMITED (for and on behalf of
4  the six limited partnerships
   constituting the Terra Firma
5  Capital Partners II Fund), and
   TERRA FIRMA INVESTMENTS (GP) 3
6  LIMITED (for and on behalf of
   Terra Firma Capital Partners
7  III, L.P.),

8              Plaintiffs,

9         v.                          09 CV 10459 (JSR)

10 CITIGROUP INC., CITIBANK,
   N.A., CITIGROUP GLOBAL MARKETS
11 LIMITED, AND CITIGROUP GLOBAL
   MARKETS, INC.,

12
              Defendants.            Jury Trial
13
   ------------------------------x
14
                                     New York, N.Y.
15                                   October 20, 2010
                                     9:30 a.m.
16 Before:

17              HON. JED S. RAKOFF,

18                                   District Judge

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AK3TER1

1                              APPEARANCES

2   BOIES, SCHILLER & FLEXNER LLP
            Attorneys for Plaintiffs
3   BY:  DAVID BOIES, ESQ.
         WILLIAM C. JACKSON, ESQ.
4        JONATHAN SHERMAN, ESQ.
         KAREN C. DYER, ESQ.
5        CHRISTOPHER DUFFY, ESQ.
         ABBY L. DENNIS, ESQ.
6
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
7            Attorneys for Defendants
    BY:  THEODORE VON WELLS, JR., ESQ.
8        JAY COHEN, ESQ.
         JOHN F. BAUGHMAN, ESQ.
9        FARRAH BERSE, ESQ.
         KIRA DAVIS, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

0AK3TER1

1          (In open court; jury not present)

2          MR. WELLS:  The reason I went to a different area in

3    my cross yesterday was I had asked the question or was about to

4    ask the question concerning a statement made by the witness.

5    Perhaps the witness should be excused.  We were going to have a

6    side bar.

7          THE COURT:  Come to the side bar.

8          (At the side bar)

9          MR. WELLS:  Your Honor, I was about to ask a question

10   yesterday and Mr. Boies objected and I withdrew it and went to

11   another area because it was so late.  But shortly after the

12   purchase of EMI, Mr. Hands went to EMI and gave a speech where

13   he talked to the employees.  And in that speech, which is

14   transcribed here, and this comes directly from the files of

15   Terra Firma, he told the employees how important EMI was to him

16   personally, and made the statement at the bottom of the page to

17   the effect that he had 60, 70 percent of his wealth depending

18   on how EMI does.  I would like to bring that out to show

19   motive.

20         THE COURT:  So, I never got to rule on this because

21   you went on.  So, is there any objection?

22         MR. BOIES:  Yes, your Honor.  Mr. Wells has already

23   asked him several questions about this.  He established that he

24   had a significant amount of his wealth in this transaction.  I

25   don't remember all the questions, but there were two or three

OAK3TER1

1    questions that I did not object to because of the earlier

2    discussion that we'd had with the Court.

3         THE COURT:  But it seems to me there is a difference

4    between saying you have a lot and saying you have 60 to

5    70 percent.  60 to 70 percent conveys, or arguably conveys, a

6    particularly strong motive to color your testimony regarding

7    this issue, and to have a motive to try to recoup any loss,

8    which is essentially the two points Mr. Wells is arguing.

9         When we had the motion in limine, my concern was that

10   Mr. Hands would be gratuitously portrayed as a man of great

11   wealth or luxury, and that that would have an unfortunate and

12   unfair spillover effect.  But that's not this at all.  So I

13   think this is permissible.  And besides which, Mr. Wells has a

14   long tradition of quoting speeches back to --

15        MR. WELLS:  Your Honor, I assume it would not be

16   permissible -- well, I'm really asking the question, if I asked

17   him in rough figures what does that mean?

18        THE COURT:  No.  That's what I'm trying to avoid.

19        MR. WELLS:  Your Honor, there is another statement in

20   one of the offering memorandums I believe to the effect that

21   with respect to Terra Fund 3, which is one of the funds where

22   the money goes into EMI, he tells the investors with respect to

23   that fund, I have put $100 million into that fund and given 40

24   million to the capital accounts of my employees, many of whom

25   are witnesses in this case.  Am I permitted to bring that out?

OAK3TER1

1          THE COURT:  What are you trying to show?  This

2     establishes the personal investment --

3          MR. WELLS:  Yes.  That's for him --

4          THE COURT:  It's essentially undisputed, and I don't

5     understand that it will be disputed.

6          MR. WELLS:  I'm trying to show in terms of Mr. Pryce

7     and other witnesses what Mr. Hands did and what he says.  I'm

8     just quoting from the offering memorandum, he put up 100

9     million in his money and his family trust and said 40 million

10    I'm giving to the employees.

11         THE COURT:  No.  I think you could have examined

12    Mr. Pryce about the extent of his financial stake, if any,

13    directly or indirectly, and you chose not to.  But you can

14    examine other witnesses who may have that about that.  But I

15    don't think that's a question to put to this witness.

16         MR. WELLS:  That's why I asked.

17         (Continued on next page)

18

19

20

21

22

23

24

25

OAK3TER1

1        (In open court; jury present)

2        THE COURT:  Good morning, ladies and gentlemen.  Thank

3   you once again for your promptness.  We had to discuss some

4   legal issues, counsel and I.  For example, we had to discuss

5   whether or not capital punishment was appropriate for the

6   Yankees.

7        But, in any event, we dealt with all these issues and

8   we're ready to continue.  Mr. Wells.

9    GUY HANDS,

10   CROSS-EXAMINATION

11   BY MR. WELLS:

12   Q.  Good morning, Mr. Hands.

13   A.  Good morning.

14   Q.  I would like to direct your attention to tab 93 of your

15   book, which contains an exhibit labeled ABE-1.  And that is a

16   transcript of a speech you gave in September of 2007 to

17   employees at EMI.  It was produced by Terra Firma.

18        Do you recollect giving that speech, sir?

19   A.  If I can have a quick look and see.  Sorry.

20   Q.  The full copy is tab 79.  I apologize.

21   A.  Okay.  Yes, I do.

22        MR. WELLS:  Your Honor, at this time I would introduce

23   into evidence as an admission the last paragraph of the speech

24   which is page 15, which is marked as exhibit ABE-1.

25        MR. BOIES:  I have no objection to the speech, which

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OAK3TER1                    Hands - cross

1    is behind tab 79.  What's behind tab 93 is just one paragraph.

2    I would object to that out of context.  I have no objection to

3    him using it.

4              THE COURT:  I think either the whole speech comes in

5    or, Mr. Wells, you can read to him that one paragraph and then

6    Mr. Boies can read into the record any other paragraphs that he

7    wants when we get to redirect.

8              MR. WELLS:  Sure.

9              THE COURT:  Any other paragraphs that put into

10   context.  Go ahead.

11   Q.  Mr. Hands, if you will look at exhibit ABE-1.  Are you with

12   me?

13   A.  I've got the speech.

14   Q.  I'm looking at the redacted copy.  I want you to go back to

15   tab 93.

16   A.  Okay.  So that's -- the paragraph out of the speech, yes.

17   Q.  Sir.  And the transcript reflects that you told the

18   employees at EMI who were listening to your speech the

19   following, quote:  I've worked in a lot of public companies and

20   I've never met in a public company an executive who has very

21   much of their personal wealth in the business.  And I'll be

22   blunt about it, Terra Firma as individuals have probably on

23   average somewhere around a quarter of their wealth dependent on

24   this one deal.  Some of us are more leveraged.  In the case of

25   myself, it's probably around 60 to 70 percent of my wealth is

OAK3TER1                    Hands - cross

1   dependent on how EMI does.

2          Did you make those statements, sir, during that

3   speech?

4   A.  Yes, I did.

5   Q.  With respect to the statement about Terra Firma individuals

6   having around a quarter of their wealth, were you referring to

7   some of Terra Firma's senior executives?

8   A.  I was.

9   Q.  Those senior executives would include Mr. Pryce?

10  A.  I'm not sure it included Mr. Pryce.  It certainly would

11  include Mr. Alexander.  I can't remember the exact numbers with

12  regard to Mr. Pryce.

13  Q.  Mr. Pryce you understand does have a significant portion of

14  his personal wealth tied up in EMI?

15  A.  Not today.  He, at the time he did, yes.

16  Q.  Yesterday you talked about your friendship with

17  Mr. Wormsley.  Is it correct that in the course of your

18  friendship with Mr. Wormsley, that you told him at various

19  times how you wanted to build the largest private equity firm

20  in Europe?

21  A.  I can't remember those conversations, no.

22  Q.  No, you don't recall, or no, it didn't happen?

23  A.  No, I don't recall.

24  Q.  Did you tell Mr. Wormsley during your conversations that

25  you had with him during the course of your friendship that you

OAK3TER1                    Hands - cross

1   hoped one day to become one of the most successful businessmen

2   in Europe?

3   A.  I can't recall.  But, I have no reason not to believe it.

4   Q.  Did you tell Mr. Wormsley during your conversations that

5   you wanted ultimately to have a business empire of both

6   industrial firms and hopefully financial institutions?

7   A.  That's highly unlikely.  I certainly can't remember that,

8   no.

9   Q.  Did you tell Mr. Wormsley you wanted to go into the hedge

10  fund business?

11  A.  I can't remember telling him that, no.

12  Q.  Now, following the -- withdrawn.

13        Yesterday you said that after Terra Firma acquired

14  EMI, you found that a number of problems existed within the

15  company that you did not know about at the time of purchase.

16  Correct?

17  A.  Yeah, we found that out about a year later.

18  Q.  You talked about channel stuffing, for example?

19  A.  I did.

20  Q.  You talked about accounting problems with respect to the

21  Bertelsmann settlement?

22  A.  Yes.

23  Q.  These were things that your due diligence did not pick up,

24  correct?

25  A.  Totally correct.

OAK3TER1                          Hands - cross

1   Q.  Because your due diligence did not pick up those items, is

2   it fair to say that you thought you had paid more for EMI than

3   it was worth?

4   A.  My due diligence didn't have any chance of picking up those

5   items, but you are correct.  If those items had been picked up,

6   clearly one would have paid less.

7   Q.  Is it correct that following your acquisition of EMI, you

8   had concerns about the amount of debt that you had used to

9   finance the purchase of EMI?

10  A.  That would be correct.  We felt it was too much debt on the

11  company.

12  Q.  Is it correct that after your acquisition of EMI, you came

13  to the conclusion that, because of the debt structure, you had

14  made a mistake in purchasing the company and structuring the

15  transaction as you did?

16  A.  Not for some time, but we did come to that conclusion

17  eventually, yes.

18  Q.  Is it correct that following your conclusion that the debt

19  structure was too high, and that you had paid too much for EMI,

20  that you had concerns that your investors might lose

21  significant sums of money on the EMI transaction?

22  A.  I would say from mid -- maybe a little bit later than

23  that -- 2008, we felt there was a possibility of that, yes.

24  Q.  With respect to the amount of money your investors might

25  lose, it would be in the hundreds of millions of dollars?

OAK3TER1                    Hands - cross

1    A.   That would be correct.

2    Q.   Did you have concerns that at some point your investors

3    might bring lawsuits against you for engaging in a transaction

4    where they lost hundreds of millions of dollars?

5    A.   No, I did not.

6    Q.   Is it your testimony to the jury that you have no present

7    concerns about being sued by investors because of your decision

8    to invest your money in EMI?

9    A.   As I sit here today, I have no concerns about that, no.

10   Q.   Now, did you ever express to Mr. Wormsley that because of

11   the EMI transaction, you were concerned that you might have

12   trouble raising money from investors in the future?

13   A.   I have no recollection of expressing to David Wormsley.

14   Q.   You are not saying it didn't happen; you just don't

15   recollect one way or the other?

16   A.   I have no memory of that, no, one way or the other.

17   Q.   Did you ever express to other persons that because of the

18   EMI transaction, you might have trouble raising money in the

19   future from investors?

20   A.   Yes.  I mean back in 2 -- late 2008.  But that's all --

21   that's all past now.

22   Q.   You stated yesterday that you were reluctant to bring this

23   lawsuit because you didn't want to sue a bank.  Do you recall

24   that?

25   A.   I do.

0AK3TER1                         Hands - cross

1   Q.  Isn't it true that you were reluctant to bring this lawsuit

2   because it is based on false allegations?

3   A.  No, that is not correct.

4   Q.  Isn't it true you were reluctant to bring this lawsuit

5   because David Wormsley never lied to you about Cerberus?

6   A.  That is not correct.

7   Q.  Isn't it true you brought this lawsuit because you wanted

8   to blame someone else for your mistake in purchasing EMI?

9   A.  That is not correct.

10  Q.  Now, I want to show you exhibit W, which is tab 58.  It's

11  not.

12          Exhibit W is an e-mail from you to Mr. Punja, correct?

13  A.  That is correct.

14          MR. WELLS:  I offer it, your Honor.

15          MR. BOIES:  No objection, your Honor.

16          THE COURT:  W is received.

17          (Defendant's Exhibit W received in evidence)

18          MR. WELLS:  Could you display it.

19  Q.  The e-mail was sent by your assistant to Mr. Punja and

20  others on August 24, 2007, correct?

21  A.  That is correct.

22  Q.  That was about a month before Mr. Alexander sent to you the

23  e-mail that we were looking at yesterday where he stated that

24  it was his understanding that Cerberus did not submit a formal

25  offer.  Correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0AK3TER1                    Hands - cross

1   A.  That is correct.

2   Q.  What you wrote in that e-mail to Mr. Punja and cc'd others

3   in the first paragraph was:  Dear Riaz, we have spoken about

4   this, and I have expressed my extreme disappointment.  At the

5   end of the day, you and Stephen Alexander have to take total

6   responsibility for the fact that during the period between when

7   we signed and the period when we agreed to extend the offer,

8   that although Stephen's interaction with the company on a less

9   formal basis and your interaction with your team and the

10  company on a more formal basis, this was not bottomed out.

11          The reference to the company is to EMI, correct?

12  A.  That is correct.

13  Q.  What you were doing is criticizing Mr. Punja and

14  Mr. Alexander because they did not pick up certain information

15  in the course of their due diligence, right?

16  A.  Not during due diligence.  Post due diligence.  There were

17  some particular numbers they didn't pick up.

18  Q.  Is it fair to say that what you were doing is you were

19  expressing your disappointment in the fact that they did not

20  pick up those numbers, right?

21  A.  That's correct.

22  Q.  You would agree, you were criticizing Mr. Punja, right?

23  A.  I think that's self-evident, yes.

24  Q.  The numbers they didn't pick up, do you recall it was just

25  15 million pounds, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300